**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 11-cv-00520-PAB-BNB

HEALTH GRADES, INC.,

      Plaintiff,

vs.

MDX MEDICAL, INC. d/b/a VITALS.COM,

      Defendant.

---

**HEALTH GRADES, INC.'S CLAIM CONSTRUCTION BRIEF AND EVIDENCE**

---

{01004348 / 1}

**TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................................1

II.     APPLICABLE CLAIM CONSTRUCTION PRINCIPLES .......................................2

III.    SUMMARY OF THE '060 PATENT .....................................................................4

IV.     CONSTRUCTION ARGUMENT ..........................................................................6

        A.      Terms That Need to Be Construed............................................................6

                1.      "first healthcare provider"..............................................................6

                2.      "healthcare provider report on the first healthcare provider" ..........10

                3.      "comparison ratings of healthcare providers"..................................13

        B.      Claim Terms That Do Not Need to Be Construed .......................................16

                1.      "healthcare provider-verified information"......................................18

                2.      "received from the first healthcare provider"...................................20

                3.      "verified by an independent third-party source" ..............................21

                4.      "compiling" / "compile" ................................................................22

                5.      "using the healthcare provider-verified information, the
                        patient-provided information, and the information verified by
                        an independent third-party source" ................................................23

                6.      "hyperlink to an affiliated hospital, medical center, or other
                        type of treatment center"...............................................................24

                7.      "the results list further includes an advertisement" .........................25

V.      CONCLUSION ....................................................................................................26

I.      __INTRODUCTION__

The only patent asserted by Health Grades against MDX is U.S. Patent No. 7,752,060

(the "'060 patent").  Health Grades asserts that MDX infringes claims 1, 4-9, 11, and 14-16.

Eleven phrases are at issue during claim construction.  Health Grades formally withdraws its

request to have the term "member" construed with respect to claim 9.  MDX proposed that "the

term has a plain and ordinary meaning and does not require construction."  Health Grades agrees.

The '060 patent generally relates to an Internet-based system that allows patients to

search for healthcare providers, such as physicians, and that enables physicians to reach patients

with whom they might not otherwise come into contact.  The claims are written in a

straightforward manner and use common and well-understood terms.  As a result, Health Grades

asserts that there are only three phrases that need to be interpreted by the Court:

> (1) "first healthcare provider"
> (2) "healthcare provider report on the first healthcare provider"
> (3) "comparison ratings of healthcare providers"

Although these phrases also use commonly understood terms, they are a fundamental part of the

claims and their scope is in dispute.

MDX also asks this Court to construe terms (bolded) within the following seven phrases:

> (1)     "healthcare provider-**verified** information"
> (2)     "**received** from the first healthcare provider"
> (3)     "**verified** by an independent third-party source"
> (4)     "**compiling**" / "**compile**"
> (5)     "**using** the healthcare provider-verified information, the patient-provided information, and the information verified by an independent third-party source"
> (6)     "hyperlink **to** an affiliated hospital, medical center, or other type of treatment center"
> (7)     "the results list further **includes** an advertisement"

However, MDX's proposed constructions do little to actually define the claim terms.  Instead, they add unduly narrow limitations in a transparent attempt to manufacture non-infringement defenses.  In some cases, the additional words MDX seeks to substitute for the bolded words are redundant and in some cases they create ambiguity and confusion.  In all cases, the additional limitations are not supported by the claim language, the specification, or the prosecution history.

This Court has the power to determine that no construction is necessary for terms that have a commonly understood meaning and/or where additional language may be unduly limiting, confusing, or redundant as is the case here.  The actual terms at issue within these seven phrases are well-understood and do not need interpretation.  Thus, this Court should reject MDX's attempt to narrow the scope of the claims and instruct the jury to use the plain and ordinary meaning of these terms to determine infringement and validity.

## II.    APPLICABLE CLAIM CONSTRUCTION PRINCIPLES

The Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.* provides a roadmap for claim construction.  415 F.3d 1303 (Fed. Cir. 2005).

The Court should begin its claim construction analysis with the words of the claim.  Claim terms should be given their ordinary and customary meaning, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," *i.e.*, as of the effective filing date of the patent application.  *Phillips*, 415 F.3d at 1313-14 ("[T]he claims themselves provide substantial guidance as to the meaning of the particular claim terms.").  Because claim terms are often used "consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314.

{01004348 / 1}                              2

Next, the Court must consider the rest of the intrinsic evidence, including the specification and the prosecution history. *Id.* at 1313-14. A person of ordinary skill in the art should view the ordinary meaning of the claim terms within "the context of the entire patent, including the specification." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357 (Fed. Cir. 2006) (quoting *Phillips*, 415 F.3d at 1313). The specification is always relevant to the claim construction analysis and is usually the single best guide to the meaning of the disputed term. *Id.* at 1315. Where the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," it is "the inventor's lexicography" that governs. *Id*. at 1316.

However, the Federal Circuit has cited as a "well-established" principle that a "court may not import limitations from the written description into the claims." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998). The disclosure of a particular embodiment of the claimed invention in the specification does not narrow the patent claims. *See id*. at 1347-48.

