1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF COLORADO

3       Case No. 11-CV-00520-PAB-BNB

4       _____

5       HEALTH GRADES, INC.,

6            Plaintiff,

7       vs.

8       MDX MEDICAL, INC.,
        *doing business as* Vitals.com,

9

10           Defendant.

11      _____

12            Proceedings before BOYD N. BOLAND, United States
        Magistrate Judge, United States District Court for the
13      District of Colorado, commencing at 10:05 a.m.,
        December 2, 2011, in the United States Courthouse,
14      Denver, Colorado.

15      _____

16            WHEREUPON, THE ELECTRONICALLY RECORDED
        PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

17      _____

18                            APPEARANCES

19      MR. JESUS M. VAZQUEZ, JR., ESQ., MR. GREGORY KANAN, ESQ.
                   Appearing on behalf of the Plaintiff.

20
          MR. SCOTT D. STIMPSON, ESQ., MS. RAMONA LAMPLEY, ESQ.
21                 Appearing on behalf of the Defendant.

22      _____

23                          MOTION HEARING

24

25

1              P R O C E E D I N G S

2              (Whereupon, within the electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURTROOM DEPUTY:  All rise.  Court is in

6    session.

7              THE COURT:  Thank you.  Please be seated.  We

8    are here this morning in case 11-CV-520, Health Grades,

9    Inc. against MDX Medical, Inc. on two motions.  The

10   first is MDX Medical's motion to amend the answer,

11   Document 57, and the second is MDX Medical's motion to

12   strike plaintiff's supplemental infringement

13   contentions, Document 62.  May I have appearances,

14   please.

15             MR. VAZQUEZ:  Good morning, Your Honor.  Jesus

16   Vazquez and my partner Greg Kanan on behalf of plaintiff

17   Health Grades from Rothgerber, Johnson & Lyons.

18             THE COURT:  Thank you.

19             MR. STIMPSON:  Good morning, Your Honor.  I'm

20   Scott Stimpson from Sills, Cummis & Gross, New York

21   City.  With me is Ramona Lampley from Wheeler, Trigg,

22   O'Donnell.  We represent the defendant MDX.

23             THE COURT:  I'm holding up the motion to

24   strike the supplemental infringement contentions.  It's

25   three inches thick or so.  Mr. Ridley, who's not here

1    today, was here not long ago when I commented that my

2    favorite law is the second law of thermodynamics, which

3    compels that the universe is moving towards greater and

4    greater entropy.  The example which textbooks give of

5    entropy is if you throw the pages of War and Peace into

6    the air the chances that they'll come back 1 to 1,052 in

7    the proper order, extremely minute.  Regrettably, I

8    dropped the motion to strike which proved the -- once

9    again, the second law of thermodynamics.

10           Let's start with the motion to amend.

11    Mr. Stimpson.

12           MR. STIMPSON:  Thank you, Your Honor.  On the

13    motion to amend, the application that led to the

14    patent-in-suit in this case was filed in 2006.  Just

15    very broadly and generally speaking, the patent is

16    directed to ways to get information on healthcare

17    providers over the internet.

18           So, you go to your computer, you get on the

19    website and you request information for Dr. Smith, and

20    they have data from Dr. Smith from third parties, from

21    maybe patient ratings.  They put it all together and

22    they give a report on Dr. Smith.  So that's the

23    nutshell, obviously a very broad overview, of what this

24    patent is related to.

25           Through extensive undertakings on our part,

1   Your Honor, and six months of effort, we have now

2   determined that Health Grades actually was offering this

3   sort of thing in 2003 to 2005 in the prior art period.

4   They had at that period a website.  You could get on the

5   website, request information on a physician.  And in

6   response they'd give you these reports.  And we've

7   listed them in our motion to amend.  But there are

8   various types of reports you could get but they'd give

9   you information, for example, on, you know, gender,

10  specialty, years in profession, you know, professional

11  appointments, memberships, et cetera, residency, where

12  you went to med school.  And those were all available in

13  2003 to 2005.  And it looks like that was very good

14  prior art.

15          So, the inventors -- all three of the named

16  inventors in this patent were at Health Grades at the

17  time, and they knew about this prior art and they knew

18  about their duty to disclose and they didn't disclose

19  it.  That by itself, Your Honor, is enough for

20  inequitable conduct.  It's one thing to forget to

21  disclose some other piece of prior art.  But somebody

22  went around to all the competitors, including our

23  company, WebMD, and they disclosed all that stuff to the

24  patent and trademark office.  But the one they didn't

25  disclose was the best one, their own prior art at Health

1    Grades.

2              THE COURT:  What do I make of the argument

3    that in order to show inequitable conduct the prior art

4    has to demonstrate all of the elements of the patent,

5    and here the -- the includable prior art does not teach

6    requiring patient provided ratings?

7              MR. STIMPSON:  Well, there are a couple of

8    responses to that.  First of all, Your Honor, the prior

9    art that was withheld does not by itself have to prevent

10   these claims.  Okay.  It's a but-for test.

11             So, for example, assume just for a moment that

12   it didn't have patient ratings, okay.  It doesn't

13   matter.  The examiner had the patient ratings already.

14             Now, I'd like to hand up, if it's all right,

15   Your Honor, the notice of liability.  May I approach?

16             THE COURT:  Does Mr. Vazquez have this?

17             MR. STIMPSON:  Yeah, I have a copy for him.

18             THE COURT:  All right.  Thank you.

19             MR. STIMPSON:  This is -- to answer your

20   question, Your Honor, this is a record of why this

21   patent was issued.  It's the patent office saying, look

22   Health Grades, look inventors, we're going to give you a

23   patent and this is why we're going to do it.  I thought

24   about highlighting this for you, Your Honor, but I don't

25   need to because the examiner already did it for you.

1    There are a couple of claim elements there that they

2    focused on, the examiner focused on.  In that paragraph

3    4 you see they're underlined.  It's not the patient

4    ratings.  Patient ratings was already before the patent

5    and trademark office.

6         So, had these pieces of prior art been

7    disclosed to the patent and trademark office, Your

8    Honor, what they showed at least were these various

9    groupings of data that were in the claims that we're

10   missing here.  So you combine them -- even if it didn't

11   have patient ratings, you'd combine it with what was

12   already before the patent and trademark office, these

13   claims would never have issued.

14        Oh, excuse me.  A second response to your

15   question, Your Honor, is whether or not they had patient

16   ratings.  And I -- if you look at Exhibit F in our

17   brief, Your Honor, that's something we got on

18   October 26, two days before we filed this motion,

19   and I'll wait -- I can just tell you what it says.  It's

20   a press release from Health Grades.  And one of the

21   things it says, it's talking about this physician

22   quality reports.  Health Grades recently began adding

23   two new sets of data to its physician quality reports.

24   One is physician satisfaction surveys.  So, if that is

25   not patient provided information, Your Honor, I don't

1    know what is.

2             THE COURT:  And when was that added?

3             MR. STIMPSON:  That press release is dated

4    August 2, 2005.

5             THE COURT:  But the applicable prior art date,

6    according at least to Mr. Vazquez, is February 8th,

7    2000 --

8             MR. STIMPSON:  That's absolutely wrong, Your

9    Honor, for two reasons.  First -- and I wrote this down.

10   I don't want to get it -- I don't want to get it wrong

11   because I'm quoting their brief.  On page 7 of their

12   brief when they say this isn't prior art, this press

13   release, they -- there's two subsections for prior art

14   that are at issue here.  102(a) and 102(b).  102(a)

15   Health Grades says -- if I can find it.  That section,

16   quote, Only applies to prior art from third parties.

17            Your Honor, that is just dead wrong.  It does

18   not say that at all.  What it says is it's -- it's if

19   the invention was known to others.  It doesn't have to

20   be prior art of a third party, it just has to be known

21   to others.

22            Now, I'm no marketing expert, Your Honor, but

23   this is a press release.  And if a press release is sent

24   out I think the whole point is that others will know it

25   and understand it.

