# EXHIBIT B

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3     Case No. 11-cv-00520-PAB-BNB

 4     _____

 5     HEALTH GRADES, INC.,
            Plaintiff,
 6
       vs.
 7
       MDX MEDICAL, INC.,
 8          Defendant.

 9     _____

10              Proceedings before BOYD N. BOLAND, United States

11     Magistrate Judge, United States District Court for the

12     District of Colorado, commencing at 8:30 a.m., April 26,

13     2012, in the United States Courthouse, Denver, Colorado.

14     _____

15              WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16     ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...
       _____
17                          APPEARANCES

18              JESUS VASQUEZ, JR., GREGORY KANAN and KRISTIN

19     STOLL-DeBELL, Attorneys at Law, appearing for the Plaintiff.

20              SCOTT STIMPSON, Attorney at Law, appearing for the

21     Defendant.

22              ROBERT BLUME, Attorney at Law, appearing for the

23     Interested party, iTriage, LLC.

24     _____

25                        MOTIONS HEARING
```

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

```
 1                   P R O C E E D I N G S

 2       (Whereupon, the within electronically recorded proceedings

 3       are herein partially transcribed, pursuant to order of

 4       counsel.)

 5               THE CLERK:  All rise.  Court is in session.

 6               THE COURT:  Thank you, please be seated.

 7               We're here this morning in Case 11-cv-520, Health

 8       Grades, Inc. against MDX Medical, on voluminous motions.

 9               May I have appearances, please?

10               MR. VASQUEZ:  Good morning, Your Honor.  Jesus

11       Vasquez from Rothgerber, Johnson & Lyons on behalf of Health

12       Grades.  To my right is our expert consultant, Kirsten

13       Stoll-DeBell from Merchant & Gould, and then Mr. Greg Kanan,

14       our partner.

15               THE COURT:  Thank you.

16               MR. STIMPSON:  Good morning, Your Honor.  Scott

17       Stimpson, Sills, Cummis & Gross, representing the defendant

18       MDx.

19               THE COURT:  Thank you.

20               MR. STIMPSON:  Also, Your Honor, we have one more

21       appearance.

