**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  11-CV-00520-PAB-BNB

HEALTH GRADES, INC.

       Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM

       Defendant.

---

**Rebuttal Report of Richard G. Cooper, D.Sc.**

---

Attorneys for MDX have asked me to submit the following rebuttal report, responding to the expert report of Dr. Philip Greenspun.  I am engaged in ongoing development and refinement of my opinions and expected testimony and reserve the right to submit supplements to the information contained in this disclosure pursuant to the Federal Rules of Civil Procedure.

## Introduction

1.     I incorporate herein the content of my initial Report, dated July 13, 2012, specifically including my background and expertise, and my discussion of the art area and level of ordinary skill in this art.

2.     In preparation of this report, I have reviewed materials referenced in Dr. Greenspun's report, and I have reviewed all the materials identified in my initial report.  I have also read the pending motion for summary judgment of non-infringement, and related papers.  I have also reviewed the following documents:
- MDX 0104128, 30, 33, 35, and 37;
- MDX 0034444-45;
- Any other documents referenced in this report.

## No Infringement

3.     I will describe the '060 patent, and the specification and claims of that patent.  I will also explain my understanding of patent claims, and how people must be able to review the patent claims and understand them, and be able to design around them.

4. I will compare the patent claims of the '060 patent to the accused Vitals website (both the early and late version, collectively the "Vitals Website"), and demonstrate how a number of important elements of every patent claim are totally missing from the Vitals Website. I will explain how the old Vitals Website did not infringe any claim of the '060 patent, and the changes made by MDx to bring the Vitals website even farther from those claims. Unless stated otherwise, the positions in this Report apply to both early and late versions.

5. I will address literal infringement and the doctrine of equivalents, and explain how there can be no infringement literally or by equivalents for various reasons.

**The Law**

6. It is my understanding that there are two ways that an accused product or process may infringe a patent claim, literal infringement and infringement under the doctrine of equivalents.

7. Literal infringement requires that every element of a claim, as properly construed, be literally met by the accused product or process.

8. The doctrine of equivalents provides that elements not literally met under the law may still be met equivalently if an element in the accused product or process is substantially similar to the claimed element. One way to determine equivalents is to examine whether the element in the accused product or process performs substantially the same function, in substantially the same way, to achieve substantially the same result, as the claimed element.

9. I also understand that there are limitations on the doctrine of equivalents. One such limitation, not considered by Dr. Greenspun, is the "all elements" rule – requiring that every element in the claim be met literally or by equivalents. This has been stated by the United States Supreme Court in that the doctrine of equivalents cannot be used to "vitiate" a claim element in its entirety. Stated another way, the doctrine of equivalents cannot be used to capture a structure that is clearly excluded from the claim. Thus, for example, the doctrine of equivalents cannot be used to capture the opposite of the claimed requirement.

10. I understand that another restriction on the doctrine of equivalents is provided by prosecution history estoppel. Under this doctrine, where a claim is amended for reasons related to patentability, there is a presumption that the claim is not entitled to capture ground between the old and amended claim under the doctrine of equivalents. While there are some ways to overcome this presumption, Dr. Greenspun does not address any of those ways in his report. If asked, however, I will address them.

11. I also understand that Health Grades has the burden of proof by a preponderance of the evidence (tipping of the scales) on the infringement issue.

EXHIBIT B

## INFORMATION VERIFIED BY THE FIRST HEALTH CARE PROVIDER

12. Claim 1 has the following limitation:

   accessing healthcare provider-verified information about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of:

   specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;

13. I agree with paragraph 122 of Dr. Greenspun's report that the meaning of "verify" is to prove, confirm or substantiate an assertion. There is no evidence that Vitals.com health care providers verify (in any of the above three senses) the database entries describing the first health care provider. For example, Health Grades verified this information in past cases by requiring documentation (Montroy, page 145). No such requirement is imposed by Vitals.com on its health care providers.

14. Even though Dr. Greenspun did not address the equivalent issue, in my opinion, there can be no infringement by equivalents of this element. Verification by the health care providers themselves is better than completely unverified information – none of the function of verification (a way to assure accuracy), way (by proof through the provider), and result (proven accurate information from the provider) are substantially similar in the Vitals website. Therefore the provider-verified information is not equivalent to unverified information. Neal (page 46) and Montroy (page 45-46).

