cooper rough transcript.txt


D I S C L A I M E R


THIS TRANSCRIPT IS A ROUGH DRAFT TRANSCRIPT.  IT IS

SUBJECT TO THE PROVISIONS OF CCP SECTION 2025

(R)(2)  IT HAS BEEN TRANSLATED FROM STENO INTO

ENGLISH BY COMPUTER.  THIS TRANSCRIPT HAS NEITHER

BEEN EDITED NOR PROOFREAD BY THE Court REPORTER.


THIS UNEDITED DRAFT MAY CONTAIN UNTRANSLATED

STENOGRAPHIC SYMBOLS, AN OCCASIONAL REPORTER'S

NOTE, A MISSPELLED PROPER NAME, OR OTHER

NONSENSICAL WORD COMBINATIONS.


        THE VIDEOGRAPHER:  Here begins volume

number I Videotape No. 1 of the deposition of

Richard Cooper in the matter of Health Grades

versus MDX Medical in the U.S. District Court

district of Colorado case number is

11-cv-00520-PAB-BNB.  Today's date is October 9th,

2012, the time on the video monitor is 10:00 am.

Video operator's name is Kenneth McNeal, contracted

by Merrill Legal Solutions at 20705 Ventura

Boulevard, Suite 205, in Woodland Hills,

California.  This deposition is taking place at the


Hampton Inn at 3700 West Florida Avenue in Hemet,

California.  And was noticed by Jesus VAZQUEZ of

EXHIBIT C

cooper rough transcript.txt

Rothgerber Johnson.  Counsel, please identify

yourselves and state whom you represent.

MR. VAZQUEZ:  Jesus VAZQUEZ, from

Rothgerber Johnson & Lyons, representing the

plaintiff Health Grades.

To my left is Kirsten Stoll-DeBell with the

firm Merchant & Gould, also representing the

Plaintiff Health Grades.

MR. STIMPSON:  Scott Stimson, Sills Cummis

& Gross representing the witness and MDX.

THE WITNESS:  Richard Cooper.  I am the

witness.

MR. STIMPSON:  We got that.

THE VIDEOGRAPHER:  The court reporter is

today is Karen Pearson-Bell of Merrill.

Would the court reporter please swear in

the witness.

EXAMINATION

BY MR. VAZQUEZ:

Q.   Good morning, Dr. Cooper.  As you know, my

name is Jesus VAZQUEZ.  And I am taking your

deposition today.

♀

I would like to mark the first exhibit,

please, Cooper 1.

(Deposition Exhibit 1 was marked for

identification by the Reporter and is annexed

hereto.)

(Discussion off the record.)

BY MR. VAZQUEZ:

Page 2

EXHIBIT C

cooper rough transcript.txt

Q.   Dr. Cooper, before you review Exhibit 1 just let me ask you a few questions.  You have had your deposition taken before; correct?

A.   Yes, I have.

Q.   About how many times?

A.   Oh, dozens.  Maybe 30, 40, 50.

Q.   Okay.  And so you know the basic rules the court reporter will do her best to transcribe both my questions and your responses.

A.   Yes.

Q.   So it's important that I talk slowly and enunciate and articulate as best I can.  Same your for your responses.  And if you could yes or no versus an uh-huh or shake of the head, nod of the head.  Is that okay?

A.   Yes.  That's fine.

Q.   All right.  So, Dr. Cooper, you have been handed Exhibit 1 No. 1 which is your rebuttal report in this case.  Correct?

A.   That's correct.

Q.   And with respect to imagine 2 of your -- sorry.  One second.  I am page -- there are no page numbers of your are you bet at all report?

MR. STIMPSON:  Paragraph numbers.

MR. VAZQUEZ:  Right so I'm just catching up here.

BY MR. VAZQUEZ:

Q.   Paragraph 12.  Do you agree that the term healthcare provider as used in the 060 patent

Page 3

**EXHIBIT C**

cooper rough transcript.txt

claims is limited to human beings that provide healthcare?

    A.   I believe there are cases where it could be the hospital rather than the human being.

    Q.   And when you say cases, what do you mean?

    A.   May I see the patent?  The 060 patent?  I think it 0 he.

    Q.   Well, I'm just asking you if you can -- can you answer the question without referring to the patent?

    A.   Oh, I would rather be sure my answers are consistent with the patent.

    Q.   Well, I am talking about healthcare provider sir as it's used the in the patent claims.

Just the claims, not the specification.  Does that help you answer the question?

    MR. STIMPSON:  Objection.  Jesus, he has asked to see the patent.  So --

    MR. VAZQUEZ:  I know.  And when I am ready to show him the patent, I will.

    MR. STIMPSON:  I understand.  My objection is you are trying to ask him the question without the patent and the patent claims go in the patent so that's my objection.  So --

    MR. VAZQUEZ:  Okay.

    Q.   So you have on -- at Paragraph 12 Dr. Cooper cited claim 1 of the 060 patent.  Isn't that what that is?

    A.   That's one of the limitations, yes.

    Q.   You're right.  So just referring to that

EXHIBIT C

cooper rough transcript.txt

language there in your rebuttal report sir, can you tell me whether you agree that the term "healthcare provider" which is used in that language "healthcare provider verified information" in Paragraph 12 --

    A.   Yes.

    Q.   -- as used in the patent claims is limited to human beings that provide healthcare?

        MR. STIMPSON:  Objection.  Same objection.


It's been asked and answered.  Same objection.  He doesn't have the patent in front of him.

        THE WITNESS:  Yeah, same objection.

BY MR. VAZQUEZ:

    Q.   You can't answer it without seeing patent?

    A.   I would rather see the patent to be sure that I am consistent with the specifications.

        MR. VAZQUEZ:  All right.  Can we just go off the record for a second.

        THE VIDEOGRAPHER:  Sure.  The time now is 10:06, and we are going off the record.

        (Discussion off the record.)

        (Deposition Exhibit 2 was marked for identification by the Reporter and is annexed hereto.)

        THE VIDEOGRAPHER:  The time now is 10:07. We are back on the record.

BY MR. VAZQUEZ:

    Q.   Okay.  Dr. Cooper.  We are back on the record here and now you have in front of you the

**EXHIBIT C**

cooper rough transcript.txt

060 patent which has been marked as Deposition

Exhibit No. 2.

    A.   Yes.

    Q.   And so my question is whether you agree

that the term healthcare provider as used in the

060 patent claims is limited to human beings that

provide healthcare.

    A.   The Figure 1 of the patent shows, for

example, free hospital ratings, hospital report,

and a list of hospitals.  So I would say that it's

at this point unclear.  I would need to look

through this more completely and there is on Figure

2 B there is a hospital link.

    Q.   And that's -- I don't mean to interrupt

you, but I just want to remind you that my question

is directed at the claims.

    A.   Well, the claims are elaborated by the

specifications.  And all claims are interpreted in

terms of what the specification describes.  So I

don't think that you can use that logic to -- to

exclude hospitals.

    Q.   Okay.  Can we mark this as Exhibit No. 3,

please.

       (Deposition Exhibit 3 was marked for

    identification by the Reporter and is annexed

    hereto.)

BY MR. VAZQUEZ:

    Q.   And Dr. Cooper we have marked as

Deposition Exhibit No. 3 the Court's order

regarding claim construction or the Markman order

**EXHIBIT C**

cooper rough transcript.txt

in this case.  Do you see that?

    A.   I do, yes.

    Q.   And if you would please turn to Page 7 of
the Markman order, Exhibit No. 3.

    A.   Yes.

    Q.   And do you see there under analysis in the
heading first healthcare provider fifth line down
there is a sentence that begins:  Defendant does
not dispute that quote first healthcare provider
close quote refers to a person rather than an
entity," and there is a footnote there "but
suggests it refers to a specific healthcare
provider" and it goes on.

      Do you see the rank I just read, sir?

    A.   Yes, I do.

    Q.   And so does that help you respond to my
question on whether a healthcare provider as used
in the 060 patent claims is limited to human beings
that provide healthcare some?

    MR. STIMPSON:  Objection to the form he has
already answered that question.

    THE WITNESS:  Well, on -- on Page 1 of the
same report under background, it says the patent
quote generally relates to an Internet based system
and method that connects patients with potential

healthcare providers, for example, physicians and
hospitals.  So I think it's unclear.

**EXHIBIT C**

```
            cooper rough transcript.txt
BY MR. VAZQUEZ:
```

Q.   So your answer is that it's unclear whether healthcare provider refers to human beings that provide healthcare sir?

A.   That's correct.

Q.   Okay.  And could you see the footnote 12 then on Page 7 of the Markman order that I was just referencing?

A.   Which footnote?

Q.   Footnote number 2?

A.   2.

Q.   And can you see that that footnote is to the sentence that I read, could you please read that sentence in beginning with the word defendant into the record?

A.   "Information regarding the first healthcare provider includes specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages and hobbies ."

Q.   And so having read that into the record, sir, how could it be that -- that healthcare

provider would refer to something other than a human being?

A.   Well, certainly in that footnote that would be hard to have a hospital with a gender so I understand that that footnote at least indicates more of a human rather unanimous a hospital.

Q.   There is nothing -- none of those data or
            Page 8

**EXHIBIT C**

cooper rough transcript.txt

criteria in that foot note 2 could possibly be

something other than a human being, do you agree?

    A.   In that footnote 2, yes, I do.

    Q.   So do you agree that hospitals are not

healthcare providers as that term is uses in the

060 patent claims?

        MR. STIMPSON:  Objection.  Asked and

answered.

        THE WITNESS:  Same response.

BY MR. VAZQUEZ:

    Q.   Do you agree that healthcare provider

would mean the same thing throughout the claims of

the 060 patent?

    A.   I don't understand the question.

Healthcare provider throughout all of the claims of

the patent remains elaborated by the information in

the specification and the figures.  So I don't see

a clear answer to that.

    Q.   Well, I guess my question sir is whether

you agree that the term healthcare provider would

mean the same thing wherever it is cited in the

claims of the 060 patent?

        MR. STIMPSON:  Objection.  Asked and

answered.

        THE WITNESS:  Yeah I think I have already

given the response.  I am -- I don't see any -- any

information at this point in time that would give a

different answer.

BY MR. VAZQUEZ:

**EXHIBIT C**

```
          cooper rough transcript.txt
```
    Q.   Dr. Cooper, have you rendered opinions

infringement opinions upon as an expert witness?

    A.   Yes.

    Q.   And how many times?

    A.   Dozens.

    Q.   Dr. Cooper do you agree that the Vitals

Web site allows physicians to make edits to self

fields of Medical Center MDX's physician data base?

    A.   Yes, I do.

    Q.   I am going to list some fields,

Dr. Cooper.  And/would like you to tell me whether

the Vitals Web site allows physicians to edit that

field of the MDX database.  Physician database.

Okay?


    A.   Okay.  Could I have my report, please,

to -- to look at that?

    Q.   Let's just see how do you with my

questions and if you need it we will dig it out?

    A.   Okay.

    Q.   Specialty information?

    A.   I'm not sure.

    Q.   Gender?

    A.   I believe it does, yes.

    Q.   Awards and honors?

    A.   Not sure.

    Q.   Professional appointments?

    A.   I believe it does.  Yes.

    Q.   Okay.  Professional membership?

    A.   I'm not sure.  I would really rather see

my report before I --
                    Page 10

**EXHIBIT C**

cooper rough transcript.txt

Q.   Okay.

A.   -- go into that detail.

Q.   If you would bear with me while I finish my list, and then --

A.   Okay.

Q.   -- we will see what we do with and without your report.  Okay?

A.   Okay.

Q.   All right.  Languages?

A.   Not sure.

MR. VAZQUEZ:  We are at No. 4.

(Deposition Exhibit 4 was marked for identification by the Reporter and is annexed hereto.)

BY MR. VAZQUEZ:

Q.   Number 4.  So, Doctor, we have marked a Deposition Exhibit No. 4.

A.   Yes, I have that.

Q.   All right.  You have seen this before haven't you?

A.   I probably have.  But I am not certain.

Q.   Okay.  Could you please read 0 I don't want you to read into the record but I am going to ask you questions about Interrogatory No. 2 and MDX's response to the interrogatory.  So when you are ready, I am ask you the question.

A.   Okay.

Q.   Sir sorry to interrupt you but it's a very long summons?

**EXHIBIT C**

```
         cooper rough transcript.txt
A.    It is.

Q.    My question is just going to relate to
```

halfway through Page 3?

```
A.    Okay.

Q.    So I had asked you a list of fields as you
```

will recall and I asked you to tell me whether the

Vitals Web site allows physicians to edit those

specific fields.  Do you recall those questions I

just asked you?

```
A.    Yes, I do.

Q.    And so the first one is specialty
```

information.  And you said you were not sure.

```
A.    Yes.

Q.    And so do you see that MDX's response to
```

Interrogatory No. 2 says on the middle of Page 3

quote the following information has been entered

and/or modified by one or more physicians --

```
A.    Huh.

Q.    -- come loan?  Do you see that?

A.    Yes, I do.

Q.    And should so to speak here and make sure
```

the reporter knows that this is highly confidential

attorneys' eyes only.  So the deposition is

until -- until and if we say so just remains highly

confidential.

```
       THE REPORTER:  Okay.  Fine.
```

BY MR. VAZQUEZ:

```
Q.    All right.  And so, sir, is specialty
```

information a field that the Vitals Web site allows

physicians to edit?

**EXHIBIT C**

cooper rough transcript.txt

A.    The interrogatory says yes.  I had requested a copy of my report because I have those things more reliably documented there, and I would rather answer from the report rather than ad hoc.

Q.    Which report are you referring to?  Your rebuttal report or your initial report?

A.    The initial report.  And the rebuttal.

Q.    Okay.  Well you have the rebuttal in front of you.  That was I think Exhibit No. 1.

A.    That's part of it, yes.

Q.    So do you have any doubt that specialty information is a field that physicians can edit on the Vitals Web site?

A.    Well, the potential that they have to edit meant but the record shows that a very tiny fair and fraction of people have actually edited it.

Q.    Well, that is not my question, Dr. Cooper?

A.    Okay.

Q.    My question is whether physicians can edit the field.

A.    They do have the potential to edit it yes.

Q.    Well, that's again not my question.

MR. STIMPSON:  Yes, it was it was exactly the question.

BY MR. VAZQUEZ:

Q.    Can you please -- can you read that third paragraph under subheading A into the record?

Page 13

EXHIBIT C

cooper rough transcript.txt

A.    The following information has been entered and or modified by one or more physicians. Specialty information, gender, awards and honors, professional appointments, professional memberships, and languages.

Q.    Thank you, Dr. Cooper.  What you just read into the record is not qualified by have the potential as you were saying, it literally says has been entered and/or modified correct?

A.    Yes that's what the -- this document says.

Q.    Okay.  Could you explain in a step I by step manner Dr. Cooper how the editing process we were just discussing works?

A.    I have to have my report to answer that.

MR. VAZQUEZ:  All right.  Let's get report.

MS. STOLL-DeBELL:  He's got it.

MR. VAZQUEZ:  No.  The initial.

MS. STOLL-DeBELL:  Oh:

MR. VAZQUEZ:  Just bare with us one second, thank you.

THE WITNESS:  Sure.

MR. VAZQUEZ:  Can you please mark this as

our neck Deposition Exhibit.

(Deposition Exhibit 5 was marked for identification by the Reporter and is annexed hereto.)

BY MR. VAZQUEZ:

Q.    Whenever you are ready, Dr. Cooper, let me know.

A.    Okay.

Page 14

**EXHIBIT C**

cooper rough transcript.txt

Okay.  I'm ready.

Q.   And so Dr. Cooper we were discussing the fields that physicians have edited on the Vitals Web site; correct?

A.   Correct.

Q.   And you had asked for your report?

A.   Yes.

Q.   And you have now both your report and your rebuttal report available to you; correct?

A.   Correct.

Q.   And so my question, we discussed specialty information, gender, awards, honors, professional appointments, professional membership, and languages as fields that physicians have edited; right?

A.   Could you go over those again a little slower?

Q.   Sure, sure.  We discussed the following fields as being ones that physicians have edited on the Vitals Web site.  Specialty information, gender --

A.   We didn't --

Q.   -- award/honors, professional appointments, professional membership and languages?

A.   We didn't discuss what has been entered. We discussed what can be entered.

Q.   Well, then can we go back to MDX's interrogatory response that you reads into the

Page 15

**EXHIBIT C**

cooper rough transcript.txt

record which I thought laid to rest the question.

A.  Okay.  And that is Exhibit --

Q.  No. 4.

A.  4, okay.

Q.  And then Page 3, you read into the record the language in the paragraph that begins:  "The following information."  Do you see that?

A.  Ah yes.  "Has been entered and/or modified by one or more specialty information, gender, awards or honors, professional appointments, professional membership and languages."  Yes.

Q.  So you agree those fields have been edited or modified?

A.  Yes.  By one or more.

Q.  Okay.  Thank you.  And so I wanted to kind of understand better from you, circumstances how that process works the editing process, and specifically are messages or information set back and forth between MDX's server and the physician's computer?

A.  I believe that's the proper way to edit those, yes.  Although alternatively it could be done in Java on the client machine rather than back and forth through message passing.

Q.  Do you have whether it happens one way or the other?

A.  I haven't had access to the actual code. So no, I can't -- can't testify regarding the -- the technological implementation of T my concern has been with the patent which is more related to

Page 16

EXHIBIT C

cooper rough transcript.txt

the embodiments rather than specific
implementations.

Q.   Okay.  So, Dr. Cooper, I understand your
concern --

A.   Yeah.

Q.   So one way it can happen is with messages
going between MDX's server and the physician's
computer, and another way is using Java Script?

A.   Java or Java Script embedded into the HTML
page would provide a capability as an alternative
embodiment, but which one is actually practiced by
MDX, that's not something that I looked into.

Q.   Okay.  So those would be the only two
waist could happen; correct?

A.   Oh, no, no.  There is many, many ways.
There could be database records sent back and
forth.  All the Internet protocols like TCP/IP
could be used.  There is no -- there is limitation
inherent in how those embodiments are implemented.

Q.   So in preparing your opinions, you did not
investigate how this editing process occurs?

A.   That's correct.  There is no need for me
to look into the software and go through the source
code.

MR. VAZQUEZ:  All right.  Just move to
strike everything "that's correct."

MR. STIMPSON:  Denied.  You didn't really
think I was going to let that get by me, did you?

MR. VAZQUEZ:  I was fully expecting it.

Page 17

EXHIBIT C

cooper rough transcript.txt

Q.   Let's assume if you will, Dr. Cooper, that the information -- the information is sent back and forth between MDX's server and the physician's computer.  Okay?

A.   You are going to make that assumption?

Q.   That's right.  I am asking to you assume it for the purposes of this question.

A.   Oh, I find that a little hard to assume but I will fry to play that game.

Q.   Well, tell me why you find it so hard to assume, sir?

A.   Well, there is no knowledge that's been presented as to how that is done, what the MDX embodiment is that normally would be the burden of the plaintiff.  That hasn't been done and hasn't been laid out.

Q.   All right.  When I ask you if the editing process could occur by information mess or messages being sent fact and for the between MDX's server and the physicians computer you schedule yes that could be one way do you remember that?

A.   That is one possibility yes.

Q.   So let's just follow-up on your response where you said yes that is one possibility.

A.   Okay.

Q.   Can you assume that?

A.   For the moment, sure.

Q.   Okay.  If that was how it was happening, what were -- what would be the type of messages or

Page 18

EXHIBIT C

cooper rough transcript.txt

information being exchanged?

    A.   The type of message?  Could be anything that communicates between server and client.  With any degree of processing at the server or any degree at the client.  All depends on what the designers decide would be a proper use and what would make sense for the through put for all the many, many limitations that are implied in designing Web sites.  That's not a simple thing to choose.

    Q.   So, Dr. Cooper, don't -- -- Strike that.

        Dr. Cooper don't you agree that to edit all of those fields that we were discussing, some type of information needs to get to the MDX server?

    A.   Oh, well, certainly some kind of information would need to get there, yes.

    Q.   Okay.  And having agreed that some information must get there, from where would that information come, sir?

    A.   That again depends on the implementation. If the information is still on the server, it might be strictly a choice from a list.  If the information is typed in, it might be new information not previously seen, that's -- that's indeterminate.  Could be done in many, many ways.

But the word -- the operant word is could.  We don't really know.  It hasn't been asserted exactly how that's done.

**EXHIBIT C**

cooper rough transcript.txt

Q.   Well, it would have to come from the doctor, though, wouldn't it?

A.   No.  I think there is cases that it came from the physician assistant or the he one of the doctor's staff, or it might have come from the hospital itself.  Who knows.  It's not -- it's not been determined.

Q.   Well, you mean the hospital where the physician works?

A.   Possibly that.  Possibly the physician's wife did it at home overnight.  I mean there is no -- there is no clarification as too who is restricted to access and who is not.  Could have been from anywhere.

Q.   So the possibilities that you just reference were -- could be from the doctor, could be from the doctor's assistant or the doctor's wife or a hospital where the doctor works or -- did I miss any --

A.   It's unknown -- no, I think that covers pretty much the gamut of what I said.

Q.   Okay.  Dr. Cooper, does the MDX server

sends the physician's computer a web form that displays what information MDX has collected regarding that physician?

A.   Again I haven't seen the source code so I wouldn't know whether it's a form or some other implementation, Java.  It's entirely up to the implement terse and that hasn't been established in the case.

Page 20

EXHIBIT C

cooper rough transcript.txt

Q.   Well, in an effort to try to simplify the questions, Dr. Cooper, do you agree that information is passed from a doctor or his or her agent to the MDX server in order to edit the information on the fields with we with discussing?

MR. STIMPSON:  Objection to the form of the question.

THE WITNESS:  By "agent" do you include the doctor's wife or husband and the hospital and --

BY MR. VAZQUEZ:

Q.   Yes.

A.   -- a third party and -- That's a reasonable supposition but I don't think that's been demonstrated.

Q.   Okay.  I think I asked?  But I am going to ask it in a ditch norm.  Do you know Dr. Cooper whether the MDX server use as computer web form?

That contains information the physician --

A.   No, I don't.

Q.   You don't know?

A.   No.

Q.   Okay.  Dr. Cooper, assume that a physician decides to change her gender from male to female?

A.   That is assumption you are making?

Q.   Yes, sir that's what I said.  Can you assume that for me?

A.   If I want me to, sure.

Q.   Okay.  All right.  What would be the message that is would be sent back to the server

Page 21

**EXHIBIT C**

cooper rough transcript.txt

for the gender field?

    A.   That could be any of the things that I have mentioned in previous responses.  It could be a form, it could be Java Script, it could be TCP/IP, there is no -- there is no knowledge at this point.  There has been no demonstration of precisely how those things are done or --

    Q.   I am asking you to assume that a physician simply wants to change their gender?

    A.   Yes.

    Q.   She wants to change her gender from female to male.

    A.   Okay.


    Q.   So take would be the information that the physician would exchange with the MDX server?

    A.   I don't know.

    Q.   How would the server know to change only the gender and no other field?

    A.   I don't know.

    Q.   Okay.  Do you agree that in this case, the physician has verified her gender?

    A.   In --

    MR. STIMPSON:  Objection to the form of the question.

BY MR. VAZQUEZ:

    Q.   In the assumption physician wants to change her gender from female to male.

    A.   Sorry saying it's the physician who makes the change somehow that change gets made, and the gender is changed.  And I think your question had

Page 22

EXHIBIT C

cooper rough transcript.txt

to do with whether that was verified.

    Q.   Yes, sir.

    A.   It would only be verified by the physician not by a third party.  In the supposition that you are making.  But whether that's in actual fact or not is completely unknown to me and hasn't been demonstrated.

    Q.   Okay so my question is I think just to be

sure we are on the same page I think you answered it but please indulge me?

    A.   Yes.

    Q.   In this case the physician has verified her gender.

        MR. STIMPSON:  Objection.  I got to have that question back.

        MR. VAZQUEZ:  Can you please.

        THE WITNESS:

        MR. STIMPSON:  I'm not sure what the hypothetical is.

        THE WITNESS:  I am lack of foundation always also.

BY MR. VAZQUEZ:

    Q.   Will you?  Let's start from the beginning we have a female physician, she wants to change her gender to male.  Are you guys with me?

        MR. STIMPSON:  A female wants to change -- say she is a man and not a woman?

BY MR. VAZQUEZ:

    Q.   Right she is going to change her gender.

**EXHIBIT C**

cooper rough transcript.txt

MR. STIMPSON:  Okay.

THE WITNESS:  But it hasn't been verified?

BY MR. VAZQUEZ:

Q.   You said were you a little lost.  I am

trying to just set it up.

MR. STIMPSON:  Why would a female want

to --

MR. VAZQUEZ:  That doesn't matter,

Mr. Stimpson.

MR. STIMPSON:  I'm just asking.

MR. VAZQUEZ:  Let me just try and simplify

it.

BY MR. VAZQUEZ:

Q.   Wave female.  She is a female.  She is --

she notes that her gender as ask shown as a male?

A.   Okay.

Q.   She wants to change it to female?

A.   Okay.

Q.   She wants to correct the gender to

appropriately show it, as she is a female and not a

male?

A.   Okay.

Q.   That's the assumption.

A.   Okay.

Q.   She communicates the information in this

case, in that case I just referenced.  And has a

physician verified her gender?

A.   This is a supposition we are making not --

okay.

Page 24

**EXHIBIT C**

cooper rough transcript.txt

Q.   Yeah?

A.   I wouldn't use the word "verified" on that no.

Q.   Okay.  I am not asking --

MR. STIMPSON:  Let him answer, please, Mr. Vazquez.  He's not done.

MR. VAZQUEZ:  Well, don't coach him, Mr. Stimpson.

MR. STIMPSON:  I'm not coaching him.  I'm just saying don't cut him off just because you hear something you don't like.

MR. VAZQUEZ:  Go ahead.

MR. STIMPSON:  So let's hear hear the answer back.  I want to know where he was.

THE WITNESS:  Well, I don't think --

MR. STIMPSON:  Hold on a second.

THE WITNESS:  Oh.

MR. STIMPSON:  I want to know where you stopped.

(The preceding answer was read.)

MR. STIMPSON:  Are you finished your answer?

THE WITNESS:  I think that's pretty close. I wouldn't use the word "verified," correct.

MR. STIMPSON:  Okay.

BY MR. VAZQUEZ:

Q.   Why not?

A.   Because verified implies finding the

EXHIBIT C

cooper rough transcript.txt
ground truth of the statement and that could have
been put in by anybody.  Now if you are really
assuming it is a -- the May -- is it a male
changing to female?  Because we have changed the
story a couple times I am not really sure -- could
you start with a new question please?

     Q.   Let's start again?

     A.   Okay.

     Q.   This is the same question.  I don't think
it's really that comply indicated?

     A.   Okay.

     Q.   We have a female?

     A.   Yes.

     Q.   She wants to change the gender field on
the Vitals database?

     A.   Yes.

     Q.   To note that it is -- a she is a female
because it says male?

     A.   Okay.

     Q.   She communicates that change to that
field.

     A.   Yes.

♀

     Q.   In this -- in that case, has she verified
her gender?

          MR. STIMPSON:  Objection this question hats
been asked and answered now.

          THE WITNESS:  I wouldn't use the word
verified.  I don't think that's a proper use of the
term.  She had edited.  But "verified" implies that
there is an observer not participating in the

EXHIBIT C

cooper rough transcript.txt

process who gives true or false to a particular answer.  So I don't think the person providing the information can also be called the person who verified the information.  That's a matter of the English word verified and what it means.  She edited it I will agree.  But she didn't verify in the sense I would use that word.

BY MR. VAZQUEZ:

Q.   What else would she need to do to verify the information then?

A.   She wouldn't be able to verify it.  It would take a third party another let's say a record from a medical school, something other than the physician to do -- to use the word "verify."  She did, according to your supposition, edit but she did not, according to my understanding of the word verify, verify.

Q.   So your testimony, then, Dr. Cooper, is that a male physician cannot verify his own gender?  Is that correct?

A.   I would say it's broader than that.  A physician cannot verify his own information.

Q.   I am talking about gender.

A.   Whether it's gender or licensure or any of those things.  He can edit them yes but he didn't verify them.  By nature of the word verify.

Q.   So it is your testimony that a male physician cannot verify his own gender?

A.   Correct.

EXHIBIT C

cooper rough transcript.txt

Q.   Okay.  Do you agree that in this case, the physician has at least confirmed the accuracy of her gender?

MR. STIMPSON:  Objection to the form.

THE WITNESS:  I think it's the same question in a sense.  The physician can change anything that's -- that's -- the site allows the physician to change.  But that does not imply verification.

BY MR. VAZQUEZ:

Q.   Okay.  Could you take a look at Exhibit 3 which is the Markman order?

A.   Exhibit 3.  Okay.

Q.   And Page 15 of the Markman order please.

A.   Okay.

Q.   Do you see -- well if you turn -- did I say Page 14, sir?

A.   You said 15.  I'm sorry.

Q.   I'm sorry.  Good if you could go to Page 14, it's right at the bottom of 14, the sentence that begins sentence:  "The Court agrees"?

THE WITNESS:  "The Court agrees with plaintiff that there is no need to construe the word verified and to the extent it were to be construed the plane and ordinary meaning could apply.  (When the claim language involves little more than the application of the widely accepted meaning of commonly understood words, construction is relatively straightforward and the ordinary meaning may be readily apparent even to lay judges.

Page 28

EXHIBIT C

cooper rough transcript.txt

BY MR. VAZQUEZ:

    Q.   Okay.  And then there was a footnote there, Footnote No. 8.

    A.   Yes.

    Q.   And could you -- Do you see the footnote at the bottom sir?

    A.   I do yes.

    Q.   And do you see about halfway through it there is a parenthetical that ends with "Phillips." And then there is a sentence that begins with the word:  "Here"?

    A.   Yes.

    Q.   Would you please that into the record?

    A.   The sentence starting with "Here"?

    Q.   Yes, sir.

    A.   "Here the specification makes claim clear that the act of verifying, and that's in quotes, requires only that the Web site receive confirmation of the information from some other source in this instance the healthcare provider.

    Q.   And can you keep going please?

    A.   Continue?  Indeed, the confirmation described appears to not extend beyond receipt of such information from the first healthcare provider.  Shall I continue?

    Q.   No, sir.  So having now seen what the Markman order states with respect to verifying --

    A.   Yes.

    Q.   -- verified, once the physician sends the

EXHIBIT C

cooper rough transcript.txt

information could not first paging or saying that

she is in fact a female, and would like that

information changed or corrected --

        A.    Yes.



        Q.    -- is that verified?

        MR. STIMPSON:  Objection to the form.

Asked and answered.

        THE WITNESS:  I disagree with the Markman

construction of verified or lack of construction.

Because it has very specific meaning in computer

science.  It's not just to edit, it's to confirm.

To relate to ground truth rather than to

assertions.

BY MR. VAZQUEZ:

        Q.    Okay.  And then do you agree that in this

case, the physician has at least confirmed the

accuracy of her gender?

        MR. STIMPSON:  Objection.  Form --

        THE WITNESS:  No.  I regard that word

similar to "verify."  "Confirm" means to establish

ground truth, not to simply provide information.

BY MR. VAZQUEZ:

        Q.    Do you agree that in this case, the

physician has confirmed the accuracy of the fields

that she did not change?

        MR. STIMPSON:  Objection to form.

        THE WITNESS:  Same responses as previous

time.

Page 30

**EXHIBIT C**

cooper rough transcript.txt

BY MR. VAZQUEZ:

Q.   And so why not?  It is a different question.

A.   It's a different question, but you are still using the word confirm.  And I don't believe the word confirm is appropriate.  I think for the same reason that verify is not appropriate.  The physician can edit the information according to your supposition, but I don't see that as providing ground truth.  That would come from as it said above another party.

Q.   I'm sorry.  What did you -- what did you just reference when you said "another party" just to be clear on the record?  The Markman order?  I thought I just read disagreed with the Markman order with is --

A.   I disagree with the word "verify" as interpreted without the context of the computer science use of that term.

Q.   Okay.

A.   "Confirm" is equivalent to that.

Q.   Okay.  Do you agree that in this instance that we are discussing, the physician wanting to edit her gender, that the Vitals Web site would have received gender information from the

physician?

A.   In the supposition that you are making that the supposition sends that information?  Then I would assume in that supposition that the server

Page 31

**EXHIBIT C**

cooper rough transcript.txt

receives that information in some form.

Q.   What would happen if the physician does not change anything?  Would the message -- would any messages being sent back to her?

A.   To her.

MR. STIMPSON:  To her?

BY MR. VAZQUEZ:

Q.   Yes.  Here we are talking about a female physician who wants to change -- make sure that her gender is noted as female.

A.   Okay.

Q.   So if the physician does not change anything, would there be any messages that are sent back to the server?

A.   Again that's a matter of the implementation of my -- it's purely a guess I would guess there is no information sent back to the server if there is no change.  But, you know, the question is very, very unformed, I think is the right description.

Q.   Okay.  Does the system record that the

physician has registered with Vitals the Vitals Web site?

A.   I don't know.  I haven't looked at the source code of the Vitals Web site.

Q.   Do you know if the Vitals Web site system records whether the physician has changed or not changed certain fields?

A.   I don't know.  I haven't looked at the software or the database or even the HTML

**EXHIBIT C**

cooper rough transcript.txt

presentation.

Q.   I am going to list some fields, Dr. Cooper, and I would you it tell me whether the Vitals Web site has actually ever received an edit or edits to that field of the MDX physician database.

A.   Okay.

Q.   Specialty information?

A.   I don't know.

Q.   Gender?

A.   I don't know.

Q.   Awards and honors?

A.   I don't know.

Q.   Professional appointments?

A.   Again I don't know.

Q.   Professional membership?

A.   I don't know.

Q.   And languages?

A.   I don't have personal knowledge of that either.

Q.   So when you say I don't know, that means maybe the Web site has received it, maybe it hasn't you don't know?

A.   I simply don't know.

Q.   Okay?

A.   That's all the answer that I can realistically provide.

Q.   Given your disagreement with the Court, Markman order with respect to verified, you did not

Page 33

EXHIBIT C

cooper rough transcript.txt

use the Court's interpretation of verified in your opinion is that correct?

A.   I think the Court's interpretation of that particular -- or lack of interpretation of that word actually it wasn't construed in the Markman order as I recall, the lay term lay meaning of the term instead was substituted.  And I am saying that within the field of computer science where the accuracy and truth of the data has a special meaning, that the word verify or its equivalent synonym such as "confirm" mean that there is some other party besides the provider of the information

♀

that verifies that.

Q.   So did you use the Court's interpretation of verified in your opinion or opinions?

MR. STIMPSON:  Objection that's been asked and answered just now.

THE WITNESS:  I would say I have already answered that.

