**Rebuttal Report of Philip Greenspun**

**Regarding Invalidity of U.S. Patent No. 7,752,060 by MDx Medical**

September 17, 2012

This report is submitted pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

## I.      INTRODUCTION

1.      My name is Philip Greenspun. I disclosed my qualifications and background in my July 13, 2012 report in this matter, as well as my retention by Health Grades, Inc. ("Health Grades").

2.      For purposes of this Rebuttal Report, I have been asked by Health Grades to provide an expert technical analysis regarding the validity of the asserted claims of U.S. Patent No. 7,752,060 (the "'060 Patent") and to rebut the opinions set forth in the Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012 (the "Cooper Report").

3.      I currently hold the opinions set forth in this Report.  As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in added observations. I reserve the right to supplement this Expert Report and to rely on additional documents and testimony that come to my attention between now and the time of the trial.  For example, I may supplement this Report to take into account the fact that MDx continues to produce additional documents relevant to my analyses in response to Health Grades' document requests.  Nevertheless, I believe the evidence adduced to-date provides support for the opinions expressed in this Report.  I also reserve the right to rely on all other Expert Reports submitted in this litigation.

4.      If requested, I will testify regarding the opinions set forth herein.  I may also discuss my own work and experience with the technology disclosed in the '060 Patent, and knowledge of the state of the art at the relevant time period

## II.      MATERIALS REVIEWED AND INVESTIGATION CONDUCTED

- Documents referenced in my July 13, 2012 report in this matter;

- Documents referenced within the text below;

- Expert Report of Richard Cooper and exhibits and testimony cited therein;

- Discovery responses served by the parties in this action;

- MDx's Invalidity Contentions and associated claim chart;

- MDx's First Supplemental Invalidity Contentions and associated claim chart;

**EXHIBIT J**

- MDx's Second Supplemental Invalidity Contentions and associated claim chart;

- MDx's Third Supplemental Invalidity Contentions and associated claim chart;

- Deposition of Jeff LaPointe;

- Deposition of David Hicks;

- Deposition of Scott Montroy;

- Deposition of John Neal;

- Deposition of Alan Dodge;

- Public websites, including those listed below and their representative screenshots attached as an Exhibit hereto.

### III.   <u>SUMMARY OF MY REBUTTAL TO DR. COOPER'S OPINIONS</u>

5.     Dr. Cooper defines a person of ordinary skill in the art as someone that has "at least a bachelor's degree in computer science from an accredited college, with at least several years experience in developing web sites and database applications linked together in a web site, and also having significant experience in the health care area."  (Cooper Report at ¶27, p. 7.)

6.     As described in detail below, I do not agree that a person of ordinary skill in the art would need "significant experience the healthcare area" and while I believe that some experience building database-backed Web sites would be necessary, I do not believe that at least several years of experience would be required.

7.     Dr. Cooper states that the '060 Patent is not entitled to the earlier priority date of the provisional application, and thus the effective filing date of the '060 Patent is August 29, 2006.  (Cooper Report at ¶¶28-32, pp. 7-8.)  I do not agree.  It is my opinion that the asserted claims are entitled to priority back to the provisional application and that the effective filing date is February 8, 2006.

8.     Dr. Cooper bases his invalidity opinions on a collection of Health Grades' products and services, which he collectively refers to as the "Early HG Reports and Services."  (Cooper Report at ¶33, p. 8.)  Dr. Cooper includes the following within his definition of "Early HG Reports and Services":

- <u>HG Reference 1</u>:  Health Grades Premium Reports;

- <u>HG Reference 2</u>:  Drucker Reports;

- <u>HG Reference 3</u>:  Physician Quality Guides;

EXHIBIT J

- HG Reference 4:  Physician Quality Reports;

- HG Reference 5:  Physician Research Comparison Reports;

- HG Reference 6:  Comparative Physician Report;

- HG Reference 7:  Physician Quality Comparison Reports;

- HG Reference 8:  Nursing Home Comparison Reports;

- HG Reference 9:  Physician Online Services ("POS");

- HG Reference 10:  Connecting Point; and

- HG Reference 11:  Physician New Marketing Media.

(Cooper Report at ¶33, p. 8.)

9.      Dr. Cooper contends that a collection of Health Grades' products and services, which he collectively refers to as the "Early HG Reports and Services," qualify as prior art under 35 U.S.C. §102(b).  (Cooper Report at ¶¶35-36, pp. 8-9.)  I do not agree that all of the above-listed Health Grades products and services qualify as prior art under §102(b) for various reasons described below.

10.     Dr. Cooper contends that a collection of Health Grades' products and services, which he collectively refers to as the "Early HG Reports and Services," qualify as prior art under 35 U.S.C. §102(a).  (Cooper Report at ¶¶34, 37, pp. 8-9.)  I do not agree that any of Health Grades products or services qualify as prior art under §102(a) for the reasons described below.

11.     Dr. Cooper states:  "I have determined that all the asserted claims of the '060 patent are anticipated, or at the very least would have been obvious to a Posita, and therefore all these claims should be held invalid."  (Cooper Report at ¶84, p. 40.)  I do not agree as set forth below.

12.     Based upon the meanings of the relevant terms in the claims of the '060 Patent, and my review of the alleged prior art references relied upon by MDx's expert, Dr. Cooper, in his Initial Report, I do not agree, as explained below, that this alleged prior art anticipates any of the claims of the '060 Patent.

13.     In addition, I do not agree that the alleged prior art would have rendered any of the patent claims obvious to a person of ordinary skill in the art at the time of the inventions claimed in the patents-in-suit.

14.     With respect to MDx's invalidity opinions based on prior art, the evidence does not support the contention that any of these alleged prior art references anticipates any claim of the '060 Patent.  Similarly, the evidence does not support the contention that

EXHIBIT J

any combination of these prior art references would have rendered any of the patent claims obvious to a person of ordinary skill in the art, either alone or in combination with any of the other prior art references relied upon by Dr. Cooper.

15.     Dr. Cooper states: "[B]ut for the inventors' failure to disclose the Early HG Reports and Services, the Patent Office would not have allowed any of these claims to issue." (Cooper Report at ¶85, p. 40.)  As described above, the evidence does not support the contention that any of the alleged "Early HG Reports and Services," either alone or in combination anticipates and/or renders obvious any of the asserted claims.  Therefore, I do not agree that the Patent Office would not have allowed the asserted claims to issue had these references been disclosed to the Patent Office.

16.     Dr. Cooper states: "After reviewing the various web sites, I found numerous web sites that are acceptable substitutes for the alleged invention." (Cooper Report at ¶86, p. 40.)  For the reasons discussed below, I do not agree that any of the sites listed by Dr. Cooper are acceptable, non-infringing alternatives.

17.     Dr. Cooper states: "It is my opinion that Search Engine Optimization (SEO) is unrelated to these patent claims, and thus is a major driver for website traffic unrelated to the '060 patent." (Cooper Report at ¶87, p. 40.)  I disagree as described below.

18.     Dr. Cooper states: "I have reviewed the evidence and concluded that, to the extent that Health Grades is right and the Vitals website infringes (something I very much disagree with), the amount of use of the patented invention is trivial.  I find that if Health Grades was right that there is infringement now (I very much disagree), there are numerous ways in which the '060 patent would not be practiced because the full complement of claim elements of the asserted claims I and 15 would not be practiced, and thus there are various easy design-arounds to these claims." (Cooper Report at ¶¶88-89, p. 40.)  I disagree as described below.

## IV.     OPINION 1:  Priority Date

### A.     The Law Regarding Priority Claims

19.     I understand applicants for United States patents are allowed to file a provisional application that can provide the priority date for a non-provisional utility application filed within one year of the provisional.  I further understand that a provisional application need only include a specification conforming to the requirements of 35 U.S.C. § 112 P 1 and at least one drawing filed under § 113; no claims are required.

20.     I am informed that for a non-provisional utility application to be afforded the priority date of the provisional application, the two applications must share at least one common inventor and the written description of the provisional application must adequately support the claims of the non-provisional application.  Specifically, the specification of the provisional application must contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise,

EXHIBIT J

and exact terms, to enable an ordinarily skilled artisan to practice the invention claimed in the non-provisional application.

21.     I understand that priority is determined on a claim by claim basis.

**B.     The Asserted Claims are Entitled to Priority to the Provisional Application**

22.     Dr. Cooper states the '060 Patent is not entitled to the earlier priority date of the provisional application, and thus the effective filing date of the '060 Patent is August 29, 2006.  (See Cooper Report at ¶¶28-32, pp. 7-8.)

23.     He specifically states:  "[T]he provisional application does not disclose or teach "*comparison ratings of health care providers*", "*results list further includes an advertisement for the first healthcare provider*", and "*favorable positioning in the results list*" for a member.  In my opinion, these missing disclosures would make a Posita uncertain about how to implement the claimed invention without undue trial and error experimentation."  (Cooper Report at ¶31, p. 8.)  I disagree.

24.     The "*comparison ratings of health care providers*" element is included in claims 1 and 15 of the '060 Patent.  It is my opinion as one of ordinary skill in the art that the provisional application adequately supports this claim element.  Support for this claim element includes the following:

        a.      "Further, even if such information is available, **it is usually not organized in a manner that would allow a patient to compare doctors**, search for a particular doctor by geographic area, or verify a doctor's certifications.  Also, the information available to a potential patient typically does not include comments **or ratings** by other patients or consumers."  (Provisional App. at p. 1 (emphasis added).)

        b.      "In general, the present invention is related to providing an Internet-based business that drives patients to **potential physicians**, or doctors, and, similarly, provides doctors with the types of patients they desire.  In an embodiment, the present invention involves a large database of doctor-related information, where each doctor has the ability to, for a fee, manage his or her specific data. Regardless, each doctor's "report" provides different levels of verified information about the doctor, such as the name of his/her medical school, graduation date, board certifications, internships, fellowships, publications, state or federal reprimands, suspensions, or license revocations, **and information interpreting this data for a potential patient**.""  (Provisional App. at p. 2 (emphasis added).)

        c.      "In essence, the report has at least three portions. First, there is a doctor-verified, or doctor-provided, section. This portion allows the doctor to put whatever information he or she feels **will help a patient choose him or her as a physician**."  (Provisional App. at p. 2 (emphasis added).)

**EXHIBIT J**

     d.     "Following the certification process, the operation flow passes to the creation, or compiling, of the doctor profile 110 in compile operation 408. In this operation, the doctor provided, independent certification-provided, and patient-provided information is compiled into a report and stored as a profile 110 in the database 108. **Other sections of information may also be provided. The particular embodiment described herein is not intended to limit the types of information which may be provided and/or certified.**"  (Provisional App. at p. 9 (emphasis added).)

     e.     "Having described the embodiments of the present invention with reference to the figures above**, it should be appreciated that numerous modifications may be made to the present invention that will readily suggest themselves to those skilled in the art and which are encompassed in the spirit of the invention disclosed and as defined in the appended claims. Indeed, while a presently preferred embodiment has been described for purposes of this disclosure, various changes and modifications may be made which are well within the scope of the present invention.**"  (Provisional App. at pp. 11-12 (emphasis added).)

25.     The "*results list further includes an advertisement for the first healthcare provider*" is included in claim 8 of the '060 Patent.  It is my opinion as one of ordinary skill in the art that the provisional application adequately supports this claim element.  Support for this claim element includes the following:

     a.     "[T]he present invention involves a large database of doctor-related information, where each doctor has the ability, to, for a fee, manage his or her specific data". A POSITA would understand that, as the database was "large" it would include most or all doctors in the United States. As it would not be possible to collect a fee simply to correct a mistake, a POSITA would interpret "manage his or her specific data" to include "manage the relative prominence of his or her specific data".  (Provisional App. at p. 2.)

     b.     Page 2 also says "In one embodiment, the doctor may provide a link so that the patient can make an appointment on-line and view further information regarding the doctor's backgrounds, qualifications, and location, among other information."  (Provisional App. at p. 2.)  A POSITA would understand that such a link was advertising.

## V.     <u>OPINION 2:  Person of Ordinary Skill in the Art</u>

### A.     <u>The Law Regarding the Level of Skill in the Art</u>

26.     I understand that a person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention.  I am informed that the following factors that may be considered in determining the level of ordinary skill in the art may include:

**EXHIBIT J**

a.    "type of problems encountered in the art;"

b.    "prior art solutions to those problems;"

c.    "rapidity with which innovations are made;"

d.    "sophistication of the technology"; and

e.    "educational level of active workers in the field."

**B.    Dr. Cooper Sets the Level of Skill in the Art Too High**

27.    Dr. Cooper defines a person of ordinary skill in the art as someone that has "at least a bachelor's degree in computer science from an accredited college, with at least several years experience in developing web sites and database applications linked together in a web site, and also having significant experience in the health care area." (Cooper Report at ¶27, p. 7.)

28.    I disagree with the Cooper Report's definition, in paragraph 27, of a person of ordinary skill in the art. The requirement of "also having significant experience in the health care area" is excessive, in my opinion, as well as vague. This could mean, for example, that the person building an Internet application in accordance with the '060 Patent specification would have worked as a nurse or doctor. It could also mean that the person building an Internet application had previously worked in the IT department of a hospital. I do not believe that either kind of experience would be required to read and understand the prior art and to build a functioning system.

29.    In paragraph 31 of my July 13, 2012 report, I stated that "[m]y definition of a person of ordinary skill in the art, based on my direct personal experience in the field in 2006, is someone with a Bachelor's degree in Computer Science or related field and some experience building database-backed Web sites." One reason for this definition is that this is the kind of person that a company building an Internet application would seek to hire and be able to hire. Competent software developers are scarce and it is not practical to insist that everyone in an organization building software for health care, for example, have previously worked in the health care industry. A company may have a founder or chief executive with a vision for what new software will be useful in an industry. When software developers are hired, they are tasked with realizing that vision, not with coming up with alternative visions. Therefore a programmer need not have direct personal experience with the application for which the software is intended.

30.    Dr. Cooper's suggestion that "at least several years' experience" is required is excessive. Fresh graduates in computer science who have done some work with Web applications during summers are offered jobs by world-class companies such as Facebook, Google, and Microsoft and put immediately into roles where they are developing software for public sites.

EXHIBIT J

## V.   OPINION 3:  None of the Claims Are Anticipated and/or Rendered Obvious By Any of the Alleged Early Health Grades' Reports and Services

### A.   The Law of Invalidity

31.     In formulating my opinions and conclusions in this case, I have been provided with an understanding of the prevailing principles of U.S. patent law that govern the issues of patent validity.

