# Rebuttal Report of Philip Greenspun

## Regarding Invalidity of U.S. Patent No. 7,752,060 by MDx Medical

September 17, 2012

This report is submitted pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

## I.     INTRODUCTION

1.     My name is Philip Greenspun. I disclosed my qualifications and background in my July 13, 2012 report in this matter, as well as my retention by Health Grades, Inc. ("Health Grades").

2.     For purposes of this Rebuttal Report, I have been asked by Health Grades to provide an expert technical analysis regarding the validity of the asserted claims of U.S. Patent No. 7,752,060 (the "'060 Patent") and to rebut the opinions set forth in the Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012 (the "Cooper Report").

3.     I currently hold the opinions set forth in this Report.  As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in added observations. I reserve the right to supplement this Expert Report and to rely on additional documents and testimony that come to my attention between now and the time of the trial.  For example, I may supplement this Report to take into account the fact that MDx continues to produce additional documents relevant to my analyses in response to Health Grades' document requests.  Nevertheless, I believe the evidence adduced to-date provides support for the opinions expressed in this Report.  I also reserve the right to rely on all other Expert Reports submitted in this litigation.

4.     If requested, I will testify regarding the opinions set forth herein.  I may also discuss my own work and experience with the technology disclosed in the '060 Patent, and knowledge of the state of the art at the relevant time period

## II.    MATERIALS REVIEWED AND INVESTIGATION CONDUCTED

- Documents referenced in my July 13, 2012 report in this matter;
- Documents referenced within the text below;
- Expert Report of Richard Cooper and exhibits and testimony cited therein;
- Discovery responses served by the parties in this action;
- MDx's Invalidity Contentions and associated claim chart;
- MDx's First Supplemental Invalidity Contentions and associated claim chart;

obvious unless its actual application is beyond his or her skill. Following these principles often requires one to look to interrelated teachings of multiple patents; the effects of demands known to the design community present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known element in the manner claimed by the patent at issue. I am further informed and understand that the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, because one can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

48. I am further informed and understand that although the use of the teaching, suggestion or motivation test for combining references has not been completely rejected, the obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. I am informed and understand that in many fields there is little discussion of obvious techniques or combinations, and it is often the case that market demand, rather than scientific literature, drive design trends. Under the correct analysis, any need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. Finally, I am informed and understand that common sense teaches that familiar items may have obvious uses beyond their primary purposes and, in many cases, a person of ordinary skill in the art will be able to fit the teachings of multiple patents together like pieces of a puzzle.

### B. Each of the "Early HG Reports and Services" is a Separate Piece of Art That Must Be Analyzed Individually for Invalidity

49. Dr. Cooper's invalidity opinion relies exclusively on references from Health Grades, which he lumps together and refers to as the "Early HG Reports and Services":

> To demonstrate the invalidity of the asserted claims of the '060 patent, I will refer to prior art that I will call "Early HG Reports and Services", which includes the Health Grades web site prior to August 29, 2006, and encompasses prior art products and services of Health Grades. Examples of the Early HG Reports and Services are [1] the Health Grades Premium Reports, [2] the Drucker reports, [3] the Physician Quality Guides, [4] the Physician Quality Reports, [5] the Physician Research Comparison Reports, [6] the Comparative Physician Report, [7] the Physician Quality Comparison Reports, [8] the Nursing Home Comparison Reports, [9] the Physician Online Services, [10] Connecting Point, and [11] the Physician New Marketing Media. See for example Defendant's deposition exhibits 8, 13, 21 and 51.

(Cooper Report at ¶33, p. 8 (highlighting and bracketed numbers added).)

11

50. Although acknowledging that the "Early HG Reports and Services" comprise several different kinds of reports and services, throughout the rest of Dr. Cooper's report, he improperly treats them collectively as if they were a single reference. For example:

- "Since the web site was publicly hosting this information, it is my opinion that the Early HG Reports and Services meet this claim language." (Cooper Report at ¶40, p. 10.) Dr. Cooper does not say "what information" was publicly hosted and in most cases does not cite enough to prove that the specific HG references (listed below) were known or used or on sale or in public use.

