Attorneys' Eyes Only

Page 1

**CONFIDENTIAL - ATTORNEYS EYES ONLY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 11-CV-00520-PAB-BNB

30(b)(6) DEPOSITION OF HEALTH GRADES, INC.,
Representative John Neal
and
DEPOSITION OF JOHN NEAL
June 13, 2012

HEALTH GRADES, INC.,

Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,

Defendant.

**Condensed Copy**

**CONFIDENTIAL**

Job No. NJ399592

EXHIBIT B

Attorneys' Eyes Only

## Page 2

CONFIDENTIAL - ATTORNEYS EYES ONLY

APPEARANCES:

MERCHANT & GOULD
By Kristin L. Stoll-DeBell, Esq.
1050 17th Street
Suite 1950
Denver, CO 80265
Phone: 303.357.1670
Fax: 303.357.1671
kstolldebell@merchant-gould.com
Appearing on behalf of the plaintiff

ROTHGERBER JOHNSON & LYONS LLP
By Jesus Manuel Vazquez Jr., Esq.
1200 Seventeenth Street
Suite 3000
Denver, CO 80202-5855
Phone: 303.623.9000
Fax: 303.623.9222
jvazquez@rothgerber.com
Appearing on behalf of the Plaintiff

SILLS CUMMIS & GROSS, PC
By Scott D. Stimpson, Esq.
David C. Lee, Esq.
30 Rockefeller Plaza
New York, NY 10112
Phone: 212.643.7000
Fax: 212.653.6500
sstimpson@sillscummis.com
Appearing on behalf the Defendant

## Page 3

CONFIDENTIAL - ATTORNEYS EYES ONLY

Pursuant to Notice and the Federal Rules of Civil Procedure, the 30(b)(6) Deposition of Health Grades, Inc. and Deposition of John Neal, called by Defendant, was taken on Wednesday, June 13, 2012, commencing at 8:22 a.m., at 1200 Seventeenth Street, Suite 3000, Denver, Colorado, before Kelly A. Mackereth, Certified Shorthand Reporter, Registered Professional Reporter, Certified Realtime Reporter and Notary Public within Colorado.

* * * * * * *

INDEX

| EXAMINATION | PAGE |
|---|---|
| BY MR. STIMPSON | 6 |
| BY MR. VAZQUEZ | 316 |

PRODUCTION REQUEST(S):

None.

## Page 4

CONFIDENTIAL - ATTORNEYS EYES ONLY

INDEX OF EXHIBITS

| DESCRIPTION | INITIAL REFERENCE |
|---|---|
| Exhibit 44  MDx Medical, Inc.'s Notice of Deposition of John Neal | 12 |
| Exhibit 45  MDx Medical, Inc.'s Notice of 30(b)(6) Deposition of Health Grades | 38 |
| Exhibit 46  Project Development Plan, 4/15/2004 | 164 |
| Exhibit 47  E-mail string re Patient Experience Survey | 166 |
| Exhibit 48  E-mail string re Patient Experience Survey | 173 |
| Exhibit 49  Patient Experience Survey | 179 |
| Exhibit 50  2/16/05 e-mail from Montroy to Hicks re Consumer Update | 212 |
| Exhibit 51  E-mail string re Health Grades' reports, w/attachments | 215 |
| Exhibit 52  1/19/05 e-mail from Neal to Kerry Hicks re presentation, w/attachments | 237 |
| Exhibit 53  3/24/05 e-mail from Loughran to Neal, et al. | 255 |
| Exhibit 54  E-mail string re Vitals.com | 272 |
| Exhibit 55  E-mail string re Vitals new posting on their hospital program | 279 |
| Exhibit 56  E-mail string re Vitals/UCompare | 284 |

## Page 5

CONFIDENTIAL - ATTORNEYS EYES ONLY

| DESCRIPTION | INITIAL REFERENCE |
|---|---|
| Exhibit 57  Complaint and Demand for Jury Trial | 291 |
| Exhibit 58  E-mail string re Vitals.com | 293 |
| Exhibit 59  E-mail string re Insurance Provider Filter for Search | 296 |
| Exhibit 60  3/17/08 e-mail from Neal to Hicks, et al., w/attachment re Target List | 299 |
| Exhibit 61  E-mail string re Vitals.com hospital ratings | 312 |

PREVIOUSLY MARKED EXHIBITS

| Exhibit 3 | 13 |
|---|---|
| Exhibit 4 | 269 |
| Exhibit 8 | 108 |
| Exhibit 10 | 249 |
| Exhibit 12 | 267 |
| Exhibit 20 | 103 |
| Exhibit 21 | 99 |
| Exhibit 25 | 157 |
| Exhibit 26 | 205 |
| Exhibit 27 | 209 |
| Exhibit 29 | 168 |

Attorneys' Eyes Only

## Page 6

CONFIDENTIAL - ATTORNEYS EYES ONLY

* * * * * *

PROCEEDINGS

JOHN NEAL, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STIMPSON:

(Exhibits 44 and 45 marked.)

