Civil Action No. 11-CV-00520-PAB-BNB

# HEALTH GRADES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

## Exhibit L -- Deposition of Scott Montroy
(*selected portions*)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

VOLUME I - Pages 1 to 187

HEALTH GRADES, INC.,

    Plaintiff,

vs.                    Civil Action No.
                        11-CV-00520-PAB-BNB

MDX MEDICAL, INC., d/b/a
VITALS.COM,

    Defendant.
                      /

*Condensed Copy*

    Deposition of SCOTT MONTROY, taken on behalf of the Defendant, pursuant to Amended Subpoena to Testify at a Deposition in a Civil Action in the above-entitled action, on Monday, January 16, 2012, at 7:03 a.m., at Crowne Plaza Jacksonville Riverfront, 1201 Riverplace Boulevard, Jacksonville, Florida, before Teresa S. DeCiancio, RDR, CRR, CCP, CBC, FPR, and Notary Public in and for the State of Florida at Large.

                - - -

Job No. NJ371358

Page 188

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3
 4              VOLUME II - Pages 188 to 331
 5
 6   HEALTH GRADES, INC.,
 7
 8              Plaintiff,
 9
10       vs.                          Civil Action No.
11                                    11-CV-00520-PAB-BNB
12   MDX MEDICAL, INC., d/b/a
13   VITALS.COM,
14
15              Defendant.
16
17                                  /
18
19       Deposition of SCOTT MONTROY, taken on behalf of
20   the Defendant, pursuant to Amended Subpoena to Testify
21   at a Deposition in a Civil Action in the above-entitled
22   action, on Monday, January 16, 2012, at 7:03 a.m., at
23   Crowne Plaza Jacksonville Riverfront, 1201 Riverplace
24   Boulevard, Jacksonville, Florida, before Teresa S.
25   DeCiancio, RDR, CRR, CCP, CBC, FPR, and Notary Public in
```

Page 189

1  and for the State of Florida at Large.
2
3
4              - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 190

1  APPEARANCES:
2  FOR THE PLAINTIFF:
3      JESÚS M. VÁZQUEZ, Esquire
         Rothgerber Johnson & Lyons LLP
4      One Tabor Center
         1200 17th Street, Suite 3000
5      Denver, Colorado 80202-5855
6
7  FOR THE DEFENDANT:
8      SCOTT D. STIMPSON, Esquire
         Sills Cummis & Gross, P.C.
9      30 Rockefeller Plaza
         New York, New York 10112
10
11
     ALSO PRESENT:
12
       KIRSTIN L. STOLL-DEBELL, Esquire
13     Merchant & Gould
         1050 Seventeenth Street, Suite 1950
14     Denver, Colorado 80265-0100
15
       ASHLEY HOLT, Videographer
16
17
              - - -
18
19
20
21
22
23
24
25

Page 191

1            INDEX AND EXAMINATIONS
             FOR VOLUMES I and II
2  WITNESS                                Page
3  SCOTT MONTROY
4      DIRECT EXAMINATION BY MR. STIMPSON    6
5      CROSS-EXAMINATION BY MR. VÁZQUEZ    313
6
7               E X H I B I T S
8  FOR IDENTIFICATION                     Page
9      Exhibit Numbers 14, 15 and 16         8
10     Exhibit Number 17                    66
11     Exhibit Number 18                    80
12     Exhibit Number 19                   158
13     Exhibit Number 20                   163
14     Exhibit Number 21                   171
15     Exhibit Number 22                   213
16     Exhibit Number 23                   221
17     Exhibit Number 24                   226
18     Exhibit Number 25                   226
19     Exhibit Number 26                   243
20     Exhibit Number 27                   244
21     Exhibit Number 28                   247
22     Exhibit Number 29                   250
23     Exhibit Number 30                   257
24     Exhibit Number 31                   280
25

Page 192

1  P R E V I O U S L Y   M A R K E D   E X H I B I T S
2  Exhibit Number                         Page
3      Exhibit Number 3                    29
4      Exhibit Number 9                   255
5      Exhibit Number 8                   258
6      Exhibit Number 13                  279
7      Exhibit Number 10                  285
8      Exhibit Number 5                   293
9      Exhibit Number 4                   295
10     Exhibit Number 6                   320
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 22

1  exact name. It was something like that.
2      MR. STIMPSON: That's okay. You did say that
3  you weren't quite sure whether it was
4  healthcarereports.
5      But whatever it was in 1999, I'd like to get
6  copies of, at least. Thanks.
7  BY MR. STIMPSON:
8  Q  So -- actually I have another document I'm
9  going to go through with your various responsibilities
10 at Health Grades, so we'll do that in a few minutes.
11     In 2007 you left Health Grades?
12 A  Yes.
13 Q  And why did you leave Health Grades?
14 A  Just wanting to move on, try something new.
15 I'd kind of been there for a while, worked really hard
16 helping them out and was just ready to kind of move on.
17 Q  And you left in the summer of 2007?
18 A  Yeah.
19 Q  Okay. And did you have another job when you
20 left?
21 A  I didn't, no.
22 Q  Any other reasons why you left?
23 A  At that time, you know, some of the -- I had a
24 chance to get -- with some of my stock options and stuff
25 like that, to -- to pursue some new items on my own, and

Page 23

1  that's what I wanted to do. So there was an opportunity
2  for that.
3  Q  Okay. You had stock options in Health Grades?
4  A  Uh-huh.
5  Q  Okay. And can I ask you how much money you
6  took from Health Grades in stock options when you left?
7  A  I took from Health Grades?
8  Q  Well, that's maybe not the right wording. I
9  mean, how much money did you make when you -- you cashed
10 stock options when you left?
11 A  I cashed -- well, no, I actually had stock at
12 that time.
13 Q  Okay.
14 A  So I think some of that -- I'm trying to think.
15 I think at that time it was all -- I had -- it was all
16 stock.
17 Q  Okay.
18 A  I converted it.
19 Q  Okay. And how much was it worth at that time?
20 A  I think probably like -- maybe like
21 1.6 million.
22 Q  Oh, okay. And so you took that and then went
23 on to find a different place?
24 A  Yeah. Well, I tried to like -- I wanted to go
25 into business, see if I could do something on my own.

Page 24

1  Q  Okay. I think I asked you, but there weren't
2  any other reasons you left Health Grades?
3  A  That was -- that was the main reason.
4  Q  Are there any other reasons, though?
5  A  (Shakes head.)
6  Q  You have to answer "yes" or --
7  A  Oh, no.
8  Q  Were you -- did you have good relationships
9  with the people at Health Grades?
10 A  I'd say yeah.
11 Q  Okay. In 2008 you started with Digital Dream
12 Street?
13 A  Yeah.
14 Q  Okay. What was that?
15 A  That was my own company, just trying to provide
16 digital services.
17 Q  What -- what kind of digital services?
18 A  Any kind. I was just trying to, you know, see
19 if I could apply some of my knowledge and get on my own
20 feet. So there was a website. I didn't -- so -- I
21 don't know. I didn't do -- really do too well, so...
