**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,

    Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,

    Defendant.

---

**MDX MEDICAL, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF**
**MR. DAVID HALL PURSUANT TO FED. R. EVID. 403 AND 702, AND**
***DAUBERT V. MERRELL DOW PHARMS., INC.*, 509 U.S. 579 (1993)**

---

Defendant and Counterclaim Plaintiff MDx Medical, Inc. ("MDx"), by and through its undersigned counsel, respectfully submits this Motion To Exclude Expert Testimony of Mr. David Hall Pursuant to Federal Rules of Evidence ("Fed. R. Evid.") 403 and 702, and the Supreme Court's holding in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1992) (the "Motion").[1]

Pursuant to D.C.COLO.LCivR 7.1(A), counsel for MDx conferred with Health Grades, Inc.'s ("Health Grades") counsel, who indicated that Health Grades opposes this Motion.

---

[1] MDx is concurrently filing an unopposed motion for leave to exceed page limitations.

## I.     INTRODUCTION

The Court should preclude any testimony from Health Grades' proposed damages expert, Mr. David Hall. Both his lost profits and reasonable royalty analyses are unreliable, speculative, unsupported, and contrary to Federal Circuit law. Moreover, he relies heavily on statements of a Health Grades' employee who was never disclosed to MDx as having relevant knowledge. As such and for the reasons provided in more detail below, MDx seeks to exclude all of Mr. Hall's testimony and opinions on damages, including but not limited to, his opinions on lost profits and reasonable royalty.

## II.    FACTUAL BACKGROUND

Health Grades has accused MDx of infringing United States Patent No. 7,752,060 ("the '060 patent"; Exhibit A). The accused product is the MDx website www.vitals.com ("the Vitals website"). Generally speaking, the patent relates to internet sites where users request information on a healthcare provider; certain specific data elements (including patient ratings) are accessed, compiled, and verified; and a report is prepared including, among other things, these data elements and comparison ratings of other healthcare providers. Health Grades is seeking both lost profits damages and a reasonable royalty based on MDx's alleged infringement of the '060 patent.

## III.   THE RELEVANT LAW

### A.    Damages in Patent Cases, Generally

In order for Health Grades to be awarded lost profits as a measure of damages, it must be reasonably likely that Health Grades would have made Vitals accused sales "but for" the act of infringement. *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995). Moreover,

"[t]he patent owner bears the burden to present evidence sufficient to show a reasonable probability that it would have made the asserted profits absent infringement." *Id.* One approach commonly used to substantiate the appropriateness of a lost profits claim is the *Panduit* test. *Micro Chem. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003). Performing the lost profits analysis under *Panduit* requires analyzing (a) demand for the patented product; (b) the absence of acceptable non-infringing substitutes; (c) manufacturing and marketing capability to exploit the demand; and (d) the amount of profits the patentee would have made. *Panduit Corp. v. Stahlin Bros. Fiber Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

A reasonable royalty is often determined by considering the payment that would have resulted from a hypothetical negotiation between a willing licensor (patentee) and a willing licensee (alleged infringer) taking place at the time when the alleged infringing conduct began. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989).

### B. The Court Acts As Gatekeeper for Expert Analyses

Federal Rule of Evidence 702 permits expert testimony if such testimony will be helpful to the trier of fact. An expert may be qualified by knowledge, skill, experience, training, or education. Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court indicated that a trial court must act as a gatekeeper by making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" to prevent misleading or confusing expert testimony from being presented to the jury. *Id.* at 592-93. For an expert's testimony to be admissible, the expert must be qualified, the expertise asserted must be relevant to the facts of the case (helpful to the trier of fact), and the

- 3 -

expert's testimony must be reliable (based on valid methodology). *Id.* at 588-93; Fed. R. Evid. 702. As the "gatekeeper," this Court should "carefully and meticulously make an early pretrial evaluation of issues of admissibility" with regard to the proposed expert's opinions. *Robinson v. Missouri Pac. R.R. Co.*, 16 F.3d 1083, 1089 (10th Cir. 1994).

