# EXHIBIT B

# In The Matter Of:

*Health Grades, Inc.*
*vs.*
*MDX Medical, Inc.*

_____

*Richard G. Cooper, D. Sc.*

*October 9, 2012*

_____

*\*HIGHLY CONFIDENTIAL\**
*Attorneys' Eyes Only*

**MERRILL CORPORATION**
LegaLink, Inc.
311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.    October 9, 2012

```
                                                                1

              IN THE UNITED STATES DISTRICT Court
                 FOR THE DISTRICT OF COLORADO


  HEALTH GRADES, INC.,        )
                              )
              Plaintiff,      ) Civil Action
                              ) No. 11-cv-00520-PAB-BNB
       vs.                    )
                              )
  MDx MEDICAL, INC. d/b/a,    )
  VITALS.COM,                 )
                              )
              Defendant.      )
                              )


          THIS DEPOSITION IS HIGHLY CONFIDENTIAL
                  ATTORNEYS' EYES ONLY




  DEPOSITION OF:
                    RICHARD G. COOPER, D.Sc.
                    TUESDAY, OCTOBER 9, 2012
                    10:00 A.M.






  REPORTED BY:
                    KAREN I. PEARSON-BELL
                    CSR NO. 3557, RPR
```

**Merrill Corporation - Chicago**

(312) 386-2000                          www.merrillcorp.com/law

**Highly Confidential - Attorneys' Eyes Only**
**Richard G. Cooper, D. Sc.    October 9, 2012**

---

Page 2

1  Videotaped deposition of RICHARD G. COOPER,
2  D.Sc., taken on behalf of the Plaintiff, at the
3  Hampton Inn in Hemet, 3700 West Florida Avenue,
4  Ramona Meeting Room, Hemet, California, commencing
5  at 10:00 a.m., on Tuesday, October 9, 2012, before
6  Karen I. Pearson-Bell, RPR, CSR No. 3557.
7
8  APPEARANCES OF COUNSEL:
9
10 FOR THE PLAINTIFF:
11
12     ROTHGERBER, JOHNSON & LYONS, LLC
13     BY: JESÚS M. VÁZQUEZ, ESQ.
14     One Tabor Center, Suite 3000
15     1200 Seventeenth Street
16     Denver, Colorado 80202
17     (303) 623-9000   Fax: (303)623-9222
18     E-mail: jvazquez@rothgerber.com
19        -and-
20     MERCHANT & GOULD
21     BY: KIRSTIN L. STOLL-DeBELL, ESQ.
22     1050 Seventeenth Street, Suite 1950
23     Denver, Colorado 80265-0100
24     (303) 357-1670   Fax: (303) 357-1671
25     E-mail: kstolldebell@merchantgould.com

---

Page 3

1  APPEARANCES OF COUNSEL (continued)
2
3  FOR THE DEFENDANT and THE WITNESS:
4
5      SILLS CUMMIS & GROSS P.C. – NEW YORK
6      BY:  SCOTT DAVID STIMPSON
7      30 Rockefeller Plaza
8      New York, New York 10112
9      (212) 643-7000   Fax: (212) 643-6500
10     E-mail:  sstimpson@sillscummis.com
11
12
13
14   ALSO PRESENT:
15
16     KENNETH McNEAL – VIDEOGRAPHER

---

Page 4

1              I N D E X
2  EXAMINATION                           PAGE
3  By Mr. Vazquez                          9
4    (P.M. Session)                       97
5  By Mr. Stimpson                       337
6  By Mr. Vazquez                        341
7
8              E X H I B I T S
9  DEPOSITION  DESCRIPTION               PAGE
10 Exhibit 1   Rebuttal Report of Richard G.    9
11             Cooper, D.Sc. (7 pages)
12 Exhibit 2   United States Patent, Patent    12
13             No. US 7,752,060 B2 (18 pages)
14 Exhibit 3   Order Regarding Claim Construction  14
15             (12 pages)
16 Exhibit 4   Defendant MDx Medical's Second  19
17             Supplemental Objections and
18             Responses to Plaintiff's First Set
19             of Interrogatories (6 pages)
20 Exhibit 5   Declaration of Richard G. Cooper,  24
21             D.Sc. (29 pages)
22 Exhibit 6   Deposition of Lawrence West taken  137
23             June 26, 2012 (37 pages)
24 Exhibit 7   Deposition of Erika Boyer taken  177
25             June 5, 2012 (28 pages)

---

Page 5

1             E X H I B I T S
2  DEPOSITION  DESCRIPTION               PAGE
3  Exhibit 8   Three different copies of screen  183
4              shots from the Vitals website
5              (14 pages)
6  Exhibit 9   Document headed "Appendix C"     192
7              (101 pages)
8  Exhibit 10  Document headed "Exhibit B -    212
9              Claim Chart" (32 pages)
10 Exhibit 11  Declaration of Ms. Stoll-DeBell  230
11             in Support of Health Grades'
12             Response to MDx's Second Motion
13             for Partial Summary Judgment of
14             Noninfringement (17 pages)
15 Exhibit 12  Deposition of John Neal taken   239
16             June 13, 2012 (64 pages)
17 Exhibit 13  U.S. Patent document headed     255
18             "Issue Notification" (117 pages)
19 Exhibit 14  Expert Report of Philip Greenspun  259
20             (27 pages)
21 Exhibit 15  United States Patent Publication,  260
22             October 16, 2003 (21 pages)
23 ///
24 ///
25 ///

2 (Pages 2 to 5)

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.     October 9, 2012

## Page 6

```
 1              I N D E X
 2
 3       INFORMATION REQUESTED:
 4             (None)
 5
 6
 7
 8       UNANSWERED QUESTIONS:
 9             (None)
10
11
12
13
14
15  START VIDEOTAPE #1:  Page   7
16  START VIDEOTAPE #2:  Page  97
17  START VIDEOTAPE #3:  Page 198
18  START VIDEOTAPE #4:  Page 270
19
20
21
22
23
24
25
```

