# EXHIBIT E

Attorneys' Eyes Only

Page 1

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2              IN THE UNITED STATES DISTRICT COURT

3                FOR THE DISTRICT OF COLORADO

4      Case No. 11-CV-00520-PAB-BNB

5      _____

6      30(b)(6) DEPOSITION OF HEALTH GRADES, INC.,

7      Representative John Neal

8      and

9      DEPOSITION OF JOHN NEAL

10     June 13, 2012

11     _____

12

       HEALTH GRADES, INC.,

13

       Plaintiff,

14

       v.

15

       MDX MEDICAL, INC. d/b/a VITALS.COM,

16

       Defendant.

17     _____

18

19

20

21

22

23

24

25      Job No. NJ399592

Attorneys' Eyes Only

Page 2

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     APPEARANCES:
 3         MERCHANT & GOULD
              By Kristin L. Stoll-DeBell, Esq.
 4                1050 17th Street
                  Suite 1950
 5                Denver, CO 80265
                  Phone: 303.357.1670
 6                Fax: 303.357.1671
                  kstolldebell@merchant-gould.com
 7                Appearing on behalf of the
                  plaintiff
 8
 9         ROTHGERBER JOHNSON & LYONS LLP
              By Jesus Manuel Vazquez Jr., Esq.
10                1200 Seventeenth Street
                  Suite 3000
11                Denver, CO 80202-5855
                  Phone: 303.623.9000
12                Fax: 303.623.9222
                  jvazquez@rothgerber.com
13                Appearing on behalf of the
                  Plaintiff
14
           SILLS CUMMIS & GROSS, PC
15            By Scott D. Stimpson,  Esq.
                  David C. Lee, Esq.
16                30 Rockefeller Plaza
                  New York, NY 10112
17                Phone: 212.643.7000
                  Fax: 212.653.6500
18                sstimpson@sillscummis.com
                  Appearing on behalf the Defendant
19
20
21
22
23
24
25
```

Attorneys' Eyes Only

Page 3

1         CONFIDENTIAL - ATTORNEYS EYES ONLY

2              Pursuant to Notice and the Federal Rules of

3     Civil Procedure, the 30(b)(6) Deposition of Health

4     Grades, Inc. and Deposition of John Neal, called by

5     Defendant, was taken on Wednesday, June 13, 2012,

6     commencing at 8:22 a.m., at 1200 Seventeenth Street,

7     Suite 3000, Denver, Colorado, before Kelly A.

8     Mackereth, Certified Shorthand Reporter, Registered

9     Professional Reporter, Certified Realtime Reporter

10    and Notary Public within Colorado.

11

                         * * * * * * *

12                       I N D E X

13

      EXAMINATION                              PAGE

14

       BY MR. STIMPSON                           6

15     BY MR. VAZQUEZ                          316

16

      PRODUCTION REQUEST(S):

17

       None.

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

Page 4

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2                  INDEX OF EXHIBITS
 3
                                              INITIAL
 4    DESCRIPTION                             REFERENCE
 5
        Exhibit 44  MDx Medical, Inc.'s Notice of      12
 6                  Deposition of John Neal
 7      Exhibit 45  MDx Medical, Inc.'s Notice of      38
                    30(b)(6) Deposition of Health
 8                  Grades
 9      Exhibit 46  Project Development Plan,         164
                    4/15/2004
10
        Exhibit 47  E-mail string re Patient          166
11                  Experience Survey
12      Exhibit 48  E-mail string re Patient          173
                    Experience Survey
13
        Exhibit 49  Patient Experience Survey         179
14
        Exhibit 50  2/16/05 e-mail from Montroy to    212
15                  Hicks re Consumer Update
16      Exhibit 51  E-mail string re Health Grades'   215
                    reports, w/attachments
17
        Exhibit 52  1/19/05 e-mail from Neal to       237
18                  Kerry Hicks re presentation,
                    w/attachments
19
        Exhibit 53  3/24/05 e-mail from Loughran to   255
20                  Neal, et al.
21      Exhibit 54  E-mail string re Vitals.com       272
22      Exhibit 55  E-mail string re Vitals new       279
                    posting on their hospital
23                  program
24      Exhibit 56  E-mail string re Vitals/UCompare 284
25
```

Page 5

1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2
                                          INITIAL
3    DESCRIPTION                          REFERENCE
4
     Exhibit 57  Complaint and Demand for Jury    291
5                Trial
6    Exhibit 58  E-mail string re Vitals.com      293
7    Exhibit 59  E-mail string re Insurance       296
                 Provider Filter for Search
8
     Exhibit 60  3/17/08 e-mail from Neal to       299
9                Hicks, et al., w/attachment re
                 Target List
10
     Exhibit 61  E-mail string re Vitals.com       312
11               hospital ratings
12
     PREVIOUSLY MARKED EXHIBITS
13
14   Exhibit 3                                      13
     Exhibit 4                                     269
15   Exhibit 8                                     108
     Exhibit 10                                    249
16   Exhibit 12                                    267
     Exhibit 20                                    103
17   Exhibit 21                                     99
     Exhibit 25                                    157
18   Exhibit 26                                    205
     Exhibit 27                                    209
19   Exhibit 29                                    168
20
21
22
23
24
25

Attorneys' Eyes Only

                                                    Page 6

 1              CONFIDENTIAL - ATTORNEYS EYES ONLY

 2                        * * * * * * *

 3                   P R O C E E D I N G S

 4                      JOHN NEAL,

 5      having been first duly sworn, was examined and

 6      testified as follows:

 7                      EXAMINATION

 8      BY MR. STIMPSON:

 9              (Exhibits 44 and 45 marked.)

10          Q      Good morning, Mr. Neal.

11          A      Good morning.

12          Q      I'm Scott Stimpson.  I'll be taking your

13      deposition today.  Have you ever had your deposition

14      taken before?

15          A      No.

16          Q      Well, I'll be asking you questions, and

17      you'll be expected to answer completely and

18      truthfully.  Okay?

19          A      Um-hum, yes.

20          Q      And from time to time your lawyer may

21      object, but you'll still be expected to answer the

22      question.  All right?  So if you can please pay

23      attention to the question even if there's some

24      colloquy between counsel.  Okay?

