**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

**HEALTH GRADES, INC.'S OPPOSITION TO MDX MEDICAL'S MOTION TO PRECLUDE ANY TESTIMONY FROM HEALTH GRADES, INC.'S EXPERT DR. GREENSPUN**

---

Plaintiff Health Grades, Inc. ("Health Grades"), by its undersigned counsel, respectfully submits its Opposition to MDx Medical, Inc.'s Motion to Preclude any Testimony from Health Grades' expert, Dr. Philip Greenspun [Dkt 349].

### 1. Summary of the Opposition

It is noteworthy that MDx Medical, Inc. ("MDx") does *not* criticize Dr. Greenspun's analysis or methodologies. Rather MDx seeks to exclude Dr. Greenspun for the *sole* reason that he does not (MDx argues) have "significant' experience in healthcare issues, which (MDx argues) is required in this case. MDx is wrong on both accounts. The patent in suit relates to a database-backed website that provides information about physicians to potential patients to help them compare and select a physician that best meets their needs. "Significant" experience with healthcare is not necessary because the "healthcare issues" involved in the patent are concepts that are easily understood by a lay person. Further, Dr. Greenspun is qualified to give testimony in this case. Among other things, he has a Ph.D in computer science from MIT, he wrote a

1

textbook on database-websites (like the ones at issue in this case), and he has worked with hundreds of database-back websites including medical records systems for Boston Children's' Hospital and Massachusetts General Hospital. To the extent that MDx attacks the amount of healthcare experience Dr. Greenspun has, this issue goes to the weight of his testimony, not its admissibility. MDx's motion should be denied.

## 2. Background Facts

Health Grades accuses MDx of infringing its U.S. Patent No. 7,752,060 ("the '060 Patent"). The '060 Patent relates to an online information system for helping potential patients find and compare physicians to find the one that best meets their needs. MDx moves to the exclude the testimony of Health Grades' technical expert, Dr. Philip Greenspun, arguing that Dr. Greenspun is not qualified to testify about the issues of infringement and validity in this case.

To qualify as a technical expert in a patent case, the proffered expert must have knowledge of a person of ordinary skill in the relevant art. *See Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351, 1360-61 (Fed. Cir. 2006). In this case, the parties dispute what level of ordinary skill should apply to the '060 Patent. Health Grades defines a hypothetical person of ordinary skill in the art as:

> someone with a Bachelor's degree in Computer Science or related field and some experience building database-backed Web sites.

(7/13/2012 Expert Report of Phillip Greenspun at ¶31 ("Greenspun Report") (Ex. 8 hereto).)

MDx sets the level of skill higher, stating such a hypothetical person must have:

> at least a bachelor's degree in computer science from an accredited college, with at least several years experience in developing web sites and database applications linked together in a web site, *and also having significant experience in the health care area.*

(7/13/2012 Expert Report of Richard G. Cooper at ¶27 (emphasis added) ("Cooper Report") (Ex.

1 hereto).)

There is no dispute that Dr. Greenspun meets the first component of MDx's proposal – he has a Ph.D in computer science and electrical engineering from MIT, a Master of Science in computer science and electrical engineering, as well as a Bachelor of Science in mathematics, all from MIT.  (Greenspun Report at ¶13 (Ex. 8).)

Similarly, Dr. Greenspun meets the second component of MDx's definition -- he has *many* years of experience "developing web sites and database applications linked together in a web site," including without limitation the following:

- In 1978, he developed a non-relational database management system for the Pioneer Venus Orbiter at the National Aeronautics and Space Administration's Goddard Space Flight Center.  (Greenspun Report at ¶17 (Ex. 8).)

- In 1994, he wrote his first program using a relational database management system with a Web interface to the Children's Hospital database.  (*Id.* at ¶19 (Ex. 8).)

- He wrote a text book on Internet Application development entitled "Database Backed Web Sites", which was published by Macmillan in 1997.  (*Id.* at ¶22 (Ex. 8).)

