# EXHIBIT G
# (Redacted Version of Doc. # 369-23)

Civil Action No. 11-CV-00520-PAB-BNB

# HEALTH GRADES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**Exhibit R -- Deposition of Jeffrey LaPointe**
(*selected portions*)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF COLORADO
- - - - - - - - - - - - - - - - - x
HEALTH GRADES, INCORPORATED,       :
                                   :CIVIL ACTION NO:
                                   :11-CV-00520-PAB-BNB
        Plaintiff,                 :
  vs.                              :
                                   :
MDX MEDICAL, INCORPORATED,         :
d/b/a, VITALS.COM                  :
                                   :
        Defendant.                 :
- - - - - - - - - - - - - - - - - x


              - - -
        Thursday, December 15, 2011
              - - -

***This transcript contains Confidential and Highly

Confidential Portions noted in the Index Page.***


        Videotaped Deposition of JEFFREY

LaPOINTE, taken pursuant to notice, held at the

office of Sills Cummis & Gross, 30 Rockefeller

Plaza, New York, New York, commencing at 9:22 a.m.

before Jamie I. Moskowitz, a Shorthand Reporter and

Registered Professional Reporter and Notary Public.

## Page 2

```
 1   A P P E A R A N C E S:
 2
     ROTHGERBER JOHNSON & LYONS, LLP
 3   BY:  JESUS M  VAZQUEZ, ESQUIRE
     90 S  Cascade Avenue
 4   Suite 1100
     Colorado Springs, Colorado  80903
 5   303 628 9517
     jvazquez@rothgerber com
 6       Counsel for the Plaintiff
 7
     MERCHANT & GOULD
 8   BY:  KRISTIN L  STOLL-DeBELL, ESQUIRE
     1050 Seventeenth Street  Suite 1950
 9   Denver, Colorado  80265
     303 357 1670
10   kstolldebell@merchantgould com
         Counsel for the Plaintiff
11
12   SILLS CUMMIS & GROSS P C
     BY:  SCOTT B  MURRAY, ESQUIRE
13   One Riverfront Plaza
     Newark, New Jersey  07102
14   973 643 7000
     smurray@sillscummis com
15       Counsel for the Defendant MDX
16
     SILLS CUMMIS & GROSS P C
17   BY:  DAVID C  LEE, ESQUIRE
     30 Rockefeller Plaza
18   New York, New York
     212 643 7000
19   dlee@sillscummis com
         Counsel for the Defendant MDX
20
21
22   ALSO PRESENT:
23   RYAN McMULLEN
     Legal Video Specialist
24
25
```

## Page 3

```
 1              I N D E X
 2
 3   Testimony of:  JEFF LaPOINTE
 4   Mr. Vazquez................7
 5        E X H I B I T S
 6   EXHIBIT   DESCRIPTION           PAGE
 7   Exhibit 1    Amended Notice of Deposition    19
                 of Jeff LaPointe
 8
     Exhibit 2    A page from the                 20
 9               UCompareHealthCare website
10   Exhibit 3    MDX Medical, Inc.'s             57
                 Supplemental Invalidity
11               Contentions and Documents
                 Accompanying Invalidity
12               Contentions
13   Exhibit 4    Document entitled UCHC         102
                 Competitive Analysis
14
     Exhibit 5    Pages from the Competitive     105
15               Analysis
16   Exhibit 6    Segment of the Competitive     111
                 Analysis
17
     Exhibit 7    Document entitled Comparative  115
18               Analysis of Like Sites
19   Exhibit 8    Printouts                      117
20   Exhibit 9    Document entitled              123
                 HealthGrades Financials
21
     Exhibit 10   Document entitled              126
22               Physician Quality Report
                 created 9/15/04
23
     Exhibit 11   Printout of HealthGrades'      141
24               website homepage from 10/19/04
25   Exhibit 12   Search Results from HealthGrades'  144
```

