# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

## HEALTH GRADES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff Health Grades, Inc. ("Health Grades") respectfully moves for summary judgment on Defendant MDx Medical, Inc.'s counterclaims and affirmative defenses asserting that Health Grades' U.S. Patent No. 7,752,060 ("the '060 patent") is invalid and unenforceable.

EXHIBIT A

## TABLE OF CONTENTS

I.      INTRODUCTION ..........................................................................................3

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................5

        A.      Undisputed Material Facts Regarding the Alleged Prior Art
                from Health Grades ................................................................................6

        B.      Undisputed Material Facts Regarding the Comparison Ratings
                Element................................................................................................7

                1.      Undisputed Material Facts Regarding the Early HG Reports
                        and Services Cited By MDx and Dr. Cooper for the
                        Comparison Ratings Element.....................................................7

                2.      Undisputed Material Facts Regarding Third Party Prior Art
                        Cited by MDx for the Comparison Ratings Element ...............13

        C.      Undisputed Material Facts Regarding MDx's Obviousness
                Defense...............................................................................................13

        D.      Undisputed Material Facts Regarding MDx's Inequitable
                Conduct Defense.................................................................................15

III.    ARGUMENT ...........................................................................................17

        A.      Standard for Summary Judgment.................................................17

        B.      MDx Cannot Prove that Any of the Asserted Claims are
                Anticipated as a Matter of Law ....................................................17

                1.      None of the Early HG Reports and Services Qualify as
                        Prior Art Under §102(a)..........................................................17

                2.      All of the Asserted Claims Require Comparison Ratings of
                        Human Healthcare Providers.  MDx Did Not Cite a Single
                        Prior Art Reference that Included This Element.....................19

        C.      MDx Cannot Prove that Any of Health Grades Prior Reports
                or Services Render Any of the Asserted Claims Obvious under
                §103......................................................................................................23

        D.      MDx Cannot Prove its Inequitable Conduct Defense ...................26

IV.     CONCLUSION.........................................................................................30

## I.  __INTRODUCTION__

Health Grades respectfully moves for summary judgment that the '060 patent is both valid and enforceable.  Summary judgment is appropriate given that the art relied on by MDx is either not prior art and/or does not support a finding of invalidity as a matter of law.

MDx relies primarily (and its technical expert relies *exclusively*) on Health Grades' own prior reports and services ("Early HG Reports and Services") to support both its invalidity and inequitable conduct defenses.  MDx asserts that the Early HG Reports and Services qualify as prior art under 35 U.S.C. §§102(a) and 102(b).

However, §102(a) is limited to activities of third parties and does not apply to Health Grades' own work *as a matter of law.*  Thus, Health Grades seeks summary judgment that the Early HG Reports and Services are not prior art under §102(a).

MDx also argues that the asserted patent claims are anticipated by the prior art. Anticipation under either §102(a) or §102(b) requires that a single prior art reference include all of the elements of the asserted claim yet none of the references proffered by MDx satisfy this requirement.  In this case, all of the asserted patent claims require "comparison ratings of [human] healthcare providers," but MDx and its expert do not cite, and cannot cite, any evidence showing that Health Grades itself had such ratings *before* the §102(b) critical date nor have they cited a single third party prior art reference that has ever had ratings of human healthcare providers.  As such, Health Grades seeks summary judgment that the asserted claims are not anticipated as a matter of law.

Recognizing that none of the prior art includes comparison ratings of human healthcare providers, MDx argues that it would have been obvious to substitute comparison ratings of physicians for comparison ratings of hospitals.  An important component of any obviousness

3

defense is that there be a reason to combine the elements in the same way as the asserted claims. In this case, neither MDx's invalidity contentions, nor its expert report, identify any reason to substitute physician ratings for hospital ratings, other than stating that it would have been obvious to do so. Such conclusory statements are insufficient as a matter of law. Consequently, Health Grades seeks summary judgment that the asserted claims are not obvious.

Finally, MDx asserts that the inventors' failure to disclose the Early HG Reports and Services to the Patent Office during the prosecution of the '060 patent constitutes inequitable conduct. This defense requires, and has always required, proof by clear and convincing evidence that there was intent to deceive the Patent Office. MDx's only evidence of intent is the mere fact that these reports were not disclosed. This is not sufficient as a matter of law. Summary judgment should be granted for this reason alone. Indeed, the Federal Circuit has called the habit of charging inequitable conduct on the slenderest grounds, like those in this case, an "absolute plague" on the courts and the patent system. Moreover, it is even clearer that summary judgment is proper in this case under the new, more rigorous standards set forth in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011). Under the new law, MDx must now prove by clear and convincing evidence that: (1) Health Grades "made a deliberate decision to withhold" the Early HG Reports and Services; (2) that the Patent Office would not have allowed the claims to issue had it been aware of the Early HG Reports and Services (i.e., "but-for material to patentability"); and (3) the inventors knew these references were but-for material to patentability. As discussed above, the Early HG Reports and Services do not anticipate or render obvious any of the asserted claims as a matter of law. Therefore, MDx cannot prove that these references are but-for material to patentability or that the inventors had specific intent to deceive.

Early resolution of these defenses will dramatically reduce the scope of this case.

2003918240_1

Summary judgment should be entered.

## II.   <u>STATEMENT OF UNDISPUTED MATERIAL FACTS[1]</u>

1.      At the outset of this case, the Parties agreed, and the Court ordered, that the parties would abide by the Local Rules of Practice for Patent Cases before the United States District Court for the Northern District of California ("Patent Local Rules").  (Dkt. 34, Scheduling Order at p. 6.)

2.      Pursuant to Patent Local Rule 3-3, MDx Medical has served Health Grades with invalidity contentions that disclose, among other things, (a) what prior art it intends to rely on at trial; (b) whether each item of prior art anticipates each asserted claim or renders it obvious; (c) an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness; and (d) a chart identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found. (*See,* e.g., Fourth Supplemental Invalidity Contentions and Documents Accompanying Invalidity Contentions dated Sept. 17, 2012 ("Invalidity Cont.") (Ex. B hereto).)

3.      Pursuant to Fed. R. Civ. P. 26(a)(2)(a), MDx served Health Grades with an expert report on invalidity from Dr. Richard G. Cooper that consists of a complete statement of all opinions he will express and the basis and reasons for them with regard to patent invalidity. (7/13/12 Declaration of Richard G. Cooper, D.Sc. ("Invalidity Report") (Ex. D hereto).)

