Civil Action No. 11-CV-00520-PAB-BNB

# HEALTH GRADES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

## Exhibit J -- Deposition of John Neal
(*selected portions*)

Attorneys' Eyes Only

Page 1

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2          IN THE UNITED STATES DISTRICT COURT
 3             FOR THE DISTRICT OF COLORADO
 4     Case No. 11-CV-00520-PAB-BNB
 5     _____
 6     30(b)(6) DEPOSITION OF HEALTH GRADES, INC.,
 7     Representative John Neal
 8     and
 9     DEPOSITION OF JOHN NEAL
10     June 13, 2012
11     _____
12
       HEALTH GRADES, INC.,
13
       Plaintiff,
14
       v.
15
       MDX MEDICAL, INC. d/b/a VITALS.COM,
16
       Defendant.
17     _____
18
19
20
21
22
23
24
25       Job No. NJ399592
```

Page 2

```
 1           CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     APPEARANCES:
 3        MERCHANT & GOULD
              By Kristin L. Stoll-DeBell, Esq.
 4                1050 17th Street
                  Suite 1950
 5                Denver, CO 80265
                  Phone: 303.357.1670
 6                Fax: 303.357.1671
                  kstolldebell@merchant-gould.com
 7                Appearing on behalf of the
                  plaintiff
 8
 9        ROTHGERBER JOHNSON & LYONS LLP
              By Jesus Manuel Vazquez Jr., Esq.
10                1200 Seventeenth Street
                  Suite 3000
11                Denver, CO 80202-5855
                  Phone: 303.623.9000
12                Fax: 303.623.9222
                  jvazquez@rothgerber.com
13                Appearing on behalf of the
                  Plaintiff
14
15        SILLS CUMMIS & GROSS, PC
              By Scott D. Stimpson,  Esq.
                  David C. Lee, Esq.
16                30 Rockefeller Plaza
                  New York, NY 10112
17                Phone: 212.643.7000
                  Fax: 212.653.6500
18                sstimpson@sillscummis.com
                  Appearing on behalf the Defendant
19
20
21
22
23
24
25
```

Attorneys' Eyes Only

Page 3

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Pursuant to Notice and the Federal Rules of

3   Civil Procedure, the 30(b)(6) Deposition of Health

4   Grades, Inc. and Deposition of John Neal, called by

5   Defendant, was taken on Wednesday, June 13, 2012,

6   commencing at 8:22 a.m., at 1200 Seventeenth Street,

7   Suite 3000, Denver, Colorado, before Kelly A.

8   Mackereth, Certified Shorthand Reporter, Registered

9   Professional Reporter, Certified Realtime Reporter

10  and Notary Public within Colorado.

11

                    * * * * * * *

12                   I N D E X

13

    EXAMINATION                                PAGE

14

     BY MR. STIMPSON                            6

15   BY MR. VAZQUEZ                            316

16

    PRODUCTION REQUEST(S):

17

     None.

18

19

20

21

22

23

24

25

Case No. 1:21-cv-00520-PAB-BNB   Document 369-461   filed 11/02/12   USDC Colorado   pg 5 of 52

Attorneys' Eyes Only

Page 4

1           CONFIDENTIAL - ATTORNEYS EYES ONLY
2                    INDEX OF EXHIBITS
3
                                              INITIAL
4    DESCRIPTION                              REFERENCE
5
6    Exhibit 44  MDx Medical, Inc.'s Notice of     12
                 Deposition of John Neal
7    Exhibit 45  MDx Medical, Inc.'s Notice of     38
                 30(b)(6) Deposition of Health
8                Grades
9    Exhibit 46  Project Development Plan,        164
                 4/15/2004
10
     Exhibit 47  E-mail string re Patient         166
11               Experience Survey
12   Exhibit 48  E-mail string re Patient         173
                 Experience Survey
13
     Exhibit 49  Patient Experience Survey        179
14
     Exhibit 50  2/16/05 e-mail from Montroy to   212
15               Hicks re Consumer Update
16   Exhibit 51  E-mail string re Health Grades'  215
                 reports, w/attachments
17
     Exhibit 52  1/19/05 e-mail from Neal to      237
18               Kerry Hicks re presentation,
                 w/attachments
19
     Exhibit 53  3/24/05 e-mail from Loughran to  255
20               Neal, et al.
21   Exhibit 54  E-mail string re Vitals.com      272
22   Exhibit 55  E-mail string re Vitals new      279
                 posting on their hospital
23               program
24   Exhibit 56  E-mail string re Vitals/UCompare 284
25

Veritext/NJ Reporting Company

800-227-8440                                      973-410-4040

Attorneys' Eyes Only

Page 5

1                CONFIDENTIAL - ATTORNEYS EYES ONLY

2
                                                    INITIAL
3    DESCRIPTION                                     REFERENCE

4
     Exhibit 57   Complaint and Demand for Jury       291
5                 Trial

6    Exhibit 58   E-mail string re Vitals.com         293

7    Exhibit 59   E-mail string re Insurance          296
                  Provider Filter for Search
8
     Exhibit 60   3/17/08 e-mail from Neal to         299
9                 Hicks, et al., w/attachment re
                  Target List
10
     Exhibit 61   E-mail string re Vitals.com         312
11                hospital ratings

12
     PREVIOUSLY MARKED EXHIBITS
13
14   Exhibit 3                                         13
     Exhibit 4                                        269
15   Exhibit 8                                        108
     Exhibit 10                                       249
16   Exhibit 12                                       267
     Exhibit 20                                       103
17   Exhibit 21                                        99
     Exhibit 25                                       157
18   Exhibit 26                                       205
     Exhibit 27                                       209
19   Exhibit 29                                       168

20

21

22

23

24

25

Case 1:11-cv-00520-PAB-BNB Document 569-16 Filed 11/02/12 USDC Colorado Page 7 of
52

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:11-cv-00520-PAB-BNB   Document 369-4   Filed 11/02/12   USDC Colorado   Page 9 of 52

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:11-cv-00520-PAB-BNB Document 361-4 Filed 11/02/12 USDC Colorado Page 11
