# EXHIBIT E

(Redacted Version of Doc. # 375-1)

# EXHIBIT B

# HealthGrades, Inc.

v.

# MDx Medical, Inc. d/b/a Vitals.com

Expert Report of David A. Hall

*David A. Hall* (signature)

July 13, 2012



ALVAREZ & MARSAL GLOBAL FORENSIC AND DISPUTE SERVICES, LLC

### III. SUMMARY OF ANALYSIS AND OPINIONS

**A. HealthGrades' lost profits and reasonably royalty damages suffered through May 2012 as a result of Vitals' infringement of the '060 patent are approximately $2,262,000.**

**B. 12% is a reasonable royalty resulting from a hypothetical negotiation for Vitals related to the '060 patent.**

**C. Reasonable Royalty Damages on the all Vitals' infringing revenue through June 2012 are approximately $926,000.**

### IV. ANALYSIS AND OPINIONS

**A. HealthGrades' lost profits and reasonably royalty damages suffered through May 2012 as a result of Vitals' infringement of the '060 patent are approximately $2,262,000.**

#### 1. Damages Overview – Patent Infringement Damages

22. Assuming infringement of a valid patent, the patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[15] To the extent that lost profits damages are not applicable on any sales that are subject to damages, the patentee would be entitled to a reasonable royalty on such sales. The overall damages may be split between lost profits on some of the infringing sales and a reasonable royalty on any remaining infringing sales that are not included in the lost profit amounts.[16]

#### 2. General Principles For Establishing Lost Profits

23. In order to establish a claim for lost profits, the patentee must demonstrate that there is a reasonable probability that "but-for" the assumed infringement, the patentee would have made some or all of the accused sales and earned the associated profits. At the heart of an appropriate lost profits analysis is a requirement to reconstruct the "but-for" hypothetical market based on sound economic proofs. Numerous published decisions recap the basic methodologies and requirements for a lost profit claim. The following summary of the basic lost profits framework is from the Grain Processing Corporation v. American Maize-Products Company case[17]:

---

[15] 35 USC Sec 284
[16] State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573 (Fed. Cir 1989)
[17] 185 F.3d 1341 (Fed. Cir. 1999).

Confidential                Page 6 of 25

> To recover lost profits, the patent owner must show "causation in fact," establishing that "but for" the infringement, he would have made additional profits. When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for" the infringement. Once the patent owner establishes a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's "but for" causation claim] is unreasonable for some or all of the lost sales."
>
> ….
>
> In Aro Manufacturing, the Supreme Court stated that the statutory measure of "damages" is "the difference between [the patent owner's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." The determinative question, the Supreme Court stated, is: "had the Infringer not infringed, what would the Patent Holder-Licensee have made?" The "but for" inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee "would ... have made."

24. This general framework of a "but-for" damages approach is also articulated in earlier cases that involved patent damages analysis.[18] Lost profits damages may take on a number of different forms, including lost sales units, eroded prices and increased costs:

> In determining such damages, the profits lost by the patent owner in a two-supplier market is a proper ground for granting relief. Lost profits may be in the form of diverted sales, eroded prices, or increased expenses. The patent owner must establish a causation between his lost profits and the infringement. A factual basis for the causation is that "but for" the infringement, the patent owner would have made the sales that the infringer made, charged higher prices, or incurred lower expenses. In proving his damages, the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability.[19]

---

[18] For example see Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056 (Fed. Cir 1983):
Pursuant to 35 U.S.C. § 284, a patent owner is entitled to damages that are adequate to compensate for the infringement. Such damages "constitute 'the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.' … The question to be asked in determining damages is 'how much had the Patent Holder suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder … have made?' "

[19] Ibid.

Confidential                Page 7 of 25

25. Based on the facts of this case, I have analyzed the damages experienced by HealthGrades framed by the above-noted construct and considering the well accepted methodologies outlined below.

