# EXHIBIT F

## (Redacted Version of Doc. # 375-2)

Case 1:11-cv-00520-PAB-BNB   Document 975-2   Filed 11/02/12   USDC Colorado   Page 1 of
144

# EXHIBIT C

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2         IN THE UNITED STATES DISTRICT COURT
3            FOR THE DISTRICT OF COLORADO
4      Case No. 11-CV-00520-PAB-BNB
5      _____
6      DEPOSITION OF DAVID HALL
7      October 4, 2012
8      _____
9

       HEALTH GRADES, INC.,
10

       Plaintiff,
11

       v.
12

       MDX MEDICAL, INC. d/b/a VITALS.COM,
13

       Defendant.
14     _____
15
16
17
18
19
20
21
22
23
24
25     Job No. NJ1339309

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 57

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2     a substantial portion of the demand related to
3     advertising revenue related to the patented features
4     with respect to Panduit test 1.
5          Q     Okay.  You said that you determined from
6     reviewing these documents and talking -- and reading
7     the deposition testimony, a substantial portion of
8     the websites were using the patent.
9                Is that what your testimony was?
10         A     No.  And I would add that also an
11    important benchmark was the market, as far as
12    visitors were going to the site.  That prompted or
13    that identified in their own internal documents the
14    features related to the '060 Patent would also be a
15    source I considered as well in the substantial market
16    share that Health Grades and Vitals had as they, both
17    on their website, if you click on a Google search or
18    Yahoo search, or within their documents that both
19    emphasize and feature that they have information from
20    the sources I described earlier as well as comparison
21    ratings.
22         Q     So I don't think that was really quite my
23    question, Mr. Hall.  Let me see if I can make it
24    clearer.
25                You talked about how you looked at all

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    this evidence and you think that the '060 Patent is

3    important.  But my question is a little bit

4    different.  My question is, do you have anything,

5    Mr. Hall, to indicate what percentage of users of the

6    Vitals website use the technology from the '060

7    Patent?

8          A     I do not have a percentage, a fixed

9    percentage based on a survey or a source of that

10   sort, given the sensitivity of healthcare searches

11   and the practicalities of that as far as privacy

12   information and practicalities.

13               I do not have a percentage of visitors.  I

14   have not determined one that utilized the features of

15   the '060 Patent.

16               But in lieu of that, I have, as I'd

17   indicated earlier, looked at what the companies put

18   forth to the market that they have and are their key

19   features.  And understood then how the market reacted

20   to those explanations or benefits of their

21   patented -- of the patented features related to their

22   websites.  And tracked over time the market's

23   reaction to that, as well as what the deposition

24   testimony yielded.  And concluded with the increasing

25   both visits and increasing ad revenue related to

Page 59

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     those visits, that the patented features were a

3     substantial part of the demand as it relates to the

4     Panduit test.

5                MR. STIMPSON:  Okay.  So I have to move to

6     strike everything starting with, but in lieu of that,

7     as nonresponsive.

8                Why don't we take our break, okay?

9                (Recess taken from 9:47 a.m. to

10    10:02 a.m.)

11       Q    (BY MR. STIMPSON)  Okay.  Mr. Hall, later

12    in your report, you talk about various agreements

13    between MDx and third parties and Health Grades and

14    third parties.  And a lot of them are about licensing

15    out data.

16                Do you remember that?

17       A    Yes.

18       Q    Did you consider the Vitals database to be

19    covered by the patent?

20                MR. VAZQUEZ:  Objection.  Calls for a

21    legal conclusion.

22       A    My understanding was that the database

23    alone was not a violation of the patent.

24       Q    (BY MR. STIMPSON)  Okay.  And did you also

25    understand, Mr. Hall, that there are many uses for

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 60

1              CONFIDENTIAL - ATTORNEYS EYES ONLY
2      the Vitals website that are not covered by the
3      patent?
4              MR. VAZQUEZ:  Same objection to the word
5      covered.  Calls for a legal conclusion.
6         A    My understanding is that there could be or
7      are uses other than using the information for a
8      comparison ratings report.  I'm also aware of what
9      Vitals promotes as far as its data and comparison
10     reports and reviews.
11        Q    (BY MR. STIMPSON)  Okay.  And like, for
12     example, you know, if someone gets on the Vitals
13     website and just looks at the directories for doctors
14     A to Z, that's not covered by the patent, right; you
15     understand that?
16             MR. VAZQUEZ:  Object to form.
17        A    That's my understanding.
18        Q    (BY MR. STIMPSON)  And you understand, as
19     you say here in the patent claim, that the patient
20     ratings are part of this patent claim too, right?
21             MR. VAZQUEZ:  Form.
22        A    Are part of it, yes.
23        Q    (BY MR. STIMPSON)  And do you have an
24     understanding of what percentage of the profiles on
25     the Vitals website actually have patient ratings for

Page 61

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    the doctors?

3        A    I may have seen that information, but I
4    don't know a percentage right now.

5        Q    Do you remember if it's actually less than
6    half of them?

7             MR. VAZQUEZ:  Form.

8        A    I don't.

9        Q    (BY MR. STIMPSON)  Okay.  Why don't you
10   turn to page 4 of your report and paragraph 17 there,
11   sir.  Now you're talking about the Health Grades
12   website here, right?

13       A    Yes.

14       Q    Okay.  And the first bullet refers to
15   Health Grades having information on over 5500
16   hospitals; is that correct?

17       A    Yes.

18       Q    And so you understand that you can get on
19   the Health Grades website and search for hospitals?

20       A    Yes.

21       Q    Okay.  And then your last bullet point
22   refers to over 15,000 nursing homes.  Do you see
23   that?

24       A    I do.

25       Q    And you also understand that you can get

Page 62

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      on the Health Grades website and search for nursing

3      homes, right?

4          A      Yes.

5          Q      And then the third way to search is you

6      can search for doctors, right?

7                MR. VAZQUEZ:  Form.

8          A      My understanding is that, yes, you can

9      search for doctors.

10         Q      (BY MR. STIMPSON)  So two of the three

11     ways to search on the Health Grades website are for

12     facilities like nursing homes or hospitals, right?

13                MR. VAZQUEZ:  Form.

14         A      Yes, those two are available.

15         Q      (BY MR. STIMPSON)  Okay.  And so would you

16     agree with me that, you know, those are substantial

17     parts of the Health Grades website?

18                MR. VAZQUEZ:  Object to form.

19         A      They're certainly parts of the website

20     that they identify, yes.

21         Q      (BY MR. STIMPSON)  Are those substantial

22     parts of the website?

23                MR. VAZQUEZ:  Form.

24         Q      (BY MR. STIMPSON)  Let me back up a sec.

25     You've actually visited the Health Grades website,

Page 63

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      right?

3           A     Yes.

4           Q     So would you agree with me that they're

5      substantial parts of the Health Grades website,

6      right?

7                 MR. VAZQUEZ:  Form.

8           A     I would answer it this way.  I believe all

9      of the information there they would consider

10     important and substantial.

11          Q     (BY MR. STIMPSON)  Okay.  The searching

12     for hospitals on the Health Grades website, was it

13     your understanding that that was covered by the

14     Health Grades patent?

15                MR. VAZQUEZ:  Form.

16          A     I don't have that understanding.

17          Q     (BY MR. STIMPSON)  Well, let me just make

18     sure we're clear.  Is it your understanding that the

19     patent does not cover the searching for hospitals?

20                MR. VAZQUEZ:  Form.

21          A     Yes.

22          Q     (BY MR. STIMPSON)  Okay.  And is it also

23     your understanding that the patent does not cover

24     searching for nursing homes?

25          A     That's also my understanding.

Page 64

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               MR. VAZQUEZ:  Form.

3      Q     (BY MR. STIMPSON)  So there's lots of uses

4   of Health Grades' website that aren't covered by this

5   Health Grades patent, even under Health Grades'

6   analysis, right?

7               MR. VAZQUEZ:  Form.

8      A     There are features on both websites that

9   from my understanding do not violate -- well, the

10  Vitals site violates the patent and the Health Grades

11  site uses all the elements of the patent.

12     Q     (BY MR. STIMPSON)  So you would agree with

13  me, Mr. Hall, that the Health Grades website

14  certainly is not coextensive with the patent claims,

15  right?

16              MR. VAZQUEZ:  Form.

17     A     I'm not sure I understand that.  One more

18  time, please.

19     Q     (BY MR. STIMPSON)  Well, the Health Grades

20  website is not coextensive with the scope of the

21  patent, right?

22              MR. VAZQUEZ:  Form.

23     Q     (BY MR. STIMPSON)  They don't have the

24  same scope and the same --

25     A     Oh, coextensive?

Case No. 1:11-cv-00520-RM-NYW Document 397-17 filed 11/21/13 USDC Colorado pg 12
of 145
Case 1:11-cv-00520-PAB-BNB Document 393-1 Filed 11/02/12 USDC Colorado Page 11 of
145

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 65

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      Q      Yeah.

3      A      That's a term I'm -- my understanding is

4   that the patented features that Health Grades has for

5   the '060 Patent are important and promoted by Health

6   Grades.  I understand there's other features on their

7   website.

8           MR. STIMPSON:  Okay.  Move to strike that.

9   Nonresponsive.

10      Q      (BY MR. STIMPSON)  Sir, can you answer

11   that?  Maybe you can't answer the question, that's

12   okay.  But can you agree with me that the Health

13   Grades website is not coextensive with the scope of

14   the patent claim?

15           MR. VAZQUEZ:  Object to form.  Asked and

16   answered.

17      A      I think I would answer it the way I did

18   before, without, you know, referencing the

19   coextensive term.

20      Q      (BY MR. STIMPSON)  So you're not

21   comfortable saying that the Health Grades website is

22   not coextensive with the patent claim?

23           MR. VAZQUEZ:  Object to form.

24      A      It's not the term I would use.  I would

25   answer it as I did.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 66

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Q     (BY MR. STIMPSON)  Okay.  And I assume

3     your answers would be the same for the Vitals website

4     and whether that's coextensive with the patent

5     claims?

6               MR. VAZQUEZ:  Form.

7          A     I would answer the question related to

8     Vitals as, certainly early on in the period they just

9     had -- they had physician searches and not other

10    types of healthcare providers, REDACTED

11    REDACTED                              But that

12    certainly promotes the patented features of the '060

13    Patent at Vitals, but also has other features on

14    their website.

15         Q     (BY MR. STIMPSON)  Okay.  So, for example,

16    you know from your view of the Health Grades website

17    that they have things like articles and tips for

18    consumers, right?

19         A     I recall seeing such things.

20         Q     And those, too, I mean, Health Grades puts

21    that on there, you know.  Those were added to try to

22    generate more consumer interest in the site, right?

23               MR. VAZQUEZ:  Form.

24         A     Yes, I think that's accurate.

25         Q     (BY MR. STIMPSON)  And you've seen the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 67

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     Vitals website?

3          A    Yes.

4          Q    The same thing for the Vitals website,

5     right?  It has articles and tips and things like that

6     that are also added for the purpose of generating

7     interest in their website, right?

8               MR. VAZQUEZ:  Same objection.

9          A    Yes.  Those aren't features promoted the

10    way others were, that I saw from my searches and the

11    documents.

12              MR. STIMPSON:  Move to strike everything

13    after yes.  Nonresponsive.

14         Q    (BY MR. STIMPSON)  Could you please turn

15    to paragraph 21 in your report.

16         A    21, was it?

17         Q    Yes, please.  And you state there, Vitals

18    describes its core IP asset as being the master

19    provided database.

20              Did I read that right?

21         A    You did.

22         Q    Do you agree, sir, that one of the core

23    assets for Vitals is its database?

24         A    I agree that's what Vitals described and

25    one that's indicated in the background section.  I

Case No. 1:11-cv-00520-RM-NYW Document 401-7 filed 11/02/12 USDC Colorado pg 15
of 145
Case 1:11-cv-00520-PAB-BNB Document 367 Filed 11/02/12 USDC Colorado Page 14 of
145

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 68

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      don't contest that, but I am citing it here.
 3           Q    Okay.  If you would turn to your summary
 4      on page 6.  So let me just make sure I understand
 5      this correctly.  I understand these are only through
 6      May of 2012, so let's just talk about that for
 7      simplicity, okay?
 8           A    Yes.
 9           Q    So you calculate the total damages as
10      $2,262,000, right?
11           A    Yes, using lost profits and royalty
12      damages.
13           Q    Right.  And so that's -- you know, if the
14      trial were just through May, you would be asking the
15      jury to award $2,262,000?
16           A    Yes, I would.  Based on the assumptions I
17      indicate and the information contained in this
18      report, yes.
19           Q    Okay.  And you also come up with a
20      12 percent reasonable royalty, right?
21           A    Yes.
22           Q    And in any of the three patent cases you
23      have had in the last four years, have you proposed a
24      royalty rate of 12 percent or higher?
25           A    Yes.
```

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2        Q      Okay.  Are you aware of patent marking?

3    Do you know what patent marking means?

4        A      I do.  But I don't have a legal

5    understanding of it, but I'm familiar with the term.

6        Q      Okay.  Do you understand that if the

7    patent plaintiff did not mark its product with a

8    patent number, then you can't get damages until you

9    either have actual notice of the claim?

10               MR. VAZQUEZ:  Object to the form.  Calls

11    for a legal conclusion.

12        A      I have a general understanding that the

13    parties would contest that issue on when the marking

14    happened, when you can start damages.  I don't have

15    case law understanding or legal understanding.

16        Q      (BY MR. STIMPSON)  That's okay.  Did you

17    do any analysis as to what the damages would be,

18    depending on whether the Court finds that Health

19    Grades properly marked their product with a patent

20    number?

21        A      I did not, other than to do it by the time

22    periods I indicated, which within that information,

23    there is the ability to parse out time periods.

24        Q      Okay.  And you also realize that there's

25    two versions of the Vitals website here, right,

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  there's one before January 2011 and there's one --

3  and it was changed in January 2011, right?

4      A    Yes, I had that understanding.

5      Q    And you assume that both of them infringe,

6  right?

7      A    I have made that assumption, yes.  And

8  back to my answer, I don't have a firsthand knowledge

9  of having clicked on the Vitals website.  I know from

10  the deposition testimony and the record in the case

11  that there is an assertion that the website changed

12  at that time.

13      Q    Okay.  So have you, since you were hired

14  by Health Grades, have you gotten on the Vitals

15  website?

16      A    Yes.

17      Q    Okay.  How many times did you do that?

18      A    Several is my recollection.

19      Q    Okay.  So let's go to paragraph 28, okay.

20  This is where you start your discussion of demand,

21  right?

22      A    It is.

23      Q    And we've talked about attachment 1 and

24  the documents you have used there so I won't go over

25  that again.  In your second sentence there -- well,

Page 72

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      actually, let me read the first two sentences.
 3              Attachment 1 presents Health Grades'
 4      income statements for the years ended December 31,
 5      2008 through December 31, 2011 and from the
 6      four-month period ending April 30, 2012.  These
 7      income statements were compiled from the various
 8      departments that report the revenues and costs
 9      associated with the patented invention.
10              Let me just stop right there.  First of
11      all, did I read that correctly?
12          A    Yes.
13          Q    What do you mean, Mr. Hall, when you refer
14      to departments that report revenues and costs
15      associated with the patented invention?
16          A    Exactly that.  In cases such as this, I
17      attempt to isolate the revenues and expenses and
18      therefore profitability of the company's use of the
19      patented features.  In some cases, various products
20      or it just depends on the company.
21              So this sentence refers to that effort.
22          Q    So, I mean, but for this case, what
23      criteria did you use to determine if revenue was
24      associated with a patented invention?
25          A    The criteria was the features of the
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 73

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      patent and how Health Grades used those and

3      discussions with Andrea Pearson and Allen Dodge

4      starting with, does all of Health Grades' business

5      activity relate or use the patented features.  The

6      answer was no.

7              And from that I said, do they have

8      financial information kept in the normal course of

9      business that relates to a subset of their business

10     activity that uses the patented features in some

11     form.  And the answer was yes.

12             And there were certain departments that

13     did.  And I wanted those departments identified and

14     requested the financial information for those

15     departments so I could have a metric of the revenues

16     and expenses of how Health Grades uses the patented

17     features.

18     Q     So who was it, then, that made the

19     determination of what parts, quote, uses the patent?

20     A      In the discussions of the business

21     activities of Health Grades, Allen Dodge and Andrea

22     and myself and JP Anderson discussed which

23     departments, what business activities were associated

24     with the departments, and which, in Health Grades'

25     view, utilized the '060 Patent to generate revenues,

Case 1:11-cv-00520-PAB-BNB   Document 367   Filed 11/02/12   USDC Colorado   Page 13 of 145

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 74

```
1           CONFIDENTIAL - ATTORNEYS EYES ONLY
2      or if there were expenses associated with the use of
3      the '060 Patent, even if there weren't revenues in
4      departments, to include those as well.
5              And that's what is referenced in these
6      first two sentences you read.
7      Q    So what business activities of Health
8      Grades were identified as using the '060 Patent?
9      A        Certainly, their advertising efforts as
10     they drive, attempt to drive traffic up and drive up
11     their advertising revenue.
12             They also use the patented features or
13     have over the years to -- as part of their effort in
14     other businesses such as consulting to physicians, as
15     far as improving quality and ratings related to
16     assisting providers and facilities in improving their
17     ratings.
18     Q     Anything else?
19     A     Yes.  There was, I understand from John
20     Neal's deposition testimony and from discussions with
21     Andrea and Allen, that he believes it's even more
22     expansive as far as how they use the '060 Patent.
23     That it goes to the core of all of their businesses
24     as far as the unique experience website visitors will
25     have that really drives all of their business
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 75

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2    activity.  I understand John Neal's view on that, but

3    I wanted to limit it to what Health Grades' CFO and

4    Andrea Pearson, as we discussed department by

5    department, what was related to the '060 Patent.

6         Q    So what I'm trying to do here, Mr. Hall,

7    is I'm trying to figure out how you determined sort

8    of what was associated with the patented invention.

9    And you told me that there -- or you identified

10   certain business activities by talking to Andrea

11   Pearson and Mr. Dodge.  But what I need is, I need a

12   list of what those activities are.

13              I mean, is that in your report anywhere?

14        A    Yes, a reference is in my report.

15        Q    And where are those referenced in your

16   report?

17        A    Attachment 1 lists all the revenue and

18   expense categories that are in departments that have

19   revenue or expenses associated with Health Grades'

20   using the patented features.

21        Q    Right.  But they don't really identify all

22   the activities, do they?  Take a look at Exhibit 1.

23   So maybe that will become clear.

24              MR. VAZQUEZ:  Attachment 1?

25        Q    (BY MR. STIMPSON)  Yes, attachment 1.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 76

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    It's Exhibit 70 -- actually, what is the exhibit
 3    here?
 4              (Discussion off the record.)
 5              MR. STIMPSON:  Let's mark as Exhibit 81
 6    attachment 1 to Mr. Hall's report.
 7              (Exhibit 81 marked.)
 8       Q    (BY MR. STIMPSON)  So we're looking at
 9    attachment 1.  I have no idea what my question was
10    now.
11              Oh, I know.  Mr. Hall, we were talking
12    about, I'm trying to get a list of the business
13    activities that you say fall under, as you say in
14    your report, are associated with the patented
15    invention.  Can you tell me what those are?  I need a
16    complete list.  If it's somewhere in attachment 1,
17    that's easy too.
18       A    Well, the revenue categories are listed
19    there.  Again, we went through those with Mr. Dodge
20    and Ms. Pearson and also referencing Health Grades'
21    10-K, which describes those for 2009.  And gained an
22    understanding at the different time periods indicated
23    how it is Health Grades utilizes the patented
24    features to generate revenue and these associated
25    expenses.
```

Page 77

CONFIDENTIAL - ATTORNEYS EYES ONLY

1              With a note on page 8, footnote 21, I want

2   to point out, that says, As noted elsewhere in this

3   report, revenues reported by the various departments

4   include more than that of the patented invention.

5   However, Health Grades did not separately report the

6   revenue expenses related to the patented invention.

7   Therefore I included these entire departments in

8   their entirety, versus taking a departmental P&L and

9   parsing it out or doing an analysis.

10             As that note indicates, if these

11   departments had any part of their revenue or expenses

12   that related to their use, either generating revenue

13   or expenses, for that matter, with the patented

14   features, I included the departments in attachment 1.

15     Q    So there may be a lot more in attachment 1

16   in terms of revenue or whatever else is in there than

17   just the business activities revenue generated from

18   business activities, associated with the patent?

19     A    That is a fact.  There is more, yes.

20     Q    Okay.  So how much more?

21     A    The advertising network is the primary

22   revenue source that I believe from my analysis and

23   discussions that relates to the use of the patented

24   features.  It's not the entirety of the revenue as

Page 78

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    they use the rating systems at different periods in
 3    time to help with other revenue-generating
 4    activities.
 5              But the advertising revenue is what I
 6    limited and focused my analysis on as far as Health
 7    Grades' damages.
 8         Q    How much revenue from attachment 1 is
 9    included in attachment 1 but doesn't relate to these
10    business activities regarding the '060 Patent?
11              MR. VAZQUEZ:  Form.
12         A    I have not made a calculation of that.
13    The Health Grades cites the features and promotes the
14    features of its '060 Patent in a variety of ways and
15    has over the years and believes it to be a key part
16    of their website for the unique experience they try
17    to provide and believes that a substantial portion of
18    their traffic over the years and ad revenue relates
19    to the use.
20              I understand John Neal's view, as well as
21    Mr. Dodge's and Ms. Pearson's, as well as what is
22    yielded from the ones who have been deposed
23    testimony.  And also contemporaneous, pre-litigation
24    documents that cite the patented features.
25         Q    Can you tell me if $100 or more of the
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 79

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      revenue in attachment 1 is unrelated to the '060
 3      Patent?
 4          A     I have not made that determination.
 5          Q     Can you tell me if 10 million or more in
 6      revenues of attachment 1 are unrelated to the '060
 7      Patent?
 8          A     From my analysis, I think a substantial
 9      portion of their website traffic is generated based
10      on the use of the patented features.  As search
11      engines pull up the rating systems, and the
12      information they have available, it's their -- my
13      analysis concluded they're really the key feature or
14      their most prominent feature relates to the patent.
15              As far as the each and every visitor,
16      other than as I identified in the report, the
17      co-visitors, I have not made a mathematical
18      determination of a split between the patented
19      features revenue and non-patented features revenue.
20          Q     Right.  But my question, sir, was, can you
21      tell me whether or not $10 million or more of the
22      revenue of attachment 1 are unrelated to the '060
23      Patent?
24              MR. VAZQUEZ:  Object.  Asked and answered.
25          A     I thought I'd answered that.
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 80

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q    (BY MR. STIMPSON)  What is the answer?  Is

3  it no?  You can't tell me, right?

4           MR. VAZQUEZ:  Object.  Asked and answered.

5  Argumentative.

6      Q    (BY MR. STIMPSON)  I'll rephrase it.

7  Maybe it will be easier this way in another question.

8           Mr. Hall, you can't tell me -- let me

9  rephrase it.

10          You don't know one way or another whether

11 $10 million or more of the revenue in your attachment

12 1 is unrelated to the '060 Patent?

13          MR. VAZQUEZ:  Form.

14     A    I have not made a calculation.  And

15 therefore, would not say if it's $10 million or more.

16 I have studied what they promote and understand what

17 they believe they generate through ad revenue based

18 on the patented features.

19     Q    (BY MR. STIMPSON)  What business

20 activities -- we come back to this question again

21 because I've really got to try to nail it down.

22 You've talked about this attachment 1.  But I'm

23 trying to get a list of the business activities that

24 you use in your attachment 1 that you say are

25 associated with the patented invention.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 81

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2                   What are those business activities?
 3              MR. VAZQUEZ:  Form.
 4         A     It would start with the advertising
 5    revenue.
 6         Q     (BY MR. STIMPSON)  Well, that's revenue.
 7    That's not an activity, right?
 8         A     It's related to the business activity of
 9    having a website and earning ad revenue from that
10    website.
11         Q     Okay.  So your activities are -- so all
12    the ad revenue you consider to be a business activity
13    related to the '060 Patent?
14         A     I would phrase it this way:  That their
15    use of the features of the '060 Patent on their
16    website is certainly a business activity Health
17    Grades pursues to earn revenue from advertisers.
18         Q     Okay.  What other activities did you
19    include as being associated with the '060 Patent?
20         A     For purposes of calculating revenues and
21    expenses for departments that use the features of the
22    '060 Patent or had over time, there is, prior to
23    2011, there is consumer reports and watchdog, halfway
24    down through the revenue list in 2010, there's
25    ████ million listed, just for 2010.
```

Veritext/NJ Reporting Company

800-227-8440                                    973-410-4040

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 82

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY

 2        Q     Okay.  So did you consider then consumer

 3   reports and watchdog all to be associated with the

 4   '060 Patent?

 5        A     No.

 6        Q     Did you consider part of it to be?

 7        A     For purposes of calculating profit from a

 8   subset of the entire company and excluding activities

 9   that have -- and departments that have no relation to

10   the '060 Patent, I included it as the revenue base

11   for 2010, with the understanding that Health Grades

12   contends and I gained an understanding based on their

13   description of it, that both the information covered

14   in the patent and the comparison ratings were used to

15   generate those reports through December of 2010.

16              So it's included on attachment 1 for that

17   reason.  And any of the revenue and expenses with the

18   departments that covered that category would also be

19   in that column, top to bottom, on attachment 1.

20        Q     I'm still struggling with that as far as

21   identifying these business activities associated with

22   the '060 Patent.  So far, for sure, advertisements.

23              Is there anything else?

24              MR. VAZQUEZ:  Form.

25        Q     (BY MR. STIMPSON)  Maybe I missed
```

Page 83

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    something in that answer.  It was a long answer.

3         A    Selling reports that I just answered to.

4         Q    (BY MR. STIMPSON)  Selling reports, okay?

5         A    Did you include that?  That was part of my

6    answer.

7         Q    Well, it was a long answer.  I didn't

8    quite get it.  So selling reports is another thing,

9    right?

10             And what revenues on this is that --

11        A    Excuse me.

12             MR. VAZQUEZ:  Form.

13        A    The year 2010; ███████████.

14        Q    (BY MR. STIMPSON)  You thought all that

15   was within the '060 Patent, right?

16        A    No.

17        Q    Okay.  What part did you think it was on

18   there?

19        A    I didn't make a determination as a portion

20   of that.  I included it because Health Grades used

21   its patented features to generate some of the revenue

22   for this report.

23             I didn't make a determination if it was

24   all of it.  I wanted on this schedule to reflect all

25   of the departments that had any revenue or expenses

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 84

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      with activity associated with the '060 Patent.  And
 3      that's why it was included in attachment 1.
 4          Q     You realize, though, that a lot of
 5      profiles on the Health Grades website don't have
 6      patient ratings?
 7          A     I do.
 8          Q     And that's in fact even true today, right?
 9          A     Yes.
10          Q     Okay.  So you don't have any idea what the
11      percentage would be of those sales of reports that
12      might fall in the '060 Patent, do you sir?
13          A     I have not made a determination of that.
14          Q     Okay.  So I've got advertisements.  I've
15      got sales of reports.  What other activities do you
16      consider to be under the '060 Patent?
17          A     There's some of these categories relate to
18      SQI sales, SQP, that relate to their -- as described
19      to me and as described on their 10-K, relate to some
20      of their consulting efforts.  Strategic Quality
21      Partnership and others, Quality Assessment and
22      Implementation in different time periods where they
23      used comparison ratings and the information covered
24      under the patent to perform consulting services to
25      earn revenue that's indicated on attachment 1.
```

Page 85

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2          So SQP, PSEA, these are all acronyms shown

3  in their departmental statements as well as in their

4  2009 10-K.  And I have a description of those and

5  we -- I can read through those descriptions or

6  describe the discussions we had related to those.

7          But there was all activities that Health

8  Grades identified as related to their use of the

9  patented features to generate revenue or incur

10  expenses or both.

11     Q    So you basically just relied on what

12  Health Grades told you was related to the '060

13  Patent, right?

14          MR. VAZQUEZ:  Object to form.  Misstates

15  testimony.

16     A    A large part on the determination of a

17  subset from their company as a whole of their revenue

18  and expenses was Health Grades' knowledge of their

19  use of the '060 Patent.  I discussed and gained an

20  understanding of that, and looked at the departmental

21  statements and compiled them here, but that certainly

22  was a part of my analysis, was their view of how they

23  use the '060 Patent to generate revenue and incur

24  expenses, yes.

25     Q    (BY MR. STIMPSON)  And you know the person

Page 86

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   who is doing the infringement analysis for Health
3   Grades is Dr. Greenspun, right?

4       A    Yes, I'm aware of that.

5       Q    And was he involved in any of this?

6       MR. VAZQUEZ:  Form.

7       A    Not directly with me.  I did not rely on
8   Dr. Greenspun for this.

9       Q   (BY MR. STIMPSON)  Well, do you know of
10  any way that Dr. Greenspun, the guy who is hired by
11  Health Grades to say what does and doesn't fall under
12  the patent, do you know if he was involved in any way
13  in determining what business activities related to
14  the '060 Patent?

15       A    Not beyond what I have read in his report.
16  I've read his report or both reports.

17       Q    Right.  But you read his report after you
18  did this analysis for your report, right?

19       A    True.

20       Q    Okay.  So Dr. Greenspun had nothing to do
21  with your conversations and work with the Health
22  Grades people in determining what should we say falls
23  under the '060 Patent, right?

24       MR. VAZQUEZ:  Form.

25       A    He did not.  Though I don't think that was

Page 87

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2    the characterization, what should they say.  They

3    analyzed their departments and went through it,

4    Mr. Dodge and Ms. Pearson, to discern what their

5    activities that yielded revenue expenses related to

6    the patent, versus what should they say.

7        Q    (BY MR. STIMPSON)  And so, as opposed to

8    -- when you were having these conversations with

9    Ms. Pearson and Mr. Dodge, and trying to figure out

10   what activities related to the '060 Patent, did you

11   have the patent out in front of you?

12       A    We may have.  Certainly, it was in the

13   support binder that we generally used to perform the

14   work.  I don't recall it being out and reading it

15   specifically.

16       Q    So did anybody, in making this

17   determination, say, Hey, look, we've got to get out

18   the patent here and try and figure out what -- make

19   sure the patent claims match up to what we're saying

20   are activities related to this patent?

21            MR. VAZQUEZ:  Form.

22       A    I don't recall that specifically.  But the

23   knowledge of the patent certainly was in the room, as

24   far as Mr. Dodge and Ms. Pearson and our review of

25   the patent claims.  And what Health Grades promoted

Page 88

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     as its features.

3          Q    (BY MR. STIMPSON)  Okay.  So you mentioned

4     as your third business activity, SQI and this SQP,

5     PSEA, and OPA -- OPEA sales as also being business

6     activities that you determined with Health Grades'

7     people were associated with the '060 Patent, right?

8          A    Yes.

9          Q    Okay.  And why?

10         A    That Health Grades' description of the use

11    of the patented features to generate revenue from

12    activities in these departments listed.

13         Q    So you just rely on Health Grades telling

14    you that, yeah, the patent relates to us generating

15    revenues from these?

16              MR. VAZQUEZ:  Object to form.

17         A    After discussion and description of the

18    business and the decision on my part not to try to

19    parse out because I don't believe I had a basis for

20    parsing from within a department P&L to -- a

21    reasonable basis or would not be as reasonable as

22    taking all of the departmental revenue and expenses

23    to, after the fact parse out revenue expenses related

24    to the patent.

25              My decision to use all of the departmental

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 89

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    revenue and expenses, if any part of the departmental
 3    revenue and expenses was related to the patented
 4    features.
 5            Q     (BY MR. STIMPSON)  So let's just take SQI
 6    for example.  Do you know what that means?
 7            A     Yes.
 8            Q     What does it mean?
 9            A     Strategic quality initiative.
10            Q     Okay.  And why specifically was that
11    included as an activity related to the '060 Patent?
12            A     Well, the -- I would look back at the work
13    papers.  But if SQI sales were involved in a
14    department that had revenue, whether or not SQI
15    specifically was involved, it would show up on
16    attachment 1.
17            Q     Right.  But, I mean, was there any
18    determination made to say, Hey, look, SQI is an
19    activity related to the '060 Patent and this is why.
20    Did anybody do that?
21            A     Yes, we had that discussion.
22            Q     Okay.  So what was the reasons for
23    including SQI as an activity related to the '060
24    Patent?
25            A     Related to their ratings and their
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 90

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2    assistance with -- on a consulting basis to assist in

3    improving the ratings and part of the rating services

4    of Health Grades.

5           Q      So how do they get revenue from SQI?

6           A      I believe fees paid by the hospitals.

7           Q      And what are those fees paid for?

8           A      Business development and marketing tools

9    Health Grades provided to the hospitals.

10          Q      So you included, in revenue related to the

11   '060 Patent, revenue Health Grades receives by them

12   providing marketing tools to hospitals?

13          A      I included the departmental revenue that

14   includes SQI revenue and expenses as part of a subset

15   of Health Grades' overall financial statements, to

16   attempt to exclude any departments that do not either

17   have any revenue or expenses -- do not have revenue

18   or expenses associated with the '060 Patent.

19          Q      So maybe, you know, instead of going

20   through all this, we can just kind of cut to the

21   chase here, Mr. Hall.

22                 I mean, would you agree with me that what

23   portion of all these revenues are truly associated

24   with the '060 Patent, a lot of that is since there

25   are no records showing it, a lot of that is just pure

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 91

2    speculation, right?

3          MR. VAZQUEZ:  Object to form.

4      A    No.

5      Q    (BY MR. STIMPSON)  Okay.  Well, why -- can

6    you give me any certainty, then, as to what part of

7    SQI is related to the '060 Patent?

8      A    I could look at the work papers related to

9    it, but the intent was to identify without what I

10    would view as something that would go into

11    speculation, as parsing a departmental P&L after the

12    fact, based on what uses the patented features or

13    not.

14          My decision was to obtain a subset from

15    all of Health Grades' P&L, which is profit and loss

16    statements, of any departmental revenue or expenses

17    that was generated during the time periods indicated

18    that related to the patented features, and exclude

19    any that did not at all relate to it.

20      Q    Okay.  Well, actually, in your damages

21    analysis, you actually use the full █████████

22    number, right?  You didn't exclude anything?

23      A    I do not.  I don't agree with that.

24      Q    Okay.  Well, let me just see if we can get

25    to that.  You know, let's just take it in order and

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 92

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     we'll get back there.
 3              So what other business activities
 4     associated with the '060 Patent did you consider with
 5     regard to this paragraph 28?
 6        A    The Internet business group activity from
 7     '08 to '09.
 8        Q    So what were they doing to generate, like
 9     I see in '08, there is almost $7 million, right?
10        A    Yes.  And in '09, 4.5 million.
11        Q    So what were they doing?
12        A    After then after that, the activities in
13     that group were captured in the advertising network,
14     is my recollection of our discussion of that.  But
15     using the comparison ratings and the information
16     sources to generate revenue.
17        Q    Let's take 2008.  $6,944,020, where did
18     that revenue come from?  How it was generated?
19        A    I'll look back at the 10-K to refresh my
20     recollection.
21              My recollection is as they were
22     transitioning their business model to advertising
23     network revenue, which is the top line, they were
24     generating revenue from the Internet business group
25     with advertising as well.
```

Page 93

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      Q      So is it your testimony that the Internet

3  business group, all that money is all advertising?

4      A      No, it's not.

5      Q      Okay.  What else is there, then?

6      A      I would have to look at my work papers to

7  recall 100 percent.

8      Q      Okay.  And those work papers were not

9  produced, right, the ones we talked about earlier?

10      A      I don't recall talking about this work

11  paper that I'm referencing, earlier.

12      Q      Okay.  Maybe it's a different work paper.

13  But anyway, was it produced?

14      A      I don't know.

15      Q      Okay.  What other business activities did

16  you consider to be associated with the '060 Patent?

17      A      Again, with the preamble I've had before,

18  that if any part of it was in a business, in a

19  department, it was included in here, was the way I

20  approached it, once I understood that they did not

21  have contemporaneous or financial statements in the

22  normal course.  That was strictly limited to the

23  patented features.  With that caveat, advertising

24  sponsorships from 2008.

25      Q      Okay.  Anything else?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      That was a category they had in a

3   department prior to creating for 2009 forward the

4   advertising network.

5      Q      Okay.  What else?

6      A      Connecting Point, fourth down in 2009 and

7   2011.

8      Q      And so what generated that revenue?

9      A      Health Grades designed premium profiles

10  for physicians that incorporated the source verified

11  information covered in the patent, as well as rating

12  services.

13     Q      So it was just physicians paying Health

14  Grades to design reports for them?

15     A      Not just that, no.  There was other

16  components, including certain advertising revenue

17  related to website traffic to the Connecting Point

18  with the physician.

19     Q      Okay.  What else did you consider to be

20  business activities associated with the '060 Patent?

21     A      Patient Direct Connect.

22     Q      Okay.  And what's that?

23     A      It's another -- it's focused on the

24  patient versus the physician as far as Connecting

25  Point related to that.  And again, would generate

Page 95

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2   revenue based on advertisement placements, is my

3   recollection.

4      Q    So what advertisements?  I'm not sure I

5   understand.  What is Patient Direct Connect?

6      A    It's a local connection between online

7   patients and providers initiative that they tried for

8   the years indicated and earned revenue.

9      Q    So it's basically just a way to hook up a

10  patient with a doctor, right, they give them a way

11  for the patient to connect to the doctor?

12         MR. VAZQUEZ:  Form.

13     A    As I recall from discussions and as is

14  described in their 10-K, it's, you know, for a fee,

15  clients were provided the opportunity to engage and

16  assist patients searching for provider information,

17  Physician Quality Reports and other information that

18  related to ratings and the information sources that

19  Health Grades uses on its website.

20     Q    (BY MR. STIMPSON)  What 10-K are you

21  looking at there?  And what are the Bates numbers?

22     A    It's the 2009 form 10-K which is the last

23  full year prior to the grant of the patent.  It's

24  HG 0001580 through 1649.

25     Q    Okay.  And -- but actually -- so you

Page 96

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2   identified Patient Direct Connect.  How about -- what

3   else did you consider to be business activities

4   associated with the '060 Patent?

5       Is it basically all the stuff listed under

6   revenue here, of attachment 1?

7       MR. VAZQUEZ:  Form.

8       Q    (BY MR. STIMPSON)  To cut to the chase

9   here a bit?

10      A    All the revenue and expenses listed here

11  were in departments listed above.  All departments

12  listed above that had, those departments had some

13  amount of activity, revenue and expenses, or versus

14  activity, revenue and expenses that Health Grades

15  believes and describes as relates to the '060 Patent,

16  the use of the '060 Patent features.

17      And so as I said earlier, rather than

18  parsing out within any department after the fact of

19  which I don't think is supportable or reasonable, I

20  included all of the departments that had any

21  relationship to the '060 patented features and

22  created attachment 1 to measure the revenue and

23  expenses for all of those departments.

24      Q    (BY MR. STIMPSON)  Okay.  But attachment 1

25  does not give us an accurate picture of the revenue

1         CONFIDENTIAL - ATTORNEYS EYES ONLY

2 associated with the '060 Patent because as we talked

3 about earlier, there's a lot more that may be

4 included there that is not related to the '060

5 Patent, right?

6         MR. VAZQUEZ:  Form.

7     A    Attachment 1 was not intended to identify

8 all the revenue associated with the '060 Patent.

9 There is more here than -- yes.

10     Q   (BY MR. STIMPSON)  In fact, we can't

11 really know what revenue is associated with the '060

12 Patent, as you candidly state in your footnote 21.

13 There just aren't documents to show that, right?

14         MR. VAZQUEZ:  Form.

15     A    That is accurate.  And also my experience

16 on other cases, that companies don't create P&Ls

17 based on intellectual property, but rather

18 departments and business activities.

19     Q   (BY MR. STIMPSON)  Okay.

20         MR. STIMPSON:  How long have we been

21 going?  What time is it?

22         MR. VAZQUEZ:  An hour.

23         MR. STIMPSON:  Why don't we take a break.

24         (Recess taken from 10:55 a.m. to

25 11:12 a.m.)

Page 98

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Q     (BY MR. STIMPSON)  Can we go to paragraph

3    29 of your report, please.

4          A     Yes.

5          Q     The first sentence of paragraph 29 says,

6    One of the claims of the '060 Patent is that visitors

7    to its website can access data on a first healthcare

8    provider.

9          We talked about this just a little bit

10   before, Mr. Hall.  But you understand that that's not

11   a claim of the patent, right?  That's just an element

12   of one claim.

13         MR. VAZQUEZ:  Object to form.

14         A     You know, I would defer to legal counsel

15   on that.  I cite the court order regarding claims

16   construction and the quote from that.

17         Q     (BY MR. STIMPSON)  Right.  But I'm just

18   trying to figure out what you meant in your report

19   here, where you said that one of the claims was that

20   visitors to its website can access data on a first

21   healthcare provider.

22         Would it be more accurate -- would you

23   understand it to be more accurate, Mr. Hall, to say

24   that one of the elements of the claims of the '060

25   Patent is that visitors to the website can access

Page 100

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     who come to the website to research hospital

3     information generate advertising revenue for Health

4     Grades and Vitals?

5          A     Yes.

6          Q     Is it also true, sir, to say that visitors

7     who come to the website to research nursing home

8     information generate advertising revenue for Health

9     Grades?

10         A     Yes.

11         Q     Is it also true that visitors who come to

12    the website and seek directions to a doctor's office

13    are generating revenue for the Health Grades website?

14         A     Yes.

15         Q     Is it also true to say that visitors who

16    come to the website to make appointments with doctors

17    are generating advertising revenue for Health Grades?

18         A     Yes.

19         Q     Is it also true to say that visitors who

20    come to the website to read articles and tips

21    provided by Health Grades or Vitals are generating

22    advertising revenue for Health Grades and Vitals?

23         A     Yes.

24         Q     Is it also true to say that visitors who

25    come to the website to do many other things that are

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 101

1                CONFIDENTIAL - ATTORNEYS EYES ONLY

2       on those websites are also generating advertising

3       revenue, right?

4                MR. VAZQUEZ:  Object to form.  Vague and

5       ambiguous.

6           A    I would answer it as the visitors to the

7       website for, my understanding is, any and all reasons

8       would result in advertising revenue for these

9       companies.

10          Q    (BY MR. STIMPSON)  Okay.  Thank you.

11               Paragraph 30, you first refer to this

12      $22 million figure for Health Grades from attachment

13      1 that we talked about, right?

14          A    Yes.

15               REDACTED

16

17

18

19

20

21

22

23

24          Q    (BY MR. STIMPSON)  Okay.  Now, your

25      concluding sentence in that paragraph says, this

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 102

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     advertising revenue, combined with the website

3     visits, demonstrates the demand from the claims

4     embodied in the '060 Patent.

5               What's your basis for saying that,

6     Mr. Hall?

7          A     The basis is both the, as I mentioned

8     earlier, the -- what both these companies promote in

9     the information I received related to their business

10    overview as their features they have for consumers to

11    visit their websites, as well as the marketing

12    information.

13              That includes two business overviews for

14    Vitals, its financial information and the financial

15    statements which indicates its business, if you will,

16    mentioning the patented features, as well as the

17    market of visitors gravitating to Health Grades and

18    Vitals as indicated in the web visits.

19              I say in that statement, as well as the

20    deposition testimony I read, and the Health Grades

21    10-K, as far as what it describes what its business

22    is.

23              And that's a partial list.  But it's

24    really everything I looked at relates to what the two

25    companies promote as their features.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 103

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               Also my searches on the web referenced

3     earlier that pulls up in bold ratings and reviews for

4     both companies.

5               It's the first thing a visitor to Google

6     or Yahoo will see.  And that has resulted in those

7     two entities having half the market and growing over

8     time during the infringement period.

9          Q    Anything else?

10         A    I guess two different Vitals or MDx

11    financial statements, two of their business

12    overviews.  Health Grades' business overview I would

13    include in that list.

14         Q    Anything else?

15         A    There may be, but that's what comes to

16    mind as to demonstrate the demand for this product.

17    The market's reaction is a strong component of it as

18    far as what the two companies promote and then how

19    the market has responded to that, as opposed to what

20    other information sources online are available.

21         Q    Okay.  So all those things that you cited

22    as supporting that statement, are any of them

23    identified here as support for this paragraph 30?

24         A    They're identified throughout my report.

25         Q    Okay.  Can you --

Case 1:11-cv-00520-PAB-BNB Document 337 Filed 11/02/12 USDC Colorado Page 48 of
145

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 104

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      I cite a case here as far what -- what

3   demonstrated, what my understanding of case law in

4   demonstrating, the need for demonstrating demand for

5   the product or of the patent features.

6      Q      Okay.  So I'm trying to get a handle on

7   what your actual documentary support is for saying

8   there is demand.  And can you identify those

9   documents for me, please?

10     A      Yes.

11     Q      And show me where they are in your report,

12   please?

13     A      The first document is Vitals' business

14   overview, progress, strategy and plans.

15     Q      What's the Bates number, please?

16     A      MDx 0012688.

17     Q      Okay.

18     A      Through 12756.

19     Q      Okay.

20     A      In addition to being -- should I do all

21   the sources and then show where they're at?

22     Q      Yeah, let's do that.  We'll do the sources

23   first and then we'll go back and try and find them in

24   the report.

25     A      Okay.  Another business overview, Vitals

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      MDx 0012882 through 12934.

3          Q      12934, okay.

4          A      Correct.

5              MDx's audited financial statements years

6      ending December 31, 2011 and 2010.  MDx 0104440

7      through 104466.

8              I have referenced before Health Grades'

9      form 10-K, HG 0001580 through 1649.

10             MDx audited financial statements years

11     ending May 31, 2009 and 2008.

12         Q      Do you have a Bates number?

13         A      Oh, sorry.  MDx 0104632, 0104649.

14             Then Allen Dodge deposition testimony,

15     pages in the 250s towards the end of his deposition,

16     is my recollection.

17         Q      Anything else?

18         A      There's discussions I referenced earlier

19     with Andrea Pearson and Allen Dodge.  Then there's

20     the Health Grades investor day presentation,

21     HG 0001728 through 1800.

22         Q      Anything else?

23         A      Those are what come to mind right now.

24         Q      So you have a section in your report

25     headed demand, starting right before paragraph 28,

Page 106

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2       right?

3            A       Yes.

4            Q       Are any of those documents or deposition

5       testimonies referenced in that section anywhere?

6            A       Not with footnotes.

7            Q       In any way?

8            A       Elsewhere in the report and my attachments

9       they're cited, especially when I do the website

10      visits.  And they're cited there as well, in the

11      attachments, as well as in other places in my report.

12           Q       But my question is, when I sat down to

13      review this report to prepare for your deposition,

14      how could I have possibly known that you were using

15      any of these to support your demand analysis?

16                   MR. VAZQUEZ:  Form.

17           A       Having read, for example, through page 5

18      as part of the background of the companies and

19      discussions of the patent and the patented features.

20      Footnote 10 is a snapshot of Vitals from business

21      overview, progress strategy plan.

22           Q       (BY MR. STIMPSON)  Hold on just a second.

23      And that's the second document you reference, right?

24           A       Yes.

25           Q       Okay.  That's not cited in your section on

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 107

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    demand, is it?

3         A    I didn't recite every source that I relied

4    on.  I wanted to -- it is not, is the answer, no.

5         Q    Right.  I mean, and in fact, the paragraph

6    it's cited for just says that Vitals began operations

7    in July 2006.  Initially the company spent 18 months

8    collecting data and building its website.  About

9    REDACTED

10

11

12

13        A    That's the cite.

14        Q    And the word demand is not in that

15    paragraph, right?

16        A    No, compounded annual growth relates to a

17    demonstration of demand as it promotes the patented

18    features and then experiences growth from that.

19        Q    Where does it say promotes patented

20    features in this paragraph?  In fact, the patent

21    isn't even mentioned in paragraph 19, is it?

22        A    It is not.  I don't in every paragraph

23    restate every point I'm making with respect to the

24    patented features and then the demand.

25        Q    Okay.  So you found one footnote that is

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    outside the demand section in your report that
 3    mentions one of these eight things you gave me.
 4            Is there any other way I could know from
 5    reading your report that you were relying on any of
 6    these other things for your demand analysis?
 7            MR. VAZQUEZ:  Form.
 8       A    Yes.
 9       Q    (BY MR. STIMPSON)  Okay.  Can you tell me,
10    please?
11       A    The next sentence.  Vitals describes its
12    business as an online healthcare directory service
13    provider in the audited financial statements it
14    referenced earlier.
15            And in the organization section -- well,
16    in the next sentence as well.  And it's an Ibid.
17    footnote below.  And if you reference the next
18    section, or sentence, it references one of the
19    sources as far as online healthcare directory service
20    allows users to compare and rate physicians on its
21    primary website.  It's the first sentence of the
22    description of the organization and entity MDx.
23       Q    What page are you referring to now?  I
24    mean, actually, this is one of the problems.  And
25    I'll just tell you bluntly.  I don't have any of
```

Page 109

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    these documents with me because I couldn't match this

2    up.  So I can't even really ask you about it.

3            But this document you're looking at is in

4    your binder and it's a marked-up copy of something

5    you have used, right?  And which document is that you

6    just read from?

7         A    It is a referenced copy, is what I would

8    say.  It is MDx 0104440, MDx's audited financial

9    statements.

10        Q    Okay.  And so read me the part again,

11   please, that you think supports demand.

12        A    MDx operates as an online healthcare

13   directory service provider.  MDx Medical allows users

14   to compare and rate physicians on its primary

15   website, Vitals.com, and its recently acquired

16   websites.

17           Part of demonstrating demand is gaining an

18   understanding of what the companies promote to try

19   and attract business.  And to the extent that compare

20   and rating physicians is the lead-in sentence, as

21   well as the other sources, is to me a demonstration

22   of what Vitals is doing to attract demand for its

23   website, which yields advertising revenue.  So that's

24   how it is related to the demand.

25

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q    Okay.  So it's your belief then, Mr. Hall,

3      that by showing that these companies promoted certain

4      features, that's enough to show demand for the patent

5      invention?

6           MR. VAZQUEZ:  Form.

7      A    No, that's not my testimony.

8      Q    (BY MR. STIMPSON)  Okay.  So is it your

9      understanding that promoting a patented feature is

10     enough by itself to show demand under federal circuit

11     law?

12          MR. VAZQUEZ:  Form.  Calls for a legal

13     conclusion.

14     A    That's not my understanding.

15     Q    (BY MR. STIMPSON)  So -- I think we have

16     too many negatives going on here.

17          So you in your view agree that it requires

18     more than just Health Grades or Vitals saying, Hey,

19     look, here is a cool feature on our website, to show

20     demands for the patented product, right?

21          MR. VAZQUEZ:  Form.

22     A    That's certainly my view.  I don't have a

23     view related to, of course, the federal circuit.  But

24     it's part of an analysis I performed.

25     Q    (BY MR. STIMPSON)  And the rest of --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 111

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      And an important one as to what they're

3   promoting to the market.  And then how the market

4   responds to that is an important part as well.

5      Q      Okay.  And what evidence do you have that

6   the market responded to that statement you just read

7   for me in the MDx document?

8      A      Along with the other business overview and

9   other sources I cited, demonstrates to me that Vitals

10  identified and described themselves, as well as their

11  website, promotes the ratings feature on search

12  engines.

13          That, as well as Health Grades doing that

14  as well, yielding the -- for most of the time the

15  number one and number two visitors within their

16  market and essentially dominating those two.

17  Starting at 50 percent and growing in the years after

18  the infringement shows me that those are features

19  that the market was receptive to and visited their

20  health sites related to.

21          It was the intent of the parties as they

22  promoted those features to get the traffic, get

23  website traffic.  And that's what has happened in the

24  market, reasonably demonstrates that there's a demand

25  for those features.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 118

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2              (Record read as requested.)

3              MR. VAZQUEZ:  Same objections.

4       A     Is the question that Mr. Dodge was trying

5    to help himself get money?

6       Q     (BY MR. STIMPSON)  Let me just rephrase

7    this.  You've been an expert for a long time, right?

8       A     I've consulted 24 years, yes.

9       Q     And I assume you've heard a lot of

10   testimony from witnesses, right?

11      A     Yes.

12      Q     Okay.  And you've seen testimony at trial

13   from witnesses, right?

14      A     Yes, I have.

15      Q     And in your experience, Mr. Hall, do

16   witnesses for parties try to help themselves and

17   their own companies?

18      A     My experience is really -- it spans the

19   range.  My main experience is witnesses try to answer

20   truthfully what they're asked.

21      Q     Okay.  But the whole point, you understand

22   the whole point -- well, let me rephrase that.

23              You understand that witnesses, if they can

24   answer one way or another, they're going to try to

25   answer in a way that helps their company, right?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 119

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2          MR. VAZQUEZ:  Form.

3     A     If they can answer one way or another,

4     meaning, depending on the question?

5     Q     (BY MR. STIMPSON)  Truthfully answer one

6     way or another.

7          MR. VAZQUEZ:  Form.

8     A     I wouldn't want to make a generalization

9     like that.

10    Q     (BY MR. STIMPSON)  Okay.

11    A     I think most answer the way they

12    understand the question to be.

13    Q     All right.

14    A     I have seen some witnesses impeached and

15    then I have different opinions of those witnesses.

16    But my experience is most witnesses try to answer

17    the question asked.

18    Q     Let me ask you a different question, then.

19    Specifically what did you ask Mr. Dodge and

20    Ms. Pearson or Health Grades' counsel or anybody

21    about finding information on what Health Grades and

22    Vitals promote other than these patient ratings?

23         MR. VAZQUEZ:  Form.  Compound.

24    A     I don't recall asking -- perhaps

25    Ms. Pearson, we discussed Vitals, but your question

Page 120

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2   included Vitals.  So with Mr. Dodge and Ms. Pearson,

3   I asked them broadly, after reviewing documents made

4   available about Health Grades, how it is they attempt

5   to make money, particularly with advertising revenue.

6   Once I gained an understanding of the visitors and

7   the connection between visitors and advertising

8   revenue and how they attempted to do that, which

9   included both a discussion about the patented

10  features, but also non-patented features that Health

11  Grades has that generates revenue.

12      Q      (BY MR. STIMPSON)  So what other things

13  does Health Grades promote on their website besides

14  the ratings?

15      A      I could look at the printout I had of the

16  website, but recalling that they promote on the

17  search engine, the search engine tools.  And on their

18  documents, the main thing I saw them promote was the

19  features of the '060 Patent.

20          On the website itself, it offers a variety

21  of services that we talked to earlier, or searches

22  related to information alone that may not be

23  connected to a comparison or rating report.  So it

24  would be the factors we discussed earlier.

25          And there are searches and visitors, in my

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 121

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2    view, that visit Health Grades that both are related

3    to the '060 Patent and both are not.

4         Q    So as we sit here today, can you identify

5    any other specific things that Health Grades promotes

6    besides these ratings that you identified?

7              MR. VAZQUEZ:  Object to form.

8         A    Yes.  They promote the information that I

9    discuss in my report and that we discussed earlier,

10   on physicians or healthcare providers, nursing homes,

11   hospitals, some of the other things I mentioned in my

12   report in the background section.

13        Q    (BY MR. STIMPSON)  Okay.  So we've got --

14   you know that Health Grades promotes, as you say, the

15   comparison ratings, you cited me some documents.  We

16   also know that Health Grades promotes nursing homes.

17   We also know that Health Grades promotes hospitals,

18   right, the hospital searches, right?

19        A    Promotes their information on those

20   entities.

21        Q    Right.  So Health Grades is promoting

22   searches for all those things on its website, right?

23             MR. VAZQUEZ:  Form.

24        A    It makes those available, yes.

25        Q    (BY MR. STIMPSON)  Right.  So, and some of

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 122

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2     those are promoting features that aren't covered by
3     the '060 Patent, right?
4          A     I agree.
5          Q     So how do you know, Mr. Hall, that it's
6     only the promotion of the '060 Patent features that
7     leads to this, what you refer to as a success of the
8     Health Grades website?
9          A     The fact that it's the primary feature.
10    When you search on web searches, it's the one in bold
11    as far as their comparison ratings, and the one that
12    shows up on search engines, as well as it's the
13    documents I referred to earlier.  Their business
14    features the comparison ratings.
15          And what Mr. Neal described in his
16    deposition is the unique experience that they want
17    visitors to have, due to the combination of their
18    information with comparison ratings of physicians.
19          That, combined with how Vitals describes
20    its effort to be the trip advisor of the healthcare
21    information, online healthcare information, which of
22    course includes comparison ratings and star ratings,
23    as well as what it shows, what it decided to bold and
24    show on searches on the web and its internal
25    documents pre-litigation about the features it

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 123

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2       promotes in its hope for website traffic.

3                    And ending with, and very importantly, how

4       the market has responded to that.  Whether it's the

5       market as defined in my first report or Mr. Napper's

6       report, the market reaction to the two entities that

7       promote the patented features and the domination

8       those two have, measured either way, leads me to

9       reasonably believe that the patented features is a

10      substantial sources of demand.

11           Q     What percentage of the demand comes from

12      the patented features?

13           A     I have not calculated a percentage.

14           Q     Is it more than 20 percent?

15                 MR. VAZQUEZ:  Object to form.  Asked and

16      answered.

17           Q     (BY MR. STIMPSON)  Actually, your counsel

18      is right.  You don't have any idea, do you, what

19      percentage?

20                 MR. VAZQUEZ:  Object to form.

21      Argumentative and inappropriate.

22           Q     (BY MR. STIMPSON)  You don't have -- my

23      question, Mr. Hall, is this.  You don't have any idea

24      what percentage of the demand for the Health Grades

25      website comes from the '060 patented features, right?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 124

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A     Based on my answer earlier, I believe it's

3    a substantial part of the demand, but not all.

4        Q     Okay.  So you can't quantify that in any

5    way, right?

6              MR. VAZQUEZ:  Form.

7        A     I have not -- I have not undergone a

8    quantification, nor do I think it's needed to pass

9    the Panduit test 1, as far as demand.

10        Q     (BY MR. STIMPSON)  So you say substantial.

11    But I'm just trying to get a handle on what you mean.

12    You can't -- all right.  That's okay.  You didn't try

13    to quantify that, right?  That wasn't a metric in

14    your analysis, right?

15              MR. VAZQUEZ:  Form.

16        A     What metric are you referring to?

17        Q     (BY MR. STIMPSON)  Well, what we've been

18    talking about.  What percentage of the demand for the

19    Health Grades website is generated by the '060

20    features?

21        A     I haven't calculated a percentage.

22        Q     Okay.  Would you agree with me, Mr. Hall,

23    that the database itself, the actual data is a

24    critical part of both the Health Grades and the

25    Vitals websites?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 125

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    A    I would agree it's a very important part

3    of both.  And I stated in my report, I don't know if

4    I used the word critical, but yes, the data is

5    important for these entities.

6    Q    And in your analysis, Mr. Hall, did you

7    consider what Health Grades was doing before it added

8    comparison ratings to its reports?

9    MR. VAZQUEZ:  Form.

10    A    Yes, I recall learning about that.

11    Q    (BY MR. STIMPSON)  Okay.  And what did you

12    learn?

13    A    That Health Grades obtained the

14    information, as far as from its different sources,

15    and then ultimately began generating reports for

16    sale, is the chronology I recall.  But I recall

17    understanding the history of Health Grades in the

18    various time periods.

19    Q    Well, you understand that for a damages

20    analyses in patent cases, one of the factors you look

21    at is, how did this invention differ from what was in

22    the prior art, right?

23    MR. VAZQUEZ:  Object to form.  Calls for a

24    legal conclusion.

25    A    I'm familiar from my experience on issues

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     related to prior art and the parties taking positions

3     on that.

4          Q     (BY MR. STIMPSON)  Right.  The idea is you

5     want to know what are the advantages of this patent

6     compared to what was done before, right?

7               MR. VAZQUEZ:  Same objections.

8          A     I have that understanding, yes.

9          Q     (BY MR. STIMPSON)  And so did you ask

10    Health Grades or their counsel or anybody to show you

11    what was in the prior art?

12              MR. VAZQUEZ:  Same objections.

13         A     I did not ask that question specifically.

14    I gained an understanding from my review of the

15    record of Health Grades' history and then its patent

16    application and its proposed use of the patent.

17         Q     (BY MR. STIMPSON)  Okay.  So what's that

18    understanding that you gained?

19         A     How far back?

20         Q     Well, let's take it, you know, before the

21    filing date of the patent.  Did you have the

22    understanding that Health Grades in the prior art had

23    reports on physicians that had ratings on those

24    physicians?

25         A     I did not have that understanding of that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 127

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     prior to the patent application.

3          Q    Okay.  Let me show you what has been

4     marked as Exhibit 13.  Have you seen that document

5     before?

6          A    I may have as part of a deposition, but I

7     can't say for sure right now.

8          Q    So if you look at the front page at the

9     bottom right-hand corner, what's the date you see

10    there?

11         A    June 4th, 2005.

12         Q    And that's a long time before Health

13    Grades filed its first patent application, right?

14         A    That's my understanding, yes.

15         Q    And you see from the URL down there that

16    this is healthgrades.com?

17         A    Yes.

18         Q    And if you just follow along with me on

19    the front page, sir, you can see that this report on

20    Dr. Drucker shows his gender, right?

21         A    Yes.

22         Q    His age?

23         A    (Indicating.)

24         Q    You have to answer audibly.

25         A    Yes.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 128

CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q     Okay.  The languages he speaks?

3      A     Yes.

4      Q     Years in profession?

5      A     I see that.

6      Q     And it has his awards and his honors,

7  right?

8      A     Yes.

9      Q     Okay.  And it has his affiliations and

10  memberships?

11      A     It does.

12      Q     Personal interests?

13      A     Yes.

14      Q     It's got his medical school?

15      A     It does.

16      Q     And it's got information on intern, where

17  his internship, his residency and fellowship were all

18  done, right?

19      A     Yes.

20      Q     And then if you look to the next page,

21  under patient experience?

22      A     Yes.

23      Q     You can see that there are ratings for

24  Dr. Drucker, right?

25              MR. VAZQUEZ:  Form.

Page 129

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    A    I see the patient experience listed by the

3    bars, yes.

4    Q    (BY MR. STIMPSON)  And that's a patient

5    experience rating, right?

6          MR. VAZQUEZ:  Form.

7    A    It's under the patient experience

8    category.  I don't see the footnote 2 as to how

9    that's described.  Maybe it's at the end.  I see

10   that.

11   Q    (BY MR. STIMPSON)  In any event you can

12   see Patient Experience Survey data for Dr. Drucker in

13   this prior art, right?

14   A    I don't know that it's from a survey, from

15   this page.  I see what you're referencing, the

16   patient experience section.  Now I see six surveys,

17   yes.  I'm with you.

18   Q    Okay.  So, and if you look to the last

19   page under affiliated hospitals.

20   A    Yes.

21   Q    You can see there are comparison ratings

22   for hospitals right in this report, right?

23          MR. VAZQUEZ:  Object to form.  Misstates

24   the document.

25   A    I see affiliated hospitals, best, as

Page 130

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      expected and poor.
 3                   Are you referring to something below that?
 4          Q     (BY MR. STIMPSON)  Sure.  Do you see where
 5      Staten Island University got three stars for total
 6      hits?
 7          A     Yes.
 8          Q     And then Overlook Hospital got one star?
 9          A     That's right.
10          Q     Those are comparison ratings for
11      hospitals, right?
12                   MR. VAZQUEZ:  Object to form.
13          A     Yes, that's what it looks like.
14          Q     (BY MR. STIMPSON)  So here is my question,
15      Mr. Hall.  What did you do, sir, if anything, to
16      determine how the '060 Patent supposedly improves
17      upon this and how that improvement might drive sales
18      or demand for the Health Grades website?
19                   MR. VAZQUEZ:  Object to form.
20          A     I did not do a prior art analysis, nor was
21      I asked to.  I evaluated Health Grades' business and
22      gained an understanding of its operations from the
23      time periods in question for the damage period.  But
24      in years preceding it as well, to gain an
25      understanding as to Health Grades and its entry into
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 131

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    the market in January 2008.

3            I did not undergo a prior art analysis.

4       Q    (BY MR. STIMPSON)  So assume with me

5    please, Mr. Hall, that this is prior art to the

6    Health Grades patent.  And that the only difference

7    between this prior art and what Health Grades is

8    doing under the '060 Patent is they added comparison

9    ratings for physicians, okay?

10      A    Okay.  This is a hypothetical?

11      Q    Yes.  Do you understand it?

12      A    I do.

13      Q    How -- do you have anything in your report

14   or otherwise showing how the addition of those

15   comparison ratings of physicians impacted the demand

16   for the Health Grades website?

17      A    I do.  I've seen information related to

18   that.

19      Q    Okay.  And what's that information?

20      A    The Health Grades promotion of that

21   feature, as well as the market's reaction to it, it

22   increased website traffic.

23      Q    So you know that the market reacted to

24   that specific part about adding comparison ratings of

25   physicians?  Is that your testimony?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 132

1    CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A    My testimony is, I think it's a reasonable

3    inference, given the focus of the promotion of that

4    ability or feature.  And coupled with Vitals'

5    promotion of the same, and those two entities being

6    far and away the two biggest as far as traffic,

7    visitors, website traffic or online visitors in the

8    market.

9        Q    And what documents -- are they the same

10   documents you referred to earlier about supporting

11   your conclusion there?

12             MR. VAZQUEZ:  Form.

13       A    It would be the same documents, but also

14   the Comscore website traffic.  And I don't know if I

15   included that.  Though you were asking questions

16   about a sentence that I think referenced Comscore

17   documents.

18             So it would also be the measurement of the

19   market's reaction of these entities as they promoted

20   patented features.

21       Q    (BY MR. STIMPSON)  Do you know of any

22   documents where Health Grades or Vitals promoted only

23   the comparison ratings feature?  I mean, not in the

24   context of, you know, come get reports from us, and

25   we'll give you all this information.  We'll give you

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 149

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      Departments 00, 24, 25 -- or 24, 25, 28,

3      29, 63, 64, 65 and InHealth, LLC.  And to restate or

4      be clear, any part of the '060 Patent, whether it's

5      information or ratings, that visits that was the

6      criteria in how these departments were selected.

7          And then once the department is selected

8      because if it's either expense or revenues related to

9      any part of the '060 Patent, I included all of the

10     departmental financial information, to be complete.

11     Q      Okay.  So for example, if you had just one

12     department that only worked on, like information that

13     goes into a report, that information is referenced

14     somewhere in the claims of the patent, you would

15     include that department?

16     A      Yes.

17     Q      Okay.  So all you were doing, is this

18     right -- you reference the department numbers from

19     the top of attachment 1, right?

20     A      Yes.

21     Q      And to find out what departments those

22     are, I would have to go back into the documents that

23     were attached as Exhibit C?

24     A      Yes.

25     Q      And identify them?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 150

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     A     Yes.

3     Q     You also mentioned that you spoke with

4   Mr. Dodge and Ms. Pearson.

5     A     Yes.

6     Q     Okay.  What -- can you tell me what you

7   discussed with each of them, please?

8          Let me back up.  Can you remember what

9   information you got from Ms. Pearson and what

10  information you got from Mr. Dodge?

11     A     I believe so.  The information specific to

12  the financials that we relied on Mr. Dodge for,

13  related to attachment 1.  And the departments that

14  had revenues and expenses was just Mr. Dodge and not

15  Ms. Pearson.

16     Q     Okay.

17     A     Discussed with both of them at a meeting

18  at the same time the -- the nature of Health Grades'

19  business and its operation over time.  And also

20  included in the discussion is the '060 Patent and how

21  Health Grades utilized that or used the features in

22  its businesses.

23          That was with both of them.  So I received

24  information from both of them on that.

25     Q     Just let me stop you there for a second.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 151

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2              Can you remember what parts you got from
 3    Mr. Dodge and what parts you got from Ms. Pearson or
 4    is that kind of all together?
 5        A    It's together in my mind.  I don't recall
 6    any disagreements between them.  They would both
 7    pitch in on answering questions I had.
 8        Q    I'm sorry.  I stopped you in the middle of
 9    your answer.
10        A    No problem.  Then with respect to website
11    traffic and visitors and how Health Grades attempts
12    to maximize that, that was primarily Ms. Pearson's
13    input, though Mr. Dodge had some views on that as
14    well.  And also read some of that from Mr. Dodge's
15    testimony, but I think your question just relates to
16    the meetings I had with him.
17        Q    Okay.  Anything else that you can
18    remember?
19        A    To the extent I've referenced them in my
20    report or attachments, they would also relate to
21    that.  But the several discussions or a couple of
22    discussions with both of them, more in-depth
23    discussions with Mr. Dodge as it relates to the
24    financials information we've discussed previously.
25    And the accounting information available and how they
```

Page 152

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    keep their books and records in the normal course.

2        Q    Okay.  So let's talk a little bit about

3    how people go about using the Health Grades and

4    Vitals websites.  I mean, really, what motivates

5    people to find a way to these websites is generally a

6    desire to find information on, you know, either a

7    physician or hospital or nursing homes, right?

8            MR. VAZQUEZ:  Form.

9        A    I think I would generally agree with that

10   characterization.

11       Q    (BY MR. STIMPSON)  And so, for example, if

12   I get on Google and I want to find out something

13   about Dr. Smith in Denver, Colorado, I get on Google

14   and I type in the search box, Dr. Smith, Denver,

15   Colorado, and then up pops up a results list, right?

16       A    Yes.

17       Q    And you understand that a lot of people

18   actually find their way to the Health Grades and

19   Vitals websites by searches on Google or Bing or

20   whatever, right?

21       A    Yes.

22       Q    And do you have any idea what percentage

23   of users find their way to Health Grades or Vitals by

24   searches through general search engines like Google

25

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 153

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     or Bing?

3          A     I don't have a specific percentage in

4     mind.  I understand it's a majority.

5          Q     Do you -- did you assume when you did your

6     report that people who find their way to the Vitals

7     or Health Grades websites through searches on Google

8     or Bing, did you assume that those were also covered

9     by the patent?

10         A     Those referring to the individual visitor?

11         Q     Well, let me just rephrase it because my

12    question wasn't terribly clear.  So if someone gets

13    on Google and types in Dr. Smith, Denver, Colorado,

14    and up comes a Google results list.  And then one of

15    them is the Health Grades website and they click on

16    the Health Grades website and find the report on

17    Dr. Smith that way.

18              Did you assume in your damages analysis

19    that that way of finding, getting to the Health

20    Grades website, was an infringement of the '060

21    Patent?

22              MR. VAZQUEZ:  Objection.  Calls for a

23    legal conclusion.

24         A     First, I have assumed there is both

25    validity and infringement by Vitals.  As to website

Page 154

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     traffic, I did not make an assumption one way or

3     another if they went direct to Vitals or through a

4     Google or Bing.

5          Q    (BY MR. STIMPSON)  Don't you think that

6     would be important to your analysis on whether --

7     since a majority of people who get onto the Health

8     Grades website get there through a Google or a Bing

9     search, don't you think it's important to your

10    analysis to know whether or not that way of getting

11    there would infringe the patent?

12         A    I don't think that's necessary for my

13    analysis, assuming validity and infringement and

14    understanding the way the two companies have promoted

15    features that relate to the '060 Patent.

16         Q    So when you assumed infringement, though,

17    I just want to make sure we're clear.  Did you assume

18    that getting to the Health Grades website through a

19    Google or a Bing search was an infringement of the

20    patent?

21              MR. VAZQUEZ:  Object to form.

22         A    That's not how I would state it, no.

23         Q    (BY MR. STIMPSON)  Well, how would you

24    state it, then?

25         A    I've assumed that Vitals is using the '060

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 155

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     Patent features in a way that a court will determine
 3     to be infringing, which means actively using it to
 4     attempt to get traffic the way its business overview
 5     and other documents indicate its business model
 6     works.  That's the assumption on infringement I've
 7     taken.
 8          Q     So you didn't make any specific
 9     assumptions on whether going through Google or Bing
10     to get to those websites would or would not infringe
11     the patent?
12          A     Not beyond the assumption I've stated as
13     it relates to the content of Vitals and the '060
14     Patent infringement assumption.
15          Q     Okay.  Do you know what SEO is?
16          A     Yes.
17          Q     What is it?
18          A     It's an acronym that stands for search
19     engine optimization.
20          Q     And when you were doing your damages
21     analysis, did you assume that -- well, let me just
22     back up.
23               Search engine optimization and how high up
24     in the ranking you come when you do a search through,
25     say, Google, that's really important to whether a
```

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     person is going to end up on the Health Grades
 3     website or the Vitals website or some other website,
 4     right?
 5             MR. VAZQUEZ:  Form.
 6        A    My answer to that is it's important to
 7     show up on the first page and the higher up a search,
 8     generally, the better.
 9        Q    (BY MR. STIMPSON)  So that's one driver
10     for how -- whether people end up on Health Grades or
11     Vitals or some other website, right, how high they
12     come up in the Google search results?
13        A    It is a factor.  And it's a factor that
14     relates to the entity's content and quality and
15     relevance of its content.
16        Q    How do you know that?  What makes you
17     think that?
18        A    In discussions with Andrea related to
19     website traffic, she described the path to Health
20     Grades.  And when I first -- I believe that's when I
21     first understood or learned that the majority get to
22     Health Grades' website via search engine.
23        Q    Andrea is Andrea Pearson?
24        A    Correct.
25        Q    So you relied on Ms. Pearson to tell you
```

Page 157

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  that the content of the Health Grades website is what

2  dictates how high up they come in Google search

3  results or Bing search results?

4  MR. VAZQUEZ:  Object to form.

5  A    I don't think that's what I answered.

6  Q    (BY MR. STIMPSON)  Okay.  Can you explain

7  it to me a little better?  Maybe you explained it

8  perfectly, but it's in the afternoon and I'm losing

9  focus.

10  So what did you rely on from Ms. Pearson

11  to determine anything about how Health Grades comes

12  up in the Google search results?

13  A    First, the fact of -- the nature in which

14  website traffic or visitors arrive at Health Grades.

15  And we may have discussed it in terms of Vitals, too,

16  or other online information sites, but certainly

17  Health Grades.  And then discussed the fact that most

18  go through a search engine site.  And the importance

19  of Health Grades there, I think her observation also

20  that Vitals is right there as well.

21  And those are the two market leaders and

22  have the most relevant content was discussed.

23  I gained an understanding of search engine

24  optimization on another matter, a consulting matter,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 158

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     not specific to healthcare websites, but the

3     discussion related to with Andrea, the content and

4     the relevance in how Health Grades attempts to keep

5     their content and relevance in such a way that they

6     show up high.

7               I also notice that that's mentioned in

8     Vitals' business overview and records as far as the

9     things that drive traffic:  content, quality, quality

10    links to other companies and SEO.  So those are the

11    bases for my understanding.

12        Q     So how does Health Grades optimize its

13    website so that it comes up higher in the Google

14    search results?

15               MR. VAZQUEZ:  Object to form.

16        A     Company efforts, including the features of

17    this '060 Patent to have the most relevant, high

18    quality data available for potential patients trying

19    to obtain information on physicians, patient ratings,

20    and the other information within the '060 Patent.

21    And it's important to them and a factor because it's

22    a window.  It's a modern-day Yellow Pages or way to

23    reach the market through those search engines.

24        Q     (BY MR. STIMPSON)  So Andrea Pearson told

25    you all this?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 159

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A    We discussed it.  I don't know that she

3    told me every one of those factors, but we discussed

4    it.

5        Q    Who told you -- I'm sorry, who told you

6    that the '060 features were important in coming up

7    high in the Google search results?

8        A    I observed it when I did some searches

9    after that meeting.  I believe Mr. Dodge may have

10   mentioned it as well as Andrea, but we discussed

11   the -- really the pathway to web traffic for Health

12   Grades that result in the Comscore hits and result in

13   their ad revenue.

14       Q    But my question wasn't quite that.  Who

15   told you, I think in your prior answer you said it

16   was the '060 features that led to a higher listing in

17   the Google search results.

18            Did I misunderstand that?

19       A    It was part of it.  They also have other

20   features.  And it's important to them to have as high

21   quality information, as relevant information as

22   possible, to drive web traffic to their site.

23       Q    Right.  But, I mean, who told you the '060

24   features were part of what determined how high you

25   come up in Google website results?

Page 160

1

2          A     I don't know that I stated that in an

3     answer specifically.  You may be --

4          Q     I maybe misheard it, but I thought that

5     you said in one of your answers that you thought the

6     features of the '060 help dictate how high you come

7     up in your Google search results?

8          A     I don't think I directly stated it.  I

9     said in the context of a question you asked, but we

10    can check, and maybe I did miscommunicate.  I said

11    that's part of their effort.  As John Neal testified,

12    and I cite in my report his testimony, how important

13    it was for a patient to have a unique experience at

14    their website and how the information they have, what

15    information is available, what they can do with that

16    information.

17               And that effort by Health Grades includes

18    features of their '060 Patent, the information as I

19    mentioned.  And that was important to them as a

20    factor in staying high on the search results.

21         Q     Okay.  So let me just see if I can ask

22    this a little more directly, then.

23               Mr. Hall, do you have any evidence that

24    the features of the '060 Patent influence how high

25    Health Grades shows up in a Google search results?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 161

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      I had an understanding at the time I wrote

3    my report how content was important.  And part of

4    content, of course, is the '060 features and

5    relevance.  And in both parties, you know, citing,

6    wanting to be able to do comparison ratings and an

7    understanding of being a trip advisor in Vitals'

8    instance, of healthcare information, I have that

9    understanding.

10           Subsequent to my report, I read

11    Dr. Cooper's and Mr. Greenspun's reports.  I gained a

12    further understanding in those two views of it, as

13    well as, after seeing some quoted excerpts of

14    deposition and Mr. Napper's report.

15           Had a follow-up conversation with Mr. Neal

16    and Ms. Pearson about some of the statements in

17    Napper's report.  So that's both prior to my issuance

18    of my report and after, the basis for my

19    understanding.

20      Q      Okay.  So that's -- and you rattled off an

21    awful lot of things there.  But really, my question

22    is, can you cite me to any evidence -- you said that

23    content influences the SEO -- the search results in

24    Google, right?

25      A      Contents and relevance is a very important

Page 162

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    part, yes.

3        Q    Okay.  But my question is a little more

4    specific.  What evidence do you have, what specific

5    evidence do you have that the '060 features and

6    coming under the '060 Patent has any influence on how

7    high up you come in the Google search results?

8        A    First, I was not asked to specifically

9    provide an opinion on that.  But that said, the

10   evidence is in my answer prior, that part of the

11   content, which I understand to be an important factor

12   and where you come up, includes the '060 features.

13            Assuming infringement, that Vitals is

14   using those as well.  I believe the information I

15   cited in the previous answer is a basis for an

16   understanding.

17            I have not been asked to provide evidence

18   in a technical sense.

19            I know Mr. Greenspun has an opinion on it

20   as does Dr. Carter (sic).  That's evidence in

21   addition to what I have cited.  But that's my answer.

22       Q    Are you assuming that practicing the '060

23   Patent leads to a higher ranking in Google search

24   results?

25       A    I have not made that direct assumption.

Page 163

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      Q     Okay.  So since most people come to Health

3   Grades' website and the Vitals website through

4   Google, and you're not assuming that the patent has

5   anything to do with how high up Vitals or Health

6   Grades land on the Google search results, you can't

7   really say that the '060 has anything to do with

8   people coming to the Health Grades or Vitals websites

9   when they do that through Google or Bing, right?

10            MR. VAZQUEZ:  Object to form.

11      A     I disagree with that statement and no to

12   the question.

13      Q     (BY MR. STIMPSON)  Okay.  See, that's what

14   I'm having some difficulty with.  I mean, you're

15   saying that -- you answer that question no, so you're

16   not willing to say that the '060 --

17      A     I don't think it's reasonable to say the

18   '060 features have nothing to do with the content and

19   therefore where it shows up.

20            You had asked me did I make an assumption.

21      Q     Okay.  All right.  So I'm still struggling

22   with this, though, Mr. Hall.  I mean, how much --

23   would you agree with me, sir, that how much these

24   '060 features generate people coming to the website,

25   that's an important factor in damages, right?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 164

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      A    Yes, that the patented features drive

3   demand for the website hits, which drive advertising

4   revenue.

5      Q    So we're talking about more than half of

6   the demand for people getting on Health Grades and

7   Vitals when we're talking about people going through

8   Google or Bing, right?

9      A    Yes, or all of them.  Might be Yahoo,

10   Google, Bing, but that group of --

11      Q    Right.

12      A    -- web search.

13      Q    So what I'm trying to figure out is, then,

14   isn't it really important to know whether or not the

15   '060 features influence how high you come up on those

16   search results?

17            MR. VAZQUEZ:  Form.

18      A    It's important to -- as to whether it does

19   impact or is a factor, yes, absolutely.

20      Q    (BY MR. STIMPSON)  And what evidence do

21   you have that you can tell me or the jury that this

22   is how I know the '060 features influence how high

23   you come up on those search results through Google or

24   Bing?

25            MR. VAZQUEZ:  Form.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 165

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A     I have not had that opinion in my report.

3    It's part of my understanding of the demand.  And I

4    will provide the evidence I did in an earlier answer

5    or provide the answer that all the information I have

6    cited before about the content and what both

7    companies promote as far as their content and the

8    relevance and the importance of the information and

9    the comparison ratings to the companies as they cite

10   in their own documents, testimony related to that.

11           And my understanding, though I'm not

12   providing an expert opinion the way Mr. Greenspun is,

13   as far as his view of Dr. Cooper's view of the search

14   engine optimization, I'm aware that he is going to be

15   provided -- or an opinion is going to be provided.

16   It is reasonable to conclude that the content of the

17   Vitals and Health Grades website which includes the

18   '060 patented features, which I have assumed Vitals

19   is infringing, using it is infringing, is a factor,

20   an important factor in where they surface on the

21   searches on Google or Bing and relates to the demand

22   for web traffic.

23       Q     (BY MR. STIMPSON)  So content is an

24   important factor?

25       A     Content and relevance, yes.

Page 166

1

2     Q    Okay.  How about the '060 features, can

3  you say those are important factors on where you come

4  up on these search results through Google and Bing?

5     A    That would be a part of the content that

6  both companies have to offer.

7     Q    Right.  But my question is a little

8  different.  Would you say that the '060 features,

9  that part of the content is important on how high up

10  Health Grades and Vitals come up?

11     A    I think it's reasonable to conclude that

12  it is, yes.

13     Q    Why?

14     A    The answer I have just given would be my

15  answer.

16     Q    Do you know anything about the algorithms

17  that Google or Bing used to figure out who comes up?

18     A    A little bit.

19     Q    And what do you know about those?

20     A    That they're involved and that there's

21  several factors at work, including links to other

22  websites, quality links as they put it.  I understand

23  they're constantly or near constantly trying to

24  improve the ability of their search engine

25  optimizations to identify the best information for

Page 167

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     what they think a searcher is looking for, given what
 3     they plug in, that there's engineers studying it.
 4     And that it's involved and it's very speedy, how
 5     quickly one can click on a request and get a variety
 6     of information, including related to healthcare
 7     providers.
 8              MR. STIMPSON:  I lost my Live Notes
 9     connection here.
10              (Discussion off the record.)
11        Q    (BY MR. STIMPSON)  So my last question,
12     Mr. Hall, I asked you what you knew about the
13     algorithms Google and Bing use to figure out who
14     comes up first on their search results, right?
15        A    Yes.
16        Q    You testified that they're involved and
17     there are several factors at work, including links to
18     other websites, and they're constantly trying to
19     change it.
20        A    Yes.  And the quality and contents
21     reviewed.  From my perspective, I'm not an expert on
22     computer technology, but they're involved and
23     complex.  But having read Mr. Neal's deposition
24     testimony and Mr. Dodge's, and subsequently seeing
25     the reports of Cooper and Greenspun, gained further
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 168

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    CONFIDENTIAL - ATTORNEYS EYES ONLY

2    understanding of the algorithms.

3        Q    Do you have any way to quantify how, if at

4    all, the '060 features impact on how high you come up

5    on the Google or Bing search results?

6        A    I don't know of a way that would exist to

7    do that.

8        Q    Okay.

9        A    Other than assessing whether reasonably

10   they do have an impact on the content and relevance,

11   and I believe they do.

12       Q    I've got to go back, then.  I said, do you

13   have any way to quantify how if at all the '060

14   features impact on how high you come up on the Google

15   or Bing search results.

16            Your first answer is, I don't know of any

17   other way you can do that.  And then you continued

18   your answer and said, Other than assessing they

19   reasonably do have impact on the content and

20   relevance, and I believe they do.

21       A    I meant a threshold, not a percent out of

22   a hundred.  But I do know of a way to assess, is it

23   reasonable that they have an impact and are a factor,

24   and that's what I was answering.

25            In case your question was beyond do I have

Page 169

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    a percentage answer or a mathematical answer.

3         Q    Okay.  So let's just get things clear,

4    then.  You do believe that the '060 features might

5    have some impact on how high you come up on the

6    Google or Bing search results, correct?

7         A    Yes.

8         Q    But you have no way to quantify that,

9    correct?

10        A    Quantify what?  My conclusion that it is a

11   factor?

12        Q    No, let me rephrase it, then.  You have no

13   way to quantify what effect, how big a factor those

14   '060 features are in how high you come up on the

15   Google or Bing search results?

16        A    I have not quantified that.  Though I do

17   note that the two that come up highest are also the

18   two that are highest as far as market leaders on web

19   traffic and are the ones that are practicing the '060

20   patented features.

21        Q    Well, how does that help you quantify the

22   '060 features and how they impact?

23        A    I don't think that I testified that it did

24   help you quantify it.

25        Q    Okay.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 170

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A      I was answering as to they reasonably have

3    an impact.

4       Q      Would you agree with me, Mr. Hall, that --

5    forgive me if I've asked this before, I may have, but

6    would you agree with me that how much the '060

7    features are used in the Vitals website has an impact

8    on the amount of damages?

9       A      I don't know that that was asked before.

10   Are you asking if you asked it before or just asking

11   it in your question?

12      Q      No.  I'm just asking a question.

13      A      Sure.

14      Q      Let me just ask you the question and then

15   I'll rephrase it.

16            How much the '060 Patent features are used

17   in the Vitals website has an impact on the damages

18   that should be assessed, correct?

19            MR. VAZQUEZ:  Object to form.

20      A      The way I would answer that is I think

21   it's more important -- the most important assessment

22   is whether the existence, the website's existence or

23   use of the '060 patented features drive demand to

24   that website because when web traffic goes there,

25   that drives advertising revenue.

Page 185

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 infringer's market share, spread it throughout the

2 market and the patent holder would get a share of

3 that, but for the infringement analysis.  And that

4 would be an acceptable way to calculate lost profits.

5    Q    Would you agree with me, Mr. Hall, that

6 which companies you include in your definition of the

7 market is very important to a Mar-Flo analysis?

8    A    It's a factor.  Certainly, the biggest

9 factor is the percent of the market that a patent

10 holder and the patent infringer have and the size of

11 the market.

12         I think it's good to know who the other

13 entities are, so an assessment can be beyond just a

14 damage expert's, as to the non-infringing acceptable

15 alternative or not.

16    Q    Right.  Well you can't do the Mar-Flo

17 analysis properly without knowing all the entities

18 that are in the hypothetical market, right?

19    A    You may be able to, mathematically.  I

20 have done it with an identification of competitors in

21 the market.  And then I also did one with a different

22 set of competitors that Mr. Napper asserts are part

23 of the market.

24    Q    Okay.  In this Exhibit 3a we have, this is

Page 186

1       CONFIDENTIAL - ATTORNEYS EYES ONLY

2    where you tell us where you think the market would

3    be -- this is where you show us what you think are

4    the competitors in the market for your Mar-Flo

5    analysis, right?

6            MR. VAZQUEZ:  Attachment 3a, right?

7        Q    (BY MR. STIMPSON)  Attachment 3a.  Is that

8    correct?

9        A    Yes, it is.

10       Q    Why didn't you include WebMD in there?

11       A    Well, WebMD is an online provider of

12   healthcare information.  It was not identified in my

13   first point of reference, which is who Vitals viewed

14   in mid 2010 as its competitors.  And then, further,

15   in discussions with Health Grades, with Allen Dodge

16   and Andrea Pearson, while it was mentioned as a

17   player, quote, in a broader market of healthcare

18   information, it was also not viewed by them as a

19   direct competitor for the advertising revenue in

20   particular and web hits that are indicated on

21   attachment 3a.

22       Q    So the bottom line is, you just didn't

23   think, from your discussions with the Health Grades

24   folks, you just didn't think WebMD was close enough

25   to the Health Grades website to justify including it

Page 187

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 in this analysis?

2     MR. VAZQUEZ: Object to form. Misstates

3 the testimony.

4   A  No, that's not how I would state it.

5   Q  (BY MR. STIMPSON) Okay. Well, I need a

6 little bit more clarification, then, because I don't

7 understand why you didn't include it.

8     Could you please tell me?

9   A  Yes. A starting point for my analysis was

10 who Vitals believed -- and its two business

11 overviews -- who their competitors were.

12   Q  So why did you start with who Vitals

13 believed their competitors were, rather than who

14 Health Grades believed who their competitors were?

15   A  Well, it's really a parallel analysis, but

16 since I had access to Health Grades's personnel and

17 documents for Vitals, I started with Vitals'

18 documents.

19   Q  Okay.

20   A  And it's important to assess both. And

21 under their business overview progress strategy plans

22 at Bates MDx 0012724, for a document that is at about

23 the time of the hypothetical negotiation or would

24 have been the hypothetical negotiation, it's a

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 192

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      Q      Right.  Close as you can come.  And you

3    chose WebMD for one of those analyses, right?

4      A      I did not have the financial information

5    for these other competitors.  WebMD is publicly

6    traded and did have that information, so I used the

7    best information I had available to me.

8      Q      Okay.  So WebMD is not in your market

9    share analysis for Mar-Flo, right?

10     A      It is not.

11     Q      And if WebMD was in that analysis, that

12   would tend to reduce, if you just added WebMD to the

13   companies you have here, that would tend to reduce

14   the market share of Health Grades in the Mar-Flo

15   analysis, right?

16     A      I believe it would.  I haven't looked at

17   the Comscore for WebMD to know for certain.

18     Q      Well, the only thing it could do is reduce

19   Health Grades's percentage, right?  That's the only

20   thing it could do; it couldn't increase it?

21     A      You're asking if you just add it and all

22   the others stay the same?

23     Q      Sure.

24     A      Yes, you're right.  Mathematically, it

25   could only reduce it.  I don't know to what extent.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 193

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      I haven't looked at their Comscore.
 3           Q     How about RevolutionHealth, you didn't put
 4      RevolutionHealth in your market analysis either, did
 5      you?
 6           A     I did not.
 7           Q     Okay.  Look at Mr. Neal's transcript
 8      again, same page, page 85.
 9           A     Okay.
10           Q     You read this transcript, right?
11           A     Yes.
12           Q     Okay.  Page 85, line 18:  How about
13      RevolutionHealth?
14                 Mr. Neal's answer as a 30(b)(6) witness:
15      Yeah, they're a competitor.
16                 Did I read that correctly?
17           A     Yes.
18           Q     So Mr. Neal thinks that RevolutionHealth
19      is a competitor, correct?
20           A     He does, as he was asked these questions,
21      correct.
22           Q     And it's not in your market share
23      analysis, right?
24           A     Correct.
25           Q     If we added RevolutionHealth to your
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 194

```
 1           CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    market share analysis, again, that could only lead to
 3    the conclusion that Health Grades' market share is
 4    less than you come up with in your report, correct?
 5         A     It would have that impact, yes.
 6         Q     Did you consider wellness.com, Mr. Hall,
 7    and including that in your market share analysis?
 8         A     I recall looking at Wellness, as well as
 9    others.
10         Q     Why didn't you include wellness.com?
11         A     The market share.  I thought the strongest
12    indications of the market for the specific business
13    model related to advertising, based on Vitals'
14    assessment of it and discussions with Ms. Pearson and
15    Mr. Dodge, were the entities listed here, that do not
16    include wellness.com.
17         Q     Did you talk with Mr. Dodge or Ms. Pearson
18    about, hey, what about wellness.com?  Why don't we
19    include that?  Or did they just not mention it?
20         A     No, we went through the Comscore report
21    with them, in particular Mr. Dodge.  And I think we
22    covered most of them that were either brought up by
23    Vitals as we represented -- as I represented to them
24    or that were listed on the Comscore.
25         Q     Okay.  And you decided with the Health
```

Page 195

CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     Grades people that you would not include wellness.com
 3     in your analysis of Mar-Flo, right?
 4            MR. VAZQUEZ:  Form.
 5       A     I concluded based on all the information I
 6     saw from Vitals and Health Grades to have these
 7     entities in the market share analysis.
 8       Q     (BY MR. STIMPSON)  And you have in
 9     there -- did you consider adding MD Ratings as a
10     competitor in your analysis?
11       A     I believe I did consider that.  If they're
12     in the referenced underlying documents, either in the
13     Comscore reports or in Vitals' business overview, I
14     did consider.
15       Q     And why didn't you include MD Ratings as a
16     competitor in your analysis?
17       A     Same answer.  I thought based on the
18     Vitals identification of who they believed their
19     competitors were, beyond the assertion they thought
20     they had one true competitor, I thought the entities
21     listed here most reasonably represented the market
22     share that Vitals and Health Grades were competing
23     for, advertising revenue based on web visits.
24       Q     And did you consider Mr. Neal's testimony
25     with regard to MD Ratings?
```

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     A      I did.

3     Q      And do you remember what Mr. Neal said

4   about whether MD Ratings is a competitor?

5     A      I don't.

6     Q      Page 86.

7     A      I recall reading his --

8     Q      Line 12.  Page 86, line 12.

9     A      Yes, I recall reading this.

10    Q      Okay.  So Mr. Neal testified that

11  MD Ratings was a competitor, correct?

12    A      Yes.

13    Q      And despite that you still did not include

14  MD Ratings in your analysis, right?

15    A      That's correct.

16    Q      And again, had you included MD Ratings

17  that could only have the effect of reducing Health

18  Grades' market share, right?

19    A      If you kept in all the others, yes.

20    Q      How about DoctorsScore; did you consider

21  that?

22    A      Yes.

23    Q      And why didn't you include that?

24    A      Same answer as earlier.  Based on all the

25  information I received and reviewed in discussions

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 197

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2     with Health Grades and the Vitals information on who
3     they understood to be their competitors.
4          Q     All right.  So let me identify some
5     competitors just so we can get through this more
6     quickly.  I'll identify a bunch of them, okay,
7     DoctorsScore, Yelp, LocateADoc, Xoova, that's
8     X-O-O-V-A, PharmaStats, RightHealth, myuhc.com,
9     SteadyHealth, qualitycheck, RemarkableDocs, AARP,
10    Health Market Science, Consumer Health Ratings.
11            For all those, did you consider adding all
12    those and just chose not to?
13         A     I considered all of them.  I also had
14    discussions with Health Grades' personnel about how
15    widely Mr. Neal was viewing competitors, whether it
16    was for the advertising revenue or more broadly on
17    his view of what the patent -- the infringement of
18    the patent more broadly damaged Health Grades, and
19    the discussion that he may have a wider view of
20    competitors beyond for the advertising revenue.  And
21    I factored that in as well.
22         Q     So you and Mr. Dodge and Ms. Pearson all
23    sat down and decided that Mr. Neal had too broad an
24    analysis of competitors?
25         A     No.

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2       Q      Okay.  Then who did you decide that with?

3       A      I said it was discussed.  I decided -- I

4    ultimately decided and Mr. Dodge agreed with my view

5    of the competitors, based on who Vitals identified as

6    the market and who Health Grades, Mr. Dodge and

7    Ms. Pearson, viewed as the market as well.

8       Q      So when you were meeting with Mr. Dodge

9    and Ms. Pearson, where were you?

10       A      We met at these offices at one point and

11    we had telephone conversations.

12       Q      Did you consider calling Mr. Neal and

13    asking him about his testimony?

14       A      I don't recall considering that.

15       Q      You had two exhibits you gave me on

16    substitutes earlier today.  Let's see if we can find

17    them.  79 is one of them, right?

18       A      Yes.

19       Q      There was one on --

20          MR. VAZQUEZ:  77, 78 and 79.

21          MR. STIMPSON:  I'm sorry?

22          MR. VAZQUEZ:  76, 77, 78 and 79.

23          MR. STIMPSON:  That may be right.

24       Q      (BY MR. STIMPSON)  Oh, 77, is that the

25    other one on the market share analysis, or is that

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 199

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    something else?

3          A     It is one of them -- both of them.  I'm

4    sorry.

5          Q     76 and 77?

6          A     Correct.

7          Q     Okay.  All right.  Let me take a look at

8    those for just a second?  Okay.  Actually, I may have

9    to come back to those.  I'll come back to the

10   substitutes later.

11         A     Okay.

12         Q     Would you look at paragraph 44 of your

13   report, please.

14         A     Yes.

15         Q     And this is the section where you

16   calculate Health Grades' lost revenues in your

17   report, right?

18         A     Yes.

19         Q     And paragraph 44, about the middle, says,

20   I began with identifying Vitals' infringing

21   advertising revenue.

22               Did I read that right?

23         A     That's the second half of the second

24   sentence, yes.

25         Q     Right.  So am I correct that you did begin

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 201

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q      Okay.

3      A      Based on the assumption of infringement

4   and how they earned advertising revenue in their

5   business model.

6      Q      So did you make any effort to apportion

7   the advertising revenue to identify the parts of that

8   revenue that are relevant to the patent claims?

9          MR. VAZQUEZ:  Form.

10     A      Yes.

11     Q      (BY MR. STIMPSON)  Okay.  How did you do

12  that?

13     A      I did that by apportioning -- well, first,

14  adjusting that ad revenue for the co-visitors to

15  represent but-for causation, a reasonable and

16  accurate representation of what Health Grades would

17  have potentially achieved.

18          And then I apportioned the revenue amongst

19  all the competitors, with the understanding that

20  those competitors were not all practicing, to my

21  knowledge, the '060 patented features.  And so the

22  reasonable step of apportioning would account for

23  features unrelated to the patent as it spread the

24  website visits which drive ad revenue to the market.

25     Q      Okay.  So I'm not sure that -- maybe we

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 202

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2     have a little disconnect there.  But my question was
3     very specific.  Before you took out a portion because
4     you have co-visitors and before you took that
5     advertising revenue and applied a percentage for
6     Mar-Flo, before you even get to those steps, my
7     question is, did you do anything to apportion those
8     advertising revenues?  You started with all of the
9     advertising revenues.
10          My question is, did you do anything to
11     apportion those advertising revenues and say, Hey,
12     look, of all these Vitals advertising revenues, this
13     is the part that was generated because of the '060
14     features?
15     A     I did not and don't believe that is
16     reasonably required, given the subsequent steps I
17     took to reduce the ad revenue to reasonably
18     approximate what Health Grades would have achieved by
19     applying acceptable methodology of taking the
20     infringer out of the market.
21     Q     Okay.  So let me just see.  So anywhere in
22     this analysis where you're trying to figure out the
23     lost revenues from Health Grades, did you ever take
24     into consideration how much of the Vitals website was
25     using the '060 features?

Page 203

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2       MR. VAZQUEZ:  Form.

3       A     Again, starting with the assumption of

4    validity infringement, that's an assumption that

5    they're utilizing the patented features in the

6    market.

7            So with that assumption, and how they

8    promoted those features and how they earned revenue,

9    I did take into account their use of the '060

10   patented features.

11      Q     (BY MR. STIMPSON)  And where is that shown

12   in your report?

13      A     Throughout.  It's described as far as --

14      Q     Is there anywhere you can point me to in

15   your report that says, Oh, look, and this is how I

16   adjusted because of the amount of use I think that

17   MDx is making of the '060 features?

18      A     Adjusted what?

19      Q     The advertising revenue that you're

20   starting -- as your starting point for calculating

21   damages.

22      A     I don't believe my answer earlier had the

23   word adjusted in it.

24      Q     Okay.

25      A     But I do adjust the revenues further down,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 204

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     as I answered earlier.

3          Q     All right.  So let me just back up a bit

4     because maybe my question wasn't as clear as I can

5     perhaps make it.

6               In this analysis, this entire analysis you

7     do here, do you ever discount anything due to how

8     much Vitals is using or not using the '060 patented

9     features?

10               MR. VAZQUEZ:  Form.

11          A     This analysis, yes.

12          Q     (BY MR. STIMPSON)  Okay.  And where do you

13     do that?

14          A     I do that in the apportionment and also

15     using what I actually know happened.  And that's the

16     advertising revenue Vitals earned with the assumption

17     of infringement.

18               I don't have a data point as to the

19     revenue they would have earned without infringement.

20     If Mr. Napper had presented that, I would have read

21     that with interest.  So I have not speculated as to a

22     portion of their ad revenue they may have earned

23     without infringing.

24               So followed well-accepted methodologies,

25     by removing them from the market and apportioning

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     with the assumption of infringement, and apportioning

3     their web visits, which drive ad revenue to the rest

4     of the market.

5          Q     Well, you did know, though, when you

6     drafted this report, sir, that not the entire MDx

7     Vitals website was using the '060 features, right?

8               MR. VAZQUEZ:  Form.

9          A     Yes.

10         Q     (BY MR. STIMPSON)  Right.  And you knew,

11    for example, that not -- you know, less than half of

12    the profiles on the Vitals website actually use

13    patient ratings, right?

14              MR. VAZQUEZ:  Form.

15         A     No, I don't have that understanding.  I've

16    seen that asserted, but I have not seen specific data

17    on it that supports that.

18         Q     (BY MR. STIMPSON)  So when you wrote this

19    report, nobody told you about how many profiles in

20    the Vitals website used patient ratings?

21         A     The topic was discussed.  I have not seen

22    a specific figure.

23         Q     But you know it's not all of them, right?

24         A     That's my understanding.

25         Q     All right.  Okay.  So let's just see if we

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 206

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     can kind of summarize what happened here, then.

3              In your Mar-Flo analysis, to determine

4     what the profits are that Health Grades should have

5     had, had Vitals not infringed, you started with all

6     the advertising revenue from Vitals, right, as your

7     starting point?

8          A     For the infringement period, yes.

9          Q     Okay.

10         A     The data point we know and have and the

11    assumption of infringement, it's a reasonable start

12    point.

13         Q     Right.  And you started with that entire

14    advertising revenue, even though, as we've talked

15    about today, you knew that not every part of the

16    Vitals website was using the features of the

17    '060 Patent, right?

18         A     That's correct.  I also don't know what

19    they would have earned by way of advertising revenue

20    with just those features, without the '060 infringing

21    features.

22         Q     Right.  You just don't know that.  And

23    nobody knows that right now, right?  I mean, we just

24    don't know?

25         A     That's right, because Vitals did not do

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 207

1         CONFIDENTIAL - ATTORNEYS EYES ONLY
2    business that way.  They did it with the features and
3    the assumption of infringement.  REDACTED
4
5
6         Q    Right, but this isn't your first damages
7    case, right?  You know how things are done in other
8    cases, right?  You go out and get a surveyor.  You
9    can do a survey to figure out what percentage of this
10   website generated advertisements, right?  There were
11   options, right?
12             MR. VAZQUEZ:  Form.
13        A    I don't agree that a survey is feasible or
14   reasonable in this case.
15        Q    (BY MR. STIMPSON)  Okay.  So, anyway,
16   knowing that the entire -- not the entire MDx/Vitals
17   website uses the '060 patented features,
18   nevertheless, you started your analysis with all the
19   advertising revenue during the period of alleged
20   infringement from Vitals, right?
21        A    From their actual records, yes.
22        Q    Right.
23        A    It's a reasonable start point.
24        Q    All right.  And then from there, you cut
25   that back by acknowledging the fact that you have a

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 208

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2       lot of users who use both -- go to both Health Grades

3       and Vitals on the same Internet session, right?

4              A     Yes, co-visitors.

5              Q     Right.

6              A     Approximately half.

7              Q     And then what you did is, you did the

8       Mar-Flo analysis.  So from your determination of the

9       competitors in the market, you figured out what the

10      percentages you thought Health Grades would have in

11      the market and applied that percentage to your now,

12      the number -- the advertising revenue that you get

13      from cutting it back for the co-visitors, right?

14             MR. VAZQUEZ:  Form.

15      A      I think you described that correctly.

16             Q     (BY MR. STIMPSON)  And so that's the

17      number that you're proposing for the lost profits

18      number, right?

19                          REDACTED

20

21             Q     Okay.  Good.

22             Did you consider in any of your analyses,

23      Mr. Hall, how difficult or easy it would be for

24      Vitals to design around the '060 Patent?

25             A     Yes.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 209

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      Q      Okay.  And what was your understanding

3  about whether it would be easy or hard to design

4  around this patent?

5      A      I don't have a technical understanding.

6  My understanding is that's often an issue, maybe more

7  than often an issue in patent disputes.  And so I

8  considered it from that perspective, did not have

9  data on it or how Vitals pursued or whether Vitals

10 pursued that.

11          So as I have done in other cases, did not

12 speculate as to that but would read with interest any

13 subsequent analysis related to that and assess it at

14 that time.

15     Q      Did you ask Dr. Greenspun how difficult or

16 easy it would be to design around the '060 Patent?

17     A      I did not.  And I think the issue is not

18 just ease or difficulty, but also whether Vitals

19 would achieve the same amount of traffic with that

20 workaround.  So I think those two concepts should be

21 linked.

22     Q      Right.  Well, let's just look back in your

23 report here on page 3, okay?

24     A      Yes.

25     Q      You have this paragraph 11.  Your

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 222

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Vitals and certainly would be taken into

3      consideration in the negotiation.

4          Q     (BY MR. STIMPSON)  Okay.

5              MR. STIMPSON:  How long have we been

6      going?

7              MR. VAZQUEZ:  About an hour.

8              MR. STIMPSON:  Boy, time flies when you're

9      having fun.  Why don't we take a little break, okay?

10             (Recess taken from 3:13 p.m. to 3:24 p.m.)

11         Q     (BY MR. STIMPSON)  So paragraph 64 of your

12     report, you start talking about licenses, right?

13         A     Yes.

14         Q     Okay.  And you say, many of the Health

15     Grades licenses were fixed fees or tiered fees.

16             Did you consider a fixed fee arrangement

17     here?

18         A     Yes, based on the review of the licenses.

19         Q     So why are you proposing a royalty rate?

20         A     I believe that the way that the two

21     parties have exploited the patented features or used

22     the patented features has been to drive advertising

23     revenue.  And to the extent that that varies, based

24     on the usage of the patented features of the license,

25     I think it's a reasonable basis for the parties to

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 223

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     have had an agreement.

3              And also noted that while Health Grades

4     had done a fixed fee license, they had also done a

5     percent of revenue, ad revenue license agreement as

6     well.  And those were, while not directly analogous

7     or comparable to a '060 license, in at least one case

8     one was closer, then, in my view, than others and

9     that happened to be a percentage of ad revenue.

10         Q     Which one was that?

11         A     DrTango, Inc., the translation into

12    Spanish language.  But it's still data and it's not

13    the '060 Patent so it has that large caveat or large

14    basis for not making it directly comparable.

15         Q     All right.  Well, let's see.  You first

16    refer to the best quality license.  So let's look at

17    that one first.

18              MR. STIMPSON:  Let's have marked as

19    Exhibit 84 a multipage document bearing Bates numbers

20    HGLA 0041 to 50.

21              (Exhibit 84 marked.)

22         Q     (BY MR. STIMPSON)  And this is the Best

23    Quality Healthcare report you refer to?

24         A     License agreement, yes.

25         Q     License agreement?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 224

CONFIDENTIAL - ATTORNEYS EYES ONLY

2      And you think this is a good indication of

3    what Health Grades would have started to request?

4           MR. VAZQUEZ:  Form.

5      A      I have not provided that testimony or

6    written that in my report.

7      Q      (BY MR. STIMPSON)  Well, do you think

8    that?

9           MR. VAZQUEZ:  Form.

10     A      I think it would have been a reference

11   point for Health Grades.  The date of it is after the

12   hypothetical negotiation, but -- and it's not for the

13   '060 Patent.  And I understand from Andrea Pearson

14   that it's with a doctor who they believed was a

15   thought leader in the field.  And I understand not

16   any or much activity has happened on this license.

17          So there are a number of limiting factors

18   as far as comparability, but wanted to include it in

19   my attachment 6a of all the agreements I have

20   received and note that it has a percent of ad revenue

21   or revenue including ad revenue, royalty rate with an

22   option for a fixed amount.

23     Q      (BY MR. STIMPSON)  So part of your

24   testimony regarding this agreement is based on your

25   conversations with, who was it, Andrea Pearson?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 225

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A      Yes.

3       Q      And so how much has Best Quality

4   Healthcare paid under this agreement?

5       A      I don't believe anything, since there

6   isn't any activities happened under this agreement.

7       Q      So they haven't paid a penny under this?

8       A      I don't believe they have.

9       Q      Okay.  Why not?

10      A      I don't recall the reason.

11      Q      Okay.  So -- and you got that information

12  from Andrea Pearson?

13      A      Yes, I also spoke about the agreements

14  with Allen Dodge, but I recall this piece of

15  information from Andrea Pearson.

16      Q      And so under section 7 of this agreement,

17  which is on page 42, Bates number 42, as you point

18  out, there is an option for an annual fixed fee of

19  $172,000, right?

20      A      Yes.

21      Q      And so our damages period that you're

22  discussing here is, you know, roughly two years,

23  right?

24      A      So far, yes.

25      Q      Okay.  So if --

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 226

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      A      Maybe three years by the time of trial,

3  but through my report two years.

4      Q      So through your report, two years.  So if

5  Vitals had paid this $172,000 per year, then their

6  total they were to pay would be less than $350,000,

7  right?

8      A      170 times two years is a little less than

9  350, correct.

10      Q      And your damages analysis, however, comes

11  up with a number of 2.6 million, right, 2.26 million?

12      A      Combining lost profits and royalty, the

13  correct comparison -- yes, comparing 350,000 for a

14  data only, non '060 Patent is implied in your

15  question.

16            And the royalty only damages is a little

17  over 900,000.  My royalty and lost profits damages is

18  the figure you cited.

19      Q      Is Best Quality Healthcare still in

20  existence?

21      A      I don't know.

22      Q      You don't think that this includes at

23  least an implicit agreement that the '060 Patent is

24  not going to be as asserted against Best Quality

25  Healthcare?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 235

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     commissions or other direct costs associated with

3     such revenue received by licensee for delivering any

4     third-party advertisements in the frame surrounding

5     the Health Grades data displayed on the licensee's

6     websites.

7               What does that mean?

8          A    My understanding is as it reads.

9          Q    Well, can you tell me, then, what does it

10    mean when it says they're paying for advertising

11    revenue received by licensee for delivering any

12    third-party advertisements in the frame surrounding

13    the Health Grades data displayed on the licensee's

14    websites?

15         A    They're referencing a specific location,

16    from my read of this, on the DrTango site.

17         Q    Did you ask Ms. Pearson or anybody else

18    what that meant?

19         A    I don't recall specifically when we

20    discussed this license asking about that sentence.

21         Q    So your report, which says that they pay

22    40 percent of all gross ad revenue isn't quite

23    accurate, is it?

24               MR. VAZQUEZ:  Object to form.

25         A    I believe it is.  It says 8, Health Grades

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 236

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     shall receive 40 percent of all gross advertising

3     revenue.

4          Q     (BY MR. STIMPSON)  But you haven't

5     finished the sentence there, have you, Mr. Hall?

6     There's more to it.  There's a limitation on which ad

7     revenue they're going to pay on, right?

8          A     Yes.

9          Q     And that limitation has to be, and as you

10    say, in a specific part of the website, a specific

11    frame, right?

12         A     Yes.

13         Q     So DrTango has complete control over this,

14    right?  He can just put the advertisement in some

15    other part of the website and not pay a penny?

16         A     I'm not aware that he's able to do that,

17    but I don't know.

18         Q     Well, I mean, do you have any reason to

19    believe that he is restricted in where he puts

20    advertisements on his website?

21         A     I don't know.

22         Q     And so you don't know whether DrTango

23    would be required to pay 40 percent on all ad

24    revenues or if he put all the ads outside the frame,

25    whether he would have to pay on any revenues, right?

Page 237

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               MR. VAZQUEZ:  Object to form.

3          A     I have an understanding from the agreement

4     and Ms. Pearson's description of it that he would

5     have an obligation to pay licensing fees based on ad

6     revenue as subject per the agreement as it's worded.

7          Q     (BY MR. STIMPSON)  So Ms. Pearson told

8     you, regardless of what this says, Ms. Pearson told

9     you that he was going to have to pay 40 percent on

10    all ad revenue, right?

11         A     No.

12         Q     Okay.  What did she tell you, then?

13         A     She described it as we went over the

14    agreement, as the agreement states.

15         Q     And you didn't have a discussion with her

16    about what it means, this qualification that says

17    he's only going to have to pay on ad revenue if it's

18    in this specific frame?

19              MR. VAZQUEZ:  Object to form.

20         A     I don't recall that we discussed that

21    directly.

22         Q     (BY MR. STIMPSON)  Okay.  So really, as we

23    sit here, we don't know, do we, Mr. Hall, whether or

24    not he's paying on all ad revenues or just some part

25    of it, right?

Page 238

CONFIDENTIAL - ATTORNEYS EYES ONLY

1               CONFIDENTIAL - ATTORNEYS EYES ONLY

2               MR. VAZQUEZ:  Form.

3     A    JP Anderson may know the amount he's paid

4  to date.  I don't know as I sit here.

5     Q    (BY MR. STIMPSON)  Right.  And so it's not

6  mentioned in your report anywhere, right?

7     A    It's not, no.  The terms of the license

8  are referenced as are the Bates numbers for this

9  agreement.

10     Q    Did you look at any royalty reports from

11  DrTango?

12     A    No.

13     Q    But they exist, don't they?  You can see

14  in the second paragraph there under section 8, he was

15  supposed to get royalty reports.  Do you know if

16  those have been produced to us?

17     A    I don't know.

18     Q    And you haven't seen any royalty reports?

19     A    I have not.

20     Q    Health Grades didn't and their counsel

21  didn't volunteer to give you those, right?

22               MR. VAZQUEZ:  Object to form.

23     A    I don't recall anybody volunteering or

24  discussing those royalty reports.  I recall reading

25  them in the agreement.

Page 254

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  high because Vitals knew they were using the features

3  of the '060 Patent?

4      A    I have not stated that in my report.  My

5  view of the projections specifically as you stated,

6  my view of the projections is it's a good -- it's an

7  important assessment for how Vitals planned to go

8  forward at the time of the hypothetical negotiation,

9  with the assumption of validity infringement and its

10  desire to use the features of the '060 Patent, which

11  primarily, to my knowledge, impacts the advertising

12  revenue line item at the top of each of these

13  projections.

14      Q    But again -- I'm sorry, go ahead.

15      A    I was going to say, an important

16  assessment for Vitals to assess the reasonable

17  royalty for Vitals' plan for going forward with a

18  license for the '060 Patent.

19      Q    But you have -- as we talked about earlier

20  today, advertising revenue can be for a variety of

21  reasons, right?  And it doesn't -- not all

22  advertising revenue is tied to features of the

23  '060 Patent, right?

24      A    Yes.  To the extent the websites attract

25  visitors for other reasons, and I have not concluded

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 255

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    that the only reason one would go to either Health

3    Grades or Vitals is the features of the '060 Patent.

4    There are other features that would drive traffic,

5    but that the '060 Patent features are ones they

6    promoted and certainly a part of, an important part

7    of the reason the two companies cite.

8          Q     So did you do anything, any kind of

9    allocation to try to figure out what part of this

10   revenue would have been attributable to use of the

11   '060 features, as opposed to all the unpatented

12   features on the website?

13         A     I did not make that assessment or

14   speculate as to that.

15         Q     Right.  That would be speculation,

16   wouldn't it?

17         A     I would want to see the basis for anybody

18   doing that and certainly would have looked with

19   interest if Mr. Napper had done that.  But I did not

20   see a basis or way to do it that, in my mind, would

21   be reasonable.  So I wasn't asked, nor did I

22   undertake that analysis.

23         Q     And so you have no way to tell us today

24   what part of these projected revenue streams were

25   projected because of the features of the '060 Patent,

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 256

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2    as opposed to anything else, right?
3        A    I would answer it this way.  The use of
4    the '060 patented features would result in revenue
5    for the advertising line for Vitals.  And that's why
6    they would sit down with Health Grades at a
7    hypothetical negotiation, assuming infringement, and
8    negotiate for a license so that they could earn all
9    the revenue that they possibly could using those
10   features, understanding that they would earn
11   advertising revenue based on other features as well.
12           MR. STIMPSON:  Move to strike as
13   nonresponsive.
14       Q    (BY MR. STIMPSON)  Let me give you the
15   question back one more time, Mr. Hall.  You have no
16   way to tell us today what part of these projected
17   revenue streams were projected because of the
18   features of the '060 Patent as opposed to anything
19   else, right?
20       A    When you're saying revenue streams, are
21   you meaning these six areas?  And I was trying to say
22   they reasonably would know that it would relate to
23   their advertising revenue.  So are you -- is your
24   question, is the revenue stream data leasing,
25   sponsored listings, or are you limiting your question

1    CONFIDENTIAL - ATTORNEYS EYES ONLY

2    whether you had any way -- hold on a second.

3         Okay.  So I asked you about this first

4    projections in 7a.  And the question was, do you have

5    any way to quantify for us what percentages of these

6    projections of revenue would be attributable to the

7    '060 feature, as opposed to what part of the

8    projections were attributed to other non-patented

9    features of the website.  And your answer was, I have

10   not seen data that would allow for that type of

11   calculation.

12        And my question for you, Mr. Hall, trying

13   to cut this a little shorter is, you also rely on the

14   projections for 7b and 7c.  Would your answer be the

15   same?  That is, that you haven't seen data that allow

16   the calculation of a quantification for what portions

17   of projections of revenue would be attributable to

18   the '060 feature, as opposed to the part of the

19   projections that were attributed to other non-

20   patented features.  And your answer would be the same

21   for those, too?

22        MR. VAZQUEZ:  Form.

23   A    One minute.

24   Q    (BY MR. STIMPSON)  Okay.

25   A    Yes.

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2     Q     So let's go back then to -- back to the --
3  to your report here, the analytical approach, all
4  right?
5     A     Yes.
6     Q     Now, you say for the analytical approach
7  here that you weren't able to find a close comparable
8  invention, right?
9     A     Which paragraph are you referring to?
10    Q     Paragraph 79 in the last couple lines.
11    A     I was unable to find profit information
12  for a group of the Health Grades and Vitals
13  competitors, correct.
14    Q     So this isn't your first patent case,
15  right?  You've done damages analyses for other patent
16  cases?
17    A     Yes.
18    Q     So do you understand, Mr. Hall, that if
19  you want to get the profit information for other more
20  comparable companies, you can just subpoena them?
21         MR. VAZQUEZ:  Object to form.
22    A     I've heard of that being done, but I don't
23  know that that's available in all options.
24    Q     (BY MR. STIMPSON)  All right.  Well, you
25  came on to this in the summer of 2011, right, is when

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 270

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      you were hired?

3           A     Yes.

4           Q     Okay.  And did you ever talk to your

5      counsel, I mean, counsel for Health Grades, say, Hey,

6      look, we better be getting profit information for

7      these other companies so I can do a damages analysis?

8           A     I may have had that discussion -- I

9      certain -- I did not recommend a subpoena of a

10     competitor or a request of a competitor for their --

11     for what they would use, very proprietary information

12     on the margins they make on their advertising

13     revenue.

14          Q     All right.  It's because there was no

15     subpoena served that we're now looking at your report

16     and you're doing the profit and your analytical

17     approach with WebMD in paragraph 79, right?

18               MR. VAZQUEZ:  Object to form.  Misstates

19     the evidence.

20          A     I've done an analysis based on WebMD as

21     well as Health Grades overall.

22          Q     (BY MR. STIMPSON)  Right.  So you used

23     WebMD.  Let's talk about that first.  That's not even

24     close to the '060 Patent, is it?

25               MR. VAZQUEZ:  Form.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 271

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     A     It's not.  And that makes it a, in part,

3    makes it a good comparison.

4     Q     (BY MR. STIMPSON)  Oh, really?

5     A     Because it's an online advertising

6    business model, but without the '060 patented

7    feature.

8     Q     Well, I mean, let me just -- I though we

9    went over this today.  But let me just ask you again.

10   The idea behind the analytical approach, Mr. Hall, is

11   to get something as close to the patent as you

12   possibly can without using the patent and compare

13   those profits to what the profit margins are when you

14   do use the patent, right?

15         Because that way you can compare and say,

16   okay, this additional profit, this is because you're

17   using the patent, right?

18         MR. VAZQUEZ:  Form.

19    A     When you said not close with the '060

20   Patent, you don't want it to be practicing or being

21   infringing or using the '060 patented features.

22    Q     (BY MR. STIMPSON)  Of course not.

23    A     Which is what I was answering to.

24    Q     Oh.

25    A     As far as then finding an entity like

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 272

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2    WebMD that uses an advertising revenue model and is
3    cited by Vitals as a public comparable company, I
4    think is a reasonable basis, particularly if you have
5    other bases to try to determine through an excess
6    profits or analytical method, incremental profit one
7    could earn from the '060 patented features.
8          Q     Does WebMD have patient ratings?
9          A     Let me see.  I don't see that indicated
10   under description of their services.
11         Q     Do you know where WebMD gets their data?
12   Whether they get any from the healthcare providers or
13   third parties or whether they're verified?  Do you
14   know anything about how or where they get their data?
15         A     Not beyond what they disclose in their
16   website and their 10-K that I reviewed.
17         Q     Well, do they give anything in there about
18   where they're getting their data for their providers?
19         A     I recall seeing it on their 10-K.  I don't
20   have that here.
21         Q     Well, you don't even count WebMD as being
22   in the same market as Health Grades, right?
23         A     Not the specific market for accessing
24   online physician information that Vitals both viewed
25   and Health Grades viewed as their direct competitors

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 273

1           CONFIDENTIAL - ATTORNEYS EYES ONLY
2      for that, that's correct.
3           Q     Okay.  We've got some other problems with
4      this approach of using WebMD, right, too?
5                 MR. VAZQUEZ:  Form.
6           Q     (BY MR. STIMPSON)  One of them is you
7      don't know -- first of all, you're using WebMD's
8      overall profit margin, right?
9           A     Yes, which is 85 to 90 percent advertising
10     revenue based.
11          Q     But you don't know what factors are
12     driving that advertising revenue, right?
13          A     I have a general understanding of the
14     factors that drive that.  They're online content and
15     online visits.
16          Q     Well, what's the basis for that
17     understanding?
18          A     A review of their information provided
19     online, as well as their 10-K.
20          Q     So is there anything in their 10-K saying
21     this is what makes our advertising revenue go up and
22     down?
23          A     Not worded like that.  There's information
24     related to their business model in their 10-K.  And
25     there was also some information in Vitals about

Page 274

CONFIDENTIAL - ATTORNEYS EYES ONLY

1   WebMD.

2        Q    My point is this, Mr. Hall.  You really

3   don't know what is driving WebMD's profit margin, do

4   you?

5        A    I have a general idea from review of the

6   documents about them, yes.  Revenue obviously is a

7   big part of what drives their profit margin and

8   obviously the costs they incur to earn that revenue

9   as they report it.

10       Q    Do you know how they get their advertising

11  revenue?  I mean, is it paid on a hits per million or

12  is it paid by monthly access fees?  How do they get

13  their revenue for advertising?

14       A    I would have to look at the source.  I

15  don't recall as I sit here.

16       Q    And you know that they have a lot of stuff

17  on their website that's totally unrelated to looking

18  for physicians, right?

19       A    They do.  That's one of the reasons

20  neither I, or Vitals or Mr. Napper included them as

21  direct competitors for them.

22       Q    My question is, with the evidence we have,

23  Mr. Hall, thus far, how am I going to test this

24  theory?  I mean, you compare these two profit

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 275

```
1              CONFIDENTIAL - ATTORNEYS EYES ONLY
2      margins.  And, you know, without knowing specifically
3      what's driving the WebMD profit margins and what
4      portions of their website are more profitable than
5      others, there's no way for us to really test with any
6      accuracy your analytical approach using WebMD, right?
7                   MR. VAZQUEZ:  Form.
8         A      I don't agree.  It's a publicly traded
9      company.  I've disclosed how I've used that and the
10     sources for it.  There's information about the
11     aspects you just listed, so I don't agree with that.
12        Q      (BY MR. STIMPSON)  So what portion of the
13     WebMD revenue is generated by parts of their website
14     other than searching for doctors?
15                  MR. VAZQUEZ:  Form.
16        A      I don't have that specific figure today.
17        Q      (BY MR. STIMPSON)  Do you have any idea?
18                  MR. VAZQUEZ:  Same.
19        A      I would look back at the information I
20     reviewed before and see if there is an answer to
21     that.  I don't, as I sit here.
22        Q      (BY MR. STIMPSON)  And what part of their
23     profitability is attributed to parts of their website
24     other than searching for physicians?
25                  MR. VAZQUEZ:  Form.
```

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 276

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      A      As far as related to their advertising

3   revenue and profitability?

4      Q      (BY MR. STIMPSON)  Right.

5            MR. VAZQUEZ:  Same.

6      A      I don't recall.  I would have to look back

7   at the information we had for them.

8      Q      (BY MR. STIMPSON)  There's nothing in your

9   report indicating what that is, right?

10     A      No, there's not.

11     Q      And what part of their overall costs are

12  attributed to parts of their website other than

13  looking for physicians?

14     A      I would have to look at the 10-K to answer

15  that specifically.  I see the summary of the capital

16  IQ report here, but I don't have the detailed

17  information in front of me to answer that.

18     Q      There is nothing in your report indicating

19  that, right?

20     A      Correct.

21     Q      Okay.  Do you have Exhibit 13 there?

22  Where did that go?

23     A      Attachment 13?

24     Q      No, Exhibit 13 was the Drucker report.

25  Where are all these exhibits?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 277

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               (Discussion off the record.)

3          Q    (BY MR. STIMPSON)  Now, paragraph 78 of

4     your report says you weren't able to find a close

5     comparable product, right?

6          A    Paragraph 79.  I was unable to find profit

7     information for a group of Health Grades' and Vitals'

8     competitors to make such a comparison.

9          Q    Right.  It's really not a comparison of

10    competitors, is it, Mr. Hall?  It's really just a

11    comparison of products?

12         A    Competitors --

13              MR. VAZQUEZ:  Form.

14         A    -- certainly are ones I would start first

15    with because of their efforts in the market with the

16    products, I think referenced in your question to earn

17    advertising revenue.

18         Q    (BY MR. STIMPSON)  Oh, but it's much

19    better to actually use the product of the company

20    that owns the patent, right?  I mean, because if you

21    have a product, that company has a product that's out

22    in the marketplace and then they make a change to

23    make it fall into the patent, you've got them right

24    there, right, in the same place?

25              You've got the one before the patent was

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 278

1            CONFIDENTIAL - ATTORNEYS EYES ONLY
2      used and one afterward and you can say, Hey, look,
3      now I can see what the difference in profit margin
4      is, right?
5                MR. VAZQUEZ:  Form.
6          Q    (BY MR. STIMPSON)  I mean, that's a great
7      comparison, isn't it?
8                MR. VAZQUEZ:  Form.
9          A    I'm not sure I understand the beginning
10     part of that question, but I think the final part of
11     that question was, if you had an entity that had a
12     similar business model but without the patent?
13         Q    (BY MR. STIMPSON)  Right.  So let's just
14     look at this situation, okay?  You've got before you
15     Exhibit 13.  This is what Health Grades was selling
16     before they started to use the patent invention.
17     Okay?
18               MR. VAZQUEZ:  Form.
19         Q    (BY MR. STIMPSON)  June 2005.
20         A    You're not saying this is all.  This is
21     part of what they were --
22         Q    Sure.
23         A    Yes.
24         Q    I'm telling you in June of 2005, you could
25     get on the Health Grades website.  You could ask for

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 279

         CONFIDENTIAL - ATTORNEYS EYES ONLY

1    a report on Dr. Drucker, and you could get this.

2           MR. VAZQUEZ:  Form.  Assumes facts not in

3    evidence.

4       Q    (BY MR. STIMPSON)  Okay?  You can assume

5    that?

6       A    Okay, I'll make that assumption.

7       Q    Okay.  So --

8       A    I don't know that to be the case from this

9    document, but --

10      Q    That's okay.  So you could determine what

11   Health Grades' profit margin was on this by just

12   asking Health Grades, right?

13          MR. VAZQUEZ:  Form.

14      A    I could look at Health Grades' financial

15   information, can discern their profit at different

16   time periods, yes.

17      Q    (BY MR. STIMPSON)  Right.  And then you

18   could also find out from Health Grades how their

19   profit margin changed when they added comparison

20   ratings, right?

21      A    Yes.

22          MR. VAZQUEZ:  Wait.  Sorry.  I just meant

23   to make an objection.  I should have made it before

24   to the extent it calls for a legal conclusion to the

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 280

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     meaning of the phrase comparison ratings.

3          Q     (BY MR. STIMPSON)  And if you had done

4     that, Mr. Hall, that would tell you how the Health

5     Grades profit margin changed when it went from no

6     comparison ratings to comparison ratings, right?

7                MR. VAZQUEZ:  Same.

8          A     That could be a metric, certainly.  And

9     I've also compared their portion of the business that

10    utilizes the patented features with its overall

11    business because that's reasonably something a

12    company like Health Grades in a hypothetical

13    negotiation would discern or want to know as it sat

14    down for a hypothetical negotiation.

15               MR. STIMPSON:  So move to strike

16    everything starting with and I've also compared as

17    nonresponsive.

18         Q     (BY MR. STIMPSON)  So you didn't ask

19    Health Grades to show you what they were doing before

20    they added comparison ratings, did you?

21               MR. VAZQUEZ:  Same objections.

22         A     I did not.  I asked for financial records

23    back through 2008.

24         Q     (BY MR. STIMPSON)  And you didn't ask

25    them -- okay.  Never mind.  I have that answer.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 281

1    CONFIDENTIAL - ATTORNEYS EYES ONLY

2         So let's talk about this other one here

3    you're referring to.  You did this second analysis

4    where -- general paragraph it says now.  I don't know

5    what paragraph, paragraph 80, maybe?

6         A    Yes.

7         Q    And that's where you do a comparison of

8    the overall Health Grades profits with the profits

9    associated with what you refer to, I guess, as the

10   what you think are the profits associated with the

11   '060 Patent, right?

12             MR. VAZQUEZ:  Form.

13        A    That's not how I would describe it.

14        Q    (BY MR. STIMPSON)  Well, how do you

15   describe it, sir?

16        A    Health Grades' overall company profit

17   margin, which would include and therefore has the

18   benefit of profitability from the '060 Patent with a

19   subset of the company of the departments that it any

20   way have used and generated revenue incurred expenses

21   related to the patented features of the

22   '060 Patent.

23        Q    So really, you took the overall Health

24   Grades profit margin and compared that to what you

25   have in attachment 1, right; is that right?

Page 282

1    CONFIDENTIAL - ATTORNEYS EYES ONLY

2    A    Yes, that's right.

3    Q    Okay.  And we've talked about that

4    attachment 1 before.  I'm not going to go over that

5    again.

6         But you can confirm for me, though, sir,

7    that Health Grades does not separately report the

8    revenues and expenses related to the patented

9    technology, right?

10   A    They, like most companies, certainly do

11   not do P&Ls on patented technologies, that I'm aware

12   of, that I've experienced.

13   Q    And as we talked about earlier today,

14   revenue reports by the various Health Grades

15   departments include more than just the patented

16   technology, right?

17   A    Yes.  But it would also include, the

18   patented features, that they earned revenue and

19   incurred expenses.

20   Q    Right.  We talked about that before.  The

21   problem though, is -- the problem with this analysis

22   is there is no isolation in this analysis of the

23   profit margins that are just from the patented

24   features, right?

25              MR. VAZQUEZ:  Form.

Page 283

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      A      I believe it's a reasonable attempt with

3      the data as it was available, without speculating or

4      parsing data kept in the normal course of their P&L

5      statements to ascertain the profit increment they're

6      able to earn on departments that utilize the patented

7      feature.

8      Q      (BY MR. STIMPSON)  All right.  But just so

9      we're clear, then.  In this analysis you do against

10     the whole Health Grades profit margin, there is no

11     isolation anywhere of the profit margins that are

12     only attributable to the '060 features.  And that may

13     be because there is no documents on it, but there is

14     no isolation of it, right?

15     A      There is an attempt, reasonable attempt by

16     me with the data limitations and the data available

17     as there are with all companies that have patents and

18     do not keep track of profits and losses on patent by

19     patent, which is common.

20            There is one other data point of reference

21     and that's the incremental profit that Health Grades

22     earns on its added advertising revenue, which is

23     quite high.  But that is a point of reference, but

24     also is the ad revenue -- I'm sorry, the incremental

25     profit they would earn on ad revenue, both with --

Page 286

CONFIDENTIAL - ATTORNEYS EYES ONLY

1       information on physicians?

2              MR. VAZQUEZ:  Form.

3       A      Yellow Page sites.  I don't believe I've

4       seen government sites.

5       Q      Did you read Mr. Montroy's testimony?

6       A      Yes, after seeing it referenced in

7       Mr. Napper's report.

8       Q      So would you agree with me that there are

9       government sites that also provide information on

10      physicians?

11      A      I would not.  A number of the deposition

12      cites -- I would not, based on Mr. Napper's reference

13      to them alone, based on some of the cites --

14      references I saw.

15      Q      Would you agree with me that a number of

16      websites that provide information on physicians

17      generate a portion of their revenue from

18      advertisements?

19      A      Yes, as we discussed earlier.

20      Q      And the revenues on these -- from these

21      advertisements are generally recognized by a cost per

22      thousand impressions, right?

23      A      I can't speak for all of them.  But I

24      think, yes, that's a general standard, that web

Page 287

2    advertising revenue policy.

3        Q     Would you agree with me that Health

4    Grades' website includes information on directions,

5    e-mail links, information on why a doctor's hospital

6    matters and tips for better health and profiles?

7            MR. VAZQUEZ:  Form.

8        A     I recall seeing that information.

9        Q     (BY MR. STIMPSON)  Health Grades also

10   offers physicians and hospitals the opportunity to

11   license its ratings and trademarks, provides

12   marketing assistance to hospitals and consults with

13   hospitals on quality improvement, right?

14       A     Yes, that's my understanding.

15       Q     Would you agree that the Vitals website

16   provides users with doctor evaluations, assistance in

17   scheduling appointments, preparation for doctor

18   visits, among other things?

19           MR. VAZQUEZ:  Form.

20       A     I don't know that I recall all of that,

21   those offered on its website.  Some of those sound

22   familiar, but I don't have the website in front of me

23   right now.

24       Q     (BY MR. STIMPSON)  Well, do you recall if

25   Vitals also provides assistance with scheduling

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 288

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    appointments?
 3          A     I believe so.
 4          Q     And Vitals also gives information on
 5    preparation for doctor visits, right?
 6          A     I would want to look specifically.  I
 7    don't recall that specific one, but I'm not
 8    contesting it.
 9          Q     That's okay.  Would you agree that people
10    generally don't go into a search bar and type in
11    vitals.com or healthgrades.com?
12          MR. VAZQUEZ:  Form.
13          A     I think, yes.  As measured on the overall
14    web traffic that goes to those sites, I would agree
15    that that would not be the predominant way a visitor
16    would get there.
17          Q     (BY MR. STIMPSON)  So would you agree that
18    what drives consumers to web properties like Vitals
19    and Health Grades on physician searches is at least
20    in part how well the company's search engine is
21    optimized?
22          A     Yes, and that relates to content and
23    relevance.
24          Q     Would you agree with me that SEO is the
25    biggest factor on whether consumers search for
```

Page 289

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     physician information on healthgrades.com or

3     vitals.com or both?

4          A     No, not without the explanation beyond

5     that of why the search engine has selected the two

6     that make available the content that includes the

7     '060 patented features, and why those two are the

8     dominant website visits within their market.

9          Q     And my question, though, is just a little

10    bit different.  I mean, regardless of why SEO may be

11    the biggest factor, the fact is that SEO is the

12    biggest factor in whether consumers searching for

13    physician information end up on healthgrades.com or

14    vitals.com or both, right?

15              MR. VAZQUEZ:  Asked and answered.  Form.

16         A     No, I would give that same answer because

17    it's the root cause and the root content and

18    relevance and link to other quality websites is such

19    a big part of that, that that's my answer.

20         Q     (BY MR. STIMPSON)  Okay.  Would you agree

21    with me that Health Grades in response to searches on

22    places like Google and Bing usually is listed first?

23         A     Yes, I think that's fair, depending on the

24    search term.

25         Q     Right.  And would you also agree with me