Civil Action No. 11-CV-00520-PAB-BNB

**HEALTH GRADES, INC.'S OPPOSITION TO MDx MEDICAL, INC.'S MOTION FOR SUMMARY JUDGMENT OF NO WILLFULNESS**

**HEALTH GRADES, INC.'S OPPOSITION TO MDx MEDICAL, INC.'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

---

**Exhibit 7**

**July 13, 2012 Greenspun Report**

EXHIBIT 7

**Expert Report of Philip Greenspun**

**Regarding infringement of U.S. Patent No. 7,752,060 by MDX Medical**

This report is submitted pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

## I.    Introduction

1.      My name is Philip Greenspun. I received a PhD in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology in 1999 and have been teaching software engineering for Internet applications and database programming there periodically since receiving my degree.  My business address is 5 Irving Terrace, #3, Cambridge, Massachusetts 02138.  I have been involved in the computer science field for since 1978.  I am over eighteen years of age and I would otherwise be competent to testify as to the matters set forth herein if I am called upon to do so at trial.

2.      I have been retained by counsel for Health Grades, Inc. ("Health Grades") as a technical expert witness with respect to the proceedings currently before the Court in the above-captioned matter.  I receive compensation in the amount of $425 per hour.  Health Grades has also reimbursed me for travel and other expenses that I have incurred that are related to providing this technical analysis.  My compensation does not depend on the outcome of this case.

3.      For purposes of this Expert Report, I have been asked by Health Grades to provide an expert technical analysis of whether the asserted claims of U.S. Patent No. 7,752,060 (the "'060 Patent") that Health Grades contends are infringed by Defendant MDx Medical, Inc. ("MDx") as properly interpreted, are infringed by MDx's systems and methods, either literally, or under the doctrine of equivalents.  Additionally, I have been asked by Health Grades to provide an expert technical analysis concerning whether MDx indirectly infringes these patent claims by inducing or contributing to the direct infringement of the patent claims by selling its customers certain products and services and enabling its customers to implement systems and methods which infringe the patent claims either literally or under the doctrine of equivalents.

4.      I understand that Health Grades contends that MDx directly or indirectly infringes claims 1, 4-9, 11, and 14-16 of the '060 Patent ("the asserted claims").  I further understand that Health Grades contends that MDx directly infringes all of the asserted claims with the exception of claim 11. I further understand Health Grades further contends that MDx indirectly infringes (either through inducement or contributory infringement) all of these claims.

5.      As set forth herein, it is my opinion that MDx's systems and methods directly infringe claims 1, 4- 9, and 14-16 of the '060 Patent literally or, alternatively, under the doctrine of equivalents.

6.      Moreover, it is my opinion that MDx indirectly infringes all of the asserted claims by inducing or contributing to the direct infringement of these patent claims by its customers (e.g., Aetna) by selling/licensing its physician database and providing services and enabling its customers to implement systems and methods which infringe the patent claims either literally or under the doctrine of equivalents.

7.      In a separate Rebuttal Expert Report, I may also provide expert technical analysis with respect to MDx's contentions that the asserted claims of the patents-in-suit are invalid, if any.

8.      This report briefly sets forth my background and qualifications to provide my opinions, sets forth the materials reviewed and investigations conducted to prepare this report, and sets forth my opinions and analysis.

9.      This Expert Report is based on my study to date and includes:

a.  My opinion concerning a person of ordinary skill in the field of the patents-in-suit;

b.  My opinions that MDx's systems and methods directly infringe the asserted patent claims either literally or under the doctrine of equivalents; and

c.  My opinions that MDx indirectly infringes the asserted patent claims by inducing or contributing to the direct infringement of those claims by Aetna.

10.      I currently hold the opinions set forth in this Report. As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in added observations. I reserve the right to supplement this Expert Report and to rely on additional documents and testimony that come to my attention between now and the time of the trial.  For example, I may supplement this Report to take into account the fact that MDx continues to produce additional documents relevant to my analyses in response to Health Grades' document requests.  Nevertheless, I believe the evidence adduced to-date provides support for the opinions expressed in this Report.  However, I believe that the additional discovery outstanding from MDx would serve to buttress my opinions.  I also reserve the right to rely on all other Expert Reports submitted in this litigation.

11.      If requested, I will testify regarding the opinions set forth herein.  I may also discuss my own work and experience with the technology disclosed in the '060 Patent, and knowledge of the state of the art at the relevant time period

DISTRICT OF NEW YORK, Case No. 09-14326 (deposition); (4) Bouret et al v. Caribbean Aviation Maintenance Corp. et al, Puerto Rico District Court, Case No. 3:2009cv2034 (deposition and trial); (5) The Rector and Visitors of the University of Virginia v. IDX Systems Corporation, Civil Case No. CL09-58, Circuit Court for the City of Charlottesville, Virginia (deposition).

### III.     Materials Reviewed and Investigation Conducted

28.     The materials that I reviewed, considered, and/or relied on in preparing this report are those that are referenced within. I have also attached as Appendix B a list of the most important materials that I reviewed, considered, and/or relied on. In addition, I attended the depositions of Mitchell Rothschild, the CEO of MDx Medical, and Larry West, the manager of engineering for the vitals.com site.

### IV.     Priority Date

29.     My understanding is that the '060 Patent claims priority to U.S. Provisional Application No. 60/771,757, which was filed on February 8, 2006.

### V.     Person of Ordinary Skill in the Art

30.     I personally hired and supervised Web developers in 2006 for the photo.net online community, an Internet Application.

31.     My definition of a person of ordinary skill in the art, based on my direct personal experience in the field in 2006, is someone with a Bachelor's degree in Computer Science or related field and some experience building database-backed Web sites.

### VI.     Summary of My Opinions

32.     Opinion No. 1: It is my opinion that MDx's systems and methods directly infringe claims 1, 4- 9, and 14-16 of the '060 Patent literally or, alternatively, under the doctrine of equivalents.

33.     Opinion No. 2:  It is my opinion that MDx indirectly infringes all of the asserted claims by inducing or contributing to the direct infringement of these patent claims by its customers (e.g., Aetna) by selling/licensing its physician database and providing services and enabling its customers to implement systems and methods which infringe the patent claims either literally or under the doctrine of equivalents.

## VII.     The Basis and Reasons for My Opinions

**A.     Background of Database-backed Web Sites**

**1.     What is a Database?**

34.     A database is an organized collection of information. A computer program that assists programmers with common challenges regarding creating, updating, and querying a database is a database management system (DBMS). The most popular type of DBMS is the relational DBMS or "RDBMS", the best conceptual model for which is "a big spreadsheet that several people can update simultaneously." Familiar examples of the RDBMS include Oracle and Microsoft SQL Server.

35.     Information within an RDBMS is stored in tables. Communication with the RDBMS is via the Structured Query Language (SQL), which includes statements such as CREATE TABLE, INSERT (add a row), UPDATE (change a data item within a table), DELETE (remove a row), and SELECT (return a report). The "SQL schema" or "data model" is a collection of CREATE TABLE statements that prepares the RDBMS to accept data items.

36.     For example, suppose that a Web site developer wished to record subscribers to an email newsletter. He or she would create a new table called mailing_list with two columns (also sometimes called "fields"), email and name, both text strings that can be up to 100 characters in length ("varchar(100)"):

```
create table mailing_list (
       email       varchar(100),
       name        varchar(100)
);
```

37.     After a series of INSERT commands, the contents of this table may be viewed in a spreadsheet format, e.g.:

| Name | email |
|------|-------|
| Philip Greenspun | philg@mit.edu |
| Bill Gates | billg@microsoft.com |
| Scott Adams | scottadams@aol.com |

by typing a SELECT statement such as:

select name, email from mailing_list

38.     Each row in the table is also referred to as a record. Note that, unlike with a desktop spreadsheet Application, every data item in the same column, e.g., email, must be of the same data type (in this case a character string).

## 2.     What is a Database Application?

39.     A database application is a computer program whose primary purpose is entering information into and retrieving information from a computer-managed database. Some of the earliest database Applications were accounting systems and airline reservation systems such as SABRE, developed between 1957 and 1960 by IBM and American Airlines.

40.     Users interacted with early database applications, such as SABRE, by typing at a terminal connected directly to a mainframe computer running the database management system. The IBM 3270 terminal, introduced in 1972, was a very commonly used device.  The terminal had no ability to process information, but merely displayed characters or "screens" sent from the mainframe.

41.     Software development for an early database application was simply software development for the mainframe computer, which executed all of the program code centrally. Software was developed in assembly language, a "second-generation language", or one of the "third-generation languages" developed in the late 1950s and early 1960s, e.g., COBOL, Fortran, or PL/I. Whatever conventional programming language was used, there may have been embedded database commands in a specialized query language.

42.     The heart of any database application is the data model or SQL schema. If there is no table or column to store, for example, a customer's credit card number, even the cleverest programmer will not be able to add an automatic monthly bill-my-credit-card feature.

## 3.     What is a Web Application?

43.     A "Web application" is a server-based computer program that can be used by a user sitting in front of a standard Web browser, such as Microsoft Internet Explorer, Firefox, or Google Chrome. Examples of Web applications include wikipedia.org, nytimes.com, facebook.com, and youtube.com. The advantage of the Web, compared to some 1980s and early 1990s systems of networked computers, is that no specialized software need be installed on the end-user's computer. The same personal computer or mobile phone and the same Web browser can be used to read a news article from nytimes.com, order a book from amazon.com, or

calculate the cost of a new car using Google Spreadsheets. A classical Web application is very similar to an old mainframe application. All computation is performed on the central computer in response to a request for a URL. E.g., a request for http://www.txwd.uscourts.gov/general/judges/biographyview.asp?bID=13 causes the server to run the program in the file biographyview.asp located in the /general/judges/ directory on the www.txwd.uscourts.gov server) and only information necessary to paint a "screen" is sent to the device on the user's desktop via the Hypertext Transfer Protocol (HTTP). Thanks to 30 years of progress in microelectronics, the desktop device can display color graphics rather than simply green characters, but the software ideas are very similar.

44.     Rather than the IBM 3270 terminal protocol, the specifications for the screen or "page" to be displayed are sent in Hypertext Markup Language (HTML), which is a specification or format for a document (analogous to the format in which Microsoft Word, for example, might save a file to disk). The structured data in HTML is distinct from a programming language, which generally either expresses a step-by-step algorithm for a computer to follow or specifies a computation to be performed.

### 4.     What is a "Web-based database Application" or "database-backed Web site"?

45.     A "Web-based database application" or "database-backed Web site" is simply a combination of the systems described above, i.e., "a computer program that can be used by a user sitting in front of a standard Web browser whose primary purpose is entering information into and retrieving information from a computer-managed database". No additional software needs to be installed by end-users. The computer programs on the server, however, are modified so that they rely on a database management system (DBMS) for storing and retrieval of information. The user requests pages by URL, as before, and in response the server will run computer programs (page scripts) that will generally access the DBMS and then merge the results with a template in order to build up a complete HTML page to return.

## B.     The '060 Patent

### 1.     Background

46.     The '060 Patent describes a database-backed Web site whose function is to connect patients with healthcare providers such as physicians and hospitals.  (*See* '060 Patent, Abstract.)

47.     The company providing the information service creates and maintains a database of detailed information relating to healthcare providers.  (*See* '060 Patent, Abstract.)

knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

86.     To be liable for induced infringement, I am informed and understand that the defendant must have either actual knowledge of a patent or a willful blindness to the existence of the patent, committed affirmative actions that induced the infringing acts and the defendant knew or should have known that his actions would induce infringement. Various activities may be relied upon to show inducement of the direct infringement of another, including advertising and providing instructions to the other on how to carry out the acts or operate the systems or methods that give rise to the direct infringement, licensing the activities of the direct infringer and the inducer's provision of assistance in the design, implementation or operation of the direct infringer's systems or operations.

### E.     Accused Products

87.     My understanding is that the accused products include the following:

a.   Vitals.com Web site:

  i.   current version of the vitals.com Web site ("Current Version")

  ii.   an earlier version of the vitals.com Web site ("Prior Version")

  iii.   the two versions are very similar, with the removal of the comparison feature being the major difference between the Prior Version and the Current Version.  Unless otherwise noted, the opinions described herein relate to both versions of the vitals.com Web site.

b.   iTriage Mobile Application, both iOS (e.g., iPhone and iPad) and Android versions ("iTriage")

c.   In addition, I understand that an MDx iPhone Application ("App") as described in a March 30, 2012 design document (MDX 0104422-39), may be added to the above list of accused products. If so, I will be supplementing my report with a full analysis of this App. Based on an initial reading of MDX 0104422-39, I believe that it is likely that this App infringes at least one claim of the '060 Patent, e.g., pages MDX 0104424 and MDX 0104433 appear to show search results pages similar to what the Current Version displays, with lists of physicians and star ratings next to each physician.

88.     For the behavior of the Current Version, I relied on the behavior of the live vitals.com Web site, as accessed between December 2011 and July 2012 as well as screen captures within Plaintiff's Rule 3.1(c) Disclosure dated October 19, 2011 and February 2012.

89.     For the behavior of the Prior Version, I relied on the screen captures with Plaintiff's Rule 3.1(c) Disclosure dated July 1, 2011 and February 2012.

**F.      Both Versions of Vitals.com**

90.     The vitals.com site, as of January 25, 2012, tells visitors that it is "Your source for comprehensive medical information on 830,000 doctors nationwide."  The title of the home page is "Doctor Reviews and Doctor Ratings | Compare & Find Doctors | Vitals".  (*See* Appendix C.) This title is displayed by a Web browser due to the presence of the following line in the HTML source of the home page: <title>Doctor Reviews and Doctor Ratings | Compare & Find Doctors | Vitals</title> (obtained using the "View page source" command from the Google Chrome browser on July 11, 2012)  The four most prominent links invite a patient to check on a particular doctor, search for a doctor by specialty, search for a doctor by "medical need" (e.g., symptom or disease), and "rate your doctor". Less prominent are links for medical doctors, offering the ability for them to "update your profile" or "drive more patients" or "manage your reviews". These lead to a separate area of the site titled "Doctor Portal". There is an additional set of links targeted at potential advertisers on the site.

91.     A typical patient session with vitals.com might start with a search for endocrinologists within 10 miles of Denver, Colorado.  This brings up a list of 73 doctors, of which the first 8 are shown, along with links to the remainder. The first page or summary page of a report on each doctor is displayed and the reports are presented in order of how well they match the patient's search criteria.  The responsive reports may be sorted by "distance," "relevance," or "last name", depending on the user's selection from a drop-down menu at the top right of the list. If sorted by distance, for example, the doctor closest to the center of Denver appears at the top of the list. If sorted by last name, a doctor whose last name begins with "A" appears at the top of the list. It is unclear what the criteria for "relevance" are. Sliding controls at the lower left allow the user to, for example, adjust the importance of "years of experience" or "travel distance".  Following an adjustment to a slider, the list of doctors is reordered according to what Vitals calls a "match score."  (*See* Vitals.com PowerPoint, "Site Functionality & Data Set Overview" at MDX0071975; Vitals.com PowerPoint, "Thinking About Physician Quality" at MDX0012076; Deposition of Larry West (Rough Draft) at 178.)

92.     Further, www.vitals .com (both versions) allows for filtering by gender, board certification, star ratings, languages spoken, and physicians who were educated in the U.S.  If the "board certified" checkbox is selected, for example, the number of doctors is reduced from 73 to

42, with those doctors who are not board-certified having been removed. This feature allows a user to specify narrower search criteria for the particular doctor he or she seeks.

93.     The summary page (e.g., first page) of a doctor's report includes an overall star rating (1-4 stars), whether or not the doctor has received the distinction of being one of "America's Top Doctors", and whether or not the doctor has received the vitals.com "Patients' Choice Award" (http://www.patientschoice.org/whatispca).  Clicking on the doctor's name brings up the remainder of the report, which includes more detail from patient surveys as well as information regarding the doctor's training, affiliations, awards, languages spoken, etc. From the report, the Web site visitor has the opportunity, following treatment, to rate the doctor.  (*See* Appendix C.)

94.     As this dispute involves the operation of a Web application, which may be reprogrammed to some extent between the date of this report and the date of the trial, I am attaching to this report a set of video recordings that show a Web user interacting with the vitals.com Web site (Current Version) in June 2012. I reserve the right to use these as demonstratives at trial.

**1.     Claim 1 and both versions of the vitals.com Web site**

a.     <u>Preamble</u>: *A computer-implemented method of providing healthcare provider information to potential patients, said method comprising:*

95.     Vitals.com meets this element.

96.     Both the Current Version and the Prior Version, like any Web site on the Internet, must respond to requests via the TCP/IP and HTTP protocols and therefore must be implemented with computers.

97.     The Current Version menu bar offers choices including "check up on your doctor" and "find a doctor".  A doctor is a "healthcare provider" and a person looking for a doctor is a "potential patient".  The Prior Version had similar language.

98.     The Current Version, states that vitals.com was "Your source for comprehensive medical information on 830,000 doctors nationwide." As a doctor is a healthcare provider, the site explicitly promises "information."  (*See* Appendix C.)

99.     Based on the screen shots reviewed and the live site accessed, both versions of the vitals.com Web site are computer-implemented methods of providing healthcare provider information to potential patients.

    *b.*    <u>*Step 1*</u>*: receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider,*

100.    Vitals.com meets this element.

101.    This claim element depends in part on whether or not there is a company that has a Web server computer. A WHOIS lookup on the register.com Web site on June 26, 2012 resulted in the following record for vitals.com:

> Registrant:
> mdX Medical
> ATTN VITALS.COM
> care of Network Solutions
> PO Box 459
> Drums, PA. US 18222

102.    From this I conclude that the vitals.com Web site is owned and operated by MDx Medical and that Network Solutions is the domain registrar.

103.    Both the Current Version and the Prior Version offer a variety of options for connecting healthcare providers with potential patients and a user can request information in a variety of ways, e.g., by searching for a doctor by specialty, by condition, or by name. As of December 9, 2011, the first page of the site promised to "match you with the right doctor", i.e., connect a healthcare provider with a patient.

104.    The Court has construed "first healthcare provider" as "a particular healthcare provider about whom information is requested and a report is produced".

105.    A "particular healthcare provider" can mean one particular doctor, for example. Both the Current Version and Prior Version are able to display information on one doctor at a time as well as being able to display information in such a way that one doctor is highlighted, e.g., by appearing at the top of a list.  Both versions are able to produce reports as discussed in detail in below portions of report dealing with other claim elements.

106.    One mechanism via which the Current Version receives a request for information regarding a first healthcare provider is when a user types a doctor's name into the search box on the vitals.com home page. When the user clicks the "search" button, his or her web browser submits a GET request via HTTP to the URL: http://www.vitals.com/doctor/checkup with arguments of "name" and "location."  (*See* Appendix C.)

107.    Another mechanism is when a user searches for a doctor by specialty or by medical condition, in which case the browser will request the URL

http://www.vitals.com/doctor/find with arguments such as "specialist_id" or "expertise". (*See* Appendix C.)

108. Based on the Internet domain registration for vitals.com, the HTML source code of the Current Version's home page and the fact that response pages are generated after I clicked the "search" button, I conclude that MDx Medical operates a system that is capable of receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider.

     c.    *Step 1 continued: wherein the Web server computer comprises at least one computer processor and memory;*

109. Vitals.com meets this element.

110. All conventional Web servers contain at least one processor, such as an Intel Pentium. Conventional processors read their program instructions from a memory and therefore a memory is required for the processor to function, a design called a "stored program computer" that goes back at least as far as the 1949 EDSAC. There has been no evidence in this case that MDx Medical has developed or is employing computers that are unconventional.

111. Further, based at least on the deposition testimony of Larry West, I conclude that the Current Version of vitals.com is delivered from Web server computers with at least one computer processor and memory. (Deposition of Larry West (Rough Draft) at 77:11-77:16; 80:21-81:04)

     d.    *Step 2: accessing healthcare provider-verified information about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;*

112. Vitals.com meets this element.

113. The vitals.com database includes specialty information, which it displays on vitals.com for every physician in the database. (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3; Deposition of Larry West (Rough Draft) at 26:15-26:19; Appendix C; Vitals.com PowerPoint, "Site Functionality & Data Set Overview" at MDX0071958; MDx E-mail dated 06/11/2010 at MDX0019305.)

114. The vitals.com database includes medical philosophy information in at least one place, which is the location storing whatever physicians type as a "personal statement". (*See* Appendix C; MDx E-mail dated 06/11/2010 at MDX0019305.)

115.     The vitals.com database includes gender information, which it displays on vitals.com for every physician in the database.  (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3; Deposition of Larry West (Rough Draft) at 26:15-26:19; Appendix C; MDx E-mail dated 06/11/2010 at MDX0019305.)

116.     The vitals.com database includes age information. (*See* MDx E-mail dated 06/11/2010 at MDX0019305.)

117.     The vitals.com database either includes or derives years in profession information, which it displays on vitals.com for every physician in the database.  (*See* Appendix C; MDx E-mail dated 06/11/2010 at MDX0019305.)

118.     The vitals.com database includes awards and honors information, which it displays on vitals.com for physicians, where applicable.  (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3; Appendix C; MDx E-mail dated 06/11/2010 at MDX0019305.)

119.     The vitals.com database includes professional appointments and memberships information, which it displays on vitals.com for physicians, where applicable.  (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3; Deposition of Larry West (Rough Draft) at 26:15-26:19 & 279:21-279:23; Appendix C.)

120.     The vitals.com database includes publications information, which it displays on vitals.com for physicians, where applicable.  (*See* Vitals.com PowerPoint, "Site Functionality & Data Set Overview" at MDX0071958; MDx E-mail dated 06/11/2010 at MDX0019305; Appendix C.)

121.     The vitals.com database includes information regarding the language spoken by physicians, which it displays on vitals.com for physicians, where applicable.  (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3; Deposition of Erika Boyer at 92:11-92:18; Vitals.com PowerPoint, "Site Functionality & Data Set Overview" at MDX0071958; MDx E-mail dated 06/11/2010 at MDX0019305; Appendix C.)

122.     The Court found that the term "verified" should be given its plain and ordinary meaning, of which there are several.  One meaning of verified is "to prove."  Another is "to confirm" or "to substantiate."  The Court stated: "the specification makes clear that the act of 'verifying' requires only that the website receive confirmation of the information from some other source, in this instance the healthcare provider. Indeed, the confirmation described appears to not extend beyond receipt of such information from the first healthcare provider."  (Markman Order at p. 15 n.8.)

123.    http://www.vitals.com/v/index.php?v=user/show_register offers physicians the ability to "Edit and add information that patients and others see."  (*See* Appendix C.)

124.    MDx admits that the system is capable of allowing physicians to edit the following fields: specialty information, gender, awards/honors, professional appointments, professional memberships, and languages.  (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3.)

125.    MDx further admits that physicians have actually edited each of these fields. (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3.)

126.    While MDx says it does not know of any physician who edited three or more of these fields, this could be determined by the same conventional SQL queries that MDx used to count the numbers of physicians who had made edits to a single field. Larry West testified  that all edits made by physicians can be determined.  (*See* Deposition of Larry West (Rough Draft) at 269:14-270:16)  I believe that information regarding edits made by physicians via Web forms are stored in a table named "mdx_import.impt_provider_webedit".  (*See* MDx Queries at MDX0104073.)  Without access to the complete SQL data model for the Vitals system it is not possible for me to provide an example SQL query, but a query such as:

```
SELECT pro_master_id, count(*)
FROM mdx_import.impt_provider_webedit
GROUP BY pro_master_id
HAVING count(*) >= 3
ORDER BY count(*) desc
```

would return a list of providers who had made at least three edits via the Web site and, for each provider, the number of edits that had been made. Adding additional query terms would make it possible to limit the results to those providers who had edited gender, specialty, and language, for example.

```
SELECT pro_master_id, count(*)
FROM mdx_import.impt_provider_webedit
GROUP BY pro_master_id
HAVING count(*) >= 3 and max(pro_gender) != ''
and max(lang_record_status) != '' and max(spe1_field_specialty_id) is not null
ORDER BY count(*) desc
```

127.    Regardless of the popularity of editing profile information, the system is capable of receiving this information from physicians and it is used to create some reports.  This capability is available to any licensed physician and no changes or alternations need be made to enable this feature.

128.     Additionally, I understand that many more physicians have registered with vitals.com and viewed their profiles without changing any information. (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 3.)  It is my opinion that in doing so these physicians have confirmed (e.g., verified) their information for MDx and that MDx has thereafter received this information from these physicians.

      e.      *Step 3*: *compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider,*

129.     Vitals.com meets this element.

130.     The Court construed the terms "compiling" / "compile" to mean: "gathering and/or putting together."

131.     Vitals.com compiles ratings from one or more past or current patients of the first healthcare provider.  I know this at least because I see patient ratings displayed on the Vitals.com website.

132.     Vitals receives patient ratings from an on-line patient experience survey on the vitals.com website.  The Current Version displays a "RATE this doctor" button near the upper right corner of a page showing information regarding one doctor, e.g., http://www.vitals.com/doctors/Dr_Kenneth_Mandl.  Clicking on this button results in the display of a survey form regarding the patient's opinion of the doctor and experience with that doctor in specific areas such as "accuracy in diagnosing a problem" and "following up as needed after my visit."  (*See* Appendix C.)

133.     The Prior Version offered a patient experience survey with similar questions. (*See* Vitals.com PowerPoint, "Site Functionality & Data Set Overview" at MDX0071980.)

134.     Specifically, the patient experience survey on vitals.com asks former or current patients to rate a physician from 1 to 4 stars based on the following questions:

**1.  Overall, what is your opinion of this doctor?**

**2.  Now, tell us how this doctor rates on...**

- Ease in getting an appointment

- Waiting time during a visit

- Courtesy and professionalism of office staff

- Accuracy in diagnosing a problem

- Bedside manner (caring)

- Spending enough time with me

- Following up as needed after my visit

- How long was your wait at the office?

135.    On the same page, the patient is also offered the opportunity to "leave a review" of the doctor.  The review has two components, an option "Title", and a body called "Comments".  The patient is prompted within the "Comments" text entry field with some grayed-out text, reading "Some ideas to get you started: -Write about overall experiences – Write about what you like or dislike about your physician –Write about whether you would recommend –Write as if you are talking to a peer who is asking your opinion".

136.    A single Submit button sends both the ratings and the review, if entered, to the vitals.com server.

137.    MDx admits that it compiles patient ratings.  (*See* Deposition of Larry West (Rough Draft) at 91:13-93:2 & 158:6-158:10; MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 5.)

> f.    <u>Step 3 continued</u>: *and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;*

138.    Vitals.com meets this element.

139.    As noted above, a WHOIS lookup at register.com reveals that the vitals.com Internet domain is owned by "mdX Medical". http://www.vitals.com/about states that the content on the page is "Copyright 2006-2011 Vitals.com & MDx Medical, Inc.".  The page says, under "To Our Consumers": "How do you choose the doctor that is right for you? Do you have enough information at your fingertips? We at Vitals would like to help." and, above, that the site was "created to give consumers the tools … to make informed decisions about which doctor to choose."  (*See* Appendix C.)

140.    Larry West, at his June 26, 2012 deposition, testified that he supervises a group of MDx Medical employees who manage the technical aspects of the vitals.com Web site. (*See* Deposition of Larry West (Rough Draft) at 95:15-95:19.)

141.    Based on the vitals.com "about" page and Larry West's description of who manages the vitals.com Web site, I conclude that the vitals.com Web site is "managed by a company providing a service for connecting healthcare providers with potential patients".

142.    I understand that MDx is arguing that vitals.com does not infringe because not all patient ratings come from vitals' online experience survey. I disagree. The claim does not require that all ratings come from the on-line experience survey.

g.    *Step 4: compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, me*dical internship, medical residency, *and medical fellowship information;*

143.    Vitals.com meets this element.

144.    The Court construed the terms "compiling" / "compile" to mean: "gathering and/or putting together."

145.    The Court found that the term "verified" should be given its plain and ordinary meaning, of which there are several. One meaning of verified is "to prove." Another is "to confirm" or "to substantiate." The Court stated: "the specification makes clear that the act of 'verifying' requires only that the website receive confirmation of the information from some other source, in this instance the healthcare provider. Indeed, the confirmation described appears to not extend beyond receipt of such information from the first healthcare provider." (Markman Order at p. 15 n.8.)

146.    The vitals.com database includes board certification information that MDx gathers from third parties (e.g., from sources other than physicians), such as ABMS (as stated on a typical doctor report: "Vitals receives quarterly updates on board certification from ABMS.") (*See* Appendix C; MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; MDx E-mail dated 06/11/2010 at MDX0019305; Deposition of Erika Boyer at 55:16-55:17.) Therefore, this information is verified by these third parties.

147.    The vitals.com database includes medical licensure information that MDx gathers from third parties (e.g., from sources other than physicians). (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; Deposition of Erika Boyer at 81:10-81:16; 85:8-85:12; MDx E-mail dated 06/11/2010 at MDX0019305; Appendix C.) Moreover,

Vitals.com states that the doctor is "confirmed" (e.g., verified) to have certain state licenses. (*See,* e.g., Appendix C.)  Therefore, this information is verified by these third parties.

148.     The vitals.com database includes medical school information that MDx gathers from third parties (e.g., from sources other than physicians) because it is able to display a medical school for every doctor on the site that I looked at.  (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; MDx E-mail dated 06/11/2010 at MDX0019305; Appendix C; Deposition of Erika Boyer at 87:12-87:15.)  Therefore, this information is verified by these third parties.  The vitals.com database includes internship information that MDx gathers from third parties (e.g., from sources other than physicians).  (*See* Deposition of Erika Boyer at 87:1-87:7; MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; MDx E-mail dated 06/11/2010 at MDX0019305.)  Therefore, this information is verified by these third parties.

149.     The vitals.com database includes residency information that MDx gathers from third parties (e.g., from sources other than physicians).  (*See* Deposition of Erika Boyer at 87:1-87:7; MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; MDx E-mail dated 06/11/2010 at MDX0019305.)  Therefore, this information is verified by these third parties.

150.     The vitals.com database includes fellowship information that MDx gathers from third parties (e.g., from sources other than physicians).  (*See* Deposition of Erika Boyer at 87:1-87:7; MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; MDx E-mail dated 06/11/2010 at MDX0019305.)  Therefore, this information is verified by these third parties.

151.     The vitals.com database includes disciplinary information that MDx gathers from third parties (e.g., from sources other than physicians).  (*See* Deposition of Erika Boyer at 93:5-93:23; MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; MDx E-mail dated 06/11/2010 at MDX0019305.)  Therefore, this information is verified by these third parties.

152.     I understand that MDx argues that it does not infringe because it employs the following rule:

If displaying third-party verified information for a physician would include three or more of third-party information, then the same information obtained from a physician (e.g., medical school, residency, fellowship, internship) would be used instead (when available) to reduce the number of displayed third-party data to less than three. If the same information for a data field has not been obtained from a physician, then the data field is not displayed at all, so that no more than two third-party data fields are ever displayed for a physician.

(Policy E-mail from Mitch Rothschild dated 1/5/2011 at MDX0034444-MDXMDX0034445.)

153.    Such a programming rule would not be relevant to the question of whether or not this claim element is infringed. This claim element relates to whether information is compiled, e.g., into a relational database, and is unrelated to the question of what is ultimately displayed in a report. MDx has admitted (see above) that they compile at least three kinds of information regarding physicians from third party sources. As will be further discussed below, a person of ordinary skill in the art would understand "compiling" to mean collecting information and organizing it into a database for retrieval. This information would then be processed or "used" by report- or page-generating software. Finally the report or page would be "displayed" to a Web site user such as a patient. The claim construction of "compiling" as "gathering and/or putting together" does not change this analysis. "Compiling" and "Displaying" are separate operations and relate to separate elements of Claim 1.

154.    I understand that MDx argues it does not infringe this element because it compiles third party information based on a schedule that depends on the third party source rather than compiling the information in response to a request for information. I disagree. The claim does not place any limits on when the information is compiled – it does not have to be in response to a request. If we were to extend MDx's argument, the patient-provided information, such as ratings, would also have to be obtained in response to a request for a report on a doctor. This would require the potential patient and previous patients all to be visiting the vitals.com site simultaneously. The potential patient would then have to wait for a report until the previous patients had finished typing.

    h.    *Step 5: creating, by the at least one computer processor, a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers;*

155.    Vitals.com meets this element.

156.    In the HTML files that are delivered to a consumer's browser, e.g., in response to a request for http://www.vitals.com/doctors/Dr_Peter_Hoenig , there are references to files on the vitals.com server with a ".php" extension, indicating that these are computer programs written in the popular PHP language. (*See* Appendix C.)

157.    The report on an individual physician contains a combination of information that the physician entered or verified (e.g., personal statement, languages spoken, specialties, awards, honors), information that patients have provided, and information from third party sources. (*See,* e.g., Appendix C.)  Furthermore, the creation of the report involves using a combination of the information that the physician entered or verified (e.g., personal statement, languages spoken,

specialties, awards, honors), information that patients have provided, and information from third party sources, even if that information is not explicitly displayed. (*See* Deposition of Mitch Rothschild at 116:06-117:01; Vitals.com PowerPoint, "Thinking About Physician Quality" at MDX0012068.)

158.    If information is displayed in a report, then I can conclude it was used to create a report. It is not necessary to examine the source code of the report-generation software to draw this conclusion.

159.    I know that the reports are created using physician-verified information because, in many cases, this information is displayed in the physician report.  For example, I have viewed physician reports on vitals.com that display the following: specialty information, medical philosophy, gender, years in profession, awards, honors, professional appointments, professional memberships, publications, and languages.  (*See,* e.g., Appendix C.)

160.    I know that the reports are created using patient-provided information because, in many cases, this information is displayed in the physician report.  (*See,* e.g., Appendix C.)

161.    I know that the reports are created using third party-verified information because, in many cases, this information is displayed in the physician report.  For example, I have viewed physician reports on vitals.com that display: board certification, licensure, medical school, medical residency, and medical fellowship information.  (*See,* e.g., Appendix C.)

162.    Vitals.com creates multi-page reports.  The first page typically is a summary page with some information about the particular physician about whom information is requested (e.g., specialty information, star rating, location, awards, ratings of affiliated hospital, rating of medical school, etc.).  (*See*, e.g., February 2012 Infringement Contentions; Appendix C.) Additional pages of each physician's report may be accessed by clicking on the physician's name.

163.    Within each page of a report, additional pages may be accessed that have additional information.  My review of the vitals.com website showed that most reports have the following sections: specialty, patient ratings & comments, hospital affiliation, education, awards & honors, publications, and insurance accepted.  (*See,* e.g., Appendix C.)  Each of these sections may have links to additional pages.  (*See* Deposition of Larry West (Rough Draft) at 190:1-193:04; Vitals.com PowerPoint, "Creating the First Truly Comprehensive Website, Database and Evaluation System of America's Physicians" at MDX0069163, MDX0069167; "Find a Doctor on Vitals.com" Video.)  For example, the publications section may have a link to an additional page that lists all of a physician's publications.  (*See* Appendix C.)

164.    I understand that MDx argues that it does not infringe this element because it employs the following rule:

If displaying third-party verified information for a physician would include three or more of third-party information, then the same information obtained from a physician (e.g., medical school, residency, fellowship, internship) would be used instead (when available) to reduce the number of displayed third-party data to less than three. If the same information for a data field has not been obtained from a physician, then the data field is not displayed at all, so that no more than two third-party data fields are ever displayed for a physician.

(Policy E-mail from Mitch Rothschild dated 01/05/2011 at MDX0034444-MDXMDX0034445.)

I disagree that MDx follows this rule.  I have seen physician reports (for example, TABS 66 & 161) that display board certification, medical school information, and licensure information. All three of these items come from third parties.  (*See* MDx's Second Supplemental Resps. to Health Grades' First Set of Interrogs. at p. 6; Appendix C; Deposition of Erika Boyer at 55:16-55:17, 87:12-87:15; 81:10-81:16; 85:8-85:12.)

165.    Additionally, I disagree that following this rule will avoid infringement of this element because it does not require that the report display *all* compiled information.  The Court's Markman Order specifically rejected this construction.  (*See* Markman Order at p. 20.)  Even without the Court's order, a person of ordinary skill in the art would not expect a report designed for viewing by humans to contain all of the information previously compiled in a database. One of the main purposes of report-generation or page-generation software is to select, distill, and summarize the most relevant information from a database. A typical server hard drive can store 3 trillion characters of information or approximately 600 billion words. The average adult reads no more than 300 words per minute and therefore would require approximately 3800 years (reading 24 hours per day) to read through the contents of a single hard drive, absent report-generation software to assist with the process.

166.    Also, if vitals.com displays fellowship information that has been self-reported by a doctor, it is my opinion that it is still "using" the fellowship information MDx collected from a third party.  It is after all stored in the database.  In order to avoid displaying incorrect information, Vitals must resolve conflicts between doctor-reported information and third-party verified information. This is a "use" of both kinds of information.

167.    Further, MDx displays reports only for physicians who are actively licensed.  (*See* Deposition of Larry West (Rough Draft) at 141:04-142:05.)  Thus, it is my understanding that Vitals.com uses licensure information to create a report even if they do not always explicitly display that information in the report.

168.    I understand that MDx is arguing that these screenshots (*see*, e.g., Appendix C) cannot be a report because they are a results list.  It is my opinion that they are both a results list (see discussion below) and a healthcare provider report.  They contain a list of physicians who meet the search criteria, but they also contain additional information (e.g., specialty information,

address, ratings, awards, hospital affiliations, board certifications), which is not required by the results list claim element, but which meets the claim limitation of a report on a particular healthcare provider as discussed above.

169. I understand that MDx is arguing that these screenshots are not part of the "report," but instead believe that the report includes only what vitals.com refers to as the "full profile." I disagree. Both parties agree that an ordinary meaning of the term "report" is a "formatted and organized presentation of information." These screenshots include information about a particular healthcare provider that is formatted and organized. The fact that the information is organized into multiple pages linked together does not mean that these pages are not a report. Paper reports often contain many pages and the same is true for reports in electronic form. I do not see any requirement in the claim that the report be limited to one-page, that all of the information be displayed on the same page, or that an embodiment cannot offer multiple report options.

170. If a multi-page report does not literally meet this claim element, then it meets it under the doctrine of equivalents. Vitals.com's multi-page reports perform substantially the same function, in substantially the same way, to produce substantially the same result a single page report. The "function" of the "report on the first healthcare provider" claim element is to allow patients to obtain detailed information about a particular doctor. The "way" this function is achieved in the claim is to create a report with the three types of information (i.e., doctor-verified, patient-provided, and third-party verified). MDx achieves the same function in the same way. The "result" of the claim is a report that includes the claimed information about the particular provider. The result of vitals.com's reports is the same.

171. The court has construed "comparison ratings of healthcare providers" as ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers. (Markman Order at p. 24.)

172. A variety of items on vitals.com (both versions) that qualify as comparison ratings. Each of these "ratings" applies to individual physicians, therefore to the first healthcare provider and other healthcare providers.

173. First, there is an "overall patient rating" (1-4 stars) for most physicians. (*See,* e.g., Appendix C.) By displaying the scale along with every rating, vitals.com ensures that potential patients can see how a doctor compares to an ideal doctor. Most physicians on vitals.com have an overall star rating.

174. An additional "comparison rating" for a doctor is whether or not the doctor has been selected for certain awards. (*See* Deposition of Larry West (Rough Draft) at 145:24-148:20.) For example, one "comparison rating" is the "Patients' Choice Award", which is based

on vitals.com patient surveys (source: http://www.patientschoice.org/whatispca).  (*See* Appendix C.)

175.    A similar, but separate, "comparison rating" is presented to show whether or not the doctor has been selected for an "America's Top Doctors" award, administered by http://www.castleconnolly.com/, one of Vitals.com's listed database vendors.  (*See* Appendix C.)

176.    Another similar "comparison rating" is whether or not a doctor is listed as "one of America's Leading Experts" (*see* http://www.vitals.com/doctors/Dr_Robert_Mcduffie for example).  (*See* Appendix C.)

177.    A personalized "comparison rating" is offered following the search for a doctor in that doctors are shown in order of "match score", i.e., how closely a doctor matches the potential patient's search criteria.  (*See* Appendices C and D.)

178.    The healthcare provider reports created by the Current Version literally include each of the foregoing "comparison ratings" of both the first healthcare provider and other healthcare providers, either on the same screen in response to a search query or on separate screens, depending on the detail level of the reports sought by patients.  (*See,* e.g., Appendix C.)

179.    For example, if a patient runs a specialty search for a particular doctor, MDx's current website uses information within MDx's database to produce a report on that doctor that can include comparison ratings of that doctor and other doctors contained within the right-hand section of the first page of the report.  These ratings can include any of those listed above.   By clicking on the particular doctor's name, a patient is able to access additional pages of the healthcare provider report.  (*See,* e.g., February 2012 Infringement Contentions.)  A demonstration for such a search is attached as Appendix D.

180.    Another example if a patient runs a name search for a particular doctor, MDx's current website uses information within MDx's database to produce a report on that doctor that can include comparison ratings of that doctor and other doctors contained within the "highlights" section of the first page of the report, thus permitting comparison of that particular doctor with other potential doctors.  These ratings can include any of those listed above.   By clicking on the particular doctor's name, a patient is able to access additional pages of the healthcare provider report.  (*See,* e.g., February 2012 Infringement Contentions; Appendix C.)  A demonstration for such a search is attached as Appendix D.

181.    I understand that MDx is arguing the overall patient rating is the claimed patient-provided information and thus cannot also be comparison ratings.  I disagree.  It is my opinion that it satisfies the requirements of both claim elements as described in this report.

182.    I understand that MDx argues that the healthcare provider report must be limited

to the first healthcare provider and *only* the first healthcare provider, and thus, the display of search results cannot be a healthcare provider report if it contains information on more than one physician (as is the case with the screenshot examples I referenced above). I disagree. (*See* Markman Order at p. 24.)

183.    However, if the claimed report must be limited to only one physician, then vitals.com infringes under the doctrine of equivalents. As shown in the screenshots and demos listed above, MDx's current website displays multiple healthcare provider reports, each limited to a single healthcare provider and each containing comparison ratings of that particular healthcare provider, on the same Web page, with other healthcare provider reports of other physicians. (*See,* e.g., Appendix C.) Each of those other reports contains comparison ratings of their particular doctor.

184.    Furthermore, on pages of an individual physician's reports, there are links to "Related Doctors" in the profiles. (*See* Appendix C.) These related doctors' profiles, which are included as links within the profile of a particular doctor's profile, each contain "comparison ratings." These related profiles are included in the report just as the other pages of the report are integrated as links. As confirmed by Mr. West, when a section of profile is backed by more data, those data are accessible by a link to a "drill down" page. (*See* Deposition of Larry West (Rough Draft) at 190:1-193:04.) These other profiles, and their ratings, have been included as a "drill down" page in a report on the first healthcare provider.

185.    These above examples of reports on Vitals.com perform substantially the same function, in substantially the same way, to produce substantially the same result as the claimed comparison ratings element. The "function" of the comparison ratings claim element is to allow patients to compare the first healthcare provider with other healthcare providers. Vitals.com performs the same function. The "way" this function is achieved in the claim is to include comparison ratings of other healthcare providers in the same report with ratings of the first healthcare provider. The way MDx achieves this function is by displaying multiple reports, each with comparison ratings of the first healthcare provider, on the same page, so that a patient can compare the first healthcare provider with other healthcare providers. This is substantially the same as the claim. The "result" of the claim is a report that allows for comparison of the first healthcare provider with others. The result of vitals.com is substantially the same, i.e., multiple reports that allow for comparison of the first healthcare provider with other healthcare providers.

186.    Viewed another way, a healthcare provider report that includes multiple providers (as shown the display of profiles within search results, e.g., Appendix C) performs substantially the same function, in substantially the same way, to produce substantially the same result as the claimed report on the first healthcare provider. The functional difference of reporting on one particular doctor versus multiple particular doctors is insubstantial. A single provider report is substantially the same as a multiple provider report – both have information on the single

particular provider.

187.     Additionally, the Prior Version had a "Compare" Feature that allowed a user to select up to three physicians to compare.  The result was a one page report that included "full profiles" for each of the physicians selected, where each physician was displayed in a columnar format.  (*See,* e.g., February 2012 Infringement Contentions; Appendix C.)  This Compare Feature included comparison ratings for the first healthcare provider and other healthcare providers, including star ratings.  If the healthcare provider report is limited to one and only one physician, the doctrine of equivalents arguments detailed above apply equally to this embodiment.

188.     Despite the removal of the "Compare" feature from the Current Version, the capability remains available to the user of any standard Web browser on any standard desktop computer. Previously, the user would click the mouse once to select Physician A, once to select Physician B, and once to activate the "compare" page. After these three mouse clicks, the user would be looking at information about Physician A and Physician B side-by-side. In the Current Version, the user would right-click the mouse to select Physician A, left-click the mouse to "open in new window", right-click the mouse to select Physician B, and left-click the mouse to "open in new window". Thus after four mouse clicks, the user would be looking at information about Physician A and Physician B side-by-side on the same computer screen. This is the same function (comparing doctors), in the same way (clicking the mouse), to produce the same result (side-by-side display of information about two doctors). The only difference is that one version requires three mouse clicks and one version requires four mouse clicks.

      i.     *Step 6: and providing access to the healthcare provider report on the first healthcare provider over a computer network.*

189.     Vitals.com meets this element.

190.     Both the Current Version and the Prior Version would have no business purpose if they did not provide their reports over the Internet so that potential patients could see them. Sitting at my home computer, for example, I was able to access reports on all of the doctors for whom I searched.

**2.     Claim 4 and both versions of the vitals.com Web site**

*The method as defined in claim 1, wherein the healthcare provider report includes a hyperlink to an affiliated hospital, medical center, or other type of treatment center.*

191.     Vitals.com meets this element.