**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,

      Defendant.

---

**MDX MEDICAL, INC.'S OPPOSITION TO HEALTH GRADES, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendant and Counterclaim Plaintiff MDx Medical, Inc. ("MDx"), by and through its undersigned counsel, respectfully submits this Opposition to Health Grades, Inc.'s ("Health Grades") Motion For Partial Summary Judgment [Doc. #369, the "Motion"].

Health Grades demonstrates a fundamental misunderstanding of the rules of summary judgment. Its brief recites *seventy* allegedly "undisputed" facts in support of its motion, and references *dozens* of exhibits, and only selective parts of deposition testimony. Many of the Health Grades allegedly "undisputed" facts are nothing more than Health Grades' characterizations of what it believes the deposition testimony and documents show – and most of the Health Grades characterizations of the evidence are demonstrably inconsistent with the evidence, *and with Health Grades' own admissions*. Health Grades relies heavily on its carefully chosen, biased testimonies of the inventors, claiming contrary to all the evidence that comparison ratings were not in the prior art.

Health Grades seems utterly unaware of the substantial credibility issues surrounding the testimonies of its witnesses (straining against all the evidence to avoid findings that they committed fraud on the Patent Office), and asks this Court to simply accept its cautiously selected snippets of their testimonies at face-value for its motion for summary judgment. *See, e.g.,* Health Grades' alleged "undisputed" facts 28-70. In addition, Health Grades ignores much of the evidence (including Health Grades' own sworn admissions) demonstrating that Health Grades was practicing this patent in the prior art, and Health Grades ignores what happened during the prosecution history of the patent.

This Health Grades motion does not even remotely approach the standards for summary judgment. Indeed, if summary judgment is to be granted on the validity and enforceability issues, it should be summary judgment that the patent is invalid for anticipation and obviousness, and unenforceable due to inequitable conduct.

## I.       RESPONSES TO ALLEGEDLY UNDISPUTED FACTS

1. Admitted.

2. Admitted.

3. Admitted.

4. Denied. Admitted, however, that the ***application*** for U.S. Patent No. 7,752,060 (hereinafter the "'060 patent") was filed on August 29, 2006.

5. Admitted, with the qualification that such references are prior art under at least 35 U.S.C. §102(a), as they were available prior to the February 8, 2006 invention date alleged by Health Grades. Health Grades' Response to MDx's First Set of

Interrogatories, Exhibit A hereto, Response to Interrogatory 1, at page 7 (all highlighting is added to exhibits).[1]

6. Admitted, although these are not the only materials on which MDx and Dr. Cooper rely. *See* Cooper Report, Exhibit U hereto.

7. Denied. *See, e.g.,* Health Grades' Press Release, dated Aug. 2, 2005, Exhibit B hereto.

8. Admitted.

9. Admitted.

10. Admitted, although this list is not exhaustive.

11. Admitted.

12. Admitted.

13. Admitted, although these are not exhaustive. *See also* MDx Facts 34-70, *infra*.

14. Admitted, although these are not exhaustive. *See also* MDx Facts 34-70, *infra*.

15. Admitted, as the page labeled UCHC 0000080 is only a printout of the physician search result page indicating that the consumer can purchase a Physician Comparison Report (*i.e.,* it was on sale and in public use pursuant to 35 U.S.C. §102(a), (b)) – it is not an actual Physician Comparison Report. UCHC 0000080, HG Exhibit E.  The search result indicates, however, that "the report [when purchased] will provide **detailed comparison information on each doctor** that matched your search criteria." *Id*. (emphasis added). Health Grades did not produce the report in discovery.

16. Admitted.

---

[1] The exhibits to this brief are designated as "Exhibit __ hereto"; and the exhibits to the Health Grades brief are designated "HG Exhibit __."

17. Admitted, although there is disclosure of ratings and comparison ratings of healthcare providers (e.g., page HG 32038), and this Exhibit also expressly teaches the concept of comparing physicians in the same report as comparison ratings of other healthcare providers (HG Exhibit F3, generally, and at pages HG 32073-75).  *See also* MDx Facts 34-70, *infra*.

18. Admitted.

19. Admitted.  *But see* MDx Facts 34-70, *infra*.

20. Admitted; provided, however, that Health Grades has insisted in this litigation that reports like the Drucker report meet the comparison ratings element of healthcare providers found in the claims.  *See, e.g.,* Health Grades' February 2012 Supplemental Infringement Contentions Chart, Exhibit Q hereto, at pages 34-35 (overall patient rating for a single doctor "comprises comparison ratings of healthcare providers"); pages 35-37 (alleging that awards and honors are "comparison rating[s] of healthcare providers"). So, if Health Grades is correct, then the Drucker report also has comparison ratings of healthcare providers.  Moreover, Health Grades has admitted that comparison ratings of healthcare providers were in its prior art reports.  Exhibit A hereto, Response to Interrogatory 4, at page 14; *see also* Response to Interrogatory 1, at page 5 ("Health Grades began launching the first version of these products in the Spring/Summer of 2005.").  And regardless of this issue, the Drucker Report teaches (in the same report disclosing physician ratings) the concept of comparison ratings of healthcare providers, at page MGHG 000019 of HG Exhibit G, and thus renders the idea of comparison

ratings of healthcare providers obvious.  Exhibit U hereto, at pages 17-19; *see also* MDx Facts 34-70, *infra*.

21. Admitted.

22. Admitted that ratings of a specific physician are not shown, but the concept of comparing healthcare providers is taught.

23. Denied.  The emails are about Health Grades prior art reports, not only the Physician Marketing Program.  HG Exhibit I, at pages HG0179518-550.

24. Denied.  Nowhere does this document indicate that "Physician New Marketing Media" is confidential.  HG Exhibit I.

25. Admitted.  *But see* MDx Facts 34-70, *infra*.

26. Admitted.  *But see* MDx Facts 34-70, *infra*.

27. Admitted; provided, however, that Health Grades has insisted in this litigation that reports like the Drucker report meet the comparison ratings element of healthcare providers found in the claims.  *See, e.g.,* Health Grades Infringement Contentions Chart, Exhibit Q hereto, at pages 34-35 (overall patient rating for a single doctor "comprises comparison ratings of healthcare providers"); pages 35-37 (alleging that awards and honors are "comparison ratings of healthcare providers").  So, if Health Grades is correct, then the Drucker report also has comparison ratings of healthcare providers.  Moreover, Health Grades has admitted that comparison ratings of healthcare providers were in its prior art reports.  Exhibit A hereto, Response to Interrogatory 4, at page 14; *see also* Response to Interrogatory 1, at page 5 ("Health Grades began launching the first version of these products in the Spring/Summer of 2005.").  And regardless of this issue,

the Drucker Report teaches (in the same report disclosing physician ratings) the concept of comparison ratings of healthcare providers, at page MGHG 000019 of HG Exhibit G, and thus renders the idea of comparison ratings of healthcare providers obvious.  Exhibit U hereto, at pages 17-19; *see also* MDx Facts 34-70, *infra*.

28. Denied.  While this evidence is part of the MDx anticipation and obviousness evidence (not exhaustive), the argument is not that a single "element" is anticipated or obvious – the claims are anticipated and obvious.

29. Denied.  While this evidence is part of the MDx anticipation and obviousness evidence (not exhaustive), the argument is not that a single "element" is anticipated or obvious – the claims are anticipated and obvious.

30. Admitted.

31. Admitted that Mr. Neal's testimony includes discussions of comparison ratings of healthcare provider hospitals, and in the same pages also discusses *physician* quality *comparison* reports.

32. Denied, in that the testimony addressed comparison ratings of healthcare providers, and comparison reports on physicians, all of which is evidence at least of the obviousness of comparison ratings of physicians.  HG Exhibit J, at pages 153-54.

33. Admitted that the Neal testimony confirms that patient experience data was in the Drucker report at least as early as February of 2005 (at least eighteen months before the filing date of the application for the '060 patent, and a year before Health Grades' claimed invention date).  35 U.S.C. §102(a), (b).

34. Admitted that Mr. Dodge discusses ratings of hospitals, but also discusses comparisons of physicians (including comparing information "for all these physicians").

35. Admitted, and that Mr. Dodge also admits at pages 225-26 that the ratings are "the same sort of thing that [Health Grades] has today. . ." and that users are able to compare ratings of healthcare providers.

36. Admitted, and that Mr. Dodge also admits at pages 225-26 that the ratings are "the same sort of thing" as found in the prior art Drucker report, in which users were able to compare ratings of healthcare providers.

37. Admitted, and that Mr. Dodge also admits at pages 225-26 that the ratings are "the same sort of thing that [Health Grades] has today. . ." and that users are able to compare ratings of healthcare providers.

38. Admitted, and that Mr. Montroy also shows that the prior art was teaching the comparison of physicians (*e.g.,* page 225: "compare physicians").

39. Admitted that these particular pages do not discuss ratings, but Mr. Montroy confirmed elsewhere that patient ratings were in the prior art (*e.g.*, HG Exhibit L, at pages 259-64), and despite document requests clearly calling for them, Health Grades had not produced all the evidence of the Health Grades prior art in time for this deposition.

40. Admitted that this prior art teaching of comparison ratings of healthcare providers is part of Mr. Montroy's sworn testimony.

41. Admitted, qualified by the fact that  Mr. Montroy confirmed elsewhere that patient ratings were in the prior art (*e.g.*, HG Exhibit L, at pages 259-64), and despite document

requests clearly calling for them, Health Grades had not produced all the Health Grades prior art in time for this deposition.

42. Admitted that this testimony is one small part of the evidence that comparison ratings of physicians were disclosed in, or obvious from, the Early HG Reports and Services.  *See* MDx Facts 34-70, *infra*.

43. Denied. *See* Exhibit A hereto, Response to Interrogatory 4, at pages 14 and 19 (sworn statement from Health Grades witness Mr. Dodge that the "records and information" of Health Grades confirm that the claimed invention was commercialized in the spring/summer of 2005 – more than a year before the application filing date and several months before the alleged invention date, 35 U.S.C. §§102(a), (b)); *see also* Response to Interrogatory 1, at page 5 (additional sworn statement by Mr. Dodge that "Health Grades began launching the first version of these products in the Spring/Summer of 2005."); *see also* HG Fact 42 (Health Grades 30(b)(6) witness unable to deny that comparison ratings of physicians were in the prior art, and instead confirming that they were in the prior art "***by 2006***"); *see also* Exhibit U hereto, at pages 17-19 and cited evidence including additional testimony of Mr. Dodge; *see also* the MDx motion for sanctions for Health Grades deliberate failure to produce a 30(b)(6) witness that could testify on the date of first use of comparison ratings of healthcare providers.  *See also* MDx Facts 34-70, *infra*.

44. Admitted that Mr. Neal's testimony includes these statements, and that he did not know when comparison ratings of physicians were first used; provided, however, that Mr. Neal's testimony does confirm that a reason for delay was concern over reactions by hospitals – a concern that Health Grades now admits (*see, e.g.,* HG Fact 33), and the

evidence clearly shows (contrary to Mr. Neal's heavily biased testimony – attempting to avoid a finding that he and his co-inventors personally committed fraud on a Federal agency) to have been overcome by Health Grades at least as early as February of 2005 – more than a year before the Health Grades invention date and eighteen months before the application for the '060 patent was filed.  HG Fact 33 and cited evidence.  *See also* Exhibit A hereto, Response to Interrogatory 4, at pages 14 and 19 (sworn statement from Health Grades 30(b)(6) deponent Mr. Dodge that the "records and information" of Health Grades confirm that the claimed invention was commercialized in the spring/summer of 2005 – more than a year before the application filing date and several months before the alleged invention date, 35 U.S.C. §§102(a), (b)); *see also* Response to Interrogatory 1, at page 5 (additional sworn statement by Mr. Dodge that "Health Grades began launching the first version of these products in the Spring/Summer of 2005."); *see also* HG Fact 42 (Health Grades 30(b)(6) witness unable to deny that comparison ratings of physicians were in the prior art, and instead confirming that they were in the prior art "***by 2006***"); *see also* Exhibit U hereto, at pages 17-19 and cited evidence including additional testimony of Mr. Dodge; *see also* the MDx motion for sanctions for Health Grades deliberate failure to produce a 30(b)(6) witness that could testify on the date of first use of comparison ratings of healthcare providers. *See also* MDx Facts 34-70, *infra*.

45. See Response to alleged HG Fact 44.

46. Admitted.

47. Admitted.

48. Denied, in that this is not an accurate representation of Mr. LaPointe's testimony, and it ignores the fact that Health Grades was successfully employing user-generated patient ratings in the prior art at least as early as February of 2005.  HG Fact 33 and cited evidence. *See also* MDx Facts 34-70, *infra*.

49. Admitted that this is one of many references cited by MDx, and denied to the extent Health Grades implies that patient ratings were not very well known in the early prior art and easily combined with this art.  See Responses to HG Facts, *supra*.

50. Admitted that this is one of many references cited by MDx, and denied to the extent Health Grades implies that patient ratings were not very well known in the early prior art and easily combined with this art.  See Responses to HG Facts, *supra*.

51. Admitted that this is one of many references cited by MDx, and denied to the extent Health Grades implies that patient ratings were not very well known in the early prior art and easily combined with this art.  See Responses to HG Facts, *supra*.

52. Admitted that this is one of many references cited by MDx, and denied to the extent Health Grades implies that patient ratings were not very well known in the early prior art and easily combined with this art.  See Responses to HG Facts, *supra*.

53. Admitted that this is one of many references cited by MDx, and denied to the extent Health Grades implies that patient ratings were not very well known in the early prior art and easily combined with this art.  See Responses to HG Facts, *supra*.

54. Denied, *see, e.g.,* Exhibit U hereto, at pages 7 and 10-11 ("a Posita would immediately recognize as the well known technology …"  ); pages 11-13 ("commonly used by prospective patients …"), etc.

55. Admitted that this is part, but not all, of Dr. Cooper's analysis.

56. Admitted that this is part of the invalidity defense analyses.

57. Admitted.

58. Admitted.

59. Admitted.

60. Admitted.

61. Admitted that this was part of Mr. Neal's testimony, and does not address a single claim element or single prior art reference.  *See* MDx Facts 116-18, *infra*.

62. Admitted that this was part of Mr. Neal's testimony, and does not address a single claim element or a single prior art reference. *See* MDx Facts 116-18, *infra*.

63. Admitted that this was part of Mr. Neal's testimony, and does not address a single claim element, or identify a single missing claim element from the Drucker anticipatory prior art. *See* MDx Facts 116-18, *infra*.

64. Denied.  Mr. Montroy was a named inventor, and was working at Health Grades for many months after the applications were filed.  Like the other inventors, he signed a sworn declaration that he understood his duty of candor in connection with the patent prosecution, and the cited testimony shows Mr. Montroy was involved with the prosecution. *See* MDx Facts 116-18, *infra*.

65. Admitted that this was part of the Montroy testimony, as was his testimony showing that he understood that the withheld prior art had all the elements of at least claim 1 of the patent (pages 308-20), and even though he read his declaration and understood his duty

of candor (pages 296-300), he did not disclose this critical prior art to the Patent Office.

Montroy Dep. Tr., Exhibit C hereto.

66. Admitted this was part of Mr. Montroy's testimony.

67. Admitted that this was part of the testimony of Mr. Montroy, who is attempting to prevent a finding that he committed fraud on a governmental agency.

68. Admitted that this was part of Mr. Hick's testimony.

69. Admitted that this was part of Mr. Hick's testimony.

70. Admitted that Mr. Hicks could provide no excuse for failing to disclose the Health Grades Reports and Services to the Patent Office.

## II.    DISPUTED (AND UNDISPUTED) FACTS IGNORED BY HEALTH GRADES

Counsel for MDx is familiar with the Court's Practice Standards and specifically, Rule III.F.3.b., and have done its best to comply therewith given the complex nature of this opposition brief and the nature of the facts at issue. This Section includes more than only the "disputed" facts section contemplated by the Court's rules.  But MDx cannot truthfully characterize many of these facts showing anticipation, obviousness, and fraud, as "disputed" because Health Grades does not, or cannot, dispute them.  Indeed, they include sworn admissions by Health Grades. These facts were simply ignored in the Health Grades motion, but must be addressed in any analysis of the invalidity and inequitable conduct issues.

**Health Grades Admissions**

A.    **35 U.S.C. §102(b)**

1. Health Grades has admitted that  the alleged invention of the '060 patent was commercialized in the spring/summer of 2005 -- more than one year before the August

29, 2006 application filing date.  Exhibit A hereto, Response to Interrogatory 4, at page 14; *see also* Response to Interrogatory 1, at page 5 ("Health Grades began launching the first version of these products in the Spring/Summer of 2005.").

2.  This Health Grades admission is consistent with the evidentiary record.  MDx Facts 3-72, *infra*.

3.  For this motion, Health Grades assumes that it is not entitled to the February 8, 2006 priority date (and Health Grades in fact is not entitled to that priority date; Exhibit U hereto, at pages 7 and 8).  Commercial launch of the patented subject matter in the spring/summer of 2005 pursuant to Health Grades' sworn admission would thus invalidate all the claims under 35 U.S.C. §102(b).

**B.    35 U.S.C. §102(a)**

4.  Health Grades has never alleged a date of invention earlier than February 8, 2006.  Exhibit A hereto, Response to Interrogatory 1, at page 7.

5.  The only evidence alleged to support Health Grades' claim that the inventors conceived the invention as early as February 8, 2006 is the priority application for the '060 patent.  *Id.*

6.  The priority application does not adequately disclose comparison rating of healthcare providers included in a report on a first healthcare provider.  Provisional App. Ser. No. 60/771,757, Exhibit D hereto; *see also* Exhibit U hereto, at pages 7 and 8.

7.  The named inventors on the '060 patent did not "invent" anything.  A different entity, their employer Health Grades, was practicing the same thing found in their claims, long before they even claim to have invented anything. Exhibit A hereto, Response to

Interrogatory 4, at page 14; *see also* Response to Interrogatory 1, at page 5 ("Health Grades began launching the first version of these products in the Spring/Summer of 2005.").

8. Health Grades has cited no evidence that ***the named inventors*** invented anything before February 8, 2006, and the only evidence they do cite for their alleged invention is a document (the priority application) that does not disclose comparison ratings of any healthcare providers (not even comparison ratings of hospitals). Exhibit A hereto, Response to Interrogatory 1, at page 7; Exhibit D hereto.

9. Health Grades has admitted that the alleged invention of the '060 patent was commercialized in the spring/summer of 2005 – many months before the February 8, 2006 invention date on which Health Grades relies.  Exhibit A hereto, at pages 5, 7, 14, and 19.

10. Because the alleged invention was admittedly commercialized in the spring/summer of 2005, it was ***known*** by others before the invention date relied upon by Health Grades.  35 U.S.C. §102(a).

11. Because the alleged invention of the '060 patent was admittedly commercialized in the spring/summer of 2005, it was ***used*** by others before the invention date relied upon by Health Grades.  35 U.S.C. §102(a).

12. Because the alleged invention was admittedly commercialized in the spring/summer of 2005, it was ***described in printed publications*** prior to the invention date relied upon by Health Grades; these printed publications included one or more of the following: the Health Grades premium reports, the Drucker reports, Physician Quality Guides,

14

Physician Qualify Reports, Physician Research Comparison Reports, Comparative Physician Reports, Physician Quality Comparison Reports, Nursing Home Comparison Reports, Physician Online Services, Connecting Point, and Physician New Marketing Media (collectively, the "Early HG Reports and Services").  *See, e.g.,* Deposition Exhibit 8, HG Exhibit F; Deposition Exhibit 13, HG Exhibit G; Deposition Exhibit 23, HG Exhibit H; Deposition Exhibit 51, HG Exhibit I.  35 U.S.C. §102(a).[2]

**Other Evidence of Prior Art Status**

        **A.**        **35 U.S.C. §102(a) – all Early HG Reports and Services**

13. Even apart from the Health Grades admissions, the evidence shows that all the Early HG Reports and Services were used on or in connection with the Health Grades website before February 8, 2006.  *See, e.g.,* Exhibit U hereto (generally at pages 10-40, citing the specifics of these other exhibits); *see also, e.g.,* HG Exhibits C, E, F1-F5, G, H, I (all showing early dates of public disclosure); Exhibit A hereto, at pages 5, 14, 19 (Health Grades sworn admissions of prior art); Exhibit B hereto (Health Grades press release showing patient ratings and provider-received data in the prior art); and all the deposition testimony attached to the memoranda of both parties (discussing these exhibits and confirming all were in the prior art on Health Grades' website); 35 U.S.C. §102(a).

---

[2] MDx is combining all these reports in an attempt to lessen the burden on the Court and reduce the number of undisputed/disputed facts (otherwise there would be separate facts for each of them).  If Health Grades disagrees with regard to any of these statements about one or more of the identified Early HG Reports and Services, the Health Grades response will surely identify specifically which are denied.

14. Health Grades is a different entity than the three inventors named on the '060 patent,[3] and was using and commercializing the Early HG Reports and Services before the alleged invention date of February 8, 2006.  MDx Fact 13; *see also* 35 U.S.C. §102(a).

15. Third parties, including users of the Health Grades website, were ***using*** the Early HG Reports and Services before February 8, 2006.  MDx Fact 13, *supra*; *see also* 35 U.S.C. §102(a).

16. The various reports identified in the Early HG Reports and Services were published on the Health Grades website before the alleged invention date of February 8, 2006, and thus ***known*** to others.  MDx Fact 13, *supra*; *see also* 35 U.S.C. §102(a).

17. The Early HG Reports and Services were in ***printed publications*** before the alleged invention date of February 8, 2006.  MDx Fact 13, *supra*; *see also* 35 U.S.C. §102(a).

**B.**     **35 U.S.C. §102(b) – all Early HG Reports and Services**

18. The Early HG Reports and Services were ***in public use*** at least one year before the August 29, 2006 filing date.  MDx Fact 13, *supra*; *see also* 35 U.S.C. §102(b).

19. The Early HG Reports and Services were ***on sale*** at least one year before the August 29, 2006 filing date. MDx Fact 13, *supra*; *see also* 35 U.S.C. §102(b).

20. The Early HG Reports and Services were disclosed in ***printed publications*** at least one year before the August 29, 2006 filing date.  MDx Fact 13, *supra*; *see also* 35 U.S.C. §102(b).

---

[3] *See* Manual of Patent Examining Procedure § 2132 (rev. 9 of 8th ed., 2012) ("The term 'others' in 35 U.S.C. 102(a) refers to any entity which is different from the inventive entity. The entity need only differ by one person to be 'by others.' This holds true for all types of references eligible as prior art under 35 U.S.C. 102(a) … .")

**C.      35 U.S.C. §102(a),(b) – Specific Examples**

21. Multiple versions of the Drucker report were published on the Health Grades website more than one year before the application filing date of the '060 patent.  *See, e.g.,* HG Exhibits G and I (*e.g.,* HG 0179533-42); 35 U.S.C. §102(a),(b).

22. The Drucker reports were obtained over the Health Grades website, by requests from users, and the reports were publicly disclosed.  HG Exhibits G and I (*e.g.,* HG 0179533-42).

23. The Drucker reports employ every element of the asserted claims of the '060 patent, or at least render those claims obvious.  *See, e.g.,* Exhibit U hereto, at pages 10-40, citing HG Exhibits G and I and various related testimonies attached as exhibits; *see also* 35 U.S.C. §§102(a),(b), 103.

**All the Elements of the Claims Are Taught in the Withheld Health Grades Prior Art**

**A.      Health Grades Admissions**

24. Health Grades' has admitted that it commercialized the alleged invention of the '060 patent, and thus that the alleged invention recited in the claims of the '060 patent was known, used, and disclosed in printed publications, more than a year before the application filing date and many months before the Health Grades alleged date of invention.  MDx Facts 1-12, *supra*.

**B.      The Disclosures**

25. The only claim element that the Health Grades' Motion asserts to be missing from the prior art is "comparison ratings of healthcare providers" (but the elements of the independent claims are addressed herein because, even though Health Grades' Motion

does not dispute that Health Grades was practicing all these elements, the fact that Health Grades was using all these claim elements in the prior art is at least relevant to the inequitable conduct allegations).

26. All the Early HG Reports and Services were part of a computer implemented method of providing healthcare provider information to potential patients over a computer network, fully meeting the preamble of claims 1 and 15 (the only independent claims). Exhibit U hereto, at pages 10, 24-25. *See also* Exhibit C hereto, at pages 308-09; Health Grades' Second Supplemental Response to MDx's Interrogatory No. 8, Exhibit E hereto, at pages 13-15.

27. The reports on healthcare providers in the Early HG Reports and Services were obtained by requests over the Health Grades website, wherein the Health Grades web server computer contained both a processor and memory, fully meeting elements 1.1 and 15.1 of the claims (the designations 1.1, 15.1, etc., are from the Cooper Report). Exhibit U hereto, at pages 10-11 and 25. *See also* Hicks Dep. Tr., Exhibit F hereto, at page 149; Exhibit C hereto, at pages 309-10; Neal Dep. Tr., Exhibit G hereto, at pages 214-15; Exhibit E hereto, at pages 13-15; HG Exhibits C, E, F1-F5, G, H, I.

28. In creating the reports in the Early HG Reports and Services, Health Grades accessed information it had received from the healthcare providers, and that information included at least three of the data elements recited in the claims, fully meeting elements 1.2 and 15.2 of the claims of the '060 patent. Exhibit U hereto, at pages 11-13, 26-28. *See also,* Exhibit B hereto; Exhibit G hereto, at pages 206-11, 224-31; HG Exhibits C, E, F1-F5, G, H, I; Deposition Exhibit 50, E-mail from Scott Montroy to Dave Hicks, dated Feb. 16,

2005, Exhibit H hereto (reporting additional content of Dr. Drucker); Deposition Exhibit 27, E-mail from Scott Montroy to HG employees, dated May 25, 2004, Exhibit I hereto and Deposition Exhibit 28, E-mail from Janet Burkhard to Dave Hicks, dated May 26, 2004, Exhibit J hereto (showing physicians could input data in 2004); Exhibit C hereto, at pages 202 and 245-51; Dodge Dep. Tr., Exhibit K hereto, at page 80; Deposition Exhibit 26, E-mail from Scott Montroy to Samantha Collier, et al., dated May 11, 2004, Exhibit L hereto (2004 data to be collected from physicians).

29. In creating the reports in the Early HG Reports and Services, Health Grades compiled patient provided rating from its own website over an on-line patient experience survey, fully meeting claim elements 1.3 and 15.3 of the '060 patent.  Exhibit U hereto, at pages 14-16 and 28-30.  *See also* Exhibit B hereto (reporting prior art use of patient ratings); HG Exhibits G; Exhibit H hereto (confirming Drucker patient ratings were in production ("IN PROD") at least as early as February of 2005); HG Exhibit I, at page HG 197533-42 (showing patient ratings of Dr. Drucker obtained from the Health Grades website, *e.g.,* HG 197538, including "share your experience"); Exhibit G hereto, at pages 167, 169, 174-78, 214, 228-29 (Mr. Neal confirming that Health Grades was collecting patient ratings as early as May, 2004; and confirming that Dr. Drucker's patient ratings were in production in the prior art); Deposition Exhibit 47, E-mail from Dave Hicks to Shaikat Sen, dated May 14, 2004, Exhibit M hereto (confirming May, 2004 launch of patient experience survey); Exhibit C hereto, at pages 229-30 (confirming early 2004 survey use); Deposition Exhibit 29, Patient Experience Survey dated Aug. 16, 2004, Exhibit N hereto ("new" survey to be used in 2004, and "results display" in September, 2004 and

public disclosure to all prior report purchasers in October, 2004); Deposition Exhibit 48, Patient Experience Survey Nos., dated Nov. 9, 2004, Exhibit O hereto (117 patient survey results per day in November of 2004, see Neal Exhibit G at 169); Deposition Exhibit 49, Patient Experience Survey, Exhibit P hereto ("original patient survey" sent to consumers in 2004, *see* Exhibit G hereto, at page 179; Exhibit K hereto, at page 167); Exhibit C hereto at pages 47-49, 253, 312-14 (confirming Health Grades use of survey patient data in the prior art and public disclosure of such).

30. In creating the reports in the Early HG Reports and Services, Health Grades compiled information it had received and verified from third parties, including the data elements recited in the claims of the '060 patent, so that elements 1.4 and 15.4 were fully met in the prior art.  Exhibit U hereto, at pages 16-17, 30-32.  *See also* HG Exhibit G; Exhibit G hereto, at pages 128-29, 227-28 (Neal confirming third party verification in the prior art); HG Exhibit I; Exhibit C hereto, at pages 269-75 (indicating that every data element in this part of the claim was copied directly from the Health Grades prior art:  "in this claim you have a list of information that is exactly as we see it in the [prior art] physician quality reports") and 313-17 (same); HG Exhibits F1-F5; Exhibit K hereto, at pages 36-37 (further confirming third party verified information in the prior art); Exhibit F hereto, at pages 114-15 (Hicks confirming that "every single one of [the data elements of the claim] was found in this [Health Grades prior art] 2004 report").

31. In the Early HG Reports and Services, Health Grades created reports on healthcare providers using the healthcare-provider-verified information, the patient-provided information, and the information verified by third parties, and included in those reports

comparison ratings of healthcare providers, fully meeting the first part of elements 1.5 and 15.5 of the claims of the '060 patent.  For Comparison Ratings, see MDx Facts 34-70, *infra*.  Exhibit U hereto, at pages 17-19 and 32-33; MDx Fact 13, *supra*.

32. The Early HG Reports and Services provided healthcare reports to consumers over a computer network, thus fully meeting claim elements 1.6 and 15.6.  Exhibit U hereto, at pages 19 and 33-34.  *See also* HG Exhibits F1-F5, G, I; Exhibit C hereto, at page 320.

33. Health Grades' Motion does not contend that the Early HG Reports and Services lack the elements of the dependent claims, and accordingly they are not addressed in detail here.  *See* Exhibit U hereto, at pages 19-34.

**Comparison Ratings of HealthCare Providers**

    **A.**    **Health Grades Admissions**

34. The reports created by the Early HG Reports and Services also included comparison ratings of healthcare providers.  *See* MDx Facts 35-72, *infra*.

35. Health Grades "began to launch the commercial embodiment of the patent-in-suit in summer 2005."  Exhibit A hereto, at page 14.

36. An "embodiment" of the patent-in-suit meets all the elements of at least one patent claim, and so must meet the element "comparison ratings of healthcare providers" which is a requirement of every claim.  '060 patent, HG Exhibit A.

37. "Health Grades began launching the first version of these products in the Spring/Summer of 2005." Exhibit A hereto, at page 5.

38. The products addressed at page 5 of Exhibit A are products that were embodiments of at least one claim of the '060 patent and thus met the "comparison ratings of healthcare provider" element. *Id.*

39. The spring and summer of 2005 were more than one year before the August 29, 2006 filing date of the application for the '060 patent.  35 U.S.C. §102(b).

40. The spring and summer of 2005 were prior to the only date (February 8, 2006) identified by Health Grades as a date of alleged invention.  Exhibit A hereto, at page 7; *see also* 35 U.S.C. §102(a).

41. Health Grades has argued that overall patient ratings for a single doctor "comprises comparison ratings of healthcare providers."  Exhibit Q hereto, pages 34-37.

42. The Early HG Reports and Services disclose overall patient ratings for a single doctor. *See, e.g.,* HG Exhibits G (MGHG000017), I (HG0179538).

43. Health Grades has argued that awards and honors meet the claim language requiring "comparison ratings of healthcare providers."  Exhibit Q hereto, pages 35-37.

44. The Early HG Reports and Services disclose awards and honors.  *See, e.g.,* HG Exhibits G (MGHG000016), I (HG0179535).

### B.    The Prior Art Teaches Comparison Ratings

45. The '060 patent characterizes hospitals as healthcare providers.  *See, e.g.,* HG Exhibit A, Abstract, first sentence.

46. The Early HG Reports and Services expressly teach the concept of comparing ratings of healthcare providers.  *See, e.g.,* HG Exhibits G (MGHG000019), I (HG0179541).

47. The Drucker reports, for example, show that ratings of healthcare providers (as that term is used in the '060 patent, *see, e.g.,* HG Exhibit A, at Abstract) can be shown together for comparison purposes.  HG Exhibits F1-F5, G, I.

48. Comparison ratings of hospitals are found in the Early HG Reports and Services, in the very same document that shows patient ratings of physicians.  *See, e.g.,* HG Exhibits G, I.

49. The teachings found in the Early HG Reports and Services of (1) ratings of human healthcare providers, and (2) comparing ratings of healthcare providers, would teach any person of ordinary skill in the art at the time of the invention (hereinafter "person of ordinary skill in the art") that ratings of human healthcare providers could be compared. Exhibit U hereto, at pages 17-19; *see also* MDx Facts 60-70, *infra*.

50. Any person of ordinary skill in the art would recognize the teachings in the Early HG Reports and Services to show that any healthcare providers could have their ratings compared.  Exhibit G hereto, at pages 153-54; Exhibit K hereto, at pages 200-01, 225-26; HG Exhibit F1-F5, G, I;  Exhibit U hereto, at pages 17-19; *see also* MDx Facts 60-70, *infra*.

### C.    Health Grades' 30(b)(6) Deponents

51. For a 30(b)(6) witness on the Health Grades prior art (including the Health Grades products and services prior to 2006), Health Grades designated Allen Dodge, who was only a ***financial officer*** at the critical time period and who knew virtually nothing on the critical prior art issues.

52. The Health Grades 30(b)(6) witnesses designated to testify about when comparison ratings were first used in the Health Grades reports were unprepared to respond to those

inquiries, and did not even review the Product Development Plans (documents identified by another Health Grades witness as the critical documents showing when features were launched).

53. By the time of Health Grades' reply memorandum, MDx will have a motion for sanctions pending, seeking sanctions for Health Grades' failures to comply with the requirements of Rule 30(b)(6).

54. Health Grades 30(b)(6) witness Mr. Dodge testified that he knew the comparison ratings were used ***at least*** as early as 2006.  Exhibit K hereto, at page 72-73.

55. Health Grades 30(b)(6) witness Allen Dodge testified that the comparison ratings were used "by 2006".  *Id.*

56. Mr. Dodge also testified that patient ratings were in the Health Grades reports in 2006, so that he clearly understood that both patient ratings and comparison ratings were in the Health Grades reports in the ***same year***.  *Id.*

57. Contrary to Mr. Dodge's testimony, patient ratings were being used and collected well before 2006.  *See, e.g.,* Exhibit B hereto (Health Grades press release confirming use of patient ratings in reports in 2005 – more than a year before the August 29, 2006 application filing date and many months before the alleged invention date).

58. Mr. Dodge's belief that the patient ratings and comparison ratings were used in the healthcare provider reports in the ***same year*** (which turns out to be at least as early as 2005) is consistent with Health Grades' sworn interrogatory responses that the claim embodiments were commercialized in the spring and summer of 2005.  Exhibit A hereto, at pages 5, 14 and 19.

59. To the extent that the Health Grades 30(b)(6) witnesses testified that comparison ratings may not have been used until 2006, that testimony is inconsistent with the sworn interrogatory answers of Health Grades, which confirm that Health Grades commercialized the claim embodiments in 2005. Exhibit A hereto, at pages 5, 14 and 19.

   **D.      The Experts Of Both Parties Support Anticipation**

60. The '060 patent was allowed, in large part, due to claim elements directed to where healthcare data elements should be obtained, which healthcare data elements should be verified, and which healthcare data elements to include in reports on healthcare providers. Selected Portions of the Prosecution History of the '060 patent, Exhibit R hereto, at MDX 0013566-73.

61. Health Grades' expert, Dr. Greenspun, has no significant experience in healthcare that would qualify him to opine on the teachings to a person of ordinary skill in the art from the Early HG Reports and Services.  Dr. Greenspun's Resume, Exhibit T hereto.

62. The only opinion on the teachings of the Early HG Reports and Services from a person with significant healthcare related experience is the opinion of the MDx expert, Dr. Cooper.  Exhibit U hereto.

63. Dr. Cooper has opined, based on documentary and testimonial evidence from Health Grades, that the Early HG Reports and Services disclosed comparison ratings of healthcare providers, and thus fully anticipate all the asserted claims of the '060 patent. *Id.*, at page 17-19.

64. Dr. Cooper has opined, based on documentary and testimonial evidence from Health Grades, that the Early HG Reports and Services (if, contrary to the evidence, they were

not anticipatory), would nevertheless render all the asserted claims of the '060 patent extremely obvious to a person of ordinary skill in the art.  *Id.*

65. Dr. Cooper opined that the Early HG Reports and Services expressly teach the concept of comparing ratings of healthcare providers by showing comparison ratings of hospitals in the same report as ratings of physicians (*see, e.g.,* HG Exhibits G (MGHG000019), I (HG0179541)), that it would have been obvious to a person of ordinary skill in the art that ratings of other healthcare providers such as physicians could be employed.  Exhibit U hereto, at pages 17-19.

66. Both Health Grades, and its technical expert, Dr. Greenspun, go much further than Dr. Cooper on when comparison ratings of physicians are clear to a person of ordinary skill in the art.  Both Health Grades, and its expert, have repeatedly opined the Health Grades' priority application (Exhibit D hereto) is sufficient to teach a person of ordinary skill the concept of comparison ratings of physicians.  Unlike the Early HG Reports and Services, that priority application has no teaching of comparison ratings of healthcare providers. *See, e.g.,* Greenspun Dep. Tr., Exhibit S hereto, at pages 171-72.

67. Health Grades' expert, going even further than Dr. Cooper on what document content would make clear the idea of comparison ratings of physicians to a person of ordinary skill, reviewed a document that had nothing about comparisons of any healthcare providers but merely referenced "ratings" and he concluded that was a sufficient teaching of comparison ratings of healthcare providers.  Exhibit S hereto, at pages 171-72 (insisting that the priority application (Exhibit D hereto), without any teachings of comparison ratings of even hospitals, adequately disclosed comparison ratings of

physicians to a person of ordinary skill in the art: "I mean, reading this whole page, it all makes sense to me that all the information should be organized, would be desirable to organize any information that has been gathered to help a patient compare doctors … ."); *see also* page 178 (insisting that the idea is adequately conveyed even without disclosures of comparison ratings of any healthcare providers: "The phrase 'comparison ratings' does not appear [in this document]. This report uses some – expresses the same concepts and ideas as the final application, but not always in the exact language.").

68. Contrary to Health Grades' current position, Health Grades' expert testified that, because the ordinary skilled artisan would have basic knowledge and understanding, prior art could still teach the claimed "comparison ratings of healthcare providers" even if it did not use the words "comparison ratings," even if it did not show comparison ratings, and even if it did not show multiple ratings of healthcare providers. Exhibit S hereto, at pages 180:23-181:8.

69. Thus, the Early HG Reports and Services, which (unlike the priority application) expressly disclose comparison ratings of what the patent itself teaches to be healthcare providers (HG Exhibit A, Abstract), would easily teach the claimed comparison ratings of healthcare providers to a person of ordinary skill in the art, consistent with the testimonies of the technical experts of both parties.

70. If Health Grades and its expert are correct that the priority application, with no disclosures of comparison ratings of any healthcare providers (not even hospitals) is a disclosure to a person of ordinary skill in the art of the concept of comparison ratings of

physicians, then *a fortiori* so is the disclosure found in the prior art Early HG Reports and Services.[4]

## Inequitable Conduct

### A.     Failures To Disclose, Generally

71. All the inventors, in connection with the prosecution of the application that led to the '060 patent, signed a declaration confirming that they understood they had a duty of candor to the Patent Office.  Exhibit R hereto, at pages MDX 0013416-423.

72. The declaration explained the importance of disclosing prior art.  *Id.*

73. All of the inventors read and understood the declaration.   *Id.*

74. All of the named inventors worked at Health Grades, and thus were aware of the Early HG Reports and Services during prosecution of the application that led to the '060 patent. *Id.; see also* Exhibits C, F, G hereto (discussing the prior art).

---

[4] *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (U.S. 2007) ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."); *id.* ("[A] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions."); *id.* at 418 ("As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."); *id.*, at 420 ("Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."); *id.*, at 421 ("Rigid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it.").  *See*, *e.g.*, *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006) ("Our suggestion test is in actuality quite flexible and not only permits, but requires, consideration of common knowledge and common sense"); and *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (2006) ("There is flexibility in our obviousness jurisprudence because a motivation may be found implicitly in the prior art. We do not have a rigid test that requires an actual teaching to combine … .").

75. None of the Early HG Reports and Services were disclosed to the Patent Office in connection with the prosecution of the applications that led to the '060 patent.

76. The Patent Examiner was unaware of any of the reports or services in the Early HG Reports and Services.

**B.        The Many Arguments That Led to Patentability**

77. The declaration signed by all the inventors explained that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability.  Exhibit R hereto, at pages MDX 0013416-423.

78. During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to disclose *the creation of a report using healthcare provider verified information*.  *See, e.g.,* Exhibit R, hereto, at pages MDX 0013505-06, February 16, 2010 Amendment and Response.

79. The Early HG Reports and Services disclosed the creation of a report using healthcare provider verified information.  *See* MDx Fact 28, *supra*.

80. Each of the three named inventors knew that the Early HG Reports and Services disclosed the creation of a report using healthcare provider verified information.  *Id.*

81. Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, at pages MDX 0013416-423), all of the inventors withheld the fact that the Early HG Reports and Services disclosed the creation of a report using healthcare provider verified information from the Patent Office.

82. During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to disclose **the creation of a report using patient provided information**.  *See, e.g.,* Exhibit R hereto, at pages MDX 0013505-06, February 16, 2010 Amendment and Response.

83. The Early HG Reports and Services disclosed the creation of a report using patient provided information.  *See* MDx Fact 29, *supra*.

84. Each of the three named inventors knew that the Early HG Reports and Services disclosed the creation of a report using patient provided information.  *Id.*

85. Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, at pages MDX 0013416-423), all of the inventors withheld the fact that the Early HG Reports and Services disclosed the creation of a report using patient provided information from the Patent Office.

86. During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to disclose **the creation of a report using information verified by third party sources**.  *See, e.g.,* Exhibit R, hereto, at pages MDX 0013505-06, February 16, 2010 Amendment and Response.

87. The Early HG Reports and Services disclosed the creation of a report using information verified by third party sources.  *See* MDx Fact 30, *supra*.

88. Each of the three named inventors knew that the Early HG Reports and Services disclosed the creation of a report using information verified by third party sources.  *Id.*

89. Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, pages MDX 0013416-423), all of the inventors withheld the fact that the Early HG Reports and Services disclosed the creation of a report using information verified by third party sources from the Patent Office.

90. During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to disclose *the creation of a report using comparison ratings of healthcare providers*. *See, e.g.,* Exhibit R hereto, at pages MDX 0013506-10, February 16, 2010 Amendment and Response.

91. The Early HG Reports and Services disclosed the creation of a report using comparison ratings of healthcare providers. *See* MDx Facts 34-70, *supra*.

92. Each of the three named inventors knew that the Early HG Reports and Services disclosed the creation of a report using comparison ratings of healthcare providers. *Id.*

93. Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, pages MDX 0013416-423), all of the inventors withheld the fact that the Early HG Reports and Services disclosed the creation of a report using comparison ratings of healthcare providers from the Patent Office.

94. During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to

disclose **receiving requests for information over a company website**.  Exhibit R hereto, at pages MDX 0013547-48, April 26, 2010 Supplemental Amendment.

95. The Early HG Reports and Services disclosed receiving requests for information over a company website.  *See* MDx Fact 27, *supra*.

96. Each of the three named inventors knew that the Early HG Reports and Services disclosed receiving requests for information over a company website.  *Id.*

97. Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, pages MDX 0013416-423), all of the inventors withheld the fact that the Early HG Reports and Services disclosed receiving requests for information over a company website from the Patent Office.

98. During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to disclose **specific data elements to be received from the healthcare provider**. Exhibit R hereto, at pages MDX 0013547-49, April 26, 2010 Supplemental Amendment.

99. The Early HG Reports and Services disclosed specific data elements to be received from the healthcare provider.  *See* MDx Fact 28, *supra*.

100.      Each of the three named inventors knew that the Early HG Reports and Services disclosed specific data elements to be received from the healthcare provider.  *Id.*

101.      Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, pages MDX 0013416-423), all of the

inventors withheld the fact that the Early HG Reports and Services disclosed specific data elements to be received from the healthcare provider from the Patent Office.

102.      During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to disclose ***obtaining patient ratings from the company website***. Exhibit R hereto, at pages MDX 0013548-49, April 26, 2010 Supplemental Amendment.

103.      The Early HG Reports and Services disclosed obtaining patient ratings from the company website.  *See* MDx Fact 29, *supra*.

104.      Each of the three named inventors knew that the Early HG Reports and Services disclosed obtaining patient ratings from the company website.  *Id.*

105.      Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, at pages MDX0013416-423), all of the inventors withheld the fact that the Early HG Reports and Services disclosed obtaining patient ratings from the company website from the Patent Office.

106.      During prosecution of the application that led to the issuance of the '060 patent, Health Grades argued that the claims should be allowed because the prior art of record failed to disclose ***specific data elements to be verified by third parties***.  Exhibit R hereto, at pages MDX 0013548-50, April 26, 2010 Supplemental Amendment.

107.      The Early HG Reports and Services disclosed the specific data elements to be verified by third parties.  *See* MDx Fact 30, *supra*.

108.     Each of the three named inventors knew that the Early HG Reports and Services disclosed specific data elements to be verified by third parties.  *Id.*

109.     Although the declaration signed by all the inventors expressly stated that prior art was considered material and should be disclosed if it refuted or was inconsistent with arguments made for patentability (Exhibit R hereto, at pages MDX 0013416-423), all of the inventors withheld the fact that the Early HG Reports and Services disclosed the specific data elements to be verified by third parties from the Patent Office.

110.     The Patent Office allowed the claims for all the reasons argued by Health Grades. Exhibit R hereto, at pages MDX 0013566-573, Notice of Allowance.

111.     The Early HG Reports and Services fully anticipated every claim of the '060 patent.  *See*  MDX Facts, *supra*.

112.     The Early HG Reports and Services rendered every claim of the '060 patent obvious to a person of ordinary skill.  *See* MDX Facts, *supra*.

113.     While Health Grades did not disclose any of its own critical prior art, it did disclose to the Patent Office information from websites of its competitors.  Exhibit R hereto, at pages MDX 0013489-501 and MDX 0013520-536.

114.     None of the website materials from the Health Grades competitors was prior art, and so the Patent Office could not have rejected the claims over that art even if it disclosed the claim elements.

115.     The only expert to opine on this issue who has healthcare information experience, Dr. Cooper, has unequivocally opined that none of the claims of the '060 patent would have issued but for the fraud of Health Grades.  Exhibit U hereto, at page 36.

B.      <u>No Adequate Excuses</u>

116.        Named inventor Mr. Montroy claimed he was assuming others had disclosed the

Health Grades prior art, but had no basis to believe that it had been done, and otherwise

had no excuse for not disclosing the prior art to the Patent Office.  Exhibit C hereto, at

pages 304-06.  Mr. Montroy admitted that the prior art had all the claim elements.  *Id.* at

pages 306-21.

117.        Named inventor Mr. Hicks had no reason for withholding the Early HG Reports

and Services from the Patent Office.  Exhibit F hereto, at pages 128, 134-35.

118.        Named inventor Mr. Neal evaded the question of why he did not disclose the

Early HG Reports and Services, couching his responses in generalities and not

identifying a single claim element, and when asked about specific claim elements he was

extremely evasive and refused to answer the questions, repeatedly stating that he was

"not counsel" and even claiming (contrary to his declaration, Exhibit R hereto, at pages

MDX 0013416-423) that he did not understand the claims that described his own alleged

invention.  Exhibit G hereto, at pages 129-57.

119.        Further demonstrating the past, and continuing, fraud of Health Grades, Health

Grades signed a sworn interrogatory response, claiming that it knew of no prior art other

than the art cited to the Patent Office.  Exhibit A hereto, at pages 8 and 19.

120.        Due to Health Grades' falsified interrogatory response, counsel for MDx was

forced to learn of the prior art Health Grades reports that were not disclosed to the Patent

Office through discovery of third parties.

121.     Health Grades apparently gave the Drucker report (HG Exhibit G) to its lawyers, but did not produce it to MDx in this litigation – MDx obtained it only through a subpoena to Health Grades' counsel.  HG Exhibit G (note bates labels of the attorneys, Merchant & Gould).

122.     Each of the three named inventors on the '060 patent intended to deceive the Patent Office.  *See* MDX Facts, *supra*.

123.     But for the intentional fraud on the Patent Office by all of the inventors, none of the claims of the '060 patent would have issued, and neither this Court nor MDx would have been forced to deal with the litigation based on this fraudulently-obtained patent.

## III.    THE HEALTH GRADES' ARGUMENTS

The evidence above solidly supports MDx's anticipation, obviousness, and inequitable conduct defenses.  The summary judgment requested by Health Grades should, therefore, be denied.

Health Grades only raises a few specific points, each addressed below.

**(1) Health Grades claims that its own work cannot be prior art under 35 U.S.C. §102(a) (HG Motion, at 3, 17-19).**

First, Health Grades cites no authority stating this proposition, and there is none.  The cases cited by Health Grades (HG Motion, at 18) do nothing more than recite the statutory language.  Contrary to Health Grades' argument, the "other," referenced in the statute, is any entity other than the inventive entity (here, named inventors Neal, Hicks, and Montroy).  Indeed, even if two of the three alleged inventors did something in the prior art, they would qualify as an "other" under this statute.  *See* Manual of Patent Examining Procedure § 2132 (rev. 9 of 8th ed.,

2012) ("The term 'others' in 35 U.S.C. 102(a) refers to any entity which is different from the inventive entity. The entity need only differ by one person to be 'by others.' This holds true for all types of references eligible as prior art under 35 U.S.C. 102(a) … .").

Second, even if Health Grades was not an "other" under 35 U.S.C. §102(a), it does not matter because the HG Early Reports and Services were in public use and disclosed in printed publications – all the users of the Health Grades website are "others."  Health Grades response to this argument is only that these "uses" cannot be prior art under this Section because the public use was not before the invention.  HG Motion, at 19.  This argument, however, ignores the fact that the date these alleged inventors supposedly "invented" these claims is ***February 8, 2006*** – Health Grades has never asserted an earlier date, or done anything to prove that these named inventors conceived the claims earlier.  Exhibit A hereto, Response to Interrogatory 1, at page 7. So, all the public use or disclosure prior to this date is prior art under this Section.  (In fact, these alleged inventors did not "invent" anything – their employer, Health Grades, was practicing the same thing long before they even claim to have invented anything.)

Third, even if 35 U.S.C. §102(a) did not apply, 35 U.S.C. §102(b) does.

**(2)** **Health Grades claims that "comparison ratings of healthcare providers" is not found in the prior art (HG Motion, at 3, 19-22).**

MDx has ample evidence of comparison ratings of healthcare providers within the prior art, including Health Grades' own sworn admissions.  *See* MDX Facts 34-70, *supra*.  Health Grades argument that every element must be found "within the four corners" of a single document (HG Motion, at 20) is simply wrong here.  The alleged invention is anticipated

because it was in public use and on sale, as well as described in printed publications (and everything was available in the same Health Grades website in any event).

**(3) Health Grades argues that there is no reason to substitute physician ratings for hospital ratings, and thus the claims cannot be obvious (HG Motion, at 3-4, 23-26).**

This argument is not legally supported, as there is no requirement that a document teach the obvious.  Instead, the Supreme Court has made it clear that under certain circumstances a person of ordinary skill in the art can determine, on his own, that a claim is obvious under 35 U.S.C. § 103.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (U.S. 2007) ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."); *see also id.*, at 418 ("[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.")  The Federal Circuit too has held that a person of ordinary skill in the art may use common sense or implement a predictable variation, to render a claim obvious under 35 U.S.C. § 103.  *Cimline, Inc. v. Crafco, Inc.*, 413 Fed. Appx. 240, 246-247 (Fed. Cir. 2011) (finding that the claims are obvious using common sense); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239-1240 (Fed. Cir. 2010) (finding that the claims are obvious using common sense); *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 992-993 (Fed. Cir. 2009) (finding the claims to be obvious as a predictable variation of the prior art); *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1330-1331 (Fed. Cir. 2009) (finding that the claims are obvious using common sense).  This is clearly the situation here. Comparing human healthcare providers is obvious in light of a disclosure that teaches comparing hospitals.  This is nothing more than a predictable variation

and, therefore, the asserted claims of the '060 patent are obvious (if not anticipated) by the prior art of record.

The cases cited by Health Grades at pages 23-24 of its Motion bear no resemblance to the facts of this case.  In *ActiveVideo* the testimony was generic and was unrelated to any specific claim elements.  *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327-1328 (Fed. Cir. 2012).  Similarly, in *Innogenetics*, the expert "merely list[ed] a number of prior art references" and nothing more.  *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1363, 1373 (Fed. Cir. 2008).  In sharp contrast to the facts of the cases cited by Health Grades, Dr. Cooper has cited ample evidence teaching the comparison ratings of healthcare providers, and he did not need to "combine" anything – the teachings are all within the same prior art.  *See* MDx Facts 34-70, *supra*.  In addition, Health Grades' expert agrees with Dr. Cooper on this point, and has insisted that even documents that do not disclose comparison ratings of any healthcare providers adequately teach the claim language.  *See* MDx Facts 60-70, *supra*.

**(4)  Health Grades claims that MDx does not have sufficient evidence of intent to prove inequitable conduct (HG Motion, at 4, 26-30).**

This Health Grades argument, like its other requests in this motion, is nothing more than Health Grades' biased interpretations of its carefully selected evidence.  The evidence of inequitable conduct, however, is very strong:  (1) the prior art references were anticipatory; (2) the inventors disclosed far less relevant prior art to the Patent Office even though they were all well-aware of the Early HG Reports and Services; (3) the inventors could never have made the arguments they did to distinguish the Early HG Reports and Services had they not been

concealed; and (4) the inventors had no justifications for failing to disclose Health Grades' own critical prior art.  *See* all the MDX Facts, *supra*.

Health Grades argues that summary judgment should be granted because the inventors claim that they did not intend to deceive the Patent Office.  But that testimony simply cannot be believed, when the facts are considered:  (a) the Early HG Reports and Services were Health Grades ***own prior art***; (b) Health Grades chose to disclose the public uses and sales of its competitors, which showed nowhere near as many claim elements, and were not even prior art; (c) the Health Grades prior art was anticipatory; (d) the inventors either had no explanation for why they failed to disclose the Early HG Reports and Services, or they met the question with evasion and vague generalities (e.g., "the patent was about the experience for the consumer . . .") without any substance having relation to the claims or prior art; and (e) ***none*** of the many arguments made to the Patent Office resulting in the issuance of this patent could have been made to distinguish the Early HG Reports and Services.

The case law simply does not support summary judgment under these circumstances.  *See Therasense, Inc. v. Becton Dickinson and Co.*, 649 F.3d 1276, 1290-91 (Fed. Cir. 2011) (even "indirect and circumstantial evidence" can be sufficient to establish intent where that is the most reasonable inference); *Aventis Pharma S.A. v. Hospira Inc.*, 675 F.3d 1324 (Fed. Cir. 2012) (Post *Therasense*: finding inequitable conduct); *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, No. 10-805-RGA, 2012 U.S. Dist. LEXIS 100566 (D. Del. July 19, 2012) (Post *Therasense*: denying motion for summary judgment of no inequitable conduct); *Network Signatures, Inc. v. State Farm Mutual Auto. Ins. Co.*, No. SACV 11-00982 JVS, 2012 WL 2357307 (C.D. Cal. June 13, 2012) (Post *Therasense*: finding inequitable conduct).

**IV.**     <u>**CONCLUSION**</u>

For all the foregoing reasons, we respectfully request that the Health Grades motion be

denied in its entirety.

Dated:  November 26, 2012                                  Respectfully submitted,


                                                           <u>*s:/Scott D. Stimpson*</u>
                                                           Scott D. Stimpson
                                                           Scott B. Murray
                                                           David C. Lee
                                                           Sills Cummis & Gross P.C.
                                                           30 Rockefeller Plaza
                                                           New York, New York 10112
                                                           Tel: (212) 643-7000
                                                           Fax: (212) 643-6500
                                                           E-mail:sstimpson@sillscummis.com
                                                           E-mail:smurray@sillscummis.com
                                                           E-mail:dlee@sillscummis.com

                                                           and

                                                           Terence Ridley, Atty. No. 15212
                                                           Wheeler Trigg O'Donnell LLP
                                                           370 Seventeenth Street, Suite 4500
                                                           Denver, Colorado 80202
                                                           Tel:  (303) 244-1800
                                                           Fax:   (303) 244-1879
                                                           E-mail: ridley@wtotrial.com

                                                           *Attorneys for Defendant*
                                                           MDx Medical, Inc. d/b/a VITALS.COM

## CERTIFICATE OF SERVICE

I hereby certify that on <u>November 26, 2012</u>, I electronically filed the foregoing MDX MEDICAL, INC.'S OPPOSITION TO HEALTH GRADES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jesus Manuel Vazquez , Jr.
    jvazquez@rothgerber.com, phenke@rothgerber.com

Gregory B. Kanan
    gkanan@rothgerber.com, dgrooms@rothgerber.com

Kris John Kostolansky
    kkosto@rothgerber.com, dgrooms@rothgerber.com

Scott David Stimpson
    sstimpson@sillscummis.com, gcaceres@sillscummis.com

Scott B. Murray
    smurray@sillscummis.com

David Chunyi Lee
    dlee@sillscummis.com

Terence M. Ridley
    ridley@wtotrial.com, norris@wtotrial.com

                    *s:/ David C. Lee*