# EXHIBIT F

Page 1

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF COLORADO
 2
     Civil Action No. 11-CV-00520-PAB-BNB
 3   _____
 4   DEPOSITION OF DAVID HICKS           January 11, 2012
     _____
 5
     HEALTHGRADES, INC.,
 6
          Plaintiff,
 7
     vs.
 8
     MDX MEDICAL, INC. d/b/a VITALS.COM,
 9
          Defendant.
10   _____
11   APPEARANCES
12       ROTHGERBER JOHNSON & LYONS, LLC
             By Jesús M. Vázquez, Jr., Esq.
13              Kris J. Kostolansky, Esq.
                1200 17th Street, Suite 3000
14              Denver, Colorado  80202
                (303) 623-9000
15
         MERCHANT & GOULD
16           By Kirstin L. Stoll-DeBell, Esq.
                1050 Seventeenth Street, Suite 1950
17              Denver, Colorado  80265-0100
                (303) 357-1670
18
                     Appearing on behalf of Plaintiff
19
         SILLS CUMMIS & GROSS, PC
20           By Scott David Stimpson, Esq.
                David C. Lee, Esq.
21              30 Rockefeller Plaza, 25th Floor
                New York, New York  10112
22              (212) 643-1546
                     Appearing on behalf of Defendant
23
24
25      Job No. NJ371356
```

1          Pursuant to Subpoena and the Federal Rules of
2   Civil Procedure, the deposition of DAVID HICKS, called
3   by Defendant, was taken on Wednesday, January 11, 2012,
4   commencing at 8:02 a.m., at 1200 17th Street, Suite
5   3000, Denver, Colorado, before Andrea Ballantyne,
6   Certified Shorthand Reporter and Notary Public within
7   and for the State of Colorado.
8
9                          I N D E X
10
11  DEPOSITION OF DAVID HICKS
12  EXAMINATION BY:                                  PAGE
13       Mr. Stimpson                                  4
14       Mr. Vázquez                                  --
15
16
17  EXHIBITS                              INITIAL REFERENCE
18  Exhibit 1      Subpoena to Testify at a            5
                   Deposition in a Civil Action
19
    Exhibit 2      Amended Subpoena to Testify         5
20                 At a Deposition in a
                   Civil Action
21
    Exhibit 3      United States Patent, Patent       21
22                 Number 7,752,060 B2
23  Exhibit 4      Patent Prosecution History         29
24  Exhibit 5      Request for Provisional            60
                   Application
25

```
                                                  Page 113
 1        A.   Once again, I don't know.  They provided it to
 2   us.
 3        Q.   (By Mr. Stimpson)  And the next page, you see
 4   there's information provided on internship?
 5        A.   Yes.
 6        Q.   Okay.  Provided from third parties as well?
 7        A.   Yes.
 8        Q.   Next page, information on residency?
 9        A.   Yes.
10        Q.   Also provided from third parties?
11        A.   Yes.
12        Q.   Next page, fellowship?
13        A.   Yes.
14        Q.   Also provided from third parties?
15        A.   Uh-huh.
16        Q.   Next page, physician licensure, do you see
17   that?
18        A.   Yes.
19        Q.   Also provided from third parties?
20        A.   I believe so.
21        Q.   Next page, 32068, government disciplinary
22   actions?
23        A.   Yes.
24        Q.   Also provided by third parties?
25        A.   Yes.
```

Page 114

1  Q. Next page -- actually, Page 32071, board
2  certification?
3  A. Yes.
4  Q. Also provided by third parties?
5  A. Yes.
6  Q. Let me refer you back to Claim 1 of the patent.
7  I'm specifically going to refer you to the page,
8  Column 20, and the line at the bottom there that talks
9  about, around Line 50, compiling information.
10  A. Yes.
11  Q. So this paragraph is talking about information
12  that's compiled by third parties, right?
13  A. Yes.
14  Q. And you see at the bottom of that paragraph
15  they start: board certification, licensure,
16  disciplinary action information, medical school, medical
17  internship, medical residency and medical fellowship
18  information.
19    Do you see that?
20  A. Yes.
21  Q. Every single one of those was found in this
22  2004 report that we just went over, right?
23  A. I believe so.
24  Q. Did this list come from these 2004 reports?
25  A. I don't know. I don't recall.

Page 115

1  Q. Do you think it might be a coincidence that
2  this list exactly matches what's in this 2004 report?
3      MR. VÁZQUEZ: Form. argumentative.
4  A. I don't know.
5  Q. (By Mr. Stimpson) Do you have any reason to
6  disagree with me, that this list comes from the 2004
7  report?
8  A. Again, I don't know.
9  Q. In 2004, were there other healthcare provider
10 information categories that were used as well?
11 A. I don't recall.
12 Q. Philosophy?
13 A. I don't remember.
14 Q. How about gender?
15 A. I don't remember.
16 Q. How about age?
17 A. I don't remember.
18 Q. Awards, honors?
19 A. Again, I don't remember.
20 Q. If you could, turn to Page 32072, please.
21 A. (Deponent complied.)
22 Q. Actually 32072 and 73. This report from 2004
23 shows ratings of healthcare providers, right?
24     MR. VÁZQUEZ: Form.
25 A. It shows ratings for hospitals.

1  Q. (By Mr. Stimpson) Right. A hospital is a
2  healthcare provider, right?
3  A. Yes.
4  Q. So am I right then that this report from 2004
5  shows ratings of healthcare providers?
6  MR. VÁZQUEZ: Form.
7  A. Yes.
8  Q. (By Mr. Stimpson) 32075, please. Do you see
9  "gender" there?
10 A. Yes.
11 Q. And where did you get that information in 2004?
12 A. Third-party source.
13 Q. Are you sure this came from a third-party
14 source and not from the healthcare provider?
15 A. Relatively certain.
16 Q. How would you know that?
17 A. I don't believe in 2004 we had the capability
18 to collect that from healthcare providers.
19 Q. Well, pick up the phone and call them, right?
20 MR. VÁZQUEZ: Form.
21 A. I don't know.
22 Q. (By Mr. Stimpson) Do you know if anybody was
23 doing that?
24 A. I don't know. I don't remember.
25 Q. How would we find out where this information on

Page 127

1  providers, in the patent claim.
2       A.  Okay.
3       Q.  Right.  Did you come up with that idea?
4       A.  I don't recall.
5       Q.  Do you remember who might have contributed to
6  that?
7       A.  No, I don't.
8       Q.  How about the part about patient ratings up
9  above here on the first "compiling" paragraph there?
10 Patient ratings, do you remember if you were involved
11 with that idea?
12      A.  I don't remember.
13      Q.  Do you remember if anybody -- anybody who was?
14      A.  No.
15      Q.  Can we look at 32100, please?  This is a
16 hospital quality report.
17      A.  Yes.
18      Q.  This is also 2004?
19      A.  Yes.
20      Q.  And this is also -- this report is basically
21 just a report on ratings of healthcare providers, right?
22      A.  Hospitals, yes.
23      Q.  Yeah.  A hospital is a healthcare provider,
24 right?
25      A.  Yes.

Page 128

1  Q. And if you could turn to Page 32105.
2  A. (Deponent complied.)
3  Q. Are those comparison ratings under the
4  orthopedics ratings?
5  A. They're service ratings.
6  Q. Are they comparison ratings of healthcare
7  providers under Claim 1 of your patent, sir, in your
8  view?
9  A. They're service ratings.
10 Q. Can you not answer the question?
11 A. I don't know. I think -- I don't know.
12 Q. There are several reports in Exhibit 8 from
13 2004, Mr. Hicks, right?
14 A. Yes.
15 Q. Why didn't you disclose them to the United
16 States Patent and Trademark Office in connection with
17 the prosecution of the '060 patent?
18      MR. VÁZQUEZ: Form.
19 A. I don't know.
20      MR. STIMPSON: Want to take a break?
21      MR. VÁZQUEZ: Sure.
22      (Short recess from 11:30 a.m. to 11:41 a.m.)
23      (Mr. Kostolansky exited deposition room.)
24 Q. (By Mr. Stimpson) Let me show you what's
25 marked as Exhibit 9, Mr. Hicks, a one-page document

Page 129

1  bearing Bates No. HG0209647.
2           MR. VÁZQUEZ:  9.  Thank you.
3       Q.  (By Mr. Stimpson)  Can you identify this
4  document for me, please?
5       A.  It's a report showing the patient experience
6  surveys filled out.  It looks like number of users that
7  filled out a survey and number of surveys filled out.
8       Q.  So at least as early as October 2004,
9  HealthGrades was collecting patient-provided data on
10 healthcare providers?
11      A.  Patient experience surveys.
12      Q.  Okay.  And what did this survey request?  Do
13 you remember?
14      A.  It was the questions we asked patients about
15 that provider.  For example, was the physician -- I
16 don't remember all the questions and the specific
17 sentences on those, but would you recommend this
18 physician to family and friends; how friendly was the
19 office staff; those kinds of things.
20      Q.  Where would we find the results of these
21 surveys?  Are they still at HealthGrades?
22      A.  I believe so.
23      Q.  Who -- do you know where they would be?
24          Like, as opposed to just generally at
25 HealthGrades, are they in somebody's office, on the

Page 133

1       A.   I believe so.
2       Q.   On this next page, Page 2 of 2, there's a
3  paragraph that starts there:  "HealthGrades' Web site is
4  the leading destination for healthcare ratings for
5  consumers," continued Hicks.
6            That's a quote from you?
7       A.   No.
8       Q.   No.  Oh, this is your brother?
9       A.   Yes.
10      Q.   Okay.  Sorry.  You can understand that.
11      A.   I understand.
12      Q.   But were there other healthcare ratings for
13 consumers on the HealthGrades' Web site prior to the
14 addition of these physician satisfaction surveys?
15           MR. VÁZQUEZ:  Form.
16      A.   On the HealthGrades' Web site?  I'm sorry.
17      Q.   (By Mr. Stimpson)  Yes.
18      A.   Can you repeat the question?
19      Q.   Your brother is saying here that HealthGrades'
20 Web site is a leading destination for healthcare ratings
21 for consumers, right?
22      A.   Yes.
23      Q.   So my question to you is, before these
24 physician satisfaction survey results were added to the
25 physician quality reports, were there other healthcare

Page 134

1  ratings for consumers on the HealthGrades Web site?
2          MR. VÁZQUEZ:  Form.
3      A.  I --
4      Q.  (By Mr. Stimpson)  Let me rephrase it.
5      A.  I'm sorry.  I'm really confused by your
6  question.
7      Q.  That's all right.  Let me just rephrase it.
8  It's not the first time I've asked a confusing question;
9  it won't be the last.
10         When your brother refers to healthcare ratings
11 for consumers --
12     A.  Yes.
13     Q.  -- what's he referring to there?  Do you know?
14     A.  Ratings of healthcare providers, I think.
15     Q.  Okay.  Is he referring to ratings of healthcare
16 providers other than these physician satisfaction
17 surveys?
18         MR. VÁZQUEZ:  Form.
19     A.  I don't know.
20     Q.  (By Mr. Stimpson)  That's okay.  After the
21 physician satisfaction surveys were added to the
22 physician quality reports in at least August of 2005,
23 why didn't you disclose those reports to the patent and
24 trademark office in connection with the '060 patent?
25         MR. VÁZQUEZ:  Object to form.

Page 135

1       A.   I don't know.
2            MR. STIMPSON:  Can we get the privilege log?
3            MR. LEE:  Exhibit 12.
4            (Exhibit 12 was marked.)
5       Q.   (By Mr. Stimpson)  Let me show you what's
6   been -- sorry about the staple.
7            Let me show you what's been marked as
8   Defendant's Deposition Exhibit 12.  This is a privilege
9   log we received from your -- from Merchant & Gould,
10  which was the firm that prosecuted the patent, the '060
11  patent.  You can see Merchant & Gould's name somewhere.
12      A.   Okay.
13      Q.   So what this does -- I know you're not familiar
14  with a privilege log; so let me explain it to you.  It's
15  an -- attorney-client communications are privileged.
16  They don't have to be disclosed to us.  But what they
17  have to do is they have to identify them in a log.  It's
18  just generally what's the subject matter, when was it.
19           This is the result.  This is the privilege log.
20  But there is some information we can get from privilege
21  logs, and that's why I'm bringing it out to show you.
22           Could you look to No. 107 on the log, please?
23      A.   (Deponent complied.)
24      Q.   Number 107 refers -- it says it's an e-mail
25  regarding next steps for patent application.  Do you see

Page 136

1  that?
2      A.  Yes.
3      Q.  And it's dated June 5, 2009?
4      A.  Yes.
5      Q.  And it shows that it was from Mr. Dodge and you
6  were copied on it, right?
7      A.  What's that last column, recipient?
8      Q.  Yes.
9      A.  Yes.
10     Q.  Okay.  So this tells us at least, Mr. Hicks, as
11 of June 2009, you were at least involved in
12 communications regarding the steps for the patent
13 application, right?
14     A.  I believe so.
15     Q.  And so does that refresh your memory, you were,
16 in fact, involved with this patent prosecution for the
17 '060?
18     A.  I was involved.
19     Q.  I'm sorry, you --
20     A.  Yes, I was.
21     Q.  And that's true for the entire prosecution
22 period from filing until issuance, generally, right?
23     A.  Yeah.  I think.
24     Q.  Okay.
25         MR. VÁZQUEZ:  Hold on.  Hold on.

Page 148

1   inventor on the '060 patent, does this show comparison
2   ratings of healthcare providers?
3          MR. VÁZQUEZ:  Object to form.  Calls for a
4   legal conclusion.
5       A.  I'm sorry.  Can you repeat the question?
6          MR. STIMPSON:  You can read it, please.
7          (Requested portion was read.)
8       A.  It shows the average response for surveys and
9   then the national average.
10      Q.  (By Mr. Stimpson)  All right.  And as a named
11  inventor on the '060 patent, is that comparison ratings
12  of healthcare providers?
13         MR. VÁZQUEZ:  Same objections.
14      A.  I think it just shows the response of six
15  surveys and then a national average.
16      Q.  So the answer is no?
17      A.  That's what --
18         MR. VÁZQUEZ:  Same objection.
19      A.  -- it says.
20      Q.  (By Mr. Stimpson)  So you can't tell me whether
21  or not this is comparison ratings of healthcare
22  providers?
23      A.  I don't --
24         MR. VÁZQUEZ:  Same objections.
25      A.  I don't know.

Page 149

1    Q.  (By Mr. Stimpson)  It doesn't come out -- when
2  you just look at it, it doesn't jump out to you as
3  comparison ratings of healthcare providers, right?
4         MR. VÁZQUEZ:  Same objections.
5    A.  I don't know.
6    Q.  (By Mr. Stimpson)  Okay.  And the user would
7  obtain access to this report through this, HealthGrades'
8  Web page, right?
9    A.  I believe so.
10    Q.  And that's -- we talked about this earlier, but
11  they enter criteria.  For example, they could put in
12  this guy's name exactly, right?  They could put in a
13  request of David A. Drucker, and this would come up,
14  right?
15    A.  I think so.
16    Q.  Okay.  Can you tell from this report whether or
17  not Dr. Drucker is a member?
18    A.  A member of what?
19    Q.  Of HealthGrades, the HealthGrades Web site.
20  Let me back up a bit.
21         At this time in 2005, did you have the ability
22  for physicians to be members of the HealthGrades Web
23  site?
24         Do you know what I mean by "members"?
25    A.  I'm not sure.

Page 150

1  Q. Well, I mean, if Dr. Drucker wanted to be --
2  get special treatment on the HealthGrades Web site at
3  this time in 2005, would he be able to do that by paying
4  some extra money?
5  A. As part of our -- like our PNMM program,
6  physician new media marketing program?
7  Q. As anything. Yeah, as part of anything.
8  A. I don't know if that was at this time or not,
9  but that was one of the programs we had.
10 Q. You don't remember when that started?
11 A. I don't know exactly when it started.
12 Q. But was it started at the same time that you
13 started collecting the information from healthcare
14 providers?
15 A. I'm sorry. I don't really remember if there's
16 a tie in on that.
17 MR. STIMPSON: I'm so used to having it
18 videotaped, I keep doing this.
19 Give me a minute, and I'll see what else I have
20 left.
21 MR. VÁZQUEZ: Off the record?
22 MR. STIMPSON: Sure.
23 (Short recess from 1:20 p.m. to 1:28 p.m.)
24 MR. STIMPSON: No further questions. Do you
25 have any questions?