# EXHIBIT G

Attorneys' Eyes Only

Page 1

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2          IN THE UNITED STATES DISTRICT COURT

3             FOR THE DISTRICT OF COLORADO

4     Case No. 11-CV-00520-PAB-BNB

5     _____

6     30(b)(6) DEPOSITION OF HEALTH GRADES, INC.,

7     Representative John Neal

8     and

9     DEPOSITION OF JOHN NEAL

10    June 13, 2012

11    _____

12
      HEALTH GRADES, INC.,

13
      Plaintiff,

14
      v.

15
      MDX MEDICAL, INC. d/b/a VITALS.COM,

16
      Defendant.

17    _____

18

19

20

21

22

23

24

25      Job No. NJ399592

Attorneys' Eyes Only

Page 2

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     APPEARANCES:
 3        MERCHANT & GOULD
              By Kristin L. Stoll-DeBell, Esq.
 4                1050 17th Street
                  Suite 1950
 5                Denver, CO 80265
                  Phone: 303.357.1670
 6                Fax: 303.357.1671
                  kstolldebell@merchant-gould.com
 7                Appearing on behalf of the
                  plaintiff
 8
 9        ROTHGERBER JOHNSON & LYONS LLP
              By Jesus Manuel Vazquez Jr., Esq.
10                1200 Seventeenth Street
                  Suite 3000
11                Denver, CO 80202-5855
                  Phone: 303.623.9000
12                Fax: 303.623.9222
                  jvazquez@rothgerber.com
13                Appearing on behalf of the
                  Plaintiff
14
15        SILLS CUMMIS & GROSS, PC
              By Scott D. Stimpson,  Esq.
                  David C. Lee, Esq.
16                30 Rockefeller Plaza
                  New York, NY 10112
17                Phone: 212.643.7000
                  Fax: 212.653.6500
18                sstimpson@sillscummis.com
                  Appearing on behalf the Defendant
19
20
21
22
23
24
25
```

Attorneys' Eyes Only

Page 3

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               Pursuant to Notice and the Federal Rules of

3     Civil Procedure, the 30(b)(6) Deposition of Health

4     Grades, Inc. and Deposition of John Neal, called by

5     Defendant, was taken on Wednesday, June 13, 2012,

6     commencing at 8:22 a.m., at 1200 Seventeenth Street,

7     Suite 3000, Denver, Colorado, before Kelly A.

8     Mackereth, Certified Shorthand Reporter, Registered

9     Professional Reporter, Certified Realtime Reporter

10    and Notary Public within Colorado.

11

                         * * * * * * *

12                       I N D E X

13

      EXAMINATION                              PAGE

14

       BY MR. STIMPSON                          6

15     BY MR. VAZQUEZ                           316

16

      PRODUCTION REQUEST(S):

17

       None.

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      years in profession and years in practice, and
 3      specialty information in this report, right?
 4          A     Yes.
 5          Q     Okay.  How about languages, is that in
 6      here?
 7          A     I'm not seeing it.  If it is, if you could
 8      point it out to me.
 9          Q     All right.  So anyway, going back and you
10      can start at the beginning of the report again, and
11      after receiving your request for the healthcare
12      provider, Health Grades would compile at least
13      patient provided information regarding the first
14      healthcare provider; is that right?
15                  MR. VAZQUEZ:  Form.
16          A     I apologize.  I need to get you --
17          Q     (BY MR. STIMPSON)  Let me back up a little
18      bit.  When did Health Grades start collecting patient
19      provided information?
20          A     It was -- I don't know for certain.  It
21      was in the 2006 timeframe, I believe.
22          Q     Okay.
23          A     2006 to 2007.
24          Q     Okay.  Is that the first time it did that
25      even with beta testing in pilot programs?
```

Attorneys' Eyes Only

Page 128

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2              MR. VAZQUEZ:  Form.
 3    A      I just recall 2006 to 2007.
 4    Q      (BY MR. STIMPSON)  Okay.
 5    A      I can't speak to beta specifics.
 6    Q      All right.  In this report, this Physician
 7  Quality Comparison Report, it included information
 8  from third parties, including board certification,
 9  right?
10    A      Yes.
11    Q      And medical school?
12    A      I believe so.
13    Q      And licensure?
14    A      Let me go through the elements that you're
15  speaking to.  I don't recall licensure being listed
16  separately, but --
17    Q      32067.
18    A      Okay.  Got it.
19    Q      Disciplinary information?
20    A      That was incorporated as available.
21    Q      Okay.  And medical school?
22    A      Yes, as available.
23    Q      And medical internship?  32064.
24    A      Okay.  Yes.
25    Q      And medical residency?
```

Attorneys' Eyes Only

Page 129

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      Yes.

3      Q      And medical fellowship information?

4      A      Yes.

5      Q      And then the Health Grades website would

6  create a healthcare provider report in response to

7  the request, right?

8           MR. VAZQUEZ:  I'm going to object to form.

9      Q      (BY MR. STIMPSON)  Including this

10 Physician Quality Comparison Report, right?

11          MR. VAZQUEZ:  Form.

12     A      The report was produced.

13     Q      (BY MR. STIMPSON)  Okay.  And that would

14 be made available over the web to the consumers,

15 right?

16     A      It was accessible on the Internet, yes.

17     Q      Why didn't you disclose the Physician

18 Quality Comparison Report to the Patent and Trademark

19 Office in connection with the patent application that

20 led to the '060 patent?

21     A      The intent behind the patent filing was to

22 patent what we believed to be unique where there was

23 no prior art that existed.  And this was not deemed

24 to be unique or different.

25          So that's the reason we didn't reference

Attorneys' Eyes Only

Page 130

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    it.

3         Q    Okay.  I need a little bit more specifics

4    on that.  What was it -- well, first of all, did you

5    talk about the Physician Quality Comparison Reports

6    with your patent attorneys?

7              MR. VAZQUEZ:  You can say whether you

8    discussed it, but, of course, do not disclose what

9    you actually discussed.

10        A    I don't recall the specific conversation.

11   But we covered a range of topics, and I'm sure we

12   reevaluated what we were already doing at that time.

13        Q    (BY MR. STIMPSON)  So you did go over with

14   your patent prosecution counsel what Health Grades

15   was doing at the time?

16             MR. VAZQUEZ:  Objection.  Misstates the

17   testimony.

18        A    I don't recall exactly what we discussed

19   and how it was discussed.

20             MR. VAZQUEZ:  Did you say so you didn't go

21   over with your patent prosecution counsel what Health

22   Grades was doing at the time?

23             MR. STIMPSON:  I think I said he did.

24             MR. VAZQUEZ:  Oh, okay.  So then I

25   withdraw my objection.  I thought you said didn't,

Attorneys' Eyes Only

Page 131

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    but I see here that it says "did."
 3          Q     (BY MR. STIMPSON)  Let me just ask you,
 4    Mr. Neal, do you have a recollection of discussing
 5    Physician Quality Comparison Reports from 2004 or
 6    2005 with your patent prosecution counsel?
 7          A     I do not recall that specific
 8    conversation.
 9          Q     Now, we were talking about why you didn't
10    disclose these Physician Quality Comparison Reports
11    to the Patent and Trademark Office.  Let me back up
12    just a bit.
13                You understood you had a duty of candor to
14    the Patent and Trademark Office?
15          A     I understand the requirements in signing
16    the patent filing.
17          Q     And one of them was that you were to
18    disclose any relevant prior art to the Patent and
19    Trademark Office?
20                MR. VAZQUEZ:  Form.
21          A     I am aware of that.
22          Q     (BY MR. STIMPSON)  Yeah, you are aware now
23    but you were also aware then, right?
24          A     Yeah, which is exactly what we did.
25          Q     So let's talk about why this Physician
```

Attorneys' Eyes Only

Page 132

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     Quality Comparison Report from 2004 and 2005, why

3     they were not disclosed to the Patent and Trademark

4     Office.

5              You said, I thought, if I remember right,

6     you said that the Physician Quality Comparison Report

7     was deemed to be different from what is in your

8     patent '060; is that correct?

9          A     Yes.

10         Q     Okay.  How?

11         A     It's bringing together those different

12    elements in types of data and making that accessible

13    to consumers, not just in a report, but more

14    importantly on the website.

15             And most importantly, to give them a means

16    to differentiate providers based on a rating or a

17    score.  And this is not what we were doing in 2004.

18         Q     Okay.  So any other reasons?  Any other

19    reasons?

20         A     Any other reasons for?

21         Q     For why you didn't disclose it.

22         A     It was about being innovative and ensuring

23    that we were protecting what was not being done by

24    anyone else.  That was the intent behind the patent.

25         Q     Any other reasons?

Attorneys' Eyes Only

Page 133

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      Any other reasons for?

3      Q      Why you didn't disclose it.

4      A      It wasn't relevant to the patent

5   application that we were filing.

6      Q      Why?  Why not?

7      A      It's for the reason I just said.

8      Q      Okay.

9      A      This patent was to protect a unique

10   experience, something that no one else was doing in

11   any form or fashion in terms of combining data

12   elements, creating a unique experience to consumers

13   on a website.

14      Q      Did you understand then, with your duty of

15   candor, Mr. Neal, that the only prior art you need to

16   disclose was prior art that showed every element of

17   your patent claims?

18          MR. VAZQUEZ:  Form.

19      A      I don't recall what those specific

20   discussions were with our counsel as relates to that.

21      Q      (BY MR. STIMPSON)  I'm just trying to get

22   a factual understanding here.  Back at the time when

23   this application was pending, was it your

24   understanding, sir, that the only prior art you

25   needed to disclose was prior art that showed every

Attorneys' Eyes Only

Page 134

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     element of your patent claims?

3               MR. VAZQUEZ:  Same objection.

4      A     Was it my understanding -- I'm sorry, if

5     you can read back or say that last part.  Was it my

6     understanding -- sorry, if you can read back or say

7     that last part, was it my understanding --

8               (Record read as requested.)

9               MR. VAZQUEZ:  I object to form.  Calls for

10    a legal conclusion.

11     A     Yeah, I don't understand the question.

12    Were we supposed to -- I need you to rephrase or

13    re-ask the question.  I just don't understand it.

14     Q     (BY MR. STIMPSON)  Okay.  Well, let me try

15    again, then.  I'm talking about the time when your

16    patent application was pending before it issues a

17    patent.  And you understood you had a duty of candor

18    to disclose relevant prior art to the Patent and

19    Trademark Office, correct?

20               MR. VAZQUEZ:  Form.

21     A     Yes.

22     Q     (BY MR. STIMPSON)  Was it your

23    understanding, sir, at that time that you only needed

24    to disclose prior art that showed every element of

25    your patent claims?

Veritext/NJ Reporting Company

800-227-8440                                              973-410-4040

Page 135

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               MR. VAZQUEZ:  Object to form.  Calls for

3     legal conclusion and expert testimony.

4          A    I don't recall specifically what the

5     instructions were as it relates to what prior art we

6     needed to disclose.  It was a conversation with

7     counsel.

8          Q    (BY MR. STIMPSON)  Okay.  But you don't

9     recall actually discussing the physician quality

10    comparison reports with your counsel?

11         A    We discussed -- we discussed everything as

12    it relates to what we had done historically, were

13    doing then, and plan to do in the future.

14         Q    So is it your testimony that in connection

15    with your patent application you disclosed to

16    Merchant & Gould that Health Grades had these 2004,

17    2005 Physician Quality Comparison Reports?

18         A    I don't know that we specifically

19    discussed these reports.  I don't recall that

20    conversation.  We covered a range of topics, as I

21    just said.

22         Q    All right.  Do you remember disclosing to

23    Merchant & Gould any of the 2005, 2004 reports that

24    Health Grades had disclosed to the public?

25              MR. VAZQUEZ:  Again, just to warn you,

Attorneys' Eyes Only

Page 136

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     Mr. Neal, you can answer his questions to the best of

3     your ability, but don't disclose the communications

4     you had with Merchant & Gould.

5               THE DEPONENT:  Okay.

6        A    I can't recall the specific conversations

7     as it relates to these reports.

8        Q    (BY MR. STIMPSON)  Okay.  There are some

9     things in your patent claims that you know this

10    Physician Quality Comparison Report had, right?

11              MR. VAZQUEZ:  Object to form.

12       Q    (BY MR. STIMPSON)  We have gone over those

13    things, right?

14              MR. VAZQUEZ:  Same thing.  Form.

15       Q    (BY MR. STIMPSON)  Let's just start there.

16    Let me start with that.  You know, and you knew at

17    the time your patent application was pending, that

18    there were a number of claim elements from your

19    claims in the '060 patent that were found in this

20    Physician Quality Comparison Report, right?

21              MR. VAZQUEZ:  Same thing.  Form.  Also,

22    legal conclusions.

23       A    Yeah, I would have to defer to counsel on

24    that.  I don't know what the interpretation of the

25    patent was as it relates to any reports that may have

Attorneys' Eyes Only

Page 137

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      been in existence at that time.

3          Q    (BY MR. STIMPSON)  Well, you knew your

4      patent claim had a claim element, for example, about

5      consumers requesting information of a website, right?

6          A    Well, I think it's a legal interpretation

7      that I'm not qualified to make.

8               MR. VAZQUEZ:  I don't want to keep

9      interrupting you, Scott, but can I just have the same

10     objection when you ask about claims and use, you

11     know, terminology that's --

12              MR. STIMPSON:  That's fine.  Yes, yes.

13              MR. VAZQUEZ:  Yes?

14              MR. STIMPSON:  Yes.

15              MR. VAZQUEZ:  Thank you.

16         Q    (BY MR. STIMPSON)  So you're a named

17     inventor on this, right?

18         A    Um-hum.

19         Q    And you read the patent application, and

20     you understood the patent application?

21         A    I do.

22         Q    Right, and you read the patent claims that

23     were submitted to the Patent Office, right?

24         A    I have absolutely, um-hum.

25         Q    So at the time when this patent

Attorneys' Eyes Only

Page 138

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     application was pending, you understood that one of

3     the claim elements was about how a consumer would get

4     on and request information about a healthcare

5     provider on a website, right?

6          A     I didn't know how the patent application

7     and any claims that were made therein might apply to

8     the reports because I'm not counsel, I'm not an

9     attorney.  So I don't know -- so I can't respond to

10    that question.

11         Q     Okay.  You are an inventor, though, sir.

12         A     Um-hum.

13         Q     And you signed a declaration.  I can show

14    it to you if you want to see it, but you signed a

15    declaration saying that you understood the patent

16    application and the claims.

17         A     You're asking me to make a legal

18    determination, though, and I'm just not qualified to

19    do that.

20         Q     Sir, I'm not -- you can -- just answer the

21    question as best you can.  That's all I'm asking.

22         A     I really am trying.  I really am.

23         Q     So my question is this, when the

24    application was pending you understood that one of

25    the claim elements of your '060 patent application

Attorneys' Eyes Only

Page 139

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      was that a consumer would get on a website and make a

3      request for information about healthcare providers?

4          A      I think that's an element in the claim, in

5      the filing.

6          Q      Right.  And that was also something that

7      was found on Health Grades website in 2004 with

8      regard to Physician Quality Comparison Reports,

9      right?

10         A      I don't know how that claim applies to

11     anything we may have been doing on the website.

12     That's for attorneys to determine.

13         Q      But that wasn't quite my question, sir.

14         A      Okay.

15         Q      My question was, you understood, that as

16     of 2004, the Health Grades website allowed consumers

17     to get on and make a request about information for

18     healthcare providers, correct?

19         A      It did provide that functionality.

20         Q      And you understood that the Health Grades

21     website, one of the features that was available on

22     that website is it would allow consumers to get on

23     and get these Physician Quality Comparison Reports,

24     right?

25         A      Um-hum.

Attorneys' Eyes Only

Page 140

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Q     Okay.  You have to answer.

3          A     Oh, I'm sorry.

4          Q     Yes?

5          A     Consumers, at that point in time, based on

6     the report we're looking at, in 2004, they were able

7     to access the third-party data provided consumer

8     comparison reports.

9          Q     Right.  And some of that data, as we've

10    been over in the claim, contained information on

11    gender, right?  The Physician Quality Comparison

12    Report included information on gender, right?

13         A     I'm not sure how the claim relates.

14    Again, I'm not counsel.  I'm not an attorney.  I

15    don't know how the claim relates to what we may or

16    may not have been doing on the website in 2004.

17         Q     Okay.  I'm not asking that, though,

18    Mr. Neal.  My question was --

19         A     But you were reading -- I'm sorry.  You

20    were reading that to me, which is part of the patent

21    application, which requires an interpretation.

22         Q     I'm just asking you a factual question,

23    sir.  You understood that in 2004, the Physician

24    Quality Comparison Report had information on

25    healthcare provider gender, right?

Page 141

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A     It did.

3      Q     Okay.  You understood that in 2004, the

4  Physician Quality Comparison Report had information

5  on specialty information?

6      A     It did.

7      Q     You understood that in 2004, the Physician

8  Quality Comparison Report had information on

9  healthcare provider age, right?

10      A     Age was not in there.  I think we

11  determined that it was years in medical practice.

12      Q     Okay.  And you understood that in 2004,

13  the Physician Quality Comparison Report had

14  information on, yes, years in profession, years in

15  practice, right?

16      A     Yes.

17      Q     Okay.  And you understood that in 2004,

18  the Physician Quality Comparison Report showed

19  comparison ratings of healthcare providers, right?

20      A     There were no comparison ratings of

21  healthcare providers.

22      Q     Okay.  Can you please turn to 32073?

23      A     32073.

24      Q     Okay.  And that's referencing hospitals

25  there, right?

Attorneys' Eyes Only

Page 142

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A     Those are hospitals, not physicians.

3       Q     Right.  Hospitals, as you told me earlier,

4    are healthcare providers, right?

5       A     Okay.  I'm sorry.  By definition, that was

6    the broader definition to include hospitals.  Okay.

7       Q     Okay.  Right?  So with that understanding,

8    you understood that the Physician Quality Comparison

9    Reports in 2004 showed comparison ratings of

10   healthcare providers, right?

11          MR. VAZQUEZ:  Form.

12      A     They provided comparison ratings of

13   hospitals.  Very important distinction.

14          MR. STIMPSON:  Okay.  Move to strike as

15   nonresponsive.

16          Can you read the question back?

17          (Record read as requested.)

18          MR. VAZQUEZ:  Form.

19      A     It provided comparison ratings of only

20   hospitals.

21      Q     (BY MR. STIMPSON)  All right.  And as you

22   talked about earlier, hospitals can be considered

23   healthcare providers, correct?

24      A     That's for someone else to determine.

25   I've heard multiple uses of providers, which is the

Attorneys' Eyes Only

                                        Page 143

 1          CONFIDENTIAL - ATTORNEYS EYES ONLY

 2     reason I keep making the distinction with you.

 3              MR. STIMPSON:  Move to strike as

 4     nonresponsive.

 5         Q    (BY MR. STIMPSON)  My question, Mr. Neal,

 6     is, you understood, at the time this patent

 7     application was pending, that hospitals could be

 8     considered healthcare providers, correct?

 9         A    I didn't know how the court might

10     interpret or the Patent Office might interpret it.

11              MR. STIMPSON:  Move to strike as

12     nonresponsive.

13         Q    (BY MR. STIMPSON)  Mr. Neal, my question

14     is this, during the time that patent application was

15     pending you understood that hospitals could be

16     considered healthcare providers, correct?

17              MR. VAZQUEZ:  Okay.  Object.  You're

18     asking the witness -- asked and answered.

19              MR. STIMPSON:  I --

20              MR. VAZQUEZ:  Let me finish my objection,

21     please.

22              MR. STIMPSON:  Okay.

23              MR. VAZQUEZ:  It's been asked and

24     answered.  It's argumentative, it's harassing.  Give

25     me one more shot at it, Scott.

Attorneys' Eyes Only

Page 144

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2              MR. STIMPSON:  Well, I'll take as many

3      until I get the answer, thank you.

4              MR. VAZQUEZ:  Well, we'll see about that.

5         Q    (BY MR. STIMPSON)  Will you please answer

6      the question, sir?

7         A    By the definition you provided of

8      providers, which is inconsistent with the definition

9      others have provided, but with the definition you

10     provided of providers that includes physicians and

11     hospitals defined as providers, the fact that we are

12     providing quality ratings on hospitals, that would

13     suit your definition.

14        Q    My question didn't have anything about my

15     definition.

16        A    It's all about your definition.  I'm

17     sorry.

18        Q    No, no, no, it's about yours, sir.  Listen

19     to my question, please, okay?

20             MR. STIMPSON:  And move to strike the last

21     answer as nonresponsive again.

22        Q    (BY MR. STIMPSON)  Please listen to the

23     question.  It's about what you understood at the time

24     the patent application was pending, the '060 patent.

25     And the question is simply this, at the time that

Attorneys' Eyes Only

Page 145

 1              CONFIDENTIAL - ATTORNEYS EYES ONLY

 2    application was pending, you understood that by, at

 3    least some definitions, hospitals could be considered

 4    healthcare providers, correct?

 5              MR. VAZQUEZ:  Form.

 6         A    By some definitions, yes.

 7         Q    (BY MR. STIMPSON)  And using those

 8    definitions, the Physician Quality Comparison Report

 9    had comparison ratings of healthcare providers,

10    correct?

11              MR. VAZQUEZ:  Form.

12              You can answer.

13         A    Okay.  This is not a comparison rating of

14    physicians.  This is a clinical-based outcome score

15    for hospitals.

16              MR. STIMPSON:  Move to strike as

17    nonresponsive.

18              Please read the question back to the

19    witness.

20              (Record read as requested.)

21              MR. VAZQUEZ:  Same objections.  Asked and

22    answered.  Argumentative.  Harassing the witness.

23         A    Let's look at the content of this report.

24    The answer is no.

25              MR. VAZQUEZ:  He's answering.  Let him --

Attorneys' Eyes Only

Page 146

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      The answer is no.  Because look at the

3   elements that are contained for each of these

4   hospitals and the information that is contained

5   therein.

6           MR. STIMPSON:  Move to strike as

7   nonresponsive.

8      Q      (BY MR. STIMPSON)  Mr. Neal, we're going

9   to be here the rest of our lives if we don't get this

10  question answered, okay, so will you just please

11  focus on my question?

12          MR. VAZQUEZ:  You're not going to get the

13  answer you want, Mr. Stimpson.

14          MR. STIMPSON:  Just a second.  Just a

15  second.

16          MR. VAZQUEZ:  All right.

17          MR. STIMPSON:  We've been through this,

18  okay?

19     Q      (BY MR. STIMPSON)  Just a few questions

20  ago we established that you understood at the time

21  this application was pending that under some

22  definitions hospitals can be considered healthcare

23  providers, right?  You remember that?

24     A      Under that definition, they could be.

25     Q      Okay.  And then using that definition, the

Attorneys' Eyes Only

Page 147

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     Physician Quality Comparison Reports of 2004 contain
 3     comparison ratings of healthcare providers, correct?
 4              MR. VAZQUEZ:  Same objection.
 5          A     This is not comparison data, sir.
 6              MR. STIMPSON:  Move to strike as
 7     nonresponsive.
 8          A     It's not comparison data.
 9              MR. STIMPSON:  Please read back --
10              MR. VAZQUEZ:  No, we're not.  I'm making a
11     motion under Rule 30 --
12              MR. STIMPSON:  Okay, call the Court.
13              MR. VAZQUEZ:  No, let me finish my motion.
14              MR. STIMPSON:  If you're moving for a
15     protective order, let's do it right now.
16              MR. VAZQUEZ:  Will you just -- you know, I
17     hate to do it again, but please let me make my
18     objection --
19              MR. STIMPSON:  Okay.
20              MR. VAZQUEZ:  -- and finish saying what
21     I'm saying, okay?
22              MR. STIMPSON:  Okay, go ahead.
23              MR. VAZQUEZ:  Okay, good.  I make a motion
24     to limit this deposition because right now you're
25     conducting it in bad faith to simply annoy,
```

Attorneys' Eyes Only

Page 148

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     embarrass, and to press Mr. Neal.  You don't like the

3     answer, and that's your problem.  Okay?  He's

4     answered it multiple times.

5               So I can go further and simply demand that

6     we just suspend the deposition right now, or if you

7     would like to agree to simply move on or ask

8     different questions, Mr. Stimpson.

9               The Court may order that the deposition be

10    terminated on limited scope as provided in Rule 26.

11    So however you want to go.

12               MR. STIMPSON:  You done?

13               MR. VAZQUEZ:  However you want to go.

14               MR. STIMPSON:  Are you done?

15               MR. VAZQUEZ:  However you want to go.

16               MR. STIMPSON:  Read the question back to

17    the witness, please.

18               MR. VAZQUEZ:  Okay.  We're suspending it.

19               MR. STIMPSON:  You've got to call the

20    Court.

21               MR. VAZQUEZ:  No.

22               MR. STIMPSON:  You've got to move for a

23    protective order.

24               MR. VAZQUEZ:  No, I know what I need to

25    do.  You don't tell me how to practice law,

Attorneys' Eyes Only

Page 149

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     Mr. Stimpson.  We're just suspending the deposition

3     right now.

4               MR. STIMPSON:  I'm calling the Court right

5     now.

6               MR. VAZQUEZ:  Good.

7               MR. STIMPSON:  Get the number to the

8     Court, please.

9               (The deponent left the room.)

10              THE REPORTER:  Off the record?

11              MR. VAZQUEZ:  Yes, we are.

12              MR. STIMPSON:  No, this is going to be on

13     the record.

14              (Pause.)

15              (Discussion off the record.)

16              (The deponent entered the room.)

17        Q    (BY MR. STIMPSON)  Mr. Neal, isn't it true

18     that in your own patent, your '060 patent where

19     you're a named inventor, that you've identified

20     hospitals as healthcare providers?

21              MR. VAZQUEZ:  Form.

22        A    Where in the claim?

23        Q    (BY MR. STIMPSON)  Abstract.  Just look at

24     the abstract.  It's right on the front page.

25        A    Okay.  We have.

Attorneys' Eyes Only

Page 150

```
 1           CONFIDENTIAL - ATTORNEYS EYES ONLY
 2        Q     Okay.  So under that definition, and now
 3    your definition, Mr. Neal, right, the one that you
 4    signed the application attesting that you read the
 5    application and understood it.
 6        A     Um-hum.
 7        Q     Under your definition of hospitals being
 8    healthcare providers --
 9        A     Right.
10        Q     -- isn't it correct, sir, that in 2004,
11    the Physician Quality Comparison Report contained
12    comparison ratings of healthcare providers?
13           MR. VAZQUEZ:  Same objections that I made
14    to this question before.
15           If you can answer.
16        A     Yeah, the comparison ratings is not an
17    accurate depiction of what that data for hospitals
18    represents.
19        Q     (BY MR. STIMPSON)  Mr. Neal, let's look at
20    this page, okay?
21        A     Yeah.
22        Q     Okay.  32073.  Are you with me?
23        A     Give me just a second.
24           MR. VAZQUEZ:  Take whatever time you need
25    to look at that, Mr. Neal.
```

Attorneys' Eyes Only

Page 151

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Q     (BY MR. STIMPSON)  Are you with me,

3     Mr. Neal?

4          A     I am.

5          Q     Okay.  This 2004 Physician Quality

6     Comparison Report shows ratings of hospitals,

7     correct?

8          A     It does.

9          Q     It shows ratings of multiple hospitals,

10    correct?

11         A     It does not show a hospital rating.  It

12    shows how they performed by cohort or service line.

13    So they are not hospital ratings.

14         Q     Do you see above the table where it says,

15    What are the ratings for hospitals in my area?

16               Do you see that?  Do you see that, sir?

17         A     Yes.

18         Q     And that's language that's right in this

19    Physician Quality Comparison Report, right?

20         A     It is.

21         Q     And so ratings are provided for multiple

22    hospitals in this report, correct?

23         A     The rating is not assigned to the

24    hospital.  It's assigned to the service lines that

25    are parts of that hospital.  It's an important

Attorneys' Eyes Only

Page 152

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     distinction.

3          Q     Okay.  So the ratings are assigned to

4     parts of hospitals, correct?

5          A     They are.

6          Q     And under your own definition, founding

7     your own patent of '060, right, you said that

8     hospitals were healthcare providers, correct?

9               MR. VAZQUEZ:  Form.

10         A     Based on, yes, the abstract definition.

11         Q     (BY MR. STIMPSON)  Right.  And any user

12    looking at this Physician Quality Comparison Report

13    could compare ratings on these parts of hospitals

14    from this Physician Quality Comparison Report in

15    2004, correct?

16         A     I'm not sure what interpretation the

17    consumer might make, but there's not a means by which

18    to compare facilities and make a choice.  You can

19    choose my service line and evaluate, but there is no

20    method of comparison in there.

21         Q     So you're telling me that a user of this

22    Physician Quality Comparison Report could not look at

23    the Central Baptist Hospital and say, cardiac has a

24    three-star rating and then -- let me just find one

25    word here.

Attorneys' Eyes Only

Page 153

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2 So you're telling me, Mr. Neal, that a

3 user could not look at this Physician Quality

4 Comparison Report and look, for example, and see that

5 Central Baptist Hospital in neurosciences -- I'm

6 sorry, in pulmonary, has a three-star rating, and

7 also note from the same exact document that Pattie A.

8 Clay Hospital in Richmond, Kentucky had a five-star

9 rating in pulmonary, right?

10 MR. VAZQUEZ:  What is the question?

11 Q (BY MR. STIMPSON)  The user could do that,

12 right?

13 A They could look at this report and see

14 that information.

15 Q Right, and the way they do that is they

16 look at the ratings for the Central Baptist Hospital

17 under pulmonary, and then they compare it to the

18 Pattie A. Clay Hospital, pulmonary, right, and you'd

19 see that the Pattie A. Clay Hospital had a much

20 better rating than the Central Baptist Hospital,

21 correct?

22 A A consumer might do that.

23 Q If a consumer did that -- well, let me

24 just back up.

25 Actually, that's exactly the reason why

Attorneys' Eyes Only

Page 154

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2     these ratings are here, right, so the consumers can

3     compare these ratings to these various hospitals in

4     the various areas, right?

5              MR. VAZQUEZ:  Object to form.  Compound.

6          A     That may be a reason why.

7          Q     (BY MR. STIMPSON)  Okay.  Thank you.

8              Now, you also knew that the Health Grades

9     website was managed by Health Grades in the 2004

10    timeframe, right?

11         A     The Health Grades website -- I'm just

12    repeating the question.  Repeat the question, please.

13              (Record read as requested.)

14         A     Okay, yes, I did.

15         Q     (BY MR. STIMPSON)  And you knew that the

16    Physician Quality Comparison Reports for 2004

17    included board certification, right?

18         A     Correct.

19         Q     You knew that came from third parties?

20         A     It did.

21         Q     Okay.  And you knew it included licensure,

22    right?

23         A     I believe that was one of the elements we

24    identified, yes.

25         Q     And you knew that came from third parties?

Attorneys' Eyes Only

Page 155

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A     Yes.

3       Q     Okay.  You knew that the Physician Quality

4    Comparison Report of 2004 included disciplinary

5    information?

6       A     Yes.

7       Q     And you knew that came from third parties?

8       A     Correct.

9       Q     You knew that the Physician Quality

10   Comparison Reports from 2004 included medical school

11   information, right?

12      A     Yes.

13      Q     And you knew that came from third parties?

14      A     Yes.

15      Q     Okay.  And you knew it also included

16   internship, residency, and fellowship information,

17   right?

18      A     Correct.

19      Q     And you also knew that all three of those

20   came from third parties, right?

21      A     Correct.

22      Q     And then you also knew that the Health

23   Grades website, in response to the request from the

24   consumer, would create a report, could create a

25   report on healthcare providers, right?

Attorneys' Eyes Only

Page 156

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A     That's correct.

3        Q     And you also knew that that report could

4    be created using this information that we just talked

5    about that came from third parties, right?

6        A     Yes.

7        Q     And you also knew that the report would

8    also be made available to the consumer over the

9    website, right?

10       A     Yes.

11       Q     So, Mr. Neal, the physician quality

12   comparison reports for 2004 had numerous of the claim

13   elements from your '060 patent, right?

14            MR. VAZQUEZ:  Form.  And, again, calls for

15   expert testimony.  He's not an attorney.

16            To the extent you can answer it, go ahead.

17       A     I would have to defer to counsel on that

18   one.

19       Q     (BY MR. STIMPSON)  So you're not going to

20   answer that question?

21       A     No.

22            MR. STIMPSON:  Did he say no?

23       A     I'm going to say I would defer to counsel.

24       Q     (BY MR. STIMPSON)  Okay.  But my question

25   is, are you refusing to answer that question?

Attorneys' Eyes Only

Page 157

1         CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      I'm not qualified to answer that question.

3      Q      So are you refusing to answer it?

4      A      That's my answer.

5      Q      Okay.  So let's look at -- when did Health

6   Grades start collecting patient provided information?

7      A      Patient provided information, from my

8   prior comments, the 2006 to 2007 timeframe is my

9   recollection.  If you have any documents that suggest

10  otherwise, I would love to see them.  I don't know

11  exactly.

12         MR. STIMPSON:  25.

13     Q      (BY MR. STIMPSON)  Let me show you what

14  has been marked as Exhibit 25.  This is an e-mail

15  from Dave Hicks to a bunch of people, including

16  yourself.

17     A      Okay.

18     Q      Do you agree?

19         MR. VAZQUEZ:  Can you give him a chance

20  just to read it?

21         MR. STIMPSON:  Yeah, sure.

22         MR. VAZQUEZ:  When you're done and ready

23  to answer the question, just let him know.

24     A      Okay.

25     Q      (BY MR. STIMPSON)  This is an e-mail from

Attorneys' Eyes Only

Page 158

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     Mr. Hicks to several people, including yourself, on

3     February 4, 2004, correct?

4          A     Yeah, that's what this document is.

5          Q     And these e-mails are created and kept in

6     the ordinary course of Health Grades' business,

7     correct?

8          A     Yes, I believe so.

9          Q     And so as of this time, 2004, Health

10    Grades had already collected answers to patient

11    satisfaction surveys, correct?

12         A     Based on this document, I would say yes.

13         Q     So it wasn't 2006, 2007 like you

14    testified; it was actually early 2004?

15         A     I think my --

16              MR. VAZQUEZ:  Form.  Misstates the

17    testimony.

18         A     Yeah, I said I thought it was 2006, 2007,

19    but I wasn't sure.

20         Q     (BY MR. STIMPSON)  Okay.  Actually it was

21    1999, right?

22              MR. VAZQUEZ:  Form.  What is 1999?

23         Q     (BY MR. STIMPSON)  Read number 1 there,

24    Mr. Neal.

25              MR. VAZQUEZ:  Again, form.  I don't even

Attorneys' Eyes Only

Page 166

```
  1              CONFIDENTIAL - ATTORNEYS EYES ONLY
  2        Q     (BY MR. STIMPSON)  I'm asking a question.
  3        A     Okay.
  4        Q     Does this help refresh your recollection
  5   that as of early 2004, Health Grades was collecting
  6   patient satisfaction data?
  7              MR. VAZQUEZ:  Object to form.
  8        A     This -- as I understand Project
  9   Development Plans, and I'm not a developer or
 10   programmer, this is a plan to develop the capability
 11   to have that solution, any solution.
 12              So I wouldn't make the assumption that
 13   this was available in any specific timeframe
 14   immediately after this document was produced.
 15              MR. STIMPSON:  Let me have this one
 16   marked, okay?
 17              MR. LEE:  It's going to be Exhibit 47.
 18              (Exhibit 47 marked.)
 19              MR. VAZQUEZ:  Thank you.
 20        Q     (BY MR. STIMPSON)  Take a second and take
 21   a look at that, please.
 22        A     Okay.
 23        Q     Does this refresh your memory, Mr. Neal,
 24   that patient experience surveys were launched in mid
 25   May 2004?
```

Attorneys' Eyes Only

Page 167

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               MR. VAZQUEZ:  Object to form.

3      A     This -- any reference to JD Power &

4    Associates, I can tell you that the form of questions

5    that they use in any content that we may have

6    gathered is not used on our website today.

7               So it was unrelated to my activities.  I

8    see I was copied on one of these e-mails.  It just

9    wasn't something I was working on.

10              MR. STIMPSON:  Move to strike as

11   nonresponsive.

12     Q     (BY MR. STIMPSON)  Mr. Neal, Health Grades

13   was collecting patient experience survey data in May,

14   starting in May of 2004, correct?

15     A     Okay.  You know, the thing I'm struggling

16   with, is this on JD Power's website, or is this on

17   Health Grades'?

18     Q     I don't know.

19     A     The e-mail suggests that it was.

20     Q     That it was what?

21     A     That it was launched in some fashion.

22     Q     Okay.

23              MR. STIMPSON:  Let me have this one, 29.

24     Q     (BY MR. STIMPSON)  Just while you have

25   that in front of you, Mr. Neal, this is an e-mail

Attorneys' Eyes Only

Page 168

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      from Dave Hicks to Steve Wood at JDPA.com.  And

3      included in this, you're included in some of these

4      e-mails as a copy holder, right?

5          A     I see one area where I was included, one

6      e-mail.

7          Q     This is an e-mail prepared and kept in the

8      ordinary course of business at Health Grades, right?

9          A     I believe so.

10         Q     Let me show you what's been marked as

11     Exhibit 29, please.

12              MR. VAZQUEZ:  We're now re-marking this as

13     an exhibit for his?

14              MR. STIMPSON:  Did we mark this already?

15              MR. VAZQUEZ:  It's Exhibit 29.

16              MR. STIMPSON:  Yeah, it was 47.

17              MR. LEE:  That one was --

18              MR. VAZQUEZ:  My question is simply when

19     you give me an exhibit that has been marked before,

20     are we re-marking it as an exhibit for his

21     deposition?

22              MR. STIMPSON:  No.

23              MR. VAZQUEZ:  Okay.

24         Q     (BY MR. STIMPSON)  This is an

25     August 16, 2004 e-mail from Dave Hicks to yourself.

Attorneys' Eyes Only

Page 169

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A      Um-hum.

3        Q      Well, to Health Grades senior management

4    copied to you, correct?

5        A      Yes.

6        Q      Okay.  And this is also about the new

7    patient experience surveys, right?

8        A      Yes.

9        Q      Okay.  And attached is a patient

10   experience timeline.

11              Do you see that, Mr. Neal?

12       A      I do.

13       Q      And you can tell from the timeline that

14   they were intending to build results display,

15   application, and database as of the end of

16   September 2004, correct?

17       A      That's what this document suggests.

18       Q      Okay.  And then also to e-mail all report

19   purchasers about it as of this October 15, 2004,

20   correct?

21       A      That's what it says.

22       Q      Do you have any reason to believe that

23   these timelines were not met?

24       A      No.

25       Q      Is there a difference between patient

Attorneys' Eyes Only

Page 170

1               CONFIDENTIAL - ATTORNEYS EYES ONLY

2     experience survey and patient satisfaction surveys?

3          A     I think most people would assume they are

4     very similar, one and the same.

5          Q     I mean, within Health Grades, was there a

6     difference between the two?

7          A     There is a difference.  The distinction is

8     that experience, while still subjective, takes into

9     account different measures; for example, how long you

10    might have had to wait in a physician office, whereas

11    experience might be more oriented to how do you feel

12    about a doctor.

13              So there is -- there actually is a

14    distinction.

15         Q     They're both ratings of sorts, though,

16    right?

17              MR. VAZQUEZ:  Form.

18         A     I wouldn't call just the survey itself a

19    rating.

20         Q     (BY MR. STIMPSON)  Do you know how the

21    consumers, the patients, responded to this survey?

22    Was it they had a number of things they could check,

23    1, 2, 3, 4, 5 or -- right?

24              MR. VAZQUEZ:  Form.

25         A     There are different mechanisms you can use

Attorneys' Eyes Only

Page 173

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     future period display that information in that

3     content was deemed to be a risk to our business.  If

4     our clients found out that we were gathering that

5     information with some future intent, that was the

6     risk that we were considering or contemplating.

7          Q     Okay.  All right.  We'll get to other

8     documents to talk about that a little bit later.

9          A     Okay.

10              MR. STIMPSON:  Can I get this one here,

11    please?  Actually, David, I've changed my mind.  I

12    want that one.

13              MR. LEE:  Exhibit 48.

14              (Exhibit 48 marked.)

15         Q     (BY MR. STIMPSON)  We have marked a

16    multipage document as Exhibit 48 Health Grades

17    0209008 through 0209010.

18              Take a second to look at this, please,

19    Mr. Neal.

20         A     Okay.

21         Q     So this is a November 11, 2004 e-mail from

22    Scott Montroy to various people, including yourself,

23    correct?

24         A     It is.

25         Q     Prepared and kept in the ordinary course

Page 174

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2     of business?
3          A     It looks like it.
4          Q     Okay.  And what Mr. Montroy is doing is
5     sending out a report on the new patient experience
6     data, correct?
7          A     It would appear so.
8          Q     So this, in fact, confirms that, in fact,
9     Health Grades was collecting experience patient data
10    in late 2004, correct?
11         A     Yeah.  So it's after the date that was in
12    that table.
13         Q     Let me put that back in front of you,
14    Exhibit 21.  So it's about a month after when they
15    said when they were going to send out the e-mails
16    to --
17         A     Yeah, I see that.
18         Q     Right?
19         A     Um-hum.
20         Q     So do you want to change your testimony,
21    Mr. Neal, about whether or not those e-mails went
22    out?
23         A     No, I said they came out sometime after.
24         Q     Okay.  So am I correct, then, as of late
25    2004, e-mails had gone out to report purchasers about

Attorneys' Eyes Only

Page 175

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     the surveys on the Health Grades website?

3          A     Based on this e-mail, it looks like it

4     did.

5          Q     And you're referring to, is it 49?

6     Exhibit number.

7          A     This is 48.

8          Q     48, okay.  And those e-mails would tell

9     these report purchasers that there is a survey on our

10    website you can complete, and by completing the

11    survey you're agreeing that Health Grades can use

12    them in its results, correct?

13              MR. VAZQUEZ:  Form.

14         A     I don't know if I recall exactly, but I

15    don't believe there was a place on the

16    consumer-facing website where they could complete

17    these surveys.  It was only via secure e-mail access

18    that they could go in and complete these surveys.

19              So via this confirmed e-mail address, it

20    was a request to complete a survey.  I believe that's

21    what the table lays out as creating that process.

22         Q     (BY MR. STIMPSON)  Okay.  When did the

23    availability to survey go online at healthgrades.com?

24         A     I don't know the date.

25         Q     2005?

Attorneys' Eyes Only

Page 176

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A    I don't know.

3        Q    Could have been here, 2004?

4        A    Highly unlikely.

5        Q    Why?

6        A    Because of the concerns about the revenue

7    streams to the business.

8        Q    But in any event, we can agree that in

9    late 2004, Health Grades was disclosing to the

10   public, including these e-mail recipients, that

11   Health Grades has intended to collect survey results

12   that may be displayed later on its website, correct?

13            MR. VAZQUEZ:  Form.

14       A    I think it just confirms that we're

15   collecting surveys.  It doesn't demonstrate intent.

16       Q    (BY MR. STIMPSON)  Pardon me?

17       A    I don't think it demonstrates intent.

18       Q    Well, I'm just asking you --

19       A    But that's what you said.

20       Q    Okay.  Well, let me rephrase my question,

21   then.  In late 2004, Health Grades was disclosing to

22   these e-mail recipients that it wanted to collect

23   survey data, correct?

24       A    Yes.

25       Q    Okay.  And they would also disclose to

Attorneys' Eyes Only

Page 177

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2       these recipients that the idea behind this was to use

3       those survey results in some fashion, correct?

4              A       In my opinion, that's supposition.

5              Q       Okay.  So you're not comfortable saying

6       that Health Grades told these recipients that they

7       might use the survey data?

8              A       No, because I'm aware of the conversations

9       we were having internally about the risk to our

10      business.

11             Q       Don't you think the consumers who got

12      these e-mails might have figured out that, gee, maybe

13      they want us to use those survey results?

14                     MR. VAZQUEZ:  Form.

15             A       I don't know.

16             Q       (BY MR. STIMPSON)  Well, that's a nice

17      supposition, isn't it?  You can give that

18      supposition, right?

19             A       It's so easy you can answer it yourself,

20      then.

21             Q       Well, I want you to answer it because

22      you're the witness.  Right?

23                     MR. VAZQUEZ:  Form.

24             A       I don't know what the consumers believe.

25             Q       (BY MR. STIMPSON)  Well, of course they

Veritext/NJ Reporting Company

800-227-8440                                        973-410-4040

Attorneys' Eyes Only

Page 178

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      knew the survey results were going to be used in some
 3      fashion?
 4           A     If you say so.
 5           Q     Do you agree with that?
 6                 MR. VAZQUEZ:  Form.  Form.  All right.
 7      Let's just get back to direct questions --
 8           A     It's silly.
 9                 MR. VAZQUEZ:  -- and you answer if you
10      know.
11           Q     (BY MR. STIMPSON)  Do agree with that?
12                 MR. VAZQUEZ:  Agree with what?
13           A     Say it again, please, sir.
14           Q     (BY MR. STIMPSON)  Do you agree that the
15      consumers must have understood that Health Grades
16      intended to use these survey results --
17           A     I can't say what any consumers understood.
18           Q     Okay.  So Exhibit 48, if you can look at
19      the last page.  As of late 2004, Health Grades was
20      averaging over 100 survey results per day, correct?
21           A     That's what the data suggests.
22           Q     Okay.  And it says that surveys were
23      received as early as October 2004, correct?
24           A     That's what it suggests, yes.
25                 MR. STIMPSON:  Can I get this one, David?
```

Attorneys' Eyes Only

Page 179

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     Actually, sorry, I will need that one.  I need this
 3     one right now, though.
 4                MR. LEE:  Exhibit 49.
 5                (Exhibit 49 marked.)
 6         Q    (BY MR. STIMPSON)  I would like to have
 7     the court reporter mark as Exhibit 49 a multipage
 8     document bearing Bates numbers HGMKES 022569 to 574.
 9                Take a second and if you can identify that
10     for me, please.
11         A    Okay.
12         Q    And this is a patient experience survey
13     from Health Grades, correct?
14         A    This is the original patient experience
15     surveys, patient screen survey.
16         Q    And it was sent out to consumers in 2004,
17     correct?
18         A    This most likely would have been the
19     version that would have been sent to consumers in
20     2004.  It was not the version that we used more
21     recently.
22         Q    Okay.  So if you would look at -- so you
23     can see these questions the way they're set up;
24     excellent, very good, good, fair, poor.
25         A    Right.
```

Attorneys' Eyes Only

Page 180

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2       Q     Those are ratings, right?

3             MR. VAZQUEZ:  Form.

4       A     No.

5       Q     (BY MR. STIMPSON)  No?

6       A     It's not a rating.

7       Q     Okay.  What is it then?

8       A     It's an assessment by item of how they

9   felt about something.

10      Q     Okay.  So when you're asking someone to

11  say whether a doctor is excellent or good or fair, in

12  your view, sir, as an inventor of this patent, that's

13  not a patient rating, right?

14            MR. VAZQUEZ:  Form.

15      A     Excellent, very good, good, fair, poor,

16  don't know, a rating?  No, that's not a form of a

17  rating.

18      Q     (BY MR. STIMPSON)  Okay.  So if Vitals

19  changes its website so it's asking these questions in

20  the form of excellent, very good, good, fair, poor,

21  no longer would they -- would even Health Grades

22  accuse them of infringing the patent, right?

23            MR. VAZQUEZ:  Object to form.  Calls for a

24  legal conclusion.

25      A     That's not for me to interpret.

Attorneys' Eyes Only

Page 205

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY

 2     your alleged copying, Mr. Neal?

 3               MR. VAZQUEZ:  Form.

 4         A     Just what I have seen.

 5         Q     (BY MR. STIMPSON)  Let me show you what

 6     has been marked as Exhibit 26.  Take a second and

 7     take a look at that.

 8         A     Okay.

 9         Q     This is an e-mail from Scott Montroy dated

10     May 11, 2004, and you received a copy, correct?

11         A     I did.

12         Q     And prepared and kept in the ordinary

13     course of business?

14         A     I believe so.

15         Q     And this is providing a rough cut of the

16     fields and content that was to be collected from

17     physicians in the physician online service, correct?

18         A     That's what this document suggests.

19         Q     And it says they were trying to fast-track

20     this project.

21               Do you see that?

22         A     Yes.

23         Q     And below is a list of all the information

24     they were trying to get from the physicians, correct?

25         A     Yes.
```

Attorneys' Eyes Only

Page 206

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Q     Is that an accurate list, to your

3     recollection, as to what they -- a roughly accurate

4     list of what they were getting from physicians from

5     the physician online service?

6          A     This is what the tool was developed to

7     capture.  But it doesn't indicate what we were

8     actually gathering from physicians, or eventually

9     gathered from physicians.

10         Q     Do you remember -- does this help you

11    remember when that physician online service was

12    launched?

13         A     It does give me a reference point.

14         Q     Based on this, when do you think the

15    physician online service was available?

16         A     I don't know when it was available, but

17    what this suggests is that the development work was

18    being defined.  Yeah.

19         Q     How long after the physician online

20    services was launched, how long after that did

21    physician provided information make it into the

22    Health Grades reports?

23         A     I do not know.

24         Q     A month later?

25         A     I don't know.

Attorneys' Eyes Only

Page 207

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2     Q     Would it have been within six months?

3     A     I'm not -- I'm not sure, but probably a

4   six- to twelve-month timeframe seems reasonable.

5     Q     Well, I'm talking about actually the first

6   of the healthcare provider information from the

7   physician online services.

8         When did the first part of it start

9   getting into healthcare provider, the reports,

10  healthcare reports?

11        MR. VAZQUEZ:  Form.

12    A     The part that is absent from this is there

13  was also a process, a system that was developed to

14  validate, review and validate that information.  And

15  that's the additional reference point I need to

16  understand when we might, because without that system

17  in place, they hadn't been reviewed and validated

18  such that they would be displayed, or this

19  information would be displayed.

20    Q     (BY MR. STIMPSON)  So you don't know, as

21  we sit here today, how long after the physician

22  online services were implemented that physician

23  provided data was implemented in any reports?

24    A     I do not know.

25    Q     Okay.  Can you say that it was within six

Attorneys' Eyes Only

Page 208

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2     months?

3          A    I think it's reasonable to assume that it

4     was within six to twelve months.

5          Q    Is it reasonable to assume it was within

6     six months?

7          A    I think it's reasonable to assume it was

8     within six to twelve months.

9          Q    Okay.  But my question is, do you think

10    it's reasonable to assume it was within six months?

11         A    I've answered it three times now.

12         Q    No.  No.

13         A    It's the same answer.  I said it's

14    reasonable to assume that it would have occurred

15    within six to twelve months.

16         Q    Did my question say anything about twelve

17    months?  Do you remember that?

18         A    What?

19         Q    My question didn't ask you about twelve

20    months, did it?

21         A    I'm giving you the answer.  You asked me a

22    question.  You're trying to direct me to answer it's

23    six months, and I'm telling you it's six to twelve

24    months.

25         Q    Well, if you can't tell me --

Attorneys' Eyes Only

Page 209

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A     That's the reason I provided you with a

3     range.

4        Q     Okay.  So is the answer, then, you can't

5     tell me -- that you don't believe it was within six

6     months?

7        A     I don't know.

8        Q     Okay.  Let me show you what has been

9     marked as Exhibit 27.  Let me know when you're ready,

10    Mr. Neal.

11       A     Okay.  Okay.

12       Q     What was the additional system that

13    validated information entered into the physician

14    online services?

15       A     You know, I said system or process.  Just

16    a means by which we could review submitted content.

17       Q     And what can you tell me about that?

18       A     I wasn't involved in the development of

19    that.  I'm just aware that there was a system in

20    place.

21       Q     Do you know how long after the physician

22    online services were implemented that this was in

23    place?

24       A     I do not.

25       Q     So according to your testimony, then, a

Attorneys' Eyes Only

Page 210

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      physician -- you can see from this e-mail, Exhibit

3      27, that this physician online services was launched

4      as of May 25, 2004, correct?

5              A      Yes.

6              Q      And so according to your testimony, the

7      six- to twelve-month testimony, you think that a

8      physician could have gotten on, changed information

9      about gender, for example, and then not had that

10     change in the Health Grades system for four to six

11     months, right?

12                 MR. VAZQUEZ:  Form.

13             A      It's possible.

14             Q      (BY MR. STIMPSON)  Don't you think that

15     would irritate physicians?

16                 MR. VAZQUEZ:  Form.

17             A      Speculation.  Yeah, I think it might.

18             Q      (BY MR. STIMPSON)  So does that help you

19     remember that this validation process was actually

20     implemented the same time the physician online

21     services were started?

22                 MR. VAZQUEZ:  Form.

23             A      No, because it's not directly referenced

24     in the document.

25             Q      (BY MR. STIMPSON)  Right.  I understand,

Attorneys' Eyes Only

Page 211

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  but just from the, you know, relationship point of

3  view for the physicians, don't you think Health

4  Grades would have implemented that at roughly the

5  same time the physician online service was started?

6  Doesn't that make sense?

7           MR. VAZQUEZ:  Form.

8      A    You know, I think it makes sense.  But I

9  know it was a separate process and it's not

10  referenced here.  And that's what is causing concern

11  to me.

12     Q    (BY MR. STIMPSON)  Are you familiar with

13  Dr. Drucker?

14     A    I am familiar with a profile for a

15  Dr. David Drucker.

16     Q    How is it you are familiar with a profile

17  for Dr. Drucker?

18     A    That was our prototype profile that was on

19  the website for quite a period of time.

20     Q    Okay.  And when did Dr. Drucker's profile

21  first go on the website?

22     A    Well, his original profile would have gone

23  on the website when we launched physician reports as

24  just part of all the physician profiles that we

25  provided, so when we launched the site, which would

Attorneys' Eyes Only

Page 212

```
 1            CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    have been 2003.
 3               MR. STIMPSON:  Actually, let me have this,
 4    David.
 5         Q     (BY MR. STIMPSON)  Do you know what a
 6    premium report is?
 7         A     If you'd explain to me the definition.
 8         Q     Well, I'm just asking you if you know what
 9    a premium report is?
10         A     It could mean a lot of different things to
11    different people.
12         Q     Well, did Health Grades have a premium
13    report for its physicians?
14         A     The name vaguely rings a bell with me,
15    premium.  We had a lot of different names assigned to
16    what effectively were the same reports.
17               (Exhibit 50 marked.)
18               MR. STIMPSON:  Let me show you what has
19    been marked Exhibit 50, a multipage document bearing
20    Bates numbers HGMKES 022179 and 80.
21         Q     (BY MR. STIMPSON)  This is an e-mail from
22    Scott Montroy to Dave Hicks copying you,
23    February 16, 2005, correct?
24         A     It is.
25         Q     Prepared and kept in the ordinary course
```

Attorneys' Eyes Only

Page 213

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     of business at Health Grades?

3          A     It appears so.

4          Q     What is a pilot project?  Can you explain

5     to me what the pilot project is there?

6          A     Pilot project for Dr. David Drucker was

7     our prototype physician profile.

8          Q     And when was that first put on the

9     website?

10         A     Let's see.  This is February of 2005.  So

11    the prototypes, it suggests, based on this e-mail,

12    that that prototype profile was hard-coded on our

13    website in February of 2005.

14         Q     Okay.  What do you mean hard-coded?

15         A     Hard-coded means that it was one of a

16    kind.  We didn't have an automated system to support

17    other physicians being able to update the profile.

18    Hard-coded means that within the actual development

19    of the program code on the website, whatever content

20    was visible on that physician profile had to be

21    hard-coded in.

22              So it was actually typed in, there was an

23    image that may have appeared within it.  It was one

24    of a kind.  It was a prototype.

25         Q     Do you think that was available on the

Attorneys' Eyes Only

Page 214

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      website as of at least February 2005, right?

3           A    This doesn't say it was available on the

4      website.  I'm uncertain of the timing.  So I can't

5      say based on this document that it was the case.

6           Q    The second bullet there, it says, Drucker

7      patient experience data on pilot report in prod.

8                What does that mean?

9           A    So in prod would be -- that would mean in

10     production.  So that would be on the website in some

11     form.

12          Q    So we know, as of February 16, 2005, at

13     least that early, there was patient experience data

14     in Dr. Drucker's report on the website available to

15     the public, correct?

16          A    Yes.  I think that's a fair assumption.

17          Q    And how would consumers find Dr. Drucker's

18     report?

19               MR. VAZQUEZ:  Form.

20          Q    (BY MR. STIMPSON)  For example -- let me

21     just withdraw that, and I'll start another question.

22               A consumer could get on the Health Grades

23     website in February 2005, type in, you know, doctors

24     and, you know, Dr. Drucker in New York and up would

25     pop Dr. Drucker's report?

Veritext/NJ Reporting Company

800-227-8440                                        973-410-4040

Attorneys' Eyes Only

Page 215

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A     Right.

3             MR. VAZQUEZ:  Object to form.

4       Q     (BY MR. STIMPSON)  Was that a beta test?

5       A     That wasn't even a beta.  It was a

6    prototype.  We never developed anything that was

7    consistent with the content that was produced in the

8    form in which it was produced in that profile.

9             (Exhibit 51 marked.)

10      Q     (BY MR. STIMPSON)  Let's have marked

11   Defendant's Exhibit 51, a multipage document bearing

12   Bates numbers HG 0179518 to 550.

13      A     Is there something specific you would like

14   me to look at it?

15      Q     Well, you can just peruse the e-mail if

16   you want, and then we'll highlight some specific

17   questions throughout the document.

18            My first question to you, Mr. Neal, is

19   just going to be whether this is an e-mail string

20   between yourself and Lauren Deritis, D-E-R-I-T-I-S,

21   in March of 2005 regarding Health Grades' reports?

22      A     Yes.

23      Q     And prepared and kept in the ordinary

24   course of business in Health Grades?

25      A     I believe so.

Page 216

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q      What is the Rothman Institute?

3      A      It is an orthopedic practice in

4   Philadelphia, Pennsylvania.

5      Q      And why were you communicating with the

6   Rothman Institute?

7      A      This was related to a physician marketing

8   program that we were in the process of developing.

9      Q      And had you contacted Ms. Deritis prior to

10  March 2005?

11     A      I don't recall.

12     Q      In your e-mail at 2:20 on March 21, on the

13  second page, it says, We're very excited about

14  getting the Rothman Institute into the Health Grades

15  position marketing program.  The web presence and

16  premium placement programs have exceeded all

17  expectations for our beta clients.

18          What was their web presence program?

19     A      It was a means by which we presented

20  physicians that were participating in the physician

21  marketing program a different way on our website to

22  draw attention to those physicians for their

23  practices such that they could disproportionately

24  drive consumers to their practices.

25     Q      Okay.  How about the premium placement

Attorneys' Eyes Only

Page 223

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2     have been available perhaps in January of 2005?

3          A      What exactly?

4          Q      This premium report of Dr. Drucker.

5          A      I don't know.

6          Q      This page 179535, it's got Dr. Drucker's

7     age, right?

8          A      Yes.

9          Q      His gender?

10         A      Yes.

11         Q      His language?

12         A      Yes.

13         Q      His years in the profession?

14         A      Yes.

15         Q      Awards and honors?

16         A      Yes.

17         Q      Professional appointments?

18         A      Yes.

19         Q      Publications?

20         A      Yes.

21         Q      Where was that information obtained, all

22    that information?

23         A      I don't know.

24         Q      February '05, in the prior documents we've

25    seen, February '05 was at least seven months after

Attorneys' Eyes Only

Page 224

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      the physician online services was launched, right?
 3           A     If those dates match up, yeah, that sounds
 4      right.  This data in Dr. Drucker's, this form of
 5      report, didn't come from that POS system.  That's not
 6      how that system was constructed.  It wasn't
 7      constructed to display elements like this.  This is
 8      prototype content.
 9                And the reason I know that for certain is
10      if I look at slide number 17, 179537, it says,
11      Performance information.  Procedure, total hip, total
12      knee.  Revisions, and then the number of procedures.
13                I know for a fact that wasn't in the POS
14      system because that was specific to his practice and
15      was only part of the prototype.
16                So this report that we're viewing here is
17      a prototype as opposed to a standard premium
18      report --
19           Q     Okay.
20           A     -- in the context by which you're
21      referring to it.
22           Q     That's fine.  But it was all -- it was on
23      the Health Grades website in February of '05, so
24      that's all I really care about at the moment.
25                MR. VAZQUEZ:  Form.  Move to strike.  That
```

Page 225

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     wasn't a question.

3          Q     (BY MR. STIMPSON)   In the introduction of

4     Dr. David Drucker, Dr. Drucker's philosophy on

5     treating patients.

6               Do you see that?

7          A    I do.

8          Q    We just talked a few minutes ago about

9     Vitals website and how you could determine that some

10    stuff had to come from the healthcare provider.

11              Remember that conversation?

12         A    Yes.

13         Q    Can you make the same deduction here that

14    some of this probably came from Dr. Drucker?

15         A    That philosophy was one of a kind.  That

16    was hard-coded in the website.  It most likely came

17    from Dr. Drucker, or one of his close associates, or

18    perhaps his office assistant.

19         Q    And how about his languages, would that be

20    something you also would have obtained from

21    Dr. Drucker or one of his assistants?

22         A    Most likely not.  That's a typical

23    third-party source of data.

24         Q    How about awards and honors?

25         A    No, there are sources for some of that

Attorneys' Eyes Only

Page 226

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    information, but it's possible that Dr. Drucker's

3    office administrator could have provided that for

4    this prototype.

5          Q     Did Health Grades have a particular

6    relationship with Dr. Drucker?

7          A     It was a unique relationship.

8          Q     So he had seen this, right?

9          A     Yes.  Oh, yes.

10         Q     So he had at least, at the very least, had

11   seen this and had to have provided information or

12   verified that it was correct, right?

13         A     Absolutely.  It was one of a kind.

14         Q     Okay.  How about publications?  Would that

15   have come from Dr. Drucker or his assistant?

16         A     I think -- my guess is that it probably

17   did.

18         Q     And years in profession, would that have

19   probably come from Dr. Drucker or one of his

20   assistants?

21         A     Most likely a third party.

22         Q     How about the English language?

23         A     Third party.

24         Q     So if Dr. Drucker spoke Spanish or

25   something, you would be able to get that from a third

Attorneys' Eyes Only

Page 227

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     party?

3          A     Yes.

4          Q     Okay.  And what third party?

5          A     I don't know.  We would do it today.  We

6     did it back then.

7          Q     But it seems clear that at least some of

8     this on this page 179535 came from Dr. Drucker,

9     right?

10         A     Yes, for the prototype.

11         Q     On the next page, experience and training.

12    Do you see there are specialties listed there;

13    orthopedic surgery, and it says, Health Grades has

14    verified that Dr. Drucker is board certified by the

15    American Board of Orthopedic Surgery; is that

16    correct?

17         A     That's what it says.

18         Q     So that's Health Grades' verified data?

19               MR. VAZQUEZ:  Form.

20         A     It is.  The source of that data is ABMS.

21    And if a doctor was board certified by ABMS, then

22    that little logo is here.

23         Q     (BY MR. STIMPSON)  How about the rest of

24    it?  Medical school, residency, internship,

25    fellowship, areas of expertise; those all came from

Attorneys' Eyes Only

Page 228

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2       third parties, too?

3                   MR. VAZQUEZ:  Form.

4          A     Most likely, yes.

5          Q     (BY MR. STIMPSON)  Would Health Grades

6       have verified that information?

7                   MR. VAZQUEZ:  Form.

8          A     For Dr. Drucker we would have because,

9       again, this is the prototype profile.

10         Q     (BY MR. STIMPSON)  Next page, it's got

11      disciplinary actions.

12                  Do you see that?

13         A     I do.

14         Q     And Health Grades has also included that

15      information and verified its content, correct?

16                  MR. VAZQUEZ:  Form.

17         A     That's correct.  It's third-party data.

18         Q     (BY MR. STIMPSON)  Right.  And received

19      from a third party.  And it's something that Health

20      Grades verified, correct?

21                  MR. VAZQUEZ:  Form.

22         A     The logo would suggest that.

23         Q     (BY MR. STIMPSON)  And the next page,

24      patient experience, these are information from

25      patients, right?

Attorneys' Eyes Only

Page 229

CONFIDENTIAL - ATTORNEYS EYES ONLY

2   A     It would appear, yes.

3   Q     And, in fact, five patients provided

4   information ratings for Dr. Drucker, right?

5   A     That's what it says.

6   Q     Okay.  And the bottom there says survey

7   details.  What does that mean?

8   A     I don't know.  I think it may show the

9   individual responses to those questions.

10   Q     Okay.

11   A     So there were five that make up each bar

12   and perhaps survey details.

13   Q     Where were the survey -- where were these

14   surveys performed?  Were they on Health Grades'

15   website?

16         MR. VAZQUEZ:  Form.

17   A     I do not know.

18   Q     (BY MR. STIMPSON)  It says here, Share

19   your experience.  So at least as of that time, there

20   was an ability for someone to get on and share their

21   experience with Dr. Drucker, right?

22   A     I'm not sure of the timing.  Remember,

23   this is a prototype, and it's a screen shot for a

24   PowerPoint.  So I can't say that to be a fact.

25   Q     Well, at least as of February 2005, Health

Attorneys' Eyes Only

Page 230

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2    Grades' website had this where it says, Share your

3    experience in connection with Dr. Drucker, right?

4        A     I wouldn't derive that conclusion from

5    looking at this page.

6        Q     Well, where -- well --

7        A     This is referencing a report that may or

8    may not be live on the Health Grades website.  This

9    is a PowerPoint text.  I do this all the time where I

10   share slides that are not part of our production

11   environment, meaning live on our website.

12       Q     I understand that, sir, but you've also

13   testified about what was available on Dr. Drucker in

14   February of 2005.  But my question is --

15       A     I know, but you were asking about this.

16       Q     Can I finish?  Okay.  I'm asking about

17   that right now.  The "share your experience" button,

18   was that -- can you just tell me, is that something

19   that was live that a user could click on; did you

20   know?

21       A     I can't determine that based on this.

22       Q     Okay.  That's fine.  That's fine.

23             The next page, Languages spoken by staff.

24   Where would that information have come from?

25       A     I don't know.

Page 231

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2        Q     That would have come from a healthcare

3    provider?

4        A     It very well could have.

5        Q     Well, can you think of any other place

6    where that information would have come from?

7        A     The data sources may or may not have

8    included that data.  I just don't know.

9        Q     Do you know of any data sources that would

10    tell us the languages spoken by the staff of

11    Dr. Drucker at this time?

12        A     I don't know.

13              (Discussion off the record.)

14              (Recess taken from 2:05 p.m. to 2:27 p.m.)

15        Q     (BY MR. STIMPSON)  Please turn to page

16    HG 0179548.

17              MR. VAZQUEZ:  What exhibit are you on

18    again?  I'm sorry.

19              MR. STIMPSON:  The same, 51.

20              MR. VAZQUEZ:  Thank you.

21        A     48.

22        Q     (BY MR. STIMPSON)  Yes, please.

23        A     Okay.

24        Q     Can you tell me what is being displayed on

25    that page?

Page 232

1    CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A     This is -- practice A, I think, is

3    Dr. Drucker's profile.

4        Q     Practice A or physician A?

5        A     Physician A, I'm sorry.  Physician A is

6    Dr. Drucker's profile.  Practice A is a -- would be a

7    group.  I know the group.

8              In terms of what each of the sub-bullets

9    beneath them represent, I do not know what the

10   different distinctions are across those bullets.

11       Q    Let's look in the second bullet under

12   physician A.  February 2005, 117 expanded profile

13   reports viewed.

14             What are expanded profile reports?

15       A    I don't know.

16       Q    Would it be the premium report that we saw

17   earlier in this document?

18       A     It could be, but I don't know.

19       Q     Do you have any other idea what it might

20   be?

21       A     I don't.

22       Q     Does this help refresh your memory that

23   Dr. Drucker's premium report was available at the

24   beginning of February 2005?

25       A     It suggests some sort of enhanced profile