# EXHIBIT S

```
                                                              Page 1
 1   Volume I                                     Pages 1 - 292
 2                                                Exhibits 64 - 71
 3              UNITED STATES DISTRICT COURT
 4                  DISTRICT OF COLORADO
 5                 Civil Action No. 11-CV-00520-PAB-BNB
 6   ************************************
 7   HEALTH GRADES, INC.,                    *
 8        Plaintiff,                         *
 9   Vs.                                     *
10   MDX MEDICAL, INC., d/b/a VITALS.COM,    *
11        Defendant.                         *
12   ************************************
13
14           DEPOSITION of PHILIP G. GREENSPUN
15           Friday, September 28, 2012 at 8:30 a.m.
16           Courtyard by Marriott
17           700 Unicorn Park Drive
18           Woburn, Massachusetts
19
20      ------ Jacqueline P. Shields, RPR, CSR ------
21
22
23
24        Job No. NJ1339308
```

Page 2

1  APPEARANCES:

2

3  Representing the Plaintiff:

4      ROTHGERBER JOHNSON & LYONS LLP

5      BY:  KRIS J. KOSTOLANSKY, Esquire

6      One Tabor Center, Suite 3000

7      Denver, Colorado 80202-5855

8      303-623-9000 ~ Fax: 303-623-9222

9      kkosto@rothgerber.com

10            - and -

11     MERCHANT & GOULD

12     BY:  KIRSTIN L. STOLL-DeBELL, Esquire

13     1050 17th Street, Suite 1950

14     Denver, Colorado 80265

15     303-357-1670 ~ Fax: 303-357-1671

16     kstolldebell@merchant-gould.com

17

18  Representing the Defendant:

19     SILLS CUMMIS & GROSS

20     BY:  SCOTT D. STIMPSON, Esquire

21     30 Rockefeller Plaza

22     New York, New York 10112

23     212-643-7000 ~ Fax: 212-653-6500

24     sstimpson@sillscummis.com

Page 3

```
                            I N D E X
Testimony of:                                      Page(s)

Philip Greenspun

By Mr. Stimpson                                     5,280

By Mr. Kostolansky                                    267

                          E X H I B I T S

Exhibit No.      Description                       For I.D.
  64     Expert report of Philip Greenspun,
         dated July 13, 2012                           5

  64A    Resume of Philip Greenspun                    5

  64B    Document titled Appendix B                    5

  64C    Document titled Appendix C                    5

  65     Defendant MDX Medical, Inc.'s Second
         Supplemental Objections and
         Responses to Plaintiff's First Set
         of Interrogatories                           59

  66     Rebuttal Report of Richard G.
         Cooper, D.Sc.                                85

  67     '060 Patent                                 102

  68     Deposition transcript of John Neal,
         dated June 13, 2012                         106

  69     Rebuttal Report of Philip Greenspun,
         dated September 17, 2012                    167

  70     Deposition of Scott Montroy, Volume
         I                                           226

  71     Deposition of Scott Montroy, Volume
         II                                          226

         EXHIBITS APPENDED TO ORIGINAL TRANSCRIPT
```

Page 170

1    A.   Okay.  I don't think I'm going to change my
2    answer.  I think it's still talking about
3    information about physicians.
4    Q.   Okay.  So where it says it refers to such
5    information, is it a fair reading, Doctor, it's
6    referring to such information as discussed above it?
7    A.   Well, that's where I got the information
8    about physicians.  That phrase occurs two sentences
9    previously.
10   Q.   All right.  So the information it's
11   referring to is information, you know the veracity
12   of the information, and the information that might
13   not be updated by the doctor, right?
14   A.   This talks about, up here at the top,
15   technical field about, you know, levels of
16   verification, some from doctor, some from
17   independent and some from patient verified.  And
18   down here in the middle of the background they are
19   talking about information about physicians, some of
20   which is provided by physicians themselves.  So I
21   would say that this paragraph starts with "Further,
22   even if such information is available," I would
23   interpret "such information to refer to all of the
24   information that's discussed up above.

Page 171

1    Q.  Okay.  And is there anything up above that
2    mentions patient ratings?
3    A.  Not above that, no.  Unless you want to
4    count the whole introductory graph and technical
5    fields when you talk about patient verified portion.
6    Q.  Right.  There is nothing there that refers
7    to patient ratings, right?
8         MR. KOSTOLANSKY:  Is that phrase used,
9    "patient ratings"?
10        MR. STIMSON:  No, my question is as I asked
11   it.
12        MR. KOSTOLANSKY:  He answered you and
13   referred you to that paragraph.
14   Q.  You can answer, Doctor.
15   A.  I think the first occurrence of the word
16   "ratings" on this page is in the next sentence down
17   where it talks about comments or ratings by other
18   patients or consumers.
19   Q.  Right.  So where it's referring to such
20   information, it doesn't make sense it's referring to
21   information that hasn't yet been discussed, right?
22        MR. KOSTOLANSKY:  Object to the form.
23   A.  I mean, reading this whole page, it all
24   makes sense to me that all the information should be

Page 172

```
 1   organized, would be desirable to organize any
 2   information that has been gathered to help a patient
 3   compare doctors, search for a doctor or verify a
 4   doctor.
 5        Q.   That wasn't quite my question, Doctor.
 6             MR. STIMPSON:  Move to strike that.  Please
 7   read the question back.
 8             MR. KOSTOLANSKY:  He answered your question.
 9             (Read back.)
10             MR. KOSTOLANSKY:  Objection.  Asked and
11   answered.
12        A.   You know, this isn't being used as an
13   example of idealizing English grammar, so I don't
14   think there's any way to be certain that the
15   inventors wanted to limit --
16             MR. KOSTOLANSKY:  I'm going to move to
17   strike his answer.  He's not --
18             MR. STIMPSON:  Let him answer, Kris.  It's
19   not an objection that you make anyway.  Let him
20   answer.
21        Q.   Please continue, Dr. Greenspun.
22        A.   In reading this, whoever the author of this
23   was, I don't, I don't read this to -- they're
24   clearly trying to communicate some background.  I
```

Page 173

1  don't read this to have this strict ordering of
2  sentences that I think you're suggesting.
3       Q.  So just so I'm clear then, Doctor, you're
4  saying that when he refers to, when this refers to
5  "such information," it can be referring to
6  information that's actually not even been discussed
7  yet, right?
8            MR. KOSTOLANSKY:  Object to the form.
9       A.  It can be referring to information that's
10 mentioned in the very first paragraph at the top,
11 and I think it also can be referring to the
12 information that is described more fully in the next
13 sentence down.  And generally I think -- well, the
14 way I read it at first is still the way that I read
15 it, as information about physicians.
16           You know, there are few, if any, resources
17 available for patients to discover information about
18 physicians that's above the sentence, and it's not
19 specific as to what kind of information that might
20 be, as long as it's somehow useful to a potential
21 patient.
22      Q.  So it's not particular about what
23 information that's talking about when they're first
24 comparing doctors, is it, Dr. Greenspun?

Page 177

1 concise and exact terms, right?
2 　　　　MR. KOSTOLANSKY: Objection. Asked and
3 answered. You want him to repeat what he just said?
4 He just answered that question.
5 　　Q. You can answer it, Doctor.
6 　　　　MR. KOSTOLANSKY: Do you have anything to
7 add to your answer?
8 　　　　MR. STIMPSON: Kris, say your objection;
9 otherwise be quiet, please. Just say objection.
10 This is the way it works. Just say your objection,
11 it's on the record, be quiet. I'm not talking your
12 deposition.
13 　　　　MR. KOSTOLANSKY: You're badgering the
14 witness by asking him the same --
15 　　　　MR. STIMPSON: Then call the Court. Call
16 the Court.
17 　　　　MR. KOSTOLANSKY: -- over and over.
18 　　　　MR. STIMPSON: Call the Court then if you
19 don't like it, otherwise make your objection.
20 　　Q. Doctor, "comparison ratings" are not found
21 in concise and exact terms, correct?
22 　　　　MR. KOSTOLANSKY: Objection. Asked and
23 answered. Calls for a legal conclusion. We've been
24 through this.

Page 178

1     A.  The phrase "comparison ratings" does not
2  appear.  This report uses some -- expresses the same
3  concepts and ideas as the final application, but not
4  always in the same exact language.
5        MR. STIMPSON:  Move to strike everything
6  after "appear".
7     Q.  Doctor, is there anything in your report
8  referring to anything in this provisional
9  application indicating where comparison ratings
10 might be included?  Let me rephrase that.
11       Is there anything in your report, Doctor,
12 indicating that you found anything indicating that
13 ratings of other providers have to be included in
14 the report of the first healthcare provider?
15    A.  Well, on page 4 under the description of
16 the drawings.
17    Q.  Are you in your report or your --
18    A.  Sorry, in the provisional application, page
19 4 talks about the process for developing a report of
20 information regarding a doctor.
21    Q.  What figure?  Figure 4?
22    A.  Figure 4.  And that has to include
23 information regarding patient comments and ratings.
24    Q.  Okay.  And is that referenced anywhere in

Page 179

1 your expert report, Doctor?
2  A. I don't know.
3  Q. Well, take a look.
4  A. No, I don't think that's in my report.
5  Q. Where it refers to Figure 4, there's
6 absolutely nothing there about the word "compare,"
7 "comparisons," anything like that in that report,
8 right?
9  A. That's true. The paragraph on Figure 4
10 doesn't mention how those comments or ratings are to
11 be used.
12  Q. Okay. Let's turn to your report.
13  MR. KOSTOLANSKY: Supplemental report or
14 initial?
15  MR. STIMPSON: Rebuttal report.
16  Q. To page 8, please. So this is talking --
17 we're going to talk now about the prior art, what
18 the prior art discloses, and that's where we're
19 going to go now, okay?
20  A. Okay.
21  Q. So paragraph 35, can you read that to
22 yourself, please?
23  A. Okay. I think I've read it.
24  Q. It's your understanding, isn't it, Doctor,

Page 180

1  or let me just ask you, how clear does the prior art
2  reference need to be to disclose comparison ratings?
3          MR. KOSTOLANSKY: Objection. Calls for a
4  legal conclusion.
5     A.   Well, clear enough that a person of
6  ordinary skill could build it.
7     Q.   So for a reference to teach comparison
8  ratings, would it need to use the words "comparison
9  ratings" or show comparison ratings in a figure?
10         MR. KOSTOLANSKY: Object to the form. Calls
11 for a legal conclusion.
12    A.   It would really depend on the year of the
13 publication.
14    Q.   Assuming it's prior art.
15    A.   Well, let's say it was 100 years ago, for
16 example, there was no Michelin Guide with the star
17 system. There was no AMAZON.COM with reader reviews
18 and comparisons of different products under reviews,
19 so 100 years ago, you know, a person of ordinary
20 skill in the art would need a much more detailed
21 document in order to build comparison ratings than a
22 person would today or in 2005 or '6.
23    Q.   Okay. So let's take 2004, 2005 for a
24 reference to teach comparison ratings. Would it

Page 181

1    need to use the words "comparison ratings" or
2    otherwise show comparison ratings in a figure?
3         A.   No, I don't think so.
4         Q.   Would it need to have an express teaching
5    of showing multiple ratings for healthcare
6    providers?
7         A.   Not in the context of an Internet
8    application, no.
9         Q.   Let's turn to page 11, please.
10        A.   Okay.
11        Q.   So under section B, you said that "Each of
12   the early Health Grades reports and services is a
13   separate piece of art that must be analyzed
14   individually for invalidity," right?  That's your
15   heading?
16        A.   Yes.
17        Q.   And so your opinion, Doctor, is that all
18   these things Dr. Cooper refers to are separate
19   things and you can't just look at them all together,
20   right?
21        A.   Yes.
22        Q.   So actually, each one of these things,
23   Doctor, you know, it's not like one was found in
24   Australia, one was found in Zimbabwe, and one in

Page 182

1  Canada, and they were all put together, right?  You
2  can, for every single one of these things, 2004,
3  2005, whenever they were available here, the user
4  sits down, types in HEALTHGRADES.COM, boom, every
5  one is available, right?
6           MR. KOSTOLANSKY:  Object to the form.
7       A.  I don't -- I like your example of the
8  different countries, but I don't think that's, I
9  don't think that's quite true.  I think that some of
10 the references are all from roughly the same date,
11 but others are so far apart, you know, from 2003 or
12 2005, that it seems unlikely they would have been
13 available on the server at the same time.
14      Q.  Right, so let's not talk about timing,
15 though.  What I'm talking about is location.  Every
16 one of these things was from the same source,
17 HEALTHGRADES.COM, right?
18      A.  Yes, I believe so.
19      Q.  Okay.  So you know regardless of whether
20 they were on there at the same time, one was in June
21 of 2005 or one was in January of 2005, the point is
22 a user can get on the HEALTHGRADES.COM website and
23 from that website pull up these reports, right?
24      A.  Yes, I suppose if you have a very, very