# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

## HEALTH GRADES, INC.'S OPPOSITION TO MDX MEDICAL, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF MR. DAVID HALL

---

Plaintiff Health Grades, Inc. ("Health Grades") respectfully submits its Opposition to Defendant MDx Medical, Inc.'s ("MDx") Motion to Exclude Expert Testimony of Mr. David Hall Pursuant to Fed. R. Evid. 403 and 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (the "Motion") [Dkt. 375]:

## I.      **INTRODUCTION**

MDx does not contend that Hall is not qualified to render expert testimony on patent infringement damages.  MDx also does not contend that the widely accepted methodologies identified and used by Hall are inappropriate or improper.  Rather than preclusion, MDx's complaints regarding the facts and data Hall considered, his reliance on information from Health Grades' employees, and how he applied the methodologies to the facts and data he considered, should be addressed via cross-examination, presentation of contrary evidence, and careful instruction to the jury regarding the applicable burdens of proof, not the preclusion of an expert's testimony.

MDx grossly mischaracterizes the contents of Hall's expert report.  MDx completely

1

ignores entire sections of the report which underpin and support the analyses performed by Hall, and which show the widely accepted methodologies he used to arrive at his opinions. MDx even goes as far as embellishing and changing Hall's deposition testimony, as will be shown below. Further, MDx misapprehends the law on patent damages and confuses and conflates the applicable burdens and standards.

As is clearly apparent from any objective reading of his two expert reports in this case, Hall identified and used reliable and widely accepted methodologies, and provided cites to the cases that identify and support those methodologies. Pursuant to Fed. R. Evid. 702, Hall clearly identified and reasonably analyzed sufficient and appropriate facts and data, and reliably applied the methodologies to those facts and data. His reports and deposition testimony identify the facts and data he analyzed and the widely accepted methodologies that support his opinions in this case. Contrary to MDx's contentions, Hall's analyses are consistent with Federal case law, as will be shown below.

## II.      HEALTH GRADES' RESPONSE TO MDx's ARGUMENTS

Under Rule 702, in addition to showing that the witness is qualified, the proponent of the witness' opinions must demonstrate that the process by which the witness derived his or her opinions is reliable. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). Hall is qualified to render expert patent damage opinions. In its Motion MDx does not challenge Hall's qualifications. This satisfies the first prong of proving the foundational requirements of Rule 702 for admission of expert testimony.

Hall's opinions are reliable, which satisfies the second prong of the Rule 702 analysis for admission of expert testimony. The opinions are reliable because (1) they are based upon sufficient facts and data directly related to the case; (2) the opinions are the product of reliable

principles and methods; and (3) Hall reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702(b)-(d)

### A.  HALL'S OPINIONS ARE BASED UPON SUFFICIENT FACTS AND DATA

The assessment of the sufficiency of the facts and data used is a quantitative, rather than a qualitative, analysis.  Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments; *see also United States v. Lauder*, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005).  The Court does not examine whether the facts obtained by the witness are themselves reliable – whether the facts used are qualitatively reliable is a question of the weight that should be given to the opinions by the fact-finder, not the admissibility of the opinion.  *Lauder* 409 F.3d at 1264.

When the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.  *Micro Chemical, Inc. v. Lextron, Inc.*, 02-1155 (Fed. Cir. 2003)  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  For example, in *Ensil*, the Tenth Circuit held that while an expert's failure to include appropriate data from sales records may make that testimony "vulnerable," it does not make it inadmissible. 2012 WL 375498, at *12.  Instead, the opponent can exploit that vulnerability by presenting evidence contrary to the expert's assumptions and through cross examination. *See id.*; *see also* FED. R. EVID. 705 (permitting cross-examination of expert on "underlying facts or data").  As the Tenth Circuit has made clear:  "[T]he full burden of exploration of the facts and assumptions underlying the testimony of an expert witness [is] squarely on the shoulders of [MDx's] counsel's cross-examination." *Aspen Highlands Skiing Corp.*, 738 F.2d at 1524 (internal quotation omitted).

MDx has its own rebuttal-expert witness, so the jury can weigh the dueling opinions and decide whose expert is more credible. *See Ensil*, 2012 WL 375498, at *12.  There is no basis to exclude Hall's expert testimony simply because MDx disagrees with the factual basis.

Hall's opinions are based on quantitatively sufficient facts and data.  Hall identified 383 individual documents as "Facts and Data Considered" in forming his initial expert report, including filings in the case, deposition transcripts and exhibits, discovery responses, and a significant variety of financial documents that were contemporaneously prepared by both MDx and Health Grades.  *See* Hall Initial Report, Appendix C, attached hereto as Exhibit A.  He listed 25 additional documents that he considered for his supplemental report.  See Hall Supplemental Report, Appendix C, attached hereto as Exhibit B.

### B.  HALL's OPINIONS ARE BASED UPON RELIABLE METHODOLOGIES

The requirement that the opinion be derived from reliable principles and methods involves two related inquiries: (1) identification of the methodology used to reach the opinion; and (2) determination of whether the methodology is generally considered "reliable" in the field. *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1222 (D. Colo. 2008).  These inquiries are solely factual, and the proponent of the opinion must establish both inquiries by sufficient, competent evidence.  *Id.*

The first inquiry requires that the witness explain how he reached the opinion at issue – a simple explanation of the process normally is sufficient.  *Id.*  The second inquiry, whether the methodology is reliable, requires that the court assess whether that method is "scientifically valid."  *Hollander v. Sandoz Pharm. Corp*., 289 F.3d 1193, 1204 (10th Cir. 2002); *Truck Ins. Exchange v. MagneTek, Inc*. 360 F.3d 1206, 1210 (10th Cir. 2004).  A determination that a method is "scientifically valid" requires an inquiry into whether it is a scientific or logical method that can be replicated and validated.  *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137,

152 (1999).  Depending on the methodology at issue, courts have wide discretion to consider a variety of factors in assessing reliability.  Those factors include, but are not limited to: (1) whether the methodology is one that can be tested or falsified – that is, whether the witness' approach can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the method or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to the use of the method; (4) whether there are standards controlling the operation of the technique; and (5) whether the method or approach has "general acceptance" in the "relevant scientific community."  *See Daubert*, 509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 149-50.

The factors listed above are neither exclusive nor dispositive.  *Crabbe*, 556 F. Supp. 2d at 1223.  For example, a methodology that is not peer reviewed or tested may still be reliable when it is considered a generally-accepted practice in the discipline.  *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004).  Likewise, an otherwise reliable methodology does not become unreliable merely because the witness did not test it thoroughly in all applicable situations.  *Id.* at 1236.  Instead, once a court is satisfied that the methodology is generally reliable, suggestions that the witness should have engaged in additional testing to achieve certainty in his or her conclusions simply go to the weight of the opinion, not its admissibility.  *Id.*

Hall's opinions are the product of reliable methodologies.  The first part of the inquiry simply requires that the witness explain how he or she reached the opinions at issue.  In his Initial Report, Hall explained that "[i]n order to establish a claim for lost profits, the patentee must demonstrate that there is a reasonable probability that "but-for" the assumed infringement,

the patentee would have made some or all of the accused sales and earned the associated profits." Ex. A at ¶23.  Hall summarized and identified the "basic lost profits framework" he used as set forth in *Grain Processing Corp. v. American Maize-Products Co.,* 185 F.3d 1341 (Fed. Cir. 1999).  Ex. A at ¶23.  Hall went on to state "[b]ased on the facts of this case, I have analyzed the damages experienced by HealthGrades framed by the above-noted construct [i.e., reasonable probability, but-for test from *Grain Processing*] and considering the well accepted methodologies outlined below."  Ex. A at ¶25.

Hall stated that "[t]he "Panduit Test" is one way to systematically consider and evaluate the market impact on the patent owner's (HealthGrades) sales, "but-for" Vitals' assumed infringement," and identified the four *Panduit* factors.  Ex. A at ¶26.  Hall then discussed how he analyzed the Panduit factors to reach his conclusion that Health Grades is entitled to lost profits: "[m]y analysis of the Panduit factors demonstrates that HealthGrades is entitled to lost profits. The following sections address why the Panduit test is satisfied for Vitals' accused revenue." Ex. A at ¶27.   Hall additionally explained how he analyzed the Parties' income statements, the Parties' advertising revenues, the number of visitors to the Parties' respective websites, how he accounted for co-visitors, i.e., visitors to both Health Grades and Vitals' websites, how he analyzed competitors and how he calculated market share "[c]onsistent with the Mor-Flo Industries, Inc. case."  Ex. A at ¶¶ 28-38, referencing Attachments 1, 2, 2a, 3a, 11 and 12.

Hall further explained how he considered Vitals' <u>advertising</u> revenue, visitors and co-visitors to the Parties' respective websites, and how he applied the actual co-visitor factors by time period to determine Vitals' infringing revenue as reduced for the impact of co-visitors for the July 2010 through May 2012 period.  Ex. A at ¶¶ 38-47, referencing Attachments 2a, 3b, and 4.

Hall also explained how he determined and reconstructed the market absent the infringer (Vitals) and inherently included competitors as acceptable non-infringing substitutes in order to satisfy the required "but-for" scenario, and how he applied the data to determine the revenue that Health Grades would have reasonably earned but-for the infringement.  Hall made clear that his market share calculations and revenue calculations were shown within Attachments 3a and 4 of his report.  Ex. A at ¶¶ 48, 49, referencing Attachments 3a and 4.

In his report Hall further explained how he calculated Health Grades' lost profits damages resulting from lost advertising revenue by subtracting the costs that Health Grades would have incurred to earn that revenue.  Ex. A at ¶ 50.  He describes how he categorized and calculated costs and Health Grades' incremental profit rates for the relevant time periods, and Health Grades' lost profits from July 2010 through May 2012.  Ex. A at ¶¶ 50 - 53, referencing Attachments 4 and 5.  Thus Hall identified and described his use of an accepted lost profits methodology for his lost profits analysis.

With respect to the methodology he used to calculate reasonable royalty damages, Hall explained that he applied a reasonable royalty of 12% to the advertising revenue that was not included in his calculation of lost profits.  Ex. A at ¶ 54.  Hall further explained how he used the widely accepted hypothetical negotiation construct and the factors from *Georgia Pacific* factors to determine a reasonable royalty.  Ex. A at ¶¶ 55–58, referencing Attachment 9.  Hall also explained how he considered license agreements by the Parties to be "points of reference as to the hypothetical negotiation" and how he evaluated the license agreements.  Ex. A at ¶¶ 59–69, referencing Attachments 6a and 6b.  Hall additionally explained how the fact that Health Grades and Vitals are direct competitors impacted his reasonable royalty analysis.  Ex. A at ¶ 70.  Hall also described how he used Vitals' actual and projected revenues, and Vitals' own market

analysis, in his reasonable royalty analysis.  Ex. A at ¶¶ 71-77, referencing Attachments 2, 2a, 7a, 7b, and 7c.

In his report Hall also explained his use of two approaches to the "analytical method" to calculate excess profit rates and how he reduced the rate from his analytical conclusion to determine his reasonable royalty conclusion.  Ex. A at ¶¶ 78-87, referencing Attachments 1, 5a, and 8 and *TWM Manufacturing Co., Inc. v. Dura Corp*., 789 F.2d 895, 901 (Fed. Cir. 1986).  In the "Reasonable Royalty Rate Conclusion" section of his report, Hall explained the bases for his determination of 12% as a reasonable royalty, and even how he conducted a reasonableness check on his calculations.  Ex. A at ¶¶ 88-91, referencing Attachments 9, 10, 13, and 13a. Finally, in Paragraph 92 of his report, Hall explained how he calculated royalty damages on all of Vitals' infringing revenue in case the Court rules that Health Grades is entitled to only a reasonable royalty.  Ex. A at ¶ 92.

As shown above there is no doubt that Hall properly and sufficiently identified the methodologies he used for his damages analyses, i.e., the reasonable probability, but-for test as set forth in the *Grain Processing* case, the *Panduit* and *Georgia Pacific* tests, the *Gyromat* tests and criteria for demand, and the *Mor-Flo* case approach for the market value analysis, all of which are widely accepted methodologies.  Hall has thus satisfied the first part of the inquiry. *Crabbe, supra,* at 1222.

Regarding the second part of the inquiry, whether the methodologies are reliable, the Court must assess whether the methodologies at issue are "scientifically valid."  MDx does not contend that the methodologies identified and used by Hall are not reliable.  Rather, MDx's complaint is that Hall allegedly did not properly apply the methodologies to the facts of this case. As discussed below, however, Hall reliably applied the methodologies to the facts of the case.

### C.  HALL PROPERLY APPLIED HIS METHODOLOGIES TO THE FACTS OF THIS CASE

The third and final step requires that the witness reliably apply the methodologies to the facts and data he or she obtained.  Importantly, "the requirement that the witness 'reliably' do so is not an invitation to a court to assess the worth of the opinion itself."  *Crabbe* 556 F. Supp. 2d at 1223.  The Court's inquiry instead focuses on "whether the witness followed the dictates of the methodology in considering the facts and data."  *Id.*   In conducting this inquiry, the Court may consider whether the witness unjustifiably extrapolated from an accepted premise to an unfounded conclusion, whether the gap between the analytical data and the opinion proffered is too large, and whether the witness adequately accounted for obvious alternative explanations.  *See Kuhmo Tire*, 526 U.S. at 152; *Bitler*, 400 F.3d at 1233.

This Court has recognized that "rejection of expert testimony is the exception rather than the rule."  *Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (In *Cook* Judge Kane recognized that "courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony.").  To the extent that, as MDx contends, Hall failed to consider or account for factors that may be considered under applicable law, that failure goes to the weight to be accorded to his opinion and not its admissibility.  *Cartel Asset Mgmt.*, 2010 WL 3522416 at *7 (citations omitted).  Likewise, the correctness of Hall's conclusions and the qualitative adequacy of the facts and data underlying his opinion are questions for the jury.  MDx's challenges to Hall's opinions should be made at trial through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Id.* at *2.  Because he reliably applied the methodologies to the facts and data, Hall's expert opinions pass muster pursuant to Rule 702.

1. **Hall's Lost Profits Analysis and Opinions**

***MDx is Wrong that Hall's Demand Analysis Under Panduit is Unreliable and Speculative***

In its Motion, MDx agrees with Hall that under the *Panduit* test Health Grades must show "demand for the patented product" and "the absence of acceptable non-infringing substitutes," but argues that Hall's "proposed testimony entirely fails to satisfy either of these criteria." Motion at p. 4, Section IV.  Hall, however, addressed "demand for the patented product" and "absence of acceptable non-infringing substitutes" by reasonably analyzing the facts and data from both Parties and applying reliable and widely accepted methodologies to those facts and data, including the *Gyromat* criteria for demand, and the *Mor-Flo* approach, applied conservatively, for the "absence of acceptable non-infringing substitutes" analysis.  Ex. A, ¶¶ 26-32, 34-38, referencing Attachments 1, 2, 2a, 11, 12 and 3a and relevant case law as well as deposition testimony and documents supporting the analysis.  It is for the jury to decide what weight to give to the facts and data he used, and whether his conclusions regarding "demand for the patented product" and "absence of acceptable non-infringing substitutes" are correct or incorrect.

***MDx Confuses the Panduit Demand Test with the Entire Market Value Rule***

The features claimed in the '060 patent essentially enable people to find and compare doctors using the patented features' search and comparison functions.  Health Grades' website is the Health Grades' product that incorporates the patented features.  Similarly, the accused product in this case is Vitals' website.  Infringement is assumed for purposes of calculating damages, and Health Grades contends that Vitals' infringes because it uses the patented features in its website to attract visitors (that want to "Compare and Find Doctors" as advertised by MDx,

using the patented features' search and comparison functions), which in turn generates advertising revenue for Vitals.  *See* Health Grades' Response to MDx's Second Motion for Partial Summary Judgment  [Dkt. 201, p. 7 of 41, showing title of Vital's website "Compare & Find Doctors."]; *see also* Health Grades' Supplemental Response to MDx's Second Motion for Partial Summary Judgment  [Dkt. 236, p. 7 of 9, showing that MDx's Audited Financial Statements for Years Ended December 31, 2011 and 2010 state that Vitas allows users to "compare and rate physicians."]   Vitals' income statements show substantial advertising revenue, as do Health Grades' income statements.  As stated by Hall, this advertising revenue, and the significant number of website visits to the sites, show demand for the patented product.  Ex. A, ¶ 30.  "The substantial number of sales by Champion of infringing products containing the patented features itself is compelling evidence of the demand for the product."  *The Gyromat Corporation v. Champion Spark Plug Co*., 735 F.2d 549, 552 (Fed. Cir. 1984).

MDx's contention that "Hall's entire "demand" analysis is contained in five paragraphs of his expert report" grossly misrepresents his demand analysis.  Motion at p. 5, referencing ¶¶ 28-32 of Hall's report.  To the contrary, in addition to ¶¶ 28-32, Hall addressed and discussed other substantial and important information that bears on demand in the following sections of his report:

- ¶9 through ¶21 (background information on the parties, their website offerings, the patented features, Vitals' description of its business including its claim that is "is by far the largest source of US doctor ratings & reviews);
- ¶22 through ¶27 (patent damages discussion, principles and cases that bear on 'demand' and but-for causation)
- Hall Report Attachment 1 (See Advertising Network revenue line item)
- Hall Report Attachment 2 (See Advertising revenue line item)
- Hall Report Attachment 3a (See unique visitors to HG's and Vitals' websites—product with patented feature)

11

- Hall Report Attachment 7a (See Vitals' projected advertising revue which comes from its website which Hall rightly assumes is infringing the '060 patent);

- Hall Report Attachment 9 (See *Georgia Pacific* factors #8 and #11)

- Hall Report Attachment 11 (graph of Vitals' advertising revenue over time showing increased demand for its website which is assumed to be infringing '060 patent)

- Hall Report Attachment 12 (graph of HG's advertising revenue over time showing increased demand for its website which uses '060 patent.)

- Hall Report Attachment 16 (graph of market share for the two companies that use, or for Hall's purpose are assumed to use, the '060 patent)

- See also Hall's deposition where he responds to questions regarding demand:  56:2-57:21; 58:16-59:4; 79:8-19; 102:3-103:24; 104:6-105:21; 109:8-25; 110:8-111:25; 122:5-123:10; 131:13-133:19. (Exhibit D)

MDx also contends incorrectly that "Hall's basis for concluding there was demand starts with the revenues of both MDx and Health Grades."  Motion at p. 5.  This is not true and mischaracterizes Hall's analysis.  *See* Hall Affidavit, attached hereto as Exhibit C, ¶¶ 4-18.  Use of an Affidavit by an expert witness subject to a *Daubert* motion is proper.  *See* Order, Case 1:10-cv-01899-RBJ-KLM, Doc. 162, August 15, 2012.

MDx also complains that the revenue data Hall used is "exaggerated, unconnected to the patented invention, and speculative."  Motion at p. 5.  However the advertising revenue that Hall analyzed for demand is directly connected to the patented features in that both Vitals and Health Grades use the patented features on their websites to attract visitors, and then earn advertising revenue based on those visitors.  Hall Affidavit, attached hereto as Exhibit C, ¶¶ 4-18.

MDx complains further that "Hall made no effort to capture revenue derived from the practice of the patent claims."  Motion at p. 5. ***The Panduit demand test, however, does not require such a showing.***  It requires a showing of demand for the patented

product, which can be made by demonstrating a substantial number of sales of infringing products containing the patented features, which "is compelling evidence of the demand for the product." *Gyromat* at 552. Likewise, here the substantial (and increasing over time) number of clicks on the Parties' respective websites by visitors to the websites (which use the patented features) yield substantial and increasing advertising revenue, which is compelling evidence of demand for the "patented product" as required by *Panduit*. Furthermore, as Hall's report makes clear, he identified the revenue (which Hall narrowed to advertising revenue) that both Vitals and Health Grades generated from their websites (which use the '060 patented features), with Hall rightly assuming that Vitals is infringing. (Ex. A, ¶19, ¶20, ¶29-¶32, ¶39 and ¶41-¶44, and Attachment 1 for Health Grades' advertising revenue and Attachment 2 for Vitals advertising revenue, and Ex. A, ¶1 regarding accepted approach of damage expert to assume validity and infringement.)

The *Mor-Flo* case is also instructive as to MDx's convenient and conclusory contention that "the features of the '060 patent are commercially insignificant." Motion at 4. In *Mor-Flo* the court found that the value of the patented feature to the infringer "was obvious" because the infringer never considered an alternative and opted to risk infringement by using the patented feature. *Mor-Flo, supra*, at 1580. Similarly, here MDx/MDx's experts have opined that MDx could have easily avoided infringement and that it would have cost MDx less than $1,000 to implement a design-around to the patent. Napper Expert Report, p, 24, attached hereto as Ex. E. But MDx chose to risk infringement and engage in protracted and expensive litigation instead of implementing a design-around at nominal cost because, obviously, the patented features are of significant

value.  Thus the value of the patented method to MDx is obvious, too.  Or, as the court

stated in *Gyromat*, on which Hall also relied, "[i]f there was no demand for the patented

system, Champion would not have run the risk of infringement."  *Gyromat, supra*, at 552.

MDx summarizes some of the patent claims and then contends that "[n]owhere in

the Hall analysis is any of this ever considered."  Motion at 5.  This, too, is not true.  *See*

Ex. A, ¶9 through ¶15.  As a damage expert, Hall is reasonably assuming, and is entitled

to assume, both validity and infringement.  Further, see Hall Depo. 74:18-75:5., Ex. D.

MDx misrepresents Hall's report and testimony to support its contention that the

he "used revenue that was embellished."  Motion at 5-7.  Not true.  See Hall Affidavit,

Ex. C, ¶¶12-14.

MDx mischaracterizes the contents of Hall's expert report  by improperly inserting

words into its counsel's question that were not used when the question was asked on the

record in the deposition.  *See* Motion at 6, citing "Exhibit C, 149:11-16 (Q: if you had just

one department that only worked on, like information that goes into a report, that

information is referenced somewhere in the claims of the patent, you would include that

department **[in the alleged demand revenue]**?  A:  Yes.")  The bracketed phrase "in the

alleged demand revenue" was not part of the question and changes both the context and the

question.  The question as asked at the deposition related to Attachment 1 (*See* Hall depo.,

148:22-149:10) and was NOT about the "alleged demand revenue."  *See* Hall Affidavit, Ex.

C, ¶¶15-17.  Hall also clarified his answer in his Errata so the answer reads:  "Yes, in

Attachment 1."  Hall Report ¶30 and Attachments 11 and 12 and Hall deposition, 77:21-

78:7 (see excerpt below) make it clear that Hall only included advertising revenue in his

demand analysis for lost profits.

Q.  Okay. So how much more?

A.   The advertising network is the primary revenue source that I believe from my analysis and discussions that relates to the use of the patented features. It's not the entirety of the revenue as they use the rating systems at different periods in time to help with other revenue-generating activities.  ***But the advertising revenue is what I limited and focused my analysis on as far as Health Grades' damages.***

Hall Depo, 77:21-78:7, Ex. D (Emphasis added).

### *MDx is Wrong that Hall's Mor-Flo Analysis is Flawed*

MDx cites *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573 (Fed. Cir. 1989), correctly characterizing that, "Where there are acceptable, non-infringing substitutes, a patent holder may use market shares of the other companies to determine what percentage of the alleged infringer's sales would have gone to the patent holder and from this determine what profits the patent holder might have made."   Motion at 10. MDx then states that Hall's *Mor-Flo* analysis is speculative and unreliable because it ignores the 30(b)(6) witness John Neal on competition, fails to identify any reliable criteria for including or excluding other websites in the *Mor-Flow* analysis, and Hall (allegedly inappropriately) asked Health Grades' personnel which ones ***they*** thought should be included (emphasis in original), and relied on the statements of these obviously interested witnesses.  Each of these claims misrepresent the efforts and analyses that Hall undertook to develop his *Mor-Flow* analysis.

Hall did not ignore John Neal's testimony on the competition.  He did note, however, that Mr. Neal stated that he would answer MDx's counsel's questions from a layman's perspective and that he was not a patent attorney and it would be a judgment for counsel to make.  He also

noted that Mr. Neal appeared to be answering questions about *infringing* competitors (or competitors "that embody or employ a claim in the patent-in-suit"—see deposition excerpt below).  Therefore, Hall took reasonable additional steps and used additional sources of information to identify acceptable non-infringing substitutes.

> Q.    So what we're going to talk about now is products and services of other companies that compete with the Health Grades products and services <u>that</u> **embody or employ a claim in the patent-in-suit, okay**?
>
> A.    Okay.  Got it.
>
> Q.    So, let's identify them.  Vitals.com?
>
> A.    Okay.
>
> Q.    Ucompare.com.  Correct?
>
> A.    **I have to tell you from a layman's standpoint, I would say absolutely I am not a patent attorney.  So that's a judgment that counsel would have to make.**
>
> Q    But let's just do the best we can here because you're identified for these topics.
>
> A    Right.

(John Neal depo, 84:15 – 85:5, Ex. F)(emphasis added).

Hall stated his criteria both in his report and at his deposition how he executed his *Mor-Flo* analysis to determine market share.  *See* Hall Report ¶¶34-38, Ex. A and Hall Depo. 185:6-188:22, Ex. D.  Further, Hall also ran his *Mor-Flo* analysis based on Vitals' expert's (Napper) market share conclusion, in addition to his original analysis, that yielded no substantive change to the resulting damages and is prepared to present both to the court.  *See* Ex. A, Attachments 3, 3a and Attachment "3a -- Napper Market Share Data," and Hall Depo. 8:11-10:14 and 303:7-17, Ex. D.  *See* also Hall Affidavit, Ex. C, ¶¶ 24-27.  Hall's analysis of the market also is consistent with Vitals' pre-litigation view of the market.  *See* Hall Depo, 180:11-13, Ex. D and MDX 0012724-12725, Ex. G.

Hall also cited *TWM Manufacturing Co., Inc. v. Dura Corp.*, 789 F.2d 895 (Fed. Cir. 1986) at footnote 44 of his report.  One of the principals of that case is that the "Mere existence of a competing device does not make that device an acceptable substitute."  Id. at 901.   Hall's analysis is conservative in this respect and identified this point of conservatism in ¶35 of his report:

> "Consistent with the Mor-Flo Industries, Inc. case, for purposes of measuring lost profits, I have treated HealthGrades' competitors as acceptable non-infringing alternatives.[1]  To the extent that these competitors are infringing or not an acceptable substitute, my analysis understates HealthGrades' lost profits."

Ex. A, ¶35.

That Hall also considered pre-litigation sources of information and the input of Health Grades representatives other than its 30(b)(6) witness is unremarkable and should be the subject of cross examination, not preclusion.  MDx cites no authority that requires a damages expert to accept the testimony of 30(b)(6) witnesses or face *Daubert* exclusion.  Further, if Mr. Hall had accepted this testimony without his own analysis, MDx would surely contend (as it does elsewhere in the Motion) that Mr. Hall merely accepted whatever his client said.

### 2.   Hall's Royalty Analysis

While MDx makes much of the alleged "unpatented features" that it argues generated revenue that should not be included in Health Grades' damages, ***MDx has not identified or presented any evidence of the value of the so-called unpatented features***. In *Mor-Flo*, the infringer, like MDx here, argued that the patented feature (foam insulation) was not the basis for consumer demand and that "several unidentified non-patented components" were the basis for demand.  *Mor-Flo, supra*, at 1580.  The court

---

[1] *State Industries, Inc. v. Mor-Flo Industries, Inc. et al.*, 883 F.2d 1573 (U.S. Court of Appeals, 1989).

rejected the infringer's argument, noting first that the infringer, like MDx here, "did not identify or present evidence of the value of these nonpatented components." *Id.* The court then observed that "no components can be used separately, except as spare and repair parts for which State does not claim damages." *Id.* (*citing Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 656 (Fed. Cir. 1995) (the entire market value rule is properly applied when the non-patented devices cannot be sold without the patented feature). Thus the court affirmed the district court's adoption of the entire market value rule. *Mor-Flo, supra*, at 1580. The same result should be reached here, because MDx has not identified what non-patented features it claims drives demand, nor has it presented any evidence of the value of the un-identified, non-patented features. Further, the so-called non-patented features are incorporated into the Vitals' website the same as the patented features are, and thus cannot be "used separately" or "sold without the patented feature" – indeed, a visitor to the accused website that is looking to find and compare doctors will generate advertising revenue for Vitals, regardless of the presence or incorporation in the website of any so-called non-patented features.[2]

In any event, Hall's 12% royalty rate does account for unpatented features. Ex. A, ¶¶ 78-91, and Attachment 9; Hall Affidavit, ¶¶ 78-91, Ex. C.

The *Mondis Technology* case is analogous and instructive as to MDx's contention that Hall's use of all of the advertising revenue is equivalent to adopting the entire market value rule, and that his analysis is flawed and should be precluded. In *Mondis* the plaintiff's damages expert used the entire market value rule to calculate the reasonable royalty, and the defendants filed *Daubert* motions to exclude the expert's testimony

---

[2]   There is only one MDx/Vitals website. No alternative, non-infringing site exists, and Hall must necessarily assume infringement by the website.

because the patented feature had not been shown to provide the basis for demand.

*Mondis Technology, Ltd., v. LG Electronics, Inc,* 2011 WL 2417367 at *1,*2 (E.D.Tex.)

The court noted that it was "largely undisputed" that the patented feature did not provide

the basis for customer demand.   *Id.* at *2.   Nonetheless, the court held that "under the

facts of this case, Dr. Magee may use the entire market value of the accused products in

calculating the reasonable royalty because it is economically justified."   *Id.*   The *Mondis*

court noted that while the Federal Circuit in *Lucent* had stated that ""[i]n one sense," the

law is clear that "[f]or the entire market value rule to apply, the patentee must prove that

the patented-related feature is the basis for the customer demand."   *Id.*   However, the

*Mondis* court correctly observed that "[o]n the other hand, the Federal Circuit in *Lucent*

later stated:

> Although our law states certain mandatory conditions for applying
> the entire market value rule, courts must nevertheless be cognizant
> of a fundamental relationship between the entire market value rule
> and the calculation of a running royalty award.  Simply put, the
> base used in a running royalty calculation can always be the value
> of the entire commercial embodiment, as long as the magnitude of
> the rate is within an acceptable range (as determined by the
> evidence).

*Mondis* at *2, citing *Lucent* at 1338-39.

The *Mondis* court also observed "[f]urther, the Federal circuit stated "even when

the patented invention is a small component of a much larger commercial product,

awarding a reasonable royalty based on either sale price or number of units sold can be

***economically justified***.""   *Id.* (citing *Lucent* at 1339)(emphasis added).   Similar to Hall's

analysis, in *Mondis* the expert's opinion considered several license agreements.   *Mondis*

at *2. Similar to Hall's testimony, in which he made clear that he did not attempt to

"speculate" by apportioning what advertising revenues were realized from the so-called

non-patented features, in *Mondis* the court noted that if the rule that the entire market value could be used "*only* where the patented feature creates the basis for the customer demand" was absolute, it would put the patentee "in a tough position" because it would have to "**speculate**" as to how the parties to the licenses in evidence in the case would have apportioned the patented features. *Id.* at *3.  This is the situation here:

> Q.   So did you do anything, any kind of allocation to try to figure out what part of this revenue would have been attributable to use of the '060 features, as opposed to all the unpatented features on the website?
>
> A.   I did not make that assessment or *speculate* as to that.
>
> Q.   Right. ***That would be speculation, wouldn't it***?
>
> A.   I would want to see the basis for anybody doing that and certainly would have looked with interest if Mr. Napper had done that. But I did not see a basis or way to do it that, in my mind, would be reasonable. So I wasn't asked, nor did I undertake that analysis.

Hall Deposition at 255:8-22, Ex. D (emphasis added).

Thus the court held that the plaintiff  "may base its reasonable royalty analysis on the entire market value of the accused products, despite not showing the accused features provide the basis of customer demand."  Mondis at *3.  "In this Court's view, Federal Circuit jurisprudence regarding the "entire market value rule" allows for this result, and further, Federal Circuit damages jurisprudence encourages this result by placing a large emphasis on comparable licenses of the patents-in-suit."  Id.  Similarly, Hall's use of all of the advertising revenue, which MDx contends is equivalent to using the entire market value rule, is economically justified in this case.  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  Mondis at *1 (citation omitted).  "That is, a trial court

is not permitted under Daubert to "transform a Daubert hearing into a trial on the merits." Id. (citation omitted).   In any event, Hall did not use the entire market value rule, he used all of the advertising revenue, which MDx argues is the same as using the entire market value rule.  As shown here, assuming for argument's sake only that MDx is correct, Hall's reasonable royalty analysis is consistent with Federal law.

**III.    HALL'S RELIANCE ON HIS DISCUSSIONS WITH A HEALTH GRADES' EMPLOYEE DOES NOT PRECLUDE HIS OPINIONS**

Under Fed. R. Evid. 703, an expert witness may rely on facts, data, and opinions of other experts that are not admissible in evidence if they are of a type relied upon by experts in a particular field in forming opinions or inferences upon the subject. Fed. R. Evid. 703; *TK–7 Corp. v. Estate of Ihsan Barbouti,* 993 F.2d 722, 732 (10th Cir.1993).  It is telling that MDx does not cite the Federal Rules of Evidence in support of it's request that Hall's opinions be precluded simply because he relied on information from a Health Grades' employee.   The rules expressly allow him to do so.  Nor has MDx argued that the information Hall obtained from the Health Grades' employee is not of the "type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" as permitted by Rule 703.  The one case MDx cites in support of its request, *General Steel Domestic Sales, LLC v. Chumley*, does not support MDx's request.  In *General Steel* the plaintiff attached affidavits of two experts to its response to the defendants' motion for summary judgment.  2012 WL 1378536 at *1, (D. Colo.)  The plaintiff did not disclose or endorse the individuals pursuant to Rule 26(a)(2)(A), and thus the court excluded the affidavits.  Id. at *4.  This is far from the case here.  Hall has not listed or introduced an affidavit from Ms. Pearson in support of his opinions.  He has simply relied on information from her as permitted by Rule 703 and properly disclosed this in his report.  Indeed, MDx then took Hall's deposition and had ample opportunity to inquire into the bases of his

opinions, and did in fact inquire substantively regarding the information he obtained from all the Health Grades' employees he listed in his report.  *See Paradigm Sales, Inc. v. Weber Marking Systems, Inc*., 880 F.Supp 1247, 1251 (N.D.Indiana 1995)(patent infringer's failure to timely disclose a document did not require exclusion of portion of damages expert's testimony based on the document, where the patentee had ample opportunity to take expert's deposition and inquire into bases of his opinions).  Here, like in Paradigm Sales, MDx had ample opportunity to inquire regarding the bases for Hall's opinions, and in fact did so, and thus MDx's request should be denied.

Furthermore, as is confirmed by Hall's Affidavit, Exhibit C, Ms. Pearson only corroborated information provided by Mr. Dodge and Mr. Neal.  She did not provide any new or independent information that was relied upon by Hall in his report.  See Hall Affidavit, Ex. C, ¶¶ 28-30.

MDx's request should also be denied because it failed to comply with Judge Brimmer's Practice Standards regarding motions to exclude expert testimony, which require that MDx "identify with specificity each opinion the moving party seeks to exclude," and to "also identify the specific ground(s) on which each opinion is challenged, e.g., relevancy, sufficiency of facts and data, methodology.  See Fed. R. Evid. 702."  Practice Standards, p. 12.  In its Motion MDx simply asks that "all of Mr. Hall's proposed analyses, which rely so heavily on Ms. Pearson, should be precluded."  Motion at 12.  This fails to identify with specificity each of Hall's opinions that MDx seeks to exclude as required by Judge Brimmer's Practice Standards.  Furthermore, MDx fails to identify the specific grounds on which each opinion is challenged.

Finally, Ms. Pearson is no stranger to MDx – her name appears in over *one thousand two hundred* emails and documents produced to MDx, and thus MDx cannot claim any surprise or prejudice.

## IV.   <u>CONCLUSION</u>

For all the reasons discussed above, the Motion should be denied.

Respectfully submitted this 27th day of November, 2012.

ROTHGERBER JOHNSON & LYONS LLP

*s/ Jesús M. Vazquez*
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
1200 17th Street, Suite 3000
Denver, Colorado  80202
Tel:  (303) 623-9000
Fax:  (303) 623-9222
Email: gkanan@rothgerber.com
            kkosto@rothgerber.com
            jvazquez@rothgerber.com

*Attorneys for Plaintiff Health Grades, Inc.*

2003946896_1

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 27, 2012, I electronically filed the foregoing **HEALTH GRADES, INC.'S OPPOSITION TO MDX MEDICAL, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF MR. DAVID HALL** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott David Stimpson
Scott Murray
David Chunyi Lee
Sills Cummis & Gross P.C. – New York
30 Rockefeller Plaza
New York, NY  10112
Email: sstimpson@sillscummis.com
Email: smurray@sillscummis.com
Email: dlee@sillscummis.com

Terence M. Ridley
Wheeler Trigg O'Donnell, LLP
1801 California Street, #3600
Denver, CO  80202-2617
Email: ridley@wtotrial.com

*s/ Jesús M. Vazquez*
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
Rothgerber Johnson & Lyons, LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202-5855
Tel:     (303) 623-9000
Facsimile: (303) 623-9222
Email: gkanan@rothgerber.com
         kkostolansky@rothgerber.com
         jvazquez@rothgerber.com

*Attorneys for Plaintiff Health Grades, Inc.*

2003946896_1