CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2              IN THE UNITED STATES DISTRICT COURT

3                FOR THE DISTRICT OF COLORADO

4      Case No. 11-CV-00520-PAB-BNB

5      _____

6      DEPOSITION OF DAVID HALL

7      October 4, 2012

8      _____

9

10     HEALTH GRADES, INC.,

       Plaintiff,

11

       v.

12

       MDX MEDICAL, INC. d/b/a VITALS.COM,

13

       Defendant.

14     _____

15

16

17

18

19

20

21

22

23

24

25     Job No. NJ1339309

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 8

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2        Q     Okay.  Were there any facts in there that

3    you did not know when you prepared the report,

4    Exhibit 75?

5             MR. VAZQUEZ:  Objection.  Form.

6        A     I don't recall.  I would want to look at

7    his report again.  Nothing jumped out.  But I don't

8    recall.  There may have been, but I don't recall.

9        Q     (BY MR. STIMPSON)  Okay.  Well, we'll get

10   a chance to look at it a little bit later today.

11            Does Mr. Napper's report impact on your

12   damages analysis at all in the sense that you might

13   want to revise something?

14            MR. VAZQUEZ:  Form.

15       A     No, though I did look with interest at all

16   of it and that included his market share information,

17   which I ran a sensitivity analysis on my damages

18   model with his market share information.

19       Q     (BY MR. STIMPSON)  Okay.

20       A     But I did not change -- it's not causing

21   me to change my opinion.

22       Q     Okay.  So it's not causing you to change

23   your opinion as to competitors in the market?

24       A     It is not.

25       Q     And what kind of sensitivity analysis did

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 9

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    you run?

3         A     Using Mr. Napper's market share

4    information for Health Grades and Vitals, I used that

5    in my attachment 3a and attachment 4 to see what the

6    damages would yield from using his market share

7    information.

8         Q     And how did that change the results, if at

9    all?

10        A     It barely changed them.  They may have

11   gone up 20, $25,000.

12        Q     Do you mean the damages went up about

13   $25,000?

14        A     Correct.

15        Q     So using his additional competitors, it

16   increased your damages by $25,000?

17        A     Using the market share information, yes,

18   that he describes in his report, did increase damages

19   or would increase damages if you used those, by about

20   20 or $25,000, is my recollection.  I prepared a

21   schedule.

22        Q     Do you have it with you?

23        A     Yes.

24        Q     Can I take a look?

25        A     (Tendered.)

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 10

1                CONFIDENTIAL - ATTORNEYS EYES ONLY

2        Q        Thank you.  So this is new, is what you're

3    showing me right now, right?  These documents,

4    entitled attachment 3a, Napper Market Share Analysis

5    and attachment 4, Napper Market Share Data.

6                Do you see that?

7        A        Yes, they are new from the subsequent

8    reports and obviously after Mr. Napper's report was

9    provided to me and I read it.

10                MR. STIMPSON:  Let's have 3a, Napper

11    Market Share Data (sic) marked as Exhibit 76, and

12    attachment 4, Napper Market Share Data marked as

13    Exhibit 77.

14                (Exhibits 76 and 77 marked.)

15                MR. STIMPSON:  I'm going to get to those

16    later.  Jesus, can I get these PDF'd to me, please?

17                MR. VAZQUEZ:  Do you mean right now?

18                MR. STIMPSON:  Yeah.

19                MR. VAZQUEZ:  Let's take a break and I

20    will be happy to ask her.  Can you just whatever --

21                MR. VAZQUEZ:  I'll give it to her.

22                MR. STIMPSON:  Okay.  That's fine.  Let's

23    just take a quick break, okay?

24                MR. VAZQUEZ:  Off the record?

25                MR. STIMPSON:  Yeah.

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 56

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2           Q      (BY MR. STIMPSON)   The amount of use of

3      the patented invention in the Vitals website was not

4      considered by you in your damages analysis, right?

5           MR. VAZQUEZ:   Form.

6           A      I don't agree with that.

7           Q      (BY MR. STIMPSON)   Okay.   So how did you

8      use that data?

9           A      Once I gained an understanding of the

10     patent, I undertook a review of the information

11     provided, which includes Vitals' description and its

12     financial statements of its business, several

13     business overviews Vitals had, as well as Health

14     Grades, similar type overview.   These are all

15     pre-litigation or pre-notification of patent

16     infringement documents to gain an understanding of

17     how both companies put forth their product or their

18     features to the market, and what they considered

19     important features.

20              And understood and saw from that as well

21     as deposition testimony that both companies

22     highlighted the comparison ratings and the

23     information they had that relates to my understanding

24     of the patent claim.   And that, along with the

25     assumption of infringement, was how I determined that

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 57

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     a substantial portion of the demand related to

3     advertising revenue related to the patented features

4     with respect to Panduit test 1.

5          Q     Okay.  You said that you determined from

6     reviewing these documents and talking -- and reading

7     the deposition testimony, a substantial portion of

8     the websites were using the patent.

9               Is that what your testimony was?

10         A     No.  And I would add that also an

11    important benchmark was the market, as far as

12    visitors were going to the site.  That prompted or

13    that identified in their own internal documents the

14    features related to the '060 Patent would also be a

15    source I considered as well in the substantial market

16    share that Health Grades and Vitals had as they, both

17    on their website, if you click on a Google search or

18    Yahoo search, or within their documents that both

19    emphasize and feature that they have information from

20    the sources I described earlier as well as comparison

21    ratings.

22         Q     So I don't think that was really quite my

23    question, Mr. Hall.  Let me see if I can make it

24    clearer.

25               You talked about how you looked at all

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 58

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  this evidence and you think that the '060 Patent is

2  important.  But my question is a little bit

3  different.  My question is, do you have anything,

4  Mr. Hall, to indicate what percentage of users of the

5  Vitals website use the technology from the '060

6  Patent?

7      A     I do not have a percentage, a fixed

8  percentage based on a survey or a source of that

9  sort, given the sensitivity of healthcare searches

10  and the practicalities of that as far as privacy

11  information and practicalities.

12      I do not have a percentage of visitors.  I

13  have not determined one that utilized the features of

14  the '060 Patent.

15      But in lieu of that, I have, as I'd

16  indicated earlier, looked at what the companies put

17  forth to the market that they have and are their key

18  features.  And understood then how the market reacted

19  to those explanations or benefits of their

20  patented -- of the patented features related to their

21  websites.  And tracked over time the market's

22  reaction to that, as well as what the deposition

23  testimony yielded.  And concluded with the increasing

24  both visits and increasing ad revenue related to

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 59

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    those visits, that the patented features were a

3    substantial part of the demand as it relates to the

4    Panduit test.

5          MR. STIMPSON:  Okay.  So I have to move to

6    strike everything starting with, but in lieu of that,

7    as nonresponsive.

8          Why don't we take our break, okay?

9          (Recess taken from 9:47 a.m. to

10   10:02 a.m.)

11   Q     (BY MR. STIMPSON)  Okay.  Mr. Hall, later

12   in your report, you talk about various agreements

13   between MDx and third parties and Health Grades and

14   third parties.  And a lot of them are about licensing

15   out data.

16         Do you remember that?

17   A     Yes.

18   Q     Did you consider the Vitals database to be

19   covered by the patent?

20         MR. VAZQUEZ:  Objection.  Calls for a

21   legal conclusion.

22   A     My understanding was that the database

23   alone was not a violation of the patent.

24   Q     (BY MR. STIMPSON)  Okay.  And did you also

25   understand, Mr. Hall, that there are many uses for

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 74

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2   or if there were expenses associated with the use of

3   the '060 Patent, even if there weren't revenues in

4   departments, to include those as well.

5        And that's what is referenced in these

6   first two sentences you read.

7        Q    So what business activities of Health

8   Grades were identified as using the '060 Patent?

9        A    Certainly, their advertising efforts as

10  they drive, attempt to drive traffic up and drive up

11  their advertising revenue.

12       They also use the patented features or

13  have over the years to -- as part of their effort in

14  other businesses such as consulting to physicians, as

15  far as improving quality and ratings related to

16  assisting providers and facilities in improving their

17  ratings.

18       Q    Anything else?

19       A    Yes.  There was, I understand from John

20  Neal's deposition testimony and from discussions with

21  Andrea and Allen, that he believes it's even more

22  expansive as far as how they use the '060 Patent.

23  That it goes to the core of all of their businesses

24  as far as the unique experience website visitors will

25  have that really drives all of their business

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 75

1       CONFIDENTIAL - ATTORNEYS EYES ONLY

2    activity.  I understand John Neal's view on that, but

3    I wanted to limit it to what Health Grades' CFO and

4    Andrea Pearson, as we discussed department by

5    department, what was related to the '060 Patent.

6        Q     So what I'm trying to do here, Mr. Hall,

7    is I'm trying to figure out how you determined sort

8    of what was associated with the patented invention.

9    And you told me that there -- or you identified

10   certain business activities by talking to Andrea

11   Pearson and Mr. Dodge.  But what I need is, I need a

12   list of what those activities are.

13            I mean, is that in your report anywhere?

14       A     Yes, a reference is in my report.

15       Q     And where are those referenced in your

16   report?

17       A     Attachment 1 lists all the revenue and

18   expense categories that are in departments that have

19   revenue or expenses associated with Health Grades'

20   using the patented features.

21       Q     Right.  But they don't really identify all

22   the activities, do they?  Take a look at Exhibit 1.

23   So maybe that will become clear.

24            MR. VAZQUEZ:  Attachment 1?

25       Q     (BY MR. STIMPSON)  Yes, attachment 1.

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 77

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2               With a note on page 8, footnote 21, I want

3     to point out, that says, As noted elsewhere in this

4     report, revenues reported by the various departments

5     include more than that of the patented invention.

6     However, Health Grades did not separately report the

7     revenue expenses related to the patented invention.

8     Therefore I included these entire departments in

9     their entirety, versus taking a departmental P&L and

10    parsing it out or doing an analysis.

11               As that note indicates, if these

12    departments had any part of their revenue or expenses

13    that related to their use, either generating revenue

14    or expenses, for that matter, with the patented

15    features, I included the departments in attachment 1.

16         Q     So there may be a lot more in attachment 1

17    in terms of revenue or whatever else is in there than

18    just the business activities revenue generated from

19    business activities, associated with the patent?

20         A     That is a fact.  There is more, yes.

21         Q     Okay.  So how much more?

22         A     The advertising network is the primary

23    revenue source that I believe from my analysis and

24    discussions that relates to the use of the patented

25    features.  It's not the entirety of the revenue as

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1                CONFIDENTIAL - ATTORNEYS EYES ONLY

2       they use the rating systems at different periods in

3       time to help with other revenue-generating

4       activities.

5                But the advertising revenue is what I

6       limited and focused my analysis on as far as Health

7       Grades' damages.

8           Q       How much revenue from attachment 1 is

9       included in attachment 1 but doesn't relate to these

10      business activities regarding the '060 Patent?

11               MR. VAZQUEZ:   Form.

12          A       I have not made a calculation of that.

13      The Health Grades cites the features and promotes the

14      features of its '060 Patent in a variety of ways and

15      has over the years and believes it to be a key part

16      of their website for the unique experience they try

17      to provide and believes that a substantial portion of

18      their traffic over the years and ad revenue relates

19      to the use.

20               I understand John Neal's view, as well as

21      Mr. Dodge's and Ms. Pearson's, as well as what is

22      yielded from the ones who have been deposed

23      testimony.  And also contemporaneous, pre-litigation

24      documents that cite the patented features.

25          Q       Can you tell me if $100 or more of the

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     revenue in attachment 1 is unrelated to the '060

3     Patent?

4          A     I have not made that determination.

5          Q     Can you tell me if 10 million or more in

6     revenues of attachment 1 are unrelated to the '060

7     Patent?

8          A     From my analysis, I think a substantial

9     portion of their website traffic is generated based

10    on the use of the patented features.  As search

11    engines pull up the rating systems, and the

12    information they have available, it's their -- my

13    analysis concluded they're really the key feature or

14    their most prominent feature relates to the patent.

15              As far as the each and every visitor,

16    other than as I identified in the report, the

17    co-visitors, I have not made a mathematical

18    determination of a split between the patented

19    features revenue and non-patented features revenue.

20         Q     Right.  But my question, sir, was, can you

21    tell me whether or not $10 million or more of the

22    revenue of attachment 1 are unrelated to the '060

23    Patent?

24              MR. VAZQUEZ:  Object.  Asked and answered.

25         A     I thought I'd answered that.

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 97

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    associated with the '060 Patent because as we talked

3    about earlier, there's a lot more that may be

4    included there that is not related to the '060

5    Patent, right?

6              MR. VAZQUEZ:  Form.

7       A     Attachment 1 was not intended to identify

8    all the revenue associated with the '060 Patent.

9    There is more here than -- yes.

10      Q     (BY MR. STIMPSON)  In fact, we can't

11   really know what revenue is associated with the '060

12   Patent, as you candidly state in your footnote 21.

13   There just aren't documents to show that, right?

14             MR. VAZQUEZ:  Form.

15      A     That is accurate.  And also my experience

16   on other cases, that companies don't create P&Ls

17   based on intellectual property, but rather

18   departments and business activities.

19      Q     (BY MR. STIMPSON)  Okay.

20             MR. STIMPSON:  How long have we been

21   going?  What time is it?

22             MR. VAZQUEZ:  An hour.

23             MR. STIMPSON:  Why don't we take a break.

24             (Recess taken from 10:55 a.m. to

25   11:12 a.m.)

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 102

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     advertising revenue, combined with the website

3     visits, demonstrates the demand from the claims

4     embodied in the '060 Patent.

5          What's your basis for saying that,

6     Mr. Hall?

7     A     The basis is both the, as I mentioned

8     earlier, the -- what both these companies promote in

9     the information I received related to their business

10    overview as their features they have for consumers to

11    visit their websites, as well as the marketing

12    information.

13         That includes two business overviews for

14    Vitals, its financial information and the financial

15    statements which indicates its business, if you will,

16    mentioning the patented features, as well as the

17    market of visitors gravitating to Health Grades and

18    Vitals as indicated in the web visits.

19         I say in that statement, as well as the

20    deposition testimony I read, and the Health Grades

21    10-K, as far as what it describes what its business

22    is.

23         And that's a partial list.  But it's

24    really everything I looked at relates to what the two

25    companies promote as their features.

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 103

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2          Also my searches on the web referenced

3     earlier that pulls up in bold ratings and reviews for

4     both companies.

5          It's the first thing a visitor to Google

6     or Yahoo will see.  And that has resulted in those

7     two entities having half the market and growing over

8     time during the infringement period.

9          Q    Anything else?

10         A    I guess two different Vitals or MDx

11    financial statements, two of their business

12    overviews.  Health Grades' business overview I would

13    include in that list.

14         Q    Anything else?

15         A    There may be, but that's what comes to

16    mind as to demonstrate the demand for this product.

17    The market's reaction is a strong component of it as

18    far as what the two companies promote and then how

19    the market has responded to that, as opposed to what

20    other information sources online are available.

21         Q    Okay.  So all those things that you cited

22    as supporting that statement, are any of them

23    identified here as support for this paragraph 30?

24         A    They're identified throughout my report.

25         Q    Okay.  Can you --

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 104

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2     A     I cite a case here as far what -- what

3    demonstrated, what my understanding of case law in

4    demonstrating, the need for demonstrating demand for

5    the product or of the patent features.

6         Q     Okay.  So I'm trying to get a handle on

7    what your actual documentary support is for saying

8    there is demand.  And can you identify those

9    documents for me, please?

10        A     Yes.

11        Q     And show me where they are in your report,

12   please?

13        A     The first document is Vitals' business

14   overview, progress, strategy and plans.

15        Q     What's the Bates number, please?

16        A     MDx 0012688.

17        Q     Okay.

18        A     Through 12756.

19        Q     Okay.

20        A     In addition to being -- should I do all

21   the sources and then show where they're at?

22        Q     Yeah, let's do that.  We'll do the sources

23   first and then we'll go back and try and find them in

24   the report.

25        A     Okay.  Another business overview, Vitals

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 105

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2     MDx 0012882 through 12934.

3          Q      12934, okay.

4          A      Correct.

5                 MDx's audited financial statements years

6     ending December 31, 2011 and 2010.  MDx 0104440

7     through 104466.

8                 I have referenced before Health Grades'

9     form 10-K, HG 0001580 through 1649.

10                MDx audited financial statements years

11    ending May 31, 2009 and 2008.

12         Q      Do you have a Bates number?

13         A      Oh, sorry.  MDx 0104632, 0104649.

14                Then Allen Dodge deposition testimony,

15    pages in the 250s towards the end of his deposition,

16    is my recollection.

17         Q      Anything else?

18         A      There's discussions I referenced earlier

19    with Andrea Pearson and Allen Dodge.  Then there's

20    the Health Grades investor day presentation,

21    HG 0001728 through 1800.

22         Q      Anything else?

23         A      Those are what come to mind right now.

24         Q      So you have a section in your report

25    headed demand, starting right before paragraph 28,

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 109

1       CONFIDENTIAL - ATTORNEYS EYES ONLY

2   these documents with me because I couldn't match this

3   up.  So I can't even really ask you about it.

4           But this document you're looking at is in

5   your binder and it's a marked-up copy of something

6   you have used, right?  And which document is that you

7   just read from?

8       A       It is a referenced copy, is what I would

9   say.  It is MDx 0104440, MDx's audited financial

10  statements.

11      Q       Okay.  And so read me the part again,

12  please, that you think supports demand.

13      A       MDx operates as an online healthcare

14  directory service provider.  MDx Medical allows users

15  to compare and rate physicians on its primary

16  website, Vitals.com, and its recently acquired

17  websites.

18          Part of demonstrating demand is gaining an

19  understanding of what the companies promote to try

20  and attract business.  And to the extent that compare

21  and rating physicians is the lead-in sentence, as

22  well as the other sources, is to me a demonstration

23  of what Vitals is doing to attract demand for its

24  website, which yields advertising revenue.  So that's

25  how it is related to the demand.

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 110

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2         Q     Okay.  So it's your belief then, Mr. Hall,
 3    that by showing that these companies promoted certain
 4    features, that's enough to show demand for the patent
 5    invention?
 6              MR. VAZQUEZ:  Form.
 7         A     No, that's not my testimony.
 8         Q     (BY MR. STIMPSON)  Okay.  So is it your
 9    understanding that promoting a patented feature is
10    enough by itself to show demand under federal circuit
11    law?
12              MR. VAZQUEZ:  Form.  Calls for a legal
13    conclusion.
14         A     That's not my understanding.
15         Q     (BY MR. STIMPSON)  So -- I think we have
16    too many negatives going on here.
17              So you in your view agree that it requires
18    more than just Health Grades or Vitals saying, Hey,
19    look, here is a cool feature on our website, to show
20    demands for the patented product, right?
21              MR. VAZQUEZ:  Form.
22         A     That's certainly my view.  I don't have a
23    view related to, of course, the federal circuit.  But
24    it's part of an analysis I performed.
25         Q     (BY MR. STIMPSON)  And the rest of --
```

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 111

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      And an important one as to what they're

3  promoting to the market.  And then how the market

4  responds to that is an important part as well.

5      Q      Okay.  And what evidence do you have that

6  the market responded to that statement you just read

7  for me in the MDx document?

8      A      Along with the other business overview and

9  other sources I cited, demonstrates to me that Vitals

10  identified and described themselves, as well as their

11  website, promotes the ratings feature on search

12  engines.

13          That, as well as Health Grades doing that

14  as well, yielding the -- for most of the time the

15  number one and number two visitors within their

16  market and essentially dominating those two.

17  Starting at 50 percent and growing in the years after

18  the infringement shows me that those are features

19  that the market was receptive to and visited their

20  health sites related to.

21          It was the intent of the parties as they

22  promoted those features to get the traffic, get

23  website traffic.  And that's what has happened in the

24  market, reasonably demonstrates that there's a demand

25  for those features.

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 122

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     those are promoting features that aren't covered by

3     the '060 Patent, right?

4          A     I agree.

5          Q     So how do you know, Mr. Hall, that it's

6     only the promotion of the '060 Patent features that

7     leads to this, what you refer to as a success of the

8     Health Grades website?

9          A     The fact that it's the primary feature.

10    When you search on web searches, it's the one in bold

11    as far as their comparison ratings, and the one that

12    shows up on search engines, as well as it's the

13    documents I referred to earlier.  Their business

14    features the comparison ratings.

15          And what Mr. Neal described in his

16    deposition is the unique experience that they want

17    visitors to have, due to the combination of their

18    information with comparison ratings of physicians.

19          That, combined with how Vitals describes

20    its effort to be the trip advisor of the healthcare

21    information, online healthcare information, which of

22    course includes comparison ratings and star ratings,

23    as well as what it shows, what it decided to bold and

24    show on searches on the web and its internal

25    documents pre-litigation about the features it

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 123

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2      promotes in its hope for website traffic.

3              And ending with, and very importantly, how

4      the market has responded to that.  Whether it's the

5      market as defined in my first report or Mr. Napper's

6      report, the market reaction to the two entities that

7      promote the patented features and the domination

8      those two have, measured either way, leads me to

9      reasonably believe that the patented features is a

10     substantial sources of demand.

11         Q    What percentage of the demand comes from

12     the patented features?

13         A    I have not calculated a percentage.

14         Q    Is it more than 20 percent?

15              MR. VAZQUEZ:  Object to form.  Asked and

16     answered.

17         Q    (BY MR. STIMPSON)  Actually, your counsel

18     is right.  You don't have any idea, do you, what

19     percentage?

20              MR. VAZQUEZ:  Object to form.

21     Argumentative and inappropriate.

22         Q    (BY MR. STIMPSON)  You don't have -- my

23     question, Mr. Hall, is this.  You don't have any idea

24     what percentage of the demand for the Health Grades

25     website comes from the '060 patented features, right?

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 131

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2    the market in January 2008.

3              I did not undergo a prior art analysis.

4         Q    (BY MR. STIMPSON)  So assume with me

5    please, Mr. Hall, that this is prior art to the

6    Health Grades patent.  And that the only difference

7    between this prior art and what Health Grades is

8    doing under the '060 Patent is they added comparison

9    ratings for physicians, okay?

10        A    Okay.  This is a hypothetical?

11        Q    Yes.  Do you understand it?

12        A    I do.

13        Q    How -- do you have anything in your report

14   or otherwise showing how the addition of those

15   comparison ratings of physicians impacted the demand

16   for the Health Grades website?

17        A    I do.  I've seen information related to

18   that.

19        Q    Okay.  And what's that information?

20        A    The Health Grades promotion of that

21   feature, as well as the market's reaction to it, it

22   increased website traffic.

23        Q    So you know that the market reacted to

24   that specific part about adding comparison ratings of

25   physicians?  Is that your testimony?

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 132

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      My testimony is, I think it's a reasonable

3   inference, given the focus of the promotion of that

4   ability or feature.  And coupled with Vitals'

5   promotion of the same, and those two entities being

6   far and away the two biggest as far as traffic,

7   visitors, website traffic or online visitors in the

8   market.

9      Q      And what documents -- are they the same

10  documents you referred to earlier about supporting

11  your conclusion there?

12          MR. VAZQUEZ:  Form.

13     A      It would be the same documents, but also

14  the Comscore website traffic.  And I don't know if I

15  included that.  Though you were asking questions

16  about a sentence that I think referenced Comscore

17  documents.

18          So it would also be the measurement of the

19  market's reaction of these entities as they promoted

20  patented features.

21     Q      (BY MR. STIMPSON)  Do you know of any

22  documents where Health Grades or Vitals promoted only

23  the comparison ratings feature?  I mean, not in the

24  context of, you know, come get reports from us, and

25  we'll give you all this information.  We'll give you

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 133

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2    the comparison ratings.

3           But do you know of anything where Health

4    Grades or Vitals said this is the newest, greatest

5    thing we have, is comparison ratings?

6           MR. VAZQUEZ:  Object to form.  Compound.

7       A     Most of the information I saw related to

8    that also included other features.

9           The website search, searches I did would

10   be an exception to that, in that they bolded the

11   physician ratings and reviews.  The first snippet one

12   would see if you pulled up to find a doctor search,

13   for example.  And I did not see other features

14   because there's just one half-sentence line that

15   you'll get on the web page.

16      Q     (BY MR. STIMPSON)  Is that attached as an

17   exhibit or anything, or did you print any of that?

18      A     I have printed it and reference it in

19   appendix C.

20      Q     So it's in appendix C?

21      A     I believe so.

22      Q     Is the actual document that we can look at

23   in appendix C?

24      A     I have one of them here.

25      Q     Well, let's first focus on your report.  I

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 141

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     view of it is, it's a rule that courts have cited

3     when determining royalty damages as to whether a

4     patent holder can assert a royalty based on the

5     entire value of a product that the patented features

6     are a part of that product, would be a high level

7     description of it.

8          Q    Okay.  And under what circumstances are

9     you allowed to seek a royalty based on the entire

10    market value?

11         A    First, I have not done that here.  Second,

12    the courts have laid out guidelines or requirements

13    that relate to a demonstration of the patented

14    features being a basis of demand for the product.

15         Q    Right.  So in order to get royalties based

16    on the entire product, it's the plaintiff's burden to

17    show that the patented features is the basis for the

18    customer demand, correct?

19              MR. VAZQUEZ:  Form.  Calls for a legal

20    conclusion.

21         A    It's my general understanding.  But also

22    I'm aware that there can be adjustments in the

23    royalty rate to account for non-patented -- or in the

24    base or the royalty rate, to account for features

25    other than the patented features.

EXHIBIT D

Page 142

1       CONFIDENTIAL - ATTORNEYS EYES ONLY

2       Q     (BY MR. STIMPSON)  Okay.  So then you do

3   not agree with this statement, that the requirement

4   to prove that the patented feature drives demand for

5   the entire product may not be avoided by the use of a

6   smaller royalty rate?

7           MR. VAZQUEZ:  Form.

8       A     My answer to that would be one could

9   reduce the royalty base for features unrelated to the

10  patent or reduce the rate.

11          In this case, Health Grades had a

12  licensing history of applying license rates to ad

13  revenue.  And I thought that was most realistic in a

14  hypothetical negotiation, but adjusted the royalty

15  rate to account for value in features other than the

16  patented features.

17          MR. STIMPSON:  Move to strike everything

18  after, starting with in this case as nonresponsive.

19          MR. VAZQUEZ:  Denied.

20          MR. STIMPSON:  Okay.  Thanks, Judge.

21      Q     (BY MR. STIMPSON)  So, Mr. Hall, in your

22  analysis, you think it's okay to get royalties on the

23  entire market value simply by using a smaller royalty

24  rate?

25      A     That's not my testimony.

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 144

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2     A     In this case I think there's a -- while

3     there's the demonstration that reasonably -- one can

4     reasonably conclude that the patented features are a

5     substantial basis for the demand, I adjusted the

6     royalty rate downward to account for other features

7     as I think the two parties in hypothetical

8     negotiation would reasonably negotiate with one

9     another.

10          With Health Grades asserting that the '060

11    Patent is very valuable to attracting traffic and

12    therefore advertising revenue, Vitals arguing that

13    it's not, but we want it anyway.  But we have other

14    nice features so we're not going to negotiate a rate

15    lower.

16          And so in this case I could have adjusted

17    the royalty base down by a percentage and then

18    applied a higher royalty, but I thought it was most

19    reasonable to track what the parties would have done,

20    given past indications, that to apply an adjusted

21    down royalty rate to Vitals' infringing advertising

22    rates.

23     Q     (BY MR. STIMPSON)  Okay.  I'm sorry, we

24    had a miscommunication there.  So I have to move to

25    strike as nonresponsive.

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2     visitors for reasons unrelated to the patent.

3           The but-for causation analysis that I did

4     does not give Health Grades all of that website

5     traffic and therefore ad revenue.

6           MR. STIMPSON:  Okay.

7           MR. VAZQUEZ:  Scott, can we take a break?

8           MR. STIMPSON:  Yeah, sure.  Let's do it

9     now.  That's fine.

10          (Recess taken from 12:19 p.m. to

11    1:21 p.m.)

12     Q     (BY MR. STIMPSON)  Mr. Hall, I just need

13    to back up a bit because there's some things, going

14    through my notes, that I probably should have filled

15    in some holes that I didn't earlier.

16          When you were talking about attachment 1

17    to your report, the income, we talked about the

18    business activities associated with the '060 Patent.

19    We went through that for quite some time.

20          Do you remember that?

21     A     Yes.

22     Q     And you also said you included in that

23    attachment 1 revenues from departments that generated

24    revenue from the '060 Patent, I think.  So what

25    departments were those?

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 149

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2          A       Departments 00, 24, 25 -- or 24, 25, 28,
3     29, 63, 64, 65 and InHealth, LLC.  And to restate or
4     be clear, any part of the '060 Patent, whether it's
5     information or ratings, that visits that was the
6     criteria in how these departments were selected.
7               And then once the department is selected
8     because if it's either expense or revenues related to
9     any part of the '060 Patent, I included all of the
10    departmental financial information, to be complete.
11         Q       Okay.  So for example, if you had just one
12    department that only worked on, like information that
13    goes into a report, that information is referenced
14    somewhere in the claims of the patent, you would
15    include that department?
16         A       Yes.
17         Q       Okay.  So all you were doing, is this
18    right -- you reference the department numbers from
19    the top of attachment 1, right?
20         A       Yes.
21         Q       And to find out what departments those
22    are, I would have to go back into the documents that
23    were attached as Exhibit C?
24         A       Yes.
25         Q       And identify them?

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 180

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     Health Grades starts out by dictating, look, you have

3     to have a license.

4          The way a hypothetical negotiation is

5     constructed, there would be assumption of

6     infringement and it would be Vitals certainly going

7     to Health Grades and saying, Look, we want to use

8     these patented features, we're about to use them, and

9     we want a license agreement.

10         And Health Grades would look and evaluate,

11    okay, a competitor, one that Vitals identified as its

12    having just one competitor in its business overview

13    at that time, wants to license something we believe

14    very, as John O'Neal (sic) testified, important and

15    revenue and value driven for Health Grades, including

16    the unique patient experience at their website.

17         And your competitor wants to license that

18    from you.  I think the way I have approached, told

19    you the specific factors, the analytical method,

20    value and high profitability that they would come to

21    a 12 percent royalty rate, that that's reasonable.

22    But also allows Vitals to keep a large portion of its

23    advertising profit for other reasons, including those

24    features unrelated to the '060 Patent.

25         Q    Okay.  So let's change it a little bit,

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 185

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2    infringer's market share, spread it throughout the

3    market and the patent holder would get a share of

4    that, but for the infringement analysis.  And that

5    would be an acceptable way to calculate lost profits.

6          Q    Would you agree with me, Mr. Hall, that

7    which companies you include in your definition of the

8    market is very important to a Mar-Flo analysis?

9          A    It's a factor.  Certainly, the biggest

10   factor is the percent of the market that a patent

11   holder and the patent infringer have and the size of

12   the market.

13             I think it's good to know who the other

14   entities are, so an assessment can be beyond just a

15   damage expert's, as to the non-infringing acceptable

16   alternative or not.

17         Q    Right.  Well you can't do the Mar-Flo

18   analysis properly without knowing all the entities

19   that are in the hypothetical market, right?

20         A    You may be able to, mathematically.  I

21   have done it with an identification of competitors in

22   the market.  And then I also did one with a different

23   set of competitors that Mr. Napper asserts are part

24   of the market.

25         Q    Okay.  In this Exhibit 3a we have, this is

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 186

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     where you tell us where you think the market would

3     be -- this is where you show us what you think are

4     the competitors in the market for your Mar-Flo

5     analysis, right?

6               MR. VAZQUEZ:  Attachment 3a, right?

7          Q    (BY MR. STIMPSON)  Attachment 3a.  Is that

8     correct?

9          A    Yes, it is.

10         Q    Why didn't you include WebMD in there?

11         A    Well, WebMD is an online provider of

12    healthcare information.  It was not identified in my

13    first point of reference, which is who Vitals viewed

14    in mid 2010 as its competitors.  And then, further,

15    in discussions with Health Grades, with Allen Dodge

16    and Andrea Pearson, while it was mentioned as a

17    player, quote, in a broader market of healthcare

18    information, it was also not viewed by them as a

19    direct competitor for the advertising revenue in

20    particular and web hits that are indicated on

21    attachment 3a.

22         Q    So the bottom line is, you just didn't

23    think, from your discussions with the Health Grades

24    folks, you just didn't think WebMD was close enough

25    to the Health Grades website to justify including it

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 187

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      in this analysis?

3              MR. VAZQUEZ:  Object to form.  Misstates

4      the testimony.

5         A     No, that's not how I would state it.

6         Q     (BY MR. STIMPSON)  Okay.  Well, I need a

7      little bit more clarification, then, because I don't

8      understand why you didn't include it.

9              Could you please tell me?

10        A     Yes.  A starting point for my analysis was

11     who Vitals believed -- and its two business

12     overviews -- who their competitors were.

13        Q     So why did you start with who Vitals

14     believed their competitors were, rather than who

15     Health Grades believed who their competitors were?

16        A     Well, it's really a parallel analysis, but

17     since I had access to Health Grades's personnel and

18     documents for Vitals, I started with Vitals'

19     documents.

20        Q     Okay.

21        A     And it's important to assess both.  And

22     under their business overview progress strategy plans

23     at Bates MDx 0012724, for a document that is at about

24     the time of the hypothetical negotiation or would

25     have been the hypothetical negotiation, it's a

EXHIBIT D

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 188

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2    section called marketplace in competition.

3            And I've reflected on the lower part of

4    attachment 3a the information from Vitals' assessment

5    of the marketplace in competition.  And that is

6    Health Grades, Vitals, uCompareHealth, Angie's List

7    and rateMDs.  And that's the bottom part indicated

8    August 2010.

9            And from there, or in addition to that

10   understanding of pre-litigation assessment of the

11   market, I also inquired with Health Grades who they

12   viewed as their competitors.  And they named several

13   of the same competitors that Vitals had identified.

14   Also thought that locatedoc.com and ZocDoc were

15   competitors as well.

16           And so I reflected in the two sections

17   above on 3a the market with those two added.  But

18   also wanted to keep Vitals' assessment of it at the

19   bottom.

20       Q     Did you talk to Mr. Neal about this?

21       A     I did not.  I read Mr. Neal's deposition

22   testimony.

23       Q     Do you know what a 30(b)(6) deponent is?

24       A     I do.

25       Q     The 30(b)(6) deponent is the deponent who

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 221

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2              MR. VAZQUEZ:  Form.

3      A     For Angie's List, that could be.  But this

4  section you're referring to is in the hypothetical

5  negotiation where there's an assumption of validity

6  and infringement and I'm evaluating Vitals and their

7  wanting to negotiate with Health Grades, in fact a

8  requirement that they come to an agreement in the

9  hypothetical negotiation and will be using the '060

10  Patent for its version or view of an effective

11  website.

12      Q     (BY MR. STIMPSON)  Right.

13      A     So that's the context of the paragraph

14  you're pointing to.

15      Q     Right.  But in that hypothetical

16  negotiation both sides would understand that just

17  like Angie's List, MDx doesn't really need the

18  '060 Patent to compete in this space and make money,

19  right?

20              MR. VAZQUEZ:  Form.

21      A     They likely would assert that and say they

22  have other features.  And I have accounted for that.

23  But at the same time the hypothetical negotiation

24  requires ultimate agreement.  So that certainly, I

25  think, would be I think a negotiation posture by

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 244

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    they're not '060 licensed.  And so I have considered

3    all of them and I have listed them as such and

4    addressed them in my report, and the Georgia-Pacific

5    factors attachment.

6        Q    How do they influence your royalty rate

7    determination?

8        A    One, there's two that establish a

9    precedent for applying a royalty rate to ad revenue,

10   that concept.  And two, the points of reference that

11   Health Grades would reasonably have in mind as I sat

12   down with Health Grades -- I'm sorry, with Vitals, as

13   Vitals would have their license agreement in mind as

14   they sat down with Health Grades as well.

15           Whether directly comparable or not.  And

16   in this case, I have not seen a license that is

17   directly comparable.

18       Q    You also refer to the agreement with Kroll

19   on paragraph 69, right?

20       A    I do.

21       Q    And does that impact your reasonable

22   royalty analysis at all?

23       A    As part of Vitals' agreement with Kroll?

24       Q    Yeah.  Does that agreement impact your

25   reasonable royalty analysis?

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 255

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2     that the only reason one would go to either Health
3     Grades or Vitals is the features of the '060 Patent.
4     There are other features that would drive traffic,
5     but that the '060 Patent features are ones they
6     promoted and certainly a part of, an important part
7     of the reason the two companies cite.
8          Q     So did you do anything, any kind of
9     allocation to try to figure out what part of this
10    revenue would have been attributable to use of the
11    '060 features, as opposed to all the unpatented
12    features on the website?
13         A     I did not make that assessment or
14    speculate as to that.
15         Q     Right.  That would be speculation,
16    wouldn't it?
17         A     I would want to see the basis for anybody
18    doing that and certainly would have looked with
19    interest if Mr. Napper had done that.  But I did not
20    see a basis or way to do it that, in my mind, would
21    be reasonable.  So I wasn't asked, nor did I
22    undertake that analysis.
23         Q     And so you have no way to tell us today
24    what part of these projected revenue streams were
25    projected because of the features of the '060 Patent,

**EXHIBIT D**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 303

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2    traffic.  We've talked about that earlier, though.
 3          I disagree that I failed to satisfy the
 4    criteria set forth in Panduit factor 2.
 5    Q     That's the substitutes?
 6    A     Correct.
 7    Q     Do you agree that wellness.com,
 8    healthcare.com and doctor.com had combined market
 9    shares of 20 percent and 25 percent in July 2010 and
10    2011, as he states on page 35?
11    A     I saw the Quancast data for that that he
12    cites.  I could not corroborate that with Comscore,
13    which is one of the reasons I ran the apportionment
14    analysis with Mr. Napper's market share figures, in
15    case the parties decided to agree on the market or
16    market share or the Court decided on one or other of
17    the market shares.
18          So I see that data and I saw it in the
19    Quancast support, but I was not able to corroborate
20    it with Comscore.
21          MR. VAZQUEZ:  We skipped ahead.  Do you
22    want to keep going page by page?
23          MR. STIMPSON:  Whatever he wants to do is
24    fine.
25    A     The blanket rule or not rule, blanket
```

EXHIBIT D