Civil Action No. 11-CV-00520-PAB-BNB

**HEALTH GRADES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO PARTIALLY EXCLUDE EXPERT TESTIMONY OF DR. RICHARD G. COOPER PURSUANT TO FED. R. EVID. 403 AND 702, AND DAUBERT V. MERRIL DOW PHARMS., INC., 509 U.S. 579 (1993)**

---

**Exhibit K**

**June 13, 2012 Deposition of John Neal**
*(selected portions; highlighting added)*

Attorneys' Eyes Only

Page 1

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2            IN THE UNITED STATES DISTRICT COURT

3              FOR THE DISTRICT OF COLORADO

4    Case No. 11-CV-00520-PAB-BNB

5    _____

6    30(b)(6) DEPOSITION OF HEALTH GRADES, INC.,

7    Representative John Neal

8    and

9    DEPOSITION OF JOHN NEAL

10   June 13, 2012

11   _____

12

     HEALTH GRADES, INC.,

13

     Plaintiff,

14

     v.

15

     MDX MEDICAL, INC. d/b/a VITALS.COM,

16

     Defendant.

17   _____

18

19

20

21

22

23

24

25    Job No. NJ399592

Attorneys' Eyes Only

Page 2

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     APPEARANCES:
 3         MERCHANT & GOULD
              By Kristin L. Stoll-DeBell, Esq.
 4               1050 17th Street
                 Suite 1950
 5               Denver, CO 80265
                 Phone: 303.357.1670
 6               Fax: 303.357.1671
                 kstolldebell@merchant-gould.com
 7               Appearing on behalf of the
                 plaintiff
 8
 9         ROTHGERBER JOHNSON & LYONS LLP
              By Jesus Manuel Vazquez Jr., Esq.
10               1200 Seventeenth Street
                 Suite 3000
11               Denver, CO 80202-5855
                 Phone: 303.623.9000
12               Fax: 303.623.9222
                 jvazquez@rothgerber.com
13               Appearing on behalf of the
                 Plaintiff
14
           SILLS CUMMIS & GROSS, PC
15            By Scott D. Stimpson,  Esq.
                 David C. Lee, Esq.
16               30 Rockefeller Plaza
                 New York, NY 10112
17               Phone: 212.643.7000
                 Fax: 212.653.6500
18               sstimpson@sillscummis.com
                 Appearing on behalf the Defendant
19
20
21
22
23
24
25
```

Attorneys' Eyes Only

Page 3

1        CONFIDENTIAL - ATTORNEYS EYES ONLY

2            Pursuant to Notice and the Federal Rules of

3    Civil Procedure, the 30(b)(6) Deposition of Health

4    Grades, Inc. and Deposition of John Neal, called by

5    Defendant, was taken on Wednesday, June 13, 2012,

6    commencing at 8:22 a.m., at 1200 Seventeenth Street,

7    Suite 3000, Denver, Colorado, before Kelly A.

8    Mackereth, Certified Shorthand Reporter, Registered

9    Professional Reporter, Certified Realtime Reporter

10   and Notary Public within Colorado.

11

                     *  *  *  *  *  *  *

12                    I N D E X

13

     EXAMINATION                          PAGE

14

      BY MR. STIMPSON                        6

15    BY MR. VAZQUEZ                        316

16

     PRODUCTION REQUEST(S):

17

      None.

18

19

20

21

22

23

24

25

Attorneys' Eyes Only

Page 4

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2                  INDEX OF EXHIBITS
3
                                          INITIAL
4     DESCRIPTION                         REFERENCE
5
        Exhibit 44  MDx Medical, Inc.'s Notice of    12
6                   Deposition of John Neal
7       Exhibit 45  MDx Medical, Inc.'s Notice of    38
                    30(b)(6) Deposition of Health
8                   Grades
9       Exhibit 46  Project Development Plan,       164
                    4/15/2004
10
        Exhibit 47  E-mail string re Patient        166
11                  Experience Survey
12      Exhibit 48  E-mail string re Patient        173
                    Experience Survey
13
        Exhibit 49  Patient Experience Survey       179
14
        Exhibit 50  2/16/05 e-mail from Montroy to  212
15                  Hicks re Consumer Update
16      Exhibit 51  E-mail string re Health Grades' 215
                    reports, w/attachments
17
        Exhibit 52  1/19/05 e-mail from Neal to     237
18                  Kerry Hicks re presentation,
                    w/attachments
19
        Exhibit 53  3/24/05 e-mail from Loughran to 255
20                  Neal, et al.
21      Exhibit 54  E-mail string re Vitals.com     272
22      Exhibit 55  E-mail string re Vitals new     279
                    posting on their hospital
23                  program
24      Exhibit 56  E-mail string re Vitals/UCompare 284
25

Veritext/NJ Reporting Company

Attorneys' Eyes Only

```
                                              Page 5

 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2
                                         INITIAL
 3    DESCRIPTION                        REFERENCE
 4
      Exhibit 57  Complaint and Demand for Jury   291
 5               Trial
 6    Exhibit 58  E-mail string re Vitals.com      293
 7    Exhibit 59  E-mail string re Insurance       296
                 Provider Filter for Search
 8
      Exhibit 60  3/17/08 e-mail from Neal to      299
 9               Hicks, et al., w/attachment re
                 Target List
10
      Exhibit 61  E-mail string re Vitals.com      312
11               hospital ratings
12
      PREVIOUSLY MARKED EXHIBITS
13
14    Exhibit 3                                    13
      Exhibit 4                                   269
15    Exhibit 8                                   108
      Exhibit 10                                  249
16    Exhibit 12                                  267
      Exhibit 20                                  103
17    Exhibit 21                                   99
      Exhibit 25                                  157
18    Exhibit 26                                  205
      Exhibit 27                                  209
19    Exhibit 29                                  168
20
21
22
23
24
25
```

Attorneys' Eyes Only

Page 59

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A     Well, there are.  And it's essentially so

3    there really are -- there are two phases that the

4    company has gone through from a product standpoint.

5    Those reports had a number of different names, but

6    essentially they were all the same thing.

7              So Physician Quality Report, Hospital

8    Quality Report, Physician Quality Comparison Report.

9       Q     So --

10      A     That is --

11      Q     Go ahead.

12      A     -- those were solutions that we offered,

13   or products we offered, to the consumers.  Go ahead.

14      Q     Does a Physician Quality Report have

15   comparison ratings of healthcare providers?

16      A     The Physician Quality Comparison Report

17   did not have a comparison rating of providers.

18      Q     Okay.  I think what I heard you say that

19   what fell under the patent claims were the Physician

20   Quality Report, Hospital Quality Report, and

21   Physician Comparison Report.

22              Did I get that wrong?

23      A     That fell under the claim?

24      Q     Yeah, did either --

25      A     No, the point I was making is that there

Attorneys' Eyes Only

Page 60

```
1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2      were a number of products that were a function of the

3      website experience that we created.  The website

4      experience in the offerings that we made to consumers

5      were the subject of the patent.

6          Q     Okay.  But I'm trying to get an

7      identification of the products and services that

8      embody or employ any claim of the patent-in-suit.

9          A     Understood.  There are elements that we

10     employ today on the website.  If you go to Health

11     Grades we're employing certain embodiments of the

12     patent.

13         Q     Okay.  I mean, can you --

14               MR. VAZQUEZ:  Hold on.  I'm not having a

15     chance to interject.  I just want to make an

16     objection to form to the last question, please.

17         Q     (BY MR. STIMPSON)  Can you please identify

18     for me products or services of Health Grades that

19     embody or employ any claim in the patent-in-suit?

20               MR. VAZQUEZ:  Form.

21               You can answer.

22         A     Okay.  First of all, there is the

23     experience on the current version of the Health

24     Grades website and previous iterations whereby we

25     facilitate search on multiple physicians and provide
```

Page 61

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     quality comparison ratings and scores on the

3     physicians and facilitate comparison of physicians,

4     okay?  That's just the website experience, not

5     specific to any specific product.

6               And then there are a series of products

7     that we have offered, primarily to hospital clients,

8     that are a result of or a function of that experience

9     on the Health Grades website.

10       Q     Well, what's the earliest product or

11    service that Health Grades embodies or employs in a

12    claim in the patent-in-suit?

13       A     I can't speak to the specific claims and

14    products to those individual claims, per se.  I just

15    know I have an idea of the dates when we offered

16    specific products.

17       Q     Well, when was the -- when did you start

18    offering products and services that embodied or

19    employed the claim in the patent-in-suit?

20               MR. VAZQUEZ:  Form.

21       A     So you're talking about third-party

22    provided information, physician provided information,

23    consumer provided information, in providing a form of

24    comparison rating for those?

25       Q     (BY MR. STIMPSON)   I am.

Attorneys' Eyes Only

Page 62

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A      That was -- that would have been more

3   recently in the -- kind of the 2006, 2007 timeframe.

4      Q      Do you remember when, specifically when in

5   2006 and 2007?

6      A      I don't know exactly what dates in that

7   timeframe.  I can tell you the consideration that we

8   had and the sensitivity was, and the reason that we

9   didn't present that information to users of the

10   website is that our clients are hospitals, large

11   hospital systems.  And they have relationships with

12   physicians.

13          And there was the concern, the very real

14   concern, that anything we might do to shed light on

15   physicians or rate physicians, provide comparisons of

16   physicians based on quality, would put our revenue at

17   risk with our hospital clients.

18          So we're very thoughtful and judicious in

19   our approach as to when we introduced that and then

20   how we introduced it on the website.

21      Q      Was that a concern about when you

22   introduced it to the consumer side of the website?

23      A      Well, there was just one side.  There was

24   only a consumer side.

25      Q      Right.  But you also had a physician site,

Attorneys' Eyes Only

Page 63

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     right?

3          A     There was a portal, a physician portal.

4          Q     So what I'm getting at, there was a time

5     before you allowed general consumers to get on where

6     you were showing comparison ratings and ratings of

7     physicians but just to your hospital side of your

8     clients, right?

9          A     I'm unaware of that.

10         Q     Okay.  So anyway, we talked about the

11    products and services of Health Grades that embody or

12    employ a claim in the patent-in-suit.

13              Just talking about that, who are your

14    competitors?

15         A     So competitors, Vitals, of course; New

16    Compare Healthcare; WebMD.  There are MD Ratings.

17         Q     MD Ratings?

18         A     Yeah, I think it's MD Ratings.  There are

19    a couple of physician rating sites that provide

20    comparison ratings.  There are a host of directory

21    type sites that provide basic physician information.

22              So Internet Yellow Page sites like Super

23    Pages, Yellow Book, Yellowpages dot com.  There are

24    others, too, that could fall into that definition of

25    competitor that I provided.

Attorneys' Eyes Only

Page 64

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2       Q     Is it fair to say that Health Grades has
 3   dozens of competitors in this space?
 4       A     I think there are categories of
 5   competitors, and I would say, yeah, that's an
 6   accurate statement.
 7       Q     Since 2010, how has Vitals hurt Health
 8   Grades by its accused website?
 9             MR. VAZQUEZ:  Object to form.
10       A     I think that there's no doubt that what
11   they've done in replicating a lot of what we do, it's
12   allowed them to attract an audience.  And I think
13   that's detrimental to Health Grades in that they've
14   redirected consumer interest and traffic.
15       Q     (BY MR. STIMPSON)  Anything else?
16             MR. VAZQUEZ:  Object to form.  Calls for
17   expert testimony.
18       A     That's the primary concern.
19       Q     (BY MR. STIMPSON)  So as we sit here
20   today, you can't think of any other way that Health
21   Grades has been harmed by the presence of MDx, the
22   Vitals website, correct?
23             MR. VAZQUEZ:  Object to form.  Calls for
24   expert testimony.
25       A     I'm sorry, can I answer?
```

Attorneys' Eyes Only

Page 94

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     names?

3          A     It did.

4          Q     Pardon me?

5          A     It did.  We had different names, but that

6     was kind of one we landed on as being the primary.  I

7     can't recall exactly which ones were external in

8     terms of what was communicated or accessible via the

9     website in terms of the name.

10         Q     Can you remember any other of the names?

11         A     For the Physician Quality Comparison

12    Report?

13         Q     No, the Physician Research Comparison

14    Report.

15         A     Physician research.

16         Q     It's actually in your deposition notice

17    down there.

18               If you have it, Jesus.  It's under your

19    notebook maybe?

20               MR. VAZQUEZ:  I have it right there.

21         Q     (BY MR. STIMPSON)  It's in that

22    parenthetical, the first one, Physician Research

23    Comparison Report.

24               Do you remember any other names that that

25    used to go by?

Attorneys' Eyes Only

Page 95

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2        A     There was a -- I thought we had the one

3    that we had taken to market was Physician Comparison

4    Report, although reviewing the reports, I can't

5    recall which one was the one that was in that.

6        Q     Have you ever heard the name, how about

7    Comparative Physician Report, is that the same thing?

8        A     Well, it could be.  I would be speculating

9    to say for certain if that's the case.

10       Q     Do you know any other names of the

11   Physician Research Comparison Report?

12       A     They all contain some version of

13   comparison or comparative.  And that's really the

14   distinction.  They all have that commonality.

15       Q     Okay.  Did they have patient ratings?

16             MR. VAZQUEZ:  Form.

17       A     They did not.

18       Q     (BY MR. STIMPSON)  Okay.  How do you know

19   that?

20       A     Because the content of the report was --

21   it was the third-party data that I referenced

22   earlier.  So both that Physician Quality Report and

23   the Physician Research Comparison Report was a

24   compilation of third-party data that was combined

25   into this named report.

Attorneys' Eyes Only

Page 96

1           CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q    How do you know that?

3      A    Because in preparing for this deposition,

4  I looked at the report, and I also recall having

5  seen, you know, that report.

6      Q    Did you discuss this with your -- and I

7  just want a yes or no.  Did you discuss this with

8  your counsel between our first -- after our -- during

9  our first break?

10     A    I never said that I hadn't seen these

11  reports.  I said I had some uncertainty about the

12  timing of the reports.

13     Q    Okay.  So did the Physician Research

14  Comparison Report contain comparison ratings of

15  healthcare providers?

16          MR. VAZQUEZ:  Form.

17     A    There was -- it was just a -- the answer

18  is no.

19     Q    (BY MR. STIMPSON)  Um-hum.

20     A    It was just a comparison of -- it was

21  third-party data that was compiled into a single

22  report.

23     Q    Okay.  And what was the comparison, then,

24  in those reports?

25     A    So there was no overt comparison.  There

Attorneys' Eyes Only

Page 97

1              CONFIDENTIAL - ATTORNEYS EYES ONLY

2       wasn't a means to compare doctors, other than we

3       provided third-party data on each physician.

4              So, for example, if someone is looking at

5       an orthopedic surgeon, that one physician may have

6       board certification, another may not.  So as we

7       present all of the elements for each of those

8       physicians that were available, via these third-party

9       sources, that could be a means by which consumers

10      could compare.  And that was the reason behind the

11      name.

12             But there wasn't an overt comparison

13      mechanism in those reports.

14        Q     Did you ever see a comparative physician

15      report that did have comparison ratings of healthcare

16      providers?

17             MR. VAZQUEZ:  Form.

18        A     We -- per my prior comments, we were

19      sensitive to introducing anything in the way of

20      physician ratings to consumers because of the risk to

21      the business.  We didn't do that until much later.

22        Q     (BY MR. STIMPSON)  Okay.

23        A     That report, that was kind of, you know,

24      the 2004, 2005 timeframe, and we didn't introduce

25      those physician ratings until -- it would have been

Attorneys' Eyes Only

Page 98

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2    much later.  It would have been 2006-ish.  It may be

3    even early 2007 because of the risk that it posed to

4    our business.

5         Q    Did you disclose -- are you aware of

6    comparative physician reports that were offered on

7    that physician consumer site that had ratings of

8    healthcare providers?

9              MR. VAZQUEZ:  Form.

10        A    Was I aware -- I'm sorry, do you mind

11   repeating?

12        Q    (BY MR. STIMPSON)  Were you aware of

13   comparative physician reports that included ratings

14   of healthcare providers that were offered on the

15   physician consumer site?

16        A    No.

17        Q    Have you ever seen a Comparative Physician

18   Report that has consumer ratings?  I mean comparison

19   ratings?

20        A    Have I ever seen one?

21        Q    Yes.

22             MR. VAZQUEZ:  Form.

23        A    That has?  At any point in time?

24        Q    (BY MR. STIMPSON)  Yes.

25        A    Yeah, our website today is a version of

Attorneys' Eyes Only

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     that.

3          Q     How about before 2006, did you ever see a

4     Comparative Physician Report that had healthcare

5     provider ratings?

6          A     No.

7          Q     Let me show you what has been marked

8     previously.  Let me show you what has been previously

9     marked as Exhibit 21.  If you would identify that for

10    me, please.

11         A     Do you want me to go through every page?

12         Q     You don't have to.  I'll point you to

13    specific pages.

14         A     Okay.

15         Q     The cover e-mail, this is an e-mail from

16    yourself to Scott Montroy on April 17, 2003, correct?

17    That's the bottom part.

18         A     That's what I'm looking at.

19         Q     And then Mr. Montroy responds to you the

20    same day, copying Dave Hicks, correct?

21         A     Okay, yes.

22         Q     And the subject is a sample report?

23         A     Right.

24         Q     And you're asking Mr. Montroy to forward

25    you a sample doctor report?

Attorneys' Eyes Only

Page 140

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2        Q    Okay.  You have to answer.

3        A    Oh, I'm sorry.

4        Q    Yes?

5        A    Consumers, at that point in time, based on

6    the report we're looking at, in 2004, they were able

7    to access the third-party data provided consumer

8    comparison reports.

9        Q    Right.  And some of that data, as we've

10   been over in the claim, contained information on

11   gender, right?  The Physician Quality Comparison

12   Report included information on gender, right?

13       A    I'm not sure how the claim relates.

14   Again, I'm not counsel.  I'm not an attorney.  I

15   don't know how the claim relates to what we may or

16   may not have been doing on the website in 2004.

17       Q    Okay.  I'm not asking that, though,

18   Mr. Neal.  My question was --

19       A    But you were reading -- I'm sorry.  You

20   were reading that to me, which is part of the patent

21   application, which requires an interpretation.

22       Q    I'm just asking you a factual question,

23   sir.  You understood that in 2004, the Physician

24   Quality Comparison Report had information on

25   healthcare provider gender, right?

Veritext/NJ Reporting Company

800-227-8440                                    973-410-4040

Page 141

1            CONFIDENTIAL - ATTORNEYS EYES ONLY

2       A    It did.

3       Q    Okay.  You understood that in 2004, the

4  Physician Quality Comparison Report had information

5  on specialty information?

6       A    It did.

7       Q    You understood that in 2004, the Physician

8  Quality Comparison Report had information on

9  healthcare provider age, right?

10       A    Age was not in there.  I think we

11  determined that it was years in medical practice.

12       Q    Okay.  And you understood that in 2004,

13  the Physician Quality Comparison Report had

14  information on, yes, years in profession, years in

15  practice, right?

16       A    Yes.

17       Q    Okay.  And you understood that in 2004,

18  the Physician Quality Comparison Report showed

19  comparison ratings of healthcare providers, right?

20       A    There were no comparison ratings of

21  healthcare providers.

22       Q    Okay.  Can you please turn to 32073?

23       A    32073.

24       Q    Okay.  And that's referencing hospitals

25  there, right?

Page 142

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2      A      Those are hospitals, not physicians.

3      Q      Right.  Hospitals, as you told me earlier,

4   are healthcare providers, right?

5      A      Okay.  I'm sorry.  By definition, that was

6   the broader definition to include hospitals.  Okay.

7      Q      Okay.  Right?  So with that understanding,

8   you understood that the Physician Quality Comparison

9   Reports in 2004 showed comparison ratings of

10  healthcare providers, right?

11         MR. VAZQUEZ:  Form.

12      A      They provided comparison ratings of

13  hospitals.  Very important distinction.

14         MR. STIMPSON:  Okay.  Move to strike as

15  nonresponsive.

16         Can you read the question back?

17         (Record read as requested.)

18         MR. VAZQUEZ:  Form.

19      A      It provided comparison ratings of only

20  hospitals.

21      Q      (BY MR. STIMPSON)  All right.  And as you

22  talked about earlier, hospitals can be considered

23  healthcare providers, correct?

24      A      That's for someone else to determine.

25  I've heard multiple uses of providers, which is the

Attorneys' Eyes Only

Page 250

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Q     (BY MR. STIMPSON)  I show you what has

3   been marked as Exhibit 10, Mr. Neal.

4            Have you seen this document before?

5      A     Press Release, I do recall seeing this.

6      Q     And this confirms that as of

7   August 2, 2005, Health Grades was adding physician --

8   adding physician satisfaction survey results to its

9   Physician Quality Reports, correct?

10     A     That's what the document says.

11     Q     It also confirms that detailed physician

12  and practice information from physicians themselves

13  are being added as of that date?

14     A     Yes, that's what it says.

15     Q     What was the first time, to your

16  recollection, that comparison ratings were provided

17  to the Health Grades reports?

18            MR. VAZQUEZ:  Object to form.

19     A     What's the definition of a comparison

20  rating?

21     Q     (BY MR. STIMPSON)  Well, what do you

22  understand it to be?

23     A     By my definition, a comparison rating is a

24  score or rating that's assigned to an individual

25  physician.

Veritext/NJ Reporting Company

800-227-8440                                    973-410-4040

Attorneys' Eyes Only

Page 251

```
 1                CONFIDENTIAL - ATTORNEYS EYES ONLY

 2          Q      Okay.  Using that definition, when were

 3     comparison ratings first added to Health Grades'

 4     reports?

 5                MR. VAZQUEZ:  Form.

 6          A      I don't know.

 7          Q      (BY MR. STIMPSON)  Well, how would the

 8     comparison ratings then differ from the physician

 9     satisfaction surveys, under your definition?

10          A      The survey is just a survey.

11          Q      Okay.

12          A      We haven't assigned any type of rating or

13     score.  It's just a survey.

14          Q      Okay.  So how were they displayed in the

15     Physician Quality Reports then?

16          A      It would have just been the actual survey

17     results, a compilation of those, but there were no

18     scores assigned, and that was intentional for the

19     reasons that I mentioned previously, because it was a

20     risk to our business model.

21          Q      All right.  So as of August 2, though, we

22     have physician satisfaction surveys and detailed

23     physician and practice information from physicians in

24     the quality reports, right?

25          A      That's what this indicates.
```

Attorneys' Eyes Only

Page 252

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2                  MR. STIMPSON:  David, could I have this,

3      please?

4          Q    (BY MR. STIMPSON)  Actually, before I get

5      to this document, let me ask you this.  The Drucker

6      report we saw in Exhibit 51, why didn't you disclose

7      that to the Patent and Trademark Office in connection

8      with the application that led to the '060 patent?

9          A    We weren't patenting the Drucker report.

10     It was unrelated to what we were patenting.

11         Q    Any other reasons?

12         A    I think that's probably a good enough

13     reason, at least in my mind.

14         Q    All right.  And how, in your mind, did

15     what you were patenting differ from the Drucker

16     report?

17         A    The Drucker report was a prototype.  It

18     was for us to try to gain an understanding and try to

19     conceptualize certain thoughts and ideas that we had.

20             But as it turns out, we ended up doing

21     things differently.  And maybe as a result of that,

22     that influenced our future ideas in the way that we

23     presented information and results and combined those

24     results on our website.

25         Q    So you said the reason you didn't disclose

Attorneys' Eyes Only

Page 253

```
 1              CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      it was because it was unrelated, and I asked you how.
 3      And one reason you gave me was it was a prototype,
 4      right?
 5              A      Right.
 6              Q      Any other reasons?
 7              A      Why we didn't disclose it?
 8              Q      Yeah.
 9              A      It was not central to what we were
10      patenting.
11              Q      Why not?
12              A      The patent was about the experience for
13      the consumer on our website and specifically how we
14      combined different elements of data to make it
15      relevant to their experience and allowed them to
16      differentiate physicians.
17                     And the way that we were doing it was all
18      about the experience, not an individual physician
19      profile on our website.  It was the overall
20      experience.
21                     So a report takes many forms.  It's not
22      just a physician profile.  It's a list of physicians
23      that are presented within search results.  It's many
24      different things.  It's that form of presentation and
25      the content of that presentation and the means of
```

Attorneys' Eyes Only

Page 254

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     differentiation which made up the patent.  That

3     didn't exist in the Drucker report.

4          Q     Anything else?  Anything else?  Any other

5     reasons?

6          A     Not that I can recall right now.

7          Q     Why don't you get the patent, Exhibit 3,

8     please.

9          A     Okay.

10         Q     And you know where the claims are, right?

11    Look at claim 1, starting with column 20.  Sir, at

12    the back, column 20.

13         A     Column 20?

14         Q     Yeah.

15         A     Got it.

16         Q     Can you go through that claim 1, sir,

17    and -- actually, let me back up here.

18              Can I just have his last answer read back,

19    something about it was not central to what we were

20    patenting?

21              (Record read as requested.)

22         Q     (BY MR. STIMPSON)  Okay.  We'll talk about

23    that a bit later.

24              You had -- apart from the Drucker report,

25    you had the Health Grades website, it was available

Attorneys' Eyes Only

Page 255

1          CONFIDENTIAL - ATTORNEYS EYES ONLY

2     as of 2004.  Consumers could get on and do searches

3     for healthcare providers, right?

4          A     Yes.

5          Q     Let me show you what has been marked as

6     Exhibit 53.  It's a two-page document bearing Bates

7     number HG 0209051 to 52.

8                (Exhibit 53 marked.)

9          Q     (BY MR. STIMPSON)  Actually, Mr. Neal,

10    before I move on, though, I exhausted your reasons --

11    I just wanted to make sure I exhausted your reasons

12    for why the Drucker report was not disclosed.

13         A     To the best of my recollection, I shared

14    with you --

15         Q     Okay.  Take a second and take a look at

16    this e-mail and then I'll ask you some questions.

17         A     Okay.

18               MR. STIMPSON:  Jesus, same reason for

19    redacting?

20               MR. VAZQUEZ:  Yes.  Pretty much any one

21    that will be on the top like that is forwarding.

22               MR. STIMPSON:  Gotcha.

23         A     Okay.

24         Q     (BY MR. STIMPSON)  This is a series of

25    e-mails, including you as a copy holder and an