**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

**HEALTH GRADES, INC.'S REPLY IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Health Grades, Inc. ("Health Grades") respectfully submits this reply to MDx's

Opposition [Dkt. 407] to Health Grades' Motion for Partial Summary Judgment [Dkt. 369].

## I.   SUMMARY OF THE REPLY

MDx "admitted" 59 of 70 facts listed in the Statement of Undisputed Facts of Health

Grades' Motion and admitted the substance of four more statements of fact.  These admissions of

undisputed material fact by MDx demonstrate that MDx cannot meet its burden to prove

invalidity and inequitable conduct as a matter of law and that Health Grades is entitled to

summary judgment.  Despite MDx's attempts to muddy the record and create confusion, the

issues involved in Health Grades Motion are straightforward:

<u>Invalidity by Anticipation</u>

- Anticipation requires proof, by clear and convincing evidence, that a single prior art reference qualifies under a subsection of 35 U.S.C.§102 *and* includes "each and every element" of the asserted claims.  If even a single element is missing, there can be no anticipation *as a matter of law.*

- It is undisputed that all of the asserted claims require "comparison ratings of healthcare providers" in "the healthcare provider report on the first healthcare provider."

- This Court's construction of "comparison ratings of healthcare providers" requires "*multiple* ratings of [*human*] healthcare providers." This is an issue of law that should be decided on summary judgment.

- It is undisputed that "any reference dated" *after* August 29, 2005 does "not qualify as prior art under §102(b)."

- It is undisputed that none of the evidence cited by MDx (or Dr. Cooper) show use of *multiple* ratings of *human* healthcare providers as claimed *before* August 29, 2005. Therefore, there is no anticipation under §102(b) as a matter of law.

- The Early HG Reports and Services are based on the work of the '060 patent inventors and thus cannot qualify as prior art under §102(a) as a matter of law.  Therefore, there is no anticipation under §102(a) as a matter of law.

<u>Invalidity by Obviousness</u>

- The law requires the party asserting obviousness to explain why it would change the prior art (either by combining references or substituting features) to achieve the claimed invention.

- In this case, the prior art included comparison ratings of hospitals but not comparison ratings of physicians.

- Neither MDx, nor its expert, have explained why it would have been obvious to substitute physician ratings for hospital ratings.  Their conclusory statements that it would have been obvious to do so are insufficient as a matter of law.

<u>Inequitable Conduct</u>

- Inequitable conduct requires proof that the withheld references are "but for" material to patentability.

- As described above, none of the references anticipate or render obvious any of the asserted claims.  Therefore, they are not material to patentability.

- MDx cannot prove that the "single most reasonable inference" is that the '060 patent inventors intended to deceive the Patent Office.

As such, this Court should grant summary judgment of no invalidity and no inequitable conduct.

Although the issues that are ripe for *this* summary judgment motion are straightforward, MDx does not address them head-on as required by the Court's Summary Judgment Practice Standards.  Instead, MDx's Opposition flagrantly violates the letter and spirit of the Practice

Standards.  In the section it mislabeled "Responses to Allegedly Undisputed Facts," MDx included arguments about materiality of facts that it admitted even though such arguments are not permitted.  *See* Practice Standards, Sections III(F)(3)(b)(iv) and (vii).  Similarly, in another section it mislabeled "Disputed (and Undisputed) Facts Ignored by Health Grades," MDx listed 123 additional "facts" without specifying which ones it claims are disputed or undisputed, and most of which contain legal argument, no citations to record evidence, and/or which do not relate to any of the issues raised in Health Grades' Motion.  All of this is a further violation of the Practice Standards.  *See* Practice Standards, Section III(F)(3)(b)(v).

## II.    **REPLY CONCERNING UNDISPUTED FACTS**[1]

7.    SUMF ¶7 stated:

The "Early HG Reports and Services" are the only prior art references that Dr. Cooper relies on for his invalidity analysis of independent claims 1 and 15. (Invalidity Report at ¶33, p. 8 (Ex. D).)

MDx disputes this fact, but cites only to a Health Grades press release in support of its denial. The press release, however, relates to changes made to one of the specific reports (i.e., physician quality reports) that are included within the Early HG Reports and Services listed in ¶33 of Dr. Cooper's Invalidity Report.  (Opp. Ex. U (Dkt. 407-14).)  As such, this fact should be deemed admitted.

---

[1]    MDx admitted 59 of the 70 undisputed material facts listed in Health Grades' Statement of Undisputed Material Facts ("SUMF"), but made arguments as to why some of these facts are not material.  *See,* e.g., Opp. at pp. 2-12 (¶¶5, 6, 10, 13-15, 17, 19-20, 22, 25-27, 31, 33-42, 44-45, 49-53, 55-56, 61-63, 65, 67, and 70).  These arguments violate Sections III(F)(3)(b)(iv) and (vii) of this Court's Practice Standards and should be disregarded. *See* Motion to Strike Sections of MDx Medical, Inc.'s Opposition to Health Grades, Inc.'s Motion for Partial Summary Judgment (Dkt. 407) for Failure to Follow the June 2012 Practice Standards (Civil Cases) ("Motion to Strike"), filed concurrently herewith.

28.     SUMF ¶28 listed the deposition testimony MDx cited to "support its argument that the Early HG Reports and Services anticipate or render obvious the Comparison Ratings Element."  MDx "denied" this fact based on semantics, arguing that claims, not "single claim elements," are anticipated or obvious.  (Opp. at p. 6.)  MDx did admit the substance of this paragraph, but argued that this evidence was "not exhaustive."  However, MDx did not cite any deposition testimony that was missing from this paragraph. As such, this fact should be deemed admitted.

29.     SUMF ¶29 listed the deposition testimony Dr. Cooper cited to "support his argument that the Early HG Reports and Services anticipate or render obvious the Comparison Ratings Element."  MDx "denied" this fact based on semantics, arguing that claims, not "single claim elements," are anticipated or obvious.  (Opp. at p. 6.)  MDx did admit the substance of this paragraph, but argued that this evidence was "not exhaustive."  However, MDx did not cite any other evidence or deposition testimony that was missing from this paragraph. As such, this fact should be deemed admitted.

32.     SUMF ¶32 states:

> Pages 153-154 of the Neal Dep. do not discuss ratings of human healthcare providers. (Neal Dep. at pp. 153-154 (Ex. J).)

MDx "denied" this fact stating:

> 32. Denied, in that the testimony addressed comparison ratings of healthcare providers, and comparison reports on physicians, all of which is evidence at least of the obviousness of comparison ratings of physicians. HG Exhibit J, at pages 153-54.

(Opp. at p. 6.)  Although MDx "denied" this fact, it did not deny the substance of it.  Further, it cannot be denied that Mr. Neal did *not* discuss *ratings* of human *healthcare* providers at pp. 153-154 of his deposition:

Q.  So you're telling me, Mr. Neal, that a user could not look at this Physician Quality Comparison Report and look, for example, and see that Central Baptist Hospital in neurosciences -- I'm sorry, in pulmonary, has a three-star rating, and also note from the same exact document that Pattie A. Clay Hospital in Richmond, Kentucky had a five-star rating in pulmonary, right?

MR. VAZQUEZ: What is the question?

Q.  (BY MR. STIMPSON) The user could do that, right?

A.  They could look at this report and see that information.

Q.  Right, and the way they do that is they look at the ratings for the Central Baptist Hospital under pulmonary, and then they compare it to the Pattie A. Clay Hospital, pulmonary, right, and you'd see that the Pattie A. Clay Hospital had a much better rating than the Central Baptist Hospital, correct?

A.  A consumer might do that.

Q.  If a consumer did that -- well, let me just back up.  Actually, that's exactly the reason why these ratings are here, right, so the consumers can compare these ratings to these various hospitals in the various areas, right?

A.  That may be a reason why.

Q.  (BY MR. STIMPSON) Okay. Thank you. Now, you also knew that the Health Grades website was managed by Health Grades in the 2004 timeframe, right?

A.  The Health Grades website -- I'm just repeating the question. Repeat the question, please.  (Record read as requested.)

A.  Okay, yes, I did.

Q.  (BY MR. STIMPSON) And you knew that the Physician Quality Comparison Reports for 2004 included board certification, right?

A.  Correct.

Q.  You knew that came from third parties?

A.  It did.

Q.  Okay. And you knew it included licensure, right?

A.  I believe that was one of the elements we identified, yes.

Q.  And you knew that came from third parties?

(Neal Dep. at pp. 153-154 (HG Ex. J) (Dkt. 369-15).)  As such, this fact should be deemed

admitted.

III.   __RESPONSE CONCERNING DISPUTED FACTS__[2]

1.      Health Grades disputes this statement.

2.      Health Grades disputes this statement.

3.      It is undisputed, for purposes of this motion only, that the '060 patent is not entitled to the February 8, 2006 priority date.  (Motion at p. 6, n.2.)  Health Grades disputes the remainder of this statement.

4.      Health Grades disputes this statement.

5.      Health Grades disputes this statement.

6.      Health Grades disputes this statement.

7.      Health Grades disputes this statement.

8.      Health Grades disputes this statement.

9.      Health Grades disputes this statement.

10.      Health Grades disputes this statement.

11.      Health Grades disputes this statement.

12.      Health Grades disputes this statement.

13.      It is undisputed that the following documents were publicly disclosed on Health Grades' website before February 8, 2006:  Ex. E (Dkt. 369-5); Ex. F1 (Dkt. 369-7); Ex. F2 (Dkt.

---

[2]      Instead of providing a "Statement of Additional *Disputed* Facts" as required by Section III(F)(3)(b)(v) of the Court's Practice Standards, MDx's Opposition includes a section entitled: "Disputed (and Undisputed) Facts Ignored by Health Grades."  (Opp. at p. 12.)  In this section, MDx did not specify which of the 123 so-called "facts" it contends are disputed and which it contends are undisputed.  MDx's failure to follow the rules makes it impossible for Health Grades to comply with the requirement that it "either admit that the fact is disputed or supply a brief factual explanation for its position that the fact is undisputed" as required by Section III(F)(3)(b)(vi) of the Practice Standards.   Thus, Health Grades will indicate its position as to whether each statement set forth in Section II of MDx's Opposition is disputed or undisputed, and if Health Grades does not dispute a statement, Health Grades will include a cite to evidence in the record indicating that such statement is undisputed.

369-8); Ex. F3 (Dkt. 369-9); Ex. F4 (Dkt. 369-10); Ex. F5 (Dkt. 369-11); and Ex. G (Dkt. 369-12). Health Grades disputes the remainder of this statement.

14.     It is undisputed that Health Grades is a different entity than the three inventors of the '060 patent.  Health Grades disputes the remainder of this statement.

15.     Health Grades disputes this statement.

16.     It is undisputed that the following documents were published on Health Grades' website before February 8, 2006:  Ex. E; Ex. F1; Ex. F2; Ex. F3; Ex. F4; Ex. F5; and Ex. G. Health Grades disputes the remainder of this statement.

17.     It is undisputed that the following documents were in printed publications on Health Grades' website before February 8, 2006:  Ex. E; Ex. F1; Ex. F2; Ex. F3; Ex. F4; Ex. F5; and Ex. G.  Health Grades disputes the remainder of this statement.

18.     It is undisputed that the following documents were in public use on Health Grades' website at least one year before the August 29, 2006 filing date:  Ex. E; Ex. F1; Ex. F2; Ex. F3; Ex. F4; Ex. F5; and Ex. G.  Health Grades disputes the remainder of this statement.

19.     Health Grades disputes this statement.

20.     It is undisputed that the following documents were in printed publications on Health Grades' website at least one year before the August 29, 2006 filing date:  Ex. E; Ex. F1; Ex. F2; Ex. F3; Ex. F4; Ex. F5; and Ex. G.  Health Grades disputes the remainder of this statement.

21.     It is undisputed that the Drucker Report, shown in HG Ex. G (Dkt. 369-12), was published on the Health Grades website more than one year before the application filing date of the '060 patent.  Health Grades disputes the remainder of this statement.

22.     It is undisputed that the Drucker Report, shown in HG Ex. G, was obtained over the Health Grades website, by requests from users, and was publicly disclosed.  (Neal Dep. at pp. 211:12-19 (Ex. 369-15).)  Health Grades disputes the remainder of this statement.

23.     Health Grades disputes this statement.

24.     Health Grades disputes this statement.

25.     It is undisputed that the only claim element that the Health Grades' Motion asserts to be missing from the prior art is "comparison ratings of healthcare providers".  (Motion at pp. 2-3.)  Health Grades disputes the remainder of this statement.

26.     Health Grades disputes this statement.

27.     Health Grades disputes this statement.

28.     Health Grades disputes this statement.

29.     Health Grades disputes this statement.

30.     Health Grades disputes this statement.

31.     Health Grades disputes this statement.

32.     Health Grades disputes this statement.

33.     This statement is undisputed.  (Motion at pp. 1-3.)

34.     Health Grades disputes this statement.

35.     It is undisputed that Health Grades' interrogatory response stated:  "Health Grades has seen significant commercial success and unexpected results since it **began to launch** the commercial embodiment of the patents-in-suit in summer 2005."  (Ex. A at p. 14 (Dkt. 407-1) (emphasis added).)

36.     Health Grades disputes this statement.

37.     It is undisputed that Health Grades **began** launching the first version of the Physician New Media Marketing ("PNMM"), Hospital On-Line Marketing ("HOM"), and Physician On-Line Marketing ("POM") in the Spring/Summer 2005.  (Ex. A at p. 5 (Dkt. 407-1) (emphasis added).)

38.     Health Grades disputes this statement.

39.     Health Grades disputes this statement.

40.     Health Grades disputes this statement.

41.     It is undisputed that Health Grades has argued that overall patient ratings for multiple doctors constitutes the claimed comparison ratings.  (Infringement Contentions at pp. 34-35 & 53-54 (Dkt. 406-7).)  Health Grades disputes the remainder of this statement.

42.     Health Grades disputes this statement.

43.     It is undisputed that Health Grades has argued that *MDx's* patient choice award is another comparison rating when it includes the "Patient Choice" mark next to a physician's name.  MDx gives this award to physicians within its database who have "received near perfect scores as rated by patients" compared to other physicians."  (Infringement Contentions at pp. 35-36 (Dkt. 406-7).)  Health Grades disputes the remainder of this statement.

44.     It is undisputed that the Drucker Report, shown in HG Ex. G at MGHG000016 (Dkt. 369-12), and the screenshot of a Drucker Report, shown in HG Ex. I at HG0179535 (Dkt. 369-14), listed the following Awards and Honors:

> Awards and Honors:
> 2001-2002 UMDNJ Orthopaedic Chief Residents Award for Excellence in Teaching
> 1991 Mueller Foundation Research Fellow

45.     It is undisputed that the specification of the '060 patent characterizes hospitals as healthcare providers.  ('060 patent, Abstract (Dkt. 369-1).)

... 

46.     It is undisputed that the Drucker Report, shown in HG Ex. G at MGHG000019 (Dkt. 369-12), and the slide, shown in HG Ex. I at HG0179541 (Dkt. 369-14), show comparison ratings of hospitals.  Health Grades disputes the remainder of this statement.

47.     It is undisputed that the Drucker Report, shown in HG Ex. G at MGHG000019 (Dkt. 369-12), and the slide, shown in HG Ex. I at HG0179541 (Dkt. 369-14), show comparison ratings of hospitals.  It is also undisputed that some of the 1994 sample reports shown in Exhibits F1, F3-F-5 also show comparison ratings of hospitals.  Ex. F1 at p. HG0032038  (Dkt. 369-7); Ex. F3 at p. HG0032073-75 (Dkt. 369-9); Ex. F4 at p. HG0032096-98 (Dkt. 369-10).  Health Grades disputes the remainder of this statement.

48.     It is undisputed that the Drucker Report, shown in HG Ex. G (Dkt. 369-12) and HG Ex. I (Dkt. 369-14) has patient ratings of one physician, Dr. Drucker, and comparison ratings of hospitals.  (HG Ex. G at MGHG000017-19; HG Ex. I at HG0179541.)

49.     Health Grades disputes this statement.

50.     Health Grades disputes this statement.

51.     Health Grades disputes this statement.

52.     Health Grades disputes this statement.

53.     Health Grades disputes this statement.

54.     It is undisputed that Mr. Dodge testified that he believed comparison ratings were added to the PQR "sometime in 2006."  (Dodge Dep. at pp. 72-73 (Dkt. 407-8).)  Health Grades disputes the remainder of this statement.

55.      It is undisputed that Mr. Dodge testified that he believed comparison ratings were added to the PQR sometime in 2006.  (Dodge Dep. at pp. 72-73 (Dkt. 407-8).)  Health Grades disputes the remainder of this statement.

56.     It is undisputed that Mr. Dodge testified that he "believed" that patients ratings became available in the physician quality reports in 2005 and patient ratings were "certainly" available in the physician quality reports by 2006.  (Dodge Dep. at pp. 38:9-39:6, 61:6-12; 72-73 (Dkt. 407-8).)  Health Grades disputes the remainder of this statement.

57.     It is undisputed that the August 2, 2005 press release stated:  "HealthGrades recently began adding two new sets of data to its Physician Quality Reports': physician-satisfaction surveys from the consumers that visit its Web site monthly . . . ."  (Dkt. 406-3.) Health Grades disputes the remainder of this statement.

58.     Health Grades disputes this statement.

59.     Health Grades disputes this statement.

60.     This statement is undisputed.  ('060 File History (Dkt. 406-9 at MDX 0013570-13571).)

61.     Health Grades disputes this statement.

62.     Health Grades disputes this statement.

63.     Health Grades disputes this statement.

64.     Health Grades disputes this statement.

65.     This statement is undisputed.  (Cooper Report at pp. 17-19 (Dkt. 369-4).)

66.     Health Grades disputes this statement.

67.     Health Grades disputes this statement.

68.     Health Grades disputes this statement.

69.     Health Grades disputes this statement.

70.     Health Grades disputes this statement.

71.     This statement is undisputed.  ('060 File History (Dkt. 406-8 at pp. 3-10).)

11

72.     This statement is undisputed.  ('060 File History (Dkt. 406-8 at pp. 3-10).)

73.     This statement is undisputed.  ('060 File History (Dkt. 406-8 at pp. 3-10).)

74.     This statement is undisputed.  (Interrogatory Response at pp. 5-7 (Dkt. 407-1).).

75.     This statement is undisputed.  ('060 patent, pp. 1-2 (Dkt. 369-1).)

76.     MDx does not cite any evidence to support this.  Health Grades is without sufficient information to determine whether or not to dispute it.

77.     This statement is undisputed.  ('060 File History (Dkt. 406-8 at pp. 3-10).)

78.     It is undisputed that Health Grades argued:

> For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:
>
> . . .
>
> > creating, by a processor, a healthcare provider report *using the healthcare provider-verified information, the past-patient provided information, and the information verified by independent third-party sources, wherein the healthcare provider report includes comparison ratings of healthcare providers*; and
> > > providing access to the healthcare provider report over a computer
> > network.
>
> *Claim 1, supra (as amended) (emphasis added).*

('060 File History (Dkt. 406-8 at p. 28).)

79.     Health Grades disputes this statement.

80.     Health Grades disputes this statement.

81.     Health Grades disputes this statement.

82.     It is undisputed that Health Grades argued:

> For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:
>
> . . .
>
> > creating, by a processor, a healthcare provider report *using the healthcare provider-verified information, the past-patient provided information, and the information verified by independent third-party sources, wherein the healthcare provider report includes comparison ratings of healthcare providers*; and
> > > providing access to the healthcare provider report over a computer
> > network.
>
> *Claim 1, supra (as amended) (emphasis added).*

12

('060 File History (Dkt. 406-8 at p. 28).)

83.     Health Grades disputes this statement.

84.     Health Grades disputes this statement.

85.     Health Grades disputes this statement.

86.     It is undisputed that Health Grades argued:

> For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:
>
> . . .
>
> creating, by a processor, a healthcare provider report *using the healthcare provider-verified information, the past-patient provided information, and the information verified by independent third-party sources, wherein the healthcare provider report includes comparison ratings of healthcare providers*; and
>         providing access to the healthcare provider report over a computer network.
>
> *Claim 1, supra (as amended) (emphasis added).*

('060 File History (Dkt. 406-8 at p. 28).)

87.     Health Grades disputes this statement.

88.     Health Grades disputes this statement.

89.     Health Grades disputes this statement.

90.     It is undisputed that Health Grades argued:

> For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:
>
> . . .
>
> creating, by a processor, a healthcare provider report *using the healthcare provider-verified information, the past-patient provided information, and the information verified by independent third-party sources, wherein the healthcare provider report includes comparison ratings of healthcare providers*; and
>         providing access to the healthcare provider report over a computer network.
>
> *Claim 1, supra (as amended) (emphasis added).*

('060 File History (Dkt. 406-8 at p. 28).)

91.     Health Grades disputes this statement.

92.     Health Grades disputes this statement.

13

93.    Health Grades disputes this statement.

94.    It is undisputed that Health Grades argued:

> For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:
>
> . . .
>
> > *receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients*, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;
> > accessing healthcare provider-verified information about the first healthcare provider, *wherein the healthcare provider-verified information is*
> >
> > *received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;*
> > compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and *wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients*;
> > *compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;*
> > *creating*, by the at least one computer processor, *a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source*, wherein the healthcare provider report on the first healthcare provider includes *comparison ratings* of healthcare providers;
> >
> > . . . .
>
> *Claim 1, supra (as amended) (emphasis added).*

('060 File History (Dkt. 406-9 at pp. 24-25).)

96.    Health Grades disputes this statement.

97.    Health Grades disputes this statement.

98.    It is undisputed that Health Grades argued:

For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:

> . . .

> *receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients*, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;
> accessing healthcare provider-verified information about the first healthcare provider, *wherein the healthcare provider-verified information is*

> *received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;*
> compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and *wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients*;
> *compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;*
> *creating*, by the at least one computer processor, *a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source*, wherein the healthcare provider report on the first healthcare provider includes *comparison ratings* of healthcare providers;

> . . . .

*Claim 1, supra (as amended) (emphasis added).*

('060 File History (Dkt. 406-9 at pp. 24-25).)

99.     Health Grades disputes this statement.

100.    Health Grades disputes this statement.

101.    Health Grades disputes this statement.

102.    It is undisputed that Health Grades argued:

15

For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:

. . .

*receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients*, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;
accessing healthcare provider-verified information about the first healthcare provider, *wherein the healthcare provider-verified information is*

*received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;*
compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and *wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients*;
*compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;*
*creating*, by the at least one computer processor, *a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source*, wherein the healthcare provider report on the first healthcare provider includes *comparison ratings* of healthcare providers;

. . . .

*Claim 1, supra (as amended) (emphasis added).*

('060 File History (Dkt. 406-9 at pp. 24-25).)

103.   Health Grades disputes this statement.

104.   Health Grades disputes this statement.

105.   Health Grades disputes this statement.

106.   It is undisputed that Health Grades argued:

2003979841_1.doc

For example, Henley in view of Cook fail to teach or suggest at least the following with respect to claim 1:

. . .

*receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients*, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;
accessing healthcare provider-verified information about the first healthcare provider, *wherein the healthcare provider-verified information is*

*received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;*
compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and *wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients*;
*compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;*
*creating*, by the at least one computer processor, *a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source*, wherein the healthcare provider report on the first healthcare provider includes *comparison ratings* of healthcare providers;

. . . .

*Claim 1, supra (as amended) (emphasis added).*

('060 File History (Dkt. 406-9 at pp. 24-25).)

107.    Health Grades disputes this statement.

108.    Health Grades disputes this statement.

109.    Health Grades disputes this statement.

110.    Health Grades disputes this statement.

111.    Health Grades disputes this statement.

112.    Health Grades disputes this statement.

113.    Health Grades disputes this statement.

114.    Health Grades disputes this statement.

115.    Health Grades disputes this statement.

116.    Health Grades disputes this statement.

117.    Health Grades disputes this statement.

118.    Health Grades disputes this statement.

119.    Health Grades disputes this statement.

120.    Health Grades disputes this statement.

121.    Health Grades disputes this statement.

122.    Health Grades disputes this statement.

123.    Health Grades disputes this statement.

## IV.    ARGUMENT IN REPLY

### A.    The Health Grades' Inventors Own Work Cannot Be Prior Art Under §102(a) As A Matter of Law

In support of its invalidity defense, MDx relies on testimony from Allen Dodge and John Neal that comparison ratings of human healthcare providers were added to Health Grades' physician reports in 2006.  (Opp. at p. 24 (citing Dodge Dep. at pp. 72-73).)  These 2006 reports cannot be prior art under §102(b) because it is undisputed that anything dated *after* August 29, 2005 does not meet the requirements of §102(b).  (SUMF ¶5; Admitted, Opp. at p. 2.)  Instead, MDx argues that these 2006 reports are prior art under §102(a).  However, §102(a) does not apply as a matter of law to any of the alleged Health Grades' prior art in this case, including the 2006 reports, for at least the reasons explained below.

First, section 102(a), by its express language, applies only to work of "others."  MDx

does not dispute this, but rather argues that "Health Grades" is an "other" because it is different from the three inventors named on the '060 patent.  However, MDx focuses on the wrong issue. The relevant question for §102(a) is *whose invention* is being used, not who is using it.  *In re Katz*, 687 F.2d 450, 454 (CCPA 1982).  While "Health Grades" the corporation may be a different entity than the three inventors, *the Health Grades' reports are not the work of an "other"* – they are derived from the work of the inventors.  An inventor's own work, whether publicly disclosed or used by the inventor *or by someone else* (e.g., Health Grades), cannot be considered prior art under §102(a) as a matter of law.  *See, e.g.,* Manual of Patent Examining Procedure §2137 (2012) (Ex. T hereto) ("[A] disclosure by the deriver, absent a bar under 35 U.S.C. 102(b), will not bar the issuance of a patent to the party from which the subject matter was derived.  *In re Costello*, 717 F.2d 1346, 1349, 219 USPQ 389, 390-91 (Fed. Cir. 1983) ("[a] prior art reference that is not a statutory bar may be overcome by two generally recognized methods": an affidavit under 37 CFR 1.131, or an affidavit under 37 CFR 1.132 "**showing that the relevant disclosure is a description of the applicant's own work**") . . . .") (emphasis added).)  Any other interpretation of §102(a) would negate the grace period offered by §102(b). *In re Katz*, 687 F.2d 450, 454 (CCPA 1982).

In *Katz*, the Court of Customs and Patent Appeals[3] held that a printed publication that was authored by an "other" (i.e., the inventor and two non-inventors) could *not* be considered prior art under §102(a) because it was describing the work of the inventor:

> It may not be readily apparent from the statutory language that a printed publication cannot stand as a reference under § 102(a) *unless it is describing the work of another.*  A literal reading might appear to make a prior patent or printed publication "prior art" even though the disclosure is that of the applicant's own work.  **However, such an interpretation of this section of the statute would negate the one year period afforded under § 102(b) during which an inventor**

---

[3]     The CCPA was the predecessor to the U.S. Court of Appeals for the Federal Circuit.

> is allowed to perfect, develop and apply for a patent on his invention and
> publish descriptions of it if he wishes.

*Id.* (emphasis added); *see also* MPEP §2132 (applying the *In re Katz* rule to public knowledge and use under §102(a), as well as printed publications: "This holds true for all types of references eligible as prior art under 35 U.S.C. 102(a) including publications as well as public knowledge and use. Any other interpretation of 35 U.S.C. 102(a) 'would negate the one year [grace] period afforded under § 102(b).'"); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 U.S. Dist. LEXIS 90889, 82-85 (N.D. Cal. June 29, 2012) (same).

Nevertheless, MDx tries to use a so-called "admission" from Health Grades' interrogatory response to create new law surrounding §102(a).  MDx argues that Health Grades "admitted" the "invention date" was February 8, 2006 and thus anything before that must have been the work of others.  (Opp. at p. 6, AF ¶¶4, 7.)  This is ridiculous.

First, MDx's underlying premise is incorrect:  Health Grades did allege a date of invention before February 8, 2006.  In the same interrogatory response relied on by MDx, Health Grades stated conception[4] occurred and development work began on the products related to the patent in 2004:

> Although conception of various aspects of these products (and the invention
> described in the patent-in-suit) happened earlier, work began on the development
> of the . . .  products [related to the patent-in-suit] **in late 2004 continuing
> through early 2005.**

(July 2011 Interrogatory Response at p. 5 (Dkt. 407-1).)

---

[4]	The date of conception is considered the "date of invention" for purposes of §102(a) so long as there is diligence between conception and reduction to practice, either actual (building the invention) or constructive (filing a patent application).  37 CFR §1.131(b); *see also* MPEP §715 (Ex. T).

Second, inventions usually are not completed in one day, but rather evolve over time as is the case with the claimed invention of the '060 patent. Even if Health Grades did admit that that the invention was completed on February 8, 2006, it defies logic to argue that everything that happened before February 8, 2006 was *unrelated* to the work of the inventors.

Third, Health Grades should not be precluded from arguing that its own products are *not* prior art under §102(a) just because Health Grades said that the *claimed* invention was completed (i.e., conceived *and* reduced to practice) by *at least* the filing date of its provisional patent application. Indeed, Health Grades has contested MDx's reliance on §102(a) for Health Grades' prior art from the beginning of this case. To the extent that Health Grades is arguing that the claimed invention predates the Early HG Reports and Services (and has an invention date before February 8, 2006), this argument is made in response to MDx's argument that the Health Grades' prior art is the same as the claimed invention (i.e., it has all the claimed elements). Health Grades disputes this, but argues that if MDx is right, then the claimed invention must predate the Health Grades' prior art because it could not be disclosed until it was invented. In other words, §102(a) does not apply to the Health Grades' prior art because this work was derived from the inventors and it is not work from an "other."

MDx's Opposition lists several supposedly Disputed (And Undisputed) Facts Ignored By Health Grades (hereinafter referred to as "Additional Facts" or "AF") that relate to its reliance on §102(a) for its invalidity defense: AF ¶¶4-17, 40, and 54-55.[5] However, this section of the Opposition violates the Court's Practice Standards, the so-called facts are not identified by MDx as undisputed or disputed, and none of these so-called facts are material to this Motion. AF ¶¶4-12, and 40 are not material because they relate to when the inventors invented the claimed

---

[5] AF ¶¶4-17, 40, and 54-56 violate several sections of this Court's Practice Standards and should be stricken. *See* Motion to Strike, filed concurrently herewith.

invention, not whether the Early HG Reports and Services are based on the '060 patent inventors' work.  As discussed above, if the Early HG Reports and Services are covered by the '060 claims (as MDx contends), then they are based on the '060 inventors' work and do not qualify as prior art under §102(a).  Further, AF ¶¶13-17 and 54-56 are not material because they relate to Health Grades' work that is dated after the §102(b) critical date of August 29, 2005.

In sum, this Court should grant summary judgment that the Early HG Report and Services do not qualify as prior art under §102(a) as a matter of law because they are not by an "other."

**B.**     **This Court Should Grant Summary Judgment of No Anticipation Because MDx Has No Evidence That Health Grades Included Comparison Ratings (As Defined By this Court) In Its Physician Reports Before the August 29, 2005 §102(b) Critical Date**

MDx argues that the '060 patent is anticipated by the Early HG Reports and Services, which include several different kinds of reports and services that were offered by Health Grades over a period of time from 2004-2006 as shown in the timeline below:



For purposes of this motion, the parties agree that any report or service that was publicly disclosed before August 29, 2005 is prior art under §102(b).  (SUMF ¶5; Admitted, Opp. at p. 2.)

All of the asserted claims require comparison ratings of healthcare providers.  (SUMF ¶12; Admitted, Opp. at p. 3.)  Thus, to prevail on its anticipation defense, MDx must show that one of the Early HG Reports and Services was: (1) publicly disclosed before August 29, 2005; and (2) included comparison ratings of healthcare providers.  *Verdegaal Bros. v. Union Oil Co. of Cal.,* 814 F.2d 628, 631 (Fed. Cir. 1987).  MDx makes several arguments to try to show this element in Health Grades' products before the August 29, 2005 date.  Each attempt fails as a matter of law for the reasons described below.

### 1.      The Asserted Claims Require Ratings of Multiple Human Healthcare Providers

All of the asserted claims require "comparison ratings of healthcare providers," which this Court interpreted as:  "[1] ratings on **multiple healthcare providers**, [2] including the 'first healthcare provider' [who is a person], [and 3] in the report on that 'first healthcare provider,' thus permitting comparison of the 'first healthcare provider' with other potential healthcare providers."  (Markman Order at pp. 7 & 24 (emphasis added) (Dkt. 138).)  MDx half-heartedly argues that the "multiple healthcare providers" can be hospitals, even though MDx has admitted that the "first healthcare provider" is a person.  (Markman Order at p. 7.)  This argument defies logic.  The purpose of having ratings on multiple providers (part 1 of the Court's definition) is to permit comparison of the first healthcare provider, a human being, with other healthcare providers (part 3 of the Court's definition).  Ratings of hospitals cannot permit comparison with ratings of a physician (i.e., human healthcare provider).  To suggest otherwise makes no sense – it would compare apples and oranges.  As such, this Court should confirm that the Markman Order requires ratings of multiple *human* healthcare providers.

This is a question of law (i.e., claim interpretation) that should be decided on summary judgment.  *Markman v. Westview Instruments,* 517 U.S. 370, 384-85 (1996) (claim construction

is a question of law); *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1320 (Fed. Cir. 2012) ("Where

. . . the parties do not dispute any relevant facts regarding the accused product[ and] disagree

[only] over which of two possible meanings of [the claim at issue] is the proper one, the question

of literal infringement collapses to one of claim construction and is thus amenable to summary

judgment.") (citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir.

1996).)

> 2.      **None of the Early HG Reports and Services Have Ratings of Multiple Human Healthcare Providers**

MDx's Invalidity Contentions and Dr. Cooper's Invalidity Report collectively rely on

seven Health Grades' documents to support the argument that the Early HG Reports and Services

disclose the "comparison ratings of healthcare providers" claim element. However, MDx admits

that none of these documents disclose *multiple* ratings of *human* healthcare providers:

| Health Grades' Documents cited by MDx for "comparison ratings" claim element: (SUMF ¶¶13-14; Admitted, Opp. at p. 3) | Ex. No. | MDx Admits This Document Does **Not** Have Ratings of Multiple Human Healthcare Providers: |
|---|---|---|
| (1) UCHC 0000080; | HG Ex. E | SUMF ¶15; Admitted, Opp. at p. 3. |
| (2) Nursing Home Quality Comparison Report created 12/28/2004 (HG032052-57) (part of Dep. Ex. 8); | HG Ex. F2 | SUMF ¶17; Admitted, Opp. at p. 4. |
| (3) Physician Quality Comparison Report created 12/28/2004, page 17-18 (HG0032078-79) (part of Dep. Ex. 8); | HG Ex. F3 | SUMF ¶17; Admitted, Opp. at p. 4. |
| (4) Physician Quality Report created 12/28/2004, pages 9-10 (comparison to national data) (HG0032094-95) (part of Dep. Ex. 8); | HG Ex. F4 | SUMF ¶17; Admitted, Opp. at p. 4. |
| (5) Physician Quality Report created 06/04/2005 (i.e., Drucker Report) (MGHG 000016 – 19) (Dep. Ex. 13); | HG Ex. G | SUMF ¶¶19-20; Admitted, Opp. at p. 4. |
| (6) Health Grades' e-mail dated 8/12/2003 that relates to the "project plan for Quality Guides – updated" (Dep. Ex. 23); | HG Ex. H | SUMF ¶22; Admitted, Opp. at p. 5. |
| (7) Dep. Ex. 51. | HG Ex. I | SUMF ¶¶26-27; Admitted, Opp. at p. 5. |

MDx's Invalidity Contentions and Dr. Cooper's Invalidity Report collectively rely on the following testimony to support the argument that the Early HG Reports and Services disclose "comparison ratings of healthcare providers" claim element.  However, none of this testimony states that Health Grades' products included *multiple* ratings of *human* healthcare providers *before* August 29, 2005:

| Witness Testimony cited by MDx for "comparison ratings" claim element: (SUMF ¶¶28-29; Substance Admitted, Opp. p. 6) | Ex. No. | This Testimony Does <u>Not</u> Show Use of Ratings of Multiple Human Healthcare Providers Before August 29, 2005: |
|---|---|---|
| (1) Neal Deposition, page 129; | HG Ex. J | SUMF ¶30; Admitted, Opp. at p. 6. |
| (2) Neal Deposition, pages 153-54; | HG Ex. J | SUMF ¶¶31-32; Opp. at p. 6[6]. |
| (3) Neal Deposition, page 214; | HG Ex. J | SUMF ¶33; Admitted, Opp. at p. 6. |
| (4) Dodge Deposition, pages 72-73; | HG Ex. K | SUMF ¶42; Admitted, Opp. at p. 8. |
| (5) Dodge Deposition, pages 200-01; | HG Ex. K | SUMF ¶34; Admitted, Opp. at p. 7. |
| (6) Dodge Deposition, pages 225-26; | HG Ex. K | SUMF ¶¶35-37; Admitted, Opp. at p. 7. |
| (7) Montroy Deposition at pp. 224-225; and | HG Ex. H | SUMF ¶¶38-39; Admitted, Opp. at p. 7. |
| (8) Montroy Deposition at pp. 259-264. | HG Ex. H | SUMF ¶¶40-41; Admitted, Opp. at p. 7. |

Despite the foregoing admissions, MDx disputed the following Statement of Undisputed Material Fact in Health Grades' Motion:

43.    MDx's Invalidity Report does not specifically identify any witness who testified that Health Grades put comparison ratings *of physicians* in a healthcare provider report *prior to 2006.*  (Invalidity Report at ¶45, pp. 17-19 (Ex. D).

(Opp. at p. 8.)  To show this fact is disputed, MDx cited to pages 72-73 of Mr. Dodge's

---

[6]      MDx admitted SUMF ¶31.  As discussed above, although MDx "denied" SUMF ¶32, it did not deny the substance of it.  Further, it cannot be denied that Mr. Neal did *not* discuss *ratings* of human *healthcare* providers at pp. 153-154 of his deposition.  (HG Ex. J at pp. 153-154 (Dkt. 369-15).

deposition transcript (i.e., SUMF ¶42) discussed above, pages 17-19 of Dr. Cooper's Invalidity

Expert Report, and ¶¶34-70 of the Disputed (And Undisputed) Facts Ignored By Health Grades

in the Opposition.  However, none of this discloses a witness who testified that Health Grades

publicly used ratings of multiple human healthcare providers in a healthcare provider report

*before* August 29, 2005.

Pages 72-73 of Mr. Dodge's deposition say only that comparison ratings were introduced

to physician reports in 2006:

> 42.   To show the alleged existence of comparison ratings *of physicians* in the
>
> HG prior art, MDx's Invalidity Report relies the following testimony from Mr. Dodge:
>
> Q      And the PQR in 2006, that changed sometime in 2006, at least sometime
> in 2006, to include patient ratings, right?
> A      I believe it did, correct.
> Q      (BY MR. STIMPSON) Did that also change sometime in 2006 to include
> comparison ratings?
> A      I don't know the time it changed. I believe by 2006, sometime in 2006 I
> believe we did offer quality ratings. And I don't know the date it was launched.
> Q      (BY MR. STIMPSON) My question was about comparison ratings. Do
> you mean in 2006 you added comparison ratings at some time?
> A      I believe that to be the case, yes.
> Q      (BY MR. STIMPSON) But you can't tell me whether it was in the first
> half or the second half of the year?
> A      I don't recall. I can't tell you, correct.
>
> (Invalidity Report at ¶45, p. 18 (Ex. D) (citing Dodge Dep. at pp. 72-73 (Ex. K).)

(SUMF ¶42.)  This does not state that Health Grades used comparison ratings (of any kind) in

2005.  No reasonable jury could find otherwise.

All of the evidence (documents and testimony) cited at pp. 17-19 of Dr. Cooper's

Invalidity Report is addressed in the two tables shown above – none of them show use of ratings

of multiple human healthcare providers before August 29, 2005.

Finally, MDx's AF ¶¶34-70 are not material to the issue of whether MDx can meet its

burden to prove anticipation based on Health Grades' prior art because they do *not* identify any

26

witness testimony or document showing use of multiple ratings of human healthcare providers before August 29, 2005.  Specifically:

- ¶¶35, 37-38, 40, and 59 are all based on, and cite *only* to Health Grades' Interrogatory Response, discussed in detail below (Opp. Ex. A (Dkt. 407-1).)  It does not even mention comparison ratings, let alone admit any particular product had multiple ratings of human healthcare providers before the §102(b) critical date.

- ¶¶54-56 cite to pages 72-73 of Mr. Dodge's deposition discussed above (e.g., comparison ratings were introduced in 2006).

- ¶¶42, 44, 46-48, 63, 65 cite to the documents discussed above, namely:  Dep. Ex. 8 (HG Ex. F1-F5); Dep. Ex. 13 (HG Ex. G); Dep. Ex. 51 (HG Ex. I); and pp. 17-19 of Dr. Cooper's Invalidity Report (Opp. Ex. U).  None of these included ratings of multiple human healthcare providers.

- ¶¶34, 36, 39, 51-53, 63, 66, and 69-70 do not cite any evidence and should be disregarded all together.[7]

- ¶¶45, 48 relate to ratings of hospitals, not people.

- ¶¶41 and 43 cite to Health Grades' infringement claim charts against vitals.com.

- ¶¶49-50, 64, and 67-68 relate to what would be obvious to one of ordinary skill in the art.

- ¶¶61-62 relate to the qualifications of the experts.

There is simply no evidence in the record to show any prior art reference had the claimed comparison ratings.

> ### 3.   Health Grades Did Not Admit that it Publicly Used a Healthcare Provider Report that Included Comparison Ratings of Human Healthcare Providers Before the August 29, 2005 Critical Date

Undeterred by the undisputed fact that *none* of the documents produced in this case and *none* of the witnesses testified that Health Grades was publicly using comparison ratings of

---

[7]     AF ¶¶34, 36, 39, 51-53, 63, 66, and 69-70 violate several sections of this Court's Practice Standards and should be stricken.  *See* Motion to Strike, filed concurrently herewith.

human healthcare providers before the §102(b) critical date, MDx also argues that Health Grades admitted that the claimed invention of the '060 patent was publicly used in the spring/summer of 2005.  (AF ¶ 1 (Opp. at p. 12.).)  This is not true and no reasonable jury could find otherwise.

To support this argument, MDx relies on two statements (highlighted yellow below) made in interrogatory responses Health Grades served in July 2011:

> The patent-in-suit was filed in connection with Health Grades' development of products called Physician New Media Marketing ("PNMM"), Hospital On-Line Marketing ("HOM"), and Physician On-Line Marketing ("POM").  Although conception of various aspects of these products (and the invention described in the patent-in-suit) happened earlier, work began on the development of the PNMM, HOM, and POM products in late 2004 continuing through early 2005.  Health Grades began launching the first version of these products in the Spring/Summer of 2005.

(Ex. A to the Opp. at p. 5 (Dkt. 407-1) (highlighting in exhibit).)

> (4) Commercial Success and Unexpected Results:
>
> Health Grades has seen significant commercial success and unexpected results since it began to launch the commercial embodiment of the patents-in-suit in summer 2005.  For example, the total number of users, total number of visits, and total page views of its on-line information system increased at least 130% from 2005-2007 as shown in the following charts:

(*Id.* at p. 14 (Dkt. 407-1) (highlighting in exhibit).)  Neither of these statements admit that the invention as ultimately **_claimed_** in the '060 patent was in public use **_before_** **_August 29, 2005_**.

First, neither statement specifies what features and functionality were part of the products that were launched.  Although the second statement says the product was the "commercial embodiment of the patents-



in-suit," there is a difference between a "patent" and a "claimed invention" – the former covers, but is not limited to, the latter.  Indeed, the '060 patent has a robust specification that includes numerous embodiments and has supported the filing of four separate patent applications, including the application that issued as the '060 patent as shown in the drawing to the right.

Further, in the same interrogatory response, Health Grades discussed facts relating to the ***claimed invention***, thus demonstrating that distinction between the "patent" and the "claimed invention."  (Ex. A to the Opp. at p. 7 (Dkt. 407-1) (highlighting in exhibit).)   If Health Grades had meant the "claimed invention" was publicly launched in Spring/Summer 2005 it would have so stated, it did not.  MDx bears the burden of proving, by clear and convincing evidence, that Health Grades publicly used (or sold) art that is covered *by the claims* before August 29, 2005.  No reasonable jury could find that these statements are sufficient to meet this burden.

Moreover, this interrogatory response was served early in discovery and *before* this Court had issued the Markman Order.  The discovery produced in this case demonstrates that Health Grades did not launch a product that included comparison ratings of human healthcare providers until at least 2006.  Mr. Dodge, the witness who verified these interrogatory responses, testified unequivocally that Health Grades did not start including comparison ratings of physicians until 2006.  (SUMF ¶42; Admitted, Opp. at p. 8.)  Mr. Neal said the same thing.  SUMF ¶¶44-45; Admitted, Opp. at pp. 8-9.)  MDx admits that Dep Ex. 51, which includes a PowerPoint presentation entitled "Physician New Media Marketing" and thus is related to a product mentioned in this interrogatory response (i.e., PNMM), did not have multiple ratings of human healthcare providers.  (SUMF ¶¶25-26; Admitted, Opp. at p. 5.)  None of the other exhibits cited by MDx and Dr. Cooper demonstrate use of this element before August 29, 2005.  (SUMF ¶¶15, 17-20, 22, and 25-26; Admitted, Opp. at pp. 3-5.)  Thus, MDx's interpretation of the two

statements in Health Grades' interrogatory response is inconsistent with the undisputed facts identified in this Motion.

Second, neither of these statements admit that the products were launched *before* August 29, 2005.  August 30, 2005 also falls within the definition of "summer 2005" but is too late to qualify as prior art under §102(b).  A general statement that Health Grades began to launch a product in Summer 2005 is not enough for a reasonable jury to find anticipation by clear and convincing evidence under §102(b).

### 4.   The Remaining Additional Disputed Facts Cited By MDx are Not Material to the Issue of Anticipation

None of the remaining Additional Disputed Facts in MDx's Opposition are material to issue of anticipation – they do not relate to the central issue of whether or not the Early HG Report and Services disclosed multiple ratings of human healthcare providers:

- ¶¶18-22 relate to whether the Early HG Reports and Services qualify as prior art under §102(b).  Even if they all do, none of them teach "comparison ratings" as interpreted by the Court, so MDx cannot prove anticipation.

- ¶¶26-33 relate to claim limitations other than "comparison ratings," which are not at issue in this Motion.

- ¶¶71-110 and 113-123 relate to inequitable conduct.

### 5.   In sum, MDx Has Not and Cannot Show Any Prior Art Reference that Included All of the Elements of the Claims

MDx admitted 51 of the 56 Statements of Undisputed Material Facts relating to invalidity listed in Health Grades' Motion.  MDx disputed five paragraphs related to validity (¶¶23-24, 43, 48, and 54), but these are not material because they do not relate to whether the Health Grades' prior art had multiple ratings of human healthcare providers.  Further, despite MDx attempts to throw as much mud at the wall as possible with its 123 statements of Additional Disputed Facts,

these "facts" cite the same evidence over and over again, none of which proves that the Health

Grades' prior art had multiple ratings of human healthcare providers as shown in the table below:

| Exhaustive List of Evidence Cited by MDx and Dr. Cooper (collectively) | SJ Exhibit No. | Multiple Ratings of Human Healthcare Providers? | If **Yes**, Before August 29, 2005? |
|---|---|---|---|
| Printout from www.healthgrades.com (UCHC 0000080); | HG Ex. E | **NO** | |
| 12/28/2004 Nursing Home Quality Comparison Report (part of Dep. Ex. 8); | HG Ex. F2 | **NO** | |
| 12/28/2004 Physician Quality Comparison Report (part of Dep. Ex. 8); | HG Ex. F3 | **NO** | |
| 12/28/2004 Physician Quality Report (part of Dep. Ex. 8); | HG Ex. F4 | **NO** | |
| Drucker Report (Dep. Ex. 13); | HG Ex. G | **NO** | |
| Health Grades' e-mail dated 8/12/2003 (Dep. Ex. 23); | HG Ex. H | **NO** | |
| Dep. Ex. 51. | HG Ex. I | **NO** | |
| Neal Deposition | HG Ex. J | Yes | **NO** |
| Dodge Deposition | HG Ex. K | Yes | **NO** |
| Montroy Deposition | HG Ex. H | **NO** | |
| July 2011 Health Grades' Interrogatory Responses | Opp. Ex. A | **NO** | |
| Dr. Cooper Invalidity Report | Opp. Ex. U | **NO** | |

As such, this Court should grant summary judgment that the asserted claims of the '060

patent are not anticipated by the Early HG Reports and Services.

**C.    This Court Should Grant Summary Judgment of No Obviousness Because MDx's Obviousness Argument is Merely Conclusory**

MDx argues that even if the prior art does not teach comparison ratings of human

healthcare providers, the prior art included comparison ratings of hospitals in a physician report

and it would have been obvious to one of ordinary skill in the art to substitute physician ratings

for hospital ratings.  (AF ¶¶45-50, 64-70, and 112.)  However, neither MDx's invalidity

contentions nor its expert report on invalidity explain *why* it would be obvious to make this substitution.

MDx admits that the following consists of the entirety of Dr. Cooper's analysis on obviousness with respect to the comparison ratings element.

> 55.   Dr. Cooper provides the following statements regarding reasons to substitute physician ratings for hospital ratings:
>
> > Even if the element were not anticipated, the idea of comparison ratings of health care providers was disclosed in these documents, and comparisons of line items in database reports have been used to rank retrieved records for decades, **and so this use of comparison ratings for this purpose would have been extremely obvious to a Posita.**
> >
> > . . . .
> >
> > The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers. **It would be obvious to a Posita that ratings of other physicians would be a natural addition to the report.**
> >
> > See also Neal deposition pages 153-154. Dodge deposition pages 200-201 also supports concluding that this claim element was known. Dodge deposition pages 225-226 again confirms the claim element was known prior to the filing date. Defendant's deposition Exhibit 8 is also relevant. These items of evidence clearly demonstrate that the concept of having provider information and ratings available to prospective patients had been practiced in a way that the ratings could be compared. Even if hospital ratings do not meet the claim language literally, **there are plain and clear teachings that any Posita would understand that ratings of health care providers could be shown side by side for comparison purposes, and these documents provide the motivation to do so.**
> >
> > . . . .
> >
> > [A]t the very least, comparison ratings of health care provider hospitals were shown in the Early HG Reports and Services, **thus making it extremely obvious to a Posita that the same could be done with patient ratings of physicians.**
>
> (Invalidity Report at ¶45, pp. 18-19 (emphasis added) (Ex. D).)

(Opp. at p. 55.)  Dr. Cooper does not explain *why* it would be obvious to make this substitution – he says only:  "It would be obvious to a Posita that ratings of other physicians would be a natural addition to the report."  Such a conclusory statement is not sufficient.  *See, e.g., Whitserve, LLC v. Computer Packages, Inc.*, No. 2011-1206, 2011-1261, 2012 U.S. App. LEXIS 17510, *28-*29 (Fed. Cir. Aug. 7, 2012); *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D.

Va. 2011); *Degelman Indus. v. Pro-Tech Welding & Fabrication, Inc.*, No. 06-CV-6346, 2011 U.S. Dist. LEXIS 150190, at *15-16 (W.D.N.Y. May 27, 2011).

MDx argues that the law does not require it to cite to a document that explicitly discloses a reason to combine, or in this case a reason to make the substitution from hospital ratings to physician ratings. Health Grades agrees. However, the problem with Dr. Cooper's analysis is that he does not explain the basis for his obviousness opinion. The issue raised in Health Grades' motion relates to the sufficiency of the disclosure in Dr. Cooper's invalidity opinion, which issue was not addressed in any of the cases cited at pp. 38-39 of MDx's Opposition.

While, in some cases the law allows experts to rely on common sense to support an obviousness opinion, this does *not* relieve the expert from explaining that he is, in fact, relying on common sense. In *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, the Federal Circuit stated:

> Although the obviousness analysis should "take account of the inferences and creative steps that a person of ordinary skill in the art would employ," the Supreme Court emphasized that **this evidentiary flexibility does not relax the requirement that, "[t]o facilitate review, this analysis should be made explicit."** *Id.* at 418 (citing Kahn, 441 F.3d at 988 ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.")). "[T]he analysis that 'should be made explicit' refers not to the teachings in the prior art of a motivation to combine, but to the court's analysis." *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 993 (Fed. Cir. 2009). We reiterate that, on summary judgment, to invoke "common sense" or any other basis for extrapolating from prior art to a conclusion of obviousness, a district court must articulate its reasoning with sufficient clarity for review.

587 F.3d 1324, 1330 (Fed. Cir. 2009) (emphasis added). The same holds true for expert reports on invalidity – the expert must articulate his reasoning with sufficient clarity for the opposing party to be able to counter his testimony. Here, Dr. Cooper's expert report does not articulate the reasoning for his obviousness – he says only that it would be obvious. This disclosure is insufficient as a matter of law.

MDx argues that the Drucker Report teaches the concept of showing comparison ratings of hospitals in the same report as ratings of physicians and thus "it would have been obvious . . . that ratings of other healthcare providers such as physicians could be employed." (AF ¶ 65.) But MDx does not say *why* it would be obvious or for what reason a person of ordinary skill would make this substitution.

MDx's invalidity contentions do not provide any additional details on reasons to substitute. (SUMF ¶ 56.)

MDx argues that its expert, Dr. Cooper, has more healthcare experience that Health Grades' expert, Dr. Greenspun. (AF ¶¶ 61-62, 115.) While this is not true, it is not material. No amount of expertise will exempt a party from having to prove the legal requirements of obviousness by clear and convincing evidence.

MDx makes a convoluted argument about Health Grades' expert opinion that the '060 patent is entitled to priority back to the provisional application supports MDx's obviousness argument. (AF ¶¶ 66-68.) The issue of priority is not material to this motion because Health Grades is asserting that summary judgment should be granted even in the absence of priority. (Motion at p. 21 n.5.) Moreover, MDx did not make this priority argument to support obviousness in its invalidity contentions and Dr. Cooper did not make it to support his obviousness opinions in his expert report. Therefore, it should be disregarded in this Motion.

In sum, MDx's invalidity contentions and its expert report on invalidity do not provide sufficient reasons for substituting physician ratings for hospital comparison ratings as is required to show obviousness under 35 U.S.C. §103 as a matter of law. Summary judgment of no obviousness should be granted.

**D.    This Court Should Grant Summary Judgment of No Inequitable Conduct Because MDx Cannot Prove that Any of the Early HG Reports and Services Were "But For" Material to Patentability**

"Intent and materiality are separate requirements" for inequitable conduct. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (citing *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003). Health Grades' Motion argued that MDx cannot prove materiality because all of the claims require comparison ratings of human healthcare providers and none of the Health Grades' references included this element (Motion at pp. 29-30.) Yet, the argument section of MDx's Opposition (pp. 36-41) does not even address the materiality issue, let alone explain why MDx believes that it can prove any of the asserted prior art was "but-for" materiality to patentability.

Several of MDx's Additional Facts relate to the issue of materiality, but none of them are sufficient to refute the lack of but-for materiality demonstrated in Health Grades' opening Motion.

AF ¶¶77-79, 81-83, 85-87, 89-91, 93-95, 97-99, 101-103, 105-107, and 110[8] all relate to the Patent Office Rule 56 (codified at 37 C.F.R. §1.56), which is a different standard of materiality that no longer applies to inequitable conduct. *Therasense*, 649 F.3d at 1294-95 (emphasis added) (citations omitted). For example, AF ¶77 states:

> 77. The declaration signed by all the inventors explained that prior art was considered material and should be disclosed **if it refuted or was inconsistent with arguments made for patentability**. Exhibit R hereto, at pages MDX 0013416-423.

---

[8]    AF ¶¶81, 85, 89, 93, 97, 101, and 105 contain legal argument and should be stricken. *See* Motion to Strike Sections of MDx Medical, Inc.'s Opposition to Health Grades, Inc.'s Motion for Partial Summary Judgment (Dkt. 407) for Failure to Follow Practice Standards (Civil Cases), filed concurrently herewith.

(Opp. at p. 29 (emphasis added).)  The cited pages of Exhibit R are the declarations signed by the inventors, which quote from Rule 56:

> I acknowledge the duty to disclose information that is material to the patentability of this application in accordance with Title 37, Code of Federal Regulations, § 1.56 (reprinted below):
>
> **§ 1.56  Duty to disclose information material to patentability.**
>
> ****
>
> (b)    Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> (1)    It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim;
>
> or
>
> (2)    It refutes, or is inconsistent with, a position the applicant takes in:
>
> (i)    Opposing an argument of unpatentability relied on by the Office, or
>
> (ii)    Asserting an argument of patentability.
>
> ****

(Opp. Ex. R at p. MDX 0013417 (Dkt. 406-8) (highlighting added).)  The remaining paragraphs identify arguments for patentability that (MDx asserts) Health Grades made during prosecution, assert that the Health Grades' undisclosed prior art "refuted or was inconsistent with these arguments," and conclude from this that the Health Grades' undisclosed prior art was material to patentability.  However, these "fact" paragraphs use the wrong standard for materiality.

In *Therasense*, the Federal Circuit unequivocally held the materiality standards of Rule 56 do <u>not</u> apply to inequitable conduct and specifically rejected the standard for materiality asserted by MDx in AF ¶¶77-79, 81-83, 85-87, 89-91, 93-95, 97-99, 101-103, 105-107, and 110:

> **This court does not adopt the definition of materiality in PTO Rule 56.**  As an initial matter, this court is not bound by the definition of materiality in PTO rules. While this court respects the PTO's knowledge in its area of expertise, the routine invocation of inequitable conduct in patent litigation has had adverse ramifications beyond its effect on the PTO.  As discussed above, patent prosecutors, inventors, courts, and the public at large have an interest in reining in inequitable conduct. Notably, both the American Bar Association and the

36

American Intellectual Property Law Association, which represent a wide spectrum of interests, support requiring but-for materiality (which is absent from Rule 56).

. . . .

This court declines to adopt the current version of Rule 56 in defining inequitable conduct because reliance on this standard has resulted in the very problems this court sought to address by taking this case *en banc*. Rule 56 provides that information is material if it is not cumulative and:

> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>
>> (i) Opposing an argument of unpatentability relied on by the Office, or
>>
>> (ii) Asserting an argument of patentability.
>
> 37 C.F.R. § 1.56. . . .

[L]ikewise, the second prong of Rule 56 broadly encompasses anything that could be considered marginally relevant to patentability. If an applicant were to assert that his invention would have been non-obvious, for example, anything bearing any relation to obviousness could be found material under the second prong of Rule 56. **Because Rule 56 sets such a low bar for materiality, adopting this standard would inevitably result in** patent prosecutors continuing the existing practice of disclosing too much prior art of marginal relevance and **patent litigators continuing to charge inequitable conduct in nearly every case as a litigation strategy.**

*Therasense*, 649 F.3d at 1294-95 (emphasis added) (citations omitted).  As such, none of these additional "fact" paragraphs warrant denial of Health Grades' Motion.

AF ¶¶26-33 assert that the Early HG Reports and Services included claim elements other than the "comparison ratings" claim element at issue in this Motion.  They do not assert that this prior art teaches all of the claim elements or renders the claims obvious because they do not address the comparison ratings element.  Thus, they do not establish but for materiality and should be disregarded.

There are three other "fact" paragraphs that relate to materiality and none of them warrant denial of Health Grades' Motion.  AF ¶91 is a near duplicate of AF ¶34 (addressed above) and

consists of a conclusory statement that the Early HG Reports and Services disclosed comparison ratings without any specific cite to record evidence.  Instead, AF ¶91 cites to AF ¶¶34-70 (discussed in detail above), none of which disclose evidence to show public use of comparison ratings of human healthcare providers before August 29, 2005.  AF ¶¶111-112 are conclusory statements that Early HG Reports and Services anticipate and render obvious the asserted claims.  Neither cite to any record evidence.

As such, MDx's Opposition fails to demonstrate that the Early HG Reports and Services meet the standard of materiality mandated by the Federal Circuit in *Therasense*.  This Court should grant summary judgment of no inequitable conduct for this reason alone.

**E.   This Court Should Grant Summary Judgment of No Inequitable Conduct Because MDx Cannot Prove that the Single Most Reasonable Inference is that the Inventors Intended to Deceive the Patent Office**

Inequitable conduct requires proof of specific intent to deceive the Patent Office. *Therasense*, 649 F.3d at 1290-91.  MDx's inequitable conduct allegations relate to nondisclosure of information.  Therefore, MDx must provide this Court with "clear and convincing evidence that [the '060 inventors] knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290-91 (citing *Molins*, 48 F.3d at 1181 (emphases added).)  There is no direct evidence that any of the inventors specifically intended to deceive the Patent Office.  (SUMF ¶¶57-63, 65-70; admitted, Opp. at pp. 11-12.)

Nevertheless, MDx argues that this Court may infer intent to deceive from the following: (1) "the prior art references were anticipatory;" (2) the inventors disclosed less relevant prior art; (3) "the inventors could never have made the arguments they did to distinguish the Early HG Reports and Services had they not been concealed;" and (4) "the inventors had no justifications

for failing to disclose Health Grades' own critical prior art."  (Opp. at p. 39.)  None of these are sufficient as a matter of law to support an inference of specific intent to deceive.

First, intent may be not be inferred from materiality alone.  *Therasense*, 649 F.3d at 1290-91 ("a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive.").  Thus, even if the Early HG Reports and Services were anticipatory (they are not), this would not support an inference that the '060 patent inventors specifically intended to deceive the Patent Office.

Second, to meet the clear and convincing evidence standard, "**the specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence."** *Therasense*, 649 F.3d at 1290 (emphasis added) (citations omitted).   "[W]hen there are multiple reasonable inferences that may be drawn, **intent to deceive cannot be found**." *Id.* at 1291 (emphasis added) (citations omitted).  In this case, MDx argues that this Court can infer intent to deceive from the fact that Health Grades disclosed less material information to the Patent Office and the argument that the Health Grades' prior products are inconsistent with arguments Health Grades made for patentability.  Even if these were true (they are not), it is just as reasonable to infer that the inventors did not disclose the Health Grades' products because they did not think were material.  Indeed, Mr. Neal testified that he did not think these documents were material to patentability because they did not disclose comparison ratings of physicians.  (SUMF ¶¶61-63; Admitted, Opp. at p. 11.)  The other inventors do not remember anything about the nondisclosure of these references during the prosecution of the '060 patent.  (SUMF ¶¶66-70; Admitted, Opp. at p. 12.)  It is not reasonable to infer a specific intent to deceive from memory loss.  *BASF Corp.*

*v. Aristo, Inc.*, No. 2:07 CV 222 PPS, 2012 U.S. Dist. LEXIS 73910, 51-52 (N.D. Ind. May 29, 2012) (citing *Larson Mfg. Co. of South Dakota v. Aluminart Prods., Ltd.*, 559 F.3d 1317, 1341 (Fed. Cir. 2009); *Hospira, Inc. v. Sandoz Inc.*, No. 09-4591 (MLC), 2012 U.S. Dist. LEXIS 63227 (D.N.J. May 4, 2012) (holding lack of memory cannot be used to infer specific intent to deceive).

Finally, MDx argues that the inventors have no adequate excuses for failing to disclose the Health Grades' prior art. This is not true, but even if it was, it would not support a finding of inequitable conduct:

> Because the party alleging inequitable conduct bears the burden of proof, the "patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence."

*Id.* at 1291 (citations omitted). Even a finding that the misrepresentation or omission amounts to gross negligence or negligence is not enough to prove specific intent to deceive. *Id.* at 1289.

In sum, specific intent to deceive is not the single most reasonable inference to be drawn from the undisputed facts of this case. For this additional reason, this Court should grant summary judgment of no inequitable conduct.

## V.   <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should grant summary judgment in favor of Health Grades on the following issues:

(1)   The Early HG Reports and Services do not qualify as prior art under 35 U.S.C. §102(a).

(2)   The '060 patent is not anticipated by the Early HG Reports or Services or any of the other prior art references identified in MDx's Invalidity Contentions.

(3)   The '060 patent is not rendered obvious by the Early HG Reports or Services or

any of the other prior art references identified in MDx's Invalidity Contentions.

(4)     The '060 patent is not unenforceable due to inequitable conduct.

41

Dated: December 13, 2012          ROTHGERBER JOHNSON & LYONS LLP


*s/ Jesús M. Vazquez*
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
1200 17th Street, Suite 3000
Denver, Colorado  80202
Tel:  (303) 623-9000
Fax:  (303) 623-9222
Email: gkanan@rothgerber.com
            kkosto@rothgerber.com
            jvazquez@rothgerber.com

*Attorneys for Plaintiff Health Grades, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2012, I electronically filed the foregoing **HEALTH GRADES, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott David Stimpson
Scott Murray
David Chunyi Lee
Sills Cummis & Gross P.C. – New York
30 Rockefeller Plaza
New York, NY  10112
Email:  sstimpson@sillscummis.com
Email:  smurray@sillscummis.com
Email: dlee@sillscummis.com

Terence M. Ridley
Wheeler Trigg O'Donnell, LLP
1801 California Street, #3600
Denver, CO  80202-2617
Email:  ridley@wtotrial.com

*s/ Jesús M. Vazquez*
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
Rothgerber Johnson & Lyons, LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202-5855
Tel:     (303) 623-9000
Facsimile: (303) 623-9222
Email: gkanan@rothgerber.com
            kkostolansky@rothgerber.com
            jvazquez@rothgerber.com

*Attorneys for Plaintiff Health Grades, Inc.*