IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| HEALTH GRADES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MDX MEDICAL, INC. d/b/a VITALS.COM,<br><br>Defendant. | Civil Action No. 1:11-cv-00520-PAB-BNB |

**Expert Report of Brian W. Napper**

September 17, 2012

Brian W. Napper

EXPERT REPORT OF BRIAN W. NAPPER
HIGHLY CONFIDENTIAL – PURSUANT TO THE
PROTECTIVE ORDER

-1-

**EXHIBIT E**

## I.  INTRODUCTION

I, Brian W. Napper, am a Senior Managing Director in the San Francisco office of
FTI Consulting ("FTI Consulting").   I also lead FTI Consulting's national intellectual
property practice.   I provide valuation, financial, economic and accounting consulting
services, including economic valuation of intellectual property such as patents, trade secrets,
trademarks and copyrights, to counsel and client companies.  A complete copy of my current
curriculum vitae, which summarizes my qualifications and professional experience, a listing,
to the best of my recollection, of my deposition, arbitration and trial testimony over the
preceding five years, and a listing of the articles I have published in the past ten years are
attached as Exhibits 1-3.  FTI Consulting charges $595 per hour for time I spend consulting,
assessing damages and time that may be spent testifying related to my damages analysis.
Other staff members at FTI Consulting working under my direction on this matter have
billing rates of $150 to $540 per hour.  FTI Consulting's compensation is not dependent on
the outcome of this matter or the content of my testimony.

FTI Consulting was retained by Sills Cummis & Gross P.C., ("Counsel") on behalf of
MDx Medical, Inc.'s ("MDx") d/b/a Vitals.com ("Vitals" and/or "vitals.com") (collectively,
the "Defendant") to prepare certain analyses to assist the Court and/or jury (collectively, the
Court) in considering the type and amount of economic damages that may be recoverable by
HealthGrades, Inc. ("HealthGrades" or "Plaintiff") from Defendant should HealthGrades'
U.S. Patent No. 7,752,060 B2 (the '060 patent) ("patent-in-suit") be found valid, enforceable
and infringed by Defendant. I have also been asked to review and comment on the report
dated July 13, 2012 of Mr. David A. Hall ("Mr. Hall") related to HealthGrades' claims for
damages in this case (the "Hall Report").[1]

I considered information from a variety of sources in the course of my work.  These
include marketing/sales/operations presentations, license agreements, sales and financial
information produced by MDx and the Plaintiff as well as depositions, 10-Ks, press releases,
and industry information obtained by FTI Consulting from public sources, summarized in

---

[1] I have also reviewed Mr. Hall's Supplemental Expert Report dated July 20, 2012 which addresses the damages
related to the legal claims in HealthGrades' July 13th Motion (the "Hall July 20th Report").

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -2- | |

**EXHIBIT E**

Exhibit 4.[2]   While I may cite to certain documents and specific sections within such documents in this report, such pinpoint cites are for ease of review and do not suggest that other portions of the documents cited are not relevant to my analysis.

I have also held discussions with various individuals, including:

- Mitchel Rothschild, Chief Executive Officer, MDx
- Hal Polley, Chief Financial Officer, MDx
- Erika Boyer, Vice President, MDx
- Larry West, Chief Technical Officer, MDx

In connection with my anticipated trial testimony in this action, I may use as exhibits various documents produced in this litigation which refer to or relate to the matters discussed in this report.  In addition, I may create or assist in the creation of certain demonstrative or illustrative exhibits to assist me in testimony.

## II.  SUMMARY AND CONCLUSIONS

I understand that HealthGrades has alleged that MDx's website vitals.com includes features that infringe certain technology owned by HealthGrades.  Assuming the '060 patent is found valid and infringed, HealthGrades would be entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[3]

Based on my assumptions as set forth herein, including that HealthGrades will succeed in proving that MDx infringes the patent-in-suit and that MDx will not succeed in proving that the patent is invalid or unenforceable, which I make for purposes of analyzing HealthGrades' alleged damages, it is my opinion that the damages incurred by HealthGrades would be in the form of reasonable royalty based on an annual fixed amount of [REDACTED] from the date of first infringement through July 2012, resulting in total damages of no more than

---

[2] All of the license agreements that I have reviewed in this matter are summarized in Exhibit 5.
[3] Title 35 U.S.C. Section 284.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -3- | |
|---|---|---|

**EXHIBIT E**

REDACTED .[4,5]  As discussed further in this report, I have determined this royalty amount based on my consideration of the *Georgia-Pacific* factors, information such as potential design around costs and other information in this case.  I also discuss in this report other information that would support and provide data points for what HealthGrades would accept and MDx would pay for the patent-in-suit.

In determining a reasonable royalty, the construct is such that MDx would have entered into a hypothetical negotiation with HealthGrades for a license to the patent-in-suit at the date of first infringement when the patent-in-suit was issued.  It is my opinion that the hypothetical negotiation date in this matter would have taken place on July 6, 2010, the date the '060 patent issued. I discuss the facts and circumstances surrounding the hypothetical negotiation in my analysis below.

Moreover, I have reviewed the Hall Report which concludes that HealthGrades is entitled to damage payments as follows:[6]

---

[4] Total damages through the date of trial, assuming trial by the summer of 2013, would be no more than REDACTED .
  Should the Court determine that MDx stopped infringing the '060 patent in January 2011 (i.e., when MDx removed side by side comparisons and changed guidelines to show data) total reasonable royalty damages would be REDACTED from the date of first infringement through February 1, 2011.  Should the Court determine that HealthGrades did not start marking its website with the '060 patent until November 2010, total reasonable royalty damages would be REDACTED from November 1, 2010 through November 1, 2012.  Should the Court determine that HealthGrades did not start marking its website with the '060 patent until November 2010 and that MDx stopped infringing the '060 patent in January 2011, total reasonable royalty damages would be REDACTED from November 1, 2010 through February 1, 2011.  Lastly, should the Court determine that damages do not begin until MDx filed suit, then damages, assuming infringement and patent validity would not begin until March 2, 2011, approximately two months after MDx removed side by side comparisons and changed guidelines to show data.

[6] Should the Court determine that MDx stopped infringing the '060 patent in January 2011 (i.e., when MDx removed side by side comparisons and changed guidelines to show data), Mr. Hall's total lost profits plus reasonable royalty damages would be REDACTED and total reasonable royalty damages on all infringing revenue would be REDACTED from the date of first infringement through February 1, 2011.  Should the Court determine that HealthGrades did not start marking its website with the '060 patent until November 2010, Mr. Hall's total lost profits plus reasonable royalty damages would be REDACTED and total reasonable royalty damages on all infringing revenue would be REDACTED from November 1, 2010 through May 2012.  Should the Court determine that HealthGrades did not start marking its website with the '060 patent until November 2010 and that MDx stopped infringing the '060 patent in January 2011, Mr. Hall's total lost profits plus reasonable royalty damages would be REDACTED and total reasonable royalty damages on all infringing revenue would be REDACTED from November 1, 2010 through February 1, 2011.  Lastly, should the Court determine that damages do not begin until MDx filed suit, then damages, assuming infringement and patent validity would not begin until March 2, 2011, approximately two months after MDx removed side by side comparisons and changed guidelines to show data.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -4- | |

**EXHIBIT E**

(A) HealthGrades' lost profits and reasonable royalty damages suffered through May 2012 as a result of Vitals' infringement of the '060 patent are approximately REDACTED.

(B) REDACTED is a reasonable royalty resulting from a hypothetical negotiation for Vitals related to the '060 patent.

(C) Reasonable Royalty Damages on all of Vitals' infringing revenue through June 2012 are approximately REDACTED.[7,8]

Based on my understanding of the facts and circumstances surrounding this matter, as discussed below, I do not believe that lost profits is an appropriate measure of damages. Furthermore, Mr. Hall's conclusion that a REDACTED royalty would have resulted from a hypothetical negotiation is not reasonable or reliable. As such, it is my opinion that the basis and calculations supporting Mr. Hall's opinions of damages in this matter are flawed in several ways and his calculation of the amount of damages HealthGrades has allegedly suffered in this case is significantly overstated.

## III.  RESERVATION OF RIGHTS

I reserve the right to supplement my report based on my review of any additional information produced by HealthGrades or its experts, MDx, or any third party.

---

[7] Expert Report of David A. Hall dated July 13, 2012, page 6.
[8] In the Hall July 20th Report, Mr. Hall also concludes that reasonable royalty damages on Vitals' infringing licensing agreement with Aetna Life Insurance Company through March 2012 are approximately REDACTED *See* Supplemental Expert Report of David A. Hall dated July 20, 2012, page 3. I understand that the iTriage application is not part of the infringement allegations in this matter. Hence, I provide no opinion relating to damages on it in my report. However, I reserve my right to offer an opinion should iTriage become part of the case.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -5- | |
|---|---|---|

EXHIBIT E

## IV.   THE PATENTED TECHNOLOGY

My general understanding of the nature of the technology and patent-in-suit is discussed below.  I have gained this understanding through discussions with MDx personnel, depositions, and documents produced in this matter.  I have no opinion as to the technical details of the patent or any of the claims contained within.

The '060 patent, titled "Internet System for Connecting Healthcare Providers and Patients," was filed on August 29, 2006 and issued on July 6, 2010.  The inventors of the patent are David G. Hicks, Scott Montroy and John Neal and Health Grades is the assignee.[9] The '060 patent is purported to cover an "Internet-based system [that] involves a database and search capabilities for connecting patients with healthcare providers, e.g. physicians, hospitals, nursing homes, treatment facilities, etc., and further enables such providers to reach patients with whom they may not otherwise come in contact."[10]  As such, the '060 patent generally relates to a system to facilitate the process by which a patient selects a healthcare provider using an online computer network which includes usage of information provided to the patient in the form of a report, profile, ratings, including patient-provided information, physician-verified information, and information provided by an independent third party.  This information allows the patient to differentiate among healthcare providers and select the provider that best suits their personal needs.[11]

I understand from Counsel that the patent requires information received from patients to include patient ratings, and these ratings must be obtained from a survey on the website of the host web server.  The information obtained from the provider and from third parties must include for each at least three of several enumerated data elements, and those must be verified by the provider and third parties.  The system then creates a report using this information, specifically including in the report comparison ratings for other healthcare providers.[12]

---

[9] U.S. Patent No. 7,752,060 B2.
[10] U.S. Patent No. 7,752,060 B2.
[11] U.S. Patent No. 7,752,060 B2.
[12] Discussions with Counsel.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -6- | |

**EXHIBIT E**

I understand that Health Grades alleges that "MDX makes, uses, offers for sale and/or sells one of more systems, methods and/or apparatuses that are covered and claimed by the '060 patent.  Specifically, the features of the www.Vitals.com web site that enable the public to access information supplied by physicians (including the physicians with which MDX does business in Colorado), health care providers, patients, and third-party verified information, are covered by the claims in the '060 patent."[13]

## V.  INTERNET SYSTEMS USED TO CONNECT HEALTHCARE PROVIDERS AND PATIENTS

### A.  General Industry Overview

There are several websites that allow patients to find, research, compare and/or connect with doctors online ("healthcare-related websites").  These websites primarily generate revenue from advertisements, physicians, health care facilities and insurance companies.[14]

Many healthcare-related websites allow a patient to search for a doctor by name, specialty, condition and/or location.  Upon a search, the user can generally review information relating to the doctor's specialty, hospital affiliation, education, credentials, address, insurance policy and patient reviews, among other things.  Additionally, on some healthcare-related websites, users have the ability to directly schedule an appointment with a doctor online.[15]

Below is a list of the primary healthcare-related websites, along with each company's average market share as of July 2010, January 2011 and July 2011.

---

[13] Health Grades, Inc. vs. MDX Medical, Inc d/b/a VITALS.com, Complaint, page 3.

[14] http://www.usatoday.com/yourlife/health/healthcare/doctorsnurses/2011-01-03-online-appointments_N.htm

[15] http://www.usatoday.com/yourlife/health/healthcare/doctorsnurses/2011-01-03-online-appointments_N.htm

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -7- | |

EXHIBIT E

| Website / Company | Market Share | | |
|---|---|---|---|
| | Jul-10 | Jan-11 | Jul-11 |
| Healthgrades | 36.7% | 40.3% | 51.5% |
| Vitals | 15.5% | 18.4% | 17.3% |
| Wellness.com | 13.4% | 14.8% | 16.8% |
| UCompareHealthCare | 10.0% | 10.1% | 13.4% |
| Healthcare.com | 8.2% | 3.3% | 0.0% |
| Angie's List | 7.4% | 5.4% | 0.0% |
| Rate MDs | 4.9% | 3.2% | 0.5% |
| Doctor.com | 1.1% | 0.8% | 0.5% |
| Physician Reports | 0.7% | 0.3% | 0.0% |
| Vimo | 0.6% | 0.6% | 0.0% |
| Dr Score | 0.5% | 0.3% | 0.0% |
| Doctors Dig | 0.5% | 0.5% | 0.0% |
| ZocDoc | 0.2% | 0.4% | 0.0% |
| Check MD | 0.1% | 0.0% | 0.0% |
| Suggest a Doctor | 0.1% | 0.0% | 0.0% |
| Doctor Directory | 0.1% | 0.0% | 0.0% |

*Source: MDX_0007062-7072*

In addition, there are several other websites that provide users with similar information, including WebMD and U.S. News & World Report. Certain government sites, individual physician websites and internet Yellow Page sites may also provide similar information as well.

I understand that several of the websites listed above, if not all, generate a portion of their revenue from advertisements. Revenues from these advertisements are generally recognized by Cost per Thousand Impressions ("CPM"), which is based on the number of people that will be exposed to the ad by traveling to the host's website.[16]

---

[16] http://www.allbusiness.com/marketing/advertising-internet-advertising/2646-1.html#axzz26emPm94P.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -8- | |
|---|---|---|

**EXHIBIT E**

## VI.  DESCRIPTIONS AND COMPANY PROFILES

### A.  HealthGrades

HealthGrades, incorporated under the name Specialty Care Network, Inc. in 1995,[17] provides users with physician and hospital information[18] which can be found on HealthGrades' website, healthgrades.com.  Information included on the website includes physician ratings, excellence awards, directions, email links, information on why a doctor's hospital matters, tips for better health and profiles.

HealthGrades also offers physicians and hospitals the opportunity to license its ratings and trademarks, provides marketing assistance to hospitals, and/or consults with hospitals on quality improvement, among other things.[19]

HealthGrades primarily generates its revenue through its Internet Business Group and Professional Services f/k/a Provider Services.  Internet Business Group revenue includes internet advertising and sponsorship, Connecting Point[TM] and Patient Direct Connect[TM] offerings, quality reports, subscriptions to consumers and quality information to employers, health plans and others.[20]   Professional Services revenue principally includes sales of hospital marketing products and quality improvement products.[21]

On July 12, 2010, HealthGrades completed its acquisition of certain assets (principally of a technology platform) of HealthWorldWeb, "an internet-based social decision platform related to the medical and healthcare industry,"[22] including community tools, content syndication, semantic search and a proprietary recommendation engine for an upfront cash payment of $750,000 and contingent consideration with an aggregate potential payout of $1,500,000, based upon certain levels of page view targets.[23]  Additionally, I understand that HealthGrades contemplated purchasing Target Lists among other

---

[17] Bloomberg Businessweek Profile.
[18] 10-K, for the year ended 12/31/2009.
[19] HG 0163138 - 0163163 at 0163147.
[20] HG 0090175 – 0090182 at 0090176.
[21] I understand that ratings and advisory information is provided with respect to both the Internet Business Group and Professional Services.  *See* HG 0074830.
[22] HG 0090175 – 0090182 at 0090177.
[23] HG 0090175 – 0090182 at 0090177.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -9- | |

**EXHIBIT E**

companies[24] and made an offer to purchase UCompareHealthCare.com ("UCHC") from the New York Times Company.[25]

On October 7, 2010, Mountain Acquisition Corp. ("MAC") acquired HealthGrades "through its wholly owned subsidiary Mountain Merger Sub Corp. ("Mountain"), which was formed to allow Health Grades' shareholders to tender their shares to Mountain in exchange for cash."[26]

REDACTED

### B.  MDx / Vitals

MDx, founded in 2006,[30] is an "online healthcare directory service provider"[31] that provides users with "factual information on a doctor's expertise and practice, consumer reviews, and recommendations from other doctors"[32] on its primary website, vitals.com. MDx generates its revenue primarily through advertising, software and data licensing, general marketing services and physician revenue.[33]

In January 2008, MDx launched vitals.com, a healthcare information website that enables consumers to search for a doctor or dentist by name, specialty, and/or condition.  The physician information obtained by Vitals comes from a variety of public and private sources including medical boards from all 50 states, federal websites, hospitals, doctors, surveys,

---

[24] HG 0082817 - 0082830.
[25] Deposition of Allen Dodge dated June 28, 2012, pages 139-141.
[26] HG 0163138 - 0163163 at 0163146.
[27] HG 0163138 - 0163163 at 0163146.  InHealth Holdings is controlled by Vestar Capital Partners, which organized MAC for the purpose of acquiring all of the outstanding shares of HealthGrades.
[28] Deposition of Allen Dodge dated June 28, 2012, pages 155-156.  From October 2010 to December 31, 2011, InHealth was a separate subsidiary of Health Grades.  On December 31, 2011, InHealth as a legal entity was dissolved and the operations as they had existed continued within HealthGrades.
[29] http://www.vestarcapital.com/en/portfolio/.
[30] http://www.businesswire.com/news/home/20110228006227/en/York-Times-Company-Completes-Sale-UCompareHealthCare.com-MDx.
[31] MDx Medical, Inc.  Audited Financial Statements, December 31, 2011 and 2010.  MDX 0104440 – 0104466 at 0104447.
[32] http://www.vitals.com/about
[33] MDX 0073234 – 0073253 at 0073246.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -10- | |

EXHIBIT E

business alliances and third party affiliates.[34]  Vitals also provides users with doctor evaluations, assistance in scheduling appointments, and preparation for a doctor's visit, among other things.[35]

MDx primarily generates its revenue from consumer advertisements which are sold directly to customers, advertising networks and to Google and other partners,[36] which is largely driven by website traffic.

In February 2011, MDx acquired the UCHC website and database assets and certain liabilities from the New York Times Company for       REDACTED .[37]  "UCHC is primarily in a similar business as vitals.com (discussed below) and attracts approx. 40 million visitors annually."[38]  Additionally, in February 2011, MDx acquired the assets and certain liabilities of HealthLeap, LLC ("HealthLeap") for REDACTED

.  HealthLeap "has developed technologies and customers to effect online appointments with doctors and other health care providers."[39]  MDX's acquisition of UCHC created "a sizeable competitor [to HealthGrades] where one didn't exist."[40]

## VII.   LOST PROFITS DETERMINATION

I understand that for HealthGrades to be awarded lost profits as a measure of damages, it must be reasonably likely that HealthGrades would have made MDx's accused sales but for the act of infringement.  I understand from Counsel, as well as from my prior experience in patent legal proceedings, that there are different ways of establishing entitlement to lost profits.

One approach commonly used to satisfy this "but for" test is to show that the patentee and infringer operate in a two-supplier market.  When the patent owner and infringer are the

---

[34] http://www.vitals.com/faq.
[35] http://www.vitals.com/about/advertisers.
[36] Discussions with Mitch Rothschild and Hal Polley.
[37] MDX 0073234 – 0073253 at 0073254.
[38] MDX 0073234 – 0073253 at 0073254.
[39] MDX 0073234 – 0073253 at 0073255.
[40] Deposition of John Neal dated June 13, 2012, page 290.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -11- | |
| --- | --- | --- |

only suppliers of the relevant product demand, it is reasonable to infer that the patent owner would have made the sales made by the infringer.

As discussed in the following sections of my report, HealthGrades and MDx do not operate in a two supplier market, either at the time of the first infringement or at present. Hence, under this approach, it cannot be definitively proven that HealthGrades would have made every sale of MDx's allegedly infringing product, and, therefore, HealthGrades is not automatically entitled to lost profits damages under this approach.

Another approach used to satisfy this "but for" test is by meeting the following four criteria, commonly referred to as the Panduit factors.[41]

1. Demand for the patented product;

2. Absence of acceptable non-infringing substitutes;

3. Manufacturing and marketing capability to exploit demand; and,

4. Amount of the profit that the patentee would have made.

Based on my analyses and review of the documents produced to date, I do not believe that each of these four criteria have been fully satisfied and, therefore, I do not believe that it is reasonably likely that HealthGrades would have made all or any portion of MDx's allegedly infringing sales. I have summarized my observations regarding each, as follows:

1. Demand for the patented product

In order for HealthGrades to satisfy the first factor of the Panduit test, it is my understanding that HealthGrades must prove that there was a demand for the patented technology and that the accused functionality of the '060 patent drove users to Vitals' website.[42]   I understand that it is not the patented technology that drives users to Vitals' but rather Search Engine Optimization ("SEO") and other non-patented aspects of the website. Thus, only a small portion of the benefits generated by Vitals, if any, are attributable to the claimed invention.

---

[41] <u>Panduit Corp. v. Stahlin Bros. Fiber Works, Inc.</u>, 575 F.2d 1152 (6th Cir. 1978).
[42] <u>LaserDynamics Inc. v. Quanta Computer, Inc.,</u> Case Nos. 2011-1440, -1470 (Fed. Cir.).

<table>
<tr><td>EXPERT REPORT OF BRIAN W. NAPPER<br>HIGHLY CONFIDENTIAL – PURSUANT TO THE<br>PROTECTIVE ORDER</td><td>-12-</td><td></td></tr>
</table>

**EXHIBIT E**

First and foremost, I understand that SEO plays a major role in the amount of traffic a website experiences[43] which "is unrelated to [the] patent claims, and this is a major driver for website traffic unrelated to the '060 patent."[44]   According to Dr. Cooper, "[t]here is no teaching in the patent claims about how to implement search engine optimization.  Therefore, I conclude that SEO is not a claimed aspect of the invention, and this major driver of consumers to websites is unrelated to the patent."[45]  I also understand that when users visit Vitals' physician profiles through general web searches, that visit is not alleged to infringe the patented technology in the HealthGrades infringement contentions (only requests on the Vitals website are alleged to meet the claim language requiring a request for information).[46]

Mr. Allen Dodge, Executive Vice President of Finance and CFO of HealthGrades, also believes that "[m]ost sites, absent [the] WebMDs of the world, don't receive their traffic by somebody coming directly to their website.  People don't go into a search bar typically and type in, I don't believe, vitals.com, or even healthgrades.com or other sites.  WebMD is different.  They have a very strong name in terms of somebody coming directly to that website.  So my point is most sites rely on, as we talked about earlier, SEO, search engine optimization.  So I think what drives consumers to the web properties on physician search is how well do the companies search engine optimize for search terms around individual physician names or perhaps specialty in geo modifier, meaning cardiac surgeon, Denver, Colorado."[47]  Mr. Dodge states that "SEO is the biggest factor [in whether consumers search for physician information on healthgrades.com or vitals.com or both].  What's challenging within that is SEO in and of itself means nothing, meaning the algorithm that Google utilizes and other search engines, Yahoo, name [the] search engine, are not completely well known."[48]

David Hicks, Former Vice President of HealthGrades and an inventor of the '060 patent, also acknowledged that whether healthgrades.com comes up as either third or five thousandth on a list of search results on google.com (or bing.com) will affect the number of

---

[43] Deposition of Allen Dodge dated June 28, 2012, page 254 and discussions with Mitchel Rothschild.
[44] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 40.
[45] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[46] Discussions with Counsel.
[47] Deposition of Allen Dodge dated June 28, 2012, pages 253-254.
[48] Deposition of Allen Dodge dated June 28, 2012, pages 254-255.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -13- |
|---|---|

EXHIBIT E

visitors HealthGrades receives.[49] I understand that although Healthgrades, Vitals and UCHC are the principal websites that come up during related search results,[50] HealthGrades is usually listed first and users have a tendency to click on [at least] the first site.[51] Additionally, since several users visit more than one site after a Google search, a sub-set of traffic for HealthGrades, Vitals and other similar non-infringing websites is shared[52] ("co-visitors"). This is another indicator that there is no demand for the patented technology.

I understand that although the majority of Vitals' traffic is attributable to SEO, users may (re)visit the website due to its easy to use search box, good messaging, user-friendly interface[53] and proprietary data and services, all features not covered by the '060 patent. According to comScore, Inc. ("comScore"), "a third-party company that looks at [and] analyzes traffic throughout all the Web sites on the Internet and then develops roughly how many—what—I guess what the rank is within all the different Web sites, also by industry,"[54] in May 2009, Vitals' ComScore was 28, which meant that its page views per user and time on the site statistics were better than HealthGrades.[55] It was suggested by Scott Shapiro, an internet specialist at HealthGrades that one reason for this was because of the easy to use search box that Vitals had on its search page.[56] In January 2010, John Neal, HealthGrades Vice President of Business Development, also noted that with respect to its hospital ratings, MDx was "getting a decent enhanced profile capture rate. They provide good messaging, I guess, a direct phone number for physicians."[57]

I understand that in January 2011, MDx removed side-by-side comparisons on its website and changed its guidelines to show data,[58] neither of which had an impact on traffic

---

[49] Deposition of David Hicks dated January 11, 2012, page 88.
[50] Deposition of Allen Dodge dated January 11, 2012, pages 256-257.
[51] Deposition of Allen Dodge dated January 11, 2012, page 257.
[52] Deposition of John Neal dated June 13, 2012, pages 66-67.
[53] Deposition of John Neal dated June 13, 2012, page 313 -314 and H 0053581.
[54] Deposition of David Hicks dated January 11, 2012, pages 85-86.
[55] Deposition of John Neal dated June 13, 2012, page 293 and HG 0051701- 0051702.
[56] Deposition of John Neal dated June 13, 2012, page 293 and HG 0051701- 0051702.
[57] Deposition of John Neal dated June 13, 2012, page 313 and HG 0053581.
[58] Deposition of Allen Dodge dated June 28, 2012, page 138.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -14- | |

**EXHIBIT E**

to the site.[59] This too, along with the availability of numerous non-infringing alternatives, illustrates lack of demand for the patented features.

### 2. Absence of acceptable non-infringing substitutes

I understand from Richard G. Cooper, D. Sc., a consultant in the software, systems and electrical engineering field, that there are numerous websites that are acceptable substitutes for the alleged invention.[60]   Specifically, UCHC, iTriage, ratemds.com, Dcotor.com, Doctors Dig, ZocDoc, Healpth, Vimo, Check MD, Dr. Score, Physician Reports, Find A Doc, Suggest a Doc, Doctor Directory, Healthcare.com, Wellness.com and Angie's List all compete with HealthGrades for business and are acceptable substitutes to vitals.com.[61]

HeathGrades itself defines a competitor as "any website that attempts to attract consumers who are searching for provider information online.  And provider information can be in the form of physician information, hospital information, dentists,"[62] including Vitals, UCHC, WebMD, Rate MDs and Revolution Health.  According to Mr. Neal, "[t]here are a couple of physician rating sites that provide comparison ratings.  There are a host of directory type sites that provide basic physician information.  So Internet Yellow Page sites like Super Pages, Yellow Book, Yellowpages dot com.  There are others, too, that could fall into that definition of competitor that I provided."[63]  Moreover, Scott Montroy, former Vice President of Development and Business Intelligence of HealthGrades and one of the inventors of the '060 patent, stated that "over time, yeah, that more and more people are moving into that space [quality information on hospitals and physicians].  The government is, too, right?  The government—I think you can get ratings from the government."[64]  As such, it appears as if Mr. Montroy believes that if Vitals did not exist, users would have had lots of other options to get information in addition to HealthGrades.[65]

---

[59] MDX0007062-MDX007072.
[60] Declaration of Richard G.  Cooper, D.Sc. dated July 13, 2012, page 40.
[61] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 37.
[62] Deposition of John Neal dated June 13, 2012, pages 56-57.
[63] Deposition of John Neal dated June 13, 2012, page 63.
[64] Deposition of Scott Montroy dated January 16, 2012, page 154.
[65] Deposition of Scott Montroy dated January 16, 2012, pages 155-156.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -15- | |

EXHIBIT E

SEO also plays a major role in the availability of non-infringing alternatives since several users visit more than one site after a Google search.[66]

Lastly, I understand that MDx could have implemented acceptable, non-infringing alternatives and remained on the market by making any of at least the following adjustments to its website:

-By only requiring one or two items from the group of data elements from the healthcare provider.[67]

- By obtaining the information required to be from the healthcare provider from a source other than the health care provider.[68]

-By using a third party website, not managed by the company, to construct, gather and update the company website database. This approach might require partnering with another healthcare related website so that both companies benefit from the data sharing.[69]

-By getting unverified information from third parties.[70]

- By obtaining less than three of the required items from third parties.[71]

- By getting information the claims require to be from third parties from the healthcare providers. [72]

3. <u>Manufacturing and marketing capability to exploit demand</u>

I am not aware of information produced by HealthGrades related to their ability to market their website and services in order to exploit assumed increase in demand absent vitals.com in the relevant market.

4. <u>Amount of the profit that the patentee would have made</u>

---

[66] Deposition of John Neal dated June 13, 2012, pages 66-67.
[67] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[68] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[69] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 39.
[70] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[71] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 39.
[72] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 39.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -16- | |

EXHIBIT E

Based on the basis and reasoning outlined above, it is my opinion that HealthGrades has not proven that it is reasonably likely that it would have made MDx's accused sales but for the act of infringement. As such, the amount of profit that HealthGrades would have made is speculative.

## VIII.    REASONABLE ROYALTY DETERMINATION

It is my understanding that in patent infringement cases a patent holder is entitled to damages that are "in no event less than a reasonable royalty" for another's infringement, 35 U.S.C. § 284.

Reasonable royalty amounts are generally determined by evaluating economic conditions and various factors that would have been considered by the parties if they had negotiated a license agreement at the time of first infringement. This approach considers the factors discussed in *Georgia-Pacific v. United States Plywood Corp.* and a hypothetical negotiation between a willing licensee and a willing licensor.[73]  As discussed above, the hypothetical negotiations would have occurred in July 2010.

It is my understanding that in patent cases, a patent holder is entitled to "damages that are adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[74]

---

[73] *Georgia-Pacific v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120-21 (S.D.N.Y. 1970), *modified and aff'd,* 446 F.2d 295 (2d Cir. 1971).
[74] 35 U.S.C. § 284.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -17- | |

**EXHIBIT E**

A. **Evaluation of *Georgia-Pacific* Factors**

*Georgia-Pacific* established 15 factors that may be considered when determining an appropriate royalty in a patent infringement case. These 15 factors provide a framework of analysis when calculating a reasonable royalty. Each of the factors can have an effect on the potential royalty, however, all factors do not necessarily apply in each case, and the importance of each factor can vary depending on the case facts. The factors are not necessarily mutually exclusive, as certain issues discussed below under one factor may also relate to other factors, and certain items discussed above may also relate to these factors.

Below I present information in the framework of the *Georgia-Pacific* factors and discuss how this information supports my determination of the royalties Defendant would have agreed to pay HealthGrades as a result of the hypothetical negotiation.

1. <u>The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty (Factor 1)</u>

I am not aware of royalties received by HealthGrades for the licensing of the '060 patent.

This factor is neutral to my analysis of a reasonable royalty for the '060 patent.

2. <u>The rates paid by the licensee for the use of other patents comparable to the patent in suit (Factor 2)</u>

I am not aware of any rates paid by MDx for the use of other patents comparable to the patent in suit.

This factor is neutral to my analysis of a reasonable royalty for the '060 patent.

3. <u>The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold (Factor 3)</u>

| EXPERT REPORT OF BRIAN W. NAPPER<br>HIGHLY CONFIDENTIAL – PURSUANT TO THE<br>PROTECTIVE ORDER | -18- | |
|---|---|---|

**EXHIBIT E**

It is assumed that HealthGrades would have granted MDx a non-exclusive, non-restrictive license for the life of the patent.

This factor is neutral to my analysis of a reasonable royalty for the '060 patent.

4.      The Licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly (Factor 4)

REDACTED

This factor is neutral to my analysis of a reasonable royalty for the '060 patent.

5.      The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter (Factor 5)

HealthGrades, Vitals and other similar websites all provide information to users about healthcare providers, among other things.[76]  I understand that it's common for visitors to visit multiple sites and that several users visit both healthgrades.com and vitals.com.[77]

Although MDx and HealthGrades do compete on some level, I understand that at the time of the hypothetical negotiation, HealthGrades was charging a fee for an "enhanced or premium" physician report while MDx was providing a similar report for free.  In December 2010 HealthGrades stopped charging a fee "[b]ecause of several reasons.  One, [they] would like to provide as much information as possible to consumers to select their physician.  It's part of what HealthGrades stands for.  And, also, with respect to making more information

---

[75] Deposition of Allen Dodge dated June 28, 2012, page 272.
[76] Deposition of Allen Dodge dated June 28, 2012, pages 240-241.
[77] Deposition of John Neal dated June 13, 2012, page 67.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -19- | |

**EXHIBIT E**

free, typically, as least [HealthGrades] believes it provides more engagement, more folks come into the [HealthGrades] website properties."[1]

According to Mitchel Rothschild, Chief Executive Officer of MDx, "when MDx launched Vitals, they "looked around to who else was showing up in search engine results, and HealthGrades was one of probably a dozen companies that did it.  Their business model was different than Vitals, so we viewed them as not directly competitive."[78]  When asked about how HealthGrades model was different, Mr. Rothschild states that "[t]hey charged to get any information on doctors, and you needed to pay a fee to see a report.  We did not."[79]

This factor would have a slight upward influence on the royalty for the '060 patent.

6.  <u>The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales (Factor 6)</u>

According to Mr. Neal, "there is [no] direct relationship between the services and products related to the '060 patent and other products."[80]

As such, this factor would have a downward influence on the royalty for the '060 patent.

7.  <u>The duration of the patent and term of the license (Factor 7)</u>

I have assumed the license term would be for the remainder of the life of the '060 patent, which I understand is scheduled to expire on July 6, 2026.

This factor would have an upward influence on the royalty for the '060 patent.

8.  <u>The established profitability of the product made under the patent; its commercial success; and its current popularity (Factor 8)</u>

---

[78] Deposition of Mitchel Rothschild dated June 7, 2012, page 23.
[79] Deposition of Mitchel Rothschild dated June 7, 2012, page 23.
[80] Deposition of John Neal dated June 13, 2012, page 316.

**EXHIBIT E**

Although MDx has generated approximately REDACTED in advertising revenue from 2008 through May 2012, its REDACTED during this period.[81] Specifically, in 2010, Vitals REDACTED , and, in 2011, REDACTED .[82]

Notwithstanding the fact the REDACTED , I understand that its advertising revenue is primarily generated by traffic to its website which is not dependent on the '060 patent. Instead, users primarily visit Vitals as a result of SEO and other non-patented features of the Vitals site including its easy to use search box, good messaging, user-friendly interface[83] and proprietary data and services. Additionally, REDACTED .[84] This too supports the fact that MDx's advertising revenue was not generated by the '060 patent.

Although HealthGrades had a total of REDACTED in advertising revenue in 2011, I have seen no evidence that these revenues and the related profits are related to the '060 patent. First, I understand that SEO is a major driver of HealthGrades sales.[85] Second, similar to MDx, HealthGrades' advertisements are placed via directly, or through an agency or ad network relationship."[86] Specifically, "HealthGrades displays advertisements on the majority of [its] physician profile pages utilizing Google AdSense and DoubleClick's advertising network."[87]

As such, this factor has a downward influence on my royalty payment determination.

9.   The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results (Factor 9).

I have considered this factor in conjunction with Factor 10.

---

[81] MDX000104632-649, MDX000104440-446 and MDX 0104672-736.
[82] MDX000104632-649 and MDX000104440-44..
[83] Neal Deposition, page 314.
[84] MDX 0101069 and discussions with Hal Polley.
[85] Deposition of Scott Montroy dated January 16, 2012, page 100.
[86] HG 0074820 – 0074842 at 0074833.
[87] HG 0163138 - 0163163 at 0163147.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -21- | |

**EXHIBIT E**

10.     The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention (Factor 10)

I have not seen support that the patented invention has provided any benefit or added-value to either HealthGrades' and/or Vitals' websites, namely an increase in traffic volume.

First, I understand that prior art of the '060 patent includes the HealthGrades website prior to August 29, 2006, and encompasses prior art products and services of Health Grades.[88]  I also understand that HealthGrades started including comparison ratings on its website in late 2006 or 2007.[89]

Moreover, HealthGrades recognizes the importance of SEO and does not specifically identify the '060 as a contributor to its traffic volume.   According to Mr. Dodge, "traffic that comes to Health Grades' site is principally, as we discussed, related to physician search.  And the way that we've shown up in many cases very highly in physician search, as we've discussed, is due to the Google algorithm which includes numerous factors.  So my point would be probably not an individual feature necessarily."[90]

As for MDx, I understand that SEO is also the primary source for website traffic.  I also understand that when users visit Vitals' physician profiles through general web searches, that visit is not alleged to infringe the patented technology in the HealthGrades infringement contentions (only requests on the Vitals website are alleged to meet the claim language requiring a request for information).[91]

The Vitals' website includes many non-patented features that contribute to the success of the site including its easy to use search box, good messaging, user-friendly interface,[92] and proprietary data and services including doctor alerts, the ability to talk to a doctor online, health insurance information and other related features, assistance in preparing

---

[88] Declaration of Richard G.  Cooper, D.Sc. dated July 13, 2012, page 8.
[89] Deposition of Allen Dodge dated June 28, 2012, pages 72-73.
[90] Deposition of Allen Dodge dated June 28, 2012, page 276.
[91] Discussions with Counsel.
[92] Deposition of John Neal dated June 13, 2012, page 313 -314 and H 0053581.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -22- | |

**EXHIBIT E**

for doctor visits, assistance for doctors to manage their reviews, international doctor directories, other related blogs, frequently asked questions, symptom checkers, custom services, doctor responses to patient questions, patient guides for many different symptoms, doctor directories by state and location, doctors A to Z, doctors by specialty, news reports of interest to consumers and contact information and related features, among other things.[93]

*Alternatives*

I understand there were alternatives available in the marketplace at the time of the hypothetical negotiation. In addition to the alternatives already available in the marketplace, I understand that MDx could have easily designed around the '060 patent at the time of the hypothetical negotiation. According to Dr. Cooper "there are numerous ways in which the '060 patent would not be practiced because the full complement of claim elements of the asserted claims 1 and 15 would not be practiced, and thus there are various easy design-arounds to these claims."[94] Specifically, MDx could have implemented the following:

-By only requiring one or two items from the group of data elements from the healthcare provider.[95]

- By obtaining the information required to be from the healthcare provider from a source other than the health care provider.[96]

-By using a third party website, not managed by the company, to construct, gather and update the company website database. This approach might require partnering with another healthcare related website so that both companies benefit from the data sharing.[97]

-By getting unverified information from third parties.[98]

- By obtaining less than three of the required items from third parties.[99]

---

[93] http://www.vitals.com/
[94] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 40.
[95] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[96] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[97] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 39.
[98] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[99] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 39.

| | | |
|---|---|---|
| EXPERT REPORT OF BRIAN W. NAPPER<br>HIGHLY CONFIDENTIAL – PURSUANT TO THE<br>PROTECTIVE ORDER | -23- | |

**EXHIBIT E**

- By getting information the claims require to be from third parties from the healthcare providers.[100]

Based on discussions with Lawrence West, Chief Technology Officer of MDx, I understand that these changes would not impact the functionality of the website. Additionally, they likely would not impact the amount of traffic to Vitals as well.[101]  In fact, when MDx removed side-by-side comparisons on its website and changed its guidelines to show data, neither had an impact on traffic to the site.[102]  I also understand that the costs that MDx would have likely incurred in order to incorporate most, if not all, of these design around alternatives would have been no more than REDACTED.[103]  This is supported by the fact that in January 2011, when MDx removed side-by-side comparisons on its website and changed its guidelines to show data, it took a developer approximately half a day to make these changes, resulting in total costs of no more than REDACTED.[104]

In sum, since no other healthcare-related information website allegedly utilizes the '060 patent besides HealthGrades and Vitals and the patented functionality can be designed around, there is little utility, advantage or benefit provided by the patented technology.

As such, this factor has a downward influence on my royalty payment determination.

11.     <u>The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use (Factor 11)</u>

One measure of extent of use is to consider the portion of Plaintiff's and Defendant's revenue that employ the patent-in-suit. Another consideration is the impact the patented feature has had on website traffic and advertising revenue for both HealthGrades and Vitals.

---

[100] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 39.
[101] Discussions with Larry West.
[102] MDX0007062-MDX007072.
[103] Discussion with Larry West.
[104] Based on discussions with Hal Polley and Larry West, I understand that it took a developer half a day to remove side-by-side comparisons on the Vitals website and to change guidelines to show data.  Thus, assuming the average annual salary of a developer, $94,400, the total cost to make these changes was approximately $200.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -24- | |

**EXHIBIT E**

MDx's "advertising services are largely validated by third parties as to the number of impressions determined by the third party to have been delivered through the month."[105] Although Vitals has earned approximately REDACTED in advertising revenue during July 2010 through May 2012 (which is directly related to website traffic), MDx's advertising revenue is not generated by the functionality of the '060 patent. Instead, users primarily visit Vitals as a result of SEO and other non-patented features of the Vitals site including its easy to use search box, good messaging, user-friendly interface[106] and proprietary data and services. Additionally, at least REDACTED

.[107] This too illustrates that MDx's advertising revenue was not generated by the '060 patent.

I also understand that MDx gets data from third parties relating to the claim element that require the provider to provide at least three of the data elements listed.[108] However, physicians can edit the information by entering the MDx physician portal. I understand that no more than REDACTED of all physicians could have entered at least three of the data elements required to be received by the providers[109] That said, the use of the alleged invention in MDx's provider profiles is inconsequential. Similarly, the claims all require use of patient ratings obtained from the MDx website.[110] However, only REDACTED of MDx's profiles have patient ratings that include ratings from MDx's website.[111] Again, this percentage illustrates another limitation of MDx's use of the alleged invention.

As such, this factor has a downward influence on my royalty payment determination.

12.    The portion of the profit or selling price which is customary in the particular business or in comparable businesses (Factor 12)

---

[105] MDX 0104440 – 0104466 at 0104453.
[106] Neal Deposition, page 314.
[107] MDX 0101069 and discussions with Hal Polley.
[108] U.S. Patent No. 7,752,060 B2.
[109] Defendant MDX Medical, Inc.'s Second Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories, page 3.
[110] U.S. Patent No. 7,752,060 B2.
[111] U.S. Patent No. 7,752,060 B2.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -25- | |

EXHIBIT E

In this factor, I look at other indicators of value in the marketplace that may have similarity to the technology included in the '060 patent, including licenses entered into by HealthGrades and MDx for proprietary data, which is a "necessary component" and "critical contribution for an effective website."[112] Notwithstanding the fact that I have seen no evidence that the '060 patent is a necessary component and critical contribution to Vitals', these licenses likely represent the maximum value of the '060 patent. Moreover, it appears as if some of the Physician Data that HealthGrades licensed includes several of the data elements purportedly covered under the '060 patent.

*HealthGrades Data Licenses*

REDACTED

---

[112] Expert Report of David A. Hall dated July 13, 2012, page 17.
[113] HGLA0051-HGLA0058.
[114] HGLA0069-HGLA0076.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -26- | |
|---|---|---|

**EXHIBIT E**

REDACTED




*MDx Data Licenses*

REDACTED

---

[115] HGLA0020-HGLA0031.
[116] MDX0104300-MDX0104309.
[117] MDX-1-4184-MDX0104194

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -27- | |

EXHIBIT E

REDAC

---

[118] MDX0104159-MDX0104178.

[119] MDX 0104373-MDX 0104382 and MDX0104149-MDX0104158.

[120] MDX0104310-MDX0104317.
[121] MDX0104391-MDX0104405.

| EXPERT REPORT OF BRIAN W. NAPPER<br>HIGHLY CONFIDENTIAL – PURSUANT TO THE<br>PROTECTIVE ORDER | -28- | |
|---|---|---|

**EXHIBIT E**

Case 1:11-cv-00520-AB-BNB Document 412-5 Filed 11/27/12 USDC Colorado Page 29 of 40

REDACTED

 

As such, this factor provides data-points to consider in terms of the amount of a royalty payment as well as providing insight as to a preferred structure for a portion of the profit (or amount of payment) companies in the marketplace are willing to pay for data. Use of this information is consistent with the Market Approach to valuing intangible assets such as patents.

---

[122] MDX0104138-MDX0104148.
[123] Discussions with Mitchel Rothschild.
[124] MDX0103820-MDX0103826.
[125] MDX0102292-MDX0102301.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -29- | |
|---|---|---|

EXHIBIT E

13.     The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer (Factor 13)

As previously discussed throughout my report, I have not seen evidence supporting that MDx's advertising revenue was primarily driven by the functionality of the '060 patent. I further understand that in January 2011, MDx removed side-by-side comparisons on its website and changed its guidelines to show data,[126] neither of which had an impact on traffic to the site.[127]

14.     The amount that a licensor (such as a patentee) and a licensee (such as an infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desire, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license (Factor 15)

A reasonable royalty with respect to patent infringement damages reflects, in part, the amount of money a willing licensor and a willing licensee would negotiate for a license to the patent-in-suit. I have taken into consideration the first fourteen *Georgia-Pacific* factors as well as the data points and information discussed below in determining a royalty the parties would have agreed to for the '060 patent.

## IX.  CALCULATION OF ROYALTIES DUE

I have considered the information contained within *Georgia-Pacific* factors 1-15 as well as other considerations to arrive at an appropriate royalty for the patent-in-suit and have

---

[126] Deposition of Allen Dodge dated June 28, 2012, page 138.
[127] MDX0007062-MDX007072.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -30- | |

EXHIBIT E

concluded that an appropriate royalty rate in this matter is an annual fixed amount of ^REDACTED from the date of first infringement through July 2012, resulting in total damages of ^REDACTED. An annual payment is appropriate in this matter for the following reasons:

- An annual payment is consistent with the HealthGrades and MDx Data Licenses;

- The HealthGrades license with Premera included an annual payment for Physician Data which includes numerous of the data elements purportedly covered in the '060 patent for ^REDACTED; and

- Considering indications as to the limited use of the patented functionality, it would not be reasonable for either party to identify and track usage with a royalty rate per unit or as a percentage of sales.

Additionally, in order to assess the appropriate royalty in this matter, I have considered information and analyses contained in the *Georgia-Pacific* factors, among other information.  In general my analysis of the information contained within the *Georgia-Pacific* factors is neutral to slightly downward.  Specifically I have considered at least the demand, functionality and use of the patented feature, amounts paid for Data Licenses, MDx's profitability, the availability of design around alternatives and the cost of developing the accused technology to determine the reasonable royalty rate.

<u>Demand, functionality and use of the patented feature:</u>  As discussed above, I have seen no evidences that there is any demand, functionality and use for the patented technology.  However, even assuming advertising revenue was generated, in part, by the '060 patent, it would be necessary to apportion MDx's total advertising revenue during the infringement period.[128,129]  Notwithstanding the fact that at least REDACTED

[130] I understand that no more than ^REDACTED

---

[128] <u>*Uniloc USA v. Microsoft Corporation*</u> 2011 U.S. App. LEXIS 11, * (Fed. Cir. 2011).

[129] <u>*Rite-Hite Corp. v. Kelley Co.*</u>, 56 F.3d 1538, 1569 (Fed Cir. 1995) ("Moreover, under our precedent, lost profit awards have been dependent, inter alia, on proof that consumer demand for the patentee's goods is created by the advantages of the patented invention.")

[130] MDX 0101069 and discussions with Hal Polley.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -31- | |
|---|---|---|

EXHIBIT E

of all physicians could have entered at least three of the data elements required to be received by the providers; and that only <sup>REDACTED</sup> of MDx's profiles have patient ratings that include ratings from MDx's website.[131]   Use of these metrics would indicate that no more than an estimated <sup>REDACTED</sup> in advertising revenue REDACTED     may be directly attributable to the accused functionality, and even substantially less considering that only <sup>REDACTED</sup> of the profiles use patient-ratings from the MDx website.[132] (*Georgia-Pacific* factors 10 and 11)

Amounts Paid for HealthGrades Data:  I understand that HealthGrades licensed its Provider Data for an annual fee of no more than <sup>REDACTED</sup> .  (*Georgia-Pacific* factor 12)

Profitability: REDACTED

(*Georgia-Pacific* factor 8).

In addition to the above, I also considered other available data that is consistent with (or less than) the amount of damages I determine appropriate for the patent in suit, including non-infringing alternatives that MDx would have implemented for no more than <sup>REDACTED</sup> as discussed in *Georgia-Pacific* factor 13 and the cost incurred by MDx to design, manage and develop the accused technology, approximately <sup>REDACTED</sup> .[133]

## X.   REBUTTAL

I have numerous disagreements and criticisms of the Hall report.  First and foremost, Mr. Hall simply states in his report that his "analysis of the Panduit factors demonstrates that

---

[131] U.S. Patent No. 7,752,060 B2.
[132] Simply applying Mr. Hall's royalty rate of REDACTED results in total reasonable royalty damages of <sup>REDACTED</sup>

Based on discussions with Hal Polley and Larry West, I understand that in order to manage and develop the accused technology, MDx incurred the following expenses:  1)  the costs associated with 1 designer designing the accused technology for 5 days (at an annual salary of REDACTED     ); 2) the costs associated with 1 QA manager managing the project for 5 days (at an annual salary of REDACTED     ); 3) the costs associated with 1 technical manager managing the project for 5 days (at an annual salary of <sup>REDACTED</sup>     ); and 4) the costs associated with 2 developers developing the accused technology for 19 days (at an annual salary of REDACTED     ).

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -32- |
| --- | --- |

EXHIBIT E

HealthGrades is entitled to lost profits."[134]  However, I do not believe that Mr. Hall's analysis
has sufficiently proven that HealthGrades is entitled to lost profits as a measure of damages
due to MDx's alleged infringement of the '060 patent.  Specifically, I have not seen evidence
to suggest, nor has Mr. Hall sufficiently proven that the '060 patented technology drove users
to visit the Vitals website.  Additionally, Mr. Hall failed to sufficiently satisfy the criteria set
forth in Panduit Factor 2 (absence of acceptable non-infringing alternatives) to claim lost
profits damages as it is clear that other healthcare-related websites were available during the
alleged infringement period and MDx could have easily implemented an alternative design to
the '060 patent that would not have impacted the number of users visiting the website.  I
discuss these points as well as additional criticisms of the Hall Report in detail below.


*Mr. Hall Erroneously Equates the Functionality of the Patented Technology with the Reason
why Users Visit Vitals in his Lost Profits and Reasonable Royalty Analyses*

In Paragraphs 28 - 32 of the Hall Report, Mr. Hall suggests that simply because
HealthGrades and Vitals both provide "comparison ratings of healthcare providers" that there
is demand for the '060 patent.  Mr. Halls' conclusion, however, is neither corroborated nor
supported by the facts.

First, Mr. Hall provides no support that there is demand for the '060 patent.  Simply
because a user visits the Vitals website and/or because MDx generates advertising revenue
from Vitals' does not mean there is demand for the '060 patent.  Specifically, Mr. Hall states
that because "HealthGrades and Vitals' income statements clearly show substantial
advertising revenue- over REDACTED for HealthGrades in 2011… and over REDACTED for
Vitals in 2011 [that] [t]his advertising revenue combined with the website visits demonstrates
demand for the claims embodied in the '060 patent."[135]  However, if this were true, non-
infringing competitors would not exist in the market and/or these competitors would not be
able to generate advertising revenue, which is clearly not the case.  Mr. Hall also makes the
comment that since the "patented features are a fundamental portion of HealthGrades' and
Vitals' websites from which both earn significant and growing advertising revenue, [that he

---

[134] Expert Report of David A. Hall dated July 13, 2012, page 8.
[135] Expert Report of David A. Hall dated July 13, 2012, page 9.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -33- | |

**EXHIBIT E**

has] reasonably concluded that there was (and is) demand for the patented invention."[136]
Notwithstanding the fact that Mr. Hall provides no support that the patented features are what
drove users to HealthGrades and Vitals' websites, even assuming they were (which I don't
believe to be the case) Mr. Hall provides no support to show how the functionality of the
patented features generated advertising revenue.[137]

Contrary to Mr. Hall's unsupported conclusion that there is demand for the patented
technology, I understand that are several reasons why a user visits Vitals, none of which are
dependent on the inventions disclosed in Claims 1 and 15 of the '060 patent.[138]  These
reasons are discussed in Section VII above.

Additionally, the REDACTED in advertising revenue that MDx generated in 2011 (that
Mr. Hall refers to as "substantial advertising revenue") includes advertising revenue from
other MDx websites in addition to Vitals, namely UCHC, a non-infringing competitor of
HealthGrades and MDx, which "is primarily in a similar business as vitals.com, and attracts
approximately 40 million visitors annually."[139]


*Mr. Hall Does Not Appropriately Account for Non-Infringing Alternatives Available in the
Market in his Lost Profits and Reasonable Royalty Analyses*

First, Mr. Hall states that although he is not "aware of any acceptable non-infringing
substitute to HealthGrades' patented invention" he treats "HealthGrades' competitors as
acceptable non-infringing alternatives"[140] for the purpose of measuring lost profits.
However, a competitor in the marketplace is a non-infringing alternative.

I understand that acceptable alternative methods and alternative designs to the '060
patent could have been employed by Vitals at the time of the hypothetical negotiation and
these alternative methods may be considered non-infringing alternatives as well.  Not only
do competitors in the marketplace and/or other alternative methods to the '060 patent
illustrate that there were non-infringing alternatives in the marketplace, they also illustrate

---

[136] Expert Report of David A. Hall dated July 13, 2012, page 9.
[137] LaserDynamics Inc. v. Quanta Computer, Inc., Case Nos. 2011-1440, -1470 (Fed. Cir.)
[138] Declaration of Richard G. Cooper, D.Sc. dated July 13, 2012, page 38.
[139] MDX 0104440 – 0104466 at 0104457.
[140] Expert Report of David A. Hall dated July 13, 2012, page 10.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -34- | |

EXHIBIT E

the demands of the customer in the market (and the lack thereof for the '060 patent) and helps demonstrate that Vitals could have provided the same services without the '060 patent.

I also note that although Mr. Hall does adjust his lost profits calculation to account for certain competitors in the marketplace, his analysis is not complete.[141]  Specifically, Mr. Hall does not include other websites (including wellness.com, healthcare.com and doctor.com), that have a combined market share of 20% and 25% in July 2010 and July 2011, respectively.[142]

Lastly, several of these websites also provide other services and allow users to search for other general healthcare topics.[143]  According to Mr. Dodge "[t]he market at a very high level, a global level, is consumers seeking healthcare information"[144] but  "the majority of searchers and users coming to those sites [Health Grades and Vitals] are seeking physician information, but they may also be seeking other healthcare information."[145]  Mr. Hall's analysis ignores the fact that a) users of HealthGrades and Vitals may search for other healthcare information besides physician information and b) some visitors may seek general information on physicians as opposed to comparative ratings, both searches and/or features that are not covered by the '060 patent.

*Mr. Hall Inappropriately Applies the Entire Market Value Rule*

Mr. Hall has used as his royalty base all of MDx's advertising revenues without providing an assessment of whether the Entire Market Value Rule ("EMV Rule") applies in this matter and without any basis to conclude that the methods covered by the '060 patent create the basis for website traffic.

First, I understand that MDx's advertising revenue is primarily generated by website traffic which is not derived from the '060 patent.  Instead, users primarily visit Vitals as a result of SEO and other non-patented features of the Vitals site including its easy

---

[141] Additionally, in a Competitive Analysis performed by MDx in June 2010, MDx noted HealthGrades, UCompare, Rate MD, Dr. Score, LocateADoc, Doctor.com, Doctor.WebMd.com, DoctorBase, DoctorsDig, PriceDoc, Wellness and ZocDoc as competitors.  See MDX 0006999 – 0007297 at 0007040.
[142] MDX 0007062-0007072
[143] Deposition of Allen Dodge dated June 28, 2012, pages 241-243.
[144] Deposition of Allen Dodge dated June 28, 2012 page 249.
[145] Deposition of Allen Dodge dated June 28, 2012, page 249.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -35- | |

**EXHIBIT E**

to use search box, good messaging, user-friendly interface[146] and proprietary data and services.   Additionally, at least REDACTED

.[147]   This illustrates that MDx's advertising revenue was not generated by the '060 patent.

I understand the EMV Rule "*permits recovery of damages based on the value of the entire apparatus containing several features, where the patent-related feature is the **basis for customer demand**.*"[148]   However, the courts recently more clearly defined and started limiting the application of the EMV Rule.  In *Lucent Technologies, Inc., v. Gateway, Inc.*, the Federal Circuit stated that "*our law on the entire market value rule is quite clear*" and that "*[f]or the entire market value rule to apply, the patentee must prove that 'the **patent-related feature is the basis for customer demand**.*'"[149]   In *Uniloc v Microsoft,* the Federal Circuit states that the EMV Rule "*…allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the **basis for customer demand** or **substantially creates the value of the component parts**.*"[150,151]   In short, the application of the EMV Rule relies on economic evidence that the patented invention is the basis for customer demand and the component parts.  However, Mr. Hall has provided no evidence that any benefits unique to the '060 patented method created the basis for customer demand or substantially created the value of vitals.com.

*Mr. Hall Does Not Consider the "Book of Wisdom"*

In conducting a reasonable royalty analysis, the "Book of Wisdom" has often been considered to incorporate post hypothetical negotiation events into the determination of the

---

[146] Neal Deposition, page 314.

[147] MDX 0101069 and discussions with Hal Polley.

[148] <u>State Industries, Inc. v. Mor-Flo Industries, Inc.</u>, 883 F.2d 1573, 1580 (Fed. Cir. 1989), emphasis added

[149] <u>Lucent Technologies, Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1336 (Fed. Cir. 2009), emphasis added

[150] <u>Uniloc USA v. Microsoft Corporation</u> 2011 U.S. App. LEXIS 11, * (Fed. Cir. 2011), emphasis added.

[151] <u>Rite-Hite Corp. v. Kelley Co.</u>, 56 F.3d 1538, 1569 (Fed Cir 1995) ("Moreover, under our precedent, lost profit awards have been dependent, inter alia, on proof that consumer demand for the patentee's goods is created by the advantages of the patented invention.")

| EXPERT REPORT OF BRIAN W. NAPPER<br>HIGHLY CONFIDENTIAL – PURSUANT TO THE<br>PROTECTIVE ORDER | -36- | |

**EXHIBIT E**

reasonable royalty rate resulting from that negotiation.[152] As such, in addition to the parties' expectations about the relevant products' sales and profits, the Book of Wisdom can provide insights into the licensor's and licensee's positions in light of subsequent events.

In determining MDx's wherewithal to pay a [REDACTED] royalty, Mr. Hall relies on MDx projections and forecasts as of 2009 and 2010 without any consideration of MDx's actual sales and profits.

Although Mr. Hall does state that "[f]or 2010, Vitals… REDACTED

"[153] and that "[f]or 2011, Vitals… REDACTED

,"[154] it does not appear as if he considered these REDACTED in his royalty rate determination.  In light of the fact that MDx REDACTED , it is unreasonable that MDx would be willing to pay a royalty of [REDACTED].[155]

*Mr. Hall's Analysis Using the Analytical Approach is Incorrect*

Although I agree with Mr. Hall that the "analytical approach compares the profitability of the patented features to the profitability of other comparable technology to determine if higher profits are earned on the use of the patented features,"[156]  it is not appropriate to perform an analysis of the analytical approach by comparing HealthGrades or Vitals' profit margins to that of the industry or similarly situated competitors who do not use the patented invention.  Not only is this assessment not a reliable or accurate measure of the excess profits of the patented invention, but Mr. Hall was unable "to find profit information for a large group of HealthGrades and Vitals competitors to make such a comparison."[157] Instead, Mr. Hall compares profit information for WebMD to HealthGrades.  Again, this is an egregious interpretation of the analytical approach considering the fact that Mr. Hall does not identify WebMd as a competitor of HealthGrades and/or include them in his Market

---

[152] *See,* for example, *Howard A. Fromson v. Western Litho Plate and Supply Company et al.* (853 F.2d 1568, 7 USPQ2d 1606 (Fed. Cir. 1988).
[153] Expert Report of David A. Hall dated July 13, 2012, page 21.
[154] Expert Report of David A. Hall dated July 13, 2012, page 17.
[155] MDX 000104632 – 104649, MDX 000104440 – 000104466, and MDX 0104672 – 0104736.
[156] Expert Report of David A. Hall dated July 13, 2012, page 21.
[157] Expert Report of David A. Hall dated July 13, 2012, page 21.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -37- | |

Share Analysis.  Not surprisingly, Mr. Hall does not compare WebMD's profits to MDx's profits, REDACTED .

Mr. Hall also incorrectly concludes that "[a]nother reasonable approach to yield a starting point based on a profitability analysis it to compare HealthGrades' profit earned on revenues associated with the features of the patented invention and the profit of its overall operations.  This will yield a profit differential that HealthGrades would reasonably measure and be mindful of as it entered into a hypothetical negotiation."[158]  Again, Mr. Hall's analysis is not reasonable or reliable.  Not only has he not shown any demand for the '060 patent, he makes no attempt to identify and/or apportion any other features distinguishing departments that utilize the '060 patent from one another as well as from other departments within the company.[159]

As such, the two analyses performed by Mr. Hall do not yield "excess profits" of [REDACTED] since these rates erroneously reflect other products and patented inventions in addition to the '060 patent.  Consequently, the average of these two percentages, [REDACTED] is not a reasonable starting point for HealthGrades to begin negotiating with Vitals.


*Mr. Hall Fails to Consider the Availability of Design Around Alternatives*

I understand that MDx could have implemented design around alternatives to the patent in suit for no more than [REDACTED]. This amount represents another important consideration in the determination of the amount that MDx would be willing to pay to HealthGrades.  MDx would likely make a judgment regarding the financial consideration proposed by HealthGrades as compared to its cost and effect of implementing an alternative to the '060 patent.


*The Licenses Considered by Mr. Hall are Not Instructive as a Point of Reference as to the Hypothetical Negotiation*

In Mr. Hall's discussion of HealthGrades' licenses, Mr. Hall states that although the licenses discussed below [the Best Quality Healthcare License and Dr. Tango, Inc. License]

---

[158] Expert Report of David A. Hall dated July 13, 2012, pages 21-22.
[159] Mr. Hall notes in footnote 21 of his report that "revenues reported by the various departments include more than that of the patented invention.  *See* Expert Report of David A. Hall dated July 13, 2012, page 8.

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -38- | |

EXHIBIT E

"generally only appear to relate to the physician or other healthcare provider data and not a license to the '060 patent…the licenses discussed below [the Best Quality Healthcare License and Dr. Tango, Inc. License] are still instructive as a point of reference as to the hypothetical negotiation.  The parties in negotiation would reasonably consider the amounts and rates that if negotiated for on a critical component – data—that is a necessary component to be able to effectively use the patented technology."[160]  Not only is this statement in itself an acknowledgement by Mr. Hall that there are several features, including "good data" that are "critical components" for an "effective website" (which are not covered by the '060 patent), the fact that none of the companies that HealthGrades granted a data license to was in connection with the patented technology further supports that non-patented features drive a user to MDx's website and not the '060 patent.

Additionally, and just as importantly, these licenses are not instructive as a point of reference as to the hypothetical negotiation as they do not provide "a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in this case."[161]  In order to use other licensing agreements to derive a royalty rate in a litigation matter, the patentee has "… the burden to prove that the license [are] sufficiently comparable to support the … award."[162]  First, both of these licenses are based on a percentage of sales.  However, this rate structure would not be appropriate in this matter since MDx's advertising revenue is not generated by the '060 patent.  Second, considering there is very limited use of the patented functionality, it would not be reasonable for either HealthGrades or MDx to identify and track usage with a royalty rate per unit or as a percentage of sales.

*Mr. Hall's Analysis of Certain of the Georgia Pacific Factors is Flawed.*

*Georgia Pacific* Factor 6- It does not appear as if Mr. Hall relied on data licenses included in his Attachments 6a and 6b that are instructive to the hypothetical negotiation.  As stated above, certain of these licenses do provide some insight as to the economic value of the '060 patent.

---

[160] Expert Report of David A. Hall dated July 13, 2012, page 17.
[161] *Uniloc USA v. Microsoft Corporation* 2011 U.S. App. LEXIS 11, * (Fed. Cir. 2011).
[162] *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).) and *ResQnet.com., et al v. Lansa, Inc.*, (Fed. Cir. 2010).

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -39- |
|---|---|

**EXHIBIT E**

*Georgia Pacific* Factors 8, 9 and 10- Although Mr. Hall states that "[t]he use of the patented features has yielded many visitors and relating advertising revenue for both HealthGrades and Vitals"[163] and "[t]he demand for the patented features reflected by HealthGrades and Vitals' web traffic and advertising revenues demonstrates the value of the patent,"[164] Mr. Hall does not perform any analysis showing the demand, functionality and/or use of the patented features, if any, and relation thereof, to MDx's advertising revenue.

*Georgia Pacific* Factor 11:  As discussed in detail above, Vitals has not earned over REDACTED using the features of the '060 patent.

Consequently, these factors do not have an upward influence on the royalty in this matter.

## XI.  INJUNCTION/COMPULSORY LICENSE

I understand that, based on certain case decisions,[165] should the patent in suit be found valid, enforceable and infringed, HealthGrades may not be granted an injunction and the Court may instead instruct that the parties enter into a license for the patents-in-suit.  Should this occur, I may be asked to provide additional information or data, beyond what has been considered in this report, which may assist in determining royalties.  The type of additional information which may be relevant to such an analysis would include, but not be limited to, accused sales, market data, information on current alternatives available to the defendants and/or in the marketplace, any license agreements and/or offers not already considered.

---

[163] Expert Report of David A. Hall dated July 13, 2012, Analysis of Georgia Pacific Factors
[164] Expert Report of David A. Hall dated July 13, 2012, Analysis of Georgia Pacific Factors.
[165] *e.g., eBay Inc. et al. v. MercExchange LLC; z4 Technologies v. Microsoft; Finisar v. DirecTV; Visto. Corporation v. Seven Networks, Inc.*

| EXPERT REPORT OF BRIAN W. NAPPER HIGHLY CONFIDENTIAL – PURSUANT TO THE PROTECTIVE ORDER | -40- | |
|---|---|---|

**EXHIBIT E**