# EXHIBIT J

(Redacted Version of Dkt. # 411-3 and 412-2)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

### AFFIDAVIT OF DAVID A. HALL

---

STATE OF COLORADO                   )
                                    )        ss.
CITY & COUNTY OF DENVER             )

I, David A. Hall, hereby depose and state under oath as follows:

1.  Alvarez & Marsal Global Forensic and Dispute Services, LLC ("A&M") was retained by
    HealthGrades, Inc. ("HealthGrades") and its counsel to calculate patent infringement
    damages in the matter of HealthGrades, Inc. v. MDx Medical, Inc. ("MDx") d/b/a
    Vitals.com ("Vitals").

2.  As I indicated in my July 13, 2012 report, HealthGrades claims that Vitals infringes its
    U.S. Patent No. 7,752,060 B2 ("the '060 patent") and that for purposes of my analyses and
    calculations, I have been asked to assume that the '060 patent is valid, enforceable, and
    that Vitals has infringed the '060 patent, and that HealthGrades is entitled to damages.

3.  Counsel for HealthGrades has requested that I address certain issues in MDx's November
    2, 2012 motion to exclude my testimony (the "Motion") including instances of
    mischaracterizing or confusion regarding my bases, analysis and opinions.

**EXHIBIT C**

### My Lost Profits Demand Analysis Was Mischaracterized

4.   In section IV.A.1. and 2. (at pages 4 - 9) of the Motion, MDx's counsel mischaracterizes

the analysis of demand that I performed for the *Panduit* test for lost profits.

5.   First, my analysis of demand, lost profits and reasonable royalty all begin with my review

and analysis of the '060 patent and patented features (see my Initial Report, referred to as

Ex. A throughout this affidavit, ¶9 through ¶15).

6.   Second, I identified the patented product that encompasses the patented features –

HealthGrades' website (and infringing product – Vitals' website) so that I could determine

if there was evidence of demand for the patented product.  See Ex. A ¶19, ¶20 and ¶29

through ¶32 and ¶39 which includes:

> "Visitors come to the website to research physician information generate
> advertising revenue for HealthGrades and Vitals." (Ex. A ¶29)

> "The key features of the '060 patent allows visitors, via the internet, to access data
> on physicians in order to conduct a comparative analysis of them.  This
> comparative analysis is a feature of the '060 patent and is provided for in one of
> the claims stated above." (Ex. A ¶39)

7.   Third, I analyzed visitors to both the patented product—HealthGrades' website and to the

infringing product—Vitals' website.  See Ex. A ¶32 and ¶39 which includes:

> "As noted earlier, visitors come to the website to research physician information
> generate advertising revenue for HealthGrades and Vitals."  (Ex. A ¶39)

I also identified total unique visitors to HealthGrades' and Vitals' websites on

Attachment 3a to my Initial Report (Ex. A).

**EXHIBIT C**

8.    Fourth, I analyzed the advertising revenue earned from website visits.  See Ex. A ¶41 through ¶44 and Attachments 1 and 12 (Ex. A) for HealthGrades' advertising revenue and Attachment 2 and 11 (Ex. A) for Vitals' advertising revenue.[1]

9.    MDx's counsel ignored the first three steps I took and states on page 5 of the Motion as leadoff to section IV.A.1. that "Mr. Hall's basis for concluding there was demand starts with the revenue of both MDx and Health Grades."  This is misleading and untrue.

10.   To gain an understanding of how the market reacted (as far as demand) to HealthGrades' patented product (and also to Vitals' infringing product), I analyzed the market share over time.  See Ex. A ¶37 and ¶38 and Attachments 3a and 16 (Ex. A).

11.   MDx counsel also claims that the revenue I "used" was exaggerated, unconnected to the patented invention, and speculative (see Motion page 5).  The advertising revenue that I analyzed for the *Panduit* test for demand is directly connected to the '060 patent.  MDx's counsel ignored the on-point statements in my Initial Report and my deposition testimony on this topic.  He instead uses my answers to his questions on Attachment 1 to mischaracterize my *Panduit* demand test analysis and opinion.

12.   For example, MDx's counsel claims that I ". . . used revenue that was embellished because it included revenue from the websites *that was not attributable to the patent*."  He cites footnote 21 in my Initial Report but misuses it by claiming that I admitted that I "used" (MDx's counsel's word, not in my footnote) revenues reported by the various departments [that] include more than that of the patented invention."  He cites my footnote combined with his words to mischaracterize what I did to demonstrate demand for the patented product.

---

[1] See also Ex. E, Napper's report page 5: "MDx primarily generates its revenue from consumer advertisements which are sold directly to customers, advertising networks and to Google and other partners, which is largely driven by website traffic."

**EXHIBIT C**

13.   This characterization is misleading.  My footnote 21 refers to my Attachment 1 (Ex. A), which I created to both perform my analytical method for my reasonable royalty analysis and to isolate HealthGrades' advertising revenue and use *only* its advertising revenue (see top line of Attachment 1) as part of my *Panduit* analysis of demand for patented product. See Ex. A ¶30:

> "HealthGrades' and Vitals' income statements clearly show substantial advertising revenue – [REDACTED]   for HealthGrades in 2011 (see **Attachment 1 and Attachment 12**) and (see **Attachment 2 and Attachment 11**).  This advertising revenue combined with the website visits demonstrates the demand for the claims embodied in the '060 patent." (emphasis in original text)

MDx's counsel also cites my deposition transcript (referred to in this affidavit as Ex. D) for my response to his question about my Attachment 1:  77:11-15; 77:16-20; and 149:11-16 (Ex. D) to conclude that I had "wildly overbroad inclusion of revenue supposedly showing 'demand' for practice of the patent included *anything* even remotely connected to the patent, . . . ."[2]

14.   This is also misleading and untrue because all of his cites to my deposition relate to my description of items on Attachment 1 that are *not* the advertising revenue that I did use as part of the support for evidence of demand for HealthGrades' patented product.  MDx's counsel cites testimony that is not relevant to my lost profits analysis.  I describe this both in my Initial Report at ¶30 (Ex. A) and several times during my deposition:

> "But the advertising revenue is what I limited and focused my analysis on as far as Health Grades' damages." 77:22-78:7 (Ex. D)

> "Attachment 1 was not intended to identify only[3] the revenue associated with the '060 Patent. There is more here than -- yes." 97:7-9 (Ex. D)

---

[2] The Motion pages 6 and 7.
[3] I submitted errata for clarity which changed the word 'all' to 'only' at page 97, line 8.

**EXHIBIT C**

15.     Most misleading is MDx's counsel inserting words ('demand revenue') into a question of

his to make it appear as if I was identifying and using non-advertising revenue in my

demand analysis.  MDx's counsel never asked me about 'demand revenue', and I did not

use the term 'demand revenue' in either of my reports or in my deposition.

Notwithstanding these facts, MDx counsel states in the middle of page 6 of the Motion:

"Exhibit C, 149:11-16 (Q: "if you had just one department that only worked on, like

information that goes into a report, that information is referenced somewhere in the claims

of the patent, you would include that department [in the alleged demand revenue]?  A:

Yes.").  I submitted errata for completeness for answer to read, "Yes, in Attachment 1."

16.     MDx counsel adds "[in the alleged demand revenue]" to his question about Attachment 1

revenue line items that *were not* advertising revenue that I used as part of my demand

analysis.  Counsel's addition of words completely changes the meaning of the question.

He asked me about Attachment 1 (see Ex. D 148:22-149:10) and NOT about "alleged

demand revenue."  My Initial report (Ex. A ¶30 and Attachments 11 and 12) and my

deposition make it clear that I only included advertising revenue in my demand analysis

for lost profits.

> Q.  Okay. So how much more?
> A.  The advertising network is the primary revenue source that I believe from my
> analysis and discussions that relates to the use of the patented features. It's not the
> entirety of the revenue as they use the rating systems at different periods in time to help
> with other revenue-generating activities. ***But the advertising revenue is what I limited
> and focused my analysis on as far as Health Grades' damages.*** (emphasis added)[4]

17.     MDx's counsel then repeats his altered question referencing 'demand revenue' four more

times on pages 6 and 7 of the Motion to make similar misleading claims such as:  "Hall

admitted that ***he made no determination*** of how much of his alleged 'demand revenue'

---

[4] My deposition 77:21-78:7 (Ex. D)

related to the patent. *Id.* at 78:8-12." MDx's counsel equates his made up term with all of the revenue on Attachment 1 (Ex. A) which is false and his cite cuts off my full answer— see 78:13-24 (Ex. D). I only used HealthGrades' advertising revenue (top line of my Initial Report Attachment 1, Ex. A) and use it as part of my basis for *Panduit* test— evidence of demand for patented product.

18.    MDx's counsel also claims that "there is nothing in Hall's report, or elsewhere, showing *how* he made the determination of what revenue should be included, and what should be excluded." This is false. I described my criteria for identifying the revenue I used to evaluate the *Panduit* test for demand for the patented product—see Ex. A ¶9 -- ¶15; ¶19, ¶20; ¶29 -- ¶32 and ¶39, ¶41 -- ¶44 and my report Attachments 1, 2 and 3a (Ex. A).

**My 12% Royalty Rate Accounts For Unpatented features**

19.    My royalty rate determination accounts for Vitals' unpatented features.

20.    My analysis accomplished this important step in three ways: First, I began with an analytical approach which attempts to reasonably exclude profit achieved on advertising revenue earned without infringing the patent. I used a non-infringing industry benchmark, WebMD,[5] to calculate a profit differential of 33%. See my Initial Report ¶78 through ¶80 (Ex. A). Unlike in *TWM Mfg. Co. Inc. v. Dura Corp,* which concluded that the royalty rate should be equal to this type of profit differential, I further analyzed the facts and circumstances of a hypothetical negotiation between Vitals and HealthGrades to conclude a much lower royalty rate than just the profit differential yielded from analytical approach.

21.    I then reduced the prospective royalty rate derived from analytical method to account for co-visitors (see ¶86, Ex. A) which nearly cut in half the royalty rate yielded from the

---

[5] HealthGrades' describes WebMD in its December 31, 2009 10-K "as a well-established web platform which widely known as the most trafficked healthcare website on the internet today for general healthcare content." See Hall Appendix C Facts and Data Considered item 15.

analytical approach. I then cut the reduced prospective rate in half to reflect that "A rationale negotiation would lead to a near split between a rate in low single digits and or low rate and HealthGrades' starting point—either 16.5 % or 23% (or mid-point of approximately 20%). This would reasonably yield a royalty rate of approximately 10% prior to a full evaluation of the Georgia Pacific factors." See ¶89, Ex. A). This negotiation split would reasonably include MDx's negotiation point that the starting point based on the analytical method does not fully account for its unpatented features. See my deposition 141:21-15; 142:8-16; 144:2-22; 180:22-24; and 221:21-22 (Ex. D) for my testimony on reducing the royalty rate to account for unpatented features.

22.  I then concluded with a comprehensive analysis of the all of the *Georgia Pacific* factors to arrive at a 12% royalty rate (see ¶78 through ¶91 and Attachment 9, Ex. A).

**HealthGrades' Advertising Revenue As The Basis For The Royalty Base Is Supported By HealthGrades' License Agreements.**

23.  One of the reasons that I believe it is reasonable and appropriate to apply an adjusted rate (adjusted lower to account for unpatented features) to Vitals' infringing advertising revenue is that HealthGrades had established a history of applying a license rate to advertising revenue. I referenced this point in ¶62 Ex. A ("structure of licenses") and Attachment 6a. I also testified to this point at 142:11-16; 244:8-14 (Ex. D).

**My *Mor-Flo* Analysis Was Mischaracterized**

24.  MDx's counsel's mischaracterizes my *Mor-Flo* analysis and ignores the fact that I also performed a *Mor-Flo* analysis using MDx's damages expert's (Mr. Napper's) market share analysis (see Napper report page 8, Ex. E). See my deposition: 8:11-10:14 and 303:7-17 (Ex. D) and also see Ex. A, Attachment 3a, Attachment 3a--Napper Market Share, Attachments 4 and Attachment 4--Napper Market Share Data. Using Mr. Napper's

market share analysis does not significantly change my lost profits damages and in fact, increases it slightly.

25.  The following table from Napper's report was the basis for my Attachment 3a--Napper Market Share, Attachment 4--Napper Market Share Data, and Attachment 16, Ex. A).

26.  Mr. Napper identified these companies as competitors and indicated his source's market share. See Ex. E page 8. In the first column, I note whether or not Vitals (pre-litigation), Mr. Neal, and I all agree with Mr. Napper's inclusion of these Website/ Companies in HealthGrades' market. 'All include' indicates that Vitals, Neal, Napper and I all agree that referenced Website/Company is in HealthGrades' market.

| Who Identified as Competitor | Website / Company | Market Share | | |
|---|---|---|---|---|
| | | Jul-10 | Jan-11 | Jul-11 |
| All include | **Healthgrades** | 36.7% | 40.3% | 51.5% |
| All include | **Vitals** | 15.5% | 18.4% | 17.3% |
| Vitals did not include (MDX 0012724-25, Ex. G) and Mr. Neal did not identify as competitor | **Wellness.com** | 13.4% | 14.8% | 16.8% |
| All include | **UCompareHealthCare** | 10.0% | 10.1% | 13.4% |
| Vitals did not include (Ex. G) and Mr. Neal testified *NOT* a competitor, p. 93 (Ex. F) | **Healthcare.com** | 8.2% | 3.3% | 0.0% |
| All include | **Angie's List** | 7.4% | 5.4% | 0.0% |
| All include | **Rate MDs** | 4.9% | 3.2% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctor.com** | 1.1% | 0.8% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Physician Reports** | 0.7% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal "not familiar with Vimo" p. 85 (Ex. F) | **Vimo** | 0.6% | 0.6% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal recalls as a competitor, p.88 (Ex. F) | **Dr Score** | 0.5% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctors Dig** | 0.5% | 0.5% | 0.0% |
| Hall includes; Vitals did not include (Ex. G); and Mr. Neal did not identify as competitor | **ZocDoc** | 0.2% | 0.4% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Check MD** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Suggest a Doctor** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex G) and Mr. Neal did not identify as competitor | **Doctor Directory** | 0.1% | 0.0% | 0.0% |

**EXHIBIT C**

27. My thorough analysis of the market for my *Mor-Flo* analysis was mischaracterized by MDx's counsel in its Motion.

**MDx Counsel Overstates My reliance On Andrea Pearson**

28. Ms. Pearson was one of three Health Grades' personnel sources that I relied upon and I identified her as an information source in my reports' Appendix C—Information and Data considered.   MDx overstates my reliance on Ms. Pearson and ignores my many other bases for his opinions and omits many of my references to the two other Health Grades' personnel (Allen Dodge and John Neal) that I relied upon and identified in my Initial Report (Ex. A) and in my deposition.

29. In section IV.C. and V.C. of the Motion, MDx's counsel cites a number of instances where I mentioned Andrea Pearson in my testimony.  In every one of these instances, I also mentioned Allen Dodge.  There is one instance when I referenced both Allen Dodge and John Neal.

30. The information supplied by HealthGrades' witnesses and relied upon by me in preparing my report all came from Mr. Dodge and Mr. Neal.  Ms. Pearson corroborated information provided by Mr. Dodge and Mr. Neal, but did not provide any new information that was relied upon by my in preparing my report.  In addition, the only occasion that I spoke with Ms. Pearson with no other HealthGrades personnel involved was after I submitted my reports (and therefore, all of my opinions).  This was to ask additional questions about HealthGrades' license agreements that MDx's expert (Napper) had cited as his basis for his damages.  I also spoke with John Neal and Allen Dodge about these same license agreements after reading Napper's report.

**EXHIBIT C**

FURTHER THE AFFIANT SAYETH NOT.

_____
David A. Hall

The foregoing Affidavit was subscribed and sworn to before me this 26th Day of November, 2012, by David A. Hall.

WITNESS my hand and official seal.

My commission expires: May 3, 2014

```
DEBRA L. MENAUGH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20044002420
MY COMMISSION EXPIRES MAY 3, 2014
```

[SEAL]                        _____
                              Notary Public

**EXHIBIT C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

### AFFIDAVIT OF DAVID A. HALL

---

| | | |
|---|---|---|
| STATE OF COLORADO | ) | |
| | ) | ss. |
| CITY & COUNTY OF DENVER | ) | |

I, David A. Hall, hereby depose and state under oath as follows:

1.   Alvarez & Marsal Global Forensic and Dispute Services, LLC ("A&M") was retained by HealthGrades, Inc. ("HealthGrades") and its counsel to calculate patent infringement damages in the matter of HealthGrades, Inc. v. MDx Medical, Inc. ("MDx") d/b/a Vitals.com ("Vitals").

2.   As I indicated in my July 13, 2012 report, HealthGrades claims that Vitals infringes its U.S. Patent No. 7,752,060 B2 ("the '060 patent") and that for purposes of my analyses and calculations, I have been asked to assume that the '060 patent is valid, enforceable, and that Vitals has infringed the '060 patent, and that HealthGrades is entitled to damages.

3.   Counsel for HealthGrades has requested that I address certain issues in MDx's November 2, 2012 motion to exclude my testimony (the "Motion") including instances of mischaracterizing or confusion regarding my bases, analysis and opinions.

EXHIBIT B

### My Lost Profits Demand Analysis Was Mischaracterized

4. In section IV.A.1. and 2. (at pages 4 - 9) of the Motion, MDx's counsel mischaracterizes the analysis of demand that I performed for the *Panduit* test for lost profits.

5. First, my analysis of demand, lost profits and reasonable royalty all begin with my review and analysis of the '060 patent and patented features (see my Initial Report, referred to as Ex. A throughout this affidavit, ¶9 through ¶15).

6. Second, I identified the patented product that encompasses the patented features – HealthGrades' website (and infringing product – Vitals' website) so that I could determine if there was evidence of demand for the patented product. See Ex. A ¶19, ¶20 and ¶29 through ¶32 and ¶39 which includes:

> "Visitors come to the website to research physician information generate advertising revenue for HealthGrades and Vitals." (Ex. A ¶29)

> "The key features of the '060 patent allows visitors, via the internet, to access data on physicians in order to conduct a comparative analysis of them. This comparative analysis is a feature of the '060 patent and is provided for in one of the claims stated above." (Ex. A ¶39)

7. Third, I analyzed visitors to both the patented product—HealthGrades' website and to the infringing product—Vitals' website. See Ex. A ¶32 and ¶39 which includes:

> "As noted earlier, visitors come to the website to research physician information generate advertising revenue for HealthGrades and Vitals." (Ex. A ¶39)

I also identified total unique visitors to HealthGrades' and Vitals' websites on Attachment 3a to my Initial Report (Ex. A).

EXHIBIT B

8.   Fourth, I analyzed the advertising revenue earned from website visits.  See Ex. A ¶41 through ¶44 and Attachments 1 and 12 (Ex. A) for HealthGrades' advertising revenue and Attachment 2 and 11 (Ex. A) for Vitals' advertising revenue.[1]

9.   MDx's counsel ignored the first three steps I took and states on page 5 of the Motion as leadoff to section IV.A.1. that "Mr. Hall's basis for concluding there was demand starts with the revenue of both MDx and Health Grades."  This is misleading and untrue.

10.  To gain an understanding of how the market reacted (as far as demand) to HealthGrades' patented product (and also to Vitals' infringing product), I analyzed the market share over time.  See Ex. A ¶37 and ¶38 and Attachments 3a and 16 (Ex. A).

11.  MDx counsel also claims that the revenue I "used" was exaggerated, unconnected to the patented invention, and speculative (see Motion page 5).  The advertising revenue that I analyzed for the *Panduit* test for demand is directly connected to the '060 patent.  MDx's counsel ignored the on-point statements in my Initial Report and my deposition testimony on this topic.  He instead uses my answers to his questions on Attachment 1 to mischaracterize my *Panduit* demand test analysis and opinion.

12.  For example, MDx's counsel claims that I ". . . used revenue that was embellished because it included revenue from the websites *that was not attributable to the patent*."  He cites footnote 21 in my Initial Report but misuses it by claiming that I admitted that I "used" (MDx's counsel's word, not in my footnote) revenues reported by the various departments [that] include more than that of the patented invention."  He cites my footnote combined with his words to mischaracterize what I did to demonstrate demand for the patented product.

---

[1] See also Ex. E, Napper's report page 5: "MDx primarily generates its revenue from consumer advertisements which are sold directly to customers, advertising networks and to Google and other partners, which is largely driven by website traffic."

EXHIBIT B

13.    This characterization is misleading.  My footnote 21 refers to my Attachment 1 (Ex. A), which I created to both perform my analytical method for my reasonable royalty analysis and to isolate HealthGrades' advertising revenue and use *only* its advertising revenue (see top line of Attachment 1) as part of my *Panduit* analysis of demand for patented product. See Ex. A ¶30:

> "HealthGrades' and Vitals' income statements clearly show substantial advertising revenue – REDACTED for HealthGrades in 2011 (see **Attachment 1 and Attachment 12**) and (see **Attachment 2 and Attachment 11**).  This advertising revenue combined with the website visits demonstrates the demand for the claims embodied in the '060 patent." (emphasis in original text)

MDx's counsel also cites my deposition transcript (referred to in this affidavit as Ex. D) for my response to his question about my Attachment 1:  77:11-15; 77:16-20; and 149:11-16 (Ex. D) to conclude that I had "wildly overbroad inclusion of revenue supposedly showing 'demand' for practice of the patent included *anything* even remotely connected to the patent, . . . ."[2]

14.    This is also misleading and untrue because all of his cites to my deposition relate to my description of items on Attachment 1 that are *not* the advertising revenue that I did use as part of the support for evidence of demand for HealthGrades' patented product.  MDx's counsel cites testimony that is not relevant to my lost profits analysis.  I describe this both in my Initial Report at ¶30 (Ex. A) and several times during my deposition:

> "But the advertising revenue is what I limited and focused my analysis on as far as Health Grades' damages." 77:22-78:7 (Ex. D)

> "Attachment 1 was not intended to identify only[3] the revenue associated with the '060 Patent. There is more here than -- yes." 97:7-9 (Ex. D)

---

[2] The Motion pages 6 and 7.
[3] I submitted errata for clarity which changed the word 'all' to 'only' at page 97, line 8.

EXHIBIT B

15. Most misleading is MDx's counsel inserting words ('demand revenue') into a question of his to make it appear as if I was identifying and using non-advertising revenue in my demand analysis. MDx's counsel never asked me about 'demand revenue', and I did not use the term 'demand revenue' in either of my reports or in my deposition. Notwithstanding these facts, MDx counsel states in the middle of page 6 of the Motion: "Exhibit C, 149:11-16 (Q: "if you had just one department that only worked on, like information that goes into a report, that information is referenced somewhere in the claims of the patent, you would include that department [in the alleged demand revenue]? A: Yes."). I submitted errata for completeness for answer to read, "Yes, in Attachment 1."

16. MDx counsel adds "[in the alleged demand revenue]" to his question about Attachment 1 revenue line items that *were not* advertising revenue that I used as part of my demand analysis. Counsel's addition of words completely changes the meaning of the question. He asked me about Attachment 1 (see Ex. D 148:22-149:10) and NOT about "alleged demand revenue." My Initial report (Ex. A ¶30 and Attachments 11 and 12) and my deposition make it clear that I only included advertising revenue in my demand analysis for lost profits.

Q. Okay. So how much more?
A. The advertising network is the primary revenue source that I believe from my analysis and discussions that relates to the use of the patented features. It's not the entirety of the revenue as they use the rating systems at different periods in time to help with other revenue-generating activities. *But the advertising revenue is what I limited and focused my analysis on as far as Health Grades' damages.* (emphasis added)[4]

17. MDx's counsel then repeats his altered question referencing 'demand revenue' four more times on pages 6 and 7 of the Motion to make similar misleading claims such as: "Hall admitted that *he made no determination* of how much of his alleged 'demand revenue'

---
[4] My deposition 77:21-78:7 (Ex. D)

EXHIBIT B

related to the patent. *Id.* at 78:8-12." MDx's counsel equates his made up term with all of the revenue on Attachment 1 (Ex. A) which is false and his cite cuts off my full answer—see 78:13-24 (Ex. D). I only used HealthGrades' advertising revenue (top line of my Initial Report Attachment 1, Ex. A) and use it as part of my basis for *Panduit* test—evidence of demand for patented product.

18.  MDx's counsel also claims that "there is nothing in Hall's report, or elsewhere, showing *how* he made the determination of what revenue should be included, and what should be excluded." This is false. I described my criteria for identifying the revenue I used to evaluate the *Panduit* test for demand for the patented product—see Ex. A ¶9 -- ¶15; ¶19, ¶20; ¶29 -- ¶32 and ¶39, ¶41 -- ¶44 and my report Attachments 1, 2 and 3a (Ex. A).

**My 12% Royalty Rate Accounts For Unpatented features**

19.  My royalty rate determination accounts for Vitals' unpatented features.

20.  My analysis accomplished this important step in three ways: First, I began with an analytical approach which attempts to reasonably exclude profit achieved on advertising revenue earned without infringing the patent. I used a non-infringing industry benchmark, WebMD,[5] to calculate a profit differential of 33%. See my Initial Report ¶78 through ¶80 (Ex. A). Unlike in *TWM Mfg. Co. Inc. v. Dura Corp,* which concluded that the royalty rate should be equal to this type of profit differential, I further analyzed the facts and circumstances of a hypothetical negotiation between Vitals and HealthGrades to conclude a much lower royalty rate than just the profit differential yielded from analytical approach.

21.  I then reduced the prospective royalty rate derived from analytical method to account for co-visitors (see ¶86, Ex. A) which nearly cut in half the royalty rate yielded from the

---

[5] HealthGrades' describes WebMD in its December 31, 2009 10-K "as a well-established web platform which widely known as the most trafficked healthcare website on the internet today for general healthcare content." See Hall Appendix C Facts and Data Considered item 15.

EXHIBIT B

analytical approach. I then cut the reduced prospective rate in half to reflect that "A rationale negotiation would lead to a near split between a rate in low single digits and or low rate and HealthGrades' starting point—either 16.5 % or 23% (or mid-point of approximately 20%). This would reasonably yield a royalty rate of approximately 10% prior to a full evaluation of the Georgia Pacific factors." See ¶89, Ex. A). This negotiation split would reasonably include MDx's negotiation point that the starting point based on the analytical method does not fully account for its unpatented features. See my deposition 141:21-15; 142:8-16; 144:2-22; 180:22-24; and 221:21-22 (Ex. D) for my testimony on reducing the royalty rate to account for unpatented features.

22.    I then concluded with a comprehensive analysis of the all of the *Georgia Pacific* factors to arrive at a 12% royalty rate (see ¶78 through ¶91 and Attachment 9, Ex. A).

**HealthGrades' Advertising Revenue As The Basis For The Royalty Base Is Supported By HealthGrades' License Agreements.**

23.    One of the reasons that I believe it is reasonable and appropriate to apply an adjusted rate (adjusted lower to account for unpatented features) to Vitals' infringing advertising revenue is that HealthGrades had established a history of applying a license rate to advertising revenue. I referenced this point in ¶62 Ex. A ("structure of licenses") and Attachment 6a. I also testified to this point at 142:11-16; 244:8-14 (Ex. D).

**My *Mor-Flo* Analysis Was Mischaracterized**

24.    MDx's counsel's mischaracterizes my *Mor-Flo* analysis and ignores the fact that I also performed a *Mor-Flo* analysis using MDx's damages expert's (Mr. Napper's) market share analysis (see Napper report page 8, Ex. E). See my deposition: 8:11-10:14 and 303:7-17 (Ex. D) and also see Ex. A, Attachment 3a, Attachment 3a--Napper Market Share, Attachments 4 and Attachment 4--Napper Market Share Data. Using Mr. Napper's

EXHIBIT B

market share analysis does not significantly change my lost profits damages and in fact, increases it slightly.

25.   The following table from Napper's report was the basis for my Attachment 3a--Napper Market Share, Attachment 4--Napper Market Share Data, and Attachment 16, Ex. A).

26.   Mr. Napper identified these companies as competitors and indicated his source's market share. See Ex. E page 8. In the first column, I note whether or not Vitals (pre-litigation), Mr. Neal, and I all agree with Mr. Napper's inclusion of these Website/ Companies in HealthGrades' market. 'All include' indicates that Vitals, Neal, Napper and I all agree that referenced Website/Company is in HealthGrades' market.

| Who Identified as Competitor | Website / Company | Market Share | | |
|---|---|---|---|---|
| | | Jul-10 | Jan-11 | Jul-11 |
| All include | **Healthgrades** | 36.7% | 40.3% | 51.5% |
| All include | **Vitals** | 15.5% | 18.4% | 17.3% |
| Vitals did not include (MDX 0012724-25, Ex. G) and Mr. Neal did not identify as competitor | **Wellness.com** | 13.4% | 14.8% | 16.8% |
| All include | **UCompareHealthCare** | 10.0% | 10.1% | 13.4% |
| Vitals did not include (Ex. G) and Mr. Neal testified *NOT* a competitor, p. 93 (Ex. F) | **Healthcare.com** | 8.2% | 3.3% | 0.0% |
| All include | **Angie's List** | 7.4% | 5.4% | 0.0% |
| All include | **Rate MDs** | 4.9% | 3.2% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctor.com** | 1.1% | 0.8% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Physician Reports** | 0.7% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal "not familiar with Vimo" p. 85 (Ex. F) | **Vimo** | 0.6% | 0.6% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal recalls as a competitor, p.88 (Ex. F) | **Dr Score** | 0.5% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctors Dig** | 0.5% | 0.5% | 0.0% |
| Hall includes; Vitals did not include (Ex. G); and Mr. Neal did not identify as competitor | **ZocDoc** | 0.2% | 0.4% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Check MD** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Suggest a Doctor** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex G) and Mr. Neal did not identify as competitor | **Doctor Directory** | 0.1% | 0.0% | 0.0% |

EXHIBIT B

27. My thorough analysis of the market for my *Mor-Flo* analysis was mischaracterized by MDx's counsel in its Motion.

**MDx Counsel Overstates My reliance On Andrea Pearson**

28. Ms. Pearson was one of three Health Grades' personnel sources that I relied upon and I identified her as an information source in my reports' Appendix C—Information and Data considered.   MDx overstates my reliance on Ms. Pearson and ignores my many other bases for his opinions and omits many of my references to the two other Health Grades' personnel (Allen Dodge and John Neal) that I relied upon and identified in my Initial Report (Ex. A) and in my deposition.

29. In section IV.C. and V.C. of the Motion, MDx's counsel cites a number of instances where I mentioned Andrea Pearson in my testimony.  In every one of these instances, I also mentioned Allen Dodge.  There is one instance when I referenced both Allen Dodge and John Neal.

30. The information supplied by HealthGrades' witnesses and relied upon by me in preparing my report all came from Mr. Dodge and Mr. Neal.  Ms. Pearson corroborated information provided by Mr. Dodge and Mr. Neal, but did not provide any new information that was relied upon by my in preparing my report.  In addition, the only occasion that I spoke with Ms. Pearson with no other HealthGrades personnel involved was after I submitted my reports (and therefore, all of my opinions).  This was to ask additional questions about HealthGrades' license agreements that MDx's expert (Napper) had cited as his basis for his damages.  I also spoke with John Neal and Allen Dodge about these same license agreements after reading Napper's report.

EXHIBIT B

FURTHER THE AFFIANT SAYETH NOT.

_____

David A. Hall

The foregoing Affidavit was subscribed and sworn to before me this 26th Day of November, 2012, by David A. Hall.

WITNESS my hand and official seal.

My commission expires: May 3, 2014

```
DEBRA L. MENAUGH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20044002420
MY COMMISSION EXPIRES MAY 3, 2014
```

[SEAL]

_____

Notary Public

EXHIBIT B

# EXHIBIT I

(Redacted Version of Dkt. # 433-5)

## Attachment 4--Napper Market Share Data

### HealthGrades Lost Profits and Reasonable Royalty Damages



| | | July 2010 to December 2010 | 2011 | January 2012 to May 2012 | Total |
|---|---|---|---|---|---|
| $A$ | Vitals Infringing Advertising Revenue | REDACTED | | | |
| $B$ | Vitals Traffic Also Visiting HealthGrades | | | | |
| $C = A \times (1-B)$ | HealthGrades Revenue Subject to Market Share Analysis | $ 693,395 | $ 1,982,618 | $ 913,400 | $ 3,589,412 |
| $D$ | HealthGrades Market Share without Vitals (using Napper's figures) | 43.0% | 62.0% | 62.0% | |
| $E = C \times D$ | HealthGrades Revenue Subject to Lost Profits Analysis | $ 298,160 | $ 1,229,223 | $ 566,308 | $ 2,093,691 |
| $F$ | HealthGrades Incremental Profit Rate | 70% | 78% | 78% | |
| $G = E \times F$ | **HealthGrades Lost Profits** | $ 208,712 | $ 958,794 | $ 441,720 | $ 1,609,226 |
| $H = A - E$ | Revenue Subject to Reasonable Royalty | $ 1,161,618 | $ 2,998,108 | $ 1,463,469 | $ 5,623,195 |
| $I$ | Reasonable Royalty Rate | 12% | 12% | 12% | |
| $J = H \times I$ | **Reasonable Royalty on Infringing Revenue not in Lost Profits** | $ 139,394 | $ 359,773 | $ 175,616 | $ 674,783 |
| $K = G + J$ | **Total Lost Profits Plus Reasonable Royalty** | $ 348,106 | $ 1,318,567 | $ 617,336 | $ 2,284,009 |
| $L = A \times I$ | **Reasonable Royalty Damages on all Infringing Revenue** | $ 175,173 | $ 507,280 | $ 243,573 | $ 926,026 |

EXHIBIT J

*Note:*
(1) Source: Monthly Detailed Income Statements, MDX 0104672 to MDX 0104736. See Attachment 2a.