Attorneys' Eyes Only

1      CONFIDENTIAL - ATTORNEYS EYES ONLY

2        IN THE UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF COLORADO

4    Case No. 11-CV-00520-PAB-BNB

5    _____

6    30(b)(6) DEPOSITION OF HEALTH GRADES, INC.,

7    Representative John Neal

8    and

9    DEPOSITION OF JOHN NEAL

10   June 13, 2012

11   _____

12

     HEALTH GRADES, INC.,              **Condensed**
13                                        **Copy**
     Plaintiff,

14

     v.                                CONFIDENTIAL

15

     MDX MEDICAL, INC. d/b/a VITALS.COM,

16

     Defendant.

17   _____

18

19

20

21

22

23

24

25     Job No. NJ399592

EXHIBIT H

Attorneys' Eyes Only

Page 2

1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2 APPEARANCES:
3    MERCHANT & GOULD
     By Kristin L. Stoll-DeBell, Esq.
4       1050 17th Street
      Suite 1950
5       Denver, CO 80265
      Phone: 303.357.1670
6       Fax: 303.357.1671
      kstolldebell@merchant-gould.com
7       Appearing on behalf of the
      plaintiff
8
9 ROTHGERBER JOHNSON & LYONS LLP
     By Jesus Manuel Vazquez Jr., Esq.
10      1200 Seventeenth Street
      Suite 3000
11      Denver, CO 80202-5855
      Phone: 303.623.9000
12      Fax: 303.623.9222
      jvazquez@rothgerber.com
13      Appearing on behalf of the
      Plaintiff
14
15 SILLS CUMMIS & GROSS, PC
     By Scott D. Stimpson, Esq.
     David C. Lee, Esq
16      30 Rockefeller Plaza
     New York, NY 10112
17      Phone: 212.643.7000
     Fax: 212.653.6500
18      sstimpson@sillscummis.com
     Appearing on behalf the Defendant
19
20
21
22
23
24
25

Page 3

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2      Pursuant to Notice and the Federal Rules of
3 Civil Procedure, the 30(b)(6) Deposition of Health
4 Grades, Inc. and Deposition of John Neal, called by
5 Defendant, was taken on Wednesday, June 13, 2012,
6 commencing at 8:22 a.m., at 1200 Seventeenth Street,
7 Suite 3000, Denver, Colorado, before Kelly A.
8 Mackereth, Certified Shorthand Reporter, Registered
9 Professional Reporter, Certified Realtime Reporter
10 and Notary Public within Colorado.
11
        * * * * * * *
12        I N D E X
13

EXAMINATION        PAGE
14
   BY MR. STIMPSON         6
15   BY MR. VAZQUEZ         316
16

PRODUCTION REQUEST(S):
17
   None.
18
19
20
21
22
23
24
25

Page 4

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2         INDEX OF EXHIBITS
3
                 INITIAL
4 DESCRIPTION              REFERENCE
5
   Exhibit 44  MDx Medical, Inc.'s Notice of    12
6       Deposition of John Neal
7   Exhibit 45  MDx Medical, Inc.'s Notice of    38
      30(b)(6) Deposition of Health
8       Grades
9   Exhibit 46  Project Development Plan,      164
      4/15/2004
10
   Exhibit 47  E-mail string re Patient      166
11      Experience Survey
12   Exhibit 48  E-mail string re Patient      173
      Experience Survey
13
   Exhibit 49  Patient Experience Survey     179
14
   Exhibit 50  2/16/05 e-mail from Montroy to   212
15      Hicks re Consumer Update
16   Exhibit 51  E-mail string re Health Grades' 215
      reports, w/attachments
17
   Exhibit 52  1/19/05 e-mail from Neal to    237
18      Kerry Hicks re presentation,
      w/attachments
19
   Exhibit 53  3/24/05 e-mail from Loughran to   255
20      Neal, et al.
21   Exhibit 54  E-mail string re Vitals.com    272
22   Exhibit 55  E-mail string re Vitals new    279
      posting on their hospital
23      program
24   Exhibit 56  E-mail string re Vitals/UCompare 284
25

Page 5

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2
                 INITIAL
3 DESCRIPTION              REFERENCE
4
   Exhibit 57  Complaint and Demand for Jury   291
5      Trial
6   Exhibit 58  E-mail string re Vitals.com    293
7   Exhibit 59  E-mail string re Insurance     296
      Provider Filter for Search
8
   Exhibit 60  3/17/08 e-mail from Neal to    299
9      Hicks, et al., w/attachment re
      Target List
10
   Exhibit 61  E-mail string re Vitals.com    312
11      hospital ratings
12
   PREVIOUSLY MARKED EXHIBITS
13
14 Exhibit 3         13
   Exhibit 4         269
15 Exhibit 8         108
   Exhibit 10        249
16 Exhibit 12        267
   Exhibit 20        103
17 Exhibit 21        99
   Exhibit 25        157
18 Exhibit 26        205
   Exhibit 27        209
19 Exhibit 29        168
20
21
22
23
24
25

Veritext/NJ Reporting Company

800-227-8440

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 6

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 * * * * * * *
3 P R O C E E D I N G S
4 JOHN NEAL,
5 having been first duly sworn, was examined and
6 testified as follows:
7 EXAMINATION
8 BY MR. STIMPSON:
9 (Exhibits 44 and 45 marked.)
10 Q Good morning, Mr. Neal.
11 A Good morning.
12 Q I'm Scott Stimpson. I'll be taking your
13 deposition today. Have you ever had your deposition
14 taken before?
15 A No.
16 Q Well, I'll be asking you questions, and
17 you'll be expected to answer completely and
18 truthfully. Okay?
19 A Um-hum, yes.
20 Q And from time to time your lawyer may
21 object, but you'll still be expected to answer the
22 question. All right? So if you can please pay
23 attention to the question even if there's some
24 colloquy between counsel. Okay?
25 A Yes.

Page 7

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 Q If there's anything about my questions you
3 don't understand, please just let me know, okay? I
4 want to make sure they're clear for you. Okay?
5 A I will.
6 Q Can you tell me about your education after
7 high school, please.
8 A I attended the University -- well, Belmont
9 University for one year in Nashville, Tennessee.
10 Q Okay.
11 A And then attended the University of
12 Tennessee in Knoxville for three years. That's where
13 I received my undergraduate degree in finance.
14 And then two years later I went back to
15 school, and I received my MBA at the University of
16 Tennessee, as well.
17 Q Knoxville?
18 A Yes.
19 Q Okay. And what years was that? When did
20 you go to Belmont?
21 A So Belmont would have been in '87. And
22 then three years later, '90, and then add two. I
23 started in '92 with my graduate studies and finished
24 in 94, I guess.
25 Q Okay. What did you do after -- what did

Page 8

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 you do in that two years between finance degree and
3 going for your MBA?
4 A I worked at a company called Service
5 Merchandise. I was a cash management/financial
6 analyzer.
7 Q Okay. And after you graduated in 1994,
8 what did you do then?
9 A After I graduated from graduate school I
10 went to work at Morgan Keegan as an investment banker
11 in Memphis, Tennessee.
12 Q I'm sorry, what was the name of the
13 company?
14 A Morgan Keegan.
15 Q Morgan Keegan?
16 A Um-hum. It's now part of Raymond James
17 Financial.
18 Q Okay. How long were you there?
19 A I was there for about two years.
20 Q And what did you do there?
21 A I was an investment banking associate.
22 Q Okay. What did you do after you left
23 Morgan Keegan?
24 A I was the junior co-founder of the
25 predecessor to Health Grades, a company called

Page 9

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 Specialty Care Network.
3 Q And that was in 1996?
4 A We actually funded the company initially
5 in 1995. But, yeah, approximately 1996 we started
6 operations.
7 Q And who founded it with you?
8 A It was Kerry Hicks, Pat Jaeckle, Peter
9 Fatianow and myself, and there were a couple of
10 others that I don't think participated in the initial
11 founders roundup. So they were subsequent to that.
12 Q Okay. Did you contribute capital
13 contribution to this?
14 A I did.
15 Q Do you own part of Health Grades today?
16 A I do.
17 Q Okay. And how much do you own?
18 A It's -- it's in the form of stock options,
19 mostly. I do have a direct investment in the
20 restricted shares of the company.
21 Q Okay.
22 A I can't tell you exactly. You would have
23 to check with Veststar, and they could tell you what
24 the value of those holdings are worth today.
25 Q Can you give me a ballpark?

3 (Pages 6 - 9)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 10

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    A    I know what I have invested in the company

3  directly.

4    Q    How much have you invested directly?

5    A    200,000 directly.

6    Q    And when you say directly, did you invest

7  some indirectly?

8    A    Well, the other holdings are related to my

9  equity participation via stock options, as well as

10  restricted share matches.  So there's a vesting

11  associated with that restricted share investment as

12  well.

13    Q    And when do those vest?

14    A    They -- there's a portion that vests,

15  based on time, over a five-year period.  And then

16  there's -- that's 25 percent.

17        And then there's another 75 percent at

18  vest based on certain thresholds being hit from a

19  performance and liquidity standpoint.

20    Q    Okay.  And so when does the first part

21  vest?  You said it's over a five-year period?

22    A    It invests radically over a five-year

23  period.

24    Q    Okay.  Starting when?

25    A    It's already begun.

Page 11

CONFIDENTIAL - ATTORNEYS ONLY

1

2    Q    Okay.

3    A    So the history is that Health Grades was

4  taken private by Veststar Capital Partners.  And in

5  taking the company private, they assumed primary

6  ownership interest.

7        And essentially what they worked out is

8  Veststar owns a substantial majority of the shares,

9  and then the remainder is in the hands of management,

10  which is made up of these restricted holdings, as

11  well as these equity incentive grants.

12    Q    So your total ownership interest in Health

13  Grades, is it fair to say it's hundreds of thousands

14  of dollars right now?

15        MR. VAZQUEZ:  Object to form.

16    A    You would have to check with the

17  investors.

18    Q    (BY MR. STIMPSON) So you don't have any

19  idea right now how much that --

20    A    I hope it's worth a lot.  I hope it's

21  worth a lot.

22    Q    I understand.

23    A    I mean, I don't know.  There are companies

24  that perform valuations, and they could do the

25  analysis.

Page 12

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2    Q    I understand, but I mean, since I can't

3  get that right now I'm just asking you for your best

4  understanding.

5        Is it less than $100,000?

6    A    I don't think the investment has declined

7  in value.

8    Q    Okay.  So it's somewhere between 100 and

9  300,000; is that fair?

10    A    I invested 200,000.  I don't think it's

11  declined.

12    Q    Okay.  So it could be more than 300,000

13  now?

14    A    Could be.

15    Q    So then back to my question, is it fair to

16  say that you own hundreds of thousands of dollars in

17  ownership of Health Grades?

18    A    I can't make that determination.

19    Q    But you think it is, right?

20    A    I hope so.

21    Q    I've marked a couple of deposition

22  notices.  The first one, 44, is just your Notice of

23  Deposition for your personal deposition.  And then 45

24  is what is called a 30(b)(6) notice, and we'll get to

25  that in a few minutes.

Page 13

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

2        I've also shown you what we've marked as

3  Exhibit 3.

4        Do you recognize that as a patent-in-suit?

5    A    I do.

6    Q    You're a named inventor on that?

7    A    I am.

8    Q    When was the last time you read it?

9    A    It's been a long time.  I don't know

10  exactly.

11    Q    When was the last time you read parts of

12  it?

13    A    I didn't review the application in

14  preparation for this deposition.  So it's been --

15  it's probably been years since I've looked at it and

16  read through it in detail.

17    Q    When was the last time you looked at the

18  patent claims?

19    A    The claims I've looked at in just the past

20  couple of days.

21    Q    Okay.  All right.  So we'll get to that a

22  little bit later today.

23        Do you have any responsibilities with

24  regard to this litigation?

25    A    It depends on how you --

Attorneys' Eyes Only

**Page 14**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    MR. VAZQUEZ: Object to form.
2    A    -- because I need to define
3  responsibilities.
4    Q    (BY MR. STIMPSON) How do you define
5  responsibilities?
6    A    Well, I'm here today providing a
7  deposition, so I would say that I do --
8    Q    Okay.
9    A    -- in that form.
10    Q    Were you involved in the decision to bring
11  suit against MDx?
12    A    That was a decision that was made by
13  counsel.
14    Q    Right. But who at Health Grades gave the
15  green light for it?
16    A    I was a party to those conversations. I
17  didn't make the determination, and I don't know
18  exactly who did.
19    Q    Okay. Who else was involved in those
20  determinations?
21    A    It would have been -- it would have been
22  myself, David Hicks. Kerry Hicks would have been a
23  part of that conversation. And I don't recall who
24  else may have been involved.

**Page 15**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q    Why did Health Grades sue MDx?
2    A    We've had concerns about Vitals copying
3  the content in execution of our website for some
4  time. And the patent was an effort to protect the
5  display form of content as it was presented on the
6  website.
7        And it was obvious to us that Vitals was
8  directly infringing on the patent as granted by the
9  Patent Office.
10    Q    Any other reasons?
11    A    Not that I'm aware of.
12    Q    In your involvement in the decision to
13  bring suit against MDx, did you personally look at
14  the MDx website?
15    A    I did.
16    Q    When did you do that?
17    A    I continuously looked at other websites,
18  particularly in the healthcare vertical. Those
19  provided provider information online.
20        So it was just part of an ongoing analysis
21  in making sure that I'm aware of what is available in
22  the marketplace.
23    Q    Did you personally look at the MDx website
24  and compare it to the claims in your patent?

**Page 16**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A    No, that was an analysis done by the
2  attorneys.
3    Q    Okay. When was the last time you looked
4  at the MDx Vitals website prior to bringing suit?
5    A    Prior to bringing the suit?
6    Q    Right.
7        MR. VAZQUEZ: Form.
8    A    I don't recall.
9    Q    (BY MR. STIMPSON) Are you aware of
10  changes that -- changes to the Vitals website that
11  were done in approximately January 2011?
12    A    I am aware that certain changes have been
13  made, but in reviewing the most recent version of the
14  website, I still see elements, at least based on a
15  layman's perspective, that are in violation of the
16  claims.
17        MR. STIMPSON: Move to strike the second
18  part of that.
19    Q    (BY MR. STIMPSON) Mr. Neal, what changes
20  are you aware of that Vitals made to its website in
21  January of 2011?
22    A    I'm not sure of the specific changes, but
23  the form of the presentation was altered.
24    Q    Okay. Can you give me more specifics?

**Page 17**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A    No.
2    Q    Were you aware in March of 2011 -- well,
3  let me back up a little bit and ask you a different
4  question.
5        Were you aware that at one point Vitals
6  had comparison ratings of healthcare providers in
7  reports on its healthcare providers?
8        MR. VAZQUEZ: Object to form.
9    A    I was and they still do.
10    Q    (BY MR. STIMPSON) Are you aware that
11  Vitals made changes to that?
12    A    I was told that certain changes had been
13  made that were specific to some of the claims made in
14  the patent, but there are still comparison ratings on
15  the website.
16        MR. STIMPSON: Move to strike the last
17  part of that.
18    Q    (BY MR. STIMPSON) Who told you about
19  these changes?
20    A    Well, conversations internally and also
21  with counsel.
22    Q    What I'm trying to get at, Mr. Neal, is
23  did you know, prior to bringing suit against Vitals
24  and MDx, that MDx -- that this change had already

5 (Pages 14 - 17)

**EXHIBIT H**

Attorneys' Eyes Only

Page 18

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  been made?
3       MR. VAZQUEZ:  Form.
4       A    It wasn't -- you know, regardless of what
5  changes were made, there's still violations of the
6  claims made in the patent.  So that was a concern and
7  the reason for the suit, as I understand it.
8       MR. STIMPSON:  Move to strike as
9  nonresponsive.
10      Please read the question back to the
11 witness.
12      (Record read as requested.)
13      A    I was unaware that changes were made.
14 Those changes that were made were specific to
15 addressing the claims made in the patent.
16      MR. STIMPSON:  Can I please have that
17 back?
18      (Record read as requested.)
19      MR. STIMPSON:  I move to strike everything
20 starting from "those changes that were made" as
21 nonresponsive.
22      Q    (BY MR. STIMPSON)  So, Mr. Neal, do you
23 know if anyone at Health Grades knew at the time this
24 litigation was brought that Vitals had made these
25 changes to their website?

Page 19

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2       MR. VAZQUEZ:  Just one second, Mr. Neal.
3  Just caution you to not divulge any of our
4  communications regarding bringing the lawsuit or any
5  communications we've had as those are protected as
6  attorney-client privilege.
7       Other than that, you can answer the
8  question.
9       A    I'm unaware.
10      Q    (BY MR. STIMPSON)  Do you remember the
11 first time that you looked -- that you became aware
12 of these changes to the Vitals website?
13      A    No.
14      Q    Did you discuss these changes for the
15 MDx -- to the MDx website with anyone other than
16 counsel?
17      MR. VAZQUEZ:  Object to form.
18      A    Not that I recall.
19      Q    (BY MR. STIMPSON)  So even after the
20 litigation began, you never talked with Kerry Hicks
21 about the changes to the Vitals website?
22      MR. VAZQUEZ:  Same objection.
23      A    There was no communication that it's not
24 protected.
25      Q    (BY MR. STIMPSON)  How about with

Page 20

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  Mr. Hicks, David Hicks?
3       MR. VAZQUEZ:  Objection.
4       A    The same.
5       Q    (BY MR. STIMPSON)  Can you tell me whether
6  those conversations occurred, just -- without giving
7  me the substance of them -- just a yes or no whether
8  they occurred?
9       MR. VAZQUEZ:  Form.
10      A    They involved counsel.
11      Q    (BY MR. STIMPSON)  So they did exist.  I'm
12 not asking for the substance.  Since they involved
13 counsel I don't want you to disclose that, but I just
14 want a yes or no as to whether those conversations
15 occurred?
16      MR. VAZQUEZ:  Form.
17      A    Yeah, there was conversation.
18      Q    (BY MR. STIMPSON)  What did you do to --
19 oh, I'm sorry, I need to back up because I didn't
20 quite finish your background.
21      You said you were with Morgan Keegan until
22 '96, and then cofounded this Specialty Care Network
23 in about '95, '96; is that right?
24      A    Um-hum.
25      Q    What was Specialty Care Network?

Page 21

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2       A    It was a physician practice management
3  company that purchased and managed orthopedic
4  physician practices and related services.
5       Q    Okay.  Was there anything web based about
6  that?
7       A    No.
8       Q    What was your position at that company?
9       A    I was Specialty Care's cofounder and vice
10 president of business development.
11      Q    Did you hold that same title the whole
12 time you were with Specialty Care?
13      A    No, I didn't.  There was progression.  I
14 started out as manager of -- I don't recall exactly,
15 finance and business development, I think, and it
16 evolved to vice president of business development.
17      Q    And how long did Specialty Care Network --
18 is that still in existence today?
19      A    That company is now Health Grades, CPM
20 Health Grades.
21      Q    Okay.  And when did -- what did you say,
22 CPM?
23      A    CPM Health Grades is the name of our
24 corporate entity today.
25      Q    Oh.  Is that a recent change, CPM?

Veritext/NJ Reporting Company
800-227-8440

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 22

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     A     It is.
3     Q     What does CPM stand for?
4     A     I can't recall exactly.
5     Q     Do you know when the change was made?
6     A     Yeah, we merged with that company in
7  October of last year.
8     Q     Okay.  So was there a change in management
9  at that time?
10    A     No.
11    Q     What is CPM, even if you don't remember
12  what CPM stands for?
13    A     It is -- it's a customer relationship
14  management company.
15    Q     Okay.  And so is Veststar still a majority
16  holder of CPM Health Grades?
17    A     Yes.
18    Q     Were there any changes with regard to
19  Health Grades website after this merger?
20    A     There have been changes in Health Grades
21  website since we launched the website in 2002.  So
22  it's unrelated to anything that occurred related to
23  the merger?
24    Q     Okay.  So there have been changes but just
25  nothing as a result of the merger?

Page 23

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     A     No.
3     Q     Okay.  So when did Specialty Care Network
4  become Health Grades?
5     A     That was -- I don't know the exact dates,
6  but it was 1999, 2000, the name was changed from
7  Specialty Care to Health Grades.
8     Q     Why -- so, it was just a name change?
9     A     It was, um-hum.
10    Q     And was there a change in the business
11  that the company did as of that time?
12    A     There was.
13    Q     And how was it -- what was that change?
14    A     I actually left Specialty Care.  I
15  participated in the recapitalization of what became
16  Health Grades.  We sold all the assets that we had
17  acquired as part of our physician practice
18  acquisition.  That's the process that took place in
19  1999 and into early 2000.
20          And then corresponding with that
21  recapitalization and the sale of assets, Health
22  Grades, Incorporated was created.  And the focus of
23  that entity was to provide information to consumers
24  to allow them to differentiate providers.  And
25  initially the focus was on hospitals.

Page 24

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     Q     Okay.  And at some point the focus
3  expanded to physicians and other healthcare
4  providers?
5     A     It did.
6     Q     Okay.
7     A     Um-hum.
8     Q     All right.  And when did Veststar come in
9  as a major stockholder?
10    A     That would have been -- it's been a year
11  and a half ago.  So it was October of 2010, if my
12  math is right.
13    Q     Okay.  Have you been involved with any
14  other companies besides -- since the 1995, '96
15  timeframe besides the Specialty Care Network and
16  Health Grades?
17    A     I have.
18    Q     And what companies are those?
19    A     I was on the senior management team of a
20  company called Service Magic.
21    Q     Service Management?
22    A     Service Magic.
23    Q     Okay.
24    A     ServiceMagic.com, which is now part of
25  InterActiveCorp.

Page 25

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     Q     Okay.  And when were you with Service
3  Magic?
4     A     That would have been 2001 through maybe
5  late 2000 -- you know, I have to check the dates
6  because I actually was -- I separated from Specialty
7  Care and explored doing some other things, even
8  getting back into investment banking.  So somewhere
9  in the 2000 to early 2003 timeframe was my employment
10  with Service Magic.  I don't know exact dates.
11    Q     Okay.  What did Service Magic do?
12    A     It is a consumer-facing website that helps
13  consumers find home service professionals and, at
14  that point in time, real estate agents.
15    Q     Home service professionals like carpenters
16  and electricians, that sort of thing?
17    A     Yes.
18    Q     And real estate agents?
19    A     Um-hum, yes.
20    Q     So for Service Magic, a consumer would get
21  on the website of Service Magic, type in a search for
22  carpenters in Denver, and up would come information
23  on carpenters in Denver; that sort of thing?
24    A     Yeah, exactly.  A directory type solution.
25    Q     Okay.  Did you have any -- what

7 (Pages 22 - 25)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

**Page 26**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  information did you have at Service Magic on these
3  professionals and real estate agents?
4    A    It wasn't -- that service wasn't about
5  information.  It was basic information about
6  providers.  It was about certifying professionals to
7  ensure that they had appropriately -- appropriate
8  licensing to perform whatever services within that
9  industry.
10   Q    And who provided the certification?
11   A    Service Magic.  Service Magic certified
12  them.
13   Q    Okay.  And from what information did you
14  determine to make the certification?
15   A    I don't recall exactly what those were.  I
16  wasn't involved with that.  I was responsible for
17  business development acquisitions.
18   Q    Okay.  So did you have information on
19  there like education and schools?
20   A    No.
21   Q    No?
22   A    No.  If you think about home service
23  professionals, they're typically -- they don't
24  have --
25   Q    Right.

**Page 27**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    So it's not --
3    Q    Real estate agents often do that, right?
4    A    Yeah, that was about -- it was about
5  promotion.  So we would build a network.  It was a
6  marketing website, so there's a directory.
7    Q    Okay.
8    A    But our network was supported by those who
9  joined it, and that's what that model was.
10   Q    Did Service Magic ever collect any
11  information on quality of the professionals or real
12  estate agents?
13   A    There's no means in that industry.  They
14  may have done things since I left.  Again, that was
15  only through very early -- late 2002 or early 2003.
16   Q    Okay.
17   A    They may have found the means to
18  differentiate based on quality, but it didn't -- it
19  simply didn't exist when I was there.
20   Q    Was there any way for consumers to rate
21  their service providers?
22   A    You know, I don't think that we did
23  provide ratings.  I don't recall having provided
24  ratings at that point in time.
25   Q    At some point in time they did?

**Page 28**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    They provide a form of survey that's from
3  consumers now.  I wouldn't qualify it necessarily as
4  a rating.
5    Q    And you said they do that now.  Do you
6  know when they started that?
7    A    I do not.
8    Q    Was it before 2006?
9    A    I don't know.
10   Q    How would I find out that information?
11   A    I don't know.
12   Q    Do you have any information on Service
13  Magic that you keep personally?
14   A    No.
15   Q    Is Service Magic still in existence?
16   A    It is, um-hum.
17   Q    And if I was to contact -- who would I
18  contact over there to ask them about who -- do you
19  know anybody -- let me ask an intelligible question.
20       Do you know anybody who is there now who
21  would know when these surveys were first available on
22  Service Magic?
23   A    No.
24   Q    Do you know anyone there now at all?
25   A    I do know a couple of people.

**Page 29**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    People who were still there when you were
3  there?
4    A    There's at least one person that's still
5  there.
6    Q    Who is that?
7    A    Andy Zurcher.
8    Q    Can you spell the last name, please?
9    A    Z-U-R-C-H-E-R.
10   Q    Where does Andy Zurcher live?
11   A    Denver.  It's a Denver-based company.
12   Q    And what is his position?
13   A    I'm not sure of his current position.
14   Q    At the time that you filed your
15  application on the '060 patent, Exhibit 3, did you
16  know of other entities that provided ratings to
17  consumers over the web?
18       MR. VAZQUEZ:  Object to form.
19   A    I can't recall.
20   Q    (BY MR. STIMPSON)  Did you know at some
21  point during the prosecution of this patent about
22  other companies who provided ratings to consumers
23  over the web?
24       MR. VAZQUEZ:  Same objection.
25   A    I can't recall dates when other companies

8 (Pages 26 - 29)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 30

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  may have offered ratings over the web.
2
3      Q     (BY MR. STIMPSON) Did Service Magic
4  provide ratings on professionals prior to Health
5  Grades providing ratings on professionals?
6          MR. VAZQUEZ: Form.
7      A     I never said they provided ratings.
8      Q     (BY MR. STIMPSON) Okay. Surveys?
9      A     They captured surveys.
10     Q     Okay.
11     A     And there's a distinction, an important
12  distinction, between capturing a survey and providing
13  a rating.
14     Q     Okay. What was the survey that Service
15  Magic did?
16     A     I don't recall the content of the survey.
17     Q     Did Service Magic provide these surveys
18  prior to Health Grades providing patient ratings?
19     A     I don't recall.
20         MR. VAZQUEZ: Form.
21     Q     (BY MR. STIMPSON) Pardon me?
22     A     I don't recall.
23     Q     When you filed the application that became
24  the '060 patent, did you do anything to check on when
25  they did that?

Page 31

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2          MR. VAZQUEZ: Same.
3      A     No, because this was completely unrelated
4  to what we were filing the patent for.
5          MR. STIMPSON: Move to strike everything
6  after "no." Nonresponsive.
7      Q     (BY MR. STIMPSON) Do you -- at the time
8  you filed the application for the '060 patent, did
9  you know of any entities that provided ratings to
10  consumers over the web for any type of professionals?
11     A     It would be speculation on my part to
12  guess the dates of who may have been providing what
13  at what times.
14     Q     Okay. Well, do the best you can, please.
15     A     I can't recall.
16     Q     You don't remember any companies -- let's
17  just take the 2000 time period before 2007. Do you
18  recall any companies that were providing ratings to
19  consumers over the web?
20     A     It would be speculation for me to guess
21  the dates. I just don't recall the dates.
22     Q     Do you know any companies that were doing
23  it about that time?
24         MR. VAZQUEZ: Form.
25     A     I'm aware of sites that have done it. I

Page 32

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  just can't recall the dates.
2
3      Q     (BY MR. STIMPSON) What are those sites?
4      A     They're the restaurant websites, for
5  example.
6      Q     What specific sites?
7      A     I don't recall the exact sites.
8      Q     Is it fair to say, Mr. Neal, that the idea
9  of providing ratings to consumers over the web, as of
10  early 2006, late 2005, that was well known?
11         MR. VAZQUEZ: Object to form.
12     A     No, that's the reason we filed the patent.
13     Q     (BY MR. STIMPSON) Because you provided
14  ratings over the web?
15         MR. VAZQUEZ: Form.
16     A     No. No because -- no.
17     Q     (BY MR. STIMPSON) What is the reason you
18  filed the patent then?
19     A     We created a very unique platform to
20  assist consumers in educating themselves on
21  providers, specifically physician providers, but
22  secondarily hospital providers.
23         So the names by which we presented that
24  content, form of content, and the means by which we
25  combine that content, and then created a score by

Page 33

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  which they could differentiate, was unique. There
3  was no one else that was doing that.
4      Q     Okay. As of early 2006, Mr. Neal, it was
5  known that ratings could be provided to consumers for
6  various professionals over the web, right?
7          MR. VAZQUEZ: Form.
8      A     If that's your analysis. I said I
9  couldn't recall the dates.
10     Q     Okay. What did you do to prepare for the
11  deposition?
12     A     I've met with counsel twice over the last
13  two days, so Monday and Tuesday. Monday for --
14         MR. VAZQUEZ: I'm sorry to interrupt. You
15  can answer the question, but don't disclose any of
16  our communications.
17         THE DEPONENT: Okay.
18     A     -- for about an hour and a half Monday and
19  for about 30 minutes, at the most, yesterday.
20     Q     (BY MR. STIMPSON) So a total of two hours
21  meeting with your counsel?
22     A     We also had a video conference last week
23  for no more than two hours.
24     Q     Okay. Anything else you did to prepare?
25     A     No.

9 (Pages 30 - 33)

**EXHIBIT H**
973-410-4040

Attorneys' Eyes Only

Page 34

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    Q    Did you talk --
3    A    I --
4    Q    Go ahead.
5    A    I did look at these specific items that
6    you're going to be asking me about today in terms of
7    the bullet points.
8    Q    Okay.
9    A    But that was the limit of my review of
10   those documents.
11   Q    To prepare yourself for the -- to talk
12   about the topics that are assigned to you, did you
13   speak with anyone besides counsel?
14   A    No.
15   Q    Did you look at any documents that have
16   not been produced to MDx, to your knowledge?
17   A    No.
18   Q    What documents did you look at to prepare
19   for the topics --
20       MR. VAZQUEZ:  Object and instruct you not
21   to answer based on the work-product privilege.
22   Q    (BY MR. STIMPSON)  Did you review any of
23   the -- any information on earlier Health Grades
24   websites, the website for 2004 and 2005?
25       MR. VAZQUEZ:  Same.

Page 35

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    Q    (BY MR. STIMPSON)  Mr. Neal, can you tell
3    me prior to August of 2006 what products and services
4    did Health Grades have available on the web?
5    A    You know, I don't think about the website
6    so much in terms of products or services.  It was an
7    experience on the website.
8    Q    Well, you did offer products and services
9    over the website, right, prior to 2006?
10   A    There were reports that were available to
11   consumers.
12   Q    And what reports were those?
13   A    There was a Physician Report and a
14   Hospital Report.
15   Q    Did they have specific names, these
16   reports?
17   A    Over time they had a number of different
18   names.
19   Q    Can you tell me what they are, please, to
20   the extent you remember?
21   A    I don't recall all the names.
22   Q    Do you remember any of them?
23   A    I do.  I have a recollection of some of
24   the names.
25   Q    Would you please tell them to me.

Page 36

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    A    There was a Physician Report, I think
3    online Physician Report, online Hospital Report.
4    There was a Physician Quality Report.
5    Q    Anything else?
6    A    I remember an alphabet soup of acronyms.
7    I can't recall what all those stood for.
8    Q    Can you remember any others?
9    A    Any other what?
10   Q    Any other names that you can give me.
11   A    So you're talking about in that timeframe
12   of 2006?
13   Q    Yes.
14   A    I don't recall the specific names.
15   Q    Okay.  There was a physician quality
16   guide, right?
17       MR. VAZQUEZ:  Scott, are these questions
18   qualified by prior to 2006?  I believe that's how you
19   started.
20       MR. STIMPSON:  I'm sorry.
21   Q    (BY MR. STIMPSON)  Let's do it prior to
22   August 29, 2006.
23       MR. STIMPSON:  Thank you.
24   Q    (BY MR. STIMPSON)  There was a physician
25   quality guide, right?

Page 37

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    A    A physician quality guide.  I'm unaware of
3    a physician quality guide.  There may have been a --
4    yeah, we had a lot of different names for the same
5    thing.
6    Q    How about the Physician Quality Report?
7    A    That name rings a bell.  That's the one I
8    think I just mentioned.
9    Q    Right, yeah, you did.
10       How about a Physician Research Quality
11   Report?
12   A    It's the same thing.
13   Q    I'm just giving you some names I've seen.
14   I don't know if they're the same or not.
15       Physician Research Comparison Report?
16   A    Yeah, I mentioned that one.
17   Q    That's the same thing?  Okay.
18       And what was the Physician Research
19   Comparison Report?
20   A    It was an addendum to -- if someone
21   purchased a Physician Quality Report, we also, as
22   part of that purchase, included the means by which
23   they would get additional physician reports.  It
24   wasn't so much a comparison of physicians as access
25   to additional physician information.  We called it a

Veritext/NJ Reporting Company
800-227-8440

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 38

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Physician Comparison Report.
3        Q    When was that available?
4        A    I don't recall exact dates.
5        Q    Was it prior to August of 2006?
6        A    I don't recall the exact dates.  There was
7    some form of Physician Report available prior to 2006
8    because we were selling reports.
9        Q    Well, let's look at Exhibit 45, okay?
10       A    Which one is that?
11       Q    That's it.  That's the last page.
12       A    Okay.
13           MR. STIMPSON:  And, Mr. Vazquez, correct
14   me if I'm wrong, but the parenthetical in topic 1 was
15   for Mr. Neal?
16           MR. VAZQUEZ:  Correct.
17       Q    (BY MR. STIMPSON)  So, Mr. Neal, do you
18   see that parenthetical refers to Physician Research
19   Comparison Reports?
20       A    I do.
21       Q    So you understand it was your duty to
22   prepare yourself to testify about that?
23       A    I just mentioned the Physician Comparison
24   Report to you and that I was aware of it.
25       Q    Okay.  But my question was a little

Page 39

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    different.  You're aware that it was your
3    responsibility to prepare yourself to testify about
4    that Physician Research Comparison Report, correct?
5        A    That's part of the reason I'm here today,
6    I believe.
7        Q    And the same as the Physician Quality
8    Report?
9        A    Indeed.
10       Q    And the same as the Physician Quality
11   Guide?
12       A    I'm not familiar with the Physician
13   Quality Guide, independent of if you can refresh my
14   memory on that.
15       Q    Did you do anything to prepare yourself to
16   talk about the Physician Quality Guide?
17           MR. VAZQUEZ:  Don't disclose any of our
18   communications.  If you can answer the question
19   without doing that, please do so.
20       A    Someone is going to have to show me what
21   that is because that's not something I recall.
22       Q    (BY MR. STIMPSON)  So you didn't do
23   anything to prepare yourself to talk about physician
24   quality guides today?
25           MR. VAZQUEZ:  Object to form.

Page 40

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Mischaracterizes testimony.
3        Q    (BY MR. STIMPSON)  Is that right?
4            MR. VAZQUEZ:  Same objection.
5        A    I'm fully prepared to answer the questions
6    that you have to the best of my ability.
7        Q    (BY MR. STIMPSON)  Okay.  But my question
8    was, did you do anything to prepare yourself to talk
9    about physician quality guides today?
10           MR. VAZQUEZ:  Object to form.
11       A    I don't recall exactly what a physician
12   quality guide -- or not exactly at all what a
13   physician quality guide is.  I think it's just
14   perhaps a name that was assigned to the same report
15   that we've already discussed.
16       Q    (BY MR. STIMPSON)  So as we sit here
17   today, you can't even tell me for sure what a
18   physician quality guide is, right?
19           MR. VAZQUEZ:  Form.  Mischaracterizes
20   testimony.
21       Q    (BY MR. STIMPSON)  Is that accurate?
22           MR. VAZQUEZ:  Same.
23       A    I don't know what a physician quality
24   guide is.  That name does not ring a bell.
25       Q    (BY MR. STIMPSON)  How about a Physician

Page 41

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Quality Report?  Can you tell me what that is?
3        A    Yeah, it's a compilation of information
4    about physicians using third-party data.
5        Q    When was that first launched?
6        A    I don't recall the exact date.
7        Q    Can you recall anything about the dates?
8        A    I do not.
9        Q    Do you see in that topic 1 -- let's go
10   back to topic 1, okay?
11       A    Um-hum.
12       Q    Let's start reading from the top of the
13   list, okay?  Number 1 it says, All facts surrounding
14   each and every Health Grades product or service for
15   providing information on healthcare providers prior
16   to August 29, 2006.
17           And then I realize that the ones you're
18   supposed to talk about are the ones in the
19   parenthetical later, but it says, including, but not
20   limited to, facts concerning dates of use.
21       A    Um-hum.
22       Q    Did you do anything to prepare yourself to
23   tell me when physician quality reports were first
24   used?
25           MR. VAZQUEZ:  Well, hold on a second.  I'm

11 (Pages 38 - 41)

**EXHIBIT H**

973-410-4040

Attorneys' Eyes Only

---

Page 42

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    going to object to form. Scott, I think he answered
2    this is before August 29, 2006 in response to your
3    earlier questions. Right?
4         MR. STIMPSON: Okay. First of all, Jesus,
5    please --
6         MR. VAZQUEZ: I know what you're about to
7    say. You think I'm coaching or whatever, but he, in
8    fact, told you this is pre 2006.
9         MR. STIMPSON: So that's all you think
10   this meant, dates of use? Just as long as he can say
11   prior to August 29, 2006?
12        MR. VAZQUEZ: No, I'm not saying anything
13   else about it. It just -- it seems from your
14   question that maybe you're forgetting that he did say
15   that.
16        MR. STIMPSON: Okay. Just object to form,
17   please.
18        Q    (BY MR. STIMPSON) Okay. Mr. Neal, what
19   did you do to prepare yourself to tell me the date of
20   first use of physician quality reports in preparation
21   for this deposition?
22        A    I did not review when those reports were
23   first available on the website. I have a lot of
24   information that's in my head.

---

Page 43

CONFIDENTIAL - ATTORNEYS EYES ONLY

1         Q    When was the Physician Quality Report
2    first available on the Health Grades website?
3         A    I don't recall the exact date.
4         Q    Can you tell me a year?
5         A    I can't recall the exact date.
6         Q    Can you tell me a year?
7         A    It was prior to August 29th, 2006.
8         Q    Can you tell me a year, sir?
9         THE DEPONENT: It would be speculating,
10   Jesus, for me to say exactly what year.
11        MR. VAZQUEZ: Well, just answer it if you
12   can. I'll make my objections.
13        THE DEPONENT: Okay.
14        A    It would have been 2003 or 2004.
15        Q    (BY MR. STIMPSON) But you don't know for
16   sure? Sometime in 2003 to 2004?
17        A    Right.
18        Q    And did you do anything to prepare
19   yourself to tell me a specific date?
20        A    No.
21        MR. VAZQUEZ: Object to form.
22        Q    (BY MR. STIMPSON) Did you look at any
23   documents on the Physician Quality Report?
24        A    Not as it relates to when the report was

---

Page 44

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    first offered.
2         Q    Okay. What documents did you look at
3    about the Physician Quality Report?
4         MR. VAZQUEZ: Well, I object and I'm
5    instructing you not to answer based on the
6    work-product privilege.
7         Q    (BY MR. STIMPSON) Did you look at any
8    documents regarding the Physician Quality Report in
9    preparation for this deposition?
10        MR. VAZQUEZ: You can answer that.
11        THE DEPONENT: Okay.
12        A    I did.
13        Q    (BY MR. STIMPSON) Okay. What did the
14   Physician Quality Report contain?
15        A    I think I answered that a moment ago. But
16   it was a compilation of third-party sources of data
17   put into a form of report that was sold to consumers.
18        Q    Did it include information received from
19   healthcare providers?
20        A    It did not.
21        Q    Did it include information received from
22   third parties?
23        A    I just said it did.
24        Q    It did. Okay.

---

Page 45

CONFIDENTIAL - ATTORNEYS EYES ONLY

1         And was that information, any of the
2    information, verified by Health Grades in that
3    report?
4         MR. VAZQUEZ: Object to form.
5         A    What does verified mean?
6         Q    (BY MR. STIMPSON) What do you understand
7    verified to mean?
8         A    Were we analyzing the content that was
9    included in that report? If that's the definition of
10   verified, then, yes, it was verified.
11        Q    And there's actually -- well, there is a
12   difference between verified data and unverified data,
13   right?
14        MR. VAZQUEZ: Form.
15        Q    (BY MR. STIMPSON) Verified data is much
16   more trustworthy?
17        MR. VAZQUEZ: Form.
18        Q    (BY MR. STIMPSON) Is that accurate?
19        MR. VAZQUEZ: Form.
20        A    It depends on what content data you're
21   talking about.
22        Q    Okay. How so?
23        A    There's a variety of data that is
24   available regardless of industry vertical. Certain

---

Veritext/NJ Reporting Company

800-227-8440

**EXHIBIT H**

973-410-4040

Attorneys' Eyes Only

Page 46

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  data had be to scrutinized or reviewed more closely
3  depending on the nature of the data, the source of
4  the data, how it's going to be presented to
5  consumers.
6      Q    Would you agree with me, though, that data
7  that is verified is generally more trustworthy than
8  data that is not verified?
9      MR. VAZQUEZ:  Object to form.
10     A    It depends on who does the verification.
11     Q    (BY MR. STIMPSON)  If Health Grades does
12 the verification?
13     MR. VAZQUEZ:  Form.
14     A    There is more use, I would think,
15 associated with verified data as opposed to
16 unverified data.
17     Q    (BY MR. STIMPSON)  Okay.  Can you tell
18 me -- you told me there was a compilation of
19 third-party sources of data in this Physician Quality
20 Report.
21         Is there anything else you can tell me
22 about the content of those reports?
23     A    That's what they were.
24     Q    Can you tell me what specific data was
25 available in those reports?

Page 47

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A    Some of the data elements I can tell you.
3  It was the physician name, their practice location.
4  There was board certification, as available.  There
5  was disciplinary action and sanction data by state,
6  as available.
7          And in select cases, though particularly
8  early on there were challenges in getting useful data
9  and meaningful data from third parties.  There was
10 sometimes medical school information, fellowship-type
11 information.  But it was challenging.
12     Q    Anything else you can remember?
13     A    Those were the things that stand out to
14 me.
15     Q    It also has in the parenthetical here
16 Physician Research Comparison Reports.
17         Do you see that?
18     A    Um-hum, I do.
19     Q    When was the Physician Research Comparison
20 Report first provided for the Health Grades website?
21     A    I don't recall the exact date, but it was
22 later.  We started with just the Physician Quality
23 Report.
24     Q    Okay.  When was the Physician Research
25 Comparison Report first made available on the Health

Page 48

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  Grades website?
3      A    I don't recall.
4      Q    Can you give me a year?
5      A    I don't recall.
6      Q    You can't even give me a year?
7      A    No.
8      Q    Was it before 2006?
9      A    It would have, I believe, been before
10 2006.
11     Q    Was it before 2005?
12     A    I don't recall.
13     Q    What did you do to determine the date of
14 first use of the Physician Research Comparison Report
15 in preparation for this deposition?
16         MR. VAZQUEZ:  Again, if you can answer the
17 question without divulging any of our communications,
18 please do so.
19         THE DEPONENT:  Okay.
20     A    I'm just working from memory.
21     Q    (BY MR. STIMPSON)  So you didn't do
22 anything; you're just relying on your memory?
23         MR. VAZQUEZ:  Misstates the testimony.
24 Object to form.
25     A    There was discussion with counsel about

Page 49

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  certain items, which I can't discuss.
3      Q    (BY MR. STIMPSON)  Was there a beta test
4  for the Physician Research Comparison Report?
5      A    Most websites will beta test virtually
6  everything they do to consumers on the web.  So with
7  virtually everything we do today, and what we did
8  historically, there were beta tests.  So that would
9  include that report, too, I would think.
10     Q    So there were beta tests -- the answer is
11 yes, there were beta tests with regard to the
12 Physician Research Comparison Report?
13     A    I don't know that to be a fact, but I
14 believe there probably were.
15     Q    What can you tell me about the beta test
16 for the Physician Research Comparison Report?
17     A    Well, I can't tell you for a fact that
18 they existed or took place, so I can't tell you
19 exactly what was done.
20     Q    Then I assume the answer is you can't tell
21 me when the beta tests were done, right?
22     A    I don't even know if beta tests were done
23 for a fact, so that's correct.
24     Q    Can you tell me the first time that the
25 Physician Research Comparison Reports were disclosed

13 (Pages 46 - 49)

**EXHIBIT H**
973-410-4040

Attorneys' Eyes Only

Page 50

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  to the public?
3      A    I don't recall.
4      Q    Did Health Grades promote this to anyone
5  outside of Health Grades before the beta tests?
6          MR. VAZQUEZ: Object to form.
7      A    What is "this"?
8      Q    (BY MR. STIMPSON) The Physician
9  Comparison Research Reports.
10      A    What do you mean by promote?
11      Q    Well, did you tell anyone?
12      A    Who is anyone?
13      Q    Anyone outside of Health Grades.
14      A    I talked about a physician quality
15  comparison report outside of the corporate structure
16  of Health Grades.
17      Q    No, it's Physician Research Comparison
18  Report. My question is, prior to the beta tests, did
19  anyone at Health Grades disclose Physician Research
20  Comparison Reports to anyone outside of Health
21  Grades?
22      A    I'll remind you that I didn't say beta
23  tests, and I don't recall any conversations with
24  anyone outside of Health Grades.
25      Q    Did you do anything to find out whether

Page 51

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  there were any conversations with anyone outside of
3  Health Grades?
4      A    No.
5      Q    So if I can just recap here on the
6  Physician Research Comparison Reports, you can't tell
7  me a date when they were first on the Health Grades
8  website, right?
9      A    I did tell you a date. I said it was
10  before August 29th, 2006.
11      Q    Okay. Is that a date?
12      A    It absolutely is. It's a range of dates.
13      Q    Okay. So was it in 1991 that they
14  launched this? See, it's not a date, is it,
15  Mr. Neal?
16      A    But we don't have to be absurd, okay?
17      Q    So I know we don't.
18      A    Right.
19      Q    So my question is this, you can't tell me
20  a date when the Physician Comparison Research Report
21  was launched?
22      A    You're also not asking me questions;
23  you're making statements.
24      Q    Well, the questions are up to me.
25      A    Well, you're not asking questions; you're

Page 52

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  making a statement.
3      Q    All right. Well, here is a question,
4  then, for you, Mr. Neal. What date was the Physician
5  Research Comparison Report launched?
6      A    I don't recall.
7      Q    And you can't tell me a year when it was
8  launched?
9      A    That's not a question.
10      Q    Yes, it is.
11      A    That was a statement.
12      Q    Okay. It's called a leading question.
13  It's perfectly acceptable.
14          You can't tell me a date, a year, you
15  can't even tell me a year when the Physician Research
16  Comparison Report was launched, correct?
17      A    There's a time period prior to
18  August 29th, 2006 that it was launched.
19      Q    Is the answer to my question that it's
20  correct, you can't tell me a year?
21          MR. VAZQUEZ: Object to form. I think
22  it's argumentative and harassing the witness.
23      Q    (BY MR. STIMPSON) You can answer.
24      A    I don't recall the date.
25      Q    And you can't tell me whether there were

Page 53

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  beta tests on the Physician Research Comparison
3  Report, correct?
4      A    That's a statement, not a question.
5      Q    Well, you didn't listen to it, okay?
6      A    If you can ask a question, I'll answer the
7  questions.
8      Q    Okay. You can't tell me whether there
9  were beta tests --
10      A    You're saying you can't tell me. That's
11  not a question.
12          MR. VAZQUEZ: Okay. Okay.
13      Q    Please just hear me out, okay?
14      A    Okay. I prefer that you ask me a question
15  so I can provide you an answer.
16      Q    Please listen to it, okay?
17      A    Okay.
18      Q    You can't tell me a date -- you can't tell
19  me whether there were beta tests on the Physician
20  Research Comparison Report, correct?
21      A    I cannot tell you that for a fact.
22      Q    You can't tell me whether anyone from
23  Health Grades disclosed Physician Research Comparison
24  Reports outside of Health Grades, correct?
25      A    That was not done to my knowledge.

14 (Pages 50 - 53)

Attorneys' Eyes Only

Page 54

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  Q   Did you do anything to find this out?
3      MR. VAZQUEZ: If you can answer the
4  question without disclosing our communications, do
5  so.
6      A   I can't without disclosing attorney-client
7  privilege.
8      Q   (BY MR. STIMPSON) Well, it's just a yes-
9  or no-question. Did you do anything to determine
10 whether or not Physician Research Comparison Reports
11 were disclosed outside of Health Grades?
12     A   To my knowledge, there was some research
13 conducted into that.
14     Q   What research?
15     A   I don't know. It was the attorneys -- the
16 attorneys did that.
17     Q   Sir, you said there was some research into
18 Physician Research Comparison Reports, and I just
19 want to know what you're referring to there.
20     MR. VAZQUEZ: Let's just kind of back up
21 here. Let's pause after he's done with the question.
22 It allows me to think about it and make an objection,
23 and then you can answer. And a lot of these
24 questions are about the preparation.
25     THE DEPONENT: Right.

Page 55

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      MR. VAZQUEZ: That's what he's asking you
3  about. Because you already testified we had
4  meetings. And all I'm telling you is, if you can
5  answer his questions without divulging what we talked
6  about, please do so.
7      THE DEPONENT: Okay.
8      A   So your question.
9      Q   (BY MR. STIMPSON) Okay. You mentioned
10 research on Physician Research Comparison Reports.
11 What research were you referring to?
12     A   Just research as to when those reports may
13 have been available, and I'm unaware of the results
14 of that research.
15     MR. STIMPSON: I flew to Denver for this.
16 I'm missing my kid's baseball game.
17     THE DEPONENT: Hey, you know, we're all
18 missing things.
19     MR. STIMPSON: He didn't do anything to
20 prepare for this, Jesus.
21     MR. VAZQUEZ: No, that's not true.
22     MR. STIMPSON: He can't tell me anything.
23     MR. VAZQUEZ: That's not true.
24     MR. VAZQUEZ: I think that we should maybe
25 take a quick break and --

Page 56

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      MR. STIMPSON: No, I'm not quite ready,
3  okay? I mean, if you absolutely have to --
4      MR. VAZQUEZ: We've been going like an
5  hour. Well, I just personally want to go to the
6  bathroom.
7      MR. STIMPSON: Okay.
8      MR. VAZQUEZ: But I think, given the level
9  of tone that has escalated here, it just makes sense
10 to cool down and come back and keep going at it.
11 Okay?
12     MR. STIMPSON: Okay.
13     MR. VAZQUEZ: Let's do that.
14     (Recess taken from 9:11 a.m. to
15 9:34 a.m.)
16     Q   (BY MR. STIMPSON) Mr. Neal, can you
17 please identify Health Grades competitors?
18     A   There are a number of competitors. If
19 it's okay, I'll provide a definition of a competitor.
20     Q   That's fine.
21     A   Okay. So definition of a competitor is
22 any website that attempts to attract consumers who
23 are searching for provider information online. And
24 provider information can be in the form of physician
25 information, hospital information, dentists.

Page 57

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      So really, that's the competitive set, by
3  definition.
4      Q   And why is that your definition of
5  competitors? Is that the way you've used it
6  throughout your career? Or is that something that --
7      A   Well, that's the foothold that we've
8  established. That's where our business is focused.
9  So as we look across the landscape, anyone that is
10 offering similar forms of content or services to
11 consumers on the Internet is deemed to be a
12 competitor.
13     Q   Okay. Let me just back up and ask you
14 another question. Can you tell me what products and
15 services of Health Grades fall within the claims of
16 the patent as Exhibit 3?
17     A   It's not so much a product that falls.
18 The intent behind the patent filing was to protect
19 the unique experience that we've created on the
20 website. So how we display content, how we
21 facilitate search, and then, more recently, how we
22 facilitate ratings and comparison of providers.
23     So it's not -- and then ancillary to that
24 would be the product sets that were a result of that
25 consumer experience.

15 (Pages 54 - 57)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 58

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    MR. STIMPSON: I'm sorry, I have to move
3 to strike that as nonresponsive.
4    Q    (BY MR. STIMPSON) Mr. Neal, one of the
5 topics that you were designated to testify about
6 today, and I'm sorry I don't have the deposition
7 notice with me, but maybe you guys do, was products
8 and/or services of Health Grades that embody and/or
9 imply any claim -- and/or employ any claim of the
10 patent-in-suit.
11    And I'm just asking you, sir, what
12 products and/or services of Health Grades embody or
13 employ any claim with the patent-in-suit?
14    A    Understood. Thank you.
15    So encompassed within that experience that
16 I've just described for the website are the products
17 specific to consumers. So things like that Physician
18 Quality Report, things like the Hospital Quality
19 Report and the Physician Comparison Report.
20    So those were all a function of the
21 website experience in more a product as a result of
22 having created that experience.
23    Q    Are there any other, besides those three,
24 that embody or employ any claim in the
25 patent-in-suit?

Page 59

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    A    Well, there are. And it's essentially so
3 there really are -- there are two phases that the
4 company has gone through from a product standpoint.
5 Those reports had a number of different names, but
6 essentially they were all the same thing.
7    So Physician Quality Report, Hospital
8 Quality Report, Physician Quality Comparison Report.
9    Q    So --
10    A    That is --
11    Q    Go ahead.
12    A    -- those were solutions that we offered,
13 or products we offered, to the consumers. Go ahead.
14    Q    Does a Physician Quality Report have
15 comparison ratings of healthcare providers?
16    A    The Physician Quality Comparison Report
17 did not have a comparison rating of providers.
18    Q    Okay. I think what I heard you say that
19 what fell under the patent claims were the Physician
20 Quality Report, Hospital Quality Report, and
21 Physician Comparison Report.
22    Did I get that wrong?
23    A    That fell under the claim?
24    Q    Yeah, did either --
25    A    No, the point I was making is that there

Page 60

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2 were a number of products that were a function of the
3 website experience that we created. The website
4 experience in the offerings that we made to consumers
5 were the subject of the patent.
6    Q    Okay. But I'm trying to get an
7 identification of the products and services that
8 embody or employ any claim of the patent-in-suit.
9    A    Understood. There are elements that we
10 employ today on the website. If you go to Health
11 Grades we're employing certain embodiments of the
12 patent.
13    Q    Okay. I mean, can you --
14    MR. VAZQUEZ: Hold on. I'm not having a
15 chance to interject. I just want to make an
16 objection to form to the last question, please.
17    Q    (BY MR. STIMPSON) Can you please identify
18 for me products or services of Health Grades that
19 embody or employ any claim in the patent-in-suit?
20    MR. VAZQUEZ: Form.
21    You can answer.
22    A    Okay. First of all, there is the
23 experience on the current version of the Health
24 Grades website and previous iterations whereby we
25 facilitate search on multiple physicians and provide

Page 61

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2 quality comparison ratings and scores on the
3 physicians and facilitate comparison of physicians,
4 okay? That's just the website experience, not
5 specific to any specific product.
6    And then there are a series of products
7 that we have offered, primarily to hospital clients,
8 that are a result of or a function of that experience
9 on the Health Grades website.
10    Q    Well, what's the earliest product or
11 service that Health Grades embodies or employs in a
12 claim in the patent-in-suit?
13    A    I can't speak to the specific claims and
14 products to those individual claims, per se. I just
15 know I have an idea of the dates when we offered
16 specific products.
17    Q    Well, when was the -- when did you start
18 offering products and services that embodied or
19 employed the claim in the patent-in-suit?
20    MR. VAZQUEZ: Form.
21    A    So you're talking about third-party
22 provided information, physician provided information,
23 consumer provided information, in providing a form of
24 comparison rating for those?
25    Q    (BY MR. STIMPSON) I am.

16 (Pages 58 - 61)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

---

**Page 62**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    A    That was -- that would have been more
3    recently in the -- kind of the 2006, 2007 timeframe.
4    Q    Do you remember when, specifically when in
5    2006 and 2007?
6    A    I don't know exactly what dates in that
7    timeframe. I can tell you the consideration that we
8    had and the sensitivity was, and the reason that we
9    didn't present that information to users of the
10   website is that our clients are hospitals, large
11   hospital systems. And they have relationships with
12   physicians.
13        And there was the concern, the very real
14   concern, that anything we might do to shed light on
15   physicians or rate physicians, provide comparisons of
16   physicians based on quality, would put our revenue at
17   risk with our hospital clients.
18        So we're very thoughtful and judicious in
19   our approach as to when we introduced that and then
20   how we introduced it on the website.
21   Q    Was that a concern about when you
22   introduced it to the consumer side of the website?
23   A    Well, there was just one side. There was
24   only a consumer side.
25   Q    Right. But you also had a physician site,

---

**Page 63**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    right?
3    A    There was a portal, a physician portal.
4    Q    So what I'm getting at, there was a time
5    before you allowed general consumers to get on where
6    you were showing comparison ratings and ratings of
7    physicians but just to your hospital side of your
8    clients, right?
9    A    I'm unaware of that.
10   Q    Okay. So anyway, we talked about the
11   products and services of Health Grades that embody or
12   employ a claim in the patent-in-suit.
13        Just talking about that, who are your
14   competitors?
15   A    So competitors, Vitals, of course; New
16   Compare Healthcare; WebMD. There are MD Ratings.
17   Q    MD Ratings?
18   A    Yeah, I think it's MD Ratings. There are
19   a couple of physician rating sites that provide
20   comparison ratings. There are a host of directory
21   type sites that provide basic physician information.
22        So Internet Yellow Page sites like Super
23   Pages, Yellow Book, Yellowpages dot com. There are
24   others, too, that could fall into that definition of
25   competitor that I provided.

---

**Page 64**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    Q    Is it fair to say that Health Grades has
3    dozens of competitors in this space?
4    A    I think there are categories of
5    competitors, and I would say, yeah, that's an
6    accurate statement.
7    Q    Since 2010, how has Vitals hurt Health
8    Grades by its accused website?
9        MR. VAZQUEZ: Object to form.
10   A    I think that there's no doubt that what
11   they've done in replicating a lot of what we do, it's
12   allowed them to attract an audience. And I think
13   that's detrimental to Health Grades in that they've
14   redirected consumer interest and traffic.
15   Q    (BY MR. STIMPSON) Anything else?
16       MR. VAZQUEZ: Object to form. Calls for
17   expert testimony.
18   A    That's the primary concern.
19   Q    (BY MR. STIMPSON) So as we sit here
20   today, you can't think of any other way that Health
21   Grades has been harmed by the presence of MDx, the
22   Vitals website, correct?
23       MR. VAZQUEZ: Object to form. Calls for
24   expert testimony.
25   A    I'm sorry, can I answer?

---

**Page 65**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2        MR. VAZQUEZ: You can.
3    Q    (BY MR. STIMPSON) Is that correct?
4    A    Yeah. Yes.
5    Q    Do you have any feel for the monetary
6    value of that harm?
7        MR. VAZQUEZ: Same objection.
8        Can you just give me a continuing one
9    here?
10       MR. STIMPSON: Yes.
11       MR. VAZQUEZ: Thank you.
12   A    Yeah, it would be significant.
13   Q    (BY MR. STIMPSON) What do you mean
14   significant?
15   A    It's somewhat immeasurable because we
16   can't precisely tie it back to what the cost of one
17   redirected consumer is. But it's substantial. One
18   way to do it would be to look at the relative traffic
19   of the two websites. As I understand it, based on
20   the latest site traffic scores, Vitals is
21   approximately 50 percent, maybe a little bit less
22   than 50 percent of Health Grades traffic.
23       So if you were to value the
24   healthgrades.com entity in a revenue stream that
25   we've created, I would assume that one measure would

---

17 (Pages 62 - 65)

**EXHIBIT H**
973-410-4040

Attorneys' Eyes Only

Page 66

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  be 50 percent, whatever the value of that 50 percent
2  of audience is that Vitals has attracted.
3      Q    So if Vitals website were to shut down
4  today, is it your belief that every one of those
5  would go to Health Grades as opposed to Ucompare or
6  something else, one of the other competitors?
7      A    I think it's impractical to think that all
8  of that traffic would get to us, but I do think that
9  the lion's share of it would get to us.
10     Q    Why?
11     A    Because we are the primary platform for
12 provider research online, and Vitals is number two.
13 And any time a number two competitor gets displaced,
14 then that has a very real impact on whoever the
15 primary provider is in that space.
16         So it would be very beneficial to Health
17 Grades.
18     Q    So if -- how does traffic end up getting
19 to healthgrades.com?
20         MR. VAZQUEZ:  Form.
21     Q    (BY MR. STIMPSON)  I mean, do you have an
22 understanding of that, like from a Google search?
23     A    I do.  I do.  It's a variety of sources.
24 Google search is one way.  But we were the first to

Page 67

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  offer physician and hospital information online.  And
2  from that, that first mover advantage, we've created
3  some brand awareness on the Internet which is
4  beneficial.
5          So it's a combination of investing in our
6  brand, so we have national television advertising
7  campaign, and then search engine optimization, like
8  you're talking about Google, and then people just
9  coming back to Health Grades and doing searches and
10 researching their providers on the Health Grades
11 website.
12     Q    Okay.  But I'm talking about the customers
13 who are not at Health Grades now, but any people who
14 go to -- well, first of all, let me back up and just
15 ask another question.
16         You know that a substantial portion of the
17 consumers who visit the Vitals website also visit
18 Health Grades website, right?
19     A    I'm not aware of the exact percentage, but
20 there should be a subset of the traffic for each site
21 that is shared.
22     Q    Have you seen reports?
23     A    I have not seen how much of our traffic is
24 shared with Vitals.

Page 68

CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q    Do you have any feel for the percentage of
2  that?
3      A    I think it's less than half that is
4  shared.
5      Q    And what's the basis for that?
6          MR. VAZQUEZ:  Hold on, John.
7          THE DEPONENT:  Um-hum.
8          MR. VAZQUEZ:  Scott, I just wanted to
9  confirm these last series of questions appear to be
10 outside the scope of the topics.  So do you want to
11 just let me have a, you know, reserved continuing
12 objection on --
13         MR. STIMPSON:  Yes, that's fine.
14         MR. VAZQUEZ:  -- any questions that are
15 outside the scope of the 30(b)(6) testimony?
16         MR. STIMPSON:  That's fine.
17         MR. VAZQUEZ:  Thank you.
18         You can answer.
19         MR. STIMPSON:  Do you want the question
20 back?
21         THE DEPONENT:  I'm sorry.  Do you mind?
22         (Record read as requested.)
23     A    Okay.  It's been some time since I've
24 looked at the data, but there are third-party sites,

Page 69

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  Comp Score Media Metrics is one.  But there's another
2  one, Point Cast, that shows affinity scores between
3  websites.
4          And it's one measure to determine what
5  percentage of traffic is shared, although it's very
6  imprecise, and that's why I'm ballparking what I'm
7  saying.  But the relative affinity score between
8  Vitals.com and healthgrades.com led me to believe
9  that it's a meaningful percentage that is shared, but
10 it's something less than half, based on that affinity
11 score.
12     Q    (BY MR. STIMPSON)  Let's just talk about
13 the consumers that go to both Vitals and Health
14 Grades.  Since they go to Health Grades, Health
15 Grades doesn't lose any money because they're also
16 going to Vitals, right?
17     A    Of those that would be shared.
18     Q    Yeah.
19     A    Yeah.
20     Q    Is that correct?
21     A    No, it's not because what happens is, to
22 the extent a consumer visits first Health Grades and
23 then engages in some way on the Vitals website,
24 whether it be on advertising or on -- Vitals has

18 (Pages 66 - 69)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 actually replicated something called Patient Direct
3 Connect, which is a mechanism to monetize traffic.
4       So if that traffic that is shared starts
5 on Health Grades and then goes to Vitals, and they've
6 ultimately monetized that visitor on their website,
7 that quote-unquote shared consumer, actually, we will
8 have lost revenue as a result of Vitals attracting
9 that user.
10   Q    And what's the source of that revenue when
11 you say monetize it?
12   A    So there are a couple of forms. One is
13 advertising. So banner ads, digital media on the
14 website. But the other way is via a program that we
15 have. It's called Patient Direct Connect, and it's
16 very similar to a program that Vitals has rolled out
17 in coordination with Beryl in the last few months;
18 actually, the last couple of months is what I have
19 become aware of.
20       And it's a means by which you affiliate
21 with a hospital system. And they designate
22 physicians. And by attracting a consumer to the
23 website and connecting them with a hospital's medical
24 staff member, the hospital advertises, secures
25 positions on the website.

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2       So it's a means to monetize that consumer
3 that you're facilitating the connection between the
4 consumer and the physician and the website.
5   Q    How long has Health Grades had this
6 patient directing net?
7   A    Well, we've had a few forms of it. Well,
8 really two forms, but several different names.
9 There's an alphabet soup of acronyms, but essentially
10 the same offerings.
11       The prior offering, I'll just call it
12 again, that had multiple names; Patients Provider
13 Gateway, Connecting Point. That was a
14 consumer-directed offering that was very similar to
15 the product I just described, except it didn't
16 involve the call center.
17       So the connection was made on the website
18 where we presented a hospital's medical staff members
19 to users of our website. And consumers connected
20 with those physicians, but we didn't use a call
21 center.
22       The difference is, as a current solution,
23 Patient Direct Connect, we do use a call center. So
24 essentially the same type of solution to consumers.
25 One didn't use a call center; the current version

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 does.
3   Q    When did the first one without the call
4 center start?
5   A    That would have been -- that would have
6 been in -- the first iteration would have been early
7 2005, I think.
8   Q    Okay. And what about the one with the
9 call center, when did that start?
10   A    That was done -- we are almost exactly
11 three years into it. So it would have been 2009.
12   Q    So what do you mean when you say with a
13 call center?
14   A    With a call center, so if a consumer is
15 able to research and find a physician on our website,
16 we'll present our hospital's call center phone number
17 on that results page. The consumer sees that number,
18 calls the number to schedule an appointment. That
19 call goes to the hospital call center and it is
20 directed to that hospital's medical staff member.
21   Q    How does Health Grades make money off
22 that?
23   A    The hospital is entering into a
24 sponsorship program with us. So they designate their
25 medical staff -- it's a hospital advertising program

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 is the simplest way to describe it.
3   Q    So I'm not sure I understand. If I get on
4 the Health Grades website and I pull up something on
5 Dr. Smith, and he is affiliated with some hospital,
6 and then I call the call center, how does that
7 somehow translate into somebody giving money to
8 Health Grades?
9   A    Yeah, so the hospital actually compensates
10 us for displaying their physicians in certain ways on
11 our website.
12   Q    Okay. So that's not -- there's no
13 connection, then, to whether or not the patient
14 actually calls the hospital. It's just for the
15 displaying of them?
16   A    That's correct.
17   Q    Okay. So what I'm trying to piece
18 together here is how do you think that the -- you've
19 said that because somebody starts in Health Grades
20 and then goes to MDx, somehow Health Grades loses
21 money on that?
22   A    So it's a hospital marketing program with
23 the intent of driving as much call activity to a
24 hospital's designated medical staff as possible.
25   Q    Right.

19 (Pages 70 - 73)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 74

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   A    The way we're compensated is indirectly
3   tied to that, but legally, to conform to start
4   getting a kickback, you can't be compensated every
5   time the phone rings. That's illegal.
6   Q    Okay.
7   A    So the way that we've structured these
8   programs is a client will pay us a fixed, or
9   sometimes variable fee, based on a number of searches
10  for the program.
11       But there's an expectation that from that
12  program it's going to generate a certain volume of
13  call and consumer engagement activity.
14  Q    So you don't really get paid because
15  somebody picks up the phone, looks at the Health
16  Grades website, and picks up the phone and calls the
17  hospital. You don't get paid because of that, right?
18       MR. VAZQUEZ: Object to form.
19  A    If we can't make the phone ring, the
20  hospital won't renew the contract. So I would say
21  it's absolutely critical that we make the phone ring.
22  So, yes, we do lose money if we don't make the phone
23  ring.
24  Q    (BY MR. STIMPSON) Okay. But didn't you
25  say that was illegal to have compensation based on

Page 75

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   how frequently you get consumers to call the
3   hospital?
4   A    It's illegal -- it's illegal to
5   contractually commit to delivery of a specific volume
6   of call activity.
7   Q    So what you're saying is that indirectly
8   Health Grades is getting paid for how often it makes
9   the hospital's phones ring, right?
10  A    No.
11  Q    No?
12       MR. VAZQUEZ: Object to form. Counsel,
13  you're giving me -- you're allowing me to preserve my
14  objections as to outside the scope of 30(b)(6),
15  right?
16       MR. STIMPSON: Right.
17       MR. VAZQUEZ: What about all these
18  questions about damages? Do you need me to make the
19  objections every time you ask?
20       MR. STIMPSON: Well, what's the objection?
21  Why can't I ask him about damages?
22       MR. VAZQUEZ: Well, first, it's not one of
23  the topics. But you're letting me preserve that.
24  And as a fact witness, he's not a damages expert. So
25  that's my objection.

Page 76

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2       MR. STIMPSON: Well, that's not an
3   objection. I can ask him anything I want.
4       MR. VAZQUEZ: Well, I'm just going to make
5   the objections. You know, it calls for legal
6   conclusions, it calls for expert testimony. You know
7   the objections.
8       So I just -- if you want to let me
9   preserve that, questions about loss, monetary, you
10  know, the one that you're asking now, we can do it
11  that way, or else I'll just have to make them every
12  time you ask.
13       MR. STIMPSON: Well, if I understood it,
14  you don't think I should ask him about damages, and
15  therefore it's an objection?
16       MR. VAZQUEZ: No, I'm just -- you can ask
17  whatever you want, Scott. I think I have a valid
18  objection that this stuff calls for legal
19  conclusions, and it's the subject of expert
20  testimony. These are all the same objections you
21  have made when I ask similar questions in depos.
22       MR. STIMPSON: All right. Let's just see
23  how it goes.
24       MR. VAZQUEZ: Okay.
25       MR. STIMPSON: So can I have the last

Page 77

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   question back, please?
3       (Record read as requested.)
4       MR. VAZQUEZ: I object to form. He's not
5   an attorney. He's not a damages expert.
6       If you can answer, please do so.
7   A    It's absolutely a component of the value
8   of proposition.
9   Q    (BY MR. STIMPSON) Is the answer to my
10  question yes?
11  A    We're not directly compensated based on
12  making the phone ring. We do provide, in many cases,
13  contractual guarantees for a minimum number of
14  calls, but that is not in violation as to our
15  agreement with them.
16  Q    What is the minimum -- I mean, does Health
17  Grades easily make those minimum number of calls?
18       MR. VAZQUEZ: Form.
19  A    In some cases we exceed, easily exceed,
20  the minimum number of calls.
21  Q    (BY MR. STIMPSON) Just so I make it
22  clear, there is no direct compensation from a
23  hospital to Health Grades because some competitor --
24  because some consumer went to Health Grades website
25  and called the call center, right?

Attorneys' Eyes Only

Page 78

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     MR. VAZQUEZ: Form.
3     Q    (BY MR. STIMPSON) There's no direct
4  compensation?
5     A    There is a value associated with making
6  that phone ring?
7     Q    Right.
8     MR. VAZQUEZ: Same.
9     A    So I don't think I -- I do not agree with
10  the statement, the conclusion you're making.
11     Q    (BY MR. STIMPSON) Okay. So do you have
12  any idea how many consumers go to Health Grades
13  website and then go to the Vitals website and make
14  calls to hospitals?
15     MR. VAZQUEZ: Form.
16     A    I do not.
17     Q    (BY MR. STIMPSON) And if the consumer --
18  if Vitals wasn't there, you understand that the
19  consumer would go to Health Grades website and then
20  just go to another website, right, like Ucompare?
21     MR. VAZQUEZ: Form.
22     Q    (BY MR. STIMPSON) Right? That's entirely
23  possible, right?
24     MR. VAZQUEZ: Form.
25     A    It's possible.

Page 79

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     Q    (BY MR. STIMPSON) In fact, Ucompare takes
3  a lot of traffic, as well, right?
4     MR. VAZQUEZ: Form.
5     A    When you say takes a lot of traffic --
6     Q    (BY MR. STIMPSON) Well, let me rephrase
7  that. That's a good point.
8     Ucompare is right up there on the
9  competition list with Health Grades too, right?
10     A    Yes, the competitor, as well.
11     Q    So as we sit here today, do you have any
12  factual basis to say that if Vitals wasn't there
13  these people would not go from Health Grades website
14  to some other website?
15     MR. VAZQUEZ: Object to form.
16     A    I don't. The other element, though, I
17  have is feedback from hospital clients related to the
18  value of the solution and the ability to control the
19  experience on the Health Grades website.
20     MR. STIMPSON: Move to strike everything
21  after "I don't."
22     Q    (BY MR. STIMPSON) Now, let's talk about
23  the consumers that go to the Vitals website and do
24  not also go to the Health Grades website, okay?
25     A    Um-hum.

Page 80

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     Q    Those consumers, if Vitals wasn't there,
3  do you have any factual basis to believe that if
4  Vitals wasn't there they would all go to Health
5  Grades?
6     MR. VAZQUEZ: Again, object to form.
7  Calls for expert testimony.
8     MR. STIMPSON: You can have a continuing
9  objection.
10     MR. VAZQUEZ: I can?
11     MR. STIMPSON: Um-hum.
12     MR. VAZQUEZ: All right. Thank you.
13     A    Based on my knowledge of the Internet and
14  the industry, there is actually a very -- there is an
15  increased likelihood that if Vitals and their share
16  were significantly diminished or didn't exist that we
17  would retain more of the value associated with those
18  visits to our website and we would derive incremental
19  traffic.
20     Q    (BY MR. STIMPSON) What is the basis for
21  that?
22     A    The basis is, the fewer the choices
23  available to consumers with relevant information, the
24  more likely they are, consumers are, to migrate to
25  the site that provides what it is that they're

Page 81

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  looking for, and that would be Health Grades.
3     Q    Any other basis?
4     A    I think there are others I'm probably not
5  thinking of right now.
6     Q    Do you have any factual basis to believe
7  that if Vitals wasn't there, if the consumers that
8  are going to Vitals aren't going to Health Grades,
9  do you have any factual basis to believe that those
10  consumers would go to Health Grades as opposed to
11  Ucompare?
12     A    It's speculative on my part. I -- it's
13  speculative. I don't know.
14     Q    You're right. It would be very
15  speculative to say that those consumers would go to
16  Health Grades as opposed to Ucompare or any other
17  competitors you identified?
18     A    I think there's an increased likelihood
19  when, just as I said, when you take a significant
20  competitor out of the marketplace that we would get
21  more traffic because we have the information that
22  consumers are seeking.
23     Q    And do you have any feeling for what
24  that percentage of that increase would be?
25     A    It would be substantial because if you

21 (Pages 78 - 81)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

**Page 82**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  looked at the audience, the traffic, that Vitals is
3  getting today, and the portion of which that traffic,
4  it's most likely the majority of that traffic hasn't
5  visited Health Grades yet, and knowing that Ucompare,
6  for example, doesn't have content that is as rich.
7  Vitals is more of a replica of Health Grades, so
8  there is a much greater chance that Vitals' traffic
9  would -- that is not currently visiting Health
10  Grades, would end up on Health Grades should
11  Vitals.com not exist.
12    Q    If you search for a doctor in cardiology
13  in Denver, say, on Google, you come up with a list --
14  search results, right?
15    A    Right.
16    Q    Is Health Grades usually at the top of
17  that list?
18    A    Sometimes.  Usually.  I would say usually
19  is correct.
20    Q    What about if you search for Dr. John
21  Smith in New York?
22    A    Usually.
23    Q    So anyone who is using Google, the first
24  thing they're going to get up is Health Grades
25  website, usually, right?

**Page 83**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    I think, for the most part, that's true.
3    Q    Okay.  So all those users, where Health
4  Grades comes up first, they're probably going to
5  visit Health Grades first, right?
6    A    Not necessarily.
7    Q    Why do you say that?
8    A    It's just not consistent with Internet
9  behavior.  It increases the chances that they'll
10  visit whatever site, it could be Health Grades or
11  anyone else, but as you work down the list, the
12  propensity to visit is -- it decreases.
13    Q    Can you put a monetary value on what you
14  see is the harm to Health Grades from Vitals?
15    A    That would be speculative on my part.
16    Q    Okay.  Let's identify all competitors we
17  can for just those products and services we talked
18  about earlier of Health Grades that fall under the
19  patent claims, okay?
20      You mentioned Vitals, right?
21    A    Can I ask you a question --
22    MR. VAZQUEZ:  I'm sorry, let me just put
23  an objection.  I'm not sure I understood what you
24  said, and the claims, just object to form.
25    MR. STIMPSON:  Okay.  Well, let me make it

**Page 84**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  clear, then.
3    MR. VAZQUEZ:  Yes.
4    Q    (BY MR. STIMPSON)  One of the topics that
5  you were here to talk about today was products and/or
6  services of Health Grades that embody and/or employ
7  any claim of the patent-in-suit.
8    A    Um-hum.
9    Q    And another topic you were here to talk
10  about today is products and/or services of other
11  companies that compete with Health Grades products
12  and/or services that embody and/or employ any claim
13  of the patent-in-suit.
14    A    Right.
15    Q    So what we're going to talk about now is
16  products and services of other companies that compete
17  with the Health Grades products and services that
18  embody or employ a claim in the patent-in-suit, okay?
19    A    Okay.  Got it.
20    Q    So, let's identify them.  Vitals.com?
21    A    Okay.
22    Q    Ucompare.com.  Correct?
23    A    I have to tell you from a layman's
24  standpoint, I would say absolutely I am not a patent
25  attorney.  So that's a judgment that counsel would

**Page 85**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  have to make.
3    Q    But let's just do the best we can here
4  because you're identified for these topics.
5    A    Right.
6    Q    Ucompare is one, right?
7    A    Yes.
8    Q    WebMD, right?
9    A    Yes.
10    Q    RatingsMD, right?
11    A    Yes.
12    Q    How about RevolutionHealth?
13    MR. VAZQUEZ:  Scott, will you just give me
14  a continuing objection on all of these things that
15  call for legal conclusions?
16    MR. STIMPSON:  Sure.
17    MR. VAZQUEZ:  Thank you.
18    Q    (BY MR. STIMPSON)  How about
19  RevolutionHealth?
20    A    Yeah, they're a competitor.
21    Q    Vimo?
22    A    I'm not familiar with Vimo to list them as
23  a competitor.
24    Q    Actually, you know what, I need to back up
25  and do this a little bit differently.  Starting with

22 (Pages 82 - 85)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 86

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Vitals.com, I want to talk about the time period
3    January 2011 to today, okay?
4       A    Okay.
5       Q    In that time period, keeping that time
6    period in mind, Vitals.com is a competitor, right?
7       A    Yes.
8       Q    Ucompare.com is a competitor, right?
9       A    Yes.
10      Q    WebMD is a competitor, right?
11      A    Yes.
12      Q    MDRatings is a competitor, right?
13      A    Yes.
14      Q    RevolutionHealth is a competitor, right?
15      A    Yes. In the definition that I gave, yes.
16      Q    Well, it's a competitor to the products
17   and services of Health Grades that embody --
18      A    That's right.
19      Q    Okay.
20      A    I believe it's consistent with what you're
21   asking.
22      Q    That's fine.
23           Is Vimo a competitor, is Vimo, V-I-M-O, a
24   competitor?
25      A    I am not familiar enough with Vimo to
```

Page 87

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2    label them as a competitor.
3       Q    How about RateMDs?
4       A    Yes.
5       Q    Have they been a competitor in that time
6    period?
7       A    Yes.
8       Q    LocateAdoc, is that a competitor in that
9    time period?
10      A    Not really.
11      Q    Why do you say not really?
12      A    At least based on -- and I have not looked
13   at that site in a very long time, and that's where I
14   should leave that statement. I don't know if they
15   are or not because I have not recently visited that
16   website.
17      Q    How about back in 2010? No, I'm sorry,
18   2011?
19      A    I haven't visited since 2011.
20      Q    Could be a competitor; you're just not
21   sure today?
22      A    It could be today. It could be.
23      Q    How about XOOVA, X-O-O-V-A, is that a
24   competitor in that time period?
25      A    The name rings a bell, but I don't know
```

Page 88

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2    exactly what they do.
3       Q    How about Carol.com?
4       A    Same thing.
5       Q    How about DoctorScorecard?
6       A    I'm not aware. I'm not familiar with
7    that.
8       Q    How about DrScore?
9       A    DrScore I believe is a site that I
10   visited, and given their use of comparison, physician
11   comparison ratings, if I recall correctly, they would
12   be a competitor.
13      Q    How about FamilyDoctor.org?
14      A    I am not familiar with that one.
15      Q    How about Yelp?
16      A    I'm not familiar enough with how Yelp
17   presents physician information or even if they're
18   presenting physician information on their website.
19      Q    Could be, you just don't know, as you sit
20   here today?
21      A    Right.
22      Q    How about HealthWordWeb?
23      A    HealthWardWeb (sic)?
24      Q    HealthWordWeb?
25      A    I'm not familiar with them.
```

Page 89

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2       Q    PharmaStats?
3       A    I'm not familiar with them.
4       Q    RightHealth?
5       A    I'm familiar with the name, but not
6    familiar with the content of the website.
7       Q    Myuhc.com?
8       A    That's -- I believe, if I'm correct,
9    that's United Health Care. And they do have a
10   competing service in that they provide physician
11   directory content on their website.
12      Q    So they have been a competitor in that
13   time period?
14      A    United Health Care is not, but the content
15   of that website is. So I guess, yeah, by extension,
16   they would be.
17      Q    They would. Okay.
18           SteadyHealth, is that a competitor in the
19   2011 timeframe to today?
20      A    I'm not familiar with SteadyHealth.
21      Q    Is QualityCheck.org a competitor in the
22   2011, 2012 timeframe?
23      A    I'm not aware of them.
24      Q    Is RemarkableDocs.org a competitor in the
25   2011, 2012 timeframe?
```

23 (Pages 86 - 89)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 90

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   A   I'm unfamiliar with them.
3   Q   How about Health Market Science, is that a
4   competitor in the 2011, 2012 timeframe?
5   A   Not to my knowledge.
6   Q   How about AARP.org, is that a competitor
7   in the 2011, 2012 timeframe?
8   A   Not to my knowledge.
9   Q   How about Consumer Health Ratings?
10  A   Consumer Health Ratings, not to my
11  knowledge.
12  Q   How about A.D.A.M., A-D-A-M?
13  A   Not to my knowledge.
14  Q   DoctorRatings?
15  A   Not to my knowledge.
16  Q   MDNationwide?
17  A   Not to my knowledge.
18  Q   HealthCareReviews?
19  A   Not to my knowledge.
20  Q   HealthWorldWeb?
21  A   Not to my knowledge.
22  Q   Healthology?
23  A   Not to my knowledge.
24  Q   AMA DoctorFinder?
25  A   I'm not familiar with that website.

Page 91

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   Q   Could be a competitor in 2011 and '12; you
3   just don't know, as we sit here today?
4   A   It could be.
5   Q   How about MedicineNet?
6   A   I'm not familiar with that website.
7   Q   MSNHealth?
8   A   I'm unaware of any competing service or
9   solution on that website.
10  Q   AOL Body?
11  A   Same thing.
12  Q   Wego Health, that's W-E-G-O?
13  A   I'm not familiar with that one.
14  Q   CareSeek?
15  A   I'm not familiar with that one.
16  Q   Are there any other competitors, other
17  than the ones you've identified from my list, that
18  compete with the products and services of Health
19  Grades that fall under the patent-in-suit?
20  A   Not that I can recall right now.
21  Q   I know you allege that the Vitals.com
22  website falls under the patent-in-suit.  Any of those
23  other competitors, to your knowledge?
24      MR. VAZQUEZ:  Calls for a legal
25  conclusion.  Object to form.

Page 92

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2       You can answer.
3   A   Yeah, I haven't -- I really leave that
4   work to my attorneys to assess whether or not they're
5   infringing on the patent.
6   Q   (BY MR. STIMPSON)  So as we sit here
7   today, you're not aware of any other of those
8   competitors that might be infringing your patent,
9   right?
10      MR. VAZQUEZ:  Same objection.
11  A   No, I am not.
12  Q   (BY MR. STIMPSON)  Who was Health Grades'
13  most formidable competitor in 2009?
14      MR. VAZQUEZ:  Form.
15  A   2009.  We -- there was a period of time
16  where there were really no viable competitors out
17  there.  WebMD had a directory service, but they
18  really weren't focused on it building it out and
19  building revenue for people searching that area.
20      I believe 2009, though, was the -- was the
21  advent of Vitals, and the Vitals website, sometime in
22  that time period, 2009, maybe early 2010.  So I am
23  aware of Vitals.
24      You know, I'm also unsure, Ucompare
25  originated around the same time as Vitals or maybe

Page 93

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2   even a little bit prior to that.
3   Q   (BY MR. STIMPSON)  Okay.
4   A   I don't know the exact dates.
5   Q   What about healthcare.com?
6   A   Healthcare.com, I'm familiar with that
7   name, the website.  I don't think I've ever
8   categorized them as a competitor, though.
9   Q   Okay.  Well, let me ask you today, would
10  you characterize them as a competitor in 2011 and
11  2012?
12  A   They're not on my radar screen.  So
13  doesn't mean they're not a competitor; they're just
14  not someone I have looked at as a competitor.
15  Q   So there may be other competitors than the
16  ones we've talked about, but you just don't know them
17  all, as we sit here today?
18      MR. VAZQUEZ:  Form.
19  A   That's right.
20      MR. STIMPSON:  Can we take a break,
21  please?
22      (Recess taken from 10:13 a.m. to
23  10:30 a.m.)
24  Q   (BY MR. STIMPSON)  Mr. Neal, did the
25  Physician Research Comparison Report go by any other

24 (Pages 90 - 93)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 94

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 names?

2    A   It did.

3    Q   Pardon me?

4    A   It did. We had different names, but that

5 was kind of one we landed on as being the primary. I

6 can't recall exactly which ones were external in

7 terms of what was communicated or accessible via the

8 website in terms of the name.

9    Q   Can you remember any other of the names?

10    A   For the Physician Quality Comparison

11 Report?

12    Q   No, the Physician Research Comparison

13 Report.

14    A   Physician research.

15    Q   It's actually in your deposition notice

16 down there.

17      If you have it, Jesus. It's under your

18 notebook maybe?

19      MR. VAZQUEZ: I have it right there.

20    Q   (BY MR. STIMPSON) It's in that

21 parenthetical, the first one, Physician Research

22 Comparison Report.

23      Do you remember any other names that that

24 used to go by?

Page 95

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A   There was a -- I thought we had the one

2 that we had taken to market was Physician Comparison

3 Report, although reviewing the reports, I can't

4 recall which one was the one that was in that.

5    Q   Have you ever heard the name, how about

6 Comparative Physician Report, is that the same thing?

7    A   Well, it could be. I would be speculating

8 to say for certain if that's the case.

9    Q   Do you know any other names of the

10 Physician Research Comparison Report?

11    A   They all contain some version of

12 comparison or comparative. And that's really the

13 distinction. They all have that commonality.

14    Q   Okay. Did they have patient ratings?

15      MR. VAZQUEZ: Form.

16    A   They did not.

17    Q   (BY MR. STIMPSON) Okay. How do you know

18 that?

19    A   Because the content of the report was --

20 it was the third-party data that I referenced

21 earlier. So both that Physician Quality Report and

22 the Physician Research Comparison Report was a

23 compilation of third-party data that was combined

24 into this named report.

Page 96

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q   How do you know that?

2    A   Because in preparing for this deposition,

3 I looked at the report, and I also recall having

4 seen, you know, that report.

5    Q   Did you discuss this with your -- and I

6 just want a yes or no. Did you discuss this with

7 your counsel between our first -- after our -- during

8 our first break?

9    A   I never said that I hadn't seen these

10 reports. I said I had some uncertainty about the

11 timing of the reports.

12    Q   Okay. So did the Physician Research

13 Comparison Report contain comparison ratings of

14 healthcare providers?

15      MR. VAZQUEZ: Form.

16    A   There was -- it was just a -- the answer

17 is no.

18    Q   (BY MR. STIMPSON) Um-hum.

19    A   It was just a comparison of -- it was

20 third-party data that was compiled into a single

21 report.

22    Q   Okay. And what was the comparison, then,

23 in those reports?

24    A   So there was no overt comparison. There

Page 97

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 wasn't a means to compare doctors, other than we

2 provided third-party data on each physician.

3      So, for example, if someone is looking at

4 an orthopedic surgeon, that one physician may have

5 board certification, another may not. So as we

6 present all of the elements for each of those

7 physicians that were available, via these third-party

8 sources, that could be a means by which consumers

9 could compare. And that was the reason behind the

10 name.

11      But there wasn't an overt comparison

12 mechanism in those reports.

13    Q   Did you ever see a comparative physician

14 report that did have comparison ratings of healthcare

15 providers?

16      MR. VAZQUEZ: Form.

17    A   We -- per my prior comments, we were

18 sensitive to introducing anything in the way of

19 physician ratings to consumers because of the risk to

20 the business. We didn't do that until much later.

21    Q   (BY MR. STIMPSON) Okay.

22    A   That report, that was kind of, you know,

23 the 2004, 2005 timeframe, and we didn't introduce

24 those physician ratings until -- it would have been

25 (Pages 94 - 97)

EXHIBIT H

973-410-4040

Attorneys' Eyes Only

**Page 98**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  much later. It would have been 2006-ish. It may be
3  even early 2007 because of the risk that it posed to
4  our business.
5      Q    Did you disclose -- are you aware of
6  comparative physician reports that were offered on
7  that physician consumer site that had ratings of
8  healthcare providers?
9          MR. VAZQUEZ: Form.
10     A    Was I aware -- I'm sorry, do you mind
11 repeating?
12     Q    (BY MR. STIMPSON) Were you aware of
13 comparative physician reports that included ratings
14 of healthcare providers that were offered on the
15 physician consumer site?
16     A    No.
17     Q    Have you ever seen a Comparative Physician
18 Report that has consumer ratings? I mean comparison
19 ratings?
20     A    Have I ever seen one?
21     Q    Yes.
22         MR. VAZQUEZ: Form.
23     A    That has? At any point in time?
24     Q    (BY MR. STIMPSON) Yes.
25     A    Yeah, our website today is a version of

**Page 99**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  that.
3      Q    How about before 2006, did you ever see a
4  Comparative Physician Report that had healthcare
5  provider ratings?
6      A    No.
7      Q    Let me show you what has been marked
8  previously. Let me show you what has been previously
9  marked as Exhibit 21. If you would identify that for
10 me, please.
11     A    Do you want me to go through every page?
12     Q    You don't have to. I'll point you to
13 specific pages.
14     A    Okay.
15     Q    The cover e-mail, this is an e-mail from
16 yourself to Scott Montroy on April 17, 2003, correct?
17 That's the bottom part.
18     A    That's what I'm looking at.
19     Q    And then Mr. Montroy responds to you the
20 same day, copying Dave Hicks, correct?
21     A    Okay, yes.
22     Q    And the subject is a sample report?
23     A    Right.
24     Q    And you're asking Mr. Montroy to forward
25 you a sample doctor report?

**Page 100**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      A    Yes.
3      Q    Have you seen this document before?
4      A    I --
5      Q    Within the last year or so?
6      A    This document? I have not.
7      Q    Why were you requesting a sample doctor
8  report?
9      A    At this point in time, we were trying to
10 determine whether or not we wanted to productize the
11 data that we had in our database by producing reports
12 that we could make available to consumers. And this
13 was, I think, what Scott was sending me, was a
14 prototype, I think this would be.
15     Q    So did you have in your database at the
16 time ratings of healthcare providers?
17     A    We did not.
18     Q    Can you turn to page -- we have Bates
19 numbers at the bottom -- 208987, please.
20     A    208987.
21     Q    Can you identify this for me, please?
22     A    Comparative Physician Report.
23     Q    And it says the report was created in
24 April of 2003, correct?
25     A    Okay.

**Page 101**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      Q    Is that right?
3      A    That's what this document says.
4      Q    Do you know if this was ever -- if these
5  comparative physician reports were made available on
6  the Health Grades website?
7          MR. VAZQUEZ: Form.
8      A    This -- based on what I am looking at here
9  and the content of these reports, I don't believe
10 this was ever made available. This was more of just
11 some concepts and ideas about what might be made
12 available.
13     Q    (BY MR. STIMPSON) Okay.
14     A    I need to look at this because you asked
15 about this.
16     Q    Take your time.
17     A    Okay.
18     Q    So this Comparative Physician Report, what
19 you referred to as a concept, if you could turn to
20 page 208992. At the bottom and going onto the next
21 page, now, those are comparison ratings of healthcare
22 providers; is that right?
23         MR. VAZQUEZ: Object to form.
24     A    So if I can read the copy above because
25 this is part of my answer. Do you mind if I read it?

Attorneys' Eyes Only

Page 102

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   (BY MR. STIMPSON) Sure.
3  A   The section is labeled Hospitals.
4      When considering a physician, find out the
5  hospitals to which she or he may admit patients. If
6  receiving care at a particular hospital is important
7  to you, make sure that the physician you are
8  considering can admit to that hospital. Also, check
9  the hospital affiliations of any specialist to whom
10  you may refer. Are these physicians affiliated with
11  a quality hospital?
12      The ratings that you see there are
13  hospital ratings where that physician has privileges.
14  They are not physician ratings.
15  Q   Okay. Are they comparison ratings of
16  healthcare providers?
17      MR. VAZQUEZ: Form.
18  A   They are ratings of hospitals.
19  Q   (BY MR. STIMPSON) Is a hospital a
20  healthcare provider?
21      MR. VAZQUEZ: Form.
22  A   By some definitions they are absolutely a
23  healthcare provider.
24  Q   (BY MR. STIMPSON) So is this the form --
25  after you've looked through this Comparative

Page 103

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Physician Report, is this the form of the first
3  Comparative Physician Report that was launched on the
4  Health Grades website?
5      MR. VAZQUEZ: Form.
6  A   No. No, we couldn't come close to
7  introducing this level of detail to consumers. The
8  data just wasn't available.
9  Q   (BY MR. STIMPSON) Okay. What I'm asking
10  you about, though, is on the physician consumer site.
11  How about on the physician consumer site?
12      Actually, let me back up. Do you know
13  what the physician consumer site is?
14  A   I think you're referencing, just for
15  clarification, the site that could be accessed by
16  physicians?
17  Q   Okay.
18  A   Is that what you're asking me about?
19  Q   Whatever you refer to as the physician
20  consumer site. Let me just show what -- this might
21  help, what's been marked as Exhibit 20, and read
22  that, and then we'll talk about the physician
23  consumer site?
24      MR. VAZQUEZ: Sorry, Scott, read that and
25  what?

Page 104

CONFIDENTIAL - ATTORNEYS EYES ONLY
2      MR. STIMPSON: And then we'll talk about
3  the physician consumer site. You'll see it's there
4  in the first paragraph.
5  A   Okay. In that context, physician research
6  or the physician consumer site references the fact
7  that healthgrades.com, the domain, had two separate
8  experiences. Okay. So if you went to the
9  healthgrades.com home page, that was not a consumer
10  site.
11  Q   (BY MR. STIMPSON) It was not the
12  physician consumer site?
13  A   It was not the physician or consumer site.
14  Q   Okay.
15  A   It was not intended for consumption by
16  consumers.
17  Q   Okay.
18  A   There was a subdirectory on
19  healthgrades.com that became the physician consumer
20  site. That's what's referenced here. Had you
21  visited the healthgrades.com home page, at that point
22  in time you would have received just information
23  specific to our hospital quality program.
24      And it was intended for a -- it was a B to
25  B site. It was intended for consumption only by

Page 105

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  healthcare professionals.
3  Q   That's the physician consumer site?
4  A   No.
5  Q   What was the physician consumer site,
6  though? I'm not sure I understand.
7  A   It was a site that was developed to
8  introduce this provider content, physician content,
9  and hospital content to consumers.
10  Q   Okay. So that existed as of the time in
11  2003, March 2003?
12  A   According to this e-mail, yes. It would
13  have been in very much a beta stage at that point.
14  Q   Okay. That's all right. But I mean, I'm
15  just trying to figure out -- so consumers, or whoever
16  you're beta testing, did you have an area that was
17  beta testing, or was it just -- what was your beta
18  testing?
19      MR. VAZQUEZ: Form.
20  A   We used to set up -- I'm not sure I
21  understand the question.
22  Q   (BY MR. STIMPSON) What was your beta
23  testing?
24  A   Well, we used to set up a controlled
25  environment where access was limited to whoever we

27 (Pages 102 - 105)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 106

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 wanted to make the content available to. So very
2 typical of anything that we might do. Again, it's
3 just the way a website is managed and run.
4    Q    Do you know what the limitations were on
5 access for the physician consumer site for the beta
6 testing?
7    MR. VAZQUEZ: Form.
8    MR. STIMPSON: Actually, back up a little
9 bit. Maybe I just need to ask another question.
10 Withdraw that one.
11    Q    (BY MR. STIMPSON) I think you testified
12 earlier you're not sure whether there was beta
13 testing on that Physician Research Comparison Report,
14 right?
15    A    I think I said typically that beta testing
16 is introduced for any significant new offering. So
17 what I said is I couldn't verify that there was a
18 beta site, but I would suspect there had been a beta
19 or test environment to determine what worked, what
20 made sense, whether or not we could render the
21 reports, that kind of stuff.
22    Q    Can you tell me anything about that beta
23 testing for the Physician Research Comparison Report?
24    A    I cannot speak. I just cannot recall the

Page 107

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 specifics. I can't even recall for certain what the
2 circumstances were associated with the beta.
3    Q    Did you -- can you tell me what the
4 Physician Research Comparison Report had in the beta
5 testing?
6    A    It was some form of the compilation of
7 third-party data for physicians. We're talking about
8 the Physician -- again, just the Physician Comparison
9 Report?
10    Q    Physician Research Comparison Report.
11    A    It was the compilation of third-party data
12 presented in a single report for multiple physicians.
13    Q    Okay.
14    A    But I would add there was no juxtaposition
15 of physicians, so that kind of a line-by-line
16 comparison could be made.
17    Q    Where would I see that? Is there a
18 Physician Research Comparison Report from the time
19 that we could find?
20    A    There was one that I looked at in
21 preparation that provided the same kind of
22 information that I'm describing here.
23    Q    Can you tell me what document that is? I
24 need to see that, please.

Page 108

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    MR. VAZQUEZ: Well, it's been produced,
2 Scott.
3    MR. STIMPSON: I know, but I need to know
4 what it is.
5    MR. VAZQUEZ: See if it's literally
6 Physician Research Comparison Report, right?
7    MR. STIMPSON: Whatever Mr. Neal looked at
8 in preparation for his 30(b)(6).
9    A    I think that version was like the 2004.
10    MR. VAZQUEZ: Scott, do you have HG 32036,
11 and that was an e-mail that had five reports
12 attached?
13    MR. STIMPSON: Maybe I do actually. Yeah,
14 here it is, Exhibit 8.
15    MR. VAZQUEZ: That has -- I don't want to
16 waive the work product objection, but I can tell
17 you --
18    MR. STIMPSON: No, no.
19    MR. VAZQUEZ: -- that in preparation for
20 this deposition, these documents were reviewed.
21    Q    (BY MR. STIMPSON) Let me show you what
22 has been marked previously as Exhibit 8, Mr. Neal.
23    A    Okay.
24    Q    Does this document contain the Physician

Page 109

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 Research Comparison Report you said you reviewed in
2 preparation for this?
3    A    This is the one you just handed me?
4    Q    Exhibit 8. Well, what I want to know is
5 which -- I'm trying to find out what the Physician
6 Research Comparison Report is that you said you saw
7 in preparation for this deposition?
8    A    I believe, if it's the same document that
9 Jesus just referenced --
10    MR. VAZQUEZ: Well --
11    A    -- then it would be the same document.
12    MR. VAZQUEZ: -- why don't you flip
13 through there --
14    THE DEPONENT: Okay.
15    MR. VAZQUEZ: -- and see if you can answer
16 Mr. Stimpson's question.
17    THE DEPONENT: Can I also review the one
18 that we used to prepare?
19    MR. VAZQUEZ: Yes. It's the same thing.
20    THE DEPONENT: Okay.
21    MR. VAZQUEZ: This should be exactly the
22 same thing.
23    THE DEPONENT: Okay. Got it.
24    A    Okay, it looks like we're talking about

28 (Pages 106 - 109)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 110

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 the same documents I reviewed.
3 Q (BY MR. STIMPSON) Does the one you
4 reviewed that's the basis of your testimony start at
5 32062?
6 A 32062, yes, it does.
7 Q And so this is the Physician Quality
8 Comparison Report that was available, the type of
9 Physician Quality Comparison Report that was
10 available on Health Grades website as of December
11 2004, right?
12 A Yes.
13 Q So turning back to Exhibit 20.
14 A Yeah.
15 Q It says that the Physician Research
16 Comparison Report was launched as of March 2003.
17 Do you know how that Physician Research
18 Comparison Report differed, if at all, from the
19 Physician Quality Comparison Report found in this
20 Exhibit 8?
21 A I do not.
22 Q So, I mean, the reason I'm struggling is
23 because I'm trying to figure out what was available
24 as of March 28th, 2003. And is there any way you can
25 tell me how they differed?

Page 111

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 A This is the reason, with all due respect,
3 our prior conversation, the reason I have uncertainty
4 because there were different names and different
5 versions and different intents in the different
6 reports that were produced. I was not trying to be
7 evasive in my response. And this is perfect evidence
8 of that.
9 Q So, I mean, my question is, and you may
10 not know, but I'm asking you what the difference is
11 between this Physician Quality Comparison Report of
12 Exhibit 8 and the one that was launched in 2003?
13 A I don't know.
14 Q Okay. So this Physician -- let's just
15 talk about this Physician Quality Comparison Report
16 that is in Exhibit 8, then, starting at Health Grades
17 production 0032062.
18 A Okay.
19 Q This was available on the Health Grades
20 website?
21 A I believe it was, based on what I'm
22 looking at here.
23 Q And that Health Grades website was a
24 computer-implemented method of providing healthcare
25 provider information to potential patients, right?

Page 112

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 MR. VAZQUEZ: Object to form.
3 A Legal nomenclature, but I think I
4 understand the essence of what you're saying, yes.
5 Q (BY MR. STIMPSON) Okay. And on that
6 website, Health Grades would receive by the web
7 server computer a request for information regarding
8 the first healthcare provider, right?
9 MR. VAZQUEZ: Hold on a second. Object to
10 form. You're looking at what appears to be the
11 patent claims. He's not an attorney. He's not a
12 patent expert. Calls for expert testimony.
13 Do you want me to just have a continuing
14 objection on that?
15 MR. STIMPSON: That's fine.
16 MR. VAZQUEZ: Thank you.
17 Q (BY MR. STIMPSON) So, Mr. Neal, on the
18 Health Grades website at this time, they'd receive --
19 Health Grades would receive a request for information
20 regarding a first healthcare provider, right?
21 MR. VAZQUEZ: Object to form. I'm not
22 sure what time you just meant.
23 MR. STIMPSON: We're talking about
24 December 2004.
25 MR. VAZQUEZ: Thank you.

Page 113

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 Q (BY MR. STIMPSON) Just so the record is
3 clear, we have in front of us, and the witness has in
4 front of him also, and it's the only document the
5 witness should have in front of him right now, is
6 this Physician Quality Comparison Report starting at
7 Health Grades 0032062.
8 MR. VAZQUEZ: Every time you say in your
9 questions "at this time" you mean
10 December 28th, 2004?
11 MR. STIMPSON: Correct.
12 MR. VAZQUEZ: Okay. Thank you.
13 Q (BY MR. STIMPSON) So let's start again,
14 Mr. Neal. At this time, late in December of 2004,
15 Health Grades had a computer-implemented method of
16 providing healthcare provider information to
17 potential patients, right?
18 MR. VAZQUEZ: Same objections as to -- did
19 you say you would let me have it?
20 MR. STIMPSON: Yes.
21 MR. VAZQUEZ: Sorry. Thank you.
22 Q (BY MR. STIMPSON) You can answer.
23 A Okay. I'm a little concerned because I
24 have the layman's terms. I have reviewed -- I
25 reviewed the patent, and I was a party to it and read

29 (Pages 110 - 113)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 114

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 it and submitted and signed it. But I really view
2 these things from a layman's perspective.
3 Q   Okay.
4 A   So I qualify my answers. There was a
5 system to return physician names, calling in the data
6 base and returning names.
7 Q   But just so we're clear, you're a named
8 inventor on this patent, right?
9 A   I am absolutely.
10 Q   And you read the application and
11 understood it when you submitted it?
12 A   Oh, I certainly did.
13 Q   Next question, Health Grades website would
14 receive requests for information regarding a first
15 healthcare provider in December 2004, right?
16 A   Yes. There was a search mechanism on our
17 website.
18 Q   The web server computer had at least a
19 computer processor in the memory, correct?
20 A   I would assume so.
21 Q   And in response to the request, Health
22 Grades would access healthcare provider, verified
23 information about the first healthcare provider,
24 correct?

Page 115

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 A   A report was produced, so I would say yes.
2 Q   All right. And these reports included
3 information that was received from the healthcare
4 provider, too, right?
5 A   Oh, I'm sorry, you asked about
6 information -- these reports were only third-party
7 reports, like I said before.
8 Q   So you're talking about the Health Grades
9 32062? That only came from third parties?
10 A   This was third-party information, and I
11 don't believe this report -- I don't think we had the
12 physician portal available to include physician
13 provided information at that point in time.
14 Q   So --
15 A   So the answer would be it would not, based
16 on my recollection.
17 Q   Okay. Did you do anything to determine
18 and find out whether this included any information
19 from healthcare providers in preparation for your
20 deposition today?
21 A   Specific -- we absolutely -- you tell me
22 what I can talk about.
23 MR. VAZQUEZ:  Don't tell him -- please do
24 not disclose our communications.

Page 116

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 THE DEPONENT:  Okay.
2 MR. VAZQUEZ:  To the extent you can answer
3 Mr. Stimpson's questions without making those
4 disclosures, I just ask for your best to do so.
5 A   We have discussed it.
6 Q   (BY MR. STIMPSON)  Right. But I'm asking
7 did you do anything -- I'm just asking you factually,
8 did you do anything to determine whether or not this
9 Physician Quality Comparison Report from 2004
10 included information that was received from
11 healthcare providers?
12 A   I reviewed hundreds of pages of content.
13 And I can't distinguish between what did or did not
14 contain certain elements and what occurred on which
15 dates.
16 So I can tell you that I absolutely did
17 review this report in preparation for this. I would
18 need to look through it again to ensure that it
19 doesn't contain -- I don't -- my recollection is this
20 report did not contain any physician provided
21 information.
22 It was only the third-party data that we
23 had available to us that we're using to compile these
24 reports at that point in December of 2004.

Page 117

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 Q   When did Health Grades start receiving
2 information from healthcare providers?
3 A   There should be some reference in e-mails
4 to when we introduced a POS system. And that's when
5 we started gathering information from providers.
6 So provider information that sourced
7 from providers or their office managers, so the date
8 would be specific to that.
9 But even after we started gathering that
10 information, we didn't introduce that into reports
11 because we didn't have a mechanism to -- you talked
12 about validation earlier to validate and regulate
13 what might be presented. So what was being input
14 into those reports, that was also part of the
15 consideration.
16 Q   So can you tell me, Mr. Neal, when did the
17 Physician Quality Comparison Report start to include
18 information from healthcare providers?
19 A   I don't know. I don't know for certain
20 that this report ever did include information
21 provided by the providers themselves or their office
22 managers.
23 Q   So you don't know if the Physician Quality
24 Comparison Reports ever included information from

25 reports at that point in December of 2004.

Attorneys' Eyes Only

Page 118

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  healthcare providers?
3      A    I don't recall having done that. The
4  intent and the origin of this report was to compile
5  that third-party data and present it in this form of
6  report.
7      Q    Right. But one of the issues I'm
8  struggling with here, Mr. Neal, is, and it's an
9  element in one of the patent claims, I have no reason
10  to hide that from you, is we're trying to find out
11  whether these reports contained information at any
12  time prior to August 2006, if it contained
13  information that was received from healthcare
14  providers?
15      A    That's not my recollection. They did not,
16  based on what I recall.
17      Q    So your testimony here, as the 30(b)(6)
18  witness for Health Grades, is that these reports
19  never included healthcare provider information?
20      A    The physician --
21      MR. VAZQUEZ: Wait, object to form. That
22  misstates his testimony.
23      A    I didn't say that for certain.
24      Q    (BY MR. STIMPSON) Okay. So you just
25  don't know?

Page 119

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      A    I don't recall when we introduced that
3  physician provided information to consumers on the
4  website. That's the distinction.
5      Q    So I mean, just so I'm perfectly clear
6  here, as we sit here today, you can't tell me whether
7  or when physician quality comparison reports included
8  information received from healthcare providers,
9  correct?
10      A    I'm unsure of the date, or whether this
11  form of report ever included that information.
12      Q    Okay. This report includes specialty
13  information, correct?
14      A    It does.
15      Q    It includes medical philosophy?
16      A    Where is the medical philosophy?
17      Q    Actually, let's just go through the
18  report. It would be easier.
19      A    Okay.
20      Q    So, information about the specialties is
21  provided in Section 1, right?
22      A    Yep.
23      Q    Information about education and training
24  is provided in Section 2, correct?
25      A    Yes.

Page 120

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      Q    The report also contains information on
3  gender, right?
4      A    What page? I'm sure it does but --
5      Q    Page 32075.
6      A    All right.
7      MR. VAZQUEZ: The question is whether it
8  contains information on gender?
9      MR. STIMPSON: Yes.
10      A    This report does.
11      Q    (BY MR. STIMPSON) As we sit here today,
12  you can't tell me whether or not that information
13  came from healthcare providers, right?
14      A    No, that was third-party data.
15      Q    Okay.
16      A    The gender of the physicians.
17      Q    Okay. And did the --
18      A    We still get third-party data from
19  vendors, the gender information.
20      Q    So gender information, Health Grades has
21  never received gender information from healthcare
22  providers?
23      MR. VAZQUEZ: Form.
24      A    When we affiliate, so that program I
25  described earlier, Patient Direct Connect, and even

Page 121

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  Connecting Point, there was an additional level of
3  review that went on when those physicians became
4  designated by a hospital system, in which case we may
5  have looked more closely at that specific data
6  element to ensure that it was accurate.
7      So that would be inaccurate to say that
8  Health Grades has never looked at the gender of the
9  physician and made an adjustment based on feedback
10  from the hospital client or a physician or their
11  office manager.
12      Q    (BY MR. STIMPSON) Can you tell me, as you
13  sit here today, whether the Physician Quality
14  Comparison Report has ever had gender information
15  that was received from the healthcare provider?
16      MR. VAZQUEZ: Object to form.
17      A    Not to my recollection.
18      Q    (BY MR. STIMPSON) Okay. You don't know
19  one way or the other?
20      A    I highly doubt it because it's a common
21  third-party source of information. I mean, it's one
22  of the top three elements. You get a name, you get a
23  sex, and you get the practice address and phone
24  number. It's fairly standard.
25      Q    (BY MR. STIMPSON) Okay. And when the POS

31 (Pages 118 - 121)

EXHIBIT H

Attorneys' Eyes Only

Page 122

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  started, could healthcare providers change that
3  information if it was wrong?
4      A    There was -- as I recall, there was a
5  mechanism to alter those inputs and to capture
6  additional information or to correct any
7  inaccuracies.
8      Q    And that included gender, right?
9      A    I'm not certain, but that would be
10 reasonable to assume that it did.
11     Q    So if that's the case, then it's entirely
12 possible that Physician Quality Comparison Reports
13 would include gender information that was received
14 from the healthcare provider, right?
15         MR. VAZQUEZ:   Form.
16     A    Based on my recollection, we were not
17 using any provider information in these reports.
18     Q    (BY MR. STIMPSON)   Okay.  Now, we talked
19 about that earlier.  But you can't -- we've already
20 addressed that, but I'm just trying to find out on
21 gender information, can you tell me, as we sit here
22 today, that no Physician Quality Comparison Report
23 ever had gender information that was entered or
24 provided by a healthcare provider?
25         MR. VAZQUEZ:   Object to form.

Page 123

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A    I think we can say that about --
3         MR. VAZQUEZ:   Hold on a second.  Let me
4  object to form.
5         THE DEPONENT:   Okay.
6         MR. VAZQUEZ:   Asked and answered.  If you
7  can answer it again.
8      A    Well, I think it's speculation.  I mean,
9  anyone can provide a hypothetical that any data in
10 this report could be, but the reality is that's not
11 how it was constructed.  It was constructed using
12 third-party data.
13     Q    (BY MR. STIMPSON)   Right.  I understand it
14 was constructed that way.  But then when --
15     A    That's what we're looking at.  That's the
16 report we're looking at.
17     Q    Okay.  But what I'm saying is after it was
18 constructed initially, you did something to get the
19 data initially, right?  Right?
20     A    What data?
21         MR. VAZQUEZ:   Form.
22     Q    (BY MR. STIMPSON)   All this data in this
23 report.  You got it from third parties, right?
24     A    Third party.  We did.  We did.
25     Q    Then there came a time when Health Grades

Page 124

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  introduced the POS system, which is a physician
3  online services, right?
4      A    Yes.
5      Q    And do you know what that date was?
6      A    I don't recall the exact date.
7      Q    Do you know if it was in 2005?
8      A    I do not recall the exact date.
9      Q    So whenever that was, at that stage,
10 physicians could get on and change some data about
11 themselves, right?
12     A    They could within our POS system, is the
13 acronym.
14     Q    Right.
15     A    Yeah.
16     Q    And that included things like gender,
17 specialty information, correct?
18     A    They could within that system.  But what
19 didn't happen for a very long time, and I don't know
20 the exact amount of time, that system was not
21 integrated with the reports that we displayed on our
22 website.
23         So for a period of time we were just
24 capturing the information.  We weren't displaying it
25 directly into reports because we didn't have a

Page 125

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  mechanism.  We had to build an infrastructure to go
3  in and review and validate that data.
4      Q    So when was the time when that system
5  started being integrated with your reports so that
6  they contained information of healthcare providers?
7      A    I don't know the exact date.
8      Q    Can you say it was in 2005?
9      A    You said that the POS system went into
10 operation in 2005?
11     Q    I didn't say that.  I'm asking you.  I
12 don't know --
13     A    I don't recall the exact day.
14     Q    So as we sit here today, you can't tell me
15 whether or not that POS system was integrated so the
16 information made it into the reports in 2005?
17     A    I cannot confirm that.
18     Q    Okay.  This report also contains age
19 information, right?  We're again looking at the
20 Physician Quality Comparison Report on Health Grades
21 32062.
22     A    Do you want to turn to the page?  I'm sure
23 it does.
24     Q    If you can just look through and find it,
25 please.

Veritext/NJ Reporting Company

800-227-8440

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 126

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    A   Okay. What page is that? It says
3 standard third-party data delivery. You may have
4 been confused. I think it's years in practice you're
5 referring to.
6    Q   All right. So years in profession is in
7 here?
8    A   It is.
9    Q   Okay. And years in practice?
10    A   I think that's the same thing.
11    Q   How about awards, are those in here?
12    MR. VAZQUEZ: Well, I thought we weren't
13 going to flip through this.
14    Q   (BY MR. STIMPSON) Are awards in here?
15    MR. VAZQUEZ: Take your time to look
16 through and find it. Don't speculate.
17    A   I believe -- hospital quality awards are
18 actually in here. I'm looking at 32073, and there
19 are hospital quality awards.
20    Q   How about professional appointments, are
21 these in here?
22    A   By definition, as I've gone through this,
23 I have not seen that term or phrase. Is it in here?
24    Q   We may see it. Anyway, we've at least
25 found -- let's just say we've at least found gender,

Page 127

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 years in profession and years in practice, and
3 specialty information in this report, right?
4    A   Yes.
5    Q   Okay. How about languages, is that in
6 here?
7    A   I'm not seeing it. If it is, if you could
8 point it out to me.
9    Q   All right. So anyway, going back and you
10 can start at the beginning of the report again, and
11 after receiving your request for the healthcare
12 provider, Health Grades would compile at least
13 patient provided information regarding the first
14 healthcare provider; is that right?
15    MR. VAZQUEZ: Form.
16    A   I apologize. I need to get you --
17    Q   (BY MR. STIMPSON) Let me back up a little
18 bit. When did Health Grades start collecting patient
19 provided information?
20    A   It was -- I don't know for certain. It
21 was in the 2006 timeframe, I believe.
22    Q   Okay.
23    A   2006 to 2007.
24    Q   Okay. Is that the first time it did that
25 even with beta testing in pilot programs?

Page 128

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    MR. VAZQUEZ: Form.
3    A   I just recall 2006 to 2007.
4    Q   (BY MR. STIMPSON) Okay.
5    A   I can't speak to beta specifics.
6    Q   All right. In this report, this Physician
7 Quality Comparison Report, it included information
8 from third parties, including board certification,
9 right?
10    A   Yes.
11    Q   And medical school?
12    A   I believe so.
13    Q   And licensure?
14    A   Let me go through the elements that you're
15 speaking to. I don't recall licensure being listed
16 separately, but --
17    Q   32067.
18    A   Okay. Got it.
19    Q   Disciplinary information?
20    A   That was incorporated as available.
21    Q   Okay. And medical school?
22    A   Yes, as available.
23    Q   And medical internship? 32064.
24    A   Okay. Yes.
25    Q   And medical residency?

Page 129

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    A   Yes.
3    Q   And medical fellowship information?
4    A   Yes.
5    Q   And then the Health Grades website would
6 create a healthcare provider report in response to
7 the request, right?
8    MR. VAZQUEZ: I'm going to object to form.
9    Q   (BY MR. STIMPSON) Including this
10 Physician Quality Comparison Report, right?
11    MR. VAZQUEZ: Form.
12    A   The report was produced.
13    Q   (BY MR. STIMPSON) Okay. And that would
14 be made available over the web to the consumers,
15 right?
16    A   It was accessible on the Internet, yes.
17    Q   Why didn't you disclose the Physician
18 Quality Comparison Report to the Patent and Trademark
19 Office in connection with the patent application that
20 led to the '060 patent?
21    A   The intent behind the patent filing was to
22 patent what we believed to be unique where there was
23 no prior art that existed. And this was not deemed
24 to be unique or different.
25    So that's the reason we didn't reference

33 (Pages 126 - 129)

EXHIBIT H

Attorneys' Eyes Only

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    it.
3        Q    Okay.  I need a little bit more specifics
4    on that.  What was it -- well, first of all, did you
5    talk about the Physician Quality Comparison Reports
6    with your patent attorneys?
7        MR. VAZQUEZ:  You can say whether you
8    discussed it, but, of course, do not disclose what
9    you actually discussed.
10       A    I don't recall the specific conversation.
11   But we covered a range of topics, and I'm sure we
12   reevaluated what we were already doing at that time.
13       Q    (BY MR. STIMPSON)  So you did go over with
14   your patent prosecution counsel what Health Grades
15   was doing at the time?
16       MR. VAZQUEZ:  Objection.  Misstates the
17   testimony.
18       A    I don't recall exactly what we discussed
19   and how it was discussed.
20       MR. VAZQUEZ:  Did you say so you didn't go
21   over with your patent prosecution counsel what Health
22   Grades was doing at the time?
23       MR. STIMPSON:  I think I said he did.
24       MR. VAZQUEZ:  Oh, okay.  So then I
25   withdraw my objection.  I thought you said didn't,

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    but I see here that it says "did."
3        Q    (BY MR. STIMPSON)  Let me just ask you,
4    Mr. Neal, do you have a recollection of discussing
5    Physician Quality Comparison Reports from 2004 or
6    2005 with your patent prosecution counsel?
7        A    I do not recall that specific
8    conversation.
9        Q    Now, we were talking about why you didn't
10   disclose these Physician Quality Comparison Reports
11   to the Patent and Trademark Office.  Let me back up
12   just a bit.
13       You understood you had a duty of candor to
14   the Patent and Trademark Office?
15       A    I understand the requirements in signing
16   the patent filing.
17       Q    And one of them was that you were to
18   disclose any relevant prior art to the Patent and
19   Trademark Office?
20       MR. VAZQUEZ:  Form.
21       A    I am aware of that.
22       Q    (BY MR. STIMPSON)  Yeah, you are aware now
23   but you were also aware then, right?
24       A    Yeah, which is exactly what we did.
25       Q    So let's talk about why this Physician

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Quality Comparison Report from 2004 and 2005, why
3    they were not disclosed to the Patent and Trademark
4    Office.
5        You said, I thought, if I remember right,
6    you said that the Physician Quality Comparison Report
7    was deemed to be different from what is in your
8    patent '060; is that correct?
9        A    Yes.
10       Q    Okay.  How?
11       A    It's bringing together those different
12   elements in types of data and making that accessible
13   to consumers, not just in a report, but more
14   importantly on the website.
15       And most importantly, to give them a means
16   to differentiate providers based on a rating or a
17   score.  And this is not what we were doing in 2004.
18       Q    Okay.  So any other reasons?  Any other
19   reasons?
20       A    Any other reasons for?
21       Q    For why you didn't disclose it.
22       A    It was about being innovative and ensuring
23   that we were protecting what was not being done by
24   anyone else.  That was the intent behind the patent.
25       Q    Any other reasons?

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        A    Any other reasons for?
3        Q    Why you didn't disclose it.
4        A    It wasn't relevant to the patent
5    application that we were filing.
6        Q    Why?  Why not?
7        A    It's for the reason I just said.
8        Q    Okay.
9        A    This patent was to protect a unique
10   experience, something that no one else was doing in
11   any form or fashion in terms of combining data
12   elements, creating a unique experience to consumers
13   on a website.
14       Q    Did you understand then, with your duty of
15   candor, Mr. Neal, that the only prior art you need to
16   disclose was prior art that showed every element of
17   your patent claims?
18       MR. VAZQUEZ:  Form.
19       A    I don't recall what those specific
20   discussions were with our counsel as relates to that.
21       Q    (BY MR. STIMPSON)  I'm just trying to get
22   a factual understanding here.  Back at the time when
23   this application was pending, was it your
24   understanding, sir, that the only prior art you
25   needed to disclose was prior art that showed every

34 (Pages 130 - 133)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 134

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  element of your patent claims?
3        MR. VAZQUEZ:  Same objection.
4     A   Was it my understanding -- I'm sorry, if
5  you can read back or say that last part.  Was it my
6  understanding -- sorry, if you can read back or say
7  that last part, was it my understanding --
8        (Record read as requested.)
9        MR. VAZQUEZ:  I object to form.  Calls for
10  a legal conclusion.
11    A   Yeah, I don't understand the question.
12  Were we supposed to -- I need you to rephrase or
13  re-ask the question.  I just don't understand it.
14    Q   (BY MR. STIMPSON)  Okay.  Well, let me try
15  again, then.  I'm talking about the time when your
16  patent application was pending before it issues a
17  patent.  And you understood you had a duty of candor
18  to disclose relevant prior art to the Patent and
19  Trademark Office, correct?
20        MR. VAZQUEZ:  Form.
21    A   Yes.
22    Q   (BY MR. STIMPSON)  Was it your
23  understanding, sir, at that time that you only needed
24  to disclose prior art that showed every element of
25  your patent claims?

Page 135

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        MR. VAZQUEZ:  Object to form.  Calls for
3  legal conclusion and expert testimony.
4     A   I don't recall specifically what the
5  instructions were as it relates to what prior art we
6  needed to disclose.  It was a conversation with
7  counsel.
8     Q   (BY MR. STIMPSON)  Okay.  But you don't
9  recall actually discussing the physician quality
10  comparison reports with your counsel?
11    A   We discussed -- we discussed everything as
12  it relates to what we had done historically, were
13  doing then, and plan to do in the future.
14    Q   So is it your testimony that in connection
15  with your patent application you disclosed to
16  Merchant & Gould that Health Grades had these 2004,
17  2005 Physician Quality Comparison Reports?
18    A   I don't know that we specifically
19  discussed these reports.  I don't recall that
20  conversation.  We covered a range of topics, as I
21  just said.
22    Q   All right.  Do you remember disclosing to
23  Merchant & Gould any of the 2005, 2004 reports that
24  Health Grades had disclosed to the public?
25        MR. VAZQUEZ:  Again, just to warn you,

Page 136

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Mr. Neal, you can answer his questions to the best of
3  your ability, but don't disclose the communications
4  you had with Merchant & Gould.
5        THE DEPONENT:  Okay.
6     A   I can't recall the specific conversations
7  as it relates to these reports.
8     Q   (BY MR. STIMPSON)  Okay.  There are some
9  things in your patent claims that you know this
10  Physician Quality Comparison Report had, right?
11        MR. VAZQUEZ:  Object to form.
12    Q   (BY MR. STIMPSON)  We have gone over those
13  things, right?
14        MR. VAZQUEZ:  Same thing.  Form.
15    Q   (BY MR. STIMPSON)  Let's just start there.
16  Let me start with that.  You know, and you knew at
17  the time your patent application was pending, that
18  there were a number of claim elements from your
19  claims in the '060 patent that were found in this
20  Physician Quality Comparison Report, right?
21        MR. VAZQUEZ:  Same thing.  Form.  Also,
22  legal conclusions.
23    A   Yeah, I would have to defer to counsel on
24  that.  I don't know what the interpretation of the
25  patent was as it relates to any reports that may have

Page 137

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  been in existence at that time.
3     Q   (BY MR. STIMPSON)  Well, you knew your
4  patent claim had a claim element, for example, about
5  consumers requesting information of a website, right?
6     A   Well, I think it's a legal interpretation
7  that I'm not qualified to make.
8        MR. VAZQUEZ:  I don't want to keep
9  interrupting you, Scott, but can I just have the same
10  objection when you ask about claims and use, you
11  know, terminology that's --
12        MR. STIMPSON:  That's fine.  Yes, yes.
13        MR. VAZQUEZ:  Yes?
14        MR. STIMPSON:  Yes.
15        MR. VAZQUEZ:  Thank you.
16    Q   (BY MR. STIMPSON)  So you're a named
17  inventor on this, right?
18    A   Um-hum.
19    Q   And you read the patent application, and
20  you understood the patent application?
21    A   I do.
22    Q   Right, and you read the patent claims that
23  were submitted to the Patent Office, right?
24    A   I have absolutely, um-hum.
25    Q   So at the time when this patent

35 (Pages 134 - 137)

EXHIBIT H

Attorneys' Eyes Only

Page 138

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  application was pending, you understood that one of
2  the claim elements was about how a consumer would get
3  on and request information about a healthcare
4  provider on a website, right?
5      A   I didn't know how the patent application
6  and any claims that were made therein might apply to
7  the reports because I'm not counsel, I'm not an
8  attorney. So I don't know -- so I can't respond to
9  that question.
10     Q   Okay. You are an inventor, though, sir.
11     A   Um-hum.
12     Q   And you signed a declaration. I can show
13 it to you if you want to see it, but you signed a
14 declaration saying that you understood the patent
15 application and the claims.
16     A   You're asking me to make a legal
17 determination, though, and I'm just not qualified to
18 do that.
19     Q   Sir, I'm not -- you can -- just answer the
20 question as best you can. That's all I'm asking.
21     A   I really am trying. I really am.
22     Q   So my question is this, when the
23 application was pending you understood that one of
24 the claim elements of your '060 patent application

Page 139

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  was that a consumer would get on a website and make a
2  request for information about healthcare providers?
3      A   I think that's an element in the claim, in
4  the filing.
5      Q   Right. And that was also something that
6  was found on Health Grades website in 2004 with
7  regard to Physician Quality Comparison Reports,
8  right?
9      A   I don't know how that claim applies to
10 anything we may have been doing on the website.
11 That's for attorneys to determine.
12     Q   But that wasn't quite my question, sir.
13     A   Okay.
14     Q   My question was, you understood, that as
15 of 2004, the Health Grades website allowed consumers
16 to get on and make a request about information for
17 healthcare providers, correct?
18     A   It did provide that functionality.
19     Q   And you understood that the Health Grades
20 website, one of the features that was available on
21 that website is it would allow consumers to get on
22 and get these Physician Quality Comparison Reports,
23 right?
24     A   Um-hum.

Page 140

CONFIDENTIAL - ATTORNEYS EYES ONLY

1      Q   Okay. You have to answer.
2      A   Oh, I'm sorry.
3      Q   Yes?
4      A   Consumers, at that point in time, based on
5  the report we're looking at, in 2004, they were able
6  to access the third-party data provided consumer
7  comparison reports.
8      Q   Right. And some of that data, as we've
9  been over in the claim, contained information on
10 gender, right? The Physician Quality Comparison
11 Report included information on gender, right?
12     A   I'm not sure how the claim relates.
13 Again, I'm not counsel. I'm not an attorney. I
14 don't know how the claim relates to what we may or
15 may not have been doing on the website in 2004.
16     Q   Okay. I'm not asking that, though,
17 Mr. Neal. My question was --
18     A   But you were reading -- I'm sorry. You
19 were reading that to me, which is part of the patent
20 application, which requires an interpretation.
21     Q   I'm just asking you a factual question,
22 sir. You understood that in 2004, the Physician
23 Quality Comparison Report had information on
24 healthcare provider gender, right?

Page 141

CONFIDENTIAL - ATTORNEYS EYES ONLY

1      A   It did.
2      Q   Okay. You understood that in 2004, the
3  Physician Quality Comparison Report had information
4  on specialty information?
5      A   It did.
6      Q   You understood that in 2004, the Physician
7  Quality Comparison Report had information on
8  healthcare provider age, right?
9      A   Age was not in there. I think we
10 determined that it was years in medical practice.
11     Q   Okay. And you understood that in 2004,
12 the Physician Quality Comparison Report had
13 information on, yes, years in profession, years in
14 practice, right?
15     A   Yes.
16     Q   Okay. And you understood that in 2004,
17 the Physician Quality Comparison Report showed
18 comparison ratings of healthcare providers, right?
19     A   There were no comparison ratings of
20 healthcare providers.
21     Q   Okay. Can you please turn to 32073?
22     A   32073.
23     Q   Okay. And that's referencing hospitals
24 there, right?

36 (Pages 138 - 141)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 142

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    A    Those are hospitals, not physicians.
3    Q    Right. Hospitals, as you told me earlier,
4  are healthcare providers, right?
5    A    Okay. I'm sorry. By definition, that was
6  the broader definition to include hospitals. Okay.
7    Q    Okay. Right? So with that understanding,
8  you understood that the Physician Quality Comparison
9  Reports in 2004 showed comparison ratings of
10  healthcare providers, right?
11    MR. VAZQUEZ: Form.
12    A    They provided comparison ratings of
13  hospitals. Very important distinction.
14    MR. STIMPSON: Okay. Move to strike as
15  nonresponsive.
16    Can you read the question back?
17    (Record read as requested.)
18    MR. VAZQUEZ: Form.
19    A    It provided comparison ratings of only
20  hospitals.
21    Q    (BY MR. STIMPSON) All right. And as you
22  talked about earlier, hospitals can be considered
23  healthcare providers, correct?
24    A    That's for someone else to determine.
25  I've heard multiple uses of providers, which is the

Page 143

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  reason I keep making the distinction with you.
3    MR. STIMPSON: Move to strike as
4  nonresponsive.
5    Q    (BY MR. STIMPSON) My question, Mr. Neal,
6  is, you understood, at the time this patent
7  application was pending, that hospitals could be
8  considered healthcare providers, correct?
9    A    I didn't know how the court might
10  interpret or the Patent Office might interpret it.
11    MR. STIMPSON: Move to strike as
12  nonresponsive.
13    Q    (BY MR. STIMPSON) Mr. Neal, my question
14  is this, during the time that patent application was
15  pending you understood that hospitals could be
16  considered healthcare providers, correct?
17    MR. VAZQUEZ: Okay. Object. You're
18  asking the witness -- asked and answered.
19    MR. STIMPSON: I --
20    MR. VAZQUEZ: Let me finish my objection,
21  please.
22    MR. STIMPSON: Okay.
23    MR. VAZQUEZ: It's been asked and
24  answered. It's argumentative, it's harassing. Give
25  me one more shot at it, Scott.

Page 144

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    MR. STIMPSON: Well, I'll take as many
3  until I get the answer, thank you.
4    MR. VAZQUEZ: Well, we'll see about that.
5    Q    (BY MR. STIMPSON) Will you please answer
6  the question, sir?
7    A    By the definition you provided of
8  providers, which is inconsistent with the definition
9  others have provided, but with the definition you
10  provided of providers that includes physicians and
11  hospitals defined as providers, the fact that we are
12  providing quality ratings on hospitals, that would
13  suit your definition.
14    Q    My question didn't have anything about my
15  definition.
16    A    It's all about your definition. I'm
17  sorry.
18    Q    No, no, no, it's about yours, sir. Listen
19  to my question, please, okay?
20    MR. STIMPSON: And move to strike the last
21  answer as nonresponsive again.
22    Q    (BY MR. STIMPSON) Please listen to the
23  question. It's about what you understood at the time
24  the patent application was pending, the '060 patent.
25  And the question is simply this, at the time that

Page 145

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  application was pending, you understood that by, at
3  least some definitions, hospitals could be considered
4  healthcare providers, correct?
5    MR. VAZQUEZ: Form.
6    A    By some definitions, yes.
7    Q    (BY MR. STIMPSON) And using those
8  definitions, the Physician Quality Comparison Report
9  had comparison ratings of healthcare providers,
10  correct?
11    MR. VAZQUEZ: Form.
12    You can answer.
13    A    Okay. This is not a comparison rating of
14  physicians. This is a clinical-based outcome score
15  for hospitals.
16    MR. STIMPSON: Move to strike as
17  nonresponsive.
18    Please read the question back to the
19  witness.
20    (Record read as requested.)
21    MR. VAZQUEZ: Same objections. Asked and
22  answered. Argumentative. Harassing the witness.
23    A    Let's look at the content of this report.
24  The answer is no.
25    MR. VAZQUEZ: He's answering. Let him --

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 146

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        A    The answer is no. Because look at the
3    elements that are contained for each of these
4    hospitals and the information that is contained
5    therein.
6        MR. STIMPSON:  Move to strike as
7    nonresponsive.
8        Q    (BY MR. STIMPSON)  Mr. Neal, we're going
9    to be here the rest of our lives if we don't get this
10   question answered, okay, so will you just please
11   focus on my question?
12       MR. VAZQUEZ:  You're not going to get the
13   answer you want, Mr. Stimpson.
14       MR. STIMPSON:  Just a second.  Just a
15   second.
16       MR. VAZQUEZ:  All right.
17       MR. STIMPSON:  We've been through this,
18   okay?
19       Q    (BY MR. STIMPSON)  Just a few questions
20   ago we established that you understood at the time
21   this application was pending that under some
22   definitions hospitals can be considered healthcare
23   providers, right?  You remember that?
24       A    Under that definition, they could be.
25       Q    Okay.  And then using that definition, the

Page 147

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Physician Quality Comparison Reports of 2004 contain
3    comparison ratings of healthcare providers, correct?
4        MR. VAZQUEZ:  Same objection.
5        A    This is not comparison data, sir.
6        MR. STIMPSON:  Move to strike as
7    nonresponsive.
8        A    It's not comparison data.
9        MR. STIMPSON:  Please read back --
10       MR. VAZQUEZ:  No, we're not.  I'm making a
11   motion under Rule 30 --
12       MR. STIMPSON:  Okay, call the Court.
13       MR. VAZQUEZ:  No, let me finish my motion.
14       MR. STIMPSON:  If you're moving for a
15   protective order, let's do it right now.
16       MR. VAZQUEZ:  Will you just -- you know, I
17   hate to do it again, but please let me make my
18   objection --
19       MR. STIMPSON:  Okay.
20       MR. VAZQUEZ:  -- and finish saying what
21   I'm saying, okay?
22       MR. STIMPSON:  Okay, go ahead.
23       MR. VAZQUEZ:  Okay, good.  I make a motion
24   to limit this deposition because right now you're
25   conducting it in bad faith to simply annoy,

Page 148

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    embarrass, and to press Mr. Neal.  You don't like the
3    answer, and that's your problem.  Okay?  He's
4    answered it multiple times.
5        So I can go further and simply demand that
6    we just suspend the deposition right now, or if you
7    would like to agree to simply move on or ask
8    different questions, Mr. Stimpson.
9        The Court may order that the deposition be
10   terminated on limited scope as provided in Rule 26.
11   So however you want to go.
12       MR. STIMPSON:  You done?
13       MR. VAZQUEZ:  However you want to go.
14       MR. STIMPSON:  Are you done?
15       MR. VAZQUEZ:  However you want to go.
16       MR. STIMPSON:  Read the question back to
17   the witness, please.
18       MR. VAZQUEZ:  Okay.  We're suspending it.
19       MR. STIMPSON:  You've got to call the
20   Court.
21       MR. VAZQUEZ:  No.
22       MR. STIMPSON:  You've got to move for a
23   protective order.
24       MR. VAZQUEZ:  No, I know what I need to
25   do.  You don't tell me how to practice law,

Page 149

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Mr. Stimpson.  We're just suspending the deposition
3    right now.
4        MR. STIMPSON:  I'm calling the Court right
5    now.
6        MR. VAZQUEZ:  Good.
7        MR. STIMPSON:  Get the number to the
8    Court, please.
9        (The deponent left the room.)
10       THE REPORTER:  Off the record?
11       MR. VAZQUEZ:  Yes, we are.
12       MR. STIMPSON:  No, this is going to be on
13   the record.
14       (Pause.)
15       (Discussion off the record.)
16       (The deponent entered the room.)
17       Q    (BY MR. STIMPSON)  Mr. Neal, isn't it true
18   that in your own patent, your '060 patent where
19   you're a named inventor, that you've identified
20   hospitals as healthcare providers?
21       MR. VAZQUEZ:  Form.
22       A    Where in the claim?
23       Q    (BY MR. STIMPSON)  Abstract.  Just look at
24   the abstract.  It's right on the front page.
25       A    Okay.  We have.

38 (Pages 146 - 149)

EXHIBIT H

973-410-4040

Attorneys' Eyes Only

Page 150

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    Q    Okay.  So under that definition, and now
3  your definition, Mr. Neal, right, the one that you
4  signed the application attesting that you read the
5  application and understood it.
6    A    Um-hum.
7    Q    Under your definition of hospitals being
8  healthcare providers --
9    A    Right.
10    Q    -- isn't it correct, sir, that in 2004,
11  the Physician Quality Comparison Report contained
12  comparison ratings of healthcare providers?
13        MR. VAZQUEZ:  Same objections that I made
14  to this question before.
15        If you can answer.
16    A    Yeah, the comparison ratings is not an
17  accurate depiction of what that data for hospitals
18  represents.
19    Q    (BY MR. STIMPSON) Mr. Neal, let's look at
20  this page, okay?
21    A    Yeah.
22    Q    Okay.  32073.  Are you with me?
23    A    Give me just a second.
24        MR. VAZQUEZ:  Take whatever time you need
25  to look at that, Mr. Neal.

Page 151

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    Q    (BY MR. STIMPSON)  Are you with me,
3  Mr. Neal?
4    A    I am.
5    Q    Okay.  This 2004 Physician Quality
6  Comparison Report shows ratings of hospitals,
7  correct?
8    A    It does.
9    Q    It shows ratings of multiple hospitals,
10  correct?
11    A    It does not show a hospital rating.  It
12  shows how they performed by cohort or service line.
13  So they are not hospital ratings.
14    Q    Do you see above the table where it says,
15  What are the ratings for hospitals in my area?
16        Do you see that?  Do you see that, sir?
17    A    Yes.
18    Q    And that's language that's right in this
19  Physician Quality Comparison Report, right?
20    A    It is.
21    Q    And so ratings are provided for multiple
22  hospitals in this report, correct?
23    A    The rating is not assigned to the
24  hospital.  It's assigned to the service lines that
25  are parts of that hospital.  It's an important

Page 152

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  distinction.
3    Q    Okay.  So the ratings are assigned to
4  parts of hospitals, correct?
5    A    They are.
6    Q    And under your own definition, founding
7  your own patent of '060, right, you said that
8  hospitals were healthcare providers, correct?
9        MR. VAZQUEZ:  Form.
10    A    Based on, yes, the abstract definition.
11    Q    (BY MR. STIMPSON)  Right.  And any user
12  looking at this Physician Quality Comparison Report
13  could compare ratings on these parts of hospitals
14  from this Physician Quality Comparison Report in
15  2004, correct?
16    A    I'm not sure what interpretation the
17  consumer might make, but there's not a means by which
18  to compare facilities and make a choice.  You can
19  choose my service line and evaluate, but there is no
20  method of comparison in there.
21    Q    So you're telling me that a user of this
22  Physician Quality Comparison Report could not look at
23  the Central Baptist Hospital and say, cardiac has a
24  three-star rating and then -- let me just find one
25  word here.

Page 153

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2        So you're telling me, Mr. Neal, that a
3  user could not look at this Physician Quality
4  Comparison Report and look, for example, and see that
5  Central Baptist Hospital in neurosciences -- I'm
6  sorry, in pulmonary, has a three-star rating, and
7  also note from the same exact document that Pattie A.
8  Clay Hospital in Richmond, Kentucky had a five-star
9  rating in pulmonary, right?
10        MR. VAZQUEZ:  What is the question?
11    Q    (BY MR. STIMPSON)  The user could do that,
12  right?
13    A    They could look at this report and see
14  that information.
15    Q    Right, and the way they do that is they
16  look at the ratings for the Central Baptist Hospital
17  under pulmonary, and then they compare it to the
18  Pattie A. Clay Hospital, pulmonary, right, and you'd
19  see that the Pattie A. Clay Hospital had a much
20  better rating than the Central Baptist Hospital,
21  right?
22    A    A consumer might do that.
23    Q    If a consumer did that -- well, let me
24  just back up.
25        Actually, that's exactly the reason why

39 (Pages 150 - 153)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 154

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  these ratings are here, right, so the consumers can
3  compare these ratings to these various hospitals in
4  the various areas, right?
5      MR. VAZQUEZ: Object to form. Compound.
6  A   That may be a reason why.
7  . Q   (BY MR. STIMPSON) Okay. Thank you.
8      Now, you also knew that the Health Grades
9  website was managed by Health Grades in the 2004
10 timeframe, right?
11 A   The Health Grades website -- I'm just
12 repeating the question. Repeat the question, please.
13     (Record read as requested.)
14 A   Okay, yes, I did.
15 Q   (BY MR. STIMPSON) And you knew that the
16 Physician Quality Comparison Reports for 2004
17 included board certification, right?
18 A   Correct.
19 Q   You knew that came from third parties?
20 A   It did.
21 Q   Okay. And you knew it included licensure,
22 right?
23 A   I believe that was one of the elements we
24 identified, yes.
25 Q   And you knew that came from third parties?

Page 155

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  A   Yes.
3  Q   Okay. You knew that the Physician Quality
4  Comparison Report of 2004 included disciplinary
5  information?
6  A   Yes.
7  Q   And you knew that came from third parties?
8  A   Correct.
9  Q   You knew that the Physician Quality
10 Comparison Reports from 2004 included medical school
11 information, right?
12 A   Yes.
13 Q   And you knew that came from third parties?
14 A   Yes.
15 Q   Okay. And you knew it also included
16 internship, residency, and fellowship information,
17 right?
18 A   Correct.
19 Q   And you also knew that all three of those
20 came from third parties, right?
21 A   Correct.
22 Q   And then you also knew that the Health
23 Grades website, in response to the request from the
24 consumer, would create a report, could create a
25 report on healthcare providers, right?

Page 156

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  A   That's correct.
3  Q   And you also knew that that report could
4  be created using this information that we just talked
5  about that came from third parties, right?
6  A   Yes.
7  Q   And you also knew that the report would
8  also be made available to the consumer over the
9  website, right?
10 A   Yes.
11 Q   So, Mr. Neal, the physician quality
12 comparison reports for 2004 had numerous of the claim
13 elements from your '060 patent, right?
14     MR. VAZQUEZ: Form. And, again, calls for
15 expert testimony. He's not an attorney.
16     To the extent you can answer it, go ahead.
17 A   I would have to defer to counsel on that
18 one.
19 Q   (BY MR. STIMPSON) So you're not going to
20 answer that question?
21 A   No.
22     MR. STIMPSON: Did he say no?
23 A   I'm going to say I would defer to counsel.
24 Q   (BY MR. STIMPSON) Okay. But my question
25 is, are you refusing to answer that question?

Page 157

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  A   I'm not qualified to answer that question.
3  Q   So are you refusing to answer it?
4  A   That's my answer.
5  Q   Okay. So let's look at -- when did Health
6  Grades start collecting patient provided information?
7  A   Patient provided information, from my
8  prior comments, the 2006 to 2007 timeframe is my
9  recollection. If you have any documents that suggest
10 otherwise, I would love to see them. I don't know
11 exactly.
12     MR. STIMPSON: 25.
13 Q   (BY MR. STIMPSON) Let me show you what
14 has been marked as Exhibit 25. This is an e-mail
15 from Dave Hicks to a bunch of people, including
16 yourself.
17 A   Okay.
18 Q   Do you agree?
19     MR. VAZQUEZ: Can you give him a chance
20 just to read it?
21     MR. STIMPSON: Yeah, sure.
22     MR. VAZQUEZ: When you're done and ready
23 to answer the question, just let him know.
24 A   Okay.
25 Q   (BY MR. STIMPSON) This is an e-mail from

40 (Pages 154 - 157)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 158

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  Mr. Hicks to several people, including yourself, on
2  February 4, 2004, correct?
3  A  Yeah, that's what this document is.
4  Q  And these e-mails are created and kept in
5  the ordinary course of Health Grades' business,
6  correct?
7  A  Yes, I believe so.
8  Q  And so as of this time, 2004, Health
9  Grades had already collected answers to patient
10  satisfaction surveys, correct?
11  A  Based on this document, I would say yes.
12  Q  So it wasn't 2006, 2007 like you
13  testified; it was actually early 2004?
14  A  I think my --
15  MR. VAZQUEZ:  Form.  Misstates the
16  testimony.
17  A  Yeah, I said I thought it was 2006, 2007,
18  but I wasn't sure.
19  Q  (BY MR. STIMPSON)  Okay.  Actually it was
20  1999, right?
21  MR. VAZQUEZ:  Form.  What is 1999?
22  Q  (BY MR. STIMPSON)  Read number 1 there,
23  Mr. Neal.
24  MR. VAZQUEZ:  Again, form.  I don't even

Page 159

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  know what the question is.
2  MR. STIMPSON:  You don't have to, Jesus.
3  MR. VAZQUEZ:  Yes, I do.
4  A  What is the question, sir?
5  Q  (BY MR. STIMPSON)  Actually, Health Grades
6  had been collecting patient satisfaction information
7  since about 1999, right?
8  A  This would suggest so.
9  Q  Okay.  So let's just go back for a second.
10  MR. STIMPSON:  Which one is this, David?
11  It's Exhibit 21.
12  Q  (BY MR. STIMPSON)  And let me show you the
13  Comparative Physician Report on 208987.
14  Do you remember this on Exhibit 21, sir?
15  A  Yeah, I have some recollection.
16  Q  So as of this time, 2003, 2004 timeframe,
17  Health Grades, in fact, did have patient satisfaction
18  survey results, correct?
19  A  Based on the e-mail, it suggests so.
20  Q  Okay.  Thank you.
21  Can I have that 21 back?
22  A  Okay.
23  Q  In fact, by early 2004, Health Grades had
24  about 50,000 questions and answers on patient

Page 160

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  satisfaction, correct?
2  A  Can I provide history?
3  Q  No.  You can just answer the question,
4  please, sir.
5  MR. VAZQUEZ:  No, answer however you feel
6  is appropriate, Mr. Neal.  If it means history,
7  provide the history.
8  A  There were a set of patient experience
9  surveys, which I think probably represent this set
10  that were thrown out because they weren't
11  representative of consumer experience.
12  So I strongly suspect that this 50,000
13  that is referenced here was never used in any form or
14  fashion, and we actually started the collection of
15  surveys for display on the website at a later date.
16  Q  (BY MR. STIMPSON)  So when were these
17  thrown out?
18  A  I don't recall.
19  Q  Do you know if these were --
20  A  I'm not -- I should tell you, based on my
21  answers, I'm not real familiar with these.  But I can
22  tell you this, those 50,000 surveys are not the
23  surveys that display on our website today.
24  Q  Okay.  But my question here -- here is

Page 161

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  another question for you, though, Mr. Neal.  Were
2  these survey results displayed on any website?
3  A  Not to my knowledge.
4  Q  Does that mean you don't know whether they
5  were or they weren't, or are you just saying that
6  they weren't?
7  A  Not to my knowledge.
8  Q  So you just don't know?
9  A  I don't know.
10  Q  Okay.  So look at number 2.  Partners such
11  as Discovery Health are currently using our survey
12  instrument.
13  What was Discovery Health doing in 2004
14  with your survey instrument?
15  A  I don't know.  I wasn't involved with
16  that.
17  Q  Do you know if Discovery Health was
18  displaying any survey results?
19  A  I don't know.
20  Q  Look at number 6.  Fairly direct
21  correlation between the GE questions, initial set of
22  54 and Health Grades.
23  What are the GE questions?
24  A  What they're referencing there is the form

Veritext/NJ Reporting Company

800-227-8440

EXHIBIT H

973-410-4040

Attorneys' Eyes Only

Page 162

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  and number of questions that are used in the survey,
3  I believe.
4    Q    What does GE stand for?
5    A    I don't know for sure. I suspect it's
6  General Electric, but I have no idea how that can be
7  relevant to this conversation. I don't know.
8    Q    Was General Electric, in 2004, and
9  earlier, using survey questions on its website?
10    A    I have no idea.
11    Q    So you knew, at least as early as 2004,
12  that the idea of having surveys over the web and
13  collecting data information was publicly known,
14  right?
15    MR. VAZQUEZ: Form.
16    A    What I can tell you is that what I was
17  focused on didn't involve these 50,000 surveys. I
18  can't speak to what others in the organization were
19  doing as it relates to these surveys.
20    Q    (BY MR. STIMPSON) Okay. But you knew --
21  you can tell from this document, Mr. Neal, that at
22  least Discovery Health was using a survey instrument
23  as early as 2004, right?
24    A    This suggests they were using some sort of
25  survey instrument.

Page 163

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    And you were copied on this e-mail?
3    A    I was.
4    Q    So at least as of that time you would have
5  known that surveys from customers over the web were
6  known to the public, right?
7    A    No.
8    MR. VAZQUEZ: Form.
9    Q    (BY MR. STIMPSON) No?
10    A    This doesn't -- I don't interpret this as
11  meaning that.
12    Q    What did you understand that Discovery
13  Health was doing at the time with the surveys --
14    A    It says they were using the survey
15  instrument. It doesn't mean they were displaying any
16  results to user-specific websites.
17    Q    What were they doing, then, Mr. Neal?
18    A    I have no idea.
19    Q    How about Hewitt, were you doing anything
20  with Hewitt at that time?
21    MR. VAZQUEZ: Form.
22    A    There was a relationship with Hewitt. I'm
23  unfamiliar with any aspect of it.
24    Q    (BY MR. STIMPSON) The first sentence of
25  this says, Here is a brief summary of where we are

Page 164

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  with our products related to patient satisfaction.
3    What products are being referenced there?
4    A    I don't know.
5    Q    So does the word products indicate that
6  Health Grades actually had something that was used to
7  the patient's satisfaction?
8    A    I don't know.
9    Q    Did you receive in the 2004, 2005
10  timeframe Project Development Plans?
11    A    I am aware of Project Development Plans.
12  That's a tool that the product group used to build
13  out different aspects of the website.
14    Q    Did you see Project Development Plans in
15  2004, 2005?
16    A    I believe I may have.
17    Q    Was it a practice at Health Grades for you
18  to see the Project Development Plans?
19    A    It wasn't practice for me to see those
20  things. I was -- I was focused on other things.
21  That's a very specific web program and development
22  function.
23    MR. LEE: This will be marked as
24  Exhibit 46.
25    (Exhibit 46 marked.)

Page 165

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    (BY MR. STIMPSON) How often did Project
3  Development Plans come out?
4    A    I don't know.
5    Q    Let me show you what's been marked as
6  Defendant's Exhibit 46. It's a multipage document
7  bearing Bates numbers HGMKFS 098307 through 325.
8  Just take a second to look at that, please.
9    A    Okay.
10    Q    Have you seen this document before?
11    A    I do not recall having seen this document.
12    Q    Do you remember a project name, Patient
13  Satisfaction Survey Consumer Site?
14    A    I don't recall that name.
15    Q    Do you have an understanding of what Phase
16  I means here?
17    A    I do not.
18    Q    What were the JD Power survey questions?
19    A    I don't know.
20    Q    Does this help refresh your memory,
21  Mr. Neal, that as of early 2004, Health Grades was
22  collecting patient satisfaction data?
23    MR. VAZQUEZ: Object to form.
24    A    Is what? Are you making a statement or
25  asking me a question?

42 (Pages 162 - 165)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 166

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    (BY MR. STIMPSON) I'm asking a question.
3    A    Okay.
4    Q    Does this help refresh your recollection
5    that as of early 2004, Health Grades was collecting
6    patient satisfaction data?
7        MR. VAZQUEZ: Object to form.
8    A    This -- as I understand Project
9    Development Plans, and I'm not a developer or
10   programmer, this is a plan to develop the capability
11   to have that solution, any solution.
12       So I wouldn't make the assumption that
13   this was available in any specific timeframe
14   immediately after this document was produced.
15       MR. STIMPSON: Let me have this one
16   marked, okay?
17       MR. LEE: It's going to be Exhibit 47.
18       (Exhibit 47 marked.)
19       MR. VAZQUEZ: Thank you.
20   Q    (BY MR. STIMPSON) Take a second and take
21   a look at that, please.
22   A    Okay.
23   Q    Does this refresh your memory, Mr. Neal,
24   that patient experience surveys were launched in mid
25   May 2004?

Page 167

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        MR. VAZQUEZ: Object to form.
3    A    This -- any reference to JD Power &
4    Associates, I can tell you that the form of questions
5    that they use in any content that we may have
6    gathered is not used on our website today.
7        So it was unrelated to my activities. I
8    see I was copied on one of these e-mails. It just
9    wasn't something I was working on.
10       MR. STIMPSON: Move to strike as
11   nonresponsive.
12   Q    (BY MR. STIMPSON) Mr. Neal, Health Grades
13   was collecting patient experience survey data in May,
14   starting in May of 2004, correct?
15   A    Okay. You know, the thing I'm struggling
16   with, is this on JD Power's website, or is this on
17   Health Grades'?
18   Q    I don't know.
19   A    The e-mail suggests that it was.
20   Q    That it was what?
21   A    That it was launched in some fashion.
22   Q    Okay.
23       MR. STIMPSON: Let me have this one, 29.
24   Q    (BY MR. STIMPSON) Just while you have
25   that in front of you, Mr. Neal, this is an e-mail

Page 168

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    from Dave Hicks to Steve Wood at JDPA.com. And
3    included in this, you're included in some of these
4    e-mails as a copy holder, right?
5    A    I see one area where I was included, one
6    e-mail.
7    Q    This is an e-mail prepared and kept in the
8    ordinary course of business at Health Grades, right?
9    A    I believe so.
10   Q    Let me show you what's been marked as
11   Exhibit 29, please.
12       MR. VAZQUEZ: We're now re-marking this as
13   an exhibit for his?
14       MR. STIMPSON: Did we mark this already?
15       MR. VAZQUEZ: It's Exhibit 29.
16       MR. STIMPSON: Yeah, it was 47.
17       MR. LEE: That one was --
18       MR. VAZQUEZ: My question is simply when
19   you give me an exhibit that has been marked before,
20   are we re-marking it as an exhibit for his
21   deposition?
22       MR. STIMPSON: No.
23       MR. VAZQUEZ: Okay.
24   Q    (BY MR. STIMPSON) This is an
25   August 16, 2004 e-mail from Dave Hicks to yourself.

Page 169

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    Um-hum.
3    Q    Well, to Health Grades senior management
4    copied to you, correct?
5    A    Yes.
6    Q    Okay. And this is also about the new
7    patient experience surveys, right?
8    A    Yes.
9    Q    Okay. And attached is a patient
10   experience timeline.
11       Do you see that, Mr. Neal?
12   A    I do.
13   Q    And you can tell from the timeline that
14   they were intending to build results display,
15   application, and database as of the end of
16   September 2004, correct?
17   A    That's what this document suggests.
18   Q    Okay. And then also to e-mail all report
19   purchasers about it as of this October 15, 2004,
20   correct?
21   A    That's what it says.
22   Q    Do you have any reason to believe that
23   these timelines were not met?
24   A    No.
25   Q    Is there a difference between patient

43 (Pages 166 - 169)

EXHIBIT H
973-410-4040