Attorneys' Eyes Only

Page 170

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  experience survey and patient satisfaction surveys?
2  A   I think most people would assume they are
3  very similar, one and the same.
4  Q   I mean, within Health Grades, was there a
5  difference between the two?
6  A   There is a difference. The distinction is
7  that experience, while still subjective, takes into
8  account different measures; for example, how long you
9  might have had to wait in a physician office, whereas
10  experience might be more oriented to how do you feel
11  about a doctor.
12       So there is -- there actually is a
13  distinction.
14  Q   They're both ratings of sorts, though,
15  right?
16       MR. VAZQUEZ: Form.
17  A   I wouldn't call just the survey itself a
18  rating.
19  Q   (BY MR. STIMPSON) Do you know how the
20  consumers, the patients, responded to this survey?
21  Was it they had a number of things they could check,
22  1, 2, 3, 4, 5 or -- right?
23       MR. VAZQUEZ: Form.
24  A   There are different mechanisms you can use

Page 171

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  to capture their responses, but that's one that you
2  described.
3  Q   (BY MR. STIMPSON) And that's one that
4  Health Grades was using in 2004 and 2005?
5  A   We used -- we used a form of that type of
6  response. I'm not sure exactly -- I don't know if it
7  was numbered or what exactly the form was.
8       MR. VAZQUEZ: Do you intend to break for
9  lunch, Mr. Stimpson?
10       MR. STIMPSON: Yeah, whenever you guys are
11  ready, we can break.
12       MR. VAZQUEZ: Let me ask, we can order
13  or --
14       MR. STIMPSON: Probably just go out.
15  Probably just go out.
16       MR. VAZQUEZ: Just go out and do our own
17  thing?
18       MR. STIMPSON: Yeah, I think so.
19       MR. VAZQUEZ: Okay. So whenever you want.
20  I just thought I would bring it up because if you
21  were going to order, it's going to take some time.
22       MR. STIMPSON: Yeah, okay.
23  Q   (BY MR. STIMPSON) Do you know if e-mails
24  went out to report purchasers about the patient

Page 172

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  experience surveys?
2  A   They wouldn't have in this timeframe, to
3  my recollection, because of the risks it posed to the
4  business.
5  Q   So you're guessing that they did not go
6  out?
7       MR. VAZQUEZ: Form.
8  A   Based on what I recall, I do not believe
9  that they went out.
10  Q   (BY MR. STIMPSON) Okay. Why would that
11  risk -- why would that create a risk to the
12  business -- what this was referring to, as I
13  understand it, and correct me if I'm wrong, you were
14  copied on this in 2004, but the e-mails to the report
15  purchasers are just telling them that the surveys
16  were available for them to take, right?
17       MR. VAZQUEZ: Form.
18  A   Yeah. See, there are two things that
19  could have been e-mailed. One was just a
20  notification that, hey, you can complete this patient
21  experience. And that's what this references.
22  Q   (BY MR. STIMPSON) Okay. And why would
23  that hurt your business, sending out that e-mail?
24  A   Just the intent to at some point in a

Page 173

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  future period display that information in that
2  content was deemed to be a risk to our business. If
3  our clients found out that we were gathering that
4  information with some future intent, that was the
5  risk that we were considering or contemplating.
6  Q   Okay. All right. We'll get to other
7  documents to talk about that a little bit later.
8  A   Okay.
9       MR. STIMPSON: Can I get this one here,
10  please? Actually, David, I've changed my mind. I
11  want that one.
12       MR. LEE: Exhibit 48.
13       (Exhibit 48 marked.)
14  Q   (BY MR. STIMPSON) We have marked a
15  multipage document as Exhibit 48 Health Grades
16  0209008 through 0209010.
17       Take a second to look at this, please,
18  Mr. Neal.
19  A   Okay.
20  Q   So this is a November 11, 2004 e-mail from
21  Scott Montroy to various people, including yourself,
22  correct?
23  A   It is.
24  Q   Prepared and kept in the ordinary course

44 (Pages 170 - 173)

EXHIBIT H

973-410-4040

Attorneys' Eyes Only

Page 174

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  of business?
3      A   It looks like it.
4      Q   Okay.  And what Mr. Montroy is doing is
5  sending out a report on the new patient experience
6  data, correct?
7      A   It would appear so.
8      Q   So this, in fact, confirms that, in fact,
9  Health Grades was collecting experience patient data
10  in late 2004, correct?
11      A   Yeah.  So it's after the date that was in
12  that table.
13      Q   Let me put that back in front of you,
14  Exhibit 21.  So it's about a month after when they
15  said when they were going to send out the e-mails
16  to --
17      A   Yeah, I see that.
18      Q   Right?
19      A   Um-hum.
20      Q   So do you want to change your testimony,
21  Mr. Neal, about whether or not those e-mails went
22  out?
23      A   No, I said they came out sometime after.
24      Q   Okay.  So am I correct, then, as of late
25  2004, e-mails had gone out to report purchasers about

Page 175

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  the surveys on the Health Grades website?
3      A   Based on this e-mail, it looks like it
4  did.
5      Q   And you're referring to, is it 49?
6  Exhibit number.
7      A   This is 48.
8      Q   48, okay.  And those e-mails would tell
9  these report purchasers that there is a survey on our
10  website you can complete, and by completing the
11  survey you're agreeing that Health Grades can use
12  them in its results, correct?
13      MR. VAZQUEZ:  Form.
14      A   I don't know if I recall exactly, but I
15  don't believe there was a place on the
16  consumer-facing website where they could complete
17  these surveys.  It was only via secure e-mail access
18  that they could go in and complete these surveys.
19      So via this confirmed e-mail address, it
20  was a request to complete a survey.  I believe that's
21  what the table lays out as creating that process.
22      Q   (BY MR. STIMPSON)  Okay.  When did the
23  availability to survey go online at healthgrades.com?
24      A   I don't know the date.
25      Q   2005?

Page 176

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      A   I don't know.
3      Q   Could have been here, 2004?
4      A   Highly unlikely.
5      Q   Why?
6      A   Because of the concerns about the revenue
7  streams to the business.
8      Q   But in any event, we can agree that in
9  late 2004, Health Grades was disclosing to the
10  public, including these e-mail recipients, that
11  Health Grades has intended to collect survey results
12  that may be displayed later on its website, correct?
13      MR. VAZQUEZ:  Form.
14      A   I think it just confirms that we're
15  collecting surveys.  It doesn't demonstrate intent.
16      Q   (BY MR. STIMPSON)  Pardon me?
17      A   I don't think it demonstrates intent.
18      Q   Well, I'm just asking you --
19      A   But that's what you said.
20      Q   Okay.  Well, let me rephrase my question,
21  then.  In late 2004, Health Grades was disclosing to
22  these e-mail recipients that it wanted to collect
23  survey data, correct?
24      A   Yes.
25      Q   Okay.  And they would also disclose to

Page 177

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  these recipients that the idea behind this was to use
3  those survey results in some fashion, correct?
4      A   In my opinion, that's supposition.
5      Q   Okay.  So you're not comfortable saying
6  that Health Grades told these recipients that they
7  might use the survey data?
8      A   No, because I'm aware of the conversations
9  we were having internally about the risk to our
10  business.
11      Q   Don't you think the consumers who got
12  these e-mails might have figured out that, gee, maybe
13  they want us to use those survey results?
14      MR. VAZQUEZ:  Form.
15      A   I don't know.
16      Q   (BY MR. STIMPSON)  Well, that's a nice
17  supposition, isn't it?  You can give that
18  supposition, right?
19      A   It's so easy you can answer it yourself,
20  then.
21      Q   Well, I want you to answer it because
22  you're the witness.  Right?
23      MR. VAZQUEZ:  Form.
24      A   I don't know what the consumers believe.
25      Q   (BY MR. STIMPSON)  Well, of course they

45 (Pages 174 - 177)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

**Page 178**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    knew the survey results were going to be used in some
3    fashion?
4        A    If you say so.
5        Q    Do you agree with that?
6        MR. VAZQUEZ: Form. Form. All right.
7    Let's just get back to direct questions --
8        A    It's silly.
9        MR. VAZQUEZ: -- and you answer if you
10   know.
11       Q    (BY MR. STIMPSON) Do agree with that?
12       MR. VAZQUEZ: Agree with what?
13       A    Say it again, please, sir.
14       Q    (BY MR. STIMPSON) Do you agree that the
15   consumers must have understood that Health Grades
16   intended to use these survey results --
17       A    I can't say what any consumers understood.
18       Q    Okay. So Exhibit 48, if you can look at
19   the last page. As of late 2004, Health Grades was
20   averaging over 100 survey results per day, correct?
21       A    That's what the data suggests.
22       Q    Okay. And it says that surveys were
23   received as early as October 2004, correct?
24       A    That's what it suggests, yes.
25       MR. STIMPSON: Can I get this one, David?

**Page 179**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Actually, sorry, I will need that one. I need this
3    one right now, though.
4        MR. LEE: Exhibit 49.
5        (Exhibit 49 marked.)
6        Q    (BY MR. STIMPSON) I would like to have
7    the court reporter mark as Exhibit 49 a multipage
8    document bearing Bates numbers HGMKES 022569 to 574.
9        Take a second and if you can identify that
10   for me, please.
11       A    Okay.
12       Q    And this is a patient experience survey
13   from Health Grades, correct?
14       A    This is the original patient experience
15   surveys, patient screen survey.
16       Q    And it was sent out to consumers in 2004,
17   correct?
18       A    This most likely would have been the
19   version that would have been sent to consumers in
20   2004. It was not the version that we used more
21   recently.
22       Q    Okay. So if you would look at -- so you
23   can see these questions the way they're set up;
24   excellent, very good, good, fair, poor.
25       A    Right.

**Page 180**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        Q    Those are ratings, right?
3        MR. VAZQUEZ: Form.
4        A    No.
5        Q    (BY MR. STIMPSON) No?
6        A    It's not a rating.
7        Q    Okay. What is it then?
8        A    It's an assessment by item of how they
9    felt about something.
10       Q    Okay. So when you're asking someone to
11   say whether a doctor is excellent or good or fair, in
12   your view, sir, as an inventor of this patent, that's
13   not a patient rating, right?
14       MR. VAZQUEZ: Form.
15       A    Excellent, very good, good, fair, poor,
16   don't know, a rating? No, that's not a form of a
17   rating.
18       Q    (BY MR. STIMPSON) Okay. So if Vitals
19   changes its website so it's asking these questions in
20   the form of excellent, very good, good, fair, poor,
21   no longer would they -- would even Health Grades
22   accuse them of infringing the patent, right?
23       MR. VAZQUEZ: Object to form. Calls for a
24   legal conclusion.
25       A    That's not for me to interpret.

**Page 181**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        Q    (BY MR. STIMPSON) Right. But as you, as
3    an inventor, sir, as an inventor on this patent,
4    that's not what you envisioned when you said patient
5    ratings in your patent, right?
6        MR. VAZQUEZ: Form.
7        A    The survey responses are -- these specific
8    survey responses are not what we intended as ratings
9    in the patent.
10       Q    (BY MR. STIMPSON) Right. So if Vitals is
11   doing questions like this where they ask the patients
12   to say whether a doctor is excellent or very good or
13   good or fair or poor, they're not collecting patient
14   ratings, according to your understanding, as an
15   inventor of the '060 patent, correct?
16       MR. VAZQUEZ: Form.
17       A    This could be turned into a rating. It's
18   not how we used it. Excellent could be 5. Very good
19   could be 4. Good could be 3.
20       So you absolutely could create a rating
21   from this form, and if you did, then it would
22   absolutely be a rating.
23       MR. STIMPSON: Could you move to strike as
24   nonresponsive? Could you please read the question
25   back?

46 (Pages 178 - 181)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 182

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  (Record read as requested.)
3  MR. VAZQUEZ: Same objections.
4  A   You don't collect a patient rating. You
5  assign a patient rating.
6  MR. STIMPSON: Move to strike as
7  nonresponsive.
8  Please read the question back to the
9  witness.
10  A   The question is incorrect.
11  Q   (BY MR. STIMPSON) So what's wrong with
12  it, Mr. Neal? What is it that you don't understand?
13  A   You create a physician rating from data
14  that you have. It could come from a number of
15  elements. It's how you use and present a rating.
16  Q   Let me see if I can break this down for
17  you, okay? If Health Grades asks these questions
18  over its website to consumers --
19  A   Um-hum.
20  Q   -- as an inventor of this patent, sir,
21  would that be collecting patient rating information?
22  A   It would be --
23  MR. VAZQUEZ: Form.
24  A   -- if we turned it into a score. It
25  absolutely would be.

Page 183

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   (BY MR. STIMPSON) Okay. And if it isn't,
3  if Vitals just reports 3,000 people said good and
4  2,300 said fair, that's not a patient rating, right?
5  MR. VAZQUEZ: Form.
6  A   If there were -- it depends on how it was
7  done.
8  Q   (BY MR. STIMPSON) Okay. Well, I just
9  told you how it would be done.
10  Would that be a patient rating?
11  A   That could be problematic if there is any
12  means to differentiate based on number of responses
13  or the type of responses that were presented.
14  Q   It's a very fine distinction, isn't it,
15  Mr. Neal, between what you have here on this patient
16  experience survey and patient ratings, right?
17  MR. VAZQUEZ: Form.
18  Q   (BY MR. STIMPSON) Right?
19  MR. VAZQUEZ: Form.
20  A   It depends on how you define distinction
21  or define --
22  Q   (BY MR. STIMPSON) Well, I know there's
23  two -- I understand your predicament, right? So
24  you've got -- on one hand, you're looking at
25  something of 2004, which is clearly prior art. Okay,

Page 184

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  so you don't want to say this is patient ratings. I
3  get that.
4  On the other hand, if Health Grades -- if
5  MDx does that with Vitals.com, if you're not going to
6  say the prior art is patient ratings, you can't say
7  that Vitals is patient ratings?
8  So here is my question for you with a
9  background, okay? You're an inventor. I'm asking
10  you, sir, just to make a decision. Are these
11  questions collecting patient rating information or
12  not?
13  MR. VAZQUEZ: Okay. Before you answer,
14  I'm going to move to strike that narrative or
15  everything before the question. It wasn't a
16  question.
17  So if you can answer the question, if you
18  understand it.
19  A   So let me tell you. Let me tell you why
20  we did it this way.
21  Q   (BY MR. STIMPSON) I didn't ask you why
22  you did it that way.
23  A   It's your answer. Do you want the answer?
24  Q   No, I don't. I want you to answer my
25  question. My question is, are these patient ratings

Page 185

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  or not?
3  A   My answer is in what I'm going to tell
4  you. And you can --
5  MR. VAZQUEZ: Please allow him to answer
6  it.
7  Q   (BY MR. STIMPSON) So as an inventor of
8  this patent, you can't tell me definitively yes or
9  no --
10  MR. VAZQUEZ: Objection.
11  Mischaracterizes --
12  MR. STIMPSON: Quiet. Wait until I'm
13  done. Wait till I'm done, Mr. Vazquez.
14  MR. VAZQUEZ: You asked the question.
15  MR. STIMPSON: I'm talking. It's not fair
16  to the court reporter.
17  MR. VAZQUEZ: Since when have you been
18  concerned about that?
19  Q   (BY MR. STIMPSON) My question is, as an
20  inventor -- as an inventor on the '060 patent, and
21  what you see here in this exhibit --
22  MR. STIMPSON: Is it 49?
23  MR. LEE: Yes.
24  Q   (BY MR. STIMPSON) -- what you see here in
25  Exhibit 49, is this asking for patient ratings or

47 (Pages 182 - 185)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 186

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  not?
3        MR. VAZQUEZ:  Form.
4        Q    (BY MR. STIMPSON) Can you answer that yes
5  or no?
6        THE DEPONENT:  Can I answer --
7        MR. VAZQUEZ:  Answer it however you want
8  to answer it.
9        A    This is not a patient rating, and I'll
10  tell you why it's not a patient rating.  It's because
11  we intentionally built the survey in this way to
12  avoid any appearance that we were providing or
13  assigning any type of score or rating to physicians
14  because of our concerns about how it might impact our
15  corporate revenue.
16        Q    (BY MR. STIMPSON) I understand and that
17  did answer my question.  It's not a patient rating.
18  Thank you.
19        Could you look at page HGMKES 022572?
20        A    I'm sorry, which document?
21        Q    It's the same document, 572.
22        A    Okay.
23        Q    After question 17, it says, Thank you for
24  taking our patient experience survey.  By completing
25  the survey, you authorize us to include your

Page 187

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  responses in the survey results.
3        Did I read that correctly?
4        A    Yes.
5        Q    So as of 2004, Health Grades was telling
6  the public, including these e-mail recipients, that
7  they should take a patient survey, and that they
8  were -- Health Grades intended to use the responses
9  and survey results, correct?
10        A    Your supposition is proved correct.
11        Q    Thank you.
12        MR. VAZQUEZ:  Let's go to lunch.
13        MR. STIMPSON:  Okay.
14        (Recess taken from 12:12 p.m. to
15  1:13 p.m.)
16        Q    (BY MR. STIMPSON) Mr. Neal, early in the
17  deposition testimony today you talked about, I think,
18  correct me if I'm wrong, but you said that Vitals was
19  replicating some parts of the Health Grades website.
20        Do you remember that?
21        A    I do.
22        Q    What parts?
23        A    Almost from the outset, as we've tracked
24  what Vitals is doing on the website, we've seen many
25  of the elements that we use on our website, present

Page 188

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  to our consumers, and it's presented in a very
3  similar way.
4        Q    Can you identify any specific parts?
5        A    Yeah.  It's the content of the
6  information, so the form in which it's presented.
7  Physician information, so if a person were to do a
8  search on a physician on the website.  It's the form
9  of content.
10        It's the elements of content.  It is the
11  presentation of ratings type information.  It is also
12  the search mechanism, so the means by which you
13  search.  It really encompasses all aspects of this.
14        Q    What about the form of content do you
15  think Vitals has replicated from MDx -- from Health
16  Grades?
17        A    It's not always replicating content, per
18  se.  It's replicating the presentation of content.
19        Q    Form and content, you said that.
20        A    Um-hum.
21        Q    So what is it in the form and content you
22  think they replicated?
23        A    It's everything that they're showing on
24  the website.  I could go item by item, and you look
25  at the data elements that we present on physicians

Page 189

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  and you'll see the same data elements, which there's
3  an expectation that certain of those elements would
4  exist in virtually any comparable website.
5        But what is interesting is the lengths to
6  which Vitals has gone to replicate the Health Grades
7  experience.
8        Q    Okay.  Do you have any evidence that they
9  actually took that from Health Grades as opposed to
10  somewhere else?
11        A    No, I don't.
12        Q    And you're talking about things like, you
13  know, gender, medical school, board certification,
14  those sort of things?
15        A    Those are the data elements.  What I'm
16  talking about is how the site is configured, what the
17  search mechanisms are, how the content is presented
18  on the page, what is combined to produce, information
19  that's consumed.
20        Q    I'm trying to get some specifics, though,
21  because I need to know specifically what it is you
22  think has been replicated so I can address that.  I
23  can't -- this is just very general.  I just need
24  something more specific.
25        A    Okay.  If you look at all of the data that

48 (Pages 186 - 189)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 190

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    might be presented on that physician, so starting
3    with third-party data, and much of it is what you
4    already referenced.  It's the name, it's the address,
5    it's the phone number, it is medical school, years in
6    practice, sex, disciplinary actions; all those
7    third-party sources of data.
8         So there's that information.
9      Q    Can we stop there for a second?
10     A    Sure.
11     Q    What about that information makes you
12   think that it's replicated from Health Grades?
13     A    I didn't say the data is replicated.  What
14   I said is the form of the presentation of the data
15   was replicated.
16     Q    Well, what about the form of presentation
17   is the same?
18     A    So it's which data elements are included.
19   What is suspect about what Vitals has done is that as
20   we introduce new data elements, they seem to appear
21   soon there after they appear on our site.
22     Q    Okay.  Can you give me an example?
23     A    Nothing specific comes to mind right now.
24     Q    Well, let's make sure we -- because if you
25   have any, I don't want to hear it for the first time

Page 191

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    at trial, that's all.  So if you can think of
3    anything, now is the time.
4      A    There is nothing specific right now, but
5    what I can tell you is, over the course of time,
6    since Vitals launched, if you go back and look at
7    versions of their website you'll steadily see that --
8    or you'll consistently see that they have made
9    obvious attempts to replicate what it is that we do
10   on our website.
11     Q    So you think that they're copying right
12   from Health Grades as opposed to any other -- and
13   getting it from any other source?
14     A    It is obvious in certain ways that they're
15   pulling ideas directly from our website.  Absolutely.
16     Q    In what ways?
17     A    The way that they facilitate search is one
18   example.
19     Q    What ways?
20     A    The means of search, you can search on a
21   physician name, you can search by specialty in a
22   geographic area.  So those are examples.
23     Q    All those are pretty common sense, though,
24   aren't they?
25     MR. VAZQUEZ:  Object to form.  Also just

Page 192

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    make the objection, we're not using Mr. Neal as a
3    patent expert at trial.
4      Q    (BY MR. STIMPSON)  If you're looking for a
5    doctor, searching by a doctor's name is kind of the
6    common sense, isn't it?
7      MR. VAZQUEZ:  Form.
8      A    Yeah, but it's how you do it.  So if you
9    look at how the site is architected, how the
10   information is presented on the website, what
11   information is combined and the results of those
12   searches, that's what I'm talking about.
13     Q    (BY MR. STIMPSON)  So, can you give me
14   more specific, how they're combined?  What is it?
15     MR. VAZQUEZ:  Same objection.
16     A    It would be helpful -- yeah, without being
17   able to walk you through and compare the websites
18   side by side, it's difficult to do.
19     Q    (BY MR. STIMPSON)  Do you have any
20   evidence that MDx has copied anything from Health
21   Grades?
22     MR. VAZQUEZ:  Object to form.
23     A    I'm sorry, copied what?
24     Q    (BY MR. STIMPSON)  Do you have any
25   evidence that MDx has copied anything from Health

Page 193

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Grades?  Copied from Health Grades.
3      A    I can say with near certainty that they
4    have copied from Health Grades.
5      Q    Why?
6      A    Because when we've made enhancements to
7    our website, soon thereafter we see similar
8    enhancements on Vitals.com.  And those were not
9    things that were intuitive that would naturally come
10   to mind.
11     Q    Which is what?  Give me one example.
12     A    A good example is the elements in the
13   patent.
14     Q    What, which ones?
15     A    It's the combination of data and
16   presenting it in a form that can be consumed by
17   consumers in the ratings.  The ratings and the
18   ability to search based on a physician rating.
19     Q    This is what I'm struggling with,
20   Mr. Neal.  This is all very general.  I need to know
21   what specifically can you point to and say, look,
22   this is what Health Grades had; MDx copied it?
23     A    That's --
24     MR. VAZQUEZ:  Hold on a second.  I just
25   want to make the objection.  Again, Scott, we are not

49 (Pages 190 - 193)

EXHIBIT H

Attorneys' Eyes Only

Page 194

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2    using Mr. Neal as a patent expert at trial.
3    Furthermore, as you know, we cannot show him any of
4    the documents because they're all marked attorneys'
5    eyes only.
6        MR. STIMPSON: It's got nothing to do with
7    documents.
8        MR. VAZQUEZ: Yes, you're asking about
9    evidence, and we have that evidence.
10       MR. STIMPSON: I'm asking if he's got
11   evidence of copying.
12       MR. VAZQUEZ: The evidence you've given
13   us, we can't show him.
14       MR. STIMPSON: Well, there isn't any, but
15   anyway --
16       MR. VAZQUEZ: Yes, there is and you know
17   it.
18       MR. STIMPSON: You know what, Jesus, right
19   there is a violation of our agreement, okay?
20       MR. VAZQUEZ: What is?
21       MR. STIMPSON: What did you just put on
22   the record? What did you just tell everybody in this
23   room?
24       MR. VAZQUEZ: That there --
25       MR. STIMPSON: Think about this and do it
```

Page 195

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2    right next time, okay? I don't appreciate that,
3    okay? I don't think MDx appreciates it either, okay?
4        MR. VAZQUEZ: You can --
5    Q    (BY MR. STIMPSON) Mr. Neal --
6        MR. VAZQUEZ: Just --
7    Q    (BY MR. STIMPSON) Mr. Neal --
8        MR. VAZQUEZ: -- state your questions and
9    I'll make my objections.
10   Q    (BY MR. STIMPSON) -- do you have any
11   evidence that MDx has copied anything from Health
12   Grades?
13   A    Um, I don't have direct evidence.
14   Q    Okay. Okay. So anything that you're
15   talking about copying would just be your opinion,
16   right?
17   A    It's opinion supported by fact.
18   Q    Okay. And do you have any more specific
19   facts?
20   A    That's not an analysis that I have
21   prepared for this meeting.
22   Q    I'm just asking you, do you have any more
23   specific facts?
24   A    I don't right now.
25   Q    How about the patent claims?
```

Page 196

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2        MR. VAZQUEZ: Form.
3    Q    (BY MR. STIMPSON) Is there anything about
4    the patent claims that you can say definitively right
5    now that you think MDx copied from Health Grades?
6        MR. VAZQUEZ: Object to form.
7    A    Absolutely. In fact, the thing that I see
8    as being most problematic is facilitating the ability
9    to search using ratings, physician ratings.
10   Q    (BY MR. STIMPSON) Search using ratings?
11   A    Yeah, in the display of the ratings on the
12   search results page.
13   Q    Oh, okay. All right. You think that's --
14   all right. So just let me back up for a bit then.
15   Let's just get a list of them, okay?
16   A    Um-hum.
17   Q    What is it -- and feel free to look at the
18   patent if you want to.
19   A    I mean, I'm familiar. I told you I read
20   it some time ago. I'm very familiar with the
21   elements of the patent. So I have a general layman's
22   understanding of what it entails.
23   Q    So this is the stuff that you think MDx
24   copied that relates to the patent. The results list
25   showing ratings, right?
```

Page 197

```
1        CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    There are different forms of presentation
3    that they could use that, I would think, would be in
4    violation of the patent but, of course, that's up to
5    the attorneys to decide and the courts.
6    Q    I'm just trying to get a list, Mr. Neal.
7    A    Yes.
8    Q    What is it that you think MDx copied from
9    Health Grades relating to the elements of the patent
10   claims?
11   A    Um-hum.
12   Q    Can you just give me a list?
13   A    For now, it's a short list because the
14   most egregious ways that they're violating, at least
15   based on my understanding, is --
16   Q    I'm not asking you about violating the
17   patent. I'm just asking you about what you think --
18   where you think they might have been copying, and
19   then we'll talk about your evidence.
20       So you can just give me a list, and we'll
21   talk about it.
22   A    So as it relates to the patent. You asked
23   as it relates to the patent, correct?
24   Q    Um-hum. Yes.
25   A    Okay. Well, I'm not an attorney so I
```

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 198

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  can't interpret directly, you know, however the
2  courts or a jury might interpret it. But based on my
3  understanding of the claims that have been granted in
4  the patent, then it is the way that they facilitate
5  comparison ratings of physicians on the website. And
6  I have looked at it recently, and it's still
7  facilitated in the same way.
8        There's a mechanism by which they allow
9  consumers to do that research based on ratings. And
10 then they present results that showed physicians in a
11 list that have ratings, comparison ratings.
12     Q    Anything else?
13     A    There are other things, but those are the
14 two that are most egregious in my mind.
15     Q    Does Health Grades provide patient ratings
16 and results lists?
17         MR. VAZQUEZ: Form.
18     A    We do it in different formats. And the
19 results we would absolutely display those ratings.
20     Q    (BY MR. STIMPSON) So I'm just asking you,
21 let's take 2012. Has Health Grades presented patient
22 ratings in results lists?
23     A    Yes.
24     Q    You have?

Page 199

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A    Patient ratings --
3      Q    In results lists?
4          MR. VAZQUEZ: Object to the form to the
5  extent you're referring to patent claim language.
6      Q    (BY MR. STIMPSON) You can answer the
7  question.
8      A    So have we presented ratings in a list?
9      Q    Not quite. 2012 --
10     A    Okay.
11     Q    -- has Health Grades presented patient
12 ratings in its results lists?
13         MR. VAZQUEZ: Same objection.
14     A    The definition of patient rating is
15 critical. We do present patient experience survey
16 results in the form of what someone might construe as
17 a rating in various ways on our website.
18     Q    (BY MR. STIMPSON) Yeah, that wasn't quite
19 my question, though.
20         My question was, does Health Grades, in
21 2012 -- has Health Grades shown patient ratings in
22 its results lists?
23         MR. VAZQUEZ: Same objections.
24     A    Yes.
25     Q    (BY MR. STIMPSON) Okay. And so are those

Page 200

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  ratings all available right on the results list, or
2  do you have to click through?
3          MR. VAZQUEZ: Same objections. Form.
4      A    No, I believe the current execution,
5  they're visible in the result lists.
6      Q    (BY MR. STIMPSON) They are visible in the
7  results list?
8      A    Yeah.
9      Q    Okay. And is a results list a report on a
10 healthcare provider?
11         MR. VAZQUEZ: Object to form.
12     A    We don't really think of the experience in
13 terms of reports today. So the current execution
14 website, it's just not a term or definition that we
15 use.
16     Q    (BY MR. STIMPSON) So you're not willing
17 to say that the results list is a report on a
18 healthcare provider?
19         MR. VAZQUEZ: Object to form.
20     A    It would be a matter of interpretation.
21     Q    (BY MR. STIMPSON) Well, what's your
22 interpretation?
23         MR. VAZQUEZ: I'm sorry, Scott. Before
24 you say that question, I want to pause. This is not

Page 201

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  working.
2          (Discussion off the record.)
3      Q    (BY MR. STIMPSON) So what's your
4  interpretation, Mr. Neal?
5      A    Of the results list and what that
6  represents?
7      Q    No, on the healthcare provider report.
8      A    That results list is not a healthcare
9  provider report, in my opinion.
10     Q    Okay. Let me show you what has been
11 marked as -- where is that? Can I have that -- is
12 there anything else you said that the -- when I asked
13 you about the patent claims, and you think that
14 Vitals MDx has copied from MDx, and you think it was
15 the way they facilitate the comparison ratings on the
16 website.
17         Is there anything else?
18         MR. VAZQUEZ: Form.
19     A    There are other ways, but I'll leave that
20 to the attorneys to interpret.
21     Q    (BY MR. STIMPSON) No, I need to know.
22     A    A combination of data. So the use of the
23 data and the form in which it's presented on the
24 website.

51 (Pages 198 - 201)

EXHIBIT H

Attorneys' Eyes Only

**Page 202**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    And the patent claims, what element of the
3    patent claims does that relate to?
4         MR. VAZQUEZ:  Form.
5    A    So combining physician provided data,
6    third-party data, and patient provided data, and then
7    also combining that with a rating or score.
8    Q    (BY MR. STIMPSON)  How do you know where
9    Vitals gets their data?
10        MR. VAZQUEZ:  Form.
11   A    I haven't researched where they get their
12   data.
13   Q    (BY MR. STIMPSON)  So as we sit here
14   today, Mr. Neal, you just told me that you think
15   Vitals is copying healthcare provided data,
16   third-party provided data, but the reality is you
17   have no idea where Vitals gets their data, correct?
18        MR. VAZQUEZ:  Form.
19   A    If they're not getting it from those
20   sources, then it would be fraudulent in what they're
21   representing to the public because they're
22   representing it as such.
23   Q    (BY MR. STIMPSON)  What part of data is
24   that?
25   A    Patient experience survey.  So a patient

**Page 203**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    provided response.  That suggests it's from the
3    public.  A physician's care philosophy, that suggests
4    it came from a physician.  I don't know who else
5    could do that.  And there's a host of third-party
6    provider data.  And then there's also ratings.
7         So I think if there's any other
8    representation, other than those sources, then it's
9    fraud.
10   Q    So you think, then, that Health Grades
11   (sic) copied that idea from Health Grades?
12        MR. VAZQUEZ:  Form.
13   A    Health Grades didn't copy anything.
14   Q    (BY MR. STIMPSON)  No, no, no, I'm sorry.
15   You said you think that MDx copied those things from
16   Health Grades?
17   A    I'm led to believe that they did.
18   Q    Okay.  Why?
19        MR. VAZQUEZ:  Form.
20   A    There was not a website or source by which
21   they could get the ideas to combine that information
22   and facilitate the experience that they do on a
23   website.  We already had the experience on our
24   website, and it suddenly appeared on the Vitals
25   website.

**Page 204**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    (BY MR. STIMPSON)  How about -- what
3    did -- there were other websites available in 2008,
4    2009, right, that had healthcare provider
5    information, right?
6         MR. VAZQUEZ:  Form.
7    Q    (BY MR. STIMPSON)  Right?
8         MR. VAZQUEZ:  Form.
9    A    There are other healthcare websites.
10   Q    (BY MR. STIMPSON)  RevolutionHealth,
11   right?
12        MR. VAZQUEZ:  Form.
13   A    Um-hum.
14   Q    (BY MR. STIMPSON)  What did
15   RevolutionHealth have on their website in 2008 and
16   2009?
17        MR. VAZQUEZ:  Form.
18   A    Based on my last review of
19   RevolutionHealth, and it's been quite some time, they
20   have a basic directory, and they've talked about
21   introducing additional elements.  But I don't think
22   the Vitals website is taking anything and copying
23   substantially from RevolutionaryHealth.
24   Q    (BY MR. STIMPSON)  Okay.  Anything else
25   that you say -- do you have any other evidence of

**Page 205**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    your alleged copying, Mr. Neal?
3         MR. VAZQUEZ:  Form.
4    A    Just what I have seen.
5    Q    (BY MR. STIMPSON)  Let me show you what
6    has been marked as Exhibit 26.  Take a second and
7    take a look at that.
8    A    Okay.
9    Q    This is an e-mail from Scott Montroy dated
10   May 11, 2004, and you received a copy, correct?
11   A    I did.
12   Q    And prepared and kept in the ordinary
13   course of business?
14   A    I believe so.
15   Q    And this is providing a rough cut of the
16   fields and content that was to be collected from
17   physicians in the physician online service, correct?
18   A    That's what this document suggests.
19   Q    And it says they were trying to fast-track
20   this project.
21        Do you see that?
22   A    Yes.
23   Q    And below is a list of all the information
24   they were trying to get from the physicians, correct?
25   A    Yes.

52 (Pages 202 - 205)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 206

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    Is that an accurate list, to your
3    recollection, as to what they -- a roughly accurate
4    list of what they were getting from physicians from
5    the physician online service?
6    A    This is what the tool was developed to
7    capture. But it doesn't indicate what we were
8    actually gathering from physicians, or eventually
9    gathered from physicians.
10   Q    Do you remember -- does this help you
11   remember when that physician online service was
12   launched?
13   A    It does give me a reference point.
14   Q    Based on this, when do you think the
15   physician online service was available?
16   A    I don't know when it was available, but
17   what this suggests is that the development work was
18   being defined. Yeah.
19   Q    How long after the physician online
20   services was launched, how long after that did
21   physician provided information make it into the
22   Health Grades reports?
23   A    I do not know.
24   Q    A month later?
25   A    I don't know.

Page 207

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    Would it have been within six months?
3    A    I'm not -- I'm not sure, but probably a
4    six- to twelve-month timeframe seems reasonable.
5    Q    Well, I'm talking about actually the first
6    of the healthcare provider information from the
7    physician online services.
8        When did the first part of it start
9    getting into healthcare provider, the reports,
10   healthcare reports?
11       MR. VAZQUEZ: Form.
12   A    The part that is absent from this is there
13   was also a process, a system that was developed to
14   validate, review and validate that information. And
15   that's the additional reference point I need to
16   understand when we might, because without that system
17   in place, they hadn't been reviewed and validated
18   such that they would be displayed, or this
19   information would be displayed.
20   Q    (BY MR. STIMPSON) So you don't know, as
21   we sit here today, how long after the physician
22   online services was implemented that physician
23   provided data was implemented in any reports?
24   A    I do not know.
25   Q    Okay. Can you say that it was within six

Page 208

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    months?
3    A    I think it's reasonable to assume that it
4    was within six to twelve months.
5    Q    Is it reasonable to assume it was within
6    six months?
7    A    I think it's reasonable to assume it was
8    within six to twelve months.
9    Q    Okay. But my question is, do you think
10   it's reasonable to assume it was within six months?
11   A    I've answered it three times now.
12   Q    No. No.
13   A    It's the same answer. I said it's
14   reasonable to assume that it would have occurred
15   within six to twelve months.
16   Q    Did my question say anything about twelve
17   months? Do you remember that?
18   A    What?
19   Q    My question didn't ask you about twelve
20   months, did it?
21   A    I'm giving you the answer. You asked me a
22   question. You're trying to direct me to answer it's
23   six months, and I'm telling you it's six to twelve
24   months.
25   Q    Well, if you can't tell me --

Page 209

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    That's the reason I provided you with a
3    range.
4    Q    Okay. So is the answer, then, you can't
5    tell me -- that you don't believe it was within six
6    months?
7    A    I don't know.
8    Q    Okay. Let me show you what has been
9    marked as Exhibit 27. Let me know when you're ready,
10   Mr. Neal.
11   A    Okay. Okay.
12   Q    What was the additional system that
13   validated information entered into the physician
14   online services?
15   A    You know, I said system or process. Just
16   a means by which we could review submitted content.
17   Q    And what can you tell me about that?
18   A    I wasn't involved in the development of
19   that. I'm just aware that there was a system in
20   place.
21   Q    Do you know how long after the physician
22   online services were implemented that this was in
23   place?
24   A    I do not.
25   Q    So according to your testimony, then, a

53 (Pages 206 - 209)

EXHIBIT H

Attorneys' Eyes Only

Page 210

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   physician -- you can see from this e-mail, Exhibit
3   27, that this physician online services was launched
4   as of May 25, 2004, correct?
5      A    Yes.
6      Q    And so according to your testimony, the
7   six- to twelve-month testimony, you think that a
8   physician could have gotten on, changed information
9   about gender, for example, and then not had that
10  change in the Health Grades system for four to six
11  months, right?
12         MR. VAZQUEZ:  Form.
13     A    It's possible.
14     Q    (BY MR. STIMPSON)  Don't you think that
15  would irritate physicians?
16         MR. VAZQUEZ:  Form.
17     A    Speculation.  Yeah, I think it might.
18     Q    (BY MR. STIMPSON)  So does that help you
19  remember that this validation process was actually
20  implemented the same time the physician online
21  services were started?
22         MR. VAZQUEZ:  Form.
23     A    No, because it's not directly referenced
24  in the document.
25     Q    (BY MR. STIMPSON)  Right.  I understand,

Page 211

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   but just from the, you know, relationship point of
3   view for the physicians, don't you think that Health
4   Grades would have implemented that at roughly the
5   same time the physician online service was started?
6   Doesn't that make sense?
7          MR. VAZQUEZ:  Form.
8      A    You know, I think it makes sense.  But I
9   know it was a separate process and it's not
10  referenced here.  And that's what is causing concern
11  to me.
12     Q    (BY MR. STIMPSON)  Are you familiar with
13  Dr. Drucker?
14     A    I am familiar with a profile for a
15  Dr. David Drucker.
16     Q    How is it you are familiar with a profile
17  for Dr. Drucker?
18     A    That was our prototype profile that was on
19  the website for quite a period of time.
20     Q    Okay.  And when did Dr. Drucker's profile
21  first go on the website?
22     A    Well, his original profile would have gone
23  on the website when we launched physician reports as
24  just part of all the physician profiles that we
25  provided, so when we launched the site, which would

Page 212

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   have been 2003.
3          MR. STIMPSON:  Actually, let me have this,
4   David.
5      Q    (BY MR. STIMPSON)  Do you know what a
6   premium report is?
7      A    If you'd explain to me the definition.
8      Q    Well, I'm just asking you if you know what
9   a premium report is?
10     A    It could mean a lot of different things to
11  different people.
12     Q    Well, did Health Grades have a premium
13  report for its physicians?
14     A    The name vaguely rings a bell with me,
15  premium.  We had a lot of different names assigned to
16  what effectively were the same reports.
17         (Exhibit 50 marked.)
18         MR. STIMPSON:  Let me show you what has
19  been marked Exhibit 50, a multipage document bearing
20  Bates numbers HGMKES 022179 and 80.
21     Q    (BY MR. STIMPSON)  This is an e-mail from
22  Scott Montroy to Dave Hicks copying you,
23  February 16, 2005, correct?
24     A    It is.
25     Q    Prepared and kept in the ordinary course

Page 213

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   of business at Health Grades?
3      A    It appears so.
4      Q    What is a pilot project?  Can you explain
5   to me what the pilot project is there?
6      A    Pilot project for Dr. David Drucker was
7   our prototype physician profile.
8      Q    And when was that first put on the
9   website?
10     A    Let's see.  This is February of 2005.  So
11  the prototypes, it suggests, based on this e-mail,
12  that that prototype profile was hard-coded on our
13  website in February of 2005.
14     Q    Okay.  What do you mean hard-coded?
15     A    Hard-coded means that it was one of a
16  kind.  We didn't have an automated system to support
17  other physicians being able to update the profile.
18  Hard-coded means that within the actual development
19  of the program code on the website, whatever content
20  was visible on that physician profile had to be
21  hard-coded in.
22         So it was actually typed in, there was an
23  image that may have appeared within it.  It was one
24  of a kind.  It was a prototype.
25     Q    Do you think that was available on the

54 (Pages 210 - 213)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 214

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  website as of at least February 2005, right?
2     A   This doesn't say it was available on the
3  website. I'm uncertain of the timing. So I can't
4  say based on this document that it was the case.
5     Q   The second bullet there, it says, Drucker
6  patient experience data on pilot report in prod.
7     What does that mean?
8     A   So in prod would be -- that would mean in
9  production. So that would be on the website in some
10  form.
11     Q   So we know, as of February 16, 2005, at
12  least that early, there was patient experience data
13  in Dr. Drucker's report on the website available to
14  the public, correct?
15     A   Yes. I think that's a fair assumption.
16     Q   And how would consumers find Dr. Drucker's
17  report?
18     MR. VAZQUEZ: Form.
19     Q   (BY MR. STIMPSON) For example -- let me
20  just withdraw that, and I'll start another question.
21     A consumer could get on the Health Grades
22  website in February 2005, type in, you know, doctors
23  and, you know, Dr. Drucker in New York and up would
24  pop Dr. Drucker's report?

Page 215

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2     A   Right.
3     MR. VAZQUEZ: Object to form.
4     Q   (BY MR. STIMPSON) Was that a beta test?
5     A   That wasn't even a beta. It was a
6  prototype. We never developed anything that was
7  consistent with the content that was produced in the
8  form in which it was produced in that profile.
9     (Exhibit 51 marked.)
10     Q   (BY MR. STIMPSON) Let's have marked
11  Defendant's Exhibit 51, a multipage document bearing
12  Bates numbers HG 0179518 to 550.
13     A   Is there something specific you would like
14  me to look at it?
15     Q   Well, you can just peruse the e-mail if
16  you want, and then we'll highlight some specific
17  questions throughout the document.
18     My first question to you, Mr. Neal, is
19  just going to be whether this is an e-mail string
20  between yourself and Lauren Deritis, D-E-R-I-T-I-S,
21  in March of 2005 regarding Health Grades' reports?
22     A   Yes.
23     Q   And prepared and kept in the ordinary
24  course of business in Health Grades?
25     A   I believe so.

Page 216

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2     Q   What is the Rothman Institute?
3     A   It is an orthopedic practice in
4  Philadelphia, Pennsylvania.
5     Q   And why were you communicating with the
6  Rothman Institute?
7     A   This was related to a physician marketing
8  program that we were in the process of developing.
9     Q   And had you contacted Ms. Deritis prior to
10  March 2005?
11     A   I don't recall.
12     Q   In your e-mail at 2:20 on March 21, on the
13  second page, it says, We're very excited about
14  getting the Rothman Institute into the Health Grades
15  position marketing program. The web presence and
16  premium placement programs have exceeded all
17  expectations for our beta clients.
18     What was their web presence program?
19     A   It was a means by which we presented
20  physicians that were participating in the physician
21  marketing program a different way on our website to
22  draw attention to those physicians for their
23  practices such that they could disproportionately
24  drive consumers to their practices.
25     Q   Okay. How about the premium placement

Page 217

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  program?
2     A   It's the same thing.
3     Q   And what were your beta clients?
4     A   We had -- we had a couple of plastic
5  surgeons, and I believe one was here in Denver, that
6  are the ones that I'm referencing here.
7     So if someone was searching a plastic
8  surgeon on the Health Grades website, then we would
9  apply this premium treatment to drive consumers
10  hopefully to those physicians.
11     Q   Okay. And it says there in that same
12  e-mail that you had a soft launch planned in April;
13  is that correct?
14     A   Which e-mail?
15     Q   That same e-mail that refers to the web
16  presence and premium placement, same paragraph.
17     A   Okay.
18     Q   And so was that referring to the launching
19  of the web presence and premium placement in April?
20     A   I'm sorry, I'm just going to read it to
21  make sure. However, our intent is to include
22  Dr. Rothman and one other doctor free of charge in
23  our web presence program for a soft launch at the
24  beginning of April.

55 (Pages 214 - 217)

EXHIBIT H

Attorneys' Eyes Only

Page 218

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    So we were going to include one of their
3 doctors. Couldn't include the whole practice. It
4 was too many, it seems, so we just said, okay, you
5 can choose one.
6    Q   In your e-mail -- actually, let me ask you
7 this, had you been to the Rothman Institute and
8 provided and given them a PowerPoint presentation
9 prior to this?
10   A   For this specific product?
11   Q   Actually, for any product. Let's just
12 start there.
13   A   Well, at the Rothman Institute Dr. Dick
14 Rothman was the chairman of the founding company,
15 which is Specialty Care. So that goes back to 1995.
16   Q   Had you been to the Rothman Institute and
17 given a PowerPoint presentation?
18   A   I don't recall doing that.
19   Q   Let's look at your e-mail on the front
20 page. That paragraph that starts, if you do the
21 math, about four lines down it says, I have attached
22 an updated presentation for your review.
23       Do you see that?
24   A   I do.
25   Q   And that's the presentation that's

Page 219

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 attached to this e-mail, right?
3   A   I think so.
4   Q   Okay. And did you draft that?
5   A   The e-mail?
6   Q   No, no, no, the PowerPoint.
7   A   Most likely, yes, I probably did, with
8 some assistance.
9   Q   Okay. And it says, Included in the
10 presentation are results experienced by two of our
11 beta clients that demonstrate the potential of the
12 program.
13       Did I read that correctly?
14   A   I'm sorry, which e-mail is that?
15   Q   That was the next sentence after the
16 updated presentation attachment.
17   A   Okay. Oh, okay. Yes.
18   Q   What do you have on your front page there?
19 Is that the same as this?
20   A   I don't know.
21   Q   Can I see that? Yeah, it's the same.
22 It's right in here is what I'm talking about.
23   A   Okay. Yeah, updated -- yeah, I see the
24 copy you're talking about.
25   Q   Did Health Grades have confidentiality

Page 220

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 agreements with its beta clients?
3   A   I don't recall.
4   Q   Was there any understanding of
5 confidentiality with beta clients?
6   A   There's at least some understanding based
7 on what I put in this e-mail.
8   Q   Do you recall ever -- anyone at Health
9 Grades ever telling beta clients that they have to
10 keep things confidential?
11   A   Most likely that would have been me having
12 those conversations, and it's likely that I
13 replicated at a minimum some form of this.
14   Q   You don't remember that. You're just
15 speculating from this document?
16   A   Well, I did it in this document, and it's
17 typical of my behavior. So I would think that I
18 would have done the same.
19   Q   Okay. So what was it that was
20 confidential?
21   A   There was not a market -- there was not a
22 product like this available in the marketplace.
23   Q   All right. Let's just go through the
24 PowerPoint, okay? Specifically, I would like to
25 start with -- I would like to talk about starting on

Page 221

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 page 8, Health Grades 0179531.
3       You see there your PowerPoint refers to
4 premium report to consumers. Do you know what that
5 means?
6   A   I don't recall what the elements of that
7 premium report were.
8   Q   You were offering to the Rothman Institute
9 this physician web presence package that included the
10 premium report to consumers, right?
11   A   Yes, it would appear.
12   Q   And if you could turn two pages from there
13 at Health Grades 179533, and see there is
14 Dr. Drucker, and he's got -- on the bottom right-hand
15 corner you have a notation, Premium report access is
16 free to consumer and provides competitive advantage
17 to physician.
18       Do you see that?
19   A   I do.
20   Q   And was this something, this Health Grades
21 report on Dr. Drucker, was that something that was
22 on the -- you got that from the Health Grades
23 website?
24   A   I don't recall.
25   Q   Where else would you have gotten it from?

56 (Pages 218 - 221)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

---

**Page 222**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  
2    A    We developed mockups all the time, most of
3  which never make it to the website.
4    Q    But we know Dr. Drucker had a premium
5  report on the Health Grades website, right?
6    A    He had a prototype profile.
7    Q    Right.  Why don't you look to page Health
8  Grades 179535.  Is this the profile that was
9  available on Health Grades' website at least as early
10  as February of 2005 for Dr. Drucker?
11    A    You know, I think so.  There's a version
12  that I've seen of the prototype.  I don't know that
13  this screen shot here, this mockup, includes all the
14  elements of the prototype.  I don't know.
15    Q    Okay.  Well, there's subsequent pages and
16  we'll talk about them.
17    A    Okay.
18    Q    But we can say with some certainty, then,
19  that this premium report was available on Health
20  Grades' website at least as early as February of
21  2005?
22    A    I think a form of enhanced report was
23  available, yes.
24    Q    Okay.  Now, can you give me any better
25  indication of when that might have been?  Would it

---

**Page 223**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  
2  have been available perhaps in January of 2005?
3    A    What exactly?
4    Q    This premium report of Dr. Drucker.
5    A    I don't know.
6    Q    This page 179535, it's got Dr. Drucker's
7  age, right?
8    A    Yes.
9    Q    His gender?
10    A    Yes.
11    Q    His language?
12    A    Yes.
13    Q    His years in the profession?
14    A    Yes.
15    Q    Awards and honors?
16    A    Yes.
17    Q    Professional appointments?
18    A    Yes.
19    Q    Publications?
20    A    Yes.
21    Q    Where was that information obtained, all
22  that information?
23    A    I don't know.
24    Q    February '05, in the prior documents we've
25  seen, February '05 was at least seven months after

---

**Page 224**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  
2  the physician online services was launched, right?
3    A    If those dates match up, yeah, that sounds
4  right.  This data in Dr. Drucker's, this form of
5  report, didn't come from that POS system.  That's not
6  how that system was constructed.  It wasn't
7  constructed to display elements like this.  This is
8  prototype content.
9      And the reason I know that for certain is
10  if I look at slide number 17, 179537, it says,
11  Performance information.  Procedure, total hip, total
12  knee.  Revisions, and then the number of procedures.
13      I know for a fact that wasn't in the POS
14  system because that was specific to his practice and
15  was only part of the prototype.
16      So this report that we're viewing here is
17  a prototype as opposed to a standard premium
18  report --
19    Q    Okay.
20    A    -- in the context by which you're
21  referring to it.
22    Q    That's fine.  But it was all -- it was on
23  the Health Grades website in February of '05, so
24  that's all I really care about at the moment.
25      MR. VAZQUEZ:  Form.  Move to strike.  That

---

**Page 225**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  
2  wasn't a question.
3    Q    (BY MR. STIMPSON)  In the introduction of
4  Dr. David Drucker, Dr. Drucker's philosophy on
5  treating patients.
6      Do you see that?
7    A    I do.
8    Q    We just talked a few minutes ago about
9  Vitals website and how you could determine that some
10  stuff had to come from the healthcare provider.
11      Remember that conversation?
12    A    Yes.
13    Q    Can you make the same deduction here that
14  some of this probably came from Dr. Drucker?
15    A    That philosophy was one of a kind.  That
16  was hard-coded in the website.  It most likely came
17  from Dr. Drucker, or one of his close associates, or
18  perhaps his office assistant.
19    Q    And how about his languages, would that be
20  something you also would have obtained from
21  Dr. Drucker or one of his assistants?
22    A    Most likely not.  That's a typical
23  third-party source of data.
24    Q    How about awards and honors?
25    A    No, there are sources for some of that

---

57 (Pages 222 - 225)

EXHIBIT H

Attorneys' Eyes Only

Page 226

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 information, but it's possible that Dr. Drucker's
2 office administrator could have provided that for
3 this prototype.
4    Q    Did Health Grades have a particular
5 relationship with Dr. Drucker?
6    A    It was a unique relationship.
7    Q    So he had seen this, right?
8    A    Yes. Oh, yes.
9    Q    So he had at least, at the very least, had
10 seen this and had to have provided information or
11 verified that it was correct, right?
12    A    Absolutely. It was one of a kind.
13    Q    Okay. How about publications? Would that
14 have come from Dr. Drucker or his assistant?
15    A    I think -- my guess is that it probably
16 did.
17    Q    And years in profession, would that have
18 probably come from Dr. Drucker or one of his
19 assistants?
20    A    Most likely a third party.
21    Q    How about the English language?
22    A    Third party.
23    Q    So if Dr. Drucker spoke Spanish or
24 something, you would be able to get that from a third

Page 227

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 party?
2    A    Yes.
3    Q    Okay. And what third party?
4    A    I don't know. We would do it today. We
5 did it back then.
6    Q    But it seems clear that at least some of
7 this on this page 179535 came from Dr. Drucker,
8 right?
9    A    Yes, for the prototype.
10    Q    On the next page, experience and training.
11 Do you see there are specialties listed there;
12 orthopedic surgery, and it says, Health Grades has
13 verified that Dr. Drucker is board certified by the
14 American Board of Orthopedic Surgery; is that
15 correct?
16    A    That's what it says.
17    Q    So that's Health Grades' verified data?
18    MR. VAZQUEZ: Form.
19    A    It is. The source of that data is ABMS.
20 And if a doctor was board certified by ABMS, then
21 that little logo is here.
22    Q    (BY MR. STIMPSON) How about the rest of
23 it? Medical school, residency, internship,
24 fellowship, areas of expertise; those all came from

Page 228

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 third parties, too?
2    MR. VAZQUEZ: Form.
3    A    Most likely, yes.
4    Q    (BY MR. STIMPSON) Would Health Grades
5 have verified that information?
6    MR. VAZQUEZ: Form.
7    A    For Dr. Drucker we would have because,
8 again, this is the prototype profile.
9    Q    (BY MR. STIMPSON) Next page, it's got
10 disciplinary actions.
11    Do you see that?
12    A    I do.
13    Q    And Health Grades has also included that
14 information and verified its content, correct?
15    MR. VAZQUEZ: Form.
16    A    That's correct. It's third-party data.
17    Q    (BY MR. STIMPSON) Right. And received
18 from a third party. And it's something that Health
19 Grades verified, correct?
20    MR. VAZQUEZ: Form.
21    A    The logo would suggest that.
22    Q    (BY MR. STIMPSON) And the next page,
23 patient experience, these are information from
24 patients, right?

Page 229

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    A    It would appear, yes.
2    Q    And, in fact, five patients provided
3 information ratings for Dr. Drucker, right?
4    A    That's what it says.
5    Q    Okay. And the bottom there says survey
6 details. What does that mean?
7    A    I don't know. I think it may show the
8 individual responses to those questions.
9    Q    Okay.
10    A    So there were five that make up each bar
11 and perhaps survey details.
12    Q    Where were the survey -- where were these
13 surveys performed? Were they on Health Grades'
14 website?
15    MR. VAZQUEZ: Form.
16    A    I do not know.
17    Q    (BY MR. STIMPSON) It says here, Share
18 your experience. So at least as of that time, there
19 was an ability for someone to get on and share their
20 experience with Dr. Drucker, right?
21    A    I'm not sure of the timing. Remember,
22 this is a prototype, and it's a screen shot for a
23 PowerPoint. So I can't say that to be a fact.
24    Q    Well, at least as of February 2005, Health

58 (Pages 226 - 229)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 230

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Grades' website had this where it says, Share your
3  experience in connection with Dr. Drucker, right?
4      A   I wouldn't derive that conclusion from
5  looking at this page.
6      Q   Well, where -- well --
7      A   This is referencing a report that may or
8  may not be live on the Health Grades website. This
9  is a PowerPoint text. I do this all the time where I
10  share slides that are not part of our production
11  environment, meaning live on our website.
12     Q   I understand that, sir, but you've also
13  testified about what was available on Dr. Drucker in
14  February of 2005. But my question is --
15     A   I know, but you were asking about this.
16     Q   Can I finish? Okay. I'm asking about
17  that right now. The "share your experience" button,
18  was that -- can you just tell me, is that something
19  that was live that a user could click on; did you
20  know?
21     A   I can't determine that based on this.
22     Q   Okay. That's fine. That's fine.
23         The next page, Languages spoken by staff.
24  Where would that information have come from?
25     A   I don't know.

Page 231

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2      Q   That would have come from a healthcare
3  provider?
4      A   It very well could have.
5      Q   Well, can you think of any other place
6  where that information would have come from?
7      A   The data sources may or may not have
8  included that data. I just don't know.
9      Q   Do you know of any data sources that would
10  tell us the languages spoken by the staff of
11  Dr. Drucker at this time?
12     A   I don't know.
13         (Discussion off the record.)
14         (Recess taken from 2:05 p.m. to 2:27 p.m.)
15     Q   (BY MR. STIMPSON) Please turn to page
16  HG 0179548.
17         MR. VAZQUEZ: What exhibit are you on
18  again? I'm sorry.
19         MR. STIMPSON: The same, 51.
20         MR. VAZQUEZ: Thank you.
21     A   48.
22     Q   (BY MR. STIMPSON) Yes, please.
23     A   Okay.
24     Q   Can you tell me what is being displayed on
25  that page?

Page 232

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2      A   This is -- practice A, I think, is
3  Dr. Drucker's profile.
4      Q   Practice A or physician A?
5      A   Physician A, I'm sorry. Physician A is
6  Dr. Drucker's profile. Practice A is a -- would be a
7  group. I know the group.
8          In terms of what each of the sub-bullets
9  beneath them represent, I do not know what the
10  different distinctions are across those bullets.
11     Q   Let's look in the second bullet under
12  physician A. February 2005, 117 expanded profile
13  reports viewed.
14         What are expanded profile reports?
15     A   I don't know.
16     Q   Would it be the premium report that we saw
17  earlier in this document?
18     A   It could be, but I don't know.
19     Q   Do you have any other idea what it might
20  be?
21     A   I don't.
22     Q   Does this help refresh your memory that
23  Dr. Drucker's premium report was available at the
24  beginning of February 2005?
25     A   It suggests some sort of enhanced profile

Page 233

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  was available.
3      Q   At the beginning of February 2005, right?
4      A   An expanded profile report was viewed in
5  February, 117 times.
6          What is your question?
7      Q   My question is, this indicates -- let's
8  just back up a second.
9          What you were trying to do with this slide
10  was convince the Rothman Institute that this was a
11  great product and you get a lot of hits, right?
12     A   Right.
13     Q   So if this had been 117 expanded profile
14  reports starting from February 15, this bullet, it
15  would have been better for you to say, hey, starting
16  February 15 to the end of February, we had 117
17  expanded profile reports.
18         So what I'm trying to get at here is this
19  indicates, doesn't it, that at least as early as
20  February, this is talking about the entire month of
21  February, you had 117 expanded profile reports,
22  right?
23     A   That's what this says, yes.
24     Q   And practice A, orthopedic group -- what's
25  the Consumer Quality Reports? Do you know what that

59 (Pages 230 - 233)

**EXHIBIT H**

Attorneys' Eyes Only

Page 234

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  is talking about?
3      A    I don't know specifically what that
4  references.
5      Q    Okay.
6      A    I believe that's just another name that
7  was applied to Physician Reports. We had a number of
8  names. I just think that's another one.
9      Q    Okay. And what about Premium Placement
10  Profiles, what's that?
11      A    I don't know.
12      Q    Could that be the premium reports we saw
13  earlier in this PowerPoint?
14      A    I don't think so. Because that report
15  that's in this deck is the Drucker prototype. I know
16  we didn't have other profiles on our website. It was
17  one of a kind.
18          The orthopedic group would have had just a
19  basic report. You know, how we distinguish that and
20  called it premium, I don't recall what we did.
21      Q    Well, let's go back up to physician A,
22  Dr. Drucker's orthopedic surgeon. The third bullet
23  point says 18,000 premium placement profiles
24  displayed.
25          Does that indicate that as of the time of

Page 235

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  this that premium report from Dr. Drucker had been
3  viewed 18,000 times?
4      A    I don't know if it was the prototype or
5  some subset of that prototype report. I don't know
6  what makes up that 18,000.
7      Q    Okay. It says also 43 appointment
8  inquiries. That means that Dr. Drucker had received
9  43 appointment inquiries as of that time?
10      A    What we were experimenting with was
11  putting an appointment button within a physician's
12  profile to see what the interest level was among
13  consumers. But that's the extent of it. There was a
14  button, and that's what we were tracking. Those 43
15  appointment inquiries were the number of times that
16  button was pushed.
17      Q    Okay. On the next page, can you tell me
18  what is being disclosed there?
19      A    Just -- this is -- it's just the count of
20  the different number of engagements based on examples
21  provided by the net client. So just the number of
22  times those reports were viewed.
23      Q    Were these beta tests?
24      A    I believe what we were trying to
25  demonstrate here is just the volume of consumer

Page 236

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  engagement on our website. This, I don't believe,
3  based on what I'm looking at here, was in any way
4  part of the beta test.
5      Q    I'm sorry, you were saying what? I'm
6  sorry, I didn't understand that.
7      A    If you look at the data elements that
8  we're reporting on, it's just traffic counts, is what
9  we call them.
10          So static profile pages viewed is the
11  missing word, 613. Comparison reports viewed, 149.
12  Physician name searches conducted, 656. City and
13  state searches conducted, 372.
14          So what we're trying to demonstrate is,
15  hey, we have people on our website and they're
16  looking up these reports. But it's not tied to this
17  product that we were covering in the previous slides.
18      Q    Okay. Actually, it's tied to the next
19  slide, right? You can see the comparison for it on
20  179550; is that right?
21      A    Yeah, those stats are for each of those
22  four examples provided on that following slide.
23      Q    And so the physician quality comparison
24  reports -- actually, the comparison reports that are
25  referenced on this slide that have been viewed would

Page 237

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  be the same basic Physician Quality Comparison
3  Reports that we talked about in Exhibit 8 at page --
4      A    Yes, I believe that's so.
5      Q    -- page Health Grades 0032062?
6      A    Yeah, I believe so, yes.
7          MR. STIMPSON: David, can I have this one,
8  please?
9          Thank you.
10      Q    (BY MR. STIMPSON) Let me show you a
11  multipage document bearing Bates number HG 0207384
12  through 398.
13          (Exhibit 52 marked.)
14      Q    (BY MR. STIMPSON) This is an e-mail from
15  yourself to Kerry Hicks, copying Dave Hicks,
16  attaching a presentation, correct?
17      A    Yes.
18      Q    And dated January 19, 2005?
19      A    Yes.
20      Q    Prepared and kept in the ordinary course
21  of business at Health Grades?
22      A    I believe so.
23      Q    Did you draft the presentation?
24      A    Most likely I drafted most, if not all, of
25  this presentation.

Veritext/NJ Reporting Company

800-227-8440

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 238

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    Q    Who was the presentation to?
3    A    It was simply for discussion.  This is
4  meant for internal use.
5    Q    If you would look at the next page, do you
6  see there's a confidential attorneys' eyes only stamp
7  there?
8    A    Um-hum.
9    Q    That wasn't actually on the PowerPoint,
10  was it?  That was something your counselor added?
11   A    I don't recall.  I don't know.
12       MR. STIMPSON:  Jesus, I assume this is
13  your designation?
14       MR. VAZQUEZ:  I'm sorry, which page?
15       THE DEPONENT:  (Indicating.)
16       MR. VAZQUEZ:  Yes.
17       MR. STIMPSON:  Okay.
18   Q    (BY MR. STIMPSON)  Would you turn to page
19  HG 0207395.
20   A    Okay.
21   Q    This is a screen shot from the Health
22  Grades website, correct?
23   A    No, I don't believe so.  This was just a
24  mockup.
25   Q    What makes you think it was a mockup?

Page 239

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    A    I don't recall any execution that
3  resembled anything like this.
4    Q    What do you mean you don't recall an
5  execution that resembled something like this?
6    A    The presentation of the providers at the
7  top of the page in this form about the general search
8  results.  At this point in time we were not doing
9  that.
10   Q    Were you providing results lists that
11  looked like this?
12   A    I believe so.
13   Q    So in the results list, do you see there
14  is physician's name in the first column, right?
15   A    Yes.
16   Q    And what's the next one?  Is it extra
17  info?
18   A    It looks like extra info.
19   Q    Do you know what that is?
20   A    I do not.
21   Q    The next column is patient experience.
22  And a few of them have tabs for patient experience;
23  is that correct?
24   A    That's what it says.  I don't recall,
25  though, ever presenting patient experience in a form

Page 240

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  like this in the list results for physicians.  It
3  doesn't mean we didn't, but I don't recall doing
4  that.  Again, this is a mockup.
5    Q    Well, are you sure the results list is a
6  mockup?
7    A    I'm led to believe that the entire slide
8  is a mockup.
9    Q    Right.
10   A    -- by definition, because we never
11  executed anything like this on our website.
12   Q    I'm just asking about the part on the
13  search results, though.  It says, Your search
14  results, we found six physicians with extra
15  information; we found four physicians with general
16  information.
17       At the time did you have search results
18  that looked like this?
19   A    Not that I recall.
20   Q    Why would you have created something on
21  search results that wasn't -- for your PowerPoint
22  presentation -- that wasn't representative of what
23  you had on your website?
24   A    Because it's an internal document for
25  discussion.

Page 241

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    Q    So this was a PowerPoint for internally,
3  not for --
4    A    It's sent to Kerry Hicks, the CEO.  David
5  Hicks was the head of technology.
6    Q    Well, I understand.  But the PowerPoint
7  itself was not meant to be for outside?
8    A    No.
9    Q    Are you sure you never presented this
10  outside of Health Grades?
11   A    Never.  Because it was never in
12  production.
13   Q    Well, you sent one PowerPoint -- okay.
14  Let's just scratch that.
15   A    That was to the client.  This is internal.
16   Q    Let me ask you this, this results list
17  right here, does that results list show comparison
18  ratings of healthcare providers?
19       MR. VAZQUEZ:  Object to form.  I think
20  you've given me the continuing objection, right?
21       MR. STIMPSON:  Sure.
22       MR. VAZQUEZ:  To the extent you're talking
23  about patent claims or the terms in the patent.
24   A    You're asking my opinion of whether this
25  presents -- what was the --

61 (Pages 238 - 241)

**EXHIBIT H**

Attorneys' Eyes Only

Page 242

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   (BY MR. STIMPSON) As an inventor of the
3  patent-in-suit, sir, it says, on this results list,
4  does that show comparison ratings in healthcare
5  providers?
6      MR. VAZQUEZ: Same objection.
7  A   No, there is no overt comparison ratings
8  that appears on this page.
9  Q   (BY MR. STIMPSON) I'm sorry, what?
10 A   No, there is no overt comparison of
11 providers on this page.
12 Q   And what if you could click on the patient
13 experience tabs and go through and see the patient
14 survey results, would it then be disclosing
15 comparison ratings of healthcare providers?
16     MR. VAZQUEZ: Same objection.
17 A   I mean, we're discussing a hypothetical.
18 This page never existed.  It could be whatever you
19 might wanted to make it.
20     MR. STIMPSON: Okay.  Could you please
21 read my question back.
22     (Record read as requested.)
23     MR. VAZQUEZ: Same objection.
24 A   This is a mockup.  It didn't go to
25 anything.

Page 243

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   (BY MR. STIMPSON) I didn't ask if it was
3  a mockup, sir.  I'm just asking you, as an inventor
4  of the patent-in-suit, would you have considered this
5  to disclose comparison ratings of healthcare
6  providers?
7      MR. VAZQUEZ: Same objections.
8  A   There are no comparison ratings that show
9  up on this page.
10 Q   (BY MR. STIMPSON) Right.  Now, let's take
11 it one step further.  Suppose you can click on these
12 patient experience tabs here --
13 A   That's a hypothetical --
14 Q   Yes, it is.
15 A   -- we didn't contemplate.  I didn't
16 contemplate that.  You're asking me about something I
17 never even contemplated.
18 Q   Right.  I'm not arguing with you about it.
19 It is a hypothetical, okay?
20 A   Okay.
21 Q   But you've got to answer the question
22 anyway, though, sir, okay?
23 A   Okay.
24 Q   Suppose you can click on these patient
25 experience surveys and go through it and see the

Page 244

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  patient ratings --
3  A   Um-hum.
4  Q   -- would this then disclose comparison
5  ratings of healthcare providers?
6      MR. VAZQUEZ: Same objections.
7  A   So if we provided a score, if someone
8  hypothetically were to click on those patient
9  experience surveys, it would certainly be dependent
10 on how you defined a score or a rating, but there is
11 the possibility that that would be -- if someone were
12 to present content in a similar fashion, that would
13 be infringing on a patent, as I understand it.
14 Q   (BY MR. STIMPSON) Okay.  I didn't ask you
15 about infringing a patent.
16     Focus right in on the question, sir, okay?
17 My question to you -- let's just back up, okay?
18     I know you think that you may not have had
19 something exactly like this, okay?
20 A   No, I told you we didn't.
21 Q   Okay.  Fine.  That's fine.  I'm not asking
22 you about ratings.
23 A   I'm not thinking about it.  I told you we
24 didn't.
25 Q   That's fine.

Page 245

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  A   All right.  You're trying to restate
3  something I've already told you.
4  Q   It's a hypothetical question.
5  A   There's a known fact, though, we didn't
6  have a page like this.
7  Q   That's okay.  So what?  I can still ask
8  you about it, can't I?
9  A   You just changed my statement.  You turned
10 my words into something else.
11 Q   No, I'm not, sir.  You just said -- you
12 have to wait till I'm finished, okay?
13     MR. VAZQUEZ: All right.
14 Q   (BY MR. STIMPSON) You said it was a
15 hypothetical question.  I agree with you.  That's
16 fine.  We can all agree it's hypothetical.
17     Now, sir, looking at this, as a named
18 inventor of the patent-in-suit, do you see anything
19 in here in the search results that could be
20 considered comparison ratings of healthcare
21 providers?
22     MR. VAZQUEZ: Same objections.
23 A   Not within this list.
24 Q   (BY MR. STIMPSON) Thank you.
25     Could you turn to the next page, please.

Attorneys' Eyes Only

Page 246

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  Is this also a mockup?
3      A   It is.
4      Q   It says here above the button, Get report.
5  It says, Patient experience information available on
6  five physicians within your report.
7          Do you see that?
8      A   I do.
9      Q   Would that be comparison ratings of
10 healthcare providers?
11         MR. VAZQUEZ:  Same objections as before.
12     A   It feels like we're in the same spot as
13 with the previous slide.  I would say it's not --
14 there is no comparison on this mockup that we're
15 looking at, and you're asking me if someone clicked
16 on that get report button, if somebody could display
17 comparison ratings?
18     Q   (BY MR. STIMPSON)  No, I'm asking you if
19 somebody could click on this get report -- yeah, it
20 is what you're asking -- if you click on this get
21 report and you end up with patient experience
22 information available on five physicians within your
23 report, as it says there, would that be comparison
24 ratings of healthcare providers?
25         MR. VAZQUEZ:  Same objections.

Page 247

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      A   It would depend on in what form it was
3  presented.
4      Q   (BY MR. STIMPSON)  Where did you get this
5  information for this PowerPoint?
6      A   It's about creating.  We create stuff
7  every day.  I did it yesterday.  I've done it this
8  week and last month.  This is just more of that.
9  It's just -- what is this, 2005.
10     Q   How would you create a fictitious part of
11 this PowerPoint slide that says, Purchase the first
12 report on 20 physicians for only $9.95?  How would
13 you create that for inserting into this PowerPoint?
14     A   I could create a website for you today
15 that doesn't exist and you would swear that it does.
16 You can do anything in development in creating these
17 slides and mockups.
18     Q   So as we sit here today, you're sure you
19 didn't have anything in your website that said
20 purchase the first report on 20 physicians for only
21 $9.95?
22     A   No, I didn't say that.
23     Q   Well, did you?
24     A   I don't know.
25     Q   So you just don't remember, as we sit here

Page 248

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  today, whether or not you had something like this on
3  your website?
4      A   That's correct.
5      Q   And is the same true for the prior page,
6  Health Grades HG 0207395?
7      A   As it relates to the list of providers?
8      Q   Right.
9      A   That's correct.  I don't know.
10     Q   Do you remember if Health Grades, in 2005,
11 provided a results list that included experience
12 survey?
13         MR. VAZQUEZ:  Same objections.
14     A   Not to my knowledge.
15     Q   (BY MR. STIMPSON)  How would I find that
16 out?
17     A   If that information existed, I assume that
18 would have been disclosed.
19     Q   I mean, what I mean, if I was in your
20 position at Health Grades, where would you go to find
21 out whether or not you had that in the results list
22 in 2005?
23     A   The same thing.  I think it's similar to
24 the process that's been undertaken here; just review
25 all the e-mails, the contents of those e-mails, and

Page 249

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  just to see what was being discussed.
3      Q   Look to page HG 0207397, please.
4      A   Okay.
5      Q   Is this a mockup?
6      A   It would appear to be, yes.
7      Q   And what makes you say that?
8      A   Because I don't recall -- what jumps out
9  to me at the top of this page is the Center for Joint
10 Reconstruction.  At the top specialties, location,
11 philosophy, surgical expertise.
12         I don't recall us ever -- we didn't even
13 prototype something like that, to my knowledge.  I
14 just don't recall anything similar to that.
15         MR. STIMPSON:  Jesus, what was redacted up
16 here?  Do you know?  It seems strange because it's a
17 presentation, so I don't know what you would have
18 redacted.
19         MR. VAZQUEZ:  I think what was redacted
20 here was that this was forwarded to me.
21         MR. STIMPSON:  All right.
22         MR. VAZQUEZ:  It's just a forwarding
23 e-mail from --
24         MR. STIMPSON:  Thank you.
25         Can I have Exhibit 10, please, David?

63 (Pages 246 - 249)

EXHIBIT H

Attorneys' Eyes Only

Page 250

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    Q    (BY MR. STIMPSON) I show you what has
3    been marked as Exhibit 10, Mr. Neal.
4         Have you seen this document before?
5    A    Press Release, I do recall seeing this.
6    Q    And this confirms that as of
7    August 2, 2005, Health Grades was adding physician --
8    adding physician satisfaction survey results to its
9    Physician Quality Reports, correct?
10   A    That's what the document says.
11   Q    It also confirms that detailed physician
12   and practice information from physicians themselves
13   are being added as of that date?
14   A    Yes, that's what it says.
15   Q    What was the first time, to your
16   recollection, that comparison ratings were provided
17   to the Health Grades reports?
18        MR. VAZQUEZ: Object to form.
19   A    What's the definition of a comparison
20   rating?
21   Q    (BY MR. STIMPSON) Well, what do you
22   understand it to be?
23   A    By my definition, a comparison rating is a
24   score or rating that's assigned to an individual
25   physician.

Page 251

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    Q    Okay. Using that definition, when were
3    comparison ratings first added to Health Grades'
4    reports?
5         MR. VAZQUEZ: Form.
6    A    I don't know.
7    Q    (BY MR. STIMPSON) Well, how would the
8    comparison ratings then differ from the physician
9    satisfaction surveys, under your definition?
10   A    The survey is just a survey.
11   Q    Okay.
12   A    We haven't assigned any type of rating or
13   score. It's just a survey.
14   Q    Okay. So how were they displayed in the
15   Physician Quality Reports then?
16   A    It would have just been the actual survey
17   results, a compilation of those, but there were no
18   scores assigned, and that was intentional for the
19   reasons that I mentioned previously, because it was a
20   risk to our business model.
21   Q    All right. So as of August 2, though, we
22   have physician satisfaction surveys and detailed
23   physician and practice information from physicians in
24   the quality reports, right?
25   A    That's what this indicates.

Page 252

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2         MR. STIMPSON: David, could I have this,
3    please?
4    Q    (BY MR. STIMPSON) Actually, before I get
5    to this document, let me ask you this. The Drucker
6    report we saw in Exhibit 51, why didn't you disclose
7    that to the Patent and Trademark Office in connection
8    with the application that led to the '060 patent?
9    A    We weren't patenting the Drucker report.
10   It was unrelated to what we were patenting.
11   Q    Any other reasons?
12   A    I think that's probably a good enough
13   reason, at least in my mind.
14   Q    All right. And how, in your mind, did
15   what you were patenting differ from the Drucker
16   report?
17   A    The Drucker report was a prototype. It
18   was for us to try to gain an understanding and try to
19   conceptualize certain thoughts and ideas that we had.
20        But as it turns out, we ended up doing
21   things differently. And maybe as a result of that,
22   that influenced our future ideas in the way that we
23   presented information and results and combined those
24   results on our website.
25   Q    So you said the reason you didn't disclose

Page 253

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    it was because it was unrelated, and I asked you how.
3    And one reason you gave me was it was a prototype,
4    right?
5    A    Right.
6    Q    Any other reasons?
7    Q    Why we didn't disclose it?
8    Q    Yeah.
9    A    It was not central to what we were
10   patenting.
11   Q    Why not?
12   A    The patent was about the experience for
13   the consumer on our website and specifically how we
14   combined different elements of data to make it
15   relevant to their experience and allowed them to
16   differentiate physicians.
17        And the way that we were doing it was all
18   about the experience, not an individual physician
19   profile on our website. It was the overall
20   experience.
21        So a report takes many forms. It's not
22   just a physician profile. It's a list of physicians
23   that are presented within search results. It's many
24   different things. It's that form of presentation and
25   the content of that presentation and the means of

Veritext/NJ Reporting Company

800-227-8440

EXHIBIT H

973-410-4040

Attorneys' Eyes Only

Page 254

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 differentiation which made up the patent. That
2 didn't exist in the Drucker report.
3
4     Q    Anything else? Anything else? Any other
5 reasons?
6     A    Not that I can recall right now.
7     Q    Why don't you get the patent, Exhibit 3,
8 please.
9     A    Okay.
10     Q    And you know where the claims are, right?
11 Look at claim 1, starting with column 20. Sir, at
12 the back, column 20.
13     A    Column 20?
14     Q    Yeah.
15     A    Got it.
16     Q    Can you go through that claim 1, sir,
17 and -- actually, let me back up here.
18        Can I just have his last answer read back,
19 something about it was not central to what we were
20 patenting?
21        (Record read as requested.)
22     Q    (BY MR. STIMPSON) Okay. We'll talk about
23 that a bit later.
24        You had -- apart from the Drucker report,
25 you had the Health Grades website, it was available

Page 255

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 as of 2004. Consumers could get on and do searches
3 for healthcare providers, right?
4     A    Yes.
5     Q    Let me show you what has been marked as
6 Exhibit 53. It's a two-page document bearing Bates
7 number HG 0209051 to 52.
8        (Exhibit 53 marked.)
9     Q    (BY MR. STIMPSON) Actually, Mr. Neal,
10 before I move on, though, I exhausted your reasons --
11 I just wanted to make sure I exhausted your reasons
12 for why the Drucker report was not disclosed.
13     A    To the best of my recollection, I shared
14 with you --
15     Q    Okay. Take a second and take a look at
16 this e-mail and then I'll ask you some questions.
17     A    Okay.
18        MR. STIMPSON: Jesus, same reason for
19 redacting?
20        MR. VAZQUEZ: Yes. Pretty much any one
21 that will be on the top like that is forwarding.
22        MR. STIMPSON: Gotcha.
23     A    Okay.
24     Q    (BY MR. STIMPSON) This is a series of
25 e-mails, including you as a copy holder and an

Page 256

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 addressee, in March of 2005?
3     A    Yes.
4     Q    Prepared and kept in the ordinary course
5 of business?
6     A    I believe so.
7     Q    Who is Sarah Loughran, L-O-U-G-H-R-A-N?
8 How do you pronounce that?
9     A    Sarah Loughran.
10     Q    Who was she?
11     A    She was a senior executive at Health
12 Grades. I think SVP provider services, if I recall
13 correctly.
14     Q    And Kerry Hicks was the president?
15     A    CEO.
16     Q    CEO. And Allen Dodge and Dave Hicks we
17 know. What was the subject PNMM patent?
18     A    So, that actually -- it wasn't so much a
19 PNMM patent. PNMM, is that what you're asking about?
20     Q    Yeah.
21     A    I can't remember exactly what the acronym
22 stands for. It had something to do --
23     Q    Physician New Marketing Media?
24     A    Okay, that sounds right. So, no, I notice
25 that -- I'm saying the same things that I talked

Page 257

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 about today; layout and design, contents of site,
3 ways of search, et cetera.
4        So it related to the experience on the
5 website and how we were combining that and presenting
6 that to users of the website.
7     Q    Is this PNMM patent referring to what
8 became the '060 patent?
9     A    I don't know for certain. I don't know.
10     Q    Are you an inventor on any other patents?
11     A    I am an inventor on a more recent patent
12 than the '060 patent.
13     Q    Did you file any patent application in
14 2005, to your knowledge?
15     A    No.
16     Q    Your e-mail there at 4:18 p.m. starts, Our
17 model combines elements for a variety of other
18 business models in other sectors.
19        Did I read that correctly?
20     A    Yes.
21     Q    It's also true of the '060 patent, right?
22 What you're doing is you're combining a variety of
23 things from other business sectors, right?
24     A    Yes.
25        MR. VAZQUEZ: Form.

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 258

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    (BY MR. STIMPSON) And if you turn to the
3    second page, please. Attached are notes for a
4    meeting that Alan and I had. That's from Sarah
5    Loughran.
6         Are there any notes, to your knowledge? I
7    couldn't find anything.
8    A    Are you asking me?
9    Q    Would these be kept in the ordinary course
10   of business at Health Grades with the notes attached?
11   A    I don't have the notes and -- promissory,
12   so that would have been in the disclosure, I think.
13   If it existed it would have been in what was already
14   disclosed.
15   Q    Okay. Let's go back to your deposition
16   notice, please. What is it? 45.
17   MR. STIMPSON: So, Jesus, just for my
18   clarification, is Mr. Neal identified for topic 2
19   only for the things that are also in the
20   parentheticals of 1?
21   MR. VAZQUEZ: Yes.
22   Q    (BY MR. STIMPSON) Excuse me, Mr. Neal.
23   Who are the people who developed the Health Grades
24   Physician Research Comparison Report?
25   A    That was a combination of myself,

Page 259

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Mr. David Hicks, and Mr. Montroy.
3    Q    And who are the people who tested it?
4    A    There were a number of developers involved
5    in writing the script. So doing the programming --
6    it depends on your definition of testing. What is
7    your definition of testing?
8    Q    What is your definition of testing?
9    A    It was all the people that touched it and
10   worked on the development to get the report in place.
11   Q    Okay. With that definition, who are the
12   people who tested the Health Grades Physician
13   Research Comparison Report?
14   A    It would have been the inventors, along
15   with technology and product resources.
16   Q    How about the Physician Quality Report,
17   would your answers be the same for the people who
18   developed and tested?
19   A    They would.
20   Q    And the same for Physician Quality Guide?
21   A    I still do not recall Physician Quality
22   Guide. It doesn't surprise me that it existed, but
23   that name doesn't ring a bell with me.
24   Q    On the third topic it says, Identification
25   of all other prior art known to Health Grades,

Page 260

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    including but not limited to Health Grades' products
3    and services sold and/or known to the public before
4    August 29, 2006, and not disclosed to the Patent and
5    Trademark Office.
6         Can you identify all the other prior art
7    for me, please, Mr. Neal?
8    MR. VAZQUEZ: Form.
9    A    So you're asking me to identify all prior
10   art that was not disclosed?
11   Q    (BY MR. STIMPSON) That was known to
12   Health Grades, including, but not limited to, Health
13   Grades' products and services that were sold and/or
14   known to the public before August 29, 2006.
15   A    As discussed earlier, there was not prior
16   art in our eyes. What we were patenting was novel.
17   It was innovative. It was new. That was the intent
18   behind the patent. There wasn't a prior art.
19   Q    What do you understand prior art to mean?
20   A    Something that existed -- again, layman's
21   interpretation, something that existed in form and
22   function that resembled what it is that is being
23   patented.
24   Q    So in your view, there was nothing like
25   that prior to August 29, 2006, right?

Page 261

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    That is correct.
3    Q    Okay.
4    MR. STIMPSON: So Mr. Dodge is going to
5    testify on 1, except the stuff that's in the
6    parenthetical?
7    MR. VAZQUEZ: Yes. That's what the
8    February 9 e-mail says.
9    MR. STIMPSON: Yeah, okay.
10   Q    (BY MR. STIMPSON) Actually, though, we've
11   got to go back to this topic number 3. Topic number
12   3 says, Identify the prior art, including, but not
13   limited to, Health Grades products and services sold
14   and/or known to the public before August 29, 2006.
15        Can you identify the Health Grades
16   products and services that were sold and known to the
17   public before August 29, 2006?
18   MR. VAZQUEZ: Form.
19   A    We've gone through products and services
20   that were in the public market, but they weren't
21   prior art.
22   Q    (BY MR. STIMPSON) Okay. But I'm just
23   asking you whether or not you can identify for us
24   here today the Health Grades' products and services
25   that were sold or known to the public before

66 (Pages 258 - 261)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 262

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  August 29th, 2006?
2      A    No.
3          MR. VAZQUEZ:  Form.
4      A    You're asking me if what we were selling
5  to the public was prior art?
6      Q    No, I'm not.  I'm asking you if you can
7  identify for me today the Health Grades products and
8  services that were sold or known to the public before
9  August 29, 2006?
10     A    Okay.  So separate from the prior art?
11     Q    Yes.
12     A    So that would be the reports that we've
13 discussed today.
14     Q    Anything else?
15     A    Prior to 2006, there was a version of
16 the -- of that marketing program, which we have gone
17 through that as well.  So the reports themselves, the
18 PowerPoint presentation to the Rothman group in
19 Philadelphia.  Those were the products that were in
20 existence.
21     Q    Anything else that we haven't talked about
22 today?
23     A    Not that I'm aware of.  Not that I can
24 recall.
25     Q    Did you do anything to try to prepare

Page 263

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  yourself to identify the Health Grades products and
3  services known to the public before August 29, 2006?
4      A    I did absolutely.
5      Q    Okay.  So now are you comfortable that
6  everything we've talked about today is everything
7  that there was?
8          MR. VAZQUEZ:  Object to form.  It
9  misstates the testimony.
10     A    I can't say that I have recalled every
11 single thing, but the things that have come to mind
12 I've absolutely disclosed.
13     Q    (BY MR. STIMPSON)  What did you do to
14 identify these products and services in preparation
15 for your deposition?
16         MR. VAZQUEZ:  Just remind you, do not
17 disclose communications that we had between us when
18 you were preparing.
19         Otherwise, answer the best you can.
20     A    Yeah, I just -- I looked at the forms of
21 reports and just refreshed my memory.
22     Q    (BY MR. STIMPSON)  Okay.  Did you write
23 them down anywhere?
24     A    No.
25     Q    The products and services?

Page 264

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      A    No.
3      Q    So how would I know whether I've got a
4  complete list of the Health Grades products and
5  services?
6      A    Via all the disclosure that's been made
7  today.
8      Q    Right, but I mean, how would I know from
9  this deposition whether I've got all the products and
10 services that Health Grades was using before
11 August 29, 2006?
12     A    To the best of my ability, I have
13 attempted to disclose those and communicate those to
14 you today.
15     Q    Were you involved in the prosecution of
16 the '060 patent?
17     A    What does involved mean?
18     Q    Well, let me just change the question
19 then.
20         Did you get copies of office actions from
21 the Patent and Trademark Office?
22     A    I don't recall receiving them.
23     Q    Did you have any input into responses to
24 the office actions?
25     A    I'm sorry, can you go back and state the

Page 265

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  original question?  I want to make sure that I'm
3  following the line of questioning.
4      Q    Sure.  What I'm trying to get at,
5  Mr. Neal, is whether or not you were kept up to speed
6  as to what was happening in the prosecution of the
7  '060 patent?
8          MR. VAZQUEZ:  Object to form.
9      A    As it relates to this and the MDx case?
10     Q    (BY MR. STIMPSON)  Yeah, well, it's about
11 the '060 patent.  So how that patent was obtained
12 from the Patent and Trademark Office, I want to know
13 whether you were kept up to speed as to what was
14 happening during the prosecution?
15         MR. VAZQUEZ:  Form.
16     A    You're talking about the prosecution as it
17 relates to this suit with MDx?
18     Q    (BY MR. STIMPSON)  As it relates to the
19 '060 patent, yeah.
20         MR. VAZQUEZ:  Form.
21     A    So I'm confused by your question.  Is it
22 specific to the patent itself and being updated on
23 what claims were granted as it relates to this
24 patent?  I don't think that's the question you're
25 asking me.

67 (Pages 262 - 265)

EXHIBIT H

Attorneys' Eyes Only

Page 266

```
1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       Q    (BY MR. STIMPSON)  No, that's not really
3   part of it.
4       A    Okay.
5            MR. VAZQUEZ:  Just -- I think the
6   confusion is the meaning of prosecution.
7            MR. STIMPSON:  Okay.  I'll explain it to
8   him.
9       Q    (BY MR. STIMPSON)  So during the life
10  cycle of the patent application, you file a patent
11  application.  Then, at least in this case, the patent
12  officer rejected the claims, and then there was a
13  response, and then maybe another rejection or
14  response, and then eventually the patent issued.
15           So that's a series of things that happened
16  in the life of that application that eventually led
17  to the issuance of the patent.
18      A    All right.
19      Q    So my question to you, sir, is this was
20  filed in 2006 and it issued in 2010.  In that
21  four-year period, were people keeping you up to speed
22  and telling you what the Patent Office was doing?
23      A    Oh, yes.
24      Q    So you would get copies of the office
25  actions?
```

Page 267

```
1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       A    I don't recall what they were, but I do
3   remember speaking with the attorneys.
4       Q    Okay.  So would you have input into how
5   responses were provided to the Patent and Trademark
6   Office?
7            MR. VAZQUEZ:  Form.
8       A    There was communication with counsel.  I
9   can't recall the content of those conversations.
10           MR. STIMPSON:  Can I have Defendant's
11  Deposition Exhibit 12, please, David?
12           Just one second.  Let's see if we need it.
13  Well, maybe we can skip this and ask another
14  question.
15      Q    (BY MR. STIMPSON)  It's your recollection
16  that you were kept up to speed from your patent
17  prosecution counsel as to what was happening in the
18  prosecution of the '060 patent?
19      A    Yes.
20      Q    Okay.  That's easy.
21           Did you get copies of prior art that was
22  cited --
23           MR. VAZQUEZ:  Object to form.
24      Q    (BY MR. STIMPSON)  -- from the Patent
25  Office?
```

Page 268

```
1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       A    I do recall seeing something returned from
3   the Patent Office that included references to prior
4   art.
5       Q    Did you read the references?
6            THE DEPONENT:  This involved discussions
7   and dialogue with counsel.
8            MR. VAZQUEZ:  Right.  As so we've talked,
9   sometimes when you're in a deposition, you can answer
10  his questions to the best of your ability.  Just do
11  not disclose the discussions, what was literally said
12  in the meetings with prosecution counsel or with us.
13      A    Okay.  Prior art was a discussion topic.
14      Q    (BY MR. STIMPSON)  Okay.  But my question
15  was, did you read the prior art?
16      A    I do recall having some conversation about
17  the prior art.
18      Q    But do you remember reading the prior art?
19      A    In terms of looking exactly at what the
20  patent officer returned to us?
21      Q    Yeah, the prior art itself.  For example,
22  you might remember the Henley reference that was
23  cited by the Patent Office?
24      A    Yes.
25      Q    Did you read that?
```

Page 269

```
1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       A    I did look at that prior art at the time.
3       Q    Okay.
4       A    I do recall looking at that.
5       Q    Do you remember, Mr. Neal, that during
6   patent prosecution Health Grades disclosed websites
7   of other companies in connection with its patent
8   prosecution?
9       A    I don't recall.
10      Q    Let's see if I can refresh your memory
11  here.
12           (Discussion off the record.)
13           (Recess taken from 3:15 p.m. to 4:02 p.m.)
14           (Ms. Stoll-DeBell not present following
15  recess.)
16      Q    (BY MR. STIMPSON)  I show you what has
17  been marked as Exhibit 4.  This is a record of the
18  prosecution history before the Patent and Trademark
19  Office, Mr. Neal.
20           Have you seen this before?
21      A    I don't know what parts I may or may not
22  have seen.
23      Q    In the part that is flagged, there's an
24  information disclosure statement.  And it identifies,
25  and I'll represent to you this is where Health Grades
```

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 270

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 is disclosing to the Patent and Trademark Office
2 websites of competitors.
3     Do you know, sir, why Health Grades
4 disclosed websites of competitors as prior art?
5     A   I don't recall.
6     Q   Do you remember discussing this at all
7 with counsel for -- your counsel?
8         MR. VAZQUEZ: Again, just if you discussed
9 it, you can say yes or no. Just don't disclose any
10 actual contents of the discussions.
11     A   Yes.
12     Q   (BY MR. STIMPSON) Yes, you did discuss
13 it?
14     A   Yes.
15     Q   Okay. Did you discuss disclosing Health
16 Grades' prior websites? Same conversation?
17     A   I don't recall.
18     Q   So you don't have -- you can't tell me
19 today why these were disclosed but not the Health
20 Grades prior websites?
21     A   I don't recall any specific discussions
22 about either Health Grades or any of these individual
23 companies.
24     Q   All right. But you know they were

Page 271

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 discussed?
2     A   The topic was discussed, yes.
3     Q   All right. That's enough. That's a big
4 document for just a short question. Thanks.
5         Have you talked to Mitch Rothschild
6 before?
7     A   I have, yes.
8     Q   How many times have you talked to him?
9     A   I believe only one time.
10     Q   Okay. And when was that?
11     A   I'm guessing that was -- it was 2009 or
12 2010.
13     Q   What about?
14         MR. VAZQUEZ: Form.
15     Q   (BY MR. STIMPSON) I'm sorry, what did you
16 discuss with Mr. Rothschild?
17     A   It was -- he had engaged a consultant to
18 work for him that had formerly worked at Health
19 Grades. The guy's name is John Morrow.
20     Q   Um-hum.
21     A   And I've known John going back some period
22 of time. And John suggested that there may be an
23 opportunity for a working relationship between Vitals
24 and Health Grades at that point in time.

Page 272

CONFIDENTIAL - ATTORNEYS EYES ONLY
1     So that was the purpose of the call, to
2 explore whether or not a partnership opportunity may
3 exist.
4     Q   And what happened on your call with
5 Mr. Rothschild about that?
6     A   I recall having a discussion, it was not
7 really that lengthy, just basic introductions.
8 Talked about what it is that he and they had an
9 interest in as it relates to the partnership
10 opportunity.
11         And I don't know if the conclusion was
12 discussed but, ultimately, I think both parties
13 determined that it didn't make sense to partner at
14 that time.
15     (Exhibit 54 marked.)
16     Q   (BY MR. STIMPSON) Let me show you what
17 has been marked as Exhibit 54, a two-page document
18 bearing Bates numbers HG 0051899 to 00. Let me know
19 when you're ready to discuss this, Mr. Neal.
20     A   Okay.
21         Okay.
22     Q   This is a -- the top e-mail is an e-mail
23 from yourself to Kerry Hicks and Dave Hicks about
24 Vitals, correct?

Page 273

CONFIDENTIAL - ATTORNEYS EYES ONLY
1     A   Yes.
2     Q   Dated May 19, 2009?
3     A   Yes.
4     Q   And it was prepared and kept in the
5 ordinary course of business, this string of e-mails?
6     A   I believe so.
7     Q   The e-mail below is an e-mail from
8 yourself to Kerry Hicks and copying Dave Hicks,
9 May 8, about your conversation with John Morrow?
10     A   Okay.
11     Q   Is that accurate?
12     A   That seems accurate to me, yes.
13     Q   This is where Mr. Morrow is telling you
14 that Vitals would like to discuss the possibility of
15 Health Grades' access --
16     A   Yeah.
17     Q   -- of offering Health Grades access to
18 enhanced data elements from Vitals?
19         MR. VAZQUEZ: Is there a question, Scott?
20         MR. STIMPSON: It's just a question
21 whether that's what it says.
22     A   That's what John Morrow said. So that was
23 the purpose of the call, as to whether there was
24 anything real to that statement.

69 (Pages 270 - 273)

EXHIBIT H

Attorneys' Eyes Only

Page 274

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 Q (BY MR. STIMPSON) And you actually
3 interpreted it as that Vitals wanted to sell the
4 company to Health Grades, right?
5 A Yeah, because they didn't have any unique
6 data on their website that we didn't already have.
7 Q And, actually, did you later contact -- or
8 actually, did Health Grades later contact Vitals and
9 try to buy Vitals?
10 A I was not involved in that, but I am aware
11 of a conversation that has taken place more recently
12 than this.
13 Q And who was involved in that conversation?
14 A Roger Holstein.
15 Q Were you, in fact, correct that Vitals
16 wanted to sell to Health Grades?
17 A I think my conclusion was that in the
18 first e-mail they're not interested. They were
19 not interested at this point in time.
20 In the e-mail dated May 19th, 2009, I just
21 completed a call with Mitch Rothschild and Jeff
22 Cutler of Vitals. Mitch said explicitly they're not
23 interested in selling.
24 Q Okay. I see. In your e-mail below your
25 May 8 e-mail, the key discussion items with John

Page 275

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 Morrow were as follows, and you've got those bullet
3 points?
4 A Right.
5 Q The third bullet point says, They have
6 placed a lot of emphasis on data-gathering. But it
7 sounds like some of their data was
8 scraped-red-flagged.
9 What did you mean by that?
10 A When data is scraped it means it is
11 essentially acquired illegally on the web.
12 Q Does Health Grades scrape data?
13 A We do not scrape data.
14 Q Where does it get the -- what sources does
15 Health Grades use?
16 MR. VAZQUEZ: Form.
17 A Third-party data sources that we've
18 discussed, physician provided information, and then
19 also consumer provided information. We do not scrape
20 content from other websites.
21 Q (BY MR. STIMPSON) Okay. So you said
22 third party -- you said physician provided, and what
23 was the other one?
24 A Consumer provided.
25 Q Consumer provided?

Page 276

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 A Yeah.
3 Q Are those the only places you get the
4 information?
5 MR. VAZQUEZ: Form.
6 A Yeah. At the moment, I don't know what
7 other sources would exist.
8 Q (BY MR. STIMPSON) Well, like, for
9 example, earlier today we saw some reports, and we
10 were talking about whether the information that was
11 in there about gender and age and stuff on
12 physicians, whether that came from the healthcare
13 provider.
14 A Um-hum.
15 Q And you were saying that originally that
16 came from third-party sources. What third-party
17 sources would that come from?
18 A There are a number of -- we have over 70
19 data providers, and I think multiple of those provide
20 that type of content. I don't know which exactly
21 provide the gender. I don't know for certain that
22 they do, but my belief is that they do provide the
23 gender.
24 Q Do you get information from hospital
25 websites?

Page 277

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 A We might, with the permission of a client.
3 Q Of a hospital?
4 A Um-hum.
5 Q So as you sit here today, you can say with
6 certainty that Health Grades doesn't go to any
7 hospital websites and collect data without the
8 expressed permission of the hospital?
9 MR. VAZQUEZ: Form.
10 A Not to my knowledge.
11 Q (BY MR. STIMPSON) So in any event, let's
12 talk about this scraped data. Is it also less
13 reliable than verified information?
14 MR. VAZQUEZ: Form.
15 A I don't know that I would judge the
16 reliability. I think anyone that would do that
17 should question the quality of that information.
18 Q (BY MR. STIMPSON) Okay. So it's not --
19 scraped data is not equivalent to verified data, in
20 your mind?
21 A No.
22 Q Okay. No, it's -- we just have to be
23 clear. You disagree or --
24 A It's not the same as verified data
25 regardless -- I think almost regardless of what form

70 (Pages 274 - 277)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 278

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    verified takes, by definition.
2       Q    And it's not equivalent to verified
3
4    either?
5       A    Scraped data is not equivalent to verified
6    data.
7       Q    Thank you.
8         If the Vitals website came off, stopped
9    operation tomorrow, would Health Grades be able to
10   raise any of its prices?
11      MR. VAZQUEZ: Form.
12      A    I don't know.
13      Q    (BY MR. STIMPSON) What would you need to
14   know to know that information?
15      A    I suspect that it would enhance our
16   competitive position, which could translate into
17   higher prices.
18      Q    But if Ucompare, and all the other
19   competitors we talked about today, are still in
20   existence, would Health Grades raise its prices?
21      MR. VAZQUEZ: Form.
22      A    It would definitely enhance our position,
23   most likely providing us with pricing power.
24   Absolutely.
25      Q    (BY MR. STIMPSON) So you would increase

Page 279

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    your prices if Vitals came off the website tomorrow?
3       A    I didn't say we would. I said it would
4    present us with improved or enhanced pricing power,
5    which could lead to higher prices.
6       Q    And who would make that decision?
7       A    There would be a few people that would be
8    involved in that decision, one of which would be me.
9       Q    As we sit here today, what would your
10   decision be on raising prices if Vitals came off the
11   web tomorrow? Would you raise prices?
12      A    I don't know.
13      Q    Okay. So let me see.
14      (Exhibit 55 marked.)
15      Q    (BY MR. STIMPSON) I show you a one-page
16   document bearing Bates number HG 0052138.
17      MR. VAZQUEZ: This is --
18      THE REPORTER: 55.
19      MR. VAZQUEZ: Thank you.
20      Q    (BY MR. STIMPSON) This is a May 13, 2010
21   e-mail from yourself, correct?
22      A    Yes.
23      Q    Okay. Prepared and kept in the ordinary
24   course of business?
25      A    I believe so.

Page 280

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2       Q    Okay. This is about Vitals' new posting
3    on their hospital program, right?
4       A    Yes.
5       Q    What was that?
6       A    It is the knockoff of our Patient Direct
7    Connect program.
8       Q    Of our what?
9       A    Patient Direct Connect program. It's the
10   product name for the program, the hospital marketing
11   program, that we sell to hospital systems.
12      Q    Okay. And so you were trying to gather
13   intelligence on their program and pricing?
14      A    That's correct.
15      Q    Why?
16      A    Because it makes good business sense to
17   understand what your competition is doing.
18      Q    Was the pricing public information?
19      A    Sometimes pricing is made public.
20      Q    Was this pricing information publicly
21   available?
22      A    That's really the origin of my e-mail is
23   wanting to understand whether or not it is.
24      Q    Actually, you're asking, Is there someone
25   outside Health Grades that could assist? Ideally it

Page 281

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    would be someone from within the industry without
3    obvious ties to us.
4         Why didn't you want them to have obvious
5    ties to you?
6       A    I'm not sure -- I'm not sure what I was
7    referring to.
8       Q    You didn't want MDx to know you were
9    trying to get this information, right, Mr. Neal?
10      MR. VAZQUEZ: Form.
11      A    I can't recall exactly what I was
12   thinking.
13      Q    (BY MR. STIMPSON) Well, as you sit here
14   today, can you think of any other reason why you were
15   trying to find someone without obvious ties to Health
16   Grades?
17      A    Because -- well, the most obvious answer
18   is that if someone has an obvious tie to us, then
19   Vitals is not going to disclose that information.
20      Q    Right.
21      A    I think it was less about caring -- I
22   don't care if Vitals found out whether or not I was
23   getting their information. It was more about whether
24   or not I would be able to access that information if
25   someone approached Vitals to get it if they knew that

71 (Pages 278 - 281)

EXHIBIT H

Attorneys' Eyes Only

Page 282

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 they had some relationship with Health Grades.
3     The thing is, pricing information is in
4 the public domain all the time.
5     Q    So, but if you asked Vitals for this
6 information, they wouldn't give it to you, right?
7     A    Yeah, just like we wouldn't give ours to
8 them.
9     Q    So you were trying to find a way to get it
10 without them knowing you were trying to get it,
11 right?
12         MR. VAZQUEZ:  Form.
13     A    I think my comment a moment ago was that I
14 really didn't care if Vitals found out.
15     Q    (BY MR. STIMPSON)  Then why didn't you
16 call them?
17     A    Because what I'm saying here is anyone
18 with obvious ties to Health Grades is not going to
19 have access to that information.
20     Q    So what did you do?  Did you find the
21 information?
22     A    I don't recall.  I don't recall receiving
23 that information.
24     Q    How did you do this?  Did you find someone
25 from the industry without obvious ties to Health

Page 283

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 Grades?
3     A    There was -- to my recollection, I don't
4 recall any attempts to follow up on this point, and
5 really did not pursue it.  It just wasn't that
6 important to us.
7     Q    So as you sit here today, you can tell me,
8 with certainty, that you didn't -- despite your
9 request here, you didn't find anyone to look around
10 for program and pricing information from MDx, right?
11     A    Not as a result of this e-mail.
12     Q    Well, did you at all, as a result of this
13 e-mail or not?
14     A    Not that I recall.
15     Q    You keep an eye out on Vitals and what
16 they're doing, right?
17         MR. VAZQUEZ:  Form.
18     A    I do.
19     Q    (BY MR. STIMPSON)  And there is nothing
20 unusual about competitors watching and making sure
21 they know what their competitors are doing, right?
22         MR. VAZQUEZ:  Form.
23     A    Particularly when Vitals has copied
24 virtually everything that we've done.
25         MR. STIMPSON:  Move to strike as

Page 284

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2 nonresponsive.
3         Please read the question back to the
4 witness, please.
5         (Record read as requested.)
6     A    There is not anything unusual about that.
7     Q    (BY MR. STIMPSON)  Let me have marked
8 as -- what exhibit number are we on anyway?
9         (Exhibit 56 marked.)
10     Q    (BY MR. STIMPSON)  Health Grades tried to
11 buy Ucompare, right?
12     A    We did.
13     Q    They did not succeed?
14     A    We did not.
15     Q    Who purchased Ucompare?
16     A    MDx Vitals.
17     Q    Do you remember when you found that out?
18     A    I do not remember the date.
19     Q    How did it relate to when you brought this
20 lawsuit?
21     A    I don't know.
22     Q    Did the fact that MDx bought Ucompare
23 influence the decision to sue MDx?
24         MR. VAZQUEZ:  Form.
25     A    Not to my knowledge.

Page 285

1 CONFIDENTIAL - ATTORNEYS EYES ONLY
2     Q    (BY MR. STIMPSON)  Who made the decision
3 to sue MDx?
4     A    I don't know.
5     Q    Were you involved with it?
6     A    I was a party to the discussions, but do
7 not know who made the decision.
8     Q    When was the decision made to sue MDx?
9     A    I don't -- I don't know.
10     Q    Let me show you what has been marked as
11 Exhibit 56.  It's a multipage document bearing Bates
12 numbers HG 0051789 to 92.
13         MR. VAZQUEZ:  Thank you.
14     A    Okay.
15     Q    (BY MR. STIMPSON)  Okay.  So does this
16 refresh your memory that it was you who found out on
17 February 28, 2011 that Vitals had acquired Ucompare?
18     A    It does.
19         MR. VAZQUEZ:  Object to form.
20     Q    (BY MR. STIMPSON)  Okay.  This is a series
21 of e-mails, including yourself, among other people,
22 from February 28th, 2011?
23     A    Yes.
24     Q    And the one that's 9:50 a.m. was you
25 sending it to Kerry Hicks, Allen Dodge, Andrea

72 (Pages 282 - 285)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 286

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  Pearson, Wes Crews, and Dave Hicks advising them that
3  Vitals had acquired Ucompare, correct?
4      A   Yes.
5      Q   And the next e-mail is from Kerry Hicks
6  forwarding it to certain people. I guess it's not
7  really clear who he is forwarding it to, but one of
8  them would be Garrick Bernstein?
9      A   It appears so.
10     Q   Who is Garrick Bernstein?
11     A   He is a -- he's an employee of Veststar
12 Capital Partners.
13     Q   And why would he be interested in this
14 information?
15     A   I believe that he was one of the parties
16 that was engaged with Ucompare.
17     Q   Do you see his e-mail here says, Great.
18 If I see the banker, I'll break his legs.
19         Do you know why he would say something
20 like that?
21     A   Yes, because I know Gary.
22     Q   Is it fair to say that Health Grades was
23 upset that they lost this deal?
24         MR. VAZQUEZ: Form.
25     A   I think certain individuals had different

Page 287

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  opinions on whether they were -- certain people may
3  have been disappointed more than others.
4      Q   (BY MR. STIMPSON) The loss of this deal
5  had nothing to do with the '060 patent, did it,
6  Mr. Neal?
7      A   No, I don't think so.
8      Q   You can see that Norman Albert (sic) sends
9  an -- Alpert, A-L-P-E-R-T, sends an e-mail to Kerry
10 Hicks, We may have got screwed here based on what
11 Garrick tells me he did not try to get the deal.
12 Maybe we can learn some more now that the deal is
13 done.
14         Who is Norman Alpert?
15     A   He's a founder and partner in Veststar
16 Capital Partners.
17     Q   Another person who is not happy about the
18 situation, right?
19     A   I think that would be a fair assessment.
20     Q   And then you have an e-mail from -- I
21 think it's from Kerry Hicks at 12:37 p.m.
22         Do you see that?
23     A   I do.
24     Q   It says, It makes the legal action even
25 more relevant in my view.

Page 288

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2          Do you see that?
3      A   I do.
4      Q   Do you have an understanding what that
5  meant?
6      A   I do not.
7      Q   Did it make the legal action -- I assume
8  he's talking about the legal action against Vitals?
9      A   One could assume that.
10         MR. VAZQUEZ: Form.
11     A   I don't know.
12     Q   (BY MR. STIMPSON) What did you understand
13 this to mean when you read it?
14     A   I think that was my assumption as well.
15     Q   Did you talk to him about what he meant by
16 making a legal action more relevant?
17     A   I did not.
18     Q   Did you have an understanding as to what
19 he meant by that?
20     A   You know, I personally was just not
21 concerned. I had other things I was focused on.
22     Q   Right. So the answer to my question is
23 you did not talk to Kerry Hicks about why he thought
24 that legal action was more relevant now?
25     A   I did not.

Page 289

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      Q   Then Kerry Hicks says in his e-mail on the
3  front page, In my view, every successful business
4  will have its competitors.
5          Do you see that?
6      A   I do.
7      Q   Okay. Do you agree with it?
8      A   If you're asking me if I agree with
9  everything he says here, no.
10     Q   No. Just the first sentence.
11     A   No.
12     Q   You don't agree that every successful
13 business will have its competitors?
14     A   No. That's the definition of a monopoly.
15     Q   Of what?
16     A   A monopoly. It doesn't have any
17 competitors.
18     Q   Okay. And then he says, Think about other
19 well-healed potential acquirers. And he mentions
20 WebMD, right?
21         Do you see that?
22     A   I do.
23     Q   It says, These would all have the high
24 potential to be disruptive in certain channels.
25 Although, to your point, this does give Vitals more

73 (Pages 286 - 289)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 290

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    mass, I would love for them to be in market within
3    the provider space.
4         What does that mean?
5         A    I'm not sure what Gary meant by this.
6         Q    And you see down below there Norman Alpert
7    says to Kerry Hicks, Why is this the best outcome for
8    us besides us getting it, of course?  My reaction is
9    it creates a sizable audience competitor where one
10   didn't exist.
11        What did you understand that to mean?
12        A    Just the scale of the platform, I think is
13   what Norm was talking about; similar to the
14   discussion I had with you earlier today.
15        Q    So what does it mean sizable audience
16   competitor?
17        A    Yeah, as you build audience or traffic to
18   your website, it makes you more relevant and
19   meaningful.  So physicians then compete --
20        Q    Health Grades sued MDx two days after they
21   purchased Ucompare, right?
22        A    I don't know.
23        Q    Let me show you what I will mark as
24   Exhibit -- what's next?
25        MR. VAZQUEZ:  57.

Page 291

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2         Q    (BY MR. STIMPSON) -- 57, a copy of the
3    Complaint in the action.
4         (Exhibit 57 marked.)
5         Q    (BY MR. STIMPSON)  Have you seen this
6    document before, Mr. Neal?
7         A    I do not recall seeing this document
8    before.
9         Q    Now, you can see at the top it has a court
10   stamp, and it says filed 3/2/11.
11        Do you see that?
12        A    I do.
13        Q    Can you confirm for me, then, this action
14   was filed two days after Vitals purchased Ucompare?
15        A    That's what it looks like.
16        Q    Thank you.
17        Does Health Grades sell licensing --
18   license its data to third parties?
19        A    We have limited licensing agreements with
20   some entities.
21        Q    Okay.  Who have you licensed with?
22        A    It's not what I do.  I don't know what
23   those relationships are.  It's beyond my scope.
24        Q    Is licensing data to third parties in any
25   way connected to your patent application, your

Page 292

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    patent, your '060 patent?
3         A    I would have to defer to counsel.  But as
4    contemplated when we filed it, I don't recall data
5    licensing being a part of the discussion.
6         Q    Okay.  If you could -- let's see what I've
7    got here for you.  I might be winding down.  I'm sure
8    it will break your heart.
9         Do you know what the Vitals comScore rank
10   is?
11        A    I do not know what their comScore rank is.
12        Q    Do you know ballpark what it is?
13        A    There are multiple ways that you rank
14   companies on comScore.  So they are all Internet
15   sites.  There are healthcare sites.  There are
16   subsets of the healthcare industry vertical, and all
17   of those rankings are different.
18        Q    In 2009, Vitals page views per user and
19   time on the site stats were better than Health
20   Grades', right?
21        A    I don't know.
22        MR. STIMPSON:  Could I have this marked,
23   please?
24        Q    (BY MR. STIMPSON)  Mr. Neal, some doctors
25   show up on the Vitals website that do not show up on

Page 293

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Health Grades' website, right?
3         A    I don't know.
4         Q    Have you ever seen information on that?
5         A    No.
6         (Exhibit 58 marked.)
7         Q    (BY MR. STIMPSON)  I'll show you a
8    two-page document bearing Bates number HG 0051701
9    through 02.  This e-mail was forwarded to you by
10   Kerry Hicks May 11, 2009?
11        A    Yes.
12        Q    And prepared and kept in the ordinary
13   course of business?
14        A    I believe so.
15        Q    As of this time, May 2009, Vitals'
16   comScore rank was number 28.
17        Do you see that?
18        A    I do.
19        Q    And the last, I guess, bullet point there,
20   it starts, Interestingly, according to Alexa -- are
21   you with me?
22        A    Yeah.
23        Q    -- their page views per user and time on
24   the site stats are better than ours.
25        Did I read that correctly?

Veritext/NJ Reporting Company

800-227-8440

EXHIBIT H

973-410-4040

Attorneys' Eyes Only

Page 294

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  A    That's what it says.
3  Q    Does that refresh your recollection that
4  as of this time Vitals actually had stats on page use
5  per user and time on the site that was better than
6  Health Grades?
7  A    I wouldn't rely on Alexa for that type of
8  information. Scott Shapiro is not an Internet guy.
9  Q    Pardon me?
10 A    The guy that originated this e-mail and
11 used Alexa is the source of that data. It's not --
12 Q    What is Alexa?
13 A    At that point in time, it was a website
14 that tracked various web properties' traffic and also
15 consumer or user behavior on those websites.
16 Q    Did you have any data at the time that
17 Health Grades page used per user and time on sites
18 were better than Vitals?
19 A    I don't recall ever looking at that kind
20 of a comparison.
21 Q    You can see Scott Shapiro says that he
22 thinks this is perhaps due to the easy to use search
23 box Vitals has on their home page.
24      Do you see that?
25 A    I do.

Page 295

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  Q    Okay. So at least Mr. Shapiro at Health
3  Grades was thinking that Vitals had a better and
4  easier to use search box than Health Grades at the
5  time, right?
6      MR. VAZQUEZ: Form.
7  A    I don't know what Mr. Shapiro was
8  suggesting.
9  Q    (BY MR. STIMPSON) Well, he says here
10 that, Perhaps due to the easy to use search box they
11 have on their home page, right? And he's suggesting
12 that that's why they may have better stats.
13 A    That seems to be what he's suggesting.
14 Q    And he also says that Health Grades is
15 working to improve theirs, right?
16 A    I'm not sure what the data is that he's
17 referring to.
18 Q    Well, that refers to the search box,
19 right?
20 A    The bullet point is about page use per
21 user and time on site. I think -- my interpretation
22 was that was the parenthetical reference, not a
23 search box on the site.
24 Q    So the way you read this Mr. Shapiro
25 doesn't think that Vitals has any better search box

Page 296

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  than Health Grades does, right?
3      MR. VAZQUEZ: Form.
4  A    I don't know what he's saying about
5  comparison of the search box. The point is the data
6  that he looks at suggests we're working on that
7  time on the site. He suggests we're working on that
8  as a product team but not sure, you know, where we
9  are in rolling out items to address that.
10 Q    (BY MR. STIMPSON) Did you ask Mr. Shapiro
11 what he meant by this?
12 A    No, I'm just interpreting what I am
13 reading.
14 Q    So you don't interpret this as meaning
15 that Health Grades is trying to improve their search
16 box? I just want to make sure we're clear on that.
17 A    I don't -- I don't know. I don't know.
18 Q    So you just don't know?
19 A    No, I interpreted this language exactly
20 the way that I just told you. What Mr. Shapiro was
21 suggesting, I'm uncertain of.
22 Q    Okay.
23      MR. STIMPSON: Let's get this one, David,
24 okay?
25      (Exhibit 59 marked.)

Page 297

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2  Q    (BY MR. STIMPSON) Let me have marked as
3  Exhibit 59 a multipage document bearing Bates number
4  HG 0035818 to 20.
5  A    Okay.
6  Q    So Dave Hicks is sending you an e-mail
7  September 15, 2010?
8  A    Yes.
9  Q    With the results of accuracy checks?
10 A    Yes.
11 Q    Prepared and kept in the ordinary course
12 of business?
13 A    I believe so.
14 Q    Now, and you see that generally accuracy
15 was improving from January to May 2010?
16 A    Yes.
17 Q    Do you know why that was?
18 A    I believe so.
19 Q    Why was it?
20 A    Well, just as we do today, we're
21 continually enhancing and improving the quality of
22 the data that appears on our website.
23 Q    So how were you improving it so much in
24 five months? Four months, from January to May?
25      Like, for example, look at language

75 (Pages 294 - 297)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 298

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  accuracy. Sample size was 266 and you had an
2  accuracy of 76.89 percent.
3  Q    And then it jumped 20 percent by May. Why

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  accuracy. Sample size was 266 and you had an
2  accuracy of 76.89 percent.
3     A    Um-hum.
4     Q    And then it jumped 20 percent by May. Why
5  was that?
6     A    A simple explanation would be that we just
7  switched the data providers from that information,
8  and the data provider that we relied on was more
9  accurate. But I don't know for certain.
10    Q    Okay. Is it fair to say as of
11 January 2010, Health Grades had some accuracy issues
12 in some of its data?
13    MR. VAZQUEZ:  Form.
14    A    Data accuracy is a challenge for all
15 Internet websites.
16    Q    (BY MR. STIMPSON) So is the answer yes?
17    A    I would say we were very focused on
18 enhancing the accuracy and improving the accuracy of
19 our data.
20    MR. STIMPSON:  Can you read back my
21 question to the witness, please?
22    A    In answer to your question, no, it wasn't
23 a challenge. We were focused on increasing and
24 enhancing the accuracy of the data.

Page 299

CONFIDENTIAL - ATTORNEYS EYES ONLY
1     MR. STIMPSON:  That wasn't my question.
2  Just read it back. So move to strike all the prior
3  answers as nonresponsive.
4     (Record read as requested.)
5     A    I would say that there was definitely a
6  need to improve the accuracy, just as there is today.
7  The objective is 100 percent accuracy.
8     MR. STIMPSON:  Let me have marked as a
9  multipage document Exhibit, whatever it is. Is it 60
10 now? Multipage document HG 0082817. Wait a second.
11 I think this may be -- I'm sorry, this is 82817 to
12 830.
13    (Exhibit 60 marked.)
14    A    Is there anything specifically you would
15 like me to focus on here?
16    Q    (BY MR. STIMPSON) Yeah, I'm just going to
17 talk to you about the e-mail chain, the first four
18 pages. I'll have some specific questions for you.
19 But you can just confirm for me this is -- the top
20 one is an e-mail from yourself to Kerry Hicks, Dave
21 Hicks, Allen Dodge and Sarah Loughran?
22    A    Yes.
23    Q    Copy, Steve Wood?
24    A    Yes.

Page 300

CONFIDENTIAL - ATTORNEYS EYES ONLY
1     Q    And this is about Target Lists, right?
2     A    That's correct.
3     Q    And Target Lists was a company that Health
4  Grades was considering purchasing?
5     A    That we were evaluating for consideration.
6     Q    For purchase?
7     A    Correct.
8     Q    If you look to the second page an e-mail
9  from Steve Wood to you, March 16, 2008. He's
10 suggesting, he says, Re:  The rating feedback you
11 requested, absent further information but with a
12 benefit of some additional search on their sites I
13 would do following:  Up Xoova.com or at least rip off
14 some of the ways they're presenting information.
15    Did I read that correctly?
16    A    That's what this document says.
17    Q    Did you respond to him and say anything
18 about that statement?
19    A    Not to my knowledge.
20    Q    So did, in fact, Health Grades rip off
21 Xoova.com?
22    MR. VAZQUEZ:  Object to form. Misstates
23 testimony.
24    A    My belief is that we didn't -- I don't

Page 301

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  even recall exactly what Xoova.com does.
2     Q    (BY MR. STIMPSON)  Well, certainly Steve
3  Wood was suggesting that you steal information from a
4  competitor, right?
5     MR. VAZQUEZ:  Form.
6     A    I don't know what Steve was thinking.
7     Q    (BY MR. STIMPSON)  Well, that's what it
8  says, right?  It says, Or at least rip off some of
9  the ways they're presenting the information.
10    Did I read that correctly?
11    A    That's what the document says.
12    Q    And there is no other way to read it, is
13 there?  I mean, he's telling you that you should
14 steal from a competitor.
15    MR. VAZQUEZ:  Form.
16    Q    (BY MR. STIMPSON)  Right?
17    A    I don't know what rip-off means. I don't
18 know necessarily that that means steal.
19    Q    You really don't know what rip-off means?
20    A    Taken some way, I believe is Webster's
21 definition.
22    Q    Okay. Stealing would be a synonym, right?
23    A    A synonym but not necessarily the
24 definition.

76 (Pages 298 - 301)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 302

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    MR. VAZQUEZ: Form.
3    Q   (BY MR. STIMPSON) So there is no e-mail
4  here from you, Mr. Neal -- in fact, there is an
5  e-mail from you, and you don't say anything about his
6  suggestion that you rip off from a competitor, right?
7    A   No.
8    Q   Why didn't you tell him, hey, look, we
9  don't steal from competitors?
10    A   I have more important things to deal with
11  than spurious comments from employees.
12    Q   Was it a big deal that he was suggesting
13  you steal from a competitor?
14    MR. VAZQUEZ: Form.
15    A   Steve had no authority in this, so it
16  didn't matter.
17    Q   (BY MR. STIMPSON) It wasn't a big deal to
18  you, then, that one of the employees of Health Grades
19  was expressly suggesting that Health Grades steal
20  something from a competitor?
21    MR. VAZQUEZ: Object to form. Misstates
22  the testimony.
23    A   I'm uncomfortable with the language that
24  was used.
25    Q   (BY MR. STIMPSON) Okay.

Page 303

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    A   I'm not at all comfortable with that.
3    Q   Okay. So it wasn't a big deal for you
4  that Health Grades' employee was suggesting that
5  Health Grades rip off from a competitor?
6    MR. VAZQUEZ: Object to form. Misstates
7  the testimony. He just said he was uncomfortable.
8    MR. STIMPSON: No, no, no, Jesus, you're
9  not testifying.
10    MR. VAZQUEZ: Yeah, well --
11    Q   (BY MR. STIMPSON) Go ahead.
12    A   I just said I was uncomfortable.
13    Q   (BY MR. STIMPSON) Okay. Well, you said
14  you were uncomfortable with the word steal. Now I'm
15  using the language that you --
16    A   No, I said --
17    THE DEPONENT: Can you read back what I
18  said, please?
19    (Record read as requested.)
20    Q   So here is my question, Mr. Neal. This
21  employee of Health Grades, Steve Wood, sending you
22  personally an e-mail telling you, Hey, we should rip
23  off something from Xoova, right? I've got that
24  right, correct?
25    A   That's what the e-mail says.

Page 304

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    Q   You send him a response. It doesn't say
3  anything about whether that's right or wrong. You
4  don't even mention it, correct?
5    A   I didn't respond to Steve Wood at all in
6  an e-mail.
7    Q   But you did read it, and then you did
8  respond and you copied Steve Wood, right?
9    A   I wasn't responding. It was an
10  intermediate e-mail from Kerry Hicks, and I was
11  copied on that. That's what I was responding to.
12    Q   This is my question, Mr. Neal. Did it
13  bother you in any way an employee of Health Grades is
14  writing to you personally and saying, hey, look,
15  let's rip off from Xoova and get money?
16    MR. VAZQUEZ: Object to form. Asked and
17  answered.
18    Q   (BY MR. STIMPSON) Did it bother you?
19    A   I was very uncomfortable with the language
20  that was used, and I would not permit that.
21    Q   (BY MR. STIMPSON) What did you say to
22  him?
23    A   I can't recall what my conversation with
24  Steve may have been, but it's not reflected in the
25  e-mail because I didn't respond to his message in the

Page 305

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  e-mail.
3    Q   So he certainly thought, when he wrote to
4  you, that you wouldn't have any objection with
5  ripping off something from a competitor, right?
6    MR. VAZQUEZ: Object to form.
7    A   Sorry. Can you restate the question?
8    Q   (BY MR. STIMPSON) He didn't think you
9  would have any objection to this? You know Steve
10  Wood, right?
11    A   I do know Steve, yes.
12    Q   As of March 2008, you had known him for
13  how long?
14    A   Maybe -- maybe one to two years.
15    Q   So you had worked with Steve Wood before,
16  right?
17    A   On a very limited basis.
18    Q   But he knew you and he knew you were,
19  what, a vice president of Health Grades at the time?
20    A   No, I wasn't -- I wasn't a vice president
21  at this time.
22    Q   It's fair to say, though, Mr. Neal, that
23  Steve Wood didn't see any problem in suggesting to
24  you that Health Grades rip off something from a
25  competitor, right?

77 (Pages 302 - 305)

**EXHIBIT H**
973-410-4040

Attorneys' Eyes Only

Page 306

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    MR. VAZQUEZ: Object to form. Misstates
2    the testimony.
3    A    I don't condone the comment, nor that type
4    of activity.
5    Q    (BY MR. STIMPSON) That wasn't quite my
6    question.
7    MR. STIMPSON: Can you read it back,
8    please?
9    (Record read as requested.)
10    A    Yeah, Steve forwarded an e-mail in the
11    form that it is, and I'm not comfortable with it.
12    Q    (BY MR. STIMPSON) With what?
13    A    With the language that was used.
14    Q    With his language?
15    A    Nor with any activity that relates in some
16    way to taking or stealing information.
17    Q    Okay. Kerry Hicks was the CEO, right?
18    A    Yes.
19    Q    Kerry Hicks sent on this same message to
20    you -- I mean sent to Dave Hicks, Allen Dodge, Sarah
21    Loughran, copying you and Steve Wood, right?
22    A    Yes.
23    Q    So he read this, right?
24    A    He did.
25

Page 307

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q    Do you see anything in Mr. Hicks' e-mail
2    telling Steve Wood, hey, look, don't be crazy. We
3    could never rip off anything from a competitor?
4    MR. VAZQUEZ: Object to form.
5    A    No, there's nothing in the e-mail.
6    Q    (BY MR. STIMPSON) When did you first
7    think that Vitals was, as you put it, copying things
8    from Health Grades' website?
9    A    From the first time I looked at their
10    website. I don't recall the exact date, but then I
11    would check back periodically. We had other people
12    in the company that were keeping an eye on it.
13    And just consistently when I saw it, it
14    was remarkable. We would launch something, an
15    enhancement, and soon thereafter, which typically
16    represented a development cycle, we would see a
17    comparable enhancement on Vitals.
18    MR. STIMPSON: Strike everything after
19    consistently, including that, as nonresponsive.
20    Q    (BY MR. STIMPSON) As of the time of this
21    e-mail, you knew about Vitals, right?
22    A    This e-mail? 2008?
23    Q    Right.
24    A    I don't recall.
25

Page 308

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q    Well, you can see Vitals is listed on the
2    acquisition possibilities, right, on page HG 0082821?
3    A    21, okay. Vitals, yes. Steve.
4    Q    So at least as of that time you thought
5    that they were trying to copy Health Grades?
6    A    Yes.
7    Q    Okay. So look down on that same page,
8    please, where it says MDNationwide.org.
9    Do you see that at the bottom, third row?
10    A    Yes.
11    Q    It refers to -- it's referred to there as
12    a Health Grades copycat; is that right?
13    A    Yes.
14    Q    And right below that,
15    HealthCareReviews.com.
16    Do you see that?
17    A    Oh, right beneath it?
18    Q    Yeah.
19    A    Okay.
20    Q    And what's the comment for
21    HealthCareReviews.com?
22    A    HG copycat.
23    Q    Okay. Health Grades copycat, right?
24    A    Yes.
25

Page 309

CONFIDENTIAL - ATTORNEYS EYES ONLY

1    Q    Okay. There is no comment besides Vitals
2    saying it's a copycat, right?
3    A    No.
4    Q    Did you tell anybody, hey, wait a second,
5    if you're going to call these other guys copycats,
6    Vitals is out their copying us, too? Did you tell
7    them in response to this?
8    MR. VAZQUEZ: Form.
9    A    Vitals were unique. It would have rated
10    an A or a B.
11    MR. STIMPSON: That wasn't quite my
12    question. Move to strike as nonresponsive.
13    Q    (BY MR. STIMPSON) Did you tell anybody
14    when you got this, hey, Vitals is a copycat, too?
15    A    I'm sure I had that conversation with
16    others.
17    Q    Oh, you did, when you got this? You
18    remember that?
19    A    It's not in the document. I said I had
20    the conversation with others.
21    Q    Okay. So when you got this, your
22    testimony now is that you contacted somebody and
23    said, hey, Vitals is a copycat, too, in response to
24    this? Is that your testimony?
25

78 (Pages 306 - 309)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

Page 310

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     A   What's your question?
 3         MR. VAZQUEZ:  You know, don't ask another
 4  question while he's trying to think about answering
 5  the previous question.
 6         MR. STIMPSON:  He asked me what the
 7  question was.
 8         MR. VAZQUEZ:  I know.  You asked him quite
 9  a few questions machine gun style.  Just do one
10  question and give him a chance to answer.
11     Q   (BY MR. STIMPSON)  Here's the question.
12  Tell me if I misunderstood your testimony.  I thought
13  you said that when you got this you then contacted
14  somebody and said, hey, look Vitals should be a
15  copycat, too.
16         Did you do that?
17     A   I didn't say that.
18     Q   Did you do that?
19     A   No.
20     Q   And then under Vitals, it says
21  findadoc.com.
22     A   Um-hum.
23     Q   Do you see that?
24     A   I do.
25     Q   And it says that's redundant?
```

Page 311

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     A   It does, yeah.
 3     Q   What did you understand that to mean?
 4     A   It means non unique.
 5     Q   Right.  So it has the same basic stuff as
 6  Health Grades does, right?
 7     A   Right.
 8     Q   Okay.  And doctorsscore.com, same thing?
 9  The comment was it was redundant?
10     A   Yes.
11     Q   Was Vitals classified as redundant?
12     A   No, not in this document.
13     Q   Let's see what we have left here.
14         MR. VAZQUEZ:  Scott, at 5 o'clock I need
15  to grab a phone call.
16         MR. STIMPSON:  Okay.
17         MR. VAZQUEZ:  So can we take a little
18  break right now and let me get to my office and grab
19  that call?
20         MR. STIMPSON:  Actually, I won't have much
21  after that.  In fact, we've got that draft if you
22  want to look at it.
23         MR. VAZQUEZ:  You can just e-mail it to me
24  and I'll be able to look at it.  I won't be able to
25  get back to you until I hear back from the client.
```

Page 312

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2         MR. STIMPSON:  Okay.
 3         MR. VAZQUEZ:  This phone call is unrelated
 4  to this case.
 5         MR. STIMPSON:  That's fine.  Sure.  So
 6  just let us know when you're done, okay?
 7         MR. VAZQUEZ:  Okay.  I suggest we take a
 8  break now.
 9         MR. STIMPSON:  All right.
10         (Recess taken from 4:53 p.m. to 5:08 p.m.)
11         (Exhibit 61 marked.)
12     Q   (BY MR. STIMPSON)  I'm going to show you
13  what's been marked as Exhibit 61.  It's Health Grades
14  0053581.  This is a series of e-mails on
15  February 11, 2009, for which you are included; right,
16  Mr. Neal?
17     A   I am.
18     Q   Prepared and kept in the ordinary course
19  of business?
20     A   I believe so.
21     Q   The original e-mail is from you about
22  Vitals.com hospital ratings.  It says, Do you have
23  any idea where Vitals is getting this info?
24  Medicare?  They don't provide attribution on their
25  site.
```

Page 313

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2         Did I read that correctly?
 3     A   Yes.
 4     Q   And this is the hospital rates we talked
 5  about earlier where you told me that you thought that
 6  they were copying something from Health Grades,
 7  right?
 8     A   They weren't copying our hospital ratings.
 9     Q   And then it says -- you have an e-mail
10  there 10:04 a.m. to Dave Hicks.  They appear to be
11  getting a decent enhanced profile capture rate.  They
12  provide good messaging, I guess, a direct phone
13  number for physicians.
14         Did I read that correctly?
15     A   Yes, that's what it says.
16     Q   Some stuff Vitals was doing well was
17  helping them in the marketplace, right?
18     A   Yes.
19     Q   And Mr. Hicks e-mailed you and said that
20  they have a much better user interface than Health
21  Grades, right?
22         MR. VAZQUEZ:  Form.
23     A   That's what it says.
24     Q   (BY MR. STIMPSON)  Okay.  Did you ever
25  e-mail -- did you agree with that?
```

79 (Pages 310 - 313)

EXHIBIT H

Attorneys' Eyes Only

Page 314

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    A    I don't know.
3    Q    Pardon me?
4    A    No.
5    Q    No, you didn't?
6    A    No.
7    Q    Did you e-mail them back and say, hey,
8    look, that's crazy, we've got a better user rate?
9    A    I don't think I responded to that. I
10   don't respond to every e-mail that is sent to me.
11   Q    Dave Hicks is an inventor on the '060
12   patent, right?
13   A    He is.
14   Q    So we can at least say that Mr. Hicks
15   thought that Vitals had a better user interface than
16   Health Grades, right?
17   A    That's what this suggests, yes.
18   Q    And user interface is one factor that goes
19   into how people use sites and how frequently they use
20   sites, right?
21   A    It is.
22       MR. STIMPSON: Do we have anything else,
23   David?
24       (Discussion off the record.)
25   Q    (BY MR. STIMPSON) Let me just ask you a

Page 315

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    few quick questions, Mr. Neal. Has Health Grades
3    received royalties for licensing patents?
4    A    Not that I'm aware of.
5    Q    Has Health Grades paid royalties for
6    licensing patents?
7    A    Not that I'm aware of.
8    Q    Does Health Grades have an established
9    policy on licensing patents?
10   A    Not that I'm aware of.
11   Q    To your knowledge, does the Health
12   Grades -- the Health Grades products and services
13   that fall under this patent, do they help promote
14   sales of any other products and services of Health
15   Grades?
16       MR. VAZQUEZ: Form.
17   A    I'm not sure how to interpret that
18   question. Can you be more specific?
19   Q    (BY MR. STIMPSON) Sure. Well, you
20   testified earlier today about products and services
21   of Health Grades that fall under the patent-in-suit?
22       Do you remember?
23   A    Yes.
24   Q    Do those products and services help
25   promote so that Health Grades can sell any other

Page 316

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    products and services, that you know of?
3        MR. VAZQUEZ: Form. I just object. It
4    calls for expert testimony.
5        But answer if you know, Mr. Neal.
6    A    I don't know that there is a direct
7    relationship between the services and products
8    related to the '060 patent and other products. It
9    would be indirect.
10   Q    (BY MR. STIMPSON) Are you aware of any
11   customs in the industry about royalties?
12   A    I am not.
13       MR. VAZQUEZ: Same objection as the
14   previous one.
15       But answer it. I guess he did.
16       MR. STIMPSON: Okay. Anything else? No,
17   that's it. Nothing further.
18       MR. VAZQUEZ: I just have two follow-up
19   questions, Mr. Neal.
20           EXAMINATION
21   BY MR. VAZQUEZ:
22   Q    Do you recall earlier Mr. Stimpson asked
23   you some questions about -- I believe the exact word
24   he used was -- watching your competitors?
25   A    I do.

Page 317

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2    Q    Do you remember he asked you whether it
3    was okay to do that, and I believe you testified,
4    sure, it's okay to do that?
5    A    Yes.
6    Q    And do you believe that it's okay to copy
7    your competitors?
8        MR. STIMPSON: Objection. Calls for
9    opinion testimony.
10   A    No, I don't. I don't believe that's right
11   to copy competitors.
12   Q    (BY MR. VAZQUEZ) When you answered
13   Mr. Stimpson's question about watching, you were
14   simply answering in the context of the words he was
15   using, was watching but not copying, correct?
16       MR. STIMPSON: Objection. Leading. Calls
17   for opinion testimony.
18   A    That's correct.
19   Q    (BY MR. VAZQUEZ) All right. Just one
20   final question. Mr. Neal, did you intend to deceive
21   the Patent and Trademark Office in connection with
22   the prosecution of the '060 patent?
23   A    No.
24   Q    Did you intend to defraud the Patent and
25   Trademark Office in connection with the prosecution

80 (Pages 314 - 317)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

**Page 318**

```
1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  of the '060 patent?
3     A    No.
4        MR. VAZQUEZ:  And that's all I have.
5        MR. STIMPSON:  Okay.  Thanks.
6        MR. VAZQUEZ:  Thanks for your time.
7        (Proceedings concluded at 5:16 p.m.)
8
9           * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 320**

```
1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  STATE OF COLORADO )
3               )  ss.   REPORTER'S CERTIFICATE
4  COUNTY OF DENVER )
5        I, Kelly A. Mackereth, do hereby certify
6  that I am a Registered Professional Reporter and
7  Notary Public within the State of Colorado; that
8  previous to the commencement of the examination, the
9  deponent was duly sworn to testify to the truth.
10        I further certify that this deposition was
11  taken in shorthand by me at the time and place herein
12  set forth, that it was thereafter reduced to
13  typewritten form, and that the foregoing constitutes
14  a true and correct transcript.
15        I further certify that I am not related to,
16  employed by, nor of counsel for any of the parties or
17  attorneys herein, nor otherwise interested in the
18  result of the within action.
19        In witness whereof, I have affixed my
20  signature and seal this 18th day of June, 2012.
21        My commission expires April 21, 2015.
22
23        _____
          Kelly A. Mackereth, CRR, RPR, CLT
24        216 - 16th Street, Suite 650
          Denver, Colorado  80202
25
```

**Page 319**

```
1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        I, JOHN NEAL, do hereby certify that I have
3  read the foregoing transcript and that the same and
4  accompanying amendment sheets, if any, constitute a
5  true and complete record of my testimony.
6
7
8
          _____
9         Signature of Deponent
          ( ) No Amendments
10        ( ) Amendments Attached
11        Subscribed and sworn to before me this
12  _____ day of _____, 2012.
13
14        Notary Public: _____
15        Address: _____
16        _____
17        My commission expires _____
18        Seal:
19
20
21  KAM
22
23
24
25
```

**Page 321**

```
1        ERRATA SHEET
         VERITEXT/NEW JERSEY REPORTING COMPANY
2          800-227-8440
         ASSIGNMENT NO. NJ399592
3  CASE NAME: Health Grades Inc v. MDX Medical Inc dba Vitals.com
         DATE OF DEPOSITION: June 13, 2012
4  WITNESS' NAME: John Neal
5  PAGE/LINE(S)/  CHANGE      REASON
6  _____/_____/_____/_____
7  _____/_____/_____/_____
8  _____/_____/_____/_____
9  _____/_____/_____/_____
10 _____/_____/_____/_____
11 _____/_____/_____/_____
12 _____/_____/_____/_____
13 _____/_____/_____/_____
14 _____/_____/_____/_____
15 _____/_____/_____/_____
16 _____/_____/_____/_____
17 _____/_____/_____/_____
18 _____/_____/_____/_____
19 _____/_____/_____/_____
20        _____
          John Neal
21
   SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS_____DAY
   OF_____, 2012.
23
24   NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____
```

81 (Pages 318 - 321)

EXHIBIT H
973-410-4040

Attorneys' Eyes Only

**[& - 2006]**                                                                Page 1

| & |
| --- |
| **&**  2:3,9,14 135:16 135:23 136:4 167:3 |

| **0** |
| --- |
| **00**  272:19 |
| **0032062**  111:17 113:7 237:5 |
| **0035818**  297:4 |
| **0051701**  293:8 |
| **0051789**  285:12 |
| **0051899**  272:19 |
| **00520**  1:4 |
| **0052138**  279:16 |
| **0053581**  312:14 |
| **0082817**  299:11 |
| **0082821**  308:3 |
| **0179518**  215:12 |
| **0179531**  221:2 |
| **0179548**  231:16 |
| **02**  293:9 |
| **0207384**  237:11 |
| **0207395**  238:19 248:6 |
| **0207397**  249:3 |
| **0209008**  173:17 |
| **0209010**  173:17 |
| **0209051**  255:7 |
| **022179**  212:20 |
| **022569**  179:8 |
| **022572**  186:19 |
| **05**  223:24,25 224:23 |
| **060**  29:15 30:24 31:8 129:20 132:8 136:19 138:25 144:24 149:18 152:7 156:13 181:15 185:20 252:8 257:8,12,21 264:16 265:7,11,19 267:18 287:5 292:2 314:11 316:8 317:22 318:2 |
| **098307**  165:7 |

| **1** |
| --- |
| **1**  38:14 41:9,10,13 119:21 158:23 170:23 254:11,16 258:20 261:5 |
| **1/19/05**  4:17 |
| **10**  5:15 249:25 250:3 |
| **100**  12:8 178:20 299:8 |
| **100,000**  12:5 |
| **10112**  2:16 |
| **103**  5:16 |
| **1050**  2:4 |
| **108**  5:15 |
| **10:04**  313:10 |
| **10:13**  93:22 |
| **10:30**  93:23 |
| **11**  1:4 173:21 205:10 293:10 312:15 |
| **117**  232:12 233:5,13 233:16,21 |
| **12**  4:5 5:16 91:2 267:11 |
| **1200**  2:10 3:6 |
| **12:12**  187:14 |
| **12:37**  287:21 |
| **13**  1:10 3:5 5:14 279:20 321:3 |
| **149**  236:11 |
| **15**  169:19 233:14,16 297:7 |
| **157**  5:17 |
| **16**  168:25 212:23 214:12 300:10 |
| **164**  4:9 |
| **166**  4:10 |
| **168**  5:19 |
| **16th**  320:24 |
| **17**  99:16 186:23 224:10 |
| **173**  4:12 |

| **179**  4:13 |
| --- |
| **179533**  221:13 |
| **179535**  222:8 223:6 227:8 |
| **179537**  224:10 |
| **179550**  236:20 |
| **17th**  2:4 |
| **18,000**  234:23 235:3 235:6 |
| **18th**  320:20 |
| **19**  237:18 273:3 |
| **1950**  2:4 |
| **1991**  51:13 |
| **1994**  8:7 |
| **1995**  9:5 24:14 218:15 |
| **1996**  9:3,5 |
| **1999**  23:6,19 158:21 158:22 159:8 |
| **19th**  274:20 |
| **1:13**  187:15 |

| **2** |
| --- |
| **2**  119:24 161:11 170:23 250:7 251:21 258:18 |
| **2,300**  183:4 |
| **2/16/05**  4:14 |
| **20**  5:16 103:21 110:13 247:12,20 254:11,12,13 297:4 298:5 |
| **200,000**  10:5 12:10 |
| **2000**  23:6,19 25:5,9 31:17 |
| **2001**  25:4 |
| **2002**  22:21 27:15 |
| **2003**  25:9 27:15 43:15,17 99:16 100:24 105:11,11 110:16,24 111:12 159:17 212:2 |
| **2004**  34:24 43:15,17 97:24 108:10 110:11 112:24 |

| 113:10,14 114:16 116:10,25 131:5 132:2,17 135:16,23 139:7,16 140:6,16 140:23 141:3,7,12 141:17 142:9 147:2 150:10 151:5 152:15 154:9,16 155:4,10 156:12 158:3,9,14 159:17 159:24 161:14 162:8,11,23 164:9 164:15 165:21 166:5,25 167:14 168:25 169:16,19 171:5 172:15 173:21 174:10,25 176:3,9,21 178:19 178:23 179:16,20 183:25 187:5 205:10 210:4 255:2 |
| --- |
| **2005**  32:10 34:24 48:11 72:7 97:24 124:7 125:8,10,16 131:6 132:2 135:17 135:23 164:9,15 171:5 175:25 212:23 213:10,13 214:2,12,23 215:21 216:10 222:10,21 223:2 229:25 230:14 232:12,24 233:3 237:18 247:9 248:10,22 250:7 256:2 257:14 |
| **2006**  28:8 32:10 33:4 35:3,9 36:12 36:18,22 38:5,7 41:16 42:3,9,12 43:8 48:8,10 51:10 52:18 62:3,5 98:2 99:3 118:12 127:21 127:23 128:3 157:8 158:13,18 260:4,14 260:25 261:14,17 |

**EXHIBIT H**

Attorneys' Eyes Only

[2006 - 8]

262:2,9,15 263:3
264:11 266:20
**2007**   31:17 62:3,5
98:3 127:23 128:3
157:8 158:13,18
**2008**   204:3,15
300:10 305:12
307:23
**2009**   72:11 92:13,15
92:20,22 204:4,16
271:12 273:3
274:20 292:18
293:10,15 312:15
**2010**   24:11 64:7
87:17 92:22 266:20
271:13 279:20
297:7,15 298:12
**2011**   16:12,22 17:3
86:3 87:18,19 89:19
89:22,25 90:4,7
91:2 93:10 285:17
285:22
**2012**   1:10 3:5 89:22
89:25 90:4,7 93:11
198:22 199:9,21
319:12 320:20
321:3,22
**2015**   320:21
**205**   5:18
**208987**   100:19,20
159:14
**208992**   101:20
**209**   5:18
**21**   5:17 99:9 159:12
159:15,22 174:14
216:12 308:4
320:21
**212**   4:14
**212.643.7000**   2:17
**212.653.6500**   2:17
**215**   4:16
**216**   320:24
**237**   4:17
**249**   5:15

**25**   5:17 10:16
157:12,14 210:4
**255**   4:19
**26**   5:18 148:10
205:6
**266**   298:2
**267**   5:16
**269**   5:14
**27**   5:18 209:9 210:3
**272**   4:21
**279**   4:22
**28**   285:17 293:16
**284**   4:24
**28th**   110:24 113:10
285:22
**29**   5:19 36:22 41:16
42:3,12 167:23
168:11,15 260:4,14
260:25 261:14,17
262:9 263:3 264:11
**291**   5:4
**293**   5:6
**296**   5:7
**299**   5:8
**29th**   43:8 51:10
52:18 262:2
**2:05**   231:14
**2:20**   216:12
**2:27**   231:14

**3**

**3**   5:14 13:3 29:15
57:16 170:23
181:19 254:7
261:11,12
**3,000**   183:3
**3/17/08**   5:8
**3/2/11**   291:10
**3/24/05**   4:19
**30**   1:6 2:16 3:3 4:7
12:24 33:19 68:16
75:14 108:9 118:17
147:11
**300,000**   12:9,12

**3000**   2:10 3:7
**303.357.1670**   2:5
**303.357.1671**   2:6
**303.623.9000**   2:11
**303.623.9222**   2:12
**312**   5:10
**316**   3:15
**32036**   108:11
**32062**   110:5,6
115:10 125:21
**32064**   128:23
**32067**   128:17
**32073**   126:18
141:22,23 150:22
**32075**   120:5
**325**   165:7
**372**   236:13
**38**   4:7
**398**   237:12
**3:15**   269:13

**4**

**4**   5:14 158:3 170:23
181:19 269:17
**4/15/2004**   4:9
**43**   235:7,9,14
**44**   4:5 6:9 12:22
**45**   4:7 6:9 12:23
38:9 258:16
**46**   4:9 164:24,25
165:6
**47**   4:10 166:17,18
168:16
**48**   4:12 173:13,14
173:16 175:7,8
178:18 231:21
**49**   4:13 175:5 179:4
179:5,7 185:22,25
**4:02**   269:13
**4:18**   257:16
**4:53**   312:10

**5**

**5**   170:23 181:18
311:14

**50**   4:14 65:21,22
66:2,2 212:17,19
**50,000**   159:25
160:13,23 162:17
**51**   4:16 215:9,11
231:19 252:6
**52**   4:17 237:13
255:7
**53**   4:19 255:6,8
**54**   4:21 161:23
272:16,18
**55**   4:22 279:14,18
**550**   215:12
**56**   4:24 284:9
285:11
**57**   5:4 290:25 291:2
291:4
**572**   186:21
**574**   179:8
**58**   5:6 293:6
**59**   5:7 296:25 297:3
**5:08**   312:10
**5:16**   318:7

**6**

**6**   1:6 3:3,14 4:7
12:24 68:16 75:14
108:9 118:17
161:21
**60**   5:8 299:10,14
**61**   5:10 312:11,13
**613**   236:11
**650**   320:24
**656**   236:12

**7**

**70**   276:18
**75**   10:17
**76.89**   298:3

**8**

**8**   5:15 108:15,23
109:5 110:20
111:12,16 221:2
237:3 273:10
274:25

**EXHIBIT H**

Attorneys' Eyes Only

**[80 - ancillary]**

**80**   212:20
**800-227-8440**   321:2
**80202**   320:24
**80202-5855**   2:11
**80265**   2:5
**82817**   299:12
**830**   299:13
**87**   7:21
**8:22**   3:6

**9**

**9**   261:8
**9.95**   247:12,21
**90**   7:22
**92**   7:23 285:12
**94**   7:24
**95**   20:23
**96**   20:22,23 24:14
**99**   5:17
**9:11**   56:14
**9:34**   56:15
**9:50**   285:24

**a**

**a.d.a.m.**   90:12
**a.m.**   3:6 56:14,15
  93:22,23 285:24
  313:10
**aarp.org**   90:6
**ability**   40:6 79:18
  136:3 193:18 196:8
  229:20 264:12
  268:10
**able**   72:15 140:6
  192:17 213:17
  226:25 278:9
  281:24 311:24,24
**abms**   227:20,21
**absent**   207:12
  300:12
**absolutely**   51:12
  56:3 74:21 77:7
  84:24 102:22
  114:10 115:22
  116:17 137:24
  181:20,22 182:25

**191**:15 196:7
  198:20 226:13
  263:4,12 278:24
**abstract**   149:23,24
  152:10
**absurd**   51:16
**acceptable**   52:13
**access**   37:24 105:25
  106:6 114:23 140:7
  175:17 221:15
  273:16,18 281:24
  282:19
**accessed**   103:15
**accessible**   94:8
  129:16 132:12
**accompanying**
  319:4
**account**   170:9
**accuracy**   297:9,14
  298:2,3,12,15,19,19
  298:25 299:7,8
**accurate**   40:21
  45:19 64:6 121:6
  150:17 206:2,3
  273:12,13 298:10
**accuse**   180:22
**accused**   64:8
**acquired**   23:17
  275:11 285:17
  286:3
**acquirers**   289:19
**acquisition**   23:18
  308:3
**acquisitions**   26:17
**acronym**   124:13
  256:21
**acronyms**   36:6 71:9
**action**   47:5 287:24
  288:7,8,16,24 291:3
  291:13 320:18
**actions**   190:6
  228:11 264:20,24
  266:25
**activities**   167:7

**activity**   73:23 74:13
  75:6 306:5,16
**actual**   213:18
  251:16 270:11
**add**   7:22 107:15
**added**   238:10
  250:13 251:3
**addendum**   37:20
**adding**   250:7,8
**additional**   37:23,25
  121:2 122:6 204:21
  207:15 209:12
  300:13
**address**   121:23
  175:19 189:22
  190:4 296:9 319:15
**addressed**   122:20
**addressee**   256:2
**addressing**   18:15
**adjustment**   121:9
**administrator**   226:3
**admit**   102:5,8
**ads**   70:13
**advantage**   67:3
  221:16
**advent**   92:21
**advertises**   70:24
**advertising**   67:7
  69:25 70:13 72:25
**advising**   286:2
**affiliate**   70:20
  120:24
**affiliated**   73:5
  102:10
**affiliations**   102:9
**affinity**   69:3,8,11
**affixed**   320:19
**age**   125:18 141:9,10
  223:7 276:11
**agents**   25:14,18 26:3
  27:3,12
**ago**   24:11 44:16
  146:20 196:20
  225:8 282:13

**agree**   46:6 78:9
  148:7 157:18 176:8
  178:5,11,12,14
  245:15,16 289:7,8
  289:12 313:25
**agreeing**   175:11
**agreement**   77:15
  194:19
**agreements**   220:2
  291:19
**ahead**   34:4 59:11,13
  147:22 156:16
  303:11
**al**   4:20 5:9
**alan**   258:4
**albert**   287:8
**alexa**   293:20 294:7
  294:11,12
**allege**   91:21
**alleged**   205:2
**allen**   256:16 285:25
  299:22 306:21
**allow**   23:24 139:22
  185:5 198:9
**allowed**   63:5 64:12
  139:16 253:15
**allowing**   75:13
**allows**   54:22
**alpert**   287:9,14
  290:6
**alphabet**   36:6 71:9
**alter**   122:5
**altered**   16:24
**ama**   90:24
**amendment**   319:4
**amendments**   319:9
  319:10
**american**   227:15
**amount**   124:20
**analysis**   11:25 15:21
  16:2 33:8 195:20
**analyzer**   8:6
**analyzing**   45:9
**ancillary**   57:23

EXHIBIT H

Attorneys' Eyes Only

**andrea** 285:25
**andy** 29:7,10
**annoy** 147:25
**answer** 6:17,21 19:7
33:15 34:21 39:18
40:5 43:12 44:6,11
48:16 49:10,20
52:19,23 53:6,15
54:3,23 55:5 60:21
64:25 68:19 77:6,9
92:2 96:17 101:25
109:16 113:22
115:16 116:3 123:7
136:2 138:20 140:2
144:3,5,21 145:12
145:24 146:2,13
148:3 150:15
156:16,20,25 157:2
157:3,4,23 160:4,6
177:19,21 178:9
184:13,17,23,23,24
185:3,5 186:4,6,7,8
186:17 199:6
208:13,21,22 209:4
243:21 254:18
263:19 268:9
281:17 288:22
298:17,23 310:10
316:5,15
**answered** 42:2
44:16 123:6 143:18
143:24 145:22
146:10 148:4
208:11 304:17
317:12
**answering** 145:25
310:4 317:14
**answers** 114:5
158:10 159:25
160:22 259:17
299:4
**anybody** 28:19,20
309:5,14
**anyway** 63:10
126:24 127:9

194:15 243:22
284:8
**aol** 91:10
**apart** 254:24
**apologize** 127:16
**appear** 68:10 174:7
190:20,21 221:11
229:2 249:6 313:10
**appearance** 186:12
**appearances** 2:2
**appeared** 203:24
213:23
**appearing** 2:7,13,18
**appears** 112:10
213:3 242:8 286:9
297:22
**application** 13:13
29:15 30:23 31:8
114:11 129:19
133:5,23 134:16
135:15 136:17
137:19,20 138:2,6
138:16,24,25
140:21 143:7,14
144:24 145:2
146:21 150:4,5
169:15 252:8
257:13 266:10,11
266:16 291:25
**applied** 234:7
**applies** 139:10
**apply** 138:7 217:10
**appointment** 72:18
235:7,9,11,15
**appointments**
126:20 223:17
**appreciate** 195:2
**appreciates** 195:3
**approach** 62:19
**approached** 281:25
**appropriate** 26:7
160:7
**appropriately** 26:7
**approximately** 9:5
16:12 65:21

**april** 99:16 100:24
217:13,20,25
320:21
**architected** 192:9
**area** 92:19 105:16
151:15 168:5
191:22
**areas** 154:4 227:25
**arguing** 243:18
**argumentative**
52:22 143:24
145:22
**art** 129:23 131:18
133:15,16,24,25
134:18,24 135:5
183:25 184:6
259:25 260:6,10,16
260:18,19 261:12
261:21 262:5,10
267:21 268:4,13,15
268:17,18,21 269:2
270:5
**asked** 101:14 115:6
123:6 143:18,23
145:21 185:14
197:22 201:13
208:21 253:2 282:5
304:16 310:6,8
316:22 317:2
**asking** 6:16 12:3
20:12 34:6 51:22,25
55:2 58:11 76:10
86:21 99:24 103:9
103:18 111:10
116:7,8 125:11
138:17,21 140:17
140:22 143:18
165:25 166:2
176:18 180:10,19
184:9 185:25 194:8
194:10 195:22
197:16,17 198:21
212:8 230:15,16
240:12 241:24
243:3,16 244:21

246:15,18,20
256:19 258:8 260:9
261:23 262:4,6
265:25 280:24
289:8
**asks** 182:17
**aspect** 163:23
**aspects** 164:13
188:13
**assess** 92:4
**assessment** 180:8
287:19
**assets** 23:16,21
**assign** 182:5
**assigned** 34:12
40:14 151:23,24
152:3 212:15
250:24 251:12,18
**assigning** 186:13
**assignment** 321:2
**assist** 32:20 280:25
**assistance** 219:8
**assistant** 225:18
226:15
**assistants** 225:21
226:20
**associate** 8:21
**associated** 10:11
46:15 78:5 80:17
107:3
**associates** 167:4
225:17
**assume** 49:20 65:25
114:21 122:10
170:3 208:3,5,7,10
208:14 238:12
248:17 288:7,9
**assumed** 11:5
**assumption** 166:12
214:16 288:14
**attached** 108:13
169:9 218:21 219:2
258:3,10 319:10
**attaching** 237:16

EXHIBIT H

Attorneys' Eyes Only

**[attachment - back]**

**attachment** 5:9
219:16
**attachments** 4:16,18
**attempted** 264:13
**attempts** 56:22
191:9 283:4
**attended** 7:8,11
**attention** 6:23
216:22
**attesting** 150:4
**attorney** 19:6 54:6
77:5 84:25 112:11
138:9 140:14
156:15 197:25
**attorneys** 1:1 2:1
3:1 4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1,3 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
54:15,16 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
92:4 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1

115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1,6 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,12 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1,4
195:1 196:1 197:1,5
198:1 199:1 200:1
201:1,21 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1,6
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1

248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1,3 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1,17
**attract** 56:22 64:12
**attracted** 66:3
**attracting** 70:8,22
**attribution** 312:24
**audience** 64:12 66:3
82:2 290:9,15,17
**august** 35:3 36:22
38:5 41:16 42:3,12
43:8 51:10 52:18
118:12 168:25
250:7 251:21 260:4
260:14,25 261:14
261:17 262:2,9
263:3 264:11
**authority** 302:15
**authorize** 186:25
**automated** 213:16
**availability** 175:23
**available** 15:22
28:21 35:4,10 38:3

38:7 42:24 43:3
45:25 46:25 47:4,6
47:25 55:13 80:23
97:8 100:12 101:5
101:10,12 103:8
106:2 110:8,10,23
111:19 115:13
116:24 128:20,22
129:14 139:21
156:8 166:13
172:17 200:2 204:3
206:15,16 213:25
214:3,14 220:22
222:9,19,23 223:2
230:13 232:23
233:2 246:5,22
254:25 280:21
**averaging** 178:20
**avoid** 186:12
**awards** 126:11,14
126:17,19 223:15
225:24
**aware** 15:12,22
16:10,13,21 17:3,6
17:11 19:11 31:25
38:24 39:2 67:20
70:19 88:6 89:23
92:7,23 98:5,10,12
131:21,22,23
164:11 177:8
209:19 262:23
274:10 315:4,7,10
316:10
**awareness** 67:4

**b**

**b** 1:6,15 3:3 4:7
12:24 68:16 75:14
104:24,25 108:9
118:17 309:11
**back** 7:14 12:15
17:4 18:10,17 20:19
25:8 41:10 54:20
56:10 57:13 65:16
67:10,15 68:21 77:2

EXHIBIT H