Civil Action No. 11-CV-00520-PAB-BNB

**HEALTH GRADES, INC.'S OPPOSITION TO MDx MEDICAL, INC.'S MOTION FOR SUMMARY JUDGMENT OF NO INFRINGEMENT WITH REGARD TO AMENDED COMPLAINT AND ALLEGATIONS RELATING TO AETNA LIFE INSURANCE COMPANY**

**Exhibit 17**

**Excerpts from Deposition of Philip Greenspun**

```
                                                              Page 1
 1   Volume I                                    Pages 1 - 292
 2                                               Exhibits 64 - 71
 3              UNITED STATES DISTRICT COURT
 4                  DISTRICT OF COLORADO
 5               Civil Action No. 11-CV-00520-PAB-BNB
 6   ***********************************
 7   HEALTH GRADES, INC.,                      *
 8        Plaintiff,                           *
 9   Vs.                                       *
10   MDX MEDICAL, INC., d/b/a VITALS.COM,      *
11        Defendant.                           *
12   ***************************************
13
14           DEPOSITION of PHILIP G. GREENSPUN
15           Friday, September 28, 2012 at 8:30 a.m.
16           Courtyard by Marriott
17           700 Unicorn Park Drive
18           Woburn, Massachusetts
19
20      ------ Jacqueline P. Shields, RPR, CSR ------
21
22
23
24        Job No. NJ1339308
```

```
                                                         Page 2

 1    APPEARANCES:

 2

 3    Representing the Plaintiff:

 4         ROTHGERBER JOHNSON & LYONS LLP

 5         BY:  KRIS J. KOSTOLANSKY, Esquire

 6         One Tabor Center, Suite 3000

 7         Denver, Colorado 80202-5855

 8         303-623-9000 ~ Fax: 303-623-9222

 9         kkosto@rothgerber.com

10              - and -

11         MERCHANT & GOULD

12         BY:  KIRSTIN L. STOLL-DeBELL, Esquire

13         1050 17th Street, Suite 1950

14         Denver, Colorado 80265

15         303-357-1670 ~ Fax: 303-357-1671

16         kstolldebell@merchant-gould.com

17

18    Representing the Defendant:

19         SILLS CUMMIS & GROSS

20         BY:  SCOTT D. STIMPSON, Esquire

21         30 Rockefeller Plaza

22         New York, New York 10112

23         212-643-7000 ~ Fax: 212-653-6500

24         sstimpson@sillscummis.com
```

Page 267

1  comparing it to other doctors?
2          MR. KOSTOLANSKY:  Object to the form.  Lack
3  of foundation.
4      A.  Yes, there's probably some risk there as
5  well.
6      Q.  So what I'm trying to get at, Doctor, how
7  do you quantify the difference?  How do you
8  distinguish between the fear of upsetting a
9  physician because he got a bad patient rating and
10 the fear of upsetting the physician because you're
11 putting ten other doctors with him?  I mean, do you
12 have any evidence quantifying that distinction?
13         MR. KOSTOLANSKY:  Objection.  Compound.
14     A.  No, I don't know of a way to quantify that.
15         MR. STIMPSON:  All right.  Off the record
16 for two minutes.
17         (Recess was taken at 5:20 p.m.)
18         (Reconvened at 5:24 p.m.)
19         MR. STIMPSON:  I'm done.
20                 CROSS EXAMINATION
21 BY MR. KOSTOLANSKY:
22     Q.  Mr. Greenspun, let me hand you, if I can
23 from the court reporter's pile, Exhibit 64.
24         MR. STIMPSON:  His rebuttal report?

Page 268

1  MR. KOSTOLANSKY: I think that's his initial
2  report.
3  MR. STIMPSON: Let me grab mine, please.
4  MR. KOSTOLANSKY: Let me have all those
5  exhibits over here.
6  Q. I'm going to refer you, Mr. Greenspun, to
7  page 30 of your report, subpart D under paragraph
8  111.
9  A. Okay.
10  Q. "Wherein healthcare provider-verified
11  information is received from the first healthcare
12  provider," do you see that reference?
13  A. Yes.
14  Q. And what is your understanding about how
15  individuals who are registered or affiliated with
16  Vitals' or MDX's website submit information about
17  themselves to the website?
18  A. The physicians are able to log -- register,
19  log in, authenticate themselves using their license
20  number, I believe, and then they're able to edit
21  substantially all of the information in their
22  profile. And in some cases that's done with Web
23  forms where you add information fresh from a blank
24  field, and in some cases that's done where a Web

Page 269

1  form is sent from the server down to the browser
2  with fields already partly filled out.  The
3  physician can edit none, one, or all of those
4  fields, and hit the submit button and the
5  information goes back to the server, some of which
6  has been edited or newly typed by the physician,
7  some of which the server already had.
8       Q.  And when that information is submitted by
9  the physician back to Vitals in connection with
10 fields that were already completed on the Web form,
11 is that information then received from the
12 healthcare provider?
13      A.  Yes, it was viewed on the healthcare
14 provider's browser, the healthcare provider hit the
15 submit button, it was packaged up by the healthcare
16 provider's browser program and submitted by the HTTP
17 protocol to the VITALS.COM server.
18      Q.  Have you seen a physician actually submit
19 such information to the Vitals website?
20      A.  I have.  I have been sent screen shots made
21 by friends of mine who are physicians.  I haven't
22 actually stood over their shoulders while they used
23 the site.
24           I might add that this is a completely

Page 270

1  conventional way of engineering.  Any kind of
2  website where users are able to edit information,
3  you send them a form that's partly filled out and
4  they can resubmit it back to the server with
5  changes.
6      Q.  And so looking at paragraph 128 then of
7  your report where you reference you "understand that
8  many more physicians have registered with VITALS.COM
9  and viewed their profiles without changing any
10 information."  So your example is a situation in
11 which a physician registered and submitted
12 information to Vitals?
13         MR. STIMPSON:  Objection.  Leading.
14      Q.  Is that accurate?
15         MR. STIMPSON:  Objection.  Leading.
16      A.  The example that I just gave is a physician
17 who at least desired, at least, to change one piece
18 of information and therefore got an editing form.
19      Q.  And that editing form would typically
20 repeat a significant amount of the information that
21 was already on the Vitals website?
22         MR. STIMPSON:  Objection.  Leading.
23      A.  Yes, the forms would come filled out with
24 information that was already on the Vitals site or

Page 271

1  in the Vitals database and, you know, there might be
2  four or five elements, for example, and then the
3  physician typed in a fifth one, all five would be
4  submitted back to the server at the same time,
5  including the four fields that were already known to
6  Vitals and were not being changed.
7            Paragraph 128 was really directed at
8  physicians who logged in, perhaps they want to check
9  and see what patients are saying about them, they
10 may view their profiles and not even go down that
11 path.  So I'm assuming, based on my experience as a
12 Web publisher, that some people will come to the
13 site and register without taking any further action,
14 or at least not taking any action with regard to
15 their profiles, assuming the information was
16 correct.
17       Q.  Now, you mentioned that Vitals has a data
18 quality group, or some words to that effect; is that
19 right?
20       A.  Well, that's based only on my attendance at
21 Mr. West's deposition.  I don't have any independent
22 information about that.
23       Q.  What is the purpose of data quality groups
24 in companies that utilize websites?