# EXHIBIT A

(Redacted version of Dkt. # 516-1)

CONFIDENTIAL - ATTORNEYS EYES ONLY

1

CONFIDENTIAL - ATTORNEYS EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 11-CV-00520-PAB-BNB

------------------------------------------------

DEPOSITION OF DAVID HALL

October 4, 2012

------------------------------------------------

HEALTH GRADES, INC.,

Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,

Defendant.

------------------------------------------------

Job No. NJ1339309

EXHIBIT 1

CONFIDENTIAL - ATTORNEYS EYES ONLY

**2**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2 APPEARANCES:
3 ROTHGERBER JOHNSON & LYONS LLP
      By Jesus Manuel Vazquez Jr., Esq.
4       1200 Seventeenth Street
        Suite 3000
5       Denver, CO 80202-5855
        Phone: 303.623.9000
6       Fax: 303.623.9222
        jvazquez@rothgerber.com
7       Appearing on behalf of the
        Plaintiff
8
      SILLS CUMMIS & GROSS, PC
9       By Scott D. Stimpson, Esq.
        30 Rockefeller Plaza
10      New York, NY 10112
        Phone: 212.643.7000
11      Fax: 212.653.6500
        sstimpson@sillscummis.com
12      Appearing on behalf of the
        Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

CONFIDENTIAL - ATTORNEYS EYES ONLY
INDEX OF EXHIBITS

1
2
3                        INITIAL
4 DESCRIPTION              REFERENCE
5
  Exhibit 75  7/13/12 David A. Hall report      6
6
  Exhibit 75A David A. Hall - Appendix A (CV)   6
7
  Exhibit 75B David A. Hall Appendix B         13
8     (Testimony - Last four Years)
9 Exhibit 75C David A. Hall Appendix C (Facts  28
    and Data Considered)
10
  Exhibit 76  Attachment 3a - Napper Market    10
11    Share Analysis
12 Exhibit 77  Attachment 4 - Napper Market     10
    Share Data
13
  Exhibit 78  Attachment 13b - Vitals' 2010    30
14    Projections with and without
      Royalty Payments
15
  Exhibit 79  Attachment 16 - Market Share     30
16    Analysis
17 Exhibit 80  Attachment 5 - Variable Expense  46
      Analysis
18
  Exhibit 81  Attachment 1 - HG Departmental   76
19    Income Statements
20 Exhibit 82  Attachment 3a - Market Share     184
    Analysis
21
  Exhibit 83  Copy of John Neal's deposition   189
22    transcript
23 Exhibit 84  Best Quality Healthcare license  223
    agreement
24
25

**3**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2      Pursuant to Notice and the Federal Rules of
3 Civil Procedure, the Deposition of David Hall, called
4 by Defendant, was taken on Thursday, October 4, 2012,
5 commencing at 8:32 a.m., at 1200 Seventeenth Street,
6 Suite 3000, Denver, Colorado, before Kelly A.
7 Mackereth, Certified Shorthand Reporter, Registered
8 Professional Reporter, Certified Realtime Reporter
9 and Notary Public within Colorado.
10

11              * * * * * * *

              I N D E X
12
13 EXAMINATION                   PAGE
14    EXAMINATION                  6
      BY MR. STIMPSON
15    EXAMINATION                 308
      BY MR. VAZQUEZ
16    FURTHER EXAMINATION         312
      BY MR. STIMPSON
17
18 PRODUCTION REQUEST(S):
19    None.
20
21
22
23
24
25

**5**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2
                        INITIAL
3 DESCRIPTION              REFERENCE
4
5 Exhibit 85  E-mail string and DrTango, Inc.  233
      License agreement
6
7 Exhibit 86  List Management Agreement        245
      between Kroll Direct Marketing,
      Inc. And MDx Medical, Inc.
8
9 Exhibit 87  Attachment 7a - MDX Medical,     248
      Inc. Base Plan
10 Exhibit 88  9/17/12 Brian W. Napper report  290
11
12 PREVIOUSLY MARKED EXHIBITS
13
  Exhibit 13  Health Grades, Inc. printout re  127
14    Dr. Drucker
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL - ATTORNEYS EYES ONLY

**6**

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2            * * * * * * *
 3        P R O C E E D I N G S
 4            DAVID HALL,
 5   having been first duly sworn, was examined and
 6   testified as follows:
 7            (Exhibits 75 and 75A marked.)
 8            EXAMINATION
 9   BY MR. STIMPSON:
10     Q   Good morning, Mr. Hall.
11     A   Good morning.
12     Q   I'm Scott Stimpson. I'm going to be
13   taking your deposition today. You've had your
14   deposition taken many times, I'm sure?
15     A   Yes.
16     Q   How many times have you been deposed
17   before?
18     A   I don't know the exact number. Probably
19   more than a couple of dozen.
20     Q   Okay. So I'll be asking -- you know how
21   this works, but I'll be asking you questions. If
22   there's anything that you don't understand, just let
23   me know and I'll try to clarify it for you, okay?
24     A   Yes.
25     Q   Did you get a chance to -- so you've --
```

**7**

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2   I've put in front of you your report, Exhibit 75.
 3   That's without the exhibits and attachments. We'll
 4   do those separately, just to try to cut back on some
 5   amount of the paper.
 6        That's your report you prepared for Health
 7   Grades?
 8     A   Yes, it's one of my reports.
 9     Q   Oh, right, I'm sorry, you had two.
10        And did you get a chance to read
11   Mr. Napper's report?
12     A   Yes.
13     Q   Brian Napper's report?
14     A   Yes.
15     Q   Do you know Mr. Napper, or know of
16   Mr. Napper?
17     A   I don't know Mr. Napper.
18     Q   Do you know of him?
19     A   I've heard his name.
20     Q   Okay. In what connection?
21     A   I don't recall. It may have been with
22   former colleagues of mine in San Francisco, but I
23   don't recall the context.
24     Q   Okay. So you read his report thoroughly?
25     A   Yes, I did.
```

**8**

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2     Q   Okay. Were there any facts in there that
 3   you did not know when you prepared the report,
 4   Exhibit 75?
 5        MR. VAZQUEZ: Objection. Form.
 6     A   I don't recall. I would want to look at
 7   his report again. Nothing jumped out. But I don't
 8   recall. There may have been, but I don't recall.
 9     Q   (BY MR. STIMPSON) Okay. Well, we'll get
10   a chance to look at it a little bit later today.
11        Does Mr. Napper's report impact on your
12   damages analysis at all in the sense that you might
13   want to revise something?
14        MR. VAZQUEZ: Form.
15     A   No, though I did look with interest at all
16   of it and that included his market share information,
17   which I ran a sensitivity analysis on my damages
18   model with his market share information.
19     Q   (BY MR. STIMPSON) Okay.
20     A   But I did not change -- it's not causing
21   me to change my opinion.
22     Q   Okay. So it's not causing you to change
23   your opinion as to competitors in the market?
24     A   It is not.
25     Q   And what kind of sensitivity analysis did
```

**9**

```
 1        CONFIDENTIAL - ATTORNEYS EYES ONLY
 2   you run?
 3     A   Using Mr. Napper's market share
 4   information for Health Grades and Vitals, I used that
 5   in my attachment 3a and attachment 4 to see what the
 6   damages would yield from using his market share
 7   information.
 8     Q   And how did that change the results, if at
 9   all?
10     A   It barely changed them. They may have
11   gone up 20, $25,000.
12     Q   Do you mean the damages went up about
13   $25,000?
14     A   Correct.
15     Q   So using his additional competitors, it
16   increased your damages by $25,000?
17     A   Using the market share information, yes,
18   that he describes in his report, did increase damages
19   or would increase damages if you used those, by about
20   20 or $25,000, is my recollection. I prepared a
21   schedule.
22     Q   Do you have it with you?
23     A   Yes.
24     Q   Can I take a look?
25     A   (Tendered.)
```

3 (Pages 6 to 9)

CONFIDENTIAL - ATTORNEYS EYES ONLY

## 10

CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    Thank you. So this is new, is what you're
3 showing me right now, right? These documents,
4 entitled attachment 3a, Napper Market Share Analysis
5 and attachment 4, Napper Market Share Data.
6      Do you see that?
7    A    Yes, they are new from the subsequent
8 reports and obviously after Mr. Napper's report was
9 provided to me and I read it.
10      MR. STIMPSON: Let's have 3a, Napper
11 Market Share Data (sic) marked as Exhibit 76, and
12 attachment 4, Napper Market Share Data marked as
13 Exhibit 77.
14      (Exhibits 76 and 77 marked.)
15      MR. STIMPSON: I'm going to get to those
16 later. Jesus, can I get these PDF'd to me, please?
17      MR. VAZQUEZ: Do you mean right now?
18      MR. STIMPSON: Yeah.
19      MR. VAZQUEZ: Let's take a break and I
20 will be happy to ask her. Can you just whatever --
21      MR. VAZQUEZ: I'll give it to her.
22      MR. STIMPSON: Okay. That's fine. Let's
23 just take a quick break, okay?
24      MR. VAZQUEZ: Off the record?
25      MR. STIMPSON: Yeah.

## 11

CONFIDENTIAL - ATTORNEYS EYES ONLY
2      (Recess taken from 8:37 a.m. to 8:38 a.m.)
3    Q    (BY MR. STIMPSON) Back on the record.
4 So Mr. Hall, have you worked for the
5 Rothgerber firm before?
6    A    Yes.
7    Q    How many times?
8    A    I'm recalling three times right now.
9    Q    Okay. Are any of those patent cases?
10    A    No.
11    Q    And who specifically did you work for,
12 Mr. Kostolansky?
13    A    I have not worked with him before.
14    Q    Did you work with anyone on the current
15 team?
16    A    I've worked with Mr. Vazquez one other
17 time, and Mr. Kanan one other time.
18    Q    Okay. Do you have any history with Health
19 Grades?
20    A    No.
21    Q    Did you ever hear of Health Grades before
22 this?
23    A    I have.
24    Q    Had you been on the -- well, actually,
25 their name was on a building here in Denver. I don't

## 12

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 know how you would miss that, right. Had you ever
3 been to Health Grades' website before this case?
4    A    If I have, I don't recall being there.
5    Q    Okay. How many patent cases have you been
6 hired for, for damages analyses?
7    A    I would estimate approximately ten.
8    Q    Okay. And how many of those have you
9 actually done damages analyses in the form of expert
10 reports?
11    A    The same answer. I either authored or
12 assisted an author in the ten estimate I provided.
13    Q    So some of those ten, you weren't the lead
14 damages expert?
15    A    That's correct.
16    Q    Okay. And how many times have you been
17 hired as a lead damages expert in the patent cases?
18    A    Seven or eight times is my recollection.
19    Q    Okay. When was the last time, besides
20 this case, of course?
21    A    Is my appendix B attached here? I have it
22 here, if I can reference it.
23    Q    You can look at it. Actually, why don't I
24 just mark it. It will be easier, okay?
25    A    Sure.

## 13

CONFIDENTIAL - ATTORNEYS EYES ONLY
2      MR. STIMPSON: I'll mark as Exhibit 75B a
3 copy of appendix B to Mr. Hall's report.
4      (Exhibit 75B marked.)
5    A    The last time I provided testimony that
6 was on a patent damages case was November of 2011,
7 which is National Oilwell Varco versus Pason Systems.
8      I believe earlier in that year --
9    Q    (BY MR. STIMPSON) I'm sorry, just let me
10 stop you there for a second. When you say testimony,
11 you mean trial testimony, deposition testimony,
12 expert testimony?
13    A    Expert trial damages testimony.
14    Q    Okay. What was -- can you identify any
15 others? Actually, I'm looking for not just trial
16 testimony, but anytime you've given -- you were the
17 lead expert to give a report on damages in patent
18 cases.
19    A    The prior year, I provided deposition
20 testimony related to my expert report on damages in
21 the Riezler matter.
22    Q    Where is that, the second page?
23    A    It is, second from top.
24    Q    Okay. All right. Actually, Omni National
25 Oilwell, were you for plaintiff or defendant? Patent

CONFIDENTIAL - ATTORNEYS EYES ONLY

### 14

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   holder or patent defendant?
3      A   Patent holder, plaintiff.
4      Q   And how about in the Riezler case?
5      A   A co-inventor of a patent related to -- so
6   it was a co-patent holder, along with the defendants.
7      Q   I'm sorry, I don't understand.  Was he the
8   patent -- was he asserting the patent in that case,
9   your client?
10     A   Yes.
11     Q   Okay.  And why did you say along with the
12  defendants?
13     A   There was a dispute related to lost
14  profits generated by the patented features of the
15  vitamin formula.
16     Q   But I'm not sure why you've mentioned,
17  along with the defendants.  Did you represent any of
18  the defendants in that case?
19     A   No.
20     Q   Oh, okay.  So you only represented the
21  patent co-owner, and the question was how much the
22  damages were to the patent plaintiff?
23     A   Co-inventor, correct.
24     Q   All right.
25     A   I don't recall if he owned it still, but I

### 15

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   know co-inventor.  But he may have.
3      Q   Okay.  What's your next one?
4      A   In 2010, also in Canada, Canadian dispute
5   related to the Canadian companies of Varco and Pason.
6      Q   Where is that?  Is that the second from
7   the bottom on page 2?
8      A   No, that was another trial testimony for
9   Varco.  Let me look for the one I'm referring to now.
10  Oh, first page, four up from the bottom.
11     Q   Okay.  So that was testimony under
12  Canadian law, right?
13     A   Correct.
14     Q   And it was trial?
15     A   Yes.
16     Q   And who did you represent?
17     A   Varco Canada Limited.
18     Q   Plaintiff, the patent holder?
19     A   Correct.
20     Q   Okay.  Any others?
21     A   Yes.  I issued a report for a Houston
22  company.  The name is escaping me right now.
23  Defending -- on the defense side of a patent dispute
24  related to Case running equipment on drilling rigs.
25  It's not on the list.  It settled after my report was

### 16

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   submitted, or after the reports were submitted.  I'm
3   not recalling the name of the company.  It's a
4   Houston oil and gas company.
5      Q   So in the last four years, is it fair to
6   say you've given testimony in three patent cases?
7      A   I believe that's right, but let me check.
8          Yes, and a number of trade secrets.  But I
9   believe it's three patent cases.
10     Q   Okay.  And the first one, National Oilwell
11  Varco?
12     A   Yes.
13     Q   Were you proposing lost profits and
14  reasonable royalty like you are here?
15     A   Yes, I provided opinions on both measures
16  of damage.
17     Q   And was it your opinion that the plaintiff
18  was entitled to lost profits?
19     A   It was.
20     Q   And did the plaintiff get lost profits?
21     A   Yes.
22     Q   And did the plaintiff get as much lost
23  profits as you were seeking?
24     A   Yes.
25     Q   And that was a trial court decision in --

### 17

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A   Jury decision in 2008 followed by a bench
3   decision for post trial infringement, which the trial
4   was in 2011.  The opinion from the judge came in the
5   spring of 2012.
6      Q   Okay.  And then your second one, second
7   page, is Riezler?
8      A   Yes.
9      Q   Again, were you seeking both lost profits
10  and reasonable royalty?
11     A   Just lost profits is my recollection.
12     Q   For a co-inventor?
13     A   Yes.
14     Q   And did you get lost profits?
15     A   It was the basis for the settlement.
16  There was not an adjudication or a trial decision.
17     Q   Okay.  Have you had your testimony
18  challenged under Daubert before?
19     A   Yes.
20     Q   Okay.  And how many times?
21     A   Half a dozen is my recollection.
22     Q   Any times in patent cases?
23     A   No.
24     Q   Were any of those Daubert challenges
25  successful in any part?

5 (Pages 14 to 17)

CONFIDENTIAL - ATTORNEYS EYES ONLY

## 18

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A   No.
3    Q   Okay.  Just one second.  Have you ever
4  testified regarding damages with regard to websites?
5    MR. VAZQUEZ:  Form.
6    A   No.  I've been involved in matters,
7  consulting matters where websites were part of the
8  business model, but not the specific measure of
9  damages.
10    Q   (BY MR. STIMPSON)  Let's take a look at
11  your resume, which is attached as Exhibit 75A.
12    A   Okay.
13    Q   Why don't you put that over there because
14  it's 75B, but that's not what we're talking about
15  now.
16    So your education, University of Texas at
17  Austin, you got a master's in business
18  administration?
19    A   Yes.
20    Q   You're not an accountant, are you then,
21  Mr. Hall?
22    A   Yes, I'm a certified management
23  accountant.
24    Q   Certified management accountant.  Are you
25  a CPA?

## 19

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A   I am not.
3    Q   And what was your undergraduate degree in?
4    A   It was a bachelor of arts degree from the
5  School of LS & A, as it's termed at University of
6  Michigan, which is the literature, science and arts
7  school within the university.
8    Q   Okay.  And there was nothing there -- that
9  wasn't really focused on damages or any kind of
10  auditing or anything like that, that undergraduate
11  degree, was it?
12    MR. VAZQUEZ:  Form.
13    A   Damages classes?
14    Q   (BY MR. STIMPSON)  Let me rephrase it.
15  Was there anything in that degree that was focused on
16  any kind of auditing or damages analyses or anything
17  that might help you in your career now as a damages
18  expert?
19    MR. VAZQUEZ:  Form.
20    A   Yes, there was.
21    Q   (BY MR. STIMPSON)  And what was that?
22    A   Accounting course, as well as economics
23  course, as well as, I would say the broad curriculum
24  I had aided me in my professional life.
25    Q   And in your professional experience there,

## 20

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  do you see that?
3    A   Yes.
4    Q   You started out with Peterson Consulting.
5  What was that?
6    A   That's a consulting firm I hired off
7  campus from the University of Texas to, in 1988, that
8  provided business and litigation consulting services.
9    Q   When did you graduate from University of
10  Michigan?
11    A   1985.
12    Q   Okay.  And you graduated from -- got your
13  MBA in what year?
14    A   1988.
15    Q   Okay.  And then you got hired by Peterson
16  Consulting?
17    A   Yes.
18    Q   Okay.  And why did you leave that company?
19    A   The group that I had worked with at
20  Peterson Consulting branched off from Peterson
21  Consulting, led by Alan Peterson and Abe Tucker,
22  which formed Tucker Alan, Inc. in 1994.  And those
23  were the -- that group that had branched off was a
24  group I had worked with, so I decide to join them in
25  1994.

## 21

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q   So when you were at Peterson Consulting,
3  what were your job responsibilities?
4    A   Over the six years I was there, they grew
5  over time, but began with financial and accounting
6  analyses of client situations or client matters that
7  could involve other companies as well.  That ranged
8  from compliance consulting for defense contractors
9  related to material management and accounting
10  systems, as well as damages assistance for a variety
11  of matters, including intellectual property,
12  construction and other commercial damages, would be a
13  broad description.
14    I also assisted government contractors
15  with damage claims, both putting forth damage claims
16  as well as evaluating damage claims and termination
17  claims as they contracted with both the government
18  and other companies.
19    Q   Okay.  And then Tucker Alan, how, if at
20  all, did your responsibilities change?
21    A   Over the ten years I was at Tucker Alan,
22  they continued with what I just described at Peterson
23  Consulting, but expanded.  And in 1997 I was made a
24  vice president, which is a partner level position at
25  Tucker Alan.

6 (Pages 18 to 21)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

22

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2      And in 1994 I became head of the Denver
3  office when Tucker Alan started. So I had continued
4  client duties, as well as then administrative
5  leadership duties in Denver in coordination with the
6  rest of the firm.
7      And in 2000, I believe I first provided
8  expert testimony for clients, so I continued the
9  business and litigation consulting work I had done
10  prior but expanded in both the areas I consulted in
11  and the types of clients.
12    Q    Okay. And then you went from Tucker Alan
13  to Navigant Consulting in 2004. Why was that move
14  made?
15    A    Well, all of Tucker Alan, Inc., all or
16  substantially all, is my recollection, became part of
17  Navigant Consulting, Inc., a public company, in a
18  transaction in 2004.
19    Q    Okay. And so did your business, did your
20  responsibilities continue to be basically the same
21  after that?
22    A    I think that's a fair description, yes.
23    Q    Okay. And then in 2008 you moved to
24  Alvarez & Marsal. Am I pronouncing that right?
25    A    Marsal, M-A-R-S-A-L, Marsal. I did.

---

23

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    And why did you move there?
3    A    I had an opportunity with a firm that,
4  what I learned about impressed me greatly, and
5  decided to transition from Navigant Consulting to
6  Alvarez & Marsal in early 2008.
7    Q    Any other reasons?
8    A    I viewed Alvarez & Marsal as a great
9  opportunity for me. So that goes along with what I
10  said, as far as being impressed with the firm.
11    Q    Okay. But were there any other reasons
12  besides being impressed with Alvarez & Marsal that
13  promulgated your move?
14    A    Not that I can recall.
15    Q    So here is an important question. I see
16  your Michigan ring, and I see you earned an athletic
17  scholarship. What was that?
18    A    I attended Michigan on a football
19  scholarship.
20    Q    Oh, really.
21    A    But also participated in track for four
22  years while I was there.
23    Q    What position did you play in football?
24    A    Quarterback.
25    Q    Oh, my goodness. That's big time

---

24

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  football, right?
3    A    It is. It was fun and interesting.
4    Q    So on page 2 of your resume, you have
5  selected industry experience, right?
6    A    Yes.
7    Q    Nowhere listed there is anything about
8  websites, right?
9    A    Not specifically, but there are companies
10  listed there where websites were involved in their
11  business model or analysis, our analysis.
12    Q    Before this case, have you ever been hired
13  to do a damages analysis for competitors whose
14  primary business was websites?
15    A    I'm not recalling a time.
16    Q    On page 3 of your resume, lectures and
17  seminars, am I correct there's been only one on
18  anything to do with patent damages?
19    A    Yes.
20    Q    Okay. And when was that?
21    A    The Rocky Mountain Intellectual Property
22  and Technology Institute, where I presented on patent
23  damage issues here in Denver.
24    Q    When was that?
25    A    2009 is my recollection, four or five

---

25

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  years ago.
3    Q    Were there any papers you submitted in
4  connection with that?
5    A    Yes. The co-presenter and I submitted, I
6  believe written material, certainly a PowerPoint
7  presentation, is my recollection.
8    Q    Okay. On page 7 under intellectual
9  property and trade secrets, the third paragraph says
10  you provided expert witness damages testimony, the
11  amount of lost profits and reasonable royalty in a
12  patent dispute related to automatic driller.
13    A    Yes.
14    Q    Are those the cases we talked about here
15  in appendix B or is that something else?
16    A    That's within the cases we talked about.
17    Q    Okay. So if we can go back to Exhibit 75,
18  which is your report. You've read the patent?
19    A    Yes.
20    Q    Okay. And I see in paragraph 2 of your
21  experience and qualifications, you have
22  healthcare-related information and industry
23  experience referenced there?
24    A    Paragraph 2?
25    Q    Yeah, it's about midway through that

---

7 (Pages 22 to 25)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**26**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  paragraph -- industry --
3      A   Yes.
4      Q   Do you think that healthcare experience is
5  important for the damages analysis you did in this
6  case?
7      A   I think all the experience I've had is
8  important.  It would include that, yes.
9      Q   Okay.  Do you think that
10  healthcare-related experience is particularly
11  important in this case?
12          MR. VAZQUEZ:  Form.
13      A   So same question, just adding the word
14  particularly?
15      Q   (BY MR. STIMPSON)  Yes.
16      A   I think I would have the same answer, that
17  all of my experience has been important.
18      Q   Okay.  So you get $440 an hour?
19      A   I'm sorry?
20      Q   Is that your rate, $440 an hour, as in
21  paragraph 3 there?
22      A   Our firm is being compensated with my rate
23  at that amount, yes.
24      Q   And are there others who are helping you
25  on this case?

---

**27**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A   Yes.
3      Q   And how many?
4      A   Primarily two other individuals.
5      Q   And who are they?
6      A   John Paul Anderson, also known as
7  JP Anderson.
8      Q   Um-hum.
9      A   And Adam Ashlock, A-S-H-L-O-C-K.  And also
10  had an associate help some as well, Rachel Mimms,
11  M-I-M-M-S.
12      Q   So these three are all assisting you,
13  right?  You're the lead damages expert on the case?
14      A   Yes.
15      Q   And considering all the people who are
16  working at Alvarez & Marsal, how much has Health
17  Grades been billed so far?
18      A   I would estimate that we've incurred in
19  total, with the consultants and myself, 600 or 700
20  hours, which I would estimate 200 in fees, perhaps,
21  from those hours.
22      Q   About 200,000 in fees?
23      A   That's what I would estimate.  I don't
24  know as I sit here.
25      Q   And is that what you've incurred including

---

**28**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  up through today, your best estimate?
3      A   I've incurred some additional hours that
4  we have not yet billed for September.  I don't know
5  the amount.  It's not -- I don't know the amount, so.
6      Q   So we're looking at roughly a quarter
7  million dollars so far?
8      A   It could be, yes.
9      Q   Okay.  I'll refer you to paragraph 5 of
10  your report.  Do you see that?
11      A   Yes.
12      Q   It refers to appendix C.  And that's a
13  list of documents and information you relied on,
14  right?
15      A   Yes.
16      Q   Let's see if I can actually find it here.
17  I should have done this before I got here today.  All
18  right.
19          So 75C is going to be appendix C to
20  Mr. Hall's report.
21          (Exhibit 75C marked.)
22      Q   (BY MR. STIMPSON)  Do you have any other
23  documents that you prepared since your last report?
24      A   Yes.
25      Q   What are those?

---

**29**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A   Two graphs.
3      Q   Let me just ask you, what's in your binder
4  here?  Is this all your reports and --
5      A   It's two of my reports, my attachments, my
6  appendices, as well as some of the supporting
7  information, including the patent.  Some of the legal
8  filings, as well as some of the source documents I
9  cite in my report that I brought with me in case.
10      Q   So the only other documents in that binder
11  that we don't already know about from your prior
12  report are the two documents you already gave me, and
13  two more, you're saying, two graphs?
14      A   Correct.
15      Q   Okay.  Can I take a look at the graphs,
16  please?
17      A   Yes.
18      Q   So these are both based on the analysis,
19  the projections that Vitals did, right?
20      A   No, the first one, 13b, is based on
21  attachment 10.  13a had graphed the lower part of
22  attachment 10.  I had forgot to include a graph of
23  the upper part which relates to projection.  So it
24  relates to attachment 10 of my report.
25          The second graph relates to Mr. Napper's

---

8 (Pages 26 to 29)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**30**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  market share analysis from his report, combining
3  Health Grade and Vitals for the time periods
4  indicated and all others in his definition of the
5  market.
6    Q    All right.  Let's mark your new attachment
7  13b as Exhibit 78.  Let's mark attachment 16 as
8  Exhibit 79.
9        MR. STIMPSON:  Sorry, Jesus, but I'll ask
10  the same thing.  But I'm not in as much of a hurry
11  for those, so those we can do at the break.  So at a
12  break, can you PDF them?
13        MR. VAZQUEZ:  Sure, whatever you want.
14        (Exhibits 78 and 79 marked.)
15    Q    (BY MR. STIMPSON)  Okay.  So let's take a
16  look at your appendix C.  So on page -- start on
17  page 2 of appendix C, you have non Bates stamped
18  documents?
19    A    Yes.
20    Q    And how did you come to get those
21  documents?
22    A    As we were receiving information from
23  Health Grades that we had requested, we had received
24  hard copies -- began to receive hard copies of
25  financial information reflected on page 2 and on.

---

**31**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  And we requested, as we often do when performing
3  analyses, could we get the native file or the Excel
4  file of that information, which eases our job of
5  analyzing the information, and received electronic
6  files indicated on appendix C.
7    Q    Do you know if all these documents, under
8  non Bates stamped documents, were produced in the
9  fact discovery phase of this case?
10    A    My understanding is that they've been
11  produced in this case.  I don't know when, or when
12  the fact discovery phase is.
13    Q    When did you ask for them?
14    A    My recollection is, as we started finally
15  receiving information from -- we had requested from
16  Vitals in the summer, this past summer, we were
17  starting our analysis.  There had been some lull due
18  to not having information we had requested from
19  Vitals.
20        And when we started receiving that
21  information in the summer, we requested this
22  corresponding information from Health Grade, is my
23  recollection.
24        So in the weeks and months prior to my
25  July 13th report is when I recall we asked for this.

---

**32**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    When were you hired by counsel for Health
3  Grades?
4    A    The summer of 2011.
5    Q    And it wasn't until a year later that you
6  requested these documents?
7    A    It wasn't that long from when we were
8  engaged.  We began the request for information in the
9  fall and winter from counsel related to Vitals, and
10  may have requested and received some of the
11  information from Health Grades at that time.
12        There's a list in appendix C, but recall
13  that we wanted to analyze the financial information
14  of both companies when that information was available
15  for both companies.
16    Q    But you knew you would need that
17  information in the fall and winter of 2011?
18        MR. VAZQUEZ:  Form.
19    A    I think at that time, after understanding
20  the case, I had an understanding that we would need
21  financial information from both companies involved in
22  the dispute.
23    Q    (BY MR. STIMPSON)  And did you express
24  that need to counsel for Health Grades?
25    A    I believe I did, yes.

---

**33**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    And do you know -- I mean, I'm just
3  looking at this.  I'm trying to figure out how I can
4  possibly match this up to your report and figure out
5  which of these you're using.  Do you have any way to
6  help me do that?
7    A    Yes.
8    Q    Okay.  What can you do?
9    A    I understand these electronic files
10  correspond to Bates documents HG --
11    Q    Which ones -- which electronic files are
12  you referring to first?  Is it everything under non
13  Bates stamped documents?
14    A    Yes, item 42 through I believe 336.
15    Q    Okay.  And so these correspond to what?
16    A    Bates range HG 0056017 through HG 0062023.
17    Q    Do you know when these were produced?
18  Actually, before you turn away from that, too, I need
19  to know where that information came from?  You just
20  handwrote it in your --
21    A    I did.  I made a note summary on mine.
22    Q    Okay.  Do you know when these documents
23  were produced?
24    A    I don't, specifically.  My understanding
25  is they were produced in the summer at some point.

---

9 (Pages 30 to 33)

CONFIDENTIAL - ATTORNEYS EYES ONLY

**34**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    This past summer?
3    A    Yes.
4    Q    Okay.  And at least some of these
5    documents, you expressed to Health Grades in the fall
6    or winter of 2011, that they would be needed,
7    correct?
8    A    Not by document title specifically.  The
9    concept of what information I would need to perform
10   my analysis was discussed after my retention, yes.
11   Q    And are these documents a necessary part
12   of some of your analyses?
13   A    Yes, they're information I relied on and
14   facts and data considered.
15   Q    Okay.  So can you point to me in your
16   report, please, the parts of your report and your
17   analyses that rely on these documents?  Just take
18   your time and look through it.
19   MR. VAZQUEZ:  Form.
20   A    Page 8 of my report.  Where I reference
21   attachment 1, that relies on the financial
22   information provided by Health Grades.
23   Attachment 2 is similar information, and
24   2A from Vitals, which I did not completely receive
25   until the week of my report.

**35**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    (BY MR. STIMPSON)  Okay.  Let me just back
3    up, hold you there for just a second, okay?
4    A    Sure.
5    Q    You say that attachment 1 relies on the
6    financial information provided by Health Grades,
7    right?
8    A    Yes.
9    Q    And what parts of these documents that are
10   the non Bates stamped documents formed your basis for
11   creating Exhibit 1, your attachment 1?
12   A    At the top of my attachment 1, there's
13   departments listed.
14   Q    Okay.
15   A    Under the title of Health Grades
16   Departmental Income Statements.
17   Q    Okay.
18   A    Those department numbers would cross-
19   reference with the document titles, which is why I
20   wanted in detail to describe every file we received
21   electronically.
22   Q    So these are -- so you used all these
23   documents to create your attachment 1?
24   A    I would not say I used all the documents
25   listed 42 to 336 for attachment 1.  Certainly, the

**36**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    ones that relate to the departments listed, I
3    requested from Health Grades their accounting
4    information that they keep in the normal course of
5    business related to these.
6    Q    So how would I know from reading your
7    report which of these documents you relied on to
8    create attachment 1?
9    A    As I said, the department's information
10   related at the top of attachment 1 you could pull up
11   the files as so identified in my appendix C.
12   Q    Like, for example, Mr. Hall, in the first
13   line of attachment 1 you have advertising network.
14   You rely on this in your report.  2011, you say there
15   is more than $22 million in advertising revenue.
16   Do you remember that?
17   A    Yes.
18   Q    Now, how would I know from reading this
19   what document to go to, to see if I could check that?
20   A    At the bottom of attachment 1, sources are
21   indicated.
22   Q    Can you show me how that matches up to
23   something in that appendix C, so I can -- I mean,
24   you're referring then to, it says, 2011 departments
25   include department 24, department 63?

**37**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    Yes.
3    Q    InHealth LLC, department 25 and
4    department 64?
5    A    Yes.
6    Q    Okay.  So can you then point me to which
7    documents in Exhibit C are the basis for that
8    $22 million figure?
9    A    I would start with the Excel files that
10   relate to the corresponding department number.
11   Though from my experience, I have not seen damage
12   experts tie each and every file from the facts and
13   data considered list to specific parts of their
14   report.  But I would start with the departments I've
15   identified as the sources in the Excel files that we
16   did in June and July to see the departmental
17   advertising network revenue that is summarized in my
18   attachment 1.
19   Q    So is there one document that has that
20   $22 million figure, or does it have to be added
21   together from other documents?
22   A    I have a binder that has the source.  It's
23   not with me here, but I could certainly look that up.
24   My recollection is it's added up from the departments
25   listed as the source for the various years for the

10 (Pages 34 to 37)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

38

CONFIDENTIAL - ATTORNEYS EYES ONLY
advertising network, ad revenue.
Q. Okay. But there is nothing in that appendix 1 that actually cites to specific documents for any of these lines, right? That's just something you did and you have some binder that shows how you did it?
MR. VAZQUEZ: Form.
A. I think I agree with part of that question or statement. But what was the first part again?
Q. (BY MR. STIMPSON) Let me just tell you. I think there is no surprise as to what is bothering me here. I was trying to prepare for this deposition, and I was trying to look at this attachment 1 and try and figure out where you got these numbers. And I just couldn't do it. I had no idea how to --
A. I could provide a work paper that provides that link.
Q. Yeah, but that doesn't help me much for the deposition. So let me just ask you this, Mr. Hall. It seems like, for example, look at 27 on page 11 of your report. This is just an example, but in other parts of your report you cite very specific documents on what you're referring to, right?

---

39

CONFIDENTIAL - ATTORNEYS EYES ONLY
MR. VAZQUEZ: Form.
A. Do you have another footnote you would like me to look at?
Q. (BY MR. STIMPSON) No, just look at footnote 27, for example, that's page 11.
A. Yes.
Q. Do you see you have a very specific page I can go to and see what matches up to what you're saying there, right?
A. Yes.
Q. But there is nothing like that with regard to attachment 1, right? In fact, appendix C is not even mentioned on your attachment 1, is it?
MR. VAZQUEZ: Form.
A. Appendix C is mentioned early on in the report to be very comprehensive of everything that I considered for both my, the written, narrative part of my report, as well as the attachments to my report. So that's how attachment C is covered. Then on attachment 1 -- I'm sorry, appendix C.
Then on attachment 1, I name specifically the departments that yield the data on attachment 1.
Q. (BY MR. STIMPSON) So, I mean, just to summarize, then, there is no way that anybody looking

---

40

CONFIDENTIAL - ATTORNEYS EYES ONLY
at this attachment I can know what, for example, if I wanted to find out ACE sales down in 2012, 1,371,681. There is no way I can tell from this attachment 1 where that number came from, right?
MR. VAZQUEZ: Form.
A. ACE sales, what figure did you --
Q. (BY MR. STIMPSON) There's like 1,371,681. Do you see that, in 2012?
A. Yes. There's a reference at the bottom for 2012 departments and the source for that number. So I don't agree.
Q. Okay. So it was basically -- but, you know, you didn't use every document from department 63 to account for that number, did you?
A. I would use the one that summarizes for that time period the revenue, would have been the files that supported that figure.
Q. And that's one of the hundreds of documents you have listed under here that is non Bates numbered documents, right?
A. The documents for 2012 that you're referencing related to ACE sales would be related to the 2012 period for the departments indicated.
Q. Is there anything in your recitation of

---

41

CONFIDENTIAL - ATTORNEYS EYES ONLY
documents here in appendix C that even indicates what year?
A. We put the files as they were given to us, the file names. There are some, yes, that indicate the year.
Q. So let's just take that example. Why don't you go through and show me that 1,371,681 and show me in your appendix C which documents might contain information that would show that number.
A. Sure. And for prior years, I would direct you to page 8 of 9 of appendix C, that there's files listed as revenue totals by month.
I would start with all of the files and pull up the files that have departments 63, 00, 65, 66 and 25 --
Q. Okay.
A. -- to see what that information has. Or I would look at the work paper we prepared that summarizes the information from that.
Q. That work paper you prepared, though, is only something you have, right? That hasn't been given to us, right?
A. Not to my knowledge. I would be glad to provide it.

---

11 (Pages 38 to 41)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**42**

CONFIDENTIAL - ATTORNEYS EYES ONLY

Q    So just going through this, then, we would have to look at documents 53, 58, 63, 66, 68, 70, 75, 80, 85, 88, 90, 92, 97, 102.

Anyway, just to cut this short, Mr. Hall, you would agree with me there are a lot of documents we would have to go through and analyze to try to figure out where you got that number from, right?

MR. VAZQUEZ:  Object to form.

A    As we did, yes, with detailed financial information, I would start with those.  I think as you pull them up, or as a financial, you know, accounting professional pulled these up, you could quickly see what periods those cover and pull those up or request the supporting work schedule from those.

Q    (BY MR. STIMPSON) Okay.  So anyway, we were in the middle of going through the parts of your report that rely on these documents that don't have Bates numbers.  And you told me attachment 1 and paragraph 28.  Can we just continue?

A    Yes, with the caveat of the beginning part of your question, my understanding is the hard copies have Bates numbers.  We requested the electronic so that we could more easily work with those, versus

---

**43**

CONFIDENTIAL - ATTORNEYS EYES ONLY

doing any data entry from the hard copy Bates numbered documents that relate to the Excel files.  So many of them are Excel files.

Q    When you actually issued your report, did you have the Bates numbered versions of these?

A    I recall we did.

Q    Okay.  And why didn't you reference the Bates numbers?

A    As I recall that last week was the first week we had received all of the Vitals financial information that we had requested, months, if not half a year prior.  And I believe my report deadline was tolling on when we would receive that information.  That last week was very busy.  And I don't know if we, as I'm looking at appendix C, I don't see the Bates reference number, which is why I looked back and penciled it in and talked to that today.

But I don't know of the specific reason we didn't.  Though I will recall, that last week having finally gotten Vitals information was very busy.

Q    So any other reason you can recall?

A    I think my directive to JP Anderson as we created appendix C was, be as detailed as possible on

---

**44**

CONFIDENTIAL - ATTORNEYS EYES ONLY

what we've received on file names, as we received them, so that when those files were provided, somebody will have an exact duplicate of what we receive from Health Grades.

And he listed those file names.  I don't recall if we knew at that time the Bates number specifics.  We knew that we were receiving Bates number information.

So I believe my directive was to be as descriptive as possible on the electronic files that we actually used, and that's what resulted in appendix C.

Q    And you've done a lot of expert reports in many different cases, right?

A    I have done a number of them, yes.

Q    And you understand one of the purposes of the expert report is to make sure that the opposing party can see your opinions and also reasonably understand the bases for your opinions, right?

MR. VAZQUEZ:  Form.

A    Yes, I would agree with that, and I believe we've done that fully here.

Q    (BY MR. STIMPSON) So can we move along, then, in the report?  Now what other parts of your

---

**45**

CONFIDENTIAL - ATTORNEYS EYES ONLY

report rely on these non Bates numbered documents?

A    On page 9.

Q    Okay.

A    Again, reference attachment 1, and attachment 12 is a graphical depiction of the monthly advertising revenue discussed in that paragraph.

Q    Okay.  Anything else?  So those both rely on these non Bates numbered documents that we were talking about?

A    Yes, with the caveat that there exist Bates numbered documents.  We identified the Excel file that did not have a Bates number on the Excel, on the native electronic file.

Q    Okay.

A    Attachment 5, I reference on page 13, paragraph 51.

Q    Okay.

A    Describes my incremental avoided cost analysis related to my lost profits calculation.

Q    Okay.  And those rely on some of the non Bates numbered documents?

A    They rely on the Health Grades financial information that was provided to us, both hard copy and electronic.

---

12 (Pages 42 to 45)

CONFIDENTIAL - ATTORNEYS EYES ONLY

46

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 Q And where -- so we're looking at your --
3 paragraph 51?
4 A Correct.
5 Q And how can I tell from looking at
6 paragraph 51 what formed the basis for your
7 attachment 5 of the report?
8 A By looking at attachment 5.
9 Q Okay.
10 MR. STIMPSON: Let's have that marked as
11 Exhibit 80, attachment 5 to Mr. Hall's report.
12 (Exhibit 80 marked.)
13 Q (BY MR. STIMPSON) So you now have in
14 front of you Exhibit 80. And that's actually the
15 same thing we saw with attachment 1, basically,
16 right?
17 You say at the bottom the sources and you
18 just recite various departments --
19 MR. VAZQUEZ: Form.
20 Q (BY MR. STIMPSON) -- for the various
21 years, right?
22 MR. VAZQUEZ: Form.
23 A Yes. That provides the revenue and
24 expenses in total on attachment 5, correct.
25 Q (BY MR. STIMPSON) Is there anything else

47

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 here from which we could determine what you relied on
3 for any of these numbers in your attachment 5, other
4 than that one footnote on sources?
5 A When you say one footnote, are you
6 referring to the Health Grades financial statements I
7 list there?
8 Q Yes.
9 A That's the source for this information,
10 yes.
11 Q Okay. And again, what we would have to do
12 if we wanted to try to figure out these numbers, if
13 for any given number, we would have to go to your
14 appendix C, we have to try to find out, for example,
15 2010, we have to identify every document that
16 identifies department 24, every document that
17 identifies can department 28, every document that
18 identifies department 63, every document that
19 identifies InHealth LLC, every document that
20 identifies department 29, every document that
21 identifies department 64, and then review all those.
22 And then try and figure out ourselves where you got
23 your numbers, right?
24 MR. VAZQUEZ: Form.
25 A That's exactly what I would do if I were

48

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 provided this report and were asked to analyze it.
3 You might also ask counsel if there is,
4 you know, a work paper that summarizes it. I would
5 be glad to provide it. But we created a work paper
6 that -- but I would go to the sources as your
7 question indicated, to see what was done by the
8 expert.
9 Q (BY MR. STIMPSON) But not one of the
10 numbers you have in your attachment 5, not one of
11 those numbers has a footnote saying, look at this
12 document, right?
13 A They all have that indication, the source.
14 It's not a footnote. It's a source at the bottom
15 that says look at these sources for these numbers.
16 Q But if there was one page, or one
17 particular page, for example, that you got, you know,
18 say the first line is $2,837,000 number for salaries
19 and wages for 2010. If there was a specific document
20 that you took that number from, there's nothing here
21 indicating to us what page we should go to, to look
22 at that, right?
23 MR. VAZQUEZ: Form.
24 A I don't agree. I think your question
25 assumes that there's just one source for that number.

49

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 And my sources indicate, and my report indicates
3 that's not the case. And so the source is clearly
4 listed on page 2, is how I would answer that. The
5 sources of this information.
6 Q (BY MR. STIMPSON) Well, that makes it
7 actually even harder, doesn't it? I mean, if there's
8 not one document where you got this number from, then
9 I would have to go to multiple pages and try to
10 figure out which numbers you used and how you
11 combined them to get to this number, right?
12 MR. VAZQUEZ: Form.
13 A I would go to the sources for 2010, July
14 to December. There's a monthly schedule that for
15 each of the departments that I would go to, that we
16 did go to, to understand for the time period
17 indicated. And for 2.8 million, what the salaries
18 and wages for payroll were.
19 Q (BY MR. STIMPSON) Okay. Is there
20 anything else in your report that relies on these
21 documents?
22 MR. VAZQUEZ: Form.
23 A Attachment 4 contains the Health Grades
24 incremental profit rate. That's at the bottom of
25 attachment 5. So on page 14, as I describe the lost

13 (Pages 46 to 49)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

50

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 profits damages and I guess that would include 13 as
3 well.
4     Q     (BY MR. STIMPSON) Attachment 4?
5     A     Correct.
6     Q     Okay. Those are just using some of the
7 numbers you took from other places, right?
8         MR. VAZQUEZ: Form.
9     A     Attachment 4 has the net profit margin as
10 a percent of revenue that comes from attachment 5,
11 yes.
12     Q     (BY MR. STIMPSON) Anything else that
13 relies on any of these documents?
14         MR. VAZQUEZ: Form.
15     A     Pages 21 and 22.
16     Q     (BY MR. STIMPSON) Okay.
17     A     Another reference to attachment 1.
18     Q     All right.
19     A     For the same reason I described earlier as
20 far as the source that's listed on attachment 1 are
21 discussed on these pages of my report.
22         I would say page 25 of 25, which is a
23 summary, but it references attachment 4. So as I
24 indicated earlier.
25     Q     Okay. So is it fair to say, actually,

---

51

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 Mr. Hall, that your entire damages analysis relies to
3 a great degree on these documents that are attached
4 as appendix C?
5     A     As well as other important documents and
6 sources listed throughout my report, but yes, those
7 are part of my analyses for my opinions expressed in
8 my report, yes.
9     Q     All right. So for example, attachment 1
10 is the revenue that you calculate from these
11 documents, right?
12     A     It is the revenue and expenses for Health
13 Grades, yes.
14     Q     All right. And you use those numbers in
15 calculating both lost profits and reasonable royalty,
16 correct?
17     A     I do, as used in attachment 5, I believe,
18 to determine the incremental profit rate of Health
19 Grades for the periods indicated.
20     Q     Okay. Thanks.
21         Could you please turn to page 3 of your
22 report. Now, you've done patent cases before. So
23 you understand the basics of patent claims, right,
24 Mr. Hall?
25     A     That are in patent filings?

---

52

CONFIDENTIAL - ATTORNEYS EYES ONLY
2     Q     Yeah, in patents. You understand what a
3 patent claim is, right?
4     A     I do have a general understanding. It's
5 not a legal understanding. It's as an
6 accountant/financial consultant.
7     Q     Well, for example, in paragraph 11 there
8 you refer to claim 1 and recite some of its elements,
9 right?
10     A     Yes, as part of the background of my
11 report, yes.
12     Q     Right. And do you understand, Mr. Hall,
13 that in order to be covered by a claim of a patent,
14 you have to have all the elements of the patent
15 claim?
16         MR. VAZQUEZ: Objection. Calls for a
17 legal conclusion.
18     A     I've heard that issue discussed. I
19 haven't addressed it in this report.
20     Q     (BY MR. STIMPSON) Right. But, I mean,
21 I'm just asking, as you sit here, for background.
22 For example, if someone -- if the Vitals website only
23 received a request for information about the first
24 healthcare provider, that element 1 you have there,
25 and nothing more, would that be covered by the

---

53

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 '060 Patent, in your understanding?
3         MR. VAZQUEZ: Same objection.
4     A     Before I answer that, I want to make sure
5 I have no legal opinion and I have assumed both
6 validity and infringement as I have indicated.
7     Q     (BY MR. STIMPSON) Right.
8     A     And have not analyzed the patent claims in
9 the manner your question suggests. With that caveat,
10 as a layperson on the legal issues related to a
11 patent, I have an understanding that that may not be
12 infringing. But I don't -- I haven't staked an
13 opinion on that.
14     Q     Well, actually it's kind of important to
15 your opinion, though, isn't it, Mr. Hall? I mean, in
16 order for you to be able to say this is how much this
17 patent invention is worth, you've got to know how
18 much of the Vitals website falls under the patent,
19 right?
20         MR. VAZQUEZ: Form.
21     A     I would answer that this way. It's
22 important to understand the claim, which is why I put
23 it in the background section, to understand the
24 nature of the patent. So I would agree that it is
25 important to have that understanding. And then, with

---

14 (Pages 50 to 53)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

54

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  the assumption of validity and infringement, it's
3  important to review the information that I have
4  reviewed and cite, related to Health Grades and
5  Vitals, as far as what they propose on their website
6  related to the patent claims.
7      Q   (BY MR. STIMPSON)  Well, you say -- you
8  mentioned your assumptions of infringement and I
9  agree with you, there has to be assumption of
10 infringement.  This is a damages analysis and it
11 assumes there's infringement.
12      But here is my question, Mr. Hall.  Did
13 you assume that the entire Vitals website was
14 infringing this patent?
15     MR. VAZQUEZ:  Form.  Calls for a legal
16 conclusion.
17     A   I did not make that assumption.
18     Q   (BY MR. STIMPSON)  Well, what part of the
19 Vitals website did you assume was infringing the
20 patent, then?
21     MR. VAZQUEZ:  Same objections.
22     A   The part that would cover my understanding
23 of the claim, as far as methods and procedures that
24 potential patients could access healthcare
25 information online, and that information coming from,

---

55

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  as described in here, either doctors, third-party
3  sources or patient ratings, or patient sources that
4  would allow the prospective patient to, or would
5  yield a report, a healthcare type report that
6  includes comparison ratings is the part of the Health
7  Grades and Vitals website that my understanding
8  practiced the patented features at issue in this
9  case.
10     Q   (BY MR. STIMPSON)  And what percentage of
11 the visitors to the Vitals website do that?
12     MR. VAZQUEZ:  Form.
13     A   I have not determined a percentage, some
14 certain percentage of visitors that are alleged to
15 infringe.  And I have assumed infringement by doing
16 what I think you termed as that, which was referenced
17 in my earlier answer.
18     Q   (BY MR. STIMPSON)  Right.  So when you did
19 your damages analysis, you didn't have -- well, let
20 me start a different question.
21     The amount of use of the patented
22 invention in the Vitals website was not used by you
23 in your damages analysis, right?
24     MR. VAZQUEZ:  Form.
25     A   The amount of use by Vitals?

---

56

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      Q   (BY MR. STIMPSON)  The amount of use of
3  the patented invention in the Vitals website was not
4  considered by you in your damages analysis, right?
5      MR. VAZQUEZ:  Form.
6      A   I don't agree with that.
7      Q   (BY MR. STIMPSON)  Okay.  So how did you
8  use that data?
9      A   Once I gained an understanding of the
10 patent, I undertook a review of the information
11 provided, which includes Vitals' description and its
12 financial statements of its business, several
13 business overviews Vitals had, as well as Health
14 Grades, similar type overview.  These are all
15 pre-litigation or pre-notification of patent
16 infringement documents to gain an understanding of
17 how both companies put forth their product or their
18 features to the market, and what they considered
19 important features.
20     And understood and saw from that as well
21 as deposition testimony that both companies
22 highlighted the comparison ratings and the
23 information they had that relates to my understanding
24 of the patent claim.  And that, along with the
25 assumption of infringement, was how I determined that

---

57

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  a substantial portion of the demand related to
3  advertising revenue related to the patented features
4  with respect to Panduit test 1.
5      Q   Okay.  You said that you determined from
6  reviewing these documents and talking -- and reading
7  the deposition testimony, a substantial portion of
8  the websites were using the patent.
9      Is that what your testimony was?
10     A   No.  And I would add that also an
11 important benchmark was the market, as far as
12 visitors were going to the site.  That prompted or
13 that identified in their own internal documents the
14 features related to the '060 Patent would also be a
15 source I considered as well in the substantial market
16 share that Health Grades and Vitals had as they, both
17 on their website, if you click on a Google search or
18 Yahoo search, or within their documents that both
19 emphasize and feature that they have information from
20 the sources I described earlier as well as comparison
21 ratings.
22     Q   So I don't think that was really quite my
23 question, Mr. Hall.  Let me see if I can make it
24 clearer.
25     You talked about how you looked at all

---

15 (Pages 54 to 57)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**58**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  this evidence and you think that the '060 Patent is
2  important. But my question is a little bit
3  different. My question is, do you have anything,
4  Mr. Hall, to indicate what percentage of users of the
5  Vitals website use the technology from the '060
6  Patent?
7     A   I do not have a percentage, a fixed
8  percentage based on a survey or a source of that
9  sort, given the sensitivity of healthcare searches
10 and the practicalities of that as far as privacy
11 information and practicalities.
12    I do not have a percentage of visitors. I
13 have not determined one that utilized the features of
14 the '060 Patent.
15    But in lieu of that, I have, as I'd
16 indicated earlier, looked at what the companies put
17 forth to the market that they have and are their key
18 features. And understood then how the market reacted
19 to those explanations or benefits of their
20 patented -- of the patented features related to their
21 websites. And tracked over time the market's
22 reaction to that, as well as what the deposition
23 testimony yielded. And concluded with the increasing
24 both visits and increasing ad revenue related to

---

**59**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  those visits, that the patented features were a
2  substantial part of the demand as it relates to the
3  Panduit test.
4     MR. STIMPSON: Okay. So I have to move to
5  strike everything starting with, but in lieu of that,
6  as nonresponsive.
7     Why don't we take our break, okay?
8     (Recess taken from 9:47 a.m. to
9  10:02 a.m.)
10    Q   (BY MR. STIMPSON) Okay. Mr. Hall, later
11 in your report, you talk about various agreements
12 between MDx and third parties and Health Grades and
13 third parties. And a lot of them are about licensing
14 out data.
15    Do you remember that?
16    A   Yes.
17    Q   Did you consider the Vitals database to be
18 covered by the patent?
19    MR. VAZQUEZ: Objection. Calls for a
20 legal conclusion.
21    A   My understanding was that the database
22 alone was not a violation of the patent.
23    Q   (BY MR. STIMPSON) Okay. And did you also
24 understand, Mr. Hall, that there are many uses for

---

**60**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  the Vitals website that are not covered by the
2  patent?
3     MR. VAZQUEZ: Same objection to the word
4  covered. Calls for a legal conclusion.
5     A   My understanding is that there could be or
6  are uses other than using the information for a
7  comparison ratings report. I'm also aware of what
8  Vitals promotes as far as its data and comparison
9  reports and reviews.
10    Q   (BY MR. STIMPSON) Okay. And like, for
11 example, you know, if someone gets on the Vitals
12 website and just looks at the directories for doctors
13 A to Z, that's not covered by the patent, right; you
14 understand that?
15    MR. VAZQUEZ: Object to form.
16    A   That's my understanding.
17    Q   (BY MR. STIMPSON) And you understand, as
18 you say here in the patent claim, that the patient
19 ratings are part of this patent claim too, right?
20    MR. VAZQUEZ: Form.
21    A   Are part of it, yes.
22    Q   (BY MR. STIMPSON) And do you have an
23 understanding of what percentage of the profiles on
24 the Vitals website actually have patient ratings for

---

**61**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  the doctors?
2     A   I may have seen that information, but I
3  don't know a percentage right now.
4     Q   Do you remember if it's actually less than
5  half of them?
6     MR. VAZQUEZ: Form.
7     A   I don't.
8     Q   (BY MR. STIMPSON) Okay. Why don't you
9  turn to page 4 of your report and paragraph 17 there,
10 sir. Now you're talking about the Health Grades
11 website here, right?
12    A   Yes.
13    Q   Okay. And the first bullet refers to
14 Health Grades having information on over 5500
15 hospitals; is that correct?
16    A   Yes.
17    Q   And so you understand that you can get on
18 the Health Grades website and search for hospitals?
19    A   Yes.
20    Q   Okay. And then your last bullet point
21 refers to over 15,000 nursing homes. Do you see
22 that?
23    A   I do.
24    Q   And you also understand that you can get

---

16 (Pages 58 to 61)

CONFIDENTIAL - ATTORNEYS EYES ONLY

**62**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  on the Health Grades website and search for nursing
3  homes, right?
4      A   Yes.
5      Q   And then the third way to search is you
6  can search for doctors, right?
7      MR. VAZQUEZ: Form.
8      A   My understanding is that, yes, you can
9  search for doctors.
10     Q   (BY MR. STIMPSON) So two of the three
11  ways to search on the Health Grades website are for
12  facilities like nursing homes or hospitals, right?
13     MR. VAZQUEZ: Form.
14     A   Yes, those two are available.
15     Q   (BY MR. STIMPSON) Okay. And so would you
16  agree with me that, you know, those are substantial
17  parts of the Health Grades website?
18     MR. VAZQUEZ: Object to form.
19     A   They're certainly parts of the website
20  that they identify, yes.
21     Q   (BY MR. STIMPSON) Are those substantial
22  parts of the website?
23     MR. VAZQUEZ: Form.
24     Q   (BY MR. STIMPSON) Let me back up a sec.
25  You've actually visited the Health Grades website,

**63**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  right?
3      A   Yes.
4      Q   So would you agree with me that they're
5  substantial parts of the Health Grades website,
6  right?
7      MR. VAZQUEZ: Form.
8      A   I would answer it this way. I believe all
9  of the information there they would consider
10  important and substantial.
11     Q   (BY MR. STIMPSON) Okay. The searching
12  for hospitals on the Health Grades website, was it
13  your understanding that that was covered by the
14  Health Grades patent?
15     MR. VAZQUEZ: Form.
16     A   I don't have that understanding.
17     Q   (BY MR. STIMPSON) Well, let me just make
18  sure we're clear. Is it your understanding that the
19  patent does not cover the searching for hospitals?
20     MR. VAZQUEZ: Form.
21     A   Yes.
22     Q   (BY MR. STIMPSON) Okay. And is it also
23  your understanding that the patent does not cover
24  searching for nursing homes?
25     A   That's also my understanding.

**64**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2      MR. VAZQUEZ: Form.
3      Q   (BY MR. STIMPSON) So there's lots of uses
4  of Health Grades' website that aren't covered by this
5  Health Grades patent, even under Health Grades'
6  analysis, right?
7      MR. VAZQUEZ: Form.
8      A   There are features on both websites that
9  from my understanding do not violate -- well, the
10  Vitals site violates the patent and the Health Grades
11  site uses all the elements of the patent.
12     Q   (BY MR. STIMPSON) So you would agree with
13  me, Mr. Hall, that the Health Grades website
14  certainly is not coextensive with the patent claims,
15  right?
16     MR. VAZQUEZ: Form.
17     A   I'm not sure I understand that. One more
18  time, please.
19     Q   (BY MR. STIMPSON) Well, the Health Grades
20  website is not coextensive with the scope of the
21  patent, right?
22     MR. VAZQUEZ: Form.
23     Q   (BY MR. STIMPSON) They don't have the
24  same scope and the same --
25     A   Oh, coextensive?

**65**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2      Q   Yeah.
3      A   That's a term I'm -- my understanding is
4  that the patented features that Health Grades has for
5  the '060 Patent are important and promoted by Health
6  Grades. I understand there's other features on their
7  website.
8      MR. STIMPSON: Okay. Move to strike that.
9  Nonresponsive.
10     Q   (BY MR. STIMPSON) Sir, can you answer
11  that? Maybe you can't answer the question, that's
12  okay. But can you agree with me that the Health
13  Grades website is not coextensive with the scope of
14  the patent claim?
15     MR. VAZQUEZ: Object to form. Asked and
16  answered.
17     A   I think I would answer it the way I did
18  before, without, you know, referencing the
19  coextensive term.
20     Q   (BY MR. STIMPSON) So you're not
21  comfortable saying that the Health Grades website is
22  not coextensive with the patent claim?
23     MR. VAZQUEZ: Object to form.
24     A   It's not the term I would use. I would
25  answer it as I did.

17 (Pages 62 to 65)

CONFIDENTIAL - ATTORNEYS EYES ONLY

66

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    (BY MR. STIMPSON)  Okay.  And I assume
3    your answers would be the same for the Vitals website
4    and whether that's coextensive with the patent
5    claims?
6        MR. VAZQUEZ:  Form.
7        A    I would answer the question related to
8    Vitals as, certainly early on in the period they just
9    had -- they had physician searches and not other
10   REDACTED                               But that
12   certainly promotes the patented features of the '060
13   Patent at Vitals, but also has other features on
14   their website.
15   Q    (BY MR. STIMPSON)  Okay.  So, for example,
16   you know from your view of the Health Grades website
17   that they have things like articles and tips for
18   consumers, right?
19   A    I recall seeing such things.
20   Q    And those, too, I mean, Health Grades puts
21   that on there, you know.  Those were added to try to
22   generate more consumer interest in the site, right?
23       MR. VAZQUEZ:  Form.
24   A    Yes, I think that's accurate.
25   Q    (BY MR. STIMPSON)  And you've seen the

67

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Vitals website?
3    A    Yes.
4    Q    The same thing for the Vitals website,
5    right?  It has articles and tips and things like that
6    that are also added for the purpose of generating
7    interest in their website, right?
8        MR. VAZQUEZ:  Same objection.
9    A    Yes.  Those aren't features promoted the
10   way others were, that I saw from my searches and the
11   documents.
12       MR. STIMPSON:  Move to strike everything
13   after yes.  Nonresponsive.
14   Q    (BY MR. STIMPSON)  Could you please turn
15   to paragraph 21 in your report.
16   A    21, was it?
17   Q    Yes, please.  And you state there, Vitals
18   describes its core IP asset as being the master
19   provided database.
20       Did I read that right?
21   A    You did.
22   Q    Do you agree, sir, that one of the core
23   assets for Vitals is its database?
24   A    I agree that's what Vitals described and
25   one that's indicated in the background section.  I

68

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    don't contest that, but I am citing it here.
3    Q    Okay.  If you would turn to your summary
4    on page 6.  So let me just make sure I understand
5    this correctly.  I understand these are only through
6    May of 2012, so let's just talk about that for
7    simplicity, okay?
8    A    Yes.
9    Q    So you calculate the total damages as
10   $2,262,000, right?
11   A    Yes, using lost profits and royalty
12   damages.
13   Q    Right.  And so that's -- you know, if the
14   trial were just through May, you would be asking the
15   jury to award $2,262,000?
16   A    Yes, I would.  Based on the assumptions I
17   indicate and the information contained in this
18   report, yes.
19   Q    Okay.  And you also come up with a
20   12 percent reasonable royalty, right?
21   A    Yes.
22   Q    And in any of the three patent cases you
23   have had in the last four years, have you proposed a
24   royalty rate of 12 percent or higher?
25   A    Yes.

69

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    Okay.  And what royalty rates did you
3    propose there?
4    A    In the Varco-Pason case I proposed a
5    51 percent royalty rate on the add-on product at
6    issue.
7        On the other cases, the Canadian case, for
8    those Canadian companies with that same patented
9    feature and different patent in Canadian, in
10   different markets, I recall a royalty rate in the low
11   20s or perhaps 20 percent.  But I don't recall with
12   certainty.
13   Q    Okay.
14   A    In the Case Drilling, I recall the royalty
15   rate in the high single digits or perhaps low,
16   perhaps around this rate.
17   Q    Okay.  And did the Court make
18   determinations in those cases on the appropriate
19   royalty rate, or the jury?
20   A    The Canadian case has not been decided
21   yet.  It's a bench trial and expecting a bench
22   decision soon.
23       The Varco-Pason U.S. portion of that case
24   awarded lost profits based on a profit rate of
25   60 percent.

18 (Pages 66 to 69)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**70**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   Okay.  Are you aware of patent marking?
3  Do you know what patent marking means?
4      A   I do.  But I don't have a legal
5  understanding of it, but I'm familiar with the term.
6      Q   Okay.  Do you understand that if the
7  patent plaintiff did not mark its product with a
8  patent number, then you can't get damages until you
9  either have actual notice of the claim?
10     MR. VAZQUEZ:  Object to the form.  Calls
11  for a legal conclusion.
12     A   I have a general understanding that the
13  parties would contest that issue on when the marking
14  happened, when you can start damages.  I don't have
15  case law understanding or legal understanding.
16     Q   (BY MR. STIMPSON)  That's okay.  Did you
17  do any analysis as to what the damages would be,
18  depending on whether the Court finds that Health
19  Grades properly marked their product with a patent
20  number?
21     A   I did not, other than to do it by the time
22  periods I indicated, which within that information,
23  there is the ability to parse out time periods.
24     Q   Okay.  And you also realize that there's
25  two versions of the Vitals website here, right,

---

**71**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  there's one before January 2011 and there's one --
3  and it was changed in January 2011, right?
4      A   Yes, I had that understanding.
5      Q   And you assume that both of them infringe,
6  right?
7      A   I have made that assumption, yes.  And
8  back to my answer, I don't have a firsthand knowledge
9  of having clicked on the Vitals website.  I know from
10  the deposition testimony and the record in the case
11  that there is an assertion that the website changed
12  at that time.
13     Q   Okay.  So have you, since you were hired
14  by Health Grades, have you gotten on the Vitals
15  website?
16     A   Yes.
17     Q   Okay.  How many times did you do that?
18     A   Several is my recollection.
19     Q   Okay.  So let's go to paragraph 28, okay.
20  This is where you start your discussion of demand,
21  right?
22     A   It is.
23     Q   And we've talked about attachment 1 and
24  the documents you have used there so I won't go over
25  that again.  In your second sentence there -- well,

---

**72**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  actually, let me read the first two sentences.
3      Attachment 1 presents Health Grades'
4  income statements for the years ended December 31,
5  2008 through December 31, 2011 and from the
6  four-month period ending April 30, 2012.  These
7  income statements were compiled from the various
8  departments that report the revenues and costs
9  associated with the patented invention.
10     Let me just stop right there.  First of
11  all, did I read that correctly?
12     A   Yes.
13     Q   What do you mean, Mr. Hall, when you refer
14  to departments that report revenues and costs
15  associated with the patented invention?
16     A   Exactly that.  In cases such as this, I
17  attempt to isolate the revenues and expenses and
18  therefore profitability of the company's use of the
19  patented features.  In some cases, various products
20  or it just depends on the company.
21     So this sentence refers to that effort.
22     Q   So, I mean, but for this case, what
23  criteria did you use to determine if revenue was
24  associated with a patented invention?
25     A   The criteria was the features of the

---

**73**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  patent and how Health Grades used those and
3  discussions with Andrea Pearson and Allen Dodge
4  starting with, does all of Health Grades' business
5  activity relate or use the patented features.  The
6  answer was no.
7      And from that I said, do they have
8  financial information kept in the normal course of
9  business that relates to a subset of their business
10  activity that uses the patented features in some
11  form.  And the answer was yes.
12     And there were certain departments that
13  did.  And I wanted those departments identified and
14  requested the financial information for those
15  departments so I could have a metric of the revenues
16  and expenses of how Health Grades uses the patented
17  features.
18     Q   So who was it, then, that made the
19  determination of what parts, quote, uses the patent?
20     A   In the discussions of the business
21  activities of Health Grades, Allen Dodge and Andrea
22  and myself and JP Anderson discussed which
23  departments, what business activities were associated
24  with the departments, and which, in Health Grades'
25  view, utilized the '060 Patent to generate revenues,

---

19 (Pages 70 to 73)

CONFIDENTIAL - ATTORNEYS EYES ONLY

74

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   or if there were expenses associated with the use of
3   the '060 Patent, even if there weren't revenues in
4   departments, to include those as well.
5       And that's what is referenced in these
6   first two sentences you read.
7       Q   So what business activities of Health
8   Grades were identified as using the '060 Patent?
9       A   Certainly, their advertising efforts as
10  they drive, attempt to drive traffic up and drive up
11  their advertising revenue.
12      They also use the patented features or
13  have over the years to -- as part of their effort in
14  other businesses such as consulting to physicians, as
15  far as improving quality and ratings related to
16  assisting providers and facilities in improving their
17  ratings.
18      Q   Anything else?
19      A   Yes. There was, I understand from John
20  Neal's deposition testimony and from discussions with
21  Andrea and Allen, that he believes it's even more
22  expansive as far as how they use the '060 Patent.
23  That it goes to the core of all of their businesses
24  as far as the unique experience website visitors will
25  have that really drives all of their business

75

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   activity. I understand John Neal's view on that, but
3   I wanted to limit it to what Health Grades' CFO and
4   Andrea Pearson, as we discussed department by
5   department, what was related to the '060 Patent.
6       Q   So what I'm trying to do here, Mr. Hall,
7   is I'm trying to figure out how you determined sort
8   of what was associated with the patented invention.
9   And you told me that there -- or you identified
10  certain business activities by talking to Andrea
11  Pearson and Mr. Dodge. But what I need is, I need a
12  list of what those activities are.
13      I mean, is that in your report anywhere?
14      A   Yes, a reference is in my report.
15      Q   And where are those referenced in your
16  report?
17      A   Attachment 1 lists all the revenue and
18  expense categories that are in departments that have
19  revenue or expenses associated with Health Grades'
20  using the patented features.
21      Q   Right. But they don't really identify all
22  the activities, do they? Take a look at Exhibit 1.
23  So maybe that will become clear.
24      MR. VAZQUEZ: Attachment 1?
25      Q   (BY MR. STIMPSON) Yes, attachment 1.

76

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   It's Exhibit 70 -- actually, what is the exhibit
3   here?
4       (Discussion off the record.)
5       MR. STIMPSON: Let's mark as Exhibit 81
6   attachment 1 to Mr. Hall's report.
7       (Exhibit 81 marked.)
8       Q   (BY MR. STIMPSON) So we're looking at
9   attachment 1. I have no idea what my question was
10  now.
11      Oh, I know. Mr. Hall, we were talking
12  about, I'm trying to get a list of the business
13  activities that you say fall under, as you say in
14  your report, are associated with the patented
15  invention. Can you tell me what those are? I need a
16  complete list. If it's somewhere in attachment 1,
17  that's easy too.
18      A   Well, the revenue categories are listed
19  there. Again, we went through those with Mr. Dodge
20  and Ms. Pearson and also referencing Health Grades'
21  10-K, which describes those for 2009. And gained an
22  understanding at the different time periods indicated
23  how it is Health Grades utilizes the patented
24  features to generate revenue and these associated
25  expenses.

77

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2       With a note on page 8, footnote 21, I want
3   to point out, that says, As noted elsewhere in this
4   report, revenues reported by the various departments
5   include more than that of the patented invention.
6   However, Health Grades did not separately report the
7   revenue expenses related to the patented invention.
8   Therefore I included these entire departments in
9   their entirety, versus taking a departmental P&L and
10  parsing it out or doing an analysis.
11      As that note indicates, if these
12  departments had any part of their revenue or expenses
13  that related to their use, either generating revenue
14  or expenses, for that matter, with the patented
15  features, I included the departments in attachment 1.
16      Q   So there may be a lot more in attachment 1
17  in terms of revenue or whatever else is in there than
18  just the business activities revenue generated from
19  business activities, associated with the patent?
20      A   That is a fact. There is more, yes.
21      Q   Okay. So how much more?
22      A   The advertising network is the primary
23  revenue source that I believe from my analysis and
24  discussions that relates to the use of the patented
25  features. It's not the entirety of the revenue as

20 (Pages 74 to 77)

CONFIDENTIAL - ATTORNEYS EYES ONLY

**78**

1     CONFIDENTIAL - ATTORNEYS EYES ONLY
2  they use the rating systems at different periods in
3  time to help with other revenue-generating
4  activities.
5        But the advertising revenue is what I
6  limited and focused my analysis on as far as Health
7  Grades' damages.
8     Q   How much revenue from attachment 1 is
9  included in attachment 1 but doesn't relate to these
10  business activities regarding the '060 Patent?
11        MR. VAZQUEZ:  Form.
12     A   I have not made a calculation of that.
13  The Health Grades cites the features and promotes the
14  features of its '060 Patent in a variety of ways and
15  has over the years and believes it to be a key part
16  of their website for the unique experience they try
17  to provide and believes that a substantial portion of
18  their traffic over the years and ad revenue relates
19  to the use.
20        I understand John Neal's view, as well as
21  Mr. Dodge's and Ms. Pearson's, as well as what is
22  yielded from the ones who have been deposed
23  testimony.  And also contemporaneous, pre-litigation
24  documents that cite the patented features.
25     Q   Can you tell me if $100 or more of the

**79**

1     CONFIDENTIAL - ATTORNEYS EYES ONLY
2  revenue in attachment 1 is unrelated to the '060
3  Patent?
4     A   I have not made that determination.
5     Q   Can you tell me if 10 million or more in
6  revenues of attachment 1 are unrelated to the '060
7  Patent?
8     A   From my analysis, I think a substantial
9  portion of their website traffic is generated based
10  on the use of the patented features.  As search
11  engines pull up the rating systems, and the
12  information they have available, it's their -- my
13  analysis concluded they're really the key feature or
14  their most prominent feature relates to the patent.
15        As far as the each and every visitor,
16  other than as I identified in the report, the
17  co-visitors, I have not made a mathematical
18  determination of a split between the patented
19  features revenue and non-patented features revenue.
20     Q   Right.  But my question, sir, was, can you
21  tell me whether or not $10 million or more of the
22  revenue of attachment 1 are unrelated to the '060
23  Patent?
24        MR. VAZQUEZ:  Object.  Asked and answered.
25     A   I thought I'd answered that.

**80**

1     CONFIDENTIAL - ATTORNEYS EYES ONLY
2     Q   (BY MR. STIMPSON)  What is the answer?  Is
3  it no?  You can't tell me, right?
4        MR. VAZQUEZ:  Object.  Asked and answered.
5  Argumentative.
6     Q   (BY MR. STIMPSON)  I'll rephrase it.
7  Maybe it will be easier this way in another question.
8        Mr. Hall, you can't tell me -- let me
9  rephrase it.
10        You don't know one way or another whether
11  $10 million or more of the revenue in your attachment
12  1 is unrelated to the '060 Patent?
13        MR. VAZQUEZ:  Form.
14     A   I have not made a calculation.  And
15  therefore, would not say if it's $10 million or more.
16  I have studied what they promote and understand what
17  they believe they generate through ad revenue based
18  on the patented features.
19     Q   (BY MR. STIMPSON)  What business
20  activities -- we come back to this question again
21  because I've really got to try to nail it down.
22  You've talked about this attachment 1.  But I'm
23  trying to get a list of the business activities that
24  you use in your attachment 1 that you say are
25  associated with the patented invention.

**81**

1     CONFIDENTIAL - ATTORNEYS EYES ONLY
2        What are those business activities?
3        MR. VAZQUEZ:  Form.
4     A   It would start with the advertising
5  revenue.
6     Q   (BY MR. STIMPSON)  Well, that's revenue.
7  That's not an activity, right?
8     A   It's related to the business activity of
9  having a website and earning ad revenue from that
10  website.
11     Q   Okay.  So your activities are -- so all
12  the ad revenue you consider to be a business activity
13  related to the '060 Patent?
14     A   I would phrase it this way:  That their
15  use of the features of the '060 Patent on their
16  website is certainly a business activity Health
17  Grades pursues to earn revenue from advertisers.
18     Q   Okay.  What other activities did you
19  include as being associated with the '060 Patent?
20     A   For purposes of calculating revenues and
21  expenses for departments that use the features of the
22  '060 Patent or had over time, there is, prior to
23  2011, there is consumer reports and watchdog, halfway
24  down through the revenue list in 2010, there's
25  $3.3 million listed, just for 2010.

21 (Pages 78 to 81)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

82

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    Q   Okay. So did you consider then consumer
3 reports and watchdog all to be associated with the
4 '060 Patent?
5    A   No.
6    Q   Did you consider part of it to be?
7    A   For purposes of calculating profit from a
8 subset of the entire company and excluding activities
9 that have -- and departments that have no relation to
10 the '060 Patent, I included it as the revenue base
11 for 2010, with the understanding that Health Grades
12 contends and I gained an understanding based on their
13 description of it, that both the information covered
14 in the patent and the comparison ratings were used to
15 generate those reports through December of 2010.
16      So it's included on attachment 1 for that
17 reason. And any of the revenue and expenses with the
18 departments that covered that category would also be
19 in that column, top to bottom, on attachment 1.
20    Q   I'm still struggling with that as far as
21 identifying these business activities associated with
22 the '060 Patent. So far, for sure, advertisements.
23      Is there anything else?
24      MR. VAZQUEZ: Form.
25    Q   (BY MR. STIMPSON) Maybe I missed

---

83

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 something in that answer. It was a long answer.
3    A   Selling reports that I just answered to.
4    Q   (BY MR. STIMPSON) Selling reports, okay?
5    A   Did you include that? That was part of my
6 answer.
7    Q   Well, it was a long answer. I didn't
8 quite get it. So selling reports is another thing,
9 right?
10      And what revenues on this is that --
11    A   Excuse me.
12      MR. VAZQUEZ: Form.
13    A   The year 2010; 3,300,179.
14    Q   (BY MR. STIMPSON) You thought all that
15 was within the '060 Patent, right?
16    A   No.
17    Q   Okay. What part did you think it was on
18 there?
19    A   I didn't make a determination as a portion
20 of that. I included it because Health Grades used
21 its patented features to generate some of the revenue
22 for this report.
23      I didn't make a determination if it was
24 all of it. I wanted on this schedule to reflect all
25 of the departments that had any revenue or expenses

---

84

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 with activity associated with the '060 Patent. And
3 that's why it was included in attachment 1.
4    Q   You realize, though, that a lot of
5 profiles on the Health Grades website don't have
6 patient ratings?
7    A   I do.
8    Q   And that's in fact even true today, right?
9    A   Yes.
10    Q   Okay. So you don't have any idea what the
11 percentage would be of those sales of reports that
12 might fall in the '060 Patent, do you sir?
13    A   I have not made a determination of that.
14    Q   Okay. So I've got advertisements. I've
15 got sales of reports. What other activities do you
16 consider to be under the '060 Patent?
17    A   There's some of these categories relate to
18 SQI sales, SQP, that relate to their -- as described
19 to me and as described on their 10-K, relate to some
20 of their consulting efforts. Strategic Quality
21 Partnership and others, Quality Assessment and
22 Implementation in different time periods where they
23 used comparison ratings and the information covered
24 under the patent to perform consulting services to
25 earn revenue that's indicated on attachment 1.

---

85

CONFIDENTIAL - ATTORNEYS EYES ONLY

2      So SQP, PSEA, these are all acronyms shown
3 in their departmental statements as well as in their
4 2009 10-K. And I have a description of those and
5 we -- I can read through those descriptions or
6 describe the discussions we had related to those.
7      But there was all activities that Health
8 Grades identified as related to their use of the
9 patented features to generate revenue or incur
10 expenses or both.
11    Q   So you basically just relied on what
12 Health Grades told you was related to the '060
13 Patent, right?
14      MR. VAZQUEZ: Object to form. Misstates
15 testimony.
16    A   A large part on the determination of a
17 subset from their company as a whole of their revenue
18 and expenses was Health Grades' knowledge of their
19 use of the '060 Patent. I discussed and gained an
20 understanding of that, and looked at the departmental
21 statements and compiled them here, but that certainly
22 was a part of my analysis, was their view of how they
23 use the '060 Patent to generate revenue and incur
24 expenses, yes.
25    Q   (BY MR. STIMPSON) And you know the person

---

22 (Pages 82 to 85)

CONFIDENTIAL - ATTORNEYS EYES ONLY

86

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2 who is doing the infringement analysis for Health
3 Grades is Dr. Greenspun, right?
4    A   Yes, I'm aware of that.
5    Q   And was he involved in any of this?
6       MR. VAZQUEZ: Form.
7    A   Not directly with me. I did not rely on
8 Dr. Greenspun for this.
9    Q   (BY MR. STIMPSON) Well, do you know of
10 any way that Dr. Greenspun, the guy who is hired by
11 Health Grades to say what does and doesn't fall under
12 the patent, do you know if he was involved in any way
13 in determining what business activities related to
14 the '060 Patent?
15    A   Not beyond what I have read in his report.
16 I've read his report or both reports.
17    Q   Right. But you read his report after you
18 did this analysis for your report, right?
19    A   True.
20    Q   Okay. So Dr. Greenspun had nothing to do
21 with your conversations and work with the Health
22 Grades people in determining what should we say falls
23 under the '060 Patent, right?
24       MR. VAZQUEZ: Form.
25    A   He did not. Though I don't think that was

87

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2 the characterization, what should they say. They
3 analyzed their departments and went through it,
4 Mr. Dodge and Ms. Pearson, to discern what their
5 activities that yielded revenue expenses related to
6 the patent, versus what should they say.
7    Q   (BY MR. STIMPSON) And so, as opposed to
8 -- when you were having these conversations with
9 Ms. Pearson and Mr. Dodge, and trying to figure out
10 what activities related to the '060 Patent, did you
11 have the patent out in front of you?
12    A   We may have. Certainly, it was in the
13 support binder that we generally used to perform the
14 work. I don't recall it being out and reading it
15 specifically.
16    Q   So did anybody, in making this
17 determination, say, Hey, look, we've got to get out
18 the patent here and try and figure out what -- make
19 sure the patent claims match up to what we're saying
20 are activities related to this patent?
21       MR. VAZQUEZ: Form.
22    A   I don't recall that specifically. But the
23 knowledge of the patent certainly was in the room, as
24 far as Mr. Dodge and Ms. Pearson and our review of
25 the patent claims. And what Health Grades promoted

88

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2 as its features.
3    Q   (BY MR. STIMPSON) Okay. So you mentioned
4 as your third business activity, SQI and this SQP,
5 PSEA, and OPA -- OPEA sales as also being business
6 activities that you determined with Health Grades'
7 people were associated with the '060 Patent, right?
8    A   Yes.
9    Q   Okay. And why?
10    A   That Health Grades' description of the use
11 of the patented features to generate revenue from
12 activities in these departments listed.
13    Q   So you just rely on Health Grades telling
14 you that, yeah, the patent relates to us generating
15 revenues from these?
16       MR. VAZQUEZ: Object to form.
17    A   After discussion and description of the
18 business and the decision on my part not to try to
19 parse out because I don't believe I had a basis for
20 parsing from within a department P&L to -- a
21 reasonable basis or would not be as reasonable as
22 taking all of the departmental revenue and expenses
23 to, after the fact parse out revenue expenses related
24 to the patent.
25       My decision to use all of the departmental

89

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2 revenue and expenses, if any part of the departmental
3 revenue and expenses was related to the patented
4 features.
5    Q   (BY MR. STIMPSON) So let's just take SQI
6 for example. Do you know what that means?
7    A   Yes.
8    Q   What does it mean?
9    A   Strategic quality initiative.
10    Q   Okay. And why specifically was that
11 included as an activity related to the '060 Patent?
12    A   Well, the -- I would look back at the work
13 papers. But if SQI sales were involved in a
14 department that had revenue, whether or not SQI
15 specifically was involved, it would show up on
16 attachment 1.
17    Q   Right. But, I mean, was there any
18 determination made to say, Hey, look, SQI is an
19 activity related to the '060 Patent and this is why.
20 Did anybody do that?
21    A   Yes, we had that discussion.
22    Q   Okay. So what was the reasons for
23 including SQI as an activity related to the '060
24 Patent?
25    A   Related to their ratings and their

23 (Pages 86 to 89)

CONFIDENTIAL - ATTORNEYS EYES ONLY

90

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  assistance with -- on a consulting basis to assist in
3  improving the ratings and part of the rating services
4  of Health Grades.
5  Q  So how do they get revenue from SQI?
6  A  I believe fees paid by the hospitals.
7  Q  And what are those fees paid for?
8  A  Business development and marketing tools
9  Health Grades provided to the hospitals.
10  Q  So you included, in revenue related to the
11  '060 Patent, revenue Health Grades receives by them
12  providing marketing tools to hospitals?
13  A  I included the departmental revenue that
14  includes SQI revenue and expenses as part of a subset
15  of Health Grades' overall financial statements, to
16  attempt to exclude any departments that do not either
17  have any revenue or expenses -- do not have revenue
18  or expenses associated with the '060 Patent.
19  Q  So maybe, you know, instead of going
20  through all this, we can just kind of cut to the
21  chase here, Mr. Hall.
22  I mean, would you agree with me that what
23  portion of all these revenues are truly associated
24  with the '060 Patent, a lot of that is since there
25  are no records showing it, a lot of that is just pure

91

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  speculation, right?
3  MR. VAZQUEZ:  Object to form.
4  A  No.
5  Q  (BY MR. STIMPSON)  Okay.  Well, why -- can
6  you give me any certainty, then, as to what part of
7  SQI is related to the '060 Patent?
8  A  I could look at the work papers related to
9  it, but the intent was to identify without what I
10  would view as something that would go into
11  speculation, as parsing a departmental P&L after the
12  fact, based on what uses the patented features or
13  not.
14  My decision was to obtain a subset from
15  all of Health Grades' P&L, which is profit and loss
16  statements, of any departmental revenue or expenses
17  that was generated during the time periods indicated
18  that related to the patented features, and exclude
19  any that did not at all relate to it.
20  Q  Okay.  Well, actually, in your damages
21  analysis, you actually use the full $22 million
22  number, right?  You didn't exclude anything?
23  A  I do not.  I don't agree with that.
24  Q  Okay.  Well, let me just see if we can get
25  to that.  You know, let's just take it in order and

92

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  we'll get back there.
3  So what other business activities
4  associated with the '060 Patent did you consider with
5  regard to this paragraph 28?
6  A  The Internet business group activity from
7  '08 to '09.
8  Q  So what were they doing to generate, like
9  I see in '08, there is almost $7 million, right?
10  A  Yes.  And in '09, 4.5 million.
11  Q  So what were they doing?
12  A  After then after that, the activities in
13  that group were captured in the advertising network,
14  is my recollection of our discussion of that.  But
15  using the comparison ratings and the information
16  sources to generate revenue.
17  Q  Let's take 2008.  $6,944,020, where did
18  that revenue come from?  How it was generated?
19  A  I'll look back at the 10-K to refresh my
20  recollection.
21  My recollection is as they were
22  transitioning their business model to advertising
23  network revenue, which is the top line, they were
24  generating revenue from the Internet business group
25  with advertising as well.

93

1  CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q  So is it your testimony that the Internet
3  business group, all that money is all advertising?
4  A  No, it's not.
5  Q  Okay.  What else is there, then?
6  A  I would have to look at my work papers to
7  recall 100 percent.
8  Q  Okay.  And those work papers were not
9  produced, right, the ones we talked about earlier?
10  A  I don't recall talking about this work
11  paper that I'm referencing, earlier.
12  Q  Okay.  Maybe it's a different work paper.
13  But anyway, was it produced?
14  A  I don't know.
15  Q  Okay.  What other business activities did
16  you consider to be associated with the '060 Patent?
17  A  Again, with the preamble I've had before,
18  that if any part of it was in a business, in a
19  department, it was included in here, was the way I
20  approached it, once I understood that they did not
21  have contemporaneous or financial statements in the
22  normal course.  That was strictly limited to the
23  patented features.  With that caveat, advertising
24  sponsorships from 2008.
25  Q  Okay.  Anything else?

24 (Pages 90 to 93)

CONFIDENTIAL - ATTORNEYS EYES ONLY

94

    CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2       A    That was a category they had in a
3  department prior to creating for 2009 forward the
4  advertising network.
5       Q    Okay.  What else?
6       A    Connecting Point, fourth down in 2009 and
7  2011.
8       Q    And so what generated that revenue?
9       A    Health Grades designed premium profiles
10 for physicians that incorporated the source verified
11 information covered in the patent, as well as rating
12 services.
13      Q    So it was just physicians paying Health
14 Grades to design reports for them?
15      A    Not just that, no.  There was other
16 components, including certain advertising revenue
17 related to website traffic to the Connecting Point
18 with the physician.
19      Q    Okay.  What else did you consider to be
20 business activities associated with the '060 Patent?
21      A    Patient Direct Connect.
22      Q    Okay.  And what's that?
23      A    It's another -- it's focused on the
24 patient versus the physician as far as Connecting
25 Point related to that.  And again, would generate

95

    CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  revenue based on advertisement placements, is my
3  recollection.
4       Q    So what advertisements?  I'm not sure I
5  understand.  What is Patient Direct Connect?
6       A    It's a local connection between online
7  patients and providers initiative that they tried for
8  the years indicated and earned revenue.
9       Q    So it's basically just a way to hook up a
10 patient with a doctor, right, they give them a way
11 for the patient to connect to the doctor?
12      MR. VAZQUEZ:  Form.
13      A    As I recall from discussions and as is
14 described in their 10-K, it's, you know, for a fee,
15 clients were provided the opportunity to engage and
16 assist patients searching for provider information,
17 Physician Quality Reports and other information that
18 related to ratings and the information sources that
19 Health Grades uses on its website.
20      Q    (BY MR. STIMPSON)  What 10-K are you
21 looking at there?  And what are the Bates numbers?
22      A    It's the 2009 form 10-K which is the last
23 full year prior to the grant of the patent.  It's
24 HG 0001580 through 1649.
25      Q    Okay.  And -- but actually -- so you

96

    CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  identified Patient Direct Connect.  How about -- what
3  else did you consider to be business activities
4  associated with the '060 Patent?
5       Q    Is it basically all the stuff listed under
6  revenue here, of attachment 1?
7       MR. VAZQUEZ:  Form.
8       Q    (BY MR. STIMPSON)  To cut to the chase
9  here a bit?
10      A    All the revenue and expenses listed here
11 were in departments listed above.  All departments
12 listed above that had, those departments had some
13 amount of activity, revenue and expenses, or versus
14 activity, revenue and expenses that Health Grades
15 believes and describes as relates to the '060 Patent,
16 the use of the '060 Patent features.
17      And so as I said earlier, rather than
18 parsing out within any department after the fact of
19 which I don't think is supportable or reasonable, I
20 included all of the departments that had any
21 relationship to the '060 patented features and
22 created attachment 1 to measure the revenue and
23 expenses for all of those departments.
24      Q    (BY MR. STIMPSON)  Okay.  But attachment 1
25 does not give us an accurate picture of the revenue

97

    CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  associated with the '060 Patent because as we talked
3  about earlier, there's a lot more that may be
4  included there that is not related to the '060
5  Patent, right?
6       MR. VAZQUEZ:  Form.
7       A    Attachment 1 was not intended to identify
8  all the revenue associated with the '060 Patent.
9  There is more here than -- yes.
10      Q    (BY MR. STIMPSON)  In fact, we can't
11 really know what revenue is associated with the '060
12 Patent, as you candidly state in your footnote 21.
13 There just aren't documents to show that, right?
14      MR. VAZQUEZ:  Form.
15      A    That is accurate.  And also my experience
16 on other cases, that companies don't create P&Ls
17 based on intellectual property, but rather
18 departments and business activities.
19      Q    (BY MR. STIMPSON)  Okay.
20      MR. STIMPSON:  How long have we been
21 going?  What time is it?
22      MR. VAZQUEZ:  An hour.
23      MR. STIMPSON:  Why don't we take a break.
24      (Recess taken from 10:55 a.m. to
25 11:12 a.m.)

25 (Pages 94 to 97)

CONFIDENTIAL - ATTORNEYS EYES ONLY

98

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  Q   (BY MR. STIMPSON) Can we go to paragraph
3  29 of your report, please.
4  A   Yes.
5  Q   The first sentence of paragraph 29 says,
6  One of the claims of the '060 Patent is that visitors
7  to its website can access data on a first healthcare
8  provider.
9  We talked about this just a little bit
10 before, Mr. Hall. But you understand that that's not
11 a claim of the patent, right? That's just an element
12 of one claim.
13 MR. VAZQUEZ: Object to form.
14 A   You know, I would defer to legal counsel
15 on that. I cite the court order regarding claims
16 construction and the quote from that.
17 Q   (BY MR. STIMPSON) Right. But I'm just
18 trying to figure out what you meant in your report
19 here, where you said that one of the claims was that
20 visitors to its website can access data on a first
21 healthcare provider.
22 Would it be more accurate -- would you
23 understand it to be more accurate, Mr. Hall, to say
24 that one of the elements of the claims of the '060
25 Patent is that visitors to the website can access

99

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  data on a first healthcare provider, right?
3  A   That could be. And it may be claims with
4  a small C versus a large C as far as the legal claim
5  of the patent, is how I wrote that. But I was
6  intending to convey what the court order regarding
7  claims construction had with a particular healthcare
8  provider, about the information, you know, the report
9  is being produced related to.
10 Q   Okay. But I think as we talked about
11 earlier today, you understand that all the elements
12 of the claim have to be met in order for it to cover
13 whatever is being accused, right?
14 MR. VAZQUEZ: Object to form. Calls for a
15 legal conclusion.
16 A   That's my general understanding from
17 counsel description, not from my independent
18 knowledge or any legal analysis.
19 Q   (BY MR. STIMPSON) Okay. Your last
20 sentence in paragraph 29 says, Visitors come to the
21 website to research physician information, generate
22 advertising revenue for Health Grades and Vitals.
23 Did I read that correctly?
24 A   Yes.
25 Q   Is it also true to say, sir, that visitors

100

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  who come to the website to research hospital
3  information generate advertising revenue for Health
4  Grades and Vitals?
5  A   Yes.
6  Q   Is it also true, sir, to say that visitors
7  who come to the website to research nursing home
8  information generate advertising revenue for Health
9  Grades?
10 A   Yes.
11 Q   Is it also true that visitors who come to
12 the website and seek directions to a doctor's office
13 are generating revenue for the Health Grades website?
14 A   Yes.
15 Q   Is it also true to say that visitors who
16 come to the website to make appointments with doctors
17 are generating advertising revenue for Health Grades?
18 A   Yes.
19 Q   Is it also true to say that visitors who
20 come to the website to read articles and tips
21 provided by Health Grades or Vitals are generating
22 advertising revenue for Health Grades and Vitals?
23 A   Yes.
24 Q   Is it also true to say that visitors who
25 come to the website to do many other things that are

101

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  on those websites are also generating advertising
3  revenue, right?
4  MR. VAZQUEZ: Object to form. Vague and
5  ambiguous.
6  A   I would answer it as the visitors to the
7  website for, my understanding is, any and all reasons
8  would result in advertising revenue for these
9  companies.
10 Q   (BY MR. STIMPSON) Okay. Thank you.
11 Paragraph 30, you first refer to this
12 $22 million figure for Health Grades from attachment
13 1 that we talked about, right?
14 A   Yes.

15 REDACTED

16
17
18
19
20
21
22
23
24 Q   (BY MR. STIMPSON) Okay. Now, your
25 concluding sentence in that paragraph says, this

26 (Pages 98 to 101)

CONFIDENTIAL - ATTORNEYS EYES ONLY

102

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  advertising revenue, combined with the website
3  visits, demonstrates the demand from the claims
4  embodied in the '060 Patent.
5      What's your basis for saying that,
6  Mr. Hall?
7      A   The basis is both the, as I mentioned
8  earlier, the -- what both these companies promote in
9  the information I received related to their business
10  overview as their features they have for consumers to
11  visit their websites, as well as the marketing
12  information.
13      That includes two business overviews for
14  Vitals, its financial information and the financial
15  statements which indicates its business, if you will,
16  mentioning the patented features, as well as the
17  market of visitors gravitating to Health Grades and
18  Vitals as indicated in the web visits.
19      I say in that statement, as well as the
20  deposition testimony I read, and the Health Grades
21  10-K, as far as what it describes what its business
22  is.
23      And that's a partial list. But it's
24  really everything I looked at relates to what the two
25  companies promote as their features.

103

CONFIDENTIAL - ATTORNEYS EYES ONLY

2      Also my searches on the web referenced
3  earlier that pulls up in bold ratings and reviews for
4  both companies.
5      It's the first thing a visitor to Google
6  or Yahoo will see. And that has resulted in those
7  two entities having half the market and growing over
8  time during the infringement period.
9      Q   Anything else?
10      A   I guess two different Vitals or MDx
11  financial statements, two of their business
12  overviews. Health Grades' business overview I would
13  include in that list.
14      Q   Anything else?
15      A   There may be, but that's what comes to
16  mind as to demonstrate the demand for this product.
17  The market's reaction is a strong component of it as
18  far as what the two companies promote and then how
19  the market has responded to that, as opposed to what
20  other information sources online are available.
21      Q   Okay. So all those things that you cited
22  as supporting that statement, are any of them
23  identified here as support for this paragraph 30?
24      A   They're identified throughout my report.
25      Q   Okay. Can you --

104

CONFIDENTIAL - ATTORNEYS EYES ONLY

2      A   I cite a case here as far what -- what
3  demonstrated, what my understanding of case law in
4  demonstrating, the need for demonstrating demand for
5  the product or of the patent features.
6      Q   Okay. So I'm trying to get a handle on
7  what your actual documentary support is for saying
8  there is demand. And can you identify those
9  documents for me, please?
10      A   Yes.
11      Q   And show me where they are in your report,
12  please?
13      A   The first document is Vitals' business
14  overview, progress, strategy and plans.
15      Q   What's the Bates number, please?
16      A   MDx 0012688.
17      Q   Okay.
18      A   Through 12756.
19      Q   Okay.
20      A   In addition to being -- should I do all
21  the sources and then show where they're at?
22      Q   Yeah, let's do that. We'll do the sources
23  first and then we'll go back and try and find them in
24  the report.
25      A   Okay. Another business overview, Vitals

105

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  MDx 0012882 through 12934.
3      Q   12934, okay.
4      A   Correct.
5      MDx's audited financial statements years
6  ending December 31, 2011 and 2010. MDx 0104440
7  through 104466.
8      I have referenced before Health Grades'
9  form 10-K, HG 0001580 through 1649.
10      MDx audited financial statements years
11  ending May 31, 2009 and 2008.
12      Q   Do you have a Bates number?
13      A   Oh, sorry. MDx 0104632, 0104649.
14      Then Allen Dodge deposition testimony,
15  pages in the 250s towards the end of his deposition,
16  is my recollection.
17      Q   Anything else?
18      A   There's discussions I referenced earlier
19  with Andrea Pearson and Allen Dodge. Then there's
20  the Health Grades investor day presentation,
21  HG 0001728 through 1800.
22      Q   Anything else?
23      A   Those are what come to mind right now.
24      Q   So you have a section in your report
25  headed demand, starting right before paragraph 28,

27 (Pages 102 to 105)

CONFIDENTIAL - ATTORNEYS EYES ONLY

| | 106 |
|---|---|
| | CONFIDENTIAL - ATTORNEYS EYES ONLY |
| 2 | right? |
| 3 | A   Yes. |
| 4 | Q   Are any of those documents or deposition |
| 5 | testimonies referenced in that section anywhere? |
| 6 | A   Not with footnotes. |
| 7 | Q   In any way? |
| 8 | A   Elsewhere in the report and my attachments |
| 9 | they're cited, especially when I do the website |
| 10 | visits. And they're cited there as well, in the |
| 11 | attachments, as well as in other places in my report. |
| 12 | Q   But my question is, when I sat down to |
| 13 | review this report to prepare for your deposition, |
| 14 | how could I have possibly known that you were using |
| 15 | any of these to support your demand analysis? |
| 16 | MR. VAZQUEZ: Form. |
| 17 | A   Having read, for example, through page 5 |
| 18 | as part of the background of the companies and |
| 19 | discussions of the patent and the patented features. |
| 20 | Footnote 10 is a snapshot of Vitals from business |
| 21 | overview, progress strategy plan. |
| 22 | Q   (BY MR. STIMPSON) Hold on just a second. |
| 23 | And that's the second document you reference, right? |
| 24 | A   Yes. |
| 25 | Q   Okay. That's not cited in your section on |

| | 107 |
|---|---|
| | CONFIDENTIAL - ATTORNEYS EYES ONLY |
| 2 | demand, is it? |
| 3 | A   I didn't recite every source that I relied |
| 4 | on. I wanted to -- it is not, is the answer, no. |
| 5 | Q   Right. I mean, and in fact, the paragraph |
| 6 | it's cited for just says that Vitals began operations |
| 7 | in July 2006. Initially the company spent 18 months |
| 8 | collecting data and building its website. About |
| 9 | REDACTED |
| 10 | |
| 11 | |
| 12 | |
| 13 | A   That's the cite. |
| 14 | Q   And the word demand is not in that |
| 15 | paragraph, right? |
| 16 | A   No, compounded annual growth relates to a |
| 17 | demonstration of demand as it promotes the patented |
| 18 | features and then experiences growth from that. |
| 19 | Q   Where does it say promotes patented |
| 20 | features in this paragraph? In fact, the patent |
| 21 | isn't even mentioned in paragraph 19, is it? |
| 22 | A   It is not. I don't in every paragraph |
| 23 | restate every point I'm making with respect to the |
| 24 | patented features and then the demand. |
| 25 | Q   Okay. So you found one footnote that is |

| | 108 |
|---|---|
| | CONFIDENTIAL - ATTORNEYS EYES ONLY |
| 2 | outside the demand section in your report that |
| 3 | mentions one of these eight things you gave me. |
| 4 | Is there any other way I could know from |
| 5 | reading your report that you were relying on any of |
| 6 | these other things for your demand analysis? |
| 7 | MR. VAZQUEZ: Form. |
| 8 | A   Yes. |
| 9 | Q   (BY MR. STIMPSON) Okay. Can you tell me, |
| 10 | please? |
| 11 | A   The next sentence. Vitals describes its |
| 12 | business as an online healthcare directory service |
| 13 | provider in the audited financial statements it |
| 14 | referenced earlier. |
| 15 | And in the organization section -- well, |
| 16 | in the next sentence as well. And it's an Ibid. |
| 17 | footnote below. And if you reference the next |
| 18 | section, or sentence, it references one of the |
| 19 | sources as far as online healthcare directory service |
| 20 | allows users to compare and rate physicians on its |
| 21 | primary website. It's the first sentence of the |
| 22 | description of the organization and entity MDx. |
| 23 | Q   What page are you referring to now? I |
| 24 | mean, actually, this is one of the problems. And |
| 25 | I'll just tell you bluntly. I don't have any of |

| | 109 |
|---|---|
| | CONFIDENTIAL - ATTORNEYS EYES ONLY |
| 2 | these documents with me because I couldn't match this |
| 3 | up. So I can't even really ask you about it. |
| 4 | But this document you're looking at is in |
| 5 | your binder and it's a marked-up copy of something |
| 6 | you have used, right? And which document is that you |
| 7 | just read from? |
| 8 | A   It is a referenced copy, is what I would |
| 9 | say. It is MDx 0104440, MDx's audited financial |
| 10 | statements. |
| 11 | Q   Okay. And so read me the part again, |
| 12 | please, that you think supports demand. |
| 13 | A   MDx operates as an online healthcare |
| 14 | directory service provider. MDx Medical allows users |
| 15 | to compare and rate physicians on its primary |
| 16 | website, Vitals.com, and its recently acquired |
| 17 | websites. |
| 18 | Part of demonstrating demand is gaining an |
| 19 | understanding of what the companies promote to try |
| 20 | and attract business. And to the extent that compare |
| 21 | and rating physicians is the lead-in sentence, as |
| 22 | well as the other sources, is to me a demonstration |
| 23 | of what Vitals is doing to attract demand for its |
| 24 | website, which yields advertising revenue. So that's |
| 25 | how it is related to the demand. |

28 (Pages 106 to 109)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**110**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    Q    Okay. So it's your belief then, Mr. Hall,
3    that by showing that these companies promoted certain
4    features, that's enough to show demand for the patent
5    invention?
6        MR. VAZQUEZ:  Form.
7    A    No, that's not my testimony.
8    Q    (BY MR. STIMPSON)  Okay. So is it your
9    understanding that promoting a patented feature is
10   enough by itself to show demand under federal circuit
11   law?
12       MR. VAZQUEZ:  Form. Calls for a legal
13   conclusion.
14   A    That's not my understanding.
15   Q    (BY MR. STIMPSON)  So -- I think we have
16   too many negatives going on here.
17       So you in your view agree that it requires
18   more than just Health Grades or Vitals saying, Hey,
19   look, here is a cool feature on our website, to show
20   demands for the patented product, right?
21       MR. VAZQUEZ:  Form.
22   A    That's certainly my view. I don't have a
23   view related to, of course, the federal circuit. But
24   it's part of an analysis I performed.
25   Q    (BY MR. STIMPSON)  And the rest of --

---

**111**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    A    And an important one as to what they're
3    promoting to the market. And then how the market
4    responds to that is an important part as well.
5    Q    Okay. And what evidence do you have that
6    the market responded to that statement you just read
7    for me in the MDx document?
8    A    Along with the other business overview and
9    other sources I cited, demonstrates to me that Vitals
10   identified and described themselves, as well as their
11   website, promotes the ratings feature on search
12   engines.
13       That, as well as Health Grades doing that
14   as well, yielding the -- for most of the time the
15   number one and number two visitors within their
16   market and essentially dominating those two.
17   Starting at 50 percent and growing in the years after
18   the infringement shows me that those are features
19   that the market was receptive to and visited their
20   health sites related to.
21       It was the intent of the parties as they
22   promoted those features to get the traffic, get
23   website traffic. And that's what has happened in the
24   market, reasonably demonstrates that there's a demand
25   for those features.

---

**112**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    Q    And is it your understanding that those
3    are the only features that Health Grades and Vitals
4    promote?
5    A    No.
6    Q    In fact, they promote a lot of things,
7    don't they? Right?
8    A    No, I did not always see that. I saw this
9    description of a lot of their business that would
10   include a lot of things. The Internet searches I
11   did, as well as the -- well, the Internet searches I
12   did focus right in on the ratings and reviews in
13   bold. That's what a user would see.
14       On their business overview, there is other
15   additional features, certainly.
16   Q    That they're promoting, right?
17   A    Well, the business overview is an internal
18   document, evaluating what it is they have and what is
19   the key to their success.
20       I have not seen as much information --
21   they are promoting other features. I've seen
22   evidence of that. But the information I have seen
23   shows that the patented features are highly promoted
24   by both entities, both companies, discussed in
25   pre-litigation business overviews and describe

---

**113**

CONFIDENTIAL - ATTORNEYS EYES ONLY

1
2    themselves that way in the first sentence of their
3    audited financial statements, that that was key to
4    their business model and promoted as such.
5    Q    Did you ask before you did this report,
6    Hey, I want to see everything that Health Grades and
7    Vitals promotes on their website? Or did you just
8    focus in on what they're promoting on these ratings?
9        MR. VAZQUEZ:  Form.
10   A    I looked at all the information that was
11   available and did ask Health Grades personnel what it
12   is their website did and what it is they promoted.
13   And as part of that discussion, gained an
14   understanding of the '060 Patent and its importance
15   to Health Grades and how they utilized it to generate
16   ad revenue.
17   Q    (BY MR. STIMPSON)  Well, I mean, you know
18   that the Health Grades people want as much damages as
19   they can get, right?
20       MR. VAZQUEZ:  Form.
21   Q    (BY MR. STIMPSON)  That's pretty -- that's
22   a given, isn't it?
23       MR. VAZQUEZ:  Form.
24   A    I have not had those discussions with any
25   Health Grades personnel.

---

29 (Pages 110 to 113)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**114**

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 Q (BY MR. STIMPSON) Well, let me ask you
3 this. If they were biased one way or another to say
4 it was the '060 that was driving all this, or other
5 features, they would be biased to say the '060 was
6 what's driving it, right?
7 MR. VAZQUEZ: Form, argumentative.
8 Q (BY MR. STIMPSON) That's just common
9 sense, right?
10 MR. VAZQUEZ: Form. Argumentative.
11 A And the question is?
12 Q (BY MR. STIMPSON) If the Health Grades
13 witnesses are going to be biased in what they're
14 telling you, they're much more likely to be biased in
15 saying, oh boy, the '060 Patent, those features are
16 what drives this business, than to say it's really
17 all this other stuff, right?
18 MR. VAZQUEZ: Object to form.
19 Argumentative.
20 A I have not discerned bias in my
21 discussions with Mr. Dodge and Ms. Pearson about the
22 patented features. And that was just a part of my
23 analysis. I looked at the documents and looked at
24 the web page and would not rely just on their
25 description of the patented features, but looked at

---

**115**

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 documents, particularly pre-litigation documents of
3 both parties as to what they promoted as their
4 features.
5 Q (BY MR. STIMPSON) So, but you understand
6 that, generally speaking, given the choice between
7 having more money and less money, people want more
8 money, right?
9 MR. VAZQUEZ: Object to form.
10 Q (BY MR. STIMPSON) Is that a fair
11 assumption, Mr. Hall?
12 MR. VAZQUEZ: Object to form.
13 A As this relates to Vitals?
14 Q (BY MR. STIMPSON) Anything.
15 A And Health Grades?
16 Q No, the whole world. Given the choice
17 between having more money and having less money,
18 which would do you think people would take?
19 MR. VAZQUEZ: Form.
20 A I think people would take more money.
21 Q (BY MR. STIMPSON) Right. So, and the
22 Health Grades people you spoke with understood that
23 you were their damages expert, right?
24 A Yes.
25 Q Okay. And they also understood that the

---

**116**

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 more important these features were, the '060 Patent,
3 the more they could potentially get for damages,
4 right?
5 MR. VAZQUEZ: Object to form.
6 A We didn't discuss that understanding they
7 had related to that.
8 Q (BY MR. STIMPSON) Yeah, but, I mean, they
9 understood why you were asking these questions,
10 right, Mr. Hall?
11 MR. VAZQUEZ: Form.
12 A Yes, I described my assignment and what I
13 was attempting to do.
14 Q (BY MR. STIMPSON) And I don't know
15 Ms. Pearson. But Mr. Dodge is no dummy, right? He
16 gets this, doesn't he?
17 MR. VAZQUEZ: Form.
18 A My view of Mr. Dodge is that he is
19 definitely no dummy.
20 Q (BY MR. STIMPSON) Right. So he
21 understood that if he was able to show, give you
22 evidence to show that the '060 is what is driving,
23 you know, the sales here, that would help their
24 damages case, right?
25 MR. VAZQUEZ: Form.

---

**117**

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 A I don't recall Mr. Dodge giving me
3 evidence. I read his deposition testimony related to
4 it. But the documents I've received and reviewed for
5 Vitals and Health Grades did not come from Mr. Dodge.
6 Q (BY MR. STIMPSON) Right. But you talked
7 to Mr. Dodge, and I think you listed that was part of
8 your analysis on the demand factor, right?
9 A Particularly his deposition testimony.
10 Our in-person meetings were very focused
11 on the financial information we discussed earlier and
12 what ultimately was provided to me.
13 Q Right. Well, the deposition testimony
14 really doesn't make any difference whether you're
15 asking the questions or I'm asking the questions.
16 The same, you know, analysis applies to Mr. Dodge or
17 anybody else that, you know, you want to help
18 yourself get more money, for anybody, right?
19 MR. VAZQUEZ: Object to form.
20 Argumentative.
21 Q (BY MR. STIMPSON) That's true of anybody?
22 MR. VAZQUEZ: Object to form.
23 Argumentative. Asked and answered.
24 A And the question? I'm sorry.
25 MR. STIMPSON: I can have it read back.

---

30 (Pages 114 to 117)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

118

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2          (Record read as requested.)
3          MR. VAZQUEZ:  Same objections.
4      A    Is the question that Mr. Dodge was trying
5  to help himself get money?
6      Q    (BY MR. STIMPSON)  Let me just rephrase
7  this.  You've been an expert for a long time, right?
8      A    I've consulted 24 years, yes.
9      Q    And I assume you've heard a lot of
10 testimony from witnesses, right?
11     A    Yes.
12     Q    Okay.  And you've seen testimony at trial
13 from witnesses, right?
14     A    Yes, I have.
15     Q    And in your experience, Mr. Hall, do
16 witnesses for parties try to help themselves and
17 their own companies?
18     A    My experience is really -- it spans the
19 range.  My main experience is witnesses try to answer
20 truthfully what they're asked.
21     Q    Okay.  But the whole point, you understand
22 the whole point -- well, let me rephrase that.
23          You understand that witnesses, if they can
24 answer one way or another, they're going to try to
25 answer in a way that helps their company, right?

---

119

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2          MR. VAZQUEZ:  Form.
3      A    If they can answer one way or another,
4  meaning, depending on the question?
5      Q    (BY MR. STIMPSON)  Truthfully answer one
6  way or another.
7          MR. VAZQUEZ:  Form.
8      A    I wouldn't want to make a generalization
9  like that.
10     Q    (BY MR. STIMPSON)  Okay.
11     A    I think most answer the way they
12 understand the question to be.
13     Q    All right.
14     A    I have seen some witnesses impeached and
15 then I have different opinions of those witnesses.
16 But my experience is most witnesses try to answer
17 the question asked.
18     Q    Let me ask you a different question, then.
19 Specifically what did you ask Mr. Dodge and
20 Ms. Pearson or Health Grades' counsel or anybody
21 about finding information on what Health Grades and
22 Vitals promote other than these patient ratings?
23          MR. VAZQUEZ:  Form.  Compound.
24     A    I don't recall asking -- perhaps
25 Ms. Pearson, we discussed Vitals, but your question

---

120

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2  included Vitals.  So with Mr. Dodge and Ms. Pearson,
3  I asked them broadly, after reviewing documents made
4  available about Health Grades, how it is they attempt
5  to make money, particularly with advertising revenue.
6  Once I gained an understanding of the visitors and
7  the connection between visitors and advertising
8  revenue and how they attempted to do that, which
9  included both a discussion about the patented
10 features, but also non-patented features that Health
11 Grades has that generates revenue.
12     Q    (BY MR. STIMPSON)  So what other things
13 does Health Grades promote on their website besides
14 the ratings?
15     A    I could look at the printout I had of the
16 website, but recalling that they promote on the
17 search engine, the search engine tools.  And on their
18 documents, the main thing I saw them promote was the
19 features of the '060 Patent.
20          On the website itself, it offers a variety
21 of services that we talked to earlier, or searches
22 related to information alone that may not be
23 connected to a comparison or rating report.  So it
24 would be the factors we discussed earlier.
25          And there are searches and visitors, in my

---

121

1          CONFIDENTIAL - ATTORNEYS EYES ONLY
2  view, that visit Health Grades that both are related
3  to the '060 Patent and both are not.
4      Q    So as we sit here today, can you identify
5  any other specific things that Health Grades promotes
6  besides these ratings that you identified?
7          MR. VAZQUEZ:  Object to form.
8      A    Yes.  They promote the information that I
9  discuss in my report and that we discussed earlier,
10 on physicians or healthcare providers, nursing homes,
11 hospitals, some of the other things I mentioned in my
12 report in the background section.
13     Q    (BY MR. STIMPSON)  Okay.  So we've got --
14 you know that Health Grades promotes, as you say, the
15 comparison ratings, you cited me some documents.  We
16 also know that Health Grades promotes nursing homes.
17 We also know that Health Grades promotes hospitals,
18 right, the hospital searches, right?
19     A    Promotes their information on those
20 entities.
21     Q    Right.  So Health Grades is promoting
22 searches for all those things on its website, right?
23          MR. VAZQUEZ:  Form.
24     A    It makes those available, yes.
25     Q    (BY MR. STIMPSON)  Right.  So, and some of

---

31 (Pages 118 to 121)

CONFIDENTIAL - ATTORNEYS EYES ONLY

122

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 those are promoting features that aren't covered by
3 the '060 Patent, right?
4     A    I agree.
5     Q    So how do you know, Mr. Hall, that it's
6 only the promotion of the '060 Patent features that
7 leads to this, what you refer to as a success of the
8 Health Grades website?
9     A    The fact that it's the primary feature.
10 When you search on web searches, it's the one in bold
11 as far as their comparison ratings, and the one that
12 shows up on search engines, as well as it's the
13 documents I referred to earlier.  Their business
14 features the comparison ratings.
15        And what Mr. Neal described in his
16 deposition is the unique experience that they want
17 visitors to have, due to the combination of their
18 information with comparison ratings of physicians.
19        That, combined with how Vitals describes
20 its effort to be the trip advisor of the healthcare
21 information, online healthcare information, which of
22 course includes comparison ratings and star ratings,
23 as well as what it shows, what it decided to bold and
24 show on searches on the web and its internal
25 documents pre-litigation about the features it

123

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 promotes in its hope for website traffic.
3        And ending with, and very importantly, how
4 the market has responded to that.  Whether it's the
5 market as defined in my first report or Mr. Napper's
6 report, the market reaction to the two entities that
7 promote the patented features and the domination
8 those two have, measured either way, leads me to
9 reasonably believe that the patented features is a
10 substantial sources of demand.
11     Q    What percentage of the demand comes from
12 the patented features?
13     A    I have not calculated a percentage.
14     Q    Is it more than 20 percent?
15        MR. VAZQUEZ:  Object to form.  Asked and
16 answered.
17     Q    (BY MR. STIMPSON)  Actually, your counsel
18 is right.  You don't have any idea, do you, what
19 percentage?
20        MR. VAZQUEZ:  Object to form.
21 Argumentative and inappropriate.
22     Q    (BY MR. STIMPSON)  You don't have -- my
23 question, Mr. Hall, is this.  You don't have any idea
24 what percentage of the demand for the Health Grades
25 website comes from the '060 patented features, right?

124

CONFIDENTIAL - ATTORNEYS EYES ONLY
2     A    Based on my answer earlier, I believe it's
3 a substantial part of the demand, but not all.
4     Q    Okay.  So you can't quantify that in any
5 way, right?
6        MR. VAZQUEZ:  Form.
7     A    I have not -- I have not undergone a
8 quantification, nor do I think it's needed to pass
9 the Panduit test 1, as far as demand.
10     Q    (BY MR. STIMPSON)  So you say substantial.
11 But I'm just trying to get a handle on what you mean.
12 You can't -- all right.  That's okay.  You didn't try
13 to quantify that, right?  That wasn't a metric in
14 your analysis, right?
15        MR. VAZQUEZ:  Form.
16     A    What metric are you referring to?
17     Q    (BY MR. STIMPSON)  Well, what we've been
18 talking about.  What percentage of the demand for the
19 Health Grades website is generated by the '060
20 features?
21     A    I haven't calculated a percentage.
22     Q    Okay.  Would you agree with me, Mr. Hall,
23 that the database itself, the actual data is a
24 critical part of both the Health Grades and the
25 Vitals websites?

125

CONFIDENTIAL - ATTORNEYS EYES ONLY
2     A    I would agree it's a very important part
3 of both.  And I stated in my report, I don't know if
4 I used the word critical, but yes, the data is
5 important for these entities.
6     Q    And in your analysis, Mr. Hall, did you
7 consider what Health Grades was doing before it added
8 comparison ratings to its reports?
9        MR. VAZQUEZ:  Form.
10     A    Yes, I recall learning about that.
11     Q    (BY MR. STIMPSON)  Okay.  And what did you
12 learn?
13     A    That Health Grades obtained the
14 information, as far as from its different sources,
15 and then ultimately began generating reports for
16 sale, is the chronology I recall.  But I recall
17 understanding the history of Health Grades in the
18 various time periods.
19     Q    Well, you understand that for a damages
20 analyses in patent cases, one of the factors you look
21 at is, how did this invention differ from what was in
22 the prior art, right?
23        MR. VAZQUEZ:  Object to form.  Calls for a
24 legal conclusion.
25     A    I'm familiar from my experience on issues

32 (Pages 122 to 125)

CONFIDENTIAL - ATTORNEYS EYES ONLY

126

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   related to prior art and the parties taking positions
3   on that.
4       Q   (BY MR. STIMPSON)  Right.  The idea is you
5   want to know what are the advantages of this patent
6   compared to what was done before, right?
7       MR. VAZQUEZ:  Same objections.
8       A   I have that understanding, yes.
9       Q   (BY MR. STIMPSON)  And so did you ask
10  Health Grades or their counsel or anybody to show you
11  what was in the prior art?
12      MR. VAZQUEZ:  Same objections.
13      A   I did not ask that question specifically.
14  I gained an understanding from my review of the
15  record of Health Grades' history and then its patent
16  application and its proposed use of the patent.
17      Q   (BY MR. STIMPSON)  Okay.  So what's that
18  understanding that you gained?
19      A   How far back?
20      Q   Well, let's take it, you know, before the
21  filing date of the patent.  Did you have the
22  understanding that Health Grades in the prior art had
23  reports on physicians that had ratings on those
24  physicians?
25      A   I did not have that understanding of that

127

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   prior to the patent application.
3       Q   Okay.  Let me show you what has been
4   marked as Exhibit 13.  Have you seen that document
5   before?
6       A   I may have as part of a deposition, but I
7   can't say for sure right now.
8       Q   So if you look at the front page at the
9   bottom right-hand corner, what's the date you see
10  there?
11      A   June 4th, 2005.
12      Q   And that's a long time before Health
13  Grades filed its first patent application, right?
14      A   That's my understanding, yes.
15      Q   And you see from the URL down there that
16  this is healthgrades.com?
17      A   Yes.
18      Q   And if you just follow along with me on
19  the front page, sir, you can see that this report on
20  Dr. Drucker shows his gender, right?
21      A   Yes.
22      Q   His age?
23      A   (Indicating.)
24      Q   You have to answer audibly.
25      A   Yes.

128

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       Q   Okay.  The languages he speaks?
3       A   Yes.
4       Q   Years in profession?
5       A   I see that.
6       Q   And it has his awards and his honors,
7   right?
8       A   Yes.
9       Q   Okay.  And it has his affiliations and
10  memberships?
11      A   It does.
12      Q   Personal interests?
13      A   Yes.
14      Q   It's got his medical school?
15      A   It does.
16      Q   And it's got information on intern, where
17  his internship, his residency and fellowship were all
18  done, right?
19      A   Yes.
20      Q   And then if you look to the next page,
21  under patient experience?
22      A   Yes.
23      Q   You can see that there are ratings for
24  Dr. Drucker, right?
25      MR. VAZQUEZ:  Form.

129

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       A   I see the patient experience listed by the
3   bars, yes.
4       Q   (BY MR. STIMPSON)  And that's a patient
5   experience rating, right?
6       MR. VAZQUEZ:  Form.
7       A   It's under the patient experience
8   category.  I don't see the footnote 2 as to how
9   that's described.  Maybe it's at the end.  I see
10  that.
11      Q   (BY MR. STIMPSON)  In any event you can
12  see Patient Experience Survey data for Dr. Drucker in
13  this prior art, right?
14      A   I don't know that it's from a survey, from
15  this page.  I see what you're referencing, the
16  patient experience section.  Now I see six surveys,
17  yes.  I'm with you.
18      Q   Okay.  So, and if you look to the last
19  page under affiliated hospitals.
20      A   Yes.
21      Q   You can see there are comparison ratings
22  for hospitals right in this report, right?
23      MR. VAZQUEZ:  Object to form.  Misstates
24  the document.
25      A   I see affiliated hospitals, best, as

33 (Pages 126 to 129)

CONFIDENTIAL - ATTORNEYS EYES ONLY

130

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 expected and poor.
3      Are you referring to something below that?
4      Q    (BY MR. STIMPSON)  Sure.  Do you see where
5 Staten Island University got three stars for total
6 hits?
7      A    Yes.
8      Q    And then Overlook Hospital got one star?
9      A    That's right.
10      Q    Those are comparison ratings for
11 hospitals, right?
12      MR. VAZQUEZ:  Object to form.
13      A    Yes, that's what it looks like.
14      Q    (BY MR. STIMPSON)  So here is my question,
15 Mr. Hall.  What did you do, sir, if anything, to
16 determine how the '060 Patent supposedly improves
17 upon this and how that improvement might drive sales
18 or demand for the Health Grades website?
19      MR. VAZQUEZ:  Object to form.
20      A    I did not do a prior art analysis, nor was
21 I asked to.  I evaluated Health Grades' business and
22 gained an understanding of its operations from the
23 time periods in question for the damage period.  But
24 in years preceding it as well, to gain an
25 understanding as to Health Grades and its entry into

131

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 the market in January 2008.
3      I did not undergo a prior art analysis.
4      Q    (BY MR. STIMPSON)  So assume with me
5 please, Mr. Hall, that this is prior art to the
6 Health Grades patent.  And that the only difference
7 between this prior art and what Health Grades is
8 doing under the '060 Patent is they added comparison
9 ratings for physicians, okay?
10      A    Okay.  This is a hypothetical?
11      Q    Yes.  Do you understand it?
12      A    I do.
13      Q    How -- do you have anything in your report
14 or otherwise showing how the addition of those
15 comparison ratings of physicians impacted the demand
16 for the Health Grades website?
17      A    I do.  I've seen information related to
18 that.
19      Q    Okay.  And what's that information?
20      A    The Health Grades promotion of that
21 feature, as well as the market's reaction to it, it
22 increased website traffic.
23      Q    So you know that the market reacted to
24 that specific part about adding comparison ratings of
25 physicians?  Is that your testimony?

132

CONFIDENTIAL - ATTORNEYS EYES ONLY
2      A    My testimony is, I think it's a reasonable
3 inference, given the focus of the promotion of that
4 ability or feature.  And coupled with Vitals'
5 promotion of the same, and those two entities being
6 far and away the two biggest as far as traffic,
7 visitors, website traffic or online visitors in the
8 market.
9      Q    And what documents -- are they the same
10 documents you referred to earlier about supporting
11 your conclusion there?
12      MR. VAZQUEZ:  Form.
13      A    It would be the same documents, but also
14 the Comscore website traffic.  And I don't know if I
15 included that.  Though you were asking questions
16 about a sentence that I think referenced Comscore
17 documents.
18      So it would also be the measurement of the
19 market's reaction of these entities as they promoted
20 patented features.
21      Q    (BY MR. STIMPSON)  Do you know of any
22 documents where Health Grades or Vitals promoted only
23 the comparison ratings feature?  I mean, not in the
24 context of, you know, come get reports from us, and
25 we'll give you all this information.  We'll give you

133

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 the comparison ratings.
3      But do you know of anything where Health
4 Grades or Vitals said this is the newest, greatest
5 thing we have, is comparison ratings?
6      MR. VAZQUEZ:  Object to form.  Compound.
7      A    Most of the information I saw related to
8 that also included other features.
9      The website search, searches I did would
10 be an exception to that, in that they bolded the
11 physician ratings and reviews.  The first snippet one
12 would see if you pulled up to find a doctor search,
13 for example.  And I did not see other features
14 because there's just one half-sentence line that
15 you'll get on the web page.
16      Q    (BY MR. STIMPSON)  Is that attached as an
17 exhibit or anything, or did you print any of that?
18      A    I have printed it and reference it in
19 appendix C.
20      Q    So it's in appendix C?
21      A    I believe so.
22      Q    Is the actual document that we can look at
23 in appendix C?
24      A    I have one of them here.
25      Q    Well, let's first focus on your report.  I

34 (Pages 130 to 133)

CONFIDENTIAL - ATTORNEYS EYES ONLY

134

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   mean, you're relying on what you did to go to the
3   Health Grades website and something you said you saw
4   that was bolded?
5      A   No, not the Health Grades website. I
6   believe Google.
7      Q   Oh, you went to Google?
8      A   Yes.
9      Q   Ah, okay. And what was it that was
10  bolded?
11     A   Ratings. Leading independent healthcare
12  ratings company is a Health Grades snippet. Vitals
13  bolded its ratings, but before that is doctor reviews
14  and ratings. So that was part of what I was
15  referring to.
16     Q   Stay right there for a second. So the
17  words comparison ratings were not bolded?
18     A   Ratings was bolded.
19     Q   Right. And as we saw in the prior art,
20  ratings was in the prior art, right?
21         MR. VAZQUEZ: Form. Calls for a legal
22  conclusion.
23     A   Hospital ratings I saw.
24     Q   (BY MR. STIMPSON) Also the survey results
25  for Dr. Drucker himself, right?

135

1         CONFIDENTIAL - ATTORNEYS EYES ONLY
2         MR. VAZQUEZ: Form.
3      A   Yes.
4      Q   (BY MR. STIMPSON) Okay.
5      A   I'm sorry, the hospital had comparison
6   ratings.
7      Q   Right. But just so we're clear, there
8   were ratings also on Dr. Drucker. You saw that,
9   right?
10     A   Yes. I didn't see comparison ratings but
11  I saw rating survey results from patients.
12         MR. STIMPSON: How long have we been
13  going?
14         THE REPORTER: We've been going 48
15  minutes.
16         MR. STIMPSON: Let me just finish this
17  line of questioning and then we can take a break,
18  okay?
19     Q   (BY MR. STIMPSON) So Mr. Hall, you
20  understand -- I mean, you cite several federal
21  circuit cases in your report, right?
22     A   I do cite cases, yes.
23     Q   And you've read those cases?
24     A   Yes.
25     Q   Did you come up with those cases or did

136

1         CONFIDENTIAL - ATTORNEYS EYES ONLY
2   your counsel tell you which ones to cite?
3      A   I don't recall counsel directing me on
4   those cases. We may have discussed them, but I'm
5   aware of those cases from my experience with patent
6   damages.
7      Q   So the cases are important, right, because
8   they give you the framework of what you're supposed
9   to consider and how you consider it, right?
10         MR. VAZQUEZ: Form.
11     A   I think that the cases that address
12  damages in patent cases are important. They're not
13  all -- they don't all say the same things. I think
14  we all know, but I would -- I would -- my view is,
15  yes, it's important to understand what the courts are
16  saying about damages on patent cases, yes.
17     Q   (BY MR. STIMPSON) So what I want to
18  address now is, I just want to make sure that we're
19  having the same understanding about how damages in
20  patent cases should be analyzed, okay?
21         One thing that you see from time to time
22  in these guidelines is -- this isn't the first case,
23  right, where you have products that have some things
24  patented and some things not patented, right?
25         MR. VAZQUEZ: Form.

137

1         CONFIDENTIAL - ATTORNEYS EYES ONLY
2      Q   (BY MR. STIMPSON) Do you know what I'm
3   talking about?
4      A   I do.
5      Q   So just like our case here, some products
6   are made of different components where one of the
7   components may be covered by an asserted patent and
8   others are not, right?
9         MR. VAZQUEZ: Form.
10     A   What case are you referring to?
11     Q   (BY MR. STIMPSON) I don't want to do it
12  with any -- I just want to see what your
13  understanding is today.
14     A   And the question is, in this case are
15  there features that are patented and features that
16  are not patented?
17     Q   Yeah, we've already been over that for
18  this case, right? I mean, for example, for Health
19  Grades, you know, you've seen the nursing homes and
20  the hospitals. So we know we're in a case where
21  you've got a product, here is the website, where some
22  parts may be covered by the patent and other parts
23  aren't, right?
24     A   Yes.
25     Q   Okay. You understand, sir, that damages

35 (Pages 134 to 137)

CONFIDENTIAL - ATTORNEYS EYES ONLY

138

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2   are awarded for the use made of the invention by the
3   infringer, right?
4      MR. VAZQUEZ: Form.
5      A   As I described, I think I described in my
6   report, the measure of damages that I believe is
7   appropriate for patents, whether it's lost profits.
8   And it starts with the patent statute 284.
9      Q   (BY MR. STIMPSON) Right. But my
10  question, sir, is, you understand that damages are
11  awarded for the use made of the invention by the
12  infringer, right?
13     MR. VAZQUEZ: Form.
14     A   That's my understanding. That's the basis
15  for damages.
16     Q   (BY MR. STIMPSON) And where you have
17  small elements of multi component products that are
18  accused of infringement, calculating a royalty on the
19  entire product carries considerable risk that the
20  patentee will be improperly compensated for non-
21  components of that product, right?
22     MR. VAZQUEZ: Object to form. Calls for a
23  legal conclusion.
24     A   Are you asking me to agree with that
25  statement in the case?

139

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2      Q   (BY MR. STIMPSON) That's my statement.
3   Is that the case?
4      A   Okay. You were reading from a case
5   document, so I wondered if that was from the case, or
6   you --
7      Q   I'm just asking for your understanding,
8   sir. So don't worry about what I'm reading from
9   because I'll tell you that some of what I'm going to
10  say comes from cases and some doesn't. But I just
11  want to know that we're on the same page.
12     So my question here is, where small
13  elements of a multi-component product are accused of
14  infringement, calculating a royalty on the entire
15  product carries considerable risk that the patentee
16  is going to be improperly compensated for the non-
17  patented, the non-infringing components, right?
18     MR. VAZQUEZ: Form.
19     A   I'll answer that with I don't think that's
20  the situation here, that this is a small feature that
21  is patented. And secondly, I didn't base a royalty
22  on the entire value of the product that the patented
23  features are a part of.
24     Q   (BY MR. STIMPSON) So let me ask you a
25  different way, then. Where only part of the accused

140

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2   product uses the patented technology, do you agree
3   with me, sir, that there's a risk, using the entire
4   product, that the patentee might be improperly
5   compensated for features that are not subject to the
6   patent?
7      MR. VAZQUEZ: Form.
8      A   As you worded it, that's not -- I don't
9   think I would word it that way. You said use the
10  entire product. Use the entire product for what?
11     Q   (BY MR. STIMPSON) As a royalty base.
12     A   If the revenue from the entire product, if
13  there's an established history of licensing based on
14  that revenue and if the royalty rate is adjusted to
15  account for features other than the patented
16  features, my view is that a reasonable royalty based
17  on a hypothetical negotiation can be achieved that
18  reasonably compensates the patent holder in a royalty
19  damages measurement.
20     Q   So can you tell me what the entire market
21  value rule is?
22     A   Yes.
23     Q   Okay. And what is it?
24     A   As outlined in cases beginning in the
25  1980s forward, my non-legal, but the damage expert's

141

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2   view of it is, it's a rule that courts have cited
3   when determining royalty damages as to whether a
4   patent holder can assert a royalty based on the
5   entire value of a product that the patented features
6   are a part of that product, would be a high level
7   description of it.
8      Q   Okay. And under what circumstances are
9   you allowed to seek a royalty based on the entire
10  market value?
11     A   First, I have not done that here. Second,
12  the courts have laid out guidelines or requirements
13  that relate to a demonstration of the patented
14  features being a basis of demand for the product.
15     Q   Right. So in order to get royalties based
16  on the entire product, it's the plaintiff's burden to
17  show that the patented features is the basis for the
18  customer demand, correct?
19     MR. VAZQUEZ: Form. Calls for a legal
20  conclusion.
21     A   It's my general understanding. But also
22  I'm aware that there can be adjustments in the
23  royalty rate to account for non-patented -- or in the
24  base or the royalty rate, to account for features
25  other than the patented features.

36 (Pages 138 to 141)

CONFIDENTIAL - ATTORNEYS EYES ONLY

142

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   (BY MR. STIMPSON) Okay. So then you do
3  not agree with this statement, that the requirement
4  to prove that the patented feature drives demand for
5  the entire product may not be avoided by the use of a
6  smaller royalty rate?
7      MR. VAZQUEZ: Form.
8  A   My answer to that would be one could
9  reduce the royalty base for features unrelated to the
10 patent or reduce the rate.
11     In this case, Health Grades had a
12 licensing history of applying license rates to ad
13 revenue. And I thought that was most realistic in a
14 hypothetical negotiation, but adjusted the royalty
15 rate to account for value in features other than the
16 patented features.
17     MR. STIMPSON: Move to strike everything
18 after, starting with in this case as nonresponsive.
19     MR. VAZQUEZ: Denied.
20     MR. STIMPSON: Okay. Thanks, Judge.
21  Q   (BY MR. STIMPSON) So, Mr. Hall, in your
22 analysis, you think it's okay to get royalties on the
23 entire market value simply by using a smaller royalty
24 rate?
25  A   That's not my testimony.

143

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   Okay. Then I'm a little confused. And
3  I'm not sure I'm understanding. Let's just back up a
4  second. We've got two things that go into this,
5  right, we've got the royalty base and we've got the
6  royalty rate, correct?
7  A   Yes.
8  Q   And the royalty base is whatever the
9  product is that you're applying the royalty rate to,
10 right?
11 A   In this case the royalty base is the
12 Vitals infringing ad revenue.
13 Q   Okay. Let's just talk about generalities
14 for a second. So the royalty base is what the
15 royalty rate is applied to, right?
16 A   Yes, if that's the basis for the royalty.
17 Q   So in order to use -- when you have a
18 situation like we do here, where some parts of the
19 website might fall under the patent and some parts
20 don't.
21     In order for you to use that entire
22 Health -- you know, Vitals website revenue as the
23 royalty base, you have to show the patent features
24 are driving a demand for that, right?
25     MR. VAZQUEZ: Form.

144

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  A   In this case I think there's a -- while
3  there's the demonstration that reasonably -- one can
4  reasonably conclude that the patented features are a
5  substantial basis for the demand, I adjusted the
6  royalty rate downward to account for other features
7  as I think the two parties in hypothetical
8  negotiation would reasonably negotiate with one
9  another.
10     With Health Grades asserting that the '060
11 Patent is very valuable to attracting traffic and
12 therefore advertising revenue, Vitals arguing that
13 it's not, but we want it anyway. But we have other
14 nice features so we're not going to negotiate a rate
15 lower.
16     And so in this case I could have adjusted
17 the royalty base down by a percentage and then
18 applied a higher royalty, but I thought it was most
19 reasonable to track what the parties would have done,
20 given past indications, that to apply an adjusted
21 down royalty rate to Vitals' infringing advertising
22 rates.
23  Q   (BY MR. STIMPSON) Okay. I'm sorry, we
24 had a miscommunication there. So I have to move to
25 strike as nonresponsive.

145

CONFIDENTIAL - ATTORNEYS EYES ONLY
2      My question is not about the case right
3  now. And maybe my question is wrong, I don't recall.
4  But my question is just generally, in order to
5  take -- when you have any situation where part of the
6  accused, part of the product is subject to the patent
7  and part is not, in order for you to use the entire
8  product as your royalty base, you have to show that
9  the patented features are driving the sale, right?
10 A   I would refer to the cases, the case
11 wording. I have an understanding that it's important
12 that the patented features drive demand both from a
13 Panduit perspective, but also from the royalty
14 determination perspective.
15 Q   So you're not willing to agree with my
16 statement?
17     MR. VAZQUEZ: Form. Argumentative.
18     THE DEPONENT: Could you read his
19 statement back again?
20     (Record read as requested.)
21     MR. VAZQUEZ: Same objections.
22 A   I thought I had answered that.
23 Q   (BY MR. STIMPSON) Yes? Do you agree with
24 it?
25 A   I think it's important and necessary to

37 (Pages 142 to 145)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**146**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2 show that the patented features are driving demand.
3 And I think that's been demonstrated here.
4    Q   Okay. And so in cases like that, it's the
5 patentee's burden to show, to give evidence tending
6 to separate or apportion the patentee's damages
7 between the patented feature and the unpatented
8 feature, right?
9    MR. VAZQUEZ: Object to form. Calls for a
10 legal conclusion.
11    A   It's the patentee's burden to undertake an
12 analysis -- a patent holder's burden in the case. My
13 understanding is to take a but-for causation analysis
14 to undertake an analysis to what the patent holder
15 reasonably would have earned, but for the
16 infringement.
17    Q   (BY MR. STIMPSON) Okay. So do you not
18 agree with my statement that the patentee has to give
19 evidence tending to separate or apportion the
20 defendant's profits in the patent damages from the
21 patented features and the unpatented features?
22    MR. VAZQUEZ: Form.
23    A   I don't disagree with that statement. I
24 recall reading statements like that in cases.
25    Q   (BY MR. STIMPSON) Right. And as we've

---

**147**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2 already talked about -- now we're talking about this
3 case. In this case, you did nothing and Health
4 Grades did nothing to apportion the profits of Vitals
5 or Health Grades between the patented features and
6 the unpatented features, right?
7    MR. VAZQUEZ: Form.
8    A   I don't agree.
9    Q   (BY MR. STIMPSON) What did you do to
10 apportion them?
11    A   Well, first, for royalty purposes in the
12 analytical method, undertook an effort to separate
13 the company as a whole, its financial information
14 from parts of the company that either had revenue or
15 expenses associated with the use of the patent.
16    And so there was for the royalty
17 determination portion an analysis of the relative
18 profit rates of any part of the company that has used
19 the patented features versus the entire company.
20    Second, in my lost profits calculation,
21 under well-accepted -- well-accepted methodologies stated
22 in Mar-Flo for example, apportioned the website
23 traffic for Vitals, taking the infringer out of the
24 market, which is certainly a way to say that, to the
25 extent there is other websites out there that attract

---

**148**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2 visitors for reasons unrelated to the patent.
3    The but-for causation analysis that I did
4 does not give Health Grades all of that website
5 traffic and therefore ad revenue.
6    MR. STIMPSON: Okay.
7    MR. VAZQUEZ: Scott, can we take a break?
8    MR. STIMPSON: Yeah, sure. Let's do it
9 now. That's fine.
10    (Recess taken from 12:19 p.m. to
11 1:21 p.m.)
12    Q   (BY MR. STIMPSON) Mr. Hall, I just need
13 to back up a bit because there's some things, going
14 through my notes, that I probably should have filled
15 in some holes that I didn't earlier.
16    When you were talking about attachment 1
17 to your report, the income, we talked about the
18 business activities associated with the '060 Patent.
19 We went through that for quite some time.
20    Do you remember that?
21    A   Yes.
22    Q   And you also said you included in that
23 attachment 1 revenues from departments that generated
24 revenue from the '060 Patent, I think. So what
25 departments were those?

---

**149**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A   Departments 00, 24, 25 -- or 24, 25, 28,
3 29, 63, 64, 65 and InHealth, LLC. And to restate or
4 be clear, any part of the '060 Patent, whether it's
5 information or ratings, that visits that was the
6 criteria in how these departments were selected.
7    And then once the department is selected
8 because if it's either expense or revenues related to
9 any part of the '060 Patent, I included all of the
10 departmental financial information, to be complete.
11    Q   Okay. So for example, if you had just one
12 department that only worked on, like information that
13 goes into a report, that information is referenced
14 somewhere in the claims of the patent, you would
15 include that department?
16    A   Yes.
17    Q   Okay. So all you were doing, is this
18 right -- you reference the department numbers from
19 the top of attachment 1, right?
20    A   Yes.
21    Q   And to find out what departments those
22 are, I would have to go back into the documents that
23 were attached as Exhibit C?
24    A   Yes.
25    Q   And identify them?

---

38 (Pages 146 to 149)

CONFIDENTIAL - ATTORNEYS EYES ONLY

150

CONFIDENTIAL - ATTORNEYS EYES ONLY
2   A   Yes.
3   Q   You also mentioned that you spoke with
4  Mr. Dodge and Ms. Pearson.
5   A   Yes.
6   Q   Okay.  What -- can you tell me what you
7  discussed with each of them, please?
8       Let me back up.  Can you remember what
9  information you got from Ms. Pearson and what
10  information you got from Mr. Dodge?
11   A   I believe so.  The information specific to
12  the financials that we relied on Mr. Dodge for,
13  related to attachment 1.  And the departments that
14  had revenues and expenses was just Mr. Dodge and not
15  Ms. Pearson.
16   Q   Okay.
17   A   Discussed with both of them at a meeting
18  at the same time the -- nature of Health Grades'
19  business and its operation over time.  And also
20  included in the discussion is the '060 Patent and how
21  Health Grades utilized that or used the features in
22  its businesses.
23       That was with both of them.  So I received
24  information from both of them on that.
25   Q   Just let me stop you there for a second.

151

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Can you remember what parts you got from
3  Mr. Dodge and what parts you got from Ms. Pearson or
4  is that kind of all together?
5   A   It's together in my mind.  I don't recall
6  any disagreements between them.  They would both
7  pitch in on answering questions I had.
8   Q   I'm sorry.  I stopped you in the middle of
9  your answer.
10   A   No problem.  Then with respect to website
11  traffic and visitors and how Health Grades attempts
12  to maximize that, that was primarily Ms. Pearson's
13  input, though Mr. Dodge had some views on that as
14  well.  And also read some of that from Mr. Dodge's
15  testimony, but I think your question just relates to
16  the meetings I had with him.
17   Q   Okay.  Anything else that you can
18  remember?
19   A   To the extent I've referenced them in my
20  report or attachments, they would also relate to
21  that.  But the several discussions or a couple of
22  discussions with both of them, more in-depth
23  discussions with Mr. Dodge as it relates to the
24  financials information we've discussed previously.
25  And the accounting information available and how they

152

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  keep their books and records in the normal course.
3   Q   Okay.  So let's talk a little bit about
4  how people go about using the Health Grades and
5  Vitals websites.  I mean, really, what motivates
6  people to find a way to these websites is generally a
7  desire to find information on, you know, either a
8  physician or hospital or nursing homes, right?
9       MR. VAZQUEZ:  Form.
10   A   I think I would generally agree with that
11  characterization.
12   Q   (BY MR. STIMPSON)  And so, for example, if
13  I get on Google and I want to find out something
14  about Dr. Smith in Denver, Colorado, I get on Google
15  and I type in the search box, Dr. Smith, Denver,
16  Colorado, and then up pops up a results list, right?
17   A   Yes.
18   Q   And you understand that a lot of people
19  actually find their way to the Health Grades and
20  Vitals websites by searches on Google or Bing or
21  whatever, right?
22   A   Yes.
23   Q   And do you have any idea what percentage
24  of users find their way to Health Grades or Vitals by
25  searches through general search engines like Google

153

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  or Bing?
3   A   I don't have a specific percentage in
4  mind.  I understand it's a majority.
5   Q   Do you -- did you assume when you did your
6  report that people who find their way to the Vitals
7  or Health Grades websites through searches on Google
8  or Bing, did you assume that those were also covered
9  by the patent?
10   A   Those referring to the individual visitor?
11   Q   Well, let me just rephrase it because my
12  question wasn't terribly clear.  So if someone gets
13  on Google and types in Dr. Smith, Denver, Colorado,
14  and up comes a Google results list.  And then one of
15  them is the Health Grades website and they click on
16  the Health Grades website and find the report on
17  Dr. Smith that way.
18       Did you assume in your damages analysis
19  that that way of finding, getting to the Health
20  Grades website, was an infringement of the '060
21  Patent?
22       MR. VAZQUEZ:  Objection.  Calls for a
23  legal conclusion.
24   A   First, I have assumed there is both
25  validity and infringement by Vitals.  As to website

39 (Pages 150 to 153)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

154

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 traffic, I did not make an assumption one way or
2 another if they went direct to Vitals or through a
3 Google or Bing.
4
5     Q    (BY MR. STIMPSON) Don't you think that
6 would be important to your analysis on whether --
7 since a majority of people who get onto the Health
8 Grades website get there through a Google or a Bing
9 search, don't you think it's important to your
10 analysis to know whether or not that way of getting
11 there would infringe the patent?
12     A    I don't think that's necessary for my
13 analysis, assuming validity and infringement and
14 understanding the way the two companies have promoted
15 features that relate to the '060 Patent.
16     Q    So when you assumed infringement, though,
17 I just want to make sure we're clear. Did you assume
18 that getting to the Health Grades website through a
19 Google or a Bing search was an infringement of the
20 patent?
21     MR. VAZQUEZ: Object to form.
22     A    That's not how I would state it, no.
23     Q    (BY MR. STIMPSON) Well, how would you
24 state it, then?
25     A    I've assumed that Vitals is using the '060

---

155

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 Patent features in a way that a court will determine
2 to be infringing, which means actively using it to
3 attempt to get traffic the way its business overview
4 and other documents indicate its business model
5 works. That's the assumption on infringement I've
6 taken.
7     Q    So you didn't make any specific
8 assumptions on whether going through Google or Bing
9 to get to those websites would or would not infringe
10 the patent?
11     A    Not beyond the assumption I've stated as
12 it relates to the content of Vitals and the '060
13 Patent infringement assumption.
14     Q    Okay. Do you know what SEO is?
15     A    Yes.
16     Q    What is it?
17     A    It's an acronym that stands for search
18 engine optimization.
19     Q    And when you were doing your damages
20 analysis, did you assume that -- well, let me just
21 back up.
22     Search engine optimization and how high up
23 in the ranking you come when you do a search through,
24 say, Google, that's really important to whether a

---

156

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 person is going to end up on the Health Grades
2 website or the Vitals website or some other website,
3 right?
4     MR. VAZQUEZ: Form.
5     A    My answer to that is it's important to
6 show up on the first page and the higher up a search,
7 generally, the better.
8     Q    (BY MR. STIMPSON) So that's one driver
9 for how -- whether people end up on Health Grades or
10 Vitals or some other website, right, how high they
11 come up in the Google search results?
12     A    It is a factor. And it's a factor that
13 relates to the entity's content and quality and
14 relevance of its content.
15     Q    How do you know that? What makes you
16 think that?
17     A    In discussions with Andrea related to
18 website traffic, she described the path to Health
19 Grades. And when I first -- I believe that's when I
20 first understood or learned that the majority get to
21 Health Grades' website via search engine.
22     Q    Andrea is Andrea Pearson?
23     A    Correct.
24     Q    So you relied on Ms. Pearson to tell you
25

---

157

CONFIDENTIAL - ATTORNEYS EYES ONLY

1 that the content of the Health Grades website is what
2 dictates how high up they come in Google search
3 results or Bing search results?
4     MR. VAZQUEZ: Object to form.
5     A    I don't think that's what I answered.
6     Q    (BY MR. STIMPSON) Okay. Can you explain
7 it to me a little better? Maybe you explained it
8 perfectly, but it's in the afternoon and I'm losing
9 focus.
10     So what did you rely on from Ms. Pearson
11 to determine anything about how Health Grades comes
12 up in the Google search results?
13     A    First, the fact of -- the nature in which
14 website traffic or visitors arrive at Health Grades.
15 And we may have discussed it in terms of Vitals, too,
16 or other online information sites, but certainly
17 Health Grades. And then discussed the fact that most
18 go through a search engine site. And the importance
19 of Health Grades there, I think her observation also
20 that Vitals is right there as well.
21     And those are the two market leaders and
22 have the most relevant content was discussed.
23     I gained an understanding of search engine
24 optimization on another matter, a consulting matter,
25

---

40 (Pages 154 to 157)

CONFIDENTIAL - ATTORNEYS EYES ONLY

158

CONFIDENTIAL - ATTORNEYS EYES ONLY
1  not specific to healthcare websites, but the
2  discussion related to with Andrea, the content and
3  the relevance in how Health Grades attempts to keep
4  their content and relevance in such a way that they
5  show up high.
6       I also notice that that's mentioned in
7  Vitals' business overview and records as far as the
8  things that drive traffic: content, quality, quality
9  links to other companies and SEO. So those are the
10 bases for my understanding.
11      Q   So how does Health Grades optimize its
12 website so that it comes up higher in the Google
13 search results?
14      MR. VAZQUEZ: Object to form.
15      A   Company efforts, including the features of
16 this '060 Patent to have the most relevant, high
17 quality data available for potential patients trying
18 to obtain information on physicians, patient ratings,
19 and the other information within the '060 Patent.
20 And it's important to them and a factor because it's
21 a window. It's a modern-day Yellow Pages or way to
22 reach the market through those search engines.
23      Q   (BY MR. STIMPSON) So Andrea Pearson told
24 you all this?

159

CONFIDENTIAL - ATTORNEYS EYES ONLY
1       A   We discussed it. I don't know that she
2  told me every one of those factors, but we discussed
3  it.
4       Q   Who told you -- I'm sorry, who told you
5  that the '060 features were important in coming up
6  high in the Google search results?
7       A   I observed it when I did some searches
8  after that meeting. I believe Mr. Dodge may have
9  mentioned it as well as Andrea, but we discussed
10 the -- really the pathway to web traffic for Health
11 Grades that result in the Comscore hits and result in
12 their ad revenue.
13      Q   But my question wasn't quite that. Who
14 told you, I think in your prior answer you said it
15 was the '060 features that led to a higher listing in
16 the Google search results.
17      Did I misunderstand that?
18      A   It was part of it. They also have other
19 features. And it's important to them to have as high
20 quality information, as relevant information as
21 possible, to drive web traffic to their site.
22      Q   Right. But, I mean, who told you the '060
23 features were part of what determined how high you
24 come up in Google website results?

160

CONFIDENTIAL - ATTORNEYS EYES ONLY
1       A   I don't know that I stated that in an
2  answer specifically. You may be --
3       Q   I maybe misheard it, but I thought that
4  you said in one of your answers that you thought the
5  features of the '060 help dictate how high you come
6  up in your Google search results?
7       A   I don't think I directly stated it. I
8  said in the context of a question you asked, but we
9  can check, and maybe I did miscommunicate. I said
10 that's part of their effort. As John Neal testified,
11 and I cite in my report his testimony, how important
12 it was for a patient to have a unique experience at
13 their website and how the information they have, what
14 information is available, what they can do with that
15 information.
16      And that effort by Health Grades includes
17 features of their '060 Patent, the information as I
18 mentioned. And that was important to them as a
19 factor in staying high on the search results.
20      Q   Okay. So let me just see if I can ask
21 this a little more directly, then.
22      Mr. Hall, do you have any evidence that
23 the features of the '060 Patent influence how high
24 Health Grades shows up in a Google search results?

161

CONFIDENTIAL - ATTORNEYS EYES ONLY
1       A   I had an understanding at the time I wrote
2  my report how content was important. And part of
3  content, of course, is the '060 features and
4  relevance. And in both parties, you know, citing,
5  wanting to be able to do comparison ratings and an
6  understanding of being a trip advisor in Vitals'
7  instance, of healthcare information, I have that
8  understanding.
9       Subsequent to my report, I read
10 Dr. Cooper's and Mr. Greenspun's reports. I gained a
11 further understanding in those two views of it, as
12 well as, after seeing some quoted excerpts of
13 deposition and Mr. Napper's report.
14      Had a follow-up conversation with Mr. Neal
15 and Ms. Pearson about some of the statements in
16 Napper's report. So that's both prior to my issuance
17 of my report and after, the basis for my
18 understanding.
19      Q   Okay. So that's -- and you rattled off an
20 awful lot of things there. But really, my question
21 is, can you cite me to any evidence -- you said that
22 content influences the SEO -- the search results in
23 Google, right?
24      A   Contents and relevance is a very important

41 (Pages 158 to 161)

Veritext Corporate Services

800-567-8658                                      973-410-4040

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

162

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 part, yes.
3    Q   Okay.  But my question is a little more
4 specific.  What evidence do you have, what specific
5 evidence do you have that the '060 features and
6 coming under the '060 Patent has any influence on how
7 high up you come in the Google search results?
8    A   First, I was not asked to specifically
9 provide an opinion on that.  But that said, the
10 evidence is in my answer prior, that part of the
11 content, which I understand to be an important factor
12 and where you come up, includes the '060 features.
13       Assuming infringement, that Vitals is
14 using those as well.  I believe the information I
15 cited in the previous answer is a basis for an
16 understanding.
17       I have not been asked to provide evidence
18 in a technical sense.
19       I know Mr. Greenspun has an opinion on it
20 as does Dr. Carter (sic).  That's evidence in
21 addition to what I have cited.  But that's my answer.
22    Q   Are you assuming that practicing the '060
23 Patent leads to a higher ranking in Google search
24 results?
25    A   I have not made that direct assumption.

---

163

CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q   Okay.  So since most people come to Health
3 Grades' website and the Vitals website through
4 Google, and you're not assuming that the patent has
5 anything to do with how high up Vitals or Health
6 Grades land on the Google search results, you can't
7 really say that the '060 has anything to do with
8 people coming to the Health Grades or Vitals websites
9 when they do that through Google or Bing, right?
10       MR. VAZQUEZ:  Object to form.
11    A   I disagree with that statement and no to
12 the question.
13    Q   (BY MR. STIMPSON)  Okay.  See, that's what
14 I'm having some difficulty with.  I mean, you're
15 saying that -- you answer that question no, so you're
16 not willing to say that the '060 --
17    A   I don't think it's reasonable to say the
18 '060 features have nothing to do with the content and
19 therefore where it shows up.
20       You had asked me did I make an assumption.
21    Q   Okay.  All right.  So I'm still struggling
22 with this, though, Mr. Hall.  I mean, how much --
23 would you agree with me, sir, that how much these
24 '060 features generate people coming to the website,
25 that's an important factor in damages, right?

---

164

CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A   Yes, that the patented features drive
3 demand for the website hits, which drive advertising
4 revenue.
5    Q   So we're talking about more than half of
6 the demand for people getting on Health Grades and
7 Vitals when we're talking about people going through
8 Google or Bing, right?
9    A   Yes, or all of them.  Might be Yahoo,
10 Google, Bing, but that group of --
11    Q   Right.
12    A   -- web search.
13    Q   So what I'm trying to figure out is, then,
14 isn't it really important to know whether or not the
15 '060 features influence how high you come up on those
16 search results?
17       MR. VAZQUEZ:  Form.
18    A   It's important to -- as to whether it does
19 impact or is a factor, yes, absolutely.
20    Q   (BY MR. STIMPSON)  And what evidence do
21 you have that you can tell me or the jury that this
22 is how I know the '060 features influence how high
23 you come up on those search results through Google or
24 Bing?
25       MR. VAZQUEZ:  Form.

---

165

CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A   I have not had that opinion in my report.
3 It's part of my understanding of the demand.  And I
4 will provide the evidence I did in an earlier answer
5 or provide the answer that all the information I have
6 cited before about the content and what both
7 companies promote as far as their content and the
8 relevance and the importance of the information and
9 the comparison ratings to the companies as they cite
10 in their own documents, testimony related to that.
11       And my understanding, though I'm not
12 providing an expert opinion the way Mr. Greenspun is,
13 as far as his view of Dr. Cooper's view of the search
14 engine optimization, I'm aware that he is going to be
15 provided -- or an opinion is going to be provided.
16 It is reasonable to conclude that the content of the
17 Vitals and Health Grades website which includes the
18 '060 patented features, which I have assumed Vitals
19 is infringing, using it is infringing, is a factor,
20 an important factor in where they surface on the
21 searches on Google or Bing and relates to the demand
22 for web traffic.
23    Q   (BY MR. STIMPSON)  So content is an
24 important factor?
25    A   Content and relevance, yes.

42 (Pages 162 to 165)

CONFIDENTIAL - ATTORNEYS EYES ONLY

**166**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2   Q   Okay. How about the '060 features, can
3  you say those are important factors on where you come
4  up on these search results through Google and Bing?
5   A   That would be a part of the content that
6  both companies have to offer.
7   Q   Right. But my question is a little
8  different. Would you say that the '060 features,
9  that part of the content is important on how high up
10  Health Grades and Vitals come up?
11   A   I think it's reasonable to conclude that
12  it is, yes.
13   Q   Why?
14   A   The answer I have just given would be my
15  answer.
16   Q   Do you know anything about the algorithms
17  that Google or Bing used to figure out who comes up?
18   A   A little bit.
19   Q   And what do you know about those?
20   A   That they're involved and that there's
21  several factors at work, including links to other
22  websites, quality links as they put it. I understand
23  they're constantly or near constantly trying to
24  improve the ability of their search engine
25  optimizations to identify the best information for

**167**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  what they think a searcher is looking for, given what
3  they plug in, that there's engineers studying it.
4  And that it's involved and it's very speedy, how
5  quickly one can click on a request and get a variety
6  of information, including related to healthcare
7  providers.
8       MR. STIMPSON: I lost my Live Notes
9  connection here.
10       (Discussion off the record.)
11   Q   (BY MR. STIMPSON) So my last question,
12  Mr. Hall, I asked you what you knew about the
13  algorithms Google and Bing use to figure out who
14  comes up first on their search results, right?
15   A   Yes.
16   Q   You testified that they're involved and
17  there are several factors at work, including links to
18  other websites, and they're constantly trying to
19  change it.
20   A   Yes. And the quality and contents
21  reviewed. From my perspective, I'm not an expert on
22  computer technology, but they're involved and
23  complex. But having read Mr. Neal's deposition
24  testimony and Mr. Dodge's, and subsequently seeing
25  the reports of Cooper and Greenspun, gained further

**168**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  understanding of the algorithms.
3   Q   Do you have any way to quantify how, if at
4  all, the '060 features impact on how high you come up
5  on the Google or Bing search results?
6   A   I don't know of a way that would exist to
7  do that.
8   Q   Okay.
9   A   Other than assessing whether reasonably
10  they do have an impact on the content and relevance,
11  and I believe they do.
12   Q   I've got to go back, then. I said, do you
13  have any way to quantify how if at all the '060
14  features impact on how high you come up on the Google
15  or Bing search results.
16       Your first answer is, I don't know of any
17  other way you can do that. And then you continued
18  your answer and said, Other than assessing they
19  reasonably do have impact on the content and
20  relevance, and I believe they do.
21   A   I meant a threshold, not a percent out of
22  a hundred. But I do know of a way to assess, is it
23  reasonable that they have an impact and are a factor,
24  and that's what I was answering.
25       In case your question was beyond do I have

**169**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  a percentage answer or a mathematical answer.
3   Q   Okay. So let's just get things clear,
4  then. You do believe that the '060 features might
5  have some impact on how high you come up on the
6  Google or Bing search results, correct?
7   A   Yes.
8   Q   But you have no way to quantify that,
9  correct?
10   A   Quantify what? My conclusion that it is a
11  factor?
12   Q   No, let me rephrase it, then. You have no
13  way to quantify what effect, how big a factor those
14  '060 features are in how high you come up on the
15  Google or Bing search results?
16   A   I have not quantified that. Though I do
17  note that the two that come up highest are also the
18  two that are highest as far as market leaders on web
19  traffic and are the ones that are practicing the '060
20  patented features.
21   Q   Well, how does that help you quantify the
22  '060 features and how they impact?
23   A   I don't think that I testified that it did
24  help you quantify it.
25   Q   Okay.

43 (Pages 166 to 169)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**170**

CONFIDENTIAL - ATTORNEYS EYES ONLY
A    I was answering as to they reasonably have
an impact.
Q    Would you agree with me, Mr. Hall, that --
forgive me if I've asked this before, I may have, but
would you agree with me that how much the '060
features are used in the Vitals website has an impact
on the amount of damages?
A    I don't know that that was asked before.
Are you asking if you asked it before or just asking
it in your question?
Q    No. I'm just asking a question.
A    Sure.
Q    Let me just ask you the question and then
I'll rephrase it.
How much the '060 Patent features are used
in the Vitals website has an impact on the damages
that should be assessed, correct?
MR. VAZQUEZ: Object to form.
A    The way I would answer that is I think
it's more important -- the most important assessment
is whether the existence, the website's existence or
use of the '060 patented features drive demand to
that website because when web traffic goes there,
that drives advertising revenue.

---

**171**

CONFIDENTIAL - ATTORNEYS EYES ONLY
Once their advertising revenue has really
been impacted, I haven't made an assessment or
opinion on the specific use of web traffic beyond
that, what reports or further on use beyond that,
since the revenue is driven by the site visits.
Q    (BY MR. STIMPSON) So do you know what
percentage of profiles in the Vitals website use the
'060 features?
A    I don't have that figure.
Q    So that wasn't a metric that you used in
determining damages?
A    It was not a metric that I used. I used
the ones I describe in my report.
Q    Okay. And so what if it's found that less
than 1 percent of the profiles on the Vitals website
used the features of the '060 Patent? Would that
impact your damages analysis?
A    It would not. As I said, I have assumed
both validity and infringement. And if Vitals is
infringing and that there is a reasonable basis,
which I believe there is, for establishing that their
use of the features is a substantial driver of demand
to their website and therefore the earning of
advertising revenue, that is the critical component

---

**172**

CONFIDENTIAL - ATTORNEYS EYES ONLY
and not the factor you mentioned.
Q    Okay. So even if Vitals was using the
'060 features in less than 1 percent of their
website, you still feel comfortable saying they would
sit down at a table with Health Grades and say, yeah,
okay, we'll pay 12 percent?
A    If in June of 2010 Vitals informed Health
Grades that they want a license to the patent to be
able to use the information from the three sources
and have their website visitors, have that yield
healthcare provider reports that have comparison
ratings, that they're still having the ability to use
the license in that fashion.
Q    No, that wasn't quite my question.
A    So it's not the hypothetical negotiation
of the '060 Patent?
Q    Well, it depends how you phrase it. Why
don't you tell me -- actually, let me start a
different question, then.
So suppose, sitting down at this
hypothetical negotiation, MDx knows we use this '060
in less than 1 percent of our profiles. And we have
no plans to use it any more than we're already using
it now.

---

**173**

CONFIDENTIAL - ATTORNEYS EYES ONLY
Do you still think it would be reasonable
that Health Grades and MDx would come to a 12 percent
royalty?
A    Are they asking to license the full
feature of the '060 Patent in this hypothetical
negotiation?
Q    They only use it in less than 1 percent of
their profiles and everybody understands that sitting
at the table.
A    What about my question in the
hypothetical?
Q    Sir, I'm just telling you. I don't care
how you want to talk about what the back and forth
is. I'm just saying that Health Grades and MDx sit
down at a table, everybody knows that MDx is not
going to use this '060 for more than 1 percent of
their profiles.
Do you still think it's reasonable that
MDx would have agreed to a 12 percent royalty?
A    I think it's reasonable that if Vitals sat
down and wanted to license the '060 Patent, which is
the three sources of information and the ability for
their users to have healthcare comparison ratings
reports on physicians, that a 12 percent royalty

---

44 (Pages 170 to 173)

CONFIDENTIAL - ATTORNEYS EYES ONLY

would be yielded, based on the bases of my report and the back and forth, if Health Grades had said, it sounds like in your hypothetical, a modified use of the '060 Patent or non-use, as your example just indicated, just maybe one part of the information of the three information sources in the '060 Patent.

So I haven't assessed your hypothetical in my report because I don't think it's -- one, it wasn't relative to my assignment.

Q Okay. So just assume it, though, for me now. Am I correct, then, from your last answer, that even if MDx is using the '060 features in less than 1 percent of their profiles, you would still say that the royalty rates should be 12 percent, correct?

A I have not testified to that. I have testified to what I have done. Let me ask a question on the hypothetical because I don't understand it.

Of the three information sources, how are the parties addressing those three information sources?

Q Okay. I'll just be more specific, then. There is evidence in this case and our technical expert has testified to it, that at most, about 1 percent of the profiles in the Vitals site get



CONFIDENTIAL - ATTORNEYS EYES ONLY

three or more of the data sources from healthcare providers, which is an express requirement of the claims.

Okay? Do you understand that?

A I understand that part of the hypothetical.

Q So now assume for me that that's correct, okay?

A Okay.

Q So we have about 1 percent maximum of the profiles on the Vitals website using the features of the '060 Patent. And my simple question to you, Mr. Hall, is even assuming those facts, would you still say that 12 percent is a reasonable royalty?

A In addition to those, that fact setting in your hypothetical, would the license enable Vitals to use -- have comparison reports, comparison ratings for physicians?

Q Of course. It's a license.

A Well, it wasn't mentioned.

Q Okay. Well, it's a license, though, so if you get a license, then can you use the patent.

A That's what I was asking earlier and I wasn't getting an answer, so I didn't understand the



CONFIDENTIAL - ATTORNEYS EYES ONLY

hypothetical.

Q Okay.

A So the hypothetical is the '060 Patent.

Q Right. So this is the question. Assuming that the profiles on the Vitals website are going to use the '060 features in about 1 percent maximum of their profiles. And there is no intent to use more than that going forward. Do you still think, Mr. Hall, that the parties would agree to a 12 percent royalty rate?

A And first, I have not seen evidence at the time of the hypothetical that that was the case. And I've seen business overviews from Vitals that show that the patented features, including the information sources, is very much what they were looking to use to generate revenue.

So I haven't seen that information, as I assess the hypothetical royalty. If the patent -- I'm sorry, if the license was for the full patent, I believe 12 percent is reasonable, even if Vitals represented at the time that it was only going to use it a little bit because there's assumption of validity and there's assumption of infringement and that means the use of the patent.



CONFIDENTIAL - ATTORNEYS EYES ONLY

And that's what the parties are sitting down to negotiate. And that's part of the Georgia-Pacific factors and the cases I've cited as far as the assumption of infringement and validity. And Vitals sitting down to want to use the license and negotiate.

I believe, given the high profitability of advertising profits generated by advertising revenue on a fixed basis on a website that has very little variable cost would drive a reasonably high royalty rate.

I also believe Vitals would reasonably argue and negotiate that they have other features that should drive the royalty rate lower than the mid 20s, which might be an assessment that Health Grades determines, based on the profit it could earn and the relative market share it would have.

Q That was a really long answer. But my question is a simple one, sir. And I gather from all that that the answer is yes. But let me just ask it again, okay, because there is no way I can use that at trial. That's just too long.

So here is my question. If Vitals was using these '060 features in 1 percent or less of

CONFIDENTIAL - ATTORNEYS EYES ONLY

178

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   their profiles and it was not going to use it for
3   more than 1 percent, you think it's reasonable to
4   impose a 12 percent royalty, despite the fact that
5   Vitals is only using it in 1 percent of the profiles,
6   correct?
7       MR. VAZQUEZ:  Asked and answered.
8   A   I provided the answer to that.  If you are
9   going to change the license agreement, the
10  hypothetical license agreement, to include a
11  limitation on how often it could be used --
12  Q   (BY MR. STIMPSON)  Okay.
13  A   -- that would impact the royalty rate.  I
14  know of no such limitation that would have existed to
15  use it.  And one party's assurance that they promise
16  not to use it much, in my experience, would not
17  impact much, if at all, the royalty determinations or
18  the license rate.
19      But if the hypothetical has restrictions
20  on the use, then it's a different analysis than I
21  performed here.
22  Q   Okay.  So is the answer to my question
23  yes?
24      MR. VAZQUEZ:  I object.  Asked and
25  answered.

179

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       Counsel, you know he's given you his
3   answer.
4   Q   (BY MR. STIMPSON)  Is the answer to my
5   question yes?
6   A   The answer is what I gave and provided.
7   You're giving me a different hypothetical than the
8   one I studied.  And if you're telling me the license
9   agreement would have a clause in addition to the
10  promise you're saying of, everybody knows we
11  wouldn't use it much, but has a clause and restricts
12  the use, then it's a different use than I analyzed.
13  And I would have an answer that may be different if
14  you specified that there would be a clause
15  restricting the use of the '060 Patent.
16  Q   So what was -- you referred to -- so let's
17  just look at it from a different angle, then.
18  Suppose you're the CEO of MDx, right, and you sit
19  down at the table with Vitals -- with Health Grades.
20  And Health Grades is saying, Look, you've got to have
21  a license to our patent.  And you know as a CEO that
22  you're only using that technology in less than
23  1 percent of your profiles, would you agree to a
24  12 percent royalty?
25  A   First, I don't agree with the setup that

180

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   Health Grades starts out by dictating, look, you have
3   to have a license.
4       The way a hypothetical negotiation is
5   constructed, there would be assumption of
6   infringement and it would be Vitals certainly going
7   to Health Grades and saying, Look, we want to use
8   these patented features, we're about to use them, and
9   we want a license agreement.
10      And Health Grades would look and evaluate,
11  okay, a competitor, one that Vitals identified as its
12  having just one competitor in its business overview
13  at that time, wants to license something we believe
14  very, as John O'Neal (sic) testified, important and
15  revenue and value driven for Health Grades, including
16  the unique patient experience at their website.
17      And your competitor wants to license that
18  from you.  I think the way I have approached, told
19  you the specific factors, the analytical method,
20  value and high profitability that they would come to
21  a 12 percent royalty rate, that that's reasonable.
22  But also allows Vitals to keep a large portion of its
23  advertising profit for other reasons, including those
24  features unrelated to the '060 Patent.
25  Q   Okay.  So let's change it a little bit,

181

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   then.  You mentioned the possibility of an additional
3   clause of the license.  So let's change it and use
4   this hypothetical, okay?
5       They sit down at a table and they
6   negotiate a license.  And one of the clauses in there
7   is a representation and warranty by Vitals that they
8   won't use these '060 features in more than 1 percent
9   of their profiles.
10      Do you still think that that license with
11  that clause would generate a 12 percent royalty?
12  A   How would the clause be enforced?  What
13  mechanism?
14  Q   Health Grades can have an audit.
15  A   An audit of their website content?
16  Q   Sure.  Assume there's a proper mechanism
17  for enforcement.
18  A   I don't know.  I haven't evaluated a
19  restriction to a license like that in this case.  I
20  think Health Grades would be very reluctant to grant
21  a license in that regard.  And I think the relevant
22  analysis is for the '060 patented features, for the
23  use as both parties would, in their business records
24  at the time, indicated kind of a full use, an effort
25  to promote the patented features and earn revenue on

46 (Pages 178 to 181)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

182

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 that basis.
3 Q Right. I understand that you don't think
4 that that's the license that would be -- come to.
5 But my question was asking you to assume that, okay?
6 So assume that Health Grades and Vitals
7 sit down and they negotiate a license and the license
8 has a clause with the ability for Health Grades to
9 check it. It has a clause that Vitals won't use the
10 '060 features in more than 1 percent of their
11 profiles.
12 And my question is, sir, do you still
13 think that MDx would have signed that agreement with
14 a 12 percent royalty?
15 A I don't know.
16 Q Okay.
17 A I think that they would negotiate
18 obviously for the lowest royalty possible, but Health
19 Grades still views Vitals as a, well, rightly as a
20 competitor. And they have not, no history of
21 licensing the '060 Patent. And I don't think they
22 would make an exception because of a clause of slight
23 use promise.
24 Q Okay. Well, but the problem I'm having
25 here is you keep coming back and saying, okay, I'm

---

183

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 assuming that they wouldn't agree to that. But
3 that's not an option right now, okay? So I'm just
4 giving you a hypothetical where that is the license,
5 okay? That's the license.
6 It says, you give them the license, Health
7 Grades has a right to check it to make sure, but
8 Vitals is guaranteeing it's not going to use that in
9 more than 1 percent of its profiles.
10 With that license, would MDx pay a
11 12 percent royalty?
12 A I don't know. If the parties viewed that
13 as something that greatly impacted the royalty rate,
14 it certainly could be different, but I don't know.
15 Q Okay. You've talked about acceptable and
16 non-infringing substitutes, correct, in your report?
17 If you want to look at it, it's page 10.
18 A Yes, I addressed that issue.
19 Q And Health Grades, this is in your
20 paragraph 34, but just so we're clear, Health Grades
21 views the pool of competitors to consist of entities
22 that try to attract consumers who are searching for
23 provider information online. And provider
24 information can be in the form of physicians,
25 hospitals, dentists, et cetera, right?

---

184

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 A Yes.
3 Q Okay. Let's talk about paragraph 36 a bit
4 because you reference this yourself. And this is
5 Mr. Neal's testimony.
6 Do you want any water or anything, by the
7 way?
8 A I'm okay, thank you.
9 (Discussion off the record.)
10 (Recess taken from 2:13 p.m. to 2:21 p.m.)
11 (Exhibit 82 marked.)
12 Q (BY MR. STIMPSON) We've marked as
13 Exhibit 82, this is your attachment 3a to your
14 report, Mr. Hall, right?
15 A Yes.
16 Q So we'll get to that in a second. Before
17 we get there, can you explain to me what a Mar-Flo
18 analysis is, please?
19 A Yes. There's a quote, -- well, there's a
20 passage, there's sections in that case that describe
21 apportioning lost profits as a response to the second
22 test of Panduit. As I understood the case, the other
23 Panduit tests are met, but that there are acceptable
24 non-infringing substitutes that an appropriate way to
25 measure lost profit damages would be to apportion the

---

185

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 infringer's market share, spread it throughout the
3 market and the patent holder would get a share of
4 that, but for the infringement analysis. And that
5 would be an acceptable way to calculate lost profits.
6 Q Would you agree with me, Mr. Hall, that
7 which companies you include in your definition of the
8 market is very important to a Mar-Flo analysis?
9 A It's a factor. Certainly, the biggest
10 factor is the percent of the market that a patent
11 holder and the patent infringer have and the size of
12 the market.
13 I think it's good to know who the other
14 entities are, so an assessment can be beyond just a
15 damage expert's, as to the non-infringing acceptable
16 alternative or not.
17 Q Right. Well you can't do the Mar-Flo
18 analysis properly without knowing all the entities
19 that are in the hypothetical market, right?
20 A You may be able to, mathematically. I
21 have done it with an identification of competitors in
22 the market. And then I also did one with a different
23 set of competitors that Mr. Napper asserts are part
24 of the market.
25 Q Okay. In this Exhibit 3a we have, this is

---

47 (Pages 182 to 185)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

186

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   where you tell us where you think the market would
3   be -- this is where you show us what you think are
4   the competitors in the market for your Mar-Flo
5   analysis, right?
6       MR. VAZQUEZ: Attachment 3a, right?
7       Q   (BY MR. STIMPSON) Attachment 3a. Is that
8   correct?
9       A   Yes, it is.
10      Q   Why didn't you include WebMD in there?
11      A   Well, WebMD is an online provider of
12  healthcare information. It was not identified in my
13  first point of reference, which is who Vitals viewed
14  in mid 2010 as its competitors. And then, further,
15  in discussions with Health Grades, with Allen Dodge
16  and Andrea Pearson, while it was mentioned as a
17  player, quote, in a broader market of healthcare
18  information, it was also not viewed by them as a
19  direct competitor for the advertising revenue in
20  particular and web hits that are indicated on
21  attachment 3a.
22      Q   So the bottom line is, you just didn't
23  think, from your discussions with the Health Grades
24  folks, you just didn't think WebMD was close enough
25  to the Health Grades website to justify including it

---

187

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   in this analysis?
3       MR. VAZQUEZ: Object to form. Misstates
4   the testimony.
5       A   No, that's not how I would state it.
6       Q   (BY MR. STIMPSON) Okay. Well, I need a
7   little bit more clarification, then, because I don't
8   understand why you didn't include it.
9       Could you please tell me?
10      A   Yes. A starting point for my analysis was
11  who Vitals believed -- and its two business
12  overviews -- who their competitors were.
13      Q   So why did you start with who Vitals
14  believed their competitors were, rather than who
15  Health Grades believed who their competitors were?
16      A   Well, it's really a parallel analysis, but
17  since I had access to Health Grades's personnel and
18  documents for Vitals, I started with Vitals'
19  documents.
20      Q   Okay.
21      A   And it's important to assess both. And
22  under their business overview progress strategy plans
23  at Bates MDx 0012724, for a document that is at about
24  the time of the hypothetical negotiation or would
25  have been the hypothetical negotiation, it's a

---

188

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   section called marketplace in competition.
3       And I've reflected on the lower part of
4   attachment 3a the information from Vitals' assessment
5   of the marketplace in competition. And that is
6   Health Grades, Vitals, uCompareHealth, Angie's List
7   and rateMDs. And that's the bottom part indicated
8   August 2010.
9       And from there, or in addition to that
10  understanding of pre-litigation assessment of the
11  market, I also inquired with Health Grades who they
12  viewed as their competitors. And they named several
13  of the same competitors that Vitals had identified.
14  Also thought that locatedoc.com and ZocDoc were
15  competitors as well.
16      And so I reflected in the two sections
17  above on 3a the market with those two added. But
18  also wanted to keep Vitals' assessment of it at the
19  bottom.
20      Q   Did you talk to Mr. Neal about this?
21      A   I did not. I read Mr. Neal's deposition
22  testimony.
23      Q   Do you know what a 30(b)(6) deponent is?
24      A   I do.
25      Q   The 30(b)(6) deponent is the deponent who

---

189

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   is speaking for the company on the topics in a
3   30(b)(6) notice, right?
4       A   Yes.
5       Q   Do you understand that Mr. Neal was a
6   30(b)(6) deponent on competition?
7       A   I think I had that understanding. I don't
8   recall right now specifically.
9       Q   Let me show you the -- I know I marked
10  this at the last deposition, but I can't remember for
11  the life of me what the exhibit number is, so I'm
12  just going to do it again.
13      Let me mark as Exhibit 83 a copy of John
14  Neal's deposition transcript.
15      (Exhibit 83 marked.)
16      Q   (BY MR. STIMPSON) There you are.
17      A   Thank you.
18      Q   So if you could turn to page 85 of
19  Mr. Neal's transcript -- actually, 84 of Mr. Neal's
20  transcript.
21      A   Yes.
22      Q   And just read to yourself there -- well,
23  I'll read it into the record. Page 84, line 15. It
24  says, my question is:
25      So what we're going to talk about now is

---

48 (Pages 186 to 189)

CONFIDENTIAL - ATTORNEYS EYES ONLY

190

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   products and services of other companies that compete
3   with the Health Grades products and services that
4   embody or employ a claim from the patent-in-suit,
5   okay?
6       He says:  Okay, got it.
7       So let's identify them.
8       Vitals.com.
9       Okay.
10      UCompare.com, correct?
11      He answers, I have to tell you from a
12  layman's standpoint, I would say absolutely I'm not a
13  patent attorney so that's a judgment that counsel
14  would have to make.
15      Question:  But let's just do the best we
16  can here because you're identified for these topics.
17      Answer:  Right.
18      Question:  uCompare is one, right?
19      Answer:  Yes.
20      Question:  WebMD, right?
21      Answer:  Yes.
22      Did I read that correctly?
23  A   Yes.
24  Q   So John Neal, the 30(b)(6) deponent for
25  Health Grades, testified under oath that WebMD was a

191

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   competitor to the Health Grades products that embody
3   the patent-in-suit, right?
4   A   Yes.
5   Q   Okay.  But despite that, you did not
6   include that in your market share analysis, right?
7   A   I did not.
8   Q   And you did use WebMD in your report,
9   though, didn't you, Mr. Hall?
10  A   Yes.
11  Q   In fact, in your analytical approach, you
12  compared Health Grades to WebMD, right?
13  A   I did.  The profitability of Health Grades
14  departments that have used aspects of the '060 Patent
15  versus WebMD's overall financial results, yes.
16  Q   Right.  And you know that the whole point
17  of an analytical approach is to try to find something
18  that is as close as you can come to the patented
19  technology without being the patented technology, and
20  compare that with the patented technology and compare
21  profit margins, right?
22  A   Yes, I agree with that, close as you can
23  come given the information available.  Which is why I
24  also did an analytical method comparing it to the
25  Health Grades as a whole.

192

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   Q   Right.  Close as you can come.  And you
3   chose WebMD for one of those analyses, right?
4   A   I did not have the financial information
5   for these other competitors.  WebMD is publicly
6   traded and did have that information, so I used the
7   best information I had available to me.
8   Q   Okay.  So WebMD is not in your market
9   share analysis for Mar-Flo, right?
10  A   It is not.
11  Q   And if WebMD was in that analysis, that
12  would tend to reduce, if you just added WebMD to the
13  companies you have here, that would tend to reduce
14  the market share of Health Grades in the Mar-Flo
15  analysis, right?
16  A   I believe it would.  I haven't looked at
17  the Comscore for WebMD to know for certain.
18  Q   Well, the only thing it could do is reduce
19  Health Grades's percentage, right?  That's the only
20  thing it could do; it couldn't increase it?
21  A   You're asking if you just add it and all
22  the others stay the same?
23  Q   Sure.
24  A   Yes, you're right.  Mathematically, it
25  could only reduce it.  I don't know to what extent.

193

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   I haven't looked at their Comscore.
3   Q   How about RevolutionHealth, you didn't put
4   RevolutionHealth in your market analysis either, did
5   you?
6   A   I did not.
7   Q   Okay.  Look at Mr. Neal's transcript
8   again, same page, page 85.
9   A   Okay.
10  Q   You read this transcript, right?
11  A   Yes.
12  Q   Okay.  Page 85, line 18:  How about
13  RevolutionHealth?
14      Mr. Neal's answer as a 30(b)(6) witness:
15  Yeah, they're a competitor.
16      Did I read that correctly?
17  A   Yes.
18  Q   So Mr. Neal thinks that RevolutionHealth
19  is a competitor, correct?
20  A   He does, as he was asked these questions,
21  correct.
22  Q   And it's not in your market share
23  analysis, right?
24  A   Correct.
25  Q   If we added RevolutionHealth to your

49 (Pages 190 to 193)

CONFIDENTIAL - ATTORNEYS EYES ONLY

194

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 market share analysis, again, that could only lead to
2 the conclusion that Health Grades' market share is
3 less than you come up with in your report, correct?
4     A    It would have that impact, yes.
5     Q    Did you consider wellness.com, Mr. Hall,
6 and including that in your market share analysis?
7     A    I recall looking at Wellness, as well as
8 others.
9     Q    Why didn't you include wellness.com?
10    A    The market share.  I thought the strongest
11 indications of the market for the specific business
12 model related to advertising, based on Vitals'
13 assessment of it and discussions with Ms. Pearson and
14 Mr. Dodge, were the entities listed here, that do not
15 include wellness.com.
16    Q    Did you talk with Mr. Dodge or Ms. Pearson
17 about, hey, what about wellness.com?  Why don't we
18 include that?  Or did they just not mention it?
19    A    No, we went through the Comscore report
20 with them, in particular Mr. Dodge.  And I think we
21 covered most of them that were either brought up by
22 Vitals as we represented -- as I represented to them
23 or that were listed on the Comscore.
24    Q    Okay.  And you decided with the Health

195

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 Grades people that you would not include wellness.com
2 in your analysis of Mar-Flo, right?
3     MR. VAZQUEZ:  Form.
4     A    I concluded based on all the information I
5 saw from Vitals and Health Grades to have these
6 entities in the market share analysis.
7     Q    (BY MR. STIMPSON)  And you have in
8 there -- did you consider adding MD Ratings as a
9 competitor in your analysis?
10    A    I believe I did consider that.  If they're
11 in the referenced underlying documents, either in the
12 Comscore reports or in Vitals' business overview, I
13 did consider.
14    Q    And why didn't you include MD Ratings as a
15 competitor in your analysis?
16    A    Same answer.  I thought based on the
17 Vitals identification of who they believed their
18 competitors were, beyond the assertion they thought
19 they had one true competitor, I thought the entities
20 listed here most reasonably represented the market
21 share that Vitals and Health Grades were competing
22 for, advertising revenue based on web visits.
23    Q    And did you consider Mr. Neal's testimony
24 with regard to MD Ratings?

196

CONFIDENTIAL - ATTORNEYS EYES ONLY
1     A    I did.
2     Q    And do you remember what Mr. Neal said
3 about whether MD Ratings is a competitor?
4     A    I don't.
5     Q    Page 86.
6     A    I recall reading his --
7     Q    Line 12.  Page 86, line 12.
8     A    Yes, I recall reading this.
9     Q    Okay.  So Mr. Neal testified that
10 MD Ratings was a competitor, correct?
11    A    Yes.
12    Q    And despite that you still did not include
13 MD Ratings in your analysis, right?
14    A    That's correct.
15    Q    And again, had you included MD Ratings
16 that could only have the effect of reducing Health
17 Grades' market share, right?
18    A    If you kept in all the others, yes.
19    Q    How about DoctorsScore; did you consider
20 that?
21    A    Yes.
22    Q    And why didn't you include that?
23    A    Same answer as earlier.  Based on all the
24 information I received and reviewed in discussions

197

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 with Health Grades and the Vitals information on who
2 they understood to be their competitors.
3     Q    All right.  So let me identify some
4 competitors just so we can get through this more
5 quickly.  I'll identify a bunch of them, okay,
6 DoctorsScore, Yelp, LocateADoc, Xoova, that's
7 X-O-O-V-A, PharmaStats, RightHealth, myuhc.com,
8 SteadyHealth, qualitycheck, RemarkableDocs, AARP,
9 Health Market Science, Consumer Health Ratings.
10    For all those, did you consider adding all
11 those and just chose not to?
12    A    I considered all of them.  I also had
13 discussions with Health Grades' personnel about how
14 widely Mr. Neal was viewing competitors, whether it
15 was for the advertising revenue or more broadly on
16 his view of what the patent -- the infringement of
17 the patent more broadly damaged Health Grades, and
18 the discussion that he may have a wider view of
19 competitors beyond for the advertising revenue.  And
20 I factored that in as well.
21    Q    So you and Mr. Dodge and Ms. Pearson all
22 sat down and decided that Mr. Neal had too broad an
23 analysis of competitors?
24    A    No.

50 (Pages 194 to 197)

CONFIDENTIAL - ATTORNEYS EYES ONLY

| | |
|---|---|
| **198** | **200** |

**198**

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      Q   Okay.  Then who did you decide that with?
 3      A   I said it was discussed.  I decided -- I
 4  ultimately decided and Mr. Dodge agreed with my view
 5  of the competitors, based on who Vitals identified as
 6  the market and who Health Grades, Mr. Dodge and
 7  Ms. Pearson, viewed as the market as well.
 8      Q   So when you were meeting with Mr. Dodge
 9  and Ms. Pearson, where were you?
10      A   We met at these offices at one point and
11  we had telephone conversations.
12      Q   Did you consider calling Mr. Neal and
13  asking him about his testimony?
14      A   I don't recall considering that.
15      Q   You had two exhibits you gave me on
16  substitutes earlier today.  Let's see if we can find
17  them.  79 is one of them, right?
18      A   Yes.
19      Q   There was one on --
20          MR. VAZQUEZ:  77, 78 and 79.
21          MR. STIMPSON:  I'm sorry?
22          MR. VAZQUEZ:  76, 77, 78 and 79.
23          MR. STIMPSON:  That may be right.
24      Q   (BY MR. STIMPSON)  Oh, 77, is that the
25  other one on the market share analysis, or is that
```

**199**

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2  something else?
 3      A   It is one of them -- both of them.  I'm
 4  sorry.
 5      Q   76 and 77?
 6      A   Correct.
 7      Q   Okay.  All right.  Let me take a look at
 8  those for just a second?  Okay.  Actually, I may have
 9  to come back to those.  I'll come back to the
10  substitutes later.
11      A   Okay.
12      Q   Would you look at paragraph 44 of your
13  report, please.
14      A   Yes.
15      Q   And this is the section where you
16  calculate Health Grades' lost revenues in your
17  report, right?
18      A   Yes.
19      Q   And paragraph 44, about the middle, says,
20  I began with identifying Vitals' infringing
21  advertising revenue.
22          Did I read that right?
23      A   That's the second half of the second
24  sentence, yes.
25      Q   Right.  So am I correct that you did begin
```

**200**

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2  with identifying what you believe to be Vitals'
 3  infringing advertising revenue?
 4      A   Yes.  To calculate a reasonable estimate
 5  of Health Grades' lost revenue.
 6      Q   Okay.  So how did you go about determining
 7  what you characterize as Vitals' infringing
 8  advertising revenue?
 9      A   Using the financial information provided
10  by Vitals ultimately and reading its description of
11  its organization in those audited financials, and
12  gaining an understanding of its business through its
13  business overview, determined or concluded that with
14  the assumption of validity and infringement, Vitals
15  was earning advertising revenue based on that
16  infringement, and that that would be the start point
17  for an analysis.  And the description I lay out here
18  is beginning with that infringing advertising
19  revenue.
20      Q   Right.  So you refer to it in your report
21  as infringing advertising revenue.  But actually,
22  what you did is just took all their advertising
23  revenue, right?
24      A   I started with all their advertising
25  revenue and worked down from there.
```

**201**

```
 1          CONFIDENTIAL - ATTORNEYS EYES ONLY
 2      Q   Okay.
 3      A   Based on the assumption of infringement
 4  and how they earned advertising revenue in their
 5  business model.
 6      Q   So did you make any effort to apportion
 7  the advertising revenue to identify the parts of that
 8  revenue that are relevant to the patent claims?
 9          MR. VAZQUEZ:  Form.
10      A   Yes.
11      Q   (BY MR. STIMPSON)  Okay.  How did you do
12  that?
13      A   I did that by apportioning -- well, first,
14  adjusting that ad revenue for the co-visitors to
15  represent but-for causation, a reasonable and
16  accurate representation of what Health Grades would
17  have potentially achieved.
18          And then I apportioned the revenue amongst
19  all the competitors, with the understanding that
20  those competitors were not all practicing, to my
21  knowledge, the '060 patented features.  And so the
22  reasonable step of apportioning would account for
23  features unrelated to the patent as it spread the
24  website visits which drive ad revenue to the market.
25      Q   Okay.  So I'm not sure that -- maybe we
```

51 (Pages 198 to 201)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

202

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  have a little disconnect there. But my question was
2  very specific. Before you took out a portion because
3  you have co-visitors and before you took that
4  advertising revenue and applied a percentage for
5  Mar-Flo, before you even get to those steps, my
6  question is, did you do anything to apportion those
7  advertising revenues? You started with all of the
8  advertising revenues.
9      My question is, did you do anything to
10 apportion those advertising revenues and say, Hey,
11 look, of all these Vitals advertising revenues, this
12 is the part that was generated because of the '060
13 features?
14     A   I did not and don't believe that is
15 reasonably required, given the subsequent steps I
16 took to reduce the ad revenue to reasonably
17 approximate what Health Grades would have achieved by
18 applying acceptable methodology of taking the
19 infringer out of the market.
20     Q   Okay. So let me just see. So anywhere in
21 this analysis where you're trying to figure out the
22 lost revenues from Health Grades, did you ever take
23 into consideration how much of the Vitals website was
24 using the '060 features?

*(numbering note: lines 1–25)*

---

203

CONFIDENTIAL - ATTORNEYS EYES ONLY

1      MR. VAZQUEZ: Form.
2      A   Again, starting with the assumption of
3  validity infringement, that's an assumption that
4  they're utilizing the patented features in the
5  market.
6          So with that assumption, and how they
7  promoted those features and how they earned revenue,
8  I did take into account their use of the '060
9  patented features.
10     Q   (BY MR. STIMPSON) And where is that shown
11 in your report?
12     A   Throughout. It's described as far as --
13     Q   Is there anywhere you can point me to in
14 your report that says, Oh, look, and this is how I
15 adjusted because of the amount of use I think that
16 MDx is making of the '060 features?
17     A   Adjusted what?
18     Q   The advertising revenue that you're
19 starting -- as your starting point for calculating
20 damages.
21     A   I don't believe my answer earlier had the
22 word adjusted in it.
23     Q   Okay.
24     A   But I do adjust the revenues further down,

---

204

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  as I answered earlier.
2      Q   All right. So let me just back up a bit
3  because maybe my question wasn't as clear as I can
4  perhaps make it.
5          In this analysis, this entire analysis you
6  do here, do you ever discount anything due to how
7  much Vitals is using or not using the '060 patented
8  features?
9      MR. VAZQUEZ: Form.
10     A   This analysis, yes.
11     Q   (BY MR. STIMPSON) Okay. And where do you
12 do that?
13     A   I do that in the apportionment and also
14 using what I actually know happened. And that's the
15 advertising revenue Vitals earned with the assumption
16 of infringement.
17         I don't have a data point as to the
18 revenue they would have earned without infringement.
19 If Mr. Napper had presented that, I would have read
20 that with interest. So I have not speculated as to a
21 portion of their ad revenue they may have earned
22 without infringing.
23         So followed well-accepted methodologies,
24 by removing them from the market and apportioning

*(numbering note: lines 1–25)*

---

205

CONFIDENTIAL - ATTORNEYS EYES ONLY

1  with the assumption of infringement, and apportioning
2  their web visits, which drive ad revenue to the rest
3  of the market.
4      Q   Well, you did know, though, when you
5  drafted this report, sir, that not the entire MDx
6  Vitals website was using the '060 features, right?
7      MR. VAZQUEZ: Form.
8      A   Yes.
9      Q   (BY MR. STIMPSON) Right. And you knew,
10 for example, that not -- you know, less than half of
11 the profiles on the Vitals website actually use
12 patient ratings, right?
13     MR. VAZQUEZ: Form.
14     A   No, I don't have that understanding. I've
15 seen that asserted, but I have not seen specific data
16 on it that supports that.
17     Q   (BY MR. STIMPSON) So when you wrote this
18 report, nobody told you about how many profiles in
19 the Vitals website used patient ratings?
20     A   The topic was discussed. I have not seen
21 a specific figure.
22     Q   But you know it's not all of them, right?
23     A   That's my understanding.
24     Q   All right. Okay. So let's just see if we

---

52 (Pages 202 to 205)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

206

CONFIDENTIAL - ATTORNEYS EYES ONLY
1   can kind of summarize what happened here, then.
2        In your Mar-Flo analysis, to determine
3   what the profits are that Health Grades should have
4   had, had Vitals not infringed, you started with all
5   the advertising revenue from Vitals, right, as your
6   starting point?
7        A    For the infringement period, yes.
8        Q    Okay.
9        A    The data point we know and have and the
10  assumption of infringement, it's a reasonable start
11  point.
12       Q    Right.  And you started with that entire
13  advertising revenue, even though, as we've talked
14  about today, you knew that not every part of the
15  Vitals website was using the features of the
16  '060 Patent, right?
17       A    That's correct.  I also don't know what
18  they would have earned by way of advertising revenue
19  with just those features, without the '060 infringing
20  features.
21       Q    Right.  You just don't know that.  And
22  nobody knows that right now, right?  I mean, we just
23  don't know?
24       A    That's right, because Vitals did not do

---

207

CONFIDENTIAL - ATTORNEYS EYES ONLY
1   business that way.  They did it with the features and

REDACTED

5        Q    Right, but this isn't your first damages
6   case, right?  You know how things are done in other
7   cases, right?  You go out and get a surveyor.  You
8   can do a survey to figure out what percentage of this
9   website generated advertisements, right?  There were
10  options, right?
11       MR. VAZQUEZ:  Form.
12       A    I don't agree that a survey is feasible or
13  reasonable in this case.
14       Q    (BY MR. STIMPSON) Okay.  So, anyway,
15  knowing that the entire -- not the entire MDx/Vitals
16  website uses the '060 patented features,
17  nevertheless, you started your analysis with all the
18  advertising revenue during the period of alleged
19  infringement from Vitals, right?
20       A    From their actual records, yes.
21       Q    Right.
22       A    It's a reasonable start point.
23       Q    All right.  And then from there, you cut
24  that back by acknowledging the fact that you have a

---

208

CONFIDENTIAL - ATTORNEYS EYES ONLY
1   lot of users who use both -- go to both Health Grades
2   and Vitals on the same Internet session, right?
3        A    Yes, co-visitors.
4        Q    Right.
5        A    Approximately half.
6        Q    And then what you did is, you did the
7   Mar-Flo analysis.  So from your determination of the
8   competitors in the market, you figured out what the
9   percentages you thought Health Grades would have in
10  the market and applied that percentage to your now,
11  the number -- the advertising revenue that you get
12  from cutting it back for the co-visitors, right?
13       MR. VAZQUEZ:  Form.
14       A    I think you described that correctly.
15       Q    (BY MR. STIMPSON) And so that's the
16  number that you're proposing for the lost profits
17  number, right?

REDACTED

20       Q    Okay.  Good.
21            Did you consider in any of your analyses,
22  Mr. Hall, how difficult or easy it would be for
23  Vitals to design around the '060 Patent?
24       A    Yes.

---

209

CONFIDENTIAL - ATTORNEYS EYES ONLY
1        Q    Okay.  And what was your understanding
2   about whether it would be easy or hard to design
3   around this patent?
4        A    I don't have a technical understanding.
5   My understanding is that's often an issue, maybe more
6   than often an issue in patent disputes.  And so I
7   considered it from that perspective, did not have
8   data on it or how Vitals pursued or whether Vitals
9   pursued that.
10           So as I have done in other cases, did not
11  speculate as to that but would read with interest any
12  subsequent analysis related to that and assess it at
13  that time.
14       Q    Did you ask Dr. Greenspun how difficult or
15  easy it would be to design around the '060 Patent?
16       A    I did not.  And I think the issue is not
17  just ease or difficulty, but also whether Vitals
18  would achieve the same amount of traffic with that
19  workaround.  So I think those two concepts should be
20  linked.
21       Q    Right.  Well, let's just look back in your
22  report here on page 3, okay?
23       A    Yes.
24       Q    You have this paragraph 11.  Your

---

53 (Pages 206 to 209)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**210**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  subparagraph 2 says, refers to one of the claim
3  elements being accessing information provided by and
4  verified by the healthcare provider and, you know, at
5  least, you know, three of these data areas, right?
6      A   Yes.
7      Q   Okay. So suppose -- you know, you don't
8  need to be a technical expert to understand this,
9  but, you know, suppose that Vitals just changed it so
10  that they didn't get the data from these specific
11  data elements from the provider and they just got
12  them from somewhere else.
13         Would that make any difference to traffic?
14  Would the guy who pulls up the Vitals website have
15  any idea where that data came from?
16      MR. VAZQUEZ: Form.
17      A   I have not made that specific
18  determination. I have read Mr. Greenspun's rebuttal
19  report to Dr. Carter (sic) and understand his expert
20  view on the impact --
21      Q   (BY MR. STIMPSON) Cooper.
22      A   Cooper, I'm sorry. Afternoon.
23      Q   Yeah, I know. I hear you.
24      A   -- that that would have had on website
25  traffic. So I have not speculated, nor have I seen

---

**211**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Mr. Napper provide a specific opinion or adjustment
3  to the actual website traffic as a result of the
4  design-around like you indicated in your question.
5      Q   Okay. So just so I'm clear, then, your
6  damages analysis did not discount the damages at all
7  due to possible design-arounds, right?
8      A   It does not. I don't have the data to
9  know what that would have done to their web traffic
10  had they undertaken a design-around. In fact, to my
11  knowledge, they did not undertake that.
12         So I evaluated what I actually knew took
13  place in the market and the data that actually
14  reflects what took place in the market.
15      Q   Okay. Well, assume with me then, please,
16  Mr. Hall, that designing around the '060 is an easy
17  matter. Would that impact your damages analysis?
18      A   I would want to know more than that, that
19  single assumption. If Vitals no longer has -- is the
20  question that it no longer has any of the elements --
21  it's not infringing, it's designed around?
22      Q   Yeah, it's just designed around. You can
23  change any of the elements and that would be a
24  design-around.
25      A   So what's -- in your hypothetical, what's

---

**212**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  the impact on its website traffic?
3      Q   So let me change my hypothetical, then.
4  Let's assume for me then, that it's an easy matter
5  for MDx to change its data sources so that it doesn't
6  meet the requirements of where the data comes from.
7  And also assume with me that because the users don't
8  have any idea where the data is coming from, it
9  doesn't make any difference to data traffic.
10         Would that impact your damages analysis?
11      A   That hypothetical, it could. I would want
12  to know what, in that realm, what the web traffic
13  would be and what the advertising revenue earned
14  would be.
15      Q   Well, I mean, my hypothetical assumed that
16  the web traffic doesn't get impacted at all.
17      A   I think your hypothetical is somewhat
18  circular in that you're saying the '060 Patent is not
19  of much value. And the action of the parties in this
20  case, that would be inconsistent, it seems, with the
21  action of the parties.
22         And I know that's a dispute between the
23  parties as to the importance of it. But I have
24  assumed infringement. I have assumed the validity of
25  the '060 Patent. And I haven't provided an opinion

---

**213**

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  on a speculative hypothetical.
3      Q   Right. But, I mean, as you're an expert,
4  I'm asking you to assume this hypothetical. And the
5  hypothetical is, it's an easy thing for MDx to change
6  the sources of data so it's not infringing the
7  patent. That's assumption one.
8         Assumption two is because it's just the
9  source of the data, and users don't really know where
10  the source is coming from, that it makes absolutely
11  no difference to the traffic.
12         So with those two assumptions, would that
13  impact your damages analysis?
14      A   I think in that hypothetical it would
15  impact any analysis and one would want to assess all
16  the hypothetical factors. What you're basically
17  describing is a hypothetical with a patent that
18  doesn't have valuable features.
19         And I've seen evidence to the contrary in
20  this case. But to answer your hypothetical, all
21  factors would impact an analysis and one would want
22  to consider that.
23      Q   Okay. In fact, it's not just that it
24  would impact it, it would impact from a downward
25  direction, right? The damages would be lower?

---

54 (Pages 210 to 213)

CONFIDENTIAL - ATTORNEYS EYES ONLY

214

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2     A    If Vitals came to a hypothetical
3  negotiation and said we're going to design around, we
4  don't care about your patent and walked away, yes,
5  that would put them in a different negotiating
6  position.
7          It's at odds with the economic logic of
8  this case or the action of the parties, but that's
9  your hypothetical. It would impact the respective
10  bargaining positions of the parties in a hypothetical
11  negotiation.
12         MR. STIMPSON: Move to strike everything
13  after negotiating position as nonresponsive.
14         MR. VAZQUEZ: Denied.
15     Q    (BY MR. STIMPSON) So my question was
16  really about your damages analysis, Mr. Hall. If you
17  were to assume those two facts, that it was an easy
18  design-around and the design-around would not impact
19  web traffic at all, your damages analysis would have
20  a smaller damages number, right?
21     A    I think I can answer that hypothetical
22  categorically beyond this case. That if you change
23  the assumptions or have hypothetical assumptions that
24  are different than what is done, yes, it will impact
25  what was done. A reasonable person will analyze that

215

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  hypothetical and make conclusions based on all the
3  evidence in that hypothetical.
4     Q    I understand that. That wasn't quite my
5  question. My question was, if you were to assume
6  those two facts, that it was an easy design-around
7  and the design-around would not impact web traffic at
8  all, your damages analysis in this case would have a
9  smaller damages number, right?
10         MR. VAZQUEZ: Form.
11     A    First, it is a hypothetical. But you're
12  referencing this case. So I have not seen support
13  for those assumptions you're asking me. But as in
14  all cases, if you changed the dynamics or factors of
15  a case, it would impact an analysis.
16         And the example you're bringing up is
17  basically asserting facts that the patent is not
18  worth anything and that the parties could have
19  designed around and avoided litigation and litigation
20  cost, but didn't. But you're asking me if they did,
21  would that impact the damage analysis.
22         The answer is, of course it would, as most
23  hypothetical frameworks would.
24     Q    (BY MR. STIMPSON) Okay. So from your
25  answer, sir, you agree, then, that if that

216

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  hypothetical is correct, that you can easily design
3  around it and it would not impact web traffic, if
4  that hypothetical is correct, in your words, the
5  patent wouldn't be worth anything, right?
6          MR. VAZQUEZ: Object to form. Misstates
7  the testimony.
8     A    I don't believe that's what I said. I
9  said your hypothetical is basically asking me to
10  assume the patent is not robust or of value, based on
11  your assertion that it's an easy design-around and
12  wouldn't have impacted traffic and therefore revenue
13  for Vitals.
14         In a hypothetical, but you're applying a
15  hypothetical in this case, so I mentioned Vitals.
16     Q    (BY MR. STIMPSON) So then, coming back to
17  your answer, Doctor -- I mean, Mr. Hall, if it's true
18  that this patent can be easily designed around and
19  the design-around would not impact web traffic, would
20  that mean this patent would not be robust or of
21  value?
22     A    It could, in that hypothetical. It
23  depends on what the cost of the design-around is.
24  And again, I've seen evidence that the patent is of
25  value because of Health Grades' use of it as well as

217

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  Vitals' pursuit of use of it.
3          MR. STIMPSON: Move to strike everything
4  after what the cost of design-around is as
5  nonresponsive.
6     Q    (BY MR. STIMPSON) Could you please turn
7  to paragraph 62 of your report.
8          MR. VAZQUEZ: Paragraph 62?
9          MR. STIMPSON: Yep.
10     A    Yes.
11     Q    (BY MR. STIMPSON) It's correct, isn't it,
12  Mr. Hall, that a critical part of effective websites
13  in this area is having good data, right?
14     A    It's important, yes, to be able to have
15  the data that prospective patients can access, yes.
16     Q    Well, it's more than important. It's
17  actually critical, right? That's your word.
18     A    Sure, yes, I mean it's very important,
19  yes.
20     Q    And now you also say that another critical
21  contribution for an effective website is permission
22  under the '060 Patent license, right?
23     A    Yes.
24     Q    Okay.
25     A    Very important contribution, yes.

55 (Pages 214 to 217)

CONFIDENTIAL - ATTORNEYS EYES ONLY

218

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   Okay. So in your view, Mr. Hall, you
3  can't have an effective website in this area unless
4  you're practicing the '060 Patent; is that what your
5  testimony is?
6  A   That's not how I've stated it today.
7  Q   Oh, I understand. But is that correct?
8  Is that a fair summary of your testimony?
9  A   That --
10  Q   Do you want me to rephrase it?
11  A   Yes, please.
12  Q   So is it a fair assessment of your
13  testimony, Mr. Hall, that without a license to the
14  '060 Patent rights and without practicing that
15  invention, people in this space can't have an
16  effective website?
17  A   I haven't testified to that.
18  Q   Is that your understanding?
19  A   I've seen other entities attract web
20  traffic that from my understanding are not infringing
21  and therefore don't have a '060 license. And I don't
22  know fully their business model, but if they're
23  attracting ad revenue or earning ad revenue without a
24  license to the '060 Patent, which would be everybody
25  because it hasn't been licensed, I don't have a

219

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  personal view that their sites are not effective.
3  Q   Right. Okay. So take, for example,
4  WebMD, they're not using the '060 Patent, right?
5  A   To my knowledge, no.
6  Q   And they're successful, right?
7  MR. VAZQUEZ: Form.
8  A   Yes. They earn profits, yes.
9  Q   (BY MR. STIMPSON) Okay. And how about
10  Angie's List, are they using the '060 Patent?
11  A   I'm not aware that they are. I know
12  Mr. Greenspun goes through a number of entities in
13  his rebuttal report that I've read that analyzes
14  whether they're using the patent or not. And I don't
15  recall the view on that.
16  Q   In fact, in your market share analysis,
17  they're one of the biggest competitors in this area,
18  right?
19  A   Angie's List is, yes.
20  Q   And so if they're not using the
21  '060 Patent, that means that you don't really need
22  the '060 Patent to have an effective website in this
23  area, right?
24  A   It depends on your business model. If
25  you're -- if you're promoting the features in the

220

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  '060 Patent, it is important to that entity. If you
3  want to practice and you add the comparison ratings
4  with the three sources of data, it would be
5  important.
6  I'm not aware that Angie's List is
7  pursuing that.
8  Q   All right. So my point is that you don't
9  have to have the '060 Patent features to have an
10  effective website in this area, right?
11  MR. VAZQUEZ: Form.
12  A   It depends on what the entity's goal is.
13  There is certainly Angie's List and others that
14  are -- have website traffic and presumably ad revenue
15  associated with that. And I don't know if they view
16  that as effective or how effective it is. I don't
17  have a personal opinion as to that.
18  Q   (BY MR. STIMPSON) Right. But just assume
19  that the goal is to compete in this same space, the
20  same space that you define in your Mar-Flo analysis.
21  And the goal is to compete in that space and make
22  money.
23  We know from Angie's List that you don't
24  need to use the '060 Patent features in order to
25  achieve both those goals, right?

221

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  MR. VAZQUEZ: Form.
3  A   For Angie's List, that could be. But this
4  section you're referring to is in the hypothetical
5  negotiation where there's an assumption of validity
6  and infringement and I'm evaluating Vitals and their
7  wanting to negotiate with Health Grades, in fact a
8  requirement that they come to an agreement in the
9  hypothetical negotiation and will be using the '060
10  Patent for its version or view of an effective
11  website.
12  Q   (BY MR. STIMPSON) Right.
13  A   So that's the context of the paragraph
14  you're pointing to.
15  Q   Right. But in that hypothetical
16  negotiation both sides would understand that just
17  like Angie's List, MDx doesn't really need the
18  '060 Patent to compete in this space and make money,
19  right?
20  MR. VAZQUEZ: Form.
21  A   They likely would assert that and say they
22  have other features. And I have accounted for that.
23  But at the same time the hypothetical negotiation
24  requires ultimate agreement. So that certainly, I
25  think, would be I think a negotiation posture by

56 (Pages 218 to 221)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

222

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 Vitals and certainly would be taken into
3 consideration in the negotiation.
4    Q    (BY MR. STIMPSON) Okay.
5    MR. STIMPSON: How long have we been
6 going?
7    MR. VAZQUEZ: About an hour.
8    MR. STIMPSON: Boy, time flies when you're
9 having fun. Why don't we take a little break, okay?
10    (Recess taken from 3:13 p.m. to 3:24 p.m.)
11    Q    (BY MR. STIMPSON) So paragraph 64 of your
12 report, you start talking about licenses, right?
13    A    Yes.
14    Q    Okay. And you say, many of the Health
15 Grades licenses were fixed fees or tiered fees.
16    Did you consider a fixed fee arrangement
17 here?
18    A    Yes, based on the review of the licenses.
19    Q    So why are you proposing a royalty rate?
20    A    I believe that the way that the two
21 parties have exploited the patented features or used
22 the patented features has been to drive advertising
23 revenue. And to the extent that that varies, based
24 on the usage of the patented features of the license,
25 I think it's a reasonable basis for the parties to

---

223

CONFIDENTIAL - ATTORNEYS EYES ONLY

2 have had an agreement.
3    And also noted that while Health Grades
4 had done a fixed fee license, they had also done a
5 percent of revenue, ad revenue license agreement as
6 well. And those were, while not directly analogous
7 or comparable to a '060 license, in at least one case
8 one was closer, then, in my view, than others and
9 that happened to be a percentage of ad revenue.
10    Q    Which one was that?
11    A    DrTango, Inc., the translation into
12 Spanish language. But it's still data and it's not
13 the '060 Patent so it has that large caveat or large
14 basis for not making it directly comparable.
15    Q    All right. Well, let's see. You first
16 refer to the best quality license. So let's look at
17 that one first.
18    MR. STIMPSON: Let's have marked as
19 Exhibit 84 a multipage document bearing Bates numbers
20 HGLA 0041 to 50.
21    (Exhibit 84 marked.)
22    Q    (BY MR. STIMPSON) And this is the Best
23 Quality Healthcare report you refer to?
24    A    License agreement, yes.
25    Q    License agreement?

---

224

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    And you think this is a good indication of
3 what Health Grades would have started to request?
4    MR. VAZQUEZ: Form.
5    A    I have not provided that testimony or
6 written that in my report.
7    Q    (BY MR. STIMPSON) Well, do you think
8 that?
9    MR. VAZQUEZ: Form.
10    A    I think it would have been a reference
11 point for Health Grades. The date of it is after the
12 hypothetical negotiation, but -- and it's not for the
13 '060 Patent. And I understand from Andrea Pearson
14 that it's with a doctor who they believed was a
15 thought leader in the field. And I understand not
16 any or much activity has happened on this license.
17    So there are a number of limiting factors
18 as far as comparability, but wanted to include it in
19 my attachment 6a of all the agreements I have
20 received and note that it has a percent of ad revenue
21 or revenue including ad revenue, royalty rate with an
22 option for a fixed amount.
23    Q    (BY MR. STIMPSON) So part of your
24 testimony regarding this agreement is based on your
25 conversations with, who was it, Andrea Pearson?

---

225

CONFIDENTIAL - ATTORNEYS EYES ONLY

2    A    Yes.
3    Q    And so how much has Best Quality
4 Healthcare paid under this agreement?
5    A    I don't believe anything, since there
6 isn't any activities happened under this agreement.
7    Q    So they haven't paid a penny under this?
8    A    I don't believe they have.
9    Q    Okay. Why not?
10    A    I don't recall the reason.
11    Q    Okay. So -- and you got that information
12 from Andrea Pearson?
13    A    Yes, I also spoke about the agreements
14 with Allen Dodge, but I recall this piece of
15 information from Andrea Pearson.
16    Q    And so under section 7 of this agreement,
17 which is on page 42, Bates number 42, as you point
18 out, there is an option for an annual fixed fee of
19 $172,000, right?
20    A    Yes.
21    Q    And so our damages period that you're
22 discussing here is, you know, roughly two years,
23 right?
24    A    So far, yes.
25    Q    Okay. So if --

---

57 (Pages 222 to 225)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

226

CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A    Maybe three years by the time of trial,
3  but through my report two years.
4    Q    So through your report, two years.  So if
5  Vitals had paid this $172,000 per year, then their
6  total they were to pay would be less than $350,000,
7  right?
8    A    170 times two years is a little less than
9  350, correct.
10    Q    And your damages analysis, however, comes
11  up with a number of 2.6 million, right, 2.26 million?
12    A    Combining lost profits and royalty, the
13  correct comparison -- yes, comparing 350,000 for a
14  data only, non '060 Patent is implied in your
15  question.
16        And the royalty only damages is a little
17  over 900,000.  My royalty and lost profits damages is
18  the figure you cited.
19    Q    Is Best Quality Healthcare still in
20  existence?
21    A    I don't know.
22    Q    You don't think that this includes at
23  least an implicit agreement that the '060 Patent is
24  not going to be as asserted against Best Quality
25  Healthcare?

---

227

CONFIDENTIAL - ATTORNEYS EYES ONLY
2        MR. VAZQUEZ:  Form.
3    A    I'm sorry, what was the question about a
4  clause?
5    Q    (BY MR. STIMPSON)  No, did you consider
6  whether or not this Best Quality Healthcare agreement
7  includes at least an implied agreement that they're
8  not going to get sued on the '060 Patent for using
9  the Health Grades data?
10        MR. VAZQUEZ:  Form.
11    A    I don't recall.  My understanding is this
12  is not for the '060 Patent, it's for data only.  And
13  it's for a mobile application, so not a web-wide use.
14  It's only for those who would choose the application.
15  So it's a smaller market.
16    Q    (BY MR. STIMPSON)  Well, right, but that's
17  not quite my question.  My question is, did you
18  consider whether or not this agreement includes at
19  least an implied license not to sue Best Quality
20  Healthcare on the '060 Patent?
21    A    If Best Quality infringes?
22    Q    No matter what Best Quality Healthcare
23  does with this data.  Don't you think it's implied
24  that Health Grades isn't going to sue them on their
25  patents if they're out there using Health Grades'

---

228

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  data, that Health Grades is getting paid for?
3    A    I have not made that legal conclusion and
4  legal analysis.
5    Q    Have you asked anybody to do that
6  analysis?
7    A    No, I haven't.
8    Q    In fact, there's a lot of agreements here
9  where Health Grades licensed data to other parties,
10  right?
11        MR. VAZQUEZ:  Form.
12    A    There's a number of them.
13    Q    (BY MR. STIMPSON)  Are you aware of any of
14  those where Health Grades has ever asserted the '060
15  Patent after licensing the data?
16    A    For infringement?
17    Q    Right.
18    A    I'm not aware that they believed any of
19  the parties that they've licensed with or have
20  agreements with are infringing.
21    Q    In fact, if you look at paragraph 3 of
22  this agreement, sir, that's limitations on use of the
23  data, okay?
24    A    Yes.
25    Q    Did you read that paragraph when you did

---

229

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  this analysis?
3    A    Yes.
4    Q    And is there anything in that paragraph
5  saying you can't use it to show ratings of multiple
6  providers?
7    A    I don't recall seeing that.
8    Q    Okay.  So they didn't put that limitation
9  on the use of the data in their agreement, did they,
10  sir?
11    A    I recall another clause that says the --
12  what the data and the use defined.  And then other
13  clauses that, in my non-legal view, have limits on
14  the use of the data.  And I've read this clause as
15  well.
16        But I'm not taking a legal position but
17  don't see an agreement where they can license the
18  features of the '060 Patent.
19    Q    Right.  I see that, but they specifically
20  took the time and effort to put a provision in this
21  agreement saying, Okay, you've got our data and here
22  are the things we will not allow you to do with our
23  data, right?  That's a specific provision in this
24  agreement?
25    A    I also see the reservation of rights, any

---

58 (Pages 226 to 229)

Veritext Corporate Services

800-567-8658                                              973-410-4040

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**230**

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  use of the data or Health Grades marks not expressly
3  allowed in this agreement is strictly prohibited.
4      Q    Right. But I'm talking about --
5      A    And any and all rights of Health Grades
6  not expressly licensed to licensee by this agreement
7  are reserved. These are the capital letter emphasis
8  in section 5.
9      Q    Okay. And there's a corresponding
10  provision, limitations on use of the data, right?
11      A    There is.
12      Q    Okay. So there's nothing in this
13  agreement talking about comparison ratings, right?
14      MR. VAZQUEZ: Form. The agreement speaks
15  for itself.
16      A    I did not see those terms.
17      Q    (BY MR. STIMPSON) Well, let me ask you
18  this. When you go back to the back, Exhibit A, they
19  have the bronze package, the silver package, the
20  basic package, and the standard package and the
21  premium package.
22      Were you able to figure out from reading
23  this agreement what was being licensed here?
24      A    I gained an understanding of reading the
25  agreement and discussing it with Health Grades'

---

**231**

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  personnel, yes.
3      Q    So what package was being licensed here,
4  then?
5      A    Well, ultimately none were because this
6  wasn't acted upon. But the extent of the data
7  license was bronze or silver or any that were listed
8  to a mobile application, not to the wide web.
9      Q    Okay. Well, a mobile application can
10  encompass the wide web, right?
11      A    It's an app that the user would have to
12  choose to get.
13      Q    Okay.
14      A    It certainly could be used, but it's not
15  as wide in the market as the wide web of just logging
16  on without an application.
17      Q    So the data includes here hospital data,
18  too, right? See, it's on page 49, about two-thirds
19  of the way down.
20      A    I'm sorry, where is the hospital data you
21  referred to?
22      Q    Right here, hospital surveys, additional
23  data.
24      A    I see that.
25      Q    Okay. So that's not even related to the

---

**232**

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  '060 Patent, right?
3      A    That's my understanding.
4      Q    So this was a $172,000 cap and they were
5  giving them more than you needed to use the '060
6  Patent data, right?
7      MR. VAZQUEZ: Form.
8      A    I don't agree.
9      Q    (BY MR. STIMPSON) Well, you don't need
10  the hospital data to practice the '060 Patent, right?
11      A    That's my understanding.
12      Q    So if they were giving them the hospital
13  data, that means they were giving them more than they
14  needed to practice the '060 Patent, right?
15      MR. VAZQUEZ: Form.
16      A    I don't agree with that.
17      Q    (BY MR. STIMPSON) Okay. Well, I mean,
18  maybe it's just the way I'm phrasing the question
19  isn't terribly clear. So let me try again.
20      They were giving them data that if Best
21  Quality Healthcare used it, this hospital data, no
22  matter how they used it, it couldn't infringe the
23  '060 Patent, right?
24      MR. VAZQUEZ: Objection. Calls for legal
25  conclusions.

---

**233**

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2      A    Not on the hospital's part. I won't say
3  that more broadly.
4      Q    (BY MR. STIMPSON) So that was all my
5  question was. Okay. And you also cited the Tango
6  Report. Let's go to that. DrTango, I love that
7  name.
8      A    Yes.
9      (Exhibit 85 marked.)
10      MR. STIMPSON: Let's have marked
11  Exhibit 85 a multipage document bearing Bates numbers
12  HGLA 0077 to 85.
13      Q    (BY MR. STIMPSON) This is the DrTango
14  exhibit -- this is the DrTango agreement you
15  referenced?
16      A    Yes.
17      Q    All right. So you reference in your
18  report that DrTango was to pay 40 percent of all
19  gross ad revenue except for the Univision
20  advertisements, which would have paid 33 percent,
21  right?
22      A    Yes.
23      Q    How much did DrTango pay on this
24  agreement?
25      A    I don't recall.

---

59 (Pages 230 to 233)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

234

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  Q   Did you ask?
3  A   I don't recall.
4  Q   So we don't know whether he paid anything
5  on this agreement, right?
6  A   No, JP Anderson may know that. I don't
7  recall as I sit here if I know that. I don't know
8  that as I sit here, but we may know. I may know.
9  Q   All right. So your report talks about
10 them, DrTango, paying 40 percent of all gross ad
11 revenue?
12 A   Was to pay, per the agreement.
13 Q   Right. Okay. Let's look at paragraph
14 section 8, okay?
15 MR. VAZQUEZ: 8?
16 MR. STIMPSON: Yep.
17 Q   (BY MR. STIMPSON) Now, that's the
18 paragraph where you got that information, right,
19 Mr. Hall?
20 A   It looks like it, yes.
21 Q   Let's read along from the beginning of it,
22 okay? Advertising revenue share?
23 A   Yes.
24 Q   Health Grades shall receive 40 percent of
25 all gross advertising revenue without reduction for

---

235

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  commissions or other direct costs associated with
3  such revenue received by licensee for delivering any
4  third-party advertisements in the frame surrounding
5  the Health Grades data displayed on the licensee's
6  websites.
7  What does that mean?
8  A   My understanding is as it reads.
9  Q   Well, can you tell me, then, what does it
10 mean when it says they're paying for advertising
11 revenue received by licensee for delivering any
12 third-party advertisements in the frame surrounding
13 the Health Grades data displayed on the licensee's
14 websites?
15 A   They're referencing a specific location,
16 from my read of this, on the DrTango site.
17 Q   Did you ask Ms. Pearson or anybody else
18 what that meant?
19 A   I don't recall specifically when we
20 discussed this license asking about that sentence.
21 Q   So your report, which says that they pay
22 40 percent of all gross ad revenue isn't quite
23 accurate, is it?
24 MR. VAZQUEZ: Object to form.
25 A   I believe it is. It says 8, Health Grades

---

236

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  shall receive 40 percent of all gross advertising
3  revenue.
4  Q   (BY MR. STIMPSON) But you haven't
5  finished the sentence there, have you, Mr. Hall?
6  There's more to it. There's a limitation on which ad
7  revenue they're going to pay on, right?
8  A   Yes.
9  Q   And that limitation has to be, and as you
10 say, in a specific part of the website, a specific
11 frame, right?
12 A   Yes.
13 Q   So DrTango has complete control over this,
14 right? He can just put the advertisement in some
15 other part of the website and not pay a penny?
16 A   I'm not aware that he's able to do that,
17 but I don't know.
18 Q   Well, I mean, do you have any reason to
19 believe that he is restricted in where he puts
20 advertisements on his website?
21 A   I don't know.
22 Q   And so you don't know whether DrTango
23 would be required to pay 40 percent on all ad
24 revenues or if he put all the ads outside the frame,
25 whether he would have to pay on any revenues, right?

---

237

CONFIDENTIAL - ATTORNEYS EYES ONLY
2  MR. VAZQUEZ: Object to form.
3  A   I have an understanding from the agreement
4  and Ms. Pearson's description of it that he would
5  have an obligation to pay licensing fees based on ad
6  revenue as subject per the agreement as it's worded.
7  Q   (BY MR. STIMPSON) So Ms. Pearson told
8  you, regardless of what this says, Ms. Pearson told
9  you that he was going to have to pay 40 percent on
10 all ad revenue, right?
11 A   No.
12 Q   Okay. What did she tell you, then?
13 A   She described it as we went over this
14 agreement, as the agreement states.
15 Q   And you didn't have a discussion with her
16 about what it means, this qualification that says
17 he's only going to have to pay on ad revenue if it's
18 in this specific frame?
19 MR. VAZQUEZ: Object to form.
20 A   I don't recall that we discussed that
21 directly.
22 Q   (BY MR. STIMPSON) Okay. So really, as we
23 sit here, we don't know, do we, Mr. Hall, whether or
24 not he's paying on all ad revenues or just some part
25 of it, right?

---

60 (Pages 234 to 237)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

238

CONFIDENTIAL - ATTORNEYS EYES ONLY
1        MR. VAZQUEZ: Form.
2    A   JP Anderson may know the amount he's paid
3 to date. I don't know as I sit here.
4    Q  (BY MR. STIMPSON) Right. And so it's not
5 mentioned in your report anywhere, right?
6    A  It's not, no. The terms of the license
7 are referenced as are the Bates numbers for this
8 agreement.
9    Q  Did you look at any royalty reports from
10 DrTango?
11    A  No.
12    Q  But they exist, don't they? You can see
13 in the second paragraph there under section 8, he was
14 supposed to get royalty reports. Do you know if
15 those have been produced to us?
16    A  I don't know.
17    Q  And you haven't seen any royalty reports?
18    A  I have not.
19    Q  Health Grades didn't and their counsel
20 didn't volunteer to give you those, right?
21        MR. VAZQUEZ: Object to form.
22    A  I don't recall anybody volunteering or
23 discussing those royalty reports. I recall reading
24 them in the agreement.

---

239

CONFIDENTIAL - ATTORNEYS EYES ONLY
1    Q  (BY MR. STIMPSON) There is also something
2 else here, too, right? I mean, if Health Grades
3 sells any third-party advertisement in that frame,
4 Health Grades had to give 60 percent of the revenue
5 to DrTango, right?
6    A  I see that, yes.
7    Q  So that's another thing that really Health
8 Grades was paying to DrTango?
9    A  I see that clause.
10    Q  So do you know how DrTango makes his
11 money? I mean, do you know if he's primarily getting
12 his money through advertising revenue or from
13 subscriptions to his website or from donations? Do
14 you know how he makes his money?
15        MR. VAZQUEZ: Form.
16    A  I don't specifically. I have not seen
17 documentation to that effect. It may have been
18 discussed when we went through this agreement, but I
19 haven't seen documentation that breaks out his
20 sources of revenue.
21    Q  (BY MR. STIMPSON) There was no
22 documentation to that effect referenced in your
23 report?
24    A  Correct.

---

240

CONFIDENTIAL - ATTORNEYS EYES ONLY
1    Q  And there is nothing in your report
2 indicating how he makes his money, right?
3    A  That's correct.
4    Q  And you can see from Exhibit A on page 84,
5 the Bates number, that's in the DrTango Report. You
6 can see that, again, what is being given here is
7 hospital data?
8    A  Correct. It's not the '060 Patent and I
9 made that clear in the report.
10    Q  Right. And so what DrTango is paying for,
11 depending on what he is paying for, if anything, it
12 includes stuff that no matter how you used it, it
13 couldn't fall under the '060 Patent, right?
14    A  Yes. As I indicated in my report, they do
15 not license their '060 Patent and have not.
16    Q  Well, that wasn't quite my question. My
17 question is this.
18      What he's paying for is more than just the
19 data that you would use on the '060 Patent, right?
20        MR. VAZQUEZ: Form.
21    A  That's not my understanding.
22    Q  (BY MR. STIMPSON) Well, do you think the
23 hospital data was free?
24    A  My answer would be that it's different

---

241

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 data and it's not '060 patented data or the patented
2 comparison, Physician Comparison Reports.
3    Q  Right. So this really isn't a good
4 measure, is it, DrTango's report?
5        MR. VAZQUEZ: Form.
6    A  I would not use it to base a royalty
7 opinion on.
8    Q  (BY MR. STIMPSON) Okay.
9    A  Nor have I. I've cited it as agreements,
10 some of the agreements that along with other
11 agreements that Health Grades entered into. It at
12 least would be a point of reference. But I agree
13 it's not a comparable because it's not the '060
14 Patent. And I have not used it as a direct basis for
15 my royalty conclusion.
16    Q  So you also referenced in that answer the
17 other license agreements Health Grades has, right?
18    A  Yes. And I would include all of them that
19 I summarize on attachment 6a and -- well, 6b is
20 Vitals.
21    Q  Would you agree with me, Mr. Hall, that
22 some of these license agreements had annual fees of
23 $40,000 a year?
24        MR. VAZQUEZ: Form. The agreements speak

---

61 (Pages 238 to 241)

CONFIDENTIAL - ATTORNEYS EYES ONLY

242

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  for themselves.
3      A    Yes, I would agree, though those are not
4  '060 licensed.
5      Q    (BY MR. STIMPSON)  Well, none of them are,
6  right?
7      A    Correct.
8      Q    Okay.  So again, like DrTango, I mean,
9  you're using these to try to come up with a royalty
10  rate but none of them even license -- at least don't
11  even expressly license patents at all, right?
12     A    I don't agree with your characterization
13  that I'm using these to try to come up with a royalty
14  rate.
15     Q    Well, why are they in your report?
16     A    One of the Georgia-Pacific factors, and it
17  relates to licensing history of the parties or more
18  than one of them.  And I believe it's good to provide
19  an overview of the agreements the parties have been
20  involved in and determine -- or take a position as to
21  whether they're directly comparable or not.
22         I've indicated here they are not.  But
23  also note that they're all points of reference that
24  the parties would have in mind.  So I think it's
25  important to at least, as I have done, not at least,

243

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  but to mention those agreements and list them out so
3  that compensation and terms can be seen for full
4  disclosure of what was considered.
5      Q    Okay.  So there's a full disclosure of
6  what was considered.  But in your opinion, Mr. Hall,
7  none of these agreements have any impact on the
8  royalty rate, right?
9      A    I have not made that opinion.
10     Q    So you're not relying on any of these
11  agreements to influence your royalty rates
12  determination, correct?
13     A    That's not how I have characterized it.
14     Q    How would you characterize it?  I'm
15  getting confused now because you said it was just for
16  full disclosure.  And I thought you said that they're
17  not comparable.
18     A    They're not directly comparable.
19     Q    So are you relying on any of these license
20  agreements to influence either up or down your
21  royalty rate?
22     A    Yes.
23     Q    Okay.  Which ones?
24     A    I have relied on all of them, my
25  understanding of all of them, and the fact that

244

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  they're not '060 licensed.  And so I have considered
3  all of them and I have listed them as such and
4  addressed them in my report, and the Georgia-Pacific
5  factors attachment.
6      Q    How do they influence your royalty rate
7  determination?
8      A    One, there's two that establish a
9  precedent for applying a royalty rate to ad revenue,
10  that concept.  And two, the points of reference that
11  Health Grades would reasonably have in mind as I sat
12  down with Health Grades -- I'm sorry, with Vitals, as
13  Vitals would have their license agreement in mind as
14  they sat down with Health Grades as well.
15         Whether directly comparable or not.  And
16  in this case, I have not seen a license that is
17  directly comparable.
18     Q    You also refer to the agreement with Kroll
19  on paragraph 69, right?
20     A    I do.
21     Q    And does that impact your reasonable
22  royalty analysis at all?
23     A    As part of Vitals' agreement with Kroll?
24     Q    Yeah.  Does that agreement impact your
25  reasonable royalty analysis?

245

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2      A    Yes, I've considered it and it's part of
3  all the factors I've considered.
4      Q    So how does it impact it?
5      A    As I described in the report in that
6  paragraph.
7      Q    Well, I know, but all this does is say
8  this is what the Kroll agreement says.  And I'm
9  trying to figure out something a little different,
10  which is how did you take this and say, okay, this is
11  how it impacts my reasonable royalty analysis.
12     A    It's like the other agreements in 6b.  I
13  identify the terms of the agreement, the timing, June
14  2010, right prior to the hypothetical negotiation.
15         And it's a point of reference that Vitals
16  would have in mind as it sat down for the
17  hypothetical negotiation and wanted to identify it as
18  such.
19     Q    Right.  But that just tells me it's
20  something that is being considered.  So my question
21  is, how does it impact the royalty rate?  Does it
22  drive it up?  Does it drive it down?  Is it neutral?
23     A    One minute.
24     Q    Okay.
25         (Exhibit 86 marked.)

62 (Pages 242 to 245)

CONFIDENTIAL - ATTORNEYS EYES ONLY

246

CONFIDENTIAL - ATTORNEYS EYES ONLY

2   Q   (BY MR. STIMPSON) Are you looking for the
3  Kroll agreement?
4   A   No, I'm looking for just the context of
5  the licenses. I want to make sure what are --
6   Q   Paragraph 69 of your report.
7   A   I see that, but I want to see the
8  reference to license agreements.
9       On page 16, paragraph 59, we were just
10  talking about the Health Grades licensing policy and
11  identify that as Health Grades' licenses history
12  combined with its use of the '060 Patent has an
13  upward influence on the reasonable royalty rate.
14       That's also Georgia-Pacific factor 4. I
15  believe on attachment 9, Georgia-Pacific 4, I say I
16  discussed it in the report. Yes, page 1 of 4 of
17  attachment 9.
18       The Health Grades licenses, I remark, and
19  Kroll is part of this, Health Grades has not licensed
20  the right for any entity to utilize the features
21  embodied -- well, that's the Health Grades factor 1.
22       The Vitals, the Aetna Life Insurance
23  agreement, the iTriage, I understand Health Grades
24  has the position that that's infringing and address
25  that separately.

247

CONFIDENTIAL - ATTORNEYS EYES ONLY

2       So if the question is, is the Kroll
3  license agreement in and of itself an upward or
4  downward pressure --
5   Q   Yes.

REDACTED

14   Q   Would your answer be the same for both the
15  Best Quality Healthcare and Tango agreements?
16   A   That they're neutral?
17   Q   Yeah.
18   A   I would say those agreements because
19  combined with all the other Health Grades, that they
20  have not licensed the '060 Patent, that overall it's
21  an upward pressure for their licensing history.
22       Those agreements specifically, I would say
23  are neutral but establish the precedent for applying
24  a royalty rate to revenue.
25   Q   Let's look at the Kroll agreement,

248

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  Exhibit 86. I just have a couple -- well, actually,
3  I just have one question, I think, on this.
4       Can you tell me what is being licensed
5  here?
6   A   I don't believe I can. I could not
7  discern it from the agreement.
8   Q   Okay. That makes two of us.
9       Well, did you -- even without data, did
10  you have any other basis to know what was being
11  licensed there besides reading the agreement?
12   A   I don't believe I do.
13   Q   Okay. Now, you also relied on the
14  projections of Vitals, right? That's its paragraph
15  7, starting at paragraph 71?
16   A   Yes. I analyzed what Vitals was
17  projecting as of around the hypothetical negotiation
18  period.
19   Q   What factors went into these projections?
20   A   I would say the ones as described in the
21  business overview for the projection that came from
22  that source, which is -- let me find the reference.
23       (Exhibit 87 marked.)
24   A   For the projections, there's three
25  projections that I was able to discern from the

249

CONFIDENTIAL - ATTORNEYS EYES ONLY

2  information provided. One of them was from the
3  business overview progress strategy and plans. It
4  was heavily redacted, but I was able to make
5  calculations to fill in some of the gaps.
6       But it's in the financial equity and info
7  section. As you flip through or read the pages
8  around the projections, you gain a sense of the, I
9  think what was your question as far as what factors
10  were being considered or applied.
11       The other sources --
12   Q   (BY MR. STIMPSON) Well, let's just take
13  them one at a time.
14   A   -- have assumptions at the bottom, and the
15  --
16   Q   Let's just take them one at a time. So
17  the first one you reference, you address in your
18  attachment 7a to your report, right?
19   A   The one I was just answering relates to
20  7c.
21   Q   Okay. Well, let's talk about 7a first.
22   A   Sure.
23   Q   Here it is.
24   A   Thank you.
25   Q   What factors went into the projections

63 (Pages 246 to 249)

CONFIDENTIAL - ATTORNEYS EYES ONLY

250

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 there at attachment 7a?
3    A    The factors included all of their actual
4 to-date revenues by category and the projected or
5 forecasted revenues, as well as the cost of goods
6 sold and expenses and the resulting gross profit and
7 operating income, as well as the assumptions below at
8 MDx 0101069 and called the base plan.
9    Q    And are all those assumptions related to
10 the '060 Patent?
11    MR. VAZQUEZ:  Form.
12    A    I didn't identify any assumptions.  Are
13 you saying the categories I described, are they all
14 related to the '060 Patent?
15    Q    (BY MR. STIMPSON)  No.  No.  I'm trying to
16 figure out if you understand what MDx did to get to
17 these projections?
18    A    The projections did not have narratives
19 with them.  I understand from my experience in
20 financial and accounting issues they used a set of
21 assumptions and projected based on category.  So I
22 have a general understanding.  I don't have a
23 narrative or any Vitals description.
24        REDACTED
25

251

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        REDACTED
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19    Q    Were they using the '060 invention at that
20 time?
21    A    I understand that Health Grades alleges
22 they were, when they -- at that time period.
23    Q    The '09?  The patent didn't issue until
24 June 2010.
25    A    Sure, but the damage period in the

252

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2 hypothetical negotiation would be early July 2010.
3 And when the patent was issued, that's when the
4 hypothetical negotiation would take place.
5        That doesn't mean -- that doesn't bear one
6 way or another whether those features were being used
7 prior to that.  But the damage period would start at
8 the July 6, 2010.
9    Q    Right.  Okay.  So my question is, it's
10 your understanding that in 2009 and 2008 the Vitals
11 website was using the '060 features, right?
12    A    I understand Health Grades' view on it.  I
13 don't have an independent view of it in '08 and '09.
14 And I'm assuming infringement from mid '10 forward.
15    Q    Okay.  So if you take Health Grades' view
16 of it that in '09 they were using the '060 features,
17 they're losing money, right?
18    A    Yes.
19        REDACTED
20
21
22
23
24
25

253

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2        REDACTED
3
4    Q    Right.  So actually, that's a very good
5 point.  You can't tell from these projections or any
6 of the documents you've seen where they're projecting
7 they're going to incur costs for development and
8 bringing people on, salaries and things like that,
9 right?
10    MR. VAZQUEZ:  Form.
11    A    Yes, you can tell that by the projections
12 of costs they had in those categories.
13    Q    (BY MR. STIMPSON)  Okay.  Okay.  Okay.  I
14 see what you're saying.  So there are a lot of things
15 that can impact projections, right?
16    MR. VAZQUEZ:  Form.
17    Q    (BY MR. STIMPSON)  Whether or not you meet
18 the projections or not?
19    A    I would agree with that as a general
20 proposition.
21    Q    Right.
22    A    There are factors, there could be a number
23 of factors that impact the company's actual
24 performance as compared to its projection.
25    Q    Is it your view that these projections are

64 (Pages 250 to 253)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**254**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  high because Vitals knew they were using the features
3  of the '060 Patent?
4      A   I have not stated that in my report. My
5  view of the projections specifically as you stated,
6  my view of the projections is it's a good -- it's an
7  important assessment for how Vitals planned to go
8  forward at the time of the hypothetical negotiation,
9  with the assumption of validity infringement and its
10 desire to use the features of the '060 Patent, which
11 primarily, to my knowledge, impacts the advertising
12 revenue line item at the top of each of these
13 projections.
14     Q   But again -- I'm sorry, go ahead.
15     A   I was going to say, an important
16 assessment for Vitals to assess the reasonable
17 royalty for Vitals' plan for going forward with a
18 license for the '060 Patent.
19     Q   But you have -- as we talked about earlier
20 today, advertising revenue can be for a variety of
21 reasons, right?  And it doesn't -- not all
22 advertising revenue is tied to features of the
23 '060 Patent, right?
24     A   Yes.  To the extent the websites attract
25 visitors for other reasons, and I have not concluded

---

**255**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  that the only reason one would go to either Health
3  Grades or Vitals is the features of the '060 Patent.
4  There are other features that would drive traffic,
5  but that the '060 Patent features are ones they
6  promoted and certainly a part of, an important part
7  of the reason the two companies cite.
8      Q   So did you do anything, any kind of
9  allocation to try to figure out what part of this
10 revenue would have been attributable to use of the
11 '060 features, as opposed to all the unpatented
12 features on the website?
13     A   I did not make that assessment or
14 speculate as to that.
15     Q   Right.  That would be speculation,
16 wouldn't it?
17     A   I would want to see the basis for anybody
18 doing that and certainly would have looked with
19 interest if Mr. Napper had done that.  But I did not
20 see a basis or way to do it that, in my mind, would
21 be reasonable.  So I wasn't asked, nor did I
22 undertake that analysis.
23     Q   And so you have no way to tell us today
24 what part of these projected revenue streams were
25 projected because of the features of the '060 Patent,

---

**256**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  as opposed to anything else, right?
3      A   I would answer it this way.  The use of
4  the '060 patented features would result in revenue
5  for the advertising line for Vitals.  And that's why
6  they would sit down with Health Grades at a
7  hypothetical negotiation, assuming infringement, and
8  negotiate for a license so that they could earn all
9  the revenue that they possibly could using those
10 features, understanding that they would earn
11 advertising revenue based on other features as well.
12     MR. STIMPSON:  Move to strike as
13 nonresponsive.
14     Q   (BY MR. STIMPSON)  Let me give you the
15 question back one more time, Mr. Hall.  You have no
16 way to tell us today what part of these projected
17 revenue streams were projected because of the
18 features of the '060 Patent as opposed to anything
19 else, right?
20     A   When you're saying revenue streams, are
21 you meaning these six areas?  And I was trying to say
22 they reasonably would know that it would relate to
23 their advertising revenue.  So are you -- is your
24 question, is the revenue stream data leasing,
25 sponsored listings, or are you limiting your question

---

**257**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2  to advertising?
3      Q   I'm not limiting my question to
4  advertising or anything.  I'm just saying -- well,
5  actually, let me change the question a bit, then.
6  Because you said advertising was the part you were
7  primarily relying on as the part that you're using
8  for your analysis, right?
9      A   That's not how I answered it.
10     Q   All right.  So it's all revenues, then,
11 I'm not limiting it to advertisement, all right?
12     A   Okay.
13     Q   So all revenues.  And here is my question.
14 Do you have any way to quantify for us what
15 percentages of these projections of revenue would be
16 attributable to the '060 feature, as opposed to what
17 part of the projections were attributed to other
18 non-patented features of the website?
19     A   I have not seen data that would allow for
20 that type of calculation.
21     Q   Okay.  So is there anything you saw in any
22 of the documents generating these projections from
23 which you got these projections that reference
24 comparison ratings of healthcare providers?
25     A   Yes.

---

65 (Pages 254 to 257)

CONFIDENTIAL - ATTORNEYS EYES ONLY

258

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q   And where is that?
3        (Discussion off the record.)
4    A   In the Vitals business overview progress
5    strategy plans, which is document MDx 0012688 through
6    12756, there are a number of cites.  And this is
7    where one of the projections comes from, page 5 of
8    that document.
9                    REDACTED
10
11
12
13
14
15   Q   Let's stay on that page for just one
16   second.  It doesn't say anything about comparison
17   ratings on that page, right?
18                    REDACTED
19
20   Q   And that page is not directly or clearly
21   linked to the projections, is it?
22   A   The projections are on page 44 of this
23   document.
24   Q   So that's 40 pages away from the
25   projections, right?

259

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A   Yes.
3    Q   Okay.
4    A   39, but it's part of the package in the
5    business overview, and I think reasonably part of the
6    assessment that leads up to the projections.
7    Q   Anything else you think might have any
8    mention of comparison ratings related to those
9    projections?
10   A   Yes, several pages back, traffic growth
11   history.
12   Q   What page?
13   A   Page 9, page 8 and 9.
14                    REDACTED
15
16
17
18
19
20
21
22
23
24   Q   Let's back up for a sec.  Stay right there
25   for a minute.  Because if you're saying doctor

260

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    ratings could be comparison ratings, then actually,
3    that's important because remember, we saw in the
4    prior art today where Dr. Drucker's report had doctor
5    ratings, right?
6        So that's an important distinction between
7    ratings and comparison ratings, right?
8    A   It certainly could be.  But in the context
9    of the projections and where I discuss them we're in
10   a hypothetical negotiation that assumes infringement
11   and it assumes validity.
12   Q   Okay.
13   A   So that's an important platform from which
14   I'm performing this analysis.
15   Q   Well, right.  But we talked about this
16   earlier today too.  And another important element is
17   what are the benefits of the patented invention
18   compared to the prior art, right?  Compared to what
19   was being done before?  And we know from the prior
20   art that doctor ratings were already being done,
21   right?
22       MR. VAZQUEZ:  Form.
23   Q   (BY MR. STIMPSON)  We saw that today?
24       MR. VAZQUEZ:  Form.
25   A   Yes, I saw that.

261

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q   (BY MR. STIMPSON)  So my question for you,
3    Mr. Hall, is, is there anywhere in these documents
4    that you rely on for these projections connecting up
5    comparison ratings with those projections?
6    A   I'm identifying where Vitals --
7        MR. VAZQUEZ:  Hold on.  I just need to
8    make an objection to form and to the extent it calls
9    for a legal conclusion as to what comparison ratings
10   means.
11   A   I was answering a question that related to
12   the projections I discuss on page 19 of my report,
13   which is in the reasonable royalty and hypothetical
14   negotiation settings.
15       And as I testified, I have assumed both
16   validity and infringement.
17   Q   (BY MR. STIMPSON)  Okay.
18   A   And so if there is infringement, there's
19   comparison ratings.  And I'm citing where at the time
20   Vitals is touting ratings.
21   Q   Right.  So actually, we can flip this
22   around and look at it from a different angle,
23   Mr. Hall.  Those documents that you're relying on for
24   projections don't have a single mention of comparison
25   ratings, right?

66 (Pages 258 to 261)

Veritext Corporate Services

800-567-8658                                            973-410-4040

CONFIDENTIAL - ATTORNEYS EYES ONLY

262

CONFIDENTIAL - ATTORNEYS EYES ONLY
1     A    I would have to look through. I see a
2    mention of ratings and I have assumed infringement
3    and validity. So it's an important point for the
4    hypothetical negotiation.
5         So to go forward on the hypothetical
6    negotiations, there is comparison ratings.
7     Q    Okay.
8     A    And Vitals will use those.
9     Q    Okay. That I understand. But this -- my
10   question is just a little bit different. I mean,
11   assuming that comparison ratings are not mentioned
12   anywhere in those documents talking about
13   projections, then no one at Vitals was even thinking
14   about comparison ratings when they did these
15   projections, at least from the documents you're
16   relying on, right?
17        MR. VAZQUEZ: Object to form.
18    A    I don't agree with that inference.
19    Q    (BY MR. STIMPSON) There is no evidence in
20   any of the document that you have that MDx was
21   thinking anything about comparison ratings when they
22   came up with those projections, right?
23        MR. VAZQUEZ: Form.
24    A    Are you assuming that mention of ratings
25

263

CONFIDENTIAL - ATTORNEYS EYES ONLY
1    precludes comparison ratings?
2     Q    (BY MR. STIMPSON) No, I'm not at all
3    assuming that. I'm just --
4     A    Then I would say that that's evidence that
5    they were, if your hypothetical does not include
6    that. I would say that ratings and reviews and the
7    assumption of infringement means, yes, that is a
8    demonstration that the projections assumed to earn ad
9    revenue, that they would be proceeding with that in
10   mind at that time at the hypothetical negotiation.
11    Q    So there is no -- this is a series of
12   slides or something that you're referring to, right,
13   some sort of presentation, right?
14    A    Yes, labeled business overview progress
15   strategy and plans.
16    Q    Right. And not one of those slides says,
17   Man, we have got this, we're doing great because we
18   have comparison ratings, right? Not one of those
19   slides even mentions that they're going to compare
20   ratings of physicians, right?
21        MR. VAZQUEZ: Form.
22    A    I don't know that I agree with that. I am
23   not seeing the word comparison but there are ratings
24   and reviews. I don't think it precludes their
25

264

CONFIDENTIAL - ATTORNEYS EYES ONLY
1    thought of using comparison ratings to earn
2    advertising revenue.
3     Q    (BY MR. STIMPSON) Okay. But that thought
4    of comparing ratings of physicians, if they were
5    having that thought, it wasn't so prominent in their
6    minds that they thought it should be put in a slide,
7    right?
8         MR. VAZQUEZ: Form.
9     A    Well, can I continue through my basis of
10   the questions?
11    Q    (BY MR. STIMPSON) Yes.
12        REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

265

CONFIDENTIAL - ATTORNEYS EYES ONLY
1         REDACTED
2
3
4
5
6
7
8
9
10    Q    Are there comparison ratings there?
11        MR. VAZQUEZ: Objection to the extent it
12   calls for a legal conclusion as to the meaning of
13   comparison ratings.
14    A    I don't see the word comparison there, but
15   --
16    Q    (BY MR. STIMPSON) Are there comparison
17   ratings? Are there multiple doctors showing ratings?
18        MR. VAZQUEZ: Same objection.
19    A    I think I -- this is hard to read, but I
20   see a hospital comparison rating. I don't believe I
21   see a physician one on that page.
22    Q    (BY MR. STIMPSON) That was page 58?
23    A    Yes.
24    Q    Okay.
25    A    Those are the ones, the pages I --

67 (Pages 262 to 265)

CONFIDENTIAL - ATTORNEYS EYES ONLY

266

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q   Can I ask you a favor and can I look at
3    that page 41? Because I don't have it with me. I
4    just want to take a look at it.
5        MR. VAZQUEZ: Can we just have a
6    two-minute break.
7        MR. STIMPSON: Sure.
8        (Recess taken from 4:25 p.m. to 4:29 p.m.)
9            REDACTED
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

267

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2            REDACTED
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17       MR. VAZQUEZ: I want to object. I think
18   there was one other spot that said compare that you
19   referenced.
20   Q   (BY MR. STIMPSON) I asked you, Mr. Hall,
21   if I can find it -- boy, I love this thing, I've got
22   to get one of these things.
23       (Discussion off the record.)
24   Q   (BY MR. STIMPSON) You testified earlier,
25   Mr. Hall, I asked you about these projections and

268

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    whether you had any way -- hold on a second.
3        Okay. So I asked you about this first
4    projections in 7a. And the question was, do you have
5    any way to quantify for us what percentages of these
6    projections of revenue would be attributable to the
7    '060 feature, as opposed to what part of the
8    projections were attributed to other non-patented
9    features of the website. And your answer was, I have
10   not seen data that would allow for that type of
11   calculation.
12       And my question for you, Mr. Hall, trying
13   to cut this a little shorter is, you also rely on the
14   projections for 7b and 7c. Would your answer be the
15   same? That is, that you haven't seen data that allow
16   the calculation of a quantification for what portions
17   of projections of revenue would be attributable to
18   the '060 feature, as opposed to the part of the
19   projections that were attributed to other non-
20   patented features. And your answer would be the same
21   for those, too?
22       MR. VAZQUEZ: Form.
23   A   One minute.
24   Q   (BY MR. STIMPSON) Okay.
25   A   Yes.

269

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q   So let's go back then to -- back to the --
3    to your report here, the analytical approach, all
4    right?
5    A   Yes.
6    Q   Now, you say for the analytical approach
7    here that you weren't able to find a close comparable
8    invention, right?
9    A   Which paragraph are you referring to?
10   Q   Paragraph 79 in the last couple lines.
11   A   I was unable to find profit information
12   for a group of the Health Grades and Vitals
13   competitors, correct.
14   Q   So this isn't your first patent case,
15   right? You've done damages analyses for other patent
16   cases?
17   A   Yes.
18   Q   So do you understand, Mr. Hall, that if
19   you want to get the profit information for other more
20   comparable companies, you can just subpoena them?
21       MR. VAZQUEZ: Object to form.
22   A   I've heard of that being done, but I don't
23   know that that's available in all options.
24   Q   (BY MR. STIMPSON) All right. Well, you
25   came on to this in the summer of 2011, right, is when

68 (Pages 266 to 269)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

270

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 you were hired?
3    A  Yes.
4    Q  Okay. And did you ever talk to your
5 counsel, I mean, counsel for Health Grades, say, Hey,
6 look, we better be getting profit information for
7 these other companies so I can do a damages analysis?
8    A  I may have had that discussion -- I
9 certain -- I did not recommend a subpoena of a
10 competitor or a request of a competitor for their --
11 for what they would use, very proprietary information
12 on the margins they make on their advertising
13 revenue.
14    Q  All right. It's because there was no
15 subpoena served that we're now looking at your report
16 and you're doing the profit and your analytical
17 approach with WebMD in paragraph 79, right?
18      MR. VAZQUEZ: Object to form. Misstates
19 the evidence.
20    A  I've done an analysis based on WebMD as
21 well as Health Grades overall.
22    Q  (BY MR. STIMPSON) Right. So you used
23 WebMD. Let's talk about that first. That's not even
24 close to the '060 Patent, is it?
25      MR. VAZQUEZ: Form.

---

271

CONFIDENTIAL - ATTORNEYS EYES ONLY
2    A  It's not. And that makes it a, in part,
3 makes it a good comparison.
4    Q  (BY MR. STIMPSON) Oh, really?
5    A  Because it's an online advertising
6 business model, but without the '060 patented
7 feature.
8    Q  Well, I mean, let me just -- I though we
9 went over this today. But let me just ask you again.
10 The idea behind the analytical approach, Mr. Hall, is
11 to get something as close to the patent as you
12 possibly can without using the patent and compare
13 those profits to what the profit margins are when you
14 do use the patent, right?
15      Because that way you can compare and say,
16 okay, this additional profit, this is because you're
17 using the patent, right?
18      MR. VAZQUEZ: Form.
19    A  When you said not close with the '060
20 Patent, you don't want it to be practicing or being
21 infringing or using the '060 patented features.
22    Q  (BY MR. STIMPSON) Of course not.
23    A  Which is what I was answering to.
24    Q  Oh.
25    A  As far as then finding an entity like

---

272

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 WebMD that uses an advertising revenue model and is
3 cited by Vitals as a public comparable company, I
4 think is a reasonable basis, particularly if you have
5 other bases to try to determine through an excess
6 profits or analytical method, incremental profit one
7 could earn from the '060 patented features.
8    Q  Does WebMD have patient ratings?
9    A  Let me see. I don't see that indicated
10 under description of their services.
11    Q  Do you know where WebMD gets their data?
12 Whether they get any from the healthcare providers or
13 third parties or whether they're verified? Do you
14 know anything about how or where they get their data?
15    A  Not beyond what they disclose in their
16 website and their 10-K that I reviewed.
17    Q  Well, do they give anything in there about
18 where they're getting their data for their providers?
19    A  I recall seeing it on their 10-K. I don't
20 have that here.
21    Q  Well, you don't even count WebMD as being
22 in the same market as Health Grades, right?
23    A  Not the specific market for accessing
24 online physician information that Vitals both viewed
25 and Health Grades viewed as their direct competitors

---

273

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 for that, that's correct.
3    Q  Okay. We've got some other problems with
4 this approach of using WebMD, right, too?
5      MR. VAZQUEZ: Form.
6    Q  (BY MR. STIMPSON) One of them is you
7 don't know -- first of all, you're using WebMD's
8 overall profit margin, right?
9    A  Yes, which is 85 to 90 percent advertising
10 revenue based.
11    Q  But you don't know what factors are
12 driving that advertising revenue, right?
13    A  I have a general understanding of the
14 factors that drive that. They're online content and
15 online visits.
16    Q  Well, what's the basis for that
17 understanding?
18    A  A review of their information provided
19 online, as well as their 10-K.
20    Q  So is there anything in their 10-K saying
21 this is what makes our advertising revenue go up and
22 down?
23    A  Not worded like that. There's information
24 related to their business model in their 10-K. And
25 there was also some information in Vitals about

---

69 (Pages 270 to 273)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

274

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  WebMD.
3      Q    My point is this, Mr. Hall. You really
4  don't know what is driving WebMD's profit margin, do
5  you?
6      A    I have a general idea from review of the
7  documents about them, yes. Revenue obviously is a
8  big part of what drives their profit margin and
9  obviously the costs they incur to earn that revenue
10  as they report it.
11      Q    Do you know how they get their advertising
12  revenue? I mean, is it paid on a hits per million or
13  is it paid by monthly access fees? How do they get
14  their revenue for advertising?
15      A    I would have to look at the source. I
16  don't recall as I sit here.
17      Q    And you know that they have a lot of stuff
18  on their website that's totally unrelated to looking
19  for physicians, right?
20      A    They do. That's one of the reasons
21  neither I, or Vitals or Mr. Napper included them as
22  direct competitors for them.
23      Q    My question is, with the evidence we have,
24  Mr. Hall, thus far, how am I going to test this
25  theory? I mean, you compare these two profit

---

275

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  margins. And, you know, without knowing specifically
3  what's driving the WebMD profit margins and what
4  portions of their website are more profitable than
5  others, there's no way for us to really test with any
6  accuracy your analytical approach using WebMD, right?
7      MR. VAZQUEZ: Form.
8      A    I don't agree. It's a publicly traded
9  company. I've disclosed how I've used that and the
10  sources for it. There's information about the
11  aspects you just listed, so I don't agree with that.
12      Q    (BY MR. STIMPSON) So what portion of the
13  WebMD revenue is generated by parts of their website
14  other than searching for doctors?
15      MR. VAZQUEZ: Form.
16      A    I don't have that specific figure today.
17      Q    (BY MR. STIMPSON) Do you have any idea?
18      MR. VAZQUEZ: Same.
19      A    I would look back at the information I
20  reviewed before and see if there is an answer to
21  that. I don't, as I sit here.
22      Q    (BY MR. STIMPSON) And what part of their
23  profitability is attributed to parts of their website
24  other than searching for physicians?
25      MR. VAZQUEZ: Form.

---

276

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A    As far as related to their advertising
3  revenue and profitability?
4      Q    (BY MR. STIMPSON) Right.
5      MR. VAZQUEZ: Same.
6      A    I don't recall. I would have to look back
7  at the information we had for them.
8      Q    (BY MR. STIMPSON) There's nothing in your
9  report indicating what that is, right?
10      A    No, there's not.
11      Q    And what part of their overall costs are
12  attributed to parts of their website other than
13  looking for physicians?
14      A    I would have to look at the 10-K to answer
15  that specifically. I see the summary of the capital
16  IQ report here, but I don't have the detailed
17  information in front of me to answer that.
18      Q    There is nothing in your report indicating
19  that, right?
20      A    Correct.
21      Q    Okay. Do you have Exhibit 13 there?
22  Where did that go?
23      A    Attachment 13?
24      Q    No, Exhibit 13 was the Drucker report.
25  Where are all these exhibits?

---

277

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      (Discussion off the record.)
3      Q    (BY MR. STIMPSON) Now, paragraph 78 of
4  your report says you weren't able to find a close
5  comparable product, right?
6      A    Paragraph 79. I was unable to find profit
7  information for a group of Health Grades' and Vitals'
8  competitors to make such a comparison.
9      Q    Right. It's really not a comparison of
10  competitors, is it, Mr. Hall? It's really just a
11  comparison of products?
12      A    Competitors --
13      MR. VAZQUEZ: Form.
14      A    -- certainly are ones I would start first
15  with because of their efforts in the market with the
16  products, I think referenced in your question to earn
17  advertising revenue.
18      Q    (BY MR. STIMPSON) Oh, but it's much
19  better to actually use the product of the company
20  that owns the patent, right? I mean, because if you
21  have a product, that company has a product that's out
22  in the marketplace and then they make a change to
23  make it fall into the patent, you've got them right
24  there, right, in the same place?
25      You've got the one before the patent was

---

70 (Pages 274 to 277)

Veritext Corporate Services

800-567-8658                                973-410-4040

278

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  used and one afterward and you can say, Hey, look,
3  now I can see what the difference in profit margin
4  is, right?
5      MR. VAZQUEZ: Form.
6      Q   (BY MR. STIMPSON) I mean, that's a great
7  comparison, isn't it?
8      MR. VAZQUEZ: Form.
9      A   I'm not sure I understand the beginning
10  part of that question, but I think the final part of
11  that question was, if you had an entity that had a
12  similar business model but without the patent?
13      Q   (BY MR. STIMPSON) Right. So let's just
14  look at this situation, okay? You've got before you
15  Exhibit 13. This is what Health Grades was selling
16  before they started to use the patent invention.
17  Okay?
18      MR. VAZQUEZ: Form.
19      Q   June 2005.
20      A   You're not saying this is all. This is
21  part of what they were --
22      Q   Sure.
23      A   Yes.
24      Q   I'm telling you in June of 2005, you could
25  get on the Health Grades website. You could ask for

279

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  a report on Dr. Drucker, and you could get this.
3      MR. VAZQUEZ: Form. Assumes facts not in
4  evidence.
5      Q   (BY MR. STIMPSON) Okay? You can assume
6  that?
7      A   Okay, I'll make that assumption.
8      Q   Okay. So --
9      A   I don't know that to be the case from this
10  document, but --
11      Q   That's okay. So you could determine what
12  Health Grades' profit margin was on this by just
13  asking Health Grades, right?
14      MR. VAZQUEZ: Form.
15      A   I could look at Health Grades' financial
16  information, can discern their profit at different
17  time periods, yes.
18      Q   (BY MR. STIMPSON) Right. And then you
19  could also find out from Health Grades how their
20  profit margin changed when they added comparison
21  ratings, right?
22      A   Yes.
23      MR. VAZQUEZ: Wait. Sorry. I just meant
24  to make an objection. I should have made it before
25  to the extent it calls for a legal conclusion to the

280

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2  meaning of the phrase comparison ratings.
3      Q   (BY MR. STIMPSON) And if you had done
4  that, Mr. Hall, that would tell you how the Health
5  Grades profit margin changed when it went from no
6  comparison ratings to comparison ratings, right?
7      MR. VAZQUEZ: Same.
8      A   That could be a metric, certainly. And
9  I've also compared their portion of the business that
10  utilizes the patented features with its overall
11  business because that's reasonably something a
12  company like Health Grades in a hypothetical
13  negotiation would discern or want to know as it sat
14  down for a hypothetical negotiation.
15      MR. STIMPSON: So move to strike
16  everything starting with and I've also compared as
17  nonresponsive.
18      Q   (BY MR. STIMPSON) So you didn't ask
19  Health Grades to show you what they were doing before
20  they added comparison ratings, did you?
21      MR. VAZQUEZ: Same objections.
22      A   I did not. I asked for financial records
23  back through 2008.
24      Q   (BY MR. STIMPSON) And you didn't ask
25  them -- okay. Never mind. I have that answer.

281

1      CONFIDENTIAL - ATTORNEYS EYES ONLY
2      So let's talk about this other one here
3  you're referring to. You did this second analysis
4  where -- general paragraph it says now. I don't know
5  what paragraph, paragraph 80, maybe?
6      A   Yes.
7      Q   And that's where you do a comparison of
8  the overall Health Grades profits with the profits
9  associated with what you refer to, I guess, as the
10  what you think are the profits associated with the
11  '060 Patent, right?
12      MR. VAZQUEZ: Form.
13      A   That's not how I would describe it.
14      Q   (BY MR. STIMPSON) Well, how do you
15  describe it, sir?
16      A   Health Grades' overall company profit
17  margin, which would include and therefore has the
18  benefit of profitability from the '060 Patent with a
19  subset of the company of the departments that it any
20  way have used and generated revenue incurred expenses
21  related to the patented features of the
22  '060 Patent.
23      Q   So really, you took the overall Health
24  Grades profit margin and compared that to what you
25  have in attachment 1, right; is that right?

71 (Pages 278 to 281)

CONFIDENTIAL - ATTORNEYS EYES ONLY

282

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       A    Yes, that's right.
3       Q    Okay. And we've talked about that
4    attachment 1 before. I'm not going to go over that
5    again.
6        But you can confirm for me, though, sir,
7    that Health Grades does not separately report the
8    revenues and expenses related to the patented
9    technology, right?
10       A    They, like most companies, certainly do
11   not do P&Ls on patented technologies, that I'm aware
12   of, that I've experienced.
13       Q    And as we talked about earlier today,
14   revenue reports by the various Health Grades
15   departments include more than just the patented
16   technology, right?
17       A    Yes. But it would also include, the
18   patented features, that they earned revenue and
19   incurred expenses.
20       Q    Right. We talked about that before. The
21   problem though, is -- the problem with this analysis
22   is there is no isolation in this analysis of the
23   profit margins that are just from the patented
24   features, right?
25       MR. VAZQUEZ: Form.

283

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2       A    I believe it's a reasonable attempt with
3    the data as it was available, without speculating or
4    parsing data kept in the normal course of their P&L
5    statements to ascertain the profit increment they're
6    able to earn on departments that utilize the patented
7    feature.
8       Q    (BY MR. STIMPSON) All right. But just so
9    we're clear, then. In this analysis you do against
10   the whole Health Grades profit margin, there is no
11   isolation anywhere of the profit margins that are
12   only attributable to the '060 features. And that may
13   be because there is no documents on it, but there is
14   no isolation of it, right?
15       A    There is an attempt, reasonable attempt by
16   me with the data limitations and the data available
17   as there are with all companies that have patents and
18   do not keep track of profits and losses on patent by
19   patent, which is common.
20       There is one other data point of reference
21   and that's the incremental profit that Health Grades
22   earns on its added advertising revenue, which is
23   quite high. But that is a point of reference, but
24   also is the ad revenue -- I'm sorry, the incremental
25   profit they would earn on ad revenue, both with --

284

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2    that they are able to drive additional traffic
3    because of the patented feature and would be a point
4    of reference that they know it's highly profitable,
5    as I mentioned in my report.
6       And I would add, while I have referenced
7    earnings before interest, taxes, depreciation,
8    amortization, or EBITDA, I've analyzed it at the net
9    income level for the analytical method and yields the
10   same differential. But the EBITDA is a close
11   approximation of cash flow from operations.
12       MR. STIMPSON: Move to strike everything
13   after which is common as nonresponsive.
14       MR. VAZQUEZ: Denied again.
15       MR. STIMPSON: I don't know why I bother
16   making those. You haven't granted one of them yet.
17   It's very unfair. It's almost like you're a biased
18   judge.
19       Can we take a break? I do have more, I
20   know, but I've just got to organize my thoughts.
21   Just give me five minutes.
22       (Recess taken from 4:54 p.m. to 5:02 p.m.)
23       Q    (BY MR. STIMPSON) Okay. Did you review
24   websites of any competitors at all, Mr. Hall?
25       A    I did with some of them. I believe

285

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2    JP Anderson and/or Adam Ashlock did with others.
3       Q    Would you agree, sir, that are a number of
4    healthcare-related websites that allow a patient to
5    search for a doctor by name, specialty, condition or
6    location?
7       A    Yes, I would agree.
8       Q    You also agree that there are websites
9    where after a search the user can generally review
10   information relating to the doctor's specialty,
11   hospital affiliation, education, credentials,
12   et cetera?
13       A    I think that's accurate.
14       Q    And on some healthcare-related websites
15   users have the ability to directly schedule an
16   appointment with a doctor online, right?
17       MR. VAZQUEZ: Form.
18       A    On some.
19       Q    (BY MR. STIMPSON) Yeah.
20       A    I've seen indications of that, yes.
21       Q    There are also several websites that
22   provide users with information on -- scratch that.
23       Would you agree with me that certain
24   government sites, individual physician websites and
25   Internet Yellow Pages sites that may also provide

72 (Pages 282 to 285)

CONFIDENTIAL - ATTORNEYS EYES ONLY

286

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 information on physicians?
2
3    MR. VAZQUEZ: Form.
4    A    Yellow Page sites. I don't believe I've
5 seen government sites.
6    Q    Did you read Mr. Montroy's testimony?
7    A    Yes, after seeing it referenced in
8 Mr. Napper's report.
9    Q    So would you agree with me that there are
10 government sites that also provide information on
11 physicians?
12    A    I would not. A number of the deposition
13 cites -- I would not, based on Mr. Napper's reference
14 to them alone, based on some of the cites --
15 references I saw.
16    Q    Would you agree with me that a number of
17 websites that provide information on physicians
18 generate a portion of their revenue from
19 advertisements?
20    A    Yes, as we discussed earlier.
21    Q    And the revenues on these -- from these
22 advertisements are generally recognized by a cost per
23 thousand impressions, right?
24    A    I can't speak for all of them. But I
25 think, yes, that's a general standard, that web

287

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2 advertising revenue policy.
3    Q    Would you agree with me that Health
4 Grades' website includes information on directions,
5 e-mail links, information on why a doctor's hospital
6 matters and tips for better health and profiles?
7    MR. VAZQUEZ: Form.
8    A    I recall seeing that information.
9    Q    (BY MR. STIMPSON) Health Grades also
10 offers physicians and hospitals the opportunity to
11 license its ratings and trademarks, provides
12 marketing assistance to hospitals and consults with
13 hospitals on quality improvement, right?
14    A    Yes, that's my understanding.
15    Q    Would you agree that the Vitals website
16 provides users with doctor evaluations, assistance in
17 scheduling appointments, preparation for doctor
18 visits, among other things?
19    MR. VAZQUEZ: Form.
20    A    I don't know that I recall all of that,
21 those offered on its website. Some of those sound
22 familiar, but I don't have the website in front of me
23 right now.
24    Q    (BY MR. STIMPSON) Well, do you recall if
25 Vitals also provides assistance with scheduling

288

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 appointments?
2    A    I believe so.
3    Q    And Vitals also gives information on
4 preparation for doctor visits, right?
5    A    I would want to look specifically. I
6 don't recall that specific one, but I'm not
7 contesting it.
8    Q    That's okay. Would you agree that people
9 generally don't go into a search bar and type in
10 vitals.com or healthgrades.com?
11    MR. VAZQUEZ: Form.
12    A    I think, yes. As measured on the overall
13 web traffic that goes to those sites, I would agree
14 that that would not be the predominant way a visitor
15 would get there.
16    Q    (BY MR. STIMPSON) So would you agree that
17 what drives consumers to web properties like Vitals
18 and Health Grades on physician searches is at least
19 in part how well the company's search engine is
20 optimized?
21    A    Yes, and that relates to content and
22 relevance.
23    Q    Would you agree with me that SEO is the
24 biggest factor on whether consumers search for
25

289

CONFIDENTIAL - ATTORNEYS EYES ONLY
1 physician information on healthgrades.com or
2 vitals.com or both?
3    A    No, not without the explanation beyond
4 that of why the search engine has selected the two
5 that make available the content that includes the
6 '060 patented features, and why those two are the
7 dominant website visits within their market.
8    Q    And my question, though, is just a little
9 bit different. I mean, regardless of why SEO may be
10 the biggest factor, the fact is that SEO is the
11 biggest factor in whether consumers searching for
12 physician information end up on healthgrades.com or
13 vitals.com or both, right?
14    MR. VAZQUEZ: Asked and answered. Form.
15    A    No, I would give that same answer because
16 it's the root cause and the root content and
17 relevance and link to other quality websites is such
18 a big part of that, that that's my answer.
19    Q    (BY MR. STIMPSON) Okay. Would you agree
20 with me that Health Grades in response to searches on
21 places like Google and Bing usually is listed first?
22    A    Yes, I think that's fair, depending on the
23 search term.
24    Q    Right. And would you also agree with me

73 (Pages 286 to 289)

CONFIDENTIAL - ATTORNEYS EYES ONLY

290

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 that users have a tendency to click on at least the
3 first site?
4    A    Yes.
5    Q    Let me show you what has been marked as
6 Exhibit 78.
7    A    Yes.
8    Q    This is something you gave me for the
9 first time today, right?
10    A    Yes.
11    Q    Okay. Can you please confirm for me, sir,
12 that the Vitals operating margin there is based upon
13 the entire market value of advertising revenue from
14 Vitals?
15    A    No.
16    Q    Well, what's it based on if it's not based
17 on the entire?
18    A    It's based on the entire company operating
19 margin, that is projected or as it's forecasted in
20 its business overview, page 44 we discussed earlier.
21      (Exhibit 88 marked.)
22    Q    (BY MR. STIMPSON) Let me show you what
23 has been marked as Exhibit 88, a copy of Mr. Napper's
24 report. You've seen this, sir, right?
25    A    Yes.

291

CONFIDENTIAL - ATTORNEYS EYES ONLY
2    Q    I take it this wouldn't be much of a
3 litigation if it weren't the case. But I take it you
4 don't agree with everything in that report?
5    A    That's correct.
6    Q    Can you tell me what you don't agree with?
7 Let's take the big issues. I just want to get a
8 general idea of what it is that you think are the
9 major problems with Mr. Napper's report.
10    A    Okay. I disagree with Mr. Napper on his
11 analysis of demand for the patented product.
12    Q    Can you tell me what page, please?
13    A    Page 12 through top of 15.
14    Q    Okay. Just one second, please.
15      So you disagree with Mr. Napper on the
16 analysis of demand for the patented product, that's
17 pages 12 to 15?
18    A    Yes.
19    Q    And what don't you agree with?
20    A    His focus on the SEO without respect to
21 the content and relevance is not correct, in my view.
22 And at odds with information Vitals had prior to the
23 litigation, that while SEO is mentioned, it's always,
24 where I saw following the importance of content and
25 relevance and linkage.

292

CONFIDENTIAL - ATTORNEYS EYES ONLY
2      In the way Mr. Napper writes this section,
3 it's very focused on just the SEO and not the
4 underlying content. And that is almost as if the
5 content or patent features are irrelevant. And I
6 don't agree with that.
7    Q    So what documents are you referring to?
8 You said you think you referred to documents that MDx
9 had?
10    A    Yes. I cited them before, but they
11 include the business overview progress strategy and
12 plans.
13    Q    Bates numbers?
14    A    MDx 0012882 through 12934.
15    Q    Okay.
16    A    MDx 0104440 through 0104466. MDx 0012688
17 through 12756. MDx 0104632 through 0104649. And
18 then Mr. Dodge's testimony as well, would be a basis.
19    Q    So I'm trying to get you out by 5:30.
20 Let's just if we can, do it from a high level. What
21 is it about that testimony and those documents
22 generally that you think is inconsistent with
23 Mr. Napper's opinion on SEO?
24    A    Well, Mr. Dodge's cites, as well as some
25 other deposition cites, and you go back and read what

293

CONFIDENTIAL - ATTORNEYS EYES ONLY
2 is cited, it's not always as represented, in my view,
3 in Mr. Napper's report.
4      In one example, they cut off Mr. Dodge's
5 final sentence within a paragraph, Mr. Napper did,
6 related to the SEO. I don't know if that's here or
7 elsewhere.
8      And then the other documents I cited cite
9 the content, comparison ratings and other features
10 that reasonably align with the '060 features. And
11 there's no mention of that here at all. It's all
12 about the SEO based on targeted questions of
13 Mr. Dodge, and I think Mr. Hix and others.
14      So I don't agree with his conclusion that
15 there's no demonstration of demand for the patented
16 features.
17    Q    So do you think that those documents you
18 cited actually tie in SEO with -- do they actually --
19 let me start there.
20      Do they talk about SEO, those documents?
21    A    Some do.
22    Q    And do they, in your view, then, make a
23 connection between SEO and having comparison ratings?
24      MR. VAZQUEZ: Same objection to the extent
25 the answer calls for a legal conclusion about the

74 (Pages 290 to 293)

CONFIDENTIAL - ATTORNEYS EYES ONLY

294

CONFIDENTIAL - ATTORNEYS EYES ONLY
meaning of comparison ratings.

REDACTED

Reading Mr. Napper's report, we jump right to the search engine importance, bypassing the contents, including the information that he indicates he's assumed infringement that relates to the three sources of information and the comparison rating of physicians.

Q (BY MR. STIMPSON) Is there anything else in the demand section there other than SEO that you don't agree with?

A I don't agree with his conclusions and I would reserve any references to depo testimonies here or anywhere in the report, as far as representing what's in the report.

Q So --

A I didn't find that every reference had an issue, but many did.

296

CONFIDENTIAL - ATTORNEYS EYES ONLY
doesn't cite the Panduit test anymore. But I don't see that here, so maybe that's later in his report.

And in any event, I've assumed for purposes of my lost profits calculation, assumed and they were provided in an apportionment but that's back further in the report.

So I don't agree with his conclusions.

On 3, manufacturing and marketing capability, I don't have a disagreement. He essentially punts on this.

4, I don't agree -- that he just uses that -- rather than evaluating the Panduit test, do you have information available to determine the profit, which the answer is yes, Health Grades does. He just uses that as a sum-up for the first three so I don't agree with that approach.

I don't agree that the amount of profit Health Grades would have made is speculative, for the reasons I stated in the report and testified to today.

Q Okay. Anything else?

A I think that's it for those sections.

And the Georgia-Pacific factors, there's a couple we agree on and many we don't. Do you want me

295

CONFIDENTIAL - ATTORNEYS EYES ONLY
Q Any you remember specifically?

A No. I have -- I don't recall them specifically, but I have noted them in my office.

Q Let's continue. You're on page 15 and you're going through and telling me the things --

A Yes. I don't agree with Mr. Napper's two-page assessment, absent of acceptable non-infringing substitutes.

Q Why not?

A In part because of the emphasis on the SEO. I already discussed that. That's on the top of page 16. And next is his understanding of the MDx could have implemented an acceptable amount of infringing alternative and remained on the market by making any of the least of the following adjustments to its website.

In my view, the test isn't whether they would have remained on the market, but whether what amount of traffic they would have generated. And he doesn't make that calculation or assessment.

Q Okay. Anything else?

A I believe it's later in the report again, his critique of my assessment of the absence of non-acceptable infringing alternatives where he

297

CONFIDENTIAL - ATTORNEYS EYES ONLY
to go through them?

Q Well, I just want you to tell me if there's anything that -- I'm just looking for big picture things here since we don't have a lot of time.

A Sure, I'll keep it to big picture but reserve that doesn't mean I agree with --

Q Sure, I understand. If you don't mention it, I'm not going to hold you to it.

A I think we agree on 1, 2 and 3, is my recollection. There was not big disagreements, anyway, on those.

4, I disagreed with him that it's neutral because licensor established policy is not to license the '060 Patent. I'm sorry -- yeah. And so I don't think that's neutral, especially to a competitor.

5, he says slight upward influence, the competitor relationship I say upward. So we're close to agreement. It's not clear to me why we would have

REDACTED

and certainly Health Grades views Vitals as that, as a competitor, not necessarily the only one.

And so he has a slight upward influence.

75 (Pages 294 to 297)

CONFIDENTIAL - ATTORNEYS EYES ONLY

### 298

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   I disagree. I think it's just upward.
3       We agree on 7.
4       MR. VAZQUEZ: How about 6?
5   A   We agree on 7.
6       MR. VAZQUEZ: I think you skipped 6.
7   A   I think I addressed 6 in my report,
8   attachment 6a and 6b, of selling others. And it
9   depends on the investigation into the Aetna life
10  insurance. Aside from that, we might be in agreement
11  on -- well, I think it's neutral. He thinks it's
12  downward.
13              REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

### 300

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   than $1,000.
3       I don't disagree with that figure, or have
4   a basis, nor have I done that analysis, but it's not
5   logical that Vitals would agree to a license of
6   $80,000 if it took them $1,000 to work around.
7       So Mr. Napper is inconsistent, in my view.
8   And it's not logical that an entity would expend many
9   times this amount or the proposed -- Mr. Napper's
10  what I believe proposed low royalty rate in dispute
11  if the workaround and their web traffic would not
12  have changed for $1,000.
13      So I'm very skeptical.
14  Q   So if that were true, that you could
15  design around this patent for $1,000 or less, then
16  you wouldn't even pay the $80,000 that Mr. Napper
17  suggests per year?
18  A   If you're in a hypothetical negotiation,
19  Mr. Napper hasn't identified a reason why you would,
20  if you're sitting at the negotiating table and you
21  could spend $1,000 to be in the same economic
22  position, which I don't believe you could be, but
23  that's what I'm identifying here. I don't understand
24  why you would pay $80,000.
25  Q   But if you could design around it and be

### 299

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2              REDACTED
3
4
5       9 and 10 we both evaluate, I think,
6   together or in conjunction. He restates what he
7   stated earlier in his report on what they could do to
8   work around.
9   Q   (BY MR. STIMPSON) Do you agree with him
10  at the bottom of page 22 going into page 23 that the
11  Vitals website includes many non-patented features
12  that he lists there?
13  A   I agree that it has other features. I
14  would reserve judgment on any cites to depo
15  testimony, citing Mr. Dodge, based on what I've
16  seen -- I'm sorry, this is Mr. Neal. And that is one
17  of them that I had an issue, it's cited several times
18  throughout. I agree they have non -- they have
19  features that are unrelated to the patent.
20      He cites Dr. Cooper on page 23 and repeats
21  what they could have done to work around.
22      On page 24, he says, I also understand
23  that the cost that MDx would have likely incurred in
24  order to incorporate most if not all of these
25  design-around alternatives would have been no more

### 301

1       CONFIDENTIAL - ATTORNEYS EYES ONLY
2   in the same basic economic position, that's a heavy
3   downward influence, then, on the damages?
4   A   Yes, but he provides no evidence that you
5   would be in the same economic position.
6   Q   All right.
7   A   11, let's see. I don't agree with his
8   conclusion on 11 as far as the downward factor. To
9   the extent which the infringer has made use of the
10  invention and any probative evidence.
11  Q   Do you agree generally, though, that
12  little use of the invention is a downward influence,
13  if there is little use of the invention?
14  A   If that can be demonstrated, yes.
15  Q   Okay. How about factor 12?
16              REDACTED
17
18
19
20
21
22
23
24
25

76 (Pages 298 to 301)

CONFIDENTIAL - ATTORNEYS EYES ONLY

<table>
<tr><td>302</td><td>304</td></tr>
</table>

**302**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    REDACTED
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21    32, we begin with the rebuttal. I
22 disagree that he -- well, I don't know that he's
23 looked at all the evidence, but he says he has not
24 seen evidence to suggest that the patented features
25 were part of the basis for the Vitals website

**304**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2 observation, I don't agree with his critique. So I
3 won't go through each one of them. I'll try to
4 identify the largest ones.
5    Q   (BY MR. STIMPSON) Do you agree that the
6 Book of Wisdom is something that can and should be
7 considered?
8    A   I do and have I considered it in this
9 matter. I have not termed it that, but I clearly
10 identify in my attachments information after the
11 infringement period that go into my analysis.
12    REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
25

**303**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2 traffic. We've talked about that earlier, though.
3    I disagree that I failed to satisfy the
4 criteria set forth in Panduit factor 2.
5    Q   That's the substitutes?
6    A   Correct.
7    Q   Do you agree that wellness.com,
8 healthcare.com and doctor.com had combined market
9 shares of 20 percent and 25 percent in July 2010 and
10 2011, as he states on page 35?
11    A   I saw the Quancast data for that that he
12 cites. I could not corroborate that with Comscore,
13 which is one of the reasons I ran the apportionment
14 analysis with Mr. Napper's market share figures, in
15 case the parties decided to agree on the market or
16 market share or the Court decided on one or other of
17 the market shares.
18    So I see that data and I saw it in the
19 Quancast support, but I was not able to corroborate
20 it with Comscore.
21    MR. VAZQUEZ: We skipped ahead. Do you
22 want to keep going page by page?
23    MR. STIMPSON: Whatever he wants to do is
24 fine.
25    A   The blanket rule or not rule, blanket

**305**

1    CONFIDENTIAL - ATTORNEYS EYES ONLY
2    REDACTED
3
4
5
6
7
8
9
10
11
12
13    I don't agree with the criticisms of the
14 analytical approach. I think it is a reasonable
15 start point to compare it to an industry leader even
16 if it's not a direct competitor, if no closer
17 competitor profit information is available. We
18 discussed that earlier.
19    I don't agree that I failed to consider
20 the availability of a design-around and alternatives.
21 I'm aware in these matters that that's going to be
22 disputed. I didn't speculate as to that and
23 evaluated what MDx and Vitals actually did, versus
24 what they are now asserting they could have done for
25 no more than $1,000.

77 (Pages 302 to 305)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

**306**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  I don't agree with the license discussions
3  on 38 and 39.
4      Q    Why not?
5      A    He quotes my comment about the data being
6  licensed but not the '060 Patent.  And then says, Not
7  only is the statement in itself an acknowledgment by
8  Mr. Hall that there are several features, including
9  good data that are critical components for an
10  effective website.  The fact that none of the
11  companies that Health Grades granted a data license
12  to was in connection with the patented technology
13  further supports the non-patented features drive a
14  user to MDx's website and not the '060 Patent.
15          I don't agree with that logic.
16      Q    Okay.
17      A    He's saying the patent holder is in a
18  no-win situation.  If you don't license your patent,
19  Mr. Napper will say that's because other features are
20  valuable.  If you do, presumably, then -- it couldn't
21  be because you don't want to license to a competitor
22  or you think the patent is so valuable you want to
23  keep it to yourself and not license it.
24          And then the next paragraph he says, These
25  licenses are not instructive as a point of reference

---

**307**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  as to the hypothetical negotiations as they do not
3  provide, quote, a basis in fact to associate the
4  royalty rates used in prior license to the particular
5  hypothetical negotiation issuing in this case.
6          So he uses this case cite to criticize my
7  just observing what they've done in the past and
8  saying it's a point of reference but it's not a
9  direct comparable.
10          Then he -- Mr. Napper takes the Primera
11  agreement that's not at all, it's even at least as
12  indirectly related if not more, and bases his damages
13  opinion on that.  And I don't agree with that.
14          And he cites that in order to use other
15  license agreements to drive a royalty rate in a
16  litigation matter that patentee has.
17          So he's describing the patentee's burden
18  to prove that the license is sufficiently comparable
19  to support the award.  I agree with that.
20          So I agree with some of his case cites or
21  the case cites because they are what they are from
22  the case cites.  But then he turns around with a
23  $1,000 workaround and cites Primera as his basis for
24  his damages.  I think that's unreliable and at odds
25  with some of the cases he cites.

---

**308**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      Q    Just one more page.
3      A    I think that's it.  There may be others if
4  I read through it line by line specifically.
5          MR. STIMPSON:  Okay.  Why don't we call it
6  a day, unless you have something, Jesus.
7          MR. VAZQUEZ:  Just very minor.  Famous
8  last words.
9              EXAMINATION
10  BY MR. VAZQUEZ:
11      Q    Can you pull out Exhibit 13, Mr. Hall.
12      A    I may have handed mine back.
13      Q    Here, you can use mine.  Do you recall
14  Mr. Stimpson asking you some questions about
15  Exhibit 13?
16      A    Yes, I do.
17      Q    And he asked you if there were comparison
18  ratings shown here.  And I'm referring specifically
19  to MGHG 000019.
20      A    Yes, I recall that.
21      Q    And do you recall that you said that you
22  thought there were comparison ratings shown there?
23  And I think it's at line 120:20.
24      A    Yes, I think I recall that.
25      Q    All right.

---

**309**

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      A    Yes, when he pointed out the different
3  Overlook Hospital information, I think, yes, I recall
4  that.
5      Q    Let me, just to make sure.  We've got this
6  slick technology.
7          Yes, the question was:  Overlook Hospital
8  got one star?
9          And you answered:  That's right.
10          And then he asked:  Those are comparison
11  ratings for hospitals, right?
12          And I made an objection to form.
13          And you said:  Yes, that's what it looks
14  like.
15          Correct?
16      A    Yes, I recall that.
17      Q    And so my question to you is, when you
18  answered that way, were you answering with knowledge
19  of the legal definition of comparison ratings as that
20  term is used in the claims?
21      A    No, I was not.
22      Q    Then, could we pull up Exhibit 85, which I
23  think is the DrTango agreement.
24      A    Yes.
25      Q    And can you look specifically at page

---

78 (Pages 306 to 309)

CONFIDENTIAL - ATTORNEYS EYES ONLY

---

310

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  Bates number HGCA 0078.
3      A   I see HGLA 0078.
4      Q   Oh, okay, yeah, that's it.  I can't read
5  my own writing.
6      A   I see that.
7      Q   And do you recall Mr. Stimpson asking you
8  about the basis for your testimony about 40 percent
9  of advertising revenue?
10     A   I do.
11     Q   And --
12         MR. STIMPSON:  What page are we on?
13         MR. VAZQUEZ:  I'm trying to find mine.  So
14  give me a second.  Here it is.
15         MR. STIMPSON:  Oh, 78, thank you.
16     Q   (BY MR. VAZQUEZ)  Okay.  And do you see at
17  the bottom of this page here is an e-mail from a
18  Mr. Metzinger to Mr. Dodge?
19     A   Yes.
20     Q   And is there any reference in this e-mail
21  as to what this DrTango agreement provides in terms
22  of advertising revenue?
23     A   Yes.  Mr. Metzinger addresses the point to
24  Mr. Dodge.
25         He says, This is the deal with Univision

---

311

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  and DrTango for us to be a search solution for
3  providers and facilities.  We get 40 percent of any
4  advertising sold around our content.  We're starting
5  with the finder and will move into content, possibly
6  video as well.  Univision will heavily promote and
7  launch in early June during World Cup because their
8  viewership is at all time highs during the
9  tournament.
10         The HolaDoctor.com portal will be the
11  health site for the network and all local affiliate
12  stations.
13     Q   And do you recall Mr. Stimpson asking you,
14  are you aware -- or how are you coming up with this
15  testimony about 40 percent of any advertising?
16     A   Yes.
17     Q   So do you recall if you mentioned or
18  referenced this in your responses?
19     A   I did not.  I just referenced the
20  agreement.  But I recall reading these e-mails when I
21  initially looked at the agreement earlier this year.
22     Q   Just one second.  I think I might be done.
23         MR. VAZQUEZ:  I'm done.
24
25

---

312

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2          FURTHER EXAMINATION
3  BY MR. STIMPSON:
4      Q   Just one question.  Mr. Hall, you've done
5  this before.  From your experience, which is going to
6  control whether a royalty has to be paid?  An
7  internal e-mail by Health Grades or an agreement
8  signed by DrTango?
9      A   In my experience, the agreement signed by
10  the parties would be the guide.
11         MR. STIMPSON:  Okay.  Thank you.  All
12  right.  I'm done.
13         (Proceedings concluded at 5:50 p.m.)
14
15         * * * * * * *
16
17
18
19
20
21
22
23
24
25

---

313

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2      I, DAVID HALL, do hereby certify that I
3  have read the foregoing transcript and that the same
4  and accompanying amendment sheets, if any, constitute
5  a true and complete record of my testimony.
6
7
8
9      _____
       Signature of Deponent
       ( ) No Amendments
10     ( ) Amendments Attached
11  Subscribed and sworn to before me this
12  _____ day of _____, 2012.
13
14  Notary Public: _____
15  Address: _____
16           _____
17  My commission expires _____
18  Seal:
19
20
21  KAM
22
23
24
25

---

79 (Pages 310 to 313)

Veritext Corporate Services

800-567-8658                                    973-410-4040

CONFIDENTIAL - ATTORNEYS EYES ONLY

314

CONFIDENTIAL - ATTORNEYS EYES ONLY
1
2  STATE OF COLORADO)
3              ) ss.  REPORTER'S CERTIFICATE
4  COUNTY OF DENVER )
5       I, Kelly A. Mackereth, do hereby certify
6  that I am a Registered Professional Reporter and
7  Notary Public within the State of Colorado; that
8  previous to the commencement of the examination, the
9  deponent was duly sworn to testify to the truth.
10      I further certify that this deposition was
11  taken in shorthand by me at the time and place herein
12  set forth, that it was thereafter reduced to
13  typewritten form, and that the foregoing constitutes
14  a true and correct transcript.
15      I further certify that I am not related to,
16  employed by, nor of counsel for any of the parties or
17  attorneys herein, nor otherwise interested in the
18  result of the within action.
19      In witness whereof, I have affixed my
20  signature and seal this 8th day of October, 2012.
21      My commission expires April 21, 2015.
22
23      _____
        Kelly A. Mackereth, CRR, RPR, CLT
24      216 - 16th Street, Suite 600
        Denver, Colorado  80202
25

1       ERRATA SHEET
        VERITEXT CORPORATE SERVICES
2       800-567-8658
        ASSIGNMENT NO CS1339309
3  CASE NAME  Health Grades Inc v. Mdx Medical Inc
   DATE OF DEPOSITION 10/4/2012
4  WITNESS NAME  David Hall
5
   PAGE/LINE(S)/  CHANGE      REASON
6       /      /
        /      /
7       /      /
        /      /
8       /      /
        /      /
9       /      /
        /      /
10      /      /
        /      /
11      /      /
        /      /
12      /      /
        /      /
13      /      /
        /      /
14      /      /
        /      /
15      /      /
        /      /
16      /      /
        /      /
17      /      /
        /      /
18      /      /
        /      /
19      /      /
20      _____
        David Hall
21
   SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS_____DAY
   OF_____, 2012
23 _____
24 ___NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

80 (Pages 314 to 315)