**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:  11-cv-00520-PAB-BNB

HEALTH GRADES, INC.

       Plaintiff,

      v.

MDX MEDICAL, INC., d/b/a VITALS.COM,

       Defendant.

**FINAL PRETRIAL ORDER**

**1.  DATE AND APPEARANCES**

      A final Pretrial Conference is set for March 6, 2013, at 8:30 a.m.  The following

counsel for the parties appeared:

Jesús M. Vázquez, Jr., Esq.
Kris J. Kostolansky, Esq.
Rothgerber Johnson & Lyons LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202
Tel: (303) 623-9000
Fax: (303) 623-9222
Email: jvazquez@rothgerber.com
Email: kkosto@rothgerber.com
Email: gkanan@rothgerber.com
*Attorneys for Plaintiff and Counterclaim Defendant Health Grades, Inc.*

Scott D. Stimpson, Esq.
Sills Cummis & Gross P.C.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 643-7000
*Attorneys for Defendant and Counterclaimant MDx Medical, Inc.*

## 2.  JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1338(a) for alleged infringement of United States Patent No. 7,752,060

("the '060 Patent") entitled "Internet System for Connecting Healthcare Providers and

Patients."

### 3.  CLAIMS AND DEFENSES

**A.      Health Grades' Claims and Defenses**

<u>Background</u>:  Health Grades is a pioneer in the field of on-line healthcare

information systems.  Founded in 1999, Health Grades is a Colorado-based company

that ultimately began its business by developing a rating system for hospitals, which it

offered to consumers on its website: www.HealthGrades.com.  Thereafter, Health

Grades became a leader in the healthcare information industry.  More than 200 million

consumers have visited Health Grades' website to research and select a new doctor or

hospital, and to find trusted healthcare information to help them make more informed

decisions for themselves and their families.  In 2011, TIME Magazine named Health

Grades one of the 50 Best Websites.[1]

Although Health Grades' business initially focused on hospital ratings, over the

years it continued to expand its offerings and to develop innovative products.  In the

early 2000s, Health Grades began offering physician reports on its website.  These

physician reports were based exclusively on data verified by third parties (e.g., board

certifications, state licensures, disciplinary actions, etc.).  In 2004-2005, Health Grades

---

[1]      http://www.time.com/time/specials/packages/article/0,28804,2087815_2088170_2088163,00.html

began to develop new and more comprehensive physician reports that would ultimately be organized to make it easier for patients to compare physicians and ultimately choose a physician that would best meet their needs.  The new format would include not only third-party verified information, *but also* information from the doctors themselves *and* information from patients about their doctors.  These were *not* obvious additions – to the contrary, at that time the general consensus in the industry was that doctors and advertisers did not want patient ratings included in on-line physician reports.[2]

Health Grades thus began work on two systems that would ultimately lead to the '060 Patent:  1) software that would allow physicians to directly edit information within the Health Grades' physician database; and 2) a survey system that would allow Health Grades to collect patient ratings of physicians and then compile the results of these surveys in a way that would allow consumers to compare and select physicians.  None of this work happened overnight.  It took time to develop the patient online survey, and even more time to collect a critical mass of patient survey response data needed to begin publishing this data in physician reports.[3]

---

[2]    MDx's own employee testified that in 2004 it was not obvious to add patient ratings to doctor reports:  "several pharmaceutical companies do not like to advertise on web sites that contain user generated content…. I mean just general knowledge from being in this field I know you hear about lawsuits all the time doctors don't like what some patients said about them."  (LaPointe Deposition at 68:22-69:03; 73:12-73:15)

[3]    *See, e.g.,* Montroy Deposition, Vol. II, 231:22-23 (testifying about how Health Grades had to collect a certain amount of survey data before it could publish it:  "Because there was like kind of a chicken and the egg thing where I think we had to get so much data before we could figure out how to publish it, and I can't remember the specifics that, so . . . .")

On or about February 16, 2005, Health Grades launched a beta test for its new physician report format that included third party-verified information, physician-verified information, and patient ratings.  The earliest documented example of this beta test is a report on Dr. David A. Drucker ("the Drucker Report"), which is dated June 4, 2005.  In a press release dated August 2, 2005, Health Grades announced that it had added information gathered from physicians and patient ratings to its on-line physician reports.

On February 8, 2006, Health Grades filed a provisional patent application that related to its new physician report format, such as the Drucker Report, among other things.  Health Grades filed the patent application that ultimately issued as the '060 Patent on August 29, 2006, which claimed priority back to the provisional application.

Health Grades added comparison ratings (e.g., star ratings of physicians) to its physician reports in 2006-2007.  (*See* Dodge Deposition 72:22-73:02 ("Q: Do you mean in 2006 you added comparison ratings at some time? A: I believe that to be the case, yes."); Neal Deposition 97:24-98:04 ("[W]e didn't introduce those physician ratings until – it would have been much later. It would have been 2006-ish. It may be even early 2007 because of the risk it posed to our business.").)

In 2008, MDx launched its website: www.vitals.com.   Vitals.com provides substantially the same type of physician reports as Health Grades.  Like the Health Grades reports, the Vitals.com reports include:  1) third-party verified information, 2) information from physicians, 3) patient ratings of physicians; and 4) comparison ratings of physicians.  The similarity is not coincidental -- numerous MDx documents reveal that MDx deliberately tracked and copied Health Grades.

In a letter dated December 15, 2009, Health Grades gave MDx actual notice of the published patent application and alerted MDx that the features of its website, Vitals.com, were "covered by [Health Grades'] published claims."  (MDX0011861)  The patent was issued seven months later, on July 6, 2010.   On October 5, 2010, MDx Vice President Larry West sent an email to MDx's CEO, Mitch Rothschild, and Erika Boyer regarding the '060 Patent.  Health Grades began marking its website with the '060 Patent number as of November 16, 2010.

On notice of the '060 Patent and concerned that its website infringed, in January 2011, MDx changed the website to remove a feature that provided side-by-side comparison reports.  As shown in Health Grades' Infringement Contentions that are summarized below and incorporated herein by reference, infringement by MDx continued, and continues to this day, despite the change.

Health Grades filed this lawsuit on March 2, 2011.  In October 2011, MDx gave Aetna a license to all of its accused data in a lucrative license deal, thereby expanding its infringement of the '060 Patent by contributing to and inducing Aetna to make and use methods and/or systems in its iTriage Application that, alone and together with MDx, infringe the '060 Patent.

<u>Direct Patent Infringement</u>

Via its former (pre-January 2011), current (post-January 2011) and newest (January 2013) website, www.vitals.com, Defendant MDx has been directly infringing under 35 U.S.C. § 271(a) claims 1, 4-9 and 14-16 of the '060 Patent, and continues to do so, by making, using, selling, and offering for sale one or more systems and methods

that infringe the foregoing claims.  To the extent that MDx's vitals.com does not literally meet each element of the '060 Patent literally, MDx infringes under the doctrine of equivalents as detailed in Health Grades' infringement contentions and expert report on infringement, which are incorporated by reference herein.

In summary, MDx directly infringes claim 1 of the '060 Patent by practicing the method recited in claim 1 via its website Vitals.com.  Both the former version and current version of Vitals.com infringe claim 1.  Vitals.com provides healthcare provider information to potential patients by allowing users to search for doctors.  To facilitate such a search, the web server utilized by Vitals.com receives a request for information about a particular doctor, i.e., the first healthcare provider.  Such a search request may be a request to search for a particular doctor's name, particular doctor's specialty, or through possible medical conditions.  For example, a search request could be for a particular doctor that is a female family practitioner that speaks Spanish, is board certified, was educated in the United States, is a medical doctor (MD), and has had at least 10 years of experience.  Notably, the particular physician can be a physician whose name is known to the user prior to searching or a particular physician that meet the search criteria entered by the user.  Even if this does not infringe the claim literally, it infringes under the doctrine of equivalents because searching for a doctor with characteristics such as those listed above (female, Spanish speaking, board certified, educated in the U.S., an MD, and 10 years experience) is substantially equivalent to a particular physician.  For example, a particular doctor defined by those characteristics performs substantially the same function of looking for a doctor by name, in

substantially the same way, i.e. searching.  This produces substantially the same result, which is ultimately a report on the particular provider.

Vitals.com and/or MDx also has a database of information about the first healthcare provider.  Some of this information is received from the first healthcare provider or one of his or her agents, such as an employee.  For example, Vitals.com collects such information by having doctors provide the information through the Vitals.com website itself, via a physician's portal or a physician's "easy edit" program. The physician verifies such information by providing it to MDx. The physician may also verify his or her information in the Vitals.com database by reviewing his or her information via the physician portal or physician easy edit system.  Notably, per the Court's Order Regarding Claim Construction [Doc. # 138 at p. 15, n. 8], verifying does not require that the information is proven to be true, but only that that information is confirmed or substantiated in some way.  MDx has also admitted that the following information has actually been entered or modified by one or more physicians: specialty information, gender, awards/honors, professional appointments, professional memberships, and languages. MDx also stores and accesses medical philosophy information.  For example, this information may be in the form of a personal statement. Through the use of at least one computer processor, Vitals.com also compiles, i.e., gathers or puts together, patient-provided information regarding the first healthcare provider.  Vitals.com collects this information through its on-line patient experience survey, which allows for users to provide feedback about a particular doctor.  This feedback and/or review that Vitals.com compiles also comprises patient ratings.  For

example, these patient ratings are often in the form of stars for multiple categories, such as "Accurate Diagnosis" or "Bedside Manner."

Vitals.com also compiles, i.e., gathers or puts together, information about the first healthcare provider that is verified by an independent third-party source, such as by Vitals.com or one of MDx's many data partners.  MDx admits that the following information is obtained from one or more third-party sources: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information.  Additionally, Vitals.com also uses licensure information in creating its reports and displays this information on some reports.  Vitals.com itself employs methods to verify the information and Vitals also has portions of its database audited for accuracy.  Indeed, certain reports display the word "verified" or "confirmed."  Also, third-parties may be verifying the information by virtue of providing it to MDx.

Vitals.com also creates, through the use of a computer processor, a healthcare provider report on the first healthcare provider.  When creating this report, Vitals.com uses the healthcare provider-verified information, the patient-provided information, and the information verified by a third-party source.  Some of this use is apparent because it is displayed within the reports themselves.  For example, many reports display specialty information, gender, awards/honors, professional appointments, professional memberships, languages, patient ratings of the healthcare provider, board certification, licensure, medical school, and medical fellowship information.  Other information is used by MDx when it applies its business rules to determine what to display and how to

display it.  Notably, not every piece of data in Vitals.com database must be used in creating a report to infringe this claim and reports on Vitals.com often consist of multiple pages.

Reports created by Vitals.com also include comparison ratings of healthcare providers, i.e., ratings on multiple healthcare providers, including the first healthcare provider in the report on that first healthcare provider.  In the former version of Vitals.com, Vitals.com created a report with two healthcare providers side by side. Ratings were shown for both healthcare providers side by side.  These ratings were comparison ratings.  In the current version of Vitals.com website, this "compare" feature was removed.  However, the current version of Vitals.com still creates reports with comparison ratings.  By way of example, when a user searches for a particular doctor, Vitals.com creates a report on that doctor.  The first page of this report often includes the doctor's specialty information, years of experience, awards, fellowship information, patient ratings, fellowship information, and other information.  This page also includes a star rating for the particular doctor and star ratings for multiple other doctors.  These star ratings are comparison ratings. If the user then wishes to view more information about the particular doctor, the user may click on the doctor's name and Vitals.com will display the second page of the report.  Comparison ratings might also include Vitals.com's "Match Score" and similar capabilities.  Comparison ratings might also include overall star ratings.  These reports are accessed over a computer network.

The multiple reports on Vitals.com with ratings also satisfy the comparison ratings element under the doctrine of equivalents because they perform substantially the

function, substantially the same way, to produce substantially the same result as the comparison ratings element. The function of the comparison ratings element is to allow patients to compare the first healthcare provider to other healthcare providers. Vitals.com performs this same function. The way this function is achieved is to include the comparison ratings in the report on the first healthcare provider. The way MDx achieves this function is by displaying multiple reports, each with comparison ratings of the first healthcare provider, on the same page, so that a patient can compare the first healthcare provider with other healthcare providers. This is substantially the same as the claim. The "result" of the claim is a report that allows for comparison of the first healthcare provider with others. The result of vitals.com is substantially the same, i.e., multiple reports that allow for comparison of the first healthcare provider with other healthcare providers.

Even if the Vitals.com multi-page reports do not literally infringe claim 1, they infringe under the doctrine of equivalents because a multi-page report performs substantially the same function, in substantially the same way, to produce substantially the same result as a single-page report.  Also, reports need not be limited to the first healthcare provider and only the first healthcare provider.  There is no such limitation in the claims, and if there was such a limitation, Vitals.com would still infringe under the doctrine of equivalents.

Vitals.com also infringes claim 4 of the '060 Patent because Vitals.com includes hyperlinks to affiliated hospitals, medical centers, or other types of treatment centers in

its reports. These hyperlinks do not need to take the user to an external website to infringe claim 4.

Claim 5 is also infringed by Vitals.com because the homepage of Vitals.com is a predetermined webpage that provides search capabilities for a database comprised of health care provider information.  For example, from Vitals.com's home pages a user can enter the search terms which, in turn, causes Vitals.com to search its database of healthcare provider information.  Claim 6, which depends from claim 5, is also infringed by Vitals.com because a predetermined webpage of Vitals.com has search capabilities that include such things as name, medical specialty, procedure, diagnosis, state, city, and location criteria, among other things.

Vitals.com also infringes claim 7 because when a search query is entered on Vitals.com, a results list is sometimes displayed, and that results list includes the first healthcare provider.  Claim 8, which depends from claim 7, is also infringed by Vitals.com because Vitals.com includes advertisements in its results lists.  The advertisements are also hyperlinks to information on the advertised doctor.  Claim 9, which depends from claim 7, is also infringed by Vitals.com because Vitals.com provides enhanced services to its certain healthcare providers, such as the ability to respond to patient feedback and the ability to update his or her profile.  Vitals.com refers to these doctors as "members."  Some of these members can be identified from the results list.  For example, these members have the ability to edit their profiles and manage their reputation or have a sponsored listing.

Vitals.com also infringes claim 14 of the '060 Patent because many of the healthcare providers on Vitals.com are physicians.

Vitals.com also infringes claim 15 via its website Vitals.com.  Claim 15 is substantially similar to claim 1 and MDx infringes this claim for at least the same or similar reasons as claim 1, discussed above.  However, claim 15 differs from claim 1 in that it is a system claim, not a method claim.  As such, Vitals.com infringes if it is capable of satisfying the claim elements even though Vitals.com may be capable of non-infringing modes of operation. Vitals.com both satisfies the elements of claim 15, and it is also capable of infringing those elements as well.

Claim 16, which depends from claim 15, is also infringed by Vitals.com. Claim 16 requires that a healthcare provider report be obtained by a predetermined webpage and/or a third-party search engine.  For similar reasons as to why claim 5 is infringed, claim 16 is also infringed by Vitals.com.  Additionally, Vitals.com allows users to obtain reports from a third-party search engine, such as Google.  In fact, MDx encourages this form of report acquisition through search engine optimization techniques.  For example, if a potential patient searches for a particular doctor via Google, Google may provide results that include a hyperlink to a report on Vitals.com of the particular doctor.  Upon clicking the hyperlink, the user obtains the Vitals.com report on the particular healthcare provider.  The second element of claim 16 relating to the search capabilities of the predetermined webpage are infringed by Vitals.com for at least the same or similar reasons as discussed above with respect to claim 6.

This foregoing summary is meant only to provide a brief overview MDx's infringement of the '060 Patent claims and does not limit Health Grades from presenting additional and more detailed arguments at trial.  Comprehensive statements of Health Grades' detailed infringement contentions are set forth in its written infringement contentions and the expert report of Dr. Philip Greenspun, and in Health Grades' summary judgment briefing [Doc. ## 201, 405], which are incorporated herein by reference.

Indirect Patent Infringement

Defendant MDx has been indirectly infringing claims 1, 4-9 and 14-16 of the '060 Patent, and continues to do so, by contributing to the infringement of Aetna under 35 U.S.C. § 271(c) by offering to sell, and/or selling component(s) of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the patented invention, namely, the aforementioned accused data, knowing the same to be especially made or especially adapted for use in an infringement of the '060 Patent by the systems, methods and/or apparatuses comprising Aetna's iTriage App, and not a staple article or commodity of commerce suitable for substantial noninfringing use.  Defendant MDx has been indirectly infringing claims 1, 4-9 and 14-16 of the '060 Patent, and continues to do so, by actively inducing Aetna to infringe under 35 U.S.C. § 271(b) by making, using, selling, and/or offering to sell one or more systems, methods and/or apparatuses comprising Aetna's iTriage App that infringe the foregoing claims.

In summary, the iTriage app (both mobile and web-based) functions similarly to Vitals.com. Like Vitals.com, the iTriage app also infringes claims 1, 4-9, and 14-16 of the '060 Patent. Because of this similarity, many of the arguments discussed in reference to Vitals.com apply similarly to iTriage. This includes both literal infringement and doctrine of equivalents arguments. iTriage is a mobile and web-based application operated by Healthagen, which is owned by Aetna.  iTriage allows users to search for doctors using search criteria such as the doctor's name, specialty, location and other similar categories.  The user may also refine his or her search by many additional categories, including by rating.  A detailed depiction of the iTriage app and its infringement of the claims of the '060 Patent is included in Philip Greenspun's Expert Report and Appendix D to that report, which is incorporated herein by reference

The iTriage app infringes claim 1 of the '060 Patent. Because iTriage uses the data from MDx's database, the arguments expressed above with regard to the MDx's database apply equally to iTriage. The iTriage app runs on mobile phones or a traditional computer, both of which are computers that implement the computer-implemented method of claim 1.  Additionally, the iTriage app works by receiving requests through a web server for a particular healthcare provider and the iTriage/Healthagen web server utilizes at least one processor and memory.  The request received by iTriage may be in the form a particular doctor's name, the doctor's specialty, or through a particular condition, similarly to Vitals.com.

iTriage also infringes claim 1 because it accesses healthcare provider-verified information about the first healthcare provider that is received from the first healthcare

provider, or one of his or her agents.  iTriage uses data that is licensed from MDx including specialty information, medical philosophy, gender, years in practice, awards, honors, publications, and languages.  Again, because this is the same data discussed above with reference to Vitals.com, substantially the same or similar arguments that were made above apply here as well.

iTriage also compiles, i.e., gathers or puts together, by at least one computer processor, patient-provided information. MDx has licensed its patient-provided information to Aetna and iTriage compiles this licensed data on a server in preparation for responding to user requests.  This licensed patient-provided information also includes patient ratings of the first healthcare provider.  Additionally, MDx is developing or has already developed a Patient Review System for Aetna.  To the extent that this element is not literally infringed, it is infringed under the doctrine of equivalents because licensing the patient ratings collected from the Vitals.com on-line survey is equivalent to using ratings collected directly by an iTriage on-line survey. In other words, iTriage performs substantially the same function of compiling patient reviews and ratings from an on-line survey by licensing the patient reviews and data from MDx. The way these results are compiled are from an online survey that is from the company providing the service for connecting patients with healthcare providers. MDx does this by having an on-line patient experience survey on Vitals.com. iTriage does this by licensing that same data and referring users directly to Vitals.com. The results are substantially the same in that iTriage has compiled patient-provided information including ratings that comes from an on-line survey.

iTriage also compiles, i.e., gathers or puts together, information that is verified by a third-party source. iTriage licenses from MDx much of the information that is listed in claim 1, including board certification, licensure information, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information. Again, because this data is licensed from MDx and comes from the MDx database, the same or similar arguments as made above in reference to Vitals.com apply here as well.

iTriage also infringes claim 1 because it creates a report using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source. Again, iTriage is not required to use all the information in creating a report. Some of this use is apparent because the information is actually displayed in the report.  For example, reports often display items such as specialty, medical school, internships, residencies, clinical interests, professional memberships, awards, fellowships, board certification, and star ratings, among other things. Additional information is used in creating the report even if it is not displayed, such as licensure information. Similar to the reports on Vitals.com, reports created by iTriage also have multiple pages.

Reports created by iTriage also include comparison ratings of healthcare providers, i.e., ratings on multiple healthcare providers, including the first healthcare provider in the report on that first healthcare provider.  In the mobile version of iTriage, comparison ratings are shown in a similar way as on Vitals.com.  By way of example, when a user searches for a particular doctor, iTriage creates a report on that doctor.

The first page of this report often includes the doctor's specialty information, medical school information, and other information.  This page also includes a star rating for the particular doctor and star ratings for multiple other doctors.  These star ratings are comparison ratings.  If the user then wishes to view more information about the particular doctor, the user may select the doctor's name and iTriage will display the second page of the report.  This multipage report is further exemplified in the web-based version of iTriage. On the web-based version of iTriage, the first page of the report remains on-screen when the second page of the report is displayed, i.e., the first and second pages of the report are displayed concurrently. When conducting an advanced search on iTriage, there are also additional comparison ratings. iTriage displays on the first page of the report a "percent matched" rating which indicates what percentage a healthcare provider matches the search criteria. This rating is displayed for multiple doctors on the first page of the report and these ratings are comparison ratings. Comparison ratings also may include such things as Top Doctor, Patient's Choice, or similar awards.  Comparison ratings might also include overall star ratings. These reports are accessed over a computer network.

iTriage also infringes claim 4, which depends from claim 1, because iTriage includes a hyperlink to at least "an affiliated medical center" from at least one doctor report. Claim 5, which depends from claim 4, is also infringed by iTriage. The home page of the iTriage app provides search capabilities from a predetermined page. To the extent that a home page on the iTriage mobile application does not literally infringe this claim, it infringes under the doctrine of equivalents because it provides a substantially

similar user experience as a web browser would in displaying a web page. In other words, the mobile iTriage home page provides substantially the same function of a Web page in that it lets a user interact with the search tools that would be on an equivalent Web page. This is done in substantially the same way, i.e., having a standard presentation of information, and has substantially the same result, i.e., a standard page where users can enter and receive information.

iTriage also infringes claim 6, which depends from claim 5, because iTriage provides various search capabilities. For example, iTriage allows a user to search by medical specialty, state, and city. Additionally, advanced search criteria allow for searching by gender and other location criteria.

Claim 7, which depends from claim 6, is also infringed by iTriage. iTriage displays a results list with one or more healthcare providers satisfying search criteria. This results list may be encompassed in the first page of a healthcare provider report.

iTriage also infringes claim 8, which depends from claim 7, because iTriage includes within the results list "Featured Providers." These "Featured Providers" may be considered advertisements and include a hyperlink to more information on that provider. Even if this claim is not literally infringed, it is infringed under the doctrine of equivalents. The featured provider has substantially the same function as an advertisement in that it promotes the featured provider. This is done in substantially the same way in that it is presented in the list and that is purchased by the provider, which creates substantially the same result of a promoted provider displayed in the list.

Claim 9, which also depends from 7, is also infringed by iTriage because iTriage provides enhanced services for physicians who have elected to purchase a "Premier Listing." Such providers that purchase this "Premier Listing" may be considered to be members. For members, the first page of the member's report shows color portraits for the member and other features not provided to non-members.

iTriage also infringes claim 14, which depends from claim 1, because the typical healthcare provider on iTriage and for whom iTriage displays a report is a physician.

Claim 15, which is an independent claim, is also infringed by iTriage.  Claim 15 is substantially similar to claim 1 and MDx infringes this claim for at least the same or similar reasons as claim 1, discussed above. However, claim 15 differs from claim 1 in that it is a system claim, not a method claim. As such, Vitals.com infringes if it is capable of satisfying the claim elements even though Vitals.com may be capable of non-infringing modes of operation. Vitals.com both satisfies the elements of claim 15, and it is also capable of infringing those elements as well. There is also an additional difference between claim 15 and claim 1. Claim 1 requires that "the patient ratings are received from an on-line patient experience survey completed on a company Web site…wherein the company Web site *is managed by _the_ company* providing the service for connecting healthcare providers with the potential patients." Claim 15 instead requires that "the patient ratings are received from an on-line patient experience survey completed on a company Web site…wherein the company Web site *is managed by _a_ company* providing a service for connecting healthcare providers with the potential patients." With regards to claim 1, even if iTriage does not use its own on-line survey, it

still infringes claim 15 because it uses MDx's patient ratings collected on Vitals.com's on-line survey, and Vitals.com is "a company providing a service for connecting healthcare providers with the potential patients."

iTriage also infringes claim 16, which depends from claim 15, because it provides search capabilities from a predetermined page. Even if this claim is not literally infringed because it is not a traditional webpage, it is infringed under the doctrine of equivalents because the home page of the mobile app provides substantially the same interface. In other words, the mobile iTriage home page provides substantially the same function of a Web page in that it lets a user interact with the search tools that would be on an equivalent Web page. This is done in substantially the same way, i.e., having a standard presentation of information, and has substantially the same result, i.e., a standard page where users can enter and receive information. Notably, this claim is infringed even if the reports are not accessible through a third-party search engine, such as Google.

MDx infringes the claims discussed above under 35 U.S.C. §271(c) by offering to sell and selling customized data and services to Aetna for use in the iTriage application. MDx was well aware of the iTriage application and its operation when MDx leased its data to Aetna. In fact, MDx tailored the data specifically for use in the iTriage application. For example, MDx manages and maintains a full database of health care providers to Aetna's specifications and is the "data backbone" for the iTriage app.  MDx also provides a "custom data extract" from that database to be used specifically in iTriage. This full database that is managed and maintained by MDx includes MDx's data

that is listed in claim 1 of the '060 Patent, including gender, age, years experience, specialty, board certification, languages, internship, residency, fellowship, medical school, awards and distinctions (including Patient's Choice award, America's Leading Doctor, etc.), disciplinary actions, publications, personal statement, overall provider quality score, and star ratings. Additionally, MDx is also creating or has already created a custom Patient Review System for Aetna and providing its Provider EZ Edit Tool. These services and data comprise a material part of the invention claimed in the '060 Patent. Also, because these custom tailored services and data have been especially made for use in the iTriage application, they are not a staple article or commodity of commerce. Therefore, because MDx knew of the '060 Patent and provided a material part of the iTriage application to Aetna that was not a staple article, MDx indirectly infringes under §271(c). A more detailed analysis of MDx's contributory infringement is included in Health Grades, Inc's Motion for Leave to Amend its Complaint to Assert Causes of Action for Joint Infringement and Indirect Infringement (Granted), which is incorporated herein by reference [Doc. # 252].

Defendant MDx also indirectly infringes claims 1, 4-9 and 14-16 of the '060 Patent, by actively inducing Aetna to infringe under 35 U.S.C. § 271(b)  by making, using, selling, offering to sell and/or importing one or more systems, methods and/or apparatuses comprising Aetna's iTriage App that infringe the foregoing claims.  MDx is actively inducing Aetna to infringe the '060 Patent via its iTriage app.  MDx presented to Aetna a presentation on what MDx has to offer and promoted use in a similar way to that of Vitals.com, effectively inducing Aetna to use the data in a such a way.

Additionally, MDx manages the database used by iTriage, provides the custom data feed for Aetna, and is creating or has already created Patient Review System, presenting additional opportunities to induce Aetna into using the iTriage application in an infringing manner. A more detailed analysis of MDx's inducement of infringement is included in Health Grades, Inc's Motion for Leave to Amend its Complaint to Assert Causes of Action for Joint Infringement and Indirect Infringement (Granted), which is incorporated herein by reference [Doc. # 252].

This foregoing summary is meant only to provide a brief overview MDx's infringement of the '060 Patent claims and does not limit Health Grades from presenting additional and more detailed arguments at trial. A more comprehensive summary of Health Grades' detailed infringement contentions are set forth in its written infringement contentions, the expert report of Dr. Phillip Greenspun, and its summary judgment briefing, which are incorporated herein by reference and listed in Health Grades' exhibit list.

<u>MDx's Opposition to Health Grades' Doctrine of Equivalents Arguments</u>

MDx contends incorrectly that prosecution history estoppel bars Health Grades' doctrine of equivalents' arguments.  The "healthcare provider report" claim element was present in the claims as originally filed and therefore prosecution history estoppel does not apply.  Other doctrine of equivalents' arguments are not barred by prosecution history estoppel because the amendments made during prosecution of the '060 Patent were tangential to the alleged equivalents.  For example, the doctrine of equivalents argument relating to MDx's display of multiple healthcare provider reports on the same

page, each report with comparison ratings of its particular provider, which is equivalent to a report on a first healthcare provider that contains comparison ratings of other healthcare providers as construed by the Court ([Doc. # 138] at pp. 12-14), is not barred by prosecution history estoppel because the reasons for the narrowing amendment was tangential to the accused MDx equivalent. This analysis and Health Grades' analyses regarding the accused MDx Multi-Provider Report and Multi-Page Report equivalents are detailed in Health Grades' Response to MDx's Second Motion Pursuant to Federal Rule of Civil Procedure 56 for Partial Summary Judgment of Non-Infringement [Doc. # 201], incorporated herein by reference.

MDX also argues that Health Grades cannot make certain doctrine of equivalents arguments because the all-elements rule prevents such arguments. However, the all elements rule should not be so broadly applied such that it would swallow the doctrine of equivalents entirely, or applied so broadly that it would reduce the doctrine of equivalents to nothing more than a repeated analysis of literal infringement. These arguments are detailed in Health Grades' Response to MDx's Second Motion Pursuant to Federal Rule of Civil Procedure 56 for Partial Summary Judgment of Non-Infringement [Doc. # 201], incorporated herein by reference.

<u>Willful Infringement</u>

MDx willfully infringed, and continues to willfully infringe, the '060 Patent. Pursuant to Section 284 of the Patent Act, upon a finding of willful infringement the Court has discretion to increase the damages up to three times the amount found or assessed. Copying is evidence of willful infringement, and numerous MDx documents

reveal that MDx deliberately tracked and copied Health Grades.  *Kaufman Co. v. Lantech, Inc.,* 807 F.2d 970, 978, 1 USPQ2d 1202, 1208 (Fed.Cir.1986).

In a letter dated December 15, 2009, Health Grades gave Vitals actual notice of the published patent application, about seven months before the patent was issued on July 6, 2010.   An email dated October 5, 2010, from MDx Vice President Larry West regarding the '060 Patent shows that MDx knew about the '060 Patent.   Health Grades began marking its website with the '060 Patent number as of November 16, 2010.   On notice of the '060 Patent and concerned that its website infringed, in January 2011, MDx changed its website to remove a feature that provided side-by-side comparison reports, but infringement continues despite this change.  MDx's experts have opined that MDx could easily and cheaply make other changes to the website such that there would be no infringement.  MDx, however, has opted not to make those changes.

MDx relies on the Braginsky opinion to defend against Health Grades' willful infringement claim.  Health Grades took the deposition of Mr. Braginsky on February 14, 2013.  Health Grades is considering whether it will renew its motion to preclude reliance on the Braginsky opinion or whether it will move to supplement its Opposition to MDx's motion for summary judgment of no willfulness [Doc. #404], given that the deposition of Mr. Braginsky confirmed that his opinion does not demonstrate an absence of willful infringement because the opinion was not independent and not competent.  Further, MDx did not follow advice rendered to it by its trial/opinion counsel in connection with the opinion.

<u>Remedies</u>

Health Grades seeks the following remedies for MDx's patent infringement:  a permanent injunction under 35 U.S.C. § 283; damages adequate to compensate Health Grades for the infringement, but no less than a reasonable royalty for the use made of the invention by MDx, together with interest and costs as fixed by the court under 35 U.S.C. § 284.  Health Grades' damages expert, David Hall, has submitted a report on damages and reasonable royalty dated July 13, 2012, and a supplemental report dated July 20, 2013, which are incorporated herein by reference; provisional rights damages under 35 U.S.C. §§ 154(d) & 284; increased damages up to three times the amount found or assessed under 35 U.S.C. § 284; attorney's fees based on an exceptional case finding under 35 U.S.C. § 285; and pre- and post-judgment interest at the highest rate allowable by law.

<u>Health Grades' Defenses to MDx's Invalidity Defenses</u>

The '060 Patent is presumed valid.  35 U.S.C. §282.  MDx bears the burden of proving invalidity by clear and convincing evidence.  *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1377 (Fed. Cir. 1999).  An invalidity analysis is conducted claim by claim. If one claim is found to be invalid, the rest of the claims are unaffected.

Invalidity under 35 U.S.C. §102, also called "anticipation," requires that a *single* prior art reference disclose every element of the challenged claim.  Further, the single prior art reference must be enabling (i.e. detailed enough to teach one of ordinary skill in the art to make and use the invention) and must actually qualify as prior art under one of the subsections of 35 U.S.C. §102.  *In re Robertson,* 169 F.3d 743 (Fed. Cir. 1999); *See also* Roger Schechter & John Thomas, *Principles of Patent Law* 73-85(2d ed. 2004).

Invalidity under 35 U.S.C. §103, also called "obviousness," occurs "if the differences between the subject matter sought to be patented and the prior art are such that the subject as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. §103(a).  Unlike the analysis under §102, multiple references may be combined to prove invalidity under §103.  However, each reference must qualify as prior art under one of the appropriate categories of §102 and the references together must still teach each and every limitation of the disputed claim.

The prior art references all must be from an analogous art, i.e., from the same field of endeavor or reasonably pertinent to the problem at hand.  *In re Clay,* 966 F.2d 656, 659 (Fed. Cir. 1992).  In addition, even if each reference qualifies as prior art and is analogous, there must be some reason to combine the references.  *KSR Intl. Co. v. Teleflex Inc.,* 550 U.S. 398, 418-19 (2007).  One reason for combining prior art reference is if there is a teaching, suggestion, or motivation to combine the references. *Id.*  Generally, the underlying question is whether the combination was obvious to a person with ordinary skill in the art. *Id.*  Notably, "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418.

Health Grades' technical expert, Dr. Philip Greenspun, has submitted a report dated September 17, 2012, incorporated herein by reference, in which he addresses MDx's invalidity defense and rebuts MDx's technical expert's opinions regarding invalidity.  MDx's technical expert, Dr. Richard Cooper, relies exclusively on Health

Grades' prior art for his invalidity opinion.  Thus, the applicable prior art section in this case is 35 U.S.C. §102(b).[4]  The '060 Patent claims priority to a provisional application, which was filed on February 8, 2006.  The '060 Patent application was filed on August 29, 2006.  Thus, the critical date for purposes of proving whether a reference is prior art in this case is either February 8, 2005 (if the '060 Patent is entitled to priority to the provisional application) or August 29, 2005 (if it is not).

MDx's expert identifies the following prior art, which he collectively refers to as the "Early HG Reports and Services."

    i.       Drucker Report;

    ii.      Health Grades Pre-August 29, 2005 Physician Report;

    iii.     Health Grades Pre-Feb. 2005 Physician Reports;

    iv.     Physician Comparison Report;

    v.      Nursing Home Comparison Report; and

    vi.     Nursing Home Quality Report.

MDx's expert incorrectly assumes that he can rely on a *combination* of all of these different reports in order to prove invalidity by anticipation. This approach is flawed and contrary to black letter patent law, which requires that each element be shown in a single reference.  Health Grades' *Daubert* motion to preclude this testimony is pending.  [Doc. # 338]   None of these references, by itself, teaches *all* of the elements of any of the asserted '060 Patent claims.

---

[4]     35 U.S.C. §102(a) does not apply because it relates only to prior art by someone other than the patentee.

All of the reports that predate February 2005 (reports iii, iv, v, and vi above) were based exclusively on third-party verified information. These reports did not contain any patient ratings of physicians and did not contain any comparison ratings.  MDx's expert does not contend otherwise.  Indeed, both parties in this case agree that "healthcare provider" as used in the '060 Patent claims is a person, not an entity, and the claimed reports at issue in this case are physician reports.  Thus, the nursing home reports (reports v and vi) have no relevance to this case.

MDx must prove its invalidity case *with documents* and the only document that MDx's expert relies on for the Pre-August 29, 2005 report (report ii above) is a one-page press release dated August 2, 2005, that stated that Health Grades added physician-verified information and patient ratings to its physician reports.  The press release does not say to which physician reports this information was added, nor does it say when the information was added.  The press release is not an enabling disclosure.  Further, assuming the '060 Patent is entitled to the priority date of its  provisional application, the press release is dated after the February 8, 2005 critical date and is not prior art.

Finally, the Drucker Report (item i above) is dated after February 8, 2005, and thus will be considered prior art *only* if the '060 Patent is not entitled to priority to the provisional application.  But even if the Drucker Report is considered to be prior art under §102(b), it does not include comparison ratings of physicians (e.g., physician star ratings). MDx's expert does not seriously contend otherwise.  In fact, MDx's expert acknowledges as much and instead argues it would be obvious to include comparison ratings:

The specific use of comparison ratings has also been found in prior art materials, as described below.  The testimony of Mr. Dodge, when combined with other evidence, also indicates that comparison ratings were in the Early HG Reports and Services early enough to be prior art. Therefore, this claim element is also anticipated.

==Even if the element were not anticipated, the idea of comparison ratings of health care providers was disclosed in these documents, and comparisons of line items in database reports have been used to rank retrieved records for decades, and so this use of comparison ratings for this purpose would have been extremely obvious to a Posita.==

****

The Early HG Reports and Services also show ratings of health care provider hospitals that were intended to and do allow comparison of health care providers.  It would be obvious to a Posita that ratings of other physicians would be a natural addition to the report.

(Cooper Report at p. 18 (highlighting added).)

Thus, MDx's expert does not present a single, viable *anticipation* opinion.  MDx does not present a viable *obviousness* opinion either – it does not identify any specific combination of references that would teach all of the elements of any of the '060 Patent claims, and it does not give any reason to combine references as required by Federal Circuit law.

The closest MDx's expert comes to discussing these necessary elements of obviousness are the three paragraphs quoted above (out of 57-page report), but these three paragraphs are woefully inadequate.  They do not identify which of the "Early HG Reports" he would combine, he never gives any reason to combine any references, and he merely concludes without any support or analysis that it would be obvious to substitute physician ratings for hospital ratings.  Such conclusory testimony should be excluded from evidence.  *See, e.g., ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 813 (E.D. Va. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999))("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district

court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Ipse dixit* is defined  to mean: "he himself said it" or "she herself said it" or "something asserted but not proved,"  Black's Law, New Pocket Edition, 1996; "he himself said it" or "an assertion without proof," Dictionary.com; and "an unproven assertion resting on the bare authority of some speaker;" or a "dogmatic statement," (Oxford English Dictionary.)

In any event, none of the prior art asserted by MDx render any of the asserted claims invalid under §103 because none of the art teach all of the elements of the asserted claims, it would not have been obvious to combine this art or to make substitutions to the art to teach all of the elements of the asserted claims, and the secondary considerations of non-obviousness show that the claimed invention is not obvious.  A more comprehensive summary of Health Grades' defenses to MDx's invalidity contentions is included in the rebuttal report of Dr. Philip Greenspun,  Health Grades' motion for partial summary judgment on MDx's counterclaims and affirmative defenses of invalidity and unenforceability, and Health Grades' reply [Doc. #369 and #442, and Health Grades' responses to MDx Interrogatory Nos. 4 and 8, incorporated herein by reference.

<u>Health Grades' Defenses to MDX's Inequitable Conduct Defense</u>

MDx asserts that the inventors' failure to disclose the Early HG Report and Services to the Patent Office during the prosecution of the '060 Patent constitutes inequitable conduct.  Health Grades disagrees.

Inequitable conduct is an issue to be decided by the Court.  *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1333 (Fed. Cir. 2011).

Inequitable conduct has always required proof that the patentee had the "specific intent to deceive" the Patent Office.  Moreover, proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO **does not prove specific intent to deceive.**

In this case, MDx has not and cannot make a showing that Health Grades' inventors made any deliberate choices with the specific intent to deceive the Patent Office.  The '060 Patent has three inventors:  John Neal, Scott Montroy, and David Hicks.  MDx deposed all three inventors.  Mr. Neal, who was involved in the prosecution of the '060 Patent, testified that they did not disclose the Early HG Reports and Services because they were different from what they trying to patent.  Mr. Neal explained that they believed their patent was unique and different from what Health Grades was doing in 2004 and 2005 because it gave "a means to differentiate providers based on a rating or a score."  Mr. Montroy left Health Grades in 2007 and testified that he "did his best" to give the team working on the patent application all the information he was supposed to (although he cannot remember now what specifically he gave them).  Mr. Montroy testified that he did not intend to deceive the Patent Office and had no incentive to do so.  Mr. Hicks did not recall being involved in the '060 Prosecution and testified he did not know why the early reports from Health Grades were not disclosed.  MDx has asserted incorrectly that Health Grades chose to dump irrelevant materials on the examiner while concealing its own, anticipatory prior art (art that Health Grades has

admitted, in sworn interrogatory responses, to be practicing the patent claims – Health

Grades is only now trying to backtrack).  The so-called "irrelevant" materials, however,

were provided to Health Grades by MDx's opinion counsel, Mr. Braginsky, as part of

MDx's efforts to cause the '060 patent application to be rejected by the Patent Office.

MDx's counsel demanded that Health Grades disclose the materials to the Patent

Office, and Health Grades complied.  Obviously these disclosures by Health Grades to

the Patent Office at the insistence of MDx do not show any intent to deceive the Patent

Office by Health Grades.

        Thus, the only evidence MDx marshals in support of inequitable conduct is the

fact that the references were not disclosed.  Under Federal Circuit law, this does not

prove specific intent.

        Further, the Federal Circuit recently changed the law to make it much more

difficult to prove inequitable conduct because this defense is an "absolute plague" on

the courts and the entire patent system:

[T]he remedy for inequitable conduct is the "atomic bomb" of patent law.  Unlike validity
defenses, which are claim specific, see 35 U.S.C. § 288, inequitable conduct regarding
any single claim renders the entire patent unenforceable.

With these far-reaching consequences, it is no wonder that charging inequitable
conduct has become a common litigation tactic.   One study estimated that eighty
percent of patent infringement cases included allegations of inequitable conduct.
Inequitable conduct "has been overplayed, is appearing in nearly every patent suit, and
is cluttering up the patent system."   "[T]he habit of charging inequitable conduct in
almost every major patent case has become an absolute plague. Reputable lawyers
seem to feel compelled to make the charge against other reputable lawyers on the
slenderest grounds, to represent their client's interests adequately, perhaps."

While honesty at the PTO is essential, low standards for intent and materiality have
inadvertently led to many unintended consequences, among them, increased
adjudication cost and complexity, reduced likelihood of settlement, burdened courts,

strained PTO resources, increased PTO backlog, and impaired patent quality. **This court now tightens the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public.**

*Therasense*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) (emphasis added) (citations omitted).

To succeed on its inequitable conduct defense, MDx bears the burden of showing by clear and convincing evidence that Health Grades made a deliberate decision to withhold a *known material* reference.   To be "material", the Early HG Reports and Services must have been "but-for" material to patentability.  That is, the Patent Office would not have allowed the claims had it been aware of the undisclosed prior art.

In this case, none of the Early HG Reports and Services anticipate or render obvious any of the asserted claims for the reasons discussed above.  Although the Patent Office would not have been bound by this Court's claim constructions, the only reasonable construction of "first healthcare provider" is that it is a person, not an entity, and MDx stipulated to this construction at the Markman hearing.  Indeed, the claims explicitly require the healthcare provider to have a gender.   Because all of the claims require comparison ratings of human healthcare providers and none of the Health Grades' references included this element, this prior art would not have impacted the decision to allow the '060 Patent claims.  Dr. Philip Greenspun, Health Grades' technical expert, addressed MDx's inequitable conduct defense in his rebuttal report dated September 17, 2012, incorporated herein by reference, and concluded that none of the Early HG Reports and Services were material to patentability.

In sum, inequitable conduct requires proof of both materiality and intent, and MDx can prove neither.  A more comprehensive summary of Health Grades' defenses to MDx's invalidity contentions is included in the rebuttal report of Dr. Philip Greenspun and Health Grades' motion for summary judgment of no inequitable conduct [Doc. #369 and #442], which are incorporated herein by reference.

**B.      MDx's Claims and Defenses**

MDx vigorously objects to the new arguments, claims, and infringement theories presented by Health Grades in its above section of claims and defenses.  These are addressed in more detail in the "Special Issues" Section 9, below.

Health Grades accuses MDx's www.vitals.com website of directly and indirectly infringing the '060 patent.  The '060 patent issued on July 6, 2010, but MDx was not aware of the issuance until it internally happened upon the patent on October 5, 2010. MDx took immediate action to determine that its website did not infringe the '060 patent. Health Grades had a reputation of being litigious.  In an effort to prevent the possibility of a lawsuit, MDx implemented website changes in January 2011 that distanced its website even further from the '060 patent, and obtained an opinion of counsel regarding the non-infringement.

Health Grades never contacted MDx regarding issuance of the '060 patent before commencing this suit.  If Health Grades had, it would have learned of the January 2011 changes to the MDx website, and this suit could have been avoided. Instead, Health Grades found out about the January 2011 changes from MDx's counsel only after commencing suit, and then struggled for weeks to validate its infringement

suit on the changed website, looking to force a square peg into a round hole.  In straining to do so, Health Grades concocted infringement theories that stretch beyond the scope of its '060 patent.

After this suit was commenced, MDx obtained prior art that would invalidate the '060 patent and asserted a counterclaim of invalidity.  MDx sought further prior art from Health Grades during discovery, but Health Grades falsely verified in its interrogatory response that it had none.  Only after MDx on its own came upon prior art Health Grades reports, did Health Grades concede that its prior products and services met various elements of the '060 patent claims.  But Health Grades hid its prior products and services from the United States Patent and Trademark Office and failed to cite any of them to the patent examiner, instead choosing to dump irrelevant materials on the examiner while concealing its own, anticipatory prior art (art that Health Grades has admitted, in sworn interrogatory responses, to be practicing the patent claims – Health Grades is only now trying to backtrack).  Realizing that Health Grades had committed a fraud upon the patent office, MDx asserted the defense and counterclaim of inequitable conduct in this case.

**(1)    MDx's Defenses to Health Grades' Claim of Patent Infringement**

MDx has numerous defenses to infringement of all claims, laid out in detail in the rebuttal report (and any subsequent rebuttal reports) of Dr. Cooper (incorporated by reference).  Some of these defenses are also addressed in pending motions for summary judgment (incorporated by reference).  Unless otherwise stated, the below

defenses apply to all versions of the Vitals website.  Health Grades cannot meet its

burden of proof for numerous reasons.

      (a)    <u>Comparison Ratings in the Healthcare Provider Report</u>.  On May 8, 2012,

MDx filed a Motion for Partial Summary Judgment of Non-Infringement [Doc. # 195,

"First Non-Infringement Motion"].  The First Non-Infringement Motion seeks a finding

that MDx from January 2011 through now has not infringed and currently does not

infringe the '060 patent.  Every claim of the '060 patent requires a report on a first

healthcare provider that includes "comparison ratings of healthcare providers."[5]  The

Vitals website lacks a report on a healthcare provider that contains comparison ratings

of other healthcare providers.  Health Grades tries a number of arguments, but none

satisfy the claim language.  One primary argument of Health Grades is that a results list

satisfies the claim element.  But a results list is a separate claim term from the claimed

report and refers to something completely different.  Inventor Neal also testified that a

results list is not a healthcare provider report, at page 201 of his deposition.  There is

nothing in the vitals reports that could be "comparison ratings of healthcare providers"

consistent with the patent or this Court's claim constructions.  Accordingly, as argued in

the First Non-Infringement Motion, MDx lacks any report on a first healthcare provider

that includes "comparison ratings of healthcare providers", and lacks anything that could

be equivalent.  The function (allowing ease of comparison of ratings in the one report),

---

[5] The Court construed that term "as including rating on multiple healthcare providers, including the 'first healthcare provider,' in the report on that 'first healthcare provider,' thus permitting comparison of the 'first healthcare provider' with other potential healthcare providers."  [Doc. # 138, Order on Claim Construction, at p.14].

way (putting the ratings of other providers in the same report) and result (a single report focused on the one provider that contains ratings of other providers) are not substantially the same.  There is also prosecution history estoppel preventing any equivalents, as well as the fact that an equivalents finding would vitiate the claim term in violation of Supreme Court and Federal Circuit precedent.

(b)   <u>Data Received From the Fist Healthcare Provider</u>.  On November 2, 2012, MDx filed another Motion for Summary Judgment of Non-Infringement [Doc. # 362, "Second Non-Infringement Motion"].  The Second Non-Infringement Motion seeks a finding that there is insufficient evidence for Health Grades to prove infringement.  Every claim of the '060 patent requires accessing three of more of certain data received from and verified by the first healthcare provider.  Mere capability is not sufficient to satisfy this requirement.  Health Grades has no evidence that any healthcare provider has ever provided even two of the required data elements, let alone three or more as the claim requires.  Health Grades points to evidence that, in trivial numbers, single data elements have been edited by unidentified healthcare providers in the past.  But this is too far removed from the claim element at issue to qualify as evidence that the claim element is met, and Health Grades failed to pursue the necessary discovery.  Health Grades also asserts, without any evidence, that healthcare providers submit an entire form of data, even when they do not edit all the fields on the form.  This is factually incorrect.  Health Grades has no evidence of this claim element being met.  There can be no equivalents because any equivalents position would vitiate this claim term in its entirety, and because there is prosecution history estoppel, and because the Vitals

website does not perform substantially the same function (obtaining at least three of the data set from the provider), in substantially the same way (receipt from the provider) or get substantially the same result (three or more data sets obtained from the provider).

(c)     Provider Verified Data.  Each claim of the '060 patent requires that certain data be provider-verified.  Mere capability is insufficient to satisfy this, or any other claim limitation of the '060 patent.  As testified by Mr. Montroy, Health Grades used to require verification from healthcare providers by having them submit documentation.  Montroy at page 145.  MDx does not obtain verification from providers.  There also can be no equivalents infringement, as there is prosecution history estoppel, and the claim term would be vitiated.  Moreover, verification is better and operates in a substantially different way (providing proof through the provider), achieving a different function (assuring accuracy) and result (more accurate information).  The element would also be entirely eliminated with an equivalents finding, contrary to precedent.

(d)     Third Party Verified Data:  The claims all require that certain data be verified by third parties.  Health Grades has no evidence that any third party has ever verified the requisite data.  In fact, third parties disclaim the accuracy of the data – the exact opposite of the claim language (vitiated).  The function, way, and result – obtaining verification from the third parties to prove the facts, are entirely missing and so there can be no equivalents.  There is also prosecution history estoppel.

(e)     Compiling and Using Information of Third Parties.  The claims require the creation of a report using the three of more data elements verified by third parties.  In January of 2011, MDx changed the website so that it would never show three of the

data sets that were verified by third parties, and these instructions were confirmed in an email from the CEO, Mitch Rothschild.  There can be no infringement by equivalents because any equivalents analysis would vitiate the claim term, and because there is prosecution history estoppel.  The function/way/result analysis is also not met for equivalents.  The function and result are substantially different because there are less than three of the required elements, and the way is also substantially different because at most two of the required three are used.

(f)  The Dependent Claims:

- Claim 4: The required hyperlink is completely missing, and the alleged links cited by Health Grades in its original and supplemental Infringement Contentions would vitiate this term, and could not possibly be equivalent.  Healthcare provider reports on the MDx Website do not include a hyperlink to an affiliated hospital, medical center, or other type of treatment facility.  The function is to provide a link to the other entity, resulting in an entirely different web page of that entity. That function and that result are completely and totally missing from the Vitals web site, as is the way by providing a direct link.

- Claim 8: This element is also entirely missing, and there cannot be equivalents as the term would be vitiated and the claim element is not substantially similar to the accused MDx Website in this regard.  There is no situation where the results list further includes an advertisement for the first healthcare provider with a hyperlink to information on the first healthcare provider.

The Health Grades infringement allegations point to no advertisements in the results list. Accordingly there is no literal infringement.  There is also no infringement by equivalents.  Having the advertisements inside the results list is not equivalent to having them outside the results list. The reason for this is that outside the results list is the exact opposite of the requirement that the advertisement be inside the results list.

- Claim 9: This element is completely missing from the MDx Website, and the complete absence of a membership of the company managing the MDx Website or the required enhanced services based on such a membership.  The MDx website also does not determine from the results list whether a particular healthcare provider is a member. The results list is determined based on search criteria entered by a web site user and is completely independent of whether a particular healthcare provider in the results list is a member.

Therefore there is no literal infringement. There is no infringement by equivalents.  Specifically, the function-way-results analysis has not been met. The function of having membership of the company managing the web site is to provide some special designation for those physicians but in the MDx web site, that function is entirely lacking. The result of having a special designation for health care providers is also entirely lacking in the Vitals web site.

    (g)    iTriage Claims.  After Health Grades was permitted to assert indirect and joint infringement claims on January 11, 2013, MDx filed on January 22, 2013, a Motion for Summary Judgment of Non-Infringement with regard to the amended complaint [Doc. # 490, "Third Non-Infringement Motion"].  There are many reasons why there can

be no infringement regarding the iTriage claims, and the Health Grades claims are frivolous.  MDx is serving a motion for sanctions under Fed.R.Civ.P. 11, which will be filed after expiration of the safe harbor.  There is no infringement by Aetna or iTriage of the iTriage claims at least because:

(i) There is no evidence that iTriage uses the right MDx data for its reports, and if it does what parts it uses.  For example, there is no evidence that iTriage uses all of the specific required data sets obtained from MDx in creating their reports.

(ii) Every claim of the '060 patent requires patient ratings received from an on-line patient experience survey completed on a company Web site that is managed by the company providing the service for connecting healthcare providers with the potential patients.  The claim language expressly excludes obtaining patient ratings from other websites.  Nevertheless, Health Grades asserts that patient ratings obtained from the Vitals website meets this claim language.  But the claim language requires the company providing the service to run the website where the patient ratings are obtained, i.e., Aetna.  Aetna does not manage the Vitals website, nor does iTriage.

(iii)  The same argument in part (b), (c), (d), and (e) apply equally to iTriage.

(iv) There are also no comparison ratings in the reports on healthcare providers in the iTriage application.  The same arguments in part (a) relating to comparison ratings will apply equally to the iTriage application.

(v) There is no contributory infringement because that claim requires (1) that defendants sold a material to be used in a patented process; (2) that the material

constituted a material part of the patented process; (3) that defendants knew the material to be especially adapted for use in the infringement of such patent; and (4) that the material did not constitute a staple article suitable for substantial non-infringing use. Not even one of these elements is satisfied by the MDx data.  For (1), (2), and (3), the data leased by MDx is not used in a patented process, nor does it constitute a material part of a patented process, because the iTriage application does not infringe any of the claims of the '060 patent.  For (4), the data has many, many non-infringing uses, as it is just data.

(vi) The inducement claim requires proof that: (1) [t]here was direct infringement by the induced party; (2) the inducer had knowledge of the asserted patents; (3) the inducer 'possessed specific intent and not merely knowledge of the acts alleged' to induce; (4) there was active inducement of the direct infringer.  For (1), there is no direct infringement; for (3) there is no evidence of the requisite intent; and for (4) there is no evidence of active inducement.  The MDx agreement with Aetna belies Health Grades' assertion that MDx induced Aetna or iTriage to infringe the '060 patent.

(vii) The joint infringement allegation requires MDx to have "controlled" Aetna, and to have been a "mastermind" in the iTriage application.  There is no evidence of either of these elements being met.  The Aetna Agreement also shows that MDx could not possibly be in control or the mastermind.

(2)   **MDx's Defenses to Health Grades' Claim of Willful Infringement**

On November 2, 2011, MDx filed a motion for summary judgment of no willfulness [Doc. # 370, "Non-Willfulness Motion"] based on evidence showing lack of willful infringement by MDx.  That motion is incorporated by reference.

As MDx noted above, the '060 patent issued on July 6, 2010, but MDx was not aware of the issuance until it internally happened upon the patent on October 5, 2010.  MDx took immediate action to confirm that its website did not infringe the '060 patent.  Health Grades had a reputation of being litigious.  So in an effort to prevent the possibility of a lawsuit, MDx implemented website changes in January 2011 that distanced its website even further from the '060 patent, and promptly obtained an opinion of counsel regarding the non-infringement.

Specifically, every claim of the '060 patent requires a report on a first healthcare provider that includes "comparison ratings of healthcare providers."  Prior to the January 2011 website changes, MDx's website contained a comparison feature that showed reports of multiple healthcare providers side-by-side.  This feature was removed from the MDx website in January 2011.  This change made non-infringement so clear that for weeks even counsel for Health Grades could not figure out a way to assert infringement.  MDx also changed its website so that it never had three or more of the required third party verified information in its reports, further ensuring there could never be any infringement.

MDx has had strong defenses since day one (as shown above).  Other evidence showing that MDx did not willfully infringe the '060 patent are shown in the Non-Willfulness Motion.   There was never an "objectively high likelihood" that MDx was

infringing this patent, nor is there any evidence that MDx was or should have been aware of such a (non-existent) risk.

**(3)      MDx's Defense and Counterclaim for Invalidity**

MDx has a defense and counterclaim seeking a declaratory judgment that the all asserted claims of the '060 patent are invalid as being anticipated and/or obvious.  The invalidity of the '060 patent is addressed in MDx invalidity contentions (incorporated by reference), and in the report of MDx's technical expert, Dr. Richard G. Cooper ("Cooper Report"; incorporated by reference).  MDx also incorporates by reference its opposition to Health Grades' motion for partial summary judgment [Doc. # 369].  The '060 patent is not entitled to the earlier priority date of the provisional application at least because the provisional application failed to disclose a report on a healthcare provider that included comparison ratings of healthcare providers.  Thus, the critical date for prior art is the filing date of the '060 patent, *i.e*, August 29, 2006.  The primary prior art relied upon for MDx's invalidity claims are Health Grades' own products and services pre-dating the filing of the '060 patent ("Early HG Products and Services").  As explained in the Cooper report (incorporated by reference), the Early HG Products and Services included every element of the claims asserted by Health Grades and invalidate them, based on both anticipation and obviousness.  One of the primary prior art references was the Drucker report, but there were many Health Grades reports available over the internet that invalidated the claims.  They contained all the elements of the claims.

Health Grades has admitted in response to interrogatories 1 and 4 that the alleged invention of the '060 patent was commercialized in the spring/summer of 2005 --

more than one year before the August 29, 2006 application filing date.  Commercial launch of the patented subject matter in the spring/summer of 2005 pursuant to Health Grades' sworn admission would thus invalidate all the claims as being in public use, on sale, and in printed publications under 35 U.S.C. §102(b).  Moreover, since Health Grades has never alleged a date of invention earlier than February 8, 2006 (response to interrogatory 1), the alleged invention was known and used by others, and described in printed publications before the invention date relied upon by Health Grades.  35 U.S.C. §102(a).

Should the Court grant Health Grades' motion for partial summary judgment regarding anticipation, the '060 patent is still invalid as being obvious under 35 U.S.C. §103(a).  There was ample motivation and suggestion in the prior art (including common sense) to provide the claimed elements and render them on the whole obvious.

**(4)    MDx's Defense and Counterclaim of Inequitable Conduct**

MDx has a defense and counterclaim that the '060 patent should not be enforced due to Health Grades' inequitable conduct in defrauding the U.S. Patent and Trademark Office ("USPTO") when it obtained the '060 patent.  Health Grades hid the Early HG Products and Services from the USPTO, including the Drucker report, while providing other less relevant prior art to the USPTO instead.  But for Health Grades' concealing of its own prior art from the USPTO, the '060 patent would never have issued as a patent, and the Health Grades prior art could never have been distinguished as was the cited prior art.  MDx's Amended Answer, Second Amended Answer, Answer to First Amended Complaint, and expert report of Dr. Richard Cooper, all explain the facts of

the inequitable conduct in detail, as does the MDx opposition to Health Grades pending motion for summary judgment on this issue.  All of these documents are incorporated by reference.  MDx seeks a finding that all claims of the '060 patent are unenforceable due to inequitable conduct.

**(5)     MDx's Defenses to Claimed Remedies**

Health Grades is not entitled to any of the remedies claimed.  Health Grades has failed to prove entitlement to lost profits because it has not proved demand, among other things.  Health Grades' has also failed to prove a reasonable royalty because it improperly based its analysis on revenue from the entire MDx website, and sought an outrageous 12% royalty.  MDx also challenges the Health Grades damages allegations because, if there had been any infringement (there has not been), Health Grades has failed to account for the trivial percentages of use in the Vitals.com website.  For example, only trivial percentages of healthcare providers have ever provided the information required by the claims.  MDx incorporates by reference the rebuttal reports of Brian Napper.

Health Grades' claim for provisional rights damages should fail because provisional rights damages cannot be obtained unless the claims of the patent and the application are "substantially identical" which was not the case here.  35 U.S.C. §154(d)(2).

Additionally, if any claim of the '060 patent is determined to be invalid, Health Grades will be precluded from obtaining any costs pursuant to Section 288 of the patent statutes.

Health Grades did not give notice to MDx about the patent before commencement of this action, or continuously mark its patented products, as required by the patent statutes and so damages are limited by 35 U.S.C. §287.

**(6)     MDx's Claim for Fees and Costs under 35 U.S.C. 285**

Section 285 of the patent statutes permits the Court to award reasonable fees and costs in exceptional circumstances.  MDx will be vigorously pursuing these fees, in part due to the baseless claims asserted by Health Grades, the fact that this patent was fraudulently obtained by inequitable conduct, and Health Grades' various other misconduct over the course of this case, including its repeated efforts to hide its own prior art.

## 4.  STIPULATIONS

A.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq.*

B.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338 for alleged infringement of United States Patent No.

7,752,060 ("the '060 Patent") entitled "Internet System for Connecting Healthcare Providers and Patients."

C.      Plaintiff Health Grades, Inc. ("Health Grades") is a Delaware corporation with its principal place of business located in Denver, Colorado.

D.      The named inventors of the '060 Patent are John Neal, Scott Montroy and David G. Hicks.

E.      The provisional application was filed on February 8, 2006.

F.      The '060 Patent application was filed on August 29, 2006.

G.      The '060 Patent issued on July 6, 2010.

H.      Health Grades filed this action against MDx Medical, Inc. d/b/a Vitals.com on March 2, 2011.

I.      Defendant MDx Medical, Inc. ("MDx") is a Delaware corporation with its principal place of business located in Lyndhurst, New Jersey.

J.      This Court has personal jurisdiction over MDx because MDx solicits and makes contacts with citizens of the state of Colorado via MDx's interactive website, Vitals.com.

K.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

L.      Each party may use exhibits from the other party's exhibit list.

M.      Listing an exhibit on an exhibit list is not an admission of relevance, admissibility, or any other admission, and does not preclude a party from making any objection thereto; nor is either party waiving any objections to admissibility of any argument or evidence, regardless of whether the evidence is referenced herein.

### 5.  PENDING MOTIONS

A.     Health Grades' motion to partially exclude expert testimony by MDx's technical expert, Dr. Richard Cooper, filed on October 17, 2012 [Doc. # 334], re-filed October 22, 2012 [Doc. # 338];  MDx's Opposition was filed November 15, 2012 [Doc. # 385]; Health Grades' Reply was filed December 3, 2012.

B.     Health Grades' motion for partial summary judgment, filed November 2, 2012 [Doc. # 369]; MDx's Opposition was filed November 26, 2012 [Doc. # 406]; Health Grades' Reply was filed December 13, 2012 [Doc. # 442].

C.     Health Grades' motion to strike portions of MDx's response to Health Grades' motion for partial summary judgment was filed on December 13, 2012 [Doc. # 440]; MDx's Opposition was filed on January 4, 2013 [Doc. # 472]; Health Grades' Reply was filed on January 22, 2013 [Doc. # 491].

D.     MDx's second motion for partial summary judgment, filed May 8, 2012 [Doc. # 195]; Health Grades' Response was filed June 1, 2012 [Doc. # 201]; MDx's Reply was filed June 8, 2012 [Doc. # 207].

E.     MDx's motion to exclude expert testimony of Health Grades' damages expert, Mr. David Hall, filed November 2, 2012 [Doc. # 374]; Health Grades' Opposition was filed November 27, 2012 [Doc. # 411]; Health Grades' Errata Submission to Correct Mistakes in Docket # 411 and Docket # 411-3 was filed on December 5, 2012 [Doc. # 433]; MDx's Reply was filed on December 14, 2012 [Doc. # 448].

F.      MDx's motion to exclude expert testimony of Health Grades' technical expert, Dr. Philip Greenspun, filed October 25, 2012 [Doc. # 349]; Health Grades' Opposition was filed November 19, 2012 [Doc. # 392]; MDx's Reply was filed December 6, 2012 [Doc. # 436].

G.      MDx's motion for summary judgment of no willfulness was filed November 2, 2012 [Doc. # 370]; Health Grades' Opposition was filed November 26, 2012 [Doc. # 404]; MDx's Reply was filed December 13, 2012 [Doc. # 443].

H.      MDx's motion for summary judgment of non-infringement was filed November 2, 2012 [Doc. # 367]; Health Grades' Opposition was filed November 26, 2012 [Doc. # 405]; MDx's Reply was filed December 13, 2012 [Doc. # 444].

I.      MDx's motion for summary judgment re: lost profits and royalty rate was filed November 2, 2012 [Doc. # 372]; Health Grades' Opposition was filed November 27, 2012 [Doc. # 414]; MDx's Reply was filed December 14, 2012 [Doc. # 446].

J.      MDx's motion for sanctions re: prior art was filed December 4, 2012 [Doc. # 425]; Health Grades' filed its Opposition on January 7, 2013 [Doc. # 473]; MDx filed its Reply on January 25, 2013 [Doc. # 495].

K.      MDx's motion for summary judgment re: iTriage claims was filed January 22, 2013 [Doc. # 490]; Health Grades filed its Opposition on February 20, 2013 [Doc. # 524, 525]; MDx will file its Reply on or before March 11, 2013.

L.      Not yet filed:  MDx's motion for sanctions pursuant to Federal Rule of Civil Procedure 11 (to be served on Health Grades and will be filed within 21 days absent withdrawal of the iTriage claims).

M.      Not yet filed:  Health Grades' motion for leave to supplement its expert report on damages based upon entry of the Second Amended Complaint and updated financial information from MDx, and its expert report on infringement (and associated infringement contentions) based upon the Second Amended Complaint and new law (Akamai), and new, recent screen shots of the iTriage mobile and web-based applications and the vitals.com website.

N.      Not yet filed:  If necessary, MDx's motion to preclude use of discovery produced after the close of discovery.  The Parties agree that, rather than now substantively addressing these documents found on the Health Grades exhibit list, and to provide them with an opportunity to amicably resolve these issues, the documents will be withdrawn from the Health Grades list to the extent required to do so by the decision on this MDx motion.

O.      Not yet filed: Health Grades' motion to bifurcate trial on equitable conduct and have it tried to the Court after the jury trial.

P.      Not yet filed:  MDx's motion to supplement its expert reports, as contemplated in Section 8 (Discovery) herein.

Q.      Not yet filed:  If necessary, Health Grade's motion to preclude use of exhibits listed in MDx's exhibit list.  The Parties agree that, rather than now substantively addressing these documents found on the MDx exhibit list, and to provide them with an opportunity to amicably resolve these issues, the documents will be withdrawn from the MDx list to the extent required to do so by the decision on this Health Grades' motion.

# 6.  WITNESSES

A.      Non-Expert Witnesses for each party:

1.      Plaintiff's Non-Expert Witnesses who will be present at trial:

(a)     John Neal – Mr. Neal will be called to testify regarding Health Grades' business and operations, search engine optimization, the healthcare information market, the development of the method and system claimed in the '060 Patent, the prosecution of the '060 Patent, his actions relating to the prosecution of the '060 Patent, damages suffered by Health Grades as a result of MDx's infringement, and regarding his knowledge of MDx's business activities.

(b)     Allen Dodge – Mr. Dodge will be called to testify regarding Health Grades' business and operations, search engine optimization, Health Grades' financial information, the market for Health Grades' products and services, and damages suffered by Health Grades as a result of MDx's infringement.

(c)     Mitch Rothschild – Mr. Rothschild will be called to testify about the accused vitals.com website (all versions), the accused iTriage product (all versions), MDx's business and operations, knowledge of Health Grades, its website, its business, and its '060 patent (and related application), MDx's defenses to willful infringement, competition between Health Grades and MDx, competitors of Health Grades and MDx and others, the healthcare information market, and relationship, dealings, and contracts between MDx and Aetna.

(d)     Lawrence West – Mr. West will be called to testify regarding the www.vitals.com websites (all versions) and related technology, MDx's business and operations, knowledge of Health Grades, its website, its business, and its '060 patent (and related application), competition between Health Grades and MDx, and MDx's defenses to willful infringement.

(e)     Erika Boyer – Ms. Boyer will be called to testify regarding the www.vitals.com websites (all versions) and related technology as well as the database associated with these products. MDx's business and operations, knowledge of Health Grades, its website, its business, and its '060 patent (and related application), the healthcare information market, competition between Health Grades and MDx and others, and MDx's defenses to willful infringement.

(f)     If MDx's pending motion for summary judgment of non-infringement with regard to the amended complaint [Doc. # 490] is denied, Health Grades will present a witness (not yet identified due to the very recently added claim) to testify about the iTriage application.

2.     Plaintiff's Non-Expert Witnesses who may be present at trial:

(a)     Scott Montroy – Mr. Montroy may be called to testify regarding Health Grades' business, the development of the method and system claimed in the '060 Patent, and his actions relating to the prosecution of the '060 Patent.

(b)     David Hicks -  Mr. Hicks may be called to testify regarding Health Grades' business, the development of the method and system claimed in the '060 Patent, and his actions relating to the prosecution of the '060 Patent.

(c)      Jeff Cutler – Mr. Cutler may be called to testify regarding the www.vitals.com websites (all versions) and related technology, MDx's business and operations, knowledge of Health Grades, its website, its business, and its '060 patent (and related application), competition between Health Grades and MDx and others.

(d)      Jeffrey LaPointe – Mr. Pointe may be called to testify about the healthcare information market in 2004 and products/features that were available and not available at that time.

(e)      Any witness needed for impeachment, rebuttal or authentication.

(f)      Any witness identified by Defendant MDx Medical, Inc.

3.      Plaintiff's Non-Expert Witnesses whose testimony is expected to be presented by means of a deposition:

(a)      Larry West (if not present)

(b)      Mitch Rothschild (if not present)

(c)      Erika Boyer (if not present)

(d)      Jeff LaPointe (if not present)

(e)      Jeff Cutler (if not present)

4.      Defendant's Non-Expert Witnesses who will be present at trial:

(a)      Mitchel Rothschild – Mr. Rothschild will be called to testify regarding MDx's business and operations, the www.vitals.com website and technology, the healthcare information market, efforts to assure non-infringement of the '060 patent, and knowledge of Health Grades' activities.

(b)      John Neal – In addition to cross examination on topics raised by Health Grades, Mr. Neal will testify about the Health Grades prior art and what it all contained including all claim elements, the prosecution of the '060 patent, intent to deceive the patent office, and inequitable conduct.

(c)      David Hicks – In addition to cross examination on topics raised by Health Grades, Mr. Hicks will testify about the Health Grades prior art and what it all contained including all claim elements, the prosecution of the '060 patent, intent to deceive the patent office, and inequitable conduct.

(d)      Mr. Montroy (if Health Grades brings him to trial, otherwise by deposition testimony) – In addition to cross examination on topics raised by Health Grades, Mr. Montroy will testify about the Health Grades prior art and what it all contained including all claim elements, the prosecution of the '060 patent, intent to deceive the patent office, and inequitable conduct.

(e)      Mr. Dodge -  In addition to cross examination on topics raised by Health Grades, Mr. Dodge will be called to testify regarding Health Grades' business and operations, Health Grades' financial information, the market for Health Grades' products and services, alleged damages, and the Health Grades prior art activities and what it all contained including all claim elements.

5.      Defendant's Non-Expert Witnesses who may be present at trial:

(a)      Erika Boyer – Ms. Boyer may be called to testify regarding MDx's business and operations, and the www.vitals.com website and technology.

(b)     Lawrence West – Mr. West may be called to testify regarding the www.vitals.com website and technology and authentication of certain documents.

(c)     Jeffrey LaPointe – Mr. LaPointe may be called to testify regarding prior art activities, the healthcare information market, and authentication of certain documents.

(d)     Jeff Cutler – Mr. Cutler may be called to testify regarding MDx's business and operations, the www.vitals.com website.

(e)     Brian Blackman – Mr. Blackman may be called to testify regarding his actions relating to the '060 Patent.

(f)     In the event MDx's pending motion for summary judgment of non-infringement with regard to the amended complaint [Doc. # 490] is denied, MDx will present a witness (not yet identified due to the very recently added claim) to testify about the iTriage application.  The witness will depend, necessarily, on the scope of the action remaining after determination of the motion.

(g)     Any witness needed for impeachment, rebuttal or authentication.

(h)     Any witness identified by Plaintiff Health Grades Inc.

6.     Defendant's Non-Expert Witnesses whose testimony is expected to be presented by means of a deposition:

(a)  John Neal (if not present)

(b) Allen Dodge (if not present)

(c) Scott Montroy (if not present)

(d) David Hicks (if not present)

(e) Jeff LaPointe (if not present)

B.      Expert Witnesses for each party:

      1.      Plaintiff's Expert Witnesses who will be present at trial:

          (a)      David Hall – Mr. Hall performed damages analyses and will testify regarding the methodology, results and conclusions from the analyses.

          (b)      Philip Greenspun – Dr. Greenspun performed technical analyses regarding infringement and validity and inequitable conduct, as well as analyzed the report of Defendant's expert, Richard Cooper.  Dr. Greenspun will testify regarding the methodology, results and conclusions of his analyses set forth in his expert reports.

      2.      Plaintiff's Expert Witnesses who may be present at trial:

          N/A

      3.      Plaintiff's Expert Witnesses whose testimony is expected to be presented by means of a deposition:

          N/A

      4.      Defendant's Expert Witnesses who will be present at trial:

          (a)      Brian Napper – Mr. Napper analyzed the report of Plaintiff's expert Mr. David Hall and performed damages analyses.  Mr. Napper will testify regarding the methodology, results and conclusions of his analyses.

          (b)      Richard Cooper – Dr. Cooper performed technical analyses regarding non-infringement, invalidity, inequitable conduct, and acceptable substitutes, as well as analyzed the report of Mr. Greenspun.  Dr. Cooper will testify regarding the methodology, results and conclusions of his analyses.

5.      Defendant's Expert Witnesses who may be present at trial:

N/A

6.      Defendant's Expert Witnesses whose testimony is expected to be

presented by means of a deposition:

N/A

## 7.  EXHIBITS

A.      Exhibits

1.      Plaintiff's List of Trial Exhibits is attached hereto as Appendix A.

2.      Defendant's List of Trial Exhibits is attached hereto as Appendix B.

B.       Copies of listed exhibits must be provided to opposing counsel and any *pro se*

party no later than 30 days before trial.  The objections contemplated by Fed. R. Civ. P.

26(a)(3) shall be filed with the clerk and served by hand delivery or facsimile no later

than 14 days after the exhibits are provided.

## 8.  DISCOVERY

The Parties agree that limited supplements to expert reports, rebuttals, and

focused depositions of the experts are warranted.  There is a dispute as to the scope of

the infringement supplement.  The Parties agree to work together to resolve this issue.

If they cannot resolve it, then the Parties will file appropriate motions.

## 9.  SPECIAL ISSUES

MDx Special Issues

A.      MDx believes that certain infringement allegations set forth by Health

Grades in its claims and defenses section above are not currently in the Health Grades

infringement contentions, including (1) allegations relating to iTriage Android app, iTriage web-based web site, iTriage app running on a traditional computer, alleged use of additional information . . . such as licensure information by iTriage (p.16), (2) doctrine of equivalents arguments that iTriage infringes claim 8, and (3) alleged inducement of infringement by MDx from making a presentation to Aetna.

MDx conferred with Health Grades regarding these allegations.  For certain of these allegations, Health Grades intends to later file a motion to amend infringement contentions under patent local rule 3-6 to add them to the infringement contentions. These disputes may be resolved by that motion to amend.

MDx reserves all objections, including those related to requirements of patent local rule 3-6 for amending infringement contentions.  For any Health Grades infringement allegations herein that are not now or eventually in the Health Grades infringement contentions, MDx does not acquiesce to them and reserves the right to move for their exclusion.

Health Grades' Response:   Health Grades conferred with MDx counsel substantively regarding MDx's contentions that certain of Health Grades allegations in its statement of claims and defenses are unsupported in the record.  Pursuant to those conferrals, the Parties resolved almost all of the disputed issues.  Health Grades disagrees that the allegations referenced above by MDx are in any way inappropriate.

B.      MDx proposes the following two orders:

(1) Absent trial subpoenas, identified witnesses of one party need not be present at trial for examinations by the other party; provided however that their testimonies may be presented by deposition designations by the other party.

(2) Witnesses presented for the first time in one party's case-in-chief, if identified as a trial witness for the other party, may be examined on all identified issues while first testifying, in order to avoid the need for the witness to be recalled a second time.

Health Grades' Response:  Health Grades opposes entry of these two orders. As discussed with MDx, Health Grades intends to discuss MDx's production of witnesses at trial once a trial date is set. If the parties are unable to reach an agreement regarding production of witnesses at trial, they will raise the issue with the Court.

C.      MDx believes that additional claim constructions are needed on the following issues: (1) whether "capability" of performing the claim elements is sufficient to meet those elements, as has been alleged by Health Grades; (2) whether receipt of information from a healthcare provider or third party is enough to prove that those entities also "verified" that information; (3) whether use of third party data in creating the report requires more than use in creation of the underlying database.   Claim elements (1) and (2) may be resolved in connection with pending summary judgment motions.

Health Grades' Response: Health Grades disagrees. Issue No. 1 is not a matter of claim construction but would be more appropriately decided in connection with the jury instructions. In any event, this issue is currently pending before Judge Brimmer in connection with MDx's Motion for Summary Judgment of No Infringement [Doc. # 349]

and Health Grades' Response thereto [Doc. # 405]. Issue No. 2 was already decided in connection with the Markman Order. [Doc. # 138 at pp. 15 n.8 & 17]  Issue No. 3 was also already decided in connection with the Markman Order. [Doc. # 138 at pp. 20-21]

D.      MDx objects to Health Grades calling any witness from iTriage.  Health Grades stated to the Court that it required no further discovery in relation to its claims involving iTriage.

Health Grades' Response:  Calling witnesses for trial is not discovery.

E.      Because this Pretrial Order does more than recite claims and defenses, the parties confirm that they preserve all objections to evidence, regardless of whether the evidence is referenced in this Order.

Health Grades' Special Issues

F.      Since this is a jury trial, Health Grades requests that the trial be bifurcated to handle the equitable defense of inequitable conduct separately in a trial to the Court. If necessary, Health Grades will file a motion to bifurcate.

MDx Response:  MDx vigorously objects to this proposed bifurcation, as it is inconsistent with case law and implicates Seventh Amendment issues.  It is also raised too late at this stage.  The Court should take an advisory verdict from the jury on the inequitable conduct issue.

## 10.  SETTLEMENT

a.      Counsel for the parties met in person on August 30, 2012, in a formal mediation before an independent mediator, to discuss in good faith the settlement of the case.

b.      The participants in the formal mediation included counsel and party

representatives.

c.      The parties were promptly informed of all offers of settlement.

d.      Counsel for the parties do not intend to hold future settlement
conferences.

e.      It appears from the discussion by all counsel that there is little possibility

of settlement.

f.      Counsel for the parties considered ADR in accordance with

D.C.COLO.LCivR.16.6.

## 11.  OFFER OF JUDGMENT

Counsel and any *pro se* party acknowledge familiarity with the provision of Rule

68 (Offer of Judgment) of the Federal Rules of Civil Procedure.  Counsel have

discussed it with the clients against whom claims are made in this case.

## 12.  EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this

action and the trial, and may not be amended except by consent of the parties and

approval by the Court or by order of the Court to prevent manifest injustice.  The

pleadings will be deemed merged herein.  This Final Pretrial Order supersedes the

Scheduling Order.  In the event of ambiguity in any provision of this Final Pretrial Order,

reference may be made to the record of the pretrial conference to the extent reported

by stenographic notes and to the pleadings.

## 13.  TRIAL AND ESTIMATED TRIAL TIME; FURTHER
## TRIAL PREPARATION PROCEEDINGS

Trial is to a jury before the Honorable Philip A. Brimmer, United States District Judge.  The parties anticipate a seven-day jury trial.  The site of the trial is Courtroom A701, Alfred A. Arraj United States Courthouse, 901 19th St., Denver, Colorado.

DATED this _____ day of _____, 2013.

BY THE COURT

_____
United States Magistrate Judge

APPROVED:

s:/ Jesús M. Vázquez
_____
Jesús M. Vázquez, Jr., Esq.
Kris J. Kostolansky, Esq.
Gregory B. Kanan, Esq.
Rothgerber Johnson & Lyons LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202
Tel: (303) 623-9000
Fax: (303) 623-9222
Email: jvazquez@rothgerber.com
Email: kkosto@rothgerber.com
Email: gkanan@rothgerber.com

Attorneys for Plaintiff
Health Grades, Inc.

s:/ Scott D. Stimpson
_____
Scott D. Stimpson
Scott B. Murray
David C. Lee
Sills Cummis & Gross P.C.
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 643-7000
Fax: (212) 643-6500
E-mail:sstimpson@sillscummis.com
E-mail:smurray@sillscummis.com
E-mail:dlee@sillscummis.com

and

Terence Ridley, Atty. No. 15212
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
Tel:  (303) 244-1800
Fax:   (303) 244-1879
E-mail: ridley@wtotrial.com

Attorneys for Defendant
MDx Medical, Inc. d/b/a VITALS.COM

2004036538v1