# EXHIBIT A

(Redacted version of Dkt. # 525)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

**HEALTH GRADES, INC.'S OPPOSITION TO MDx MEDICAL, INC.'S MOTION FOR SUMMARY JUDGMENT OF NO INFRINGEMENT WITH REGARD TO AMENDED COMPLAINT AND ALLEGATIONS RELATING TO AETNA LIFE INSURANCE COMPANY**

---

Plaintiff Health Grades, Inc. ("Health Grades") opposes MDx Medical, Inc.'s Motion for Summary Judgment of No Infringement with Regard to Amended Complaint and Allegations Relating to Aetna Life Insurance Company [Dkt 490] (hereinafter referred to as the "Motion").

I.    **INTRODUCTION**

The claims of U.S. Patent No. 7,752,060 ("the '060 patent") require that three types of information be compiled (1. physician-verified; 2. patient-provided (i.e., patient ratings); and 3. third-party verified) and that this information be used to create a physician report that also includes comparison ratings of physicians. MDx compiles all three types of claimed information and uses this information to create infringing physician reports on its vitals.com website.

In March 2011, Health Grades filed this lawsuit asserting that MDx's database-backed website (vitals.com) directly infringes the '060 patent. In July 2011, Health Grades served MDx

1

with its infringement contentions explaining in detail how vitals.com infringes the '060 patent. In September 2011, MDx licensed its database ~~REDACTED~~ ~~REDACTED~~ to Aetna for use in Aetna's iTriage application ("iTriage"), which has a web-based version as well as mobile versions. iTriage has strikingly similar features and functionality to those of vitals.com. Although Health Grades served discovery seeking information and documents relating to MDx's database licenses, MDx actively resisted all of Health Grades' attempts to get this information. Thus, Health Grades did not discover MDx's license agreement with Aetna until Aetna publicly announced it in March 2012. Further, MDx did not produce a copy of the Aetna Agreement until June 6, 2012, almost a month *after* it was ordered to do so by Magistrate Judge Boland. On July 13, 2012, Health Grades filed a motion to amend its complaint to assert causes of action for indirect infringement against MDx based on its license to Aetna.[1] Magistrate Judge Boland granted the motion on January 11, 2013. (Dkt. 480.)

MDx now seeks summary judgment that there is no inducing or contributory infringement based on iTriage. However, MDx's summary judgment motion is a house of cards – it requires resolution of numerous disputed issues of fact that themselves rest on still more disputed issues of fact, several of which are at issue in MDx's three other pending motions for summary judgment. For example, MDx asks this Court to decide the following issues of fact on summary judgment:

- Whether iTriage literally meets the requirement of compiling patient ratings that are received from a web site that is managed by a company that provides a service for connecting potential patients with healthcare providers.

---

[1] Health Grades has withdrawn its cause of action for joint infringement in this case. *See* E-mail from K. Kostolansky to S. Stimpson dated January 30, 2013 (Ex. 16 hereto); Health Grades' Second Amended Complaint (Doc. # 514).

- If iTriage does not literally meet this requirement, whether iTriage's message to users instructing them to "visit vitals.com" to rate their doctor, which ratings will then be compiled and used by iTriage to create physician reports, infringes under the doctrine of equivalents.

- Whether MDx has received three or more of the claimed types of physician-verified information.

- Whether Aetna has received three or more of the claimed types of physician-verified information.

- Whether iTriage creates a physician report that contains comparison ratings of multiple physicians.

- Whether MDx intends to induce direct infringement by iTriage.

- Whether the data that MDx leases to Aetna is a staple item of commerce that has substantial non-infringing uses.

This Court should deny MDx's motion for summary judgment because these questions of fact and the others, addressed below, are material to the issue of indirect infringement and should be decided by a jury.

## II.    RESPONSE TO STATEMENT OF MATERIAL UNDISPUTED FACTS (hereinafter referred to as "RSUMF")

1.    <u>Disputed</u>. MDx misquotes[2] claim 15 of the '060 patent by twice using the definite article "the" instead of the indefinite article "a" as stated in claim 15. (*Compare* Motion at p. 3 *with* '060 patent, col. 22:9-34 (Dkt. 490-3).) By its motion dated Feb. 7, 2013 (Dkt. 509), MDx added a footnote[3] to ¶1, which contains seven additional statements, each of which is addressed

---

[2]    MDx acknowledges that it misquoted claim 15.  (Dkt. 509).

[3]    MDx's new footnote violates several provisions of this Court's Practice Standards for Civil Cases (June 2012). First, it contains numerous legal arguments in violation of §III(F)(3)(b)(vii). Second, it contains numerous statements within one paragraph in violation of §III(F)(3)(b)(i).

separately below.[4]

a) Disputed. Claim 15 is different from claim 1. Claim interpretation is a matter of law that should not be addressed in this section of the response. (Practice Standards, §III(F)(3)(b)(vii).) Health Grades addresses this argument in the appropriate section below.

b) Admitted that claim 15 states that the survey results are received from an on-line patient experience survey completed on a company Web site. The remainder of this statement relates to claim construction, and is addressed in the argument section below.

c) Admitted that the '060 patent uses the word "company" to reference a company that runs a service for connecting healthcare providers with potential patients.

d) Disputed. The phrase "the company Web site" in claim 15 (col. 22:37) refers back to "a company Web Site" at col. 22:35. Claim 15 further states that "the company Web site is managed by a company providing a service for connecting healthcare providers with potential patients." (*See* Demonstrative Ex. 20: Claim 1 v. Claim 15.)

e) Disputed. Health Grades did not state that the language of claim 19 (issued claim 15) that states "by *a* company providing *a* service" has the same meaning as the language from claim 1: "by *the* company providing *the* service"). (Dkt. 490-4 at pp. 24-25.)

f) Disputed. The cited argument did *not* state that claim 19 has the same scope as claim 1. Instead, it argued: "In addition, for at least reasons similar to those set forth above, Henley in view of Cook fail to teach or suggest each and every limitation of claim 19." (*Id.*) The "reasons" that claim 1 did not teach the combination of Henley and Cook did *not* relate to whether the same company was providing the claimed service and managing a website with a

---

[4]     In Ex. 19, Health Grades added annotations giving paragraph numbers (¶¶1(a)-1(g)) to the seven statements in MDx's new footnote.

patient experience survey. Rather, the reasons were: 1) Henley is related to on-line auctioning of medical services and fails to disclose the claimed element of creating a healthcare provider report using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, wherein the report includes comparison ratings of health care providers; and 2) Cook relates to enabling a patient to choose a healthcare provider who uses an electronic medical records and fails to cure deficiencies of Henley. (*Id.*)

   g) Disputed. *See* reasons addressed in ¶¶1(a)-1(f) above.

  2. Disputed. The above-cited claim language is not part of claim 15. *See supra.*

  3. Admitted.

  4. Admitted.

  5. Admitted that Aetna is a company that provides a service for connecting healthcare providers with potential patients (i.e., iTriage).

  6. Admitted.

  7. Admitted with the qualification that "received from the first healthcare provider" has been construed by this Court. (Markman Order at p. 24 (Dkt. 138).)

  8. Disputed. Health Grades has evidence to prove that physicians, or their agents, have provided (and Aetna has received) three or more of the types of the healthcare provider-verified information specified in claims 1 and 15 of the '060 patent. For example:

   a) iTriage sells "premier listings" that allow physicians to provide (and Aetna to receive) detailed information about his or her practice. (iTriage screenshot (Ex. 1).)

   b) iTriage allows physicians to edit their profiles. (iTriage screenshot (Ex. 2).)

   c) REDACTED

REDACTED

     d) REDACTED

     e) REDACTED

          Evidence of this includes, for example:

      (i) MDx admits that its current vitals.com database is capable of receiving the following information from a physician through the vitals.com website: specialty information, medical philosophy, gender, languages spoken, awards and honors received, and publications authored. (*See* MDx's Second Supplemental Responses to Health Grades' First Set of Requests for Admission at pp. 3-8 ("MDx Admissions") (Ex. 3).

      (ii) REDACTED

6



(iii) REDACTED

(iv) REDACTED

(v) REDACTED

(vi) REDACTED

(vii) REDACTED

f) REDACTED

9.    Disputed. The claims require: "healthcare provider-verified information about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider . . . ." ('060 patent, col. 22:19-28 (Dkt. 490-3).)

7

10. <u>Disputed</u>. Health Grades has substantial evidence to show that healthcare providers have "verified" three or more of the claimed data elements in iTriage, including without limitation, the information cited in response to paragraph 8 above.

11. <u>Disputed</u>. The claims require that the "the healthcare provider report on the first healthcare provider includes comparison ratings of health care providers . . . ." ('060 patent, col. 22:48-55 (Ex. C to the Motion) (Dkt. 490-3); Markman Order at p. 24 (Dkt. 138).)

12. <u>Disputed</u>. Claims 7-11 and 13 require: "wherein the search of the database produces a results list of one or more healthcare providers satisfying the search criteria, wherein the results list includes the first healthcare provider. ('060 patent, col. 21:41-22:8 (Dkt. 490-3).)

13. <u>Disputed</u>. Defendant proposed that the term "first healthcare provider" be construed to mean: "a report directed specifically to the 'first healthcare provider.'" (Markman Order at p. 12 (Dkt. 138).) This Court did not to adopt this definition. (*Id.* at p. 13.)

14. Admitted.

15. <u>Disputed</u>. Health Grades has evidence that iTriage infringes the "comparison ratings of healthcare providers" claim element as construed by the Court. (*See* Greenspun Report at ¶¶278-284 (Ex. 9); *see also* iTriage screenshot (HGISC000119) (Ex. 10) (orange circles added to show comparison ratings of first healthcare provider (e.g., Dr. Leopold) and other healthcare providers (e.g., Dr. Wegleitner and Dr. Adolf).)

16. Admitted.

17. Admitted.

18. REDACTED

REDACTED

19.    Disputed. Health Grades has evidence to show that MDx is liable for contributory

infringement regarding iTriage. For example:

    a) REDACTED

      (i) REDACTED

      (ii) REDACTED

    b) MDx had actual knowledge of the '060 patent when it licensed the Custom

Data Extract to Aetna as demonstrated by the following evidence:

      (i) Mitch Rothschild, CEO of MDx, was aware that the '060 patent issued at

least as of October 2010. (*See* E-mail from Larry West to Mitch Rothschild, Oct. 5, 2010

(MDX0019254) (Ex. 11).)

      (ii) Health Grades filed this lawsuit accusing MDx of infringing the '060

9

patent in March 2011. (Dkt. 1.)

(iii) On July 1, 2011, Health Grades served MDx with detailed contentions outlining how and why the MDx database and vitals.com system infringed the asserted claims of the '060 patent. (July 1, 2011 E-mail from Jesús Vázquez to Scott Stimpson (Ex. 12).)

c) MDx knew the Aetna Custom Data Extract was especially made or especially adapted for use in infringing the '060 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use as demonstrated by the following evidence:

(i) Mr. Rothschild signed Schedule No. 1. (Dkt. 486-1 at p. 5.)

(ii) Mr. Rothschild has looked at iTriage and has it loaded on his smartphone. (*See* Deposition of Mitchel Rothschild at 170:8-171:20 (Ex. 13).)

(iii) On January 5, 2011, Mr. Rothschild sent an e-mail outlining a "policy" for vitals.com to follow to avoid infringement of the '060 patent that stated, among other things, that "our display of 3rd party verified information does not include IRF [internship, residency, and fellowship information]." (Jan. 5, 2011 E-mail from Mitch Rothschild (Ex. 14).)

(iv) REDACTED

(v) MDx did not inform Aetna of its "policy" to avoid infringement of the '060 patent and iTriage does not comply with the statements in the Jan. 5, 2011 "policy" email. (*See* iTriage screenshots for Dr. Allen Cohn at p. 5 (IRF is displayed (green boxes) (Ex. 18).)

20. <u>Disputed.</u> REDACTED

2004065848_1

REDACTED

21.   <u>Disputed</u>. Health Grades has evidence to prove that MDx causes, urges, encourages, or aids the direct infringement by iTriage, including, for example, the evidence cited in RSUMF ¶¶18-19 *supra* and the following:

      a) In the Statement of Work, MDx agreed to do the following:

          (i) REDACTED

          (ii) REDACTED

          (iii) REDACTED

          (iv) REDACTED

          (v) REDACTED

          (vi) REDACTED

          (vii) MDx agreed to provide the following deliverables to Aetna: REDACTED

11

Case No. 1:11-cv-00520-PAB-BNB Document 521 Filed 02/20/13 USDC Colorado Page 13 of 31
Case 1:11-cv-00520-PAB-BNB Document 525 Filed 02/20/13 USDC Colorado Page 12 of 32
of 32

REDACTED

b) MDx provided Aetna with a presentation as to how MDx's accused vitals.com website functions. (*See* Proposal to Develop a Transparent, Accurate and Fair Tool to Find and Check Up on Doctors, MDX0070459-70477 (Ex. 15).

22 - 25.    Withdrawn claim.

## III.    STATEMENT OF ADDITIONAL DISPUTED FACTS (hereinafter referred to as "ADF")

1.    Whether iTriage's message to users instructing them to "visit vitals.com" to rate their doctor, in which ratings will then be compiled and used by iTriage to create physician reports, performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claims. (*See* Greenspun Report at ¶255 (Ex. 9).)

2.    Whether iTriage can create a report on a first healthcare provider that includes ratings for that particular provider and ratings of other healthcare providers. (*See* iTriage Screenshot (HGISC000119) (Ex. 10); Greenspun Report at ¶¶278-300 (Ex. 9).)

3.    Whether the screenshots cited in para. 2 above (and those like them) are part of a report on a particular healthcare provider. (*See* Greenspun Report at ¶¶260-300 (Ex. 9).)

4.    Whether iTriage can create a results list of healthcare providers satisfying the

2004065848_1

search criteria on the same page as a healthcare provider report. (*See Id.* at ¶¶168 & 260-300.)

5.      Whether the multiple healthcare providers reports displayed on the same page, where each is limited to a single provider and each contains comparison ratings of that particular provider, performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claims. (*See* Greenspun Report at ¶¶297-298 (Ex. 9).)

6.      Whether the healthcare provider report that includes multiple healthcare providers, performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claims. (*See* Greenspun Report at ¶299 (Ex. 9).)

7.      Whether a multiple page report of a particular healthcare provider performs substantially the same function, in substantially the same way, to achieve substantially the same result as a single page report on a particular provider. (*See Id.* at ¶¶169, 285-288, & 300 (Ex. 9).)

## IV.    ARGUMENT

### A.    DIRECT INFRINGEMENT BY iTRIAGE SUPPORTS THE CAUSES OF ACTION FOR INDIRECT INFRINGEMENT BY MDx

#### 1.    Summary of the Law of Direct Infringement

There are two types of indirect infringement: (i) active inducement; and (ii) contributory infringement. *See* 35 U.S.C. §§271(b)-(c). Both types require proof of direct infringement that occurs (at least in part) by someone other than the indirect infringer. *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1305 (Fed. Cir. Aug. 31, 2012) (*en banc*); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009). However, what is required to prove such "direct infringement" depends in part on whether the claim at issue is a system claim or a method claim. *Akamai*, 692 F.3d at 1322-1323. For system claims (like claim 15 of the '060 patent), direct infringement occurs in either of the following scenarios: (1) A single actor makes,

2004065848_1

uses, sells, offers for sale, or imports into the United States a system that has all of the elements of the claim; or (2) an actor puts the system as whole into use, even if that actor is not in possession of *all* of the system claim elements (e.g., a customer uses software on-line). *Centillion Data Sys., LLC. v. Quest Commc'ns Int'l, Inc.,* 631 F.3d 1279 (Fed. Cir. 2011). For system claims, either of two parties which separately possess parts of a claimed system will directly infringe if that party "put[s] the invention into service, i.e., control[s] the system as a whole and obtain[s] benefit from it." *Centillion,* 631 F.3d. at 1284.

For method claims (like claim 1 of the '060 patent), prior to *Akamai* the law required proof that a *single actor* directly infringed the claims (e.g., practiced all the method steps) to support liability for indirect infringement. *Akamai* eliminated this requirement and thereby made it easier to prove indirect infringement of method claims. Specifically, *Akamai* ruled:

- A defendant may be held liable for induced (indirect) infringement if the defendant has performed some of the steps of a claimed method and has induced other parties to commit the remaining steps of the claimed method; and

- A defendant may be held liable for induced (indirect) infringement if the defendant has induced other parties to collectively perform all the steps of the claimed method, but no single party has performed all of the steps itself.

*Akamai,* 692 F.3d at 1305.

There are two ways for Health Grades to prove the direct infringement required for indirect infringement: literally and under the doctrine of equivalents. Health Grades is asserting indirect infringement against MDx based on both.

To literally infringe a claim, the accused product or process must practice every limitation in the claim. *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed. Cir. 1996). However, a patentee may rely on either direct or circumstantial evidence

2004065848_1

to prove literal infringement. *Lucent*, 543 F.3d at 723. Applying the claims as construed by the Court to the accused product to determine whether there is literal infringement is a question of fact to be decided by a jury. *See, e.g., N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1344 (Fed. Cir. 2005).

Patent claims protect the patentee not only from those who produce devices falling within the literal patent claims, *but also* from "unscrupulous copyists" who "make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950). Thus, even if a product does not literally infringe a patent claim because it is missing one or more elements, the accused product may still infringe under the doctrine of equivalents *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29-30 (1997). Infringement under the doctrine of equivalents is a question of fact to be decided by a jury. *Conroy v. Reebok Int'l*, 14 F.3d 1570, 1577 (Fed. Cir. 1994).

### 2. iTriage Directly Infringes the Patient-Provided Information Element of the Asserted Claims

#### a. Claim 15 Does Not Require that the Patient Ratings Come From the Same Entity that Provides the Claimed System

MDx argues that the claimed patient ratings have to be obtained from the same website that provides the claimed physician information service. (Motion at 11.) Health Grades disputes this contention. (RSUMF at ¶¶1-2.) The '060 patent includes two independent claims: claim 1 is a method claim and claim 15 is a system claim. Claims 1 and 15 have different language that impacts the infringement analysis for iTriage. Notably, MDx glossed over this fact in its initial

15

2004065848_1

filing of its motion for summary judgment and now attempts to address this significant difference in a footnote. (RSUMF at ¶¶1-2, *supra*.)

Courts presume that different language in different claims means different things. *See, e.g., Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368-69 (Fed. Cir. 2005). As shown in Exhibit 20, there are distinct differences in two of the elements (blue and orange boxes) of claims 1 and 15. Claim 1 requires that "a company providing a service" receive the request for information about the first healthcare provider (blue box) *AND* "**the** company providing **the** service" also manage the Web site that receives ratings from the patient experience survey (orange box). (Ex. 20.) In contrast, the request for information element of claim 15 (blue box) does not mention "a company" at all. Rather, this limitation is first introduced much later in the claim and in connection only with the patient-provided information element (orange box). This difference is significant – it means that claim 15 will read on a system where one entity (e.g., Aetna) receives the request for information about the first healthcare provider and another company (e.g., MDx) manages a Web site that receives patient ratings from an on-line survey.

The claim interpretation rules requiring the use of antecedent basis support this claim interpretation. *See, e.g., Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) (holding that "a discharge rate" in an earlier limitation refers to the same discharge rate as "the discharge rate" in a later limitation); *Tuna Processors, Inc. v. Haw. Int'l Seafood, Inc.*, 327 Fed. Appx. 204, 210 (Fed. Cir. 2009) ("the introduction of a new element is accomplished through the use of an indefinite article, not through the use of a definite article.") Claim 1 uses definite articles (highlighted red in Ex. 20) to make clear that the same company mentioned earlier in the request for information element also manages the Web site with the

2004065848_1

patient experience survey that is required in the patient-provided information element. In

contrast, claim 15 uses indefinite articles (highlighted green in Ex. 20) to demonstrate that a

company Web site and a service for connecting patients are new limitations not required by any

other claim elements. MDx argues that claim 15 must have the same meaning as claim 1 because

the same terms must be interpreted consistently between different claims. This rule does not

apply because the terms are not the same. Claim 1 states "**the** company managing **the** service"

whereas claim 15 states "**a** company providing **a** service." The claim interpretation at issue

relates to the meaning of a definite article ("the") and an indefinite article ("a"), which are

different terms and should be construed differently.

MDx argues that the '060 patent consistently uses the word "company" to reference the

company running the service. (Motion at p. 11.) Again, the dispute is not about what "company"

means. Both claims 1 and 15 state that the claimed "company" must provide an information

service for connecting providers with patients and manage a Web site that includes the claimed

patient experience survey. The dispute relates to whether the _same_ company must provide a

system as claimed (e.g., that receives a request for information about the first healthcare provider

and compiles patient ratings) _and_ manage a website that with the patient experience survey. This

is required by the ordinary meaning of the term "the" in claim 1 and _not_ required by the ordinary

meaning the term "a" in claim 15.

       b.     iTriage Literally Meets the Patient-Provided Information Element
            of Claim 15

iTriage literally meets every limitation of the patient-provided information element of

claim 15.  iTriage compiles patient ratings from past and current patients of physicians. This is

not disputed. (RSUMF at ¶4.) The iTriage patient ratings are received from an on-line patient

17

experience survey completed on an MDx Web site by the one or more past or current patients of the first healthcare provider. This is not disputed. (*Id.*) The MDx Web site is managed by MDx. This is not disputed. (*Id.* ¶4) MDx provides a service for connecting healthcare providers with the potential patients. This is not disputed. (MDx Admissions at p. 2 (Ex. 3).) Thus, there is sufficient evidence to show direct infringement of this claim element by iTriage and vitals.com, which is sufficient to preclude summary judgment of no indirect infringement against MDx.

c.    iTriage Directly Infringes the Compiling Patient-Provided<br>Information Step of Claim 1

Claim 1 is a method claim. Under the new rule of *Akamai*, Health Grades does not need to prove that a single entity (e.g., Aetna) performs all of the steps of the claimed method *in connection with a cause of action for indirect infringement*. Rather, for direct infringement (to support indirect infringement) it is sufficient for Health Grades to prove that MDx performed some of the steps of the claimed method and that Aetna performed the remaining steps of the claimed method. *Akamai,* 692 F.3d at 1305. More specifically, it is sufficient to show that MDx performs the method step of compiling the patient-provided information (which MDx admits it does) and to show that Aetna performs other steps of the method. At a minimum, there is a disputed issue of fact regarding whether the combination of Aetna's actions and MDx's actions meet all of the limitations of the compiling patient-provided information step of claim 1, which precludes the grant of summary judgment on this issue.

Moreover, even if claim 1 did require that the same company receive the request for information and manage the web site with the patient survey, iTriage meets this element under the doctrine of equivalents. REDACTED                                    (RSUMF at ¶¶4, 8(d), 18.) MDx obtains these ratings from a patient survey that is completed on a web site

18

managed by MDx. (*Id.* at ¶4.) MDx also provides a service for connecting patients with physicians. (MDx Admissions at p. 2 (Ex. 3).) Although iTriage does not directly have a patient experience survey, it encourages the patients to visit vitals.com to rate a doctor; these ratings are then posted in iTriage. (RSUMF at ¶¶4, 21; ADF at ¶1.) Providing a link to a patient experience survey hosted by a company that has a contractual relationship with the company providing the information service performs substantially the same function, in substantially the same way, to achieve substantially the same result, where the function is to provide users with patient ratings of physicians and to allow users to rate their own physicians which can then be reviewed by other users. In this case, the "way" is to provide an on-line experience survey and report the results of these surveys, and the "result" is a comprehensive physician report with patient ratings and the ability to generate additional ratings by additional patients. (ADF at ¶1.) At a minimum, this is a disputed issue of fact that should preclude summary judgment.

MDx argues that infringement under the doctrine of equivalents is barred by prosecution history estoppel because the phrase: "wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by a company providing a service for connecting healthcare providers with the potential patients" was added during prosecution for reasons related to patentability. (Motion at 12; RSUMF at ¶16.) However, this fact is not determinative. In this case, prosecution history estoppel does not apply because the claim amendment was tangential to the equivalent being used by iTriage. *Insituform Technologies, Inc. v. Cat Contracting, Inc.*, 385

F.3d 1360, 1370 (Fed. Cir. 2004) (holding that prosecution history estoppel did not limit infringement under the doctrine of equivalents because the narrowing amendment made during prosecution did not relate to the equivalent that was being accused of infringement).[5] That is, the arguments raised during prosecution related to healthcare provider report claim element – they did not relate to whose website provided the online patient experience survey, which is the nature of the equivalent being used by iTriage. (RSUMF at ¶1(f).)

MDx also argues that the doctrine of equivalents is barred by the "all elements" rule, which precludes infringement under the doctrine of equivalents if it would "vitiate *an entire claim limitation*." *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005) (emphasis added). But "a claim is not vitiated *merely* because it does not literally exist in the accused product -- such an interpretation of the 'all elements' rule would swallow the doctrine of equivalents entirely." *Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1212 (Fed. Cir. 2007)); *see also Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1018-1019 (Fed. Cir. 2006) ("[A]ny analysis of infringement under the doctrine of equivalents *necessarily* deals with subject matter that is 'beyond,' 'ignored' by, and not included in the literal scope of a claim." (emphasis added).) Here, Health Grades is not reading out any limitation of the claims – there are still patient ratings, which ratings are received from an on-line experience survey, which survey is completed on a company website, which website is managed by a company that provides a service for connecting patients with physicians. Although there may be a literal

---

[5]     Several other courts have found that infringement under the doctrine of equivalents was available despite narrowing amendments during prosecution because the reason for the amendment was tangential to the equivalent in question.  *See, e.g., Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 849 (Fed. Cir. 2006); *Centennial Molding, LLC v. Carlson*, 401 F. Supp.2d 985, 994 (D. Neb. 2005); *Microstrategy, Inc. v. Business Objects, S.A.*, 331 F. Supp.2d 432, 444 (E.D. Va. 2004), *aff'd*, 429 F.3d 1344 (Fed. Cir. 2005).

difference in that they survey is completed on a website managed by a licensor of Aetna, versus

Aetna itself, any analysis of doctrine of equivalents assumes that something is literally missing.

The "all elements" rule should not be so broadly applied as to eliminate the doctrine of

equivalents all together. *See, e.g., Ethicon*, 149 F.3d at 1317 (holding the "all elements rule"

should not be so broadly applied that it would reduce the doctrine of equivalents to "nothing

more than a repeated analysis of literal infringement.")

In sum, Health Grades has evidence (and admissions from MDx) to support its arguments

that there is direct infringement of the patient-provided information element of claim 1 (and its

associated dependent claims) even though MDx manages the website that hosts the patient

experience survey. MDx's motion for summary judgment should be denied.

**3.     iTriage Directly Infringes the Received from a Physician Limitation of the Asserted Claims**

MDx argues that there is no evidence that iTriage includes information that is "received

from the first healthcare provider." This is a disputed issue of fact based on many underlying

disputed issues of fact. The legal requirements for proving infringement of method claims differ

from the requirements for proving infringement of system claims. The disputed issues of fact and

the legal requirements are addressed separately below.

a.     Disputed Issues of Fact Exist Regarding Whether Aetna and/or
         MDx Have Received the Claimed Information from Physicians

Claim 1 is a method claim that requires, in part, the step of accessing healthcare provider-

verified information that includes three or more of: specialty information, gender, awards,

honors, professional appointments, professional memberships, and languages spoken. As

discussed above, Health Grades may show direct infringement of a method claim in support of

21

indirect infringement by showing that the method steps are collectively performed by MDx and Aetna. *Akamai,* 692 F.3d at 1305.

       REDACTED

                       Additionally, there is evidence that Aetna itself practices this step by allowing physicians to directly edit data within iTriage. (*Id.* at ¶¶8(a)-8(c).) As such, there is more than enough evidence to demonstrate disputed issues of fact showing MDx and/or Aetna have received the claimed information from physicians. [6] MDx's motion for summary judgment should be denied.

         b.    For the System Claims, Health Grades Need Prove Only that iTriage is Reasonably Capable of Accessing Healthcare Provider-Verified Information that is Received from a Healthcare Provider

       Claim 15 is directed to a system. When a system claim is drawn to a capability, the patent owner need prove *only* that the accused system is reasonably capable of operating as claimed. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010)[7]. Moreover, the

---

[6]    *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) (relying on system capability as circumstantial evidence of direct infringement); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) (holding direct infringement may be established by circumstantial evidence of extensive sales by defendant of a product capable of practicing the patented method and distribution by defendant of an instruction manual teaching the patented method);

[7]    *See also Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (holding an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation.); *Soverain Software LLC v. Newegg Inc.*, 2010 U.S. Dist. LEXIS 89268, 17-18 (E.D. Tex. Aug. 11, 2010) *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 378

mere fact that a product or process may be used in a manner that does not infringe a patent is not a defense to a claim of infringement if the product or process is also capable of an infringing use.

Asserted claim 15 of the '060 patent recites a system comprising a computer processor and memory with a series of instructions that *are capable* of causing the computer to perform various tasks *when executed*. Claim 15, in part, recites: "[a]n online-information system for connecting health-care providers with potential patients, the system comprising: at least one computer processor; and memory coupled with and readable by the at least one computer processer and comprising a series of instructions that, **when executed** by the at least one computer processor, **cause** the at least one computer processor to" perform a series of recited tasks. (('060 Patent at col. 22:14-17 (emphasis added).) Like *Finjan*, the system of claim 15 does not require actual performance of the recited tasks; rather claim 15 merely requires the system be capable of causing the computer processor to perform the recited tasks "when executed." The "when executed" language is part of the introductory preamble of claim 15 and accordingly applies to every limitation of every element of claim 15.

In other words, the system must be capable of accessing information that has been received from a healthcare provider. MDx has admitted that its system has this capability. (MDx Admissions at pp. 3-8.) Thus, Health Grades has evidence that MDx's database meets this claim element.                                           REDACTED

(RSUMF

at ¶¶8(a)-8(f).) Thus, iTriage directly infringes claim 15 even though MDx directly received the

---

(E.D. Tex. 2009) ("[T]o infringe an apparatus claim, it is not necessary for an accused device actually to be performing the functions specified by the claim. All that is required is that the device have the claimed structure, and that this structure in the device have the capability of functioning as described by the claim.").

2004065848_1

information from the physicians. *Centillion*, 631 F.3d at 1284.

Even if this Court finds that the "received from" language is not directed to a capability, the capabilities of MDx's website would still be circumstantial evidence that the system operates as claimed for the same reasons discussed above. MDx's motion should be denied.

**4.     iTriage Directly Infringes the Physician-Verified Information Elements of the Asserted Claims**

MDx argues that the claims require verification "separate" from receipt of the information from the physician and that "verification" means "obtaining proof" of the accuracy of the information. (MDx Motion at p. 10.) This Court already rejected both of these arguments in the Markman Order. (Markman Order at p. 15 n.8 (emphasis added) (citations omitted) (Dkt. 138).) In sum, although this Court declined to construe the term "verified," it did find that one way to satisfy the "healthcare provider-verified information" element is to have a physician provide the information to information service provider (e.g., MDx).

As described above, Health Grades has compelling evidence to show that physicians have provided information to MDx and Aetna relating to three or more of the claimed fields. (RSUMF at ¶¶8(e)-8(f).) Thus, this information is "verified" by the physicians. At the very least, this is a disputed issue of fact that should preclude summary judgment.

**5.     iTriage Directly Infringes the Comparison Ratings Limitation**

MDx contends iTriage cannot satisfy, either literally or equivalently, the claimed requirement of a "report on a first healthcare provider" that includes comparison ratings of the first healthcare provider and other providers "thus permitting comparison of the "first healthcare provider" with other potential healthcare providers." These are disputed issues of fact that should be decided by a jury. (RSUMF at ¶15; ADF at ¶¶2-7.)

MDx argues that the iTriage pages that have ratings of multiple doctors cannot be part of the claimed "healthcare provider report" because they are the claimed "results list." It is the job of a jury to compare the claim elements to the accused product to determine infringement. There is a variety of information on these pages and a reasonable jury could conclude that some of it satisfies the "results list" limitation (e.g., each name listed matches the search query) and some of it meets the "report" limitation (e.g., specialty information, awards, star ratings). This is a disputed issue of fact that should be decided by a jury. (ADF at ¶¶2-4.)

MDx argues that iTriage pages that have ratings of multiple doctors cannot satisfy the "report on the first healthcare provider" limitation because they are not limited to a single, particular healthcare provider. Even if true, MDx infringes under the doctrine of equivalents for two alternative reasons. First, a report on multiple, particular doctors that includes comparison ratings for each doctor, is equivalent to a report on a single, particular doctor that includes comparison ratings of that doctor and other doctors. This is a disputed issue of fact that should be decided by a jury. (ADF at ¶6.) Second, displaying multiple reports on the same page, where each report is on a single, particular doctor and each report contains comparison ratings of that doctor, is equivalent to a report on a single, particular doctor that includes comparison ratings of that doctor and other doctors. This is a disputed issue of fact that should be decided by a jury. (*Id.* at ¶5.)

MDx argues that iTriage pages that have ratings of multiple doctors cannot be part of the "healthcare provider report" because the claimed report begins on the page that is linked to the healthcare provider's name *and not before*. In contrast, Health Grades argues that the list of search results contains the first page of the healthcare report and the pages linked to the doctor

name are additional pages of the same report, in the same manner that pages 1, 2, and 3 of a book are still part of the book.  Indeed, the list of physicians that match a search query contains detailed information about each doctor including for example, their specialty, star rating, faculty appointments, and gender. A simple click on the physician brings up the next page of his or her report. (ADF at ¶7; Greenspun Report at ¶¶285-288 (Ex. 9.) This is a disputed fact that should be decided by the jury.

Moreover, the web-based version of iTriage (Ex. 10) shows the first and second pages of the physician reports side-by-side in an accordion view, making it even clearer that these screenshots satisfy both the report and search results claim elements. In any event, this is a disputed issue of fact that should be decided by a jury. (RSUMF at ¶15.)

Furthermore, the claims do not literally require that the entire healthcare provider report be displayed on a single page. But even if they did, creating a multiple page report, wherein the additional pages are accessed via link buttons, is equivalent to creating a single page healthcare provider report, wherein additional information is accessed via a scroll bar. This too is a disputed issue of fact that should be decided by a jury. (ADF at ¶7.)

### B.    INDUCED INFRINGEMENT BY MDx

Active inducement occurs when one encourages, aides, or otherwise causes another entity to directly infringe a patent. *Akamai*, 692 F.3d at 1308; *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009). A potential inducer must actually be aware of the patent and intend for their actions to result in direct infringement. *Id.* Here, MDx learned that the '060 patent had issued in October 2010. (RSUMF at ¶19.) Nevertheless, MDx seeks summary judgment of no inducement arguing that it did not intend to cause Aetna's direct infringement.

Health Grades needs to prove intent to induce by a preponderance of the evidence and

may meet this burden through circumstantial evidence. *Broadcom Corp. v. Qualcomm, Inc.*, 543

F.3d 683, 699-700 (Fed. Cir. 2008); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 2012 U.S. Dist. LEXIS

142102 (N.D. Cal. Sept. 28, 2012). Intent to induce infringement is generally a question of fact

that should be decided by a jury. *See, e.g., Civix-DDI, LLC v. Hotels.Com LP*, No. 05 C 6869,

2012 U.S. Dist. LEXIS 156441, 13-14 (N.D. Ill. Nov. 1, 2012); *Halo Elecs., Inc. v. Pulse Eng'g,*

*Inc.*, 810 F. Supp. 2d 1173 (D. Nev. 2011).

Moreover, intent to induce infringement does *not* require that MDx directed or controlled

Aetna's conduct, instead, it is enough for Health Grades to show that MDx caused, urged,

encouraged, or aided Aetna's infringing conduct and that the Aetna carried out this conduct.

*Akamai*, 692 F.3d at 1308. Courts have held that knowledge of the patent combined with

instructions to customers on how to infringe can demonstrate specific intent to induce

infringement. *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851-52 (Fed. Cir. 2010);

*Mformation Techs., v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 842 (N.D. Cal. 2011)

(denying summary judgment of no inducement and finding an issue of triable fact when

defendants had knowledge of the patent before the suit and had also instructed customers with

regard to use of the accused product).

Health Grades has proffered more than enough evidence for a reasonable jury to find that

MDx intended to induce Aetna's direct infringement. (RSUMF at ¶¶19, 21.) In October of 2011,

REDACTED

(RSUMF at ¶21.)

iTriage is an on-line information system that is strikingly similar to MDx's accused on-line

information system. (*See, e.g.,* RSUMF at ¶8.)                     REDACTED

                                                                                 (RSUMF at ¶19.)

MDx has a "policy" it supposedly follows to avoid infringement, but did not communicate this

policy to Aetna. (RSUMF at ¶19(c)(v).) Aetna does not follow this policy. (*Id.*)

        By providing its accused data and performing the other tasks outlined in the Aetna

Agreement, MDx is actively inducing Aetna to infringe the '060 patent.

REDACTED

                                                                . (*Id.* at ¶21.)  MDx also provided

Aetna with a demonstration as to how MDx's accused vitals.com website functions. (*Id.*)

        At a minimum, there are disputed issues of fact concerning whether MDx intends to

2004065848_1

induce direct infringement by iTriage. (RSUMF at ¶¶19(a)-(c), 21(a)-(b).) As such, MDx's

motion for summary judgment of no inducement should be denied.

### C.     <u>CONTRIBUTORY INFRINGEMENT BY MDx</u>

Contributory infringement occurs when a seller provides a part or component that, while

not itself infringing of any patent, has a particular use as part of some other machine or

composition that is covered by a patent. *Lucent*, 580 F.3d at 1320. To be liable for contributory

infringement, the part or component must *not* be a "staple article or commodity of commerce

suitable for substantial non-infringing use." 35 U.S.C. §271(c).

MDx argues that summary judgment of no contributory infringement should be granted

because the data it leases to Aetna has substantial non-infringing uses. This is a disputed issue of

material fact. REDACTED



(RSUMF at ¶19.) Nevertheless,

MD argues: "The data provided by MDx is only that – ***data***. It is simply information about

healthcare providers." (Motion at 12 (emphasis in original).) Not true. REDACTED


(RSUMF at ¶¶18, 19.) MDx's motion for summary judgment of no

contributory infringement should be denied.

### V.     <u>CONCLUSION</u>

In sum, this Court should deny MDx's motion for summary judgment of no indirect

2004065848_1

infringement relating to Aetna's iTriage because these causes of action involve numerous

disputed issues of material fact that should be decided by the jury.

Dated: February 20, 2013                     ROTHGERBER JOHNSON & LYONS LLP


                                             s/ Jesús M. Vazquez
                                             Gregory B. Kanan, Esq.
                                             Kris J. Kostolansky, Esq.
                                             Jesús M. Vázquez, Jr., Esq.
                                             1200 17th Street, Suite 3000
                                             Denver, Colorado 80202
                                             Tel: (303) 623-9000
                                             Fax: (303) 623-9222
                                             Email: gkanan@rothgerber.com
                                                     kkosto@rothgerber.com
                                                     jvazquez@rothgerber.com

                                             *Attorneys for Plaintiff Health Grades, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2013, I electronically filed the foregoing **HEALTH GRADES, INC.'S OPPOSITION TO MDx MEDICAL, INC.'S MOTION FOR SUMMARY JUDGMENT OF NO INFRINGEMENT WITH REGARD TO AMENDED COMPLAINT AND ALLEGATIONS RELATING TO AETNA LIFE INSURANCE COMPANY** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott David Stimpson
Scott Murray
David Chunyi Lee
Sills Cummis & Gross P.C. – New York
30 Rockefeller Plaza
New York, NY 10112
Email: sstimpson@sillscummis.com
Email: smurray@sillscummis.com
Email: dlee@sillscummis.com

Terence M. Ridley
Wheeler Trigg O'Donnell, LLP
1801 California Street, #3600
Denver, CO 80202-2617
Email: ridley@wtotrial.com

_s/ Jesús M. Vazquez_
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
Rothgerber Johnson & Lyons, LLP
1200 17th Street, Suite 3000
Denver, Colorado 80202-5855
Tel:     (303) 623-9000
Facsimile: (303) 623-9222
Email: gkanan@rothgerber.com
        kkostolansky@rothgerber.com
        jvazquez@rothgerber.com

_Attorneys for Plaintiff Health Grades, Inc._

2004065848_1