Civil Action No. 11-CV-00520-PAB-BNB

**HEALTH GRADES, INC.'S SUPPLEMENT TO ITS OPPOSITION TO MDX MEDICAL, INC.'S MOTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56 FOR SUMMARY JUDGMENT OF NO WILLFULNESS**

---

**Exhibit B**

**Deposition of Philip Braginsky dated February 14, 2013**

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

**1**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF COLORADO

Civil Action No. 1-CV-00520-PAB-BNB

------------------------------x

HEALTH GRADES, INC.,

     Plaintiff,

     -against-

MDX MEDICAL, INC., d/b/a

VITALS.COM,

     Defendant.

------------------------------x

February 14, 2013

8:40 a.m.

CONFIDENTIAL - ATTORNEYS'EYES ONLY

VIDEOTAPED DEPOSITION of PHILIP BRAGINSKY, taken by Plaintiff, pursuant to Notice, under Federal R.C.P. 20, at the offices of Sills, Cumis & Gross P.C., 30 Rockefeller Center, New York, New York, before Amy Klein Campion, a Shorthand Reporter and Notary Public within and for the State of New York.

---

**2**

A P P E A R A N C E S :

ROTHGERBER JOHNSON & LYONS LLP
Attorneys for Plaintiff
    One Tabor Center, Suite 3000
    1200 Seventeenth Street
    Denver, Colorado   80202-5855
BY:  GREGORY B. KANAN, ESQ.
    gkanan@rothgerber.com
    303.623.9000

SILLS CUMMIS & GROSS P.C.
Attorneys for Defendant
    30 Rockefeller Plaza
    New York, New York   10112
BY:  SCOTT D. STIMPSON, ESQ.
    sstimpson@sillscummis.com
    212.643.7000

ALSO PRESENT:

    WILLIAM PACE, Video Operator
    Merrill Court Reporting
    Chicago Office

---

**3**

---------------- I N D E X-------------------
WITNESS        EXAMINATION        PAGE
P. BRAGINSKY   MR. KANAN          7, 178
               MR. STIMPSON       166, 190
-----------REQUESTS/DIRECTIONS-------------
DIRECTIONS:  180
REQUESTS:  188
TO BE FURNISHED: Basis for redaction in
Exhibit 11.
-----------------EXHIBITS-----------------
BRAGINSKY EXHIBIT      FOR IDENTIFICATION
Braginsky Exhibit 1 marked for    23
identification, letter dated
December 15, 2009 on the
letterhead of Merchant & Gould
with production numbers MDX
0011861 through 862.
Braginsky Exhibit 2 marked for    26
identification, chain of e-mails
with production numbers MDX
0104788 through 4789.
Braginsky Exhibit 3 marked for    38
identification, e-mail chain
with production numbers MDX
0104795 through 4797.
Braginsky Exhibit 4 marked for    46
identification, e-mail with
attachment, with production
numbers MDX 0104798 through
4800.

---

**4**

Braginsky Exhibit 5 marked for   49
identification, e-mail string,
with production numbers
MDX0104805 through 4807.
Braginsky Exhibit 6 marked for   53
identification, letter on the
letterhead of Sill Cummis &
Gross dated January 25, 2010,
with production numbers MDX
0011863 through 864.
Braginsky Exhibit 7 marked for   58
identification, e-mail chain,
with production numbers MDX
0104812 through 4814.
Braginsky Exhibit 8 marked for   67
identification, seven-page
document, with production
numbers MDX 0104112 through
4118.
Braginsky Exhibit 9 marked for   112
identification, e-mail from
Mitchel Rothschild dated
December 31, 2010, with
production number MDX 0100719.

1 (Pages 1 to 4)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

5

```
 1   Braginsky Exhibit 10 marked for   115
 2   identification, e-mail with
 3   attachment, with production
 4   numbers MDX 0100720 through
 5   0722.
 6   Braginsky Exhibit 11 marked for   121
 7   identification, e-mail chain,
 8   with production number
 9   MDX010411.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

6

```
08:40:35   1        THE VIDEO OPERATOR:  Stand by.
08:40:45   2    This is the video operator
08:40:47   3   speaking William Pace of Merrill Court
08:40:50   4   Reporting of Chicago, Illinois.
08:40:52   5        Today is February 14, 2013.  The
08:40:54   6   time is 8:40 a.m., and we're at the
08:40:58   7   offices of Sills Cummis & Gross, 30
08:41:01   8   Rockefeller Plaza, New York, New York,
08:41:03   9   to take the videotape deposition of
08:41:08  10   Philip Braginsky in the matter Health
08:41:08  11   Grades, Incorporated versus MDx
08:41:08  12   Medical, Incorporated, doing business
08:41:15  13   as Vitals.com, with the Civil Action
08:41:16  14   No. 11-CV-00520.  And is in the United
08:41:24  15   States District Court for the District
08:41:25  16   of Colorado.
08:41:26  17        Counsel please introduce
08:41:27  18   yourselves and state whom you
08:41:29  19   represent.
08:41:30  20        MR. KANAN:  Greg Kanan for the
08:41:33  21   Plaintiff, Health Grades.
08:41:35  22        MR. STIMPSON:  Scott Stimpson
08:41:36  23   for MDx, and I'm also representing the
08:41:38  24   witness.
08:41:39  25        THE VIDEO OPERATOR:  The court
```

---

7

```
08:41:39   1   reporter is Amy Klein Campion for
08:41:42   2   Merrill Court Reporting from Chicago
08:41:44   3   and you may swear in the witness.
08:41:44   4        P H I L I P   B R A G I N S K Y,
08:42:00   5   doing business at Sills Cummis & Gross
08:42:03   6   Rockefeller Center, 30 Rockefeller Center,
           7   having been first duly sworn by the Notary
           8   Public (Amy Klein Campion), was examined
           9   and testified as follows:
          10   EXAMINATION BY
          11   MR. KANAN:
08:42:11  12     Q.   Good morning, Mr. Braginsky.
08:42:13  13     A.   Good morning.
08:42:14  14     Q.   We met just a moment ago.
08:42:16  15        My name is Greg Kanan, and I
08:42:17  16   represent Health Grades, you understand?
08:42:17  17     A.   Yes.
08:42:21  18     Q.   And we're here for a deposition
08:42:21  19   in a patent infringement involving Health
08:42:26  20   Grades and MDx.
08:42:28  21     A.   Yes.
08:42:28  22     Q.   And you're familiar with MDx?
08:42:30  23     A.   Yes.
08:42:31  24     Q.   They are a client of the firm --
08:42:31  25     A.   Yes.
```

---

8

```
08:42:39   1     Q.   -- your firm?
08:42:39   2     A.   Yes.
08:42:39   3     Q.   You are, sir, a partner in the
08:42:39   4   firm of Sills Cummis & Gross; is that
08:42:39   5   right?
08:42:39   6     A.   Yes.
08:42:39   7     Q.   The same firm as Mr. Stimpson
08:42:39   8   who represents MDx in this litigation,
08:42:43   9   correct?
08:42:43  10     A.   Yes.
08:42:44  11     Q.   I would like to ask you -- tell
08:42:45  12   me.  Back up for a second.
08:42:47  13        Mr. Braginsky, have you been
08:42:49  14   deposed before?
08:42:49  15     A.   I have not.
08:42:50  16     Q.   Okay.  Do you do litigation?
08:42:52  17     A.   I have done, yes, in my career.
08:42:55  18     Q.   So you're familiar generally
08:42:56  19   with the deposition process?
08:42:58  20     A.   I am.
08:43:00  21     Q.   Yes?
08:43:01  22     A.   Yes, I am.
08:43:02  23     Q.   One rule of which is, please
08:43:04  24   always answer my question.  Don't nod and
08:43:06  25   so forth, so the reporter can take down
```

**Merrill Corporation - Chicago**

800-733-6885                                                            www.merrillcorp.com/law

9

08:43:10 1 your answers. Okay?
08:43:12 2     A.   Why he.
08:43:12 3     Q.   I'll try not to interrupt you
08:43:14 4 during your answer and you can try to let
08:43:17 5 me finish my question before you start
08:43:20 6 with answer. You understand?
08:43:22 7     A.   Yes.
08:43:22 8     Q.   If there's a question you don't
08:43:24 9 understand, just say so and I'll reask it.
08:43:28 10    A.   Okay.
08:43:28 11    Q.   I would like to ask you a few
08:43:30 12 questions about your background,
08:43:32 13 Mr. Braginsky.
08:43:33 14        Tell me where you attended law
08:43:36 15 school.
08:43:36 16    A.   Cardozo School of law.
08:43:38 17    Q.   What year did you graduate?
08:43:39 18    A.   Oh, I don't recall.
08:43:40 19    Q.   Oh, sure you do.
08:43:42 20    A.   It's about 21 years ago,
08:43:44 21 something like that.
08:43:45 22    Q.   So sometime in the early
08:43:47 23 nineties?
08:43:47 24    A.   Yes, the early nineties.
08:43:49 25    Q.   And what did you do after you

10

08:43:51 1 graduated from law school?
08:43:52 2     A.   I founded a tech transfer --
08:43:57 3 actually, while I was in law school I
08:43:59 4 founded a tech transfer company. I ran
08:44:05 5 that as president and general counsel for
08:44:07 6 about six years.
08:44:11 7     Q.   All right. And then what did
08:44:13 8 you do?
08:44:13 9     A.   After that I went into private
08:44:18 10 practice at several law firms.
08:44:23 11    Q.   Okay. Tell me which firms and
08:44:25 12 for how long.
08:44:26 13    A.   I was at Schulman & Associates
08:44:29 14 for about three-and-a-half years, I went
08:44:36 15 to Scully, Scott, Murphy & Presser for
08:44:39 16 three-and-a-half or four years before
08:44:42 17 joining Sills Cummis.
08:44:43 18    Q.   So what year was it you joined
08:44:45 19 this firm?
08:44:46 20    A.   I believe it was 2 -- 2005?
08:44:59 21 2005.
08:45:00 22    Q.   All right. And what has been
08:45:03 23 the focus of your practice since you've
08:45:05 24 been at the Sills Cummis firm?
08:45:08 25    A.   Intellectual property.

11

08:45:09 1     Q.   What type of work do you do in
08:45:11 2 particular?
08:45:11 3     A.   I do a lot of client counseling,
08:45:18 4 strategic advice. We -- I do patent
08:45:23 5 prosecution and trademark prosecution. I
08:45:27 6 supervise prosecuting attorneys here.
08:45:30 7     Q.   You're a member of the patent
08:45:32 8 bar?
08:45:32 9     A.   I am.
08:45:33 10    Q.   When did you pass the patent
08:45:35 11 bar?
08:45:35 12    A.   Also in the early nineties.
08:45:39 13    Q.   Okay. And then you mentioned
08:45:41 14 that you do some litigation; is that
08:45:42 15 right?
08:45:42 16    A.   I have, yeah.
08:45:44 17    Q.   On how many occasions?
08:45:46 18    A.   I've been involved in several
08:45:52 19 litigations. None that have gone to trial
08:46:04 20 over the years, I don't know, dozens.
08:46:06 21    Q.   Including patent infringement
08:46:08 22 litigation?
08:46:09 23    A.   Including patent infringement
08:46:12 24 litigation, yes.
08:46:12 25    Q.   I've placed before you what

12

08:46:15 1 previously was marked as Exhibit 8 in the
08:46:20 2 deposition of Mr. Rothschild.
08:46:22 3        So we're going to refer to it as
08:46:27 4 Rothschild Exhibit 8, okay?
08:46:29 5     A.   Yes.
08:46:29 6     Q.   This is an opinion letter that
08:46:31 7 you wrote in January of 2008, correct?
08:46:35 8     A.   Yes.
08:46:35 9     Q.   A so-called
08:46:38 10 freedom-to-operate-opinion letter, right?
08:46:40 11    A.   Yes.
08:46:40 12    Q.   And you wrote this opinion
08:46:42 13 letter, right?
08:46:42 14    A.   Yes.
08:46:43 15    Q.   And on how many occasions prior
08:46:45 16 to your issuing this opinion letter,
08:46:49 17 Rothschild 8, have you issued freedom to
08:46:53 18 operate opinion letters?
08:46:55 19    A.   Also, you know, many times. I
08:47:03 20 don't know how many, but many times.
08:47:13 21    Q.   Now, this opinion letter is --
08:47:18 22 well, you say at the beginning of the
08:47:20 23 opinion letter, which is written to
08:47:23 24 Mr. Rothschild, "This is pursuant to your
08:47:26 25 request."

3 (Pages 9 to 12)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

13

08:47:27  1    Do you see that?
08:47:27  2    A.   Yes.
08:47:28  3    Q.   That was a request
08:47:29  4  Mr. Rothschild made of you to issue this
08:47:31  5  opinion letter to him?
08:47:33  6    A.   Yes. It was part of our
08:47:36  7  discussion when Mitch came to us.
08:47:41  8    Q.   What was the purpose of this
08:47:43  9  opinion letter?
08:47:44  10    A.   The purpose was -- initially
08:47:50  11  Mitch came to us and asked us to analyze
08:48:01  12  what Vitals.com was doing relative to the
08:48:08  13  patent -- the '060 Patent, and to let him
08:48:20  14  know whether there was any possibility of
08:48:24  15  infringement of those claims, and what his
08:48:31  16  exposure was and -- and risk there.
08:48:34  17    Q.   And what is the reason that you
08:48:37  18  issued him a formal opinion letter?
08:48:39  19    A.   So after we discussed that, and
08:48:41  20  he had received a -- sort of a cease and
08:48:48  21  desist letter from -- from your client,
08:48:52  22  they were concerned about getting involved
08:48:58  23  in -- in a litigation.
08:49:00  24    So, as I said, they wanted to
08:49:02  25  ensure that there was no possibility of --

14

08:49:05  1  of any infringement. And then we said, in
08:49:09  2  addition, let's also provide an opinion
08:49:12  3  letter that you might need for any future
08:49:15  4  use.
08:49:16  5    Q.   And what might that need be?
08:49:19  6    A.   The need could be for -- if
08:49:22  7  there was a claim of willful infringement.
08:49:27  8  And to just ensure that, you know, he had
08:49:31  9  documentation that we'd investigated this
08:49:36  10  and determined that there was no
08:49:38  11  infringement.
08:49:38  12    Q.   And did you discuss with
08:49:40  13  Mr. Rothschild the use of such an opinion
08:49:42  14  in a context of such a claim of willful
08:49:46  15  infringement?
08:49:48  16    A.   I don't recall exactly, but I
08:49:50  17  would think we did.
08:49:52  18    Q.   I notice at the top of the
08:49:54  19  letter you sent here -- Rothschild Exhibit
08:49:58  20  8, it's labeled "Privileged and
08:50:01  21  Confidential, Attorney-Client and Attorney
08:50:03  22  Work Product."
08:50:04  23    Do you see that?
08:50:05  24    A.   Yes.
08:50:05  25    Q.   So this opinion letter was

15

08:50:07  1  issued in anticipation of litigation,
08:50:09  2  correct?
08:50:10  3    A.   I wouldn't say that.
08:50:11  4    Actually, we were really hoping
08:50:15  5  that we'd be able to avoid the litigation.
08:50:18  6  And we had discussed that with -- with
08:50:21  7  Mitch.
08:50:22  8    So I wouldn't say it was done in
08:50:27  9  anticipation of it. But being lawyers,
08:50:30  10  we're a cautious bunch.
08:50:32  11    Q.   Isn't that what the attorney
08:50:34  12  work product doctrine involves,
08:50:37  13  Mr. Braginsky, a work -- attorney work
08:50:40  14  done in anticipation?
08:50:41  15    A.   It could --
08:50:42  16    MR. STIMPSON: Just let me make
08:50:43  17  my objection. Objection, that calls
08:50:43  18  for expert testimony.
08:50:45  19    Q.   Go ahead, Mr. Braginsky.
08:50:47  20    A.   It could be.
08:50:48  21    Q.   Well, that's what the common law
08:50:50  22  doctrine of attorney work product is; it's
08:50:53  23  in anticipation of litigation, correct?
08:50:57  24    MR. STIMPSON: Same objection.
08:50:59  25    A.   Yes, as I understand it.

16

08:51:00  1    Q.   And that's what you labeled this
08:51:02  2  opinion letter at the top, "Attorney Work
08:51:06  3  Product"; correct?
08:51:08  4    A.   In part, yes.
08:51:10  5    Q.   Now, did you work -- well, when
08:51:13  6  did you start working on this MDx matter?
08:51:15  7    The opinion we have here is
08:51:18  8  issued January of 2011.
08:51:20  9    A.   Mm-hmm.
08:51:21  10    Q.   And I've got some documents.
08:51:23  11    Mr. Braginsky, I don't want to
08:51:24  12  trick you here. I've got some e-mails and
08:51:28  13  notes that go back in time.
08:51:28  14    A.   I believe it was --
08:51:29  15    Q.   What's your recollection of when
08:51:30  16  you started working on the matter?
08:51:32  17    A.   I believe it was in December of
08:51:33  18  2010.
08:51:36  19    Q.   And what's your recollection of
08:51:38  20  what that work was in December of 2010?
08:51:41  21  Or what you did?
08:51:43  22    A.   My recollection was that we
08:51:48  23  analyzed what Vitals.com was doing, both
08:51:56  24  its front end and back end, we analyzed
08:52:02  25  and reviewed the patent, the '060 Patent,

4 (Pages 13 to 16)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

17

```
08:52:10  1   and made a determination of -- that
08:52:19  2   Vitals.com was not infringing the claims.
08:52:21  3       Q.  Do you recall that you
08:52:22  4   previously had advised Mr. Rothschild that
08:52:25  5   you thought the patent wouldn't issue?
08:52:28  6       A.  No.  I think what -- what we
08:52:31  7   said was we felt it wouldn't -- it was
08:52:34  8   unlikely to issue as it was drafted.
08:52:39  9       Q.  And that you would follow it and
08:52:40 10   see what happened in terms of amendments?
08:52:44 11       A.  I don't recall saying that.
08:52:47 12       Q.  Okay.  Who is Mr. Mark
08:52:54 13   Rosenberg?
08:52:54 14       A.  He was a colleague, an attorney
08:52:58 15   that worked here at Sills Cummis.
08:53:00 16       Q.  Did you work with him on the
08:53:05 17   MDx/Health Grades matter?
08:53:07 18       A.  Somewhat.  I think he had some
08:53:08 19   involvement in it.
08:53:10 20       Q.  Did he have involvement in
08:53:12 21   analyzing the question of infringement
08:53:15 22   that you then gave the opinion about?
08:53:17 23       A.  I don't recall his exact role.
08:53:19 24   We probably discussed it.  But I don't
08:53:23 25   recall his exact role.
```

18

```
08:53:24  1       Q.  Is Mr. Rosenberg still with the
08:53:27  2   firm?
08:53:28  3       A.  He's not.
08:53:28  4       Q.  Do you recall whether he was
08:53:29  5   involved in the litigation that ensued?
08:53:35  6       A.  No.  I don't -- I don't believe
08:53:39  7   so.  Once the litigation ensued, I -- I
08:53:45  8   don't think he was involved.  I don't
08:53:47  9   recall.
08:53:48 10       Q.  And how about Timothy Heaton,
08:53:51 11   who is he?
08:53:51 12       A.  Tim Heaton was also an attorney
08:53:55 13   that worked here at Sills Cummis at that
08:53:58 14   time.
08:53:58 15       Q.  Did he work with you in the
08:54:01 16   issuance of your freedom to operate
08:54:04 17   opinion?
08:54:04 18       A.  He did.
08:54:05 19       Q.  Is he still with the firm?
08:54:06 20       A.  He is not.
08:54:07 21       Q.  When did he leave?
08:54:08 22       A.  I -- I don't recall.
08:54:09 23       Q.  What was his role in the work
08:54:12 24   that you did for the client?
08:54:15 25       A.  He helped me review the
```

19

```
08:54:19  1   prosecution history of the '060 Patent and
08:54:27  2   assisted in the analysis of
08:54:31  3   non-infringement.
08:54:34  4       Q.  At the time you worked on this
08:54:36  5   in December 2010, and then in January
08:54:40  6   2011, when you issued your opinion, did
08:54:42  7   you have any discussions with
08:54:43  8   Mr. Rothschild about getting an opinion
08:54:45  9   from a different firm than Sills Cummis?
08:54:50 10       A.  I don't recall that, no.
08:54:52 11       Q.  When did you learn that a patent
08:54:56 12   infringement case had been filed?
08:54:57 13       A.  I don't -- I don't recall.
08:55:00 14       Q.  And how did you learn about it?
08:55:01 15       A.  I don't recall.  I -- I believe
08:55:04 16   it was, you know, very shortly after
08:55:07 17   the -- it was filed.  I don't recall when
08:55:12 18   that was.
08:55:12 19       Q.  Have you had conversations or
08:55:17 20   discussions with Mr. Stimpson about the
08:55:20 21   litigation?
08:55:21 22       A.  Not since the litigation began.
08:55:22 23       Q.  You've never talked to him about
08:55:24 24   it?
08:55:24 25       A.  No.
```

20

```
08:55:24  1       Q.  Did you talk to him about your
08:55:27  2   deposition today?
08:55:27  3       A.  Yes, we have.
08:55:28  4       Q.  When did you talk to him?
08:55:29  5       A.  Yesterday.
08:55:32  6       Q.  What did you do yesterday to
08:55:33  7   prepare for the deposition?
08:55:35  8       A.  Well, we discussed my opinion --
08:55:39  9       MR. STIMPSON:  Excuse me.
08:55:41 10   Excuse me.  This may call for work
08:55:43 11   product.  You can tell him that we
08:55:45 12   talked.  But I don't want you
08:55:46 13   disclosing any documents we addressed
08:55:48 14   or anything specific, okay?
08:55:50 15       THE WITNESS:  Mm-hmm.
08:55:51 16       A.  Yeah.  We discussed the
08:55:54 17   deposition and prepared for that.
08:55:57 18       MR. KANAN:  So I'm not sure I'm
08:56:00 19   understanding your objection, Scott.
08:56:02 20       Are you going to instruct him
08:56:04 21   not to answer about what was either
08:56:05 22   discussed or reviewed at your
08:56:07 23   deposition preparation session
08:56:09 24   yesterday?
08:56:10 25       MR. STIMPSON:  Yes, it's work
```

5 (Pages 17 to 20)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

21

08:56:12  1    product.
08:56:14  2        MR. KANAN:  He's an expert
08:56:15  3    witness in the case.
08:56:16  4        THE WITNESS:  No, I'm not.
08:56:18  5        MR. STIMPSON:  He's not.
08:56:20  6        MR. KANAN:  His opinion is not
08:56:21  7    an expect opinion?
08:56:25  8        MR. STIMPSON:  He is not an
08:56:25  9    expert witness.  He's a fact witness.
08:56:27  10       If he was an expert witness, you
08:56:29  11   would have an expert report.
08:56:29  12       MR. KANAN:  You're claiming
08:56:31  13   privilege over the discussions and
08:56:32  14   preparation that occurred yesterday?
08:56:34  15       MR. STIMPSON:  No.  I'm claiming
08:56:36  16   work product.
08:56:37  17       MR. KANAN:  You're claiming
08:56:40  18   privilege on the basis of work
08:56:41  19   product.
08:56:42  20       MR. STIMPSON:  Well, privilege
08:56:43  21   is -- work product is a type of
08:56:45  22   privilege, but work product.  Not
08:56:47  23   attorney-client privilege.
08:56:50  24       MR. KANAN:  You're going to
08:56:50  25   instruct him that he can't answer

22

08:56:50  1    questions about what was discussed or
08:56:54  2    what documents were reviewed yesterday
08:56:54  3    on grounds of attorney work product?
08:56:56  4        MR. STIMPSON:  Yes.
08:56:57  5        MR. KANAN:  Okay.
08:57:00  6        Well, I don't agree with your
08:57:02  7    analysis.  I think this man is acting
08:57:05  8    as an expert with respect to the
08:57:07  9    opinion letter.  And I think I'm
08:57:09  10   entitled to inquire about everything
08:57:11  11   he's discussed.  But I understand your
08:57:14  12   objection.
08:57:14  13       MR. STIMPSON:  Definitely not an
08:57:16  14   expert.  I've done this many times.
08:57:19  15   He's definitely not an expert.
08:57:22  16       MR. KANAN:  We'll deal with that
08:57:25  17   another time.
08:57:26  18       MR. STIMPSON:  Yes, I know.
08:57:28  19       MR. KANAN:  You never did send
08:57:30  20   us that Colorado case that said we
08:57:34  21   couldn't depose Mr. Braginsky.  I
08:57:37  22   don't know what happened to that.
08:57:37  23       MR. STIMPSON:  Well, we're here
08:57:37  24   so you got him.
08:57:37  25       MR. KANAN:  You told us there

23

08:57:37  1    was a case.
08:57:39  2        MR. STIMPSON:  Yeah, I may have
08:57:42  3    been wrong about that one.
08:57:43  4        MR. KANAN:  Yeah, I guess you
08:57:44  5    were.
08:57:45  6        Okay.  Well, let's mark this
08:57:47  7    exhibit as I guess Braginsky 1.
08:57:51  8        (Braginsky Exhibit 1 marked for
08:57:51  9    identification, letter dated December
08:57:51  10   15, 2009 on the letterhead of Merchant
08:57:51  11   & Gould with production numbers MDX
08:58:22  12   0011861 through 862.)
08:58:22  13       Q.  Mr. Braginsky, I placed before
08:58:26  14   you what's been marked as Exhibit 1,
08:58:29  15   Braginsky Exhibit 1.
08:58:31  16       Have you seen this document
08:58:33  17   before?
08:58:34  18       A.  I don't recall.
08:58:35  19       Q.  I'm sorry, you don't recall?
08:58:38  20       A.  I don't recall.
08:58:39  21       Q.  Were you aware that a letter had
08:58:40  22   been sent by counsel for Health Grades to
08:58:46  23   MDx in December 2009, a so-called
08:58:50  24   cease-and-desist letter?
08:58:51  25       A.  I was aware that MDx had

24

08:58:55  1    received a letter, yes.
08:58:57  2        Q.  And do you recall how you became
08:58:58  3    aware of that?
08:58:59  4        A.  I don't.
08:59:00  5        Q.  Did you have discussions in late
08:59:03  6    2009, or after this letter was issued,
08:59:07  7    with Mr. Rosenberg about such a letter?
08:59:11  8        A.  I don't recall.
08:59:17  9        Q.  Or how about with Mr. Heaton?
08:59:19  10       A.  I don't recall.
08:59:21  11       Q.  Was MDx a client of the Sills
08:59:29  12   Cummis firm in 2009?
08:59:30  13       A.  I don't know.
08:59:32  14       Q.  What about in 2010?
08:59:36  15       A.  I -- I am unsure when they
08:59:42  16   became a client.  Not my client.
08:59:44  17       Q.  Whose client are they?
08:59:46  18       A.  Jeff Wasserman.
08:59:50  19       Q.  And is he also an attorney here
08:59:52  20   at the Sills Cummis firm?
08:59:56  21       A.  He is.
08:59:57  22       Q.  A partner in the firm?
08:59:58  23       A.  He is.
08:59:59  24       Q.  And, I'm sorry, I might have
09:00:00  25   asked you this, Mr. Braginsky.  When

6 (Pages 21 to 24)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

25

```
09:00:04   1    you -- was Mr. Rosenberg a partner at the
09:00:07   2    firm in 2010?
09:00:07   3         A.   No, he was not.
09:00:08   4         Q.   And Mr. Heaton?
09:00:09   5         A.   No.
09:00:10   6         Q.   So they were both associates in
09:00:13   7    the firm?
09:00:13   8         A.   I think Mr. Rosenberg was
09:00:15   9    counsel.  I don't recall.
09:00:17   10        Q.   Of counsel?
09:00:17   11        A.   Yes.
09:00:20   12        Q.   And Mr. Stimpson's a partner,
09:00:22   13   correct?
09:00:22   14        A.   Yes.
09:00:23   15        Q.   You're a partner?
09:00:24   16        A.   Yes.
09:00:24   17        Q.   Mr. Wasserman's a partner?
09:00:27   18        A.   He is now.
09:00:29   19        Q.   Okay.
09:00:29   20        A.   I don't believe he was at -- at
09:00:33   21   that time.
09:00:33   22        Q.   In 2010?
09:00:35   23        A.   Correct.
09:00:36   24        Q.   Okay.  In any event, you don't
09:00:38   25   recall seeing Exhibit 1 or discussing it
```

26

```
09:00:42   1    with anyone; is that correct?
09:00:46   2         (The witness reads document.)
09:00:49   3         A.   That's correct.  I don't recall.
09:00:51   4         Q.   Do you recall that there was a
09:00:53   5    response to this letter sent by
09:00:56   6    Mr. Rosenberg on behalf of MDx?
09:00:59   7         A.   No.
09:01:35   8         MR. KANAN:  Mark this next
09:01:38   9    exhibit.
09:01:38   10        (Braginsky Exhibit 2 marked for
09:01:38   11   identification, chain of e-mails with
09:01:38   12   production numbers MDX 0104788 through
09:01:38   13   4789.)
09:01:38   14        Q.   All right, Mr. Braginsky.  I'm
09:01:41   15   handing you what's been marked as Exhibit
09:01:43   16   2.  And why don't you just take a minute
09:01:46   17   and review the e-mails that are shown on
09:01:47   18   this exhibit.
09:01:48   19        There are several.
09:01:50   20        (The witness reads document.)
09:02:31   21        A.   Okay.
09:02:32   22        Q.   Have you had a chance to review
09:02:34   23   the exhibit?
09:02:34   24        A.   I have.
09:02:35   25        Q.   Now, it appears, at the bottom
```

27

```
09:02:38   1    of the first page of Exhibit 2, that there
09:02:41   2    is an e-mail you sent to Mr. Rothschild in
09:02:43   3    January of 2010.  Correct?
09:02:46   4         A.   Yes.
09:02:47   5         Q.   So -- and it's from you,
09:02:49   6    correct?
09:02:52   7         A.   Yes.
09:02:53   8         Q.   And it's regarding the Health
09:02:56   9    Grades patent application; is that right?
09:02:59   10   And the question of infringement?
09:03:00   11        (The witness reads document.)
09:03:02   12        A.   Yes.
09:03:03   13        Q.   So by January of 2010, you were
09:03:06   14   working on this matter, correct?
09:03:08   15        A.   Yes.
09:03:09   16        Q.   And do you recall how you became
09:03:11   17   engaged in this?
09:03:14   18        A.   No.  As I said, I don't
09:03:18   19   remember.
09:03:18   20        Q.   Did Mr. Wasserman come to you to
09:03:20   21   tell you that Mr. Rothschild needed
09:03:23   22   assistance in this matter?
09:03:25   23        A.   I don't recall.  That sounds
09:03:27   24   likely, but I don't recall.
09:03:32   25        Q.   It says at the beginning of the
```

28

```
09:03:34   1    e-mail you wrote Mr. Rothschild on January
09:03:38   2    6th, 2010, "I've begun to review the
09:03:42   3    letter you received from Health Grades'
09:03:45   4    attorneys."
09:03:45   5         Do you see that?
09:03:46   6         A.   Yes.
09:03:46   7         Q.   Do you think that's a reference
09:03:48   8    to the cease and desist letter I showed
09:03:50   9    you a minute ago?
09:03:51   10        A.   It seems likely, yes.
09:03:53   11        Q.   So it seems likely that you had
09:03:55   12   reviewed the letter at this time; is that
09:03:56   13   right?
09:03:57   14        A.   Yes.
09:03:57   15        Q.   Okay.  You went on to say in
09:04:02   16   this e-mail to Mr. Rothschild that, "If
09:04:05   17   the application does eventually grant in a
09:04:08   18   form substantially identical to its
09:04:10   19   current form, you may be liable for
09:04:14   20   damages during the pendency period equal
09:04:16   21   to a reasonable royalty."
09:04:17   22        Do you see that?
09:04:19   23        A.   I do.
09:04:19   24        Q.   Did you have any discussions
09:04:20   25   with Mr. Rothschild about that fact around
```

7 (Pages 25 to 28)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

29

```
09:04:23  1    the time of this e-mail?
09:04:25  2        A.  I don't recall.
09:04:33  3        Q.  And then you said in the second
09:04:35  4    paragraph, "I need to finish my evaluation
09:04:38  5    of the application in light of the Office
09:04:41  6    Action rejecting the claims and in light
09:04:44  7    of the patent references you have sent
09:04:47  8    before I can provide you with a strategy
09:04:50  9    for moving ahead."
09:04:51 10        Do you see that?
09:04:52 11        A.  Yes.
09:04:53 12        Q.  Was that what you understood you
09:04:55 13    were doing was providing Mr. Rothschild a
09:04:58 14    strategy for moving ahead?
09:05:00 15        A.  In broad strokes, yes.
09:05:02 16        Q.  You were engaged as MDx's
09:05:06 17    attorney to help them with a strategy for
09:05:08 18    dealing with this patent application,
09:05:10 19    correct?
09:05:10 20        A.  Yes.
09:05:16 21        Q.  Now, you referenced, "in light
09:05:17 22    of the patent references you have sent,"
09:05:21 23    do you see that?
09:05:22 24        A.  Yes.
09:05:22 25        Q.  This is in that sentence I read
```

---

30

```
09:05:24  1    you at the bottom of the first page of
09:05:26  2    Exhibit 2.
09:05:27  3        A.  Yes.
09:05:27  4        Q.  What were those patent
09:05:29  5    references Mr. Rothschild sent?
09:05:31  6        A.  I don't recall.
09:05:32  7        Q.  Well, do you recall generally
09:05:33  8    what it was?
09:05:35  9        A.  Hmmm, no.
09:05:36 10        Q.  Did he send you something
09:05:38 11    regarding what might be called "prior
09:05:44 12    art"?
09:05:46 13        A.  I don't recall.
09:05:48 14        Q.  You don't recall anything about
09:05:50 15    this?
09:05:51 16        A.  No.  I don't recall the patent
09:05:54 17    references that he sent to me.
09:05:56 18        Q.  Well, generally, do you recall
09:05:58 19    what they were?
09:06:00 20        A.  No.  I don't recall receiving
09:06:05 21    patent references from him.
09:06:06 22        Q.  Did you do any research on
09:06:07 23    preexisting patents that might be
09:06:10 24    characterized as prior art?
09:06:12 25        A.  I -- I don't recall doing any
```

---

31

```
09:06:18  1    searching on that.
09:06:27  2        Q.  And then Mr. Rothschild
09:06:31  3    responded to you, saying, "This is pretty
09:06:34  4    good news.  Can we talk in the a.m.?  I am
09:06:36  5    pretty free."
09:06:37  6        And you respond -- and this is
09:06:39  7    shown at the top of Exhibit 2 -- "I have a
09:06:42  8    couple of things on the calendar, but
09:06:43  9    we'll try to reach you in between."
09:06:45 10        Do you see that?
09:06:46 11        A.  I do.
09:06:47 12        Q.  Did you speak with him about
09:06:48 13    this time, January -- early January 2010?
09:06:51 14        A.  I don't recall.
09:06:53 15        Q.  Do you recall any discussions
09:06:54 16    you had with him?
09:06:55 17        A.  Not at that time.  No, I don't.
09:06:57 18        Q.  Did you make notes of your
09:06:59 19    conversations with Mr. Rothschild?
09:07:02 20        A.  I don't recall.
09:07:06 21        Q.  Do you typically take notes of
09:07:08 22    conversations you have with clients
09:07:10 23    regarding matters?
09:07:11 24        A.  Hmmm, sometimes I do, sometimes
09:07:15 25    I don't.  It depends.
```

---

32

```
09:07:16  1        Q.  Have you looked for notes in
09:07:18  2    connection with this MDx matter?
09:07:20  3        A.  I have, yes.
09:07:21  4        MR. KANAN:  And so,
09:07:23  5    Mr. Stimpson, whatever notes exist
09:07:25  6    have been provided to us; is that
09:07:27  7    correct?
09:07:28  8        MR. STIMPSON:  I don't remember
09:07:28  9    what the process was, but whatever he
09:07:31 10    had we looked through, and whatever
09:07:33 11    was needed to be produced was
09:07:35 12    produced, yes.
09:07:40 13        MR. KANAN:  Have there been
09:07:41 14    notes of Mr. Braginsky's that have
09:07:44 15    been withheld on grounds of
09:07:46 16    privileged?
09:07:47 17        MR. STIMPSON:  I don't know.
09:07:47 18    Many Months ago you got a privileged
09:07:49 19    log.  If so, they'd be on there.
09:07:53 20        MR. KANAN:  So there might be
09:07:55 21    notes?
09:07:56 22        MR. STIMPSON:  I don't know.  I
09:07:57 23    mean, and there might not be.  I don't
09:07:58 24    think so.  If they're on the
09:07:59 25    privileged log, then technically they
```

8 (Pages 29 to 32)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

33

```
09:08:02  1    could be, yeah.
09:08:04  2         MR. KANAN:  Okay.
09:08:05  3    BY MR. KANAN:
09:08:05  4         Q.   Now, when you told
09:08:07  5    Mr. Rothschild that if the application
09:08:13  6    grants us is a form substantially
09:08:15  7    identical to its current form you might be
09:08:17  8    liable for damages, what did you mean by
09:08:19  9    that Mr. Mr. Braginsky?
09:08:25  10        A.   That -- if the application
09:08:28  11   grants in substantially the identical
09:08:31  12   form, once he's been notified of the
09:08:35  13   existence of this application, that there
09:08:42  14   is a risk that -- if you're found to
09:08:47  15   infringe the patent, a claim in the
09:08:50  16   patent, once the patent grants, that you
09:08:54  17   can also be liable for a reasonable
09:08:57  18   royalty during -- during the pendency
09:09:00  19   period.
09:09:00  20        Q.   So you had read the patent
09:09:02  21   application at this time; is that right?
09:09:08  22        (The witness reads document.)
09:09:09  23        A.   I don't recall.
09:09:11  24        Q.   Well, what was the basis for
09:09:14  25   your statement "if the application does
```

34

```
09:09:17  1    grant in a form substantially identical to
09:09:21  2    its current form"?
09:09:23  3         A.   That's the law, so that's what I
09:09:25  4    was stating.
09:09:25  5         Q.   That's the law?
09:09:26  6         A.   If the application granted in a
09:09:29  7    form substantially identical to its
09:09:31  8    current form, and you're found to infringe
09:09:34  9    a claim in that patent, you could be
09:09:38  10   liable for those damages.
09:09:40  11        Q.   Well, you're only liable for
09:09:43  12   damages if you're infringing a particular
09:09:45  13   patent, right?
09:09:46  14        A.   Correct.
09:09:46  15        Q.   And were you commenting about
09:09:48  16   the current application and the claims at
09:09:52  17   that time, correct?
09:09:53  18        A.   Correct.  Generally, yes.
09:09:56  19        Q.   And had you read them?
09:09:58  20        A.   I don't recall.  This is just
09:10:01  21   (indicating) -- it says, "you may be
09:10:04  22   liable."
09:10:06  23        So it's -- there's a lot of
09:10:10  24   contingencies there before any of that is
09:10:11  25   found.
```

35

```
09:10:12  1         Q.   Well, look at the second
09:10:13  2    paragraph of this same e-mail in the
09:10:15  3    middle.  You say, "However, I also note
09:10:18  4    that the first claim of the application is
09:10:20  5    very broad"--
09:10:22  6         A.   Oh, good.
09:10:22  7         Q.   -- "and I anticipate it will
09:10:26  8    require substantial amendment if it is to
09:10:27  9    grant at all."
09:10:28  10        Does that suggest that you had
09:10:30  11   looked at the claims of the patent
09:10:31  12   application?
09:10:32  13        A.   Yes, it does.
09:10:33  14        Q.   Okay.  So it would appear that
09:10:34  15   you had read the patent application at
09:10:36  16   this time?
09:10:36  17        A.   Yes.
09:10:36  18        Q.   And that's what you meant when
09:10:38  19   you advised in the first paragraph that if
09:10:40  20   the patent granted in substantially
09:10:42  21   identical form, that MDx could be liable
09:10:45  22   for damages for infringement?
09:10:47  23        A.   Well, as I said, that's, you
09:10:50  24   know, a general statement of the law, as I
09:10:52  25   understand it.  So, you know, there are
```

36

```
09:10:55  1    many contingencies that would need to be
09:10:58  2    satisfied before any of that would to
09:11:03  3    come.
09:11:03  4         Q.   So is it your testimony,
09:11:05  5    Mr. Braginsky, that this sentence in the
09:11:09  6    first paragraph of the e-mail at the
09:11:11  7    bottom of Exhibit 2 that says, "If this
09:11:13  8    application does eventually grant in a
09:11:16  9    form substantially identical to its
09:11:18  10   current form, you may be liable for
09:11:20  11   damages," that you were just stating the
09:11:22  12   general concept of the law; that if you
09:11:24  13   infringe a patent, you're liable for
09:11:26  14   damages and that's all?
09:11:27  15        A.   I think that's what it says,
09:11:29  16   yes.
09:11:29  17        Q.   Mr. Rothschild surely knew that,
09:11:32  18   didn't he?  That's why he came to you.
09:11:35  19        MR. STIMPSON:  Objection.
09:11:36  20        A.   This is specifically addressing
09:11:37  21   the pendency period after giving notice.
09:11:40  22        Q.   And what did you mean by that?
09:11:42  23        A.   So I don't -- I don't know what
09:11:47  24   Mr. Rothschild knew or didn't know about
09:11:49  25   damages in the patent infringement cases,
```

9 (Pages 33 to 36)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

37

| | |
|---|---|
| 09:11:55 1 | but there is a provision that provides for |
| 09:12:00 2 | receiving a reasonable royalty, if you are |
| 09:12:04 3 | found to eventually infringe a claim in a |
| 09:12:10 4 | patent, and you are given notice of that |
| 09:12:13 5 | while the patent was -- while the patent |
| 09:12:16 6 | application was pending and the claims |
| 09:12:22 7 | grant in substantially identical form. |
| 09:12:26 8 | Q. Now, what was it that you had |
| 09:12:28 9 | learned or knew at this time about the MDx |
| 09:12:34 10 | website and how it operated in -- in |
| 09:12:37 11 | relationship to the patent application? |
| 09:12:39 12 | A. As of that date, I don't recall. |
| 09:12:43 13 | Q. Had Mr. Rothschild advised you |
| 09:12:46 14 | about the MDx website? |
| 09:12:48 15 | A. I don't recall. I don't think |
| 09:12:49 16 | so. I don't think we had an occasion to |
| 09:12:53 17 | discuss that yet. |
| 09:12:54 18 | Q. So your best recollection today |
| 09:12:56 19 | is that you didn't know anything about the |
| 09:12:58 20 | MDx website -- |
| 09:12:59 21 | MR. STIMPSON: Objection to the |
| 09:13:00 22 | form. |
| 09:13:01 23 | Q. -- as of January 2010? |
| 09:13:02 24 | MR. STIMPSON: Objection to the |
| 09:13:03 25 | form. Misstates his testimony. |

38

| | |
|---|---|
| 09:13:06 1 | A. I don't believe we had -- had an |
| 09:13:09 2 | opportunity to discuss the Vitals.com |
| 09:13:15 3 | methodology. |
| 09:13:16 4 | Q. When was it that you did have an |
| 09:13:18 5 | opportunity to discuss the MDx website? |
| 09:13:22 6 | A. I don't recall when that was. |
| 09:13:24 7 | Q. Was that in December of 2010, |
| 09:13:28 8 | before you wrote your freedom to operate |
| 09:13:31 9 | opinion letter? |
| 09:13:31 10 | A. I -- I believe that's when it |
| 09:13:33 11 | was. |
| 09:13:33 12 | Q. Okay. And not before? |
| 09:13:34 13 | A. I don't think so. I don't |
| 09:13:36 14 | recall. |
| 09:14:07 15 | (Braginsky Exhibit 3 marked for |
| 09:14:07 16 | identification, e-mail chain with |
| 09:14:07 17 | production numbers MDX 0104795 through |
| 09:14:11 18 | 4797.) |
| 09:14:11 19 | Q. By the way, Mr. Braginsky, you |
| 09:14:15 20 | testified earlier, I think, that you have |
| 09:14:17 21 | not been deposed before; is that right? |
| 09:14:19 22 | A. That's correct. |
| 09:14:19 23 | Q. And have you ever testified in |
| 09:14:21 24 | court before in connection with a freedom |
| 09:14:24 25 | to operate opinion letter? |

39

| | |
|---|---|
| 09:14:25 1 | A. I have not. |
| 09:14:26 2 | Q. Okay. And so I take it from |
| 09:14:29 3 | that, that the other occasions, when |
| 09:14:31 4 | you've issued freedom to operate opinion |
| 09:14:33 5 | letters, you were not deposed on any of |
| 09:14:36 6 | those matters? |
| 09:14:36 7 | A. That's correct. |
| 09:14:50 8 | Q. All right. You have before you |
| 09:14:53 9 | Exhibit 3, Mr. Braginsky. And you'll see |
| 09:14:57 10 | that the second page and thereafter is |
| 09:15:01 11 | picking up the earlier e-mails we looked |
| 09:15:03 12 | at in Exhibit 2. |
| 09:15:05 13 | So if you would focus on the |
| 09:15:06 14 | first page of this exhibit -- |
| 09:15:08 15 | A. Mm-hmm. |
| 09:15:08 16 | Q. -- for a moment. And then I |
| 09:15:11 17 | have a few questions for you. |
| 09:15:19 18 | (The witness reads document.) |
| 09:15:27 19 | A. Okay. |
| 09:15:28 20 | Q. Okay. You have had a chance to |
| 09:15:29 21 | review it? |
| 09:15:30 22 | A. I have. |
| 09:15:31 23 | Q. Is it fair to say, |
| 09:15:32 24 | Mr. Braginsky, at this time, January of |
| 09:15:35 25 | 2010, you were involved in working on the |

40

| | |
|---|---|
| 09:15:37 1 | response to the cease and desist letter |
| 09:15:40 2 | that we've marked Exhibit 1? |
| 09:15:42 3 | A. I think -- I think that's what |
| 09:15:44 4 | this shows, yeah. |
| 09:15:45 5 | Q. The response was actually, I |
| 09:15:49 6 | believe, signed by Mr. Rosenberg. |
| 09:15:52 7 | Do you recall that? |
| 09:15:53 8 | A. I don't. |
| 09:15:59 9 | Q. We're going to look at it |
| 09:16:00 10 | shortly. It is signed by Mr. Rosenberg. |
| 09:16:04 11 | Do you recall how it came to be |
| 09:16:06 12 | that you were working on this, but |
| 09:16:08 13 | Mr. Rosenberg signed the response letter? |
| 09:16:11 14 | A. No. |
| 09:16:13 15 | Q. Did you work with Mr. Rosenberg |
| 09:16:15 16 | at this time; that is, January 2010, on |
| 09:16:21 17 | analyzing the situation for purposes of |
| 09:16:23 18 | the response? |
| 09:16:24 19 | A. I don't recall. It seems |
| 09:16:30 20 | likely. |
| 09:16:30 21 | Q. Were you a partner in the firm |
| 09:16:32 22 | at this time, 2010? |
| 09:16:35 23 | A. Hmmm, I -- I don't recall. |
| 09:16:42 24 | Q. When was the first time you |
| 09:16:45 25 | spoke with Mr. Stimpson about this matter? |

10 (Pages 37 to 40)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

41

09:16:47 1    A.  I don't recall.  I don't
09:16:49 2  remember.
09:16:50 3    Q.  Was it before the litigation was
09:16:51 4  filed?
09:16:53 5    A.  I don't think so.
09:16:56 6    Q.  Afterward?
09:16:59 7    A.  Only that we spoke -- I know we
09:17:06 8  spoke after the litigation was filed about
09:17:12 9  creating -- there was a litigation, we
09:17:14 10  needed to create an ethical wall.  And,
09:17:18 11  you know, we set up a process so that I
09:17:20 12  would not get involved in any of the
09:17:22 13  litigation aspects.
09:17:23 14    Q.  You're anticipating my question.
09:17:25 15  So a "wall" was created within
09:17:29 16  this firm, Sills Cummis, so that you and
09:17:35 17  Mr. Stimpson wouldn't communicate
09:17:37 18  regarding the litigation or the opinion
09:17:39 19  letter you had issued; is that correct?
09:17:40 20    A.  That's correct.
09:17:41 21    Q.  And what is the practice or the
09:17:43 22  procedure for implicating -- implementing
09:17:48 23  the ethical wall?
09:17:50 24    A.  There's a memo that is
09:17:52 25  circulated around the firm, and the files

42

09:17:57 1  are marked also, and contain that memo.
09:18:01 2  The people involved are informed.
09:18:04 3    Q.  And so it's your testimony that
09:18:05 4  after the litigation was filed, that
09:18:07 5  ethical wall was implemented; is that
09:18:11 6  right?
09:18:11 7    A.  Yes.
09:18:11 8    Q.  And that, in fact, you have not
09:18:13 9  had communications with Mr. Stimpson or
09:18:15 10  anyone else involved in the litigation
09:18:17 11  since that time; is that correct?
09:18:19 12    A.  That's correct.  Other than
09:18:21 13  yesterday, discussing this deposition.
09:18:25 14    Q.  All right.  Now, back to Exhibit
09:18:28 15  3.  On the first page there is an e-mail
09:18:32 16  at the bottom half of the page from
09:18:34 17  Mr. Rothschild to you, January 14th, 2010.
09:18:38 18  He says: "You asked about prior
09:18:40 19  art." And then he says: "I know of the
09:18:44 20  following" and he lists some examples.
09:18:48 21  Do you recall that you had a
09:18:50 22  discussion with Mr. Rothschild asking him
09:18:52 23  about prior art?
09:18:54 24    A.  Not specifically.  Vaguely, yes.
09:19:01 25    Q.  And this e-mail would suggest

43

09:19:04 1  you did have such conversations, right?
09:19:05 2    A.  Yes.
09:19:06 3    Q.  And what did you do after you
09:19:09 4  received this e-mail from Mr. Braginsky
09:19:14 5  about potential prior art?
09:19:15 6  (Discussion off the record.)
09:19:16 7    Q.  Sorry.  -- from Mr. Rothschild
09:19:18 8  about potential prior art?
09:19:20 9  MR. KANAN:  Thank you.
09:19:20 10    A.  I'm sorry, so restate your
09:19:22 11  question?
09:19:23 12    Q.  Yes, let me do it again.  What
09:19:25 13  did you do after you received the e-mail
09:19:27 14  from Mr. Rothschild that we see at the
09:19:29 15  bottom of Exhibit 3 regarding prior art?
09:19:31 16    A.  I don't recall specifically.  I
09:19:35 17  suppose I investigated the information
09:19:38 18  that he sent to us.
09:19:41 19    Q.  You say, in response to
09:19:43 20  Mr. Rothschild, on the e-mail shown on the
09:19:46 21  top of the first page of Exhibit 3, "I
09:19:50 22  will review all of these and get back to
09:19:53 23  you.  We have completed our search of the
09:19:55 24  patent records and are analyzing the
09:19:57 25  results now."

44

09:19:58 1  Do you see that?
09:19:59 2    A.  Yes.
09:20:00 3    Q.  And what is that referring to?
09:20:02 4    A.  Which part?
09:20:03 5    Q.  Well, let's take the second
09:20:07 6  sentence.  "We've completed our search of
09:20:07 7  the patent records" --
09:20:09 8    A.  Yes.
09:20:09 9    Q.  -- "and are analyzing the
09:20:11 10  results now."
09:20:14 11    A.  I'm not sure.  I'm not sure if
09:20:16 12  that is referencing a potential prior art
09:20:22 13  or the prosecution history of the
09:20:24 14  application.
09:20:25 15    Q.  You just don't remember what
09:20:27 16  this is?
09:20:28 17    A.  I don't remember what it's
09:20:31 18  referencing.
09:20:31 19    Q.  And you don't remember what you
09:20:33 20  did at this time?
09:20:35 21    A.  Not specifically, no.
09:20:37 22    Q.  Do you recall that there was a
09:20:39 23  search of the prior art?
09:20:42 24    A.  I believe there was, but I don't
09:20:48 25  recall specifically.

11 (Pages 41 to 44)

45

```
09:20:52  1      Q.   And do you recall that you
09:20:53  2  reviewed the patent history of this '060
09:21:06  3  Patent at this time?
09:21:07  4      A.   I don't recall whether that was
09:21:08  5  done at this time.
09:21:08  6      Q.   And you say in the first
09:21:10  7  sentence, "I will review all of these and
09:21:12  8  get back to you."
09:21:13  9          This is in response to
09:21:14 10  Mr. Rothschild's e-mail to you about prior
09:21:16 11  art.
09:21:16 12          What did you do as you're
09:21:20 13  referring to in this sentence?
09:21:22 14      A.   Again, I don't recall
09:21:23 15  specifically.  It makes sense that I
09:21:26 16  investigated what -- the information that
09:21:29 17  he sent to us.
09:21:31 18      Q.   And that's your best
09:21:32 19  recollection today of what you did?
09:21:33 20      A.   Yes.
09:21:36 21      Q.   And you don't recall making any
09:21:38 22  notes regarding your search of the patent
09:21:41 23  records?
09:21:42 24      A.   No, I don't.
09:21:43 25      Q.   Or your review of the
```

46

```
09:21:47  1  information Mr. Rothschild supplied you?
09:21:49  2      A.   No, I don't.
09:22:21  3          (Braginsky Exhibit 4 marked for
09:22:21  4      identification, e-mail with
09:22:21  5      attachment, with production numbers
09:22:27  6      MDX 0104798 through 4800.)
09:22:27  7      Q.   All right, Mr. Braginsky.  You
09:22:31  8  have now before you, Exhibit 4, which
09:22:33  9  appears on the first page to be an e-mail
09:22:36 10  that you sent to Mr. Rothschild.  And you
09:22:42 11  say "Attached is a response we propose
09:22:46 12  sending to Health Grades."
09:22:47 13          Do you see that?
09:22:48 14      A.   I do.
09:22:49 15      Q.   And then attached is an unsigned
09:22:52 16  draft of a two-page letter.
09:22:54 17          Do you see that?
09:22:55 18      A.   I do.
09:22:56 19      Q.   Now, the letter is in the draft
09:23:00 20  form attached to this exhibit.  It's set
09:23:03 21  up for the signature of Mr. Rosenberg.
09:23:06 22          Do you see that?
09:23:07 23      A.   Yes.
09:23:07 24      Q.   Why was this set up for
09:23:09 25  Mr. Rosenberg's signature rather than
```

47

```
09:23:13  1  yours?
09:23:13  2      A.   I think generally our process
09:23:16  3  then was Mark would take the lead on this
09:23:20  4  type of, you know, pre-litigation dispute.
09:23:25  5      Q.   What's that process you're
09:23:28  6  referring to?
09:23:28  7      A.   An internal process within the
09:23:31  8  firm.  He was a more experienced
09:23:36  9  litigation attorney.  So these types of
09:23:40 10  responsibilities generally fall to him.
09:23:42 11      Q.   As opposed to you?
09:23:43 12      A.   Yes.
09:23:49 13      Q.   And did you have conversations
09:23:50 14  with Mr. Rosenberg at this time, then,
09:23:53 15  about the draft response letter?
09:23:56 16      A.   I -- I don't recall, but we must
09:23:59 17  have.
09:23:59 18      Q.   And did you draft the response
09:24:00 19  letter?
09:24:02 20      A.   I don't recall.  I would think
09:24:07 21  that Mark drafted it, and I reviewed it
09:24:10 22  and approved it.
09:24:12 23      Q.   You said you must have spoken to
09:24:17 24  Mr. Rosenberg, but you do not recall the
09:24:19 25  conversations?
```

48

```
09:24:20  1      A.   Correct.
09:24:22  2      Q.   Did you mark up any drafts of
09:24:26  3  this response letter?
09:24:27  4      A.   I don't remember doing so.
09:24:30  5      Q.   Did you comment to Mr. Rosenberg
09:24:33  6  about the draft letter before it was
09:24:35  7  finalized?
09:24:35  8      A.   I don't recall.  I'm sure we
09:24:38  9  discussed it.
09:24:39 10      Q.   Was anyone else involved in --
09:24:43 11  in this at the time in the discussions
09:24:45 12  besides you and Mr. Rosenberg, that is
09:24:50 13  within Sills Cummis?
09:24:51 14      A.   I don't remember.  I don't
09:24:54 15  recall.
09:24:54 16      Q.   Was Mr. Stimpson involved in any
09:24:57 17  way at this point?
09:24:57 18      A.   I don't believe so.
09:24:59 19      Q.   So explain to me, again,
09:25:05 20  Mr. Rosenberg's role in the firm at this
09:25:08 21  time.  I'm referring to January of 2010.
09:25:10 22      A.   Mm-hmm.
09:25:11 23      Q.   Was he a litigator in the firm?
09:25:14 24      A.   He did litigation, but also did
09:25:25 25  counseling and some trademark work as
```

49

```
09:25:30  1   well.
09:25:30  2       Q.   And you don't recall that
09:25:32  3   Mr. Rosenberg was at sometime in 2011 part
09:25:38  4   of the litigation team in the lawsuit that
09:25:41  5   Health Grades brought?
09:25:44  6       A.   I don't -- after the suit was
09:25:46  7   filed?
09:25:46  8       Q.   Yes.
09:25:47  9       A.   I don't believe so.
09:26:13 10           (Braginsky Exhibit 5 marked for
09:26:13 11       identification, e-mail string, with
09:26:13 12       production numbers MDX0104805 through
09:26:17 13       4807.)
09:26:17 14       A.   Thank you.
09:26:18 15       Q.   All right, Mr. Braginsky.  You
09:26:21 16   have before you Deposition Exhibit 5.  And
09:26:39 17   Mr. Rothschild responds to the e-mail you
09:26:40 18   sent him with the draft letter at the
09:26:43 19   bottom of the first page and carry-over to
09:26:45 20   the second page.
09:26:46 21       Do you see that?
09:26:47 22       A.   I do.
09:26:48 23       Q.   And he -- this is January 21st,
09:26:54 24   2010.  He says, "Looks pretty good."  He's
09:27:00 25   referring to the draft letter.  "A few
```

50

```
09:27:03  1   comments."  Do you see?
09:27:05  2       A.   Yes.
09:27:05  3       Q.   At the top of the second page,
09:27:08  4   the number 3, he says -- or asks you --
09:27:11  5   well, I guess he asks -- yes, he asks you,
09:27:13  6   "Is it required for us to reference the
09:27:16  7   particular names of the prior art?  As I
09:27:18  8   mentioned, I'm not 100% on some of them,
09:27:22  9   and why should we top our hand?  Can we
09:27:24 10   just say something like we've identified
09:27:29 11   instances of prior art."
09:27:32 12       Do you see that?
09:27:32 13       A.   I do.
09:27:33 14       Q.   What was your response to him
09:27:34 15   about those questions?
09:27:38 16           (The witness reads document.)
09:27:40 17       A.   I don't recall.
09:27:42 18       Q.   Did you have a conversation with
09:27:44 19   him about these questions?
09:27:46 20       A.   I don't remember.
09:27:47 21       Q.   All right.  In fact, there's a
09:27:51 22   response sent to Mr. Rothschild by
09:27:55 23   Mr. Rosenberg then on January 22nd, 2010,
09:27:58 24   correct?
09:27:58 25           (The witness reads document.)
```

51

```
09:27:59  1       A.   Yes.
09:28:00  2       Q.   And he says, "...we are
09:28:06  3   specifically identifying the prior art
09:28:08  4   because under Patent Office rules, the
09:28:11  5   attorneys prosecuting the application are
09:28:12  6   required to disclose all material prior
09:28:16  7   art to the Patent Office..."
09:28:17  8       Do you see that?
09:28:18  9       A.   Yes.
09:28:19 10       Q.   And he said, "We believe that we
09:28:22 11   should take a firm, aggressive approach
09:28:24 12   while Health Grades' application is
09:28:27 13   pending."
09:28:27 14       Do you see that?
09:28:28 15       A.   I do.
09:28:29 16       Q.   Do you recall that, in fact,
09:28:31 17   there was included a demand to Health
09:28:34 18   Grades in the response letter that certain
09:28:35 19   prior art be disclosed to the Patent
09:28:38 20   Office?
09:28:38 21       A.   I don't recall.
09:28:41 22       Q.   Were you doing research on the
09:28:44 23   prior art at this time, January 22, or
09:28:51 24   thereabouts, 2010?
09:28:53 25       A.   I was probably, as I said,
```

52

```
09:28:55  1   reviewing the information that Mitch had
09:28:58  2   sent.
09:28:59  3       Q.   Who else was working on the
09:29:00  4   matter at this point besides you and
09:29:03  5   Mr. Rosenberg?
09:29:04  6       A.   I don't recall.
09:29:05  7       Q.   Was Mr. Heaton involved?
09:29:07  8       A.   I don't recall.
09:29:08  9       Q.   Was he with the firm at that
09:29:10 10   point?
09:29:10 11       A.   I don't -- I don't remember.
09:29:14 12       Q.   Did you have any communications
09:29:15 13   with Mr. Heaton at this time, January
09:29:18 14   2010, about the matter?
09:29:19 15       A.   I don't -- I don't recall.
09:29:22 16       Q.   As between you and
09:29:25 17   Mr. Rosenberg, who was the one responsible
09:29:27 18   for doing the research on prior art?
09:29:30 19       A.   In this instance, it wouldn't
09:29:37 20   have been Mr. Rosenberg.
09:29:38 21       Q.   So does that mean it was you?
09:29:40 22       A.   I don't remember.
09:29:42 23       Q.   Is there anybody else you think
09:29:44 24   might have been involved in doing that
09:29:46 25   research?
```

13 (Pages 49 to 52)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

53

```
09:29:46   1      A.  No.  I just don't remember the
09:29:50   2   different associates that were here and
09:29:52   3   who -- who -- if they were responsible or
09:29:55   4   not, I don't recall.  I don't recall when
09:29:57   5   Tim joined and...
09:30:00   6      Q.  Who would have made the decision
09:30:03   7   whether to involve associates?  You or
09:30:06   8   Mr. Rosenberg?
09:30:07   9      A.  Either one of us.
09:30:19  10      Q.  Did you agree with
09:30:22  11   Mr. Rosenberg's statement to
09:30:23  12   Mr. Rothschild that "We believe we should
09:30:25  13   take a firm, aggressive approach while
09:30:27  14   Health Grades' application is pending"?
09:30:31  15      A.  I -- I believe at the time I did
09:30:34  16   agree with that, yes.
09:30:35  17      Q.  And what did you understand that
09:30:37  18   to mean?
09:30:38  19      A.  I believe what we meant there
09:30:42  20   was that we wanted to do whatever was
09:30:46  21   possible to either ensure that the
09:30:51  22   application wouldn't grant or that it
09:30:54  23   wouldn't grant in the form that it was
09:30:58  24   currently in; that it would be narrowed.
09:31:24  25      (Braginsky Exhibit 6 marked for
```

54

```
09:31:24   1   identification, letter on the
09:31:24   2   letterhead of Sill Cummis & Gross
09:31:24   3   dated January 25, 2010, with
09:31:24   4   production numbers MDX 0011863 through
09:31:28   5   864.)
09:31:28   6      Q.  All right, Mr. Braginsky, you
09:31:33   7   have now Exhibit 6, and this appears to be
09:31:36   8   the response letter that was finally
09:31:37   9   issued by the firm on behalf of MDx dated
09:31:41  10   January 25, 2010, correct?
09:31:42  11      A.  Correct.
09:31:44  12      Q.  And it was, in fact, signed by
09:31:46  13   Mr. Rosenberg, correct?
09:31:47  14      A.  Yes.
09:31:48  15      Q.  Do you recall any discussions
09:31:49  16   with Mr. Rosenberg when the letter was
09:31:53  17   finally issued about who would sign, you
09:31:56  18   or he?
09:31:56  19      A.  No.
09:32:02  20      Q.  And it appears there's a typo at
09:32:05  21   the top of the second page that says,
09:32:07  22   "January 21st," probably carried over from
09:32:10  23   the draft letter.  It actually appears to
09:32:13  24   have been sent on January 25th, correct?
09:32:15  25      A.  Yes.
```

55

```
09:32:16   1      Q.  And the letter included a
09:32:17   2   description of what was claimed to be
09:32:19   3   prior art, correct?
09:32:23   4      (The witness reads document.)
09:32:27   5      A.  Yes.
09:32:28   6      Q.  And a demand made that this
09:32:31   7   alleged prior art be disclosed to the
09:32:33   8   Patent Office, correct?
09:32:37   9      (The witness reads document.)
09:32:38  10      A.  Yes.  I wouldn't say it's a
09:32:43  11   demand, but yes --
09:32:44  12      Q.  Well, you say, "We expect your
09:32:47  13   client and attorneys will comply with
09:32:48  14   their duties and promptly notify this
09:32:52  15   material prior art."
09:32:53  16      A.  That's what it says, yes.
09:32:55  17      Q.  You would characterize that as a
09:32:57  18   demand, wouldn't you, fairly?
09:32:58  19      A.  Whatever.  I mean, I don't think
09:33:00  20   it's important how we characterized it.
09:33:02  21      But that's what it says.  "We
09:33:04  22   expect that your client and its
09:33:05  23   prosecuting attorneys will comply with
09:33:08  24   their duties and obligations."
09:33:09  25      Q.  And you had identified -- or you
```

56

```
09:33:13   1   and Mr. Rosenberg had identified various
09:33:17   2   patents, correct?
09:33:18   3      A.  Yes.
09:33:18   4      Q.  And other sites that involve
09:33:23   5   physician search features that you listed
09:33:26   6   here, correct?
09:33:26   7      A.  Yes.
09:33:27   8      Q.  That you believed was existing
09:33:30   9   prior art, whether it involved patents or
09:33:32  10   not, correct?
09:33:33  11      A.  Yes.
09:33:35  12      Q.  And is this the information
09:33:37  13   Mr. Rothschild had provided regarding
09:33:42  14   GeoAccess and UCompare, WebMD and the
09:33:46  15   others?
09:33:46  16      A.  I believe so.  That's what it
09:33:48  17   looks like in the e-mail.
09:33:49  18      Q.  Was any research done by Sills
09:33:53  19   Cummis' attorneys about these websites to
09:33:55  20   determine if, in fact, it might fairly be
09:33:59  21   characterized as prior art?
09:34:00  22      A.  Yes, certainly.
09:34:02  23      Q.  Who did that research?
09:34:02  24      A.  I don't recall, but certainly
09:34:04  25   either Mark Rosenberg or myself looked at
```

14 (Pages 53 to 56)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

57

| | |
|---|---|
| 09:34:10 | 1 |

that.
Q.   Well, I thought you testified earlier as between you and Mr. Rosenberg doing the research, it would have been you not him?
A.   Yeah, but I think the websites that you're referencing, Mark might have looked at those.
Q.   Well, did you look at these sites?
A.   I don't recall.
Q.   Did you look at these patents that are cited in this letter?
A.   I don't recall specifically, no.
Q.   And you don't know whether Mr. Rosenberg did or not?
A.   I don't remember.
Q.   Did you have discussions with Mr. Rosenberg that he had looked at the patents that are cited in this letter?
A.   I don't recall.
Q.   Did you have discussions with Mr. Rosenberg that he had looked at these other websites, GeoAccess, WebMD and the others?

58

A.   I don't recall any specific conversations.
Q.   Did you make any notes regarding your research regarding these patents or the other prior art that was described in this letter?
A.   I don't remember.
Q.   And you don't remember the specific research you did?
A.   No.
Q.   Or whether you did specific research on these sites, correct?
A.   That's correct.
(Braginsky Exhibit 7 marked for identification, e-mail chain, with production numbers MDX 0104812 through 4814.)
Q.   All right.  Mr. Braginsky, you have now before you Exhibit 7.  I have questions for you about all of the e-mails.  So the first one appears on the second page.  You can certainly read them all before we -- before I ask you about them.
(The witness reads document.)

59

MR. KANAN:  I'm going to stop for a second and get a quick cup of coffee.
MR. STIMPSON:  Sure.  You want to take a quick break?
MR. KANAN:  Yes, sure.
THE VIDEO OPERATOR:  Going off the record at 9:36 a.m.
(A recess was taken.)
THE VIDEO OPERATOR:  Returning to the record at 9:43 a.m.
BY MR. KANAN:
Q.   All right, Mr. Braginsky, we're back on the record and I have handed you Exhibit 7.
You have that before you, correct?
A.   Yes.
Q.   And if you turn to the second page, it appears to be an e-mail that you sent to Mr. Rothschild on March 15, 2010, correct?
A.   Yes.
Q.   So now you had been initially engaged to work on the response to the

60

cease and desist letter in January.  And we've looked at the various e-mails and the letter that finally was issued.
You recall that?
A.   Yes.
Q.   And now we're at March.
Do you recall anything you had done between January and March, other than what's described in this particular e-mail that we'll talk about in a moment (indicating Exhibit 7)?
A.   I don't recall, no.
Q.   The e-mail that you sent then on March 15 to Mr. Rothschild says at the very beginning, "I updated our review of the Health Grades patent application."
Do you see that?
A.   Yes.
Q.   What did you do to do the update?
A.   Well, I don't recall, but likely looked at the prosecution history to see if anything had changed.
Q.   Was your updating part of a monitoring of the patent application that

15 (Pages 57 to 60)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

61

| | |
|---|---|
| 09:44:57 | 1 |
| 09:45:01 | 2 |
| 09:45:04 | 3 |
| 09:45:11 | 4 |
| 09:45:15 | 5 |
| 09:45:17 | 6 |
| 09:45:20 | 7 |
| 09:45:22 | 8 |
| 09:45:24 | 9 |
| 09:45:26 | 10 |
| 09:45:27 | 11 |
| 09:45:29 | 12 |
| 09:45:33 | 13 |
| 09:45:36 | 14 |
| 09:45:38 | 15 |
| 09:45:38 | 16 |
| 09:45:39 | 17 |
| 09:45:40 | 18 |
| 09:45:42 | 19 |
| 09:45:46 | 20 |
| 09:45:53 | 21 |
| 09:45:55 | 22 |
| 09:45:56 | 23 |
| 09:45:58 | 24 |
| 09:46:00 | 25 |

you were intending to pursue?
 A. I don't recall exactly. But I
believe we had some informal process to
keep track of its prosecution.
 Q. And that was part of the steps
necessary to take a firm, aggressive
approach on the application and try to
defeat it all together, or have it
narrowed, correct?
 A. Generally, yes.
 Q. And then you say in the second
paragraph of this e-mail that, "The prior
art that we sent to Health Grades has been
submitted to the Patent Office for
review."
 Do you see that?
 A. Yes.
 Q. And how did you determine that?
 A. It must have appeared in -- in
IDS, on the system that the Patent Office
has when they publish the prosecution
history.
 Q. And so you were able to confirm
at this time that indeed the prior art
that had been mentioned for Mr. Rosenberg

62

| | |
|---|---|
| 09:46:03 | 1 |
| 09:46:06 | 2 |
| 09:46:08 | 3 |
| 09:46:09 | 4 |
| 09:46:12 | 5 |
| 09:46:14 | 6 |
| 09:46:16 | 7 |
| 09:46:17 | 8 |
| 09:46:18 | 9 |
| 09:46:19 | 10 |
| 09:46:20 | 11 |
| 09:46:21 | 12 |
| 09:46:22 | 13 |
| 09:46:25 | 14 |
| 09:46:27 | 15 |
| 09:46:31 | 16 |
| 09:46:33 | 17 |
| 09:46:37 | 18 |
| 09:46:38 | 19 |
| 09:46:40 | 20 |
| 09:46:41 | 21 |
| 09:46:42 | 22 |
| 09:46:43 | 23 |
| 09:46:47 | 24 |
| 09:46:49 | 25 |

in the letter for MDx had, in fact, been
passed on by MD -- Health Grades to the
Patent Office for review, correct?
 A. Yeah. That's what -- what that
sentence seems to say, yes.
 Q. And that was pursuant to the
demand, or whatever we call it --
 A. Yes.
 Q. -- that was contained in the
response letter, right?
 A. Correct.
 Q. All right. In the first
paragraph, again, going up to the first
paragraph, you said in the middle, "While
the pending claims were amended, it is
difficult to determine whether they were
changed enough to no longer make them
substantially identical to those as
published."
 Do you see that?
 A. Yes.
 Q. What were you meaning by that?
 A. Well, you know, it's a difficult
determination to make. It's I think very
subjective standard of "substantially

63

| | |
|---|---|
| 09:46:53 | 1 |
| 09:46:58 | 2 |
| 09:47:00 | 3 |
| 09:47:07 | 4 |
| 09:47:10 | 5 |
| 09:47:15 | 6 |
| 09:47:16 | 7 |
| 09:47:19 | 8 |
| 09:47:21 | 9 |
| 09:47:22 | 10 |
| 09:47:24 | 11 |
| 09:47:26 | 12 |
| 09:47:27 | 13 |
| 09:47:28 | 14 |
| 09:47:29 | 15 |
| 09:47:33 | 16 |
| 09:47:35 | 17 |
| 09:47:38 | 18 |
| 09:47:39 | 19 |
| 09:47:40 | 20 |
| 09:47:40 | 21 |
| 09:47:42 | 22 |
| 09:47:43 | 23 |
| 09:47:45 | 24 |
| 09:47:50 | 25 |

identical."
 So it appears that we saw the
claims had been amended, but it was not
clear whether it was -- whether the claims
were still -- would be considered
substantially identical or not.
 Q. And you were advising
Mr. Rothschild of that; the fact that it's
difficult to determine anyway?
 A. Yes.
 Q. And that you say that it -- it's
in fact a sort of subjective analysis
anyway, right?
 A. Yes.
 Q. Then, in the third paragraph you
say, "Based on our experience, we expect
the Examiner will issue a final rejection
within the next few weeks."
 Do you see that?
 A. Yes.
 Q. So that was your opinion at this
time; that you thought the patent would be
denied, correct?
 A. Yes.
 Q. And you, in fact, advised your

64

| | |
|---|---|
| 09:47:53 | 1 |
| 09:47:55 | 2 |
| 09:47:56 | 3 |
| 09:47:58 | 4 |
| 09:48:01 | 5 |
| 09:48:02 | 6 |
| 09:48:06 | 7 |
| 09:48:08 | 8 |
| 09:48:10 | 9 |
| 09:48:11 | 10 |
| 09:48:12 | 11 |
| 09:48:13 | 12 |
| 09:48:14 | 13 |
| 09:48:24 | 14 |
| 09:48:26 | 15 |
| 09:48:29 | 16 |
| 09:48:33 | 17 |
| 09:48:38 | 18 |
| 09:48:41 | 19 |
| 09:48:44 | 20 |
| 09:48:47 | 21 |
| 09:48:49 | 22 |
| 09:48:53 | 23 |
| 09:48:55 | 24 |
| 09:48:57 | 25 |

client that you expected the patent to be
denied, correct?
 A. Yes. Along with letting him
know that there's no way of knowing that
with any certainty.
 Q. But you'd made a determination,
that in your professional opinion, you
thought the patent would be denied by the
Patent Office?
 A. Yes.
 Q. That was your opinion at that
time?
 A. Yes.
 Q. And then Mr. Rothschild
responded to you in an e-mail that's shown
on the first page of Exhibit 7, and says,
"So is the upshot..." -- and then he had
various points -- "They are acting on
their patent; They notified the office
about their prior art; You are not
optimistic about their getting a patent";
and "We should not be more concerned than
before and maybe less."
 And you responded essentially,
yes.

16 (Pages 61 to 64)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

65

| | | |
|---|---|---|
| 09:48:57 | 1 | A. Yes. |
| 09:48:59 | 2 | Q. And that was your opinion on |

March 16th, 2010, correct?
09:49:03  4   A.  Yes.
09:49:06  5   Q.  And what did you do thereafter
to continue to monitor the -- that patent
application?
09:49:14  8   A.  I don't recall.
09:49:16  9   Q.  Did you monitor it thereafter?
09:49:18 10   A.  I don't recall.
09:49:20 11   Q.  Well, I have not been provided
any communications to Mr. Rothschild or
otherwise reflecting any work you did on
this between March, the last e-mail that
we've looked at --
09:49:35 16   A.  Mm-hmm.
09:49:35 17   Q.  -- and all the way to December
2010.
09:49:39 19   A.  Mm-hmm.
09:49:39 20   Q.  So nine more months.
09:49:42 21       Are you recalling that you did
anything at all?
09:49:45 23   A.  I don't recall, no.
09:49:46 24   Q.  Now, as of March 2010, of course
the patent hadn't issued, correct?

66

09:49:52  1   A.  I don't --
09:49:55  2   Q.  As of March -- well, I'll tell
you, the patent issues later in the summer
of 2010, Mr. Braginsky.
09:50:01  5   A.  Mm-hmm.
09:50:02  6   Q.  June, I think.  June or July.
09:50:04  7       MR. STIMPSON:  It sounds, right.
It's a year, but I forget.
09:50:08  9   Q.  2010.  So in March 2010, of
course, necessarily, the patent hadn't
issued, right?
09:50:14 12   A.  Correct.
09:50:15 13   Q.  And you had not yet been advised
of any specifics about the MDx website and
how it operated, correct?
09:50:22 17   A.  I don't recall.
09:50:22 18   Q.  In connection with the question
of whether there would be an infringement
or not, correct?
09:50:26 20   A.  That's correct.  I don't recall.
09:50:28 21   Q.  And, then, the next thing we see
are -- is the meeting you have in December
2010 with Mr. Rothschild to discuss the
question of infringement.
09:50:38 25       Do you recall that?

67

09:50:39  1   A.  The meeting, yes.
09:50:41  2   Q.  Yes.
09:50:42  3   A.  Yeah.  Um-hmm.
09:50:43  4   Q.  Do you recall anything in
between March and December?
09:50:46  6   A.  I don't.  I don't.
09:50:47  7   Q.  When did you learn that the
patent had issued?
09:50:49  9   A.  I don't remember.
09:50:51 10   Q.  How did you learn that the
patent had issued?
09:50:54 12   A.  I don't remember.
09:50:54 13   Q.  How did it come to pass that
there was a meeting you had with
Mr. Rothschild in December -- late
December 2010?
09:51:02 17   A.  I don't remember, other than,
you know -- I vaguely remember arranging
for that meeting.  But I don't recall what
the impetus was for that.
09:51:13 21   Q.  And by December 2010 --
09:51:18 22       MR. KANAN:  Strike that.  I'll
withdraw that question.
09:51:41 24       (Braginsky Exhibit 8 marked for
09:51:41 25       identification, seven-page document,

68

09:51:41  1   with production numbers MDX 0104112
through 4118.)
09:51:42  3   Q.  All right.  Mr. Braginsky, I've
placed before you what's been marked as
Deposition 8.
09:51:50  6       Now, this is a seven-page
exhibit.  Six pages of which -- no, I'm
sorry -- yes -- five pages of which have
been redacted.  And you can see that.
They say at the top "REDACTED," okay?
09:52:15 11   A.  Yes.
09:52:15 12   Q.  And, then, in the middle of the
exhibit are two pages of notes.
09:52:20 14       Do you see that?
09:52:21 15   A.  Yes.
09:52:21 16   Q.  I can't tell.  I gather these
documents -- these all go together.  They
are Bates numbered consecutively.
09:52:30 19       MR. KANAN:  Do you know, Scott?
09:52:32 20       MR. STIMPSON:  Yes, they do.
They're different topics.  That's why
they're redacted.
09:52:36 23       MR. KANAN:  So these --
09:52:37 24       MR. STIMPSON:  They are all one
set of notes.  They are different

17 (Pages 65 to 68)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

69

| | |
|---|---|
| 09:52:40 1 | topics so we redacted the ones that |
| 09:52:43 2 | are different topics. |
| 09:52:45 3 | MR. KANAN: So these are all |
| 09:52:45 4 | handwritten notes, including the |
| 09:52:46 5 | redacted ones -- and the redacted |
| 09:52:47 6 | notes concern topics other than this |
| 09:52:48 7 | particular patent matter? |
| 09:52:50 8 | MR. STIMPSON: That's my |
| 09:52:50 9 | understanding, yes. |
| 09:52:52 10 | MR. KANAN: Okay. |
| 09:52:52 11 | BY MR. KANAN: |
| 09:52:53 12 | Q. And the notes that we do have in |
| 09:52:55 13 | the middle of this exhibit, Mr. Braginsky, |
| 09:52:59 14 | are of a meeting on December 30th between |
| 09:53:02 15 | you, Mr. Rothschild and Mr. Heaton. |
| 09:53:05 16 | Do you see that at the top? |
| 09:53:06 17 | A. I do see that. |
| 09:53:07 18 | Q. Now, do you know who wrote these |
| 09:53:09 19 | notes? |
| 09:53:10 20 | A. I don't know. |
| 09:53:14 21 | Q. Is it your writing? |
| 09:53:16 22 | A. No. |
| 09:53:16 23 | Q. Okay. Is it likely it's |
| 09:53:19 24 | Mr. Heaton's notes? |
| 09:53:20 25 | A. Likely, yes. |

---

70

| | |
|---|---|
| 09:53:21 1 | Q. I mean, you didn't get notes |
| 09:53:23 2 | from Mr. Rothschild, did you? |
| 09:53:24 3 | A. No. |
| 09:53:26 4 | Q. So since there were only the |
| 09:53:28 5 | three of you at the meeting, and they're |
| 09:53:30 6 | not Mr. Rothschild's notes, and they're |
| 09:53:32 7 | not yours, it would appear they're |
| 09:53:36 8 | Mr. Heaton's? |
| 09:53:38 9 | A. Likely his. |
| 09:53:39 10 | Q. And Mr. Heaton was in attendance |
| 09:53:42 11 | at the meeting, and appeared to have been |
| 09:53:46 12 | taking notes, as far as you recall? |
| 09:53:47 13 | A. Yes. |
| 09:53:48 14 | Q. And what was the purpose of this |
| 09:53:49 15 | meeting? |
| 09:53:50 16 | A. The purpose of this meeting was |
| 09:53:51 17 | to analyze the '060 Patent and compare the |
| 09:54:00 18 | claims to the Vitals.com website and |
| 09:54:07 19 | process. |
| 09:54:07 20 | Q. And to make a determination of |
| 09:54:09 21 | how likely it was that there was an |
| 09:54:12 22 | infringement or not? |
| 09:54:15 23 | A. To determine whether there was |
| 09:54:17 24 | an infringement or not, yes. |
| 09:54:18 25 | Q. Well, you couldn't ultimately |

---

71

| | |
|---|---|
| 09:54:21 1 | determine it. You aren't a court. But |
| 09:54:24 2 | the idea would be to assess the level of |
| 09:54:26 3 | risk; is that a fair way of saying it? |
| 09:54:30 4 | A. Correct. |
| 09:54:31 5 | Q. All right. Now, what had you |
| 09:54:33 6 | done in advance of this December 30th |
| 09:54:35 7 | meeting in connection with making that |
| 09:54:37 8 | determination, if anything? |
| 09:54:39 9 | A. I don't remember. |
| 09:54:41 10 | Q. Had you read the patent by this |
| 09:54:42 11 | time? |
| 09:54:43 12 | A. I don't recall. But I would |
| 09:54:47 13 | think that I had, yes. |
| 09:54:50 14 | Q. And had you done anything to |
| 09:54:51 15 | review the Vitals website or learn |
| 09:54:55 16 | anything about how the Vitals website |
| 09:54:58 17 | operated? |
| 09:54:58 18 | A. Again, I don't recall |
| 09:54:59 19 | specifically. But I would think I would |
| 09:55:02 20 | attend the meeting prepared and would have |
| 09:55:04 21 | done that. |
| 09:55:05 22 | Q. And would you have made notes |
| 09:55:07 23 | about your review of the patent or your |
| 09:55:10 24 | review of the Vitals website? |
| 09:55:12 25 | A. I don't remember. |

---

72

| | |
|---|---|
| 09:55:17 1 | Q. So you think you might have both |
| 09:55:19 2 | read the patent and reviewed the Vitals |
| 09:55:23 3 | website in anticipation of this meeting, |
| 09:55:25 4 | correct? |
| 09:55:25 5 | A. Yes. |
| 09:55:26 6 | Q. But you don't think you took a |
| 09:55:27 7 | single note? |
| 09:55:28 8 | A. I don't remember. I don't know |
| 09:55:32 9 | what's -- whatever notes there are, |
| 09:55:37 10 | they've been collected from me. |
| 09:55:39 11 | Q. Well, there are none that have |
| 09:55:41 12 | been provided to us in this case from |
| 09:55:43 13 | which I conclude you didn't make any |
| 09:55:45 14 | notes. Is that a fair conclusion? |
| 09:55:46 15 | A. I think so. |
| 09:55:47 16 | Q. Okay. Did Mr. Heaton do |
| 09:55:51 17 | anything for you in advance of this |
| 09:55:52 18 | meeting on December 30? |
| 09:55:55 19 | A. I would -- I don't recall, |
| 09:55:58 20 | specifically. But, again, I would think |
| 09:56:00 21 | he also prepared in much the same way. |
| 09:56:06 22 | Q. In much the same way as you? |
| 09:56:08 23 | A. Yes. |
| 09:56:09 24 | Q. Did he provide you any sort of |
| 09:56:12 25 | memorandum regarding his review of the |

---

18 (Pages 69 to 72)

73

```
09:56:14  1   patent or the Vitals website or both?
09:56:16  2      A.  No.
09:56:17  3      Q.  Did you have a conversation with
09:56:19  4   him regarding his work and the work you
09:56:23  5   had done discussed before the December 30
09:56:27  6   meeting?
09:56:27  7      A.  I don't remember.
09:56:29  8      Q.  Had you formed any opinions or
09:56:31  9   conclusions before the December 30 meeting
09:56:34 10   about the question of whether the Vitals
09:56:36 11   website infringed the patent?
09:56:38 12      A.  I don't remember.
09:56:41 13      Q.  Had you expressed to Mr. Heaton
09:56:44 14   any concerns or areas of concern in
09:56:48 15   connection with the Vitals website and the
09:56:52 16   patent?
09:56:52 17      A.  I don't remember.
09:56:53 18      Q.  Did you identify in your own
09:56:56 19   mind, prior to the December 30 meeting,
09:56:59 20   any areas of concern that you had
09:57:01 21   regarding the infringement question?
09:57:03 22      A.  I -- I don't recall.
09:57:06 23      Q.  Right.  Well, let's look at the
09:57:09 24   notes.  And do you recall, by the way,
09:57:11 25   Mr. Braginsky, how long the December 30
```

74

```
09:57:14  1   meeting lasted?
09:57:16  2      A.  I do remember it was quite a
09:57:17  3   long meeting.  I think it was four or five
09:57:22  4   hours.  If I remember correctly.
09:57:27  5      Q.  Four or five hours?
09:57:34  6      A.  (Nodded affirmatively.)
09:57:36  7      THE WITNESS:  Yes.
09:57:37  8      Q.  And the top is a description or
09:57:39  9   the words appear "Claim 1."
09:57:42 10      Do you see that?
09:57:42 11      A.  Yes.
09:57:42 12      Q.  What does it say thereafter?
09:57:45 13      MR. STIMPSON:  Objection to the
09:57:47 14   interpretation of someone else's
09:57:49 15   notes.  You can do it if you want to,
09:57:54 16   if you can, Mr. Braginsky.
09:57:55 17      Q.  Well, since you were at the
09:57:57 18   meeting, Mr. Braginsky, you perhaps are
09:57:59 19   better able to read these notes than me.
09:58:01 20   I'm happy to ask you what I think they
09:58:04 21   say.  But you were there, so you might be
09:58:07 22   able to better interpret.
09:58:08 23      It looks like under "Claim 1,"
09:58:10 24   it says, "Physician verified, Patient
09:58:17 25   provided information and 3rd party,
```

75

```
09:58:18  1   sources verified information."
09:58:19  2      Is that how you read it?
09:58:22  3      A.  I mean, it looks like part of
09:58:24  4   that is there, yes.  I see -- it's
09:58:26  5   difficult to decipher.  I see "physician,"
09:58:33  6   I see the number "3," it looks like an
09:58:37  7   "e.g." "3 or more of" and "patient
09:58:44  8   provided information" and "3rd party
09:58:49  9   source" maybe "verified information."
09:58:53 10      Q.  And then you'll see a few lines
09:58:56 11   below, it looks like there maybe was an
09:59:00 12   arrow going down those three lines down to
09:59:02 13   a portion that says, "He doesn't do" -- I
09:59:07 14   would say maybe -- "reads medical
09:59:09 15   philosophy age, years, honors and
09:59:15 16   hobbies."
09:59:16 17      Do you see that?
09:59:17 18      A.  Yes.
09:59:17 19      Q.  And then it says "the other
09:59:20 20   eight (of 13) they do."
09:59:22 21      Do you see that?
09:59:23 22      A.  I do.
09:59:23 23      Q.  What does all that mean to you,
09:59:25 24   as best you recall, of the meeting?
09:59:29 25      A.  I believe that's in reference to
```

76

```
09:59:33  1   certain claim elements from the patent.
09:59:37  2   Some of the requirements of the claims.
09:59:39  3      Q.  So there was a description of 13
09:59:41  4   categories of information that were
09:59:43  5   provided or obtained.  And Mr. Rothschild
09:59:47  6   was relating to you that there were five
09:59:51  7   of those categories that he didn't do in
09:59:54  8   his website.
09:59:55  9      Is that your recollection?
09:59:58 10      (The witness reads document.)
09:59:59 11      A.  I don't recall the numbers, but
10:00:05 12   that's what we discussed.
10:00:07 13      Yes, there were certain required
10:00:10 14   elements of the claim and compared those
10:00:14 15   to what Vitals.com did.
10:00:19 16      Q.  And the statement of the "other
10:00:22 17   8 (of 13) they do," means Mr. Rothschild
10:00:25 18   was telling you the other eight categories
10:00:28 19   as described in the claim are categories
10:00:31 20   of information that they obtained -
10:00:35 21      MR. STIMPSON:  Excuse me.
10:00:37 22      Q.  -- or gathered; is that correct?
10:00:39 23      MR. STIMPSON:  Let me just
10:00:40 24   interrupt, please.
10:00:41 25      Can I please have a continuing
```

19 (Pages 73 to 76)

77

| | | |
|---|---|---|
| 10:00:43 | 1 | objection to the questioning on these |
| 10:00:44 | 2 | notes that are not his? |
| 10:00:46 | 3 | MR. KANAN: On sort of the |
| 10:00:47 | 4 | interpretation of it? |
| 10:00:49 | 5 | MR. STIMPSON: Yes. Well, |
| 10:00:49 | 6 | anything relating to these notes |
| 10:00:51 | 7 | because it's -- |
| 10:00:52 | 8 | MR. KANAN: That's fine. You |
| 10:00:54 | 9 | certainly can have the standing |
| 10:00:55 | 10 | objection. |
| 10:00:56 | 11 | MR. STIMPSON: Thank you. |
| 10:00:56 | 12 | Q. Mr. Braginsky, I don't mean to |
| 10:00:59 | 13 | have you read these notes as though you |
| 10:01:01 | 14 | wrote them. I understand you didn't write |
| 10:01:04 | 15 | them. But you were at the meeting. |
| 10:01:06 | 16 | A. Yes. |
| 10:01:06 | 17 | Q. And I gather you have some |
| 10:01:08 | 18 | recollection of the meeting? |
| 10:01:09 | 19 | A. I do, yes. |
| 10:01:10 | 20 | Q. And you wrote an opinion letter. |
| 10:01:12 | 21 | A. Yes. |
| 10:01:12 | 22 | Q. And I'm asking you, as best we |
| 10:01:15 | 23 | all can read them, and with your |
| 10:01:16 | 24 | recollection of the meeting to -- to |
| 10:01:18 | 25 | describe what you recall was discussed and |

78

| | | |
|---|---|---|
| 10:01:20 | 1 | what the notes might mean. |
| 10:01:22 | 2 | And if you're not sure either, |
| 10:01:23 | 3 | because you can't read the note or you |
| 10:01:25 | 4 | don't have a recollection, you say so, |
| 10:01:27 | 5 | okay? |
| 10:01:27 | 6 | A. Yes. |
| 10:01:27 | 7 | Q. Fair enough? |
| 10:01:29 | 8 | A. Yes. |
| 10:01:29 | 9 | Q. I just want to try and get what |
| 10:01:31 | 10 | happened at the meeting. |
| 10:01:32 | 11 | A. Yes. |
| 10:01:32 | 12 | Q. And this is the only guide post |
| 10:01:34 | 13 | I have, okay? |
| 10:01:35 | 14 | A. Yes. |
| 10:01:37 | 15 | Q. So it appears that |
| 10:01:39 | 16 | Mr. Rothschild said, "the other 8 (of 13) |
| 10:01:43 | 17 | they do." You see that sentence there? |
| 10:01:46 | 18 | A. I do, yes. |
| 10:01:47 | 19 | Q. It doesn't look that difficult |
| 10:01:49 | 20 | to interpret it. It looks like it clearly |
| 10:01:52 | 21 | says, "the other 8 (of 13) they do," |
| 10:01:56 | 22 | right? |
| 10:01:56 | 23 | A. Yes. |
| 10:01:57 | 24 | Q. Would that be your best |
| 10:01:58 | 25 | recollection that that's what |

79

| | | |
|---|---|---|
| 10:02:02 | 1 | Mr. Rothschild said? |
| 10:02:02 | 2 | A. I don't know if that's what |
| 10:02:04 | 3 | Mitch said -- Mr. Rothschild said. |
| 10:02:06 | 4 | Q. Well, let me ask you this: |
| 10:02:08 | 5 | You didn't have a working |
| 10:02:10 | 6 | knowledge of how the MDx website operated |
| 10:02:14 | 7 | as of the 12/30 meeting, did you? |
| 10:02:17 | 8 | A. At the time of this meeting, we |
| 10:02:19 | 9 | were developing that working knowledge. |
| 10:02:21 | 10 | Q. At the time of that meeting, |
| 10:02:23 | 11 | Mr. Rothschild was telling you exactly how |
| 10:02:24 | 12 | it operated, correct? |
| 10:02:26 | 13 | A. Yes. |
| 10:02:26 | 14 | Q. And what you were doing was |
| 10:02:28 | 15 | talking about what the claim elements were |
| 10:02:32 | 16 | and comparing that to what MDx did, right? |
| 10:02:34 | 17 | A. Yes. |
| 10:02:34 | 18 | Q. And that's how you were able to |
| 10:02:37 | 19 | determine whether there was a likely |
| 10:02:38 | 20 | infringement or not, right? |
| 10:02:40 | 21 | A. Correct, yes. |
| 10:02:41 | 22 | Q. And the next line on this first |
| 10:02:43 | 23 | page of the notes says -- it looks like it |
| 10:02:47 | 24 | says, "rarely get these from MD. Get it |
| 10:02:52 | 25 | usually from third-party." |

80

| | | |
|---|---|---|
| 10:02:54 | 1 | Do you see that? |
| 10:02:54 | 2 | A. Yes. |
| 10:02:55 | 3 | Q. Is that how you would read that? |
| 10:02:58 | 4 | In other words, am I reading |
| 10:03:00 | 5 | these words the way you would read these |
| 10:03:02 | 6 | words? |
| 10:03:02 | 7 | A. I think so, yes. Yes. |
| 10:03:03 | 8 | Q. Do you recall what Mr. -- well, |
| 10:03:05 | 9 | I'll just ask you. |
| 10:03:07 | 10 | Do you recall what was said |
| 10:03:08 | 11 | about that? |
| 10:03:09 | 12 | A. No. I don't. |
| 10:03:10 | 13 | Q. Was this Mr. Rothschild saying |
| 10:03:13 | 14 | to you and Mr. Heaton that he rarely gets |
| 10:03:15 | 15 | this information, those categories from |
| 10:03:19 | 16 | the doctors, usually gets it from third |
| 10:03:23 | 17 | parties; is that how you would interpret |
| 10:03:26 | 18 | this? |
| 10:03:26 | 19 | A. I don't recall if that is what |
| 10:03:28 | 20 | Mr. Rothschild said. |
| 10:03:32 | 21 | Q. Well, do you think Mr. Heaton |
| 10:03:35 | 22 | said this? |
| 10:03:36 | 23 | A. It's -- yeah, it's possible that |
| 10:03:38 | 24 | just through our investigation of how it |
| 10:03:40 | 25 | works, Mr. Heaton could have formulated |

20 (Pages 77 to 80)

CONFIDENTIAL - ATTORNEYS'EYES ONLY

**PHILIP BRAGINSKY - 2/14/2013**

---

81

| | | |
|---|---|---|
| 10:03:44 | 1 | that without Mitch saying it, yes. |
| 10:03:47 | 2 | Q.   Did you say this? |
| 10:03:49 | 3 | A.   I don't recall. |
| 10:03:50 | 4 | Q.   So you think these notes might |
| 10:03:52 | 5 | contain Mr. Heaton's comments at the |
| 10:03:55 | 6 | meeting rather than Mr. Rothschild's? |
| 10:03:58 | 7 | A.   I would -- I don't know.  I |
| 10:04:00 | 8 | would think they contain all of that; my |
| 10:04:04 | 9 | thoughts, his thoughts and |
| 10:04:06 | 10 | Mr. Rothschild's thoughts. |
| 10:04:07 | 11 | Q.   So your testimony is that |
| 10:04:09 | 12 | Mr. Heaton may have looked at the patent |
| 10:04:11 | 13 | and the MDx website before the 12/30 |
| 10:04:15 | 14 | meeting, made a determination about what |
| 10:04:18 | 15 | things -- the website did or didn't do, |
| 10:04:20 | 16 | never made a note about that, and then |
| 10:04:22 | 17 | made notes about his observations at this |
| 10:04:25 | 18 | 12/30/2010 meeting; is that your |
| 10:04:28 | 19 | testimony? |
| 10:04:28 | 20 | A.   No.  That's what we were doing |
| 10:04:30 | 21 | at the meeting (indicating); we were |
| 10:04:33 | 22 | investigating the website and the patent |
| 10:04:36 | 23 | during the meeting. |
| 10:04:36 | 24 | So he's taking notes of what |
| 10:04:40 | 25 | we're doing during the meeting. |

---

83

| | | |
|---|---|---|
| 10:05:50 | 1 | this was Mr. Rothschild describing what |
| 10:05:52 | 2 | appeared on the website? |
| 10:05:54 | 3 | A.   I don't recall. |
| 10:05:55 | 4 | Q.   Did you look at the website |
| 10:05:57 | 5 | before December 30th?  I think I've asked |
| 10:06:01 | 6 | you that but... |
| 10:06:02 | 7 | A.   You have.  I don't recall if I |
| 10:06:04 | 8 | did or not. |
| 10:06:04 | 9 | Q.   Were you and Mr. Rothschild and |
| 10:06:06 | 10 | Mr. Heaton looking at the website at the |
| 10:06:08 | 11 | meeting? |
| 10:06:08 | 12 | A.   Yes. |
| 10:06:09 | 13 | Q.   Okay.  So it could be an actual |
| 10:06:12 | 14 | review of the website at the time that the |
| 10:06:16 | 15 | meeting was going on? |
| 10:06:18 | 16 | A.   Correct. |
| 10:06:18 | 17 | Q.   And Mr. Rothschild was making |
| 10:06:22 | 18 | comments about the website as you were |
| 10:06:23 | 19 | looking at it; is that right? |
| 10:06:25 | 20 | A.   He was. |
| 10:06:25 | 21 | Q.   All right.  Now, over on the |
| 10:06:30 | 22 | left, in the middle of the page, there's |
| 10:06:32 | 23 | the words "Option 1" circled. |
| 10:06:36 | 24 | Do you see that? |
| 10:06:36 | 25 | A.   I do. |

---

82

| | | |
|---|---|---|
| 10:04:43 | 1 | Q.   Yes.  And what I'm asking you |
| 10:04:46 | 2 | is: |
| 10:04:46 | 3 | Is he taking notes of what |
| 10:04:49 | 4 | observations Mr. Rothschild was making at |
| 10:04:51 | 5 | the meeting or was he making notes either |
| 10:04:54 | 6 | separately or in addition of things he had |
| 10:04:57 | 7 | looked at prior to the meeting? |
| 10:04:59 | 8 | A.   I don't know. |
| 10:05:00 | 9 | Q.   You don't know.  And you don't |
| 10:05:02 | 10 | recall who said this, "rarely get these |
| 10:05:04 | 11 | from MD; get it usually from third-party"? |
| 10:05:08 | 12 | A.   I don't. |
| 10:05:14 | 13 | Q.   And then the next line down |
| 10:05:16 | 14 | says, "may put awards, professional |
| 10:05:19 | 15 | appointments" -- and some other |
| 10:05:21 | 16 | descriptions of categories in there -- |
| 10:05:24 | 17 | "but he might not display it." |
| 10:05:26 | 18 | Do you see that? |
| 10:05:27 | 19 | A.   Yes, mm-hmm. |
| 10:05:28 | 20 | Q.   And what's your understanding of |
| 10:05:29 | 21 | what those notes mean? |
| 10:05:30 | 22 | (The witness reads document.) |
| 10:05:36 | 23 | A.   I think it's some idea about |
| 10:05:41 | 24 | what appears on the Vitals.com website. |
| 10:05:49 | 25 | Q.   And is it your recollection, |

---

84

| | | |
|---|---|---|
| 10:06:37 | 1 | Q.   And it says, "he could remove |
| 10:06:39 | 2 | the tool for physicians to verify. |
| 10:06:42 | 3 | Receive the info for someone else besides |
| 10:06:44 | 4 | from the doctor." |
| 10:06:45 | 5 | Did I read those words the way |
| 10:06:47 | 6 | you read them? |
| 10:06:48 | 7 | (The witness reads document.) |
| 10:06:51 | 8 | A.   Yes. |
| 10:06:55 | 9 | Q.   And what do you recall was said |
| 10:06:57 | 10 | by Mr. Rothschild, or anyone, at the |
| 10:07:03 | 11 | meeting about these two sentences? |
| 10:07:05 | 12 | A.   I don't recall. |
| 10:07:05 | 13 | Q.   And what does the phrase "Option |
| 10:07:09 | 14 | 1" mean over on the left? |
| 10:07:12 | 15 | A.   I don't know. |
| 10:07:12 | 16 | Q.   Was that an option of how to |
| 10:07:14 | 17 | avoid infringement? |
| 10:07:15 | 18 | A.   I don't know. |
| 10:07:16 | 19 | Q.   You don't recall? |
| 10:07:17 | 20 | A.   No. |
| 10:07:23 | 21 | Q.   Now, below those two lines, over |
| 10:07:27 | 22 | toward the right, there's a circle and |
| 10:07:29 | 23 | then it says, "says he must have." |
| 10:07:33 | 24 | Do you see that? |
| 10:07:33 | 25 | A.   Yes. |

---

21 (Pages 81 to 84)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

85

```
10:07:34   1      Q.   And below that phrase are
10:07:36   2   various categories, some of which are
10:07:38   3   circled.  Do you see that?
10:07:40   4      A.   Yes.
10:07:41   5      Q.   So, for example, below the
10:07:44   6   phrase, "says he must have" is circled,
10:07:49   7   "board cert," referring presumably to
10:07:53   8   board certification, "disciplinary
10:07:56   9   action," "medical school."
10:07:57  10          Do you see those categories
10:07:59  11   circled?
10:07:59  12      A.   I do.
10:07:59  13      Q.   Was this Mr. Rothschild telling
10:08:03  14   you and Mr. Heaton these categories he has
10:08:07  15   to have on his website?
10:08:10  16      A.   I don't remember.
10:08:11  17      Q.   Is that your best understanding
10:08:13  18   of what was said at the meeting, or do you
10:08:14  19   think it's something different?
10:08:16  20      A.   I don't know.  I just -- I don't
10:08:18  21   know.
10:08:18  22      Q.   Do these notes refresh in any
10:08:20  23   way your recollection of the meeting,
10:08:23  24   Mr. Braginsky?
10:08:23  25      A.   They don't, no.
```

86

```
10:08:24   1      Q.   And is it your testimony today,
10:08:26   2   that you have absolutely no recollection
10:08:28   3   about specific discussions at the meeting,
10:08:30   4   other than that there was a meeting and
10:08:33   5   you were looking at the website?
10:08:35   6      A.   No.  No, not at all.  That's not
10:08:37   7   my testimony.
10:08:37   8      Q.   So you do have some recollection
10:08:39   9   of what was discussed?
10:08:39  10      A.   I do, yes.
10:08:40  11      Q.   All right.  Let's not look at
10:08:43  12   the notes for a minute.  Tell me what you
10:08:45  13   recall was discussed.
10:08:46  14      A.   We went through in great detail
10:08:51  15   each of the claims, each of the claim
10:08:55  16   elements, parsed the words from those
10:08:58  17   claims, and compared them to both the
10:09:03  18   front end of the Vitals.com website, and
10:09:09  19   had in-depth discussion on -- with Mitch
10:09:13  20   about the back end as well, and how -- how
10:09:16  21   the website functions.
10:09:19  22      Q.   Is that the extent of what you
10:09:22  23   recall discussed at the meeting?
10:09:23  24      A.   Yes.
10:09:23  25      Q.   Was there a discussion about
```

87

```
10:09:26   1   whether there was a problem of
10:09:27   2   infringement?
10:09:28   3      A.   We -- after going through that
10:09:34   4   step-by-step, element-by-element, we felt
10:09:38   5   that there was no likelihood that they
10:09:43   6   were infringing.
10:09:44   7      Q.   No likelihood that they were
10:09:46   8   infringing.
10:09:47   9      A.   Yeah.  They weren't infringing.
10:09:50  10      Q.   All right.  And did you
10:09:52  11   discuss -- do you recall discussing
10:09:53  12   options of things that could be changed in
10:09:56  13   the website?
10:09:56  14      A.   No.  I don't recall discussing
10:10:00  15   any options.
10:10:04  16      Q.   So these notes that Mr. Heaton
10:10:07  17   apparently wrote, where he has "Option 1,"
10:10:12  18   "Option 2," and then there's actually an
10:10:13  19   "Option 3," you have no recollection of a
10:10:16  20   discussion of options --
10:10:16  21      A.   No.
10:10:17  22      Q.   -- or that there was a
10:10:18  23   discussion about various possible changes
10:10:20  24   that could be made to avoid infringement?
10:10:23  25   You don't recall any discussion like that?
```

88

```
10:10:25   1      A.   We had discussions at the time
10:10:29   2   after concluding about an appropriate
10:10:33   3   strategy to -- to address this threat.
10:10:38   4          Because there are many instances
10:10:42   5   when you're not infringing and -- but
10:10:46   6   might still be sued.  And we did
10:10:50   7   discuss -- I believe during this meeting,
10:10:58   8   we did discuss other things that could be
10:11:00   9   done to make it abundantly obvious that
10:11:06  10   there was no infringement in an effort to
10:11:09  11   avoid litigation.
10:11:11  12      Q.   So it's your testimony that at
10:11:14  13   the meeting you advised Mr. Rothschild
10:11:17  14   there was no likelihood of infringement,
10:11:20  15   but that there were also discussions about
10:11:23  16   options, changes that could be made to
10:11:26  17   make it abundantly clear that there was no
10:11:29  18   infringement; is that a fair statement of
10:11:31  19   what you recall?
10:11:32  20      A.   We concluded that there was no
10:11:35  21   infringement and -- excuse me -- concluded
10:11:41  22   that there was no infringement, and
10:11:44  23   that -- in an effort to avoid litigation,
10:11:48  24   other changes might be able to be made
10:11:53  25   that, you know, might convince them not
```

22 (Pages 85 to 88)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

89

| | | |
|---|---|---|
| 10:11:56 | 1 | to -- not to pursue this. |
| 10:12:00 | 2 | Q.   Now, your testimony previously |
| 10:12:03 | 3 | was, you do not recall whether you had |
| 10:12:04 | 4 | read the patent before this meeting. |
| 10:12:07 | 5 | A.   Correct. |
| 10:12:07 | 6 | Q.   Correct?  And you don't recall |
| 10:12:09 | 7 | whether you had looked at the Vitals |
| 10:12:13 | 8 | website before this December 30 meeting? |
| 10:12:16 | 9 | A.   Correct. |
| 10:12:16 | 10 | Q.   And you don't recall whether you |
| 10:12:18 | 11 | had done any research regarding the patent |
| 10:12:23 | 12 | after it issued before the December 30 |
| 10:12:25 | 13 | meeting? |
| 10:12:26 | 14 | A.   Say that again.  I'm sorry? |
| 10:12:28 | 15 | Q.   Did you do anything regarding -- |
| 10:12:30 | 16 | well, you don't recall when you learned |
| 10:12:35 | 17 | the patent had issued, do you? |
| 10:12:35 | 18 | A.   No, I don't. |
| 10:12:36 | 19 | Q.   So do you recall doing anything |
| 10:12:37 | 20 | about this patent -- |
| 10:12:38 | 21 | A.   Hm-mmm. |
| 10:12:38 | 22 | Q.   -- and this question prior to |
| 10:12:40 | 23 | the December 30th meeting? |
| 10:12:41 | 24 | A.   I don't, no. |
| 10:12:42 | 25 | Q.   Okay.  And then at the meeting, |

90

| | | |
|---|---|---|
| 10:12:45 | 1 | Mr. Rothschild explains the site, and you |
| 10:12:48 | 2 | look at the site.  Correct? |
| 10:12:49 | 3 | A.   Yes. |
| 10:12:50 | 4 | Q.   And you had the patent there -- |
| 10:12:52 | 5 | A.   Yes. |
| 10:12:52 | 6 | Q.   -- at the meeting?  And in that |
| 10:12:55 | 7 | meeting of four or five hours, you said |
| 10:12:59 | 8 | the meeting lasted, you made the |
| 10:13:01 | 9 | conclusion, right there on the spot, there |
| 10:13:03 | 10 | was no likelihood of infringement, |
| 10:13:05 | 11 | correct? |
| 10:13:05 | 12 | A.   Yes. |
| 10:13:06 | 13 | Q.   And then you discussed other |
| 10:13:07 | 14 | changes that might be made to make it |
| 10:13:09 | 15 | abundantly clear that there was no |
| 10:13:11 | 16 | infringement, correct? |
| 10:13:13 | 17 | A.   I believe that conversation took |
| 10:13:14 | 18 | place at the same meeting. |
| 10:13:16 | 19 | Q.   So you didn't have the meeting |
| 10:13:18 | 20 | go away, reflect on what you had learned, |
| 10:13:24 | 21 | and read the patent, and do anything else |
| 10:13:26 | 22 | you might do to make your opinion; you |
| 10:13:28 | 23 | made your opinion then and there on |
| 10:13:31 | 24 | December 30th? |
| 10:13:32 | 25 | A.   Well, we -- after leaving |

91

| | | |
|---|---|---|
| 10:13:36 | 1 | that -- I mean, our minds didn't shut off. |
| 10:13:39 | 2 | So of course we continued to think about |
| 10:13:42 | 3 | that, and reflect on what we had |
| 10:13:44 | 4 | determined during that meeting, and the |
| 10:13:53 | 5 | opinion persisted. |
| 10:13:57 | 6 | Q.   And did you discuss at the |
| 10:13:58 | 7 | meeting on December 30th with |
| 10:14:02 | 8 | Mr. Rothschild that you would issue a |
| 10:14:04 | 9 | freedom to operate opinion letter? |
| 10:14:07 | 10 | A.   I don't recall.  I think we did. |
| 10:14:11 | 11 | Q.   You wouldn't necessarily do |
| 10:14:12 | 12 | that, right?  I mean, you might meet with |
| 10:14:15 | 13 | a client to discuss infringement and even |
| 10:14:18 | 14 | give him your opinions about it.  You |
| 10:14:19 | 15 | wouldn't necessarily always write a |
| 10:14:22 | 16 | freedom to operate opinion letter, right? |
| 10:14:25 | 17 | A.   We don't always, no. |
| 10:14:26 | 18 | Q.   Was there a discussion about |
| 10:14:28 | 19 | whether the firm would represent |
| 10:14:29 | 20 | Mr. Rothschild if litigation did ensue? |
| 10:14:31 | 21 | A.   No. |
| 10:14:36 | 22 | Q.   All right.  And do you recall |
| 10:14:38 | 23 | anything else that was discussed at the |
| 10:14:39 | 24 | meeting on December 30th, besides what |
| 10:14:42 | 25 | you've just related to me? |

92

| | | |
|---|---|---|
| 10:14:43 | 1 | A.   No. |
| 10:14:47 | 2 | Q.   All right.  If you'll refer down |
| 10:14:54 | 3 | toward the bottom of this first page of |
| 10:14:56 | 4 | the notes, before the lines right above |
| 10:15:04 | 5 | "Option 2." |
| 10:15:05 | 6 | You see "Option 2" start? |
| 10:15:08 | 7 | A.   Yes. |
| 10:15:09 | 8 | Q.   And then there's a couple of |
| 10:15:10 | 9 | stars on the left; do you see that? |
| 10:15:12 | 10 | A.   Yes. |
| 10:15:12 | 11 | Q.   And it says, "licensure - they |
| 10:15:15 | 12 | check it, but never report it." |
| 10:15:17 | 13 | Do you see that? |
| 10:15:18 | 14 | (The witness reads document.) |
| 10:15:19 | 15 | A.   "They check it, but never report |
| 10:15:23 | 16 | it."  Yes. |
| 10:15:24 | 17 | Q.   Did you understand that to |
| 10:15:28 | 18 | mean -- meaning, MDx -- checks on |
| 10:15:31 | 19 | licensing of doctors who are in their |
| 10:15:32 | 20 | database, but they don't actually report |
| 10:15:35 | 21 | it on the website? |
| 10:15:36 | 22 | A.   I don't know -- I don't know. |
| 10:15:40 | 23 | Q.   Do you think that's true today? |
| 10:15:43 | 24 | A.   I don't know. |
| 10:15:47 | 25 | Q.   And then it says, "he'd be happy |

23 (Pages 89 to 92)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

93

| | |
|---|---|
| 10:15:51 1 | to not show IRF," and then it says, |
| 10:15:55 2 | "internship residency fellowship." |
| 10:15:59 3 | Is that what the acronym IRF |
| 10:16:02 4 | refers to? |
| 10:16:02 5 | Is that your understanding? |
| 10:16:04 6 | A.   Yes. |
| 10:16:04 7 | Q.   "He doesn't show licensure," it |
| 10:16:08 8 | says there again. |
| 10:16:08 9 | Do you see that? |
| 10:16:10 10 | A.   Yes. |
| 10:16:10 11 | Q.   Do you recall a discussion where |
| 10:16:12 12 | Mr. Rothschild said, "I don't have to show |
| 10:16:17 13 | internship, residency, fellowship.  I can |
| 10:16:22 14 | eliminate that"? |
| 10:16:22 15 | A.   Not specifically, no. |
| 10:16:24 16 | Q.   Were these major points that |
| 10:16:27 17 | were discussed at this time?  Mr. Heaton |
| 10:16:29 18 | apparently put stars next to them. |
| 10:16:32 19 | Do you see that? |
| 10:16:33 20 | A.   Mm-hmm. |
| 10:16:33 21 | Q.   Do you recall that? |
| 10:16:34 22 | A.   I recall specifics -- speaking |
| 10:16:38 23 | about those specific claim elements in the |
| 10:16:42 24 | claim and the requirements that -- that |
| 10:16:44 25 | the claim has. |

94

| | |
|---|---|
| 10:16:48 1 | Q.   And then it says -- there's |
| 10:16:51 2 | another star -- and it says "Option 2"; do |
| 10:16:55 3 | you see that? |
| 10:16:56 4 | A.   Yes. |
| 10:16:56 5 | Q.   And it appears to say "so when" |
| 10:17:00 6 | something -- "disciplinary action, don't |
| 10:17:04 7 | show patient rating." |
| 10:17:06 8 | Do you see that? |
| 10:17:07 9 | A.   Yes. |
| 10:17:07 10 | Q.   Is that a statement, that when |
| 10:17:09 11 | there has been disciplinary action on a |
| 10:17:12 12 | particular doctor, they would not then |
| 10:17:14 13 | show patient ratings? |
| 10:17:15 14 | A.   I don't -- I don't know. |
| 10:17:17 15 | Q.   You don't recall that |
| 10:17:18 16 | discussion? |
| 10:17:19 17 | A.   Not specifically, no. |
| 10:17:23 18 | Q.   Did you rely on any of the |
| 10:17:25 19 | information Mr. Rothschild related in this |
| 10:17:29 20 | meeting and these options that were |
| 10:17:33 21 | discussed for purposes of your freedom to |
| 10:17:35 22 | operate opinion? |
| 10:17:37 23 | A.   I absolutely relied on the |
| 10:17:39 24 | information we discussed and the |
| 10:17:41 25 | information Mitch provided us on |

95

| | |
|---|---|
| 10:17:43 1 | Vitals.com. |
| 10:17:53 2 | Q.   And then below, on the last line |
| 10:17:55 3 | of this page of notes in Exhibit 8, it's |
| 10:17:58 4 | again starred and says, "and - continued |
| 10:18:01 5 | to not gather the third-party info from |
| 10:18:03 6 | the physicians." |
| 10:18:05 7 | Do you see that? |
| 10:18:06 8 | A.   Yes. |
| 10:18:06 9 | Q.   Or "info for the position"; do |
| 10:18:09 10 | you see that? |
| 10:18:09 11 | A.   Yes. |
| 10:18:10 12 | Q.   Was that Mr. Rothschild saying |
| 10:18:12 13 | they would not do that? |
| 10:18:14 14 | A.   I don't remember. |
| 10:18:20 15 | Q.   All right.  Look at the next |
| 10:18:23 16 | page of the notes.  And you'll see there's |
| 10:18:27 17 | a reference to "Comparison ratings"? |
| 10:18:32 18 | Do you see those words written? |
| 10:18:33 19 | A.   I do. |
| 10:18:33 20 | Q.   "Paragraph 5" is written before |
| 10:18:36 21 | that, it looks like, having been referred |
| 10:18:39 22 | to the paragraph of the claim, do you |
| 10:18:40 23 | think? |
| 10:18:41 24 | A.   I don't know. |
| 10:18:43 25 | Q.   And then it says, "Phil says |

96

| | |
|---|---|
| 10:18:45 1 | this requires comparing one doctor to |
| 10:18:47 2 | another." |
| 10:18:47 3 | Do you see that? |
| 10:18:48 4 | A.   Yes. |
| 10:18:49 5 | Q.   Is that what you said at the |
| 10:18:51 6 | meeting? |
| 10:18:51 7 | A.   I don't remember. |
| 10:18:55 8 | Q.   You don't remember that you said |
| 10:18:58 9 | that? |
| 10:18:58 10 | A.   No. |
| 10:18:59 11 | Q.   Did you believe that at the |
| 10:19:02 12 | time, at the December 30 meeting, that the |
| 10:19:04 13 | comparison ratings element of the patent |
| 10:19:09 14 | requires comparing one doctor to another? |
| 10:19:11 15 | A.   I'm not really sure what this is |
| 10:19:13 16 | in reference (indicating) to without |
| 10:19:15 17 | looking at -- at the patent.  So I don't |
| 10:19:17 18 | know. |
| 10:19:18 19 | Q.   Were you looking at the patent |
| 10:19:22 20 | at the meeting? |
| 10:19:23 21 | A.   We were definitely looking at |
| 10:19:25 22 | the patent at the meeting, yes. |
| 10:19:27 23 | Q.   You just don't recall today |
| 10:19:29 24 | whether you had reached that -- had that |
| 10:19:31 25 | opinion or conclusion as of the time of |

24 (Pages 93 to 96)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

97

| | |
|---|---|
| 10:19:33 | 1 |
| 10:19:34 | 2 |
| 10:19:37 | 3 |
| 10:19:39 | 4 |
| 10:19:40 | 5 |
| 10:19:42 | 6 |
| 10:19:45 | 7 |
| 10:19:48 | 8 |
| 10:19:48 | 9 |
| 10:19:50 | 10 |
| 10:19:53 | 11 |
| 10:19:55 | 12 |
| 10:19:57 | 13 |
| 10:19:58 | 14 |
| 10:19:59 | 15 |
| 10:19:59 | 16 |
| 10:20:02 | 17 |
| 10:20:07 | 18 |
| 10:20:09 | 19 |
| 10:20:12 | 20 |
| 10:20:12 | 21 |
| 10:20:15 | 22 |
| 10:20:16 | 23 |
| 10:20:20 | 24 |
| 10:20:23 | 25 |

the meeting?

A.   Yeah.  I'm just not sure what -- what specifically this is referring to (indicating).

I don't know what Paragraph 5 is, and just would need to see what the claim says there about the comparison ratings.

Q.   Well, do you have any reason today to think that you did not say or didn't hold the opinion that comparison ratings requires comparing one doctor to another?

MR. STIMPSON:  Objection to the form.

You can answer, Philip.

A.   I have.  I assume Tim's notes are accurate.  I don't have any recollection of me saying anything about that.

Q.   Yeah, I know you don't have a recollection, Mr. Braginsky.  I'm trying to get at the difference between that and you're saying today you think you didn't say that or didn't hold that opinion.

98

| | |
|---|---|
| 10:20:25 | 1 |
| 10:20:27 | 2 |
| 10:20:28 | 3 |
| 10:20:30 | 4 |
| 10:20:32 | 5 |
| 10:20:34 | 6 |
| 10:20:35 | 7 |
| 10:20:36 | 8 |
| 10:20:37 | 9 |
| 10:20:38 | 10 |
| 10:20:40 | 11 |
| 10:20:41 | 12 |
| 10:20:42 | 13 |
| 10:20:43 | 14 |
| 10:20:45 | 15 |
| 10:20:48 | 16 |
| 10:20:51 | 17 |
| 10:20:51 | 18 |
| 10:20:54 | 19 |
| 10:21:02 | 20 |
| 10:21:08 | 21 |
| 10:21:10 | 22 |
| 10:21:12 | 23 |
| 10:21:14 | 24 |
| 10:21:17 | 25 |

A.   I don't --

Q.   You just don't know?

A.   I don't even -- as I say, I'm not sure what this is referring to (indicating) exactly.

Q.   Well, do you recall a discussion about comparison ratings?

A.   Yes.

Q.   Do you recall that there was a comparison ratings element contained in the patent?

A.   There is, yes.

Q.   All right.  What do you recall of the discussion at the meeting on December 30th about comparison ratings?  Forget the notes.  Just what you remember being discussed.

A.   I remember we discussed that as -- and our required element, and we went through how that was required in -- in the claim and compared that to what Vitals was doing.

Q.   And did you reach any conclusions at the meeting --

A.   Yes.

99

| | |
|---|---|
| 10:21:18 | 1 |
| 10:21:20 | 2 |
| 10:21:22 | 3 |
| 10:21:24 | 4 |
| 10:21:27 | 5 |
| 10:21:33 | 6 |
| 10:21:36 | 7 |
| 10:21:39 | 8 |
| 10:21:41 | 9 |
| 10:21:42 | 10 |
| 10:21:42 | 11 |
| 10:21:43 | 12 |
| 10:21:44 | 13 |
| 10:21:48 | 14 |
| 10:21:48 | 15 |
| 10:21:49 | 16 |
| 10:21:51 | 17 |
| 10:21:53 | 18 |
| 10:21:55 | 19 |
| 10:21:57 | 20 |
| 10:22:00 | 21 |
| 10:22:04 | 22 |
| 10:22:06 | 23 |
| 10:22:09 | 24 |
| 10:22:11 | 25 |

Q.   -- about that element and whether it was --

A.   Like I said, I would need to see the patent and where that shows up.  But we reached a conclusion that -- that what Vitals was doing did not -- did not infringe all of the elements of the claim.

Q.   Have you looked at the patent recently?

A.   Yes.

Q.   When?

A.   Yesterday.

Q.   Oh, so you read the patent yesterday?

A.   Yes.

Q.   So you have a recollection to some degree of what it says if you looked at it yesterday, right?

A.   Some, yes.  But it's -- it's a long and wordy bunch of claims.  So if you want to show me the claims to -- to help me see, you know, what it says exactly about the comparison ratings, I might be able to give you some better idea.

Q.   The next line of the notes below

100

| | |
|---|---|
| 10:22:14 | 1 |
| 10:22:18 | 2 |
| 10:22:21 | 3 |
| 10:22:24 | 4 |
| 10:22:25 | 5 |
| 10:22:26 | 6 |
| 10:22:27 | 7 |
| 10:22:28 | 8 |
| 10:22:30 | 9 |
| 10:22:30 | 10 |
| 10:22:33 | 11 |
| 10:22:37 | 12 |
| 10:22:39 | 13 |
| 10:22:40 | 14 |
| 10:22:43 | 15 |
| 10:22:45 | 16 |
| 10:22:48 | 17 |
| 10:22:48 | 18 |
| 10:22:50 | 19 |
| 10:22:52 | 20 |
| 10:22:59 | 21 |
| 10:23:01 | 22 |
| 10:23:04 | 23 |
| 10:23:05 | 24 |
| 10:23:07 | 25 |

that line I just read you says -- I think says, "Mitch, this could be easily disabled.  It's on-site, but almost no one uses."

Do you see that?

(The witness reads document.)

A.   Yes.

Q.   Is that how you'd read it?

A.   Yes.

Q.   Okay.  What do you recall being discussed about that concept?

A.   I don't -- I don't recall anything about that.

Q.   Do you recall Mr. Rothschild saying I have comparison ratings, but I could disable it?  No one uses it?

A.   No.

Q.   You don't recall anything said like that by anybody?

A.   No.

Q.   All right.  And then below there is a "Option 3" circled.  Do you see that?

A.   Yes.

Q.   And that's double starred as well on the left, right?

25 (Pages 97 to 100)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

101

```
10:23:08  1      A.  Yes.
10:23:09  2      Q.  And then it says next to "Option
10:23:11  3  3," "Report to not include comparison."
10:23:20  4      Do you see that?
10:23:22  5      A.  Yes.
10:23:22  6      Q.  What do you recall about a
10:23:23  7  discussion as in Option 3 that a report
10:23:26  8  generated by the MDx site would not
10:23:28  9  include comparisons?
10:23:29 10      A.  I know that there's a report
10:23:31 11  that's required as an element of the
10:23:34 12  claim.  And -- and we discussed what is
10:23:42 13  report -- what the report contains from
10:23:44 14  Vitals.com.
10:23:48 15      Q.  And what was said?
10:23:50 16      A.  I believe that we determined
10:23:58 17  that that element was non-infringed.
10:24:04 18      Q.  Below those notes it says --
10:24:06 19  towards the right, it says, "need to
10:24:09 20  determine" -- appears to say -- "how this
10:24:13 21  entered the claim."  And then the phrase
10:24:15 22  is written in parens, it looks like,
10:24:19 23  "wherein...include comparison ratings."
10:24:23 24      Do you see that?
10:24:24 25      A.  Yes.
```

102

```
10:24:24  1      Q.  And then there's a reference,
10:24:25  2  "see November '09 response to amendment."
10:24:28  3      Do you see that?
10:24:28  4      A.  Yes.
10:24:29  5      Q.  Does that refresh your memory
10:24:31  6  about any discussion about -- about
10:24:33  7  needing to determine how the comparison
10:24:35  8  rating element entered the claim?
10:24:38  9      A.  It doesn't refresh my memory
10:24:41 10  about what was specifically said on -- on
10:24:44 11  that day, no.
10:24:45 12      Q.  And after this meeting on
10:24:48 13  December 30, was there anyone who made an
10:24:50 14  attempt to determine how this element
10:24:53 15  entered the claim?
10:24:55 16      A.  I don't recall.
10:24:58 17      Q.  Did you make an effort to
10:25:00 18  determine how the element entered the
10:25:02 19  claim?
10:25:02 20      A.  I don't recall.  I know that
10:25:03 21  when we drafted the opinion, we did review
10:25:08 22  again the prosecution history.
10:25:10 23      Q.  Did Mr. Heaton report to you any
10:25:13 24  research he had done on determining how
10:25:15 25  the comparison rating element entered the
```

103

```
10:25:18  1  claim?
10:25:18  2      A.  I don't -- I don't remember.
10:25:19  3      Q.  And you don't remember any
10:25:21  4  conclusion about how the comparison rating
10:25:24  5  element entered the claim?
10:25:27  6      A.  I -- not specifically.  I
10:25:31  7  believe it was -- it was part of a
10:25:36  8  narrowing amendment.
10:25:38  9      Q.  That's what you recall today?
10:25:39 10      A.  Yes.  That's what I recall
10:25:41 11  today.
10:25:41 12      Q.  And, then, over to the left,
10:25:45 13  below "Option 3," it says, "Might be
10:25:49 14  best" -- then there's a sort of line or
10:25:51 15  arrow -- it says, "start here"; do you see
10:25:56 16  that?
10:25:56 17      A.  Yes.
10:25:56 18      Q.  And then it says, "based on this
10:25:59 19  alone we conclude you do not infringe the
10:26:02 20  claims."
10:26:02 21      Do you see that?
10:26:03 22      A.  Yes.
10:26:04 23      Q.  And then it says, "by
10:26:07 24  additionally not doing 1 and 2, it's clear
10:26:10 25  that you don't infringe as you describe
```

104

```
10:26:12  1  your algorithm to us."
10:26:14  2      Do you see that?
10:26:15  3      A.  Yes.
10:26:15  4      Q.  Is that how you would read those
10:26:17  5  words?
10:26:17  6      A.  Yes.
10:26:17  7      Q.  And what do you recall being
10:26:19  8  discussed about these (indicating)
10:26:21  9  concepts that are described here in the
10:26:22 10  notes?
10:26:23 11      A.  I don't recall in this specific
10:26:27 12  conversation that day about that.  You
10:26:32 13  know, about that (indicating) statement.
10:26:34 14      What I recall is that we went
10:26:36 15  through each element of -- of the claims
10:26:43 16  and compared that to what Vitals was doing
10:26:48 17  on both -- on the front end and back end,
10:26:50 18  and that there were several missing
10:26:55 19  elements that made it clear there was no
10:27:00 20  infringement of the claims.
10:27:03 21      Q.  What does the phrase, or what do
10:27:07 22  you recall discussed about the phrase,
10:27:10 23  "it's clear you do not infringe as you
10:27:12 24  describe your algorithm to us"?
         25      (The witness reads document.)
```

26 (Pages 101 to 104)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

105

```
10:27:21  1      A.  So what was the question?
10:27:22  2      Q.  Yes.  What do you recall being
10:27:24  3  discussed about that?
10:27:25  4      A.  Nothing specifically, no.
10:27:27  5      Q.  What did Mr. Rothschild say to
10:27:29  6  you about the MDx algorithm?
10:27:31  7      A.  He -- he went through it
10:27:35  8  step-by-step, about what process they --
10:27:39  9  they follow on the back end in order to
10:27:43 10  produce the -- you know, what the user
10:27:47 11  sees and experiences on the website.
10:27:49 12      Q.  So you've been talking today --
10:27:51 13  several times you've mentioned "front end"
10:27:54 14  and "back end."
10:27:55 15      Why don't you explain what you
10:27:58 16  mean by that, Mr. Braginsky --
10:28:00 17      A.  Sure.
10:28:01 18      Q.  -- those phrases.
10:28:03 19      A.  Generally, by "front end," I
10:28:05 20  mean the user experience and the user
10:28:07 21  interface when utilizing the Vitals.com
10:28:11 22  website.  And the "back end," is the
10:28:17 23  process of how that's put together, what
10:28:20 24  information is gathered, how that
10:28:22 25  information is gathered, and how that's
```

106

```
10:28:25  1  put together to create the user interface.
10:28:29  2      Q.  And the algorithm would be a
10:28:31  3  reference to how the back end of the site
10:28:33  4  works to generate the so-called front end
10:28:37  5  of what the consumer sees?
10:28:38  6      A.  I think so, yes.
10:28:45  7      Q.  Now, back to your notes -- I'm
10:28:48  8  sorry, Mr. Heaton's notes, as best we
10:28:51  9  understand them -- on the line below the
10:28:54 10  phrase about the algorithm, it's written
10:28:59 11  maybe "within" -- I'm not sure --
10:29:01 12  "additional not doing 1 and 2, a 'well
10:29:05 13  informed court would conclude that you do
10:29:07 14  not infringe.'"
10:29:08 15      Do you see that?
10:29:09 16      A.  Yes.
10:29:10 17      Q.  And what do you recall of a
10:29:11 18  discussion about "not doing 1 and 2"?
10:29:17 19      (The witness reads document.)
10:29:19 20      A.  I don't recall anything.
10:29:20 21      Q.  Do you recall at the meeting a
10:29:22 22  discussion that -- that you believed the
10:29:29 23  comparison ratings element was not
10:29:32 24  infringed, but that if Mr. Rothschild also
10:29:35 25  took the steps described as Options 1 and
```

107

```
10:29:39  1  2 in these notes, that that would
10:29:42  2  strengthen the idea that there wasn't an
10:29:44  3  infringement?
10:29:45  4      A.  I'm sorry.  I'm sorry.  Just
10:29:48  5  repeat that one more time?
10:29:49  6      Q.  Yes.  So I'm asking you, do you
10:29:52  7  recall a discussion where you concluded
10:29:53  8  that the comparison ratings element was
10:29:56  9  not infringed, but that there was a
10:29:59 10  further discussion that if Mr. Rothschild
10:30:02 11  did as described as Options 1 and 2 in
10:30:06 12  these notes --
10:30:07 13      A.  Mm-hmm.
10:30:08 14      Q.  -- it would strengthen the idea
10:30:11 15  that there was not an infringement?
10:30:13 16      A.  No, I don't -- I don't recall
10:30:14 17  that.  No.
10:30:15 18      Q.  So what do you think it means
10:30:17 19  when it says, "additional not doing 1 and
10:30:20 20  2, 'a well informed court would conclude
10:30:23 21  that you do not infringe'"?
10:30:26 22      A.  Yeah, I don't know.
10:30:29 23      Q.  You don't recall any discussion
10:30:31 24  like that?
10:30:31 25      A.  No.  I don't know.  I don't know
```

108

```
10:30:32  1  what 1 and 2 is.
10:30:33  2      Q.  Do you recall who spoke about,
10:30:35  3  or used the phrase, "a well informed court
10:30:38  4  would conclude you do not infringe"?  Or
10:30:41  5  put it in quotes or why was put in quotes?
10:30:44  6      A.  No.
10:30:48  7      MR. STIMPSON:  I'm sorry, I know
10:30:50  8  we haven't been going a total hour,
10:30:54  9  when you get a chance I need another
10:30:56 10  break.
10:30:57 11      MR. KANAN:  Oh, I'm almost done
10:30:59 12  with these notes.  Just a couple of
10:31:01 13  minutes, Scott, and then we can surely
10:31:04 14  take a break.
10:31:05 15      MR. STIMPSON:  Mm-hmm.
10:31:08 16  BY MR. KANAN:
10:31:09 17      Q.  All right.  And then down below
10:31:12 18  that, Mr. Braginsky, there's a phrase,
10:31:16 19  "See sample from PB old and do search for
10:31:20 20  opinion authored by Phil."
10:31:21 21      Do you see that?
10:31:23 22      A.  Yes.
10:31:24 23      Q.  Does that refresh your memory
10:31:25 24  about a discussion that relates to that --
10:31:29 25  those words?
```

27 (Pages 105 to 108)

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

109

10:31:29 1  A.   You know, it doesn't.  I know I
10:31:32 2  can surmise what that means (indicating).
10:31:34 3  But it doesn't refresh my memory about
10:31:36 4  what we specifically spoke on that day.
10:31:39 5  Q.   Is it referring to getting an
10:31:41 6  opinion you've previously written and
10:31:42 7  using that as a template for writing an
10:31:45 8  opinion to Mr. Rothschild?
10:31:46 9  A.   I think it is, yes.
10:31:47 10  Q.   Do you recall a discussion like
10:31:48 11  that?
10:31:50 12  A.   Not specifically.
10:31:52 13  Q.   Do you recall that there was a
10:31:53 14  discussion toward the end of the meeting
10:31:55 15  that you would provide to Mr. Rothschild a
10:32:00 16  freedom to operate opinion?
10:32:03 17  A.   I don't recall that
10:32:04 18  specifically, no.
10:32:04 19  Q.   You had expressed at this
10:32:05 20  meeting to Mr. Rothschild your opinion
10:32:07 21  that there was no infringement?
10:32:11 22  A.   Yes.
10:32:11 23  Q.   No likelihood of infringement?
10:32:15 24  A.   Well, no opinion -- no
10:32:18 25  opinion -- no infringement, yes.

---

110

10:32:21 1  Q.   And you just don't remember
10:32:22 2  whether there was a discussion that you
10:32:24 3  would provide him a formal written
10:32:26 4  opinion?
10:32:27 5  A.   Yeah, I don't remember
10:32:28 6  specifically when we decided to provide
10:32:29 7  that.
10:32:31 8  (Telephonic interruption.)
10:32:32 9  MR. KANAN:  Let's take a break.
10:32:33 10  MR. STIMPSON:  Okay, sorry.
10:32:35 11  THE VIDEO OPERATOR:  Going off
10:32:36 12  the record at 10:52.  This also marks
10:32:39 13  the end of Tape 1.
10:32:43 14  (A recess was taken.)
10:45:08 15  THE VIDEO OPERATOR:  Stand by.
10:45:12 16  Returning to the record at 10:45
10:45:24 17  a.m.
10:45:25 18  And this marks the beginning of
10:45:27 19  Tape Number 2.
10:45:29 20  BY MR. KANAN:
10:45:30 21  Q.   All right.  Mr. Braginsky, we
10:45:32 22  have been talking about the December 30th
10:45:35 23  meeting you had with Mr. Rothschild, you
10:45:37 24  and Mr. Heaton.
10:45:38 25  Do you recall anything else

---

111

10:45:39 1  being discussed at that meeting that
10:45:41 2  you've not testified about?
10:45:43 3  A.   Well, what I recall discussing
10:45:46 4  was looking at each of the claim elements
10:45:52 5  in detail and comparing that to the
10:45:57 6  Vitals.com website and process, and
10:46:04 7  concluding that -- that there was an
10:46:10 8  infringement because of the various
10:46:12 9  elements that were not satisfied.
10:46:14 10  Q.   Do you -- or do you recall that
10:46:17 11  you made suggestions to Mr. Rothschild of
10:46:20 12  changes that should be made or could be
10:46:22 13  made in the website to avoid infringement?
10:46:27 14  A.   We felt that the way the
10:46:32 15  website was currently functioning, during
10:46:37 16  that meeting, that there was no
10:46:39 17  infringement.
10:46:40 18  Q.   And so you don't recall
10:46:42 19  discussing changes that might be made, or
10:46:44 20  suggesting some changes that might be
10:46:46 21  made, to avoid infringement?
10:46:47 22  A.   No.  No.
10:46:55 23  Q.   You don't recall discussing the
10:46:56 24  options that are described in the notes as
10:47:00 25  changes that could be made?

---

112

10:47:02 1  A.   No.  I don't recall what those
10:47:04 2  options are.
10:47:40 3  (Braginsky Exhibit 9 marked for
10:47:40 4  identification, e-mail from Mitchel
10:47:40 5  Rothschild dated December 31, 2010,
10:47:41 6  with production number MDX 0100719.)
10:47:41 7  Q.   All right.  Mr. Braginsky, you
10:47:44 8  have before you what's marked Exhibit 9.
10:47:47 9  This appears to be an e-mail
10:47:48 10  that Mr. Rothschild sent you on December
10:47:51 11  31st.
10:47:52 12  So this is the day after the
10:47:54 13  meeting.  And he sent it at 6 in the
10:47:57 14  morning, it looks like.  So maybe not even
10:47:59 15  a full day after the meeting.
10:48:01 16  A.   Mm-hmm.
10:48:01 17  Q.   Early.  And the subject was
10:48:04 18  "Thanks for your time yesterday."
10:48:06 19  So this is, of course, the day
10:48:08 20  after the meeting we've been discussing,
10:48:10 21  correct?
10:48:10 22  A.   Yes.
10:48:10 23  Q.   And he said, "I thought it was a
10:48:13 24  very productive session.  Your wisdom is
10:48:17 25  appreciated."

---

28 (Pages 109 to 112)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

113

```
10:48:18   1        And then he said, "Had a
10:48:20   2   question:  Based on our meeting, Vitals is
10:48:23   3   inserting certain changes to ensure that
10:48:26   4   we are in no way in violation of the
10:48:28   5   patent."
10:48:28   6        Do you see that?
10:48:30   7     A.   Yes.
10:48:30   8     Q.   Do you recall that at the
10:48:31   9   meeting there was a discussion about
10:48:33  10   implementing changes?
10:48:37  11     A.   I don't recall specifically
10:48:41  12   discussing certain changes.
10:48:43  13        As I said, I do recall
10:48:47  14   discussing various ways to minimize the
10:48:54  15   risk of -- of a litigation.
10:48:56  16        So we said that you are not
10:49:01  17   infringing the claim.  But looking at this
10:49:05  18   more holistically, as a business strategy,
10:49:08  19   you still want to avoid the possibility of
10:49:11  20   a litigation.  And anything you can do in
10:49:15  21   addition would -- might help to convince
10:49:20  22   them that there's no infringement.
10:49:22  23     Q.   Okay.  Well, I had just asked
10:49:24  24   you a moment ago if you had made any
10:49:26  25   recommendations or changes.
```

114

```
10:49:30   1     A.   Right.
10:49:31   2     Q.   And you testified you didn't
10:49:32   3   recall any.
10:49:33   4     MR. STIMPSON:  There's no
10:49:35   5   question pending.
10:49:36   6     Q.   I'm asking, do you recall that
10:49:39   7   previous testimony when I asked you that
10:49:41   8   just a minute ago?
10:49:42   9     A.   Yes, mm-hmm.
10:49:42  10     Q.   Now, this Exhibit 9 indicates,
10:49:44  11   that based on the meeting, there was a
10:49:47  12   discussion about implementing changes.
10:49:50  13   And your answer was just about
10:49:53  14   implementing changes; is that correct?
10:49:55  15     A.   Yes.  We discussed that if there
10:49:59  16   are things that could be done to further
10:50:02  17   broaden your distance from this claim so
10:50:04  18   that -- as I said, I used the term "make
10:50:09  19   it abundantly clear" that there is no
10:50:13  20   infringement to -- to Health Grades, then
10:50:15  21   we should do that.
10:50:16  22     Q.   Because it wasn't abundantly
10:50:18  23   clear without changes; is that right?
10:50:20  24     A.   I don't know what Health Grades
10:50:21  25   was thinking.  Only, you know, what our
```

115

```
10:50:23   1   conclusion was.
10:50:46   2        (Braginsky Exhibit 10 marked for
10:50:46   3   identification, e-mail with
10:50:46   4   attachment, with production numbers
10:50:57   5   MDX 0100720 through 0722.)
10:50:57   6     Q.   All right.  Mr. Braginsky,
10:51:00   7   Exhibit 10 is an e-mail that
10:51:02   8   Mr. Rothschild sent to you on January 2nd.
10:51:08   9   So a couple of days later.
10:51:10  10     A.   Mm-hmm.
10:51:11  11     Q.   And then there's a two-page
10:51:13  12   attachment.  And he says in the e-mail,
10:51:15  13   "Following up on our Friday conversation,
10:51:18  14   please review the attached list of
10:51:20  15   protocols to ensure that this document is
10:51:24  16   in conformance with our conversations."
10:51:28  17        Do you see that?
10:51:29  18     A.   Yes.
10:51:30  19     Q.   And what were the conversations
10:51:31  20   that you had with Mr. Rothschild about
10:51:37  21   protocols to be followed going forward?
10:51:39  22     A.   I don't remember specifically.
10:51:43  23     Q.   Was this Friday conversation
10:51:45  24   that he's referring to -- let's see --
10:51:50  25   Sunday the 2nd, Saturday the 1st, it would
```

116

```
10:51:56   1   seem that Friday would be December 31st.
10:51:59   2   So the day after your meeting --
10:52:02   3     A.   Right.
10:52:02   4     Q.   -- you had a conversation with
10:52:04   5   him?
10:52:06   6     A.   I don't recall, but from this
10:52:08   7   e-mail it seems like it.  Yes.
10:52:09   8     Q.   You apparently didn't make any
10:52:12   9   notes of a conversation with him; is that
10:52:14  10   right?
10:52:14  11     A.   I don't remember.
10:52:14  12     Q.   Did you discuss with him in a
10:52:16  13   phone conversation a set of protocols that
10:52:20  14   Vitals would follow to avoid infringement?
10:52:23  15     A.   I don't recall what we discussed
10:52:25  16   or that we had the discussion.
10:52:30  17     Q.   Please look at the two pages
10:52:33  18   that are attached to the e-mail.
10:52:36  19        (The witness reviews document.)
10:52:57  20     Q.   Have you seen this list of
10:52:58  21   protocols before, if you recall?
10:53:01  22     A.   Yes.  I saw it.  I've seen it
10:53:06  23   before, yes.
10:53:07  24     Q.   You saw it in January of 2011,
10:53:10  25   when Mr. Rothschild sent it to you; is
```

29 (Pages 113 to 116)

117

```
10:53:13  1   that right?
10:53:13  2       A.   That I don't recall.
10:53:14  3       Q.   When do you recall seeing it?
10:53:16  4       A.   I definitely saw it yesterday.
10:53:18  5       Q.   Yesterday, when you were doing
10:53:20  6   your preparation for the deposition?
10:53:21  7       A.   Yes.
10:53:21  8       Q.   And did you review this e-mail
10:53:25  9   that the list is attached to?
10:53:26 10       A.   Yes.
10:53:27 11       Q.   Okay.  And toward the bottom of
10:53:31 12   the second page of the exhibit, there is a
10:53:34 13   listing of the Vitals protocols that would
10:53:40 14   have to be strictly enforced.
10:53:41 15       Do you see that?
10:53:42 16       A.   Yes.  Where it says, "must
10:53:46 17   continue to be strictly enforced..."?
10:53:49 18       Q.   Right.
10:53:51 19       A.   Yes.
10:53:51 20       Q.   "...to ensure that Vitals is not
10:53:54 21   in violation of the patent."
10:53:55 22       Do you see that?
10:53:56 23       A.   I do, yes.
10:53:57 24       Q.   It included third-party
10:53:59 25   information -- excuse me, it included that
```

118

```
10:54:01  1   the display of third-party information
10:54:03  2   would not include internship, residency
10:54:06  3   and fellowships.
10:54:08  4       Do you see that?
10:54:08  5       A.   I do, yes.
10:54:10  6       Q.   And was it your understanding at
10:54:12  7   that time that Vitals would not display
10:54:13  8   that information?
10:54:14  9       A.   Yes.
10:54:14 10       Q.   And is it your understanding
10:54:16 11   that it does not display that information
10:54:20 12   to date?
10:54:21 13       A.   I don't know -- I don't know.  I
10:54:24 14   haven't looked at their website.
10:54:25 15       Q.   It also says that there is not
10:54:28 16   to be displayed licensure status.
10:54:31 17       Do you see that?
10:54:32 18       A.   Yes.
10:54:32 19       Q.   And is it your understanding
10:54:34 20   that they did not display licensure status
10:54:36 21   as of January 2011?
10:54:39 22       A.   That they didn't satisfy that
10:54:41 23   element of the claim where you needed to
10:54:43 24   have three out of this category or --
10:54:47 25       Q.   That wasn't quite what I asked
```

119

```
10:54:48  1   you.
10:54:49  2       I asked you:  Did you have the
10:54:50  3   understanding in January 2011, as this
10:54:53  4   memo says, that their 3rd party verified
10:54:57  5   information did not include licensure
10:55:00  6   status?
10:55:01  7       A.   I don't recall -- I don't
10:55:05  8   recall.
10:55:06  9       Q.   And turning to the last page of
10:55:07 10   the exhibit, the topic 4, "No report on
10:55:14 11   Vitals show comparison ratings to other
10:55:18 12   providers."
10:55:19 13       Was it your understanding, as of
10:55:20 14   January 2011, that that was the case at
10:55:24 15   the Vitals site?
10:55:24 16       A.   Yes.  Yes.
10:55:25 17       Q.   Do you know whether it's
10:55:26 18   remained that way since then?
10:55:28 19       A.   I do not.
10:55:34 20       Q.   And paragraph 5 says,
10:55:36 21   "Information on specialty, age, years in
10:55:41 22   profession" -- and other categories listed
10:55:43 23   there -- "would be gathered only from 3rd
10:55:45 24   party sources, not from the provider
10:55:47 25   directly."
```

120

```
10:55:48  1       Do you see that?
10:55:49  2       A.   I do, yes.
10:55:50  3       Q.   Was that your understanding,
10:55:51  4   that that's how it was done as of January
10:55:53  5   2011?
10:55:53  6       A.   I don't recall.
10:55:55  7       Q.   Do you know whether in fact
10:55:57  8   doctors do in fact -- do go to the Vitals
10:55:59  9   website and either provide or edit some of
10:56:03 10   this information listed in paragraph 5?
10:56:05 11       A.   Hmmm -- I don't -- I don't know.
10:56:10 12       Q.   You don't know.  Have you
10:56:12 13   investigated that?
10:56:13 14       A.   Whether they do that now?  I
10:56:15 15   haven't looked at -- I haven't looked at
10:56:18 16   the website.  I don't know.
10:56:21 17       Q.   When did you last look at the
10:56:22 18   website?
10:56:25 19       A.   Around this point in time, when
10:56:27 20   we were drafting the opinion.
10:56:29 21       Q.   So around January 2011?
10:56:32 22       A.   Yeah.  I don't recall the last
10:56:35 23   time I looked at it, but -- actually, I
10:56:38 24   have no recollection of the last time I
10:56:40 25   looked at it.  I don't know.
```

30 (Pages 117 to 120)

121

10:56:41 1    Q.   Well --
10:56:42 2    A.   It's not recent.
10:56:43 3    Q.   I want to get your best
10:56:45 4  recollection.
10:56:45 5        Do you think you looked at it
10:56:47 6  after January 2011, when your freedom to
10:56:50 7  operate letter was written?
10:56:51 8    A.   I have no recollection of that.
10:56:52 9    Q.   Okay.
10:57:08 10       (Braginsky Exhibit 11 marked for
10:57:08 11  identification, e-mail chain, with
10:57:11 12  production number MDX010411.)
10:57:11 13   Q.   All right. Mr. Braginsky, you
10:57:13 14  have before you, Exhibit 11. And this
10:57:16 15  appears to be a couple of e-mails.
10:57:22 16       The e-mail in the middle of the
10:57:23 17  page is the one we just looked at from
10:57:26 18  Mr. Rothschild regarding reviewing the
10:57:29 19  list of protocols that he sent on January
10:57:32 20  2nd.
10:57:33 21       Do you see that?
10:57:34 22   A.   Yes.
10:57:34 23   Q.   And then it appears there's an
10:57:36 24  e-mail from you to Mr. Heaton, the next
10:57:38 25  day, January 3rd. The subject is the

122

10:57:43 1  "Vitals Web Site Protocols."
10:57:46 2        Do you see that?
10:57:46 3    A.   Yes.
10:57:47 4    Q.   Whatever is in there has been
10:57:49 5  redacted, it appears.
10:57:51 6    A.   Yes.
10:57:51 7    MR. KANAN:  And so my question
10:57:53 8  to you, Mr. Stimpson:  What is the
10:57:56 9  basis for it being redacted?  It
10:57:56 10  appears that it relates specifically
10:58:01 11  to this document.
10:58:01 12   MR. STIMPSON:  The question
10:58:01 13  should have been asked before the
10:58:03 14  deposition.  I can't tell you right
10:58:03 15  now.  I can't give you a reason.  I
10:58:04 16  can find out later.
10:58:04 17   MR. KANAN:  Do you know a basis
10:58:10 18  for redaction?
10:58:10 19   MR. STIMPSON:  I do not, no.
10:58:11 20   MR. KANAN:  So could you please
10:58:12 21  find out for me?
10:58:15 22   MR. STIMPSON:  I will.
10:58:16 23  BY MR. KANAN:
10:58:16 24   Q.   All right.  Now, let's go to
10:58:18 25  your freedom to operate opinion letter

123

10:58:27 1  that is marked as Rothschild 8.
10:58:30 2        You have that, correct?
10:58:32 3    A.   Yes.
10:58:39 4    Q.   Now, you say at the bottom of
10:58:49 5  the first page of this opinion letter,
10:58:53 6  that you've performed a study which
10:58:55 7  included a review of the patent, the
10:58:57 8  prosecution history, prior art references,
10:59:01 9  and the Vitals MDx website as
10:59:06 10  Mr. Rothschild has described it to you.
10:59:10 11  Correct?  Or the processes used to
10:59:13 12  implement the site as Mr. Rothschild
10:59:15 13  described it, correct?
10:59:16 14   A.   Yes, mm-hmm.
10:59:17 15   Q.   And is that the extent of what
10:59:20 16  you did in order to write this opinion?
10:59:21 17   A.   I believe so, yes.
10:59:22 18   Q.   Do you recall today that you did
10:59:26 19  anything else?
10:59:28 20   A.   No, I don't.
10:59:30 21   Q.   Had you issued any amendments or
10:59:33 22  supplements to this opinion letter?
10:59:36 23   A.   No, we haven't.
10:59:37 24   Q.   Have you done any substantive
10:59:38 25  work at all since January of 2011, when

124

10:59:41 1  the letter was written on this matter?
10:59:45 2  Other than preparing for the deposition
10:59:46 3  yesterday.
10:59:47 4    A.   No, I don't believe so.
10:59:49 5    Q.   Have you reviewed the Markman
10:59:52 6  ruling in the case?
10:59:52 7    A.   No.
10:59:54 8    Q.   You don't know anything about
10:59:56 9  what the Markman ruling was?
10:59:59 10   A.   No.
11:00:07 11   Q.   All right.  At the top of page 2
11:00:09 12  of the opinion, it says, "It's our
11:00:11 13  opinion, based on the analysis, that the
11:00:16 14  commercial activity presently being
11:00:18 15  contemplated by Vitals avoids
11:00:25 16  infringement."
11:00:25 17       Do you see that?
11:00:26 18   A.   I do.
11:00:26 19   Q.   I've paraphrased.  Did you use
11:00:29 20  the phrase, "being contemplated" in a
11:00:33 21  conscious way, as opposed to what it was
11:00:35 22  actually doing at the time?
11:00:35 23   A.   I don't recall.
11:00:36 24   Q.   What was being "contemplated,"
11:00:40 25  as you understand it, when you wrote this

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

125

```
11:00:41  1   letter?
11:00:44  2       A.  I don't recall.  I think it was,
          you know, just as they conducted their
11:00:45  3
11:00:47  4   business.
11:00:48  5       Q.  So why did you say, "being
11:00:51  6   contemplated" as opposed to "commercial
11:00:54  7   activity presently being conducted by
11:00:56  8   Vitals"?
11:00:57  9       A.  I don't know.
11:00:57 10       Q.  Did you write this opinion
11:00:59 11   letter?
11:00:59 12       A.  I did, yes.
11:01:02 13       Q.  So you can't recall why you
11:01:04 14   phrased it that way?
11:01:05 15       A.  No.
11:01:09 16       Q.  All right.  At the bottom of
11:01:11 17   this second page is a section called
11:01:14 18   "Summary Opinion."
11:01:16 19       Do you see that?
11:01:17 20       A.  Yes.
11:01:17 21       Q.  And you said that, "During the
11:01:20 22   course of the investigation, we studied
11:01:23 23   the information and materials provided to
11:01:25 24   us by Vitals."
11:01:27 25       Do you see that?
```

126

```
11:01:27  1       A.  I do, yes.
11:01:28  2       Q.  What was that information and
11:01:29  3   materials provided?
11:01:30  4       A.  I believe that's, you know, what
11:01:32  5   was stated on -- on page 1 and carried
11:01:35  6   over to 2.
11:01:39  7       Q.  Well, that was the site itself,
11:01:45  8   and the processes that Mr. Rothschild
11:01:47  9   described to you, right?
11:01:48 10       A.  Right.
11:01:48 11       Q.  Anything else that was provided?
11:01:51 12       A.  I don't think so.  Not that I
11:01:53 13   recall.
11:01:53 14       Q.  So that would appear to be
11:01:55 15   information Mr. Rothschild provided,
11:01:57 16   correct?
11:01:58 17       A.  Yes.
11:01:58 18       Q.  Was there some materials also
11:02:01 19   provided?
11:02:03 20       A.  Not that I recall, no.
11:02:08 21       Q.  All right.  If you would refer
11:02:10 22   to the third page of the letter.
11:02:14 23       (The witness complies.)
11:02:15 24       Q.  At the top it says, "Based on
11:02:17 25   our study of the patent, it's our opinion
```

127

```
11:02:20  1   upon a fully" -- "that upon a fully
11:02:23  2   developed record, it's more likely than
11:02:26  3   not that the Vitals site not" -- "does not
11:02:33  4   infringe or a court will determine that."
11:02:35  5       Do you see?
11:02:36  6       A.  Yes.
11:02:37  7       Q.  Now, "more likely than not," is
11:02:39  8   quite a bit different than "no
11:02:41  9   infringement" or "abundantly clear no
11:02:45 10   infringement."
11:02:45 11       Why did you phrase it "more
11:02:47 12   likely than not"?
11:02:49 13       MR. STIMPSON:  Objection to the
11:02:50 14   form of the question.
11:02:50 15       You can still answer.
11:02:55 16       A.  I think we phrased it that way
11:02:57 17   to ensure that, you know, the client
11:02:59 18   understands that there's -- this is a
11:03:05 19   subjective process, and that there's
11:03:09 20   always -- risk still remains.
11:03:14 21       Q.  Referring to the next paragraph
11:03:17 22   on page 3, you say, "Specifically, we
11:03:20 23   conclude the patent would not implicate
11:03:23 24   the site"; that is, the site does not
11:03:27 25   infringe the patent is another way of
```

128

```
11:03:29  1   saying it, right?
11:03:29  2       A.  Yes.
11:03:30  3       Q.  Because -- and then you're going
11:03:32  4   to list here reasons why.  Correct?
11:03:35  5       A.  Yes.
11:03:36  6       Q.  And the first one you list is
11:03:39  7   that, "The Vitals site does not create and
11:03:41  8   provide access to a report that includes
11:03:45  9   third-party verified information," that
11:03:50 10   you describe, right?
11:03:52 11       A.  Correct.
11:03:52 12       Q.  Is that what the patent element
11:03:56 13   is; that the report include third-party
11:03:58 14   verified information?
11:03:59 15       MR. STIMPSON:  Objection to the
11:04:00 16   form of the question, without the
11:04:04 17   patent being front of him.
11:04:05 18       A.  I don't recall specifically what
11:04:06 19   the claim language is.
11:04:08 20       Q.  Were you quoting the claim
11:04:09 21   language when you were writing this?
11:04:11 22       A.  I don't remember.
11:04:16 23       Q.  Well, Mr. Braginsky, Claim 1 of
11:04:21 24   the patent, with respect to the report,
11:04:24 25   says that, "...it is the creation of a
```

32 (Pages 125 to 128)

129

11:04:28 1 healthcare provider report using
11:04:30 2 healthcare provider information, patient
11:04:33 3 information and information verified by a
11:04:37 4 third party."
11:04:38 5 A. Say that again?
11:04:39 6 Q. Yes. It uses the verb "using."
11:04:39 7 A. Okay.
11:04:42 8 Q. Okay. I'll just show you my
11:04:44 9 copy.
11:04:44 10 A. "Creating a report" --
11:04:46 11 Q. Using those three types of
11:04:48 12 information.
11:04:48 13 A. Okay.
11:04:53 14 Q. Do you see that?
11:04:54 15 A. Mm-hmm.
11:04:54 16 Q. So the patent does not say the
11:04:56 17 report would include that information,
11:04:57 18 does it?
11:04:58 19 MR. STIMPSON: Excuse me, I have
11:04:59 20 to object to this line of questioning.
11:05:01 21 If you're not going to put the
11:05:03 22 patent in front of him -- I know you
11:05:07 23 showed him the patent and then you
11:05:09 24 took it away --
11:05:10 25 MR. KANAN: Well, he can look

130

11:05:12 1 at -- I don't care -- the copy there.
11:05:13 2 Yes, he can look at the copy
11:05:15 3 there for purposes of what I'm asking.
11:05:17 4 Q. You've got Claim 1 there?
11:05:19 5 A. I do, yes.
11:05:20 6 Q. And Claim 1, with respect to the
11:05:22 7 healthcare provider report, doesn't say
11:05:24 8 that the report includes those -- that
11:05:28 9 type of information, does it?
11:05:31 10 A. No.
11:05:31 11 Q. It just says "using"?
11:05:33 12 A. Yes.
11:05:34 13 Q. So your opinion letter is
11:05:35 14 erroneous in its description of what's
11:05:38 15 required by the patent, isn't it?
11:05:40 16 A. No. No. No.
11:05:42 17 Q. Why not?
11:05:43 18 MR. STIMPSON: Objection. This
11:05:45 19 is not -- this is an objection because
11:05:47 20 you're asking for expert testimony
11:05:49 21 now. There's a distinction between
11:05:52 22 asking him what was happening back
11:05:53 23 then and what he thinks is going on
11:05:55 24 right now, and that's what you just
11:05:57 25 asked him.

131

11:05:58 1 So that's my objection. Expert
11:06:00 2 testimony.
11:06:00 3 Q. Okay. You can answer.
11:06:02 4 A. I think from the claim language,
11:06:05 5 as a whole, including the preamble as
11:06:08 6 well, that the use of -- the way this is
11:06:15 7 phrased, "including this independent
11:06:18 8 third-party verified information," mirrors
11:06:23 9 what it says here about "using."
11:06:26 10 "Using" in this context means
11:06:29 11 that the report -- let's see -- "the
11:06:32 12 creating..." -- hmmm -- -- healthcare
11:06:35 13 provider report has to have that
11:06:37 14 information within it.
11:06:40 15 Q. So you would say the word
11:06:42 16 "using" in the element there of the claim
11:06:44 17 means the same thing as the "report
11:06:46 18 includes" that information, as you phrased
11:06:49 19 it in your opinion letter; is that right?
11:06:51 20 A. Yes.
11:06:51 21 Q. Are you aware that the Judge in
11:06:53 22 this case in his Markman ruling explicitly
11:06:56 23 rejected that interpretation?
11:06:59 24 A. No --
11:07:00 25 MR. STIMPSON: Objection. I

132

11:07:01 1 object to the form. Because I don't
11:07:03 2 agree with that. He already told you
11:07:07 3 he didn't see the claim instruction.
11:07:09 4 So -- and also it calls for expert
11:07:10 5 testimony, because now you're asking
11:07:12 6 him what's going on today.
11:07:14 7 Q. Are you aware that the Judge's
11:07:16 8 Markman ruling expressly rejected that?
11:07:19 9 Are you?
11:07:19 10 MR. STIMPSON: Objection. All
11:07:20 11 the same objections.
11:07:21 12 A. I'm not.
11:07:22 13 Q. And you haven't looked at the
11:07:24 14 Markman opinion?
11:07:24 15 A. I have not.
11:07:25 16 Q. Now, if you were aware that, in
11:07:28 17 fact, the Court had construed that the
11:07:29 18 word "using" to not require the report
11:07:31 19 actually include this information, would
11:07:33 20 that change your opinion --
11:07:34 21 A. No --
11:07:35 22 MR. STIMPSON: Hold on.
11:07:37 23 Objection to the form of the question.
11:07:39 24 THE WITNESS: I'm sorry.
11:07:40 25 MR. STIMPSON: You're asking him

33 (Pages 129 to 132)

133

11:07:42  1   about expert testimony right now and
11:07:42  2   you are asking him about a claim
11:07:43  3   construction, which you haven't shown
11:07:47  4   him, and he's never seen before.  And
11:07:47  5   I think you're mischaracterizing the
11:07:50  6   Judge's claim construction in any
11:07:53  7   event.
11:07:54  8        A.   I would not change my opinion.
11:07:55  9        This is one reason why we
11:07:57 10   concluded that there was no infringement.
11:08:01 11        Plus, the fact that -- you
11:08:03 12   haven't told me what the Judge -- how the
11:08:05 13   Judge interpreted "using."  So it might
11:08:09 14   still be grounds for a non-infringement,
11:08:13 15   so I don't know.
11:08:14 16        Q.   And you never looked at this, in
11:08:16 17   light of the Markman ruling by the Judge,
11:08:19 18   after the Markman ruling was issued?
11:08:23 19        MR. STIMPSON:  Same objection.
11:08:24 20        A.   No.
11:08:25 21        Q.   And you weren't asked to, were
11:08:28 22   you?
11:08:28 23        MR. STIMPSON:  Same objection.
11:08:29 24        A.   Asked to...?
11:08:30 25        Q.   Review the Markman ruling --

134

11:08:30  1        A.   No.
11:08:33  2        Q.   And review your opinion in light
11:08:36  3   of the Markman ruling?
11:08:37  4        MR. STIMPSON:  Same objection.
11:08:37  5        A.   No, I was not.
11:08:39  6        Q.   Now, your opinion, basis number
11:08:41  7   2, says, "When Vitals creates and provides
11:08:44  8   access to a report that includes
11:08:46  9   third-party verified disciplinary action,
11:08:49 10   the report does not include patient
11:08:51 11   information."
11:08:52 12        Do you see that?
11:08:54 13        A.   I do.
11:08:54 14        Q.   Now, if Vitals, in fact, didn't
11:08:57 15   follow this procedure -- actually either
11:09:01 16   one of them, number 1, you've identified
11:09:03 17   in your opinion, or number 2, would that
11:09:06 18   affect your opinion?
11:09:07 19        A.   No.  As I said, there were
11:09:10 20   various other reasons why we believed
11:09:13 21   there was no infringement.  One of which
11:09:17 22   is in -- one additional one is in the
11:09:21 23   opinion (indicating).
11:09:22 24        Q.   Well, you give three reasons --
11:09:24 25   right? -- in your opinion?  That's what

135

11:09:26  1   this summary is, to describe the three
11:09:30  2   basis for your opinion, right?
11:09:31  3        A.   Yes.
11:09:32  4        Q.   And they are the first two that
11:09:34  5   we just discussed, correct?
11:09:34  6        A.   Correct.  Yes.
11:09:35  7        Q.   And, then, the one noted on the
11:09:37  8   last paragraph of page 3, which is the
11:09:41  9   idea that the provider report does not
11:09:44 10   include comparison ratings, right?
11:09:46 11        A.   That's correct.
11:09:47 12        Q.   That's it?  Right?
11:09:48 13        A.   That's what we said in the
11:09:49 14   opinion, yes.
11:09:49 15        (Requested portion marked for
11:09:49 16   read-back.)
11:09:50 17        Q.   Right.  So now, if number 1 and
11:09:53 18   2, that you describe in this opinion
11:09:54 19   letter, are factually not as you
11:09:57 20   understood them to be, would that affect
11:09:59 21   your opinion?
11:10:00 22        A.   Well, if I believed that they
11:10:03 23   were not factually true, I would not have
11:10:07 24   included that paragraph in there, I would
11:10:10 25   still make the same conclusion.

136

11:10:11  1        Q.   Because you would have rested
11:10:13  2   the opinion entirely on the idea that the
11:10:16  3   MDx healthcare provider report does not
11:10:20  4   include comparison ratings; is that
11:10:22  5   correct?
11:10:22  6        A.   Well, I think that's a very
11:10:24  7   strong reason.  But I also recall at the
11:10:31  8   time, that we felt there were others
11:10:33  9   besides from our conversation in December,
11:10:41 10   but we felt (indicating) these were --
11:10:43 11   these were very strong.
11:10:44 12        Q.   There were others -- what?
11:10:46 13        A.   Other reasons why Vitals was not
11:10:51 14   infringing the patent claims.
11:10:53 15        Q.   Oh, that you didn't put in this
11:10:56 16   opinion letter?
11:10:57 17        A.   That's correct.
11:10:57 18        Q.   What were those reasons?
11:10:58 19        A.   I don't recall specifically.
11:10:59 20        But I remember during that
11:11:00 21   conversation, you know, we went through
11:11:03 22   several different reasons why.  And we
11:11:10 23   felt -- you know, once we got to -- once
11:11:13 24   we had these (indicating), that we were
11:11:17 25   confident there was no infringement.

34 (Pages 133 to 136)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

137

```
11:11:17  1        (Requested portion marked for
11:11:21  2    read-back.)
11:11:21  3        MR. STIMPSON:  Excuse me, can I
11:11:22  4    have the last two questions and
11:11:23  5    answers back, please?
11:11:24  6        THE WITNESS:  I'm sorry.
11:11:26  7        (Requested portion of record
11:11:26  8    read.)
11:11:26  9        MR. STIMPSON:  No, I'm sorry,
11:11:26 10    the question and answer before that.
11:11:26 11        (Requested portion of record
11:12:32 12    read.)
11:12:32 13        MR. STIMPSON:  Can you mark
11:12:33 14    that, please?  I want to come back to
11:12:35 15    it after.
11:12:36 16     Q.    So there were other reasons you
11:12:38 17    understood that the MDx website did not
11:12:41 18    infringe that you did not put in this
11:12:43 19    opinion letter, correct?
11:12:44 20     A.    That's my recollection from our
11:12:49 21    discussion in December with -- with Mitch.
11:12:53 22     Q.    And those reasons are reasons
11:12:54 23    you learned at your December 30 meeting
11:12:56 24    with Mr. Rothschild; is that your
11:12:58 25    testimony?
```

138

```
11:12:58  1     A.    Yes.
11:12:59  2     Q.    And what were those other
11:13:00  3    reasons?
11:13:01  4     A.    Like I said, I don't -- I don't
11:13:03  5    recall specifically what they were.
11:13:04  6     Q.    Did you see them mentioned in
11:13:05  7    the notes that we looked at that
11:13:09  8    Mr. Heaton apparently took, Exhibit 8?
11:13:11  9        Did you see those other reasons
11:13:13 10    mentioned in the notes?
11:13:15 11     A.    I don't -- I don't know.
11:13:17 12        No.  I didn't notice that that
11:13:21 13    was where the reasons are or I didn't --
11:13:22 14    that did not refresh my recollection.
11:13:24 15     Q.    Okay.  So what I'm trying to get
11:13:27 16    at, Mr. Braginsky, to understand why you
11:13:29 17    think there are these other reasons --
11:13:31 18     A.    Uh-hmm.
11:13:32 19     Q.    -- where you're not recalling
11:13:34 20    them, and the notes don't seem to describe
11:13:36 21    those reasons, but you have it in your
11:13:38 22    mind --
11:13:39 23     A.    Yes.
11:13:39 24     Q.    -- clearly that there were some
11:13:41 25    other reason.
```

139

```
11:13:42  1        MR. STIMPSON:  Hold on.
11:13:43  2     Q.    What is the basis for that
11:13:45  3    testimony?
11:13:45  4        MR. STIMPSON:  I have to object
11:13:47  5    to that question.  I think you're
11:13:49  6    mischaracterizing his testimony.
11:13:51  7        If you read it back, I think
11:13:52  8    you're reading something into his
11:13:54  9    testimony that's not there.
11:13:55 10        MR. KANAN:  Well, he can correct
11:13:57 11    me if I said it wrong.  I didn't try
11:13:59 12    to.  I just said what his testimony
11:14:02 13    has been.
11:14:02 14     Q.    Do you understand what I'm
11:14:04 15    asking you, Mr. Braginsky?
11:14:05 16        You say you don't recall the
11:14:08 17    other reasons, but you say there were
11:14:10 18    other reasons that you didn't include in
11:14:12 19    the opinion.
11:14:13 20        Why do you say that if you don't
11:14:14 21    recall?
11:14:15 22     A.    My recollection is that we had
11:14:17 23    other reasons.
11:14:17 24     Q.    What is the basis for that
11:14:18 25    recollection?
```

140

```
11:14:20  1     A.    My recollection -- the basis is
11:14:24  2    my recollection.  That's how I remember
11:14:26  3    it.
11:14:26  4     Q.    But you don't recall what those
11:14:28  5    other reasons were?
11:14:28  6     A.    No.  Not specifically.
11:14:29  7     Q.    Do you have any general concepts
11:14:31  8    of what those other reasons were?
11:14:33  9     A.    No.  No.  I don't recall.
11:14:34 10     Q.    Do you have any recollection of
11:14:36 11    a conversation, a snippet of conversation,
11:14:38 12    that makes you think there were these
11:14:40 13    other reasons?
11:14:41 14     A.    No.
11:14:48 15     Q.    And you made a conscious
11:14:50 16    decision, then, to not include those other
11:14:53 17    reasons in this freedom to operate opinion
11:14:55 18    letter; is that correct?
11:14:56 19        MR. STIMPSON:  Objection to the
11:14:57 20    form.
11:14:58 21     A.    No.  I think what we decided is
11:15:00 22    that the -- I only need one reason, and we
11:15:09 23    have, you know, a couple of really good
11:15:11 24    reasons (indicating) here, and that there
11:15:14 25    was nothing -- no reason to pursue
```

35 (Pages 137 to 140)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

141

```
11:15:17  1   anything further. It's inefficient and a
11:15:23  2   waste of the client's money.
11:15:25  3        So we felt (indicating), you
11:15:27  4   know, these are golden, and we can move
11:15:30  5   on.
11:15:31  6        Q.   And you made the conclusion that
11:15:32  7   they were, as you say, "golden" at your
11:15:37  8   meeting on December 30th?
11:15:39  9        A.   Yes. I believe so.
11:16:34 10        Q.   Did you understand that the
11:16:37 11   Vitals website at any time did include
11:16:40 12   comparison ratings?
11:16:43 13        A.   I'm sorry, say that again?
11:16:47 14        Q.   Did you have an understanding at
11:16:53 15   any time that the Vitals website did
11:16:56 16   include comparison ratings?
11:16:56 17        A.   Comparison ratings. No, I think
11:16:57 18   our understanding was that it did not.
11:16:59 19        Q.   So as of the time of the
11:17:00 20   December 30 meeting, you understood that
11:17:02 21   it did not include comparison ratings,
11:17:05 22   then?
11:17:05 23        A.   What it didn't include was the
11:17:07 24   claim element. The claim element is not
11:17:09 25   just -- you have comparison ratings.
```

142

```
11:17:13  1        The claim element, you know, if
11:17:16  2   you give me the patent again, I can point
11:17:18  3   you to that section.
11:17:21  4        Q.   (Handing document to the
11:17:24  5   witness.)
11:17:24  6        A.   But the claim element says --
11:17:31  7        (The witness reads document.)
11:17:33  8        A.   Let's see... "comparison
11:17:36  9   ratings..."
11:17:42 10        It says, "...wherein the
11:17:44 11   healthcare provider report on the first
11:17:47 12   healthcare provider includes comparison
11:17:50 13   ratings of healthcare providers."
11:17:53 14        That was our conclusion, that
11:17:55 15   Vitals did not meet that element.
11:17:57 16        Q.   Yes. And you said in your
11:17:59 17   opinion letter, Rothschild Exhibit 8, the
11:18:05 18   bottom of the third page, that an
11:18:06 19   additional basis for your opinion was that
11:18:08 20   the healthcare provider report of MDx --
11:18:11 21        A.   Hm-mmm.
11:18:12 22        Q.   -- as you said, "does not
11:18:13 23   include comparison ratings of healthcare
11:18:15 24   providers"?
11:18:16 25        A.   That's correct, yes.
```

143

```
11:18:16  1        Q.   And that was your understanding
11:18:18  2   as of December 30; that it did not include
11:18:20  3   comparison ratings of healthcare
11:18:24  4   providers; is that correct?
11:18:24  5        A.   Yes.
11:18:25  6        Q.   And are you aware that the
11:18:26  7   Vitals website ever included comparison
11:18:29  8   ratings, either before or after?
11:18:31  9        A.   I'm not.
11:18:32 10        Q.   Okay. So your understanding is,
11:18:34 11   it's never included comparison ratings; is
11:18:38 12   that correct?
11:18:38 13        MR. STIMPSON: Objection.
11:18:39 14   Objection.
11:18:40 15        I have to object here. This is
11:18:42 16   getting very confusing. He just read
11:18:44 17   you a claim element and you're just
11:18:46 18   taking a snippet of it and then you're
11:18:48 19   asking him and there's a disconnect
11:18:49 20   here.
11:18:50 21        MR. KANAN: Well, you made your
11:18:50 22   objection --
11:18:50 23        MR. STIMPSON: Well, that is my
11:18:50 24   objection --
11:18:50 25        MR. KANAN: You made it so don't
```

144

```
11:18:52  1   make a speaking objection.
11:18:52  2        MR. STIMPSON: And I'm also
11:18:54  3   saying that you won't put the patent
11:18:55  4   in front of him. The real -- the
11:18:56  5   patent -- you keep taking it back and
11:18:58  6   you keep asking him about little
11:19:01  7   snippets. I object to that. Put the
11:19:03  8   patent in front of him.
11:19:05  9        MR. KANAN: Okay. You made your
11:19:06 10   objection.
11:19:06 11   BY MR. KANAN:
11:19:07 12        Q.   Did you understand at any time,
11:19:09 13   Mr. Braginsky, that the Vitals website
11:19:13 14   included comparison ratings?
11:19:16 15        MR. STIMPSON: Objection -- hold
11:19:16 16   on. Same objection to the form of the
11:19:17 17   question.
11:19:17 18        You keep referring to
11:19:20 19   "comparison ratings," and he told you
11:19:21 20   what he was talking about, so can you
11:19:21 21   just give me a continuing objection.
11:19:25 22        MR. KANAN: Okay.
11:19:26 23        Q.   You use the phrase "comparison
11:19:28 24   ratings" in your opinion letter, don't
11:19:30 25   you, Mr. Braginsky? At the bottom of page
```

36 (Pages 141 to 144)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

145

11:19:32  1  3?
11:19:32  2      A.  I do, yes.
11:19:33  3      Q.  You said, "The healthcare
11:19:35  4  provider report does not include
11:19:36  5  comparison ratings," right?
11:19:38  6      A.  It says that, "The healthcare
11:19:43  7  provider report does not include
11:19:45  8  comparison ratings of healthcare
11:19:47  9  providers." That's what it says.
11:19:48  10      Q.  I'm just asking you:
11:19:50  11      Did you have an understanding
11:19:50  12  that the Vitals website at any time did
11:19:52  13  include comparison ratings of healthcare
11:19:54  14  providers, the same words you've used in
11:19:57  15  your opinion letter?
11:19:59  16      MR. STIMPSON:  No.  That's
11:20:00  17  absolutely --
11:20:00  18      Q.  Did you?  Did you ever have that
11:20:01  19  understanding?
11:20:02  20      MR. STIMPSON:  No.  Object --
11:20:02  21  hold on.  Objection.
11:20:03  22      MR. KANAN:  I just gave you a
11:20:06  23  standing objection, Scott.
11:20:07  24      MR. STIMPSON:  No.  Now, you're
11:20:07  25  misrepresenting what he said.

146

11:20:08  1      You said did you have an
11:20:09  2  understanding that Vitals website ever
11:20:11  3  had -- that's not what his opinion
11:20:13  4  says.  The healthcare provider report
11:20:14  5  does not have.
11:20:14  6      MR. KANAN:  Oh, get out of here.
11:20:15  7      MR. STIMPSON:  It's huge.  It's
11:20:15  8  huge.
11:20:15  9      MR. KANAN:  You're being
11:20:18  10  disingenuous.  You're playing games.
11:20:21  11      MR. STIMPSON:  Just put the
11:20:22  12  patent in front of him.
11:20:23  13      Q.  Mr. Braginsky, let me ask you a
11:20:25  14  very simple question.
11:20:27  15      Did you believe that the MDx
11:20:28  16  website at any time included comparison
11:20:31  17  ratings of doctors in the healthcare
11:20:33  18  provider report?
11:20:34  19      MR. STIMPSON:  Objection to the
11:20:35  20  form of the question.
11:20:37  21      A.  When we analyzed the website, we
11:20:42  22  made a conclusion that Vitals.com website
11:20:48  23  did not satisfy the element, which
11:20:51  24  requires the healthcare provider report
11:20:53  25  include a comparison ratings of healthcare

147

11:20:56  1  providers.
11:20:57  2      Q.  And you don't know whether
11:20:59  3  that's changed since you wrote this
11:21:00  4  opinion letter, correct?
11:21:01  5      A.  That's correct.
11:21:02  6      Q.  And your understanding, as of
11:21:04  7  the time you wrote this opinion letter,
11:21:06  8  was that that -- that it did not include
11:21:09  9  comparison ratings in the healthcare
11:21:11  10  provider report, correct?
11:21:14  11      A.  Comparison ratings, yes.  The
11:21:16  12  report did not include comparison ratings
11:21:19  13  with healthcare providers.
11:21:20  14      Q.  And do you know at any time
11:21:22  15  prior to December 30, when you met with
11:21:24  16  Mr. Rothschild, the MDx website included
11:21:28  17  healthcare provider reports that had
11:21:30  18  comparison ratings?
11:21:31  19      A.  I don't know.
11:21:32  20      Q.  Okay.
11:21:36  21      Did you take any steps to verify
11:21:48  22  in any way the information Mr. Rothschild
11:21:51  23  gave you about the website, whether they
11:21:53  24  were using the information you describe
11:21:56  25  here on page 3?

148

11:21:58  1      (The witness reads document.)
11:22:00  2      A.  We invested -- we utilized the
11:22:05  3  website as the user.
11:22:09  4      Q.  You did?
11:22:10  5      A.  Yes.
11:22:10  6      Q.  Other than the meeting on
11:22:13  7  December 30, did you utilize it at any
11:22:16  8  other time?
11:22:16  9      A.  I don't recall.
11:22:17  10      Q.  Did you look at the website
11:22:19  11  between the time of the meeting on
11:22:23  12  December 30 and when you issued this
11:22:25  13  opinion on January 25th?
11:22:26  14      A.  I don't remember.
11:22:40  15      Q.  Well, it would be true, wouldn't
11:22:42  16  it, Mr. Braginsky, almost as a necessity,
11:22:45  17  that if your factual assumptions turned
11:22:48  18  out to be incorrect, that that might
11:22:50  19  affect your legal conclusions; is that a
11:22:53  20  fair statement?
11:22:55  21      A.  In the abstract, if factual
11:22:58  22  assumptions are incorrect, your opinion
11:23:00  23  might change?
11:23:01  24      If you knew that they were
11:23:06  25  incorrect, your opinion might change, yes.

37 (Pages 145 to 148)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

149

11:23:08 1  Q.  And is it true, then, that if
11:23:10 2  the factual assumptions you made on page
11:23:14 3  3, regarding the three basis for your
11:23:16 4  opinion, if those -- each of the three
11:23:18 5  factual assumptions were incorrect, it
11:23:20 6  would change your opinion?
11:23:21 7  A.  Well, do you mean the written
11:23:24 8  opinion or our opinion of infringement?
11:23:27 9  Q.  Well, let's take them both.
11:23:29 10  A.  Well --
11:23:30 11  Q.  The written opinion first.
11:23:31 12  A.  The written opinion would
11:23:33 13  change.  We wouldn't include things that
11:23:36 14  we didn't think were factually correct.
11:23:38 15  Q.  And what about your opinion of
11:23:40 16  infringement?
11:23:42 17  A.  Like I said, my recollection is
11:23:42 18  that we had other reasons for a basis of
11:23:48 19  concluding non-infringement.  I would --
11:23:53 20  so I don't know -- I would assume I would
11:23:58 21  rely on those.
11:23:59 22  Q.  So your opinion of infringement
11:24:01 23  would remain the same; is that your
11:24:03 24  testimony?
11:24:03 25  A.  Yes.

150

11:24:04 1  Q.  And you don't recall what those
11:24:05 2  other reasons are?
11:24:06 3  A.  No.
11:24:06 4  Q.  And you don't recall a
11:24:08 5  discussion at the December 30 meeting
11:24:09 6  about what those other reasons are?
11:24:12 7  A.  Well, I recall discussing them.
11:24:15 8  I don't recall what they are.
11:24:17 9  Q.  And you didn't include them in
11:24:18 10  your opinion?
11:24:19 11  A.  Correct.
11:24:22 12  Q.  But it's your testimony today,
11:24:25 13  that your opinion of infringement would
11:24:27 14  not change; is that your testimony?
11:24:30 15  A.  That's my belief, yes.
11:24:42 16  Q.  Turn to page -- the page number
11:24:45 17  5 of your opinion, Rothschild Exhibit 8.
11:24:50 18  At the bottom of the page you'll
11:24:52 19  see you quote the Claim 15.
11:24:55 20  Do you see that?
11:24:56 21  A.  I do, yes.
11:24:57 22  Q.  And if you'll turn to the next
11:25:02 23  page, page 6, and look at the second
11:25:06 24  paragraph of your quote, which begins
11:25:11 25  "...compile patient provided

151

11:25:13 1  information" -- do you see that?
11:25:14 2  A.  I do.
11:25:15 3  Q.  Towards the end of that
11:25:16 4  paragraph it says, "...and wherein the
11:25:18 5  company website is managed by the company
11:25:21 6  providing the service for connecting
11:25:22 7  providers with patients."
11:25:25 8  Do you see that?
11:25:26 9  A.  I do.
11:25:26 10  Q.  It appears to me, Mr. Braginsky,
11:25:28 11  that you've misquoted the claim.  That, in
11:25:32 12  fact, it reads, "wherein the company
11:25:34 13  website is managed by a company providing
11:25:37 14  a service."  Okay?  And I'm happy to show
11:25:41 15  you the claim, if you want to see.  And
11:25:42 16  I've looked at it and I think you did
11:25:44 17  misquote it.
11:25:45 18  A.  Okay.
11:25:46 19  Q.  Okay?
11:25:47 20  A.  Is this --
11:25:49 21  MR. STIMPSON:  There's no
11:25:50 22  question pending.
11:25:51 23  Mr. Braginsky, there's no
11:25:53 24  question pending.
11:25:54 25  A.  Sure.

152

11:25:54 1  Q.  So my question to you is:
11:25:54 2  If you did indeed misquote it,
11:25:58 3  and it should say, "managed by a company
11:25:58 4  providing a service," would that change
11:25:58 5  your opinion in any way with respect to
11:26:05 6  line 15 and infringement on line 15?
11:26:05 7  A.  I don't know.  I would need to
11:26:06 8  go back and do an analysis.  I don't know
11:26:09 9  if that would change it or not.
11:26:12 10  Q.  So you can't tell right now off
11:26:14 11  the top without doing an analysis?
11:26:15 12  A.  No.  No.  I mean, there's --
11:26:19 13  there's a lot of words here that you need
11:26:21 14  to satisfy.
11:26:22 15  Q.  And how would you go about doing
11:26:24 16  that analysis?
11:26:26 17  A.  Well, the same way.  I'd need to
11:26:30 18  look at each and every element of the
11:26:33 19  claim and see if that is -- or was
11:26:38 20  satisfied by the service and product that
11:26:45 21  it's being asserted against.
11:27:33 22  Q.  Turn to page 26, if you would,
11:27:36 23  please, Mr. Braginsky.
11:27:36 24  (The witness complies.)
11:27:52 25  A.  Okay.

38 (Pages 149 to 152)

153

Q.   And at the bottom of that page, you'll see there's a section labeled "For the '060 Claims"?

A.   Yes.

Q.   And you say at the beginning of this section that, "We believe as a threshold consideration that the words as recited in the claims are free of ambiguity.  Plain meaning will prevail."

Do you see that?

A.   Yes.  I do.

Q.   And do you know if that was the ruling of the Judge in this case at the Markman hearing --

A.   No, I don't.

Q.   -- as to the words of the patent?

A.   No, I don't.

Q.   And you haven't looked, as you said, at the Markman opinion; is that correct?

A.   Correct.

Q.   And if you were incorrect about your assumption, that "the plain meaning would prevail," and that the words are

154

"free of ambiguity," would that affect your opinion?

MR. STIMPSON:  Objection to the form.

A.   I don't know.  I -- there's no answer to that.  I would need to analyze what the claim terms mean and compare that to -- to the Vitals.com service.

Q.   And, then, if you'll turn to page 30, you said at the top of page 30, that the "Comparison ratings of healthcare providers in Element 6 also has a plain meaning; that is, comparing information that is part of the healthcare provider report to other healthcare providers."

Do you see that?

A.   Yes.

Q.   And that was your opinion at that time, correct?

A.   Yes.

Q.   And remains your opinion, correct?

A.   Yes.

Q.   And, then, further down that page, you have a section labeled "5)

155

non-infringement analysis."

Do you see that?

A.   I do.

Q.   And here again in the -- in the big paragraph, the second paragraph on that page, and in that section you talk about, "The report does not create and provide access to this third-party verified information."

Do you see that?  You use the phrase "does not include"?

MR. STIMPSON:  I'm sorry, where is this?

Q.   Well, read the paragraph, Mr. Braginsky.  And then I'll start over.

(The witness reads document.)

A.   Okay.

Q.   This is similar to what you said in your summary of the opinion over on page 3, when you were talking about the justifications for your opinion, right?

A.   Yes.

Q.   I asked you questions about the patent, whether it, in fact, requires that the report include these various elements?

156

A.   Right.

Q.   Do you recall that?  And I showed you the patent that uses the word "using"; do you remember that?

A.   Yes.

Q.   And I asked you whether there was a difference?

A.   Yes.

Q.   And this is that same (indicating) analysis here on page 30, correct?

(The witness reads document.)

A.   Yes.

Q.   And you don't believe -- it was your opinion then -- that there isn't a difference between a report "using" this information is -- means the same thing as actually recording it in the report; is that right?

A.   Yes.  As I said in my earlier testimony, yes.

Q.   Okay.  And you're not aware of the Judge's Markman ruling on this issue, correct?

MR. STIMPSON:  Objection.  It's

CONFIDENTIAL - ATTORNEYS'EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

157

| | |
|---|---|
| 11:31:50 1 | asked and answered almost ten times |
| 11:31:52 2 | now, Greg. |
| 11:31:53 3 | A.  I am not. |
| 11:31:55 4 | Q.   And if the Judge rejected that |
| 11:31:56 5 | interpretation, the one you used, then |
| 11:32:00 6 | that interpretation is simply wrong, |
| 11:32:02 7 | correct? |
| 11:32:02 8 | MR. STIMPSON:  Same objection. |
| 11:32:05 9 | Objection; asked and answered. |
| 11:32:07 10 | A.   I suppose -- |
| 11:32:08 11 | MR. STIMPSON:  Mischaracterizes |
| 11:32:09 12 | the Court's opinion as well. |
| 11:32:11 13 | A.   And I suppose that could be |
| 11:32:14 14 | appealed as well.  So -- I don't know. |
| 11:32:19 15 | No.  That doesn't mean that I |
| 11:32:22 16 | was absolutely wrong, no. |
| 11:32:24 17 | Q.   Well, I didn't ask you about |
| 11:32:27 18 | "absolutely wrong." |
| 11:32:29 19 | A.   That the Judge disagrees with |
| 11:32:33 20 | me. |
| 11:32:33 21 | Q.   That's right.  If the Judge |
| 11:32:36 22 | disagrees with you. |
| 11:32:37 23 | A.   If that's what the Judge said. |
| 11:32:38 24 | Q.   Well, he said, "The parties |
| 11:32:40 25 | disagree about whether a defendant |

158

| | |
|---|---|
| 11:32:43 1 | contends" -- as MDx contends -- |
| 11:32:43 2 | (Discussion off the record.) |
| 11:32:44 3 | MR. KANAN:  I'm quoting from the |
| 11:32:45 4 | Markman ruling -- |
| 11:32:46 5 | MR. STIMPSON:  What page, |
| 11:32:48 6 | please? |
| 11:32:48 7 | MR. KANAN:  Page 20. |
| 11:32:49 8 | Q.   -- "about whether a defendant |
| 11:32:52 9 | contends" -- that's MDx in this case -- |
| 11:32:55 10 | you're aware of that, Mr. Braginsky? |
| 11:32:57 11 | A.   I'm, yes. |
| 11:32:58 12 | Q.   -- "the 'use' must be of all the |
| 11:33:00 13 | designated information."  And the Judge |
| 11:33:03 14 | said that he was not convinced of that. |
| 11:33:05 15 | And said, "Furthermore, the categories of |
| 11:33:08 16 | information are being 'used' to 'create' a |
| 11:33:14 17 | report.  There's nothing in the patent |
| 11:33:16 18 | that requires when receiving, acquiring or |
| 11:33:21 19 | call -- compiling information a |
| 11:33:24 20 | pre-determination of what will ultimately |
| 11:33:25 21 | be put into a report." |
| 11:33:27 22 | A.   Okay. |
| 11:33:28 23 | MR. STIMPSON:  Hold on a second. |
| 11:33:29 24 | There's no question pending. |
| 11:33:31 25 | THE WITNESS:  Yep. |

159

| | |
|---|---|
| 11:33:32 1 | Q.   So the Judge disagreed with your |
| 11:33:34 2 | interpretation of the patent on that |
| 11:33:37 3 | point, Mr. Braginsky.  Okay? |
| 11:33:37 4 | MR. STIMPSON:  No.  First of |
| 11:33:39 5 | all, objection.  Objection.  Okay? |
| 11:33:40 6 | You can't just like read a huge quote, |
| 11:33:43 7 | and, frankly, taken out of context |
| 11:33:45 8 | about a different claim element and |
| 11:33:47 9 | expect the guy to memorize it, Greg. |
| 11:33:49 10 | Why don't you make a copy of it |
| 11:33:51 11 | and put in front of him. |
| 11:33:53 12 | MR. KANAN:  I'm not expecting |
| 11:33:53 13 | him to memorize it. |
| 11:33:53 14 | MR. STIMPSON:  I don't know what |
| 11:33:53 15 | you're doing.  I don't know what |
| 11:33:53 16 | you're doing. |
| 11:33:53 17 | MR. KANAN:  It's not a |
| 11:33:54 18 | complicated process. |
| 11:33:55 19 | MR. STIMPSON:  Let me finish. |
| 11:33:56 20 | It's a very complicated process.  Let |
| 11:33:58 21 | me finish, please.  If you have a |
| 11:34:00 22 | question about a document that he's |
| 11:34:02 23 | never seen before, at least have the |
| 11:34:05 24 | decency to put it in front of him. |
| 11:34:10 25 | MR. KANAN:  And if he says he |

160

| | |
|---|---|
| 11:34:10 1 | doesn't understand what I said, he can |
| 11:34:11 2 | tell me. |
| 11:34:11 3 | MR. STIMPSON:  No.  Anybody can |
| 11:34:11 4 | understand it, if you have the whole |
| 11:34:11 5 | document and you get a chance to read |
| 11:34:11 6 | it, Greg. |
| 11:34:12 7 | What you're doing today is |
| 11:34:13 8 | you're taking the patent and putting |
| 11:34:16 9 | it in front of him and then taking it |
| 11:34:18 10 | away, and then you're reading it -- |
| 11:34:18 11 | MR. KANAN:  I let him look at |
| 11:34:20 12 | the patent whenever he needed to. |
| 11:34:22 13 | MR. STIMPSON:  I've never seen |
| 11:34:23 14 | anybody take that position -- |
| 11:34:23 15 | MR. KANAN:  Well, you've never |
| 11:34:26 16 | seen it -- it happened. |
| 11:34:26 17 | MR. STIMPSON:  I'm speaking, |
| 11:34:26 18 | okay? |
| 11:34:27 19 | I've never seen a deposition on |
| 11:34:27 20 | willfulness on a patent where you |
| 11:34:27 21 | won't let him look at the patent.  And |
| 11:34:31 22 | now you're reading from a claim |
| 11:34:32 23 | construction order that you won't give |
| 11:34:33 24 | to him?  Come on.  What are you doing |
| 11:34:35 25 | here, Greg?  What are you afraid of? |

40 (Pages 157 to 160)

161

```
11:34:37  1      MR. KANAN:  You made your
11:34:38  2   objection.  You made your objection,
11:34:39  3   Scott.
11:34:40  4      MR. STIMPSON:  Show it to him.
11:34:42  5   And that's not even the same claim
11:34:45  6   term.
11:34:46  7      MR. KANAN:  Okay.  Well, we'll
11:34:48  8   decide that later.
11:34:50  9      MR. STIMPSON:  It's already been
11:34:52 10   decided.
11:34:52 11      MR. KANAN:  It has been.
11:34:55 12   Rejecting the Defendant's point of
11:34:58 13   view.
11:34:58 14      THE VIDEO OPERATOR:  Mr. Kanan,
11:35:02 15   would you slide your microphone up.
11:35:06 16      MR. KANAN:  Oh, I'm sorry.  It's
11:35:06 17   fallen.
11:35:09 18   BY MR. KANAN:
11:35:09 19      Q.   In light of Mr. Stimpson's
11:35:12 20   objection, Mr. Braginsky, I'm going to
11:35:12 21   abandon this line of questioning.  I'm
11:35:12 22   going to take that document away from you.
11:35:17 23      Mr. Stimpson has persuasively
11:35:19 24   objected that you don't know what the
11:35:22 25   Markman opinion ruled, correct?
```

162

```
11:35:23  1      MR. STIMPSON:  There's no
11:35:24  2   question.  You're asking him what my
11:35:28  3   objections are now, Greg?
11:35:31  4      MR. KANAN:  Scott, listen to my
11:35:31  5   question.  I'm asking him.
11:35:31  6      MR. STIMPSON:  Come on, Greg.
11:35:33  7      Q.   Mr. Braginsky, you don't know
11:35:34  8   what the Markman ruling is, correct?
11:35:38  9      MR. STIMPSON:  Objection.
11:35:38 10   That's been asked now -- it must be 15
11:35:38 11   times.
11:35:39 12      Q.   Is that correct?
11:35:39 13      A.   That is correct.
11:35:40 14      Q.   You have not looked at it to see
11:35:43 15   whether your opinion is affected by it,
11:35:46 16   correct?
11:35:46 17      A.   That is correct.
11:35:47 18      Q.   All right.
11:36:06 19      What was your understanding when
11:36:08 20   you wrote the opinion letter,
11:36:09 21   Mr. Braginsky, about what role the doctors
11:36:14 22   themselves had in either providing or
11:36:16 23   editing information on the Vitals/MDx
11:36:20 24   website?
11:36:20 25      A.   I don't recall.
```

163

```
11:36:22  1      Q.   Do you recall at the December 30
11:36:25  2   meeting with Mr. Rothschild a discussion
11:36:28  3   about that?
11:36:28  4      A.   Not specifically.
11:36:30  5      Q.   Well, do you recall generally a
11:36:32  6   discussion about that?
11:36:33  7      A.   I recall we went through each of
11:36:36  8   the elements of the claim.  That's my
11:36:41  9   recollection.  Compared that to Vitals'.
11:36:45 10      Q.   And when you wrote your opinion
11:36:46 11   letter, Rothschild Exhibit 8, on January
11:36:51 12   25th, 2011, had you learned anything more
11:36:55 13   about what physicians do on the website,
11:36:59 14   apart from what Mr. Rothschild told you at
11:37:02 15   the December 30 meeting?
11:37:03 16      A.   I don't remember.
11:37:07 17      Q.   Is there anything you recall
11:37:09 18   that you learned in addition to what
11:37:11 19   Mr. Rothschild told you about that on
11:37:13 20   December 30th, 2010?
11:37:15 21      A.   No, I don't recall anything.
11:37:17 22      Q.   Okay.
11:37:21 23      Are you aware that MDx at a
11:37:35 24   point in time licensed some of the data in
11:37:39 25   its website to Aetna?
```

164

```
11:37:42  1      A.   No.
11:37:43  2      Q.   For a so-called iTriage
11:37:47  3   application?
11:37:47  4      A.   No.
11:37:48  5      Q.   And have you made any analysis
11:37:50  6   about infringement with respect to that?
11:37:51  7      A.   No.
11:37:52  8      Q.   And you've not been asked to?
11:37:54  9      A.   No.
11:38:09 10      Q.   When you met with Mr. Rothschild
11:38:11 11   on December 30 -- well, let me back up to
11:38:16 12   set the stage for my question to you.
11:38:18 13      You had looked at the
11:38:22 14   application as it existed in March 2010.
11:38:25 15      Do you recall that?
11:38:26 16      A.   I don't recall doing that,
11:38:29 17   but --
11:38:29 18      Q.   We looked at some of the
11:38:31 19   e-mails.
11:38:31 20      A.   You showed me the e-mails, yes.
11:38:34 21      Q.   Right.  And one of them, toward
11:38:36 22   the end of March, you opined that you
11:38:38 23   thought the patent would not be issued?
11:38:42 24      A.   That they would receive a final
11:38:44 25   rejection.  There's a difference.
```

41 (Pages 161 to 164)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

---

165

11:38:46  1   Q.   Okay. Fair enough. And then
11:38:48  2   there's nothing between March and your
11:38:50  3   meeting in December, at least in terms of
11:38:53  4   documents we have been provided. And you
11:38:55  5   don't recall any work you did on this
11:38:57  6   matter, correct?
11:38:58  7   A.   Correct.
11:38:59  8   Q.   So when you met with
11:39:02  9   Mr. Rothschild in December, on December
11:39:03  10  30th, did he ask you anything about why
11:39:06  11  the patent had issued, when in March you
11:39:10  12  had said you thought it would be rejected?
11:39:13  13  A.   I don't recall.
11:39:15  14  Q.   You don't recall the topic
11:39:20  15  coming up?
11:39:20  16  A.   No.
11:39:21  17  Q.   Did you give an explanation to
11:39:22  18  him of why you had opined in March that
11:39:25  19  the patent would be rejected and then
11:39:28  20  later the patent was issued?
11:39:31  21  A.   I don't remember.
11:39:32  22  Q.   I'm sorry?
11:39:33  23  A.   I don't remember. I'm sorry.
11:39:35  24  Q.   When did you learn that a patent
11:39:45  25  infringement lawsuit had been filed?

166

11:39:47  1   MR. STIMPSON:  Objection; asked
11:39:49  2   and answered.
11:39:49  3   A.   Yeah, I don't remember.
11:40:07  4   MR. KANAN:  That's all I have.
11:40:09  5   MR. STIMPSON:  I'm going to have
11:40:10  6   some questions. Let's take a break.
11:40:13  7   THE VIDEO OPERATOR:  Going off
11:40:14  8   the record at 11:40 a.m.
12:05:58  9   (A recess was taken.)
12:06:01  10  THE VIDEO OPERATOR:  Stand by.
12:06:10  11  Returning to the record at 12:06 p.m.
12:06:15  12  EXAMINATION BY
12:06:15  13  MR. STIMPSON:
12:06:19  14  Q.   Mr. Braginsky, let me show you
12:06:20  15  what's been marked as Exhibit 6.
12:06:23  16  Do you remember that document?
12:06:26  17  (The witness reviews document.)
12:06:27  18  A.   Yes.
12:06:28  19  Q.   And I think Mr. Kanan was asking
12:06:33  20  you if you recall whether anyone reviewed
12:06:38  21  the prior art before that letter went out.
12:06:42  22  Do you remember that?
12:06:42  23  A.   Yes.
12:06:43  24  Q.   And I think you said you
12:06:44  25  couldn't remember if you had or

167

12:06:47  1   Mr. Rosenberg had.
12:06:48  2   But my question is going to be a
12:06:50  3   little bit different, Mr. Braginsky.
12:06:52  4   I want to talk about your
12:06:54  5   practice.
12:06:54  6   Would it have been consistent or
12:06:56  7   inconsistent with your practice to have
12:06:59  8   that prior art reviewed before this letter
12:07:02  9   went out?
12:07:02  10  A.   It certainly would have been
12:07:04  11  consistent to review all the prior art
12:07:09  12  before we sent any letter like this, yes.
12:07:15  13  Q.   You also talked about that --
12:07:18  14  thanks, if I can get that back.
12:07:19  15  You also talked about that
12:07:21  16  December 30, 2011 meeting with
12:07:24  17  Mr. Rothschild and Mr. Heaton.
12:07:25  18  Do you remember that?
12:07:25  19  A.   Yes.
12:07:26  20  Q.   You talked about -- one of your
12:07:28  21  answers talked about, that you had
12:07:29  22  mentioned in response to a question from
12:07:32  23  Mr. Kanan, that you may have talked about
12:07:35  24  what the willfulness issue was.
12:07:38  25  Do you remember that?

168

12:07:39  1   A.   Yes.
12:07:39  2   Q.   Just to back up, Mr. Braginsky,
12:07:41  3   was there a primary purpose for that
12:07:44  4   meeting?
12:07:44  5   A.   There was a sole purpose of the
12:07:48  6   meeting. And why that meeting was
12:07:54  7   arranged was to -- to review the patent
12:07:58  8   claims, compare that to Vitals.com's
12:08:04  9   website and process and determine whether
12:08:07  10  there was infringement or not.
12:08:10  11  So the purpose was to explain to
12:08:13  12  the -- to Mitch and for Mitch to feel
12:08:16  13  comfortable that there was absolutely
12:08:18  14  no -- no infringement.
12:08:20  15  Q.   And from your discussions with
12:08:22  16  Mr. Rothschild, and your interactions at
12:08:24  17  that meeting, did you have an
12:08:25  18  understanding about whether or not
12:08:28  19  Mr. Rothschild was satisfied with the
12:08:29  20  result of the meeting?
12:08:30  21  A.   He was. I mean, he came in
12:08:33  22  believing strongly that -- that they
12:08:35  23  weren't infringing, recognized that he
12:08:39  24  probably needs a lawyer to look at this as
12:08:41  25  well. And I think he left very satisfied.

42 (Pages 165 to 168)

**CONFIDENTIAL - ATTORNEYS'EYES ONLY**
**PHILIP BRAGINSKY - 2/14/2013**

169

12:08:44 1    Q.   So did you give Mr. Rothschild
12:08:48 2    an opinion, legal advice, at that meeting?
12:08:52 3    A.   The only legal advice that --
12:08:55 4    that we provided him was -- was the basis
12:08:59 5    of the opinion; there was no infringement
12:09:03 6    for -- for the reasons that it states.
12:09:05 7    Q.   You're referring to the
12:09:06 8    Rothschild Exhibit 8?
12:09:08 9    A.   Yes.
12:09:09 10   Q.   Apart from that advice, was --
12:09:12 11   to your recollection, was there any other
12:09:14 12   advice given to Mr. Rothschild?
12:09:17 13   A.   No.  We weren't offering advice.
12:09:20 14   We were there to make the non-infringement
12:09:30 15   determination which -- which we did.
12:09:32 16   Q.   And so I think you testified in
12:09:34 17   response to some of Mr. Kanan's questions
12:09:36 18   earlier -- and that was the part I had
12:09:39 19   marked earlier -- that there may have been
12:09:41 20   other discussions.  And I think he phrased
12:09:44 21   it in terms of what was discussed or
12:09:47 22   defenses, but what were you referring to
12:09:48 23   in that line of questioning?
12:09:49 24   A.   That as we went through the
12:09:54 25   claims and compared them to Vitals.com on

170

12:09:58 1    an element-by-element basis, we had
12:10:01 2    various discussions about why -- why they
12:10:04 3    weren't infringing.  And when we landed on
12:10:09 4    the three items that are referenced in the
12:10:15 5    opinion, we knew that there was no
12:10:18 6    infringement.
12:10:18 7    Q.   Did you give him -- either
12:10:21 8    Mr. Rothschild or anybody else at MDx --
12:10:24 9    any other advice about whether any other
12:10:27 10   claim elements might be -- were not
12:10:29 11   infringed?
12:10:30 12   MR. KANAN:  Are you referring
12:10:31 13   now to the December 30 meeting or in
12:10:35 14   general?
12:10:35 15   MR. STIMPSON:  No.  No.  I mean
12:10:35 16   in general.
12:10:37 17   BY MR. STIMPSON:
12:10:37 18   Q.   Let me just rephrase it then,
12:10:39 19   Mr. Braginsky.
12:10:40 20   Certainly, including the
12:10:41 21   December 30 meeting, but at any time did
12:10:42 22   you give anybody at MDx any advice about
12:10:45 23   non-infringement for any other claim
12:10:48 24   that's not addressed in this Rothschild
12:10:53 25   Exhibit 8?

171

12:10:53 1    A.   No, we didn't discuss that.
12:10:56 2    Q.   Let me see -- let me show you --
12:11:01 3    oh, can I have the binder for those?
12:11:03 4    A.   (Handing to counsel.)
12:11:08 5    Q.   Let me show you Rothschild
12:11:11 6    Exhibit 8.
12:11:12 7    On page 3, Mr. Kanan was asking
12:11:13 8    you about the language is "more likely
12:11:18 9    than not that there could be no
12:11:21 10   infringement"; do you see that?
12:11:23 11   A.   Yes.
12:11:23 12   Q.   Why is that specific language
12:11:25 13   included in the opinion?
12:11:27 14   A.   It's included in the opinion
12:11:28 15   because it's important for the client to
12:11:31 16   understand that -- this is our opinion
12:11:35 17   (indicating).  We feel very strongly about
12:11:38 18   this.
12:11:39 19   But this is a process that
12:11:44 20   involves many people, and a judge is going
12:11:49 21   to have an opinion on this, and ultimately
12:11:55 22   an appeals court might as well.
12:11:56 23   So it's important for the client
12:11:59 24   to understand that there is no opinion
12:12:02 25   that we can give that's 100 percent

172

12:12:04 1    certain.
12:12:05 2    Q.   Did that -- is that a reflection
12:12:08 3    in any way about the strength of your
12:12:10 4    conviction that there was no infringement?
12:12:13 5    A.   No, it was clear -- our belief
12:12:15 6    was very clear.  And I think it's well
12:12:17 7    stated in the opinion (indicating), that
12:12:20 8    you're not infringing because each and
12:12:24 9    every element is not satisfied.
12:12:31 10   Q.   You mentioned that -- appeals.
12:12:38 11   So let me talk just a bit about
12:12:40 12   claim construction, because Mr. Kanan was
12:12:43 13   asking about it today.
12:12:44 14   Just -- now, I know you haven't
12:12:46 15   seen the claim construction opinion,
12:12:49 16   Mr. Braginsky, but let me ask you to
12:12:51 17   assume for me that there is something
12:12:52 18   inconsistent between your opinion and what
12:12:54 19   the Judge says.
12:12:55 20   Does that mean you're wrong?
12:12:57 21   A.   No.  I don't think so.  One, if
12:13:01 22   it's inconsistent doesn't mean that now
12:13:05 23   all of a sudden the claims -- each of the
12:13:08 24   elements are satisfied.
12:13:09 25   It's -- it only means that the

43 (Pages 169 to 172)

173

```
12:13:14  1   Judge disagrees with us on some part of
12:13:19  2   this.  And -- that's it.  That's all it
12:13:23  3   means.
12:13:23  4       Q.  Have you considered in answering
12:13:25  5   that whether or not there could be an
12:13:27  6   appeal to the claim construction
12:13:29  7   determination?
12:13:29  8       A.  There usually is.  Almost all of
12:13:32  9   them are appealed and often overruled.
12:13:40  10      Q.  Mr. Kanan also asked you about
12:13:42  11  whether or not you looked at the website
12:13:43  12  sometime between December 30 and January
12:13:46  13  25 when this opinion issued.
12:13:48  14      Do you remember that?
12:13:48  15      A.  Yes.
12:13:49  16      Q.  I think you said you couldn't
12:13:50  17  remember?
12:13:51  18      A.  Yes.
12:13:51  19      Q.  But, again, let me ask you about
12:13:53  20  your practice, okay?
12:13:54  21      Consistent with your practice,
12:13:56  22  Mr. Braginsky, would you have looked at
12:13:59  23  the website at or about the time you
12:14:02  24  issued this opinion?
12:14:03  25      A.  Yeah, absolutely.  We wouldn't
```

174

```
12:14:06  1   send an opinion out and sign -- and send
12:14:09  2   an opinion out without having everything
12:14:13  3   fully documented and buttoned up and
12:14:16  4   reviewed everything.
12:14:17  5       Q.  Okay, thank you.
12:14:20  6       Can you please turn to the Claim
12:14:23  7   15 in there.  Mr. Kanan asked you what
12:14:25  8   might have been typos in Claim 15?
12:14:28  9       A.  Yes.
12:14:29  10      Q.  And it's language that starts
12:14:31  11  with "Compiling"?
12:14:33  12      A.  Yes, "Compile."
12:14:35  13      Q.  What page of the opinion is that
12:14:37  14  on?
12:14:37  15      A.  Page 6, I think it was.
12:14:39  16      Q.  So Mr. Kanan was asking you
12:14:42  17  about -- what might have been a typo or
12:14:44  18  something in that particular paragraph
12:14:45  19  that starts, "Compile patient provided
12:14:48  20  information."
12:14:49  21      Do you see that?
12:14:49  22      A.  Yes.
12:14:49  23      Q.  So, Mr. Braginsky, have you had
12:14:51  24  a chance to consider whether or not a typo
12:14:54  25  in this paragraph would have any impact on
```

175

```
12:14:56  1   this opinion?
12:14:56  2       A.  Yes.  I have considered that,
12:15:00  3   and it would not change anything in the
12:15:03  4   opinion if -- that's just simply the typo
12:15:10  5   that -- that was mentioned.
12:15:11  6       It doesn't change the basis of
12:15:12  7   the opinion, which is based on other
12:15:16  8   elements.  "Create" -- further down
12:15:20  9   "create a healthcare provider report," et
12:15:23  10  cetera, et cetera, and "providing access
12:15:27  11  to the healthcare provider report," et
12:15:30  12  cetera.
12:15:30  13      So that typo (indicating) would
12:15:35  14  not affect the basis of our opinion.
12:15:37  15      Again, it's -- the basis of the
12:15:39  16  opinion's clear.
12:15:40  17      "Healthcare provider verified
12:15:43  18  by" -- "information verified by an
12:15:47  19  independent third-party source" and this
12:15:50  20  report that was provided, the comparison.
12:15:53  21      Q.  Okay.  Thank you.
12:15:54  22      If you can please turn back to
12:15:56  23  page 3.
12:15:56  24      (The witness complies.)
12:15:58  25      Q.  And the paragraph there that
```

176

```
12:16:00  1   starts, "Specifically we conclude..."
12:16:03  2       Do you see that?
12:16:03  3       A.  Yes.
12:16:04  4       Q.  Mr. Kanan was asking you about
12:16:05  5   that, and asking you about whether there
12:16:11  6   might be factual misunderstandings.
12:16:13  7       Do you remember that line of
12:16:14  8   questioning?
12:16:15  9       A.  Yes.
12:16:15  10      Q.  Have you seen anything that
12:16:19  11  indicates to you that there'd be any
12:16:22  12  factual mistakes in that paragraph?
12:16:24  13      A.  No.
12:16:25  14      Q.  So assume with me,
12:16:30  15  Mr. Braginsky, that you were shown a
12:16:32  16  document that shows that in response --
12:16:35  17  look at that part 1 here, but, in fact,
12:16:38  18  assume you were shown a document that
12:16:39  19  showed licensure, internship, residency or
12:16:43  20  fellowship information in a profile, would
12:16:46  21  that change your opinion?
12:16:50  22      A.  No.
12:16:52  23      Q.  By itself, would it change your
12:16:55  24  opinion?
12:16:55  25      A.  No, it would not change the
```

44 (Pages 173 to 176)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PHILIP BRAGINSKY - 2/14/2013

177

```
12:16:57  1   opinion really at all. And it probably
12:16:59  2   wouldn't even change this portion of the
12:17:01  3   opinion (indicating) -- it wouldn't change
12:17:04  4   this portion of the opinion unless it
12:17:06  5   showed that "this is a healthcare provider
12:17:13  6   report that includes independent
12:17:14  7   third-party verified information."
12:17:17  8       So it would need to show that.
12:17:20  9       And then you'd have to satisfy
12:17:22 10   also -- you'd have to show that Vitals was
12:17:28 11   also satisfying all the other elements as
12:17:31 12   well so...
12:17:32 13       Q.   So suppose that paragraph, even
12:17:35 14   that entire paragraph starts
12:17:38 15   "Specifically, we conclude...," even if
12:17:39 16   that was entirely wrong --
12:17:41 17       A.   Right.
12:17:41 18       Q.   -- would that change your
12:17:43 19   opinion so that MDx would then be
12:17:45 20   infringing?
12:17:45 21       A.   No. That's why it says, "an
12:17:48 22   additional and independent basis for
12:17:50 23   non-infringement is the healthcare
12:17:53 24   provider report does not include
12:17:55 25   comparison ratings of healthcare
```

178

```
12:17:57  1   providers."
12:17:58  2       Q.   And, again, has anyone shown you
12:18:01  3   any information that would indicate to you
12:18:03  4   that any part of this is factually
12:18:05  5   incorrect?
12:18:05  6       A.   No.
12:18:07  7       MR. STIMPSON: I have nothing
12:18:08  8   further.
12:18:10  9   CONTINUED EXAMINATION
12:18:10 10   BY MR. KANAN:
12:18:11 11       Q.   I have just a couple of
12:18:12 12   questions.
12:18:12 13       Mr. Braginsky, again, on
12:18:15 14   Rothschild Exhibit 8, if you would go to
12:18:17 15   page 6. And that's the language of Claim
12:18:23 16   15 that Mr. Stimpson just asked you about
12:18:27 17   with respect to the incorrect citation of
12:18:31 18   the claim saying, "the company" and "the
12:18:34 19   service," when the claim reads "a company
12:18:37 20   providing a service."
12:18:38 21       You recall that?
12:18:39 22       A.   Yes.
12:18:39 23       Q.   And you recall I asked you about
12:18:41 24   it. And I asked you in my questions would
12:18:44 25   this change your opinion, and you said, I
```

179

```
12:18:47  1   don't know. It's a big claim and I'd have
12:18:49  2   to read it to make a determination.
12:18:51  3       You recall that?
12:18:52  4       A.   Yes.
12:18:53  5       Q.   And we took a break for about 25
12:18:55  6   minutes and you come back and now you say
12:18:56  7   it doesn't change my opinion, right?
12:18:58  8       MR. STIMPSON: Okay. Object to
12:19:01  9   the question because it
12:19:04 10   mischaracterizes facts. But you
12:19:04 11   can answer if you understand it.
12:19:04 12       Q.   Okay. Well, am I correct you
12:19:05 13   answered my question saying you couldn't
12:19:06 14   say whether it would change your
12:19:08 15   conclusions about Claim 15 when I was
12:19:10 16   asking you those questions?
12:19:11 17       MR. STIMPSON: That's a
12:19:12 18   different question.
12:19:13 19       You can answer that.
12:19:14 20       A.   Is that what I said?
12:19:15 21       Q.   That's what you said to me.
12:19:16 22       A.   I think that's what I said, yes.
12:19:18 23       Q.   All right. And then we took a
12:19:20 24   break --
12:19:20 25       A.   Mm-hmm.
```

180

```
12:19:21  1       Q.   -- and now you've come back and
12:19:23  2   testified that your opinion is it wouldn't
12:19:25  3   change your analysis, correct?
12:19:27  4       A.   Correct, yes.
12:19:28  5       Q.   You made this analysis during
12:19:29  6   the break we just had, right?
12:19:31  7       A.   Yes.
12:19:32  8   DIR Q.   While you were meeting with
12:19:34  9   Mr. Stimpson, correct?
12:19:36 10       MR. STIMPSON: Objection.
12:19:36 11       No. Objection to the form of
12:19:38 12   the question. He can answer the first
12:19:40 13   question. He can't answer what he did
12:19:42 14   with me. That's work product.
12:19:44 15       MR. KANAN: I wasn't asking
12:19:45 16   about work product. I said, while you
12:19:48 17   were meeting with Mr. Stimpson.
12:19:51 18       MR. STIMPSON: You can't answer
12:19:52 19   that question.
12:19:52 20       Q.   Did you meet with Mr. Stimpson
12:19:55 21   during the break we just had?
12:19:55 22       MR. STIMPSON: You can answer
12:19:59 23   that question.
12:20:00 24       A.   I did.
12:20:00 25       Q.   Now, you've testified there are
```

45 (Pages 177 to 180)

181

12:20:02 1 other reasons why your opinion is that the
12:20:09 2 Vitals/MDx website does not infringe the
12:20:13 3 patent that you did not enumerate in your
12:20:16 4 opinion letter, Rothschild Exhibit 8?
12:20:18 5     MR. STIMPSON: Objection.
12:20:20 6 Objection to the question. That
12:20:23 7 misstates his testimony.
12:20:24 8     Q.   Is that right?  Does that
12:20:25 9 misstate your testimony?
12:20:26 10     A.   I believe that what I said was,
12:20:28 11 that as we went through the analysis, we
12:20:31 12 discussed various reasons why they don't
12:20:34 13 infringe the claim.
12:20:35 14     Q.   And that you didn't put all of
12:20:36 15 those reasons or these other reasons into
12:20:38 16 the opinion letter, correct?
12:20:40 17     MR. STIMPSON: Same objection.
12:20:41 18     A.   And that it was unnecessary to
12:20:46 19 include other reasons.  That's correct.
12:20:48 20     Q.   Now, my question is:
12:20:49 21     You didn't put them in the
12:20:51 22 opinion, right?
12:20:52 23     A.   They're not in the opinion.
12:20:54 24     Q.   Right?
12:20:54 25     A.   That's correct.

182

12:20:55 1     Q.   But you discussed them with
12:20:58 2 Mr. Rothschild at the December 30th
12:21:00 3 meeting, correct?
12:21:00 4     A.   No.  What we discussed was the
12:21:05 5 elements of the claim and the -- what
12:21:11 6 Vitals.com does and compared the two.
12:21:18 7 That's what we discussed.
12:21:19 8     Q.   And in that comparison, you
12:21:21 9 reached conclusions --
12:21:23 10     A.   Mm-hmm.
12:21:24 11     Q.   -- about whether certain
12:21:25 12 elements were infringed that you did not
12:21:29 13 include in this written opinion
12:21:31 14 (indicating), Exhibit 8, correct?
12:21:33 15     MR. STIMPSON: Objection to the
12:21:37 16 form. Misstates his testimony.
12:21:39 17     A.   Yeah.  I thought that there were
12:21:41 18 various reasons, yes.
12:21:42 19     Q.   That you didn't put in your
12:21:44 20 written opinion, Rothschild Exhibit 8?
12:21:45 21     A.   They're not in the opinion,
12:21:47 22 that's correct.
12:21:47 23     Q.   And you expressed those reasons
12:21:49 24 at the meeting on December 30th; is that
12:21:51 25 correct?

183

12:21:51 1     A.   Hmmm, I don't recall that.  No.
12:21:55 2     Q.   You thought about them, you
12:21:57 3 thought them to yourself, but you did not
12:21:59 4 speak about these other reasons; is that
12:22:01 5 your testimony?
12:22:01 6     A.   Yeah.  I don't recall speaking
12:22:03 7 to Mitch about them.
12:22:04 8     Q.   Okay.  So the testimony is:
12:22:07 9     There were other reasons
12:22:09 10 supporting your conclusion that there's no
12:22:10 11 infringement, but you don't remember what
12:22:13 12 they are; is that right?
12:22:13 13     A.   That's correct.  Yes.
12:22:14 14     Q.   And you thought about them at
12:22:16 15 the December 30 meeting with
12:22:19 16 Mr. Rothschild, but you didn't speak about
12:22:21 17 them at the meeting of December 30; is
12:22:24 18 that correct?
12:22:24 19     A.   That's correct.
12:22:25 20     Once -- once we focused on these
12:22:29 21 (indicating) -- these reasons, there was
12:22:32 22 nothing further to discuss with Mitch.
12:22:34 23     Q.   Now, Mr. Stimpson asked you some
12:22:38 24 questions about your testimony you
12:22:40 25 previously gave in circumstances where you

184

12:22:46 1 didn't recall about certain things.  And
12:22:47 2 then he asked you about forgetting about
12:22:47 3 the specifics, what's your practice on
12:22:47 4 certain matters.
12:22:52 5     Do you recall that?
12:22:52 6     A.   Yes.
12:22:52 7     Q.   And you described what your
12:22:54 8 practice is.
12:22:54 9     A.   Yes.
12:22:54 10     Q.   Is it your practice, when you do
12:22:57 11 legal work, Mr. Braginsky, to take notes
12:22:59 12 about what you were working on?
12:23:03 13     A.   I -- I'm not a huge note-taker.
12:23:07 14 Sometimes I take notes, sometimes I don't.
12:23:10 15     Q.   Is it your practice to do
12:23:15 16 research when you're doing your work?
12:23:17 17     A.   Generally, yes.
12:23:19 18     Q.   That that research is reflected
12:23:24 19 as a practice in your files?
12:23:24 20     A.   I don't know.  Sometimes.
12:23:26 21     Q.   Do you have research that you
12:23:28 22 did in this freedom-to-operate-opinion
12:23:30 23 that you wrote?
12:23:32 24     A.   I don't recall what was in the
12:23:34 25 file.  I recall being asked to provide

46 (Pages 181 to 184)

CONFIDENTIAL - ATTORNEYS'EYES ONLY

PHILIP BRAGINSKY - 2/14/2013

---

185

| | |
|---|---|
| 12:23:41 1 | whatever I had, which I did. |
| 12:23:43 2 | Q.   Yes.  So there isn't any |
| 12:23:46 3 | research we've been provided. |
| 12:23:48 4 | So we can only conclude from |
| 12:23:49 5 | that, you didn't do any; is that right? |
| 12:23:51 6 | A.   Yes. |
| 12:23:52 7 | Q.   Is it your practice to do |
| 12:23:54 8 | research on legal questions you're asked |
| 12:23:55 9 | to write opinion letters about? |
| 12:23:57 10 | A.   If necessary, I would do it. |
| 12:23:59 11 | Q.   Right.  We also weren't provided |
| 12:24:01 12 | any of your notes.  So from that we |
| 12:24:03 13 | conclude there are none. |
| 12:24:05 14 | Is that a fair conclusion? |
| 12:24:06 15 | A.   Yes. |
| 12:24:06 16 | Q.   And is it your practice |
| 12:24:07 17 | typically, when you're working on matters, |
| 12:24:10 18 | including 30 some-page opinion letters, to |
| 12:24:14 19 | have notes about what you're working on? |
| 12:24:17 20 | A.   It really depends.  Sometimes, |
| 12:24:20 21 | yes/sometimes, no. |
| 12:24:23 22 | Q.   And were there drafts of this |
| 12:24:25 23 | opinion letter that's been marked |
| 12:24:28 24 | Rothschild Exhibit 8? |
| 12:24:29 25 | A.   I don't recall. |

---

186

| | |
|---|---|
| 12:24:31 1 | Drafts.  I'm sure there were |
| 12:24:33 2 | drafts. |
| 12:24:33 3 | Q.   Well, they haven't been provided |
| 12:24:35 4 | to us. |
| 12:24:36 5 | MR. STIMPSON:  There's no |
| 12:24:38 6 | question pending. |
| 12:24:39 7 | Q.   Did you write drafts of this |
| 12:24:40 8 | letter? |
| 12:24:40 9 | MR. STIMPSON:  Objection; asked |
| 12:24:44 10 | and answered. |
| 12:24:44 11 | MR. KANAN:  Okay.  Well, he did. |
| 12:24:46 12 | And I'd like to see them. |
| 12:24:47 13 | MR. STIMPSON:  Well, whatever |
| 12:24:47 14 | there was. |
| 12:24:47 15 | MR. KANAN:  No -- |
| 12:24:48 16 | MR. STIMPSON:  Greg, please. |
| 12:24:48 17 | You have to let me -- you have to be |
| 12:24:50 18 | polite.  When I'm speaking, don't talk |
| 12:24:53 19 | over me.  It's not fair to the court |
| 12:24:55 20 | reporter, it's not fair to anybody, |
| 12:24:57 21 | okay? |
| 12:24:58 22 | I understand what you're saying. |
| 12:24:58 23 | You've been trying to find something |
| 12:25:00 24 | that we didn't get you forever.  It |
| 12:25:03 25 | doesn't exist.  He told you he might |

---

187

| | |
|---|---|
| 12:25:05 1 | have notes and he might not.  It's |
| 12:25:08 2 | either on the privileged log or it's |
| 12:25:11 3 | not. |
| 12:25:12 4 | MR. KANAN:  You're not listening |
| 12:25:13 5 | to his answer.  He did do drafts of |
| 12:25:17 6 | this opinion.  I would like to see |
| 12:25:19 7 | them.  I would like them. |
| 12:25:21 8 | MR. STIMPSON:  He says he |
| 12:25:23 9 | doesn't have them.  They don't exist. |
| 12:25:25 10 | MR. KANAN:  He said they did. |
| 12:25:25 11 | THE WITNESS:  No.  No. |
| 12:25:27 12 | MR. STIMPSON:  You're not |
| 12:25:31 13 | listening, Greg.  I know how badly you |
| 12:25:33 14 | want try to seclude this opinion, but |
| 12:25:33 15 | it doesn't mean that you can just -- |
| 12:25:33 16 | MR. KANAN:  No, no, no -- |
| 12:25:34 17 | MR. STIMPSON:  You can't make to |
| 12:25:34 18 | stuff up, Greg.  Okay?  It has to have |
| 12:25:37 19 | some factual basis.  You can't just |
| 12:25:37 20 | like say stuff.  Okay? |
| 12:25:37 21 | MR. KANAN:  I'm not making stuff |
| 12:25:37 22 | up. |
| 12:25:40 23 | BY MR. KANAN: |
| 12:25:40 24 | Q.   Mr. Braginsky, did you do |
| 12:25:43 25 | drafts?  I asked you a minute ago and you |

---

188

| | |
|---|---|
| 12:25:45 1 | said you probably did. |
| 12:25:47 2 | Did you do drafts of this |
| 12:25:50 3 | exhibit, Rothschild Exhibit 8, your |
| 12:25:53 4 | opinion letter?  Did you do drafts of |
| 12:25:55 5 | this? |
| 12:25:55 6 | A.   Hmmm, likely, I did, yes. |
| 12:25:57 7 | Q.   All right.  Have they been |
| 12:25:58 8 | provided to us? |
| 12:25:59 9 | A.   I don't know. |
| 12:26:00 10 | Q.   Do they exist? |
| 12:26:02 11 | A.   I don't know. |
| 12:26:02 12 | Q.   Were they destroyed? |
| 12:26:05 13 | A.   Very possibly. |
| 12:26:05 14 | Q.   Is that your practice?  You |
| 12:26:05 15 | destroy the drafts; you don't keep them in |
| 12:26:05 16 | your files? |
| 12:26:05 17 | A.   That's correct. |
| 12:26:05 18 | Q.   And your testimony is you've |
| 12:26:08 19 | looked in your files for any drafts and |
| 12:26:08 20 | provided them to Mr. Stimpson if they |
| 12:26:12 21 | existed at the time; is that your |
| 12:26:13 22 | testimony? |
| 12:26:13 23 | A.   I provided the files, yes. |
| 12:26:16 24 | REQ   MR. KANAN:  Okay.  Well, I'm |
| 12:26:17 25 | making a specific request for any |

---

47 (Pages 185 to 188)

CONFIDENTIAL - ATTORNEYS'EYES ONLY
**PHILIP BRAGINSKY - 2/14/2013**

189

| | |
|---|---|
| 12:26:19 1 | drafts of Exhibit 8 that exist. |
| 12:26:22 2 | MR. STIMPSON: They don't exist. |
| 12:26:24 3 | You got them. |
| 12:26:32 4 | Q. Did anyone review this opinion |
| 12:26:35 5 | letter, Exhibit 8, before you sent it out, |
| 12:26:39 6 | Mr. Braginsky, besides yourself? |
| 12:26:41 7 | A. I don't recall. |
| 12:26:45 8 | Q. Did you consult with |
| 12:26:48 9 | Mr. Rosenberg about it? |
| 12:26:49 10 | A. I could have, yes. |
| 12:26:51 11 | Q. What about Mr. Heaton? |
| 12:26:56 12 | A. Not likely. |
| 12:26:57 13 | Q. Did he draft any portions of the |
| 12:26:59 14 | opinion letter? |
| 12:27:00 15 | A. I -- I don't recall. |
| 12:27:05 16 | Q. Did Mr. Rosenberg provide you |
| 12:27:07 17 | any suggestions regarding the opinion |
| 12:27:09 18 | letter before it was issued? |
| 12:27:11 19 | A. I don't remember. I don't think |
| 12:27:12 20 | so. |
| 12:27:13 21 | Q. If he did that, would he have |
| 12:27:15 22 | provided them to you in writing? |
| 12:27:18 23 | A. I -- I don't know what he would |
| 12:27:20 24 | have done. |
| 12:27:20 25 | Q. Is that a practice in your firm, |

190

| | |
|---|---|
| 12:27:22 1 | that when lawyers communicate about drafts |
| 12:27:26 2 | of opinion letters, they provide their |
| 12:27:28 3 | comments in writing? |
| 12:27:29 4 | A. No. |
| 12:27:29 5 | Q. It's not? |
| 12:27:30 6 | A. No. |
| 12:27:31 7 | MR. STIMPSON: Objection; asked |
| 12:27:32 8 | and answered. |
| 12:27:33 9 | Q. It's only done in conversation? |
| 12:27:34 10 | A. Well, there's no practice either |
| 12:27:36 11 | way. We don't have a practice controlling |
| 12:27:39 12 | that. |
| 12:27:44 13 | MR. KANAN: That's all I have. |
| 12:27:45 14 | CONTINUED EXAMINATION |
| 12:27:45 15 | BY MR. STIMPSON: |
| 12:27:46 16 | Q. I need to make one thing very |
| 12:27:48 17 | clear, Mr. Braginsky. Because there was |
| 12:27:49 18 | confusion about the questioning or talking |
| 12:27:52 19 | about what you were thinking and other |
| 12:27:55 20 | claim elements you might have thought |
| 12:27:57 21 | about generally. |
| 12:27:58 22 | I just got to make this |
| 12:27:59 23 | perfectly clear, Mr. Braginsky. |
| 12:28:00 24 | Did you give any advice to |
| 12:28:03 25 | anybody at MDx about these infringement |

191

| | |
|---|---|
| 12:28:04 1 | issues as opposed to just like generally |
| 12:28:07 2 | talking about website and claims? Did you |
| 12:28:10 3 | give any advice to anybody at MDx that's |
| 12:28:13 4 | not reflected in this opinion, Rothschild |
| 12:28:15 5 | Exhibit 8? |
| 12:28:16 6 | A. No. |
| 12:28:16 7 | MR. STIMPSON: Thank you. |
| 12:28:17 8 | Nothing further. |
| 12:28:20 9 | MR. KANAN: That's all I have. |
| 12:28:21 10 | THE VIDEO OPERATOR: Going off |
| 12:28:22 11 | the record at 12:28 and this will mark |
| 12:28:25 12 | the end of tape number 2. |
| 12:28:33 13 | (Time noted: 12:28 p.m.) |
| 14 | |
| 15 | |
| 16 | PHILIP BRAGINSKY |
| 17 | |
| 18 | Subscribed and sworn to before me |
| 19 | this _____ day of _____, 2013 |
| 20 | |
| 21 | _____ |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

192

| | |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | STATE OF NEW YORK    ) |
| 3 |                      : ss. |
| 4 | COUNTY OF NEW YORK.) |
| 5 | I, AMY KLEIN CAMPION, a |
| 6 | Shorthand Reporter and Notary Public |
| 7 | within and for the State of New York, |
| 8 | do hereby certify: |
| 9 | That PHILIP BRAGINSKY, the |
| 10 | witness whose deposition is |
| 11 | hereinbefore set forth, was duly sworn |
| 12 | by me and that such deposition is a |
| 13 | true record of the testimony given by |
| 14 | the witness. |
| 15 | I further certify that I am |
| 16 | not related to any of the parties to |
| 17 | this action by blood or marriage, and |
| 18 | that I am in no way interested in the |
| 19 | outcome of this matter. |
| 20 | IN WITNESS WHEREOF, I have |
| 21 | hereunto set my hand this 26th day of |
| 22 | February, 2013. |
| 23 | |
| 24 | |
| 25 | AMY KLEIN CAMPION |

48 (Pages 189 to 192)