# EXHIBIT B

(Redacted version of Dkt. # 626-2)

Civil Action No. 11-CV-00520-PAB-BNB

**HEALTH GRADES, INC.'S MOTION FOR LEAVE TO FILE
SUPPLEMENTAL EXHIBITS IN SUPPORT OF ITS OPPOSITION
[Doc. #201] TO MDX'S SECOND MOTION PURSUANT TO FEDERAL
RULE OF CIVIL PROCEDURE 56 FOR PARTIAL SUMMARY
JUDGMENT OF NON-INFRINGEMENT [Doc. #195]**

---

**Exhibit 12**

**Supplemental Rebuttal of Dr. Richard Cooper
October 9, 2013**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  11-CV-00520-RM-BNB

HEALTH GRADES, INC.

        Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM

        Defendant.

---

### Supplemental Rebuttal of Richard G. Cooper, D.Sc.
### (CONFIDENTIAL)

---

Attorneys for MDX have asked me to submit the following supplemental rebuttal report, responding to the expert report of Dr. Philip Greenspun regarding iTriage and to the supplemental expert report of Dr. Greenspun.  I am engaged in ongoing development and refinement of my opinions and expected testimony and reserve the right to submit supplements to the information contained in this disclosure pursuant to the Federal Rules of Civil Procedure.

## Introduction

1.      I incorporate herein the content of my initial Report, dated July 13, 2012, and my rebuttal Report, dated September 17, 2012, specifically including all arguments and evidence therein, my background and expertise, and my discussion of the art area and level of ordinary skill in this art.

2.      In preparation of this report, I have reviewed materials referenced in Dr. Greenspun's report and in Dr. Greenspun's supplemental report, and I have reviewed all the materials identified in my rebuttal report.  I have also read the pending motion for summary judgment of non-infringement [Doc. # 490], motion for Rule 11 sanctions [Doc. # 564], and related papers.  I have also reviewed the following documents:
      - MDX 0104859 - MDX 0104896
      - Any other documents referenced in this report.

## No Infringement

3.      In my initial report and rebuttal report, I described the '060 patent, and the specification and claims of that patent.  They are incorporated herein, but I may address them again herein as appropriate.

4.      Unless stated otherwise, where I refer to "iTriage" here, I shall mean "iTriage, LLC", and where I refer to "Aetna" or "Aetna Life" herein, I shall mean "Aetna Life Insurance Co."  Furthermore, "Health Grades" refers to "Health Grades Inc.", and "MDx" refers to "MDx Medical, Inc."

5.      I will compare the patent claims of the '060 patent to the accused 2013 www.vitals.com website (the "Vitals Website"), the accused iTriage apps for Android and iOS (the "iTriage Apps"), and the accused www.itriagehealth.com website (the "iTriage Website"), and demonstrate how a number of important elements of every patent claim are totally missing from them.  I will explain how the Vitals Website, the iTriage Apps, and the iTriage Website, did not infringe any claim of the '060 patent, and how Dr. Greenspun has failed to show that any of these, or the Health Grades website, meet the claim language.

6.      I will address literal infringement and the doctrine of equivalents, and explain how there can be no infringement literally or by equivalents for various reasons.  I will also address inducement of infringement and contributory infringement, and explain how there can be no indirect infringement for various reasons.

7.      I note that, in various paragraphs in Dr. Greenspun's reports, he opines that the mere capability of the MDx Website, the iTriage Apps, and the iTriage Website, to perform certain functions is sufficient to show infringement.  I disagree.  The claim elements affirmatively recite steps and computer instructions (when executed) that must be performed.  Therefore, the mere capability to do so is not sufficient for infringement.  My analysis is the same for all assertions by Dr. Greenspun that mere capability is sufficient for infringement.

## The Law

8.      In my initial report, I described my understanding of the law of direct infringement.  They are incorporated herein.  Below, I describe my understanding of the law of indirect infringement.

9.      It is my understanding that there are two ways a patent claim can be indirectly infringed, inducement of infringement and contributory infringement.

10.     Each of these requires two components.  First, there must be a direct infringement such that every element of a claim, as properly construed, is literally met or met under the doctrine of equivalents.  And second, there must be an indirect infringer who actively induces or contributes to the direct infringement, with knowledge that direct infringement

would result.  If either or both of these two components is missing, then there is no indirect infringement.

11.    I understand that contributory infringement further requires that the indirect infringer sell a component that constitutes a material part of a claimed invention, knowing the component to be especially made or especially adapted for use in an infringement of a patent.  But there is no contributory infringement if the component is a staple article or commodity of commerce suitable for substantial noninfringing use.

12.    I understand that there are limitations on inducement of infringement.  One such limitation, not considered by Dr. Greenspun, is a good faith belief by the accused direct infringer that a patent is not infringed or is invalid. *See Commil USA LLC v. Cisco Systems Inc.*, 720 F.3d 1361 (Fed. Cir. 2013).  A finding of good faith belief precludes any inducement of infringement of the patent.  Another limitation is that inducement of infringement cannot be based on actions occurring before the grant of the patent.  *See National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1196 (Fed. Cir. 1996).

13.    I also understand that Health Grades has the burden of proof by a preponderance of the evidence (tipping of the scales) on the infringement issue.

### INFORMATION VERIFIED BY THE FIRST HEALTH CARE PROVIDER

14.    Claim 1 has the following limitation:

accessing healthcare provider-verified information about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of:

specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;

Vitals

15.    It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation.  Therefore, my analysis of this claim limitation in paragraphs 13 - 15 of my rebuttal report applies to the Vitals Website.

iTriage

16.    With respect to the iTriage Apps and the iTriage Website, Dr. Greenspun argues (*e.g.*, ¶82, ¶85) that they use data licensed from MDx's physician database and so they meet this claim limitation for the same reasons that data from MDx's physician database

allegedly meet this claim limitation. He also claims that Aetna and iTriage collect information for providers themselves. Because Dr. Greenspun's arguments here for the iTriage Apps and the iTriage Website are the same as his arguments for data from MDx's physician database, my analysis of this claim limitation in paragraphs 13 - 15 of my rebuttal report applies to the iTriage Apps and the iTriage Website. Moreover, Dr. Greenspun lacks evidence that iTriage actually used this data for all the elements he alleges. In fact, Aetna no longer has a contract with MDx, yet the data on the iTriage website seems largely the same, indicating that iTriage was never using all of this data.

17.    Dr. Greenspun says in paragraph 83 of his supplemental report that Aetna Inc. can receive information directly from physicians. This is similar to the capability argument that I addressed in my rebuttal report and above herein. The claims require that methods steps be performed and that computer instructions be performed when executed, not that they be merely capable of being performed. Dr. Greenspun also confuses the different companies, iTriage, Aetna Inc., and Aetna Life Insurance Co.

18.    Dr. Greenspun does not argue that information Aetna Inc. can receive from physicians is verified by physicians in anyway. If asked, it is my opinion that paragraphs 13-15 of my rebuttal report apply equally to the Aetna data.

Healthgrades.com

19.    With regard to the healthgrades.com analysis, Dr. Greenspun recites no evidence that any provider has ever provided three or more of the required data elements, or that any provider has ever verified any of this data. Thus, this claim limitation is not met literally or equivalently.

## INFORMATION RECEIVED FROM
## THE FIRST HEALTH CARE PROVIDER

20.    The claim language above also requires that three items of the data set be received from the first health care provider.

Vitals

21.    It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation. Therefore, my analysis of this claim limitation in paragraphs 16 - 22 of my rebuttal report applies to the Vitals Website.

iTriage

22.    With respect to the iTriage Apps and the iTriage Website, Dr. Greenspun argues that they use data licensed from MDx's physician database and so they meet this claim limitation for the same reasons that data from MDx's physician database allegedly meet this claim limitation. He also claims that Aetna and iTriage collect information for

providers themselves. Because Dr. Greenspun's arguments here for the iTriage Apps and the iTriage Website are the same as his arguments for data from MDx's physician database, my analysis of this claim limitation in paragraphs 16 - 22 of my rebuttal report applies to the iTriage Apps and the iTriage Website. Moreover, Dr. Greenspun lacks evidence that iTriage actually used this data for all the elements he alleges. In fact, Aetna no longer has a contract with MDx, yet the data on the iTriage website seems largely the same, indicating that iTriage was never using all this data.

23.     Dr. Greenspun says in paragraph 83 of his supplemental report that Aetna Inc. can receive information directly from physicians. This is similar to the capability argument that I addressed in my rebuttal report and above herein. The claims require that methods steps be performed and that computer instructions be performed when executed, not that they be merely capable of being performed. Dr. Greenspun also confuses the different companies, iTriage, LLC, Aetna Inc., and Aetna Life Insurance Co.

24.     Aside from Dr. Leopold, Dr. Greenspun does not opine about which healthcare provider reports in the iTriage Apps or in the iTriage Website contain data received from healthcare providers. Because Dr. Greenspun does not address it, I do not address it, either. But if asked, I will provide my opinion.

Healthgrades.com

25.     With regard to the healthgrades.com analysis, Dr. Greenspun recites no evidence that any provider has ever provided three or more of the required data elements, or that any provider has ever verified any of this data. Thus, this claim limitation is not met literally or equivalently.

## COMPILING PATIENT-PROVIDED INFORMATION

26.     All claims require the following element:

> compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and
>
>> wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and
>>
>> wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;

27.     I understand that claim 15 is worded slightly differently, reciting "by *a* company providing *a* service" rather than "by *the* company providing *the* service". The meaning is the same, however, as explained in Doc. # 509 filed in this case. I agree with and adopt the analysis in Doc. # 509. In short, it is my opinion that the specification and the prosecution history require claim 15 to have the identical meaning as claim 1 for this claim limitation.

## iTriage

28.     With respect to the iTriage Apps and the iTriage Website, it is my opinion that there is no direct infringement of this claim limitation. Specifically, the claim limitation requires "an on-line patient experience survey completed on a company Web site . . . wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients". For the iTriage Apps and the iTriage Website, iTriage is the company providing the iTriage Apps and the iTriage Website (*i.e.*, the claimed service for connecting healthcare providers with the potential patients). Thus, the on-line patient experience survey must be completed on a company Web site managed by iTriage.

29.     Dr. Greenspun does not contend that this claim limitation is met by a company Web site managed by iTriage. Rather, Dr. Greenspun argues that this claim limitation is met by the patient survey on the Vitals.com web site managed by MDx. I cannot see how this could possibly meet the claim limitation, either literally or under the doctrine of equivalents. Contrary to what is required by the claim limitation, the patient survey on Vitals.com is not managed by iTriage. Therefore, there is no literal infringement.

30.     Dr. Greenspun's doctrine of equivalents analysis for this claim element is incorrect. It is my understanding that the doctrine of equivalents cannot be asserted in a way that vitiates the claim limitation. But Dr. Greenspun's doctrine of equivalents analysis does exactly that. By accusing a patient survey on a website not managed by iTriage, Dr. Greenspun vitiates the claim limitation requiring that "*the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients*" (emphasis added). Because Dr. Greenspun's doctrine of equivalents argument vitiates the claim element, it is an incorrect analysis. Therefore, there is no infringement under the doctrine of equivalents.

31.     The doctrine of prosecution history estoppel also precludes a doctrine of equivalents finding, since this language was added to the claims by amendment in response to a prior art rejection. (*See* Supplemental Amendment dated April 26, 2010). As the limitation was added for reasons related to patentability, there is a presumption of estoppel.

32.     Further, if asked, my opinion is that there cannot be equivalents because the function, way, and result are all substantially different from that required by the claim limitation. The function is to, through users on the company website, compile patient-provided information regarding the first healthcare provider. The way to do so is through

an on-line patient experience survey completed on a website managed by iTriage.  And the result is patient-provided information in the on-line patient survey on the website managed by iTriage.  In my opinion, a patient survey on the www.vitals.com website managed by MDx is not equivalent to the way and the result required by the doctrine of equivalents analysis.

## THIRD PARTY VERIFIED INFORMATION

33.     All claims require the following element:

compiling information regarding the first healthcare provider verified by an independent third-party source,

wherein the information verified by the independent third-party source comprises three or more from the group consisting of:

board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;

<u>Vitals</u>

34.     It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation.  Therefore, my analysis of this claim limitation in paragraphs 24 - 29 of my rebuttal report applies to the Vitals Website.

<u>iTriage</u>

35.     With respect to the iTriage Apps and the iTriage Website, Dr. Greenspun argues that they use data licensed from MDx's physician database and so they meet this claim limitation for the same reasons that data from MDx's physician database allegedly meet this claim limitation.  Because Dr. Greenspun's arguments here for the iTriage Apps and the iTriage Website are the same as his arguments for data from MDx's physician database, my analysis of this claim limitation in paragraphs 24 - 29 of my rebuttal report applies to the iTriage Apps and the iTriage Website.  Moreover, Dr. Greenspun lacks evidence that iTriage actually used this data for all the elements he alleges.  In fact, Aetna no longer has a contract with MDx, yet the data on the iTriage website seems largely the same, indicating that iTriage was never using all this data.

36.     Dr. Greenspun does not opine that Aetna obtained third party information in any way other than receiving it from MDx.  Because Dr. Greenspun does not address it, I do not address it, either.  But if asked, I will provide my opinion.  Dr. Greenspun also confuses the different companies, iTriage, LLC, Aetna Inc., and Aetna Life Insurance Co.

37.     Dr. Greenspun says in paragraph 90 of his supplemental report that Aetna verifies claimed data by placing it on a Web site.  I disagree that merely placing information on a web site can verify that information.

Healthgrades.com

38.     With regard to the healthgrades.com analysis, Dr. Greenspun recites no evidence that any third party has ever verified any of this data.  Thus, this claim limitation is not met literally or equivalently.

## COMPILING AND USING INFORMATION FROM THIRD PARTIES

39.     The claim also requires:

> creating, by the at least one computer processor, a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information[1], and the information verified by the independent third-party source,
> > wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers;

Vitals

40.     It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation.  Therefore, my analysis of this claim limitation in paragraphs 31 - 41 of my rebuttal report applies to the Vitals Website.

41.     Dr. Greenspun also refers to "Similar doctors nearby" in his paragraph 21.  Apparently, Dr. Greenspun is arguing that a link to a report on another doctor means that the other doctor's profile is just another page of the report on the first doctor.  That is inconsistent with the court's claim construction, and simply factually incorrect.  Links can take the user anywhere, and it doesn't mean the next landing page is part of the first.

iTriage

42.     My analysis of this claim limitation in paragraphs 35 - 41 of my rebuttal report also applies to the iTriage Apps and the iTriage Website.

43.     To reiterate in part, in my view, Dr. Greenspun's analysis does not adhere to the court's claim constructions.  He refers to the results list as being the report on the "first health care provider", but that doesn't meet the claim construction for the report on the "first health care provider."  Dr. Greenspun similarly confuses the claim language by

---

[1] REDACTED                                                                                                                    I do not understand that Health Grades, or Dr. Greenspun allege that the others are part of the alleged infringement.  See MDx Supplemental Response to Interrogatory 2.

referring to the first doctor in a results list as the "first" healthcare provider, but that is not consistent with the way the court construed "first healthcare provider" or report on the "first healthcare provider" – the results lists are claimed in claim 7, and they are only results lists. A search for doctors matching various search criteria is not a request for information regarding a particular healthcare provider, either literally or equivalently. And results lists are not directed specifically to the "first health care provider", either literally or equivalently, but instead are just lists of providers who satisfy the search criteria. Results lists are claimed separately in claim 7. *See* Neal at page 201 wherein he states "that results list is not a health care provider report, in my opinion."

44. Dr. Greenspun points to various physician profiles in the iTriage Apps and the iTriage Website and concludes that iTriage used the data that Aetna licensed from MDx to create those healthcare provider reports. I disagree.

45. For the physician profiles referenced by Dr. Greenspun, REDACTED (see appendices to Dr. Greenspun's reports) REDACTED (*e.g.*, MDX 0104864 - MDX 0104896).

46. REDACTED

47. REDACTED

It is my opinion that even though MDx licensed data to Aetna Life, the iTriage Apps and the iTriage Website did not use MDx data for all of the claimed data in the physician profiles referenced by Dr. Greenspun. And because Dr. Greenspun did not opine about how else Aetna or iTriage received that claimed data, evidence is lacking to show that this claim limitation was infringed by the iTriage Apps and the iTriage Website.

## COMPARISON RATINGS INCLUDED IN THE REPORT

48. The claims of the '060 patent require 1) receiving a request for information regarding a "first health care provider"; 2) creation of a report on the first health care provider; and 3) the report must include comparison ratings of health care providers. The court construed "first health care provider" to mean "a particular health care provider about whom information is requested and a report is produced". See page 12 of the court's claim construction order. The court also held that the report must be directed specifically to the first health care provider. See pages 12-13. The court construed the claims so that "ratings of multiple health care providers, including the 'first health care

provider,' [be included] in the report on the 'first health care provider' thus permitting comparison of the 'first health care provider' with other potential health care providers." See page 14.

<u>Vitals</u>

49.    It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation, so my analysis of this claim limitation in paragraphs 42 - 56 of my rebuttal report applies to the Vitals Website. While Dr. Greenspun does now reference an additional award (Compassionate Doctor award), and while that might be excluded by the Court, my analysis is the same as in my initial report – this does not even remotely meet the court's claim construction, and there is no literal infringement or infringement by equivalents.

<u>iTriage</u>

50.    My analysis of this claim limitation in paragraphs 42 - 56 of my rebuttal report also applies to the iTriage Apps and the iTriage Website.

51.    With respect to the iTriage Apps and the iTriage Website, they have no reports specifically directed toward a "first health care provider" that contain comparison ratings. Dr. Greenspun says that the results lists are part of reports, but that cannot be true within the court's construals because the results list is not directed to the particular "first health care provider", either literally or equivalently.  Furthermore, any part of the results list that does include any particular health care provider does not contain "ratings of multiple healthcare providers" as required by the Court's construal.  Therefore the claim element is not met by Dr. Greenspun's analysis.

52.    I also conclude that there can be no infringement under the doctrine of equivalents.

53.    Under Dr. Greenspun's analysis, comparison ratings excluded from the report would be equivalent to the claim requirement that they be included in the report.  Stated another way, Dr. Greenspun would have the ratings outside the report be equivalent to the claim requirement that they be inside the report.  Dr. Greenspun thus argues that the exact opposite (antithesis) of the claim language should be found to be equivalent to the claim language itself; clearly this is self-contradictory and reads the element entirely out of the claim without any basis in law.  Because Dr. Greenspun's analysis relies on the opposite of the claim language, it is not correct, and there can be no equivalence between a statement and its opposite.

54.    I also disagree with Dr. Greenspun's equivalents analysis.  In my opinion, Dr. Greenspun is performing equivalence analysis on the wrong claim element.  Instead, he should have been focusing the analysis on whether comparison ratings outside the report could be equivalent to the requirement be inside the report.  In my opinion, having

comparison ratings inside the report is directly and logically opposed to the alleged equivalent of having the comparison ratings outside the report.

55.     The function of the claim language requiring comparison ratings to be included in the first health care provider report is to allow ease of comparison to the other providers in the same report that focuses on that first health care provider.  This is accomplished by including the comparison ratings in the report that focuses on the first health care provider.  The result is a single report focusing on the first health care provider that also contains ratings of other providers.

56.     I also find prosecution history estoppel precluding the alleged equivalence.  The reasons are the same as those explained in paragraphs 49-52 in my rebuttal report.


## HYPERLINK TO AFFILIATED HOSPITALS

57.     Claim 4 recites the following:

> The method as defined in claim 1, wherein the healthcare provider report includes a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

### Vitals

58.     It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation, so my analysis of this claim limitation in paragraphs 58 - 59 of my rebuttal report applies to the Vitals Website.

### Healthgrades.com

59.     Dr. Greenspun does not provide an opinion for the www.healthgrades.com website in relation to this claim limitation.  If asked, my opinion is that my analysis of this claim limitation in paragraphs 58 - 59 of my rebuttal report applies to the www.healthgrades.com website.


## RESULTS LIST ADVERTISEMENTS

60.     Claim 8 states as follows:

> The method as defined in claim 7, wherein the results list further includes an advertisement for the first healthcare provider with a hyperlink to information on the first healthcare provider.

Vitals

61.    It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation, so my analysis of this claim limitation in paragraphs 61 - 62 of my rebuttal report applies to the Vitals Website.

62.    Dr. Greenspun describes that in searching for "otolaryngologist in Houston, Texas", an advertisement appeared for a plastic surgeon. Dr. Greenspun then argues that the advertisement for a plastic surgeon could meet the claim requirement of "an advertisement for the first healthcare provider", but I disagree. The "first healthcare provider" must be the particular healthcare provider who is the subject of a request for information. Dr. Greenspun has not identified a request for information on a particular healthcare provider. Assuming a search for "otolaryngologist in Houston, Texas" could be a request for information on a particular healthcare provider, Dr. Greenspun admits that a plastic surgeon does not fall within this search at all. Thus, by Dr. Greenspun's own admission, this claim limitation is not satisfied.

63.    Dr. Greenspun does not argue doctrine of equivalents for this claim limitation. But if asked, it is my opinion that paragraphs 33, 34, and 43 of Dr. Greenspun's supplemental report, if applied to doctrine of equivalents, would impermissibly vitiate the claim element.

64.    Furthermore, if asked, it is my opinion that Dr. Greenspun's opinion does not substantially meet the function, way, result analysis for doctrine of equivalents. The function is provide an advertisement for the first healthcare provider with a hyperlink to information on the first healthcare provider. The way is to provide such advertisement in a results list. And the result is such advertisement in a results list. There is no substantial equivalent for any of the function, way, or result for the reason I explained above. Specifically, an advertisement for a healthcare provider other than the first healthcare provider cannot be equivalent.

65.    Prosecution history estoppel also precludes Dr. Greenspun's analysis. Specifically, in response to a rejection, this claim limitation was changed for patentability reasons from "an advertisement for a healthcare provider" to "an advertisement for the first healthcare provider". (*See* Supplemental Amendment dated April 26, 2010). The doctrine of equivalents cannot be used to recapture this subject matter that was relinquished during prosecution.

iTriage

66.    My entire analysis above applies to the iTriage Apps and the iTriage Website.

Healthgrades.com

67.    Dr. Greenspun does not provide an opinion for the www.healthgrades.com website in relation to this claim limitation. If asked, my opinion is that my analysis of

this claim limitation in paragraphs 61 - 62 of my rebuttal report applies to the www.healthgrades.com website, as does my analysis above herein.  Thus, this claim limitation is not met literally or equivalently.

## MEMBER OF THE COMPANY MANAGING THE WEB SITE

68.     Claim 9 states:

The method as defined in claim 7, further comprising: determining from the results list whether a particular healthcare provider is a member of the company managing the Web site; and if the particular healthcare provider is a member of the company managing the Web site, providing enhanced services for the member healthcare provider on the Web site.

Vitals

69.     It is my understanding that the Vitals Website does not differ from previous versions of Vitals.com as it relates to this claim limitation, so my analysis of this claim limitation in paragraphs 64 - 66 of my rebuttal report applies to the Vitals Website.  (This same analysis applies to claim 11, which depends on claim 9.)

70.     Dr. Greenspun appears to argue that just because there is an option for a healthcare provider to edit information and have it be displayed, the Vitals Website must satisfy this claim limitation of "determining from the results list whether a particular healthcare provider is a member".  I disagree.  The Vitals Website allows each and every healthcare provider to edit his or her information, and have it be displayed.  This does not involve any determination from a results list about whether a healthcare provider is a member.  (This same analysis applies to claim 11, which depends on claim 9.)

iTriage

71.     My analysis of this claim limitation in paragraphs 64 - 66 of my rebuttal report applies to the iTriage Apps and the iTriage Website insofar as there is no determination of whether a physician is a member of iTriage LLC, Aetna Inc., Aetna Life Insurance Co., or any other company.  My analysis above herein also applies to the iTriage Apps and the iTriage Website.  (These same analyses apply to claim 11, which depends on claim 9.)

Healthgrades.com

72.     My analysis of this claim limitation in paragraphs 64 - 66 of my rebuttal report applies to the healthgrades.com website insofar as there is no determination of whether a physician is a member of Health Grades Inc. or any other company.  My analysis above herein also applies to the healthgrades.com website.  (These same analyses apply to claim 11, which depends on claim 9.)

# CLAIM 15

73.     Dr. Greenspun says that his analysis for claim 15 is the same as the analysis for claim 1.  I agree that they are the same basic analysis, and I reassert my entire analysis found above for claim 1.

# INDIRECT INFRINGEMENT

74.     With respect to the iTriage Apps and the iTriage Website, I conclude that there was no direct infringement for the reasons shown above.  Because there was no direct infringement, there could not have been any indirect infringement.

75.     There are other reasons why there was no indirect infringement.  I understand that various of these reasons are explained in Doc. # 490 and 564, filed in this case.  I agree with and hereby incorporate the contents of those documents herein.

76.     For the inducement of infringement allegation, Dr. Greenspun relies on an agreement between MDx and Aetna Life as the only evidence of inducement.   (I understand that activities occurring before the date of the patent cannot be evidence of inducement.)

77.     REDACTED                                                                                      , and there is no allegation of indirect infringement after June 2013.

78.     But it is my understanding that there was no inducement of infringement before June 2013, either, for various reasons.

79.     I am informed that MDx provided data to Aetna Life REDACTED

       , MDx did not induce Aetna Life.  Aetna Life, I understand, is a different company from iTriage, and is a subsidiary of a sister company of Aetna Life; there is no evidence that communications from MDx to Aetna Life would induce infringement.  Also, Dr. Greenspun has no evidence of MDx inducing iTriage or Aetna to do all the acts that are alleged to be the infringement.

80.     MDx entered into the agreement with Aetna Life      REDACTED          .  I understand that, long before, MDx had a good faith belief that the patent was not infringed and/or was invalid.

81.     In particular, I understand that MDx obtained an opinion of counsel in January 2011, opining that the Vitals.com website did not infringe the patent.  Furthermore, MDx filed a motion for partial summary judgment of non-infringement in April 2011 [Doc. # 9], and served interrogatory responses explaining its non-infringement positions in

August 2011. I have reviewed these documents, and it is my opinion that they reflect not only a good faith belief by MDx that the patent claims were not infringed, but that the patent should be deemed not infringed as expressed in my initial report. I understand that a finding of good faith belief of non-infringement precludes any inducement of infringement.

82. Additionally, I understand that MDx provided invalidity contentions in August 2011. It is my opinion that the August 2011 invalidity contentions reflect a good faith belief by MDx that the patent claims were invalid. I understand that a finding of good faith belief of invalidity precludes any inducement of infringement.

83. It is also my opinion that there was no contributory infringement. I am informed that MDx simply provided data to Aetna. Additionally, I understand that MDx did not especially make or especially adapt the data. From my experience, electronic data in general is versatile and can be used in many different ways. I have reviewed the list of data licensed to Aetna, and it is my opinion that such data can be used in many different ways that do not infringe the patent, including any use that eliminates even one claim element. I disagree that the only substantial use of the licensed data was to infringe the patent.

## FINDINGS

My opinions on the infringement issue include the above, and include at least the following:

84. The Vitals Website, the iTriage Apps, the iTriage Website, and the healthgrades.com website, do not have, either literally or equivalently, three or more of the items required to be verified by the health care provider.

85. The Vitals Website, the iTriage Apps, the iTriage Website, and the healthgrades.com website do not have, either literally or equivalently, three or more of the required items that must be received from the first health care provider.

86. The Vitals Website, the iTriage Apps, the iTriage Website, and the healthgrades.com website, do not have, either literally or equivalently, three or more of the required items that must be verified by a third party.

87. The Vitals Website, the iTriage Apps, the iTriage Website, and the healthgrades.com website, do not have, either literally or equivalently, three or more of the required items to be received from a third party and used in health care provider reports.

88. The Vitals Website, the iTriage Apps, and the iTriage Website, do not have, either literally or equivalently, any comparison ratings included in the report on the first health care provider.

89.    The Vitals Website and the healthgrades.com website do not have, either literally or equivalently, a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

90.    The Vitals Website, the iTriage Apps, the iTriage Website, and the healthgrades.com website do not have, either literally or equivalently, a results list that further includes advertisements for a first health care provider.

91.    The Vitals Website, the iTriage Apps, the iTriage Website, and the healthgrades.com website, do not have, either literally or equivalently, a method including determining from the results list whether a particular health care provider is a member of the company managing the Web site.

92.    MDx did not induce infringement or engage in contributory infringement.

93.    The data provided by MDx to Aetna was not especially made or especially adapted, and such data can be used in many different ways that do not infringe the patent.

Dated this _9th_ day of _October,_ 2013

By: _Richard G Cooper_
        Dr. Richard G. Cooper

# Exhibit A



# Richard G. Cooper, D.Sc.

1795 San Lorenzo Drive, Hemet, CA 92545;
(949)525 5712;
Rich@EnglishLogicKernel.com

## Expertise

- Databases
- Source Code Comparison
- Abstraction, Filtration, Comparison
- Communications
- Internet/Web/e-Commerce
- Client/Server, N-Tier Technology
- Graphics/GUIs
- Sensor Processing
- EEG Analysis
- GPS tracking
- Pattern Recognition
- Computer Linguistics
- Content analysis
- Patent Analysis and Licensing
- Algorithm Development
- Medical records database analysis
- Software Architecture
- Simulation
- Reliability Engineering
- Probabilistic and Statistical Analysis
- Bayesian and Markov Analysis
- Monte Carlo Simulation
- Hidden Markov Models

- Embedded systems
- Point of Sale Systems
- Geographic Information Systems
- Distributed Computing
- Systems Development
- Industry Practices
- Networking Protocols
- Medical Devices
- Patent Prosecution
- Patent Litigation
- Business Methods
- Text Processing
- Radar
- Sonar
- Financial Software
- Control Systems
- Ultrawideband
- Fourier Analysis
- Work Flow Tracking and Analysis
- Knowledge Based Systems
- Project Planning
- Technical Marketing Support
- Manufacturing Execution Systems

## Professional Summary

Dr. Cooper has over 30 years of experience in software, systems and electrical engineering. His expert witness services comprise over thirty cases, a dozen depositions and federal and state court testimony. His litigation background includes patents, trade secrets, trade dress, software contract failure, electronics manufacturing, medical devices, database analysis, web site comparisons, enterprise software, management of patent licensing projects, technical advisor for counsel, internet, web site and systems development, software product development, database management systems, software architecture, research and development, and system specification.

## Employment History

| From: | 2007 | **Self Employed** |
| To: | Present | **Consultant, Expert Witness** |
| | Position: | |

- contract consulting and expert witness services in computer, software, internet, web, electronics, embedded systems, and communications technologies

| From: | 2006 | **Heller Ehrman, LLP** |
| To: | 2007 | |
| | Position: | *Patent Specialist* |

- Reviewed Bluetooth implementation in view of WRF patent;
- Developed licensing project plan for contingency agreement;
- Reviewed invalidity contentions;
- Expressed expert opinion on quality of opponent's case;
- Developed provisional patent application;
- Reviewed client's production materials for relevance.
- Assessed prospective client's patent portfolio for contingency licensing;
- Worked with shareholders to structure licensing of major patent portfolio
- Developed financial profile based on potential infringers;
- Worked with litigation and marketing to project IP licensing financials.

| From: | 2005 | **MetaSemantics Corporation** |
| To: | 2006 | |
| | Position: | *Patent Technical Advisor at Paul, Hastings, Janofsky and Walker, LLP* |

- Analysis of technical content in patents and in patent applications;
- support of prosecution of patent applications;
- support for patent infringement litigation and infringement defense law suits;
- provided technical opinions on the strengths and weaknesses of patents relating to software technologies, electronics technologies, business method and medical technologies;
- development of prior art materials relating to patent suits;
- assessment of patent portfolios;
- developing responses to Office Actions from patent examiners;
- analysis of technical documents to support discovery;
- definition of requirements for motion to compel opposing counsel to provide software for discovery;
- development of patent applications for clients;
- construction of claim language based on technical concept papers and other materials provided by inventors;
- development of claim charts to support litigation relating to patent infringement;

- development of tutorial materials to introduce technical concepts to legal counsel;
- analysis of software source code for detection of patent infringement;
- development of proof of infringement for presentation in court and to attorneys.

*2004-2005:  President & Chief Technology Officer*

- Developed embedded medical records text mining software using WordNet database, class lattices, and semantic relationships;
- developed business plan and technical proposal for text mining technology development project;
- developed question-answering system using unstructured text resources;
- developed content analysis linguistic tool set for product release;
- refined radar processing software for recognition of 3D shapes;
- developed embedded software able to recognize the collar (joint) of underground pipeline infrastructure in a natural gas distribution system;
- software engineering for loan origination system enhancement for an Eastern Software Empower installation;
- N-tier programming support;
- development of an embedded web client application that tests a web server for security and visibility of retrieved documents.

| From: | 2001 | **ValuTech, Inc.** |
|---|---|---|
| To: | 2004 | |
| | Position: | *Chief Scientist* |

- Developed new financial software products using logical representations of invoice and lockbox financial objects;
- developed graphic display with zoom and pan;
- development of web services using Client/Server, SQL Server 2000, Windows 2000, and HTTP and TCP components;
- presented demonstrations and project plans to prospects and customers;
- instrumented software to collect functional history and measure performance;
- data mining of SQL Server database for invoices and payments received against unevenly structured receivables documents;
- analyzed object structure within operational data;
- analyzed time series data to predict future financial behavior on the part of customers;
- developed business financial analysis tools for calculating cash float actually observed in payable and receivable operations for Fortune 500 companies;
- developed analytical techniques and adaptive learning methods to

maximize cash float in payables and to minimize cash in receivables for large companies;
- trained programming staff in object-oriented analysis and design;
- development of financial web services;
- mentored staff, and taught them good software design principles and practices.

| From: | 1992 | **EfficacyFX.com** |
| To: | 2000 | |
| | Position: | *President & Chief Technology Officer* |

- Developed sensor processing software to support commercial low-cost utility radars;
- applied pattern recognition techniques to detect specific target shapes;
- implemented and tested a prototype ultrawideband radar sensor as a candidate for deployment;
- constructed imagery software to build a 3D image from sensor inputs while scanning the ground over natural gas pipeline infrastructure;
- developed anechoic radar range for ultrawideband (UWB) radar sensor and populated it with natural gas pipe and collar materials;
- identified signal patterns that could discriminate between normal pipe and the collars at joints between pipes;
- built a database of time series signals and Fourier spectra for test cases;
- demonstrated feasibility of identifying the collars on pipeline infrastructure.

- Defined and developed turnkey software products for hospital scheduling, staff development, medical records and vertical manufacturing industries;
- Interviewed customer staff to define systems;
- developed the software to meet customer expectations.

- Developed a work flow measurement system for small and medium sized manufacturers;
- collected work flow information by time stamping bar-coded work orders, activity labels and employee badges so that full performance information could be collected;
- developed reports for calculating the value of customers, the efficiency of employees, and the performance profile of activities.

| From: | 1991 | **Casa Del Sol** |
| To: | 1994 | |
| | Position: | *Owner* |

- Developed point of sale software for use in retail environment;

           •   analyzed customer purchasing of activities and products;
           •   implemented credit checking software;
           •   developed accounting modules for use in tracking retail accounts;
           •   developed reports for calculating the value of customers, the efficiency of employees, and the performance profile of activities.

| From: | 1980 | **Hughes Aircraft Company** |
|---|---|---|
| To: | 1992 | |
| | Position: | *Senior Systems Engineer for Software R&D* |

  • Managed a team of six software engineers developing software technologies for Hughes' products;
  • developed reusable radar sensor processing and display application;
  • applied knowledge based and rule based technologies, including measurement and diagnosis of systems and networks;
  • used Bayesian and Markov models to predict static and dynamic performance loads and to identify potential systems problems.

  • Developed models and simulation software;
  • planned and defined distributed database information systems;
  • developed resource management, graphic information display, radar systems, command and control information systems.

  • Development of technology projects for feasibility demonstrations;
  • conduct of R&D projects as principal investigator;
  • managed software R&D staff;
  • formulated project plans for determining feasibility of risky portions of large projects.

  • Planned software development tasks for large and small projects;
  • developed new business proposals and technical approach;
  • organized technical task plans for proposals and R&D projects;
  • managed implementation of projects.

| From: | 1976 | **Washington University** |
|---|---|---|
| To: | 1980 | Saint Louis, MO |
| | Position: | *Assistant Professor, Computer Science* |

Taught undergraduate and graduate computer science classes, monitored thesis and dissertations for graduate students, and directed the Computer Engineering Laboratory for graduate and funded research projects.  In the summers, operated Cooper Computing Company, a consulting company with close ties to the local IBM General Systems Division to provide software engineering services to manufacturers in the Saint Louis area.

| From: | 1968 | **National Security Agency** |
|---|---|---|
| To: | 1976 | Fort Meade, MD |

Position:   *Senior Electrical Engineer*
At Fort Meade, was assigned to computer systems development projects for two years, and then was promoted to the computer science research department after writing a scientific paper that was deemed important to the agency.

Assigned to solve numerous problems related to high performance computing and cryptology for the remaining six years at NSA. During the eight year period, was awarded a full time tuition paid scholarship from NSA to complete a Master's degree. Then continued education on evenings and weekends to complete requirements for the PhD in 1976. An article based on the dissertation was published in the IEEE Transactions on Computers in September, 1977.

## Consulting History

From:   2007        **Acacia Technologies Group**
To:     2007        Newport Beach, California
        Duties:     Analysis and opinions of database compaction patent for investment, licensing, and possible detection of infringement.

From:   2006        **Acacia Technologies Group**
To:     2006        Newport Beach, California
        Duties:     Analysis and opinions of patents for investment, licensing, detection of infringement, and analysis of several potential infringing companies.

From:   2005        **Paul, Hastings, Janofsky & Walker, LLP**
To:     2006        San Diego, California
        Duties:     Provided a wide array of technical analysis and opinions on intellectual property issues related to prosecution and litigation of patents, defense for infringement suits, analysis of patentability, analysis of software source code for infringement, document discovery, development of patent applications, replies of office actions, and many other tasks.

From:   1998        **Consumer's Gas**
To:     2000        Toronto, Canada
        Duties:     Development of ultrawideband (UWB) technology for identifying the collar joint of underground gas delivery infrastructure;
                    Developed anechoic UWB radar range to support data collection of positive and negative reflections;
                    Developed pattern recognition software for detection of collar joints;
                    Demonstrated efficacy of collar joint detection.

From:   1997        **Contract Resources**
To:     2001        Cerritos, California
        Duties:     Define requirements for manufacturing execution system;
                    Develop methods for instrumenting work and material flow;
                    Select equipment to implement capture of work flow and material flow;

Case No. 1:1 cv-00520-RM-BNB NWL Document 263e-2 filed 10/31/13 USDC Colorado pg 26
Case 1:11-cv-00520-RM-BNB Document 626-2 Filed 10/17/13 USDC Colorado Page 25 of
of 33
33

Develop distributed client/server implementation system;
Develop analysis programs for calculating value of customers,
profitability of products, and efficiency of employee labor.

## Litigation Experience

Date:    2013    **Uniloc USA**
        Case:    Uniloc v eClinical.  I am demonstrating infringement and validity of the
        Project:    asserted patent.
        Status:    In process

Date:    2013    **Variant**
        Case:    Variant v Hotels.  I am demonstrating infringement and validity of the
        Project:    asserted patent.
        Status:    In process

Date:    2012    **Dish Network**
        Case:    Federal Trade Commission (FTC) v Dish Network.  I developed report for
        Project:    Dish Network showing their compliance with database requirements for
            meeting discovery practices required by the court.
        Status:    In process

Date:    2012    **MDx**
        Case:    HealthGrades v MDx.  I developed report for defendant showing that the
        Project:    asserted patent was not practiced by MDx.  I was deposed in this case.
        Status:    In process

Date:    2012    **Extended Disk North America**
        Case:    Target Training v EDNA.  I wrote report demonstrating that EDNA did
        Project:    not practice the asserted Target Training patent.  I was deposed, and the
            litigation was settled before going to court.
        Status:    Completed.

Date:    2011    **Parallel Networks**
        Case:    Parallel Networks v many defendants;  I am developing claim
        Project:    construction opinions, demonstrations of infringement,
        Status:    Completed.

Date:    2011-12    **State Farm Insurance**
        Case:    State Farm filed as Intervenor in a Colorado insurance case.  The plaintiff
        Project:    had moved to require State Farm to delete information from their many
            databases after the case had been completed.  I demonstrated to the judge
            that this put an undue burden on State Farm, limited their capability to
            make continuing payments, and interfered with actuarial data modeling.
        Status:    Completed.

Date:    2011    **INova**

| | | |
|---|---|---|
| | Case: | INova v many defendants. Patent infringement case; my task is to |
| | Project: | demonstrate infringement through discovery. |
| | Status: | Completed. |

| | | |
|---|---|---|
| Date: | 2011 | **Sleepy's** |
| | Case: | Escalate v Sleepy's. Infringement of software license alleged; I |
| | Project: | demonstrated that Sleepy's used different methods. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date: | 2011 | **Motorola, Motorola Mobility** |
| | Case: | Apple, Next v Motorola, Motorola Mobility. Three patents related to |
| | Project: | touch screen and Android portable smart phones, tablets. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date: | 2010 | **Genutec** |
| | Case: | Genutec v Taus. Evaluation of how portable software was at time of |
| | Project: | acquisition. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date: | 2010 | **Hunter** |
| | Case: | Hunter v Home Depot; Hunter v Lamps Plus; Hunter v Ikea. Developed |
| | Project: | claim charts, expert reports for three independent cases related to LED light strip technology. |
| | Status: | Completed. |

| | | |
|---|---|---|
| Date: | 2010 | **City National Bank (CNB), Imperial** |
| | Case: | CNB, Imperial v Sussex, First American Title. I demonstrated from |
| | Project: | deposition and web site evidence regarding problems with the computing methods used to process "flip" transaction for real estate. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date: | 2009 | **John Lawless** |
| | Case: | Microsoft v Lawless. Case that settled within hours; I only read the |
| | Project: | complaint, did nothing else on the case. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date: | 2009 | **Medcorp, Inc** |
| | Case: | Medcorp v Pinpoint, Zoll. Wrote report, and was deposed, on how an |
| | Project: | SQL Server database application could be restructured to improve performance and responsiveness in a 911 response database system. |
| | Status: | Completed |

| | | |
|---|---|---|
| Date: | 2009 | **Inalfa Roof Systems** |
| | Case: | Inalfa v Nidec. Analyzed software source transformations in refactored |
| | Project: | library of software functions re possible introduction of software errors. |
| | Status: | Completed |

| Date: | 2009 | **Motivation Innovations** |
|---|---|---|
| | Case: | Motivation v Hallmark.  Analyzed candidate prior art in view of validity |
| | Project: | examination for patents. |
| | Status: | Completed |

| Date: | 2008 | **Health Hero** |
|---|---|---|
| | Case: | Health Hero v Alere.  Demonstrated infringement of patent claims; |
| | Project: | developed detailed claim charts from discovery materials. |
| | Status: | Completed |

| Date: | 2008 | **Family Honda** |
|---|---|---|
| | Case: | Winer v Family Honda.  Assessed GPS functionality for position location, |
| | Project: | travel planning, and console management of electronics peripherals; |
| | | testified in deposition. |
| | Status: | Completed |

| Date: | 2008 | **Bradshaw, International** |
|---|---|---|
| | Case: | Fitzpatrick v Bradshaw.  Assessed complaint, motions and depositions. |
| | Project: | The case was settled quickly. |
| | Status: | Completed |

| Date: | 2008 | **KeyLink, Incorporated** |
|---|---|---|
| | Case: | Patent litigation LogicLink v KeyLink.  Assessed computer rental |
| | Project: | processes using internet, MS Office, etc in hotels re asserted patent. |
| | | Wrote rebuttal expert report; was deposed; testified at trial. |
| | Status: | Completed |

| Date: | 2008 | **WindOptions Corporation** |
|---|---|---|
| | Case: | WindOptions v RAM, Tier.  Inspected factory production of electronics |
| | Project: | inverters for wind turbine power generation and interface to power grid. |
| | Status: | Completed |

| Date: | 2008 | **Jesse Kohler** |
|---|---|---|
| | Case: | Kohler v Wyeth case required database analysis re stability, reliability and |
| | Project: | control processes on history database.  Gave deposition on database |
| | | issues; second deposition anticipated. |
| | Status: | Completed |

| Date: | 2008 | **Net Currents** |
|---|---|---|
| | Case: | Net Currents v Dow Jones, Factiva.  Analyzed DJ Factiva functionalities |
| | Project: | with regard to demonstrating patent infringement for reputation |
| | | management on the internet; I was consulting expert assisting inventor. |
| | Status: | Completed |

| Date: | 2008 | **Emptoris Corporation** |
|---|---|---|
| | Case: | Emptoris v BIQ.   Analyze source code, trade secret documentation, |
| | Project: | copyright of software look and feel; write expert report |

|         |       |                                                                                   |
|---------|-------|-----------------------------------------------------------------------------------|
| Status: |       | Completed                                                                          |

Date:    2008    **GTX Corporation**
Case:    GTX v Kofax, Nuance, Cannon et al.   Evaluate expert reports on
Project:    document imaging/understanding; write expert report re patent invalidity
& alleged prior art; provide two days of deposition; prepare to testify
Status:    Completed

Date:    2007    **Phillip Shi**
Case:    Avaak v Shi.   Software trade secret case requiring response to challenge
Project:    by Avaak re my participation in this case.
Status:    Completed

Date:    2007    **California State Board of Equalization**
Case:    PeoplePC v State Board of Equalization.   Methodically evaluate the
Project:    percentage of compact disk (CD) storage used in mailers for advertising
Status:    Completed

Date:    2007    **Manatt, Phelps & Phillips**
Case:    Aeschbacher v California Pizza Kitchen.
Project:    Identify process of changing point of sale software to meet requirements
Status:    Completed

Date:    2007    **Chatham Law Group**
Case:    NITV, LLC v Computer Voice Stress Testing
Project:    Analyze software evidence re copying of source code for a stress analyzer
Status:    Completed

Date:    2007    **Payne & Fears, LLP**
Case:    American Reprographics v Brazo, Inc.
Project:    Analyze evidence re copying of source code for business IT system
Status:    Completed

Date:    2007    **Beckley, Singleton, CHTD**
Case:    Watson v Eaton Electrical, Inc.
Project:    Provided expert advice re variable frequency drives patent infringement
Status:    Completed

Date:    2007    **Gordon, Rees, LLP**
Case:    SG Services v God's Girls, LLC
Project:    Wrote expert report re findings on trade dress of two web sites
Status:    Completed

Date:    2007    **Heller Ehrman, LLP**
Case:    Asteres
Project:    Developed patent application related to pharmacy vending machine
Status:    Completed

| Date: | 2007 | **Heller Ehrman, LLP** |
|---|---|---|
| | Case: | WRF v Apple  - represented Apple |
| | Project: | Reviewed contentions alleging Bluetooth technology infringed. |
| | Status: | Completed |

| Date: | 2007 | **Neufeld Law Group** |
|---|---|---|
| | Case: | Epicore Software v Imagery Group  - represented Imagery Group |
| | Project: | Was deposed in suit on use of manufacturing software and damages due to delayed implementation of software. |
| | Status: | Completed |

| Date: | 2006-7 | **Heller Ehrman, LLP** |
|---|---|---|
| | Case: | Wyeth v Impax  - represented Impax |
| | Project: | Reviewed discovery documents for possible use in suit. |
| | Status: | Completed |

| Date: | 2006 | **Heller Ehrman, LLP** |
|---|---|---|
| | Case: | Licensing project  - represented Heller Ehrman, LLP |
| | Project: | Define strategic licensing approach for patent portfolio; estimate costs and payoffs for contingency agreement; structure attorney representation contract for contingency; present to shareholders for review. |
| | Status: | Completed |

| Date: | 2006 | **Heller Ehrman, LLP** |
|---|---|---|
| | Case: | Cellport v @Road  - represented @Road |
| | Project: | Assist attorney in demonstrating that patent claim does not read on client's wireless vehicle instrumentation system. |
| | Status: | Completed |

| Date: | 2006 | **Heller Ehrman, LLP** |
|---|---|---|
| | Case: | Appeligo |
| | Project: | Developed provisional patent application relating to content analysis of video and audio documents. |
| | Status: | Completed |

| Date: | 2006 | **Heller Ehrman, LLP** |
|---|---|---|
| | Case: | Broadcomm v. Qualcomm  - represented Qualcomm |
| | Project: | Analyzed invalidity contentions re wireless networking patent; reviewed client's production of discovery documents for possible technical strengths and weaknesses. |
| | Status: | Completed |

| Date: | 2006 | **Julander, Brown and Bollard** |
|---|---|---|
| | Case: | Capton v Comcash  - represented Comcash |
| | Project: | Wrote report analyzing contract violation allegations re wireless liquor bottle caps point of sale software; prepared to testify in arbitration of suit |

regarding software design equivalence and charges of reverse engineering.

Status:    Completed

Date:    2006    **Paul, Hastings, Janofsky & Walker, LLP**
Case:    Matthew Snyder
Project:    Conducted patentability study of email client concept in light of prior art found during patent search; identified open conceptual material not previously addressed related to email client functionality, versus conceptual material anticipated by earlier patent applications
Status:    Completed

Date:    2006    **Paul, Hastings, Janofsky & Walker, LLP**
Case:    MediaTek v. Sanyo – representing MediaTek
Project:    Developed claim chart on strengths and weaknesses of plaintiff's invalidity contentions related to AC-3 coder/decoder standards as prior art to issued patent
Status:    Completed

Date:    2006    **Paul, Hastings, Janofsky & Walker, LLP**
Case:    XSLENT Corporation
Project:    Developed three patent applications, including claim language, specifications and abstracts, for distributed computing infrastructure architecture, computing networks, data modeling methods
Status:    Completed

Date:    2006    **Paul, Hastings, Janofsky & Walker, LLP**
Case:    WebEx v. Raindance – representing Raindance
Project:    Developed invalidity contentions claim chart for suite of nine patents; Demonstrated diligent reduction to practice through software source code history in defense of patent
Status:    Completed

Date:    2005    **Paul, Hastings, Janofsky & Walker, LLP**
Case:    Cendant v. Amazon – representing Cendant
Project:    Patent infringement – electronic commerce; Searched patent database for prior art to invalidate patent; Developed three claim charts demonstrating prior art; Briefed counsel on technical matters to assist in presenting case
Status:    Completed

Date:    2005-
    2006    **Paul, Hastings, Janofsky & Walker, LLP**

Case:    Autobytel v. Dealix – representing Autobytel
Project:    Patent infringement – electronic commerce; demonstrated infringement through electronic discovery of source code functionality; prepared questions for interrogatories to further develop discovery materials; supported motion to compel opposing counsel to prepare adequate software source code environment with observation programs; identified

timing issues related to patent claims; performed discovery of timing specifications in database settings; nine months of active involvement in this case covered a wide variety of tasks related to patent litigation technology investigations

| | | |
|---|---|---|
| | Status: | Completed |

| Date: | 2005 | **Paul, Hastings, Janofsky & Walker, LLP** |
|---|---|---|
| | Case: | Transitive, Ltd |
| | Project: | Prepared response to office action for two patent prosecutions related to emulation and translation of object code images in multiple host environments |
| | Status: | Completed |

| Date: | 2005 | **Paul, Hastings, Janofsky & Walker, LLP** |
|---|---|---|
| | Case: | Scott Adams |
| | Project: | Searched patent database for possible prior art on self heating cups; Wrote patent application specification for self heating cup invention |
| | Status: | Completed |

| Date: | 2005 | **Paul, Hastings, Janofsky & Walker, LLP** |
|---|---|---|
| | Case: | Persyst, Inc. |
| | Project: | Wrote patent continuation application for EEG analysis invention, including specification, claims, abstract |
| | Status: | Completed |

## Personal Patents filed, prosecuted and issued

| App Number | Date Filed | Title |
|---|---|---|
| 11/337359 | Jan 23, 2006 | "Organizing structured and unstructured database columns using corpus analysis and context modeling to extract knowledge from linguistic phrases in the database" |
| Office Action | June 9, 2006 | Developed reply to office action with amended claims and amended drawings supported by appropriate legal language |
| Office Action | Sept 13, 2006 | Replied to office action with amended claims appropriate legal language to demonstrate that claims are novel – negotiated notice of allowance |
| Patent 7,209,923 | April 24, 2007 | Patent issued by USPTO as 7,209,923 |
| Patent App 20090070317 | September 7, 2007 | Filed US Patent application "Patent Claim and Specification Analysis" published March 12, 2009 |

## Education

| Year | College/University | Degree |
|---|---|---|
| 1976 | George Washington University | DSc, Computer Science and Electrical Engineering |
| 1971 | George Washington University | MS, Computer Science and Electrical Engineering |

1968        Georgia Institute of Technology                    BS, Electrical Engineering