Civil Action No. 11-CV-00520-PAB-BNB

**HEALTH GRADES, INC.'S SUPPLEMENTAL BRIEF IN
RESPONSE TO MDx's SECOND MOTION PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 56 FOR PARTIAL
SUMMARY JUDGMENT OF NON-INFRINGEMENT [DOC. #195]**

---

# Exhibit C

## <u>Highlighted Copies of Case Law:</u>

*Deere & Co. v. Bush Hog, LLC,* 703 F.3d 1349

*Raylon v. Complus Data Innovations, Inc.,* 700 F.3d 1361

*Paone v. Microsoft,* 881 F.Supp.2d 386

*LG Elecs., Inc. v. Bizcom Elecs., Inc.,* 453 F.3d 1364

*Overhead Door Corp. v. Chamerlain Group, Inc.,* 194 F.3d 1261

*Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563

# Deere & Co. v. Bush Hog, LLC

United States Court of Appeals for the Federal Circuit
December 4, 2012, Decided
2011-1629, 2011-1630, 2011-1631

**Reporter:** 703 F.3d 1349; 2012 U.S. App. LEXIS 24895; 104 U.S.P.Q.2D (BNA) 1881

DEERE & COMPANY, Plaintiff-Appellant, v. BUSH HOG, LLC, Defendant-Cross Appellant, AND GREAT PLAINS MANUFACTURING INCORPORATED, Defendant-Cross Appellant.

**Subsequent History:** Appeal dismissed by *Deere & Co. v. Hog, 2013 U.S. App. LEXIS 2336 (Fed. Cir., Jan. 31, 2013)*

**Prior History:** [**1] Appeal from the United States District Court for the Southern District of Iowa in Case No. 09-CV-0095, Senior Judge Charles R. Wolle.

*Deere & Co. v. Bush Hog, LLC, 2012 U.S. App. LEXIS 8527 (Fed. Cir., Apr. 25, 2012)*

**Disposition:** AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART AND REMANDED.

---

### Case Summary

#### Procedural Posture

Appellant owner of a patent disclosing an easy-clean dual wall deck for a rotary mowing cutter brought an action against cross-appellant competitors alleging that the competitors infringed the patent. The owner and the competitors cross-appealed the order of the U.S. District Court for the Southern District of Iowa which granted summary judgment of non-infringement in favor of the competitors.

#### Overview

The owner contended that the patent claim requirement that front and rear deck walls engage and be secured to a lower deck was improperly construed to require direct contact, and that the patent was improperly deemed to include power mowers which were not towed by a tractor. The competitors argued that the patent terms "substantially planar" and "easily washed off" were relative and rendered the patent invalid based on indefiniteness. The appellate court first held that the requirement for engagement of the deck walls did not require direct contact, and indirect contact by filler plates as indicated in the specification was consistent with the plain meaning of the claim term "engagement." Further, the limitation of a rotary cutter deck as demonstrated in the specification provided no indication of an intent to exclude self-powered mowers, self-propelled mowers, or walk-behind mowers from the definition of a rotary cutter. Also, the requirements that the lower deck wall of the cutter be substantially planar and that the upper deck be easily washed off due to a convex smooth surface reasonably described the claimed subject matter and did not render the claims indefinite.

#### Outcome

The order granting summary judgment of non-infringement was reversed in part with regard to the claim term "engagement" as requiring direct contact, the order was affirmed in part with regard to the inclusion of power mowers which were not towed and the validity of patent claims as definite, and the case was remanded for further proceedings.

**Counsel:** RODERICK R. MCKELVIE, Covington & Burling LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was R. JASON FOWLER.

CRAIG C. MARTIN, Jenner & Block LLP, of Chicago, Illinois, argued for defendant-cross appellant Bush Hog, LLC. With him on the brief were STEVEN R. TRYBUS, of Chicago, Illinois, MATTHEW S. HELLMAN, of Washington, DC, and ELIZABETH A. EDMONDSON, of New York, New York. Of counsel were JEFFREY D. HARTY and EDMUND J. SEASE, McKee, Voorhees & Sease, P.L.C., of Des Moines, Iowa.

SCOTT R. BROWN, Hovey Williams LLP, of Overland Park, Kansas, argued for defendant-cross appellant Great Plains Manufacturing Incorporated. With him on the brief was MATTHEW B. WALTERS.

**Judges:** Before RADER, Chief Judge, NEWMAN

703 F.3d 1349, *1352; 2012 U.S. App. LEXIS 24895, **1

and PLAGER, Circuit Judges.

**Opinion by:** RADER

---

**Opinion**

---

[*1352]  RADER, *Chief Judge.*

The United States District Court for the Southern District of Iowa construed the terms of Deere & Co.'s ("Deere") U.S. Patent No. 6,052,980 (the "'980 Patent") and granted Bush Hog, LLC's ("Bush Hog") and Great Plains [**2] Manufacturing, Inc.'s ("Great Plains") motions for summary judgment of noninfringement. This court affirms the construction of "rotary cutter deck" and the determination that the terms "substantially planar" and "easily washed off" do not render the asserted claims invalid under *35 U.S.C. § 112*. Because the district erroneously construed the term "into engagement with" to require direct contact, this court vacates that construction, reverses the grant of summary judgment, and remands for further proceedings.

I.

The '980 Patent discloses an "easy clean dual wall deck" for a rotary cutter. Bush Hog and Great Plains (collectively, "Defendants"), manufacture rotary cutters that are pulled behind a tractor and used to mow wide swaths of ground. The accused rotary cutters can "rough cut" fields after a harvest or clear weeds and brush along roadsides. The '980 Patent addresses a problem encountered by rotary cutters: "[d]uring [**3] cutting/shredding of material, such as cotton[,] corn, milo and wheat stubble, grass, etc. with a rotary cutter, debris accumulates on the top of the cutter deck. If not regularly cleaned off, the debris retains moisture which eventually results in the deck rusting out." '980 Patent, col. 1, ll. 21-25.

The specification explains that prior art rotary cutters had structural components such as gearboxes and deck bracings mounted either on top of or underneath the cutter deck. *Id.* col. 1, ll. 25-35. When placed on top of the deck, these components create traps for debris and water, making it difficult to clean the deck. *Id.* When placed underneath the deck, the structural components interfere with the flow of cut material, reducing cutting efficiency. *Id.*

The '980 Patent discloses a dual-wall deck that encloses the structural components in a torsionally-

strong box. This leaves smooth surfaces on the top and bottom of the deck. Figure 3 of the '980 Patent shows a side view of the claimed dual-wall deck. In the embodiment shown, the front and rear of the upper deck wall **56** slope down to contact the lower deck wall 28. *Id.* col. 2, l. 59 - col. 3, l. 4.

[*1353]



'980 Patent,  [**4] fig. 3 (highlighting added).

Claim 1 of the '980 Patent recites:

1. A rotary cutter deck comprising:

   a lower, substantially planar, horizontal deck wall;

   an upper deck wall including a central portion elevated above said lower deck wall, and

   front and rear portions respectively sloped downwardly and forwardly, and downwardly and rearwardly from said central portion into **engagement with, and being secured to**, said lower deck wall;

   and right- and left-hand end wall structures respectively being joined to right- and left-hand ends of said lower and upper deck walls to thereby define a box section having torsional stiffness. *Id.* col. 4, ll. 44-53 (emphasis added).

The district court construed the term "into engagement with" to mean "brought into contact with," and construed "being secured to" as "fastened or attached." *Deere & Co. v. Bush Hog LLC* ("Claim Construction Order"), No. 3:09-cv-95 (S.D. Iowa Jan. 25, 2011). The district court granted summary judgment of noninfringement, holding Deere did not raise a genuine issue of material fact as to literal infringement because "the upper deck walls do not come into contact with the lower deck walls in any of the accused products." *Deere & Co. v. Bush*

*Hog LLC* ("*Summary Judgment Opinion*"), No. 3:09-cv-95, slip. op. at 13 (S.D. Iowa Aug. 1, 2011) [**5] .

In each of the accused products, an intermediate structure connects the upper deck wall to the lower deck wall at both the front and rear portions of the deck. *Id.* at 3. Like the district court, this court refers to those intermediate structures as "connectors." The size and shape of the connectors is different in the various accused products, but the district court did not distinguish between different types of connectors in granting summary judgment. The differences are therefore irrelevant to this appeal.

In addition to granting summary judgment of no literal infringement, the district court held Deere could not assert infringement under the doctrine of equivalents because doing so would vitiate the "into engagement with" limitation. *Id.* at 15-16. Further, the district court barred Deere from asserting equivalence because the "into engagement with" limitation "specifically excludes structures where the deck walls are not engaged with each other." *Id.* at 16.

The district court entered final judgment in favor of Defendants, dismissing without prejudice Defendants' counterclaims of invalidity. [**6] This court has jurisdiction under *28 U.S.C. § 1295(a)(1)*.

II.

*HN1* This court reviews claim construction without deference. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) (en banc). This court also reviews a district court's grant of summary judgment without deference. *ICU Med., Inc. v. Alaris Med. Sys. Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009).

[*1354] The district court erroneously construed the term "into engagement with" to require direct contact between the upper and lower deck walls. At the outset, the claim language itself counsels against this narrow interpretation of the term. *HN2* "[T]he words of a claim 'are generally given their ordinary and customary meaning' . . . that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he person of ordinary skill in the art is

deemed to read the claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification." *Id.* at 1313. While claim [**7] terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims. *Id.* at 1323.

Claim 1 of the '980 Patent requires the front and rear of the upper deck wall to slope downwardly "into engagement with, and being secured to," the lower deck wall. '908 Patent, col. 4, l. 49. To give effect to all terms of the claim, "secured to" and "into engagement with" must have distinct meanings. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). The parties agree that two objects may be "secured to" one another without being in direct contact. For example, a rigid bracket can "secure" two objects together yet maintain space between them. Defendants argue that if "engagement" also includes connection through indirect contact, then it is redundant with "secured to."

This court gives effect to the claim terms "secured to" and "engagement" as conveying distinct meanings. The term "engagement" connotes a connection between two objects in which the motion of one object is constrained by the other. This connection can be indirect, such as where a motor is engaged with a gear through a second, intermediate gear. The [**8] gear and motor are engaged even though they are not "secured" together, such as with nuts and bolts or by welding. Objects that are secured to one another are not just connected, but are fastened or attached in some way. Thus, construing "engagement" to include indirect contact, consistent with its plain meaning, does not render the term superfluous.

The specification illustrates that "engagement" includes indirect contact between the upper and lower deck walls. As shown in Figure 1, the "[o]uter rear portions of the right- and left-hand upper deck wall sections **56** and **58** [yellow] are connected to the right- and left-hand lower deck wall portions [red] by respective downwardly and rearwardly inclined filler plates **86** and **88** [blue]." '980 Patent, col. 3, ll. 4-7 (highlighting added) (upper deck wall section **58** not labeled; filler plate **86** not shown). Thus, the filler plates provide an indirect connection by which the upper deck wall slopes "downwardly and rearwardly . . . into engagement with" the lower deck wall.



*Fig. 3*

703 F.3d 1349, *1355; 2012 U.S. App. LEXIS 24895, **8

[*1355] '980 Patent, Fig. 1 (highlighting added).

Defendants respond that the filler plates cannot be considered to bring the upper deck "into engagement with" the lower deck as contemplated [**9] by Claim 1, because they are located at a point where the upper deck is substantially horizontal. Claim 1 requires engagement at a point where the upper deck "slope[s] downwardly" to meet the lower deck. *Id.* col. 4, ll. 45-50. However, the specification describes the portion of the upper deck wall where the filler plate is attached (labeled **64** in Figure 1) as "convexly bowed from front to rear." *Id.* col. 2, ll. 44-53. In other words, the upper deck wall is "sloped downwardly" at the point where it engages the lower deck wall via the filler plate.

Claim 1 indicates that the "engagement" between the upper and lower deck walls serves to impart "torsional stiffness" to the rotary cutter deck. *Id.* col. 4, ll. 44-53. The specification depicts this torsional stiffness in a way that does not require direct contact between the upper and lower deck walls. Specifically, the specification explains that upper and lower decks are "joined together to create a central box structure having good torsional strength." *Id.* col. 1, ll. 60-64. Elsewhere, the specification states that "the upper and lower deck walls . . . cooperate with each other, the filler plates, and [other structures] to form a box section [**10] having torsional rigidity." *Id.* col. 4, ll. 28-32.

The ordinary meanings of the terms that describe the relationship between the upper and lower deck walls—"cooperate," "join[ ]," "engage[ ]"—do not necessitate direct contact. Further, the filler plates, which indirectly connect the upper and lower deck walls, are expressly described as forming part of the torsionally-strong box structure. In other words, the specification contemplates the upper deck wall engaging the lower deck wall by way of the filler plates to achieve the desired torsional strength. Read in the context of the specification, Claim 1 allows for the upper deck wall to come "into engagement with" the lower deck wall through indirect contact.

The district court granted summary judgment of non-infringement because the upper and lower deck walls of the accused products do not directly contact one another. Because in the context of the '980 Patent "into engagement with" encompasses indirect contact, this court vacates the district court's construction of this term, reverses the grant of summary judgment, and remands for further proceedings.

III.

The district court held Deere could not assert infringement under the doctrine [**11] of [*1356] equivalents because the "into engagement with" limitation, as construed by the court, "is binary in nature"—either the upper deck wall is "in contact with the lower deck wall or it is not." *Summary Judgment Opinion*, slip. op. at 15 (internal quotation omitted). Further, the court held Deere's theory of equivalence was precluded by the doctrine of specific exclusion, "because the 'into engagement with' claim limitation specifically excludes structures where the deck walls are not engaged with each other." *Id.* at 16. Because the district court's analysis of this issue was based on its erroneous claim construction, this court also vacates the grant of summary judgment of no infringement under the doctrine of equivalents.

The district court's treatment of the doctrine of equivalents reveals a common misperception regarding "vitiation" that warrants some discussion. **HN3** The concept of vitiation derives from the requirement that the doctrine of equivalents must be applied to the claims "on an element-by-element basis," so that every claimed element of the invention—or its equivalent—is present in the accused product. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997). Of [**12] course, in every case applying the doctrine of equivalents, at least one claimed element is not literally present in the accused product. The question is "whether an omitted part is supplied by an equivalent device or instrumentality." *Id.* at 32 (quoting *Hubbell v. United States*, 179 U.S. 77, 21 S. Ct. 24, 45 L. Ed. 95, 36 Ct. Cl. 571, 1900 Dec. Comm'r Pat. 382 (1900)). Thus, the doctrine of equivalents, by its very nature, assumes that some element is missing from the literal claim language but may be supplied by an equivalent substitute.

**HN4** The test of the equivalence of a proposed substitute for a missing element is ordinarily a factual inquiry reserved for the finder of fact. *Warner-Jenkinson*, 520 U.S. at 38-39; *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). It is the role of the court, however, to ensure that the doctrine of equivalents is not permitted to overtake the statutory function of the claims in defining the scope of the patentee's exclusive rights. *Sage*, 126 F.3d at 1424. Thus, for example,

courts properly refuse to apply the doctrine of equivalents "where the accused device contain[s] the antithesis of the claimed structure." *Planet Bingo*, 472 F.3d at 1345. In such a case, application of the doctrine of equivalents [**13] would "vitiate" a claim element. *Warner-Jenkinson*, 520 U.S. at 39 n.8.

*HN5* "Vitiation" is not an exception to the doctrine of equivalents, but instead a legal determination that "the evidence is such that no reasonable jury could determine two elements to be equivalent." *Id.* The proper inquiry for the court is to apply the doctrine of equivalents, asking whether an asserted equivalent represents an "insubstantial difference" from the claimed element, or "whether the substitute element matches the function, way, and result of the claimed element." *Id.* at 40. If no reasonable jury could find equivalence, then the court must grant summary judgment of no infringement under the doctrine of equivalents. *Id.* at 39 n.8.

*HN6* Courts should be cautious not to shortcut this inquiry by identifying a "binary" choice in which an element is either present or "not present." Stated otherwise, the vitiation test cannot be satisfied by simply noting that an element is missing from the claimed structure or process because the doctrine of equivalents, by definition, recognizes that an element is missing that must be supplied by the [*1357] equivalent substitute. If mere observation of a missing element could satisfy the [**14] vitiation requirement, this "exception" would swallow the rule. And, the Supreme Court declined to let numerous contentions bury the doctrine. *Id.* at 21, 40. Thus, preserving the doctrine in its proper narrowed context requires a court to examine the fundamental question of whether there is a genuine factual issue that the accused device, while literally omitting a claim element, nonetheless incorporates an equivalent structure.

In this case, the district court construed "contact" to require "direct contact," and thus found that allowing "no direct contact" would vitiate the court's construction. Yet, a reasonable jury could find that a small spacer connecting the upper and lower deck walls represents an *insubstantial difference* from direct contact. *See TurboCare Div. of Demag Daval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1124 (Fed. Cir. 2001) (construing claim term "contact" to require "touching" but remanding question of whether "indirect contact" could be equivalent). Thus, the trial court erred by invoking the vitiation exclusion in this context.

This court has considered Defendants' other arguments against application of the doctrine of equivalents, but finds them [**15] unpersuasive. This court vacates the district court's determination that Deere is barred from asserting infringement under the doctrine of equivalents.

IV.

This court will take the opportunity to streamline this case by addressing the additional claim construction arguments raised in this appeal. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1369 (Fed. Cir. 2012); *Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1378 (Fed. Cir. 2011); *Riverwood Int'l Corp. v. R. A. Jones & Co.*, 324 F.3d 1346, 1357 (Fed. Cir. 2003) (addressing appellee's challenge to claim construction because judgment of invalidity in appellee's favor was vacated). The district court's claim constructions have been fully briefed on appeal and may become important on remand.

Deere appeals the construction of "rotary cutter deck," which the district court defined as "the blade housing on a power mower." *Claim Construction Order*, slip op. at 1. The district court rejected Deere's proposed construction, which would have excluded "consumer turf care equipment, self-powered mowers, self-propelled mowers or walk-behind mowers." *Id.* Deere seeks to exclude such consumer lawn mowers to limit the scope [**16] of prior art that may be asserted against the '980 Patent.

The term "rotary cutter deck" appears only in the preamble of the asserted claims, although it provides antecedent basis for "said deck" in Claim 5. As a preliminary matter, this court must determine whether the term is a limitation of the claims. *HN7* Whether to treat a preamble as a limitation is "determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996). In general, a preamble is limiting if it is "'necessary to give life, meaning, and vitality' to the claim." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (quoting *Kropa v. Robie*, 187 F.2d 150, 152, 38 C.C.P.A. 858, 1951 Dec. Comm'r Pat. 177 (CCPA 1951)).

In *Catalina Marketing International, Inc. v. Coolsav-*

703 F.3d 1349, *1357; 2012 U.S. App. LEXIS 24895, **16

ings. com, Inc., 289 F.3d 801, 808-09 (Fed. Cir. 2002), this court identified several guideposts to determine whether a preamble limits claim scope. Relevant here, **HN8** "when reciting additional [*1358] structure . . . underscored as important by the specification, the preamble [**17] may operate as a claim limitation." Id. at 808. Additionally, a preamble phrase that provides antecedent basis for a claim limitation generally limits the scope of the claim. Id. at 808; Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 620 (Fed. Cir. 1995). By contrast, if the body of the claim describes a structurally complete invention, a preamble is not limiting where it "merely gives a name" to the invention, extols its features or benefits, or describes a use for the invention. Catalina, 289 F.3d at 809.

The recitation of a "rotary cutter deck" in Claim 1 is necessary to understand the subject matter encompassed by the claim, which otherwise generally recites deck walls that "define a box section having torsional stiffness." '980 Patent, col. 4, ll. 44-53. Unlike non-limiting preamble terms, "rotary cutter deck" does not merely state a name or a use for the claimed box section. Rather, the term describes a "fundamental characteristic of the claimed invention" that informs one of skill in the art as to the structure required by the claim. Poly-Am., L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303, 1310 (Fed. Cir. 2004). For example, that the claim is drawn to a [**18] "rotary cutter deck" informs the meaning of the "torsional stiffness" limitation—the claimed structure must possess sufficient stiffness to withstand the torsional loads imposed by the operation of a rotary cutter.

The specification further demonstrates that the preamble phrase "rotary cutter deck" is a limitation. The specification repeatedly refers to the "present invention" as "an improved deck for a rotary cutter," or a "rotary cutter deck." '980 Patent, col. 1, ll. 19-55. The title of the patent, the summary of the invention, and every drawing describe the invention as a deck for a rotary cutter. See Poly-Am., 383 F.3d at 1310. The specification explains that the invention addresses a concern specific to rotary cutters: the need for a cutter deck that is smooth and easy to clean, but does not reduce cutting efficiency. '980 Patent, col. 1, ll. 19-35. In sum, the specification underscores the importance of "rotary cutter deck" as a limitation of the claimed invention.

Recognizing that the term is a claim limitation, this court affirms the district court's construction of "ro-

tary cutter deck" as "the blade housing on a power mower." The specification gives no indication that the patentee [**19] intended to exclude "consumer turf care equipment, self-powered mowers, self-propelled mowers or walk-behind mowers" from the definition of "rotary cutter" as Deere now seeks. The specification describes cutting grass with a rotary cutter, id. col. 1, ll. 21-23, and explains that while the disclosed embodiment shows a large rotary cutter that supports three mower spindles, the dual wall deck can also be made for a smaller "single spindle" device, id. col. 4, ll. 39-42. Although the disclosed embodiment has hitch supports and mounting holes that permit it to be attached or mounted to a tractor, id. col. 3, ll. 50-52, those structures are not required by every asserted claim, see id. col. 4, ll. 44-67. The specification does not limit the term rotary cutter to a device that is mounted to a tractor, and this court will not import limitations from the sole embodiment described in the specification. Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc).

Moreover, during prosecution, the examiner rejected claims as anticipated or obvious over prior art mower decks that would be excluded from Deere's proposed construction. Deere did not argue that the cited references did not [**20] disclose a "rotary cutter deck" or should be considered non-analogous art. The prosecution history thus provides no evidence of the clear and [*1359] unmistakable disclaimer required to limit the ordinary meaning of the term "rotary cutter deck."

Defendants cross-appeal the district court's determination that the "substantially planar" limitation of Claim 1 and the "easily . . . washed off" limitation of Claim 6 do not render the claims invalid under 35 U.S.C. § 112 ¶ 2. See Claim Construction Order, slip. op. at 2. **HN9** A claim is invalid as indefinite only where it is "not amenable to construction" or is "insolubly ambiguous." Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005). Because the disputed terms do not render the claims indefinite, this court affirms.

The district court did not interpret "substantially planar," finding the plain meaning sufficient. Claim Construction Order, slip. op. at 1. Defendants assert the term is insolubly ambiguous in the context of the '980 Patent because the claims and the specification do not explain the term, and statements in the prosecution history contradict its plain mean-

703 F.3d 1349, *1360; 2012 U.S. App. LEXIS 24895, **20

ing. During prosecution, Deere added the "substantially [**21] planar" language to distinguish its claimed rotary cutter deck from one disclosed in U.S. Patent No. 4,724,660 ("Bowie"). Bowie discloses a dual deck wall with the cross-section shown in Figure 9 below. The lower deck is highlighted in yellow.



Bowie, fig. 9 (highlighting added).

This court has repeatedly confirmed that *HN10* relative terms such as "substantially" do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim. *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001); *Andrew Corp. v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821 (Fed. Cir. 1988) ("The criticized words ['approach each other,' 'close to,' 'substantially equal,' and 'closely approximate'] are ubiquitous in patent claims. Such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts.").

This court does not agree with Defendants that the lower deck wall of Bowie is necessarily within the ordinary meaning of "substantially planar." Bowie's lower deck wall significantly [**22] deviates from planarity, both at the central peak **112** and the depressions at each outer side **117, 123**. There is ample room to design lower deck walls that are more planar than that disclosed by Bowie. Thus, the prosecution history does not render "substantially planar" nonsensical in the context of the '980 Patent. To the contrary, the distinction that the lower deck wall of Bowie is not substantially planar assists the person of ordinary skill in the art in determining the scope of the claims. Because "substantially planar" reasonably describes the claimed subject matter to one skilled in the art, it does not render Claim 1 indefinite.

The district court did not interpret any language of Claim 6, and found its terms not ambiguous. Claim 6 recites:

[*1360] The rotary cutter deck defined in claim 1 wherein said lower and upper deck walls cooperate to present an upwardly facing deck surface which is **smooth and substantially obstruction free** from front to back, **whereby material may slide or easily be washed off** said deck surface, and water will run off said deck surface.

'980 Patent, col. 5, ll. 5-10 (emphases added).

On appeal, Defendants argue that the subjective term "easily" renders Claim 6 indefinite. [**23] The specification and prosecution history, however, provide several physical characteristics that guide the determination of whether a deck is "easily . . . washed off" within the meaning of Claim 6. The specification explains that an easily cleaned deck has "an upper, generally convex smooth surface from which debris tends to slide off and water will run off." '980 Patent, col. 1, ll. 40-46. Deere reinforced this requirement during prosecution, explaining it is "important" that the front and rear portions of the upper deck be sloped downwardly from the central section to aid the shedding of water and debris. Response to Office Action dated Aug. 23, 1999 in U.S. App. No. 09/118,591, at 3. Thus, consistent with the language of Claim 6, the intrinsic evidence explains that a deck with a smooth, generally convex upper surface is "easily" washed off.

Moreover, the specification explains that upper decks that "can be cleaned of debris quite easily and efficiently" were known in the prior art. '980 Patent, col. 1, ll. 29-31. The availability of known easy-clean decks provides a standard for measuring the scope of Claim 6. *See Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1367 (Fed. Cir. 2010); [**24] *Datamize*, 417 F.3d at 1351. Contrary to Defendants' arguments, the '980 Patent does not require the deck to be *more easily* cleaned than prior art decks. Rather, the invention is distinguished from prior art easy-clean decks because it avoids mounting equipment underneath the deck in a manner that reduces cutting efficiency. *Id.* col. 1, ll. 29-35 & ll. 40-42. This court affirms the district court's conclusion that Claim 6 is not rendered indefinite by the relative term "easily . . . washed off."

V.

This court affirms the district court's construction of "rotary cutter deck" and its determination that "substantially planar" and "easily . . . washed

703 F.3d 1349, *1360; 2012 U.S. App. LEXIS 24895, **24

off″ do not render the claims indefinite under *35 U.S.C. § 112*. Because the district court erred by construing ″into engagement with″ to require direct contact, this court vacates that construction, reverses the grant of summary judgment of noninfringement, and remands for further proceedings.

**AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART AND REMANDED**.

# Raylon v. Complus Data Innovations, Inc.

United States Court of Appeals for the Federal Circuit

December 7, 2012, Decided

2011-1355, 2011-1356, 2011-1357, 2011-1358, 2011-1359

**Reporter:** 700 F.3d 1361; 2012 U.S. App. LEXIS 25111; 105 U.S.P.Q.2D (BNA) 1355; 84 Fed. R. Serv. 3d (Callaghan) 250; 2012 WL 6062504

RAYLON, LLC, Plaintiff-Appellee, v. COMPLUS DATA INNOVATIONS, INC., Defendant-Appellant, AND CASIO AMERICA, INC. AND CASIO COMPUTER CO., LTD., Defendants-Appellants, AND SYMBOL TECHNOLOGIES, INC., Defendant-Appellant, AND ADVANCED PUBLIC SAFETY, INC., TRIPOD DATA SYSTEMS, ZEBRA TECHNOLOGIES CORPORATION, EZ TAG CORPORATION, FUJITSU AMERICA, INC. AND FUJITSU JAPAN LTD., Defendants.

**Subsequent History:** US Supreme Court certiorari denied by _Raylon, LLC v. Complus Data Innovations, Inc., 2013 U.S. LEXIS 5355 (U.S., Oct. 7, 2013)_

**Prior History:**  [**1] Appeal from the United States District Court for the Eastern District of Texas in No. 09-CV-0355, 09-CV-0356, 09-CV-0357, Judge Leonard Davis.

_Raylon LLC v. Complus Data Innovations, 2011 U.S. Dist. LEXIS 30034 (E.D. Tex., Mar. 23, 2011)_

**Disposition:** AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.

| Case Summary |
| --- |

## Procedural Posture

In a patent infringement case, appellants challenged a ruling from the United States District Court for the Eastern District of Texas, which denied appellants' motion for _Fed. R. Civ. P. 11_ sanctions and attorneys' fees under _35 U.S.C.S. § 285_.

## Overview

Appellants were defendants in consolidated patent infringement cases where, after prevailing, they moved for _Rule 11_ sanctions and attorneys' fees. The district court denied the motions and appellants sought review. The court held that the district court abused its discretion by evaluating plaintiff patentee's conduct under a subjective standard. Specifically, the court evaluated the patentee's damages model and early settlements to determine whether it brought its suits in good faith or merely to obtain nuisance value settlements. In its view, _Rule 11_ sanctions only applied where the case lacked any credible infringement theory and had been brought only to coerce a nuisance value settlement. That was not the proper standard. The _Rule 11_ analysis should have been a strictly objective inquiry that did not consider the motivation behind the filing. Applying the objectively reasonable standard, the reviewing court agreed with appellants that the patentee's claim construction and infringement contentions were frivolous and sanctionable under _Rule 11(b)(2)_. The court remanded for a proper sanction and a reconsideration of whether the case was exceptional under _35 U.S.C.S. § 285_.

## Outcome

The court reversed the district court's holding that there was no _Rule 11_ violation and remanded to the district court to determine, in the first instance, a proper sanction. The court vacated the district court's denial of attorneys' fees and costs, and remanded for the court to reconsider those motions in light of this decision.

**Counsel:** D. SCOTT HEMINGWAY, Hemingway & Hansen LLP, of Dallas, Texas, argued for the plaintiff-appellee. On the brief was AMANDA ABRAHAM, Roth Law Firm, of Marshall, Texas.

.JOHN R. EMERSON, Haynes and Boone, LLP, of Dallas, Texas, argued for the defendant-appellant, Complus Data Innovations, Inc. With him on the brief were DEBRA J. MCCOMAS, DONALD EDWARD TILLER and SEAN M. O'NEILL.

SCOTT D. STIMPSON, Sills Cummis & Gross P.C., of New York, New York, argued for defendant-appellants, Casio Computers Co. Ltd, et al. With him on the brief were KATHERINE M. LIEB and DAVID C. LEE.

MITCHELL S. FELLER, Sobel & Feller, of New

700 F.3d 1361, *1363; 2012 U.S. App. LEXIS 25111, **1

York, New York, argued for defendant- appellant, Symbol Technologies, Inc. With him on the brief was JONATHAN M. SOBEL.

**Judges:** Before PROST, MOORE, and REYNA, Circuit Judges. Opinion for the court filed by Circuit Judge PROST. Concurring opinion filed by Circuit Judge REYNA.

**Opinion by:** PROST

---

## Opinion

[*1363] Prost, *Circuit Judge*.

Raylon, LLC ("Raylon") brought three suits against, inter alia, Complus Data Innovations, Inc. ("Complus"), [**2] Casio America, Inc. and Casio Computer Co., Ltd., (collectively "Casio"), and Symbol Technologies, Inc. ("Symbol") (collectively, "defendants") in the Eastern District of Texas. Raylon alleged that all defendants infringe claims 1-17 of U.S. Patent No. 6,655,589 ("'589 patent"). The district court consolidated the three suits. After a combined hearing, the court adopted defendants' claim construction, granted summary judgment in their favor, and denied their motions for Rule 11 sanctions. The district court also denied defendants' motions for attorneys' fees and costs under *35 U.S.C. § 285*, citing its *Rule 11* decision. Defendants appeal the denial of sanctions and attorneys' fees. For the reasons set forth below, we affirm in part, vacate in part, and remand for further proceedings.

### Background

Raylon is the assignee of the '589 patent, which is directed to a hand-held identification investigating and ticket issuing system. The object of the invention is to provide an affordable, durable system that reduces the amount of time a user spends identifying and issuing tickets to individuals and allows the user to maintain visual contact with the individual throughout the identification and [**3] ticketing process. '589 patent col.2 ll.64-65; col.3 ll.34-48. The system is described as containing a housing within which there is an input assembly for entering data, an elongated slot for receiving identification forms that have a magnetic tape, an elongated aperture for access to the housing's interior, a transceiver assembly to communicate remotely with a computer, a printer assembly for printing tickets, and a display that "is pivotally mounted on the housing for displaying data entered into the input assembly." *See, e.g.*, '589 patent Abstract; col.1 ll.26-40; col.1 l.66—col.2 l.14; col.3 ll.18-33. Figure 1 is a schematic perspective of the system:

[*1364]



With reference to Figure 1, the preferred embodiment's display 39 "may be pivotally mounted on the housing 12 and may be positioned generally adjacent to the first end 13 of the housing 12." *Id.* col.5 ll.58-61. Claim 1 is representative of the patented system:

> 1. A system for investigating an identification of a person and for issuing tickets, the identification comprising a card having a computer readable magnetic tape secured on the card, the computer readable magnetic tape containing pertinent data relating to the person displayed [**4] on the identification card, said system being connectable to a computer for transmitting data between said system and the computer, said system being connectable to a data cable of a computer, said system comprising:
>
>> a housing having an interior, said housing having an elongated slot for selectively receiving the identification card, said housing having an elongated aperture providing access into said interior of said housing;

700 F.3d 1361, *1364; 2012 U.S. App. LEXIS 25111, **4

an input assembly for inputting data about a person, said input assembly being mounted on said housing, said input assembly including a data reading means for reading the computer readable magnetic tape on the identification card;

a transceiver assembly for remotely communicating with a computer, said transceiver assembly being mounted in said interior of said housing;

a display for displaying data entered into said input assembly, *said display being pivotally mounted on said housing*;

a printer assembly being mounted in said interior of said housing for printing a ticket; and wherein said printer assembly includes

a substrate for receiving indicia, said substrate including an end extendable  [*1365] through said elongated aperture in said housing,

a printer means for printing [**5] indicia on said substrate, and

means for advancing said substrate with respect to said printer means such that substrate is advanced though said elongated aperture in said housing when said printer means prints indicia on said substrate.

*Id*. col.7 ll.9-44 (emphasis added).

Independent system claims 16 and 17 also recite a "display being pivotally mounted on said housing" limitation. *Id*. col.8 ll.55-57; col.9 ll.20-22.

In 2009, Raylon filed three suits in the U.S. District Court for the Eastern District of Texas against software integrators and product component manufacturers of various ticket-writing and enforcement handheld devices, including Complus, Casio, and Symbol. In each suit, Raylon asserted that defendants' devices directly infringe claims 1-17 of the '589 patent literally and under the doctrine of equivalents, that defendants induce others to infringe, and that defendants contributorily infringe all claims of the '589 patent. Defendants moved to dismiss, for judgment on the pleadings, or for summary judgment; the court denied or postponed these motions pending claim construction.

During the spring of 2010, Casio and other defendants sent several letters to Raylon, expressing [**6] their concerns that Raylon's complaints violated *Rule 11(b)(2)* and *Rule 11(b)(3)* because, inter alia, Raylon's claim construction positions were unsupportable by intrinsic evidence and its infringement positions with regards to the display, magnetic strip reader, and printer elements of the asserted claims were unreasonable. Raylon disagreed, maintaining that the patent supported a broad claim construction and that the accused products infringed each and every claim of the '589 patent. Specifically, Raylon alleged that the accused devices all literally met the "display being pivotally mounted on said housing" element because they each had "a display that is mounted on the housing and can be pivoted relative to the viewer's or user's angle of visual orientation." J.A. 4223; J.A. 4912; J.A. 5768. In other words, under Raylon's theory of infringement a display with a fixed-mounted screen meets the 'pivotally mounted on said housing' limitation when the user pivots the device by moving his elbow, wrist, or other joint.

In advance of the *Markman* hearing, both Raylon and defendants proposed constructions of, inter alia, "display being pivotally mounted on said housing," "a printer assembly [**7] being mounted in said interior of said housing," and "said housing having an elongated slot for selectively receiving the identification card." Defendants also filed motions for Rule 11 sanctions in each suit. The district court consolidated the three suits for purposes of claim construction, summary judgment, and sanctions.

700 F.3d 1361, *1365; 2012 U.S. App. LEXIS 25111, **7

On December 2, 2010, the district court held a consolidated hearing. The only term construed was "display being pivotally mounted on said housing." Raylon construed the term to mean "an electronic device attached to a housing for the visual presentation of information, the display capable of being moved or pivoted relative to the viewer's perspective." Defendants proposed various constructions, all of which excluded from "pivotally mounted" any displays that are fixed or incapable of pivoting.[1] The district court rejected Raylon's **[*1366]** construction, noting that its citation to the specification did not support its overly broad claim construction such that its construction "stretch[es] the bounds of reasonableness beyond what I am willing to accept." J.A. 3681. Accepting defendants' construction, the district court granted summary judgment in their favor. The court concluded **[**8]** the hearing by denying defendants' motions for Rule 11 sanctions.

The district court's holdings were memorialized in later-issued orders. On March 9, 2011, the district court issued an order reflecting its denial of Rule 11 sanctions. In that order, the district court quoted the Fifth Circuit's objective standard and stated that while "Raylon's claim construction arguments and infringement theory do stretch the bounds of reasonableness, and the Court rejected Raylon's positions, they do not cross the line." J.A. 4. The court then analyzed Raylon's settlements and damages model to determine whether Raylon filed suit to recover nuisance value settlements or whether the numbers were "indicative of the good faith nature with which the case is brought." *Id*. It found Raylon's proffered model "not large for a patent case," suggesting that Raylon's "earlier settlements were not so unreasonable as **[**9]** to indicate that Raylon believed its case was weak or frivolous." *Id*. On this basis, the district court concluded that this was not a situation where "the cost of the litigation is more of a driving force than the merits of the patent-in-suit," so it denied the motions without considering the merits of the suit. J.A. 6.

On March 23, 2011, the district court issued an order granting summary judgment of non-infringement in favor of defendants. Based on the court's construction of the "pivotally mounted" term[2] and the fact that all the accused products have a fixed display screen, the district court held that none of the accused products literally infringe. The district court also found that the accused products' fixed screens do not infringe under the doctrine of equivalents because the fixed screens do not perform substantially the same function in the same way to achieve the same result as a pivotally mounted display, and Raylon's theory would read the "pivotally mounted" limitation out of the claims.

After final judgment was entered on March 23, 2011, defendants filed motions for attorneys' fees and costs pursuant to *35 U.S.C. § 285*, *28 U.S.C. § 1927*, and the court's inherent powers. In a joint order on October 31, 2011, the district court denied the motions. It found Raylon's suits were not objectively baseless for the same reason it denied Rule 11 sanctions. The court also rejected defendants' arguments that Raylon's conduct in pursuing the baseless claims constituted litigation misconduct. The court similarly denied fees and costs under *§ 1927*. On October 31, 2011, the court entered an amended final judgment. Defendants appeal.

DISCUSSION

On appeal, defendants challenge the district court's denial of Rule 11 sanctions and of attorneys' fees. We address each issue in turn.

A. Rule 11 Sanctions

*HN1* *Rule 11* expressly requires that an attorney presenting a pleading, motion, or other **[*1367]** paper before the court certify that he has performed "an inquiry reasonable under the circumstances" such that he can verify that (1) "it is not being presented for any improper purpose, such as to harass, cause unnecessary **[**11]** delay, or needlessly increase the cost of litigation," (2) "the claims . . . are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law;" (3) "the factual contentions have eviden-

---

[1]   Defendant EZ Tag proposed a construction that requires the housing and display to not be in fixed positions. Defendants Casio, Complus, and Fujitsu construed the limitation as requiring the display to be mounted to the housing such that the housing and display are pivotal with respect to each other.

[2]   As a result of the consolidated hearing, discussed above, the district court construed the "display being pivotally mounted on said housing" term as "the display must be mounted on the **[**10]** housing so that the display and housing may pivot with respect to each other." J.A. 7029.

700 F.3d 1361, *1367; 2012 U.S. App. LEXIS 25111, **11

tiary support or, . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Fed. R. Civ. P. 11(b)(1)-(3)*. As the 1993 advisory committee note explains, this rule "requires litigants to 'stop-and-think' before initially making legal or factual contentions." *Fed. R. Civ. P. 11* advisory committee note to 1993 amendments, 149 F.R.D. 401, 584-85. The notes explain that the changes to the rule "emphasize[] the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable." *Id*.

**HN2** In reviewing a district court's decision to deny Rule 11 sanctions, we apply the law of the regional circuit. *Eon-Net LP v. Flagstar Bancorp, 653 F.3d 1314, 1328 (Fed. Cir. 2011)*. The Fifth Circuit reviews a denial of sanctions for an abuse of discretion. *Whitehead v. Food Max of Miss., Inc., 332 F.3d 796, 802 (5th Cir. 2003)* (en banc); *see Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)*. [**12] A district court necessarily abused its discretion "'if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Whitehead, 332 F.3d 796* (quoting *Cooter & Gell, 496 U.S. at 405*); *Skidmore Energy, Inc. v. KPMG, 455 F.3d 564, 566 (5th Cir. 2006)* ("A district court abuses its discretion if it imposes sanctions based on (1) an erroneous view of the law or (2) a clearly erroneous assessment of the evidence.").

Defendants argue that the denial of Rule 11 sanctions should be reversed because the district court abused its discretion in two regards. They argue that the district court applied the wrong standard—a subjective, rather than objective one—in evaluating Raylon's conduct. Defendants argue that under the proper standard, Raylon's claim construction and infringement contentions with regards to the "pivotally mounted" limitation (as well as others not addressed by the district court) were objectively unreasonable. Defendant Symbol also alleges that the district court abused its discretion by failing to consider some of its arguments. Specifically, Symbol argued that Raylon's construction of a printer in "said housing" to include a printer [**13] in any housing, including an auxiliary housing, was frivolous; Symbol also argued that Ray-

lon's infringement allegations against its products, none of which contain a printer, were frivolous.

We agree with defendants. **HN3** In the Fifth Circuit, when determining whether there was a *Rule 11* violation, "the standard under which an attorney is measured is an objective, not subjective standard of reasonableness under the circumstances." *Whitehead, 332 F.3d at 803*. The district court abused its discretion by evaluating Raylon's conduct under a subjective standard.[3] *See FDIC v. Maxxam, Inc., 523 F.3d 566, 580-81 (5th Cir. 2008)*; *Cooter & Gell, 496 U.S. at 405*. Specifically, the court evaluated Raylon's damages [*1368] model and early settlements to determine whether it brought its suits in good faith or sought to obtain nuisance value settlements. The court opined that "in some situations, a plaintiff asserting a large damages model while making very low offers in the case may indicate that the plaintiff realizes its case is very weak or even frivolous" and that the amount of damages "may be indicative of the good-faith nature with which the case is brought." J.A. 4. It found Raylon's damages model "not [**14] large for a patent case" such that "the earlier settlements were not so unreasonable as to indicate that Raylon believed its case was weak or frivolous." *Id*. Based on these findings as to Raylon's motives, the district court denied defendants' motion. In its view, Rule 11 sanctions only apply "[w]here it is clear that a case lacks any credible infringement theory *and* has been brought only to coerce a nuisance value settlement." J.A. 5 (emphasis added). But, this is not the proper standard. **HN4** The Fifth Circuit "has been emphatic" that the Rule 11 analysis is a strictly objective inquiry and "expressly rejected any inquiries into the motivation behind a filing." *Maxxam, 523 F.3d at 580*; *Jenkins v. Methodist Hosps. of Dallas, 478 F.3d 255, 264 (5th Circuit 2007)*. Thus, an evaluation of Raylon's litigation motives—whether it brought suit in good faith or to obtain nuisance value settlements—contradicts Fifth Circuit law and has no place in the Rule 11 analysis. The district court denied Rule 11 sanctions through the lens of an erroneous view of the law, and thus abused its discretion. *Skidmore, 455 F.3d at 566*.

Applying the objectively reasonable standard, we agree with defendants that Raylon's claim construction (and thus infringement contentions) were frivolous. **HN5** Claim construction is a matter of law,

---

3   The district court mentioned Raylon's claim construction positions—stating "[w]hile [**15] Raylon's claim construction arguments and infringement theory do stretch the bounds of reasonableness, and the [c]ourt rejected Raylon's positions, they do not cross that line"—but provided no analysis or explanation for this conclusion.

700 F.3d 1361, *1368; 2012 U.S. App. LEXIS 25111, **14

so that an attorney's proposed claim construction is subject to *Rule 11(b)(2)*'s requirement that all legal arguments be non-frivolous. *Antonious v. Spalding & Evenflo Cos., Inc.*, 275 F.3d 1066, 1071 (Fed. Cir. 2002). Reasonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous. But, there is a threshold below which a claim construction is "so unreasonable that no reasonable litigant could believe it would succeed," *iLor*, *LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011), and thus warrants Rule 11 sanctions.

Raylon's claim construction of "display pivotally mounted on said housing" is a prime example of a construction that falls below this threshold. Raylon, throughout the litigation, argued that **[**16]** this term should be construed as requiring a "display being capable of being moved or pivoted *relative to the viewer's perspective*." J.A. 1477 (emphasis added). Its construction encompasses any portable device with a display, regardless of how it is mounted to the housing. *See, e.g.*, J.A. 3671 (Raylon's example of a device not covered by the claim term is "a printer with a fixed display" because a printer cannot be pivoted relative to the user). In support of this broad construction, Raylon relies on a single sentence in the specification. That sentence states: "Even still another object of the present invention is to provide a new identification investigating and ticket issuing system that permits a police officer to maintain visual contact of a stopped person while investigating whether the person has any warrants or suspended license." '589 patent col.3 ll.42-46.

Neither this sentence nor any other intrinsic evidence supports Raylon's position that the term "pivotally mounted" is relative to the user rather than to the device's housing. Rather, each and every claim of **[*1369]** the '589 patent requires a "display being pivotally mounted *on said housing*." '589 patent col.7 ll.29-31; col.8 ll.55-57; **[**17]** col.9 ll.20-22 (emphasis added). Throughout the specification, the patentee describes the invention as containing a display that "is pivotally mounted on the housing." *Id.* Abstract; col.1 ll.38-39; col.2 l.11; col.3

ll.29-30; col.5 ll.59-60. A display pivotally mounted on the housing is even identified by the patentee as one of the important features of the invention. *Id.* col.2 ll.14-16. Figure 1, the only schematic of the preferred embodiment, shows a display that is mounted to pivot relative to the housing on which it is attached. Furthermore, throughout the prosecution history, the patentee described the display as "pivotally mounted on said housing." No other placement of the display relative to the housing is described in the patent or prosecution history. Thus, Raylon's claim construction—that pivotally mounted only requires the display be pivotable relative to the user—is contrary to all the intrinsic evidence and does not conform to the standard canons of claim construction. J.A. 7025-26; *see Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1301 (Fed. Cir. 2004); *cf. MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 918 (Fed. Cir. 2012) (finding a claim construction position **[**18]** objectively baseless where "no reasonable application of the principles enunciated in *Phillips* . . . supports its position"). This is a clear instance where no objectively reasonable litigant, relying on the single sentence in the specification to support its position, would believe its claim construction could succeed; therefore, Raylon's claim construction is frivolous and thus sanctionable under *Rule 11(b)(2)*.[4]

In addition to the "pivotally mounted" limitation, defendants—in particular, Symbol—argued that several other of Raylon's claim constructions were frivolous based on similar reasoning.[5] Despite the presence of these arguments in defendants' *Rule 11* briefs, claim construction briefs, and a motion for judgment on the pleadings, the district court failed to even touch on these terms in its Rule 11 analysis. The district court's failure to consider these arguments was an abuse of discretion. *Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472, 484-85 (5th Cir. 2002) **[**19]** (*HN6* "It is well settled that, to conduct our review, we must be able to understand the district court's disposition of the sanctions motion."); *S. Bravo Sys., Inc. v. Containment Techs. Corp.*, 96 F.3d 1372, 1375 (Fed. Cir. 1996) ("When the requesting party makes a strong show-

---

[4]   Raylon's infringement contentions were based on its claim construction. Because we find Raylon's claim construction of "pivotally mounted" frivolous, we need not reach whether Raylon's infringement contentions serve as an independent basis for imposing Rule 11 sanctions.

[5]   The limitations at issue were "a printer assembly being mounted in said interior of said housing" and "said housing having an elongated slot for selectively receiving the identification card." Raylon construed these limitations as covering printer assemblies and elongated slots that were contained in any housing despite the use of "said" housing in the claims. Symbol argued that based on the claims' use of "said housing" and the specification, the claims require the printer assembly and elongated slot to be in the same housing as the other elements of the device.

ing that Rule 11 violations may have occurred, how-ever, the district court should provide some expla-nation for disregarding the proffered showing."); *Refac Int'l Ltd. v. Hitachi, Ltd.*, 921 F.2d 1247, 1257 (Fed. Cir. 1990). Raylon's construction of "a printer assembly being mounted in said interior of said housing" is, if anything, even more unreason-able than the "pivotally mounted" construction.

 **[*1370]** The claims are clear that the housing has an interior, the display is pivotally mounted "on said housing," and the printer assembly is mounted "in said interior of said housing." The specifica-tion is completely consistent with the claims, ex-plaining that an "object of the present invention" is to provide a system "which includes a housing that includes an interior." *Id*. col.3 ll.17-19. The printer assembly, in turn, "is mounted in the inte-rior of the housing." *Id*. col.3 ll.30-33; *see also* col.1 ll.25-41; col.1 l.66-col.2 l.13; **[**20]** col.5 ll.66-67 (same). The only reasonable construction is that the printer is mounted inside and the display is mounted on the same housing.

Raylon's attorney argued that claim construction "is kind of [an] arcane subject that gets ordinary law-yers like me in trouble a lot of times." J.A. 14048. There is nothing arcane about the location of the printer assembly in the claimed invention. Raylon's position that the printer could be in an en-tirely different housing from the rest of the compo-nents is objectively unreasonable and an indepen-dent violation of *Rule 11* with respect to Symbol, whose products lack a printer entirely. **[**21]** On remand, the district court should weigh Raylon's multiple frivolous arguments with respect to Sym-bol's products when crafting an appropriate sanc-tion.

*HN7* When a party's conduct violates *Rule 11(b)*, the court may impose "an appropriate sanction." *Fed. R. Civ. P. 11(c)(2)*. *Rule 11* sanctions "may be set at a level 'sufficient to deter repetition of such con-duct or comparable conduct by others similarly situ-ated.'" *Clinton v. Jones*, 520 U.S. 681, 710 n.42, 117 S. Ct. 1636, 137 L. Ed. 2d 945 (1997) (quoting *Fed. R. Civ. P. 11(c)(2)*). Determining what sanc-tions, if any, to impose is initially a matter within the discretion of the district court. *Judin v. United States*, 110 F.3d 780, 785 (Fed. Cir. 1997). We re-mand these cases for a determination of an appropri-ate sanction.

### B. Attorneys' Fees and Costs

Defendants argue that the district court improperly denied attorneys' fees and costs under *35 U.S.C. § 285*, and that these cases qualify as exceptional un-der the statute. *HN8* A case is exceptional under *§ 285* if there has been some inappropriate conduct relating to the matter in litigation. *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). Absent litigation misconduct or misconduct in securing the patent, **[**22]** a case is exceptional under *§ 285* if "(1) the litiga-tion is brought in subjective bad faith, and (2) the liti-gation is objectively baseless." *Id*. Similar to the evaluation under *Rule 11*, for litigation to be objec-tively baseless, the allegations "must be such that no reasonable litigant could reasonably expect suc-cess on the merits." *Dominant Semiconductors Sdn. Bhd. v. Osram Gmbh*, 524 F.3d 1254, 1260 (Fed. Cir. 2008). The district court found that there was no litigation misconduct. In evaluating whether the cases were otherwise exceptional, the court relied exclusively on it *Rule 11* order to find that the litigation was not "objectively baseless." Since we reverse the district court's holding with re-gards to a *Rule 11* violation, the district court can no longer rely on its Rule 11 analysis to find the ob-jectively baseless prong not met. We remand to the district court to reconsider, in light of our deci-sion, whether these cases are exceptional under *§ 285*.[6] In doing so, the **[*1371]** court should con-sider all of Raylon's conduct, including its asser-tions with regard to limitations other than "pivot-ally mounted," as raised by defendant Symbol.

### Conclusion

The district court abused its discretion in denying de-fendants' Rule 11 motions. We reverse the district court's holding that there was no Rule 11 violation and remand to the district court to determine, in the first instance, a proper sanction. Because the court's evaluation of *§ 285* relied on its Rule 11 analysis, we vacate the district court's denial of at-torneys' fees and costs, and remand for the court to reconsider defendants' motions in light of our de-cision.

---

6   We leave the district court's denial of attorneys' **[**23]** fees and costs under *28 U.S.C. § 1927* undisturbed. *HN9* Establish-ing attorney misconduct under *§ 1927* implicates a higher level of culpability than *Rule 11*, and defendants have not established that Raylon's misconduct rises to the level required by *§ 1927*. *See Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 694 (5th Cir. 2010).

700 F.3d 1361, *1371; 2012 U.S. App. LEXIS 25111, **22

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

**Concur by:** REYNA

```
Concur
```

REYNA, *Circuit Judge*, concurring.

I concur with the majority opinion and the result reached. I write separately to make clear that when a court finds a Rule 11 sanction based on conduct involving the allegation and pursuit of patent infringement claims that have been found objectively unreasonable, the court is compelled, if so moved by a party, [**24] to undertake a detailed and thorough § 285 inquiry and analysis. I deviate slightly from my colleges in the majority in that, given the record in this case, I would reverse and declare this an exceptional case and limit the remand to determination of appropriate sanctions.

I. LEGAL LANDSCAPE

In three separate suits that were later consolidated, Raylon, LLC ("Raylon") alleged that numerous defendants infringed U.S. Patent No. 6,655,589 ("the '589 patent"). At the conclusion of a hearing addressing claim construction, summary judgment, and motions for sanctions, eight defendants, including appellants Complus Data Innovations, Inc., Casio America, Inc. and Casio Computer Co., Ltd., (collectively "Casio"), and Symbol Technologies, Inc. ("Symbol") (collectively, "defendants"), prevailed on their respective motions for summary judgment of non-infringement.

Casio argued a Rule 11 motion on behalf of defendants. Casio asserted that the accused devices were missing certain limitations claimed in the '589 patent. Casio stressed that it gave Raylon advance notice that its infringement allegations were without merit, further, were objectively unreasonable.

Symbol joined Casio's argument regarding [**25] the pivotal mounting of the display, but also moved for sanctions under *Rule 11* because Raylon had disregarded claim language requiring that a printer be inside of the housing to which the pivotally mounted display is attached.

In the face of defendants' strongly argued assertions of objective unreasonableness, Raylon maintained that its allegations were objectively reasonable, including on grounds that it relied on expert advice of patent attorneys who conducted a pre-suit investigation. At the claim construction hearing, instead of advancing arguments based on the plain language of its asserted claims, Raylon offered that its claim construction proposals were premised on the "rather unusual interpretations that are sometimes put on claim terms by the Federal Circuit and practitioners." J.A. 14049.

[*1372] The district court denied the motions for sanctions. At the hearing, and later in a written order, the district court determined that Raylon's positions "stretched the bounds of reasonableness," but were not "objectively frivolous." J.A. 4; J.A. 14052. Rather than analyzing the reasonableness of Raylon's proposed claim constructions in the context of the intrinsic record, the district court [**26] supported its ruling by weighing the reasonableness of Raylon's settlement agreements against a damages model. *See* Majority Op. 8 (citing J.A. 6); J.A. 14053-14054. The district court's written order concluded that Rule 11 sanctions would only be warranted "[w]here it is clear that a case lacks any credible infringement theory *and* has been brought only to coerce a nuisance value settlement." J.A. 5 (emphasis added).

Prevailing parties Casio, Complus, and Symbol moved for an award of fees and a declaration that this case is exceptional pursuant to *35 U.S.C. § 285*. The district court tied its *§ 285* objective inquiry to the earlier Rule 11 sanctions inquiry and declined to find the case exceptional. The district court did not provide detailed findings regarding whether the litigation was objectively baseless or whether Raylon brought the litigation in subjective bad faith. The ruling generally concluded that Raylon's pivotally mounted display positions were not objectively baseless and there was no litigation misconduct that warranted an inference of bad faith. J.A. 13.

II. DISTINCT *Rule 11* AND *§ 285* INQUIRIES

*Rule 11 of the Federal Rules of Civil Procedure* and *35 U.S.C. § 285* of the Patent [**27] Act offer courts distinct, yet overlapping, rationales for awarding an injured party relief. In asking whether a party violated *Rule 11*, courts in the Fifth Circuit look only to "objectively ascertainable circumstances." *FDIC v. Maxxam, Inc., 523 F.3d 566, 586 (5th Cir. 2008)*. By contrast, our *§ 285* precedent asks (1) whether the litigation is brought in subjective bad faith, and (2) whether the litigation is objectively baseless. *Brooks Furniture Mfg., Inc.*

700 F.3d 1361, *1372; 2012 U.S. App. LEXIS 25111, **27

*v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005).

*Rule 11* directs attorneys to focus on their obligations and responsibilities as officers of the court in making representations, while also operating as an enforcement mechanism to correct any "unusual circumstances" where a party "pursued an illegitimate purpose to increase costs or to harass a party regardless of the weight of that purpose in filing suit." *Maxxam*, 523 F.3d at 586 (explaining that *Rule 11* reaches those pleadings which constitute an abuse of legal purpose by discouraging dilatory or abusive tactics); *see also Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 265 (5th Cir. 2007) ("As stated by the Advisory Committee Note to *Rule 11*, a lawyer [**28] is required to 'stop-and-think' before . . . making legal or factual contentions.") (quoting Advisory Committee Notes on Fed. R. Civ. P. 11 (1993 Amendments)). Sanctionable Rule 11 conduct is distinguishable from a judgment on the merits because *Rule 11* addresses the collateral issue of "whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990).

*Section 285* was enacted to address a patent-specific policy rationale, awarding fees in "exceptional cases" in which sanctions were necessary to deter the "improper bringing of clearly unwarranted suits." *Automated Bus. Cos., v. NEC Am., Inc.*, 202 F.3d 1353, 1354 (Fed. Cir. 2000) (quoting *Mathis v. Spears*, 857 F.2d 749, 753-54 (Fed. Cir. 1988)). The purpose of the statute [*1373] has been described by this court as compensation for the prevailing party for its monetary outlays in the prosecution or defense of the suit. *See Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). Such a purpose is distinguishable from *Rule 11*, which addresses conduct in general, because *§ 285* recognizes the particular strain that meritless patent [**29] litigation bears on judicial and party resources. *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011) (noting the burden of unnecessarily requiring a "district court to engage in excessive claim construction before it is able to see the lack of merit of the

patentee's infringement allegations"); *Mathis*, 857 F.2d at 758 (explaining that Congress codified *§ 285* to make a prevailing defendant "whole" following a gross injustice).

In non-patent contexts, a litigant is sometimes sanctioned for misleading the court, *e.g., Precision Specialty Metals, Inc. v. U.S.*, 315 F.3d 1346, 1357 (Fed. Cir. 2003), or for exhibiting sloppiness during the course of the proceedings, *Spiller v. Ella Smithers Geriatric Ctr.*, 919 F.2d 339, 347 (5th Cir. 1990) ("slipshod and unprofessional work"). But in patent cases invoking *Rule 11*, courts are often asked to weigh whether the substantive allegations are so weak that they are not grounded in fact and legally tenable. *See, e.g., View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000).

Here, notwithstanding whether sanctions are issued pursuant to *Rule 11*, *§ 285*, or both, the offending conduct is intertwined with governing [**30] patent law. I believe that if the circumstances in a patent case result in finding that *Rule 11* has been violated on grounds related to substantive positions taken or advanced, then the district court must also, when so moved by the parties, engage in a comprehensive *§ 285* inquiry. In my view, a *§ 285* inquiry is compelling where the case progresses beyond the pleading stages and a party's unwillingness to abide by precedent controlling claim construction lends to escalation of avoidable costs.

III. RECORD INFERENCES OF BAD FAITH

Having determined that the challenged litigation is objectively meritless,[1] a court may examine the litigant's subjective motivation. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993). There is a presumption that the assertion of infringement is made in good faith, *Brooks Furniture*, 393 F.3d at 1382 (internal citation omitted), but even so, we examine the record with care to determine, among other things, whether a party demonstrated good faith during the claim construction process. *See Eon-Net*, 653 F.3d at 1325. If the record indicates by clear and convincing evidence that a patentee is manifestly unreasonable in [**31] assessing and pressing its infringement al-

---

[1]   This court recently held that objective baselessness is a question of law based on underlying mixed question of law and fact. *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1309 (Fed. Cir. 2012). The *Highmark* decision did not issue until after the district court denied the *§ 285* motion. Because I find Raylon's claim construction and infringement positions meritless, the objective analysis would compel the same result regardless of whether we reviewed *de novo* or for clear error.

700 F.3d 1361, *1373; 2012 U.S. App. LEXIS 25111, **31

legations, then a court may infer that the claims were brought in bad faith. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 810-11 (Fed. Cir. 1990).

Our cases have not established a precise definition for "bad faith" in the exceptional case context. We recognize the enactment of *§ 285* as a "bad faith equitable exception" to the American Rule on awarding fees to an alleged infringer, *Mathis*, 857 [*1374] F.2d at 758 (internal citation omitted), and discuss "bad faith" as closely aligned with "a finding of unfairness":

> [T]he payment of attorney's fees for the victor is not to be regarded as a penalty for failure to win a patent infringement suit. The exercise [**32] of discretion in favor of such an allowance should be bottomed upon **a finding of unfairness or bad faith** in the conduct of the losing party, or some other **equitable consideration** of similar force, which makes it **grossly unjust** that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear.

*Rohm & Haas Co. v. Crystal Chemical Co.*, 736 F.2d 688, 691 (Fed. Cir. 1984) (emphases added) (discussing 1952 Patent Act) (quoting *Park-in Theatres, Inc. v. Perkins*, 190 F.2d 137, 142 (9th Cir. 1951)). Against this backdrop, I interpret "bad faith" as synonymous with a patent holder's unreasonable continued pursuit of an infringement claim that has been demonstrably shown to be based on "wrongful intent, recklessness, or gross negligence." *Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1246 (Fed. Cir. 2003) (quoting *Eltech*, 903 F.2d at 811).

As I have noted, I agree with and join the majority's strong analysis and result on Rule 11 sanctions. But, unlike the majority, I believe that the district court, in the first instance, should have fully explored the existence of an inference of bad

faith.[2] These consolidated cases [**33] provide fertile grounds for a determination that Raylon's pursuit of objectively unreasonable allegations compelled the conduct of an exceptional case inquiry. While reasonable minds can—and often do—differ as to the proper construction of a given claim term, it is unreasonable minds that go to extraordinary lengths to conjure and advance through various stages of a legal proceeding unsupported arguments that are also inconsistent with established precedent in order to accuse non-infringing devices. Here, specific circumstances which, if taken in the aggregate, potentially give rise to an inference that Raylon demonstrated an awareness that its allegations lacked support.

A. Early Notice

Here the likelihood of success [**34] on infringement could have been projected simply by examining the accused devices and comparing those features element-by-element and claim-by-claim with the disclosures in the '589 patent. Rather than acknowledge that its claims could not survive, Raylon built its case on positions that misapply Federal Circuit precedent.[3] The record establishes that Raylon was not unaware as to knowledge of its substantive shortcomings because it was faced with early motions for summary judgment, a motion for judgment on the pleadings, and motions for sanctions that identified the flaws in the infringement theories.

Indeed, Casio memorialized its concerns by writing to Raylon early in the case regarding the merits of its allegations, but it appears that Raylon took no curative measures and proceeded through claim [*1375] construction undeterred. J.A. 3139 ("As we have repeatedly told you since day one, these infringement allegations are violations of *Rule 11*."); J.A. [**35] 3141-43; J.A. 3145-46; J.A. 3153-54 (counsel correspondence discussing perceived violations of *Rule 11*). This early notice at least suggests that Raylon had a duty to "stop and think," and to investigate whether its positions were objectively baseless, but it opted to ignore grappling with the incongruence raised by visual comparison of the accused devices with the plain language of

---

[2]   The district court limited its scant subjective intent analysis to general statements that there was no material misconduct because of a low probability of the case having been brought to force a settlement. J.A. 13. These general statements are incomplete following the acknowledgement that Raylon's claim construction positions "stretched the bounds of reasonableness." J.A. 4. Recognition of the objectively weak contentions was basis enough to further inquire as to bad faith.

[3]   Although Raylon noted at the claim construction hearing that it considers Federal Circuit teachings "somewhat unusual," it is still bound to adhere to those guidelines—even when such rulings do not suit its litigation strategy. *See* J.A. 14049.



700 F.3d 1361, *1375; 2012 U.S. App. LEXIS 25111, **35

the claims.

B. "PIVOTALLY MOUNTED DISPLAY"

Raylon contended that the flatly fixed displays of the accused devices could meet the "pivotally mounted display" limitation because a person could move the entire device while it was held in the user's hand. Yet, as the majority well clarifies, this position is inconsistent with the intrinsic disclosures and Raylon cannot rely on a single, inapposite sentence in the specification to redefine the meaning of the claim. Majority Op. <u>13-14</u>. As shown in Figure 1, the display was mounted on the housing in such a manner that it could be pivoted up or down with no movement of the housing. Illustrations of the patent figures next to the accused devices emphasize the objective unreasonableness of Raylon's infringement allegations.



Figure 1 in '589 patent (display pivotally **[**36]** mounted to housing)

Casio Accused Devices (flat display fixed to housing)

The '589 patent specification teaches that the pivotally mounted display is attached to the housing and as a result the housing be made able to pivot up or down. '589 patent col.5 ll.58-61 (depicted in Figure 1). By contrast, it is readily apparent that the accused devices are fixed in a flat position and lack a display that is not, nor is it capable of, being pivotally mounted on the housing. Given the clear meaning of the claim elements, no objectively reasonable litigant would believe it could succeed by linking the "pivot" to the up and down movement of the user's arm.[4]

C. "INTERIOR PRINTER ASSEMBLY"

Raylon also asserted all seventeen claims in the '589 patent against printerless Symbol devices by contending that an *external* printer attached to a separate housing would satisfy the limitation requiring **[**37]** **[*1376]** the printer assembly be mounted in the *interior* of the housing. To maintain its allegations, Raylon disregarded the meaning of the word "said" as presented in the claims: "a printer assembly being mounted in **said** interior of **said** housing for printing a ticket." '589 patent col.7 ll.32-33 (claim 1) (emphases added). As our cases require, "said" refers back to an earlier use of that term in the claim. *Intamin, Ltd. v. Magnetar Techs. Corp., 483 F.3d 1328, 1333 (Fed. Cir. 2007); Bell Communications Research v. Vitalink Communications Corp., 55 F.3d 615, 621 (Fed. Cir. 1995).* Here, "said housing" is referring back to an earlier use of "housing" that describes "an interior," "an elongated slot," and "an elongated aperture." '589 patent col.7 ll.17-20. Despite the known requirements, Raylon glosses over the well-defined relationship between the interior printer, the housing, and remaining claim elements.

The disconnect between the accused devices and the claim language should have been apparent, but we have no indication as to whether Raylon's expert's conducted a visual examination of the Symbol devices and the stand alone printers. *See* J.A. 3975-82; 3991-4008. Again, the above figures clearly show **[**38]** that in the preferred embodiment of the '589 patent, a printer is housed within the device. Raylon argues that attaching a stand alone

---

[4]   As pointed out in the briefing, Raylon misrepresented the claim language—by substituting "pivotable" in place of the "pivotally mounted" limitation—and proceeded to claim construction by relying on an untenable position that was refuted by the '589 patent specification. *See* J.A. 12239-40; 12247; 12253; 12273-74.

printer to the Symbol device satisfies the claim that the printer be located in the housing of the device.

The absence of analysis regarding the Symbol devices immediately raises doubt as to the credibility of Raylon's assertions. For example, in responses to defendants' motions for summary judgment, counsel for Raylon made only the limited statement that accused Symbol devices were analyzed by Raylon's patent expert and that Symbol was provided claim charts that "consisted of a good faith, informed comparison of the claims of a patent against the accused subject matter." J.A. 3972, ¶ 9; *see also id*. at 3969-71, ¶¶ 1-5. Raylon did not supplement the comparison with an explanation as to what the expert was relying upon or how the Symbol devices might infringe. In the end, Raylon never conceded the unavoidable reality that Symbol models did not infringe. Notably, Raylon continued to defend the reasonableness of its allegations on appeal, including during the oral argument before this court. Oral Argument, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/all/raylon.html.

### D.   [**39] Undue Reliance on Expert Declarations

Instead of focusing on why its pre-suit investigation was a reasonable application of *Phillips*, Raylon argues that its allegations were made in good faith because it was informed by pre-suit advice it received from a patent practitioner it considered an expert. Applicable law, however, clearly states that a patent practitioner's statements regarding the meaning of claim terms are entitled to no weight. *Symantec Corp. v. Computer Assocs. Intern., Inc.*, 522 F.3d 1279, 1289 n.3 (Fed. Cir. 2008) (citing *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1137 n. 3 (Fed. Cir. 2007)). Similarly, patent practitioners are unqualified to opine on the issue of infringement. *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1362.

The majority has ascertained that Rule 11 sanctions were necessary because Raylon did not follow standard canons of claim construction and its arguments were not reasonably supported by the intrinsic record. To date there have been no findings as to the adequacy of the presuit investigation and whether it was conducted in a manner intended to ignore or overlook the [*1377] weakness of the infringement allegations. The [**40] circumstances surrounding the pre-suit investigation,

including whether plaintiff demonstrated diligence prior to filings its suits, might be accounted for on remand when determining whether Raylon's actions support an inference of bad faith.

For the post-Complaint analysis, Raylon defers to its technical expert, Dr. Sharp. Review of Dr. Sharp's declaration reveals no significant effort to explain why Raylon's interpretation of the pivotally mounted display limitation is the best understanding of the feature in light of the patent disclosures. *See* J.A. 3991-4008. The declaration simply states Dr. Sharp's tacit approval of Raylon's expansive positions through cursory conclusions indicating that there is "no restriction" that would stand in the way of Raylon's effort to link the claim language to the perspective of the viewer. J.A. 4001-02. Dr. Sharp made no reasonable attempt to create a nexus between the asserted patent and the accused devices. Raylon's heavy and continued reliance on an uninformative declaration calls into question whether the statements were predicated in good faith.

Raylon's elevation of extrinsic declarations again ignores Federal Circuit precedent, which, at minimum, [**41] requires that structural discrepancies that lie at the basis of an infringement allegation be explained according to the intrinsic evidence. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("Patents should be interpreted on the basis of their intrinsic record, not on the testimony of such after-the-fact 'experts' that played no part in the creation and prosecution of the patent.") (citing *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995)). I submit that an inference of bad faith may arise where expert conclusions are steadfastly relied upon to "inject a new meaning into terms that is inconsistent with what the inventor set forth in his or her patent and communicated, first to the patent examiner and ultimately to the public." *Bell & Howell*, 132 F.3d at 706.

### IV. Conclusion

When a court finds a Rule 11 sanction based on conduct involving the allegation and pursuit of patent infringement claims that have been found objectively unreasonable, the court is compelled, if so moved by a party, to undertake a detailed and thorough [**42] inquiry and analysis. I concur with the majority and would reverse and declare this an exceptional § 285 case and limit the remand to determination of appropriate sanctions.



5 of 11 DOCUMENTS

**LUCIANO F. PAONE, Plaintiff, -against- MICROSOFT CORPORATION, Defendant.**

**07-cv-2973 (ADS)(ARL)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**881 F. Supp. 2d 386; 2012 U.S. Dist. LEXIS 105990**

**July 30, 2012, Decided**
**July 30, 2012, Filed**

**SUBSEQUENT HISTORY:** Later proceeding at Paone v. Microsoft Corp., 2013 U.S. Dist. LEXIS 59613 (E.D.N.Y., Apr. 25, 2013)

**PRIOR HISTORY:** Paone v. Microsoft Corp., 771 F. Supp. 2d 224, 2011 U.S. Dist. LEXIS 12611 (E.D.N.Y., 2011)

**COUNSEL:** [**1] For Plaintiff: Andrew Gordon Heinz, Esq., Jeanne M. Heffernan, Esq., John Michael Desmarais, Esq., Jon Todd Hohenthaner, Esq., Ryan Charles Micallef, Esq., of Counsel, Kirkland & Ellis LLP, New York, NY.

For Defendant: Dale M. Heist, Esq., Daniel J. Goettle, Esq., John E. McGlynn, Esq., Steven J. Rocci, Esq., of Counsel, Woodcock Washburn LLP, Philadelphia, PA.

For Defendant: Greg S. Zucker, Esq., Jeffrey A. Miller, Esq., of Counsel, Westerman, Ball, Ederer, Miller & Sharfstein, LLP, Uniondale, NY.

**JUDGES:** ARTHUR D. SPATT, United States District Judge.

**OPINION BY:** ARTHUR D. SPATT

**OPINION**

[*389] **MEMORANDUM OF DECISION AND ORDER**

**SPATT, District Judge**.

In this patent infringement case, the Plaintiff Luciano F. Paone ("Paone") alleges that the Defendant Microsoft Corporation ("Microsoft") has infringed United States Patent 6,259,789 ("the '789 Patent"), which Paone holds. Pursuant to the Supreme Court's decision in Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996), the Court previously construed the disputed claim terms of the '789 Patent. Presently before the Court is the Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied [**2] in part.

**I. BACKGROUND**

**A. Background of the Invention**

For purposes of the present motion, the Court will restate the relevant facts as they appeared in the previous claim construction decision issued on February 9, 2011 (the "Markman Order"). See generally Paone v. Microsoft Corp., 771 F. Supp. 2d 224 (E.D.N.Y. 2011).

881 F. Supp. 2d 386, *389; 2012 U.S. Dist. LEXIS 105990, **2

On July 10, 2001, the United States Patent and Trademark Office ("PTO") issued the '789 Patent, entitled "Computer Implemented Secret Object Key Block Cipher Encryption and Digital Signature Device and Method", to the Plaintiff Luciano F. Paone. The '789 Patent describes a method of translating (or "encrypting") ordinary data (called "plaintext") into encoded data (called "ciphertext"), so that the plaintext may not be viewed by an unintended reader. In cryptography, which is the science of encryption, such a method is called a "cipher". Generally, encrypted ciphertext is later decoded, or "decrypted", into plaintext, so that the data is again usable.

There are several ways to encrypt computer data, but the '789 Patent deals exclusively with "symmetric key" encryption of computer data, which requires that the encryptor and decryptor share knowledge of both a cipher and a key. [**3] Computer based symmetric key ciphers divide roughly into two types: block ciphers and stream ciphers. As a general matter, a stream cipher employs its key to encrypt data one bit at a time, while a block cipher employs its key to encrypt bits in groups. The '789 Patent describes a block cipher.

Computer implemented block ciphers have been in wide use in the United States since at least 1976, when a block cipher called the "Data Encryption Standard" or "DES" was adopted by the United States government for general use. As of 1997, when Paone filed his patent application, dozens of additional block encryption algorithms had been published. However, most of those inventions used a single key to encrypt successive blocks of data. Paone's innovation--in the most general terms--was to change the encryption key for each data block, based on additional, randomly generated data.

**B. Infringing Technology**

There are two components of Microsoft's flagship computer operating system, Windows, that Paone asserts infringe the '789 Patent. Temporal Key Integrity Protocol ("TKIP") encryption is an industry-standard data encryption protocol used to encrypt and decrypt data that is transmitted over wireless [**4] local area networks. TKIP technology improves on prior wireless encryption standards by using a dynamic keying scheme in which the encryption key changes from one block of data to the next. The Defendant Microsoft implements or supports TKIP in many of its products, including Windows Vista, XP and 7, and Xbox 360. Paone claims that method

[*390] claims 2 and 33 in the '789 Patent, as well as system claims 24 and 34 in the '789 Patent, are infringed by the TKIP technology. In order for TKIP to infringe any these claims, Paone necessarily must prove that TKIP incorporates every limitation of the claim, either literally or under the doctrine of equivalents.

The second component Paone asserts as being infringed is BitLocker. BitLocker is an encryption feature implemented in Microsoft software, which is used to encrypt and decrypt data on a customer's hard drive. BitLocker targets the "lost laptop" scenario, in which unprotected data could be vulnerable to theft or offline attacks. The BitLocker technology encrypts data on a hard drive using an encryption key that changes from one block of data to the next. As with TKIP, Microsoft has incorporated the BitLocker feature into a number of its products, [**5] including Windows Vista and 7 Ultimate. Paone claims that the method claims 2 and 33 in the '789 Patent are infringed by the BitLocker technology. In order for BitLocker to infringe either of these claims, Paone necessarily must prove that BitLocker incorporates every limitation of either of the claims, either literally or under the doctrine of equivalents.

In sum, Paone alleges that Microsoft's products implementing and supporting TKIP encryption infringe claims 2, 24, 33 and 34 of the '789 Patent, while products incorporating Microsoft's BitLocker encryption feature infringe claims 2 and 33 of the '789 Patent.

**C. Procedural History**

Paone filed his application for the '789 Patent on December 12, 1997. Following the initial application, the PTO rejected Paone's claims as unpatentable in three successive office actions, dated September 29, 1999, March 16, 2000, and October 30, 2000. In response to each of these rejections, Paone modified his claims and provided additional argument. Then, on July 10, 2001, the PTO deemed the described invention patentable, and issued the '789 Patent.

On July 23, 2007, Paone commenced the present action against Microsoft, alleging that Microsoft was infringing [**6] the '789 patent. Specifically, Paone asserts that two components of Microsoft's flagship computer operating system, Windows, infringe the '789 Patent, as set forth above. The parties proceeded with discovery, during which time Microsoft on May 16, 2008

881 F. Supp. 2d 386, *390; 2012 U.S. Dist. LEXIS 105990, **6

requested the PTO to reexamine the '789 Patent. In early 2009, with the reexamination proceeding still pending, the parties briefed claim construction motions. However, before holding a Markman hearing, the Court on April 5, 2009 stayed the case pending the resolution of the reexamination proceeding. Then, before the stay was lifted, Microsoft also filed two more reexamination requests, dated June 29, 2009, and July 27, 2009. The three reexamination proceedings as a whole resulted in the cancellation of claims 1, 3, 23, and 32 of the '789 Patent, but also a ruling that several claims, including claims 2, 24, 33, and 34, were patentable. After certain amendments, a number of other claims were also found to be patentable.

After the reexamination proceedings had been finalized, the Court on March 3, 2010 lifted the stay of the case. Partly as a result of the reexamination proceedings, Paone modified his position to assert that Microsoft [**7] was infringing claims 2, 24, 33, and 34 of the '789 Patent, all of which had been ruled patentable by the PTO. These claims read in full as follows (the language of claims 1, 23, and 32 are also included, because some of the asserted claims are dependent on those claims).

What is claimed is:

1. A computer implemented method for encrypting data comprising the steps of:

[*391] creating at least one object key in a block cipher, the at least one object key comprising data and methods that operate on said data;

creating a key schedule based upon the at least one object key;

encrypting a random session object key in a block cipher encryption process with the at least one object key;

encrypting a block of input plaintext data utilizing said key schedule;

modifying the at least one object key based on seeding from the random session object key;

modifying the key schedule based upon the at least one modified object key;

encrypting a next block of input plaintext data utilizing said modified key schedule; and

repeating the steps of modifying the at least one object key, modifying the key schedule and encrypting utilizing the modified key schedule until the encrypting of blocks of plaintext data is completed.

2. [**8] A computer implemented method as defined in claim 1, wherein the modification of the key schedule is independent of the input plaintext data.

23. A cryptographic communications system comprising:

at least two networked computer systems linked by a communication channel; and

each computer system including a central processing unit and a memory storage device for executing a block cipher encryption/decryption process;

wherein the encryption process transforms an input plaintext message to a ciphertext message and the decryption process transforms the ciphertext

881 F. Supp. 2d 386, *391; 2012 U.S. Dist. LEXIS 105990, **8

message to the input plaintext message, the encryption/decryption process using at least one dynamic object key which is modified using a non-linear function for each block of input data, each object key being associated with a different key schedule to encrypt/decrypt the input plaintext/output ciphertext message.

24. A cryptographic communications system as defined in claim 23, wherein the encryption/decryption process further includes the use of a random session object key having an initial state randomly generated by the computer system, and wherein the object key modifications are based on seeding from the random session object [**9] key.

32. A computer implemented method for encrypting data comprising the steps of:

creating at least one object key in a block cipher, the at least one object key comprising data and methods that operate on said data;

creating a key schedule based upon the at least one object key;

encrypting a block of input plaintext data utilizing said key schedule;

modifying the at least one object key based on at least a non-linear function;

modifying the key schedule based upon the at least one modified object key;

encrypting a next block of input plaintext data utilizing said modified key schedule; and

repeating the steps of modifying the at least one object key, modifying the key schedule and encrypting utilizing the modified key schedule until the encrypting of blocks of plaintext data is completed.

33. A computer implemented method as defined in claim 32, where in the non-linear function is a hashing function.

34. A cryptographic communications systems [sic] as defined in claim 23, wherein the non-linear function is a hashing function.

[*392] It is crucial to note that claims 2 and 33 in the '789 Patent are method claims. See In re Kollar, 286 F.3d 1326, 1332 (Fed. Cir. 2002) ("the distinction between a claim [**10] to a product, device, or apparatus, all of which are tangible items, and a claim to a process, which consists of a series of acts or steps."); see also NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1322 (Fed. Cir. 2005) ("The invention recited in a method claim is the performance of the recited steps."). "The law of this circuit is axiomatic that a method claim is directly infringed only if each step of the claimed method is performed." Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328 (Fed. Cir. 2008). Paone claims that both of the methods claims are infringed by TKIP and BitLocker. On the other hand, 24 and 34 are systems claims, and not method claims. Paone claims that both of these claims are infringed, but only by TKIP and not by BitLocker.

Upon the lifting of the stay, the parties resumed their claim construction motions. Then, on the consent of the parties, the Court appointed Gale R. Peterson, Esq., an experienced and well-regarded patent attorney, as a special master in this case for the limited purpose of conducting a Markman hearing and issuing a report and recommendation to the Court on claim construction. On June 23, 2010 Special Master Peterson conducted [**11]

881 F. Supp. 2d 386, *392; 2012 U.S. Dist. LEXIS 105990, **11

a non-evidentiary Markman hearing, at which the parties' attorneys presented their arguments on claim construction. On August 11, 2010, Special Master Peterson issued an extensive and detailed Report and Recommendation on claim construction (the "Special Master's Report"). In response to this report, both Paone and Microsoft filed memoranda of law on September 17, 2010, each objecting in part to the Special Master's Report.

Prior to the Markman hearing, the parties presented nine claim terms for construction. However, after meeting and conferring at the suggestion of the Special Master, the parties agreed on meanings for three of those terms. The remaining six terms that were in dispute were:

| Disputed Terms/Phrases | Asserted Claims (or underlying independent claims) Containing the Disputed Terms/Phrases |
|---|---|
| "object key" | 1, 23, 24, 32 |
| "random session object key" | 1, 24 |
| "repeating the step[] of modifying the at least one object key" | 1, 32 |
| "block" | 1, 23, 32 |
| "key schedule" | 1, 2, 23, 32 |
| "block cipher" | 1, 23, 26, 32 |

On February 9, 2011, this Court issued a decision construing these six claim terms (the "Markman Order"). As for "object key", the Court concluded that the "object key" is an encryption key that is not [**12] available to the general public, and which is composed of (1) key data and (2) methods that modify that key data. The Court also found that the object key need not be implemented in an object-oriented programming language. As for "random session object key", the Court construed the term to mean an object key, as defined above, with data that is generated randomly for each instance of the use of the encryption application. As for "repeating the step[] of modifying the at least one object key", the Court found the phrase to [*393] be understood as limited in the sense that the object key's data, as it presently exists in the object key at each instance of modification, must be an input into the modification methods of that object key. As for "block", the Court adopted in its entirety the Special Master's analysis and construction of the term, which is:

The term "block" as used in the claims

and specification of the '789 patent means a sequence of bits wherein that sequence has a fixed length that does not vary from block-to-block. The length of a block may be determined through selection in an encryption algorithm. Plaintext data having a length longer than the length of a block is divided [**13] into blocks of fixed length.

As for "key schedule", the Court construed this term as a string of bits that is used in encrypting a block of input plaintext data. Moreover, the Court explained that it is created by using an object key as an input to an expansion function, which increases the size of the object key to form the key schedule. In addition, sub-portions of the key schedule must be accessible to be used separately in the encryption algorithm if called for, but those sub-portions may be accessed merely by identifying those sub-portions' positions in the string of bits that forms the key schedule. Finally, as for "block cipher", the Court found that a cipher that encrypts data in blocks, but does so by performing a single, successive, comparison of

881 F. Supp. 2d 386, *393; 2012 U.S. Dist. LEXIS 105990, **13

each element of the data block to an element of key data, is not a block cipher as the term is used in the '789 Patent.

On December 21, 2011, the Defendant Microsoft filed the instant motion for summary judgment requesting a determination of non-infringement.

## II. DISCUSSION

### A. Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits [**14] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citation and internal quotation marks omitted).

"The standard for summary judgment in a patent case is the same as in any other case." CA, Inc. v. Simple.com, Inc., No. 02 Civ. 7248, 2009 U.S. Dist. LEXIS 25240, 2009 WL 7445199, at *2 (E.D.N.Y. Mar. 5, 2009) (citing Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1332 (Fed. Cir. 1998) and Union Carbide Corp. v. Am. Can Co., 724 F.2d 1567, 1571 (Fed. Cir. 1984)). Summary judgment on the ground of noninfringement of a patent, the relevant inquiry in this case, may be granted "where the patentee's proof is deficient in meeting [**15] an essential part of the legal standard for infringement liability." Johnston v. IVAC Corp., 885 F.2d 1574, 1577 (Fed. Cir. 1989); see Frank Sentry, Inc. v. Tropp, 736 F. Supp. 2d 623, 631 (E.D.N.Y. 2010).

"When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to nonpatent issues and the law of the Federal Circuit to issues of substantive patent law." In re [*394] Omeprazole Patent Litig., 490 F. Supp. 2d 381, 399 (S.D.N.Y. 2007) (citing Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1378-79 (Fed. Cir. 2005)); see, e.g., Desenberg v. Google, Inc., No. 08 Civ. 10121,

2009 U.S. Dist. LEXIS 66122, 2009 WL 2337122, at *5 (S.D.N.Y. July 30, 2009).

In this case, there is no dispute that the '789 Patent has been deemed valid upon its initial examination and subsequent reexaminnation. Accordingly, the only issues remaining for determination with respect to the patent are infringement and damages. At this stage of the litigation, the Defendant contends that it is entitled to summary judgment on the remaining issue of patent infringement.

### B. Patent Infringement

Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, [**16] within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Patent infringement is "a strict liability offense". In re Seagate Technology, LLC, 497 F.3d 1360, 1368 (Fed. Cir. 2007), cert. denied sub nom. Convolve, Inc. v. Seagate Technology, LLC, 552 U.S. 1230, 128 S. Ct. 1445, 170 L. Ed. 2d 275 (2008). Thus, while intent is not necessarily an element of a direct infringement claim, an alleged infringer cannot claim ignorance or a good faith belief of non-infringement in order to defend against a claim of infringement. See In re Omeprazole Patent Litig., 490 F. Supp. 2d 381, 413 (S.D.N.Y. 2007) ("Making, using, selling, or offering to sell matter covered by a patent without authority of the owner constitutes infringement regardless of knowledge or intent."), aff'd, 281 Fed. App'x. 974 (Fed. Cir. 2008), cert. denied sub nom. Apotex Corp. v. Astrazeneca AB, 556 U.S. 1105, 129 S. Ct. 1593, 173 L. Ed. 2d 677 (2009); see also Metal Film Co. v. Metlon Corp., 316 F. Supp. 96, 111 n.15 (S.D.N.Y. 1970) ("neither lack of knowledge of the patent nor lack of intent to infringe is a defense on the issue of infringement.").

To [**17] assess a patent infringement claim, there are two relevant inquiries. "First, the court must construe the patent's claims as a matter of law to determine their proper scope." Serby v. First Alert, Inc., No. 09 Civ. 4229, 2011 U.S. Dist. LEXIS 109029, 2011 WL 4464494, at *4 (E.D.N.Y. Sept. 26, 2011). This task was previously completed by the Court in the Markman Order. "Second, a jury generally determines the factual issue of whether infringement has occurred, unless there is no genuine issue of material fact, in which case summary judgment is appropriate." Id. Thus, as the Court previously resolved all disputes over the language of the

patent claims, the issue of infringement may be resolved as a matter of law on a motion for summary judgment. See Moore U.S.A. Inc. v. The Standard Register Co., 144 F. Supp. 2d 188, 191-92 (W.D.N.Y. 2001); see also Gart v. Logitech, Inc., 254 F.3d 1334, 1339 (Fed. Cir. 2001) (noting that infringement is properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device), cert. denied, 534 U.S. 1114, 122 S. Ct. 921, 151 L. Ed. 2d 886 (2002); Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1199 (Fed. Cir. 1994) [**18] ("In order for a court to find infringement, the plaintiff must show the

presence of every . . . [limitation] or its substantial equivalent in the accused device.").

Paone asserts that there is infringement by Microsoft as to four claims of the '789 patent. In particular, the Plaintiff asserts that four claims--2, 24, 33, and 34--are infringed in connection with the TKIP component, and two claims--2 and 33--are infringed in connection with the BitLocker component. As for the latter, all of the [*395] infringement claims in connection with BitLocker are asserted under the doctrine of equivalents ("DOE"), namely, not literal infringement. The Plaintiff's claims are summarized as follows:

| Claim | Accused Technology | | Infringement Theory | |
|---|---|---|---|---|
| 2 (method) | TKIP | BitLocker | | DOE |
| 33 (method) | TKIP | BitLocker | | DOE |
| 24 (system) | TKIP | | Literal | DOE |
| 34 (system) | TKIP | | Literal | DOE |

The core of the Defendant's present summary judgment motion on the basis of non-infringement is that neither of Microsoft's accused technologies--TKIP nor BitLocker--fall within the claim boundaries of the '789 patent set by the Court's previous Markman Order. "[I]nfringement is assessed by comparing the accused device to the claims[;] the accused device infringes if it [**19] incorporates *every limitation of a claim*, either literally or under the doctrine of equivalents." Nazomi Commc'ns, Inc. v. Arm Holdings, PLC, 403 F.3d 1364, 1732 (Fed. Cir. 2005) (emphasis added). If, however, even one claim limitation is missing or not met, there is no literal infringement. Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed.Cir.1998). The Defendant's arguments center on three claim limitations; two of the limitations are found in all four claims, one of the limitations is found in only two claims.

The first limitation at issue is "block", which is contained in all four claims. Microsoft contends that TKIP cannot meet this claim limitation either literally or under the doctrine of equivalents, and therefore TKIP cannot be found to infringe any of the four claims. See z4 Techs., Inc. v. Microsoft Corp., 507 F.3d 1340, 1348 (Fed. Cir. 2007) ("We presume, unless otherwise

compelled, that the same claim term in the same patent or related patents carries the same construed meaning." (internal quotation marks omitted)). As a practical matter, if Microsoft ultimately prevails on this argument, then claims 2, 33, 24, and 34 cannot be infringed by TKIP.

The next limitation [**20] at issue is the "object key" limitation, which also is contained in all four claims. Microsoft maintains that neither TKIP nor BitLocker meet this claim limitation, and therefore neither component can be found to infringe any of the four claims. Again, as a practical matter, if Microsoft ultimately prevails on this argument, then claims 2, 33, 24, and 34 cannot be infringed by TKIP or BitLocker.

The last limitation at issue is the "repeating step" limitation, which is only contained by incorporation in the method claims 2 and 33. Microsoft maintains that neither TKIP nor BitLocker meet this claim limitation, and therefore neither component can be found to infringe the two method claims. As a practical matter, if Microsoft ultimately prevails on this argument, then claims 2 and 33 cannot be infringed by TKIP or BitLocker.

Ultimately, the resolution of one of these contentions has the potential to dispose of the entire matter, or at least dispose of certain claims that are at issue. For instance, if

Page 8

881 F. Supp. 2d 386, *395; 2012 U.S. Dist. LEXIS 105990, **20

there is no question of fact that BitLocker does not meet the "repeating step" limitation found in the method claims 2 and 33, then it is irrelevant whether it also meets the "object key" limitation [**21] in those two claims. However, for purposes of the present motion, the Court will fully address all issues raised by the parties and will assess each claim limitation independently. In the conclusion, the Court will [*396] summarize the practical effect of the Court's findings on the claims that remain.

## C. As to Whether Microsoft Encrypts "Blocks" of Plaintext with a "Block Cipher"

The first relevant inquiry is whether Microsoft's TKIP component literally infringes the '789 patent or infringes under the doctrine of equivalents, in light of the method in which TKIP encrypts "blocks" of plaintext with a "block cipher".

As mentioned above, TKIP is an industry-standard data encryption protocol used to encrypt and decrypt data that is transmitted over wireless local area networks. The Defendant Microsoft implements or supports TKIP in many of its products. The data units used in the TKIP encryption, called MAC Protocol Data Units ("MPDUs"), are the only components that could potentially qualify as "blocks" in a "block cipher" under the '789 patent.

When a data message such as a computer document is transmitted over a TKIP-enabled network, the system determines the size of the message and compares it [**22] to the maximum TKIP block size, also known as the "fragmentation threshold." If, and only if, the message has a length that is precisely an exact multiple of the applicable fragmentation threshold, will this result in an encryption where each and every MPDU has the same length. However, if the message length exceeds the fragmentation threshold, the message will be fragmented and encrypted (and subsequently decrypted) as a series of TKIP MPDUs, with the final MPDU having a different length. This last MPDU consists of what are the leftover bits after the message is divided. The capability to split a data message if the fragmentation threshold is exceeded is a requirement of the TKIP standard.

According to Microsoft, every asserted claim--2, 33, 24, and 34--requires encryption of "blocks" of plaintext in a "block cipher." (See '789 patent claims 2, 33, 24 & 34.) Thus, in order to prove infringement, Paone would necessarily need to demonstrate at trial that Microsoft's

TKIP component satisfies these limitations in the claims. Honeywell Int'l, Inc. v. United States, 70 Fed. Cl. 424, 446 (Fed. Cl. 2006) (noting that a *prima facie* case of literal infringement requires the accused matter to fall [**23] clearly within the patent claim, meaning that "every limitation of a claim [must] be met to establish literal infringement.") (quoting Intellicall, Inc. v. Phonometrics, Inc., 952 F.3d 1384, 1389 (Fed. Cir. 1992) (overturned on other grounds); see also Research Plastics, Inc. v. Federal Packaging Corp., 421 F.3d 1290, 1297 (Fed. Cir. 2005) ("Literal infringement requires that the accused device embody each of the limitations of the asserted claim."). In other words, for Microsoft to succeed on its motion for summary judgment, it must show that there is no genuine issue of material fact as to whether TKIP encrypts plaintext "blocks" and does so in a "block cipher". Microsoft contends that the record clearly confirms that TKIP contains neither of these elements either literally or equivalently, and accordingly, cannot be found to infringe the '789 patent.

### 1. "Block"

As previously and thoroughly analyzed in the Markman Order, the claim term "block" is used to describe groups of data to be encrypted or decrypted. As relevant to the allegedly infringed claims, the term appears in claim 1 (incorporated by reference in claim 2), claim 23 (incorporated by reference in claims 24 and 34), and [**24] claim 32 (incorporated by reference in claim 33). For example, claim 1 describes the methods of the invention as including the steps of:

[*397] encrypting a *block* of input plaintext data utilizing said key schedule;

. . .

encrypting a next *block* of input plaintext data utilizing said modified key schedule; and

repeating the step[] of . . . encrypting utilizing the modified key schedule until the encrypting of *blocks* of plaintext data is completed.

('789 Patent, 11:26-38 (emphasis added).) The systems claims--24 and 34--state that a dynamic object key is modified "for each *block* of input data." (Id. at 11:28-30 (emphasis added).)

Case No. 1:11-cv-00520-RM-NYW   Document 646-5   filed 11/04/13   USDC Colorado   pg 30 of 84

Page 9

881 F. Supp. 2d 386, *397; 2012 U.S. Dist. LEXIS 105990, **24

The primary dispute between the parties at the time of claim construction regarding the claim term "block" was whether it required that all blocks of data in a given encryption be of the same length, or whether the block length could vary among blocks. Paone's patent contained a preferred embodiment where the blocks have a "fixed length"; namely, each block contains 512 bits of information. The patent application explains that data blocks of 512 bits (64 bytes) each are encrypted, and that the input file will be padded with random bytes in order to produce a file with a length [**25] having a multiple of 512 bits. Nevertheless, Paone proposed at the claim construction stage that blocks are simply groups of data that are input into the block cipher. The Plaintiff further suggested that each block must have a fixed length, so that the length is "known to the cipher algorithm", but that there is no limitation in the patent that each and every block must be set to the same size. On the other hand, Microsoft contended that "block" meant a string of fixed length that applies to *all* strings of data, as defined by a block cipher.

Ultimately, the Court concurred with the Special Master and found that the term "block" as used in the claims and specification of the '789 patent means "a sequence of bits wherein that sequence has a fixed length that *does not vary from block-to-block*. The length of a block may be determined through selection in an encryption algorithm. Plaintext data having a length longer than the length of a block is divided into blocks of fixed length." (Markman Order, at 43.) The Court explicitly accepted the Defendant's interpretation that every block must be the same size and thus be "not subject to change or variation", thereby rejecting Paone's interpretation [**26] that "fixed" meant only "determined, established, or set". (Special Masters Report, at 197.)

Therefore, in order for Microsoft to literally infringe the relevant four claims of the '789 patent, the blocks in TKIP's encryption would necessarily need to have a fixed length, and that length cannot vary from block-to-block. The Defendant asserts that it is entitled to summary judgment on the ground that the blocks in TKIP do not necessarily have the same length from block-to-block, and consequently cannot literally infringe. In addition, the Defendant contends that it cannot be found to have infringed under the doctrine of equivalents, as posited by the Plaintiff. The Court will address each of these contentions in turn.

**a. Literal Infringement**

Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, *i.e.*, when "the properly construed claim reads on the accused device exactly." Amhil Enters., Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996).

As an initial matter, the Court notes that based upon the evidence in the record, there is no question of fact that TKIP allows in theory for two different scenarios: one in which MPDU blocks [**27] are all the same length, and one in which the MPDU blocks are not all the same length. [*398] The Plaintiff does not appear to dispute this fact in its opposition papers or in its Local 56.1 Statement. (See Pl. Resp. 56.1, ¶ 34.) Dr. Blaze, the Plaintiff's technical expert, testified to this explicitly in his deposition:

A. The MPDUs are blocks in TKIP, yes.

Q. And the length of an MPDU can vary from MPDU to MPDU, right? *See* A. Well, that depends. That depends on what's presented to TKIP. Whether an MPDU is the same size as a previous MPDU, whether they're all the same size or not, depends on a number of factors. *See* Q. But they can be different, then; the length of one MPDU can be different than the length of a subsequent MPDU? *See* A. There may be scenarios under which that's true, and, again, it depends on a variety of factors whether that will be true.

(Blaze 9/13/2011 Tr. at 124-25.)

For the moment, the Court sets aside the possible circumstance where the MPDUs are uniformly the same length. Instead, the Court will focus on the other potential (and presumably more likely) outcome: where the MPDUs are not uniformly the same size. Typically, this scenario is illustrated by an extremely high number [**28] of MPDUs that do have the same length, followed one single MPDU of a different length that represents the leftover bits that were not an exact multiple of the fragmentation threshold.

Paone argues that even in this situation--where one MPDU is not the same length as every other MPDU--this nevertheless meets the "blocks" limitation in the '789

881 F. Supp. 2d 386, *398; 2012 U.S. Dist. LEXIS 105990, **28

patent. He contends that the MPDUs still comprise a "sequence of bits wherein that sequence has a fixed length that does not vary from block-to-block" and therefore literally meets the Court's construction of "block." In short, Paone asserts that simply because TKIP could encrypt a single MPDU having a different length, i.e., representing the remaining bytes after the message is encrypted into identical MPDUs, does not mean that TKIP does not contain the "blocks" element of the claim. Paone also attempts to argue that this potential additional MPDU that is non-conforming in length is merely an additional step that does not remove the accused technology from the literal scope of the claims. See CollegeNet, Inc. v. ApplyYourself, Inc., 418 F.3d 1225, 1235 (Fed. Cir. 2005) ("The transitional term 'comprising' . . . is inclusive or open-ended [**29] and does not exclude additional, unrecited elements or method steps. . . A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'") (internal quotations and citations omitted).

However, despite Paone's arguments to the contrary, the Court finds that in this particular scenario, TKIP would not be infringing. This is because when the MPDUs are all of uniform length except for a single non-conforming MPDU, they are not fixed in a way that every block has precisely the same length, as the claims of the '789 patent have been construed. The Court's claim construction requires that TKIP encrypted blocks *do not vary* from block to block. To the extent that several or merely one does, this simply does not literally infringe the patent. It may be a minor distinction, but it is one that patent law requires this Court to make. See, e.g., Atlas Powder Co. v. E.I. Du Pont de Nemours and Co., 588 F. Supp. 1455, 1471 (D.C. Tex. 1983) ("The differences between the two emulsifiers are slight, but they preclude a finding of literal infringement because '[m]inor modifications are . . . sufficient to avoid literal infringement.'") (quoting Weidman Metal Masters v. Glass [*399] Master Corp., 623 F.2d 1024, 1026 (5th Cir. 1980)).

To [**30] the extent that Paone attempts again to assert that merely because the block length is set by the algorithm so that it is "fixed", whether or not they are all of the same length, this argument is once again rejected. Fixed in this case means constant. While it is unnecessary for the Court to restate its reasoning as to this notion, as it has been thoroughly explored in the Markman Order, the Court notes that it previously relied upon claim 15 when construing the claim term:

an additional piece of intrinsic evidence apparently not addressed by the parties or the Special Master supports the Special Master's conclusion. The patent provides in claim 15 for "[a] computer implemented method as defined in claim 2, wherein input plaintext is compressed . . . and padded . . . to produce a file with a length that is evenly divisible by the block length . . . ." ('789 Patent, 13:36-41.) Claim 15's description of a file that is "evenly divisible by the block length" is a strong indication that, at least for that claim, block length does not vary from block to block. Otherwise, the term "evenly divisible" would have little meaning. The Court is cognizant of the bar on reading the additional limitations [**31] of claim 15 into claims 1 and 2. However, claim 15 does not define "block" separately from claims 1 and 2, but rather inherits this term from them as a dependent claim. Moreover, claim 15 says nothing about the "block" or "block length" until it is referenced in a way that implies that a block has a fixed length. While this evidence is not conclusive, the Court finds that it does support the Special Master's finding that the term "block" as used in claim 1 has a fixed length. See Phillips, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.")

(Markman Order, at 42.) This same reasoning supports the conclusion here. The description of a file that is "evenly divisible by the block length" led the Court, in part, to conclude that the blocks must have a fixed length. If infringement could be found where there was uneven division, so that there was one block of unfixed length, this would contradict the rationale as set forth in this Court's previous decision.

The Court now addresses the more complicated issue, which is that there is a potential permutation [**32] of the TKIP encryption protocol in which the data

881 F. Supp. 2d 386, *399; 2012 U.S. Dist. LEXIS 105990, **32

file has a length that is precisely a multiple of the fragmentation constraint, so that MPDUs of exactly equal length are created. There does not appear to be a question of fact that this is conceivable and hence theoretically possible. Certainly there is some possibility, however remote, that the data file has a length that is precisely a multiple of the fragmentation constraint, as the Plaintiff's expert posits there is. This then leads to two lines of inquiry. First, is it enough for TKIP to merely be capable of infringement? While certainly this is not like other patent cases in which the technology is set to a non-infringing default, it is somewhat similar to those cases in which there is both a non-infringing and an infringing mode. However, unlike the precedent cited by the parties, whether the TKIP will result in blocks of equal length is not a result of a user implemented choice to operate one particular feature of the technology. Rather, in what appears to be a matter of first impression, whether TKIP results in infringement is entirely driven by randomness.

[*400] As for the question of whether capability alone is sufficient, [**33] it is highly relevant as to what types of claims are at issue. With regard to method claims 2 and 33, which speak to the steps of encryption, capability is determinative. "It is well established that a patent for a method or process is not infringed unless *all steps* or stages of the claimed process are utilized." Roberts Dairy Co. v. United States, 208 Ct. Cl. 830, 530 F.2d 1342, 1354 (1976) (citing Engelhard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347 (9th Cir. 1963), cert. denied, 377 U.S. 923, 84 S. Ct. 1220, 12 L. Ed. 2d 215 (1964) (emphasis added)). "A patented method is a series of steps, each of which must be performed for infringement to occur. It is not enough that a claimed step be 'capable' of being performed." Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc., 243 Fed App'x 604, 606-07 (Fed. Cir. 2007) (citing Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1311 (Fed. Cir. 2006) (rejecting an argument that a claim requiring the replacement of appliances can be performed if the appliances are merely "capable of" being replaced)); see also NTP, 418 F.3d at 1318 ("[T]he use of a [claimed] process necessarily involves doing or performing each of the steps [**34] cited.").

Therefore, even if the Plaintiff could produce evidence to demonstrate that TKIP, in certain random implementations, would result in blocks of uniform equal length, that capability alone would not be sufficient for a

finding of infringement, at least as to the methods claims. See Lucent Technologies, Inc. v. Gateway, Inc., 543 F.3d 710 (Fed. Cir. 2008) (finding that patent owner did not demonstrate infringement of audio coding methods claim by offering circumstantial evidence that proved at most that accused encoder possibly was capable of running; owner had to show, circumstantially or otherwise, that accused encoder actually had run and performed claimed method); E-Pass Technologies, Inc. v. 3Com Corp., 473 F.3d 1213, 1216 (Fed. Cir. 2007) (affirming district court's grant of summary judgment of non-infringement where the patents were directed to a method of substituting an electronic multi-function card for a plurality of credit cards and the evidence provided by the patentee at best showed that customers were taught each step of the claimed method in isolation, yet failed to establish that all of the steps of the method had actually been performed in the prescribed order, [**35] so that it would be too speculative to conclude that any customer actually performed the claimed method).

On the other hand, as for the systems claims, capability may be sufficient. It is clear that "an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 622-23 (Fed. Cir. 1995). Compare Netscape Commn's Corp. v. Valueclick, Inc., 684 F. Supp. 2d 699, 722 (E.D. Va. 2010) ("these patent claims do not require a user to execute the claimed method; rather, the claimed computer systems are simply described as capable of performing the method, not as actually performing the method.").

Nevertheless, even if capability to form equal length "blocks" is sufficient to constitute infringement, the Court need not reach the issue of whether capability is sufficient for systems claims. This is because there is no genuine issue of material fact as to whether TKIP is even capable of meeting this limitation. The second relevant inquiry is, assuming that it is enough for TKIP to be merely capable of infringing in one particular randomly generated instance, is it sufficient that no real world [**36] implementations of this result have been demonstrated?

[*401] The Defendant contends that summary judgment is appropriate because MPDUs may only *theoretically* be of uniform length. Put another way, the question is whether Microsoft can be held liable because TKIP may hypothetically result in identical length

blocks, although the Plaintiff has been unable to demonstrate at this stage of the litigation that real-world implementations of the protocol can infringe. Microsoft asserts that "[m]erely because, hypothetically, consecutive MPDUs may sometimes have the same length does not literally mean that MPDU length is 'fixed.'" (Pl. Mem. at 8.) The Defendant's logic is that the possibility that MPDUs may sometimes have the same length runs contradictory to this Court's ruling that block lengths not be sometimes the same for two consecutive blocks, but rather be fixed for all blocks. In this regard, the Court agrees with Microsoft that merely presenting a theoretical possibility of capability is insufficient.

The ultimate burden of proving infringement rests with the patentee so that "an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing [**37] evidence that would preclude a finding of infringement, or by showing that the evidence fails to establish a material issue of fact essential to the patentee's case." Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001). Here, Microsoft has not provided evidence that TKIP is incapable of resulting in equal block length, only that it is "theoretical" and presumably, highly unlikely. Cf. Harris Corp. v. Fed. Exp. Corp., 07 Civ. 1819, 2010 U.S. Dist. LEXIS 3424, 2010 WL 129794, at *8 (M.D. Fla. 2010) (finding that because FedEx provided credible evidence of noninfringement, the burden shifted to the Plaintiff to provide evidence raising actual doubt as to potential infringement). Nevertheless, the Defendant has shown that the evidence fails to establish a material issue of fact essential to the patentee's case.

At this point, the Plaintiff can only demonstrate that it is theoretically possible for the TKIP component to infringe his patent. "[H]e has shown no more than a theoretical possibility or 'metaphysical doubt,' which is insufficient to create a genuine issue of material fact. Jansen v. Rexall Sundown, Inc., 342 F.3d 1329, 1334 (Fed. Cir. 2003) (quoting Anderson, 477 U.S. at 261, 106 S. Ct. 2505); [**38] see Fire King Intern. LLC v. Tidel Eng'g, L.P., 613 F. Supp. 2d 836, 842 (N.D. Tex. 2009 ) ("none of this hypothetical evidence creates a genuine issue of material fact as to whether any of the Sentinel products installed at Speedy Stop stores are actually configured in such a way as to infringe Claim 1 and Claim 11 of the '252 Patent.").

Essentially, TKIP is capable of acting in both a non-infringing mode and an infringing mode. When the data exceeds the fragmentation threshold in a way that is not precisely divisible by the applicable number, then the result is blocks that are not all of equal length. On the other hand, if the data exceeds the fragmentation threshold in a way that is precisely divisible by the applicable number so that equal MPDUs are created, then this implementation of TKIP may be infringing, as it would literally satisfy the claims limitation in the '789 patent. However, the Plaintiff has failed to demonstrate a single instance of the latter actually occurring in the real world, and thus has failed to prove that TKIP is actually capable of infringement. The Defendant asserts that Dr. Blaze was required to compare the '789 patent with the encryption actually utilized [**39] by Microsoft technology, look for real "blocks", and see whether there are actual instances in the real world where the blocks are uniformly of equal length. The Court agrees.

[*402] Instead, Dr. Blaze supposedly reached his conclusions based solely upon the text of the TKIP protocol and thus merely pondered whether such a result would be theoretically possible. This is insufficient to show that TKIP is actually capable of meeting the "block" limitation, which is necessary to prove infringement. See Cybersettle, 243 Fed App'x at 609 ("In the course of their operation, the accused ANS 3 and ANS 1x systems would infringe (assuming all the other claim limitations were satisfied) only when they received multiple demands and multiple offers; proof that those systems were capable of receiving multiple demands and multiple offers is not proof that they ever performed the claimed methods"); Webzero, LLC v. Clicvu, Inc., No. 08 Civ. 0504, 22009 U.S. Dist. LEXIS 129485, 009 WL 8173102, at *4-5 (C.D. Cal. May 1, 2009) aff'd, 392 F. App'x 863 (Fed. Cir. 2010) (noting that "while it is true that an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes, the accused infringing product must be [**40] capable of accomplishing the entire method of the claim") (internal quotation marks omitted); see also Fire King Intern. LLC v. Tidel Eng'g, L.P., 613 F. Supp. 2d 836, 842 (N.D. Tex. 2009) (finding that even where marketing materials and expert testimony demonstrated that a system was capable of infringing the patent, "none of this hypothetical evidence creates a genuine issue of material fact as to whether any of the Sentinel products installed at Speedy Stop stores are actually configured in such a way as to infringe Claim 1 and Claim 11 of the '252 Patent."). This

is in stark contrast to a case like Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1326 (Fed. Cir. 2009), for example, where there was expert testimony that certain testing and demonstrations conducted by the defendant constituted infringement.

This is not to say that in every instance of patent infringement, the patentee must necessarily demonstrate specific instances of infringement. See ACCO Brands, Inc. v. ABA Locks Mfr. Co., 501 F. 3d 1307, 1313 (Fed. Cir. 2007) (holding that the patent owner must show actual infringement, rather than just the capability to infringe). What the Court finds here is that Paone [**41] has failed to even satisfy the minimal burden that TKIP is in reality capable of meeting the "blocks" limitation. Cf. Fujitsu, 620 F.3d 1321 ("The claim language at issue in the '789 patent does not merely require the capacity to contain blocks; it explicitly requires "blocks" in the claim language. Unless the claim language only requires the capacity to perform a particular claim element, we have held that it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of . . . infringement."); Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 832 (Fed. Cir. 1991) (holding that the claim term "programmable selection means" only required that the infringing product be capable of infringing).

Thus, Paone has failed to establish a genuine issue of material fact regarding literal infringement with regard to TKIP.

As a final matter on this subject, the Court will address the recent case relied on by the Defendant entitled Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1326-29 (Fed. Cir. 2010). According to Microsoft, comparing a standard like TKIP with the claims in a patent can only warrant recovery if the Plaintiff [**42] can demonstrate that real-world implementations of the standard always infringe. See Fujitsu Ltd.., 620 F.3d at 1326-29. In Fujitsu, the issue was whether the Defendant's implementation of a certain wireless networking protocol for sending and receiving messages between a base station, such as a wireless router, and a mobile station, such as a laptop, infringed the plaintiffs' patent. In [*403] the summary judgment motion filed by the plaintiffs, they argued that by simply complying with the standard, Netgear necessarily infringed the asserted claims. In other words, the plaintiffs claimed that because the standard itself allowed for infringement, that was

sufficient without any proof of real world implementations of that standard. In its First Noninfringement Order, the district court held that any product that complied with certain sections of the standard infringed the asserted claims. But in its Second Noninfringement Opinion, the district court noted that the fragmentation option is disabled by default in the accused products and required Philips to show evidence of direct infringement by users turning on the fragmentation function.

On appeal, Netgear argued that it was legally incorrect [**43] to compare claims to a standard rather than directly to accused products. The Court held that:

> a district court may rely on an industry standard in analyzing infringement. If a district court construes the claims and finds that the reach of the claims includes any device that practices a standard, then this can be sufficient for a finding of infringement. We agree that claims should be compared to the accused product to determine infringement. However, if an accused product operates in accordance with a standard, then comparing the claims to that standard is the same as comparing the claims to the accused product. . . . An accused infringer is free to either prove that the claims do not cover all implementations of the standard or to prove that it does not practice the standard.

Id. at 1327.

The Fujitsu court went on to state that public policy weighed in favor of this approach, because if a court determined that *all* implementations of a standard infringed the claims of a patent, then it would be a waste of judicial resources to separately analyze every accused product that undisputedly practices the standard. However, the court acknowledged "that in many instances, an industry standard [**44] does not provide the level of specificity required to establish that practicing that standard would always result in infringement." Id. For instance, in the Fujitsu case, the standard was merely optional, so that standards compliance alone did not establish that the accused infringer chose to implement the infringing optional section. In those instances, the Federal Circuit stated that:

881 F. Supp. 2d 386, *403; 2012 U.S. Dist. LEXIS 105990, **44

it is not sufficient for the patent owner to establish infringement by arguing that the product admittedly practices the standard, therefore it infringes. In these cases, the patent owner must compare the claims to the accused products or, if appropriate, prove that the accused products implement any relevant optional sections of the standard. This should alleviate any concern about the use of standard compliance in assessing patent infringement. Only in the situation where a patent covers every possible implementation of a standard will it be enough to prove infringement by showing standard compliance.

Id. at 1328.

While the Fujitsu case is certainly relevant to the current analysis, it is not determinative and has several key distinctions. One key distinguishing factor is that the standard in Fujitsu [**45] had a default mode that was automatically non-infringing. Only if a user chose to implement an optional feature of the standard would infringement occur. Here, while there is arguably an infringing and non-infringing "mode" of TKIP, there is no default mode. More importantly, whether the standard can be implemented in an infringing way is not based upon a user actively utilizing an [*404] option in the protocol, but rather upon randomness and chance. Therefore, the Court agrees with Paone that the Fujitsu precedent is not applicable to the instant case for several reasons. Regardless, putting aside this authority, the Court still finds that the Plaintiff has failed to demonstrate a genuine issue of material fact in regard to whether the blocks limitation may be literally met. Even if the Court is to disregard Fujitsu and reject the notion that the Plaintiff must demonstrate that real-world implementations of the standard always infringe, he must at least produce evidence that the standard is actually capable of infringing. The Plaintiff has only presented Dr. Blaze's conjecture that TKIP may theoretically result in MPDUs that are uniform length. This is plainly insufficient.

Moreover, the [**46] Plaintiff also argues that Fujitsu is not applicable to claims 24 and 34 because they are directed communications systems, rather than methods. See NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1318 (Fed. Cir. 2005) ("[T]he use of a process necessarily involves doing or performing each of the steps recited. This is unlike use of a system as a whole. . . ."). In this vein, the Plaintiff urges the Court to disregard Fujitsu and instead follow the dictates of Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1204 (Fed. Cir. 2010). In this latter case, the Federal Circuit held that because the claims at issue were "system" claims that did not require the performance of any method steps, "to infringe a claim that recites capability and not actual operation, an accused device need only be capable of operating in this described mode." However, in the Finjan case, the claim language only required the *capacity* to perform a particular claim element. In particular, "Finjan's apparatus claims [did] not require that the proactive scanning software be configured in a particular way to infringe--only that it be programmed for performing the claimed steps." Id. at 1204 (emphasis added). [**47] That is plainly not the system claims at issue here. Rather, claims 24 and 34 both contain language that requires "blocks" of data. It does say that the data need only be capable of being divided into equal block units. Thus, the Plaintiff's reliance on Finjan is misplaced.

In sum, the Court grants the Defendant's motion for summary judgment as to the literal infringement of the four claims, in light of the Plaintiff's failure to produce evidence that TKIP even has the capability to meet the blocks limitation.

**b. Doctrine of Equivalents**

In light of the Court's finding that there are no genuine issues of material fact as to whether TKIP can literally infringe any of the relevant four patent claims as a matter of law based upon the "block" limitation, the Court must proceed to assess whether TKIP can nevertheless be found to infringe the four patent claims because it meets the "block" limitation under the doctrine of equivalents.

Infringement under the doctrine of equivalents requires that the accused method or system contain each limitation of the claim *or its equivalent*. See Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997) (noting that [**48] because each limitation contained in a patent claim is material to defining the scope of the patented invention, a doctrine of equivalents analysis must be applied to individual claim limitations, not to the

881 F. Supp. 2d 386, *404; 2012 U.S. Dist. LEXIS 105990, **48

invention as a whole). An element in the accused method or system is equivalent to a claim limitation if the differences between the two are "insubstantial" to one of ordinary skill in the art. See id.

Paone argues that TKIP may infringe the '789 patent claims because it meets the "block" limitation under the doctrine of [*405] equivalents. In particular, the Plaintiff contends that "one of ordinary skill in the art would consider the differences between a system or method that encrypts blocks that vary in length in some circumstances, and one that does not, to be insubstantial--it is merely a design choice." (Pl. Mem. at 7.) Moreover, the Plaintiff maintains that although the patent discloses an embodiment that encrypts blocks that do not vary in length, that aspect is not the inventive focus of the asserted claims, which do not address block length at all. Finally, Paone asserts that in scenarios when the TKIP's "blocks" vary in length from one to the next, those MPDUs nonetheless perform [**49] substantially the same function--dividing a large amount of data into manageable portions to facilitate block cipher encryption; in substantially the same way--by grouping data for encryption by a block cipher; to achieve substantially the same result--the conversion by a block cipher of unencrypted plaintext blocks of data into encrypted ciphertext blocks of data--as the "blocks" of the asserted claims.

<mark>Microsoft makes several arguments as to why the application of the doctrine of equivalents should be precluded. First, the Defendant relies upon an exception to the doctrine of equivalents; namely, the claim-vitiation doctrine. This doctrine provides that "an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation."</mark> Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)). "There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation. . . . Rather, courts must consider the totality of the [**50] circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." Id. at 1359. <mark>"Claim vitiation applies when there is a 'clear, substantial difference or a difference in kind' between the claim limitation and the</mark>

<mark>accused product." Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1355 (Fed. Cir. 2010) (quoting Freedman, 420 F.3d at 1360). "It does not apply when there is a 'subtle difference in degree.'" Id.</mark>

The purpose of the doctrine is to not allow the recapture of subject matter excluded by a deliberate claim-drafting decision. Planet Bingo, LLC v. GameTech Int'l, Inc., 472 F.3d 1338, 1344 (Fed. Cir. 2006). The "doctrine of equivalence cannot be used to erase meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." Conopco, Inc. v. May Dep't Stores Co., 46 F.3d 1556, 1562 (Fed. Cir. 1994) (internal citation omitted); see, e.g., Tronzo v. Biomet, Inc., 156 F.3d 1154, 1160 (Fed. Cir. 1998) (noting that the finding of all shapes to be equivalent structures [**51] would entirely vitiate the limitation requiring a "generally conical shape"). "If [the doctrine] were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely." Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1424-25 (Fed. Cir. 1997). Case 2:07-cv-02973-ADS Document 169 Filed 07/30/12 Page 31 of 68 PageID #: 4597

Ultimately, the Court finds that there are questions of fact that preclude the granting of the Defendant's motion for summary judgment as to whether the MPDUs may meet the "blocks" limitation under the doctrine of equivalents.

<mark>Many of the arguments Paone raises in this regard have more to do with a rehashing of its arguments as to whether the [*406] claim term "blocks" should be construed to require the MPDUs to have equal length. However, as set forth in the previous Markman Order, this issue has already been resolved. The Court explicitly rejected Paone's contentions and found that the term "block" meant a sequence of bits wherein that sequence has a fixed length that *does not vary from block-to-block*. Thus, the Court finds that Paone's arguments miss the mark and agrees that Paone failed to [**52] argue that the hypothetical "remainder" situations infringe under the doctrine of equivalents. Nevertheless, there is enough in the record for the Court to find, even without an argument to this effect, that the hypothetical remainder situation may infringe under the doctrine of equivalents.</mark>

<mark>At this stage of the litigation, the Court cannot say that the differences between the "block" limitation and</mark>

881 F. Supp. 2d 386, *406; 2012 U.S. Dist. LEXIS 105990, **52

the MPDUs are insubstantial as a matter of law. Whether the difference is a "subtle difference in degree" rather than a "difference in kind" is a factual question, and one that is more properly left to the jury. Trading Techs., 595 F.3d at 1355. First, Microsoft admits that there are often times when the TKIP encryption processes results in blocks that are of fixed length that do not vary from block-to-block, except for one single MPDU having a different length, i.e., representing the remaining bytes after the message is encrypted into identical-length MPDUs (See Blaze Decl. at ¶ 33.) Thus, it is conceivable that a jury could find that where millions of blocks are precisely the same size with only one deviation, this is a subtle difference in degree rather than a difference in kind. This [**53] finding would depend on a large number of factual disputes, such as, how often such a result occurs, what percentage of the encryption is not uniform, and the absolute size of the nonconforming block, relative to the size of the computer document or image as a whole. Contrary to Microsoft's assertions, this could result in a finding that the difference between the two is insubstantial.

Second, even in the situation where the data message does not reach the applicable fragmentation threshold so that no fragmentation will occur (which results in MPDUs that vary in length from one to the next), there is a question of fact as to the doctrine of equivalents. In other words, the differences between a system or method that encrypts in uniform length blocks versus one that encrypts in varying length blocks, may be a design choice that the trier of fact ultimately finds to be insubstantial. Certainly, Paone contends that the TKIP blocks perform substantially the same function, in substantially the same way, to achieve substantially the same result, as the "blocks" in the claimed subject matter. (Blaze Suppl. Expert Report at 51.)

The Plaintiff has presented sufficient evidence in this regard [**54] to at least present this dispute to a jury.

For example, the Plaintiff's expert Dr. Blaze has testified that "a person of ordinary skill in the art would consider the differences between TKIP blocks and the claimed subject matter to be insubstantial." (Blaze Suppl. Expert Report at 49-51.) Blaze contends that in both the TKIP encryption process and in the '789 patent, a group of data is split up into smaller sequences so that it may be processed together, in part for security reasons. To encrypt multiple smaller blocks rather than one large

block likely results in a more effective encryption process. Thus, whether the multiple smaller blocks are all of equal length, according to the Blaze, is inconsequential. To support this contention, the Plaintiff also points to prior art that was well known in the field since before Paone filed his patent, in which the block ciphers encrypt blocks of variable size. See, e.g., Article: Two Practical and Provably Secure Block Ciphers: BEAR [*407] and LION, R. Anderson et al., at 1 ("[O]ur constructions allow arbitrary sized blocks to be enciphered . . .").

Therefore, the Court will not impose vitiation to prevent the jury from reaching the factual question [**55] of Paone's equivalence theory. Paone has presented evidence that that one block having a different length than every other single block does not change the efficacy of the method or system. A jury may disagree with Paone's theory. The Court, however, is unwilling to take that decision out of the jury's hands. See, e.g., Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1020 (Fed. Cir. 2006) (rejecting defendant's argument of claim vitiation because of the finding "that a question of fact exists as to whether the difference between the 'spherical-shaped' limitation and the alleged equivalent is substantial."). The Court does not find that Paone's arguments would necessarily render the "blocks" claim limitation meaningless, as construed by this Court. The relevant inquiry is, in light of the fact that the Court has found that the blocks must all be of equal length, would it eviscerate the limitation to find that an encryption in which every single block but one is of equal length, infringes under the doctrine of equivalents. The Plaintiff has presented the Court with sufficient evidence to demonstrate that there is at least a question of fact as to this issue.

For this [**56] reason, the Court declines to apply the doctrine of vitiation and finds that the question of whether the doctrine of equivalents is applicable to the MPDUs in the TKIP component is properly left to the jury. Thus, the Defendant's motion for summary judgment on this ground it is denied.

## 2. "Block Cipher"

All four asserted claims also require that the encryption be carried out in a "block cipher," which the Court has construed as "a cipher that encrypts data in blocks." (Markman Order at 61.) Thus, the Defendant argues that because TKIP does not encrypt data in

Case No. 1:11-cv-00520-RM-NYW   Document 646-5   filed 11/04/13   USDC Colorado   pg 38 of 84

Page 17

881 F. Supp. 2d 386, *407; 2012 U.S. Dist. LEXIS 105990, **56

"blocks", as the term has been defined by the Court, then TKIP cannot utilize a "block cipher." For all of the reasons stated above in connection with "block", the Defendant's motion with regard to literal infringement is granted but with regard to the doctrine of equivalents it is denied.

## D. As to Whether TKIP and Bitlocker Employ an "Object Key" Having Data and Methods that Modify That Data

The next issue of contention concerns "object key", an element that all four claims of the '789 patent require.

### 1. The Previous Claim Construction

The parties have always agreed, at a minimum, that the term "object key" refers to a key that is [**57] used to encrypt data, and they also agreed that this term did not have a standard meaning within the fields of computer science or cryptography prior to the filing of the '789 patent. The use of object key throughout the patent is typified by its use in claim 1, which states that one of the methods of the invention is "creating at least one object key in a block cipher, the at least one object key comprising data and methods that operate on said data." ('789 Patent, 11:19-21; see also, e.g., id. at 18:12-14.) The Special Master construed "object key" as follows:

> In the field of cryptography, encryption and decryption are controlled by keys. The inventor coined the term "object key" to refer to a "first" encryption key which is distinct from a "second" encryption key which the inventor called a "random session object key," also a coined term. Both are "dynamic," i.e., [*408] both are modified from an initial static state, however it is unnecessary to expressly add that to the construction of "object key" because that modification is required by other claim language. The term "object key" per se as used in the claims and specification, simply means a "first encryption key."

The Special Master [**58] further ruled that the "object key" need neither be "secret" nor defined in object-oriented programming and self-contained.

However, the Court did not adopt this exact finding.

Rather, the Court read the claims in view of the specification and concluded that the "object key" needed to be secret, not only because the object key is referred to as "secret" in several places in the specification and the patent title, but the "Background of the Invention" portion of the specification focuses almost exclusively on the importance in cryptography of maintaining the secrecy of an encrypted message. Importantly, it appeared to the Court that a non-secret object key would undermine the usefulness of the entire invention.

With regard to the more central argument over the meaning of "object key"--namely, whether the object key must be defined in what computer scientists call "object-oriented programming"--this presented a more thorny issue at the claim construction stage. It is worthwhile here to repeat some relevant background information.

Object-oriented programming ("OOP") is not easy to define, and a recently published book for beginning computer programmers notes that "OOP is difficult to summarize [**59] because it doesn't represent a single concept . . . and even experts are unable to agree on a common definition." Richard Mansfield, Programming: A Beginner's Guide, p. 264 (McGraw Hill 2009). Even the programming language C++, one of the most widely used object-oriented programming languages, is viewed by some as "not a pure OOP language." Namir C. Shammas, Foundations of C++ and Object-oriented Programming, p. 10 (IDG Books Worldwide, Inc. 1995).

However, on a very basic level, object-oriented programming is usually defined in contrast to a method of computer programming that preceded OOP, which is called "structured" (or "functional") programming. Structured programming is a method of giving computers instructions in "reusable subroutines and functions . . . [which] enjoy[] a certain level of autonomy". Shammas at 7. Thus, structured programs can define a complicated task for a computer to do--say, calculate the square root of a number--and define that task in a "subroutine". That subroutine contains all of the steps necessary to do the task, so the task can be repeated over and over by using the subroutine, without forcing the programmer to re-write the individual steps each time.

However, [**60] structured programming generally stores data in ways that permit data to be manipulated broadly, which "[i]n large-scale software projects . . . can lead to chaos." See Shammas at 7, 9. In other words, this

Case No. 1:11-cv-00520-RM-NYW   Document 646-5   filed 11/04/13   USDC Colorado   pg 39 of 84

Page 18

881 F. Supp. 2d 386, *408; 2012 U.S. Dist. LEXIS 105990, **60

means that in structured programming, the data used by a given subroutine is shared with and can be modified by other subroutines. One result of this is that when data becomes damaged or lost, it can be difficult to determine the source of the problem because so many different subroutines have access to the data.

Object-oriented programming seeks to solve this problem. While an object-oriented program still defines complex tasks into subroutines, it allows only the piece of the program that uses each piece of data most directly to have immediate access to that data. Thus, in object-oriented programming, instead of using subroutines as [*409] the building blocks of a program, programmers use "objects". "Objects" consist of both the instructions for various subroutines and the data needed to carry out those instructions. Thus, whereas the data in a structured program might be very loosely thought of as being in a shared pool, the data in an object-oriented program is encapsulated into pockets, [**61] accessible only by the "object" that will use that data directly. Any other part of the program that wishes to change an object's data must go through the object to do so. Objects are thus described variously as having "attributes and [] methods that alter these attributes," Shammas at 15; "both data . . . as well as code that processes that data," Mansfield at 264; or "data and the operations that manipulate the data," Matt Weisfeld, The Object-Oriented Thought Process, p. 9 (Sams Publishing 2004). (The Court notes that while some of these sources post-date the filing of the '789 patent, there is no indication that the understanding of this basic theory in object-oriented programming has changed since the '789 patent was filed in 1997.) Generally, a programming language is viewed as either a "structured programming language" or an "object-oriented programming language"--although there are some exceptions to this rule.

In the Markman Order, the Court ultimately agreed with the Special Master that an "object key" need not be executed in an object-oriented program and hence need not be self-contained. Paone's implicit reference to object-oriented programming did not limit the technical [**62] execution of the invention to an object-oriented programming language. (See Markman Order at 25-26 ("The claim language and specification say nothing that indicates that the invention must be practiced using a computer programming language that prevents other parts of the program from modifying the object key's data,

such as an object-oriented programming language would do. Indeed, the patent does not even suggest that this would benefit the invention.").)

However, the Court respectfully disagreed with the Special Master's determination that the word "object" in the claim term connotes no special meaning in the context of the patent. Rather, the Court construed an "object key" as an encryption key that is not available to the general public, and which is composed of both (1) key data and (2) methods that modify that key data. Specifically, the Court held that "object key" refers to an element of the invention that functions analogously to an object in an object-oriented program. Just like a bona fide object in an object-oriented program, the "object key" contains both data--the key data that will inform the operation of the cipher--and the methods that operate on that data. More importantly, [**63] just as in an object-oriented program, the methods contained in the object key are the only methods that operate on the key data.

## 2. As to the TKIP Technology

In short, the Defendant argues that TKIP does not encrypt "object keys", as that phrase has been defined by the Court. According to Microsoft, the Plaintiff's expert Dr. Blaze admitted that (1) certain data he identifies as object key data is never modified; and (2) other data he identifies as object key data is modified, but not by the alleged methods of those object keys. Thus, according to the Defendant, the requirement that the object key data be modified and that it be modified by the methods contained in that object key are not satisfied and thus TKIP cannot be found to infringe the '789 patent.

In order to fully assess the Defendant's claims in this regard, the Court must endeavor to explore the technology in TKIP [*410] that is alleged to be equivalent to the "object keys" in Paone's patent. Dr. Blaze identified two values in TKIP as key data. First, he alleged that the initial state of the data of the "object key" used in the TKIP encryption --the TKIP-mixed transmit address and key ("TTAK")--is key data. Second, he identified the [**64] per-frame keys in TKIP encryption, or "WEP seeds", which are produced as a result of the methods of the "object key", as key data. The latter are, in essence, subsequent modified versions of the initial "object key". In addition, the Plaintiff's expert identified one method, referred to as "phase 2 key mixing," that he alleges is the method of TKIP's "object key". The

881 F. Supp. 2d 386, *410; 2012 U.S. Dist. LEXIS 105990, **64

Defendant provided a simplified diagram showing the relationship of these three elements:



However, according to the Defendant, Dr. Blaze admitted that the first data value, TTAK, is not modified by any method because it remains unchanged for many MPDUs or "blocks". More specifically, under the TKIP encryption process, the TTAK value remains unchanged for 65,000 MPDUs, at which point a new TTAK is calculated. (See IEEE 802.11 standard.) The Defendant further emphasizes that while the WEP seed value is different for each encrypted MPDU, it is not modified by the "phase 2 key mixing" method. Rather, the WEP value changes due to another value that is an input to the phase 2 key mixing function. Put simply, Microsoft alleges that this specific object key data is modified, but not pursuant to the object key's method. Thus, according [**65] to the Defendant, the following diagram is an accurate description of the undisputed facts in this case:



To summarize, Microsoft contends that it is undisputed that the TTAK value--one form of object key data--remains unchanged for many blocks, and the WEP seed data value--another form of object key data--changes from block to block, but is not changed by the "method" of the TKIP object key.

On the other hand, these contentions are based solely upon interpretations of Dr. Blaze's expert testimony and reports. Moreover, the above pictorial representations of TKIP are highly simplified. In Dr. Blaze's declaration, he has provided a more comprehensive diagram of how TKIP actually operates:

[*411]



Figure 8-4—TKIP encapsulation block diagram

According to the Plaintiff, TKIP literally meets the "object key" limitation of the asserted claims, as construed by the Court. First, the TTAK is determined by the phase-1 mixing function, which utilizes as inputs (1) a transmitted address value (TA), (2) a temporal key value (TK) (the secret key), and (3) a TKIP sequence counter value (TSC). The TTAK is "not available to the general public" as required by the Court, which the Defendant does not dispute. More importantly, the Plaintiff also contends that [**66] TKIP's "object key" comprises methods that modify the TTAK. For instance, the phase 2 mixing function is a method that modifies the TTAK, and thereby produces modified versions of the "object key" data--otherwise known as "WEP seeds" or per-frame seeds--for each block of input plaintext data. (See Blaze Decl. at ¶ 52-54.) Thus, with regard to the fact that the same TTAK value is used for multiple MPDUs, the Plaintiff argues that TTAK is nevertheless modified because the phase 2 mixing function modifies it in every block to form the WEP seed. With regard to the fact that the "WEP seeds" are not input into the phase-2 mixing function, the Plaintiff essentially contends that this is irrelevant because there is "key data"--the TTAK--and the phase 2 key mixing is modifying that key data. Case 2:07-cv-02973-ADS Document 169 Filed 07/30/12 Page 41 of 68 PageID #: 4607

With regard to the first alleged element of key data--the TTAK--the Defendant maintains that it is merely an "input" to be used in the phase 2 mixing process and consequently TTAK is not modified, but rather acts only as a building block to create the WEP seed. On the other hand, the Plaintiff argues that TTAK, by being used in a mixing [**67] function that creates the WEP seed, is in fact being modified for each block or MPDU. An analogy in this regard may be helpful. The Defendant views TTAK as one brick, which is utilized in the building process to create a home. Seen in this light, the brick is not "modified"--it remains a brick, yet it is used as a building block to create something new. The

Plaintiff views TTAK as basic white paint, which is then mixed with other colors, such as red, green, and blue, to create a new brown color. If looked at from this perspective, the white paint has clearly been "modified" to create a new color of paint.

As a preliminary matter, the Court declines to adopt a narrower definition of "modify" than was set out in the Markman Order. Any notion by the Plaintiff that modify must mean that a mutation occurs, is disregarded. Rather, the Court has previously construed the modification of object key data as follows:

> [*412] In the opinion of the Court, this language implies that the object key's data--whether in original or already modified form--is an input into the object key's new state. (See, e.g., "Modify", Merriam Webster Online Dictionary, available online at <http://www.merriam-webster.com/dictionary/modify> [**68] ("3a: to make minor changes in; 3b: to make basic or fundamental changes in often to give a new orientation to or to serve a new end <the wing of a bird is an arm modified for flying>") (accessed February 2, 2011)). . . . There is no limitation on including other inputs into the modification algorithm--and indeed, claim 1 and claim 32 require additional inputs--but the object key's own data is a required input to "modify" the object key.

(Markman Order at 37.) Thus, the Court's previous interpretation of the term "modify" relied upon the plain meaning of the term, and specifically stated that the language implied that the object key's data is an *input* into the object key's new state.

Here, the evidence put forth by the parties clearly indicates that TTAK is, at a minimum, an input into the phase 2 mixing function, and thus is utilized in the process in order to create the resulting data--the WEP seed. The relevant protocol states that phase 2 comprises three steps: (1) Step 1 makes a copy of TTAK and brings in the TSC; (2) Step 2 is a 96-bit bijective mixing, employing an S-box; and (3) Step 3 brings in the last of the temporal key TK bits and assigns the 24-bit WEP IV value. (IEEE Standard [**69] 802.11, at 178.) A figure

that lays out each step for the phase 2 mixing function also appears in the protocol:

[*413] **Input**:intermediate key TTAK0... TTAK4, TK, and TKIP sequence counter TSC

**Output**:WEP Seed WEPSeed0...WEPSeed15

PHASE2-KEY-MIXING(TTAK0... TTAK4, TK0... TK15... TSC5)

PHASE2_STEP1:

PPK0 <- TTAK0

PPK1 <- TTAK1

PPK2 <- TTAK2

PPK3 <- TTAK3

PPK4 <- TTAK4

PPK5       <- TTAK4+Mk16(TSC1, TSC0)

PHASE2_STEP2:
PPK0 <- PPK0 + S[PPK5 [#x2295]   Mk16(TK1, TK0)]

PPK1  <-  PPK1  + S[PPK0   [#x2295] Mk16(TK3, TK2)]

PPK2  ->  PPK2  + S[PPK1   [#x2295] Mk16(TK5, TK4)]

PPK3 [darr] PPK3 + S[PPK2   [#x2295] Mk16(TK7, TK6)]

PPK4  <-  PPK4  + S[PPK3   [#x2295] Mk16(TK9, TK8)]

PPK5  <-  PPK5  + S[PPK4   [#x2295] Mk16(TK11, TK10)]

PPK0  <-  PPK0  +

881 F. Supp. 2d 386, *413; 2012 U.S. Dist. LEXIS 105990, **69

RotR1(PPK5    [#x2295]
Mk16(TK13, TK12))

    PPK1  <-  PPK1  +
RotR1(PPK0    [#x2295]
Mk16(TK15, TK14))

    PPK2  <-  PPK2  +
RotR1(PPK51)

    PPK3  <-  PPK3  +
RotR1(PPK52)

    PPK4  <-  PPK4  +
RotR1(PPK53)

    PPK5  <-  PPK5  +
RotR1(PPK54)

PHASE2_STEP3:
        WEPSeed-0 <- TSC1

    WEPSeed-1 <- TSC1 |
0x20) & 0x7F

    WEPSeed-2 <- TSC0

    WEPSeed-3         <-
Lo8((PPK5 + Mk16(TK1,
TK0))>>1)

    for i=0 to 5

    WEPSeed4+(2.i)    <-
Lo8(PPKi)

    WEPSeed5+(2.i)    <-
Lo8(PPKi)

        end

**return** WEPSeed... WEPSeed15

### Figure 8-14--Phase 2 key mixing

Thus, it appears to the Court that TTAK could inform the operation of the cipher, and the method of the phase 2 mixing function may operate on the [**70] TTAK. For instance, the process plainly specifies that TTAK is subject to bijective mixing, employing an S-box, and the figure demonstrates that several

algorithms function on the TTAK data. Moreover, Dr. Blaze testified that "I'm identifying--to the extent that the TTAK is the data of the object key, I believe that the data of the object key can be considered to be TTAK initially, and then as we operate that data, the data of the object key is the WEP seed." (Blaze 9/3/2011 Tr. at 83.)

Moreover, TKIP clearly requires that TTAK is copied for each block before the data is used or manipulated. The Defendant seems to argue that because TTAK is copied for each block and consequently utilized in the same format for every block, that it cannot be deemed "modified". However, the Court understands this fact as actually undercutting the Defendant's position. It is precisely because TTAK is [*414] copied for each block for use in the phase 2 mixing function, that there appears to be evidence to support the finding that TTAK is modified. If it were not, then there would be no need to copy the data; instead, the same master copy could be utilized for each block. In addition, the Defendant argues that "Dr. [**71] Blaze admitted that the TTAK value is not modified by any method because it remains unchanged for many, many MPDUs." (Pl. Mem. at 14.) However, that is a mischaracterization of Dr. Blaze's testimony. When asked, "So if the implementation of the TKIP recalculates the TTAK for every MPDU in a session, there will be many, many, many MPDUs with the same TTAK", Dr. Blaze testified "With the same resulting calculation, that's right". (Blaze 9/3/2011 Tr. at 84:17-22.) However, that only means that the TTAK input might be the same from block to block. It does not mean, as Microsoft attempts to argue, that the input cannot be modified *within* a block. In fact, Dr. Blaze further responded to that line of questioning by stating "because the method is the Phase 2 key mixing, which will modify it, producing a different WEP seed for each packet." (Id. at 85:3-5.)

Finally, to the extent that the phase 2 key mixing combines TTAK with another input--TSC--for use in the mixing function, does not preclude a possible finding that TTKIP infringes the "object key" claim limitation. The Court specifically noted in the Markman Order that "[t]here is no limitation on including other inputs into the modification [**72] algorithm--and indeed, claim 1 and claim 32 require additional inputs--but the object key's own data is a required input to 'modify' the object key." (Markman Order at 37.)

Other than using the terminology of "input" rather

881 F. Supp. 2d 386, *414; 2012 U.S. Dist. LEXIS 105990, **72

than "change" or "modify", the Defendant has not presented the Court with any evidence or otherwise pointed to sufficient deficiencies in the Plaintiff's evidence to demonstrate that there is an absence of a genuine issue of material fact in this regard. Rather, the Court finds that there is a dispute as to what functionally happens to the TTAK data when it is processed in the phase 2 mixing function. The Court is merely provided with what is essentially an algorithm, and the parties' competing explanations over what that means in plain terms. The Plaintiff's expert claims that the data is, under the Court's definition, "modified", in that it is put through the mixer function and utilized in a way to create something new--the WEP seed. The Defendant does not provide its own expert report or testimony, but rather attempts to poke holes in the Plaintiff's case by pointing to gaps in Blaze's opinion and grasping at whatever arguable admissions he makes. What the Court [**73] does not have before it at this stage of the proceedings is enough evidence to make this determination. All the Court has is Blaze's testimony and the TKIP protocol language itself. As indicated above, the party seeking summary judgment has the initial burden of showing that no issue of material fact exists. Thus, Microsoft has failed at this stage to meet its burden to demonstrate an absence of genuine issue of material fact.

Paone's expert testified to his understanding that TTAK is modified, and the Court sees no reason at this point to disregard that opinion. Based on the highly complicated and sophisticated nature of this case, it is simply not a situation where the Court can rely on Microsoft's legal arguments and positions in their memorandum of law to resolve the issue of how this encryption process functions. As stated long ago by the Fifth Circuit:

> Where by the nature of things, the moving papers themselves demonstrate that there is inherent in the problem a factual controversy then, while it is certainly [*415] the part of prudence for the advocate to file one, a categorical counter-affidavit is not essential. Bruce Construction Corp. v. United States, 5 Cir., 242 F.2d 873; Whitaker v. Coleman, 5 Cir., 115 F.2d 305.

> How [**74] thoroughly the function of . . . purporting to state facts in support

of motions for summary judgment was confused with the laudable function of the advocate and the hope that counsel's observations could take the place of testimony normally offered is further evident. [The Plaintiff] undertakes to compare, claim by claim, step by step, each of the two operations. From this he then concludes as a fact that for which expert witnesses are normally used. Analyzing it step by step substantially . . . he asserts that the patent claims 'read on' each of these ingredients. We may assume that an expert patent counsel or engineer might be permitted in proper circumstances to give such evidence, but in an appliance so remote from the common experience of Judges, it will be an unusual case in which this 'fact' is compulsorily established as a matter to law.

Inglett & Co. v. Everglades Fertilizer Co., 255 F.2d 342, 349 (5th Cir. 1958).

Counsel has set out to explain facts, fueled by certain statements made by the Plaintiff's expert, and then compares claim by claim, step by step, each of the relevant technologies. From this, Microsoft concludes that the TTAK is not modified. However, this computer [**75] encryption technology is simply too remote a common experience of judges, so that the "fact" of non-modification cannot be established as a matter of law. "[W]ithout impugning any improper professional motive to this obviously able counsel, [the Court] doubt[s] that the disposition of patent cases is furthered by counsel being the personal vehicle by which the 'undisputed' facts are put before the Court. [The Court] consider[s] it a tribute to the high calling of advocacy to say that we think it an unnatural, if not virtually impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the somber garb of an objective fact-stater." Id. "Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony." Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1068 (Fed. Cir. 2005); see Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd., 482 F. Supp. 2d 1045, 1065 (N.D. Ind. 2007) ("Such wholly conclusory assertions on a legal issue cannot carry

881 F. Supp. 2d 386, *415; 2012 U.S. Dist. LEXIS 105990, **75

Tranquil's burden on summary judgment) (citing Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1353 (Fed. Cir. 2001)).

In [**76] sum, the Defendant has not met its burden in demonstrating that there are no genuine issues of material fact pertaining to whether TKIP contains an "object key". The technical questions concerning the concept of encryption processes and algorithms, specifically what happens to the TTAK data during the phase-2 mixing function, cannot be resolved as a matter of law on the record presently before the Court. By reason of the extremely technical nature of the fact question involved, the Court feels as did the Court of Appeals in the Second Circuit: 'Were we skilled in the art it might be simple to determine whether there was any 'genuine issue' as to any material fact * * * but we lack that special knowledge which would permit us to read the patents so understandingly and this record is barren of proof to enable us to do so." Bridgeport Brass Co. v. Bostwick Labs., Inc., 181 F.2d 315-19 (2d Cir. 1950); see, e.g., Acoustiflex Corp. v. Owens-Corning Fiberglas Corp., 572 F. Supp. 936, 937 (N.D. Ill. 1983) ("[A] patent case is not ripe for summary judgment on the issues of validity or enforceability [*416] where the technical aspects are not readily comprehensible by one unskilled in the art, where [**77] the record is inadequate to decide the issue, where there is a need for expert testimony, where the expert testimony submitted is conflicting, or where there is some other genuine issue of credibility on a motion for summary judgment."); see also May v. Carriage, Inc., 688 F. Supp. 408, 413 (N.D. Ind. 1988) ("Many patent cases are virtually impossible to decide on summary judgment due to the need for expert testimony relating to technical or scientific matters beyond the court's expertise."). Cf. Shemitz v. Deere & Co., Inc., 623 F.2d 1180, 1184 (7th Cir. 1980) ("Rule 56 applies to patent cases and is used where, as here, the structure and mode of operation of the invention described and claimed in the patent may be readily comprehended by the court without need for technical explanation by expert witnesses and in such circumstances; if said invention is found invalid because of the prior art, then summary judgment is proper."); G.B. Lewis Company v. Gould Products, Inc., 436 F.2d 1176 (2d Cir. 1971) (finding summary judgment appropriate in design patent cases because expert testimony would not aid the Court in evaluating non-technical matters of visual impression).

With regard to the [**78] WEP seed, Microsoft also contends that the existence of an element that the Plaintiff labels as "key data", but that is not modified by the method contained in the object key, similarly warrants a finding of summary judgment as to the TKIP technology. The Court agrees with the Defendant that the evidence clearly demonstrates that there is no question of fact that WEP is not modified by the only process identified as being part of the "object key"--the phase 2 mixing. In fact, the Plaintiff admits that the WEP seed is an output of the process, and logically, cannot be modified by the process that created it. Thus, the Court finds, as a matter of law, that the WEP seed cannot be object key data under the terms of the patent.

However, this finding does not alter the Court's finding as to the denial of summary judgment on this issue. The patent only requires the "at least one [dynamic] object key". Thus, even if the Court were to disregard the existence of the WEP seed, the TKIP technology still possibly meets the limitations of the patent claims because the TTAK and phase 2 mixing function might nevertheless qualify as an object key, of which there must be "at least one." As long as TTAK [**79] may possibly meet the claims limitations, the WEP seed is irrelevant. For this reason, the Defendant's arguments in this regard are denied.

### 3. As to the BitLocker Technology

BitLocker, the other accused technology of Microsoft, uses an algorithm, implemented in software, to encrypt and decrypt data on a system volume in blocks corresponding to disk sectors. In the BitLocker encryption process, for each fixed-size disk sector to be encrypted, a 512-bit key, comprising a sector key component ("$K_{SEC}$") and an AES-CBC component ("$K_{AES}$"), is allegedly "modified" by the methods described by the following equation:

$$K_s := E(K_{sec}, e(s)) \,\|\, E(K_{sec}, e'(s))$$

$E(\ )$ is the AES encryption function, and $e(\ )$ and $e'(\ )$ are encoding functions. This results in a different modified key for each disk sector. (Blaze Decl., at ¶ 57-58.)

[*417] With regard to BitLocker, the Defendant

Case No. 1:11-cv-00520-RM-NYW   Document 646-5   filed 11/04/13   USDC Colorado   pg 45 of 84

Page 24

881 F. Supp. 2d 386, *417; 2012 U.S. Dist. LEXIS 105990, **79

claims that Dr. Blaze repeated the same faulty analysis in connection with consideration of the alleged "object key" in this technology. Dr. Blaze identified certain data values that he claimed were the "key data" of BitLocker's "object key": "KSEC", "KAES", and KS. He also identified two "methods" in BitLocker that modify the key data.

[remainder of page intentionally left blank]



However, [**80] according to Microsoft, Dr. Blaze admitted that two of the three key data values--"K$_{SEC}$" and "K$_{AES}$"--are never modified at all, and remain the same for every block encrypted. Moreover, although KS does vary from block to block, it does not do so pursuant to the "key method" identified by Dr. Blaze. (See Blaze 9/13/2011 Tr. at 117-18 ("No, the KS value of a previous sector is not one of the inputs to this equation [used to derive KS]").) Therefore, Microsoft contends that the undisputed record can be accurately depicted by the following simplified diagram:



Microsoft's arguments in this regard are nearly identical to those in the TKIP context. Microsoft contends that KSEC and KAES are merely "inputs" into the identified key methods and that these inputs are identical from block to block, so that it cannot be said that they are ever "modified" under the Court's claim construction. However, once again the Defendant misconstrues the Plaintiff's expert's supposed "admissions", and fails to offer any evidence of its own to demonstrate that there are no issues of fact as to this highly complicated encryption technology.

Instead, it appears to the Court that there may be an issue of fact as to [**81] whether the identified key data--namely KSEC and KAES--are modified by the supposed BitLocker object-key methods. For instance, the BitLocker Whitepaper (Pl. Ex. G) describes how KAES is used in a function--E (KAES, e(s))--and then the plaintext is encoded using the output of that function and one of the relevant methods--AES-CBC. The Plaintiff's expert provides support for this evidence. He maintains that the initial-state key data, specifically a 512-bit [*418] key, comprising KSEC and KAES, is repeatedly modified by the methods defined in the relevant equation. He states that the 512-bit key for BitLocker "is modified by the identified methods because those methods take the initial state data as input and change it to produce a different output--the modified key, comprising KS and KAES."

The Defendant's contention that "because . . . KSEC and KAES (the supposed object key data) are inputs into the equation that Dr. Blaze says is the object key method, the result of running that equation is not that KSEC and KAES change, but rather that a new value of a different item, KS, is created." Once again, that does not preclude a finding that those two data values are not "modified". The Defendant has [**82] provided nothing except for its own interpretation of the technology, that running the equation does not modify the data. This is insufficient for the Court to find that there is no question of fact as to whether this data is in fact "modified" under the plain meaning this Court has given this term. This is not to say that simply because something is an "input", then it automatically means it is "modified". However, it is a question that should rightfully go to jury and cannot be determined by this Court at this juncture based on the record before it.

With regard to KS, as with the WEP seed above, the Court agrees that it cannot be "key data" under the object key claims limitation as a matter of law. However, to the extent KSEC and KAES may possibly be found to be modified for each block pursuant to the process contained in the object key, then the claims limitation may nevertheless be satisfied.

Accordingly, the Defendant's motion for summary judgment in connection with the "object key" claims limitation is denied.

On a final note, in its opposition brief to the instant summary judgment motion, the Plaintiff raises the

argument that both TKIP and BitLocker satisfy the "object key" limitation [**83] under the doctrine of equivalents. The Defendant characterizes this as a "surprise infringement theory" because Dr. Blaze never offered a doctrine of equivalents theory for "object key" in any of his expert reports and accordingly, Microsoft contends that it should be discarded as in violation of Fed. R. Civ. P. 26 and Local Rule 56.1. The Court agrees with the Defendant that the Plaintiff may not be permitted at this late stage of the litigation to assert a new theory of liability. Munoz v. City of New York, No. 04 Civ. 1105, 2008 U.S. Dist. LEXIS 12305, 2008 WL 464236, at *7 (S.D.N.Y. Feb. 20, 2008) ("In general, plaintiffs are not permitted to raise new theories of their case in opposition to a motion for summary judgment.") (citing Rendely v. Town of Huntington, No. 03 Civ. 03805, 2006 U.S. Dist. LEXIS 97203, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006)). Thus, to the extent the Plaintiff raises any doctrine of equivalents arguments in connection with the "object key", these contentions will be disregarded.

### E. As to Whether TKIP and Bitlocker Satisfy the "Repeating Step"

Finally, the Defendant claims that the Court should hold that Microsoft has not infringed either of claims 2 and 33 with regard to either TKIP or BitLocker. Claims 2 [**84] and 33 are each directed at a method for encrypting data, as opposed to the system claims. Each of these claims requires, in part, the steps of:

> o "creating at least one object key in a block cipher,"
>
> o "modifying the at least one object key . . .," and
>
> o "repeating the steps of modifying the at least one object key, modifying the key schedule and encrypting utilizing the modified key schedule until the [*419] encrypting of blocks of plaintext data is completed."

In the Markman Order, the Court found the claim term "repeating the step[] of modifying the at least one object key" to be understood as limited, because the Court construed this to mean that the object key's data, as it presently exists in the object key at each instance of modification, must be an input into the modification methods of that object key. In light of this construction,

Paone no longer contends that these claims are literally infringed by either technology. (Def. Ex. C, at ¶ 5.) This is because the key modification methods performed by TKIP and BitLocker differ from the "repeating step" of the asserted claims in that the initial state of the "object key" data is repeatedly input into the "object key" methods for each input [**85] block of plaintext data, rather than the output of the "object key" methods being input into those methods for the next block of input plaintext data. (See Blaze Decl., at ¶¶ 68-70.) Thus, the Court now holds, as a matter of law, that there has been no literal infringement of claims 2 or 33.

In addition, the Defendant also urges the Court to find that Paone is barred by prosecution history estoppel from asserting that the use of TKIP or BitLocker satisfies the recited "repeated" step under the doctrine of equivalents. For its part, the Plaintiff claims that even though prosecution history estoppel is presented as a question of law, it raises a number of genuine issues of underlying material fact that are vigorously disputed by the parties, and thus is not a matter for summary judgment.

#### 1. Prosecution History Estoppel

Prosecution history estoppel may, as a matter of law, prevent a patentee from subsequently relying on the doctrine of equivalents for a particular claim limitation. Bai v. L & L Wings, Inc., 160 F.3d 1350, 1354 (Fed. Cir. 1998). Amendment-based prosecution history estoppel "arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." [**86] Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 736, 122 S. Ct. 1831, 152 L. Ed. 2d 944 (2002). Thus, prosecution history estoppel limits the range of equivalents covered by a patent claim when the claim has been distinguished from relevant prior art during prosecution of the patent. In other words, it stops a patentee from attempting to recapture through equivalence certain claims coverage given up during prosecution. Whatever subject matter was distinguished from the patent claim is deemed surrendered by the patentee, and cannot be recaptured by claims of infringement under the doctrine of equivalents. See Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1578-79 (Fed. Cir. 1995). When a court applies the doctrine of prosecution history estoppel, "a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender." Id.

881 F. Supp. 2d 386, *419; 2012 U.S. Dist. LEXIS 105990, **86

at 1580 (quotations and citations omitted).

"A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." Festo, 535 U.S. at 740, 122 S. Ct. 1831. But the patentee may rebut this presumption [**87] by "demonstrat[ing] that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was 'some other reason' suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd. ("Festo [*420] II"), 344 F.3d 1359, 1368 (Fed. Cir. 2003) (en banc) (quoting Festo, 535 U.S. at 741, 122 S. Ct. 1831). The Court will address in turn the presumption of surrender and Paone's effort to rebut that presumption.

**2. Presumption of Surrender**

During prosecution, Paone narrowed the scope of the '789 patent by filing amendments to his application claims that specifically recited the repeated step language. As explained above, claim 1 is incorporated by reference into claim 2. The original application for claim 1 was filed as follows:

> 1. A computer implemented method for encrypting data comprising the steps of:
>
> creating an object key comprising data and methods that operate on said data; and
>
> encrypting input plaintext data utilizing said object [**88] key in conjunction with an encryption process.

(Paone's 56.1, at ¶ 8.) Application claim 10, as originally filed, depended on claim 1. ('789 File History at MSLP0854062-64, Def. Ex. H.) Application claim 10 further required that the "object key" be "dynamic" and that "a modification method of said object key includes a hashing function." (Id. at 64.)

The Patent Office initially rejected these claims, in part because of prior art disclosures in the "Wood patent", U.S. Patent 5003596. ('789 File History, Def. Ex. H.) In

this regard, on March 16, 2000, the PTO issued a communication, known as an "office action", during prosecution of the '789 patent, which stated:

> As per claim 1, the claimed invention teaches encrypting input plaintext using an object key where the object key comprises data and methods. Wood (US 5003596) teaches a block encryption method to convert a block of input plaintext into a unique block of ciphertext (see column 3, lines 38-40 and Fig. 1). In the method of Wood (US 5003596), encryption keys are selected from a key table for use in the encryption process (column 3, lines 66-68). The block encryption method in Wood (US 5003596) differs from the block encryption method [**89] in claim 1 since the encryption keys in Wood (US 5003596) are not object keys as defined in claim 1.
>
> [However], one of ordinary skill in the art of programming would know to code the encryption keys in Wood (US 5003596) . . . to create an encryption key object . . . .

(See '789 patent file history, 3/16/2000 Office Action at 3 (MSLP0854434).) Paone understood the Wood reference as teaching a static key schedule. In other words, while each plaintext input block in Wood would be encrypted uniquely, this was based solely on the combination of an unchanging key schedule (table), the current state of the cypher text, and what were referred to as "mask values".

The major difference between the two innovations, according to Paone, was that his invention used a dynamic object key to create a dynamic key schedule for each block. Thus, the object key and the key schedule were changing for each block of plaintext data. Accordingly, to distinguish his invention over the prior art, Paone undisputedly modified his application claim 1 by amending it to include five additional steps, one of which was the "repeating" step. The following demonstrates the relevant revisions to the claim language:

> A computer [**90] implemented method for encrypting data comprising the steps of:

881 F. Supp. 2d 386, *420; 2012 U.S. Dist. LEXIS 105990, **90

creating [an] at least one object key in a block cipher, the at least one object key comprising data and methods that operate on said data;

creating a key schedule based upon the at least one object key;

encrypting a block of input plaintext data utilizing said [object] key schedule; [*421] [in conjunction with an encryption process]

modifying the at least one object key;

modifying the key schedule based upon the at least one modified object key;

encrypting a next block of input plaintext data utilizing said modified key schedule; and

*repeating the steps of modifying the at least one object key, modifying the key schedule and encrypting utilizing the modified key schedule until the encrypting of blocks of plaintext data is completed*.

(Id. at ¶ 15 (emphasis added), '789 File History at MSLP0854544-45, Def. Ex. H.) As for the dependent claim 10, he rewrote the claim as a new independent claim--application claim 41 (now patent claim 32), and added the "repeating step" limitation to this as well. ('789 File History at MSLP0854640, Ex. H.) The following demonstrates the revisions to the claim language:

Application claim 41. (Newly added) A [**91] computer implemented method for encrypting data comprising the steps of:

creating [an] at least one object key in a block cipher, the at least one object key comprising data and methods that operate on said data;

creating a key schedule based upon the at least one object key; encrypting a block of input plaintext data utilizing said [object] key schedule; [in conjunction with an encryption process]

modifying the at least one object key using at least a non-linear function;

modifying the key schedule based upon the at least one modified object key;

encrypting a next block of input plaintext data utilizing said modified key schedule; and

*repeating the steps of modifying the at least one object key, modifying the key schedule and encrypting utilizing the modified key schedule until the encrypting of blocks of plaintext data is completed*.

(emphasis added).

Paone notified the Patent Office that the new claim 41 included the "allowable subject matter of claims 1 and 10." (Id. at 641.) To be clear, claim 41 was not amended to add the repeating step. Rather, this was a new independent claim that included this language. However, according to Microsoft, "the narrowing effect is the same because the [**92] claim language is the same in relevant part and patentees cannot make an end-run around prosecution history estoppel by rewriting dependent claims in independent form." (Def. Mem., at 22 (citing Honeywell Intern. Inc. v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1140 (Fed. Cir. 2004); Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc., 347 F.3d 1314, 1326 (Fed. Cir. 2003).) In sum, claim 1--which forms the basis of what is now claim 2--and claim 41--which forms the basis of what is now claim 33--were either amended or redrafted to include the "repeating step" limitation language, which is arguably narrower than the two-step method originally recited in the as-filed claims.

The Court agrees that based upon the particular circumstances of this case, namely, the relevant prosecution history, "[t]he mere fact that his claims were narrowed by rewriting them to include the repeating step creates a presumption that Mr. Paone added the step for the purpose of securing his patent" and thus there is a presumption against the availability of the doctrine of equivalents. (Def. Mem. at 23); see Warner-Jenkinson Co., 520 U.S. at 33; Festo II, 344 F.3d at 1366-67 ("When the prosecution [**93] history record reveals no reason for the narrowing amendment, Warner-Jenkinson presumes that the patentee had a substantial reason relating to patentability"). There is no [*422] indication in the prosecution history as to why Paone would have added the "repeating step" language were it not to secure

Page 28

881 F. Supp. 2d 386, *422; 2012 U.S. Dist. LEXIS 105990, **93

the patent. In fact, the prosecution history lends support to the idea that this was Paone's sole purpose for adding the language. Once Paone's patent application was rejected and his claims were rewritten and amended, he made several arguments to the Patent Office in order to distinguish his patent from the prior art of the Wood patent. Case 2:07-cv-02973-ADS Document 169 Filed 07/30/12 Page 58 of 68 PageID #: 4624

First, he maintained that the Wood patent disclosed encrypting with a "static" key schedule, whereas his claimed method, as amended, required a dynamic key schedule. The term "dynamic" was used to identify that the object key and the key schedule are being modified, i.e., changing, *with each input block of plaintext data.* Second, Paone contended that his claimed method, as amended, was patentable over the Wood patent because, unlike Wood, his key schedule was modified in a way that [**94] "is not dependent upon the input plaintext . . . ."

Third, and most relevant to the present inquiry, Paone argued that his claimed method, as amended, was patentable over the Wood patent not only because his key schedule changed with each block of input plaintext data, but also because the process of changing the key schedule based upon the object key data "continued," i.e., was repeated, "until all the plaintext had been encrypted". The August 16, 2000 Amendment submitted during prosecution of the '789 patent states:

> Accordingly, the present invention describes a novel encryption technique in which at least one object key is created, a key schedule is created based upon the at least one object key, a block of input plaintext data is encrypted using the key schedule, the object key is then modified, *the modified object key is used to create a modified key schedule, and this modified key schedule is used to encrypt the next block of input plaintext data. This method is continued until all plaintext data has been encrypted.*

('789 patent file history, 8/16/2000 Amendment at 15) (emphasis added). Based upon these arguments to the Patent Office, it appears obvious to the Court that Paone added [**95] the repeating step limitation for the purpose of securing his patent. See Festo, 535 U.S. at 727, 122 S. Ct. 1831 ("When the patentee responds to the rejection by narrowing his claims, this prosecution history estops him from later arguing that the subject matter covered by the original, broader claim was nothing more than an equivalent." (emphasis added)); id. at 734, 122 S. Ct. 1831 ("[A patentee's] decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim." (emphasis added)); id. at 740, 122 S. Ct. 1831 ("A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." (emphasis added)).

Certainly, one crucial difference between the Wood prior art and Paone's application was that the key schedule in Wood was static, while the key schedule in Paone was dynamic. Moreover, another key distinction was that Paone's key schedule was created based upon a dynamic object key, rather than the plaintext or the ciphertext as in the Wood patent. However, it is the addition of language describing [**96] the extrapolation from these two facts--the repeating step--that was a crucial for Paone to secure his patent. The creation of a key schedule for each block based upon a modified object key was only a part of what distinguished Paone's invention from the prior art. What accomplished the full distinction was that a modified object key would create a modified key schedule for [*423] each and every new block of plaintext data, until all of the data had been encrypted. Put another way, "repeating the steps of modifying the at least one object key, modifying the key schedule and encrypting utilizing the modified key schedule until the encrypting of blocks of plaintext data is completed", was a necessary final step of the process in Paone's application to help distinguish his invention over prior art. Without the "repeating step", an object key would be created; a key schedule would be created; a block would be encrypted; both the object key and key schedule would be modified; and then the next block would be encrypted utilizing the modified key schedule. However, it appears from the prosecution record that the recurrence and dependence of these steps was not entirely clear without the addition of [**97] the repeating step language. It is the repetitive nature of modifying the object key for each block, and in turn modifying the key schedule for each block, that truly made Paone's patent application unique. Thus, in part to overcome the Wood patent, it was necessary to include a statement that every single block is subject to a modified key schedule based

Case No. 1:11-cv-00520-RM-NYW   Document 646-5   filed 11/04/13   USDC Colorado   pg 50 of 84

Page 29

881 F. Supp. 2d 386, *423; 2012 U.S. Dist. LEXIS 105990, **97

upon a modified object key.

Although claim 41 (which now forms the basis of claim 33) was not an amended claim *per se*, but rather a rewritten new independent claim, this is irrelevant. Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc., 347 F.3d 1314, 1325 (Fed. Cir. 2003) ("Deering's addition of [a rewritten independent claim], coupled with the clear surrender of the broader subject matter of the deleted original independent claim presumptively bars Deering from arguing infringement under the doctrine of equivalents."); see also Honeywell, 370 F.3d at 1142 ("[T]he fact that the scope of the rewritten claim has remained unchanged will not preclude the application of prosecution history estoppel if, by canceling the original independent claim and rewriting the dependent claims into independent form, the scope of [**98] subject matter claimed in the independent claim has been narrowed to secure the patent.").

Furthermore, it is also immaterial that that the amendments were to application claims 1 and 41, rather than to application claims 2 and 33, which are the present basis for Paone's alleged infringed claims. The presumption of surrender "applies to all claims containing the [added] [l]imitation, regardless of whether the claim was, or was not, amended during prosecution." Deering, 347 F.3d at 1326; see also Builders Concrete, Inc. v. Bremerton Concrete Prods. Co., 757 F.2d 255, 260 (Fed. Cir. 1985) ("[T]he prosecution history of all claims is not insulated from review in connection with determining the fair scope of [the asserted claim]. To hold otherwise would be to exalt form over substance and distort the logic of this jurisprudence, which serves as an effective and useful guide to the understanding of patent claims. The fact that the [the limitation in question] was not itself amended during prosecution does not mean that it can be extended by the doctrine of equivalents to cover the precise subject matter that was relinquished in order to obtain allowance of [another claim].").

The Plaintiff [**99] argues that the addition of the "repeating step" did not narrow the scope of the asserted claims, so that the presumption of prosecution history estoppel need not apply. In particular, Paone contends that Dr. Blaze has explained that one of ordinary skill in the art would have understood the addition of the "repeating step" to have merely explicitly clarified a requirement that was already implicit in the claims as

previously written--namely, that the "object key" data was to be repeatedly modified by "object key" methods. (Blaze Decl., at ¶¶ 83-84.) However, this argument is without merit. Dr. [*424] Blaze's interpretation of what was "implicit" in the original patent application is not determinative. Rather, it is the prosecution history record that is significant.

The initial application included the creation of an object key to play a role in the encryption of input plaintext data, in which the object key would have both data and methods that operate on said data. While it may have been implicit that the object key would change -- application 10 did state that the "object key" would be "dynamic" -- it is not plain from the initial application that the process of changing the object key, [**100] and consequently the key schedule, continued for every single block of plaintext data until the entire document or image was encrypted. While this may have been implicit to Paone, there is nothing in the prosecution history to support that notion. Moreover, the Court rejects the idea that repeating the modification of the object key was so obvious, that it need not have been included because it did not act to narrow the claims. "[C]laims are interpreted with an eye toward giving effect to all terms in the claim." Bicon, Inc. v. Straumann Co., 441 F.3d 945, 950 (Fed. Cir. 2006) ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration."); see, e.g., Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1305, 1307 (Fed. Cir. 2000) (finding claim language "only within a zone extending between latitudes 30°-45°" did not read on a device with radiation sources extending [**101] between 14° and 43° because "[a]ny other conclusion renders the reference to 30° superfluous"); Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1563 (Fed. Cir. 1991) ("When the language of a claim is clear, as here, and a different interpretation would render meaningless express claim limitations, we do not resort to speculative interpretation based on claims not granted."); In re Danly, 46 C.C.P.A. 792, 263 F.2d 844, 847, 1959 Dec. Comm'r Pat. 212 (1959) (limiting claims to require that the claimed device actually be connected to an alternating current source because, although the claims "do not positively recite a source of alternating current as an element of the claims,"

881 F. Supp. 2d 386, *424; 2012 U.S. Dist. LEXIS 105990, **101

any other interpretation would render certain language in the claims meaningless).

Therefore, the Court agrees that there is a presumption that the "rendering step" limitation was added to the claims to narrow their scope to permit allowance.

### 3. Tangentiality

Nonetheless, Paone may rebut this presumption by showing, inter alia, that "the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question." Festo II, 344 F.3d at 1368. "[T]he patentee bears the burden of showing that a narrowing amendment [**102] did not surrender a particular equivalent . . . ." Festo, 344 F.3d at 1368. "Whether a patent-holder has successfully rebutted the Festo presumption of the surrender of equivalents is a question of law, which [is] review[ed] de novo." Amgen Inc. v. Hoechst Marion Roussel, Inc., 457 F.3d 1293, 1312 (Fed. Cir. 2006). It is a rare case in which the presumption is rebutted. As noted by Federal Circuit Judge Randall R. Rader in a concurring opinion five years ago, "Festo itself recognized that rebuttals under the tangential principle will be rare. . . . Cases in the interim have confirmed Festo's insight; only two cases have successfully invoked the tangential rebuttal principle in this court." Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 480 F.3d 1335, 1346 (Fed. Cir. 2007) (concurring).

[*425] "[A]n amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim. . . . [T]he inquiry into whether a patentee can rebut the Festo presumption under the 'tangential' criterion focuses on the patentee's objectively apparent reason for the narrowing amendment[, which must be] discernible from the prosecution history record. [**103] . . ." Id. at 1369; see Intervet Inc. v. Merial Ltd., 617 F.3d 1282, 1291 (Fed. Cir. 2010) ("Although there is no hard-and-fast test for what is and what is not a tangential relation, it is clear that an amendment made to avoid prior art that contains the equivalent in question is not tangential.").

"The scope of the estoppel must fit the nature of the narrowing amendment. A district court must look to the specifics of the amendment and the rejection that provoked the amendment to determine whether estoppel precludes the particular doctrine of equivalents argument

being made." Id.; See Festo, 535 U.S. at 737-38, 122 S. Ct. 1831 ("There is no reason why a narrowing amendment should be deemed to relinquish equivalents . . . beyond a fair interpretation of what was surrendered.").

Paone requests the Court to find that he has successfully rebutted the presumption of amendment-based prosecution history estoppel. Specifically, Paone argues that the accused equivalents differ from the claimed invention only in that in Microsoft's technologies, the repeating step of modifying the object key data is enacted solely through acts on the initial state of the data, rather than the output of the previous [**104] block's object key methods (i.e., modified object key data). This difference, Paone submits, is unrelated to the rationale for the amendment, which was to distinguish the claimed invention from the prior art based only on the static nature of Wood's key schedule.

The inquiry is "whether the reason for the narrowing amendment is peripheral, or not directly relevant, to the alleged equivalent." Festo II, 344 F.3d at 1369. The tangential rebuttal principle is quite narrow. Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 480 F.3d 1335, 1348 (Fed. Cir. 2007); see Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1306 (Fed. Cir. 2005) (distinguishing a case finding the tangentiality presumption rebutted as limited to situations in which the prosecution history clearly demonstrates that "the amendment and alleged equivalent involve different aspects of the invention").

Here, the applicant amended the claims to overcome prior art that encrypted data utilizing keys based on a static key schedule. In amending the claims, Paone added the additional steps, including the "repeating step", to demonstrate that object keys were modified for each block, which in turn modified the key [**105] schedule so that it was dynamic, and that these two modifications occurred for each and every block until the encryption was complete. Paone himself argued that the thrust of the novelty of his invention was not only that an object key was created, and that a key schedule was created based upon this object key, but that a modified object key would then go on to create a modified key schedule, in a somewhat domino effect, until all plaintext data had been encrypted. There is clearly more than a tangential relationship between the reason for the amendment and the accused equivalents. Case 2:07-cv-02973-ADS

881 F. Supp. 2d 386, *425; 2012 U.S. Dist. LEXIS 105990, **105

Document 169 Filed 07/30/12 Page 65 of 68 PageID #: 4631

Moreover, Paone's asserted reason for why this amendment is merely "peripheral" is that it was only meant to distinguish the claimed invention from the Wood prior art based upon the dynamic key schedule. However, it is not "objectively apparent" from Paone's arguments that he made the addition of the "repeating step" language only to address the dynamic key schedule. This is because from the initial filing to the [*426] PTO, Paone made clear throughout the application that the key schedule would be modified for each block. (See '789 Patent [**106] Application, at MSLP0854043 ("The key modification is performed for each input plaintext data block so that each data block is encrypted with a different key.").) Thus, Paone has identified no explanation in the prosecution history for the addition of the repeating step limitation. Therefore, Paone cannot meet his burden to show that the rationale for adding the repeating step limitation was tangential to the equivalents in question--using the initial state of the object key data (as opposed to the present state) as the input to the modification methods. The point of the repeating step was to indicate that Paone's advancement was the consistent loop: the object key would create the key schedule, a modified object key (based upon a random session key) would then create a modified key schedule, and so forth. This is precisely connected to--and not merely tangential to--the question of whether an object key's methods act upon key data that is modified or in its original state. The addition of the "repeating step" language is to ensure modification of the *already modified* object key.

Accordingly, the Court holds that Paone is barred by prosecution history estoppel from asserting infringement [**107] under the doctrine of equivalents as to the "repeating step" limitation.

For the foregoing reasons, the Court grants summary judgment of noninfringement of claims 2 and 33 with respect to both BitLocker and TKIP. Paone alleges infringement of these claims only under the doctrine of equivalents, and because he is barred from doing so, as a matter of law, by virtue of the doctrine of prosecution history estoppel, infringement of these claims is denied. Accordingly, the Defendant's summary judgment motion in this regard is granted.

**III. CONCLUSION**

Based upon the above findings, any infringement claims by Paone against Microsoft as to the method claims in the '789 patent--2 and 33--are dismissed. Consequently, any infringement claims as to the BitLocker technology are also dismissed. As to the remaining system claims asserted against Microsoft as to TKIP, these claims are still viable. Paone will need to demonstrate that TKIP meets each of the limitations in those two claims, either literally or under the doctrine of equivalents. In particular, there are questions of fact that remain as to whether TKIP meets the "block" limitation under the doctrine of equivalents and whether TKIP meets the [**108] "object key" limitation literally.

For the foregoing reasons, it is hereby

**ORDERED** that the Defendant's motion for summary judgment for a finding of no literal infringement as to the "block" and "block cipher" limitation in all claims is GRANTED; and it is further

**ORDERED** that the Defendant's motion for summary judgment for a finding of no infringement as to the "block" and "block cipher" limitation in all claims under the doctrine of equivalents is DENIED; and it is further

**ORDERED** that the Defendant's motion for summary judgment for a finding of no infringement as to the "object key" limitation in all claims is DENIED; and it is further Case 2:07-cv-02973-ADS Document 169 Filed 07/30/12 Page 67 of 68 PageID #: 4633

**ORDERED** that the Defendant's motion for summary judgment as to claims 2 and 33 is GRANTED; and it is further

**ORDERED** that the parties are directed to appear on Monday, August 6, 2012 at 9:30am for a conference to set a trial date.

**SO ORDERED**.

Dated: Central Islip, New York

July 30, 2012

undisputed record can be accurately*/s/ Arthur D. Spatt*

ARTHUR D. SPATT

881 F. Supp. 2d 386, *426; 2012 U.S. Dist. LEXIS 105990, **108

United States District Judge



**LG ELECTRONICS, INC., Plaintiff-Appellant, v. BIZCOM ELECTRONICS, INC., COMPAL ELECTRONICS, INC., and SCEPTRE TECHNOLOGIES, INC., Defendants-Cross Appellants, and EVEREX SYSTEMS, INC., Defendant-Appellee, and FIRST INTERNATIONAL COMPUTER INC. and FIRST INTERNATIONAL COMPUTER OF AMERICA, INC., Defendants-Cross Appellants, and Q-LITY COMPUTER, INC., QUANTA COMPUTER, INC., and QUANTA COMPUTER USA, INC., Defendants-Cross Appellants.**

**05-1261, -1262, -1263, -1264, -1302, -1303, -1304**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**453 F.3d 1364; 2006 U.S. App. LEXIS 16916; 79 U.S.P.Q.2D (BNA) 1443**

**July 7, 2006, Decided**

**SUBSEQUENT HISTORY:** Rehearing denied by, Rehearing, en banc, denied by LG Elecs., Inc. v. Bizcom Elecs., Inc., 2006 U.S. App. LEXIS 23211 (Fed. Cir., Sept. 1, 2006)
Motion granted by Quanta Computer, Inc. v. LG Elecs., Inc., 127 S. Ct. 1036, 166 L. Ed. 2d 699, 2007 U.S. LEXIS 24 (U.S., 2007)
Later proceeding at Quanta Computer, Inc. v. LG Elecs., Inc., 127 S. Ct. 2087, 167 L. Ed. 2d 762, 2007 U.S. LEXIS 3945 (U.S., 2007)
US Supreme Court certiorari granted by Quanta Computer, Inc. v. LG Elecs., Inc., 128 S. Ct. 28, 168 L. Ed. 2d 805, 2007 U.S. LEXIS 9068 (U.S., 2007)
Motion granted by Quanta Computer, Inc. v. LG Elecs., Inc., 128 S. Ct. 957, 169 L. Ed. 2d 721, 2008 U.S. LEXIS 118 (U.S., 2008)
Reversed by Quanta Computer v. Lg Electronics, 2008 U.S. LEXIS 4702 (U.S., June 9, 2008)

**PRIOR HISTORY:**     [**1] Appealed from: United States District Court for the Northern District of California, Judge Claudia Wilken.
LG Elecs., Inc. v. Bizcom Elecs., Inc., 2004 U.S. Dist. LEXIS 29906 (N.D. Cal., Nov. 30, 2004)
LG Elecs., Inc. v. Asustek Computer, Inc., 248 F. Supp.

2d 912, 2003 U.S. Dist. LEXIS 8924 (N.D. Cal., 2003)

**DISPOSITION:**                AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED.

**COUNSEL:** Richard G. Taranto, Farr & Taranto, of Washington, DC, argued for plaintiff-appellant. On the brief was Michael J. Schaengold, Patton Boggs LLP, of Washington, DC.

William J. Anthony, Jr., Orrick, Herrington & Sutcliffe LLP, of Menlo Park, California, argued for defendants-cross appellants Bizcom Electronics, Inc., et al. With him on the brief were Eric L. Wesenberg, Kaiwen Tseng, Matthew J. Hult and Rowena Y. Young.

Joseph L. Strabala, Law offices of Joseph L. Strabala, of San Francisco, California for defendant-appellee Everex Systems, Inc., joined in the co-defendants' briefs.

Ronald S. Lemieux, Paul, Hastings, Janofsky & Walker LLP, of Palo Alto, California for defendants-cross appellants First International Computer, Inc., et al. Of counsel on the brief was James M. Smith, Squire, Sanders

453 F.3d 1364, *; 2006 U.S. App. LEXIS 16916, **1;
79 U.S.P.Q.2D (BNA) 1443

& Dempsey L.L.P., of Palo Alto, California.

Terry D. Garnett, Paul, Hastings, Janofsky & Walker LLP, of Los Angeles, California for defendants-cross appellants Q-Lity Computer, Inc., et al. With [**2] him on the brief were Vinent K. Yip, Maxwell A. Fox, Peter J. Wied, Sang N. Dang and Jay C. Chiu. Of counsel was Jeffrey D. Mills, Fulbright & Jaworski L.L.P., of Austin, Texas.

Joel E. Lutzker, Schulte Roth & Zabel LLP, of New York, New York, for amicus curiae Minebea Co., Ltd. With him on the brief were David H. Kagan and Richard Chern.

Steven E. Feldman, Welsh & Katz, Ltd., of Chicago, Illinois, for amicus curiae Papst Licensing GmbH & Co. KG.

**JUDGES:** Before MICHEL, Chief Judge, NEWMAN, and MAYER, Circuit Judges.

**OPINION BY:** MAYER

**OPINION**

[*1368] MAYER, *Circuit Judge.*

LG Electronics, Inc. ("LGE") appeals from the final judgment of the United States District Court for the Northern District of California, which granted summary judgment of noninfringement of U.S. Patent Nos. 4,918,645; 5,077,733; 4,939,641; 5,379,379; and 5,892,509 in favor of Bizcom Electronics, Inc.; Compal Electronics, Inc.; Sceptre Technologies, Inc.; First International Computer, Inc.; First International Computer of America, Inc.; Q-Lity Computer, Inc.; Quanta Computer, Inc.; and Everex Systems, Inc. (collectively "defendants"). *LG Elecs., Inc. v. Asustek Computer, Inc.*, Nos. C-01-1375, -1552, [**3] -1594, -2187 (N.D. Cal. Jan. 31, 2005); *LG Elecs., Inc. v. Asustek Computer, Inc.*, Nos. C-01-1375, -1594, -2187, -1552, 2004 U.S. Dist. LEXIS 29906 (N.D. Cal. Nov. 30, 2004); *LG Elecs., Inc. v. Asustek Computer, Inc.*, 248 F. Supp. 2d 912 (N.D. Cal. 2003); *LG Elecs., Inc. v. Asustek Computer, Inc.*, 2002 U.S. Dist. LEXIS 25956 , Nos. C-01-326, -1375, -1594, -2187, -1552 (N.D. Cal. Aug. 20, 2002) ("*Intel I*"). LGE also appeals and defendants cross appeal various claim construction rulings by the trial court. *LG Elecs.,Inc. v. Asustek Computer, Inc.*, Nos. C-01-00326, -01375, -01594,

-02187, -01552, 2002 U.S. Dist. LEXIS 25956 (N.D. Cal. Aug. 20, 2002) ("*Claim Construction Order*"). Defendants First International Computer, Inc.; First International Computer of America, Inc.; Q-Lity Computer, Inc.; Quanta Computer, Inc.; and Quanta Computer USA, Inc. also cross appeal the denial of summary judgment based on their implied license defense. *LG Elecs., Inc.*, 248 F. Supp. 2d 912.

*Background*

LGE is the owner of patents relating to personal computers, including U.S. Patents Nos. 4,918,645 (disclosing systems and methods that increase the band width efficiency of a computer's system bus); 5,077,733 (claiming, in relevant [**4] part, a method that controls the access of a device to a bus shared by multiple devices); 4,939,641 (claiming, in relevant part, a system for ensuring that outdated data is not retrieved from memory); 5,379,379 (claiming a system and method for ensuring that outdated data is not retrieved from memory); and 5,892,509 (claiming networked computers capable of sharing certain video images). LGE sued defendants alleging infringement of these patents.

Defendants purchase microprocessors and chipsets from Intel or its authorized distributors and install them in computers. Intel is authorized to sell these products to defendants under an agreement with LGE. However, pursuant to this agreement, Intel notified defendants that, although it was licensed to sell the products to them, they were not authorized under that agreement to combine the products with non-Intel products. LGE brought suit against defendants, asserting that the *combination* of microprocessors or chipsets with other computer components infringes LGE's patents covering those combinations. LGE did not assert patent rights in the microprocessors or chipsets themselves.

After construing the patent claims, the trial court granted [**5] summary judgment of noninfringement of each patent. It determined that there was no implied license to any defendant, but that, with the exception [*1369] of the '509 patent, LGE's rights in any system claims were exhausted. The court also found that LGE was contractually barred from asserting infringement of the '509 patent against defendants. It found the '645, '733, and '379 patents not infringed after applying its claim construction to the accused methods and devices. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

453 F.3d 1364, *1369; 2006 U.S. App. LEXIS 16916, **5;
79 U.S.P.Q.2D (BNA) 1443

*Discussion*

"We review the trial court's grant of summary judgment without deference, reapplying the same standard as the trial court." *Lacavera v. Dudas*, 441 F.3d 1380 (Fed. Cir. 2006) (citing *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) [**6] . We review claim construction *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

*I. Implied License* [1]

> 1   First International Computer,Inc.; First International Computer of America, Inc.; Q-Lity Computer, Inc.; Quanta Computer, Inc.; and Quanta Computer USA, Inc. are the defendants challenging the trial court's implied license ruling.

"In a suit for patent infringement, the burden of proving the establishment of an implied license falls upon the defendant." *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924 (Fed. Cir. 1984) (citing *Bassick Mfg. Co. v. Adams Grease Gun Corp.*, 54 F.2d 285, 286 (2d Cir. 1931)). To prevail, defendants were required to establish that the products have no noninfringing uses and that "the circumstances of the sale . . . 'plainly indicate that the grant of a license should be inferred.'" *Met-Coil Sys. Corp.v. Korners Unlimited, Inc.*, 803 F.2d 684, 686 (Fed. Cir. 1986) (quoting *Bandag, Inc.*, 750 F.2d at 925). The trial court found, and we agree, that Intel's sales of its licensed products [**7] to defendants do not warrant the inference of a license with respect to the asserted patents. Regardless of any noninfringing uses, Intel expressly informed them that Intel's license agreement with LGE did not extend to any of defendants' products made by combining an Intel product with non-Intel products. In light of this express disclaimer, no license can be implied.

*II. Patent Exhaustion*

The patents asserted by LGE do not cover the products licensed to or sold by Intel; they cover those products when combined with additional components. The trial court, nevertheless, found that the system claims in all patents except the '509 patent were exhausted, but that the exhaustion doctrine did not apply to the method claims. We reverse the trial court's holding with respect to the system claims and affirm with respect to the method claims.

It is axiomatic that the patent exhaustion doctrine, commonly referred to as the first sale doctrine, is triggered by an unconditional sale. *See Mitchell v. Hawley*, 83 U.S. 544, 547, 21 L. Ed. 322 (1873). "[A]n *unconditional* sale of a patented device exhausts the patentee's right to control the purchaser's use of the device [**8] thereafter. The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods. This exhaustion doctrine, however, does not apply to an expressly conditional sale or license. In such a [*1370] transaction, it is more reasonable to infer that the parties negotiated a price that reflects only the value of the 'use' rights conferred by the patentee." *B. Braun Medical v. Abbott Lab.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (discussing *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 (Fed. Cir. 1992)) (emphasis added and citations omitted).

There are two sales at issue here. First, prior to this litigation, LGE granted Intel a license covering its entire portfolio of patents on computer systems and components. This transaction constitutes a sale for exhaustion purposes. *See United States v. Masonite Corp.*, 316 U.S. 265, 278, 62 S. Ct. 1070, 86 L. Ed. 1461, 1942 Dec. Comm'r Pat. 777 (1942). Second, with LGE's authorization, Intel sold its microprocessors and chipsets to each defendant. Notably, this sale involved a component of the asserted patented invention, not the entire patented system.

The [**9] trial court issued two orders on patent exhaustion. The first is unclear about which sale the court relied upon in holding LGE's system patent rights exhausted with respect to defendants, but we understand it to be LGE's license to Intel. *Intel I*, 2002 U.S. Dist. LEXIS 25956, [slip. op] at 9-10. However, the second order, which reaffirmed the first, clearly relied on Intel's sale of its microprocessors and chipsets to defendants as the exhausting sale. *LG Elecs.,Inc.*, 248 F. Supp. 2d at 917. In finding the unconditional sale requirement satisfied, the court concluded that although "LGE is entitled to impose conditions on the sale of the essential components of its patented products does not mean that it actually did so here. To the contrary, defendants'

453 F.3d 1364, *1370; 2006 U.S. App. LEXIS 16916, **9;
79 U.S.P.Q.2D (BNA) 1443

purchase of the microprocessors and chipsets from Intel was unconditional, in that defendants' purchase of the microprocessors and chipsets from Intel was in no way conditioned on their agreement not to combine the Intel microprocessors and chipsets with other non-Intel parts and then sell the resultant products." *Id.* at 916-17. We disagree.

The LGE-Intel license expressly disclaims granting a license allowing computer system manufacturers [**10] to combine Intel's licensed parts with other non-Intel components. Moreover, this conditional agreement required Intel to notify its customers of the limited scope of the license, which it did. Although Intel was free to sell its microprocessors and chipsets, those sales were conditional, and Intel's customers were expressly prohibited from infringing LGE's combination patents. *Cf.* N.Y. U.C.C. Law § 2-202 (allowing contracts to be supplemented by consistent additional terms unless the writing is intended to be complete and exclusive). The "exhaustion doctrine . . . does not apply to an expressly conditional sale or license," *B. Braun Med. Inc.*, 124 F.3d at 1426, so LGE's rights in asserting infringement of its system claims were not exhausted.

Conversely, the trial court declined to find LGE's asserted method claims exhausted. Several defendants contest this ruling on cross-appeal, and we reject their challenge. Based on the above reasoning, even if the exhaustion doctrine were applicable to method claims, it would not apply here because there was no unconditional sale. However, the sale of a device does not exhaust a patentee's rights in its method claims. [**11] *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1341 n.1 (Fed. Cir. 1999) (citing *Bandag, Inc.*, 750 F.2d 903, 924 (Fed. Cir. 1984)). The court was correct.

### III. '509 Patent

The '509 patent discloses a system of networked computers capable of sharing video images. The trial court's exhaustion ruling did not extend to the '509 patent; instead it granted summary judgment of noninfringement on the ground that LGE [*1371] was contractually barred from asserting infringement of the '509 patent claims against defendants. This conclusion was based on a non-assertion provision in a contract between LGE and Microsoft, which barred LGE from suing "[Microsoft], its suppliers, their subsidiaries, or their licensees." [2] The court concluded that defendants were included within this class of parties. Because a genuine issue of material fact

exists as to whether defendants fall within the protection of this contract provision, we reverse the trial court's grant of summary judgment of noninfringement.

> 2  The relevant contract provision provides:
>
> > [As partial consideration for the rights granted to [[LGE] under the License Agreement(s), [LGE] agrees not to (A) sue, or (B) bring, prosecute, assist or participate in any judicial, administrative or other proceedings of any kind against [Microsoft], its Suppliers, their subsidiaries, or their licensees (including without limitation [original equipment manufacturer] customers and end users) for infringement of [LGE's] Patents . . . which occurs during the Immunity period . . . on account of the manufacture, use, sale, or distribution of . . . [the product's licensed to LGE by Microsoft].]

[**12]  In determining whether LGE is barred under the LGE-Microsoft agreement from suing defendants for infringement, the dispositive issue is whether each defendant is a Microsoft licensee. Defendants are third-party installers ("TPIs") that assemble computers for original equipment manufacturers ("OEMs"). The OEMs have licenses with Microsoft, and it is undisputed that defendants were authorized to install Microsoft's products on the systems they manufacture. It is unclear, however, whether defendants' authorization was under "have made" rights of the OEMs' agreements with Microsoft, whereby the OEM would be authorized to use a third party for completing work on its behalf, or whether such authorization was as a sublicensee. If the work was authorized solely by an OEM's have made rights, and if that OEM were not authorized to grant sublicenses under its agreement with Microsoft, then defendants may not be "licensees" protected by the LGE-Microsoft non-assertion provision. *Cf. Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1388 (Fed. Cir. 1996) (distinguishing "have made rights" from sublicenses). A genuine issue of material fact exists as to each defendant's status.

453 F.3d 1364, *1371; 2006 U.S. App. LEXIS 16916, **12;
79 U.S.P.Q.2D (BNA) 1443

On remand, [**13] defendants must establish that LGE is contractually barred from pursuing infringement claims against them. *See McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995). Although the parties have relied on the LGE-Microsoft agreement in arguing whether or not defendants are Microsoft licensees, that agreement is not the proper focus. It is the agreements between each OEM and each defendant, and those between Microsoft and the OEM hiring each defendant that matter.

The record indicates that FIC was both a TPI and an OEM. As an OEM, it had a license from Microsoft, and therefore falls squarely within the scope of protected parties under the non-assertion provision. However, the contract provision only bars suit against Microsoft licensees for infringement "on account of" the manufacture, use, sale, or distribution of Microsoft's products. LGE does not dispute that there is no infringement absent the Microsoft software in the accused devices, since the software satisfies some, but not all, limitations of the '509 patent claims. However, LGE argues that any infringement was not "on account of" the use of Microsoft products. The trial court rejected this argument, [**14] essentially reading the "on account of language" as a "but for" requirement.

The "on account of" language, however, is not susceptible of only one interpretation. [*1372] According to the Supreme Court in construing this phrase in an unrelated statute, "the phrase 'on account of' does not unambiguously define itself." *O'Gilvie v. United States*, 519 U.S. 79, 82, 117 S. Ct. 452, 136 L. Ed. 2d 454 (1996) (construing 26 U.S.C. § 7405(b)). Here, too, the degree of causation required by this contract term is unclear. Because proper construction requires factual considerations, we reverse the trial court's grant of summary judgment. *Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc.*, 120 Wn.2d 573, 844 P.2d 428, 433 (Wash. 1993); *see also BNC Mortgage, Inc. v. Tax Pros, Inc.*, 111 Wn. App. 238, 46 P.3d 812, 819-820 (Wash. Ct. App. 2002) ("If the contract's written words have two or more reasonable meanings (i.e., are 'ambiguous') when read in context, a court may not grant summary judgment or direct a verdict; instead, it must put the case to a trier of fact.") (citations omitted).

The parties also dispute the trial court's construction [**15] of several claim terms in the '509 patent. Claim 35, from which asserted claims 45 and 51 depend,

contains the limitation of "a control unit for controlling the communication unit, wherein the control unit comprises a [central processing unit ("CPU")] and a partitioned memory system." LGE contends that the trial court erroneously construed the term "control unit" as a means-plus-function limitation.

> '[A] claim term that does not use 'means' will trigger the rebuttable presumption that § 112 AP 6 does not apply.'" *LightingWorld, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002)). This presumption can be rebutted" by showing that the claim element recite[s] a function without reciting sufficient structure for performing that function." *Watts v. XL Sys.*, 232 F.3d 877, 880 (Fed. Cir. 2000) (citing *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999)). However, the presumption "is a strong one that is not readily overcome." *Lighting World, Inc.*, 382 F.3d at 1358. [**16]

Here, the claim limitation at issue does not use the term "means," and the presumption against means-plus-function treatment is not overcome. The claim itself provides sufficient structure, namely "a CPU and a partitioned memory system," for performing the stated function," controlling the communication unit." *See id.* at 1359-60. Thus, the proper construction of "control unit" is "a combination comprising a CPU and a partitioned memory system capable of controlling the communication unit."

Defendants contend on cross appeal that the trial court also misconstrued claim 35 by not requiring multiple displays. In particular, they contend that the preamble term "image processing system" requires multiple displays in light of the prosecution history. However, the claim language does not include this limitation, and the trial court properly refused to read it into the claim. Moreover, the body of the claim provides for "a display." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in

open-ended [**17] claims containing the transitional phrase 'comprising.'") (citations omitted). Claim differentiation also supports the trial court's construction because dependent claim 38 adds the limitation of the "image processing system further compris[ing] at least first and second displays coupled to the CPU of the image processing system." *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." (citing *Laitram* [*1373] *Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed. Cir. 1991))).

The prosecution history relied upon by defendants does not compel a different construction. The patentee made arguments during prosecution to distinguish claims in the parent application to the '509 patent, which expressly required multiple displays, over the prior art. These arguments, however, do not compel reading a multiple display limitation into the '509 patent, which does not expressly require multiple displays. *See Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, [**18] the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents *that contain the same claim limitation.*" (emphasis added)).

*IV. '645 patent*

The '645 patent discloses a digital computer system that has devices called agents that are inter-connected by a system bus. The claimed system and corresponding method require one agent, the requesting agent, to request access to a memory stored on another agent, called the replying agent. The requested data is organized as a matrix of memory cells, having column and row coordinates. The "memory controller" of the replying agent processes the request from the requesting agent by asserting a plurality of memory address control signals, including at least one row address strobe ("RAS") signal and one column address strobe ("CAS") signal. This "page mode memory access" operates by the assertion of an entire row of data followed by the assertion and deassertion of multiple column addresses. By the RAS signal accessing an entire row followed by the assertion and deassertion of particular column addresses, this page mode memory access differs from the conventional [**19] memory access, which separately accessed each

memory cell by asserting its individual row address and column address. In the claimed invention, after the data is accessed, it is then transferred to the requesting agent over the system bus.

LGE alleged infringement of system claims 1-4 and 6 and method claims 12-15 and 17. The trial court granted summary judgment of noninfringement of all asserted claims, concluding that the RAS/CAS signals in defendants' devices did not travel over the system bus. However, the '645 patent claims do not contain a limitation requiring that the strobe signals travel over the system bus. Moreover, the specification does not suggest that the strobe signals must travel over the system bus. To the contrary, Figure 5 shows an embodiment of the invention in which the strobe signals travel only internally within the replying agent, not across the system bus.

In an attempt to impose this limitation on the claims, defendants rely on the prosecution history. While the prosecution history is relevant to claim construction, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317 [**20] (citations omitted). Here, defendants point to statements in the prosecution history that the prior art does not teach "a page mode type of access over a system bus from a requesting agent to a replying agent." While we agree that this and other statements in the prosecution history lack ideal clarity, we do not find that they rise to the level of disclaiming or limiting the scope of the express claim language. Therefore, the trial court erred in construing the '645 claims to require the RAS and CAS signals to travel over the system bus. In addition, there is a genuine issue of material fact as to whether the accused devices and methods utilize strobe signals. LGE's expert submitted an affidavit that the accused devices [*1374] employ strobe signals, which precludes summary judgment.

In the alternative, defendants contend that LGE failed to present evidence of an "end of access signal." This signal, which is required by the claims, is generated by the requesting agent and received by a detecting means coupled to the memory address control signal asserting means. When the detection means receives this end of access signal, the operation is halted. Defendants contend that LGE failed to establish [**21] the existence of a genuine issue of material fact as to whether the accused devices contain this limitation. However, the trial

court did not consider this argument, and we will not address this factual issue in the first instance. LGE also argues that the trial court's construction of the "requesting agent" claim limitation was in error. The court construed this term as "a device coupled to the system bus that requests access to a memory located on a replying agent." *Claim Construction Order* at 6-9. LGE contends that an industry standard, which was incorporated into the specification by reference, provides the proper claim construction of this term. '645 patent col. 3 ll. 51-56. [3] The incorporated standard explicitly defines the term "requesting agent" as "an agent that has entered into the arbitration function for bus access." Defendants contend, however, that the patentee did not act as its own lexicographer by incorporating this industry standard by reference. The trial court did not accept LGE's proposed construction, concluding that it was a preferred embodiment and did not limit the claimed invention. The difference in the two constructions is temporal: LGE's proposed construction [**22] defines an agent as a requesting agent only when it is engaged in arbitration for bus access, whereas the trial court's construction defines a requesting agent regardless of whether it is actively engaged in arbitration.

[3] The specification provides:

> Although the method and apparatus of the invention will be described herein in the context of a Multibus II environment, it should be appreciated that the invention may be practiced in many digital computer systems having a bus for transferring data between at least two agents interconnected upon the bus.

> The operating characteristics of the Multibus II are described in a document entitled "High Performance 32-Bit Bus Standard P1296" which was produced by the IEEE microprocessor standards committee P1296 working group, Jun. 20, 1986, draft 2.0, the disclosure of which is incorporated herein in its entirety.

'645 patent col. 3 ll. 45-56.

We have recognized that the "[i]nterpretation of descriptive statements in a patent's written description is a difficult task, as an inherent tension exists as to whether a statement is a clear lexicographic definition or a description of a preferred embodiment." *E-Pass* [**23] *Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003). "Thus in determining whether a statement by a patentee was intended to be lexicographic, it is important to determine whether the statement was designed to define the claim term or to describe a preferred embodiment." *Id.* We agree with the trial court and defendants that the patentee did not act as its own lexicographer here. Instead, the industry standard was incorporated as a preferred embodiment. The specification makes this clear by explaining that "[a]lthough the method and apparatus of the invention will be described herein in the context of a Multibus II environment, it should be appreciated that the invention may be practiced in many digital computer systems having a bus for transferring data between at least two agents interconnected upon the bus." '645 patent col. 3 ll. 45-49.

*Chimie v. PPG Industries, Inc.*, 402 F.3d 1371 (Fed. Cir. 2005), does not compel [*1375] a different result. In *Chimie*, we were confronted with the claim terms "dust-free and non-dusting." After concluding that these terms were relative and could only be understood by comparison with the prior art, we concluded that [**24] only one standard was disclosed in the specification for making such a comparison. We limited these claim terms to the disclosed standard. Here, however, there is no relative term that cannot be understood without reference to an industry standard.

But, this does not end our inquiry. The proper claim construction is "the ordinary and customary meaning . . . that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313 (citations omitted). "When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000). Although we have concluded that the patentee did not expressly adopt the definition of "requesting agent" in the

453 F.3d 1364, *1375; 2006 U.S. App. LEXIS 16916, **24;
79 U.S.P.Q.2D (BNA) 1443

incorporated industry standard, that standard remains relevant in determining [**25] the meaning of the claim term to one of ordinary skill in the art at the time the patent application was filed, and it is treated as intrinsic evidence for claim construction purposes, *see V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("This court has established that 'prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'") (citations omitted).

Here, the trial court erred by failing to give proper weight to the incorporated industry standard; it failed to consider the standard as intrinsic evidence of the meaning to one of ordinary skill in the art as of the filing date. After considering the standard, in addition to the patent claims and specification, we conclude that LGE's proffered definition based on the standard is correct. Thus, we construe "requesting agent" as "an agent that has entered into the arbitration function for bus access." This construction is entirely consistent with the specification, which provides that "at one time in the operation of the system . . . the requesting agent 12 may be a replying agent, and that the replying agent 16 may at that time be a requesting [**26] agent." '645 patent col. 4 ll. 8-11. This language makes clear that the classification of an agent depends upon the function the agent is performing at any given time, i.e., whether it is engaged in arbitration at a given moment.

*V. '733 patent*

The '733 patent discloses a rotating priority system that provides multiple computer devices alternating access to a system bus, which is the pathway over which the various components of a computer system transmit data. This system addresses the problem of "hogging," in which one component of a computer system monopolizes access to the system bus. The asserted claims of the '733 patent, method claims 15-19, [4] establish a rotating priority [*1376] system that limits each device's access to the bus. In particular, claim 15 sets forth two steps of the method as "counting a number of accesses by the device to the bus" and then "in response to a predetermined number of accesses to the bus, giving another [device] the highest priority." The trial court granted summary judgment of noninfringement of the '733 patent, holding that the claim limitation of "counting a number of accesses by the device to the bus" was not practiced in the accused method. [**27]

[4] Claim 15, the only independent claim at issue, provides:

A method for determining priority of access to a bus among a set of devices coupled to the bus, each device being represented for priority purposes by a node in a group of nodes and each node having a priority relative to a single node currently having the highest priority, the method comprising the steps of:

receiving an access request in a node from a represented device;

determining whether any node with a higher priority has received an access request;

if no such node has received an access request, permitting the device to access the bus;

counting a number of accesses by the device to the bus; and

in response to predetermined number of accesses to the bus, giving another node the highest priority.

The court construed the claim limitation "counting a number of accesses" as "counting the number of times a device gains use of the bus." *Claim Construction Order* at 38-41. The parties do not directly challenge this

construction, but LGE argues that a genuine issue of material fact exists as to whether the accused method performed this step. LGE argues that the [**28] master latency timer ("MLT") in defendants' accused devices performs this step. MLTs count clock signals when an anchor node has possession of the bus. Defendants contend that although an MLT limits the time duration of bus access by a device, it does not count the number of accesses by the device. Defendants also contend that, in some instances, the MLTs continue counting when clock signals pass even if no access to the bus is taking place, such as during WAIT periods when no data is being placed on the bus.

LGE responds that the bus is accessed even during WAIT periods, regardless of whether any data is placed on the bus, because the device has access to the bus. LGE points out that the purpose of the invention is to eliminate "hogging" the bus, and that the bus is "being hogged" even during WAIT periods. Further, LGE argues that, under the trial court's construction, a device still has "use of the bus" during a wait period. LGE points to the discussion in the '733 patent relating to Figure 8. '733 patent col. 21. In this preferred embodiment, the description includes a programmable node grant counter NGCNT 720. The description explains that when certain conditions are met, an enable [**29] count input is asserted and during a bus access cycle a transition of a clock signal causes NGCNT 720(1) to increment by one count. Therefore, when certain criteria are met, a clock signal can create an access count.

There is a genuine issue of material fact as to whether the accused devices count the number of accesses. *See Ranbaxy Pharms., Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1240 (Fed. Cir. 2003) ("Infringement, both literal and under the doctrine of equivalents, is a question of fact." (citing *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 692 (Fed. Cir. 1998))). The central issue is whether the bus is accessed on each clock signal so that the clock signals, in effect, count the number of accesses to the bus. The trial court agreed that LGE's argument is consistent with its claim construction, but found that it failed to present evidence supporting its position. To the contrary LGE presented sufficient expert testimony on this issue to avoid summary judgment. LGE's expert testified that some type of signal is asserted with each clock signal, and, if proven, this would in effect make the MLTs count accesses. The summary judgment [**30] is vacated.

[*1377] *VI. '641 patent*

The '641 patent discloses a system for ensuring that the most current data is retrieved from the main memory. Because individual devices can update data in their own local cache memory without immediately writing the new data back to the main memory, data in the main memory can be "stale." Therefore, the system claimed in the '641 patent monitors the data being transferred over the bus, and if data stored in the cache matches the address of the data being transferred, a hold signal is asserted. Then, the data being transferred is compared with the data on the cache. If there is a difference, the data stored on the cache, which is the most recent data, is also transferred.

The trial court concluded the '641 patent claims asserted were not infringed based on its patent exhaustion holding, which we reverse above. However, LGE contends that the trial court also improperly construed claims 1, 5, and 14. In particular, LGE disputes the trial court's construction of "cache memory means" (in claims 1 and 5) and "cache memory" (in claim 14), which were construed as "one of at least two high speed memories located close to the CPU of a computer to give [**31] the CPU faster access to blocks of data than could be taken directly from the larger, slower main memory and never using valid/invalid bits." *Claim Construction Order* at 18-22. LGE contends that the trial court improperly read claims 1 and 14 as requiring at least two caches. It also contends that the trial court improperly read in the limitation that neither cache uses valid/invalid bits.

We agree with LGE that the trial court erred in reading the limitation of at least two high speed memories into claims 1 and 14. Unlike claim 5, which expressly requires at least two cache memory means, claims 1 and 14 have no such express limitation. *Cf. Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991))). To the contrary, claims 1 and 14 only require one or more CPUs and a cache memory coupled between the CPU and the bus. Because the claims expressly cover one central processing unit, they logically also cover systems with only one cache coupled between that single central processing unit and the [**32] bus. Defendants rely on the fact that the written description describes a system with multiple caches. However, as we explain in more detail below, the patent application initially described two

inventions, and these statements relate to the other invention that is not claimed in the '641 patent.

We also agree with LGE that the trial court improperly read the limitation of never using valid/invalid bits into the claims. The patent's background section suggests that valid/invalid bits were used to manage data in systems with more than one cache. In particular, it explains that the purpose of the invalid bit is to redirect a processor attempting to access an address in its cache to another cache with a more updated memory associated with that address. '641 patent col. 1 ll. 44-52. The claims at issue do not themselves expressly include or exclude the use of valid/invalid bits. Defendants, however, contend that the trial court's construction is supported by the specification and prosecution history. The specification states that "a further object of this invention [is] to provide a cache memory system wherein the use of valid/invalid data indicators are avoided." '641 patent col. 1 [**33] ll. 65-67. It further states that "[i]t should be kept in mind during the following description, that the invention maintains data integrity by assuring that cache data is always the most up-to-date in the system. Thus, there never [*1378] is a 'valid' or 'invalid' indication with respect to any cache data as it is always assured that if data is provided by a cache, that it invariably is valid (i.e. most up-to-date)." *Id.* col. 3 ll. 27-33.

Defendants are correct that reviewing the specification in construing claims is appropriate, *Phillips*, 415 F.3d at 1315-17, but such review need not be done in the abstract. Here, as noted above, the original patent application disclosed two inventions. As the examiner observed, one invention was "drawn to a cache system for updating each copy of the data stored in a plurality of caches when the data is modified," and the other was drawn to "a cache system for sending the most current data to a requestor by monitoring the address of a data on a data bus for detecting whether the [data] is stored and modified in the cache." The patent examiner concluded that these two inventions were distinct and required the applicant to elect one [**34] invention. The applicant ultimately limited the original application to the latter group of claims, which issued as the '641 patent, and the other claim group was separated into a different application, which ultimately issued as U.S. Patent No. 5,097,409.

%Here, the discussion of valid/invalid bits in the specification was relevant to multi-cache systems, because the patent's background provides that "[s]o long as a write back cache is utilized with only one processor, data management is straight forward. However, when more than one central processor uses the same main memory, data management problems multiply." '641 patent col. 1 ll. 39-43. The patent explains that the data management problems in multiple CPU systems are a result, at least in part, of their containing more than one cache memory. Managing data in multiple cache systems was the subject of the invention not elected during prosecution and, therefore, the statements in the specification referring to valid/invalid bits are not relevant to the invention ultimately claimed in the '641 patent. *Cf. Pitney Bowes, Inc. v. Hewlett-PackardCo.*, 182 F.3d 1298, 1311 (Fed. Cir. 1999) (observingthat a written description [**35] describing multiple inventions may not be relevant" in toto" to each of those inventions). Indeed, the unelected claims expressly contained the limitation that the "cache memory means hav[e] no provisions for indicating the invalidity of said data units," whereas the elected claims contained no such limitation.

For the same reasons, we do not find that the patentee disavowed the use of valid/invalid bits under the doctrine of specification disclaimer. "[T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by an inventor. In that instance, . . . the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, at 1316; *see also SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). However, because the statements relied upon by defendants relate to the invention not elected during prosecution, there is no clear disavowal with respect to the invention actually claimed in the '641 patent.

## VII. '379 patent

Like the '641 patent, the '379 patent claims a system and method for ensuring that the most current [**36] data, as opposed to "stale" data, is retrieved from memory. The claimed invention relates to how a memory controller coordinates requests to read data from the memory and requests to write data to the memory. Generally, when a read request is asserted that corresponds to a buffered write request, the write request must go first to ensure that what is read from memory is the most current data. The invention disclosed in [*1379]

453 F.3d 1364, *1379; 2006 U.S. App. LEXIS 16916, **36;
79 U.S.P.Q.2D (BNA) 1443

the '379 patent does this by comparing the address of each read request to the buffered write requests, noting any matches, halting read execution when there is a match, and executing the buffered write requests.

LGE contends that the trial court erred in construing system claims 1 and 23 as requiring all write requests to be executed after a match is detected, as opposed to executing any number of write requests until the write request corresponding to the matching read request is executed. We agree. The claim language does not require all write requests to be executed after a match is detected. Moreover, claim 2, which depends from claim 1, expressly requires the execution of all write requests, as does independent method claim 7. *See Phillips*, 415 F.3d at 1314 [**37] (recognizing the utility of claim differentiation). In addition, the claim limitation at issue is written in means-plus function-claim language ("means for . . . causing an execution of buffered write requests"). Because the recited function is clear on its face, it was improper to incorporate the additional functional limitation of executing" all" buffered write requests. *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1357 (Fed. Cir. 1999); *see also Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("[A] court may not import functional limitations that are not recited in the claim . . . .").

==LGE also disputes the trial court's grant of summary judgment of noninfringement of method claim== 7. [5] This claim explicitly requires the step of buffering "each" read request and then comparing that read request to the buffered write addresses. If the read request matches a write request, then the claim provides for the following steps: executing all buffered read requests up to the matching request; then executing "all buffered write requests;" and then executing the matching read request. If, however, [**38] the comparison of the read request does not yield a match to a buffered write request, then all read requests are executed. Defendants contend, and LGE does not appear to dispute, that the accused devices do not operate in this [*1380] manner. Instead, they contend that when a buffered read request matches a buffered write request, their devices do not execute "all" write requests before executing the matching read request, but instead only execute the write requests up to the one matching the read request, and then execute the matching read request.

5   Claim 7 provides:

In an information processing system having a system bus for coupling together a plurality of bus connections, one of the bus connections being a memory control unit coupled to one or more memory units, the memory control unit being responsive to address and data signal lines of the system bus for writing information units to and for reading information units from the memory units, a method of reading and writing the information units comprising the steps of:

buffering write requests, including write addresses, as they are received from the system bus;

buffering read requests, including read addresses, as they are received from the system bus; comparing when received each read address against buffered write addresses, if any, to determine if a received read address has an address value within a predetermined range of address values of a buffered write address;

if a received address is determined not to be within the predetermined range of addresses of any buffered write addresses then:

first executing in sequence all buffered read requests; and then executing in sequence all buffered write requests;

else if a received address is determined to have an address value within the predetermined range of address values of any buffered write address:

first executing in sequence all buffered read requests up to but not including the received read request which was determined to be within the predetermined range;

then executing all buffered write requests; and then executing

453 F.3d 1364, *1380; 2006 U.S. App. LEXIS 16916, **38;
79 U.S.P.Q.2D (BNA) 1443

the buffered read request which

was determined to be within
the predetermined range.

[**39] The trial court concluded, and we agree, that there was no literal infringement of this claim. The claimed method requires handling each read address in one of two ways depending on whether the read request matches a write request. The second way, which applies when the pending read request matches a pending write request, is to execute all write requests before executing the read request. LGE contends that when the matching write request happens to be the last in the buffer, all write requests are in fact executed before the matching read request. Although LGE correctly asserts that any practice of the claimed method would be infringement, *Bell Communications Research v. Vitalink Communications Corp.*, 55 F.3d 615, 622 (Fed. Cir. 1995), the claim must be considered in its entirety. Here, the claim requires *each* read request to be compared with the buffered write requests, and then one of two alternatives be followed. Because the claim was drafted with this limitation, the fact that the accused device occasionally operates in such a manner does not amount to literal infringement of claim 7. For infringement to be found, the claim requires the accused device to operate [**40] in this manner in response to "each" read request.

The trial court also found, as a matter of law, that there was no infringement under the doctrine of equivalents. In doing so, it rejected LGE's argument that performing all of the write requests up to (and including) the one matching the read request is an insubstantial difference from the claim limitation of performing all write requests before executing the incoming read request. The trial court reasoned that LGE's equivalence theory would vitiate the claim limitation of performing "all" write requests before an incoming read request matching a write request.

The doctrine of equivalents operates under the "all limitations rule," whereby "equivalence [is] assessed on a limitation-by-limitation basis, as opposed to from the perspective of the invention as a whole." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem.Co.*, 520 U.S. 17, 29, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)). This doctrine, by its very nature, extends beyond the patent's literal claim scope, because

otherwise a finding of no literal infringement would be a fore ordained [**41] conclusion of no infringement at all. *Ethicon Endo-Surgery v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir. 1998). At the same time, however, "[i]f our case law on the doctrine of equivalents makes anything clear, it is that all claim limitations are not entitled to an equal scope of equivalents." *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000).

"There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Freedman Seating Co.*, 420 F.3d at 1359 (citations omitted). LGE contends that performing some of the write requests is a permissible equivalent to performing all write requests, and that while performing no write requests may vitiate the claim language, performing some does not. As discussed above, there is inevitably a [*1381] range of equivalents [**42] for performing all write requests, even if that range is narrow. *See Ethicon Endo-Surgery*, 149 F.3d at 1317. If substantially all or nearly all write requests are performed by the accused devices before each matching read request, then the doctrine of equivalents would be fully applicable without vitiating the claim language. Although such scope would be outside of the claim's literal scope, which is true in any doctrine of equivalents analysis, it would not be inconsistent with the language of the claim. Therefore, a genuine issue of material fact exists as to whether the accused device can function within the narrow range of equivalents that we have described above, and we vacate the trial court's grant of summary judgment of noninfringement on this ground.

*Conclusion*

Accordingly, the judgment of the United States District Court for the Northern District of California is affirmed in-part, reversed in-part, and vacated in-part. The case is remanded for further proceedings in accordance with this opinion.

COSTS

LGE shall have its costs.

453 F.3d 1364, *1381; 2006 U.S. App. LEXIS 16916, **42;
79 U.S.P.Q.2D (BNA) 1443

*AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED*



**OVERHEAD DOOR CORPORATION and GMI HOLDINGS, INC.,
Plaintiffs-Appellees, v. THE CHAMBERLAIN GROUP, INC., Defendant-Appellant.**

**98-1428**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**194 F.3d 1261; 1999 U.S. App. LEXIS 25514; 52 U.S.P.Q.2D (BNA) 1321**

**October 13, 1999, Decided**

**SUBSEQUENT HISTORY:** [**1] As Corrected October 15, 1999. Rehearing and Rehearing En Banc Denied December 16, 1999, Reported at: 1999 U.S. App. LEXIS 34469.

**PRIOR HISTORY:** Appealed from: United States District Court for the Northern District of Texas. Judge Sidney A. Fitzwater.

**DISPOSITION:** AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.

**COUNSEL:** Kenneth R. Glaser, Akin, Gump, Strauss, Hauer & Field, L.L.P., of Dallas, Texas, argued for plaintiffs-appellees. With him on the brief were Michael Lowenberg, Steven E. Ross, and Alex Chartove.

John F. Flannery, Fitch, Even, Tabin & Flannery, of Chicago, Illinois, argued for defendant-appellant. With him on the brief were Robert J. Fox and Karl R. Fink.

**JUDGES:** Before MICHEL, RADER, and SCHALL, Circuit Judges.

**OPINION BY:** RADER

**OPINION**

[*1264] RADER, *Circuit Judge.*

The United States District Court for the Northern District of Texas ruled on summary judgment that Overhead Door Corp. and GMI Holdings, Inc. did not infringe U.S. Patent No. Re. 35,364 (the '364 patent). *See Overhead Door Corp. v. Chamberlain Group, Inc.*, 1998 U.S. Dist. LEXIS 22513 No. 95-CV-1648-D (N.D. Tex. Apr. 30, 1998), (order). The '364 patent claims improvements on remote control systems for garage door openers. Because the district court erred in concluding as a matter of law that the claims at issue cannot cover the accused device under the doctrine of equivalents or as structural [**2] equivalents, this court affirms-in-part, vacates-in-part, and remands.

I.

Chamberlain Group, Inc. owns the '364 patent. Both Chamberlain and Overhead Door manufacture and sell remote control garage door opener systems. Remote control garage door opener systems typically include hand-held, portable transmitters and a stationary garage door opening motor with a processing unit and receiver. To open or close a garage door, a user presses a button on the transmitter to send a signal to the receiver. The receiver relays the signal to a processing unit that directs the door motor to open or close the garage door.

To prevent signals of foreign transmitters from opening the door, these systems use coded signals. A unique code thus links each transmitter to its own system, and a garage door opener's processing unit verifies that

194 F.3d 1261, *1264; 1999 U.S. App. LEXIS 25514, **2;
52 U.S.P.Q.2D (BNA) 1321

the signal code comes from its own transmitter before activating the opening motor.

Before the '364 patent, garage door systems required users to install transmitter codes manually. A typical code installation system required the user to set matching dual in-line package (DIP) switches on the transmitters. These manual codes had shortcomings, including installation [**3] errors by inexperienced installers and limits on code length due to the size of DIP switches.

The '364 patent eliminates manual code switches in garage door transmitters, and enables a garage door opener to learn the identities of and respond to multiple transmitters with different codes. *See* '364 patent, col. 4, ll. 15-22. An embodiment of the invention described in the '364 patent includes two or more transmitters with lengthy, factory-programmed codes. The microprocessor in the receiver switches between "program" and "operate" modes. In the "program" mode, the microprocessor stores in a memory a pre-programmed code it receives from the transmitter. *See id.* at col. 3, ll. 40-48. The microprocessor [*1265] can store multiple codes in this manner. In the "operate" mode, the microprocessor verifies that a signal matches one of the stored transmitter codes. *See id.* at col. 3, ll. 49-58.

The '364 patent includes eight claims, all of which Chamberlain asserts in this action. Claims 1-4 were part of the original patent, U.S. Patent No. 4,750,118 (the '118 patent). Chamberlain added claims 5-8 during reissue proceedings. The two independent claims 1 and 5 recite:

1. A garage [**4] door operator for a garage door comprising,

a garage door operation mechanism with an output shaft connected to said garage door to open and close it,

a radio receiver,

a decoder connected to receive the output of said radio receiver,

a microprocessor connected to receive the output of said decoder and to said garage door operation mechanism to energize it,

a switch moveable between program and operate positions connected to said microprocessor to place said microprocessor in the operate or program mode,

a memory means for storing a plurality of addresses connected to said microprocessor when said switch is in the program position,

*A memory selection switch connected to said microprocessor,*

a plurality of radio transmitters with *different codes*, *said memory selection switch setable in a first position* at a time when a first one of said radio transmitters is energized so that the code of said first transmitter will be stored in said memory means and *said memory selection switch set in a second position* at a time when a second one of said radio transmitters is energized so that the code of said second transmitter will be stored in said memory means,

and said [**5] microprocessor placed in the operate mode when said switch is in the operate position so that either or both of said first and second radio transmitters when energized cause said microprocessor to energize said garage door operator mechanism.

5. An operator for controlling operation of equipment comprising:

a radio receiver,

a decoder connected to receive the output of said radio receiver,

a microprocessor connected to receive the output of said decoder and to said equipment to energize it,

first switch means for selection between program and operate positions connected to said microprocessor to place said microprocessor in the operate or the program mode,

194 F.3d 1261, *1265; 1999 U.S. App. LEXIS 25514, **5;
52 U.S.P.Q.2D (BNA) 1321

a memory means for storing a plurality of addresses connected to said microprocessor when said first switch means is in the program position,

*a memory selection second switch means connected to said microprocessor*,

a plurality of radio transmitters with *different codes, said memory selection second switch means being adapted to select a first position* at a time when a first one of said radio transmitters is energized so that the code of said first transmitter will be stored in said memory means and *said* [**6] *memory selection second switch means being adapted to select a second position* at a time when a second one of said radio transmitters is energized so that the code of said second transmitter will be stored in said memory means,

and said microprocessor placed in the operate mode when said first switch means is in the operate position so that either or both of said first and second radio transmitters, when energized cause said microprocessor to energize said equipment.

'364 patent, col. 5, ll. 11-35; col. 6, ll. 7-30 (emphasis added).

[*1266] Overhead Door's accused openers - marketed as the "Intellicode" system - also use factory-programmed identification codes instead of manual switches and "learn" to identify multiple transmitters. Like the invention claimed in the '364 patent, the Intellicode features "program" and "operate" modes, and stores transmitter codes in selected memory locations during the learning process. The Intellicode, however, does not use a manual, mechanical memory selection switch. Rather, the Intellicode features software that determines the memory location for each new code. The Intellicode's microprocessor, under control of the software, identifies unused [**7] locations in memory and automatically stores a new code in an unused and available location. The parties dispute whether the Intellicode's software-driven memory selection scheme is outside the scope of the '364 patent.

On August 7, 1995, Overhead Door filed a declaratory judgment action, seeking a judgment that the Intellicode does not infringe the '118 patent. Chamberlain counterclaimed, alleging willful infringement. The '118 patent reissued as the '364 patent in October 1996 and Overhead Door amended its complaint to include additional claims 5-8. The parties filed cross-motions for summary judgment. The court referred the motions to a special master for a recommendation.

The special master concluded as a matter of law that the Intellicode does not literally infringe the '364 patent. In reaching this conclusion, the special master construed the claim elements "memory selection switch" (claim 1) and "memory selection second switch means" (claim 5) to require "a switch *separate from* the microprocessor which is *user operated* to select different positions of the switch." *Overhead Door*, No. 95-CV-1648-D, at 36 (N.D. Tex. Jan. 13, 1999) (report of Special Master) (emphasis [**8] added). The special master further determined that the claims "cannot be construed so broadly to include a microprocessor controlled random memory selection process." Because the Intellicode selects memory locations with software rather than a manual switch, the special master concluded that the Intellicode does not literally infringe the claims in suit.

The special master also concluded as a matter of law that the Intellicode does not infringe the '364 patent under the doctrine of equivalents. The special master identified the "function" of the "memory selection switch" and "memory selection second switch means" as "permitting selection of a particular memory location at the receiver for subsequent storage of a transmitted code." *Id.* at 46. According to the special master, the Intellicode lacks this function because its microprocessor uses software to automatically select memory locations. Further, the special master noted that "the user is unable to predetermine . . . memory locations" or replace a location with a new code. The special master therefore concluded that the Intellicode cannot infringe the '364 patent under the doctrine of equivalents.

The district court adopted [**9] the special master's report in its entirety, thereby granting Overhead Door's summary judgment motion of non-infringement and denying Chamberlain's cross-motion. Chamberlain appeals.

II.

This court reviews a district court's grant of summary judgment without deference. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307, 46 U.S.P.Q.2D (BNA) 1752, 1755 (Fed. Cir. 1998). This court also reviews the district court's claim construction without deference. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 U.S.P.Q.2D (BNA) 1169, 1172 (Fed. Cir. 1998) (*en banc*). Whether the accused device exactly contains each element, as properly construed, or its equivalent, is a determination of fact. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575, 34 U.S.P.Q.2D (BNA) 1673, 1676 (Fed. Cir. 1995). In review [*1267] of the district court's summary judgment in favor of Overhead Door, this court draws reasonable inferences from the evidence in favor of the non-movant, Chamberlain. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986).

In dispute are three elements [**10] of claim 1: "memory selection switch," "switch moveable," and "different codes." Similar elements of claim 5 are in dispute. The first two elements of claim 5, however, are in means-plus-function format, i.e., "memory selection second switch means" and "first switch means."

**"Memory Selection Switch" - Claim 1**

The district court construed the "memory selection switch" element of claim 1 to mean "a switch separate from the microprocessor which is user operated to select different positions of the switch." The claim uses the term "switch," a word connoting a mechanical device with different settings, such as "on" or "off." Claim 1 further defines the memory selection switch as "connected to" the microprocessor, "setable in" a first position, and "set in" a second position. This claim language is more consistent with a mechanical switch attached to the microprocessor, rather than software programmed into the microprocessor.

In the '364 patent's "Brief Description of the Drawings," the patentee states that "Fig. 2 illustrates in block form *the invention*." Col. 2, l. 43 (emphasis added). Figure 2 complements the definition supplied by the claim language:

[SEE FIGURE 2 IN ORIGINAL] Figure [**11] 2 shows the program/operate switch 22 as a mechanical switch, which alternates between "program" and

"operate." Moreover, the drawing depicts the memory selection switch 23 as a mechanical switch with five separate numbered positions. The associated written description identifies the memory selection switch with 23, *see* '364 patent, col. 3, ll. 9-11, and describes it as a five-position, moveable switch separate from and "*connected to*" the microprocessor 44. *See id.* at col. 3, ll. 9-19 (emphasis added); *see also* Fig. 2. Again this part of the patent suggests a mechanical switch.

Finally, Chamberlain does not contest the special master's interpretation of the program mode "switch" as a mechanical toggle switch. To interpret the term "switch" consistently in the claim and to harmonize the drawing depiction with the [*1268] claim language, this court confirms the district court's reading of the term "switch." Thus, the term "memory selection switch" means a mechanical device separate from the microprocessor. This interpretation is also most in harmony with the prosecution history of the reissue application, as explained later.

In reaching this claim interpretation, this court [**12] considered but rejected the contention that Figure 3 discloses as part of the claim a software embodiment for the switch of claim 1. Figure 3 of the '364 patent, shown below, illustrates how the invention receives and validates codes:

[SEE FIGURE 3 IN ORIGINAL] In Figure 3, the two dialog boxes in the lower-right corner refer to storing the code at the location "pointed to" by the "code location pointer," "incrementing" the code location pointer, and "loading" [*1269] the code location pointer with a value of one. The '364 patent, however, does not indicate whether the "code location pointer" is a particular embodiment of the "switch" of claim 1, or some other (unclaimed) component. "Code location pointer" appears nowhere in the claims. Moreover, the only reference to a code location pointer in the written description is a single sentence that does not

illuminate Figure 3: "If the switch 22 is in the 'program' mode as shown in FIG. 3 when the incoming signal from a transmitter is received, the flow diagram is followed so as to store the new incoming program in the code location pointed to by the code location pointer 23." Col. 4, ll. 57-61. The vague terms in Figure 3 do not override [**13] the claim language and written description that closely identify the "memory selection switch" as a mechanical device. This court interprets "memory selection switch" to mean a mechanical switch with different positions, each position corresponding to a different location in memory, thus enabling the garage door operator to store codes in different memory locations. Thus, this court affirms on review the district court's interpretation of "memory selection switch."

Applying this claim construction to the accused device, this court affirms the district court's summary judgment of no literal infringement of claim 1. "Literal infringement of a claim requires that every limitation recited in the claim appear in the accused device, i.e., that the properly construed claim reads on the accused device exactly." *Amhil Enters., Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562, 38 U.S.P.Q.2D (BNA) 1471, 1476 (Fed. Cir. 1996). Claim 1 covers a mechanical "memory selection switch." The accused Intellicode system, in contrast, selects memory locations with a software program, not with a mechanical switch. Thus, the "memory selection switch," as correctly construed, is literally absent from the Intellicode. [**14] Therefore, the Intellicode does not literally infringe claim 1.

The district court erred, however, in also deciding on summary judgment that the Intellicode did not infringe under the doctrine of equivalents. The doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 41 U.S.P.Q.2D (BNA) 1865, 1875, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997). An element in the accused product is equivalent to a claim element if the differences between the two are "insubstantial" to one of ordinary skill in the art. *Warner-Jenkinson*, 520 U.S. at

39-40; *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1517, 35 U.S.P.Q.2D (BNA) 1,641 (Fed. Cir. 1995) (*en banc*), *rev'd on other grounds*, 520 U.S. 17, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997). The district court found as a matter of law that the Intellicode had no equivalent of the memory selection switch claim element.

"Although equivalence is a factual matter normally reserved for a fact-finder, the trial court should grant summary judgment in any case where [**15] no reasonable fact-finder could find equivalence." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423, 44 U.S.P.Q.2D (BNA) 1103, 1106 (Fed. Cir. 1997). This case does not satisfy this lofty standard. The record contains considerable evidence, including several reports and declarations by Chamberlain's expert, Dr. Rhyne, that one of ordinary skill in the art would find the Intellicode's software-driven memory selection system insubstantially different from the hardware switch of claim 1. Dr. Rhyne averred in his June 2, 1997 report: "[it is a] fundamental and well understood tenet of the computing art [that] . . . 'any software process can be transformed into an equivalent hardware process, and any hardware process can be transformed into an equivalent software process.'" *See* ED KLINGLER, MICROPROCESSOR SYSTEMS DESIGN 5 (1977). Dr. Rhyne stated that this "dualistic transformation," known as the "hardware/software" trade-off, effectively [*1270] means that the selection of a software pointer for a microprocessor versus a hardware switch to control a microprocessor-based system is simply a matter of design choice. This record evidence shows that one of skill in the art [**16] would recognize these alternative systems as interchangeable substitutes. Drawing all reasonable inferences in favor of Chamberlain, as this court must in reviewing the summary judgment of non-infringement, this court concludes that Dr. Rhyne's statements and supporting citations to computer science literature show a genuine issue of material fact precluding summary judgment.

In discerning this genuine factual issue, this court also considered the district court's interpretation that a mechanical switch would necessarily require a human operator. In operation of a mechanical switch, a human operator would indeed set the memory selection switch to one of five positions. This "user operated" characteristic of a mechanical switch, however, would not necessarily preclude a finding that software performs equivalently without human operation. Indeed in other contexts, this

194 F.3d 1261, *1270; 1999 U.S. App. LEXIS 25514, **16;
52 U.S.P.Q.2D (BNA) 1321

court has noted the interchangeability of hardware and software. *See, e.g., Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935, 4 U.S.P.Q.2D (BNA) 1737, 1740 (Fed. Cir. 1987) (*en banc*) ("If . . . the accused devices differ only in substituting a computer for hard-wired circuitry, [the patentee] [**17] might have a stronger position for arguing that the accused devices infringe the claims."). Moreover the Supreme Court has acknowledged that interchangeability can be one of the hallmarks of an equivalent. *See Warner-Jenkinson*, 520 U.S. at 37 ("known interchangeability . . . for an element of a patent is one of the express objective factors . . . bearing upon whether the accused device is substantially the same as the patented invention"); *Graver Tank & Mfg. Co., Inc. v. Linde Air Prods. Co.*, 339 U.S. 605, 609, 85 U.S.P.Q. (BNA) 328, 331, 94 L. Ed. 1097, 70 S. Ct. 854 (1950) ("An important factor [in determining equivalency] is whether persons reasonably skilled in the art would have known of the interchangeability . . . .").

This court has explained that the "function-way-result" test may help detect an equivalent, particularly for mechanical elements. *See Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1016, 46 U.S.P.Q.2D (BNA) 1109, 1113 (Fed. Cir. 1998). The function-way-result test dictates that an element in the accused device is equivalent to the claim element if it "performs substantially the same function in substantially the same way [**18] to obtain the same result." *Graver Tank*, 339 U.S. at 608. Applying the function-way-result test to claim 1, the district court found that "the function of the memory selection switch [is] . . . to permit selection of a particular memory location at the receiver for subsequent storage of a transmitted code, *by use of a switch connected to the microprocessor*." *Overhead Door Corp*, No. 95-CV-1648-D, at 24 (N.D. Tex. Jan. 13, 1999) (emphasis added). The district court then found that this function was "totally missing" from the accused device because "the user is unable to predetermine selection of specific, desired memory locations." This application of the function-way-result test erroneously incorporates the claim element's "way" into the definition of the function, effectively limiting the claim element to its literal terms.

The claim language and the specification explain that the "memory selection switch" functions to select memory locations. This claim element accomplishes its function by way of a mechanical switch. This particular switch constitutes the claim element's "way" of accomplishing the memory selection function, not the function itself. The [**19] result of this element is storage of codes in different memory locations. The record at this stage, preliminary to a trial, creates a genuine issue of material fact whether the Intellicode accomplished substantially the same function, in substantially the same [*1271] way, to achieve substantially the same result.

Moreover, contrary to the district court's determination, this court's ruling in *Sage Products* does not limit the range of equivalents to the memory selection switch in this case. In *Sage Products*, this court noted that the claim limitations "top of the container" and "over said slot" constituted "a precise arrangement of structural elements" and a "clear structural limitation" in a "relatively simple structural device." *Sage Prods.*, 126 F.3d at 1425. Finding that Sage's theory of equivalence - i.e., a container having two constrictions below its top was equivalent to the claimed container having a constriction above and a constriction below -- would "remove entirely the 'top of the container' and 'over said slot' limitations from the claim," this court affirmed the district court's grant of summary judgment of non-infringement. *Id.* at 1423-24. [**20] Thus, the proposed application of the doctrine in *Sage Products* would have utterly written out of the claim not one, but at least two (maybe more) express limitations of the claim. Indeed under Sage Products' equivalents theory, a finding of equivalents for one limitation ("at the top") would necessarily require writing out of the claim another limitation ("over said slot"). No matter how the patentee purported to apply the claim to the accused device under the doctrine, the device was always missing at least one limitation. Thus, the claim language specifically negated the patentee's equivalence theory. Moreover, this court in *Sage Products* noted that "any subsequent change in the state of the art, such as later developed technology" would have been eligible for coverage under the doctrine of equivalents, thus clearly defining at least one type of expanded claim coverage under the doctrine. *Id.* at 1425.

In contrast to the facts in *Sage Products*, claim 1 of the '364 patent does not contain any clear structural limitations that preclude a reasonable jury from finding a software system equivalent to the claimed system. By definition, an equivalent does not [**21] fall literally within the claim language. Although the literal meaning of the "memory selection switch" does not cover the software-implemented Intellicode, this case does not

194 F.3d 1261, *1271; 1999 U.S. App. LEXIS 25514, **21;
52 U.S.P.Q.2D (BNA) 1321

preclude application of the doctrine under *Sage Products* because any application of the doctrine would not leave some aspect of the claim missing from the accused device. Applying the doctrine of equivalents to cover Intellicode's software does not vitiate the "memory selection switch" element. *See id.*, at 1423-24.

As properly construed, the "memory selection switch" means a mechanical switch for selecting memory locations. The question remains whether the Intellicode's software-driven memory selection scheme is equivalent to a mechanical switch. This issue remains for the fact-finder to determine at trial in view of the considerable evidence in the record.

**"Memory Selection Second Switch Means" - Claim 5**

Claim 5 recites a "memory selection second switch means being adapted to select a first position . . . and . . . a second position." Because this claim element utilizes the term "means" and the claim does not specify any structure or material for performing the recited function, [**22] the district court properly held "memory selection second switch means" is a means-plus-function element under 35 U.S.C. § 112, P 6 (1994). *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318, 50 U.S.P.Q.2D (BNA) 1161, 1166 (Fed. Cir. 1999) ("if the word 'means' appears in a claim element in combination with a function, it is presumed to be a means-plus-function element"). Thus, "memory selection second switch means" covers the "corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, P 6 (1994).

The district court's determination of corresponding structure is a matter of claim construction, *see Chiuminatta*, 145 [*1272] F.3d at 1306, which this court reviews *de novo. See Cybor*, 138 F.3d at 1456. Determining whether Figure 3 is a "corresponding structure" for the "switch means" of claim 5 requires the court to consult again the language of the claim and the other factors that inform claim meaning. Of course, the central focus remains on the claim language. The written description, the prosecution history, and admissible extrinsic evidence [**23] may supply context to understand the claim language. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 U.S.P.Q.2D (BNA) 1573, 1576-77 (Fed. Cir. 1996); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309, 51 U.S.P.Q.2D (BNA) 1161, 1169 (Fed. Cir. 1999).

In construing claim 5, the district court determined the term "memory selection second switch means" encompasses the same scope as the "memory selection switch" of claim 1. Specifically, the district court determined that "memory selection second switch means" covers only the mechanical switch of Figure 2, not the software embodiment of Figure 3. The written description of the '364 patent and the prosecution history, however, reveal a broader meaning of "memory selection switch means."

As previously explained in this court's analysis of claim 1, Figure 3 illustrates a flow diagram "describing both the operate and program modes of the invention." '364 patent, col. 4, ll. 23-24. The two lower-right corner dialog boxes of Figure 3 describe steps to "store code at location *pointed to* by the code location *pointer*" and "*increment* code location pointer[;] if pointer increments over five [**24] then *load* code location pointer with one." *See id.* at Fig. 3 (emphasis added). Dr. Rhyne's expert testimony shows that one of ordinary skill in the computer science art would understand the underlined terms to describe software operations.

Although software operations do not fall within the literal scope of the "memory selection switch" in claim 1, the reissue prosecution history also discloses a broader reading for the "switch means" of claim 5. First, the patentees' representation to the Patent and Trademark Office in its November 29, 1989 sworn declaration indicated their intent to include the algorithm of Figure 3 as a "corresponding structure" for the switch means. The patentees stated:

We believe the aforesaid Letters Patent to be wholly or partly inoperative or invalid by reason of our *claiming less than we had a right to claim* in the patent. More specifically, we believe the sole independent original claim [i.e., claim 1 of the '118 and now claim 1 of the '364 patent] is *too narrow* in three respects:

. . . .

(c) The claim requires a "switch moveable" and a "*memory selection switch*" but should have required a --first switch means-- and a [**25] --*memory selection switch means*--, respectively, because switch means *includes electronic*

194 F.3d 1261, *1272; 1999 U.S. App. LEXIS 25514, **25;
52 U.S.P.Q.2D (BNA) 1321

*switches as well as mechanical switches*.

J.A. at 5388 (emphasis added). While this statement weighs against construing claim 1 to include software operations, it gives a broader reading to claim 5. This statement evinces the patentees' use of the term "switch means" to include microprocessor operations driven by software, i.e., "electronic" switches, as opposed to a mechanical switch of Figure 2. The patentees' use in claim 5 of the term "switch means" rather than "switch" and "being adapted to select" rather than "setable" and "set," to describe software operations, further support a broader construction.

Later in the reissue proceedings, the patentees argued in response to an anticipation rejection:

> Applicants' method and apparatus is intended to simplify the remote control of equipment by code transmitters. . . . Such simplifications are provided by including multiple storage locations in the receiver and including a *programming* [*1273] *routine* which receives and stores codes transmitted from the code transmitters of the system.

J.A. at 5822 (emphasis added). This [**26] statement further supports reading "switch means" to include structure corresponding to Figure 3.

==The differences in claim language, bolstered by the patentees' statements during the reissue proceedings, cause this court to reach a broader construction for claim 5 than for claim 1. *See Vitronics*, 90 F.3d at 1582.== The district court erred in ruling that only the mechanical switch in Figure 2 is "corresponding structure" for the claimed "switch means." "Switch means," when properly construed, also covers the software-based embodiment described in Figure 3.

Chamberlain asserts that, should this court construe claim 5 to cover the software embodiment of Figure 3, then it is entitled to summary judgment of literal infringement. An accused device satisfies a means-plus-function element literally if it performs the identical function required by the limitation, and incorporates the structure disclosed in the specification or an equivalent thereof. *See Cybor*, 138 F.3d at 1456. The language of claim 5 and the written description establish

that the function of "switch means" is to select different memory locations, thereby enabling the [**27] microprocessor to store transmitter identifiers in the memory locations. The parties do not dispute that the Intellicode's memory selection software program performs this function.

The Intellicode, however, constitutes a different "structure" than the software disclosed in the '364 patent because it uses a different algorithm to perform the recited function. Figure 3 and the corresponding description indicate that the code location pointer increments through a series of memory locations, automatically erasing the previous contents of a memory location when it stores a new transmitter code in that location. When the pointer can no longer increment, i.e., when it is pointing to the last memory location in the series, the microprocessor "loads code location pointer with one," causing the pointer to loop back and select the first memory location in the series. The Intellicode, on the other hand, randomly chooses an unused memory location. Thus, the Intellicode's memory selection scheme is not identical to the structure disclosed in Figure 3 of the '364 patent.

Moreover, Overhead Door presented evidence that its memory selection scheme is not structurally equivalent to that of Figure [**28] 3. A structure in an accused device is equivalent to the disclosed structure corresponding to a means-plus-function element if it is insubstantially different from the disclosed structure. *See Chiuminatta*, 145 F.3d at 1309. Overhead Door urged that the Intellicode software is substantially different from the claim element because its software uses memory more efficiently and minimizes the chances of overwriting previously-stored codes. Viewing the evidence in a light most favorable to the non-movant Overhead Door, this court finds that Overhead Door has raised a genuine issue of material fact precluding summary judgment of literal infringement of claim 5. Accordingly, this court remands for the fact-finder to determine whether the Intellicode uses a structure equivalent to the mechanical switch in Figure 2 or to the software-implemented algorithm in Figure 3, for selecting different memory locations.

## "Switch Moveable" - Claim 1

This court also agrees with the district court that "switch moveable" of claim 1, i.e., the program/operate switch, is present in the accused device. The district court

194 F.3d 1261, *1273; 1999 U.S. App. LEXIS 25514, **28;
52 U.S.P.Q.2D (BNA) 1321

properly construed this element as a "moveable[] switch connected [**29] to the microprocessor having at least two positions." The mechanical switch of Figure 2 supports this construction. Contrary to Overhead Door's assertion, neither the claim language nor the specification requires [*1274] each switch position to be stationary and completely user-selected.

Applying the trial court's correct claim construction to the accused device, this court affirms the district court's finding that the Intellicode's two-position, spring-loaded, push-button switch satisfies the "switch moveable" limitation. In affirming, this court understands that the accused switch returns to a stationary position when the user releases the push-button. The parties do not dispute that the program/operate switch of the Intellicode is "a mechanical, two position, user-operated switch." Overhead Door urges, however, that its momentary switch does not have an operate position, the program position is not stationary, and the switch does not permit the user to select the "operate" mode. This court finds this argument unpersuasive. The Intellicode two-position switch is "a mechanical switch movable between an operate and program position at least momentarily and is connected to the microprocessor. [**30] " Thus, this court affirms the district court's summary judgment ruling insofar as it rested on the finding that the Intellicode literally meets the "switch moveable" requirement.

**"First Switch Means" - Claim 5**

Claim 5 recites "first switch means for selection between program and operate positions connected to said microprocessor." This claim element uses the term "means" and the claim does not specify any structure or material for performing the recited function. Therefore, the district court properly held "first switch means" is a means-plus-function element under 35 U.S.C. § 112, P 6. *See Al-Site*, 174 F.3d at 1318. Thus, "first switch means" covers the disclosed structure, i.e., mechanical switch 22 and its structural equivalents. Specifically, Figure 2 shows mechanical switch 22 as a two-position, moveable switch. As discussed above, this court finds that the "switch moveable" element is literally present in the Intellicode. Similarly, the "first switch means," properly construed as a two-position, mechanical switch or its structural equivalent, is also literally present in the Intellicode. This court therefore affirms the district [**31] court's judgment.

**"Different Codes" - Claims 1 and 5**

The district court also addressed the "different codes" element of claims 1 and 5, and found these elements literally present in the Intellicode. In particular, the district court construed "different codes" to mean "factory-defined codes stored within the radio transmitters which uniquely identify each different transmitter and are not selectable or modifiable by the user of the garage door opener ("GDO") system." The district court's interpretation of this term is consistent with the claim language and finds support in the written description. The claim language requires association of each code with a different transmitter. The written description notes that each code uniquely identifies a transmitter. The specification adds that the codes are set in a factory and remain unchangeable by the user "to eliminate the requirements for code selection switches in the transmitters." '364 patent, col. 1, ll. 53-54.

The claim language does not supply any further constraints on the meaning of "codes." *See Vitronics*, 90 F.3d at 1582. Claims 1 and 5 do not require an identical code in the transmitter and the receiver. [**32] The language of both claims recite "that the code of said first transmitter will be stored in said memory means." Properly construed, this language requires the memory to retain the code it associates with the "first transmitter." The claims, however, do not require that the memory store the exact sequence of coded bits transmitted from the transmitter as its identifying signal. This reading of the claim language finds support in the written description, which explains that a code is associated with a transmitter. It does not describe any particular format, encryption, [*1275] or alteration in transmitted and stored codes. The district court thus avoided interpreting "codes" so narrowly that any simple reformatting or addition of a single bit at the end of the code before storage would avoid the literal scope of claims 1 and 5.

In the Intellicode system, the unique, fixed, factory-programmed string of binary numbers in the transmitter do not match exactly the bits stored in the microprocessor's memory. Rather the Intellicode encrypts the transmitter code for transmission creating a different string of bits, the so-called "hopping code." The Intellicode microprocessor in "program" mode stores [**33] a secret key (yet another string of bits), and thereafter in "operate" mode uses the secret key to verify authorized (i.e. previously learned) transmitters. These features of the Intellicode, as explained above, however, do not avoid literal infringement of the "different codes"

194 F.3d 1261, *1275; 1999 U.S. App. LEXIS 25514, **33;
52 U.S.P.Q.2D (BNA) 1321

element. Thus, this court affirms the district court's construction of the "different codes" element and its finding that this element is literally present in the Intellicode.

III.

In conclusion, this court affirms the district court's grant of Overhead Door's motion for summary judgment of no literal infringement of claim 1, but vacates the summary judgment of non-infringement under the doctrine of equivalents. Specifically, the district court correctly found as a matter of law that the accused device literally includes the "switch moveable" and "different codes" claim elements and does not literally include the "memory selection switch" element. The district court erred, however, in deciding on summary judgment that the accused device does not contain an equivalent of the "memory selection switch." This court concludes that this is a genuine issue of material fact to be determined by a fact-finder.

As [**34] to claim 5, this court vacates the district court's grant of summary judgment of non-infringement. The district court erred in finding as a matter of law that "memory selection second switch means" is absent in the accused device either literally or under the doctrine of equivalents. This court concludes that this is a genuine issue of material fact to be determined by a fact-finder. The district correctly found, however, that as a matter of law the accused device literally contains "different codes" and "first switch means."

The court therefore remands this case to the district court for further proceedings in accordance with this opinion.

COSTS

Each party shall bear its own costs.

*AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.*



ZYGO CORPORATION, Plaintiff-Appellee, v. WYKO CORPORATION, Defendant-Appellant.

94-1445

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

79 F.3d 1563; 1996 U.S. App. LEXIS 5614; 38 U.S.P.Q.2D (BNA) 1281

March 26, 1996, DECIDED

SUBSEQUENT HISTORY:   [**1] Rehearing Denied May 15, 1996, Reported at: 1996 U.S. App. LEXIS 12587.

PRIOR HISTORY:   Appealed from: U.S. District Court for the District of Arizona (Tucson). Judge Quackenbush.

DISPOSITION:   AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED

COUNSEL: Lawrence G. Kurland, of New York, New York, argued for plaintiff-appellee. With him on the brief were Michael G. Biggers, Arthur Mann and Bryan Cave.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, of Washington, D.C., argued for defendant-appellant. Joseph W. Mott, Terry E. Fenzl and Patricia A. Hubbard, Brown & Bain, P.A., of Phoenix, Arizona, were on the brief for defendant-appellant. Of counsel was J. Michael Jakes, Finnegan, Henderson, Farabow, Garrett & Dunner, of Washington, D.C.

JUDGES: Before LOURIE, Circuit Judge, NIES, * Senior Circuit Judge, and BRYSON, Circuit Judge.

   *   Judge Nies assumed Senior status on November 1, 1995.

OPINION BY: NIES

OPINION

   [*1565] NIES, *Senior Circuit Judge*.

   Wyko Corporation appeals the final judgment of the United States District Court for the District of Arizona (Civil Action No. CIV 88-454-T-JLQ), which held Zygo Corporation's United States Patent No. 4,201,473 ("the '473 patent") for an interferometer system not invalid and infringed by three models of Wyko interferometers, resulting [**2] in an award of $ 2,668,710.43 in damages calculated in part as lost profits and in part as a reasonable royalty. We hold that the district court clearly erred in finding that one model, the Wyko 6000 Redesign, infringed under the doctrine of equivalents. We affirm the finding of infringement on the Original Wyko 6000 designs.

   In sum, for reasons discussed more fully below, we *affirm-in-part, reverse-in-part*, and *remand* for recalculation of damages.

I.

*Background*

   Dissatisfied with existing interferometers, Zygo set out to design and patent its own devices. In 1977, Zygo designed the Zygo Mark II, the commercial embodiment of the invention claimed in the '473 patent. The patented interferometer has two modes of operation, alignment and

79 F.3d 1563, *1565; 1996 U.S. App. LEXIS 5614, **2;
38 U.S.P.Q.2D (BNA) 1281

viewing. In the alignment mode, the internal TV camera is focused down the "alignment leg." The reference and test wavefronts are collected by a series of optic elements and projected as two dots of light onto a stationary diffuse screen. Embedded into the stationary diffuse screen is a visible cross-hair reticle with a marked center indicating the optical axis. The image on the screen of the dots and reticle is picked up by a TV camera [**3] and displayed on a CCTV monitor. An operator moves the dots to the center of the alignment reticle at which point alignment is achieved.

To view the fringe pattern, the interferometer must be switched into the "view mode." When the view mode is entered, a flip mirror is moved and a TV camera is focused down the "view leg," which permits the combined wavefronts to be imaged as a fringe pattern onto a second diffuse screen. This diffuse screen is movable with respect to the path of the wavefronts so as to destroy the coherence length of the beam [1] and to eliminate spurious fringe patterns. The view leg includes a continuous zoom lens positioned between the camera and the movable diffuse screen. The diffuse screen, together with the fringe pattern caused by the interference of the reference and test wavefronts in the recombined beam, is imaged onto the camera.

> 1  "Coherence length" is defined as the maximum tolerable optical path length difference between two energy beams which are forming an interference pattern. Handbook of Chemistry and Physics, F-83 (Robert C. Weast, Ph.D. ed., 63rd ed. 1982-83).

[**4] The inventors constructed a "breadboard" of the patented interferometer during the course of their development work. The breadboard, which was built on a 2' by 2' plate, consisted of the various optical components disclosed in the '473 patent. In transforming the breadboard interferometer into a functioning commercial unit, Zygo made several necessary additions. For example, the entire device was encased in a metal box for protective purposes, and a spherical field lens, which functioned to make the alignment spots appear brighter on the television monitor, was built into the back of the stationary view screen. As a result of encasing the device, a mirror had to be added to illuminate the [*1566] view screen and improve visibility. The '473 patent does not disclose the enclosure, the spherical field lens, or the illumination mirror.

On April 21, 1978, Zygo filed the patent application which matured into the '473 patent. The claims were initially rejected under 35 U.S.C. § 103 as being obvious in view of a brochure describing a prior art interferometer, the Tropel reference. Zygo responded with argument that the claims as filed were patentably distinct over that prior art. In particular, [**5] Zygo noted that the Tropel reference failed to teach the use of zoom magnification, an alignment reticle, or means for destroying coherence length (i.e. the movable diffuse screen). The Examiner then allowed the claims, and the '473 patent issued on May 6, 1980.

*The Accused Device*

Defendant Wyko Corporation was founded in 1982 by Dr. Wyant, a professor at the University of Arizona, and Mr. Chris Koliapolis, a former doctoral candidate student of Dr. Wyant's. This litigation centers around two Wyko optical interferometer systems: the original Wyko 6000 and the Wyko 6000 Redesign. The original Wyko 6000 interferometer was first introduced in January 1988. The Wyko 6000 Redesign made its debut about one year after initiation of this lawsuit.

The original Wyko 6000 included a stationary diffuse screen onto which the reference and test wavefronts were focused as dots of light which were imaged onto a television camera, converted into electronic data, and appeared on a computer monitor along with a reticle for alignment that was generated by computer software. The two dots were tilted and tipped until they overlapped at the center of the cross-hair which meant they were aligned [**6] along the optical axis of the interferometer.

In the Wyko 6000 Redesign, no reticle is displayed for alignment. Instead, a prism is used which is factory-positioned so that its axis is parallel to the optical axis of the interferometer. When so positioned, the prism deflects light that is not parallel to its axis. If the wavefronts are not in alignment, the prism creates a split-image of the test and reference wavefronts such that four dots (two for each wavefront) are projected onto the diffuse screen. This image is transferred to a TV monitor. Both pairs of dots are moved together. When properly aligned, the four dots coalesce into a single spot, which means they are aligned along the optical axis of the interferometer.

In the view mode, both the original and redesigned

79 F.3d 1563, *1566; 1996 U.S. App. LEXIS 5614, **6;
38 U.S.P.Q.2D (BNA) 1281

Wyko 6000 systems included a rotating ground glass screen positioned in front of a continuous zoom lens. Similar in purpose to the movable screen in the Zygo interferometer, the rotating ground glass screen functioned to eliminate spurious fringe patterns. There is no dispute that the Wyko devices meet the limitations respecting the view mode.

*Procedural History*

The court entered its Findings of Fact [**7] and Conclusions of Law on March 3, 1993, holding the '473 patent was neither invalid (1) for lack of an enabling disclosure or (2) for failing to disclose the best mode, nor was the patent unenforceable for inequitable conduct before the Patent Office. While none of the accused Wyko devices were found to literally infringe the '473 patent, the court concluded that all versions of the accused Wyko devices infringed under the doctrine of equivalents.

The damages phase of the trial was similarly tried to the bench, after which the court entered its Findings of Fact and Conclusions of Law and awarded Zygo over $ 2.1 million in total lost profits and a reasonable royalty. The court also awarded prejudgment interest in the amount of $ 532,755.04.

On appeal, Wyko alleges the district court erred in the finding that the accused devices infringed the '473 patent under the doctrine of equivalents, and in concluding that the '473 patent was not invalid for failure to disclose the best mode. Wyko also challenges the award of damages calculated as lost profits.

II.

*Best Mode*

Compliance with the best mode requirement [*1567] of 35 U.S.C. § 112 P 12 [2] is a question of fact. *Scripps Clinic &* [**8] *Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1578, 18 U.S.P.Q.2D (BNA) 1001, 1012 (Fed. Cir. 1991). In this case, which was tried to the bench, the court's finding that there was no violation of section 112 is reviewed under the clearly erroneous standard. *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535-36, 3 U.S.P.Q.2D (BNA) 1737, 1745 (Fed. Cir.), *cert. denied*, 484 U.S. 954, 98 L. Ed. 2d 372, 108 S. Ct. 346 (1987).

2 Section 112 reads in pertinent part:

The specification . . . shall set forth the best mode contemplated by the inventor for carrying out his invention.

Prior to filing the patent application, the inventors made an optical breadboard embodiment of the invention. Also prior to filing, Zygo made a commercial embodiment which encased the interferometer in a box. To make the encased interferometer work, it was necessary to add an illumination mirror and a spherical field lens. Only the interferometer, that is, without any enclosure together with the add-ons thereby made necessary, is disclosed and claimed.

[**9] Wyko argues that the encased interferometer--the commercial embodiment--was the best mode contemplated by the inventors for carrying out their invention. Zygo argues that the court properly concluded that the best mode requirement of section 112 P 1 was met here because the claimed invention is not an encased interferometer and that section 112 does not mandate disclosure of activities done in furtherance of commercialization of the claimed invention.

The phrases "best mode" and "carrying out the invention" are not statutorily defined. What is a "mode" of the "invention"? What acts or ideas are meant to be encompassed by the phrase "carrying out the invention"? These questions are not answered by a mechanical rule. *See Wahl Instruments, Inc. v. Acvious, Inc.*, 950 F.2d 1575, 1579, 21 U.S.P.Q.2D (BNA) 1123, 1126 (Fed. Cir. 1991) ("The words in the statute are not without ambiguity. This case illustrates that the term 'mode' and the phrase 'carrying out the invention' are not definable with precision.").

Wyko's best mode defense amounts to an attack on the nondisclosure of a particular embodiment, a commercial mode for a particular type of use of the claimed invention. At least one of the [**10] inventors contributed to the commercial design. The failure to disclose the commercial mode, however, does not *ipso facto* result in a section 112 violation. The focus of a section 112 inquiry is not what a particular user decides to make and sell or even in what field the invention is most likely to find success. Rather, in keeping with the statutory mandate, our precedent is clear that the

parameters of a section 112 inquiry are set by the claims. *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531, 20 U.S.P.Q.2D (BNA) 1300, 1302 (Fed. Cir. 1991) ("The best mode inquiry is directed to what the applicant regards as his invention, which in turn is measured by the claims."); *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 927, 16 U.S.P.Q.2D (BNA) 1033, 1036 (Fed. Cir. 1990) ("The other objective limitation on the extent of the disclosure required to comply with the best mode requirement is, of course, the scope of the claimed invention.").

Here, the claimed invention is an interferometer system which has a number of applications. The inventors disclosed the mode for carrying out that claimed invention: a light source, beamsplitters, various optical elements, a diffuse screen with [**11] a reticle, a camera, and a monitor arranged in a particular manner. It is undisputed by the parties that the disclosure is adequate to enable one of skill in this art to practice the invention of the claims. *Chemcast*, 913 F.2d at 928, 16 U.S.P.Q.2D (BNA) at 1036-37. It is also undisputed and the record indicates that interferometers can function and are used commercially without an enclosure. The only argument is that the hardware added to make Zygo's enclosed commercial embodiment should have also been disclosed. That argument must be rejected. Because the claims simply do not require packaging of any sort, the failure to disclose the enclosure is not a violation of section 112. *Engel Indus.,*, 946 F.2d at 1531 ("Unclaimed subject matter is not subject to [*1568] the disclosure requirements of § 112."); *Christianson v. Colt Indus. Operating Corp.*, 822 F.2d 1544, 1563, 3 U.S.P.Q.2D (BNA) 1241, 1255 (Fed. Cir. 1987) (since "inter-changeability with M-16 parts appears nowhere as a limitation in any claim . . . the best mode for making and using and carrying out the claimed inventions does not entail or involve" interchangeability), *vacated on other grounds*, 486 U.S. 800 (1988) (emphasis [**12] in original).

With respect to the subject matter of the claims, an enclosed mode may or may not be "best" for a particular commercialization. But it is clear that an enclosure is not a necessary part of this invention and there is no evidence that either inventor considered an enclosed interferometer to be the best mode of carrying out the invention. *Cf. Dana Corp. v. IPC Ltd. Partnership*, 860 F.2d 415, 8 U.S.P.Q.2D (BNA) 1692 (Fed. Cir. 1988) (best mode violated when inventor failed to disclose use of specific surface treatment that he knew to be necessary for satisfactory performance), *cert. denied*, 490 U.S. 1067, 104 L. Ed. 2d 633, 109 S. Ct. 2068 (1989).

Under all of the circumstances of this case, the trial court's finding that Wyko failed to establish a violation of the best mode requirement of section 112 P 1 is not clearly erroneous. Accordingly, the court's conclusion of law that the '473 patent is not invalid is affirmed.

III.

*Infringement Under the Doctrine of Equivalents*

The infringement dispute in this case centers on the claim language "means for collecting said two wavefronts and focusing them as spots onto a diffuse screen containing an integral alignment reticle having a marked center." The [**13] court construed the emphasized language to mean the alignment reticle and the diffuse screen were "one piece." Literal infringement is not an issue. No Wyko device contains a unitary screen and an alignment reticle as required by the claim. The only issue is infringement under the doctrine of equivalents. We affirm the finding of infringement by the original Wyko 6000 models but reverse with respect the Wyko 6000 Redesign.

Infringement under the doctrine of equivalents may be found where those limitations of a claim not found exactly in the accused device are met equivalently. In *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 935, 4 U.S.P.Q.2D (BNA) 1737, 1739-40 (Fed. Cir. 1987) (*in banc*), *cert. denied*, 485 U.S. 961, 485 U.S. 1009, 99 L. Ed. 2d 426, 108 S. Ct. 1226 (1988), the *in banc* court held:

It is well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device. *Lemelson v. United States*, 752 F.2d 1538, 1551, 224 U.S.P.Q. (BNA) 526, 533 (Fed. Cir. 1985).

*See Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581, 37 U.S.P.Q.2D [**14] 1365, 1373 (Fed. Cir. 1996) ("Liability for infringement thus requires, without exception, that an accused product contain each limitation or its equivalent."); *Laitram Corp.*

79 F.3d 1563, *1568; 1996 U.S. App. LEXIS 5614, **14;
38 U.S.P.Q.2D (BNA) 1281

v. *Rexnord, Inc.*, 939 F.2d 1533, 1539, 19 U.S.P.Q.2D (BNA) 1367, 1369 (Fed. Cir. 1991) ("The failure to meet a single limitation is sufficient to negate infringement of the claim."); *see also Dolly, Inc. v. Spalding & Evenflo Co.*, 16 F.3d 394, 397, 29 U.S.P.Q.2D (BNA) 1767, 1769 (Fed. Cir. 1994). Infringement may not be found under the doctrine of equivalents if a limitation is missing, that is, not replaced with an equivalent substituent. But as explained in *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 9 U.S.P.Q.2D (BNA) 1962 (Fed. Cir. 1989), the substituent need not be in the exact same location specified by the claim. If, in the context of the invention, the substituent substantially performs the same function to achieve the same result in the same way as the required limitation, that limitation is satisfied.

### A.

In the original Wyko 6000 devices, a reticle which coincided with the location of the optical axis, in the words of the claim, an "alignment reticle," was generated by hardware [*1569] or software [**15] and appeared on a monitor together with the two dots imaged by the camera from the diffuse screen. [3] Thus, the image on the Wyko monitor duplicated the required image on the monitor in the alignment mode of the invention. We have no difficulty agreeing that the image of the reticle generated on the monitor is the equivalent of the physical reticle on the screen which is also imaged on the monitor in the Zygo invention. While the alignment reticle has been moved within the alignment leg of the accused interferometers, the function of alignment is accomplished in the same way, by moving the two spots to coalesce at the center of a reticle which coincides with the optical axis of the interferometer. Similarly, the point at which the crosshairs cross is at least equivalent to a marked spot.

> 3 In the first four original units, the alignment crosshair was displayed on the computer monitor only. In the 14 modified original units, the reticle also was generated on the TV monitor.

In sum, the evidence supports the [**16] trial court's finding of equivalency between the alignment reticles of the accused and patented devices both of which are the means for alignment. Inasmuch as all other elements of the claims are admittedly met in Wyko's original devices, this ultimate finding of infringement is not clearly erroneous.

### B.

Turning to the Wyko 6000 Redesign, we reach the opposite conclusion. In these devices, an image inverting prism is placed in the path of the wavefronts that emerge from the diffuse screen. Each portion of the wavefronts that passes around the prism is projected as a spot on the camera. Each part of the wavefront passing through the prism is deflected and projected as a separate spot on the camera. The spots are mirror images. When these four spots coincide, the positions of which can be adjusted by the operator, alignment is achieved. In the Redesign, there is no substitute "alignment reticle," that is, crosshairs defining the optical axis of the interferometer. The "alignment aid" is the prism structure which splits each of the beams on its way to the camera into two so that four dots appear on the monitor. These four dots are moved so as to coalesce into one, at which point [**17] the beams are centered on the axis of the interferometer. Thus, to find infringement, the prism structure must be found an equivalent of an alignment reticle placed on the optical axis, a finding which is not supportable. That both can be labelled "alignment aids," as Zygo terms them, does not answer the question whether they are equivalent within the concept of infringement. That the substituent performs the same general function to achieve the same result as the required element also does not establish their equivalency. The result must be achieved in substantially the same way. *Dolly*, 16 F.3d at 400, 29 U.S.P.Q.2D (BNA) at 1771 ("An 'equivalent' of a claim limitation cannot substantially alter the manner of performing the claimed function.").

Here, there is simply no dispute that the alignment aids in the two devices are not only structurally different but also operate in a different way. Making four beams coalesce without a reticle for centering on the optical axis is obviously not the same principle of operation as making two beams coalesce at the center of an alignment reticle. A finding of equivalency just because the same result is achieved is "a flagrant abuse of the term 'equivalent'." [**18] *Burr v. Duryee*, 68 U.S. (1 Wall.) 531, 573, 17 L. Ed. 650 (1863).

One complicating factor here is that a software generated reticle can be made to appear on the computer monitor of the Wyko Redesign and the four alignment spots happen to coalesce very near the center of that reticle. Zygo asserts that because of this reticle in the Wyko Redesign, these devices also meet the limitations

79 F.3d 1563, *1569; 1996 U.S. App. LEXIS 5614, **18;
38 U.S.P.Q.2D (BNA) 1281

of "an alignment reticle integral with the screen." Wyko counters that the reticle on the computer monitor is not positioned exactly on the optical axis and, therefore, unlike in the original Wyko 6000, this reticle cannot serve as a meaningful reference. The record establishes that the software in the original was replaced in the Redesign. The new software creates a reticle which is used only to assist factory setup of the view mode intensity display. It serves no purpose on the computer [*1570] monitor in the alignment mode, and the computer must be misadjusted for it even to be seen.

Zygo argues that under the precedent of *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832, 20 U.S.P.Q.2D (BNA) 1161, 1171 (Fed. Cir. 1991), a device which is capable of infringing use does not escape infringement although [**19] not actually used in an infringing manner. However, Zygo overreads *Intel*. By its literal terms, the claim involved in *Intel* only required "capability" (*i.e.*, "programmable selection means"). The substitute means in the accused device in *Intel* literally met the claim language.

In any event, the alignment aid in the Wyko Redesign is the prism, not an alignment reticle, *i.e.*, one placed on the center of alignment. The reticle in the Redesign is not positioned as an "alignment reticle," does not function as one, and is present in the device for an entirely different purpose. Further, using spots through and around the prism is a distinctly different "way" of achieving alignment from imaging spots directly from the diffuse screen to a monitor for alignment on a displayed reticle. Because the Redesign operates on different optical principles, the same "way" prong of the tripartite test has not been satisfied. [4]

    4 We note that the trial court's original opinion contained language in agreement with our disposition:

        The Wyko Redesign utilizes a different way, that is, a prism, to create a split image alignment aid focused onto a diffuse screen, with no alignment aid physically appearing on the television monitor, which is a different way of indicating the spot where the optical axis is.

However, the court issued an Amended Opinion from which this language was stricken and replaced with a contrary conclusion.

[**20] Finally, for purposes of infringement under the doctrine of equivalents, the differences between the claimed device and the accused device must be insubstantial. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 610, 94 L. Ed. 1097, 70 S. Ct. 854 (1950); *Singer Mfg. Co. v. Cramer*, 192 U.S. 265, 286, 48 L. Ed. 437, 24 S. Ct. 291 (1904); *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1518, 35 U.S.P.Q.2D (BNA) 1641, 1645 (Fed. Cir. 1995) (*in banc*), *cert. granted*, 134 L. Ed. 2d 95, 1995 WL 668878 (U.S. 1996) ("The application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard."). According to Wyko, the fact that the Wyko 6000 Redesign alignment system was patented demonstrates the substantiality of the differences between the claimed and accused devices.

Wyko's patent, against which the '473 patent was cited and considered as prior art, is thus presumed nonobvious in view of the '473 patent until proven otherwise. The nonobviousness of the accused device, evidenced by the grant of a United States patent, is relevant to the issue of whether the change therein is substantial. *Roton Barrier, Inc.* [**21] *v. Stanley Works*, 79 F.3d 1112, 1996 U.S. App. LEXIS 5380, 1996 WL 92068, 37 U.S.P.Q.2D 1816 (Fed. Cir. 1996) (Nies, J., Additional Views); *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1192, 37 U.S.P.Q.2D (BNA) 1685, 1689 (Fed. Cir. 1996) ("The fact of separate patentability is relevant, and is entitled to due weight.").

In sum, the accused interferometer with the prism alignment system simply can not be deemed an insubstantial change from Zygo's claimed interferometer with the reticle alignment system. *Hilton Davis*, 62 F.3d at 1518, 35 U.S.P.Q.2D (BNA) at 1645. Because the Redesign has no reticle for alignment or equivalent thereof, a limitation required by the claim is missing and there is no infringement. *Pennwalt*, 833 F.2d at 935, 4 U.S.P.Q.2D (BNA) at 1739-40; *Athletic Alternatives*, 73 F.3d at 1581, 37 U.S.P.Q.2D (BNA) at 1373.

IV.

*Damages*

79 F.3d 1563, *1570; 1996 U.S. App. LEXIS 5614, **21;
38 U.S.P.Q.2D (BNA) 1281

In view of the reversal of the finding that the Wyko 6000 Redesign infringed the '473 patent, the damages award is vacated. The trial court's analysis did not distinguish between the Original and the Redesign Wyko models in addressing the issues of lost profits, convoyed sales, and reasonable royalty, and it is unclear that the court's findings are applicable to the Original [**22] Wyko alone. Under [*1571] these circumstances, we remand with instructions to recalculate the damages due Zygo for the infringement by the Original Wyko models.

### Lost Profits

The central damages issue on appeal is whether the court erred in concluding that Wyko's SIRIS interferometer was not an acceptable noninfringing alternative to the Zygo interferometers. The record indicates that Wyko stopped marketing the SIRIS interferometer when it began marketing the Wyko 6000 interferometer. Wyko argues that the award of lost profits was error on the theory that they would have continued making and selling the SIRIS had they not made and sold the Wyko 6000 interferometers.

It is axiomatic, however, that if a device is not available for purchase, a defendant cannot argue that the device is an acceptable noninfringing alternative for the purposes of avoiding a lost profits award. A lost profits award reflects the realities of sales actually lost, not the possibilities of a hypothetical market which the infringer might have created. Thus, whether or not the SIRIS was an acceptable noninfringing alternative is relevant only for the period of time that the SIRIS interferometer was being [**23] marketed by Wyko.

The court's finding that the SIRIS interferometer was not an acceptable noninfringing alternative is reviewed for clear error. *See Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577, 24 U.S.P.Q.2D (BNA) 1321, 1337 (Fed. Cir. 1992) ("The existence of a noninfringing substitute is a question of fact, reviewable under the clearly erroneous standard."); *SmithKline Diagnostics v. Helena Lab. Corp.*, 926 F.2d 1161, 1163-65, 17 U.S.P.Q.2D (BNA) 1922, 1924-27 (Fed. Cir. 1991) (discussing standard of review). We must question the court's finding that the SIRIS interferometer was not an acceptable alternative, however, because of the insufficiency of the court's findings. Zygo bore the burden of proof and the record evidence, while sparse, suggests a contrary conclusion, at least as to the Mark IV interferometer.

The SIRIS interferometer with the FIZ4 adapter, like the Wyko 6000 and the Mark IV interferometers, was a phase-shifting Fizeau type interferometer. The software that was used in the Wyko 6000 was "basically the same package" as used in the SIRIS interferometer and the SIRIS was "repackaged" and renamed the 6000. Furthermore, there was [**24] ample testimony regarding the capabilities of the SIRIS interferometer with the FIZ4 adapter, the advantages of the SIRIS and the disadvantages of the Mark IV interferometer. For example, whereas the SIRIS used a "powerful Hewlett-Packard computer," the Mark IV had a Zygo-built computer that lacked an internal hard drive, was "very slow" and had "very poor computer graphics." There was also testimony that the SIRIS and Mark IV interferometers could test the same components, served the same applications, and that there was nothing the Mark IV could do that the SIRIS with the FIZ4 adapter could not.

While we do not, on this record, have a definite and firm conviction that a mistake has been made warranting reversal on this issue, *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948), we, nevertheless, vacate the award and remand with instructions for the court to provide findings in support of its conclusion that the SIRIS was not an acceptable noninfringing [5] alternative (assuming its actual availability during some of the period the Original Wyko models were on the market). The court's findings should include details regarding the similarities and differences between [**25] the SIRIS, Mark IV, and Mark IVxp interferometers.

    5   That the SIRIS was noninfringing was not, as noted by the court, in dispute below, nor does Zygo assert the SIRIS infringed the '473 patent on appeal.

### Reasonable Royalty

In contrast, the fact that Wyko could have continued marketing the SIRIS is a factor relevant to the determination of a proper royalty during hypothetical negotiations. Wyko would have been in a stronger position to negotiate for a lower royalty rate knowing it had a competitive noninfringing [*1572] device "in the wings." On remand, the court shall reconsider its award of a 25% royalty rate in light of Wyko's ability to market the noninfringing SIRIS in lieu of marketing the infringing Original Wyko 6000.

79 F.3d 1563, *1572; 1996 U.S. App. LEXIS 5614, **25;
38 U.S.P.Q.2D (BNA) 1281

V.

*Conclusion*

The court's conclusion that the '473 patent is not invalid for failure to set forth the best mode is affirmed, as is the finding that the original Wyko 6000 infringed claim 1 of the '473 patent under the doctrine of equivalents. The court's finding that the [**26] Wyko 6000 Redesign infringed claim 1 under the doctrine of equivalents is reversed. The case is remanded to the district court for a redetermination of the damage award consistent with this opinion.

*Costs*

Each party shall bear its own costs.

AFFIRMED-IN-PART,      REVERSED-IN-PART, AND REMANDED