**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 11-cv-00520-RM-BNB

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC.,
doing business as Vitals.com,

      Defendant.

_____

**ORDER GRANTING IN PART AND DENYING IN PART MDX'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT**
_____

This matter is before the Court on the motion for partial summary judgment of

noninfringement filed by Defendant MDx Medical, Inc.[1] ("MDx").  (ECF No. 195.)  The motion

is fully briefed and ripe for disposition.  A hearing was held regarding this motion on October

25, 2013.  (ECF No. 636.)  Pursuant to 28 U.S.C. § 1338(a), the Court's jurisdiction over this

case is based on the U.S. Patent Act, 35 U.S.C. § 101 *et seq.*

**I.  BACKGROUND**

    **A.  The 7,752,060 Patent**

Plaintiff Health Grades, Inc. ("Health Grades") owns U.S. Patent No. 7,752,060 (issued

Jul. 6, 2010) (the "'060 Patent").  The invention claimed therein relates to an "Internet-based

system and method that connects patients with potential healthcare providers, e.g., physicians

_____

[1] The motion is for partial summary judgment as it pertains only to the alleged non-infringement by the MDx
website as it has existed since January 2011.  As the motion is temporally constrained, the Court's rulings in this
matter are confined to the time period designated by MDx.

1

and hospitals." ('060 Patent col.1 ll.12-14.)  More specifically, the patented system makes reports available to users containing physician-verified, third-party-verified, and patient-provided information about healthcare providers, including comparison ratings, in order to "assist patients in differentiating among healthcare providers."  ('060 Patent col.1 ll.14-20.)  A description of the invention is set forth in the Court's claim construction order (the "Markman Order") and need not be repeated at length here.  (ECF No. 138 at 1-4.)

Health Grades alleges that MDx infringes Claims 1, 4 through 9, 11, and 14 through 16 of the '060 Patent.  Claims 1 and 15 are independent claims which disclose, in pertinent part:

Claim 1:

> A computer-implemented method of providing healthcare provider information to potential patients, said method comprising: receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider . . . [and] creating . . . a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, **wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers . . . .**

('060 Patent col. 20 ll.20-22, 58-65 (emphasis added).)

Claim 15:

> An on-line information system for connecting healthcare providers with potential patients, the system comprising: at least one computer processor and memory…and comprising a series of instructions that, when executed . . . cause the . . . processor to: receive a request for information regarding a first healthcare provider . . . [and] create a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third party source, **wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers . . . .**

('060 Patent col. 22 ll. 9-18, 48-54 (emphasis added).)

MDx denies infringement and, for purposes of the instant motion, focuses on the apparent claim limitation or requirement that comparison ratings on healthcare providers be included in the report on the first healthcare provider.  MDx asserts that it does not include comparison ratings in its reports on the first healthcare providers (called "profiles" on the MDx website),[2] and thus Health Grades cannot establish infringement, either literally or by equivalents.

### B.  The Accused Product

MDx maintains the website www.vitals.com (the "MDx website"), the current version of which was launched in January 2011.  (ECF No. 195 at 2.)  Health Grades asserts that this website is the infringing product.

MDx's website enables users to search for information on healthcare providers.  (ECF No. 195 at 3, ¶ 6; ECF No. 201 at 4, ¶ 6.)  A user can search for healthcare providers by name or by one or more descriptive variables, for example location, gender, or language ability.  (*See* ECF No. 201 at 22; ECF No. 207 at 3-6.)  When a user initiates a search for a particular provider by name, assuming there is but a single provider with such name, the user is taken directly to a profile on that particular provider.  For instance, if one were to type "Robin J. Sadker"[3] into the "Type a name" field, specifying "Denver, CO" for the place, as there is but one such Dr. Sadker in this location, the user would be taken directly to Dr. Sadker's profile.  This profile contains a variety of information including the provider's name, her address, medical specialties, patient reviews (based on a four-star rating system), and other data.  The ratings of other providers are not visible from any of the pages of her profile. (*See* screenshot of the Sadker profile, attached as Exhibit 1.)

---

[2] The '060 Patent refers to "reports on the first healthcare provider."  The MDx website calls its reports "profiles." For the most part, this Order will refer to "profiles" when referring to the MDx website, and "reports" when referencing the claimed invention and the patent language.

[3] The Sadker example will be used extensively throughout this Order.

If the user types only a non-unique or incomplete name, such as "Smith," or opts to search not by name, but by specialty, location or other criteria, then initiation of the search does not take the user to a profile on any single provider.  Instead, a search results page appears, which contains a list of providers with that name, specialty, location or specified criteria.  And for each provider shown, some data—including ratings—are displayed.  Thus, when viewing the search results, a user can simultaneously see names, addresses, specialties, and patient ratings of multiple providers satisfying the search criteria.  From the results list, the user can also compare providers by comparing the number of stars (ratings) each provider received.  The user may click on the hyperlinked name of any single provider and be taken to his or her profile or report.  (*See* screenshot of "Internist" in "Denver, CO," attached as Exhibit 2.)

To summarize, on the MDx website an individual provider's profile contains at most[4] only his or her individual rating (stars), but no ratings or stars for other providers.  Therefore, a user cannot, within the profile, find comparison ratings for other providers.  However, the user who has not yet selected a specific provider[5] profile to view, but rather has only initiated a broad or generic search, sees a result list from which the user can select a provider whose report the user wishes to view.  And on the results list, the user can see the ratings of multiple providers before determining which profile he or she wishes to review.

There is an additional aspect of the MDx website that merits mention.  The MDx provider profile is organized as follows:  Across the top of the profile is a persistent header which contains a photo or photo place-holder for the provider, a statement of her specialty and years of experience, and her address.  Beneath the persistent header are tabs for such items as credentials,

---

[4] Some healthcare providers have no patient reviews, and thus have greyed out—or zero—stars.
[5] For purposes of this Order, the healthcare provider, often herein simply referred to as a "provider," is an individual person, not a healthcare facility.

patient reviews, insurance, and other matters.  Clicking on a tab changes the information presented beneath the persistent header to that which corresponds to the subject of the tab. Within a tab section, the lower right hand corner of the "tab page" contains a hyperlink which reads "Search All Similar Doctors."[6]

The results list generated by clicking the hyperlink, which the Court calls a "hyperlink generated" search result, contains the same information for each provider as is shown on results lists generated by search results initiated by users (hereinafter "user initiated" searches or search results).  More precisely, as is true of user initiated searches, the hyperlink generated search results show ratings or stars for each provider listed in the results.  The principle differences between user initiated search results and hyperlink generated search results are twofold: (1) the user initiated search results can precede production of the provider profile discussed above; (2) the user initiated search results are in response to user generated search criteria, while hyperlink generated search results are returned on the basis of criteria established by MDx and are triggered by clicking on the referenced hyperlink.

### C. The Pivotal Issue

The '060 Patent covers provider reports containing information beyond comparison ratings of providers.  Indeed, a multitude of other information from the healthcare provider, patients and third parties is contained within each Health Grades provider report.  This additional information includes such data as addresses, specialty, board certification, disciplinary action, languages, and more.  And the "profiles" on the MDx website contain generally similar information.  (There is disagreement, however, as to whether MDx obtained its information by methods protected by the '060 Patent.)  The focus of the Court in this decision, however, is on

---

[6] As near as the Court can determine, the hyperlink appears on each tab or page except that for "Patient Reviews," a seemingly deliberate, and curious, omission.

the issue of comparison ratings because it is the pivotal one between the parties as framed by the motion for summary judgment.

MDx contends that it does not infringe the '060 Patent, literally or by equivalents, because its provider profiles do not contain **within them** "comparison ratings of healthcare providers." MDx views Claims 1 and 15, and the dependent claims which follow, as requiring comparison ratings in the provider profile. And this requirement is viewed as a limitation of the '060 Patent. Further, MDx contends that permitting Health Grades to proceed under the doctrine of equivalents would be improper as it would vitiate entirely the claim limitation that comparison ratings be in a specific location—within the healthcare provider profile or report. MDx further argues that prosecution history estoppel should apply to bar application of the doctrine of equivalents, and that there is no substantial similarity between the claimed and accused products.

Health Grades' response is multifaceted. It argues that MDx's search results[7] are within or part of the MDx provider profiles. This response is dependent upon two alternative characterizations of the MDx search results. Health Grades contends that the MDx search results page is actually the first page of the profiles of each provider shown thereon[8] or, alternatively, the results list contains a series of executive summaries for each provider shown where each summary is "part of" the profile or report for that provider. In essence, Health Grades argues that MDx's search results are actually two things—search results **and** portions of provider profiles. Health Grades bolsters this position by reliance on a user's ability to navigate between search results and subsequently accessed profiles by using the forward and back buttons on the Internet browser which displays the web pages.

---

[7] Unlike the Court, MDx does not differentiate between user initiated searches and hyperlink generated searches. Health Grades seems to focus in its briefing and argument on what the Court has labeled as user initiated searches.

[8] Sometimes, Health Grades limits this further by suggesting that the results list is part of the report of the practitioner at the top of the results list. (*See* ECF No. 201 at 25.)

As for infringement by equivalents, Health Grades reasserts its characterizations of the results list and submits that these characterizations are equivalent to comparison ratings within a report as protected by the '060 Patent.  As for vitiation, Health Grades argues that the doctrine of vitiation must be applied carefully so as to prevent the "all elements" rule from swallowing the doctrine of equivalents.  It also argues that there is not, in any event, complete vitiation of any claim element.  At most, there is but partial vitiation, according to Health Grades.  Health Grades further argues that neither prosecution history estoppel, nor product dissimilarity, precludes application of the doctrine of equivalents.

### D. The Markman Order

On February 13, 2012, Judge Brimmer[9] issued the Markman Order regarding claim construction in this case.  (ECF No. 138.)  In the Markman Order, he construed a number of terms central to resolution of the pending motion.  The term "first healthcare provider" was construed as follows:

- First Healthcare Provider: a particular healthcare provider about whom information is requested and a report is produced.

(*Id*. at 12.)

As to whether the "particular" healthcare provider may be one or more individuals, the Markman Order resolved this issue in footnote 4:

> One possible interpretation of 'first healthcare provider' that would be consistent with plaintiff's proposal is to conclude that the phrase refers to one or more healthcare providers resulting from a first search….This interpretation, however, strains the meaning of 'first' when placed directly before 'healthcare provider.' Furthermore, it fails to account for claim 7's introduction of a 'results list' with 'one or more' healthcare providers resulting from a search.  Finally, the patent elsewhere refers to 'healthcare providers' without use of 'first'…further supporting the interpretation that 'first' identifies a single healthcare provider.

---

[9] Subsequent to the issuance of the Markman Order, this matter was transferred to this District Judge.

(*Id*. at 9, n.4.)

The Markman Order also construed a term which lies at the heart of the instant motion—comparison ratings:

- <u>Comparison Ratings of Healthcare Providers</u>: ratings on multiple healthcare providers including the 'first healthcare provider,' in the report on that 'first healthcare provider,' thus permitting comparison of the 'first healthcare provider' with other potential healthcare providers.

(*Id*. at 14.)

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A movant who bears the burden at trial must submit evidence to establish every essential element of its claim.  *In re Ribozyme Pharms., Inc. Sec. Litig*., 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* FED. R. CIV. P. 56(c).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  When

reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

To be entitled to summary judgment of non-infringement, the moving party—MDx—must demonstrate that the facts presented and inferences therefrom, taken in the light most favorable to the non-moving party, would not permit a reasonable jury to return a verdict on the issue of infringement in favor of the patent holder. *Business Objects, S.A. v. Microstrategy*, 393 F.3d 1366, 1371-72 (Fed. Cir. 2005).

## III. ANALYSIS

MDx argues that every claim of the '060 Patent requires the generation of a report on the first healthcare provider which has within it "comparison ratings of healthcare providers." (ECF No. 195 at 2.) MDx contends that its website, as of January 2011, lacks reports on first healthcare providers which include such comparison ratings and, therefore, cannot infringe. (*Id.*) Health Grades argues that MDx's website infringes the '060 Patent, both literally and under the "doctrine of equivalents." (ECF No. 201 at 18-39.)

A determination of infringement is a two-step process. The first step is determining the meaning and scope of the asserted claims, which is a matter of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, 1456 (Fed. Cir. 1998) (en banc). The second step is comparing the accused device to the properly construed claims. *Id.* at 1454. This analysis is a question of fact. *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). A device literally infringes if each element of the asserted claim is found in the accused device. *Id.* Alternatively, a device may infringe under the doctrine of equivalents if it contains elements

"equivalent to each claimed element of the patented invention."  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

### A.  Literal Infringement

MDx argues that it is entitled to summary judgment on the issue of literal infringement because its healthcare provider profiles do not include within them comparison ratings on multiple providers.  Simply stated, MDx claims that its provider profiles are not of a type protected by the '060 Patent.

Health Grades' response is as described earlier.  It essentially defines the results list, under alternative constructions, as part of the profile on the first healthcare provider.  And, as that redefined profile shows comparison ratings (stars) for multiple providers, Health Grades claims that the MDx website satisfies the claim limitation on which MDx focuses its motion, and constitutes literal infringement.  The Court finds this response creative, but not convincing.

Part of the issue being determined is largely resolved by the Markman Order.  In it, Judge Brimmer rejected the position, then being advanced by Health Grades, that the "first healthcare provider" was "one or more healthcare providers resulting from a first search."  (ECF No. 138 at 9, n. 4.)  If the search results do not constitute a collection of first healthcare providers, it naturally follows that they also do not constitute a collection of "report[s] on the first healthcare provider…[which] includes comparison ratings…" as required by independent Claims 1 and 15 and the dependent claims which follow.

Insofar as Health Grades seeks to construe the entire results list as the first page of the report of a single healthcare provider—assuming one could identify at that juncture which provider in that list was the first healthcare provider—Health Grades conflates the results list and

the provider report in a manner not consistent with the patent itself. The '060 Patent makes the distinction several times between a results list and a provider report. Claim 7 introduces a results list, distinct from the report. ('060 Patent col. 21, ll. 40-44; *see also* ECF No. 138 at 9, n.4.) And the illustrations included in the specifications, such as Figure 10, clearly distinguish between "Search Results" and the "Select Physician Report" phase of the user experience. (*See, e.g.*, '060 Patent Fig. 10, ECF No. 195-2 at 18.) As Health Grades itself argued to the Court before the Markman Order issued, "[m]ultiple different providers may be identified in response to such a search…Reports may be created for any one, or all of, the providers identified in response to a search." (ECF No. 79 at 9.) That statement recognizes what Health Grades is now struggling to back away from—that the report and the results list are separate and distinct items.

The contention that the results list generated in response to a user's search request constitutes a part of the report on the first healthcare provider and forms a basis for literal infringement is untenable. It also requires acceptance of an almost magical quality which this Court is disinclined to attribute to the MDx website. If the results list is the first page of a provider's profile, then the first page of the "report on the first healthcare provider" necessarily varies depending upon what search criteria is input by a website user. In the case of Dr. Sadker, the first page of her report will differ if the user searches for "Sadker" in "Denver, CO" or "Robin" in "Denver, CO," and will then continuously change as the user refines the search to, perhaps, "female" or "female" and "board certified." This chameleon-like quality of the first page of a provider profile would require the Court to depart from the idea of a singular, static Sadker profile. This is a serious flaw in the Health Grades approach.[10]

---

[10] Even if one adopts the alternative approach Health Grades proposes—that the box or executive summary for Dr. Sadker is part of her profile and the remaining practitioners are those she is being compared to—is adopted, the magical or chameleon-like quality of the Sadker report remains. In this construction, some portion of the profile or

Even if the foregoing were not enough reason to discount the creative interpretation being advocated by Health Grades, there are additional temporal and linguistic difficulties. The Markman Order construes the first healthcare provider as a singular and particular individual "about whom information is requested and a report is produced." (ECF No. 138 at 23.) This is wholly consistent with Claims 1 and 15 which each require that a "request for information regarding a first healthcare provider" be provided, and that then a "report on the first healthcare provider [which] includes comparison ratings" be created. ('060 Patent col. 20 ll. 20-22, 58-65; '060 Patent col. 22 ll. 9-18, 48-54.) If the Health Grades view of a results list is to be adopted, one must first ignore the '060 Patent's requirement that the initiating event be a request for information about a singular and particular individual (a first healthcare provider). Instead, one must treat generic search requests for such classes of persons as "female dentists" or "internists within Denver" as being a request for information about a singular and particular individual, or ignore that patent requirement altogether. That is because the generic request may be all that precedes the generation of a results list, which Health Grades casts as the first page of one or more reports on the first healthcare provider or mini reports on first healthcare providers. Again, the need for such contortion is indicative of the problems with Health Grades' response, and the Court cannot embrace Health Grades' proffered rationale for rejecting MDx's motion on literal infringement.

Earlier, the Court noted a distinction between user initiated search results and hyperlink generated search results. Because the MDx hyperlink generated search results follow the production of a provider's profile, they avoid the temporal and linguistic difficulties just

---

report containing comparisons is continuing to vary, and the profile is non-static. Two users, attempting to print the Sadker profile, would then have very different paper results depending upon their path to the Sadker information. In the Court's view, a reasonable jury could not conclude that "different things" are the "same thing," in the manner argued by Health Grades.

discussed.  They also avoid the need for the characterization of the results as the first page of one or many provider reports, which the Court has just rejected.  Because of this, these hyperlink generated search results merit some additional discussion and analysis.

The MDx provider profile has already been briefly described.  The report is in a standard format.  Across the top is a persistent header showing the doctor's name and photo (if supplied), and her area of practice.  Beneath this are various tabs for such items as Summary, Patient Reviews, Credentials, and Accepted Insurance.  Clicking on any tab will change the information shown below the header and reveal data relevant to the tab selection.

The profile, regardless of tab selection, contains numerous hyperlinks throughout.  For example, clicking on the "Locations and availability" hyperlink within the persistent header for Dr. Sadker will take the user to the same portion of the report as clicking on the "Locations & Availability" tab.  And at any place within the profile, clicking on the hyperlinked name of the provider in the persistent header returns the user to the summary tab for that provider.

Some hyperlinks operate slightly differently.  Rather than moving the user about within the profile to a particular section or segment, these hyperlinks generate "call out" boxes which appear superimposed over the profile and contains requested information.  For example, if a user clicks on the "Education" hyperlink at the bottom of Dr. Sadker's summary page, the user will be taken to a page within the profile which shows her education beneath the persistent header. Once there, if the user then clicks on "University of Maryland" hyperlink, a call out box appears superimposed over the education page containing information about that medical school.

To complicate matters further, the call out box for the University of Maryland itself contains a hyperlink, which operates still differently: http://medschool.umaryland.edu/.  Clicking

on this hyperlink opens a new tab in the browser and takes the user to the University of Maryland website.

The ultimate question is whether the hyperlink generated search results, created upon the user's clicking on a "Search All Similar Doctors" hyperlink within a profile page on a first healthcare provider, are **part of** the profile of the first healthcare provider such that the comparison ratings within the results list can be said to be **"in" the profile**.  If so, Health Grades' claim for literal infringement would survive MDx's motion.  If not, MDx would be entitled to summary judgment on this aspect of literal infringement as well.

The failure of the parties to differentiate between user initiated search results which precede production of the "report" on the first healthcare provider and hyperlink generated search results accessed from within the provider "profile" leaves the Court with little direct guidance from the parties on this issue.  Nonetheless, the Court has determined that the hyperlink generated search results are not **in** the report of the first healthcare provider any more so than are the user initiated search results.

There are three bases for this conclusion.  First, the Court finds that the mere fact that a hyperlink is included in a first healthcare provider report is insufficient to establish that the results and data accessed through the link are within that report.  Today, across the Internet, hyperlinks are everywhere.  One can follow hyperlinks from Fox News to ESPN to CNN without ever typing an http address.  This simply does not mean that CNN data is within or part of ESPN or Fox News.  Second, the first healthcare provider profile on the MDx website is visually distinct.  One prominent feature that the Court has described is the persistent header, which disappears once one accesses the hyperlink generated search results.  The clear implication is

14

that the user has left the provider profile.  And there is no tab, hyperlink or other means within the hyperlink generated results list to return readily to the report.[11]  Third, and lastly, the Court looks to the address bar in the browser.  Returning to the example of Dr. Sadker, when one moves about her profile, the http address shows movement within a single and distinct report or location.  The address always begins with http://www.vitals.com/doctors/Dr_Robin_Sadker/. Depending upon whether one is looking at credentials or office location or accepted insurance, the address will end with "credentials" or "insurance" or other designation of the appropriate section within the Sadker profile.  When, however, the hyperlink generated search results are accessed, the address wholly changes to http://www.vitals.com/search?type=specialty&provider_type=1&q=110-Internist&location=Denver%2C+CO.  In the Court's view, the user remains on the MDx website, but is no longer in Dr. Sadker's profile.  Thus, the comparison ratings or stars for other providers are not "in the report on the first healthcare provider" as required by '060 Patent as construed by the Markman Order.

The Court finds there is no genuine dispute that MDx's website does not literally infringe the '060 Patent.  No reasonable jury could conclude otherwise.  Thus, MDx's Motion is granted with respect to literal infringement.

---

[11] To the extent that Health Grades may point to the browser's forward and back buttons as a means of navigating between the report and the results list, the Court declines to use such browser/operating system functionality as a means for concluding that all of these pages are easily accessible and thus "part" of a single report.  Apart from the fact that the Court views this as strained and improperly superimposing on the allegedly infringing device (webpage) functionality from the computer on which it is displayed, there is not even internal consistency in this position from Health Grades.  At oral argument, the Court inquired about various interchangeable browser and operating system methodologies for moving back and forth from one page to another (multiple instances of browser, multiple tabs, using the history button to navigate rather than the forward and back buttons on Internet Explorer).  For most methodologies, Health Grades made no claim that the functionality combined with the MDx website amounted to infringement.

**B.  Doctrine of Equivalents**

A device that does not literally infringe may nonetheless infringe under the doctrine of equivalents if "every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). Equivalence is a question of fact.  *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000); *see also Winans v. Denmead*, 56 U.S. 330, 344 (1853) ("Whether, in point of fact, the defendant's [product] did copy the plaintiff's invention . . . is a question for the jury"). The Supreme Court has clearly articulated the motivation behind the doctrine of equivalents:

> [C]ourts have . . .  recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing . . . Outright and forthright duplication is a dull and very rare type of infringement.  To prohibit no other would place the inventor at the mercy of verbalism, and would be subordinating substance to form . . . The doctrine of equivalents evolved in response to this experience.

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950).

To determine whether a device infringes under this doctrine, a court may consider whether, on a limitation by limitation basis, the accused product "performs substantially the same function in substantially the same way with substantially the same result as each claim limitation."  *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).  A court may not use the doctrine to "erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely."  *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed. Cir. 1987).

MDx contends that Health Grades may not rely on the doctrine of equivalents to establish infringement, because (1) application of the doctrine in this case would vitiate the claim limitation that the comparison ratings be included in the report on the first healthcare provider; (2) Health Grades is estopped by patent prosecution history to rely on equivalents; and (3) there is no substantial similarity between MDx's website and the '060 Patent.  (ECF No. 195 at 9.)

### 1. Vitiating a Claim Term

MDx's position is relatively straightforward.  MDx notes that both Claims 1 and 15 characterize the first healthcare provider report as one which includes comparison ratings.  MDx notes that the Markman Order construed comparison ratings as being location specific—"in the report on that "first healthcare provider"."  (ECF No. 138 at 14.)  If the doctrine of equivalents were to be applied to ratings located "outside" of the report on the first healthcare provider, the result would then be to entirely vitiate a claim element that applies to a central component of the '060 Patent (comparison ratings "in" the report).  "[I]f a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve."  *Warner-Jenkinson*, 520 U.S. at 39 n.8 (emphasis in original).  Accordingly, courts will not apply the doctrine of equivalents where "the accused device contain[s] the antithesis of the claim structure."  *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1330 (Fed. Cir. 2009) (internal citation omitted).

MDx relies on cases pertaining to claims having location restrictions in support of its argument that equivalence would vitiate a claim limitation in this case.  In *Sage Products v. Devon Industries*, 126 F.3d 1420, 1424 (Fed. Cir. 1997), the court held that a container for disposing of sharp medical instruments did not infringe on the plaintiff's patent because it did

not have a disposal slot that was substantially "at the top of the container body" or a constriction extending substantially "over said slot" as required by the patent.   Instead, its disposal slot was within the body of the container.  *Id*. at 1423.  The court found that the patent claimed a "precise arrangement of structural elements that cooperate in a particular way to achieve a certain result" and that it contained "clear structural limitations." *Id*. at 1425.  It found that the patent defined a "relatively simply structural device" and that a skilled drafter would have been able to foresee the "limiting potential of the 'over said slot' limitation." *Id*. at 1425.  It pointed out that the drafter, foreseeing the results of the limitation, could have "sought claims with fewer structural encumbrances."  *Id*.  It held that allowing the plaintiff "license to remove entirely the 'top of the container' and 'over said slot' limitations" would reduce the claim to a "functional abstract[], devoid of meaningful structural limitations on which the public could rely." *Id*. at 1424-25.

Similarly, in *Asyst Technologies v. Emtrak*, 402 F.3d 1188, 1192-95 (Fed. Cir. 2005), the court held that a device for manufacturing circuits did not infringe on the plaintiff's patent because it featured microcomputers that were not "mounted on" workstations, as required by the patent, but instead connected by a serial cable.  The court found that plaintiff had not offered any intrinsic evidence that the term "mounted on" included attached by serial cable. *Id*. at 1193.  The court also noted that the use of the term "mounted on" in the patent specification made it clear that the term meant attached or fastened to. *Id*.  In addition, the patent used the term "mounted on" interchangeably with the term "on" and distinguished it from the term "connected to." *Id*. at 1194.  Relying in part on this intrinsic evidence, the court concluded that the claim limitation was "binary in nature," meaning that a microcomputer could be "either mounted or unmounted," but not both. *Id*. at 1195.

Health Grades' response focuses, appropriately, on the claim language itself.  The

language allegedly vitiated is the near identical language in Claims 1 and 15 which requires:

> creat[e/ing] . . . a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, **wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers . . . .**

('060 Patent col.20 ll. 58-65; col.22 ll. 48-54 (emphasis added).)  According to Health Grades,

this claim element would not be vitiated, or at least only partially vitiated, by application of the

doctrine of equivalents.

Health Grades' view is that the term "includes" is the crucial one.  It is said to be a

"standard, generic transitional phrase that is used by patent lawyers to create an open-ended

claim that does not exclude additional, unrecited elements or method steps."  (ECF No. 201 at

30.)  Health Grades further argues that "it would be error to characterize the 'includes' claim

element as a binary choice, where the comparison ratings are either included in the report or not

(*i.e.*, excluded).  Rather, the term 'includes,' if not literally met, encompasses a range of

equivalents, such as 'linked to' or 'displayed side-by-side,' and the question of whether these

differences are insubstantial or not should be decided by the jury." (*Id.*)  Thus, according to

Health Grades, MDx's method of displaying comparison ratings is equivalent to that protected

by the '060 Patent.

The Health Grades approach begs the question of whether the claim limitation at issue

stems from the word "includes" or whether it stems instead from the term "comparison ratings of

healthcare providers" which the Markman Order defines as ratings "in the report."  But the Court

will resist the temptation to focus on either term in isolation.

The product at hand is different from most others analyzed in the case law under the doctrine of equivalents.  At issue is not a classic mechanical device, or even a chemical one. Instead, this case involves a digital product which is both novel and ambiguous in terms of its interplay with the doctrine of equivalents.  The issue before the Court is much more subtle than whether a tangible component lies at the top or in the middle of a physical device.

What is clear to the Court is that the choices as to "location" of the comparison ratings for purposes of application of the doctrine of equivalents in this case is not a binary choice.  The MDx website and display of provider information is not the antithesis of the claimed invention's display of that information.  Rather than black and white, the margins are here quite gray.

The MDx website generates user initiated search results which contain stars which can be said to permit comparisons of the various healthcare providers.  The user navigates from the results list to the provider profile by clicking on hyperlinks within the search results.  Once in the provider report, the user navigates about by clicking on tabs and hyperlinks—most of which obviously keep one within the profile.  Occasionally, a hyperlink (such as the University of Maryland example in the Sadker profile) takes one clearly outside the profile.  But this tends to be done in a straightforward manner by opening a new browser tab separate from that browser tab "containing" the provider profile.  There is, however, one instance where it is less clear whether  a noticeable departure from the profile has taken place—the "Search All Similar Doctors" hyperlink, which announces and facilitates provider comparisons and which is present from within multiple sections of the profile. This link appears "in" the profile beneath a box showing a handful of "similar doctors"—typically six—displayed by name, practice specialty, years of experience and city location.  None have stars or other ratings tools disclosed.  Clicking

on the "Search All Similar Doctors" hyperlink for what might be thought to yield similar data for additional providers instead navigates the user to search results containing multiple providers whose star ratings are prominently displayed.

The MDx website thus sandwiches the provider profile between user initiated search results and hyperlink generated search results.  The profile has "in" it a hyperlink which appears multiple times and coaxes the user back into search results displaying comparison tools.  And it does so using a navigation tool—hyperlinks—which is common for moving about within the profile.  Although the Court has determined that the "stars" or comparison ratings are not actually "within" the profile for literal infringement purposes, it is far from certain that this fact would be apparent to an ordinary user.  Regardless, the fact that a portal to the comparison ratings (the hyperlink) rests squarely within the provider profile blurs the distinction between "in the report" and "outside the report" and has no real analog in the realm of mechanical products.

Because of the foregoing, the Court need not determine and delineate the complete circumstances in which vitiation bars reliance on the doctrine of equivalents when dealing with digital products.  Extrapolating from the case law on physical products, if the patented and allegedly infringing products are antitheses of one another in terms of a claim limitation, then application of the doctrine of equivalents should be barred where the claim limitation of the patent would be entirely vitiated by such application.  That is not clearly the case here.  Consequently, claim vitiation does not serve to preclude application of the doctrine of equivalents in this case.

### 2. *Prosecution History Estoppel*

MDx asserts that the patent prosecution history estops Health Grades to argue that MDx infringes its patent by equivalents.

Prosecution history estoppel precludes application of the doctrine of equivalents when a patentee has amended a claim for reasons of patentability to specifically exclude an accused equivalent.  *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003).  Estoppel does not apply, however, where the "alleged disavowal of claim scope is ambiguous."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003).  Rather, the alleged disavowal must be clear and unmistakable," constituting "unambiguous evidence of disclaimer."  *Id*. at 1325, 1326.

Once the alleged infringer establishes that the patentee has disavowed the accused equivalent, the patentee is barred from relying on the doctrine of equivalents unless he or she can show that (1) the amendment was made for a purpose other than patentability; (2) the alleged equivalent was unforeseeable at the time of application; or (3) the rationale underlying the amendment is tangential to the accused equivalent.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 739-41 (2002).  "[T]he inquiry into whether a patentee can rebut the *Festo* presumption under the 'tangential' criterion focuses on the patentee's objectively apparent reason for the narrowing amendment."  *Id*. at 1369.  The reason "should be discernible from the prosecution history of record, if the public notice function of a patent and its prosecution history is to have significance."  *Id*.  An "amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim."  *Id*.  In cases where the court is "unable to determine the purpose underlying a narrowing amendment–and hence a rationale for limiting the estoppel to the surrender of particular

equivalents–the court should presume that the patentee surrendered all subject matter between the broader and the narrower language." *Id.* at 1366.

MDx asserts that, during patent prosecution, Health Grades added the limitation that the report be "on the first healthcare provider" and that it "include" the "comparison ratings of healthcare providers" in order to obtain a patent over prior art.  (ECF No. 195 at 10; *see* ECF No. 195-3 at 4, 8, 17, 20.)  It further asserts that MDX's website falls within the territory disclaimed by these amendments.  (ECF No. 195 at 13.)  Health Grades concedes that these amendments were made for the purpose of patentability but argues that they are tangential to the accused equivalent.  (ECF No. 201 at 33.)  It was not the location of comparison ratings which drove amendments according to Health Grades.  Rather, amendments were made to differentiate from prior art the specific types of provider information presented to the user and distinguish comparison ratings from mere facts from which comparisons could be made.

### a.  Prosecution History

In its November 16, 2009 remarks, the Patent Office rejected Health Grades' Claim 1 on the grounds that the prior art (Henley and Cook) disclosed a "method of providing healthcare provider information to potential patients, said method comprising," "compiling health care provider-verified information," "compiling past-patient provided information," "compiling information verified by independent third-party sources," "providing access to the healthcare provider report over a computer network," and "creating a healthcare provider report using the physician-verified information, the past-patient provided information, and the verified information."  (Patent History File Portions, ECF No. 195-3 at 38-39.)  Subsequently, Health Grades amended Claim 1 by adding references to "a" or "the" "first healthcare provider" in six

of seven paragraphs, as well as limitations regarding the information to be included in the

provider reports and the method of gathering patient feedback.  After amendment, the claim read:

A <u>computer-implemented</u> method of providing healthcare provider information to potential patients, said method comprising:

<u>receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;</u>

<u>accessing</u> healthcare provider-verified information <u>about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;</u>

compiling, <u>by the at least one computer processor</u>, ~~past patient~~ patient-provided information <u>regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;</u>

compiling information <u>regarding the first healthcare provider</u> verified by <u>an</u> independent third-party <u>source</u>, ~~sources~~ <u>wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;</u>

creating, by [[a]] <u>the at least one computer</u> processor, a healthcare provider report <u>on the first healthcare provider</u> using the healthcare provider-verified information, the ~~past patient~~ patient-provided information, and the information verified by <u>the</u> independent third-party <u>source</u>, wherein the healthcare provider report <u>on the first healthcare provider</u> includes comparison ratings of healthcare providers; and

providing access to the healthcare provider report <u>on the first</u> <u>healthcare provider</u> over a computer network.

(Patent History File Portions, ECF No. 195-3 at 4-5) (underlining signifies elements added to amended claim).

The Patent Office also rejected Health Grades' initial Claim 5 on the grounds that prior art discloses "the method as defined in claim 1, wherein the healthcare provider report includes comparison ratings of healthcare providers." (Patent History File Portions, ECF No. 195-3 at 42.) The Patent Office cited Henley, U.S Patent Pub. No. 2003/0195838, which discloses "[d]irect links to one or more transaction feedback databases . . . established to allow consumers of medical services to verify and evaluate a particular provider's product or service." (Henley Patent Application, ECF No. 197-7 at 28, ¶ 37.) In response, Health Grades argued that Henley fails to teach or suggest "comparison ratings" on the grounds that "making general qualifications 'available' to a consumer" or providing "access to databases storing the 'identification' of medical services providers" does not teach or disclose "comparison ratings." (Patent History File Portions, ECF No. 195-3 at 26-27.) Health Grades subsequently canceled Claim 5. (Patent History File Portions, ECF No. 195-3 at 18.)

The Patent Office rejected Claim 19 on the grounds that prior art discloses "[a]n on-line information system for providing verified information regarding healthcare providers, the system comprising: a compilation module for compiling healthcare provider-verified information," "a compilation module for compiling patient-provided information," "a compilation module for compiling healthcare provider information verified by an independent third party," "a computing system with access to healthcare provider information stored in a database, wherein patients may search the database and review healthcare provider reports to differentiate among healthcare

providers," and "a creation module for creating a healthcare provider report using the provider-verified information, the patient-provided information, and the independently verified information."  (Patent History File Portions, ECF No. 195-3 at 44-45.)

In response, Health Grades asserted the same arguments it had made with respect to Claim five.  (*Id.* at 28-29.)  It subsequently amended Claim 19 in part by replacing the limitation of a "computing system with access to healthcare provider information stored in a database, wherein patients may search the database and review healthcare provider reports to differentiate among healthcare providers" with the limitation that the system "create a healthcare provider report using the healthcare provider-verified information, the patient-provided information, and the independently verified information, wherein the healthcare provider report includes comparison ratings of healthcare providers."  (*Id.* at 20, 28-29.)

### b.  Discussion

The Court does not find the prosecution history in this case constitutes such "clear and unmistakable" evidence that Health Grades disclaimed coverage of comparison ratings "outside of" provider reports that the application of the doctrine of equivalents should be precluded at the summary judgment stage.  *See Omega*, 334 F.3d at 1325.  Indeed, as previously explained, the contours of "inside" and "outside" provider profiles or reports—for purposes of equivalents—are themselves somewhat amorphous in this case.

Notwithstanding the foregoing, the Court reserves the right to make further rulings pertaining to prosecution history.  The prosecution history implicates other aspects of this litigation (*e.g.*, obviousness) and that the record provided by the parties on this motion is

inadequate for detailed consideration of the full implications of the prosecution history in this case.

### 3. Substantial Similarity

MDx argues that it does not infringe Health Grades' patent under the doctrine of equivalents as a matter of law because the MDx website lacks substantial similarity to the invention protected by the '060 Patent in that "[r]equiring the user to jump from place to place to view the claimed provider information and compare ratings of various providers is not even remotely similar to having all the other claimed information and comparison ratings in the one report on the first healthcare provider."  (ECF No. 195 at 13.)

Substantial similarity is a question of fact.  *Hoop v. Hoop*, 279 F.3d 1004, 1007 (Fed. Cir. 2002).  Under the "function-way-result" test, two elements are substantially similar if they perform substantially the same function, in substantially the same way, with substantially the same result.  *Crown Packaging*, 559 F.3d at 1312.  Applying this test, the court in *Cordis* held that there was sufficient evidence to support a jury's finding of infringement where an expert witness had testified that the "'corners' in claim 36 and the circular arcs or rounded corners of the [accused product] both function as actual and potential reference points for joining adjacent stent rings, fulfill this function through their similar locations, and can or do result in offset connections between stent rings."  561 F.3d at 1330.

For the reasons set forth above in the discussion of claim vitiation, the Court views the substantial similarity or lack thereof between the MDx website's display of provider information and the claimed invention to be far more debatable than either party admits.  Under the facts of this case, substantial similarity is a question best left for the jury.

Accordingly, the Court concludes that there exist disputes on genuine issues of material fact as to infringement by equivalents—notwithstanding MDx's contentions as to vitiation, prosecution history estoppel, and substantial similarity.  Infringement by equivalents in this case is properly for a jury to decide.  Since these facts give rise to reasonable inferences for a juror that equivalency could exist—and "reasonable inferences" must be found in the light most favorable to the nonmoving party—it becomes apparent that there is a genuine issue of material fact as to equivalence. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

## IV.  CONCLUSION

For the foregoing reasons, defendant MDx's Second Motion Pursuant to Federal Rule of Civil Procedure 56 for Partial Summary Judgment of Non-infringement (ECF No. 195) is

1.  GRANTED as to literal infringement; and

2.  DENIED as to infringement by equivalents.

DATED this 23rd day of December, 2013.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge