# EXHIBIT J

```
                                                          Page 1
 1   Volume I                           Pages 1 - 188
 2                                      Exhibits 2000 - 2012
 3           UNITED STATES DISTRICT COURT
 4           FOR THE DISTRICT OF COLORADO
 5   *******************
 6   HEALTHGRADES, INC.    *
 7       Plaintiff,        *    Civil Action No.
 8   VS.                   *     11-CV-00520-RM-BNB
 9   MDx MEDICAL INC.,     *
10       Defendant.        *
11   *******************
12
13           DEPOSITION of PHILIP GREENSPUN
14         Monday, January 6, 2014 at 8:00 a.m.
15                The Charles Hotel
16                One Bennett Street
17              Cambridge, Massachusetts
18
19     ------ Jacqueline P. Shields, RPR, CSR ------
20
21
22
23
24     Job No. NJ1790896
```

Page 2

```
 1  APPEARANCES:
 2  Representing the Plaintiff:
       LEWIS ROCA ROTHGERBER LLP
 3     BY:  KRIS J. KOSTOLANSKY, Esquire
       1200 Seventeenth Street, Suite 300
 4     Denver, Colorado 80202
       303-628-9515 ~ Fax: 303-623-9222
 5     kkostolansky@lrrlaw.com
 6         ~ and ~
 7     MERCHANT & GOULD P.C.
       By:  KIRSTIN L. STOLL-DeBELL, Esquire
 8     1050 Seventeenth Street, Suite 1950
       Denver, Colorado 80265-0100
 9     303-357-1670 ~ Fax: 303-357-1671
       kstolldebell@merchantgould.com
10
11  Representing the Defendant:
       SILLS CUMMIS & GROSS
12     BY:  SCOTT D. STIMPSON, Esquire (via telephone)
            VINCENT FERRER0, Esquire
13     30 Rockefeller Plaza
       New York, New York 10112
14     212-643-7000 ~ Fax: 212-643-6500
       sstimpson@sillscummis.com
15     vferrero@sillscummis.com
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1    1006  Summary
 2    2010  Printout of screenshots         131
 3    2011  Document entitled Preliminary
          Amendment                          143
 4
      2012  Supplemental Expert Report of Philip
 5       Greenspun dated September 9, 2013    155
 6    EXHIBITS APPENDED TO ORIGINAL TRANSCRIPT
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1           I N D E X
 2
 3  Testimony of:            Page(s)
 4  PHILIP GREENSPUN
 5  By Mr. Stimpson              5
 6  By Mr. Kostolansky         180
 7
             E X H I B I T S
 8
 9  Exhibit No.   Description       For I.D.
10  2000  Supplemental Expert Report of Philip
          Greenspun dated January 3, 2013    12
11
    2001  Document entitled Vitals Business
12       Overview for Consumers, Health Plans
         & Hospitals dated October 2012      23
13
    2002  Document entitled 2013 Media Kit,
14       Vitals Patient Link                 34
15  2003  Document entitled Vitals' Data and
         Database dated November 2013        40
16
    2004  Compilation of Information
17       Disclosure Statements               54
18  2005  Declaration of Richard G. Cooper,
         D.Sc.                               98
19
    2006  Document entitled Notice of
20       Allowance and Fee(s) Due           115
21  2007  Document entitled Petition to
         Expunge Pursuant to 37 CFR 1.59 and
22       MPEP 724.05                        118
23  2008  Document entitled Data Summary of
         Dr. Scott Cowan                    124
24
    2009  Document entitled Exhibit C, F.R.E.  126
```

Page 5

```
 1             P-R-O-C-E-E-D-I-N-G-S
 2          PHILIP GREENSPUN, having been
 3  satisfactorily identified and duly sworn by the
 4  Notary Public, was examined and testified as
 5  follows:
 6             DIRECT EXAMINATION
 7  BY MR. STIMPSON:
 8     Q.  Good morning, Dr. Greenspun.  I'm sorry I
 9  can't be with you there in person, all the lovely
10  weather the last few days has me stranded in Denver
11  for a few days.
12          This may be a little slower than normal, I
13  didn't get a chance to get back and see the
14  documents in person.  I have them on my hard drive,
15  so it may move a little slower than normal, but just
16  bear with me.
17          So, Dr. Greenspun, since your last
18  deposition you produced two reports, right?  You got
19  the January 3rd and the September 9, 2013 reports,
20  right?
21     A.  That sounds right.
22     Q.  Okay.  Since that time I assume you put in
23  more time for Healthgrades, right?
24     A.  Yes.
```

Page 18

1  report, click on search all similar doctors, and
2  then get that results list.
3      Q. Can you still hear me?
4      A. Yes.
5      Q. Okay. I've got a poor connection, but I --
6  so my -- really my question is, if you're going to
7  point to anything on any of these screens, I can't
8  tell from your report what you're going to point to,
9  right?
10        MR. KOSTOLANSKY: Object to the form.
11     A. Well, as I said, for Exhibit C, speaking
12 concretely, now that you've asked a more detailed
13 question, you don't have to look at the PDF to see
14 where the search similar doctors feature is, because
15 I just told you it would be that portion of the
16 video or the demo that corresponds to pages 616 and
17 617.
18     Q. Okay. I understand that, and thank you for
19 pointing that out, but there's hundreds of pages
20 here and I'm trying to figure out in order to
21 prepare for trial, frankly in order to prepare for
22 this deposition, was there any way that I could tell
23 if you were going to point to any other parts of any
24 of these pages?

Page 19

1        MR. KOSTOLANSKY: Object to the form.
2     A. I don't know, other than just the
3  description in the report of what's significant, no.
4  I think, you know, you would need to have some
5  familiarity with the Vitals.com website and you
6  would need to scroll through these, and I apologize
7  for not giving you a more compact set.
8     Q. So one way this could have been done was to
9  Bates number the 694 pages and then have your report
10 say I'm going to go to this Bates number and
11 reference point A, B or C, right?
12    A. Yes, that's true.
13    Q. If you could please turn to page 2 of your
14 -- this is still the January 3rd report, okay?
15       MR. STIMPSON: We marked this 2000, didn't
16 we, Vin?
17       MR. FERRERO: Say that again, Scott.
18       MR. STIMPSON: We marked this 2000?
19       MR. FERRERO: Yeah, that's right.
20    Q. Dr. Greenspun, are you at page 2?
21    A. Yes.
22    Q. And you see the heading "physician
23 verification of data"?
24    A. Yes.

Page 20

1     Q. This data here, if it's okay with you, I
2  would like to shorthand it as the provider data
3  elements; is that okay?
4     A. Sure.
5     Q. I'm sorry, you cut out just a bit.
6     A. That's fine.
7     Q. Okay. Thank you. And paragraphs 5 through
8  9 you refer to -- that's the next page, you refer to
9  -- well, let me back up just a second. I mean, with
10 these documents that were produced, they're emails
11 and faxes basically, right? Is that a good way to
12 refer to them?
13    A. Yes, I think most of them are, that's
14 right.
15    Q. So from what we've learned in the case,
16 there are basically two different ways that
17 providers could have given these provider data
18 elements. I mean, one is these emails and faxes,
19 which we're going to talk about today. And then
20 there's also the physician portal where the website
21 itself allows physicians to directly add the data?
22    A. Yes, that's my understanding.
23    Q. Those are two distinct ways that providers
24 can provide this data, correct?

Page 21

1        MR. KOSTOLANSKY: Object to the form. When
2  you say "two," what do you mean by "two," Scott? I
3  think you -- I thought you referred to three. Are
4  you counting emails and faxes as one? Those sound
5  distinct to me.
6        MR. STIMPSON: Yeah, emails and faxes are
7  counted as one.
8     Q. So, Dr. Greenspun, so basically there's two
9  distinct ways to do it, emails and faxes, and there
10 was also the physician...
11    A. You cut out a little bit.
12    Q. So can you hear me okay?
13    A. Now we can.
14    Q. Okay. So Kris raises a good point, emails
15 and faxes I am counting as just one. We have two
16 distinct ways to do this. One is the emails and
17 faxes, which we'll talk about today, and then
18 there's also the physician portal where the website
19 itself allows physicians to directly enter data,
20 correct?
21    A. Yes.
22    Q. Okay. So these paragraphs 5 to 9, these
23 are basically five examples you found where
24 providers are giving three or more of the claim data

6 (Pages 18 - 21)

Page 170

1 Aetna was for somebody to set up a website, set up a
2 search parameter so there could be requests for
3 information on providers and that the response to
4 those requests access all this data and provide a
5 report that includes comparison ratings of
6 healthcare providers, and then generate that and
7 give it to the requester over the Internet? That's
8 the only substantial use of that data?
9     MR. KOSTOLANSKY: Objection. Asked and
10 answered.
11     A. Well, I don't think I went quite that far.
12 You know, I said that the only use I could think of
13 that would be sensible for those --
14     MR. STIMPSON: I can't hear. I'm sorry, can
15 I hang up and call you right back? Thanks.
16     (An off-the-record discussion was held.)
17     MR. STIMPSON: Can I have the last answer
18 read back, please?
19     (Read back.)
20     A. Yes. So as I said, I wouldn't go quite
21 that far, the only use of this data set would be to
22 make something almost exactly like Healthgrades.com
23 or Vitals.com. I would say that the only
24 substantial use would be making some sort of

Page 171

1 information service for consumers shopping for
2 doctors and trying to choose among doctors.
3     Q. Does that information service have to
4 infringe the '060 patent?
5     MR. KOSTOLANSKY: Object to the form. What
6 do you mean by "surfaced"?
7     Q. You can answer, Doctor.
8     A. I think you said does that information
9 service have to infringe.
10     Q. I thought that was in your answer. I
11 thought you said -- can I have the Dr. Greenspun's
12 last answer back, please?
13     (Read back.)
14     Q. So the information service that you
15 mentioned there, Doctor, would that information
16 service have to infringe the '060 patent?
17     A. No, I don't think it would necessarily have
18 to infringe the '060 patent.
19     Q. Doctor, did you consider Healthgrades
20 website, whether that fell under the claims?
21     A. Yes.
22     Q. Actually, it's in your report, isn't it?
23 If you turn to paragraph 106, page 23.
24     A. Okay.

Page 172

1     Q. This is where you do an analysis of the
2 Healthgrades website, and I assume this is for the
3 commercial success purposes, right?
4     A. Well, I was asked to do this and I think,
5 yes, I think it was at least partly to answer the
6 question of whether there were secondary
7 considerations of nonobviousness.
8     Q. And if you could turn to paragraph 115,
9 please, top of page 25.
10     A. Okay.
11     Q. And it says -- one of the last, toward the
12 end of that paragraph it says, at page 31, it
13 includes some annotation indicating that a doctor
14 may log into the physician portal to update his or
15 her profile?
16     A. Yes.
17     Q. Doctor, did you ask Healthgrades if they
18 had any emails or faxes with physicians about
19 receiving data?
20     A. No, I did not ask for that.
21     Q. Well, since you undertook to show whether
22 or not the Healthgrades system fell under the patent
23 claims, why didn't you do that?
24     A. Well, it says right there that they have a

Page 173

1 physician portal and you can update your profile and
2 I -- they also had, I think, some contact
3 information so a physician could contact them. So I
4 just assumed that it seemed like a reasonable
5 assumption that they had a mechanism by which
6 physicians could ask for changes or make changes
7 directly.
8     Q. So if a website has a portal whereby
9 physicians could come in and edit their own data
10 directly, the emails and faxes aren't so important?
11     MR. KOSTOLANSKY: Object to the form.
12     A. I don't know. I mean, they're all
13 important. If you have doctors who you're trying to
14 get to advertise with you, and they see themselves
15 on the site, and the information isn't correct, then
16 just from a business point of view you have to make
17 it as easy as possible for them to correct their
18 profile. They're not going to buy an ad until their
19 profile is correct. I think that's a reasonable
20 assumption.
21     Q. I'm not talking about whether they are
22 going to advertise with you or not. I'm talking
23 about to show whether or not the websites fall under
24 the patent claims. And my question is, if you have

44 (Pages 170 - 173)

Page 174

1 proof that providers can log on and edit their own
2 data, it's not so important to look for other ways,
3 like the emails and faxes, right?
4     MR. KOSTOLANSKY: Object to the form.
5     A. Well, the patent claim doesn't say that the
6 verification from providers has to come via any
7 mechanism. So if you had a recording of a phone
8 call that a physician made, you could stop there and
9 then say that the emails, faxes, and Web updates
10 were not important. If you had a really good email,
11 as an example, then you wouldn't have to look to
12 other stuff. I'm not saying that one has a higher
13 priority than others. I'm saying this is the first
14 thing that caught my eye and once I saw that, I
15 stopped looking for other things.
16     But if the first thing that I had found was
17 an email address, where it said send us an email and
18 tell us what to change in the profile, I might just
19 as easily have identified that in this paragraph,
20 rather than the physician portal.
21     Q. You didn't think it was important to go
22 looking for emails and faxes once you knew that
23 Healthgrades had the physician portal, right?
24     A. Well, I don't know. The question, the

Page 175

1 question is a little bit confusing to me, because I
2 was also not looking at HealthGrades totally in
3 isolation. I knew that they'd been operating this
4 business continuously, at least since the patent was
5 filed. So I thought it was reasonable to assume
6 that they had the capabilities of the system
7 described in the patent spec, that that was their
8 system they were describing. So it was probably,
9 you know, less of a -- there were just fewer open
10 questions than there would be from looking at a
11 system that had never been described in a patent
12 spec.
13     Q. Well, you know MDx was going to challenge
14 whether or not Healthgrades fell under the patent,
15 right? MDx can certainly do that, right?
16     MR. KOSTOLANSKY: Object to the form.
17     A. I don't know what MDx would do. I guess
18 it's possible.
19     Q. So when you were looking to show whether
20 the Healthgrades system fell under the patent,
21 Doctor, just cut to the chase here, once you saw
22 that they had a log-in for the physicians, so that
23 they come in and edit their data, that was enough
24 for you and you didn't feel the need to go look for

Page 176

1 emails and faxes, correct?
2     MR. KOSTOLANSKY: Objection.
3 Mischaracterizes.
4     A. Yes, but remember, like I said, that's also
5 informed by the patent spec from 2006, informed by
6 what I knew of the capabilities of the physician
7 portal on the Vitals.com site, because it's a direct
8 competitor and the same physicians go to Vitals.com
9 physician pages as Healthgrades.com. So if I didn't
10 know all of that, and I just saw this, I might have
11 been more prone to ask questions about it.
12     But given, yeah, given that they've --
13 given all the years that have passed since the
14 patent was filed, given what the Vitals.com
15 physician portal can do, it didn't seem like it was
16 the subject that needed more investigation.
17     Q. So let's go back to the same question that
18 I asked earlier in a little different context. Once
19 you knew, Doctor, that the website had a log-in for
20 physicians to come in and enter data themselves, on
21 a scale of 1 to 10 how important were the emails and
22 faxes, zero being irrelevant and ten being extremely
23 relevant?
24     MR. KOSTOLANSKY: Objection. The question

Page 177

1 has nothing to do with the trial of this matter.
2 You're simply trying to develop evidence regarding
3 your site.
4     MR. STIMPSON: Kris, please don't. Just
5 object then. Fine, object.
6     Q. Can you please answer the question, Dr.
7 Greenspun?
8     A. It's incomplete, but given that I knew the
9 capabilities of the Vitals.com physician portal as
10 of, I think, well, late 2011 at least, given that I
11 read the patent spec and I knew that it described an
12 earlier version of the Healthgrades.com site, and
13 given that I saw the link, given all those three
14 things, I would say that yes, seeing an email or a
15 fax would have been a low importance. Like a 1.
16     Q. So, Doctor, let me ask you this, did you
17 ever ask Healthgrades to run any queries to see how
18 many physicians had logged in and changed their
19 data?
20     A. No.
21     Q. And why didn't you do that?
22     A. Well, it was kind of like that probability
23 analysis that I did for the summary judgment motion.
24 You have hundreds of thousands of doctors. You have

45 (Pages 174 - 177)

Page 178

1 a very popular website, Healthgrades.com. It's just
2 not -- it's just not believable that they could have
3 been out there on the Web for all of these years and
4 never have published a mistake that would have
5 caught the attention of a doctor. So, yeah, it's
6 like -- trying to think of a good example. You
7 know, if you're asking me like do you know for sure
8 -- I'm looking out the window at Harvard Square, do
9 you know for sure that of all the people that you
10 see walking out there, how can you be sure that none
11 of them ate breakfast today? Well, I can't be sure.
12 It's possible that, you know, nobody in the Boston
13 area had breakfast this morning, but it doesn't seem
14 to have a common sense point of view. It's just not
15 very probable.
16    Q. But you understand, Doctor, that to show
17 commercial success, it's HealthGrades' burden to
18 prove that the Healthgrades website falls under the
19 claims of the '060 patent, correct?
20    A. Yes.
21    Q. And you are comfortable doing that without
22 emails and faxes and without queries run, right?
23    A. Well, again, not in a vacuum. I mean, I
24 knew that thousands or tens of thousands of doctors

Page 179

1 had made corrections to the Vitals.com website.
2 Given that information, it didn't seem probable that
3 zero doctors had made corrections to the
4 Healthgrades.com site.
5       MR. KOSTOLANSKY: Let's take a break when
6 you're ready, Scott.
7       MR. STIMPSON: Okay, just a few minutes.
8    Q. What evidence do you have, Doctor, that
9 third parties verified the data in Healthgrades'
10 website?
11       MR. KOSTOLANSKY: So you're moving on to a
12 different claim element then?
13       MR. STIMPSON: Yes.
14       MR. KOSTOLANSKY: This was the very
15 beginning, initial report that Dr. Greenspun
16 submitted. Find something new, Scott.
17    A. Yeah, I think it's all in paragraphs 144,
18 145 and 153 of my original report, but I'm pretty
19 sure that -- I'm pretty sure that Healthgrades.com,
20 like Vitals.com in some cases, lists their data
21 sources publicly.
22    Q. Okay.
23       MR. STIMPSON: Let's take a break then.
24 What time is it there, 4:00?

Page 180

1       MR. KOSTOLANSKY: 4:05.
2       (Recess was taken at 4:05 p.m.)
3       (Reconvened at 4:30 p.m.)
4    Q. (By Mr. Stimpson) Welcome back.
5    A. Thanks.
6    Q. I'm done. Dr. Greenspun, I have nothing
7 else. Thank you for your time.
8    A. Okay. Thanks.
9       MR. KOSTOLANSKY: I've got a couple
10 questions.
11          CROSS-EXAMINATION
12 BY MR. KOSTOLANSKY:
13    Q. Dr. Greenspun, you were asked some
14 questions about various portions of deposition
15 testimony in connection with the IDS; do you recall
16 that?
17    A. Yes.
18    Q. Do you know if those sections of the
19 deposition were attached to the summary judgment or
20 any other briefing in connection with the
21 submissions to the PTO?
22    A. I don't know.
23    Q. Exhibit B to your report contains numerous
24 sponsored listings, roughly 14 or so, correct?

Page 181

1    A. Hold on a sec.
2       MR. STIMPSON: Kris, where is that?
3       MR. KOSTOLANSKY: Exhibit B.
4       MR. STIMPSON: Let me see if I can pull that
5 up. I had some difficulty here.
6    A. Exhibit B is the most recent report.
7    Q. Yes.
8       MR. STIMPSON: You may have to wait a sec.
9 I have to pull this up.
10       MR. KOSTOLANSKY: Let me finish my question.
11 If you need to pull it up, then you can.
12       MR. STIMPSON: Can you tell me, is that
13 what -- is it Exhibit B?
14       MR. KOSTOLANSKY: You examined him regarding
15 Exhibit B and I indicated it was the sponsored
16 listings. I'm going to ask my questions and then
17 you can redirect as appropriate.
18       MR. STIMPSON: I'm going to object.
19       MR. KOSTOLANSKY: I don't know how you can
20 object, I haven't asked a question.
21       MR. STIMPSON: Because you have a document
22 in front of him and you're not letting me pull it up
23 before you ask. So how am I supposed to know
24 whether to object or not, I can't even see it?