# EXHIBIT A

(Redacted version of Dkt. # 677-1)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-RM-BNB
HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a
VITALS.COM,
Defendant.

---

## STATEMENT OF DAVID A. HALL PURUSANT TO
## CIV.PRACTICE STANDARD IV.K.1

---

Health Grades, Inc., by its undersigned attorneys, pursuant to Civ. Practice Standard
IV.K.1., submits the following Statement of David A. Hall, Managing Director at Alvarez &
Marsal Global Forensic and Dispute Services, LLC ("A&M"):

1.      I was retained by Health Grades, Inc. ("Health Grades") and its counsel to
calculate patent infringement damages in the matter of Health Grades, Inc. v. MDx Medical, Inc.
("MDx") d/b/a <u>Vitals.com ("Vitals")</u>.  I have submitted three expert damages reports dated July
13, 2012 (Ex. A), July 20, 2012, and December 5, 2013 (Ex. B).

2.      On November 2, 2012, Vitals filed a motion to exclude me from testifying in this
case [Doc. #375] (the "Motion").  Vitals does not challenge my qualifications or the well-
accepted methodologies I employed.  Vitals challenges only how I applied the methodologies to
the facts and data.  Vitals badly mischaracterizes my analyses, the bases for my opinions, and the
opinions themselves.  Consequently, Vitals' description of my work should be ignored.[1]

---

[1] Vitals' mischaracterizations include changing my deposition testimony.  See my November 26, 2012, Affidavit
(Ex. C).  In my 25 years of experience, I can only recall one other instance of this level of mischaracterization.

**My Lost Profits Analysis**

3.      My lost profits analysis and opinion began with an overview of patent infringement damages and I cited as guidance 35 USC Sec 284 and *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573 (Fed. Cir 1989) (Ex. A ¶22[2]).  I then discussed principles for establishing lost profits (Ex. A ¶23) including that in order to establish a claim for lost profits, the patentee must demonstrate that there is a reasonable probability that "but-for" the assumed infringement, the patentee would have made some or all of the accused sales and earned the associated profits.  I cited for guidance *Grain Processing Corporation v. American Maize-Products Company*, 185 F.3d 1341 (Fed. Cir. 1999) and  *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed. Cir 1983) which includes the point that "In proving his damages, the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability."

4.      I applied the "*Panduit* Test"[3] to systematically consider and evaluate the "but-for" Vitals' infringement scenario to determine if lost profits damages are warranted. (Ex. A ¶26)  I addressed each of the four *Panduit* factors:  1) demand for the patented product; 2) manufacturing and marketing capability to exploit the demand; 3) absence of acceptable non-infringing substitutes; and, 4) the amount of the profit. (Ex. A ¶26)

5.      My analysis of the *Panduit* factors led me to conclude that Health Grades is entitled to lost profits on a portion of Vitals' sales.  Vitals disagrees with my conclusion.

### *My Demand Analysis Is Reliable And Not Speculative*

6.      While an adequate showing of demand under the *Panduit* factors only requires a showing of a substantial number of sales of the product containing the patented features, my

---

[2] For cited paragraphs in Ex. A and Ex. B, please also review footnotes and attachments in such paragraphs.
[3] *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978).

analysis went further.[4]  I began with an analysis of the '060 patent and its patented features (Ex. A, ¶9 through ¶15).  Then the second step in that analysis was to identify and review the products containing the patented features – the HealthGrades' website, which is the patented product, and the Vitals' website, which is the accused product.  Given my assumption that the '060 patent is valid, enforceable, and infringed by Vitals, it is clear that Vitals' website is the patented product for Vitals, i.e., the infringing, accused product.  See Ex. A ¶19, ¶20 and ¶29 through ¶32 and ¶39 which includes my discussion of Vitals' website.

7.       Third, I analyzed the unique website visitors and visitors who clicked on both websites (co-visitors).  See Ex. A ¶29 – 31 and Ex. B Supplemental Attachment 3a.  Fourth, I analyzed the advertising revenue that both Health Grades and Vitals earned from website visits.  See Ex. A ¶30, and ¶41 – 44 and Ex. B ¶ 8 – 12 (including Tables 1 & 2).

8.       To understand the market demand for Health Grades' patented product and Vitals' infringing product, I analyzed the market share for them and their competitors over time.  See Ex. A ¶37 – 38 and Ex. B ¶11 – 12.

9.       Finally, I described my criteria to evaluate the *Panduit* test for demand for the patented product—see Ex. A ¶9 – 15; 19, 20; 28 – 32, 39, 41 – 44; Ex. B ¶9 – 10.  Based on my analysis and applying the guidance from both the *Panduit* and  *Gyromat cases*, I reasonably concluded that *Panduit* factor 1, demand for the patented product, has been demonstrated.

### *The Revenue I Used is Not Speculative, Not Unsupported, and Not "Admittedly Exaggerated"*

10.       Vitals misconstrues the revenue that I used in my analysis of demand for *Panduit*.  The following tables summarize the revenue that was a part of my demand analysis.  Table 1 is advertising revenue generated from the websites for the indicated periods.  (Ex. B ¶9 and 10)

---

[4] *Gyromat Corporation v. Champion Spark Plug Company*, 735 F.2d 549 (U.S. Court of Appeals, 1984).



11.      Table 2 summarizes all the revenue categories from the infringing website with

Vitals' advertising revenue highlighted.

| | Table 2 | | | | | |
|---|---|---|---|---|---|---|
| | **Vitals Revenue by Category ($s in thousands)** | | | | | |
| | 2010 | | | 2013 | | % of |
| | Jul - Dec | 2011 | 2012 | Jan – Sept | Total | Total |
| | | REDACTED | | | | |

12.      The revenue in these tables is supported by both Health Grades' and Vitals'

accounting records.  This revenue is not speculative or unsupported.  The advertising revenue is

directly related to the patented product and infringing product.

### *My Conclusion that the Patent Drove Demand is Reliable and Not Speculative*

13.      The *Panduit* demand test is for the patented product.  *Gyromat* provides guidance

regarding what satisfies a showing of demand for the patented product: "The <u>substantial number</u>

<u>of sales</u> by Champion <u>of infringing products containing the patented features itself is compelling</u>

<u>evidence of the demand</u> for the product."  *Gyromat* at 552. (Emphasis added)  Here, the

substantial and increasing number of website visitors to the parties' respective websites utilizing

the '060 patent features results in substantial and increasing advertising revenue.  This is

compelling evidence of demand for the "patented product."

4

14. Vitals' technical expert opined that there are "various easy design-arounds" that Vitals could make to its accused website such that there would be no infringement. Vitals has decided not to implement any of those design-arounds. These facts support my opinion that the *Panduit* test for demand is satisfied. Concluding that there was demand for the patented product, the court in *Gyromat* observed: "Champion's decision to risk infringement liability indicates the value it placed on the patented features." *Id*. "If there was no demand for the patented system, Champion would not have run the risk of infringement." *Id*. (Emphasis added.)

### My *Mor-Flo* Analysis is Not "Critically Flawed"

15. Vitals complains that I ignored the testimony of Health Grades' 30(b)(6) witness, John Neal, and left out competitors that Mr. Neal and Vitals' damages expert, Mr. Napper, identified. I did not ignore Mr. Neal's testimony but rather noted that the competitors Mr. Neal identified, which Vitals cites, was testimony Mr. Neal gave in response about *infringing* competitors and, as such, would not be included in a *Mor-Flo* analysis.

16. To measure Health Grades' lost profits, I relied on guidance from the *State Industries, Inc. v. Mor-Flo Industries, Inc. et al.*, 883 F.2d 1573 (U.S. Court of Appeals, 1989) and treated Health Grades' competitors as acceptable non-infringing alternatives. (Ex. A ¶35 and Ex. B ¶19) In my but-for infringement scenario, I removed Vitals from the market and apportioned Vitals' website visitors to six competitors including Health Grades. I identified these competitors using Vitals' own 2010 Business Overview's "Marketplace & Competition" section where Vitals identified four competitors: Health Grades, UCompare Health Care, Angie's List, and Rate MDs.[5] Health Grades personnel confirmed these four competitors and identified two additional competitors – ZocDoc and locatedoc.

---

[5] MDX 0012724-725.

17.     Vitals' identification of competitors varies:  1) prior to this litigation and at the time of the first infringement (July 2010), Vitals stated in its business overview that "Vitals has only one serious competitor."[6]  2) In June 2013, Vitals' CEO stated, "We've committed millions and millions of dollars and a couple dozen people nonstop to building this up.  Other than us and a company called Health Grades, there's really no one else."[7]  3)  Notwithstanding 1) and 2), Vitals' damages expert, Mr. Napper, identified 16 competitors, including three he cited in his report criticizing me for not including:  *wellness.com*, *healthcare.com* and *doctor.com*.[8] However, these three websites were *not* identified by either Mr. Neal (who was the basis of Vitals' criticism of my *Mor-Flo* analysis) or Vitals' own Business Overviews in July 2010. While the facts and data in this case do not support including the additional competitors identified by Mr. Napper as acceptable non-infringing alternatives, I have measured the influence of including these additional 16 competitors.  Apportioning lost profits using Mr. Napper's market share analysis yields essentially the same damages result.  (Ex. B ¶17 – 21 and ¶24 – 27)

18.     These results support the conclusion that my *Mor-flo* analysis is based on reliable information and that my methodology was applied in a reliable manner.

**Vitals Claims That My "Royalty Analysis Should be Precluded" because "The Entire Market Value Basis Is Unsupported" Mischaracterizes My Analysis**

19.     I have three key points in response to Vitals' claim:  1) I did not employ the entire market value rule; 2) I determined that the '060 patent is a substantial basis for demand that would nevertheless justify the entire market value rule; and 3) the application of my methodology is economically justified.

---

[6] MDX 0012692.  It is clear from the source that the one competitor is Health Grades.
[7] June 19, 2013 article (HG233307 – 233308).
[8] I am also aware that in the *TWM Manufacturing* case the court stated that the "[m]ere existence of a competing device does not make that device an acceptable substitute."  *TWM* at 901.

     1) <u>I did not employ the entire market value rule.</u>

  20. The notes to MDx's audited financial statements clearly state that it "… operates as an online healthcare directory service provider.  MDx Medical allows users to compare and rate physicians on its website, *vitals.com*."[9]  Its infringing website generates revenue, and therefore value, greater than just Vitals' advertising revenue.

  21. I did not employ the entire market value rule.  My royalty base did not include all Vitals' revenue earned from the entire accused website.  I used only the advertising revenue that Vitals generated from its accused patented product.

  22. I determined the royalty revenue base by:  1) Starting with Vitals' entire revenue of <span style="color:red">REDACTED</span>  (Ex. B Supplemental Attachment 2a; Table 2 above); 2) I then eliminated

<span style="color:red">REDACTED</span>

  (*Id*)[10]; and, 3) I apportioned advertising revenue by eliminating <span style="color:red">REDACTED</span> *ucomparehealthcare.com* and *drscore.com* advertising revenues (Ex. B Supplemental Attachment 4).  These three steps excluded <span style="color:red">REDACTED</span> revenue of Vitals' website and resulted in a royalty base of <span style="color:red">REDACTED</span>  (See Table 2 above).  I did not apply the entire market value rule because I did not include the entire market value of the infringing website.  I also adjusted my royalty rate to account for other non-infringing factors, as described above.

  23. Vitals' Motion states, "Where the patented features are not driving demand …, the patent holder must do a reasonable analysis to apportion the revenues…"  However, as Vitals' own counsel agreed at my deposition, further apportioning Vitals' advertising revenue can only be done by speculating.

---

[9] MDx's Audited Financial Statements for 2010 and 2009 (MDX 0073234 – 73255, specifically 0073241).

[10] I applied my reasonable royalty to the revenues derived from the licensing agreement Vitals had with Aetna.

7

24.     Rather than speculate to further apportion the infringing revenue figures, I considered further apportionment in my royalty rate determination.  I specifically adjusted the royalty rate to account for economic factors that would include Vitals asserting that its unpatented features provide value as well.[11]  My conclusion yields an appropriate royalty rate applied to the advertising revenue earned by Vitals from its accused website – a framework that has been used by Health Grades in other licenses involving its websites.[12]

25.     As a starting point in my reasonable royalty analysis, I applied  an analytical approach that used a non-infringing industry benchmark, WebMD, to calculate a profit differential of 35%. (Ex. B ¶33 – 34).  *TWM Mfg. Co. Inc. v. Dura Corp* concluded that the royalty rate should be equal to this type of profit differential (30% in that case).  I continued my royalty rate analysis and concluded that a much lower royalty rate (12%) would have been negotiated by the parties. (Ex. A ¶70 – 91; Ex. B ¶31 – 40)

26.     Economic factors influencing my reasonable royalty conclusion included the co-visitor impact (Ex. B ¶37 – 38), which cut in half the royalty rate yielded from the analytical approach.  Also, I concluded that a rational and reasonable negotiation with both parties strongly asserting their positions would have reasonably led to a further reduction in the royalty rate.  I also considered all of the *Georgia Pacific* factors to arrive at a 12% royalty rate. (Ex. B ¶33 – 40)

   2)     <u>I determined that the '060 patent is a substantial basis for demand that would nevertheless justify the entire market value rule.</u>

27.     In this case, the '060 patented invention is more than just a small element of a

---

[11] "… sophisticated parties routinely enter into license agreements that base the value of the patented inventions as a percentage of the commercial products' sales price.  There is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.,* 580 F.3d.
[12] See Dr. Tango license agreement; Ex. B. Supplemental Attachment 3a, item 3.

much larger product.  Health Grades asserts it is a fundamental portion of the websites that both

Vitals and HealthGrades promote to create demand for their websites.  My work has determined

that the facts and data reasonably demonstrate that the '060 patent is a substantial basis for

demand of the parties' websites.

28.     First, both parties promote doctor reviews and ratings on search engine results and

elsewhere (Ex B ¶11 – 12; Exhibits 1 and 2).  Second, both parties market share substantially

increased after employing and promoting the '060 patent.  (Ex. B Supplemental Attachment 16).

Third, Vitals CEO stated that it and Health Grades were the only ones in the market.

29.     *Mondis Technology, Ltd. v. LG Electronics, Inc.*[13] states that the basis for demand

of the patented features does not have to be absolute.  Otherwise, any case involving a reasonable

royalty for a product that may also incorporate non-infringing or non-accused elements whose

value could not be extracted from the revenue base, would then require speculation by the expert

to apportion such a value.  Instead, as the facts of this matter support, it is reasonable and not

speculative to base my royalty rate on the advertising revenue related to the patented invention,

even if such advertising revenue may be partially attributable to non-patented features.

3)  The application of my methodology is economically justified.

30.     *Lucent* also recognizes that, "… even when the patented invention is a small

component of a much larger commercial product, awarding a reasonable royalty based on either

sale price or number of units sold can be economically justified."[14]  As I described above, I have

identified the appropriate base that is not an application of the entire market value rule, upon

which to calculate royalty streams.  In light of the royalty based being used, I arrived at a royalty

---

[13] *Mondis Technology, Ltd. v. LG Electronics, Inc.* 2011 WL 2417367.
[14] *Lucent Technologies, Inc. et al. v. Gateway, Inc. et al.,* 580 F.3d.

rate using a methodology that directly accounts for non-patented features and eliminates them from the royalty rate.  I reliably applied tangible facts and data to determine the base and the royalty rate for my well-accepted methodology, and it yielded a reliable result that is neither conjectural nor speculative.

### *My Analytical Approach is Not "Fatally Flawed"*

31.     Vitals is critical of my use of WebMD as an industry benchmark.  I have a reasonable basis for using WebMD as a benchmark.  Both Vitals and Health Grades identified WebMD[15] as an industry participant.  Vitals included WebMD in the industry section[16] and listed WebMD in its public company comparable section of its business overview.[17]

32.     As discussed above, I used an analytical approach that used a non-infringing industry benchmark, WebMD, to calculate a profit differential of 35%. (Ex. B ¶33 – 34).  From that profit differential, I further analyzed and concluded that a much lower royalty rate (12%) would have been negotiated by the parties.  (Ex. A ¶70 – 91; Ex. B ¶31 – 40)  I reliably applied the facts and data to the well-accepted analytical approach as the basis for my methodology.

### *Vitals Criticizes My "Reliance On An Unidentified Health Grades Employee"*

33.     Ms. Pearson was one of three Health Grades' individuals that I spoke with. (Ex. A App. C)  Vitals' motion cites instances where I mentioned Andrea Pearson's name in my testimony.  In all of these instances, I also mentioned Allen Dodge, Health Grades' CFO.  I relied upon Health Grades' witnesses, Mr. Dodge and Mr. Neal.  Ms. Pearson corroborated information provided by them.

Respectfully submitted, David A. Hall, CMA, CFE, MBA _____

---

[15] WebMD's Annual Report filed March 1, 2013 states *"The WebMD Health Network*, . . . , includes *www.WebMD.com* (which we sometimes refer to as *WebMD Health* ), our primary public portal for consumers, . . ."
[16] See MDX 0012917 and 12700.
[17] See MDX 0012928 and MDX 0012733.