# EXHIBIT B

(Redacted version of Dkt. # 677-2)

# HealthGrades, Inc.

## v.

# MDx Medical, Inc. d/b/a Vitals.com

### Expert Report of David A. Hall



July 13, 2012

ALVAREZ & MARSAL GLOBAL FORENSIC AND DISPUTE SERVICES, LLC

**DAVID HALL STATEMENT - EXHIBIT A**

## I.   INTRODUCTION AND OVERVIEW

### A.  Assignment

1.   Alvarez & Marsal Global Forensic and Dispute Services, LLC ("A&M") was retained by HealthGrades, Inc. ("HealthGrades") and its counsel to calculate patent infringement damages in the matter of HealthGrades, Inc. v. MDX Medical, Inc. d/b/a Vitals.com (collectively, "Vitals").  HealthGrades claims that Vitals infringes its U.S. Patent No. 7,752,060 B2 ("the '060 patent").  I have been asked to assume that the '060 patent is valid, enforceable, and that Vitals has infringed the '060 patent, and that HealthGrades is entitled to damages.

### B.  Experience and Qualifications

2.   I am a Managing Director in the Denver office of Alvarez & Marsal Global Forensic and Dispute Services, LLC.  I have a Master of Business Administration degree from the University of Texas at Austin and a Bachelor's degree from the University of Michigan.  I am a Certified Management Accountant and a Certified Fraud Examiner.  I have 24 years of experience analyzing the operations and financial condition of companies in many different industries including healthcare-related information and industry.  I have developed and evaluated hundreds of damage claims, including damage claims related to lost profits, and reasonable royalty analyses.  I have testified in federal and state courts on economic damages including lost profits and reasonable royalty conclusions.  My experience includes the study of actual and projected revenues, cost of goods, indirect costs, general and administrative expenses, cost of capital, discount rates and various assets, liabilities and equity.  A&M's work on this matter was performed either directly by me or by other A&M consultants working under my direct supervision.

3.   A&M is compensated for time worked on this matter at hourly rates.  My hourly rate for this matter is $440.  A&M's compensation is not contingent upon the outcome of this litigation or upon our opinions.  I have authored no published materials in the last 10 years.  I have presented at the National Contract Management Association, Rocky Mountain Intellectual Property & Technology Institute and other venues on various topics related to damages.  **Appendix A** to this report is my resume and **Appendix B** contains my testimony for the last four years.  I have not published any articles in the last 10 years.

**DAVID HALL STATEMENT - EXHIBIT A**

### C. Information Considered

4.     In developing the opinions expressed below, I relied on a number of information sources including HealthGrades' complaint; other legal case filings including interrogatory responses; financial information for HealthGrades and Vitals, deposition transcripts and exhibits, and publicly available information.

5.     **Appendix C** contains a list of the documents and information I considered to reach my conclusions and opinions. If additional information is produced in this matter, I will consider it, and I may update the conclusions and opinions expressed in this Report.

6.     I want to note that in late 2011 and again several times in 2012, I requested Vitals' financial information so that I could complete my assignment. I did not receive the complete set of this information until less than a week ago including Vitals' infringing revenue.

7.     In addition to the analyses and opinions described in this Report, I may also be asked to perform additional analysis based on additional information provided to me between now and the trial. Specifically, related to Vitals' late disclosure of its license agreements, I understand that HealthGrades' counsel may make further legal claims. If that occurs, I plan to review and discuss such claims and to supplement my report to address the damage issues of such claims.

8.     I understand that I may also be asked to testify at trial. I may prepare charts or other demonstrative exhibits based on the information and analyses included in this and subsequent reports.

## II.   BACKGROUND INFORMATION[1]

9.     The '060 patent is described as an "Internet System for connecting Healthcare Providers and Patients."[2] The inventors are David G. Hicks, Scott Montroy, and John Neal. HealthGrades is the assignee. A provisional patent application was filed on February 8, 2006. The full application was filed on August 29, 2006. Patent '060 was issued on July 6, 2010.

---

[1] The primary sources for this section of the Report is HealthGrades' Complaint, discussions with counsel and HealthGrades personnel, and other sources of information cited in footnotes.
[2] '060 Patent, p. 1.

**DAVID HALL STATEMENT - EXHIBIT A**

10.   The patented invention is described as follows:

> This invention generally relates to an Internet-based system and
> method that connects patients with potential healthcare providers,
> e.g., physicians and hospitals.   More particularly, the present
> invention relates to providing on-line ratings and reports comprised
> of detailed healthcare provider information with verified information
> sections, including physician-verified and/or independent third-party-
> verified portions, and patient-provided information sections, to assist
> patients in differentiating among healthcare providers.[3]

11.   Claim 1 of the '060 patent has the following elements:

(1)   receiving a request for information about a first healthcare provider;

(2)   accessing information provided and verified by the same healthcare
provider such as specialty, medical philosophy, gender, age, years in
profession, years in practice, awards, honors, professional
appointments, professional memberships, publications, languages and
hobbies;

(3)   compiling patient provided information regarding the healthcare
provider from past or current patients, i.e., patient ratings;

(4)   compiling information regarding the healthcare provider verified by
an independent third party source such as board certification,
licensure, disciplinary action information, medical school, medical
internship, medical residency, and medical fellowship; and,

(5)   creating a report on the healthcare provider using (2), (3) and (4)
above that includes comparison ratings.[4]

12.   Element (1) covers to the act of the patient accessing information on a healthcare provider.

Elements (2), (3), and (4) relate to the databases that contain information on the healthcare

provider.   Specifically, element (2) relates to healthcare provider verified information.

Element (3) pertains to patient-provided information, and Element (4) relates to independent

third-party -provided information.   Finally, Element (5) is the output from the database

pursuant to the request received at Element (1) and the results derived from Elements (2)

through (4).

---

[3] '060 patent, column 1, "Technical Field"
[4] '060 patent, column 20.

**DAVID HALL STATEMENT - EXHIBIT A**

13. In addition to Claim 1, Claim 15 of the '060 patent begins by stating that the patent also consists of "An on-line information system for connecting healthcare providers with potential patients, the system comprising…"

14. Based on my plain reading of these claims, the patented invention is comprised of not only the data necessary to research information, including patient-provided information, on healthcare providers, but also a mechanism for accessing that data and generating a report from the query.

15. With respect to the data, HealthGrades collects available data principally from three sources: 1) healthcare provider-verified information; 2) information verified by independent third-party source 3) patient provided information.[5]  This information consists of, but is not limited to, primary and secondary specialty areas, medical school attended, years since medical school, residency, fellowships, address, board certifications, malpractice data, etc.  Since not all of the data collected is associated with a unique physician identification number, HealthGrades has developed a proprietary matching process to ensure that the data is properly matched to the provider.

16.  According to HealthGrades' 10-K filed for the fiscal year ended December 31, 2009, HealthGrades began to focus on providing healthcare information via the web in 1998.  The company was incorporated in 1995 under the name Specialty Care Network, Inc. commencing operations in 1996.  In November 2000, the company changed its name to HealthGrades, Inc.[6]

17. HealthGrades provides information relating to the following healthcare providers:

- Over 5,500 hospitals
- Over 800,000 physicians in 125 specialties
- Over 175,000 dentists in 10 specialties
- Over one million alternative specialty providers (e.g. acupuncturists, chiropractors, mental health professionals) in more than 40 specialties
- Over 15,000 nursing homes.[7]

---

[5] '060 Patent claim 1 and Order Regarding Claim Construction, p. 23.
[6] HealthGrades 10-K filed with the U.S. Securities and Exchange Commission for the fiscal year ended December 31, 2009, p. 12, Bates No. HG0001591.
[7] Ibid, p. 4, Bates No. HG0001583

**DAVID HALL STATEMENT - EXHIBIT A**

Summarizing the above, HealthGrades provides information on hospitals, physician healthcare providers, and nursing homes.[8]

18. HealthGrades includes up to a Five-Star Doctor designation to its report from the database for those physicians that meet certain criteria in its ratings. These criteria relate to HealthGrades rating of the hospital(s) in which the physician has admission privileges, licensure actions against the physician, disciplinary actions by the state, board certification, etc.[9]

19. REDACTED

[10]

20. Vitals describes its business in its Audited Financial Statement as "an online healthcare directory service provider."[11] Vitals also states in its second sentence in Organization section that "MDx Medical allows users to compare and rate physicians on its primary website, vitals.com, and its recently acquired websites, UCompareHealthCare.com, Healthleap.com and PAtientsChoice.org. These websites are primarily designed to locate and provide information for any doctor in the United States."[12]

21. Vitals describes its "Core IP Asset" as being the "Master Provider Database."[13] Vitals described this database as being a unique collection, collation & cleansing methodology. The company further described it was, "The only Master list of every active (unduplicated) doctor, nested into their group practices and hospital affiliation." Vitals also claims that it "is by far the largest source of US doctor ratings & reviews."[14]

---

[8] I understand that the claims of the patent cover physicians.
[9] Ibid, p. 7, Bates No. HG0001586
[10] "Snapshot of Vitals" from Business Overview: Progress, Strategy, Plans; Bates Nos. MDX 0012882 through 12934, specifically MDX 0012886.
[11] MDx Medical, Inc. Audited Financial Statements, December 31, 2011 and 2010. MDX 0104440-0104466.
[12] Ibid, p. 2, Bates No. MDX 0104447
[13] Ibid, p. 2, Bates No. MDX 0012883
[14] MDX 0012916 and MDX 0012702

DAVID HALL STATEMENT - EXHIBIT A

### III.   SUMMARY OF ANALYSIS AND OPINIONS

**A.   HealthGrades' lost profits and reasonably royalty damages suffered through May 2012 as a result of Vitals' infringement of the '060 patent are approximately $2,262,000.**

**B.   12% is a reasonable royalty resulting from a hypothetical negotiation for Vitals related to the '060 patent.**

**C.   Reasonable Royalty Damages on the all Vitals' infringing revenue through June 2012 are approximately $926,000.**

### IV.   ANALYSIS AND OPINIONS

**A.   HealthGrades' lost profits and reasonably royalty damages suffered through May 2012 as a result of Vitals' infringement of the '060 patent are approximately $2,262,000.**

#### 1.   Damages Overview – Patent Infringement Damages

22.   Assuming infringement of a valid patent, the patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[15]  To the extent that lost profits damages are not applicable on any sales that are subject to damages, the patentee would be entitled to a reasonable royalty on such sales.  The overall damages may be split between lost profits on some of the infringing sales and a reasonable royalty on any remaining infringing sales that are not included in the lost profit amounts.[16]

#### 2.   General Principles For Establishing Lost Profits

23. In order to establish a claim for lost profits, the patentee must demonstrate that there is a reasonable probability that "but-for" the assumed infringement, the patentee would have made some or all of the accused sales and earned the associated profits.  At the heart of an appropriate lost profits analysis is a requirement to reconstruct the "but-for" hypothetical market based on sound economic proofs.  Numerous published decisions recap the basic methodologies and requirements for a lost profit claim.  The following summary of the basic lost profits framework is from the Grain Processing Corporation v. American Maize-Products Company case[17]:

---

[15] 35 USC Sec 284
[16] State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573 (Fed. Cir 1989)
[17] 185 F.3d 1341 (Fed. Cir. 1999).

**DAVID HALL STATEMENT - EXHIBIT A**

Case 1:11-cv-00520-PAB-BNB   Document 411-1   Filed 11/27/12   USDC Colorado   Page 8 of 79

To recover lost profits, the patent owner must show "causation in fact," establishing that "but for" the infringement, he would have made additional profits. When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for" the infringement. Once the patent owner establishes a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's "but for" causation claim] is unreasonable for some or all of the lost sales."

....

In Aro Manufacturing, the Supreme Court stated that the statutory measure of "damages" is "the difference between [the patent owner's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." The determinative question, the Supreme Court stated, is: "had the Infringer not infringed, what would the Patent Holder-Licensee have made?" The "but for" inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee "would ... have made."

24.  This general framework of a "but-for" damages approach is also articulated in earlier cases that involved patent damages analysis.[18]  Lost profits damages may take on a number of different forms, including lost sales units, eroded prices and increased costs:

In determining such damages, the profits lost by the patent owner in a two-supplier market is a proper ground for granting relief.  Lost profits may be in the form of diverted sales, eroded prices, or increased expenses.  The patent owner must establish a causation between his lost profits and the infringement.  A factual basis for the causation is that "but for" the infringement, the patent owner would have made the sales that the infringer made, charged higher prices, or incurred lower expenses.  In proving his damages, the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability.[19]

---

[18] For example see Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056 (Fed. Cir 1983):
   Pursuant to 35 U.S.C. § 284, a patent owner is entitled to damages that are adequate to compensate for the infringement.  Such damages "constitute 'the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.' … The question to be asked in determining damages is 'how much had the Patent Holder suffered by the infringement.  And that question [is] primarily: had the Infringer not infringed, what would Patent Holder … have made?' "

[19] Ibid.

**DAVID HALL STATEMENT - EXHIBIT A**

25. Based on the facts of this case, I have analyzed the damages experienced by HealthGrades framed by the above-noted construct and considering the well accepted methodologies outlined below.

### a) Lost Profits Analysis

26. The "Panduit Test" is one way to systematically consider and evaluate the market impact on the patent owner's (HealthGrades) sales, "but-for" Vitals' assumed infringement.  The following are the four Panduit factors:

> ➢ Demand for the patented product;
> ➢ Manufacturing and marketing capability to exploit the demand;
> ➢ Absence of acceptable non-infringing substitutes; and,
> ➢ The amount of the profit.[20]

27. My analysis of the Panduit factors demonstrates that HealthGrades is entitled to lost profits. The following sections address why the Panduit test is satisfied for Vitals' accused revenue.

### Demand

28. **Attachment 1** presents HealthGrades' income statements for the years ended December 31, 2008 through December 31, 2011 and for the four-month period ended April 30, 2012. These income statements were compiled from the various departments that report the revenues and costs associated with the patented invention.[21]  **Attachment 2** presents Vitals' audited income statements for the years ended December 31, 2008 through December 31, 2011.   Monthly income statement information for Vitals is summarized at **Attachment 2a**.  This information is summarized for the infringement period of July 2010 through May 2012 – the most recent information produced by Vitals at the date of this report.

---

[20] Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152 (6th Cir. 1978).
[21] As noted elsewhere in this report, revenues reported by the various departments include more than that of the patented invention.  However, HealthGrades did not separately report the revenues and expenses related to the patented invention.  Therefore, these departmental income statements were considered in their entirety.

**DAVID HALL STATEMENT - EXHIBIT A**

29. One of the claims of the '060 patent is that visitors to its website can access data on a "first healthcare provider."[22]  Based on the information on the first health care provider, visitors (or prospective patients) could obtain "comparison ratings of healthcare providers," including the first healthcare provider in the report that would permit a comparison of that healthcare provider with other healthcare providers.  HealthGrades provides this comparison online via the internet at its website.  This comparative analysis is another of the claims of the '060 patent and is provided for in one of the claims stated above.  Visitors come to the website to research physician information generate advertising revenue for HealthGrades and Vitals.

30. HealthGrades' and Vitals' income statements clearly show substantial advertising revenue – over ▮▮▮▮▮ for HealthGrades in 2011 (see **Attachment 1 and Attachment 12**) and REDACTED ▮▮▮▮ for Vitals in 2011(see **Attachment 2 and Attachment 11**).  This advertising revenue combined with the website visits demonstrates the demand for the claims embodied in the '060 patent.[23]

31. As I discuss later in this report, some visitors visited both Vitals' and HealthGrades' website to gather healthcare provider information without cost.  A visitor who clicked on both HealthGrades' and Vitals' website ("co-visitors") would have caused ad revenue to be generated for both HealthGrades and Vitals.  This means that there is not a one for one relationship between visitors to Vitals' website and lost visitors/ad revenue for HealthGrades.  This phenomenon impacts the quantity of lost HealthGrades revenue (and therefore, profits) in my "but-for" analysis, and I properly accounted for this phenomenon.

32. As noted earlier in my report, the patented invention is comprised of several features.  Among these features are verified provider information and patient provided reviews that provide information to visitors to evaluate and compare providers.  Since these patented features are a fundamental portion of HealthGrades' and Vitals' websites from which both earn significant and growing advertising revenue, I have reasonably concluded that there was (and is) demand for the patented invention.

---

[22] Court Order Regarding Claims Construction, the First Healthcare Provider is "a particular healthcare provider about whom information is requested and a report is produced."
[23] The Gyromat Corporation v. Champion Spark Plug Company, 735 F.2d 549 (U.S. Court of Appeals, 1984).

**DAVID HALL STATEMENT - EXHIBIT A**

## Manufacturing and marketing capability

33.   HealthGrades has the "manufacturing and marketing capability" to exploit the demand of the patented features.  Since HealthGrades' database is hosted on the web, access to the data is available to all who have a web connection.  Plus, there are no geographical restrictions within the U.S. domestic market to access the data.

## Absence of Acceptable Non-Infringing Substitutes

34.   I am not aware of any acceptable non-infringing substitute to HealthGrades' patented invention.  However, I am aware that there are companies that HealthGrades views as competitors for visitors and advertising revenue.  HealthGrades views the pool of competitors to consist of entities that try "… to attract consumers who are searching for provider information online.  And provider information can be in the form of physician information, hospital information, dentists."[24]

35.   Consistent with the Mor-Flo Industries, Inc. case, for purposes of measuring lost profits, I have treated HealthGrades' competitors as acceptable non-infringing alternatives.[25]  To the extent that these competitors are infringing or not an acceptable substitute, my analysis understates HealthGrades' lost profits.

36.   HealthGrades also asserts that the patented features employ the data provided by healthcare providers, patients, and third-party verified information, but also add to this data by facilitating the comparison of healthcare providers and providing a user experience for the visitor.  HealthGrades' Vice President of Corporate Strategy & Development (and one of the inventors of the '060 patent), John Neal testified:

> "The intent behind the patent filing was to protect the unique experience that we've created on the website.  So how we display content, how we facilitate search, and then, more recently, how we facilitate rates and comparison of providers."[26]

37.   Vitals also identified market competitors.  In a presentation that appears to be created at the approximate time that the '060 patent was issued; Vitals identified HealthGrades as the market leader.[27]

---

[24] John Neal deposition transcript, p. 56.
[25] State Industries, Inc.  v. Mor-Flo Industries, Inc. et al., 883 F.2d 1573 (U.S. Court of Appeals, 1989).
[26] Ibid, p. 57.

**DAVID HALL STATEMENT - EXHIBIT A**

38. I identified the competition based on both Vitals and HealthGrades documents and testimony as well as our research.  In conjunction with consultations with HealthGrades' management, I identified those websites that were competing for consumers in the on-line provision of information on healthcare providers.  This information is presented on a monthly basis at **Attachment 3a** for the period July 2010 through May 2012.  Based on this data, I have calculated HealthGrades market share for the period July 2010 through June 2012 to be 48% (with Vitals in the market).

### Amount of Profit

39. The online market for information on physicians and other individual healthcare providers such as dentists is the relevant market for this matter.  The key features of the '060 patent allows visitors, via the internet, to access data on physicians in order to conduct a comparative analysis of them.  This comparative analysis is a feature of the '060 patent and is provided for in one of the claims stated above.  As noted earlier, visitors come to the website to research physician information generate advertising revenue for HealthGrades and Vitals.  Some of the visitors who visited Vitals' website also visited HealthGrades' website.  Further, HealthGrades maintained financial records that would reasonably allow for the quantification of profit that it would have earned.  Therefore, a lost profits approach is supported in this matter.

40. To measure lost profits in this matter, I start with the incremental demand and apply a market share estimate to arrive at HealthGrades' lost revenue which is a portion of the accused sales.

### Lost Revenues

41. Companies pay HealthGrades for ad placements on its website.  These ad placements appear each time a visitor comes to the website and searches for a healthcare provider.

42. HealthGrades' ad revenues are driven by the visitors' use of its patented features.  Generally, the targeted ads also known as direct network sales yield the highest ad revenue per thousand impressions.  HealthGrades lowest ad revenue per thousand impressions comes from Google Ad Sense, an auction market for advertisements that may or may not

---

[27] MDX 0012725.

**DAVID HALL STATEMENT - EXHIBIT A**

be related to the healthcare provider being searched.  These ads are sometimes referred to as remnant advertising revenues.

43.   Visitors to HealthGrades' and Vitals' websites do not pay HealthGrades or Vitals.  Instead, both entities are compensated by advertisers.[28]

44.   I concluded that HealthGrades would have reasonably achieved additional advertising revenue had Vitals not infringed on the '060 patent.  To calculate a reasonable estimate of HealthGrades' additional revenue, I began with identifying Vitals' infringing advertising revenue.  This information is presented at **Attachment 2a** for the period of infringement.[29]
**Attachment 4** presents the advertising revenue from **Attachment 2a**.

<div align="center" style="color:red">REDACTED</div>

45.   As I discussed earlier in this report, there were co-visitors to both Vitals' and HealthGrades' websites.  Assuming infringement and with Vitals no longer participating in the "but-for" market, co-visitors would not generate incremental revenue for HealthGrades because they already visited HealthGrades' website.

46.   comScore, Inc. ("comScore") is a data service that provides a "Cross Visiting" reports that shows the number of visitors who clicked on two websites.  I used this data to determine the number of visitors who clicked on both Vitals' and HealthGrades' websites.  As noted earlier, I have assumed that these visitors would not have generated additional revenue for HealthGrades.  See **Attachment 3b** for the information on the percentage of co-visitors and visitors who did not go to both websites.

47.   I applied the actual co-visitors factors by time period (which ranged from 52% to 55%) to yield Vitals infringing revenue reduced for the impact co-visitors for the period July 2010 through May 2012 which yielded of $3.589 million (see **Attachment 4**).

---

[28] HealthGrades also sold healthcare provider reports in 2010.  Vitals did not sell physician reports in a similar fashion.  I am continuing to study the HealthGrades' report sales in the last six months of 2010 to determine if HealthGrades' lost convoyed report sales due to Vitals' infringement.  I may supplement my report on this issue.
[29] For 2011, **Attachment 2**, Vitals audited income statements, agrees to the same year on **Attachment 2a**, based on the monthly income statements.

**DAVID HALL STATEMENT - EXHIBIT A**

48. To determine what HealthGrades' revenues would have been in the "but-for" scenario, I assessed and determined what the market would reasonably be absent the infringer's presence. I did this by determining the established market share for HealthGrades at points in time during the infringement. Using comScore and a Vitals' business overview, I determined that HealthGrades' established market share was 48%. See **Attachment 3a.**

49. I then reconstructed the market excluding Vitals to determine HealthGrades' market share in "but-for" scenario.[30] This calculation was made at **Attachment 3a**. HealthGrades' reconstructed market share is 58% as of June 2011 and 57% as of June 2012. I then applied these market share statistics to calculate the amount of revenue that HealthGrades would have reasonably earned. **Attachment 4** includes this calculation which yields $2.073 million of HealthGrades' lost revenue subject to lost profits measure.

### Incremental (Avoided/Variable Costs)

50. To calculate HealthGrades' lost profits damages resulting from lost advertising revenue, I subtracted the costs that HealthGrades would have incurred to earn that revenue. These costs are incremental or variable costs that would change with changes in revenue. In describing the damages methodology, these costs are also called 'avoided costs' – costs that HealthGrades avoided but would have incurred to earn the lost revenue. It is necessary to deduct these costs from lost revenues to properly calculate lost profits.

51. I based my determination of the appropriate amount of incremental costs on my analysis of HealthGrades' periodic revenue and costs, my experience analyzing costs, and discussions with HealthGrades' Chief Financial Officer, Mr. Allen Dodge. After analyzing HealthGrades' revenues and costs for the relevant period, I categorized its costs as either fixed, variable, or semi-variable (See **Attachment 5**). To determine these incremental (or variable) cost percentages, I totaled HealthGrades' periodic expenses I determined to be incremental and divided those costs by the month's revenue. I concluded that HealthGrades' incremental profit rate for the infringement period were 70% for the July through December 2010 period and 78% for the 2011 and 2012 (through April) periods. These are high profit rates but reasonable because of the fact that once an advertising

---

[30] State Industries, Inc. v. Mor-flo Industries, et al., 883 F.2d 1573.

**DAVID HALL STATEMENT - EXHIBIT A**

platform (such as a website) is complete, there are relatively small incremental costs incurred to yield advertising revenue.

52. Finally, to calculate HealthGrades' costs it would have incurred to earn the lost revenue, I applied the incremental cost percentage to each period's lost revenue to determine the amount of incremental expenses.

### **HealthGrades' Lost Profits and Reasonable Royalty Damages**

53. To calculate HealthGrades' lost profits from Vitals' infringement of the '060 patent from July 2010 through May 2012, I subtracted the incremental cost expense from the lost revenue. This calculation is on **Attachment 4** and totals approximately $1,585,000 of lost profits HealthGrades suffered as a result of Vitals' infringement of the '060 patent.

54. Since HealthGrades is entitled to no less than a reasonable royalty, I have applied a reasonable royalty rate to Vitals' infringing ad revenue amounts that were not subject to lost profits. As discussed in detail later in this report, I determined a reasonable royalty rate from a hypothetical negotiation of 12%. Applying this reasonably royalty to the ad revenue not subject lost profits. Reasonable royalty damages are approximately $677,000. Table 1 below summarizes lost profits and the reasonable royalty damages which total $2.262 million. These figures are through May 31, 2012 and will need to be updated through the date of trial when monthly infringing revenue beyond May 2012 is available.

| Table 1: HealthGrades Lost Profits and Reasonable Royalty Damages | | | |
|---|---|---|---|
| **Period** | **Lost Profits** | **Reasonable Royalty** | **Total Damages** |
| Jul 2010 – Dec. 2010 | $281,518 | $126,913 | $408,431 |
| 2011 | $896,936 | $369,289 | $1,266,225 |
| Jan 2012 – May 2012 | $406,097 | $181,097 | $587,194 |
| June 2012 – End of Trial | TBD | TBD | TBD |
| Total | $1,584,552 + TBD | $677,299 + TBD | $2,261,851 + TBD |

**DAVID HALL STATEMENT - EXHIBIT A**

### B. 12% is a reasonable royalty resulting from a hypothetical negotiation for Vitals related to the '060 patent

55.  "…Assuming infringement, a patent holder is entitled to damages adequate to compensate it for the infringement, but not less than a reasonable royalty."[31]  For purposes of calculating HealthGrades' damages in this matter, we have performed the reasonable royalty analysis as an alternative to the measurement of lost profits described in previous sections.  A reasonable royalty can be determined based on the factors that the infringer and the patent holder would have considered in a hypothetical negotiation that took place at the time of first infringement.  We also agree that the hypothetical negotiation concepts are set forth in the Court's ruling in the Georgia Pacific case:

> The amount that a licensor (such as the patentee) and a license (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[32]

56.  In the hypothetical negotiation, it is assumed that the asserted patent is valid and infringed by Vitals.  Compared to licenses negotiated outside of a litigation context, this assumption would have an upward influence on the reasonably royalty rate.[33]

57.  The hypothetical negotiation is completed on the date of first infringement, assuming both parties are knowledgeable of the relevant facts, including knowledge regarding actual events after the date of the hypothetical negotiation.  Since the '060 patent was issued in July 2010, and since Vitals had already been in the market by then,[34] the hypothetical negotiation is assumed to have occurred in July 2010.

---

[31] The Patent Statute, 35 U.S.C. 284.
[32] Georgia Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 116 (S.D.N.Y 1970)
[33] Royalty rates for a hypothetical negotiation between two parties in litigation may be higher than the typical rates negotiated between willing parties.  In many situations, the negotiated royalty rate outside of litigation includes a discount for the risks that the patent involved may not be valid and/or that the patent is not infringed by the licensee.  Such discounts are not appropriate in a hypothetical negotiation.  Since a hypothetical negotiation assumes that the patent is valid and infringed, for the determination of a reasonable royalty, there is no doubt surrounding the validity of the '060 patent or Vitals' infringement.
[34] MDX 0012886.

**DAVID HALL STATEMENT - EXHIBIT A**

58. To arrive at a reasonable royalty rate, I considered the Georgia Pacific factors and other relevant considerations in connection with this hypothetical negotiation. **Attachment 9** addresses each of the Georgia Pacific factors. The following paragraphs discuss important considerations in my rationale for determining the amount of reasonable royalty in this matter.

### 1. Reasonable Royalty Considerations

#### a. <u>HealthGrades Licensing Policy</u>

59. While HealthGrades does not have a written policy, its licensing practice and strategy has been to use its best business judgment in managing its intellectual property. HealthGrades uses the features of the '060 patent on its website to generate revenue and profits. HealthGrades has not licensed the '060 patent. Consequently, for HealthGrades to consider a license to Vitals for patented features (in the '060 patent) that is a key component of HealthGrades' business and its profitability, the financial terms would need to be very favorable. HealthGrades' licensing history combined with its use of the '060 patent has an upward influence on the reasonable royalty rate.

#### a) <u>Existing Licenses</u>

##### i. HealthGrades Licenses

60. I am aware that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."[35] In order to use other licensing agreements to derive a royalty rate in a litigation matter, the patentee has "…the burden to prove that the licenses [are] sufficiently comparable to support the…award."[36] The Federal Circuit goes on to say that a "…damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers…particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here."[37]

---

[35] Uniloc USA, Inc., et al. v. Microsoft Corporation (Fed. Cir. 2011).
[36] Lucent Technologies, Inc. et al. v. Gateway, Inc., et al., (Fed. Cir. 2009). Also see ResQnet.com, Inc., et al. v. Lansa, Inc., (Fed Cir. 2010) in which the Court rejected testimony based on licenses that did not mention the patents in suit or show any other discernible link to the claimed technology.
[37] Ibid.

**DAVID HALL STATEMENT - EXHIBIT A**

61. The licenses discussed below generally only appear to relate to the physician or other healthcare provider data and not a license of the '060 patent. However, the licenses discussed below are still instructive as a point of reference as to the hypothetical negotiation. The parties in negotiation would reasonably consider the amounts and rates that it negotiated for on a critical component—data—that is a necessary component to be able to effectively use the patented technology.

62. While I do not consider these licenses comparable, they do provide a timely point of reference for rates, terms and structure of licenses in the industry that involves a critical contribution for an effective website—good data. Another critical contribution for an effective website is permission under a '060 license.

63. HealthGrades has not licensed the '060 patent but it has licensed its data. This robust and comprehensive dataset is one of the necessary components of effectively utilizing features of the '060 patent. **Attachment 6a** presents a summary of the HealthGrades' license agreements.

64. Many of HealthGrades' licenses were (or are) for fixed fees or tiered fees on a per-unit basis, such as employee headcounts. A few of the licenses specified a royalty rate such as HealthGrades' license agreement with Best Quality Healthcare, dated February 22, 2011 (seven months after the date of the hypothetical negotiation). This agreement called for HealthGrades to receive 25% of all gross revenues up to $1 million and 10% of all gross revenues exceeding $1 million, with an annual fixed fee option of $172,000.[38]

65. HealthGrades entered into a license agreement with DrTango, Inc., dated June 23, 2010 (very close to the date of hypothetical negotiation), DrTango was to pay 40% of all gross ad revenue except for Univision advertisements, which were to pay 33% of gross add revenues to HealthGrades.[39]

66. HealthGrades' license agreements indicate that it negotiated royalty rates for its data ranging from 10% to 40% at or near the time of its hypothetical negotiation in this matter. While not controlling, HealthGrades would have been mindful of these rates.

---

[38] Bates Nos. HGLA0041 – HGLA0050.
[39] Bates Nos. HGLA0077 – HGLA0085.

**DAVID HALL STATEMENT - EXHIBIT A**

### ii. Vitals Licenses

67. Late in June, I was provided 22 license agreements executed by Vitals during the period December 2008 through March 2012.  Most of these license agreements appear to be fixed fee or recurring amounts.  These licenses are summarized at **Exhibit 6b**.

68. <span style="color:red">REDACTED</span>

69. <span style="color:red">REDACTED</span>

### b) HealthGrades' Competitive Position with Vitals

70. HealthGrades and Vitals compete directly for visitors to come to their website which drives advertising revenue for both parties.  Vitals competing with HealthGrades for advertising revenue means that a HealthGrades license to Vitals for its '060 patent will cause HealthGrades to lose a portion of advertising sales and corresponding high profit margins.  For HealthGrades to maintain its profitability with a license to Vitals, the license rate would need to reflect the appropriate portion of HealthGrades' incremental profit rate it earns on the ad revenue that it may capture (subject to co-visitor impact), but for Vitals infringement.  HealthGrades' competitive position with Vitals has an upward influence on the reasonable royalty rate.

**DAVID HALL STATEMENT - EXHIBIT A**

c) **Vitals anticipated high levels of revenue and profitability from its use of the patented features at time of the hypothetical negotiation.**

71. Vitals projected that its use of the patented invention would be profitable. **Attachments 7a, 7b** and **7c** present Vitals' actual and projected revenues and profits which appear to have been prepared around the time of the hypothetical negotiation.[40] REDACTED REDACTED

72. REDACTED

73. This is important information that demonstrates that Vitals' planned and believed it could earn high levels of revenue that would yield high profits with its use of the features in the '060 patent as it negotiated with HealthGrades over a license agreement. Vitals would have assessed its projected revenues and profit margins to negotiate a royalty rate with HealthGrades and such a rate would reasonably have been on a percentage basis of advertising revenue.

74. In addition to the quantitative projections that Vitals created in 2010, it also qualitatively assessed its business and market in the mid 2010 time period—right at or just before the time of the hypothetical negotiation. At this time, Vitals created two business overviews both titled "Business Overview: Progress, Strategy, Plans."[42] This comprehensive overview includes the following categories and information about Vitals:

---

[40] Because the 2010 data is identified as being "50% Actual + Plan," it appears that these projections were prepared contemporaneous to the July 2010 patent issue date and would have been available contemporaneously to any hypothetical negotiation.
[41] MDX 0007187.
[42] MDX 0012688-12756. This document is undated; however, on MDX 0012697, Vitals displays its actual audience traffic and the data is through either May or June 2010—right before the hypothetical negotiation.

**DAVID HALL STATEMENT - EXHIBIT A**

The Vitals Brand – What We Do
- "Helps people find the doctor that's right for them, on-line"
- "Delivers detailed information, quality metrics & <u>patient reviews for every doctor in the U.S.</u>" (emphasis added)
- "Powered by a proprietary database of info on every doctor, . . ."

Snapshot
- Began in July 2006 and launched its website in January 2008
- REDACTED
- REDACTED

Revenue History
- REDACTED

- Marketing services – biggest long-term growth area for the company

Good Market News
- "The wind is at our backs."
- Vitals' market leadership will make it the place to access this physician quality  and cost data

Marketplace & Competition
- Lists HealthGrades first in monthly searches for doctors and it in its "Competitive Marketplace" chart
- Identifies itself as 21st largest Health website and that same source (May 2010 comScore) shows HealthGrades as 6th largest.

75.  Vitals' base case projection[43] includes the following information:

REDACTED

---

[43] MDx financial projection (MDX 0101069).

**DAVID HALL STATEMENT - EXHIBIT A**

76.   REDACTED

77.   REDACTED

### d) Excess Profit/Analytical Approach

78.   The analytical approach compares the profitability of the patented features to the profitability of other comparable technology to determine if higher profits are earned on the use of the patented features.  In an ideal circumstance, one would be able to compare the profitability of an invention that has the same intended use as the patented invention, but lacks only the attributes associated with the patent and nothing else.  The profit difference between these two inventions is assumed to represent the value of the patented invention. However, this ideal circumstance does not always exist and in this case, I was not able to find such a close comparable invention.

79.   Another form of the analytical approach is to compare HealthGrades' or Vitals' profit margins to that of the industry or similarly situated competitors who do not use the patented invention.[44]  This comparison provides an indication of the contribution margin of the patented invention.  I was unable to find profit information for a large group of HealthGrades and Vitals competitors to make such a comparison.  However, I was able to locate the profit information for a company in the healthcare information industry— WebMD.

80.   WebMD reported an EBITDA margin of 14% in 2009 and 25% in both 2010 and 2011. HealthGrades' EBITDA margin for its departments that benefitted from the '060 patent

[44] TWM Manufacturing Co. Inc. v. Dura Corp, et al., 789 F.2d 895.

**DAVID HALL STATEMENT - EXHIBIT A**

was 60%, 42% and 62% for these same years (see **Attachment 1**).  The average differential for these years is 33% which indicates that the financial performance related to the patented invention is superior to that of an industry benchmark.  The 33% profit differential (or excess profit from the patented invention) could be a reasonable starting point for a hypothetical negotiation based on a widely accepted methodology—the analytical approach.

81.   Another reasonable approach to yield a starting point based on a profitability analysis is to compare HealthGrades' profit earned on revenues associated with the features of the patented invention and the profit of its overall operations.  This will yield a profit differential that HealthGrades would reasonably measure and be mindful of as it entered into a hypothetical negotiation.  This excess profit also defines a range of a reasonable royalty negotiation for HealthGrades, as it sets aside a normal profit rate for Vitals to compensate it for non-patented elements, the manufacturing process and business risks encountered.

82.   **Attachment 8** is a summary of the consolidated income statements for HealthGrades.  These consolidated income statements are for all of HealthGrades' operations.  As previously noted, **Attachment 1** reflects the revenue and expenses for the departments identified as having revenues and/or expenses related to the patented invention.

83.   According to **Attachment 1**, for 2010, 2011 and 2012 year-to-date, HealthGrades' actual Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA")  margin for its departments that utilize the '060 patent was 42%, 62% and 61%, respectively.  Comparing these profit rates to HealthGrades' budgeted EBITDA margins for its entire operations for the same years — 24%, 19% and 16% yields a profit differential of 18%, 43% and 45%, respectively.  This is a range of 18% to 45% with an average of 35%.

84.   The two approaches to the analytical method that I had the data to use yielded the following excess profit rates:  33% (comparison to industry) and  35% (comparison to

**DAVID HALL STATEMENT - EXHIBIT A**

HealthGrades overall operations).  By either measure, it is clear that the use of the patented features yields substantial excess profits for HealthGrades.[45]

85.   An average of these two excess profit percentages (34%) would be a reasonable starting point for HealthGrades to begin negotiating with Vitals.  For its part, Vitals would be reviewing its forecasted plans for the use of the patented invention, its understanding of the high profit margins it earns from advertising revenue, and its view of a very large future market for its services and try to minimize what it would pay in a royalty to HealthGrades.

86.   An important element of the hypothetical negotiation is that both parties would have recognized that not all of the revenues HealthGrades licensed to Vitals would be lost to HealthGrades.  Approximately half of the people who visited Vitals' website also visited HealthGrades' website.  A quantifiable way to account for this factor is to apply a 47% co-visitor percentage[46] to the excess profit rate(s) which yields 16.5%.  Based on this approach, HealthGrades would reasonably view this as a potential starting point to negotiate in a hypothetical negotiation.

87.   Another perspective that HealthGrades would have reasonably considered what it would giving up to license the '060 patent to its competitor Vitals.  In this regard, HealthGrades would reasonably assess a royalty rate based on its established market share, the co-visitor impact and its incremental profit rate on its advertising revenue.  This assessment would begin with HealthGrades established market share of 58% then apply a co-visitor rate of 47% and then apply its incremental profit rate of 83% (see **Attachment 5a**) which yields 23%.  Based on this approach, HealthGrades would reasonably view this as a potential starting point to negotiate in a hypothetical negotiation.

### e)   <u>Reasonable Royalty Rate Conclusion</u>

88.   Based on my evaluation of all of the factors discussed in this report, including the Georgia Pacific factors (see **Attachment 9**), I have concluded that a 12% royalty rate would have

---

[45] I do not have access to Vitals' incremental profit rate for its use of the patented invention.  However, given that both HealthGrades and Vitals earn advertising revenue from their use of the patented invention, it is likely that Vitals also earns a high operating and incremental profit rate from its use of the patented invention.

[46] 53% was the average shared visitor rate for the July 2010 through April 2012 time period.  100% minus 53% equals 47%, the portion HealthGrades would reasonably expect to achieve.

**DAVID HALL STATEMENT - EXHIBIT A**

been the reasonable outcome of a hypothetical negotiation in July 2010.  An important factor is the determination of a reasonable royalty is the fact that HealthGrades earns high profit margins from its use of the '060 patent features yields high-margin advertising profits.  This was made clear by the excess profit rates determined by the analytical methods I utilized.

89.  As discussed above, it is reasonable that HealthGrades would start the negotiation for a royalty rate at either 16.5% or 23%.  From its perspective, it is likely that Vitals would start as low as possible but would certainly recognize that a rate at or near zero is not at all reasonable.   A rationale negotiation would lead to a near split between a rate in low single digits and or low rate and HealthGrades' starting point—either 16.5 % or 23% (or mid-point of approximately 20%).  This would reasonable yield a royalty rate of approximately 10% prior to a full evaluation of the Georgia Pacific factors.

90.  My assessment of Georgia Pacific factors (See **Attachment 9**) is that there are six factors which have an upward influence on a royalty rate while the rest are either neutral or addressed in this report to get to 10% rate discussed in prior paragraph.  I have concluded that the upward influence of my analysis of the Georgia Pacific factors would have resulted in the HealthGrades and Vitals negotiating a 12% royalty rate.   The base to which this rate would be applied is Vitals' advertising revenue.

91.  I conducted a reasonableness check on this rate with respect to Vitals' projections by including a line item of expense for Vitals of 12% multiplied by its projected advertising revenue.  This analysis is on **Attachment 10** (also see **Attachments 13 and 13a**) and demonstrates that while paying 12% of its advertising revenues to HealthGrades as a royalty payment, its projected operating profit margins in 2012 and 2013 range from 30% to 44%.  These substantial operating profits margins and demonstrates that Vitals would have projected that it could reasonable agree to pay a 12% royalty to HealthGrades for use of the '060 patent which drives Vitals' advertising-based business model so critical to its business and its future plans as of July 2010.

**DAVID HALL STATEMENT - EXHIBIT A**

**C. Reasonable Royalty Damages on the all Vitals' infringing revenue through April 2012 are $926,000.**

92.   If the court determines that HealthGrades is entitle to damages on basis of reasonable royalty (and not both lost profits and reasonable royalty), the HealthGrades' reasonable royalty damages for the period July 1, 2010 through May 31, 2012 are approximately $926,000.  See **Attachment 4.**  This figure will need to be updated through the date of trial based on Vitals' infringing revenue beyond May 2012.

**DAVID HALL STATEMENT - EXHIBIT A**

**HealthGrades, Inc.**
HealthGrades Departmental Income Statements
(Departments 00, 24, 25, 28, 29, 63, 64, 65, inHealth, LLC )

**Attachment 1**



| | 2008 | 2009 | 2010 | 2011 | 2012 (Jan - Apr) | Total |
|---|---|---|---|---|---|---|

**Sources:**
HealthGrades Financial statements:
   2010 departments include Dept. 24, Dept. 28, Dept. 63, inHealth LLC, Dept. 29 and Dept. 64
   2011 departments include Dept. 24, Dept. 63, inHealth LLC, Dept. 25 and Dept. 64
   2012 departments include Dept. 63, Dept. 00, Dept. 65, Dept. 66 and Dept. 25
   Deparments identified based on conversations with Allen Dodge, Executive Vice President and CFO of HealthGrades

**DAVID HALL STATEMENT - EXHIBIT A**

Case 1:11-cv-00520-PAB-BNB Document 411-1 Filed 11/27/12 USDC Colorado Page 28 of 79

**Attachment 2**

**MDX Medical, Inc**
**Audited Income Statements**

REDACTED

*Source:*
(1) *MDX Audited Financial Statements (MDX000104632-649).*
(2) *MDX Audited Financial Statements (MDX000104440-466).*

**DAVID HALL STATEMENT - EXHIBIT A**

**MDX Medical, Inc.**

Detailed Income Statements for Infringement Period up to May 2012

REDACTED

**DAVID HALL STATEMENT - EXHIBIT A**

**MDX Medical, Inc.**                                   **Attachment 2a**

Detailed Income Statements for Infringement Period up to May 2012

<span style="color:red">REDACTED</span>

**DAVID HALL STATEMENT - EXHIBIT A**

**MDX Medical, Inc.**                                              **Attachment 2a**

Detailed Income Statements for Infringement Period up to May 2012

REDACTED

**DAVID HALL STATEMENT - EXHIBIT A**

Case 1:11-cv-00520-PAB-BNB   Document 411-1   Filed 11/27/12   USDC Colorado   Page 32 of 79

**MDX Medical, Inc.**                                                    **Attachment 2a**

Detailed Income Statements for Infringement Period up to May 2012

REDACTED

**DAVID HALL STATEMENT - EXHIBIT A**

**MDX Medical, Inc.**                                    **Attachment 2a**

Detailed Income Statements for Infringement Period up to May 2012

REDACTED

*Source:*
  *Monthly Detailed Income Statements, MDX 0104672 to MDX 0104736*

**DAVID HALL STATEMENT - EXHIBIT A**

## Market Share Analysis

**Attachment 3a**

### June 2011

| | | A | B | C = A, less Vitals | D | E = D x 16,194 | F |
|---|---|---|---|---|---|---|---|
| | | Total Unique Visitors (000) | % of total | Total Unique Visitors without Vitals (000) | % of total | Total Unique Visitors with Vitals visitors spread to market (000) | % of total |
| 1 | HEALTHGRADES.COM | 7,720 | 48% | 7,720 | 58% | 9,363 | 58% |
| 2 | VITALS.COM | 2,842 | 18% | | 0% | 0 | 0% |
| 3 | ANGIESLIST.COM | 2,730 | 17% | 2,730 | 20% | 3,311 | 20% |
| 4 | UCOMPAREHEALTHCARE.COM | 2,076 | 13% | 2,076 | 16% | 2,518 | 16% |
| 5 | RATEMDS.COM | 284 | 2% | 284 | 2% | 344 | 2% |
| 6 | ZOCDOC.COM | 277 | 2% | 277 | 2% | 335 | 2% |
| 7 | LOCATEADOC.COM | 266 | 2% | 266 | 2% | 322 | 2% |
| | | 16,194 | 100% | 13,352 | 100% | 16,194 | 100% |

### June 2012

| | | A | B | C = A, less Vitals | D | E = D x 18,528 | F |
|---|---|---|---|---|---|---|---|
| | | Total Unique Visitors (000) | % of total | Total Unique Visitors without Vitals (000) | % of total | Total Unique Visitors with Vitals visitors spread to market (000) | % of total |
| 1 | HEALTHGRADES.COM | 8,822 | 48% | 8,822 | 57% | 10,573 | 57% |
| 2 | ANGIESLIST.COM | 3,516 | 19% | 3,516 | 23% | 4,213 | 23% |
| 3 | VITALS.COM | 3,067 | 17% | | 0% | 0 | 0% |
| 4 | UCOMPAREHEALTHCARE.COM | 2,002 | 11% | 2,002 | 13% | 2,399 | 13% |
| 5 | ZOCDOC.COM | 563 | 3% | 563 | 4% | 675 | 4% |
| 6 | RATEMDS.COM | 335 | 2% | 335 | 2% | 402 | 2% |
| 7 | LOCATEADOC.COM | 223 | 1% | 223 | 1% | 267 | 1% |
| | | 18,528 | 100% | 15,461 | 100% | 18,528 | 100% |

### August 2010

| | | A | B | C = A, less Vitals | D | E = D x 13,750 | F |
|---|---|---|---|---|---|---|---|
| | | Total Monthly Searches (000) | % of total | Total Monthly Searches without Vitals (000) | % of total | Total Monthly Searches with Vitals visitors spread to market (000) | % of total |
| 1 | HEALTHGRADES.COM | 6,500 | 47% | 6,500 | 69% | 9,458 | 69% |
| 2 | VITALS.COM | 4,300 | 31% | | 0% | 0 | 0% |
| 3 | UCOMPAREHEALTHCARE.COM | 1,800 | 13% | 1,800 | 19% | 2,619 | 19% |
| 4 | ANGIESLIST.COM | 750 | 5% | 750 | 8% | 1,091 | 8% |
| 5 | RATEMDS.COM | 400 | 3% | 400 | 4% | 582 | 4% |
| | | 13,750 | 100% | 9,450 | 100% | 13,750 | 100% |

Sources:
ComScore Key measures for June 2011 and June 2012
Market assessments by Vitals and HealthGrades
Vitals Business Overview: Progress, Strategy, Plans MDX 0012882-12934

**DAVID HALL STATEMENT - EXHIBIT A**

**Attachment 3b**

**Cross Visiting Analysis between HealthGrades and Vitals.com**

| Period | Total Unique Visitors to Vitals.com (000) | Shared Visitors with HealthGrades (000) | Shared Visitors % |
|---|---|---|---|
| Jul-10 | 2,643 | 1,510 | 57.1% |
| Aug-10 | 2,666 | 1,441 | 54.1% |
| Sep-10 | 2,780 | 1,524 | 54.8% |
| Oct-10 | | | |
| Nov-10 | 2,905 | 1,411 | 48.6% |
| Dec-10 | 2,714 | 1,309 | 48.2% |
| | **13,708** | **7,195** | **52.5%** |
| | | | |
| Jan-11 | 3,310 | 1,756 | 53.1% |
| Feb-11 | 2,995 | 1,633 | 54.5% |
| Mar-11 | 2,935 | 1,738 | 59.2% |
| Apr-11 | 2,685 | 1,289 | 48.0% |
| May-11 | 2,802 | 1,408 | 50.2% |
| Jun-11 | 2,842 | 1,490 | 52.4% |
| Jul-11 | 2,652 | 1,311 | 49.4% |
| Aug-11 | 3,134 | 1,731 | 55.2% |
| Sep-11 | 3,139 | 1,644 | 52.4% |
| Oct-11 | 3,032 | 1,528 | 50.4% |
| Nov-11 | 2,898 | 1,519 | 52.4% |
| Dec-11 | 2,623 | 1,567 | 59.7% |
| | **35,047** | **18,614** | **53.1%** |
| | | | |
| Jan-12 | 3,111 | 1,675 | 53.8% |
| Feb-12 | 2,984 | 1,630 | 54.6% |
| Mar-12 | 3,217 | 1,781 | 55.4% |
| Apr-12 | 2,970 | 1,667 | 56.1% |
| | **12,282** | **6,753** | **55.0%** |
| | | | |
| **Total** | **61,037** | **32,562** | **53.3%** |

**Source:**

1. comScore monthly Cross Visiting Reports

**DAVID HALL STATEMENT - EXHIBIT A**

**HealthGrades Lost Profits and Reasonable Royalty Damages**                                **Attachment 4**

<span style="color:red">REDACTED</span>

_Note:_
(1) Source:  Monthly Detailed Income Statements, MDX 0104672 to MDX 0104736.  See **Attachment 2a**.

**DAVID HALL STATEMENT - EXHIBIT A**

**Attachment 5**

**HealthGrades, Inc.**
**Variable Expense Analysis**

| | Expense Classification | Jul 2010 to Dec 2010 | | | 2011 | | | Jan 2012 to Apr 2012 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | Percent of Revenue | Percent Variable | $ | Percent of Revenue | Percent Variable | $ | Percent of Revenue | Percent Variable |
| Revenue | | $ 20,035,174 | 100% | | $ 74,695,593 | 100% | | $ 25,966,978 | 100% | |
| Expenses | | | | | | | | | | |



Maintenance & Repairs:

**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 5

**HealthGrades, Inc.**
**Variable Expense Analysis**



**Sources:**
HealthGrades Financial statements:
  2010 departments include Dept. 24, Dept. 28, Dept. 63, inHealth LLC, Dept. 29 and Dept. 64
  2011 departments include Dept. 24, Dept. 63, inHealth LLC, Dept. 25 and Dept. 64
  2012 departments include Dept. 63, Dept. 00, Dept. 65, Dept. 66 and Dept. 25
  Deparments identified based on conversations with Allen Dodge, Executive Vice President and CFO of HealthGrades

**DAVID HALL STATEMENT - EXHIBIT A**

**Attachment 5a**

**HealthGrades, Inc.**
**Variable Expense Analysis**
2008 to June 2010



**DAVID HALL STATEMENT - EXHIBIT A**

**Attachment 5a**

**HealthGrades, Inc.**
**Variable Expense Analysis**
2008 to June 2010



**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 5a

**HealthGrades, Inc.**
**Variable Expense Analysis**
2008 to June 2010

| | | Jan 2008 to Jun 2010 | |
|---|---|---|---|
| Expense Classification | $ | Percent of Revenue | Percent Variable |



Page 3 of 4

**DAVID HALL STATEMENT - EXHIBIT A**

**Attachment 5a**

**HealthGrades, Inc.**
**Variable Expense Analysis**
2008 to June 2010

| Expense Classification | Jan 2008 to Jun 2010 | | |
| --- | --- | --- | --- |
| | $ | Percent of Revenue | Percent Variable |



**Sources:**

HealthGrades Financial statements:

    2008 departments include Dept. 20, Dept. 21, Dept. 24, Dept. 27, Dept. 28 and Dept 63

    2009 departments include Dept. 20, Dept. 21, Dept. 24, Dept. 28 and Dept 63

    2010 departments include Dept. 24, Dept. 28, Dept. 63, inHealth LLC, Dept. 29 and Dept. 64

    Departments identified based on conversations with Allen Dodge, Executive Vice President and CFO of HealthGrades

**DAVID HALL STATEMENT - EXHIBIT A**

Case No. 1:11-cv-00520-PAB-BNB Document 274-8 filed 02/04/14 USDC Colorado pg 44 of 80

Case 1:11-cv-00520-PAB-BNB Document 411-1 Filed 11/27/12 USDC Colorado Page 43 of 79

HealthGrades License Agreements

**Attachment 6a**



Page 1 of 1

**DAVID HALL STATEMENT - EXHIBIT A**

MDx License Agreements                                                                    Attachment 6b

<span style="color:red">REDACTED</span>

**DAVID HALL STATEMENT - EXHIBIT A**

REDACTED

MDx License Agreements

Attachment 6b

**DAVID HALL STATEMENT - EXHIBIT A**

**MDx Medical, Inc.**
**Base Plan**

<span style="color:red">REDACTED</span>

**Attachment 7a**

*Source:  MDx financial projection (MDX 0101069)*

**DAVID HALL STATEMENT - EXHIBIT A**

MDx Medical, Inc.
Growth Plan

<span style="color:red">REDACTED</span>

Attachment 7b

DAVID HALL STATEMENT - EXHIBIT A

Case 1:11-cv-00520-PAB-BNB   Document 411-1   Filed 11/27/12   USDC Colorado   Page 48 of 79

**Vitals'**                                                                    Attachment 7c
**Actual & Forecasted Financial Information**

REDACTED

<u>*Source:*</u>
  *MDX 0012731 and calculations*

**DAVID HALL STATEMENT - EXHIBIT A**

**Attachment 8**

**HealthGrades, Inc.**
Consolidated Income Statements

| | 2008 | 2009 | 2010 | 2011 | 2012 (Jan - Apr) | Total |
|---|---|---|---|---|---|---|
| **Actual HealthGrades' Results** | | | | | | |
| Revenues | | | | | | |
| EBITDA | | | | | | |
| Net Income before taxes | | | | | | |
| | | | | | | |
| EBITDA / Total Revenue | | | | | | |
| Net Income before taxes / Total Revenue | | | | | | |
| | | | | | | |
| **HealthGrades' Budgeted Amounts** | | | | | | |
| Budgeted Revenues | | | | | | |
| Budgeted EBITDA | | | | | | |
| Budgeted Pre-Tax Earnings | | | | | | |
| | | | | | | |
| EBITDA / Total Revenue | | | | | | |
| Net Income before taxes / Total Revenue | | | | | | |

<u>**Sources:**</u>
HealthGrades Consolidated Financial Statements and inHealth Income Statements.

**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 9

## Analysis of Georgia Pacific Factors

**Factor #1:**     **The royalties received by the patentee for licensing of the '060 patent, proving or tending to prove an established royalty.**

HealthGrades has not licensed the right for any entity to utilize the features embodied by the '060 patent.  HealthGrades has licensed its data and a robust and comprehensive dataset is one of the necessary components of the '060 patent.  I understand that Vitals also developed its own database and a robust and comprehensive database is a critical feature of the '060 patent.  I further address this factor in my report.

**Factor #2:**     **The rates paid by the licensee (Vitals) for the use of other patents comparable to the patent in suit.**

<span style="color:red">REDACTED</span>

**Factor #3:**     **The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

Because the patented technology is deployed via the internet, there is not a geographic restriction on its domestic use.  Also, HealthGrades has demonstrated that it grants non-exclusive licenses of certain of its data to other companies.  Since HealthGrades and Vitals both competed (and continue to compete) for webpage visitors and associated advertising revenue during the infringement period, the hypothetical license would be non-exclusive.  The issues in this factor, when considered in total, would tend to have a neutral influence on the reasonable royalty rate.

**Factor #4:**     **The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions to preserve the monopoly.**

HealthGrades has not licensed its '060 patent.  This fact has an upward influence on the royalty rate.

**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 9

## Analysis of Georgia Pacific Factors

**Factor #5:     The commercial relationship between the licensor and the licensee.**

Vitals and HealthGrades are direct competitors serving consumers who are seeking information on healthcare providers.  This fact has an upward influence on the royalty rate.  There are no barriers for visitors to go to either of their websites, and visitors do go to both Vitals' and HealthGrades' websites which leads to advertising revenue for both competitors.  This fact dampens the upward influence on the royalty rate though it is still above neutral.

**Factor #6:     The effect of selling the patented specialty in promoting sales of other products of the licensee; existing value of the invention to licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

Both HealthGrades and Vitals license data.  These license agreements are summarized at **Attachments 6a** and **6b**.   I am withholding my judgment on the impact of this factor on a reasonable royalty rate until HealthGrades counsel has completed its investigation into Vitals' license agreement with Aetna Life Insurance dated October 14, 2011.

**Factor #7:     The duration of the patent and the term of the license.**

The '060 patent was filed on August 29, 2006 and issued on July 6, 2010.  This means that at the time of the hypothetical negotiation in July 2010, the '060 patent had approximately 16 years remaining.  This factor has an upward influence on the reasonable royalty rate in this matter.

**Factor #8:     The established profitability of the product made under the patent; its commercial success; and its current popularity.**

The use of the patented features has yielded many visitors and related advertising revenue for both HealthGrades and Vitals.  My report and **Attachment 1** demonstrate that HealthGrades has realized significant revenues and profits from the use of its '060 patent.   According to comScore data presented at **Attachment 3a**, HealthGrades is one of the market leaders in healthcare provider data with approximately 9.143 million unique visitors in May 2012.[1]  This placed it in the top 5 health related website according to the same report.  Also, according to the same report, Vitals had 3.244 million unique visitors placing it in the top 10.  The high web traffic drives

---

[1] comScore Key Measures Report for May 2012, dated June 7, 2012.

**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 9

Analysis of Georgia Pacific Factors

advertising revenue and the high margins on the product indicators of the popularity of the patented features.  This factor has an upward influence on the royalty rate.

**Factors #9/10:    The utility and advantages of the patent property over the old modes and devices, if any that had been used for working out similar results AND the nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

The invention provides important information online on healthcare providers, by allowing visitors to compare physicians within specialty and gather additional information, such as star rankings and patient reviews, on the physicians.  The demand for the patented features reflected by HealthGrades and Vitals' web traffic and advertising revenue demonstrates the value of the patent and therefore, this factor has upward influence on the royalty rate in this matter.

**Factor #11:      The extent to which the infringer has made use of the invention; and any evidence of probative of the value of that use.**

<span style="color:red">REDACTED</span>

**Factors #12/13:  The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions AND the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

Please see the body of my report for a detailed discussion of these factors.

**Factor #14:      The opinion of qualified experts.**

I am well qualified and experienced to express the opinions described throughout my report and its attachments.

Confidential                          Page 3 of 4

DAVID HALL STATEMENT - EXHIBIT A

Attachment 9

Analysis of Georgia Pacific Factors

**Factor #15:**     **The amount that a licensor (such as the patentee) and the licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

My conclusion on reasonable royalty is based on all of the information that I have reviewed, considered, and analyzed in this matter.  It is also based on my education and 24 years of experience.  My opinion is that a reasonable royalty rate in this case for Vitals is 12% of its accused advertising revenue  My basis for 12% is both described in the above sections of this report and also based on a qualitative/quantitative assessment of the Georgia Pacific factors discussed above.

**DAVID HALL STATEMENT - EXHIBIT A**

**Vitals'**
**Financial Projections Including**
**Reasonable Royalty Rate**

<span style="color:red">REDACTED</span>

*Sources:*
    *MDX 0012731 and calculations*
    *MDx financial projection (MDX 0101069)*

**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 11

## Vitals' Advertising Revenue by Month

REDACTED

Confidential – Attorneys Only

**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 12

## HealthGrades' Advertising Revenue by Month

[redacted]

Confidential – Attorneys Only

**DAVID HALL STATEMENT - EXHIBIT A**

Attachment 13

# Vitals' 2010 Projections with and without Royalty Payments

REDACTED

Confidential – Attorneys Only

DAVID HALL STATEMENT - EXHIBIT A

Attachment 13a

# Vitals' 2010 Projections with and without Royalty Payments

*Millions*
REDACTED

Confidential – Attorneys Only

DAVID HALL STATEMENT - EXHIBIT A





**Appendix A**

### David A. Hall, CMA, CFE, MBA

Managing Director – Global Forensic and Dispute Services
dhall@alvarezandmarsal.com

**Alvarez & Marsal**
707 Seventeenth Street
Suite 2125
Denver, CO 80202

dhall@alvarezandmarsal.com

<u>Education</u>
- **M.B.A., University of Texas at Austin**
- **B.A., University of Michigan, Ann Arbor**

<u>Certifications</u>
- **Certified Management Accountant**
- **Certified Fraud Examiner**

<u>Honors</u>
- **Attended the University of Michigan on an Athletic Scholarship**
- **Treasurer, Michigamua, University Senior Honor Society**
- **University of Texas Sord Scholar Recipient (academic achievement)**
- **Darrell K. Royal Scholarship Recipient for coaching and academic achievement**
- **Century Club Scholarship Recipient for academic achievement**
- **Graduated from the University of Texas MBA class with highest distinction and received Dean's Award for academic excellence**

M. Hall has performed financial, economic, and accounting analysis in relation to a wide variety of damage issues. His experience includes damages claim preparation, claim review, litigation support and expert testimony in both courts and arbitration. His testimony has covered economic, valuation and damages matters. He is a Certified Management Accountant and Certified Fraud Examiner.

He is a member of the Institute of Management Accountants, the National Contract Management Association, the Association of Certified Fraud Examiners, and the National Association of Certified Valuation Analysts.

**Professional Experience**

<u>Navigant Consulting, Inc.</u> (2004 -2008), an international business and litigation consulting firm – Managing Director.

<u>Tucker Alan Inc.</u> (1994 -2004), a national business and litigation consulting firm – Vice President.

<u>Peterson Consulting</u> (1988-1994), an international consulting company -- staff consultant, senior and executive consultant.

**Overall Experience Summary**

Mr. Hall has analyzed the financial condition of corporations, partnerships, joint ventures, and individuals. He has performed damage studies, analyzed financial statements, disclosures and other representations in a variety of circumstances including in the context of disputes and management consulting. He has analyzed and prepared numerous lost profits, increased costs, business and asset valuations, royalty and other damages claims. His analyses have included study of actual and projected revenues, cost of goods sold, indirect costs, general and administrative expenses, cost of capital, discount rates and assets, liabilities and equity. He has also served as an expert witness testifying in federal and state courts and arbitration.

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                    **Appendix A**

Mr. Hall's Experience includes the following practice areas and types of cases.

- Antitrust Disputes
- Bankruptcy Causation Analyses
- Breach of Contract
- Business and Management Consulting
- Business Interruption
- Class Action Litigation
- Commercial Damages
- Construction Disputes
- Employment and Labor Disputes

- False Claims (Qui Tam matters)
- Forensic Accounting and Tracing
- Fraud Investigations
- Government Contract Claims
- Patent Infringement Disputes
- Post-Acquisition Disputes
- Professional Negligence
- Real Estate Disputes
- Trade Secrets Disputes

**Selected Industry Experience**

His selected industry experience includes the following:

- Accounting malpractice
- Aerospace & Defense
- Agribusiness
- Airline
- Automotive
- Banking
- Construction
- Consumer Products
- Drilling equipment
- Educational Services
- Energy Laboratories
- Ethanol
- Healthcare and Medical Products

- Hedge Funds/Investment Advisory
- Legal malpractice
- Mining and processing plants
- Mutual Funds
- Natural Gas and NGLs royalties
- Oil royalties
- Real Estate – Resorts, Hotels, Lifestyle Centers, Condominiums
- Restaurants and retail
- Satellites
- Telecommunications
- Utilities
- Vitamins and supplements
- Wind Energy

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                                    Appendix A

**Testimony and Alternative Dispute Resolution Experience**

Mr. Hall has provided expert testimony in over 50 matters in trials (U.S. state and federal courts, Canadian federal court), arbitrations), and depositions involving many types of disputes. The subject matter of his testimony has included economic damages, loss causation, valuation, accounting and financial issues, and fraud investigation results.

Mr. Hall has also consulted with companies on methods to avoid disputes and assisted in resolving existing disputes. These efforts have included participating in settlement negotiations and mediations presenting accounting, economic and business operations analyses and assisting in developing alternative methods to resolve the disputes. Examples include assisting a government contractor in mediating a large and complex claim for increased costs related to the development and production of a Special Forces aircraft. The mediation resulted in a substantial settlement with the United States Air Force.

He has served as Independent Accountant Arbitrator to render opinion on accounting dispute involving past practice and GAAP in a post-acquisition dispute.

**Professional Associations**

- Institute of Management Accountants
- Association of Certified Fraud Examiners
- National Association of Certified Valuation Analysts
- National Contract Management Association

**Lectures and Seminars and Representative Topics Covered**

- National Contract Management Association -- National Education Seminar Instructor
  - ➤ Contract Costs and Pricing Contract Changes
  - ➤ Preparation and Analysis of Construction Contract Claims
- American Bar Association Annual—Public Contracts Section Annual Meeting
  - ➤ Dealing with a More Active Defense Contract Audit Agency
- Rocky Mountain Intellectual Property & Technology Institute Lecturer
  - ➤ Patent Valuation and Damages Issues
- Various Company and Law Firm lectures
  - ➤ Preparation and Analysis of Economic Damage Claims
  - ➤ Loss Causation Analyses
  - ➤ Preparation and Analysis of Government Contract Claims

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                                  **Appendix A**

### Additional Experience

**Commercial Litigation**

Mr. Hall has analyzed and prepared numerous lost profits, increased costs, business and asset value, royalty and other damage claims. Analyses have included study of actual and projected revenues, cost of goods, indirect costs, general and administrative expenses, taxes, cost of capital, discount rates and various assets, liabilities and equity. Experience has included the following types of cases:

**Construction**

Mr. Hall has served as an expert witness and/or consultant on construction cost and damage issues. His experience includes preparing or rebutting constructive change claims including delay and disruption cost claims, and fraud investigations. He has extensive experience with termination claims (both for convenience default). He has also assisted clients with project cost reviews (for contract compliance and fraud) and forensic accounting analyses related to Qui Tam (false claims). His project experience includes:

- Airport Facilities
- Computer Chip Manufacturing Plant
- City Jail
- Coal Mining Facility
- Education Facilities
- Environmental Laboratories
- Gold Mining Facility

- Highway Bridge

- Hotels
- Multi-Family Housing Developments
- Oil Refineries
- Parking Garage
- Phosphate Plant
- Single Family Residential
- Spent Nuclear Fuel storage facility
- Wind Farms

**Accounting and Professional Services Cases**

Mr. Hall has consulted on disputes involving allegations of professional negligence against public accounting firms and law firms. He has analyzed causation and damages issues.

He has assisted counsel to analyze damages and cause of failure issues related to the post-acquisition dispute between an investment company and a Big 4 accounting firm who provided due diligence and audit services to the investment company.

He has also assisted counsel with causation and damages analyses in legal malpractice lawsuits. These cases have included Russian investment banking industry and Colorado conservation easement investments.

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                                    **Appendix A**

**Employment and Labor Related Matters**

Mr. Hall has performed damage analyses in the context of labor and employment disputes including economic studies of salaries, fringe benefits, retirement plans, wage escalation and discount rates. Employment and labor matters include:

- Analyzed claimed damages related to alleged off-the-clock work (both regular time and overtime) in case involving alleged violations of the federal Fair Labor Standards Act. Assisted counsel in assessing impact of off-the-clock labor hours of thousands of employees in many manufacturing sites throughout the U.S.

- Performed quantitative analyses related to liability issues in the context of labor and employment disputes including studies of bonus pay that would not have been paid had employees recorded more labor hours.

- Examined recorded labor hours and payroll costs of manufacturing facilities throughout the U.S. to demonstrate that employees were not similarly situated.

- Analyzed labor costs on breach of contract disputes, construction and government contract claims.

- Analyzed damage issues in dispute involving former employee and allege theft of trade secrets.

- Analyzed damages claim related to employee/employer dispute claiming lost wages and benefits which included testimony of alternative damages amount.

- Analyzed damages claim related to lost airline benefit of employees transferred to company that was then sold. Analysis included calculation and testimony of alternative damages amount.

- Analyzed damages for former portfolio manager in dispute with his former investment company.

- Analyzed and provided opinions on a former CEO's communications to Board of Directors on the company's projected and actual financial performance.

**Energy**

- Performed damage analyses for a natural gas transportation company in a dispute with another gas transportation company on a natural gas pipeline dispute that included analyzing actual volumes shipped, prices at various points of the pipeline and the impact of alleged contractual limits on volumes shipped.

- Performed damage analyses for a large oil and gas company facing class action matters with class members alleged that the company deducted unreasonable processing and marketing fees when performing net-back calculations to determine the value of the Natural Gas Liquids for royalty payment purposes.

- Performed damages analysis related to dispute involving petroleum byproducts.

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                                    **Appendix A**

- Provided expert witness damages testimony in dispute involving oil drilling equipment related to patent dispute.

- Performed damage analysis related to antitrust dispute involving natural gas production in Colorado.

- Performed damage analysis for construction manager of wind energy projects related to civil works contractor's failure to perform.

- Performed damages analysis related to petroleum refinery EPA-required upgrade.

- Performed damage analyses for a large oil company facing a qui tam action for allegedly underpaying royalties to federal government for its Gulf of Mexico crude oil production.

- Assisted an electric utility company in quantifying its out-of-pocket losses related to the DOE not accepting its nuclear spent fuel. Performed analysis of temporary storage facility costs, operating and maintenance costs, cost of money, and impacted overhead costs.

**Financial Institutions and Investing Entities**

Mr. Hall has provided consulting services matters involving banks and investment entities. Experience includes financial statement review, analyzing damages related to lender liability matters, and performing forensic analyses related to trade secret dispute.

**Government Contracts**

Mr. Hall has performed project cost audits, and general business consulting for government and long-term contracting companies. Analyzed and prepared requests for equitable adjustments, changed work claims, termination claims and false claims disputes in the following areas:

- Aircraft Depot Level Maintenance
- Command Centers – Battlefield
- Command Control and Communications Center – National

- Computer Hardware and Software
- Fighter Aircraft
- Flight Test Simulators
- Fire Station
- Gunship (AC-130)

- Low-level radioactive waste shipments
- Power Plant (Spent Fuel Storage)
- Satellites
- Tank Trailers
- Tank Munitions (120mm)
- Trainer Aircraft
- Transport Aircraft
- Student Loan Debt Management System

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                                    Appendix A

Mr. Hall's false Claims experience includes analyzing accounting issues related to percent complete on long-term contracts and related progress billing issues, value of oil and gas royalties, and reported progress of environmental clean at large DOE site.

He has assisted manufacturing companies with Material Management and Accounting Systems ("MMAS") compliance audits involving review, analysis and corrective actions to companies' Material Requirements Planning ("MRP") systems.

He has also assisted contractor and its counsel with dispute involving the design and development of student loan software.  Analysis included causation and damages related to the substantial increase in development costs and dispute between a state and contractor related to their partnership and joint development effort.

### Healthcare

Mr. Hall has provided consulting services including expert testimony on matters involving medical products manufacturers, healthcare providers, hospitals, and healthcare information

His experience includes forensic accounting analyses as well as analyzing damages related to breach of contract and intellectual property disputes.

### Intellectual Property and Trade Secrets

Mr. Hall has consulted for clients in disputes involving patents and trade secrets. Damages analyses included lost profits, reasonably royalty, and analyzing economic impact of alleged theft trade secrets.   Assisted counsel in trade secrets disputes by both quantifying and evaluating disgorgement of profits damages, lost profits and unjust enrichment measures.

He has assisted royalty owner in quantifying royalties owed from a company that moved assets internationally to avoid royalty payments.

He has provided expert witness damages testimony on the amount of lost profits and reasonable royalty in patent dispute related to automatic driller used to for oil and gas exploration.  He has also testified on trade secrets damages related to medical devices and air destratification fans.  Intellectual property experience includes the following industries/products:

- Air Destratification fans
- Automated oil & gas drilling system
- Automatic clutches for motorcycles
- Casing running tools for oil & gas drilling
- Cochlear implants
- Electronics (household products)

- Hedge Funds
- Moving Company
- Petroleum by-products
- Surgical Products
- Trailer hitches
- Waste Disposal Systems
- Vitamin patents

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                                Appendix A

## Mergers and Acquisitions

Mr. Hall has assisted a Telecommunications Company and its counsel with a post merger class action dispute related to the last declared dividend to shareholders of the non-surviving entity of a telecommunications merger.  Tasks included analyzing and quantifying increases in shareholder value from announcement of merger to the close, quantifying class members' gain on the day that the merger closed through the conversion of the shares to surviving merged entity, and quantifying the value impact to the shareholders and company of a specific dividend payment.

He has also assisted Aerospace Company and its counsel with a post acquisition purchase price dispute related to the sale of a $3 billion satellite company.  Analyses included valuation of individual satellite contracts, proper accounting for long-term contracts and comparing the accounting for the closing balance sheet with the selling company's past practices.

He has served as Independent Accountant to determine outcome of post-acquisition dispute between acquiring company and the former shareholders related to the sale of a golf, private club and resort operator.

## Real Estate Experience

Provided expert witness damages testimony in Denver District Court caused by breach of partnership agreement related to failure to fund in attempted acquisition of apartment complexes.

Provided expert witness damages testimony in Colorado Federal Court for failure to fund matter for a high-rise condominium development project.  Determine damages caused by a bank lender's failure to provide funds under a loan agreement the plaintiff alleged had been executed.  Damage analysis included additional cost caused by suspended construction activity while alternative financing was obtained as well as the economic impact of less favorable loan terms from new financing.

He has analyzed damages issues in a dispute related to a failed land development partnership in Colorado.  Projected partnership cash flows and values over time by forecasting development costs, lot values, take-down schedules, tap fees, partnership operating expenses and financing costs.  Developed a complex financial model and drafted an expert report prior to settlement of the case.

Provided expert witness damages testimony in arbitration in a breach of contract dispute between LLC partners involving lifestyle center mixed use.  Analyses included assessing the economic impact of the partners from different equity and debt structure for the project.

He has additional experience includes fraud investigations and damages assessments for many low-income housing developments throughout the country.

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                    **Appendix A**

### Securities Litigation Experience

Mr. Hall has assisted counsel and clients on securities litigation matters preparing and analyzing damages claims and conducting loss causation analyses. Experience with these matters includes the following:

- Provided expert witness testimony in class action case involving non-payment of a cash dividend to common shareholders due to the timing of (or "resulting from") the merger of two large telecommunication/internet companies. Claimed damages were based on would-have-been dividend payment of $276 million. Our analysis and testimony included impact of dividend payment on value of class members' shares of company stock and that, depending on the stock holdings of class members (whether they held shares in both companies that merged or just one of the companies), the impact to class members could vary greatly.

- He has consulted on post-acquisition dispute involving shares of stock in a New Zealand Gold Mine. Our work included loss causation analysis involving the mine's decline in profitability as gold prices decreased and as mine operating and remediation costs increased.

### Telecommunications Experience

Mr. Hall has consulted on telecommunications matters preparing and analyzing damages claims and conducting fraud analyses. Disputes have included breach of contract, fraud, and antitrust matters. Experience with these matters includes the following:

- Provided expert witness testimony in trial covering damages, causation and valuation issues in matter involving a telecommunications company and call center company involving alleged fraud, breach of contract and the bankruptcy of the company.

- He has assisted a company in quantifying its costs to rebuild its damaged network and switching facility.

- Provided expert witness damages testimony in an arbitration on a matter related to potential lost profits suffered by a telecommunications company as a result of alleged failure by another telecommunication company to purchase access to fiber optic networks in certain high-rise office buildings.

- He assisted a company with the analysis of potential damages resulting from alleged fraud perpetrated by third-party resellers of wireless products and services.

- He assisted a company with large damages claim related to changes and delays to communication system in foreign country.

**DAVID HALL STATEMENT - EXHIBIT A**

David A. Hall, CMA, CFE, MBA                                    **Appendix A**

- Assisted counsel for long distance Telecommunications Company to quantify disputed access charges invoiced from a Competitive Local Exchange Carrier ("CLEC") for wireless-originating toll free telephone calls.

- He provided expert witness testimony covering damages, causation and valuation issues in matter involving Telecommunications Company and a Tier 1 internet back bone company who had purchased an indefeasible right of use (IRU) fiber optic network involving breach of contract allegations and the cause of bankruptcy of the company.

**DAVID HALL STATEMENT - EXHIBIT A**

| David A. Hall | Appendix B |
|---|---|

**Testimony – Last Four Years**

**Great Western Railway of Colorado, LLC v. Front Range Energy, LLC,** Denver, Colorado; JAG Deposition and Arbitration 2012; 11-1069A

**Jeffrey Benton and Zoo Fans, Inc. v. Avedon Engineering, Inc.; Airius IP Holdings, LLC; and Airius, LLC,** U.S. District Court for the District of Colorado; Deposition 2011; 10-cv-01899-WYD-KLM

**National Oilwell Varco, L.P. v. Pason Systems USA Corp.,** U.S. District Court for the District of Colorado; Trial 2011; 03-CV-02579-RPM

**Tetra Tech Tetra Tech EC, Inc.  v.  Jerry Herling Construction, Inc. and Jerry Herling,** U.S. District Court for the District of Wyoming; Trial 2011; 08-CV-00210-WFD

**Securities and Exchange Commission v. Rajnish K. Dean and Stormy L. Dean,** U.S. District Court for the District of Nebraska; Deposition 2011;  8:10-CV-00102

**Gulf Pacific Rice Co., et al. v. Bayer CropScience, Inc., et al,** U.S. District Court for the Eastern District of Missouri, Eastern Division; Deposition 2011; 4:  08-CV-01545-CDP

**Texana Rice Mill, Ltd. and Texana Rice, Inc. v. Bayer CropScience, Inc., et al,** U.S. District Court for the Eastern District of Missouri, Eastern Division; Deposition 2011; 4: 06-MD-01811-CDP

**Newport Health Network, Inc. d/b/a Newport Audiology Centers  and Newport Health Network Holding, LLC  v.  Laura A. Smallen, Maureen Keene, et al.,** District Court, City and County of Denver, Colorado; Deposition 2011; 09 CV5363

**Creditanstalt Investment Bank, AG, et al. v.  Holme Roberts & Owen, LLP, et al.,** District Court, City and County of Denver, Colorado; Deposition 2010, Trial 2011; 01-CV-1677

**SA Neurelec  v.  Otologics, LLC, et al.,** District Court, City and County of Denver, Colorado; Deposition 2010, Trial 2011; 2008CV 1060 1

**Varco Canada Limited et al.   v.  Pason Systems Corp. and Pason Systems Inc.,** Canadian Federal Court; Trial 2011; 03-CV-02579-RPM

**Cadeka Microcircuits, LLC v. Fairchild Semiconductor Corporation and Kota Microcircuits, Inc.,** District Court, Larimer County, Colorado; Deposition 2010; 09-CV-1073

**Superior Plaster and Drywall, Inc . v. Akzo Nobel Paints LLC,** Denver JAG; Arbitration 2010; JAG Case # 10-0226A

**Beck Development, LLC v. Akzo Nobel Paints LLC,** Denver JAG; Arbitration 2010; JAG Case # 10-0226A

**DAVID HALL STATEMENT - EXHIBIT A**

| David A. Hall | Appendix B |
|---|---|
| **Testimony – Last Four Years** | |

**Storm Rock Sandestin, LLC and Howard Rock Venture, LLC v. Howard Grand, LLC and J. Keith Howard,** New York JAMS; Deposition and Arbitration 2010;  JAMS Ref. # 1425006225

**Reiner Riezler and Servi Med GmbH  v.  Metabolite Laboratories, Inc., et al.,** U.S. District Court for the District of Colorado; Deposition 2010; 08-CV-00332-RPM-BNB

**Steven J. Abraham, et al.  v.  BP America Production Company,** U.S. District Court of New Mexico; Deposition 2010; 6:09-cv-00961-WDS-RLP

**Phil Long Denver Jeep Chrysler, LLC v. Chrysler Group LLC**, American Arbitration Association; Arbitration 2010; 77-532-000020-10

**Layton Dodge, Inc. v. Chrysler Group LLC**, American Arbitration Association; Arbitration 2010; 77-532-000064-10

**Manuel Dodge v. Chrysler Group LLC**, American Arbitration Association; Arbitration 2010; 71 532 00097 10

**Tilda Ltd. v. Bayer CropScience, Inc., et al**, U.S. District Court for the Eastern District of Missouri; Deposition 2010; 4: 07 CV0457 CDP

**Elite Media Partners, LLC v. Great-West Healthcare of Colorado, Inc., et al**, District Court, Arapahoe County, Colorado; Deposition 2010; 2008CV2334

**TAC Liquidating Trust  v.  Los Alamos National Security, LLC**, U.S. Civilian Board of Contract Appeals, Washington, D.C.; Deposition 2009; CBCA 1384-ADR

**GCC Energy, LLC  v.  Industrial Systems, Inc.**, American Arbitration Association, Denver, Colorado; Deposition and Arbitration, 2009; 77 158 Y 00265 08

**Gary L. Waters and David Stewart v.  Bowen W. Banbury, Lana P. Banbury, and DocuVault Group, LLLP and Brooke Banbury and Mary Jo Banbury v. DocuVault Colorado, LLC, DocuVault Group, LLLP, Bowen W. Banbury, Lana P. Banbury**, District Court, City and County of Denver, Colorado; Deposition and Trial 2009; 07 CV 7375

**Edward Keely  v.  Janus Management Holdings Corporation,** District Court, City and County of Denver, Colorado; Deposition and Trial 2009; 2007cv 7366

**Varco, L.P.  v.  Pason Systems USA Corp.,** U.S. District Court for the District of Colorado; Deposition and Jury Trial 2008; 03-M-2579

**Spire Denver, LLC, Spire Denver Investors, LLC  v.  Hypo Real Estate Capital Corporation**, District Court, City and County of Denver, Colorado; Deposition 2008; 07-cv-02156-WDM-MEH

**DAVID HALL STATEMENT - EXHIBIT A**

**Appendix C**

**Facts and Data Considered**

<u>**Legal Filings**</u>

1. Complaint and Demand for Jury Trial dated March 2, 2011
2. Motion to Compel dated January 24, 2012
3. Supplemental Response to Interrogatory No. 6 dated January 23, 2012
4. MDX's Notice of Rule 30(B)(6) Deposition to HealthGrades dated June 11, 2012
5. Order Regarding Claim Construction dated February 13, 2012
6. Parties' Joint Motion to Amend Scheduling Order to Modify Deadlines dated March 14, 2012
7. Parties' Joint and Agreed to Motion to Modify Scheduling Order and Extend Fact Discovery Cut-off, Expert Reports Deadline and Expert Discovery Cut-off dated December 6, 2011

<u>**Depositions**</u>

8. Deposition of Allen Dodge dated June 28, 2012
9. Deposition of Larry West dated June 26, 2012 (Rough Draft)
10. Deposition of Jeffrey Cutler dated June 6, 2012 (Rough Draft)
11. Deposition of John Neal dated June 13, 2012
12. Deposition of Mitchel Rothschild dated June 7 2012

<u>**Consultations**</u>

13. Conversations with Allen Dodge and Andrea Pearson

<u>**Bates Stamped Documents**</u>

14. HG0001384 - HG0001449
15. HG0001451 - HG0001660
16. HG0001664 - HG0001846
17. HG0001848 - HG0001903
18. HG0001905 - HG0002058
19. HG0002060 - HG0002355
20. HG0002363 - HG0002590
21. HG0002600 - HG0002612
22. HG0055710 - HG0062016
23. HG0060706 - HG0060715
24. MDX0000177 - MDX0000182
25. MDX0001650 - MDX0001710
26. MDX0002251 - MDX0002446
27. MDX0002467 - MDX0005045
28. MDX0003257 - MDX0003731
29. MDX0006512 - MDX0007297
30. MDX0007359
31. MDX0019305 - MDX0019306
32. MDX0016995 - MDX0017132
33. MDX0012537 - MDX0013293
34. MDX0104138 - MDX0104271
35. MDX0104300 - MDX0104421
36. MDX0073234 - MDX0073255
37. MDX0100725 - MDX0100983

**DAVID HALL STATEMENT - EXHIBIT A**

**Appendix C**

**Facts and Data Considered**

38. MDX0100985 - MDX0100999
39. MDX0101001 - MDX0103826
40. MDX0104440 - MDX0104743
41. HGLA0001 - HGLA0179

**Non-Bates Stamped Documents**
42. 2008 expenses.zip
43. 2008.xls
44. 2009 expenses.zip
45. 2009 Revenue Totals by Month.xlsx
46. 2010 expenses.zip
47. 2010 Revenue Totals by Month.xlsx
48. 2011 Revenue Totals by Month.xlsx
49. ACTUAL TO BUDGET 0108 CONSOLIDATED_FINAL.XLS
50. ACTUAL TO BUDGET 0108 DEPT 21.XLS
51. ACTUAL TO BUDGET 0108 DEPT 24.XLS
52. ACTUAL TO BUDGET 0108 DEPT 27.XLS
53. ACTUAL TO BUDGET 0108 DEPT 63.XLS
54. ACTUAL TO BUDGET 0109 CONSOLIDATED.XLS
55. ACTUAL TO BUDGET 0109 Dept 21.XLS
56. ACTUAL TO BUDGET 0109 DEPT 24.XLS
57. ACTUAL TO BUDGET 0109 DEPT 28.XLS
58. ACTUAL TO BUDGET 0109 DEPT 63.XLS
59. ACTUAL TO BUDGET 0110 CONSOLIDATED.XLS
60. ACTUAL TO BUDGET 0110 DEPT 24.XLS
61. ACTUAL TO BUDGET 0110 DEPT 28.XLS
62. ACTUAL TO BUDGET 0110 DEPT 29.XLS
63. ACTUAL TO BUDGET 0110 DEPT 63.XLS
64. ACTUAL TO BUDGET 0110 DEPT 64.XLS
65. ACTUAL TO BUDGET 0111 CONSOLIDATED-After Entry.XLS
66. ACTUAL TO BUDGET 0111 Dept 00 Revised.XLS
67. ACTUAL TO BUDGET 0111 DEPT 24.XLS
68. ACTUAL TO BUDGET 0111 DEPT 63.XLS
69. ACTUAL TO BUDGET 0111 DEPT 64.XLS
70. ACTUAL TO BUDGET 0111 DEPT 25- After Entry.XLS
71. ACTUAL TO BUDGET 0208 CONSOLIDATED.XLS
72. ACTUAL TO BUDGET 0208 DEPT 21.XLS
73. ACTUAL TO BUDGET 0208 DEPT 24.XLS
74. ACTUAL TO BUDGET 0208 DEPT 27.XLS
75. ACTUAL TO BUDGET 0208 DEPT 63.XLS
76. ACTUAL TO BUDGET 0209 CONSOLIDATED.XLS
77. ACTUAL TO BUDGET 0209 DEPT 21.XLS
78. ACTUAL TO BUDGET 0209 DEPT 24.xlsx
79. ACTUAL TO BUDGET 0209 DEPT 28.XLS
80. ACTUAL TO BUDGET 0209 DEPT 63.XLS
81. ACTUAL TO BUDGET 0210 CONSOLIDATED.XLS
82. ACTUAL TO BUDGET 0210 DEPT 24.XLS

**DAVID HALL STATEMENT - EXHIBIT A**

**Appendix C**

### Facts and Data Considered

83.  ACTUAL TO BUDGET 0210 DEPT 28.XLS
84.  ACTUAL TO BUDGET 0210 DEPT 29.xlsx
85.  ACTUAL TO BUDGET 0210 DEPT 63.XLS
86.  ACTUAL TO BUDGET 0210 DEPT 64.xlsx
87.  ACTUAL TO BUDGET 0211 CONSOLIDATED - After Entry.XLS
88.  ACTUAL TO BUDGET 0211 DEPT 00.XLS
89.  ACTUAL TO BUDGET 0211 DEPT 24.XLS
90.  ACTUAL TO BUDGET 0211 DEPT 63.XLS
91.  ACTUAL TO BUDGET 0211 DEPT 64.XLS
92.  ACTUAL TO BUDGET 0211 DEPT 25-After Entry.XLS
93.  ACTUAL TO BUDGET 0308 CONSOLIDATED.XLS
94.  ACTUAL TO BUDGET 0308 DEPT 21.XLS
95.  ACTUAL TO BUDGET 0308 DEPT 24.XLS
96.  ACTUAL TO BUDGET 0308 DEPT 27.XLS
97.  ACTUAL TO BUDGET 0308 DEPT 63.XLS
98.  ACTUAL TO BUDGET 0309 CONSOLIDATED.XLS
99.  ACTUAL TO BUDGET 0309 DEPT 21.XLS
100. ACTUAL TO BUDGET 0309 DEPT 24.xlsx
101. ACTUAL TO BUDGET 0309 DEPT 28.XLS
102. ACTUAL TO BUDGET 0309 DEPT 63.XLS
103. ACTUAL TO BUDGET 0310 CONSOLIDATED.XLS
104. ACTUAL TO BUDGET 0310 DEPT 24.XLS
105. ACTUAL TO BUDGET 0310 DEPT 28.XLS
106. ACTUAL TO BUDGET 0310 DEPT 29.XLS
107. ACTUAL TO BUDGET 0310 DEPT 63.XLS
108. ACTUAL TO BUDGET 0310 DEPT 64.XLS
109. ACTUAL TO BUDGET 0311 CONSOLIDATED-After Entry.XLS
110. ACTUAL TO BUDGET 0311 DEPT 00.XLS
111. ACTUAL TO BUDGET 0311 DEPT 24.XLS
112. ACTUAL TO BUDGET 0311 DEPT 63.XLS
113. ACTUAL TO BUDGET 0311 DEPT 64.XLS
114. ACTUAL TO BUDGET 0311 DEPT 25 - After Entry.XLS
115. ACTUAL TO BUDGET 0408 CONSOLIDATED.XLS
116. ACTUAL TO BUDGET 0408 DEPT 21.XLS
117. ACTUAL TO BUDGET 0408 DEPT 24.XLS
118. ACTUAL TO BUDGET 0408 DEPT 27.XLS
119. ACTUAL TO BUDGET 0408 DEPT 63.XLS
120. ACTUAL TO BUDGET 0409 CONSOLIDATED.XLS
121. ACTUAL TO BUDGET 0409 DEPT 21.XLS
122. ACTUAL TO BUDGET 0409 DEPT 24.xlsx
123. ACTUAL TO BUDGET 0409 DEPT 28.XLS
124. ACTUAL TO BUDGET 0409 DEPT 63.XLS
125. ACTUAL TO BUDGET 0410 CONSOLIDATED.XLS
126. ACTUAL TO BUDGET 0410 DEPT 24.XLS
127. ACTUAL TO BUDGET 0410 DEPT 28.XLS
128. ACTUAL TO BUDGET 0410 DEPT 29.XLS
129. ACTUAL TO BUDGET 0410 DEPT 63.XLS

**DAVID HALL STATEMENT - EXHIBIT A**

<div align="right">**Appendix C**</div>

**Facts and Data Considered**

130. ACTUAL TO BUDGET 0410 DEPT 64.XLS
131. ACTUAL TO BUDGET 0411 DEPT 00.XLS
132. ACTUAL TO BUDGET 0411 DEPT 24.XLS
133. ACTUAL TO BUDGET 0411 DEPT 63.XLS
134. ACTUAL TO BUDGET 0411 DEPT 64.XLS
135. ACTUAL TO BUDGET 0411 DEPT 25-After Entry.XLS
136. ACTUAL TO BUDGET 0411 DEPT CONSOLIDATED-After Entry.XLS
137. ACTUAL TO BUDGET 0508 CONSOLIDATED.XLS
138. ACTUAL TO BUDGET 0508 DEPT 21.XLS
139. ACTUAL TO BUDGET 0508 DEPT 24.XLS
140. ACTUAL TO BUDGET 0508 DEPT 27.XLS
141. ACTUAL TO BUDGET 0508 DEPT 63.XLS
142. ACTUAL TO BUDGET 0509 CONSOLIDATED.xlsx
143. ACTUAL TO BUDGET 0509 DEPT 21.xlsx
144. ACTUAL TO BUDGET 0509 DEPT 24.xlsx
145. ACTUAL TO BUDGET 0509 DEPT 28.xlsx
146. ACTUAL TO BUDGET 0509 DEPT 63.xlsx
147. ACTUAL TO BUDGET 0510 CONSOLIDATED.XLS
148. ACTUAL TO BUDGET 0510 DEPT 24.XLS
149. ACTUAL TO BUDGET 0510 DEPT 28.XLS
150. ACTUAL TO BUDGET 0510 DEPT 29.XLS
151. ACTUAL TO BUDGET 0510 DEPT 63.XLS
152. ACTUAL TO BUDGET 0510 DEPT 64.XLS
153. ACTUAL TO BUDGET 0511 CONSOLIDATED-After Entry.XLS
154. ACTUAL TO BUDGET 0511 Dept 00.xlsx
155. ACTUAL TO BUDGET 0511 HGRD STAND ALONE-After Entry.xls
156. ACTUAL TO BUDGET 0608 CONSOLIDATED.XLS
157. ACTUAL TO BUDGET 0608 DEPT 21.XLS
158. ACTUAL TO BUDGET 0608 DEPT 24.XLS
159. ACTUAL TO BUDGET 0608 DEPT 27.XLS
160. ACTUAL TO BUDGET 0608 DEPT 63.XLS
161. ACTUAL TO BUDGET 0609 CONSOLIDATED7.15.09.XLS
162. ACTUAL TO BUDGET 0609 DEPT 21.XLSX
163. ACTUAL TO BUDGET 0609 DEPT 24.XLSX
164. ACTUAL TO BUDGET 0609 DEPT 28.XLSX
165. ACTUAL TO BUDGET 0609 DEPT 63.XLSX
166. ACTUAL TO BUDGET 0610 CONSOLIDATED.XLS
167. ACTUAL TO BUDGET 0610 DEPT 24.XLS
168. ACTUAL TO BUDGET 0610 DEPT 28.XLS
169. ACTUAL TO BUDGET 0610 DEPT 29.XLS
170. ACTUAL TO BUDGET 0610 DEPT 63.XLS
171. ACTUAL TO BUDGET 0610 DEPT 64.XLS
172. ACTUAL TO BUDGET 0611 ALL COMPANY.xls
173. ACTUAL TO BUDGET 0611 ALL HG.XLS
174. ACTUAL TO BUDGET 0611 IH.xlsx
175. ACTUAL TO BUDGET 0708 CONSOLIDATED.XLS
176. ACTUAL TO BUDGET 0708 DEPT 21.XLS

**DAVID HALL STATEMENT - EXHIBIT A**

**Appendix C**

**Facts and Data Considered**

177. ACTUAL TO BUDGET 0708 DEPT 24.XLS
178. ACTUAL TO BUDGET 0708 DEPT 27.XLS
179. ACTUAL TO BUDGET 0708 DEPT 63.XLS
180. ACTUAL TO BUDGET 0709 CONSOLIDATED.XLS
181. ACTUAL TO BUDGET 0709 DEPT 21.XLSX
182. ACTUAL TO BUDGET 0709 DEPT 24.xlsx
183. ACTUAL TO BUDGET 0709 DEPT 28.XLSX
184. ACTUAL TO BUDGET 0709 DEPT 63.XLSX
185. ACTUAL TO BUDGET 0710 CONSOLIDATED.XLS
186. ACTUAL TO BUDGET 0710 DEPT 24.xls
187. ACTUAL TO BUDGET 0710 DEPT 28.xls
188. ACTUAL TO BUDGET 0710 DEPT 29.xls
189. ACTUAL TO BUDGET 0710 DEPT 63.XLS
190. ACTUAL TO BUDGET 0710 DEPT 64.xls
191. ACTUAL TO BUDGET 0711 CONSOL.XLS
192. ACTUAL TO BUDGET 0711 HG.XLS
193. ACTUAL TO BUDGET 0711 IH.xlsx
194. ACTUAL TO BUDGET 0808 CONSOLIDATED.XLS
195. ACTUAL TO BUDGET 0808 DEPT 21.XLS
196. ACTUAL TO BUDGET 0808 DEPT 24.XLS
197. ACTUAL TO BUDGET 0808 DEPT 27.XLS
198. ACTUAL TO BUDGET 0808 DEPT 63.XLS
199. ACTUAL TO BUDGET 0809 CONSOLIDATED.XLS
200. ACTUAL TO BUDGET 0809 DEPT 21.XLS
201. ACTUAL TO BUDGET 0809 DEPT 24.XLS
202. ACTUAL TO BUDGET 0809 DEPT 28.xls
203. ACTUAL TO BUDGET 0809 DEPT 63.XLS
204. ACTUAL TO BUDGET 0810 CONSOLIDATED.XLS
205. ACTUAL TO BUDGET 0810 DEPT 24.XLS
206. ACTUAL TO BUDGET 0810 DEPT 28.XLS
207. ACTUAL TO BUDGET 0810 DEPT 29.XLS
208. ACTUAL TO BUDGET 0810 DEPT 63.XLS
209. ACTUAL TO BUDGET 0810 DEPT 64.XLS
210. ACTUAL TO BUDGET 0908 CONSOLIDATED.XLS
211. ACTUAL TO BUDGET 0908 DEPT 21.XLS
212. ACTUAL TO BUDGET 0908 DEPT 24.XLS
213. ACTUAL TO BUDGET 0908 DEPT 27.XLS
214. ACTUAL TO BUDGET 0908 DEPT 63.XLS
215. ACTUAL TO BUDGET 0909 CONSOLIDATED 10.14.09.xlsx
216. ACTUAL TO BUDGET 0909 DEPT 21.xlsx
217. ACTUAL TO BUDGET 0909 DEPT 24.xlsx
218. ACTUAL TO BUDGET 0909 DEPT 28.xlsx
219. ACTUAL TO BUDGET 0909 DEPT 63.xlsx
220. ACTUAL TO BUDGET 0910 CONSOLIDATED.XLS
221. ACTUAL TO BUDGET 0910 DEPT 24.XLS
222. ACTUAL TO BUDGET 0910 DEPT 28.XLS
223. ACTUAL TO BUDGET 0910 DEPT 29.XLS

**DAVID HALL STATEMENT - EXHIBIT A**

**Appendix C**

**Facts and Data Considered**

224.  ACTUAL TO BUDGET 0910 DEPT 63.XLS
225.  ACTUAL TO BUDGET 0910 DEPT 64.XLS
226.  ACTUAL TO BUDGET 1008 CONSOLIDATED.XLS
227.  ACTUAL TO BUDGET 1008 DEPT 21.XLS
228.  ACTUAL TO BUDGET 1008 DEPT 24.XLS
229.  ACTUAL TO BUDGET 1008 DEPT 27.XLS
230.  ACTUAL TO BUDGET 1008 DEPT 28.XLS
231.  ACTUAL TO BUDGET 1008 DEPT 63.XLS
232.  ACTUAL TO BUDGET 1009 CONSOLIDATED.xlsx
233.  ACTUAL TO BUDGET 1009 DEPT 21.XLS
234.  ACTUAL TO BUDGET 1009 DEPT 24.xlsx
235.  ACTUAL TO BUDGET 1009 DEPT 28.XLS
236.  ACTUAL TO BUDGET 1009 DEPT 63.XLS
237.  ACTUAL TO BUDGET 1010 CONSOLIDATED 2.21.11.xlsx
238.  ACTUAL TO BUDGET 1010 DEPT 24 2.XLS
239.  ACTUAL TO BUDGET 1010 DEPT 28 2.XLS
240.  ACTUAL TO BUDGET 1010 DEPT 29 2.XLS
241.  ACTUAL TO BUDGET 1010 DEPT 63 2.XLS
242.  ACTUAL TO BUDGET 1010 DEPT 64 2.XLS
243.  ACTUAL TO BUDGET 1108 CONSOLIDATED.XLS
244.  ACTUAL TO BUDGET 1108 DEPT 21.XLS
245.  ACTUAL TO BUDGET 1108 DEPT 24.XLS
246.  ACTUAL TO BUDGET 1108 DEPT 27.XLS
247.  ACTUAL TO BUDGET 1108 DEPT 28.XLS
248.  ACTUAL TO BUDGET 1108 DEPT 63.XLS
249.  ACTUAL TO BUDGET 1109 CONSOLIDATED.XLS
250.  ACTUAL TO BUDGET 1109 DEPT 21.XLS
251.  ACTUAL TO BUDGET 1109 DEPT 24.XLS
252.  ACTUAL TO BUDGET 1109 DEPT 28.XLS
253.  ACTUAL TO BUDGET 1109 DEPT 63.XLS
254.  ACTUAL TO BUDGET 1110 DEPT 24.XLS
255.  ACTUAL TO BUDGET 1110 DEPT 28.XLS
256.  ACTUAL TO BUDGET 1110 DEPT 29.XLS
257.  ACTUAL TO BUDGET 1110 DEPT 63.XLS
258.  ACTUAL TO BUDGET 1110 DEPT 64.XLS
259.  ACTUAL TO BUDGET 1110 HGRD CONSOLIDATED with Dept 11.XLS
260.  ACTUAL TO BUDGET 1208 CONSOLIDATED.XLS
261.  ACTUAL TO BUDGET 1208 DEPT 21.XLS
262.  ACTUAL TO BUDGET 1208 DEPT 24.XLS
263.  ACTUAL TO BUDGET 1208 DEPT 27.XLS
264.  ACTUAL TO BUDGET 1208 DEPT 28.XLS
265.  ACTUAL TO BUDGET 1208 DEPT 63.XLS
266.  ACTUAL TO BUDGET 1209 CONSOLIDATED 1.26.10.XLS
267.  ACTUAL TO BUDGET 1209 DEPT 21 1.25.10.XLS
268.  ACTUAL TO BUDGET 1209 DEPT 24.XLS
269.  ACTUAL TO BUDGET 1209 DEPT 24.XLS
270.  ACTUAL TO BUDGET 1209 DEPT 28.XLS

**DAVID HALL STATEMENT - EXHIBIT A**

**Appendix C**

### Facts and Data Considered

271. ACTUAL TO BUDGET 1209 DEPT 63.XLS
272. ACTUAL TO BUDGET 1210 CONSOLIDATED.XLS
273. ACTUAL TO BUDGET 1210 DEPT 24.XLS
274. ACTUAL TO BUDGET 1210 DEPT 28.XLS
275. ACTUAL TO BUDGET 1210 DEPT 29.XLS
276. ACTUAL TO BUDGET 1210 DEPT 63.XLS
277. ACTUAL TO BUDGET 1210 DEPT 64.XLS
278. April 2009 ComScore.xls
279. AVB 10- 2011.XLS
280. AVB 11- 2011.XLS
281. AVB 1-12.XLS
282. AVB 12- 2011.XLS
283. AVB 2-12.XLS
284. AVB 3-12.XLS
285. AVB 4-12.XLS
286. AVB 9- 2011.XLS
287. AVB IH 10-11.XLS
288. AVB IH 11-11.XLS
289. AVB IH 12-11.XLS
290. AVB IH 9-11.XLS
291. AVB INHEALTH DEC 2010.XLS
292. AVB INHEALTH NOV 2010.XLS
293. AVB INHEALTH OCT 2010.XLS
294. comScore Cross_Visiting_December_2010.xls
295. comScore Cross_Visiting_March_2012.xls
296. Cross_Visiting_July_2010.xls
297. Cross_Visiting_August_2010.xls
298. Cross_Visiting_September 2010.xls
299. Cross_Visiting_October_2011.xls
300. Cross_Visiting_November_2010.xls
301. Cross_Visiting_December_2010.xls
302. Cross_Visiting_January_2011.xls
303. Key_Measures_May_2012.xls
304. comScore_Apr_2012.xlsx
305. Physician_Search_ComScore_Key_Measures_June_2011.xls
306. Physician_Search_ComScore_Key_Measures_June_2012.xls
307. csmmx sept 09.xls
308. Dec ComScore_2008.xls
309. Cross Visiting June 8 2012.xls
310. Key Measures June 8 2012. xls
311. HG Ad Revenue Report_Jan10 EOM V1.xlsx
312. HG Monthly Revenue Data.xlsx
313. HG.XLS
314. January 2009 comScore.xlsx
315. Key Pages from MDX0101071.pdf
316. Nat Adv.XLS
317. October 2009 ComScore.xls

**DAVID HALL STATEMENT - EXHIBIT A**

Appendix C

**Facts and Data Considered**

318. WD Ad Revenue Report_Jan10 EOM FINAL.xlsx
319. Health Grades 10-K for December 31, 2004
320. 2008.xls
321. 2009 Revenue Totals by Month.xlsx
322. 2010 Revenue Totals by Month.xlsx
323. 2011 Revenue Totals by Month.xlsx
324. Chronology-Critical Documents Log.pdf
325. Document Log.xlsx
326. Health Grades - Documents Received Index.xlsx
327. Health Grades Matter.log
328. Health Grades Matter.pdx
329. HG Ad Revenue Report_Jan10 EOM V1.xlsx
330. Rule 3-7 Disclosures Exhibit A.pdf
331. index.idx
332. index1.idx
333. MDX DETAILED INCOME STATEMENTS 2008 2010 2011 MARCH312012.xlsx
334. MDX 2008 - 2009 Audited Financials.pdf
335. MDX Medical's Response to First Requests for Production of Documents.pdf
336. WD Ad Revenue Report_Jan10 EOM FINAL.xlsx


**Other**

337. http://www.vitals.com/res/pdf/vitals-patient-exchange-brochure-2012.1.pdf
338. Capital IQ Transaction Detail - MDX Merger
339. ComScore How to Pull and Read Report User Guide
340. Capital IQ Financials - Smiths Group
341. Capital IQ Financials - WebMD Health Corp
342. Capital IQ Financials - Unitedhealth Group Inc
343. Factiva - iGenix Margin News
344. Factiva - WebMD Margin News
345. Patent No. 7,752,060 dated July 6, 2010
346. HealthGrades Press Release - Sponsorship Agreement with Fresenius Medical Care
347. HealthGrades 8-k dated May 4, 2006
348. Capital IQ Financials - HealthGrades, Inc
349. HealthGrades Press Release - HealthGrades and CPM to Merge
350. RoyaltySource Intellectual Property Database Search
351. Description for SIC 7375: Information Retreival Services
352. Description for SIC 7389: Business Services, Not Elsewhere Classified
353. Description for SIC 8099: Health and Allied Services, Not Elsewhere Classified
354. Vitals Trademark 3,612,937
355. Asset Purchase Agreement between HealthGrades and Adviware dated October 13, 2008
356. Adviware Financial Statements for the year ended June 30, 2008
357. HealthGrades and Adviware Combined Financials for the year ended June 30, 2008
358. HealthGrades 8-k dated October 13, 2008
359. HealthGrades 8-k/a Amendment No. 1 dated October 13, 2008
360. WebMD Form 10-k for the period ending December 31, 2007
361. WebMD Form 10-k/a for the period ending December 31, 2008

**DAVID HALL STATEMENT - EXHIBIT A**

Appendix C

**Facts and Data Considered**

362. WebMD Form 10-k/a for the period ending December 31, 2009
363. WebMD Form 10-k/a for the period ending December 31, 2010
364. Agreement and Plan of Merger between Mountain Acquisition Corp and HealthGrades dated July 27, 2010
365. Amendment No. 1 to Agreement and Plan of Merger between Mountain Acquisition and HealthGrades
366. Amendment No. 2 to Agreement and Plan of Merger between Mountain Acquisition and HealthGrades
367. HealthGrades 8-k dated July 27, 2010
368. HealthGrades 8-k dated October 10, 2010
369. HealthGrades 8-k dated October 7, 2010
370. comScore myMetrix - Dictionary Glossary & Media Set Definitions
371. Litigation Services Handbook: The Role of the Financial Expert, 4th Ed. By Weil, Frank, Hughes, and Wagner
372. Intellectual Property: Valuation, Exploitation, and Infringement Damages By Smith and Parr
373. www.healthgrades.com
374. www.vitals.com
375. Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152 (6th Cir. 1978)
376. State Industries, Inc. v. Mor-flo Industries, et al., 883 F.2d 1573
377. The Patent Statute, 35 U.S.C. 284
378. Georgia Pacific Corp. v. U.S. Plywwod Corp., 318 F. Supp 116 (S.D.N.Y 1970)
379. Uniloc USA, Inc., et al. v. Microsoft Corporation (Fed. Cir. 2011).
380. Lucent Technologies, Inc. et al. v. Gateway, Inc., et al., (Fed. Cir. 2009)
381. ResQnet.com, Inc., et al. v. Lansa, Inc., (Fed Cir. 2010)
382. TWM Manufacturing Co., Inc. v. Dura Corp, et al., 789 F.2d 895
383. The Gyromat Corporation v. Champion Spark Plug Company

**DAVID HALL STATEMENT - EXHIBIT A**