# EXHIBIT D

(Redacted version of Dkt. # 677-4)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

### AFFIDAVIT OF DAVID A. HALL

---

STATE OF COLORADO                    )
                                     )     ss.
CITY & COUNTY OF DENVER              )


I, David A. Hall, hereby depose and state under oath as follows:

1. Alvarez & Marsal Global Forensic and Dispute Services, LLC ("A&M") was retained by HealthGrades, Inc. ("HealthGrades") and its counsel to calculate patent infringement damages in the matter of HealthGrades, Inc. v. MDx Medical, Inc. ("MDx") d/b/a Vitals.com ("Vitals").

2. As I indicated in my July 13, 2012 report, HealthGrades claims that Vitals infringes its U.S. Patent No. 7,752,060 B2 ("the '060 patent") and that for purposes of my analyses and calculations, I have been asked to assume that the '060 patent is valid, enforceable, and that Vitals has infringed the '060 patent, and that HealthGrades is entitled to damages.

3. Counsel for HealthGrades has requested that I address certain issues in MDx's November 2, 2012 motion to exclude my testimony (the "Motion") including instances of mischaracterizing or confusion regarding my bases, analysis and opinions.

---

**EXHIBIT C**

**DAVID HALL STATEMENT - EXHIBIT C**

### My Lost Profits Demand Analysis Was Mischaracterized

4.    In section IV.A.1. and 2. (at pages 4 - 9) of the Motion, MDx's counsel mischaracterizes the analysis of demand that I performed for the *Panduit* test for lost profits.

5.    First, my analysis of demand, lost profits and reasonable royalty all begin with my review and analysis of the '060 patent and patented features (see my Initial Report, referred to as Ex. A throughout this affidavit, ¶9 through ¶15).

6.    Second, I identified the patented product that encompasses the patented features – HealthGrades' website (and infringing product – Vitals' website) so that I could determine if there was evidence of demand for the patented product.  See Ex. A ¶19, ¶20 and ¶29 through ¶32 and ¶39 which includes:

> "Visitors come to the website to research physician information generate advertising revenue for HealthGrades and Vitals." (Ex. A ¶29)

> "The key features of the '060 patent allows visitors, via the internet, to access data on physicians in order to conduct a comparative analysis of them.  This comparative analysis is a feature of the '060 patent and is provided for in one of the claims stated above." (Ex. A ¶39)

7.    Third, I analyzed visitors to both the patented product—HealthGrades' website and to the infringing product—Vitals' website.  See Ex. A ¶32 and ¶39 which includes:

> "As noted earlier, visitors come to the website to research physician information generate advertising revenue for HealthGrades and Vitals." (Ex. A ¶39)

I also identified total unique visitors to HealthGrades' and Vitals' websites on Attachment 3a to my Initial Report (Ex. A).

**EXHIBIT C**

**DAVID HALL STATEMENT - EXHIBIT C**

8.    Fourth, I analyzed the advertising revenue earned from website visits.  See Ex. A ¶41 through ¶44 and Attachments 1 and 12 (Ex. A) for HealthGrades' advertising revenue and Attachment 2 and 11 (Ex. A) for Vitals' advertising revenue.[1]

9.    MDx's counsel ignored the first three steps I took and states on page 5 of the Motion as leadoff to section IV.A.1. that "Mr. Hall's basis for concluding there was demand starts with the revenue of both MDx and Health Grades."  This is misleading and untrue.

10.   To gain an understanding of how the market reacted (as far as demand) to HealthGrades' patented product (and also to Vitals' infringing product), I analyzed the market share over time.  See Ex. A ¶37 and ¶38 and Attachments 3a and 16 (Ex. A).

11.   MDx counsel also claims that the revenue I "used" was exaggerated, unconnected to the patented invention, and speculative (see Motion page 5).  The advertising revenue that I analyzed for the *Panduit* test for demand is directly connected to the '060 patent.  MDx's counsel ignored the on-point statements in my Initial Report and my deposition testimony on this topic.  He instead uses my answers to his questions on Attachment 1 to mischaracterize my *Panduit* demand test analysis and opinion.

12.   For example, MDx's counsel claims that I ". . . used revenue that was embellished because it included revenue from the websites *that was not attributable to the patent*."  He cites footnote 21 in my Initial Report but misuses it by claiming that I admitted that I "used" (MDx's counsel's word, not in my footnote) revenues reported by the various departments [that] include more than that of the patented invention."  He cites my footnote combined with his words to mischaracterize what I did to demonstrate demand for the patented product.

---

[1] See also Ex. E, Napper's report page 5:  "MDx primarily generates its revenue from consumer advertisements which are sold directly to customers, advertising networks and to Google and other partners, which is largely driven by website traffic."

**DAVID HALL STATEMENT - EXHIBIT C**

13.   This characterization is misleading.  My footnote 21 refers to my Attachment 1 (Ex. A),

which I created to both perform my analytical method for my reasonable royalty analysis

and to isolate HealthGrades' advertising revenue and use *only* its advertising revenue (see

top line of Attachment 1) as part of my *Panduit* analysis of demand for patented product.

See Ex. A ¶30:

> "HealthGrades' and Vitals' income statements clearly show substantial
> advertising revenue – over ▮▮▮▮▮▮▮ for HealthGrades in 2011 (see
> **Attachment 1 and Attachment 12**) and (see **Attachment 2 and Attachment
> 11**).  This advertising revenue combined with the website visits demonstrates the
> demand for the claims embodied in the '060 patent." (emphasis in original text)

MDx's counsel also cites my deposition transcript (referred to in this affidavit as Ex. D) for

my response to his question about my Attachment 1:  77:11-15; 77:16-20; and 149:11-16

(Ex. D) to conclude that I had "wildly overbroad inclusion of revenue supposedly showing

'demand' for practice of the patent included *anything* even remotely connected to the

patent, . . . ."[2]

14.   This is also misleading and untrue because all of his cites to my deposition relate to my

description of items on Attachment 1 that are *not* the advertising revenue that I did use as

part of the support for evidence of demand for HealthGrades' patented product.  MDx's

counsel cites testimony that is not relevant to my lost profits analysis.  I describe this both

in my Initial Report at ¶30 (Ex. A) and several times during my deposition:

> "But the advertising revenue is what I limited and focused my analysis on as far
> as Health Grades' damages."  77:22-78:7 (Ex. D)

> "Attachment 1 was not intended to identify only[3] the revenue associated with the
> '060 Patent. There is more here than -- yes." 97:7-9 (Ex. D)

---

[2] The Motion pages 6 and 7.
[3] I submitted errata for clarity which changed the word 'all' to 'only' at page 97, line 8.

---

**EXHIBIT C**

**DAVID HALL STATEMENT - EXHIBIT C**

15. Most misleading is MDx's counsel inserting words ('demand revenue') into a question of his to make it appear as if I was identifying and using non-advertising revenue in my demand analysis. MDx's counsel never asked me about 'demand revenue', and I did not use the term 'demand revenue' in either of my reports or in my deposition. Notwithstanding these facts, MDx counsel states in the middle of page 6 of the Motion: "Exhibit C, 149:11-16 (Q: "if you had just one department that only worked on, like information that goes into a report, that information is referenced somewhere in the claims of the patent, you would include that department [in the alleged demand revenue]? A: Yes."). I submitted errata for completeness for answer to read, "Yes, in Attachment 1."

16. MDx counsel adds "[in the alleged demand revenue]" to his question about Attachment 1 revenue line items that *were not* advertising revenue that I used as part of my demand analysis. Counsel's addition of words completely changes the meaning of the question. He asked me about Attachment 1 (see Ex. D 148:22-149:10) and NOT about "alleged demand revenue." My Initial report (Ex. A ¶30 and Attachments 11 and 12) and my deposition make it clear that I only included advertising revenue in my demand analysis for lost profits.

> Q. Okay. So how much more?
> A. The advertising network is the primary revenue source that I believe from my analysis and discussions that relates to the use of the patented features. It's not the entirety of the revenue as they use the rating systems at different periods in time to help with other revenue-generating activities. *But the advertising revenue is what I limited and focused my analysis on as far as Health Grades' damages.* (emphasis added)[4]

17. MDx's counsel then repeats his altered question referencing 'demand revenue' four more times on pages 6 and 7 of the Motion to make similar misleading claims such as: "Hall admitted that *he made no determination* of how much of his alleged 'demand revenue'

---

[4] My deposition 77:21-78:7 (Ex. D)

**DAVID HALL STATEMENT - EXHIBIT C**

related to the patent. *Id.* at 78:8-12." MDx's counsel equates his made up term with all of the revenue on Attachment 1 (Ex. A) which is false and his cite cuts off my full answer— see 78:13-24 (Ex. D). I only used HealthGrades' advertising revenue (top line of my Initial Report Attachment 1, Ex. A) and use it as part of my basis for *Panduit* test— evidence of demand for patented product.

18. MDx's counsel also claims that "there is nothing in Hall's report, or elsewhere, showing *how* he made the determination of what revenue should be included, and what should be excluded." This is false. I described my criteria for identifying the revenue I used to evaluate the *Panduit* test for demand for the patented product—see Ex. A ¶9 -- ¶15; ¶19, ¶20; ¶29 -- ¶32 and ¶39, ¶41 -- ¶44 and my report Attachments 1, 2 and 3a (Ex. A).

### My 12% Royalty Rate Accounts For Unpatented features

19. My royalty rate determination accounts for Vitals' unpatented features.

20. My analysis accomplished this important step in three ways: First, I began with an analytical approach which attempts to reasonably exclude profit achieved on advertising revenue earned without infringing the patent. I used a non-infringing industry benchmark, WebMD,[5] to calculate a profit differential of 33%. See my Initial Report ¶78 through ¶80 (Ex. A). Unlike in *TWM Mfg. Co. Inc. v. Dura Corp,* which concluded that the royalty rate should be equal to this type of profit differential, I further analyzed the facts and circumstances of a hypothetical negotiation between Vitals and HealthGrades to conclude a much lower royalty rate than just the profit differential yielded from analytical approach.

21. I then reduced the prospective royalty rate derived from analytical method to account for co-visitors (see ¶86, Ex. A) which nearly cut in half the royalty rate yielded from the

---

[5] HealthGrades' describes WebMD in its December 31, 2009 10-K "as a well-established web platform which widely known as the most trafficked healthcare website on the internet today for general healthcare content." See Hall Appendix C Facts and Data Considered item 15.

**DAVID HALL STATEMENT - EXHIBIT C**

Case No. 1:11-cv-00520-RM-NYW Document 743-4 filed 02/04/13 USDC Colorado pg 8 of 24

analytical approach. I then cut the reduced prospective rate in half to reflect that "A

rationale negotiation would lead to a near split between a rate in low single digits and or

low rate and HealthGrades' starting point—either 16.5 % or 23% (or mid-point of

approximately 20%). This would reasonably yield a royalty rate of approximately 10%

prior to a full evaluation of the Georgia Pacific factors." See ¶89, Ex. A). This

negotiation split would reasonably include MDx's negotiation point that the starting point

based on the analytical method does not fully account for its unpatented features. See my

deposition 141:21-15; 142:8-16; 144:2-22; 180:22-24; and 221:21-22 (Ex. D) for my

testimony on reducing the royalty rate to account for unpatented features.

22. I then concluded with a comprehensive analysis of the all of the *Georgia Pacific* factors to

arrive at a 12% royalty rate (see ¶78 through ¶91 and Attachment 9, Ex. A).

**HealthGrades' Advertising Revenue As The Basis For The Royalty Base Is
Supported By HealthGrades' License Agreements.**

23. One of the reasons that I believe it is reasonable and appropriate to apply an adjusted rate

(adjusted lower to account for unpatented features) to Vitals' infringing advertising

revenue is that HealthGrades had established a history of applying a license rate to

advertising revenue. I referenced this point in ¶62 Ex. A ("structure of licenses") and

Attachment 6a. I also testified to this point at 142:11-16; 244:8-14 (Ex. D).

**My *Mor-Flo* Analysis Was Mischaracterized**

24. MDx's counsel's mischaracterizes my *Mor-Flo* analysis and ignores the fact that I also

performed a *Mor-Flo* analysis using MDx's damages expert's (Mr. Napper's) market

share analysis (see Napper report page 8, Ex. E). See my deposition: 8:11-10:14 and

303:7-17 (Ex. D) and also see Ex. A, Attachment 3a, Attachment 3a--Napper Market

Share, Attachments 4 and Attachment 4--Napper Market Share Data. Using Mr. Napper's

     **EXHIBIT C**

**DAVID HALL STATEMENT - EXHIBIT C**

market share analysis does not significantly change my lost profits damages and in fact, increases it slightly.

25. The following table from Napper's report was the basis for my Attachment 3a--Napper Market Share, Attachment 4--Napper Market Share Data, and Attachment 16, Ex. A).

26. Mr. Napper identified these companies as competitors and indicated his source's market share. See Ex. E page 8. In the first column, I note whether or not Vitals (pre-litigation), Mr. Neal, and I all agree with Mr. Napper's inclusion of these Website/ Companies in HealthGrades' market. 'All include' indicates that Vitals, Neal, Napper and I all agree that referenced Website/Company is in HealthGrades' market.

| Who Identified as Competitor | Website / Company | Market Share | | |
|---|---|---|---|---|
| | | Jul-10 | Jan-11 | Jul-11 |
| All include | **Healthgrades** | 36.7% | 40.3% | 51.5% |
| All include | **Vitals** | 15.5% | 18.4% | 17.3% |
| Vitals did not include (MDX 0012724-25, Ex. G) and Mr. Neal did not identify as competitor | **Wellness.com** | 13.4% | 14.8% | 16.8% |
| All include | **UCompareHealthCare** | 10.0% | 10.1% | 13.4% |
| Vitals did not include (Ex. G) and Mr. Neal testified **NOT** a competitor, p. 93 (Ex. F) | **Healthcare.com** | 8.2% | 3.3% | 0.0% |
| All include | **Angie's List** | 7.4% | 5.4% | 0.0% |
| All include | **Rate MDs** | 4.9% | 3.2% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctor.com** | 1.1% | 0.8% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Physician Reports** | 0.7% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal "not familiar with Vimo" p. 85 (Ex. F) | **Vimo** | 0.6% | 0.6% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal recalls as a competitor, p.88 (Ex. F) | **Dr Score** | 0.5% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctors Dig** | 0.5% | 0.5% | 0.0% |
| Hall includes; Vitals did not include (Ex. G); and Mr. Neal did not identify as competitor | **ZocDoc** | 0.2% | 0.4% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Check MD** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Suggest a Doctor** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex G) and Mr. Neal did not identify as competitor | **Doctor Directory** | 0.1% | 0.0% | 0.0% |

**EXHIBIT C**

**DAVID HALL STATEMENT - EXHIBIT C**

27. My thorough analysis of the market for my *Mor-Flo* analysis was mischaracterized by MDx's counsel in its Motion.

**MDx Counsel Overstates My reliance On Andrea Pearson**

28. Ms. Pearson was one of three Health Grades' personnel sources that I relied upon and I identified her as an information source in my reports' Appendix C—Information and Data considered. MDx overstates my reliance on Ms. Pearson and ignores my many other bases for his opinions and omits many of my references to the two other Health Grades' personnel (Allen Dodge and John Neal) that I relied upon and identified in my Initial Report (Ex. A) and in my deposition.

29. In section IV.C. and V.C. of the Motion, MDx's counsel cites a number of instances where I mentioned Andrea Pearson in my testimony. In every one of these instances, I also mentioned Allen Dodge. There is one instance when I referenced both Allen Dodge and John Neal.

30. The information supplied by HealthGrades' witnesses and relied upon by me in preparing my report all came from Mr. Dodge and Mr. Neal. Ms. Pearson corroborated information provided by Mr. Dodge and Mr. Neal, but did not provide any new information that was relied upon by my in preparing my report. In addition, the only occasion that I spoke with Ms. Pearson with no other HealthGrades personnel involved was after I submitted my reports (and therefore, all of my opinions). This was to ask additional questions about HealthGrades' license agreements that MDx's expert (Napper) had cited as his basis for his damages. I also spoke with John Neal and Allen Dodge about these same license agreements after reading Napper's report.

---

**EXHIBIT C**

**DAVID HALL STATEMENT - EXHIBIT C**

FURTHER THE AFFIANT SAYETH NOT.

_____
David A. Hall

The foregoing Affidavit was subscribed and sworn to before me this 26th Day of November, 2012, by David A. Hall.

WITNESS my hand and official seal.

My commission expires: May 3, 2014

```
DEBRA L. MENAUGH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20044002420
MY COMMISSION EXPIRES MAY 3, 2014
```

[SEAL]                          _____
                                      Notary Public

**EXHIBIT C**

**DAVID HALL STATEMENT - EXHIBIT C**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-PAB-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

## HEALTH GRADES, INC.'S ERRATA SUBMISSION TO CORRECT MISTAKES IN DOCKET # 411 AND DOCKET # 411-3

---

Plaintiff and Counterclaim Defendant Health Grades, Inc. ("Health Grades") hereby files

this errata submission to correct mistakes in its Opposition to MDx Medical, Inc.'s Motion to

Exclude Expert Testimony of Mr. David Hall, filed November 27, 2012 ("Opposition") [Dkt.

411], and in Exhibit C to the Opposition [Dkt. 411-3].

### Corrections to pages 12 and 16 of Docket # 411:

On page 12 of the Opposition the following bullet point paragraph appears:

- Hall Report Attachment 16 (graph of market share for the two companies
  that use, or for Hall's purpose are assumed to use, the '060 patent)

Attachment 16 is not an attachment to the Hall Report, it is Exhibit 79 to the Hall
Deposition, and should have been referenced as such and included as a stand-alone exhibit to the
Opposition. Thus, the bullet point paragraph should read:

- Ex. H, Attachment 16 (graph of market share for the two companies that use,
  or for Hall's purpose are assumed to use, the '060 patent) (Hall Depo. Exhibit 79)

1

**DAVID HALL STATEMENT - EXHIBIT C**

On page 16 of the Opposition the following citations appear:

*See* Ex. A, Attachments 3, 3a and Attachment "3a -- Napper Market Share Data," and Hall Depo. 8:11-10:14 and 303:7-17, Ex. D.  *See* also Hall Affidavit, Ex. C, ¶¶ 24-27.

Attachment "3a – Napper Market Share Data" is not an attachment to the Hall Report, it is Exhibit 76 to the Hall Deposition, and should have been referenced as such and included as a stand-alone exhibit to the Opposition.  Thus, the citations should read:

*See* Ex. A, Attachments 3, 3a; Ex. D, Hall Depo. 8:11-10:14 and 303:7-17; Ex. I, Attachment "3a -- Napper Market Share Data" (Hall Depo. Exhibit 76).  S*ee also* Hall Affidavit, Ex. C, ¶¶ 24-27.

Attached hereto are corrected versions of pages 12 and 16 of the Opposition that replace pages 12 and 16 of the Opposition as filed at Docket # 411, and the stand-alone Exhibits H and I referenced in the corrections.

### **Corrections to ¶ 24 and ¶ 25 of Exhibit C to the Opposition, Docket # 411-3**

In paragraph 24 of Exhibit C to the Opposition the following citations appear:

See my deposition: 8:11-10:14 and 303:7-17 (Ex. D) and also see Ex. A, Attachment 3a, Attachment 3a--Napper Market Share, Attachments 4 and Attachment 4--Napper Market Share Data.

As discussed above in the correction to page 16 of the Opposition, Attachment 3a – Napper Market Share Data, is not an attachment to the Hall Report, it is Exhibit 76 to the Hall Deposition, and should have been referenced as such and included as a stand-alone exhibit to the Opposition.  Similarly, Attachment 4--Napper Market Share Data, is not an attachment to the Hall Report, it is Exhibit 77 to the Hall Deposition, and should have been referenced as such and

**DAVID HALL STATEMENT - EXHIBIT C**

Case 1:11-cv-00520-PAB-BNB   Document 433   Filed 12/05/12   USDC Colorado   Page 3 of 5

included as a stand-alone exhibit to Exhibit C to the Opposition.  Thus, the citations in paragraph 24 of Exhibit C to the Opposition should read:

See my deposition: 8:11-10:14 and 303:7-17 (Ex. D) and also see Ex. A, Attachments 3a, 4; Ex. I to Opposition, Attachment 3a--Napper Market Share (Hall Depo. Exhibit 76); Ex. J hereto, Attachment 4--Napper Market Share Data (Hall Depo. Exhibit 77).

In paragraph 25 of Exhibit C to the Opposition the following language appears:

The following table from Napper's report was the basis for my Attachment 3a--Napper Market Share, Attachment 4--Napper Market Share Data, and Attachment 16, Ex. A).

As discussed above, Attachment 3a--Napper Market Share, Attachment 4--Napper Market Share Data, and Attachment 16, are not attachments to the Hall Report, they are Exhibits to the Hall Deposition, and should have been referenced as such and included as stand-alone exhibits.  Thus, the citations in paragraph 25 of Exhibit C to the Opposition should read:

The following table from Napper's report was the basis for my Attachment 3a--Napper Market Share, Ex. I to the Opposition (Hall Depo. Exhibit 76); Attachment 4--Napper Market Share Data, Ex. J hereto (Hall Depo. Exhibit 77), and; Attachment 16, Ex. H to the Opposition (Hall Depo. Exhibit 79).

Attached hereto are corrected versions of pages 7 and 8 of Exhibit C to the Opposition which contain the corrected paragraphs 24 and 25, which replace pages 7 and 8 of Exhibit C to the Opposition as filed at Docket # 411-3, and the stand-alone Exhibit J referenced in the corrections.

2003962497_1.doc

**DAVID HALL STATEMENT - EXHIBIT C**

Respectfully submitted this 5th day of December, 2012.

ROTHGERBER JOHNSON & LYONS LLP

*s/ Jesús M. Vázquez*
Kris J. Kostolansky, Esq.
Jesús M. Vázquez, Jr., Esq.
Gregory B. Kanan, Esq.
1200 17th Street, Suite 3000
Denver, Colorado  80202
Tel:  (303) 623-9000
Fax:  (303) 623-9222
Email:  kkosto@rothgerber.com
          jvazquez@rothgerber.com
          gkanan@rothgerber.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*Health Grades, Inc.*

**DAVID HALL STATEMENT - EXHIBIT C**

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on December 5, 2012, I electronically filed the foregoing **HEALTH GRADES, INC.'S ERRATA SUBMISSION TO CORRECT MISTAKES IN DOCKET # 411 AND DOCKET # 411-3** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott David Stimpson
David Chunyi Lee
Scott B. Murray
Sills Cummis & Gross P.C. – New York
30 Rockefeller Plaza
New York, NY 10112
Email: sstimpson@sillscummis.com
Email: mrosenberg@sillscummis.com
Email: dlee@sillscummis.com
Email: smurray@sillscummis.com

Terence M. Ridley
Wheeler Trigg O'Donnell, LLP
370 17th Street, Suite 4500
Denver, CO 80202-5647
Email: ridley@wtotrial.com

                                *s/ Jesús M. Vázquez*
                                Gregory B. Kanan, Esq.
                                Kris J. Kostolansky, Esq.
                                Jesús M. Vázquez, Jr., Esq.
                                Rothgerber Johnson & Lyons, LLP
                                1200 17th Street, Suite 3000
                                Denver, Colorado 80202-5855
                                Tel:    (303) 623-9000
                                Facsimile: (303) 623-9222
                                Email: gkanan@rothgerber.com
                                        kkostolansky@rothgerber.com
                                      jvazquez@rothgerber.com

                                *Attorneys for Plaintiff/Counterclaim Defendant*
                                *Health Grades, Inc.*

5

**DAVID HALL STATEMENT - EXHIBIT C**

analytical approach. I then cut the reduced prospective rate in half to reflect that "A rationale negotiation would lead to a near split between a rate in low single digits and or low rate and HealthGrades' starting point—either 16.5 % or 23% (or mid-point of approximately 20%). This would reasonably yield a royalty rate of approximately 10% prior to a full evaluation of the Georgia Pacific factors." See ¶89, Ex. A). This negotiation split would reasonably include MDx's negotiation point that the starting point based on the analytical method does not fully account for its unpatented features. See my deposition 141:21-15; 142:8-16; 144:2-22; 180:22-24; and 221:21-22 (Ex. D) for my testimony on reducing the royalty rate to account for unpatented features.

22. **I** then concluded with a comprehensive analysis of the all of the *Georgia Pacific* factors to arrive at a 12% royalty rate (see ¶78 through ¶91 and Attachment 9, Ex. A).

   **HealthGrades' Advertising Revenue As The Basis For The Royalty Base Is Supported By HealthGrades' License Agreements.**

23. One of the reasons that I believe it is reasonable and appropriate to apply an adjusted rate (adjusted lower to account for unpatented features) to Vitals' infringing advertising revenue is that HealthGrades had established a history of applying a license rate to advertising revenue. I referenced this point in ¶62 Ex. A ("structure of licenses") and Attachment 6a. I also testified to this point at 142:11-16; 244:8-14 (Ex. D). **My *Mor-Flo* Analysis Was Mischaracterized**

24. MDx's counsel's mischaracterizes my *Mor-Flo* analysis and ignores the fact that I also performed a *Mor-Flo* analysis using MDx's damages expert's (Mr. Napper's) market share analysis (see Napper report page 8, Ex. E). See my deposition: 8:11-10:14 and 303:7-17 (Ex. D) and also see Ex. A, Attachments 3a, 4; Ex. I to Opposition, Attachment 3a--Napper Market Share (Hall Depo. Exhibit 76); Ex. J hereto, Attachment 4--Napper Market Share Data (Hall Depo. Exhibit 77). Using Mr. Napper's

**DAVID HALL STATEMENT - EXHIBIT C**

market share analysis does not significantly change my lost profits damages and in fact, increases

it slightly.

25. The following table from Napper's report was the basis for my Attachment 3a--Napper Market Share, Ex. I to the Opposition (Hall Depo. Exhibit 76); Attachment 4--Napper Market Share Data, Ex. J hereto (Hall Depo. Exhibit 77), and; Attachment 16, Ex. H to the Opposition (Hall Depo. Exhibit 79).

26. Mr. Napper identified these companies as competitors and indicated his source's market share. See Ex. E page 8. In the first column, I note whether or not Vitals (pre-litigation), Mr. Neal, and I all agree with Mr. Napper's inclusion of these Website/ Companies in HealthGrades' market. 'All include' indicates that Vitals, Neal, Napper and I all agree that referenced Website/Company is in HealthGrades' market.

| Who Identified as Competitor | Website / Company | Market Share | | |
|---|---|---|---|---|
| | | Jul-10 | Jan-11 | Jul-11 |
| All include | **Healthgrad es** | 36.7% | 40.3% | 51.5% |
| All include | **Vitals** | **15.5%** | 18.4% | 17.3% |
| Vitals did not include (MDX 0012724-25, Ex. G) and Mr. Neal did not identify as competitor | **Wellness.com** | 13.4% | 14.8% | 16.8% |
| All include | **UCompareHealthCare** | **10.0%** | 10.1% | 13.4% |
| Vitals did not include (Ex. G) and Mr. Neal testified ***NOT*** a competitor, p. 93 (Ex. F) | **Healthcare.com** | 8.2% | 3.3% | 0.0% |
| All include | **Angie's List** | 7.4% | 5.4% | 0.0% |
| All include | **Rate MDs** | 4.9% | 3.2% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctor.com** | 1.1% | 0.8% | 0.5% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Physician Reports** | 0.7% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal "not familiar with Vimo" p. 85 (Ex. F) | Vimo | 0.6% | 0.6% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal recalls as a competitor, p.88 (Ex. F) | **Dr Score** | 0.5% | 0.3% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Doctors Dig** | 0.5% | 0.5% | 0.0% |
| Hall includes; Vitals did not include (Ex. G); and Mr. Neal did not identify as competitor | **ZocDoc** | 0.2% | 0.4% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Check MD** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex. G) and Mr. Neal did not identify as competitor | **Suggest a Doctor** | 0.1% | 0.0% | 0.0% |
| Vitals did not include (Ex G) and Mr. Neal did not identify as competitor | **Doctor Directory** | **0.1%** | 0.0% | 0.0% |

**EXHIBIT C**

2003963504_1.doc

**DAVID HALL STATEMENT - EXHIBIT C**

- Hall Report Attachment 7a (See Vitals' projected advertising revue which comes from its website which Hall rightly assumes is infringing the '060 patent);

- Hall Report Attachment 9 (See *Georgia Pacific* factors #8 and #11)

- Hall Report Attachment 11 (graph of Vitals' advertising revenue over time showing increased demand for its website which is assumed to be infringing '060 patent)

- Hall Report Attachment 12 (graph of HG's advertising revenue over time showing increased demand for its website which uses '060 patent.)

- Ex. H, Attachment 16 (graph of market share for the two companies that use, or for Hall's purpose are assumed to use, the '060 patent) (Hall Depo. Exhibit 79)

- See also Hall's deposition where he responds to questions regarding demand: 56:2-57:21; 58:16-59:4; 79:8-19; 102:3-103:24; 104:6-105:21; 109:8-25; 110:8-111:25; 122:5-123:10; 131:13-133:19. (Exhibit D)

MDx also contends incorrectly that "Hall's basis for concluding there was demand starts with the revenues of both MDx and Health Grades." Motion at p. 5. This is not true and mischaracterizes Hall's analysis. *See* Hall Affidavit, attached hereto as Exhibit C, ¶¶ 4-18. Use of an Affidavit by an expert witness subject to a *Daubert* motion is proper. *See* Order, Case 1:10-cv-01899-RBJ-KLM, Doc. 162, August 15, 2012.

MDx also complains that the revenue data Hall used is "exaggerated, unconnected to the patented invention, and speculative." Motion at p. 5. However the advertising revenue that Hall analyzed for demand is directly connected to the patented features in that both Vitals and Health Grades use the patented features on their websites to attract visitors, and then earn advertising revenue based on those visitors. Hall Affidavit, attached hereto as Exhibit C, ¶¶ 4-18.

MDx complains further that "Hall made no effort to capture revenue derived from the practice of the patent claims." Motion at p. 5. ***The Panduit demand test, however,***

2003962278_1.doc

**DAVID HALL STATEMENT - EXHIBIT C**

Hall did not ignore John Neal's testimony on the competition. He did note, however, that Mr. Neal stated that he would answer MDx's counsel's questions from a layman's perspective and that he was not a patent attorney and it would be a judgment for counsel to make. He also noted that Mr. Neal appeared to be answering questions about *infringing* competitors (or competitors "that embody or employ a claim in the patent-in-suit"—see deposition excerpt below). Therefore, Hall took reasonable additional steps and used additional sources of information to identify acceptable non-infringing substitutes.

> Q.   So what we're going to talk about now is products and services of other companies that compete with the Health Grades products and services **that embody or employ a claim in the patent-in-suit, okay**?
>
> A.   Okay. Got it.
>
> Q.   So, let's identify them. Vitals.com?
>
> A.   Okay.
>
> Q.   Ucompare.com. Correct?
>
> A.   **I have to tell you from a layman's standpoint, I would say absolutely I am not a patent attorney. So that's a judgment that counsel would have to make.**
>
> Q   But let's just do the best we can here because you're identified for these topics.
>
> A   Right.

(John Neal depo, 84:15 – 85:5, Ex. F)(emphasis added).

Hall stated his criteria both in his report and at his deposition how he executed his *Mor-Flo* analysis to determine market share. *See* Hall Report ¶¶34-38, Ex. A and Hall Depo. 185:6-188:22, Ex. D. Further, Hall also ran his *Mor-Flo* analysis based on Vitals' expert's (Napper) market share conclusion, in addition to his original analysis, that yielded no substantive change to the resulting damages and is prepared to present both to the court. *See* Ex. A, Attachments 3, 3a; Ex. D, Hall Depo. 8:11-10:14 and 303:7-17; Ex. I, Attachment "3a -- Napper Market Share Data" (Hall Depo. Exhibit 76); s*ee also* Hall Affidavit, Ex. C, ¶¶ 24-27. Hall's analysis of the

**DAVID HALL STATEMENT - EXHIBIT C**

**Attachment 3a--Napper Market Share Data**

## Market Share Analysis

### July 2010

|  | A | B | C = A, less Vitals | D | E = D x 16,194 | F |
|---|---|---|---|---|---|---|
|  | Total Unique Visitors (000) | % of total | Total Unique Visitors without Vitals (000) | % of total | Total Unique Visitors with Vitals visitors spread to market (000) | % of total |
| HEALTHGRADES.COM | 6,658 | 36.7% | 6,658 | 43.4% | 7,880 | 43% |
| VITALS.COM | 2,812 | 15.5% |  | 0.0% | 0 | 0% |
| All Other | 8,672 | 47.8% | 8,672 | 56.6% | 10,263 | 57% |
|  | 18,143 | 100.0% | 15,331 | 100% | 18,143 | 100% |

### January 2011

|  | A | B | C = A, less Vitals | D | E = D x 18,528 | F |
|---|---|---|---|---|---|---|
|  | Total Unique Visitors (000) | % of total | Total Unique Visitors without Vitals (000) | % of total | Total Unique Visitors with Vitals visitors spread to market (000) | % of total |
| HEALTHGRADES.COM | 7,986 | 40.3% | 7,986 | 49.4% | 9,787 | 49% |
| VITALS.COM | 3,646 | 18.4% |  | 0.0% | 0 | 0% |
| All Other | 8,184 | 41.3% | 8,184 | 50.6% | 10,030 | 51% |
|  | 19,817 | 100.0% | 16,171 | 100% | 19,817 | 100% |

### July 2011

|  | A | B | C = A, less Vitals | D | E = D x 13,750 | F |
|---|---|---|---|---|---|---|
|  | Total Monthly Searches (000) | % of total | Total Monthly Searches without Vitals (000) | % of total | Total Monthly Searches with Vitals visitors spread to market (000) | % of total |
| HEALTHGRADES.COM | 8,853 | 51.5% | 8,853 | 62.3% | 10,705 | 62% |
| VITALS.COM | 2,974 | 17.3% |  | 0.0% | 0 | 0% |
| All Other | 5,363 | 31.2% | 5,363 | 37.7% | 6,485 | 38% |
|  | 17,190 | 100.0% | 14,216 | 100% | 17,190 | 100% |

Sources:
  Expert Report of Brian W. Napper, p. 8; MDX0007062-7072



EXHIBIT I

**DAVID HALL STATEMENT - EXHIBIT C**

**Attachment 3a--Napper Market Share Data**

## Market Share Analysis

### July 2010

| | A | B | C = A, less Vitals | D | E = D x 16,194 | F |
|---|---|---|---|---|---|---|
| | Total Unique Visitors (000) | % of total | Total Unique Visitors without Vitals (000) | % of total | Total Unique Visitors with Vitals visitors spread to market (000) | % of total |
| HEALTHGRADES.COM | 6,658 | 36.7% | 6,658 | 43.4% | 7,880 | 43% |
| VITALS.COM | 2,812 | 15.5% | | 0.0% | 0 | 0% |
| All Other | 8,672 | 47.8% | 8,672 | 56.6% | 10,263 | 57% |
| | 18,143 | 100.0% | 15,331 | 100% | 18,143 | 100% |

### January 2011

| | A | B | C = A, less Vitals | D | E = D x 18,528 | F |
|---|---|---|---|---|---|---|
| | Total Unique Visitors (000) | % of total | Total Unique Visitors without Vitals (000) | % of total | Total Unique Visitors with Vitals visitors spread to market (000) | % of total |
| HEALTHGRADES.COM | 7,986 | 40.3% | 7,986 | 49.4% | 9,787 | 49% |
| VITALS.COM | 3,646 | 18.4% | | 0.0% | 0 | 0% |
| All Other | 8,184 | 41.3% | 8,184 | 50.6% | 10,030 | 51% |
| | 19,817 | 100.0% | 16,171 | 100% | 19,817 | 100% |

### July 2011

| | A | B | C = A, less Vitals | D | E = D x 13,750 | F |
|---|---|---|---|---|---|---|
| | Total Monthly Searches (000) | % of total | Total Monthly Searches without Vitals (000) | % of total | Total Monthly Searches with Vitals visitors spread to market (000) | % of total |
| HEALTHGRADES.COM | 8,853 | 51.5% | 8,853 | 62.3% | 10,705 | 62% |
| VITALS.COM | 2,974 | 17.3% | | 0.0% | 0 | 0% |
| All Other | 5,363 | 31.2% | 5,363 | 37.7% | 6,485 | 38% |
| | 17,190 | 100.0% | 14,216 | 100% | 17,190 | 100% |

Sources:
  Expert Report of Brian W. Napper, p. 8; MDX0007062-7072



EXHIBIT
76
Hall   10/4/12 PM

EXHIBIT I

**DAVID HALL STATEMENT - EXHIBIT C**

**Attachment 4--Napper Market Share Data**

**HealthGrades Lost Profits and Reasonable Royalty Damages**

|  |  |  | July 2010 to December 2010 | 2011 | January 2012 to May 2012 | Total |
|---|---|---|---|---|---|---|
| *A* |  | REDACTED |  |  |  |  |
| *B* |  | REDACTED |  |  |  |  |
| *C = A x (1-B)* |  | HealthGrades Revenue Subject to Market Share Analysis | ▮ ██ | ▮ ██ | ▮ ██ | ▮ ██ |
| *D* |  | HealthGrades Market Share without Vitals (using Napper's figures) | 43.0% | 62.0% | 62.0% |  |
| *E = C x D* |  | HealthGrades Revenue Subject to Lost Profits Analysis | ▮ ██ | ▮ ██ | ▮ ██ | ▮ ██ |
| *F* |  | HealthGrades Incremental Profit Rate | 70% | 78% | 78% |  |
| *G = E × F* |  | **HealthGrades Lost Profits** | $ 208,712 | $ 958,794 | $ 441,720 | $ 1,609,226 |
| *H = A - E* |  | REDACTED |  |  |  |  |
| *I* |  | Reasonable Royalty Rate | 12% | 12% | 12% |  |
| *J = H x I* |  | **Reasonable Royalty on Infringing Revenue not in Lost Profits** | $ 139,394 | $ 359,773 | $ 175,616 | $ 674,783 |
| *K = G + J* |  | **Total Lost Profits Plus Reasonable Royalty** | $ 348,106 | $ 1,318,567 | $ 617,336 | $ 2,284,009 |
| *L = A x I* |  | REDACTED |  |  |  |  |

<u>Note:</u>
(1) Source:  Monthly Detailed Income Statements, MDX 0104672 to MDX 0104736.  See **Attachment 2a**.

**EXHIBIT J**



EXHIBIT
77  Hall
10/4/12  Ken

**DAVID HALL STATEMENT - EXHIBIT C**

Attachment 16



## Market Share Analysis

Sources:  September 17, 2012 Expert Report of Brian W. Napper, page 8

Confidential – Attorneys Only

EXHIBIT H

**DAVID HALL STATEMENT - EXHIBIT C**