# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-RM-BNB

HEALTH GRADES, INC.,

    Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,

    Defendant.

**MDX MEDICAL, INC.'S RESPONSE TO HEALTH GRADES, INC.'S PROPOSED SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. #369]**

    Defendant and Counterclaim Plaintiff MDx Medical, Inc. ("MDx"), by and through its undersigned counsel, respectfully submits its Response To Health Grades, Inc. ("Health Grades")'s Proposed Supplemental Brief In Support Of Its Motion For Partial Summary Judgment ["HG's Supplement"; Doc. #673-1].   While Health Grades has not been granted leave to supplement, in view of the scheduled February 13, 2014 hearing on the underlying motion ("HG's Motion", Doc. #369], MDx submits this Proposed Response in the event leave is granted.

**I.    SUMMARY OF THE ARGUMENT**

    Health Grades has, ***twice***, admitted that it commercialized the '060 patent in the prior art, and thus there is outright anticipation.  *See* MDx's Opposition to Health Grades' Motion for Partial Summary Judgment ("MDx's Opp."), dated Nov. 26, 2012, Dkt. #407, at 12-14.  Yet, Health Grades now claims that this ***anticipatory*** prior art was not "material" to the prosecution, and no examiner would have used it to reject the claims.  Health Grades reaches this conclusion

because, in connection with another patent application with different claims (Health Grades' patent application 13/551,471, hereinafter the "'471 application"), some of this art was submitted and the patent examiner allowed those different claims.  HG's Supplement, at 2-6.  Anticipatory prior art, however, is always material; as is prior art that renders claims obvious.

The basis for Health Grades' Supplement is nothing more than an elaborate maneuver, created for the sole purpose of making this argument to the Court and the jury, not to satisfy its duty of candor to the Patent Office.  While Health Grades would like this Court to believe that the patent examiner of the '471 application was well-aware of the critical prior art, that is far from the truth.  Indeed, Health Grades deliberately buried the patent examiner in thousands of pages of irrelevant materials across six (6) separate submissions to the patent examiner – including materials neither Health Grades' prosecution counsel, nor Health Grades' technical expert, in all their years of experience, could ever remember being submitted during the prosecution of any other patent application.  That these thousands of pages of burying material (e.g., motions to restrict, to compel, to bifurcate, on infringement issues, for extensions of time, for scheduling order changes, for oral arguments, to strike materials, etc.) were completely irrelevant to the prosecution of '471 application is evidenced by the fact that Health Grades never gave them to its technical expert to consider in his validity analysis, nor had Health Grades' expert ever considered such documents in all his prior validity analyses in any case, ever.

Apparently nervous that this patent examiner might be abnormally diligent and actually find the best prior art, Health Grades erected other road blocks to assure the patent examiner would remain in the dark such as, (1) ***withholding*** important pieces of the prior art, including deposition testimonies relied on by MDx and its expert; (2) for those pieces of the prior art

Health Grades did submit, *scattering* them over different disclosure statements (Health Grades submitted *six* separate disclosure statements in total to date, and Health Grades' patent prosecution attorney indicated more are to come), and among the thousands of pages of burying material; and (3) identifying the pieces of the prior art on the disclosure statements with docket and exhibit numbers *different* from those used in the MDx invalidity analyses (so even if the examiner found the analyses, she could never find the supporting pieces of the prior art).

All of Health Grades' concealment efforts were in direct violation of multiple Patent Examining Procedures found in the Patent Office's Manual of Patent Examining Procedure – a Manual well known to all patent attorneys. Put simply, the '471 application shows nothing more than Health Grades' continuing pattern of fraud on this governmental agency.

## II.     RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

71.     Admitted.

72.     Admitted.

73.     Admitted that one of the examiners was the same, but otherwise denied. The primary examiner was different in these two cases. The primary examiner of the application leading to the '060 patent was Gerald J. O'Connor. Exhibit 1 to HG's Motion, Dkt. #369-1, cover page. However, the primary examiners of the '471 application are Sheetal R. Rangrej and John A. Pauls. *See* Office Action, dated Apr. 5, 2013, p. 25, attached hereto as Exhibit V; and Notice of Allowance, Nov. 22, 2013, p. 10, attached hereto as Exhibit W.

74.     Denied. Buried material cannot fairly be said to be disclosed; and Health Grades withheld much about the state of the art, including certain deposition testimonies.

3

75. Admitted only that the patent examiner initialed the IDS statements as "considered" (as is standard operating practice for all patent applications), but otherwise denied. MDx specifically denies that the patent examiner was given any fair opportunity to truly "consider" the art, or that she did "consider" or could have "considered" the invalidity positions of MDx. Also, the patent examiner, Examiner Nguyen, did not "consider" the items submitted in connection with the petitions to expunge, nor was she able to consider anything not submitted to her. Indeed, even Health Grades' experienced prosecution counsel admitted he has "no idea" what it means when a patent examiner says she "considered" references as it would depend on her specific practices. Portions of Timothy Scull's Deposition Transcript, dated Jan. 3, 2014, attached hereto as Exhibit X, at 82:2-9.

76. Denied. The people who reviewed the Petition to Expunge (people other than the examiners assigned to the application, in this case, Greg Vidovich, Director of Patent Technology Center 3600) only determined if these materials alone, i.e., without the other pieces to the prior art puzzle that were buried and scattered throughout the prosecution, and without the pieces to the prior art that Health Grades did not submit at all to the Patent Office, were material to the examination of the '471 application. *See* Response to Petition to Expunge, dated Nov. 13, 2013, Exhibit AA to HG's Supplement, Doc. #673-8.

77. Admitted.

78. Admitted only that the examiner initialed the IDS statement.

79. Admitted.

80. Admitted that the claims are of different scope; denied that Health Grades has accurately represented the differences.

81.     Admitted that the Patent Office issued an obviousness-type double patenting rejection (confirming that the claims are in fact of different scope).

82.     Denied, this is a legal conclusion not an alleged fact; and in any event the claims are different and use different language so different things can meet these different claims.

### III.     SUPPLEMENTAL STATEMENT OF DISPUTED (AND UNDISPUTED) FACTS IGNORED BY HEALTH GRADES

**Guidance of the MPEP and the Health Grades Plan**

124.    The Manual of Patent Examining Procedures ("MPEP") is a reference work on the practices and procedures regarding the prosecution of patent applications before the U.S. Patent and Trademark Office ("PTO").  Foreword of the MPEP, dated Aug. 2005, attached hereto as Exhibit Y.

125.    The MPEP expressly states that applicants should "submit information promptly." MPEP §2004(12), attached hereto as Exhibit Z (highlighting added).

126.    The MPEP also expressly states that it is "desirable to avoid the submission of long lists of prior art if it can be avoided." *Id.*, at §2004(13) (highlighting added).

127.    The MPEP also instructs that applicants should eliminate clearly irrelevant and marginally pertinent cumulative information.  *Id.* (highlighting added).

128.    The MPEP also states that, if long lists of references are submitted, applicants should highlight documents specifically brought to their attention to be of significance.   *Id.*

129.    Health Grades' patent prosecution counsel is highly experienced with patent prosecution, and so is familiar with the MPEP, as are at least some members of Health Grades' litigation team.  *See* Exhibit X, at 5:17-6:10 (Mr. Scull confirming he his practice consists of "quite a bit of patent prosecution." ); and *id.*, at 43:5-19 (Mr. Scull acknowledging that under the

5

MPEP he is under a duty to disclose relevant material to the PTO); *see also*, Bio of Kirstin L. Stoll-DeBell from the merchantgould.com website, printed February 10, 2014, attached hereto as Exhibit AA (highlighting added).

130. Health Grades litigation counsel was involved with the prosecution of the '471 application and on information and belief was deeply involved in orchestrating the events that unfolded in connection with the '471 application. *See, e.g.*, Exhibit X, at 10:16-11:3; 12:21-13:20; 25:8-26:9; 31:11-32:8; 32:17-33:6; and 87:9-90:5.

131. On information and belief, the prosecution of the '471 application was not a legitimate effort to be candid with the Patent Office, but instead was primarily motivated by an effort to argue to the Court and the jury that the critical prior art was considered by the patent examiner, while in fact hiding the actual art and ensuring that the patent examiner could never find the information necessary to issue a rejection. *See, e.g.*, Exhibit X, at 31:25-32:8; and 91:16-92:21 (refusing to answer on privilege grounds whether Health Grades' litigation counsel and prosecution counsel set out to create an argument to make to the jury).

**The Health Grades "Disclosures"**

**Timing**

132. While Health Grades and its counsel knew of the MDx invalidity contentions long ago, in direct contravention of the MPEP §2004(12), Health Grades did not submit any of the prior art relied on by MDx until more than a year after it filed the '471 application, and only three months before the Notice of Allowance. *Compare* MDx's Fourth Supplemental Invalidity Contentions, dated Sept. 17, 2012, Doc. #294-2, *with* Corrected Exhibit Z to HG's Supplement, Doc. #738-1 (MDx's fourth supplemental invalidity contentions were submitted on September

6

12, 2012, but Health Grades waited to submit its first Information Disclosure Statement until August 23, 2013).

### More Than 11,000 Pages Dumped on the Examiner

133.     Health Grades and its counsel deliberately (and successfully) buried the relevant prior art among more than 11,000 pages of irrelevant documents, and intentionally scattered the pieces of the prior art puzzle throughout six information disclosure statements and 2 petitions to expunge, to ensure that the examiner could never have a grasp on the prior art in order to use it in a rejection.  *See* the Information Disclosure Statements and Petitions to Expunge submitted by Health Grades in connection with the '471 application, attached hereto as Exhibit BB.

134.     Health Grades hid the critical prior art among thousands of pages of irrelevant documents like briefing and exhibits relating to motions on infringement, to bifurcate, to compel, for extensions, requests for oral argument, motions for scheduling changes, motions to redact documents, motions to strike, requests for discovery, the complaint, and many other irrelevant materials.  Exhibit BB (searchable and highlighting added to show just some examples of the irrelevant materials submitted; many others are also irrelevant).

135.     Contrary to the MPEP §2004(13), and while Health Grades highlighted some of the references for the Court in connection with its Supplemental Brief (*see* Exhibit Z to HG's Supplement, Doc. #738-1), it did not highlight any of them for the patent examiner.

136.     In his nearly two-decades of prosecution experience, and thousands of patent applications which he has touched, Health Grades' prosecution counsel had never before submitted such obviously irrelevant documents and had no legitimate explanation as to why any of these documents were submitted.  Exhibit X, at 44-46 (infringement information); 50 (motions

to compel); 56-58 (motions to restrict); 58-59 (motions for extension of time); pages 59-60 (motions to modify scheduling orders); 68-69 (motions for summary judgment of willfulness); 69-71 (motion papers relating to bifurcation of issues for trial); 71-72 (requests for discovery, without any responses).

137. In all his experience, Health Grades' prosecution counsel could remember for sure only one of the thousands of applications he touched that submitted so much paper. Exhibit X, at 144:23-145:8.

138. Even Health Grades' prosecution counsel could not be bothered with reading so many documents. *Id.* at 147:19-25.

139. Health Grades' technical expert, who has "a lot of experience . . . analyzing validity issues," obviously was also baffled as to what legitimate reason Health Grades could have had for dumping these many thousands of documents on the overwhelmed patent examiner. Portions of Deposition Transcript of Dr. Philip Greenspun, dated Jan. 6, 2014, attached hereto as Exhibit CC, at 79:14-80:18 (examiner would not need to see motions to compel, Dr. Greenspun has never used them before in invalidity analyses, and no one has asked that he consider them for this case); 80:19-82:3 (same for motion to bifurcate); 82:4-83:10 (same for motions for extension); *see also* 90:16-95:1 and 98:1-12 (did not know a case with documents submitted like this).

### The Cooper Report

140. One of the most important references was the expert report of MDx's technical expert, Dr. Cooper ("the Cooper Report"). Exhibit U to MDx's Opp., Doc. #407-14.

8

141. The Cooper Report shows how the Health Grades prior art is anticipatory, and renders the claims obvious. *Id.*, at 10-36 and 40.

142. Health Grades knew, from this litigation, that the Cooper Report and all the cited prior art was particularly relevant to the validity analyses. *See* Exhibit U to MDx's Opp. and MDx's Fourth Supplemental Invalidity Contentions, Doc. #294-2.

143. Health Grades buried the Cooper Report, submitting it at the bottom of a page toward the end of one of its disclosures (reference 193 of 233, by MDx's count), and nothing in any of Health Grades' disclosure statements highlighted it for the patent examiner. Exhibit BB, at Information Disclosure Statement of Aug. 23, 2013, page 9 of 11 of the Statement (and page 10 of 26 of Exhibit BB).

144. In order to understand the Cooper Report, assuming the patent examiner was diligent enough to have found it first, the patent examiner must have the exhibits and deposition testimonies referenced. Exhibit U to MDx's Opp., at 10-36.

145. Neither Health Grades nor its counsel ever gave the patent examiner the Cooper Report accompanied by its exhibits and transcripts; and in fact, Health Grades intentionally prevented the patent examiner from reviewing the exhibits by separating them far from the Cooper Report and burying them; by withholding the central Drucker Report from the patent examiner until nearly a month after the Cooper Report was submitted; by scattering the few deposition transcript portions it did submit; and by failing to disclose other important deposition testimonies. *See* Exhibit BB, generally.

146. The Cooper Report itself is not prior art, but it references many exhibits and deposition transcripts establishing the state of the prior art. Exhibit U to the MDx Opp. (citations to exhibits and deposition testimonies are throughout the Cooper Report).

147. Dr. Cooper relied heavily on the deposition testimonies of Health Grades witnesses Montroy, Hicks, Neal, and Dodge. *Id.*

148. None of Montroy, Hicks, Neal, and Dodge deposition transcripts are found on any disclosure statement submitted to the examiner. A searchable version of the Information Disclosure Statements is attached hereto as Exhibit BB -- those names never come up in connection with any testimony, nor does the word "deposition." Accordingly, if the patent examiner was looking for any of the supporting deposition testimony, she could not have found it identified as such on any disclosure statement. *See, e.g.,* Exhibit CC, at 106:5-12 (Dr. Greenspun admitting that "without those pages, she wouldn't be able to replicate or reproduce Dr. Cooper's analysis").

149. Health Grades represented to this Court, in its Supplemental Brief that it had given to the patent examiner "all the deposition testimony" relied on by MDx. HG's Supplemental Brief, Doc. #673-1, Fact 74(a,b). This statement was false, and Health Grades only corrected it after counsel for MDx inquired as to the basis for the statement. *See* E-mail between counsel for the parties, dated February 2014, attached hereto as Exhibit DD; *see also* Health Grades' corrected page 2 to its Supplement (Doc. # 673-1), dated Feb. 5, 2014, Doc. #744-1, at ¶ 74.

150. Contrary to Health Grades' representation, it only submitted some random portions of the critical deposition testimonies to the patent examiner, and those portions were not

submitted with the Cooper Report that relied upon them, or with MDx's invalidity contentions. Rather, Health Grades scattered them throughout the many thousands of pages submitted, and gave the patent examiner no indication on any information disclosure statement (or otherwise) of where they could be found. *See* Exhibit DD, at 1 (where counsel for Health Grades identified Bates numbers for some deposition transcripts – note the large breaks in Bates numbers between the transcript portions).

151. For the few, scattered transcript portions that were submitted, Health Grades did not submit exhibits on which the witnesses were testifying (and if they were submitted there was no easy way to connect the testimony to the exhibit or document), so that even if those transcripts were found the patent examiner could not follow the testimony.

152. The Cooper report referenced deposition exhibit numbers for the prior art. Exhibit U to MDx's Opp., throughout the entire Report.

153. Health Grades did not list any of that art by deposition number on any of its disclosure statements or otherwise, so the patent examiner could not find the deposition exhibits used by Dr. Cooper in the list of hundreds of references cited. *See* Exhibit BB; *see also* Exhibit CC, at 101:11-20.

**The Health Grades Prior Art Commercialization**

154. The Health Grades prior art is anticipatory, as has been admitted under oath by Health Grades' own witnesses when they admitted that Health Grades was selling a "commercial embodiment" of the '060 patent in the prior art. Doc. #407, at 12-14 and at ¶ 35.

11

155. Patent prosecution counsel for Health Grades agrees that a "commercial embodiment" of the patent (what Health Grades admits it was selling in the prior art) is something that falls under the claims of a patent. Exhibit X, at 72:24-73:22; 113:12-16.

156. Patent prosecution counsel for Health Grades also admits that a patent examiner would want to know the date when a patent applicant began selling a commercial embodiment of a patent claim in the prior art. *Id.*, at 73:17-22.

157. Anticipatory prior art (art that falls under the claims of a patent) is the most relevant and material prior art. 35 U.S.C. 102.

158. Health Grades never highlighted the fact that it was commercializing the invention in the prior art as required by the MPEP, and indeed Health Grades even hid that fact from its own prosecution counsel. Exhibit X, at 111:23-114:6.

159. This critical information about the anticipatory prior art was buried in one sentence on page 5, and one sentence on page 14, of the Health Grades Interrogatory Responses. Exhibit A to MDx's Opp., at 5 and 14.

160. The interrogatory response itself was also buried deep in a list of hundreds of references and was never highlighted to the examiner. Exhibit BB, Information Disclosure Statement of Aug. 23, 2013, at page 10 of 11 of the Statement (and at 11 of 26 of Exhibit BB).

161. Health Grades' expert, Dr. Greenspun, could not say that the patent examiner would have picked up on Health Grades' prior art commercialization. Exhibit CC, at 75:10-18.

**The Drucker Report**

162. The Drucker Report was submitted as the very last reference (the 294th reference, by MDx's count), in a long, long list of references submitted before the Notice of Allowance,

12

and it was the last of many thousands of submitted pages. Exhibit BB, Information Disclosure Statement of Sept. 20, 2012, at page 2 of 2 of the Statement (and page 17 of 26 of Exhibit BB).

163. The Drucker Report was not submitted with the same disclosure statement as the Cooper Report. Exhibit BB; *see also* Exhibit CC, at 109:20-110:19 (Drucker Report may not have even been available to the patent examiner when she reviewed the Cooper Report).

164. Despite the MPEP requirements, Health Grades did not in any way call it out or otherwise highlight the Drucker Report to the patent examiner. Exhibit X, at 111:13-16 and 116:8-11.

165. Although the patent examiner would need to know the source of the information in the Drucker Report in order to understand its relevance to the patent claims (Exhibit X, at 117:22-118:15), the examiner had nothing by which she could identify the sources. *Id.* at 123:11-15.

### The Deposition Testimony

166. The patent claims recite various sources for the various data elements must be obtained. Exhibit A to HG's Supplement, at Claim 1, Col. 20, Lines 20-67 and Claim 15, Col. 22, Lines 9-56.

167. Dr. Cooper relied on the deposition testimony of a number of Health Grades' witnesses for proof as to where data elements were obtained in the prior art. Exhibit U to MDx's Opp., throughout the entire Report.

168. While Health Grades represented to this Court that it submitted "all" of the deposition testimony relied on by Dr. Cooper and the MDx invalidity contentions (HG Supp. at 2), it did not do so. Exhibit BB.

169. Some of the deposition testimonies submitted by Health Grades were snippets used in connection with this summary judgment motion – a motion where only the "comparison ratings" is alleged to be missing from the prior art.

170. The briefing on this motion was also buried by Health Grades, and not highlighted to the patent examiner. Exhibit BB (submitted in the middle of a pile of references and scattered across at least 2 separate Information Disclosure Statements).

171. If the patent examiner found the briefing on this motion, she would not have access to many of the proofs on any of the many claim elements other than the "comparison ratings" element.

## The Prosecution is not Done

172. Even if Health Grades had disclosed the art, and not acted as they did, this prosecution still is not relevant for the additional reason that it is not over. As Mr. Scull admitted, and as the prosecution history itself confirms, the Notice of Allowance could be withdrawn at any time. Exhibit X, at 132:18-133:16. Indeed, Health Grades will be submitting more documents, so the Notice of Allowance could be revoked at any time for that reason, too. *Id.*, at 138:3-139:9.

**IV. ARGUMENT**

Health Grades is merely continuing with its pattern of inequitable conduct before the Patent Office. The allowance of the '471 application means nothing here, because the patent examiner was deprived of any true opportunity to understand MDx's invalidity positions. Health Grades' assertion that there is no genuine issue of fact about its alleged disclosures, and whether the patent examiner had a fair opportunity to review the prior art, is simply wrong.

14

Of course, MDx does not need to prove here that there is inequitable conduct in connection with the '471 application – the issue here is simply a question of fact for the jury as to whether Health Grades succeeded in hiding the best prior art from the patent examiner, and so summary judgment should be denied. For what it's worth, however, the '471 application is overflowing with its own fraud, and any resultant patent will also be unenforceable. *See*, *e.g.*, *Synqor, Inc. v. Cisco Systems, Inc.*, 2012 U.S. Dist. LEXIS 129463, *19 (E.D. Tex. Aug. 7, 2012) ("A review of the cases reveals that a voluminous list of references contained in an IDS can, in some circumstances, lead to a finding of inequitable conduct if a material reference was 'buried' in the IDS with the intent to deceive the PTO by 'burying' the reference"); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 837 F. Supp. 1444, 1477 (N.D. Ind. 1992) (holding that it is "a violation of the duty of candor and fair dealing with the [PTO] for an applicant or its attorney to disclose a pertinent prior art patent reference to the examiner in such a way as to 'bury' it or its disclosures in a series of disclosures of less relevant prior art references, so that the examiner would be likely to ignore the entire list and permit the application to issue."), *aff'd*, 11 F.3d 1072 (Fed. Cir. 1993); *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948, 964-65 (S.D. Fla. 1972) (failure to cite most pertinent prior art, and attempt "to bury" relevant patent "in a long list of allegedly old prior art patents in the hope that the Patent Examiner … would ignore the list and permit the [applicant's] patent to issue" constituted deliberate misrepresentations to the patent office), *aff'd*, 479 F.2d 1328 (5th Cir. 1973); *see also Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1184 (Fed. Cir. 1995) ("'burying' a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith.").

15

Put simply, the tentative allowance of the '471 application does nothing to show that the '060 patent is not unenforceable due to inequitable conduct, as Health Grades would like the Court to believe, but instead illustrates the great lengths Health Grades will go to get patents issued.

## V. CONCLUSION

For all the foregoing reasons and those stated in MDx's Opposition, Health Grades' motion for summary judgment should be denied.

Dated: February 11, 2014                                          Respectfully submitted,

*s:/Scott D. Stimpson*
Scott D. Stimpson                                                 Terence Ridley, Atty. No. 15212
Trent S. Dickey                                                   Wheeler Trigg O'Donnell LLP
David C. Lee                                                      370 Seventeenth Street, Suite 4500
Vincent M. Ferraro                                                Denver, Colorado 80202
Sills Cummis & Gross P.C.                                         Tel:  (303) 244-1800
30 Rockefeller Plaza                                              Fax:  (303) 244-1879
New York, New York 10112                                          E-mail: ridley@wtotrial.com
Tel: (212) 643-7000
Fax: (212) 643-6500                                               *Attorneys for Defendant*
E-mail: sstimpson@sillscummis.com                                 MDx Medical, Inc. d/b/a VITALS.COM
E-mail: tdickey@sillscummis.com
E-mail: dlee@sillscummis.com
E-mail: vferraro@sillscummis.com

16

# CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2014, I electronically filed the foregoing **MDX MEDICAL, INC.'S RESPONSE TO HEALTH GRADES, INC.'S PROPOSED SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. #369]** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

- **Jesus Manuel Vazquez, Jr.**
  jvazquez@lrrlaw.com, phenke@lrrlaw.com

- **Gregory B. Kanan**
  gkanan@lrrlaw.com

- **Kris John Kostolansky**
  kkosto@lrrlaw.com

- **Adam Lee Massaro**
  amassaro@lrrlaw.com

- **Scott David Stimpson**
  sstimpson@sillscummis.com, gcaceres@sillscummis.com

- **Trent S. Dickey**
  tdickey@sillscummis.com

- **David Chunyi Lee**
  dlee@sillscummis.com

- **Vincent Marc Ferraro**
  vferraro@sillscummis.com

- **Terence M. Ridley**
  ridley@wtotrial.com, norris@wtotrial.com

<em>s:/    Vincent M. Ferraro</em>