# EXHIBIT X

Page 1

1    IN THE UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF COLORADO

2

     Case No. 11-CV-00520-PAB-BNB

3    _____

4    DEPOSITION OF TIMOTHY SCULL

     January 3, 2014

5    _____

6    HEALTH GRADES, INC.,

7    Plaintiff,

8    vs.

9    MDX MEDICAL, INC. d/b/a VITALS.COM,

10   Defendant.

11   _____

12   APPEARANCES:

13       LEWIS ROCA ROTHGERBER

             By Gregory B. Kanan, Esq.

14               Kirsten Stoll-DeBell, Esq.

15               1200 Seventeenth Street, Suite 3000

16               Denver, Colorado 80202

17                Appearing on behalf of Plaintiff

18

19

20       SILLS CUMMIS & GROSS, P.C.

21           By Scott D. Stimpson, Esq.

22               Vincent Feraro, Esq.

23               30 Rockefeller Plaza

24               New York, New York 10112

25                Appearing on behalf of Defendant

Page 2

```
 1        Pursuant to Notice and the Federal Rules of
 2  Civil Procedure, the deposition of TIMOTHY SCULL,
 3  called by Defendant, was taken on Friday, January 3,
 4  2014, commencing at 9:05 a.m., at 1200 17th Street,
 5  Suite 3000, Denver, Colorado, before Barbara J.
 6  Castillo, Registered Merit Reporter, Certified
 7  Realtime Reporter and Notary Public within and for
 8  the State of Colorado.
 9
10
11                I N D E X
12  EXAMINATION                     PAGE
13  BY MR. STIMPSON                   4
14
15
    EXHIBIT       DESCRIPTION        INITIAL
16                   REFERENCE
17
    Exhibit 1000  Prosecution History      13
18
    Exhibit 1001  MDX Medical, Inc.'s Notice of   8
19        Deposition of Health Grades,
          Inc. Pursuant to Federal Rule
20        of Civil Procedure 30(b)(6)
21  Exhibit 1005  Patent 5,365,425          148
22  Exhibit 1006  Health Grades, Inc.'s Motion  152
          for Partial Summary Judgment
23
    Exhibit 1007  Health Grades, Inc.'s Motion  152
24        for Partial Summary Judgment
25
```

Page 3

```
 1           I N D E X  (Continued)
 2
    Exhibit 1008  Health Grades, Inc.'s Motion  152
 3        for Partial Summary Judgment
 4  Exhibit 1009  Health Grades, Inc.'s Motion  152
          for Partial Summary Judgment
 5
    Exhibit 1010  Composite of exhibit of    167
 6        petition exhibits
 7
 8  **Exhibits 1002 through 1004 were marked but never
      identified
 9
10  PRODUCTION REQUEST(S):
11  Copy of memo                    77
12  Redline of the claims           99
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           P R O C E E D I N G S
 2        (Exhibit Numbers 1000 through 1004 were
 3        marked.)
 4           TIMOTHY SCULL,
 5  being first duly sworn in the above cause, was
 6  examined and testified as follows:
 7           EXAMINATION
 8  BY MR. STIMPSON:
 9     Q    Good morning, Mr. Scull.
10     A    Good morning.
11     Q    Have you been deposed before?
12     A    No.
13     Q    Have you ever taken a deposition?
14     A    Yes.
15     Q    So you know the rules how it works?
16     A    (Deponent nodded head.)
17     Q    How many depositions have you taken?
18     A    Just like one or two.
19     Q    Okay.  But this is not unfamiliar ground
20  for you.
21     A    Not completely, although I haven't been in
22  this world for a long time, so . . .
23     Q    Okay.  So, you know, basic ground rules.
24  If there's anything -- the most important stuff is if
25  there's anything you don't understand about my
```

Page 5

```
 1  question, just ask.  If you need to take a break, let
 2  me know.  If anything troubles you, let me know.
 3  We'll deal with it.  Okay?
 4     A    (Deponent nodded head.)
 5     Q    You've got to answer audibly.
 6     A    Yes.
 7     Q    You're currently with Merchant & Gould?
 8     A    Yes.
 9     Q    And how long have you been with them?
10     A    Since '99.
11     Q    Okay.  Where were you before that?
12     A    John Ley, LLC.
13     Q    How do you spell that?
14     A    L-e-y.
15     Q    And was that here in Denver?
16     A    Yes.
17     Q    Okay.  And what's your practice consisted
18  of since you -- you graduated law school -- I think
19  it was, what, '96?
20     A    I graduated law school in '96, yes.
21     Q    So you've been practicing patent law for
22  18 years?
23     A    Yeah, whatever that math adds up to.
24     Q    Okay.  Right.  Yeah.  I got a calculator
25  last night to figure it out.  What has your practice
```

Page 6

1 been in patent law? Has it been mostly patent
2 prosecution?
3    A   Quite a bit of patent prosecution.
4    Q   Is that what most of your work is today?
5    A   It's a mix.
6    Q   Okay. How much of it is patent
7 prosecution?
8    A   I really don't know.
9    Q   Is it more than 50 percent?
10    A   I would say it's around 50 percent.
11    Q   Okay. And when you came to Merchant &
12 Gould, were you doing patent prosecution at that
13 time?
14    A   Yes.
15    Q   And so you've been doing patent
16 prosecution consistently at Merchant & Gould?
17    A   I have.
18    Q   And is it mostly in electrical arts and
19 software?
20    A   Mostly software.
21    Q   Okay. And you're the managing partner at
22 the Denver office of Merchant & Gould?
23    A   Yes.
24    Q   And you're the -- you're chair of one of
25 the departments, right?

Page 7

1    A   I was chair. I'm longer chair.
2    Q   And that was the EE software, was it?
3    A   That is.
4    Q   So how many -- rough guess, how many
5 patent applications have you worked on since law
6 school?
7    A   I don't know what you mean by worked on.
8 Touched?
9    Q   Worked on in any way.
10    A   In any way?
11    Q   Yeah.
12    A   I don't know. Maybe a couple thousand.
13    Q   Okay. And you -- how long have you been
14 working for Health Grades?
15    A   I think since '04, '05, something like
16 that.
17    Q   Are they your client?
18    A   Maybe even before that.
19    Q   Are they your client at Merchant & Gould?
20    A   Yes.
21    Q   And how many patent applications have you
22 done for Health Grades?
23    A   How many have I done for them?
24    Q   Yeah.
25    A   How many have I done for them.

Page 8

1    Q   Well, I mean, you raise a good point. I
2 mean, have you either done yourself or supervised.
3    A   I don't know what the number is exactly.
4 I think it's on the order of -- and what do you mean
5 by application? Like brand-new specification? Or
6 just a claim?
7    Q   Any application, whether you start from
8 scratch or you pick it up from a law firm.
9    A   Based on a PTO serial number?
10    Q   Could be anything, any kind of patent
11 application.
12    A   I don't know.
13    Q   I'm not looking for an exact number, just
14 ballpark.
15    A   Yeah. I don't know. Six or seven.
16    Q   Okay. And have you ever been accused of
17 inequitable conduct before?
18    A   Never.
19    Q   Can I have the deposition there, please.
20 Let me show you what's -- here's your 30(b)(6)
21 deposition notice for Health Grades. You
22 understand --
23        MR. KANAN: What number did we mark it?
24        MR. STIMPSON: It is 1001.
25        MR. KANAN: Okay.

Page 9

1    Q   (BY MR. STIMPSON) You understand you're
2 here today as a 30(b)(6) deponent for Health Grades?
3    A   I do.
4    Q   Okay. And what did you do to prepare for
5 the -- well, first of all, let me back up. You
6 understand your responsibilities as a 30(b)(6)
7 deponent, right?
8    A   For the most part, yes.
9    Q   Okay. So you understand that you're --
10 anything you don't know you're to educate yourself so
11 you can answer the questions reasonably, right?
12    A   Yes.
13    Q   Okay. And what did you do to prepare for
14 -- you can see the topics on the second page, right?
15    A   Yes.
16    Q   And what did you do to prepare for the
17 deposition?
18    A   I looked at this list of topics and I went
19 back through and looked at the file history and
20 refreshed my memory of what had happened regarding
21 all these topics as best I could and then I conferred
22 with Pouzeshi in my office --
23    Q   Pouzeshi. That's how you pronounce it.
24    A   -- who was primary prosecution
25 responsibility on the '471 application, and we

3 (Pages 6 - 9)

Page 10

1  discussed to make sure that I was basically
2  remembering and/or knew anything that would help
3  answer these questions.
4      Q    Anything else?
5      A    I conferred with counsel.
6      Q    Litigation counsel?
7      A    Litigation counsel on the case.
8      Q    Have you been involved in the litigation
9  at all?  Have you billed any time in the litigation?
10     A    A little bit.  A little bit.
11     Q    In what role?
12     A    More with respect to strategy, if there
13 was a patent related issue or particular response
14 filing based on something like a validity or
15 something like that.
16     Q    So is it fair to say that with regard to
17 the '471 patent application you were consulting with
18 counsel -- litigation counsel for Health Grades?
19     A    Not really.  I mean, I did talk to Kirsten
20 at times about it --
21     Q    Okay.
22     A    -- if we had things going on and things
23 like that.
24     Q    How about Mr. Kostolansky or Mr. Kanan or
25 Mr. Vasquez?

Page 11

1      A    You know, I might have had one
2  conversation with Kris Kostolansky about the
3  procedural aspects of --
4          MR. KANAN:  Let's limit the "about" part.
5  It's privileged.
6          MR. STIMPSON:  I know it's -- well, let me
7  just ask you, Greg.  Are you guys going to be taking
8  privilege and work product on some of these topics
9  like reasons for --
10         MR. KANAN:  Well, it will depend on
11 question by question, Scott, and I'm hoping we can
12 work around it a little bit, but yeah.  Where the
13 privilege is implicated I will be invoking the
14 privilege.
15         MR. STIMPSON:  So I mean, it gets a little
16 tricky because as Magistrate Boland said, you guys
17 have to take the privilege or not take the privilege,
18 and so I explained to him when I was at the last
19 hearing that, you know, it's fine if you guys want to
20 take the privilege but if you do, then when we get to
21 trial and we make our arguments about what was going
22 on here, people can't stand up and start testifying
23 about -- explaining themselves at that time.  So --
24         MR. KANAN:  Well, I'm not quite sure what
25 you mean and I guess that's why I think it needs to

Page 12

1  be done on a question by question basis, but the fact
2  of what occurred at the patent office or
3  communications with the patent office are not
4  privileged.  What was provided to the patent office
5  is not privileged.  So there will be no privilege
6  issue there.
7          But if you get into issues about
8  communications with clients and that sort of thing
9  that do involve the privilege, then yeah, I'll be
10 asserting the privilege.
11         MR. STIMPSON:  So that's going to apply to
12 reasons for -- I don't mean to put you on the spot.
13         MR. KANAN:  I mean it will I am sure to
14 some degree, yes.  I'm thinking there might be a way
15 that he can answer the questions in a sort of general
16 sense that might -- that might work, but yeah.  The
17 privilege is certainly involved in the reasons.
18         MR. STIMPSON:  Let me try some questions
19 and if you turn them down, we'll have a good idea
20 where we're going.
21     Q    (BY MR. STIMPSON)  What did you disclose
22 -- when I say litigation counsel, I mean the
23 Rothgerber firm and the current firm, which is Lewis
24 Roca, including Mr. Kostolansky, Mr. Vasquez,
25 Mr. Kanan, and also Ms. Stoll-DeBell in your firm.

Page 13

1  Do you understand that?
2      A    Yes.
3      Q    So what did you discuss with any of the
4  litigation counsel about any of the prosecution parts
5  of the '471 application?
6          MR. KANAN:  Okay.  So that does implicate
7  the privilege and I would instruct him not to answer.
8          MR. STIMPSON:  And I'm not pushing.  I've
9  just got to know where this ends.
10     Q    (BY MR. STIMPSON)  Can you tell me if
11 litigation counsel was involved in strategy of the
12 '471 patent application?
13         MR. KANAN:  Let's take a quick break and
14 let me talk with Mr. Scull.
15         MR. STIMPSON:  Okay.
16         (Recess from 9:15 to 9:17 a.m.)
17         MR. KANAN:  So I don't see a way in my
18 view that we can kind of work around this without
19 getting into a waiver problem.  So I'll just instruct
20 him not to answer.
21     Q    (BY MR. STIMPSON)  I've marked as Exhibit
22 -- what is that, a thousand -- Exhibit Number 1000.
23 I've marked as Exhibit Number 1000 --
24         MR. KANAN:  You're going to identify it
25 now?

4 (Pages 10 - 13)

Page 22

1 Q So as we sit here today, you have no
2 recollection of discussing the Cooper report with
3 anyone from the litigation team either, right?
4 MR. KANAN: Your recollection, if you have
5 one, about discussing it.
6 A I do not remember.
7 Q (BY MR. STIMPSON) Okay. Did you ever
8 read the Hicks deposition?
9 A No.
10 Q Do you know if any of your team ever read
11 any part of the Hicks deposition?
12 A I don't know.
13 Q Did you ever read the --
14 A By team, what are you referring to?
15 Q Well, you have a patent prosecution team
16 that works on the '471 and that's what I'm referring
17 to. Okay? Okay?
18 A Okay.
19 Q And so do you know if anyone in your
20 prosecution team ever read the Montroy transcript?
21 MR. KANAN: Deposition transcript, you're
22 asking him?
23 MR. STIMPSON: Yes.
24 A In its entirety, I have no idea.
25 Q (BY MR. STIMPSON) Do you know if anybody

Page 23

1 read one page from it?
2 A You know, I think there are snippets even
3 in this report, so I can't say.
4 Q Okay. But you don't -- we already talked
5 about the report. You don't remember whether anybody
6 read that either. So my question is, do you know if
7 anyone on your team, including yourself or anyone
8 who's working on the '471 application, actually read
9 any portions of the transcript from Mr. Montroy?
10 A I think it would be the same with Hicks.
11 I don't know. I'm sure that snippets were probably
12 read for sure, but . . .
13 Q Snippets were read?
14 A Probably.
15 Q Why do you think snippets were read?
16 A If somebody skims this, there are chances
17 -- I think I just saw something that looked like it
18 was probably a snippet.
19 Q Right. But when I asked you a little
20 earlier, you said you -- are you now -- you now want
21 to say that you think somebody from your prosecution
22 team did read the Cooper report?
23 MR. KANAN: Wait a minute. I'm going to
24 object. That's mischaracterizing what he testified
25 to earlier. You may answer.

Page 24

1 MR. STIMPSON: No. It's okay. I'll
2 withdraw it. Let me just ask it again.
3 Q (BY MR. STIMPSON) Do you know whether
4 anyone from your patent prosecution team read the
5 Cooper report?
6 A I think like I said I think probably. I
7 think that Andy probably would have looked through it
8 as we were submitting IDS's.
9 Q And you don't know --
10 A But I don't know. I didn't ask him
11 specifically before coming in here.
12 Q Okay. So do you know if anyone on your
13 prosecution team, including yourself, or anyone on
14 your prosecution team read the actual transcripts or
15 any portions of the transcripts of Hicks, Montroy,
16 Neal, or Dodge?
17 A I would say a similar answer. I would
18 assume that they were looked at least as far as
19 providing them to the patent office.
20 Q So you think those were provided to the
21 patent office?
22 A If they were. I actually don't remember.
23 I would have to look at the IDS to see if they were.
24 I think that there were -- we definitely had a
25 discussion about providing them and I think we did.

Page 25

1 I can't recall now.
2 Q Okay. So as we sit here today, you can't
3 tell me whether or not the Hicks, Neal, Dodge or
4 Montroy transcripts were actually supplied to the
5 patent office?
6 A I would look at the IDS and I could -- if
7 you handled me the IDS's, I could tell you today.
8 Q We'll go through them. Do you think, Mr.
9 Scull, that the examiner was aware when she allowed
10 the '471 application of all the details of the MDX
11 invalidity contentions from the litigation?
12 A I do.
13 MR. KANAN: Objection, calls for
14 speculation.
15 Q (BY MR. STIMPSON) And why do you think
16 that?
17 A Because I suggested that she look at it.
18 Q When did you talk to her?
19 A In an interview.
20 Q Okay. And that was a recent interview?
21 A No. It was in August.
22 Q Okay. And what specifically did you
23 suggest she look at?
24 A The expert report from MDX.
25 Q You specifically told the examiner to

Veritext/NJ Reporting Company

800-227-8440                                                973-410-4040

Page 26

1 review the expert report of MDX?

2    A   I did.

3    Q   Okay.  And did you put that in your

4 interview summary?

5    A   No, I don't think so.

6    Q   Okay.  And is the reason you did that

7 because litigation counsel told you to do that?

8         MR. KANAN:  Objection, it's privileged,

9 and I'll instruct him not to answer.

10    Q   (BY MR. STIMPSON)  Why did you do that?

11 Mr. Scull, why did you do that?

12         MR. KANAN:  If this implicates

13 attorney/client communications, communications with

14 any counsel, then I'm instructing you not to answer.

15    A   I don't think it does.

16         MR. KANAN:  If you think it does --

17    Q   (BY MR. STIMPSON)  I'm sorry, you said you

18 think it does?

19    A   I don't think it does.

20         MR. KANAN:  Don't think it does.  I'm

21 sorry.

22    Q   (BY MR. STIMPSON)  So why did you?

23    A   Because I was in a case, another case

24 where we had a similar issue of a litigation process,

25 you know, that was based on the parent and the

Page 27

1 examiner when we gave them all the documents that we

2 were supposed to give them as part of the litigation

3 as part of our duty of disclosure, he came back and

4 he said what should I look at, because you gave me a

5 lot of material.

6         And back then I wasn't involved or even

7 knew that much that was going on because it was --

8 someone else was handling it and I just happened to

9 be there in the interview.  And so I -- when I went

10 into this interview, I thought if they ask me the

11 same question, I want to tell them, you know, what

12 makes the most sense for where to start.

13    Q   Okay.

14    A   And the place to start, in my opinion, was

15 the -- whatever MDX said would make it invalid based

16 on the prior art, based on their arguments, and I

17 specifically pointed to that and said, this is what,

18 if I were you, I would look at.

19    Q   Okay.  And when you say this is what I

20 would look at, what specifically did you tell the

21 examiner?

22    A   I said look at the expert report from MDX.

23    Q   Okay.  Anything else?

24    A   And I think I said the summary judgment

25 filings.

Page 28

1    Q   Which summary judgment filings?

2    A   But I don't recall that I said anything in

3 particular.  I would have focused on validity or

4 invalidity.

5    Q   So you told this examiner, look at the

6 expert reports from MDX --

7    A   I said look at everything, but if they

8 wanted to focus on certain aspects or if they were --

9 basically I was anticipating that question of what is

10 it -- what is in this stack.  I wanted to be as

11 transparent as possible and say that this would be

12 the most interesting, this being the expert report

13 from MDX and our responses to it.

14    Q   And so you suggested the examiner read

15 this document that you yourself don't remember ever

16 having read, right?

17    A   Correct.

18    Q   Okay.  And did you actually have a copy to

19 hand to the examiner?

20    A   Absolutely not.

21    Q   Okay.  So how did you tell her where it

22 was in the IDS, or did you -- let me withdraw that.

23 Did you ask the examiner -- tell the examiner where

24 it was in the IDS?

25         MR. KANAN:  "It" being the Cooper report?

Page 29

1         MR. STIMPSON:  Yeah.

2    A   No.

3    Q   (BY MR. STIMPSON)  And you understand that

4 you submitted over 300 references to the examiner,

5 right?

6    A   I have no idea the number of references

7 that we cited.

8    Q   Okay.  So you told her to find the expert

9 report.  Did you -- did you identify Dr. Cooper by

10 name?

11    A   I may have.  Andy Pouzeshi was with me and

12 he may have.

13    Q   Do you remember either person specifically

14 identifying Dr. Cooper's name?

15    A   I do not recall right now.

16    Q   So you know other expert reports were

17 submitted with the IDS's, right?

18    A   I think so.

19    Q   Right.  So other than telling the examiner

20 to review the expert report of MDX and you think you

21 might have said review summary judgment filings, do

22 you remember telling the examiner to review anything

23 else other than a general everything?

24    A   Did I tell her in that conversation.  It

25 was a very short conversation where I -- we went in

8 (Pages 26 - 29)

Page 30

1 there for other reasons, to talk about her rejection
2 and then to -- and to do other things and I said, by
3 the way, there's this big IDS and, you know, I'm
4 available if you have questions or if you want to
5 talk about it and that's -- and then I mentioned this
6 and, you know, they said what they said and then it
7 was over.
8     Q    So the reason you came down there with the
9 Cooper report in mind, this document you don't
10 remember actually reading yourself, that was entirely
11 your idea, or did someone else suggest that to you?
12     A    To narrow it down as far as to say what I
13 said was my idea.
14     Q    No.  Who -- did anyone --
15     A    I think that that might call for
16 privilege.
17     Q    Okay.  So that's what I want to get at.
18 See.  What I suspect is that someone from the
19 litigation team told you to mention the Cooper
20 report.  Can you tell me whether that's true or
21 correct -- true or not?
22         MR. KANAN:  Objection.  Any communications
23 he had with counsel are privileged.
24     Q    (BY MR. STIMPSON)  So are you taking that
25 advice and not answering that question?

Page 31

1     A    Can I hear the question again?
2         MR. KANAN:  Yeah.  Go ahead you can read
3 him back the question, and if the answer does not
4 implicate -- well, I guess it necessarily implicates
5 the privilege because you've asked the question did
6 it come from attorneys.
7     Q    (BY MR. STIMPSON)  Let me just rephrase
8 it.
9         MR. KANAN:  Rephrase the question and then
10 we might need to step out for a second.
11     Q    (BY MR. STIMPSON)  Well, my question -- I
12 think -- my suspicion is that someone from the
13 litigation team suggested that you mention Cooper so
14 that later in this deposition and at trial you could
15 say that you mentioned the Cooper report.  Is that
16 correct?
17         MR. KANAN:  Okay.  So let's just take a
18 minute and let me visit with the witness.
19         (Recess from 9:38 to 9:42 a.m.)
20         MR. KANAN:  So, Scott, I think the
21 question you asked him was whether he had a
22 conversation with litigation counsel --
23         MR. STIMPSON:  No.
24         MR. KANAN:  What was it?  Read it back.
25         MR. STIMPSON:  My question was my

Page 32

1 suspicion is that someone from the litigation team
2 suggested that you mention Cooper so that later in
3 this deposition, at trial you could say that you
4 mentioned the Cooper report; is that correct.
5         MR. KANAN:  Well, of course, it's a badly
6 phrased question, your suspicion.  But I think that
7 does implicate the privilege and I'll instruct him
8 not to answer.
9     Q    (BY MR. STIMPSON)  So let me ask a
10 different question then.  Is it fair to say that
11 within, you know, a month before -- well, first of
12 all, you arranged this interview, right?
13     A    Yes.
14     Q    Was it entirely your idea to arrange this
15 interview?
16     A    Yes.
17     Q    Okay.  And is it fair to say that within a
18 month before this interview you had a conversation
19 about the '471 application with counsel -- with
20 litigation counsel?  That's just yes or no.
21         MR. KANAN:  You can answer that yes or no
22 or if you don't remember.
23     A    Is it fair to say that within a month
24 before the interview I talked to somebody on the
25 litigation counsel.

Page 33

1     Q    (BY MR. STIMPSON)  About the '471
2 application.
3     A    About the '471 application in any shape or
4 form?
5     Q    Yes.
6     A    Yes.
7     Q    And you don't remember mentioning Dr.
8 Cooper by name at the interview?
9     A    No.
10         MR. KANAN:  Objection.  I think that
11 mischaracterizes his testimony.
12     Q    (BY MR. STIMPSON)  You did not identify
13 which reference of the many that were submitted that
14 the Cooper report was, correct?
15     A    No.  I did.  I told him to look for the
16 expert from MDX.
17     Q    Okay.  But you didn't say, here it is on
18 this Number 193 on -- of the 300 something exhibits,
19 right?
20     A    I don't know.  Was it 300 in that one IDS?
21     Q    No.  But all together they were.  That's
22 not the point.
23     A    All together is the point because I was
24 talking about the IDS from that today -- from -- it
25 was like only a couple days beforehand.

9 (Pages 30 - 33)

Page 42

1 they were all just provided.
2    Q    Right.  But you didn't do anything to
3 highlight them for her or help her find those, did
4 you?
5    A    Did I do anything to help her?  I mean, if
6 they're listed on an IDS, she can find them.  Did I
7 walk in and hand them to her?  No.
8    Q    Did you do anything else besides
9 submitting the IDS?
10    A    I mean, I asked her.  So I basically
11 opened the door, if she had a question if she read
12 that and said I can't find these, I better call.
13    Q    Did she have any questions?
14    A    She did not.
15    Q    Did she ever call you?
16    A    She did not call with respect to the
17 IDS's, no.
18    Q    Okay.  Did she ever comment about the
19 magnitude of the references that were submitted?
20    A    I think she said, yeah, I got it and it's
21 quite big.
22    Q    She said what?
23    A    It's quite large or quite big or something
24 like that.
25    Q    Did she laugh?

Page 43

1    A    She did not laugh.
2    Q    Were people chuckling about it because of
3 the size of this?
4    A    No.
5    Q    Tell me something, Mr. Scull.  I'll
6 represent to you, because, you know, there's a lot of
7 things, but there are hundreds of pages submitted,
8 for example, on the infringement issue in the
9 litigation, summary judgment motions for
10 non-infringement, infringement contentions.  Why did
11 you disclose those?
12        MR. KANAN:  Well, again, if you can answer
13 without revealing attorney/client privileged
14 information, you may answer.
15    A    I'm under a duty to disclose the relevant
16 material, and under MPEP it even talks about special
17 case of litigation and how all the different
18 documents might be provided, might be found.  And so
19 I submitted a lot of different things.
20    Q    You knew that there was nothing -- any
21 infringement contentions or summary judgment motions
22 that MDX was relying on as prior art, right?
23    A    I have no idea.
24    Q    You had no -- you had no reason to believe
25 that there was anything in any of those documents

Page 44

1 that MDX was relying on for prior art, right?
2    A    I think they -- I think that the -- when I
3 look at infringement, it talks about claim, scope,
4 claim interpretation at some level even if it's
5 inferred so that it makes sense to send it in.
6    Q    Did you think that the examiner could do
7 anything with the infringement contentions with
8 regard to rejecting any of these claims?
9    A    I could speculate all day long that she
10 could do -- she could look at it and she could say
11 no, I see how somebody is reading this in light of
12 this particular product and my eyes are now opened
13 differently and here is a new rejection based on art
14 that I know about.  So yes.
15    Q    Okay.  So you've touched on thousands of
16 patent applications in your career, right, as we
17 discussed that earlier?
18    A    Yeah, touched.
19    Q    Okay.  So how many of those were summary
20 judgment infringement motions submitted of prior art
21 as references?
22    A    This is a very rare case to have a parent
23 in litigation.
24    Q    Can you identify for me, whether you
25 touched on it or not, any patent prosecution ever

Page 45

1 where a summary judgment for non-infringement brief
2 was submitted as a reference in an IDS?
3    A    I would have to -- the one that I was
4 referring to earlier where the guy -- where the
5 examiner wanted me to narrow it down for him.  I
6 suspect in that case we did, but I don't know because
7 I didn't study that IDS before coming in here.
8    Q    So you don't know.  So as we sit here
9 today, you don't know of any patent prosecution
10 you've ever worked with where summary judgment briefs
11 have been submitted?
12        MR. KANAN:  Objection, asked and answered.
13 You may answer again.
14    A    I don't know -- I don't know that they
15 have or have not.
16    Q    (BY MR. STIMPSON)  As we sit here today,
17 do you remember any examiner ever rejecting a claim
18 based on briefs on infringement issues?
19    A    So it's a similar answer.  They may have
20 looked at an infringement analysis and then turned
21 around and found art and then rejected it based on
22 the art, based on something they learned in an
23 infringement analysis.
24    Q    Well, you're speculating, right?  You
25 don't remember that.

12 (Pages 42 - 45)

Page 46

1 MR. KANAN: Well, you just asked him if he
2 remembered and gave his best answer. So objection to
3 your argumentative question.
4 Q (BY MR. STIMPSON) Do you remember it?
5 MR. KANAN: Asked and answered.
6 Q (BY MR. STIMPSON) You mentioned that an
7 examiner may have done that, right?
8 A Correct.
9 Q But as we sit here today, you have no
10 recollection of any examiner ever specifically doing
11 that, right?
12 A No examiner has said to me, this is why
13 I'm reading this art in this way so here's your
14 rejection. So if that is your question, then no,
15 they didn't specifically point to the infringement
16 analysis, but if they did, they wouldn't have told
17 me. So I wouldn't know necessarily anyway.
18 MR. STIMPSON: Okay. Move to strike
19 everything after "but."
20 Q (BY MR. STIMPSON) Mr. Scull, you also --
21 you remember you disclosed hundreds of pages on
22 motions to compel to the examiner. Do you remember
23 that?
24 A I don't remember specifically.
25 Q Let me give you -- this is a document

Page 47

1 bearing Bates Number 230245 to 57.
2 MR. KANAN: Well, are you going to mark
3 it?
4 MR. STIMPSON: No. It comes from that.
5 MR. KANAN: Okay. You know, I'm
6 wondering -- Scott, obviously it's up to you what
7 to do but I'm wondering if you should mark these too
8 even though they're part of 1000, mark them as 1000 A
9 or something for convenience.
10 MR. STIMPSON: Thank you, but I prefer not
11 to.
12 Q (BY MR. STIMPSON) Look at Docket 65 on --
13 it's like the fourth page in. It's in one of the
14 models --
15 MR. KANAN: Are you saying 248?
16 MR. STIMPSON: Docket 065. Mine aren't
17 Bates numbered.
18 MR. KANAN: Yours isn't. I see. Well,
19 the fourth page in on --
20 MR. STIMPSON: It's right here.
21 MR. KANAN: We should have the record
22 clear. The fourth page in is 248, it appears to me,
23 on the exhibit that the witness has.
24 MR. STIMPSON: Yes.
25 Q (BY MR. STIMPSON) Okay. So Docket 065

Page 48

1 see, Mr. Scull, that was a motion to compel, right?
2 A I see that, yes.
3 Q And you submitted hundreds of pages in
4 connection with a motion to compel as a reference to
5 the examiner, correct?
6 A It appears that we did, yes.
7 Q Why?
8 A Same analysis. Basically there's a lot of
9 discussion in the Bar about inequitable conduct and
10 attorneys are accusing other attorneys left and right
11 of inequitable conduct, and so providing more than
12 less is something that happens. And in this case
13 this is a document that was provided either because
14 it had some reference in it or some material that may
15 be material to a reasonable examiner.
16 Q Whose idea was it to disclose this?
17 A I do not know.
18 Q Okay. So that was part of your topic. I
19 mean, let me just back up. Do you know who was
20 involved in the decision to disclose all these
21 dockets from the litigation?
22 A It was me and Andy Pouzeshi.
23 Q Okay. Anyone else?
24 A And it was filtered for protective order
25 issues from -- with Kirsten Stoll-DeBell's help.

Page 49

1 Q Okay. And Ms. Stoll-DeBell helped you
2 identify specific documents that should be disclosed?
3 MR. KANAN: Okay. Again, I'm going to, I
4 think, assert the privilege here if it's going to
5 implicate communications you had with
6 Ms. Stoll-DeBell on those issues and instruct you not
7 to answer.
8 MR. STIMPSON: Greg, I'm having a problem
9 with that. I don't mean to cause too much of an
10 issue here, but he's clearly testified why they're
11 disclosing these documents. So if part of that
12 reason was because litigation counsel called and
13 said, hey, look, disclose this, then I'm entitled to
14 get that.
15 MR. KANAN: Well, I don't agree. I
16 haven't waived the privilege, so I'm instructing him
17 not to answer when you ask questions about the
18 communications he had with Ms. Stoll-DeBell. He's
19 described in a general way what was done.
20 MR. STIMPSON: I specifically asked him
21 why this was disclosed and he gave me his full answer
22 it on it, and if there's -- you know, if litigation
23 counsel is calling saying these are the ones you want
24 to disclose and this is why, then part of the
25 reasoning too and I should be able to get that.

Page 50

1    MR. KANAN:  I don't agree.  You shouldn't
2  be able to get it if it's privileged.
3    MR. STIMPSON:  Then at the end of this
4  deposition I'm going to keep it open and this will
5  have to go to the court because you can't just like
6  give me the parts you want me to know.
7    MR. KANAN:  I'm not giving you the parts
8  we want you to know.
9    MR. STIMPSON:  Anyway, we'll deal with it
10  later.  I don't want to create a hassle here.
11  Q   (BY MR. STIMPSON)  What did you think, Mr.
12  Scull, the examiner was going to do with a motion to
13  compel -- 206 pages of a motion to compel?  What did
14  you think the examiner was going to do with that?
15  A   Look through that for relevant material.
16  Q   Did you look through it for relevant
17  material?
18  A   No.
19  Q   Did anybody on the prosecution team that
20  you're aware of?
21  A   I don't know.
22  Q   Do you know if anyone -- well, I'll just
23  represent to you that in this particular IDS there
24  are 233 references.  Did anyone on the Health Grades'
25  prosecution team review all these references?

Page 51

1  A   I don't know.  I mean, I don't know the
2  detail in which they were reviewed, whether it was,
3  you know, at a high level or not.
4  Q   Well, to read and understand all these
5  references would take a lot of time, right?
6  A   I don't know.
7  Q   Well, there are 233 references, some of
8  which are hundreds of pages long each.
9  A   And some are repetitive and some, you
10  know -- like we didn't give them the damages stuff
11  and things like that.  So we didn't give them
12  everything.
13  Q   Yeah.  So my question to you is, don't you
14  think it would take someone a lot of time to review
15  all these references?
16    MR. KANAN:  Object to the form.  You can
17  answer if you can.
18  A   I don't know what you mean by review.
19  Q   (BY MR. STIMPSON)  Read them.
20  A   And know every last word of them?
21  Q   Read them.
22  A   That would probably take a while.
23  Q   Not memorize them.  Read them.
24  A   Look at them?
25  Q   Read them.

Page 52

1  A   Well, read them.  That takes -- that would
2  take a while.
3  Q   Right.  So as far as you can tell, as far
4  as you know, no one on the Health Grades' prosecution
5  team read all these documents?
6  A   Oh, I'm not saying that.  I think that we
7  had someone look at them as we sent them in to make
8  sure that they were things that should be sent in.
9  Q   Okay.  So who was responsible for saying,
10  okay, this motion to compel needs to go in?
11  A   On this particular one, I don't know.  I
12  mean, Andy Pouzeshi definitely was involved.  I think
13  he signed it.
14  Q   Are you aware of the law burying as
15  inequitable conduct?  You've heard of that, right?
16  A   I have heard of it.
17  Q   Right.  And did you do any research on
18  burying as inequitable conduct?
19    MR. KANAN:  Objection.  His research is
20  privileged.
21  Q   (BY MR. STIMPSON)  Well, in your decisions
22  on how many references to disclose, did you consider
23  whether or not you might be burying the most
24  important references?
25    MR. KANAN:  Again, to the extent this

Page 53

1  involves any thought process that implicates
2  privileged material, privileged communications, I
3  would instruct you not to answer.
4  A   The -- we recognize the burden on the
5  patent office when there is a pending litigation, but
6  we have a duty to give them material that may be
7  relevant.  And if it's ten times what we've already
8  provided, we have a duty to provide it.  And there is
9  for sure going to be discussions if I weed out and
10  provide them only three documents from a litigation
11  as to not providing enough.
12    So including motions to compel, providing
13  reasons why things are extra important and that sort
14  of thing, as far as I know she might have gone right
15  to that and felt like that was very important and
16  read it in detail.  I know she considered these and I
17  know that it's her job.
18    MR. STIMPSON:  Move to strike that as
19  nonresponsive.
20  Q   (BY MR. STIMPSON)  Here's my question.
21  Here's my question, Mr. Scull.  This is my question.
22  In your decisions on how many references to disclose,
23  did you consider whether or not you might be burying
24  the most important references?
25    MR. KANAN:  Objection, asked and answered.

14 (Pages 50 - 53)

Page 54

1 You may answer again. It's a perfectly responsive
2 answer.
3        MR. STIMPSON: All right. We can talk
4 about that later.
5    Q    (BY MR. STIMPSON) Yes or no, did you
6 consider whether or not you might be burying the most
7 important references?
8    A    So there's a lot in your question.
9    Q    No, there's not.
10   A    Yes, there's a lot.
11       MR. KANAN: Don't argue. Just give your
12 answer and Mr. Stimpson can follow up or dispute it
13 or whatever he wants to do. Just give your answer.
14   A    So the word "burying" is a loaded word.
15 And whether or not you give somebody a lot of
16 material, you might be argued to be burying. Did I
17 consider that I was burying anything in a way that
18 was somehow improper? No. I have to give them
19 everything that's relevant and if it's ten times what
20 we had, then I would have to give them ten times
21 more.
22   Q    (BY MR. STIMPSON) And so --
23   A    And burying is not something that I'm
24 sitting there saying, okay, we can't provide any more
25 because that would be burying.

Page 55

1    Q    So did you then consider -- let me phrase
2 it a little differently then in light of your
3 comment. Did you consider whether or not you might
4 be making it harder for the examiner to find the key
5 art by disclosing hundreds of references in thousands
6 of pages?
7        MR. KANAN: And, again, I don't want you
8 to get into your thought processes that involve
9 communications with clients or other counsel. You
10 can answer the question in a general sense. Go
11 ahead.
12   A    No. If I have material that's relevant, I
13 have to provide it. And, in fact, that's why I
14 pointed her to the expert report. And then when I
15 was accused of inequitable conduct and specific
16 references were provided to me, I, in turn, provided
17 those to her again so that she could have that
18 focused review based on what you thought was
19 something that she should have.
20       MR. KANAN: Scott, whenever you have a
21 chance --
22       MR. STIMPSON: We can take a break now,
23 sure.
24       (Recess from 10:11 to 10:19 a.m.)
25   Q    (BY MR. STIMPSON) Mr. Scull, I'll

Page 56

1 represent to you that in the -- I'll represent to you
2 that I count 304 references that were submitted to
3 the patent examiner in connection with the '471
4 application. In there were motions to restrict. Do
5 you know what a motion to restrict is?
6    A    Motion to restrict.
7    Q    I can just tell you if you'd like. It's a
8 motion to keep certain documents under seal with the
9 court.
10   A    Not a restriction requirement. That's
11 sort of the world I live in.
12   Q    So no. It is not related to restriction
13 requirement. It's -- say a confidential document was
14 submitted to the court, MDX or Health Grades would
15 submit a motion telling the court please keep this
16 one under seal so the public can't see it.
17   A    Okay.
18   Q    Okay. There were a number of motions to
19 restrict submitted to the examiner in connection with
20 the '471 application. Why were those disclosed?
21   A    From who?
22   Q    Well, they were disclosed from Merchant &
23 Gould and IDS --
24   A    Who filed the motions to restrict in the
25 first place?

Page 57

1    Q    Both Health Grades and MDX.
2    A    Okay.
3    Q    But either one, why were those disclosed?
4    A    I would have to speculate.
5    Q    Okay. Well, give me your best shot
6 because I'm going to ask you at trial.
7        MR. KANAN: Well, don't speculate. If you
8 have an informed ability to opine why they were
9 submitted, fine, but don't speculate. That's
10 speculation.
11   Q    (BY MR. STIMPSON) So as we sit here right
12 now, you don't know why those were disclosed, right?
13   A    Well, I think that there was probably some
14 thought that went into it to say that, you know, this
15 might lead a reasonable examiner to -- even if they
16 wanted to ask more questions and ask for more
17 information, they have the ability to do that. So
18 providing information to them is never a bad thing.
19   Q    Well, under that theory then, why didn't
20 you disclose every document on the docket?
21   A    Because not everything necessarily in our
22 estimation would lead to relevant material --
23   Q    Right. So --
24   A    -- like damages and stuff like that.
25   Q    Why did you think that the motions to

15 (Pages 54 - 57)

Page 58

1 restrict could be some help to the examiner?
2    A    I wasn't involved in that. What documents
3 are the underlying documents?
4    Q    Well, you're the guy who's the 30(b)(6)
5 topic guy. So my question to you is, as we sit here,
6 do you know why motions to restrict were submitted to
7 the examiner?
8    A    I don't know today.
9    Q    How about motions for extension of time?
10 I'll represent to you that those were also submitted
11 in IDS forms. Why would an examiner want to see a
12 motion for an extension of time?
13    A    I don't know what the extension of time
14 is.
15    Q    It's an extension to get more time to file
16 something with the court.
17    A    I don't know. If it was related maybe to
18 another document that was ultimately filed, maybe a
19 determination was made that these are all part of the
20 relevant record or the document that is relevant.
21    Q    How about a motion --
22    A    Because I think we did, by the way, submit
23 some of our -- some of Health Grades' confidential
24 information under seal. And so those documents would
25 have been probably the subject of a motion to

Page 59

1 restrict, which I'm just not familiar with that
2 language. So it's related to a document that was
3 ultimately filed in an IDS.
4    Q    And so if the motions to restrict were not
5 related to those documents, then why would they be
6 submitted?
7    A    For the reason that I answered before.
8    Q    Which is?
9    A    It might -- it might lead to something
10 relevant.
11    Q    As we sit here today, you do not have --
12    A    I don't have --
13    Q    -- an answer to why?
14    A    I don't have a specific independent
15 answers for these documents to which you're referring
16 to generally.
17    Q    How about motions to modify scheduling
18 orders? I'll represent to you that those were also
19 submitted in the IDS forms. Why would those be
20 submitted?
21    A    The same answer.
22    Q    Which is?
23    A    That it might lead to relevant material or
24 someone at some point said we should provide this to
25 the examiner in case she finds it relevant.

Page 60

1    Q    Okay. Who said that? Do you have any
2 idea?
3    A    It would probably be Andy Pouzeshi.
4    Q    Okay. You knew that MDX wasn't relying on
5 motions to restrict or motions for extensions of time
6 or motions for oral argument or to modify scheduling
7 orders. MDX wasn't relying on any of that with
8 regard to its prior art. You understood that, right?
9    A    I understand that I have to provide
10 material from the litigation that's relevant
11 independent of what MDX is relying on for validity.
12    Q    That wasn't my question, though.
13       MR. STIMPSON: Move to strike. And could
14 you please read my question back. Actually, I'll
15 read it back.
16    Q    (BY MR. STIMPSON) You knew that MDX
17 wasn't relying on motions to restrict or motions for
18 extensions of time or motions for oral argument or
19 motions to modify scheduling orders. MDX wasn't
20 relying on any of that with regard to its prior art,
21 correct?
22       MR. KANAN: Objection, asked and answered.
23 You may answer again.
24    A    I don't know specifically all the
25 documents that MDX was relying on for validity, but I

Page 61

1 have to provide material from litigation.
2    Q    (BY MR. STIMPSON) Yeah. But you don't
3 have to provide all documents from litigation, right?
4 You understand that.
5       MR. KANAN: Asked and answered. You may
6 answer again.
7    Q    (BY MR. STIMPSON) Right. You understand
8 that?
9    A    Yes.
10    Q    In fact, you understand, don't you, Mr.
11 Scull, that it's desirable to avoid the submission of
12 long lists of documents if it can be avoided, right?
13       MR. KANAN: Are you reading from
14 something? And if you are, I would ask that you show
15 the witness what you're reading from.
16    Q    (BY MR. STIMPSON) You can answer the
17 question.
18       MR. STIMPSON: No.
19       MR. KANAN: Well, when you say you're
20 aware of that, are you referring, Mr. Stimpson, to a
21 document --
22       MR. STIMPSON: I'm just asking the
23 question.
24       MR. KANAN: -- some law or some rule or
25 regulation?

16 (Pages 58 - 61)

1 to be referencing to -- to Page -- this is Page 9.
2        MR. KANAN:  You mean it says Sheet 9 of 11
3 at the top?
4        MR. STIMPSON:  Right.  It's 253 Bates
5 number.
6    Q   (BY MR. STIMPSON)  And can you look at
7 that for me, please, Mr. Scull.  And specifically I
8 want to reference you to the -- it's the third
9 reference from the bottom.
10   A   Declaration of Richard G. Cooper.
11   Q   Right.  And I'll represent to you that of
12 the 233 references in this IDS, this one was
13 Number 193.  Okay.  And why did you put the Cooper
14 declaration there, Mr. Scull, as opposed to upfront?
15   A   So first of all, are you counting the
16 patents?
17   Q   Yes.
18   A   So first of all, the form calls for
19 patents first.
20   Q   Okay.  So that would explain why it wasn't
21 in the top first 70.  Why wasn't it -- why was it 193
22 overall in this IDS?
23   A   Well, right there is a big part of your
24 answer.  In the second section, form patent, so we
25 had one there.  The third section it looks like

1 they're based on docket number, and that takes us
2 down to basically the last group, and it's second of
3 the last group.
4    Q   So why was it submitted -- why was it on
5 the form there?
6    A   I just told you.
7    Q   That was the extent of your reasoning.
8 Any other reason?
9    A   I suspect that was the determination was
10 to go in some sort of logical order.
11   Q   So certainly with this IDS there's no
12 highlighting of the Cooper report to the examiner,
13 right?
14   A   I don't know what highlighting means.
15 Maybe she went right to that.
16   Q   Right.  But you don't know what the word
17 "highlighting" means?
18   A   Well, it clearly doesn't mean top of the
19 list because the patents have to be top of the list.
20 And these are done in sequential order.
21   Q   Okay.  I'm not asking about --
22        MR. KANAN:  Well, let him finish his
23 answer.
24   A   These are in sequential order.  These look
25 like these are done in sequential order.  So, again,

1 it was a matter of not providing some jumbled list,
2 which I think would be probably worse.
3    Q   (BY MR. STIMPSON)  So you could have --
4 let's just talk about things you could have done,
5 okay, Mr. Scull.  You could have submitted a cover
6 with this and said here's our 233 documents to this
7 IDS, we want to point out the Cooper report which MDX
8 is relying on and thinks is great prior art, it's
9 attached or you can find it here.  You could have
10 done that, right?
11   A   Yes.
12   Q   So if you look to the last page --
13        MR. KANAN:  And that's Bates 257.
14        MR. STIMPSON:  Sheet 11 of 11.
15        MR. KANAN:  Oh, wait a minute.  That's
16 different.  That's Bates 255; is that right?
17        MR. STIMPSON:  Yeah.
18        MR. KANAN:  Scott, yes.
19   A   I have something else and it looks like
20 it's ripping.
21   Q   (BY MR. STIMPSON)  Oh, here, let me staple
22 it.  Actually, let me just do it this way, Mr. Scull.
23 I'll also represent to you that in your references
24 disclosed you have motions on summary judgment of
25 willfulness.  Why did you disclose briefs on the

1 willfulness issue to the examiner in IDS?
2    A   What's in the -- I don't know what's in
3 the willfulness as we sit here today, so if it talks
4 about art or claims or even products the claims might
5 read on, then I think it's relevant to potential
6 interpretation that an examiner might find --
7    Q   Any other --
8        MR. KANAN:  Let him finish.  Were you
9 done?
10   A   So that's why I would think it was
11 submitted.  I don't know.
12   Q   (BY MR. STIMPSON)  Okay.  And did you
13 decide to submit the willfulness briefs?
14   A   Did I decide specifically?  I don't
15 remember.  If someone came to me and said should we
16 submit them, I don't remember.
17   Q   And you don't know as we sit here today
18 specifically why the willfulness briefs were
19 submitted, right?  You were just saying why they
20 might have been submitted, right?
21   A   Say that again.
22   Q   You don't know specifically why the
23 willfulness briefs were submitted, right?
24   A   I think that's what I just said.
25   Q   And so there are also motions to

1 bifurcate. Do you know what that means?

2    A    To split the trial.

3    Q    Right. So those briefs were submitted as

4 references in the IDS. Do you know why?

5    A    I'm speculating so that the examiner knows

6 or what's going on with the trial and what's going on

7 with the case.

8    Q    Why would the examiner want to know what's

9 going on procedurally with the trial?

10   A    I can speculate if you want. I mean, they

11 might want to know all kinds of things as to what's

12 going on with the trial.

13   Q    Okay. Well, then do your best --

14   A    Including like when is it going to be

15 over.

16   Q    Okay. So that's why you think you

17 submitted the bifurcation briefs?

18   A    No. I suspect it was more based on

19 potential relevancy to the interpretation and claim

20 scope.

21   Q    Any idea as you sit here today what that

22 relevancy might be?

23   A    I don't know what the motion to bifurcate

24 says.

25   Q    And you didn't read it before you

1 submitted it?

2    A    I didn't study it.

3    Q    Did you read it?

4    A    I don't remember reading it.

5    Q    How about requests for discovery? There

6 are actually requests for discovery, not the

7 responses to the requests but actually questions for

8 discovery without any substantive responses. Why did

9 you disclose those?

10   A    I would think those would be potentially

11 highly relevant about, hey, what's happening out

12 there.

13   Q    If you were an examiner, how would you use

14 that?

15   A    I don't know.

16   Q    So let me ask you --

17   A    There's a lot of ways I could use it.

18   Q    All right. Well, tell them.

19   A    Including, hey, tell me more about what

20 this is. Tell me what the answer was to this. You

21 know, tell me what art came back in response to this.

22   Q    Any way the examiner could use those to

23 reject a claim?

24       MR. KANAN: Objection, asked and answered.

25 He just said, but go ahead. You can answer again.

1    A    Examiners, they do what they do and they

2 do a great job of weeding through tons of art to

3 figure out whether things are patentable or not. So,

4 again, it goes into their body of knowledge and their

5 understanding of the claims, and so it's relevant.

6       MR. STIMPSON: Okay. Move to strike as

7 nonresponsive.

8    Q    (BY MR. STIMPSON) Is there any way an

9 examiner could use a request for discovery in

10 rejecting a patent claim?

11       MR. KANAN: Asked and answered. You may

12 answer again.

13   A    There are lots of ways that they could use

14 it based on their body of understanding of the case

15 and the responses, even sort of what one side thinks

16 and what another side thinks and it might lead them

17 to some art and it might lead them to more questions

18 to put upon the prosecution counsel to supply more

19 information to them.

20   Q    (BY MR. STIMPSON) Any other reasons you

21 can think of why asks for discovery would be

22 submitted to an examiner?

23   A    Not at the moment.

24   Q    What do you understand -- what do you

25 understand the term "commercial embodiment" to mean?

1    A    I mean, me personally, I mean, I would

2 just have to guess that it means something someone

3 has come up that's commercially viable.

4    Q    Okay. But we don't have to guess, right.

5 We're both patent lawyers. We know that commercial

6 embodiment of a patent is something that falls under

7 a patent claim, right? I mean, you know that, right?

8    A    I think it's more a term of art used in

9 litigation than in prosecution.

10   Q    So you've never used the term "commercial

11 embodiment" in a patent before?

12   A    Rarely. I don't remember the last time

13 I've ever used it.

14   Q    But when you do use it, you use it to mean

15 something that falls under a claim of a patent,

16 right?

17   A    Which is what I think what I said, yeah.

18   Q    And if the -- Health Grades had been

19 selling a commercial embodiment of the patent in the

20 prior art, the examiner would want to know that,

21 right?

22   A    I think so.

23   Q    Okay. So you said you had an interview

24 with -- do you know how to pronounce her name? I

25 believe -- it's a "she" I think. Trang Nguyen?

19 (Pages 70 - 73)

Page 82

1 considered.
2    Q    Okay.  I've got to make sure I'm clear
3 because you keep saying you mean considered.  When an
4 examiner says she considered a reference, does that
5 necessarily mean that the examiner read every word of
6 that reference, in your understanding?
7    A    Well -- and let me back up.  I have no
8 idea.  Her specific practice might be to read
9 everything.
10    Q    Now, you said that you had a conversation
11 with Ms. Nguyen about the examiner amendment?
12    A    I did.
13    Q    Okay.  And what was talked about there?
14    A    She wanted to make some amendments to the
15 claims and we talked about what those potential
16 amendments were.
17    Q    What were they?
18    A    Oh, I can't recall off the top of my head
19 other than they were overcoming 101 type rejections
20 and providing system or server or certain words like
21 that.  There may have been also a 112 -- I think
22 there was a 112 tweak that we had to make as well.
23    Q    Anything else discussed in that
24 conversation?
25    A    She -- that's when she told me about her

Page 83

1 new supervisor and the new supervisor focusing on
2 that.
3    Q    Anything else?
4    A    I don't recall off the top of my head.
5    Q    Do you recall anything else other than
6 what we've talked about in the October 2
7 conversation?
8    A    No.  That was a very, very short
9 conversation.
10    Q    Then there was a conversation you had
11 about a typo?
12    A    Correct.
13    Q    And what was said there?
14    A    She asked a question about -- we basically
15 -- and it's in the record.  So we had to file another
16 filing to explain how we had misnumbered a claim.
17 And she picked up on it and said, well, your
18 arguments here don't seem to relate to the words of
19 that particular claim that you quoted.  And it was
20 just -- it was just a typo and a cut and paste or
21 something as far as the number of the claim and that
22 type of thing.
23        So she was asking -- she put it both ways,
24 are you changing the claim so the claim numbers or is
25 this a typo.  She was on it.  And we looked and it

Page 84

1 was a typo.  And so I think the conversation was also
2 what do we do about it.  Do we file a supplemental or
3 do we have to file a brand-new response.  And I think
4 in part did we lose our time, do we have to pay an
5 extension of time, all sort of just specifics around
6 how to recover or -- I mean, correct that accidental
7 typo.
8    Q    Anything else discussed in that
9 conversation?
10    A    I don't recall.  I don't recall.
11    Q    And then you said -- and we've talked
12 about -- other than the interview, we've talked about
13 all the conversations you've had with the examiner,
14 right?
15    A    I believe so.  I don't think I was
16 involved in setting up the interview so much.  I
17 tried to find out -- I didn't see that I had
18 necessarily called her, because typically for an
19 interview you call ahead of time and you ask for
20 schedules and make sure the dates are going to work
21 out and all that kind of thing, and I think Andy
22 and/or his assistant might have done that legwork.
23    Q    What about either of the primary
24 examiners, Jerry O'Connor and then there was another
25 one.  Did you ever talk to either of them outside of

Page 85

1 this interview?
2    A    No.
3    Q    Now, you said that Andy -- how do you
4 pronounce his last name again?
5    A    Pouzeshi.
6    Q    Pouzeshi.  He had some conversations with
7 the examiner.  Can you tell me what those were,
8 please.
9    A    Yes.  So I talked to him to find out what
10 they were.  And he doesn't recall any substantive
11 conversations.  Again, I think he set up the
12 interview.  His name is listed.  So she would call
13 him or me on -- like she did and left that message
14 about the examiner amendment.  He was trying to
15 recall.  He might have actually talked to her and
16 immediately said, you know, let's get Tim involved
17 because we -- when we talked to her about the
18 details, we talked to her.
19    Q    When you talked to her about the details
20 of what?
21    A    The examiner amendment, the 101.
22    Q    So that conversation you already told me
23 about.
24    A    The one I already told you about.  He was
25 involved.

22 (Pages 82 - 85)

Page 86

1    Q    Anything else that Andy talked to her
2 about?
3    A    I don't know any, no, not that I know of.
4    Q    Did Andy talk to either of the primary
5 examiners other than at the interview?
6    A    I doubt it.
7    Q    Okay.  Tell me about Ms. Nguyen.  How old
8 is she?  Do you know roughly?
9    A    I have no idea.
10    Q    Is she over 50?
11    A    I have no idea.
12    Q    You don't -- is she over 20?
13    A    No.  She's -- you know, she's over 40.
14 She might be over 50.
15    Q    Okay.  And how is her English?
16    A    It's okay.
17    Q    Okay.  Is it -- could she -- English was
18 not her first language?
19    A    Oh, I have no idea.
20    Q    Did she have a heavy accent?
21    A    She has a little accent.
22    Q    All right.  That's fine.  Do you know if
23 she had any experience in litigation at all?
24    A    I have no idea.
25    Q    Do you know if the primary examiner had

Page 87

1 any experience in litigation at all?
2    A    I have no idea.
3    Q    While he's getting that, Mr. Scull, were
4 any documents submitted on behalf of Health Grades in
5 connection with the '471 application reviewed by --
6 before they were submitted by litigation counsel for
7 Health Grades?
8    A    Can you repeat that question?
9    Q    Were any of the documents that were
10 submitted in connection with the '471 application,
11 preliminary amendment, response to office action,
12 IDS's, were any of those documents reviewed before
13 they were submitted to the patent office by
14 litigation counsel for Health Grades?
15    A    Were they reviewed.
16        MR. KANAN:  Well, I think you can simply
17 answer the question yes or no or you don't know
18 without getting into any details of what may have
19 occurred or not.
20    A    Yes.
21    Q    (BY MR. STIMPSON)  And were they -- was
22 the preliminary amendment reviewed by counsel --
23 litigation counsel for Health Grades before it was
24 submitted?
25    A    I don't recall.

Page 88

1    Q    Do you know who drafted those claims in
2 the preliminary amendment?
3    A    Who drafted the claims in the preliminary
4 amendment.  Oh, yeah, I do recall.  Yes.
5    Q    Who drafted them?
6    A    The previous question, yes.  I did.
7    Q    So the previous question was did
8 litigation -- counsel for litigation -- litigation
9 counsel for Health Grades review the preliminary
10 amendment before it went in.  The answer is yes?
11    A    Yes.
12    Q    And you drafted the claims?
13    A    I drafted and -- well, Andy -- I think
14 together we drafted them.
15    Q    And did litigation counsel for Health
16 Grades make any edits?
17        MR. KANAN:  Wait a minute now.  Now we're
18 getting into attorney/client work product issues, so
19 I'm going to instruct him not to answer.
20    Q    (BY MR. STIMPSON)  How about the
21 information disclosure statements?  Were those
22 reviewed by litigation counsel for Health Grades
23 before they were submitted to the patent office?
24        MR. KANAN:  Again, yes, no or you don't
25 recall.

Page 89

1    A    The actual document right before it went
2 in, I don't know.
3    Q    (BY MR. STIMPSON)  Well, why did you
4 qualify like that?  Did they review anything
5 regarding the --
6    A    Yeah.  To make sure the confidentiality
7 was protected and everything else.
8    Q    Did they review it to see and discuss with
9 you, well, which documents were being submitted in
10 the IDS's, did litigation counsel review that?
11        MR. KANAN:  Again, that's privileged.
12        MR. STIMPSON:  Instructing him not to
13 answer?
14        MR. KANAN:  Yeah.
15    Q    (BY MR. STIMPSON)  How about the responses
16 to the office actions?  Were those run by litigation
17 counsel for Health Grades before they were submitted
18 to the patent office?
19        MR. KANAN:  Yes, no or you don't recall.
20    A    Sorry.  I'm just trying to remember what
21 you said.  The office action response?
22    Q    (BY MR. STIMPSON)  Yes.
23    A    Was that submit -- did we submit it, was
24 it run by litigation counsel?
25    Q    There was a response to that April 5 --

23 (Pages 86 - 89)

Page 90

1 A The 9/5 filing?

2 Q Whatever the date was on that response to

3 the office action, was that run by litigation counsel

4 before it was submitted?

5 A I don't know. I think so.

6 Q And just generally speaking, you were very

7 well aware, I mean, during this patent prosecution

8 that what happened in this prosecution might be

9 argued to the jury in this case, right?

10 MR. KANAN: Well, again, I don't want you

11 to relate any communications you had with clients or

12 litigation counsel. So if you're able to answer the

13 question without that.

14 A I actually don't know that I thought that

15 this would be an issue in the current litigation.

16 Q (BY MR. STIMPSON) So do I understand you

17 correctly to be telling me that you did not -- when

18 you were doing all this patent prosecution and

19 submitting the stuff from the '060 litigation it

20 didn't occur to you that perhaps these documents

21 would be shown to the jury in this case?

22 A Well, so my thought process on it was less

23 about --

24 MR. KANAN: And let's not get into thought

25 process that involves communications with counsel or

Page 91

1 client, just --

2 A This is my personal --

3 MR. KANAN: -- the generality.

4 A This is my personal thought, is that the

5 case is the case and the continuation is the

6 continuation and, you know, it has its record. It

7 has its documents necessary in case any litigation

8 occurs out of '471, but -- and we're dumping all this

9 litigation, you know, in there which, you know, we

10 did, I think, a really good job to try to limit it

11 and narrow it down for the examiner.

12 But did I know that the reverse might

13 occur with the '471 and things we were doing might

14 all along -- you know, that's something that --

15 that I wouldn't -- I don't know that I would say.

16 Q (BY MR. STIMPSON) You've been practicing

17 patent law for 18 years, right?

18 A Uh-huh.

19 Q And so your testimony is that you didn't

20 realize that if this prior art got past this '471

21 examiner, you didn't realize that might go to the

22 jury in the -- this litigation?

23 A You know, I thought that it would be

24 relevant to the '471.

25 Q And so --

Page 92

1 A And then I think that there's some

2 attorney/client privilege in there.

3 Q So the discussions about how this might

4 impact the jury, those were discussions you had with

5 counsel for litigation, the litigation counsel for

6 Health Grades?

7 MR. KANAN: Well, object to the form of

8 the question which in itself characterizes the nature

9 of the discussions. He said this implicates

10 attorney/client communications or communications with

11 litigation counsel, so I'll instruct him not to

12 answer.

13 Q (BY MR. STIMPSON) Is it fair to say that

14 one of your goals, Mr. Scull, was to try to get this

15 prior art through the patent office on the '471

16 because you knew that if you could do that somebody

17 might be able to argue to the jury that the examiner

18 looked at the art?

19 MR. KANAN: And I'll instruct him not to

20 answer.

21 Q (BY MR. STIMPSON) These are pages HG

22 223784 and 86, and this is the interview summary,

23 right, Mr. Scull?

24 MR. KANAN: So this is still part of

25 Exhibit 1000?

Page 93

1 MR. STIMPSON: Yes.

2 MR. FERARO: Yeah.

3 Q (BY MR. STIMPSON) Right, Mr. Scull?

4 Interview summary.

5 A I'm looking at it. So there are two

6 interview summaries. This is one.

7 Q Right. This is the examiner's interview

8 summary, right?

9 A This is the examiner's interview summary.

10 Q And you understand that the examiner is

11 supposed to create a complete and accurate record of

12 the interview, right?

13 A I don't know about those words. She's --

14 I know that they do try to create a record of the

15 interview.

16 Q Right. But not just create --

17 A It's not inaccurate. They don't want to

18 do anything that's inaccurate.

19 Q Right. They don't want to do it

20 incomplete either, right?

21 A There's no trans- -- there's no record

22 created or anything like that.

23 Q Well, here's my question to you, Mr.

24 Scull. You understood that this examiner was trying

25 to create an accurate and complete record of the

24 (Pages 90 - 93)

Page 110

1 some time.
2    Q    Okay.  Did you ever have any discussion
3 about the sources of the data with the examiners?
4    A    The sources of the data with the
5 examiners.  Sources of the data with the examiners.
6 So you mean like whether or not it comes from a
7 doctor or a patient?
8    Q    Right.  Or a third party.
9    A    I don't recall.  I probably did.  We
10 talked about the claims.  I think the claims say
11 something to the effect of where they come from.
12    Q    After the primary examiner's supervisor
13 said that he was focused on the actual prior art, not
14 what people said about it, did you or Mr. Pouzeshi
15 say anything about the art after that?
16    A    Anything about the art after that.  Did I
17 say anything about the art after that.  If I did, it
18 would have been something along the lines of the art
19 is in the -- is in the IDS or something like that.
20    Q    You don't remember saying that?
21    A    I don't remember saying that.  I know that
22 we had just given them a rather large IDS and they
23 were going to, you know -- and she said that she was
24 going to go through it.  In fact, that's kind of how
25 she concluded, was I think I need to go through all

Page 111

1 that and then I can make determinations.
2    Q    Is that exactly what she said?
3    A    Something like that.  I don't remember.
4    Q    Anything else she said about going through
5 the IDS's?
6    A    She might have said that -- they might
7 have had a short conversation about, you know -- it
8 would have been her saying, you know, if I have
9 questions, you know, can I bring them to you type of
10 thing.
11    Q    Anything else?
12    A    Not that I remember.
13    Q    Did you -- now, we talked about your
14 mentioning of the MDX expert.  Did you ever mention
15 the Drucker report in this interview?
16    A    Not specifically, no.
17    Q    Well, did you mention it not specifically?
18    A    If it's in the Druck- -- in the Cooper
19 report, then yes.
20    Q    Okay.  But only by referencing the MDX
21 expert if it's in there, right?
22    A    Yes.
23    Q    Did you know at the time this interview
24 that Health Grades was commercializing this invention
25 in the summer of 2005?

Page 112

1        MR. KANAN:  Object to the form of the
2 question.
3    A    I have no idea of dates.
4    Q    (BY MR. STIMPSON)  Did anybody ever tell
5 you when Health Grades --
6    A    Those dates, I don't know.
7    Q    Did anybody ever tell you that Health
8 Grades was commercializing the '060 patent in the
9 summer of 2005?
10    A    In the summer of 2005 did somebody come to
11 me and tell me about claims that haven't been
12 drafted.  I mean, it doesn't make any sense.  I'm not
13 following.
14    Q    The '060 patent we're talking about.  The
15 '060 patent.
16    A    Right.
17    Q    And you know there's a relationship
18 between the '060 patent and the '471.
19    A    Of course.
20    Q    So did anyone ever tell you that Health
21 Grades was commercializing the '060 patent in the
22 summer of 2005?
23    A    So the claims as they turned out after it
24 issued -- which when did it issue, like 2010 or
25 something like that?

Page 113

1    Q    Uh-huh.
2    A    -- did someone, say you and/or litigation
3 counsel, come to me and say, hey, by the way, that --
4 there's a commercialization of the '060 and it was
5 done in 2005?
6    Q    You're adding a lot to my question.  It's
7 really -- let me try to simplify it.
8    A    I think that's exactly what you're asking
9 me.
10    Q    If so, I didn't get that question.  So
11 let's just start again.  Did you know at the time of
12 this interview -- let me back up.  You know what I
13 mean when I say a commercial embodiment of the '060
14 patent.  It's something that falls under at least one
15 claim of the 060 patent, right?
16    A    Okay.
17    Q    And did you know that Health Grades was
18 commercializing that in the summer of 2005 when you
19 had this interview?
20    A    Did I know that they were commercializing
21 it in the summer of 2005.  You know, none of that
22 comes together for me that I -- so . . .
23    Q    You just don't remember knowing that,
24 right?
25    A    Yeah.  I mean, I don't even remember --

29 (Pages 110 - 113)

Page 114

MR. KANAN: I think his answer was he didn't recall.
MR. STIMPSON: No. It's not your answer.
A I'm trying to remember the dates and things like that. And I don't remember specific conversations about commercial embodiments, so . . .
Q (BY MR. STIMPSON) Okay. So did you ever --
MR. KANAN: Scott, whenever you get a chance.
MR. STIMPSON: Let's take a break. It's fine.
MR. KANAN: You don't have to do it now.
MR. STIMPSON: Let's take one now. It's about time.
(Recess from 11:30 to 11:42 a.m.)
Q (BY MR. STIMPSON) Mr. Scull, let me show you what's been marked with Bates Numbers HG 223292 to 93 and 3034 to 35, and the reason that this has such a gap in the Bates numbers is because the references are in between these two documents -- that's why -- in the prosecution history. Okay.
And if you look at the third page, Mr. Scull, this is an information disclosure statement that was submitted in connection with the '471

Page 115

application, correct?
A Yes.
MR. KANAN: Bates 292.
Q (BY MR. STIMPSON) And in this IDS you disclosed -- you can see -- just go down the list a bit here. You see nursing home quality reports, physician quality comparison reports, physician quality reports, hospital quality reports. Do you see that, Mr. Scull?
A I do.
Q Okay. And then on the next page, the very last entry is a Health Grades report on Mr. Drucker.
A Okay.
Q And that's the Drucker report we've been talking about. And I'll show you -- you can confirm for me, but I'll give you -- it matches up with Bates numbers that are there, MGHG 000016 to 19.
A Okay.
Q And I'll represent to you that this is -- there are two hundred -- at this point in time there are 294 references not in this IDS alone but all of them combined. Okay. And so if that's accurate, Mr. Scull, the Drucker report was submitted as the 294th reference in all these IDS's, right?
A I don't know how you count things. I

Page 116

think that -- if that's what you say. Okay.
Q And this was submitted September 20, 2013, correct?
A Correct.
Q This was after your interview with the examiner, correct?
A Yes.
Q Okay. And there's nothing here highlighting the Drucker report for the examiner, correct?
A Correct.
Q And this is submitted as the last four pages of thousands of documents from the IDS's, correct?
A I don't know how many references were cited in the '060 that all of these references now cited again. So, you know, I don't know that the characterization that this is the last on some big stack is necessarily accurate.
Q Okay. Well, do you have any reason to disbelieve me when I tell you that this is at least, by my count -- I went through one, two, three, four, five, every one --
A It looks like what you're saying it's last on this list and that it looks like it's last on this

Page 117

list.
Q Right. And this list is one of the last ones that was submitted to the patent and trademark office, correct?
A I think we just submitted another IDS.
Q Right. There was another one that was submitted after the notice of allowance. But other than that before the allowance --
A Which I think has even more. I think it's quite large actually.
Q So before the allowance this was the last -- very last piece of reference submitted, right?
A So this was the last art she may have considered, right, as she was allowing it.
Q Right. If that's --
A Possibly. You're asking me to speculate.
Q Yeah. So whether she actually read that before the notice of allowance is speculation, right?
MR. KANAN: Form, objection.
A No. I wouldn't say that at all. It was considered. She marked it as considered.
Q (BY MR. STIMPSON) Right. Considered. Let's look -- talk about the Drucker report then, Mr. Scull. You -- first of all, before we get there, you understand that every -- well, the claims all talk

Page 118

1 about sources of data, right? We talked about this
2 earlier, right? What comes from the physician, what
3 comes from third parties, who comes from patients,
4 right?
5    A    It's part of the claim, yes.
6    Q    Right. So in order to invalidate those
7 claims the examiner would have to know what the
8 sources of the data are, right?
9    A    In order to invalidate the claim or reject
10 it, I guess is what you're saying.
11    Q    Yes.
12    A    She would have to know the source of all
13 the data. She would have to know the source of all
14 the data. There would have to be some teaching as to
15 the source of data.
16    Q    If you would look at the first part of the
17 Drucker report where it talks about patient medical
18 philosophy --
19        MR. KANAN: Do you have a copy of that?
20        MR. FERARO: I'm sorry.
21    Q    (BY MR. STIMPSON) The medical philosophy,
22 personal facts, awards and honors, do you see that?
23    A    Where did this come from?
24    Q    It's right there. You submitted it to the
25 examiner, Mr. Scull.

Page 119

1    A    Is it even prior art?
2    Q    I'm not asking you about that right now.
3 I'm asking you about the top of it. Okay. I just
4 want to ask some substantive questions about it.
5    A    Okay. Well, I didn't study this before I
6 came in here, so.
7    Q    That's okay. I'm just asking you -- like
8 look at the top part of it where it talks about -- I
9 think it says patient/medical philosophy, then
10 personal facts and awards and honors. Do you see
11 that?
12    A    I do.
13    Q    And professional appointments,
14 professional affiliations, memberships. Do you see
15 that?
16    A    I do.
17    Q    Do you see anything in that data
18 indicating where those data elements came from?
19    A    So there's copyright. This is something
20 on here. What does that mean? I mean, there's
21 nothing specific that I can necessarily see.
22    Q    And if you look at the next page, you'll
23 see there are patient experience ratings there for
24 Dr. Drucker. Do you see the bar graph?
25    A    Oh, yes.

Page 120

1    Q    And you understand that the claims require
2 the patient experience grading to come from certain
3 Websites, right, including Health Grades' own
4 Website?
5    A    You're asking me if I appreciate where the
6 data came from to populate this report? I can't -- I
7 can't say.
8    Q    Okay. So you can't tell from this
9 document where these patient ratings came from,
10 right?
11    A    I can't say from this document.
12    Q    Do you know --
13    A    Well, I haven't finished -- do you want me
14 to finish reading it?
15    Q    I'm sorry. Go ahead.
16    A    So it says here Health Grades has examined
17 disciplinary actions within the last five years, the
18 office of --
19    Q    My only question, Mr. Scull, is can you
20 tell where these patient ratings came from?
21    A    Average response from six surveys. So my
22 issue with this is twofold. First of all, it does
23 say there were surveys and it's patient experience,
24 but I happen to know about the Drucker report and I
25 don't know if this is something just put together as

Page 121

1 sort of test site so she may have made it up.
2    Q    Did you discuss that with litigation
3 counsel for Health Grades?
4        MR. KANAN: Well, objection. Instruct him
5 not to answer.
6    Q    (BY MR. STIMPSON) You can answer yes or
7 no, right?
8        MR. KANAN: No. Because your question
9 asks about the specific answer he gave and I
10 instructed him not to answer.
11    Q    (BY MR. STIMPSON) Let me change it again.
12 Did you discuss the Drucker report with litigation
13 counsel for Health Grades?
14        MR. KANAN: Yes, no or you don't recall.
15 You can answer yes or no or you don't recall.
16    A    Yes.
17    Q    (BY MR. STIMPSON) And my question which
18 is -- I think you answered but I'm not sure -- is you
19 can't tell from these patient experience surveys
20 where they came from, right?
21    A    I can't tell.
22    Q    And how did Dr. -- you know Dr. Cooper
23 relies on this reference, right?
24    A    You said he did, yes.
25    Q    And how did Dr. Cooper determine where the

31 (Pages 118 - 121)

Page 122

1 survey results came from, do you know?

2    A   I have no idea what he thinks and does.

3    Q   Because you didn't read the Cooper report,

4 right?

5    A   And I don't know what other people say

6 about this.

7    Q   Right.  I mean, Health Grades' witnesses

8 testified in this litigation about these very

9 issues --

10    A   Oh, okay.

11    Q   -- right?  Did you know that?

12    A   I did not know that.

13    Q   Did you ever ask anyone?

14    A   No.

15    Q   Did you ever read any deposition

16 transcripts to find out for yourself?

17    A   No.

18    Q   And did you ever tell the examiner that

19 there were sworn deposition testimonies that might be

20 of interest to the examiner?

21    A   Well, indirectly I pointed to that report.

22    Q   Okay.

23    A   And apparently -- and you pointed it out.

24 It said that in there.

25    Q   Okay.  Did you provide the examiner with

Page 123

1 any of the deposition testimony of Mr. Hicks?

2    A   I think I already answered that earlier.

3    Q   And what was your answer?

4    A   I don't remember.

5    Q   How about the deposition testimony of

6 Mr. Montroy?

7    A   Same, I don't remember.

8    Q   How about the deposition testimony of

9 Mr. Dodge?

10    A   I don't remember.

11    Q   And so you submitted this Drucker report

12 and these other reports but you did nothing to help

13 the examiner find out where the sources of the data

14 came from, right?

15    A   Correct.

16    Q   If you could please turn to the last page

17 of the document.  Actually, let me show you -- let me

18 show you what's been marked as -- it's part of the

19 file history, and this is a September 5 -- this is

20 Bates Number HG 223759 to 83 and it's part of the

21 prosecution history and this is a September amendment

22 in response to non final office action, right?

23    A   Okay.

24    Q   And if you turn to Page 12 --

25    MR. KANAN:  So what Bates number is that?

Page 124

1    MR. STIMPSON:  I don't know.  It's just

2 Page 12 of the document.

3    MR. KANAN:  Number 12 at the bottom, you

4 mean?

5    MR. STIMPSON:  Yeah.

6    MR. KANAN:  So 770 is the Bates number.

7    MR. STIMPSON:  I'll take your word for it.

8 Mine isn't Bates numbered, foolishly.

9    Q   (BY MR. STIMPSON)  This is your interview

10 summary, right, Mr. Scull?

11    A   Oh, correct, yes.

12    Q   And it talked about there -- on the front

13 page about the 101 rejection.  You mention that had

14 earlier, right?

15    A   Correct.

16    Q   And the double patenting rejection.  We

17 talked about that, right?

18    A   Same thing, yes.

19    Q   Okay.  And then towards the end of your

20 summary it says, Examiners Nguyen and O'Connor agreed

21 that cited references failed to teach or disclose all

22 of the elements of the pending claims.  What cited

23 references were those?

24    A   The ones that we were discussing.

25    Q   That was Henley and Baker -- actually, you

Page 125

1 can see above a little bit in your interview summary,

2 right?

3    A   Correct.

4    Q   Okay.  And then in the last phrase you

5 say, Examiner Nguyen noted that she would have to

6 review the recent IDS submission prior to ultimately

7 agreeing upon allowance.  Did I read that correctly?

8    A   Yes.

9    Q   So at that time she hadn't reviewed

10 anything, to your knowledge, right?

11    A   No.

12    MR. KANAN:  Objection.  You may answer.

13    Q   (BY MR. STIMPSON)  Well, I mean, it's a

14 good objection.  Let me rephrase it.  At that time,

15 to your knowledge, she hadn't reviewed any of the art

16 on the IDS's, correct?

17    MR. KANAN:  Object to the form.  You may

18 answer if you can.

19    A   I think that she had reviewed some for

20 sure because some of it was stuff that she had looked

21 at in the '060, so she knew those.

22    Q   (BY MR. STIMPSON)  Okay.

23    A   And she knew there was an IDS, and I think

24 that she had started on that but she knew that she

25 had this task in front of her.

32 (Pages 122 - 125)

Page 130

1   A    That's where I made the typo.
2   Q    That was supposed to be 38, I think.
3   A    If we look at the supplemental, you'll
4 have a better --
5   Q    Again, making the same arguments that the
6 prior art just does not teach this stuff, right?
7   A    I cannot make any statements about
8 something that is inaccurate here.
9   Q    Well, this is --
10   A    It's inaccurate.  There's a typo here.
11   Q    Well, the only thing that is inaccurate is
12 that 39 is supposed to be 38, right?  I'll represent
13 that to you because I read your supplement.
14   A    Well, can I see the supplement and then
15 let's talk about that.
16   Q    Sure.  Here, I'll just show you mine.
17 I've highlighted some things for you.  There it is.
18 I think it's right on the front page actually.
19   A    Sorry.  There's two, right.  So the
20 language is from -- the reference -- there are two
21 mistakes it.  Referenced Claim 39 and included
22 language from Claim 42.
23   Q    Let me just put that aside and say
24 whatever claim you're talking about there on Page 17
25 of the office action, whatever claims you're talking

Page 131

1 about there you're arguing that the prior art does
2 not disclose those single spaced elements, right?
3      MR. KANAN:  Does not disclose all of the
4 features is what the document says.
5   A    I would prefer not to even refer to this
6 document, Page 17, because it was corrected here.  So
7 here in the new document, the supplemental, I think
8 we say something to that effect.
9   Q    (BY MR. STIMPSON) Okay.  So you're
10 looking at Bates Number HG 223025 to 33 and you're
11 looking at what, Page 2?
12   A    I don't know because you don't have Bates
13 on your copy.
14   Q    Here you go.  Let's trade.  So, anyway,
15 now you've got the supplemental response to non-final
16 office action dated September 23, 2013, right?  The
17 front page will show that.
18   A    Sorry.  I was reading.
19   Q    That's okay.  The front page of this,
20 you're looking at the supplemental response to the
21 non final office action dated September 23, 2013?
22   A    Correct.
23   Q    Okay.  And on Page 2 and Page 3 you're
24 again raising at least in part some of the source
25 data elements like from the healthcare provider, from

Page 132

1 the patient, from the third party and saying, look,
2 the prior art doesn't show all that stuff, right?
3   A    That the combination of Henley, Baker and
4 Martin fails to teach all of the features of
5 independent Claim 38.
6   Q    Okay.  So if Dr. Cooper had opined that
7 all those things were taught in one anticipatory
8 reference, the examiner would want to know that,
9 right?
10      MR. KANAN:  Object to the form.
11   A    Yes.
12   Q    (BY MR. STIMPSON) Okay.  Can I have those
13 back.  I want to show you, this is the notice of
14 allowance.  And you recognize -- this is Bates Number
15 MG 1097 to 112, and the front page you'll see this is
16 a notice of allowance, correct?
17   A    Correct.
18   Q    On the second sentence there, it says,
19 This application is subject to withdrawal from issue
20 at the initiative of the office or upon petition by
21 the applicant.  Did I read that correctly?
22   A    I don't know where you're reading.
23   Q    It's the very first paragraph under the --
24      MR. KANAN:  The third line.  He was
25 reading from the third line.

Page 133

1   A    Oh, in the middle of that paragraph.
2   Q    (BY MR. STIMPSON) Yeah.  Sorry.
3   A    So I assume you were reading it, so I will
4 say yes to that.
5   Q    Okay.  And so we can't say with certainty
6 that this is -- this patent prosecution is done, can
7 we?
8   A    No.
9   Q    In fact, you submitted new references
10 after this notice of allowance, right?
11   A    Correct.
12   Q    So the patent office could withdraw the
13 notice of allowance, right?
14   A    Correct.
15   Q    Have you paid the issue fee yet?
16   A    No.
17   Q    Why not?
18   A    I think it's not due until February 24th.
19   Q    And if you could please turn to Page --
20   A    And the fees just went down anyway.
21   Q    Did they?
22   A    So I wouldn't have paid them early anyway.
23   Q    On Page 2, it's actually the third page of
24 the document but it's labeled Page 2 at the top right
25 up here.  Labeled Page 2 up here.  It's the third

34 (Pages 130 - 133)

1  disclosed what you wanted to us to hear and you
2  wouldn't tell us all of that stuff. Just so there's
3  no surprise for you, Mr. Kanan.
4      MR. KANAN: Let's move on.
5      Q    (BY MR. STIMPSON) So did you tell -- did
6  you send this to the client, the reasons for
7  allowance?
8      MR. KANAN: Did you send it, yes, no or
9  you don't remember. Did you send this document to
10  the client?
11      A    I handed it to them.
12      Q    (BY MR. STIMPSON) Okay. And who did you
13  hand it to?
14      MR. KANAN: You can answer who it was.
15      A    Harris Troutman (phonetic) and Joel
16  Liftman (phonetic).
17      Q    Okay. Did you discuss it with them?
18      MR. KANAN: You can answer yes or no.
19      A    Yes.
20      Q    (BY MR. STIMPSON) Did you discuss it with
21  anybody else at Health Grades?
22      MR. KANAN: You can answer if you know.
23      A    No.
24      Q    (BY MR. STIMPSON) Did you send it to the
25  inventors, any of the inventors?

1      MR. KANAN: You can answer yes or no.
2      A    No.
3      Q    (BY MR. STIMPSON) Have you considered,
4  Mr. Scull, the possibility of submitting an affidavit
5  from someone at Health Grades telling the patent
6  office what they were doing in the prior art?
7      MR. KANAN: Objection. I'll instruct him
8  not to answer. His considerations are
9  attorney/client privilege.
10      Q    (BY MR. STIMPSON) Mr. Scull, you
11  understand as an experienced patent prosecutor that
12  one option for Health Grades is to submit an
13  affidavit and Health Grades simply tell the patent
14  office what it was doing in the prior art.
15      A    I guess that's an option.
16      Q    And have you discussed that option with
17  Health Grades?
18      MR. KANAN: Objection. Instruct the
19  witness not to answer.
20      Q    (BY MR. STIMPSON) Now, if Health Grades
21  had submitted an affidavit rather than the 300 and
22  something documents, references, and thousands of
23  pages that were submitted with this application, it
24  would put the examiner, right, on notice, right?
25  Here's what we're doing in the prior art, right?

1      A    That's your argument. I would have to
2  submit all of this anyway.
3      Q    Right. But an affidavit could get right
4  to the point with the examiner. Let me tell you, let
5  me come clean with you, Mr. Examiner or
6  Ms. Examiner --
7      A    I did come clean with them.
8      Q    I'm not debating with you right now.
9      A    I think you are.
10      Q    Mr. Scull, please -- okay. Here's my
11  question. Okay. You could have come straight to the
12  examiner with an affidavit from one of these
13  inventors or someone else in Health Grades saying,
14  look, this is what we were doing in the prior art,
15  right?
16      MR. KANAN: Object to the form and asked
17  and answered. You may answer again.
18      A    I don't understand the question.
19      Q    (BY MR. STIMPSON) Well, look, 11,500
20  something pages were submitted to the patent
21  trademark office, right?
22      A    If you say so.
23      Q    Okay. How many other patent applications
24  have you had with more than 10,000 pages of
25  references submitted?

1      A    I don't usually count the pages.
2      Q    Okay. Can you name one?
3      A    I know of one for sure.
4      Q    Okay. Do you know of two?
5      A    That I personally worked on or that I knew
6  about?
7      Q    That you touched on.
8      A    One that I knew about for sure.
9      Q    Of the thousands of applications that
10  you've touched on, this is only the second one that
11  you remember where you've ever submitted this much
12  material to an examiner, right?
13      A    Actually, that wouldn't be true. There
14  are several this had parent litigations going on that
15  I had some prosecution responsibility, several.
16      Q    Okay. And do you know in each of those
17  that you submitted more than 10,000 pages for the
18  examiner?
19      A    I don't know the number of pages, no.
20  Likely more than this, though.
21      Q    So for all this stuff that was submitted
22  to the examiner, Mr. Scull, all the prior art is
23  Health Grades' own prior art, right?
24      A    I don't understand your question.
25      Q    It's Health Grades' prior art that

Page 146

1 Dr. Cooper is relying on and MDX is relying on,
2 right?
3    A    If you say so.
4    Q    Right.  So rather than submitting 11,500
5 pages to the --
6    A    I have to submit those.
7    Q    Wait a second.  I've got to ask my
8 question.  Rather than submitting or perhaps in
9 addition to submitting the 11,500 pages, you could
10 have just done an affidavit and said, look, let me
11 come -- someone from Health Grades say, look, this is
12 what we were doing in the prior art, right?
13        MR. KANAN:  You're just arguing with him.
14 You've asked him this question before.  He said an
15 affidavit could be submitted.  It's been asked and
16 answered.  So get off of it.  Answer it one more time
17 and let's move on.
18    Q    (BY MR. STIMPSON) Can you answer, please.
19        MR. KANAN:  You're just arguing with him.
20    A    I did say that you suggested it could be
21 done.  I'm not disagreeing with you.
22    Q    (BY MR. STIMPSON) Okay.
23    A    But I do take issue with the form of the
24 question with respect to you could do this instead of
25 submitting other documents that I have to submit or

Page 147

1 otherwise implying that somehow that's a silver
2 bullet that changes everything.
3        MR. STIMPSON:  Move to strike after --
4 everything from "but I do take issue" as
5 nonresponsive.
6    Q    (BY MR. STIMPSON) This is the MGH 1131 to
7 52, and I think Mr. Scull will see -- recognize this
8 is the one where the examiner stamped every page that
9 she considered the references.
10    A    Okay.
11    Q    Okay.  And usually examiners just initial,
12 actually initial, right?
13    A    I wouldn't say that.  I think a lot of
14 them do this now.
15    Q    Okay.  And we've talked about this and
16 what it means to say considered.  I don't think we
17 need to belabor it any longer.  But let me see if I
18 have any questions about this actually.  I may not.
19        Do you know if -- I don't know if I asked
20 you this before, Mr. Scull.  Do you know if anyone on
21 the Health Grades patent prosecution team, your team,
22 actually read all of these references?
23        MR. KANAN:  Asked and answered.  You may
24 answer again.
25    A    I don't know.

Page 148

1    Q    (BY MR. STIMPSON) Let me show you what's
2 been marked -- it's United States Patent 5,365,425.
3 It's going to be marked as Exhibit --
4        MR. FERARO:  1005.
5    Q    (BY MR. STIMPSON) -- 1005.
6        (Exhibit Number 1005 was marked.)
7        MR. KANAN:  Did we have a 2, 3, and 4
8 today?
9        MR. FERARO:  I think we pre-marked some
10 that didn't get used.
11    Q    (BY MR. STIMPSON) You'll recognize this
12 as the first document, right?  That's why I pulled
13 it, Mr. Scull.
14    A    Okay.
15    Q    So it's the first reference cited on the
16 reference considered by the examiner.  Now, if the
17 examiner is going to consider using something like
18 this to reject claims, it's not a casual review, is
19 it?  It's a pretty intense review, right?
20    A    I don't know.  I know examiners do it all
21 the time.  I know they have tons of art that they
22 look at all the time, and so each one has their own
23 individual style, I'm sure, about how much to look
24 at, what parts to look at.  I can't speculate on what
25 examiners are going to do and how detailed or not.

Page 149

1    Q    Well, in order to use this reference, for
2 example, as either anticipatory or for obviousness,
3 the examiner would have to read this closely enough
4 to figure out whether it discloses every element of
5 the claim, right?
6        MR. KANAN:  Object to the form.  Calls for
7 speculation.  You may answer if you can.
8    A    And it's not every element.
9    Q    (BY MR. STIMPSON) Well, it depends.  If
10 it's anticipation it is, right?
11    A    If it's anticipation it is.
12    Q    And if it's obviousness, the examiner
13 still wants to review the reference to see if it's
14 got all the elements, right?
15    A    Correct.
16    Q    And to do that with 304 references would
17 take the examiner an awful long time, right?
18        MR. KANAN:  Object to the form.
19    A    That's their job.
20    Q    (BY MR. STIMPSON) Do you agree with me?
21    A    I don't know.  That's their job.  They
22 look at prior art.  They consider it in the amount of
23 detail that they need to in order to determine
24 whether or not they should reject the claims and
25 that's -- I mean, I can't say anything else about

38 (Pages 146 - 149)

Veritext/NJ Reporting Company
800-227-8440                              973-410-4040

1 what she did or didn't do.
2     Q    How did you find all those patent
3 references that are in there?  I'll represent to you
4 there are 69 of them.
5     A    I don't know.  I suspect that these are
6 references that were cited in either the '060 or
7 other related cases.
8     Q    Okay.  Thank you.  On August 27, the same
9 day of your interview, you filed a petition to
10 expunge with the commissioner of patents, correct?
11    A    Correct.
12    Q    And this has got the Bates Number HG
13 225312 to 17.  And this was not submitted to the
14 examiner.  It was submitted to the commissioner of
15 patents, right?
16    A    Okay.  I don't know.  I said that earlier.
17    Q    Well, you addressed it to the commissioner
18 of patents, right?
19    A    It doesn't mean that she doesn't get it.
20    Q    You don't know if she did or not, right?
21    A    That's how I testified earlier and I stand
22 by that.  I don't know if she saw this or not.
23    Q    Okay.  And if you could look to the third
24 page of the document, there's your Exhibit A.  These
25 are the specific documents.

1     A    Right.
2     Q    These are the specific documents that
3 you're seeking to expunge, correct?
4     A    Yes.
5     Q    And the reason you're doing that is
6 because you don't want the public to be able to see
7 it?
8     A    I think the reason was, is it was
9 confidential in the beginning so it just as well be
10 confidential in the end.  The only reason it's even
11 outside of Health Grades' walls is because of this
12 litigation.
13    Q    Okay.  How did you identify these, Mr.
14 Scull?
15    A    I didn't.
16    Q    Who did?
17    A    I don't know who did.  Andy Pouzeshi could
18 have worked with Maggie Martinez, and then Kirsten
19 Stoll-DeBell provided the filter for confidential
20 stuff, and I think since these were Health Grades'
21 own material, I don't know that Kirsten -- I don't
22 know if she was involved or not.
23    Q    Actually, I'll represent to you --
24        MR. STIMPSON:  And, Kirsten, maybe you can
25 help me here.  But I didn't find any of these

1 documents in there in the prosecution history.  Do
2 you know if they were submitted?
3        MR. KANAN:  You mean the attachments to
4 the petition, you're talking about?
5        MS. STOLL-DEBELL:  You mean did we produce
6 them to you?
7        MR. STIMPSON:  No.  Were they produced to
8 the patent and trademark office?
9        THE DEPONENT:  Yes.
10        MR. STIMPSON:  Because I don't have them
11 anywhere in the prosecution history.
12        THE DEPONENT:  They were submitted.  They
13 were submitted under seal so they're not part of the
14 public.
15        MR. STIMPSON:  Well, one of the questions
16 would be whether they were produced to me.
17        MS. STOLL-DEBELL:  They were produced to
18 you.
19    Q    (BY MR. STIMPSON)  Let me show you what's
20 been marked as Exhibit 1006, 1007, 1008 and 1009, and
21 I'll represent to you, Mr. Scull, these are the
22 documents referenced in Exhibit A.  Have you
23 reviewed --
24        MR. KANAN:  I'm sorry, I missed what you
25 said.

1        MR. STIMPSON:  1006.
2        MR. KANAN:  I got the number, but what you
3 said about them.
4        MR. STIMPSON:  They are the documents
5 referenced in Exhibit A.
6        MR. KANAN:  Thank you.
7     Q    (BY MR. STIMPSON)  Have you reviewed these
8 documents before, Mr. Scull?
9     A    Not in this form.
10    Q    Maybe we can do this, kind of
11 short-circuit -- but you can see that from the --
12 your Exhibit A and the documents that are in front of
13 you that what's being submitted here in 1006 to 1009
14 is Health Grades' brief regarding invalidity
15 and three of the exhibits that Health Grades
16 submitted to the court.
17    A    Okay.
18    Q    Do you agree with that?
19    A    If you say so.
20    Q    Well, I need you to understand and agree
21 with me or disagree with me.  Can you just read the
22 exhibit.  You can see that it's Exhibit -- Deposition
23 Exhibit H, I, and J.
24    A    I see something called a motion for
25 partial summary judgment, something called a motion