# EXHIBIT CC

Page 1

1  Volume I                        Pages 1 - 188
2                                  Exhibits 2000 - 2012
3          UNITED STATES DISTRICT COURT
4          FOR THE DISTRICT OF COLORADO
5  *******************
6  HEALTHGRADES, INC.   *
7      Plaintiff,       *   Civil Action No.
8  VS.                  *      11-CV-00520-RM-BNB
9  MDx MEDICAL INC.,    *
10     Defendant.       *
11 ******************
12
13        DEPOSITION of PHILIP GREENSPUN
14      Monday, January 6, 2014 at 8:00 a.m.
15             The Charles Hotel
16             One Bennett Street
17          Cambridge, Massachusetts
18
19   ------ Jacqueline P. Shields, RPR, CSR ------
20
21
22
23
24    Job No. NJ1790896

Veritext/NJ Reporting Company
800-227-8440                                           973-410-4040

Page 2

1  APPEARANCES:
2  Representing the Plaintiff:
     LEWIS ROCA ROTHGERBER LLP
3    BY:  KRIS J. KOSTOLANSKY, Esquire
     1200 Seventeenth Street, Suite 300
4    Denver, Colorado 80202
     303-628-9515 ~ Fax: 303-623-9222
5    kkostolansky@lrrlaw.com
6         ~ and ~
7  MERCHANT & GOULD P.C.
     By:  KIRSTIN L. STOLL-DeBELL, Esquire
8    1050 Seventeenth Street, Suite 1950
     Denver, Colorado 80265-0100
9    303-357-1670 ~ Fax: 303-357-1671
     kstolldebell@merchantgould.com
10
11 Representing the Defendant:
     SILLS CUMMIS & GROSS
12   BY:  SCOTT D. STIMPSON, Esquire (via telephone)
          VINCENT FERRER0, Esquire
13   30 Rockefeller Plaza
     New York, New York 10112
14   212-643-7000 ~ Fax: 212-643-6500
     sstimpson@sillscummis.com
15   vferrero@sillscummis.com
16
17
18
19
20
21
22
23
24

Page 3

1           I N D E X
2
3  Testimony of:              Page(s)
4  PHILIP GREENSPUN
5  By Mr. Stimpson               5
6  By Mr. Kostolansky          180
7
           E X H I B I T S
8
9  Exhibit No.    Description         For I.D.
10 2000  Supplemental Expert Report of Philip
         Greenspun dated January 3, 2013       12
11
   2001  Document entitled Vitals Business
12       Overview for Consumers, Health Plans
         & Hospitals dated October 2012       23
13
   2002  Document entitled 2013 Media Kit,
14       Vitals Patient Link              34
15 2003  Document entitled Vitals' Data and
         Database dated November 2013       40
16
   2004  Compilation of Information
17       Disclosure Statements           54
18 2005  Declaration of Richard G. Cooper,
         D.Sc.                     98
19
   2006  Document entitled Notice of
20       Allowance and Fee(s) Due         115
21 2007  Document entitled Petition to
         Expunge Pursuant to 37 CFR 1.59 and
22       MPEP 724.05                 118
23 2008  Document entitled Data Summary of
         Dr. Scott Cowan              124
24
   2009  Document entitled Exhibit C, F.R.E.    126

Page 4

1     1006 Summary
2  2010  Printout of screenshots        131
3  2011  Document entitled Preliminary
         Amendment                143
4
   2012  Supplemental Expert Report of Philip
5       Greenspun dated September 9, 2013   155
6     EXHIBITS APPENDED TO ORIGINAL TRANSCRIPT
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1           P-R-O-C-E-E-D-I-N-G-S
2         PHILIP GREENSPUN, having been
3  satisfactorily identified and duly sworn by the
4  Notary Public, was examined and testified as
5  follows:
6            DIRECT EXAMINATION
7  BY MR. STIMPSON:
8     Q.  Good morning, Dr. Greenspun.  I'm sorry I
9  can't be with you there in person, all the lovely
10 weather the last few days has me stranded in Denver
11 for a few days.
12        This may be a little slower than normal, I
13 didn't get a chance to get back and see the
14 documents in person.  I have them on my hard drive,
15 so it may move a little slower than normal, but just
16 bear with me.
17        So, Dr. Greenspun, since your last
18 deposition you produced two reports, right?  You got
19 the January 3rd and the September 9, 2013 reports,
20 right?
21    A.  That sounds right.
22    Q.  Okay.  Since that time I assume you put in
23 more time for Healthgrades, right?
24    A.  Yes.

Page 74

1 here there's some interrogatories that are 10 or
2 4 pages, or 15 pages, she would have to scan through
3 those herself, those 15 pages, to see what was in
4 them. There's not a description in here. Other
5 than that, it is a set of interrogatories, for
6 example.
7    Q. Right. Well, actually, there's more than
8 just one set of interrogatories in the discovery
9 requests in here, right? There's a number of them,
10 right?
11    A. Yes.
12    Q. So, before you get to your point, the
13 examiner would first need to realize that there is
14 even something in the interrogatory responses that
15 would be relevant, right?
16    A. Well, I don't know why she would have to do
17 that, because I think by definition, if it's
18 included in this information disclosure statement,
19 that at least the applicant considers it to be
20 relevant.
21    Q. Okay. So in order to find what might be
22 relevant, including the interrogatory responses, the
23 examiner would have to read the entirety of the, you
24 know, ten or 11,000 pages, right?

Page 75

1       MR. KOSTOLANSKY: Object to the form.
2    A. Well, again, I think the examiner can
3 assume that all of these are relevant from the
4 perspective of the applicant. And she would have at
5 least to scan quickly through these documents to
6 make her own determination of relevance. She
7 wouldn't be able to, in most cases, just rely on the
8 title and the date here in the information
9 disclosure statement.
10    Q. So if the examiner, as you say, scans
11 through every one of these pages, do you think that
12 she'd pick up on one sentence in one interrogatory
13 response that said Healthgrades commercialized in
14 the summer of 2005?
15       MR. KOSTOLANSKY: Object to the form and
16 calls for speculation.
17    A. I really don't know. I haven't worked at
18 the patent office, so I can't say.
19    Q. So, Dr. Greenspun, so you said that you
20 know by definition all these documents are relevant,
21 right?
22    A. From the perspective of the patent
23 analysis, my understanding -- I'm not a patent
24 prosecutor, I wouldn't think that you would want to

Page 76

1 send information to the patent office that you
2 thought was potentially relevant or was relevant.
3    Q. Okay. So when you say that they wouldn't
4 be submitted if they weren't relevant, you mean
5 relevant to the examiner's determination of whether
6 or not to allow the claims, right?
7       MR. KOSTOLANSKY: Object to the form, lack
8 of foundation.
9    A. Yes, I think the examiner's primary job is
10 allowing or disallowing claims and, therefore,
11 relevance primarily would concern whether or not to
12 allow a claim, yes.
13    Q. So it's basically whether or not -- it's a
14 validity analysis basically, right?
15       MR. KOSTOLANSKY: Object to the form.
16    A. Yes, I think all of this is generally, you
17 know, the context of whether or not it's relevant
18 would be in the context of a validity analysis.
19    Q. And did you review everything that was
20 submitted?
21    A. No, I did not.
22    Q. Did you review anything that was submitted?
23    A. Yes.
24    Q. What did you review that was submitted?

Page 77

1    A. Well, I generally read most of the filings
2 in this case. So most of these things that have a
3 docket number on them I believe that I've read.
4    Q. I'm sorry, I think we had a
5 miscommunication. I don't mean that you might have
6 read some of these docket numbers. I mean like did
7 you physically see what they submitted to see if it
8 was the same as, you know, because it may be
9 different, it may be the same, it may be different
10 from what you reviewed? My question is, did you
11 actually physically get this prosecution history and
12 read what they submitted?
13    A. No, I did not. Well, actually that's not
14 true, I did look at the --
15    Q. I'm sorry.
16    A. I do have the prosecution history, and I
17 did look at it, but I looked primarily at things --
18 communications back and forth between the patent
19 office and the applicant. I didn't, you know, check
20 to see if these references were accurately
21 reproduced. I assume that they were. And I don't
22 think these -- I don't remember seeing these patent
23 documents in the big file history at all. I assume
24 maybe that's because the patent office has their own

20 (Pages 74 - 77)

Page 78

1 copy.
2    Q. That's right, they have their own. Those
3 don't get submitted.
4       MR. KOSTOLANSKY: Scott, I apologize, we're
5 having some issues with respect to our flight back
6 tonight that we need to take a moment to address
7 right now, so can we take like five minutes and
8 we'll be right back?
9       MR. STIMPSON: Okay, that's fine. Just call
10 me back when you're ready.
11       (Recess was taken at 11:27 a.m.)
12       (Reconvened at 11:36 a.m.)
13       MR. STIMPSON: Can I have the last question
14 and answer read back?
15       (Read back.)
16    Q. (By Mr. Stimpson) Doctor, have you
17 considered whether Healthgrades varied the MDx
18 invalidity analyses in order to make it difficult
19 for the examiner to find the things that she could
20 reasonably rely on?
21    A. No, that didn't occur to me.
22    Q. Okay. Have you heard that MDx is alleging
23 that that's what happened?
24    A. I have not heard that, no.

Page 79

1    Q. When you went through these IDS's, did you
2 see how many pages were being submitted by
3 Healthgrades' counsel?
4       MR. KOSTOLANSKY: Objection, asked and
5 answered.
6    A. Well, I didn't add them all up, but I see
7 there's, you know, a lot of pages. If you just take
8 the page count for each of these documents, you
9 know, there's -- each one is, you know, typically at
10 least four pages long and sometimes more than 100.
11    Q. Right. There are some included there
12 hundreds of pages long, right?
13    A. That's true, yes.
14    Q. So you have a lot of litigation experience
15 and, you know, analyzing validity issues, right?
16    A. Yes.
17    Q. With that kind of background and
18 experience, Doctor, do you think that the examiner
19 would want to consider a motion to compel with
20 regard to the validity issue?
21       MR. KOSTOLANSKY: Object to the form, lack
22 of foundation.
23    A. A motion to compel discovery? Is that what
24 you're asking about?

Page 80

1    Q. Yes.
2       MR. KOSTOLANSKY: Same objection.
3    A. Probably not. But that would be my guess,
4 but I don't know.
5    Q. In your analyses of the validity issues in
6 this case, Doctor, have you asked Healthgrades to
7 provide you with motions to compel?
8    A. No, I have not.
9    Q. Has anyone suggested to you that you should
10 seek a motion to compel in connection with your
11 validity analyses?
12    A. Are you talking about for this case or for
13 any case?
14    Q. For this case. Has anyone in this case,
15 anyone at all, suggested to you that you should
16 perhaps consider a motion to compel, any motion to
17 compel, in connection with your invalidity analyses?
18    A. No, I don't think so.
19    Q. Do you think, Doctor, based on your
20 background and experience that the examiner would
21 want to consider a motion to bifurcate in connection
22 with the validity analyses?
23    A. I think it would depend on the kind of
24 argument that was in there, so I would have to see

Page 81

1 it.
2    Q. Well, as we sit here today can you think of
3 any reason why an examiner might want to see a
4 motion to bifurcate in connection with a validity
5 analysis?
6       MR. KOSTOLANSKY: Objection, lack of
7 foundation.
8    A. Well, if the motion was to bifurcate say
9 validity from infringement, then, or validity and
10 infringement from damages, then I think possibly,
11 because that kind of motion could contain a summary
12 of some of the arguments that were going to be heard
13 or how complicated the discussion was going to be
14 with one of those issues. But if it didn't relate
15 to validity, then no, I wouldn't think they'd want
16 to see it.
17    Q. In all of your experience in invalidity
18 analyses, Doctor, have you ever used a motion to
19 bifurcate?
20    A. No, I have not.
21    Q. In your analyses in this case, did you look
22 at any motion to bifurcate?
23    A. No.
24    Q. Did anyone suggest to you that you should

21 (Pages 78 - 81)

Page 82

1 perhaps consider a motion to bifurcate in your
2 validity analyses?
3   A. No, not that I can recall.
4   Q. With your background and experience,
5 Doctor, do you think that the examiner would want to
6 consider motions for extension for time in
7 connection with her validity analyses?
8     MR. KOSTOLANSKY: Objection, lack of
9 foundation, calls for speculation.
10   A. I would say only if the extension -- if the
11 motion had some kind of argument about, you know,
12 why the extension was being asked for that related
13 somehow to validity analysis or documents that were
14 needed for validity. I was going to say but, you
15 know, not if the motion related to, you know,
16 somebody's sick or somebody's on maternity leave and
17 therefore we need an extension of time. So it would
18 kind of depend on what the extension of time -- what
19 the reason was for the extension.
20   Q. Well, in all your experience, Doctor, have
21 you ever seen a motion for extension that discussed
22 substantive validity analyses?
23   A. I don't think so, no.
24   Q. And in all your experience, Doctor, have

Page 83

1 you ever used a motion for extension in any of your
2 validity analyses?
3   A. No, I don't think so.
4   Q. Did you see any motions for extensions in
5 connection with your validity analyses in this case?
6   A. No.
7   Q. Did anyone suggest to you that you should
8 seek a motion for an extension in connection with
9 your validity analysis in this case?
10   A. No.
11   Q. Based on your experience and background,
12 Doctor, do you think an examiner would want to
13 consider the complaint in connection with a validity
14 analysis?
15   A. Yes.
16   Q. Why?
17   A. Well, because there's other documents in
18 the case that are generally possibly relevant, like
19 the invalidity contentions. And I think it's very
20 confusing to have a document that's from the middle
21 of some sort of litigation without having an idea of
22 what the litigation is about.
23     So I think for completeness, I wouldn't
24 feel comfortable looking at, you know, some sort of

Page 84

1 motion from the middle of a lawsuit without seeing
2 also, you know, the original pleadings, like the
3 complaint and the answer and anything else that
4 establishes a context for the motions that are in
5 the middle.
6     I'm not saying that I would want to read
7 every page or every paragraph of the complaint
8 carefully, but I would want to have it.
9   Q. And is there anything that you can think of
10 substantively that the examiner could use the
11 complaint for to make a validity rejection?
12   A. No, I think it could only be used for
13 background. I don't think it could be used for the
14 basis of validity analysis.
15   Q. Have you ever used a complaint as a basis
16 for a validity analysis other than as possible
17 background?
18   A. No, I've only ever used the complaint to
19 provide context for other documents and pleadings
20 that I was reading.
21   Q. Did you see the complaint in this case?
22   A. Yes.
23   Q. Okay. Do you think, based on your
24 experience, Doctor, that the examiner would want to

Page 85

1 see documents regarding whether MDx is infringing in
2 connection with validity analyses?
3   A. Yes.
4   Q. Why?
5   A. Well, the patent claims -- this is not a
6 legal -- these are not legal terms, they're just my
7 lay understanding. The patent claims don't really
8 become operable until there is a question of
9 infringement. In other words, it's a little bit
10 hard to know how the words are going to be used
11 until you see people arguing about an infringement.
12     So to me in deciding validity, I would
13 think it would be helpful to see how people were
14 using the terms or using similar terms in a dispute
15 about infringement.
16   Q. So you want to know generally what is being
17 accused in infringement?
18   A. Yeah, and how the words were being used.
19 So, for example, well, let's just say server.
20 Server could be the person who brings food to you in
21 the restaurant or it could be a computer server. So
22 that's probably unlikely to lead to confusion. But
23 it's only by seeing a dispute about an infringement
24 that -- you're really going to know that maybe some

22 (Pages 82 - 85)

Page 90

1  Q. I understand. That's true.
2     So in all of your experience with patents,
3  Doctor, have you ever seen a patent prosecution
4  history that had more than 10,000 pages of
5  references submitted?
6  A. Yes, definitely.
7  Q. When was that?
8  A. I think I've seen quite a few. You know,
9  especially patents that were re-examined. It seems
10 like, you know, they'll have several pages of
11 references and, you know, it's in pretty fine print,
12 so each reference could be a patent or a journal
13 paper. So, yes, I've definitely seen a bunch of
14 patents that have, at least by the time they went
15 through re-exam, had far more than 10,000 pages.
16 Q. And have you ever seen a patent prosecution
17 history where a motion to compel was as a reference?
18    MR. KOSTOLANSKY: Objection. Asked and
19 answered.
20 A. No, I don't think so.
21 Q. Have you ever seen a prosecution history
22 where a motion to bifurcate was submitted as a
23 reference?
24    MR. KOSTOLANSKY: Didn't you ask these

Page 91

1  questions already, Scott?
2     MR. STIMPSON: No.
3     MR. KOSTOLANSKY: I think you did.
4  A. Not that I can remember, no.
5  Q. Have you ever seen a prosecution history
6  where a motion for extension of time was submitted
7  as a reference?
8     MR. KOSTOLANSKY: I know you asked that one
9  before.
10 A. Not that I can remember, no.
11 Q. Have you ever seen a prosecution history
12 where a complaint was submitted as a reference?
13 A. I think so, but, again, it would have been
14 one of those re-exam patents.
15 Q. What makes you think that the complaint was
16 submitted as a reference?
17 A. I just remember some documents that had
18 come out of litigation were included as a reference,
19 and I don't have a clear memory of exactly which
20 documents, but I think it was a pretty comprehensive
21 set. I think it did include the complaint.
22 Q. Have you ever seen a prosecution history
23 where a motion for summary judgment was submitted on
24 infringement as a reference?

Page 92

1  A. I don't remember. I'm not sure.
2  Q. Have you ever seen a prosecution history
3  where requests for oral argument were submitted as
4  references?
5  A. No, I don't so.
6  Q. Do you think the examiner would want to
7  consider a request for an oral argument?
8  A. Only if it contained some kind of summary
9  of what the oral argument was going to be, but not
10 if it was just, you know, one page that said I'd
11 like to have an oral argument on such and such a
12 date. No, I wouldn't think that the examiner would
13 want that.
14 Q. Have you considered any requests for oral
15 argument in this case in your validity analysis?
16 A. No.
17 Q. Has anyone suggested to you that you should
18 be considering a request for oral argument in
19 connection with your validity analysis?
20 A. No.
21 Q. In your background and experience do you
22 think that the examiner would want to consider a
23 motion to strike a document in connection with a
24 validity analysis?

Page 93

1     MR. KOSTOLANSKY: Objection. Calls for
2  speculation.
3  A. I think it would depend on the document.
4  And on the argument that was in there.
5  Q. And all your experience, Doctor, have you
6  ever relied on a motion to strike in connection with
7  a validity analysis?
8  A. No.
9  Q. So that means in this case as well you
10 never considered a motion to strike in your validity
11 analysis, right?
12 A. That's correct.
13 Q. And has anyone ever suggested to you that
14 you should consider a motion to strike in connection
15 with your validity analysis?
16 A. No.
17 Q. Have you ever seen a prosecution history in
18 your experience that includes as a reference a
19 motion to strike?
20 A. No, I don't think so, but I wouldn't have
21 been focusing on that.
22 Q. How about a scheduling order, Doctor, do
23 you think that the examiner would want to consider a
24 scheduling order in connection with validity

24 (Pages 90 - 93)

Page 94
1 analysis?
2    A. Yes.
3    Q. Why?
4    A. Well, the scheduling order would tell her
5 whether or not there were likely to be additional
6 relevant documents regarding, especially validity
7 generated in the litigation.
8    Q. The examiner couldn't rely on a scheduling
9 order in any way to support a validity analysis,
10 right?
11    A. No. It would just help her schedule her
12 own work and give her, you know, some kind of
13 heads-up as to when additional documents might be
14 coming her way.
15    Q. But nothing substantive on the validity
16 analysis, right?
17    A. No, I don't think so. I mean, I agree with
18 you.
19    Q. Have you ever seen a scheduling order
20 submitted as a reference in a prosecution history
21 before?
22    A. You know, I really can't say. I don't
23 think -- that hasn't jumped out at me, but, again,
24 that's not the kind of thing I would have been

Page 95
1 looking for.
2    Q. Why wouldn't you be looking for it?
3    A. These prosecution histories are huge. I
4 mean, I have definitely gotten them that have
5 10,000 pages and, you know, I don't -- first of all,
6 it's all in the past by the time I get to it.
7 Whatever litigation is being referenced is usually
8 long settled. A scheduling order, all the dates
9 would be in the past. It's just not very
10 interesting. Oftentimes when I get a big file
11 history, you know, there's already been some
12 preliminary analysis done by an attorney, so I'll be
13 pointed to specific sections. So I just -- you
14 know, I don't go through the whole thing. And if --
15 you know, I'm not redoing all the work of the patent
16 examiner, so I don't look at every reference.
17      If I was looking at a file history, I
18 wouldn't look at, you know, all of these patents
19 here. I would be looking at the ones that the
20 examiner talked about in response to the applicant.
21 I would assume that if something hadn't caught the
22 eye of the examiner, and had not been mentioned by
23 the examiner in an office action, that it probably
24 wasn't very relevant. Or it wasn't the most

Page 96
1 relevant reference.
2    Q. Did you consider a scheduling order in
3 connection with your validity analyses?
4    A. I did not, no.
5    Q. And did anyone suggest to you that you
6 should perhaps in connection to your analyses?
7    A. No.
8    Q. You said that you've known prosecution
9 histories that had more than 10,000 pages of
10 references?
11    A. Yes.
12    Q. And can you identify them for me, please?
13    A. I think some of them were a group of
14 patents that were assigned to a company called
15 Openwave or Unwired Planet. They go by two
16 different names. They were patents from the mid
17 '90s regarding mobile phones. Or regarding Web
18 browsers on mobile phones primarily. That's a good
19 summary of them. And I think maybe one or more of
20 them was re-examined.
21      I can also think of maybe some of the open
22 market patents. I think some of those were
23 re-examined.
24      MR. STIMPSON: Doctor, excuse me one second,

Page 97
1 we have a call. Sorry to interrupt, Kris and I have
2 a phone call. Let's go off the record now. Kris,
3 what number would you like us to use?
4      MR. KOSTOLANSKY: Hang on one second.
5      (An off-the-record discussion was held.)
6      (Recess was taken at 12:04 p.m.)
7      (Reconvened at 1:19 p.m.)
8    Q. (By Mr. Stimpson) I want to finish up a
9 little bit on where we were, Dr. Greenspun. Based
10 on your background and experience, do you think that
11 the examiner would want to consider motions to
12 restrict in determining validity issues?
13    A. Well, my background and experience doesn't
14 include working at the patent office, so I can't
15 give an answer based on that because I don't have
16 any background or experience that's relevant. I can
17 answer to the best of my ability just hypothetically
18 if I were working there then, you know, I think I'd
19 be interested in seeing a comprehensive view of the
20 litigation, or having the documents available. But
21 as I said earlier, I think for any particular
22 document related to a litigation, I don't think I
23 would be likely to find it critical to a validity
24 analysis, no.

25 (Pages 94 - 97)

Page 98

1  Q. And have you ever seen motions to restrict
2 cited as references in any prosecution history
3 report?
4  A. No, I have not.
5  Q. In connection with this litigation did you
6 consider motions to restrict in connection with your
7 validity analysis?
8  A. No.
9  Q. Did anyone suggest to you that you should
10 consider motions to restrict in your connection with
11 your validity analysis?
12  A. No.
13  Q. Okay.
14   MR. STIMPSON: Vin, can we please mark Dr.
15 Cooper's report?
16   I don't mean to keep turning away from you,
17 Doctor, I'm trying to get all of these exhibits up
18 and I'm having real trouble with my Internet.
19   MR. FERRERO: All right. It's going to be
20 Exhibit 2005.
21   MR. STIMPSON: Okay.
22   (Exhibit No. 2005, marked; Declaration of
23 Richard G. Cooper, D.Sc.)
24  Q. Do you recognize this as -- do you have it

Page 99

1 yet?
2  A. Yes, I do. It's Exhibit 2005, Declaration
3 of Richard G. Cooper.
4  Q. Okay. Of course you're familiar with this
5 because you submitted a rebuttal report to it,
6 right?
7  A. I don't necessarily remember it being in
8 declaration form when I looked at it last. I
9 thought it might have been in report form, but I do
10 remember writing a rebuttal report to an expert
11 report from Dr. Cooper.
12  Q. Yeah, well, this was it, your counsel could
13 tell you. It says declaration, it's actually a
14 report.
15  A. That's probably the same one, I just
16 haven't looked at every page.
17  Q. Okay. If you could turn to paragraph 33,
18 please. By the way, do you still have Exhibit 2004
19 there?
20  A. Yes.
21  Q. Okay. If you could please turn to
22 paragraph 33 of the Cooper report, 2005.
23  A. Okay.
24  Q. And that's a paragraph where you're

Page 100

1 referencing his various prior art that he's relying
2 on, right?
3  A. Yes.
4  Q. And the last sentence, it says, he is
5 telling you where you can find those depositions 8,
6 13, 21 and 51, do you see that?
7  A. Yes.
8  Q. Can you -- would you be able to find any of
9 those in the IDS, any of the IDS's submitted by
10 Healthgrades, Exhibit 2004?
11  A. Well, I'm not sure if all of them are in
12 Exhibit 2004, but I think I found some of them on
13 the last two pages of Exhibit 2004.
14  Q. Okay. And where are they?
15  A. Well, it says sheet 1 of 2 and sheet 2 of
16 2. They're the last two pages and they have a Bates
17 number at the bottom, 1151, 1152. You said your
18 copy wasn't numbered, but they're at the very end.
19  Q. Yeah, I'm there. And so is there anything
20 on any of those pages -- incidentally, you can see
21 at the top, this one was actually submitted late
22 September. September 20, 2013, right?
23  A. Yes, I do see it was, yes, mailed on
24 September 20th.

Page 101

1  Q. Do you know why Healthgrades waited until
2 September 20th to submit this prior art?
3  A. No, I don't know.
4  Q. Do you see anything in this IDS from
5 September 20th, 2013 indicating defendant's
6 deposition exhibit numbers?
7  A. No, I don't. I see Bates numbers on these
8 and descriptions of the document, and the dates of
9 each document, but I don't see -- I don't see
10 they're marked as exhibits one way or the other.
11  Q. So if the examiner had the Cooper report
12 and was trying to find the documents that he relied
13 on, the examiner, she would not be able to find
14 those by referencing the deposition number as Dr.
15 Cooper does in his report, right?
16   MR. KOSTOLANSKY: Object to the form.
17  A. I think that's true. She would have had to
18 use the title and the date or possibly the Bates
19 numbers. I don't remember if those were in the
20 Cooper report or not.
21  Q. Healthgrades could have made this a lot
22 easier for the examiner to find the support that Dr.
23 Cooper was relying on, right?
24   MR. KOSTOLANSKY: Object to the form,

26 (Pages 98 - 101)

Page 106

1 out in the IDS. So, again, I think she would have
2 been relying on this is an accurate summary or she
3 would have had to ask for it. Unless I somehow
4 missed it in the IDS.
5     Q. There's no way for her to -- without the
6 Neal transcript or the Montroy transcript, there's
7 no way for her to follow along and analyze for
8 herself whether or not the support is present in the
9 claim element, right?
10     A. No. I mean, I agree with you there, that
11 without those pages she wouldn't be able to
12 replicate or reproduce Dr. Cooper's analysis.
13     Q. And then at the next paragraph, 42, you see
14 the first thing he writes there is, "Defendant's
15 Deposition Exhibit 10," do you see that?
16     A. Yes.
17     Q. Can you find that in the IDS's?
18     A. Defendant's deposition Exhibit 10. No, I
19 can't see from these titles if I had, if I had the
20 full stack and it was in there. I might be able to
21 find it by recognizing that language, but I don't
22 think I'd be able to recognize it from looking at
23 the titles of these documents in Exhibit 2004.
24     Q. And you've actually seen Defendant's

Page 107

1 Deposition Exhibit 10 before, right?
2     A. Yes, I believe so.
3     Q. If you could, please, we could spend a lot
4 of time and go through all of these claim elements
5 one by one and all of the support documents, Dr.
6 Greenspun, but to try to cut to the chase here,
7 would you agree with me that the examiner did not
8 have easy access to the deposition testimonies
9 relied on by Dr. Cooper and the -- nor did she have
10 an easy way to try to match up what he was relying
11 on with anything in the IDS?
12     MR. KOSTOLANSKY: Object to the form and
13 foundation.
14     A. Well, yes and no. I think that where Dr.
15 Cooper does not actually quote an excerpt from a
16 deposition, I would agree with you that she did not
17 have easy access to the original deposition
18 testimony. For some of the documents, like where it
19 says "Drucker report," I think it was -- it would be
20 pretty easy to find it here. Like the last, the
21 very last reference, Healthgrades' report on David
22 A. Drucker, I think it would be pretty easy for her
23 to infer that was the Drucker report.
24     But then for some of these numbered

Page 108

1 exhibits, then I would agree with you, it would not
2 be very easy for her to do, to find the original
3 document.
4     Q. Okay. And the Drucker report -- actually,
5 if the examiner did do that, she'd see the word
6 "Drucker" somewhere in the Cooper report and then
7 try to find it in the IDS; is that right?
8     A. Yes, I suppose if she saw it in the Cooper
9 report and she wanted to see it, then, yes, I
10 believe she would have been able to find it from the
11 table of contents here in Exhibit 2004 in the IDS.
12     Q. Well, actually, when Healthgrades submitted
13 the Cooper report, they didn't submit the Drucker
14 report with it, did they? They were submitted as
15 different IDS's and the Drucker report wasn't
16 submitted until September of 2013.
17     A. That sounds right. I don't know if the
18 Drucker report was included. You know, a lot of
19 these things, the reason they're so long is because
20 they have a lot of exhibits and attachments. I have
21 a feeling that the Drucker report was probably
22 submitted in August, in the first one as an
23 attachment to one of these other things. But I
24 think I could agree with you that the first time it

Page 109

1 was called out as a separate document was perhaps in
2 that September IDS.
3     Q. So if you're the examiner and she's trying
4 to find -- she says she gets the Drucker report,
5 she's looking through it, she says ah, Drucker, and
6 let me go through the IDS and see if I can find
7 that. Before this September 20, 2013 IDS was
8 submitted, do you see anything that would lead her
9 to the Drucker report in any of those prior IDS's?
10     A. Well if it wasn't in the attached -- if it
11 was not an attachment to something that was titled
12 "invalidity," then I would probably say no. That
13 she would either have had to go through a big stack
14 of stuff or pick up the phone and call the attorney
15 for the applicant and say hey, send me this Drucker
16 report, please.
17     Q. Do you think that Healthgrades was relying
18 on the examiner to ask?
19     A. I don't know.
20     Q. And so if the examiner -- let's say all
21 these references considered were before the examiner
22 when she looked at the Cooper report, but we don't
23 know that, right? We don't know when she looked at
24 the references, whether she looked at them when they

| | |
|---|---|
| Page 110<br>1 came in or all at the end, we don't know that,<br>2 right?<br>3   A. True.<br>4   Q. So it may have been she looked at the<br>5 Cooper report before they even submitted the Drucker<br>6 report, right?<br>7       MR. KOSTOLANSKY: Objection. Calls for<br>8 speculation.<br>9   A. I think it's possible.<br>10   Q. But let's just assume maybe she did wait<br>11 until the very end and looked at them all together,<br>12 okay? If she did that and she wanted to find the<br>13 Drucker reference and the IDS's, she'd read every<br>14 single one of these hundreds of references and she<br>15 wouldn't find the Drucker reference until the very<br>16 last one, right?<br>17   A. That's true. If she just started at the<br>18 very beginning and read to the end, you're right,<br>19 she would reach the Drucker report at the very end.<br>20   Q. Generally speaking, if you have really good<br>21 prior art that really is going to risk validating<br>22 your claim, if you give that to the patent examiner<br>23 by itself and highlight it, would you agree with me<br>24 there's a lot better chance that the examiner is | Page 112<br>1   Q. And it's also not at the very bottom of the<br>2 page, but three or four up from the bottom of the<br>3 page, right?<br>4   A. True.<br>5   Q. So let me go back to my original question<br>6 then, Doctor. Just generally speaking, if you have<br>7 prior art that you know has been told to you and<br>8 explained to you that it's really, really relevant<br>9 to the patent language, would you agree with me that<br>10 it's a lot more likely that the examiner would use<br>11 that prior art to reject the claims if it's<br>12 submitted to the examiner, highlighted to the<br>13 examiner as opposed to being submitted with hundreds<br>14 of other references?<br>15       MR. KOSTOLANSKY: Object to the form, lack<br>16 of foundation.<br>17   A. I don't know. Most of the patent file<br>18 histories that I've seen, the examiners, they always<br>19 seem to come up with some way to reject the claims<br>20 at least initially. Even though they had to look<br>21 for, you know, one or two patents out of more than 8<br>22 million in the database. So I don't know, they seem<br>23 to be pretty good at their job.<br>24       MR. STIMPSON: Can I have that answer read |
| Page 111<br>1 going to use that to reject the claims than if you<br>2 bury it in 300 references?<br>3       MR. KOSTOLANSKY: Objection. Calls for<br>4 speculation, lack of foundation.<br>5   A. I don't know. I mean, I don't really agree<br>6 with you. I don't think putting something at the<br>7 very end is burying it. I'd be more suspicious if<br>8 the Drucker report had been in the middle of a bunch<br>9 of boring legal stuff, you know, because oftentimes<br>10 people would look at the beginning of the book and<br>11 then look at the end to see how it ends. So I don't<br>12 think putting it at the very end is hiding it. I<br>13 don't know what they do at the patent office.<br>14   Q. Where was the Cooper report in all of these<br>15 references?<br>16   A. Well, I think all the litigation stuff is<br>17 presented chronologically. So the Cooper report --<br>18 I might be wrong. Let me see. No, the Cooper<br>19 report is on page 9 of 11.<br>20   Q. So that's 9 of 11 of the first IDS, right?<br>21   A. Yes.<br>22   Q. So with all the IDS's considered, it's<br>23 basically somewhere in the middle, right?<br>24   A. Yes, I think that's fair. | Page 113<br>1 back?<br>2       (Read back.)<br>3       MR. STIMPSON: I move to strike everything<br>4 after "I don't know."<br>5   Q. But, Dr. Greenspun, if Healthgrades really<br>6 was interested in making sure that this examiner<br>7 knew of the prior art analyses that Dr. Cooper had<br>8 done, they could have done a better job of making<br>9 sure that she knew that by just submitting it to her<br>10 alone and saying look, here's what our opponent is<br>11 saying makes all these claims invalid, right?<br>12       MR. KOSTOLANSKY: Object to the form, calls<br>13 for speculation.<br>14   A. Well, I guess I don't know if these people<br>15 had phone calls or what, so I actually don't know<br>16 the extent to which, you know, the applicant or the<br>17 attorney for the applicant may have had a discussion<br>18 with the examiner and said look at stuff, so I'm not<br>19 sure that this IDS, you know, has to entirely stand<br>20 on its own. Or if there are more documents. So I<br>21 don't know. I don't think that's possible, to look<br>22 at this in a vacuum.<br>23   Q. Just from the written record, Doctor, from<br>24 the written record, if Healthgrades had just -- put |