1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2

3   Civil Action No. 11-cv-520-RM-BNB

4   HEALTH GRADES, INC.,

5       Plaintiff,

6   vs.

7   MDX MEDICAL, INC., D/B/A VITALS.COM,

8       Defendant.
    _____

9

10                      **REPORTER'S TRANSCRIPT**
                         Daubert Hearing

11  _____

12          Proceedings before the HONORABLE RAYMOND P. MOORE,

13  Judge, United States District Court for the District of

14  Colorado, occurring at 9 a.m., on the 18th day of December,

15  2013, in Courtroom A-601, United States Courthouse, Denver,

16  Colorado.

17

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Tamara Hoffschildt, 901 19th Street,
25      Room A251, Denver, Colorado, 80294, (303) 292-1088

**APPEARANCES**

1

2      Kris Kostolansky, Jesus Manuel Vazquez, Greg Kanan,

3  Attorneys at Law, Rothgerber Johnson & Lyons, LLP, 1200 17th

4  Street, Suite 3000, Denver, Colorado, 80202-5855, and

5  Kirstin Stoll-DeBell, Attorney at Law, Merchant & Gould, 1050

6  17th Street, Denver, Colorado, 80265, appearing for the

7  Plaintiff.

8      Scott Stimpson and Mark Rosenberg, Attorneys at Law,

9  Sills Cummis & Gross, P.C., One Rockefeller Plaza, New York,

10 New York, 10020, and Trent Dickey, The Legal Center, One

11 Riverfront Plaza, Newark, New Jersey, and Terence Ridley,

12 Wheeler Trigg O'Donnell, LLP, 370 Seventeenth Street, Suite

13 4500, Denver, Colorado, 80202, Attorneys at Law, appearing for

14 the Defendant.

15                    *   *   *   *   *

16                      **PROCEEDINGS**

17

18    (In open court at 9:08 a.m.)

19      *THE COURT:*  Please be seated.  Okay.  Before we

20 begin -- well, let me introduce the matter, and then start

21 talking.  11-cv-520, Health Grades versus MDx Medical, Inc.

22      I will take appearances please, starting with

23 plaintiffs.

24      *MR. KOSTOLANSKY:*  Good morning, Your Honor.

25 Kris Kostolansky, with the law firm of Lewis, Roca &

1   Rothgerber, here on behalf of the plaintiffs, Health Grades.

2   To my right is Ms. Kristin Stoll-DeBell, with Merchant & Gould.

3   To her right is one of my partners, Jesus Vazquez.   To

4   Mr. Vasquez's right is another one of my partners,

5   Mr. Greg Kanan.   Sitting behind me is Mr. Dan Brewer, with

6   Visual Advantage.

7           *MR. STIMPSON:*   Good morning, Your Honor.

8   Scott Stimpson, Sills Cummis.   To my left is my partner,

9   Trent Dickey.   And Mr. Ridley, from Wheeler Trigg, they are

10   local counsel.

11           *THE COURT:*   Good morning.

12           Nick, here is what I want to do, I understand that

13   there's some issue with regard to the connection feeds not

14   working right.   Would you call I.T. and tell I.T. to come up

15   and interrupt the hearing, and then, depending upon where we

16   are, we can all kind ignore them, if -- if they are kind of --

17   I don't want to say playing around, but, basically, in the back

18   doing whatever it is that I.T. people do with connections.

19           On the other hand, if -- if it gets to where they need

20   to get to the ELMO, where counsel is, it's a little more

21   disruptive than that, I can take a five-minute break.   But what

22   I don't want them to do is to not come up until some time.   I

23   want them to come up as soon as they can free somebody up for

24   this, and then go from there.

25           So, anyway we're here today on various *Daubert*

1    motions, and if I have got the numbers right they are 338, 349,

2    and 374.  We're not -- we have enough information to where

3    testimony is not required and we are here for argument.

4         Unless there's some agreement of the parties as to the

5    order to hear this in, I would like to start, if you would,

6    with 349, which is the MDx Motion To Exclude The Testimony Of

7    Dr. Philip Greenspun.

8         MR. STIMPSON:  Thank you, Your Honor.

9         THE COURT:  And I should say to everyone that I -- I

10   have more notebooks than I know what to do with, but if, in

11   fact, you want to direct my attention to a particular exhibit,

12   I'm more than happy to pull up, even though we don't have

13   the -- the high tech, I'm more than happy to go low tech, and

14   pull up the pertinent exhibit in the document.

15        MR. STIMPSON:  Thank you, Your Honor.

16        With regard to our motion for Dr. Greenspun, this is

17   all relating to the level of ordinary skill in the art, of

18   course.  Every question these technical experts are going to

19   address is going to be through the lens of the person of

20   ordinary skill in the art at the time of the invention in

21   February of 2006.  So, anticipation, obviousness, infringement

22   is all through that viewpoint.  So it's not, you know, from a

23   judge's viewpoint or a genius' viewpoint or from anyone with

24   other skill.  It's level of ordinary skill in the art.  And the

25   reason that's there is it maintains some objectivity.  There's

1    some tendency to say, Was it obvious to this particular

2    inventor?  But that's why we have this standard of the

3    hypothetical person having ordinary skill in the art at the

4    time of the invention.  And that is determined by the Court,

5    Your Honor.

6         And Health Grades cites several factors, they were

7    correct factors, in their brief, but how we determine what the

8    level of ordinary skill in the art is, and those include the

9    problems that we're looking to solve, they also include people

10   who are working in the art at the time, including the inventors

11   and others.

12        For the problems, Your Honor, if you look at the

13   patent, and I think Health Grades and MDx seem to agree on

14   this, they have a listing --

15        *THE COURT:*  I would be shocked if you guys agreed on

16   anything, but -- but that's just ... that's unnecessary, and

17   hopefully you accept it in the spirit of humor in which I

18   intend it.

19        *MR. STIMPSON:*  I do, Your Honor.

20        *THE COURT:*  Only half humor, though.

21        *MR. STIMPSON:*  I fully understand.  But, the problem

22   that's being addressed by this patent, from a reading of the

23   patent, and from the prosecution history, it was data.  What

24   data sources do you need to get to match up patients and

25   providers?  What are the sources you need for which types of

1    data?  Which ones need to be verified?  How do you put together

2    a report that's helpful?  That's the problem that's being

3    solved.  We cited pages of the prosecution history, and you can

4    see there --

5              THE COURT:  Ignore me.  I.T. is coming in behind you.

6    And just go ahead and help out with whatever needs to be done.

7    If you need to, I don't know, bring down the courtroom, let me

8    know and I will take a break.

9              MR. STIMPSON:  So, Your Honor, we have cited you pages

10   of the prosecution history, I won't go into it in great detail,

11   but you can see that's what they were addressing throughout the

12   prosecution history.  Those data elements, where they come

13   from, verification, what goes in the report.

14             I think it's also very important to understand what

15   the problem was not.  And what the problem was not, Your Honor,

16   is how to build and access a database.  The problem was not

17   programming.  That's where Dr. Greenspun's expertise comes in.

18   He has got a Ph.D. from M.I.T., in computer science, that's

19   what he does.

20             The second thing to look at are the people working in

21   the art at the time, and that includes the inventors, and it

22   includes others who are working in the art.  I don't have the

23   ELMO, but Health Grades' Exhibit 7 is helpful, I thought, on

24   that.  It's Exhibit 7 from Health Grades' brief.

25             THE COURT:  All right.  I have got Exhibit 7 in front

1    of me.

2           *MR. STIMPSON:*  That's a chart that Health Grades did,

3    about the people who were working in the art.  Now, the

4    question is, what was the level of ordinary skill of people in

5    the art at the time of the invention, February of 2006?  There

6    are three inventors named here, Hicks, Montroy, and Mr. Neal.

7    You can see from this chart that Health Grades' prepared, that

8    Mr. Hicks was working at Health Grades from 2000.  So before

9    the date of invention, 2006, he had six-years experience,

10   working right in this area, healthcare issues, providers,

11   patients, helping to match them up.

12          Mr. Montroy, the same thing.  He started in 1999 with

13   Health Grades.  So before the invention date, 2006, he had

14   seven-years experience, working right with this stuff,

15   healthcare information, healthcare issues, healthcare data.

16          John Neal, the third inventor.  He started Health

17   Grades in 2003.  So he had three-years experience, working

18   right in this area, healthcare issues, providers, patients,

19   knowing what it takes to match them up.

20          The fourth person they list is Jeff LaPoint, he is

21   actually with a company called UCompare.  That's a company

22   owned by MDx, and he started in 2004.

23          So before the date of the invention he too had

24   two-years experience working right in this stuff.  The rest of

25   the people here didn't start until 2007, so they are really not

8

1    people of ordinary skill in the art.  But as you can see, the

2    people -- all the people that were working as of that time,

3    that Health Grades has mentioned, had some significant

4    experience in the healthcare area, knowledge and information,

5    both patients and providers.  So that's why we have our

6    proposed interpretation -- interpretation, it's a level of

7    ordinary skill in the art, as being, you need the computer

8    science background, so we have the bachelor of science,

9    computer science, but you also need some significant experience

10   with patients or providers in healthcare.

11        So with that done then you turn to Dr. Greenspun, and

12   see what is his experience like?  And he submitted a

13   declaration, in paragraph seven and eight of that declaration

14   he talks about his experience.  All of his experience is just

15   building the web interface; building -- doing the computer

16   science part of it.  He mentions W3Health, I asked him about

17   that at his deposition, and it wasn't the same type of data,

18   and he did nothing about what data elements should go where.

19   That's pages 21 to 23 of his deposition.

20        He also mentions ArsDigita.  When I asked him about

21   this in his deposition, it was about photography.  He couldn't

22   remember anything being about healthcare.  So that was all

23   about the software side too.

24        But I think, Your Honor, the most important part, most

25   telling part of Dr. Greenspun's declaration is this paragraph

1    seven.  It's right on point for us.  What is his experience?

2    His first -- his first sentence says that he built a web

3    interface for Boston's Children's Hospital.  That's what he

4    did.  He did the computer science part.  But the rest of that

5    paragraph, Your Honor, is very telling for us.  He talks about

6    the other things, the meaning of the required fields.  This is

7    a medical field.  The meaning of the required fields.  What's

8    stored?  Retrieved?  Displayed?  What was most important?  What

9    should be highlighted?  How you group information.  What makes

10   the most logical sense in putting these things together?  And

11   what he says there, Your Honor, "I didn't do that.  In order to

12   figure that out, I had to ask somebody."  That's what he says

13   in his declaration.  That's exactly the same thing they want

14   him to do here.  It's what data is most important?  What do

15   these fields mean?  What should be retrieved?  What groupings

16   of information?

17            *THE COURT:*  You know, if we were talking about a tool

18   that was to be used for physicians, I might be more inclined --

19   and I am not sure, just while I'm talking, would you just drop

20   something on ELMO?  Just put something on there.  I think we've

21   got some degree of feedback now.

22            *THE COURTROOM DEPUTY:*  It works now, Your Honor.

23            *THE COURT:*  So we seem to have -- we're -- we climbed

24   the ladder back up to high tech.  Okay.

25            In any event, if we were talking about something where

1    what's being sorted or pulled or analyzed or collected, were, I

2    don't know, symptoms of disease, or something of that nature, I

3    would be a lot more inclined, even though it's a medical cite,

4    I mean, the thing we are talking about is, What language do you

5    speak?  Did you get this award?  What school did you go to?

6    Are you male or female?  And in terms of what the -- the

7    patient reviews are, I mean, frankly, that could be, Did you

8    smile enough at me?  It's essentially -- I grant you it's the

9    medical field, but I'm having some difficulty seeing why -- I

10   grant you that it is being used in connection with a medical

11   field, but I'm having some difficulty seeing why the expert

12   would need to have some significant involvement of an undefined

13   type, from my perspective, to be able to opine in the area,

14   given the level of things that are being collected and

15   displayed to the user.

16        *MR. STIMPSON:*  We do, Your Honor.  You have to go back

17   to the problem that's being solved.  The problem that's being

18   solved is the stuff that was out there, they had no way to

19   verify it, it wasn't trustworthy.  This is all at Health Grades

20   brief at page five.  Wasn't trustworthy.  Wasn't collected in

21   the right manner.  It wasn't really what patients and -- needed

22   to see in order to differentiate providers.

23        So the question then becomes, how do you do that?  How

24   do you solve that problem?  And everybody has experience with

25   healthcare.  We have all chosen doctors, but that's not what

1   this patent is talking about.  It's talking about, what do you

2   do to solve those problems?  Where do you get the data?  Where

3   do you get this data?  Why do you get this data from the

4   provider, and this other data from a third party, and this

5   other data from the patient?  Which are the best sources?  And

6   what's the verification?  Those are the issues that are being

7   addressed.  And people who have normal everyday experience with

8   choosing doctors, they may know what they like in a doctor, I

9   may want 30-years experience, someone else may not care if they

10   get a good rating.  But to know how to organize data, where to

11   get it from, and how to collect it, and put it in a -- in a

12   report, that's what this patent is talking about.  It's not

13   just collecting data from anywhere and putting it in a report.

14   It's specifically, as they argued in the prosecution history,

15   what's -- how do we solve these problems?  And what

16   distinguishes over the prior art?  And that's what

17   Dr. Greenspun really is not qualified to testify about.

18           *THE COURT:*  Okay.

19           *MR. STIMPSON:*  Okay.  So, Your Honor, I would

20   emphasize that paragraph seven of Dr. Greenspun's declaration,

21   I think that's very telling.  If he had to do this when he has

22   faced, basically, the same thing, and he had to go ask people

23   how to answer these same questions that we're going to be

24   asking, then why is he able to assist the trier of fact here?

25   He really is just -- just doesn't have that -- any experience

12

1  or knowledge about healthcare providers and patients in order

2  to be able to do that.

3        THE COURT:  Let me hear from Health Grades.

4        MR. KOSTOLANSKY:  Good morning, Your Honor.

5  Kris Kostolansky on behalf of Health Grades.

6        Your Honor, the Daubert gatekeeping function requires

7  the Court to make a preliminary assessment of whether the

8  reasoning or methodology underlying the testimony is

9  scientifically valid and whether that reasoning or methodology

10 can properly be applied to the facts at issue in the case.

11       Those -- those typical Daubert issues are not the

12 issues here in connection with this motion.  MDx does not

13 allege fraud -- flaws with respect to the methodology.  They do

14 not allege that the methodology implied by Dr. Greenspun cannot

15 be applied to the facts of this case.  Rather, they contend

16 that Dr. Greenspun is not a person of ordinary skill in the art

17 who can render an opinion.  And if we look at the -- at the

18 parties' definitions of a person of ordinary skill in the art,

19 there's substantial overlap.  Health Grades' proposed someone

20 with a bachelors degree in computer science or related field,

21 and some experience building database-backed websites.  MDx

22 focuses on at least a bachelor's degree in computer science

23 from an accredited college with at least several years

24 experience in developing websites and database applications

25 linked together in a website, and also having significant

1    healthcare experience.

2          So if we look at the first -- at the first two pieces

3    of MDx proposal; that is, the bachelor's degree, and the years

4    of experience developing websites and database applications

5    linked together, it's clear that Dr. Greenspun satisfies those

6    elements.  He has a bachelor of arts -- science degree in

7    mathematics from M.I.T.  He has a masters of science degree in

8    electronic -- electrical engineering from M.I.T., that he

9    received in 1993.  He has a Ph.D. in computer science from

10   M.I.T. in 1999, and his thesis there concerned Internet

11   communities with web browser front end and relational

12   databases.  He began full-time work in 1978, developing a

13   database management system for the Pioneer Venus Orbiter, for

14   the National Aeronautics and Space Administration.

15         In 1997 he published his first textbook on Internet

16   application regarding the development of database-backed

17   websites.  In 1997, he started a company called ArsDigita, and

18   he worked there from 1997 through the middle of 2000.  There he

19   supervised the development of a number of software development

20   projects, over -- around 200, that also dealt with Internet

21   applications on the web, front end, and the oracle-relation

22   database management systems on the back end.

23         He personally developed functional specifications,

24   S.Q.L. data models that were standard programming language with

25   respect to relational database management systems.

1          He was also a part-time teacher at M.I.T., in their

2     electrical engineering and computer science department, where

3     he educated students at M.I.T. regarding the database-backed

4     websites, and he wrote 15 chapters of their book.

5          Turning to the issue of healthcare, Your Honor -- so I

6     think the first two elements of MDx's proposal are satisfied.

7     The third part of the proposal, concerns having significant

8     experience in the healthcare arena, and Dr. Greenspun's

9     activities, as laid out in his resume' and education and work

10    experience satisfy that requirement.

11         He developed, in 1999, a computer program using a

12    relational database system to interface to Children's

13    Hospitals' Oracle Relation Database Management System, called

14    Version Six.  This enabled the hospital and doctors to view

15    patient clinical information using computer-equipped web

16    browser.

17         Now he worked with the doctors in 1994, as set forth

18    in paragraph seven of his supplement, to develop that system,

19    and there he learned about the meaning of the required fields

20    to be stored, retrieved, and displayed.  He learned that from

21    interacting with the physicians.  He interacted with the

22    physicians with respect to determining what information is most

23    important, and what needs to be highlighted in connection with

24    the relation-database management system.  He asked the

25    physicians about grouping of systems, and received responses

from them, and then put the system together.  This is back in 1994, and from that he has learned how to build relational-database management systems, based upon the needs of physicians.

He testified in his deposition that the data modeling that he did included talking to domain experts, physicians, hospital administrators.  With respect to W3Health, again, prior to the date of invention, that was a company that was spun off of the Children's Hospital Medical Information Group, and that offered improved and commercialized versions of a web-based electronic medical record system that had been developed in 1994.

At ArsDigita, he developed a database-backed system that permitted heart surgeons to enter data about various types of bypass operations.  This data went into the relational database, so it's possible to utilize queries to find specific information.  Again, this type of relational-management database is developed through interacting with physicians.  This was done prior to the date of the invention in 1997 through 2000.

Also a CEO of ArsDigita in 1999 and 2000, he participated in discussions, with the online community, about the software tool kit that had been developed by ArsDigita.

Then if we look at Dr. Greenspun's publications, and this is Exhibit 37, Dan.  If you wouldn't mind bringing that

16

1    up.  We see that Dr. Greenspun published an article in 1996,

2    that appeared in the *Journal of American Medical Informatics*

3    *Association*.  This involved the building of national electronic

4    medical record system, via the worldwide web, and there the

5    article notes in the abstract that the authors have designed a

6    preliminary E.M.R.S. architecture that exploits the

7    multi-platform, multi-protocol, client-serving technology of

8    the worldwide web.

9         Dr. Greenspun also testified in his deposition that

10   with respect to the -- the courses he has taught at M.I.T.,

11   which have been for the last ten years or more, that he has

12   taught students about data modeling, using problems that

13   involve medical examples and scenarios.

14        So we believe, Your Honor, that Dr. Greenspun has

15   satisfied the third element suggested by MDx in its proposal;

16   namely, having experience in the healthcare arena.  This is

17   very comparable experience to that of Dr. Cooper, who is the

18   plaintiff's expert who prosecuted a patent related to E.E.G.

19   monitoring, who developed a staff scheduler regarding nurse

20   scheduling, and who developed a system to help the director of

21   staff development find errors in healthcare-related data

22   concerning patients.

23        But Dr. Greenspun, Your Honor, brings a third area of

24   expertise that helps tie the three elements that we've talked

25   about, education, work experience, and healthcare together; and

17

that is, Dr. Greenspun has substantial experience building

consumer-oriented, database-backed websites.  As I indicated

earlier, he has been involved in building 200 or more of those,

many of which involve consumer interfaces, and the knowledge

that he possesses regarding the consumer interface, and the

behavior of consumers in dealing with consumer-based interfaces

is relevant with respect to his analysis of the development of

this patent.

In 1995 Dr. Greenspun led an effort by the Hearst

Corporation to set up an infrastructure for Internet

applications across all of the Hearst Corporations' newspaper,

magazine, radio, and television properties.  This

infrastructure included software for managing users, shopping

carts, electronic commerce, advertising, and user tracking.

Dr. Greenspun also built a database-backed website

called Photo.net.  While operating Photo.net he required

additional experience regarding the challenge of managing

user-contributed ratings on websites.  By 1999 it was possible

for users to participate in discussions, comment on articles,

attach digital photos, with comments, questions or answers on

the Photo.net site that he and others built.

Around the year 2000, Dr. Greenspun and his co-workers

decided to add a feature that would enable users to rate photos

with one to five stars.  This type of rating was entirely

noncommercial in that it had no specific value, with respect to

1     an individual's photograph who was viewed or rated highly,

2     other than giving them some type of right to claim that they

3     were five stars.

4           But in that situation, Dr. Greenspun found that the

5     users colluded to form rating blocks so that user A might team

6     up with users B and C to rate each others photographs more

7     highly, and that would cause some users to fall off top rated,

8     would cause them to get upset, and consequently there needed to

9     be systems put in place in order to make sure that the system

10    was maintained honestly.

11          The Photo.net system also generated revenue through

12    advertising, like the Health Grades system does, though this

13    was different in that it was more Google-ad-sense revenue, and

14    it also involved revenue generated from folks who would come

15    from the Photo.net website, go to a camera website that it

16    advertised, and then purchase a camera on that website.

17          So, Your Honor, we believe that this added dimension

18    of Dr. Greenspun clearly satisfies all of the elements

19    necessary for him to be a person of -- of ordinary skill in the

20    art.

21          Turning just briefly, Your Honor, to the five factors

22    that are -- that are referenced in the Environmental Designs,

23    case.  Dr. Greenspun's level of education, is, obviously,

24    substantial.  He is familiar with the types of product problems

25    that are encountered in the art, as -- as referenced from his

1    Photo.net and other interaction -- other circumstances

2    involving interactions with physicians, and also, Your Honor,

3    it's important to note that the prior art is not limited simply

4    to the healthcare arena.   The *Henley* patent, which is one of

5    the patents -- the most frequently discussed during the

6    prosecution history.   That describes an Internet-based auction

7    system that enables prospective clients, patients, and

8    professional service providers to competitively negotiate fees,

9    and *Henley* discusses various kinds of service providers,

10   including medical personnel, financial-, or legal-service

11   providers; noting that, quote, the skilled artisan will

12   appreciate that the apparatus and method of the present

13   invention may easily be adapted for use in other fields of

14   professional service, such as the provision of legal and

15   accounting services.

16       The same is true with respect to the '855 patent,

17   that's referenced in our brief.   There, the prosecution history

18   notes, quote, not limited to experts in biological sciences,

19   but can be used to other areas of expertise such as consumer --

20   computer consulting.

21       The '233 publication, references as an exemplary

22   system.   The matching system is configured to match attorneys

23   to consumers.   So that part of the prosecution history,

24   Your Honor, had nothing to do with -- with health --

25   healthcare.

1          The prior art solutions to the problems.  You know,

2    Dr. Greenspun has worked with -- with developing computer

3    based -- database-backed systems involving consumer interfaces.

4    He has worked with physicians to build database-backed

5    websites, in his work in the -- with respect to Children's

6    Hospital, just simply confirms that he has worked with

7    physicians, gathered information from them, asked appropriate

8    questions, and worked with them to establish the goals that are

9    to be accomplished.

10         His education level of the workers in the field,

11   certainly exceeds that.  And the reference to the fields of

12   the -- of the MDx workers.  They came after the invention had

13   been put -- put in place, and their expertise should be

14   analyzed accordingly.

15         Regarding the sophisticated nature of the technology.

16   Here, really, the most complex part of this area is the -- is

17   the database-backed website design.  On the -- on the

18   healthcare side, Dr. Cooper states in his -- in his report, at

19   page 11, talking about the healthcare provider verified

20   information, quote, none of these properties are novel, in

21   fact, they are commonly used by prospective patients to help

22   select a provider which meets the patient's requirements.  And

23   they are referring to specialty information, medical

24   philosophy, gender, age, years in profession, et cetera.

25         With respect to the healthcare provider report and its

1    content, Dr. Cooper, at pages 17 and 18 of his report, says,

2    quote, this claim element therefore is also not novel per se,

3    and prior art will be shown to illustrate the lack of novelty.

4    Thus, these are not inordinately sophisticated medical

5    healthcare concepts.  Dr. Greenspun's level of expertise is

6    more than sufficient to permit him to testify regarding this

7    level of sophistication, given his past interactions with --

8    with physicians.

9         Under Rule 702, Your Honor, a witness who is qualified

10   as an expert by knowledge, skill, experience, training, or

11   education, may testify in the form of opinion or otherwise, if

12   the expert's scientific, technical, or other special knowledge

13   will help the trier of fact to understand the evidence or to

14   determine a fact in issue.

15        Rule 705, from the *Microfinancial* case, cited at page

16   12 of our brief, that's Rule 702, Is not so wooden as to demand

17   and intimate familiarity with every component of a transaction

18   or device as a prerequisite to offering testimony.

19        And this is far from the case, Your Honor, like the,

20   *Sundance* case, cited by the other -- the other side, where a

21   patent lawyer with no technical expertise in the art, testified

22   regarding issues of infringement and validity.  Dr. Greenspun

23   has substantial technical expertise.

24        Accordingly, Your Honor, based upon his education,

25   experience, and technical expertise, he clearly satisfies the

22

1    threshold of Rule 702, in that he can use his knowledge and

2    expertise to help the finder of fact to understand the evidence

3    or determine a fact in issue.

4         Thank you, Your Honor.

5         THE COURT:  Do you want to respond?

6         MR. STIMPSON:  May I just have one minute, please,

7    Your Honor?

8         I would like to just briefly address one of

9    Mr. Kostolansky's last points, that also relates to the point

10   you made, Your Honor, about the sophistication, the technology,

11   and complexity of the technology.  It isn't rocket science.

12   It's not organic chemistry or biotechnology, but I suggest

13   strongly to you, Your Honor, when we get here to this trial,

14   Health Grades is not going to be saying what Mr. Kostolansky

15   just told you, this is simple stuff.  They are going to be

16   telling this jury, nobody could figure this out.  Nobody could

17   figure this out.  This wasn't clear.  It was an ongoing problem

18   forever.  It wasn't clear how to do this.  That's what they are

19   going to be saying.

20        Dr. Greenspun, he is a highly educated man.  There is

21   no doubt about that.  He is a very smart guy.  I took his

22   deposition.  But, Your Honor, I can tell you, from what

23   Mr. Kostolansky said, and what's in their brief, it's all

24   computer science; building interfaces, building

25   infrastructures.  There's nothing in what Mr. Kostolansky said

1    or in their brief or anywhere showing that he has been involved

2    in determining required fields, what's most important to

3    include, and what you do, what they need to know to connect

4    patients to healthcare providers and help them distinguish

5    providers.  There's nothing like that.

6         And, Your Honor, just lastly, very briefly, he is not

7    comparable to Dr. Cooper.  I chose Dr. Cooper very carefully

8    because I knew this was an issue.  And Dr. Cooper has been

9    working in the healthcare area, I think his report says, for

10   decades.  He has a medical engineering degree.  That's why

11   Dr. Cooper meets the standard and Dr. Greenspun does not.  He

12   has been working in this area with patients, with providers; he

13   has got the experience.

14        Thank you, Your Honor.

15   THE COURT:  Okay.  With respect to this motion, I

16   don't want to get into any tremendous detail.  Obviously any

17   ruling -- well -- a ruling that it doesn't meet the threshold

18   under Daubert clearly is an exclusion ruling, but a ruling that

19   we can go forward does not mean that the parties can't object

20   to additional matters at the time of trial.

21        I'm not going to get bogged down in whether or not

22   some experience, significant experience, where the line is

23   between those two.  I think that I am satisfied that he meets

24   the 702 threshold, and so the motion is denied.

25        Let's talk about Mr. Hall.  To keep the ball, if you

1    would, in your court.

2            *MR. DICKEY:*  Good morning, Your Honor.  I'm ready to

3    address Mr. Hall.  If you give me a minute to orient myself.

4            *THE COURT:*  Absolutely.

5            *MR. DICKEY:*  I have been to Denver many times,

6    Your Honor, but it's my first pleasure to be in the courtroom

7    here.

8            *THE COURT:*  It's not that pleasurable.

9            *MR. DICKEY:*  It's a very nice courtroom.

10           *THE COURT:*  It's pretty much the same as every other

11   courtroom in this building, but okay.

12           *MR. DICKEY:*  Your Honor, as far as the Motion To

13   Exclude David Hall As An Expert, I'm not going to go into the

14   *Daubert* role of the Court.  I know the Court is fully aware of

15   that.

16           We're also not challenging that with the right proofs,

17   with the right evidence, lost profits and a reasonable royalty

18   are a fair measure of damages, but you have to prove them

19   correctly.

20           We are also not challenging Mr. Hall's credentials.

21   Nor that he can cite the proper test and methodology.  He

22   certainly cited the *Panduit* test that we embraced, and the

23   *Mor-Flo* analysis, but what he failed to do is he failed to even

24   come close to addressing the plaintiff's burden to show demand

25   for the patented features, the '060 patented suit.  And he also

25

1    did not come close to determining the non-infringing

2    substitutes, which are necessary from the *Analytical* and

3    *Mor-Flo* approach.

4           Basically, our objection to his testimony is it is

5    speculation and unreliable.

6           Now, the fundamental flaw is in the failure to

7    apportion the Health Grades' website patented features from the

8    entire website, which is required for your lost profits.  We

9    all know that the "but-for analysis" gets us to *Panduit*, but

10   for the infringement, the plaintiffs would have made the sales,

11   and we look to the *Panduit* test, and the first thing is to show

12   the actual demand for the patent.

13          Now, here, it's not the sale of a website.  It's not

14   the sale of a product.  This is different.  But it's no

15   different than the the case law teaches for the last four

16   years, which I'm going to get into, because there's specific

17   case law in this, Your Honor.

18          This is a website and the revenue is generated by hits

19   or consumers being directed to the website.  That generates

20   revenue.  The number of hits equals greater revenue.  But we

21   all know, and there's no dispute, and Mr. Hall certainly

22   concedes, that there are numerous non-patented features in both

23   of these websites, and the prior art had physician ratings.  So

24   we all know there's lots of different ways to search, and the

25   majority of those ways I will go into, Your Honor, a little

1    bit, would not impact the patented suit at all.

2          Consumers, and this is conceded, the majority of

3    consumers make it to the Health Grades or Vitals website not by

4    putting in the address of the sites.  They get there through

5    search engines, Google, Yahoo, Bing being the most popular

6    right now.  And we all know that it's -- and it's conceded by

7    both parties, that search engine optimization, which is the

8    method by which these search engines take a consumer's word

9    inquiry, results in a list of websites.  And we all recognize

10   and it's conceded it's important to be in the first page, at

11   least.  The higher you are on that listing, the better.

12   Presumably the higher you are the more hits you are going to

13   get, the more revenue you are going to get.  Very simple

14   concept.

15          However, the search engine optimization is a black

16   box; it's an Algorithm that the search engines keep secret.

17   However, it's all recognized that most all companies are

18   sophisticated try to game the system.  Google tries to prevent

19   it, they change the Algorithms, but the reality is and the

20   testimony from both parties is, both of these companies try to

21   figure out how to get higher in the order.

22          Mr. Hall talked about content, but couldn't say what

23   content was.  Well, content -- I'm not sure this is in the

24   briefs, but I think it's judicial notice, is mostly metadata.

25   It's not what the consumer sees.  It's what's behind the

27

1    website.  But again, there's really -- and this is a major

2    fault of Mr. Hall's report -- he never gets into search engine

3    optimization.  There's no claim that search engine optimization

4    is a violation of the patent.  It gets you to the websites.

5    But it was nothing that's volitive of the patent, we submit, if

6    the consumer is searching for a hospital, which both sides

7    provide.  If the consumer is searching for a nursing home,

8    which both sides provide.  Including comparisons of hospitals,

9    Judge.  If the consumer is searching for a doctor that now is

10   under their new healthcare plan, it's not violative of the

11   patent.  Nothing to do with the revenue that's generated by

12   these websites.  And there's a myriad of searches, locations,

13   wait times of doctors.  There's all of these searches consumers

14   can be putting in to find out information on their selection of

15   a doctor.

16        The patent.  Mr. Stimpson got into it a little bit.

17   It's a report.  It's a report on patient ratings, verification,

18   and comparison rating of other providers to the first

19   healthcare provider.  There's no allegation in the search

20   engines to get you to the websites, infringe, but that's what

21   the patent is; that's what we're talking about.

22        Now, Mr. Hall aggregated all advertising revenue in

23   his analysis; both for plaintiff and for the defendant.  His

24   report and his statement don't back away from that.  He

25   attempted no apportionment, whatsoever, of ad revenue, which

1     was the driver, which is the relevant revenue -- is the

2     relevant ... revenue here.  He undertook no surveys, no

3     studies, no statistical modeling.  He did nothing to determine

4     demand or apportionment for the patent features.  Because

5     remember, prior art, we already had ratings, patient ratings

6     were already there.  This is directly contrary to a very

7     extensive body of law for the last four years, which has

8     developed over the last four years, and is basically the

9     Federal Circuit law now, and particularly Chief Judge Rader.

10    This began, really, in 2009, the law directly applicable to why

11    Mr. Hall's report and opinion should not be admitted in this

12    case.

13          In 2009, I think it was -- it's not cited in our

14    brief, but it's cited in some of the 2013 cases, been many of

15    them, Judge, at least four that are directly on point that I

16    can provide to the Court, because they are really all relevant

17    to *Laser Dynamics* and the development of the law on these

18    points.  But in *Cornell University vs. Hewlett-Packard*, that's

19    when he first opined, Chief Judge Rader, that you need rigorous

20    economic drilling down on what are the patent features, as

21    opposed to the product as a whole?

22          The next year, 2010, where he was also sitting by

23    designation, in the *IP Innovations vs. Red Hat*, he rejected the

24    plaintiff's expert and barred the plaintiff's expert from

25    testifying, because, again, the plaintiff's expert did not do

29

1    the studies and the research to prove to the Court that the

2    compensatory damages are limited to the actual advancement by

3    the patent features over the prior art.  This is the new test.

4    This is what *Laser Dynamics* clearly specifies for us.

5          In that case, it was a laptop, Judge.  It was an

6    operating system.  There were improvements to the operating

7    system.  Well, the operating system, there was no proof that

8    the improvement to the operating system drove the demand for

9    the laptop in that case.

10          When we look at the *Panduit* test, and the first a

11    demand for the patent products, we look and we say, Unless you

12    can show that the demand of the patent features is what's

13    pulling the demand for the entire product, you have got to show

14    that demand for the patent feature is separate.  And as I said,

15    what Mr. Hall does is he says, Well, both these companies grew

16    rapidly.  That's -- that's it.  That's his his whole

17    explanation for why this patent must be important.  But he

18    didn't do any analysis of that growth.  He didn't even figure

19    out when the functionality of '060 began for Health Grades, to

20    see what the growth-curve change was, if there was one.  Or the

21    profit margin, before or after the functionality was introduced

22    into the websites.  He didn't do anything.  He just said they

23    both grew rapidly, therefore there's demand.  That's not what

24    the Federal Circuit requires.

25          What he did do, and what he had to do, is he had to

1    take out departments that his client told him aren't generated

2    ad revenue.  So his -- his statement, and I am not using the

3    entire market value rule, because I took out department revenue

4    that has nothing to do with ad revenue, that's a non sequitur.

5    You have to apportion the ad revenue.  That's what we are

6    dealing with here.  That's where the damages are, allegedly.

7    And he makes no attempt, whatsoever, to do this.  Now -- and he

8    admits that.  I think if you look at page 78, eight to twelve,

9    that's clear.

10           Now, the Supreme Court in *G.E. vs. Joiner*, that was in

11    1997, held that the expert testimony must be relevant, must be

12    reliable, irrespective of the qualifications of the expert, and

13    irrespective of the methodology employed.  It also held that

14    the cost of economics in doing this is not relevant.  In *Laser*

15    *Dynamics*, the Federal Circuit made it very clear, the expert

16    must drill down, or must look at and apportion the smallest

17    saleable element.  That's what needs to be employed.  Unless,

18    again, you can show that the patent features are driving the

19    entire demand for the product.

20           In *Laser Dynamics*, the expert looked at a laptop

21    again, happened to be another laptop, took a third of the

22    laptop value, but the Court said that was insufficient.  He

23    hadn't established the demand for sales only, based on one

24    little study; just one study wasn't enough for the Court.

25           Now, even though practical necessity isn't an excuse

1    for not doing the reports, Mr. Hall says, in his report, and

2    his statement, Vitals' website is the patent product.  So he

3    claims is the whole product.  But the patented features are not

4    the website.  It's not co-extensive.  They are very, very

5    different.  Incredibly, what he didn't consider or address, is

6    less than 2 percent of Vitals' profiles have information from

7    the first healthcare provider.  Less than 50 percent have

8    information of patient ratings, therefore 98 percent can't be

9    violative of the patent.  Never addressed it.  Never

10   apportioned.  Never looked at, maybe I will look at the

11   database and apportion it that way.  Do some kind of analysis,

12   statistical modeling that way.

13        Now, he says he didn't do the entire market value

14   rule, but he really did.  He just took out departments that had

15   nothing to do with ad revenue, and didn't touch the ad revenue

16   itself, and the market value rule is greatly disfavored as I'm

17   sure the Court knows from the cases we've cited.  Here there

18   are many competitors.  There's no question there's many

19   competitors.  I'm going to address whether they are all

20   included or not in Mr. Hall's analysis in a minute, but there's

21   no question there's a lot of ways to search for doctors and a

22   lot of websites to do so.

23        But, here, it would have been very simple to apportion

24   demand.  It would have been very simple to do a survey.

25   Because all you have -- when I landed here, Judge, and got off

1    my plane from United, I got a pop-up on my -- my -- my phone

2    that says, Will you take a two-minute survey?  All Mr. Hall had

3    to do was ask Health Grades, when a consumer visits the site,

4    to have a pop-up, Will you take a two-minute survey, and he

5    could have asked, did you come here from search engine

6    optimization, Yahoo, or did you put in the website?  He could

7    have asked, What you are looking for?  He could have asked, Are

8    you looking for hospitals or doctors?  He could have asked,

9    What's the criteria?  Is it healthcare insurance dominated.

10   And he could have done modeling, and he could have figured out

11   what percentage of this revenue has anything to do with

12   comparing doctors at all, much less the patent; comparing

13   doctor ratings to a first healthcare provider.  None of that

14   was done.

15          Now, obviously, if he had done that, we might have

16   challenged how he did it, may have been biased, our expert

17   could have done his own survey, put up a survey on the Vitals

18   site.  We would have had competing testimony.  But it's the

19   plaintiff's burden, not the defendant's burden here.

20          Now, the plaintiffs are attempting to excuse this

21   failure by the *Gyromat/Champion Spark Plug* case, and a little

22   bit by *Mor-Flo*, but neither of those cases are applicable.  You

23   had two manufactures in those cases.  There was -- the two

24   products are the only products, the foam water heaters and the

25   institutional spray.  That was not an issue.  That wasn't even

1      a challenge on that.  Here you have many competitors.

2            Now, I go back, again to -- Dr. Hall seems to say the

3      websites are the patent.  But the term "first healthcare

4      provider" appears ten times in the short claim one, and eleven

5      times in the short claim fifteen, which are the two independent

6      claims.  It's part and parcel of the patent.  It's not invoked

7      by almost a myriad of these searches that the consumer would be

8      looking for.

9            Your Honor, I also submit that the Court can take

10     judicial notice of the fact that millions of consumers have

11     lost their employer healthcare benefits during the recession,

12     when they lost their jobs.  I think the Court can take judicial

13     notice that the healthcare system has been in flux -- some

14     people would say turmoil, but I'm not going there -- for the

15     last quite a few years.  There's been a real alignment of

16     physician groups under the healthcare coverage.  There have

17     been consumers that have been dropped from the healthcare

18     systems.  They are finding they need to find a new doctor in

19     their locale that has or takes their insurance coverage.  The

20     massive driver of growth of websites like these.  Not the

21     patent.  Healthcare insurance, I think that's -- that was never

22     touched by -- by Mr. Hall.

23           Remarkably, there was also no attempt by Mr. Hall to

24     address the profit margin of Health Grades before the patent in

25     suit functionality was introduced and after, and that was

1    apparently because he didn't know that there were patient

2    ratings prior to, in the prior art.  Maybe that was why.  But

3    that would have shown whether or not the patent has an impact

4    on the growth of Health Grades, as he claims.  This 300 percent

5    growth.  Nothing was done.  No studies, no models, no

6    statistics, nothing.  He says it was speculative to do so.  I

7    submit it's easy.

8          Under -- under *Uniloc*, Your Honor, cited in several of

9    the cases, I don't think we cited it directly, but cited in

10   several of the cases before the Court, the Court also rejected

11   an attempt to just lower a royalty rate.  When you are trying

12   to use the whole product, you say, Well, I can't really figure

13   it out, you can't just drop the royalty rate, that won't cut

14   it.

15         Now, under the *Mor-Flo* analysis I have touched on that

16   briefly.  The analytical approach in looking at market share.

17   Your Honor, we actually have, in our brief, and I am not

18   advocating that now, that grounds to strike Mr. Hall's report

19   would also be his reliance upon Andrea Pearson, who wasn't

20   disclosed in the Rule 26 disclosures.  Was never disclosed as a

21   witness.  But I think what I -- what I look at now is

22   Mr. Hall's credibility.  He has put in his statement that she

23   was merely corroborative.  But the deposition citations that we

24   have throughout here show anything but.  She was the one that

25   describes some licenses to him.  She was the one that talked

1    about search engine optimization and traffic -- web traffic to

2    the Health Grades site, critical factors in this case.

3         There are a number of things she, and apparently

4    Mr. Dodge, are the ones that basically overruled, and I

5    don't -- and I think impermissibly, Mr. John Neal, the 30(b)(6)

6    witness that was designated to testify as to who the

7    competitors of Health Grades are.  Mr. Neal's testimony stands,

8    identifying over a dozen competitors, including WebMD, which is

9    not insignificant, it's a major player.

10        Now, the company is locked into it's 30(b)(6)

11   testimony.  No substitute witnesses put up.  There's no errata

12   sheet denying his testimony.  Yet, apparently, in conversation

13   with Ms. Pearson and Mr. Dodge, Mr. Hall decided it's a much

14   narrower list of competitors.  I don't believe, by extension,

15   the expert can take a position contrary to the company's

16   position under a 30(b)(6).  I don't think it can be done.  It's

17   topic number three that's in the -- in the interrogatory,

18   notice of 30(b)(6).

19        Surprisingly, WebMD is not considered a competitor by

20   Mr. Hall, yet -- for the market-share analysis, yet he relies

21   upon it for his profit margin calculations.  So it's a

22   competitor and it's information, it's public, so it's easy to

23   get to, that's impermissible.  I don't believe you can do that

24   just because it happens to be in the industry.  Personally, we

25   believe it should be in both, because that's what Health

1    Grades' position was and is, as of now.

2            It's just more evidence that Mr. Hall's report is

3    completely speculative and not relevant.

4            By the way the citations of Ms. Pearson's testimony

5    are pages 156, 157 of the deposition, 197, and also she advised

6    him of some things he should read, that was 119 to 120.

7            Now, the plaintiffs also try to rely upon the *Mondis*

8    *Technology* decision, the magistrate judge decision in the

9    Eastern District of Texas, I think it was 2011, maybe 2010.  In

10   that case, Your Honor, it's not applicable at all.  In this

11   case, you had -- what would be nice if you had in this case,

12   but we don't -- multiple licenses that both sides conceded were

13   comparable to the patent in suit.  So you had all these

14   licenses that were good comparisons, if you will, and in that

15   case, both sides conceded it was industry standard to use the

16   entire product for licensing.  Even though both sides conceded,

17   totally contrary to this, that the invention didn't propel

18   demand.

19           So those cases just -- that case has nothing to do

20   with what we're dealing with here.  In this case there's

21   certainly a -- it's contested that there is demand at all, and

22   if there is any demand, it's very minor, the defendants say,

23   and of course the plaintiffs say that the demand is huge,

24   because of their patent.

25           I also didn't cite to the Court, but it's Exhibit 13,

1    to Mr. Hall's deposition, the Drucker report, which had the

2    patient ratings from 2005, Your Honor.

3         Your Honor, the -- basically, when the proof of demand

4    is this weak, we say there's none, but it's this weak, using a

5    12 percent royalty, is egregious.  There's -- the number is

6    just picked out of thin air.  It starts with 34 percent, again

7    picked out of thin air.  The license says they are data points,

8    but they are not relevant -- excuse me wrong word -- they don't

9    compare to the patent in suit.  So there's nothing there.

10   That, in and of itself, is another fundamental failure of

11   Mr. Hall's report.

12        Finally, Your Honor, in summing up, the briefs were

13   submitted 2012, there are four major decisions that have been

14   decided this year that directly address *Laser Dynamics*.  Would

15   the Court like me to provide those citations to the Court?

16             *THE COURT:*  Yes.

17             *MR. DICKEY:*  Wrong notebook.  One second, Judge.

18        Your Honor, I cite to the Court, *Axcess*, A X C E S S,

19   *International vs. Savi Tech*, Northern District of Texas, and

20   that is -- it's 2013 Lexis 98642.  I cite to the Court, *AVM*

21   *Tech LLC vs. Intel*, District Court of Delaware, 2013, and that

22   is 2013, Lexis 1165.  I would cite to the Court, *Network*

23   *Protection Sciences vs. Fortinet*, Northern District of

24   California, 2013, that's -- 2013 U.S. District Court Lexis

25   138890.  And finally, I think under the apportionment methods

38

1    *V I R N E T X Inc vs. Cisco Systems*, Eastern District of Texas,

2    2013 is another decision that all these are following the

3    Federal Circuit's directive that one has to have a rigorous

4    economic analysis of the advancement of the patent over the

5    prior art.  And that case, Your Honor, I am not finding the

6    cite for.  I apologize.

7         THE COURT:  That's fine.

8         MR. DICKEY:  Your Honor, in sum and substance, we

9    believe this report is very seriously deficient, and we

10   understand the Tenth Circuit's general leaning, which is most

11   circuits in granting in dieing *Daubert* motions, but here we

12   just think it's a very clear-cut case.  Thank you.

13        THE COURT:  Understood.

14        THE COURT:  Who from plaintiffs side is going to be

15   speaking to this?

16        MR. KANAN:  The B team, Your Honor.  I am, Your Honor.

17        THE COURT:  I know we started a little late, but let's

18   just take a morning break of about ten -- ten minutes to give

19   my reporter a chance, and then we will run through till noon.

20   Okay.

21        THE COURTROOM DEPUTY:  All rise.  Court is in recess.

22      (Recess at 10:14 a.m.)

23      (In open court at 10:24 a.m.)

24        THE COURT:  Please be seated.  Counsel.

25        MR. KANAN:  Good morning, Your Honor.

1          *THE COURT:*  Good morning.

2          *MR. KANAN:*  Greg Kanan for Health Grades.

3     Mr. Stimpson and Mr. Kostolansky are letting the B team handle

4     this particular issue, Judge.

5          I want to talk about a couple of primary basic points,

6     Your Honor, that I know you are aware of, but they are worthy

7     of a reminder, and one of them is what the standard here is

8     under Rule 702 in a *Daubert* hearing, excluding testimony, as

9     the Court is aware, the comments to Rule 702 speak to that, and

10    say a review of the case law after *Daubert* shows that the

11    rejection of expert testimony is the exception rather than the

12    rule.  *Daubert* did not work a see change over federal evidence

13    law, and the trial court's role as gatekeeper is not intended

14    to serve as a replacement for the adversary system.  Vigorous

15    Cross-examination -- presentation of contrary evidence and

16    careful instruction on the burden of proof are the traditional

17    and appropriate means of attacking shaky, but admissible

18    evidence.

19         We are not here to determine whether Mr. Hall is right

20    or not, or the -- certainly not as to whether the defendant's

21    damage expert is right or not.  That isn't the test.  That's

22    not the standard.  It is whether that threshold and relatively

23    low threshold is met, such that he can testify and be subject

24    to Cross-examination.  Nothing Mr. Dickey said here this

25    morning is the type of information that couldn't be presented

40

1    in Cross-examination of Mr. Hall, if indeed it is all that

2    Mr. Dickey claims it is.

3         I also want to point out that, as Mr. Dickey conceded,

4    there is no challenge to Mr. Hall's qualifications.  He is

5    eminently qualified in this area.  There isn't really a

6    challenge even to the methodology that he used, and as I think

7    Mr. Dickey acknowledged, he has used the correct cases, case

8    law, the standards that are set out in the case law for

9    determination of damages in this case.

10        And I want to speak for just a minute, briefly, about

11   exactly what Mr. Hall did, so that you have the proper context

12   about what is being argued here.  As the Court knows, 35 U.S.C.

13   284 says that a plaintiff in an infringement case is entitled

14   to damages, and in any event not less than a reasonable

15   royalty.  And so what commonly can occur and what Mr. Hall did

16   in this case, is prepare two somewhat alternative measures of

17   damage here.  One of them, a lost profit analysis.  The other

18   one, a simple royalty analysis to apply to the revenues of MDx.

19   In his lost profit analysis, Mr. Hall applied the *Panduit*

20   factors, as Mr. Dickey acknowledged.  He considered the demand

21   for the product.  He considered the issue of the capability to

22   produce additional product by Health Grades, had it gotten the

23   demand that Vitals, instead, has received, and he considered

24   what incremental costs would be incurred.  He did consider

25   non-infringing substitutes, the requirement is to consider only

1    non-infringing substitutes, and I am going to come back to that

2    later, and then he calculated the amount of lost profits.

3            In his work in doing that, he did something really

4    quite complicated and sophisticated and thorough.  He looked at

5    the revenues that Vitals had generated, since it has infringed

6    this patent, advertising revenues only, and I am going to come

7    back to that later, as well; but he didn't simply take all of

8    those revenues and say that's our starting point of what Health

9    Grades would have gotten, because he recognized that there are

10   consumers who visit both sites, co-visitors to a site, no

11   surprise.  There are reports in the industry that calculate

12   those co-visits.  In this case it's called the comScore report,

13   which is regularly provided to Health Grades, and Mr. Hall used

14   that comScore report to calculate the amount of co-visits that

15   would have been occurring over the period of time, and he

16   deducted from the revenues, the percentage applicable to

17   co-visits, because Health Grades got those visits.

18           He then, also, made a deduction by allocating the

19   remaining revenues of Vitals amongst the marketplace; amongst

20   competitors.  So he did consider non-infringing alternatives,

21   and allocated to the market shares of each of the competitors

22   their property amount.

23           And I will come back to this a little later too,

24   Your Honor, but he not only looked at what he, after his

25   investigation, believed to be the appropriate, non-infringing

1    alternatives, and he utilized information provided by Health

2    Grades and information he had assembled, he then also, in

3    his -- and has recited this in his supplemental report, used

4    the exact alternatives that -- that the defendant's expert

5    contended are the non-infringing alternatives, and calculated

6    the damage figure or the substitutes in that manner, using the

7    defendant's expert's claim of who the competitors are, and

8    thereafter he calculated the lost profit on that remaining,

9    greatly reduced figure.

10        As I said, part of the lost-profit calculation then is

11   to go back to the revenues that Vitals received, but that were

12   not used in the calculation of lost profits, for the reasons I

13   have described, but were received by Vitals, and then to apply

14   his royalty calculation, his 12 percent royalty to those

15   remaining revenues as also part of the lost-profit calculation.

16        So that's one of his two alternative methods of

17   damage.

18        THE COURT:  Where does the 12 percent come from?

19        MR. KANAN:  He does an analysis to conclude that a

20   reasonable royalty in this setting would be 12 percent.  And I

21   was going to come to that, but I will talk about it right now,

22   since you have asked the question, Judge.

23        It bears a little bit on some of the claims Mr. Dickey

24   made.  Well, there isn't any magic to how this royalty is

25   calculated.  There isn't any formula to go to.  There isn't a

1　book to go to.  One has to look at the particular facts in each

2　case, and -- and determine, through analysis, what might those

3　factors be that would influence a royalty?  The royalty is a

4　hypothetical negotiation between Health Grades and Vitals at

5　the time the patent was issued, presumably.  Vitals would say,

6　Can we license your patented product?  Health Grades would say,

7　Let's talk about it.  And they would negotiate in an

8　arms-length negotiation a royalty rate.

9　　　　Where do we start?  What do we do to determine that?

10　Well, Mr. Hall did several things.  One, he looked at the

11　internal profit rate that Health Grades was earning on this

12　patented cite as compared to its profit margin on other

13　products.  There was a difference.  That difference, he

14　concluded, is an excess profit margin, attributed to the

15　patented product, and that happened to be in the range of 35

16　percent.  I might be a little off by a percent or two.  But

17　it's in the range of 35 percent.

18　　　　Then he looked at WebMD, only for this purpose, he

19　looked at WebMD to say, What is their profit margin that I can

20　tell from publicly filed documents?  As a sort of test point

21　for this starting profit that Health Grades might say, Well,

22　this is what we want.  This is what we expect.  It turns out

23　WebMD's profit margin is right in that range, 33 percent or so.

24　And so he averaged those two numbers to say, As a starting

25　point, 34 percent, I might, again, be off a percent or two.

1   That's the only basis upon which he used any information from

2   WebMD, and I might add, Your Honor, that no one, not even

3   Vitals, has identified WebMD as a competitor.

4         In fact, Your Honor, in Mr. Hall's supplemental

5   report, which is -- at least the citation I'm using here for it

6   is Docket 677-3.  Mr. Hall noted that MDx has acknowledged in

7   its financial statements that WebMD is a public, comparable

8   company, but not a competitor, because, of course, WebMD does a

9   great deal of other things unrelated to this

10  physician-comparison process.

11        That was the sole purpose for which he used the WebMD,

12  and then Mr. Hall took a third data point, I will call it,

13  looked at the profit margin of Health Grades overall, applied

14  that co-visitor factor, and then calculated a profit margin

15  using that methodology.  All of them in that 33, 35 percent

16  range.  And then, all he did with that -- he didn't then say

17  okay, the royalty rate is 35 percent, or the profit margin is

18  35 percent.  He said, Well, that's a reasonable starting point

19  for Health Grades, in this hypothetical negotiation that would

20  occur.  Except he made even a further reduction.  He

21  recognized, again, the co-visitor issue.  So he reduced by

22  almost half.  And basically said, and I am simplifying this a

23  good deal, he basically said, A starting point for Health

24  Grades would have been in the 19 to 22 percent range.  They

25  might have said to Vitals that's what we're looking for, for a

1    license.  And he assumed Vitals would say, We don't think we

2    should pay virtually anything to you.  Single-digit royalty

3    rate.  And Mr. Hall concluded then in that hypothetical,

4    arms-length negotiation that the parties might engage in, they

5    might have ended up in the range of 10 percent as a royalty

6    rate.  So we're down a long way from 35 percent.  We are not

7    using a formula.  Mr. Hall is looking at the specific facts of

8    this case.

9         He then went through each of the factors, recited in

10   the Georgia Pacific case, which discusses and distributes how

11   the royalty calculation should work.  He looked at every one of

12   those factors and came up with a slight 2 percent increase to

13   the royalty based on some of those factors.  All of which is

14   recited in his report.  That's how he got to 12 percent.

15        The 12 percent then is used on those revenues of

16   Vitals that were not part of the lost-profit calculation, so

17   that that would be part of what is the overall lost-profit

18   claim, and then as the second alternative damage model, he

19   said, Assume no lost profit claim, for whatever reason, we

20   don't get lost profits, the statute says we get a reasonable

21   royalty, no matter what.  He used the same 12 percent royalty

22   rate, applying it to all of the Vitals advertising revenue on

23   its website to calculate the alternative-damage theory.  So

24   that's what he did.

25        Now, Vitals here has challenged, really, only three

46

1    things.  Let me say one thing very briefly, as an aside, and

2    then I will get to those three things.  This argument about him

3    having utilized information from Andrea Pearson.  It's clear,

4    she was a corroborative source of information for Mr. Hall.  He

5    says that repeatedly.  He says it repeatedly in the deposition.

6    He utilized information from Mr. Dodge, the CFO, and Mr. Neal,

7    as well.  And only used Ms. Pearson in a corroborative manner.

8    In any event, he was deposed more than a year ago.  No one has

9    ever said we want to depose Andrea Pearson.  Or give us the

10   information, the specific information Andrea Pearson told

11   Mr. Hall.  And as Mr. Dickey conceded, some of the things

12   Ms. Pearson said were simply, Read this article.  Read that

13   article.  So the argument that somehow that was improper is

14   simply an ineffectual argument.

15        So we are left with what they argue are his

16   speculation, with respect to demand, the claim that he did not

17   properly consider the marketplace of alternatives, and the

18   argument that he has used all of the advertising revenue of

19   Vitals' website and that that somehow is improper.

20        Well, what did Mr. Hall do, exactly, with respect to

21   demand?  He did look at the number of visits to the site.  He

22   did look at how frequently consumers go to the Health Grades'

23   website or the Vitals' website, and it is true, much of that,

24   most of that, the vast majority of that occurs through a Google

25   search.  But a Google response to a search isn't something that

1    comes up random.  We know that.  It isn't a random response.

2    Mr. Dickey even says, you know, there's the black box.

3    Whatever the Algorithm is that Google uses that produces who

4    comes up on that list first, who comes up second, and so on,

5    it's not a random thing.  So it does have to do with the

6    patented infringement by Vitals here, and by the way, that is

7    what both damage experts are to assume, is that there is an

8    infringement happening.

9           And as Mr. Hall pointed out in his supplemental

10   report, again it's Docket 677-3, his Exhibit 2 to that

11   supplemental report, he points out, he gives an example of what

12   happens when you do a Google search, and what comes up for

13   Vitals?  Doctor reviews and doctor ratings, compare and find

14   doctors.  That's what it says.  That's what the consumer sees.

15          So there is clear indication of demand for the

16   patented product here, and, in fact, the website is what is

17   infringing.  It is the Vitals' website that we contend

18   infringes the patent.

19          In addition, if you could pull up Exhibit 12, Dan.

20   Mr. Hall looked at this market-share analysis, which begins at

21   approximately the time the patent was issued.  And as you can

22   see, Your Honor, the blue line, Health Grades and Vitals

23   increases in just a year from a 52 percent market share to a 69

24   percent market share.  Health Grades using the patent, and we

25   contend, Vitals using the patent.

1          The rest of the market goes from 48 to 31 percent in

2     that same period of time.

3          So there were all of these factors that Mr. Hall

4     looked at, in considering demand.  He also looked at, of

5     course, the patent, the patented product, and the infringed

6     product.  He looked at the unique visitors to each website, as

7     I said.  He considered the co-visitor issue.  And he looked at

8     the revenue and advertising revenue that the parties earned

9     from the visits.  He considered the deposition testimony of the

10    parties.  He considered the, quote, business overviews that

11    Vitals identified or prepared in its business.  All of that was

12    considered in addressing the issue of demand.

13         So there can be little doubt that there is a

14    sufficient showing here of demand for the product, and that's

15    what we're talking about here.  We are not talking about, This

16    is the damages; or that there has to be mathematical certainty

17    to determine demand.  It's just a determination that there's

18    demand for the infringed -- for the product.  For the patented

19    product.  And we have shown it both for Health Grades and for

20    Vitals, who are using the patented product.

21         There's one other important factor that can be

22    considered as well, Judge, in consideration demand and it's

23    identified in the *Gyromat* case.  Well first of all, *Gyromat*,

24    which the parties cite in the briefing, specifically said, The

25    substantial number of sales by *Champion* of infringing products

1    is compelling evidence of the demand for the product.  And we

2    say it is the website of Vitals that infringes, and they do

3    make sales.  They do have advertising revenue, and that alone

4    is evidence of demand.  But *Gyromat* said something else, later

5    in the opinion -- and by the way, the quote, the exact quote

6    from *Gyromat* is, The substantial number of sales by Champion of

7    infringing products containing the patented features.  It

8    doesn't say exclusively.  It doesn't say bit by bit of each

9    patented feature.  It says containing the patented features.

10   Sales of a product containing the patented features is evidence

11   of demand for the patented features.

12         *Gyromat* said something else, that there was other

13   evidence of demand, because the patented control system at

14   issue there was obviously important enough to keep by the

15   infringer for 15 years on its painting systems, which was the

16   issue there.  If there was no demand for the patented system,

17   *Champion* would not have run the risk of infringement.  They

18   would have changed.  They would have done something different.

19   If there was no demand for the patented features.

20         Now Mr. Napper, the defendant's expert, actually

21   addressed that very point.  And, Dan, if you will pull up

22   Exhibit 6.  This is the cover page of Mr. Napper's report.  He

23   is -- he is the defendant's expert, and at page 16, Mr. Napper

24   said, Lastly, I understand that MDx could have implemented

25   acceptable, non-infringing alternatives, and remained on the

1    market by making any of at least the following adjustments to

2    its website.  And he then recounts, I don't know how many that

3    is, eight or so, adjustments that could have been made.  Later

4    in his report, and in his deposition testimony, he even says

5    these changes would have cost less than 1,000 dollars to make.

6    And he identifies they could have changed so that they would

7    have required only one or two items from the group of data

8    elements from the healthcare provider.  Or they could have

9    gotten unverified information from third parties, or obtained

10   less than three of the required items from third parties.  He

11   identifies a whole series of changes, simple, easy changes for

12   less than a thousand dollars, that could have been made.

13          And what *Gyromat* points out the fact that changes

14   aren't made in an infringing product is evidence of demand.

15   Did Vitals make any of these changes Mr. Napper has identified?

16   No.  Not one of them.  That, too, is ample evidence of demand.

17          On the second point, made, regarding the

18   non-infringing alternatives, this is in allocating amongst the

19   market, the business that was lost, I want to mention first of

20   all this idea that somehow Mr. Hall ignored Mr. Neal's

21   testimony about non-infringing alternatives in his work.  He,

22   of course, looked at Neal's testimony and read it and

23   considered it.  But there's a bit of a disconnect here in

24   what's being argued, because what Mr. Neal was asked, and this

25   is set out at page 16 in our brief, Judge, what Mr. Neal was

1    asked in his deposition was, So what we're going to talk about,

2    this is the question -- what we're going to talk about now is

3    products and services of other companies that compete with

4    Health Grades products and services that embodied or employ a

5    claim in the patent in suit.

6         In other words, that are infringing.  That's what he

7    was being asked about.  And that's what he responded to.  The,

8    *Mor-Flo* analysis doesn't require allocation of the market share

9    amongst infringers, it requires the allocation amongst

10   non-infringing alternatives, and that's precisely what Mr. Hall

11   did.

12        Now, he used seven or so competitors, initially, but

13   he did go another step further.  He then looked at Mr. Napper's

14   list of competitors, 16 of them, or so, in his report, and he

15   calculated allocating the market share amongst those 16 too,

16   and came up with a damage figure using that alternative non--

17   non-infringing acceptable alternatives.  The very analysis of

18   the competitive marketplace that the defendant's expert used.

19   As it happens, a great number of those competitors have

20   virtually zero market share; but nevertheless, Mr. Hall did

21   that.

22        And lastly, I would point out, Your Honor, that there

23   could have been a very substantial claim, here, that this was

24   really a two-supplier market; it's Health Grades' and Vitals'.

25   Indeed, Vitals has provided us discovery information showing

1    that Vitals thought that before this lawsuit ever began, those

2    were the two, in the marketplace.

3              But even more recently, Vitals has said the very same

4    thing.  If you could pull up Exhibit 15, Dan.  This is an

5    article from publication concerning these kinds of products,

6    and it's an article describing Vitals having gotten some

7    financing, some 22 million dollars of financing, this is from

8    June of this year, Judge, and you will see below it talks about

9    the influx of healthcare shoppers, below the phones it mentions

10   the long-time physician rating platform, Vitals.com, and then

11   down below it quotes, Vitals.com CEO Mitch Rothschild, who

12   says, for this article, Other than us, in a company called

13   Health Grades, there's really no one else.  That was

14   Mr. Rothschild's statement, not even six months ago.

15             So Mr. Hall has very adequately considered

16   non-infringing alternatives, and certainly this is an issue

17   that's a fact issue that can be presented by testimony and

18   Cross-examination in exactly the same way, the whole demand

19   analysis can be, as well.

20             And then, finally, I have described for you the

21   reasonable royalty issue.  I do want to comment, though, on the

22   claim that Vitals made in their brief, and Mr. Dickey somewhat

23   referred to it, as well, that this was an entire-market-value

24   analysis.  And, Dan, if you could pull up Exhibit 55.

25             This is what Mr. Hall did, Judge, in applying that 12

1    percent royalty rate.  The total revenues of Vitals is shown on

2    the left, in the red bar.  Those are the total revenues from

3    this website and otherwise, some XX XXXXXXX.  Mr. Hall excluded

4    revenues from license fees, sponsored links, physician revenue,

5    and other revenue, and then he further excluded revenues for

6    Vitals from UCompare, Healthcare, and DrScore, so that he

7    applied the 12 percent royalty to the figure on the far right,

8    the XX XXXXXXX, not the total advertising revenues.  So he did

9    not consider all revenues.  He considered advertising revenues

10   only, and then made these adjustments to -- to recognize what

11   was attributable to the patented infringement here.

12        Doing something beyond that would have been, as

13   Mr. Stimpson suggested, in Mr. Hall's deposition, speculation.

14   When he asked him, Did you apportion further?  No.  Mr. Hall

15   said that would be speculation.  Stimpson said, That's right,

16   that would be speculation, and asked him some more questions

17   about that.  And you can rest assure that Mr. Hall made an

18   attempt to apportion, further, the argument we being here today

19   about speculation, would be about that very apportionment.

20        So, Your Honor, we think none of the issues raised in

21   the motion directed to Mr. Hall's testimony warrant a *Daubert*

22   exclusion here.  Mr. Hall did an extensive and very thorough

23   analysis to come up with his, what I, frankly, consider to be a

24   pretty modest and reasonable damage analysis, and his testimony

25   should be subject to Cross-examination presentation at the

 1    trial.  Thank you, Judge.

 2           *THE COURT:*  Mr. Dickey?

 3           *MR. DICKEY:*  Thank you, Your Honor.  I will be brief,

 4    Judge, but there was a lot to cover here.

 5           Let me start out with the basic premise that the

 6    Federal Circuit has now rejected the argument that

 7    Cross-examination in a situation like this is good enough.

 8    Chief Judge Rader has made it very, very clear that you have

 9    got to drill down to the smallest saleable unit.  You have got

10    to do an apportionment, and if you don't, you have got to be in

11    a two-market economy.  That's not the case.  That's not

12    Mr. Hall's report.  He doesn't say it's a two-market economy.

13    And the references that you heard at the end to a news article

14    purporting quoting Mr. Rothschild, is not in context, and I

15    would actually ask the Court, if you look at that paragraph,

16    the jargon, he is like -- he is sort of like playing games --

17    not games -- but he is making a little light of some of the

18    other players out there.  But there's been no examination of

19    that -- that news report.

20           Judge, what is required is a rigorous examination and

21    proofs of demand to apportion.  You never heard Greg Kanan, at

22    any time, talk about any survey.  That would have been easy to

23    do.  That the Federal Circuit requires in these cases.  Not a

24    word one.

25           Now, we do say that the methodology Mr. Hall cited is

55

1    correct, but he did misuse it.  It's not only the underlying

2    data that's unreliable, but the application of the methodology

3    was also not proper as our brief expands on.

4         One of the things, which I'm a little surprised at,

5    the argument is, Well, he did apportion, because he took out

6    licensing fees.  We just saw that chart.  I'm not going to pick

7    it back up, Judge.  He took out licensing fees and other

8    revenues, of course he did.  Has nothing to do with this case,

9    nothing to do with the patents.  If he left that in, he would

10   absolutely, we wouldn't even be here.

11        The other thing is co-visits.  Of course he had to

12   take out co-visits, they got the revenue.  They got the hit.

13   You can't get -- you can't claim, But for your infringement I

14   would have lost the sale, when you got the sale.  So this is

15   really not an argument that he did any apportionment at all.

16   He took out unrelated factors that don't belong in this at all,

17   and then he dealt -- dealt with the revenue that does belong,

18   the XX XXXXXXX dollars, but he took it all.  He did bother to

19   search it.  Did bother are they searching for hospitals?  Are

20   they searching for nurses?  Are they searching for healthcare

21   providers under my insurance?  All of which has nothing to do

22   with this patent suit.  Could have done it easily, I submit.

23        The interesting thing about Mr. Neal, and I -- it's --

24   I have trouble addressing this because, again, we have our

25   federal rules, 26, you have got to disclose your witnesses,

56

 1   Mr. Neal is disclosed as a witness, Ms. Pearson is not, we have

 2   30(b)(6), Mr. Neal is the guy who is going to testify on

 3   competitors.

 4          So what we hear being presented to the Court, and

 5   Mr. Neal was also asked not just about -- he was asked about

 6   competitors and competitors that infringe.  And he did say,

 7   Well, I think they may be infringing, but I'm a lay person, I'm

 8   not a lawyer.  I don't know if this is patent infringement.

 9   They say that's why Mr. Hall didn't include it?  Because a lay

10   person doesn't know if they are infringing?  The company

11   identified these twelve people as competitors.  If they are

12   infringing, they are competitors.  If they are infringing,

13   truly, you don't have to put them into the market share

14   analysis, that's true.  But it's for the attorneys and the

15   experts to determine whether these others are infringing and

16   should be competitors.  It's the plaintiffs that are saying

17   these are all competitors, not Mr. Napper.

18          In fact, Vitals doesn't think WebMD is a competitor,

19   so our analysis is different, but it's the plaintiffs that are

20   doing their analysis and they say it is a competitor.  I don't

21   know how they can have it both ways, and then use the profit

22   margins of a noncompetitor for the analysis.  It just doesn't

23   work.  It's not logical.

24          The -- the starting with the profit margin of 33

25   percent.  I heard the argument, and I still have no idea where

1   it came from.  It came from WebMD.  How can they say it's not a

2   competitor that has anything to do with this?  It has nothing

3   to do with it.  They used Health Grades, but they used the

4   profit margin looking at, after the patent.  They didn't go to

5   the time before the patent functionality was put in place.

6   What was the profit margin then?  The graph, 65 percent growth.

7   When does it start?  With the functionality of the patent.  If

8   you are an expert, don't you want to know what was happening

9   with your clients' profit margin before?  What is the growth

10  curve?  Is it the same?  Because there's patient ratings

11  before.  There's hospital comparisons before.  There's nursing

12  homes before.  There's health insurance before.  All of this

13  exists in the prior art.  You should be looking at what's

14  happening, not just start from a point certain and say, Well,

15  I'm starting here, because I assume, which are the words in the

16  deposition, growth means demands.  You can't assume.  He is an

17  expert.  He is here to tell a jury.  And the federal circuit

18  will not allow assumptions by an expert anymore, when we have

19  patented features that are components of other -- of a full

20  product.

21        Now, the *Georgia Pacific* -- both experts went through

22  the *Georgia Pacific* 15 factors, but if you start out with

23  grabbing a royalty rate out of the the sky, saying we start

24  with 34 percent, it doesn't matter how you adjust that.  Makes

25  no difference.  Taking out the co-visitors.  You had to,

1    because there's no lost revenue.

2          One thing I do take exception, I just direct -- I just

3    ask the Court to look at the deposition citations in the brief,

4    as to Ms. Pearson.  I heard it said that Mr. Hall testified in

5    his deposition that her testimony was corroborative.  I just

6    looked in the word index, the word corroborative or corroborate

7    doesn't appear in the word index at all in this entire

8    deposition.  I'm not sure what that references to.  I have

9    never seen it.

10         The issue with Google.  He did a search, and he says

11   the word compare comes up.  Compare doctors.  Again, comparing

12   doctors doesn't violate the web -- I mean, doesn't impact the

13   patent in suit.  It might, if we are talking about the

14   comparable ratings of a first healthcare provider, then it

15   might, but the fact they are using compare, and in their brief

16   they also have compare of Vitals, and the brief has a

17   business -- not a survey.  I guess it's a -- one-page from some

18   business sales meeting, and it has the words compare, doctor

19   practice groups.  Compare doctors within a practice group.

20   That's not violation of the patent in suit.  Got the word

21   compare there.  Under their theory, since the word compare

22   there is, that means Google is going to come up and move them

23   higher on the list.  Has nothing to do with this litigation.

24         The word compare is a word and it means a lot of

25   different things.  No drill down at all, what the word compare

1    means in terms of searches.

2           Mr. Hall did not go through a whole list of different

3    kind of searches to find out what would happen when you put in

4    different word combinations looking for doctors, there's

5    nothing there.

6           Now, I hear, again, that the patent is the website

7    that's just a non sequitur.  There's no proof to that

8    whatsoever, at all.  And *Gyromat*, Your Honor, is a 30-year-old

9    case.  It's a case before this whole body of federal circuit

10   law, and the case and progeny that followed it all happened in

11   the last four years.  More significantly, probably than

12   anything else, is the fact that the defendant *Champion Spark*

13   *Plug* conceded infringement.  If you conceded infringement, the

14   issue of demand is not a big deal.  You are not -- so, I say,

15   if the Court takes a careful look at *Gyromat* you will find it's

16   not applicable, at all, to these facts here.

17          What I think is significant is in Exhibit C,

18   Mr. Hall's deposition transcript to our brief.  He admits,

19   clearly, very clearly, that he cannot say if there's a hundred

20   dollars or ten-million dollars of unrelated revenue to the

21   patent.  He has no clue.  Clear as a bell.  Pages 78,1-79,10,

22   page 80-10 to 18 clear as a bell.  He has no clue what the

23   unpatented revenue is within the websites.

24          Finally, as to the entire market value, rule, the

25   plaintiffs have said they are not using it.  Now they seem to

1    want to use it.  I don't know which it.  But, as I say, if you

2    look at their Exhibit 55, the exclusions, what we're dealing

3    with is XXXXXXXXXX dollars.  That's what we should start with.

4    The 27 has nothing to do with reality.  Nothing to do with what

5    the claims are in this case.

6          We are starting with XXXXXXXXXX dollars, and there's

7    no attempt to do any survey, any statistical studies.  You

8    could also do studies on the database, but there's nothing

9    here, whatsoever, to show apportionment or demand, as I think

10   the Court will see under the case law that we've cited,

11   including the four new cases that have just come down this year

12   all say the same thing.  Thank you Your Honor.

13         THE COURT:  Again, I don't take lightly the arguments

14   that MDx makes, but at the end of the day it really feels more

15   like each side is asking me to, basically, take out the

16   kneecaps of the other before it gets to a jury, and I think

17   that there is enough there for the witness to testify, and so

18   the motion it denied.

19         Let's take up the last one, which is the Health

20   Grades' motion with respect to selected opinions of Dr. Cooper.

21         MR. KOSTOLANSKY:  Thank you, Your Honor.  And as -- as

22   the Court noted, this is not, sort of, kneecap-taking-out

23   motion, this is more of a rifle-shot motion directed at certain

24   specific opinions that have been made by Dr. Cooper.

25         And I want to group them into a couple distinct areas,

61

1    and then address each one within that area.  I want to start

2    with -- with the non-infringement, and then talk about the

3    acceptable substitute opinion, and then deal with the

4    affirmative defense opinions, concerning anticipation,

5    obviousness, and inequitable conduct.

6            So let me begin, Your Honor, with the opinion

7    concerning the three elements of healthcare provider verified

8    information that had been the subject of the motion for summary

9    judgment before Your Honor that was withdrawn by the other

10   side.

11           If we could put up, please, Dan, Exhibit 17, paragraph

12   69.  There we have the opinion, The Vitals website does not

13   have either literally or equivalently, three or more of the

14   items required to be verified by the healthcare provider.

15           Your Honor, that opinion is completely unsupported and

16   is contrary to have the *Markman* order entered by Judge Brimmer.

17           If we could go to the *Markman* order, Exhibit 58, at

18   page 16.  Judge Brimmer states that information may be verified

19   by receipt of the information from the first healthcare

20   provider or in some other manner.  The findings there ignore

21   the clear language of Judge Brimmer.

22           In this case, Your Honor, in advance of the summary

23   judgment hearing, we had raised issues with MDx concerning its

24   document production, specifically, the failure to produce some

25   30,000 pages of fax documents that MDx had received from

1   physicians providing information regarding the three elements

2   of the healthcare provider verified information.

3          We have not received all of the 30,000 documents yet.

4   We have received 16,000, and then we received another chunk of

5   documents here this week.  But I want to look at two of the

6   documents that have been provided.  If we could pull up Exhibit

7   59, at page three.  This is a fax transmittal form that

8   WebMD -- I'm sorry that MDx created.  And if we could go to the

9   very, very beginning, Dan.  Yeah.  Let's look at this, Please

10  review language.

11         So this is the form that MDx used beginning in 2010,

12  to collect information from physicians, and there they ask that

13  the physician, Please review the summary below, and if any

14  changes are needed you can simply update online by clicking on

15  login physician in the upper right of the website, then it

16  gives the website, Or make corrections on the attached sheet

17  and fax back to us.  And then provides the attached -- the fax

18  number.

19         Now, if we look at the information that Dr. Lipkowitz

20  provided in sending this form back to MDx.  You will see that

21  of the three healthcare-provider elements that are necessary,

22  there are 12 or so of them, but focusing on a minimum of three

23  here, we have, Years in practice, 28.  We have languages

24  spoken, the doctor has specifically stricken four of them and

25  left Hebrew in place.  We have references to specialties,

63

1    internal medicine, gastroenterology.  We have years in

2    profession, 1980.  And then we have professional appointments,

3    the Upham professor and director position that Dr. Lipkowitz

4    received at the New York Medical College.

5          Thus, this form clearly reference of receipt from the

6    physician of the type of healthcare provider verified

7    information at issue.

8          Another example, from Exhibit 60, page six, here we

9    have the -- the same fax form, and as I said MDx had created

10   this back in -- back in 2010, yet never produced it in response

11   to Judge Boland's order, that information with respect to the

12   accused products be produced by them, and specifically his

13   order required MDx for each claim element, which would

14   obviously include this claim element, Whether MDx's accused

15   products provides such an element or equivalent, and if not,

16   explain how MDx's accused products operate or function

17   differently than the claim element?

18         These faxes, the 30,000 of them, are clearly relevant

19   with respect to providing the claim element.  So we look at

20   Dr. Cowan's fax submission that he sent back to MDx, Exhibit

21   60, at page six.  There we see under the years experience, he

22   had received a form that said 10, but he personally crossed

23   that out and wrote 16.  With respect to the specialties, you

24   will see that personally written in, spinal surgery, board

25   certified.  Years in the profession, see there's a reference to

1    1988, written in with doctor's own hand.  His position, oral

2    surgery, clinical instructor at Tufts and B.U.  Those are

3    referenced as faculty appointment.  So there we have this in

4    the doctor's own hand.

5         But, Your Honor, also, when these forms are faxed out

6    to the physicians, or faxed back by the physicians, they are

7    changing the areas that they have some disagreement with, and

8    sending information back that goes into Vitals' system with

9    respect to the information that they do not agree with.

10        And this issue regarding the three elements from

11   healthcare providers is not only confirmed by the faxes that

12   they -- that Vitals has produced, but by Vitals' own website.

13   And if we look at -- at Exhibit 61, page four.  Here we have

14   the Vitals' website, listing for a Dr. Steven M. Schwartz, and

15   there he lists, this is his personal statement, he listed about

16   four lines down, he was the recipient of the Charles H. Revison

17   Foundation Center Scientist Award; that's an award, needless to

18   say.  That he has professional memberships, and if we look

19   down, he says that in addition to his memberships in the

20   academy, the American Gastroenterology Association and the

21   North American Society for Pediatric Gastroenterology and

22   Nutrition.  Then he lists other professional memberships.  He

23   also lists three fields of healthcare provider verified

24   information, because the final field is -- comes at the end,

25   regarding publications.  He has published more than 60 -- right

1    in that same paragraph, Dan.  He has published more than 90

2    original papers, abstracts, book chapters on a wide variety of

3    both basic research and clinical topics.

4         We also have, Your Honor, with respect to this item, a

5    claim element.  We have Exhibit 62, from page six, this

6    constitutes a -- an August 2011 form that Vitals had used in

7    connection with PowerPoint presentations, being made to

8    potential investors.  There you will see that the various

9    categories of the physician-provided information are set forth

10   with green -- green checkmarks.  When it's in color it's in

11   green.  And then you will see there's an approve button for the

12   physician to approve those submissions in sending -- sending

13   them them back to Vitals, via the Internet.

14        So there, if we look at the general information, we

15   have specialty, practice, special expertise, we have awards, we

16   have many, many, of the 12 or so elements of healthcare

17   provider verified information all sought, obtained from MDx,

18   through the -- the approve button of their system.

19        And so what we did when we saw this presentation from

20   the website, Your Honor, is we went back and looked at Dr. Jack

21   Shephard to determine whether Dr. Jack Shephard is a real

22   physician who appears on Vitals website, and, in fact, he is.

23   So this is information that has been approved by the physician

24   and submitted to Vitals, thus, the efforts to proffer an

25   opinion that states Vitals' website does not have either

1    literally or equivalently three or more of the items required

2    to be verified by the healthcare provider simply does not

3    withstand analysis in light of the factual reality, and in

4    light of Judge Brimmer's *Markman* ruling, and that opinion

5    should be stricken.

6         The next opinion, Your Honor, regarding -- also

7    regarding non-infringement, and if we could go to Dr. Cooper's

8    report, Exhibit 17, at paragraph 71.  There they state that --

9    or Dr. Cooper states, That the Vital's website does not have

10   either literally or equivalently three or more of the required

11   items that must be verified by a third party.  Well, this is

12   now addressing third-party verified information.

13        So let's pull up, if we could, Dan, that PowerPoint

14   slide that Ms. Stoll-DeBell put together.  So here we have,

15   Your Honor, Dr. Cooper's uses of different meanings of the word

16   verified in connection with non-infringement invalidity.  In

17   his rebuttal report regarding non-infringement, he talks about

18   Verification of data, however, is not the same as receiving the

19   data.  For example, the American Board of Medical Specialties,

20   A.B.M.S., specifically disclaims the data they provide in the

21   following statement, and then he puts forth the statement in

22   his rebuttal report.  So regarding non-infringement, he takes

23   the position that when the A.B.M.S. says it's got a disclaimer,

24   then that means they are not verifying it.

25        Now let's look what he does when he argues invalidity.

1    In that case, he states, and this is at page 44 of his original

2    report, that as shown in the figure above, medical school,

3    medical internship, medical residency and medical fellowship

4    information are all provided by Elsevier and the American Board

5    of Medical Specialties; therefore, the claim element has been

6    met in every detail.

7         Well, if it has been met in every detail by the

8    A.B.M.S. then it's met by verification of third-party data by

9    the A.B.M.S. report, but that is not the position that he took

10   when he wanted to argue non-infringement.

11        So, Your Honor, the opinion should either be -- for

12   these two areas, should either be stricken as unreliable, or

13   the opinion should be stricken to the extent that it's

14   inconsistent with the ruling by Judge Brimmer regarding

15   Markman, which would effectively strike the non--

16   non-infringement opinion.

17        The next area, Your Honor, concerns the hyperlink, and

18   this also concerns non-infringement.  If we go to paragraph 58

19   of Dr. Cooper's opinion, Exhibit 17 at paragraph 58.  Thank

20   you, Dan.  Concerning the hyperlinks, Dr. Cooper opines that

21   this claim clearly requires links to affiliated hospitals from

22   within the First Healthcare provider report.  The Vitals'

23   website simply does not have links of that kind, therefore

24   there is no literal infringement.  As Dr. Greenspun

25   acknowledges, the hyperlinks on the Vitals' website simply link

1    to Vitals' own sub-pages, outside of the report pages that show

2    information on affiliated hospitals.

3            That opinion, Your Honor, is contrary to

4    Judge Brimmer's *Markman* order.  If we look at Judge Brimmer's

5    *Markman* order, Exhibit 58, at page 21, right in the center, The

6    Court disagrees.  The Court disagrees that a hyperlink to an

7    affiliated hospital necessarily must lead to a website external

8    to plaintiff's website.  Thus the opinion is directly contrary

9    to Judge Markman -- I'm sorry -- Judge Brimmer's *Markman* ruling

10   and should be stricken.

11           The next area to which the motion directs itself,

12   Your Honor, concerns acceptable substitutes.  That was

13   discussed earlier in connection with the motion regarding

14   Mr. Hall.  It's recognized under *Panduit*, that a factor in

15   determining damages for lost profits is the absence of

16   acceptable non-infringing substitutes.

17           If we look at Exhibit 16, Dr. Cooper's original

18   report, in paragraph seven -- seven, zero, 70, he lists various

19   competitors' websites that he has visited, and he says, I find

20   that at least the following would be acceptable substitutes,

21   and then he lists 16 or so websites.  At the concluding page of

22   his opinion, page 40, in paragraph 86, he states that After

23   reviewing the various websites, I found numerous websites that

24   are acceptable substitutes for the alleged invention.  However,

25   the test from *Panduit* is acceptable, non-infringing

1    substitutes, and that is not addressed by Dr. Cooper in his

2    opinion, and providing this testimony regarding acceptable

3    substitutes is likely to create confusion, with respect to the

4    issue.  It's all irrelevant, and there has not been a person of

5    ordinary skill in the art who has testified that the 16 or so

6    websites referenced by Dr. Cooper are non-infringing.  Thus

7    paragraphs -- the opinions expressed in paragraphs 70 and 86 in

8    Dr. Cooper's report should be stricken.

9         Let me now, Your Honor, turn to the issue of

10   anticipation of claims.  Let's turn to Dr. Cooper's opinion,

11   Exhibit 16, page 40, paragraph number 84, and let's just look

12   at the, I have determined language.  I have determined -- in

13   the second line -- I have determined that all asserted claims

14   of the '060 patent are anticipated.

15        If we could turn to Ms. Stoll-DeBell's PowerPoint,

16   page four, setting forth anticipation, Your Honor.  A claim is

17   anticipated only if each and every element appears in a single

18   prior art reference.  Because the hallmark of anticipation is

19   prior invention, the prior art reference, in order to

20   anticipate under 35 U.S.C. Section 102, must not only disclose

21   all elements of the claim, within the four corners of the

22   document, but must also disclose those elements arranged as in

23   the claim.

24        Let's turn to page three of the PowerPoint.  The

25   element here of focus, Your Honor is comparison ratings of

1    multiple human healthcare providers.  As noted in *Markman*, the

2    defendant does not dispute that the first healthcare provider

3    refers to a person.  Thus comparison ratings on the first

4    healthcare provider that permit comparison ratings of the first

5    healthcare provider with other potential healthcare providers

6    involves a comparison of human healthcare providers.

7         Let's now look to Dr. Cooper's report.  If we can go

8    to slide nine.  Thank you, Dan.  With respect to the

9    comparison-ratings report.  There, Dr. Cooper, at page 18 of

10   his report, talks about how the early healthcare reports and

11   services specifically comprise reports that were prior art to

12   the claim, and which meet in every detail the claim

13   limitations.  See for example, information the defendant's

14   Deposition Exhibits 13, 51 then he references including

15   healthcare provider verified information, patient-provided

16   information, and information verified by independent

17   third-party source as specified in the claim element.

18        Now we've heard -- there's been some loose discussion,

19   Your Honor, to patient ratings.  Patient ratings are different

20   from comparison ratings.  If we look at Exhibit 13 that's

21   referenced in Dr. Cooper's report, that is the Drucker report.

22   If we could turn to page ten.  That is a beta test by Health

23   Grades that was placed on the Internet briefly in June of 2005,

24   And that concerns Dr. Drucker and a numerical reference to, Do

25   you trust your physician?  And then a national average.  Would

1    you recommend your physician to a family member?  And then --

2    or a friend?  And then a national average.  Those are not --

3    those are comparison facts not comparison ratings.  And none of

4    those entries are comparison -- create comparisons to multiple

5    healthcare providers as referenced in Judge -- Judge Brimmer's

6    *Markman* order.

7         The *Markman* order, Your Honor, if we look at page 14

8    of Exhibit 58, provides Comparison ratings of healthcare

9    providers as including ratings on multiple healthcare providers

10   including the first healthcare provider, in a report on the

11   first healthcare provider, thus permitting comparison of the

12   first healthcare provider, with other potential healthcare

13   providers being other human healthcare providers.

14        Thus, Your Honor, the claims are not anticipated and

15   MDx cannot point to any document, or show us any document that

16   discloses all elements the '060 patent before the provisional

17   or utility patent application dates.

18        And those application dates, Your Honor, were February

19   9, 2005, for the provisional, and August 29 -- I'm sorry

20   February 9, 2006 for the provisional, and August 29, 2006 for

21   the utility application.

22        Dr. Cooper provides nothing but speculation regarding

23   the existence of all of the claim elements in a particular

24   document or apparatus prior to the disclosures -- provider to

25   the filing of the provisional or patent application.  And if we

72

1   look, Your Honor, at the PowerPoint that we put together, or

2   Ms. Stoll-DeBell put together, at page six, we can see that

3   Dr. Cooper, in addressing this issue, states that these --

4   things supporting his conclusion that it anticipates deposition

5   testimony of Mr. Dodge.  He testified that comparison ratings

6   of physicians were added to reports at least as early as 2006.

7   Mr. Neal testified that it was 2007.  Dr. Cooper, in

8   referencing Mr. Dodge's, testimony, focuses on patient ratings.

9       Again, that is not comparison ratings, that is simply

10  ratings of patients that do not draw the comparison as we saw

11  during the summary judgment hearing.  Dr. Cooper also

12  references hospital ratings.  And from all of that, Dr. Cooper

13  concludes that Mr. Dodge was just wrong about the year when he

14  testified he recalled 2006.

15      Your Honor, an expert must base his opinion upon

16  facts, not speculation, and there's no basis -- there's no

17  basis for Dr. Cooper to state that someone may have just been

18  wrong when they recalled a certain thing.  There's no

19  foundation for this testimony.  Should not be admissible, and

20  under Rule 403 it would simply create jury confusion.

21      Turning, Your Honor, to the testimony regarding

22  obviousness.  Here, if we could go to page 18 of Dr. Cooper's

23  original report.  Here, Dr. Cooper states that, Even if the

24  element were not anticipated, the idea of comparison ratings of

25  healthcare providers was disclosed in these documents, and

73

1    comparison of line items in database reports have been used to

2    rank retrieved records for decades.  So this use of comparison

3    ratings for this purpose would have been extremely obvious to a

4    posita.

5         Well, there is no reference, again, to any documents

6    that disclosed comparison ratings, during this time period,

7    other than a summary statement by Dr. Cooper, and the reference

8    to comparison of line items in database reports, again concerns

9    comparison facts not -- not comparison ratings.  So the opinion

10   by Dr. Cooper is conclusory and should be stricken.

11        The final area, Your Honor, concerns inequitable

12   conduct, and this finding, or opinion, I should say, by

13   Dr. Cooper appears in paragraph 85 of his -- of his original

14   report, and that deals with issues regarding materiality.  If

15   the testimony regarding anticipation and the testimony

16   regarding obviousness is stricken, then there would be no basis

17   for any testimony regarding inequitable conduct.

18        And I should note, Your Honor, we have also filed a

19   motion to bifurcate that is pending before the Court that deals

20   with the issue of inequitable conduct.

21        That's all I have, Your Honor, with respect to those

22   specific points.

23             *THE COURT:*  Okay.

24             *MR. STIMPSON:*  Thank you, Your Honor.  I will try to

25   modify a little bit, so I can follow the way Mr. Kostolansky

1    did things.

2         First of all, first thing he talked about was the term

3    verified, and he brought up a lot of documents that have been

4    produced recently.  What wasn't mentioned was that those are

5    not in the Health Grades' infringement contentions, and they

6    were not specifically requested in discovery.  And both experts

7    are going to supplement to address those documents, because

8    they have just been produced.  So it's just -- it's just

9    something experts haven't addressed yet, that's all.

10        Talking about the verified and the hyperlink.  These

11   terms that were not construed by Judge Brimmer in the *Markman*.

12   I mean that just makes my -- makes my blood boil.

13        *THE COURT:*  Well, maybe you should simmer down.

14        *MR. STIMPSON:*  No, I know.  In a way it's just like, I

15   was here at the *Markman*, and they argued to Judge Brimmer, they

16   had big headings, terms that do not need to be construed,

17   verified, hyperlink.  And they sat there and they argued it

18   over and over and over again, and they won.  They won.

19   Judge Brimmer says there's no need to construe the word

20   verified.

21        *THE COURT:*  Well, let me tell you, of all of the

22   things that are talked about -- have been talked about today,

23   this is the one that has caught my eye, so to speak.  I

24   understand that you are saying that Judge Brimmer did not

25   construe the terms, and I don't disagree with you.  You

75

1   haven't -- you have me at a disadvantage, sir.  As you know, I

2   was not here at the *Markman* hearing, but what I see

3   Judge Brimmer as doing at various places throughout the *Markman*

4   order is saying, Hm, this is the common understanding of the

5   meaning of term X, therefore I don't have to construe it.  And

6   whether or not one runs afoul of the *Markman* hearing, may

7   depend upon whether or not you are suggesting that that

8   analytical thread allows for MDx or, frankly, even Health

9   Grades, to disagree or constrain or change his characterization

10  of the common everyday meaning.

11       *MR. STIMPSON:*  Yes.  Well, Your Honor, a couple of

12  things.  First of all, I very much disagree with Health Grades'

13  reading of the *Markman* order.  If I may just grab it, please.

14  First of all, Judge, to back up, Your Honor, this is my

15  understanding, and, of course, you know, do things however you

16  say we do them at the trial, but I have done trials in patent

17  cases before, after *Markman*, and the way it works, is -- all my

18  prior cases -- is you have the jury instructions.  In the jury

19  instructions have comparison ratings of healthcare providers,

20  the terms that Judge Brimmer construed, This is what they mean.

21  For the rest of them, it's plain and ordinary meaning.  So this

22  claim-construction document is not something that's going to be

23  handed to the jury, or the experts aren't going to be batting

24  it back and forth and debating what Judge Brimmer meant by this

25  comment or that comment or his dicta.  We have the claim

1    constructions, and the claim constructions were verified as

2    plain and ordinary meaning.

3         Now, whether -- what Judge Brimmer understood the

4    plain and ordinary meaning to mean, of the term verified, I do

5    not agree with Health Grades about that, Your Honor.  Footnote

6    eight, first thing says is that the defendant is correct --

7         THE COURT:  I have my copy.  Give me the page.

8         MR. STIMPSON:  It's page 15, footnote eight.

9         THE COURT:  Got it.

10        MR. STIMPSON:  The defendant is correct that verify

11   can mean to prove.  So he is not disputing that plain and

12   ordinary meaning, Your Honor.  Judge Brimmer is not disputing

13   that.  In fact, their expert, Dr. Greenspun, doesn't dispute

14   that.  He has it right in his expert report.  I mean that's one

15   plain and ordinary meaning.

16        Then about midway through that footnote he says, The

17   act of verifying requires the website received confirmation.  I

18   mean, there has to be some confirmation.  And we have testimony

19   from the Health Grades' witnesses, Your Honor, that what they

20   did is they required documentation.  Some doctor comes in and

21   says, look, I'm Dr. Smith, and I got the world's greatest

22   physician award.  They are not just going to take his word for

23   it.

24        THE COURT:  Let's go back to what you just were

25   reading to me.  Here the specification makes clear the act of

77

1    verifying requires only that the website receive confirmation

2    of the information from some other source.  In this instance,

3    the healthcare provider, indeed, the confirmation described

4    appears not to extend beyond receipt of such information from

5    the first healthcare provider.

6         That, kind of, runs a little counter to your

7    suggestion, We are not just going to take his word for it.  It

8    kind of suggests that if it comes from the healthcare provider,

9    that's -- that's a form of verification.

10        MR. STIMPSON:  The question I have -- I don't read

11   this the same way, because it says, receipt of such information

12   from the healthcare provider.  Well, what information?  I mean,

13   if the American Medical Association sent him a paper giving him

14   an award, that's my understanding of the information.  If this

15   is not -- if this patent claim is interpreted, Your Honor, so

16   that receipt from a healthcare provider is also verification,

17   you may as well take that verification language and throw it in

18   the river, because it means nothing.  It means nothing.

19        This claim has two specific distinct requirements.

20   You have to receive it from the healthcare provider, and you

21   have to get it verified by the healthcare provider.  And if --

22   I just don't read Judge Brimmer's analysis, in footnote eight

23   as saying anything different.  This is not --

24        THE COURT:  Then what do you read this sentence in

25   footnote eight as meaning, Indeed, the confirmation described

1   appears to not extend beyond receipt of such information from

2   the first healthcare provider?

3           MR. STIMPSON:  Well, Your Honor, frankly, I didn't

4   read it that way.  I read it -- I read it, the receipt of the

5   information is the information, is the confirmation.  That's

6   the way I read it.  And if that's the way it's going to be

7   interpreted, then we need an interpretation, maybe we do need

8   an interpretation.  In fact, maybe we need to have some

9   supplemental *Markman* decisions here.

10          But this is -- this footnote eight, we can argue about

11  what it is, but there's no doubt what it's not.  It's not claim

12  construction.  Judge Brimmer's claim construction is at the

13  end.  It's not claim construction.  It's just reasoning of how

14  Judge Brimmer gets there.

15          THE COURT:  Well, I hear you, and just to turn your

16  blood up another couple of degrees, over on page 16, below the

17  block quote, Information may be verified by receipt of the

18  information from the first healthcare provider.  What does that

19  mean to you?

20          MR. STIMPSON:  Well, he wasn't even addressing

21  verification.  Received from the first healthcare provider,

22  that is what was being argued there.  As claim construction is

23  at the back.  We are not going to construe that.  It's just

24  going to have plain and ordinary meaning.

25          THE COURT:  Why do your people get to decide what the

1    plain and ordinary meaning is?

2         *MR. STIMPSON:*  Honestly, Your Honor, if you want my

3    honest, candid opinion about this.

4         *THE COURT:*  No, I would like a deceitful, misleading

5    opinion.

6         *MR. STIMPSON:*  I hope you understand I'm being -- I'm

7    joking.

8         *THE COURT:*  I do.  I do.  I understand.

9         *MR. STIMPSON:*  But my honest opinion, Your Honor, is I

10   was right the first time.  This needs to be construed.  We

11   stood here and patent -- Health Grades' counsel argued to

12   Judge Brimmer, Plain and ordinary meaning, Plain and ordinary

13   meaning, just like most patent plaintiffs, because they want

14   plain and ordinary meaning, because that gives them the freedom

15   to argue what they want.

16         I stood here and I said, Look, plain and ordinary

17   meaning might work for some terms, but this one, this,

18   verified, that's going to be trouble.  And look at what's come

19   of it, right?  We have gone through a year and a half of

20   discovery, they have taken discovery on what they think this

21   means, we have taken discovery on what we understand the plain

22   and ordinary meaning means, I'm standing here at the podium in

23   a *Daubert* here, where my opposing counsel is trying to exclude

24   my expert for supposedly not complying with the claim

25   construction that the Court didn't give.  And in six weeks we

80

1    are going to have people sitting in that jury box, and without

2    the construction we're going to be -- they are going to be

3    taking different positions than we are.

4         I think we need construction of this term.  And if,

5    Your Honor -- if the construction -- this isn't the *Markman*

6    proceeding, but I feel very strongly that verification can't be

7    receipt -- those two words are not synonyms.  They are recited

8    separately in the claims.  But if they get this interpretation,

9    that any receipt is verification, then it's not going to impact

10   Dr. Cooper's invalidity analysis at all, because he has got

11   both receipt and verification in there.  So it's not going to

12   impact his invalidity analysis at all.  The only thing it would

13   impact would be his infringement analysis.

14        So respectfully, Your Honor, I thought 18 months ago,

15   and I still think today, that this -- we should have a

16   construction.  We should submit supplemental briefs and address

17   this, because I have a very -- you are right, I have a very

18   different view of what Judge Brimmer was saying here, and I

19   have a very different view of whether verification requires

20   something different than receipt.

21        Anything else on that issue or should I --

22        *THE COURT:*  Well, I don't know.  I am not -- go ahead.

23        *MR. STIMPSON:*  I know there's no lack of motions, and

24   another one is probably not something that anybody would love

25   to do right now, but in all honesty if we don't get that

1    clarified, then I think the trial is going to be a little

2    confusing in that point.

3         Substitutes, Mr. Kostolansky talk about non-infringing

4    substitutes, and he said, Dr. Cooper shouldn't be able to talk

5    about substitutes, because he didn't talk about whether they

6    were infringing or not.  It's just not our place.  He doesn't

7    have to do that; it's their burden.

8         In patent cases, the way this happens, in 99 percent

9    of the cases, you get interrogatories from the plaintiff,

10   Identify your non-infringing substitutes.  We give them our

11   list of five or six, or whatever it is.  We have their thing,

12   they think they are infringing, if they think they are

13   fringing, they issue subpoenas, they go out and prove

14   infringement.  They did none of that.  So they all are

15   non-infringing.  I think this relates to Mr. Kanan's argument

16   earlier, too; if there is no proof by them of any infringement,

17   there is no infringement by any of these.  It's their burden.

18        Anticipation.  Anticipation issue, Your Honor.  Health

19   Grades is arguing that Dr. Cooper does not have sufficient

20   evidence for anticipation.  And their argument is that he

21   doesn't have a document he can hold up and say, Look, here it

22   is.  Here is healthcare provider report, here's all of the

23   elements here, and here are physician comparisons in that

24   report.  And you know what, they are right.  They are right.

25   We don't have that.  I wish I had it, but I don't have it.  Why

82

1    don't I have it?  Because I can't get in a time machine and go

2    back to 2005 and find out what was on their website.  This

3    isn't like a prior art situation where you go to a library and

4    it's been there for 30 years.  It's not like a prior art

5    situation where you go to the patent office and just pull out a

6    patent.  Their website was a fluid, dynamic, ever-changing

7    website.  I can't go back in 2005 and pull that document off.

8         We do have a Drucker report, which comes close,

9    frankly.  We got lucky.  Somebody, back in 2005, happened to

10   print that off, put it in the correspondence file, and we found

11   it.  But we don't have that document.  They are right.  He is

12   not going to pull out some magic document say, Here it is, it's

13   got physician comparison ratings.

14        Does that mean he can't prove anticipation?  Well of

15   course not.  Of course not.  You know, prior art isn't just

16   stuff that's in publications.  It's also stuff that was in

17   prior use and known to the public back in 2005.  That type of

18   prior art happens all the time.  It happens all the time in

19   patent cases.  There is no document showing it.  So how do you

20   do it?  I mean, how do you prove the prior art is there?  Well,

21   you take the guy who knows, you sit him in a chair, you put him

22   under oath, you say, Look, was this widget sold back in 1988?

23   Yep.  Did it have elements A, B, C, D from the claim?  Yep.

24   That's it.  Anticipation.  That's what Dr. Cooper did.  He is

25   relying, for that element, on the testimony of their own

1    witnesses.

2          Mr. Dodge testified, and this is -- these are his

3    words, not mine, I didn't put him in a leading question.   These

4    are his words.  Comparison ratings were being used by 2006.

5    Those are his words.  And if that's the case, that's

6    anticipation.  His words.  That's in the prior art.

7          Let me just show you one more thing, Your Honor.

8    Health Grades, in their reply brief, they come back and say --

9    they talk about Mr. Dodge, but they drop it right down to

10   footnote.  They say, he must have been talking about something

11   that wasn't prior art.  They are basically attacking their own

12   witness.  But let me show you their interrogatory response.

13   This is their -- these are their responses, interrogatories one

14   through six.  I want to show you, first, verification page.

15   Allen Dodge, declaring under penalty of perjury, the foregoing

16   is true and correct.  So what is Mr. Dodge, the same guy that

17   Dr. Cooper is relying on, what does he say under penalty of

18   perjury?  These products, he is talking about the invention

19   described in the patent in suit, quote, Health Grades began

20   launching the first version of these products in the spring and

21   summer of 2005.  That is months early enough to have prior art.

22   Health Grades here admitting that they were selling under the

23   patent way early enough to be prior art.

24          If that's not good enough, page 14, quote, Health

25   Grades began to launch the commercial embodiment of the patents

84

1   in suit in the summer of 2005.  So if they want to challenge

2   Mr. Dodge's testimony that this was out there and being fully

3   anticipated in the prior art, then, you know, bring it on.  We

4   will do it at trial.  We will see what happens.  We have

5   anticipation, we think, quite easily.

6        Obviousness, Your Honor.  Dr. Cooper, his reports

7   there, I'm going to paraphrase a little bit, but basically he

8   is saying, Look, if you -- if there's no anticipation, we, of

9   course, think there is, but if there's no anticipation, then

10  look what you do have.  Um, here is an example of Dr. Drucker's

11  report, Your Honor.  This is Dr. Drucker's report.  This is the

12  one we found in a correspondence file from 2005.  So look what

13  this report has.  Right here.  Comparison ratings of hospital

14  healthcare providers.

15       THE COURT:  I'm not suggesting that you are not

16  skilled in the art of ELMO zooming, I just as soon get it where

17  I can see.

18       MR. STIMPSON:  Thank you.  So these are ratings of

19  healthcare provider hospitals, and hospitals look at the

20  abstract of the patent, they are healthcare providers in the

21  patent.  They have Stanton Island University Hospital, Overlook

22  Hospital, and they are comparing ratings.  So what is

23  Dr. Cooper saying in his obviousness analysis?  He is saying,

24  Look, you have got this, and you have got all of this other

25  stuff where they are using ratings.

1    So you got a person of ordinary skill in the art

2    looking at this in 2005.  It has got everything, except it

3    doesn't have comparison ratings of physicians.  So what's the

4    obviousness analysis?  You are staring straight at this,

5    Dr. Drucker's report itself is telling you, Hey, you can

6    compare ratings to healthcare providers.  It's right there.  So

7    what's the great leap in science that Health Grades made?  They

8    took comparison ratings, that were disclosed for comparing

9    these healthcare providers, and did it for another set of

10   healthcare providers.  That's obvious.  That's as obvious as it

11   gets, Your Honor.

12        And if the Court has any inclination to consider this

13   argument, I respectfully urge the Court to read the K.S.R.

14   case, 2007 United States Supreme Court.  I have just a couple

15   quotes here.  This is Dr. Cooper's obviousness analysis, page

16   415 from K.S.R., Our cases have set forth an expansive and

17   flexible approach to obviousness.  If a person of ordinary

18   skill -- this is page 417.  If a person of ordinary skill can

19   implement a predictable variation, Section 103 likely bars its

20   patentability.  If that is not a predictable variation,

21   Your Honor, I don't know what it is.  It's as obvious as it

22   comes.

23        So Health Grades is arguing, Whoa, whoa, whoa, can't

24   do this.  You have to show us -- just forget Mr. Dodge for a

25   second -- you have to show us somewhere in the prior art

86

1   physician comparison ratings.  Well, that's just wrong under,

2   K.S.R., page 418, Our precedence made clear that the analysis

3   need not seek out precise teachings directed to the specific

4   subject matter of the challenged claim, for a Court can take

5   account of the inference and creative steps that a person of

6   ordinary skill in the art would employ.  Dr. Cooper's

7   obviousess analysis is smack dab under K.S.R.

8         So the last issue, Your Honor, was just inequitable

9   conduct, and that's just piggybacking off the obviousness and

10   anticipation issues.

11         So if you have no further questions...

12         THE COURT:  Well, I don't have any further questions,

13   I will tell you that I am still troubled the *Markman* --

14         MR. STIMPSON:  The verified?

15         THE COURT:  Yeah.

16         MR. STIMPSON:  Well, Your Honor, what I suggest is, we

17   can do this in three pages, if you want.  We can do it in three

18   pages and just resolve it.

19         THE COURT:  Let me hear from Health Grades again on

20   this.

21         MR. STIMPSON:  Thank you, Your Honor.

22         MR. KOSTOLANSKY:  Your Honor, regarding the

23   verification issue, that was argued by the other side at

24   *Markman*, and while they say that Health Grades argued that

25   there was no construction necessary, while that's true, the

1   other side argued that there was construction necessary, and

2   that there should be this two-step process put in place

3   regarding receipt and verification.  And so when Judge Brimmer

4   entered his ruling, he rejected their effort to put this

5   two-step process in place, relying on common sense, that if

6   someone sends you something, they have verified what they are

7   sending you, implicit in that is they are sending you something

8   that's truthful -- truthful information.  So -- and that's why

9   Judge Brimmer, when he referenced receipt, made reference to

10  receipt being sufficient.  He did it both in the -- both in the

11  footnote and on the next page of the *Markman* ruling, as

12  Your Honor has indicated.

13      So I don't think that there's anything necessary in

14  terms of a new construction or additional construction

15  regarding *Markman*.  I think it's all right there in the

16  language that Judge Brimmer has written.

17      The other side has simply sought to go around it, by

18  claiming that, Well, since he didn't officially construe the

19  term as part of his *Markman* ruling, they get to ride, free

20  reign, beyond what he said in the language of his opinion, and

21  that simply doesn't make sense, because when a Court issues an

22  order, even if it doesn't construe a term, it expects the

23  parties to comply with the language that the Court has set

24  forth in it's -- in it's order.  And then the other side,

25  apparently, wishes to use that as some type of excuse for not

1    producing 30,000 pages that they say are now creating all sorts

2    of ripple affects as we move toward trial, you know, it is.

3    But that's something that should have been handled long ago and

4    handled correctly and appropriately within the confines of the

5    Judge's order, and that's the subject of our Rule 37 motion,

6    that Your Honor has referred to Magistrate Judge Boland.

7        Concerning anticipation, Your Honor, that the -- the

8    single reference of a document, the closest thing that they --

9    closest document they have is the Drucker report, which we've

10   shown, Your Honor, it clearly does not contain comparison

11   ratings.  Mr. Dodge's deposition testimony, while it's not very

12   clear, I don't think it was referring to the product as

13   ultimately developed by Health Grades, but it was not anything

14   that Dr. Cooper relied upon in entering his -- his opinion.

15       The purpose of Section 102(b) is to allow inventors

16   that one-year grace period to have, you know, a product in use,

17   and still -- still protected.  And I am not saying that it was

18   in use in 2005, I don't believe it was, nothing in the record

19   to indicate that, and the one-year grace period from -- from

20   August 29, 2006 would take us back into the -- the 2005 time

21   period.

22       Regarding the issues of obviousness and the notion

23   that, you know, Dr.-- Dr. Cooper was not taking a great leap in

24   science, with respect to addressing issues regarding

25   obviousness of rating healthcare providers.  I mean, that is

1    not something that was obvious, at the time, at all, because

2    you are generating revenue from hospitals who employ healthcare

3    providers, and the showing of comparison ratings of various

4    healthcare providers may substantially impact that revenue

5    stream, and this has all been covered in the deposition

6    testimony by various witnesses, but to the extent the

7    technology here existed in the early 90s, and nothing was put

8    in place until the -- the -- after the patent application was

9    filed in 2006, clearly is indicative of the fact that this

10   was -- this was not obvious.

11          I realize that goes to the merits, Your Honor, and

12   maybe looks like I'm quibbling a little bit about the basis,

13   but there does seem to be a leap, with respect to Dr. Cooper's

14   testimony here.

15          May I have a moment, Your Honor?

16          *THE COURT:*  Yes.

17          *MR. KOSTOLANSKY:*  Ms. Stoll-DeBell makes a good point.

18   I think the solution that may make the most sense, with respect

19   to this issue regarding verification, is to simply have the

20   parties follow the language that Your Honor has -- has quoted

21   from Judge Brimmer's *Markman* ruling, and that the parties

22   should follow that and be precluded from acting inconsistently

23   therewith either themselves or their experts.

24          *THE COURT:*  Okay.

25          *MR. KOSTOLANSKY:*  Thank you, Your Honor.

1        THE COURT:  With all of the disagreement as to what

2   the word obvious means, I think it should be obvious to

3   everybody that there is a point that is concerning to me,

4   except as it pertains to the inconsistencies with the *Markman*

5   ruling, I deny the motion in part, because I think that there

6   is enough there for the witness to testify, much of this is

7   arguing the merits, some of it, is 402, 403, which is difficult

8   to deal with outside of the context of a trial.  So I don't

9   mean that it's with prejudice in any way, shape or form, but I

10  think that in terms of entering an order of exclusion at this

11  point I think that would be wrong.

12       I do want five -- what the hell, I will give you ten

13  pages, no more, on this *Markman* issue.  I do want some more

14  focus on that, because I hear different things, I'm disinclined

15  to say, Well, you know, let me just unwind Judge Brimmer's

16  ruling.  You know, why not unwind all of it?  There's a certain

17  bit of, two bites at an apple, that I'm not really inclined to

18  go with, but there's been so much submitted on these broad

19  points that I want to kind of narrow the focus, and see if I

20  can get, by the end of the month, ten pages on this issue, and

21  what the parties' position is with respect to -- specifically,

22  exactly what opinions are out, if -- or what opinions are -- or

23  what particular statements -- and please, I don't need anymore

24  of these.  Okay.  I mean, if I don't have the exhibit by now,

25  the exhibit don't exist.  I'm not suggesting that you can't

1   attach something to your ten pages, but a little restraint,

2   gentlemen.  Just a little.

3          And, of course, Mr. Stimpson I don't mean to preclude

4   you from suggesting to me anything you want to suggest to me,

5   but I feel a little bit like this issue is -- perhaps it is the

6   rifle shot it was claimed to be, but it's a little bit mixed in

7   with a lot of other stuff that I just want to put to the side

8   and see what we can deal with.

9          I can tell you that I am disincline -- I'm not ruling,

10  but I'm disinclined to be changing the language of the *Markman*

11  order at this stage of the proceedings.

12         I also will tell you that -- well, let me ask if

13  there's any questions with regard to that piece?

14         *MR. KOSTOLANSKY:*  No, Your Honor.

15         *MR. STIMPSON:*  Fine.  Thank you.

16         *THE COURT:*  I also will tell you that I had hoped to

17  get you a ruling on the motion for summary judgment -- well,

18  partial motion for summary judgment that we heard, I heard

19  argument on, earlier.  It didn't happen.  I was in Durango and

20  some other things did happen, but I will try and get that to

21  you by early next week, at the latest, and then we will see

22  where we are with respect to that as well.  Anything further?

23         *MR. STIMPSON:*  Your Honor, if I may, and I am taking a

24  chance raising this, I know, but I just want you to know that

25  there's another *Markman* issue lingering out there that was

1    never addressed at the *Markman* hearing, and I just want to take

2    the opportunity to tell you now, so we're not all surprised

3    when there's differences of opinion of meaning when we get to

4    trial.  They are arguing that all these claims require the

5    capability of receiving information, and that they don't

6    actually have to prove that they received information or that

7    they verified.  All it requires is the capability.  We are

8    saying, No way, that's not what these claims say, and that has

9    developed since the *Markman* hearing, that has developed into a

10   pretty big issue, and if that's not addressed, then we are

11   going to have different arguments on that issue.

12        That was nothing that ever came up at the -- at the

13   *Markman* hearing, so it's brand-new.  But I, at least, want to

14   let the Court know it's there.  I can do both in ten pages,

15   easily, if you want to do it that way.  But I just want to, at

16   least, alert the Court that's out there.

17        *THE COURT:*  You know, at the risk of -- at the risk of

18   inviting still more paper, let's do it this way, I will give

19   you a separate five on that, and give you a separate five on

20   that.

21        *MR. STIMPSON:*  Thank you, Your Honor.

22        *THE COURT:*  Anything further?

23        *MR. KOSTOLANSKY:*  No, thank you.  Thank you.

24        *THE COURT:*  We are in recess.

25        *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

1        (Recess at 12:07 p.m.)

2                    **REPORTER'S CERTIFICATE**

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.  Dated

5    at Denver, Colorado, this 27th day of December, 2013.

6

7                                    *S/Tamara Hoffschildt*
                                     Tamara Hoffschildt
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25