IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-520

HEALTHGRADES, INC.,

    Plaintiff,

vs.

MDx MEDICAL, INC., d/b/a Vitals.com,

    Defendant.

_____

REPORTER'S TRANSCRIPT
HEARING

_____

      Proceedings before the HONORABLE Raymond P. Moore,
Judge, United States District Court for the District of
Colorado, commencing at 9 a.m., on the 13th day of February,
2014, in Courtroom A601, United States Courthouse, Denver,
Colorado.

APPEARANCES

For the Plaintiff: Kris John Kostolansky, Lewis Roca Rothgerber
LLP-Denver, 1200 17th Street, One Tabor Center, Suite 3000,
Denver, CO, 80202-5855, 303-623-9000, and Kristen Stoll-Debell,
Merchant and Gould, 1050 Seventeenth Street, Suite 1950,
Denver, CO 80265.


For the Defendant:  Scott David Stimpson, Sills Cummis & Gross
P.C.-New York 30 Rockefeller Plaza, 25th Floor, New York, NY,
10112, and Terence M. Ridley, Wheeler Trigg O'Donnell, LLP 370
17th Street, Suite 4500, Denver, CO, 80202-5647, 303-244-1800
212-643-7000.

TAMMY HOFFSCHILDT, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

```
 1                     P R O C E E D I N G S

 2        (In open court at 9:01 a.m.)

 3             THE COURT:  Please be seated.  All right.  We're here

 4   on 11-cv-520, Heathgrades versus MDx Medical.  I will take

 5   appearances, please.

 6             MR. KOSTOLANSKY:  Good morning, Your Honor.

 7   Kris Kostolansky, with the law firm of Lewis, Roca, Rothgerber

 8   on behalf of the plaintiff, Heathgrades.  With me at counsel

 9   table is Ms. Kristin Stoll-Debell, our consultant from Merchant

10   and Gould, and then Mr. Nate Martinez, from Visual Advantages,

11   assisting us with the electronics.

12             THE COURT:  Good morning to all of you.

13             MR. STIMPSON:  Scott Stimpson, representing MDx, with

14   me is Terence Ridley with Wheeler, Trigg, O'Donnell.

15             THE COURT:  Where is our M.I.T. graduate?

16             MR. STIMPSON:  Actually, he is home, because his wife

17   just had their first baby.  So that's a good enough reason.

18             THE COURT:  Is that permitted at M.I.T.?

19             MR. STIMPSON:  I'm not sure.  I will have to ask him

20   that question.  I gave him some time off.

21             THE COURT:  All right.  We're here on -- for argument

22   on, I believe, it's Heathgrades' Motion For Partial Summary

23   Judgment that was filed at Document 369.

24             Let me see -- you may have picked up on this last

25   time, if not, you weren't paying attention.  I tend to kind of
```

1   prefer to follow my own meandering thoughts, rather than to

2   necessarily let counsel just educate me.  And my meandering

3   thoughts kind of lead me to say this, first, Mr. Kostolansky, I

4   know this seems silly to you, but how many fingers am I holding

5   up?

6          MR. KOSTOLANSKY:  Three, Your Honor.

7          THE COURT:  And, Mr. Stimpson, do you agree with that?

8          MR. STIMPSON:  I do, Your Honor?

9          THE COURT:  So you gentlemen have the capacity to

10   agree, at least on some things.  Let's see how much more we

11   can -- how far we can ride this horse before it collapses, due

12   to the disagreements.

13          Of the three parts of the Heathgrades motion, the one

14   I'm most interested in kind of batting about is the

15   anticipation or novelty part of it.  As I understand the

16   Heathgrades' position, it is, essentially, having raised the

17   challenge or thrown down the gauntlet, the burden deny is on

18   MDx to show by clear and convincing evidence, that -- or at

19   least to survive the Summary Judgment Motion, the burden is on

20   you, to show invalidity.  Have I fairly stated your position?

21          MR. KOSTOLANSKY:  Yes, Your Honor.

22          THE COURT:  You agree with the position, not as stated

23   by me, but with MDx's position on the matter?

24          MR. STIMPSON:  Basically, Your Honor, yes.

25          THE COURT:  Okay.  And you can stay seated.  Frankly,

1    it's going to be easier.

2         I also understand that not the issue with respect to

3    Heathgrades, but an issue, or a major position is basically

4    this, cut through all of the fog, Heathgrades looks to MDx and

5    says, Show me one piece of prior art, one piece, I don't care

6    which piece, that contains all of the elements of the patents.

7    And I have forgotten the shorthand, is it '060?

8         *MR. STIMPSON:* Yes, Your Honor.

9         *MR. KOSTOLANSKY:* Yes.

10        *THE COURT:* Am I correct again?

11        *MR. KOSTOLANSKY:* You are, Your Honor.

12        *THE COURT:* Mr. Stimpson, show me.

13        *MR. STIMPSON:* Okay.

14        *THE COURT:* And just so we can all be clear, I put

15   this little easel up here because, even though we have all of

16   this high-tech stuff, from time to time I just kind of want to

17   know exactly what's going on, and I might ask one or the other

18   of you to play Vanna or Vincent White and make entries for me

19   up here.  And if I point to someone I mean no disrespect to

20   them in that regard.  It's just there are certain things that

21   slip through my memory.  I will tell you one is there's a

22   February date, that, for the life of me, I'm not sure what

23   we're talking about in as much as we're talking about it, but

24   we will get to that in a minute.

25        Tell me the prior art.

1          MR. STIMPSON:  Okay.  Anticipation, Your Honor.

2   First, if I might start with something maybe a little

3   unexpected of the prior art.  And I just had this thought about

4   an hour ago.  So I'm sorry I can't elaborate in great detail,

5   literally, as you walked in, Your Honor, my associate was

6   sending me a text on it.

7          We were here, I don't know if it was a month or two

8   ago, and these -- we were arguing the same thing.  This is what

9   Heathgrades argued in their motion to exclude Dr. Cooper, that

10  the anticipation can't work, because it did not identify a

11  single prior art reference that discloses each and every claim

12  element.

13         So, Your Honor, it's been a long time since I looked

14  at issue of law in this case.  I don't remember it.  That's

15  what my email was checking on.  But the Court has already ruled

16  that -- against Heathgrades on that, and I believe it may be

17  law of the case.  But in any event, I will show you.  And what

18  I might be showing you here will certainly seem repetitive,

19  because I stood here and argued the same thing in the *Daubert*

20  motion.

21         First of all, Your Honor, how Heathgrades phrased this

22  in their brief I do not agree with.  They said we need to hold

23  up one piece of paper that says, Show us every element of the

24  claim.  That's true in some contexts.  If I had a prior-art

25  patent and I needed to use that to show anticipation, I would

1    need to show, in that document, every element of the claim.

2    Same thing if I went to the library, pulled out an old article.

3    If I'm going to use that for anticipation, I need to show every

4    element in the claim.  But here it's a public use.  It was on

5    Heathgrades' website back in 2005.  We can't go back in time

6    and get back on that website and see what's there, and I can't

7    pull it off and show you.  So how do I prove anticipation?

8    Well, I prove it with testimony and admissions.  So where is --

9    I will show you what I think is the very best indication of

10   anticipation, Your Honor.

11            THE COURT:  All right.  And I am sure it will be

12   marvelous, but what piece of prior art are you relying on?

13            MR. STIMPSON:  I'm relying on the piece of prior art

14   that was on Heathgrades' website that they admitted was on the

15   website in the summer of 2005.  You are familiar with the

16   Drucker Report, Your Honor.  I can't show you -- Drucker Report

17   was June 5, 2005.  Drucker Report, that date, I can show you

18   that, because somebody happened to print it, put it in their

19   files.  I can't show you, for this reference, whatever -- I

20   think there are probably thousands of them, Your Honor, but I

21   can't say here is a report from Dr. Smith from May 26, 2005,

22   because I just can't print it from the Heathgrades' website

23   anymore.  Doesn't mean I can't show anticipation.

24            So what prior art am I relying on?

25            THE COURT:  Are you relying on any other prior art,

1   other than the website as it existed in 2005?

2        MR. STIMPSON:  It's the website as it existed in 2005,

3   and it's the -- we had the physician quality reports, we had

4   the physician comparison reports.  I can't tell you which one

5   of those it was, Your Honor, because they didn't point that

6   out.  What they did tell us, Your Honor, is that they launched

7   a commercial embodiment of this in the summer of 2005.

8        THE COURT:  And look, I understand, and let's just

9   assume that I understand all of the, It's their faults, that

10  get exchanged in this case, because there's an awful lot of,

11  They didn't show us, You didn't tell me, You buried it, You hid

12  it, You didn't.  I'm not interested in any of that.  I'm

13  just -- I just want to know, are we talking about one piece of

14  prior art and only one piece of prior art?  Because, unless you

15  tell me something other than the 2005 website, I'm saying,

16  Okay, I'm closing the barn door as to what you are relying on

17  for prior art.  And the reason I'm being so finicky, is that as

18  I was reading through the paper -- the papers, I had a sense

19  that I was a brick wall against which various smelly substances

20  were being hurled to see what sticks.  And I know that wasn't

21  counsel's intention, and I am not offended by it.  The brick

22  wall might be, but it just seemed like there were tons of words

23  being kind of poured out at me, when there should be fairly

24  simple answers to things.  And I -- so I'm trying to slice

25  through all of the verbiage, and get down to where the rubber

1   meets the road.  So it's very simple.  Right now, I see, and I

2   am not -- I haven't -- I recognize you haven't put the -- the

3   defining limits on what we mean by the 2005 website, but I'm

4   seeing the 2005 website as the piece of prior art you are

5   relying on for anticipation.  Is there a number two?

6            MR. STIMPSON:  No, Your Honor.  It's a 2005 website.

7            THE COURT:  All right.

8            MR. STIMPSON:  And, Your Honor, all we need -- if this

9   piece of prior art -- if Heathgrades, in 2005, was using the

10  claimed invention, an embodiment of the invention that's

11  anticipation.  And what's my best prior art?  It's this,

12  Your Honor, it's this interrogatory response.  Heathgrades

13  admits this is a verified response that they began to launch

14  the commercial embodiment of the patents-in-suit in the summer

15  of 2005.  It's a commercial embodiment.  It has to meet the

16  claim.  If you have any doubt about that, Your Honor, look at

17  the context it's in.  It's commercial success.  To have

18  commercial success you have to have a product that falls under

19  the claim.  A product's commercial success can't support the

20  validity of a patent claim unless it falls under that claim.

21           So Heathgrades is admitting here, we think consistent

22  with Mr. Dodge's testimony, that they were launching and they

23  had this in the prior art in the summer of 2005.

24           THE COURT:  When was this signed?

25           MR. STIMPSON:  Two thousand eleven.

1          THE COURT:  Before the *Markman*?

2          MR. STIMPSON:  Yes.

3          THE COURT:  What do you think that means?

4          MR. STIMPSON:  Nothing.  Because the only thing that

5    Heathgrades says in their brief, Your Honor, is that they hint

6    that maybe, and they don't say this, but they hint that maybe

7    it was hospital comparison ratings.  But how can they say that,

8    Your Honor?  They are the ones who have been telling the Court,

9    right at that time, it has to be human healthcare providers.

10   How can -- how can there be summary judgment, Your Honor, that

11   this is wrong?  This is a verified statement, by them assuring

12   us that this was sold in the summer of 2005.

13         THE COURT:  Okay.  I get that.  What else you got?

14         MR. STIMPSON:  Your Honor, there's that.  There's also

15   Mr. Dodge's testimony.  And Mr. Dodge also testified.  Now

16   there's debate about what that means, but Mr. Dodge's

17   testimony, we think, is consistent with this verified

18   interrogatory response.  I asked him when comparison ratings

19   were used in the prior art, and he said, By 2006.

20         THE COURT:  Comparison ratings of what?

21         MR. STIMPSON:  I don't think that question

22   specifically lay that out.  You have to go back a few pages,

23   Your Honor.  But everyone understood that comparison ratings at

24   that time, when I took that deposition, comparison ratings were

25   of human healthcare providers.

1          THE COURT:  Why do you think that the horse just died,

2    fell over and broke it's leg?  And what I mean by that is, of

3    all of the things said, I'm strongly suspecting that

4    Mr. Kostolansky is not agreeing with this, correct?

5          MR. KOSTOLANSKY:  You are correct, Your Honor.

6          THE COURT:  All right.

7          THE COURT:  Keep going.  I just want -- again -- I

8    just want to make sure I get it.

9          MR. STIMPSON:  Okay.  I understand, Your Honor.  I

10   fully understand.

11         So Mr. Dodge -- these are his words not mine -- when I

12   said when were comparison ratings used in the prior art, his

13   words were by 2006.  By 2006.  That is perfectly consistent

14   with this, where they were launching commercial embodiment of

15   the patent.  Of the patent claims in the summer of 2005.  And a

16   commercial embodiment of the claims in the summer of 2005 is

17   anticipation under 102(a) or 102(b).

18         THE COURT:  All right.  What else you got?

19         MR. STIMPSON:  Your Honor, that's -- really that's it

20   I mean that's -- cited to the Dodge testimony.  I cite you to

21   Dr. Cooper's report.  It's really very much what I recited.

22   But this, to me, Your Honor, this interrogatory response, how

23   can we say there's no genuine issue of material fact, when they

24   have admitted the fact?  I mean, is Mr. Mr. Kostolansky going

25   to say there's no genuine issue of fact when they have already

11

1   admitted that they were doing this in the prior art?  It's an

2   admission.  It has to be under the claim to be commercial

3   success; it has to be.

4         THE COURT:  All right.  Now, one of the things that

5   they say is that -- they being Heathgrades -- is that your

6   website infringes.

7         MR. STIMPSON:  Yes.

8         THE COURT:  And, of course, you say that your website

9   does not.  That's why I'm curious as to what is it that I'm

10  supposed to read into this statement about, Began to launch the

11  commercial embodiment of the patent-in-suit by the summer of

12  2005?  I mean ... let me be more precise.  One of the things

13  that Heathgrades speaks of is the notion that there has to be

14  comparison ratings of humans.  We've already talked about

15  Mr. Dodge, and my comment about comparison ratings, what was he

16  talking about, means to highlight, or tickle out, what I think

17  is one of the places where Heathgrades is planting its flag.  I

18  could be wrong about that, and certainly, Mr. Kostolansky, it's

19  your motion, I'm going to come back to you, but I wanted to get

20  some clarity in my mind as to what the MDx position was, first.

21  Am I to read into this that it also included human comparison?

22        MR. STIMPSON:  Absolutely, Your Honor.  You can't have

23  commercial success and an embodiment of the patent claim if it

24  doesn't fall under the patent claims.  You raised the date on

25  this.  This was back in 2011.  This is talking about commercial

1   success.  Let me show you something more recent.  All right.

2   It goes to the same thing.  This interrogatory response,

3   commercial success.  We filed a motion in limine to preclude

4   their evidence of secondary considerations and one of those was

5   commercial success.  And Heathgrades is saying, Look this --

6   this doesn't mean that it was under the patent claim.  It just

7   meant it was under the specification or something.  Well,

8   that's inconsistent, because in order to have commercial

9   success support a patent claim, it has to fall under the patent

10  claim that's Black Letter Hornbook law.  So what's Heathgrades

11  say about this in their opposition to our motion in limine?

12  Here is Docket 725.  It's the nexus.  That's why -- has to show

13  it falls under the patent claims.  That's how you get the nexus

14  the connection to the patent claim.  This is what they said,

15  and this is this year, 2014, Heathgrades served MDx with claim

16  charts mapping the '060 patent claims to its own website in

17  healthgrades.com, and that's their support for commercial

18  success, and now they are trying to tell you, No, no, no it

19  wasn't what we meant.  It wasn't under the patent claim.  And

20  look at the next sentence and see what they cite.  They cite

21  August 5, 2011, that's two weeks after that interrogatory

22  response.  And why -- they are referring to the interrogatory

23  response, and why are they saying that it supports validity by

24  commercial success?  Heathgrades also notified MDx in writing

25  that there was a nexus between the commercial success and these

1  websites because -- emphasis by Heathgrades -- because the

2  websites practiced the claimed invention.  If it practices the

3  claimed invention, Your Honor, it was being launched in the

4  summer of 2005, that's anticipation.  It has to be.  And it's

5  not like we have to decide this today, Your Honor.  The only

6  thing we have to decide today, as you all very well know, of

7  course, is whether there's a question of fact.  That's all.

8      THE COURT:  Now, what does the summer of 2005 mean to

9  you?  Or better way of saying it is, what should it mean to me?

10     MR. STIMPSON:  Well, the summer -- it means the entire

11 summer of 2005.

12     THE COURT:  Which goes from when to when?

13     MR. STIMPSON:  I was afraid you were going to ask that

14 question.  I think it's late May to --

15     THE COURT:  I think it's June 21 to September 21, or

16 thereabouts, but maybe I'm wrong on that.  But, I suppose, I

17 can check a solar chart.

18     MR. STIMPSON:  But in some respects it doesn't matter,

19 because remember there is another interrogatory response which

20 says the spring/summer of 2005.  That's on page five of those

21 same interrogatory responses.  So if it was launched in the

22 summer or the spring and the summer, it would have to be

23 earlier.  It would have to be prior art.  Even if it was

24 September.  Even if it was December 31, 2005, it's still prior

25 art because it's 102(a) art.  The invention date is February

1    2006.  That's what they claim.  That's in their interrogatory

2    response.  They have not proved an invention date earlier than

3    that.  102(a), even if it was January 31, 2006, it's still

4    prior art.

5          THE COURT:  All right.  We will come back.  Let me

6    hear from Heathgrades.

7          MR. KOSTOLANSKY:  Thank you, Your Honor.

8          THE COURT:  And I give you the invitation that should

9    be standing, if you want to write, you can write.  If you want

10   to use the ELMO, you can use the ELMO.  You have got a computer

11   guy back there, I'm more than happy to let him do his thing.

12         MR. KOSTOLANSKY:  Let Mr. Martinez do his thing,

13   Your Honor.

14         THE COURT:  All right.  That's fine.

15         MR. KOSTOLANSKY:  Why don't we pull up the

16   interrogatory answers, that's 407-1.  Let's go to page 15.

17   This is the interrogatory answer at issue, Your Honor.  You see

18   the reference to, Began to launch the commercial embodiment of

19   the patents-in-suit in the summer of 2005.  As Your Honor

20   points out, that interrogatory answer was made before *Markman*,

21   and has subsequently been amended to include the arguments set

22   forth in the brief that we filed regarding this pending motion.

23         But there was reference, too, opposing counsel made

24   about, Well, maybe this also involved hospital comparisons.  So

25   let's go back -- let's go back a page in this interrogatory

1       answer.  Mr. Martinez, let's go specifically to page -- page

2       12.  This involved recognition of Heathgrades' success.  If we

3       go through the entries there, A, B, C, D, all the way through

4       N, virtually all of those entries concern, if we look at A,

5       high-performing hospitals.  If we look at B, regional network

6       of hospitals.  If we look at C, on the next page, on the last

7       line of C, safety data for hospitals.  If we look at D, do your

8       homework, hospital guides.  If we look at F, can walk you

9       through how to choose a hospital.

10              So these entries, Your Honor, are pre-*Markman*

11      notations concerning the overall success of the -- of the

12      health Grades' website.  If you look in the interrogatory

13      answers that really addresses the question Your Honor was

14      raising, that is interrogatory number two, that's at page nine,

15      Nate.  If we could pull that up, please.  There we see -- this

16      is the interrogatory that directs itself to prior art.

17      Identify all prior art, instances of prior public use and sale,

18      or all other prior art references of any sort.  Then

19      Heathgrades answers that interrogatory, then in the second

20      paragraph of the Response, referencing certain publicly

21      available prosecution histories, and then stating that outside

22      of those websites, some of which may or may not qualify as

23      prior art, Heathgrades is currently not aware of any prior art,

24      including any prior public use or sale.

25              So that is the -- that's the direct answer to the

1  question.  And the reference to commercial embodiments,

2  Your Honor, does not mean the claim elements.  That is not

3  equivalent, and the patent itself describes numerous

4  embodiments.  And Nate, if we could please pull up the patent,

5  369-1.  Let's look at -- let's look at column three, if we

6  could.  Page -- I think that's page 27.  So there -- there we

7  have a reference to numerous other embodiments, that you can

8  see referenced in -- in each -- in each sentence, beginning in

9  that column, In other embodiments, In one embodiment, In one

10  embodiment, In -- in certain embodiments, Other embodiments.

11  Then there's a reference to a particular embodiment regarding

12  architecture and structure and content of the website.

13      And the same is true when we go back to column two, on

14  the preceding page, of the patent.  There, there is also

15  reference, Your Honor, to numerous other embodiments,

16  encompassed within the patent.  Talking about reports

17  containing information that's been verified in an embodiment.

18  In one embodiment.  Searches by a potential patient may be

19  conducted from within the website of the company providing the

20  healthcare provider information and comparison service while

21  other embodiments involve use of common search engines.

22      And then the next -- the final sentence there,

23  Your Honor, in some -- some embodiments relate to searches for

24  physicians, while others relate to searches for hospitals,

25  nursing homes or other types of healthcare providers or

1    treatment facilities.  And as we saw the interrogatory answer

2    included numerous references regarding hospitals, hospital

3    ratings, and other embodiments that were included in that

4    interrogatory answer.

5            The prior portions of the interrogatory answer

6    concerning, you know, Heathgrades, again, as we noted, made

7    repeated references to the hospital rating aspect of this.

8    These interrogatories were several months before the Court's

9    *Markman* ruling, and thus were not based upon the Court's

10   Markman ruling and its definition of healthcare comparison

11   ratings involving multiple healthcare providers all contained

12   in a report in the first healthcare provider.  And as

13   Your Honor is well aware, prior to the *Markman* ruling, we

14   argued, and this is in Docket 79, that comparison ratings need

15   not include ratings of multiple healthcare providers prior to

16   the interrogatory being answered.  Judge Brimmer disagreed with

17   us.  Once Judge Brimmer entered his *Markman* ruling, then there

18   were, you know, there were subsequent depositions.  Mr. Neal

19   testified that the comparison ratings was added in 2006 or

20   2007.  And if we go to Docket Number 369-15, there we have, at

21   pages nine and ten, we have the deposition testimony of

22   Mr. Neal, and there he is clarify the question, at the bottom

23   of page nine, And so you are talking about third-party-provided

24   information, physician-provided information, consumer-provided

25   information, in providing a form of comparison ratings to

1    those?  And Mr. Stimpson notes, I am.  And then Mr. -- Mr. Neal

2    answers, That would have been more recently in the -- kind of

3    2006, 2007 timeframe.

4          So once Judge Brimmer construed the -- the language of

5    the patent, those were the answers provided by Heathgrades.

6    The interrogatory answer referenced by MDx was never referenced

7    in Dr. Cooper's report, not reflected in MDx's --

8          THE COURT:  All right.  Let's -- let's stop with me

9    being the wall again, and get right down to brass tacks.

10   Basically what I understand Mr. Stimpson is saying, is really

11   very simple, it's, Hey, the prior art is the MDx website.  MDx

12   was.

13         MR. KOSTOLANSKY:  The Heathgrades' website.

14         THE COURT:  I'm sorry.  The Heathgrades' website, and

15   by virtue of that it was in public use and therefore not novel,

16   anticipated, whatever characterization one wants to put on it.

17   And the difficulty, is, of course, if I say to them, or to you,

18   Okay, let me see the 2005 website, you can't do it, or at least

19   no one is pointing me to anything that I should be looking at.

20   And I would recognize, obviously, single screen shot doesn't

21   have a real functionality to -- to tease out the full capacity

22   of a website; but be that as it may, basically, his argument

23   is, You were using it, it was out there in the public in 2005,

24   and the evidence of it is this singular interrogatory.  What is

25   it that you are telling me?

1          MR. KOSTOLANSKY:  I'm telling Your Honor that the

2     interrogatory answer, in essence, makes reference to certain

3     embodiments of the website.  I have gone through other

4     references in the interrogatory answer where it's shown that

5     those embodiments include, for example, hospital ratings, and

6     thus, that is not the -- the embodiment that is at -- is at

7     issue here, because it hadn't been construed by Judge Brimmer.

8     The parties didn't know what the embodiment was.  And thus,

9     once Judge Brimmer had entered his ruling, and Heathgrades

10    responded to discovery questions regarding the embodiment, as

11    defined in *Markman*, and we saw Mr. Neal in the deposition, he

12    clarified, So this is exactly what you are asking me, then he

13    answered the question, 2006 or 2007.

14         THE COURT:  So, in essence, what you are saying is

15    well, the embodiment that we admitted -- you are not walking

16    backwards from the statement that's contained in the

17    interrogatory.  The response is the response.  But the real

18    question becomes what does that mean?  Does it mean comparison

19    rating of healthcare providers as defined by the *Markman* order?

20    Does it mean something different?  You are telling me it means

21    something different.  Is there anything I can point to, other

22    than what -- how do I know which -- why should I let you walk

23    backwards from that statement, I suppose, is a better way of

24    putting it?

25         MR. KOSTOLANSKY:  Your Honor, I'm not -- the --

1    because the statement doesn't mean that -- that an embodiment

2    constitutes all of the elements of the patent-in-suit, and by

3    referring to the other interrogatory answers, I'm showing to

4    Your Honor that that was the company's understanding at the

5    time the interrogatory was answered.

6        THE COURT:  And certainly you are not disagreeing with

7    me that an embodiment can be broader than what's claimed in the

8    patent, because the patent can narrow the embodiment, but the

9    embodiment can't narrow the patent?

10       MR. KOSTOLANSKY:  Yes, Your Honor.

11       THE COURT:  What about this Dodge testimony?

12       MR. KOSTOLANSKY:  The Dodge testimony is some time in

13   2006.  So 2006 is after August 29, 2005, so that -- under

14   102(b) that would not -- would not create a bar.  Because

15   102(b) has the one-year grace period from the date the utility

16   application was made.

17       THE COURT:  And we will come -- I'm going to hear from

18   Mr. Stimpson again, but towards the end he was referencing the

19   invention date being 2006, and that therefore --

20       MR. KOSTOLANSKY:  Well, the -- that would go back,

21   Your Honor, to -- to 102(a), which is the other piece of the --

22   of the Summary Judgment Motion.  But, you know, the invention

23   was conceived and development begun in 2005, and that

24   development continued, you know, continued forward, the

25   provisional patent application was -- was then -- was filed in

1    February of 2006, and then the utility application was filed

2    in -- in August of 2006, and so this has been, you know, an

3    ongoing process that the inventors started in the 2004, 2005

4    timeframe, and you know, and that process marched forward from

5    conception through -- through development.  And, Your Honor, we

6    have produced all of the -- the document production in this

7    case has been, you know, monumental.  We've produced all of the

8    company's interrogatories -- I'm sorry.  All of the company's

9    emails, all of the company's written documents regarding what

10   was being developed.  We provided a wealth of information that

11   shows what the company was working on through the inventors at

12   these various 2004-forward points in time, and there's nothing

13   in those documents that references that there were comparison

14   ratings of human healthcare providers, let alone comparison

15   ratings of human healthcare providers set forth in -- you know,

16   in a report on the first healthcare provider.

17        And if I might note, Your Honor, there's one of the --

18   of the -- of the documents, if we can look, Nate, at 369-14.

19   Let's take a look at the first page of that, if we could.  This

20   is an email, company email, back in -- in March of 2005

21   referencing the, you know, Premium Placement Package.  And this

22   was one of the, you know, alleged elements of prior art by the

23   other -- the other side.

24        *MR. STIMPSON:*  Excuse me, I'm sorry to interrupt.  I

25   just lost my video feed here.

22

1          THE COURT:  Hold on a moment.

2          MR. STIMPSON:  I'm sorry to interrupt.

3          THE COURT:  No, it's okay.  Well, I shouldn't say it's

4   okay, I'm not sure counsel feel --

5          MR. KOSTOLANSKY:  Nope, no problem.

6          THE COURT:  -- the same.  But we will get the

7   connection.  Let's do this -- oh, okay.  What I was going to

8   say, if it goes out again, let's bring the -- the big boy

9   forward, and put it on the big boy, and that way you will be

10  able to read it.

11         All right.  Go ahead.

12         MR. KOSTOLANSKY:  So this is one of the references,

13  the Premium Placement Package.  One of the elements that the --

14  one of the items that opposing counsel would contend

15  constituted a prior art.  But if we look at page ten of that --

16  of that document, we see there that Heathgrades' marketing

17  program is not about rating physicians, universal

18  physician-level clinical data doesn't exist.  So this is in

19  March of 2005, and there, you know, the inventors, as they are

20  working through this process are saying, This is not, you know,

21  part of, you know, our program at this -- at this juncture.

22  Which, again, further confirms that this was not added until

23  much later, 2006, 2007, as testified to by Mr. Neal.

24         THE COURT:  Okay.  So where the rubber meets the road

25  is this, as I see it, and you will each get the opportunity to

1  correct me, Mr. Stimpson says, Hey, Heathgrades admitted we

2  were doing the commercial embodiment in the summer -- by the

3  summer of 2005 or in the summer of 2005, and that commercial

4  embodiment has to mean every claim element of the patent, and

5  you are saying, No it doesn't.  It doesn't have to mean every

6  claim element of the patent.  And it surely doesn't mean

7  comparisons of human healthcare providers.

8         MR. KOSTOLANSKY:  That's right, Your Honor.  The

9  patent, itself, says that.

10        THE COURT:  Okay.  Let me toss it back to opposing

11  counsel.  And again, just to kind of help you focus, I will

12  say, It seems to me that you are asking me to take this leap,

13  and say that there is enough to deny a motion on summary

14  judgment grounds, as it pertains to anticipation, because that

15  answer alone is sufficient to create a dispute, material

16  dispute, even when I look at it as a clear-and-convincing

17  standard.

18        I don't know if that all came out correctly or not,

19  but I'm just trying to, kind of, lay out to you the -- where I

20  see it.

21        MR. STIMPSON:  I understand, Your Honor.  I certainly

22  wouldn't agree that it's a leap, because there are only two

23  things that have to be true about that interrogatory response,

24  and they are both in the interrogatory response.  One, it has

25  to be an embodiment of the patent claims.  And you just raised

24

1    the question of whether it has to mean every element of the

2    claim, and Mr. Kostolansky says no.  What he didn't tell you,

3    what he didn't deny is that if you are relying on it for

4    commercial success, yes, it most certainly does have to meet

5    every element of the claim.  There's tons of federal circuit

6    law on that, and they are relying on it for commercial success

7    and the second thing you need to know is the date, and the

8    dates are in the interrogatory response too, Your Honor.

9         Now, granted, Mr. Kostolansky, is arguing that they

10   didn't mean it had to fall under the claims, and even though

11   they are arguing commercial success, and he argued to you that,

12   Look, back when we got the claim construction, then, you know,

13   that changed things.  Well, there's a duty to supplement.

14   There's a duty to supplement.  That interrogatory response is

15   still alive and kicking right now.  They never changed it.  And

16   that was two years ago.  When they got that *Markman* decision,

17   they didn't change this, and we've relied on it, we have cited

18   it, they haven't changed it.

19        So, Your Honor, I'm not asking for -- excuse me, I'm

20   not asking for summary judgment of anticipation.  But how can

21   there not be a genuine issue of material fact when my opposing

22   counsel, opposing party, has a verified interrogatory response,

23   which is still alive and well today, that says we launched the

24   commercial embodiment.  We are relying on it for commercial

25   success, so it has to fall under the claim.  We launched a

25

1    commercial embodiment in the prior art.  How can that possibly

2    not be an issue of fact for the jury?

3           If Heathgrades wants to argue to the jury, We didn't

4    really mean that, and show them these documents that he is

5    showing Your Honor, that's fine.  But how can there not be a

6    genuine issue of material fact when they've said that?  I mean,

7    it's not just the interrogatory response.  We think Mr. Dodge's

8    testimony corroborates it.  It's just -- it's just -- it's got

9    to be a question of fact, Your Honor.  It's for the jury.

10   It's -- the two elements are right there, and they are

11   verified.  It was under the patent claim, and it was in the

12   prior art.  That's all we need.

13          THE COURT:  All right.  So ... educate me some more

14   about the link that you are making between -- which, as I hear

15   it is this, all right, you are saying, Heathgrades can say

16   whatever the heck it wants to say.  At the end of the day, the

17   way that answer is phrased, not only is commercial embodiment

18   an important term, but also commercial success is an important

19   term, and the two together help one define the full -- the full

20   answer?

21          MR. STIMPSON:  Exact -- that's -- yes.

22          THE COURT:  All right.  This host of claim -- and I am

23   not inviting you guys to kill more trees, but I also don't care

24   to toss aways about, Well, there's tons of federal case law

25   that says that if it's commercial success, it must mean

26

1    everything that's in the -- that's in the the patent.  I'm

2    assuming it's not too complicated for you to tell me a couple

3    of cases that you refer to?

4              MR. STIMPSON:  I can do so right now, Your Honor.

5              THE COURT:  I would hope so.

6              MR. STIMPSON:  I refer the Court, generally, for

7    several of the cases to Docket Number 685, which is our motion

8    in limine, it's at pages 13 to 14, there are several cases

9    listed there.  Heathgrades does not contest those.  In fact, I

10   have shown you, Your Honor, their opposition to their motion in

11   limine where they say, referring right back to this

12   interrogatory response, that they prove that nexus, by showing

13   it was under the claim, so they are not going to deny this.  I

14   don't think Mr. Kostolansky will deny it.

15             Here is a specific cite from the Federal Circuit, it's

16   the Eaton case, E A T O N, 106 F.3d, 1563, at 1571.  That's one

17   of the several cases cited in Docket 685.  But this is, you

18   know -- I don't think it's disputed.  It has to be under --

19   falls under the claim in order for commercial success to be

20   relevant.

21             THE COURT:  Again, in the interests of transparency,

22   the thought that is going through my head right now is this, At

23   the end of the day, the burden is going to be on you to prove,

24   by clear and convincing evidence that there's invalidity, and

25   you think some interrogatory answer that you say means one

1    thing and they say means something else, meets that?

2         MR. STIMPSON:  Yes, Your Honor.  What could be more

3    probative of that issue than an admission by Heathgrades?  They

4    have -- they have said the two things we have to have.  They

5    can try to explain it away.  I wouldn't expect anything else.

6    They are trying to backpedal from this, Your Honor, but the

7    reality is, even today, that interrogatory is there.  What is

8    it, a year and a half after the claim construction.  They have

9    never changed it.  They are still relying on it for commercial

10   success.  The paper they just submitted to the Court says, We

11   are relying for commercial success, because it falls under the

12   patent claims, and they say they did it in summer of 2005.

13   It's an admission clear -- a clear admission by -- by opposing

14   party, that they were doing this in the prior art, and we have

15   Mr. Dodge's testimony.

16        THE COURT:  You're way more impressed by Mr. Dodge's

17   testimony than I am.

18        MR. STIMPSON:  Well, it's --

19        THE COURT:  But --

20        MR. STIMPSON:  I understand, Your Honor.  I

21   understand.

22        THE COURT:  Let's assume I accept what you tell me.

23   The second layer of fuzz that's out there is the summer of

24   2005.  What does that mean?

25        MR. STIMPSON:  Well, Your Honor, it has to mean -- so

1    I see what you are saying.  You are saying, the summer of 2005

2    includes something after August 29, 2005?

3           THE COURT:  Correct.

4           MR. STIMPSON:  If that's what summer is defined as,

5    then it could include that.  But they don't say after August

6    29.  They say the summer.  And also, all Your Honor --

7           THE COURT:  I understand what they say, but the point

8    is you are trying to take what they say and reach a goal that's

9    defined by a not insubstantial burden of proof.  So I'm saying

10   to you, how do you take what they say, fuzzy as it is, and get

11   to that goal?

12          MR. STIMPSON:  Okay.  There's two answers to that.

13   The first is, Your Honor, that the summer of 2005 includes

14   prior art 102(b), let's just talk about 102(b) now, and

15   certainly the spring does.  We have that other interrogatory

16   response which we have not focused a lot on, but that says

17   spring and summer 2005.  But second answer is this, Your Honor,

18   102(a), and that's another issue in Heathgrades' brief.  And

19   they are saying that it can't be prior art under the 102(a).

20   If it is prior art, under 102(a), Your Honor, then, as long as

21   summer 2005 means some time before February 2006, and I think

22   we can all agree on that, then it's prior art.  Because it has

23   to be -- there's two separate ways this can be prior art,

24   102(a) and 102(b), and I think that does have -- I would like

25   to address that issue very briefly, because the 102(a) issue,

1    from what I'm hearing right now is becoming important.

2         The cases they cite to show that this can't be 102(a)

3    art, Your Honor, they say two important things, and that's the

4    *Katz* case and its progeny.  And what it says is, Look, you can

5    disqualify some stuff as being prior art under 102(a), but the

6    way you do that is you have to show that the exact same

7    inventive entity was responsible for that prior art.  Now,

8    what's important here is what those cases say we have to do to

9    do that.  It's their burden.  All the cases starting from *Katz*,

10   say -- and I can even ... read you from the *Katz* case,

11   Your Honor, this is the predecessor to the federal circuit.

12   It's incumbent upon appellate to provide a satisfactory showing

13   which would lead to reasonable conclusion that he is the sole

14   inventor.  It's required that there's showing supporting the

15   basis for the applicant's purpose.  In other words, you can't

16   presume just because this comes under Heathgrades it comes from

17   the exact inventive entity and the *Katz* case says that.  The

18   only way they can disqualify this as prior art under 102(a) is

19   by proving it.  And this record is completely barren,

20   Your Honor.  There's no invention disclosure statements.

21   There's no conception drawings.  There's nothing.  It's their

22   burden.  All of these cases show that, and they didn't meet it.

23   Not only did they not meet it on summary judgment, they didn't

24   meet it any way.  It's not in their expert reports.  It's

25   nowhere.

1          This is 102(a) art, and because it's 102(a) art,

2    Your Honor, any time -- excuse me -- any time that product

3    under the patent is launched, even if it was February 5, 2006,

4    that's prior art.  That's prior art.

5          So I hope that that addresses your question about the

6    date and what the summer of 2005 means.  The answer is, it

7    doesn't matter, because it's still 102(a) art.  It doesn't

8    matter.

9          So Your Honor --

10         THE COURT:  All right.  So the operative date that you

11   are pushing is for 102(a) the --

12         MR. STIMPSON:  February 6, 2006, which is the date

13   that Heathgrades claims to be their invention date.

14         THE COURT:  And for 102(b)?

15         MR. STIMPSON:  August 29, 2005.  That's one year

16   before their utility -- utility application is filed.

17         THE COURT:  Let me kick it back to Mr. Kostolansky.

18         MR. KOSTOLANSKY:  Your Honor, let me start with the

19   comment the Court made about whether the other side was linking

20   commercial embodiment with commercial success, and therefore

21   arguing that the commercial embodiment referred to in the

22   interrogatory answer was the patent-in-suit.

23         So if we look at the answer to -- and Nate, if we

24   could pull up Docket 47 -- 407-1.  And let's go to page 12 of

25   that.  This is part of the same interrogatory answer, the

1   answer to number four, this one focusing on a different

2   element; namely, recognition of Heathgrades' success by varying

3   national authorities.  So that is an element then with respect

4   to obviousness, just as commercial success is an element with

5   respect to obviousness.

6          So as far as commercial embodiment and commercial

7   success being treated the same, then commercial recognition of

8   Heathgrades' success should be treated the same, and supportive

9   of the definition of commercial embodiment.  If we look here,

10  as we did earlier, we see that 90 percent of these references

11  refer to high-performing hospitals, or the embodiment under

12  which the -- the hospital rankings are utilized, thus that

13  information was included in this answer, at that time, and that

14  shows that the answer regarding commercial success is not, in

15  fact, limited to the only embodiment that had not yet been

16  interpreted by Judge Brimmer, at this juncture.  And again,

17  Your Honor, going back to interrogatory number two, in this

18  same set, you know, that is the interrogatory that asks about

19  prior art.  That's the direct question.  And Heathgrades'

20  response is that it's -- it's not aware of any.

21          THE COURT:  Well, I understand that, but they don't

22  have to accept your characterization of prior art to -- to

23  advance their claim of anticipation.

24          MR. KOSTOLANSKY:  Yes.

25          THE COURT:  Let me see the interrogatory answer again.

32

 1    The one that we're arguing about.

 2              *MR. KOSTOLANSKY:*  I think that's page 15, Nate.

 3              *NATE MARTINEZ:*  Fourteen.

 4              *MR. KOSTOLANSKY:*  Yeah.  Page 15 in the Court file.

 5              *THE COURT:*  Then go to the next page for me.  And the

 6    next.

 7              Okay.  Now, Mr. Stimpson basically says, Don't worry

 8    too much about this summer of 2005 line in the sand, because

 9    even if that's arguably relevant under 102(b), it's really not

10    very useful to you under 102(a).  Agree or disagree?

11              *MR. KOSTOLANSKY:*  Well, I disagree that one 102(a) is

12    even applicable here, Your Honor, but I would like to -- before

13    I get to that, if I may, just, you know, Heathgrades has

14    amended its interrogatory answers in that, you know, confirm

15    the positions that have been articulated here, regarding

16    post-*Markman*, and what that interrogatory response means, and

17    those are -- those are in the -- in the court file.  And the

18    duty to supplement under -- you know, under Rule 26(e), does

19    not extend the information that's been otherwise made known to

20    the other side during the discovery process, and this

21    information, you know, post-*Markman* was made known to the other

22    side in the discovery process.  So any concern they had about

23    what that particular definition was, was addressed in

24    Mr. Neal's deposition.

25              *THE COURT:*  I'm really not -- I'm not going down that

33

 1    rat hole.  So I guess that's my way of saying to you, I doubt,

 2    seriously, that I would base a ruling on some kind of an

 3    assumption about the meaning of a failure to supplement.

 4            MR. KOSTOLANSKY:  Okay.

 5            THE COURT:  I'm not chasing that.

 6            MR. KOSTOLANSKY:  Okay.

 7            THE COURT:  So let's get back to 102(a).

 8            MR. KOSTOLANSKY:  Okay, Your Honor.  Thank you.

 9            Well, that concerns, you know, entitlement to a patent

10    unless the invention was -- was known by others, you know, in

11    this country, or patented or described in a printed publication

12    before the invention there of the applicant of the patent.  So

13    that's the language.

14            THE COURT:  I'm not anywhere near as faciled with this

15    statute and the related case law as you gentlemen are, and

16    obviously you know that.  So help me out.  Is there something

17    about public use in that 102(a)?

18            MR. KOSTOLANSKY:  No, Your Honor.  This is really --

19    it's really --

20            THE COURT:  Whoever has got it, read it to me, that's

21    what I'm asking you.

22            MR. KOSTOLANSKY:  I'm sorry, Your Honor.  What's --

23            THE COURT:  Whoever has got it, read it to me, 102.  I

24    can chase it off by going on screen -- I mean by going online,

25    and I actually did have a copy.  I meant to bring out here and

34

1    I left it on my desk, which is why I'm saying read it to me.

2            MR. STIMPSON:  Your Honor, if I may, I think I have it

3    here.

4            THE COURT:  Does it have some notes on --

5            MR. STIMPSON:  Copy of 102(a).

6            THE COURT:  Let me just read it real quickly.  That's

7    fine.  I will give it right back to you.

8            MR. STIMPSON:  You can keep it Your Honor.  Actually,

9    I don't know if there's notes behind it, but that's okay.

10           THE COURT:  There are not.  It's clean on the

11   backside.  Okay.  Okay.  Go ahead.  I was crossing my (a)s and

12   (b)s.  I see that now.  Go ahead.

13           MR. KOSTOLANSKY:  Your Honor, for an invention to be

14   known by others, it must be the work of someone other than the

15   inventors.  And so in our brief we address this by looking

16   at -- at the Manual Of Patent Examining Procedures, Section

17   2137, this is 2012, and there they state that, A disclosure by

18   the deriver, absent a bar under 102(b), will not bar the

19   issuance of a patent to the party from which the subject matter

20   is derived.  Now that's fairly dense also, but I think the

21   point here is, Your Honor -- I'm sorry.

22           THE COURT:  As I can be.

23           MR. KOSTOLANSKY:  Is that, really, Heathgrades is the

24   deriver, and all of the inventors were employees of Heathgrades

25   working within the course and scope of their employment.  Thus

35

1    a deriver's use or disclosure, does not create a bar under

2    102(a), because the deriver is not inventing anything.  And

3    under 102(a), Your Honor, there's also from the Rader and

4    Adelman textbook, cited at page 18 of our brief, that the issue

5    is always whether a third party's use suffices to render him,

6    the prior inventor, in terms of the patent.  And here

7    Heathgrades is not a third-party prior inventor.  Heathgrades'

8    rights are derivative from the rights of the employees and no

9    greater.

10           So the seminal case, Your Honor, is the *Katz* case,

11   which was decided in 1982, and there the Court addressed a

12   printed publication that was authored by, and quote, other;

13   namely, the inventor and two or co-inventors whether that could

14   or could not be considered prior art under 102(a).  They found

15   that couldn't be considered prior art, because it was

16   describing the work of the inventor.  The Court said, at page

17   454, 687 Fed. 2d, It may not be readily apparent from the

18   statutory language that a printed publication cannot stand as a

19   reference under 102(a), unless it is describing the work of

20   another.  A literal reading might appear to make a prior patent

21   or printed publication prior art even though the disclosure is

22   that of the applicant's own work.  However, such an

23   interpretation of this section would negate the one-year period

24   afforded under Section 102(b), in which the inventor has to

25   perfect and develop and apply for a patent on his invention and

1    publish descriptions, if he wishes.

2            So in this case, Your Honor, any disclosure by

3    Heathgrades would not be describing the work of another.  As in

4    Katz, treating a disclosure by Heathgrades as work of another

5    would negate the one-year period afforded under section 102(b),

6    during which an inventor is allowed to protect and develop and

7    apply for a patent.  The language of the patent manual, cited

8    by the other side, in their brief, which is the only authority

9    that they have cited there, that citation expressly references

10   *Katz*, and the need to ensure that the one-year grace period

11   afforded under section 102(b) is not negated.

12           The interpretation sought by the other side here would

13   negate the one-year period in which Heathgrades, acting through

14   its employer/inventor, employee/inventors can disclose some or

15   all of the claimed inventions.

16           *THE COURT:*  All right.  Let's --

17           *MR. KOSTOLANSKY:*  Maybe, Your Honor, I can -- I can

18   demonstrate to the Court how this plays into summary.

19   Judgment.  Maybe that would --

20           *THE COURT:*  That will help, but so will this; let me

21   assume that Heathgrades has five employees, has only ever had

22   five employees, and they coincidentally were named by their

23   mothers one, two, three, four, and five.  One, two, and, three,

24   ultimately apply for and receive a patent.  Four and five were

25   either using the patented material or described it in a printed

1    publication.  I suppose what I'm saying -- what I'm asking you

2    is whether you're playing, again not intentionally, and I am

3    not suggesting any impropriety there, a little bit of a shell

4    game in terms of who the inventor is?  Is everybody -- if one,

5    two, and three applied for the patent, am I to assume that

6    everything that Heathgrades did emanated from one, two, and

7    three?  Why shouldn't I assume that it emanated from four and

8    five?  Or from one, three, and five?  Or for two and four?  Or

9    some other combination that is something other than the tight

10   confines of the one, two, and three, who applied for the

11   patent?

12       MR. KOSTOLANSKY:  Is the other -- the other employees

13   worked under the direction of one, two, and three.

14       THE COURT:  And where do I see any of that in what I

15   have before me?  In other words, as a summary judgment issue,

16   why -- how do I turn to Mr. Stimpson and say, Too bad, so sad,

17   you lose, because the other employees, everybody else who may

18   have been making some public use or description of it,

19   everything was coming from the inventors, and nothing was

20   coming from somewhere else, and everything was coming from all

21   of the inventors opposed to some smaller subset thereof.

22       And, look, don't be shy.  If what I'm asking is just

23   absolute rank stupidity, very politely tell me I'm being rankly

24   stupid and I am fine with that.

25       MR. KOSTOLANSKY:  Okay.  Well, Your Honor, in --

1    what's the Court's file, with respect to this motion, at 407-1

2    at, pages six through eight, we explain, you know, who the

3    inventors are and what they did, with respect to the

4    development and creation of -- of this invention.

5            So that is -- is in the record.  Now, with respect to

6    your example about four and five, in -- if four and five

7    published something that was -- had been developed by one, two,

8    and three, that would -- that would not create a bar under

9    102(a), because what was published was the invention of one,

10   two, and three.  In other words, there was nothing of another

11   that was published, what was published, in your example, was of

12   one, two and three.  So, to the extent something is published

13   of one, two, and three, then that is not a circumstance that

14   will create a bar under 102(a).

15           THE COURT:  Let's get away from published and get back

16   to something closer to used by.  I guess what my one area of

17   concern, at least, as we are sitting here kind of bantering

18   back and forth is that it seems to be that you are saying

19   anything -- that anything that Heathgrades did emanated from

20   the inventors, and I should accept that and use that to rule

21   against MDx on the summary judgment motion.  And just as I was

22   kind of poking at Mr. Stimpson, saying, Why should I -- why

23   should I leap from that lily pad to the next lily pad, I'm

24   saying the same thing to you, Why should I assume that

25   everything that was done in the summer -- spring and summer of

1    2005, particularly when I don't -- when we don't really have

2    it, in a way that I can hold or look at, or resort to, emanated

3    from the inventors as opposed to somebody else, and or why

4    shouldn't I just toss that to the jury?

5         MR. KOSTOLANSKY:  Because, Your Honor -- and I will

6    get to our interrogatory answer here in a moment, but I mean

7    that's the way in which many patents are developed in this

8    country, through employees who are -- who have the job

9    responsibility for developing something in this area that

10   emanates from the employer, and in the course of performing

11   their job responsibilities, they are acting in the course and

12   scope of their employment, others are, you know, reporting, you

13   know, to them, and they are the ultimate drivers of the

14   development and creation of the invention, hence their name

15   appears on the patent.  And so if we...

16        (Discussion off the record between Kostolansky and

17   Ms. Stoll-DeBell.)

18        THE COURT:  You know, I actually will let you speak.

19        MS. STOLL-DEBELL:  Well, I was just going to say that

20   the -- there's been no contention in this case that the

21   inventorship is not proper.  That it was anymore than the three

22   inventors, Mr. Neal, Mr. Mantra, and Mr. Hicks, or that it was

23   less than them.  We explain in our interrogatory response what

24   each of them did, in detail, and they all were deposed by MDx,

25   and went through, in detail, all of the different things that

1     they contributed to this invention.

2           If MDx thought they weren't correct, they could have

3     raised an invalidity defense based upon improper inventorship.

4     Either because there's too many or too few, and they did not.

5     If you look at what they are saying is used, it's all the exact

6     same things that these inventors said they invented, and so for

7     that reason, 102(a) cannot apply, because everything that

8     Heathgrades did came from the inventors.  That's what all of

9     the evidence says and there's no evidence to the contrary.

10          THE COURT:  Okay.

11          MS. STOLL-DEBELL:  Thank you.

12          THE COURT:  Wasn't that easier than writing those

13    cryptic notes to, Mr. Kostolansky?

14          MS. STOLL-DEBELL:  It was, but now I don't think I can

15    be quiet, Your Honor.

16          THE COURT:  Believe me I know how to make you be

17    quiet.

18          MR. KOSTOLANSKY:  So, Your Honor, let's go ahead now

19    and take a look and see how this applies, factually, with

20    respect to summary judgment.  So if we look at -- at Document

21    407, please, Nate, page -- page 34.  Let's go back and look at

22    this.  This is MDx's response in connection with this matter,

23    response, and in paragraph number 114, which is at page 34, MDx

24    states that, None of the website materials from Heathgrades

25    competitors was prior art.  Okay.  So now we have prior art

1    vis-a-vis Heathgrades' competitors off the board.  So since the

2    only prior art MDx relies upon to establish invalidity is this

3    supposed prior art of Heathgrades, then MDx may not, as a

4    matter of law, establish invalidity under section 102(a).

5              THE COURT:  Okay.

6              MR. KOSTOLANSKY:  That's all I have on 102(a),

7    Your Honor.

8              THE COURT:  Okay.  Mr. Stimpson, do you want to

9    retort?

10             MR. STIMPSON:  Yes, please, Your Honor.

11             THE COURT:  And I am assuming you are not limited by

12   not having your --

13             MR. STIMPSON:  No, I'm fine.  Thank you.

14             THE COURT:  -- paper?  I also assume you can quote it

15   as you roll out of bed in the morning.

16             MR. STIMPSON:  Not so sure about that, but ...

17   Your Honor, I loved your example of employees one, two, three,

18   four, five.  And in response to your question, Mr. Kostolansky,

19   you hit the nail on the head; that's exactly right.  Their --

20   underlying their argument is this massive umbrella of an

21   assumption.  They cite all of the right law, but they have this

22   huge assumption that what's in this prior art was done by these

23   three people and only these three people, and that's just --

24   you can't make that assumption, Your Honor.  The *Katz* case says

25   it.  In fact, the *Katz* case says that when you have prior art

42

 1   that has their name on it, even if there is an authorship, it

 2   does not raise a presumption that they are the prior art.  How

 3   you do that is they have to prove it.  It's their burden to

 4   prove.  It's -- it's -- I have quoted you the *Katz* case before,

 5   and all of the other cases say it.  They can't just come in

 6   here and say it, take our word for it, these three inventors,

 7   and only these three inventors involved the prior art.  They

 8   have to prove it, and that's all over the case law.

 9          THE COURT:  But if they do, you lose on the 102(a)?

10          MR. STIMPSON:  Yes.  Yes, Your Honor.  So Ms.--

11   Ms. Stoll-DeBell raised the inventorship issue.  Yes, we have

12   not raised inventorship as a defense in this case, but that's

13   not the point.  I mean, we have to pick and choose our

14   defenses.  We pick the best ones and leave some to the side.

15   That's not the point.

16          What I am contesting is that these three specific

17   people who are responsible for what's in the prior art, and we

18   have listed it as 102(a) art, and now they have to come back

19   and prove to us that those three specific people are

20   responsible for that, and they haven't done it.

21          Let me just show you one thing in the prior art,

22   Your Honor.  I mean, there's a lot of things that are prior

23   art, but here is one thing.  This is Exhibit H, the

24   Heathgrades --

25          THE COURT:  Hold on.  Okay.

43

1           MR. STIMPSON:  So this is one of the things that is

2    mentioned as prior art.  This is a Quality Guide Project Plan.

3    Okay.  And the subject line is Project Plan For Quality Guides.

4    Quality guides are part of the prior art.  It's been updated.

5    Who updated it?  Who is this from?  Janet Burkhard.  Your Honor

6    you will not find Ms. Burkhard's name in the inventor's list.

7    I mean, there's lots of other names here, not just five

8    employees, but lots of other people.

9           THE COURT:  Yeah.  And that doesn't move me a lick.

10   The fact that somebody sends an email about something

11   doesn't -- I mean, come on.

12          MR. STIMPSON:  I understand, Your Honor, but, you

13   know, it is there.  So here -- here is where the rubber does

14   meet the road, Your Honor.  It's their burden, that's the

15   bottom line.  I mean, if -- if I'm -- if this was going to be

16   an issue, if they raised this and contested 102(a), this is the

17   sort of thing we would be exploring though.  But they never

18   raised it.  So in discovery, I didn't take Ms. Burkhard's

19   deposition and ask her what she did.  But, I mean, I obviously

20   would.  There are several other people who are not inventors.

21   Same with the prior art.  But it wasn't explored, because they

22   never raised it.  It's their burden.

23          I'm sorry if that doesn't move you, Your Honor.  I

24   understand.  But the bottom line is it's their burden.

25          THE COURT:  I'm not saying that the burden issue

 1   doesn't move me.  I'm not saying it does.  I'm just saying

 2   somebody sends an email, anybody can send an email about

 3   something.  If I send an email about ... I don't know, the

 4   budget, it doesn't mean that I put the budget together.

 5        MR. STIMPSON:  I understand, Your Honor, but --

 6        THE COURT:  And of course I get it.  At least in your

 7   example, we're talking about an employee of Heathgrades;

 8   whereas, I'm just kind of a little bit rank nutty in suggesting

 9   that because an email would emanate from me, that would somehow

10   mean I was a member of Congress.

11        MR. STIMPSON:  I understand, Your Honor.  It just

12   comes down to the burden of proof, and it just hasn't been

13   satisfied here.

14        THE COURT:  All right.  You know, the fascinating part

15   about all of this is that I have been chasing you around the

16   room, and I want to make sure that I understand where you are.

17   We started with 102(b), and I said, Boy, I mean, the burden is

18   on you to show me some invalidity here.  How are you going to

19   do this with this ambiguous, mushy summer of 2005 reference?

20   And you said, Oh, well, I'm -- don't worry about that, because

21   102(a).

22        All right.  Let's assume I agree with you.  Let's

23   assume I say, you know what, you are right, I'm going to push

24   102(a) to the jury.  Why should I push 102(b)?  Because we got

25   to 102(a), again to use the analogy of me chasing you around

 1  the room, where I thought I had you in the corner, and you

 2  said, Oh, no, no, no, no.  Let's talk about 102(a), because,

 3  you see, this thing you are hung up on isn't really an issue

 4  under 102(a).  Assume I agree with you.  What about 102(b)?

 5  Let's get back in the corner.

 6          MR. STIMPSON:  Well, Your Honor, I -- I still think

 7  that 102(b) should go to the jury, and we did discuss this a

 8  little bit earlier, but we still have those two interrogatory

 9  responses, and I am not going to go back to Mr. Dodge's

10  testimony, because I know that isn't your favorite testimony

11  for my point of view.

12          THE COURT:  You can do it.

13          MR. STIMPSON:  But it's there, and also 102(b), if

14  they have -- they have got two interrogatory responses here.

15  We have been talking about that one on page 14 of the

16  interrogatory response, which says summer 2005, but there's

17  two.  The other says spring and summer of 2005.

18          THE COURT:  Do you have it?  There's so much paper

19  that I don't expect you to have it at your fingertips, I don't.

20  But if you do, I would like to see it, or if you can certainly

21  tell or ask Heathgrades ... look -- look at you.

22          MR. STIMPSON:  It's a little marked up, Your Honor.

23          THE COURT:  That's fine.  I can live with that.  Let

24  me see the top of the page, because I want to make sure I know

25  how to get back to it.  407-1.  Okay.

1      MR. STIMPSON:  Okay.  It's this paragraph that starts,

2   The patent-in-suit was filed in connection with.  Then go to

3   talk about these three different products.  The last sentence

4   says, Heathgrades began launching the first version of these

5   products in the spring/summer of 2005.  So it's spring/summer

6   2005 now when they were launching this, when they admit in the

7   same paragraphs the patents-in-suit were based on these

8   products that were being launched.  So when you combine that

9   with the other interrogatory response, which says the summer of

10  2005 as well for embodiments, it's at least enough to raise a

11  genuine issue of material fact, Your Honor.

12      You know, look, there's another kind of big-picture

13  thing I don't want to be lost here, Your Honor.  This has been

14  a heck of a battle for these years of discovery, and the reason

15  this is such a battle is because I'm not dealing with some

16  third party that I want to go get prior art from.  I didn't

17  subpoena to get this stuff.  The people who I have to get this

18  from, I'm forced to get this from, are Heathgrades' people, and

19  let me tell you, they don't love me.  They don't love MDx --

20      THE COURT:  You love them?

21      MR. STIMPSON:  Well, I will defer that question.

22      THE COURT:  Are you the spurn lover in all of this?  I

23  think that's a little much.

24      MR. STIMPSON:  The point is, Your Honor, is simply

25  this, everything I had to get was fought tooth and nail.  These

1    deponents, they knew that 2006 date so well.  They all knew it,

2    and they fought and they fought and they fought, and I am not

3    being critical of them.  They want to defend their patent.  But

4    it's not like it's some third party where I just go out and

5    subpoena them and they have got nothing to lose one way or the

6    other.  They are going to tell me what I need to know.  But I

7    have got this.  I have got two interrogatory responses which

8    said that they were doing this in the spring and summer of

9    2005.

10          THE COURT:  Said they were doing something.

11          MR. STIMPSON:  Well --

12          THE COURT:  Heathgrades began launching the first

13   version.  How does that version compare to the patent?

14          MR. STIMPSON:  Well, the patent is mentioned in the

15   first paragraph, Your Honor, the patent-in-suit in connection

16   with these products.

17          Now, Your Honor, between the two of those, though, I

18   mean, if that's not enough to survive summary judgment, when we

19   also have Dodge testimony, it's -- it's at least enough, when

20   you consider the fact of the people who are giving all of this

21   testimony are Heathgrades, and their trying their best to

22   defend their patent, that's at least enough to put this before

23   jury for 102(b).  It's at least enough for that.  I'm not

24   trying to get summary judgment of anticipation.  I'm just

25   trying -- I'm defending summary judgment.  All factual

1    inferences are mine.  Reasonable factual inferences are mine.

2         And so I think, Your Honor, that it should go to the

3    jury, because it does -- we have enough here between Mr. Dodge

4    and these two interrogatory responses to prove anticipation

5    under 102(b) as well as 102(a).

6         THE COURT:  Okay.  May have beaten this horse to

7    death, if Mr. -- Mr. Kostolansky, if there's anything else you

8    want to toss into the pool on this topic, I would be more than

9    happy to hear it from you.  Then I think we will take a break

10   and talk about inequitable conduct, because I think I want to

11   hear more about that than I do about obviousness.

12        MR. KOSTOLANSKY:  Your Honor, let me just wrap up with

13   a final little point on 102(b), and I think Your Honor was --

14   was getting there.  Can we put that screen shot back up.  Oh

15   yeah, go ahead Nate.  It's 107-1 -- I'm sorry 407-1.  I

16   apologize.  Page 21.  And, sir, here, in that paragraph,

17   Patent-in-suit was filed in connection with Heathgrades

18   development of various products.  And then we list these PNM,

19   HOM, POM.  I mean, those are all products that have been

20   previously referenced by MDx in their infringement contentions

21   and in their argument, regarding -- regarding liability here,

22   and they have not been able to show that any of those products

23   include comparison ratings of human healthcare providers

24   especially multiple healthcare providers contained in a report.

25   So to say that Heathgrades began launching the first version of

49

1    these products in the spring slash summer of 2005, really says

2    nothing with respect to the -- the issuance -- the issue

3    regarding when the patent -- patented product was first

4    utilized.

5          Now, with respect to 102(a), Your Honor, let me go

6    back -- back to that and address, just very briefly.  So the

7    patent is presumed to be valid.  Invalidity is an affirmative

8    defense.  We've heard from the other side that they want their

9    opportunity to prove that there were some other people involved

10   in this invention and somehow that makes it invalid under

11   102(a).  We disagree with that from a legal standpoint.  We

12   think that the example I gave regarding, you know, four and

13   five, and their publication of something would not be something

14   from the -- that would preclude patentability under 102(a).

15   But they are saying they have some argument about -- about

16   something else, and what these other people may or may not have

17   done.  If they think that's relevant, then that was teed up by

18   this motion.  They admit they didn't plead this as an

19   affirmative defense, because they had to pick and choose.

20   Well, they picked, they chose, and now they want to come back

21   and apparently re-pick, because this issue has been teed up in

22   the motion.  It's their burden of proof to come forward with

23   the facts that would create a genuine issue of material fact

24   here.

25          THE COURT:  And I understand, and let me just to --

50

1    your point is well taken, but let me just try and extend the

2    discussion a little bit.  I'm not saying it's correct or

3    incorrect, but the way I'm hearing it from MDx is, Look, our

4    burden -- you are right, you teed it up with this motion.  So

5    now the burden is on us to establish the invalidity.  We think

6    that these interrogatories and the Dodge testimony establishes

7    invalidity under 102(a) because Heathgrades was -- this was out

8    there being used in the public, because Heathgrades put it out

9    there.

10         You say, Wait, Heathgrades put it out there,

11   Heathgrades doing that is only really doing -- putting out

12   there those matters which were the product of the work of the

13   inventors.

14         MR. KOSTOLANSKY:  Correct.

15         THE COURT:  Their response is, we have met our burden.

16   If that's your position, now the weight shifts back to you, and

17   you can't knock us out because of something that you're

18   claiming by way of relationship between the inventors and what

19   was publicly out there on the website.  At least that's the way

20   I'm hearing it.  Am I hearing it correctly?

21         MR. STIMPSON:  That's exactly correct.

22         THE COURT:  All right.  So to some extent this burden

23   is a game of ping-pong, where it's kind of going back and

24   forth, and even if you are correct, in saying, Hey, it's all

25   teed up, what they're saying is, by virtue of the type of

51

1    response they made, it's almost a game of tag, you are it.

2    They have now tagged you, and the burden shifts back to you.

3           Now, again, I'm not saying right or wrong, I'm just

4    saying that's the way I hear this as, kind of, shaping up.  If

5    you want to respond to it, pound on it, show Mr. Stimpson some

6    love or whatever else you choose by way of an appropriate

7    response.

8           MR. KOSTOLANSKY:  I don't have much -- much else to

9    add, Your Honor.  We feel that this is an affirmative defense

10   and it's their burden to prove it.  We are not -- to extent we

11   are down into the narrows of the affirmative defense, I'm not

12   sure the game continues, at that moment.  I think once we enter

13   into the affirmative defense, they have the obligation to come

14   forward with evidence.  If they choose not to, that's -- you

15   know that's their choice.  Again, it's not something that they

16   pled.  It's not something that they conducted much discovery

17   with respect to.  They aren't sitting here holding Your Honor,

18   Jeez, I'm terribly sorry, we should have attached this

19   deposition transcript, we didn't.  It's something that they

20   didn't address, and so by virtue of not addressing it they

21   don't have any evidence today, and we think that seals the

22   issue with respect to a matter where the burden of proof has

23   shifted to them.

24          THE COURT:  Okay.  Let's take 15, then we will come

25   back.  I will tell that you I'm looking to inequitable conduct

52

1    before obviousness.  Obviousness is probably the most

2    straightforward of the arguments that's been kind of contained

3    in that motion, and so I'm not sure that my mind is helped by

4    poking at each of you trying to make sure I understand your

5    positions.  Okay.  We are in recess until ten of.

6         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

7         (Recess at 10:32 a.m.)

8         (In open court at 10:48 a.m.)

9         THE COURT:  Please be seated.  All right.  Inequitable

10   conduct.  Mr. Kostolansky, let me hear from you.

11        MR. KOSTOLANSKY:  Thank you, Your Honor.  To succeed

12   on its inequitable conduct defense, MDx bears the burden of

13   showing by clear and convincing evidence that Heathgrades made

14   a deliberate decision to withhold a known material reference.

15   And the elements of materiality and intent are separate

16   elements that both need to be satisfied under the clear and

17   convincing evidence standard by MDx.

18        And so how did we get to this heightened standard with

19   respect to inequitable conduct?  That's through the *Therasense*

20   decision from the federal circuit in 2011.  The circuit

21   determined, as we've referenced in our brief that this defense

22   had become an absolute plague on the courts and the patent

23   system, since the remedy is, as the Court describes it, the

24   atomic bomb, and unlike other defenses it could render a patent

25   entirely unenforceable.  Given those far reaching consequences

1    the Court in *Therasense* estimated that 80 percent of the

2    infringement cases included allegations of inequitable conduct,

3    that the doctrine has been overplayed, and is near -- and is

4    appearing in nearly every patent suit and cluttering up the

5    patent system.   The habit of charging inequitable conduct in

6    almost every major patent case is, as I said, an absolute

7    plague, with the charges being made against, you know reputable

8    lawyers, as the Court has observed on that -- that is the Court

9    in *Therasense* -- on the slanderous of grounds.

10          So the Court put that standard in place about clear

11   and convincing evidence, deliberate decision to withhold known

12   material references.   Now, to be material, the early healthcare

13   provider reports and services, as MDx has referenced them,

14   would need to be but-for material; that is, that the Patent

15   Office would not have allowed the claims had it been aware of

16   the undisclosed prior art.

17          Regarding intent.   Intent cannot be referred --

18   inferred from materiality alone.   The Court in *Therasense*

19   instructs, District Court may not infer intent solely for

20   materiality.   Instead, the Court must weigh the evidence of

21   intent to deceive in its analysis of materiality, proving that

22   the applicant knew of a reference or should have known of

23   materiality and decided not to submit it to the Patent Office

24   does not prove a specific intent to deceive.

25          The Court stated that under the clear and convincing

54

1   evidence standard, the specific intent to deceive must be the

2   single most reasonable inference to be drawn from the evidence.

3   When there are multiple inferences that can be drawn, intent to

4   deceive cannot be found.  So that's the standard and sort of

5   why we got here.

6           And so briefly, regarding materiality, as we've

7   discussed in our prior discussion regarding 102(a), and more

8   particularly 102(b), none of the prior art includes comparison

9   ratings of human healthcare providers contained in a report

10  comparing multiple healthcare providers as defined by

11  Judge Brimmer.  Accordingly, under -- and in fact nothing --

12  nothing references comparison ratings of human healthcare

13  providers in connection with the prior art.  Accordingly, under

14  the clear and convincing evidence standard, in connection with

15  this doctrine that's become a plague upon the system, there are

16  no genuine issues as to material fact regarding materiality,

17  and summary judgment should be entered in favor of Heathgrades

18  in connection with the inequitable conduct claim with respect

19  to the '060 patent.

20          But in this case, Your Honor, we even have additional

21  evidence as to why summary judgment should be entered in favor

22  of Heathgrades.  Because Heathgrades submitted a related

23  patent, the '471, which has been allowed by the Patent Office,

24  and that -- that process further confirms that under no

25  circumstance can MDx meet its burden of proof regarding

55

1     materiality.

2          The '471 contains the same base elements as the '060,

3     but is broader than the '060, in that it includes patent

4     protection for a device that includes comparison ratings of

5     healthcare providers, but the rating may be that only of a

6     single healthcare provider.

7          So if we look at -- a Document 673-1, pages five and

8     six, this sets forth -- Your Honor, this is a little short

9     summary from our brief.  I don't intend to, you know, to walk

10    through it, but this shows that --

11          THE COURT:  You can trot through it.

12          MR. KOSTOLANSKY:  I'm sorry?

13          THE COURT:  You can trot through it.

14          MR. KOSTOLANSKY:  This shows that the changes

15    between -- or the differences, I should say, between claim one

16    of the '060 and claim 38 of the '471 application are very

17    minimal, that the same base elements are in play, and therefore

18    the -- the prior art, to the extent that what we've been

19    discussing is prior art, it -- it would be the same.

20          So in connection with the 471, Heathgrades has

21    submitted the prior art that MDx contends should have been

22    submitted in connection with the '060.  This was done in

23    response to a request made by MDx's counsel, saying that issues

24    regarding inequitable conduct would arise in the future, if

25    Heathgrades did not do that.  So Heathgrades made the

1    disclosures requested, the Patent Office reviewed the

2    disclosures and noted expressly, in the Patent Office review,

3    that the documents at issue had been, quote, considered, closed

4    quote by the -- by the PTO.

5        So if we look at document three -- I'm sorry 738-1, at

6    page 17, this is the submission to the Patent Office, we see,

7    from the upper portion, that -- that the -- that the

8    contentions regarding -- that MDx has raised regarding prior

9    art, these various physician quality comparison report, nursing

10   home quality report, these were submitted to the -- the Patent

11   Office in connection with the '471.  We will see, also, that

12   the Patent Office did not consider a specific reference to a

13   GeoAccess rating, because it noted at the end of the page the

14   examiner, Trang Nguyen noting that, All references considered

15   except where lined through, T.N.  And that confirms that the

16   prior art referenced by MDx was considered.

17       In addition to that, at page eight of the submissions

18   considered by the patent examiner, we see that MDx's

19   opposition to this motion, some 200 pages, and that's docket

20   406, and Docket 407, some 300 pages submitted by MDx was sent

21   to the Patent Office and considered by the patent examiner.

22       We also see at page ten, that that Dr. Cooper's report

23   was -- was -- MDx's expert was submitted to the Patent Office

24   and considered.  As well as MDx's supplemental invalidity

25   contentions, which is 60 pages, submitted September 17th, 2012,

1    was considered by the -- by the patent examiner.

2         If we go to page 18, we see that the Drucker Report

3    was also considered by the -- the patent examiner in connection

4    with her review.  After all of that work and effort, the patent

5    examiner determined that the '471 should be allowed.

6         In such a circumstance, Your Honor, it cannot be said

7    that the prior art in connection with the '060 was -- was

8    but-for material, under a clear and convincing evidence

9    standard.

10        Now, MDx contends, however, that Heathgrades buried

11   information provided to the PTO.  And it's difficult to fathom

12   the concept when the patent examiner indicates that something

13   has been considered by them in connection with their -- with

14   their work; but be that as it may, that is MDx's contention.

15        We believe, Your Honor, that the case law supports the

16   proper position that where information has been considered by

17   the patent examiner there can be no inequitable conduct.  In

18   the *Parkervision v. Qualcomm* case, a January 22d, 2013

19   decision, from the Middle District Court of Florida, 924, F.

20   Supp. 2d, 1314, the Court notes that, One cannot assume that a

21   patent examiner is an ignorant rube who is easily mislead by

22   attorney argument, hyperbole or understatement.  The cases MDx

23   cites in its brief -- supplemental brief regarding inequitable

24   conduct those -- those cases, Your Honor, are -- are cases that

25   were decided prior to *Therasense*, three of the four, and one of

1    those cases the Court noted in the -- in the *Mullins* decision,

2    that the examiner initialed each reference indicating his

3    consideration of the stain, and stated that he considered all

4    of the cited prior art.  Absent proof to the contrary, we

5    assume that the examiner did consider the references.

6          The one case where a motion to dismiss was not granted

7    on inequitable conduct, the Court expressed scepticism about

8    the claim, noting that they would see whether it would survive

9    a motion for summary judgment.  This is the *Sincore* case, cited

10   by MDx.  But there also, the other side had asked the plaintiff

11   to submit a particular reference to the examiner and the

12   plaintiff had declined to do so.  And also in that -- in the

13   *Sincore* case, the claims that were ultimately allowed were

14   broader than -- than the -- than the -- than they were at the

15   time the act -- the examiner considered the underlying prior

16   art.  So that made that case different, in the eyes of the

17   Court there.

18         We think, Your Honor, that there is a -- a -- a trend,

19   supporting the *Therasense's* decision, to apply Therasense's

20   standards firmly in connection with allegations of burying, in

21   that there's a new case that came out July 30th, 2013, it's

22   *Seaboard International*, in there, there were allegations of

23   burying material within -- prior to the Patent Office, and the

24   Court describes this *Mullins* decision and then they talk about

25   there a later federal circuit case held that, An applicant

1    cannot be guilty of inequitable conduct if the reference was

2    cited to the examiner, whether or not it was grounds for

3    rejection by the examiner.  And then citing another case, When

4    a reference was before the examiner, whether through the

5    examiner's searching the applicant's disclosure, it cannot be

6    deemed to have been withheld from the examiner.  And then the

7    Court concludes that, In light of these cases several District

8    Courts have held that alleged burying of material information

9    in a long list of citations to the PTO by itself is

10   insufficient to state a claim for inequitable conduct.  And

11   here we have -- we are even one step beyond that, because the

12   information was, in fact, considered by -- by the -- the patent

13   examiner.

14        We also cited, Your Honor, in our supplemental brief,

15   that was filed yesterday, at page five, several cases where the

16   Court excludes evidence regarding the PTO and -- and whether

17   the PTO did its job, because the presumption is that a patent

18   upon issuance is valid.

19        So those cases, the *DNT, LLC* case, again cited at page

20   five says, Precluding as inappropriate anything tending to

21   disparage the patent or trademark office.  In another case,

22   *Applied Materials* excluding as inappropriate testimony about

23   overwork, quotas, awards or promotions at Patent Office, or the

24   number of patents that issue annually, or insinuating that the

25   Patent Office did not do its job properly.

1          So, we believe, Your Honor, that based upon the

2    evidence presented with respect to but-for materiality, and

3    applying a clear and convincing evidence standard, that summary

4    judgment should enter in favor of Heathgrades in connection

5    with the inequitable conduct defense.

6          And the same is true, Your Honor, with respect to the

7    separate element of intent to deceive.  Here Heathgrades has

8    submitted undisputed material facts in its brief, 61 through

9    63, which are admitted by MDx, which confirm that Mr. Neal

10   testified that he did not think the alleged prior art was

11   material to patentability, because the prior art does not

12   disclose comparison ratings of human healthcare providers, thus

13   a specific intent to deceive cannot be the single most

14   reasonable inference to be drawn from the evidence regarding

15   what Heathgrades submitted to the Patent Office in connection

16   with the '060.

17         And again, the '471 now provides another secondary

18   overlay with respect to the specific intent to deceive element,

19   because there's no intent to deceive when the PTO has the

20   information in connection with the '470, considers the

21   information and allows the patent.  Thus, for this additional

22   reason, Your Honor, we believe that summary judgment should be

23   entered in favor of Heathgrades in connection with the second

24   prong of the inequitable conduct test, both of which must be

25   met; this one the specific intent to deceive.  Thank you,

1    Your Honor.

2         MR. STIMPSON:  Thank you, Your Honor.  First of all,

3    just addressing the case law he cited, every time inequitable

4    conduct is alleged against a patent holder, about how, This

5    being a plague.  It's over plagued it's not --

6         THE COURT:  I get it.

7         MR. STIMPSON:  I just want the Court to know that I

8    don't.  I don't perpetuate that plague.  I don't think -- it's

9    been years since I have asserted inequitable conduct.

10         To -- under Therasense, page 1209, we need to prove

11    that the inventors new reference, they knew it was material,

12    and they made a deliberate decision to withhold it.

13    Mr. Kostolansky is right, there's two separate elements now,

14    there is materiality and intent.  I will address materiality

15    first.

16         We've had all of this supplemental briefing,

17    Your Honor, about the '471 application and its prosecution

18    history, and we, obviously, have a very different view of what

19    happened there.  We know that not all of the deposition

20    testimony, which was relied on as state-of-the-art, which was

21    not submitted to the patent trademark office, and we think that

22    the way they scattered things, there's just no way the examiner

23    could have picked up on it.  But this also relates -- this is

24    intimately intertwined with two other parts of the summary

25    judgment motion, that's the anticipation and the obviousness

62

1    part.  You know how strongly we feel about our invalidity

2    defenses, Your Honor.  But if this Court leaves even a little

3    bit of that invalidity argument for the jury, then I can't see

4    how summary judgment can be granted on the materiality issue;

5    and the reason is that if this jury finds even one claim to be

6    invalid over that prior art, then that prior art is material as

7    a matter of of law.

8         And I am referring to the *Therasense's* case,

9    Your Honor, and the reason that's the case, before I get there,

10   is that we have higher burden here.  We have clear and

11   convincing evidence; whereas, in the Patent Office they take --

12   and we have our claim constructions, in the Patent Office they

13   take the broadest reasonable interpretation, and they only have

14   a preponderance standard for invalidity.  So that's why if this

15   jury finds even one claim invalid, based on that art, it is

16   material, period, as a matter of law.  *Therasense's* page 1292,

17   if a claim is properly invalidated in District Court, based on

18   the deliberately withheld reference, then that reference is

19   necessarily material.

20        *THE COURT:*  And again, I'm not saying I disagree with

21   you.  I think I want you to educate me, because I -- I might

22   consider myself, what was the phrase, Mr. Kostolansky, the rank

23   buffoon?

24        *MR. KOSTOLANSKY:*  Rube.

25        *THE COURT:*  I might consider myself to be the rube

1    here.  I could see a scenario -- let's just hypothetically say

2    that I accept your position, where it's, Look, we don't have

3    the prior art.  I can't put it in a box.  I can't show it to

4    you.  I can't display it, but I can tell that you there was

5    something out there, and I am going to let the jury decide, on

6    the basis of an interrogatory answer, whether that something

7    was or wasn't sufficient to constitute prior art that was

8    anticipated.

9            All right.  Let's say the jury agrees with you.  They

10   say, Well, we don't know what it is either, but we don't like

11   the smell.  Why does it mean, since we don't have a "thing"

12   that I can give, why does it mean that I should conclude that

13   there is -- what is it that you would have expected them to do

14   by way of giving something to the Patent Office?  If we were

15   dealing with a scenario where the prior art was an article, a

16   piece of paper, a machine, something like that, the connection

17   that you are drawing makes perfect sense to me, which is, if a

18   jury said this thing that I hold in my hand is prior art, then

19   this thing should have been given to the Patent Office, and the

20   Patent Office perhaps would have concluded that they wouldn't

21   have issued the patent, and therefore it's material.  But when

22   there is no "thing", and we're just kind of dealing with these

23   squishy concepts, that I can't physically touch, what is it

24   that you would have had them do at the Patent Office?  Say,

25   Well, we were practicing something, and then let the Patent

1    Office deal with that, and it's material, because they would

2    have come to the conclusion -- I'm not tracking.

3            MR. STIMPSON:  Well, there's two different things

4    here, Your Honor.  I mean, we talked about anticipation, this

5    morning.

6            THE COURT:  Right.

7            MR. STIMPSON:  And that's the one where we have the

8    Heathgrades website, and I can't hand you a specific document,

9    but we have lots of specific documents.  We have the Drucker

10   Report.  We have the nursing home reports.  We have the quality

11   reports.  They are all in Dr. Cooper's report.  They are all

12   submitted as exhibits.  Those are all great prior art.  And

13   while none of them have human healthcare comparison ratings,

14   they are still great prior art, and they are the basis for the

15   obviousness defense, and so the answer to your question,

16   Your Honor, is, Give those to the Patent Office, and give those

17   to the Patent Office in a way that's not splintered.  And it's

18   not enough, Your Honor, to just give them this particular --

19   these particular claims.  It's not enough to just give them the

20   Drucker Report, for example.

21           The way that this renders it obvious, is because you

22   combine it with all of this deposition testimony.  Well, what

23   was the source for these data elements?  Because the claim says

24   they have to come from the healthcare provider.  What was the

25   source for this data?  Because this one has to come from the

65

 1   website of the person practicing it, and it has to come from

 2   patients.  What was the source of this stuff, that the claim

 3   says it has to come from third parties?  It's not enough to

 4   just randomly give them these documents.  Dr. Cooper ties them

 5   together.  And he says, Look, okay, here is Drucker Report.

 6   And here is the testimony of all of these Heathgrades'

 7   witnesses saying that the right elements were coming from the

 8   right sources.  So what Heathgrades did, in this '471

 9   prosecution, which has different claims, but what Heathgrades

10   did, was they gave the report of Dr. Cooper.  They gave it by

11   itself.  They didn't give the prior art with it.  They didn't

12   give any of the deposition testimony with it.  And in other

13   information disclosure statements, they disclosed pieces of

14   what he relied on.  They never did anything to tie it together,

15   and there was some deposition testimony, they just did not give

16   the examiner at all.

17          So how do you satisfy your duty to candor?  You give

18   the -- possibly, you give the -- like the Cooper report, with

19   the prior art, with the deposition testimony, where it's all

20   nice and neat and tied together, and not buried under 11,500

21   other pages.

22          And what about the anticipation?  They can do that

23   too, Your Honor, and that was before the Patent Office, but it

24   was in those interrogatory responses.

25          The interrogatory responses, themselves, were -- I

66

1   don't know, they were like number 221 of three-hundred

2   something, and then even if you get there, you have to go to

3   that page five, find that one sentence, and page 14, and find

4   that one sentence.  The Patent Office Manual Patenting

5   Procedure says if something has been pointed out to you as

6   being particularly relevant, you have got to highlight it, and

7   you don't submit long lists of irrelevant stuff so that you

8   can't -- you know, because otherwise it's not going to be

9   found.  They didn't do that.  They didn't follow the rules in

10  the Patent Office.  They buried all of this stuff.  They didn't

11  highlight any of it.  And one thing Mr. Kostolansky didn't

12  explain to you, Your Honor, is why were all of these documents

13  submitted?  Why were they submitting our motions to restrict

14  from this case?  Or, motions for scheduling changes?  Motions

15  for extensions?  Motions to compel?  Interrogatories and

16  document requests, without any answers?  Thousands and

17  thousands and thousands of pages.  Their expert told me no.  I

18  have never relied on anything like that before.  They never

19  showed me that stuff.  And Mr. Scull, their patent prosecution

20  attorney said basically the same thing.  He couldn't remember

21  when he has ever had, in his thousands of applications, he has

22  touched, where any of that stuff has been submitted.

23          So, Your Honor, it was just impossible for this

24  examiner you know, to -- to maybe put it this way, this motion,

25  I don't know, maybe has a hundred pages, maybe 200, and it's a

1    burden to get through everything.  I'm sure it is.  But imagine

2    the examiner having 11 to 12,000 pages dumped on her desk.  She

3    doesn't have anybody to help her.  You know, no clerks.  She

4    doesn't have anybody to help.  She has no briefs pointing her

5    to the specific parts.  Boom, here you go, here is the

6    50-something claims, where the one relevant one is number 38,

7    that's no coincidence, but the one real one is number 38, and

8    here's the 11, 12,000 pages.  See if you can find something

9    relevant.  Meanwhile, in those 11, 12,000 pages, the stuff we

10   are relying on is scattered.  And the lists they give, they

11   don't list the prior art references, by the same numbers that

12   see our expert report relied on.  The deposition numbers.  They

13   change it to the trial exhibit numbers.  So even if the

14   examiner finds the Cooper report, turns to page ten, okay, here

15   is where this element of the claim is found, goes to deposition

16   Exhibit 8 or 13, she could search that list for the rest of her

17   life, she wouldn't find that, because it's not listed there

18   like that.

19        It just doesn't pass the fishy-smell test, Your Honor.

20   And the examiner could never have understood the art the way

21   that we understand it.  It just wasn't submitted to the

22   examiner like that.

23        But, Your Honor, I mean, the way I look at it, I think

24   from this *Therasense's* case, if there's -- the one thing on

25   this materiality issue, and I will come back to it, is that if

1   the jury just finds that one claim is invalid based on this

2   art, it is material.  It is material.  It's not a question

3   whether you get past summary judgment, it is material.

4        THE COURT:  Why is that not a proposition that says,

5   Never ever grant this motion?  Because I'm never going to know

6   what a jury is going to come back on, and so you could say,

7   Well, because -- if a jury finds something invalid, then that

8   means it's material, so therefore, until you know whether or

9   not the jury comes back and says it's invalid, you can't grant

10   summary judgment.

11        MR. STIMPSON:  Not on the materiality issue.  I think

12   that's correct.  There's intent issue, as well.

13        THE COURT:  So you never do it.  A judge can never

14   grant summary judgment on inequitable conduct because he or she

15   doesn't know what the jury is going to do.

16        MR. STIMPSON:  Well, Your Honor, if it's going to the

17   jury, then I don't see how a judge could grant it on the

18   materiality issue, because this is what the Federal Circuit

19   says.  I mean, if a claim is -- this is a quote from the en

20   banc Federal Circuit, if a claim is properly invalidated in

21   District Court, based on the deliberately withheld reference,

22   then that reference is necessarily material.  So I can't read

23   that any other way, Your Honor, than to answer your question

24   that you are absolutely right.  If this prior art is going to

25   the jury, and there's still a chance that the prior art is

1   going to be used to invalidate the claim in District Court,

2   then, no, you cannot say that it's not material.  You can't.

3          THE COURT:  Even if I allowed this fuzzy,

4   behind-the-frosted-glass website, then I should find that

5   that -- whatever it is, should have gone to the patent

6   examiner.

7          MR. STIMPSON:  If it goes to the jury, Your Honor --

8   first of all, I don't want to get -- I don't want to get

9   sidetracked, understanding that's the only --

10          THE COURT:  I understand that.  Believe me, I

11   understand that.

12          MR. STIMPSON:  Okay.  All right.  There's so much

13   more.

14          But the answer is yes, Your Honor.  If that goes to

15   the jury, then I can't see how -- and there's a chance a jury

16   is going to come back and say, Yeah, that's right, when

17   Heathgrades said that they were doing this in 2005, it's prior

18   art.  It's anticipated.  It's done.  If there's a chance the

19   jury in this District Court is going to come up with that

20   conclusion, then, yes, the answer to your question is yes, that

21   means it must be material, it must be.  I think that's the way

22   I read *Therasense*.

23          THE COURT:  Okay.

24          MR. STIMPSON:  So the second element, Your Honor -- I

25   will turn on to the intent issue.  You can infer intent from

1    the circumstances, of course, indirect and circumstantial

2    evidence.  You know, you are never going to have that smoking

3    gun, ever.  Nobody is ever going to say let's dupe the Patent

4    Office and put it in a memo.  Just doesn't happen.

5          So you look at the surrounding circumstances.  Look at

6    the circumstances we have here, Your Honor.  At least from our

7    point of view, when it's anticipatory, but if it's not

8    anticipatory, it sure is obvious, because at everything, except

9    for that one element, which was taught in the same prior art,

10   so it is great prior art, every one of these inventors knew of

11   every piece of prior art.  I asked them about it.  Every one of

12   these inventors knew what this prior art showed.  Every one of

13   them.  And every single piece of prior art that we are relying

14   on was withheld from the Patent Trademark Office, while these

15   inventors gave the Patent and Trademark Office other prior art

16   that wasn't even in the same ballpark.

17         And then here is the killer, Your Honor, to me.  They

18   made these arguments to the Patent and Trademark Office.  I

19   mean, who does that?  You go before this governmental agency,

20   the agency says, You can't have -- you know, they make their

21   rejections, and the inventors come back and say, No, no, no,

22   no, that prior art Mr. Examiner that you are relying on, that

23   doesn't have this element of healthcare provider verified

24   information.  You can't rely on that to invalidate our claims.

25   You have to allow our patent.  The whole time all of them know

71

1    that they are doing it in the prior art, and they don't tell

2    the patent examiner.

3         And that didn't happen once, with one claim element.

4    Didn't happen twice or three times or four times or five times.

5    It happened nine times with nine different claim elements.

6    Nine times.  Nine different elements.  How do you do that?  How

7    do you go before the examiner and say, you got to allow my

8    patent, because that prior art there, that doesn't have that

9    element, that element, that element, or that element or that

10   element; the whole time you know exactly what you are doing in

11   the prior art, and you never tell the examiner.  I mean, what

12   other conclusion can be drawn from that?

13        So, Your Honor, inequitable conduct is a disfavored

14   defense, I understand that, and *Therasense* has made it a lot

15   harder, but this one is a good one.  I mean, because it's not

16   somebody else's prior art, somebody can say, it was buried in

17   my file somewhere.  It's their own prior art.  They all knew

18   it.  They all knew exactly what it was, and they all let that

19   patent examiner issue those claims, by making arguments that

20   the prior art didn't show what they all knew their own prior

21   art showed.  That's intent.

22        So respectfully, Your Honor, this part of the summary

23   judgment motion should be denied.

24        *THE COURT:*  Okay.

25        *MR. STIMPSON:*  Thank you.

1          MR. KOSTOLANSKY:  Your Honor, let me start with the

2     proposition that the Court addressed, and the other side's

3     contention that, Well, if the jury holds that one claim was

4     invalid, a particular piece of prior art had not been disclosed

5     then that would somehow be err for the Court to grant summary

6     judgment in connection with the inequitable conduct claim.  And

7     I think -- I think Your Honor is right, that that argument made

8     by the other side would apply in every case.  *Therasense*,

9     itself, is designed to narrow something that has become a

10    plague in the system.  So if *Therasense*, as the other side

11    reads it, has this big gigantic hole in it that would preclude

12    the entry of summary judgment, which it doesn't, then, in

13    essence, the Court in *Therasense* didn't succeed in doing what

14    it told us it was doing; namely, narrowing the field.  So the

15    Court in *Therasense* has instructed that under the clear and

16    convincing evidence standard, the District Court judges should

17    apply the -- the tests pertinent, determine whether there was

18    any materiality with respect to anything withheld, and whether

19    there was an intent to deceive, recognizing that the other side

20    has a clear and convincing burden of proof to meet, apply that

21    test, call the ball or a strike and move forward.  And in this

22    case the ball or strike should be called in favor of entering

23    summary judgment, because when we go back and look at the -- at

24    the '060, and the other side is saying, Well, jeez, there

25    wasn't this deposition testimony, there weren't these

73

1    interrogatory answers, what about Dr. Cooper?  None of those

2    things existed at the time the '060 application was filed.

3           So the real issue is what would the true prior art,

4    the written manifestations, the pieces of paper, what impact

5    would that have had on the -- the patent examiner in connection

6    with issuing the '060, and the answer is it wouldn't have had

7    any impact whatsoever, because the patent examiner in the '471,

8    which has all of the same base elements, had all of those

9    pieces before it, in -- in neatly assembled piles, and that

10   there were -- they were submitted on two occasions to the

11   Patent Trademark Office.

12          These people who serve as patent examiners are

13   experienced.  They know what they are going to look for.  They

14   are going to focus on what was state of the prior art; that is,

15   the hard documents that are -- that are before them.  All of

16   those were submitted.  And in this -- in the case of the 407 --

17   '471, not only did MDx get the -- the understanding that those

18   documents were submitted, but MDx got to submit its own

19   argument through the submissions that it requested that

20   Heathgrades make, regarding its summary judgment briefing,

21   regarding Dr. Cooper, regarding its interpretation of various

22   bits of deposition testimony and interrogatory responses, and

23   the patent examiner, you know, still concluded that -- that the

24   patent should issue and was not invalid, based upon prior art,

25   and now all they want to do is come here and run the patent

1    examiner through the wringer, when she says that she was the

2    one who considered this documentation and she assigned her

3    verified statement confirming that -- that she did so, and

4    that's why many courts will not allow evidence to come in to

5    say the patent examiner didn't do what they said they did.  The

6    patent examiners are immune from testimony.  Can't come to

7    testify before the Court.  The record is what the record is.

8    They've said that they have considered those things, and -- and

9    the Court should not, on this state of the record, in any way,

10   question what the patent examiner did, and what that means

11   vis-a-vis the '060 in terms of the patent examiner's actions

12   with respect to the -- the '471.

13          And with respect to this assertion that nine times the

14   inventors went to the patent examiner and did thus and such

15   untoward things, well, the inventors did no such thing,

16   Your Honor.  Heathgrades is represented by Merchant and Gould,

17   a reputable firm, in connection with the prosecution of the

18   '060 and '460, with Mr. Scull, who is in the courtroom here

19   today.  Mr. Scull was involved in appropriate communications

20   with the Patent Office, has made -- you know, made the

21   submissions, and there's nothing improper, whatsoever, that

22   should, in any way, call into question whether summary judgment

23   should be entered in favor of Heathgrades.

24          Contrary to the other side's assertions, the patent

25   manual doesn't say that Heathgrades has an obligation to

1    highlight certain things to the patent examiner.  Heathgrades

2    presented the record, presented documents that the other side

3    requested be submitted, and this is all submitted to Your Honor

4    by analogy to confirm that with respect to the '060, the clear

5    and convincing evidence standard that the other side is

6    required to meet for inequitable conduct, cannot be met.  Thank

7    you, Your Honor.

8          THE COURT:  Okay.  Don't leave.  You can change your

9    book, but if you want to talk about obviousness.

10          MR. KOSTOLANSKY:  Okay.  I will.  Give me one moment,

11    Your Honor.

12          THE COURT:  That's fine.  Frankly, if I'm recalling it

13    correctly, the reason I pushed obviousness to the third place,

14    if you would, is that, essentially, what you are saying to MDx

15    is that, You need to tell us if it's common sense, or you need

16    to -- you need to be more precise and explicit why it's

17    obvious, and you have not done so, and therefore you don't get

18    to raise an obvious defense, and having an expert merely say

19    it's obvious is insufficient, and it's conclusory.  And I may

20    be reducing all of your pages down to a paragraph, but that's

21    the guts of what I see it as being.

22          MR. KOSTOLANSKY:  That's the essence, Your Honor.

23          THE COURT:  All right.

24          MR. KOSTOLANSKY:  We've taken the -- you know, the

25    factors that effect obviousness and level of skill in the art,

1    we have noted that it's a lower -- lower level of skill in the

2    art is what we've pled, and the case law confirms that when

3    that is what's, you know, what's applied, that -- that -- that

4    there is a lesser likelihood of establishing obviousness.

5    We've provided information regarding the scope and the content

6    of the prior art.  Talked about the fact, you know, back from

7    1994 this particular device, invention, could have been put in

8    place, had someone been able to invent it.  Yet there's no

9    evidence that anyone even conceived of the claimed invention

10   until -- you know, until Heathgrades did.  And then we've gone

11   through our -- our secondary considerations of non-obviousness,

12   and I could -- and I could go through those now, but I can tell

13   Your Honor is -- has -- properly has the issue framed.  In

14   other words --

15          THE COURT:  I like that.

16          MR. KOSTOLANSKY:  We have teed up our issues.  We have

17   alleged why we -- what the evidence is regarding

18   non-obviousness, and we think they have not.

19          THE COURT:  And let me just kind of come back to you

20   with -- don't take -- I have said this to people before.  I

21   have a bad issue with body language, and sometimes people take

22   it as unwillingness to hear what they say.  What -- what they

23   want to say.  I -- don't take my facial expressions as meaning

24   that.  I want you to have the opportunity to tell me whatever

25   you want to tell me, but what I think I'm going to hear from

1   MDx is fairly simple, and that is this, Hey, if you can rate

2   doctors -- excuse me -- Hey, if you can rate hospitals, doesn't

3   take a brain surgeon or rocket scientist to say, Hey, you can

4   rate the people that work in the hospitals too, and that's

5   enough -- and that degree of common sense, obviousness, you

6   know, I don't know what you want us to say.  I mean, I find it

7   a little amusing, but it's only in a very twisted way that I

8   find it amusing, that each of you swap horses constantly.  What

9   I mean by that is, you are saying to them, You need to tell us

10  more, and of course on different issues, on different claims

11  they are saying, You need to tell us more, or perhaps You need

12  to tell us less or You need to reorganize it.  The gist of what

13  they're -- I'm assuming their position is, and I suppose I'm

14  asking you if you want to add something to it, is, this is no

15  more complicated than a device that measures the height of men

16  being applied to thereafter to the height of women.  If you can

17  measure a guy, you can measure a gal.  What's so difficult

18  here?  And I also recognize that the teaching in the -- in the

19  marketplace may have been against it.

20          *MR. KOSTOLANSKY:*  Yes.

21          *THE COURT:*  And so I'm not -- I'm not trying to weigh

22  in on the ultimate issue here, but in the context of summary

23  judgment motion, grossly oversimplifying it, and I emphasize

24  the grossly oversimplifying it, MDx's position is, Oh, come on,

25  give me a break, it's obvious as it can be.  What are you

1    talking about?  And you are saying, No, you need to tell me

2    why.  And I --

3            MR. KOSTOLANSKY:  I think that's their burden to come

4    forward with the whys.  Whether it's, you know, through

5    secondary considerations.  Whether it's through scope and

6    content, you know, of prior art.  Whatever it is, you know,

7    those elements are -- are laid out, and it's their obligation,

8    as we have, to tie the elements back to non-obviousness or in

9    their case obviousness.  And we think simply saying, ipse

10   dixit, it's obvious, is an insufficient basis upon which expert

11   testimony can be offered, especially when -- it's not like we

12   are dealing with just comparison ratings.  There are other

13   features here.  Other elements of the patent.  And so there's

14   sort of the combining of -- of these elements to create the

15   patented device.  And there's -- there's an obligation to

16   provide expert testimony as to why these particular elements

17   should be combined in the way they are.  Why they contend it's

18   obvious to do so, and there's been no -- no -- no testimony

19   from their expert about how that is all pulled together, and

20   why that would have been obvious, and why there was a

21   motivation or would have been a motivation to a person of

22   ordinary skill in the art to do so.

23          So those are the things, you know, that are lacking

24   here, and that's what we've raised.

25          THE COURT:  Okay.  Mr. Stimpson.  You don't have a

79

1    plane today, I assume?

2         MR. STIMPSON:  No.  New York is under the weather

3    again, so no.  I lost my important piece of paper, somehow,

4    between when I sat down and when I ...

5         No.  I had to change my flight to Friday, because I

6    was stuck here for several days last time, and at least a day

7    this time.

8         On obviousness, Your Honor, this is again a little bit

9    of deja vu, and I have not had the chance to really research

10   this issue of law of the case issue, but as I was preparing

11   this, I mean, it was all so familiar, and the reason is that in

12   that *Daubert* motion, on Dr. Cooper, they made exactly the same

13   argument; the obviousness is conclusory.  And that motion,

14   along with our *Daubert* motions were denied.

15        So I think the question of whether it's too conclusary

16   has been resolved.  Now, I don't remember the law on law of the

17   case well enough to say whether that means it should be law of

18   the case, but I think it does.

19        At any rate, Your Honor, we have in --

20        THE COURT:  For whatever it's worth, that's not

21   very -- the first issue, while intellectually stimulating, is

22   just really not very convincing to me, so.

23        MR. STIMPSON:  You mean the law of the case?

24        THE COURT:  Yeah.

25        MR. STIMPSON:  Well, then that's -- I will just

1    qualify, because I didn't study it.  I didn't have a chance.

2    But in any event, Your Honor, um, what we're dealing with here,

3    inequitable conduct have to deal with *Therasense*, which is bad,

4    but obiousness I get *K.S.R.*, which is very good for

5    obviousness.  That is the background to everything; *K.S.R.*,

6    here.  You know, what Heathgrades is really asking you to do,

7    Your Honor, is to foreclose this.  Dr. Cooper has two or three

8    pages on obviousness, and he explains how the prior art taught

9    that you could compare ratings of healthcare providers, just

10   like you said, Your Honor, it's like if you use something to

11   measure a man, why can't you use it to measure a woman.  It's

12   the same or the of obviousness.

13        So they want you to foreclose that type of analysis

14   that Dr. Cooper wants to make.  But the very first point of the

15   United States Supreme Court, in that *K.S.R.* case, this is under

16   section two, where they start talking about obviousness,

17   Throughout this courts, the Supreme Courts, engagement with the

18   question of obviousness are cases set forth an expansive and

19   flexible approach.  It's an expansive and flexible approach.

20   Obviousness is always done like that.  There's no rigid

21   guidelines.  And if you don't use the word commonsense, that

22   doesn't mean you can't convey the same concept.

23        And this goes, sort of, your point, Your Honor,

24   another good point in the *K.S.R.* case, if a person of ordinary

25   skill can implement a predictable variation, 103 likely bars

1    patentability.  What is this, if it's not a predictable

2    variation?  Here's some healthcare providers, you take their

3    ratings and you put them together so you can compare them and

4    here's some others.  Could you maybe put them together and

5    compare their ratings?  It's just a predictable variation.

6            Lastly, before I get into the meat of our obviousness

7    defense, Your Honor, page 420 of *K.S.R.*, Common sense teaches

8    that familiar items may have obvious uses beyond their primary

9    purposes.  So it's predictable various.  Common sense.  That's

10   all we're talking about here.  With that background,

11   Your Honor, Dr. Cooper's report is relatively clear on this,

12   and I am not going to -- it's there.  It's in the record.  I'm

13   not going to belabor reading lots of it, but the bottom line is

14   it's -- the concept is that these early Heathgrades reports and

15   services showed this idea.  They showed the idea.  Take

16   healthcare providers and take their ratings and put them

17   together so that you can compare their ratings.  And that's

18   like as obvious as it gets, that you can do the same thing for

19   different types of healthcare providers.  And Dr. Cooper has

20   several statements about addressing common sense.  He doesn't

21   use the words common sense, I grant you that, Your Honor, but

22   it's the same concept.  That's all right there in his expert

23   report.

24           Plain and clear teachings, that any person of ordinary

25   skill would understand the ratings of healthcare providers

1    could be shown for side-by-said comparisons, that's what's in

2    this prior art.

3            Second, Your Honor, I don't need to rely on only my

4    own expert, I can rely on their expert here too, because they

5    are in a bit of a pickle, because they have to show, for this

6    102(b) issue, that they are entitled to this provisional

7    application date.  Well, that provisional application, that's

8    the February 2006 one, they are trying really hard to rely on

9    that.  But the only way they can rely on that, the law says, is

10   you have to show there's -- I can't remember the exact words --

11   but it's clear, precise, and exact teachings of the claims.

12   That provisional application, unlike the prior art that

13   Dr. Cooper is relying on, has no teaching of comparison ratings

14   of healthcare providers, not even hospitals.  But their expert

15   Dr. Greenspun says, No, that's plenty, because you can just

16   rely on the knowledge of a person of ordinary skill in the art.

17   Pages 180 to 181 of his deposition, I asked him, So for a

18   reference to teach comparison ratings, would it need to use the

19   word comparison ratings or show comparison ratings in a figure?

20   Let's take 2004, 2005 for a reference to teach comparison

21   ratings.  Would it need to use the words comparison ratings or

22   otherwise show comparison ratings in a figure?  The answer from

23   their own expert.  No, I don't think so.

24           "QUESTION:  Would it need to have an expressed

25   teaching of showing ratings of -- multiple ratings for

1    healthcare providers?

2         "ANSWER:  Not in the content of Internet application.

3    No."

4         So their own expert is on record saying, Not only do

5    you -- do you -- would it be obvious when you have comparison

6    ratings of hospitals, he says, You don't even need that.  It's

7    still clear.  Even if you don't have comparison ratings of

8    other types of healthcare providers, you can still say that

9    it's within the knowledge of a person of ordinary skill from

10   reading that.

11        So they can't have it both ways, Your Honor.  I mean,

12   Dr. Cooper has an extensive analysis, and Dr. Greenspun's

13   testimony just supports it even more so.

14        I want to address briefly, Your Honor, because you

15   mentioned it, this evidence in the market that maybe people

16   weren't going to do this.  I have a very different view of

17   that, Your Honor.  And the reason is, because basically what

18   they are referring to is they are referring to testimony where

19   these witnesses, Mr. Neal and Mr. LaPoint said, Don't do that.

20   Why?  Because we are going to tick off some doctors, and we

21   don't want to do that.  So don't do that.

22        Well there's two points about that.  First is, the

23   idea was known.  Everybody knew you could do it.  You just

24   didn't do it for business reasons.  And I am sorry I don't have

25   a case for you, but there's cases on that.  I know it's in our

84

1    motion in limine.  But that's evidence of obviousness.  Not

2    non-obviousness.  They knew that you could do it, they just

3    didn't do it for business and economic reasons.

4          Patents talk about technological advancements.  Let me

5    read one more part from *K.S.R.*, where this part about they are

6    saying, Don't do it.  You don't want to do it for market

7    reasons.  Here is *K.S.R.*, page 419, In many fields it may be

8    that there's little discussion of obvious techniques or

9    combinations, and it often may be the case that market demand,

10   rather than scientific literature, will drive design trends.

11   Granting patent protection to advances that would occur in the

12   ordinary course without real innovation retards progress.

13   That's the Supreme Court addressing this point.  Everybody knew

14   you could do it.  Let's just not do it, because we don't want

15   to make these doctors mad.  That's not technological

16   advancement, that's not innovation, that's just not doing it

17   because you have a business reason not to do it.

18         *THE COURT:*  The only thing I will correct in that, I

19   think their position is not that the doctors would be annoyed,

20   it's that the hospitals would be -- I don't know if annoyed is

21   the right word, but not embracing of a website that spoke

22   poorly of perhaps their employees, and I think, at the time, if

23   I'm understanding this correctly, the way the economics of

24   the -- of that universe existed, was that the advertisements

25   that generated the revenue were largely from the doctor -- from

1    the hospitals, as opposed to today, where, due to various

2    Google statistics, people can advertise anything from snowshoes

3    to, you know, whatever.  It doesn't change your point, I just

4    want to make sure that it's a little more accurate.

5         MR. STIMPSON:  I understand.  A little factual

6    difference there, Your Honor.  But the concept, as you said,

7    economics.  That is -- you don't get a patent on economics.

8    You get patent on technological advancements.

9         So, Your Honor --

10        THE COURT:  I hear you.  I mean, I guess what I'm

11   saying to you is, I'm not sure that ... look, as I indicated

12   when I made the statement, I'm not trying to decide obviousness

13   when I say this, but I do think that if there are pressures

14   that teach against the invention, that's something that might

15   be relevant to the consideration of obviousness.  That's all I

16   meant.

17        MR. STIMPSON:  Okay.  Well, Your Honor, I just want to

18   make sure that I'm very clear about this, that I respectfully

19   disagree with that.

20        THE COURT:  I understand.

21        MR. STIMPSON:  There may be pressures, but those are

22   market-force pressures, and they have no place in an

23   obviousness analysis.  Docket 685 there's a specific section on

24   this, where it's a specific section and there's federal circuit

25   case law, economic factors, market demand play no role in

1    obviousness.  No role.  That's -- so, Your Honor, I really -- I

2    don't really have anything else to add, unless you have

3    questions.  The *K.S.R.* also points out you don't need to seek

4    out precise teachings.  We all know that.  If you have anything

5    else, otherwise...

6         THE COURT:  I realize I'm making faces at you again,

7    but in this instance, the answer is I don't have anything else.

8         MR. STIMPSON:  Thank you.

9         MR. KOSTOLANSKY:  Nothing further, Your Honor.

10        THE COURT:  Well, you want to take up his issue about

11   whether or not market -- teaching direction of or teaching

12   against is impacted in any way by the market considering?

13        MR. KOSTOLANSKY:  Well, Your Honor, I think that's an

14   issue that will be -- will be subject to, you know, to further

15   briefing and analysis by the parties.  Intuitively, I disagree

16   with his position, because there's -- you know what -- what is

17   a market condition versus what is an innovation based upon

18   one's perception of what may well be received?  And -- and

19   advances in technology and in society are often based upon what

20   one thinks will be successful in the marketplace.  So I think

21   these things are -- they are not as neatly divided.

22        THE COURT:  I don't disagree with that.

23        MR. KOSTOLANSKY:  I'm sorry, Your Honor?

24        THE COURT:  I don't disagree with that.

25        MR. KOSTOLANSKY:  So that's the only point I would

1    make, with respect to that.

2            And then I would also say if that was the point they

3    wanted to make, that is a point that should have been made

4    through their expert, and it wasn't.

5            THE COURT:  You can both take comfort in this, that's

6    not going to be the -- the fulcrum for which the obviousness

7    decision is balanced.  It just won't be.  So, all right.  We've

8    now heard that Mr. Stimpson will be here until tomorrow.

9    Mr. Kostolansky, he is feeling unloved.  I suggest, perhaps,

10   you could take him to dinner tonight.

11           MR. KOSTOLANSKY:  Your Honor, I --

12           THE COURT:  Poison his food or not, that's between the

13   two of you.  So be careful what you eat, counsel.

14           MR. STIMPSON:  Thank you, Your Honor, I will.

15           MR. KOSTOLANSKY:  Your Honor, we spent four hours

16   together on Tuesday going over jury instructions.  We even fed

17   him in my conference room.

18           THE COURT:  Listen, I hate the -- the notion of asking

19   the two of you to file anything, but one of the things that I'm

20   trying to do is get through some of this, which is not as

21   intuitive for me as it is for you.

22           If there's an order of what's left that you think I

23   should proceed in, why don't you, in the course of the next

24   couple of weeks figure out what you think makes sense in terms

25   of knocking out these motions, so that we can get this thing

88

1    back, scheduled for trial and move forward from there.

2         MR. STIMPSON:  Yes, Your Honor.

3         THE COURT:  And I would hope that you -- well, how

4    about this, I suggest, and I am being facetious, counsel, but

5    there's always a little truth in it, Hey, look, you don't need

6    to file replies and go back and forth with this.  You don't

7    need to restrict anything.  All you need is just kind a little

8    list to send me one- or two-pager saying this makes sense to

9    us, one, two, three, four, five, six, seven.

10        MR. STIMPSON:  Yes Your Honor.

11        THE COURT:  All right.  I appreciate the input, and we

12   will be in recess.

13        MR. KOSTOLANSKY:  Your Honor, may I ask one question?

14        THE COURT:  Absolutely.

15        MR. KOSTOLANSKY:  I'm wondering what Your Honor's

16   thoughts are regarding a trial date?  And I realize that the

17   list is -- is somewhat important --

18        THE COURT:  I want to try to get it in this year.  I

19   do.  I'm not trying to push this off to some indefinite point

20   in the future.  It's a lot to slog through.

21        MR. KOSTOLANSKY:  Agreed, Your Honor.  And so one of

22   the reasons that I raise the issue is that as -- as we move

23   forward in time, there's greater compression with respect to

24   people's schedules, and to that end it's better to -- to set

25   something sooner rather -- you know, rather than later, but I

1    just -- I mention that.

2         THE COURT:  All right.  Fair point.  Fair point.  I

3    mean, let me see if I can drill down through all of this and

4    get to -- what you are saying is give us a firm date sooner

5    rather than later?

6         MR. KOSTOLANSKY:  I am, Your Honor.  Yes.

7         THE COURT:  All right.  That's fair.  All right.  I

8    understand.  Thank you.

9         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

10      (Recess at 11:52 a.m.)

11                     REPORTER'S CERTIFICATE

12

13       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

14

15       Dated at Denver, Colorado, this 29th day of March, 2014.

16                                s/Tammy Hoffschildt

17       _____

18       Tammy Hoffschildt, FCRR,RMR,CRR

19

20

21

22

23

24

25