Next, the patent's prosecution history should be considered by the Court when construing a claim. The purpose of consulting the prosecution history is to determine "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83). The Court should consult the prosecution history in order to "exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc*., 402 F.3d 1371, 1384 (Fed. Cir. 2005).

Finally, the Court may consider extrinsic evidence, if necessary, to resolve any ambiguity in a disputed claim term that was not resolved by consulting the intrinsic evidence. *Vitronics*, 90

F.3d at 1583.  Further, the Court may consult extrinsic evidence to aid itself in understanding the

general technology involved in the patent claims at issue, but not to vary or contradict the patent

claims.  *See Phillips*, 415 F.3d at 1319-24; *Vitronics*, 90 F.3d at 1584 n. 6.

Ultimately, "[t]he construction that stays true to the claim language and most naturally

aligns with the patent's description of the invention will be, in the end, the correct construction."

*Phillips*, 415 F.3d at 1316.

## III.    SUMMARY OF THE '060 PATENT

The '060 patent generally relates to an Internet-based information system that connects

patients with potential healthcare providers.  ('060 patent, Abstract (Ex. A).)  The company

providing the information service creates and maintains a database of detailed information

relating to healthcare providers.  (*See id.*)  A patient may access the healthcare provider

information through a search conducted using a search engine, such as Google, Yahoo, etc.  (*See*

*id.*)  Alternatively, a patient may access the information directly from the information service

provider's web page that provides search capabilities for its database.  (*See id.*)  Some

embodiments described in the specification relate to searches for physicians, while others relate

to searches for hospitals, nursing homes, or other types of healthcare providers or treatment

facilities.  ('060 patent, col. 1:56-2:15.)  A patient may search for physicians using various search

criteria, including for example, geographic area, physician specialty, and gender.  ('060 patent,

col. 1:56-2:15, *see also* claim 6.)

The information provided to patients in response to their search query may be in the form

of a report that includes detailed healthcare provider information with verified information

sections, including physician-verified and independent third-party-verified sections, and a

patient-provided information section that includes patient ratings to assist patients in differentiating among healthcare providers.  ('060 patent, col. 1:11-20.)  The information provided by the website enables patients to differentiate among healthcare providers and thereby select the provider who best meets their individual needs.  ('060 patent, Abstract.)

All of the claims[1] of the '060 patent require creating a healthcare provider report by using the following three kinds of information:

1) <u>healthcare provider-verified information</u>: "about the first healthcare provider . . . [that] is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;"

2) <u>patient-provided information</u>: "compris[ing] patient ratings from one or more past or current patients of the first healthcare provider, and wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;"

3) <u>third party verified information</u>:  "information regarding the first healthcare provider verified by an independent third-party source . . . [that] comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information . . . ."

('060 patent cols. 20-24.)  Further, all of the claims require that the healthcare provider report include "comparison ratings of health care providers."  ('060 patent, claims 1 and 15)

---

[1] These elements are found in both independent claims 1 and 15.  Dependent claims 2-14, and 16-17 necessarily include all of the limitations of the independent claims from which they depend.

## IV.   CONSTRUCTION ARGUMENT

### A.   Terms That Need to Be Construed

#### 1.   "first healthcare provider"

Claims 1 provides:

> 1.   A computer-implemented method of providing healthcare provider information to potential patients, said method comprising:
>
> receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding **a first healthcare provider** . . . .

(emphasis added.)  Claim 15 uses similar language.

The parties have taken fundamentally different approaches to construing this claim term.

Health Grades proposes a definition for the term "healthcare provider," whereas MDX provides

no definition for this term, but rather seeks to add unsupported and redundant claim limitations:

| Health Grades proposes: | MDX proposes: |
|---|---|
| a physician or other healthcare professional. | A specific healthcare provider on which a request for information is received, healthcare provider-verified information is accessed, patient-provided information is compiled, and information verified by an independent third-party source is compiled. |

While the term "healthcare provider" is used broadly in the '060 specification to include

both people (e.g. physicians) and entities (e.g. hospitals) that provide healthcare services (col.

1:11-14), it also makes clear that "[s]ome embodiments relate to searches for physicians, while

others relate to searches for hospitals, nursing homes, or other types of health care providers or

treatment facilities."  The '060 claims are directed to searches for physicians (and other people)

as opposed to searches for hospitals (and other entities).  For example, claim 14 depends from

claim 1 and says that the healthcare provider is a physician.  Claim 7 ultimately depends from

claim 1 and further requires search capabilities that allow a patient to search for providers by

gender, among other criteria.  Obviously, entities, such as hospitals, do not have a gender.

Other elements of claims 1 and 15 indicate that for these claims, the healthcare provider

is a person, not an entity.  For example, the claimed healthcare provider-verified information

comprises things that relate to people, not entities, such as:  "gender, age, years in profession,

years in practice, . . . professional appointments, professional memberships, . . . languages, and

hobbies . . . ."  ('060 patent, claim 1 (2nd ¶) and claim 15 (3rd ¶).)  Similarly, the claimed third

party verified information includes things that do *not* apply to entities, such as:  board

certification,  . . . medical school, medical internship, medical residency, and medical fellowship

information . . . ."  ('060 patent, claim 1 (4th ¶) and claim 15 (5th ¶).)  Thus, one of ordinary skill

in the art would understand that the term "healthcare provider" as used in the '060 claims does

*not* encompass requests for information relating to hospitals or other healthcare entities.

Moreover, the types of information that are included in the claimed healthcare provider

report are described as being part of a physician report, but are *not* part of the hospital reports:

### Example Physician Report



Fig. 3A

('060 patent, col. 7:51-8:2, Fig. 3A.)

### Example Hospital Report



Fig. 7B

('060 patent, col. 11:34-51, Fig. 7B.)

Although the claims should not be limited to the specific examples described in the specification, these examples support a finding that the '060 patent claims are directed toward requesting information about people, not entities.

Finally, while the definition of healthcare provider should not include entities, it should be broad enough to cover other kinds of *people who provide healthcare services*.  ('060 patent, col. 19:60-65 ("For example, the present invention may not be limited specifically to healthcare provider information but, instead, may be applicable to any kind of professionals, such as . . . veterinarians, dentists, etc.").)  As such, Health Grades proposed construction of "first healthcare provider" is consistent with the ordinary meaning of this phrase in light of the specification.

MDX's definition, on the other hand, attempts to read unnecessary and redundant limitations into the claims.  As shown in the table below, most of MDX's proposal consists of language that is already found in the claims, and is therefore redundant and confusing.

| MDX's proposed construction: | Actual Claim Language: | Problem? |
|---|---|---|
| "A specific | -- | Not Supported |
| healthcare provider on which a request for information is received, | "receiving . . . a request for information regarding a first healthcare provider . . ." | Redundant |
| [healthcare provider on which] healthcare provider-verified information is accessed, | "accessing healthcare provider-verified information about the first healthcare provider . . ." | Redundant |
| [healthcare provider on which] patient-provided information is compiled, and | "compiling . . . patient provided information regarding the first healthcare provider . . ." | Redundant |
| [healthcare provider on which] information verified by an independent third-party source is compiled." | "compiling information regarding the first healthcare provider verified by an independent third-party source . . . ." | Redundant |

The only portion of MDX's proposed definition that is not found already explicitly within the claims is the term "specific," which it uses to define the term "first."  MDX appears to be attempting to limit these claims to a request for information about a single, specific provider. The claims are not so limited.

Ordinarily, the term "a first" is used to introduce a thing that comes before others in a series or list of things.  Consistent with this ordinary meaning, the '060 patent describes a method for requesting information about one or more physicians using search criteria, such as gender, specialty, or geographic location.  ('060 patent, claim 6.)  Multiple different providers may be identified in a results list in response to such a search.  ('060 patent, Figs. 2A and 2B.)  Reports may be created for any one, or all of, the providers identified in response to a search.  (*See id.*)

The Federal Circuit has held that the indefinite article "a" means "one or more" in open-ended claims containing the transitional phrase "comprising" *unless* the claims and the specification clearly indicate that the term "a" means "one and only one."  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).  In *Baldwin*, the court construed a claim reciting a system comprising "a pre-soaked fabric roll" and "means for locating said fabric roll," and held that the claim encompassed systems with more than one fabric roll.  *Id.*  at 1340.

Similarly here, these claims encompass systems for providing healthcare provider information relating to multiple healthcare providers.  Neither the claims nor specification require that the request for information be limited to one specific healthcare provider and *only one* specific healthcare provider.  Thus, this Court should *not* limit these claims by defining "a first healthcare provider" to be a "specific healthcare provider."

For all of these reasons, this Court should construe the term "first healthcare provider" to mean "a physician or other healthcare professional."

### 2.   "healthcare provider report on the first healthcare provider"

Claims 1 provides:

> Creating . . . a **healthcare provider report on the first healthcare provider** using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, wherein the healthcare provider report on the first healthcare provider includes comparison ratings of health care providers . . . .

(emphasis added.)  Claim 15 uses similar language.

The parties' proposed constructions are significantly different:

**Health Grades proposes:**
"a formatted and organized presentation of information that relates to one or more healthcare providers identified in response to a query for information regarding healthcare provider(s)."

**MDX proposes:**
"report directed specifically to the first healthcare provider."

While the parties agree that this phrase needs to be construed, they disagree about what portions of the phrase need construction, with Health Grades focusing on the words "report" and "first," while MDX focuses on the word "on."  Each proposal is addressed below.

> a)   A "Report" is a Formatted and Organized Presentation of Information that Relates to a Healthcare Provider that Matches the Patient's Request for Information

Health Grades' proposed construction uses the ordinary meaning of the terms "report" and "first healthcare provider" and is consistent with the invention described in specification.

Regarding the term "report," the '060 patent refers to both physician "profiles" and physician "reports," wherein a profile consists of detailed information about a physician and a report contains profile information that is presented in a formatted and organized way:

> As discussed herein, an aspect of a particular embodiment relates to a database of physician-related information, wherefrom data is gathered and **compiled into the form of a "report"** and is made available to potential patients. Such reports contain different types of verified information for each physician within the database. In an exemplary embodiment, in response to a search query for a particular physician name conducted using a search engine external to the company Web site, the patient receives a Web-based "profile" of a selected physician matching, or closely matching, the entered search terms. **A profile lists detailed information potentially available about that physician which may be obtained in the form of a report**. . . .

('060 patent, col.2:16-40 (emphasis added).)  Figures 3A and 3B of the '060 patent show

"exemplary embodiments" of a physician report, which are organized into four sections (e.g.

company-verified information), and then subsections within these sections (e.g. disciplinary

action(s) within company-verified section).  (*See id.*)  However, the specification explicitly states

that the claims should ***not*** be limited to these embodiments:

> While four sections are shown and discussed in reference to the member-enhanced report 304, it is conceivable that the report could contain numerous additional possible sections. Further, while this disclosure has listed specific types of information and data available in the report 304 in accordance with an embodiment of the invention, **other embodiments of the invention may include other types of information and/or data.**  Moreover, other embodiments may have a different ordering of the sections. **The exemplary embodiments depicted and discussed herein are not intended to limit the scope of the invention.**

('060 patent, col. 8:45-55 (emphasis added); *see also* col. 18:27-42 ("report and profile formats

are referred to herein as exemplary embodiments. . . .  The particular embodiments described

herein are not intended to limit the types of information which may be provided and/or verified.")

Thus, the specification uses the term "report" to mean a formatted and organized presentation of

information about a healthcare provider identified in response to a query for information

regarding one or more healthcare providers.

b)      MDX's "Directed Specifically to" Language is Not Supported

MDX does not appear to take issue with Health Grades' proposed constructions for

"report" or "first healthcare provider," but rather seeks to add a limitation that the report be

"directed specifically to the first healthcare provider."   MDX is essentially asking this Court to

define the word "on" to mean "directed specifically to."   Not only is MDX's proposed

construction unnecessary, but it introduces ambiguity to this case.[2]   It begs the question:  what

does "directed specifically to" mean?  The parties have differing views on this issue and the jury

(or this Court) will need to interpret the interpretation.   For example, MDX will use the "directed

specifically to the first healthcare provider" interpretation to argue that certain sections of its

website are not part of the claimed "report" because they contain information not "directed

specifically to" the first healthcare provider.  (MDX's Interrogatory Responses at 8-9 (Ex. B).)

To the extent that MDX's proposed construction is intended to limit the content of the

report to information related *only* to a single physician, there is no support for such a limitation in

either the claims or the specification.  While one "exemplary embodiment" of the claimed report

(shown in Figure 3A) relates to a single physician, nowhere does the specification say that a

report must be so limited.  To the contrary, the specification clearly states that this is merely an

exemplary embodiment and it is not intended to limit the scope of the invention.  ('060 patent,

---

[2]  Ambiguous claim interpretations are disfavored.  *See, e.g., Elbex Video, Ltd. v. Axis Communs., Inc.*, 2008 U.S. Dist. LEXIS 108314, 38-39 (E.D.N.Y. Aug. 19, 2008) (Indeed, . . . defendant's proposed construction would require additional interpretation, not only to answer the question of what, in addition to the "composite synchronizing signal," is added to the picture signal, but also to define the "composite synchronizing signal" itself.  *See McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1898) (warning that "if we once begin to include elements not mentioned in the claim, in order to limit such claim, . . . we should never know where to stop").

col. 8:45-55.)  Moreover, the "exemplary" physician report shown in Fig. 3B contains

information that is *not* "directed specifically to the first healthcare provider," including for

example ratings for area hospitals 364.  The specification also contemplates that multiple

healthcare providers may meet the search criteria provided by a patient, which supports the

concept that a report may include multiple physicians.  ('060 patent, col. 2:21-26; *see also* col.

3:50-54.)  As such, this Court should find that claims 1 and 15 encompass reports that may

include one or more healthcare providers.

　　　　Even if MDX's proposed "directed specifically to" language does not limit the claimed

reports to information relating only to a single physician, such an interpretation is unduly narrow

and unnecessary.  Health Grades' proposes using "relates to," instead of "directed specifically to"

because it is broader and more consistent with the claims in view of the specification.

　　　　　　　　**3.　　"comparison ratings of healthcare providers"**

　　　　Claims 1 and 15 provide:

> Creating . . . a healthcare provider report on the first healthcare provider . . . ,
> wherein the healthcare provider report on the first healthcare provider includes
> **comparison ratings of health care providers** . . . .

(emphasis added.)  While the parties agree that the term "ratings" does not need to be construed,

they disagree about the remainder of each other's proposed constructions.

| **Health Grades proposes:** | **MDX proposes:** |
|---|---|
| "a rating system that facilitates comparison(s) amongst physicians to highlight which physician(s) identified in response to a query for information best fit one or more criteria." | "ratings of multiple providers other than the first healthcare provider." |

　　　　MDX argues that comparison ratings must relate to "providers other than the first

healthcare provider" who is the subject of the healthcare provider report.  This is directly

contrary to how comparison ratings are described in the '060 patent, which states that

comparison ratings relate to a particular provider (e.g. the first healthcare provider) that is

featured in a healthcare provider report.  For example, the '060 patent states:

> Aspects of particular embodiments relate to performing searches for healthcare providers based on geographic area, specialty, and/or other criteria, in which the company maintaining and/or managing the Web site . . . compiles and produces a results list of providers meeting such criteria. . . .  From this list, a patient may access a detailed "report" or, in one embodiment, **comparison ratings on that particular provider**."

('060 patent, col. 1:67-2:5 (emphasis added).)  Indeed, it does not make sense to omit

comparison ratings about a first physician in a report that is about that particular physician.

MDX also argues that comparison ratings must include "ratings of multiple providers"

within a report relating to a different provider.  There is no support in the '060 patent

specification for this construction.  Rather, the ratings described in the '060 patent relate to a

specific provider and enable a patient to compare that particular healthcare provider with other

healthcare providers to determine which healthcare provider best meets a patient's needs:

- One of the problems with prior on-line healthcare information websites is that the information, even if it exists, "is usually not organized in a manner that would allow a patient to compare physicians or hospitals . . . ."  ('060 patent, col. 1:29-47.)

- The claimed invention solves this problem by providing information and ratings in a format that enables "patients to differentiate among healthcare providers and thereby select the provider that best meets their individual needs."  ('060 patent, Abstract.)

- "In accordance with an embodiment of the invention, comparisons amongst the physicians may be provided to the patient, in which such comparisons highlight which physicians best fit the patient's specified criteria."  ('060 patent, Col. 6:63-7:15 (emphasis added).)

- "If query 1116 determines that the patient would like to receive the type of information shown in the sample report, flow branches YES to receive operation 1118 where physician comparison results are provided. In particular, operation 1118 provides the patient with information regarding how well physicians listed satisfy the specified criteria 1106, 1108, and 1110."  ('060 patent, col. 13:36-43.)

As such, the claimed comparison ratings relate to a healthcare provider that is the subject of the report and enable patients to differentiate that particular healthcare provider from other healthcare providers.  For example, a "5-star rating" system for all physicians within a database will meet Health Grades proposed definition of comparison ratings, even if each physician report includes a star rating *only* for that particular physician.  In this example, such a star rating enables patients to compare the physician in the report with other physician**s** (e.g. five stars for Dr. Smith versus three stars for another physician that matches my search criteria) to determine which physician best meets the patient's needs.

During the prosecution of the '060 patent Health Grades made clear that the claimed "comparison ratings" are different from merely providing access to qualifications and patient comments relating to physicians which may be compared.  By way of background, the PTO examiner argued that paragraphs 0015-0016, 0037, 0081, 0090 and 0107 of a prior art publication U.S. Pat. App. Publ. No. 2003/0195838 ("Henley") disclosed "a healthcare provider report that includes comparison ratings."  Henley describes a system for enabling prospective patients and professional service providers, such as doctors, to competitively negotiate fees for proffered services through an interactive on-line professional services auction system.  (Henley, Abstract (Ex. C).)  In response, Health Grades argued that the cited paragraphs of Henley do not teach comparison ratings.  (2/16/2010 Amendment and Response at 11-12 (Ex. D).)  For example, regarding paragraph 107, Health Grades argued: "making general qualifications

'available' to a consumer does not teach or suggest 'comparison ratings.'"  (*See id.*)  Regarding

paragraph 90, Health Grades argued that providing "access to databases storing the

'identification' of medical service providers satisfying a particular requirement" does not teach or

suggest of comparison ratings.  (*See id.*)   In essence, Health Grades argued that the claims

require more than just providing facts and feedback about multiple doctors which may be

compared, they require *ratings* for comparing physicians rather than just comparison facts.

      In sum, this Court should adopt Health Grades' proposed construction because it is based

on language (quoted above) that is taken directly from the specification, namely "a rating system

that facilitates *comparison(s) amongst physicians* to *highlight which physician(s)* identified in

response to a query for information *best fit* one or more *criteria*." ('060 patent, Col. 6:63-7:15.)

Further, it is consistent with arguments Health Grades made during the prosecution.

      **B.**    **Claim Terms That Do Not Need to Be Construed**

      The purpose of claim construction is to "determin[e] the meaning and scope of the patent

claims asserted to be infringed."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.

Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996).  When the parties raise an actual dispute

regarding the proper scope of these claims, the court, not the jury, must resolve that dispute. *See*

*id.* at 979 (holding that claim construction is a matter of law).  However, the Court needs to

construe *only* those claim terms "that are in controversy, and only to the extent necessary to

resolve the controversy."  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed.

Cir. 1999); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir.

2008).  "In some cases, the ordinary meaning of claim language . . . may be readily apparent even

to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

In sum, "[w]hen two parties offer different constructions, or if one side argues for ordinary meaning, then the Court must first determine whether it has a duty to resolve the meaning and the scope. While it is a district court's duty to construe the claims, part of this duty is to determine the extent which to construction is even necessary. With regard to meaning, where additional language may be unduly limiting, confusing, or redundant, **it is in a court's power to determine that no construction is necessary.** A court may decline to adopt constructions that violate claim construction doctrine, such as improperly importing limitations, and may still construe terms to have their ordinary meaning." *Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 2011 U.S. Dist. LEXIS 91124, 15-16 (E.D. Tex. Aug. 16, 2011) (emphasis added) (citing *O2 Micro*, 521 F.3d at 1360).

Following these principles, many courts have declined to construe commonly understood claim terms. *See, e.g., Univ. of Va. Patent Found. v. GE*, 755 F. Supp. 2d 709, 716 (W.D. Va. 2010); *EPOS Techs. v. Pegasus Techs.*, 2011 U.S. Dist. LEXIS 88266, 18-19 (D.D.C. Aug. 9, 2011) (declining to construct the term "drawing implement," because the plain meaning of the term as it appears in the patent is unambiguous and the Court need not look outside the patent claims for additional guidance.); *Resonance Tech., Inc. v. Schiller AG*, 2010 U.S. Dist. LEXIS 141722 (C.D. Cal. Nov. 22, 2010) ("The Court agrees that the ordinary meaning of the terms is clear and declines to construe 'shielded cable' and 'supplied.').

For example, in *Univ. of Va. Patent Found*, the patent related to a technique for three-dimensional magnetic resonance imaging ("MRI") of the human body and the disputed phrase

was "desired contrast properties," wherein the dispute specifically related to the meaning of the word "desired."  The patent owner argued that the term "desired" was well-understood and did not need to be construed.  The defendant argued that it had a specialized meaning that limited the scope of the patent claim to instances where the contrast properties were known in advance and intended.  Although the Court rejected defendant's attempt to limit the scope of the claims, it declined to further construe the disputed phrase:

> The patent itself does not provide any special definition for the term "desired," nor does it indicate that the term has taken on a specialized meaning.  This claim term is so simple that the ordinary meaning of the claim language as understood by a person of skill in the art is readily apparent.  A property that is desired is one that is hoped for or wished for.  The patentee's use of the term "desired" in this context does not by necessity require that the specific contrast properties be both known in advance and intended, as GE argues.  No further consideration of this simple and non-technical term is deemed necessary.

*Univ. of Va. Patent Found.*, 755 F. Supp. 2d at 716 (citations omitted).

Likewise in this case, this Court should decline to construe any of the following terms because they have widely understood meanings and the additional language MDX seeks to add is unduly limiting, confusing, or redundant.

### 1.     "healthcare provider-verified information"

Claims 1 and 15 provide:

> accessing **healthcare provider-verified information** about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;"

(emphasis added.)   The language of this claim element clearly specifies what healthcare provider-verified information is, namely:  1) information received from the healthcare-provider

(2) that includes at least three kinds of the specified information.  This is consistent with the

specification, which states:

> An aspect of a particular embodiment relates to the different levels of verified
> information available in each member physician's report, in which such
> information may include:  (1) a physician-verified, or physician-provided, section
> including information the physician feels will help a patient choose him or her as
> a physician . . . .

('060 patent, col. 2:53-67) and

> In essence, the member physician has the ability to craft some of the information
> provided to the patient.  This information may or may not be verified by an
> independent third party, such as the company managing the Web site, but it is
> expected that the physician, at least, verifies this information.

('060 patent, col. 7:52-66.)

In contrast, MDX proposed that the term "verified" be defined as "proven to be true

directly and personally" by the healthcare provider.  This proposal is not supported by the claims

or the specification.  The '060 patent specification does *not* contemplate any kind of verification

for physician-verified information other than the act of the physician providing the information.

It does not for example, describe that a physician must provide evidence demonstrating that the

information he provides about him is true.  Further, the claims indicate that physician-verified

information may include such things as the physician's medical philosophy, hobbies, and

languages.  How would a physician "prove these to be true" other than by saying so?  The term

"to prove" has a stringent connotation that implies production of evidence and burdens of proof,

particularly when used in front of a jury during a patent infringement lawsuit.  MDX's proposal

in this context is too narrow and is inconsistent with the claim language and specification.

Similarly, MDX's proposal that the physician verification be "direct and personal" finds no support in ordinary meaning of the terms or in the claims or in the specification. There are many ways for the company managing the website to receive information from a physician, not all of which may be "direct and personal." For example, a physician may provide her secretary with information she feels will help a patient choose her as a physician and instruct her secretary to provide this information to the company managing the website. In this example, the physician has still "verified" the information, although maybe not directly and personally. There is no reason to narrow the scope of '060 patent claims by introducing the "direct and personal" limitation to the healthcare provider-verified information claim element.

As such, this Court should reject MDX's proposed interpretation of "healthcare provider verified information." To the extent that any interpretation is necessary, Health Grades proposes that it be construed as "information verified by a physician or other healthcare professional."

### 2.        "received from the first healthcare provider"

MDX proposes that "received from the first healthcare provider" be construed to mean "provided personally from the first healthcare provider." MDX's proposed instruction should be rejected. Neither the claims nor the specification place any limits on how the company managing the information service receives the information from the physician. Instead, the specification states that there are many ways for the company to receive information from the physician:

> Start operation 1602 is initiated in response to accessing or obtaining specific physician information. In an embodiment, such information is obtained from the physician himself or herself through a client computer, a network, and a server system such as that depicted in FIG. 1. **However, in other embodiments, the information may be obtained through other means.** For example, in one embodiment, the information is obtained through an independent third party, such as the company Web service provider, that researches and gathers public

> information regarding a physician, such as medical license records, board
> certifications, federal or state disciplinary actions, **and other sources of public
> information, such as advertising by physicians . . .**.

('060 patent, col. 17:1-22 (emphasis added).)  The patent specification does not support MDX's

desire to alter the plain and ordinary meaning of the word "received."

Additionally, MDX's proposal to define the term "received" as "provided personally

from" is unduly limiting.  The word "received" is well understood and needs no interpretation.

Thus, this Court should reject MDX's proposed definition and hold that the scope of the

'060 patent claims is not limited to healthcare provider-verified information that was provided

personally from the healthcare provider to the company managing the website.

### 3.    "verified by an independent third-party source"

MDX also proposes that this phrase be construed to mean:  "Proved to be true by an

independent third-party source."  For similar reasons to those described above, MDX's proposed

construction of the term "verified" is overly narrow and is not supported by the specification.

For example, the '060 patent specification teaches that any means of verification reasonably

known to those of ordinary skill in the art may be used and that the verification may confirm the

accuracy or the completeness of the information:

> verification operation 1608 also verifies the completeness of certain information
> received in the previous steps, such as, by way of example only, information
> received and/or gathered regarding a physician's disciplinary action(s), board
> certification(s), and/or licensure(s), and gathers additional data and information
> regarding a physician, if such information has not already been received or
> gathered through other means. In an embodiment' verification operation 1608
> verifies the information through the means discussed above. In other
> embodiments, such verification may be accomplished through any number of
> means reasonably known to those of ordinary skill in the art.

('060 patent, col. 17:53-18:23.)  As such, this Court should reject MDX's proposed construction

and instruct the jury to use the plain and ordinary meaning of the term "verified" to determine

infringement and validity.

### 4.    "compiling" / "compile"

Claims 1 and 15 use the term "compiling" in the following: "compiling [or compile] . . .

patient-provided information regarding the first healthcare provider . . ." and "compiling [or

compile] information regarding the first healthcare provider verified by an independent third-

party source  . . ."

MDX proposes that the term "compiling" be construed to mean "gathering and putting

together."  This is an unduly narrow definition in that it requires *both* gathering *and* putting

together.  In contrast, both the claims and specification use the term "compiling" to mean putting

together various pieces of information from different sources, such as ratings from different

patients.  The specification also uses the term "compiling" to mean putting together:

> If the confirmation e-mail is successfully transmitted, flow branches YES to
> compile data operation 548, in which the 30 information and data provided by the
> patient survey **is compiled with other data** provided by other past or current
> patients and maintained within the company database.

('060 patent, col. 10:27-32.)   The specification does not use the term "compiling" to mean

"gathering."

The word "compiling" is well understood and needs no interpretation.  As such, this

Court should reject MDX's proposed construction and instruct the jury to use the plain and

ordinary meaning of this phrase to determine infringement and validity.

     **5.**    **"using the healthcare provider-verified information, the patient-provided information, and the information verified by an independent third-party source"**

Claims 1 and 15 provide:

> Creating . . . a healthcare provider report on the first healthcare provider **using the** healthcare provider-verified information, **the** patient-provided information, and **the** information verified by the independent third-party source . . . .

(emphasis added.)  MDX proposes the following construction, which does not define any term from the claim, but rather adds the word "all" before each of the three types of information in this phrase, so that the claim would read:

> [Creating . . . a healthcare provider report on the first healthcare provider] using **all of** the **accessed** healthcare provider-verified information, **all of the compiled** the patient-provided information, and **all of** the **compiled** information verified by the independent third-party source . . . .

(emphasis added.)  This is a blatant attempt to add limitations to the claims.  If the patentee as its own lexicographer intended to require that "all" of the provider-verified, "all" of the patient-provided, and "all" of the third party verified information be used to create a report, it would have said so.  It did not.

Further, the '060 patent specification does not state that "all" of each of the various types of information must be used to create the report.  Instead, it indicates repeatedly that the invention should *not* be limited with regard to types or sources of information:

- **"Such reports contain different types of verified information for each physician within the database.**  In an exemplary embodiment, in response to a search query for a particular physician name conducted using a search engine external to the company Website, the patient receives a Web-based "profile" of a selected physician matching, or closely matching, the entered search terms.  A profile lists detailed information potentially available about that physician which may be obtained in the form of a report."  ('060 patent, col. 2:16-29 (emphasis added).)

- **"The types of information described herein are intended to be provided as examples only and are in no way intended to delimit the scope of the present invention in any way. . . ."** ('060 patent, col. 18:60-63 (emphasis added).)

- After verifying the information and data in verification operation 1608, flow proceeds to the compiling, or creation, of healthcare provider profiles and/or reports in compile operation 1610. **In an embodiment, compile operation 1610 compiles different sources of information and data into either a report format or profile format.** Other embodiments may involve other format types; however, report and profile formats are referred to herein as exemplary embodiments." ('060 patent, col. 18:24-31 (emphasis added).)

In sum, there is no basis to add the additional limitations that "all" of each of the three types of claimed information be used to create the report. As such, this Court should reject MDX's proposed construction and instruct the jury to use the plain and ordinary meaning of this phrase to determine infringement and validity.

### 6. "hyperlink to an affiliated hospital, medical center, or other type of treatment center"

Claim 4 depends from claim 1 and further requires: "the healthcare provider report includes a **hyperlink to an affiliated hospital, medical center, or other type of treatment center**." (emphasis added.) MDX's proposes that this phrase be construed as:

Hyperlink to **a website of the** affiliated hospital, medical center, or other type of treatment center.

(emphasis added.) MDX's proposed construction does not define any term within this phrase, but rather adds an additional, and unduly limiting, term that requires the hyperlink to link to the hospital's website. MDX proposes this limitation in an attempt to avoid infringement -- the accused physician reports include hyperlinks to other pages within the accused website relating to affiliated hospitals (as opposed to linking to the hospital's own website). (*See* MDX's

Interrogatory Responses at 8-9, Ex. B.)  In any event, neither the claims nor the specification require that the hyperlink be to a website controlled or owned by the hospital.  Quite the opposite, the specification indicates that a physician report can link to a hospital report created by the company managing the information site:

> In accordance with an embodiment where a hospital or medical practice is a member entity, **a hospital hyperlink 234 for accessing a report or ratings on that hospital or medical practice is shown next to those physicians affiliated with the hospital.**

('060 patent, col. 7:31-51 (emphasis added).)  As such, this Court should reject MDX's proposed construction and instruct the jury to use the plain and ordinary meaning of this phrase to determine infringement and validity.

### 7.   "the results list further includes an advertisement"

Claim 8 further provides that: "**the results list further includes an advertisement** for the first healthcare provider with a hyperlink to information on the first healthcare provider." (emphasis added.)  MDX's proposes that this phrase be construed as:

> The results list **contains** an advertisement **as a part of the results list**.

(emphasis added.)  MDX's proposed construction does not define any term within this phrase, but rather adds limitations in an attempt to concoct a non-infringement argument – the accused website includes physician ads positioned to the side of the list of physicians that match the search criteria.  (*See* MDX's Interrogatory Responses at 8-9, Ex. B.)  These additional limitations are not supported by the specification, are unduly limiting, and are potentially confusing.



Fig. 2B

The specification does not support MDX's proposed construction. Fig. 2B (on the left) shows an exemplary embodiment of a results list 226, wherein "a member advertisement 224 is shown for results page 223" that is positioned above results list 226. ('060 patent, col. 7:45-51.)

Although it is unclear whether the advertisement 224 meets MDX's proposed construction or not, it is clear that MDX's accused website operates in the same way as the '060 patent describes. Thus, if MDX's proposed construction causes the accused website *not* to infringe this claim, then it also excludes an embodiment of the specification in violation of rules for construing claims. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (holding that a claim construction "that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."). As such, this Court should reject MDX's proposed construction.

The word "including" as used in claim 8 is clear and well understood and needs no additional construction. Thus, this Court should instruct the jury to use the plain and ordinary meaning of this phrase to determine infringement and validity.

## V.   CONCLUSION

For the reasons set forth above, the Court should adopt Health Grades' proposed constructions of the claim terms in dispute and reject all of MDX's attempts to narrow the scope of the claims at issue in this case.

Respectfully submitted this 5th day of December, 2011.

ROTHGERBER JOHNSON & LYONS LLP


*s/ Jesús M. Vázquez*
Jesús M. Vázquez, Jr., Esq.
Kris J. Kostolansky, Esq.
Jeffrey D. Phipps, Esq.
1200 17th Street, Suite 3000
Denver, Colorado  80202
Tel:  (303) 623-9000
Fax:  (303) 623-9222
Email: jvazquez@rothgerber.com
        kkosto@rothgerber.com
        jphipps@rothgerber.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Health Grades, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 5, 2011, I electronically filed the foregoing HEALTH GRADES, INC.'S CLAIM CONSTRUCTION BRIEF AND EVIDENCE with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott David Stimpson
Mark Jon Rosenberg
David Chunyi Lee
Sills Cummis & Gross P.C. – New York
30 Rockefeller Plaza
New York, NY  10112
Email: sstimpson@sillscummis.com
Email: mrosenberg@sillscummis.com
Email: dlee@sillscummis.com

Terence M. Ridley
Wheeler Trigg O'Donnell, LLP
1801 California Street, #3600
Denver, CO  80202-2617
Email: ridley@wtotrial.com

Ramona L. Lampley
Wheeler Trigg O'Donnell, LLP
1801 California Street, #3600
Denver, CO  80202-2617
Email: lampley@wtotrial.com

*s/ Jesús M. Vázquez*
Jesús M. Vázquez, Jr., Esq.
Kris J. Kostolansky, Esq.
Jeffrey D. Phipps, Esq.
Rothgerber Johnson & Lyons, LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202-5855
Tel:     (303) 623-9000
Facsimile: (303) 623-9222
Email: jvazquez@rothgerber.com
          kkostolansky@rothgerber.com
          jphipps@rothgerber.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Health Grades, Inc.*