1          The second response, Your Honor, is to the

2     102(b), where they say they have this priority date of I

3     think it's February, 2006.  That's wrong.  I don't want

4     to inundate you with papers, Your Honor, but if you want

5     this you can have it, but the February 2 date is a

6     provisional date.  It's a provisional application.

7     There were no claims in it.  And that application, quite

8     frankly, did not support these claims.  There's nothing

9     in there about comparison ratings.  And I have it here

10    if you want me to bring it up.

11         But this is a red line we did showing what

12    they added to the claims and their actual application on

13    August 26th.  All of the blue is stuff they added.

14    There is no way they're entitled to that priority date.

15    There's no way.  There is just no question that this

16    press release is prior art.  No question.

17         If you want the provisional application I'm

18    happy to give it to you, Your Honor, but --

19         THE COURT:  Perhaps you should.  Thank you.

20         MR. STIMPSON:  So, Your Honor, backing up a

21    bit now.  What actually happened during prosecution of

22    this application -- I actually have a red line too if

23    you'd like that, but that's even more documents.

24         What happened during the prosecution of this

25    application, these claims were being rejected and

1    rejected.  And so what they did, the applicants added

2    these two claim elements that you'll see addressed in

3    our briefs.  One of them was, this is the information

4    you have to get from the doctor.  And it had a listing

5    of, you know, specialty, gender, years in profession,

6    et cetera.  And it said you have to have at least three

7    of those from the doctor.  And it also added another

8    claim element that said this is the stuff you have to

9    get from third parties.  And it had another list, you

10   know, like disciplinary information, licensure,

11   et cetera.  And you had to get three of those from third

12   parties.

13            And the argument to the patent and trademark

14   office, okay, the prior art you have, Mr. Examiner,

15   doesn't show this stuff so you've got to allow our

16   patent.  And that's exactly what the patent examiner

17   did.  You have the notice of allowance.

18            So, if they had disclosed this prior art they

19   knew about, Your Honor, it showed these listings.  It

20   showed these things.  It had three and a lot more.  So

21   this patent never would have issued.

22            So, um, it's my burden because we're past the

23   July 31st date for amending to show good cause.  Health

24   Grades doesn't -- excuse me, I got a little bit mixed

25   up.  Health Grades doesn't really oppose this part of

1    the -- part of their -- it doesn't say we can't show

2    good cause and we haven't met diligence, but since June

3    of 2008 we've been asking for information on this prior

4    art, and it's been painful.  We've been getting drips

5    and drabs.  And we got some from a third party.  Even

6    now there's a lot out there we don't have.

7          We got one interrogatory response from Health

8    Grades which is a sworn interrogatory response.  It says

9    that other than the cited prior art, Health Grades

10   doesn't know of any other prior art.  So that threw me

11   for a loop and I've been going back and forth with

12   counsel for Health Grades.

13         On September 8 we sent our requested search

14   terms which included this prior art.  We wanted to see

15   what was in the inventor's files.  We have -- that was

16   almost three months ago.  We have received only the hit

17   list.  So we know, as I stand here today, that two of

18   these inventors had over 1,000 hits for documents and

19   e-mails mentioning this prior art.  But I haven't gotten

20   one piece of data from that.  Not one piece of

21   electronic data showing that.  So we're still trying to

22   get more information, Your Honor, but -- we've been

23   trying very hard.

24         So, the way that Health Grades is opposing

25   this, Your Honor, is primarily to say it's a futile

1    amendment.  First of all, I think Health Grades is

2    confusing two standards in their brief.  They're

3    confusing the standard for proving inequitable conduct,

4    a la *Therasense* was the standard for pleading

5    inequitable conduct.  And the standard for pleading

6    inequitable conduct is we just have to show that someone

7    associated with the prosecution failed to disclose

8    material information and did so with intent to deceive.

9    And that's -- in the exigent case that Health Grades

10   cites -- and if you're interested to see a case after

11   *Therasense* that still says that, it's *Oracle*, 2011

12   Lexis 87199.

13            THE COURT:  Give me the last number again.

14            MR. STIMPSON:  Sure.  It's 87199 at page 9.

15            Now, it can't be a naked (unintelligible).  I

16   understand that, Your Honor.  We have to show who, what,

17   when, where, how.  But if you look at our amended answer

18   it's all there, Your Honor.  We have that and more.

19            And we've talked a little bit about the

20   patient ratings.  And we've talked about the question

21   that they're saying it's not prior art.  I think the

22   only other thing we haven't addressed on the materiality

23   issue is Health Grades's argument that this prior art

24   was cumulative.  And they're right.  If this prior art

25   was cumulative to what was before the PTO, it's not

1    material and it can't be inequitable conduct.

2              Pages 17 to 18 of their brief they cite

3    two pieces of cited prior art, the 369 and the 233

4    patents.  If you actually go through and match that up

5    to the claim terms, Your Honor, you'll see that they

6    just don't have it.  The 369 patent that I went

7    through in -- these two claim elements are the elements

8    that say you have to have at least three of this list

9    from the doctor, and at least three of this other list

10   from third parties.  And if you go through and try to

11   match those up the 369 has only one from each list, and

12   the 233 has zero.  It doesn't have any because it's

13   talking about -- it doesn't even talk about the medical

14   profession.  But the prior art they withheld had

15   three-plus from each one.  So it's certainly not

16   cumulative, Your Honor.

17             So just a brief word on the intent.  We have

18   to allege facts sufficient for the court to infer that

19   there was intent.  That the most reasonable inference is

20   an intent to deceive.  And, Your Honor, not only is it

21   the most reasonable inference, it's really the only

22   inference here.

23             If you look at these facts, they went around

24   and they disclosed from all of their competitors.  All

25   the web cites that were prior art that were operating

1    and doing this sort of thing they disclosed them all

2    except their own one that they -- that they had right in

3    house and that they knew the most about.  That's the one

4    they didn't disclose.

5              They added limitations to the claims to get

6    over the prior art.  And the only piece of prior art

7    that they wouldn't be able to make those arguments for

8    was their own piece of prior art.  It's really the only

9    inference, Your Honor, that can be drawn here.

10             So I think if you look at our amended

11   complaint, Your Honor -- or amended answer, and our

12   affirmative defense on inequitable conduct there's

13   plenty there for inequitable conduct.  So, we

14   respectfully request leave to amend.

15             Do you have any further questions?

16             THE COURT:  I don't believe so, thank you.

17             MR. STIMPSON:  Thank you.

18             THE COURT:  Mr. Vazquez.

19             MR. VAZQUEZ:  Good morning, Your Honor.  We

20   believe that our response quite adequately addresses the

21   motion, and I really didn't hear too much from counsel

22   for MDX here that is beyond the papers.  I can tell you

23   that it's very important that -- that he just conceded

24   that the prior art that we cited is cumulative.

25   Obviously, we disagree that it doesn't contain all the

1    elements and it's easily, I think, determinable by a

2    court by looking at those references.

3         What really strikes me most importance here,

4    Your Honor, is that as the *Pfizer* case says, it's just

5    simply not enough to say that X person at X time failed

6    to turn over X info that would have -- and material,

7    with the specific intent to deceive.  Their proposed

8    amended answer, that is all it has.  And, in fact, those

9    bear allegations, which wouldn't be sufficient as stated

10   just that way, are couched in -- on information and

11   belief style.  So --

12        THE COURT:  Setting aside the information and

13   belief issue, which I understand your point about, but

14   setting that aside for a moment.  If this isn't an

15   adequate allegation of inequitable conduct what would

16   one look like?

17        MR. VAZQUEZ:  Well, it would be --

18        THE COURT:  I mean, here you've got these

19   certain people employed by the patent holder, knew about

20   these three pieces of prior art which anticipate the

21   invention and it wasn't disclosed, and then --

22        MR. VAZQUEZ:  Well --

23        THE COURT:  -- that -- that would -- and if it

24   had been disclosed it would not have -- the patent would

25   not have been allowed.  What more would -- would you

1    include?

2              MR. VAZQUEZ:  Well, Your Honor, you would have

3    to include other allegations which show -- which would

4    allege sufficient for the court to -- to consider that

5    the material was but-for material.  That's not here.

6              THE COURT:  Well, how would you know that at

7    the pleading stage, beyond his -- beyond the sort of

8    common sense surmise that Mr. --

9              MR. VAZQUEZ:  Uh-huh.

10             THE COURT:  -- Stimpson suggests?

11             MR. VAZQUEZ:  Well, one way would be to take

12   the deposition of the inventors and ask them about this.

13   That hasn't occurred in this case yet.  There's no -- he

14   has not done that yet.  That's -- we hope to do them in

15   early January.

16             THE COURT:  Is one allowed to inquire of the

17   examiners?

18             MR. VAZQUEZ:  Of the examiner?  The patent --

19             THE COURT:  I mean, if you -- if you really

20   want to know but-for I guess you ask the examiner.  But

21   I --

22             MR. VAZQUEZ:  Yeah.

23             THE COURT:  -- don't think you're allowed to

24   inquire.

25             MR. VAZQUEZ:  I don't believe --

1           THE COURT:  -- of the examiner.

2           MR. VAZQUEZ:  -- you are.  I don't believe you

3    are, but you can certainly take the deposition of the

4    inventors and have the whole prosecution file there and

5    put the question to them.  You know, you had this.  What

6    was the process.  As Your Honor I'm sure is aware, this

7    patent was prosecuted by a very well respected national

8    patent prosecution firm, Merchant & Gould.  I have no

9    doubt that these allegations are just spurious.  There

10   is no intent to deceive the patent office here.  I know

11   they did their job and they did it thoroughly.

12           I can't answer what -- why this was not

13   disclosed.  But I can say, and we've said it very

14   clearly in our response, Your Honor, that it's not

15   but-for material and that there's absolutely nothing

16   which would even allow the court to even infer in a

17   reasonable manner that these three gentlemen were

18   intending to deceive the patent office.  That is just

19   outrageous.

20           Moreover, just one -- one detail that just --

21   I just recalled.  Mr. Neil was not an employee of Health

22   Grades at the time this patent was being prosecuted.

23   The main inventor, he was a consultant.  So, here we

24   have three individuals who were just developing a

25   website and, I know, responding to the best of their

1    ability to request for information from their counsel

2    Merchant and Gould in providing information, and the

3    patent was allowed.

4              I just think that here, you know, this is a

5    classic case.  This -- I view this motion as strategic.

6    Now, there's still a lot of discovery to be taken and,

7    like I said, I think the most important disparity would

8    be relevant to this is what do these guys have to say at

9    their depositions about this.  It just hasn't happened.

10             So, you know, at this point I just think the

11   court does have that important function of being the

12   gatekeeper in this.  You know, they're just -- there's a

13   lot of strategic benefit to having these type of claims

14   allowed as we pointed out in our response.  And that is

15   what's motivating this, despite the somewhat dramatic,

16   you know, statements made here today and in the motion

17   by counsel for MDX.

18             Again, it's just not enough.  I can appreciate

19   Your Honor's logical follow-up question, Well, what

20   would be enough.  You know, enough here would be, like,

21   well, here's -- here's why they knew that this was

22   material.  That's missing.  Here was the motivation to

23   have the -- to omit it or misrepresent this information.

24   That's missing.  I mean, just because they want the

25   patent to issue -- I mean, it's not like these guys are

1    individual inventors.  You know, this patent is

2    immediately assigned to Health Grades.  They're not

3    reaping any monetary benefit from it, you know,

4    individually.

5            You know -- and, you know, why would they have

6    the specific intent to deceive the patent office, Your

7    Honor, to put their whole reputations on the line like

8    this?  I mean, I think that *Therasense*, *Pfizer*, these

9    cases say, look, these are serious things to say and we

10   -- every time somebody alleges it the courts have been

11   allowing it because amendments should be allowed and --

12   you know, freely allowed when justice so requires.

13   Well, we need to make this gate a little narrower and

14   the courts have to, you know, see if this is plausible.

15   And based on what they've put in these amended

16   allegations that they've proposed in their amended

17   answer, Your Honor, is just simply not enough.

18           Now, I can recognize it's somewhat of a

19   technical argument with looking at the references cited

20   but, you know, the fact that counsel agrees that those

21   other ones were cumulative and, as he said, the patent

22   office had the comparison ratings or patient ratings

23   before it already makes it even more, in my view, the

24   case that this motion should be denied.

25           If you have any other questions, Your Honor,

1    I'd --

2              THE COURT:  I don't think --

3              MR. VAZQUEZ:  -- be glad.

4              THE COURT:  -- I do.  Thank you.

5              MR. VAZQUEZ:  Okay.  Thank you.

6              THE COURT:  The motion to amend is granted.  I

7    understand Mr. Vazquez' argument, I simply disagree with

8    it.  I think that the fourth affirmative defense

9    adequately sets forth each and every element in a

10   plausible manner necessary to establish inequitable

11   conduct.  The last allegation that but-for fraudulent

12   withholding the PTO would not have allowed the patent is

13   reasonably inferred from the al -- factual allegations

14   which come before and adequately asserts the but-for

15   element.

16              I cannot say as a matter of law and with

17   certainty that the defense will be rejected on a motion

18   to dismiss and so, therefore, I cannot say as a matter

19   of law as I sit here today and based on the record

20   before me that the defense is futile.

21              However, on a more complete record on a motion

22   to dismiss or for summary judgment that may be so.  And

23   I make no judgment about that, and I don't foreclose a

24   motion to dismiss or a motion for summary judgment.  I

25   simply say that on the record now before me I find that

1    the assertion -- the defense is adequately pled and I'll

2    allow it.

3              That brings us to the motion to strike.

4    Mr. Stimpson.

5              MR. STIMPSON:  Thank you, Your Honor.  As

6    you're aware, Your Honor, in this court's scheduling

7    order, plaintiff Health Grades was ordered to provide

8    their infringement contentions by July 1.  They did

9    that, they provided their infringement contentions, then

10   chose to assert only one claim element under the

11   Doctrine of Equivalents.  Now, they're asking this court

12   several months later to allow them to supplement, to add

13   information that they had back at the time of the

14   original contentions.

15             The ability to amend under these Northern

16   District of California rules under which we're operating

17   is very limited.  There has to be a timely showing of

18   good cause.  So, since timeliness and diligence are the

19   central issues here I'll start with just a brief

20   recitation of the chronology, because I think it's

21   critically important.

22             It starts in April, Your Honor, when we filed

23   our motion for summary judgment.  We filed that on just

24   one claim element.  The comparison ratings element.  But

25   in there we made it very clear that there were other

1    noninfringement defenses.  We said the same thing in

2    June 9 when we filed our statement of claims and

3    defenses, and we had several other noninfringement

4    defenses.

5              Then on June 14, in response to your order,

6    Your Honor, that we discussed -- specifically discussed

7    claims and defenses, my associate Mr. Lee and I had a

8    conference with counsel for Health Grades where we laid

9    out specific other noninfringement defenses.  This was

10   more than two weeks before their infringement

11   contentions.  That's -- none of that is contested.

12             The next important date is July 1 when we got

13   their infringement contentions.  As I say, they had only

14   one equivalents argument there, and the reason they gave

15   for not giving any other equivalents was because MDX had

16   supposedly conceded literal infringement on every other

17   claim element.  That was just absurd, Your Honor, and I

18   just can't see how that was done in good faith.

19             The next important date is August 2.  It's

20   Exhibit E to my -- to our memorandum, Your Honor.  We'd

21   actually started talking with them saying, look, you

22   know, that's not a good reason.  You have to give these

23   infringement -- these equivalents positions if you're

24   going to make them.

25             My August 2 e-mail told them absent a prompt

1    supplement that we were going to take the position that

2    Health Grades had waived all their other equivalents

3    arguments.  So as of August 2 we were first being

4    cooperative, because I want to try to be cooperative.

5    You know, we'll let you do it.  I don't like what you

6    did in response to the court order, but we're going to

7    let you supplement.  We're not going to object.

8    August 2.  But we told them they had to do it promptly,

9    and we made it very, very clear that we were going to be

10   here arguing this today if they didn't -- if they didn't

11   promptly supplement.

12            There are two other e-mails that I'd like to

13   submit to the court in response to their opposition

14   memorandum.  If I -- if I may, there's -- there's a

15   September 8 and a September 22 e-mail.  May I approach?

16            THE COURT:  You may.  Thank you.

17            MR. STIMPSON:  The September 8 one was a long

18   e-mail, and I just gave you the -- I have a complete

19   copy if you want it, I'll give it to (inaudible).  So

20   the next important date, Your Honor, is September 8.

21   And we see there in that paragraph 3 I raise this issue

22   again.  Now, this is more than a month after I told them

23   that we were going to find their -- we were going to

24   consider their equivalents arguments waived.  And I

25   raised this, and then in the last sentence I say, We

1    want to be cooperative, but it's been weeks since this

2    analysis was due, and we will need the supplementation

3    relatively soon, please, or we will take the position

4    that all other equivalents positions have been waived.

5        So, again, now September 8, this is -- this is

6    now more than two months after the infringement

7    contentions were due, and I'm still offering to let them

8    do this.  The September 22 e-mail, that's the next

9    important date, Your Honor.  The second page there's a

10   heading supplementing infringement contentions, and this

11   is where I drew the line.  In the first two sentences,

12   Your Honor, you can see I told them, look, the time has

13   passed.  You haven't taken us up on our offer to

14   supplement and we're not going to allow -- we're not

15   going to agree that you can do it anymore.

16       I should explain that last sentence there,

17   which says that we may, underline "may," still be

18   willing to reach agreement.

19       The day before I'd had a conversation with

20   counsel for Health Grades and we actually talked about

21   both the motions that are before the court today and one

22   of the things that was being batted about was a

23   possible -- you know, for want of a better a word, a

24   possible horse trade.  If they didn't object to us

25   adding inequitable conduct, you know, we might be

1    willing to still give them more time to -- to provide

2    the supplement.  I told them it was on a rubber band.  I

3    hadn't talked to my client about it.  I wasn't even sure

4    that I would agree to it, but as it turned out we didn't

5    need to talk to my client because Health Grades rejected

6    it.

7           So, September 22, that's when we told them

8    that's all.  We're not going to -- we're not going to

9    agree that you can do this anymore, it's been too long.

10          The next important date is October 20.  That's

11   when we got the supplemental infringement contentions.

12   And the final important date, Your Honor, is

13   November 29, which is Tuesday of this week.  And that

14   date is important because these requirements for

15   supplementing require a timely showing of good cause,

16   and that was the first time Health Grades had ever made

17   a showing of good cause or any argument for good cause

18   to this court.  So, this is the issue before the court.

19          The rules plainly state that you can

20   supplement infringement contentions only by order of the

21   court upon a timely showing of good cause.  So, there

22   are two elements here.  Health Grades has to show that

23   there is good cause why they didn't put this in their

24   original infringement contentions, or that they were

25   diligent in supplementing.  And the second important

1  requirement is they had to have shown that -- made a

2  showing of that good cause to the court in a timely

3  manner.  So I'm going to address those separately.

4          As far as the good cause, Your Honor,

5  honestly, if Health Grades had filed a paper on July 2

6  asking to supplement their infringement contentions I

7  would have said no way.  You know, I'd offered them

8  before, but the court would be perfectly within the

9  scope of the rule by saying no, because there just isn't

10  good cause.  They knew as far back as April that we had

11  these other noninfringement defenses, and they knew

12  specific noninfringement positions in June before their

13  first infringement contentions and yet they took the

14  position that, you know, we had conceded all literal --

15  other literal infringement elements and, therefore, they

16  weren't going to do that in there infringement

17  contentions.  I mean, that's just not good cause.

18          So, I'd like the court to -- to emphasize the

19  *02Micro* case which is a federal circuit opinion that

20  we've cited.  There, the court is talking about this

21  Northern District of California rules, and they

22  emphasize that you have to -- if you're going to try to

23  supplement you have to act with diligence and promptly

24  moving to amend.  And at page 1366 of that federal

25  circuit case they tell you why this is the case.

 1    Because if -- if you're not required to do this promptly

 2    these contentions requirements would be meaningless.

 3          So Health Grades' opposition brief has really

 4    two arguments.  The first one surprised me.  They say at

 5    pages 2 and 4 that we had an agreement that if I would

 6    let them -- if they would let me supplement my

 7    invalidity contentions that they could supplemental

 8    their infringement contentions.  Well, if you look at

 9    the brief, Your Honor, there's no citation for that.

10    There's no declaration.  There's no confirming letter.

11    That -- that just didn't happen.

12          I think what they might be referring to, and

13    this is actually referenced in Exhibit E.  The only time

14    invalidity contentions came up here was -- I told him,

15    look, we'll let you supplement if you do it promptly.

16    But if you do that, you know, since you're changing the

17    playing field here, we may have to supplement our

18    invalidity contentions, and if that's the case obviously

19    you can't object to that.  That's the only time

20    invalidity contentions came up.

21          THE COURT:  Will you now have to supplement

22    your invalidity contentions in view of the allowed

23    amendment?

24          MR. STIMPSON:  I think -- I think we probably

25    will, Your Honor, yes.  I mean, what we're going to have

1    to do -- you know, what happens for invalidity

2    contentions, we get their infringement contentions and

3    you order -- you know, you do this prior art search and

4    you get a stack of prior art.  Then you go through every

5    prior art and you compare it element by element, element

6    by element.

7            And a critical, critical piece of information

8    when you're doing that is the infringement contentions.

9    Because if there's an element that you look at and say,

10   you know, it doesn't really meet that claim element.

11   This isn't going to fly.  We're going to put it in the

12   do-not-use pile.  Well, if the plaintiff has taken a

13   position that something in our product or something

14   similar to that element that's in the prior art meets

15   the claim element, then that's -- turns into a great

16   piece of prior art.

17           So what we'd have to do, we would have to go

18   back and review.  And I -- I strongly suspect we would

19   have to amend.  I strongly suspect we would.  And

20   there's only six weeks left in fact discovery.  Our

21   expert reports I think are due in six weeks.  So that

22   would be a real prejudice to us, Your Honor.

23           Health Grades also argues --

24           THE COURT:  I'm not sure I made my -- my

25   question clear.

1              MR. STIMPSON:  Oh, I'm sorry.

2              THE COURT:  I've now allowed you to amend to

3      assert inequitable conduct.

4              MR. STIMPSON:  Yes.

5              THE COURT:  In view of that, regardless of --

6      of these proffered, what you consider to be, late

7      contentions, do you have to now amend your invalidity

8      disclosures?

9              MR. STIMPSON:  To address the prior art that

10     is in the inequitable conduct?

11             THE COURT:  Yes.

12             MR. STIMPSON:  Well, we already have it in

13     there, Your Honor, to a great degree.  And, actually,

14     it's a very good question because I'm struggling with

15     that myself a little bit.  Because, as I say, we're

16     getting in this new prior art in drips and drabs and

17     every new piece of information, you know, technically,

18     okay, now we know it has this element, or now we know it

19     has that element.  And so, do we have to amend our

20     invalidity contentions every time we get another piece

21     of prior art?

22             As I say, there's a thousand electronic hits

23     mentioned in this prior art.  When I get that data, it's

24     been three months, there's going to be more in there.

25     So, I -- I think the answer is that we may have to amend

1    based on the new information we're going to get from

2    them.  And if so, if we feel like we need to do that

3    then we'll make a motion, but we already have that prior

4    art in our invalidity contentions right now.

5              I hope that answered your question.

6              THE COURT:  I think so.

7              MR. STIMPSON:  Um, the next argument Health

8    Grades make is that -- makes is that our document

9    production prompted this supplement.  Well, Your Honor,

10   the best answer I can give for that is to -- if you look

11   at Exhibit D to our memorandum, it's a redline showing

12   what they added.  And if you just go through, they do

13   have citations to our documents.  But you'll go through

14   and you'll see there's nothing in those documents that

15   could possibly change any theory of infringement.  There

16   really isn't.  And, in any event, those documents were

17   produced about two months before they supplemented.

18             THE COURT:  And maybe I'm missing something.

19   Do I have the documents?

20             MR. STIMPSON:  You have -- no, I don't think

21   you have the underlying documents.  What you have is

22   their proposed supplemental infringement contentions.

23   And in that chart they cite certain documents.

24             THE COURT:  Right.

25             MR. STIMPSON:  And they give you a

1    parenthetical saying this is what it says.

2              THE COURT:  Right.

3              MR. STIMPSON:  So you can tell what they're

4    relying on the document for.  So -- so, if you look at

5    that, Your Honor, you'll see there's nothing there that

6    could have possibly changed any infringement theory.

7    And I think the new equivalents arguments are

8    particularly important for me to note here, because I

9    went through and I counted that they added 13 new

10   paragraphs alleging equivalents.  Thirteen new

11   paragraphs.  Eleven of those don't cite any MDX

12   documents at all.  Okay?  So we know they aren't relying

13   on the MDX documents for those.  And the two they do

14   rely on are just -- just silly little things like a MDX

15   document showing that we want our website to be accurate

16   or something like that.

17             So, it's just -- it's just not an answer, Your

18   Honor.  The documents were produced months ago, and you

19   can tell from their contentions they aren't, in fact,

20   relying on those documents especially for equivalents.

21             THE COURT:  And you say that the documents

22   referenced in the supplemental disclosures were -- were

23   produced when?

24             MR. STIMPSON:  They were produced like two

25   months ago.  I think --

1        MR. VAZQUEZ:  August 29.

2        MR. STIMPSON:  Yeah, it was about -- about two

3    months ago, Your Honor.

4        THE COURT:  Thank you.

5        MR. STIMPSON:  And I think, you know, the best

6    place to look at that are Exhibit D, because that's the

7    redline, otherwise you won't know what's new and what's

8    not.

9        Um, so, I mean, I can't emphasize enough the

10   equivalents part of that too, Your Honor.  Because 11 of

11   the 13 new paragraphs that they had added don't even

12   reference our documents.  So, we think the whole thing

13   should be stricken, but at the very least the

14   equivalents arguments.

15       Plaintiff cited two case in support of their

16   opposition.  One is the *ZiLOG* case, and according to

17   plaintiff that supports their proposition that there's

18   diligence if you wait three months to move to

19   supplement.  That case does not say that, Your Honor.

20   And if you're interested there's another case, *Berger*

21   *versus Rossignol*, where the plaintiff tried to make the

22   same argument using *ZiLOG* and the California court

23   rejected it.  It's 2006, Lexus 23085.

24       So, what actually happened in *ZiLOG* is they

25   gave their infringement contentions and then eight days

1   later the court stayed the case for a re-exam.  And then

2   when the plaintiff -- after the re-exam the plaintiff

3   moved to lift the stay and at the same time said, oh, by

4   the way everybody, you know, we're going to have to

5   amend our infringement contentions because things had

6   happened at the patent office.  So everybody knew it.

7   And actually did it some weeks later, but there was no

8   surprise there and everybody knew it.  So that most

9   certainly does not stand for the proposition that you

10  can wait three months.

11          And another point, for both their cases they

12  cite *Biogenics* and *ZiLOG*.  Those were under an old rule,

13  Your Honor, in the Northern District of California.  And

14  there's only -- in 2008 they were changed.  And there's

15  only one difference, but it's an important difference.

16  They added the timeliness requirement.  So both of those

17  cases were under a rule that did not require a timely

18  showing of good cause.

19          So, the good cause -- there's just no good

20  cause here, Your Honor.  They knew of our specific

21  noninfringement defenses in June.  They just did not do

22  it and gave an answer that -- a reason why they weren't

23  giving equivalents arguments, in those -- and the court

24  ordered infringement contentions that just -- I just

25  can't say it was done in good faith when they say that

1    we had conceded all our other infringement.  They knew

2    better than that.

3          So the only other issue here, Your Honor, is

4    timeliness.  The rule requires that they timely move for

5    good cause.  We -- we cited a *Tokai* case in our brief,

6    and it's instructive on that, Your Honor.  Just reading

7    from what the California court said there:  As to

8    timeliness, defendants never moved the court for leave

9    to file supplemental contentions, they only opposed

10   plaintiff's motion.

11         That's exactly what we have here, Your Honor.

12   They served -- you know, months after their original

13   contentions they served them on us and didn't make --

14   didn't even bother to try to ask this court for a leave.

15         The California court says:  The 2008 Patent

16   Local Rules also require good cause and play special

17   emphasis on timeliness by explicitly mentioning it.

18   Accordingly, defendant's delay in communicating with the

19   court, weighs strongly against a finding in their favor.

20         That's the *Tokai* case.  That's what we have

21   here, Your Honor.  They did not even try to say anything

22   about good cause until November 29, until this week.

23   That's seven months after they knew we had multiple

24   noninfringement defenses.  It's five months after we

25   told them our specific noninfringement defenses.  It's

1    four months after my August 2 e-mail telling them that

2    they had to move promptly or we're going to say that

3    they were waived.  It's two months after my September 22

4    e-mail saying we're no longer going to agree that you

5    can supplement, and it's 40 days after they sent us

6    their proposed supplemental contentions.

7            Under no stretch, Your Honor, could that be a

8    timely showing of good cause to this court, and the

9    California courts are routinely in support of that.

10           If you have any questions, any further

11   questions, Your Honor, I'm happy to answer them.

12           On -- on the prejudice front -- I'm sorry.  I

13   should just make one more mention of prejudice because

14   they raise -- they say there's no prejudice to us in

15   their opposition brief, and we've talked about the

16   invalidity contentions a little bit, but if they don't

17   show diligence prejudice is not relevant.  There has

18   been prejudice.  I mean, it changes the entire playing

19   field and we're six weeks from the close of fact

20   discovery here.  And we've talked about the invalidity

21   contentions and what I'm going to have to do, but we

22   really don't even have to show prejudice because they

23   can't show diligence.

24           THE COURT:  The infringement contentions --

25           MR. STIMPSON:  Yes.

1          THE COURT:  -- which is what we're talking

2     about.

3          MR. STIMPSON:  Yes.

4          THE COURT:  Do they play any part in the

5     Markman construction?

6          MR. STIMPSON:  Oh, yes, Your Honor.  That's

7     another way we're prejudiced.  I mean, when we do our

8     claim constructions, and we've all submitted our -- I

9     think we've submitted our proposed claim terms to the

10    court now.  At least we've exchanged them and the

11    support.  You know, that and the validity contentions

12    are A and B.  I mean, that's what everything is based

13    around.  So, now we're starting down this road.  We've

14    got a Markman hearing in January.  We've got briefing

15    coming up.  I think, in fact, Monday they have their

16    brief due on -- on claim construction.

17         So, when they change their -- you know, they

18    try to change everything at this late stage it changes

19    -- it changes everything.  I mean, you just -- you're

20    working from an entirely different set of allegations,

21    new allegations.  So, yes, it does change it.  That

22    validity contentions and, you know, generally all our

23    defenses -- you know, maybe that's too strong, but our

24    defenses revolve around what their allegations are.  So

25    there's a substantial prejudice here.

1          THE COURT:  Thank you.

2          MR. STIMPSON:  Thank you.

3          THE COURT:  Mr. Vazquez.

4          MR. VAZQUEZ:  Your Honor, I'm just going to

5     start moving backwards from what we heard here from

6     counsel from MDX.  Um, there simply is no prejudice

7     here.  Um, there is still six weeks left in fact

8     discovery, and no prejudice was alleged.  I understand

9     the technical distinction counsel is making where if

10    there's no diligence you don't have to prove prejudice,

11    but one would think that if there was any true prejudice

12    a paragraph or two would have been included in their

13    motion and -- an none was.  Here, not a single

14    deposition has been taken.  There's still ample time to

15    explore these contentions.

16          Furthermore, Your Honor, counsel has been on

17    notice of these infringement contentions and that we

18    were making these equivalents arguments since July 1st,

19    included that in our initial contentions.  Um, now --

20          THE COURT:  Well, I thought I looked at those,

21    and I saw a footnote, I think, that says, um, or a

22    statement just as counsel indicated that everything's

23    conceded except one point, which is raised in the motion

24    for partial summary judgment and so, therefore, you're

25    not going to present that information.

1          MR. VAZQUEZ:  Well, no.  In Section E of the

2    initial contentions states that here's what we're

3    presenting, and to the extent MDX was going to allege

4    that there were other claim elements that are not

5    infringed, then we would supplement.  It's important,

6    Your Honor, to -- to look back at how the context in

7    which these dates under the patent rules affect these

8    disclosures.

9          Discovery in this case could not even be begun

10   until June 8th, and our deadline for providing these

11   initial contentions was July 1st.  So even if we had on

12   June 8th asked them to give us all the -- you know,

13   their arguments of what claims are not infringed and

14   why, we would have not have had that information by the

15   time our initial infringement contentions were due.

16         THE COURT:  Well, maybe, but I adopted your

17   proposed schedule.

18         MR. VAZQUEZ:  Yes.  Yes, Your Honor.  And as

19   you're aware after that both parties did amendment to

20   their contentions just by agreement, and we moved the

21   court for permission to do so.  So, the point I'm trying

22   to make, Your Honor, is that it was very well known --

23   and while counsel selects certain e-mails between us,

24   what he's not brought up to the court are numerous phone

25   conversations that we have had since the beginning of

 1   the case.  And so it was an understanding that I thought

 2   we had, both sides would require supplementing --

 3   supplementing these -- their respective contentions; our

 4   infringement contentions; their invalidity contentions.

 5   And that we told them from the get-go, we are going to

 6   have to supplement these.  You know, we'd like to do it

 7   after we get your documents, after we take some

 8   discovery.  We think that's logical.

 9          One month after we -- we produced the

10   infringement contentions, counsel -- he says we didn't

11   cite, you know, the agreement.  Well, we did in our

12   motion, Your Honor, and it's -- excuse me.  It's the

13   very e-mail that counsel brought -- cited in their

14   motion, the September 2nd e-mail in which they say, you

15   know, absent a prompt supplement we're going to --

16   we're -- you know, and your agreement to allow us to

17   supplement, we're going to argue that you waived.

18          THE COURT:  Right.  That's the August 2

19   e-mail.

20          MR. VAZQUEZ:  Correct.

21          THE COURT:  Yeah.  It's a long time from

22   August 2 to October 20th.

23          MR. VAZQUEZ:  Right.  But what -- what is not

24   in any e-mails, because it was simply discussed among

25   counsel, is that we said fine.  We'll -- we'll agree to

1    let you supplement your invalidity contentions and we

2    will supplement.  So the whole concession thing is

3    really a red herring here, Your Honor.  We went, okay,

4    you're not conceding this, fine.  We will supplement.

5    But what makes the most sense here is that we wait until

6    we get discovery and we, you know, just try to avoid

7    having, you know, piecemeal supplements and have a

8    supplement when, you know, we feel we have all the

9    information.

10           THE COURT:  Well, now Judge Wapner -- my

11    favorite judge, just like the second rule of thermal

12    dynamics is my favorite law -- always said get it in

13    writing.

14           MR. VAZQUEZ:  Yeah.  Well --

15           THE COURT:  But you don't seem to have this in

16    writing.

17           MR. VAZQUEZ:  No.  What I have in writing is

18    our letter just one month later saying here is what we

19    want you to supplement with your invalidity -- as far as

20    your invalidity contentions.  I mean, they say we'll let

21    you supplement if you'll let us supplement.  One month

22    later I send a letter saying here's what we think you're

23    supplement should have.  Here's what we think your

24    invalidity contentions are deficient.  To me, you know,

25    with those two pieces of paper and the conversations of

1    counsel, there is no doubt that we thought we had an

2    agreement that we could do this.

3           And even their e-mail that he brought to the

4    court today says we may allow you to supplement.  To me

5    that was a surprise.  We had already talked about this.

6    It seemed like he was just on the fence.  And the

7    *02Micro* case talks about that type of exact circumstance

8    where counsel, you know, believed to have an agreement

9    or are misled into thinking there may be an agreement.

10   Well, you know, that's something that needs to be

11   considered in favor of allowing the amendment.

12          Now, counsel I believe said here today that we

13   never said anything about good cause until just

14   November 29th.  That's simply not the case.  We've been

15   saying in communications since we filed our initial

16   contentions, hey, we have good cause to -- you know, we

17   need answers.  We asked -- you know, there's e-mails

18   that are not before the court and we said, well, okay.

19   In anticipation of supplementing these equivalents

20   arguments can you tell us this, can you tell us that.

21          And, you know, just as counsel says it's been

22   painful on their end, it's been painful on our end.

23   They haven't exactly been forthwith in saying, well,

24   sure, here's our position on that, now will you

25   supplement.  (Unintelligible) well, we don't feel we

1    need to tell you more of anything.

2            So, you know, I think that's just something

3    that's pretty important here that there's been a course

4    of conduct that's been described in our response, Your

5    Honor, on the very get-go where they knew that we would

6    supplement, we responded -- they asked for the

7    supplement, they agreed to allow to supplement.  The

8    fact that towards the end they started reconsidering

9    whether they would allow that or not, well, come on.

10           Now, the cases, Your Honor, I think that the

11   fact that we received a very significant amount of

12   materials from them, many of which had all kinds of

13   technical problems, were illegible, it took a while to

14   review that stuff and to put together our supplemental

15   contentions.  It still took less than two months from

16   the time we received those documents.

17           And you can see from the redline, Your Honor,

18   that counsel attached to their motion, you know,

19   that that was -- the supplement was very, very heavily

20   based on that new production from them.  Similar to

21   their motion for inequitable conduct in which they cite

22   a press release, says, oh, we finally got this from

23   counsel all this time later and, therefore, we should be

24   allowed to make this amendment.  Well, here we, you

25   know, received these documents in which, you know, very

1    much support the supplement that we filed.

2         And not only that, Your Honor.  You know,

3    after we sent them the supplement, they didn't say, hey,

4    what the heck is this, um, you know, we don't accept

5    this.  We said, okay, well, can you tell us what's

6    different.  And I said, well, I sent you a detailed

7    cover communication stating what's different.  He said

8    that's not enough.  How about a redline.  And we went

9    and produced the redline.  So, here's the differences

10   between the first one and the second one.  To me that

11   all seemed in accord with the agreement that we thought

12   we had, which is we can supplement.

13        So, the case is, as we cite in our response,

14   Your Honor, (unintelligible) when you have an agreement

15   or you think you had one, well, you know, that -- that

16   should be enough to show good cause and diligence.

17        THE COURT:  I'm having a little trouble with

18   this agreement business.  In your view, when did you

19   have to -- when did the agreement say -- by what time

20   did the agreement say you had to supplement?  You point

21   to an August letter and say here's the agreement, but

22   then it's more than 60 days after that, and only after

23   you get a letter -- an e-mail saying now it's too late,

24   then finally you supplement.  What was the agreement?

25   Indefinitely you can supplement?

1           MR. VAZQUEZ:  Well, no.  Clearly not, Your

2      Honor.  And it wasn't made indefinitely, it was made

3      less than two months after receiving their information.

4      Now, I understand your question.  Their -- their, you

5      know, offer to us was you make a prompt settlement -- or

6      supplement and don't -- don't oppose us supplementing,

7      this is fine.

8           Now, I guess we can quibble what is prompt or

9      not, but we -- after that, Your Honor, there was

10     significant communications about, well, listen, we --

11     here's our questions to you about the -- you know,

12     information that we need about to make our equivalent

13     supplement.  And further, we need documents that --

14     that, you know, we think bear on our anticipated

15     supplement.

16          So, the fact that -- that this occurred, okay,

17     and then a little later we get an e-mail that says,

18     well, we may allow you to supplement, you know, that's

19     not, no, the time has passed.  It's, we may allow you to

20     do so.  Well, you know, what I felt like saying is, you

21     know, you're -- you're not the judge in the case here.

22     We've agreed to supplement and we've agreed to not

23     oppose your supplement.  We recognize you like things to

24     be happening faster, but we're moving as quickly as is

25     adequately available, you know, or prudent for us.  I

1    mean, it just takes a long time to evaluate these

2    materials and put this together.  If you look at the

3    supplement it's not a simple little, you know, exercise.

4              So, you know, to me what's, you know, here

5    before the court is whether there is good cause.  And

6    there is.

7              And as I noted in our response, Your Honor, we

8    just got 6,000 pages of an additional production.  Now,

9    what if that discovery, once we get done reviewing it,

10   calls for an additional supplement?  Are we going to say

11   it's too late?  I mean, counsel's position on that

12   production is that they had these documents, but because

13   they had objected to our requests for them they were

14   holding them.  Yet suddenly they're produced six days

15   before we're supposed to take depositions in New York.

16             Now, it's our practice, we will object to --

17   you know, as -- as permitted under the rules, but

18   nonetheless, we will produce the responsive documents

19   without waiving our objections.  So, what -- what will

20   happen, you know, once we get done reviewing these 6,000

21   pages and likely have to take a production -- or

22   supplementation based on that production?  Are we going

23   to say, oh, it's too late?

24             So, you know, I guess we'll take that -- you

25   know, we'll cross that bridge when we get to it.  But

1    here, Health Grades is entitled to a full adjudication

2    on the merits, and we should have all the information

3    before the court.

4            THE COURT:  Well, I saw that argument in your

5    papers.  And perhaps my greatest concern here is that in

6    my view rules are power, and it looks to me like you're

7    not following the rules.  There is this Northern

8    District of California rule that says you have to move

9    and you didn't.  And then there's the Colorado local

10   rule that says you can't move in a response, but you

11   did.  Um, and so --

12           MR. VAZQUEZ:  Uh-huh.

13           THE COURT:  -- what am I to make of a lawyer

14   or a party, whichever it is, who just doesn't seem to

15   play by the rules, and you get an adjudication on the

16   merits if you comply with the rules.

17           MR. VAZQUEZ:  Well, Your Honor, let me address

18   the issue on the local rules requiring a motion -- or

19   not -- you know, the patent rules requiring a motion.

20   As Your Honor knows we filed two motions, each one is

21   unopposed, to allow each other to amend our respective

22   contentions.  When it came time to make the supplement I

23   looked at the schedule that's in the scheduling order on

24   page 7 -- 6 and 7, and there's not a deadline for

25   supplementing.  Rule 3.6 clearly states you've got to

1    move to amend.

2         Now, I may have been wrong, but this is not a

3    surprise to the opposing side because I made this --

4    this position known to them.  I said, look, we're going

5    to supplement our infringement contentions as we've been

6    telling you.  And, um, we're looking at the schedule and

7    there's not a deadline to supplement, which to me is

8    we're just following up on -- on previously supplied

9    information.  There's nothing new here.  There's not a

10   new change of arguments or change of position.  There's

11   nothing new.  You've known this has been coming, so --

12        THE COURT:  How -- how is it they knew?  I

13   mean, I've looked at the redline and there's a lot of --

14   there's a lot of underlined, which is addition.

15        MR. VAZQUEZ:  Yes.

16        THE COURT:  So what should I compare that to

17   to see if it's an amendment or a supplement?  Is that --

18        MR. VAZQUEZ:  Well --

19        THE COURT:  -- one of these exhibits that --

20   what came immediately before Exhibit D?

21        MR. VAZQUEZ:  Well, what you can look at

22   first, Your Honor, is our initial contentions filed on

23   July 1st where we said we will make these additional

24   equivalent arguments, you know, once we know that you're

25   not conceding them.  If you're not conceding them, we'll

1    make them.  So, to me, they've known since then that we

2    are making equivalent -- we were going to make

3    equivalents arguments on all other elements other than

4    the comparison ratings elements.  So the supplement

5    is -- is that.  We're just supplementing that argument

6    with the support for the argument.  We saw it different

7    as an amendment which, you know, we believe was just

8    brand new.  New things.

9              THE COURT:  All right.  So you've amended

10   once?

11             MR. VAZQUEZ:  Each party has.

12             THE COURT:  You've amended once?

13             MR. VAZQUEZ:  Yes.

14             THE COURT:  Is your amended disclosure among

15   the documents before me?

16             MR. VAZQUEZ:  Um, it wasn't in the briefing,

17   but it -- you have it before you in -- in their brief,

18   yes.  Yes.

19             THE COURT:  Okay.  Okay.  Which exhibit?  Yes,

20   I have their brief in front of me.  That's where

21   Exhibit D is.  What --

22             MR. VAZQUEZ:  Yes.

23             THE COURT:  -- exhibit is your --

24             MR. VAZQUEZ:  Let me grab it, Your Honor.

25             THE COURT:  -- amended disclosure?

 1              MR. VAZQUEZ:  It would be at Exhibit C, Your

 2     Honor, of their motion.

 3              THE COURT:  Okay.

 4              MR. VAZQUEZ:  62, dash, 4.

 5              THE COURT:  Well, you call that a supplement.

 6              MR. VAZQUEZ:  Yes.  But, you know --

 7              THE COURT:  There's not much -- there's not

 8     nearly as much new here as there is in Exhibit D because

 9     it's pretty brief.

10              MR. VAZQUEZ:  Well, what led to this filing,

11     Your Honor, of Exhibit C was that at the time we made

12     the initial contentions we wanted additional time to

13     make sure there was not anything else which would have

14     been new.  But since we agreed to file this, you know,

15     by this time, and we made a determination that, okay,

16     well, this is all we have as of now and here it is.  You

17     know, the point I'm trying to make --

18              THE COURT:  No.  No.  No.  No.  This

19     amendment --

20              MR. VAZQUEZ:  Yes.

21              THE COURT:  -- which you say requires court

22     approval because it's a bigger deal because you're

23     changing things, you didn't change anything.  You say

24     this information was provided July 1; this information

25     was provided July 1; this information was provided

1    July 1; this information was provided July 1.  Where you

2    change something --

3              MR. VAZQUEZ:  Uh-huh.

4              THE COURT:  -- and you say it's not very

5    important because it's just a supplement, but it's a

6    whole lot, is D.  I don't -- I don't follow that one

7    whit.

8              MR. VAZQUEZ:  Well, Your Honor, let me explain

9    here.

10             THE COURT:  Okay.

11             MR. VAZQUEZ:  Because the motion to the court

12   that preceded this amendment as Exhibit C was made, you

13   know, prior to filing by agreement between counsel.

14             THE COURT:  Prior to filing C.

15             MR. VAZQUEZ:  Yes, sir.

16             THE COURT:  But C is --

17             MR. VAZQUEZ:  Right.  But at the time the

18   motion --

19             THE COURT:  Let me ask you this.  What's the

20   difference between -- you've made a huge distinction

21   here between an amendment and a supplement.  Sounds like

22   logistics to me, but you've made a big distinction.  So,

23   you say an amendment is important and needs court

24   approval because it changes things, but a supplement

25   just adds to it a little bit.  That seems to me belied

1    by Exhibits C and D.

2              MR. VAZQUEZ:  Exhibits C and D --

3              THE COURT:  Which you've just directed me to

4    of the defendant's motion to strike.

5              MR. VAZQUEZ:  Well, here is the -- the

6    distinction, and here is really the point I'm trying to

7    make.  I'm sorry if I'm not being clear --

8              THE COURT:  Okay.

9              MR. VAZQUEZ:  -- Your Honor.  Rule 3.6 does

10   just say, to amend you must move for the -- move the

11   court for permission.  And am obviously conscious of

12   that because we moved to amend twice.  I understand

13   it -- it says supplement but what we thought we were

14   doing was amending, because when we moved for that we

15   thought there may be new material not previously

16   discussed.  As it turned out, by the time we made the

17   filing that you see in Exhibit C there wasn't anything

18   new.  But we still had to comply with our promise to

19   file this document under the patent rules.

20             When it came time for the supplement this, you

21   know, as you can see, followed a -- a lengthy time of

22   going back and forth with counsel, and it -- you know,

23   it's important, Your Honor, to know that when we

24   decided, okay, we're making the supplement.  We're going

25   to make it by this date.  That's the time we think we'll

1    be done with it.  And I said to him, you know, I don't

2    think we need to file a motion because this is a

3    supplement and we see this as our duty to supplement

4    what we already said we were going to do.  Well, they

5    didn't come back and say, you know, jeez, no, you've got

6    to file a motion and we want it to be opposed.  You

7    know, so this was all -- to me, seemed in accordance

8    with an agreement.  And so -- and, again, when we filed

9    it it wasn't like, hey, you've got to file a motion and

10   we want it to be opposed.  It was, oh, can we have a

11   redline.

12           And then the distinction between new and not

13   new is simply that Exhibit C could have well contained

14   brand new material.  By the time it was time to file it,

15   there was no new material, hence, the references to our

16   prior filing on July 1st.

17           Now the supplement, it just contains

18   supplemental arguments on matters that have already been

19   teed up.  That's what I'm trying to say.  Certainly, no

20   disrespect was meant to the court by not moving.  And,

21   you know, I have to follow that up by just saying there

22   is -- they have had the supplement now for -- since

23   October 20th.  So, you know, to me that -- that just

24   follows along with your arguments that -- you know, when

25   you take that altogether, Your Honor, that we're talking

1    about something that they requested, that we agreed to

2    provide, that we didn't oppose ever that they could

3    supplement their invalidity contentions, and we still

4    don't oppose that.

5            You know, we just feel that the -- that the

6    supplement should be allowed.  It was made just within a

7    few -- you know, within two months of obtaining this

8    information.  And as soon as I saw that counsel was

9    going to take this position of, jeez, now you've got to

10   file a motion, I -- you know, we did so in our response.

11           THE COURT:  Um, I have allowed the amendment

12   to assert inequitable conduct, and that is an argument

13   for invalidity, correct?

14           MR. VAZQUEZ:  Yes.

15           THE COURT:  All right.  And the invalidity

16   contentions were made -- they were at least initially

17   due June 19th.  I don't know if they were made later

18   than that or not.  Is it your -- do invalidity

19   contentions play any part in the Markman process?

20           MR. VAZQUEZ:  I think so, yes.

21           THE COURT:  Okay.  Is it your -- do you

22   believe that the defendant must supplement, amend, or in

23   any way further address its invalidity contentions in

24   view of the allowed amendment?

25           MR. VAZQUEZ:  Yes.  I think it's very likely

1    that they should do that.

2           THE COURT:  If I allow the motion included

3    within a response and accept these supplemented

4    infringement claims, and since I have allowed the

5    amendment to allege inequitable conduct can the Markman

6    hearing proceed -- can you be ready to proceed on the

7    Markman hearing on January 19th?

8           MR. VAZQUEZ:  I believe so.  As I stand here

9    today I think we can.  You know, even when we were

10   talking about making these supplemental contentions, on

11   both sides, we've always stated to each other we're

12   agreeing to do this, but we want to keep our Markman

13   date.  So we've always intended to abide by that.

14          THE COURT:  It startles me that there's been

15   no -- that there have been no depositions.  When will

16   those occur, if at all?

17          MR. VAZQUEZ:  Well, Your Honor, we have -- as

18   I mentioned previously we were set to take the

19   depositions of one -- of their main witness supporting

20   their invalidity allegations, and of the CEO of MDX

21   the week of -- on November 15th and 16th.  But then six

22   days prior to that we got this unanticipated production

23   of 6,000 additional pages.  Because we wanted -- we

24   didn't want to have to fight later about, well, can we

25   redepose them, and what can we get into, we thought the

1   most prudent thing would be to vacate those and

2   reschedule them.

3           They've now been rescheduled for the week of

4   December 12th.  And then I have talked with the

5   inventors and made them available for their depositions

6   the week of January 9th, two of them, and then another

7   one the week of -- who's not an employee of Health

8   Grades anymore, and lives in Florida, he's not available

9   until the week of January 16.

10          So, you know, while -- certainly it's their

11  prerogative.  They could have taken -- chosen to have

12  taken depositions earlier.  But that's the status of the

13  depositions and what's occurred now.  Anything else,

14  Your Honor?

15          THE COURT:  That's all I have.  Thank you.

16  Mr. Stimpson?

17          MR. STIMPSON:  I don't really have anything --

18  I'm sorry, I don't really have anything I need to -- I

19  need to say, Your Honor, but I -- with regard to the

20  oral agreement, I mean, I don't know how much clearer I

21  could have possibly been in my e-mails that we -- this

22  had to be prompt and we were going to take this position

23  if they didn't move.

24          And on the Markman hearing, Your Honor, asked

25  about.  If they're allowed to change things now it's

1    going to change a lot.  And I have to go back and

2    re-evaluate everything, I mean, including what we've put

3    in for, as you correctly pointed out, you know, we have

4    our claim constructions.  Um, we've submitted all our

5    evidence now, including extrinsic evidence for the claim

6    terms.  I can't remember exactly how the schedule goes

7    now, but it's coming up.  And we've got the Markman

8    hearing now next month.  And, you know, there's a lot

9    that has to be done, and if they're -- if they're

10   allowed to change this all this late in the game I've

11   got to go back with invalidity contentions, we've got to

12   re-evaluate everything, and I'm not so sure that it's

13   going to be such a smooth process for Markman.

14          Um, you know, we'll do our best, of course,

15   Your Honor, but, you know, the rules have these

16   requirements for a reason obviously.  You know, like you

17   said, the rules are the rules and they make it very

18   clear.  And we've cited case after case that this is

19   just too late, and they didn't make a timely showing.

20   And so we respectfully request they not be able to

21   change the playing field this late in the game.  Thank

22   you.

23          THE COURT:  I'm going to take the motion to

24   strike contentions under advisement and issue a

25   recommendation or an order as soon as I am reasonably

1    able.

2              Anything else we should talk about this

3    morning, Mr. Vazquez?

4              MR. VAZQUEZ:  No.  Thank you, Your Honor.

5              THE COURT:  Mr. Stimpson?

6              MR. STIMPSON:  No.  Thank you, Your Honor.

7              THE COURT:  Thank you very much.

8              THE COURTROOM DEPUTY:  All rise.  Court is in

9    recess.

10             (Whereupon, the within hearing was then in

11   conclusion at 11:20 on this date.)

12             I certify that the foregoing is a correct

13   transcript of the requested portion of the hearing, to

14   the best of my knowledge and belief (pursuant to the

15   quality of the recording) from the record of proceedings

16   in the above-entitled matter.

17

18

19

20   /s/ Kelly Mair                    January 20, 2012

21   Signature of Transcriber          Date

22

23

24

25