22               MR. BLUME:  Your Honor, Rob Blume from Gibson

23       Dunn.  I'm here in behalf of iTriage, who's a non-party in

24       this litigation subject to a third-party subpoena issued by

25       Health Grades, to which we've objected and are meeting and
```

3

1    conferring and it's the subject of one of the motions that

2    we're here on.

3              THE COURT:  Thank you.

4              Well, you've overwhelmed me.  I have reviewed the

5    briefing.  In general I think that the issues are obtuse and

6    the briefing is not particularly helpful.  So I will rely on

7    pointed arguments today.  In general I ask that you take up

8    each issue, not each motion, each issue individually, but I

9    will allow the movant to reasonably define on the issue by

10   issue presentation.  I caution you not to bite off too much

11   as you define your issue, because I've told you already I'm

12   overwhelmed, but we will not go past 12 o'clock noon, so pace

13   yourselves.

14             My procedure will be to allow the movant to argue

15   as to the issue as defined, I'll allow a response, I'll allow

16   a reply, and I'll rule again on an issue by issue basis.

17   Don't ask to make a sur-reply because I'll deny it, but if I

18   need further information in order to understand an issue or

19   to rule, I'll ask for it as precisely as I can.  I was

20   inclined to take up the motions in the order they were filed.

21   That seems unfair to iTriage to have to sit through all of

22   this, so I'll change order and we'll take up motion number

23   179, MDx's motion to quash.

24             Mr. Stimpson.

25             MR. STIMPSON:  Thank you, Your Honor.  The issue

4

1     is whether the Health Grades subpoenas to iTriage are

2     relevant and/or whether they should be quashed.  I'll start

3     this brief argument with an apology because I was realizing

4     as I was preparing for this argument that our reply brief

5     said that the Health Grades response did not address

6     relevance and somehow we missed it and at the very end it

7     does address relevance.  I'll address it here.

8           The first issue that we need to address, Your

9     Honor, is standing.  Health Grades has questioned our

10    standing, but we have an agreement with Health Grades that no

11    additional discovery would be sought other than for good

12    cause, so we think this is a violation of that agreement.

13    Also iTriage is a business partner, and iTriage has filed

14    objections which are very much the same as ours, so we'd like

15    to get our oar in the water on this issue as well.

16          The question comes down really I think to

17    relevance.  Health Grades has served these three subpoenas on

18    iTriage, and they relate to MDx, the defendant here,

19    licensing data to a third party.  That has nothing to do with

20    this case, Your Honor.  This is a patent infringement case

21    with just one patent, and it's got nothing to do with that.

22    So Health Grades makes three arguments on relevance at the

23    end of their opposition brief, and I'll address them in

24    order.

25          At page 9 Health Grades says that the sale of the

5

1    data, MDx actually licensing data to a third party, is an

2    infringement of the patent.  That is just completely and

3    totally wrong.  There is not one claim element in that patent

4    that I could see how that could possibly be an infringement.

5         The second argument they make, Your Honor, is that

6    this is relevant to damages, convoyed sales.  They don't

7    provide any explanation but they say it's relevant to

8    convoyed sales.  The seminal case on convoyed sales in patent

9    cases, Your Honor, is the Federal Circuit's <u>Rite-Hite</u>

10   decision.  To be a convoyed sales there has to be a

11   functional unit, the patented and unpatented product have to

12   be a functional unit -- and this is Federal Circuit case

13   law -- and it has to be foreseeable that the unpatented

14   product would be sold -- would be a damage.  For example,

15   Your Honor, if one competitor selling printers sues another

16   competitor selling printers, they'd have a pretty good

17   argument that the ink is a convoyed sale, because the ink and

18   the printer are a functional unit, you can't use the printer

19   without the ink.  That's the type of thing that convoyed

20   sales are addressed to.  Here there is no functional unit at

21   all.  This has no relationship whatsoever.  In fact this

22   isn't even sold to the same person.  With my printer example,

23   if I went in and bought a printer, of course I'm going to buy

24   the ink.  I'm going to buy both.  But here this data is sold

25   to an entirely different third party.  They're just totally

6

1    and completely unrelated, Your Honor.  There is no connection

2    to damages whatsoever.

3          The final argument that Health Grades makes is

4    that iTriage may be infringing.  Well, they don't do anything

5    specific with that, Your Honor, and from what I've seen, I

6    cannot see how they could possibly make that argument and

7    comply with Rule 11.  They don't do anything in their brief

8    to show that and it's just not there.

9          So, Your Honor, this is all entirely irrelevant,

10   and if it was relevant, if this licensing was somehow

11   relevant, then we're the source.  Don't go bothering our

12   third party, you know, business partners.  We --

13         THE COURT:  I think that's the point, at least

14   that's what I understand Mr. Vasquez's point to be, which is

15   we asked for this in an interrogatory, you gave us only

16   redacted information about advertising sales, you didn't give

17   us any information about other revenues, so then we did a

18   30(b)(6) notice, and you've moved to quash that, and so now

19   we're trying one more place because we've been unable to get

20   it in any other way.

21         MR. STIMPSON:  Well, they are -- and you're right,

22   Your Honor, they're addressed in different motions, but my

23   point is that's where the battle lies, not here.  Third

24   parties should not be pulled into this.  We have -- to the

25   extent our licensing data and whatever we made off licensing

7

1     that data is relevant, we should be the target of that, not

2     our business partners.  We have the same information.  And

3     we'll have that discussion today, it's going to be much like

4     what I addressed just now, but this is totally and completely

5     irrelevant, and -- but to the extent the Court is inclined to

6     give any of it, iTriage should have nothing to do with it.

7              So that's my presentation, Your Honor.  If you

8     have any questions.

9              THE COURT:  I think you've addressed mine.

10             Mr. Vasquez?

11             MR. VASQUEZ:  Your Honor, I just (inaudible)

12     pulled today, this motion (inaudible).

13             THE COURT:  All right.

14             MR. VASQUEZ:  And I'll be brief as well, Your

15     Honor, and the point the Court made at the end of this

16     argument is precisely the point.  We have tried to get this

17     information a number of different ways from the defendant,

18     who has refused to give it to us, and that's why we served

19     the subpoenas we served.  We have spoken with counsel for

20     iTriage, we realize they have some objections to the scope of

21     that subpoena, which we would continue to discuss with them,

22     and if we weren't able to solve it, they would file a motion

23     to quash, which is the procedure that should be followed

24     here.

25             The fact of the matter here is this information

8

1    may very well bear on damages, including licensing revenues

2    of something related to the product we claim infringes, may

3    have a bearing on what damage experts would say might be a

4    reasonable royalty.  That alone makes this information

5    relevant.  Mr. Stimpson could have solved this problem and we

6    wouldn't have had to have this motion had he simply said

7    we'll give you the licensing agreement or whatever agreement

8    is applicable and what the dollar amount is that we receive,

9    and this matter might never have come up.

10         THE COURT:  So do you agree with Mr. Stimpson that

11   I should address this issue in connection with your motion to

12   compel interrogatory which was directed to MDx and you'll get

13   whatever answer you get there but you don't need to bring

14   iTriage in because the fight is framed earlier?

15         MR. VASQUEZ:  I would agree, Your Honor, that were

16   that to happen, we would agree to withdraw the subpoenas to

17   iTriage and see what we get from Mr. Stimpson and see what we

18   get in the 30(b)(6) deposition on this issue, and there may

19   be nothing more to do, yes.  But I would like to reserve the

20   right if we don't get information we feel we should get that

21   we would reissue the subpoena, and then if there was a matter

22   we had to address with you again, we would do that.  But I

23   would agree that if you were to grant our motions with

24   respect to the licensing information in the 30(b)(6) or in

25   the written discovery that we would withdraw the subpoenas

9

1    now, yes.

2              THE COURT:  Well, but even if I deny it, that

3    answers the question.

4              MR. VASQUEZ:  Well, I guess if you deny it on the

5    basis that we're just not entitled to the information at all,

6    yes, that would -- yeah.

7              THE COURT:  All right.  Thank you.

8              MR. VASQUEZ:  Thank you, Your Honor.

9              THE COURT:  Mr. Blume, I know you're not directly

10   in this but you are here.  Did you want to add?

11             MR. BLUME:  Nothing really to add except that I

12   agree with Your Honor's reasoning, that is, what's relevant

13   if at all in this matter is what information MDx provided to

14   iTriage, that package that MDx delivered to iTriage, stopping

15   at our doorstep.  That is information that is in the

16   possession/control of MDx.  That is the subject of other

17   motions to compel.  Whether that's deemed relevant or

18   irrelevant to the underlying lawsuit as Your Honor pointed

19   out, once that's decided, the issue as far as iTriage is

20   concerned is mooted.  There are components of the subpoenas

21   and the 30(b)(6) request that go beyond that seeking

22   information about what iTriage has done with the data, what

23   our algorithms are, what our processes are, how we've mixed

24   the bag together.  That, Your Honor, is the scope issue that

25   we're speaking of, that it has nothing to do with the issues

1    that were just discussed, the licensing, the revenue, the

2    damages and all of that.  So to the extent that Health Grades

3    is seeking information as they put out in their motion where

4    they say that iTriage may infringe the '06 patent, the effort

5    of Health Grades to use non-party third party discovery to

6    find additional litigants in this case in our view, as we

7    noted in our notice, is simply improper.  My view and

8    iTriage's view, frankly, is we should never get to that

9    question because the underlying facts of the data that they

10   seem to want can be resolved by Your Honor between the

11   parties and iTriage should be left out of it altogether.

12          THE COURT:  Thank you.  I'm going to deny the --

13   I'm sorry.  I'm going to grant the motion to quash on the

14   condition which Mr. Kanan raised, which is the possibility

15   that should I grant discovery on the issue of licensing and

16   the like as against the defendant and then materials are not

17   forthcoming which may be in the possession of iTriage, you

18   may reassert the subpoenas.  But for now I think this fight

19   is between the two parties to the lawsuit, and I'll take up

20   the issue of damages and licensing and the like in connection

21   with the pending motions to compel and to strike the 30(b)(6)

22   notice.

23          MR. BLUME:  Thank you, Your Honor.  May iTriage be

24   excused from the proceedings?

25   ·          THE COURT:  Yes, sir.

1           That brings us to Health Grades' motion to compel,

2      document 126.

3           MR. VASQUEZ:  Good morning, Your Honor.

4           THE COURT:  Good morning.  So maybe you can tell

5      me how you will define the first issue that you're going

6      to -- this is one of those where there are many issues, and I

7      think it's best to take it issue by issue.

8           MR. VASQUEZ:  Yes.  Well, first, Your Honor, there

9      are really five main issues or five categories of information

10     that the motion seeks the Court to compel; however, we have

11     resolved number 5, we've withdrawn that, and that was the

12     supplemental interrogatory response to interrogatory number

13     14.  So really what remains to be sorted out here today are

14     the first four categories of information.

15          THE COURT:  So the change made to avoid

16     infringement has been rendered -- your dispute's been

17     rendered moot by supplemental discovery?

18          MR. VASQUEZ:  Correct.  After the motion was

19     filed, counsel supplemented their response to interrogatory

20     14, and so we resolved that and we withdrew that.

21          THE COURT:  All right.

22          MR. VASQUEZ:  So, then, Your Honor what remains, I

23     would say there are just four issues.  Our request that the

24     Court compel MDx to supplement their invalidity contentions

25     to comply with Local Patent Rule 3-3 of the Northern District

1    of California patent rules.

2            Would you like me to go on to the next issue or

3    just stay with this one?

4            THE COURT:  Let's stay with this one, present your

5    argument.

6            MR. VASQUEZ:  Okay.

7            THE COURT:  And I'll let Mr. Stimpson respond,

8    you'll get a chance to reply, then hopefully I'll be able to

9    rule.

10           MR. VASQUEZ:  Well, the rule mandates that when

11   MDx supplied these invalidity contentions that they include

12   an identification of any combinations of prior art that show

13   obviousness.  They have asserted the obviousness defense,

14   Your Honor.  And so when they filed their supplemental

15   invalidity contentions back in August of last year, they

16   cited certain references, and these are at page 2 and 3 of

17   our motion, public use of websites.  Now, they did not cite

18   which documents actually constitute public use within these

19   materials.  So we're seeking for them to simply identify what

20   is it that you intend to show at trial to argue this public

21   use.  We really shouldn't have to guess about that, Your

22   Honor.

23           The other issue is that those websites, they have

24   hundreds of web pages, and the public use cited is in the

25   time frame where we can't go and recover those materials

13

1    and -- so we -- that's another argument for why they should

2    tell us, well, what do you have, are they printouts of

3    certain pages, and so what are they, what is their Bates

4    number.

5            As I noted earlier, the rule also requires that

6    they identify the combinations showing obviousness, and they

7    simply have not provided a reasonable number of combinations

8    on which they rely.  And we then took all the references that

9    they cited, Your Honor, and it just -- there's thousands of

10   possible combinations.  In their response they say, well, if

11   we had told them what math we used to come up with that list,

12   then they would tell us why it's wrong.  You know, an

13   alternative approach would be to simply say, well, here's our

14   math, here's -- we come up with these many combinations and

15   here is the subset of those that we intend to fill to show

16   obviousness.  Our computations show that their disclosures

17   comprise more than 2,000 combinations, Your Honor, and that

18   would be impossible to go through at trial.

19           That's all I have on that issue, Your Honor.

20           THE COURT:  I was trying to find the basis of my

21   note, but my note here -- well, my note indicates that the

22   defendant responded by saying we don't object to identifying

23   by Bates numbers the specific documents and in fact we've

24   already done it, and you didn't -- you didn't address that I

25   don't think.

1        MR. VASQUEZ:  Well, Your Honor, we just disagree.

2    They have not.  There are many -- I mean, I would just ask

3    them to -- again we have already done it.  Where?  Why not in

4    the next sentence of that argument specify where?

5        THE COURT:  Well, page 9 of their brief:

6    Accordingly, MDx is supplementing its response to this

7    interrogatory -- I'm sorry, that's 14.  I was -- I'm sorry.

8    It's page 3.

9        MR. VASQUEZ:  Are you on page 3 of --

10       THE COURT:  If Health Grades still has a problem,

11   then all Health Grades has to do is comply with 7.1 and talk

12   to MDx.  Page 3 of MDx's response, which is document 135.

13   It's under the heading The Substance, second sentence, MDx

14   recent second supplemental invalidity contentions, that

15   they're attached as Exhibit 1, including specific citations

16   to specific pages.

17       MR. VASQUEZ:  Your Honor, we don't think that

18   those citations that they're referring to encompass all of

19   the documents that they've identified that they're going to

20   put forward to make their obviousness defense.

21       THE COURT:  Okay.  Mr. Stimpson?

22       MR. STIMPSON:  The first issue on this, Your

23   Honor, really has to be Rule 7.1(a).  That applies to this

24   entire motion, but this one in particular I think the exhibit

25   they attach to their reply brief, not to their motion, I

1    mean, I don't need to tell you what Rule 7.1(a), they have to

2    have the specifics in their motion, not their reply, so we

3    didn't get a chance to address it in the opposition, but in

4    any event their reply brief attaches exhibits.  It says,

5    look, we've talked about all this stuff, and for this one

6    they have Exhibit 17, and the only part of that exhibit I can

7    even see that's relevant to this is an e-mail that I sent

8    back in September:  As you've -- also -- this is my e-mail to

9    Mr. Vasquez:  Also you mentioned our invalidity contentions.

10   Can you please respond to our September 12 e-mail and let us

11   know what else you're looking for?  And that hardly satisfies

12   a conferral.  That's six months ago.

13          The issues here, Your Honor, we have nothing to

14   hide.  We did these invalidity contentions, I think they're

15   perfectly fine, I've done them many times before, but I

16   understand if they have questions, but all we need to do is

17   talk about it.  I mean, these little things where he says,

18   you know, I'm not sure that you have a page citation for this

19   or a page citation for that, we went, and as you pointed out

20   in our brief, we showed the Court specifically what pages and

21   that we'd already done that.  So, I mean, I'm happy to help.

22   I don't have anything to hide here, Your Honor.  But all we

23   need to do is talk about this.  If they'd complied with Rule

24   7.1, we wouldn't even be discussing it right now.

25          The second issue is about whether we need to

1    narrow our invalidity contentions.  Well, they said there are

2    thousands of invalidity combinations.  I can't figure out the

3    math to get to that number, Your Honor, but these are just

4    invalidity contentions.  We've cited you cases from

5    California addressing these rules, and one of them says,

6    yeah, here's the invalidity contentions, they have billions

7    of combinations, and that's just fine, there's nothing wrong

8    with that.  And I will be narrowing my invalidity contentions

9    sometime, Your Honor, but I can't do it now, and the reason I

10   can't do it now, as you'll see in our motion to compel, we've

11   been fighting with them for eight to 10 months trying to get

12   them to produce to us their prior art and they still haven't

13   given it to us.  So until -- and that's the best prior art.

14   So until I get their prior art, I mean, I don't know what I

15   can cut because I don't know the strength of that prior art,

16   I just don't have all the facts in front of me.  We will

17   narrow.  It will be at the latest in our invalidity expert

18   report, Your Honor.

19          Do you have further questions?

20          THE COURT:  Well, this is one of those things

21   where I'd just asked Mr. Vasquez, I'm told by the defense

22   that they've done it, he says we don't think so, so let's

23   look at your -- I think you've attached to your response what

24   you believe provides the Bates information.  Maybe you can

25   direct me and Mr. Vasquez to what you're referring to.

1            MR. STIMPSON:  This is Exhibit 1 to our

2      opposition, Your Honor.

3            THE COURT:  That's where I am.

4            MR. STIMPSON:  It's the chart.  There's a regular

5      memorandum attached to the first place and then there's a

6      chart.

7            See for example page 5.

8            THE COURT:  Of the chart?

9            MR. STIMPSON:  Yes.  This is a Health Grades

10     report prior art, which is one thing I believe they

11     complained about.  You can see there's page numbers

12     referenced there.  There's page 8, there's page 2.  If you

13     turn the page, there's page 3, page 14, page 10, page 11.

14     And page 9 to 10 same thing.

15            These are just examples, Your Honor, but I think

16     we've given them every -- and I will give them the page

17     numbers.  If there's -- if there's something I'm missing,

18     that's fine, I don't have any problem telling them what we're

19     relying on.  There's no problem with that.  I just think

20     we've done it.  And either -- either we've done it and

21     there's just some misunderstanding, and maybe they're just

22     missing it where it is in our invalidity contentions, but

23     realistically in a response to a motion to compel, you know,

24     going through and saying for every piece of prior art where

25     we cite every page is just -- it's just not realistic, but if

1    we sit down we can -- I know we can work this out.  I just

2    don't understand what the problem is.

3            THE COURT:  If -- if I were to agree with you and

4    say I am informed by Mr. Stimpson that he has provided pages

5    by Bates number and so I deny the motion to compel any

6    further specification, that would in my mind mean that you

7    are limited to those pages, and if you try to at some later

8    date say, oh, no, you needed to look at an unreferred-to

9    particular page, you wouldn't be allowed to do that.  Are you

10   comfortable that you've identified all the pages that you

11   believe you would need to identify to present your invalidity

12   claim?

13           MR. STIMPSON:  That was our goal when we did

14   these, Your Honor, so yes.  What I'd like to do though is I'd

15   like to have a conference with opposing counsel and talk

16   about his specific problems, and we haven't really done that

17   yet.  And if there's some -- I may have made a mistake, I may

18   have missed something, but I think it's all there.  So I'm

19   comfortable with this.  The answer to your question is yes,

20   because we did this with that specific goal in mind.  I mean,

21   I've been in Texas and California and everywhere where these

22   invalidity contentions are and I know what it means, you

23   better have it in there.  So that was our goal, and I think

24   it's all there, Your Honor.  But I would like the opportunity

25   to at least speak with Mr. Vasquez, just have a telephone

1   conference and we'll talk this through and point it out, I'll

2   show you specific documents if you don't know about them, and

3   there's no problem.  I've got nothing to hide here.

4           THE COURT:  Thank you.

5           MR. STIMPSON:  Thank you.

6           THE COURT:  Mr. Vasquez?

7           MR. VASQUEZ:  Your Honor, I think it will be

8   helpful, we're going to put page 1 and page 2 of this chart

9   up on the screen, and just real briefly, Your Honor, you even

10  just said if I deny this, you know, under a representation

11  that counsel has provided page numbers and Bates numbers,

12  what you don't see here, particularly if you see at the

13  bottom of the box, is any Bates number, but furthermore it's

14  just unclear.  It's page 2 of what?  It says GeoAccess prior

15  art.  The GeoAccess prior art meets this claim, CEG page 2.

16  If we go to then page 2 of the chart, we see the same type of

17  vague references continues.  Subimo prior art.  The Subimo

18  prior art meets this claim language, CEG website use from

19  2004.  Well, what -- what pages and what are the Bates

20  numbers?  These documents are Bates numbered.  And so I could

21  go through this chart, Your Honor, and that is the issue, and

22  Mr. Stimpson is saying, you know, that we can work this out

23  by conferring, and we're not opposed to doing that, but, Your

24  Honor, I must note we have conferred on this, we have had a

25  lengthy phone conference, Ms. Stoll-DeBell was on the phone

1    with me and Mr. Stimpson, and we asked specifically can you

2    just give us the Bates numbers, and we could not resolve

3    that.  So that's really all we're asking.  I think the Court

4    is correct that they ought to be limited to what they have

5    here.  The issue of what Mr. Stimpson claims he hasn't

6    received from us is irrelevant.  This is about what he has.

7              THE COURT:  So if you continue down on that same

8    page to the 369 prior art --

9              MR. VASQUEZ:  M-hm.

10             THE COURT:  -- one, two, three, four, five, six,

11   seven, eighth line, recommendations submitted by other

12   consumers, page 2, and then I guess that 18 is a Bates

13   number.  Is that reference sufficiently specific that you

14   know what that is?

15             MR. VASQUEZ:  No, I do not believe that is a Bates

16   number, because it does not have an MDx or any party acronyms

17   before it, and I'm frankly not sure what that is.

18             MS. STOLL-DeBELL:  Your Honor, if that's the

19   paragraph of the patent publications, and this is only an

20   issue for the public uses, not the patent publications, those

21   are specifically referred to as you noted.  It's just with

22   these public uses, we thought -- you know, they say website

23   from 2004.  We just want Bates numbers for those things, and

24   I did in fact tell Mr. Stimpson that on a phone call that

25   lasted over an hour long many months ago, so the '369 and any

1     prior art S number, that's not an issue here.  Subimo and

2     HealthScope and GeoAccess and Web RateMDs, those.

3          THE COURT:  I see.  Thank you.

4          The motion to compel insofar as it seeks specific

5     page references on the invalidity contentions is granted.  I

6     agree that the plaintiff is entitled to know with

7     particularity what the prior usage was, and I'm persuaded

8     that it is not sufficiently identified here.  It is

9     information which the defense knows of because they are

10    making the assertion, and so I don't think it can be

11    reasonably said that it's of equal access to both sides.  So

12    I will require that you provide precise Bates numbered

13    references for those pages that you rely on in connection

14    with the prior use invalidity argument.

15         On the obviousness issue and the multiple

16    references, I agree with the defense that the more references

17    there are goes all the more to showing obviousness.  I'm

18    informed that there be some narrowing at some point, but I'm

19    not persuaded that just because it's obvious in a lot of ways

20    means that it has to be narrowed, so I deny with respect to

21    the narrowing of the obviousness materials.

22         To facilitate the Bates numbering requirement

23    which I have identified, I will require that the parties meet

24    in person for as long as it takes to hash through all of

25    that.  If I have to tell you where to meet I will, but I

22

1    trust that you have other things you're doing and you can

2    figure that out, and I think that meeting should probably be

3    preceded by an indication, Mr. Vasquez, of -- with as much

4    precision as you can, reasonably can, what it is that you

5    think you're missing so that Mr. Stimpson and his client can

6    have time to identify the information by Bates number if

7    possible.

8              Okay.  Next issue.

9              MR. VASQUEZ:  Your Honor, the next issue relates

10   to our request that the Court compel MDx to supplement its

11   response to interrogatory number 2.  That interrogatory, Your

12   Honor, requested that they provide a statement whether MDx's

13   Accused Products provide the elements that they're arguing,

14   you know, that they would argue for non-infringement, that

15   they identify them specifically, and if not, an explanation,

16   simply an explanation how the Accused Products operate or

17   function differently than the elements claimed in the patent.

18             Their response did not go that far, Your Honor.

19   As noted in our motion at page 6 in response to claims 1 and

20   15 and the elements addressing specialty information and

21   medical philosophy and so forth, MDx simply said that for

22   most of MDx data the information required by this portion of

23   the claims is not provided by the health care provider.

24   Well, that clearly implies that perhaps there is some data

25   that is provided by the health care provider, but they

1    neglect to identify that.  They don't say what information is

2    verified by the health care provider, they don't say if the

3    information is not verified how it is received.  So we simply

4    ask the Court to compel them to supplement with more

5    information the response that they already provided.

6              THE COURT:  So when you say that it should be done

7    on a claim by claim, element by element basis, I am of course

8    aware that this case involves a single patent, but how many

9    claims and how many elements?  What is it -- what is the

10   scope of this request?

11             MR. VASQUEZ:  Well, Your Honor, claim 1 has five

12   elements, and it's the subparagraphs shown right after the

13   first claim.  Similarly every claim number has elements.

14   So --

15             THE COURT:  So how many claims are there that are

16   at issue?

17             MR. VASQUEZ:  Claims?  One answer is two.  1 and

18   15.

19             THE COURT:  So the interrogatory really goes to

20   those two claims, correct?

21             MR. VASQUEZ:  Well, no.  No.  It says with respect

22   to any version of their websites, and as the Court is

23   probably aware, we think there are just two versions, the

24   current version and the pre-January 2011 version.  We ask

25   them to use a claim chart and to state in detail how their

1    products don't meet the elements of all of the claims in the

2    patent.

3            THE COURT:  Well, why should they do that?  If

4    claim 6 is not at issue.

5            MR. VASQUEZ:  I was mistaken.  All the claims are

6    at issue, Your Honor.  I thought you were referring to the

7    two claims that we used as an example in our motion, which

8    are just 1 and 15.  Obviously we have asserted that they

9    infringe claims 1 through 4 -- if you just give me a second,

10   I'll give you the precise claims that we've identified at

11   issue, Your Honor.

12           Your Honor, the precise claims that we allege are

13   infringed are number 1, 4, 5, 6, 7, 8, 9, 11 and 14, 15 and

14   16.

15           THE COURT:  And then in general how many elements

16   do those claims encompass?

17           MR. VASQUEZ:  We're going to put the patent up on

18   the screen, Your Honor, and we can just see exactly what the

19   elements are.

20           Claim 1 has one, two, three, four, five, six

21   elements.

22           If I may approach the screen.  Claim 4 is a

23   dependent claim, so there's one element.  Claim 5 is another

24   dependent claim.  That has just one element.  Claim 6, 7

25   again are dependent claims, so each one of those just has one

1   element.  And claim 9 has two elements.  And (inaudible)

2   claim 11 is one element, has just one element, it's a

3   dependent claim.  And then (inaudible).  14 is one element,

4   15 is the other big claim, and that has one, two, three,

5   four, five elements.  Then 16 is a dependent claim, depending

6   on 15, and that has two elements.

7          Now, Your Honor, to the extent, you know, this --

8   there are a number of elements here that we just went

9   through, all we have asked is that they supplement the

10  arguments they've made.  We're not asking for any new

11  arguments.  So they've made, you know, invalidity arguments

12  that simply are a subset of the number of claims.

13         THE COURT:  This interrogatory 2 I think is as --

14  I think you say should entitle you to an inspection of the --

15  oh, no, that's next, demonstrate, that's number 3.

16         MR. VASQUEZ:  Yes, Your Honor.

17         THE COURT:  Okay.  If you get a demonstration,

18  does that answer any of this?

19         MR. VASQUEZ:  No, Your Honor.

20         THE COURT:  Those are --

21         MR. VASQUEZ:  That's --

22         THE COURT:  Those are completely distinct.

23         MR. VASQUEZ:  That's -- yes.

24         THE COURT:  Okay.

25         MR. VASQUEZ:  I mean, all we're asking the Court,

1    Your Honor, is -- we've asked from MDx is that they

2    supplement what they've told us and simply explain how it is

3    that the features of their accused websites do not meet the

4    claim elements that they allege are not met.

5         THE COURT:  All right.  Mr. Stimpson?

6         MR. STIMPSON:  Your Honor, if you look to our

7    response, which is Exhibit 4 to the Health Grades motion, we

8    have explained.  Mr. Vasquez just said all they want is to

9    know how -- what claim elements we say are missing and how

10   they are missing.  We've got four pages here identifying

11   specific elements that are missing and identifying how

12   they're missing both literally and equivalently in detail.

13   For equivalents we have numerous arguments.  They asked us

14   why we're not infringing and we told them.  These are the

15   elements that are missing, this is why they're missing.  I

16   mean, I can't -- I can't understand what else they really

17   want that this interrogatory requests.

18        THE COURT:  Well, I think one of the -- I mean,

19   one of the things that Mr. Vasquez takes exception to is in

20   the literal infringement you say at least several times for

21   most of the data it's not verified by the health care

22   provider.

23        MR. STIMPSON:  That's actually said twice, Your

24   Honor, and I'm happy to provide a supplement to that.  I

25   understand how that might be confusing, but basically there's

1    two versions of the website, so we can tell them, we can

2    supplement this, that's fine.  But, I mean, the

3    non-infringement element is there.  You know, we have -- for

4    all this data we don't have it verified by the health care

5    provider, and the same one for B, it's not received by the

6    provider itself.  That's exactly why we don't infringe.  The

7    claim says it has to be received from and verified by the

8    provider, and we don't do it, period.  I don't know what else

9    we can say about that.  But I do understand the question,

10   Your Honor, about "most," and it's just because there's been

11   some changes over time, and we'll try to identify where

12   that -- where that is.

13        THE COURT:  On the equivalents under A, for

14   numerous reasons, for example, I suppose Mr. Vasquez would

15   say that, well, we need to know all of that, that we don't

16   want an example, we need to know the reasons.

17        MR. STIMPSON:  It's just a lawyer hedging, to be

18   quite frank, Your Honor.  They're here.  Everything that

19   we're relying on is here.  I'll reconsider, but I think

20   that's everything is here, we've put everything there.

21        I don't want to leave the podium without at least

22   just mentioning 7.1(a) again.  I mean, Your Honor, on this

23   one in particular, we asked them to confer, I was literally

24   boarding a plane and got the e-mail that Mr. Vasquez attached

25   to his reply memorandum.  He didn't attach my response which

1     was 5 minutes later which said I'm just boarding a plane, I

2     can't talk right now, can you please give me another time.

3     Last we ever heard of it and he filed the motion.  And the

4     rule is just -- it was just totally disregarded here

5     entirely.  Thank you.

6           THE COURT:  Mr. Vasquez.

7           MR. VASQUEZ:  Your Honor, that's just simply not

8     true.  You'll see as Exhibit 5 to our motion there was a

9     detailed e-mail that I sent Mr. Stimpson.  In addition to

10    that there was a phone conversation where we discussed all of

11    this.  And, again, Ms. Stoll-DeBell was on that phone call

12    with us.  So as stated in -- you know, in our motion and in

13    the declaration that we provided in response to the

14    surprising contentions that we haven't conferred enough, you

15    know, there was conferral here.  You know, this could easily

16    be resolved, Your Honor, if Mr. Stimpson would simply provide

17    the answers to the questions we listed and we took time to

18    detail in Exhibit 5 to our motion.  Some of that stuff you

19    just covered.  They say for most of the MDx data.  We stated

20    that's not sufficient, state which specific information of

21    the MDx data is verified and which specific information is

22    not.

23          THE COURT:  So you've directed me to Exhibit 5 --

24          MR. VASQUEZ:  M-hm.

25          THE COURT:  -- of your --

1          MR. VASQUEZ:  Yes, document --

2          THE COURT:  -- motion.

3          MR. VASQUEZ:  Document 126-5.

4          THE COURT:  And at the date it indicates that it

5     was sent on January 17th, but when I look at some of the

6     text, for example, bottom of the second page, please let us

7     know if you'll supplement by September 18, 2012 -- I'm not

8     following that.

9          MR. VASQUEZ:  That is just simply an error, Your

10    Honor, in the e-mail.

11         THE COURT:  So this was sent on January 17 of this

12    year --

13         MR. VASQUEZ:  Yes, sir.

14         THE COURT:  -- and you were asking him to

15    supplement by when?

16         MR. VASQUEZ:  Not --

17         THE COURT:  The next day?  January 18?

18         MR. VASQUEZ:  Your Honor, this is the first time

19    I've noted this error in this e-mail.  You know, obviously I

20    didn't expect him to give us all this information the very

21    next day.  We just would like it in a reasonable time after

22    we ask for it.

23         THE COURT:  So to get to the 7.1(a) requirement,

24    how do you say you satisfied that meet and confer obligation?

25         MR. VASQUEZ:  By conferring via e-mail and then

1     also in a phone call.

2               THE COURT:  When was the phone call?

3               MR. VASQUEZ:  I don't remember the precise date,

4     but it was after this e-mail.

5               THE COURT:  So after January 17th, 2012.

6               MR. VASQUEZ:  Yes, sir.

7               THE COURT:  But before January 24th.

8               MR. VASQUEZ:  Yes.

9               THE COURT:  When you filed the motion.

10              MR. VASQUEZ:  Yes.

11              THE COURT:  All right.  The motion to compel is

12    granted with respect to interrogatory number 2 to require the

13    defendant to eliminate the lawyer hedging as he describes it

14    and to assure that all responsive information is provided.

15    It may be minor alterations that's necessary, that's what I

16    understand Mr. Stimpson to say, it may be more extensive than

17    that, but in any event I will require that information to be

18    provided on how the disputed elements are missing and that a

19    full answer be provided.

20              MR. VASQUEZ:  Your Honor, the third issue on our

21    motion to compel is the demonstration or access information.

22    In our request for production number 2 set forth in our

23    motion at page 8, Your Honor, we ask for information and

24    materials necessary to create and use a working version of

25    the Accused Products.  So there simply is no doubt that we've

1    asked for that.  As an alternative, Your Honor, we then in

2    December when we were in New York approached counsel for MDx

3    about granting us access via a login user name and a

4    password.  That would provide the same function as having us

5    build a working version.  We would simply then have our

6    expert go in and actually examine the working version that

7    exists.  In response to that request, Your Honor, first they

8    said, well, you didn't -- you didn't ask for this.  We

9    pointed out how we have in our motion that we have and that

10   this is just an easier way to get through this.  Then they

11   said, well, we'll give it to you if you give it to us.  Now,

12   we said, well, you know, that's just inappropriate, every

13   time we ask for something, well, you say then you give it to

14   us.  They certainly had never made any request like we had

15   before then.

16          Now, Your Honor, in an attempt to resolve this I

17   have conferred with the IT department at Health Grades, and

18   I've confirmed that they also have a portal by which

19   physicians can log in and access the information that is not

20   available to anybody who just gets on the website, and so,

21   you know, we're prepared to grant that dual access if that's

22   still on the table on their end, but really that's just, you

23   know, an attempt to just stop fighting about everything we

24   ask about.

25          THE COURT:  Thank you.

1         Mr. Stimpson?

2         MR. STIMPSON:  Just briefly, Your Honor.  They

3    didn't request this.  I didn't hear anything about why they

4    need this, what claim element they think is missing that they

5    need to come into our website and start poking around.  You

6    know, I don't know what they're going to do in there, and our

7    client doesn't know either.  So, I mean, this is property.

8    It's our space.  It's our Internet space.  It's just like a

9    request for entry on land.  I don't see any practical

10   difference between the two.  And if they wanted this, they

11   wanted access to come into our property -- and they're not

12   just going to look around, they're going to -- you know,

13   they're going to have a keyboard, they're going to have a

14   mouse, they're going to, you know, play with it, put in

15   information, make requests, see what happens.  I mean, that

16   is a classic 34(a)(2) request, and they just didn't request

17   it, Your Honor.  I mean, if -- if need be, we'll do this

18   compromise where we both do it, but I just don't think any of

19   it is necessary.  I just don't see how it's relevant, how

20   they -- what they want to do with it.

21        THE COURT:  I should have asked Mr. Vasquez, and I

22   will, a copy of each executable and demonstration version of

23   the code.  I mean, it does seem like E and F are trying to

24   get -- you're right, he did not -- the request is not under

25   34(a)(2), but broadly read isn't that what E and F gets to?

1           MR. STIMPSON:  E and F is different.  It's source

2      code.  And that's a -- that's very different.  In fact I have

3      an agreement with Mr. Vasquez, it was a long time ago, that

4      we weren't going to be producing source code.  I can't

5      remember the details of that, but neither party has produced

6      source code.

7           THE COURT:  Okay.  So --

8           MR. STIMPSON:  So this is --

9           THE COURT:  So --

10          MR. STIMPSON:  This is something different.  This

11     is -- this is like, okay, just let me in and let me play

12     around and see what I can do, and that's completely

13     different.  If you want to do that, there's a vehicle for

14     that, and you didn't use it and it's not -- it's just --

15     that's what the rule's for.

16          THE COURT:  And so you would say discovery is

17     closed, too late.

18          MR. STIMPSON:  Right.  Yes.

19          THE COURT:  But the motion was filed before

20     discovery was closed.

21          MR. STIMPSON:  Well, yes, but -- well -- well,

22     yes, the motion was filed, but they -- they didn't file a

23     request and they didn't file a 34(a)(2) request.  So --

24          THE COURT:  So suppose I say that I'm going to

25     allow it.  That doesn't mean, does it, that I have to let

1     them in -- I assume you would have your technician there

2     giving them -- watching what they do, doing it for them,

3     whatever it takes to make sure no mischief is achieved.

4          MR. STIMPSON:  Well, they want a user name pass

5     code basically is the way I understand it.  I mean,

6     absolutely if anybody's going to be touching our system, I

7     mean, this is -- you can sure imagine how sensitive this is

8     to our client, but if anybody from Health Grades, our -- one

9     of our biggest competitors is going to come in, or expert or

10    whatever it is, and start doing things on our website, we'll

11    want somebody there.  But what they've requested is a user

12    name pass code for this whatever it is they want to do that

13    the public can't usually get access to.  So it's -- you know,

14    it's very -- it's a sensitive issue.  I'm sure you can

15    understand it's a very sensitive issue for both parties.

16    Thank you.

17         THE COURT:  Mr. Vasquez.

18         MR. VASQUEZ:  Yes, Your Honor.

19         THE COURT:  So it does seem to me that there is a

20    specific rule, 34(a)(2), if what you want to do is inspect

21    the property, and you didn't do that.  What part of request

22    number 2 do you think meets the requirements of Rule

23    34(a)(2)?

24         MR. VASQUEZ:  Well, you're correct we did not make

25    the request under that rule, Your Honor, but you asked -- you

1    pointed out E and F, and counsel is correct, we have agreed

2    to not exchange source code, but demonstration code is not

3    source code, Your Honor.  All it -- and I think counsel will

4    agree to that.  There is a huge --

5            THE COURT:  But that's not what you want.  You

6    don't want demonstration code.  You really want to get in and

7    inspect the property.

8            MR. VASQUEZ:  What we really want is for our

9    expert to be able to show the jury at trial how their website

10   works from the prospective of a doctor, one of the doctors

11   who uses the Accused Products.  That's really what we want.

12   So -- discovery is not closed, Your Honor, and the

13   alternative to just letting our expert do it is for them to

14   build us a copy as was requested.

15           THE COURT:  So what -- where does it say build a

16   copy?

17           MR. VASQUEZ:  Well, at P, documents sufficient to

18   show the performance, specifications and/or functional

19   characteristics and capabilities of the Accused Products.  We

20   don't have that.  But that dovetails into what we ask for

21   above, which is not source code.

22           So what I'm saying is, yes, we have agreed to not

23   produce source code, and we're not asking for source code

24   here, we're asking for demonstration code, which would be,

25   you know, as it says at the bottom of E and F, sufficient to

1    create and use the working copy.

2            Now, you know, back when MDx offered to solve this

3    if we had -- if we would agree to provide the same access,

4    there was nothing said about these issues that are coming up

5    now about, well, this is confidential property and we're very

6    concerned.

7            THE COURT:  So there is such a thing as

8    demonstration code, and you would take that and you would

9    build a model of what they have online?

10            MR. VASQUEZ:  That's what our expert would do.  I

11   personally would not.  That's what we would use it for.

12            And we say that clearly at the bottom of 8 and

13   page 9 of the motion.  All we want is to allow Health Grades'

14   technical expert to demonstrate the software from the point

15   of a physician and a user.

16            THE COURT:  Thank you.  So Mr. Stimpson, what

17   about that?  Do you get -- you would provide whatever code

18   was necessary so that the plaintiff's expert could build a

19   working version and show the jury how your product works.

20            MR. STIMPSON:  That's even worse, Your Honor.

21   Taking our source code and giving it to the hands of our --

22   even an expert of our competitor, that's -- that's every

23   client's -- you know, they hate that.  Source code in

24   protective orders, there are very strict, strict provisions,

25   like I've got another case right now where I can't leave --

37

1    if it's produced it's got to be right in our office under

2    lock and key.  Giving source code is far -- far worse.

3         Why do they need this?  Mr. -- Mr. Vasquez says he

4    needs it because he needs to show from the point of view of a

5    user.  You can show that by just getting on the website.

6    That's what users see.  The point of view of a physician he

7    says, but that has nothing to do with anything.  It doesn't

8    make any -- it's not relevant to anything.

9         So, Your Honor, I come back to, you know, the

10   point that they haven't requested this.  They're trying to

11   put a square peg into a round hole.  They did not request

12   this.

13        THE COURT:  Well, what do you understand a request

14   for other software objects and conditions necessary to create

15   and use a working Accused Product?

16        MR. STIMPSON:  Your Honor, if you look at that

17   request as a whole, that just requests everything relating to

18   our system.  I mean, it's like it's enormous.  And this is a

19   request -- it was a request for source code, and what you

20   don't see here is our objections.  Forget it; you're not

21   getting our source code.  And they haven't produced source

22   code to us either.  I don't think so.

23        THE COURT:  So I thought I heard -- I did hear

24   Mr. Vasquez say there's a difference between source code and

25   demonstration code.

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

1          MR. STIMPSON:  It's all source code, Your Honor.

2     I'm not sure what Mr. Vasquez is referencing there, but if

3     he's talking about -- I just don't know what demonstration

4     source code is, but if it's source code, then about 20 red

5     flags are going up if they're asking for that.  You know,

6     we're competitors and this is -- this is -- would be very bad

7     to give the source code.  I know it has to be done sometimes,

8     but they didn't request it and you don't need it here.  These

9     patent claims talk about a user getting on the website

10    requesting a request for information.  You can see just by

11    getting on the website public information, how it works and

12    what happens, and from the point of view of a physician I

13    don't -- I just don't understand that.

14          THE COURT:  Mr. Vasquez, why do you need it?  So

15    you can get on and do it from a user's point of view?

16          MR. VASQUEZ:  Your Honor, no, that's actually not

17    correct.  Sure we can pull up the Vitals website right now

18    and we can see what's available there, but we cannot go and

19    access what we all know exists, which is physicians who have

20    profiles there, have a user name and a password to access

21    parts of the website, for example, to edit the

22    doctor-verified information.  This doctor-verified

23    information is, you know, critical to the claims, the element

24    of claim 1.

25          So we can't just do what Mr. Stimpson said.  You

1    can't just go to a computer, get on the website and see what

2    we are asking for here.  We need to show the jury not only

3    what Mr. Stimpson said but here's what happens when the

4    doctor uses his user name and his special password.  He can

5    go in there and edit information about him.  That shows that

6    there's a --

7           THE COURT:  Is there any dispute about that?  They

8    can do it, can't they, Mr. Stimpson?

9           MR. STIMPSON:  They can change some, yes.  In

10   fact, Your Honor, I was going to make a suggestion.  There

11   might be a lot easier way to do this.  We have the

12   depositions of our people coming up who are technical people.

13   They can just answer these questions.  They can just answer

14   these questions.

15          MR. VASQUEZ:  That wouldn't allow us to show the

16   jury.

17          MR. STIMPSON:  Sure it would.

18          MR. VASQUEZ:  Well --

19          MR. STIMPSON:  And then --

20          THE COURT:  Well, but, I mean, if -- they're going

21   to admit, if I heard Mr. Stimpson correctly, that physicians

22   can go in and edit some of this information that's

23   physician-verified, and you claim that that's part of what

24   they're doing that infringes your claim.

25          MR. VASQUEZ:  Yes.

1           THE COURT:  Why do you need to show it to them if

2      it's admitted?

3           MR. VASQUEZ:  Well, first of all, Your Honor,

4      it's -- you'll see in another motion that we felt that we --

5      was necessary to file, and we filed it yesterday --

6           THE COURT:  I saw that.

7           MR. VASQUEZ:  -- they did not admit that.  They're

8      taking on or making all kinds of evasive responses, and we

9      can address that with the Court when the Court's ready, but

10     that's not being admitted.  And I'm just citing that as an

11     example, Your Honor.  There are numerous other elements,

12     (inaudible), that, you know, are part of this access and

13     login request.

14          Now, it seems to me, Your Honor, they can either

15     build a demonstration copy, A, give us demonstration

16     software, which is the functional equivalent of the Accused

17     Product, B, or simply give us the -- a -- you know, a dummy

18     user name and password, which they agreed to do earlier if we

19     would do the same.  We don't necessarily understand why they

20     do it, but we went to the trouble to see, well, if they give

21     us this, can we give them the same thing, and I confirmed

22     that we can.  So there's three options here that would

23     resolve this, but apparently none of them are ones that they

24     want to agree to.

25          THE COURT:  So how would this dummy password

1    business work?  You would go to Mr. Stimpson's office or the

2    office of his technical consultant and you would ask them to

3    do certain things and see how it works?

4              MR. VASQUEZ:  Well, they would -- Vital's IT

5    department would set up a user name and a password for our

6    technical expert to be able to go in there and pretend

7    essentially that he's a doctor and so he can navigate and see

8    the screen shots and the functions and the functionality of

9    their website.

10             THE COURT:  And you're willing to let them do that

11   to you.

12             MR. VASQUEZ:  Yes.

13             THE COURT:  Sounds dangerous to me.

14             MR. VASQUEZ:  Well --

15             THE COURT:  You know, all sorts of -- what happens

16   when somebody says they altered our source code and caused us

17   6 million dollars in damages?

18             MR. VASQUEZ:  Well, I can assure you that our

19   expert who is, you know, an MIT graduate and has, you know,

20   vast experience in this --

21             THE COURT:  I'm not worried about her, I'm worried

22   about theirs.

23             MR. VASQUEZ:  Well, I think that Health Grades

24   knows how to police what's going on within their website, and

25   this lawsuit --

1          THE COURT:  I mean they'd go onto your website and

2      cost you 6 million dollars in damages.

3          MR. VASQUEZ:  Well, that's what I mean.  When this

4      happens, I mean, we can work out details such as when is your

5      expert going to access it.  You know, they're going to be

6      aware of everything that the expert has done, and they can

7      track every page the expert visits.  So, you know, those

8      concerns, you know, I understand why we would talk about

9      them, but they can be completely ameliorated.

10          What's important here is there are two websites

11      that are accused here.  We -- our expert who is going to be

12      opining as to infringement ought to be able to show the jury

13      here's how the website works, here's how -- what doctors can

14      do, and because this is what they're allowed to do via their

15      special access privileges, we can show that they in fact meet

16      element A, B, C and D of claims 1 and 15 and so forth.

17          THE COURT:  So can you create a dummy system of

18      your system that you could just hand to them on a hard drive

19      and say here's a dummy, it's not hooked up live so you can't

20      go in and change anything but you can manipulate it as if it

21      were part of our system and that's good enough to show how it

22      works?

23          MR. VASQUEZ:  Whether we can create one of the

24      Health Grades system, Your Honor?

25          THE COURT:  Right.

```
1              MR. VASQUEZ:  Well --

2              THE COURT:  Because if you can't --

3              MR. VASQUEZ:  I -- I --

4              THE COURT:  -- I bet they can't.

5              MR. VASQUEZ:  Well, I guess I cannot answer that.

6    I would have -- I think we could, but this would all be

7    solved -- I mean, they never asked us for a dummy, they never

8    asked us for a functional equivalent.  We have as you can

9    see.  But the easiest way to do this is just to allow the

10   access via user name and login which they had agreed to do

11   and then now they're taking it off the table, even though we

12   have now affirmed that they could have the equivalent access

13   that they requested, Your Honor.

14             THE COURT:  Anything more, Mr. Stimpson?

15             MR. STIMPSON:  Just one brief point, Your Honor.

16   What is this going to do for them?  Suppose they did get

17   access.  Okay?  So next month we allow this expert to see

18   our -- get into our system.  How is that possibly going to

19   help them other than collect the last three months or

20   whatever of discovery.  Right?  We've got two years before

21   this patent.  I mean, the way they're going to do that prior

22   two years is the same way I'm suggesting to the Court, is

23   they just have to ask our witnesses, what did it look like,

24   and that's -- they're going to be under oath, they're going

25   to tell the truth, this is what it looks like, and this is
```

44

1    what doctors can edit and this is what they can't.  So they

2    have to do that anyway, so why allow them access to our

3    system where a representative of Health Grades can get into

4    our system, their primary competitor.  It's just -- it's not

5    necessary, Your Honor.  It's really not relevant.

6              THE COURT:  Well, it is relevant.  I mean, if

7    you're saying, as Mr. Vasquez says you are, that they can't

8    really edit it or they can only edit some things and there's

9    a dispute that, what -- how your system works is at issue,

10   isn't it?  It's relevant.

11             MR. STIMPSON:  It is, but there's many different

12   ways to get that information, Your Honor, and one is through

13   sworn deposition testimony of our witnesses, which they have

14   requested, they haven't requested this one, and it doesn't

15   put our system into the hands of a representative of our

16   competitor.  And then it -- after those depositions if they

17   still -- we can come back and talk about it, but they're

18   going to tell the truth, Your Honor, and they're going to

19   know what they -- they're going to learn what they need to

20   know from those depositions.

21             THE COURT:  And these aren't the 30(b)(6)

22   depositions, these are some other depositions.

23             MR. STIMPSON:  No, actually they'd be the same

24   people I think, but one of the people they've noticed is

25   somebody who's the -- in fact two or three of them, they know

1    all about our system.  So they should be able to get this.

2    If they ask the right questions, they will get these no

3    problem.  We'll answer the questions.  It's just getting in

4    there and getting them into our system is very sensitive.

5            If there's nothing further, I have nothing

6    further, Your Honor.

7            THE COURT:  Thank you.

8            MR. VASQUEZ:  Your Honor, just may I add one

9    comment?

10           THE COURT:  I warned you about that.

11           MR. VASQUEZ:  This is not a motion for sur-reply.

12    I just want to follow up.

13           THE COURT:  I'll give you the last word since you

14    had the first word.

15           MR. VASQUEZ:  Your Honor, we've offered three

16    alternatives and he refused all (inaudible).  There's even a

17    fourth.  As you just mentioned, this could be something that

18    we would have -- we could inquire about in a 30(b)(6)

19    deposition, and so if they would just simply have an

20    executable version of the website at the depositions, it's

21    not enough for just the witness to testify about what it

22    does, but if the witness shows us what it does during the

23    deposition in response to our questions, even that would be

24    sufficient.  Thank you.

25           THE COURT:  Mr. Vasquez, let me make sure I

1        understood your answer.  Do you agree that in order to create

2        and use a working Accused Product or create and use a working

3        version of the Accused Product you would need to acquire

4        source code?

5                    MR. VASQUEZ:  No, Your Honor.  No, I am not a

6        software or source code expert.  It's my understanding from

7        our conversations with our technical expert that

8        demonstration software is not source code, demonstration

9        software can be used to give us what we're asking for here.

10                   THE COURT:  Thank you.  I'm going to deny the

11       motion to compel with respect to request number 2.  This is

12       in fact a request to permit inspection of property under Rule

13       34(a)(2) not properly made, and what is asked for is

14       executable and demonstration versions of code, and there's

15       been an agreement that source code will not be provided.  I'm

16       not persuaded that there's something other than source code

17       that can allow you to create and use the Accused Product.  So

18       I deny the motion.

19                   Number 4, financial information.

20                   MR. VASQUEZ:  Your Honor, the final issue on our

21       motion to compel is the request that the Court compel MDx to

22       provide us with complete financial information.  They have

23       only provided financial information related to advertising

24       revenue, yet in the documents that they have provided it

25       states that MDx makes its revenues through licensing of data,

1    merchandise sales and advertising.  So we're entitled to see

2    the revenues related to licensing and merchandising.

3          THE COURT:  So license -- this is something I

4    didn't understand.  There's so much I don't understand but

5    this is something I didn't understand.  Licensing of the

6    Accused Product or licensing of, for example, the list of

7    doctors?

8          MR. VASQUEZ:  Well, the question is a good one,

9    Your Honor, because those may well be the same thing.  In

10   fact this disclosure of the agreement with iTriage which we

11   just found out about on March 6th, you know, says that MDx

12   has obtained and is allowed to -- or iTriage is allowed to

13   use physician profiles, 750,000 of them that it gets from

14   Vitals.  And when you go to the iTriage application and look

15   at, well, let's see what that is, what is -- what that

16   generates, what it generates essentially is a report that

17   sorts and compares doctors, in other words has the comparison

18   ratings elements, appears to, and has all the other elements.

19   There's categories you can sort by whether it's a verified,

20   you can see whether -- patient information that's provided.

21   And so the question is are the profiles that they license or

22   agree to sell in fact an Infringing Product.  You know, here

23   we're -- you know, we talk about the Accused Products as the

24   old website and the current website, but that's just all that

25   is, it's a website.  The website has data that you can access

–

1    via the website, and so they appear to be licensing reports

2    on physicians that contain comparison ratings, that contain

3    doctor-provided information, patient-provided information and

4    third-party information.  So there's a direct possibility

5    that in fact what is being licensed is also an Infringing

6    Product, but even if it was not, Your Honor, as we noted in

7    our motion, this information is relevant to our damages

8    theorys because it could be a convoy sale, and under Georgia

9    Pacific, whether the defendant is using the patented product,

10   we contend they are, they're infringing by using what we have

11   patented, or did they use that to then sell other

12   non-patented products.  That's right out of the case law.

13   So --

14          THE COURT:  Well, but if they -- if they only sell

15   the verified doctors' names and that's all, or the -- you

16   know, that portion of it where you've got the doctors and

17   it's been verified, verified information, that's not a

18   convoyed sale, because they're just selling that one part.

19   Right?

20          MR. VASQUEZ:  That is -- verified information is

21   an element of the claims that we say they infringe.  So

22   that's clearly relevant.  They're making money off of that.

23   We should know what it is.  You know, they can then later

24   argue, well, you've got to exclude this from what you're

25   seeking in lost profits for reasons X, Y and Z, but right now

49

1    to completely preclude us from examining it and knowing

2    exactly what is it that you're selling for this revenue,

3    that's --

4                THE COURT:  So is the verified doctor information

5    an independent claim?

6                MR. VASQUEZ:  No, it's an element within -- within

7    an independent claim.

8                THE COURT:  So if -- if I sell light bulb

9    filaments and there is a valid patent not yet expired for an

10   incandescent light bulb, am I infringing the patent?  I only

11   sell the filaments, I don't sell the light bulb.

12               MR. VASQUEZ:  I guess it would depend on what the

13   patent actually claims, Your Honor, but it's possibly that it

14   would.

15               The point of our argument though, Your Honor, is

16   that even if it's not an Accused Product, even if in your

17   example you don't infringe, it still may be relevant to

18   damages, and is relevant under convoyed sales theorys and

19   under Georgia Pacific specifically for reasonable royalties.

20               THE COURT:  Thank you.

21               Mr. Stimpson?

22               MR. STIMPSON:  Your Honor, what I understand's

23   been licensed here is our data.  Over the years MDx has

24   accumulated data on hospitals, on doctors, whatever it is.

25   It's just data.  That's been licensed to somebody.  To

50

1    infringe a patent, you have to meet all the elements, not

2    just -- you can't get damage on something just because it

3    might relate to one element of one claim.  That's just not

4    the law and it never has been.

5          I won't repeat what I've also -- already

6    referenced with regard to the iTriage, but you're absolutely

7    correct, Your Honor, this is -- under no theory could this

8    possibly be convoyed sales.  I'll refer you back to my

9    printer-ink combination.  That might be -- might be a

10   convoyed sale.  This is just -- it's sold to an entirely

11   different party, it's not -- there's nothing that's --

12   there's no way, and they haven't tried and they couldn't

13   possibly do it, try to match up what this licensing is to the

14   patent claims.  It's just got nothing to do with this case,

15   Your Honor, it's got nothing to do with it.

16         And just one thing, in MDx's motion -- this is

17   their support for it -- at page 11, they say all revenues are

18   relevant to damages.  That could not be farther from the

19   truth.  If, you know, H-P gets sued on their cameras, they

20   don't produce revenues on, you know, their printers and their

21   ink and their software.  The revenue that's relevant is

22   revenue to the Accused Products.  The same thing applies to

23   MDx.  We're a smaller company but the same issue.  You know,

24   it's a different thing.  You just can't get revenue from

25   everything and just throwing it in and saying you're entitled

1        to damages on it.

2                THE COURT:  Well, when your materials say -- and

3        you don't dispute this I don't think -- that revenue -- that

4        revenue is generated primarily through advertising, licensing

5        and merchandise, doesn't that mean that they are entitled to

6        the licensing and merchandise information about the Accused

7        Product?

8                MR. STIMPSON:  That was talking about MDx overall,

9        Your Honor, the entire company.  That's some document they

10       have, I think, that talks about MDx whole company where do we

11       get our revenue.  One is advertising and stuff which is

12       the -- from the website, which is the Accused Product.  And

13       the other stuff is licensing and, you know, selling

14       merchandise.  But licensing our data, that's not connected to

15       our -- there's no connection there.  It's just underlying

16       data.  That's -- thank you.

17               THE COURT:  Thank you.

18               Mr. Vasquez?

19               MR. VASQUEZ:  Your Honor, first of all this goes

20       beyond iTriage.  This document we were just discussing says

21       they make licensing revenue.  We only know of iTriage.  They

22       may be licensing other data sets, broader data sets, to other

23       parties.  We've been precluded from having any discovery on

24       that.  That's just simply improper, Your Honor.  And these

25       data sets are part of the Accused Products.

1           THE COURT:  So if I limit your request to any

2      advertising, licensing and merchandise of any elements of the

3      Accused Product, does that meet your needs?  I mean, they

4      should -- as Mr. Stimpson says, if you sue a manufacturer of

5      copying machines and cameras about an infringement on the

6      copy machine, you shouldn't get information about cameras.

7           MR. VASQUEZ:  That's correct, Your Honor, but

8      here's why this is different.  They don't sell anything.

9      They have a website.  That is the company.  That is the

10     Accused Product.  They are preventing us from taking

11     discovery, peeking behind that screen when you bring up

12     Vitals.com.  All of this bears on damages, because all of

13     these data sets, the licensing revenue, merchandising

14     revenue, we don't even know what that is.  You know, what's

15     really at issue here is they appear to be selling data sets.

16     We don't know the scope of those data sets or what they

17     contain because they absolutely refuse to allow us to see it.

18           (TRANSCRIBER NOTE:  Mr. Vasquez has moved

19     completely away from any microphone.)  So we've put the

20     Georgia Pacific factors up here, Your Honor, and, you know,

21     again, my glasses are a little ineffective from that

22     distance, but factor number 6 clearly states:  (Inaudible)

23     patent (inaudible) patent (inaudible) sales of other Georgia

24     Pacific products.  In other words, other products.  Such as

25     these data sets.  The existing value of the invention.  That

1    the generators of sales of non-patented items.

2          So if they're just saying, well, the patent

3    website is (inaudible) it's clearly relevant (inaudible)

4    warranties, because (inaudible) not-patented items as they

5    contend.  We don't agree with that.  To the extent

6    (inaudible) infringing (inaudible) invention that any

7    (inaudible) of the value of that is.  Clearly, Your Honor,

8    (inaudible) getting in exchange for the data sets whatever

9    those are are probative of value for the use and it goes to

10    our damages case.

11          Number 13 finally, Your Honor, the Court's going

12    to realize the whole profit issue, the fact it's even

13    mentioned (inaudible) may not have (inaudible) manufacturing

14    process (inaudible) infringes.  So again to the extent they

15    contend these are non-patented and therefore shouldn't be

16    produced, and (inaudible) number 13 calls for production so

17    that we can distinguish that.

18          THE COURT:  Thank you.  I grant the motion to

19    compel with respect to the requirement to disclose financial

20    information.  I find that the information is reasonably

21    calculated to lead to the discovery of admissible evidence or

22    may constitute evidence directly related to the damages

23    claim, and I'll order that the information be provided.

24          I think that finishes the motion to compel.  Do

25    you agree, Mr. Vasquez?

1          MR. VASQUEZ:  Yes, Your Honor, thank you.

2          THE COURT:  All right.  We're making slow progress

3     but some.  It's 3 minutes till 10.  Let's break until 10:10.

4          THE CLERK:  All rise.  Court is in recess.

5          (Recess from 9:57 a.m. to 10:09 a.m.)

6          THE CLERK:  All rise.  Court is in session.

7          THE COURT:  Thank you.  Please be seated.  The

8     next motion is the defendant's motion to strike deposition

9     notices, number 142.

10          MR. STIMPSON:  Thank you, Your Honor.  The issue

11     on this motion is whether Health Grades has violated Rule

12     26(g) and the Court should strike the deposition -- the

13     30(b)(6) deposition notice with prejudice.  I'll be brief

14     because there isn't a lot to add to our briefing in this,

15     Your Honor, but Rule 26(g) is the operative rule here.  It's

16     the Rule 11 of discovery requests.  If you sign a discovery

17     request, it's certifying that everything you're requesting is

18     warranted and it's not interposed for some improper purpose.

19     I could sit here for hours and tell you about all that that

20     deposition notice requests that has absolutely nothing to do

21     with this case.  That won't do any good and it's in our brief

22     anyway, Your Honor.

23          So very -- it's a ridiculously overbroad, I think

24     just a ridiculously overbroad notice.  There is no way we

25     could ever have people prepared to he respond to these

1    topics.  And their opposition doesn't really even address the

2    vast majority of what they're requesting.  So, Your Honor if

3    Rule 26(g) is to have any meaning, if they're just allowed a

4    do-over here, then, you know, it has no teeth.  This was

5    not -- in my view was not prepared in good faith.  They will

6    get the same deponents anyway, just not under a 30(b)(6).  So

7    we respectfully request, Your Honor, that the entire

8    deposition notice be stricken in its entirety with prejudice.

9    Thank you.

10         THE COURT:  Thank you.

11         MR KANAN:  Your Honor, a bit of history on

12   conferral on this one.  Original 30(b)(6) topics were drafted

13   and sent to Mr. Stimpson.  I'm not personally involved in

14   this, I'm relating what Mr. Vasquez and Ms. Stoll-DeBell did.

15   And then there was a conferral because Mr. Stimpson objected

16   these were too vague, too overbroad, didn't agree to a single

17   topic.  They were again done.  As Mr. Stimpson says in his

18   motion, the 30(b)(6) topics are to be done with painstaking

19   specificity, he quotes a case saying, so if we take that

20   literally and Mr. Stimpson's approach to this literally, we

21   have to say in great detail the topics that we're noticing,

22   which we did.  They conferred again and Mr. Stimpson said no,

23   too broad, just as he said here today.  He didn't agree that

24   20 of the 31 topics were okay, or 15, or 5, or 1 topic was

25   acceptable under 30(b)(6), even though they included things

1    such as the features of the system which he had said in his

2    other discovery responses we would obtain by 30(b)(6)

3    deposition, and he even cited in his motion some of the

4    features that he claims are improperly listed in our topics.

5    The very thing he said, page 6 of his motion, these topics

6    are inappropriate, conception, design, design history and

7    development of every feature, structure, properties, function

8    and operation of every feature, the things that he said we

9    can get in a 30(b)(6) deposition now are too broad, can't be

10   answered.  Of course he said here today many of these

11   questions about how the system works can be dealt with in a

12   deposition, and he said today one of the people being deposed

13   is a technical expert.  Well, I say if the duty to confer

14   means anything, it means a lawyer has an obligation to agree

15   to the things he should agree to.

16           Not one topic.  Licensing information, other

17   damage information, that clearly goes to the issue of

18   damages.  Not a one.  Not a one.  Not a one so that we could

19   say, well, okay, let's talk about these five that you object

20   to or these 10 that you object to and maybe we can work that

21   out.  No, a motion's filed and nothing further.

22           There's no basis that I know of -- well, I

23   shouldn't say there's no basis, there probably is a basis,

24   I've never heard in 36 years practicing law of someone saying

25   you improperly noticed topics under 30(b)(6) so now you don't

1    get to take a 30(b)(6) deposition.  This is some sort of a

2    gotcha game.  You notice up 15 topics and if one of them, if

3    one of them is no good, well, that's it, you had your chance,

4    you don't get to take a 30(b)(6) deposition.

5         The topics include, and this is at Exhibit A, I

6    think, of Mr. Stimpson's motion, as I noted paragraph 3 all

7    about the features, the information we discussed previously

8    here, defendant's reasons for selecting and developing the

9    features.  That bears on many things here in this case, Your

10   Honor, including willfulness.  We have documents that we have

11   in our possession produced in this case that show the

12   defendant very closely monitoring the Health Grades site,

13   talking about copying Health Grades' processes.  All of these

14   issues bear on legal questions presented in this case.

15        And of course when we get over to the material

16   rated -- related to -- well, look at 15.  Defendant's

17   knowledge of the patent in suit.  That's not relevant here?

18   That isn't an issue that should be addressed in a 30(b)(6)

19   deposition?

20        THE COURT:  I'm glad you -- exactly.  Exactly.  So

21   put yourself, please, in my chair with now only half of the

22   motions left, one of them filed last night at 7 o'clock, by

23   parties that don't seem to be able to figure out how to do a

24   patent lawsuit on any aspect, although experienced patent

25   counsel.  What do I do when there's number 19, the

1    differences between the products and services, clearly proper

2    in my view, and number 23, written or oral communications

3    with anyone about the plaintiff, this lawsuit or the patent,

4    clearly overbroad in my view.  Am I to go through these and

5    tailor them one by one because you all can't do it?

6         MR. KANAN:  No, Your Honor, you shouldn't, and I

7    understand your upset and I agree with you completely.  This

8    is not good lawyering and this shouldn't have happened, but

9    when -- I was not involved and maybe I'll become involved,

10   but when we are met with a response to 30(b)(6) topics that

11   is the answer not one of these is appropriate for a 30(b)(6)

12   deposition and we get a motion that says we should now be

13   precluded from taking the 30(b)(6) deposition, what are we

14   supposed to do?  I guess we could start paring it down

15   unilaterally, but we'd still have this motion, and we surely

16   wouldn't have these things that maybe we wouldn't get anyway

17   but we don't know that for sure, and maybe some of them

18   there's a legitimate dispute about.

19        So the answer is, Your Honor, you shouldn't have

20   to do this.  Maybe there's a process we can still try after

21   today, perhaps, to get topics we agree on, and I would pledge

22   that I would be involved in that, but it can't be met with no

23   topic is acceptable or yes this topic's okay and then later

24   it turns out they're claiming it's not okay.

25        Could you put up, Kirsten, the Georgia Pacific

59

1    factors again?

2            These -- the damages topics that we've identified

3    here, of course you're ruling now on licensing revenue that

4    they refused to agree was an appropriate topic for 30(b)(6)

5    deposition.  The Georgia Pacific factors:  The extent to

6    which the infringer used the invention and any evidence

7    probative of the value of that use.  Number 11.  Now, if we'd

8    have used that as a topic in our 30(b)(6), I'm positive

9    Mr. Stimpson would have said too broad, but the fact of the

10   matter is that's what we tried to answer in some of these

11   topics.

12           So I guess what I would say to you is there's no

13   question we are entitled to take a 30(b)(6) deposition.

14   There's no question in my mind that the vast majority of

15   these topics are appropriate.  I am willing if the Court

16   instructs us to do this that we once more try to talk about

17   this, Mr. Stimpson and I and perhaps others as well, and come

18   to a conclusion.  If you perhaps advise us that in your view

19   at least some topics here are appropriate and at least some

20   topics are inappropriate and then both sides, you know, we

21   got some skin in the game here, we've got to solve this

22   problem, and I would pledge to do that.

23           THE COURT:  Mr. Stimpson?

24           MR. STIMPSON:  Your Honor, as we said in our

25   opposition -- as in our motion paper and our reply, we don't

 1    dispute that there's relevant information requested in these

 2    30(b)(6) topics.  I think you hit the nail on the head, Your

 3    Honor.  It's not your job to go through this and try to

 4    figure out what they should have done.  I'll take that one

 5    step further.  It's not my job either.  Okay?  When I get a

 6    notice like this of deposition topics, it's just so

 7    ridiculous.  The answer has to be go back and do it right.

 8    And that's what I told them.  And this is just -- I told

 9    them, I told them 26(g), I said read the rule, 26(g), go back

10    and do it, then we'll talk, and they came back with an even

11    worse notice.

12          So, Your Honor, it wasn't good faith, and there

13    has -- that's what 26(g) is about, good faith, doing stuff in

14    good faith, and if you don't do it in good faith, there

15    should be a consequence.

16          Mr. Kanan said he's never seen a motion like this

17    before.  Well, I have, I've seen it once before.  I filed it

18    and I filed it in only one case I've ever been in I've had to

19    do this before, and the Judge there had exactly the same

20    reaction you did, Your Honor, this is -- this is not

21    something I'm going to go through, and the Judge was furious

22    and she struck the requests.  And that's what 26(g) is all

23    about.  Telling them go back and do it right is -- it just --

24    there's no consequence.  A do-over does nothing.  They will

25    get these deponents but just not as 30(b)(6)'s.

1          THE COURT:  The motion is -- to strike is

2     denied -- well, is granted in part and denied in part.  I do

3     strike these requests.  I agree with Mr. Stimpson that many

4     of them are simply far too broad and sweeping and need to be

5     narrowed.  On the other hand, I do not agree that the request

6     is made in bad faith and should bar a 30(b)(6) deposition.

7     Many of the requests are appropriate.  And you need to work

8     that out among yourselves.  The trick in 30(b)(6) depositions

9     in my experience these days is for the plaintiff to be more

10    general and the defendant comes in and says, oh, it's

11    overbroad, or for the plaintiff to be very specific and the

12    defendant comes in and says, well, we can't properly prepare

13    anybody for all this specificity.  It's a no-win situation,

14    and I'm not going to allow that.  You must prepare a proper

15    30(b)(6) deposition notice but you're entitled to a 30(b)(6)

16    deposition and you should -- you should work together to

17    figure out what that's going to look like.  So the motion is

18    granted to strike this exhibit of topics but denied insofar

19    as it seeks to preclude any 30(b)(6) deposition, and a new

20    notice, new proper notice should be submitted.

21         The Health Grades motion to amend its infringement

22    contentions.

23         MR. VASQUEZ:  Your Honor, the issues here are

24    succinct.  It's whether there's been a timely showing of good

25    cause to make these amendments and whether undue prejudice

 1    will result to MDx.  We've put up on the screen, Your Honor,

 2    Rule 3-6, which is the operative rule, and that rule provides

 3    that a party may amend its infringement contentions by order

 4    of the Court when the party makes a timely showing of good

 5    cause.  The rule also provides that absent undue prejudice to

 6    the non-moving party, a claim construction by the Court that

 7    is different from that proposed by the party seeking the

 8    amendment supports a finding of good cause.

 9          So, Your Honor, this case presents the exact

10    circumstances that are contemplated by the rule.  First,

11    Health Grades has made a timely showing of good cause.  The

12    showing is timely because we moved just 18 days after Judge

13    Brimmer's claim construction order which was issued on

14    February 15th; we filed our motion on March 2nd.

15          Next, there is good cause because the Court's

16    claim constructions are different than the construction that

17    was proposed by Health Grades for the terms listed in our

18    motion, and those are first health care provider -- we've got

19    those on the screen as well, Your Honor -- health care

20    provider report on the first health care provider.  Health

21    care provider report includes comparison ratings of the

22    health care providers.  And then finally received from the

23    first health care provider.

24          These new constructions by Judge Brimmer, Your

25    Honor, mainly impact two claim elements.  We were looking at

1     the patent before.  So what we have on the screen now is

2     claim 1, and we've blown up language from those claims, which

3     use the terms that I just listed that were interpreted by

4     Judge Brimmer, so you can see that this impacts these two

5     elements of claim 1.

6                    Now, the Court's construction for these terms is

7     different from those that were proposed by Health Grades,

8     they're different literally, Your Honor, and different and

9     unexpected in their effect from the constructions proposed by

10    Health Grades, and I'll show you why.  Before I do that I

11    think it's important to note that MDx does not dispute that

12    Judge Brimmer's constructions are significantly different

13    from those proposed by Health Grades.  In fact MDx repeatedly

14    asserts in its papers that Judge Brimmer rejected Health

15    Grades' proposed constructions, and you can see that at page

16    6 and 7 of their response to our motion, Your Honor.  Now --

17    because it goes to the issue of good cause, I'd like to just

18    briefly walk through how the constructions are different than

19    those proposed by Health Grades.

20                    So on the screen -- if you could put number 5 up,

21    thank you.

22                    One moment, Your Honor.

23                    Okay.  So, Your Honor, here we have the term "the

24    first health care provider," which is used within the phrase

25    "receiving a request for information about a health -- first

64

1     health care provider."  Health Grades' proposed construction,

2     Your Honor, was that that should be construed as a physician

3     or other health care professional.  As you can see, Judge

4     Brimmer's construction is different; it is a particular

5     health care provider about whom information is requested and

6     a report is produced.  When I talk about a -- this being not

7     just different literally but in effect, that's because Health

8     Grades' proposed construction was that this could be more

9     than one health care provider, and that's confirmed at page 7

10    of Judge Brimmer's claim construction order.  The Court's

11    construction limits this term, the scope of it, to only one,

12    it refers to a particular health care provider.  So here we

13    see that Judge Brimmer's construction is different.

14             If we could put slide 12 on, please.

15             So the construction of health care provider report

16    on the first health care provider.  At Markman, Your Honor,

17    the parties did not dispute what the report, the structure of

18    the report, should be.  The reason we're -- this is at issue

19    here in our request to amend our infringement contentions,

20    Your Honor, is because given that the Court construes health

21    care provider, it impacts how this -- what this term means,

22    what this phrase means.  So Health Grades proposed that this

23    be a formatted -- as you can see here -- a formatted and

24    organized presentation of information that relates to one or

25    more health care providers identified in response to a query

1    of information regarding health care providers.  Judge

2    Brimmer's construction, however, was he declined to construe

3    it, but there's no dispute that in light of the construction

4    of first health care provider that would -- the phrase is, as

5    we put here, a health care provider report on a particular

6    health care provider.  So again a very big difference where

7    our construction was that it be one or more, his construction

8    is, no, you are limited to only one.

9            Now, if you could put up slide 12, please.  Thank

10   you.

11           The construction of comparison ratings of health

12   care providers.  You know --

13           UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor,

14   (inaudible).

15           MR. VASQUEZ:  Your Honor, Health Grades proposed

16   that this be construed as a rating system that facilitates

17   comparisons -- and that's with a parenthetical with an S so

18   it could be a comparison or comparisons -- amongst physicians

19   to highlight which physicians identified in response to a

20   query for information best fit one or more criteria.

21   Importantly, implicitly in the proposed construction by

22   Health Grades is the concept that comparison -- it did not

23   require inclusion of ratings for other physicians.  In other

24   words, simply having one physician showing a one star rating

25   was comparison ratings because that star rating is comparing

1    that physician to a data base of numerous physicians, so we

2    contended, you know, that's the important distinction here.

3    The Court said that this had to be ratings on multiple health

4    care providers including a first health care provider in the

5    report on that first health care provider, thus permitting

6    comparison of the first health care provider with other

7    potential health care providers.  So this includes, Judge

8    Brimmer's construction as he confirms on page 14 of his claim

9    construction order, it includes ratings on multiple health

10   care providers, as you can see here.  So again Judge

11   Brimmer's construction is new, its effect is unexpected.

12          So, Your Honor, it's clear that Judge Brimmer's

13   constructions for these terms are different from those

14   proposed by Health Grades, not just literally but

15   substantively, and the Court's constructions require that

16   Health Grades now show and give notice as to how the accused

17   websites infringe, and that is done by applying the claims as

18   construed to the features of the accused websites.

19   Infringement is a two-step process.  Infringement is

20   determined by construing the claims and then applying the

21   claims as construed to the features of the Accused Products,

22   and that's all we are seeking to do with these proposed

23   amendments.

24          Now, the Court's new constructions create issues

25   such as whether the health care provider report on the first

67

1       health care provider must refer to or include information on

2       only one health care provider given that he construed that to

3       be on a particular health care provider, and if that's true,

4       Your Honor, how that report must also include comparison

5       ratings on other health care providers.  This is per the

6       Court's construction of comparison ratings of health care

7       providers.  The Court said it has to be multiple.  On the one

8       hand, the first health care provider is one, one health care

9       provider that a report is generated on; on the other hand,

10      the report must also include comparison ratings on multiple

11      health care providers.  So what we've done in our amendments,

12      Your Honor, is simply taken the claims as construed by Judge

13      Brimmer, compared them to the accused -- the features of the

14      accused websites and articulated how now in light of these

15      new constructions the accused websites still infringe.

16            Now, Your Honor, last issue here is the undue

17      prejudice.  Here there is no prejudice to MDx, much less

18      undue prejudice.  The fact that discovery closes on June 15,

19      initial expert reports are due on June 29, rebuttal reports

20      are due on July 16th and expert discovery closes on

21      July 27th.  With respect to the two inventors who have been

22      deposed, MDx has argued, well, we've already talked to those

23      guys and now, you know, that opportunity to ask them about

24      infringement in light of these constructions is lost, and so

25      they claim undue prejudice there, but, Your Honor, they do

1    not have any relevant information regarding the question of

2    infringement.  As I said earlier, that infringement involves

3    construing claims and then applying the construed claims to

4    the accused websites.  Well, here Judge Brimmer already

5    denied MDx's attempt to insert those -- the testimony of

6    those two deposed inventors into the Markman hearing.  He

7    denied MDx's motion to supplement their Markman brief by

8    inserting their testimony.  And you can see that at docket

9    120, Your Honor.  Furthermore, as Judge Brimmer was aware,

10   the law is well settled that the inventor's subjective intent

11   is simply not relevant to claim construction.

12        Now, as to the second step required to determine

13   infringement, the inventors testified, as we noted in our

14   motion, that they're not aware of the accused websites,

15   they're not aware of why Health Grades asserts that its

16   products infringe, Your Honor.  Neither of them work for

17   Health Grades any longer.  So it's clear as you can see by

18   Exhibits 11 and 12 to our motion, Your Honor, which is

19   deposition transcript, portions of the deposition

20   transcripts, and also at page 8 of our motion, that they

21   simply don't have relevant information about infringement.

22        Now, Your Honor, notwithstanding, if MDx truly

23   believes that they must re-depose those two inventors on

24   these narrow issues, Health Grades is willing to make them

25   available.  So there is no undue prejudice here, so we would

69

1    ask that the Court grant our motion to amend our infringement

2    contentions.

3             THE COURT:  The amendments relate only to phrases

4    that have -- that the -- the phrases that you've identified

5    on pages 5 and 6.

6             MR. VASQUEZ:  Yes.

7             THE COURT:  Thank you.

8             Mr. Stimpson?

9             MR. STIMPSON:  Well, Your Honor, these can be

10   broken down into two separate claim construction groups.  The

11   first group is the three that Mr. Vasquez addressed on the

12   comparison ratings of the health care providers, and then the

13   second one is about the information received from the first

14   health care provider.  There are three terms in the first

15   group and then just one element at the end.  So they need to

16   be addressed separately because they're really different

17   facts.

18             The first group, the comparison ratings of health

19   care providers, Health Grades addressed this in their

20   original infringement contentions.

21             First of all, just backing up about this is both

22   untimely and there's absolutely no good cause here.

23   Addressing the untimeliness issue first, Your Honor, they

24   already addressed this in their original infringement

25   contentions.  Now all they want to do is they just want to

1    add new evidence, evidence that they've had for a long time,

2    evidence that was available on our website when they filed

3    this case.  So they've known about our constructions, Your

4    Honor, they've known about it since the beginning of the

5    case.  They've known how we were interpreting this and how we

6    said we weren't infringing.

7            April 19, 2011, this is our summary judgment

8    brief.  Mr. Vasquez is talking about how, you know, he needs

9    to add new evidence because the report on the first health

10   care provider now Judge Brimmer's interpreted that to include

11   these comparison ratings of other providers.  This is what we

12   said in our first brief, April 2011:  Every claim in the '060

13   patent requires a generation of a report on a first health

14   care provider and this report contained comparison ratings of

15   health care providers.  They knew that back then.  And not

16   only did they know it, Your Honor, if you look at Exhibit 8

17   of their brief, page 3, they actually cite to our summary

18   judgment motion as to why they're adding equivalents

19   arguments in their original infringement contentions.  They

20   have known this forever, and even if this didn't exist, Your

21   Honor, in September of 2011 we exchanged claims

22   constructions, so even if we had never filed the summary

23   judgment, they knew about it then, and that was six months

24   ago.  So the timeliness issue, there's just no way this is

25   timely, Your Honor.

1            So what Health Grades is doing, Your Honor, is

2    they're saying, well, look at Judge Brimmer's claim

3    construction and nobody saw this coming, this is unexpected

4    and so now we have to add new evidence.  First of all, what

5    that rule says, Your Honor, is not that a claim construction

6    is good cause, it says that it may be good cause, and we've

7    cited some cases on this from California -- I believe it's

8    California, it may be Texas.  But it's good cause if you

9    don't expect it.  If the Judge -- which they do from time to

10   time, Judges sometimes take their own construction, they do

11   their own thing, and that can be good cause, but this is not

12   a situation like that, Your Honor.

13           Starting at page 5 of their reply brief, Health

14   Grades addresses three issues where they think that this is

15   so different from what the parties proposed that they should

16   be able to amend.  The first one -- this is at page 5 of

17   their brief -- they say that the ratings can include the

18   ratings of the first health care provider.  So, in other

19   words, that this report has the ratings of the first health

20   care provider as well as comparison ratings.  And their

21   statement at page 5 is that Judge Brimmer rejected our

22   position on that.  That's just -- it's just not correct.

23   Here's our claim construction paper.  I'll refer -- reference

24   it's document number 93, page 12.  MDx does not take issue

25   with the fact that ratings of the first health care provider

1    will be in the report too.  It was just totally a non-issue.

2    And neither Health Grades nor MDx contested that at all.

3    Nobody's contested that.

4            The second thing they reference, Your Honor, is at

5    page 6, and page 6 of their reply they say that MDx -- that

6    Judge Brimmer ruled that the report on the first health care

7    provider had to have the first -- the comparison ratings, and

8    they say that neither party ever requested that.  Well, Your

9    Honor, we most certainly did.  This is page 11 from our claim

10   construction brief, document number 93.  Quote:  The claim

11   language is perfectly clear.  The report on the first health

12   care provider includes these comparison ratings of health

13   care providers.  This is plain English.  We argue that.  And

14   Judge Brimmer agreed with it.  So how can they say it was

15   unexpected, and how can they say that we never argued it?

16   It's right in our claim construction brief.

17           And the last thing, Your Honor, is at page 6 where

18   they say that Judge Brimmer rejected our position that the

19   report on the first health care provider had to be

20   specifically directed to the first health care provider.  I

21   just can't see how they can even say that, Your Honor.  Even

22   the quote they have in their brief, this is Judge Brimmer's

23   actual language:  Defendant contends that the report relates

24   only to the particular first health care provider.  For the

25   reasons discussed earlier when construing first health care

1      provider, the Court agrees with the defendant.  So how can

2      Health Grades say that Judge Brimmer just went off and did

3      his thing and didn't follow what we had suggested?  He's

4      saying he agrees with us.

5              None of these reasons they're giving for this

6      supposed big surprise from Judge Brimmer, it's just a total

7      fallacy.  They knew this since day one, they had it in their

8      original infringement contentions, they reference our summary

9      judgment motion there, they followed -- they knew our claim

10     constructions in September, and Judge Brimmer did what we

11     asked Judge Brimmer to do on these terms.

12             THE COURT:  Well, the rule says that if the

13     construction is different from that proposed by the party

14     seeking amendment.  So if the plaintiff had taken the

15     position that a wheel must be circular and you had taken the

16     position that a wheel could be circular or spherical and

17     Judge Brimmer agreed with you, but in their claim

18     construction they were pretty sure he wasn't going to agree

19     with you, then shouldn't they be allowed to amend because the

20     judge took a -- adopted your position but it wasn't what the

21     plaintiff thought he was going to do?

22             MR. STIMPSON:  Well, Your Honor, I'm not sure that

23     they should be able to do that, because this is not

24     unexpected.  And if you see the cases we cite, if the Judge

25     does something different from what the parties oppose and

1    it's really unexpected, that's good cause.  That situation,

2    Your Honor, where I -- that would be a really surprise

3    construction, maybe there would be an argument there.  But

4    here it's different.

5          We have to remember here that they already

6    addressed this in their original infringement contentions.

7    They cited to our motion for summary judgment in their

8    original infringement contentions.  How can they say they

9    didn't see this coming?  They saw it coming and they

10    addressed it.  Now they just want to add new evidence.  So

11    it's entirely different.

12          The next element, Your Honor, received from the

13    first health care provider, that's even -- that's even -- I

14    mean, that one surprises me too.  It's untimely and there's

15    no good cause.  Judge Brimmer -- Judge Brimmer said that

16    received from the first health care provider can be from the

17    first health care provider or from an agent of the first

18    health care provider.  We didn't want the agent part, we lost

19    that, so what Health Grades says is, well, that's a surprise,

20    Judge Brimmer didn't agree with MDx and we never really

21    proposed it so that's really surprising too.  Your Honor,

22    that is exactly what Health Grades asked Judge Brimmer to do.

23    Here is a quote from Health Grades' brief.  This is document

24    number 79:  For example, a physician may provide her

25    secretary with information she feels will help a patient

1     choose her as a physician and instruct her secretary to

2     provide this information to the company managing the website.

3     That's page 20 from Health Grades' own brief, and now they're

4     saying they didn't anticipate Judge Brimmer saying that

5     agents could help?  Page 21:  This Court should reject MDx's

6     proposed definition and hold that the scope of the '060

7     patent claims is not limited to health care provider-verified

8     information that was provided personally from the health care

9     provider.  Health Grades asked for that construction, and now

10    they're telling you they're surprised and that they should

11    now be able to amend their infringement claim?  That was what

12    they wanted.  Your Honor, there is no good cause here,

13    there's no good cause, none of this.

14            On the prejudice issue, it's not -- it shouldn't

15    be relevant because if there's no good cause and it's

16    untimely, prejudice is not an issue, but to the extent the

17    Court wants to consider it, we relied on these infringement

18    contentions, for our invalidity contentions, for our prior

19    art searching, it set the playing field, as all infringement

20    contentions do, it sets the playing field for the whole case.

21    Health Grades says, well, wait a second, inventors don't

22    really have anything to do -- you don't need to ask an

23    inventor about that.  That is just wrong, Your Honor.  For

24    example, one of the inventors in this case, I took something

25    from their infringement contentions, something they said

1    infringed the patent under their infringement contentions,

2    and I asked the inventor about it, and he was not on board.

3    That is -- that is extremely relevant.  And if their

4    technical expert now tries to take the stand and put on that

5    infringement case, I've got them, I've got the goods on them,

6    because the inventor doesn't even agree with them.  So it is

7    extremely important to take the inventor depositions with the

8    final and proper infringement contentions.  We would be

9    extremely prejudiced at this late stage.

10            Thank you, Your Honor.

11            THE COURT:  Thank you.

12            Mr. Vasquez?

13            MR. VASQUEZ:  Your Honor, there is a fair amount

14    of distraction in what I just heard.  The rule is simple, and

15    what we've shown you in our brief is exactly what the parties

16    argued at the Markman hearing.  Okay?  The rule says that

17    unless there is undue prejudice, and I don't think there's

18    been any convincing argument that is made here, we should be

19    allowed to make these amendments because the claim

20    constructions proposed by Judge Brimmer are different than

21    those proposed from ours.

22            THE COURT:  What about the last one?  Mr. Stimpson

23    made a pretty convincing argument that you got exactly the

24    construction you wanted.  You said no construction was

25    necessary but if there was to be a construction it shouldn't

1    be MDx's, it should allow agents to make a proposal.

2              MR. VASQUEZ:  Well, Your Honor, you're talking

3    about received from the first health care provider, correct?

4              THE COURT:  Yes, I am.

5              MR. VASQUEZ:  So we did, we did propose -- say

6    that no construction was necessary.  Judge Brimmer said,

7    well, I'm going to construe it as meaning a receipt of

8    information from the first health care provider or one of his

9    or her agents such as an employee as distinguished from

10   information received from patients or public sources.  You

11   know, just on its face --

12             THE COURT:  But that's the construction you urged.

13   Mr. Stimpson told me that's the construction you urged.

14             MR. VASQUEZ:  One second, Your Honor.

15             Your Honor, may I approach you?  These are copies

16   of our proposed amendments.  They're Exhibit 5 to our motion.

17             THE COURT:  I have Exhibit 5.

18             MR. VASQUEZ:  Okay.  So this is -- this is the

19   Exhibit A claim chart to MDx's current website.  And at page

20   19 of 129.

21             THE COURT:  Exhibit 5 is 64 pages long.

22             MR. VASQUEZ:  No, I'm talking about -- this is one

23   of the Exhibit 5's in our motion, Your Honor, and it is 129

24   pages.

25             It's Exhibit 3, I'm sorry.

1          THE COURT:  All right.

2          MR. VASQUEZ:  And it's up.

3          And so all we're -- what I'm trying to show you is

4     this is what we seek to amend in our infringement

5     contentions.

6          THE COURT:  Where should I look?  Page?

7          MR. VASQUEZ:  On page 19 of 129.

8          THE COURT:  Page 19.  All right.

9          MR. VASQUEZ:  And so you'll see there that there

10    is -- what we seek to add is the statement at the top in the

11    right-hand column that says the Court's Markman order defines

12    received from the first health care provider to mean, as we

13    just discussed.  That's also the Markman order at page 24.

14         And then on the left side, or the next column off

15    to the left, it's the column that says Markman order, is what

16    we propose to add.  That flows directly from the Court's

17    construction.  Of course it goes on then to page -- the next

18    page, Your Honor, page 20, in that column labelled Markman

19    order.  That's what we propose to add here.

20         Any questions, Your Honor?

21         THE COURT:  I don't think so.

22         MR. VASQUEZ:  Thank you.

23         THE COURT:  The motion to amend infringement

24    contentions is granted.  I find that the claim construction

25    by Judge Brimmer is different from that proposed by the party

1     seeking amendment.  I find also that there is no undue

2     prejudice to the defendant.  To the extent that there is any

3     prejudice that has been identified with any degree of

4     particularity, it concerns the deposition of an inventor, and

5     at the defendant's option the deposition of that inventor may

6     be reopened solely to inquire about these revised

7     infringement contentions.

8                 The motion for protective order.

9                 MR. STIMPSON:  Thank you, Your Honor.  The issue

10    here is very simple.  Should Health Grades be allowed to

11    disclose our confidential and highly confidential information

12    to third parties and unidentified experts without any

13    opportunity for MDx, any advance notice to MDx with

14    opportunity to object.  The language we have in our

15    protective order, and actually the language they have in

16    their protective order, Your Honor, really doesn't matter

17    which one we use, although in theirs it's crossed out, it was

18    originally proposed by Health Grades, and it's standard

19    language in protective orders in patent cases that you're not

20    going to disclose confidential information of the other party

21    unless you give them advance notice of who's going to see it.

22                So really that's it, Your Honor.  I don't have

23    anything else to add to that.  It's just a standard

24    protection from -- under a protective order.  And we cite two

25    Colorado cases having similar language.  Thank you.

1          THE COURT:  Mr. Vasquez?

2          MR. VASQUEZ:  Your Honor, it is a simple issue,

3    however it is not about -- the issue is not about giving

4    advance notice, it's about the veto power that MDx requests.

5    That's where we take issue.  And it also -- this is not even

6    dealing with experts, because both parties have already told

7    each other who their experts are and there are no issues

8    there, but this relates to what it has related to from the

9    outset once, yes, we did supply a draft and then we're

10   looking at the terms and of course both sides proposed

11   revisions, and what we propose is, you know, there's a

12   possibility here that we may determine that in order to

13   prepare appropriately for trial that we will have to show a

14   third-party witness, fact witness, confidential information,

15   and again -- and also what's -- it's just confidential

16   information, Your Honor, not highly confidential.  Highly

17   confidential both parties agree means attorneys eyes only, so

18   that wouldn't go to such a witness.  But the issue is if

19   there's a third-party witness that we feel we must show some

20   confidential information received from MDx in order to be

21   properly prepared for trial and that third-party witness

22   agrees to abide by the confidentiality provisions of the

23   protective order, then we ought to be able to do that.  And,

24   you know, this iTriage situation that just surfaced is a very

25   good example of this, Your Honor.  It may be necessary for us

81

1    to call witnesses from iTriage and show them confidential

2    documents that we received from MDx to compare MDx's story

3    regarding those licensing activities or how to sell these

4    data sets versus what the iTriage witness says or recalls.

5         So that's -- that's really the issue, Your Honor.

6    I have nothing further to add.  If you have any questions.

7         THE COURT:  So let's look at Exhibit A to your

8    response.

9         MR. VASQUEZ:  Okay.

10        THE COURT:  You don't want 5.3.  Is that where

11   the -- that is the issue, is just 5.3?  I mean 5.3 and the --

12   5.3 and points following that.  5.3 through 5.3.3.

13        MR. VASQUEZ:  I'm just making sure that it also

14   doesn't include -- I'm just reading the e-mail very quickly,

15   Your Honor.

16        It's really what we -- the issue that remains here

17   is section 5.1.7 in that Exhibit A that you just referred me

18   to, Your Honor.  That's where we say we also added a new

19   section 5.1.7 to allow third-party witnesses access once they

20   agree to abide by the PO, or protective order.  5.3 relates

21   to screening of the experts.  We also, you know, at the time

22   this was written were disputing whether it could just veto

23   our experts, experts we intended to use.  Since then we've

24   disclosed the identity of our experts, they don't have any

25   objections.  So that's not at issue here.

1          THE COURT:  So 5.3 would not be taken out anymore?

2          MR. VASQUEZ:  It's essentially moot, yes, because

3     at this point both parties have talked about their experts,

4     or at least we have disclosed our experts to them because

5     they insisted on this, so we agreed to it.

6          THE COURT:  Well, maybe I wasn't paying attention.

7     I thought Mr. Stimpson was still talking about experts.

8          MR. VASQUEZ:  Well, I think Mr. Stimpson can

9     explain that at this point, because he insisted before we

10    arrived at any resolution as to the protective order that we

11    tell him who our experts were, were going to be, I did, and

12    that they've agreed that they're fine.

13         MR. STIMPSON:  That's true, Your Honor, but I

14    don't know if they're going to have another expert or not

15    and -- I'm fine with it as long as they can represent they're

16    not -- other than the experts we know.

17         I don't mind just taking out on experts, but we

18    need something like this on third parties.  He just mentioned

19    iTriage, which is in the business, and he wants to show them

20    our confidential internal documents.  We need something like

21    this for third parties.  I just don't want them taking our

22    confidential information and showing them to other people in

23    the business as they see fit.

24         THE COURT:  So 5.1.7 is the issue, and you want to

25    require that not only they sign and be bound but also that

1    there be disclosure and a period of time for your objection.

2              MR. STIMPSON:  Just a brief period is all we need,

3    Your Honor.  Yes, please.

4              THE COURT:  So I'm not sure if there's a problem

5    with 5.3 anymore.

6              MR. STIMPSON:  Well, there's not a problem with

7    5.3 if they're representing they don't have -- they will not

8    have any more experts.  If that's the case, then the experts

9    are done and it's moot.  But if there's a possibility that he

10   may get to the damages phase or something and say, wow, I

11   better have an accountant or something, which happens, then

12   this needs to be in there.

13             On the other hand, we need something like this,

14   something with advance notice and just a brief period for us,

15   especially if he's talking about showing our confidential

16   information to other people in the industry, we need an

17   opportunity to object, please.

18             MR. VASQUEZ:  Your Honor, my issue, just to be

19   sure there's no ambiguity, is that this object right is

20   really -- as I understand it, that Stimpson referred to is

21   just the objection means no, you may not use the (inaudible)

22   and that's that.

23             THE COURT:  So where is it I look to see the --

24             MR. VASQUEZ:  (Inaudible) veto.  Veto.

25             THE COURT:  -- objection language that you don't

1    like?

2             MR. VASQUEZ:  Well, if -- if --

3             THE COURT:  If no agreement is reached they may

4    move the Court.

5             MR. VASQUEZ:  I'm sorry, Your Honor, are you

6    reading...

7             THE COURT:  Right.  Looking again --

8             MR. VASQUEZ:  Yes.

9             THE COURT:  -- at Exhibit A to your --

10            MR. VASQUEZ:  M-hm.

11            THE COURT:  -- response, it's -- it was -- it's on

12   page 11, it was 5.3.3, it somehow got numbered to 5.2.3, it's

13   still stricken, and it says that if you can't -- there's a --

14   there's a disclosure, there's a meet and confer, if you can't

15   agree then producing party may move the Court that the

16   disclosure not be permitted, and it shall be the burden of

17   the producing party to show that the disclosure should not be

18   made and it has to be within 14 days.

19            MR. VASQUEZ:  Right.  So that language that you're

20   referring to, Your Honor, that is stricken because we don't

21   agree to it.  That is the language that gives them this veto

22   power that we're objecting to.

23            THE COURT:  But it just creates a mechanism for

24   judicial review.  I mean, why would you have it happen?  If

25   you're going to -- if you're going to show it to somebody,

 1    you're going to show -- you're going to show something really

 2    sensitive because it's marked as really sensitive to a direct

 3    competitor and they don't want that to happen, I mean, aren't

 4    they entitled to some protection and why is this an

 5    unreasonable protection?

 6              MR. VASQUEZ:  Well, the first question, Your

 7    Honor, that's what the protective order is for, it affords

 8    them protection, and even without this, if such a witness

 9    agrees to keep it confidential and abide by the terms of the

10    protective order, it's our position that that's enough

11    protection.  We're willing to live that in the other case if

12    they want to do it with a third-party witness.

13              THE COURT:  Okay.  The motion for protective order

14    is granted.  I will leave it to you to decide exactly what it

15    looks like, but I agree with Mr. Stimpson that there must be

16    notice before confidential information is shown to an expert

17    or to a third party, and there must be a mechanism for an

18    objection to that disclosure and for judicial review before

19    the disclosure is made.

20              MR. STIMPSON:  The next motion, Your Honor, I

21    think is our motion to compel?

22              THE COURT:  It is.

23              MR. STIMPSON:  The issue here, Your Honor, is not

24    the scope of documents that should be produced but timing.

25    We have been fighting this battle for 10 months.  In June of

1    2011 we served a document request asking for prior art.  They

2    told us they did not have any, they even swore in

3    interrogatory response they didn't have any.  We then found

4    through third party and our own independent research that

5    they in fact did have prior art, and we've been fighting that

6    battle ever since.  At Mr. Montroy's deposition, the

7    inventor's deposition, he's no longer employed by Health

8    Grades, but he said, yeah, we have documents that show

9    precisely what we disclosed to the public in (inaudible), and

10   so I immediately requested them.  We then agreed on search

11   terms, and so attached as, I think it's Exhibit A to our

12   brief, are the agreed search terms.  There are 10 terms, and

13   we agreed to them, I think it was March 2 or maybe March 5.

14   It's been nearly two months, we have a few hundred pages,

15   they have not completed even the searching yet, and we --

16   it's taken two months and we just have virtually nothing.

17   And the reason I had to file this motion, Your Honor, is

18   because we have a fact discovery cutoff of June 16, and

19   they're just taking way too much time to do this, and without

20   a Court order we're just not going to get them in time to

21   review them and take the depositions.  So we really need an

22   order that Health Grades do this.

23          Just as a little comparison, when Health Grades

24   sent them -- sent us their search terms, I asked my

25   associates, I wanted to make sure I was correct about this,

1       they asked in like November 9 and within two months, about

2       this period, we had produced like 53,000 pages.  And so now

3       we've been in about the same period, we've got a few hundred

4       pages, and they haven't even run all the search terms.  They

5       have no incentive to do this.  It's invalidity, it's

6       inequitable conduct, and it's going to go directly to our

7       request for fees and costs.  So they have no incentive to

8       produce this.  And so all I'm asking for really, Your Honor,

9       is incentive, I think we need your involvement to order them

10      to produce it by we think May 10, which would give us enough

11      time to review them and take the depositions before the close

12      of fact discovery.  Thank you.

13              THE COURT:  Thank you.

14              MR. VASQUEZ:  Well, Your Honor, just very briefly.

15      MDx took 75 days, not just under two months, to produce

16      results of our ESI requests, and I assure you that those ESI

17      requests were much narrower than what they've asked us to do

18      here.  There are not just 10 terms, there are 16 terms.  Even

19      though they numbered them as, you know, 10 when they made

20      their request, three of those are term X or term Y.  In fact

21      the third one is term X, term Y or term Z, so that really

22      effectively, because what Health Grades has in its IT

23      department, it's not like Westlaw where you can say this or

24      that, effectively what is required is that Health Grades

25      search for 16 terms on its e-mail server and for 16 terms on

1     its file server.  Now --

2          THE COURT:  When can you have it?

3          MR. VASQUEZ:  Well, Your Honor, I can tell you

4     just yesterday I received a report from Health Grades IT

5     department, and all of the searches on the file server have

6     been completed.  One of the terms that they requested

7     produced 22,494 documents.  As with all of the search

8     results, and that's the one of the greatest magnitude,

9     there's 1,068 on one term, 500, 400, 800, all of these

10    obviously require us to take time to review them for

11    privilege before producing.  I think that setting aside the

12    one where we received 22,000 hits for, I can have the

13    non-privileged results of all of the other ones by May 10th

14    as to -- (inaudible) search results on the file server.

15         As to the searches that Mr. Stimpson correctly

16    said are still ongoing, how can I say -- I said this in our

17    response, Your Honor, how can I tell you and represent to you

18    here in Court that I'll have it by a certain date when, A, we

19    don't know the volume of results which may come from the

20    searches, we're talking about e-mails here, this likely will

21    be more than just files.  We've agreed that if the results

22    are unreasonably broad that we will then confer to try and

23    narrow or find a way to get more concise, narrower group of

24    search results.  So how can I tell you by when I will have it

25    if, A, we don't know the volume of the results because the

1    searches are still ongoing?

2            THE COURT:  Well, so, there's been a month --

3    well --

4            MR. VASQUEZ:  Well --

5            THE COURT:  There's been --

6            MR. VASQUEZ:  March 8th is when -- is when we came

7    to an agreement as to narrower searches.

8            THE COURT:  All right.  So March 8.  April 8.

9    Nearly two months time.

10           MR. VASQUEZ:  Nearly two months, Your Honor.

11           THE COURT:  So I don't understand why all of the

12   searches haven't been run within two months time, even if

13   there are 16 instead of 10 as you say.

14           MR. VASQUEZ:  Well, you know, what the client

15   advises us is that this takes significant time, upwards of 16

16   and 32 hours per term per search, and that in many of the

17   searches that they run, when they look at the results, they

18   realize, oh, this is corrupted, or other, you know, issues

19   come up that are technical.  It happened with them when they

20   took 75 days to produce their ESI and, you know, I received

21   letters, we had a foul-up, it's going to take longer.

22           I think it's important, Your Honor, to note that,

23   you know, we have on March 30 and then on April 16 sent them

24   search results already to the two terms that they were most

25   concerned about, because when we agreed to narrow these

1    searches we also agreed to an order of priority.  We also

2    agreed, Your Honor, to do two at a time on a rolling basis.

3    The notion that 32 are run simultaneously, A, is not

4    possible, B, it's not what we agreed to do.

5         You know, I illustrated -- or, you know, included

6    in our response an e-mail which set forth the circumstances

7    that led to this.  You know, initially a lot of time was lost

8    because MDx simply said run these searches and give them to

9    us.  When we said okay, let's start, and then reported we got

10   37,000 hits so we've got to work together and confer to

11   narrow this, Mr. Stimpson said no, that's unacceptable,

12   period.  Then we undertook to consult with an outside

13   document -- forensic document consultant and prepare to file

14   a motion with the Court asking that the Court shift the cost

15   of that discovery to MDx, and there's case law that said

16   that, you know, when the parties, you know, unreasonably

17   refuse to work to narrow searches, as happened here, that

18   that shift in costs is appropriate.  Well, that finally got

19   Mr. Stimpson to say, oh, well, okay, we'll give you narrower

20   searches.  And so we date restricted them, and that's what

21   happened beginning March 8th.

22        So, Your Honor, what I would propose is this.  We

23   have results here.  All the searches are done on the file

24   server.  Searches are ongoing, and it's my understanding that

25   they'll be completed within a week on the e-mail server.  I

1    don't know what the volume will be, but perhaps I can report

2    to the Court in a pleading on May 10th, or the date that you

3    order me to, here is -- we've completed searches, here are

4    the results, and we could then, you know, say, well, these

5    are too broad or based on the volume we will need this time

6    to conduct our privilege review.  We are perfectly willing to

7    staff a room with 10 attorneys, you know, to get through

8    this, but, you know, if it comes back with 20,000 results for

9    a bunch of these things, we're going to have to confer and

10   try to narrow it.  So I guess --

11           THE COURT:  So I -- what you just said is

12   especially troubling.  You had six or seven weeks and you've

13   run 16, you say you can do 16 more in one week.

14           MR. VASQUEZ:  That's because those have been

15   begun.  It's not like we're just starting these now because

16   of this motion, Your Honor.  Mr. Stimpson is well aware.

17   I've informed him.  These searches are ongoing.  And it's not

18   like they just start one and then sit there looking at the

19   machines until it's done.  They start, it goes through a

20   certain volume of data, then the IT people at Health Grades

21   have to shift priorities and run the business.  You know.  Or

22   sit down and figure out what happened, how come this search

23   stopped, how come these results don't look right.  It takes

24   time to do this, Your Honor.  So I don't think this should be

25   troubling.  In fact I think what we are proposing to do here

1     is the most reasonable thing in these circumstances.

2                    THE COURT:  Okay.

3                    Mr. Stimpson?

4                    MR. STIMPSON:   The 37,000 hits, that's old news,

5     Your Honor.  Before we agreed in early March -- you hit the

6     nail on the head, Your Honor, it's been two months, they

7     haven't even run the searches.  They haven't even completed

8     searches.  And then you ask Mr. Vasquez when are you going to

9     have it done, and I didn't hear an answer.  The answer is,

10    you know, whenever.  That's why I had to file this motion,

11    because that's the same answer I'm getting, Your Honor, and

12    with the fact discovery close coming up, we just need the

13    Court's involvement.

14                    There's one truth here, you know, Mr. Vasquez

15    talked about they have to shift priorities around maybe to do

16    this, then they'll need to do that, but we have a fact

17    discovery cutoff and we have to meet it.  So the truth, Your

18    Honor, the universal truth, is if a judge orders you to do

19    it, you're going to do it, and I think if the Court says

20    May 10, believe me, we will have those documents by May 10.

21    Thank you.

22                    THE COURT:  The motion to compel responsive

23    documents to the electronic search by May 10 is granted.  I

24    am not an unreasonable person.  On a substantial evidentiary

25    showing that it simply was impossible, substantial compliance

1    has been achieved but it was impossible to complete full

2    compliance, supported by evidence, what remains to be done

3    and what it will be take, I will consider extending as

4    necessary that deadline, but it will take -- but I expect

5    that the production will be completed or almost completed by

6    May 10.  My suggestion that evidence might lead to some brief

7    extension is not an invitation to come back and say we've

8    only -- we've still got an awful lot to do.

9              I think that's everything that's ripe.

10             MR. STIMPSON:  Yes.

11             THE COURT:  All right.  Anything more,

12   Mr. Vasquez?

13             MR. VASQUEZ:  No.  Thank you, Your Honor.

14             THE COURT:  Mr. Stimpson?

15             MR. STIMPSON:  No, thank you, Your Honor.

16             THE COURT:  Thank you very much.

17             THE CLERK:  All rise.  Court is in recess.

18             (Whereupon, the within hearing was then in

19   conclusion at 11:19 a.m. on this date.)

20             I certify that the foregoing is a correct

21   transcript, to the best of my knowledge and belief (pursuant

22   to the quality of the recording) from the record of

23   proceedings in the above-entitled matter.

24

25   _____        _____
     Signature of Transcriber                 Date

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305