15. I note that, in various paragraphs in Dr. Greenspun's report, he opines that the mere capability of the MDx web site to perform certain functions is sufficient to show infringement. I disagree. For example, this claim element affirmatively recites that the information has to be verified by the health care provider. Therefore, the mere capability to do so is not sufficient for infringement. My analysis is the same for all other assertions by Dr. Greenspun regarding other claim elements that mere capability is sufficient for infringement.

## INFORMATION RECEIVED FROM
## THE FIRST HEALTH CARE PROVIDER

16. The claim language above also requires that three items of the data set be received from the first health care provider. Dr. Greenspun showed no evidence that any health care provider had furnished even two of the required data set, let alone all three required by the claim element.

**EXHIBIT B**

17.     Discovery in this case has shown that only very small percentages of health care providers have furnished even a single item of the required data set.  See MDX0104073-4110.  Since the individual items in the data set are not logically related or mutually constrained, a health care provider's change to one of the items does not in any way imply that the health care provider would have reason to change one of the remaining items in the required data set.

18.     Dr. Greenspun opines that MDx may have been able to write a query that would determine whether any health care provider has ever edited three or more of the items in the required data set.  However, Dr. Greenspun did not himself question the accuracy of the MDX queries or responses.  I have reviewed the discovery materials requested and produced by the parties in this litigation.  To the best of my knowledge, Health Grades did not request the queries suggested by Dr. Greenspun, and I am aware of no motion to compel this information provided or filed by Health Grades.  As it is Health Grades' burden of proof to show infringement, and Health Grades has absolutely no evidence that any provider has ever edited three or more of the items as required by the claim element, there can be no infringement.

19.     Dr. Greenspun does not address the doctrine of equivalents, but if asked, I will do so.

20.     There can be no infringement by equivalents because the health care provider is furnishing fewer than three items of the required data set, and so any equivalents position would entirely eliminate this requirement of the claim.

21.     As Dr. Greenspun admits in his discussion of the prosecution history, the required three or more items was added during prosecution in response to rejections by the patent office.  Therefore there is a presumption of prosecution history estoppel, and Dr. Greenspun says nothing about this presumption.  If necessary, I will address the prosecution history to show that these additions were added for reasons related to patentability.  Thus, this should also prevent any alleged equivalents.

22.     Another reason is that the Vitals website does not perform substantially the same function, in substantially the same way, to achieve substantially the same result.  The function (obtaining at least three of the data set from the provider), the way (receipt from the provider), and the result (three or more data sets obtained from the provider) are not substantially the same in the Vitals website.  The way the Vitals web site operates is to get fewer than three items of the data set, the function is also entirely eliminated, and the Vitals website gives a result having fewer than the required three items received from and verified by the provider.

EXHIBIT B

### THIRD PARTY VERIFIED INFORMATION

23.  All claims require the following element:

>  compiling information regarding the first healthcare provider verified by an independent third-party source,
>
>  wherein the information verified by the independent third-party source comprises three or more from the group consisting of:
>
>  board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;

24.  Dr. Greenspun's analysis relies almost entirely on the fact that MDx obtains various of these items from third parties, and he concludes that therefore the third parties have verified them.  Verification of the data, however, is not the same as receiving the data.

25.  The required data is not verified by third parties, and in fact they actually disclaim reliance on the data and state that the data is not verified.  For example the American Board of Medical Specialties (ABMS) specifically disclaims the data they provide in the following statement:

> The physician certification information in the ABMS database is updated periodically with data provided by its **Member Boards**. Due to the possibility of reporting and processing delays, the accuracy and completeness of records cannot be guaranteed. ABMS shall not be liable to you or others for any decision made or action taken by you in reliance on the information obtained from this service.  It is the user's responsibility to determine that the physician record obtained is that of the physician whose information is sought.

26.  Another example is provided below by the Pennsylvania Department of State:

> **Disclaimer**
>
> The information contained in this web site is being made available as a public service by the Pennsylvania Department of State (Bureau of Professional and Occupational Affairs). No posted information or material provided is intended to constitute legal or professional advice. The information contained in this web site was supplied from license applications and other sources such as schools and other states. The Department of State makes no representations or warranties, either express or implied, as to the accuracy of any posted information and assumes no responsibility for any errors or omissions contained therein. Furthermore, no warranty, express or implied, is created by providing information through this web site and the presence of an individual licensee on the web site does not in any way constitute an endorsement by the Department of State or any of its member boards. No one shall be entitled to claim detrimental reliance on any views or information, whether provided by or accessed through this web site, or to claim any duty on our part to update posted information or to protect the interests of those accessing this web site. In no event shall the Department of State, its contractors, or its member boards or staff be liable to you or anyone else for any decision made or action taken in reliance on such information or views. For more information regarding this web site or if you have any questions about information provided therein, please contact the Licensing Board of the Department of State responsible for the license directly. The data is derived directly from the Pennsylvania LicensePA database and is updated on a daily basis.

**EXHIBIT B**

27. Other examples are provided in the documentation produced by MDx.

28. Rather than have these third parties verify the data, they do exactly the opposite, and disclaim accuracy of the data. Accordingly, there is no literal infringement.

29. Dr. Greenspun did not do an equivalents analysis on this element. If asked, however, my opinion is that there cannot be equivalence between the Greenspun assertions and the actual data, which is not verified and is in fact disclaimed by the third party providers. The function and result of the claimed element are entirely lacking in the Vitals web site because the purpose of the claim element is to *prove, substantiate* or *confirm* the accuracy of the data. Therefore the function, way and result are not substantially the same for the claim element and the Vitals web site. Any equivalents argument would effectively eliminate this claimed requirement entirely.

### COMPILING AND USING INFORMATION FROM THIRD PARTIES

30. The claim also requires:

> creating, by the at least one computer processor, a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information[1], and the information verified by the independent third-party source,
>     wherein the healthcare provider report on the first healthcare
>     provider includes comparison ratings of healthcare providers;

31. Beginning in January, 2011, MDx changed its web site so that it would never show three or more of this data set as obtained from third parties. MDX 0034444-45. See also the Rothschild, West and Boyer depositions.

32. On January 5, 2011 Mitch Rothschild sent an email to Erika Boyer and Larry West. MDX 0011997-98. The email stated the following:

```
To ensure that Vitals is not in violation of this patent, in any
way, certain of our policies, the list of which is noted below,
must continue to be strictly enforced:
1) Our display of 3rd party verified information does not
include IRF [internship, residency, fellowship]
2) Our display of 3rd party verified information does not
include licensure status
3) Whenever Disciplinary Action is recorded & displayed for a
provider, no patient ratings or reviews gathered by Vitals are
shown on any report
```

---

[1] Only about 42% of the Vitals patient-ratings come from the Vitals website as required by the claims. I do not understand that Health Grades, or Dr. Greenspun allege that the others are part of the alleged infringement. See MDx Supplemental Response to Interrogatory 2.

```
4) No report on Vitals shows comparison ratings to other
providers, in particular with reference to patient experience
surveys and comparisons to national & specialty averages.
```

33.     As points one and two make clear, third party internship, residency, fellowship and licensure information were not all to be used in the Vitals reports.  Point three also confirms that disciplinary action is never used in a report that has patient ratings.

34.     The foregoing precludes any possibility of three or more of the third party provided information being used in any report that also includes patient ratings.  The most that could possibly be used in a Vitals report having patient ratings would be two items from the list of required items, whereas the claim element requires three or more.

35.      Dr. Greenspun does not address equivalents for this element.  If asked however, I will give my opinion that there can be no infringement by equivalents.

36.     First, if using only two items of the required list could be equivalent, that would entirely read the claim element out of the claim.  Second, as Dr. Greenspun admits in his report, use of the information verified by the third party sources was added to the claim during patent prosecution in response to a rejection by the patent office.  Therefore there is a presumption of prosecution history estoppel, and Health Grades is estopped from arguing this equivalence.  If necessary, I will address the prosecution history to show that these additions were added for reasons related to patentability.  Also the function-way-result test is not met so there can be no equivalent.  Specifically the function and result are completely missing because there are less than three of the required third party verified information items in the report.  Also, it is done in a substantially different way because Vitals web site only uses two of the items, not three.

37.     Dr. Greenspun is of the opinion that the three or more items do not need to be displayed.  I disagree.  In this context, there is no way I can see in which this terminal, indivisible information can be used other than in displays meant for the prospective patient.  There is no other way in which this terminal information can be combined with other terminal information, therefore it cannot be *used* in the sense that the claims require.

38.     Dr. Greenspun argues that Vitals uses licensure information because it does not retrieve any information on physicians who are not licensed.  According to Dr. Greenspun, creating the report is a *use* of licensure information.  I disagree.  Unlicensed physicians do not even make it through a filter allowing them to be shown in any way whatsoever on the Vitals web site.  So, for example, they would not be searchable and they would not be shown in results lists.  The claim expressly requires that the information be *used* to create the report.  Licensure information is not used in any way to create the report.  For these reasons and those stated above, this also cannot reasonably be asserted to be met equivalently – it would read the limitation out of the claim entirely, and does not have a substantially similar function, way, or result.

39.     Dr. Greenspun states in paragraph 161 that:

EXHIBIT B

> *I know that the reports are created using third party-verified information because in many cases, this information is displayed in the physician report.*

This assertion is factually incorrect. To the extent that three or more items are displayed in the report, only at most two came from third parties and the other came from the health care provider. See Boyer transcript.

40. In paragraph 166, Dr. Greenspun states:

> Also, if Vitals.com displays fellowship information that has been self-reported by a doctor, it is my opinion that it is still "*using*" the fellowship information MDx collected from a third party. It is after all stored in the database. In order to avoid displaying incorrect information, Vitals must resolve conflicts between doctor-reported information and third-party verified information. This is a "*use*" of both kinds of information.

The fellowship information is indeed stored in the database, but it has not been provided by a third party; instead, it is provided by the physicians themselves, and therefore does not meet the claim element limitation. There is no compulsion for MDx to resolve conflicts because only physician reported information is *used*, not third party verified information. It is also important to note that this assertion is Health Grades burden of proof and Dr. Greenspun cites absolutely no evidence to support his supposition.

41. Dr. Greenspun does not address equivalents for this issue either. If I am asked, I will provide my opinion that there can be no equivalents. The Vitals web site simply does not use three items from the list, and any equivalents argument that using only two items would meet the claim element, would entirely vitiate this claim term. Also, as Dr. Greenspun acknowledges, use of the third party information in creating the report was added by amendment during prosecution to overcome prior art rejections. There is an estoppel precluding this equivalents argument, and I am prepared to address the prosecution history to show these additions were added for reasons related to patentability if necessary. Lastly, the function-way-result is not substantially the same. The result of the claim term is having a report with three of the list items provided and verified by third parties. The Vitals web site has no more than two items, and for the same reason, the function and way are not substantially similar for the reasons discussed above.

## COMPARISON RATINGS INCLUDED IN THE REPORT

42. The claims of the '060 patent require 1) receiving a request for information regarding a "first health care provider"; 2) creation of a report on the first health care provider; and 3) the report must include comparison ratings of health care providers. The court construed "first health care provider" to mean "a particular health care provider about whom information is requested and a report is produced". See page 12 of the court's claim construction order. The court also held that the report must be directed specifically to the first health care provider. See pages 12-13. The court construed the

**EXHIBIT B**

claims so that "ratings of multiple health care providers, including the 'first health care provider,' [be included] in the report on the 'first health care provider' thus permitting comparison of the 'first health care provider' with other potential health care providers." See page 14.

43.     In my view, Dr. Greenspun's analysis does not adhere to the court's claim constructions.  He refers to the results list as being the report on the 'first health care provider', but that doesn't meet the claim construction for the report on the 'first health care provider.'  Results lists are not directed specifically to the 'first health care provider', but instead are just lists of providers who satisfy the search terms.  Results lists are claimed separately in claim 7.  See Neal at page 201 wherein he states "that results list is not a health care provider report, in my opinion."

44.     The Vitals web site has no reports specifically directed toward a 'first health care provider' that contain comparison ratings.  Therefore there is no literal infringement.

45.     Dr. Greenspun says that the results lists are part of reports, but that cannot be true within the court's construals because the results list is not directed to the particular 'first health care provider'.  Furthermore, any part of the results list that does include any particular health care provider does not contain comparison ratings.  Therefore the claim element is not met by Dr. Greenspun's analysis.

46.     I also conclude that there can be no infringement under the doctrine of equivalents.

47.     Dr. Greenspun ignores the patent law requirement that all claim elements must be read upon, literally or equivalently (the all-elements rule) by the court's construed meanings of the terms used in the claims.  I see no indication in Dr. Greenspun's report that indicates that he was even aware of this rule.

48.     Under Dr. Greenspun's analysis, comparison ratings *excluded* from the report would be equivalent to the claim requirement that they be *included* in the report.  Stated another way, Dr. Greenspun would have the ratings *outside* the report be equivalent to the claim requirement that they be *inside* the report.  Dr. Greenspun thus argues that the exact opposite (antithesis) of the claim language should be found to be equivalent to the claim language itself; clearly this is self contradictory and reads the element entirely out of the claim without any basis in law.  Because Dr. Greenspun's analysis relies on the opposite of the claim language, it is not correct, and there can be no equivalence between a statement and its opposite.

49.     I also find prosecution history estoppel precluding the alleged equivalence.  Dr. Greenspun recites the prosecution history on pages 10-20 of his report.  However, he never analyzes the prosecution history or opines on what was added to the claims or why.  From my own review of the prosecution history, its clear that the requirement that the comparison ratings be within the first health care provider report was added to overcome a prior art rejection, and thus related to patentability.  Therefore, there is a presumption of

EXHIBIT B

estoppel, and Dr. Greenspun says nothing to rebut that presumption. Accordingly in my opinion, the clear estoppel precludes the alleged equivalence.

50.  I understand that there are ways in which the patentee can overcome the presumption of estoppel. One way is to show that the amendment was only tangential to the alleged equivalent. While Dr. Greenspun provides no opinion on this issue, if asked, I will give my opinion that this amendment is not tangential. The amendment added during prosecution requires that the comparison ratings be included directly in the report, and the results list does not fulfill the definition of the report. So the amendment was directly related to this alleged equivalent.

51.  If asked, I will explain that the prosecution history shows that Health Grades was faced with the rejection of the claims under prior art in response. Health Grades added the requirement that the report be on the 'first health care provider' and that that report include the comparison ratings. The cited Henley prior art would have been understood by a Posita to disclose a computer system allowing comparison of health care providers. See Henley, paragraphs 16, 30, 37, 107, 114, 128, 137 and figure 18. Health Grades amended the claims as noted above in order to avoid this Henley and other prior art cited in the rejections.

52.  The initial claims, not the amended claims, are much closer to the construal asserted by Dr. Greenspun. Claim 19 for example, before the Health Grades amendment, read as follows:

> … a computing system with access to health care provider information stored in a database, wherein patients may search the database and review health care provider reports to differentiate among health care providers.

53.  I also disagree with Dr. Greenspun's equivalence analysis. In my opinion, Dr. Greenspun is performing equivalence analysis on the wrong claim element. Instead, he should have been focusing the analysis on whether comparison ratings outside the report could be equivalent to the requirement be inside the report. In my opinion, having comparison ratings *inside* the report is directly and logically opposed to the alleged equivalent of having the comparison ratings *outside* the report.

54.  The function of the claim language requiring comparison ratings to be included in the first health care provider report is to allow ease of comparison to the other providers in the same report that focuses on that first health care provider. This is accomplished by including the comparison ratings in the report that focuses on the first health care provider. The result is a single report focusing on the first health care provider that also contains ratings of other providers.

55.  The alleged equivalent does not have a substantially similar function, way or result. The function is entirely missing in the alleged equivalent; the alleged equivalent of a separate results list, combined with a report, entirely precludes having that function in one report. The way is also entirely absent because the Vitals web site has ratings of other health care providers entirely outside the first report. The result is also entirely

EXHIBIT B

missing because users of the Vitals web site simply can't do what the claim element allows because they can't have this report focused on the first health care provider that also includes the comparison ratings.

56.     The benefits of having all the information in one report was even stated by the patent examiner.  See HG000088.  Health Grades witnesses also could not support the Health Grades equivalents with regard to this element.   See Neal page 201 and 238-45.

## HYPERLINK TO AFFILIATED HOSPITALS

57.     Claim 4 recites the following:

> The method as defined in claim 1, wherein the healthcare provider report includes a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

58.     This claim term clearly requires links to affiliated hospitals from within the first health care provider report.  The Vitals web site simply does not have links of that kind.  Therefore there is no literal infringement.  As Dr. Greenspun acknowledges, the hyperlinks on the Vitals web site simply link to Vitals own subpages, outside of the report pages, that show information on the affiliated hospitals.

59.     Dr. Greenspun does not allege equivalents of this element.  If asked however, I will provide my opinion that there can be no equivalence.  The requirement that there be a link to the actual hospital web site would be vitiated by this alleged equivalent, and also would not meet the function, way or result analysis.  Specifically, the function is to provide a link to the hospital itself resulting in the user being on an entirely different web site.  That function and that result are completely and totally missing from the Vitals web site, as is the way by providing a direct link.

## RESULTS LIST ADVERTISEMENTS

60.     Claim 8 states as follows:

> The method as defined in claim 7, wherein the results list further includes an advertisement for the first healthcare provider with a hyperlink to information on the first healthcare provider.

61.     The Vitals web site does not provide advertisements in the results list.  Dr. Greenspun cites no evidence supporting his proposition.  Accordingly there is no literal infringement.

62.     Dr. Greenspun does not allege equivalents in this argument.  If asked, I will provide my opinion that having the advertisements *inside* the results list is not equivalent to having them *outside* the results list.  The reason for this is that *outside* the results list is the exact opposite of the requirement that the advertisement be *inside* the results list.  The

**EXHIBIT B**

alleged equivalent of the results list proposed by Dr. Greenspun reads this claim limitation out the claim entirely.

### MEMBER OF THE COMPANY MANAGING THE WEB SITE

63.     Claim 9 states:

> The method as defined in claim 7, further comprising: determining from the results list whether a particular healthcare provider is a member of the company managing the Web site; and if the particular healthcare provider is a member of the company managing the Web site, providing enhanced services for the member healthcare provider on the Web site.

64.     The Vitals web site does not determine membership from a results list.  While all physicians can register with Vitals and access the physician portal, there is no membership functionality on the Vitals web site in connection with a results list.  Therefore there is no literal infringement in my opinion.  (The same non-infringement analyses, for literal and equivalents, apply to claim 11, which depends on claim 9.)

65.     Dr. Greenspun does not allege equivalents to this element.  If asked, I will provide my opinion that there is no equivalence.

66.     Specifically, the function-way-results analysis has not been met.  The function of having membership of the company managing the web site is to provide some special designation for those physicians but in the MDx web site, that function is entirely lacking.  The result of having a special designation for health care providers is also entirely lacking in the Vitals web site.

### CLAIM 15

67.     Dr. Greenspun references his analysis for the same elements found in claim 1.  I agree that they are the same basic analysis, and I reassert my analysis found above for claim 1.

### iTRIAGE

68.     I note that Dr. Greenspun provides an opinion on infringement with regard to the iTriage application even though that infringement allegation is not part of this case.  Because this claim is not part of this litigation, I provide no opinion on it here.  However I reserve my right to offer an opinion should this ever become part of the case.

**EXHIBIT B**

## FINDINGS

My opinions on the infringement issue include the above, and include at least the following:

69. The Vitals web site does not have, either literally or equivalently, three or more of the items required to be verified by the health care provider.

70. The Vitals web site does not have, either literally or equivalently, three or more of the required items that must be received from the first health care provider.

71. The Vitals web site does not have, either literally or equivalently, three or more of the required items that must be verified by a third party.

72. The Vitals web site does not have, either literally or equivalently, three or more of the required items to be received from a third party and used in health care provider reports.

73. The Vitals web site does not have, either literally or equivalently, any comparison ratings included in the report on the first health care provider.

74. The Vitals web site does not have, either literally or equivalently, a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

75. The Vitals web site does not have, either literally or equivalently, a results list that further includes advertisements for a first health care provider.

76. The Vitals web site does not have, either literally or equivalently, a method including determining from the results list whether a particular health care provider is a member of MDx.

Dated this 17th day of September 2012

By: _Richard M Cooper_
    Dr. Richard G. Cooper

**EXHIBIT B**