BY MR. VAZQUEZ:

Q.   I'm sorry sir you can you just answer it again?  I don't believe that you did -- I -- my question is:  We have already established that you disagree with the Court's interpretation with respect to verify; correct?

MR. STIMPSON:  Objection that misstates his testimony.

THE WITNESS:  Yeah.  I -- I don't think I said it that way.  II said the Court chose not to could not straw in the Markman order the word

Page 34

EXHIBIT C

cooper rough transcript.txt

verify and I believe that the Court should have

construed that.  I think within the meaning of the

context of that patent which is -- deals with

computer science, the word verify has a more formal

meaning that relates to establishing the ground

truth of a fact or a piece of data or a statement.


BY MR. VAZQUEZ:

    Q.    But Dr. Cooper, the Court said that the

doctor providing information is good enough, did it

not?

            MR. STIMPSON:  Objection.  Form.

            THE WITNESS:  In your scenario, the doctor

provided information.

BY MR. VAZQUEZ:

    Q.    And the court said that was good enough

did it not?

            MR. STIMPSON:  Objection to the form.

            THE WITNESS:  I believe that the Court said

that.  But I wouldn't agree with that, no.

BY MR. VAZQUEZ:

    Q.    So you disagree with te the Court in that

instance?

    A.    I disagree with that particular lack of

construal of that word.

    Q.    So, Dr. Cooper, do you intend to give

testimony that conflicts with the Court's Markman

order?

            MR. STIMPSON:  What?  Excuse me can I have

that back?

EXHIBIT C

cooper rough transcript.txt
(The pending question was read.)

THE WITNESS:  In the case of the word

verify, I intend to explain to the Court that the

word has a deeper meaning in computer science than

it does inially terms in the vernacular.

BY MR. VAZQUEZ:

    Q.  So you do intend to give testimony that

conflicts with the Court's Markman order correct?

    A.  The same response.

        MR. STIMPSON:  Objection to form.

BY MR. VAZQUEZ:

    Q.  Dr. Cooper who knows a person's gender

other than the person himself or herself?

    A.  I couldn't imagine anyone who would know

it better than the person themselves, yes.

    Q.  Thanks.  Dr. Cooper, I believe that in

your report, you give two reasons why you believe

that Vitals does not literally infringe the

healthcare provider verified information

limitation.  Correct?

    A.  Where in my report do I say that?

    Q.  I believe Paragraph 13 and Paragraph 15.

    A.  Paragraph 13 deals with my background.

    Q.  Are you looking at your rebuttal report?

    A.  I am looking at the original report.

    Q.  I'm sorry.  I should have been clear.

    A.  You are thinking of the rebuttal report?

    Q.  Yes, sir.

Page 36

EXHIBIT C

cooper rough transcript.txt

A.   And which?

Q.   Paragraph 13 and 15?

A.   Which exhibit that was?  That was No. 1, I think?

Q.   Number 1, I believe.

A.   Okay.  Could you ask the question again, please?

Q.   In your report, you give two reasons why you believe that Vitals does not literally infringe the healthcare provider verified information limitation.  Correct?

A.   Well, I said there is no evidence that Vitals.com healthcare providers verify in any of the above three sentences the database entries describing the first healthcare provider.

Q.   Well, my question is whether -- you give two reasons, and then we will discuss the reasons. Are there two reasons you give why you believe that Vitals does not literally infringe the healthcare provider verified information limitation?

A.   That depends.  I'm not sure how you are counting two.  In Paragraph 13 I agreed with what I wrote then.  I haven't changed my opinion.  Since then.  Which is that I agree that Dr. Greenspun.

♀

In fact who said that the meaning of verify it is to prove, confirm, or substantiate an assertion, there is evidence that Vitals.com healthcare providers verify in any of those sense the database entries described in the healthcare provider.

EXHIBIT C

cooper rough transcript.txt

Q.   Okay.  That was a long answer.  Did you mention somewhere in there that you have changed your opinions?

A.   No, I mentioned that I have not.

Q.   You have not.  Okay?

A.   Have not changed my opinions.

Q.   Thank you.  Paragraph 13 you first argue that the information provided by the physicians to Vitals or to Vitals Web site does not meet the definition of the term verified.  Right?

A.   That's correct.

Q.   And then in Paragraph 15 your second argument is that whether Vitals is capable of receiving verified information from a physician is not relevant to infringement.  Is that right?

A.   Paragraph 15 just a moment.  Okay I'm sorry would you repeat the question?

Q.   Sure.  Your second argument is that whether the Vitals Web site is capable of receiving verified information from a physician is not

relevant to infringement.  Is that right?

A.   That's correct.  Capability is not actuality.

Q.   Okay.  And with respect to the first argument at Paragraph 13, if the Court stands by its interpretation of "verified" referenced in footnote 8 of the Markman order that argument would go away correct?

MR. STIMPSON:  Objection to the form of the question it misstates the Court's order.

EXHIBIT C

cooper rough transcript.txt

BY MR. VAZQUEZ:

    Q.   You may answer.

    A.   Could you say again please?

    Q.   Yes.  If the Court -- with respect to your argument in Paragraph 13 --

    A.   Okay.

    Q.   -- that the information -- that the information provided by the physicians to the Vitals Web site does not meet the definition of the term verified -- we discussed that remember?

    A.   That's correct.

    Q.   -- with respect to that, if the Court stands by its interpretation of the word verified as discussed in footnote 8 of the Markman order, wouldn't that argument go away?

    MR. STIMPSON:  Objection.  It misstates the Court's order.

    MR. VAZQUEZ:  No, it doesn't but you may answer.

    MR. STIMPSON:  Yes, it does. "Interpretation."

    THE WITNESS:  Yeah, I guess I don't understand the question.  If the Court stands by, I think the purpose of the hearing is to help the Court decide based on the actual practice in the field.  And the Court necessarily needs to get that kind of feedback.

BY MR. VAZQUEZ:

    Q.   What hearing are you just referring to in

Page 39

EXHIBIT C

                    cooper rough transcript.txt
your answer?

    A.    The Markman hearing.

    Q.    Okay.  The Markman hearing already
occurred correct?

    A.    Yes.

    Q.    And we have a Markman order now right?

    A.    Yes.

    Q.    And in footnote 8 of the Markman order of
Page 15?

    A.    Which exhibit?

    Q.    3.


    A.    3.

    Q.    The Page 15 of Exhibit 3 --

    A.    Just a moment please.  Okay.  Page --

    Q.    15 --

    A.    Okay, 15 Exhibit 8 -- or Footnote 8.

    Q.    Do you recall you read into the record the
sentence beginning with the word "here"?

    A.    Yes, I do.

    Q.    And do you see the which it says indeed,
the confirmation described appears to not extend
beyond receipt of such information from the first
healthcare provider."  Do you see that?

    A.    Yes, I do.

    Q.    And I believe you disagree with that.

    A.    No, I do believe that the confirmation
appears not to extend beyond receipt of information
from the first healthcare provider.  I don't
consider that verification.

    Q.    Okay.  The Court appears to consider that
                    Page 40

**EXHIBIT C**

cooper rough transcript.txt

verification.  Do you agree with that?

       MR. STIMPSON:  Objection to the for mitt
stays the Court's order.

       THE WITNESS:  I believe that is documented
in the Markman order I am hoping that the Court
will reconsider.

BY MR. VAZQUEZ:

    Q.   Okay.  Since you are hoping that the Court
will reconsider you don't agree with what the Court
has stated with respect to verifying; right?

    A.   I think that's been established, yes.

    Q.   Okay.  If the Court sticks to its
interpretation of verifying --

    A.   Yes.

    Q.   -- or put another way, declines your
request that it reconsider, wouldn't your argument
that the information provided by the physicians
does not meet the definition of the term verified
then go away?

       MR. STIMPSON:  Objection to form misstates
the Court's order.

       THE WITNESS:  The Court did not construe
the term "verified" but instead left it to be the
lay interpretation.  So in that sense, since the
Court didn't construe it there is, I think, room to
debate whether "verify" or "confirm" has the
meaning that you are associating with it or the
meaning that I am associating with it.

BY MR. VAZQUEZ:

          Page 41

**EXHIBIT C**

```
                cooper rough transcript.txt
     Q.    If you were to state the -- what it is
that would you like to the Court to reconsider, how



would you state that?
     A.    That verification within the context of
the computer science field means that verification
confirmation, validation, all have to do with
establishing a fact from -- establish -- asserted
by one party an assertion, by another source.
     Q.    And how is that different from what the
Court has stated in its Markman order?
     A.    The Court didn't state in its Markman
order a construal of the word verify.
          MR. STIMPSON:  When you get to a good place
Jesus you need to take a break.
          THE WITNESS:  I could use a break also.
          MR. VAZQUEZ:  Well, I -- just let me do one
more question.
          MR. STIMPSON:  That's fine.
BY MR. VAZQUEZ:
     Q.    So you had would ask the Court to
reconsider as you stated and what you are asking
the Court to reconsider is for it to adopt your
interpretation of verified as you have state in
your response?
     A.    Well, the Court did not could not view
verified.
     Q.    Yes.



     A.    So I don't think the Court has established
                    Page 42
```

**EXHIBIT C**

cooper rough transcript.txt

a specific meaning that's referred to the lay interpretation.  I believe that the Court should instead add to the Markman order or at least interpret in its lay interpretation of verification within the context of computer science which involves an independent verification, not a -- not just the source of date.

Q.    So in your view Dr. Cooper, if a physician who is male wants to edit their gender field and sends that information to the MDX server, that information is not verified?

A.    Correct.

Q.    Okay.

        MR. STIMPSON:  Okay.  Break now?

        MR. VAZQUEZ:  One more one more.

        MR. STIMPSON:  Better be brief.

BY MR. VAZQUEZ:

Q.    But the Court has rejected your interpretation; correct?

A.    I don't believe it -- no I don't believe that's true.  I believe the Court has not construed the meaning of verified.

Q.    All right we will pick it up when you get back?

♀

        THE VIDEOGRAPHER:  The time now is 11:07 we are off the record.

        (Recess taken.)

        THE VIDEOGRAPHER:  Right now it's 11:33. We are back on the record.

Page 43

**EXHIBIT C**

cooper rough transcript.txt

BY MR. VAZQUEZ:

    Q.   Dr. Cooper could you please pull the copy
of the patent I believe that was marked as Exhibit
No. 2.

    A.   Yes, I have it.

    Q.   And could you please then turn to column
20, Claim No. 1.

    A.   Okay.  I'm there.

    Q.   And I would like to ask you some questions
about the term first healthcare provider; okay?

    A.   Okay.

    Q.   Do you agree, Dr. Cooper, that that term
must mean the same thing throughout this claim
Claim No. 1?

        MR. STIMPSON:  Objection.  Asked and
answered.

        THE WITNESS:  Within claim 1, yes.

BY MR. VAZQUEZ:

    Q.   Okay.  Thank you.  Thanks, Dr. Cooper.
And now could you keep claim 15 in front of you


which is at column 22.

    A.   15, yes.

    Q.   Thank you.  And also could you pull your
rebuttal report, sir, and look at Paragraph 15 of
your rebuttal report.

    A.   Rebuttal Paragraph 15.

    Q.   Would you please -- I'm sorry.

    A.   I am still looking for the rebuttal.

    Q.   I believe that was Exhibit No. 1, sir.

    A.   Okay, and that was 15?

                    Page 44

**EXHIBIT C**

cooper rough transcript.txt

Q.   Yes Paragraph 15?

A.   Okay.

Q.   Would you mind or could you please read
that Paragraph into the record.

A.   Okay.  Paragraph 15:  I note that in
various paragraphs in Dr. Greenspun's report, he
opines that the mere capability of the MDX Web site
to perform certain functions is sufficient to show
infringement.  I disagree.  For example, this claim
element affirmatively recites that the information
has to be verified by the healthcare provider.
Therefore the mere capability to do so is not
sufficient for infringement.  My analysis is the
same for all other assertions by Dr. Green spun
regarding other claim elements that mere capability

is sufficient for infringement."

Q.   Thank you.

A.   Sure.

Q.   Dr. Cooper, is it your opinion then that
the capability of MDX's on line information system
is irrelevant to the issue of infringement?

A.   I believe the Court requires practice of
the claim to infringe.  That's -- so therefore just
the capability is not sufficient for infringement
that's correct.

Q.   And is that a legal opinion?

A.   I am not a lawyer.  I am an expert
witness.  That's my opinion.

Q.   So you are not a lawyer; right?

**EXHIBIT C**

cooper rough transcript.txt

A.   I am not aware of what?

Q.   I'm sorry?

A.   You are saying --

Q.   You are not a lawyer; correct?

A.   Oh I am not a lawyer, yes, that's correct.

Q.   But that's a legal opinion; correct?

A.   I am not a lawyer -- you are more equipped to judge that than I am.

Q.   Well, I ask you questions about whether you believe that capability of MDX's on line information system is irrelevant to the issue of

infringement.

A.   I believe capability without the actual practice is irrelevant, yes, that's correct.

Q.   And that's -- isn't that a legal opinion?

A.   I am not equipped to answer that.  Is it? I will take your word for it if you say it is.

Q.   You are not going to be giving legal opinions, are you, sir?

A.   Not going to be give illegal?

Q.   No, sir?

A.   Legal opinions?

Q.   You are not going to be offering any legal opinions are you?

A.   I am offering expert witness opinions which the Court considers legally acceptable as opinions.  I believe.  But that's you are asking something that's beyond my training and education.

Q.   In other words, for you to testify he that capability is irrelevant to the issue of

EXHIBIT C

cooper rough transcript.txt

infringement is beyond your abilities and education
as you just said?

    MR. STIMPSON:  Objection to the form.

    THE WITNESS:  No.  I am saying that my
understanding of patent law which I need to know as
an expert witness is that practice is not


equivalent to the -- I mean capability is not
equivalent to actual practice of the patent.

BY MR. VAZQUEZ:

    Q.   So as you just your knowledge of patent
law is such that capability is not equivalent --

    A.   I certainly do not think that capability
is infringement, correct.

    Q.   And is that not a legal opinion be sir?

    MR. STIMPSON:  Objection to the form.  It's
been asked and answered now several times.

    MR. VAZQUEZ:  You can just say asked and
answered.  That's the objection.

    MR. STIMPSON:  Or I can say asked and
answered -- it's been asked and answered several
times which in fact is what I said.  You got a
problem with that, you need to talk to your partner
Mr. Kostolansky.

    MR. VAZQUEZ:  No, sir.

    MR. STIMPSON:  Those are his objections.

    MR. VAZQUEZ:  Well, Scott, just trying to
get through this.  The objection is asked and
answered.  That's all it is.  That's all that the
rules say it is.  So just try and keep them short

**EXHIBIT C**

cooper rough transcript.txt
and don't coach.

MR. STIMPSON:  No.  The objection is what I

said.  It's asked and answered now several times.

BY MR. VAZQUEZ:

Q.  What is the patent law that you are
referring to, sir, that says that capability is not
relevant to infringement?

A.  I don't read patent law.  I read the
patents and I way taught -- had a practice patent
law in the sense of an expert witness's aspects of
it.  But I don't know why you are pursuing this if
you want to assert that it's law I will accept your
assertion.

Q.  Well no, I just -- I am pursuing this
because I am trying to figure out what the scope of
the opinions that you are going to offer.

A.  My opinion is that capability is not
equivalent to infringement.

Q.  And you said that that opinion is based on
your knowledge of patent law; right?

A.  As far as I know it, yes.

Q.  Right.  And so is there any case law that
you are tell us that's supports your a belief --

A.  No, I am not a lawyer so I wouldn't --
wouldn't know the case --

Q.  What is the patent law that you are
referring to?

A.  Again I am not a patent lawyer I am an
Page 48

**EXHIBIT C**

cooper rough transcript.txt

expert witness.  You are asking me to explain
something that is not my specialty.  I guess.

    Q.   Well sir I'm just using your answers.  You
said that according to patent law, capability is
not relevant to infringement; right?

    A.   That's correct.  As far as I am aware.

    Q.   Okay.  So what is the patent law,
quote-unquote, that you referring to in your
response?

    A.   I don't know.

    Q.   Okay.  Dr. Cooper, are you aware that the
federal circuit has said that, quote, claims
directed to a capability may be satisfied by
showing the accused device is reasonably capable of
performing as claimed, close quote?

    A.   No, I am not.

    Q.   And that is in the Finjan case.  You are
not aware of that case?

    A.   No.

    Q.   -- of that case?

    A.   No.

    Q.   Are you aware that in the Hilgraeve
corporation versus Symantec Corporation case, 265 F
third 1336 -- why is that funny?

    A.   It's just so long and detailed.

    Q.   That's the nature of what we are doing
here today --

    A.   Yes.

    Q.   -- is detail I'm sure you know as a

**EXHIBIT C**

cooper rough transcript.txt
computer programmer.

A.   Yes.

Q.   So are you aware that in the Hilgraeve
Corporation v. Symantec Corporation case, the
Federal Circuit held that an accused device may be
found to infringe if it is reasonably capable of
satisfying the claim limitations even though it may
also be capable of non-infringement modes of
operation?

MR. STIMPSON:  Objection to the form of the
this question.  If you are not going to show him
the case and show his the claims at issue in this
case, this is entirely objectionable.  How can
anybody possibly look at that and say that's what
he said or -- he is not a --

MR. VAZQUEZ:  Please don't coach the
witness.  Just make your objections, sir.

MR. STIMPSON:  And second of all, if you
are not going to him the claims at issue, how can
he possibly answer that question?

BY MR. VAZQUEZ:

Q.   You know, my question is very simple --

MR. STIMPSON:  No, it's not.

BY MR. VAZQUEZ:

Q.   -- are you aware --

A.   I am not aware.

Q.   Okay.  Are you aware this in the Intel
versus United States case at 946 F second 821, the
Federal Circuit said, quote, because the language
of Claim 1 refers to, quote, programmable selection
Page 50

EXHIBIT C

cooper rough transcript.txt

means close quote, in states, quote, whereby when
said alternate addressing mode is selected close
quote what emphasis added, the accused device to be
infringing need only be capable of operating in the
page mode contrary to GIM's argument, actual page
mode operation in the accused device is not
required?

A.   I am not aware.

Q.   Are you aware that Claim 15 in the 060
patent is a system claim that is directed to a
capability?

A.   I am aware that it's a system claim but
not that it's directed to a capability.

Q.   Did you agree that asserted Claim 15 of
the 060 patent recites a system comprising a

computer processor and memory with a series of
instruction that is are capable of causing the
computer to perform various tasks when executed?

MR. STIMPSON:  Objection to form.  If you
got some language in the claim you want him to look
at, point him to it.

BY MR. VAZQUEZ:

Q.   You got the patent there, sir.  You can
look at Claim 15?

MR. STIMPSON:  We got to have the question
back because I didn't catch it all.  Are you
quoting specific language?

MR. VAZQUEZ:  Yes.  I just said Claim 15.

MR. STIMPSON:  Yeah, but specific language?

Page 51

**EXHIBIT C**

cooper rough transcript.txt

MR. VAZQUEZ:  There it is.  Take a look at it.

MR. STIMPSON:  You didn't recite the entirety of Claim 15.  I know you didn't.  It wasn't long enough.

What was the question?  May I have the question back please.

(The question was read as follows:

"Q.  Did you agree that asserted Claim 15 of the 060 patent recites a system comprising a computer

processor and memory with a series of instruction that is are capable of causing the computer to perform various tasks when executed?")

THE WITNESS:  I am aware that that is part of Claim 15.  There are a number of other limitations and in addition to those.

BY MR. VAZQUEZ:

Q.  Do you agree that Claim 15 in part sir recites, quote, and you have the claim in front of you --

A.  Yes.

Q.  -- "an on-line information system for connecting healthcare providers with potential patients, the system comprising at least one computer processor, and memory coupled with and readable by the at least once -- I'm sorry at least once computer processor and comprising a series of instructions that quote when executed, by the at

EXHIBIT C

cooper rough transcript.txt

least one computer processor, cause the at least
one computer processor to perform a series of
recited tasks?

    A.   NO.  Is that Claim 15 it says one computer
processor to and then receive and a request for
information regarding a first healthcare provider

♀

among other limitations.

    Q.   So the language at Column 22 of the 060
patent that I just read, you dispute that that's in
there?

        MR. STIMPSON:  Objection to form.

        THE WITNESS:  You misquoted.  I believe you
stated receive a request for information and then
after that it didn't follow the claim language.

BY MR. VAZQUEZ:

    Q.   Okay.  If I did that, I didn't mean to,
and it's important to me that I get it correct.  So
I'm just going to read right from the participate.

    A.   Okay.  Thank you.

    Q.   Okay?  Claim 15 states, and I am reading,
just at the beginning right after No. 15: "An
on-line informing system for connecting healthcare
providers with potential patients the system
comprising at least one computer processor, and
memory coupled with and readable by the at least
one computer processor and comprising a series of
instructions that when executed by the at least one
computer processor, cause the at least one computer
processor to receive a request for information

Page 53

**EXHIBIT C**

cooper rough transcript.txt
regarding a first healthcare provider" -- there is
a semicolon, and there is more.  But did I read

that correctly as in that -- exact words of the
beginning of Claim 15 in the first element?
    A.   From Claim 15 up through that semicolon,
yes, that was correct.
    Q.   Okay.  So the language when executed?
    A.   That's not part of claim --
        MR. STIMPSON:  There is no question
pending.  There is no question pending.
        THE WITNESS:  Oh okay.
BY MR. VAZQUEZ:
    Q.   I was just going to keep going.  The
language is right in there.  When executed.  Do you
see that is I just read it twice?
    A.   Oh, you are going back up?
    Q.   Yes.
    A.   Okay.  When executed.
    Q.   "when executed by the at least one
computer processor cause the at least one computer
processor to" -- et cetera.  Do you see that
language?
    A.   I will assume the "et cetera" means the
rest of the claim, yes, I do.
    Q.   Okay.  And so does not that language
indicate that Claim 15 merely requires a system to
be capable of causing the computer processor to

perform the recited tasks when executed?
                Page 54

EXHIBIT C

cooper rough transcript.txt

A.   No.  That's just a small fraction of the claim.  There is many other limitations and I don't see the word capability in there.  Could you point me to that?

Q.   I never said it was sir.  I asked if doesn't that language indicate that that's a capability.

A.   The language -- I don't think I am legally equipped to answer that.  I don't know what -- what you are trying to -- to accomplish with the word capability.  Because that's not in the claim.

Q.   Well, it's simply asking, sir, if that language' was doesn't that language indicate that Claim 15 merely requires the system be capable of causing the computer processor to perform the recited tasks when executed.

MR. STIMPSON:  Objection.  It's been asked and answered now self times.

THE WITNESS:  Yeah same response.

BY MR. VAZQUEZ:

Q.   Well no your response sir was that you didn't think the word capability was in there.

A.   Correct.  And that's the same response I am giving now.

♀

Q.   Well that's unresponsive to I will move to strike it and I will ask it again?

A.   Okay.

Q.   My question is looking at the language in Claim 15 --

EXHIBIT C

cooper rough transcript.txt

A.    Okay.

Q.    -- doesn't that language merely require the system be capable of causing the computer processor to perform the recited tasks when executed?

MR. STIMPSON:  Objection it's been asked and answered.

THE WITNESS:  No.

BY MR. VAZQUEZ:

Q.    Okay.  Are you aware sir that the Court in this case has ruled that the capability -- that the capabilities of MDX's on line physician information system are relevant to the infringement issues?

A.    No.  I am not aware of that.

Q.    Are you aware that Health Grades served MDX with requests seeking admissions as to the MDX's system capabilities?

A.    Can you point to where that request was made?

Q.    Well, my question is are you aware that those why is made.

A.    I would have to look at wherever that information was to tell you whether or not I had considered that in forming my opinions --

Q.    Sir --

A.    -- under which condition that would mean I would be aware, but am I aware off the top of my head without even looking at the documents, no.

Q.    Okay.  Well, let's just start with my simple question.  Are you aware that we served --

Page 56

**EXHIBIT C**

cooper rough transcript.txt

Health Grades served MDX with requests for
admissions requesting admission as to the
capabilities of the MDX system?

     MR. STIMPSON:  Objection.  That exact
question was just asked and answered.

     THE WITNESS:  Same response.

BY MR. VAZQUEZ:

   Q.  What is your response, sir?

     MR. STIMPSON:  Same objection.

BY MR. VAZQUEZ:

   Q.  Are you aware or not aware?

     MR. STIMPSON:  Objection.  Asked and
answered.

     THE WITNESS:  Could you read back the
response I give to that same question earlier?

     (Record read.)

     THE WITNESS:  Same response.

BY MR. VAZQUEZ:

   Q.  So your response is am I aware of that
without looking at the documents, no?

     MR. STIMPSON:  Objection.

     MR. VAZQUEZ:  I'm just asking.  Is that
what it was?  That's why we really wanted LiveNote.

     (Red answer again .)

BY MR. VAZQUEZ:

   Q.  I'm just trying to understand.  I am not
asking whether you based any opinions on it I'm
just asking whether you are aware that those --
those admissions were requested from us from Health

Page 57

EXHIBIT C

cooper rough transcript.txt
Grades of MDX?

MR. STIMPSON:  Objection that's been asked
and answered.

THE WITNESS:  Same response.

BY MR. VAZQUEZ:

Q.   I'm sorry sir but your response does not
tell me whether you are aware if the request for
admissions were made or not that's all I am asking?

A.   And I can't tell you whether or not I am
aware without looking at for example
interrogatories and the other documentation.  If

you can point to where that request was made, I
think we can make some progress.

Q.   Are you aware that MDX counsel objected to
answering those requests for admissions based on
the argument that capability is irrelevant to
infringement?

A.   I am not off the top of my head aware, no.

Q.   Are you aware that the Court disagreed
with counsel for MDX and held that capability was
relevant and compelled MDX to respond to the
requests relating to system capability?

MR. STIMPSON:  Objection.  To the form I
think that mischaracterizes what the Court said.
If you got a Court order that you want to use, put
it in front of me, please.  Because I would like to
see that.

THE WITNESS:  Same response.  Different
question but same response.

BY MR. VAZQUEZ:

Page 58

EXHIBIT C

cooper rough transcript.txt

Q.   Same response that your other counsel gave to --

A.   No, same response that I have gave to the previous question.

Q.   Okay.  So you are essentially saying "I need to see the documents"?

A.   Yes.

Q.   Okay.  Sit setting aside, Doctor, whether the claims are directed to a capability, even if they are not directed to a capability, isn't the knack the system is capable of receiving edits from physicians circumstantial evidence that some physicians have in fact edited this information?

A.   I am not aware of that.  I haven't looked at the source code or -- or -- nor have I seen any evidence that establishes that fact.  That's a burden to the plaintiff, as I understand it.  And that has not been fulfilled.

MR. VAZQUEZ:  Move to strike everything beginning with "that's burden of the plaintiff as I understand it."

Q.   Are you going to be giving a legal opinions on burden, sir?

A.   I am going to be giving expert witness opinions in all cases.

MR. VAZQUEZ:  Move to strike --

THE WITNESS:  And I am not admitted to the bar I don't have a law degree, I am not equipped to give legal opinions beyond expert witness opinions.

Page 59

**EXHIBIT C**

cooper rough transcript.txt

       MR. VAZQUEZ:  Move to strike the response as nonresponsive.

    Q.   Are you giving legal opinions in this case, sir?

       MR. STIMPSON:  Objection that's been asked and answered.

       THE WITNESS:  Same response.

       MR. VAZQUEZ:  Okay move to strike as nonresponsive.

BY MR. VAZQUEZ:

    Q.   Are you going to be giving legal opinions, sir, on capability?

       MR. STIMPSON:  Objection been asked and answered.

       THE WITNESS:  Same response.

BY MR. VAZQUEZ:

    Q.   There is no response, sir that's responsive yet.

    A.   I disagree.

       MR. STIMPSON:  Yeah.

BY MR. VAZQUEZ:

    Q.   Okay.  Are you aware going to be giving legal opinions in the case, sir?

       MR. STIMPSON:  Objection that's been asked and answered.

       THE WITNESS:  Same response.

BY MR. VAZQUEZ:

    Q.   Okay.  So you do not want to answer the

**EXHIBIT C**

cooper rough transcript.txt

question?

        MR. STIMPSON:  Objection.  He has answered
it Jesus.  Do you want me to have it found for you?

        MR. VAZQUEZ:  Yes.

        MR. STIMPSON:  I can find it for you.

        MR. VAZQUEZ:  Yeas.  Sure.

        MR. STIMPSON:  All right.  Let's go back.
Go back to the first time he mentioned legal
opinions, if you could, please.

        (The record was read as follows:

          "A.  I am going to be giving

          expert witness opinions all

          cases.")

        MR. STIMPSON:  There you go.

BY MR. VAZQUEZ:

    Q.    And can you answer the question?

    A.    The same response.

    Q.    So you do intend to give legal opinions on
burdens, sir?  Is that right?

        MR. STIMPSON:  Jesus, you are just
badgering him now.  Okay?

        MR. VAZQUEZ:  No.  That's a different
question.  Just make your objection and then zip

it.  Scott.

        MR. STIMPSON:  Well.  No --

        MR. VAZQUEZ:  We are not going to do this.
You know, we will be here all day.  I am asking --
I'm not getting -- I'm not getting a response here.

        MR. STIMPSON:  First of all, we are going

Page 61

EXHIBIT C

cooper rough transcript.txt

to be exactly seven hours and no -- not a minute
later because that's with your partner held me to.
Okay?  And the answer I just showed you.  It's
really clear.

        MR. VAZQUEZ:  I have a different question
now, if you are done making objection -- tell me
when you are done with your objections.

        MR. STIMPSON:  When it's a different
question, I will stop making my objections.

        MR. VAZQUEZ:  Are you done now?

        MR. STIMPSON:  I don't know, let's hear
your question.

        MR. VAZQUEZ:  So you're done?

        MR. STIMPSON:  Right now I am.  What's your
question?

        MR. VAZQUEZ:  Thank you.  Thank you.

    Q.    Sir, are you going to be giving expert
opinions on legal burdens in this case?

        MR. STIMPSON:  Objection.  Asked and


answered.

        THE WITNESS:  I am going to be giving
expert witnesses on things that are related to the
patent and the technology and the science behind
it, but I am not equipped to give legal opinions I
am not an attorney.  I haven't been to law school
and I vice-president passed the bar.

BY MR. VAZQUEZ:

    Q.    In other words, you are not giving
opinions on legal burdens?

        MR. STIMPSON:  Objection that's been asked
                Page 62

EXHIBIT C

                    cooper rough transcript.txt
and answered.

          THE WITNESS:  Same response.
BY MR. VAZQUEZ:

    Q.   Okay.  Are you aware that numerous Court's
including the federal circuit have also found that
software capabilities are relevant to infringement
of method claims because the knack a system is
capable of performing a method steps may be
circumstantial evidence that someone used a
software to perform the claimed method steps?

    A.   I am not so aware.

    Q.   If you could go back to Paragraph 15 of
your rebuttal report sir.  Which I think is
Exhibit 1.


    A.   Paragraph 15.  Yes.  I am at Paragraph 15.

    Q.   I'm sorry sir it's 15 of your initial
report.  My mistake.

    A.   Oh, I see.

    Q.   Oh, no.  I was correct, sir.  My bad.  Too
much paper.

    A.   Okay.

    Q.   So Paragraph 15 of your rebuttal report,
Dr. Cooper, you argued that whether Vitals is
capable of receiving verified information from a
physician is not relevant to infringement.
Correct?

    A.   Could you repeat the question?

    Q.   Can you read it back to him, please.

          (The pending question was read.)
                    Page 63

**EXHIBIT C**

```
        cooper rough transcript.txt
        THE WITNESS:  Correct.
```

BY MR. VAZQUEZ:

    Q.   And if the Court determines that
capability is relevant --

    A.   Is irrelevant?

    Q.   No.  Is relevant?

    A.   Relevant.

    Q.   If the Court that capability is relevant,
doesn't that make this argument -- dispose of your
argument in Paragraph 15?


    A.   Again, I am not certain how the Court
disposes or doesn't December post.  But my opinion
is that capability is irrelevant to infringement --

    Q.   And if the Court determines that
capability is in fact relevant, what does that you
do it your argument in Paragraph 15 of your rebut
tall report?

    A.   That depends on the Court.  That doesn't
depend on me.

    Q.   I am asking for what your -- what you
believe it would do to your argument.

    A.   I believe that the capability is not
infringement and that the Court will uphold that so
I -- in looking at your question, I see that as
a -- counterfactual, not as a real question.  The
situation isn't as you have proposed in your
question.

    Q.   Well, sir, what's counterfactual would be
you believing that the Court will uphold your
belief; right?

                    Page 64

EXHIBIT C

cooper rough transcript.txt

MR. STIMPSON:  Objection.  That's just harassment.

MR. VAZQUEZ:  No, it's not.  Just make your objection and then stop.

MR. STIMPSON:  It's harassment, and I don't

even know what your -- I don't you even understand the question myself.

THE WITNESS:  You're welcome to your opinion, but that's not my opinion.

BY MR. VAZQUEZ:

Q.  Well, you said that you hoped the Court would uphold your belief.  Weren't those your words?

A.  No.  I think those were your words.

MR. VAZQUEZ:  All right.  So let's go back and read his response to my question.  Not the last one but the one before.

(Record answer.)

MR. VAZQUEZ:  I'm sorry.  We need to go back to my previous question to that one.

(Record read.)

(Discussion off the record.)

BY MR. VAZQUEZ:

Q.  Could you hear all that, Dr. Cooper?

A.  I did.

Q.  Unfortunately you need to have your microphone on.

A.  "I did."

Q.  Okay.  And so you said you believed that

**EXHIBIT C**

cooper rough transcript.txt
capability is irrelevant to infringement and that

♀

you believe the Court will uphold that.  Are we on

the same page?

     A.   I believe capability is irrelevant to

infringement.  Whether the Court up holds it or not

is beyond my ability to predict or even appreciate

the legalities of it.

     Q.   Well, did she not read your response

correctly?

     A.   She did read it correctly yes.

     Q.   So in your response you said that you

believe that the Court would uphold your belief

that capability is irrelevant; right?

     A.   Is that what I said?  I think I did say

that, yes.

     Q.   Okay.  So is that your response, sir?

     A.   That's my response.

     Q.   All right.  So all I was saying is that

you have a belief that capability is irrelevant and

you stated in your testimony that you thought you

believed that the Court would uphold that; right?

     A.   Yes.

     Q.   And then you said that my question was

counterfactual.  Do you remember?

     A.   Yes.

     Q.   And I am simply saying, well, what's

♀

counterfactual here is your belief that the Court

will uphold it.  It hasn't happened; right?

**EXHIBIT C**

cooper rough transcript.txt

A.   That's what you are saying, yes.

Q.   Well, it's true.  If you are saying you believe the Court will uphold it, you are hoping for something that's going to happen in the future; right?

A.   I am not hoping for it.  I believe that's the case as far as I know it in conduct my duties as expert witness.  Now, what the details of the law are, again, it's beyond me.

Q.   Okay.  Conduct your doubts as an expert witness did not involve reviewing the case law on capability?

A.   That's correct.  It did not.

Q.   Dr. Cooper, doesn't case law determine whether capability is relevant or not?

MR. STIMPSON:  Objection to form.

THE WITNESS:  I have no opinion on that.

BY MR. VAZQUEZ:

Q.   Doesn't your opinion depend on your interpretation of the law?

A.   No.

Q.   Why does it not depend on your interpretation of the law?

A.   Because I am not aware of the law.

Q.   Okay.  If you could now turn to Paragraph 16 of your rebuttal report which is Exhibit 1, Dr. Cooper.

A.   Paragraph 16.  Okay I'm there.

Q.   In Paragraph 16 of your rebuttal report

Page 67

**EXHIBIT C**

cooper rough transcript.txt

Dr. Cooper you argue that there is no -- that there is evidence that any physician actually provided three or more of the claimed healthcare provider verified fields that are required by the claims. Is that correct?

A.    I agree that no evidence has been presented to me that establishes that even two have been required by the claim element -- or provided by the -- as required by the claim element.

Q.    Do you agree that the Vitals Web site is capable of receiving information from healthcare providers regarding all of the following fields, sir, specialty information, gender, awards/honors, professional appointments, professional membership and languages?

A.    I am not aware of the capabilities of the Vitals.com Web site since I have not seen the source code or analyzed the database or reviewed the HTML pages or the Java Script embedded or other

interpretations that would be implemented in an embodiment of software.

Q.    Could you please turn to Exhibit 4 MDX's second supplemental responses to Health Grades's first set of interrogatories and then turn to Page 3.

A.    Page 3.  I'm there.

Q.    And could you please read into the record the third full paragraph under Subheading A beginning "the following."

A.    "The following information has been

EXHIBIT C

cooper rough transcript.txt

entered and/or modified by one or more physicians.
Specialty information, gender, awards/honors,
professional a point of impacts, professional
membership, and languages."

        Q.  So, sir, given that those data fields,
have been entered and are modified by one or more
physicians as you just read from MDX's responses to
our interrogatories, doesn't that indicate that
if -- that the system is capable of receiving that
information?

        A.  Not necessarily.  An alternative
explanation could be that that had been populated
in developing the Web site with default information
which is a common method for developing software

and Web sites, and if the user does not enter the
information, then the default pertains.

        Q.  Well, Dr. Cooper, the language you just
read is a response verified response made by MDX in
this case; correct?

        A.  It's a response to the interrogatory, yes.

        Q.  Yes.  And it's verified; right?

        A.  No.  I don't think it was verified.  I
think it is the opinion of counsel based on the
information that had been provided by plaintiff
which was incomplete.

        Q.  Okay.  So I will just move to strike
everything after "I don't think it was verified."
Do you know what I mean by verified sir?

        A.  I do.

                        Page 69

EXHIBIT C

cooper rough transcript.txt

Q.   What does that mean?

A.   What you mean is different from what I mean on verified.  I think we have been over that before.

Q.   No, sir I am talking about verified responses, not verified healthcare information?

A.   I have no opinion on verified responses. It's not -- I don't understand the law I am not a lawyer et cetera.

Q.   In your 30 years of experience as an

expert witness, have you not ever been consulted in preparing responses to interrogatories?

A.   Yes, I have.

Q.   And so are you aware that the law requires that responses be verified by the client?

A.   I am not so aware, no.

Q.   Okay.  The language you read into the record says quote the following information has been entered and/or modified by one or more physicians.  Then it states the data fields.

A.   That's correct.

Q.   So if it was entered and/or modified quote by one or more physicians, that would not include the hypothetical alternative scenario you discussed about default fields being populated; right?

A.   If you assume all other explanations are not available, then the only one you are left with is the only one you are available to have.  So I think that's -- that's a bit of a specious argument.  But let me read the next paragraph.  "No

Page 70

EXHIBIT C

cooper rough transcript.txt

physician has ever entered and/or modified any of the following information:  Age, years and profession, years in practice or publication.  If this information is available at all, it's obtained from third party sources and are derived from third

party information."

       And I believe no physician as of this time has entered three or more fields as required by the claim according to the assertion by counsel.

       MR. VAZQUEZ:  All right.  I will move to strike everything beginning with "let me read" and afterwards.

   Q.  Sir, you are not saying that the Vitals Web site has never --

       MR. STIMPSON:  I'm sorry.

       (There was an interruption.)

       MR. VAZQUEZ:  Let's go off the record.

       THE VIDEOGRAPHER:  The time now is 12:15. We are off the record.

       (Discussion off the record.)

       THE VIDEOGRAPHER:  Time now is 12:16.  Back on the record.  Time now is 12:17.  End of Tape No. 1.  Going off the record.  Thanks.

       -oOo-

       (At the hour of 12:17 p.m., the luncheon recess was taken, the proceedings to be resumed at 1:00 p.m.)

       -oOo-

**EXHIBIT C**

cooper rough transcript.txt

-oOo-

(At the hour of 1:03 p.m., the following proceedings were had at the same place with the same persons present:)

-oOo-

THE VIDEOGRAPHER:  Time now is 1:03. Beginning of Tape No. 2.  We are back on the record.

EXAMINATION (CONTINUING)

BY MR. VAZQUEZ:

    Q.    Okay.  Dr. Cooper, I would like to return to what we were talking about before we took our lunch break.  And if you could turn to Page -- or Paragraph 16 of your rebuttal report.

    A.    Rebuttal report.  Let's see.

    Q.    Which is Exhibit 1, I believe.

    A.    Yes, it is.  And that was Paragraph --

    Q.    16?

    A.    16.  Okay.

    Q.    And this is where you state that:
"Dr. Greenspun showed no evidence any healthcare provider had furnished even of the two required

data set let alone all three required by the claim element."  Correct?

    A.    That's correct.

    Q.    You and are not saying that the Vitals Web

EXHIBIT C

cooper rough transcript.txt

site has never received three or more of the claim
fields from a physician, are you?

    A.   Well, I am saying there is no evidence
that it has ever received three and, in fact, some
of the data that's been provided to me about the
spectrum of responses on the site is indicated that
there probably isn't three.  In the response that
has three.

    Q.   So you are just arguing that there is no
evidence that this has actually happened; isn't
that correct?

    A.   Well, a little bit stronger than that I am
saying that there is no evidence that it's happened
and there is evidence that it hasn't happened.  If
I look in my supplemental responses to the
interrogatories, the -- on Page 3 second-to-last
paragraph, the various responses are listed.  And,
now, I haven't been able to verify these responses,
but they've been stated as part of the
interrogatories, and they say what the percentage
is for each of the items in the list.


    Q.   Well, do you agree that it is possible
that a physician may have changed three or more of
these fields?

    A.   I don't have any opinion whether it's
possible or not.  All I can work on is the data.

    Q.   Why not?

    A.   Because again that's not grounded by
actual proof.  That's just -- that's a speculation

EXHIBIT C

cooper rough transcript.txt

basically.  Is it possible that -- that ducks can
fly?  Well, depends on the duck, guess.

    Q.   Do you agree that it is possible for MDX
to determine whether a single physician has ever
changed three or more of these fields?

    A.   I'm sorry.  Again, please?

    Q.   Sure.  Dr. Cooper, do you agree that it is
possible for MDX to determine whether a single
physician has ever changed three or more of these
fields?

    A.   I don't know.  I don't have any opinion
and that hasn't been given in proof.  So I couldn't
render an opinion on that other than speculation
which I don't want to do.

    Q.   Couldn't MDX run a sequel query to
determine whether any physician had ever changed
three or more of these fields?

♀

    A.   Well, again you are asking a subjective
question, could, and I don't have any opinion on
things that haven't been established.  I can't
really respond to that.

    Q.   Well, Dr. Cooper, we have now several
times read part of the interrogatory response where
it says that physicians have edited or modified the
fields; right?

    A.   Could you show me the specific paragraph
that you are talking about?  Is that Page 3 of --

    Q.   Exhibit 4 --

    A.   Exhibit 4.

    Q.   -- Page 3.

Page 74

**EXHIBIT C**

cooper rough transcript.txt

A.   Page 3678 okay.  Yes.  That's --

Q.   Let me read it into the record.  The following information has been entered and/or modified by one or more physicians.  Then it lists data fields.  Do you see that?

A.   Yes, I do.

Q.   So the question is do you agree that it is possible for MDX to determine whether a single physician has ever changed three or more fields?

A.   Same response.

Q.   So even though the response to the interrogatory states physicians have in fact edited

or modified the fields, you cannot -- your testimony is that you don't know if it's possible for physicians to modify fields?

MR. STIMPSON:  Objection.  Form.

THE WITNESS:  There is -- they response you quoted says individual fields.  It doesn't say three or more.  So it's not germane to the question that you are asking.  It's completely different structure following information has been entered and/or modified by one or more.  But we don't know if there is anybody who did all three as required by the interpretation of the -- of the claims.

BY MR. VAZQUEZ:

Q.   Well, do you agree that it is possible for MDX to determine whether a single physician has ever changed one field?

A.   One field has been changed.  That has

Page 75

**EXHIBIT C**

cooper rough_transcript.txt

asserted here, the information has been entered and/or modified by one or more physicians.

Q.   Okay.

A.   Therefore, they would have had to have changed one field.

Q.   Okay.  And then could MDX run a sequel query to determine whether any physician has ever changed one field?

A.   That's speculation.

Q.   And would your answer be the same if I asked you do or three fields?

A.   Both speculation.

Q.   Okay can you now look at Paragraph -- well, let me ask you -- let me ask you a follow-up question.

How -- other than passing information through MDX's server, how else could edits be made by physicians?

MR. STIMPSON:  Objection.  Assumes facts.

THE WITNESS:  Again, a speculation.  How else could it have?

BY MR. VAZQUEZ:

Q.   Could you read that Paragraph 17 of your rebuttal report please.

A.   Rebuttal report, okay.

Q.   Exhibit 1.

A.   I'm sorry that was Paragraph 17?

Q.   Yes.

A.   Okay.  Yes, I'm there.

Q.   If could you just read it to yourself, and

Page 76

EXHIBIT C

cooper rough transcript.txt

then I will have a question or two.

A.   Okay.

Q.   Do you know how many physicians, even

approximately, MDX or the Vitals Web site has in
its physician database?

A.   No.  I think your mike has slipped.  Oh,
no, it's there.

Q.   Okay.  You cannot even approximate how
many physicians are in the database?

A.   No.  I have no evidence about what that
count would be.

Q.   Do you reads the deposition transcript of
Erika Boyer, Dr. Cooper?

A.   I reviewed it briefly.  I don't remember
any specific about how many.  Do you have a quote
from that that you could show me?

Q.   Well, yes, at Page 101 I will represent to
you that she was asked how many physician profiles
do you have, and she answered we have profiles on
all active license doctors in the United States
which that number fluctuates.  And she was asked
can you estimate about what it is?  And she
answered about 800,000.

A.   I see.

Q.   Does that refresh your recollection on
whether you may have read that when you reviewed
her transcript?

A.   I don't believe I did no.

Page 77

**EXHIBIT C**

cooper rough transcript.txt

Q.   Do you have any reason to contest her estimate about 800,000234?

A.   I don't, no.

Q.   You know who Erika Boyer is; right?

A.   Remind me please?

Q.   I'm just asking you do you remember who she is?

A.   I don't recall.  She is one of the deponents, but I don't recall what her relevance to the case was.

Q.   Do you recall where she works?

A.   Could I have the deposition of Erika Boyer, please?

Q.   Sir I'm just asking you.  Do you recall who Erika Boyer is and you said --

A.   And I am saying without looking at the material I can't answer your question.

Q.   And is that the same for the question where she works?

A.   If I may look at the material, that is probably included in the introduction there, but I don't off the top of my head have that information at my fingertips.

Q.   Dr. Cooper, you had to figure out whether any physicians have changed three or more of the

data fields we were discussing, how would you do this?

A.   Would you restate that?  If I had the information?  Is that what you said?

Page 78

**EXHIBIT C**

cooper rough transcript.txt

Q.   No, no, no.  If you had to figure out --

A.   Uh-huh.

Q.   -- whether any physicians had changed, edited or modified the data feels we have been discussing, how would you go about it?

A.   Well, I would look at the source code of the queries, I would look at the reports that are defined and -- assuming there are such.  But again, this whole thing is conjecture it's not based on evidence provided so this is still speculative response, not a real response.  In other words, I don't know.  At the simplify.

MR. STIMPSON:  Could I could I please that I have that answer back?  I'm sorry.  I was just daydreaming there.

(The last answer was read.)

MR. STIMPSON:  Thanks.

BY MR. VAZQUEZ:

Q.   So you don't know how you would go about determining whether any physician has changed three or more of the data fields?

A.   No.  Not without looking at the -- at the technology behind it.

Q.   Okay.  MDX has in doctor data in a relational database, isn't that correct?

A.   I believe that's reputed to be the case, yeah.

Q.   So SQL queries can be run to determine what information is in are relational database;

Page 79

**EXHIBIT C**

cooper rough transcript.txt

correct?

A.   You are saying SQL queries can query a database?  That's correct.

Q.   Okay.  And SQL queries on a relational database would tell you whether fields have been changed in a database; correct?

A.   That depends on the database and the architecture and whether or not that information is actually kept.

Q.   Assuming that it is kept, would it tell you is?

A.   Assuming is again just a assumption.  And so I don't know.  If the information were properly architected, then it is possible.  But there is no reason to believe that it's actual.  So I really can't give you a clear answer on that.

Q.   Okay.  Dr. Cooper, you indicated to be in

your deposition been -- you sewed you have been deposed many, many times as an expert; right?

A.   That's correct.

Q.   And so I'm sure you are aware that in depositions, hypotheticals are appropriate.  Right?

A.   And responses to hypotheticals that I don't really know can't answer that with any evidence are also appropriate so --

MR. VAZQUEZ:  Also move to strike that response.

Q.   My question is simply me asking you hypotheticals is appropriate is it not?

A.   Same response.

Page 80

**EXHIBIT C**

cooper rough transcript.txt

Q.   I am asking to you assume that the database that we were just discussing a relational database contains that information.  Contains information on edits made by physicians.  Okay?

A.   Okay.

Q.   Will you assume that in this hypothetical question, please?

A.   I will assume it but I won't be able to give you --

Q.   Thank you.

A.   -- an evidentiary answer to that question.

Q.   So SQL queries making that assumption

would tell you whether fields have been changed in a database; right?

A.   Depends on how that information is represented in the database as to whether it could be done with SQL or whether it would require some other approach.

Q.   What would be the other approach?

A.   Oh, calculations and programming, for example, sometimes there are utilities, there are a number of different possibilities that people use to extract information from a database depending on the performance requirements, the structure of the database and the problem or statements requirements.

Q.   Is it hard to do this?

A.   Sometimes.  Sometimes.

Q.   Okay.  What makes it not?

EXHIBIT C

cooper rough transcript.txt

A.   Well, for example, a large database with many, many columns I once dealt with an insurance company that had four thousand columns in their database, and it was very difficult to get straightforward information out that.  Without putting a lot of money, time and design into that.

Q.   I think you misunderstood my question.  I asked you to describe the circumstance when it would not be difficult?

A.   Oh, when it would not be difficult?

Q.   Yes.

A.   When the information was properly designed into the database to permit that kind of query which would depend on the requirements for the problem.

Q.   And do you know whether the relational database physicians that MDX has is set up such that it would be hard or not hard --

A.   No, I don't.

Q.   -- to run inquiries on it?

A.   I don't.

Q.   So you do not know one way or the other?

A.   Do not know.

Q.   What is a sequel query, Doctor?

A.   SQL is an abbreviation for structured query language.  Sequel 92 was a standard but most databases -- database management systems have unique SQL enhancements beyond the 92 standard.

Q.   Okay.  I apologize.  So what is an S Q L query in and of itself?

**EXHIBIT C**

cooper rough transcript.txt

A.   It is an inquiry rewritten in an S Q L language which would return information.

Q.   Have you ever run SQL queries before?

A.   Many times.

Q.   How many times?

A.   I have no idea.  But it's a very large number.

Q.   Probably thousands of times; right?

A.   Probably at least thousands, yes.

Q.   Okay.  So returning to the number of physicians in the Vitals database, we discussed Ms. Boyer's testimony that it was about 800,000. Do you recall that?

A.   I recall your assertion to that, yes.  I haven't actually seen Mrs. Boyer's testimony.

Q.   So let's assume that I have represented it correctly and that she answered about 800,000.  So I am asking you to assume a hypothetical here in this question.

A.   Okay.

Q.   You have -- state -- you stated that the highest percentage of physicians who could have changed three or more fields is 1.28 percent; correct?

A.   Where do you see that?

Q.   In your report.

A.   Where in the report?

Q.   You don't recall that?

Page 83

**EXHIBIT C**

cooper rough transcript.txt

A.   Is it the first report or supplemental report?

Q.   It's in your supplemental report.

A.   Rebuttal report, rather.

Q.   Yes.

A.   And where is that?  What paragraph?

Q.   I will tell you in a second, Doctor, if you find it before me, let me know.

A.   I will let you know if I find it, yeah.

I don't think it's in my rebuttal report. It might be in the --

Q.   Your initial report maybe?

A.   No.  The -- the questions.  The --

Q.   Oh you mean the MDX responses to the interrogatories?

A.   Yes.  I think it's -- if I remember right, it's in there somewhere.

Q.   So if that means Exhibit 4.

A.   4.  Okay.

Q.   Yes and if you turn to Page 3 right below that language we have been talking about it discuss the information that quote has been entered and/or modified by one or more physicians close quote? Below there, there is a paragraph that begins quote as of May 9th, 2012?

A.   Yes.  The percentages.

Q.   You uh-huh.

A.   Shall I read that?

Q.   Let me ask you.  Did you assist in

Page 84

EXHIBIT C

cooper rough transcript.txt

preparation of this response?

    A.   This was a response to the interrogatories
I am and that was before I came on the case.
Normally the attorneys answer the interrogatories
with occasional help from the experts.  But in this
case, I did not help with that.

    Q.   So yeah why don't you go ahead and read
that beginning with as of.

    A.   Okay.  "As of May 9, 2012, the percentages
much all physicians who have ever entered and/or
modified each data field are approximately
specialty information 1.71 percent.  Gender
3.22 percent.  Awards/honors 0.75 percent.
Professional appointments, 1.28 percent.
Professional memberships 0.67 percent.  And
languages 1.08 percent.  But MDX currently has no
knowledge of any physician who has entered or
modified three or more of that information.  Based
on these percentages, however, the maximum possible
percentage of physicians who may have entered
and/or modified three or more of this information

is 1.28 percent, that is, the lease of the three
highest percentages.  In reality, if any physician
has done this, the percentage is likely far lower
than 1 percent.

    Q.   Thank you.  So if it is 1.28 percent of
800,000, remember I asked you to just assume
that -- hypothetical is correct.

    A.   Hypothetical.

EXHIBIT C

cooper rough transcript.txt

Q.   I am telling you accept my representation and Ms. Boyer who was an officer of MDX, that was her testimony.

A.   I don't have her --

Q.   That's why I am asking to you accept my reputation as an officer of the Court that I am not misquoting a he official document in the case, she said 800,000?

A.   Okay.

Q.   Okay.  And so if it's 800,000 and it's correct that 1.28 percent is the percentage that have entered three or more, that would equate to more than 10,000 physicians who have changed three or more fields; right?

MR. STIMPSON:  Objection to the form of the question.  It assumes facts.

THE WITNESS:  Again that's a hypothetical

but your calculation is correct.  That 1.28 percent times 800,000 would be slightly larger than 10,000 physicians.  But I find that unlikely.

BY MR. VAZQUEZ:

Q.   Okay.  Just move to strike to I finds that unlikely part.  Isn't one instance of infringement enough to prove liability, Dr. Cooper?

A.   I think that's a legal question.  As expert witness I can't give a legal response.  But my guess is that if one did, that would be one case of infringement.  However, that is a guess.

Q.   You mean you are guessing as to whether one instance of infringement is enough to prove

Page 86

**EXHIBIT C**

cooper rough transcript.txt

liability for infringement?

A.   Correct.

Q.   But you are offering opinions that Vitals does not infringe; correct?

A.   Correct.  There is no evidence in my opinion to assert that it has.

Q.   So why does it matter if it does whether Vitals has infringed one time or 10,000 times or 800,000 times?

A.   Well, the question of why is a question for the Court.  Again, it's -- All I can do is talk about the evidence and my technological

interpretation of evidence.

Q.   So let me follow -- make sure I follow your testimony correctly, Dr. Cooper.  You cannot say whether one instance of infringement is enough to prove liability for infringement; right?

A.   That's correct.  I can't say that it is or isn't.  But I would assume that one individual infringement might be enough.

Q.   Okay.  Let's turn to the 060 patent which is Exhibit No. 2.

A.   Okay.

Q.   And if you go to column 20?

A.   Okay.

Q.   And I would like to focus on the third element of Claim 1 which begins compiling."  I'm sorry the fourth.  My bad.  Compiling -- it also begins with "compiling."  It says compiling

Page 87

**EXHIBIT C**

cooper rough transcript.txt

information regarding the first healthcare

provider."  Do you see that?

     A.   Yes, I do verified by an independent third

party source.

     Q.   Correct.  Do you agree that this claim

element does not require the display of any

information?

     A.   That's correct.  The word display is not

used nor any synonym as far as I can see.

     Q.   Okay.  I would like to as I did before

list some information fields, Dr. Cooper?

     A.   Okay.

     Q.   And I want you to tell me whether the

Vitals Web site compiles this information from

third parties.

          MR. STIMPSON:  Excuse me.  You are on

Column 22 line 40?  That compiling --

          MR. VAZQUEZ:  Column 20.

          MR. STIMPSON:  I'm sorry.  Column 20

line --

          MR. VAZQUEZ:  Line 50.

          MR. STIMPSON:  Line 50.  Let me make sure I

am on the same page.  So that -- Line 50?

          MR. VAZQUEZ:  49 and 50.

          THE WITNESS:  Oh, I'm sorry.  It's

double-sided.  Oh.  So it's the compiling

information regarding paragraph.  That's what your

last question was about?

          MR. VAZQUEZ:  Yes.

          MR. STIMPSON:  Okay.  Thanks.  Sorry.

EXHIBIT C

cooper rough transcript.txt

BY MR. VAZQUEZ:

Q.   Would you like me to repeat the question, or did you follow me, Dr. Cooper?

♀

A.   No, I followed you.

Q.   Okay.  So Board certification.

A.   Yes.

Q.   I'm sorry?  Your answer is yes?

A.   No.  My answer is I follow you.  You are using --

Q.   Let me go back to the question because --

A.   Okay.

Q.   -- I think Mr. Stimpson derailed me again.

I am going to list some information fields, and I want you to tell me whether the Vitals Web site compiles this information from third parties.  Okay?  And the first field is Board certification.

A.   That is the first element, yes.

Q.   My question, sir, is whether the Vitals Web site compiles Board certification information from third parties.

A.   Huh.  I think it does not.  There is -- well, in my report, I think I can mention material I have already given about that.  If I can find that in my report.

Q.   Sure just let me know when you have found it or --

A.   Okay.  On Page 16 we are I am talking --

♀

Page 89

EXHIBIT C

cooper rough transcript.txt

and Paragraph 44.

    Q.   Of your initial report, sir?

    A.   Yes.

    Q.   Okay.

    A.   It repeats the element of the claim that you are describing, 1.4.

    Q.   And again you are Page 16 Paragraph 44?

    A.   Page 16, Paragraph 44 that's correct.

    Q.   Yes.

    A.   The -- as I remember, the source of that gave a disclaimer saying there is no certainty to their information, it's mostly just what they happen to pick up.  And they don't guarantee it. Therefore it's not verified.

    Q.   All right.  Well, I --

    A.   So your use of the word verified is incorrect in that question.

    Q.   The thing is I did not use the word verified in my question?

    A.   But the claim does.

    Q.   Well, I did not use it in my question.  So my question does not ask you where it is verified right now.  Just whether it is compiled.  That's my question, sir.

    A.   Your question is is it compiled by MDX,

and my answer is I don't know.

    Q.   All right, so then could you pull up the interrogatory responses --

    A.   Okay.

EXHIBIT C

cooper rough transcript.txt

Q.   -- Dr. Cooper, which is Exhibit No. 4.

A.   Okay.

Q.   And this is at Page 6 underneath the heading capital E.

A.   Okay.

Q.   Could you read the third paragraph that begins the following information into the record.

A.   The following information is obtained from one or more third party sources.  Board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information."

Q.   So going back to my question, which is does the Vital's Web site compile Board certification information from third parties?

A.   And my answer is it compiles unverified information, yes.

Q.   Sir, I am going to strike that as nonresponsive.  I am not asking whether you it's verified or not.  Do you understand that in my

question does not include anything about verified?

A.   Okay.  Given that contingency, yeah, there is information that according to the claim element is compiled.  Whether or not MDX does that compilation I don't know.

Q.   Well, that is part of the question.  It is -- my question again, and I am going to change the information field --

Page 91

EXHIBIT C

cooper rough transcript.txt

A.   Okay.

Q.   The Vitals Web site compiles information about licensure from third parties; correct?

A.   I can't respond that no, I don't have -- I haven't looked at the Vitals Web site.  And I don't see information other than in part E that the following information have also been obtained from and it includes -- but they are from the physicians, medical school, internship, residency, physical low ship.

Q.   Well, sir, you just read this language into the record.  It doesn't say it's from physicians.  Maybe I will read it into the record quote the following information is obtained from one or more third party sources.

A.   Where are you reading?

Q.   Page 6.  Third paragraph after heading E.

Quote:  The following information is obtained there one or more third party source.  Board certification, licensure, disciplinary action information, medical school, medical internship, medical residency and medical fellowship information.  Close quote?

A.   Yes that's --

Q.   I read that accurately right?

A.   Yes,m you did.  And that is correct as stated here in the interrogatories.

Q.   All right.  So the Vitals Web site compiles information about licensure from third parties; correct?

Page 92

EXHIBIT C

cooper rough transcript.txt

A.   What do you mean by "compiled"?

Q.   Well you are the computer expert, sir.
What is the common meaning of the "compile"?

A.   To compile a source code, not data.
Compiling is something that's done to a program to
make it run on a machine.  It's not --

Q.   Right.

A.   -- a term that's used in databases.

Q.   And so we started this question or this
line of questions by looking at the patent.

A.   Yes.

Q.   And Claim 1 column 20 beginning at Line

50?

A.   Uh-huh.

Q.   Do you see where it says compiling
information?

A.   I do.  That's the claim.

Q.   Okay and are you -- does that not help you
understand what compiling means in that claim
language?

A.   No, it doesn't I think that's
indeterminate because the word compiling -- has
that been construed in the Court's --

Q.   Sure was you read my mind how about
turning to Exhibit 3?

A.   3 all right.

Q.   And at the very last term on Page 24, the
back page, just flip that over, sir you will be
right at it?

Page 93

EXHIBIT C

cooper rough transcript.txt

A.  Oh okay.

Q.  And do you see there where judge Brimmer construed compiling or compiled to mean quote gathering and/or putting together close quote?

A.  I do.

Q.  Okay.  So now can we return to my question, which is the Vitals Web site compiles information about licensure from third parties;

⚥

correct?

A.  I will agree that that's what the Court construal states:  Compiling information from third parties that's correct.

Q.  And the Vitals Web site compiles information about medical school from third parties; right?

A.  I believe that's true, yes.

Q.  And the Vitals Web site compiles information about residency from third parties; correct?

A.  I would like to see that in my report.

Q.  Or you can turn to the response to interrogatories sir?

A.  Okay.

Q.  With you just read that?

A.  What page would that be?

Q.  Page 6?

A.  Okay the party?

Q.  Yes.  Third paragraph.

A.  And the thing was residency?

Q.  Yes, sir?

Page 94

**EXHIBIT C**

cooper rough transcript.txt

    A.    Medical residency yes that is mentioned in there.

    Q.    So the Vitals Web site compiles

information about medical residency from third parties; correct?

    A.    According to the Court's construction of compile, yes.

    Q.    Yes.  And the Vitals Web site compiles internship information from third parties; correct?

    A.    Medical internship is also list instead, yes.

    Q.    And the Vitals Web site compiles information about fellowship from third parties; right?

    A.    Medical fellowship yes, that's correct.

    Q.    And the Vitals Web site compiles information about Board certification from third parties; right?

    A.    That's correct.

    Q.    And the Vitals Web site compiles information about disciplinary action from third parties; correct?

    A.    That's correct.

    Q.    Now, in your -- I believe it's your rebuttal report at Paragraph 24.

    A.    My rebuttal report?

    Q.    Yes, sir.  Which is Deposition Exhibit 1.

    A.    Okay you a where in that report?

**EXHIBIT C**

cooper rough transcript.txt

Q.   Paragraph 24?

A.   24.  Okay I'm there.

Q.   And if you would please read that paragraph to yourself and then I will ask you questions.

A.   Okay.  Okay.

Q.   In that paragraph the reason why you believe that Vitals Web site does not literally infringe this third party verified information limitation is what, sir?

A.   Reading Paragraph 24 Dr. Greenspun's analysis relies on the fact that MDX obtains various items from third parties, verification of the data however is not the same as receiving the data.  And finally on 26, there is a disclaimer by the providers that they do not guarantee or stand by the data and that it may be completely inaccurate so I would not consider that verified.

Q.   Okay.  So this gets back to the construction of what verified means; correct?

A.   Correct.  Are we on the construction document again?

Q.   No I'm just asking you that question.

A.   Correct.

Q.   And so it's an issue of claim

interpretation; correct?

A.   I suppose you could say that.  I think it's quite clear what verified means.

Q.   Okay.

Page 96

EXHIBIT C

cooper rough transcript.txt

A.   And I think the Court construction is in line with the way I think it should be.  Verifying is stated as checking the accuracy of the claim. May I take a moment and get a --

Q.   Sure.  Let's go off the record.

A.   -- some water.  If I want to.  But I can go ahead and answer the questions while I get a refill.

MR. STIMPSON:  Here, I can get it for you.

THE WITNESS:  Would you?  Thanks.

MR. VAZQUEZ:  You can bring that pitcher over here.

THE WITNESS:  That's a good idea.

THE VIDEOGRAPHER:  We are still on?

MR. VAZQUEZ:  Yes, still on.

MR. STIMPSON:  There you go.

THE WITNESS:  Thank you.

BY MR. VAZQUEZ:

Q.   So could you please read that last answer back.  About just what his response was.

(The preceding answer was read.)

BY MR. VAZQUEZ:

Q.   Dr. Cooper, do you agree that the term verified" should be given the same meaning when used in the phrase "healthcare provider verified" as when used in the term third party verified information"?

A.   You are quoting out of context but the healthcare provider verified information is not

Page 97

**EXHIBIT C**

cooper rough transcript.txt

verified in line with the construal by the Court if the healthcare provider was also the originator. The originator of the information can't verify his own information.  That's a basic Tenet.

Q.   So that is your expert testimony that the originator of the information cannot verify --

A.   That's correct.

Q.   -- their own information that they have provided?

A.   That's correct.

Q.   So for example, physician verifying that he is a male, under your -- your opinion is that that person cannot verify that?

A.   Well, you're welcome to verify it but he can't if he originated it.  Now, if the information came from elsewhere, then possibly he could.

Q.   Okay.  Do you agree that the term

"verified" in the phrase third party verified," required only that MDX receive confirmation from a third party?

A.   I'm sorry.  Can you go through that again? I didn't -- where your information is coming from, where is that question --

Q.   Sometimes I'm just asking a question.

A.   Oh.  Well --

Q.   And I am reading from my outline which I cannot show you.

A.   Okay.

Q.   But --

A.   Would you read it again --

Page 98

EXHIBIT C

cooper rough transcript.txt

Q.   -- I'm just asking you a questiom.

A.   Okay.  Would you read it again, please?

Q.   Sure.  Do you agree that the term, quote, verified close quote in the phrase, quote, third party verified" close quote, requires only that MDX receive confirmation from a third party?

A.   Confirmation --

Q.   Yes, sir?

A.   -- from a third party?  Yes.  Confirmation that the third party literally confirms not one that the make a disclaimer and say no question don't confirm it we just provide it of the I think

that's the distinction I would like to make that.

Q.   So the distinction you are making is that some third parties may disclaim accuracy?

A.   Yes.  In which case it's not verification.

Q.   Okay.  But is a hundred percent could not film medication of accuracy required by the Court's construction?

A.   I don't know.

Q.   All right.  Well let's take a look?

A.   All right.

Q.   It's Exhibit 3.

A.   3.

Q.   Page 17.

A.   Page or Paragraph 17?

Q.   It is Page 17.

A.   Okay.

Q.   And it's the section of the Markman order

Page 99

EXHIBIT C

cooper rough transcript.txt

which capital F verified by an independent third

party source?

    A.   Okay.  Defendant seeks the following --

    Q.   Hold on I haven't asked you to read or

anything?

    A.   Okay.

    Q.   If you would simply read what the Court

said there I will ask you should questions?


    A.   You are asking me to read the Paragraph F?

Is that --

    Q.   Yes, sir.

    A.   Okay S the --

    Q.   To yourself?

    A.   Oh to myself?

    Q.   Yes.

    A.   Okay.

    Q.   I just want you to be familiar with what I

am going to ask you about.

    A.   Okay I have read it.

    Q.   All right.  Now, we were -- I was asking

you about the issue raised when the third party

disclaims accuracy?

    A.   Uh-huh.

    Q.   And then I asked you whether 100 percent

confirmation of accuracy was necessary per the

claim construction order.  Remember that?

    A.   Yes.

    Q.   And you said you were not sure and now we

have in front of us the claim construction order.

Could you please now read into the record,

EXHIBIT C

cooper rough transcript.txt

circumstances the sentence that begins "rather --
with the word "rather" in the middle of the
paragraph.

     A.   Okay.  Rather --

          MR. STIMPSON:  Excuse me.  I just have to
object to the extent that you are just taking one
sentence out of this claim construction and have
him read that.

          MR. VAZQUEZ:  Well, I am going to ask him
to read more than one sentence, but your objection
is noted.

          MR. STIMPSON:  To the extent that you ask
him anything other than what's here the entire
thing, it's a problem.  It's objectionable.

BY MR. VAZQUEZ:

     Q.   Okay.  If you would beginning reading at
rather and all the way up to the end.

     A.   To the end of the paragraph?

     Q.   Uh-huh.

     A.   Okay.  Rather, the dispute turns on
whether the verification must equate to proof.  For
the reasons discussed above, the Court finds no
basis to limit the meaning of verified in that
manner.  The patent does not require that the third
party information be proven but rather only
describes an attempt to substantiate that will
provide a patient with some assurance that the
qualifications of the doctor have been checked by

EXHIBIT C

cooper rough transcript.txt

someone.  The 060 patent column 8, 12 to 13, the claims in no way foreclose an embodiment where such proof however defined would be required.  In short the plane and ordinary meaning of verified which can encompass late arrange every conduct aimed at confirmation of information shall apply.  No further construction is necessary."

Q.   So getting back to my question, is 100 percent confirmation of accuracy required?

A.   I don't believe a hundred percent is required, no.

Q.   Do you agree that the third party as used in the claims can be the company providing the information service such as Vitals -- such as the Vitals Web site?

A.   No, I don't.  That would be the second party.

Q.   Okay.  Can we then look at the patent. Which is Exhibit 2.  Column 8 please.

A.   2 column 8.  All right.  I am at column 8.

Q.   Okay.  And could you read into the record beginning at Line 3 the second section.

A.   You want me to read the entire paragraph?

Q.   Well, the beginning on Line 3 and then ending with certain time period.

A.   "The second Section No. 308 comprise information preferably verified by an independent third party such as the company managing the Web site, for example, Health Grades, Inc., regarding

Page 102

**EXHIBIT C**

cooper rough transcript.txt

the physicians experience and training such as
board certain verification 346, licensure 347, and
any and/or all disciplinary actions 348, both state
and federal to date are within a certain time
period.  In one embodiment such verification may be
expressly noted in the report 304.  In essence the
verification of this information provides a
potential patient with some assurance that the
qualifications of the doctor have been checked by
someone.  In addition --

    Q.   You may stop there sir?

    A.   Okay.

    Q.   Okay.  So getting back to my question,
which was do you agree that the third party as used
in the claims can be the company providing the
information service such as the Vitals Web site.

    A.   No, I don't.

    Q.   And so you disagree with this
specification language you just read?

    A.   I think the specification language is
indeterminate.  The -- the party that verifies is

the third party, not the second party.  So this
specification sentence in my opinion misstates the
interpretation of verified by a third party.  Since
the Web site is not a third party.

       May I have another glass --

       MR. STIMPSON:  Oh sure.

       THE WITNESS:  Thank you.

       MR. STIMPSON:  Sure.

**EXHIBIT C**

cooper rough transcript.txt

BY MR. VAZQUEZ:

    Q.   Where does the claim state second party, sir?

    A.   The claim doesn't mention a second party.

    Q.   Okay.  Thanks.  Do you agree that the Vitals Web site has a process for resolving conflicts in the data it receives from third parties?

    A.   I'm not sure.  Do you have a quote for me?

    Q.   Do you know who Larry west is, sir?

    A.   As I recall, he was one of the deponents.

    Q.   Okay.  Do you recall whether he is a Health Grades officer or an MDX officer?

    A.   No, I don't.

    Q.   Okay.  He works -- he is an officer for MDX.  And his deposition was taken.  And we will mark that for an exhibit.

    MR. VAZQUEZ:  Off the record.

    THE VIDEOGRAPHER:  Time now is 1:55 we are off the record.

    (Recess taken.)

    THE VIDEOGRAPHER:  Time now is 2:11 we are back on the record.

BY MR. VAZQUEZ:

    Q.   Dr. Cooper, before the break, I had asked you whether Vitals the Vitals Web site, has a process for resolving conflicts in the data it receives from third parties.  I am you said you didn't know.

    A.   Correct.

Page 104

**EXHIBIT C**

cooper rough transcript.txt

Q.   And so then I told you we had testimony from Larry west?

A.   Uh-huh.

Q.   -- on the issue and so that's been marked as Deposition Exhibit 6, I believe.

A.   Okay.

Q.   So if you could turn to Page -- it would be Page 19 of the -- of the printout but really I want you to look at Page 70 of the transcript.  Do you see how it has four transcript pages per page?

A.   Yes, I see that.

Q.   And so do you see on Page 70 --

♀

A.   Uh-huh.

Q.   -- of Mr. West's transcript, Line 18. Could you read beginning right there into the record questions and answers and then going on to Page 71 through Line 25.

A.   Through -- oh, all of Page 71?

Q.   Yes?

A.   Okay.

"Q.   What if there was a conflict in data from two sources on a physician?

"A.   We would have conflicting data in the database because we would add the second data from that source.

"Q.   So if you had data that said a doctor had gone it one

Page 105

EXHIBIT C

cooper rough transcript.txt
medical school and other gate a

said a different medical school,

you would show them both?

"A.   Yes.

"Q.   And that would be what the

public would see when they pulled

up that particular physician's

profile?

♀

"A.   Yes.

"Q.   Two medical schools?

"A.   There are business rules

that determine which medical school

to show.  In the case of a medical

school provider only has one so I

believe in the presentation of the

data on the Web site, they would

pick what we would determine is the

most likely correct medical school.

"Q.   And how would one

determine the most likely correct?

"A.   It would come from the

most sources.  I see.  --

"Q.   I see and what about a

conflict say in the year the doctor

was licensed?

"A.   Whichever one came from

the most source would be displayed.

Q.   Okay.  That's --

A.   "Q.   So in the sense that you

do some sort of reconciliation of

Page 106

**EXHIBIT C**

cooper rough transcript.txt

the data.

"A.    There is no

reconciliation."

Q.    I just wanted you to ride through Line 23 but my mistake -- that's fine.  Getting back to the original question, there is a process, then, you agree the Web site uses -- that the Vitals Web site uses to resolve conflicts in the data it receives from third parties; right?

A.    Yes.  There is a process.

Q.    And so you agree, then, that the Vitals Web site business rules provide potential patients with some assurance that someone has checked the doctor's qualifications?

MR. STIMPSON:  Object to the form.

THE WITNESS:  No.  It's -- he's stating that there are business rules.  Those are things in the data base which automatically do things to resolve problems like that.  But that's not the same as saying someone does it.

In the case of a medical school a provider only has one so I believe in the presentation, they would pick what we determine is the most likely correct school.  Previously he had answered that there were two medical schools so it's a tossup as to which one you would present whether it would be the first received or the last received, the earliest in alphabetical order.  There is no -- I

**EXHIBIT C**

cooper rough transcript.txt

would not consider that verification.  It's a
process for resolution.
BY MR. VAZQUEZ:

    Q.    All right.  And you used the words to
tossup.  It's a little more defined than that,
isn't it?  Didn't Mr. West testify that it would be
the one they received from the most sources?

    A.    Yes.  But in the example that you gave him
the hypothetical you only give two source so that
case it would be a tossup it would be a probability
like a coin toss as to which would not would be
displayed.

    Q.    Okay.  Let's keep our patent, 060 patent
in front of you please?

    A.    Okay.

    Q.    And that's again Exhibit 2.  And let's go
back to column 20.

    A.    Column 20.  Okay.  I'm there.

    Q.    Okay.  And so I would like to focus on a
line the element of Claim 1 which begins creating,
which is at line --

    A.    58?

    Q.    -- 58?

    A.    Would you like me to read the element?

    Q.    Yes, please.  Just up to providers."


    A.    Creating by the at least one computer
processor a healthcare provider report on the first
healthcare provider using the healthcare provider
verified information, the patient provided
Page 108

**EXHIBIT C**

cooper rough transcript.txt

information, and the information verified by the
independent third party source wherein the
healthcare provider report on the first healthcare
provider includes comparison ratings of healthcare
providers."  Is that --

Q.  Yes?

A.  Did you want me to continue?

Q.  Yes -- no, no, that's fine right there?

A.  Okay.

Q.  Do you agree, then, that this claim
element, Dr. Cooper, does not require the display
of healthcare provider verified information?

A.  It says healthcare provider report.  So
that would either be displayed, printed or
e-mailed.  But in one way or another, it would be
readable.  So ultimately it would have to be
displayed some form.

Q.  And where does the claim say "display"?

A.  It doesn't use that word.

Q.  Okay.

A.  That's my interpretation of what a report

is.

Q.  Could you turn to Paragraph 37 of your
rebuttal report, please.

A.  That was 37?

Q.  Yes?  Paragraph 37 of your rebuttal
report?

A.  I'm there.

Q.  Okay.

EXHIBIT C

cooper rough transcript.txt

A.   Okay.

Q.   Just one second.

A.   Okay.

Q.   Turning to the patent the language from the patent that you just read in beginning creating.

A.   Okay.

Q.   You agree that the Court held that this element $ not require that all of the physician verified information be used to create the report; right?

A.   No.  Could you show me where that's in the Court's order?

Q.   Okay sure.  Let's look at Page 20?

A.   That's Exhibit 3?

Q.   Yeah.

A.   Okay.

♀

Q.   And if you see little bit past halfway point there is a -- the Court said quote furthermore, the categories of information are being used to create a report --

A.   I am -- I am missing where that is.

Q.   Page 20?

A.   I am on 20.

Q.   Yeah.  About halfway down.  The sentence that begins "Furthermore"?

A.   "Furthermore."  Oh, I -- no.  Furthermore to categories.  But you are --

Q.   Right.  So --

A.   Repeat the question, please.
            Page 110

EXHIBIT C

cooper rough transcript.txt

Q.   Okay.  It says:  "Furthermore the categories of information are being used to create a report.  There is nothing in the patent that requires -- when receiving, acquiring, or compiling information -- a predetermination of what will ultimately be put into a report."

A.   I see that.

Q.   And then after citing in a parenthetical that states:  The particular embodiment described herein are not intended to limit the types of information which may be provided and/or verified," the quote went on and states:  "For instance, a

patient or healthcare provider might provide information to the Web site that is not deemed relevant or important upon reaching the step of creating a report."

A.   I see that.

Q.   Okay.  So having now looked at the court's order, go back to the question which was didn't the Court hold that this element the creating by element that we were looking at --

A.   Okay.

Q.   -- does not require that all of the physician verified information be used to create the report?

A.   That's correct it does not require that all the information be -- it doesn't specifically call that out.

Q.   Okay.  Now, did you state just a bit ago

Page 111

**EXHIBIT C**

cooper rough transcript.txt

in response to one of my questions that the report must be displayed?

 A. Can you read back my response on that, please.

 Q. Let me just ask you new?

 A. Okay.

 Q. Are you stating that the report must be displayed?

 A. I am saying one way or another the report has to be presented and whether it's displayed, printed, e-mailed, whatever, is -- is a matter of presentation style.

 Q. Okay.  But that does not necessarily mean that the things used to create the report need to be displayed, does it?

   MR. STIMPSON:  Objection to the form.

   THE WITNESS:  I believe the Court's construction says that not all of it need be displayed, yes.

BY MR. VAZQUEZ:

 Q. Exactly.  So you agree then, Dr. Cooper, that this claim element does not require the display of patient provided information?

   MR. STIMPSON:  Objection to form asked and answered.

   THE WITNESS:  Yeah, same answer.

BY MR. VAZQUEZ:

 Q. Which is it does not?

   MR. STIMPSON:  Objection to the form it's asked and answered.

   Page 112

EXHIBIT C

cooper rough transcript.txt

THE WITNESS:  --

BY MR. VAZQUEZ:

     Q.   Even though your counsel objects you still

have to answer the question?

     A.   I agree with counsel it was asked and

answered.  And if you would read back the answer

please, then --

          MR. VAZQUEZ:  Go ahead.

          THE REPORTER:  What am I reading?

          MR. STIMPSON:  I think it's around where he

was referring to -- where you referred to --

          MR. VAZQUEZ:  It would just --

          MR. STIMPSON:  Paragraph 37 I think of

where he was refer referring to.

          THE REPORTER:  So you want me to search for

Paragraph 37?

          MR. STIMPSON:  I think that's where he said

it, yeah.

          (The preceding answer was read.)

          MR. STIMPSON:  I'm sorry.  It must have

been before that, I think it was before that then.

          (Record read.)

          THE REPORTER:  I don't know what I am

looking for.

          MR. VAZQUEZ:  Can we agree that I will ask

the question, and you will answer it.

          MR. STIMPSON:  A second time you mean?

          MR. VAZQUEZ:  Yeah.

                    Page 113

**EXHIBIT C**

cooper rough transcript.txt

        MR. STIMPSON:  Okay.  Well -- I can hold on we will find it.  Let's go back and look where it says it's where he says that it does not need to be displayed.  So you can search for that.

        (The preceding answer was read.)

        MR. STIMPSON:  Okay.  Thank you.

BY MR. VAZQUEZ:

   Q.  All right.  So not all of it that's different from my question.

        MR. STIMPSON:  No, it's not.

        MR. VAZQUEZ:  It's not asked and answered.

        MR. STIMPSON:  I don't think so.  That was asked and answered.

BY MR. VAZQUEZ:

   Q.  So you agree, Dr. Cooper, that the report does not need to display -- does not require the display of patient provided information?

        MR. STIMPSON:  Objection.  Asked and answered.

        THE WITNESS:  You are saying the claim element or the report?

BY MR. VAZQUEZ:

   Q.  The claim element does not require the display of patient provided information.

        MR. STIMPSON:  Objection.  Asked and answered.

        THE WITNESS:  No.  I wouldn't agree.  I think that it requires a report and therefore that report must be presented in some form.  It wouldn't

Page 114

EXHIBIT C

cooper rough transcript.txt
necessarily have to be displayed.  It could be
printed, it could be read over the telephone for
that matter.  But it has to be presented to the --
BY MR. VAZQUEZ:

    Q.   So I think we are miscommunication?

    A.   Okay right.

    Q.   Not asking whether you are report needs to
be displayed?

    A.   Okay.

    Q.   My question which is getting lost because
of this ongoing back and forth objections?

    A.   Okay.

    Q.   It's unfortunate is much simple,
Mr. Dr. Cooper.  Do you agree that this claim
element does not require the display of patient
provided information?

        MR. STIMPSON:  Objection.  Asked and
answered.

        THE WITNESS:  Yeah I think I would give the
same answer.  It requires presentation which could
be displayed, could be printed, could be any form

of communication.
BY MR. VAZQUEZ:

    Q.   Of patient provided information?

    A.   Yes.  That includes that in there.
Created health -- healthcare provider report on the
first healthcare provider using the healthcare
provider verified information, the patient provided
information, and the information verified by the

                    Page 115

EXHIBIT C

cooper rough transcript.txt

independent third party source wherein the

healthcare provided report on the first healthcare

provider includes comparison ratings of healthcare

providers."  That includes the patient information.

So that information would have to be presented in

some form.

    Q.   Do you agree that this claim element does

not require the display of healthcare provider

verified information?

        MR. STIMPSON:  Objection.  Asked and

answered.

        THE WITNESS:  Yeah.  Asked and answered.

BY MR. VAZQUEZ:

    Q.   Didn't the Court hold that this element

does not require that all of the third party

verified information be used to create the report?

    A.   And where are you quoting on that one

from?

    Q.   Well, my question is didn't the Court hold

that this element does not require that all of the

third party verified information be used to create

the report?

        MR. STIMPSON:  He is asking you where it

is.

        THE WITNESS:  Yeah I am asking where --

BY MR. VAZQUEZ:

    Q.   So you are just not sure?

    A.   I would like to see the actual evidence

before I give a speculative answer.

    Q.   So don't you agree that the report does

                    Page 116

**EXHIBIT C**

cooper rough transcript.txt

not need to display at least three kinds of third
party verified information?

          MR. STIMPSON:  Objection.  Asked and
answered.

          THE WITNESS:  Yeah asked and answered.
Same response.

BY MR. VAZQUEZ:

     Q.   So it's your testimony that the report
requires the display of at least three kinds of
third party verified information?

     A.   That is not my opinion.

     Q.   What is it?


     A.   It's what I said earlier, it's requires a
report, and that report requires communication.
Whether it's displayed or September by smoke
signals it's still requires communication.  It has
to get to the patient to provide the benefit that
the patent claims to provide.

     Q.   Okay.  Does the report need to display at
least three kinds of third party verified
information?

          MR. STIMPSON:  Objection.  Asked and
answered.  Now about 20 times Jesus.

          THE WITNESS:  Again same answer.

BY MR. VAZQUEZ:

     Q.   What's the answer sir?

          MR. STIMPSON:  Objection.  Asked and
answered now I think --

          MR. VAZQUEZ:  We tried to find it and we

                    Page 117

EXHIBIT C

```
                    cooper rough transcript.txt
couldn't find it.

          MR. STIMPSON:  I found it.  Yeah, I did.

          MR. VAZQUEZ:  Okay.  Let's find it again.

          THE WITNESS:  Did you mark the place?  You
might want to keep that spot.

          MR. VAZQUEZ:  Apparently, since it's so
difficult to just answer the question.

          MR. STIMPSON:  He has already answered it


Jesus.

          THE WITNESS:  Look for the word display.

          (The preceding answer was read.)
BY MR. VAZQUEZ:

     Q.   Is that the response you are referring
to --

     A.   Yes --

     Q.   Dr. Cooper?

     A.   Yeah.

     Q.   So that one?

     A.   Yes.

     Q.   So your answer to whether a report needs
to display three kinds of third party verified
is --

          Go ahead and read that back so I am clear
on the record.

          (Record read.)
BY MR. VAZQUEZ:

     Q.   And you think that's responsive to the
question, Dr. Cooper?

     A.   Yes, I certainly.

     Q.   Okay.  It's clearly not but we will move
                    Page 118
```

**EXHIBIT C**

cooper rough transcript.txt

on?

    A.    Okay.

    Q.

        MR. STIMPSON:  I disagree I think it's very
responsive.

BY MR. VAZQUEZ:

    Q.   Your report gives two reasons why you
believe that Vitals does not literally infringe the
healthcare provider verified information
limitation; correct?

    A.   We are switching around a lot.  Can you
state that question again, please?

        MR. VAZQUEZ:  Please read it back.

        (The pending question was read.)

        THE WITNESS:  Could you point know those
two, please?

BY MR. VAZQUEZ:

    Q.   Well, could you just pull up your reports?
You know your reports, I'm sure, better than
anybody else in this room.  Right, Mr. Cooper?

    A.   That's probably true.

    Q.   All right.  So you know what reasons you
gave as to why the -- why you believe that the
Vitals Web site does not literally infringe the
healthcare provider verified information
limitation?

    A.   I don't believe I ever used the word "two"
reasons.  You are the one who is construing it that

**EXHIBIT C**

cooper rough transcript.txt

way.

    Q.   Okay.  Then --

    A.   So if you are going to do that, I need to know where in my report you decided to consider --

    Q.   Fair enough.

    A.   -- that information.

    Q.   Please tell us what are the reasons why you believe that Vitals does not literally infringe the healthcare provider verified information limitation?

    A.   I don't know that.  You are going to have to point me to somewhere in the -- in the report where you are reaching that conclusion.

    Q.   I am not reaching any conclusion I am asking you a question.  What are the reasons why you believe that Vitals does not literally infringe the healthcare provider verified information limitation.  If you could answer that whether off the top of my head our referring to your report?

    MR. STIMPSON:  Okay.  So you he says you can refer to your report.  It's Exhibit 1.

    THE WITNESS:  Okay.

    MR. STIMPSON:  And it's a question about the third party verified information.

    THE WITNESS:  Exhibit 1.  That would be --


    MR. STIMPSON:  Think that's a different exhibit.

    THE WITNESS:  That's my rebuttal report.

    MR. STIMPSON:  And he is asking about the

EXHIBIT C

cooper rough transcript.txt

third party verified information.

THE WITNESS: Okay. Well, I would quote

Paragraph one three. "I agree with Paragraph 122

of Dr. Greenspun's report that the meaning of

'verified' is to prove, confirm or substantiate an

assertion. There is no evidence that Vitals.com

healthcare providers verify in any of the above

three senses the database entries describing the

first healthcare provider. For example, Health

Grades verified this information in past cases by

requiring documentation as in Montroy Page 145. No

such requirement is imposed by Vitals.com on its

healthcare providers." M-O-N-T-R-O-Y, Page 145.

BY MR. VAZQUEZ:

Q. Are those all the arguments or all the

reasons why you believe that Vitals does not

literally infringe the healthcare provider verified

information limitation?

A. I believe there are other parts throughout

my report. If you'd like, I can read the entire

report but that's going to waste a lot of time.

Q. Well, I'm sure it is. The entire report

isn't responsive to that question?

A. Well I would have to read the entire

report that are responsive to that question so it's

still that same constraint.

Q. Okay. Well, why don't we take a little --

whatever time you think is necessary for you to

answer the question to the extent you are satisfied

Page 121

EXHIBIT C

cooper rough transcript.txt

that you fully answered it, Doctor.

A.    Okay.  Paragraph 14 in the same exhibit.
"Even though Dr. Greenspun did not address the
equivalent issue, in my opinion there could be no
infringement by equivalents of this element.
Verification by the healthcare providers themselves
is better than completely unverified information.
None of the function of verification, (a way to
ensure accuracy), way (by proof through the
provider) and result proven accurate information
from the provider) are substantially similar in the
Vitals Web site.  Therefore the provider verified
information is not equivalent to unverified
information."

And it cites Neal Page 46.  And Montroy
page 45 and 46.

Have I gone to fast on that for you?

♀

THE REPORTER:  No.

THE WITNESS:  No?  Okay.  Regarding literal
interpretation Paragraph 15 I note that in various
paragraphs in Dr. Greenspun's report he opines that
the mere capability of the MDX Web site to perform
certain functions is sufficient to show infringe:
I disagree, for example, this claim element
affirmatively recites that the information has to
be verified by the healthcare provider.  Therefore,
the mere capability to do so is not sufficient for
infringement.  My analysis is the same for all
other assertions by Dr. Greenspun
regarding other claim element that mere capability

EXHIBIT C

cooper rough transcript.txt

is sufficient for infringement.  And regarding

verification about the provider that the claim

language above also requires that three items of

the data set be received from the first healthcare

provider Dr. Greenspun showed no evidence that any

healthcare provider had furnished even two of the

required data set, let alone all three required by

the claim element."  And if the date is not

entered, then I conclude that it's not verified.

        Okay.  Paragraph 18 also relation to the

literal interpretation.  Dr. Greenspun opines that

MDX may have been able to write a query that would


determine whether any healthcare provider has ever

added to three or more of the items in the required

data set.  However Dr. Greenspun did not himself

question the accuracy of the MDX queries and

responses.  I have reviewed the discovery materials

requested and produced by the parties in this

litigation to the best of my knowledge, Health

Grades did not request the inquiry recent suggested

by Dr. Greenspun.  And I am aware of no motion to

compel this information provided or filed by Health

Grades.  As it is, Health Grades burden of proof to

show infringement and Health Grades as it is Health

Grades burden of proof to show infringement and

Health Grades has no absolutely no evidence that

any provider has ever edited three or more of the

items as required by the claim element there can be

no infringement.

EXHIBIT C

cooper rough transcript.txt

Q.   Are you done?

A.   No.  I am only on Page -- Paragraph 21.

Q.   Okay.

A.   Okay also related to even fringe meant.
Paragraph 22.  Another reason is that the Vitals
Web site does not permanent substantially the same
function in substantially the same way to achieve
substantially the same result.  The function

obtaining at least three of the data set from the
provider, the way receipt from the provide, and the
result three or more data sets obtained from the
provider, are not substantially the same in the
Vitals Web site.  The way Vitals Web site operates
is to get fewer that three items of the data set,
the function is also entirely eliminated and the
Vitals Web site gives a result having fewer than
the required three items received from and verified
by the provider."

Q.   Dr. Cooper, just confirming, that
everything you are reading now from your report
results to why you believe that Vitals does not
literally infringe the claim element creating by
the at least one computer processor --

A.   That's correct.

Q.   Okay.

A.   Paragraph 23.  All claims require the
following element.  Compiling information regarding
the first healthcare provider verified by an
independent third party source.  Wherein the
information verified by the independent third party

EXHIBIT C

cooper rough transcript.txt

source comprises three or more from the group
consisting of Board certification, licensure,
disciplinary action information, medical school,

♀

medical internship, medical residency, and medical
fellowship information."

    Q.   You are answering a question relating to
what you just said, Dr. Cooper?

    A.   Sure.

    Q.   Is it your position that MDX does not
display internship, residency or fellowship
information unless this information has been
reported by the physician?

    A.   Can you show me where in my report I said
that?

    Q.   I'm just going to ask a question.  Doesn't
eman it's in your report, sir.

    A.   Well, I want to --

    Q.   I am simply asking you question.  Again --

    A.   I don't want to answer off the top of my
head.  I would like to go back to the source
material.

    Q.   Okay.  Here's my question.

    A.   Okay.

    Q.   Is it your position that MDX does not
display internship, residency or fellowship
information unless this information has been
reported by the physician?

    A.   Is that in my report?  Where is that?

♀

EXHIBIT C

cooper rough transcript.txt

     MR. VAZQUEZ:  Could you just please read the question to him.

     MR. STIMPSON:  Jesus, it's not going to do good.

     THE WITNESS:  Well --

     MR. STIMPSON:  It's not a memory contest.

     THE WITNESS:  -- I think you agree that --

     MR. VAZQUEZ:  Well, then the answer is "I don't remember."  "I don't know," not "show me the report."

     MR. STIMPSON:  He just told you --

     MR. VAZQUEZ:  No, it's not.  It's different, Counsel.  Just make your objection.  You know, we are just going to use up all seven hours going round and round and have to deal with it later when we need more time to continue this deposition.

     THE WITNESS:  I think it would be more productive if you would point to specifics of the report to answer this --

BY MR. VAZQUEZ:

    Q.    You are -- You are good at what you do.

    A.    Thank you.

    Q.    I think I know what I am doing.  I am taking your deposition, I ask the questions.  I

don't need to you tell me how I can be more productive.  I just simply need he to answer truthfully the questions.  As I think you have been doing.

Page 126

EXHIBIT C

cooper rough transcript.txt

A.   Okay.

Q.   I have a question.  You are answering with a question.  That is not a response.  My question is very simple.

Is it your position that MDX does not display internship, residency or fellowship information unless this information has been reported by the physician?

MR. STIMPSON:  And objection.  That's been asked and answered now, and he has told you --

THE WITNESS:  Yes.

MR. STIMPSON:  -- Jesus, that it's not a memory contest and he just needs to see it just show him.  I mean --

BY MR. VAZQUEZ:

Q.   Well if you are done with your objection I would like an answer to the question?

A.   Same response.

BY MR. VAZQUEZ:

Q.   Your response is you would like to see something that -- that substantiates why I am

asking the question?

A.   Yes.  You are asking the question without any reference --

Q.   You are not responding, sir.

A.   Without any reference to the material --

MR. STIMPSON:  Yes, he is.

BY MR. VAZQUEZ:

Q.   No, you're not.  No, you're not.

Page 127

EXHIBIT C

cooper rough transcript.txt
Let's go off the record.

        MR. STIMPSON:  No, I don't want to he go off the record.

        MR. VAZQUEZ:  I'm going off the record. It's my deposition.

        MR. STIMPSON:  You know what?

        MR. VAZQUEZ:  Right now.  We are off the record.

        MR. STIMPSON:  That's what I said.  No, you have to have two people to say --

        MR. VAZQUEZ:  We are off the record.  Right now.

        MR. STIMPSON:  Takes two in this state to --

        MR. VAZQUEZ:  No, it does not.

        MR. STIMPSON:  It requires two --

        MR. VAZQUEZ:  It's my deposition, and we re

♀

off the record.

        MR. STIMPSON:  No, we're not.

        MR. VAZQUEZ:  Yes.

        Are we or not?

        THE REPORTER:  We can't unless everyone agrees.

        MR. STIMPSON:  See?

        MR. VAZQUEZ:  Okay.  Well, I'm off the record.  And I would like to go off the record because we are going to have to come to an understanding here --

        THE WITNESS:  Well, while you are refusing to ask questions, I'll use the rest room.

Page 128

**EXHIBIT C**

cooper rough transcript.txt

MR. VAZQUEZ:  You are refusing to answer the questions, Dr. Cooper.  I want to be off the record.

(At this point the witness left the deposition proceedings.)

MR. STIMPSON:  I don't.

MR. VAZQUEZ:  The deponent is not even in the room.  It's my deposition.  Please go off the record.

MR. STIMPSON:  Jesus, I learned this the hard way through Mr. Kostolansky at Dr. Greenspun's deposition.  You can't go off the record unless

♀

both parties agree.  Okay?  He did that to me, and you are just getting your own back.  I'm sorry. It's not --

MR. VAZQUEZ:  He's not me.  He's not me --

MR. STIMPSON:  But the law is the law. Okay?

MR. VAZQUEZ:  Well, whatever, Scott.  When you said you were off the record in your deposition, you go off the record.

MR. STIMPSON:  So what you do want to do?

MR. VAZQUEZ:  I want him to answer the questions.

MR. STIMPSON:  So why is going off the record going to help?

MR. VAZQUEZ:  Because we need to discuss what we are going to do here.

MR. STIMPSON:  What are we going to

Page 129

**EXHIBIT C**

cooper rough transcript.txt

discuss?

        MR. VAZQUEZ:  Are you off the record now?

        MR. STIMPSON:  Nope.

        MR. VAZQUEZ:  Okay.

        I'm just going to ask him the same questions over and over, Scott.  And saying, "Show me why you are asking this" is unresponsive.

        MR. STIMPSON:  Jesus, just --

        MR. VAZQUEZ:  It's unresponsive, Scott, you and you know it.

        MR. STIMPSON:  It's not his role --

        MR. VAZQUEZ:  So we can quit playing the little games.

        MR. STIMPSON:  Jesus, listen.  This is why he is selling you this.  I'm just telling you.  Look.  There's --

        MR. VAZQUEZ:  I don't care why, Scott.  It is unresponsive.  Period.

        MR. STIMPSON:  Just let me speak.

        MR. VAZQUEZ:  No.  No, I don't want to hear your story.

        MR. STIMPSON:  Well, you know what?  You have to, Jesus.

        MR. VAZQUEZ:  It's unresponsive, Scott.  You can make your objection, and it's unresponsive.

        MR. STIMPSON:  Okay.  This is why he is telling you that, Jesus.  Okay?  This is a big case.  There are a lot of issues.  Okay?  He's got a rebuttal report that's many pages, and it talks about many infringement issues, and there are many

Page 130

EXHIBIT C

cooper rough transcript.txt

issues to discuss.  Okay?  And --

     MR. VAZQUEZ:  Yes, yes, yes.  Scott, none of that means anything.

     MR. STIMPSON:  In addition to that --

     MR. VAZQUEZ:  You know what he's is doing.

     MR. STIMPSON:  In addition to that, there's another report which talks about priority which must be, you know, 30, 40 pages, and you are asking him to do a memory contest and --

     MR. VAZQUEZ:  No, I'm not.  No, I'm not. He can then say, "I'm not sure.  Let me look for what it is," but he is not saying that.  He wants me to bring up the reference material when there may not be any.  I can ask questions, Scott, related to the opinion --

     MR. STIMPSON:  You can.

     MR. VAZQUEZ:  Of my choosing.

     MR. STIMPSON:  Yes, you can.  You are absolutely correct.

     MR. VAZQUEZ:  And that's what I am doing. So to simply say show me where I said that is unresponsive.

     MR. STIMPSON:  No, it's not.

     MR. VAZQUEZ:  Yes, it is.

     MR. STIMPSON:  He is asking you to, Jesus --

     MR. VAZQUEZ:  And forget it.  You are never going to convince me of that.  We can be here for

EXHIBIT C

cooper rough transcript.txt

the seven remaining hours until 7:00.  You will
never convince me that saying tell -- show me where
I said that or where that is, that is unresponsive.

          MR. STIMPSON:  Well, so what -- hold on.
Hold on.  Hold on.  What you are asking for, then,
Jesus, is just him to say -- what you want him to
say is like "I don't remember.  Can you show me
somewhere"?

          MR. VAZQUEZ:  No.

          MR. STIMPSON:  What do you want him to say,
then?

          MR. VAZQUEZ:  I want to him to answer the
questions?

          MR. STIMPSON:  So --

          MR. VAZQUEZ:  It's not being answered.

          MR. STIMPSON:  So if you he doesn't
remember --

          MR. VAZQUEZ:  Then the answer is "I don't
know" or "I don't remember."

          MR. STIMPSON:  Okay.

          MR. VAZQUEZ:  "And it is it's your bad
because you didn't show me the document."  Which is
a little game he is playing and you are playing.

          MR. STIMPSON:  Oh, come on, Jesus.  You are
just getting out of control.

          (At this point the witness rejoined the
     deposition proceedings.)

          MR. VAZQUEZ:  No, I'm not.  I'm perfectly
in control.  I have been around the bush with you

EXHIBIT C

cooper rough transcript.txt

enough to go know what's going on here.

    MR. STIMPSON:  Why don't you try to ask him a question and then if he doesn't --

BY MR. VAZQUEZ:

    Q.   Is it your position that Medical Center does not difficult place internship residency or fellowship information unless this information has been reported by the physician?

    A.   Would you show me where in my report that happens, please?

    Q.   My question -- did my question say anything about your report sir?

    A.   No, it does didn't.

    Q.   Okay is it your position that MDX does not display internship, residency or fellowship information unless this information has been reported by the physician?

    A.   I don't recall.

    Q.   Thank you.

    A.   Does that satisfy --

    Q.   That's better.

    A.   It's nonproductive, but, sure, if --

    Q.   Well, that's responsive.

    MR. STIMPSON:  Come on, Jesus.

    THE WITNESS:  "I don't remember" is responsive?

BY MR. VAZQUEZ:

    Q.   It's a lot more responsive than "show me where you get that"?

**EXHIBIT C**

cooper rough transcript.txt

A.    Okay.

MR. STIMPSON:  Now you are just badgering and arguing with the witness.  Let's get on with the deposition.  You don't have much time.

BY MR. VAZQUEZ:

Q.    Are you aware that Vitals does not allow a physician to change internship, residency or fellowship information to something that differs from that which was reported by third parties?

A.    I don't recall.

Q.    Okay so let's mark next exhibit.  I think it's 7.

(Deposition Exhibit 7 was marked for identification by the Reporter and is annexed hereto.)

BY MR. VAZQUEZ:

Q.    And before you, Dr. Cooper, is the

transcript of the deposition of Erika Boyer.  And if you could turn to Page 99 of the actual transcript.

A.    Okay.

Q.    And on Page 99 beginning at Line 13, can you please read that into the record.  Through Line 25.

A.    Okay.

"Q.    Okay Mrs. Boyer --
Ms. Boyer we are back on the
record.  If a doctor self reports
fellowship or residency information
that's different from that which
Page 134

EXHIBIT C

cooper rough transcript.txt

Vitals has from a third party
source, will you display incorrect
information?

  "A.   Will I display what?

  "Q.   Incorrect information.

  "A.   No.

  "Q.   How do you verify what's
correct and what's incorrect?
Mr. Sometimes objection to form.

  "A.   We don't do verification
the way you ask.   When you say
verify what do you mean?

  "Q.   To determine whether any
of the information is correct or
incorrect.

  "MR. STIMPSON:  Same objection.

  "A.   We aggregate data.   So
it's the aggregation of the data
that helps us determine what we
feel is the right information.

  Q.   Okay you can stop there.

  A.   Okay.

  Q.   Well, based on that testimony that you
just read into the record, Dr. Cooper, isn't it
true that the Vitals Web site uses the third party
fellowship information to create the physician
reported in fellowship information field?

  A.   None of that is in the testimony that I
just read.

Page 135

EXHIBIT C

```
                 cooper rough transcript.txt
```

Q.    If you go back to Line 15 on Page 99?

A.    Okay.

Q.    I believe you just read that.

A.    "If a doctor self reports fellowship or residency information that's different from that which Vitals has from a third party source will you displace incorrect information"?   Is that the question you want me to --

♀

Q.    Right?

A.    Okay.  And I think the answer of Mrs. -- Ms. Boyer is we aggregate data and we feel what's the right information, but we don't verify.  So whether we display incorrect information is unclear.

Q.    So I guess my question is isn't it true that Vitals uses the third party fellowship information --

A.    Uses?

Q.    Uses?

A.    Okay.

Q.    -- the third party fellowship information to create the physician reported fellowship information field?

A.    I don't think that's clear from the testimony here.

Q.    Isn't it true, Dr. Cooper, that the Vitals Web site uses the physician reported fellowship information field to create the healthcare provider report?

A.    Could you show had he where are that is in
                    Page 136

**EXHIBIT C**

cooper rough transcript.txt

my report please?

    Q.   The question did not suppose it was in your report.

    A.   Well, then I can't answer it.

    Q.   -- as the previous --

    A.   I can't narrow.

    Q.   You can only answer questions that are strictly from your report sir?

    A.   Yes my job as an expert witness is to were write a report and to deal with all of the questions that arise regarding my report.  Not regarding other people's testimony.

    Q.   Vitals uses third party fellowship information to determine whether to accept fellowship information as reported by a physician. Correct?

    A.   Can you show had he where that's stated??

    MR. VAZQUEZ:  Move to strike to strike that as nonresponsive.

    I would like to go off the record now.  Can we?

    MR. STIMPSON:  Do you want to take a break?

    MR. VAZQUEZ:  Yup.

    MR. STIMPSON:  Okay.

    THE VIDEOGRAPHER:  Time now is 2:56.  We are going off the record.

    (Recess taken.)

    THE VIDEOGRAPHER:  Time now is 3:17.  We

EXHIBIT C

cooper rough transcript.txt

are back on the record.

BY MR. VAZQUEZ:

Q.   All right.  Dr. Cooper could you turn to Page -- Paragraph 38 of your rebuttal report.

A.   Rebuttal report.  Which exhibit is that?

Q.   Number 1.

A.   Oh, No. 1.  All right.  And you said Paragraph 38?

Q.   Yes.

A.   Okay.  I'm there.

Q.   Is it your position, Dr. Cooper, that the Vitals Web site never displays licensure information for physicians?

A.   You say never displays?

Q.   Yes, sir.

A.   I am not certain of that.  But I know that they won't have licensed information or -- unlicensed physicians on the Web site.  It says: "Unlicensed physicians do not even make it through a filter, allowing them to be shown in any way whatsoever on the Vitals Web site."  So the only doctors that are through there are the ones that would go through the filter.

So, for example, they would not be searchable, and they would be not shown on results lists.  The claim expressly requires that the information be used to create the report, licensure information is not used in any way to create the report.  For these reasons and those stated above,

Page 138

**EXHIBIT C**

cooper rough transcript.txt

this also cannot be reasonably be stated he cannot
be asserted -- cannot reasonably be asserted to be
met equivalently.  It would read the limitation out
of the claim entirely, and does not have a
substantially similar function, way or result.

    Q.   So then it is your position, Dr. Cooper,
that licensure information is not used in any way
to create the report; is that right?

    A.   That is my opinion, yet.

    Q.   Okay.  So let's mark I guess this will be
No. 8.  Did you base your non imprint --
infringement opinion on your belief that licensure
information is not used in any way to create the
report?

    A.   Yes, I did.

    Q.   Okay.  We will mark this as next
deposition exhibit, please.

       (Deposition Exhibit 8 was marked for
     identification by the Reporter and is annexed
     hereto.)


BY MR. VAZQUEZ:

    Q.   And then, Dr. Cooper, what's been marked
as Deposition Exhibit 8 are three different copies
of screen shots from the Vitals Web site.

    A.   Okay.

    Q.   And let's make sure we are on the same
page.  I am now going to be looking at this one,
Dr. Cooper?

    A.   What's the doctor's name on that?

EXHIBIT C

```
          cooper rough transcript.txt
Jeffrey --
```

Q.   Jeffrey Smith.

A.   Smith.

Q.   Yes.

A.   Ah.  Okay.

Q.   And if you turn to the second page of the -- those two pages that are stapled together?

A.   Uh-huh.  I'm there.

Q.   Do you see the highlighted language?

A.   "Dr. Jeffrey Smith is confirmed to have a license in Oklahoma and Maryland."

Q.   Does that affect your belief of whether licensure information is not used in any way to create the report as you asserted in your report?

A.   I don't see the license information.  There is no license number.  It's an assertion that looks like it's programmed into the Web site.  Other than that, I can't add any more information I think.

Q.   Well, is that not licensure information about Dr. Smith where it says that quote Dr. Smith is confirmed to have a license in locate Louisiana home an and Maryland, close quote?

A.   That is the comment in the report.  But I don't see the actual license information.

Q.   Is that not information about Dr. Smith's license?

A.   It's an assertion about his license.  It's not specifically the license.  Or license number or date at which the license was started or terminated

EXHIBIT C

cooper rough transcript.txt

or any of those kinds of things.

Q.   And Dr. Cooper is Vitals using the term confirmed" in the same way you use it?

A.   I have no way to determine that.  But it does state confirmed.  Whether they actually confirmed it in the sense of validation, it is not clear from just that one comment in the report.

Q.   Dr. Cooper, isn't Vitals verifying that Dr. Smith is licensed in Oklahoma and Maryland?

A.   I again would give the same answer with the word verified instead of confirmed.


Q.   Okay.  Could you turn to the second packet of Exhibit No. 8 or the second clipped pieces of paper.  And I am looking at the one that says:  "Is this the doctor you are looking for?"  Do you see that?

A.   Is this Dr. Rosengart or --

Q.   If you look across the table here you will see this is what I would like to have you find (indicating)?

A.   Oh, I see.  Okay.  And your question is?

Q.   My question is if we turn to the third page --

A.   Of the report?  Okay.

Q.   Uh-huh.  And do you see on the third page of the report at the bottom there is highlighted information.  Will you please read that into the record?

A.   The highlighted information is he

EXHIBIT C

cooper rough transcript.txt

"Dr. Brian Smith is confirmed to have a license in Utah and Colorado."

    Q.   So there is information in this report that Dr. Brian Smith is confirmed to have a license in Utah and Colorado; correct?

    A.   There is an English statement, there is no information on the license its start state, end

date, number, any of that information.  But there is an attribution saying that Dr. Brian Smith is confirmed to have a license in Utah and Colorado.

    Q.   What do you mean by add attribution?

    A.   A statement, not necessarily confirmed, verified or validated.  It's an English statement that looks like it's printed out the same for every doctor with that -- where that doctor -- I don't know where the information about licensure came from, it may have been from the doctor, it may have been verified.  But there is no -- there is no clear proof of verification in this.

    Q.   Well, was the knack quote -- where was -- -- Strike that.

    .  Dr. Cooper, was the knack Brian Smith has a license in Utah and Colorado used to create this report?

    A.   That is not a fact.  That hasn't been established as fact.  That somehow in this report that comment has been made but whether it's been verified or just opined is not clear from --

    Q.   Let's use your word then Dr. Cooper?

    A.   Okay.

Page 142

**EXHIBIT C**

cooper rough transcript.txt

Q.   Is the attribution that Dr. Brian Smith has a license in Utah, Colorado, and -- and

Colorado, excuse me, used to create this report?

A.   That attribution is used to create this report, yes.

Q.   And who is it that made the statement that -- or the ought attribution that Dr. Brian Smith is confirmed to have a license in Utah and Colorado?

A.   I have no idea that's not shown in the.

Q.   Isn't that in the Vitals -- isn't this a report by Vitals?

A.   Apparently it is, yes.  It does have the Vitals.com url at the top.

Q.   And this is a report generated by Vitals; correct?

A.   That's correct.

Q.   So who is the -- isn't Vitals making the attribution that Dr. Smith is confirmed to have a license in Utah and Colorado?

MR. STIMPSON:  Object to form.

THE WITNESS:  The attribution is printed in the report.  Whether it's Vitals making it or whether that's just being populated from the database entry I have no idea, also your question was who, and there is no clear source of that information so I can't really say that it's

Page 143

EXHIBIT C

cooper rough transcript.txt

anything more than an attribution.

BY MR. VAZQUEZ:

    Q.    So Vitals printed this attribution about
Dr. Smith's licensure in Utah and Colorado in the
report?

    A.    Vitals printed this attribution in the
report, that's correct.

    Q.    Okay.  And Dr. Cooper, you are you
familiar with the claims of the 060 patent; right?

    A.    Yes.

    Q.    Do the claims require a license number?

    A.    Let's see where the patent?  That's No. 2.
Exhibit No. 2.

    Q.    Yes.

    A.    And looking just at the independent claim
one, the license number is not specified as an
embodiment of the verification.  So it's unclear
from the patent whether that's required or
appropriate or -- or even feasible.

    Q.    You said it's unclear?

    A.    The patent doesn't mention it.  In the
claim.  In Claim 1.

    Q.    Right so my question --

    A.    Doesn't mention it in Claim 15.  So those
are the two independent --

    Q.    Thank you.

    A.    Yes.

    Q.    So I just want to make sure because I'm
not sure of your answer let me ask it this way.  Do
either Claim 1 or Claim 15 require a license

EXHIBIT C

cooper rough transcript.txt

number?

    A.   They don't.  Not specifically.

    Q.   Thank you.  And do either claim or 15
require a license start date?

    A.   There is years in profession and years in
practice.  But not specifically the date that the
license started or ended.

    Q.   Well, I'm sure you agree that a physician
may be in the profession for years --

    A.   Yes.

    Q.   That may not match the same time frame
where he or her has a license; right?

    A.   It's correct that it may or may not, yes.

    Q.   Right.  So does either Claim 1 or 15
require a license start date?

    A.   No, it doesn't neither one.

    Q.   And do either Claims 1 or 15 require a
license end date?

    A.   Neither 1 or 15 require an end date.

    MR. VAZQUEZ:  And then finally Dr. Cooper,

let's look at the third part of Exhibit 8.

    THE WITNESS:  Exhibit 8?

BY MR. VAZQUEZ:

    Q.   And that's the one that you referred to
Dr. Todd Rosengart?

    A.   Yes, I have it.

    Q.   And if you would please turn to Page 3.
Or the third page of the clipped screen shots.  In
and reads that language into the record.

Page 145

EXHIBIT C

cooper rough transcript.txt

A.   I'm sorry I didn't hear what you --

Q.   If you could please read the related language into the record.

A.   Okay.  It does Dr. Todd Rosengart is confirmed to have a license in New York and -- I think that's Illinois.

Q.   I think you are correct.  Capital I capital L.

A.   Yes.

Q.   And so this statement which you just read into the record was put into this report by Vitals; correct?

A.   Correct.

Q.   And Dr. Cooper could you now please take a look at Paragraph 43 of your rebuttal report.

A.   And that is No. 1?

Q.   That's Exhibit 1.

A.   And that was Paragraph 43?

Q.   Yes.

A.   Okay.  I'm there.

Q.   Just one second.  I have an exhibit that corresponds to the questions.  I'll ask you about that paragraph.  We are digging them up?

A.   Okay.  You want me to read it in the meantime, I take it.

Q.   Yes, if you'd like.  Not in the record; just to yourself.

A.   Okay.

MR. STIMPSON:  They took all my binder clips.

Page 146

**EXHIBIT C**

cooper rough transcript.txt

        MR. VAZQUEZ:  I may have a few extra here let me see.  Mark this as the next number please.

        (Deposition Exhibit 9 was marked for identification by the Reporter and is annexed hereto.)

BY MR. VAZQUEZ:

    Q.  And so you have been handed what's been marked as Exhibit No. 8?

    A.  I have.

        MR. STIMPSON:  9.

        MR. VAZQUEZ:  I'm sorry.  No. 9.  My bad.


BY MR. VAZQUEZ:

    Q.  And so let's take a look at some of these pages and let's start with Page 100 of Exhibit No. 8 -- 9, I don't know why I keep saying that.

    A.  Page 100?

    Q.  Yeah 100 of 204.  It's a little bit maybe -- a little blurry but it's -- says matches found, 500.  On the left?

    A.  I don't have a Page 100.  I have a Page 101.

        MR. STIMPSON:  I think this might be it.

        THE WITNESS:  Is this the legend at the bottom --

BY MR. VAZQUEZ:

    Q.  Yeah.  That's what I just said it's little blurry --

    A.  I see.  Yes.

    Q.  -- a little bit on the copy.

EXHIBIT C

cooper rough transcript.txt

A.   Okay.

Q.   So let me represent to you Dr. Cooper that this is a screen shot of the search results pages from Vitals Web site.

A.   Okay.

Q.   Is this what you are calling a results list?

A.   Yes.

Q.   Is this a report?

A.   No.  Not as defined by the claims.

Q.   This is not just a list of providers who satisfied the search terms, is it?

A.   It's a list of providers with a certain match score so yes, it is a list of providers that satisfy search terms.  But there is no further information to indicate what those search terms were other than what's shown on the form with circle 2 enter a location which looks like a ZIP code and within 15 miles.  So it's a result for that.  But there is no other indication of what the search terms were.

Q.   Okay.  So just to make sure we are on the same page, this is what you call a results list; right?

A.   That's correct.

Q.   Now, I asked you if it was a report.  When I ask you that question I mean just using your meaning of the word report is it a report just use the ordinary meaning of the word "report"?

MR. STIMPSON:  Objection.  Asked and

EXHIBIT C

cooper rough transcript.txt

answered.

THE WITNESS:  Yeah I think I have already

answered that.  It's not mentioned in the claims
and if you want to call it a report, outside of
this Court action, then I suppose you could do it
that -- do that, but that's not the meaning the
word "report" in the claims.

BY MR. VAZQUEZ:

    Q.   Well, that's exactly why I am qualifying
my --

    A.   Yes.

    Q.   -- question to say don't use -- just not
using how it may be interpreted by the claims or --

    A.   Yes.

    Q.   -- in the Markman order, just ordinary
meaning,

    A.   Yes.

    Q.   So yes, it is use a report using the
ordinary meaning?

    A.   I can't really opine on that because my
job is to look at the claims if map them.  If you
want to consider that a question of the dictionary
meaning, yes, you could probably call that a
report.  But it doesn't match claim specifications
for that report.

    Q.   Okay.  Now this has more than just names
on it doesn't it?

Page 149

**EXHIBIT C**

cooper rough transcript.txt

A.   This Page 100 has match scores, number of matches found, number of strong matches, and a panel to refine a search information, and several other control functions that would typically be on an HTML page yes.

Q.   Does it also contain something called overall patient ratings with four stars?

A.   Yes, it does.

Q.   What other information is listed for each doctor?  The two that are here?

A.   Rated by patients, Board certified, and four star hospital.  It says he is in -- the first one is in Denver, Colorado, 1.4 miles away.  And the second one is in Denver 2.1 miles away.

Q.   Why, Dr. Cooper, can't this page meet the limitations of both the healthcare provider report on the first health provider and the result list element?

A.   Can you show me where in the claims those limitations are called out?  That would be in the patent?

Q.   Uh-huh.

A.   And I am looking at claim -- Claim 1.

Q.   Actually Claim 7.

A.   Claim 7.

Q.   Well, Claim 1 you are correct but Claim 7 also talks about the results list.

A.   Okay.  And the question was?

Q.   Why can't, Dr. Cooper, this page that we were looking at with the report, under the ordinary

EXHIBIT C

cooper rough transcript.txt

meaning --

    A.   Yes.

    Q.   -- meet the limitations of both the healthcare provider report on the first healthcare provider and the result list element?

    A.   Because it doesn't match claims 6, 5, and 1 that specify the -- which are all precursors of Claim 7 and which specify the report on the first healthcare provider using the healthcare provider information patient provided and third party source.  That hasn't been demonstrated.  Excuse me.  This is simply a results list, not a report.

    Q.   Okay.  And I have been informed by the videographer that we are about to run out of tape so we can go off the record now?

    A.   Okay.

    Q.   Assuming your counsel agrees to change the tip?

    MR. STIMPSON:  No, I don't.  All right.  All right.  I'm feeling cooperative.

    THE VIDEOGRAPHER:  The time now is 3:40.  End of Tape No. 2, and we are off the record.

    (Recess taken.)

    THE VIDEOGRAPHER:  The time now is 3:47.  Beginning of Tape No. 3.  We are back on the record.

BY MR. VAZQUEZ:

    Q.   Dr. Cooper, I had asked you before the break about why your -- the screen shot of this

EXHIBIT C

cooper rough transcript.txt
report which we were looking at --

    A.   Okay which report?

    Q.   It's the screen shot here that shows
Dr. Tate and Dr. Lee, which is Page 100.

    A.   Oh, I see.  You are not in the -- in the
printed web site then?

    Q.   No.  I am in the Exhibit 9.

    A.   Okay.  Yes.  I'm with you.

    Q.   Yes.  I had asked you about why the page
couldn't meet the limitations of both healthcare
provider report on the first health provider and
the results list element, and then you, I believe,
went back and said well, looking back at all the
claims that --

    A.   Yes.

    Q.   -- Claim 7 depends on.

    A.   Yes.

    Q.   Okay.  So I want to actually rephrase that
question and limit it to the limitations in Claim
7, in other words, not what it's depending on but
ass it limited so if you look at Claim 7 of the
patent, the language that states where in the
search of the database produces a results list of
one or more healthcare providers sag the search
criteria wherein the results list includes the
first healthcare provider.

    A.   And your question is --

    Q.   The question then is why can't that page
in your right hand there meet the limitations of
both the healthcare provider report on the first

**EXHIBIT C**

cooper rough transcript.txt

healthcare provider and the results list element
specific to Claim 7?

A.   Specific to Claim 7, that is a results
list, not a report.  Claim 7 reads the method as
defined in claim 6 wherein the search of the
database produces a results list.  Not a report.
Of one or more healthcare providers sag the search
criteria wherein the results list including the
first healthcare provider."

Q.   Right.  So Page 100 of 204 of Exhibit 9?

A.   Uh-huh okay.


Q.   That's why I am asking whether this page
can meet the limitations of both the healthcare
provider report on the first healthcare provider
and the result list element specific to Claim 7.

A.   No.  Because Claim 7 requires a results
list not a report.  Report is not mentioned in
Claim 7.  So any interpretation that would call it
a report is outside the scope of the instances
mentioned in Claim 7.

Q.   Well, can't this Page 100 of 204 be both a
results list and a report?

MR. STIMPSON:  Objection that's been asked
and answered.

THE WITNESS:  Yeah I have already explained
that.  It is a results list.  It's not a report
in -- within the limitations specified in the
claims side.

BY MR. VAZQUEZ:

Page 153

EXHIBIT C

cooper rough transcript.txt

Q.   But I am asking you to say it -- to answer
a question specifically referencing only to
limitation of Claim 7?

        MR. STIMPSON:  That's been asked and
answered thousand and also I object to it because
you are asking if it can be a report on a first
healthcare provider and that language isn't even in


Claim 7 how so can he do that without looking back
to Claim 1.

        MR. VAZQUEZ:  I am only asking about the
limits in Claim 7 do you understand my question.

        MR. STIMPSON:  Then the question has to be
whether it's can be a results list because the
first healthcare provider report is not in Claim 7
as he told you.  So you can't tell him he can't
look at Claim 1, too.

BY MR. VAZQUEZ:

    Q.   Well, you can look at Claim 1 but I am
only asking you to consider the limits of Claim 7?

    A.   When I look at the limits of Claim 7, it
calls out a results list, not a report.

BY MR. VAZQUEZ:

    Q.   All right and so -- and why can't a report
also be a results list?

    A.   Within what claim?

    Q.   Just in general, just in general?

        MR. STIMPSON:  Objection.

        THE WITNESS:  Yeah I don't understand the
question.

BY MR. VAZQUEZ:

**EXHIBIT C**

cooper rough transcript.txt

Q.   Well, Page 100 of 204?

A.   Yes.  Page 100, 204.

♀

Q.   That's what we have been discussing here. Do you have it --

A.   He do.

Q.   In front of you is this a report on Dr. Tate?

A.   No.

Q.   Why not?

A.   Because it's a results list.

Q.   Why is it not a report?

MR. STIMPSON:  Objection.  Asked and answered.

THE WITNESS:  Because the claims call out two things: a results list and a report.  It doesn't say that the report is a results list or vice versa.  It specifically identifies two instances which cannot co- locate so they cannot be the same thing.

BY MR. VAZQUEZ:

Q.   What is so do you understand what the ordinary meaning of a results list is, Dr. Cooper?

A.   "Ordinary" meaning having nothing to do with this case?  Yes I do.

Q.   And what is that?

A.   It's results from some kind of operation. In the caves Claim 7, it's of a search, the search

♀

Page 155

**EXHIBIT C**

cooper rough transcript.txt

capabilities -- Oops, wherein the search of the

database produces a results list.

    Q.   What about the ordinary meaning of

"report"?

    A.   "Ordinary" meaning completely outside side

this case having nothing to do with this

deposition?

    Q.   Uh-huh.

    A.   A report is what you make of it.

    Q.   I'm sorry.  What does that mean?  What you

make of it?

    A.   Yes.  You, the programmer, can design

something and call it a report, but that doesn't

mean that it fits within the deposition of the

patent.

    Q.   So it's your position then, Dr. Cooper,

that a Web page can never meet two different claim

limitations?

    A.   No.  That's not my opinion.

    Q.   Okay.  How is that wrong?

    A.   The question was, web page can never meet

two specifications in claims.  And clearly it

could.

    Q.   Or limitations?

    A.   -- but not these claims.

    Q.   You said specifications I meant

limitations?

    A.   Limitations okay same thing.

    Q.   So you are saying that a web page can meet

two different claim limitations but not this page?

EXHIBIT C

cooper rough transcript.txt

A.   Not this page meaning these claim limitations.  There are patents I'm sure that have more than one claim that relate to the same HTML page but this isn't one of them.

Q.   And what is your understanding of what report means in the context of this patent?

A.   Well, the limitations are called out in Claim 1 and Claim 15.  As long as it fits all those limitations, then it is the report that's mentioned within these two claims.

Q.   And Dr. Cooper still referring to Page 100?

A.   Okay.

Q.   Is it your position -- well, strike that still referring to Page 100.  Is the way this information is presented on this page allow a potential patient to compare the different doctors listed on the page?

A.   Compare with respect to what attributes? Where -- what are you comparing by?

Q.   The two doctors listed on the page.

A.   Yes.  But what attributes about those two doctors are you --

Q.   That's not part of my question.  I'm just asking --

A.   Well --

Q.   -- does a potential -- Is a potential patient able to compare these two -- the doctor doctors listed on this page?

Page 157

EXHIBIT C

cooper rough transcript.txt

A.   I don't recall.  The question doesn't make sense to me.  I need to understand what you are mean by --

Q.   All right.  I will try to make it clear. I apologize?

A.   Okay.

Q.   Page 100.

A.   Page 100.

Q.   Does the way this information is presented on this page, Page 100, allow a potential patient to compare the different doctors, which is think about this case are two, the two doctors listed on this page?

A.   No.  Not within the limitations of the claim.

Q.   Why not?

A.   Because that's not what the claim says. Can you show me in the -- in the claims where the the word "compare" is used?

Q.   I can, but I won't.  I would just like you to answer the question why it is that somebody looking at this page can -- is not able to compare these two doctors?

MR. STIMPSON:  Objection.  Objection to form because, you know, he has asked you now to show him the language of the claims which obviously you are asking him about and you won't even show it to him --

BY MR. VAZQUEZ:

Q.   I am not, I am not Scott please don't

Page 158

EXHIBIT C

cooper rough transcript.txt

coach him?

       MR. STIMPSON:  Dr. Scott?

       MR. VAZQUEZ:  Don't coach him.

       MR. STIMPSON:  I am not coaching him.

       MR. VAZQUEZ:  Yes, you are.

       MR. STIMPSON:  Jesus he just asked you to show him a claim and you won't do it.

       MR. VAZQUEZ:  You know that that's not claim language.  What I just said is --

       MR. STIMPSON:  Jesus -- plea.

♀


BY MR. VAZQUEZ:

   Q.   Is this the way this information is presented allow a potential patient to compare these two pages?  There is no claim language there I'm just asking you to answer that question and you said no?

   A.   In my opinion no.

   Q.   And I am asking why?

   A.   Because they both have the same score, 96 percent; they both have four stars; and the other issues depend on what they are being compared about.  Therefore, your question is indeterminate, and I can't answer is it.

   Q.   Well, now I understand.  So let's --

   A.   Okay.

   Q.   So assume for me this hypothetical.

   A.   Okay.

   Q.   That Dr. Tate had a 96 percent but then Dr. Lee right below it says 90 percent max score.

EXHIBIT C

cooper rough transcript.txt

A.   I see.

Q.   Assume that can a potential patient be able to compare the two doctors with this page?

A.   To compare just that attribute of the percentage listed on the report, or rather on the -- you are confusing me now, on the results list, and from that it could go to the report of the one he chooses to look at.  But that is a results list and it's not made for comparison other than those attributes.

Q.   All right.  I move to strike that as nonresponsive.  And I am going to change the question.

A.   Okay.

Q.   Suppose on this Page 100 Dr. Tate showed 100 percent?

A.   Okay.

Q.   Match score and overall patient rating was four stars as noted there?

A.   Uh-huh.

Q.   But then Dr. Lee showed 50 percent max score and just two of the four stars.  My question is given those assumptions, would a potential patient be able to compare the two doctors?

A.   He could compare them with respect to the two limitations of your question which would be the percentage score and the number of stars.

Q.   So when you -- So in other words, Dr. Cooper, in order to be able to compare the things you are comparing must be different?

Page 160

EXHIBIT C

cooper rough transcript.txt

A.   They have to be of the same class.  You

can't compare apples and oranges.  And they have to
have different values within those classes.

Q.   So why is it not a comparison if they both
have the same value and a potential patient says
well, Dr. Tate and Dr. Lee have the same exact max
score and the same overall patient ratings?

A.   Well then how would you compare them if
they are identical in attributes?  There has to be
a difference in order to compare.

Q.   By the act of comparing, I see that they
both have the same max score and the same star
rating.  Aren't I comparing simply by looking at
one and the other?

A.   No, I wouldn't call it comparing.  There
needs to be an attribute where you distinguish I
think from that, the way you specified it the
percentage and the number of stars you could say
they both belong to the class that has that
percentage and that star.  But they are instances
of that class, not compared by other than those
attributes.

Q.   Just sticking with this for a second here
Dr. Cooper, do you see there on Page 100 how there
is highlights shown for Dr. Tate and Dr. Lee?

A.   I don't see yellow highlights like --


Q.   No, I mean the word "highlights."

Page 161

EXHIBIT C

cooper rough transcript.txt

A.   Yes.  The word "highlights" appears on both.

Q.   So referencing those highlights, do the highlights for each of the doctors shown on the page facilitate comparison between the listed doctors?

A.   The highlights are identical in both four stars by patients, board certified four star hospital.  So the answer is no.

Q.   Okay.  And does the listing of star ratings for each of the doctors facilitate comparison between the listed doctors?

A.   No.

Q.   And why not?

A.   Because they are both the same value. Therefore they are both instances of the same class which is the class of entries that match the search results.

Q.   So then again if they had different star ratings then your answer would be yes?

A.   Then my answer would be yes they can be compared but not within the limitations of the way the word compared is used in the claims.

Q.   Okay.  Move to strike everything beginning

♀

with but not.

What about the match score for each of the two doctors?  Is your answer the same, that those cannot be compared if they have the same match score but they can be compared if they have different match scores.

Page 162

**EXHIBIT C**

cooper rough transcript.txt

A.   That's correct you could say that one is better or worse than the other.  But they are indistinguishable on this one.

Q.   Okay.

MR. STIMPSON:  Are there any more binder clips?  I think I am out.  And I am regretting giving you all my binder clips.

MR. VAZQUEZ:  Mark this as the next deposition exhibit.

(Deposition Exhibit 10 was marked for identification by the Reporter and is annexed hereto.)

THE REPORTER:  This is Exhibit 10.

BY MR. VAZQUEZ:

Q.   All right.  Handing you what's been marked as Exhibit 10, Dr. Cooper.

A.   All right.  Thank you.

Q.   I'm sorry Dr. What page is the yellow sticky on there?

A.   It says Page 23 of 64.

MR. STIMPSON:  23 of 64.  Is that what they just gave you?

THE WITNESS:  Yes.

MR. STIMPSON:  Well, that's not what I have.  I don't even have that.

THE WITNESS:  You don't have a Page 23?

MR. STIMPSON:  No.  Mine is 123 pages.

MS. STOLL-DeBELL:  That's what I am saying, I don't think you have the right one.

Page 163

**EXHIBIT C**

cooper rough transcript.txt

MR. STIMPSON:  That's good.  I'll take the shorter one.

BY MR. VAZQUEZ:

Q.   So, Dr. Cooper, I had asked you to look at Page 23 of 64 I put a yellow Post-it on your copy?

A.   Okay.  I am looking at that.

Q.   And you see that there is a copy of a screen shot from the Vitals Web site there?  Do you see it?

A.   I do, yes.

Q.   And is that a report?

A.   That's a comparison -- or rather that's a results list.

Q.   And would a patient looking -- potential patient looking at this results list to use your words be able to compare the doctors from that result list?

A.   In this case, William F. Yates is only three stars and Sammy G -- Diab?  Or Dlab?  I can't read that -- is four stars.  And Nathan W. Pearlman has no stars, therefore the lease on that attribute it could be compared but not within the meaning of the word compared within the claim language.

MR. VAZQUEZ:  And move to strike "but not within the meaning."

Q.   My question doesn't ask you if it's within the claim language Dr. Cooper my question simply asked you if a potential patient is compare these three doctors by looking at this results list to use --

Page 164

EXHIBIT C

cooper rough transcript.txt

A.   I see.

Q.   -- the words, yours.  Is the answer yes?

A.   I would give the same answer.

Q.   Okay.  Can potential patient compare these three doctors by qualifications?

A.   Well, you don't happen to have a magnifying glass, do you?

Q.   I'm sorry.  I do not.

A.   I don't see any qualifications here that -- other than the stars and those aren't

♀

really qualifications those are ratings.

Q.   Well, do you see at for example Dr. Pearlman, shows under the highlights America's Top Doctor?

A.   Uh-huh I do see.

Q.   Board certified and holds a fact you tee appointment?

A.   Yes, I see those things.

Q.   So if somebody is America's Top Doctor, or included within those, does that expect to their qualifications?

A.   No, I don't believe it does.

Q.   Okay.  And whether somebody is Board certified, do you think that speaks to the doctor's qualifications?

A.   Not if they are all Board certified, no.

Q.   Okay.  Can you compare --

A.   Wait a minute.  Your question had to do with compare; is that correct?

Page 165

EXHIBIT C

cooper rough transcript.txt

Q.   No.

MR. STIMPSON:  Okay could you read he request question please?

MR. VAZQUEZ:  Sure.  Read it back to him please.

(The pending question was read.)

THE WITNESS:  I would say that that does speak to the doctor's qualifications, yes.  But it's not a comparison to --

BY MR. VAZQUEZ:

Q.   What about whether somebody is one of America's top doctors; does that speak to that doctor's qualifications?

A.   I have no idea how that information was produced.  And one of them does not say that.  So it in your words could be compared but it that doesn't sound like a qualification to me.

Q.   Can you compare by quality?

MR. STIMPSON:  Objection to form.

THE WITNESS:  The only comparison that I see relates to the number of stars on these three doctors in the results list.  There is no other ranking score.  You can't -- can't distinguish otherwise among them.

BY MR. VAZQUEZ:

Q.   And now let me ask you, Dr. Cooper, if a potential patient can compare these three doctors?

A.   Not in the sense of the claim, no.

Q.   And why not, sir?

A.   Well, let's see.

Page 166

EXHIBIT C

cooper rough transcript.txt

The only place that comparison ratings are

provided is in a healthcare provider report, not on
a results list as of the creating element of Claim
1, for example.

    Q.   Uh-huh.  No.  My question is whether you
can compare these three doctors by looking at this
results list in your words?

    A.   And my answer is that you can't compare
them within the meaning of the claims, no.

    Q.   Was that qualifier part of my question?

    A.   No, it wasn't.  It's part my answer.

    Q.   Why do you add it to your answer when it's
not part of my question?

        MR. STIMPSON:  Hold on.  You are just
arguing with him, Jesus.  Okay?

        MR. VAZQUEZ:  I just want to know why he is
adding --

        MR. STIMPSON:  Why don't you move to
strike.

BY MR. VAZQUEZ:

    Q.   Why d you just answer the question.  Why
are you adding that?  So I can understand why you
are answering the way you are --

        MR. STIMPSON:  It's a patent case, Jesus.
You do understand that?

        MR. VAZQUEZ:  Do not coach the witness.


        MR. STIMPSON:  Well, you know --

Page 167

**EXHIBIT C**

cooper rough transcript.txt

MR. VAZQUEZ:  Just make your objection.

MR. STIMPSON:  This is a patent claim chart.  You are bringing this out.  You are showing him in the context of a claim chart comparing it to the patent claims, and you are saying, oh, no, whatever you do don't look at the patent claims. You can't do that, Jesus.  That's unfair to the witness.

MR. VAZQUEZ:  Are you done?

MR. STIMPSON:  For that objection I am. Let's see what's next.

MR. VAZQUEZ:  All right.

THE WITNESS:  Same response.

BY MR. VAZQUEZ:

Q.   My question is why are you adding that qualification to the question -- to the response to my question?  I am trying to understand.

A.   Because the definition of the word "compare" as used within the claims requires full qualification of the data rather than giving only a partial answer.

Q.   Okay.

A.   And in my opinion that is a germane part of the answer.

Q.   All right.  Well, I am asking to you simply answer the question can a potential patient compare these doctors by looking at this report without referencing what whatever you think compare means --

A.   No, can't answer that question.

Page 168

EXHIBIT C

cooper rough transcript.txt

Q.    You cannot answer?

A.    Not without using my definition of the word compare within the claims.

Q.    Do you think that this page that we have been looking at here Page 23 of 64 of Exhibit 10 would help a potential patient choose which doctor profile to look at?

A.    Not within the meanings of the claims, no.

Q.    So in other words, a potential patient that's on the Vitals Web site needs to go study the 060 patent claims in order to be able to use this information to find what doctor they would like to look at?

A.    No.  But an attorney alleging infringement would have.

Q.    Okay my question was not would an attorney alleging infringement Dr. Cooper?

A.    Yes, sir.

Q.    My question is just a potential patient, a

layman, is on the Vitals web site.  Up comes this information.  He is trying to find a doctor.  Would looking at this information help that potential patient choose which doctor profile he or her would like to look at?

A.    Same answer.

Q.    Okay.  And, Dr. Cooper, if a potential patient clicks on a physician's name as listed in the results, to use your words, allow a potential patient to access a report on the first healthcare

Page 169

**EXHIBIT C**

cooper rough transcript.txt

provider?

    A.   That has not been demonstrated.  It's a possibility.  But you haven't shown that clicking on that does so.

    Q.   Why is it, Dr. Cooper, that when I was referencing Page 23 of 65, and asked you if comparing that -- or looking at that information would allow a patient to choose which profile they want to look at, why is it that you believe that it would not allow a patient to choose -- to choose the profile they would like to see within the meaning of the claims?

        MR. STIMPSON:  Objection to the form.  That misstates his testimony.

        THE WITNESS:  I have the same answer.  Why


is it I believe that?  Because within the limitations of the claims, that doesn't satisfy the specification -- rather the claim elements.

BY MR. VAZQUEZ:

    Q.   I guess you want to go to the nicks level then?

    A.   Okay.

    Q.   Why does is it not satisfy the claim element?  And keeping in mind that all I am asking is now going your way within the meaning of the claims --

    A.   Yes.

    Q.   -- looking at this information on Page 23 --

    A.   Okay.  Within the meaning of the claims?

Page 170

EXHIBIT C

cooper rough transcript.txt

Q.   Yes.

A.   Okay where is comparing specified here?

Q.   No, no, no my question is, Dr. Cooper?

A.   Yes.

Q.   -- within the meaning of the claims --

A.   Yes.

Q.   So why is it that looking at this information, would not allow a potential patient to choose which profile they want to look at?

A.   You are specifying that that's within the

meaning of the -- of the claims.  So at least we can make progress on that.  Where within the claims are you talking about the word compare?

Q.   My question didn't have the word compare, Dr. Cooper.

A.   Yes, it did.

Q.   No.

A.   You said compare --

Q.   No.  Mr. --

A.   Restate it please.

Q.   Where -- why is it within the meaning of the claims that looking at this results list to use your words?

A.   Uh-huh.

Q.   On Page 23 of 64 Exhibit 10 would not allow a potential patient to choose which profile they want to look at?

A.   I suppose a patient could choose that without practicing the claims so if you are saying

Page 171

**EXHIBIT C**

```
                    cooper rough transcript.txt
within the meaning of the claims, choosing is not

mentioned in the claims, therefore, it's -- the

question is irrelevant.

        MR. VAZQUEZ:  Okay.  I note your objection.

    Q.   Can you please answer the question?

    A.   I did.



        MR. STIMPSON:  It's been asked and

answered.

        THE WITNESS:  Asked and answered.

BY MR. VAZQUEZ:

    Q.   No.  It's not asked and answered.

    A.   It is.

    Q.   It's been asked.  It's not been answered,

Dr. Cooper.

    A.   I believe it has.

    Q.   No, it hasn't.

    A.   No.  You are entitled to your opinion.

    Q.   Yes, I am.  As are you.  Now I will try it

again.

    A.   Okay.

    Q.   Okay?  Within the meaning of the claims --

which is how you want the question to be praised?

    A.   Yes.

    Q.   -- why is it that -- within the meaning of

the claims.  Can a potential patient look at this

information on Page 23 of 64 and choose which

profile they want to look at?

        MR. STIMPSON:  Objection.  Asked and

answered.

        MR. VAZQUEZ:  Within the meaning of the
                    Page 172
```

**EXHIBIT C**

cooper rough transcript.txt

claims --

⚥

     THE WITNESS:  Within the meaning of the word claims, where is the word choose?

BY MR. VAZQUEZ:

   Q.   You are not responding to the question, Dr. Cooper.  We are back to the you know you are trying to tell me how I should ask my questions.

   A.   No you are trying to tell me how I should give my answers I am giving my answers the way I understand the patent and that's the purpose of this --

   Q.   You wanted me to put it within the meaning of the claims, didn't you?

   A.   Yes.  Because --

   Q.   And now my question is, I mean let's just backup here?

   A.   Okay.

   Q.   Potential patient goes to MDX Vitals Web site for information?

   A.   Yes.

   Q.   Do you agree?

   A.   Yes.

   Q.   And he looks for information on doctors; right?

   A.   Correct.

   Q.   And so they put in information, a search

⚥

query; right?

**EXHIBIT C**

cooper rough transcript.txt

A.   Yes.

Q.   And they get information in return right?

A.   That's correct.

Q.   And the information they may get in return is what's shown on Page 23 of 64.

A.   Yes.

Q.   Right?

A.   Yes.

Q.   And so now they have -- they have three doctors information on three doctors provided to them; do you agree with that?

A.   I agree.

Q.   And so this person needs to figure out which doctor should I pursue looking for more information on.  Do you agree with that?

A.   I agree that you are alleging that, yes.

Q.   Yes.  Well, not alleging it.  I'm just saying it, Dr. Cooper.

A.   Okay.

Q.   The person is looking for information on doctors, and he had received this information back.

A.   Yes.

Q.   Which is about three doctors?

A.   Yes.

Q.   And then the person asks himself, well, which of these three doctors should I look for more information on.  Okay?

A.   Uh-huh.

Q.   Does this information facilitate that person accomplishing that goal?

Page 174

**EXHIBIT C**

cooper rough transcript.txt

A.   Within the meaning of the claims, no.

Q.   Okay.  And sir why within the meaning of
the claims is your answer no?

A.   Because it doesn't meet the limitations of
comparing and using that information as specified
in claims 1 or 15 which are the independent claims.

Q.   Okay.  Do you believe that the answer to
this question is irrelevant, Dr. Cooper?

MR. STIMPSON:  Objection to form.  What
question?

BY MR. VAZQUEZ:

Q.   The one I just asked.

A.   Would you read the question back please?

(The pending question was read.)

THE WITNESS:  No that was -- oh, okay.
Because it doesn't satisfy the limitations of the
claim.

BY MR. VAZQUEZ:

Q.   I thought Dr. Cooper that earlier you said

that it was not relevant.

A.   I don't think it was that question that
was irrelevant.  I think that question just doesn't
satisfy the meaning of the claims.  Can you read
the question and the answer -- where I gave the
word irrelevant, please.

Q.   Or not relevant just do a search for
relevant offer irrelevant in his responses.

(Record read.)

THE WITNESS:  That's --

Page 175

EXHIBIT C

```
                    cooper rough transcript.txt
BY MR. VAZQUEZ:
```

Q.  That's your response?

A.  Yeah I stand with that response.

Q.  Okay.  So why is it that you believe that question is irrelevant?

A.  Because it doesn't read on the claims.

Q.  And so Dr. Cooper, will you just refuse to answer questions that you think are irrelevant?

A.  No.

Q.  Just that one?

A.  I'm sorry?

Q.  Just that one?

A.  That one is irrelevant.  Therefore I answered that it was irrelevant.

Q.  That's good, Dr. Cooper.  That's good.  I

need to run to the bathroom.

A.  Me too.

Q.  Let's take a break.

MR. STIMPSON:  How long have we been going?

THE VIDEOGRAPHER:  The time now is 4:27. We are off the record.

(Recess taken.)

THE VIDEOGRAPHER:  Time now is 4:39.  We are back on the record.

BY MR. VAZQUEZ:

Q.  Dr. Cooper, reference ing Page 23 of 64 of Exhibit 10 again?

A.  Yes.

Q.  Okay.  Do you agree that clicking a physician's name as listed on this results page to

Page 176

EXHIBIT C

cooper rough transcript.txt

use your words allows a potential patient to access

a report on a first healthcare provider?

    A.   I don't have reason to either agree or

deny on that but I will take your word for it if

you want to say that it does.  In other words all

of the is the paper not the Web site in front of

me.

    Q.   Just pulling another exhibit here.

    MR. VAZQUEZ:  Please mark this as our next

deposition exhibit, please.  I think it's 11.

    (Deposition Exhibit 11 was marked for

    identification by the Reporter and is annexed

    hereto.)

    THE WITNESS:  Are we staying on 23?

BY MR. VAZQUEZ:

    Q.   No.  I am going give you a new exhibit.

    A.   Ah.  Thank you.

    Q.   This is not the best copy.  I apologize.

I am looking at Page 24 of 32 of what we have just

mark as Exhibit 11.

    MR. STIMPSON:  Can you wait until I get my

copy, please?  I want to catch up.

    MR. VAZQUEZ:  Sure.

    MR. STIMPSON:  Thank you.  This is 11?  Now

which page are you looking at, Jesus?

    MR. VAZQUEZ:  24 of 32.

    Q.   And, Dr. Cooper, is this a report on

Dr. Sujana S. Chandrasekhar?

    A.   It appears to be, yes.

Page 177

EXHIBIT C

cooper rough transcript.txt

        MR. STIMPSON:  I'm sorry.  I can't seem

to -- oh, I see.  Okay.  I'm with you.  Okay.

BY MR. VAZQUEZ:

    Q.    And do you agree that a potential patient

could click here on Dr. Chandrasekhar's name and --

    A.    Go ahead.


    Q.    -- and access a full report on the first

healthcare provider?

    A.    All I am looking at is paper.  I'm not

sure that he could click on it but if that's your

assertion, I will go along with it since I don't

have evidence to the contrary.

    Q.    So assuming this is actually the patient

is looking at this on a screen which is what we are

assuming?

    A.    Okay.

    Q.    Your answer is yes?

    A.    Yes.

    Q.    Okay.  And is this an example of a

healthcare provider report on the first healthcare

provider?

    A.    I don't have evidence one way or the other

on that.  If you want to assert that, then I will

accept that.

    Q.    We will I think you agreed it was a

report; right?

    A.    It's an HTML display which could be could

not strayed as an a report under the right

circumstances but I don't know that it's construed

as a report under claims 1 or 15.

                    Page 178

**EXHIBIT C**

cooper rough transcript.txt

Q.   Is it a report on this particular doctor,

Dr. Chandrasekhar?

A.   It mentions Dr. Sujana S. Chandrasekhar,
M.D., but you haven't established that it's a
report on the -- within the meaning of the claims.
It is an HTML page it looks like that's been
printed.  It says at the bottom screen shot 12.

Q.   Yup.  And is it a report on a particular
doctor about whom information was requested?

A.   I have though way of knowing that.  In
Paragraph 24, I, whoever I is, captured the entire
page in four screen shots shown below.  If that's
correct, then the four screen shots would be 12, 13
14 and 15.

Q.   What are you referring to when you say 24
I?

A.   In Paragraph 24 --

Q.   Oh, the word "I"?

A.   "I" is used, yes, whoever "I" is.

Q.   Okay.  What happens Dr. Cooper when you
click on a doctor's name in a results list on the
Vitals Web site?

A.   I don't know.  I haven't clicked on that
name.  I have found that I can't get a report that
meets the construction of the claim.  That's all I
know.

Q.   Did you say you found that you can't,

Page 179

EXHIBIT C

cooper rough transcript.txt

cannot?  Get a report?

A.   I cannot find a report that meets the construction of the claim.

Q.   Okay so I asked you what happens when you click on a doctor's name on a results list?

A.   And I said I don't know but I will accept your assertion that it brings up a report.

Q.   Okay.  But -- so have you done it yourself?

A.   I have not looked at that time that way, no.  I looked at the report first, the results list second.

Q.   Have you yourself clicked on a doctor's name in the report on the Vitals Web site?

A.   In a report?

Q.   Uh-huh.

A.   This is -- I have not clicked even a doctor's name in a report, no.

Q.   Have you -- So as part of just preparing for rendering your opinions or working on the case, Dr. Cooper, have you been on the Vitals Web site?

A.   Yes, I have.

Q.   How much time have you spent on the Vitals Web site?

♀

A.   Oh, I have no idea.

Q.   Well, more than an hour?

A.   Probably more than an hour, probably less than two.

Q.   Okay.  Thanks.  And so whether it's on a report within the meaning of the claims or a

Page 180

**EXHIBIT C**

cooper rough transcript.txt

results list, have you had a chance to simply click
on a doctor's name when it comes up on the Vitals
Web site?

 A. I don't recall clicking on the name
itself.  I have clicked on pages.  I don't recall
the name being one of those.  Whether the name is a
sensitive link or just text, isn't clear from this
term.

 Q. Have you run a sample search query --

 A. Yes.

 Q. -- in the time you spent on the Vitals Web
site?

 A. Yes, I have.

 Q. And do you recall what query that was or
what queries they were?

 A. A ran a number of queries to see what the
various attributes of the claim elements were
practiced.

 Q. So for example did you just run a search

⚥

for a type of doctor?

 A. Only a type of doctor?

 Q. Yes.

 A. I believe I did not.  I searched for a
type of doctor within a location of my -- my home
within Hemet.

 Q. Okay.  Good.  And so you received
information in response to the query you submitted;
correct?

 A. That's correct.

Page 181

EXHIBIT C

cooper rough transcript.txt

Q.   And did the information include doctors' names?

A.   Yes, it did.

Q.   And so did you click on any of those doctors' names?

A.   Same answer as before.  I don't recall clicking on the name.

Q.   Okay.  Dr. Cooper, you don't recall clicking on a name.  Do you recall getting to a report on a doctor?

A.   Yes, I good.

     Did.

Q.   Okay and what was the information that you recall you accessed when did you that?

A.   I don't recall that.  I was on --

information that may or may not have been equivalent to this.

Q.   Well, then, how -- Do you recall how you got that report?

A.   I recall I searched.  I don't recall the details.  Do you have access to the Web site now? Maybe we could clarify that.

Q.   No.  As you can see, we've got a pretty slow connection here.

A.   Yes.

Q.   Otherwise I would indulge you in that.

A.   Okay.

Q.   I'm just trying to see whatever you remember about the search queries you said you ran.

A.   Yes.

Page 182

EXHIBIT C

cooper rough transcript.txt

Q.   Obviously you ran for, as you said, a type
of doctor near Hemet?

A.   Yes.

Q.   You received this information.  You say
you remember getting to a doctor report?

A.   I was getting to a doctor report, but
whether that's within the meaning of the claims, my
contention is no, it's not because it didn't
practice all the elements.  And that's what I spent
my time looking for, whether the elements were

practiced.

MR. VAZQUEZ:  All right.  Move to strike
that response.  It's nonresponsive.

Q.   Let's just move on, Dr. Cooper.  Okay,
Dr. Cooper, let's -- how it was that you pronounced
the doctor's last name on Page 24332 of Exhibit 11?

A.   I pronounced it Sujana.  I'm not sure if
that's right.  Chandrasekhar, which I believe is a
reasonable approximate.  Probably not right --

MR. STIMPSON:  Couldn't you pick Dr. Smith
or something?

THE WITNESS:  Smith, Jones.

MR. STIMPSON:  Whose idea was this?

MS. STOLL-DeBELL:  I have no idea.

BY MR. VAZQUEZ:

Q.   Well, how about just for simplicity, I
will just call her Dr. Sujana.

A.   Okay.

Q.   I'm referring to her by her first name.

Page 183

EXHIBIT C

```
            cooper rough transcript.txt
    A.   Close enough.

    Q.   Okay.  Is this a report -- I'm sorry.
Strike that.

         Is this part of the same report
Dr. Sujana?

         MR. STIMPSON:  Objection to form.
```

Objection to form.

        THE WITNESS:  Same as what?

BY MR. VAZQUEZ:

    Q.  Same as the initial report you would
receive in response to the search query.

        MR. STIMPSON:  Objection to form.
Objection to the form.  It mischaracterizes his
testimony.

        THE WITNESS:  Yeah could you ask the
question again please?

BY MR. VAZQUEZ:

    Q.  Let me see if I want to do that,
Dr. Cooper.

    A.  Okay.

    Q.  Can you go to Paragraph 43 of your
rebuttal report?

    A.  Rebuttal report.

    Q.  That's the third one.  Then let's go ahead
and mark this as the next Deposition Exhibit
please.

        THE REPORTER:  12.

        (Deposition Exhibit 12 was marked for
    identification by the Reporter and is annexed
    hereto.)

**EXHIBIT C**

cooper rough transcript.txt

BY MR. VAZQUEZ:

    Q.   Okay so Dr. Cooper, have you taken a look at Paragraph 436 your rebuttal report?

    A.   I am looking at it now.

    Q.   Okay.  Just read that to yourself and when you are done let me know.

    A.   Okay.

        Okay.  I'm done.

    Q.   And so you cite there John Neal's deposition testimony; right?

    A.   Yes, I do.  At Page 201.

    Q.   Right.  And so he we have handed you Mr. Neal's transcript from his deposition as Exhibit 12.  Let's just go to Page 201 very quickly?

    A.   Okay I'm there.

    Q.   And so you cite Page 201, for the proposition that results lists are not directed specifically to the first healthcare provider but instead are just lists of providers who satisfied a search terms.  Results lists are claims separate reply Claim 7.  That's what you believe that the testimony in Page 201 supports that?

    A.   That's correct.

    Q.   Can you explain to me how?

    A.   The results list that's mentioned in the patent claim requires the search which produces one

EXHIBIT C

```
            cooper rough transcript.txt
```
or more physicians or -- well, one or more

healthcare providers but is not a report.

    Q.   Well, it appears then you ignored

immediately preceding testimony.  Would you agree

with that?

    A.   Which testimony are you --

    Q.   Well, at Page 196 --

    A.   Okay I'm there.

    Q.   -- Line 23?

        "Q.  --

    A.   23 okay.

    Q.   -- it says so this is the stuff that you

think MDX copied that relates to the patent, the

results list showing ratings; right?  And he

answers "there are different forms of presentation

that they could use that, I would think would be a

violation of the patent but of course that's up to

the attorneys to decide and the Court.  Then?

        "Q.  I'm just trying to get a

        list, Mr. Neal.

        "A.  Yes.  And then it goes on.

        But doesn't that seem to indicate

        that Mr. Neal isn't -- did not

        testify that the results list is

        not a healthcare provider report.

    A.   I think on Page 201, the data that he we

just read says that results list is not a

healthcare provider report in my opinion.  And I

agree with that.

    Q.   Page 198 of Mr. Neal's testimony then,

EXHIBIT C

cooper rough transcript.txt

Dr. Cooper.  I want to begin at Line 3.  Well, just
for -- to give you a chance to follow the questions
preceding what's on 198, do you see that the
questions are about copying, and I believe it's
Mr. Stimpson -- Who was there?

        MR. STIMPSON:  I don't know.  Where were
we?

        MR. VAZQUEZ:  Neal?

        MR. STIMPSON:  I think so, yeah.

        MR. VAZQUEZ:  Yeah, it was you.

    Q.   All right.  So -- So as it relates to the
patent, you ask, as it relates to the patent?
Correct?

     "Q.   With Mr. Stimpson yes, and
        then --

        MR. STIMPSON:  Where are we?

        MR. VAZQUEZ:  I am on Page 1, the end of
197 going to 198, and I simply want to highlight

that doctor -- that Mr. Neal says there at the top
of 198:  "Based on my understanding of the claims
that have been granted in the patent, then it is
the way that they" -- "they" he is referring to
MDX --

        THE WITNESS:  No.  I think he is referring
to the claims.
BY MR. VAZQUEZ:

    Q.   Or the claims.  You are correct.

    A.   Yes.

    Q.   That they -- I think it's MDX but we can

EXHIBIT C

cooper rough transcript.txt

agree to disagree on that.  Then you see where he
says there is a mechanism by which they allow
consumers to do that research based on ratings.
And then they present results that showed
physicians in a list that have ratings, comparison
ratings.  Do you see that?

        A.   I do, yes.

        Q.   So then do you still think that Mr. Neal
believes that search results are not a healthcare
provider report that includes comparison ratings?

        A.   His statement there is a mechanism by
which they allow consumers to do that research
based on ratings, and then they present results
that show physicians in a list that have ratings

⚥

comparison ratings.  I believe that's what he said
and what he meant.

        Q.   So nothing about the testimony that we
just reviewed changes what you think he meant on
Page 201?

        A.   No.  I think he is referring to the
results list.

        Q.   All right?

        A.   Which showed according to him comparison
ratings.  Not --

        Q.   Okay.

        A.   Never mind.

        Q.   Now let's go to your -- you think it's
your initial report.

        A.   That would be Exhibit --

        Q.   What that was?
                    Page 188

**EXHIBIT C**

cooper rough transcript.txt

A.

MR. STIMPSON:  5.

THE WITNESS:  5.

BY MR. VAZQUEZ:

Q.   No I am incorrect it's your rebuttal report.  Sorry?

A.   Okay.  The rebuttal report I believe was 1.

MR. STIMPSON:  You guys printed that entire transcript for that one page?  You are killing trees.

THE WITNESS:  Maybe they are investing in paper companies.

MR. STIMPSON:  Now you are messing with my head.

(Discussion off the record.)

BY MR. VAZQUEZ:

Q.   Yes.  So it is Exhibit 10.

A.   Exhibit 1, Paragraph 10?

Q.   Yup.

A.   1.  Okay.  I'm on 1.  And you said Paragraph 10?

Q.   Yes.

A.   Okay.

Okay.

Q.   And so when you are done, just let me know, Dr. Cooper.

A.   Okay.

Okay.

Q.   Do you see where you wrote in your report

EXHIBIT C

cooper rough transcript.txt

"while they are some twice overcome this presumption, Dr. Greenspun does not address any of those ways in his report if asked however I will address them?  Do you see that?

A.   Yes, I do.

Q.   And then what is it that you are talking about there where you say there are some ways to overcome this presumption?

A.   I am informed by counsel that there are ways to overcome it.

Q.   What is it?  I'm sorry?

A.   The rejection of a claim in prosecution history.

Q.   Okay.

A.   Okay so I understand that there are legal ways to two that.  And if you would like to ask me about specifics, then I could address those.

Q.   Yup I do want to take you up on your invitation there?

A.   Thank you.

Q.   -- for you to address the ways that you discussed -- or that you are willing to discuss about over coming the presumption?

A.   Yes.

Q.   I think we are talking about prosecution history estoppel?

A.   Correct.

Q.   Right?

A.   Yes.

Q.   All right.  So go ahead and tell us what
                    Page 190

**EXHIBIT C**

cooper rough transcript.txt

are the ways?

A.   Well, I can't opine on the ways without a
question that relates to those.  If you as the
attorney want to tell me what way you claim would
be would to address this, then I would be happy to
do so.  But I will need a specific question.

Q.   All right.  Question No. 1.  Do you agree
that the presumption of prosecution history
estoppel can be rebutted if the reason for the
narrowing amendment was peripheral or not directly
relevant to the alleged equivalent?

A.   You are asking questions that should be
going to lawyers.  You can ask me questions about
that specific -- that specific objection and I can
give you a technical opinion about whether that is
practiced or not.  But if you are asking me about
legal questions, I can't really give you a response
that's -- that's -- that I can be sure is correct.

Q.   Okay.  Well, then you invited me to ask
questions?

A.   Yes.

Q.   And then I ask them and you say you can't
answer them.  So let's go back to you wrote in your
report in Paragraph 10.

A.   Okay.


Q.   It says -- Why don't you read it into the
record, beginning with the word "while."

Page 191

**EXHIBIT C**

cooper rough transcript.txt

A. "While there are some ways to overcome this presumption, Dr. Greenspun does not address any of those ways and his report. If asked, however, I will address them."

Q. I am asking you to address them.

A. Address which one?

Q. The ways in which the presumption can be overcome that you wrote in your report, Dr. Cooper.

A. The question needs to be more specific since I am not lawyer. I don't -- I don't -- I can't recite the law about that.

Q. I am going to ask you -- Were you done?

A. Close enough, yeah.

Q. All right. Go ahead.

MR. STIMPSON: There is no question pending now.

THE WITNESS: Ah.

BY MR. VAZQUEZ:

Q. All right. I asked you specify question and you couldn't answer it.

A. It wasn't a specific question. It didn't say specifically what --

Q. Do you agree --

♀

MR. STIMPSON: Let him finish, please, Jesus. He is talking. You can't just talk over him.

THE WITNESS: It didn't say specifically what ways -- your -- in your question what ways you assert are able to overcome those.

I understand that there are ways. If you
Page 192

**EXHIBIT C**

cooper rough transcript.txt

want to ask me about the specifics -- I can't tell

you what the law says I can tell it you the

technology, the science, the claim language

interpretations.

BY MR. VAZQUEZ:

    Q.   So you understand that there are ways that

the presumption can be overcome?

    A.   Correct.

    Q.   What ways are you aware of in general?

    A.   Same answer.

    Q.   I never asked that question.

    A.   That's the same question you asked before.

I don't --

    Q.   Can you talk about anyway in any way that

this presumption can be overcome?

    A.   Given specific questions that relate to

how the -- the -- the estoppel of results can be

overcome, I can answer those questions.  But given

broad stroke questions about the law, I can't

answer those kinds of questions.

    Q.   Because you are not going to be giving

legal opinions about overcoming presumptions;

correct?

    A.   Correct.

    Q.   Okay.  Are you aware of the Festo

presumption?

    A.   I believe I've heard the name, but I don't

know the details of what the Festo presumption is.

    Q.   Do you -- Are you aware of the tangential

**EXHIBIT C**

cooper rough transcript.txt

criterion?

A.   No, I am not.  Could you read me what that is?

Q.   Could you go Paragraph 50 of your rebuttal report, Dr. Cooper.

A.   Okay.  I'm at 50.

Q.   Could you please read Paragraph 50 into the record.

A.   Paragraph 50.  "I understand that there are ways in which the patent tee can overcome the presumption of estoppel.  One way is to show that the amendment is -- was only tangential to the alleged equivalent.  While Dr. Greenspun provides no opinion on this issue if asked I will give my

opinion this amendment is not tangential.  The amendment added during prosecution requires that the comparison ratings be included directly in the report, and the results list does not fulfill the definition of the report.  So the amendment was directly related to this alleged equivalent."

Q.   And so where you say here in Paragraph 50 I will give my opinion that this amendment is not tangential, can you -- I understand that's your opinion?

A.   Yes.

Q.   That the amendment was not tangential. And what is the basis for that opinion?

A.   That's the next sentence.  "The amendment added during prosecution requires that the comparison ratings be included directly in the

Page 194

EXHIBIT C

cooper rough transcript.txt

report.  The results list does not fulfill the definition of the report so the amendment was directly related to this alleged equivalent.

Q.   So you agree then, Dr. Cooper, that we would need to determine whether the objectively apparent reason for the narrowing amendment was peripheral to the alleged equivalent; right?

A.   Could you say that again?

Q.   Sure.  You would agree then that we would

need to determine whether the objectively apparent reason for the narrowing amendment was peripheral to the alleged equivalent; right?

A.   No.  I say that the amendment added requires comparison ratings.  That's not tangential.

Q.   Do you then disagree that the standard is whether it was objectively apparent that the reason for the narrowing amendment was peripheral to the alleged equivalent?

A.   I have no opinion on the -- on that.

Q.   And that's because you are not giving legal opinions correct?

A.   That's correct.  I can give you interpretations of the patent with respect to technology and science but not with respect to law.

Q.   Okay.  And Dr. Cooper turning to Paragraph 49 now of your rebuttal report Exhibit 1?

A.   Okay.

Q.   Could you read that into the record.

Page 195

**EXHIBIT C**

cooper rough transcript.txt

A.    Paragraph 49 I also find prosecution history estoppel precluding the alleged equivalents.  Dr. Greenspun re-rights sites the prosecution history on pages 10 to 20 of his report.  However he never analyzes the prosecution history or opines own what was asked to the claims or why.  From my own review of the prosecution history, it's clear that the requirement that the comparison ratings be within the first healthcare provider report was added to overcome a prior art rejection and thus related to patent ability. Therefore there is a presumption of estoppel and Dr. Greenspun says nothing to rebut that presumption.  Accordingly, in my opinion, the clear estoppel precludes the alleged equivalents."

Q.    What is the, quote-unquote, equivalents?

A.    The doctrine of equivalents.

Q.    No.  What is the specific equivalents the alleged equivalent you are addressing in Paragraph 49 that you just read in?

A.    It's your statement that the results list is equivalent to the report.  Which I disagree with.

Q.    Okay.  So that is the equivalent that you are addressing in Paragraph 49?

A.    Yeah.  Under the doctrine of equivalents, yes.

Q.    Okay.  Just one second, Dr. Cooper.  I am trying to understand something.

Dr. Cooper, I guess what am kind of

Page 196

EXHIBIT C

cooper rough transcript.txt

struggling with is I am trying to identify what is
the claim amendment that you are referring to?  I
think you answered the equivalent is -- healthcare
provider report is the same as a results list?

     A.   That's the alleged equivalent.  And it's
not really within the interpretation of the claims
as far as I am concerned.

     Q.   Okay.  And then you are referencing an
amendment made to the claim right?

     A.   And in the prosecution history, yes.

     Q.   Right.  And so what is that amendment?

     A.   Could you show me the prosecution history,
please?

     Q.   Yes.

          This would be No. 13.

          (Deposition Exhibit 13 was marked for
     identification by the Reporter and is annexed
     hereto.)

          MR. STIMPSON:  This is not Bates numbered.
Is this something that your side produced?  I know
we have a Bates numbered copy that's been
certified.  Do we -- I just want know because
sometimes they come from prosecution from the
patent office and they are all messed up.

          MS. STOLL-DeBELL:  This is downloaded


directly from PAIR.  It's not my stuff.

          MR. STIMPSON:  Okay.  Is it -- it's

EXHIBIT C

cooper rough transcript.txt
backwards.  All right.

       THE REPORTER:  Downloaded from where?

       MS. STOLL-DeBELL:  PAIR, P-A-I-R.

       THE REPORTER:  Thank you.

       MR. STIMPSON:  Stands for a place where you can get stuff from the patent office.

BY MR. VAZQUEZ:

    Q.  So, Dr. Cooper, there is a question pending.  Did you need us to reread it?

    A.  Yes, please.

       (The question was read as follows:

     Q.  Okay.  And then you are referencing an amendment made to the claim right?

    "A.  And in the prosecution history, yes.

    "Q.  Right.  And so what is that amendment?

    "A.  Could you show me the prosecution history, please?")

       THE WITNESS:  I have the prosecution history.  But can you show me where the amendment was made?

BY MR. VAZQUEZ:

    Q.  All right.  Can you turn to where we put a little yellow sticky that says February 16, 2010.

    A.  Yes.  Okay.

    Q.  I'm just telling that you is an amendment. Is that the amendment you are talking about?

    A.  Let's see which amendment are you

EXHIBIT C

cooper rough transcript.txt

referring to?  One, two or three?

Q.   I am asking you, sir, to tell me what is
the amendment you are referring to in -- in your
opinion as stated in Paragraph 49 that we went
over.

A.   The amendment related to whether the as
much list is equivalent to the report.  I remember
that.  I don't remember where that specific
amendment was made.

Q.   Right.  And then you said -- so can I see
the prosecution history which I have now given you
and we have tabbed where amendments occurred but I
can't go your work for you sir.  I need to you tell
me what amendment you referenced when I asked the
question.

A.   I don't recall.

MR. STIMPSON:  I just for the record there
is prosecution history has been placed in front of

me it's about a hundred, 200 pages.  So --

MR. VAZQUEZ:  We have --

MR. STIMPSON:  That's a hard way to do it.

MR. VAZQUEZ:  We have taken the trouble of
actually highlighting where amendments are within
that with yellow tabs.  So I think all you need to
do Dr. Cooper is just take your time to look at
those two spots and if you can tell me what is the
amendment you are referring to.  We will move on.

MR. STIMPSON:  Do you want some help from
me or do you want the expert to do did?

Page 199

EXHIBIT C

cooper rough transcript.txt

MR. VAZQUEZ: No.

MR. STIMPSON: Because it says in his report but that's okay you can sit here and waffle if you want to.

MR. VAZQUEZ: I don't mind if Dr. Cooper confers with you either, Scott.

MR. STIMPSON: Well, you want me to help or not? I mean I will help if you want me to help.

MR. VAZQUEZ: I don't want you to testify for him.

MR. STIMPSON: I won't testify for him you but you know it's a long document it's going to take forever and I know you are short on time you can do it your own way.

♀

MR. VAZQUEZ: No. We're fine on time.

THE WITNESS: Let's see. Dr. Greenspun's report according to my report cites the prosecution history on Pages 10 and 20 -- 10 through 20 of his report may I see Dr. Greenspun's report, please.

MR. VAZQUEZ:

(Deposition Exhibit 14 was marked for identification by the Reporter and is annexed hereto.)

THE REPORTER: 14.

MR. STIMPSON: I've got a copy of that. I don't need that. Thanks.

BY MR. VAZQUEZ:

Q. 14. Thank you.

A. Pages 9 to 12 within that office action.

MR. VAZQUEZ: Would you mark these, too,

Page 200

**EXHIBIT C**

cooper rough transcript.txt

please.

(Deposition Exhibit 15 was marked for
identification by the Reporter and is annexed
hereto.)

THE REPORTER:  15.

(Discussion off the record.)

THE WITNESS:  Well, among other places if
you look on Page 13 of that office action response,
it says.  For example, the sited reference failed

to disclose creating a healthcare provider report
using the healthcare provider verified information,
the patient provided information and the
independently verified information, wherein the
healthcare provided report includes comparison
ratings of healthcare providers."  Accordingly,
Henley in view of cook failed to teach or suggest
each and every limitation of claim 19.

BY MR. VAZQUEZ:

Q.  Dr. Cooper, you were just reading from
Page 13?  Of the response to the office action?

A.  Well, I haven't finished.  Page 13 --

Q.  I'm just trying to find out where you are.

A.  I am reading from Page 13 of what you have
marked as the February 16th, 2010, response to the
office action.

Q.  Well, you know, Dr. Cooper, perhaps you
can help me out save from time for all us of us?

A.  Okay.

Q.  What is the specific claim amendment that

Page 201

**EXHIBIT C**

cooper rough transcript.txt

you are referencing in Paragraph 50 of your report? This is where we started.

    A.   Paragraph 50.

    Q.   Of Exhibit 1.  Do you see Dr. Cooper where you reference the amendment in Paragraph 50?  There

is a specific amendment I think that you meant.

    A.   Well, I'm sure there is a specific amendment because I remember finding it.  I don't recall where I found it.

    Q.   Okay.

    A.   We can continue having me read the prosecution history if you want but if you could point me to where that amend amendment was made and in what sequence of the prosecution history --

    Q.   I'm not sure that's why we are in this discovery deposition?

    A.   At this point I'm not sure either I think it would take some -- some time to answer that question based on the prosecution history because the history from is so large.

    Q.   May it may be that Paragraph 51 is helpful.

    A.   51 of my report?

    Q.   Yes, sir.  I'm not sure if it is or not but what Imperial really after is what is the amendment that referenced in Paragraph 50?  But maybe what you are on, 51, will help you determine what that amendment was.

    A.   Oh, okay.  "Health Grades amended the claims as noted above in order to avoid this Henley

EXHIBIT C

cooper rough transcript.txt

and other prior art cited in the rejections.  The
initial claims not the amended claims in Paragraph
52 are much closer to the construal asserted by
Dr. Greenspun, and since that was the initial claim
not the amended claim, I didn't focus on the
initial claim but rather on which ones were
amended.  Claim 19, for example, before the Health
Grades amendment reads -- read as follows:  "A
computer system with access to healthcare provider
information stored in the database wherein patients
may search the database and review healthcare
provider reports to differentiate among healthcare
providers."  I also disagree with Dr. Greenspun's
equivalents --
BY MR. VAZQUEZ:
     Q.   I'm sorry.  I'm sorry I have to stop you
I'm not sure are you responding to the question
some the we -- the pending question is in Paragraph
506 your report?
     A.   Yes.
     Q.   You reference a specific amendment.  I am
trying to find what that amendment is in the
prosecution history.  You said can I see the
prosecution history.  You have it.  I realize it
might take time, but it appears what you are doing


now is just reading these other paragraphs.  That
does not answer the question that's pending,

Page 203

**EXHIBIT C**

cooper rough transcript.txt

Dr. Cooper.

What is the amendment?

A.   In order to answer the question, I need to review what I have said about the amendment and the prosecution history.  I think it would help if you could just point out where the amendment was.

Q.   We do not know.  You have to -- you have to take our representation that we do not know and that's why we have these depositions, to ask you. You authored this is these are your words?

A.   Okay.  My response is I have not found that in the prosecution history within the time available for the deposition.

Q.   Okay.  Well, we are here.  We are going to take the time it takes?

A.   Okay.

Q.   It is very important to us to know what that amendment is that you are talking about in your report sir?

A.   Okay.

MR. VAZQUEZ:  Just ask him how much time we have been on the record?

MR. STIMPSON:  We have been on the record

about an hour.

MR. VAZQUEZ:  No, no.  Total.

THE VIDEOGRAPHER:  Five forty.

MR. VAZQUEZ:  So we've got an hour and twenty minutes left.

MR. STIMPSON:  Jesus, while he is doing this, my e-mailed you guys you had that new -- you
Page 204

EXHIBIT C

cooper rough transcript.txt

added this new filed the new motion, you didn't

withdraw the other one so now the judge has two

motions.

　　　　MR. VAZQUEZ:  No.  That's what the judge --

Do you agree to go off the record for five minutes?

　　　　MR. STIMPSON:  No.  That's fine.  Whatever

you want to do.  That can --

　　　　MR. VAZQUEZ:  She is typing everything --

　　　　MR. STIMPSON:  We'll talk at the break.

　　　　MR. VAZQUEZ:  It's my understanding she did

exactly what Judge Brimmer's clerk asked her to do,

to simply re-file the corrected one.

　　　　MR. STIMPSON:  Okay.

　　　　THE WITNESS:  Well, this will partly

address it.  Page 9 of the -- let's see.  What's

the date on it?  Well, it's after the

February 16th, 2010 office action response.  The

method --


BY MR. VAZQUEZ:

　　Q.   I'm sorry.  Dr. Cooper, what page are you

on?

　　A.   I am on Page 9.

　　Q.   Okay.

　　A.   It says regarding claim 5 Henley further

discloses the method as defined in Claim 1 wherein

the healthcare provider report includes --

　　　　MR. VAZQUEZ:  Sorry Dr. Cooper before you

start reading let's just make sure we are on the

same page.  I don't see -- can you tell me where on

Page 205

EXHIBIT C

cooper rough transcript.txt

Page 9 you are at.

THE WITNESS:  I am at -- were if says regarding claim 5.

BY MR. VAZQUEZ:

Q.    Yes.  Could you hold that up and just point somewhere on the page there so I can see what you are talking about?

A.    Right (indicating).

Q.    So it's not this Page 9.  I've got a Page 9 -- do you mind if I can just look at your exhibits exactly where you are at and I will hand it right back to you.  Thank you.  Thank you.

BY MS. STOLL-DeBELL:

Q.

MS. STOLL-DeBELL:  He is in the office action.

THE WITNESS:

MR. VAZQUEZ:  Yes.

MS. STOLL-DeBELL:  Right here.

MR. VAZQUEZ:  Okay.  Thank you.

THE WITNESS:  Sure.

BY MR. VAZQUEZ:

Q.    Okay.

A.    And my response is quoting from that: "Henley further discloses the method as defined in Claim 1 wherein the healthcare provider report includes comparison ratings of healthcare providers.

Q.    Is that the amendment that you are referring to --

Page 206

EXHIBIT C

cooper rough transcript.txt

A.   No.  That's one part of this telephone book worth of office action and response material.

Q.   Dr. Cooper, are you aware of how many amendments were made to the claims?

A.   I didn't count the amendments, no.

Q.   Would you accept representation that there were just two?

A.   No.  I have already seen more than two.

Q.   Okay.  So it's your expert opinion that there were not two amendments made in the prosecution history and only two?

A.   I don't accept that representation.

Q.   All right.  Well, I am still would like to know what is the actual amendment that you referred to.

A.   Okay.

Q.   Dr. Cooper, can I just backup and then ask you just to stop looking for a second and do you understand what an amendment to a claim is?

A.   Of course.

Q.   Okay.  In the as you put it the phone book which I'm sure is much smaller than any phone book I have ever seen, we took the trouble of tabbing it.  Do you see the yellow tabs?

A.   I do.

Q.   Okay.  So there is one tab that has February 16, 2010?

A.   That's correct.

Q.   There is another tab that has April 26th,

Page 207

**EXHIBIT C**

cooper rough transcript.txt

2010.

A.   Yes.

Q.   I know you said you weren't willing to accept my representation but I again urge you accept my representation that the tab that says

February 16th, 2010, is one amendment, and the tab that says April 26th, 2010, is the second amendment.  I believe it's the only two amendments in the prosecution history.  We can disagree but I am telling you that that might help reframe where we are looking in the materials?

A.   I accept your representation that that is what you believe.  But I am also running out of space I would like to take a break for a second. To go to the rest room.

Q.   Oh, sure.

Do you agree, Mr. Stimpson?

MR. STIMPSON:  Oh, yes.

MR. VAZQUEZ:  Off the record.  Thank you.

THE VIDEOGRAPHER:  The time now is 5:46 we are off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time now is 5:55. We are back on the record.  The now is 5:55.  End of Tape No. 3.  We are going off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time now is 5:59 beginning of Tape No. 4.  We are back on the record.

THE WITNESS:  And we are continuing with

EXHIBIT C

cooper rough transcript.txt

♀

the question that's on the table?

       MR. VAZQUEZ:  Yes.

       THE WITNESS:  I'm sorry?

       THE VIDEOGRAPHER:  Mike on.

       THE WITNESS:  Oh.  Thanks.

BY MR. VAZQUEZ:

   Q.   Dr. Cooper, the question pending is what is the amendment which you specifically reference in your report some during the break I thought maybe we could skip forward and address the question.  You did point out on Page 9 of the office action where you were reading regarding claim 5 Henley further digs closes?  And do you remember referencing that as a partial response to the pending question at least?

   A.   I do remember.  And a complete response would require me finding the amendment.  I think I found what the problem was.  You had put the yellow tab over the text that's about it.  If you go Page 2 which is where you had that February 16, 2010 and move the tab up a little bit, there is a listing of claims No. 1 currently amended.  And that is the one that has the extra requirement, the -- a method of providing healthcare provider information to potential patients said method comprise and

♀

compiling healthcare provider verified information, compiling past patient provided information,

**EXHIBIT C**

cooper rough transcript.txt

compiled -- compiling information verified by

independent third party sources, creating by a

processor a healthcare provider report using the --

and physician verified is stricken.  Healthcare

provider verified information, the past patient

provided information, and the -- and the verified

is stricken information verified by independent

third party sources wherein the healthcare provider

report includes comparison ratings of healthcare

providers."  That's when that limitation was added.

And providing access to the healthcare provider

report over a computer network."

Q.  Okay.  Though it's a bit of a knit, you

are saying that this little sticky was covering all

that language?

A.  Yes, it was.

Q.  How is that possible?

A.  Because it was on the report on the part

that I was looking for.  If I am reading a phone

book I can't read every single word, I look for the

healthcare provider report.  And that was covered

by the yellow sticky.

Q.  Could you just put the sticky where it was

and show me?

A.  All right.  (Indicating) there is no

report.

Q.  Okay.  I understand.  And so do you agree,

then, Dr. Cooper that the reason for this amendment

was to overcome the rejection based on the Henley

prior art publication?

Page 210

EXHIBIT C

cooper rough transcript.txt

A.   It was rejected -- it was rejected based on prior art.  Henley was part of that, yes.  I'm not sure off the top of my head if Henley was the entire substance that was quoted, but this legally requires that you can't go back and remove this because it was amended to overcome past prior art.

Q.   Could you repeat -- you said about what is legally required?

A.   According to my Paragraph 49 which we keep going book to --

Q.   Yes.

A.   Let me bring that up.  Paragraph 49 reads "I also find prosecution history estoppel precluding the alleged equivalents.  Drug recites the prosecution history on Pages 10 to 20 of his report.  However, he never analyzes the prosecution history or opines on what was added to the claims or why.  From my own review of the prosecution

history it's clear to me at least that the requirement that the comparison ratings be within the first healthcare provider report was added to overcome the prior art rejection and thus related to patent ability.  Therefore, there is a presumption of estoppel, and Dr. Greenspun says nothing to re-put butt that presumption.  Accordingly in my opinion the clear estoppel precludes alleged equivalents."

Q.   Yes.  And if you follow on in Paragraph 50 and 51, the only prior art you cite is Henley.  So

Page 211

EXHIBIT C

cooper rough transcript.txt

I'm just trying to get if -- if it's your opinion
that that amendment was made to overcome Henley as
I believe is the case given what you -- it's the
only thing you cite, or is there other prior art
that you meant or you believe that amendment was
made to overcome?

    A.   This was the second amendment.  So the
original amendment was modified for Claim 1 twice.
There are other amendments to other claims.  For
example, in 2/16/10, Claims 2, 3, 5, 7, 10, 16, 17,
18, 19, 20, and 21, were amended.  21 is new.  The
others were amended.

        And the response to the office action --
and the office action mentioned Henley as one of

the prior art issues.  Therefore, I concluded that
Henley was the source of the rejection.  There may
have been other sources, but I only needed to prove
one.  So I can't say that there are no other source
of this just that Henley was at least one of them.

    Q.   Okay.  But you agree with me, sir, that
the only prior art you mention in you are other
report is Henley; right?

    A.   I agree that in Paragraph 51 of my report
the only one I mention is Henley.

    Q.   Why is it that you believe that you only
had to prove one piece of prior art as you just
said?

    A.   I didn't say I approved one piece of prior
art.  I said I approved that the amendment was in
response to that one at least.  Having proven my
                    Page 212

EXHIBIT C

cooper rough transcript.txt

case, I didn't need to go look at the other prior
art instances or all the other amendments that were
amended.

    Q.   Okay.  So when Dr. Cooper you just said
having proven my case --

    A.   Yes.

    Q.   Quote-unquote, what is that case that you
proved?

    A.   That's 49, 50 and 51 of my report.  That

is -- that prior art estoppel requires that this
amendment not be -- be reversed after prosecution
history because that had already been done in
response to an amendment which is what is required.

    Q.   Okay.  So let's see.  We started with me
asking what you is the specific amendment that you
were referencing prior to 51 --

    A.   Yes.

    Q.   -- of your report, of the rebuttal report,
and so you have pointed us to the amendment here
which is Page 2 of the amendment in response to
non-final office action mailed November 13th, 2009;
right?

    A.   Are you reading from my report?

    Q.   No.  Just from the office action where you
just pointed us to.

    A.   Okay.  And that office action is on
February 18th, 2010.  I don't believe that's the
number that you used.

    Q.   Well, sir, okay.  Let's go back.  You said

**EXHIBIT C**

cooper rough transcript.txt

that this little pink sticky was concealing what it was were you trying to find and this little pink sticky was on this page of the prosecution history. It is Page 2 of the amendment and response to non-final office action mailed November 13th, 2009?

A.   You a saw you are correct it is.

Q.   Okay.  And so this is the amendment you were reference -- reference in your report?

A.   Yes.

Q.   In Paragraph 50 the amendment as put it?

A.   Yes.

Q.   And in 50 and 51, you only prior art you reference is Henley.  Right?

A.   That's the only one I reference since it was sufficient to prove the case, correct.

Q.   Correct and I'm just asking you not why you reference it, I'm just asking you if that's the only prior art that you referenced is Henley.

A.   Because it proves --

Q.   I am not asking you why you did it I'm just asking if that is the only prior art?

MR. STIMPSON:  Jesus please don't interrupt him okay.

THE WITNESS:  I didn't say that's the only prior art.  Said I said that is sufficient to reject removing that by the doctrine of equivalents because it was in response to an office action reject the claim.

BY MR. VAZQUEZ:

Q.   Dr. Cooper I'm sure everybody here

EXHIBIT C

cooper rough transcript.txt

understands that -- you know why it is that you
feel it's important to add those words to your
response.  I am asking you an a very simple he
request, Henley is the only prior art that you
reference in your report yes or no?

    A.   Same response.

    Q.   That would be yes then?

    A.   No that would be as detailed.

    Q.   Okay.  Show me where in 49, 50 or 51 you
reference any other prior art other than Henley.

    A.   I don't reference other prior art in my
report.

    Q.   Okay.  Thank you.  Appreciate that?

    A.   Regarding that doctrine of equivalents
rejection.

    Q.   Okay.  And so that amendment that you have
identified was to overcome the rejection based on
the Henley prior art publication yes or no?

    A.   At least on that much.  I am not saying
that's the only cause for that amendment.  I would
have to have understood what the -- what the author
of the response had in mind.  To be able to answer.

    Q.   So let's look at Henley which has been
marked as Exhibit 15 please.

    A.   Do I have Exhibit 15?  I don't believe --

oh do I in oh here okay.  Okay.

    Q.   And specifically let's look at Paragraphs

Page 215

**EXHIBIT C**

cooper rough transcript.txt
15 and 16 of Henley.

A.    Paragraphs -- oh, I see okay.  Okay.

Q.    Well, actually, forget about Paragraphs 15 or 16 and just considering Henley in its totality. Where is it that Henley discloses comparison ratings of healthcare providers that are excluded from a report on the first healthcare provider?

A.    I can't answer that from the Henley application.  Perhaps it would answer your question if I went back to the office action to which this is a response to.

Huh.  I don't see the office action itself that preceded the response on February 16th.

Q.    Okay.

A.    Do you have a pointer for me?

Q.    Well, yes.  Let me -- let me point you to -- You had brought up earlier when we were trying to find the amendment and you found some language here in the office action.  If you could turn back to that, sir.

A.    Okay.

Q.    This is the prosecution history and do you remember it was Page 9 after the February -- it has -- it says regarding claim 5 Henley further discloses"?

A.    I don't see Henley further discloses on Page 9.

Q.    Would you point him to that Page, please (indicating)?

MR. STIMPSON:  Yeah.  Oh, that's what the
Page 216

**EXHIBIT C**

cooper rough transcript.txt

problem is there is not Bates stamp numbers.  Oh,
there you go.

THE WITNESS:  Ah, okay.

Okay.  I'm on Page 9.

BY MR. VAZQUEZ:

Q.   Is so at the top there you had referenced
this, it's you know -- in your partial response to
what is the amendment.  And so do you see there it
says regarding claim 5, Henley further discloses
the method as defined in Claim 1 wherein the
healthcare provider report includes comparison
ratings of healthcare providers, and then it says
see at least Paragraphs 15-16, 37, 81, 90 and 1076
Henley.

A.   Which I assume is --

Q.   So if you can just go to Paragraphs 15 and
16 of Henley.

A.   Okay.

♀

Q.   And the question is then where in those
two paragraphs does Henley disclose comparison
ratings of healthcare providers that are excluded
from a report on the first healthcare provider?

A.   Let's see.  I don't see it in 15 and 16.
The response also mentions 37.  Direct links to one
or more transaction feedback date databases are
also established to allow consumers of medical
services which I interpret as the patient "to
verify and evaluate a particular provider's product
or service.  The present invention also allows an

Page 217

EXHIBIT C

cooper rough transcript.txt

agreement between a patient and a medical service provider to be conditioned on the establishment of medical fitness conditions of the prospective patient for receiving a particular medical service."

Q.   Why did you read that into the record?

A.   In response to your question.

Q.   Okay.  Well, the question, Dr. Cooper, is where do those Paragraphs 15 and 16 disclose comparison ratings of healthcare providers that are excluded from a report on the first healthcare provider.

A.   Okay.

Q.   That really -- what you just read did not

answer that question.  Right?

A.   Not within 15 and 16.  It was within 37.

Q.   Can I just -- you know because I know we have less than an hour to go here.  I don't mean to interrupt you.

A.   Okay.

Q.   And if I do and you say, look, it's important for me to say what I wanted to say before you interrupted ed me, that's fine.

A.   All right.

Q.   Let me just kind of backtrack here and just focusing on Paragraphs 15 and 16 of Henley?

A.   Okay.

Q.   Do those two paragraphs disclose a result list?

THE WITNESS:  I believe it does.  The last

EXHIBIT C

cooper rough transcript.txt

sentence in Paragraph 15 says:  An authentication

qualifier engine within the system automatically

researches and verifies the credentials of

prospective member service providers as well as

maintains background information on all registered

service providers."  Earlier in that paragraph, it

says:  "In an example arrangement, the present

invention implements a professional services

auction transaction system using a digital

communications network server that interfaces and

communicates with the Internet with client computer

systems belonging to various prospective bidders

and professional service providers.  For example,

personal medical, financial or legal service

providers using, for example, an exchange of HTML

documents and a Java Script applets."

BY MR. VAZQUEZ:

    Q.   I haven't heard the words "results list."

    A.   I think the examiner interpreted that as

the results list.  HTML pages complying with that

in Paragraph 15.

    Q.   And where is it that you -- the examiner

said in the office action that he interpreted that

language to mean results list?

    A.   I don't know.

    Q.   What's the ways basis for your statement

that you think the examiner interpreted that to

mean results list?

    A.   Well, what I have to show is that the

Page 219

EXHIBIT C

cooper rough transcript.txt

claim was amended to include that particular

limitation in response to an office action.  I

don't think I need to show where the examiner

rejected the claim.  Just that the claim was

rejected.

         Q.   Well, I didn't ask you and you didn't need

to show.  I'm just asking you in response to your

statement that the examiner interpreted everything

that you just read to me in results list or part of

what you just said to results list, do you have any

supporter that?

         A.   I don't have any support at this moment,

no.

         Q.   Okay.

         A.   But I don't agree that no support exists.

         Q.   Okay.  And where in claim -- in Paragraphs

15 and 16 of Henley is a healthcare provider report

disclosed?

         A.   Same parts where I discuss the HTML

documents and Java Script applets transaction

server handles on line communications, and

procedures for conducting public on-line auctions

for the performance proffered professional services

and maintains one or more databases of information

containing registered service providers and

bidders.

         Q.   So in everything that you just read into

the record, healthcare provider report, those

words, healthcare provider report, did not exist.

Right 124?

                    Page 220

EXHIBIT C

cooper rough transcript.txt

⚥

        A.   The word healthcare provider report was
not used in that Paragraph yes.

        Q.   So again is this instance where you are
opining that the examiner must have felt that
language you read was referring to a healthcare
provider report?

        A.   The examiner rejected on the ground of
Henley the modification of the amendment was made
by the applicant not but the examiner.

        Q.   I'm not sure I understood what you just
said.  Let me try another way.  In your opinion
Dr. Cooper, do Paragraphs 15 and 16 of Henley
disclose a healthcare provider report?

        A.   I believe that by the doctrine of
equivalents they do.

        Q.   Okay.

        A.   Which is why the claim was rejected.

        MR. VAZQUEZ:  Okay.  Move to strike which
is why the claim was rejected clearly unresponsive.

        Q.   Now, in your opinion, Dr. Cooper, do
paragraphs 15 and 16 of Henley disclose a results
list?

        A.   I believe it does.  In the sense that I
described.

        Q.   Okay.  And in your opinion, Dr. Cooper, do

⚥

paragraphs 15 and 16 of Henley disclose comparison
ratings in any form?

                    Page 221

                                        EXHIBIT C

cooper rough transcript.txt

A.   Yes.  On Paragraph 16 an on-line user service feedback web page and database are provided for requiring and maintaining comments and feedback from both service providers and their patients -- or/clients regarding the complexity and quality of services received or provided."

Q.   What lines are you reading from, sir?

A.   There is no line numbers within it, it's Paragraph 16.

Q.   Paragraph 16?

A.   Yes.

Q.   And so the question was where do does Paragraph 16 and 15 or 15 I should say, disclose comparison ratings in any form and it's your opinion that what you just read discloses comparison ratings?

A.   Yes, it is.

Q.   Okay.  And are the comparison ratings included or excluded from the report?

MR. STIMPSON:  Objection to the form.  What report.

THE WITNESS:  In my opinion it says that there is a service feedback web page for

⚥

maintaining comments and feedback from both service providers and their patients regarding the complexity and quality of services rendered -- or received or provided.  I think that includes your -- your qualification.

BY MR. VAZQUEZ:

Q.   So in other words, it's your opinion that

Page 222

**EXHIBIT C**

cooper rough transcript.txt

the comparison ratings are included in the report

based on what Paragraph 16 says?

       MR. STIMPSON:  Objection to the form.

Misstates his testimony.

       THE WITNESS:  Yeah, I think that that is

justification for the examiner to reject the claim

and, therefore, the amendment to the claim had to

include those things.

BY MR. VAZQUEZ:

   Q.   Okay.  My questions aren't why an examiner

did anything, Dr. Cooper.  So I move to strike that

as nonresponsive, and I will ask you again.

       Are the comparison ratings included or

exclude from the report based on Henley?

   A.   I am saying --

       MR. STIMPSON:  Objection to the form it

misstates his testimony.

       THE WITNESS:  I am saying that eliminate

that I read of Paragraph 16 does indicate that you

are getting feedback on providers, what it would be

other than comparison ratings and my concludes is

it does include comparison ratings, though, it

doesn't use those literal materials.

BY MR. VAZQUEZ:

   Q.   So it does include the comparison ratings

in the report?  That's your opinion?

       MR. STIMPSON:  Objection to the form.

Misstates his testimony.

       THE WITNESS:  I didn't say it was in the

Page 223

**EXHIBIT C**

                    cooper rough transcript.txt
report.  I said there's --

BY MR. VAZQUEZ:

    Q.   See, that's the problem.  That's my
question.

    A.   Well --

    Q.   So are you ignoring part of my question in
your response?

         MR. STIMPSON:  Jesus, don't argue with the
witness.  I know it's getting late.  We are all
tired.

         MR. VAZQUEZ:  Yeah.  Well, you know, I am
not arguing.  I'm just, you know, asking questions
here.  Just make your objections, Scott --

         MR. STIMPSON:  Well, I'm also trying to --


         MR. VAZQUEZ:  -- and then we'll move on.

         MR. STIMPSON:  I'm also trying to get you
to stop arguing with the witness.

         MR. VAZQUEZ:  Well, you have made your
objection.  Are you done?

         MR. STIMPSON:  That's not an objection.
It's a request to --

         MR. VAZQUEZ:  Are you done?

         MR. STIMPSON:  -- stop arguing with the
witness.

         MR. VAZQUEZ:  Are you done?

         MR. STIMPSON:  Are you?

         MR. VAZQUEZ:  "Argumentative" is the
objection.  I'm sure you are aware of it.

         MR. STIMPSON:  No, it's not really an
objection.  I am just telling you to stop arguing
                    Page 224

**EXHIBIT C**

cooper rough transcript.txt

with the witness.

BY MR. VAZQUEZ:

Q.   All right.  So Dr. Cooper, the question is
very simple.  Henley, Paragraph 15 and 16, where do
those paragraphs disclose comparison ratings in any
form?

A.   Same response --

MR. STIMPSON:  Objection.  Asked and
answered.

BY MR. VAZQUEZ:

Q.   Where do those paragraphs disclose a
healthcare provider report?

MR. STIMPSON:  Objection to the form.  It's
asked and answered.

THE WITNESS:  The report is not included
directly.  It's implied by HTML pages resulting
from search of the provider database.

BY MR. VAZQUEZ:

Q.   Okay.  Do you think that the language were
you just citing by the way from Paragraphs 15 and
16 include -- well, strike that.

Do you think that the language in
Paragraphs 15 and 16 that you were just citing
meets the claim limitations before amendment?

MR. STIMPSON:  Objection to the form.

THE WITNESS:  I -- I don't have an opinion
on that.  I didn't review the -- the claims prior
to amendment.

BY MR. VAZQUEZ:

Page 225

EXHIBIT C

cooper rough transcript.txt

Q.   I believe you testified that the accused equivalent that you were referring to in Paragraph 15 of your report Dr. Cooper, is the results list. Is that correct?

A.   Let's see.  The amendment added during

prosecution requires that the comparison ratings be included directly in the report.  And the results list does not fulfill the definition of the report so the amendment was directly related to this alleged equivalent."

Q.   So does that mean yes, the accused equivalent is a results list?

A.   I am not opining on what the accused equivalent is.  Just that the amendment in pie opinion was directly related to the alleged equivalent.

Q.   Okay.  Paragraph 15 of your rebuttal report, sir.

A.   Okay.

Q.   Second sentence could you read that into the record begins one way?

A.   One way is to show that the amendment was only tangential to the alleged equivalent.

Q.   What is the alleged equivalent you are referring to there?

A.   The alleged equivalent would be your allegations as to infringement of the -- of the MDX Web site.

Q.   Which one?

A.   There is only one MDX Web site.

Page 226

**EXHIBIT C**

cooper rough transcript.txt

Q.   No.  Which allegations?

A.   The alleged equivalent that the reports list and the results -- or rather the report and the results list are equivalent.  That -- that equivalent that alleged equivalent.

Q.   Okay.  And then Paragraphs 15 and 16 as you testified they don't use the words results list, but you testified that you believe the examiner equated what Paragraphs 15 and 16 say to results list?

A.   Clearly in my opinion that is equivalent. Their description in paragraphs 15 and 16 are equivalent and cover both of those aspects.

Q.   Could we now look at Paragraph 37 of Henley.

A.   Okay.  And my first question is, where does that paragraph if at all disclose a results list.

THE WITNESS:  It doesn't specifically call out a results list.

BY MR. VAZQUEZ:

Q.   Where does Paragraph 37 disclose if at all comparison ratings of healthcare providers that are excluded from the report on the first healthcare provider?

A.   The word report is not used in Paragraph 37 of Henley.

EXHIBIT C

cooper rough transcript.txt

Q.   Where in Paragraph 37, Dr. Cooper, does Henley disclose if at all a healthcare provider report?

A.   The word report is not specifically called out in Paragraph 37 of Henley.

Q.   And similarly, Doctor, where does Paragraph 37 of Henley disclose if at all comparison ratings in any form?

A.   "The word comparison ratings is not used. However, there is direct links to one or more transaction feedback databases are also established to allow consumers of medical services to verify and evaluate a particular provider's product or service."  And the evaluation would imply comparisons in my opinion.

Q.   And what if, in your interpretation of the language, you just read the doctors don't have the same exact ratings?

A.   You are asking for a hypothetical again.

Q.   Yes.  I am allowed to do that.

A.   I don't know how to answer a hypothetical.

Q.   Oh, you know that I am entitled to ask that of expert witnesses; right?  Because you are

very experienced.

A.   Absolutely.

Q.   So I am asking to you assume in this hypothetical, please.

In your interpretation of the language there, the physicians being evaluated, I think they said evaluation, all have the same exact ratings.

Page 228

**EXHIBIT C**

cooper rough transcript.txt

Can you assume that?

    A.   If you want me to.

    Q.   I do.  I want you to.

    A.   Okay.

    Q.   All right.  And so does that change your answer of whether those physicians can be compared?

    A.   In that particular instance of the report -- or the list, the result list, as you assumed, would not include comparison ratings because it would not include differentia.

    Q.   That's great except that you said results list in your answer and I believe earlier he said there was no results list referenced in Paragraph 37 of Henley?

    A.   That's because I wasn't assuming which you insist that I assume.

    Q.   I did not ask I to assume a results list sir I simply asked you to assume that the

physicians that are being evaluated in the language in Paragraph 37 of Henley have the same ratings. And could in that instance with that assumption the physicians be compared?

    A.   I would give the same response.

        MR. VAZQUEZ:  Okay.  I move to strike the part that referred to a results list.

    Q.   How about Page 81 or -- of Paragraph 81 of Henley excuse me.  Does Paragraph disclose -- 81 of Henley disclose results lists?

    A.   No, it does not.

Page 229

EXHIBIT C

cooper rough transcript.txt

Q.   And what about comparison ratings; does Paragraph 81 of Henley disclose comparison ratings?

A.   It does not.

Q.   Okay.  Thank you.  And Paragraph 90 of Henley, same question, where if at all does Paragraph -- does Paragraph 90 of Henley disclose results lists.

A.   The qualifier database contains a list of medical services.  The qualifying requirements for rendering such medical services and hyperlinks to databases storing the identification of medical service providers having a -- having satisfied a particular qualifying requirement.  If the provider's qualifications for performing a

♀

particular service have not been previously authenticated by the system, a software qualification engine will access and search external databases that identify qualified providers for the particular medical service."

Q.   So I take it from your response that you believe the language that you just read discloses a results list; is that correct?

A.   I do.

Q.   Okay.  What about comparison ratings; does anything in Paragraph 90 of Henley disclose comparison ratings?

THE WITNESS:  No I don't believe it does.

BY MR. VAZQUEZ:

Q.   What about Paragraph 107 of Henley, Dr. Cooper; does anything in Paragraph 107 of

EXHIBIT C

cooper rough transcript.txt

Henley disclose if at all results lists?

THE WITNESS:  It says the -- "in addition by using the professional services on line auction transaction of the present invention, the consumer/patient has an enhanced ability to evaluate the quality of the physician and the hospital through the associated qualifier database and patient feedback links."


BY MR. VAZQUEZ:

Q.  I agree with you that that is what it says.

A.  Yes.

Q.  Is that -- do you believe that -- what you just read discloses a results list?

A.  I think it's within the doctrine of equivalents, yes.

Q.  Okay.  Why?

A.  For the reasons I just read.

Q.  You just read what it says.

A.  Yes.  And that statement, in my opinion, does disclose the doctrine of equivalents of the results list.

Q.  Okay.  And could you tell me why that -- applying what a doctrine of equivalents means to that statement.

A.  Because evaluating the various choices implies there are multiple choices which makes it a result list.

Q.  Yes?  Is that -- Is that analysis required

Page 231

**EXHIBIT C**

cooper rough transcript.txt

for, you know a doctrine of equivalents?  Can you

discuss what the means way function type

analysis --

    A.   No, I can't -- can't really describe it in

those terms.  I'm just saying know knowing how

software works and how the -- the patent reads,

that would be the equivalent, in my opinion, to a

results list.

    Q.   Dr. Cooper, does the doctrine of

equivalents apply to prior art?

    A.   I don't think it's called that for prior

art.  I can't remember the legal term.  But it's --

but effectively it's the same.

    Q.   My question is, does the doctrine of

equivalents apply to prior art?  Henley is prior

art, you don't disagree with that do you?

    A.   I don't disagree with that.

    Q.   So does the doctrine of equivalents which

is I understand how you are interpreting this

language to disclose a results list --

    A.   Uh-huh.

    Q.   -- apply to prior art?

    A.   What is the equivalent in prior art to

doctrine of equivalents?  I know there is

equivalent legal term.  I am not a lawyer.  So I

really can't give you that.  I know the

functionality of prior art rejections.  And

invalidity relate to something very similar to

doctrine of equivalent but I can't robe the word

Page 232

EXHIBIT C

cooper rough transcript.txt

or -- the term.

Q.    So are you saying you misspoke when you said doctrine of equivalents in your response?

A.    I am saying equivalent of doctrine of equivalents is what I meant.  And I'm not sure what the phrase is.  Therefore I can't give you the literal name of that phrase.

Q.    Okay.

A.    I know it applies in effect to prior art.

Q.    Okay.  So there is an equivalent to the doctrine of equivalents that you are aware of that in your opinion makes this language from Paragraph 107 of Henley disclose a results list; correct?

A.    That's correct.

Q.    And you don't know what that equivalent of the doctrine of equivalents is?

A.    I don't remember the legal term, no.

Q.    And does Paragraph 107 of Henley, Dr. Cooper, disclose if at all comparison ratings?

A.    The consumer patient has an enhanced ability to evaluate the quality of the physician and the hospital through the associated qualifier data bait and patient feedback links."  In my opinion that's a yes.

Q.    That's in Paragraph 107 sir?

A.    It is.

Q.    You said the consumer patient -- I see if you know.  So the consumer patient who undergoes

Page 233

EXHIBIT C

cooper rough transcript.txt

elective coronary bypass graft also ends up benefitting with a significant discount?

A.  No.

Q.  Okay.  What --

A.  "The consumer patient has an enhanced ability to evaluate the quality of the physician and the hospital through the associated qualifier database and patient feedback links."

Q.  Okay.  So it's your opinion that under the equivalent of the doctrine of equivalents, that is the same as disclosing consumer ratings; is that correct?

A.  It --

Q.  Comparison ratings.  I'm sorry.

A.  In my opinion, the evaluation does, yes.

Q.  Okay.  Now, Paragraph 51 of your rebuttal report if you could turn to that sir.

A.  Okay.  I'm there.

Q.  You state there that Henley would have been understood by a person of skill in the art to disclose a computer system allowing comparison ratings of healthcare providers."

A.  Correct.

MR. STIMPSON:  I'm sorry.  I lost you.  51?

MR. VAZQUEZ:  51.

THE WITNESS:  The cite in the Henley prior art.

MR. STIMPSON:  Oh, okay.  Sorry.

BY MR. VAZQUEZ:

Q.  Okay.  And so you agree that that's in

EXHIBIT C

cooper rough transcript.txt

your report right?

A.   I do, yes.

Q.   And so let's assume you are correct.  Sir.

A.   Okay.

Q.   This teaching does not relate to whether the comparison ratings are included or exclude from a report on healthcare providers does it?

A.   Can you rephrase that?  That's a very confusing multiplication of several concepts from the claims.

Q.   All right.  Let me just backup a second to this business about prior art and the doctrine of equivalent and the equivalent to the doctrine of equivalent, does the doctrine of equivalents a prior to prior art, sir?

A.   I -- Literally the word "the doctrine of equivalents" does not apply.  But in the examiner's

rejection, my opinion is that he felt that the prior art was so close that he rejected the claim.

MR. VAZQUEZ:  Okay.  So move to strike everything but in the -- after "but in the examiner's" whatever he said after that.

Q.   Sir, now Paragraph 51.  You stated Henley would have been understood by a person of skill in the art to disclose a computer system allowing comparison ratings of healthcare providers.

A.   No.  I didn't use "ratings."  I said the cited Henley prior art would have been understood by a person of skill in the art to disclose a

Page 235

EXHIBIT C

cooper rough transcript.txt

computer system allowing comparison of healthcare providers.

Q.   Okay.  I am looking at Paragraph 51.  And the language I am talking about is -- begin -- is in the sentence "the cited."

A.   "The cited Henley prior art" --

Q.   Can you could you just read that sentence into the record, please.

A.   Okay.  "The cited Henley prior art would have been understood by a person of skill in the art to disclose a computer system allowing comparison of healthcare providers."

Q.   Okay.  Let's assume you are correct.

Okay?

A.   Uh-huh.  Okay.

Q.   This teaching does not relate to whether the comparison ratings or comparisons as you use, comparison of healthcare providers.  Is your literal language in Paragraph 51 right?

A.   That is my literal language in 51, yes.

Q.   Right.  So this teaching does not relate to whether the comparisons of healthcare providers are included or exclude from a report on healthcare providers, does it?

A.   I think that a person of skill in the art would have understood that some comparison would be essential based on Henley.

Q.   And my question, sir, is not that.  My question is, whether this teaching relates to whether the comparison ratings are included or

EXHIBIT C

cooper rough transcript.txt

excluded from a report on healthcare providers?

      MR. STIMPSON:  I have to object to the form.  I'm not sure what you are referring to as this teaching.  And in any event the included excluded thing you have already asked him that that's been asked and answered a long time ago.

BY MR. VAZQUEZ:

    Q.   I am surprise the Scott given your vast

experience in patent litigation if you have informed this many times that you don't know what teaching means but that's what Henley does it teaches thing.  You know what that phrase means.

      MR. STIMPSON:  You referring referred to "this" teaching, and that's what's vague and ambiguous --

      MR. VAZQUEZ:  Teaching that Dr. Cooper specifically --

      MR. STIMPSON:  You just spent an hour --

      MR. VAZQUEZ:  -- specifically talked about in Henley.

      MR. STIMPSON:  So you are asking him whether or not any of these paragraphs, including ones you never even asked him about are --

      MR. VAZQUEZ:  No.

      MR. STIMPSON:  -- shown in that teaching --

      MR. VAZQUEZ:  No, I'm talking about the teaching he is referencing in his reference.

      MR. STIMPSON:  Well, he is referencing what he says there.  See Henley paragraphs -- all these

Page 237

EXHIBIT C

cooper rough transcript.txt

paragraphs, some of which you never even showed

him, and now you are asking him does this teaching

show this?  I mean, it's silly.

        MR. VAZQUEZ:  Okay.  Are you done?


        MR. STIMPSON:  I want to know what you are

asking him so I can know if I have to object.

        MR. VAZQUEZ:  Well, he did not ask, "What

do you mean by teaching?"

        MR. STIMPSON:  Well, I'm objecting,

Jesus --

        MR. VAZQUEZ:  All right.

        MR. STIMPSON:  -- because it's unclear.

        MR. VAZQUEZ:  Okay.  Are you done with your

objection?

        MR. STIMPSON:  It's not the word

"teaching"; it's the word -- it's the words "this

teaching."  I don't have any idea what usual

talking about and the second part of the objection

is that you already asked him about the included

excluded stud and that's been asked and answered a

long time ago.

        MR. VAZQUEZ:  I am talking about Henley.

  Q.   What in Henley talks about whether

comparisons are included or excluded from a report

on healthcare providers?  Can you tell me?

        MR. STIMPSON:  Objection to the form.

        THE WITNESS:  I believe I have already

answered that.

        MR. STIMPSON:  Yeah.

EXHIBIT C

cooper rough transcript.txt

BY MR. VAZQUEZ:

    Q.   Yeah.  Okay.  Where?

    A.   (No response.)

    Q.   Yeah.  We are not sure, can you indulge me and tell me where in Henley that exists if at all?

       MR. STIMPSON:  Objection.  That's not what is said.  He said he already answered it?  You asked him where, and then the question was we are now going to go back on the record and try to find out where he answered it.  I think that's --

       MR. VAZQUEZ:  No.  We are on the record. We have not gone off the record.

       MR. STIMPSON:  I'm sorry.  Go back on the record -- back to -- right.  Back to the record to try to find out what he said.  But he has already -- you've already asked him the question.

       MR. VAZQUEZ:  All right.  Well, we've got a half hour left.

    Q.   Where in paragraphs --

       MR. STIMPSON:  No, we don't.

       MR. VAZQUEZ:  Yes we do.

       MR. STIMPSON:  No, we don't.

BY MR. VAZQUEZ:

    Q.   Where in Paragraphs 16, 30, 37, 107, 114, 128 --

       THE REPORTER:  Wait a minute.  16 -- did you say 15?

       MR. VAZQUEZ:  All right.  Let me start from

Page 239

**EXHIBIT C**

cooper rough transcript.txt

the beginning.

    Q.   15, 16, 30, 37, 107, 114, 128, 137 and
Figure 18 of Henley, where in those paragraphs does
Henley discuss whether comparisons are to be
included or excluded from a report on healthcare
providers?

    A.   You are misquoting me.  I didn't say
Paragraph 15.  I said Paragraphs 16, 30, 37, 107,
114, 128, 137 and Figure 18.

    Q.   All right.  With that correction, how
about answering the question Dr. Cooper?

    A.   And the question was where within this --
ask the question again please?

        MR. VAZQUEZ:  Just read it back to him
please.

        (The question was read as follows:

        "Q.  Where in Paragraphs 16, 30, 37, 107,
        114, 128, 137 and Figure 18 of Henley, where in
        those paragraphs does Henley discuss whether
        comparisons are to be included or excluded from
        a report on healthcare providers?")

        THE WITNESS:  In the treatment outcome


block of Figure 18, there are three possible
answers that relate to what the treatment outcome
was.

BY MR. VAZQUEZ:

    Q.   And so in Figure 18 the treatment
outcome -- my question is where in Figure 18 since
you are referring to that one specifically --

    A.   Uh-huh.
                    Page 240

EXHIBIT C

cooper rough transcript.txt

Q.   -- Dr. Cooper, does it talk about whether comparisons are to be included or excluded in the report on healthcare providers?

A.   By providing a choice of three outcomes, those are the comparisons.  Also transaction E has three different entries and then there's an unstructured text block up to 160 characters, suggestions, comments about or for provider.

Q.   And where -- How is it that what you just said discuss whether the comparisons are in or not in the report?

MR. STIMPSON:  I have to object to the form of the question, too, because you keep saying "report."  And I think we have already been over this, but, anyway, it's been asked and answered.

BY MR. VAZQUEZ:

Q.   Nothing you just said Dr. Cooper, talks

about a report.  Talks about comparisons being included or excluded in your report.  So can you help me understand how it is that Figure 18 discusses whether comparisons are included or excluded from a report on healthcare providers?

MR. STIMPSON:  Objection to the form mischaracterizes his testimony he didn't say it did.

MR. VAZQUEZ:  Well, he said -- he discussed --

Q.   You described something about Figure 18 in response to the question.  Question again, sir, is

Page 241

EXHIBIT C

cooper rough transcript.txt

where in Figure 18 does it talk about whether

comparisons have to be included or exclude from a

healthcare provider report?

       MR. STIMPSON:  Same objection.

       THE WITNESS:  Same response.

BY MR. VAZQUEZ:

   Q.   So it doesn't?

   A.   It does.

   Q.   Where?

   A.   Zero one two, zero one two is responses

those are comparisons.  They are filled out by the

patient.  And that's part of the database.

   Q.   And does your zero one two include a

report?

   A.   The word report is not literally mentioned

but a person of skill in the art would understand

that that's what it's for.

   Q.   And zero one two -- there two zero one

twos, do either of them mention a report?

   A.   Zero one and two do not include the word

report no.

       MR. STIMPSON:  How are we doing on time?

How much time is left?

       THE VIDEOGRAPHER:  13 minutes.

       MR. STIMPSON:  13 minutes.

       THE WITNESS:  Light at the end of the

tunnel.

       MR. STIMPSON:  Yup.

BY MR. VAZQUEZ:

   Q.   Dr. Cooper, are you familiar with the

EXHIBIT C

cooper rough transcript.txt

compare feature that was removed from the Vitals
Web site in January 2010?

    A.  No.  I am not.

    Q.  So you did not address that at all in your
rebuttal report; right?

    A.  I addressed the situation on the Vitals
Web site as it existed at the time of my use of
that site for testing purposes.

    Q.  In other words, your rebuttal report was
addressing the -- what we have been calling in the
case the current Web site?

    A.  Correct.

    Q.  And so you don't plan to give any opinions
relating to the effect of that action taken by
Vitals in January 2010?

        MR. STIMPSON:  Objection to the form.

        THE WITNESS:  I don't have any knowledge of
what you are alleging as that action.  So I can't
really render an opinion on it.

BY MR. VAZQUEZ:

    Q.  So you are not rendering an infringement
opinion on the old Web site?

        MR. STIMPSON:  Objection to form.
Mr. Vazquez, you know what his report says, and I
don't care how he answers this question; I assure
you he will be.

        THE WITNESS:  Same answers.

        MR. VAZQUEZ:  Nice coaching, Counsel.  That
was very good.

Page 243

**EXHIBIT C**

cooper rough transcript.txt

MR. STIMPSON:  Well, don't start trying to trick him --

MR. VAZQUEZ:  That was very good -- No, there is no trick in here.  That's just the most

♀

blatant example of coaching I have ever witnessed.

MR. STIMPSON:  I'm telling you --

BY MR. VAZQUEZ:

Q.  All right.  Dr. Cooper --

MR. STIMPSON:  -- to come back and say, "Hey, I didn't know."

BY MR. VAZQUEZ:

Q.  Dr. Cooper, are you going to be rendering opinions on infringement as to the old Web site?

A.  At this point, I haven't been provided with any evidence about the old site.  So the answer is no, I will not be rendering opinion on the old site.

Q.  Okay.  Now, I have just been informed we probably have about eleven, ten minutes left here, and your counsel is determined that we have exactly seven hours in this deposition.

MR. STIMPSON:  Just like you were, Jesus, just like --

MR. VAZQUEZ:  No, not me.  Not me.  Don't accuse me, Counsel.  It wasn't me.

MR. STIMPSON:  He cut me off in the last --

MR. VAZQUEZ:  It wasn't me.  Don't say "you."

MR. STIMPSON:  You have to let --

♀

EXHIBIT C

cooper rough transcript.txt

BY MR. VAZQUEZ:

    Q.  Now, we did not get much time, Dr. Cooper, to talk about your initial --

        MR. STIMPSON:  Hold on.  Don't answer anything until I'm done talking.

        MR. VAZQUEZ:  Okay.

    Q.  We did not get much time to talk about initial expert report, Dr. Cooper, but I wanted to ask you just a few questions about it while we have time.

        MR. STIMPSON:  Okay.  So what I was going to say --

BY MR. VAZQUEZ:

    Q.  Do you affirm the opinions you gave in this report, in the initial report?

        MR. STIMPSON:  Okay.  So what I was about to say -- you cut me off, Jesus -- was that you are stuck with the actions of your partner, and he cut me off at the very minute of seven hours and would not let me go one second over.  Okay?  And so I'm sorry, but those are the ground rules we laid down, and that's -- and you got --

        MR. VAZQUEZ:  No.  That's your -- you are choosing to do this.

        MR. STIMPSON:  So now --

        MR. VAZQUEZ:  No, I understand he did that. So you are choosing to do this?  You can take the high road and go a few minutes extra --

Page 245

**EXHIBIT C**

cooper rough transcript.txt

MR. STIMPSON:  I'm not.

MR. VAZQUEZ:  -- until we are done, but you are not.

MR. STIMPSON:  You haven't --

MR. VAZQUEZ:  So let it -- Not "you."  Not "you."  Don't accuse me of doing things I haven't.  You are wasting time on the record now.  I know what you are doing.  You are trying to get me to get to that seven minutes (sic) so you can just take out your revenge.  Fine.  Way to go, Scott.

MR. STIMPSON:  Jesus --

MR. VAZQUEZ:  Hope you are proud of yourself.

MR. STIMPSON:  Jesus --

MR. VAZQUEZ:  Now can we get this question?

MR. STIMPSON:  Finish up.

MR. VAZQUEZ:  Yup.

Q.  So let me ask you some questions about your initial report which is on --

A.  The initial report?

Q.  Yes.

-- invalidity.  What did we mark that as?

A.  Let's see.  Number 5.

Q.  Thanks.

A.  Exhibit 5.

Q.  Let's go to Exhibit 5.  Do you affirm the opinions you gave in that report?

A.  Which opinions?

Q.  The opinions you gave in that report.  All of them.  Whatever they are.

Page 246

**EXHIBIT C**

cooper rough transcript.txt

A.   Specifically which opinion?  I can go through and read them all for --

Q.   I'm just asking you whether you a firm the opinions given in that report.

A.   I will have to address each opinion independently.  And that will take the ten minutes.

Q.   So is that what you intend?

A.   That's in response to your question, yes. If you want to ask me a blanket question like do I affirm all of at the -- so I consider that a rational question then I that I should be responding to.

MR. VAZQUEZ:  Obviously move to strike that as nonresponsive.

Q.   Now, it was very rational, sir, you have rendered a report, it contains opinions, and here we are in your deposition.  You are a very well experienced expert.  I am asking you if you are willing to a firm those opinions.

A.   Which opinions?

Q.   All of them.  Every opinion you gave in that initial report on invalidity.

A.   Okay.  I will go through it.

Q.   Okay.  I don't need you to do that, then. Obviously you are not ready to affirm them, then?

A.   Not without --

Q.   Yes.

A.   -- qualifications.

MR. STIMPSON:  Jesus, stop interrupting

Page 247

**EXHIBIT C**

cooper rough transcript.txt

him, please.  I know that you are out of time.

It's your fault.  You got five minutes left and you

start bringing up validity.

       MR. VAZQUEZ:  Are you done?

       MR. STIMPSON:  Now I am.

       MR. VAZQUEZ:  Great.

       MR. STIMPSON:  Stop interrupting my

witness.  Okay?  It's rude.

BY MR. VAZQUEZ:

   Q.   Is this an accurate statement of your

opinions regarding invalidity in this case?

   A.   Is what a complete and accurate statement?

   Q.   Are the opinions that you have rendered in

your initial report with respect to invalidity a

complete and accurate statement of your opinions

regarding invalidity in the case?

   A.   Well, let me see.  Paragraph 25 in that

report in my opinion the 060 discloses a database

coupled to a Web server and Web pages which

embodies a style of Web site development which is

very well-known to a person of ordinary skill in

the art to I am policemen the claims."

      And I stand by that opinion.  Paragraph 27

based on my review of the 060 patent and file

history, from my knowledge and experience with the

technology at issue, a person of ordinary skill in

the art at the time of the alleged invention --

based on my review of the 060 patent and file

history, and from my knowledge and experience with

the technology at issue, a person of ordinary skill

Page 248

EXHIBIT C

cooper rough transcript.txt

in the art at the time of the alleged invention,
(Posita) would be at least a Bachelor's degree in
computer science from an accredited college with at
least several years experience in developing
Web sites and database applications linked together
in a Web site and also having significant
experience in the healthcare area."  And I affirm
that opinion.


          The person of ordinary skill in the art at
the time of the alleged invention --
          MR. VAZQUEZ:  Where are you reading from
please.
          THE WITNESS:  Still on 27 it's the last
sense.
BY MR. VAZQUEZ:
     Q.   Okay.
     A.   The person of ordinary skill in the art at
the time of the alleged invention in my opinion
would have found these claims to be anticipated or
obvious and not novel inventions."  Paragraph 28.
The second sentence and I won't quote the -- the
left end of the sentence, so dot, dot, dot, I
provide my opinion here that the 060 patent is not
entitled to the earlier priority date of the
provisional application and I stand by that
opinion.
     Q.   I'm sorry.  What is it that you are not
affirming?
     A.   I am affirming.

                    Page 249

EXHIBIT C

cooper rough transcript.txt

Q.   Nothing you just said was a disaffirming? I misheard you?

A.   "I provide my opinion here that the 060 patent is not entitled to the earlier priority date

of the provisional application."  I affirm that opinion.

"Reviewing the provision at specification I found that it is only 20 pages long.  And presents only four figures for the consideration of the person of skill in the art.  The utility specification, by contrast, is twice as large and contains over 20 figures greatly expanding the material that was presented in the provisional. And "and I stand by that opinion.  Furthermore, same paragraph, the last sentence, "furthermore the provisional application does not disclose or teach comparison ratings of healthcare providers results list further includes an advertisement for the first healthcare provider, and favorable positioning in the results list for a member as required by the patented claims."

Q.   Dr. Cooper, you can go back to what you are doing if you'd like to in response to the question, but let me ask you.  Are there any opinions you have on invalidity that you have not put into your report?

A.   I'm sure there are, yes, I couldn't -- there is only so much I can get into a report.  So if you are trying to tell me that I have made all

Page 250

**EXHIBIT C**

cooper rough transcript.txt

of my opinions in the report, I have only made
those that are necessary to render the patent
invalid and the MDX not infringing.

Q.   And are you aware, I'm sure of the
requirement that all of your opinions be included
in your report?  Right?

A.   Oh the word all I take exception to.  My
adequate opinions to make the case need to be
included in the report.

Q.   Oh okay and where -- why is it -- what is
the basis of that understanding that it's only the
opinions to make the case versus all of the
opinions that you intend to testify about?

A.   Well, my understanding is if I wrote all
my opinions it would be thicker than the
prosecution history and it would be way beyond the
point required.

Q.   So what are the opinions that you have
that are not had our report sir?

MR. STIMPSON:  Objection.  Calls for a
narrative.

THE WITNESS:  I don't recall.

BY MR. VAZQUEZ:

Q.   Document recall you can't even summarize
for us here at the end of your deposition what are

all of these other opinions that you say you have
relating to invalidity that you did not include in
your report?

Page 251

**EXHIBIT C**

```
cooper rough transcript.txt
```
        MR. STIMPSON:  Objection it calls for a
narrative.

        THE WITNESS:  Same response.
BY MR. VAZQUEZ:
    Q.  Okay.  You can go ahead and tell me what
it is that you are affirming.
    A.  Okay.
    Q.  And I will assume everything you don't
discuss here, you are disaffirming.
        MR. STIMPSON:  Well, let me tell you, you
shouldn't assume that, Jesus.
        MR. VAZQUEZ:  Well, that's what I am going
to assume based on the way he wants to answer this.
        THE WITNESS:  Paragraph 29.  The sentence
that begins "I further understand."  "I further
understand that the written description requiement
requires the provisional application disclosure to
describe the claimed invention in a way to indicate
to a Posita that the inventors had possession of
the claimed invention at the time the application
was filed.  I further understand that the
enablement requirement requires the provisional

application to set forth a disclosure that enables
a person of skill in the art to make or use the
patented opinion -- claims."  And that is remaining
in my opinion.

        And with that as precursor in Paragraph 30:
"In my opinion the provisional application
disclosure fails at least the written description
and enable meant requirements.  My opinion is based

EXHIBIT C

cooper rough transcript.txt

on my review of the provisional application disclosure, and the 060 patent and it's final history."  And I affirm those opinions.

And Paragraph 31:  "In my opinion these missing disclosures would make a person of skill in the art uncertain about how to implement the claimed invention without undue trial and error experimentation.  Therefore, the provisional application is in my opinion unsuited to fully disclose the claimed invention."  And I affirm opinion.

32:  "Based on the foregoing, the effective filing date of the 060 patent is August 29th, 2006.  The prior art relied upon however is prior art regardless of whether Health Grades is entitled to the priority date or not."  And I stand by that opinion.

35:  "The early HG reports and services qualify others prior art under 102B.  From document and deposition discovery, the early HG reports and services were on sale in public use, and disclosed in printed publications long before the August 2006 filing date.  These all occurred at least one year before the filing of the utility application therefore the early HG reports and services are prior art under section 102 B."   And I stand by that opinion.

36:  "But even if the February 6th, 2006 filing date of the provisional application is used

Page 253

**EXHIBIT C**

cooper rough transcript.txt

for prior art determinations, the early HG reports
and services still qualify as prior art under 102B
because they were on sale and described in printed
publications and in public use more than one year
prior to that date."  And I stand by that opinion.

    37 last sentence:  "Actually there is no
proof I have seen that the invention date is
February 6th, 2006.  The only evidence of invention
date by these inventors is the August 29, 2006
application."  And I stand by that opinion.

    MR. STIMPSON:  Are we out of time yet?

    THE VIDEOGRAPHER:  One minute.

    MR. STIMPSON:  One more minute?  All right.


    Hurry up there, Rich.

    THE WITNESS:  All right.  Paragraph 40
beginning:  "All the early HG reports and services.
All the early HG reports and services met this
claim language in 2004 as shown by the Monday Troy
deposition Page 308 to 309.  In response to
Interrogatory No. 8, Health Grades does not appear
to contest this fact.  Since the Web site was
publicly hosting this information, it is my opinion
that the early HG reports and services meet this
claim language."

    And in 41:  "Referring to element 1.1.
This element describes use of a standard HTTP
protocol Web server engaged in what a person of
skill in the art would immediately recognize as the
well-known technology of Web page transport between
a server and A client computer.  There is no new

EXHIBIT C

cooper rough transcript.txt

material disclosed in this element that has not
been known to positas for decades."  A person of
skill in the art, posita.

     MR. STIMPSON:  Okay.  We've got to wrap
this up.  Time is up.  So, Jesus, if you want to
ask him one general question, go ahead but --

     MR. VAZQUEZ:  No.  I have a question
pending, and if you are suspending the deposition,

Mr. Stimpson, that's on you.

     MR. STIMPSON:  Jesus, are you saying that
you want him to go through every paragraph and
say --

     MR. VAZQUEZ:  We could have done it the
easy way.  He chose how to respond.

     MR. STIMPSON:  I will tell you what --
BY MR. VAZQUEZ:

   Q.  So the question was, you know, it is what
it is.  I asked you if you would affirm all the
opinions included in the report.  You said couldn't
Doe it without going through every single one of
them, and that's what you are attempting to do, and
your counsel has decided to call the deposition at
seven hours.

     MR. STIMPSON:  No.  Go ahead.  You can
finish up.  I'll let you finish up, and then we are
going to -- and I will just note for the record
that we were here and ready to go at 9:00 o'clock,
and you were late, and so we started at 10:00 as an
accommodation to you.  And, Jesus, what are you

EXHIBIT C

cooper rough transcript.txt
making the faces for, my friend?

        MR. VAZQUEZ:  Because I don't believe --

        MR. STIMPSON:  Isn't that a little
unprofessional, don't you think?


        MR. VAZQUEZ:  And you're just a bastion of
professionalism.  Right, Scott?

        MR. STIMPSON:  I think I am.

        MR. VAZQUEZ:  Yeah.  I'm sure --

        MR. STIMPSON:  Dr. Cooper, can you just
finish up your questions and your answers if you
can just --

        THE WITNESS:  Okay.

        MR. STIMPSON:  -- do what we can and then I
will have some cross-examination for you after we
take a break.

        THE WITNESS:  Okay.  Bottom of Paragraph
42.  "None of these properties are novel.  In fact,
they are commonly used by prospective patients to
help select a provider which meets the patients
requirements.  And I stand by that opinion.

        Further down in that same Paragraph --
well, that same numbered section, therefore, claim
element 060.1.2 was disclosed by defendants
Deposition Exhibit 10.  Therefore the element has
been anticipated."  And I affirm that decision --
or that opinion.

        Further that same section, even this date
constitutes more than one year prior to the filing
of the utility patent and therefore the patent is

Page 256

EXHIBIT C

cooper rough transcript.txt

invalid do you to anticipation."  And I stand by
that opinion.

       MR. STIMPSON:  It's been about an hour
15 minutes we will take a break and then let you
finish up after the break.

       MR. VAZQUEZ:  I am not taking a break and
according to the law we are not breaking until you
know both counsel --

       MR. STIMPSON:  That's okay with me.

       MR. VAZQUEZ:  All right.  So we are on the
record.

       THE WITNESS:  So we are taking a break
while the record is on?

       MR. VAZQUEZ:  I guess so.

       THE WITNESS:  Back in a few.

       MR. VAZQUEZ:  I hope so.

       (At this point Mr. Stimpson and the witness
   left the deposition proceedings.)

       (At this point Mr. Stimpson and the witness
   rejoined the deposition proceedings.)

       MR. STIMPSON:  Are we sill on the record?

       MR. VAZQUEZ:  Yes.

       MR. STIMPSON:

       THE WITNESS:  The record should reflect
that Dr. Cooper and I have left the room.

⚲

       MR. VAZQUEZ:  Scott, if you want just,
let's just ends the deposition.

       MR. STIMPSON:  No thanks.

**EXHIBIT C**

cooper rough transcript.txt

MR. VAZQUEZ:  Okay.

MR. STIMPSON:  Dr. Cooper, come on.

THE WITNESS:  Oh, okay.

MR. STIMPSON:  We can go off the record if you want to sit there.

(At this point the witness and Mr. Stimpson left the deposition proceedings.)

MR. VAZQUEZ:  Let the record reflect we have left the room, too.

(At this point Mr. Vazquez and Ms. Stoll-DeBell left the deposition proceedings.)

(At this point Mr. Vazquez and Ms. Stoll-DeBell rejoined the deposition proceedings.)

MS. STOLL-DeBELL:  You know what?  Some -- I wonder if people will ship things back for us.  I guess our hotel will also, huh?

MR. VAZQUEZ:  Sure they will ship them back for us.

MS. STOLL-DeBELL:  (Inaudible.)

THE REPORTER:  I can't hear you.

MR. VAZQUEZ:  She doesn't care.  We are in

a very unique situation here.

I don't know how you guys work it in California, but will we get these exhibits back? Will we get copies of these exhibits back?

(At this point the witness and Mr. Stimpson rejoined the deposition proceedings.)

THE WITNESS:  I'm still on, I believe.

MR. STIMPSON:  Are we back on the record?

Page 258

**EXHIBIT C**

cooper rough transcript.txt

THE WITNESS:  Yes.

BY MR. VAZQUEZ:

Q.   And, Dr. Cooper, do you intend to continue
going through your page -- through your initial
report paragraph by paragraph and reading the
opinions that you stand by?

A.   I will, for the interest of time, affirm
all the remaining opinions in the report.

Q.   Okay.

MR. STIMPSON:  Okay, are you done, Jesus?
Well, you have to be.  It's seven hours.

MR. VAZQUEZ:  Are you cutting me off?

MR. STIMPSON:  Seven hours, I'm cutting you
off so.

MR. VAZQUEZ:  Okay.  So counsel indicated
that we are off.  I just -- before we get off, just
want to make a point --

MR. STIMPSON:  We are not getting off --

MR. VAZQUEZ:  -- for the record is simply
that we disagree that Dr. Cooper is entitled to
keep opinions to himself that he has not disclosed
in his report, and we will intend to take that
position up with the Court.

And other than that, I appreciate your
time, Mr. Cooper.  Thanks very much.  We're done.

EXAMINATION

BY MR. STIMPSON:

Q.   Let me show you Exhibit 15, Henley

Page 259

**EXHIBIT C**

cooper rough transcript.txt

Exhibit 15, Doctor.

A.    Okay.

Q.    Have you got it there?

A.    I do.  I just picked up, though, so let me continue through.

Q.    You can look at this one if you want. It's Henley.

A.    Okay.

Q.    Just one question, Doctor.  Did you see anywhere in Henley any disclosure of comparison ratings inside a report on a first healthcare provider?

A.    Specifically comparison ratings, no, I

haven't.

Q.    Okay.  Let me show you rebuttal report you got that there?

A.    Rebuttal report.  Yes.

Q.    Turn to Paragraph 4, please.

A.    Paragraph 4.

Q.    Do you remember what Mr. Vazquez asked you whether or not you were going to be testifying about the old Web site?

A.    Yes.

Q.    Did he show you this Paragraph 4 some?

A.    No he didn't.

Q.    Can you read please the first sentence into the record?

A.    It says I will compare the patent claims of the 060 patent to the accused Vitals Web site both the early and late versions, collectively the
                    Page 260

EXHIBIT C

cooper rough transcript.txt

Vitals Web site, and demonstrate how a number of

important elements of every patent claim are

totally missing from the Vitals Web site.

    Q.   And I want you to read the next sentence.

Next phrase, anyway.

    A.   "I will explain how the old Vitals Web

site did not infringe any claim of the 060 patent

and the changes made by MDX to bring the Vitals Web

site even farther from those claims.  Unless stated

otherwise, the position in this report apply to

both early and late versions."

    Q.   Does that help refresh your memory on

whether or not you are going to be testifying that

the old Web site did not infringe?

    A.   I will, yes.

    Q.   Okay.  And let me show you what's been

marked as Exhibit 8.  Do you remember these?

    A.   Yes.

    Q.   Okay.  And these talk -- these reports,

they showed you have license information.  Do you

have do you remember that?

    A.   Yes, I do.

    Q.   So while you have your report out here,

rebuttal report turn to Paragraph 32 of it please.

    A.   Rebuttal, Paragraph 32.

    Q.   Okay.  And if you would look through that,

you are recording there from Mr. Rothchild's memo?

    A.   Yes.

    Q.   He is the CEO of MDX --

EXHIBIT C

cooper rough transcript.txt

A.    Yes.

Q.    -- right?  And if you look to that Subparagraph 2 there where is it says:  "Our display of third party"?

A.    "Verified information does not include licensure status."  Yes.

Q.    What does that tell you about the source that -- for the licensure information in Exhibit 8?

A.    It says that third party verified information was not provided in terms of licensure status.

Q.    So could this information this licensure in this Exhibit 8 have been third party verified?

A.    No.

Q.    Okay.  And any indication you have seen that MDX did anything to verify that?

A.    No.  No evidence whatsoever.

MR. STIMPSON:  Okay.  Thanks.  Nothing further.

THE WITNESS:  Okay.

THE REPORTER:  Signature?

MR. VAZQUEZ:  I get to do a little redirect now.  So let me get my microphone on.

REDIRECT EXAMINATION

BY MR. VAZQUEZ:

Q.    So, Dr. Cooper, apparently you intend to give opinions that are not in your report.  Right?

EXHIBIT C

cooper rough transcript.txt

    A.   I didn't say that.  No.

    Q.   Well, you just in response to counsel's question indicated that you intend to give opinions of infringement on the old Web site.

    A.   That's correct.

    Q.   There are no opinions of infringement about the old Web site in your report; right?

    A.   I believe that paragraph I just read does indicate opinions on infringement.  Old report. And my opinion there hasn't been a difference in the old versus the new.

    Q.   There isn't a difference in you're the old Web site versus the current Web site?

    A.   Correct.

    MR. VAZQUEZ:  Good.  Okay.  Thanks for your time.

    THE REPORTER:  Okay.  Wait, wait. Signature and copy orders.

    MR. STIMPSON:  It's his deposition.  We will -- Oh, yeah, we'll sign it.  Yeah, of course.

    THE REPORTER:  I can't hear you.

    MR. STIMPSON:  Yes, and we've got to -- and we have an opportunity to correct, too.  So yes. Yes, signature.  We are not waiving signature.

    THE REPORTER:  And where do you went the

original sent?

    MR. VAZQUEZ:  You can send it to me and at my address.  I think I have you have that.

Page 263

**EXHIBIT C**

cooper rough transcript.txt

MR. STIMPSON:  One more question.  Was there any colloquy or discussion when we were out? Anything on the record?

THE REPORTER:  I can read it to you.  There wasn't much.

MR. STIMPSON:  Yeah.  I just want to make sure that there was nothing there.  After I -- After we took our break.  I just want to make sure.

THE REPORTER:  All right.  And do you want a copy?

MR. STIMPSON:  A copy of what?

THE REPORTER:  A copy of the transcript.

MR. STIMPSON:  Well, yeah.  But I am in no hurry.  It can be regular.

THE VIDEOGRAPHER:  This concludes deposition of Richard Cooper.  The number of videotapes used was four --

THE REPORTER:  I can't hear you.

THE VIDEOGRAPHER:  This concludes --

MR. STIMPSON:  Hold on.  We can't do that until I make sure that there's nothing on the record while we were gone.  So we have to wait.  So

let's just go check the record, then we will go back.

THE VIDEOGRAPHER:  The video record is not -- that concludes this --

MR. STIMPSON:  That's okay.  The video can go off.

THE VIDEOGRAPHER:  So this concludes deposition today of Richard Cooper.  Total number
                    Page 264

EXHIBIT C

cooper rough transcript.txt

of tapes used today was four.  The original

videotape will be retained by Merrill in Chicago

going off the record.  The time now is 7:37.

(The record read as requested.)

MR. STIMPSON:  Thank you.  See everybody.


D I S C L A I M E R


THIS TRANSCRIPT IS A ROUGH DRAFT TRANSCRIPT.  IT IS

SUBJECT TO THE PROVISIONS OF CCP SECTION 2025

(R)(2)  IT HAS BEEN TRANSLATED FROM STENO INTO

ENGLISH BY COMPUTER.  THIS TRANSCRIPT HAS NEITHER

BEEN EDITED NOR PROOFREAD BY THE Court REPORTER.


THIS UNEDITED DRAFT MAY CONTAIN UNTRANSLATED

STENOGRAPHIC SYMBOLS, AN OCCASIONAL REPORTER'S

⚲


NOTE, A MISSPELLED PROPER NAME, OR OTHER

NONSENSICAL WORD COMBINATIONS.

EXHIBIT C