32.     As a result, I understand that it is a basic principle of patent law that assessing the validity of a patent claim involves a two-step analysis. In the first step, the claim language must be properly construed to determine its scope and meaning. In the second step, the claim as properly construed, must be compared to the alleged prior art to determine whether the claim is valid. I further understand that the construction of the claim terms applies equally for determining infringement and validity issues. In other words, the same construction of the claim terms must be used for both analyses. I understand that it is not appropriate to use one party's claim construction for purposes of conducting an infringement analysis and use a different construction to conduct a validity analysis.

33.     I am informed and understand that under U.S. patent law, each claim of Health Grades '060 Patent is presumed valid, and each such claim may be invalidated only if MDx presents clear and convincing evidence that it is invalid.

34.     It is my understanding that only information which satisfies one of the categories of prior art set forth in 35 U.S.C. § 102 may be used in any validity analysis under Sections 102 or 103. Those categories are (1) the invention of the patent claim was in public use or on sale in the United States more than one year prior to the effective filing date of the patent application; (2) the invention was publicly known or used by others in the United States before the date of invention of the patent claim. Therefore, if information is not properly classified as prior art under one of the subsections of Section 102, then it may not be considered in an anticipation or obviousness determination.

35.     I am also informed and understand that, in order to be considered prior art which would anticipate or render a claimed invention obvious and invalid, a reference must be enabling and must describe the claimed invention sufficiently to have placed it in the possession of a person of ordinary skill in the field of the invention. In other words, the disclosure within the four corners of the alleged prior art document must be sufficiently detailed to enable a person of ordinary skill in the relevant field to make and use the claimed invention.

36.     Furthermore, it is my understanding that to anticipate a patent claim under 35 U.S.C. § 102, a single asserted prior art reference must disclose each and every element of the claimed invention, either explicitly or inherently to a person of ordinary skill in the art. There must be no difference between the claimed invention and the disclosure of the alleged prior art reference as viewed from the perspective of the person of ordinary skill in the art. Also, I understand that in order for a reference to be an anticipating reference, it

8

EXHIBIT J

must describe the claimed subject matter with sufficient clarity to establish that the subject matter existed, and that its existence was recognized by persons of ordinary skill in the field of the invention. In addition, I am informed and understand that in order to establish that an element of a claim is inherent in the disclosure of an asserted prior art reference, the extrinsic evidence (or the evidence outside the four corners of the asserted prior art reference) must make clear that the missing element is the inevitable outcome of the process and/or thing that is explicitly described in the asserted prior art reference, and that it would be recognized as necessarily present by persons of ordinary skill in the relevant field. Inherency, I understand, however, may not be established by mere probabilities or possibilities. In other words, the mere fact that a certain thing may result from a given set of circumstances is not sufficient.

37.    With respect to an apparatus, system or process asserted to have anticipated a patent claim based on a prior public use of such an apparatus, system or process, I am informed and understand that to anticipate a patent claim, MDx must present clear and convincing evidence that such apparatus, system or process was in public use before the patentee's invention and that such apparatus, system or process discloses each and every limitation of a relevant claim.

38.    I further understand that there must be substantial corroborating evidence for the oral testimony of a witness that is relied upon to invalidate a patent based on a prior public use under Section 102 of the patent laws. This is because testimony relating to allegedly invalidating activities is typically unsatisfactory due to the forgetfulness of witnesses, their liability to make mistakes and their proneness to recollect events in a manner favorable to the party relying upon such testimony. Therefore, I understand that allegedly invalidating activities should be corroborated by tangible evidence such as devices or actual systems, schematics, invoices, sales documents, notebooks, or other contemporaneous records dating from the time of the allegedly invalidating activities.

39.    I am also informed and understand that even though a prior art reference does not fully anticipate a claim of a patent, a claim may, nonetheless, be rendered obvious to one of ordinary skill in the art if the differences between the subject matter set forth in the patent claim and the prior art are such that the subject matter as a whole of the claim would have been obvious at the time the claimed invention was made.

40.    I am informed and understand that obviousness is a determination of law based on various underlying determinations of fact. In particular, these underlying factual determinations include (1) the scope and content of the prior art; (2) the level of ordinary skill in the art at the time the claimed invention was made; (3) the differences between the claimed invention and the prior art; and (4) the extent of any proffered objective indicia of non-obviousness. I understand that the objective indicia which may be considered in such an analysis include commercial success of the patented invention (including evidence of industry recognition or awards), whether the invention fills a long-felt but unsolved need in the field, the failure of others to arrive at the invention, evidence of copying, unexpected results achieved by the invention, industry acquiescence and recognition, initial skepticism of others in the field, whether the inventors proceeded in a direction contrary to the

9

EXHIBIT J

accepted wisdom of those of ordinary skill in the art, and the taking of licenses under the patent by others, among other factors.

41.     To ascertain the scope and content of the prior art, it is necessary to first examine the field of the inventor's endeavor and the particular problem with which the inventor was involved at the time the invention was made. The relevant prior art includes prior art in the field of the invention, and also prior art from other fields that a person of ordinary skill in the art would look to when attempting to solve the problem.

42.     I am informed and understand that a determination of obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention. Instead, it is my understanding that in order to render a patent claim invalid as being obvious from a combination of references, there must be some evidence within the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination in a way that would produce the patented invention.

43.     I am further informed and understand that in an obviousness analysis, neither the motivation nor the purpose of the patentee dictates. What is important is whether there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims.

44.     In addition, it is my understanding that in order to find a patent claim invalid for obviousness, there must be a finding that each element in each limitation of the patent claim is disclosed or taught by the asserted combination of prior art references or elsewhere in the relevant prior art.

45.     I am informed and understand that a patent for a combination which only recites old elements with no change in their respective functions, withdraws what is already known into the field of its monopoly and diminishes the resources available to a person of ordinary skill in the field. When a patent claims a structure already known in the prior art that is altered by mere substitution of one element for another known in the field, the combination must do more than yield a predictable result. I am informed and understand that the corollary to this principle is that when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious. Thus, the question to be answered is whether someone reading the prior art would be discouraged from following the path taken by the inventor.

46.     I am further informed and understand that when an element is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill in the art can implement a predictable variation of that available element, Section 103 likely renders the invention obvious.

47.     For the same reason, I am informed and understand that if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that such technique would improve similar devices in the same way, using the technique is

EXHIBIT J

obvious unless its actual application is beyond his or her skill. Following these principles often requires one to look to interrelated teachings of multiple patents; the effects of demands known to the design community present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known element in the manner claimed by the patent at issue. I am further informed and understand that the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, because one can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

48.     I am further informed and understand that although the use of the teaching, suggestion or motivation test for combining references has not been completely rejected, the obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. I am informed and understand that in many fields there is little discussion of obvious techniques or combinations, and it is often the case that market demand, rather than scientific literature, drive design trends. Under the correct analysis, any need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. Finally, I am informed and understand that common sense teaches that familiar items may have obvious uses beyond their primary purposes and, in many cases, a person of ordinary skill in the art will be able to fit the teachings of multiple patents together like pieces of a puzzle.

**B.      Each of the "Early HG Reports and Services" is a Separate Piece of Art That Must Be Analyzed Individually for Invalidity**

49.     Dr. Cooper's invalidity opinion relies exclusively on references from Health Grades, which he lumps together and refers to as the "Early HG Reports and Services":

> To demonstrate the invalidity of the asserted claims of the '060 patent, I will refer to prior art that I will call "Early HG Reports and Services", which includes the Health Grades web site prior to August 29, 2006, and encompasses prior art products and services of Health Grades.  Examples of the Early HG Reports and Services are [1] the Health Grades Premium Reports, [2] the Drucker reports, [3] the Physician Quality Guides, [4] the Physician Quality Reports, [5] the Physician Research Comparison Reports, [6] the Comparative Physician Report, [7] the Physician Quality Comparison Reports, [8] the Nursing Home Comparison Reports, [9] the Physician Online Services, [10] Connecting Point, and [11] the Physician New Marketing Media. See for example Defendant's deposition exhibits 8, 13, 21 and 51.

(Cooper Report at ¶33, p. 8 (highlighting and bracketed numbers added).)

**EXHIBIT J**

50.     Although acknowledging that the "Early HG Reports and Services" comprise several different kinds of reports and services, throughout the rest of Dr. Cooper's report, he improperly treats them collectively as if they were a single reference.  For example:

- "Since the web site was publicly hosting this information, it is my opinion that the Early HG Reports and Services meet this claim language."  (Cooper Report at ¶40, p. 10.)  Dr. Cooper does not say "what information" was publicly hosted and in most cases does not cite enough to prove that the specific HG references (listed below) were known or used or on sale or in public use.

- "I conclude that the Early HG Reports and Services had all this information, and it was obtained from and verified by third parties, therefore the claim element is met."  (Cooper Report at ¶44, p. 17.)

- "The testimony of Mr. Dodge, when combined with other evidence, also indicates that comparison ratings were in the Early HG Reports and Services early enough to be prior art. Therefore, this claim element is also anticipated."  (Cooper Report at ¶45, p. 18.)

- "The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers." (Cooper Report at ¶45, p. 18.)

51.     It is my opinion that each of these eleven reports is at least one separate reference (and in some cases multiple references) that should be analyzed separately for purposes of both anticipation and obviousness because the evidence cited by Dr. Cooper demonstrates that each was a separate report, or product.  As shown in the table below, most of these references were not publicly available on Health Grades' website, if at all, at the same time as the others:

|   | Name of HG Early Report or Service | Document Cited by Dr. Cooper: | Date: |
|---|---|---|---|
| 1 | Health Grades Premium Reports | None | None |
| 2 | Drucker Reports | Ex. 13 | 06/04/2005 |
| 3 | Physician Quality Guides | Ex. 23 | 08/12/2003 |
| 4 | 2003 Physician Quality Report | Ex. 21 at HG208976-987 | 04/17/2003 |
| 4 | Dec. 2004 Physician Quality Report | Ex. 8 at HG032086-2101 | 12/28/2004 |
| 4 | August 2005 Physician Quality Report | Ex. 10 | 08/02/2005 |
| 5 | Physician Research Comparison Reports | None | None |
| 6 | Comparative Physician Report | Ex. 21 at HG208987-9000 | 04/03/2003 |
| 7 | Physician Quality Comparison Reports | Ex. 8 at HG032062-2085 | 12/28/2004 |
| 8 | Nursing Home Quality Comparison Report | Ex. 8 at HG032037-2051 | 12/28/2004 |

**EXHIBIT J**

| | Name of HG Early Report or Service | Document Cited by Dr. Cooper: | Date: |
|---|---|---|---|
| 8 | Nursing Home Quality Report | Ex. 8 at HG032052-2061 | 12/28/2004 |
| 9 | Physician Online Services (Phase I) | Ex. 27 | 05/25/2004 |
| 10 | Connecting Point | None | None |
| 11 | Physician New Marketing Media | Ex. 51 | 03/22/2005 |

### C.     Specific References Cited by Dr. Cooper

#### 1.     Health Grades' References

52.     HG Reference 1:  "Health Grades Premium Reports."  Dr. Cooper mentions these reports only once in his whole report and does not cite any documents or testimony to otherwise explain what these reports are.

53.     HG Reference 2:  "Drucker Reports."  Dr. Cooper relies on the following documents for this reference:

- Dep. Ex. 13

- Dep. Ex. 50

Although Dr. Cooper refers to plural Drucker Reports, he cites to only one example of a Drucker Report (Dep. Ex. 13) that is dated June 4, 2005.  Health Grades witnesses testified that Dep. Ex. 13 was a prototype report that was first put on the Health Grades website in February 2005.  I will refer to Exhibit 13 as the "Drucker prototype."  (See Neal Dep. at p. 234:15.)  The Drucker prototype differed from the earlier versions of Health Grades' physician profiles.  (See Neal Dep. at pp. 234:15-17.)  Dep. Ex. 50 is an e-mail that discusses a Drucker profile, but is not itself an example of such a report.

54.     HG Reference 3:  "Physician Quality Guides."  Dr. Cooper relies on the following document for this reference:

- Dep. Ex. 23

Dep. Ex. 23 discusses the rollout of a certain type of physician report called a "physician quality guide" – but is not itself an example of such a report.  Dep. Ex. 23 includes an e-mail dated August 12, 2003 and indicates that "basic functionality" of the physician quality guide was "completed" as of this date.

55.     HG Reference 4:  "Physician Quality Reports."  Dr. Cooper relies on three documents for this reference

- Dep. Ex. 21 (HG208976-987)

- Dep. Ex. 8 (HG032086-2101)

**EXHIBIT J**

- Dep. Ex. 10

Each of these documents relates to a different version of this report, and thus each of these documents is a separate prior art reference.

    a.   <u>HG Reference 4a</u>:  Dep. Ex. 21 is a "Physician Quality Report for Consumers" dated April 17, 2003.  I will refer to this reference as the "2003 Physician Quality Report."

    b.   <u>HG Reference 4b</u>:  Dep. Ex. 8 is a "Physician Quality Report" dated December 28, 2004.  I will refer to this reference as the "December 2004 Physician Quality Report."

    c.   <u>HG Reference 4c</u>:  Dep. Ex. 10 is a press release dated August 2, 2005 that discusses a new version of physician quality report.  I will refer to this reference as the "August 2005 Physician Quality Report."

56.    <u>HG Reference 5</u>:  "Physician Research Comparison Reports."  Dr. Cooper mentions these reports only once in his whole report and does not cite any documents or testimony to otherwise explain what these reports are.

57.    <u>HG Reference 6</u>:  "Comparative Physician Report."  Dr. Cooper mentions these reports only once in his whole report and does not cite any documents or testimony to otherwise explain what these reports are.  I do note, however, that Dr. Cooper cites to Dep. Ex. 21, which does include a document entitled "Comparative Physician Report" at pp. HG208987-9000.  This report is dated April 3, 2003.

58.    <u>HG Reference 7</u>:  "Physician Quality Comparison Reports."  Dr. Cooper cites the following document for this reference:

- Dep. Ex. 8 (HG032062-2085)

These pages of Exhibit 8 are an example of such a report dated December 28, 2004.

59.    <u>HG Reference 8</u>:  "Nursing Home Comparison Reports."  Dr. Cooper mentions these reports only once in his whole report, and does not cite any documents or testimony to otherwise explain what these reports are.  I do note, however, that Dr. Cooper cites to Dep. Ex. 8, which does include a document entitled "Nursing Home Quality Comparison Report" at pp. HG032037-2051 and "Nursing Home Quality Report" at HG032052-2061.  Each of these documents relates to a different version of this report and thus each of these documents is a separate prior art reference.

    a.   <u>HG Reference 8a</u>:  Dep. Ex. 8 at HG032037-2051 is a Nursing Home Quality Comparison Report" dated December 28, 2004.

    b.   <u>HG Reference 8b</u>:  Dep. Ex. 8 at HG032052-2061 is "Nursing Home Quality Report" dated December 28, 2004.

**EXHIBIT J**

60.    <u>HG Reference 9</u>:  "Physician Online Services ("POS")".  Dr. Cooper cites the following evidence to identify this reference:

- Dep. Ex. 26

- Dep. Ex. 27

- Dep. Ex. 28

These documents relate to two different versions of this application, each of which is a separate prior art reference.

    a.    <u>HG Reference 9a</u>:  Dep. Exs. 27 and 28 relate to Ver 1.0 of Physician Online Services and indicate it was launched in May 2004.

    b.    <u>HG Reference 9b</u>:  Dep. Exs. 27 and 28 relate to Phase II of Physician Online Services and indicate it work was not yet started on this new version as of May 2004.  They do not state when, if ever, it was publicly launched.

61.    <u>HG Reference 10</u>:  "Connecting Point."  Dr. Cooper mentions these reports only once in his whole report, and does not cite any documents or testimony to otherwise explain what these reports are.  Therefore, I do not have enough information to rebut or even comment on these reports.

62.    <u>HG Reference 11</u>:  "Physician New Marketing Media."  Dr. Cooper mentions these reports only once in his whole report, and does not cite any documents or testimony to otherwise explain what these reports are.  I do note, however, that Dr. Cooper cites to Dep. Ex. 51, which does discuss this product.

63.    The following timeline identifies the Health Grades references for which Dr. Cooper cited a document to support his opinion:

EXHIBIT J



## 2.    Generic References

64.     Dr. Cooper makes generic and unsupported statements that subject matter was "not new" or "was obvious" or "was known to Positas for decades" without citing to any specific prior art references, nor any documentary evidence to support such statements.  I am informed that this testimony is legally insufficient to demonstrate invalidity.

65.     The deeper problem with Dr. Cooper's sweeping characterizations of the material in the '060 Patent as "obvious" is that, if it were obvious, someone would have built a substantially similar system in the mid-1990s. The Health Grades site uses a conventional relational database management system, developed in the 1970s. The Health Grades site uses a conventional Web server machine and HTTP server program, both of which were mature technologies in the early 1990s. There were people using conventional Web servers and RDBMSes in the mid-1990s for health care (e.g., I myself built a Web-based electronic medical record system for Boston Children's Hospital in 1994; the RDBMS used was Oracle). There were millions of consumers hooked up to the Internet in the mid-1990s. A person of ordinary skill in the art of building Web applications in 1996 was just as skilled as a person of ordinary skill in the art in 2006. If the patented features of the '060 system had been obvious to a person of ordinary skill in the art in 2006, they would have been equally obvious to a person of ordinary skill in the art in 1996 and Dr. Cooper would be able to find prior art references that anticipate the claims.

EXHIBIT J

**D.** **None of the "Early HG Reports and Services" Qualify as Prior Art Under §102(a)**

66.     Section 102(a) of the Patent Act states:

"A person shall be entitled to a patent unless - (a) the invention was known or used **by others** in this country . . . before the invention thereof by the applicant for patent . . . ."

67.     I am informed that knowledge or use by the applicant (Health Grades) does not qualify as prior art under §102(a) because Health Grades is not an "other." Dr. Cooper's report relies solely on Health Grades' reports, Health Grades' services, and Health Grades' knowledge and use. Dr. Cooper does not identify anyone other than Health Grades who "knew of" or "used" these references at any given point in time. Thus, none of the references he relies on qualify as prior art under §102(a).

**E.** **Prior Art Under §102(b)**

68.     Section 102(b) of the Patent Act states:

"A person shall be entitled to a patent unless - . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."

69.     I am informed that, in this case, the date of significance for §102(b) will either be:

a.     February 8, 2005 (more than one year prior to the filing date of the provisional application) if the '060 Patent claim at issue is entitled to priority to the provisional; or

b.     August 29, 2005 (more than one year prior to the filing date of the '060 Patent) if the '060 Patent claim at issue is *not* entitled to priority to the provisional.

70.     HG Reference 1:  "Health Grades Premium Reports." Dr. Cooper mentions these reports only once in his report and does not cite any documents nor testimony to explain what these reports are or when they were made public or offered for sale. Thus, Dr. Cooper has not met his burden to demonstrate that these reports qualify as prior art under §102(b).

71.     HG Reference 2:  "Drucker Prototype." Regarding dates for the Drucker Report, Dr. Cooper states:

**EXHIBIT J**

From John Neal's deposition on pages 210 and 211:

```
20 Q Okay. And when did Dr. Drucker's profile
21 first go on the website?
22 A Well, his original profile would have gone
23 on the website when we launched physician reports as
24 just part of all the physician profiles that we
25 provided, so when we launched the site, which would
Page 211
2 have been 2003.
```

Mr. Neal's testimony indicates that the Drucker report would have been on the web site as early as 2003. On further investigation, we find that the Drucker report was posted on the web site at least as early as 2005, as shown on a date marking affixed to the Drucker report showing June 4, 2005 as the date of last editing (Defendant's deposition Exhibit 13). Even this date constitutes more than one year prior to the filing of the utility patent, and therefore the patent is invalid due to anticipation.

(Cooper Report at ¶42, p. 12.)

72.     Although Dr. Cooper states that "the Drucker report *would* have been on the web site as early as 2003," there is no evidence to show what the content of such a report would have been. Indeed, the testimony he cites from Mr. Neal is not referring to Dep. Ex. 13, which is a Drucker Report dated June 4, 2005, but rather relates to Dr. Drucker's "original profile." Mr. Neal distinguished Dep. Ex. 13 as a "prototype" that differed from the "original" profile that was on the web site in 2003. (See Neal. Dep. at pp. 211:12-212:1.) Further, Mr. Neal stated that the prototype Drucker profile was not put on the website until February 2005. (See Neal Dep. at p. 213.) Although Mr. Neal testified that some form of the Drucker prototype profile was on the website as of February 16, 2005 (which is confirmed by an e-mail saying that Drucker content was updated as of this date (Dep. Ex. 50)), there is no evidence to show what the content of the prototype profile was as of February 16, 2005 or earlier.

73.     There are only two documents that show the content of any version of a Drucker Report: Dep. Ex. 13, which is dated June 4, 2005; and Dep. Ex. 51, which is a PowerPoint presentation with screenshots of a version of a Drucker report that is attached to an e-mail dated March 21, 2005, (Dep. Ex. 50, referenced above, is a one page e-mail that does not detail what the content of the Drucker report was, but says only: "Drucker content updated on production.") Thus, if any of the asserted '060 Patent claims are entitled to priority to the provisional application, the Drucker Report (Dep. Ex. 13) is not prior art to such claims under §102(b).

74.     Prior art under §102(b) must be in "**public** use" -- It is not clear that the report shown in Dep. Ex. 51 was ever made public – to the contrary, the attached email says it was "not public." (Dep. Ex. 51 at HG0179518.) Thus, it is my opinion that Dep. Ex. 51 does not constitute prior art under §102(b).

75.     Even if none of the asserted claims are entitled to priority to the provisional application, I understand that §102(b) does not apply to public uses that qualify as an "experimental use." A use or sale is experimental for purposes of §102(b) if it represents a

18

**EXHIBIT J**

bona fide effort to perfect the invention or to ascertain whether it will answer its intended purpose. If any commercial exploitation does occur, it must be merely incidental to the primary purpose of the experimentation to perfect the invention.  Here, the inventors testified that the Drucker Report (Dep. Ex. 13) was one of a kind, that it was a "prototype" and a "beta test" to determine whether the format for this report would work for its intended purpose.  (For example, Neal Dep. at pp. 224-226, 234, 252-253.)  The experimental nature of this prototype is confirmed by statements made in Dep. Ex. 51 at pp. HG0179519 ("We are very excited about getting the Rothman Institute into the HealthGrades Physician Marketing program. The WEB PRESENCE and PREMIUM PLACEMENT programs have exceeded all expectations for our beta clients. Unfortunately, the Rothman Institute missed the cut-off for inclusion in the **beta test** phase."); HG0179548 (discussing test results of prototype versus earlier version reports).

76.    <u>HG Reference 4c</u>:  "August 2005 Physician Quality Reports." Dep. Ex. 10 is a press release from Health Grades dated August 2, 2005 that describes a new version of physician quality reports that were "now being expanded" as of August 2005.  If any of the asserted '060 Patent claims are entitled to priority to the provisional application, the August 2005 Physician Quality Reports (as described in the press release) are too new to be considered prior art to such claims under §102(b).

77.    <u>HG Reference 5</u>:  "Physician Research Comparison Reports."  Dr. Cooper mentions these reports only once in his report and does not cite any documents nor testimony to otherwise explain what these reports are or when they were made public or offered for sale.  Thus, Dr. Cooper has not met his burden to demonstrate that these reports qualify as prior art under §102(b).

78.    <u>HG Reference 6</u>:  "Comparative Physician Report."  Dep. Ex. 21 appears to be a non-public prototype report and not something that would have been available to consumers.  Note the "Business Rule" annotations throughout the document, e.g., on HG0208987.  Note further the "Future: Customer Satisfaction Section with JD Powers survey results. Kerry?" annotation on the same page. These are not items that one would expect to find on a public Web page.  Thus, this exhibit does not appear to qualify as prior art under §102(b) because it does not show a "public" use.

79.    <u>HG Reference 9b</u>:  "Physician Online Services Phase II."  Dep. Ex. 27 is a one-page e-mail that states that the Physician Online Services application, Ver 1.0, was launched on May 25, 2004.  This e-mail also indicates that this service application is still a work in progress and that Phase II has not been released:

> We are starting to begin work on Phase II  that will allow physicians to provide expanded information about themselves. These new data elements will enable HealthGrades to provide consumers more information about physicians. Stay tuned!!

Dep. Ex. 26 is an e-mail dated May 11, 2004 that relates to a concept for phase II of the physician online services application.  It indicates that work has not yet begun on this phase:

**EXHIBIT J**

> Can you review and critique this **rough cut** of fields/content we want to collect on physicians? We covered this last week and I want to make sure we get this list correct and finalized <mark>before we start working these items.</mark> These items represent the data we want to collect to give consumers more information about their physicians. We are trying to fast track this project, so a quick response is desired!

Dr. Cooper does not state, nor cite to any evidence, to show when Phase II was first finished, let alone publicly used or offered for sale.  Thus, Dr. Cooper has not met his burden of proof to show that Physician Online Services Phase II qualifies as prior art under §102(b).

80.     <u>HG Reference 11</u>:  "Physician New Marketing Media."  Dr. Cooper cites to Dep. Ex. 51, which does discuss this product.  Regarding this product, Dr. Cooper states:

> Defendant's deposition Exhibit 51 describes a letter by John Neal in which Mr. Neal offers enhanced services for providers to prospective customer Lauren Deritis for membership in the Health Grades web site at a fee.  See also Defendant's deposition Exhibit 50.
>
> See also Dodge deposition page 133 and Montroy deposition pages 112-114 and pages 139-140.  Hicks deposition pages 49-52 is also relevant.  Therefore this marketing media was available in 2004-2005 and allowed physicians to have enhanced features and services by paying a fee.

(Cooper Report at ¶52, p. 22.)  Dep. Ex. 51 includes a series of e-mails to and from inventor John Neal, all dated March 22, 2005, with an attached and undated PowerPoint presentation entitled "Physician New Marketing Media," which Mr. Neal notes is not public:

> <mark>I have one request.  Please protect the confidentiality of this email and the associated attachment as the information is highly proprietary and non-public.</mark>

If any of the asserted '060 Patent claims are entitled to priority to the provisional application, the Physician New Marketing Media product as described in Dep. Ex. 51 is too new to be considered prior art to such claims under §102(b).

### G.   <u>None of the "Early HG Reports and Services" Included Every Element of Any of the Asserted Claims</u>

81.     As mentioned above, invalidity under §102, also known as anticipation, requires that a single reference disclose all of the elements of an asserted claim.  As described below, Dr. Cooper does not even allege that this is the case for any of references he relies on for anticipation.

#### 1.   <u>HG Reference 1:  Health Grades Premium Reports</u>

82.     Dr. Cooper does not allege that these reports, whatever they may be, had all of the elements of any of the asserted claims.  Nor does he cite to any documents to show

**EXHIBIT J**

what elements these reports may have had at any given point in time.  Thus, Dr. Cooper has not met his burden to demonstrate that these reports anticipate any of the asserted claims.

## 2.  <u>HG Reference 2:  Drucker Prototype (Dep. Ex. 13)</u>

83.   Dr. Cooper's report does not specifically allege that the Drucker Report (Dep. Ex. 13), by itself, had all of the elements of claims 1 or 15.

84.   For example, he does not state that the Drucker Report had "comparison ratings of healthcare providers," which is literally required by all of the asserted claims.  I agree that it does not meet this claim limitation.  The Court construed this term to mean:

> ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

(Markman Order at p. 24.)  For purposes of these claims, a healthcare provider is a person, such as a physician, and not an entity, such as a hospital.  (Markman Order at p. 7.)  The Drucker prototype does not contain comparison ratings of multiple physicians.  Further, Mr. Neal testified that this report format was "one of a kind."  (See Neal Dep. at pp. 234:14-17.)  Dr. Cooper does not contend otherwise.  For this reason alone, the Drucker Report does not anticipate any of the asserted claims.

85.   Claim 4 requires:

> The method as defined in claim 1, wherein the healthcare provider report includes a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

Dr. Cooper alleges that the Drucker Report included this element, but he does not explain the basis for this opinion.  In any event, I disagree.  Although page MGHG000019 of the Drucker Report (Dep. Ex. 13) lists two affiliated hospitals, they are not hyperlinks. The hyperlinks in Dep. Ex. 13 have been rendered by the Web browser with underlined text. This is conventional. On MGHG000018, for example, the words "Map and Driving Directions" are underlined, indicating that they are a hyperlink to another page (presumably including a map). The "Affiliated Hospitals" listed on MGHG000019 are not underlined and therefore it is reasonable to concluded that they were not hyperlinks (compare to the "View Rating Methodologies" underlined hypertext link below the hospitals). Thus, for this additional reason, the Drucker Report does not anticipate claim 4.

86.   Claims 5, 6, and 7 require:

> 5. The method as defined in claim 1, wherein the access to the healthcare provider report is obtained through a predetermined Web page that provides search capabilities for a database comprised of healthcare provider information.

EXHIBIT J

6. The method as defined in claim 5, wherein the search capabilities permit a search based on one or more from the group consisting of: name, medical specialty, gender, state, city, procedure, diagnosis, procedure, and location criteria.

7. The method as defined in claim 6, wherein the search of the database produces a results list of one or more healthcare providers satisfying the search criteria, wherein the results list includes the first healthcare provider.

Dr. Cooper's report does not specifically allege that the Drucker Report (Dep. Ex. 13), by itself, met any of the limitations of these three claims. I agree that it does not. Thus, for this additional reason, the Drucker Report does not anticipate claims 5-7.

87.     Claim 8 requires:

The method as defined in claim 7, wherein the results list further includes an advertisement for the first healthcare provider with a hyperlink to information on the first healthcare provider.

Dr. Cooper's report does not specifically allege that the Drucker Report (Dep. Ex. 13), by itself, met these claim limitations. I agree that it does not. Thus, for this additional reason, the Drucker Report does not anticipate claim 8.

### 3.     <u>HG Reference 3:  Physician Quality Guides (Dep. Ex. 23)</u>

88.     Dr. Cooper's report does not specifically allege that the Physician Quality Guide, by itself, had all of the elements of any of the asserted claims. He mentions this reference only with regard to the sixth element of claim 1 and fifth element of claim 15, but does not even allege that this reference meets any of the specifics of these limitations, which include a report created using healthcare provider-verified information, patient-provided information, third party verified information, and a report that includes comparison ratings of healthcare providers. Specifically, Dr. Cooper states only:

> The web site was available over the internet and the reports were made available over the internet. See for example Montroy deposition page 320. See also Neal deposition pages 129 and 214. See also Defendant's deposition exhibit 23 and Montroy deposition pages 224-225 for the physician quality guide. See Montroy deposition pages 318-320. See also Defendant's deposition Exhibit 8 and Montroy deposition pages 259-264.

(Cooper Report at ¶45, p. 19)

89.     Dep. Ex. 23 does not specify the content of the physician quality guides or discuss any of the claim elements other than to state that the basic function of this report was to search for specific physician or compare physicians.

**EXHIBIT J**

**Physician Quality Guide Plan Rollout**

HealthGrades is accomplishing the objective of the Quality Guide modules for physicians by:
- Providing in-depth profiling, and
- Testing tool with consumers for usability.

| Phase Description | Detailed Description | What this accomplishes | Data Source | Estimated Completion Date |
|---|---|---|---|---|
| Basic functionality | Search for specific physician or compare physicians | Ability for user to find specific physician and compare this physician to others or find several physicians and compare those physicians. | GeoAccess | Completed |
| Add in-depth profiles | Faculty appointments, special expertise, etc. | Ability for user to find a specialist in a particular area of concern | American Board of Medical Specialties, | 3Q 2003 |
| Add search by medical condition | Medical conditions will be mapped to a specialist(s) | Ability for user to find specialists who treat their specific medical condition (e.g., thyroid disorder) and the Top Doctors who specialize in that medical condition | HealthGrades | Coming 2004 |

As such, it is my opinion that the physician quality guide as described in Dep. Ex. 23 does not anticipate any of the asserted claims.

4.   **HG Reference 4a:  2003 Physician Quality Report (Dep. Ex. 21 at HG208976-987)**

90.     Dr. Cooper's report does not specifically allege that the 2003 Physician Quality Report, by itself, had all of the elements of any of the asserted claims.  He cites this report only for claim 14 and only for the proposition that it related to physicians.

91.     Dep. Ex. 21 is missing most of the elements of the asserted claims.  This report appears to have been based only on information from third parties.  Health Grades witnesses confirmed this.  (See Dodge Dep. at pp. 202:08-203:07 (stating that Health Grades did not have the capability to collect physician-provided information until 2004).)  This report did not include physician-verified information, in fact, all of the information in the report came from third party sources.  It did not contain, patient-provided information, or comparison ratings of physicians.  It also did not include hyperlinks to affiliated hospitals as required by claim 4.  Dr. Cooper does not identify any documents to demonstrate that any of the additional elements of claims 5-8 were publicly used in connection with this report either.

92.     Further, the testimony from Health Grades was consistent that the physician quality reports as they existed in 2003 did not have the claimed physician-verified information, the claimed patient ratings, or the claimed healthcare provider report created using physician-verified information and patient-provided information.  The testimony was also clear that these reports, at this time, did not contain comparison ratings.  As such, it is

**EXHIBIT J**

my opinion that the 2003 Physician Quality Report as described in Dep. Ex. 21 does not anticipate any of the asserted claims.

### 5.   HG Reference 4b:  December 2004 Physician Quality Report (Dep. Ex. 8 at HG032086-2101)

93.     Dr. Cooper's report does not specifically allege that the 2004 Physician Quality Report, by itself, had all of the elements of any of the asserted claims.  He cites this report only for the third party verified information claim element of claims 1 and 15 and for an obviousness argument relating to comparison ratings (addressed below in the obviousness section).

94.     Dep. Ex. 8 at HG032086-2101 is missing most of the elements of the asserted claims.  This report also appears to have been based only on information from third parties. Health Grades witnesses confirmed this.  (See Dodge Dep. at p. 202:8-11.)  This report did not include physician-verified information, in fact, all of the information in the report came from third party sources.  This report also did not contain patient-provided information or comparison ratings of physicians. (Id.)  It also did not include hyperlinks to affiliated hospitals as required by claim 4.  Dr. Cooper does not identify any documents to demonstrate that any of the additional elements of claims 5-8 were publicly used in connection with this report either.

95.     Further, the testimony from Health Grades was consistent that the physician quality reports as they existed in 2004 did not have the claimed physician-verified information, the claimed patient ratings, or the claimed healthcare provider report created using physician-verified information and patient-provided information.  The testimony was also clear that these reports, at this time, did not contain comparison ratings.

96.     As such, it is my opinion that the 2004 Physician Quality Report as described in Dep. Ex. 8 does not anticipate any of the asserted claims.

### 6.   HG Reference 4c:  August 2005 Physician Quality Report (Dep. Ex. 10)

97.     Dr. Cooper's report does not specifically allege that the August 2005 Physician Quality Report (described in Dep. Ex. 10), by itself, had all of the elements of claims 1 or 15.

98.     For example, he does not state that the August 2005 Physician Quality Report had "comparison ratings of healthcare providers," which is literally required by all of the asserted claims.  I agree that it does not meet this claim limitation.  Further, Health Grades employees testified that comparison ratings were not added to these reports at least until 2006.  (See Dodge Dep. at pp. 72:18-73:02; 88:15-20 .)  For this reason alone, the August 2005 Physician Quality Report does not anticipate any of the asserted claims.

EXHIBIT J

99.     Claim 4 requires:

The method as defined in claim 1, wherein the healthcare provider report includes a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

Dr. Cooper's report does not specifically allege that August 2005 Physician Quality Report, by itself, met any of the limitations of this three claim.  Thus, for this additional reason, this report (as described in Ex. 10) does not anticipate claim 4.

100.    Claims 5, 6, and 7 require:

5. The method as defined in claim 1, wherein the access to the healthcare provider report is obtained through a predetermined Web page that provides search capabilities for a database comprised of healthcare provider information.

6. The method as defined in claim 5, wherein the search capabilities permit a search based on one or more from the group consisting of: name, medical specialty, gender, state, city, procedure, diagnosis, procedure, and location criteria.

7. The method as defined in claim 6, wherein the search of the database produces a results list of one or more healthcare providers satisfying the search criteria, wherein the results list includes the first healthcare provider.

Dr. Cooper's report does not specifically allege that the August 2005 Physician Quality Report, by itself, met any of the limitations of these three claims.  Thus, for this additional reason, the August 2005 Physician Quality Report does not anticipate claims 5-7.

101.    Claim 8 requires:

The method as defined in claim 7, wherein the results list further includes an advertisement for the first healthcare provider with a hyperlink to information on the first healthcare provider.

Dr. Cooper's report does not specifically allege that the August 2005 Physician Quality Report (as described in Dep. Ex. 10), by itself, met these claim limitations.  I agree that it does not.  Thus, for this additional reason, the August 2005 Physician Quality Report does not anticipate claim 8.

## 7.    HG Reference 5:  Physician Research Comparison Reports

102.    Dr. Cooper does not allege that these reports, whatever they may be, had all of the elements of any of the asserted claims.  Nor does he cite to any documents to show

**EXHIBIT J**

what elements these reports may have had at any given point in time.  Thus, Dr. Cooper has not met his burden to demonstrate that these reports anticipate any of the asserted claims.

**8.**    **HG Reference 6:  Comparative Physician Report (Dep. Ex. 21 at HG208987-9000)**

103.     Dr. Cooper's report does not specifically allege that the Comparative Physician Report, by itself, had all of the elements of any of the asserted claims.  He does not cite this report for any of the specific claim elements.

104.     Dep. Ex. 21 at HG208987-9000 is missing most of the elements of the asserted claims.  This report appears to have been based only on information from third parties.  Health Grades witnesses confirmed this. (See Dodge Dep. at p. 166:23-25.)  This report did not include physician-verified information, in fact, all of the information in the report came from third party sources.  This report did not have patient-provided information or comparison ratings of physicians. (Id.)  It also did not include hyperlinks to affiliated hospitals as required by claim 4.  Dr. Cooper does not identify any documents to demonstrate that any of the additional elements of claims 5-8 were publicly used in connection with this report either.

105.     As such, it is my opinion that the Comparative Physician Report as described in Dep. Ex. 21 does not anticipate any of the asserted claims.

**9.**    **HG Reference 7:  Physician Quality Comparison Reports (Dep. Ex. 8 at HG032062-2085)**

106.     Dr. Cooper's report does not specifically allege that the Physician Quality Comparison Report, by itself, had all of the elements of any of the asserted claims.  He does not cite this specific report for any of the claim elements.

107.     Dep. Ex. 8 at HG032062-2085 is missing most of the elements of the asserted claims.   This report appears to have been based only on information from third parties.  Health Grades witnesses confirmed this.  (See Neal Dep. at p. 115:3-17.)  This report did not include physician-verified information, in fact, all of the information in the report came from third party sources.  This report also did not contain patient-provided information or comparison ratings of physicians. (Id.)  It also did not include hyperlinks to affiliated hospitals as required by claim 4.  Dr. Cooper does not identify any documents to demonstrate that any of the additional elements of claims 5-8 were publicly used in connection with this report either.

108.     As such, it is my opinion that the Physician Quality Comparison Reports as described in Dep. Ex. 8 does not anticipate any of the asserted claims.

EXHIBIT J

**10.   HG Reference 8a:  Nursing Home Quality Comparison Report (Dep. Ex. 8 at HG032037-2051)**

109.     Dr. Cooper's report does not specifically allege that the Nursing Home Quality Comparison Report, by itself, had all of the elements of any of the asserted claims.  He does not cite this specific report for any of the claim elements.

110.     Dep. Ex. 8 at HG032037-2051 does not disclose any of the elements of the asserted claims.  All of the claims require a "request for information regarding a first healthcare provider."  The Court defined "first healthcare provider" to mean:

> a particular healthcare provider about whom information is requested and a report is produced.

(Markman Order at p. 23.)  The Court also noted that a "healthcare provider" refers to a person, not an entity.  (Markman Order at p. 7.)  This report does not mention human healthcare providers at all – it is limited to entities, i.e., nursing homes.   Therefore, it does not disclose, and cannot disclose, a request for information as required by the claims.  This report does not include healthcare provider–verified information and specifically does not include any of the following: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies.  These fields are specific to people, this report relates to an entity.  The report does not include patient-provided ratings.  While there does appear to be information verified by third parties, it is not the kind required by the claims (i.e., board certifications, medical school, residency, internship, and fellowship information).  Additionally, this report does not have comparison ratings of healthcare providers, which the court defined as:

> ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

(Markman Order at p. 24.)  Again, this report related to nursing homes and did not have any physician comparison ratings or other comparison ratings of any human healthcare providers.  For the same reasons, this report did not disclose any of the elements of the dependent claims that are asserted in this case.

111.     As such, it is my opinion that the Nursing Home Quality Comparison Report as described in Dep. Ex. 8 does not anticipate any of the asserted claims.

**EXHIBIT J**

11.   **HG Reference 8b:  Nursing Home Quality Report (Dep. Ex. 8 at HG032052-2061)**

112.    Dr. Cooper's report does not specifically allege that the Nursing Home Quality Report, by itself, had all of the elements of any of the asserted claims.  He does not cite this specific report for any of the claim elements.

113.    Dep. Ex. 8 at HG032052-2061 is missing most, if not all, of the elements of the asserted claims.  All of the claims require a "request for information regarding a first healthcare provider."  The Court defined "first healthcare provider" to mean:

> a particular healthcare provider about whom information is requested and a report is produced.

(Markman Order at p. 23.)  The Court also noted that a "healthcare provider" refers to a person, not an entity.  (Markman Order at p. 7.)  This report does not mention human healthcare providers at all – it is limited to entities, i.e., nursing homes.   Therefore, it does not disclose, and cannot disclose, a request for information as required by the claims.  This report does not include healthcare provider–verified information and specifically does not include  any of the following: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies.  These fields are specific to people, this report relates to an entity.  The report does not include patient-provided ratings.  While there does appear to be information verified by third parties, it is not the kind required by the claims (i.e., board certifications, medical school, residency, internship, and fellowship information).  Additionally, this report does not have comparison ratings of healthcare providers, which the court defined as:

> ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

(Markman Order at p. 24.)  Again, this report related to nursing homes and did not have any physician comparison ratings or other comparison ratings of any human healthcare providers.  For the same reasons, this report did not disclose any of the elements of the dependent claims that are asserted in this case.

114.    As such, it is my opinion that the Nursing Home Quality Reports as described in Dep. Ex. 8 does not anticipate any of the asserted claims.

EXHIBIT J

### 12.   HG Reference 9a and 9b:  Physician Online Services Phases I and II

115.     Dr. Cooper's report does not specifically allege that the Physician Online Services Phase I, by itself, or the Physician Online Services Phase II, by itself, had all of the elements of any of the asserted claims.  Rather, he again tries to lump these two different applications together as one reference and argues that they allowed physicians to update their own data within Health Grades' physician database:

> Health Grades began their Physician Online Services in May, 2004.  Defendant's deposition Exhibits 27 and 28, and Montroy deposition at page 245-251 provide more information in support of this conclusion that the alleged invention was publicly available as early as May, 2004.  The intent of the Physician Online Services was to give physicians the ability to review and edit their data.  Dodge deposition page 80 confirms that this capability was intended for physician use at that early date.  These changes were implemented in the Health Grades reports easily early enough to constitute prior art.  See Defendant's deposition Exhibit 28, Montroy deposition page 202, 250-251 and Neal deposition page 206-209.  See Defendant's deposition Exhibit 26.

(Cooper Report at ¶42, p. 13.)

116.     However, Dr. Cooper at least implicitly acknowledges, and the witnesses testified, that this product did not create physician reports, let alone create physician reports with all of the required claim limitations.

117.     Dep. Ex. 27 is a one-page e-mail that states that the Physician Online Services application, Ver 1.0, was launched on May 25, 2004.  Regarding the details of the actual service, this e-mail states: "This application allows physicians and office administrators to correct, add, or delete information on a physician profile."  It does not state what information specifically can be added, corrected, or changed.  It does not state what "profiles" it is referring to.  It does not otherwise mention or disclose any of the other claim elements of any of the asserted claims.  This e-mail also indicates that this service application is still a work in progress and that Phase II has not been released:

> We are starting to begin work on Phase II  that will allow physicians to provide expanded information about themselves.  These new data elements will enable HealthGrades to provide consumers more information about physicians. Stay tuned!!

118.     Dep. Ex. 28 is a one-page e-mail dated May 26, 2004 relating to a complaint from a physician that his "profile" is inaccurate.  The main subject of the discussion is whether to include non-affiliated hospitals in physician profiles.  Regarding the "POS" system, it says:  "I offered to correct him for it. He said he would correct it himself."  This e-mail does not state what information specifically can be added, corrected, or changed.  It does not state what "profiles" it is referring to.  It does not otherwise mention or disclose any of the other claim elements of any of the asserted claims.

**EXHIBIT J**

119.     Dep. Ex. 26 is an e-mail dated May 11, 2004 that relates to a concept for phase II of the physician online services application.  It indicates that work has not yet begun on this phase:

Can you review and critique this **rough cut** of fields/content we want to collect on physicians? We covered this last week and I want to make sure we get this list correct and finalized before we start working these items. These items represent the data we want to collect to give consumers more information about their physicians. We are trying to fast track this project, so a quick response is desired!

120.     Many of the fields of physician-verified information from claims 1 and 15 are included in the list of information that has not yet been started for Phase II:

**Physician Fields**
Introduction
Personal statement / philosophy
Awards and honors
Professional distinctions
Group/hospital/academic appointments
Media
    TV
    Radio
Research and publications
Professional affiliations
Committees
Professional interest
Special projects
Special certification
Payment methods
Area of expertise
    Conditions
    Treatments
Educational mappings to specialty.
Procedure information
    Volume
    Type
Special procedures
Access to physician extender (nurse)?
Physicians that you share call with? (is this more related to setting up the group information?)
Full admitting privileges at affiliated hospital
Admit own patients to hospitals?
Accepting new patients (is this a physician/group/location field?)
Avg time for new patient appointment (is this a physician/group/location field?)
Avg wait time for schd/urgent appoint (is this a physician/group/location field?)
Surgery center affiliations (we need ability to add/map to a surgery center)
Email address
Can patients communicate to you via e-mail ?

(are there other physician items to capture??)

121.     Thus, this e-mail seems to indicate that Phase I of physician online services did not offer physicians the ability to change these fields.

122.     As such, it is my opinion that neither Phase 1 of the Physician Online Services application nor Phase II of this product anticipates any of the asserted claims.

**EXHIBIT J**

### 12.   **HG Reference 10:  "Connecting Point"**

123.     Dr. Cooper's report does not specifically allege that the Connecting Point product, by itself, had all of the elements of any of the asserted claims.  He cites this report only for claim 8:

> The Health Grades early Connecting Point launched in 2005 had physicians showing up in advertisements in search results including hyperlinks to the health care provider information. See Dodge deposition pages 56, 130-134.  See also the web advertisement at HG0179534.

(Cooper Report at ¶51, p. 21.)  Even if this product met all of the limitations of claim 8, claim 8 depends from claims 1, 5, 6, and 7.  Dr. Cooper does not state that this report contained all of the elements of the claims to which claim 8 depends.  Thus, it is my opinion that that the Connecting Point Product does not anticipate any of the asserted claims.

### 13.   **HG Reference 11:  "Physician New Marketing Media."**

124.     Dr. Cooper's report does not specifically allege that the Physician New Marketing Media product, by itself, had all of the elements of any of the asserted claims.  He cites this report only for claim 9, which requires:

> 9. The method as defined in claim 7, further comprising: determining from the results list whether a particular healthcare provider is a member of the company managing the Web site; and if the particular healthcare provider is a member of the company managing the Web site, providing enhanced services for the member healthcare provider on the Web site.

Even if this product met all of the limitations of claim 9, claim 9 depends from claims 1, 5, 6, and 7.  Dr. Cooper does not state that this report contained all of the elements of the claims to which claim 8 depends..  Thus, it is my opinion that that the Physician New Marketing Media product does not anticipate any of the asserted claims.

### 14.   **Patient Ratings**

125.     The Cooper Report states:

> Health Grades started collecting patient-provided information at least as early as May, 2004. Neal deposition page 167 and Defendant's deposition Exhibit 47 confirm this conclusion. Defendant's deposition Exhibit 47 is an email from Dave Hicks, May 7, 2004 which states that the survey is being launched on the web site.  See also Montroy deposition pages 229-230. Defendant's deposition Exhibit 29 and Neal deposition page 169 also support this conclusion. This also shows that the prior report purchasers were sent by email knowledge of these patient surveys.  Defendant's deposition Exhibit 48 and Neal deposition page 174-178 show that they were collecting on average over one hundred survey results every day.  Reference Defendant's

**EXHIBIT J**

deposition Exhibit 49 and Neal deposition page 179 and Dodge deposition page 167. Montroy deposition page 47 further confirms that patient ratings were collected with the surveys. Montroy deposition page 253 confirms the email to past customers and solicited them for input as well. Montroy deposition page 312-314 states that providers received patient provided information well prior to February, 2006 and that the company web site provided that information.

(Cooper Report at ¶126, pp. 15-16.) Even assuming Health Grades started collecting survey data in 2004, there is no evidence that Health Grades used any of these patient surveys to create a healthcare provider report before the February 8, 2005 §102(b) date. As Inventor Scott Montroy explained, Health Grades had to collect a certain amount of survey data before it began to use this data to create physician reports. (See Montroy Dep. at p. 231:22-23 (testifying about how Health Grades had to collect a certain amount of survey data before it could publish it: "Because there was like kind of a chicken and the egg thing where I think we had to get so much data before we could figure out how to publish it, and I can't remember the specifics that, so . . . .")).

### H.   None of the "Early HG Reports and Services" Render Obvious Any of the Asserted Claims

126.    As detailed above, invalidity under §103 or obviousness requires that a combination of prior art references collectively teach all of the elements of each of the asserted claims and further requires that there be a reason to combine the references necessary to disclose each element.

127.    Dr. Cooper's report mentions obviousness only at a high level. In fact, the following excerpts include every mention of obviousness in Dr. Copper's 40 page report:

27. Based on my review of the '060 patent and file history, and from my knowledge and experience with the technology at issue, a person of ordinary skill in the art at the time of the alleged invention (Posita) would be at least a bachelor's degree in computer science from an accredited college, with at least several years experience in developing web sites and database applications linked together in a web site, and also having significant experience in the health care area. I base this opinion on the levels of education and experience of those creating the web sites at issue in this litigation and the deposition testimony of the inventors and generally from my own overall experience in this area. The person of ordinary skill in the art at the time of the alleged invention, in my opinion, would have found these claims to be anticipated or obvious, and not novel inventions.

Even if the element were not anticipated, the idea of comparison ratings of health care providers was disclosed in these documents, and comparisons of line items in database reports have been used to rank retrieved records for decades, and so this use of comparison ratings for this purpose would have been extremely obvious to a Posita.

****

EXHIBIT J

The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers.  It would be <mark>obvious</mark> to a Posita that ratings of other physicians would be a natural addition to the report.

(Cooper Report at ¶45, p. 18.)

In conclusion, this claim limitation seems to have been clearly anticipated by Health Grades' own Early Reports and Services.  <mark>At the very least, comparison ratings of health care provider hospitals were shown in the Early HG Reports and Services, thus making it extremely obvious to a Posita that the same could be done with patient ratings of physicians.</mark>

(Cooper Report at ¶¶45, 61, pp. 19, 33.)

Therefore, the '060.8 claim is invalid due to both anticipation and <mark>obviousness</mark>, in my opinion.

At the least, the '060.8 claim would have been <mark>obvious</mark> to a Posita because advertisements like this and their benefits were also well known in other art.  See Invalidity Contentions, including U.S. Patent Application Publication No. US 2006/0294138 A1, page 5 and Figure 7, for example.

(Cooper Report at ¶51, p. 22.)

Even if the element were not anticipated, the idea of comparison ratings of health care providers was disclosed in these documents, and comparisons of line items in database reports have been used to rank retrieved records for decades, <mark>this use of comparison ratings for this purpose would have been extremely obvious to a Posita.</mark>

**** 

The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers.  It would be <mark>obvious</mark> to a Posita that ratings of other physicians would be a natural addition to the report.

(Cooper Report at ¶61, p. 32.)

64.  I have considered Health Grades' alleged evidence of secondary considerations, and find nothing that would alter my views above.  First, there appears to be complete anticipation, and secondary considerations cannot alter that fact.  <mark>Second, the obviousness case is so strong, that no amount of secondary considerations would overcome it in my view.</mark>  Third, there was nothing in the alleged secondary considerations in Health Grades' response to interrogatory 4 that was tied to the patent claims, and Health Grades has provided no evidence of this required nexus.  There is also nothing in these alleged secondary considerations that would not also be true of the prior art.  Even the alleged commercial success uses sales of the prior art, and Health Grades presents no evidence that any increase in sales was a result of the patent claims rather than features found in the prior art or other factors.  If Health Grades is allowed to provide additional evidence, I reserve the right to address that in more detail.

(Cooper Report at ¶64, p. 36.)

EXHIBIT J

> 84      After conducting the methodology described in this report, and analyzing the claim elements, I have determined that all the asserted claims of the '060 patent are anticipated, or at the very least would have been obvious to a Posita, and therefore all these claims should be held invalid.

(Cooper Report at ¶84, p. 40.)

128.    As previously noted, the Health Grades site, including the features disclosed in the '060 Patent, could have been built and launched in 1994 (e.g., I could have built it myself using the server and database management system that I used to create the Boston Children's Hospital medical record site). Yet, there is no evidence that anyone conceived of the claimed invention until Health Grades did in 2005. Since then, Health Grades' physician on-line information systems have had tremendous success with users and tremendous commercial success. If it had been obvious to build and launch, someone would have built and launched it in the mid-1990s. In my experience as a Web publisher, e.g., operating the photo.net online community from 1993 through 2007, it has typically been necessary to work with users and customers for a period of years before coming up with the best way to operate an Internet application. The history of Health Grades and the '060 Patent is consistent with my personal experience.

129.    Dr. Cooper does not clearly state or identify any specific combination of references that would render the claims obvious. Even if one assumes he intended to combine *all* of the 13 references listed above, Dr. Cooper does not disclose any reasons for combining all of these references or any of the references. For this reason alone, it is my opinion that Dr. Cooper has failed to meet his burden to show that any of the claims are obvious.

130.    Even if I ignore Dr. Cooper's failure to identify a combination of references, and I assume Dr. Cooper intended to combine all of the references, and I ignore Dr. Cooper's failure to explain why one would make such a combination, Dr. Cooper's obviousness opinion fails because a combination of all of the 13 Health Grades references does not teach all of the elements of any of the asserted claims.

131.    For example, none of the references identified by Dr. Cooper disclose the claimed "healthcare provider report . . . includes comparison ratings of healthcare providers." Dr. Cooper does not use or mention the Court's construction of this term, but I understand a legally correct analysis requires consideration of this construction. The court construed this term to mean:

> ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

(Markman Order at p. 24.) The Court further defined "first healthcare provider" to mean:

**EXHIBIT J**

a particular healthcare provider about whom information is requested and a report is produced.

(Markman Order at p. 23.)  The Court also noted that a "healthcare provider" refers to a person, not an entity.  (Markman Order at p. 7.)

132.    Regarding this claim element, Dr. Cooper states:

> The specific use of comparison ratings has also been found in prior art materials, as described below.  The testimony of Mr. Dodge, when combined with other evidence, also indicates that comparison ratings were in the Early HG Reports and Services early enough to be prior art.  Therefore, this claim element is also anticipated.

(Cooper Report at ¶45, p. 18.)  As mentioned above, I am informed that oral testimony alone is not legally sufficient to invalidate a patent claim.  Dr. Cooper must be able to cite to corroborating evidence.  This paragraph does not cite to any documents to demonstrate the disclosure of comparison ratings of healthcare providers as construed by the Court.

133.    In the very next paragraph, Dr. Cooper states:

> Even if the element were not anticipated, the idea of comparison ratings of health care providers was disclosed in these documents, and comparisons of line items in database reports have been used to rank retrieved records for decades, and so this use of comparison ratings for this purpose would have been extremely obvious to a Posita.
>
> Therefore a Posita would have understood the material without first reading the patent specification or the claims.

(Cooper Report at ¶45, p. 18.)  This paragraph does not cite to any documents to demonstrate the disclosure of comparison ratings of healthcare providers as construed by the Court.  It does not allege and does not cite any of the specific Health Grades references as disclosing this element.  It is unclear to me why Dr. Cooper discusses ranking line items in database reports – this is neither required by the literal language of this claim element nor the Court's construction of this element.

134.    Dr. Cooper attempts to rely on the testimony of Alan Dodge to prove that Health Grades publicly used comparison ratings of physicians before the §102(b) date (either February 8, 2005 or August 26, 2005 depending on priority):

EXHIBIT J

Supporting my conclusion that this claim element is anticipated is the deposition testimony of Mr. Dodge.  He testified that comparison ratings of physicians were added to reports at least as early as 2006 (see pages 72-73).  But Mr. Dodge did not state exactly what date in 2006 they were first made available on the web site, and at his deposition he was unsure of when comparison ratings were first used.  But based on Mr. Dodge's testimony on other claim elements, it seems clear that the comparison ratings on physicians were actually released before 2006.  For example, Mr. Dodge testified that patient ratings did not enter the reports until 2006 (the same year he said comparison ratings were first used), yet attorneys for MDx were able to elicit testimony and show evidence that patient ratings were made available as early as 2004. Since Health Grades' web site had hospital ratings well prior to 2006, and were showing them in

comparison format, it stands to reason that they would have done the same thing with patient ratings.  This is further supported by the fact that Mr. Dodge testified that to his recollection patient ratings and comparison ratings were first used in the same year; he was just wrong about the year when he testified he recalled 2006.

(Cooper Report at ¶45, pp. 18-19.)  Mr. Dodge testified that comparison ratings of physicians were not publicly used until 2006, which is after the §102(b) date.  To counter this, Dr. Cooper concludes that Mr. Dodge's memory must be "just wrong about the year when he testified he recalled 2006."  Whether Mr. Dodge's memory was right or wrong does not matter because as I understand it, MDx and Dr. Cooper need documents to prove invalidity.  Human memory is imperfect – this is, I am informed, one of the reasons why the law requires documentary corroboration to prove invalidity.  Dr. Cooper does not cite a single document that shows when Health Grades first used comparison ratings of physicians in a physician report – he certainly does not cite to a document that shows this use occurred before 2005, let alone 2006.

135.    Recognizing that there are no documents, or even oral testimony, to show that Health Grades publicly used comparison ratings of physicians in a physician report before the 2005, Dr. Cooper next states:

The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers.  It would be obvious to a Posita that ratings of other physicians would be a natural addition to the report.

See also Neal deposition pages 153-154.  Dodge deposition pages 200-201 also supports concluding that this claim element was known.  Dodge deposition pages 225-226 again confirms the claim element was known prior to the filing date.  Defendant's deposition Exhibit 8 is also relevant.  These items of evidence clearly demonstrate that the concept of having provider information and ratings available to prospective patients had been practiced in a way that the ratings could be compared.  Even if hospital ratings do not meet the claim language literally, there are plain and clear teachings that any Posita would understand that ratings of health care providers could be shown side by side for comparison purposes, and these documents provide the motivation to do so.

(Cooper Report at ¶45, p. 18.)  He does not state which Early HG Reports and Services show ratings of hospitals – but this does not matter, because the claimed comparison ratings must be of people, e.g. physicians, not hospitals.  (Markman Order at p. 7.)  Again Dr.

EXHIBIT J

Cooper cites oral testimony, but no corroborating documentary evidence to show any kinds of physician ratings.  Although he mentions Dep. Ex. 8 as being "relevant," he does not state why this is so.  Dep. Ex. 8 includes multiple kinds of different reports, several of which are nursing home reports.  These do not mention physicians at all.  Dep. Ex. 8 has physician reports too, but they are missing many claim elements (e.g., physician-verified content, patient ratings, and comparison ratings of physicians).

136.    If Dr. Cooper's argument is that the prior art included hospital reports with hospital ratings that could be compared, and therefore it would have been obvious to create physician reports with physician ratings, I disagree.

137.    First, the nursing home reports in Dep. Ex. 8 do not have any of the elements of the asserted claims.  They are fundamentally different from physician reports.  For example, the Nursing Home Quality Comparison Report included the following sections:

To assist you in making the best choice possible, HealthGrades has compiled information from state inspections and complaint investigations. The information is arranged in seven (7) sections. The sections are:

1.  HealthGrades' Star Rating
2.  State Inspections (also known as state surveys for nursing home licensure)
3.  Complaint Investigations (as reported to the state agency)
4.  Repeating Problems
5.  Information About the Nursing Home
6.  Interview Tips
7.  Nursing Home Directory

(Dep. Ex. 8 at p. HG032037.)  The Star Rating was based on the following:



Nursing homes are rated by HealthGrades based upon their performance in inspections and complaint investigations. Each nursing home receives an overall score from HealthGrades.

These reports did not have any information received from the nursing homes and did not have any patient provided ratings.

138.    Additionally, it was not obvious at this time to include comparison ratings for physicians.  To the contrary, there was a lot of skepticism in the industry at this time – it was thought that rating physicians was a terrible idea.  This is confirmed by MDx's own employee, Jeff LaPointe, who developed a similar information system in 2004:

EXHIBIT J

19    Q      Okay.  What's missing from what
20  UCompare does, such that you feel comfortable that
21  UCompare doesn't violate the patent?
22    **A      Off the top of my head, I don't**
23  **remember anything.  But I believe one of the**
24  **specific pieces had to do with user-generated**
25  **content.**

Page  73

1    Q      User-generated content?
2    **A      Correct.**
3    Q      Okay.  UCompare doesn't have that?
4    **A      No, we don't.**
5    Q      So, meaning that potential patients
6  looking for healthcare provider information do not
7  get to provide any content --
8    **A      No.**
9    Q      -- to UCompare?
10    **A      No, not in -- certainly not in context**
11  **of this, from what I understand.**
12    Q      Okay.  What is your understanding of,
13  using your words, what user-generated content is?
14    **A      Content displayed on the website that**
15  **is, you know, typically written by the user; user**
16  **opinions, that sort of thing.**
17    Q      And a user of what?
18    **A      I'm sorry, user of -- a consumer of**
19  **the website.**
20    Q      When you say "a consumer of the
21  website," you mean a consumer of the UCompare
22  website, right?
23    **A      Correct.**
24    Q      And is another way to say "consumer of
25  a UCompare website," is that a potential patient?

EXHIBIT J

Page 76

1  BY MR. VAZQUEZ:
2    Q    Okay.  Thanks.
3         Getting back to your testimony about
4  how UCompare's website does not include
5  user-generated content, why not?
6    A    **Several different reasons.  The latest**
7  **reason is pharmaceutical companies do not like --**
8  **several pharmaceutical companies do not like to**
9  **advertise on websites that contain user-generated**
10 **content, because the FDA has not yet ruled -- made a**
11 **ruling in terms of how they view it.  So, several of**
12 **them are very cautious about that.**
13       **It's a very difficult -- a very**
14 **difficult time for pharmaceutical companies to try**
15 **and get different marketing and advertising**
16 **campaigns and things approved, very strict process,**
17 **so they're very cautious about it.**
18   Q    Okay.  So, you mentioned there are
19 several reasons, and this is, I assume, one of the
20 several, but let me just get back and understand
21 what you just said.
22        UCompare relies on pharmaceutical
23 advertising for revenue?
24   A    **It's one revenue source.**
25   Q    And, so, if you had user-generated

39

**EXHIBIT J**

Page 77

1   content that was allowed on your website, that
2   revenue source may be less, or pharmaceutical
3   companies may not want to advertise on the UCompare
4   site?
5       A       Some, yes.
6       Q       What are the other reasons why you do
7   not allow user-generated content at the UCompare
8   site?
9       A       Another possible reason, we just don't
10  have the resources for it right now.  We can only --
11  we're still a small group and can only focus on so
12  many projects at one time.
13      Q       All right.  What other reasons?
14      A       Going -- mostly attached to resource
15  allocation issues.  I mean, we've never really been
16  an extremely well-funded business.  We never had the
17  time to do anything with it, you know, while we were
18  with the New York Times or About.com.  It's
19  something we had looked into, but it just never --
20  we haven't had time to do anything with it.
21      Q       Is it something you're considering if
22  you got a little more capital or better resources?
23      A       It's always been something on the list
24  of, you know, potential projects.
25      Q       What type of resources would you need

40

EXHIBIT J

```
                                            Page 78
 1   to do that?
 2       A      It would really depend on what else we
 3   were doing at the time.  But, I mean, I -- I pretty
 4   much run -- I still wear many, many hats, and I just
 5   can't -- user-generated content is something that
 6   you need to be, you know, very careful about.
 7       Again, it's something that often brings up something
 8   like litigation and such, because of comments people
 9   might make about doctors or other healthcare
10   providers.
11           I just don't have time to ensure that
12   we can put out -- we can put out a quality product
13   in terms of that and make sure that, you know, it
14   didn't cause more issues than it's worth right now.
15   I mean, we would really need to hire, for that and
16   other reasons, you know, more product and project
17   people, more engineers.  I mean, there's never
18   enough resources.
19       Q      What would make it worth it?
20           MR. MURRAY:  Object to form.  You can
21   answer.
22           THE WITNESS:  I mean, various things
23   could make it worth it, such as, you know,
24   having unique content for search engines.
25
```

139.    Inventor John Neal confirmed that there were reasons not to add comparison ratings of physicians into the physician reports:

```
14       Q      Did you ever see a comparative physician
15   report that did have comparison ratings of healthcare
16   providers?
17           MR. VAZQUEZ:  Form.
18       A      We -- per my prior comments, we were
19   sensitive to introducing anything in the way of
20   physician ratings to consumers because of the risk to
21   the business.  We didn't do that until much later.
```

(Neal Dep. at p. 97.)

EXHIBIT J

```
17        Q     Well, when was the -- when did you start
18    offering products and services that embodied or
19    employed the claim in the patent-in-suit?
20              MR. VAZQUEZ:  Form.
21        A     So you're talking about third-party
22    provided information, physician provided information,
23    consumer provided information, in providing a form of
24    comparison rating for those?
25        Q     (BY MR. STIMPSON)  I am.
```

```
1               CONFIDENTIAL - ATTORNEYS EYES ONLY
2         A     That was -- that would have been more
3     recently in the -- kind of the 2006, 2007 timeframe.
4         Q     Do you remember when, specifically when in
5     2006 and 2007?
6         A     I don't know exactly what dates in that
7     timeframe.  I can tell you the consideration that we
8     had and the sensitivity was, and the reason that we
9     didn't present that information to users of the
10    website is that our clients are hospitals, large
11    hospital systems.  And they have relationships with
12    physicians.
13              And there was the concern, the very real
14    concern, that anything we might do to shed light on
15    physicians or rate physicians, provide comparisons of
16    physicians based on quality, would put our revenue at
17    risk with our hospital clients.
18              So we're very thoughtful and judicious in
19    our approach as to when we introduced that and then
20    how we introduced it on the website.
```

(Neal Dep. at pp. 62-63.)

140.    Additionally, the secondary considerations of non-obviousness demonstrate that there is no obviousness of the asserted claims.  Dr. Cooper contests these facts arguing that there is no "nexus" to tie Health Grades' accolades and commercial success to the patent claims.  I disagree.  Health Grades' website has been extraordinarily successful as detailed in Health Grades' response to MDx's Interrogatory No. 4.  For example, I

**EXHIBIT J**

understand that Time Magazine selected Health Grades as one of the 50 Best Websites in 2011 relating specifically to its physician reports:



The Time Magazine clip above mentions many of the elements of the asserted claims.

141.    I understand that people have visited the Health Grades website more than 200 million times to find a doctor or hospital.

142.    The website is covered by at least the independent claims 1 and 15 as detailed in Exhibit E to Health Grades' infringement contentions (dated July 19, 2011).  I agree with, adopt, and incorporate this claim chart and analysis into my report.  Therefore,

EXHIBIT J

it is my opinion that there is a nexus between this success and the patent claims, and further, that this success demonstrates that the patent claims are not invalid as obvious.

## V. OPINION 4:  None of the Early HG Reports and Services Were Material to Patentability

143.     I am informed that inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent.  I understand that the law has recently been changed to make it more difficult to prove inequitable conduct because:

> Perhaps most importantly, the remedy for inequitable conduct is the "atomic bomb" of patent law.  Unlike validity defenses, which are claim specific, see 35 U.S.C. § 288, inequitable conduct regarding any single claim renders the entire patent unenforceable.

> With these far-reaching consequences, it is no wonder that charging inequitable conduct has become a common litigation tactic.  One study estimated that eighty percent of patent infringement cases included allegations of inequitable conduct. Inequitable conduct "has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system."  "[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps."

> While honesty at the PTO is essential, low standards for intent and materiality have inadvertently led to many unintended consequences, among them, increased adjudication cost and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased PTO backlog, and impaired patent quality. **This court now tightens the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public.**

*Therasense, Inc. v. Becton, Dickinson & Co.* (Fed. Cir. 2011) (emphasis added).

144.     I understand that to prevail on a claim of inequitable conduct, MDx must prove that Health Grades acted with the specific intent to deceive the Patent Office.  A finding that the misrepresentation or omission amounts to gross negligence or negligence under a "should have known" standard, does not satisfy this intent requirement.   In other words, MDx must prove by clear and convincing evidence that the inventors knew of the reference, knew that it was material, and made a deliberate decision to withhold it.

145.     Dr. Cooper does not offer an opinion on the intent element of inequitable conduct.

146.     I understand that MDx must also prove that the withheld references were material to patentability.  When an applicant fails to disclose prior art to the Patent Office,

**EXHIBIT J**

that prior art is but-for material if the Patent Office would not have allowed a claim had it been aware of the undisclosed prior art.  Hence, the issue is whether the Patent Office would have allowed the claim if it had been aware of the undisclosed reference.

147.     Dr. Cooper states that Health Grades did not disclose the Early HG Reports and Services to the Patent Office and states his opinion that:  "In my opinion, but for the failure of the inventors to disclose the Early HG Reports and Services to the Patent Office, none of these claims would have been allowed. This is demonstrated above using the clear and convincing evidence standard. It would have been even truer under the preponderance of evidence standard of the Patent Office."  (Cooper Report at ¶64, p. 36.)  I disagree for the reasons discussed above.  None of these references, by themselves, disclose all of the elements of any of the asserted claims.  Many of them do not even qualify as prior art under §102.  None of the references disclose a "healthcare provider report on the first healthcare provider . . . that includes comparison ratings of healthcare providers" which is required by all of the asserted claims.  Therefore, I do not believe that any of these references, had they been disclosed, would have caused the Patent Office not to allow the asserted claims.

148.     Dr. Cooper also states:  "I have also compared the Early HG Reports and Services prior art to the other prior art in the file history of the utility application. In my opinion, the Early HG Reports and Services prior art were much more relevant to the claims of the '060 patent than any of the prior art in the file history of the utility application."  (Cooper Report at ¶65, p. 36.)  He does not state what specific references he is referring to and does not explain why these undisclosed references are less relevant to patentability than the Health Grades references.

## VI.     OPINION 5:  There are No Acceptable Non-infringing Substitutes

149.     Dr. Cooper gives an opinion that many different websites are "acceptable substitutes to the accused HealthGrades.com website."  It is unclear what he means by the "accused HealthGrades.com website."  Health Grades' own website is not "accused" – it is a commercial embodiment of the asserted patent.

150.     It is also unclear why this opinion is relevant to any issue in this case.  I am informed that the law of patent damages does consider whether there is an "absence of acceptable, noninfringing substitutes."  The acceptability of such substitutes, I understand, is more a question of economics and market factors.  I am informed that this issue comprises both a demand-side consideration (substitute noninfringing products already on the market) and a supply-side consideration (substitute noninfringing technologies that the infringer could have used). Both of these considerations are primarily economic in nature and driven by market considerations.  Dr. Cooper does not explain why he has any expertise to offer an opinion on these economic factors.

151.     I understand that part of this consideration relates to whether the substitutes infringe or not.  If they infringe, then they cannot be considered an acceptable non-infringing substitute.

EXHIBIT J

152.     The Cooper Report lists the following web sites as "acceptable substitutes" for the HealthGrades.com site:

a.     ucomparehealthcare.com

b.     iTriage

c.     ratemds.com

d.     Doctor.com

e.     Doctors Dig

f.     ZocDoc

g.     Healpth

h.     Vimo

i.     Check MD

j.     Dr Score

k.     Physician Reports

l.     Find A Doc

m.     Suggest a Doctor

n.     Doctor Directory

o.     Healthcare.com

p.     Wellness.com

q.     Angie's List

153.     In paragraph 70, Dr. Cooper repeats that his intent was to evaluate sites "to identify whether they compete with Health Grades for business". Therefore I have interpreted "the accused HealthGrades.com website" in Dr. Cooper's report simply to mean "HealthGrades.com".

154.     For each of these sites, I will consider the questions "Does it infringe the '060 Patent?" and "To what extent is it a substitute for HealthGrades.com?" (at least from a technical perspective).

**ucomparehealthcare.com**

155.     I visited ucomparehealth.com and searched for cardiologists in Cambridge, Massachusetts. Although the site presented an option to "rate this doctor" with 1-5 stars, no existing ratings or any other information about doctors other than name and address were presented on the results page (shown below).

EXHIBIT J



www.ucomparehealthcare.com/drs/massachusetts/cardiologists/Cambridge.html

I selected the final three doctors and "compare" buttons appeared (shown below).

EXHIBIT J



I was ultimately offered a page showing the three doctors with a star rating based, apparently, purely on patient feedback (shown below).

**EXHIBIT J**



       The page showing the "profile" for a single doctor (shown below) provides some information about board certification, medical school, affiliated hospitals, and training, but I could not find any information on the site regarding the quality of the medical school, the affiliated hospital, or the training hospital.

EXHIBIT J



       As such this site may not be an acceptable substitute for healthgrades.com, which offers detailed comparisons of hospital departments against national averages, for example. Nor does ucomparehealth.com offer anything comparable to the "care philosophy" of http://www.healthgrades.com/physician/dr-barry-molk-y2583 or the "Healthgrades Recognized Doctors" designation.

EXHIBIT J

156.     Does ucomparehealthcare.com infringe the '060 Patent?  Probably.  The "healthcare provider report" required by Claim 1, for example, requires provider-verified information, patient-provided information, and third-party information. The page showing cardiologists in Cambridge, Massachusetts contains only the most basic information, such as the doctor's name and address, with no patient-provided ratings (only the opportunity to rate the doctor). The comparison report page shows what seems to be all of the information available from the ucomparehealthcare.com database on each doctor. It contains provider-verified information. I am not a physician and therefore was not able to see the complete range of profile editing options available to a doctor. However, it seems as though at least three of the fields listed in Claim 1 of the '060 Patent should be editable/verifiable. The report also shows information from third parties, such as whether or not the doctor is board-certified, where he or she attended medical school, and licensure (implicit in the fact that the doctor is available for view on the site at all and also in the "years in practice"). The same report shows a summary of patient-provided information in the form of an average star rating.

### iTriage

157.     For the reasons set forth in my previous report, the iTriage mobile phone/tablet application infringes the '060 Patent. Due partly to the design decisions made by the iTriage developers and publisher and due partly to the inherent limitations of mobile devices and mobile networks, the iTriage applications presents more limited information than the healthgrades.com conventional Web site. Consequently it will not be an acceptable substitute for many patients, though it might well be acceptable for a patient facing an emergency situation.

### ratemds.com

158.     I visited ratemds.com and searched for cardiologists in Cambridge, Massachusetts. A list of doctors was produced showing the number of ratings and an average rating for each. However, this report cannot meet the limitations of Claim 1 of the '060 Patent because there is no indication that it has been prepared using a combination of provider-verified information and third party information. The site appears to lack most of the elements of the healthgrades.com site that are specifically mentioned in the '060 Patent claims (e.g., board certification, medical philosophy, internship, residency, languages spoken, etc.).

159.     Due to the paucity of information on the site, this would not be an acceptable substitute for healthgrades.com for a patient interested in a comprehensive perspective on a doctor's training, awards, and ability to communicate in the patient's first language.

### doctor.com

160.     Doctor.com offers a page showing cardiologists in Cambridge that allows patients to see, for each doctor, an average patient rating, "DocPoints," whether or not the doctor is Board-certified, and whether or not the doctor accepts insurance. The DocPoints

EXHIBIT J

is not a comparison of physician quality or capability, but relates only to the completeness of the doctor's profile on the site.

161.     The site offers doctors the opportunity to edit a "personalized biography" and add awards to a profile. If it were completely functional, the site would seem to infringe the '060 Patent. However, a quick sampling of the site revealed enough data quality problems that it would not seem to be an acceptable substitute for healthgrades.com or any other authoritative site. For example, one of the first cardiologists listed in Cambridge, Massachusetts is Dr. Michael Kjelsberg. Although a cardiologist must complete a residency in order to practice, the page on Dr. Campbell lists "0" for "Year completed" and states that his board-certification is in internal medicine. The HealthGrades.com page on Dr. Kjelsberg states that Dr. Kjelsberg is board-certified in "interventional cardiology" and that Dr. Kjelsberg completed a fellowship at Brigham and Women's Hospital in 1998.

## Doctors Dig

162.     DoctorsDig has a database of doctors and is able to offer a "search by specialty". The site also can collect patient information. The site, on http://www.doctorsdig.com/for-doctors/ , says that doctors can edit their profile and add "an introduction", "licenses", "honors", etc. However, unless a doctor has typed it in, the site does not show any information regarding board certification and therefore seems to lack the "at least three required" information items from independent third-party sources. The site therefore may be non-infringing but it is not an acceptable substitute for patients seeking authoritative information regarding physicians.

## ZocDoc

163.     In the "About Us" page, the company states "ZocDoc is a free service that allows patients to book doctor appointments online." In other words, the site is engineered primarily to assist physicians and patients with the task of scheduling appointments. Comparison shopping for physicians is at best a secondary function of the site.

164.     In a search for cardiologists in Cambridge, just two doctors were listed, each with an associated patient rating (1-5 stars). However, no other information on each doctor is given beyond the doctor's name, address, and available appointment times.

165.     The second page of a report on a single doctor showed education, board-certification, languages spoken, and hospital affiliations. In terms of information verified by a physician, the site shows at a minimum a "professional statement". http://www.zocdoc.com/join/whyjoin displays a video in which a doctor discusses the extent to which it has been easy to contact the support staff at ZocDoc. Therefore I would conclude that physicians are able to verify any of the information on the site, including "medical philosophy", "languages", "specialty information", "professional appointments", and "professional memberships" (there is a specific subhead for "professional memberships" on the doctor's page). It is unclear that any of the information on the ZocDoc site was "verified by an independent third-party source", as required by Claim 1 of the '060

**EXHIBIT J**

Patent. Due to the fact that the site is intended for use by only those doctors who decide to turn over some of their appointment scheduling to ZocDoc, and those doctors pay a fee to ZocDoc (see the ZocDoc FaceSheet), there would be no business reason for ZocDoc to try to verify data provided by its actual customers and resolve any contradictions. It is not possible to determine from the public Web site whether or not the ZocDoc site infringes the '060 Patent.

166.     This site is not an acceptable substitute for healthgrades.com because it contains information on only those doctors who have chosen to use ZocDoc for patient scheduling. As such it does not allow a patient to compare doctors within a geographical area. A patient with a serious heart condition would not want to limit a search for cardiologists to only those who accept appointments via ZocDoc.

### Healpth

167.     The healpth.com site offers the ability to search for cardiologists in Cambridge, Massachusetts. It also shows comparison ratings, 1-5 stars. However, the profile for Dr. David Baron shows that his 5-star rating is "based in [sic] 0 reviews". The "Discussions" section of this doctor's profile shows information regarding "UFC 89" (Ultimate Fighting Championship), an unlikely hobby for a cardiologist) and a "Dr. David Baron" who is a psychiatrist at Temple University in Pennsylvania. The main profile page for this doctor offers a link to www.drdavidbaron.yourmd.com, but that link says "The website for this physician practice is no longer available. This site is not an acceptable substitute for vitals.com or a site practicing the claims of the '060 Patent because it displays information that seems to have been collected at random.

### Vimo

168.     The vimo.com site, at the top, says that it is "comparison shopping for health insurance".  Buried within the site is a search-for-physicians capability. A search for cardiologists in Cambridge brought up a page of names and addresses, with "view ratings" and "click for doctor's background" options next to each. It is eventually possible to find a bit more information on a particular doctor, such as gender, years in practice, and education, but users of the site are encouraged to visit the healthgrades.com site for more information about any given doctor. This part of the Vimo site says "Powered by HealthGrades".

### CheckMD

169.     The www.checkmd.com site redirects to terillion.com, a more general-purpose business reviewing system:

> As we gained experience in ecommerce and online marketing, we began doing more consulting. Eventually my partners and I bought a client-server software business from one of our consulting clients. The business specialized in finding "bad doctors" – as a Risk Mitigation practice for hospitals. We transitioned the clients to a web-

EXHIBIT J

based system (now referred to as SaaS) and then sold the business to the top player in the space.

Excellent funding partners then allowed us to combine our domain knowledge in healthcare with our cloud-based SaaS experience to launch a physician directory site called checkMD. As a "Top 5" site, we were perplexed when consumers literally bypassed physician data that had been aggregated from databases all over the country, to look at 2 or 3 anonymous reviews. Our concern was that critical decisions were being made on our web site, based on suspect data.

When our research led us to the conclusion that online reviews for customer-facing businesses sorely lacked credibility (including the reviews on checkMD), we set out to solve the problem. When we did, we built our reviews capture, verification and distribution system as a Platform as a Service (PaaS) offering in the cloud. Once we proved the model in healthcare, we changed our name to "Terillion" to meet the demand for the service in other industries." – Jon Black

170.     The CheckMD site does not seem to be available anymore. In any case, it is unclear that the purpose of the now-defunct CheckMD site was at all similar to HealthGrades.com. The goal of CheckMD was simply to enable patients to see if a doctor was "bad", not to help them choose among a group of good doctors to find the best.

171.     Due to the fact that the site is no longer live, it is not possible to determine whether or not it infringed the '060 Patent. Due to the fact that the site is no longer live, it is definitely not an acceptable substitute for the live HealthGrades.com site.

### DrScore

172.     The www.drscore.com site does not enable the standard search that I used with most of the other sites listed by Dr. Cooper. It is not possible to search for cardiologists in Cambridge, Massachusetts, for example. Due to this limitation alone, it is not an acceptable substitute for HealthGrades.com. A patient might have heard about a great doctor with a last name of "Smith", but a patient might also need to look for a cardiologist and not have any idea of a good doctor's name.

173.     I experimented with DrScore by searching for "Hoenig" in Massachusetts. This resulted in a page with four search results, showing an "overall rating" for each doctor. The ratings seem to be entirely user-submitted, however, and where no patients have rated a doctor the site displays "no rating data". http://www.drscore.com/Massachusetts/Surgery/Stephen-Hoenig_10380869.html says "Some information about Dr. Stephen Hoenig provided by Vitals.com." Thus the features of this site that meet any of the elements of Claim 1 of the '060 Patent may in fact simply be an alternative presentation of the same data offered by the vitals.com site.

174.     The site is not an acceptable substitute for HealthGrades.com due to the unpopularity of the DrScore service. For example, Dr. Stephen Hoenig's profile has just one rating. The other three "Hoenig" doctors in Massachusetts have none. Dr. Hoenig's rating is

EXHIBIT J

an absurdly low 2/10 because it seems that the system simply did not record "exam rating", "timeliness rating", "treatment rating" and now those are set to 0. The "overall staff rating" is 7/10 for this doctor, so it seems unlikely that a patient actually liked the doctor's staff but gave the doctor 0/10 for everything else.

175.    The site is not an acceptable substitute for HealthGrades.com due to the bugs in the software. For example, Dr. Stephen Hoenig's report offers the potential patient links to "Other Physicians Practicing Surgery in Concord, Massachusetts". One of these is Ralph Christy, Jr. His office is in Concord, North Carolina. From Concord, Massachusetts, Google Maps calculates Dr. Christy's office to be an 823-mile trip requiring 14 hours and 34 minutes.

176.    In my opinion, this site fails to meet the requirement of Claim 1 of the '060 Patent that the report that includes the ratings also include "provider-verified information". It is possible for a person or doctor to email regarding an inaccuracy, but it is just a generic email form without even a filled-in subject line (clicking the "inaccuracies with our profile of Dr. Stephen Hoenig" link just sends email to info@drscore.com and relies on the person emailing to be specific about which doctor's profile needs to be fixed; it is quite possible that the wrong doctor's profile would end up being edited).

**Physician Reports**

177.    www.physicianreports.com is an alias for the same IP address as www.healthgrades.com. It is an acceptable substitute for Health Grades in the sense that it is exactly the same site run by the same company and served by the same physical computers.

178.    Below is a record of a Unix shell session on the Project Athena cluster of computers at the Massachusetts Institute of Technology. The command "nslookup" was used to determine the IP address corresponding to the hostnames www.physicianreports.com and www.healthgrades.com.

```
dr-wily:~/email> nslookup www.physicianreports.com
Server:         127.0.0.1
Address:        127.0.0.1#53

Non-authoritative answer:
Name:   www.physicianreports.com
Address: 63.232.49.7

dr-wily:~/email> nslookup www.healthgrades.com
Server:         127.0.0.1
Address:        127.0.0.1#53

Non-authoritative answer:
Name:   www.healthgrades.com
Address: 63.232.49.7
```

EXHIBIT J

**Find a Doc**

179.    www.findadoc.com enables a search for cardiologists in Cambridge, Massachusetts. It found 10 doctors, nine of whom seem to be at the Mount Auburn hospital. The doctors were listed with their address and an "overall rating" as well as specialty/subspecialty.

180.    http://www.findadoc.com/doctors/Massachusetts/Cambridge/Cardiology/ 582284-Michael%20Andrew%20Kjelsberg.aspx was the top-rated doctor. He gets checkmarks in a bunch of different categories, e.g., Training (med school, residency) as well as Hospital Affiliation, Years of Experience, Doctor Endorsements. The site seems to be broken in that this doctor has 0 Doctor Endorsements and yet four checkmarks (out of five possible?) in a second "doctor endorsements" area underneath. There is a link for a doctor to "edit account".

181.    The site does not appear to be fully public or tested. In addition to some of the data errors and confusing presentations noted above, the text "This is Google ADS Test" appears near the bottom of most pages. The footer says "copyright 2008" (most active Web publishers would update this footer annually).

182.    The site is not an acceptable substitute for HealthGrades.com because it is not finished and does not appear to be maintained.

**Suggest a Doctor**

183.    www.suggestadoctor.com enables a search for cardiologists in Massachusetts, but requires a search of the whole state. This is not an acceptable substitute for HealthGrades.com because a patient from western Massachusetts would be encouraged to look at doctors who were in eastern Massachusetts, a two-hour drive away from home.

184.    In response to the cardiologists search, just two pages of doctors are returned, so it is not comprehensive. One would think that this was only those doctors who had been "suggested" by patients, but clicking on the first doctor (Thomas Sullivan), one finds that there are no suggestions for this doctor yet. The site is full of ads, which makes the authoritative information hard to find. There are no comparison ratings, just whether or not an address or personal Web site link is available. Dr. Sullivan is linked to http://www.suggestadoctor.com/gourl.php?tid=13688 and requesting that URL eventually results in a page saying that the site is not valid.

185.    The site footer says "Copyright 2006-2009". From this I infer that the site has not been actively maintained since approximately three years ago. This lack of maintenance is an additional reason that suggestadoctor.com is not an acceptable substitute for the actively maintained HealthGrades.com.

186.    Due to the overall lack of information on this site, I do not believe that it infringes the '060 Patent. The site is not an acceptable substitute for HealthGrades.com because it is not useful and does not appear to be maintained.

EXHIBIT J

## Doctor Directory

187.     www.doctordirectory.com enables a search for cardiologists in Cambridge, but only three results are returned. Plainly this is not a comprehensive site. There is no comparison rating of doctors shown, just whether or not a doctor has purchased an "enhanced listing". The page on an individual doctor is thin, with no indication of where a doctor attended medical school or completed residency. There is no ability for a patient to rate a doctor and no patient-provided information is displayed. This site does not infringe the '060 Patent, at a minimum due to this lack of patient-provided information. Due to the general lack of information and the fact that the site does not show a substantial percentage of licensed physicians, doctordirectory.com is not an acceptable substitute for HealthGrades.com.

## Healthcare.com

188.     www.healthcare.com states that its mission is to assist consumers with finding health insurance, not healthcare. There are no links from the home page or site map that enable a consumer to search for a doctor. Buried in the "site map", however, is a way to search by specialty. After navigating to the cardiologists in zip code 02138, one finds that there are 534. Sorted by distance and "recommendations" the same doctor is displayed at the top. Bizarrely, both lists include a lot of doctors in other towns within Massachusetts, e.g., Newburyport, Boston, Worcester (35 miles away), all headlined with "Cardiologist in Cambridge, MA". The top doctor, Dr. Kim Saal, lacks basic information such as education and licensure. There are distracting ads for "Discount LED Televisions".  I found my doctor, Peter Hoenig, listed as "Dr. Peterandrew Andrew Hoenig" and with no education or hospital affiliations listed.

189.     Due to the lack of information presented, the site does not infringe the '060 Patent. Also due to the lack of information presented and the poor quality of the data that is presented, the site is not an acceptable substitute for HealthGrades.com.

## Wellness.com

190.     www.wellness.com makes it possible to find cardiologists in Cambridge, Massachusetts. They are listed on a page with a star rating next to 3 of the 50 or so doctors on the first page of results. The page for a single doctor, Michael Kjelsberg, says that his 4.5-star rating is based on two reviews. The doctor's education, training, and specialty are listed. There is a way for a doctor to update his or her profile (gender, specialty, other specialty, "about practice").

191.     It is not possible to determine from the public site what the source of the data on the wellness.com site might be. However, it seems reasonable to infer that providers themselves are the primary source. The profile for Robert J. Campbell, MD, for example, another cardiologist in Cambridge, is extremely thin. There is no information regarding Dr. Campbell's education or training, for example. If information was coming from a third party source, as required by Claim 1 of the '060 Patent, one would expect to see information on nearly every doctor.

EXHIBIT J

192.     Due to the lack of comprehensive data, the confusion regarding the source of much of the data and the extent to which data may be trusted, and the large number of advertisements merged into all of the reports on wellness.com, this site is not an acceptable substitute for HealthGrades.com.

## Angie's List

193.     www.angieslist.com is a subscription-only web site. Paid subscribers are able to search for cardiologists near Cambridge, Massachusetts and a page is displayed showing a grade (e.g., A) for each and the number of reports on which that grade is based. There is very little information on each doctor, e.g., nothing about years in practice or medical school attended. Users are encouraged to visit abms.org, an unaffiliated web site, to see if the doctor is board-certified. I searched for my aviation medical examiner, Dr. Thomas Risser, and his address was incorrectly listed in Somerville, Massachusetts rather than in Cambridge where he in fact practices. To determine if Dr. Risser is licensed, Angie's List offers a link to a Commonwealth of Massachusetts web site into which I could cut and paste Dr. Risser's name and license number.

194.     Due to the lack of data presented, I do not believe that angieslist.com infringes the '060 Patent. The same lack of data prevents the site from being an acceptable substitute for HealthGrades.com.

## VII.     OPINION 6:  Search Engine Optimization

195.     Dr. Cooper states:  "It is my opinion that Search Engine Optimization (SEO) is unrelated to these patent claims, and thus is a major driver for website traffic unrelated to the '060 patent."  (Cooper Report at ¶87, p. 40.) Understanding this statement requires understanding how search engines, such as Google and Bing, work.

196.     Google itself, on http://www.google.com/competition/howgooglesearchworks.htm,  references the Wikipedia page regarding PageRank: http://en.wikipedia.org/wiki/PageRank.  Google explains that "PageRank works by counting the number and quality of links to a page to determine a rough estimate of how important the website is.  The underlying assumption is that more important websites are likely to receive more links from other websites." The Wikipedia page states "A page that is linked to by many pages with high PageRank receives a high rank itself. If there are no links to a web page there is no support for that page". Note that the idea of analyzing Web pages for the number of links from other publishers is older than Google, e.g., Ellen Spertus pursued this kind of analysis in the mid-1990s and explained it in papers such as "ParaSite: Mining Structural Information on the Web." (The Sixth International WWW Conference (WWW 97); Santa Clara, USA, April 7-11, 1997). The 1998 paper by Sergey Brin and Lawrence Page, the founders of Google, titled "The Anatomy of a Large-Scale Hypertextual Web Search Engine" references Professor Spertus's work and further explains "Another intuitive justification is that a page can have a high PageRank if there are many pages that point to it, or if there are some pages that point to it and have a

EXHIBIT J

high PageRank. Intuitively, pages that are well cited from many places around the web are worth looking at."

197.     Microsoft's Bing service, a competitor to Google, describes its algorithms in similar terms: "The Bing ranking algorithm analyzes many factors, including but not limited to: the quality and quantity of indexable webpage content, **the number, relevance, and authoritative quality of websites that link to your webpages**, and the relevance of your website's content to keywords." (emphasis added)

198.     "Search Engine Optimization" is a service that some Web publishers purchase, but fundamentally the best way to achieve a high rank in Google or Bing is to have a Web site that is useful to end-users. If a site is useful, other legitimate Web publishers will link to it and these links may include references from authoritative news sites such as nytimes.com or cnn.com that count for more than a link from a personal Web site. Facebook, for example, has a high Google rank because people like what the site does and therefore there are many links to pages on Facebook from other sites.

199.     The asserted '060 Patent claims primarily relate to making a physician comparison site that is as useful as possible to potential patients. Claim 1, for example, describes how data are collected, verified, presented, and distributed. Even Claim 8, for example, which relates to how advertising is presented on the site, ties back to making a service that will be useful to patients. Claim 8 covers a way of running advertisements that will be as relevant as possible to patients and therefore least likely to be regarded as intrusive or distracting. Claim 8 covers a way of selling advertisements that will result in a good revenue source for the publisher, thus enabling the free distribution of information to potential patients.

200.     Results in the marketplace have shown that Health Grades, for example, is more popular with patients and more useful to them than sites that have more limited and less comprehensive, e.g., only patient-provided information. Therefore the high search engine rank of Health Grades rests to a substantial extent on the innovations set forth and claimed in the '060 patent.

## VIII.     OPINION 7:  MDx Database Queries

201.     Dr. Cooper states in paragraphs 72 and 73 that:

- "I am aware of no evidence that the Vitals.com web site has ever had any health care provider give three or more of the data elements required to be received from the healthcare provider, as recited in claims 1 and 15." (Cooper Report at ¶72, p. 38.)

- "Counsel for MDx has asked me to evaluate certain database queries run by MDx. These are found at MDX0104073-4110. I have discussed these queries with Larry West of MDx. From my review of the documents and discussions with Mr. West, I see no evidence that any health care provider has ever provided a full three or more of the data items. While it is technically possible

EXHIBIT J

that a provider might have done so, any such numbers would be trivially small."  (Cooper Report at ¶73, p. 38.)

202.    Essentially Dr. Cooper is speculating about the contents of the MDx database. It is unconventional to speculate about contents stored in a relational database management system (RDBMS) such as the Microsoft SQL Server system that Larry West testified is in use by Vitals.com.  A main purpose of licensing and maintaining an RDBMS is so that it is not necessary to speculate regarding the contents.  An airline would not, for example, say "From queries done previously regarding other flights, we see no evidence that all of the seats on Flight 407 for tomorrow have already been booked and therefore we will sell you a seat."  The airline would run a precise query in the SQL language and obtain a precise answer.

203.    Based on the queries that I have seen in this case and on Mr. West's deposition testimony, it is my understanding that MDx keeps a record of which changes to the database have been made by which doctors.  Thus there would be nothing to prevent Dr. Cooper from having run a query to determine exactly how many doctors to date have updated three or more items.

204.    Stepping back from Dr. Cooper's assertions, let us consider the language of Claim 1. The claim requires that information from patients be "patient-**provided**" (emphasis added) while information from physicians be "provider-**verified**" (emphasis added). A doctor who views 10 items regarding her background and training and updates just 2 of those items has implicitly verified the other 8 items.

205.    Dr. Cooper admits that MDx's website is capable of receiving edits to more than two of the claimed fields of physician information.  A fully functional system would need to have this capability.  Indeed, Dr. Cooper has not explained how to build a practical implementation of a system that limited physicians to correcting a maximum of 2 errors. Suppose that the site listed a doctor as being of the male gender, having attended Howard University, and speaking Mandarin. In reality, the doctor is female, attended Harvard University, and speaks Cantonese. Should the interface allow the doctor to correct all three errors at once and then return an error message "Failed. Cannot correct more than 2 errors total"? Or should the gender and university errors be corrected while the languages spoken error is left in the database? If so, should the data be dropped silent? Should an explanation page be returned to the doctor saying "It is possible to correct only two errors, so we ignored the languages." Must the database keep the original erroneous information so that if the doctor decides the "Howard/Harvard" distinction is less important than being able to communicate with the patients who show up, she can revert the university to "Howard" and correct the languages field?

206.    Considering that the doctors who provide the most information about themselves and who take the trouble to correct erroneous data are the most likely to be loyal customers and to purchase advertising, how is it possible from a business point of view to impose arbitrary limitations on those doctors and simultaneously collect just as much revenue from them?

**EXHIBIT J**

207.     Based on my experience as a Web publisher, I believe that a system that limited the critical users to updating at most two fields of information would be unpopular and could substantially reduce advertising revenue from physicians.

## IX.     OPINION 8:   Designing Around

208.     Dr. Cooper states:  "I have reviewed the evidence and concluded that, to the extent that Health Grades is right and the Vitals website infringes (something I very much disagree with), the amount of use of the patented invention is trivial.  I find that if Health Grades was right that there is infringement now (I very much disagree), there are numerous ways in which the '060 patent would not be practiced because the full complement of claim elements of the asserted claims 1 and 15 would not be practiced, and thus there are various easy design-arounds to these claims."  (Cooper Report at ¶¶88-89, p. 40.)  Dr. Cooper's own report rebuts this statement to a substantial extent by listing a variety of competitors to the HealthGrades.com and Vitals.com sites.

209.     Alexa, a subsidiary of Amazon.com and an authoritative source on the popularity of Web sites, shows that HealthGrades.com has an "Alexa Traffic Rank" of 639 in the U.S, with 6,931 sites linking to it, while Vitals.com enjoys a rank of 1,764 with 3,641 inbound links (data as of September 17, 2012). DoctorsDig.com, on the other hand, a non-infringing site, is ranked at 67,565 and has 379 sites linking to it.

210.     I agree with Dr. Cooper that it is technically feasible to remove features and information from the vitals.com Web site such that it no longer infringes the '060 Patent. However, the Alexa traffic data suggests that the effect of such removal would be a catastrophic fall in usage (e.g., compare Vitals.com to DoctorsDig.com). What would be straightforward from a technical perspective would not necessarily be survivable from a business perspective.

## X.     TRIAL EXHIBITS

211.     I reserve the right to use demonstrative exhibits at trial if necessary to explain my analysis.

## XI.     RESERVATION OF RIGHTS

212.     My opinions are based on the information that I have considered to date. I reserve the right to supplement or amend my opinion given new discovery, testimony heard at trial, and information from opposing experts.  In addition, I may be asked to testify in rebuttal to issues and opinions raised by other experts or fact witnesses.

Signed:     *Philip Greenspun*

     Philip Greenspun, Ph.D.

Date:     September 17, 2012

EXHIBIT J