- "I conclude that the Early HG Reports and Services had all this information, and it was obtained from and verified by third parties, therefore the claim element is met." (Cooper Report at ¶44, p. 17.)

- "The testimony of Mr. Dodge, when combined with other evidence, also indicates that comparison ratings were in the Early HG Reports and Services early enough to be prior art. Therefore, this claim element is also anticipated." (Cooper Report at ¶45, p. 18.)

- "The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers." (Cooper Report at ¶45, p. 18.)

51. It is my opinion that each of these eleven reports is at least one separate reference (and in some cases multiple references) that should be analyzed separately for purposes of both anticipation and obviousness because the evidence cited by Dr. Cooper demonstrates that each was a separate report, or product. As shown in the table below, most of these references were not publicly available on Health Grades' website, if at all, at the same time as the others:

|   | Name of HG Early Report or Service | Document Cited by Dr. Cooper: | Date: |
|---|---|---|---|
| 1 | Health Grades Premium Reports | None | None |
| 2 | Drucker Reports | Ex. 13 | 06/04/2005 |
| 3 | Physician Quality Guides | Ex. 23 | 08/12/2003 |
| 4 | 2003 Physician Quality Report | Ex. 21 at HG208976-987 | 04/17/2003 |
| 4 | Dec. 2004 Physician Quality Report | Ex. 8 at HG032086-2101 | 12/28/2004 |
| 4 | August 2005 Physician Quality Report | Ex. 10 | 08/02/2005 |
| 5 | Physician Research Comparison Reports | None | None |
| 6 | Comparative Physician Report | Ex. 21 at HG208987-9000 | 04/03/2003 |
| 7 | Physician Quality Comparison Reports | Ex. 8 at HG032062-2085 | 12/28/2004 |
| 8 | Nursing Home Quality Comparison Report | Ex. 8 at HG032037-2051 | 12/28/2004 |

12

|    | **Name of HG Early Report or Service** | **Document Cited by Dr. Cooper:** | **Date:** |
|----|----------------------------------------|-----------------------------------|-----------|
| 8  | Nursing Home Quality Report            | Ex. 8 at HG032052-2061            | 12/28/2004 |
| 9  | Physician Online Services (Phase I)    | Ex. 27                            | 05/25/2004 |
| 10 | Connecting Point                       | None                              | None      |
| 11 | Physician New Marketing Media          | Ex. 51                            | 03/22/2005 |

C.     **Specific References Cited by Dr. Cooper**

1.     **Health Grades' References**

52.    HG Reference 1: "Health Grades Premium Reports." Dr. Cooper mentions these reports only once in his whole report and does not cite any documents or testimony to otherwise explain what these reports are.

53.    HG Reference 2: "Drucker Reports." Dr. Cooper relies on the following documents for this reference:

- Dep. Ex. 13

- Dep. Ex. 50

Although Dr. Cooper refers to plural Drucker Reports, he cites to only one example of a Drucker Report (Dep. Ex. 13) that is dated June 4, 2005. Health Grades witnesses testified that Dep. Ex. 13 was a prototype report that was first put on the Health Grades website in February 2005. I will refer to Exhibit 13 as the "Drucker prototype." (See Neal Dep. at p. 234:15.) The Drucker prototype differed from the earlier versions of Health Grades' physician profiles. (See Neal Dep. at pp. 234:15-17.) Dep. Ex. 50 is an e-mail that discusses a Drucker profile, but is not itself an example of such a report.

54.    HG Reference 3: "Physician Quality Guides." Dr. Cooper relies on the following document for this reference:

- Dep. Ex. 23

Dep. Ex. 23 discusses the rollout of a certain type of physician report called a "physician quality guide" – but is not itself an example of such a report. Dep. Ex. 23 includes an e-mail dated August 12, 2003 and indicates that "basic functionality" of the physician quality guide was "completed" as of this date.

55.    HG Reference 4: "Physician Quality Reports." Dr. Cooper relies on three documents for this reference

- Dep. Ex. 21 (HG208976-987)

- Dep. Ex. 8 (HG032086-2101)

13

- Dep. Ex. 10

Each of these documents relates to a different version of this report, and thus each of these documents is a separate prior art reference.

   a. <u>HG Reference 4a:</u>  Dep. Ex. 21 is a "Physician Quality Report for Consumers" dated April 17, 2003.  I will refer to this reference as the "2003 Physician Quality Report."

   b. <u>HG Reference 4b:</u>  Dep. Ex. 8 is a "Physician Quality Report" dated December 28, 2004.  I will refer to this reference as the "December 2004 Physician Quality Report."

   c. <u>HG Reference 4c</u>:  Dep. Ex. 10 is a press release dated August 2, 2005 that discusses a new version of physician quality report.  I will refer to this reference as the "August 2005 Physician Quality Report."

56. <u>HG Reference 5</u>:  "Physician Research Comparison Reports."  Dr. Cooper mentions these reports only once in his whole report and does not cite any documents or testimony to otherwise explain what these reports are.

57. <u>HG Reference 6</u>:  "Comparative Physician Report."  Dr. Cooper mentions these reports only once in his whole report and does not cite any documents or testimony to otherwise explain what these reports are.  I do note, however, that Dr. Cooper cites to Dep. Ex. 21, which does include a document entitled "Comparative Physician Report" at pp. HG208987-9000.  This report is dated April 3, 2003.

58. <u>HG Reference 7</u>:  "Physician Quality Comparison Reports."  Dr. Cooper cites the following document for this reference:

- Dep. Ex. 8 (HG032062-2085)

These pages of Exhibit 8 are an example of such a report dated December 28, 2004.

59. <u>HG Reference 8</u>:  "Nursing Home Comparison Reports."  Dr. Cooper mentions these reports only once in his whole report, and does not cite any documents or testimony to otherwise explain what these reports are.  I do note, however, that Dr. Cooper cites to Dep. Ex. 8, which does include a document entitled "Nursing Home Quality Comparison Report" at pp. HG032037-2051 and "Nursing Home Quality Report" at HG032052-2061.  Each of these documents relates to a different version of this report and thus each of these documents is a separate prior art reference.

   a. <u>HG Reference 8a:</u>  Dep. Ex. 8 at HG032037-2051 is a Nursing Home Quality Comparison Report" dated December 28, 2004.

   b. <u>HG Reference 8b:</u>  Dep. Ex. 8 at HG032052-2061 is "Nursing Home Quality Report" dated December 28, 2004.

14

60. <u>HG Reference 9</u>: "Physician Online Services ("POS")". Dr. Cooper cites the following evidence to identify this reference:

- Dep. Ex. 26
- Dep. Ex. 27
- Dep. Ex. 28

These documents relate to two different versions of this application, each of which is a separate prior art reference.

    a. <u>HG Reference 9a:</u> Dep. Exs. 27 and 28 relate to Ver 1.0 of Physician Online Services and indicate it was launched in May 2004.

    b. <u>HG Reference 9b:</u> Dep. Exs. 27 and 28 relate to Phase II of Physician Online Services and indicate it work was not yet started on this new version as of May 2004. They do not state when, if ever, it was publicly launched.

61. <u>HG Reference 10</u>: "Connecting Point." Dr. Cooper mentions these reports only once in his whole report, and does not cite any documents or testimony to otherwise explain what these reports are. Therefore, I do not have enough information to rebut or even comment on these reports.

62. <u>HG Reference 11</u>: "Physician New Marketing Media." Dr. Cooper mentions these reports only once in his whole report, and does not cite any documents or testimony to otherwise explain what these reports are. I do note, however, that Dr. Cooper cites to Dep. Ex. 51, which does discuss this product.

63. The following timeline identifies the Health Grades references for which Dr. Cooper cited a document to support his opinion:

15



### 2. **Generic References**

64. Dr. Cooper makes generic and unsupported statements that subject matter was "not new" or "was obvious" or "was known to Positas for decades" without citing to any specific prior art references, nor any documentary evidence to support such statements. I am informed that this testimony is legally insufficient to demonstrate invalidity.

65. The deeper problem with Dr. Cooper's sweeping characterizations of the material in the '060 Patent as "obvious" is that, if it were obvious, someone would have built a substantially similar system in the mid-1990s. The Health Grades site uses a conventional relational database management system, developed in the 1970s. The Health Grades site uses a conventional Web server machine and HTTP server program, both of which were mature technologies in the early 1990s. There were people using conventional Web servers and RDBMSes in the mid-1990s for health care (e.g., I myself built a Web-based electronic medical record system for Boston Children's Hospital in 1994; the RDBMS used was Oracle). There were millions of consumers hooked up to the Internet in the mid-1990s. A person of ordinary skill in the art of building Web applications in 1996 was just as skilled as a person of ordinary skill in the art in 2006. If the patented features of the '060 system had been obvious to a person of ordinary skill in the art in 2006, they would have been equally obvious to a person of ordinary skill in the art in 1996 and Dr. Cooper would be able to find prior art references that anticipate the claims.

16

### D. None of the "Early HG Reports and Services" Qualify as Prior Art Under §102(a)

66. Section 102(a) of the Patent Act states:

"A person shall be entitled to a patent unless - (a) the invention was known or used **by others** in this country . . . before the invention thereof by the applicant for patent . . . ."

67. I am informed that knowledge or use by the applicant (Health Grades) does not qualify as prior art under §102(a) because Health Grades is not an "other." Dr. Cooper's report relies solely on Health Grades' reports, Health Grades' services, and Health Grades' knowledge and use. Dr. Cooper does not identify anyone other than Health Grades who "knew of" or "used" these references at any given point in time. Thus, none of the references he relies on qualify as prior art under §102(a).

### E. Prior Art Under §102(b)

68. Section 102(b) of the Patent Act states:

"A person shall be entitled to a patent unless - . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."

69. I am informed that, in this case, the date of significance for §102(b) will either be:

   a. February 8, 2005 (more than one year prior to the filing date of the provisional application) if the '060 Patent claim at issue is entitled to priority to the provisional; or

   b. August 29, 2005 (more than one year prior to the filing date of the '060 Patent) if the '060 Patent claim at issue is *not* entitled to priority to the provisional.

70. HG Reference 1: "Health Grades Premium Reports." Dr. Cooper mentions these reports only once in his report and does not cite any documents nor testimony to explain what these reports are or when they were made public or offered for sale. Thus, Dr. Cooper has not met his burden to demonstrate that these reports qualify as prior art under §102(b).

71. HG Reference 2: "Drucker Prototype." Regarding dates for the Drucker Report, Dr. Cooper states:

17

> From John Neal's deposition on pages 210 and 211:
>
> ```
> 20 Q Okay. And when did Dr. Drucker's profile
> 21 first go on the website?
> 22 A Well, his original profile would have gone
> 23 on the website when we launched physician reports as
> 24 just part of all the physician profiles that we
> 25 provided, so when we launched the site, which would
> Page 211
> 2 have been 2003.
> ```
>
> Mr. Neal's testimony indicates that the Drucker report would have been on the web site as early as 2003. On further investigation, we find that the Drucker report was posted on the web site at least as early as 2005, as shown on a date marking affixed to the Drucker report showing June 4, 2005 as the date of last editing (Defendant's deposition Exhibit 13). Even this date constitutes more than one year prior to the filing of the utility patent, and therefore the patent is invalid due to anticipation.

(Cooper Report at ¶42, p. 12.)

72. Although Dr. Cooper states that "the Drucker report *would* have been on the web site as early as 2003," there is no evidence to show what the content of such a report would have been. Indeed, the testimony he cites from Mr. Neal is not referring to Dep. Ex. 13, which is a Drucker Report dated June 4, 2005, but rather relates to Dr. Drucker's "original profile." Mr. Neal distinguished Dep. Ex. 13 as a "prototype" that differed from the "original" profile that was on the web site in 2003. (See Neal. Dep. at pp. 211:12-212:1.) Further, Mr. Neal stated that the prototype Drucker profile was not put on the website until February 2005. (See Neal Dep. at p. 213.) Although Mr. Neal testified that some form of the Drucker prototype profile was on the website as of February 16, 2005 (which is confirmed by an e-mail saying that Drucker content was updated as of this date (Dep. Ex. 50)), there is no evidence to show what the content of the prototype profile was as of February 16, 2005 or earlier.

73. There are only two documents that show the content of any version of a Drucker Report: Dep. Ex. 13, which is dated June 4, 2005; and Dep. Ex. 51, which is a PowerPoint presentation with screenshots of a version of a Drucker report that is attached to an e-mail dated March 21, 2005, (Dep. Ex. 50, referenced above, is a one page e-mail that does not detail what the content of the Drucker report was, but says only: "Drucker content updated on production.") Thus, if any of the asserted '060 Patent claims are entitled to priority to the provisional application, the Drucker Report (Dep. Ex. 13) is not prior art to such claims under §102(b).

74. Prior art under §102(b) must be in "**public** use" -- It is not clear that the report shown in Dep. Ex. 51 was ever made public – to the contrary, the attached email says it was "not public." (Dep. Ex. 51 at HG0179518.) Thus, it is my opinion that Dep. Ex. 51 does not constitute prior art under §102(b).

75. Even if none of the asserted claims are entitled to priority to the provisional application, I understand that §102(b) does not apply to public uses that qualify as an "experimental use." A use or sale is experimental for purposes of §102(b) if it represents a

18

bona fide effort to perfect the invention or to ascertain whether it will answer its intended purpose. If any commercial exploitation does occur, it must be merely incidental to the primary purpose of the experimentation to perfect the invention. Here, the inventors testified that the Drucker Report (Dep. Ex. 13) was one of a kind, that it was a "prototype" and a "beta test" to determine whether the format for this report would work for its intended purpose. (For example, Neal Dep. at pp. 224-226, 234, 252-253.) The experimental nature of this prototype is confirmed by statements made in Dep. Ex. 51 at pp. HG0179519 ("We are very excited about getting the Rothman Institute into the HealthGrades Physician Marketing program. The WEB PRESENCE and PREMIUM PLACEMENT programs have exceeded all expectations for our beta clients. Unfortunately, the Rothman Institute missed the cut-off for inclusion in the **beta test** phase."); HG0179548 (discussing test results of prototype versus earlier version reports).

76. <u>HG Reference 4c</u>: "August 2005 Physician Quality Reports." Dep. Ex. 10 is a press release from Health Grades dated August 2, 2005 that describes a new version of physician quality reports that were "now being expanded" as of August 2005. If any of the asserted '060 Patent claims are entitled to priority to the provisional application, the August 2005 Physician Quality Reports (as described in the press release) are too new to be considered prior art to such claims under §102(b).

77. <u>HG Reference 5</u>: "Physician Research Comparison Reports." Dr. Cooper mentions these reports only once in his report and does not cite any documents nor testimony to otherwise explain what these reports are or when they were made public or offered for sale. Thus, Dr. Cooper has not met his burden to demonstrate that these reports qualify as prior art under §102(b).

78. <u>HG Reference 6</u>: "Comparative Physician Report." Dep. Ex. 21 appears to be a non-public prototype report and not something that would have been available to consumers. Note the "Business Rule" annotations throughout the document, e.g., on HG0208987. Note further the "Future: Customer Satisfaction Section with JD Powers survey results. Kerry?" annotation on the same page. These are not items that one would expect to find on a public Web page. Thus, this exhibit does not appear to qualify as prior art under §102(b) because it does not show a "public" use.

79. <u>HG Reference 9b:</u> "Physician Online Services Phase II." Dep. Ex. 27 is a one-page e-mail that states that the Physician Online Services application, Ver 1.0, was launched on May 25, 2004. This e-mail also indicates that this service application is still a work in progress and that Phase II has not been released:

> We are starting to begin work on Phase II that will allow physicians to provide expanded information about themselves. These new data elements will enable HealthGrades to provide consumers more information about physicians. Stay tuned!!

Dep. Ex. 26 is an e-mail dated May 11, 2004 that relates to a concept for phase II of the physician online services application. It indicates that work has not yet begun on this phase:

19

> Can you review and critique this **rough cut** of fields/content we want to collect on physicians? We covered this last week and I want to make sure we get this list correct and finalized <mark>before we start working these items.</mark> These items represent the data we want to collect to give consumers more information about their physicians. We are trying to fast track this project, so a quick response is desired!

Dr. Cooper does not state, nor cite to any evidence, to show when Phase II was first finished, let alone publicly used or offered for sale. Thus, Dr. Cooper has not met his burden of proof to show that Physician Online Services Phase II qualifies as prior art under §102(b).

80. <u>HG Reference 11</u>: "Physician New Marketing Media." Dr. Cooper cites to Dep. Ex. 51, which does discuss this product. Regarding this product, Dr. Cooper states:

> Defendant's deposition Exhibit 51 describes a letter by John Neal in which Mr. Neal offers enhanced services for providers to prospective customer Lauren Deritis for membership in the Health Grades web site at a fee. See also Defendant's deposition Exhibit 50.
>
> See also Dodge deposition page 133 and Montroy deposition pages 112-114 and pages 139-140. Hicks deposition pages 49-52 is also relevant. Therefore this marketing media was available in 2004-2005 and allowed physicians to have enhanced features and services by paying a fee.

(Cooper Report at ¶52, p. 22.) Dep. Ex. 51 includes a series of e-mails to and from inventor John Neal, all dated March 22, 2005, with an attached and undated PowerPoint presentation entitled "Physician New Marketing Media," which Mr. Neal notes is not public:

> <mark>I have one request. Please protect the confidentiality of this email and the associated attachment as the information is highly proprietary and non-public.</mark>

If any of the asserted '060 Patent claims are entitled to priority to the provisional application, the Physician New Marketing Media product as described in Dep. Ex. 51 is too new to be considered prior art to such claims under §102(b).

### G. None of the "Early HG Reports and Services" Included Every Element of Any of the Asserted Claims

81. As mentioned above, invalidity under §102, also known as anticipation, requires that a single reference disclose all of the elements of an asserted claim. As described below, Dr. Cooper does not even allege that this is the case for any of references he relies on for anticipation.

#### 1. HG Reference 1:  Health Grades Premium Reports

82. Dr. Cooper does not allege that these reports, whatever they may be, had all of the elements of any of the asserted claims. Nor does he cite to any documents to show

20

what elements these reports may have had at any given point in time. Thus, Dr. Cooper has not met his burden to demonstrate that these reports anticipate any of the asserted claims.

### 2. HG Reference 2: Drucker Prototype (Dep. Ex. 13)

83. Dr. Cooper's report does not specifically allege that the Drucker Report (Dep. Ex. 13), by itself, had all of the elements of claims 1 or 15.

84. For example, he does not state that the Drucker Report had "comparison ratings of healthcare providers," which is literally required by all of the asserted claims. I agree that it does not meet this claim limitation. The Court construed this term to mean:

> ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

(Markman Order at p. 24.) For purposes of these claims, a healthcare provider is a person, such as a physician, and not an entity, such as a hospital. (Markman Order at p. 7.) The Drucker prototype does not contain comparison ratings of multiple physicians. Further, Mr. Neal testified that this report format was "one of a kind." (See Neal Dep. at pp. 234:14-17.) Dr. Cooper does not contend otherwise. For this reason alone, the Drucker Report does not anticipate any of the asserted claims.

85. Claim 4 requires:

> The method as defined in claim 1, wherein the healthcare provider report includes a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

Dr. Cooper alleges that the Drucker Report included this element, but he does not explain the basis for this opinion. In any event, I disagree. Although page MGHG000019 of the Drucker Report (Dep. Ex. 13) lists two affiliated hospitals, they are not hyperlinks. The hyperlinks in Dep. Ex. 13 have been rendered by the Web browser with underlined text. This is conventional. On MGHG000018, for example, the words "Map and Driving Directions" are underlined, indicating that they are a hyperlink to another page (presumably including a map). The "Affiliated Hospitals" listed on MGHG000019 are not underlined and therefore it is reasonable to concluded that they were not hyperlinks (compare to the "View Rating Methodologies" underlined hypertext link below the hospitals). Thus, for this additional reason, the Drucker Report does not anticipate claim 4.

86. Claims 5, 6, and 7 require:

> 5. The method as defined in claim 1, wherein the access to the healthcare provider report is obtained through a predetermined Web page that provides search capabilities for a database comprised of healthcare provider information.

21