Q  Good morning, Mr. Neal.
A  Good morning.
Q  I'm Scott Stimpson. I'll be taking your deposition today. Have you ever had your deposition taken before?
A  No.
Q  Well, I'll be asking you questions, and you'll be expected to answer completely and truthfully. Okay?
A  Um-hum, yes.
Q  And from time to time your lawyer may object, but you'll still be expected to answer the question. All right? So if you can please pay attention to the question even if there's some colloquy between counsel. Okay?
A  Yes.

## Page 7

CONFIDENTIAL - ATTORNEYS EYES ONLY

Q  If there's anything about my questions you don't understand, please just let me know, okay? I want to make sure they're clear for you. Okay?
A  I will.
Q  Can you tell me about your education after high school, please.
A  I attended the University -- well, Belmont University for one year in Nashville, Tennessee.
Q  Okay.
A  And then attended the University of Tennessee in Knoxville for three years. That's where I received my undergraduate degree in finance.
    And then two years later I went back to school, and I received my MBA at the University of Tennessee, as well.
Q  Knoxville?
A  Yes.
Q  Okay. And what years was that? When did you go to Belmont?
A  So Belmont would have been in '87. And then three years later, '90, and then add two. I started in '92 with my graduate studies and finished in 94, I guess.
Q  Okay. What did you do after -- what did

## Page 8

CONFIDENTIAL - ATTORNEYS EYES ONLY

you do in that two years between finance degree and going for your MBA?
A  I worked at a company called Service Merchandise. I was a cash management/financial analyzer.
Q  Okay. And after you graduated in 1994, what did you do then?
A  After I graduated from graduate school I went to work at Morgan Keegan as an investment banker in Memphis, Tennessee.
Q  I'm sorry, what was the name of the company?
A  Morgan Keegan.
Q  Morgan Keegan?
A  Um-hum. It's now part of Raymond James Financial.
Q  Okay. How long were you there?
A  I was there for about two years.
Q  And what did you do there?
A  I was an investment banking associate.
Q  Okay. What did you do after you left Morgan Keegan?
A  I was the junior co-founder of the predecessor to Health Grades, a company called

## Page 9

CONFIDENTIAL - ATTORNEYS EYES ONLY

Specialty Care Network.
Q  And that was in 1996?
A  We actually funded the company initially in 1995. But, yeah, approximately 1996 we started operations.
Q  And who founded it with you?
A  It was Kerry Hicks, Pat Jaeckle, Peter Fatianow and myself, and there were a couple of others that I don't think participated in the initial founders roundup. So they were subsequent to that.
Q  Okay. Did you contribute capital contribution to this?
A  I did.
Q  Do you own part of Health Grades today?
A  I do.
Q  Okay. And how much do you own?
A  It's -- it's in the form of stock options, mostly. I do have a direct investment in the restricted shares of the company.
Q  Okay.
A  I can't tell you exactly. You would have to check with Veststar, and they could tell you what the value of those holdings are worth today.
Q  Can you give me a ballpark?

Attorneys' Eyes Only

Page 10

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  A  I know what I have invested in the company
3  directly.
4  Q  How much have you invested directly?
5  A  200,000 directly.
6  Q  And when you say directly, did you invest
7  some indirectly?
8  A  Well, the other holdings are related to my
9  equity participation via stock options, as well as
10 restricted share matches. So there's a vesting
11 associated with that restricted share investment as
12 well.
13 Q  And when do those vest?
14 A  They -- there's a portion that vests,
15 based on time, over a five-year period. And then
16 there's -- that's 25 percent.
17     And then there's another 75 percent at
18 vest based on certain thresholds being hit from a
19 performance and liquidity standpoint.
20 Q  Okay. And so when does the first part
21 vest? You said it's over a five-year period?
22 A  It invests radically over a five-year
23 period.
24 Q  Okay. Starting when?
25 A  It's already begun.

Page 11

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  Q  Okay.
3  A  So the history is that Health Grades was
4  taken private by Veststar Capital Partners. And in
5  taking the company private, they assumed primary
6  ownership interest.
7     And essentially what they worked out is
8  Veststar owns a substantial majority of the shares,
9  and then the remainder is in the hands of management,
10 which is made up of these restricted holdings, as
11 well as these equity incentive grants.
12 Q  So your total ownership interest in Health
13 Grades, is it fair to say it's hundreds of thousands
14 of dollars right now?
15     MR. VAZQUEZ: Object to form.
16 A  You would have to check with the
17 investors.
18 Q  (BY MR. STIMPSON) So you don't have any
19 idea right now how much that --
20 A  I hope it's worth a lot. I hope it's
21 worth a lot.
22 Q  I understand.
23 A  I mean, I don't know. There are companies
24 that perform valuations, and they could do the
25 analysis.

Page 12

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  Q  I understand, but I mean, since I can't
3  get that right now I'm just asking you for your best
4  understanding.
5     Is it less than $100,000?
6  A  I don't think the investment has declined
7  in value.
8  Q  Okay. So it's somewhere between 100 and
9  300,000; is that fair?
10 A  I invested 200,000. I don't think it's
11 declined.
12 Q  Okay. So it could be more than 300,000
13 now?
14 A  Could be.
15 Q  So then back to my question, is it fair to
16 say that you own hundreds of thousands of dollars in
17 ownership of Health Grades?
18 A  I can't make that determination.
19 Q  But you think it is, right?
20 A  I hope so.
21 Q  I've marked a couple of deposition
22 notices. The first one, 44, is just your Notice of
23 Deposition for your personal deposition. And then 45
24 is what is called a 30(b)(6) notice, and we'll get to
25 that in a few minutes.

Page 13

CONFIDENTIAL - ATTORNEYS EYES ONLY

2     I've also shown you what we've marked as
3  Exhibit 3.
4     Do you recognize that as a patent-in-suit?
5  A  I do.
6  Q  You're a named inventor on that?
7  A  I am.
8  Q  When was the last time you read it?
9  A  It's been a long time. I don't know
10 exactly.
11 Q  When was the last time you read parts of
12 it?
13 A  I didn't review the application in
14 preparation for this deposition. So it's been --
15 it's probably been years since I've looked at it and
16 read through it in detail.
17 Q  When was the last time you looked at the
18 patent claims?
19 A  The claims I've looked at in just the past
20 couple of days.
21 Q  Okay. All right. So we'll get to that a
22 little bit later today.
23     Do you have any responsibilities with
24 regard to this litigation?
25 A  It depends on how you --

4 (Pages 10 - 13)

Page 14

**CONFIDENTIAL - ATTORNEYS EYES ONLY**

2  MR. VAZQUEZ: Object to form.
3  A  -- because I need to define
4  responsibilities.
5  Q  (BY MR. STIMPSON) How do you define
6  responsibilities?
7  A  Well, I'm here today providing a
8  deposition, so I would say that I do --
9  Q  Okay.
10  A  -- in that form.
11  Q  Were you involved in the decision to bring
12  suit against MDx?
13  A  That was a decision that was made by
14  counsel.
15  Q  Right. But who at Health Grades gave the
16  green light for it?
17  A  I was a party to those conversations. I
18  didn't make the determination, and I don't know
19  exactly who did.
20  Q  Okay. Who else was involved in those
21  determinations?
22  A  It would have been -- it would have been
23  myself, David Hicks. Kerry Hicks would have been a
24  part of that conversation. And I don't recall who
25  else may have been involved.

Page 15

**CONFIDENTIAL - ATTORNEYS EYES ONLY**

2  Q  Why did Health Grades sue MDx?
3  A  We've had concerns about Vitals copying
4  the content in execution of our website for some
5  time. And the patent was an effort to protect the
6  display form of content as it was presented on the
7  website.
8      And it was obvious to us that Vitals was
9  directly infringing on the patent as granted by the
10  Patent Office.
11  Q  Any other reasons?
12  A  Not that I'm aware of.
13  Q  In your involvement in the decision to
14  bring suit against MDx, did you personally look at
15  the MDx website?
16  A  I did.
17  Q  When did you do that?
18  A  I continuously looked at other websites,
19  particularly in the healthcare vertical. Those
20  provided provider information online.
21      So it was just part of an ongoing analysis
22  in making sure that I'm aware of what is available in
23  the marketplace.
24  Q  Did you personally look at the MDx website
25  and compare it to the claims in your patent?

Page 16

**CONFIDENTIAL - ATTORNEYS EYES ONLY**

2  A  No, that was an analysis done by the
3  attorneys.
4  Q  Okay. When was the last time you looked
5  at the MDx Vitals website prior to bringing suit?
6  A  Prior to bringing the suit?
7  Q  Right.
8  MR. VAZQUEZ: Form.
9  A  I don't recall.
10  Q  (BY MR. STIMPSON) Are you aware of
11  changes that -- changes to the Vitals website that
12  were done in approximately January 2011?
13  A  I am aware that certain changes have been
14  made, but in reviewing the most recent version of the
15  website, I still see elements, at least based on a
16  layman's perspective, that are in violation of the
17  claims.
18  MR. STIMPSON: Move to strike the second
19  part of that.
20  Q  (BY MR. STIMPSON) Mr. Neal, what changes
21  are you aware of that Vitals made to its website in
22  January of 2011?
23  A  I'm not sure of the specific changes, but
24  the form of the presentation was altered.
25  Q  Okay. Can you give me more specifics?

Page 17

**CONFIDENTIAL - ATTORNEYS EYES ONLY**

2  A  No.
3  Q  Were you aware in March of 2011 -- well,
4  let me back up a little bit and ask you a different
5  question.
6      Were you aware that at one point Vitals
7  had comparison ratings of healthcare providers in
8  reports on its healthcare providers?
9  MR. VAZQUEZ: Object to form.
10  A  I was and they still do.
11  Q  (BY MR. STIMPSON) Are you aware that
12  Vitals made changes to that?
13  A  I was told that certain changes had been
14  made that were specific to some of the claims made in
15  the patent, but there are still comparison ratings on
16  the website.
17  MR. STIMPSON: Move to strike the last
18  part of that.
19  Q  (BY MR. STIMPSON) Who told you about
20  these changes?
21  A  Well, conversations internally and also
22  with counsel.
23  Q  What I'm trying to get at, Mr. Neal, is
24  did you know, prior to bringing suit against Vitals
25  and MDx, that MDx -- that this change had already

5 (Pages 14 - 17)

Attorneys' Eyes Only

Page 18

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 been made?
2     MR. VAZQUEZ: Form.
3  A   It wasn't -- you know, regardless of what
4 changes were made, there's still violations of the
5 claims made in the patent. So that was a concern and
6 the reason for the suit, as I understand it.
7     MR. STIMPSON: Move to strike as
8 nonresponsive.
9     Please read the question back to the
10 witness.
11     (Record read as requested.)
12  A  I was unaware that changes were made.
13 Those changes that were made were specific to
14 addressing the claims made in the patent.
15     MR. STIMPSON: Can I please have that
16 back?
17     (Record read as requested.)
18     MR. STIMPSON: I move to strike everything
19 starting from "those changes that were made" as
20 nonresponsive.
21  Q   (BY MR. STIMPSON) So, Mr. Neal, do you
22 know if anyone at Health Grades knew at the time this
23 litigation was brought that Vitals had made these
24 changes to their website?

Page 19

CONFIDENTIAL - ATTORNEYS EYES ONLY

1     MR. VAZQUEZ: Just one second, Mr. Neal.
2 Just caution you to not divulge any of our
3 communications regarding bringing the lawsuit or any
4 communications we've had as those are protected as
5 attorney-client privilege.
6     Other than that, you can answer the
7 question.
8  A   I'm unaware.
9  Q   (BY MR. STIMPSON) Do you remember the
10 first time that you looked -- that you became aware
11 of these changes to the Vitals website?
12  A   No.
13  Q   Did you discuss these changes for the
14 MDx -- to the MDx website with anyone other than
15 counsel?
16     MR. VAZQUEZ: Object to form.
17  A   Not that I recall.
18  Q   (BY MR. STIMPSON) So even after the
19 litigation began, you never talked with Kerry Hicks
20 about the changes to the Vitals website?
21     MR. VAZQUEZ: Same objection.
22  A   There was no communication that it's not
23 protected.
24  Q   (BY MR. STIMPSON) How about with

Page 20

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 Mr. Hicks, David Hicks?
2     MR. VAZQUEZ: Objection.
3  A   The same.
4  Q   (BY MR. STIMPSON) Can you tell me whether
5 those conversations occurred, just -- without giving
6 me the substance of them -- just a yes or no whether
7 they occurred?
8     MR. VAZQUEZ: Form.
9  A   They involved counsel.
10  Q   (BY MR. STIMPSON) So they did exist. I'm
11 not asking for the substance. Since they involved
12 counsel I don't want you to disclose that, but I just
13 want a yes or no as to whether those conversations
14 occurred?
15     MR. VAZQUEZ: Form.
16  A   Yeah, there was conversation.
17  Q   (BY MR. STIMPSON) What did you do to --
18 oh, I'm sorry, I need to back up because I didn't
19 quite finish your background.
20     You said you were with Morgan Keegan until
21 '96, and then cofounded this Specialty Care Network
22 in about '95, '96; is that right?
23  A   Um-hum.
24  Q   What was Specialty Care Network?

Page 21

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  A   It was a physician practice management
2 company that purchased and managed orthopedic
3 physician practices and related services.
4  Q   Okay. Was there anything web based about
5 that?
6  A   No.
7  Q   What was your position at that company?
8  A   I was Specialty Care's cofounder and vice
9 president of business development.
10  Q   Did you hold that same title the whole
11 time you were with Specialty Care?
12  A   No, I didn't. There was progression. I
13 started out as manager of -- I don't recall exactly,
14 finance and business development, I think, and it
15 evolved to vice president of business development.
16  Q   And how long did Specialty Care Network --
17 is that still in existence today?
18  A   That company is now Health Grades, CPM
19 Health Grades.
20  Q   Okay. And when did -- what did you say,
21 CPM?
22  A   CPM Health Grades is the name of our
23 corporate entity today.
24  Q   Oh. Is that a recent change, CPM?

Attorneys' Eyes Only

Page 22

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  A    It is.
3  Q    What does CPM stand for?
4  A    I can't recall exactly.
5  Q    Do you know when the change was made?
6  A    Yeah, we merged with that company in
7  October of last year.
8  Q    Okay. So was there a change in management
9  at that time?
10 A    No.
11 Q    What is CPM, even if you don't remember
12 what CPM stands for?
13 A    It is -- it's a customer relationship
14 management company.
15 Q    Okay. And so is Veststar still a majority
16 holder of CPM Health Grades?
17 A    Yes.
18 Q    Were there any changes with regard to
19 Health Grades website after this merger?
20 A    There have been changes in Health Grades
21 website since we launched the website in 2002. So
22 it's unrelated to anything that occurred related to
23 the merger.
24 Q    Okay. So there have been changes but just
25 nothing as a result of the merger?

Page 23

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  A    No.
3  Q    Okay. So when did Specialty Care Network
4  become Health Grades?
5  A    That was -- I don't know the exact dates,
6  but it was 1999, 2000, the name was changed from
7  Specialty Care to Health Grades.
8  Q    Why -- oh, so it was just a name change?
9  A    It was, um-hum.
10 Q    And was there a change in the business
11 that the company did as of that time?
12 A    There was.
13 Q    And how was it -- what was that change?
14 A    I actually left Specialty Care. I
15 participated in the recapitalization of what became
16 Health Grades. We sold all the assets that we had
17 acquired as part of our physician practice
18 acquisition. That's the process that took place in
19 1999 and into early 2000.
20       And then corresponding with that
21 recapitalization and the sale of assets, Health
22 Grades, Incorporated was created. And the focus of
23 that entity was to provide information to consumers
24 to allow them to differentiate providers. And
25 initially the focus was on hospitals.

Page 24

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  Q    Okay. And at some point the focus
3  expanded to physicians and other healthcare
4  providers?
5  A    It did.
6  Q    Okay.
7  A    Um-hum.
8  Q    All right. And when did Veststar come in
9  as a major stockholder?
10 A    That would have been -- it's been a year
11 and a half ago. So it was October of 2010, if my
12 math is right.
13 Q    Okay. Have you been involved with any
14 other companies besides -- since the 1995, '96
15 timeframe besides the Specialty Care Network and
16 Health Grades?
17 A    I have.
18 Q    And what companies are those?
19 A    I was on the senior management team of a
20 company called Service Magic.
21 Q    Service Management?
22 A    Service Magic.
23 Q    Okay.
24 A    ServiceMagic.com, which is now part of
25 InterActiveCorp.

Page 25

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  Q    Okay. And when were you with Service
3  Magic?
4  A    That would have been 2001 through maybe
5  late 2000 -- you know, I have to check the dates
6  because I actually was -- I separated from Specialty
7  Care and explored doing some other things, even
8  getting back into investment banking. So somewhere
9  in the 2000 to early 2003 timeframe was my employment
10 with Service Magic. I don't know exact dates.
11 Q    Okay. What did Service Magic do?
12 A    It is a consumer-facing website that helps
13 consumers find home service professionals and, at
14 that point in time, real estate agents.
15 Q    Home service professionals like carpenters
16 and electricians, that sort of thing?
17 A    Yes.
18 Q    And real estate agents?
19 A    Um-hum, yes.
20 Q    So for Service Magic, a consumer would get
21 on the website of Service Magic, type in a search for
22 carpenters in Denver, and up would come information
23 on carpenters in Denver; that sort of thing?
24 A    Yeah, exactly. A directory type solution.
25 Q    Okay. Did you have any -- what

7 (Pages 22 - 25)

Veritext/NJ Reporting Company

800-227-8440                                   973-410-4040

Attorneys' Eyes Only

Page 26

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 information did you have at Service Magic on these
3 professionals and real estate agents?
4   A   It wasn't -- that service wasn't about
5 information. It was basic information about
6 providers. It was about certifying professionals to
7 ensure that they had appropriately -- appropriate
8 licensing to perform whatever services within that
9 industry.
10   Q   And who provided the certification?
11   A   Service Magic. Service Magic certified
12 them.
13   Q   Okay. And from what information did you
14 determine to make the certification?
15   A   I don't recall exactly what those were. I
16 wasn't involved with that. I was responsible for
17 business development acquisitions.
18   Q   Okay. So did you have information on
19 there like education and schools?
20   A   No.
21   Q   No?
22   A   No. If you think about home service
23 professionals, they're typically -- they don't
24 have --
25   Q   Right.

Page 27

CONFIDENTIAL - ATTORNEYS EYES ONLY

2   A   So it's not --
3   Q   Real estate agents often do that, right?
4   A   Yeah, that was about -- it was about
5 promotion. So we would build a network. It was a
6 marketing website, so there's a directory.
7   Q   Okay.
8   A   But our network was supported by those who
9 joined it, and that's what that model was.
10   Q   Did Service Magic ever collect any
11 information on quality of the professionals or real
12 estate agents?
13   A   There's no means in that industry. They
14 may have done things since I left. Again, that was
15 only through very early -- late 2002 or early 2003.
16   Q   Okay.
17   A   They may have found the means to
18 differentiate based on quality, but it didn't -- it
19 simply didn't exist when I was there.
20   Q   Was there any way for consumers to rate
21 their service providers?
22   A   You know, I don't think that we did
23 provide ratings. I don't recall having provided
24 ratings at that point in time.
25   Q   At some point in time they did?

Page 28

CONFIDENTIAL - ATTORNEYS EYES ONLY

2   A   They provide a form of survey that's from
3 consumers now. I wouldn't qualify it necessarily as
4 a rating.
5   Q   And you said they do that now. Do you
6 know when they started that?
7   A   I do not.
8   Q   Was it before 2006?
9   A   I don't know.
10   Q   How would I find out that information?
11   A   I don't know.
12   Q   Do you have any information on Service
13 Magic that you keep personally?
14   A   No.
15   Q   Is Service Magic still in existence?
16   A   It is, um-hum.
17   Q   And if I was to contact -- who would I
18 contact over there to ask them about who -- do you
19 know anybody -- let me ask an intelligible question.
20       Do you know anybody who is there now who
21 would know when these surveys were first available on
22 Service Magic?
23   A   No.
24   Q   Do you know anyone there now at all?
25   A   I do know a couple of people.

Page 29

CONFIDENTIAL - ATTORNEYS EYES ONLY

2   Q   People who were still there when you were
3 there?
4   A   There's at least one person that's still
5 there.
6   Q   Who is that?
7   A   Andy Zurcher.
8   Q   Can you spell the last name, please?
9   A   Z-U-R-C-H-E-R.
10   Q   Where does Andy Zurcher live?
11   A   Denver. It's a Denver-based company.
12   Q   And what is his position?
13   A   I'm not sure of his current position.
14   Q   At the time that you filed your
15 application on the '060 patent, Exhibit 3, did you
16 know of other entities that provided ratings to
17 consumers over the web?
18       MR. VAZQUEZ: Object to form.
19   A   I can't recall.
20   Q   (BY MR. STIMPSON) Did you know at some
21 point during the prosecution of this patent about
22 other companies who provided ratings to consumers
23 over the web?
24       MR. VAZQUEZ: Same objection.
25   A   I can't recall dates when other companies

Attorneys' Eyes Only

Page 30

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 may have offered ratings over the web.
3    Q  (BY MR. STIMPSON) Did Service Magic
4 provide ratings on professionals prior to Health
5 Grades providing ratings on professionals?
6    MR. VAZQUEZ: Form.
7    A  I never said they provided ratings.
8    Q  (BY MR. STIMPSON) Okay. Surveys?
9    A  They captured surveys.
10   Q  Okay.
11   A  And there's a distinction, an important
12 distinction, between capturing a survey and providing
13 a rating.
14   Q  Okay. What was the survey that Service
15 Magic did?
16   A  I don't recall the content of the survey.
17   Q  Did Service Magic provide these surveys
18 prior to Health Grades providing patient ratings?
19   A  I don't recall.
20   MR. VAZQUEZ: Form.
21   Q  (BY MR. STIMPSON) Pardon me?
22   A  I don't recall.
23   Q  When you filed the application that became
24 the '060 patent, did you do anything to check on when
25 they did that?

Page 31

CONFIDENTIAL - ATTORNEYS EYES ONLY

2   MR. VAZQUEZ: Same.
3   A  No, because this was completely unrelated
4 to what we were filing the patent for.
5   MR. STIMPSON: Move to strike everything
6 after "no." Nonresponsive.
7   Q  (BY MR. STIMPSON) Do you -- at the time
8 you filed the application for the '060 patent, did
9 you know of any entities that provided ratings to
10 consumers over the web for any type of professionals?
11   A  It would be speculation on my part to
12 guess the dates of who may have been providing what
13 at what times.
14   Q  Okay. Well, do the best you can, please.
15   A  I can't recall.
16   Q  You don't remember any companies -- let's
17 just take the 2000 time period before 2007. Do you
18 recall any companies that were providing ratings to
19 consumers over the web?
20   A  It would be speculation for me to guess
21 the dates. I just don't recall the dates.
22   Q  Do you know any companies that were doing
23 it about that time?
24   MR. VAZQUEZ: Form.
25   A  I'm aware of sites that have done it. I

Page 32

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 just can't recall the dates.
3   Q  (BY MR. STIMPSON) What are those sites?
4   A  They're the restaurant websites, for
5 example.
6   Q  What specific sites?
7   A  I don't recall the exact sites.
8   Q  Is it fair to say, Mr. Neal, that the idea
9 of providing ratings to consumers over the web, as of
10 early 2006, late 2005, that was well known?
11   MR. VAZQUEZ: Object to form.
12   A  No, that's the reason we filed the patent.
13   Q  (BY MR. STIMPSON) Because you provided
14 ratings over the web?
15   MR. VAZQUEZ: Form.
16   A  No. No because -- no.
17   Q  (BY MR. STIMPSON) What is the reason you
18 filed the patent then?
19   A  We created a very unique platform to
20 assist consumers in educating themselves on
21 providers, specifically physician providers, but
22 secondarily hospital providers.
23   So the names by which we presented that
24 content, form of content, and the means by which we
25 combine that content, and then created a score by

Page 33

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 which they could differentiate, was unique. There
3 was no one else that was doing that.
4   Q  Okay. As of early 2006, Mr. Neal, it was
5 known that ratings could be provided to consumers for
6 various professionals over the web, right?
7   MR. VAZQUEZ: Form.
8   A  If that's your analysis, I said I
9 couldn't recall the dates.
10   Q  Okay. What did you do to prepare for the
11 deposition?
12   A  I've met with counsel twice over the last
13 two days, so Monday and Tuesday. Monday for --
14   MR. VAZQUEZ: I'm sorry to interrupt. You
15 can answer the question, but don't disclose any of
16 our communications.
17   THE DEPONENT: Okay.
18   A  -- for about an hour and a half Monday and
19 for about 30 minutes, at the most, yesterday.
20   Q  (BY MR. STIMPSON) So a total of two hours
21 meeting with your counsel?
22   A  We also had a video conference last week
23 for no more than two hours.
24   Q  Okay. Anything else you did to prepare?
25   A  No.