22 Q  Okay. You stopped that in 2010?
23 A  Yeah.
24 Q  And you were your own boss there then?
25 A  Yeah.

Page 25

1  Q  Then you went to Blue Cross/Blue Shield of
2  Florida?
3  A  Correct.
4  Q  That was January 2011?
5  A  Yep.
6  Q  And what -- just briefly, what are your
7  responsibilities there?
8  A  I went to work there in their innovation group.
9  And so we take -- we look at ideas and see if we can
10 convert those to value for the organization.
11 Q  Okay. Don't take this question personally,
12 because Jesús will tell you I ask every witness. Have
13 you ever been charged or convicted of a crime?
14 A  No.
15 Q  What did you do to prepare for this deposition?
16     And I don't want you to disclose to me
17 communications you had with counsel for Health Grades,
18 but just generally did you meet with counsel for Health
19 Grades or --
20     MR. VÁZQUEZ: I'd just object to form. Several
21 questions there all at once.
22     So I just instruct you not to answer to the
23 extent the answer requests or you feel like you have
24 to talk about what you said to me or what I said to
25 you in preparing for your deposition.

Page 221

1  would seem probably -- that was probably referring to
2  the hospital ratings.
3      Q   It says, "until production deployment of the
4  new quality guide look and feel, anticipated to be
5  around September 1."  Do you know --
6      A   Yeah.  And this is -- this is -- I mean, this
7  is Sherry talking to Dave, right?  So this is -- I
8  mean -- so you're asking me to interpret someone else's
9  e-mail, right?
10     Q   Well, it was sent to you, right?
11     A   Was it?
12     Q   It was forwarded to you, right?
13         If you don't remember, you don't remember.
14     A   Okay.  Sherry.  Okay.
15     Q   So what do "pilot clients" refer to?  Do you
16 have an understanding of that?
17     A   Pilot client?  If it was for this solution, I
18 can't -- I really can't remember the solution I put
19 together for that.
20     Q   And does this refresh your memory that in about
21 September 2003 there was a new look and feel for the
22 quality guide reports?
23     A   September 2003?  Vaguely, yeah.
24     Q   And what was that change?
25     A   They were trying to update the UI, I think, to

Page 222

1  make it -- to reorganize it and make it rather polished.
2      Q   The U what?
3      A   The user interface.
4      Q   Oh, okay.
5          Any other changes you can think of?
6      A   I'm sure there were probably others, but that's
7  what comes to mind.
8      Q   Do you know if there were any confidentiality
9  restrictions with GeoAccess?
10     A   I'm not aware.  I mean, that would be more
11 Dave's level, dealing with that.
12         MR. STIMPSON:  Okay.  Can I have that?  That's
13 22.
14         We'll have that marked as Exhibit 23, a
15     multipage document bearing Bates numbers HG0049856
16     to 49863.
17         (Exhibit Number 23 was marked for
18 identification.)
19         MR. VÁZQUEZ:  Thank you.
20         MR. STIMPSON:  Sure.
21     A   Let me --
22     Q   I'll just have some questions for you.
23     A   Do I have to read all these, or --
24     Q   No, you don't have to read all those.  I just
25 wanted to ask questions --

Page 223

1      A   It's a lot of data.
2      Q   No, yeah.  I just wanted to ask a few questions
3  about it.
4      A   Okay.
5      Q   So this is an e-mail from Janet Burkhard --
6      A   Yeah.
7      Q   -- to Linda Matsuyama and Delinda Romero dated
8  August 12, 2003?
9      A   Yeah.
10     Q   You were copied?
11     A   Okay.
12     Q   Okay.  And this is a -- this is about the
13 project plan for quality guides --
14     A   Okay.
15     Q   -- right?
16         And this document, like other e-mails we talked
17 about, was prepared and used in the ordinary course of
18 Health Grades' business, right?
19     A   Appears to be.
20     Q   And it says, "This" -- the first sentence says,
21 "This does not include all the items we need to add that
22 did not go with this launch."  Do you have an
23 understanding of what that meant?
24     A   No.
25     Q   Do you know --

Page 224

1      A   I'm not sure what she's referring to, like what
2  these items, all these -- "This does not include all the
3  items that did not" -- I don't know what this launch is.
4  I'm not sure of the details.  But -- what does this
5  mean?
6      Q   This -- does this help you remember when the
7  physician quality guides, at least the first phase of
8  that, was launched?
9      A   No.
10     Q   If you'll turn to the next page, 857, the first
11 sentence there under "Project Plan For Quality Guide
12 Modules."  "The objective of the quality guide modules
13 are to allow healthcare consumers to quickly and easily
14 compare and understand provider information and enable
15 them to make the most informed decision about their
16 healthcare."
17         Did I read that correctly?
18     A   I believe you did.
19     Q   And as highlighted there, it shows that the
20 idea of these quality guides are to allow consumers to
21 easily compare healthcare providers; is that right?
22     A   Yeah.
23     Q   If you'll turn to Page -- if you'll turn to
24 Page 9860.
25     A   9860.

10 (Pages 221 - 224)

Page 225

1 Q I'm not sure. This page looks a little out of
2 place to me. Maybe you can help me sort it out. It
3 just seems like --
4 A I can barely read it.
5 Q Well, yeah. It's just -- it says,
6 "Overall hospital visits covered by fourth quarter
7 2003." I'm just not sure if this goes with a -- do you
8 know if this is part of an e-mail, this page?
9 A I have no idea.
10 Q No. Okay.
11 Turn to the next page, please. It has a phase
12 description. One of them's -- the first one's called
13 "Basic Functionality." Do you see that?
14 A Yeah.
15 Q It says, "Search for a specific physician or
16 compare physicians"?
17 A Yeah.
18 Q And what this accomplishes, one of the things
19 was to -- for the user to find several physicians and
20 compare them, right?
21 A Yeah.
22 Q Was this available on the Health Grades website
23 in 2003 and 2004?
24 A On Health Grades, like to the public?
25 Q Yeah. Yeah.

Page 226

1 A Or to our clients?
2 Q Well, let's start with the public.
3 A Physician quality guide -- I can't remember if
4 that was a solution we had for our clients or if it was
5 for public.
6 Q Well, when you say it was a solution for your
7 clients, what do you mean by that?
8 A Yeah, like we -- like we -- like -- I'm just
9 having the hardest time remembering, but there was --
10 some of the, like, information we would take and -- I
11 can't -- I'm sorry, I just can't remember it all.
12 I'm trying -- we had solutions for -- for
13 like -- like -- I don't know if it was Hewitt, but like
14 Hewitt I think we might have done it, where we'd taken
15 some of our core modules and we made them available for
16 like an employer or such. So I can't remember if we
17 called that -- we had a different name for that as a
18 solution, like as a product we were offering, and I
19 just -- I can't -- I'm not -- I'm just -- I'm real fuzzy
20 on all that.
21 Q What's a core module?
22 A Like a -- the physician reports or the
23 physician directories, so we -- you could -- you could
24 make a configurable solution based on what the client
25 was looking for. That's what I remember.

Page 227

1 Q Okay.
2 A It's been a while.
3 MR. STIMPSON: I'll have marked as Exhibit 24 a
4 one-page document bearing Bates Number 49852.
5 (Exhibit Number 24 was marked for
6 identification.)
7 THE WITNESS: Hand this back?
8 MR. STIMPSON: Yeah, please.
9 (Knock on door.)
10 MR. STIMPSON: Okay. We have to go off the
11 record.
12 THE VIDEOGRAPHER: Off the record at 11:55.
13 (A luncheon recess was taken.)
14 THE VIDEOGRAPHER: Going back on record at
15 12:43.
16 MR. STIMPSON: I'd like to have marked as
17 Defendant's Deposition Exhibit 25 a one-page
18 document bearing Bates Number HG0120457.
19 (Exhibit Number 25 was marked for
20 identification.)
21 BY MR. STIMPSON:
22 Q Just let me know when you're ready,
23 Mr. Montroy.
24 A Okay.
25 Q Okay. This is an e-mail from Dave Hicks to a

Page 228

1 group of people, including yourself, February 4, 2004?
2 A Yeah.
3 Q And, again, this is an e-mail that was prepared
4 and relied on in the ordinary course of business at
5 Health Grades, right?
6 A Correct.
7 Q The subject -- first of all, the list of people
8 there, everyone there at Health Grades at the time?
9 A Everyone employees? Is that what you're
10 saying?
11 Q Yeah. Everyone there --
12 A I mean, I don't know if John Neal was employed
13 at the time, but John Morrow was -- yeah.
14 Q So everybody else except for the possible --
15 A Yeah. I'm not sure whether John was -- if he
16 was just in a contractor role at that point or what, a
17 consulting role.
18 Q Okay. But everyone else you're comfortable was
19 an employee of Health Grades at the time?
20 A Looks like it.
21 Q Okay.
22 A John Morrow -- yeah.
23 Q The subject says, "Additional Patient SAT
24 Points." Do you know what that means?
25 A Additional patient satisfaction points, yeah.

11 (Pages 225 - 228)

Page 257

1 prepared and relied on for the purposes -- at Health
2 Grades, right?
3    A    It appears to be.
4    Q    And this one's reporting averaging 117
5 completed surveys per day in that time period?
6    A    Uh-huh.
7    Q    And do you have any idea when these survey
8 results would have been published?
9    A    I don't.
10   Q    Do you know where these survey results were
11 distributed?
12   A    Were distributed, meaning --
13   Q    Well, they were distributed within Health
14 Grades, right?
15   A    The survey results?  Like they're in our
16 database --
17   Q    Okay.
18   A    -- so -- what do you mean by "distributed"?
19   Q    Well, were the survey results provided outside
20 Health Grades at all?
21   A    I don't know.  I mean, I don't believe so.  I
22 think the focus was trying to get at some point them
23 published into the reports.  You know, could they have
24 been?  I mean, maybe.  I just -- it's not -- I don't
25 recall that, though.

Page 258

1         MR. STIMPSON:  Okay.  Let's have marked as
2    Exhibit 30 a three-page document bearing Bates
3    Number HG0031741 to 43.
4         (Exhibit Number 30 was marked for
5    identification.)
6 BY MR. STIMPSON:
7    Q    I just have a quick question about this one,
8 Mr. Montroy.
9         MR. VÁZQUEZ:  30?
10        MR. STIMPSON:  That's 30, yeah.
11 BY MR. STIMPSON:
12   Q    Actually, Mr. Montroy, I'll tell you, this
13 is -- I'm only going to ask you about the first
14 paragraph of this one.
15   A    Okay.
16   Q    This is an e-mail from John Neal to yourself
17 and David Hicks, January 4, 2005?
18   A    Yeah.
19   Q    Okay.
20   A    That's how it reads.
21   Q    Prepared and kept in the ordinary course of
22 business at Health Grades, right?
23   A    Yes.
24   Q    Okay.  In the first sign, they're talking
25 about -- in the first paragraph they're talking about

Page 259

1 AARP?
2    A    Yeah.
3    Q    Does this refresh your memory as to whether or
4 not you were involved with projects involving AARP?
5    A    I don't know.  I mean, vague -- I mean, I
6 remember -- AARP, I know what that means, but I can't
7 remember the solution.
8         AARP site -- what's the -- I can't -- I can't
9 visualize the solution, so...
10   Q    Okay.
11   A    I'm struggling on that one, so --
12   Q    That's all right.  That's fine.
13        ==Let me show you what's been marked as==
14 ==Exhibit 8.==  Let's put this one away.  And I'll take you
15 through this and we'll talk about what is in this
16 report.
17   A    You want me to look at this whole thing?
18   Q    Well, you can flip through it.  You don't have
19 to read the whole thing.  It would take too long.  But
20 I'll direct you to places and ask you questions about
21 it, okay?
22        This is an e-mail from Jim Kloberdanz to
23 Jennifer Slawson, December 28, 2004?
24   A    Okay.
25   Q    And, again, it's prepared, kept and used in the

Page 260

1 ordinary course of business at Health Grades, right?
2    A    Appears to be, yeah.
3    Q    Who is Jennifer Slawson?
4    A    I'm not sure.
5    Q    Who is Jim Kloberdanz?
6    A    I vaguely -- I don't -- I vaguely remember -- I
7 don't know.  I vaguely --
8    Q    Was he --
9    A    The name sounds familiar, but...
10   Q    Was he at Health Grades?
11   A    I believe so.  I mean, it's been a while.
12   Q    Was Jennifer Slawson at AARP?  Can you tell
13 that from the text of the e-mail?
14   A    I don't -- I don't know who that is.  I mean,
15 she -- I can't tell.
16   Q    Okay.  Why don't you turn to the second page,
17 please.  It's a nursing home quality comparison report.
18        Can you tell from the URL at the bottom that
19 this was a report printed on December 28, 2004, from the
20 Health Grades website?
21        MR. VÁZQUEZ:  Form.
22   A    Wait a second.  Based on the URL?
23   Q    Well, based on the bottom there.
24   A    That -- it's not really connected to the URL.
25   Q    Okay.

19 (Pages 257 - 260)

Page 261

1  A  So, I mean, it looks like that would be the
2  date maybe of...
3  Q  Actually, it's the date the report's created,
4  right?
5  A  Yeah.
6  Q  Okay. And does the URL indicate to you that
7  this came from the Health Grades website?
8  A  Yes.
9  Q  And it was -- is this publicly available to
10 consumers as of December 28, 2004?
11 A  I don't know what solution this would be
12 through, but -- we would have -- I mean, we would
13 have -- this would have been a product we were
14 producing, so was it on -- I don't know what solution
15 this came from. That's -- that's the challenge, whether
16 this came from a client's site or the public site. But
17 if -- your question is what?
18 Q  Was it available to others outside of Health
19 Grades December 28, 2004?
20 A  Was it available? I mean, you could assume it
21 would be. I mean, there's no...
22 Q  Okay.
23 A  I assume.
24 Q  And this is Health Grades providing information
25 over its website to consumers who enter search criteria

Page 262

1  on the Health Grades website?
2     MR. VÁZQUEZ: Form.
3  A  This would be -- if -- this report -- I mean,
4  this looks like one of our reports that -- yeah, that we
5  would have had on the consumer site. Yeah, it's
6  consumer.
7  Q  Okay.
8  A  Yeah. So based on the URL, this would have
9  been on our consumer site. Sorry. I just keyed in on
10 that.
11 Q  No, that's fine. That's where it shows -- the
12 URL at the bottom actually has
13 healthgrades.com/consumer?
14 A  Consumer, right. So that would have been our
15 consumer site.
16 Q  Okay. So in the middle of this report it has
17 this boxed information. Is that a results list?
18 A  Well, that's not what I would call a results
19 list myself, but --
20 Q  Okay.
21 A  I mean, this was just a comparison -- let's
22 see. Those were all of the nursing homes that were
23 going to be in this report.
24 Q  Okay. Based upon the criteria that was entered
25 by the user, right?

Page 263

1  A  Yeah. But there could have been others that
2  may -- you know, that may not have made it in this
3  report.
4  Q  So they get a results list --
5  A  I mean -- yeah.
6  Q  -- and then they choose the ones that they want
7  the report to be about?
8     MR. VÁZQUEZ: Form.
9  A  I can't remember.
10 Q  Okay. That's all right.
11 A  I can't remember.
12 Q  So it says, two paragraphs after that box, "To
13 assist you in making the best choice possible, Health
14 Grades has compiled information from state inspections
15 and complaint investigations." Do you see that?
16 A  Yeah.
17 Q  So Health Grades is obtaining information from
18 third-party sources?
19 A  Okay.
20 Q  Is that right?
21    MR. VÁZQUEZ: Form.
22 A  That's what it says, yeah.
23 Q  Okay. And then under Section 1, Health Grades'
24 star rating. See that?
25 A  Yeah.

Page 264

1  Q  And the next page, are those comparison ratings
2  of healthcare providers?
3     MR. VÁZQUEZ: Form. Calls for a legal
4  conclusion.
5  A  This is a -- this is a quality comparison
6  report. So it's -- it's comparing ratings, star
7  ratings.
8  Q  Thank you.
9     And at this time in 2004 can you tell whether
10 or not Health Grades was using patient ratings?
11 A  From this report?
12    MR. VÁZQUEZ: Form.
13 Q  Yeah.
14    MR. VÁZQUEZ: Form.
15 Q  Actually, let me change the question.
16    Did you ever have patient ratings for nursing
17 homes?
18    MR. VÁZQUEZ: Form.
19 A  I don't believe so.
20 Q  Okay.
21 A  I'm not -- I mean -- no, that wasn't -- no, I
22 don't think that was a major focus on that.
23 Q  They had complaint investigations, right,
24 Section 3?
25 A  Okay.

Page 265

1  Q  All right. And complaint investigations would
2  be information from patients, right?
3  A  No -- no, that came from the standard nursing
4  home data file that we had. So there was -- they
5  were -- I can't remember the source. Janet was the
6  expert on this data. But they were actually
7  complaints -- I think they came from the public feeds of
8  complaints. And I believe those were basically here
9  while we were doing this publishing.
10  Q  Right. But the complaints would come from
11  patients, right?
12  A  Yeah, I guess you could assume, but that's -- I
13  mean, that wasn't through our -- I mean, we didn't -- we
14  didn't -- that came from the data feed, though, that we
15  got from somewhere else.
16  Q  Right. But the ultimate source --
17  A  Right.
18  Q  -- of complaints would be from patients of the
19  nursing care?
20  A  Yeah, you would assume that it would be that.
21  Q  What's an ombudsman?
22  A  A what?
23  Q  Ombudsman. Do you remember that?
24  A  I remember that, but that was more in
25  Janet's -- I'm not -- I'm not really that much of an

Page 266

1  expert on that.
2  Q  Could you look to Page -- actually, skip that.
3  That's okay.
4     If you'd look to Page 32052, please.
5  A  Okay.
6  Q  This is another report on a healthcare
7  provider, right?
8  A  Yeah.
9  Q  Okay. And this one is on a specific nursing
10  home, the Bellmead Rehabilitation Center?
11  A  Yeah.
12  Q  Again, December -- it's from the consumer site,
13  so it was publicly available --
14  A  Yes.
15  Q  -- to consumers?
16     You said yes?
17  A  Yes.
18     MR. VÁZQUEZ: Form.
19  Q  And December 28, 2004?
20  A  I'm sorry?
21  Q  December 28, 2004, it was available?
22  A  That's the date on it, yeah.
23  Q  Okay. And then if you could turn to
24  Page 32062.
25  A  Okay.

Page 267

1  Q  And, again, this is a physician -- this is a
2  physician quality comparison report, right?
3  A  It's -- that's what the title of it is, yep.
4  Q  Okay. And this you can also tell from the URL
5  that it came from -- it was publicly available on the
6  Health Grades website --
7  A  Yeah.
8  Q  -- December 28 --
9     MR. VÁZQUEZ: Form.
10  Q  -- 2004?
11  A  It appears to be.
12  Q  And this was a healthcare provider information
13  provided to consumers over the Health Grades website in
14  late 2004?
15     MR. VÁZQUEZ: Form.
16  A  That's what it -- that's what it appears to be
17  suggesting, yeah.
18  Q  And it was computer-implemented, right?
19     MR. VÁZQUEZ: Form.
20  A  Huh?
21  Q  It was computer-implemented, right?
22     MR. VÁZQUEZ: Form.
23  A  How -- what -- you mean how it was done on a
24  web server?
25  Q  Right.

Page 268

1  A  Yeah.
2  Q  And it was generated at the request of a user?
3     MR. VÁZQUEZ: Form.
4  A  Yeah.
5  Q  And the user can get on -- can get on the
6  website and enter a certain criteria for -- for the
7  search?
8     MR. VÁZQUEZ: Form.
9  A  Well, they could enter criteria to find their
10  physician. And then this report -- and I believe this
11  is the free -- one we gave away for free -- would --
12  would -- the consumer wouldn't pick these to compare
13  against.
14  Q  I'm sorry. The consumer what?
15  A  The consumer wouldn't necessarily pick these.
16  Their physician might be in this list, but we would show
17  the physician report they purchased and -- against
18  these -- this set of physicians on this report.
19  Q  And this was based -- this set of physicians,
20  though, was based on the criteria --
21  A  Based on the criteria, yeah.
22  Q  Based on the criteria that the user enters.
23     And here psychiatry, located in Lexington,
24  Kentucky, within ten miles?
25  A  Yeah.

21 (Pages 265 - 268)

Page 297

1  back of one of your exhibits.
2      MR. STIMPSON: It may be because it has to
3  be -- there has to be a notification.
4      I'm going to keep it in there. It's Exhibit 4.
5  And if that's not part of the record, then I'll take
6  it out -- we'll take it out later.
7  BY MR. STIMPSON:
8   Q   Let me show you what's been marked as
9  Exhibit 4, Mr. Montroy. I'll represent to you that
10 that's a copy of the prosecution history of the
11 060 patent, which is a record of the back-and-forth
12 between the patent office and your counsel.
13  A   Okay.
14  Q   There was an application filed in February of
15 2006. That's Exhibit 5. Then there was a longer
16 application, bigger application, filed in August of
17 2006. That's what's --
18  A   Okay.
19  Q   It's shown in Exhibit 4.
20      Do you recall the differences between those
21 applications?
22  A   No.
23  Q   Okay. Let me show you -- I've marked a page
24 there on Exhibit 4. I'm going to take Exhibit 5 away
25 from you, because it's just going to confuse things.

Page 298

1  Let's try to keep these in order, if we can.
2      I'm going to turn you to Page MDX0013416 and
3  ask if you can identify that for me, please.
4   A   That's the declaration of power of attorney.
5   Q   Okay. And you'll see two or three pages back
6  that you signed that?
7   A   Yes.
8   Q   Did you read it when you signed it?
9   A   Yeah.
10  Q   If you could turn to the front page of it,
11 please.
12  A   To where?
13  Q   The front page of the declaration of power of
14 attorney.
15  A   Okay.
16  Q   The fourth paragraph down there says, "I do
17 hereby state." Do you see that?
18  A   Yes.
19  Q   So you're stating by signing this document that
20 you've reviewed and understand the contents of the
21 specification, including the claims of the patent
22 application, right?
23  A   Yes.
24  Q   And you did review the specification and claims
25 of the patent application, right?

Page 299

1   A   I did review it, what -- the application that
2  was -- that was put in front of me, what I remember,
3  yeah.
4   Q   Okay. If you could turn to the second page,
5  please.
6      Under Section 1.56(a), it says, "A patent by
7  its very nature is affected with a public interest. The
8  public interest is best served and most effective patent
9  examination occurs when, at the time an application is
10 being examined, the Office is aware of and evaluates the
11 teachings of all information material to patentability."
12 Do you see that?
13  A   Yes.
14  Q   You read that and understood it when you read
15 this declaration?
16  A   To my understanding.
17  Q   It continues, "Each individual associated with
18 the filing and prosecution of a patent application has a
19 duty of candor and good faith in dealing with the
20 Office" -- "with the Office, which includes a duty to
21 disclose to the Office all information known to that
22 individual to be material to patentability as defined in
23 this section."
24      Did I read that correctly?
25  A   You did.

Page 300

1   Q   And you read that and understood it when you
2  signed your declaration, correct?
3   A   And I -- I gave everything that I had when I
4  worked over there to the team that was working on this.
5   Q   Okay. Who was the team that was working on
6  this?
7   A   It was Brian Blackman that asked for that
8  information, and I turned over and disclosed everything
9  I had, to the best of my knowledge and information, what
10 was being asked. And then from there I really -- I
11 wasn't that involved in the patent application, because
12 I really don't know how all this translates legally over
13 to it, as I was just really -- I was the one that worked
14 on the system, and I'm not -- I'm not a patent expert, I
15 mean, so I complied and did everything the company asked
16 me to do.
17  Q   Okay. So Brian Blackman showed you this
18 declaration, had you sign it, and --
19  A   Yeah, I think it was Brian that brought it back
20 to me.
21  Q   And asked you to turn over what you had?
22  A   Uh-huh.
23  Q   Did you --
24  A   I don't know -- I don't remember the timing of
25 it all.

29 (Pages 297 - 300)

Page 301

1      THE VIDEOGRAPHER: Excuse me.
2      A    Like I believe he asked me to turn it over
3   first, and then at a later date all the paperwork came
4   back and I was asked to sign it.
5      THE VIDEOGRAPHER: Excuse me. Take that paper
6   off your microphone.
7      THE WITNESS: Yeah.
8   BY MR. STIMPSON:
9      Q    Did you give any materials to anybody besides
10  Brian Blackman?
11     A    I don't remember.
12     Q    Did you give Brian Blackman a copy -- well, did
13  you give Brian Blackman any information concerning the
14  physician quality reports, 2004 and earlier?
15     A    No, because I -- I think it was almost -- it
16  was like understood. He had asked for like any kind of
17  maybe architecture, technical documents or any other
18  things I might have had on that.
19     Q    So you didn't give him anything?
20     A    I gave him some documents, but I don't remember
21  the nature of them all.
22     Q    You gave -- so -- so in connection with this
23  patent application, you gave Brian Blackman information
24  on the physician quality reports from 2004 and --
25     A    It would have been -- I don't remember exactly

Page 302

1   what I gave him, but I gave him information.
2      Q    Okay. So do you remember whether you gave him
3   information on the physician quality reports?
4      A    I don't.
5      Q    Okay.
6      A    No, I don't.
7      Q    Do you have any records of what you gave to
8   Mr. Blackman?
9      A    I don't.
10     Q    Did you give him any information on the
11  physician -- I'm sorry. Let me just -- did you give
12  Mr. Blackman any information on the physician quality
13  comparison reports from 2004 and earlier?
14     A    I don't remember if I included that or not.
15     Q    Okay. Did you give Mr. Blackman any
16  information on the physician quality guide?
17     A    I don't remember.
18     Q    Did you give Mr. Blackman any information on
19  any of the nursing home reports we've looked at?
20     A    I don't remember.
21     Q    Do you remember if you gave Mr. Blackman
22  information on anything --
23     A    I gave him --
24     Q    -- on any of the reports --
25     A    I don't know if it was the report or --

Page 303

1      MR. VÁZQUEZ: Object to form.
2      Q    Just let me finish.
3      A    -- or the -- I don't remember specifically what
4   I gave him, but it was -- I don't.
5      Q    Let me rephrase the question.
6           Did you -- to your recollection, did you give
7   Mr. Blackman any information about any of the reports
8   that Health Grades was showing to consumers on the
9   website from 2004 and earlier?
10     A    I don't remember what I -- I don't remember.
11     Q    Did you discuss them with Mr. Blackman?
12     A    No.
13     Q    Did you discuss them with Mr. Neal?
14     A    No.
15     Q    Did you discuss them --
16     A    I don't remember.
17     Q    Did you discuss them with Mr. Hicks, David
18  Hicks?
19     A    I don't remember. They might -- I don't
20  remember. They might have asked me for a question or
21  two occasionally, but I don't remember specifically, no.
22     Q    Why didn't you ensure yourself, Mr. Montroy,
23  that the physician quality reports and the physician
24  comparison reports and other reports from 2004 and
25  earlier were disclosed to the United States Patent and

Page 304

1   Trademark Office in connection with your application?
2      MR. VÁZQUEZ: Object to form.
3      A    I wasn't filing an application, so I really --
4   I wasn't involved in it much, so I -- I assumed that,
5   you know, it was an application and that Dave was doing
6   it because, I mean, this really -- I mean, I wasn't
7   pushing it. This was something that the company was
8   pushing, and I was -- as an employee, was just trying to
9   do my part and support it.
10     Q    You understood, though, from the declaration
11  that you signed that you personally had a duty of candor
12  to the United States Patent and Trademark Office, right?
13     A    Based on that form. That's what it says, yeah.
14     Q    And you did not personally ensure that the
15  Patent and Trademark Office was aware of any of these
16  reports from 2004 and earlier, right?
17     A    I wasn't aware that, you know, that, I guess,
18  needed to be included or what should be included.
19  Again, I just turned over what -- whatever I had. I
20  mean, the reports -- I don't know. I would assume that
21  if -- if Dave was putting that together, he would have
22  worked with the attorney and had all the pieces together
23  for whatever was needed for -- to file a patent
24  application, because I had no idea what were the
25  requirements for that or -- you know, Dave said I was

30 (Pages 301 - 304)

Page 305

1 part of it, so I had to sign -- put my name on it and
2 sign off on it, so I complied with the -- I was an
3 employee of the company and I had to, for the most part.
4  Q  You had no reason to believe -- nobody ever
5 showed you any evidence that any of those 2004 and
6 earlier reports were disclosed to the Patent and
7 Trademark Office, right?
8    MR. VÁZQUEZ: Object to form.
9  A  Say that again?
10  Q  Did you have any information or evidence that
11 anyone else associated with your 060 patent application
12 had disclosed any of those 2004 reports to the Patent
13 and Trademark Office?
14    MR. VÁZQUEZ: Form.
15  A  I'm not -- I'm not sure -- I don't know what
16 you mean.
17  Q  Well, did you have any information that
18 Mr. Neal or Mr. Hicks or Mr. Blackman or anybody had
19 disclosed to the United States Patent and Trademark
20 Office those 2004 reports, any of those 2004 reports?
21    MR. VÁZQUEZ: Object to form.
22  A  I didn't have the application, so I don't know
23 what was disclosed to them.
24  Q  Okay. And did you ask to find out?
25  A  No. I assumed maybe it was just good faith

Page 306

1 that they were -- they were doing it right.
2  Q  Do you have any other reason -- I'm sorry. Is
3 there any other reasons why you did not --
4  A  I just assumed that, you know, they had all the
5 information to file the application, so I gave them what
6 I thought was all the information that I had and, you
7 know -- I don't know. I thought I did the best that I
8 gave them in terms of giving them what they needed. So,
9 I mean, I don't know all the points that were needed to
10 file the application or to submit with it or...
11  Q  Are there any other reasons why you didn't
12 satisfy yourself that the Patent and Trademark Office
13 knew about these earlier 2004 reports?
14  A  No.
15  Q  There were substantial similarities between
16 some of the 2004 reports and the invention claimed in
17 your 060 patent, right?
18    MR. VÁZQUEZ: Object to form.
19  A  I don't understand.
20  Q  Well, there were substantial similarities,
21 right? I mean, both the 2004 reports and your claimed
22 invention, the 060 patent, were directed to giving
23 healthcare provider information to potential patients,
24 right?
25    MR. VÁZQUEZ: Object to form. Calls for legal

Page 307

1 conclusions.
2  Q  Do you want the question read back?
3  A  Yeah.
4    MR. STIMPSON: Okay. Can you read the question
5 back, please?
6    (The following partial question was read by the
7 court reporter: "There were" -- )
8    MR. STIMPSON: Well, actually, let me just
9 rephrase it. I'll --
10    THE COURT REPORTER: You sure?
11    MR. STIMPSON: Yeah. Yes.
12 BY MR. STIMPSON:
13  Q  Let me put this Exhibit 3 back in front of you.
14 And it's Claim 1 we're going to refer to.
15    So if you look at Claim 1 there, Mr. --
16 actually, let's go along there a bit.
17    Now, first of all, if you could turn to the
18 front page of the patent, sir. And there's -- down the
19 left-hand column, there's a number 60, "Provisional
20 Application." Do you see that?
21  A  Yeah.
22  Q  And that's filed on February 8, 2006?
23  A  Yeah.
24  Q  Okay. And you knew that that was more than a
25 year after Health Grades was already disclosing to the

Page 308

1 public these physician quality reports and physician
2 comparison reports and nursing reports, right?
3  A  Yeah, I'm sure we had those in place before
4 2006.
5  Q  In fact, they were in place -- as we've seen
6 earlier today, they were in place and out there in 2004,
7 right?
8    MR. VÁZQUEZ: Object to form.
9  A  Somewhere in there. I just don't know the
10 actual dates.
11  Q  So if you look now to Claim 1 on Column 20 --
12  A  Okay.
13  Q  -- it says, "A computer-implemented method of
14 providing healthcare provider information to potential
15 patients."
16    The Health Grades system from 2004, where --
17 the physician quality reports and physician comparison
18 reports --
19  A  Right.
20  Q  -- and nursing home reports, those were all
21 computer-implemented methods of providing healthcare
22 provider information to potential patients, right?
23  A  Our whole website was.
24    MR. VÁZQUEZ: Form.
25  Q  Your whole website was?

31 (Pages 305 - 308)

Page 317

1  A   Are you talking about the concept report or the
2  actual report that was in production?
3  Q   The report from 2004 that we looked at earlier,
4  sir. Remember how we compared the claim to this -- to
5  the report itself?
6  A   Right.
7      MR. VÁZQUEZ: Form.
8  Q   And you confirmed for me that every single
9  one --
10 A   Right.
11 Q   -- on this list was found in that 2004 report,
12 right?
13 A   Right.
14     MR. VÁZQUEZ: Form.
15 Q   Next one, "Creating, by at least one computer
16 processor, a healthcare provider report on the first
17 healthcare provider."
18     And, again, 2003, 2004, 2005 Health Grades was
19 creating reports for consumers on healthcare providers
20 that they were requesting reports about, right?
21 A   Somewhere in that range --
22     MR. VÁZQUEZ: Form.
23 A   -- yeah. I mean...
24 Q   Well, no. We've seen them earlier today. You
25 know in 2003, 2004 and 2005 Health Grades was doing

Page 318

1  that, right?
2      MR. VÁZQUEZ: Form.
3  A   Yeah, but -- it was doing that, but what --
4  with what data points, I guess, is --
5  Q   Right. But let's just look at this claim
6  language for now, and we'll talk about the other claim
7  language as we get to it. It says, "Creating, by at
8  least one computer processor, a healthcare provider
9  report on the first healthcare provider."
10 A   Right.
11 Q   And we've seen multiple healthcare provider
12 reports --
13 A   Right.
14 Q   -- that Health Grades was giving --
15 A   Right.
16 Q   -- in 2004 and 2005, right?
17 A   Right.
18     MR. VÁZQUEZ: Form.
19 Q   And it says, "using healthcare-provider-
20 verified information, the patient-provided information,
21 and the information verified by the independent
22 third-party source" -- okay. We've already talked about
23 those datas --
24 A   Right.
25 Q   -- a little earlier -- "wherein the healthcare

Page 319

1  provider report on the first healthcare provider
2  includes comparison ratings of healthcare providers,"
3  right?
4  A   (Nods head.)
5      MR. VÁZQUEZ: Form.
6  Q   And remember we saw the -- at least the nursing
7  home report --
8  A   Right.
9  Q   -- earlier which had those various star
10 ratings, comparison star ratings --
11 A   Right.
12 Q   -- right?
13     MR. VÁZQUEZ: Form.
14 Q   And that was back in 2004, right?
15 A   The nursing report had quality ratings.
16 Q   Right. Had com- --
17 A   I'm not sure what year we put that in
18 production either, but, you know -- but, yeah, the
19 ratings were in there. So --
20 Q   And it was comparison ratings for various
21 nursing homes, right?
22 A   That report that you showed me, yeah, was
23 comparing the ratings of nursing homes.
24 Q   Right.
25     And then --

Page 320

1  A   And those were Health Grades' quality ratings,
2  I believe.
3  Q   Right.
4      Well, they were -- there were comparison
5  ratings.
6  A   But they were quality ratings --
7  Q   Okay.
8  A   -- that was Health Grades'.
9  Q   Okay. And then "providing access to the
10 healthcare provider report on the first healthcare
11 provider over a computer network."
12     And, again, those reports we saw today, all of
13 them were provided --
14 A   Yeah.
15 Q   -- to consumers all over the Health Grades
16 website, right?
17 A   Right.
18     MR. VÁZQUEZ: Form.
19 Q   And none of those reports were disclosed to the
20 United States Patent and Trademark Office, correct?
21     MR. VÁZQUEZ: Form.
22 A   That I don't know.
23 Q   But you did not assure that any of them were
24 disclosed to the Patent and Trademark Office, despite
25 your signed duty of candor, right?

34 (Pages 317 - 320)

Veritext/NJ Reporting Company
800-227-8440                                                              973-410-4040

Page 321

1     MR. VÁZQUEZ: Form.
2  A   I -- I don't know if they were.
3  Q   Okay.
4  A   I didn't -- I didn't submit the application.
5  Q   Did you see any of the prior art that was cited
6  before the Patent and Trademark Office?
7     MR. VÁZQUEZ: Object to form. Calls for a
8  legal conclusion.
9  A   Which one are you referring to, this stuff
10 here?
11 Q   Well, like, for example, there was one piece of
12 prior art that was used at the Patent and Trademark
13 Office called Henley.
14    MR. VÁZQUEZ: Same objection.
15 A   What is it?
16 Q   Henley, H-e-n-l-e-y.
17    I'll show you -- this is marked as Exhibit 6.
18 And if you could please tell me if you've seen that
19 before.
20 A   I don't recall this at all.
21 Q   Do you want to just flip through the figures
22 just maybe in case something like that jogs your memory?
23 A   I'm sorry. Your question was what?
24 Q   Do you recall seeing this?
25 A   No.

Page 322

1     MR. STIMPSON: All right. I have no further
2  questions.
3     MR. VÁZQUEZ: Okay. We need to just confer a
4  little and then we will have some questions.
5     MR. STIMPSON: Okay.
6     THE VIDEOGRAPHER: Going off the record at
7  2:55.
8     MR. VÁZQUEZ: Ten minutes?
9     MR. STIMPSON: Sure.
10    MR. VÁZQUEZ: Thank you.
11    (Break taken.)
12    THE VIDEOGRAPHER: Back on record at 3:20.
13 This is the beginning of Videotape Number 8.
14            CROSS-EXAMINATION
15 BY MR. VÁZQUEZ:
16 Q   Mr. Monroy -- Montroy, excuse me -- I have a
17 few follow-up questions.
18    As you know, we've been here most of the day,
19 and counsel for MDX has asked you questions. So I just
20 need to follow up on some of the testimony that was
21 already given and some of the questions that were asked
22 earlier today, okay?
23 A   Okay.
24 Q   Okay. You recall that there were some
25 questions at the beginning of your deposition regarding

Page 323

1  a litigation filed relating to trade secrets?
2  A   Uh-huh. Yes.
3  Q   And did you inappropriately -- or did you give
4  any trade secrets at all to EchoStar?
5  A   No, I did not.
6  Q   And did you do anything wrong with respect to
7  trade secrets in that case?
8  A   No.
9     MR. STIMPSON: Objection. Calls for -- well,
10 just objection to form.
11    MR. VÁZQUEZ: I'm sorry?
12    MR. STIMPSON: I just have an objection to form
13 of that question. That's okay.
14 BY MR. VÁZQUEZ:
15 Q   And that -- that case was settled, right?
16 A   Correct.
17 Q   And there was no finding of wrongdoing by any
18 court?
19 A   No.
20    MR. STIMPSON: Objection. Leading.
21 Q   Okay. And was there a finding of wrongdoing --
22 A   No.
23 Q   -- in that case?
24    MR. STIMPSON: Same objection.
25 Q   And with respect to -- towards the end of your

Page 324

1  deposition Counsel asked some questions about the duty
2  of candor to the Patent Office. Do you recall those
3  questions?
4  A   Vaguely, yeah.
5  Q   Okay. Did you intend to deceive the Patent
6  Office?
7  A   No, I did not.
8  Q   Do you have any incentive at all to deceive the
9  Patent Office?
10 A   I have none.
11 Q   Did you receive any compensation for being a
12 named inventor on the 060 patent?
13 A   I did not.
14 Q   Did the stock or stock options that you
15 received from Health Grades that you testified about
16 earlier today relate in any way to the fact that you are
17 a named inventor on the 060 patent?
18 A   No, they do not.
19 Q   And then, Mr. Montroy, if we could pull
20 Exhibit 8 from the -- from the pile --
21    MR. VÁZQUEZ: Would you mind assisting me,
22 Counsel?
23    MR. STIMPSON: Sure. No problem. Let me get
24 mine too, okay?
25    MR. VÁZQUEZ: Sure.

35 (Pages 321 - 324)

Page 321

1    MR. VÁZQUEZ:  Form.
2    A    I -- I don't know if they were.
3    Q    Okay.
4    A    I didn't -- I didn't submit the application.
5    Q    Did you see any of the prior art that was cited
6 before the Patent and Trademark Office?
7        MR. VÁZQUEZ:  Object to form. Calls for a
8    legal conclusion.
9    A    Which one are you referring to, this stuff
10 here?
11   Q    Well, like, for example, there was one piece of
12 prior art that was used at the Patent and Trademark
13 Office called Henley.
14       MR. VÁZQUEZ:  Same objection.
15   A    What is it?
16   Q    Henley, H-e-n-l-e-y.
17       I'll show you -- this is marked as Exhibit 6.
18 And if you could please tell me if you've seen that
19 before.
20   A    I don't recall this at all.
21   Q    Do you want to just flip through the figures
22 just maybe in case something like that jogs your memory?
23   A    I'm sorry. Your question was what?
24   Q    Do you recall seeing this?
25   A    No.

Page 322

1        MR. STIMPSON:  All right. I have no further
2    questions.
3        MR. VÁZQUEZ:  Okay. We need to just confer a
4    little and then we will have some questions.
5        MR. STIMPSON:  Okay.
6        THE VIDEOGRAPHER:  Going off the record at
7    2:55.
8        MR. VÁZQUEZ:  Ten minutes?
9        MR. STIMPSON:  Sure.
10       MR. VÁZQUEZ:  Thank you.
11       (Break taken.)
12       THE VIDEOGRAPHER:  Back on record at 3:20.
13   This is the beginning of Videotape Number 8.
14             CROSS-EXAMINATION
15 BY MR. VÁZQUEZ:
16   Q    Mr. Monroy -- Montroy, excuse me -- I have a
17 few follow-up questions.
18       As you know, we've been here most of the day,
19 and counsel for MDX has asked you questions. So I just
20 need to follow up on some of the testimony that was
21 already given and some of the questions that were asked
22 earlier today, okay?
23   A    Okay.
24   Q    Okay. You recall that there were some
25 questions at the beginning of your deposition regarding

Page 323

1 a litigation filed relating to trade secrets?
2    A    Uh-huh. Yes.
3    Q    And did you inappropriately -- or did you give
4 any trade secrets at all to EchoStar?
5    A    No, I did not.
6    Q    And did you do anything wrong with respect to
7 trade secrets in that case?
8    A    No.
9        MR. STIMPSON:  Objection. Calls for -- well,
10   just objection to form.
11       MR. VÁZQUEZ:  I'm sorry?
12       MR. STIMPSON:  I just have an objection to form
13   of that question. That's okay.
14 BY MR. VÁZQUEZ:
15   Q    And that -- that case was settled, right?
16   A    Correct.
17   Q    And there was no finding of wrongdoing by any
18 court?
19   A    No.
20       MR. STIMPSON:  Objection. Leading.
21   Q    Okay. And was there a finding of wrongdoing --
22   A    No.
23   Q    -- in that case?
24       MR. STIMPSON:  Same objection.
25   Q    And with respect to -- towards the end of your

Page 324

1 deposition Counsel asked some questions about the duty
2 of candor to the Patent Office. Do you recall those
3 questions?
4    A    Vaguely, yeah.
5    Q    Okay. Did you intend to deceive the Patent
6 Office?
7    A    No, I did not.
8    Q    Do you have any incentive at all to deceive the
9 Patent Office?
10   A    I have none.
11   Q    Did you receive any compensation for being a
12 named inventor on the 060 patent?
13   A    I did not.
14   Q    Did the stock or stock options that you
15 received from Health Grades that you testified about
16 earlier today relate in any way to the fact that you are
17 a named inventor on the 060 patent?
18   A    No, they do not.
19   Q    And then, Mr. Montroy, if we could pull
20 Exhibit 8 from the -- from the pile --
21       MR. VÁZQUEZ:  Would you mind assisting me,
22   Counsel?
23       MR. STIMPSON:  Sure. No problem. Let me get
24   mine too, okay?
25       MR. VÁZQUEZ:  Sure.

35 (Pages 321 - 324)

Page 325

1 It's the one with the big clip.
2 MR. STIMPSON: Is it?
3 MR. VÁZQUEZ: Uh-huh.
4 MR. STIMPSON: There's yours. Please wait for
5 me to get mine.
6 MR. VÁZQUEZ: Sure.
7 MR. STIMPSON: Okay.
8 BY MR. VÁZQUEZ:
9 Q Mr. Montroy, you recall counsel for MDX asking
10 you questions about the reports that are contained
11 within this Exhibit 8 earlier today?
12 A I do.
13 Q And if you would just turn to HG32062. That's
14 the Bates number on the bottom right-hand corner.
15 A Okay.
16 Q And do you recall counsel for MDX asking you
17 questions about this report earlier today?
18 A Yes.
19 Q And do you recall counsel for MDX asking you
20 whether this report was publicly available on
21 December 28th, 2004, based on the fact that it shows
22 that date at the top there where it says, "Report
23 created"?
24 MR. STIMPSON: Objection.
25 A Yes.

Page 326

1 Q Okay. And also he based those questions on the
2 fact that on the bottom right-hand corner under "URL" it
3 also says December 28th, 2004. Do you recall those
4 questions?
5 A Yes.
6 Q And my question, Mr. Montroy, is that on the
7 cover page of this Exhibit 8, the e-mail refers to these
8 being, quote, unquote, "sample reports."
9 A Right.
10 Q Do you see that?
11 So based on this saying "sample reports," do
12 you know with -- or can you say with 100 percent
13 certainty that these reports -- well, particularly the
14 one that I was just referring to at HG32062 -- was
15 publicly available on December 28th, 2004?
16 A I can't say with a hundred percent certainty.
17 Q Okay. Then I just have a similar question for
18 an exhibit which --
19 MR. VÁZQUEZ: We are not sure, Counsel, if it
20 was 8 or 9.
21 MR. STIMPSON: I think it was -- I think it's
22 9.
23 Yeah. This one's 8. So this one, Drucker's
24 report, is 9.
25 MR. VÁZQUEZ: So this would be 9. Makes sense.

Page 327

1 Thank you.
2 MR. STIMPSON: However -- hang on a minute.
3 Let me see something.
4 Okay.
5 MR. VÁZQUEZ: Okay. Thank you.
6 BY MR. VÁZQUEZ:
7 Q Mr. Montroy, earlier on during your deposition
8 you were asked some questions about this document that
9 says "David A. Drucker, M.D.," at the top which has been
10 marked as Exhibit 9. Do you recall being asked --
11 A Yes.
12 MR. STIMPSON: Oh. Actually, I have Exhibit 13
13 for that.
14 I think it is Exhibit 13. It is Exhibit 13,
15 because we had the -- remember we had the survey
16 results as 9 and then the marketing report as 10.
17 So I think this is 13.
18 MR. VÁZQUEZ: Sure. Okay. Well --
19 MR. STIMPSON: Give the Bates number.
20 MR. VÁZQUEZ: -- just to the extent there's
21 any -- any doubt, it is the document Bates-numbered
22 MGHG000016 through 19, the one that says "David A.
23 Drucker" on the first page.
24 THE WITNESS: (Nods head.)
25 BY MR. VÁZQUEZ:

Page 328

1 Q Okay. So, Mr. Montroy, do you recall counsel
2 for MDX asking you some questions about this exhibit?
3 A Yes.
4 Q And my question is similar to my question
5 earlier about Exhibit 8 and the reports contained within
6 that exhibit. Can you say with 100 percent certainty
7 whether this document at MGHG000016 was publicly
8 available on June 4, 2005 --
9 A I --
10 Q -- simply because on the right -- right on the
11 bottom it says June 4, 2005, at the URL?
12 A Right. I can't say for certainty.
13 Q Well, with 100 percent certainty?
14 A I can't say with a hundred percent certainty.
15 Q Okay. And then, Mr. Montroy, do you recall
16 earlier on several times throughout the day being asked
17 questions about the 060 patent?
18 A Yes.
19 Q And, Mr. Montroy, did you write any portion of
20 the claims that are contained within the 060 patent?
21 A No.
22 Q And, Mr. Montroy, do you understand the rules
23 for determining what patent claims mean?
24 A No.
25 Q Are you a patent expert?

36 (Pages 325 - 328)