The Supreme Court has also acknowledged that "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)*. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## IV.   MR. HALL'S LOST PROFITS ANALYSIS SHOULD BE PRECLUDED

In order to establish entitlement to lost profits, the patent holder must show, *inter alia*, (a) demand for the patented product, and (b) the absence of acceptable non-infringing substitutes. *Panduit Corp. v. Stahlin Bros. Fiber Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1373 (Fed. Cir. 2008). While Mr. Hall does not dispute these requirements (Exhibit B, Portions of Expert Report of David A. Hall, ¶ 26), his proposed testimony entirely fails to satisfy either of these criteria.

### A.   The Demand Analysis Is Unreliable And Speculative

MDx believes that the features of the '060 patent are commercially insignificant, even if they were being used in the Vitals website (multiple motions for summary judgment of no infringement are pending). But even if Health Grades could show that the patented features were valuable, important, or even essential, that would not be sufficient for Health Grades to meet its burden of proving demand. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2012 U.S. App. LEXIS 18441, at *36-37 (Fed. Cir. Aug. 30, 2012). Nor would it be sufficient even if Health

Grades could show that the website would be commercially unviable without these features. *Id.* Rather, to prove demand, Health Grades must present tangible, reliable evidence that is not conjectural or speculative, and which shows that patented features are what motivates consumers to go to these websites. *Id.* at *33; *EZ Dock, Inc. v. Schafer Sys.,* 2003 U.S. Dist. LEXIS 3634 (D. Minn. Mar. 8, 2003).

Mr. Hall's entire "demand" analysis is contained in five paragraphs of his expert report. Exhibit B, ¶¶ 28-32. He starts with income statements from both Health Grades and Vitals (*id.* ¶28), and from this somehow draws the conclusion that "[t]his advertising revenue combined with the website visits demonstrates the demand for the claims embodied in the '060 Patent." *Id.* ¶30. Mr. Hall's demand analysis is entirely speculative and unreliable.

### 1.  The Revenue Used Is Speculative, Unsupported, and Admittedly Exaggerated

Mr. Hall's basis for concluding there was demand starts with the revenue of both MDx and Health Grades. But the revenue figures he used were exaggerated, unconnected to the patented invention, and speculative.

Mr. Hall made no effort to capture revenue derived *from the practice of the patent claims*. Those claims require, for example, a request for information on a healthcare provider, compiling specific information from specific sources on that provider including patient ratings, verification of certain specific data elements, and the creation of a report having specific comparison ratings of other providers. Nowhere in the Hall analysis is any of this ever considered.

Instead, Mr. Hall used revenue that was embellished because it included revenue from the websites *that was not attributable to the patent*. *See, e.g.,* Exhibit B, footnote 21 (admitting Mr.

Hall used "revenues reported by the various departments [that] *include more than that of the patented invention*" but that nevertheless "departmental income statements were considered in their entirety") (emphasis added); Exhibit C, Portions of Transcript of Deposition of Mr. David Hall, 77:11-15[2] ("if these departments had *any part* of their *revenue or expenses* that related to their use, either generating revenue or expenses, for that matter, with the patented features, I included the departments [in revenue used to demonstrate demand]") (emphasis added); 77:16-20 (agreeing that "*there may be a lot more* [in the revenue used for demand] than just the business activities revenue generated from the business activities associated with the patent") (emphasis added). Mr. Hall's wildly overbroad inclusion of revenue supposedly showing "demand" for practice of the patent included *anything* even remotely connected to the patent, including for example anything relating only to the information *used* in the reports. Exhibit C, 149:11-16 (Q: "if you had just one department that only worked on, like information that goes into a report, that information is referenced somewhere in the claims of the patent, you would include that department [in the alleged demand revenue]?  A:  Yes.").

Mr. Hall admitted that *he made no determination* of how much of his alleged "demand revenue" related to the patent. *Id.* at 78:8-12.  And no effort was made to remove from his alleged "demand revenue" any of the revenue that is clearly attributable to things that even Health Grades does not consider to be part of the patented technology (for example, revenues derived from searches for hospitals, revenues derived from searches for nursing homes, revenues derived from the many provider profiles that lack patient ratings, or any of the many other unpatented features on the Health Grades and Vitals websites). *See* Exhibit C, at 59:18-67:11

---

[2] References to deposition testimony are in the form page:lines.  So, for example, 150:2-155:5 references page 150, line 2 through page 155, line 5.

- 6 -

(identifying numerous features not covered by the patent in both the Vitals and Health Grades websites); and 58:4-15 (Mr. Hall did nothing to determine the percentage of users of the Vitals website that use the technology of the patent) and 287:3-288:8 (same).  Mr. Hall simply has no idea what part (if any) of this revenue was attributable to the patented features, and what part was attributable to the unpatented features.  *See id.* at 78:25 -80:15 (Mr. Hall is unable to say whether revenue unrelated to the patent was a hundred dollars, or ten million dollars).

Moreover, for the revenue Mr. Hall did include in his alleged "demand revenue," there is nothing in Mr. Hall's report, or elsewhere, showing *how* he made the determination of what revenue should be included, and what should be excluded.  When asked what criteria were used, Mr. Hall said that he sat down with Health Grades personnel and they together came up with a list.  Exhibit C, 71:19-97:18.  For all that can be determined from his report and testimony, Mr. Hall simply took the words of the Health Grades people for what revenue he should use as his basis for demand.  *Id*.  He did not even consult the Health Grades technical expert on what might be under the patent (*id.* at 85:25-87:6); and when he and the Health Grades personnel made their secret determinations of what was "demand revenue" attributable to the patent, they did not even bother consulting the patent itself (*id.* at 85:25-88:2).

Mr. Hall's use of revenue that admittedly includes an unknown amount of revenue *unrelated* to the patent makes his analysis unreliable and speculative.  The analysis lacks any sound economic evidence, and thus this is one reason the analysis could not survive Federal Circuit scrutiny.

### 2. The Conclusion That The Patent Drove Demand Is Also Unreliable And Speculative

Mr. Hall states in entirely conclusory fashion that the patented features are what drove the demand for his exaggerated revenue. Specifically, Mr. Hall states that "[s]ince these patented features are a fundamental portion of Health Grades' and Vitals' websites from which both earn significant and growing advertising revenue, I have reasonably concluded that there was (and is) demand for the patented invention." Exhibit B, ¶32. Mr. Hall has absolutely no support for his claim that the patented features are what drove demand for the websites.

At his deposition Mr. Hall claimed that he knows the patented features drive the demand because Health Grades has promoted the patented features, because various financial documents allegedly "mention" the patented features, and because the Health Grades personnel told him so. Exhibit C, 101:24-107:4. None of this alleged support is cited in his report on the demand issue (Exhibit B, ¶¶ 28-32). But even if it was, the alleged evidence falls far short of proving demand.

First, none of Mr. Hall's alleged support even mentions the full requirements of the patent claims – some just have passing references to patient ratings. Patient ratings, however, ***were in the prior art***. *See* Exhibit D, which is Health Grades' own prior art (pages 2-3 show patient ratings). If Mr. Hall is right that the patient ratings were driving demand, that would only show that ***features of the prior art drove demand***, not the patented features. Mr. Hall, however, did not consider what part of the demand was being generated by the prior art. Exhibit C, 125:6-131:3. Indeed, he was not even ***aware*** that Health Grades was providing physician reports in the prior art. *Id*. at 126:20-127:2.

Mr. Hall also admitted, as he must, that simply promoting a feature is not enough to show demand. *Id*. at 110:8-24. And while he readily admitted that many ***unpatented*** features are also

- 8 -

promoted, he was entirely unable to quantify what part of the demand came from patented features as opposed to the unpatented features.  Exhibit C, 119:18-123:13.

Contrary to his claim that the patented features drive demand, Mr. Hall conceded that "*what motivates people to find a way to these websites is generally a desire to find information on . . . either a physician, or hospital, or nursing home*."  Exhibit C, 152:3-153:4 (emphasis added).  He also conceded that most users do not even attempt to go to the Vitals or Health Grades websites, but instead find their way to these websites simply through general searches such as on Google.  *Id.* at 288:9-23.  Thus, most people are not even going to the Health Grades or Vitals websites directly, let alone going there due to any specific features.  Mr. Hall also admitted that "*what drives consumers to web properties like Vitals and Health Grades on physician searches is at least in part how well the company's search engine is optimized*" (*i.e.,* how well the company does in coming up in searches done through sites like Google).  *Id.* at 288:17-23 (emphasis added).  But Mr. Hall was entirely unable to quantify how, if at all, the patented features might influence the placing of the Health Grades website in search results done through sites such as Google.  *Id.* at 152:3-169:24; *see, e.g., id.* at 168:3-7.

Thus, in addition to using overstated, irrelevant revenue to support his demand analysis, Mr. Hall has no basis to claim that the patented features drove the demand for this, or any other, revenue.  Using the words of the Supreme Court, there is "simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner, 522 U.S. 136, 146* (1997).  Accordingly, this is yet another reason why Mr. Hall's lost profits analyses should be precluded.

- 9 -

### B.     Mr. Halls *Mor-Flo* Analysis Is Also Critically Flawed

Another requirement for establishing lost profits relates to acceptable, non-infringing substitutes. Where there are acceptable, non-infringing substitutes, a patent holder may use market shares of the other companies to determine what percentage of the alleged infringer's sales would have gone to the patent holder and from this determine what profits the patent holder might have made. *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573 (Fed. Cir. 1989).

Mr. Hall's *Mor-Flo* analysis is entirely speculative and unreliable. He ignores the testimony of Health Grades' 30(b)(6) witness on competition, and fails to identify any reliable criteria for including or excluding other websites in the *Mor-Flo* analysis.

A critical part of any *Mor-Flo* analysis is determining which companies (here, what websites) should be included in the analysis. Other factors remaining the same, the more websites that are included, the lower the Health Grades resulting market share and alleged damages. Mr. Hall asked Health Grades personnel which ones ***they*** thought should be included, and relied on the statements of these obviously interested witnesses. And even though he admits that there is a very broad scope of competition to the Health Grades products (Exhibit B, ¶34: "Health Grades views the pool of competitors to consist of entities that try to attract consumers who are searching for provider information online"), Mr. Hall omitted many companies falling within this definition of competition.

Mr. John Neal was designated by Health Grades as their 30(b)(6) deponent on competitors to the Health Grades products that embodied the patent. Exhibit E, MDx's Notice of Rule 30(b)(6) Deposition, Exhibit A, Topic 3; and Exhibit F, Designation of Mr. Neal for Topic

- 10 -

3, page 3 (highlighting added).  Mr. Neal thought many other websites, not included in Mr. Hall's *Mor-Flo* analysis, **competed with the patented Health Grades product**.  *See, e.g.,* Exhibit C, at 193:18-197:21.  The websites that Mr. Neal identified as competitors to the patented product, but which were excluded from Mr. Hall's *Mor-Flo* analyses, included WebMD, Revolution Health, MD Ratings, DoctorScore, Yelp, LocateADoc, Xoova, PharmaStats, RightHealth, myuhc.com; SteadyHealth, qualitycheck, RemarkableDocs, AARP, Health Market Science, and Consumer Ratings.  *Id.*  Apparently, without even contacting or consulting with the Health Grades 30(b)(6) witness, but by consulting with other Health Grades personnel, a decision was made to narrow the market to increase the damages that Health Grades would pursue.  *Id.* at 197:22-198:14.  This is improper, as a party is not permitted to provide evidence or testimony from its employees that is inconsistent with testimony provided by the witnesses it designated under Fed. R. Civ. Pro. 30(b)(6).  *Dorocon, Inc. v. Burke*, 2005 U.S. Dist. LEXIS 38839 (D.D.C. Nov. 1, 2005).

Mr. Hall's *Mor-Flo* analysis provides no clear criteria on how he determined the substitutes to include; he ignores many websites that meet his own definition of competition to Health Grades; his analysis is inconsistent with the 30(b)(6) testimony of Health Grades on this issue; and he relies on the statements of a Health Grades employee who was never identified as having relevant knowledge (*see* part C, *infra*).  For all these reasons, the proposed analysis is unreliable, speculative, and unsupported, and should be excluded.

### C. Reliance On An Unidentified Health Grades Employee

In his lost profits analyses, Mr. Hall relied heavily on information from Health Grades employee Andrea Pearson.  Ms. Pearson is mentioned in the Hall deposition transcript (Exhibit

C) extensively as an evidentiary source, including on such critical aspects as how to determine which revenue was related to the patent (72:22-73:6); the business activities allegedly covered by the patent (76:11-25); what features are promoted by Health Grades (78:8-24); what was covered by the patent (87:22-25); general evidence of demand (104:6-105:19); information on the Vitals website (119:24-120:5); information on how Health Grades makes money (119:24-120:5); the alleged connection between website visitors and advertising revenue (119:24-120:8); the differences between patented and unpatented features in generating revenue (119:24-120:10); the Health Grades business and how it allegedly utilized the features of the patent (150:8-24); how Health Grades attempted to maximize revenue and visitors to its website (151:2-16); how Health Grades and Vitals show up on Google searches and how the content of the Health Grades website allegedly keeps them high in those search results (157:11-159:4); and competition (186:10-21).  In some instances, Mr. Hall obtained information from Ms. Pearson in addition to others, but he was unable to distinguish what information he got from Ms. Pearson from information he got from the others.  *Id.* at 151:2-7.

Ms. Pearson was never identified by Health Grades in their initial disclosures, or otherwise.  Accordingly, all of Mr. Hall's proposed analyses, which rely so heavily on Ms. Pearson, should be precluded.  *General Steel Domestic Sales, LLC v. Chumley*, 2012 U.S. Dist. LEXIS 55678 (D. Colo. 2012) ("Fed. R. Civ. P. 37(c)(1) states, in part: 'If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless.' This exclusionary sanction is thus

mandatory, unless the failure to disclose was substantially justified or harmless or unless the Court finds some other sanction to be more appropriate.").

## V.     MR. HALL'S ROYALTY ANALYSIS SHOULD BE PRECLUDED

Mr. Hall's royalty analysis concludes that MDx would have agreed to pay an outlandish ***12% royalty***, on a royalty base of revenue from the ***entire Vitals website***.  Exhibit B, Section III. Mr. Hall fails to account for the fact that the Vitals website has many features not covered by the patent, he fails to even consider how little the Vitals website uses the patented features even under the Health Grades analysis, and he attempts an "analytical analysis" that is not even remotely supported by Federal Circuit law.

### A.     The Entire Market Value Basis Is Unsupported

Although it is undisputed that the Vitals website has ***many unpatented features*** (*see, e.g.,* Exhibit C, at 59:18-67:11), Mr. Hall applied his royalty rate to the ***entire market value*** of the Vitals website.  In order to use the entire market value as a royalty base, however, Health Grades must prove that the patented features ***drove the demand for the entire website***.  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2012 U.S. App. LEXIS 18441, at *32-34 (Fed. Cir. Aug. 30, 2012).  This requirement cannot be avoided by simply lowering the requested royalty rate.  *Id.* at *34.  It is not enough for Health Grades to show that the patented features were valuable, important, or even essential (and Health Grades cannot even remotely make such a showing in any event).  *Id.* at *36-37.  Nor would it be sufficient even if Health Grades could show that the website would be commercially unviable without these features.  *Id*.   Rather, to prove demand, Health Grades must present tangible, reliable evidence that is not conjectural or speculative, and

which shows that ***patented features are what motivates consumers to go to these websites***. *Id.* at *33.  As shown in Section IV(A), *supra*, Health Grades cannot possibly show demand.

Where the patented features are not driving demand as is the case here, the patent holder must do a reasonable analysis to ***apportion*** the revenues so that revenues not attributable to the patented features are not included.  The apportionment requirement dates back many years to Supreme Court precedent:  "the patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative."  *Garretson v. Clark,* 111 U.S.120, 121, (1884); *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2012 U.S. App. LEXIS 18441, at *32-34.

As Mr. Hall readily admitted during his deposition, however, he did ***nothing*** to apportion revenues to determine which part of the Vitals website's revenue was generated due to the allegedly patented features.  Exhibit C, 202:10-15 (admitting his did not "do anything to apportion" advertising revenue); *see also* 205:5-9 (Q: "Well, you did know, though, when you drafted this report, sir, that not the entire MDx Vitals website was using the '060 features, right? A: Yes."); 255:8-14 (Q: "So did you do anything, any kind of allocation to try to figure out what part of this revenue would have been attributable to use of the '060 features, as opposed to all the unpatented features on the website?  A: I did not make that assessment or speculate as to that.").

When confronted with this glaring problem at his deposition, Mr. Hall claimed that he did not need to apportion the revenue, because he did a *Mor-Flo* analysis.  *Id.* at 202:10-20.  To the extent that Mr. Hall truly believes that no apportionment is needed in *Mor-Flo* analyses, he is way off base.  The two concepts are entirely distinct – apportionment of revenue addresses the

- 14 -

*percentage of revenue* that should be the basis used for damages claims (e.g., what revenue the royalty rate is applied to); and *Mor-Flo* is a market analysis that attempts to determine *the percentage of the market* that Health Grades would have had if MDx was not using the patented features.

Mr. Hall's evaluation is summarized at 207:15-208:15 (Exhibit C) of his transcript. There, he admits that he did only three things: (1) even though he knew that not the entire Vitals website used the patented features, he used *all* the advertising revenue from that website in his analysis; (2) he then cut back the revenue because many users visit both the Vitals and Health Grades sites; and (3) he did his *Mor-Flo* analysis. *At no point does Mr. Hall ever apportion the revenue, or make any effort to account for the fact that the Vitals website has many features unrelated to the patent*. This is a critical flaw in the reasonable royalty analysis that cannot possibly withstand Federal Circuit scrutiny.

### B.      Mr. Hall's Analytical Approach Is Fatally Flawed

The analytical approach is an accepted method for assistance with damages calculations. *TWM Mfg. Co. Inc. v. Dura Corp,* 789 F.2d 895 (Fed. Cir. 1986). In this case, the idea would be to compare the profits of a website that is as close as possible to the patented invention (without using the patented invention) to the profits of the website that does use the patented features – if the non-patented website is close enough, the difference in profit margins should be a reasonable indication of the value of the patented invention. So, for example, if a company sold a widget and then patented a certain advancement on that widget – comparing the profits before the addition of the advancement and after the addition of the advancement would indicate the worth of the advancement.

Health Grades did not pursue discovery from any competitors during the fact discovery phase. So, Mr. Hall could not perform this analysis with any of the companies he considered competitors. Exhibit C, 269:2-270:13. He therefore used WebMD because that is a company that had publically available profit information. He readily admitted, however, that WebMD was "not even close to the '060 Patent." *Id.* at 270:22-271:23. And since Health Grades did not pursue discovery from WebMD, Mr. Hall was unable to use any *relevant* portion of the WebMD profit margin, so he used the *entire* WebMD profits, without any idea how the WebMD profits are generated, what factors drive their advertising revenue, or what portion of the WebMD profits was generated by the part of their website related to searching for doctors. *Id*. at 270:22-276:20. This analysis is hopelessly off-base – WebMD has many, many features not even remotely related to the patent, and Mr. Hall has no idea what part of the WebMD profits are relevant or how those profits are obtained. It cannot possibly be considered a reliable analytical analysis.

Next, Mr. Hall performs an analytical approach by comparing Health Grades *overall profit margin* to what he claims to be the profit margin attributed to the patented features. Exhibit B, ¶80; Exhibit C, 281:2-282:19. The huge problem with this analysis, however, is the same problem with Mr. Hall's demand analysis addressed above – the profits he attributes to the patented features include large amounts of revenue unrelated to the patent, and Mr. Hall is entirely unable to quantify what revenue (if any) might be attributable to the patented features. *See,* Section IV(A), *supra.*

Surprisingly, Mr. Hall did not do a comparison of the profits of the Health Grades patented product to the profits of the Health Grades prior art product just prior to use of the

- 16 -

patented features. That is, Health Grades itself was doing everything in the prior art, with the one *possible* exception of not having comparison ratings on physicians in the reports. *See, e.g.,* Exhibit D; and Exhibit C, at 276:21-280:23. Mr. Hall should have compared these products, but did not as that comparison would surely show trivial profit increases with addition of the patented elements.

Mr. Hall's alleged analytical approach is a wild departure from the case law allowing this approach, and should be rejected outright.

### C.     Mr. Hall Improperly Relies On Ms. Pearson

Mr. Hall's royalty analyses also relied heavily on Ms. Pearson. See Section IV(C), *supra;* and *see also* Exhibit C, at 223:22-225:2 (information on Best Quality license referenced in royalty reports); and at 236:22-237:6 (information on Dr. Tango license agreement). For the same reasons stated in part IV(C), *supra*, this is another reason the Hall testimony should be excluded.

## VI. CONCLUSION

The entirety of Mr. Hall's damages analyses, including both his lost profits and reasonable royalty analyses, are unreliable, speculative, unsupported, and purportedly based on discovery Health Grades withheld.  As such, Mr. Hall should be precluded from providing any testimony at trial.

Dated:  November 2, 2012                                                        Respectfully submitted,

*s:/Scott D. Stimpson*
Scott D. Stimpson
Scott B. Murray
David C. Lee
Sills Cummis & Gross P.C.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 643-7000
Fax: (212) 643-6500
E-mail:sstimpson@sillscummis.com
E-mail:smurray@sillscummis.com
E-mail:dlee@sillscummis.com

and

Terence Ridley, Atty. No. 15212
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
Tel:  (303) 244-1800
Fax:   (303) 244-1879
E-mail: ridley@wtotrial.com

*Attorneys for Defendant*
MDx Medical, Inc. d/b/a VITALS.COM

# CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2012, I electronically filed the foregoing MDX MEDICAL, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF MR. DAVID HALL PURSUANT TO FED. R. EVID. 403 AND 702, AND *DAUBERT V. MERRELL DOW PHARMS., INC.*, 509 U.S. 579 (1993) with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

- Jesus Manuel Vazquez , Jr.
  jvazquez@rothgerber.com, phenke@rothgerber.com

- Gregory B. Kanan
  gkanan@rothgerber.com, dgrooms@rothgerber.com

- Kris John Kostolansky
  kkosto@rothgerber.com, dgrooms@rothgerber.com

- Scott David Stimpson
  sstimpson@sillscummis.com, gcaceres@sillscummis.com

- Scott B. Murray
  smurray@sillscummis.com

- David Chunyi Lee
  dlee@sillscummis.com

- Terence M. Ridley
  ridley@wtotrial.com, norris@wtotrial.com

                                                                        *s:/ David C. Lee*