## Page 7

 1    HEMET, CALIFORNIA; TUESDAY, OCTOBER 9, 2012;
 2           10:00 A.M.
 3
 4       THE VIDEOGRAPHER:  Here begins Volume
 5  No. 1, Videotape No. 1, of the deposition of
 6  Richard Cooper in the matter of Health Grades
 7  versus MDx Medical in the U.S. District Court,
 8  District of Colorado.  Case number is
 9  11-cv-00520-PAB-BNB.
10       Today's date is October 9th, 2012.  The
11  time on the video monitor is 10:00 am.  The video
12  operator today is Kenneth McNeal, Notary Public,
13  contracted by Merrill Legal Solutions at 20750
14  Ventura Boulevard, Suite 205, in Woodland Hills,
15  California.
16       This deposition is taking place at the
17  Hampton Inn at 3700 West Florida Avenue in Hemet,
18  California, and was noticed by Jesus Vazquez of
19  Rothgerber Johnson.
20       Counsel, please identify yourselves and
21  state whom you represent.  Go ahead.
22       MR. VAZQUEZ:  Jesus Vazquez, from
23  Rothgerber Johnson & Lyons, representing the
24  plaintiff, Health Grades.
25       To my left is Kirsten Stoll-DeBell with the

## Page 8

 1  firm Merchant & Gould, also representing the
 2  plaintiff, Health Grades.
 3       MR. STIMPSON:  Scott Stimson, Sills Cummis
 4  & Gross, representing the witness and MDx.
 5       THE WITNESS:  Richard Cooper.  I am the
 6  witness.
 7       MR. STIMPSON:  Just -- Oh, we got that.
 8       THE VIDEOGRAPHER:  The court reporter today
 9  is Karen Pearson-Bell of Merrill.
10       Would the court reporter please swear in
11  the witness.
12
13       RICHARD G. COOPER, D.Sc.,
14        deponent, was sworn and examined
15          and testified as follows:
16
17       DEPOSITION OFFICER:  Do you solemnly swear
18  that the testimony that you are about to give in
19  this deposition shall be the truth, the whole
20  truth, and nothing but the truth, so help you God?
21       MR. COOPER:  I do.
22  ///
23  ///
24  ///
25  ///

## Page 9

 1             EXAMINATION
 2
 3  BY MR. VAZQUEZ:
 4    Q.  Good morning, Dr. Cooper.  As you know, my
 5  name is Jesus Vazquez, and I am taking your
 6  deposition today.
 7       I would like to mark the first exhibit,
 8  please, Cooper 1.
 9       (Deposition Exhibit 1 was marked for
10   identification by the Reporter and is annexed
11   hereto.)
12       (Discussion off the record.)
13  BY MR. VAZQUEZ:
14    Q.  Dr. Cooper, before you review Exhibit 1,
15  just let me ask you a few questions.
16       You have had your deposition taken before;
17  correct?
18    A.  Yes, I have.
19    Q.  About how many times?
20    A.  Oh, dozens.  Maybe 30, 40, 50.
21    Q.  Okay.  And so you know the basic rules.
22  The court reporter will do her best to transcribe
23  both my questions and your responses --
24    A.  Yes.
25    Q.  -- so it's important that I talk slowly and

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.    October 9, 2012

38

1  been put in by anybody.
2      Now, if you are really assuming it is a --
3  the male -- Is it a male changing to female?
4  Because we have changed the story a couple times.
5  I am not really sure --
6     **Q. Okay. Let's start --**
7     A. Could you start with a new question,
8  please?
9     **Q. Let's start again.**
10    A. Okay.
11    **Q. This is the same question. I don't think**
12  **it's really that complicated.**
13    A. Okay.
14    **Q. We have a female.**
15    A. Yes.
16    **Q. She wants to change the gender field on the**
17  **Vitals database --**
18    A. Yes.
19    **Q. -- to note that it is -- a she is a female,**
20  **because it says male.**
21    A. Okay.
22    **Q. She communicates that change to that field.**
23    A. Yes.
24    **Q. In this -- In that case, has she verified**
25  **her gender?**

39

1      MR. STIMPSON: Objection. This question
2  has been asked and answered now.
3      THE WITNESS: I wouldn't use the word
4  "verified." I don't think that's a proper use of
5  the term.
6      She had edited. But "verified" implies
7  that there is an observer not participating in the
8  process who gives true or false to a particular
9  answer. So I don't think the person providing the
10 information can also be called the person who
11 verified the information. That's a matter of the
12 English word "verified" and what it means.
13     She edited it, I will agree, but she didn't
14 verify in the sense I would use that word.
15 BY MR. VAZQUEZ:
16    **Q. What else would she need to do to verify**
17 **the information, then?**
18    A. She wouldn't be able to verify it. It
19 would take a third party, another -- let's say a
20 record from a medical school, something other than
21 the physician to do -- to use the word "verify."
22     She did, according to your supposition,
23 edit, but she did not, according to my
24 understanding of the word "verify," verify.
25    **Q. So your testimony, then, Dr. Cooper, is**

40

1  **that a male physician cannot verify his own gender;**
2  **is that correct?**
3     A. I would say it's broader than that. A
4  physician cannot verify his own information.
5     **Q. I'm talking about gender.**
6     A. Whether it's gender or licensure or any of
7  those things. He can edit them, yes, but he can't
8  verify them by nature of the word "verify."
9     **Q. So it is your testimony that a male**
10 **physician cannot verify his own gender?**
11    A. Correct.
12    **Q. Okay. Do you agree that, in this case, the**
13 **physician has at least confirmed the accuracy of**
14 **her gender?**
15     MR. STIMPSON: Objection to the form.
16     THE WITNESS: I think it's the same
17 question in a sense. The physician can change
18 anything that's -- that's -- the site allows the
19 physician to change, but that does not imply
20 verification.
21 BY MR. VAZQUEZ:
22    **Q. Okay. Could you take a look at Exhibit 3,**
23 **which is the Markman order.**
24    A. Exhibit 3. Okay.
25    **Q. And Page 15 of the Markman order, please.**

41

1     A. Okay.
2     **Q. And do you see -- well, if you turn -- Did**
3  **I say Page 14, sir?**
4     A. You said 15.
5     **Q. I'm sorry. If you could go to Page 14,**
6  **it's right at the bottom of 14, the sentence that**
7  **begins, "The Court agrees." Do you see that?**
8     A. Yes, I do.
9     **Q. Could you please read that into the record.**
10    A.    "The Court agrees with plaintiff
11       that there is no need to construe
12       the word verified and, to the
13       extent it were to be construed, the
14       plain and ordinary meaning could
15       [sic] apply...(when the claim
16       language 'involves little more than
17       the application of the widely
18       accepted meaning of commonly
19       understood words,' construction is
20       relatively straightforward and 'the
21       ordinary meaning...may be readily
22       apparent even to lay judges')."
23    **Q. Okay. And then there was a footnote there,**
24 **Footnote No. 8.**
25    A. Yes.

11 (Pages 38 to 41)

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.     October 9, 2012

Page 42

1  Q.  And could you -- Do you see the footnote
2  at the bottom, sir?
3  A.  I do, yes.
4  Q.  And do you see, about halfway through it,
5  there is a parenthetical that ends with "Phillips,"
6  and then there is a sentence that begins with the
7  word "Here"?
8  A.  Yes.
9  Q.  Would you please read that into the record.
10  A.  The sentence starting with "Here"?
11  Q.  Yes, sir.
12  A.  "Here, the specification makes
13     clear that the act of
14     'verifying'" -- and that's in
15     quotes -- "requires only that the
16     website receive confirmation of the
17     information from some other source,
18     in this instance the healthcare
19     provider."
20  Q.  And can you keep going, please.
21  A.  Continue?
22     "Indeed, the confirmation
23     described appears to not extend
24     beyond receipt of such information
25     from the first healthcare

Page 43

1     provider."
2     Shall I continue?
3  Q.  No, sir.  So having now seen what the
4  Markman order states with respect to verifying --
5  A.  Yes.
6  Q.  -- verified, once the physician sends the
7  information confirming or saying that she is, in
8  fact, a female and would like that information
9  changed or corrected --
10  A.  Yes.
11  Q.  -- is that verified?
12     MR. STIMPSON:  Objection to the form.
13  Asked and answered.
14     THE WITNESS:  I disagree with the Markman
15  construction of verified, or lack of construction,
16  because it has very specific meaning in computer
17  science.  It's not just to edit; it's to confirm,
18  to relate to ground truth rather than to
19  assertions.
20  BY MR. VAZQUEZ:
21  Q.  Okay.  And then, do you agree that, in this
22  case, the physician has at least confirmed the
23  accuracy of her gender?
24     MR. STIMPSON:  Objection.  Form --
25     THE WITNESS:  No.  I regard that word

Page 44

1  similar to "verify."  "Confirm" means to establish
2  ground truth, not to simply provide information.
3  BY MR. VAZQUEZ:
4  Q.  Do you agree that, in this case, the
5  physician has confirmed the accuracy of the fields
6  that she did not change?
7     MR. STIMPSON:  Objection to form.
8     THE WITNESS:  Same responses as the
9  previous time.
10  BY MR. VAZQUEZ:
11  Q.  And so why not?  It is a different
12  question.
13  A.  It's a different question, but you are
14  still using the word "confirm."  And I don't
15  believe the word "confirm" is appropriate, I think
16  for the same reason that "verify" is not
17  appropriate.
18     The physician can edit the information
19  according to your supposition, but I don't see that
20  as providing ground truth.  That would come from,
21  as it said above, another party.
22  Q.  I'm sorry.  What did you -- What did you
23  just reference when you said "another party," just
24  to be clear on the record?  The Markman order?  I
25  thought you disagreed with the Markman order, which

Page 45

1  is --
2  A.  I disagree with the word "verify" --
3  Q.  Okay.
4  A.  -- as interpreted without the context of
5  the computer science use of that term.
6  Q.  Okay.
7  A.  "Confirm" is equivalent to that.
8  Q.  Okay.  Do you agree that, in this instance
9  that we are discussing, the physician wanting to
10  edit her gender, that the Vitals website would have
11  received gender information from the physician?
12  A.  In the supposition that you are making,
13  that the supposition sends that information?  Then
14  I would assume, in that supposition, that the
15  server receives that information in some form.
16  Q.  What would happen if the physician does not
17  change anything?  Would the messages -- Would any
18  messages be sent back to her?
19  A.  To her.
20     MR. STIMPSON:  To her?
21  BY MR. VAZQUEZ:
22  Q.  Yes.  Here we are talking about a female
23  physician who wants to change -- make sure that her
24  gender is noted as female.
25  A.  Okay.

12 (Pages 42 to 45)

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.     October 9, 2012

46

1   Q.  So if the physician does not change
2   anything, would there be any messages that are sent
3   back to the server?
4   A.  Again, that's a matter of the
5   implementation.  My -- It's purely a guess, but I
6   would guess that there is no information sent back
7   to the server if there is no change.
8       But, you know, the question is very, very
9   unformed, I think is the right description.
10  Q.  Okay.  Does the system record that the
11  physician has registered with Vitals, the Vitals
12  website?
13  A.  I don't know.  I haven't looked at the
14  source code of the Vitals website.
15  Q.  Do you know if the Vitals website system
16  records whether the physician has changed or not
17  changed certain fields?
18  A.  I don't know.  I haven't looked at the
19  software or the database or even the HTML
20  presentation.
21  Q.  I am going to list some fields, Dr. Cooper,
22  and I would like you to tell me whether the Vitals
23  website has actually ever received an edit or edits
24  to that field of the MDx physician database.
25  A.  Okay.

47

1   Q.  Specialty information?
2   A.  I don't know.
3   Q.  Gender?
4   A.  I don't know.
5   Q.  Awards and honors?
6   A.  I don't know.
7   Q.  Professional appointments?
8   A.  Again, I don't know.
9   Q.  Professional membership?
10  A.  I don't know.
11  Q.  And languages?
12  A.  I don't have personal knowledge of that,
13  either.
14  Q.  So when you say "I don't know," that means
15  maybe the website has received it, maybe it hasn't;
16  you don't know?
17  A.  I simply don't know.
18  Q.  Okay.
19  A.  That's all the answer that I can
20  realistically provide.
21  Q.  Given your disagreement with the Court's
22  Markman order with respect to "verified," you did
23  not use the Court's interpretation of "verified" in
24  your opinion.  Is that correct?
25  A.  I think the Court's interpretation of that

48

1   particular -- or lack of interpretation of that
2   word, actually.  It wasn't construed in the Markman
3   order, as I recall.  The lay term -- lay meaning of
4   the term instead was substituted.
5       And I'm saying that within the field of
6   computer science, where the accuracy and truth of
7   data has a special meaning, that the word "verify"
8   or its equivalent synonym, such as "confirm," mean
9   that there is some other party besides the provider
10  of the information that verifies that.
11  Q.  So did you use the Court's interpretation
12  of "verified" in your opinion --
13      MR. STIMPSON:  Objection --
14  BY MR. VAZQUEZ:
15  Q.  -- or opinions?
16      MR. STIMPSON:  Objection.  That's been
17  asked and answered just now.
18      THE WITNESS:  I would say I have already
19  answered that.
20  BY MR. VAZQUEZ:
21  Q.  I'm sorry, sir.  You can you just answer it
22  again, then?  I don't believe that you did -- I --
23  my question is --  We have already established that
24  you disagree with the Court's interpretation with
25  respect to "verify."  Correct?

49

1       MR. STIMPSON:  Objection.  That misstates
2   his testimony.
3       THE WITNESS:  Yeah.  I -- I don't think I
4   said it that way.  I said the Court chose not to
5   construe in the Markman order the word "verify,"
6   and I believe that the Court should have construed
7   that.
8       I think, within the meaning of the context
9   of that patent, which is -- deals with computer
10  science, the word "verify" has a more formal
11  meaning that relates to establishing the ground
12  truth of a fact or a piece of data or a statement.
13  BY MR. VAZQUEZ:
14  Q.  But, Dr. Cooper, the Court said that the
15  doctor providing information is good enough, did it
16  not?
17      MR. STIMPSON:  Objection.  Form.
18      THE WITNESS:  In your scenario, the doctor
19  provided information.
20  BY MR. VAZQUEZ:
21  Q.  And the Court said that was good enough,
22  did it not?
23      MR. STIMPSON:  Objection to the form.
24      THE WITNESS:  I believe that the Court said
25  that.  But I wouldn't agree with that, no.

13 (Pages 46 to 49)

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.    October 9, 2012

## Page 50

1  BY MR. VAZQUEZ:
2    Q.  So you disagree with the Court in that
3  instance?
4    A.  I disagree with that particular lack of
5  construal of that word.
6    Q.  So, Dr. Cooper, do you intend to give
7  testimony that conflicts with the Court's Markman
8  order?
9       MR. STIMPSON:  What?  Excuse me.
10      Can I have that back?
11      (The pending question was read.)
12      THE WITNESS:  In the case of the word
13  "verify," I intend to explain to the Court that the
14  word has a deeper meaning in computer science than
15  it does in lay terms, in the vernacular.
16 BY MR. VAZQUEZ:
17   Q.  So you do intend to give testimony that
18 conflicts with the Court's Markman order; correct?
19   A.  The same response.
20      MR. STIMPSON:  Objection to form.
21 BY MR. VAZQUEZ:
22   Q.  Dr. Cooper, who knows a person's gender
23 better than the person himself or herself?
24   A.  I couldn't imagine anyone who would know
25 it better than the person themselves, yes.

## Page 51

1    Q.  Thanks.
2        Dr. Cooper, I believe that, in your report,
3  you give two reasons why you believe that Vitals
4  does not literally infringe the healthcare
5  provider-verified information limitation.  Correct?
6    A.  Where in my report do I say that?
7    Q.  I believe, Paragraph 13 and Paragraph 15.
8    A.  Paragraph 13 deals with my background.
9    Q.  Are you looking at your rebuttal report?
10   A.  I am looking at the original report.
11   Q.  I'm sorry.  I should have been clear.
12   A.  You are thinking of the rebuttal report?
13   Q.  Yes, sir.
14   A.  And which --
15   Q.  Paragraph 13 and 15.
16   A.  Which exhibit was that?  That was --
17 Number 1, I think?
18   Q.  Number 1, I believe.
19   A.  Okay.  Could you ask the question again,
20 please?
21   Q.  In your report, you give two reasons why
22 you believe that Vitals does not literally infringe
23 the healthcare provider-verified information
24 limitation.  Correct?
25   A.  Well, I said:

## Page 52

1        "There is no evidence that
2        Vitals.com healthcare providers
3        verify (in any of the above three
4        senses) the database entries
5        describing the first healthcare
6        provider."
7    Q.  Well, my question is whether --  You give
8  two reasons, and then we will discuss the reasons.
9  Are there two reasons that you give why you believe
10 that Vitals does not literally infringe the
11 healthcare provider-verified information
12 limitation?
13   A.  That depends.  I'm not sure how you are
14 counting two.
15      In Paragraph 13, I agreed with what I
16 wrote then.  I haven't changed my opinion since
17 then, which is that I agree that Dr. Greenspun, in
18 fact, who said that the meaning of "verify" is to
19 prove, confirm, or substantiate an assertion.
20 There is no evidence that Vitals.com healthcare
21 providers verify in any of those senses the
22 database entries describing the healthcare
23 provider.
24   Q.  Okay.  That was a long answer.  Did you
25 mention somewhere in there that you have changed

## Page 53

1  your opinions?
2    A.  No.  I mentioned that I have not.
3    Q.  You have not.  Okay.
4    A.  Have not changed my opinions.
5    Q.  Thank you.
6        Well, in Paragraph 13, you first argue that
7  the information provided by the physicians to
8  Vitals or the Vitals website does not meet the
9  definition of the term "verified."  Right?
10   A.  That's correct.
11   Q.  And then, in Paragraph 15, your second
12 argument is that whether Vitals is capable of
13 receiving verified information from a physician is
14 not relevant to infringement.  Is that right?
15   A.  Paragraph 15.  Just a moment.
16      Okay.  I'm sorry.  Would you repeat the
17 question?
18   Q.  Sure.  Your second argument is that whether
19 the Vitals website is capable of receiving verified
20 information from a physician is not relevant to
21 infringement.  Is that right?
22   A.  That's correct.  Capability is not
23 actuality.
24   Q.  Okay.  And with respect to the first
25 argument at Paragraph 13, if the Court stands by

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.    October 9, 2012

---

**Page 122**

1    Q. Well, sir, you just read this language into
2  the record. It doesn't say it's from physicians.
3  Maybe I will read it into the record. Quote:
4        "The following information is
5         obtained from one or more
6         third-party sources" --
7    A. Where are you reading?
8    Q. Page 6. Third paragraph after Heading E.
9  Quote:
10       "The following information is
11        obtained from one or more
12        third-party sources: board
13        certification, licensure,
14        disciplinary action information,
15        medical school, medical internship,
16        medical residency and medical
17        fellowship information," close
18        quote.
19   A. Yes. That's --
20   Q. I read that accurately; right?
21   A. Yes, you did. And that is correct.
22   Q. Okay.
23   A. As stated here in the interrogatories.
24   Q. All right. So the Vitals website compiles
25  information about licensure from third parties;

---

**Page 123**

1  correct?
2    A. What do you mean by "compile"?
3    Q. Well, you are the computer expert, sir.
4  What is the common meaning of the word "compile"?
5    A. To compile a source code, not data.
6  Compiling is something that's done to a program to
7  make it run on a machine. It's not --
8    Q. Right.
9    A. -- a term that's used in databases.
10   Q. And so we started this question or this
11  line of questions by looking at the patent --
12   A. Yes.
13   Q. -- and Claim 1, Column 20, beginning at
14  Line 50.
15   A. Uh-huh.
16   Q. Do you see where it says, "Compiling
17  information"?
18   A. I do. That's the claim.
19   Q. Okay. And are you -- Does that not help
20  you understand what "compiling" means in that claim
21  language?
22   A. No, it doesn't. I think that's
23  indeterminate, because the word "compiling" --
24  Hasn't that been construed in the Court's --
25   Q. Sure was. You read my mind. How about

---

**Page 124**

1  turning to Exhibit 3?
2    A. 3. All right.
3    Q. And at the very last term on Page 24, the
4  back page -- Just flip that over, sir. You'll be
5  right at it.
6    A. Oh, okay.
7    Q. And do you see there where Judge Brimmer
8  construed "compiling" or "compiled" to mean, quote,
9  "gathering and/or putting together," close quote?
10   A. I do.
11   Q. Okay. So now can we return to my question,
12  which is: The Vitals website compiles information
13  about licensure from third parties; correct?
14   A. I will agree that that's what the Court
15  construal states, compiling information from third
16  parties, that's correct.
17   Q. And the Vitals website compiles information
18  about medical school from third parties; right?
19   A. I believe that's true, yes.
20   Q. And the Vitals website compiles information
21  about residency from third parties; correct?
22   A. I would like to see that in my report.
23   Q. Or you can turn to the response to
24  interrogatories, sir.
25   A. Okay.

---

**Page 125**

1    Q. You just read that.
2    A. What page would that be?
3    Q. Page 6.
4    A. Okay. The party?
5    Q. Yes. The third paragraph.
6    A. And the thing was residency?
7    Q. Yes, sir.
8    A. Medical residency, yes, that is mentioned
9  in there.
10   Q. So the Vitals website compiles information
11  about medical residency from third parties;
12  correct?
13   A. According to the Court's construction of
14  "compile," yes.
15   Q. Yes. And the Vitals website compiles
16  internship information from third parties; correct?
17   A. Medical internship is also listed, yes.
18   Q. And the Vitals website compiles information
19  about fellowship from third parties; right?
20   A. Medical fellowship, yes, that's correct.
21   Q. And the Vitals website compiles information
22  about Board certification from third parties;
23  right?
24   A. That's correct.
25   Q. And the Vitals website compiles information

---

32 (Pages 122 to 125)

**Highly Confidential - Attorneys' Eyes Only**
**Richard G. Cooper, D. Sc.    October 9, 2012**

---

### 126

1  about disciplinary action from third parties;
2  correct?
3      A.  That's correct.
4      Q.  Now, in your -- I believe it's your
5  rebuttal report, at Paragraph 24.
6      A.  My rebuttal report?
7      Q.  Yes, sir.  Which is Deposition Exhibit 1.
8      A.  Okay.  Where in that report?
9      Q.  Paragraph 24.
10     A.  24.  Okay.  I'm there.
11     Q.  And if you would please read that paragraph
12  to yourself, and then I will ask you questions.
13     A.  Okay.
14         Okay.
15     Q.  In that paragraph, the reason why you
16  believe that Vitals website does not literally
17  infringe this third-party verified information
18  limitation is what, sir?
19     A.  Reading Paragraph 24:
20         "Dr. Greenspun's analysis relies
21         on the fact that MDx obtains
22         various items from third
23         parties....Verification of the
24         data, however, is not the same as
25         receiving the data."

### 127

1          And finally, on 26, there is a disclaimer
2  by the providers that they do not guarantee or
3  stand by the data and that it may be completely
4  inaccurate.
5          So I would not consider that verified.
6      Q.  Okay.  So this gets back to the
7  construction of what "verified" means; correct?
8      A.  Correct.  Are we on the construction
9  document again?
10     Q.  No.  I'm just asking you that question.
11     A.  Correct.
12     Q.  And so it's an issue of claim
13  interpretation; correct?
14     A.  I suppose you could say that.  I think
15  it's quite clear what "verified" means.
16     Q.  Okay.
17     A.  And I think the Court construction is in
18  line with the way I think it should be.  Verifying
19  is stated as checking the accuracy of the claim.
20         May I take a moment and get a --
21     Q.  Sure.  Let's go off the record.
22     A.  -- some water?  If you want to.  But I can
23  go ahead and answer the questions while I'm getting
24  a refill.
25         MR. STIMPSON:  Here, I'll get it for you.

### 128

1          THE WITNESS:  Oh, all right.  Thanks.
2          MR. VAZQUEZ:  You can bring that pitcher
3  over here.
4          THE WITNESS:  That's a good idea.
5          THE VIDEOGRAPHER:  We are still on?
6          MR. VAZQUEZ:  Yes, still on.
7          MR. STIMPSON:  There you go.
8          THE WITNESS:  Thank you.
9          MR. VAZQUEZ:  So could you please read that
10  last answer back about -- just what his response
11  was.
12         (The answer was read as follows:
13          "A.  And I think the Court
14          construction is in line with the
15          way I think it should be.
16          Verifying is stated as checking the
17          accuracy of the claim.")
18  BY MR. VAZQUEZ:
19     Q.  Dr. Cooper, do you agree that the term
20  "verified" should be given the same meaning when
21  used in the phrase "healthcare provider verified"
22  as when used in the term "third-party verified
23  information"?
24     A.  You are quoting out of context.  But the
25  healthcare provider-verified information is not

### 129

1  verified in line with the construal by the Court if
2  the healthcare provider was also the originator.
3  The originator of the information can't verify his
4  own information.  That's a basic tenet.
5      Q.  So that is your expert testimony, that the
6  originator of the information cannot verify --
7      A.  That's correct.
8      Q.  -- their own information that they have
9  provided?
10     A.  That's correct.
11     Q.  So, for example, a physician verifying that
12  he is a male, under your -- your opinion is that
13  that person cannot verify that?
14     A.  Well, you're welcome to verify it, but he
15  can't if he originated it.
16         Now, if the information came from
17  elsewhere, then possibly he could.
18     Q.  Okay.  Do you agree that the term
19  "verified," in the phrase "third-party verified,"
20  required only that MDx receive confirmation from a
21  third party?
22     A.  I'm sorry.  Can you go through that again?
23  I didn't --  Where your information is coming from,
24  where is that question --
25     Q.  Sometimes I'm just asking a question.

33 (Pages 126 to 129)

**Merrill Corporation - Chicago**

(312) 386-2000                                    www.merrillcorp.com/law

Highly Confidential - Attorneys' Eyes Only
Richard G. Cooper, D. Sc.    October 9, 2012

---

146

1      what will ultimately be put into a
2      report."
3    A.  I see that.
4    Q.  And then, after citing, in a parenthetical
5  that states:
6       "('The particular embodiments
7       described herein are not intended
8       to limit the types of information
9       which may be provided and/or
10      verified.')."
11      The quote went on and states:
12       "For instance, a patient or
13       healthcare provider might provide
14       information to the website that is
15       not deemed relevant or important
16       upon reaching the step of creating
17       a report."
18    A.  I see that.
19    Q.  Okay. So having now looked at the Court's
20  order, I'll go back to the question, which was:
21  Didn't the Court hold that this element, the
22  creating-by element that we were looking at --
23    A.  Okay.
24    Q.  -- does not require that all of the
25  physician-verified information be used to create

---

147

1  the report?
2    A.  That's correct. It does not require that
3  all the information be -- It doesn't specifically
4  call that out.
5    Q.  Okay. Now, did you state just a bit ago,
6  in response to one of my questions, that the report
7  must be displayed?
8    A.  Can you read back my response on that,
9  please.
10    Q.  Well, let me just ask you new.
11    A.  Okay.
12    Q.  Are you stating that the report must be
13  displayed?
14    A.  I am saying, one way or another, the
15  report has to be presented. And whether it's
16  displayed, printed, e-mailed, whatever, is -- is a
17  matter of presentation style.
18    Q.  Okay. But that does not necessarily mean
19  that the things used to create the report need to
20  be displayed, does it?
21       MR. STIMPSON: Objection to the form.
22       THE WITNESS: I believe the Court's
23  construction says that not all of it need be
24  displayed, yes.
25

---

148

1  BY MR. VAZQUEZ:
2    Q.  Exactly. So you agree, then, Dr. Cooper,
3  that this claim element does not require the
4  display of patient-provided information?
5       MR. STIMPSON: Objection to form. Asked
6  and answered.
7       THE WITNESS: Yeah, same answer.
8  BY MR. VAZQUEZ:
9    Q.  Which is it does not?
10       MR. STIMPSON: Objection to the form. It's
11  asked and answered.
12       THE WITNESS: (No response.)
13  BY MR. VAZQUEZ:
14    Q.  Even though your counsel objects, you still
15  have to answer the question.
16    A.  Well, I agree with Counsel. It was asked
17  and answered. And if you would read back the
18  answer, please, then --
19       MR. VAZQUEZ: Go ahead.
20       THE REPORTER: What am I reading?
21       MR. STIMPSON: I think it's around where he
22  was referring to -- where you referred to --
23       MR. VAZQUEZ: We just --
24       MR. STIMPSON: Paragraph 37, I think, of
25  his report is where he was referring to.

---

149

1       THE REPORTER: So you want me to search for
2  Paragraph 37?
3       MR. STIMPSON: I think that's where he said
4  it, yeah.
5       (The answer was read as follows:
6        "Q. You agree that the Court
7        held that this element does not
8        require that all the
9        physician-verified information be
10       used to create the report; right?"
11        "A. No. Could you show me
12       where that's in the Court's
13       order?")
14       MR. STIMPSON: I'm sorry. It must have
15  been before that. I think it was before that then.
16       THE REPORTER: I don't know what I am
17  looking for.
18       MR. STIMPSON: Okay. Sorry.
19       MR. VAZQUEZ: Can we agree that I can ask
20  the question and you will answer it?
21       MR. STIMPSON: A second time, you mean?
22       MR. VAZQUEZ: Yeah. Because you could
23  easily find it.
24       MR. STIMPSON: Okay. Well -- Oh, I can.
25  Hold on. We will find it.

---

38 (Pages 146 to 149)

Merrill Corporation - Chicago

(312) 386-2000                              www.merrillcorp.com/law

**Highly Confidential - Attorneys' Eyes Only**
**Richard G. Cooper, D. Sc.    October 9, 2012**

230

1  not the website in front of me.
2      MR. VAZQUEZ: Just pulling another exhibit
3  here.
4      Please mark this as our next deposition
5  exhibit, please. I think it's 11.
6      (Deposition Exhibit 11 was marked for
7      identification by the Reporter and is annexed
8      hereto.)
9      THE WITNESS: Are we staying on 23?
10 BY MR. VAZQUEZ:
11     Q. No. I am going give you a new exhibit.
12     A. Ah. Thank you.
13     Q. This is not the best copy. I apologize. I
14 am looking at Page 24 of 32 of what we have just
15 marked as Exhibit 11.
16     MR. STIMPSON: Can you wait until I get my
17 copy, please? I want to catch up.
18     MR. VAZQUEZ: Sure.
19     MR. STIMPSON: Thank you. This is 11?
20 Now, which page are you looking at, Jesus?
21     MR. VAZQUEZ: 24 of 32.
22     Q. And, Dr. Cooper, is this a report on
23 Dr. Sujana S. Chandrasekhar?
24     A. It appears to be, yes.
25     MR. STIMPSON: I'm sorry. I can't seem

231

1  to -- Oh, I see. Okay. I'm with you. Okay.
2  BY MR. VAZQUEZ:
3      Q. And do you agree that a potential patient
4  could click here on Dr. Chandrasekhar's name and --
5      A. Go ahead.
6      Q. -- and access a full report on the first
7  healthcare provider?
8      A. All I am looking at is paper. I'm not
9  sure that he could click on it. But if that's your
10 assertion, I will go along with it, since I don't
11 have evidence to the contrary.
12     Q. So assuming this is -- actually, the
13 patient is looking at this on a screen, which is
14 what we are assuming --
15     A. Okay.
16     Q. -- your answer is yes?
17     A. Yes.
18     Q. Okay. And is this an example of a
19 healthcare provider report on the first healthcare
20 provider?
21     A. I don't have evidence one way or the other
22 on that. If you want to assert that, then I will
23 accept that.
24     Q. Well, I think you agreed it was a report.
25 Right?

232

1      A. It's an HTML display, which could be
2  construed as a report under the right
3  circumstances, but I don't know that it's construed
4  as a report under Claims 1 or 15.
5      Q. Is it a report on this particular doctor,
6  Dr. Chandrasekhar?
7      A. It mentions Dr. Sujana S. Chandrasekhar,
8  M.D., but you haven't established that it's a
9  report on the -- within the meaning of the claims.
10 It is an HTML page, it looks like, that's been
11 printed. It says at the bottom Screenshot 12.
12     Q. Yup. And is it a report on a particular
13 doctor about whom information was requested?
14     A. I have no way of knowing that. In
15 Paragraph 24:
16         "I" -- whoever "I" is --
17         "captured the entire page in four
18         screenshots shown below:"
19     If that's correct, then the four screen
20 shots would be 12, 13, 14, and 15.
21     Q. What are you referring to when you say "24
22 I"?
23     A. In Paragraph 24 --
24     Q. Oh, the word "I"?
25     A. "I" is used, yes, whoever "I" is.

233

1      Q. Okay. What happens, Dr. Cooper, when you
2  click on a doctor's name in a results list on the
3  Vitals website?
4      A. I don't know. I haven't clicked on that
5  name. I have found that I can't get a report that
6  meets the construction of the claim. That's all I
7  know.
8      Q. Did you say you found that you can't,
9  cannot get a report?
10     A. I cannot find a report that meets the
11 construction of the claim.
12     Q. Okay. So I asked you what happens when you
13 click on a doctor's name on a results list.
14     A. And I said I don't know, but I will accept
15 your assertion that it brings up a report.
16     Q. Okay. But -- So have you done it
17 yourself?
18     A. I have not looked at it that way, no. I
19 looked at the report first, the results list
20 second.
21     Q. Have you, yourself, clicked on a doctor's
22 name in the report on the Vitals website?
23     A. In a report?
24     Q. Uh-huh.
25     A. This is -- I have not clicked on a

59 (Pages 230 to 233)

**Highly Confidential - Attorneys' Eyes Only**
**Richard G. Cooper, D. Sc.    October 9, 2012**

|  | 234 |
|---|---|
| 1 | doctor's name in a report, no. |
| 2 | Q.  Have you --  So as part of just preparing |
| 3 | for rendering your opinions or working on the case, |
| 4 | Dr. Cooper, have you been on the Vitals website? |
| 5 | A.  Yes, I have. |
| 6 | Q.  How much time have you spent on the Vitals |
| 7 | website? |
| 8 | A.  Oh, I have no idea. |
| 9 | Q.  Well, more than an hour? |
| 10 | A.  Probably more than an hour, probably less |
| 11 | than two. |
| 12 | Q.  Okay.  Thanks. |
| 13 |     And so whether it's on a report within the |
| 14 | meaning of the claims or a results list, have you |
| 15 | had a chance to simply click on a doctor's name |
| 16 | when it comes up on the Vitals website? |
| 17 | A.  I don't recall clicking on the name |
| 18 | itself.  I have clicked on pages.  I don't recall |
| 19 | the name being one of those.  Whether the name is a |
| 20 | sensitive link or just text isn't clear from this |
| 21 | material. |
| 22 | Q.  Have you run a sample search query -- |
| 23 | A.  Yes. |
| 24 | Q.  -- in the time you spent on the Vitals |
| 25 | website? |

|  | 235 |
|---|---|
| 1 | A.  Yes, I have. |
| 2 | Q.  And do you recall what query that was or |
| 3 | what queries they were? |
| 4 | A.  I ran a number of queries to see what the |
| 5 | various attributes of the claim elements were |
| 6 | practiced. |
| 7 | Q.  So, for example, did you just run a search |
| 8 | for a type of doctor? |
| 9 | A.  Only a type of doctor? |
| 10 | Q.  Yes. |
| 11 | A.  I believe I did not.  I searched for a |
| 12 | type of doctor within a location of my -- my home |
| 13 | within Hemet. |
| 14 | Q.  Okay.  Good.  And so you received |
| 15 | information in response to the query you submitted; |
| 16 | correct? |
| 17 | A.  That's correct. |
| 18 | Q.  And did the information include doctors' |
| 19 | names? |
| 20 | A.  Yes, it did. |
| 21 | Q.  And so did you click on any of those |
| 22 | doctors' names? |
| 23 | A.  Same answer as before.  I don't recall |
| 24 | clicking on the name, no. |
| 25 | Q.  Okay. So, Dr. Cooper, you don't recall |

|  | 236 |
|---|---|
| 1 | clicking on a name.  Do you recall getting to a |
| 2 | report on a doctor? |
| 3 | A.  Yes.  I did. |
| 4 | Q.  Okay.  And what was the information that |
| 5 | you recall you accessed when you did that? |
| 6 | A.  I don't recall that.  I was on -- |
| 7 | Information that may or may not have been |
| 8 | equivalent to this. |
| 9 | Q.  Well, then, how did you --  Do you recall |
| 10 | how you got that report? |
| 11 | A.  I recall I searched.  I don't recall the |
| 12 | details.  Do you have access to the website now? |
| 13 | Maybe we could clarify that. |
| 14 | Q.  No.  As you can see, we've got a pretty |
| 15 | slow connection here. |
| 16 | A.  Yes. |
| 17 | Q.  Otherwise I would indulge you in that. |
| 18 | A.  Okay. |
| 19 | Q.  I'm just trying to see whatever you |
| 20 | remember about the search queries you said you ran. |
| 21 | A.  Yes. |
| 22 | Q.  Obviously, you ran for, as you said, a type |
| 23 | of doctor near Hemet? |
| 24 | A.  Yes. |
| 25 | Q.  You received some information.  You say you |

|  | 237 |
|---|---|
| 1 | remember getting to a doctor report? |
| 2 | A.  I was getting to a doctor report, but |
| 3 | whether that's within the meaning of the claims, my |
| 4 | contention is no, it's not, because it didn't |
| 5 | practice all the elements. |
| 6 |     And that's what I spent my time looking |
| 7 | for, whether the elements were practiced. |
| 8 |     MR. VAZQUEZ:  All right.  I'll just move to |
| 9 | strike that response.  It's nonresponsive. |
| 10 | Q.  Let's just move on, Dr. Cooper.  Okay, |
| 11 | Dr. Cooper, let's --  How was it that you |
| 12 | pronounced the doctor's last name on Page 24 of 32 |
| 13 | of Exhibit 11? |
| 14 | A.  I pronounced it Sujana.  I'm not sure if |
| 15 | that's right.  Chandrasekhar, which I believe is a |
| 16 | reasonable approximation. |
| 17 | Q.  Okay. |
| 18 | A.  Probably not right -- |
| 19 |     MR. STIMPSON:  Couldn't you pick Dr. Smith |
| 20 | or something? |
| 21 |     THE WITNESS:  Smith, Jones. |
| 22 |     MR. STIMPSON:  Whose idea was this? |
| 23 |     MS. STOLL-DeBELL:  I have no idea. |
| 24 | BY MR. VAZQUEZ: |
| 25 | Q.  Well, how about, just for simplicity, I |

60 (Pages 234 to 237)