25          A      Yes.

Attorneys' Eyes Only

Page 152

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      distinction.
 3          Q     Okay.  So the ratings are assigned to
 4      parts of hospitals, correct?
 5          A     They are.
 6          Q     And under your own definition, founding
 7      your own patent of '060, right, you said that
 8      hospitals were healthcare providers, correct?
 9              MR. VAZQUEZ:  Form.
10          A     Based on, yes, the abstract definition.
11          Q     (BY MR. STIMPSON)  Right.  And any user
12      looking at this Physician Quality Comparison Report
13      could compare ratings on these parts of hospitals
14      from this Physician Quality Comparison Report in
15      2004, correct?
16          A     I'm not sure what interpretation the
17      consumer might make, but there's not a means by which
18      to compare facilities and make a choice.  You can
19      choose my service line and evaluate, but there is no
20      method of comparison in there.
21          Q     So you're telling me that a user of this
22      Physician Quality Comparison Report could not look at
23      the Central Baptist Hospital and say, cardiac has a
24      three-star rating and then -- let me just find one
25      word here.
```

Page 153

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               So you're telling me, Mr. Neal, that a

3      user could not look at this Physician Quality

4      Comparison Report and look, for example, and see that

5      Central Baptist Hospital in neurosciences -- I'm

6      sorry, in pulmonary, has a three-star rating, and

7      also note from the same exact document that Pattie A.

8      Clay Hospital in Richmond, Kentucky had a five-star

9      rating in pulmonary, right?

10               MR. VAZQUEZ:  What is the question?

11          Q    (BY MR. STIMPSON)  The user could do that,

12      right?

13          A    They could look at this report and see

14      that information.

15          Q    Right, and the way they do that is they

16      look at the ratings for the Central Baptist Hospital

17      under pulmonary, and then they compare it to the

18      Pattie A. Clay Hospital, pulmonary, right, and you'd

19      see that the Pattie A. Clay Hospital had a much

20      better rating than the Central Baptist Hospital,

21      correct?

22          A    A consumer might do that.

23          Q    If a consumer did that -- well, let me

24      just back up.

25               Actually, that's exactly the reason why

Page 154

```
1              CONFIDENTIAL - ATTORNEYS EYES ONLY
2      these ratings are here, right, so the consumers can
3      compare these ratings to these various hospitals in
4      the various areas, right?
5              MR. VAZQUEZ:  Object to form.  Compound.
6      A       That may be a reason why.
7      Q       (BY MR. STIMPSON)  Okay.  Thank you.
8              Now, you also knew that the Health Grades
9      website was managed by Health Grades in the 2004
10     timeframe, right?
11     A       The Health Grades website -- I'm just
12     repeating the question.  Repeat the question, please.
13             (Record read as requested.)
14     A       Okay, yes, I did.
15     Q       (BY MR. STIMPSON)  And you knew that the
16     Physician Quality Comparison Reports for 2004
17     included board certification, right?
18     A       Correct.
19     Q       You knew that came from third parties?
20     A       It did.
21     Q       Okay.  And you knew it included licensure,
22     right?
23     A       I believe that was one of the elements we
24     identified, yes.
25     Q       And you knew that came from third parties?
```

Attorneys' Eyes Only

Page 155

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A     Yes.

3      Q     Okay.  You knew that the Physician Quality

4   Comparison Report of 2004 included disciplinary

5   information?

6      A     Yes.

7      Q     And you knew that came from third parties?

8      A     Correct.

9      Q     You knew that the Physician Quality

10  Comparison Reports from 2004 included medical school

11  information, right?

12     A     Yes.

13     Q     And you knew that came from third parties?

14     A     Yes.

15     Q     Okay.  And you knew it also included

16  internship, residency, and fellowship information,

17  right?

18     A     Correct.

19     Q     And you also knew that all three of those

20  came from third parties, right?

21     A     Correct.

22     Q     And then you also knew that the Health

23  Grades website, in response to the request from the

24  consumer, would create a report, could create a

25  report on healthcare providers, right?

Attorneys' Eyes Only

Page 166

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2         Q     (BY MR. STIMPSON)  I'm asking a question.

3         A     Okay.

4         Q     Does this help refresh your recollection

5    that as of early 2004, Health Grades was collecting

6    patient satisfaction data?

7              MR. VAZQUEZ:  Object to form.

8         A     This -- as I understand Project

9    Development Plans, and I'm not a developer or

10   programmer, this is a plan to develop the capability

11   to have that solution, any solution.

12             So I wouldn't make the assumption that

13   this was available in any specific timeframe

14   immediately after this document was produced.

15             MR. STIMPSON:  Let me have this one

16   marked, okay?

17             MR. LEE:  It's going to be Exhibit 47.

18             (Exhibit 47 marked.)

19             MR. VAZQUEZ:  Thank you.

20        Q     (BY MR. STIMPSON)  Take a second and take

21   a look at that, please.

22        A     Okay.

23        Q     Does this refresh your memory, Mr. Neal,

24   that patient experience surveys were launched in mid

25   May 2004?

Attorneys' Eyes Only

Page 167

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2              MR. VAZQUEZ:  Object to form.

3         A    This -- any reference to JD Power &

4    Associates, I can tell you that the form of questions

5    that they use in any content that we may have

6    gathered is not used on our website today.

7              So it was unrelated to my activities.  I

8    see I was copied on one of these e-mails.  It just

9    wasn't something I was working on.

10             MR. STIMPSON:  Move to strike as

11   nonresponsive.

12        Q    (BY MR. STIMPSON)  Mr. Neal, Health Grades

13   was collecting patient experience survey data in May,

14   starting in May of 2004, correct?

15        A    Okay.  You know, the thing I'm struggling

16   with, is this on JD Power's website, or is this on

17   Health Grades'?

18        Q    I don't know.

19        A    The e-mail suggests that it was.

20        Q    That it was what?

21        A    That it was launched in some fashion.

22        Q    Okay.

23             MR. STIMPSON:  Let me have this one, 29.

24        Q    (BY MR. STIMPSON)  Just while you have

25   that in front of you, Mr. Neal, this is an e-mail

Attorneys' Eyes Only

Page 168

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      from Dave Hicks to Steve Wood at JDPA.com.  And

3      included in this, you're included in some of these

4      e-mails as a copy holder, right?

5          A     I see one area where I was included, one

6      e-mail.

7          Q     This is an e-mail prepared and kept in the

8      ordinary course of business at Health Grades, right?

9          A     I believe so.

10         Q     Let me show you what's been marked as

11     Exhibit 29, please.

12              MR. VAZQUEZ:  We're now re-marking this as

13     an exhibit for his?

14              MR. STIMPSON:  Did we mark this already?

15              MR. VAZQUEZ:  It's Exhibit 29.

16              MR. STIMPSON:  Yeah, it was 47.

17              MR. LEE:  That one was --

18              MR. VAZQUEZ:  My question is simply when

19     you give me an exhibit that has been marked before,

20     are we re-marking it as an exhibit for his

21     deposition?

22              MR. STIMPSON:  No.

23              MR. VAZQUEZ:  Okay.

24         Q     (BY MR. STIMPSON)  This is an

25     August 16, 2004 e-mail from Dave Hicks to yourself.

Attorneys' Eyes Only

Page 169

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A     Um-hum.

3       Q     Well, to Health Grades senior management

4    copied to you, correct?

5       A     Yes.

6       Q     Okay.  And this is also about the new

7    patient experience surveys, right?

8       A     Yes.

9       Q     Okay.  And attached is a patient

10   experience timeline.

11             Do you see that, Mr. Neal?

12      A     I do.

13      Q     And you can tell from the timeline that

14   they were intending to build results display,

15   application, and database as of the end of

16   September 2004, correct?

17      A     That's what this document suggests.

18      Q     Okay.  And then also to e-mail all report

19   purchasers about it as of this October 15, 2004,

20   correct?

21      A     That's what it says.

22      Q     Do you have any reason to believe that

23   these timelines were not met?

24      A     No.

25      Q     Is there a difference between patient

Attorneys' Eyes Only

Page 170

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2    experience survey and patient satisfaction surveys?

3         A    I think most people would assume they are

4    very similar, one and the same.

5         Q    I mean, within Health Grades, was there a

6    difference between the two?

7         A    There is a difference.  The distinction is

8    that experience, while still subjective, takes into

9    account different measures; for example, how long you

10   might have had to wait in a physician office, whereas

11   experience might be more oriented to how do you feel

12   about a doctor.

13             So there is -- there actually is a

14   distinction.

15        Q    They're both ratings of sorts, though,

16   right?

17             MR. VAZQUEZ:  Form.

18        A    I wouldn't call just the survey itself a

19   rating.

20        Q    (BY MR. STIMPSON)  Do you know how the

21   consumers, the patients, responded to this survey?

22   Was it they had a number of things they could check,

23   1, 2, 3, 4, 5 or -- right?

24             MR. VAZQUEZ:  Form.

25        A    There are different mechanisms you can use

Attorneys' Eyes Only

Page 171

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     to capture their responses, but that's one that you

3     described.

4          Q    (BY MR. STIMPSON)  And that's one that

5     Health Grades was using in 2004 and 2005?

6          A    We used -- we used a form of that type of

7     response.  I'm not sure exactly -- I don't know if it

8     was numbered or what exactly the form was.

9                MR. VAZQUEZ:  Do you intend to break for

10    lunch, Mr. Stimpson?

11               MR. STIMPSON:  Yeah, whenever you guys are

12    ready, we can break.

13               MR. VAZQUEZ:  Let me ask, we can order

14    or --

15               MR. STIMPSON:  Probably just go out.

16    Probably just go out.

17               MR. VAZQUEZ:  Just go out and do our own

18    thing?

19               MR. STIMPSON:  Yeah, I think so.

20               MR. VAZQUEZ:  Okay.  So whenever you want.

21    I just thought I would bring it up because if you

22    were going to order, it's going to take some time.

23               MR. STIMPSON:  Yeah, okay.

24         Q    (BY MR. STIMPSON)  Do you know if e-mails

25    went out to report purchasers about the patient

Attorneys' Eyes Only

Page 172

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     experience surveys?

3          A     They wouldn't have in this timeframe, to

4     my recollection, because of the risks it posed to the

5     business.

6          Q     So you're guessing that they did not go

7     out?

8                MR. VAZQUEZ:  Form.

9          A     Based on what I recall, I do not believe

10    that they went out.

11         Q     (BY MR. STIMPSON)  Okay.  Why would that

12    risk -- why would that create a risk to the

13    business -- what this was referring to, as I

14    understand it, and correct me if I'm wrong, you were

15    copied on this in 2004, but the e-mails to the report

16    purchasers are just telling them that the surveys

17    were available for them to take, right?

18                MR. VAZQUEZ:  Form.

19         A     Yeah.  See, there are two things that

20    could have been e-mailed.  One was just a

21    notification that, hey, you can complete this patient

22    experience.  And that's what this references.

23         Q     (BY MR. STIMPSON)  Okay.  And why would

24    that hurt your business, sending out that e-mail?

25         A     Just the intent to at some point in a

Attorneys' Eyes Only

                                              Page 173

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2     future period display that information in that

3     content was deemed to be a risk to our business.  If

4     our clients found out that we were gathering that

5     information with some future intent, that was the

6     risk that we were considering or contemplating.

7          Q     Okay.  All right.  We'll get to other

8     documents to talk about that a little bit later.

9          A     Okay.

10               MR. STIMPSON:  Can I get this one here,

11    please?  Actually, David, I've changed my mind.  I

12    want that one.

13               MR. LEE:  Exhibit 48.

14               (Exhibit 48 marked.)

15         Q     (BY MR. STIMPSON)  We have marked a

16    multipage document as Exhibit 48 Health Grades

17    0209008 through 0209010.

18               Take a second to look at this, please,

19    Mr. Neal.

20         A     Okay.

21         Q     So this is a November 11, 2004 e-mail from

22    Scott Montroy to various people, including yourself,

23    correct?

24         A     It is.

25         Q     Prepared and kept in the ordinary course

Attorneys' Eyes Only

Page 174

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2    of business?

3           A     It looks like it.

4           Q     Okay.  And what Mr. Montroy is doing is

5    sending out a report on the new patient experience

6    data, correct?

7           A     It would appear so.

8           Q     So this, in fact, confirms that, in fact,

9    Health Grades was collecting experience patient data

10   in late 2004, correct?

11          A     Yeah.  So it's after the date that was in

12   that table.

13          Q     Let me put that back in front of you,

14   Exhibit 21.  So it's about a month after when they

15   said when they were going to send out the e-mails

16   to --

17          A     Yeah, I see that.

18          Q     Right?

19          A     Um-hum.

20          Q     So do you want to change your testimony,

21   Mr. Neal, about whether or not those e-mails went

22   out?

23          A     No, I said they came out sometime after.

24          Q     Okay.  So am I correct, then, as of late

25   2004, e-mails had gone out to report purchasers about

Attorneys' Eyes Only

Page 175

1                CONFIDENTIAL - ATTORNEYS EYES ONLY

2      the surveys on the Health Grades website?

3           A     Based on this e-mail, it looks like it

4      did.

5           Q     And you're referring to, is it 49?

6      Exhibit number.

7           A     This is 48.

8           Q     48, okay.  And those e-mails would tell

9      these report purchasers that there is a survey on our

10     website you can complete, and by completing the

11     survey you're agreeing that Health Grades can use

12     them in its results, correct?

13                MR. VAZQUEZ:  Form.

14          A     I don't know if I recall exactly, but I

15     don't believe there was a place on the

16     consumer-facing website where they could complete

17     these surveys.  It was only via secure e-mail access

18     that they could go in and complete these surveys.

19                So via this confirmed e-mail address, it

20     was a request to complete a survey.  I believe that's

21     what the table lays out as creating that process.

22          Q     (BY MR. STIMPSON)  Okay.  When did the

23     availability to survey go online at healthgrades.com?

24          A     I don't know the date.

25          Q     2005?

Page 176

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A     I don't know.

3      Q     Could have been here, 2004?

4      A     Highly unlikely.

5      Q     Why?

6      A     Because of the concerns about the revenue

7   streams to the business.

8      Q     But in any event, we can agree that in

9   late 2004, Health Grades was disclosing to the

10  public, including these e-mail recipients, that

11  Health Grades has intended to collect survey results

12  that may be displayed later on its website, correct?

13          MR. VAZQUEZ:  Form.

14     A     I think it just confirms that we're

15  collecting surveys.  It doesn't demonstrate intent.

16     Q     (BY MR. STIMPSON)  Pardon me?

17     A     I don't think it demonstrates intent.

18     Q     Well, I'm just asking you --

19     A     But that's what you said.

20     Q     Okay.  Well, let me rephrase my question,

21  then.  In late 2004, Health Grades was disclosing to

22  these e-mail recipients that it wanted to collect

23  survey data, correct?

24     A     Yes.

25     Q     Okay.  And they would also disclose to

Attorneys' Eyes Only

Page 177

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      these recipients that the idea behind this was to use

3      those survey results in some fashion, correct?

4          A     In my opinion, that's supposition.

5          Q     Okay.  So you're not comfortable saying

6      that Health Grades told these recipients that they

7      might use the survey data?

8          A     No, because I'm aware of the conversations

9      we were having internally about the risk to our

10     business.

11         Q     Don't you think the consumers who got

12     these e-mails might have figured out that, gee, maybe

13     they want us to use those survey results?

14              MR. VAZQUEZ:  Form.

15         A     I don't know.

16         Q     (BY MR. STIMPSON)  Well, that's a nice

17     supposition, isn't it?  You can give that

18     supposition, right?

19         A     It's so easy you can answer it yourself,

20     then.

21         Q     Well, I want you to answer it because

22     you're the witness.  Right?

23              MR. VAZQUEZ:  Form.

24         A     I don't know what the consumers believe.

25         Q     (BY MR. STIMPSON)  Well, of course they

Page 178

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY

 2      knew the survey results were going to be used in some

 3      fashion?

 4           A     If you say so.

 5           Q     Do you agree with that?

 6                 MR. VAZQUEZ:  Form.  Form.  All right.

 7      Let's just get back to direct questions --

 8           A     It's silly.

 9                 MR. VAZQUEZ:  -- and you answer if you

10      know.

11           Q     (BY MR. STIMPSON)  Do agree with that?

12                 MR. VAZQUEZ:  Agree with what?

13           A     Say it again, please, sir.

14           Q     (BY MR. STIMPSON)  Do you agree that the

15      consumers must have understood that Health Grades

16      intended to use these survey results --

17           A     I can't say what any consumers understood.

18           Q     Okay.  So Exhibit 48, if you can look at

19      the last page.  As of late 2004, Health Grades was

20      averaging over 100 survey results per day, correct?

21           A     That's what the data suggests.

22           Q     Okay.  And it says that surveys were

23      received as early as October 2004, correct?

24           A     That's what it suggests, yes.

25                 MR. STIMPSON:  Can I get this one, David?
```

Attorneys' Eyes Only

Page 179

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Actually, sorry, I will need that one.  I need this

3      one right now, though.

4              MR. LEE:  Exhibit 49.

5              (Exhibit 49 marked.)

6         Q    (BY MR. STIMPSON)  I would like to have

7      the court reporter mark as Exhibit 49 a multipage

8      document bearing Bates numbers HGMKES 022569 to 574.

9              Take a second and if you can identify that

10     for me, please.

11        A    Okay.

12        Q    And this is a patient experience survey

13     from Health Grades, correct?

14        A    This is the original patient experience

15     surveys, patient screen survey.

16        Q    And it was sent out to consumers in 2004,

17     correct?

18        A    This most likely would have been the

19     version that would have been sent to consumers in

20     2004.  It was not the version that we used more

21     recently.

22        Q    Okay.  So if you would look at -- so you

23     can see these questions the way they're set up;

24     excellent, very good, good, fair, poor.

25        A    Right.

Attorneys' Eyes Only

Page 180

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2       Q     Those are ratings, right?

3             MR. VAZQUEZ:  Form.

4       A     No.

5       Q     (BY MR. STIMPSON)  No?

6       A     It's not a rating.

7       Q     Okay.  What is it then?

8       A     It's an assessment by item of how they

9    felt about something.

10      Q     Okay.  So when you're asking someone to

11   say whether a doctor is excellent or good or fair, in

12   your view, sir, as an inventor of this patent, that's

13   not a patient rating, right?

14            MR. VAZQUEZ:  Form.

15      A     Excellent, very good, good, fair, poor,

16   don't know, a rating?  No, that's not a form of a

17   rating.

18      Q     (BY MR. STIMPSON)  Okay.  So if Vitals

19   changes its website so it's asking these questions in

20   the form of excellent, very good, good, fair, poor,

21   no longer would they -- would even Health Grades

22   accuse them of infringing the patent, right?

23            MR. VAZQUEZ:  Object to form.  Calls for a

24   legal conclusion.

25      A     That's not for me to interpret.

Attorneys' Eyes Only

Page 209

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2          A     That's the reason I provided you with a

3     range.

4          Q     Okay.  So is the answer, then, you can't

5     tell me -- that you don't believe it was within six

6     months?

7          A     I don't know.

8          Q     Okay.  Let me show you what has been

9     marked as Exhibit 27.  Let me know when you're ready,

10    Mr. Neal.

11         A     Okay.  Okay.

12         Q     What was the additional system that

13    validated information entered into the physician

14    online services?

15         A     You know, I said system or process.  Just

16    a means by which we could review submitted content.

17         Q     And what can you tell me about that?

18         A     I wasn't involved in the development of

19    that.  I'm just aware that there was a system in

20    place.

21         Q     Do you know how long after the physician

22    online services were implemented that this was in

23    place?

24         A     I do not.

25         Q     So according to your testimony, then, a

Attorneys' Eyes Only

Page 210

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2      physician -- you can see from this e-mail, Exhibit

3      27, that this physician online services was launched

4      as of May 25, 2004, correct?

5          A     Yes.

6          Q     And so according to your testimony, the

7      six- to twelve-month testimony, you think that a

8      physician could have gotten on, changed information

9      about gender, for example, and then not had that

10     change in the Health Grades system for four to six

11     months, right?

12              MR. VAZQUEZ:  Form.

13         A     It's possible.

14         Q     (BY MR. STIMPSON)  Don't you think that

15     would irritate physicians?

16              MR. VAZQUEZ:  Form.

17         A     Speculation.  Yeah, I think it might.

18         Q     (BY MR. STIMPSON)  So does that help you

19     remember that this validation process was actually

20     implemented the same time the physician online

21     services were started?

22              MR. VAZQUEZ:  Form.

23         A     No, because it's not directly referenced

24     in the document.

25         Q     (BY MR. STIMPSON)  Right.  I understand,

Attorneys' Eyes Only

Page 211

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     but just from the, you know, relationship point of
 3     view for the physicians, don't you think Health
 4     Grades would have implemented that at roughly the
 5     same time the physician online service was started?
 6     Doesn't that make sense?
 7              MR. VAZQUEZ:  Form.
 8         A    You know, I think it makes sense.  But I
 9     know it was a separate process and it's not
10     referenced here.  And that's what is causing concern
11     to me.
12         Q    (BY MR. STIMPSON)  Are you familiar with
13     Dr. Drucker?
14         A    I am familiar with a profile for a
15     Dr. David Drucker.
16         Q    How is it you are familiar with a profile
17     for Dr. Drucker?
18         A    That was our prototype profile that was on
19     the website for quite a period of time.
20         Q    Okay.  And when did Dr. Drucker's profile
21     first go on the website?
22         A    Well, his original profile would have gone
23     on the website when we launched physician reports as
24     just part of all the physician profiles that we
25     provided, so when we launched the site, which would
```

Page 212

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2       have been 2003.

3                   MR. STIMPSON:  Actually, let me have this,

4       David.

5              Q     (BY MR. STIMPSON)  Do you know what a

6       premium report is?

7              A     If you'd explain to me the definition.

8              Q     Well, I'm just asking you if you know what

9       a premium report is?

10             A     It could mean a lot of different things to

11      different people.

12             Q     Well, did Health Grades have a premium

13      report for its physicians?

14             A     The name vaguely rings a bell with me,

15      premium.  We had a lot of different names assigned to

16      what effectively were the same reports.

17                   (Exhibit 50 marked.)

18                   MR. STIMPSON:  Let me show you what has

19      been marked Exhibit 50, a multipage document bearing

20      Bates numbers HGMKES 022179 and 80.

21             Q     (BY MR. STIMPSON)  This is an e-mail from

22      Scott Montroy to Dave Hicks copying you,

23      February 16, 2005, correct?

24             A     It is.

25             Q     Prepared and kept in the ordinary course

Page 213

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     of business at Health Grades?

3          A     It appears so.

4          Q     What is a pilot project?  Can you explain

5     to me what the pilot project is there?

6          A     Pilot project for Dr. David Drucker was

7     our prototype physician profile.

8          Q     And when was that first put on the

9     website?

10         A     Let's see.  This is February of 2005.  So

11    the prototypes, it suggests, based on this e-mail,

12    that that prototype profile was hard-coded on our

13    website in February of 2005.

14         Q     Okay.  What do you mean hard-coded?

15         A     Hard-coded means that it was one of a

16    kind.  We didn't have an automated system to support

17    other physicians being able to update the profile.

18    Hard-coded means that within the actual development

19    of the program code on the website, whatever content

20    was visible on that physician profile had to be

21    hard-coded in.

22              So it was actually typed in, there was an

23    image that may have appeared within it.  It was one

24    of a kind.  It was a prototype.

25         Q     Do you think that was available on the

Attorneys' Eyes Only

Page 214

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    website as of at least February 2005, right?
 3         A     This doesn't say it was available on the
 4    website.  I'm uncertain of the timing.  So I can't
 5    say based on this document that it was the case.
 6         Q     The second bullet there, it says, Drucker
 7    patient experience data on pilot report in prod.
 8               What does that mean?
 9         A     So in prod would be -- that would mean in
10    production.  So that would be on the website in some
11    form.
12         Q     So we know, as of February 16, 2005, at
13    least that early, there was patient experience data
14    in Dr. Drucker's report on the website available to
15    the public, correct?
16         A     Yes.  I think that's a fair assumption.
17         Q     And how would consumers find Dr. Drucker's
18    report?
19               MR. VAZQUEZ:  Form.
20         Q     (BY MR. STIMPSON)  For example -- let me
21    just withdraw that, and I'll start another question.
22               A consumer could get on the Health Grades
23    website in February 2005, type in, you know, doctors
24    and, you know, Dr. Drucker in New York and up would
25    pop Dr. Drucker's report?
```

Attorneys' Eyes Only

Page 215

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A     Right.

3          MR. VAZQUEZ:  Object to form.

4      Q     (BY MR. STIMPSON)  Was that a beta test?

5      A     That wasn't even a beta.  It was a

6  prototype.  We never developed anything that was

7  consistent with the content that was produced in the

8  form in which it was produced in that profile.

9          (Exhibit 51 marked.)

10     Q     (BY MR. STIMPSON)  Let's have marked

11  Defendant's Exhibit 51, a multipage document bearing

12  Bates numbers HG 0179518 to 550.

13     A     Is there something specific you would like

14  me to look at it?

15     Q     Well, you can just peruse the e-mail if

16  you want, and then we'll highlight some specific

17  questions throughout the document.

18          My first question to you, Mr. Neal, is

19  just going to be whether this is an e-mail string

20  between yourself and Lauren Deritis, D-E-R-I-T-I-S,

21  in March of 2005 regarding Health Grades' reports?

22     A     Yes.

23     Q     And prepared and kept in the ordinary

24  course of business in Health Grades?

25     A     I believe so.

Attorneys' Eyes Only

Page 216

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Q      What is the Rothman Institute?

3          A      It is an orthopedic practice in

4     Philadelphia, Pennsylvania.

5          Q      And why were you communicating with the

6     Rothman Institute?

7          A      This was related to a physician marketing

8     program that we were in the process of developing.

9          Q      And had you contacted Ms. Deritis prior to

10    March 2005?

11         A      I don't recall.

12         Q      In your e-mail at 2:20 on March 21, on the

13    second page, it says, We're very excited about

14    getting the Rothman Institute into the Health Grades

15    position marketing program.  The web presence and

16    premium placement programs have exceeded all

17    expectations for our beta clients.

18              What was their web presence program?

19         A      It was a means by which we presented

20    physicians that were participating in the physician

21    marketing program a different way on our website to

22    draw attention to those physicians for their

23    practices such that they could disproportionately

24    drive consumers to their practices.

25         Q      Okay.  How about the premium placement

Attorneys' Eyes Only

Page 220

                    CONFIDENTIAL - ATTORNEYS EYES ONLY

 1    agreements with its beta clients?

 2         A     I don't recall.

 3         Q     Was there any understanding of

 4    confidentiality with beta clients?

 5         A     There's at least some understanding based

 6    on what I put in this e-mail.

 7         Q     Do you recall ever -- anyone at Health

 8    Grades ever telling beta clients that they have to

 9    keep things confidential?

10         A     Most likely that would have been me having

11    those conversations, and it's likely that I

12    replicated at a minimum some form of this.

13         Q     You don't remember that.  You're just

14    speculating from this document?

15         A     Well, I did it in this document, and it's

16    typical of my behavior.  So I would think that I

17    would have done the same.

18         Q     Okay.  So what was it that was

19    confidential?

20         A     There was not a market -- there was not a

21    product like this available in the marketplace.

22         Q     All right.  Let's just go through the

23    PowerPoint, okay?  Specifically, I would like to

24    start with -- I would like to talk about starting on

Attorneys' Eyes Only

Page 221

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    page 8, Health Grades 0179531.
 3              You see there your PowerPoint refers to
 4    premium report to consumers.  Do you know what that
 5    means?
 6         A    I don't recall what the elements of that
 7    premium report were.
 8         Q    You were offering to the Rothman Institute
 9    this physician web presence package that included the
10    premium report to consumers, right?
11         A    Yes, it would appear.
12         Q    And if you could turn two pages from there
13    at Health Grades 179533, and see there is
14    Dr. Drucker, and he's got -- on the bottom right-hand
15    corner you have a notation, Premium report access is
16    free to consumer and provides competitive advantage
17    to physician.
18              Do you see that?
19         A    I do.
20         Q    And was this something, this Health Grades
21    report on Dr. Drucker, was that something that was
22    on the -- you got that from the Health Grades
23    website?
24         A    I don't recall.
25         Q    Where else would you have gotten it from?
```

Page 222

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2        A      We developed mockups all the time, most of

3    which never make it to the website.

4        Q      But we know Dr. Drucker had a premium

5    report on the Health Grades website, right?

6        A      He had a prototype profile.

7        Q      Right.  Why don't you look to page Health

8    Grades 179535.  Is this the profile that was

9    available on Health Grades' website at least as early

10   as February of 2005 for Dr. Drucker?

11       A      You know, I think so.  There's a version

12   that I've seen of the prototype.  I don't know that

13   this screen shot here, this mockup, includes all the

14   elements of the prototype.  I don't know.

15       Q      Okay.  Well, there's subsequent pages and

16   we'll talk about them.

17       A      Okay.

18       Q      But we can say with some certainty, then,

19   that this premium report was available on Health

20   Grades' website at least as early as February of

21   2005?

22       A      I think a form of enhanced report was

23   available, yes.

24       Q      Okay.  Now, can you give me any better

25   indication of when that might have been?  Would it

Attorneys' Eyes Only

Page 223

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2    have been available perhaps in January of 2005?

3          A     What exactly?

4          Q     This premium report of Dr. Drucker.

5          A     I don't know.

6          Q     This page 179535, it's got Dr. Drucker's

7    age, right?

8          A     Yes.

9          Q     His gender?

10         A     Yes.

11         Q     His language?

12         A     Yes.

13         Q     His years in the profession?

14         A     Yes.

15         Q     Awards and honors?

16         A     Yes.

17         Q     Professional appointments?

18         A     Yes.

19         Q     Publications?

20         A     Yes.

21         Q     Where was that information obtained, all

22    that information?

23         A     I don't know.

24         Q     February '05, in the prior documents we've

25    seen, February '05 was at least seven months after

Attorneys' Eyes Only

Page 224

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2     the physician online services was launched, right?

3         A     If those dates match up, yeah, that sounds

4     right.  This data in Dr. Drucker's, this form of

5     report, didn't come from that POS system.  That's not

6     how that system was constructed.  It wasn't

7     constructed to display elements like this.  This is

8     prototype content.

9              And the reason I know that for certain is

10    if I look at slide number 17, 179537, it says,

11    Performance information.  Procedure, total hip, total

12    knee.  Revisions, and then the number of procedures.

13             I know for a fact that wasn't in the POS

14    system because that was specific to his practice and

15    was only part of the prototype.

16             So this report that we're viewing here is

17    a prototype as opposed to a standard premium

18    report --

19        Q     Okay.

20        A     -- in the context by which you're

21    referring to it.

22        Q     That's fine.  But it was all -- it was on

23    the Health Grades website in February of '05, so

24    that's all I really care about at the moment.

25             MR. VAZQUEZ:  Form.  Move to strike.  That

Attorneys' Eyes Only

Page 225

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      wasn't a question.
 3           Q    (BY MR. STIMPSON)  In the introduction of
 4      Dr. David Drucker, Dr. Drucker's philosophy on
 5      treating patients.
 6                Do you see that?
 7           A    I do.
 8           Q    We just talked a few minutes ago about
 9      Vitals website and how you could determine that some
10      stuff had to come from the healthcare provider.
11                Remember that conversation?
12           A    Yes.
13           Q    Can you make the same deduction here that
14      some of this probably came from Dr. Drucker?
15           A    That philosophy was one of a kind.  That
16      was hard-coded in the website.  It most likely came
17      from Dr. Drucker, or one of his close associates, or
18      perhaps his office assistant.
19           Q    And how about his languages, would that be
20      something you also would have obtained from
21      Dr. Drucker or one of his assistants?
22           A    Most likely not.  That's a typical
23      third-party source of data.
24           Q    How about awards and honors?
25           A    No, there are sources for some of that
```

Attorneys' Eyes Only

Page 226

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    information, but it's possible that Dr. Drucker's
 3    office administrator could have provided that for
 4    this prototype.
 5            Q     Did Health Grades have a particular
 6    relationship with Dr. Drucker?
 7            A     It was a unique relationship.
 8            Q     So he had seen this, right?
 9            A     Yes.  Oh, yes.
10            Q     So he had at least, at the very least, had
11    seen this and had to have provided information or
12    verified that it was correct, right?
13            A     Absolutely.  It was one of a kind.
14            Q     Okay.  How about publications?  Would that
15    have come from Dr. Drucker or his assistant?
16            A     I think -- my guess is that it probably
17    did.
18            Q     And years in profession, would that have
19    probably come from Dr. Drucker or one of his
20    assistants?
21            A     Most likely a third party.
22            Q     How about the English language?
23            A     Third party.
24            Q     So if Dr. Drucker spoke Spanish or
25    something, you would be able to get that from a third
```

Attorneys' Eyes Only

Page 227

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     party?

3          A     Yes.

4          Q     Okay.  And what third party?

5          A     I don't know.  We would do it today.  We

6     did it back then.

7          Q     But it seems clear that at least some of

8     this on this page 179535 came from Dr. Drucker,

9     right?

10         A     Yes, for the prototype.

11         Q     On the next page, experience and training.

12    Do you see there are specialties listed there;

13    orthopedic surgery, and it says, Health Grades has

14    verified that Dr. Drucker is board certified by the

15    American Board of Orthopedic Surgery; is that

16    correct?

17         A     That's what it says.

18         Q     So that's Health Grades' verified data?

19               MR. VAZQUEZ:  Form.

20         A     It is.  The source of that data is ABMS.

21    And if a doctor was board certified by ABMS, then

22    that little logo is here.

23         Q     (BY MR. STIMPSON)  How about the rest of

24    it?  Medical school, residency, internship,

25    fellowship, areas of expertise; those all came from

Attorneys' Eyes Only

Page 228

1                CONFIDENTIAL - ATTORNEYS EYES ONLY

2        third parties, too?

3                    MR. VAZQUEZ:  Form.

4            A      Most likely, yes.

5            Q      (BY MR. STIMPSON)  Would Health Grades

6        have verified that information?

7                    MR. VAZQUEZ:  Form.

8            A      For Dr. Drucker we would have because,

9        again, this is the prototype profile.

10           Q      (BY MR. STIMPSON)  Next page, it's got

11       disciplinary actions.

12                   Do you see that?

13           A      I do.

14           Q      And Health Grades has also included that

15       information and verified its content, correct?

16                   MR. VAZQUEZ:  Form.

17           A      That's correct.  It's third-party data.

18           Q      (BY MR. STIMPSON)  Right.  And received

19       from a third party.  And it's something that Health

20       Grades verified, correct?

21                   MR. VAZQUEZ:  Form.

22           A      The logo would suggest that.

23           Q      (BY MR. STIMPSON)  And the next page,

24       patient experience, these are information from

25       patients, right?

Attorneys' Eyes Only

Page 229

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A     It would appear, yes.

3      Q     And, in fact, five patients provided

4   information ratings for Dr. Drucker, right?

5      A     That's what it says.

6      Q     Okay.  And the bottom there says survey

7   details.  What does that mean?

8      A     I don't know.  I think it may show the

9   individual responses to those questions.

10     Q     Okay.

11     A     So there were five that make up each bar

12  and perhaps survey details.

13     Q     Where were the survey -- where were these

14  surveys performed?  Were they on Health Grades'

15  website?

16           MR. VAZQUEZ:  Form.

17     A     I do not know.

18     Q     (BY MR. STIMPSON)  It says here, Share

19  your experience.  So at least as of that time, there

20  was an ability for someone to get on and share their

21  experience with Dr. Drucker, right?

22     A     I'm not sure of the timing.  Remember,

23  this is a prototype, and it's a screen shot for a

24  PowerPoint.  So I can't say that to be a fact.

25     Q     Well, at least as of February 2005, Health

Attorneys' Eyes Only

Page 230

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    Grades' website had this where it says, Share your

3    experience in connection with Dr. Drucker, right?

4          A     I wouldn't derive that conclusion from

5    looking at this page.

6          Q     Well, where -- well --

7          A     This is referencing a report that may or

8    may not be live on the Health Grades website.  This

9    is a PowerPoint text.  I do this all the time where I

10   share slides that are not part of our production

11   environment, meaning live on our website.

12         Q     I understand that, sir, but you've also

13   testified about what was available on Dr. Drucker in

14   February of 2005.  But my question is --

15         A     I know, but you were asking about this.

16         Q     Can I finish?  Okay.  I'm asking about

17   that right now.  The "share your experience" button,

18   was that -- can you just tell me, is that something

19   that was live that a user could click on; did you

20   know?

21         A     I can't determine that based on this.

22         Q     Okay.  That's fine.  That's fine.

23               The next page, Languages spoken by staff.

24   Where would that information have come from?

25         A     I don't know.

Attorneys' Eyes Only

Page 231

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2        Q     That would have come from a healthcare
 3    provider?
 4        A     It very well could have.
 5        Q     Well, can you think of any other place
 6    where that information would have come from?
 7        A     The data sources may or may not have
 8    included that data.  I just don't know.
 9        Q     Do you know of any data sources that would
10    tell us the languages spoken by the staff of
11    Dr. Drucker at this time?
12        A     I don't know.
13              (Discussion off the record.)
14              (Recess taken from 2:05 p.m. to 2:27 p.m.)
15        Q     (BY MR. STIMPSON)  Please turn to page
16    HG 0179548.
17              MR. VAZQUEZ:  What exhibit are you on
18    again?  I'm sorry.
19              MR. STIMPSON:  The same, 51.
20              MR. VAZQUEZ:  Thank you.
21        A     48.
22        Q     (BY MR. STIMPSON)  Yes, please.
23        A     Okay.
24        Q     Can you tell me what is being displayed on
25    that page?
```

Attorneys' Eyes Only

Page 232

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A     This is -- practice A, I think, is

3    Dr. Drucker's profile.

4      Q     Practice A or physician A?

5      A     Physician A, I'm sorry.  Physician A is

6    Dr. Drucker's profile.  Practice A is a -- would be a

7    group.  I know the group.

8           In terms of what each of the sub-bullets

9    beneath them represent, I do not know what the

10   different distinctions are across those bullets.

11     Q    Let's look in the second bullet under

12   physician A.  February 2005, 117 expanded profile

13   reports viewed.

14          What are expanded profile reports?

15     A    I don't know.

16     Q    Would it be the premium report that we saw

17   earlier in this document?

18     A    It could be, but I don't know.

19     Q    Do you have any other idea what it might

20   be?

21     A    I don't.

22     Q    Does this help refresh your memory that

23   Dr. Drucker's premium report was available at the

24   beginning of February 2005?

25     A     It suggests some sort of enhanced profile

Page 233

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     was available.

3          Q     At the beginning of February 2005, right?

4          A     An expanded profile report was viewed in

5     February, 117 times.

6                What is your question?

7          Q     My question is, this indicates -- let's

8     just back up a second.

9                What you were trying to do with this slide

10    was convince the Rothman Institute that this was a

11    great product and you get a lot of hits, right?

12         A     Right.

13         Q     So if this had been 117 expanded profile

14    reports starting from February 15, this bullet, it

15    would have been better for you to say, hey, starting

16    February 15 to the end of February, we had 117

17    expanded profile reports.

18               So what I'm trying to get at here is this

19    indicates, doesn't it, that at least as early as

20    February, this is talking about the entire month of

21    February, you had 117 expanded profile reports,

22    right?

23         A     That's what this says, yes.

24         Q     And practice A, orthopedic group -- what's

25    the Consumer Quality Reports?  Do you know what that

Attorneys' Eyes Only

Page 234

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     is talking about?
 3          A     I don't know specifically what that
 4     references.
 5          Q     Okay.
 6          A     I believe that's just another name that
 7     was applied to Physician Reports.  We had a number of
 8     names.  I just think that's another one.
 9          Q     Okay.  And what about Premium Placement
10     Profiles, what's that?
11          A     I don't know.
12          Q     Could that be the premium reports we saw
13     earlier in this PowerPoint?
14          A     I don't think so.  Because that report
15     that's in this deck is the Drucker prototype.  I know
16     we didn't have other profiles on our website.  It was
17     one of a kind.
18               The orthopedic group would have had just a
19     basic report.  You know, how we distinguish that and
20     called it premium, I don't recall what we did.
21          Q     Well, let's go back up to physician A,
22     Dr. Drucker's orthopedic surgeon.  The third bullet
23     point says 18,000 premium placement profiles
24     displayed.
25               Does that indicate that as of the time of
```

Attorneys' Eyes Only

Page 235

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2      this that premium report from Dr. Drucker had been

3      viewed 18,000 times?

4           A     I don't know if it was the prototype or

5      some subset of that prototype report.  I don't know

6      what makes up that 18,000.

7           Q     Okay.  It says also 43 appointment

8      inquiries.  That means that Dr. Drucker had received

9      43 appointment inquiries as of that time?

10          A     What we were experimenting with was

11     putting an appointment button within a physician's

12     profile to see what the interest level was among

13     consumers.  But that's the extent of it.  There was a

14     button, and that's what we were tracking.  Those 43

15     appointment inquiries were the number of times that

16     button was pushed.

17          Q     Okay.  On the next page, can you tell me

18     what is being disclosed there?

19          A     Just -- this is -- it's just the count of

20     the different number of engagements based on examples

21     provided by the net client.  So just the number of

22     times those reports were viewed.

23          Q     Were these beta tests?

24          A     I believe what we were trying to

25     demonstrate here is just the volume of consumer

Attorneys' Eyes Only

Page 236

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     engagement on our website.  This, I don't believe,
 3     based on what I'm looking at here, was in any way
 4     part of the beta test.
 5          Q     I'm sorry, you were saying what?  I'm
 6     sorry, I didn't understand that.
 7          A     If you look at the data elements that
 8     we're reporting on, it's just traffic counts, is what
 9     we call them.
10               So static profile pages viewed is the
11     missing word, 613.  Comparison reports viewed, 149.
12     Physician name searches conducted, 656.  City and
13     state searches conducted, 372.
14               So what we're trying to demonstrate is,
15     hey, we have people on our website and they're
16     looking up these reports.  But it's not tied to this
17     product that we were covering in the previous slides.
18          Q     Okay.  Actually, it's tied to the next
19     slide, right?  You can see the comparison for it on
20     179550; is that right?
21          A     Yeah, those stats are for each of those
22     four examples provided on that following slide.
23          Q     And so the physician quality comparison
24     reports -- actually, the comparison reports that are
25     referenced on this slide that have been viewed would
```

Attorneys' Eyes Only

Page 251

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q      Okay.  Using that definition, when were

3   comparison ratings first added to Health Grades'

4   reports?

5             MR. VAZQUEZ:  Form.

6      A      I don't know.

7      Q      (BY MR. STIMPSON)  Well, how would the

8   comparison ratings then differ from the physician

9   satisfaction surveys, under your definition?

10     A      The survey is just a survey.

11     Q      Okay.

12     A      We haven't assigned any type of rating or

13  score.  It's just a survey.

14     Q      Okay.  So how were they displayed in the

15  Physician Quality Reports then?

16     A      It would have just been the actual survey

17  results, a compilation of those, but there were no

18  scores assigned, and that was intentional for the

19  reasons that I mentioned previously, because it was a

20  risk to our business model.

21     Q      All right.  So as of August 2, though, we

22  have physician satisfaction surveys and detailed

23  physician and practice information from physicians in

24  the quality reports, right?

25     A      That's what this indicates.

Attorneys' Eyes Only

Page 252

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2          MR. STIMPSON:  David, could I have this,

3    please?

4          Q    (BY MR. STIMPSON)  Actually, before I get

5    to this document, let me ask you this.  The Drucker

6    report we saw in Exhibit 51, why didn't you disclose

7    that to the Patent and Trademark Office in connection

8    with the application that led to the '060 patent?

9          A    We weren't patenting the Drucker report.

10   It was unrelated to what we were patenting.

11         Q    Any other reasons?

12         A    I think that's probably a good enough

13   reason, at least in my mind.

14         Q    All right.  And how, in your mind, did

15   what you were patenting differ from the Drucker

16   report?

17         A    The Drucker report was a prototype.  It

18   was for us to try to gain an understanding and try to

19   conceptualize certain thoughts and ideas that we had.

20              But as it turns out, we ended up doing

21   things differently.  And maybe as a result of that,

22   that influenced our future ideas in the way that we

23   presented information and results and combined those

24   results on our website.

25         Q    So you said the reason you didn't disclose

Attorneys' Eyes Only

Page 253

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      it was because it was unrelated, and I asked you how.

3      And one reason you gave me was it was a prototype,

4      right?

5          A     Right.

6          Q     Any other reasons?

7          A     Why we didn't disclose it?

8          Q     Yeah.

9          A     It was not central to what we were

10     patenting.

11         Q     Why not?

12         A     The patent was about the experience for

13     the consumer on our website and specifically how we

14     combined different elements of data to make it

15     relevant to their experience and allowed them to

16     differentiate physicians.

17              And the way that we were doing it was all

18     about the experience, not an individual physician

19     profile on our website.  It was the overall

20     experience.

21              So a report takes many forms.  It's not

22     just a physician profile.  It's a list of physicians

23     that are presented within search results.  It's many

24     different things.  It's that form of presentation and

25     the content of that presentation and the means of

Page 254

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2    differentiation which made up the patent.  That

3    didn't exist in the Drucker report.

4         Q      Anything else?  Anything else?  Any other

5    reasons?

6         A      Not that I can recall right now.

7         Q      Why don't you get the patent, Exhibit 3,

8    please.

9         A      Okay.

10        Q      And you know where the claims are, right?

11   Look at claim 1, starting with column 20.  Sir, at

12   the back, column 20.

13        A      Column 20?

14        Q      Yeah.

15        A      Got it.

16        Q      Can you go through that claim 1, sir,

17   and -- actually, let me back up here.

18             Can I just have his last answer read back,

19   something about it was not central to what we were

20   patenting?

21             (Record read as requested.)

22        Q    (BY MR. STIMPSON)  Okay.  We'll talk about

23   that a bit later.

24             You had -- apart from the Drucker report,

25   you had the Health Grades website, it was available

Attorneys' Eyes Only

Page 255

CONFIDENTIAL - ATTORNEYS EYES ONLY

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2   as of 2004.  Consumers could get on and do searches

3   for healthcare providers, right?

4       A    Yes.

5       Q    Let me show you what has been marked as

6   Exhibit 53.  It's a two-page document bearing Bates

7   number HG 0209051 to 52.

8          (Exhibit 53 marked.)

9       Q    (BY MR. STIMPSON)  Actually, Mr. Neal,

10  before I move on, though, I exhausted your reasons --

11  I just wanted to make sure I exhausted your reasons

12  for why the Drucker report was not disclosed.

13      A    To the best of my recollection, I shared

14  with you --

15      Q    Okay.  Take a second and take a look at

16  this e-mail and then I'll ask you some questions.

17      A    Okay.

18         MR. STIMPSON:  Jesus, same reason for

19  redacting?

20         MR. VAZQUEZ:  Yes.  Pretty much any one

21  that will be on the top like that is forwarding.

22         MR. STIMPSON:  Gotcha.

23      A    Okay.

24      Q    (BY MR. STIMPSON)  This is a series of

25  e-mails, including you as a copy holder and an

Attorneys' Eyes Only

Page 256

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      addressee, in March of 2005?

3          A      Yes.

4          Q      Prepared and kept in the ordinary course

5      of business?

6          A      I believe so.

7          Q      Who is Sarah Loughran, L-O-U-G-H-R-A-N?

8      How do you pronounce that?

9          A      Sarah Loughran.

10         Q      Who was she?

11         A      She was a senior executive at Health

12     Grades.  I think SVP provider services, if I recall

13     correctly.

14         Q      And Kerry Hicks was the president?

15         A      CEO.

16         Q      CEO.  And Allen Dodge and Dave Hicks we

17     know.  What was the subject PNMM patent?

18         A      So, that actually -- it wasn't so much a

19     PNMM patent.  PNMM, is that what you're asking about?

20         Q      Yeah.

21         A      I can't remember exactly what the acronym

22     stands for.  It had something to do --

23         Q      Physician New Marketing Media?

24         A      Okay, that sounds right.  So, no, I notice

25     that -- I'm saying the same things that I talked