- He has worked as a publisher of consumer-oriented websites for 20 years.  (9/28/12 Deposition of Philip Greenspun ("Greenspun Dep.") at 17:6-12 (Ex. 9 hereto).)

- He has supervised the development of at least 200 database-backed websites, many of which were also targeted at consumers.  (*Id.*)

- He has taught part-time at MIT within the Department of Electrical Engineering and Computer Science, educating students "in how to develop Internet Applications with an RDBMS back-end."  He also "wrote 15 chapters of a new textbook for this class, "Software Engineering for Internet Applications".  This book was published online in 2002 and 2003 and in hard copy from MIT Press in 2006."  (Greenspun Report at ¶25 (Ex. 8).)

Nevertheless, MDx contends incorrectly that Dr. Greenspun in not qualified to testify about the web-based information systems in this case because:  (1) a hypothetical person of

3

ordinary skill in the art must have "significant experience in the health care area"; and (2) Dr. Greenspun does not have any experience in the healthcare area.  Both premises are incorrect.  MDx's motion to exclude should be denied.

### 3. MDx Sets the Level of Ordinary Skill Too High

The parties dispute whether a hypothetical person of ordinary skill in the art needs to have "significant experience in the area of healthcare" as MDx suggests.  MDx does not explain what it means by "healthcare."  In its broadest sense, "healthcare" could mean anything relating to taking care of people's health, such as medical devices and pharmaceuticals, to people and entities that provide healthcare services (e.g., doctors, dentists, nurses, hospitals, etc.), to products and services that help people and entities who provide healthcare services, such as technology used in healthcare facilities (e.g., software for medical records or billing) and services offered to human healthcare providers, such as malpractice insurance and professional associations.  At the other end of the spectrum, "healthcare" could be limited to online systems for providing healthcare provider information to patients as is specifically claimed in the '060 Patent.  Health Grades will address both possibilities, which it will refer to as the "broad" and "narrow" definitions, respectively.

In determining the level of ordinary skill in the art, the Federal Circuit has indicated that district court judges may consider: (1) the educational level of the inventors; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) educational level of active workers in the field; and (5) sophistication of the technology.  *See, e.g., Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696-97 (Fed. Cir. 1983).

#### a. Type of Problems Encountered in the Art and Prior Art Solutions to the Problem

The technology in this case is a conventional application of relational database

4

management systems and Web servers.  The result is an Internet-based information system that connects patients with potential healthcare providers.  ('060 Patent at Abstract (Dkt. 349-1).)  In 2006, when the Health Grades inventors filed their application for the '060 Patent, the Internet had "become a significant source of information to consumers in general."  (*Id.* at Col. 1:28-29.)  Patients were using the Internet to gain as much information as possible about physicians and to help them select a particular physician.  (*Id.* at Col. 1:29-30.)  However, there were several problems with existing on-line healthcare provider information systems:

1. <u>Not Trustworthy or Reliable:</u>

> "[O]ne well-recognized problem with the Internet is that the patient often cannot assess the veracity of the information which is revealed through an Internet search query using a common search engine, such as Google, Yahoo, etc."

(*Id.* at Col. 1:31-34.)

2. <u>Not Accurate and No Complete:</u>

> "Further, with regard to healthcare provider information in particular, there are few, if any resources available for patients to discover any information, much less verified information, about physicians or hospitals. Typically, any information about physicians or hospitals on the Internet is provided by the physicians or hospitals themselves (and, in some cases, insurance companies). Such information may not be updated on a regular basis or may contain inaccurate or incomplete information."

(*Id.* at Col. 1:35-43.)

3. <u>Not Organized to Facilitate Comparison and Selection:</u>

> "Further, even if such information is available, it is usually not organized in a manner that would allow a patient to compare physicians or hospitals, search for a particular physician or hospital by geographic area or other criteria, or verify a physician's or hospital's certifications and licensures."

(*Id.* at Col. 1:43-47.)

The '060 Patent claims a solution to these problems that allows a patient to search a database over the Internet to find physicians using various search criteria, including, for example,

5

geographic area, physician specialty, and gender. (*Id.* at Col. 1:56-2:15, *see also* claim 6 (Col. 21:36-39).)  Patients receive information about a physician in the form of a report that includes three kinds of detailed information:  (1) information verified by the physician, (2) information verified by an independent third-party, and (3) information provided by patients, including patient ratings.  (*Id.* at Col. 1:14-20.)  Further, the physician report includes comparison ratings to help potential patients compare physicians.  The information provided by the claimed invention "enable[s] patients to differentiate among healthcare providers and thereby select the provider that best meets their individual needs."  (*Id.* at Abstract.)

MDx argues that one of ordinary skill in the art must have "significant" experience with healthcare.  However, much of the prior art that was relied on by the Patent Office and MDx is not limited to healthcare, even as broadly defined above.

For example, the main prior art reference that the Patent Office considered during prosecution of the '060 Patent was a patent publication to Henley.  ('060 File History, Dkt. 349-2 at p. 3 ("In addition, claims 1-6, 8, 9, 13-15, and 19 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over . . . Henley in view of . . . Cook, et al.  Further, claims 7, 10, 11, 12, and 20 were rejected under 35 U.S.C. § 103(a) as allegedly being unpatentable over Henley in view of Cook and further in view . . . Sameh.").)  However, ***Henley was not limited to healthcare issues.***  Rather, it describes an Internet-based auction system that enables "prospective clients/patients and professional service providers to competitively negotiate fees for proffered services."  (U.S. Patent Publication No. US 2003/0195838 ("Henley"), Abstract (Ex. 2 hereto).)  Henley discusses various kinds of service providers "(e.g., personal medical, **financial or legal service providers**)."  (Henley, ¶[0015] (emphasis added); *see also* ¶[0016] ("The present invention may also be used to provide the flexibility of an on-line auctioning

6

process . . . and/or for marketing other professional services such as, for example, legal or financial services."); ¶[0147] ("The skilled artisan will appreciate that the apparatus and method of the present invention may easily be adapted for use in other fields of professional service such as the provision of legal and accounting services . . . .").

Similarly, MDx also cited several pieces of prior art in its invalidity contentions that were not limited to, and in some cases, were not even related to, the broad definition of healthcare. (Fourth Supplemental Invalidity Contentions ("Invalidity Contentions") at pp. 3-4 (relevant references highlighted) (Ex. 3 hereto).) For example, U.S. Patent No. 7,167,855 ("'855 Patent") describes a system for matching "experts" and expertise with persons requiring expert services. ('855 Patent at Abstract (Ex. 4 hereto); Invalidity Contentions at p. 4 (Ex. 3).) The preferred embodiment of the '855 Patent relates to experts in biological sciences (biotech, pharmaceutical, and medical device). (*Id.* at Col. 1:23-31 (Ex. 4).) This patent was "not limited to experts in the biological sciences, but can be extended to other areas of expertise, such as computer consulting." (*Id.* at Col. 23:22-27 (Ex. 4).)

As another example, U.S. Patent Publication No. 2006/0294138 Al ("'138 Pub.") describes database-backed website for rating professionals. ('138 Pub at Abstract (Ex. 5 hereto); Invalidity Contentions at pp. 3-4 (Ex. 3).) The system was not limited to healthcare professionals: "[e]xamples of professionals include such traditional professions as doctors, lawyers, accountants, as well as plumbers, electricians, contractors, etc., but excludes teachers, professors, and retailers." (*Id.* at ¶[0024] (Ex. 5).)

As yet another example, U.S. Patent Publication No. 2002/0038233 ("'233 Pub.") is related to lawyers, not doctors. (*See,* e.g., '233 Pub. at ¶¶ [0004], [0014] ("In an exemplary system, the matching system is configured to match attorneys to consumers.") (Ex. 6 hereto);

7

Invalidity Contentions at p. 3 (Ex. 3).)  This publication does not even mention healthcare or healthcare providers.

In sum, the prior art relied on by both the Patent Office and MDx was not limited to healthcare-based information systems.  This factor weighs against MDx's proposal that one of ordinary skill in the art would "need significant healthcare experience" using either definition of healthcare.

### b. Education and Experience Levels of the Inventors

There are three inventors named on the '060 Patent:  John Neal, Scott, Montroy, and David Hicks.  ('060 Patent, cover page.)  Attached hereto as Exhibit 7 is a chart detailing the inventors' education and work experience.

- John Neal (Ex. 7 at p. 2):  has a background in finance.  He has an MBA and worked as an investment banker before co-founding the predecessor to Health Grades (i.e., Specialty Care Network) in 1996.  Specialty Care Network bought and managed physician practice groups and tried to make them more profitable, but did not have anything to do with providing online information about healthcare providers. In 2000, Specialty Care Network changed its name and its business – it began to build an on-line healthcare provider information system.[1] Around this same time, Mr. Neal left and went to work for Service Magic, which helps consumers find home improvement contractors.  Mr. Neal returned to Health Grades in 2003 as a consultant.

- David Hicks (Ex. 7 at p. 1):  has a degree in computer information systems.  He was in charge of the computer systems for Specialty Care Network (described above) and Health Grades.  Before that, he managed the computer systems for the Association of Operating Room Nurses ("AORN") for a year – this was a membership group for the nursing industry.  It did not have anything to do with online information systems.  Prior to working for AORN, Mr. Hicks worked for Coors and before that he worked for Martin Marietta.

- Scott Montroy (Ex. 7 at pp. 1-2):  Mr. Montroy's background also relates to computer software.  He worked for cable TV companies and a software company before he joined Health Grades.

In sum, none of the inventors had *any* experience with "healthcare" using the narrow

---

[1]  (Hicks Dep. at 10:1-11:14 (Ex. 7A hereto); Neal Dep. at 20:25-21:16 (Ex. 7C hereto).

8

definition of this term *prior to* working for Health Grades.  Mr. Neal and Mr. Hicks had several years' experience with healthcare (as broadly defined) in connection with their work for Specialty Care Network.

This factor weighs against MDx's proposal that one of ordinary skill in the art would "need significant healthcare experience," particularly if "healthcare" is narrowly defined to mean information systems about healthcare providers.

### c.    Education and Experience Levels of Active Workers in the Field

Health Grades deposed five employees of MDx, three of whom helped to develop the accused vitals.com website.  Another one of the five witnesses was a founder of a company that developed a competing online information system, which is now owned by MDx.  The final witness is the VP of Business Development for MDx.  Their education and work experience is also summarized in the chart attached hereto as Exhibit 7.  ***None of these people had any experience with healthcare, even in its broadest sense, prior to working for MDx (or UCompare Healthcare).***

- Mitch Rothschild (Ex. 7 at pp. 5-6): is the founder and CEO of MDx.  He has an MBA and worked for direct marketing companies prior to starting MDx.

- Larry West (Ex. 7 at pp. 3-4): is the CTO of MDx, has a BS in Computer Science, and worked for software companies most of his career.  Mr. West was the system architect who created vitals.com, yet he had no experience relating to healthcare before joining MDx.

- Erika Boyer (Ex. 7 at pp. 4-5):  was responsible for obtaining the data used in the accused vitals.com website.  Her degree is in government and she worked for direct marketing companies before joining MDx.

- Jeff Cutler (Ex. 7 at pp. 6-7):  is the VP of Business Development for MDx.  He had no experience with healthcare (even using the broad definition) until he started working for MDx.

- Jeff LaPointe (Ex. 7 at pp.2-3):  founded a competitive physician information

9

website called UCompareHealthcare, which was acquired by MDx in 2011. Mr. LaPointe did not have any experience with healthcare (even using the broad definition) until he founded UCompare in 2004.

This factor also weighs against MDx's proposal that one of ordinary skill in the art would "need significant healthcare experience," particularly if "healthcare" is narrowly defined to mean information systems about human healthcare providers.

### d. The Healthcare Issues Involved in this Case Are Not Extremely Sophisticated

The '060 Patent does not involve extremely sophisticated aspects of healthcare information. Rather, it relates to an ideal combination and presentation of different types of information that allows a person to find a physician that best meets their needs. The various types of healthcare information involved in the claims are easily understood by a lay person. For example, the types of physician-verified information include commonly understood characteristics, like gender, specialty, languages spoken, hobbies, etc. The types of third party verified information include commonly understood credentials, such as medical school and licensure. There is no need for significant healthcare expertise to explain this information. Indeed, almost everyone has had to select a physician at some point in their lives, and this experience with "healthcare" is more than sufficient to enable one to understand the healthcare issues in this case, even as narrowly defined.

Thus, this factor weighs in favor of finding the level of ordinary skill in this case is low, as least with regard to experience relating to healthcare.

### e. In sum, Significant Prior Experience with Online Healthcare Provider Information Systems is Not Required

None of the aforementioned factors support MDx's argument that a person of ordinary skill in the art must have significant experience with online information systems for healthcare

10

providers (i.e., the narrow definition of healthcare).

Additionally, the evidence demonstrates that little, if any, experience with healthcare issues as broadly defined is necessary for one of ordinary skill. The healthcare aspects of the '060 Patent can be easily understood by a lay person. This is demonstrated by the fact that none of the MDx personnel who built the accused vitals.com website had any healthcare experience, even in its broadest sense, prior to working for MDx.

As such, this Court should reject MDx's proposal that one of ordinary skill in the art must have significant experience with healthcare.

### 5. Dr. Greenspun Has Experience with the Broad Definition of Healthcare

MDx contends that Dr. Greenspun "has no real healthcare experience." (Motion at 7.) This is not true. Dr. Greenspun has worked with several software systems relating to the broad definition of healthcare, including:

- Building a Web-based electronic medical record system for Boston Children's Hospital. This was a "comprehensive information system that includes information on providers as well as patients." (Greenspun Dep. at pp. 18:6-20:18 (Ex. 9); Greenspun Software Expert Witness CV at p. 4 (Ex. 10 hereto).)

- Providing assistance to a spinoff company from Children's Hospital called W3 Health. The product related to a database representation of patients, their medical problems, what doctors are involved in treating those patients. (Greenspun Dep. at pp. 21:19-23:11 (Ex. 9).)

- Providing assistance to a spinoff of Massachusetts General Hospital with an electronic medical record system for ambulatory patients. (Greenspun Dep. at pp. 20:19-21:18; 29:22-30:10 (Ex. 9).)

- Shopping for doctors for himself and friends. (Greenspun Dep. at 25:21-27:8 (Ex. 9).)

Thus, if "healthcare" means anything related to caring for a person's health, Dr. Greenspun has experience with healthcare and is qualified to testify as one of ordinary skill in the art.

11

### 6. Dr. Greenspun is Qualified to Testify as an Expert in this Lawsuit Even Using the Narrow Definition of Healthcare

A patent expert must have knowledge of a person of ordinary skill in the relevant art. *Flex-Rest*, 455 F.3d at 1360-61. However, "Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony. . . ." *Microfinancial Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004). Further, when . . . an expert is 'qualified . . . by knowledge, skill, experience, training, or education,' Fed. R. Evid. 702, he need not have had first-hand dealings with the precise type of event that is at issue." *Id.*

Moreover, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F. Supp. 2d 780, 793 (S.D. Tex. 2010) (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing Daubert, 509 U.S. at 596); *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) (finding lack of familiarity with a given topic "affects the witness' credibility, not his qualifications to testify." (quotation omitted); *Newman v. State Farm Fire & Cas. Co.*, 290 Fed. Appx. 106, 114 (10th Cir. 2008) ("As long as an expert stays within the reasonable confines of his subject area, our case law establishes a lack of specialization does not affect the admissibility of the expert opinion, but only its weight.").

In *Tesco*, the district court found that plaintiff's technical expert was qualified to give expert opinions on infringement and validity even though he did not have experience with the specific technology as issue in the patents. The patents related to a tool used on a drilling rig. By way of background, drilling rigs connect segments of pipes (30-40 feet in length) together to form a pipe string that is used to drill or encase the hole in the ground. The patents-in-suit

12

described an apparatus and method for handling these pipe strings.  Defendant Weatherford argued that plaintiff's expert, Dr. Wooley, was not qualified to testify as an expert because "none of his education or experience is related to the design or use of pipe-handling equipment of any kind, much less of the type disclosed in the Patents-in-Suit." *Id.* at 795.  The district court rejected this argument stating:

> The Court agrees with Tesco that Dr. Wooley is qualified under Federal Rule of Evidence 702. **Even if he does not have specific experience studying or working with pipe handling devices, his three degrees in engineering and his experience in oil fields sufficiently qualify Dr. Wooley as an expert on the subject matter of this case. Rule 702 does not require the extreme specificity of expertise that Weatherford proposes.** Neither do the cases Weatherford cites in support of its argument. In *Proveris Sci. Corp. v. Innovasystems, Inc.*, the Federal Circuit found no abuse of discretion when the district court limited the testimony relating to aerosol sprays used in drug delivery devices by an engineer whose sole relevant experience was "using plumes to maneuver satellites."  In *Sundance, Inc. v. DeMonte Fabricating Ltd.*, the Federal Circuit did find abuse of discretion where the district court allowed a patent lawyer with no technical expertise in the art to testify on the questions of infringement and validity.  Unlike the experts at issue in Proveris and Sundance, Dr. Wooley is a trained engineer who has technical experience in the field at issue in the case, oil drilling.  **"A witness qualified as an expert is not strictly confined to his area of practice but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight."** Therefore, the jury may consider Dr. Wooley's lack of more specific experience with casing running systems in evaluating the weight to give his testimony, but the Court finds Dr. Wooley to be qualified as an expert.

*Id.* at 795-796 (emphasis added) (citations omitted).

Similarly, in *Insight Tech., Inc. v. SureFire, LLC*, the district court found that the defendant's technical expert was qualified to testify in a patent case relating to attachments for handguns.  04-cv-074-JD2005 U.S. Dist. LEXIS 46076, *11-*13 (D.N.H. 2005).  The expert, Dr. Wilson, had a Ph.D. in mechanical engineering.  Although he had worked in the field of engineering for Sylvania and General Electric, his experience was primarily academic and he had no experience relating to handguns.  The court found that Dr. Wilson's training and experience

13

in mechanical engineering was sufficient to support his opinions because the patent-in-suit and prior art related to "relatively basic mechanical engineering problems."

Likewise, in this case, Dr. Greenspun is qualified to testify as the issues of infringement and validity even though he does not have experience with the specific kind of consumer-facing, online physician information system that is claimed in the '060 Patent. Like the technology at issue in *SureFire*, the healthcare aspects of the '060 Patent are relatively basic and Dr. Greenspun's extensive experience with database-backed websites, including having written a textbook on this subject for MIT, and his experience with medical records systems, is more than sufficient to qualify him as one of ordinary skill. To the extent that MDx argues that Dr. Greenspun does not have enough healthcare experience, this is a matter of weight, not admissibility. MDx will be free to cross-examine Dr. Greenspun on this issue at trial.

Moreover, MDx asserts that its own technical expert, Dr. Richard Cooper, has the requisite level of healthcare experience and is qualified to testify as one of ordinary skill in this case. However, Dr. Cooper's level of healthcare experience is equivalent to that of Dr. Greenspun. Dr. Cooper does not have any experience with the narrow definition of "healthcare" – his expert report does not identify any experience with information systems for connecting potential patients with physicians. Rather, like Dr. Greenspun, Dr. Cooper has some experience with healthcare, as broadly defined above:

- Minoring in medical engineering, which involved studying physiology, medical instrumentation design, medical electronics in hospitals, and treatment plans as monitored by computer;
- Developing software to manage the continuing education of nurses in hospital environments;
- Developing software to organize work schedules for nurses;
- Being married to a nurse; and

14

- (Under the direction of his wife) developing a patent on software for hospital staff to determine whether all medical treatments provided to patients had been properly recorded in the medical records database.

(Cooper Report at ¶¶2, 4 (Ex. 1).)  Thus, if Dr. Cooper is qualified to testify as one of ordinary skill in this case, as MDx asserts, so too is Dr. Greenspun.  The question of who is more qualified goes to the weight of their testimony, not the admissibility.

Finally, MDx's motion relies heavily on the Federal Circuit's decision in *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008).  However, the facts of this case are nothing like those in *Sundance.*  There, the district court abused its discretion when it admitted the testimony of a patent lawyer "[d]espite the absence of any suggestion of relevant technical expertise." *Id.* at 1361-62.  Here, Dr. Greenspun is not a patent lawyer and has substantial technical expertise relating to database-backed websites, experience relating to healthcare information systems generally, and a Ph.D from MIT in computer science.  In sum, he has sufficient relevant technical expertise for the district court to allow him to testify.

### 7. Conclusion

This Court should deny MDx's motion to exclude the testimony of Dr. Greenspun because Dr. Greenspun qualifies as one of ordinary skill in the art.

Dated: November 19, 2012            ROTHGERBER JOHNSON & LYONS LLP

*s/ Jesús M. Vazquez*
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
1200 17th Street, Suite 3000
Denver, Colorado  80202
Tel:  (303) 623-9000
Fax:  (303) 623-9222
Email: gkanan@rothgerber.com
           kkosto@rothgerber.com
           jvazquez@rothgerber.com

*Attorneys for Plaintiff Health Grades, Inc.*

15

## CERTIFICATE OF SERVICE

        I hereby certify that on November 19, 2012, I electronically filed the foregoing **HEALTH GRADES, INC.'S OPPOSITION TO MDX MEDICAL'S MOTION TO PRECLUDE ANY TESTIMONY FROM HEALTH GRADES, INC.'S EXPERT DR. GREENSPUN** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott David Stimpson
Scott Murray
David Chunyi Lee
Sills Cummis & Gross P.C. – New York
30 Rockefeller Plaza
New York, NY  10112
Email:  sstimpson@sillscummis.com
Email:  smurray@sillscummis.com
Email:  dlee@sillscummis.com

Terence M. Ridley
Wheeler Trigg O'Donnell, LLP
1801 California Street, #3600
Denver, CO  80202-2617
Email:  ridley@wtotrial.com

                                      *s/ Jesús M. Vazquez*
                                      Gregory B. Kanan, Esq.
                                      Kris J. Kostolansky, Esq.
                                      Jesús M. Vázquez, Jr., Esq.
                                      Rothgerber Johnson & Lyons, LLP
                                      1200 17th Street, Suite 3000
                                      Denver, Colorado 80202-5855
                                      Tel:     (303) 623-9000
                                      Facsimile: (303) 623-9222
                                      Email: gkanan@rothgerber.com
                                                 kkostolansky@rothgerber.com
                                                 jvazquez@rothgerber.com

                                      *Attorneys for Plaintiff Health Grades, Inc.*

16