## Page 4

```
 1   EXHIBIT      DESCRIPTION            PAGE
 2
     Exhibit 13   Search Results from HealthGrades'  149
 3               website printed on 10/19/04
 4   Exhibit 14   Document entitled Hospital       150
                 Quality Report
 5
     Exhibit 15   Multi-page document              159
 6
     Exhibit 16   Document entitled The Leap       163
 7               Frog Group
 8   Exhibit 17   Multi-page document              165
 9   Exhibit 18   Document entitled Ingenix        167
10   Exhibit 19   Printout from Ingenix website    172
                 dated 11/15/04
11
     Exhibit 20   Multi-page document including    173
12               information from Ingenix
13   Exhibit 21   Press release with attachment    175
14   Exhibit 22   Printouts of the Subimo.com      180
                 website from 10/19/04
15
     Exhibit 23   Printouts of the Subimo.com      186
16               website from 10/19/04
17   Exhibit 24   Printouts of HealthScope.org     187
                 website from 10/19/04
18
     *Exhibit 25  E-mail to E. Boyer from          194
19               M. Rothschild dated 1/5/11
20
21
22
23
24
25
```

## Page 5

```
 1       DEPOSITION SUPPORT INDEX
 2   INSTRUCTIONS NOT TO ANSWER
 3   Page  Line
 4   None
 5   REQUEST FOR PRODUCTION OF DOCUMENTS:
 6   Page  Line         Description
 7   182   8            Legible copies
 8
     CONFIDENTIAL PORTIONS
 9
     Page 8 Line 7 - Page 8 Line 14
10
     Page 9 Line 24 - Page 14 Line 22
11
     Page 16 Line 6 - Page 18 Line 21
12
     Page 21 Line 1 - Page 25 Line 2
13
     Page 31 Line 13 - Page 31 Line 21
14
     Page 37 Line 23 - Page 38 Line 4
15
     Page 83 Line 11 - Page 85 Line 20
16
     Page 93 Line 9 - Page 93 Line 13
17
18   HIGHLY CONFIDENTIAL
19   Page 70 Line 24 - Page 71 Line 5
20   Page 76 Line 2 - Page 82 Line 9
21   Page 191 Line 11 - Page 192 Line 3
22
23
24
25
```

Page 10

1  Q  Could you tell us where you went to
2  high school?
3  A  Westborough High School.
4  Q  Where is that?
5  A  Westborough, Massachusetts.
6  Q  When did you graduate from Westborough
7  High School?
8  A  Nineteen ninety-eight.
9  Q  And then did you go to college after
10 high school?
11 A  Yes.
12 Q  And where did you go to college?
13 A  Bentley College, now Bentley
14 University.
15 Q  Where is Bentley College?
16 A  Waltham, Massachusetts.
17 Q  And when did you start going to
18 college?
19 A  The fall of 1998.
20 Q  And when did you graduate?
21 A  Two thousand two, spring.
22 Q  And what was your degree or degrees?
23 A  Bachelor of science in finance.
24 Q  And that was in 2002?
25 A  Correct.

Page 11

1  Q  In the spring of 2002, you said?
2  A  Correct.
3  Q  What did you do after you graduated
4  from Bentley in the spring of 2002?
5  A  I continued working at my existing
6  employer.
7  Q  And who was your existing employer?
8  A  It was a small CPA firm, Scott
9  Goffstein & Associates.
10 Q  When did you begin working at the CPA
11 firm?
12 A  I would say around winter of 2001.
13 I'm not sure of the exact date.
14 Q  So, while you were in college is when
15 you began working there?
16 A  Correct.
17 Q  Okay.  Did you say you got a degree in
18 accounting or finance?
19 A  Finance.
20 Q  Finance.
21    Have you taken any examinations, board
22 certifications in any areas such as accounting or
23 finance?
24 A  No.
25 Q  So, when you graduated in the spring

Page 12

1  of 2002, you continued to work, then, with the small
2  CPA firm, and what was the name of the firm?
3  A  Scott A. Goffstein & Associates.
4  Q  Could you spell the last word,
5  Goffstein?
6  A  Associates or Goffstein?
7  Q  Goffstein.
8  A  G-o-f-f-s-t-e-i-n, I believe.
9  Q  Okay.  And then how long did you work
10 there at that firm?
11 A  I left there, I believe, sometime in
12 the late spring of 2003.
13 Q  Why did you leave?
14 A  I didn't want to continue a career in
15 accounting.
16 Q  Okay.  What did you do after you left
17 there in the spring of 2003?
18 A  After that, I took some time off and
19 then became an executive recruiter.
20 Q  And how much time did you, quote,
21 unquote, take off?
22 A  Maybe two or three months.
23 Q  And then how was it that you ended up
24 becoming an executive recruiter?
25 A  I had gone in to visit an executive

Page 13

1  recruiter and was looking for some kind of work at
2  the time --
3     (Pause in proceedings.)
4     THE WITNESS:  -- and was looking for
5  some kind of work at the time, and they had
6  asked me to come actually work for them.
7  BY MR. VAZQUEZ:
8  Q  Okay.  And this was in the spring of
9  2003?
10 A  By this time, it was -- I left the
11 other position in spring of 2003, so by this time it
12 was sometime in the summer, maybe late summer; I
13 don't recall.
14 Q  Of 2003?
15 A  Yes.
16 Q  And what was the name of the firm, the
17 executive recruiting firm?
18 A  Select Staff.
19 Q  And then how long were you an
20 executive recruiter with Select Staff?
21 A  I believe I was still working there
22 through maybe late spring of 2005.
23 Q  Just returning, backtracking a little,
24 other than your degree from Bentley College, have
25 you done any graduate education?

Case No. 1:11-cv-00520-PAB-BNB Document 369-23 Filed 11/02/12 USDC Colorado pg 6 of 12
Case 1:11-cv-00520-RM-NYW Document 400-4 filed 11/21/12 USDC Colorado Page 5 of 14

5

Page 14

1  A   No.
2  Q   Did you receive any certifications or
3  trainings in any areas after that degree?
4  A   No.
5  Q   So, then, let's go back to, it's late
6  spring 2005, and that's when you stopped working at
7  Select Staff, correct?
8  A   Correct.
9  Q   And then what did you do?
10 A   At the time, I had already been
11 working on UCompareHealthCare for probably at least
12 a year before that, and I left full-time to work on
13 that.
14 Q   Let me make sure I understood.
15     While you were working as an executive
16 recruiter at Select Staff, you were also working on
17 or for UCompareHealthCare.
18 A   Yeah. I was not employed by
19 UCompareHealthCare; I was one of the founders, and I
20 was -- wanted to be an entrepreneur and was working
21 on it as a side project at the time, and then
22 decided to dedicate full time to it.
23     (Whereupon, the Confidential testimony
24 ends.)
25

Page 15

1  BY MR. VAZQUEZ:
2  Q   So, is it fair to say, then, since you
3  said you had been working on it for about a year,
4  that you began working on UCompareHealthCare in the
5  spring of 2004?
6  A   Somewhere around there. I don't
7  recall the exact dates. It may have -- I may have
8  started looking into it up to or more than six
9  months before that. But it started picking up time.
10 Q   Okay. Well, this is important, so let
11 me just ask the question a little more clearly.
12 A   Sure.
13 Q   When was it that you began doing
14 anything related to UCompareHealthCare?
15 A   Probably in 2003, in the summer of
16 2003.
17 Q   Summer of 2003?
18 A   Probably.
19 Q   Are you not sure?
20 A   I'm not sure.
21 Q   And do you recall what was it that you
22 began the first activities that you undertook in
23 summer of 2003 related to UCompareHealthCare?
24 A   At the time, I believe, we were just
25 exploring different business opportunities, and I

Page 16

1  don't recall exactly what we started doing at that
2  time.
3      (Whereupon, the following testimony is
4  Confidential.)
5  BY MR. VAZQUEZ:
6  Q   And who is the "we," when you say
7  "we"?
8  A   Myself and some of the other founders
9  of the company.
10 Q   Who are those people?
11 A   The two of them specifically were
12 Mark Donnelly and Ryan Donnelly.
13 Q   Are they brothers?
14 A   Father and son.
15 Q   Father and son.
16     Who is the father and who is the son?
17 A   Mark is the father, Ryan is the son.
18 Q   Thank you.
19     How do you know -- strike that.
20     Who did you meet first, Mark or Ryan?
21 A   I believe it was Mark.
22 Q   And how did you meet Mark Donnelly?
23 A   Through his daughter.
24 Q   What is Mark Donnelly's daughter's
25 name?

Page 17

1  A   Taryn.
2  Q   Could you please spell that?
3  A   T-a-r-y-n.
4  Q   And what was your relationship to
5  Taryn Donnelly?
6  A   She was my girlfriend at the time.
7  Q   When did you begin your relationship
8  with Taryn Donnelly?
9  A   In fall of 2001.
10 Q   So, in the summer of 2003, when you
11 began your work on UCompareHealthCare, were you
12 still in a relationship with Taryn?
13 A   Yes.
14 Q   And I believe you said at the time she
15 was your girlfriend. Is she not your girlfriend
16 now?
17 A   No.
18 Q   And could you tell us when that
19 relationship ended?
20 A   She's my wife.
21 Q   She's your wife?
22 A   Yes.
23 Q   Excellent. Thank you.
24 Congratulations.
25 A   Thank you.

(Pages 14 to 17)

Case No. 1:11-cv-00520-RM-NYW Document 400-4 filed 11/21/12 USDC Colorado pg 7 of 12
Case 1:11-cv-00520-PAB-BNB Document 369-23 Filed 11/02/12 USDC Colorado Page 6 of 14

7

Page 22

1    A    That would have been the summer of
2 '99.
3    Q    And where was it that you worked in
4 the summer of '99?
5    A    Neles Automation.
6    Q    Could you please spell that?
7    A    N-e-l-e-s.
8    Q    And what is Neles Automation?
9    A    They were a manufacturing company that
10 worked in the -- they made valves and things for the
11 oil industry.
12    Q    Okay.  And then how long did you work
13 at Neles Automation?
14    A    For about a year, maybe a little bit
15 more.  I don't recall the exact dates.
16    Q    Was this part-time, given that you
17 were going to school?
18    A    Yes.
19    Q    And then after that year at Neles is
20 when you began with the small firm that you
21 testified about earlier, the Goffstein firm?
22    A    No.
23    Q    There's another one?
24    A    Yes.
25    Q    So, what was the next one?

Page 23

1    A    The next one was the Butcher Wax.
2    Q    Would you please spell that?
3    A    B-u-t-c-h-e-r.
4    Q    And what was the last?
5    A    Wax, W-a-x.
6    Q    Thank you.
7         And how long did you work there?
8    A    I don't recall the exact dates.  Maybe
9 about a year.
10    Q    Okay.  And that was part-time as well,
11 right?
12    A    During the school year.
13    Q    And then after that, was that when you
14 started at the Goffstein firm?
15    A    Yes.
16    Q    So, how many of these five years on
17 your leadership page LP2 were full-time years, five
18 years in the accounting and finance analysis area?
19    A    Maybe under two years.
20    Q    Under two years?  Okay.
21         Now, Mr. LaPointe, earlier on I was
22 asking you about why you thought that United --
23 UCompareHealthCare was a good opportunity, and you
24 felt that there was -- you said that there was a
25 need in the market.

Page 24

1         Do you recall that?
2    A    Yes.
3    Q    Can you explain what you mean by that
4 statement, that you felt there was a need in the
5 market?
6    A    Well, one of the other founders, Mark
7 Donnelly, had a significant amount of experience in
8 the medical field.  He would often have people
9 coming to him, asking him because of his experience,
10 how to -- if they could help him -- if he could help
11 them find different types of healthcare and how to
12 research healthcare, such as doctors and hospitals,
13 because they couldn't find any good resources for
14 this type of information.
15    Q    What is Mark Donnelly's significant
16 experience in the healthcare field?
17    A    He has been an entrepreneur in the
18 healthcare field, has a biotechnology background,
19 worked in public and private healthcare for probably
20 over 35 years.
21    Q    Is he a doctor?
22    A    No.
23    Q    Do you know what degrees or degree he
24 has?
25    A    I believe he has some kind of degree

Page 25

1 from Northeastern University in the radiologic
2 technology field.
3        (Whereupon, the Confidential testimony
4     ends.)
5 BY MR. VAZQUEZ:
6    Q    Okay.  So, other than the fact that
7 Mr. Donnelly was approached by people asking for
8 information about healthcare, is there anything else
9 that formed the basis for you to feel that there was
10 a need in the market for United Health -- United
11 Compare Healthcare?
12    A    After he brought up the idea, we did
13 research and determined that there was indeed
14 significant room in the marketplace and people
15 looking for this, and read several different reports
16 stating the growth rate of people looking for this
17 type of information.
18    Q    And I misspoke, I apologize.  I
19 probably said "United."  Just to make it easy, let's
20 just -- whenever I say "UCompare," we're talking
21 about UCompareHealthCare.
22    A    Sure.
23    Q    Okay.  Now, I think you just mentioned
24 that you did some research.  Can you describe this
25 research that you're discussing, that you just said

### Page 26

```
 1  about?
 2     A    Spent many, many hours and days
 3  researching what was available currently in the
 4  market for this type of information and also what
 5  were the projected growth rates for people looking
 6  for this kind of information.
 7          At the time, the Internet was still
 8  significantly younger than it is now, much less
 9  developed, and did a lot of research into what the
10  growth rates of people looking for this kind of
11  information online was going to be.
12     Q    Okay.  Is there anything else as far
13  as the research you did?
14     A    Market research.  I mean, just many,
15  many hours researching every aspect of this, that we
16  could possibly think of on the Internet.
17     Q    What was the timeframe when this
18  research was being done?
19     A    The majority of it was in 2004.  May
20  have been some, you know, started in two -- or late
21  2003, and, you know, as we pretty much continued
22  going forward, as the company developed.  But the
23  majority of the research was probably done in 2004.
24     Q    When this research was being done, had
25  UCompare been formed?
```

### Page 27

```
 1     A    The company was not formed prior to
 2  starting any of the research.  We wanted to make
 3  sure that it was a viable business before forming
 4  the company.
 5     Q    You spoke about spending many hours
 6  and days doing this research.  I need to understand,
 7  as much as possible, specifically what this research
 8  entailed.  Do you understand that?
 9     A    Yes.
10     Q    So, can you help me, with as much
11  detail as possible, and explain how you performed
12  this research and what specifically it was that you
13  did?
14     A    I sat down at my computer, and for
15  many, many hours performed hundreds or probably
16  thousands of queries searching for different key
17  words associated with this type of business; looking
18  for competitors in the marketplace, looking for
19  market opportunities, looking for information that
20  was available out there, sources for this
21  information, financial information about companies.
22     Q    So, was this research done exclusively
23  by you?
24     A    No.
25     Q    Were people helping you?
```

### Page 28

```
 1     A    Everyone was independently doing their
 2  own research.
 3     Q    And who is everyone?
 4     A    Well, myself, Mark and Ryan.
 5     Q    Was the research that you and Mark and
 6  Ryan were doing, did it overlap?
 7     A    Probably, yes.
 8     Q    Well, did they share with you the
 9  results of their research?
10     A    Yes.
11     Q    And, so, don't you know whether it
12  overlapped or not?
13     A    I was not doing -- sitting next to
14  them as they were doing their research, so I can't
15  say exactly everything that they did.  But there
16  probably was some overlap.
17     Q    Okay.  Well, as to the research that
18  you were doing, you said everybody was doing the
19  research independently, so is it fair to say that
20  nobody helped you do your research?
21     A    I was sitting by myself at my computer
22  doing the research.
23     Q    And, so, all the research you did was
24  on the Internet?
25     A    There may have been -- most of it was
```

### Page 29

```
 1  on the Internet.
 2     Q    And what's a part that may have not
 3  been on the Internet?
 4     A    There may have been some different
 5  publications, magazines and things like that,
 6  current news, newspapers.
 7     Q    Okay.  Do you recall any specific
 8  publication?
 9     A    Not off the top of my head.  I know
10  local newspapers would have articles from time to
11  time related to this type of thing.  Other
12  publications, maybe, such as Time or Newsweek.
13     Q    What was the first one, Citrus Time?
14     A    Such as Time or Newsweek.
15     Q    Oh, Time Magazine?
16     A    Correct.
17     Q    And Newsweek Magazine?
18     A    Possibly.
19     Q    What about the newspapers?  Which
20  newspaper specifically, if you recall?
21     A    I don't specifically recall any of
22  these.  It's just the type of publications that we
23  probably -- we would probably have been looking at.
24     Q    Okay.  When did you begin, if you
25  recall, working on the Internet?
```

Page 70

1  Q    And, so, can you help me understand
2  the qualification about "not personally," or is
3  there some application that wasn't done personally?
4  A    I know there was -- as we were
5  starting the company, there was various things that
6  we had talked about, you know, protecting
7  intellectual property for, but I don't recall
8  specifically what parts of it.  And it wasn't, you
9  know, me, personally, applying for it.  I wasn't
10 really -- it was our attorney and mostly Mark
11 looking into that stuff.
12 Q    So, has UCompare applied for a patent?
13 A    I'm not sure.  I know we have
14 trademarks for, you know, the name and things like
15 that.  I don't recall -- I know we had met with
16 patent attorneys in the early days of the company,
17 but I don't recall exactly what specific parts of
18 the company that we were attempting to or how far
19 that got.  We weren't really extremely well-funded.
20 Attorneys are expensive.
21      (Whereupon, the following testimony is
22   Highly Confidential.)
23 BY MR. VAZQUEZ:
24
25 REDACTED

Page 71

1
2      REDACTED
3
4
5
6      (Whereupon, the Highly Confidential
7   testimony ends.)
8  BY MR. VAZQUEZ:
9  Q    As part of the work that you were
10 doing - and you testified earlier market research
11 and so forth - did you conduct a patent search or
12 have somebody perform that type of search?
13     MR. MURRAY:  I'll just object to the
14   form.
15     THE WITNESS:  Before we started the
16   company you're talking about?
17 BY MR. VAZQUEZ:
18 Q    Well, at any time.  Before or after,
19 have you, in the context of your activities for
20 UCompare, are you aware of whether you have?
21 A    I would say probably, in regards to
22 what I had spoken about just before, that we had
23 spoken to intellectual property attorneys in the
24 past.  I don't remember exactly what the searches
25 were related to; something in regards to, you know,

Page 72

1  the company.
2  Q    Now, with respect to -- you said how,
3  in general, you try to not violate intellectual
4  property rights.
5       Is there anything specific that you
6  can tell me that you -- that UCompare is supposed to
7  do or not do to avoid the HealthGrades' patent, to
8  avoid infringing the HealthGrades' patent?
9  A    I mean, from what I understand about
10 the patent, we don't meet its requirements, so I
11 don't really, you know, give it much thought.
12 Q    How did you -- how did you gain that
13 understanding that you just referenced?
14 A    From briefly looking at the patent.
15 Q    Just from briefly looking at the
16 patent you feel comfortable that UCompare does not
17 violate the patent?
18 A    Yeah.
19 Q    Okay.  What's missing from what
20 UCompare does, such that you feel comfortable that
21 UCompare doesn't violate the patent?
22 A    Off the top of my head, I don't
23 remember anything.  But I believe one of the
24 specific pieces had to do with user-generated
25 content.

Page 73

1  Q    User-generated content?
2  A    Correct.
3  Q    Okay.  UCompare doesn't have that?
4  A    No, we don't.
5  Q    So, meaning that potential patients
6  looking for healthcare provider information do not
7  get to provide any content --
8  A    No.
9  Q    -- to UCompare?
10 A    No, not in -- certainly not in context
11 of this, from what I understand.
12 Q    Okay.  What is your understanding of,
13 using your words, what user-generated content is?
14 A    Content displayed on the website that
15 is, you know, typically written by the user; user
16 opinions, that sort of thing.
17 Q    And a user of what?
18 A    I'm sorry, user of -- a consumer of
19 the website.
20 Q    When you say "a consumer of the
21 website," you mean a consumer of the UCompare
22 website, right?
23 A    Correct.
24 Q    And is another way to say "consumer of
25 a UCompare website," is that a potential patient?

(Pages 70 to 73)

Case No. 1:11-cv-00520-RBM-NYW Document 400-4 filed 01/21/12 USDC Colorado pg 10 of 12
Case 1:11-cv-00520-PAB-BNB Document 369-23 Filed 11/02/12 USDC Colorado Page 9 of 11

20

Page 74

1   **A**     **It's -- I guess it's possible. I**
2 **don't know exactly -- I don't know information about**
3 **our users specifically, individually, but yes, I**
4 **mean, one could assume that people that come to our**
5 **site are potentially a patient for someone.**
6   Q     What other type of people come to your
7 site if they're not people looking or maybe
8 potential patients?
9   **A**     **Anybody looking to research a**
10 **healthcare provider, for any reason.**
11   Q     Okay. Now, I was asking you about
12 your relationship with Mitch Rothschild. When did
13 you first meet him?
14   **A**     **I first met him -- it was sometime**
15 **between November and January -- November of 2010 and**
16 **January of 2011. I can't recall which one of those**
17 **meetings.**
18   Q     And what were the circumstances under
19 which you met?
20   **A**     **We were -- the New York Times and**
21 **About.com had hired media brokers to sell**
22 **UCompareHealthCare, and we had a few times when we**
23 **had come down to meet with potential buyers, and**
24 **Vitals was one of those groups. I just don't recall**
25 **which -- where in the order they came when we came**

Page 75

1 **down.**
2   Q     So, it was a business meeting?
3   **A**     **It was the same kind of meeting that**
4 **it was when we met with HealthGrades, for example.**
5 **It was in regards to them learning more information**
6 **about our company or business, and helping them**
7 **decide if they were interested in bidding on the**
8 **company.**
9   Q     Do you consider HealthGrades to be a
10 competitor to UCompare?
11   **A**     **Yes.**
12   Q     Does UCompare copy HealthGrades in any
13 way?
14   **A**     **No.**
15   Q     Does MDX copy HealthGrades in any way?
16   **A**     **No.**
17       MR. MURRAY: Objection to form. If
18 you know, you can answer.
19       THE WITNESS: From -- from my own
20 personal opinion, no. I don't really have much
21 association directly with the running of Vitals
22 or MDX.
23       (Whereupon, the following testimony is
24 Highly Confidential.)
25

Page 76

1 BY MR. VAZQUEZ:
2   Q     Okay. Thanks.
3
4
5
6
7
8
9
10 REDACTED

Page 77

1
2
3
4
5
6
7
8
9
10 REDACTED
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Q     What type of resources would you need

(Pages 74 to 77)

Page 186

1 BY MR. VAZQUEZ:
2   Q    Sure.
3   A    Did you ask a question regarding
4 patient information -- or patient-generated
5 information?  I don't recall if we had gotten to
6 that one yet.
7   Q    Why don't you just make the statement,
8 whatever -- assume -- I'm not sure what it is you're
9 getting to, but if you feel you need to clarify or
10 supplement something you said before, please do so.
11   A    There's something in here, on
12 page 136, referring to patient supplied information.
13   Q    What is that again?  What page --
14 where on page 136?
15   A    There's just a reference to users can
16 post questions, get answers, join the community.
17   Q    Where on page 136 is that?
18   A    Under "Ask Others."
19   Q    Okay.  All right.  Is that it,
20 Mr. LaPointe?
21   A    I believe so.
22   Q    All right.
23       MR. VAZQUEZ:  Please mark this one.
24       (Whereupon, LaPointe Exhibit 23 was
25     received and marked for Identification.)

Page 187

1 BY MR. VAZQUEZ:
2   Q    All right, Mr. LaPointe, we have
3 handed you Deposition Exhibit LP23.  This is what
4 appears to be in the right order.
5       Can you tell me what this is, please?
6   A    On the first page is a printout from
7 the Subimo website from October 19th, 2004; a page
8 of Pharma Advisor product demo; page 144, looks like
9 a printout of information gathered from probably
10 mostly Alexa.
11   Q    All right.
12   A    Possibly some other sources.  The next
13 page, 145, is traffic data provided by Alexa.  Page
14 146 and 147 are printouts from the JCAHO report from
15 2004.
16   Q    Okay.  And, Mr. LaPointe, were you the
17 person who was on the Subimo website on
18 October 19, 2004, and printed these materials?
19   A    I believe so.
20       (Whereupon, LaPointe Exhibit 24 was
21     received and marked for Identification.)
22 BY MR. VAZQUEZ:
23   Q    All right.  Mr. LaPointe, this
24 document that's been handed to you has been marked
25 as Deposition Exhibit LP24.  Can you please tell us

Page 188

1 what this is?
2   A    It's printouts from the
3 HealthScope.org website, from October 19th, 2004.
4   Q    You were pretty busy on October 19th,
5 weren't you?
6   A    Yes.
7   Q    Are you the person that was on this
8 HealthScope website and printed these materials?
9   A    Yes, I believe so.
10   Q    Do you know if this website includes
11 information that could be verified or edited by a
12 healthcare provider?
13       MR. MURRAY:  Objection to form.
14       THE WITNESS:  I can't say
15     specifically.
16 BY MR. VAZQUEZ:
17   Q    Can you tell me if this website
18 includes information by a past or current patient
19 about a doctor?
20       MR. MURRAY:  Object to form.
21       THE WITNESS:  Yes.
22 BY MR. VAZQUEZ:
23   Q    Can you show me where you see that?
24   A    On the first page, it says, "Medical
25 Group Ratings.  There's over 120 physician groups

Page 189

1 rated by patients getting treatment and specialty
2 care, doctor communication, and providing timely
3 care and service."
4   Q    Do you see -- can you tell us whether
5 this website includes information about a doctor
6 that was verified or received from a third party?
7       MR. MURRAY:  Object to form.
8       THE WITNESS:  It's possible.
9 BY MR. VAZQUEZ:
10   Q    Based on what?
11   A    On page 205 and 206, it refers to --
12 starting at the bottom of the page, specifically
13 physician ID number used by plan, refers to the
14 health plan, so I'm assuming they somehow obtained
15 that from the health plan.
16   Q    And, so, the information that you
17 think this report may include about a doctor that
18 was verified or received from a third party is the
19 physician ID?
20   A    It's the health plan's physician ID.
21   Q    Okay.  So, help me understand how you
22 feel this relates to information about a doctor that
23 was verified or received from a third party.
24   A    Because it's a third-party ID.  It's
25 not a HealthScope ID.  It's the physician plan ID,

Page 190

1  so...
2      MR. VAZQUEZ: Okay. All right. Well,
3  the videographer has indicated a few minutes
4  ago that there are five minutes left, so let's
5  stop here and change the tape. And we probably
6  have just a few minutes left anyway, but just
7  to be sure, let's get a new tape.
8      THE VIDEOGRAPHER: This ends tape 3 in
9  the deposition of Jeff LaPointe. The time is
10 5:33 p m. We're off the record.
11     (Whereupon, a short break was taken.)
12     THE VIDEOGRAPHER: This is the start
13 of tape 4 in the deposition of Jeff LaPointe.
14 The time is 5:35 p m. We're back on the
15 record.
16 BY MR. VAZQUEZ:
17  Q    Okay. Mr. LaPointe, earlier on in the
18 day you mentioned -- you made some references to
19 your financial status. You recall, right?
20  A    Yes.
21  Q    All right. I just need to ask you
22 some questions relating to the acquisition of
23 UCompare by MDX. I think you said that happened in
24 March? Of this year?
25  A    Yeah, March of this year.

Page 191

1   Q    All right. Did you make any money
2  after that acquisition or as a result of that
3  acquisition?
4       MR. MURRAY: Object to the form. You
5   can answer.
6       THE WITNESS: I'm currently employed
7   by MDX.
8       (Whereupon, the following testimony is
9   Highly Confidential.)
10 BY MR. VAZQUEZ:
11  Q    But was there any kind of, you know,
12 other than your salary, some kind of a, you know,
13 windfall, stock or some kind of a, you know, bonus
14 or anything that went your way from that
15 acquisition?
16      MR. MURRAY: Object to form. You can
17  answer.
18      THE WITNESS: I was not an owner in
19  the company. I did not make any money from MDX
20  from the sale.
21 BY MR. VAZQUEZ:
22
23 REDACTED
24
25

Page 192

1
2  REDACTED
3
4      (Whereupon, the Highly Confidential
5   testimony ends.)
6  BY MR. VAZQUEZ:
7   Q    Switching gears here, Mr. LaPointe, do
8  you understand the obviousness standard for proving
9  a patent invalid?
10      MR. MURRAY: I'm going to object to
11  form, just back to the continuing objection
12  that this is not an expert witness. He's here
13  as a fact witness. But to the extent he can
14  answer it as a fact witness, he may.
15      THE WITNESS: I'm not familiar with
16  it.
17 BY MR. VAZQUEZ:
18  Q    Okay. I think I know the answer to
19 the next question, but I still have to ask it, then.
20      Do you intend to offer any opinion at
21 trial regarding whether any claims of the '060
22 patent being invalid for obviousness?
23      MR. MURRAY: Same objection.
24      THE WITNESS: I haven't thought about
25  trial in any way.

Page 193

1  BY MR. VAZQUEZ:
2   Q    I understand you haven't thought about
3  trial, but obviously we've been here all day because
4  counsel for MDX and UCompare have listed you as a
5  witness in support of the contention that the patent
6  is invalid.
7       So, it's important for us, in order to
8  prepare for trial, to know whether you intend to
9  give even a lay opinion, not an expert opinion,
10 which is what your counsel's objections relate to,
11 but just, do you intend to offer a lay opinion about
12 any of the claims in the patent being invalid?
13      And we can short-circuit this if
14 counsel wants to say on the record whether he's
15 going to offer those types of opinions or not.
16      MR. MURRAY: I'm going to object to
17  the form of the question. I think, you know,
18  when the time comes for us to list who the
19  witnesses will be at trial, we will do so. And
20  I think the question has already been answered
21  in an interrogatory or so regarding lay
22  opinions, so we'll assume we've already given
23  our answer to that.
24 BY MR. VAZQUEZ:
25  Q    I don't know that it has, so, I guess,