4.      The '060 patent was filed on August 29, 2006.  (U.S. Pat. No. 7,752,060, Cover Page (Ex. A hereto).)

5.      Any reference dated after August 29, 2005 does not qualify as prior art under

---

[1]      Alphanumeric exhibits refer to exhibits attached to this motion, whereas numeric exhibits refer to deposition exhibits cited in connection with MDx's invalidity contentions and its expert report on invalidity.

§102(b).[2] (U.S. Pat. No. 7,752,060, Cover Page (Ex. A).)

        **A.**    ***Undisputed Material Facts Regarding the Alleged Prior Art from Health Grades***

     6.     MDx and its expert, Dr. Richard G. Cooper, rely on references they call the "Early HG Reports and Services" to support MDx's invalidity defense. (Invalidity Cont. at pp. 4-5 (Ex. B[3]); Invalidity Report at ¶33 (Ex. D).)

     7.     The "Early HG Reports and Services" are the only prior art references that Dr. Cooper relies on for his invalidity analysis of independent claims 1 and 15. (Invalidity Report at ¶33, p. 8 (Ex. D).)

     8.     The Early HG Reports and Services as defined by Dr. Cooper include Health Grades' web site prior to August 29, 2006. (Invalidity Report at ¶33, p. 8 (Ex. D).)

     9.     Dr. Cooper lists the following as specific "examples" of Early HG Reports and Services: (a) Health Grades Premium Reports; (b) the Drucker reports; (c) the Physician Quality Guides; (d) the Physician Quality Reports; (e) the Physician Research Comparison Reports; (f) the Comparative Physician Report; (g) the Physician Quality Comparison Reports; (h) the Nursing Home Comparison Reports; (i) the Physician Online Services; (j) Connecting Point; (k) the Physician New Marketing Media ("PNMM"); and (l) patient surveys collected by Health Grades. (Invalidity Report at ¶33, p. 8; ¶43, pp. 15-16 (patient surveys) (Ex. D).)

     10.     MDx asserts that the "Early HG Reports and Services" include: public use and public knowledge of the www.healthgrades.com web site since 2004 and on at least 9/15/2004, 10/19/2004, 12/28/2004, 2/16/2005, 3/22/2005, and 06/04/2005; patient experience surveys

---

[2]     For purposes of this motion only, Health Grades is assuming that the '060 patent is not entitled to priority back to the provisional application.

[3]     Where possible, the cited portions of exhibits have been highlighted in yellow to assist the Court's review of this motion.

conducted as early as 2004; and the physician online service ("POS") application launched in May 2004. (Invalidity Cont. at pp. 4-5 (Ex. B).)

11. Both MDx and Dr. Cooper assert that the Early HG Reports and Services qualify as prior art under 35 U.S.C. §§102(a) and (b). (Invalidity Contentions at pp. 4-5 (Ex. B); Invalidity Report at ¶¶34-37, pp. 8-9 (Ex. D).)

### B. *Undisputed Material Facts Regarding the Comparison Ratings Element*

12. The fifth element of claims 1 and 15 ('060.1.5 and '060.15.5 as defined in MDx's Invalidity Report) requires creation of: "a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers" (hereinafter "Comparison Ratings element"). (Invalidity Report at ¶45, pp. 17-19; ¶61, pp. 32-33 (Ex. D).)

### 1. Undisputed Material Facts Regarding the Early HG Reports and Services Cited By MDx and Dr. Cooper for the Comparison Ratings Element

13. MDx cites the following documents to support its argument that the Early HG Reports and Services anticipate and/or render obvious the Comparison Ratings element: (1) UCHC 0000080; (2) Nursing Home Quality Comparison Report created 12/28/2004 (HG032052-57) (part of Dep. Ex. 8); (3) Physician Quality Comparison Report created 12/28/2004, page 17-18 (HG0032078-79) (part of Dep. Ex. 8); (4) Physician Quality Report created 12/28/2004, pages 9-10 (comparison to national data) (HG0032094-95) (part of Dep. Ex. 8); (5) Physician Quality Report created 06/04/2005 (i.e., Drucker Report) (MGHG 000016 – 19) (Dep. Ex. 13). (Appendix to Fourth Supplemental Invalidity Contention Charts at pp. 18-19

("Invalidity Claim Chart") (Ex. C hereto).)

14.     Dr. Cooper cites the following documents to support his opinion that the Early HG Reports and Services anticipate or render obvious the Comparison Ratings element:  Dep. Ex. 8, 13, 23, and 51.  (Invalidity Report at ¶45, pp. 17-19; ¶61, pp. 32-33 (Ex. D).)

15.     The page labeled UCHC 000080 is a printout from www.healthgrades.com dated 10/19/2004 – it does not show ratings of human healthcare providers.  (UCHC 0000080 (Ex. E hereto).)

16.     Dep. Ex. 8 (Ex F hereto) is an e-mail from a Health Grades employee to Jennifer Slawson of AARP attaching the following five "sample reports" that each indicate they were created on 12/28/2004:  Nursing Home Quality Comparison Report (HG0032037-051) (Ex. F1 hereto); Nursing Home Quality Report (HG0032052-061) (Ex. F2 hereto); Physician Quality Comparison Report (HG0032062-085) (Ex. F3 hereto); Physician Quality Report (HG0032086-101) (Ex. F4 hereto); and Hospital Quality Report (HG0032102-109) (Ex. F5 hereto).

17.     None of the reports attached as part of Dep. Ex. 8 include ratings of human healthcare providers. (Ex. F1, F2, F3, F4, F5.)

18.     Dep. Ex. 13 is a Health Grades' report on Dr. David Drucker that has a date of 6/4/2005.  (MGHG000016-19 ("Drucker Report") (Ex. G hereto).)

19.     The Drucker Report (Dep. Ex. 13) contains ratings of only one human healthcare provider:  Dr. Drucker.  (Ex. G at pp. MGHG000017-18.)

20.     The Drucker Report (Dep. Ex. 13) does not include "comparison ratings of healthcare providers" as defined by the Court.  (Ex. G.)

21.     Dep. Ex. 23 is a Health Grades' e-mail dated 8/12/2003 that relates to the "project plan for Quality Guides – updated."  (HG0049856-863) (Ex. H hereto).)

22.     Dep. Ex. 23 does not include ratings of human healthcare providers.  (Ex. H.)

23.     Dep. Ex. 51 is a string of e-mails between inventor John Neal and Lauren Deritis of the Rothman Institute regarding Health Grades Physician Marketing program and attaching a PowerPoint presentation entitled "Physician New Media Marketing."  (HG0179518-550) (Ex. I hereto).)

24.     In the e-mail that is part of Dep. Ex. 51, Mr. Neal states that the "Physician New Media Marketing" attachment is "highly proprietary and non-public."  (HG0179518) (Ex. I).)

25.     Dep. Ex. 51 includes some screenshots of a report on Dr. Drucker that show ratings of a single human healthcare provider:  Dr. Drucker.  (HG0179533-542) (Ex. I.).

26.     Dep. Ex. 51 does not include ratings of multiple human healthcare providers. (Ex. I.)

27.     Dep. Ex. 51 does not include "comparison ratings of healthcare providers" as defined by the Court.  (Ex. I.)

28.     MDx cites the following deposition testimony to support its argument that the Early HG Reports and Services anticipate or render obvious the Comparison Ratings element: June 2012 Neal Deposition, e.g., pages 129, 153-54, 214; and June 2012 Dodge Deposition, e.g., pages 200-01, 225-26.  (Invalidity Claim Chart at pp. 18 (Ex. C).)

29.     Dr. Cooper cites the following deposition testimony to support his argument that the Early HG Reports and Services anticipate or render obvious the Comparison Ratings element:  Neal Dep. at pp. 129, 153-154, 214; Dodge Dep. at pp. 72-73, 200-201, 225-226; and January 2012 Montroy Deposition at pp. 224-225, 259-264, 318-320.  (Invalidity Report at ¶45, pp. 17-19 (Ex. D).)

30.     Page 129 of the Neal Dep. does not discuss ratings.  (6/13/12 Deposition of John

Neal ("Neal Dep.") at p. 129 (Ex. J hereto).)

31.     At pp. 153-154 of his deposition, Mr. Neal testifies regarding ratings of hospitals in the Physician Quality Comparison Report (Ex. F4 hereto).  (Neal Dep. at pp. 153-154 (Ex. J).)

32.     Pages 153-154 of the Neal Dep. do not discuss ratings of human healthcare providers. (Neal Dep. at pp. 153-154 (Ex. J).)

33.     At p. 214 of his deposition, Mr. Neal states that at least as early as February 16, 2005, there was patient experience data in Dr. Drucker's report on the website that was available to the public.  (Neal Dep. at p. 214 (Ex. J).)

34.     At p. 200-201 of his deposition, Mr. Dodge discusses ratings of hospitals in the Physician Quality Report (Ex. F3 hereto).  (6/28/12 Deposition of Allen Dodge ("Dodge Dep.") at pp. 200-201 ("Dodge Dep.") (Ex. K hereto).)

35.     At p. 225 of his deposition, Mr. Dodge testifies about the patient ratings of Dr. Drucker in the screenshot of a report on Dr. Drucker shown in Physician Marketing PowerPoint presentation attached as part of Dep. Ex. 51.  (Dodge Dep. at 225:3-11 (Ex. K) (discussing Dep. Ex. 51 at p. HG0719538 (Ex. I).)

36.     At p. 225 of his deposition, Mr. Dodge testifies about the patient ratings on the current Health Grades website.  (Dodge Dep. at 225:12-24 (Ex. K).)

37.     At pp. 225-226 of his deposition, Mr. Dodge testifies about the ratings of hospitals.  (Dodge Dep. at 225:25-226:8 (Ex. K).)

38.     At pp. 224-225 of his deposition, Mr. Montroy testifies about Dep. Ex. 23 (Ex. H) and agrees that the "objective of the quality guide modules are to allow healthcare consumers to quickly and easily compare and understand provider information and enable them to make the most informed decision about their healthcare."  (1/16/12 Deposition of Scott Montroy

2003918240_1

("Montroy Dep.") at pp. 224-225 (Ex. L hereto).)

39.     Pages 224-225 of the Montroy Dep. do not discuss ratings.  (Montroy Dep. at pp.
224-225 (Ex. L).)

40.     At pp. 259-264 of his deposition, Mr. Montroy testifies about the Nursing Home
Quality Comparison Report (HG0032037-051) (Ex. F1) and states that it compared "star ratings"
of nursing homes.  (Montroy Dep. at 264:1-19 (Ex. L).)

41.     Pages 259-264 of the Montroy Dep. do not discuss comparison ratings of human
healthcare providers. (Montroy Dep. at pp. 259-264 (Ex. L).)

42.     To show the alleged existence of comparison ratings *of physicians* in the
HG prior art, MDx's Invalidity Report relies the following testimony from Mr. Dodge:

> Q       And the PQR in 2006, that changed sometime in 2006, at least sometime
> in 2006, to include patient ratings, right?
> A       I believe it did, correct.
> Q       (BY MR. STIMPSON) Did that also change sometime in 2006 to include
> comparison ratings?
> A       I don't know the time it changed. I believe by 2006, sometime in 2006 I
> believe we did offer quality ratings. And I don't know the date it was launched.
> Q       (BY MR. STIMPSON) My question was about comparison ratings. Do
> you mean in 2006 you added comparison ratings at some time?
> A       I believe that to be the case, yes.
> Q       (BY MR. STIMPSON) But you can't tell me whether it was in the first
> half or the second half of the year?
> A       I don't recall. I can't tell you, correct.

(Invalidity Report at ¶45, p. 18 (Ex. D) (citing Dodge Dep. at pp. 72-73 (Ex. K).)

43.     MDx's Invalidity Report does not specifically identify any witness who testified
that Health Grades put comparison ratings *of physicians* in a healthcare provider report *prior to
2006*.  (Invalidity Report at ¶45, pp. 17-19 (Ex. D).

44.     Inventor John Neal testified that Health Grades did not include comparison
ratings of physicians into its physician reports until "2006-ish. It may be even early 2007 because

11

of the risk that it posed to our business." (Neal Dep. at pp. 97:18-98:4 (Ex. J).)

      45.

<div style="border:1px solid black; display:inline-block; padding:4px;">REDACTED</div>

      46.    Jeff LaPointe is a founder of UCompare Healthcare, which has a website that provides information about physicians. (12/15/11 Deposition of Jeffrey LaPointe at pp. 14:14-22; 23:21-25:22 ("LaPointe Dep.") (Ex. R hereto).)

      47.    MDx acquired UCompare Healthcare in March 2011. (LaPointe Dep. at p. 190:21-25.)

      48.    Mr. LaPointe testified that UCompare Healthcare's website does not display content written by users or user opinions (e.g. "user-generated content") for several reasons, including that pharmaceutical companies do not like to advertise on websites that contain user-generated content because the FDA has not yet ruled in terms of how they view it; hence it is a "very difficult time for pharmaceutical companies to try and get different marketing and advertising campaigns and things approved, very strict process, so they're very cautious about it." (LaPointe Dep. at pp. 72:2-73:23; 76:3-17.)

## 2. <u>Undisputed Material Facts Regarding Third Party Prior Art Cited by MDx for the Comparison Ratings Element</u>

49.     MDx's invalidity contentions cite Figs. 2 and 7 and their accompanying text (¶¶0009, 0014, 0019, and 0031) of US 2006/0015369 ('369 prior art) for the report element. None of these figures or paragraphs disclose ratings. (Invalidity Chart at pp. 17-18 (Ex. C); US 2006/0015369 at Figs. 2 and 7, (¶¶0009, 0014, 0019, and 0031 (Ex. M hereto).)

50.     MDx's invalidity contentions cite GeoAccess prior art (UCHC 0000295 & 297) for the report element. None of these pages disclose ratings. (Invalidity Claim Chart at pp. 19 (Ex. C); Printouts from www.ingenix.com (UCHC 0000290-300 (Ex. N hereto).)

51.     MDx's invalidity contentions cite Subimo prior art (UCHC 0000133-134) for the report element. None of these pages disclose ratings. (Invalidity Claim Chart at pp. 19-21 (Ex. C); Printouts from www.subimo.com (UCHC0000131-143 (Ex. O hereto).)

52.     MDx's invalidity contentions cite pages of the HealthScope prior art (UCHC 0000205-206) for the report element. None of these pages disclose ratings. (Invalidity Claim Chart at pp. 20 (Ex. C); Printouts from www.healthscope.com (UCHC0000202-206 (Ex. P hereto).)

53.     MDx's invalidity contentions cite Fig. 5 and accompanying text (¶¶0024 and 0084-86) of US 2003/0167187 ('187 prior art) for the report element. None of these figures or paragraphs disclose ratings of human healthcare providers. (Invalidity Claim Chart at pp. 20-21 (Ex. C); US 2003/0167187 at Fig. 5, ¶¶0024 and 0084-86 (Ex. Q hereto).)

### C. <u>*Undisputed Material Facts Regarding MDx's Obviousness Defense*</u>

54.     MDx's Invalidity Report mentions obviousness only with respect to the Comparison Ratings element ('060.1.5.b and '060.15.5.b) and claim 8 of the '060 patent. (Invalidity Report at ¶45, pp.17-19; ¶51, pp.21-22; ¶61, pp.32-33 (Ex. D).)

13

55. Dr. Cooper provides the following statements regarding reasons to substitute physician ratings for hospital ratings:

> Even if the element were not anticipated, the idea of comparison ratings of health care providers was disclosed in these documents, and comparisons of line items in database reports have been used to rank retrieved records for decades, **and so this use of comparison ratings for this purpose would have been extremely obvious to a Posita.**
> . . . .
> The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers. **It would be obvious to a Posita that ratings of other physicians would be a natural addition to the report.**
>
> See also Neal deposition pages 153-154. Dodge deposition pages 200-201 also supports concluding that this claim element was known. Dodge deposition pages 225-226 again confirms the claim element was known prior to the filing date. Defendant's deposition Exhibit 8 is also relevant. These items of evidence clearly demonstrate that the concept of having provider information and ratings available to prospective patients had been practiced in a way that the ratings could be compared. Even if hospital ratings do not meet the claim language literally, **there are plain and clear teachings that any Posita would understand that ratings of health care providers could be shown side by side for comparison purposes, and these documents provide the motivation to do so.**
> . . . .
> [A]t the very least, comparison ratings of health care provider hospitals were shown in the Early HG Reports and Services, **thus making it extremely obvious** to a Posita that the same could be done with patient ratings of physicians.

(Invalidity Report at ¶45, pp. 18-19 (emphasis added) (Ex. D).)

56. Regarding MDx's obviousness defense with regard to the Early HG Reports and Services, MDx's Fourth Supplemental Invalidity Claim Chart states:

> Motivation to combine and/or modify the prior art is recognized in at least one or more of the '369 prior art, the Early HG Reports and Services prior art, the GeoAccess prior art, the Subimo prior art, the HealthScope prior art, the '187 prior art as shown with respect to this claim language and in other portions of such prior art references.

(Invalidity Chart at p. 18 (Ex. C).)

14

**D.** _Undisputed Material Facts Regarding MDx's Inequitable Conduct Defense_

57.     MDx asserts inequitable conduct in this case because "but for the failure of the

inventors to disclose the Early HG Reports and Services to the Patent Office, none of these

claims would have been allowed." (Invalidity Report at ¶64, p. 36 (Ex. D).)

58.     The '060 patent has three inventors: John Neal, Scott Montroy, and David Hicks.

('060 patent, cover page (Ex. A).)

59.     Inventor John Neal was involved in the prosecution of the '060 patent and

reviewed prior art cited in connection with prosecution. (Neal Dep. at p. 266:19-269:1 (Ex. J).)

60.     Mr. Neal testified that he was aware of his duty to disclose relevant prior art to the

Patent Office during the prosecution of the '060 patent. (Neal Dep. at pp. 131:13-24 (Ex. J).)

61.     Mr. Neal testified that he did not disclose the Physician Quality Comparison

Report to the Patent Office in connection with the '060 patent because "[t]he intent behind the

patent filing was to patent what we believed to be unique where there was no prior art that

existed. And this was not deemed to be unique or different." (Neal Dep. at pp. 129:17-131:1

(Ex. J).)

62.     Mr. Neal testified that the Physician Quality Comparison Report from 2004 and

2005 was different from what is in the '060 patent because the patent is about "bringing

together those different elements in types of data and making that accessible to consumers, not

just in a report, but more importantly on the website. And most importantly, to give them a

means to differentiate providers based on a rating or a score. And this is not what we were

doing in 2004." (Neal Dep. at 131:25-132:17 (Ex. J).)

63.     Mr. Neal testified that he did not disclose the Drucker Report shown in Dep. Ex.

51 to the Patent Office in connection with the '060 patent because:

"We weren't patenting the Drucker report. It was unrelated to what we were patenting" (Neal Dep. at p. 252:4-25 (Ex. J).)

"The patent was about the experience for the consumer on our website and specifically how we combined different elements of data to make it relevant to their experience and allowed them to differentiate physicians. And the way that we were doing it was all about the experience, not an individual physician profile on our website. It was the overall experience. So a report takes many forms. It's not just a physician profile. It's a list of physicians that are presented within search results. It's many different things. It's that form of presentation and the content of that presentation and the means of differentiation which made up the patent. That didn't exist in the Drucker report." (Neal Dep. at pp. 253:6-254:3 (Ex. J).)

64.     Inventor Scott Montroy left the employ of Health Grades in 2007 and was not involved in the prosecution of the '060 patent. (Montroy Dep. at p. 22:11-12; 300:1-22 (Ex. L).)

65.     Mr. Montroy testified that he "did the best he could" to give everything that he had to the team that was working on patent application. (Montroy Dep. at p. 300:1-22; *see also* p. 306:4-10 (Ex. L).)

66.     Mr. Montroy does not remember specifically what documents he gave to Brian Blackman, who was part of the team working on patent application. (Montroy Dep. at p. 301:12-21 (Ex. L).)

67.     Mr. Montroy testified that he did not intend to deceive the Patent Office, he had no incentive for deceiving the Patent Office, and he did not receive any compensation for being a named inventor on the '060 patent. (Montroy Dep. at pp. 323:25-324:18 (Ex. L).)

68.     Inventor Dave Hicks did not initially remember whether or not he was involved in the prosecution of the '060 patent. (1/11/12 Deposition of David Hicks at pp. 59:22-60:1 ("Hicks Dep.") (Ex. S hereto).)

69.     Mr. Hicks testified that he did not remember who was involved in the prosecution of the '060 patent. (Hicks Dep. at p. 60:2-5 (Ex. S).)

70.     Mr. Hicks testified that he did not know why the sample reports shown in Dep.

16

Ex. 8 were not disclosed to the Patent Office.  (Hicks Dep. at p. 128:12-19 (Ex. S).)

## III.   ARGUMENT

### A.   *Standard for Summary Judgment*

The '060 patent is presumed valid.  35 U.S.C. §282.  MDx bears a "heavy" burden to

prove that it is invalid and unenforceable and MDx must meet these burdens with clear and

convincing evidence.  *Koito Mfg. Co., Ltd. v. N. Am. Lighting*, 381 F.3d 1142, 1151 (Fed. Cir.

2004).

Summary judgment is appropriate where there is no genuine issue as to any material fact

in the case and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

Because MDx bears the ultimate burden of proof at trial on invalidity and inequitable conduct,

for the purposes of this motion, Health Grades bears "the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record]

demonstrate the absence of a genuine issue of material fact."  *Mytee Prods. v. Harris Research,*

*Inc.*, 439 Fed. Appx. 882 (Fed. Cir. 2011) (citing *Celotex*, 477 U.S. at 323).  Then, the burden

shifts to MDx with the ultimate burden of proof to demonstrate why the claims are invalid or

unenforceable.  Accordingly, MDx cannot survive this summary judgment motion without

sufficient evidence to sustain its burden of proof on these points.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 327 (1986).

### B.   *MDx Cannot Prove that Any of the Asserted Claims are Anticipated as a Matter of Law*

#### 1.   None of the Early HG Reports and Services Qualify as Prior Art Under §102(a)

To meet its burden of proof for anticipation, MDx must prove that each reference it relies

on qualifies as prior art under at least one subsection of 35 U.S.C. §102.

17

MDx bases its anticipation defense primarily on prior reports and services offered by Health Grades, which it refers to as the "Early HG Reports and Services." (Statement of Undisputed Material Facts ("Facts") at ¶¶6-7.) MDx asserts that these Health Grades' references qualify as prior art under §102(a). (Facts at ¶11.) However, §102(a) does not apply to Health Grades because it is limited to activities of third parties.

Section 102(a) states:

A person shall be entitled to a patent unless—

the invention was known or used ***by others*** in this country, or patented or described in a printed publication in this or a foreign country, ***before the invention thereof*** by the applicant for patent . . . .

(emphasis added). When referring to §102(a), it is text book law that "the issue is always whether a third party's use suffices to render him the prior inventor in terms of the patent law." RANDALL R. RADER, MARTIN J. ADELMAN & JOHN R. THOMAS, CASES AND MATERIALS ON PATENT LAW 227 (3d ed. West 2009); Patent Law Institute, *Statutory Bars Under Section 102* at 5-2, available at http://www.pli.edu/product_files/EN00000000000613/89237.pdf (for 102(a) the invention must have been known, used, patented, or published by "someone other than the inventor."); *Neutral Tandem, Inc. v. Peerless Network*, LLC, 738 F. Supp. 2d 782, 785-86 (N.D. Ill. 2010) (citing 1-3 Chisum on Patents §301 (2010)) ("Section 102(a)'s requirement that an invention has not been 'known or used by others in this country' concerns novelty, whereas the 'statutory bar' of § 102(b) 'relate[s] to events and acts by the inventor or by other persons prior to the date when the inventor applies for a patent' and concerns 'tardiness in applying for a patent.'"). As such, nothing Health Grades did in the past can qualify as prior art under §102(a) *as a matter of law.*

MDx seems to argue that Health Grades posted some of the example reports on the

Internet which made them available for use by third parties, such as potential patients, who are "others" as required by §102(a). Even assuming such third party use did occur, it would not qualify as §102(a) prior art because it was too late in time. To be prior art under §102(a), the use or knowledge must be "*before the invention thereof by the applicant for patent.*" If the HG Report that is being used by the patient reads on the claims, then it is the same thing as the invention, and any use by any third party would necessarily have to happen *after* Health Grades invented it. Said another way, it is logically impossible for a third party to use Health Grades' invention before it was invented by Health Grades.

Moreover, interpreting §102(a) as MDx suggests would cause a conflict with §102(b), which gives inventors a one-year grace period to publicly use and sell their invention before they must file an application for patent. *Woodland Trust v. Flowertree Nursery*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) ("Section 102(b), unlike § 102(a), is primarily concerned with the policy that encourages an inventor to enter the patent system promptly, while recognizing a one year period of public knowledge or use or commercial exploitation before the patent application must be filed."). Allowing third party use of an invention purchased or received from an inventor to qualify as prior art under §102(a) would effectively eliminate the grace-period for public exploitation of inventions given to inventors by §102(b).

As such, this Court should grant summary judgment that the Early HG Reports or Services Qualify do *not* qualify as prior art under §102(a) as a matter of law.

> 2. <u>All of the Asserted Claims Require Comparison Ratings of Human Healthcare Providers. MDx Did Not Cite a Single Prior Art Reference that Included This Element</u>

"A claim is anticipated *only* if each and every element appears, either expressly or inherently, in a *single* prior art reference." *Verdegaal Bros. v. Union Oil Co. of Cal.,* 814 F.2d

19

628, 631 (Fed. Cir. 1987) (emphasis added).

> "Because the hallmark of anticipation is prior invention, the prior art reference--in order to anticipate under 35 U.S.C. § 102--must not only disclose all elements of the claim **within the four corners of the document**, but must also disclose those elements 'arranged as in the claim.'"

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).  In addition, an anticipatory reference must "enable one of skill in the art to make and use the claimed invention."  *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

All of the asserted claims require "comparison ratings of healthcare providers," which means:

> ratings on multiple healthcare providers, **including the "first healthcare provider,"** in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

(Dkt. 138, Markman Order at p. 24 (emphasis added).)  The Court defined "comparison ratings of healthcare providers" to mean:

> ratings on multiple healthcare providers, **including the "first healthcare provider,"** in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

(Dkt. 138, Markman Order at p. 24 (emphasis added).)  The "first healthcare provider" is a person (e.g., physician), not an entity (e.g., hospital or nursing home). (*Id.* at p. 7.)[4]

In this case, MDx's expert was required to "***explain in detail how each claim element is disclosed in the prior art reference***."  *Koito*, 381 F.3d at 1152 (emphasis added).  MDx's expert

---

[4]    ("Defendant does not dispute that "first healthcare provider" refers to a person, rather than an entity . . . .) (citing '060 Patent col. 20:33-38 (information regarding the "first healthcare provider" includes "specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies")).

2003918240_1

relies solely on the Early HG Reports and Services to support his anticipation opinion. (Facts at

¶7.) However, MDx's Invalidity Report does not identify any prior art from Health Grades that

included comparison ratings of human healthcare providers prior to August 29, 2005.[5] (Facts at

¶¶ 14, 16-27, 29-42.) Indeed, its expert admits as much by relying primarily on comparison

ratings *of hospitals* and *obviousness* for this claim element:

> **Even if the element were not anticipated**, the idea of comparison ratings of
> health care providers was disclosed in these documents, and comparisons of line
> items in database reports have been used to rank retrieved records for decades,
> and so this use of comparison ratings for this purpose would have been extremely
> obvious to a Posita.
> . . . .
>
> The Early HG Reports and Services also show ratings of health care provider
> **hospitals** that were intended to and do allow comparison of health care providers.
> **It would be obvious to a Posita that ratings of other physicians would be a**
> **natural addition to the report.**
>
> **Even if hospital ratings do not meet the claim language literally**, there are
> plain and clear teachings that any Posita would understand that ratings of health
> care providers could be shown side by side for comparison purposes, and these
> documents provide the motivation to do so.

(Facts at ¶55 (emphasis added).)

Similarly, Patent Local Rule 3-3(c) required MDx to disclose *where specifically* in each

alleged item of prior art each limitation of each asserted claim is found. (Dkt. 34 at p. 21

(emphasis added).) However, MDx's invalidity contentions do not allege or cite to evidence

showing that Health Grades had comparison ratings of human healthcare providers before the

---

[5]     The date for determining whether something is prior art under §102(b) is "more than one
year prior to the date of the application for patent in the United States . . . ." The date of the
application, also referred to as the "effective filing date," is the filing date of patent at issue
unless priority is claimed to an earlier application. In this case, the '060 patent does claim
priority to an earlier provisional application, but Health Grades is assuming for the purposes of
this motion *only* that that claim for priority does not apply. The '060 patent was filed on August
29, 2006 – therefore any reference dated after August 29, 2005 (i.e. the "critical date") is not
prior art under §102(b). (Facts at ¶¶4-5.)

§102(b) critical date (i.e. August 29, 2005).  (Facts at ¶¶ 13, 15-20, 23-29, 30-41, 43.)  Likewise, none of the third party prior art MDx cites had comparison ratings of human healthcare providers.  (Facts at ¶¶49-53.)  Rather, all of the documents MDx cites are for hospital and nursing home ratings.  (*Id.*)

The only evidence MDx cites to show comparison ratings of physicians is testimony from Mr. Dodge (Health Grades' CFO) that Health Grades did not offer comparison ratings of physicians on its website until 2006.  (Facts at ¶42.)  This is too late to be prior art under §102(b).  (Facts at ¶5.)  Although Dr. Cooper argues that Mr. Dodge's testimony about the date "was just wrong," his expert report cites no evidence to show that any use of comparison ratings *of physicians* <u>before</u> 2006.  (Facts at ¶¶14, 16-27, 29-42.)  An argument from a paid expert that the only evidence on point is "just wrong," without citing any evidence to the contrary, is not sufficient to meet the clear and convincing standard required to prove invalidity.

Moreover, MDx does not explain how Health Grades' references met this claim element *as construed by this Court*.  MDx does not cite a prior art reference that includes any physician ratings, and MDx definitely does not cite a single reference that has *both* ratings of a first healthcare provider *and* ratings of other healthcare providers in a report that was created using physician-verified information, patient provided information, and third-party verified information as required by the asserted patent claims.  (Facts at ¶¶14-42.)

MDx was required to disclose in detail the basis for its anticipation defense in its invalidity contentions and its expert report on invalidity.  Both of these documents fail to identify a single prior art reference that includes all of the claimed elements.  Thus, both are insufficient to assert an anticipation defense as a matter of law.  This Court should grant summary judgment in favor of Health Grades finding that the claims are not anticipated.

C.   *MDx Cannot Prove that Any of Health Grades Prior Reports or Services*
     *Render Any of the Asserted Claims Obvious under §103*

Obviousness is a question of law based on underlying findings of fact.  *In re Kubin*, 561

F.3d 1351, 1355 (Fed. Cir. 2009).  The underlying factual inquiries are (1) the level of ordinary

skill in the pertinent art, (2) the scope and content of the prior art, (3) the differences between the

prior art and the claims at issue, and (4) secondary considerations of non-obviousness.  *KSR*

*International Co. v. Teleflex, Inc.*, 550 US 398, 406 (2007).  It is also "important" to identify a

reason that would have prompted a person of ordinary skill in the relevant field to combine the

elements in the way the claimed new invention does because inventions in most, if not all,

instances rely upon building blocks long since uncovered, and claimed discoveries almost of

necessity will be combinations of what, in some sense, is already known.  *Id.* at 418.

A judgment as a matter of law is appropriate on obviousness when the party asserting

invalidity has made only conclusory allegations as to one or more of these inquiries.  *See, e.g.*,

*ActiveVideo Networks, Inc. v. Verizon Communs.*, Inc., 2012 U.S. App. LEXIS 18032, *32-34

(Fed. Cir. Aug. 24, 2012); *Whitserve, LLC v. Computer Packages, Inc.*, No. 2011-1206, 2011-

1261, 2012 U.S. App. LEXIS 17510, *28-*29 (Fed. Cir. Aug. 7, 2012) (finding substantial

evidence did not support jury verdict on obviousness because defendant's expert did not analyze

necessary obviousness factors and presented only a "cursory statement that data conversion and

encryption were "well known" at the time of patenting . . . .").

In *ActiveVideo*, the Federal Circuit found the following expert testimony regarding reason

to combine to be insufficient as a matter of law:

> The opinion by Verizon's expert regarding the motivation to combine references
> was likewise insufficient. Verizon's expert testified that:
>
> > The motivation to combine would be because you wanted to build
> > something better. You wanted a system that was more efficient,

cheaper, or you wanted a system that had more features, makes it more attractive to your customers, because by combining these two things you could do something new that hadn't been able to do before.

This testimony is generic and bears no relation to any specific combination of prior art elements. It also fails to explain why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does.

*ActiveVideo*, 2012 U.S. App. LEXIS 18032, at *32-33. The Federal Circuit affirmed the exclusion of similar testimony in *Innogenetics, N.V. v. Abbott Labs.*:

The district court did not err in finding that Dr. Patterson's report on the alleged obviousness of the asserted claims of the '704 patent was deficient for purposes of disclosure under Rule 26. For each of the claims that he analyzes for obviousness, Dr. Patterson merely lists a number of prior art references and then concludes with the stock phrase "to one skilled in the art it would have been obvious to perform the genotyping method in [claims 1-9 & 12-13] of the '704 patent." . . . . Nowhere does Dr. Patterson state how or why a person ordinarily skilled in the art would have found the claims of the '704 patent obvious in light of some combination of those particular references. . . . **Such vague testimony would not have been helpful to a lay jury in avoiding the pitfalls of hindsight that belie a determination of obviousness.**

512 F.3d 1363, 1373 (Fed. Cir. 2008) (emphasis added) (citations omitted); *see also Am. Med. Sys. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 901 (D. Minn. 2010) (finding the following statements insufficient to support obviousness: "[a] person of ordinary skill would have been motivated to combine the [references]" or that "[b]ased on the field of the invention and the subject matter of these prior art references, a person of ordinary skill in the art would have been motivated to combine [these references].")

MDx has not disclosed any detailed analysis of the above mentioned requirements for obviousness. Dr. Cooper does not specify which references he would combine and does not give any specific reason for making such a combination. (Facts at ¶¶54-55.) As shown in the following paragraphs, which comprise the majority of Dr. Cooper's substantive analysis on

2003918240_1

obviousness, Dr. Cooper simply argues that Health Grades' prior art included hospital reports that contained comparison ratings of hospitals – and thus, comparison ratings of physicians would be a "natural addition" to a report:

> [T]he idea of comparison ratings of health care providers was disclosed in these documents, and comparisons of line items in database reports have been used to rank retrieved records for decades, and so this use of comparison ratings for this purpose would have been extremely obvious to a Posita.
> . . . .
>
> The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers. **It would be obvious to a Posita that ratings of other physicians would be a natural addition to the report.**
>
> See also Neal deposition pages 153-154. Dodge deposition pages 200-201 also supports concluding that this claim element was known. Dodge deposition pages 225-226 again confirms the claim element was known prior to the filing date. Defendant's deposition Exhibit 8 is also relevant. These items of evidence clearly demonstrate that the concept of having provider information and ratings available to prospective patients had been practiced in a way that the ratings could be compared. Even if hospital ratings do not meet the claim language literally, **there are plain and clear teachings that any Posita would understand that ratings of health care providers could be shown side by side for comparison purposes, and these documents provide the motivation to do so.**

(Facts at ¶55 (emphasis added).)  Dr. Cooper asks the reader to take his word for it that it would be obvious to substitute physician comparison ratings (which are not disclosed in any of the references) for hospital ratings.

> Likewise, MDx's invalidity contentions do not provide any additional detail, saying only:
>
> Motivation to combine and/or modify the prior art is recognized in at least one or more of the '369 prior art, the Early HG Reports and Services prior art, the GeoAccess prior art, the Subimo prior art, the HealthScope prior art, the '187 prior art as shown with respect to this claim language and in other portions of such prior art references. See combinations and/or modifications of the Early HG Reports and Services prior art with other prior art, discussed above.

(Facts at ¶56.)  These contentions do not say where in the Early HG Prior Art (or other art) there is a motivation to combine and do not specify what that motivation is.

Although it is not Health Grades' burden to prove that the claims are not obvious in this motion or anywhere else, there is compelling evidence to show that these claims were not obvious. For example, if it was obvious to substitute physician ratings for hospital ratings, why didn't MDx find evidence that someone produced a physician report with comparison ratings of physicians *before* Health Grades? And although some Health Grades reports and one other third party prior art reference included ratings of hospitals, none of these references suggested that these ratings could be used for physicians. Indeed, before Health Grades' invention, there was skepticism in the industry about including ratings physicians on a comprehensive healthcare information website. This skepticism was fueled by concerns that advertisers (hospitals and pharmaceutical companies) would not want to advertise on a site that included physician ratings or patient-provided information about physicians. (Facts at ¶¶44-48.)

In sum, the obviousness testimony MDx expects to present at trial is conclusory and insufficient as a matter of law. This Court should grant summary judgment in favor of Health Grades as to MDx's obviousness defense.

### D.  *MDx Cannot Prove its Inequitable Conduct Defense*

MDx also asserts that the inventors' failure to disclose the Early HG Report and Services to the Patent Office during the prosecution of the '060 patent constitutes inequitable conduct. (Facts at ¶57.)

Inequitable conduct is an issue to be decided by the Court. *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1333 (Fed. Cir. 2011). Although inequitable conduct involves underlying facts relating to materiality and intent, summary judgment is proper when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant cannot prevail." *Astrazeneca Pharmaceuticals LP v. Teva Pharmaceuticals USA, Inc.*,

583 F.3d 766, 770 (Fed. Cir. 2009).

Inequitable conduct has always required proof that the patentee had the "specific intent to deceive" the Patent Office. *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 2009-1171, 2012 U.S. App. LEXIS 19931, at *9 (Fed. Cir. Sept. 21, 2012) (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (emphasis added); *see also Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (*en banc* in relevant part) ("a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive"); *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1379 (Fed. Cir. 2010) ("mistake or exercise of poor judgment . . . does not support an inference of intent to deceive"); *Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181* (Fed. Cir. 1995) ("[T]he alleged conduct must not amount merely to the improper performance of, or omission of, an act one ought to have performed."). Moreover,

> [p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO **does not prove specific intent to deceive.**

*Therasense*, 649 F.3d at 1290 (emphasis added). Thus, the mere fact that a patentee failed to disclose references is insufficient to defeat summary judgment of no inequitable conduct. *Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*, No. 07cv0894, 2011 U.S. Dist. LEXIS 146159, 18-19 (S.D. Cal. Dec. 19, 2011) (citing *Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1319-20 (Fed. Cir. 2010) (citations omitted) ("When a party has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case in accordance with the applicable standard of proof, summary judgment is properly granted against that party.")

In this case, MDx has not and cannot make a showing that Health Grades' inventors made any deliberate choices with the specific intent to deceive the Patent Office. The '060

patent has three inventors:  John Neal, Scott Montroy, and David Hicks.  (Facts at ¶58.)  MDx

deposed all three inventors.  Mr. Neal, who was involved in the prosecution of the '060 patent

(Facts at ¶59), testified that they did not disclose the Early HG Reports and Services because

they were different from what they trying to patent.  (Facts at ¶¶60-63.)  Mr. Neal explained that

they believed their patent was unique and different from what Health Grades was doing in 2004

and 2005 because it gave "a means to differentiate providers based on a rating or a score."

(Facts at ¶62.)  Mr. Montroy left Health Grades in 2007 and was not involved in the '060 patent

prosecution.  (Facts at ¶64.)  Nevertheless, he testified that he "did his best" to give the team

working on patent application all the information he was supposed to (although he cannot

remember now what specifically he gave them).  (Facts at ¶¶65-66.)  Mr. Montroy testified that

he did not intend to deceive the Patent Office and had no incentive to do so.  (Facts at ¶67.)  Mr.

Hicks did not recall being involved in the '060 prosecution and testified he did not he did not

know why the early reports from Health Grades were not disclosed.  (Facts at ¶¶68-70.)   Thus,

the only evidence MDx has to support specific intent is the fact that the references were not

disclosed.  This is not enough to defeat summary judgment.

Further, the Federal Circuit recently changed the law to make it much more difficult to

prove inequitable conduct because this defense is an "absolute plague" on the courts and the

entire patent system:

> [T]he remedy for inequitable conduct is the "atomic bomb" of patent law.  Unlike
> validity defenses, which are claim specific, see 35 U.S.C. § 288, inequitable
> conduct regarding any single claim renders the entire patent unenforceable.
>
> With these far-reaching consequences, it is no wonder that charging inequitable
> conduct has become a common litigation tactic.  One study estimated that eighty
> percent of patent infringement cases included allegations of inequitable conduct.
> Inequitable conduct "has been overplayed, is appearing in nearly every patent
> suit, and is cluttering up the patent system."  "[T]he habit of charging inequitable
> conduct in almost every major patent case has become an absolute plague.

> Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps."
>
> While honesty at the PTO is essential, low standards for intent and materiality have inadvertently led to many unintended consequences, among them, increased adjudication cost and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased PTO backlog, and impaired patent quality. **This court now tightens the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public.**

*Therasense*, 649 F.3d at 1288 (emphasis added) (citations omitted).

To succeed on its inequitable conduct defense, MDx bears the burden of showing by clear and convincing evidence that Health Grades "made a deliberate decision to withhold a *known material* reference." *Id.* at 1290 (citing *Molins*, 48 F.3d at 1181 (emphases added). To be "material", the Early HG Reports and Services must have been "but-for" material to patentability. *Id.* at 1292. That is, the Patent Office would not have allowed the claims had it been aware of the undisclosed prior art. "Often the patentability of a claim will be congruent with the validity determination . . . ." *Id.*; *see also Beckson Marine, Inc. v. NFM, Inc.,* 144 Fed. Appx. 862, 868 (Fed. Cir. 2005) ("NFM's claims of inequitable conduct . . . were all based on the alleged invalidity of the claims of the '350 patent. Because this court upholds the validity of the claims of the '350 patent, these claims are dismissed as moot.").

In this case, none of the Early HG Reports and Services anticipate or render obvious any of the asserted claims for the reasons described above. Although the Patent Office would not have been bound by this Court's claim constructions, the only reasonable construction of "first healthcare provider" is that it is a person, not an entity. Indeed, the claims explicitly require the healthcare provider to have a gender. (Dkt. 138, Markman Order at p. 7.) MDx stipulated to this construction at the Markman hearing. (*Id.*) Because all of the claims require comparison ratings

of human healthcare providers and none of the Health Grades' references included this element (Facts at ¶¶12-44), this prior art would not have impacted the decision to allow the '060 claims.

In sum, inequitable conduct requires proof of both materiality and intent. MDx cannot prove either, so this Court should grant summary judgment of no inequitable conduct.

## IV.    CONCLUSION

For all of the foregoing reasons, this Court should grant summary judgment in favor of Health Grades on the following issues:

(1)    The Early HG Reports and Services do not qualify as prior art under 35 U.S.C. §102(a).

(2)    The '060 patent is not anticipated by the Early HG Reports or Services or any of the other prior art references identified in MDx's Invalidity Contentions.

(3)    The '060 patent is rendered obvious by the Early HG Reports or Services or any of the other prior art references identified in MDx's Invalidity Contentions.

(4)    The '060 patent is not unenforceable due to inequitable conduct.

Dated: November 2, 2012                    ROTHGERBER JOHNSON & LYONS LLP


                                           *s/ Jesús M. Vazquez*
                                           Gregory B. Kanan, Esq.
                                           Kris J. Kostolansky, Esq.
                                           Jesús M. Vázquez, Jr., Esq.
                                           1200 17th Street, Suite 3000
                                           Denver, Colorado  80202
                                           Tel:  (303) 623-9000
                                           Fax:  (303) 623-9222
                                           Email: gkanan@rothgerber.com
                                                   kkosto@rothgerber.com
                                                   jvazquez@rothgerber.com

                                           *Attorneys for Plaintiff Health Grades, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2012, I electronically filed the foregoing **HEALTH GRADES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott David Stimpson
Scott Murray
David Chunyi Lee
Sills Cummis & Gross P.C. – New York
30 Rockefeller Plaza
New York, NY  10112
Email: sstimpson@sillscummis.com
Email: smurray@sillscummis.com
Email: dlee@sillscummis.com

Terence M. Ridley
Wheeler Trigg O'Donnell, LLP
1801 California Street, #3600
Denver, CO  80202-2617
Email: ridley@wtotrial.com

<div align="right">

*s/ Jesús M. Vazquez*
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
Rothgerber Johnson & Lyons, LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202-5855
Tel:     (303) 623-9000
Facsimile: (303) 623-9222
Email: gkanan@rothgerber.com
        kkostolansky@rothgerber.com
        jvazquez@rothgerber.com

*Attorneys for Plaintiff Health Grades, Inc.*

</div>

2003918240_1