of 52

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 64

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q     Is it fair to say that Health Grades has

3   dozens of competitors in this space?

4      A     I think there are categories of

5   competitors, and I would say, yeah, that's an

6   accurate statement.

7      Q     Since 2010, how has Vitals hurt Health

8   Grades by its accused website?

9          MR. VAZQUEZ:  Object to form.

10     A     I think that there's no doubt that what

11  they've done in replicating a lot of what we do, it's

12  allowed them to attract an audience.  And I think

13  that's detrimental to Health Grades in that they've

14  redirected consumer interest and traffic.

15     Q     (BY MR. STIMPSON)  Anything else?

16         MR. VAZQUEZ:  Object to form.  Calls for

17  expert testimony.

18     A     That's the primary concern.

19     Q     (BY MR. STIMPSON)  So as we sit here

20  today, you can't think of any other way that Health

21  Grades has been harmed by the presence of MDx, the

22  Vitals website, correct?

23         MR. VAZQUEZ:  Object to form.  Calls for

24  expert testimony.

25     A     I'm sorry, can I answer?

Page 94

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    names?

3         A     It did.

4         Q     Pardon me?

5         A     It did.  We had different names, but that

6    was kind of one we landed on as being the primary.  I

7    can't recall exactly which ones were external in

8    terms of what was communicated or accessible via the

9    website in terms of the name.

10        Q     Can you remember any other of the names?

11        A     For the Physician Quality Comparison

12   Report?

13        Q     No, the Physician Research Comparison

14   Report.

15        A     Physician research.

16        Q     It's actually in your deposition notice

17   down there.

18              If you have it, Jesus.  It's under your

19   notebook maybe?

20              MR. VAZQUEZ:  I have it right there.

21        Q     (BY MR. STIMPSON)  It's in that

22   parenthetical, the first one, Physician Research

23   Comparison Report.

24              Do you remember any other names that that

25   used to go by?

Case 1:11-cv-00520-PAB-BNB Document 369-461 Filed 11/02/12 USDC Colorado Page 14 of 52

Attorneys' Eyes Only

Page 95

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      There was a -- I thought we had the one

3   that we had taken to market was Physician Comparison

4   Report, although reviewing the reports, I can't

5   recall which one was the one that was in that.

6      Q      Have you ever heard the name, how about

7   Comparative Physician Report, is that the same thing?

8      A      Well, it could be.  I would be speculating

9   to say for certain if that's the case.

10     Q      Do you know any other names of the

11  Physician Research Comparison Report?

12     A      They all contain some version of

13  comparison or comparative.  And that's really the

14  distinction.  They all have that commonality.

15     Q      Okay.  Did they have patient ratings?

16            MR. VAZQUEZ:  Form.

17     A      They did not.

18     Q      (BY MR. STIMPSON)  Okay.  How do you know

19  that?

20     A      Because the content of the report was --

21  it was the third-party data that I referenced

22  earlier.  So both that Physician Quality Report and

23  the Physician Research Comparison Report was a

24  compilation of third-party data that was combined

25  into this named report.

Page 96

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2     Q     How do you know that?

3     A     Because in preparing for this deposition,

4  I looked at the report, and I also recall having

5  seen, you know, that report.

6     Q     Did you discuss this with your -- and I

7  just want a yes or no.  Did you discuss this with

8  your counsel between our first -- after our -- during

9  our first break?

10    A     I never said that I hadn't seen these

11  reports.  I said I had some uncertainty about the

12  timing of the reports.

13    Q     Okay.  So did the Physician Research

14  Comparison Report contain comparison ratings of

15  healthcare providers?

16          MR. VAZQUEZ:  Form.

17    A     There was -- it was just a -- the answer

18  is no.

19    Q     (BY MR. STIMPSON)  Um-hum.

20    A     It was just a comparison of -- it was

21  third-party data that was compiled into a single

22  report.

23    Q     Okay.  And what was the comparison, then,

24  in those reports?

25    A     So there was no overt comparison.  There

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

Page 99

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    that.

2    that.

3         Q     How about before 2006, did you ever see a

4    Comparative Physician Report that had healthcare

5    provider ratings?

6         A     No.

7         Q     Let me show you what has been marked

8    previously.  Let me show you what has been previously

9    marked as Exhibit 21.  If you would identify that for

10   me, please.

11        A     Do you want me to go through every page?

12        Q     You don't have to.  I'll point you to

13   specific pages.

14        A     Okay.

15        Q     The cover e-mail, this is an e-mail from

16   yourself to Scott Montroy on April 17, 2003, correct?

17   That's the bottom part.

18        A     That's what I'm looking at.

19        Q     And then Mr. Montroy responds to you the

20   same day, copying Dave Hicks, correct?

21        A     Okay, yes.

22        Q     And the subject is a sample report?

23        A     Right.

24        Q     And you're asking Mr. Montroy to forward

25   you a sample doctor report?

Page 127

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    years in profession and years in practice, and

3    specialty information in this report, right?

4          A     Yes.

5          Q     Okay.  How about languages, is that in

6    here?

7          A     I'm not seeing it.  If it is, if you could

8    point it out to me.

9          Q     All right.  So anyway, going back and you

10   can start at the beginning of the report again, and

11   after receiving your request for the healthcare

12   provider, Health Grades would compile at least

13   patient provided information regarding the first

14   healthcare provider; is that right?

15              MR. VAZQUEZ:  Form.

16         A     I apologize.  I need to get you --

17         Q     (BY MR. STIMPSON)  Let me back up a little

18   bit.  When did Health Grades start collecting patient

19   provided information?

20         A     It was -- I don't know for certain.  It

21   was in the 2006 timeframe, I believe.

22         Q     Okay.

23         A     2006 to 2007.

24         Q     Okay.  Is that the first time it did that

25   even with beta testing in pilot programs?

Page 128

CONFIDENTIAL - ATTORNEYS EYES ONLY

2        MR. VAZQUEZ:  Form.

3    A    I just recall 2006 to 2007.

4    Q    (BY MR. STIMPSON)  Okay.

5    A    I can't speak to beta specifics.

6    Q    All right.  In this report, this Physician

7    Quality Comparison Report, it included information

8    from third parties, including board certification,

9    right?

10   A    Yes.

11   Q    And medical school?

12   A    I believe so.

13   Q    And licensure?

14   A    Let me go through the elements that you're

15   speaking to.  I don't recall licensure being listed

16   separately, but --

17   Q    32067.

18   A    Okay.  Got it.

19   Q    Disciplinary information?

20   A    That was incorporated as available.

21   Q    Okay.  And medical school?

22   A    Yes, as available.

23   Q    And medical internship?  32064.

24   A    Okay.  Yes.

25   Q    And medical residency?

Attorneys' Eyes Only

Page 129

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    A     Yes.

3    Q     And medical fellowship information?

4    A     Yes.

5    Q     And then the Health Grades website would

6    create a healthcare provider report in response to

7    the request, right?

8         MR. VAZQUEZ:  I'm going to object to form.

9    Q     (BY MR. STIMPSON)  Including this

10   Physician Quality Comparison Report, right?

11        MR. VAZQUEZ:  Form.

12   A     The report was produced.

13   Q     (BY MR. STIMPSON)  Okay.  And that would

14   be made available over the web to the consumers,

15   right?

16   A     It was accessible on the Internet, yes.

17   Q     Why didn't you disclose the Physician

18   Quality Comparison Report to the Patent and Trademark

19   Office in connection with the patent application that

20   led to the '060 patent?

21   A     The intent behind the patent filing was to

22   patent what we believed to be unique where there was

23   no prior art that existed.  And this was not deemed

24   to be unique or different.

25        So that's the reason we didn't reference

Page 130

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    it.

2        Q    Okay.  I need a little bit more specifics

3    on that.  What was it -- well, first of all, did you

4    talk about the Physician Quality Comparison Reports

5    with your patent attorneys?

6        MR. VAZQUEZ:  You can say whether you

7    discussed it, but, of course, do not disclose what

8    you actually discussed.

9        A    I don't recall the specific conversation.

10   But we covered a range of topics, and I'm sure we

11   reevaluated what we were already doing at that time.

12       Q    (BY MR. STIMPSON)  So you did go over with

13   your patent prosecution counsel what Health Grades

14   was doing at the time?

15       MR. VAZQUEZ:  Objection.  Misstates the

16   testimony.

17       A    I don't recall exactly what we discussed

18   and how it was discussed.

19       MR. VAZQUEZ:  Did you say so you didn't go

20   over with your patent prosecution counsel what Health

21   Grades was doing at the time?

22       MR. STIMPSON:  I think I said he did.

23       MR. VAZQUEZ:  Oh, okay.  So then I

24   withdraw my objection.  I thought you said didn't,

Page 131

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2       but I see here that it says "did."

3           Q    (BY MR. STIMPSON)  Let me just ask you,

4       Mr. Neal, do you have a recollection of discussing

5       Physician Quality Comparison Reports from 2004 or

6       2005 with your patent prosecution counsel?

7           A    I do not recall that specific

8       conversation.

9           Q    Now, we were talking about why you didn't

10      disclose these Physician Quality Comparison Reports

11      to the Patent and Trademark Office.  Let me back up

12      just a bit.

13               You understood you had a duty of candor to

14      the Patent and Trademark Office?

15          A    I understand the requirements in signing

16      the patent filing.

17          Q    And one of them was that you were to

18      disclose any relevant prior art to the Patent and

19      Trademark Office?

20               MR. VAZQUEZ:  Form.

21          A    I am aware of that.

22          Q    (BY MR. STIMPSON)  Yeah, you are aware now

23      but you were also aware then, right?

24          A    Yeah, which is exactly what we did.

25          Q    So let's talk about why this Physician

Page 132

CONFIDENTIAL - ATTORNEYS EYES ONLY

1   Quality Comparison Report from 2004 and 2005, why

2   they were not disclosed to the Patent and Trademark

3   Office.

4   You said, I thought, if I remember right,

5   you said that the Physician Quality Comparison Report

6   was deemed to be different from what is in your

7   patent '060; is that correct?

8   A    Yes.

9   Q    Okay.  How?

10  A    It's bringing together those different

11  elements in types of data and making that accessible

12  to consumers, not just in a report, but more

13  importantly on the website.

14  And most importantly, to give them a means

15  to differentiate providers based on a rating or a

16  score.  And this is not what we were doing in 2004.

17  Q    Okay.  So any other reasons?  Any other

18  reasons?

19  A    Any other reasons for?

20  Q    For why you didn't disclose it.

21  A    It was about being innovative and ensuring

22  that we were protecting what was not being done by

23  anyone else.  That was the intent behind the patent.

24  Q    Any other reasons?

Attorneys' Eyes Only

Page 133

                CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      A     Any other reasons for?

3      Q     Why you didn't disclose it.

4      A     It wasn't relevant to the patent

5   application that we were filing.

6      Q     Why?  Why not?

7      A     It's for the reason I just said.

8      Q     Okay.

9      A     This patent was to protect a unique

10  experience, something that no one else was doing in

11  any form or fashion in terms of combining data

12  elements, creating a unique experience to consumers

13  on a website.

14     Q     Did you understand then, with your duty of

15  candor, Mr. Neal, that the only prior art you need to

16  disclose was prior art that showed every element of

17  your patent claims?

18            MR. VAZQUEZ:  Form.

19     A     I don't recall what those specific

20  discussions were with our counsel as relates to that.

21     Q     (BY MR. STIMPSON)  I'm just trying to get

22  a factual understanding here.  Back at the time when

23  this application was pending, was it your

24  understanding, sir, that the only prior art you

25  needed to disclose was prior art that showed every

Page 134

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     element of your patent claims?

3               MR. VAZQUEZ:  Same objection.

4        A     Was it my understanding -- I'm sorry, if

5     you can read back or say that last part.  Was it my

6     understanding -- sorry, if you can read back or say

7     that last part, was it my understanding --

8               (Record read as requested.)

9               MR. VAZQUEZ:  I object to form.  Calls for

10    a legal conclusion.

11       A     Yeah, I don't understand the question.

12    Were we supposed to -- I need you to rephrase or

13    re-ask the question.  I just don't understand it.

14       Q     (BY MR. STIMPSON)  Okay.  Well, let me try

15    again, then.  I'm talking about the time when your

16    patent application was pending before it issues a

17    patent.  And you understood you had a duty of candor

18    to disclose relevant prior art to the Patent and

19    Trademark Office, correct?

20              MR. VAZQUEZ:  Form.

21       A     Yes.

22       Q     (BY MR. STIMPSON)  Was it your

23    understanding, sir, at that time that you only needed

24    to disclose prior art that showed every element of

25    your patent claims?

Page 151

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    Q    (BY MR. STIMPSON)  Are you with me,

3  Mr. Neal?

4    A    I am.

5    Q    Okay.  This 2004 Physician Quality

6  Comparison Report shows ratings of hospitals,

7  correct?

8    A    It does.

9    Q    It shows ratings of multiple hospitals,

10  correct?

11    A    It does not show a hospital rating.  It

12  shows how they performed by cohort or service line.

13  So they are not hospital ratings.

14    Q    Do you see above the table where it says,

15  What are the ratings for hospitals in my area?

16    Do you see that?  Do you see that, sir?

17    A    Yes.

18    Q    And that's language that's right in this

19  Physician Quality Comparison Report, right?

20    A    It is.

21    Q    And so ratings are provided for multiple

22  hospitals in this report, correct?

23    A    The rating is not assigned to the

24  hospital.  It's assigned to the service lines that

25  are parts of that hospital.  It's an important

Attorneys' Eyes Only

Page 152

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    distinction.
3         Q    Okay.  So the ratings are assigned to
4    parts of hospitals, correct?
5         A    They are.
6         Q    And under your own definition, founding
7    your own patent of '060, right, you said that
8    hospitals were healthcare providers, correct?
9              MR. VAZQUEZ:  Form.
10        A    Based on, yes, the abstract definition.
11        Q    (BY MR. STIMPSON)  Right.  And any user
12   looking at this Physician Quality Comparison Report
13   could compare ratings on these parts of hospitals
14   from this Physician Quality Comparison Report in
15   2004, correct?
16        A    I'm not sure what interpretation the
17   consumer might make, but there's not a means by which
18   to compare facilities and make a choice.  You can
19   choose my service line and evaluate, but there is no
20   method of comparison in there.
21        Q    So you're telling me that a user of this
22   Physician Quality Comparison Report could not look at
23   the Central Baptist Hospital and say, cardiac has a
24   three-star rating and then -- let me just find one
25   word here.

Attorneys' Eyes Only

Page 153

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY

 2              So you're telling me, Mr. Neal, that a

 3     user could not look at this Physician Quality

 4     Comparison Report and look, for example, and see that

 5     Central Baptist Hospital in neurosciences -- I'm

 6     sorry, in pulmonary, has a three-star rating, and

 7     also note from the same exact document that Pattie A.

 8     Clay Hospital in Richmond, Kentucky had a five-star

 9     rating in pulmonary, right?

10              MR. VAZQUEZ:  What is the question?

11      Q    (BY MR. STIMPSON)  The user could do that,

12     right?

13      A    They could look at this report and see

14     that information.

15      Q    Right, and the way they do that is they

16     look at the ratings for the Central Baptist Hospital

17     under pulmonary, and then they compare it to the

18     Pattie A. Clay Hospital, pulmonary, right, and you'd

19     see that the Pattie A. Clay Hospital had a much

20     better rating than the Central Baptist Hospital,

21     correct?

22      A    A consumer might do that.

23      Q    If a consumer did that -- well, let me

24     just back up.

25              Actually, that's exactly the reason why
```

Page 154

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      these ratings are here, right, so the consumers can

3      compare these ratings to these various hospitals in

4      the various areas, right?

5              MR. VAZQUEZ:  Object to form.  Compound.

6      A      That may be a reason why.

7      Q      (BY MR. STIMPSON)  Okay.  Thank you.

8              Now, you also knew that the Health Grades

9      website was managed by Health Grades in the 2004

10     timeframe, right?

11     A      The Health Grades website -- I'm just

12     repeating the question.  Repeat the question, please.

13             (Record read as requested.)

14     A      Okay, yes, I did.

15     Q      (BY MR. STIMPSON)  And you knew that the

16     Physician Quality Comparison Reports for 2004

17     included board certification, right?

18     A      Correct.

19     Q      You knew that came from third parties?

20     A      It did.

21     Q      Okay.  And you knew it included licensure,

22     right?

23     A      I believe that was one of the elements we

24     identified, yes.

25     Q      And you knew that came from third parties?

Page 155

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2          A      Yes.

3          Q      Okay.  You knew that the Physician Quality

4    Comparison Report of 2004 included disciplinary

5    information?

6          A      Yes.

7          Q      And you knew that came from third parties?

8          A      Correct.

9          Q      You knew that the Physician Quality

10   Comparison Reports from 2004 included medical school

11   information, right?

12         A      Yes.

13         Q      And you knew that came from third parties?

14         A      Yes.

15         Q      Okay.  And you knew it also included

16   internship, residency, and fellowship information,

17   right?

18         A      Correct.

19         Q      And you also knew that all three of those

20   came from third parties, right?

21         A      Correct.

22         Q      And then you also knew that the Health

23   Grades website, in response to the request from the

24   consumer, would create a report, could create a

25   report on healthcare providers, right?

Attorneys' Eyes Only

Page 156

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2          A      That's correct.

3          Q      And you also knew that that report could

4     be created using this information that we just talked

5     about that came from third parties, right?

6          A      Yes.

7          Q      And you also knew that the report would

8     also be made available to the consumer over the

9     website, right?

10         A      Yes.

11         Q      So, Mr. Neal, the physician quality

12    comparison reports for 2004 had numerous of the claim

13    elements from your '060 patent, right?

14               MR. VAZQUEZ:  Form.  And, again, calls for

15    expert testimony.  He's not an attorney.

16               To the extent you can answer it, go ahead.

17         A      I would have to defer to counsel on that

18    one.

19         Q      (BY MR. STIMPSON)  So you're not going to

20    answer that question?

21         A      No.

22               MR. STIMPSON:  Did he say no?

23         A      I'm going to say I would defer to counsel.

24         Q      (BY MR. STIMPSON)  Okay.  But my question

25    is, are you refusing to answer that question?

Veritext/NJ Reporting Company

Page 212

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2       have been 2003.

3               MR. STIMPSON:  Actually, let me have this,

4       David.

5           Q     (BY MR. STIMPSON)  Do you know what a

6       premium report is?

7           A     If you'd explain to me the definition.

8           Q     Well, I'm just asking you if you know what

9       a premium report is?

10          A     It could mean a lot of different things to

11      different people.

12          Q     Well, did Health Grades have a premium

13      report for its physicians?

14          A     The name vaguely rings a bell with me,

15      premium.  We had a lot of different names assigned to

16      what effectively were the same reports.

17                (Exhibit 50 marked.)

18                MR. STIMPSON:  Let me show you what has

19      been marked Exhibit 50, a multipage document bearing

20      Bates numbers HGMKES 022179 and 80.

21          Q     (BY MR. STIMPSON)  This is an e-mail from

22      Scott Montroy to Dave Hicks copying you,

23      February 16, 2005, correct?

24          A     It is.

25          Q     Prepared and kept in the ordinary course

Page 213

                CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    of business at Health Grades?

3        A     It appears so.

4        Q     What is a pilot project?  Can you explain

5    to me what the pilot project is there?

6        A     Pilot project for Dr. David Drucker was

7    our prototype physician profile.

8        Q     And when was that first put on the

9    website?

10       A     Let's see.  This is February of 2005.  So

11   the prototypes, it suggests, based on this e-mail,

12   that that prototype profile was hard-coded on our

13   website in February of 2005.

14       Q     Okay.  What do you mean hard-coded?

15       A     Hard-coded means that it was one of a

16   kind.  We didn't have an automated system to support

17   other physicians being able to update the profile.

18   Hard-coded means that within the actual development

19   of the program code on the website, whatever content

20   was visible on that physician profile had to be

21   hard-coded in.

22             So it was actually typed in, there was an

23   image that may have appeared within it.  It was one

24   of a kind.  It was a prototype.

25       Q     Do you think that was available on the

Page 214

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    website as of at least February 2005, right?

3         A      This doesn't say it was available on the

4    website.  I'm uncertain of the timing.  So I can't

5    say based on this document that it was the case.

6         Q      The second bullet there, it says, Drucker

7    patient experience data on pilot report in prod.

8               What does that mean?

9         A      So in prod would be -- that would mean in

10   production.  So that would be on the website in some

11   form.

12        Q      So we know, as of February 16, 2005, at

13   least that early, there was patient experience data

14   in Dr. Drucker's report on the website available to

15   the public, correct?

16        A      Yes.  I think that's a fair assumption.

17        Q      And how would consumers find Dr. Drucker's

18   report?

19              MR. VAZQUEZ:  Form.

20        Q      (BY MR. STIMPSON)  For example -- let me

21   just withdraw that, and I'll start another question.

22              A consumer could get on the Health Grades

23   website in February 2005, type in, you know, doctors

24   and, you know, Dr. Drucker in New York and up would

25   pop Dr. Drucker's report?

Attorneys' Eyes Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 250

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      Q     (BY MR. STIMPSON)  I show you what has

3  been marked as Exhibit 10, Mr. Neal.

4          Have you seen this document before?

5      A     Press Release, I do recall seeing this.

6      Q     And this confirms that as of

7  August 2, 2005, Health Grades was adding physician --

8  adding physician satisfaction survey results to its

9  Physician Quality Reports, correct?

10     A     That's what the document says.

11     Q     It also confirms that detailed physician

12  and practice information from physicians themselves

13  are being added as of that date?

14     A     Yes, that's what it says.

15     Q     What was the first time, to your

16  recollection, that comparison ratings were provided

17  to the Health Grades reports?

18          MR. VAZQUEZ:  Object to form.

19     A     What's the definition of a comparison

20  rating?

21     Q     (BY MR. STIMPSON)  Well, what do you

22  understand it to be?

23     A     By my definition, a comparison rating is a

24  score or rating that's assigned to an individual

25  physician.

Page 251

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      Q      Okay.  Using that definition, when were

3  comparison ratings first added to Health Grades'

4  reports?

5             MR. VAZQUEZ:  Form.

6      A      I don't know.

7      Q      (BY MR. STIMPSON)  Well, how would the

8  comparison ratings then differ from the physician

9  satisfaction surveys, under your definition?

10     A      The survey is just a survey.

11     Q      Okay.

12     A      We haven't assigned any type of rating or

13 score.  It's just a survey.

14     Q      Okay.  So how were they displayed in the

15 Physician Quality Reports then?

16     A      It would have just been the actual survey

17 results, a compilation of those, but there were no

18 scores assigned, and that was intentional for the

19 reasons that I mentioned previously, because it was a

20 risk to our business model.

21     Q      All right.  So as of August 2, though, we

22 have physician satisfaction surveys and detailed

23 physician and practice information from physicians in

24 the quality reports, right?

25     A      That's what this indicates.

Page 252

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2          MR. STIMPSON:  David, could I have this,

3     please?

4          Q    (BY MR. STIMPSON)  Actually, before I get

5     to this document, let me ask you this.  The Drucker

6     report we saw in Exhibit 51, why didn't you disclose

7     that to the Patent and Trademark Office in connection

8     with the application that led to the '060 patent?

9          A    We weren't patenting the Drucker report.

10    It was unrelated to what we were patenting.

11         Q    Any other reasons?

12         A    I think that's probably a good enough

13    reason, at least in my mind.

14         Q    All right.  And how, in your mind, did

15    what you were patenting differ from the Drucker

16    report?

17         A    The Drucker report was a prototype.  It

18    was for us to try to gain an understanding and try to

19    conceptualize certain thoughts and ideas that we had.

20         But as it turns out, we ended up doing

21    things differently.  And maybe as a result of that,

22    that influenced our future ideas in the way that we

23    presented information and results and combined those

24    results on our website.

25         Q    So you said the reason you didn't disclose

Case 1:11-cv-00520-PAB-BNB Document 869-4 Filed 11/02/12 USDC Colorado Page 41 of 52

Attorneys' Eyes Only

Page 253

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     it was because it was unrelated, and I asked you how.

3     And one reason you gave me was it was a prototype,

4     right?

5          A     Right.

6          Q     Any other reasons?

7          A     Why we didn't disclose it?

8          Q     Yeah.

9          A     It was not central to what we were

10    patenting.

11         Q     Why not?

12         A     The patent was about the experience for

13    the consumer on our website and specifically how we

14    combined different elements of data to make it

15    relevant to their experience and allowed them to

16    differentiate physicians.

17              And the way that we were doing it was all

18    about the experience, not an individual physician

19    profile on our website.  It was the overall

20    experience.

21              So a report takes many forms.  It's not

22    just a physician profile.  It's a list of physicians

23    that are presented within search results.  It's many

24    different things.  It's that form of presentation and

25    the content of that presentation and the means of

Page 254

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   differentiation which made up the patent.  That
3   didn't exist in the Drucker report.
4        Q     Anything else?  Anything else?  Any other
5   reasons?
6        A     Not that I can recall right now.
7        Q     Why don't you get the patent, Exhibit 3,
8   please.
9        A     Okay.
10       Q     And you know where the claims are, right?
11  Look at claim 1, starting with column 20.  Sir, at
12  the back, column 20.
13       A     Column 20?
14       Q     Yeah.
15       A     Got it.
16       Q     Can you go through that claim 1, sir,
17  and -- actually, let me back up here.
18             Can I just have his last answer read back,
19  something about it was not central to what we were
20  patenting?
21             (Record read as requested.)
22       Q     (BY MR. STIMPSON)  Okay.  We'll talk about
23  that a bit later.
24             You had -- apart from the Drucker report,
25  you had the Health Grades website, it was available

Page 255

CONFIDENTIAL - ATTORNEYS EYES ONLY

1       as of 2004.  Consumers could get on and do searches

2       for healthcare providers, right?

3            A     Yes.

4            Q     Let me show you what has been marked as

5       Exhibit 53.  It's a two-page document bearing Bates

6       number HG 0209051 to 52.

7                  (Exhibit 53 marked.)

8            Q     (BY MR. STIMPSON)  Actually, Mr. Neal,

9       before I move on, though, I exhausted your reasons --

10      I just wanted to make sure I exhausted your reasons

11      for why the Drucker report was not disclosed.

12           A     To the best of my recollection, I shared

13      with you --

14           Q     Okay.  Take a second and take a look at

15      this e-mail and then I'll ask you some questions.

16           A     Okay.

17                 MR. STIMPSON:  Jesus, same reason for

18      redacting?

19                 MR. VAZQUEZ:  Yes.  Pretty much any one

20      that will be on the top like that is forwarding.

21                 MR. STIMPSON:  Gotcha.

22           A     Okay.

23           Q     (BY MR. STIMPSON)  This is a series of

24      e-mails, including you as a copy holder and an

Page 256

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  addressee, in March of 2005?

3      A     Yes.

4      Q     Prepared and kept in the ordinary course

5  of business?

6      A     I believe so.

7      Q     Who is Sarah Loughran, L-O-U-G-H-R-A-N?

8  How do you pronounce that?

9      A     Sarah Loughran.

10     Q     Who was she?

11     A     She was a senior executive at Health

12  Grades.  I think SVP provider services, if I recall

13  correctly.

14     Q     And Kerry Hicks was the president?

15     A     CEO.

16     Q     CEO.  And Allen Dodge and Dave Hicks we

17  know.  What was the subject PNMM patent?

18     A     So, that actually -- it wasn't so much a

19  PNMM patent.  PNMM, is that what you're asking about?

20     Q     Yeah.

21     A     I can't remember exactly what the acronym

22  stands for.  It had something to do --

23     Q     Physician New Marketing Media?

24     A     Okay, that sounds right.  So, no, I notice

25  that -- I'm saying the same things that I talked

Page 264

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2        A     No.
 3        Q     So how would I know whether I've got a
 4   complete list of the Health Grades products and
 5   services?
 6        A     Via all the disclosure that's been made
 7   today.
 8        Q     Right, but I mean, how would I know from
 9   this deposition whether I've got all the products and
10   services that Health Grades was using before
11   August 29, 2006?
12        A     To the best of my ability, I have
13   attempted to disclose those and communicate those to
14   you today.
15        Q     Were you involved in the prosecution of
16   the '060 patent?
17        A     What does involved mean?
18        Q     Well, let me just change the question
19   then.
20              Did you get copies of office actions from
21   the Patent and Trademark Office?
22        A     I don't recall receiving those.
23        Q     Did you have any input into responses to
24   the office actions?
25        A     I'm sorry, can you go back and state the
```

Page 265

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    original question?  I want to make sure that I'm
3    following the line of questioning.
4         Q    Sure.  What I'm trying to get at,
5    Mr. Neal, is whether or not you were kept up to speed
6    as to what was happening in the prosecution of the
7    '060 patent?
8              MR. VAZQUEZ:  Object to form.
9         A    As it relates to this and the MDx case?
10        Q    (BY MR. STIMPSON)  Yeah, well, it's about
11   the '060 patent.  So how that patent was obtained
12   from the Patent and Trademark Office, I want to know
13   whether you were kept up to speed as to what was
14   happening during the prosecution?
15             MR. VAZQUEZ:  Form.
16        A    You're talking about the prosecution as it
17   relates to this suit with MDx?
18        Q    (BY MR. STIMPSON)  As it relates to the
19   '060 patent, yeah.
20             MR. VAZQUEZ:  Form.
21        A    So I'm confused by your question.  Is it
22   specific to the patent itself and being updated on
23   what claims were granted as it relates to this
24   patent?  I don't think that's the question you're
25   asking me.

Page 266

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2     Q     (BY MR. STIMPSON)  No, that's not really

3  part of it.

4     A     Okay.

5         MR. VAZQUEZ:  Just -- I think the

6  confusion is the meaning of prosecution.

7         MR. STIMPSON:  Okay.  I'll explain it to

8  him.

9     Q     (BY MR. STIMPSON)  So during the life

10  cycle of the patent application, you file a patent

11  application.  Then, at least in this case, the patent

12  officer rejected the claims, and then there was a

13  response, and then maybe another rejection or

14  response, and then eventually the patent issued.

15         So that's a series of things that happened

16  in the life of that application that eventually led

17  to the issuance of the patent.

18     A     All right.

19     Q     So my question to you, sir, is this was

20  filed in 2006 and it issued in 2010.  In that

21  four-year period, were people keeping you up to speed

22  and telling you what the Patent Office was doing?

23     A     Oh, yes.

24     Q     So you would get copies of the office

25  actions?

Attorneys' Eyes Only

Page 267

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A    I don't recall what they were, but I do

3    remember speaking with the attorneys.

4      Q    Okay.  So would you have input into how

5    responses were provided to the Patent and Trademark

6    Office?

7          MR. VAZQUEZ:  Form.

8      A    There was communication with counsel.  I

9    can't recall the content of those conversations.

10          MR. STIMPSON:  Can I have Defendant's

11    Deposition Exhibit 12, please, David?

12          Just one second.  Let's see if we need it.

13    Well, maybe we can skip this and ask another

14    question.

15      Q    (BY MR. STIMPSON)  It's your recollection

16    that you were kept up to speed from your patent

17    prosecution counsel as to what was happening in the

18    prosecution of the '060 patent?

19      A    Yes.

20      Q    Okay.  That's easy.

21          Did you get copies of prior art that was

22    cited --

23          MR. VAZQUEZ:  Object to form.

24      Q    (BY MR. STIMPSON)  -- from the Patent

25    Office?

Page 268

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    A    I do recall seeing something returned from

3    the Patent Office that included references to prior

4    art.

5    Q    Did you read the references?

6         THE DEPONENT:  This involved discussions

7    and dialogue with counsel.

8         MR. VAZQUEZ:  Right.  As so we've talked,

9    sometimes when you're in a deposition, you can answer

10   his questions to the best of your ability.  Just do

11   not disclose the discussions, what was literally said

12   in the meetings with prosecution counsel or with us.

13   A    Okay.  Prior art was a discussion topic.

14   Q    (BY MR. STIMPSON)  Okay.  But my question

15   was, did you read the prior art?

16   A    I do recall having some conversation about

17   the prior art.

18   Q    But do you remember reading the prior art?

19   A    In terms of looking exactly at what the

20   patent officer returned to us?

21   Q    Yeah, the prior art itself.  For example,

22   you might remember the Henley reference that was

23   cited by the Patent Office?

24   A    Yes.

25   Q    Did you read that?

Page 269

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A     I did look at that prior art at the time.

3      Q     Okay.

4      A     I do recall looking at that.

5      Q     Do you remember, Mr. Neal, that during

6    patent prosecution Health Grades disclosed websites

7    of other companies in connection with its patent

8    prosecution?

9      A     I don't recall.

10     Q     Let's see if I can refresh your memory

11   here.

12           (Discussion off the record.)

13           (Recess taken from 3:15 p.m. to 4:02 p.m.)

14           (Ms. Stoll-DeBell not present following

15   recess.)

16     Q     (BY MR. STIMPSON)  I show you what has

17   been marked as Exhibit 4.  This is a record of the

18   prosecution history before the Patent and Trademark

19   Office, Mr. Neal.

20           Have you seen this before?

21     A     I don't know what parts I may or may not

22   have seen.

23     Q     In the part that is flagged, there's an

24   information disclosure statement.  And it identifies,

25   and I'll represent to you this is where Health Grades

Page 270

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      is disclosing to the Patent and Trademark Office

3      websites of competitors.

4              Do you know, sir, why Health Grades

5      disclosed websites of competitors as prior art?

6         A    I don't recall.

7         Q    Do you remember discussing this at all

8      with counsel for -- your counsel?

9              MR. VAZQUEZ:  Again, just if you discussed

10     it, you can say yes or no.  Just don't disclose any

11     actual contents of the discussions.

12        A    Yes.

13        Q    (BY MR. STIMPSON)  Yes, you did discuss

14     it?

15        A    Yes.

16        Q    Okay.  Did you discuss disclosing Health

17     Grades' prior websites?  Same conversation?

18        A    I don't recall.

19        Q    So you don't have -- you can't tell me

20     today why these were disclosed but not the Health

21     Grades prior websites?

22        A    I don't recall any specific discussions

23     about either Health Grades or any of these individual

24     companies.

25        Q    All right.  But you know they were

Page 271

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  discussed?

2       A     The topic was discussed, yes.

3       Q     All right.  That's enough.  That's a big

4  document for just a short question.  Thanks.

5             Have you talked to Mitch Rothschild

6  before?

7       A     I have, yes.

8       Q     How many times have you talked to him?

9       A     I believe only one time.

10      Q     Okay.  And when was that?

11      A     I'm guessing that was -- it was 2009 or

12  2010.

13      Q     What about?

14            MR. VAZQUEZ:  Form.

15      Q     (BY MR. STIMPSON)  I'm sorry, what did you

16  discuss with Mr. Rothschild?

17      A      It was -- he had engaged a consultant to

18  work for him that had formerly worked at Health

19  Grades.  The guy's name is John Morrow.

20      Q     Um-hum.

21      A     And I've known John going back some period

22  of time.  And John suggested that there may be an

23  opportunity for a working relationship between Vitals

24  and Health Grades at that point in time.