### a) Lost Profits Analysis

26. The "Panduit Test" is one way to systematically consider and evaluate the market impact on the patent owner's (HealthGrades) sales, "but-for" Vitals' assumed infringement. The following are the four Panduit factors:

   - ➢ Demand for the patented product;
   - ➢ Manufacturing and marketing capability to exploit the demand;
   - ➢ Absence of acceptable non-infringing substitutes; and,
   - ➢ The amount of the profit.[20]

27. My analysis of the Panduit factors demonstrates that HealthGrades is entitled to lost profits. The following sections address why the Panduit test is satisfied for Vitals' accused revenue.

### Demand

28. **Attachment 1** presents HealthGrades' income statements for the years ended December 31, 2008 through December 31, 2011 and for the four-month period ended April 30, 2012. These income statements were compiled from the various departments that report the revenues and costs associated with the patented invention.[21] **Attachment 2** presents Vitals' audited income statements for the years ended December 31, 2008 through December 31, 2011. Monthly income statement information for Vitals is summarized at **Attachment 2a**. This information is summarized for the infringement period of July 2010 through May 2012 – the most recent information produced by Vitals at the date of this report.

---

[20] Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152 (6th Cir. 1978).
[21] As noted elsewhere in this report, revenues reported by the various departments include more than that of the patented invention. However, HealthGrades did not separately report the revenues and expenses related to the patented invention. Therefore, these departmental income statements were considered in their entirety.

Confidential            Page 8 of 25

29. One of the claims of the '060 patent is that visitors to its website can access data on a "first healthcare provider."[22] Based on the information on the first health care provider, visitors (or prospective patients) could obtain "comparison ratings of healthcare providers," including the first healthcare provider in the report that would permit a comparison of that healthcare provider with other healthcare providers. HealthGrades provides this comparison online via the internet at its website. This comparative analysis is another of the claims of the '060 patent and is provided for in one of the claims stated above. Visitors come to the website to research physician information generate advertising revenue for HealthGrades and Vitals.

30. REDACTED

    This advertising revenue combined with the website visits demonstrates the demand for the claims embodied in the '060 patent.[23]

31. As I discuss later in this report, some visitors visited both Vitals' and HealthGrades' website to gather healthcare provider information without cost. A visitor who clicked on both HealthGrades' and Vitals' website ("co-visitors") would have caused ad revenue to be generated for both HealthGrades and Vitals. This means that there is not a one for one relationship between visitors to Vitals' website and lost visitors/ad revenue for HealthGrades. This phenomenon impacts the quantity of lost HealthGrades revenue (and therefore, profits) in my "but-for" analysis, and I properly accounted for this phenomenon.

32. As noted earlier in my report, the patented invention is comprised of several features. Among these features are verified provider information and patient provided reviews that provide information to visitors to evaluate and compare providers. Since these patented features are a fundamental portion of HealthGrades' and Vitals' websites from which both earn significant and growing advertising revenue, I have reasonably concluded that there was (and is) demand for the patented invention.

---

[22] Court Order Regarding Claims Construction, the First Healthcare Provider is "a particular healthcare provider about whom information is requested and a report is produced."
[23] The Gyromat Corporation v. Champion Spark Plug Company, 735 F.2d 549 (U.S. Court of Appeals, 1984).

Confidential　　　　　　　　Page 9 of 25

### Manufacturing and marketing capability

33. HealthGrades has the "manufacturing and marketing capability" to exploit the demand of the patented features. Since HealthGrades' database is hosted on the web, access to the data is available to all who have a web connection. Plus, there are no geographical restrictions within the U.S. domestic market to access the data.

### Absence of Acceptable Non-Infringing Substitutes

34. I am not aware of any acceptable non-infringing substitute to HealthGrades' patented invention. However, I am aware that there are companies that HealthGrades views as competitors for visitors and advertising revenue. HealthGrades views the pool of competitors to consist of entities that try "… to attract consumers who are searching for provider information online. And provider information can be in the form of physician information, hospital information, dentists."[24]

35. Consistent with the Mor-Flo Industries, Inc. case, for purposes of measuring lost profits, I have treated HealthGrades' competitors as acceptable non-infringing alternatives.[25] To the extent that these competitors are infringing or not an acceptable substitute, my analysis understates HealthGrades' lost profits.

36. HealthGrades also asserts that the patented features employ the data provided by healthcare providers, patients, and third-party verified information, but also add to this data by facilitating the comparison of healthcare providers and providing a user experience for the visitor. HealthGrades' Vice President of Corporate Strategy & Development (and one of the inventors of the '060 patent), John Neal testified:

> "The intent behind the patent filing was to protect the unique experience that we've created on the website. So how we display content, how we facilitate search, and then, more recently, how we facilitate rates and comparison of providers."[26]

37. Vitals also identified market competitors. In a presentation that appears to be created at the approximate time that the '060 patent was issued; Vitals identified HealthGrades as the market leader.[27]

---

[24] John Neal deposition transcript, p. 56.
[25] State Industries, Inc. v. Mor-Flo Industries, Inc. et al., 883 F.2d 1573 (U.S. Court of Appeals, 1989).
[26] Ibid, p. 57.

Confidential                Page 10 of 25

76. REDACTED

77. REDACTED

### d) Excess Profit/Analytical Approach

78. The analytical approach compares the profitability of the patented features to the profitability of other comparable technology to determine if higher profits are earned on the use of the patented features. In an ideal circumstance, one would be able to compare the profitability of an invention that has the same intended use as the patented invention, but lacks only the attributes associated with the patent and nothing else. The profit difference between these two inventions is assumed to represent the value of the patented invention. However, this ideal circumstance does not always exist and in this case, I was not able to find such a close comparable invention.

79. Another form of the analytical approach is to compare HealthGrades' or Vitals' profit margins to that of the industry or similarly situated competitors who do not use the patented invention.[44] This comparison provides an indication of the contribution margin of the patented invention. I was unable to find profit information for a large group of HealthGrades and Vitals competitors to make such a comparison. However, I was able to locate the profit information for a company in the healthcare information industry—WebMD.

80. WebMD reported an EBITDA margin of 14% in 2009 and 25% in both 2010 and 2011. HealthGrades' EBITDA margin for its departments that benefitted from the '060 patent

---

[44] TWM Manufacturing Co. Inc. v. Dura Corp, et al., 789 F.2d 895.

Confidential           Page 21 of 25

Case No. 1:11-cv-00520-RMB-NYW Document 401-6 filed 11/21/12 USDC Colorado pg 10 of 10
Case 1:11-cv-00520-PAB-BNB Document 375-1 Filed 11/02/12 USDC Colorado Page 9 of 9

was 60%,     and     for these same years (see **Attachment 1**). The average differential for these years is     which indicates that the financial performance related to the patented invention is superior to that of an industry benchmark. The     profit differential (or excess profit from the patented invention) could be a reasonable starting point for a hypothetical negotiation based on a widely accepted methodology—the analytical approach.

81. Another reasonable approach to yield a starting point based on a profitability analysis is to compare HealthGrades' profit earned on revenues associated with the features of the patented invention and the profit of its overall operations. This will yield a profit differential that HealthGrades would reasonably measure and be mindful of as it entered into a hypothetical negotiation. This excess profit also defines a range of a reasonable royalty negotiation for HealthGrades, as it sets aside a normal profit rate for Vitals to compensate it for non-patented elements, the manufacturing process and business risks encountered.

82. **Attachment 8** is a summary of the consolidated income statements for HealthGrades. These consolidated income statements are for all of HealthGrades' operations. As previously noted, **Attachment 1** reflects the revenue and expenses for the departments identified as having revenues and/or expenses related to the patented invention.

83. According to **Attachment 1**, for 2010, 2011 and 2012 year-to-date, HealthGrades' actual Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") margin for its departments that utilize the '060 patent was

84. The two approaches to the analytical method that I had the data to use yielded the following excess profit rates: