1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3        Case No. 11-cv-00520-RM-BNB

4        _____

5        HEALTH GRADES, INC.,

6             Plaintiff,

7        vs.

8        MDx MEDICAL, INC., doing business as Vitals.com

9             Defendant.

10       _____

11             Proceedings before BOYD N. BOLAND, United States

12       Magistrate Judge, United States District Court for the

13       District of Colorado, commencing at 1:32 p.m., August 28,

14       2014, in the United States Courthouse, Denver, Colorado.

15       _____

16             WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17       ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18       _____

19                         APPEARANCES

20             ADAM L. MASSARO and KRIS KOSTOLANSKY, Attorneys at

21       Law, appearing for the plaintiff.

22             SCOTT STIMPSON and DAVID LEE, Attorneys at Law,

23       appearing for the defendant.

24       _____

25                        MOTIONS HEARING

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

```
 1                    APPEARANCES (Cont'd)
 2                KIRSTIN STOLL-DeBELL, Attorney at Law, appearing
 3      for the plaintiff.
 4                TRENT DICKEY and TERENCE RIDLEY, Attorneys at Law,
 5      appearing for the defendant.
 6                   P R O C E E D I N G S
 7                (Whereupon, the within electronically recorded
 8      proceedings are herein transcribed, pursuant to order of
 9      counsel.)
10                THE CLERK:  All rise.  Court is in session.
11                THE COURT:  Thank you.  Please be seated.  We're
12      here this afternoon in case 11-cv-520, Health Grades against
13      MDx Medical on three pending motions.  May I have
14      appearances, please?
15                MR. KOSTOLANSKY:  Good morning -- or good
16      afternoon, Your Honor.  Kris Kostolansky, and with me is my
17      colleague Adam Massaro, Lewis Roca Rothgerber, and also at
18      counsel table with us is Miss Kirstin Stoll-DeBell with
19      Merchant & Gould all on behalf of Health Grades.
20                THE COURT:  Thank you.
21                MR. STIMPSON:  Good afternoon, Your Honor.  Scott
22      Stimpson, Sills Cummis.  With me is my partner Trent Dickey,
23      my associate David Lee, and our local counsel from Wheeler
24      Trigg, Terence Ridley.
25                THE COURT:  Thank you.  My sweet wife laid out my
```

1    tie this morning and I looked at it and I said well, Lisa,

2    that's the tie I wear to funerals and she said well, you just

3    looked so sad, and I said well, if you faced the pile of

4    motions that I face today you'd look sad, too.  So that

5    explains my tie.

6              There are three motions.  Let's start with --

7    well, let's take them in order they were filed.  So we begin

8    with the defendant's motion to compel.

9              MR. KOSTOLANSKY:  Your Honor, may I suggest since

10   the defendant's motion to compel is contingent upon or based

11   upon the motion for leave to amend regarding -- they're not

12   -- invalidity contentions I think, I think it would make

13   sense to start with the in -- invalidity contentions motion

14   first even though it was filed second.

15             MR. STIMPSON:  I'm fine with that, Your Honor.

16             THE COURT:  Okay.  Then we'll start with 814, the

17   defendant's third motion for leave to amend invalidity

18   contentions.

19             MR. STIMPSON:  So, Your Honor, may it please the

20   Court.  We seek with this motion leave to amend to add to our

21   invalidity contentions three references -- prior art

22   references which were recently discovered as well as a 101

23   defense pursuant to the Supreme Court's new Alice decision.

24   In order to prevail on this motion we need to show that we

25   were diligent, we timely filed this motion, and that there's

1    good cause, and if those are satisfied then the Court should

2    also consider any undue prejudice to Health Grades.  The

3    primary reference we're seeking to add is this NCQA article.

4    Health Grades refers to it as the Shelton article.  It's the

5    same thing obviously.  The Shelton -- the Shelton article

6    came up in a search directed to a new Health Grades patent

7    which issued in May.  So we had this search done and that's

8    when it came up along with 20 or 30 other references.  We had

9    done, of course, early in this case our own prior art

10   searching on this patent in suit, this '060.  We'd hired a

11   prior art searcher, Cardinal I think it was.  They did a

12   search.  We did our own searching.  We subpoenaed third

13   parties, looked at prosecution and counsel.  We subpoenaed --

14   I didn't subpoena, but we got prior art from third-party You

15   Compare.  In all those prior art searching this never came

16   up.  So when we got this article we searched the Health

17   Grades production documents.  It had not been produced, but

18   we did find a reference in Health Grades production to the

19   NCQA which is this National Consumer Quality Association.  So

20   we asked Health Grades if they had the article and that led

21   to the motion to compel.  They wouldn't search for it.  So

22   we're seeking leave to add this article as a new prior art

23   reference.

24          We have two grounds for good cause we believe,

25   Your Honor.  The first one is right in the patent local rules

1    themselves, 36(b) which says that the new discovery of

2    material prior art reference that was not discovered in an

3    earlier diligent prior art search is good cause.  That's

4    right in the rule itself.  And the second basis for good

5    cause we think, Your Honor, is that it sure looks to us that

6    Health Grades had this exact article or something very, very

7    close.

8            The first ground, Your Honor, is with regard to

9    our diligent early search.  And Health Grades is questioning

10   well, why didn't those searches pull up this article?  And

11   the reason is a pretty easy one I think to explain I think,

12   Your Honor, because we're talking about two different

13   patents.  Both patents are related.  There's no doubt about

14   that.  They both in their specifications talk about three

15   different things.  They talk about user searching using

16   criteria to search for health care providers.  They talk

17   about the resulting results list, the providers that meet the

18   criteria, and then from there picking a provider and getting

19   into a particular provider report.  So those three things,

20   the searching, the results list, and the particular provider

21   report.  The patent in this case is -- the claims are only

22   directed to the creation of a provider report, all of them.

23   They're all directed to what data to use, where do you get it

24   and how do you go about creating the report.  The new patent

25   has claims that are very similar, but it also has another set

6

1   of claims which are not.  They're not directed to the

2   provider report.  They're directed to the results list.  And

3   that must be why this NCQA article came up in the search for

4   the new prior art because the NCQA article talks about search

5   criteria, all the things that you should be able to put into

6   a search criteria and getting a results list.  So that's why

7   it didn't come up in our first search results.  And so we

8   think we fit squarely within that exception that's right in

9   the rule itself.  It didn't come up in a prior diligent prior

10   art search.

11       The second ground for good cause, Your Honor, is

12   related to what we think should have been produced in

13   discovery by Health Grades.  Now, I'm not alleging anything

14   nefarious.  I don't know what's in their files, whether it's

15   intentional or unintentional.  We think that they very likely

16   had this article and should have produced it in discovery,

17   but somehow it didn't get produced.  The reason I say that is

18   we have I found in our production this Health Grades provider

19   report which is Exhibit F to our motion, and in that provider

20   report they specifically refer to the NCQA.  So we know from

21   that document that Health Grades knew three things.  They

22   knew that the NCQA existed.

23       THE COURT:  But it's some big organization?

24       MR. STIMPSON:  It is a big organization, yes, Your

25   Honor.  It does many things.  But we couldn't find any other

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

1    articles about, you know, this sort of thing, web searching

2    for providers.  But it is a big organization.  So they knew

3    about NCQA.  They were citing it in their own reports as

4    indicating sources and they knew that the NCQA was

5    recommending sources for data which, of course, are multiple

6    claim limitations in all these claims.  But there are other

7    indications, Your Honor, which make me think that they

8    probably had this very article and one of the things is

9    timing.

10          If you look at the NCQA article it was published

11    in August 2004 and this report came out in December 2004, so

12    the timing sort of fits.  Potentially there could have been

13    an earlier article, but if there was one nobody could find it

14    and it's not cited in the NCQA article we have.  Another

15    thing that kind of indicates this to us, Your Honor, is that

16    this Exhibit F, it's a dead ringer for this -- this NCQA

17    article and what it says.  It says the ABMS has been

18    designated as a primary source of board certification

19    information by the NCQA.  And Page 14 of the NCQA says just

20    that, board certification, use specialty boards approved by

21    American Board of Medical Specialties and this other

22    association.

23          THE COURT:  So I thought I had marked it, but I

24    can't seem to find it.  You said it was in Exhibit F.  Where

25    is the document that was in Health Grades file that you

8

 1    think --

 2              MR. STIMPSON:  It's Exhibit F, Your Honor.

 3    Page --

 4              THE COURT:  The whole thing?  I thought there was

 5    a --

 6              MR. STIMPSON:  It's the whole thing, but Page 5 of

 7    16, Bates Number 32090.

 8              THE COURT:  Yes.  Thank you.

 9              MR. STIMPSON:  So there's that.  There's the

10    timing.  There's the fact that it's a one-to-one match as to

11    what it says NCQA is recommending and what this article

12    recommends.  And then just kind of stepping back and looking

13    at the big picture of how Health Grades -- what Health Grades

14    was doing after this NCQA article came out, they went ahead

15    and they filed these patent applications.  And we know these

16    patent claims have elements directed to provider data and

17    elements directed to third-party verified data.  The provider

18    data matches up with right -- what's right in this report.

19    This report talks about gender being from the physician.

20    That exact thing is in the claims.  The report -- it says

21    specialty has to come from the physician.  It's right in

22    their patent claims.  Years in practice.  Their patent claims

23    use that exact same language from NCQA right in their patent

24    claims.  It has to come from a physician.  Professional

25    appointments, same thing, exact same language.  This says it

1    has to come from a physician.  Their patent claims say it has

2    to come from a physician.  Languages spoken, same thing.  And

3    then the other element, talking about third-party verified

4    data, there is seven data elements in their claims.  There's

5    licensure, medical school, board certification, disciplinary,

6    internship, residency, and fellowship, all seven.  Patent

7    claims of Health Grades all say that has to be verified by a

8    third party.  It doesn't matter where you get it.  It just

9    has to be verified by a third party.  Every single one is

10   right here in this sentence of NCQA report starting at Page

11   11.  Every single one says validation by a third party.  So

12   it's just -- it could be a remarkable coincidence, Your

13   Honor.  It could be.  I don't know.  But it just looks to me

14   like they probably had this.  And so in our motion to compel

15   I hope we find that out for sure.  But, anyway, that's our

16   second ground for good cause because if, in fact, they had

17   this and didn't produce it to us then the only reason we're

18   doing this so late is because they didn't produce it to us.

19            Just briefly on prejudice, first, it's not just

20   prejudice.  It's undue prejudice.  So if Health Grades had

21   this and didn't disclose it to us then that's not undue

22   prejudice.  But we don't think there's any prejudice here

23   anyway because I know we're getting close to trial.  It's in

24   December.  But we've already agreed with counsel for Health

25   Grades we're going to have another expert supplementation for

1    the technical experts.  They already know what's going to be

2    said because we've already submitted it with this motion.  So

3    they're just going to do that.  We'll produce him for

4    deposition as you've already told them we're going to do and

5    it really doesn't add much work for anybody.  It's just

6    another prior art reference.

7           The two arguments from Health Grades I'd like to

8    address, Your Honor, one is they say that -- that this is --

9    the motion wasn't timely filed.  We had to have our conferral

10   with them and that's really what took so long.  For weeks

11   Health Grades wouldn't give us the final okay, we object so

12   we could file.  So we told them about Alice within six days

13   after that came down and we told them about the -- this

14   Shelton article.  And I asked them on July 8, you need to

15   have your answer and they didn't answer until late -- I think

16   July 23.

17          And, lastly, their last argument is that this NCQA

18   is just cumulative of other prior art.  It's not cumulative,

19   Your Honor, because, first of all, this is clearly prior art

20   under 102(b).  It just meets the strict bar date.  Health

21   Grades is challenging the Drucker Report which they say it

22   makes it cumulative.  They're saying it's not prior art.  And

23   if you look in the Drucker Report it doesn't show the sources

24   for all the data elements.  It doesn't show verification and

25   it doesn't have any comparison ratings of health care

1    providers.  So it's not cumulative.  This is -- this is a

2    very important reference, Your Honor.  So respectfully we

3    would request that we'd be able to add these three

4    references.  The NCQA article and two other articles also

5    didn't come up in our original search.  If you have any

6    questions I'll turn to the 101 issue or would you like to

7    hear from Health Grades first?

8              THE COURT:  Well, I did have a question.  I seem

9    to recall that very early in this case you opposed -- very

10   early in this case you opposed the plaintiff's motion to

11   amend its infringement contentions saying these local rules

12   in California say you can't do it.  You've got to do it.  You

13   don't want to have any shifting sands here.  We don't want to

14   have a moving target.  Doesn't the same rule apply here?

15             MR. STIMPSON:  Well, the same rules do apply, Your

16   Honor, but there's different facts.  I mean, I -- I vaguely

17   remember that and I think that they were --

18             THE COURT:  You -- vaguely because it was probably

19   in 2011.

20             MR. STIMPSON:  Yeah, it was.  It was a long time

21   ago.  And if I remember correctly, they had months of delay

22   there and also they didn't move to amend.  If I remember

23   correctly, we moved to strike.  Like, they just served their

24   contentions on us.  I may be misremembering it, but I think

25   it was a motion to strike, not a motion to amend we were

12

1    responding to.  So they didn't move to amend at all.  And the

2    rules are very clear.  You have to timely move to amend and

3    show diligence.  So I don't -- it doesn't apply the same way.

4    It's just different facts.  As soon as we found this stuff

5    out we told them about it, we had our conferral, and we filed

6    our motion.  Would you like me to move to 101 or would you

7    like to --

8            THE COURT:  I am very -- I'm very troubled by a

9    December trial date and adding a whole new piece of prior art

10   and say it's just one more piece of prior art, but then you

11   say but it's a very important piece of prior art.  So doesn't

12   that shift the sands?

13           MR. STIMPSON:  Well, there's no question, Your

14   Honor, that it changes some of the invalidity defenses.

15   There's -- I'm not trying to say that's not going to be the

16   case because it is an important prior art reference, but the

17   -- the question comes down to whether we had good cause.

18   It's not just a question of whether we're close to trial.  We

19   -- it may very well be.  We'll see in the motion to compel or

20   how that turns out.  But it may very well be that the only

21   reason I wasn't adding this back in 2011 is because they

22   didn't give it to us.  That may be the case.  And then if --

23   even if they didn't have it the rules themselves say, look,

24   if you did a diligent search early, and we sure did, we did

25   multiple searches with third parties, too, and it didn't turn

1   up and you just found out about it then that's good cause.

2   So it's just a question of showing good cause.

3            THE COURT:  And one more time -- I know you did it

4   very thoroughly, but one more time why this search turned it

5   up and the previous ones did not.

6            MR. STIMPSON:  There are -- the simple answer to

7   that, Your Honor, is they're different patent claims.  When

8   these searchers do these searches they, you know, read the

9   patent, of course, but what they're focusing on are the

10  claims of the patent.  That's what you have to -- the prior

11  art has to meet the patent claim -- the patent claims.  So

12  the '060 patent which is the patent in this case is directed

13  to -- to one part of these patents.  It's directed to the

14  provider report.  The -- the -- there's two independent

15  claims and they both recite all these steps in creating the

16  particular health care provider report.  The -- every -- all

17  -- all the steps are directed specifically to that in both

18  claims.  There is one dependent claim that mentions a results

19  list, but that's very different because that's just adding a

20  results list.  There's nothing in these claims about how you

21  create a results list.  So when our original searcher did

22  this search they looked at those claims.  I mean, I'm -- I --

23  I'm not in their mind.  I don't know what they did, but I

24  assume that they read the claims like they all do and we've

25  got to find something with a provider report.  Now we get the

1    new patent and Health Grades says that some of the claims are

2    exactly the same.  You know what?  They're right.  There's a

3    whole set of claims in that new patent that are directed to

4    the particular provider report and how you get that.  There's

5    a whole set of claims in there.  But that's not why this NCQA

6    came up.  It's because of the other set of claims.  And that

7    other -- that other set of claims is directed to results

8    lists.  And the results lists, those claims talk about how

9    you go about collecting data and what you put in results

10   lists.  Those are two different things, the results list and

11   the provider report.  So that's why there's this difference,

12   Your Honor, because NCQA -- if you read the NCQA article, and

13   it is extensive, but it's all about how are you going to

14   search.  You know, put as many search criteria as you can,

15   and that is leading to a results list.  And that -- that

16   prior art reference is good for the '060 patent, but it's

17   great for the '052 patent, the other one.  It anticipates a

18   number of those claims that are directed to the results list.

19   It just flat-out anticipates them.  And we put that in our

20   Inter Partes Review with the Patent Office and if the case

21   ends up going ahead then it will -- it will be there as well.

22   But it's a great reference for that case and it's a very good

23   reference for this case.  The short answer is, Your Honor,

24   different claims.

25              THE COURT:  So I'm looking at Page 6 of 17 of your

```
1    Exhibit F where the language is highlighted.
2              MR. STIMPSON:  6 of 17?  Oh, I'm sorry.  6 of 17.
3    Yes.  It's also got a 5 of 17 -- 5 of 16 there.  Okay.  I
4    have that.
5              THE COURT:  Where the language is highlighted.
6              MR. STIMPSON:  Yes.
7              THE COURT:  Elsevier has been designated.  I've
8    read that several times and I don't know what it means.  What
9    -- what is that saying?
10             MR. STIMPSON:  Elsevier has been designated by the
11   ABMS as an agent able to provide the primary source data on
12   behalf of ABMS.  I'm not sure that sentence is really
13   relevant here, Your Honor, but it's -- I think what it's
14   talking about is it -- Elsevier is the company that can give
15   you the data from the ABMS.  It may be a link or something.
16   But it's really not why we're -- I don't know if that was
17   highlighted in what we submitted.  It probably shouldn't have
18   been.  It's the second sentence that's most important because
19   it says ABMS is designated as a primary source for board cert
20   from NCQA.  And we know -- I mean, that didn't come out of
21   thin air.  They got that from somewhere.
22             THE COURT:  Okay.
23             MR. STIMPSON:  Okay.  Would you like me to move to
24   101 or would you like to hear --
25             THE COURT:  No, 101, please.
```

1          MR. STIMPSON:  So we're also seeking to add, Your

2     Honor, this 101 defense based on this new Supreme Court case

3     from Alice.  Just a high-level overview on Section 101, it

4     says you can have inventions on, you know, a process machine,

5     compositions of matter, and manufacture.  And -- but the

6     Courts have -- mostly the Supreme Court have created

7     exceptions to those, and the exceptions are for natural

8     phenomenon, for abstract ideas, and laws of nature.  And the

9     reason these exceptions exist is because if you -- if you let

10    people patent something that's just an abstract idea then

11    those are the basic tools that everybody needs and you're

12    just monopolizing something that should not be monopolized.

13         So as technology has evolved over the last

14    150 years so has the case law.  And I think as you can tell

15    from the en banc federal circuit decision that led to Alice

16    there are a lot of differing views on -- on the stated law

17    before Alice.  We're certainly talking about an abstract idea

18    here, these claims.  What these claims are all directed to

19    are just the organization, the collection, the organization,

20    and reporting of health care provider data.  That's what the

21    claims are directed to.  That's an abstract idea, but it's

22    applied to a specific context -- context.  It's applied to

23    doctors.

24         So the law before Alice, Your Honor, it would be

25    very hard to argue that that was patent ineligible.  You

1    know, there's so much case law out there and it makes my --

2    makes me dizzy thinking about it all.  I can't keep it all

3    straight.  But the best place to look at what the state of

4    the law was is that en banc federal circuit decision that led

5    to Alice.  Now, one thing that I think all these judges have

6    in common is they say, look, it's -- if you have an abstract

7    idea you can't include all applications of the abstract idea

8    so if you have a specific application you should be good.

9    The claim should be patent eligible.

10         And, you know, I just picked a couple of quotes

11   from that en banc, but it's -- it's throughout from Chief

12   Judge Rader.  He phrases it -- the question for patent

13   eligibility -- this is Page 1300 of the Fed -- Fed 3d.  The

14   question for patent eligibility is whether the claim contains

15   limitations that meaningfully tie the idea to a concrete

16   reality or an actual application of the data.  And he states

17   it another way later.  Preemption is only a subject matter

18   eligibility problem when a claim preempts all practical uses

19   of an abstract idea.

20         So what this is saying, Your Honor, is that if you

21   do it to something specific pre Alice, if you do it to

22   something specific, here Health Grades is directing these

23   claims to doctors, you should be good and you shouldn't have

24   a patent eligibility problem.  But then Alice changed things.

25   And what Alice did was said no, that's -- you need more than

1    that.  It's -- it's -- if you apply it to a specific

2    application it's not enough.  You've got to have something

3    more.  And the federal -- the Supreme Court says you have to

4    have something significantly more.  What that is will be

5    debated, you know, in the Courts for a long time I'm sure.

6    But you have to have something significantly more.  And

7    that's where these claims get into trouble because it's an

8    abstract idea, yes, and it's applied to a specific area, yes.

9    But how can you say that these claims had something

10   significantly more to this specific area of applying this

11   abstract idea?  I just can't see that that's the case.

12           We've cited -- Health Grades has cited some

13   commentators who said this is no big deal.  And everybody is

14   talking about this decision, Your Honor.  And there are some

15   who say that.  But look at what the Patent Office is doing.

16   We've submitted a memo from the patent office after Alice as

17   saying we're going to change how we review patent

18   applications in light of Alice, how we review these computer

19   patent applications in view of Alice.  And we submitted a

20   supplement, Exhibit M.  And what that did was the

21   Commissioner of Patents sent out a blog and said okay, we

22   have actually issued notices of allowance for some patents.

23   Okay.  But then Alice came out.  Sorry everybody.  We've got

24   to withdraw it because now we're dealing with new law and we

25   can't issue those patents.  So if Health Grades tells you

1      that that's not a change in the law, nobody is telling that

2      to the Commissioner of Patents.

3             I handed Mr. Kostolansky an article on -- it was

4      -- I just found it this morning, but it was from Mr. Pouzeshi

5      I think.  It's P-o-u-z-e-s-h-i.  Mr. Pouzeshi is a Health

6      Grades attorney.  He was involved in prosecuting this patent

7      application to this patent and he's still prosecuting for

8      Health Grades now I believe.  And he issued an article that

9      -- I'll just read you -- from it.  It says a new framework.

10     He's talking about the PTO standards.  A new framework for

11     assessing the subject matter eligibility under 101 of claims

12     involving abstract ideas in light of Alice Corp.  The USPTO

13     previously only applied the Mayo test, that's the

14     significantly more, when examining claims relating to laws of

15     nature.  In the second part, that significantly more test,

16     the claims are reviewed to determine whether they amount to

17     significantly more, an abstract idea.  So their own counsel

18     is publishing on this saying look how things have changed.

19     And things have changed.  And in light of this new law we

20     think now we have a darn good 101 defense and we'd like to be

21     able to add it.

22            THE COURT:  What impact would adding this defense

23     have on discovery, experts, and the trial date?

24            MR. STIMPSON:  Discovery -- I question whether

25     this would be in the expert reports, Your Honor.  Maybe.

```
 1      What I'd really like -- the way the Courts deal with this,
 2      and Judge Moore is not going to be happy about this
 3      suggestion, but there -- the Courts almost all deal with it
 4      on summary judgment.  I just was involved in a case where --
 5      I was out of it before, but they filed summary judgment.  The
 6      District Court granted summary judgment on 101.  It went to
 7      the federal circuit.  It was appealed and affirmed.  I mean,
 8      that's how the Courts generally deal with this, at summary
 9      judgment, because you just read the patent and you decide
10      whether it's an abstract idea, and if so, is there something
11      significantly more and decide summary judgment.  So I don't
12      think it's going to be much.  I know the last thing Judge
13      Moore wants right now is another summary judgment motion so
14      we'll have to seek permission, but if he doesn't want to do
15      it that way then we'll have to just present it in our case
16      and it will be dealt with maybe in posttrial motions.  Thank
17      you.
18              THE COURT:  Thank you.  Mr. Kostolansky -- Mr.
19      Kostolansky.
20              MR. KOSTOLANSKY:  Miss Stoll-DeBell, Your Honor.
21              THE COURT:  Okay.  Thank you.
22              MS. STOLL-DeBELL:  Good afternoon, Your Honor.  I
23      have some slides, printouts that I was going to hand up if
24      that's okay.  I have a copy.
25              THE COURT:  All right.
```

1          MS. STOLL-DeBELL:  And some case law in a

2     notebook.

3          THE COURT:  All right.  Thank you.

4          MS. STOLL-DeBELL:  I'll lower that a little bit

5     since I'm a little bit shorter than Mr. Stimpson.

6          MDx has not met its burden to show good cause in

7     this case, and there is no good cause because they were not

8     diligent in locating the new prior art.  They were not

9     diligent in adding a new defense under Section 101 of the

10    Patent Act and they didn't timely file their motion to amend.

11    Now, you'll recall that everybody agreed at the beginning of

12    this case that we would abide by and be bound by the patent

13    local rules for the Northern District of California.  And a

14    key purpose of those rules is to require both sides to make

15    early disclosures of their theories of liability so that we

16    can focus discovery and trial preparation on the things that

17    matter.  And it's even more important in patent cases to have

18    these early disclosures because everything relates to

19    everything else.  So our infringement contentions outline

20    what we think the scope of the claims will be.  And that's

21    the same scope that we -- should be used for invalidity and

22    the scope that we argued for the *Markman* hearing.  And it

23    also impacts damages.  You look at demand for the patented

24    product.  Are there acceptable, non-infringing substitutes?

25    All of those things key off the same issue.  And so if you

1    allow parties to come in three months before trial and change

2    their position by adding new prior art it can create a domino

3    effect.  You need to go back and look at claim construction

4    and infringement and damages and all of these things which is

5    why Courts are now having these local rules requiring early

6    disclosure.  And, in fact, the federal circuit looked at the

7    Northern District of California local rules, patent local

8    rules, and found that they were a valid exercise of Courts

9    power to control the docket and to try to streamline things

10   as much as is possible in patent cases.  So if you look at --

11   I think it's the last slide in that deck I handed you.

12         THE COURT:  It's a timeline, slide 11.

13         MS. STOLL-DeBELL:  So I just put together a

14   timeline.  And you're probably very familiar with this, Your

15   Honor, but I thought we could walk through it.  This case was

16   filed in March of 2011.  MDx's invalidity contentions were

17   due on August 18th, 2011.  The *Markman* order issued in this

18   case in February of 2012.  Fact discovery closed in June of

19   2012.  Expert discovery closed in September of 2012, and the

20   deadline for summary judgment motions was in January of 2013.

21   Health Grades actually filed a motion for summary judgment on

22   MDx's invalidity defense and the Court has already ruled on

23   that motion.  And now we're standing -- trial is going to

24   start on December 1st.  We're three months away from trial.

25   And now MDx wants to change their invalidity defense.  They

1    want to add three new prior art references and a whole new

2    basis for invalidity that has never been mentioned before in

3    this case.  Now, we cited a lot of case law in our -- in our

4    opposition brief, Your Honor.  And I -- and all of it that we

5    cited the Courts have denied motions to add new prior art.

6    And they were all filed much earlier than what MDx is filing

7    in this case.

8           I put together -- it's actually the first slide.

9    I listed seven of these cases.  So in all seven of these

10   cases the Court refused to allow new prior art to come in and

11   these were all filed earlier than what we're looking at here.

12   So the first four were filed before the *Markman* order issued

13   and the Courts still didn't let new prior art in.  In Number

14   5 and Number 6 the motions to add new prior art were filed

15   before the close of fact discovery.  The Courts still didn't

16   allow it to come in.  And even in the last case, fact

17   discovery and expert discovery closed, but still no summary

18   judgment deadline, no trial date.  The Court didn't allow it

19   to come in.  MDx has cited a -- I think they cited a couple

20   cases in their motion where Courts actually granted motions

21   to amend, but those were all filed earlier, too.

22          So in Yodlee and Coopervision the motion to amend

23   was filed before fact discovery closed.  And in Convolve and

24   Audionics (phonetics) it was filed before the summary

25   judgment deadline and there was no trial date.  So there's

 1    just not -- there's not a single case that has ever allowed

 2    new prior art to come in in a place where we are where the

 3    case has been pending three years, *Markman* was decided years

 4    ago, and trial is three months away.  There's just no

 5    authority.  No one has ever done it because it's not fair.

 6    It delays things and it's very prejudicial to the patent

 7    holder.

 8         So now MDx has to show good cause to allow this

 9    new prior art to come in and they haven't done so.  They --

10    they blame Health Grades and say well, we would have gotten

11    it because Health Grades knew about it and they should have

12    produced it to us.  The only evidence they have that Health

13    Grades knew about it was that one sentence in a Health Grades

14    report.  And all that says is the American Board of Medical

15    Specialties is a primary source for board certification

16    information.  And it cites an entity, the NCQA.  And they say

17    well, in the NCQA you must have known about this Shelton

18    article.  That's like saying you know -- you mentioned the

19    ABA so you know every publication the ABA has ever put out.

20    It's just completely unreasonable.  And, you know, the ABMS,

21    that's the entity that actually issues board certifications

22    so, of course, they're the primary reference.  They're the

23    ones that give it out.  It's just -- it's craziness.

24    Mr. Stimpson says well, you -- you map up Shelton to what was

25    in that December report that talks about NCQA.  You can also

1    map it out to Health Grades conception document that we had

2    -- we -- it's an exhibit to our opposition to the motion to

3    compel.  That shows that Health Grades had conceived of a

4    physician report that had all of these things in June of

5    2004.  Now, it was -- it was a private document.  It was

6    confidential.  But it -- they had conceived of this invention

7    before that NCQA Shelton article ever existed.  So, you know,

8    the fact that some of the fields are similar does not show

9    that Health Grades knew about it.  You know, another thing to

10   point out, Your Honor, is that if you look at the Shelton

11   article itself it wasn't even published by NCQA.  It was

12   published by the Commonwealth Fund on the Commonwealth Fund's

13   web site, so MDx says.  I mean, we don't really know when it

14   was published, but that's what they're saying, but it for

15   sure wasn't on NCQA's web site.  And so there's just no

16   connection.  That is -- that is not even close to being

17   enough to say Health Grades knew about it, they should have

18   produced it, and relieve MDx of their burden to find prior

19   art and disclose it in this case.

20           Now, they also say they hired a reputable search

21   firm and they did a search for prior art in 2011.  But they

22   don't say -- I mean, I guess -- I guess he says they didn't

23   find it because he didn't search for results list, but that

24   wasn't a diligent search.  They didn't search for results

25   list.  One of the claims, claim 7, that's been in this case

1    since the beginning, it was in our first infringement

2    contentions we served in July of 2011, we said they infringed

3    this results list claim.  But even more importantly, a major

4    issue in this case has been whether the results list on

5    vitals.com meet the report element of the '060 independent

6    claims.  In fact, there's a summary judgment order on this

7    issue.  And it was -- you know, we've already focused on

8    their results list.  So was it reasonable and diligent for

9    them to not search for results lists in a prior art?  No, it

10   wasn't.  Now, they say, you know, this '052 issue, patent

11   issue, and it caused them to do a whole new search.  You

12   know, they are very related, the patents.  They -- they have

13   the same inventors, the same specification, the same

14   drawings, the same priority date, and -- and -- and a

15   significant overlap in the claims.  But I think, you know,

16   what -- what really they needed to show is that -- is that

17   there was a reason why they couldn't have found that in 2011

18   and they could have and they didn't.  They just missed it.

19   And that is not enough good cause to change this whole case

20   now after we've been going so long and when trial is three

21   months away.

22            THE COURT:  Well, so with a rather grand motion of

23   your hands you say that we're going to change the whole case

24   and earlier you said that this would result in substantial

25   prejudice to the patent holder.  Tell me more about how it

1   substantially changes the case and how it substantially

2   prejudices the patent holder.  I understand delay

3   potentially, but beyond that what -- what's the problem?

4         MS. STOLL-DeBELL:  We need to go back and -- and

5   look at all of these arguments that they're making and

6   analyze how they impact everything else.  So how do they --

7   how do they impact the (inaudible) arguments, the

8   combinations of references.  How does it impact on our

9   infringement contentions?  How does it impact the claim

10   constructions?  How does it impact damages?  And -- and just

11   the exercise of going through all of that and looking at it

12   again and the time that we would need to spend on that when

13   we really need to get ready for trial, Your Honor.  We've got

14   all kinds of things coming up that are due.  That is

15   prejudice in and of itself.  And will it -- will it change

16   things?  It very well may.  It may cause a delay of trial.

17   And we shouldn't have to do that now.  They should have

18   searched for it.  They should have found it and they didn't,

19   and they've got no good excuse for it.  So that -- that in

20   and of itself is good enough for you to deny their motion to

21   amend, but as another separate reason they weren't timely in

22   filing it.  The Courts that have looked at this issue require

23   defendants who discover new prior art to immediately raise

24   the issue with the Court.

25         I've got two cites for you.  They're on the list

1       of cases I gave you.  But in CoreLogic and MacroSOLVE the

2       Courts there found that a two-month delay between the time

3       that the prior art was found and the motion to amend was

4       filed was too long.  It wasn't timely application of the

5       rules and they denied the motion.  In this case MDx waited at

6       least two months, probably more, but we don't know because

7       they haven't told us.  They say they started the search in

8       April.  They finished it in May, but we don't know when in

9       May.  It could have been the beginning of May.  That would be

10      a three-month delay.  We don't know when they actually found

11      the Shelton reference or the other two.  We also know that in

12      this period of delay instead of coming to the Court and

13      filing this motion to amend they spent their time drafting a

14      complex and long petition for IPR, filed that with the Patent

15      Office.  And they even came and filed a motion to compel

16      accusing Health Grades of hiding things and asking us to go

17      back and search our records for this NCQA article.  They did

18      those two things before they filed the motion to amend.

19      That's not diligence and it doesn't show that they timely

20      filed the motion.

21              THE COURT:  When was the Inter Partes brief filed?

22              MS. STOLL-DeBELL:  July 1st, yeah, of this year.

23      So that -- again, that's a separate, but sufficient reason

24      for you to deny their motion.  You know, they -- they also

25      haven't demonstrated the importance of this art.  You know,

```
 1       it is -- got a lot of the same fields and kinds of
 2       information that is set forth in the Drucker Report.
 3       Mr. Stimpson says well, we don't know where the information
 4       came in the Drucker Report.  I -- I disagree.  I think he's
 5       made arguments about where that information came.  But
 6       there's also a Health Grades press release that lists out all
 7       these fields and says where it came from, and so it's not
 8       critically important.  They don't even allege that it teaches
 9       all the elements of these claims.  They say it teaches many
10       of the elements in their brief.
11             And regarding the two patent publications, we
12       haven't talked about them at all, the other two pieces they
13       want to add.  They just allege it has some relevance.  It's
14       just not good enough, Your Honor.  It's not good enough to
15       change the case and add it three months before trial.  I was
16       going to move onto 101 unless --
17             THE COURT:  I'm ready.
18             MS. STOLL-DeBELL:  Okay.  So Section 101 is one of
19       the four fundamental kinds of invalidity defenses that a
20       defendant can make in a patent litigation.  The others are
21       112, 102, and 103 of the Patent Act.  But it's a fundamental
22       thing that is alleged in many different patent cases.  It's
23       so fundamental that the Northern District of California rules
24       require defendants to disclose 101 defenses in their
25       invalidity contentions.  And that is -- the rules are at
```

1    Docket 34, Page 21.  You'll see Section D.  They were

2    supposed to do it.  We didn't hear in this case about 101.

3    They never raised this issue ever, and they've raised many

4    issues, Your Honor.  In fact, I think almost every issue you

5    could possibly think of they've raised except Section 101.

6    Didn't hear a peep about that until now.  So they say they

7    should be able to because this _Alice_ decision changed the

8    law.  And I've got -- I've got several slides on this.  I'm

9    going to go to slide 3 if you don't mind following along with

10   me.

11           So they say that, you know, _Alice_ held that claims

12   that are directed to abstract ideas are not eligible for

13   patent protection and that the '060 patent claims are

14   abstract ideas.  But if you look at the _Alice_ decision

15   itself, and I have that on the right-hand side of the slide,

16   _Alice_ -- the _Alice_ Court recognizes we have long held that

17   this provision contains an important implicit exception.  You

18   can't patent abstract ideas.  And they cite Supreme Court

19   cases going back for 150 years.  That's how long the Supreme

20   Court has said you can't get a patent on an abstract idea.

21   This is not even close to new.

22           But I wanted to -- if you can turn actually to my

23   second slide -- I thought we'd walk through some of the

24   earlier Supreme Court decisions on Section 101.  And these

25   five decisions are relied on heavily in the _Alice_ case and so

1    I think, although it may not be the most exciting thing that

2    you've heard, I thought we'd walk through it quickly at

3    least.

4              In the 1970s the Supreme Court twice analyzed the

5    issue about whether patent claims that are directed to

6    computer software should be eligible for patent protection.

7    In 1972 in the Gottschalk v. Benson case the Court considered

8    whether or not a claimed algorithm implemented on a computer

9    could be patented, and they found that algorithm was an

10   abstract idea.  And then -- that wasn't the end of their

11   inquiry though.  Okay.  It covers an abstract idea.  Then

12   they looked and said does the claim claim something new and

13   useful beyond that abstract idea?  And the answer in that

14   case was no, it does not, therefore, the claims are invalid

15   under Section 101.

16             In the next case to consider this issue, Parker v.

17   Flook, the Supreme Court considered whether a claim that

18   included a mathematical formula for calculating alarm limits

19   in a catalytic conversion process was directed to an abstract

20   idea.  And, again, they looked at okay, abstract idea.  Does

21   it do something new and useful?  No, it doesn't.  They found

22   those claims to be invalid under Section 101, too.

23             Then in 1981 the Court decided Diamond v. Diehr.

24   That -- those claims involved a computer-implemented process

25   for curing rubber.  It also involved a well-known

1    mathematical equation.  But the difference here was that the

2    claims then took that equation and used them to solve a

3    technological problem that others had not been able to solve

4    before and for that reason they found the claims were not

5    invalid under 101.  They were patent eligible subject matter.

6           Now, more recently, but still before this lawsuit

7    was filed the Court decided Bilski v. Kappos.  It was -- it

8    was a big deal this Bilski case.  And the Court looked at,

9    you know, again, whether an algorithm is an abstract idea.

10   They found that it was and that the claims were not eligible

11   for patent protection.

12          And then more recently in 2012 the Supreme Court

13   decided the Mayo case.  That was a drug-related case.  The

14   claims talked about administering a drug to a patient,

15   measuring the amount of a metabolite that the patient's body

16   created and then figuring out how much dosage of the drug you

17   should give the patient based upon how much metabolite was

18   measured.  And in that case most everything was old, too.

19   The drug was known.  The fact that the drug created the

20   metabolite was known.  And even the fact that you could vary

21   the dosage of the drug based upon the measured level of

22   metabolite was known.  The only thing that was new was the

23   precise correlation between that measured level of metabolite

24   and the amount of drug you get.  And the Supreme Court said

25   well, that is a law of nature and they reiterated this

33

1    longstanding principle that you can't patent laws of nature

2    just like you can't patent abstract ideas.  But in the

3    process of doing that they -- they set forth what we call the

4    Mayo framework now.  It is really the same thing that the

5    Benson Court said.  Does it cover an abstract idea or a law

6    of nature?  If the answer is yes then you ask does it do

7    something else?  Mayo used the word significantly more.

8    Benson used the word new and useful.  But it's the same idea.

9    It's the same framework the Supreme Court has used for -- for

10   many, many years.

11            THE COURT:  But I think I heard Mr. Stimpson say

12   the importance of Alice is it moves that from laws of nature

13   to abstract ideas something not previously done.

14            MS. STOLL-DeBELL:  I disagree, Your Honor.  It was

15   previously done.  Benson was an abstract idea.  It wasn't a

16   law of nature and it was computer software.  Flook, abstract

17   idea, computer software.  Diamond v. Diehr, abstract idea,

18   computer software.

19            THE COURT:  But did they use the sig -- does

20   significantly more language in those cases?

21            MS. STOLL-DeBELL:  No.  They used new and useful

22   in addition to the abstract idea.  But, you know, I think if

23   you'll go to slide 8, Your Honor, I just pulled a few cases,

24   but this slide shows that they were defendants in patent

25   infringement cases asserting Section 101 invalidity for

1    software claims before MDx's invalidity contentions were due.

2    So, I mean, again, this is a fundamental thing that

3    defendants assert in soft -- in patent cases, but

4    particularly software cases all the time.  And -- and -- and

5    the most interesting one is the CyberSource case which is out

6    of the federal circuit so it's binding law.  And that -- in

7    that case the federal circuit applied the Bilski decision to

8    software claims and found them to be invalid under Section

9    101.  I cited three District Court cases, too, but, again,

10    this is just a sampling, Your Honor.

11         There's no reason why MDx could not have asserted

12    101 in this case.  There was law to support -- to support the

13    argument.  In their brief MDx also argues that Alice changed

14    the law because, you know, it came up with this idea that

15    just implementing something on a computer isn't good enough

16    to give you patent protection and that that's a new thing and

17    that Alice decided.  And this is on slide 7 of -- of the pack

18    I gave you.  That is not new.  That is something that, again,

19    was decided in Benson, Flook, and Diehr.  And Alice cites

20    those cases for that proposition.

21         I'm just checking my notes to make sure I didn't

22    miss anything.  Oh, Your Honor, in your book that I handed

23    you, that three-ring binder, the last case there is a case

24    out of the District of Iowa that considered a very, very

25    similar issue to what -- what is going on in this case.  I

1    think it is Page 9, but I may have a little bit different

2    printout than you do.

3              THE COURT:  What's the star number?

4              MS. STOLL-DeBELL:  Star 25.  It's -- it's

5    subheading B.  I've got it on Page 10 of my case.

6              THE COURT:  Yes.

7              MS. STOLL-DeBELL:  Subheading B.  Okay.

8              THE COURT:  Yes.

9              MS. STOLL-DeBELL:  Okay.  So in this case

10   Transamerica --

11             MR. STIMPSON:  Excuse me, Your Honor.  I'm sorry.

12   I'm not sure I have that.  Is it the ninth one you said?  I'm

13   sorry to interrupt, Your Honor.

14             MS. STOLL-DeBELL:  Transamerica.

15             MR. STIMPSON:  Oh, it's the eighth one.  Okay.

16             MS. STOLL-DeBELL:  I'm sorry.

17             MR. STIMPSON:  And it's Page -- okay.  I'm sorry.

18   I didn't have it.

19             MS. STOLL-DeBELL:  No.  It's towards the end.  So

20   -- so in this case Transamerica, the defendant --

21             THE COURT:  Page 10, star 5.

22             MR. STIMPSON:  Thank you.

23             MS. STOLL-DeBELL:  -- Transamerica, the defendant,

24   they want to all of a sudden add a Section 101 invalidity

25   argument to the case that had never been raised before, just

```
 1    like what MDx is trying to do here.  And in that case they
 2    said well, there's new law and the new law -- you know, we
 3    should be allowed to raise this defense now.  And the new law
 4    they were talking about there was the en banc decision from
 5    the federal circuit in the Bilski case.  And if you go to the
 6    next page there's a quote from the Court.  And I'm just
 7    locating -- I'm sorry, Your Honor.
 8              THE COURT:  You're just -- just the paragraph that
 9    includes footnote 6 is what you --
10              MS. STOLL-DeBELL:  It does -- it does -- oh, yeah.
11    And I'm sorry, but I'll paraphrase it rather than sitting
12    here trying to look for it.  The Court basically said look,
13    you are on notice that -- that -- the federal circuit took
14    the Bilski case en banc.  And -- and regardless of whether
15    the decision ultimately sort of made the merits of your 101
16    defense better you should have raised it in the beginning
17    because you knew that this issue was going up to the federal
18    circuit.  You knew that they were going to issue an en banc
19    decision and you should have raised it.  And had they timely
20    raised it and the federal circuit had changed the law in that
21    en banc decision then the Transamerica defendant would have
22    been entitled to the different standard because they had
23    previously raised it.  And the same is true here.  In fact,
24    the Alice Court also had an en banc decision.  And that was
25    in -- I've got the dates for you.  May 10th of 2013 was the
```

```
1     en banc decision.  And on October 9th, 2012 the federal

2     circuit indicated that they were going to consider the matter

3     en banc in Alice.  And they should have raised it then.  If

4     Alice is such a big deal and it -- and it changes the law so

5     much, they knew it was going up to the federal circuit and

6     then they ultimately knew it was going up to the Supreme

7     Court, and still we heard nothing from them.  But I think the

8     real question is did they -- could -- did they have a viable

9     101 defense or could they have made it?  Was there some law

10    to support a 101 defense in August 2011?  There absolutely

11    was.  And Alice doesn't change that.  They should have raised

12    it and they didn't and it's too late now.

13           Now, as far as prejudice to us from their failure

14    to do so, we may want to open fact discovery, Your Honor.  We

15    may want to go get another expert on this issue.  For sure

16    there will be some -- some summary judgment briefing.  And

17    there's already been five motions for summary judgment in

18    this case.  We filed one.  They filed four.  But enough is

19    enough.  I mean, Mr. Stimpson is a patent litigator.  He

20    knows about Section 101.  He knew about it when this case was

21    filed.  I'm sure he knew about the Supreme Court Bilski

22    decision which was issued the year before.  There's just no

23    excuse for not raising it.  It's too late now.  If you -- do

24    you have any questions on that?

25           THE COURT:  I do not.
```

1          MS. STOLL-DeBELL:  Okay.  Just going back to the

2     prior art search, they don't tell us -- for the prior art

3     search in 2011 they don't tell us what key words were

4     searched.  They don't tell us what claims were searched for

5     the '060 patent.  We don't even really know what sources were

6     searched.  We know they hired a search firm.  It's just not

7     good enough, Your Honor.  They missed it.  And missing

8     something is not good enough.  If -- if you allowed patent

9     infringement defendants to go back and just keep doing prior

10    art searches and you find something new and you add it to the

11    case you -- these cases will never end.  And this one has

12    been going on too long already anyway.  We want to get to

13    trial.  We want to get a decision on the merits.  And we want

14    to be able to focus the next three months on getting our case

15    ready for trial.  And it's just -- their motion should be

16    denied.

17          THE COURT:  Thank you.  Mr. Stimpson?

18          MR. STIMPSON:  Just a few quick points, Your

19    Honor.  On the motion to add the NCQA article you asked Miss

20    Stoll-DeBell tell me how you're going to be prejudiced by

21    this and every answer started with we may have to do this; we

22    may have to have an expert; we may have to do some claim

23    construction; we may have to look at this; it's going to

24    delay us getting to trial.  They have known everything that

25    we know about this Shelton article since July 1 because on

1    July 1 we sent them our Inter Partes Review and it laid out

2    in excruciating detail exactly what we saw there that related

3    to all these claims.  And so they've been sitting on it for

4    two months and we come to a hearing where one of the issues

5    at the hearing is what's your prejudice and they can't give

6    you anything.  It's just maybe this, maybe that.  There's no

7    prejudice, Your Honor.  And how can there be prejudice?  They

8    talk about the shifting sands, but that's on one hand.  On

9    the other hand they're telling you that it's cumulative with

10   the prior art we already have.  So how does that add up?  On

11   101 they -- Miss Stoll-DeBell went over a lot of history and

12   there is a lot of law on this, Your Honor.  But what --

13   unless I missed it I didn't hear anything saying this is how

14   this significantly more has been applied by the Courts before

15   -- before Alice to these computer-implemented applications.

16             THE COURT:  Well, so -- so I think this is a very

17   important point.  One of the things that I know from our

18   experience together is that you're not only a very good and

19   thorough lawyer, but you're also a creative one, and you --

20   it doesn't seem to be to me to be much of a stretch beyond

21   Benson and Flook to say that substantially more or

22   significantly more would be extended to phenomenon from acts

23   of nature.  I mean, abstract ideas from acts -- from natural

24   phenomenons.  So why didn't you do that?

25             MR. STIMPSON:  Well, Your Honor, I mean, I didn't

```
 1     -- this was a long time ago we made this decision.  But if
 2     you look -- if you look at this case law -- and I -- and the
 3     best thing, again, to refer to there is the en banc decision
 4     from the federal circuit.  The plurality opinion, Chief Judge
 5     Rader who had four judges on that opinion, they all say the
 6     same thing.  And this was going to be the problem, right?  I
 7     come in.  I say okay.  We've got a 101 defense.  And what's
 8     the response going to be?  The response is going to be come
 9     on, it's a -- it's a -- even if it's an abstract idea it's
10     applied to a specific thing.  We're applying this abstract
11     idea to doctors.  It's very specific.  And then all they do
12     is they cite that law I recited to you from the en banc
13     decision before saying, you know, look, once you apply it to
14     something specific if it's not covering all abstracts then
15     you're good.  I'm going to lose that motion.  I really think
16     that that -- that was not a winner, Your Honor.  But now
17     Alice changed things.  And it's -- I'm not the only one that
18     thinks it's changed, right?  Because patents that were going
19     to be issuing from the Patent and Trademark Office, they had
20     notices of allowances.  They're going to be -- they're all --
21     they're being pulled because Alice changed the law.  The
22     Patent and Trademark Office was doing the same thing I was in
23     pre Alice.  These things, these computer-implemented
24     applications, they're fine.  They passed this law.  They can
25     go issue notices of allowance.  Alice comes out, yank them
```

1    back.  It's a change in the law, Your Honor.  I would not

2    have won that motion.  We would not have won a summary

3    judgment motion.  We would not have won that motion pre

4    Alice.  That's why.

5           I haven't had a chance to read this Transamerica.

6    I do remember it vaguely.  But if the suggestion is that

7    every time a new patent issue goes to the Supreme Court or

8    every time a new patent issue is taken en banc by the federal

9    circuit, and not just this case, but all my other patent

10   cases I have to notify the Court and my opponents that, hey,

11   just in case the law changes in my favor I might want to add

12   this defense, that's just extremely unreasonable.  Nobody

13   does that and nor could it be done.  It's just extremely

14   unreasonable to expect.  There's no -- Alice was not a big

15   deal until Alice was issued.  That's why, Your Honor.

16          Is there -- do you have any questions?  Maybe I

17   have something else.  Right.  There's this -- I mean, prior

18   to Alice there was this -- it was basically approached two --

19   there were -- a dual way, right?  You had the

20   computer-implemented inventions which was under Bilski, and

21   then as I think Your Honor mentioned as well, these natural

22   phenomenon, they were under the Mayo standard which had this

23   significantly more.  So there was a difference.  They were

24   just approached differently by the Courts.  Thank you, Your

25   Honor.

1             THE COURT:  Thank you.

2             MS. STOLL-DeBELL:  Your Honor, could I --

3             THE COURT:  You don't win because you go last.

4    And if you go again then I will allow Mr. Stimpson to go

5    because it's his motion.  If it's important I'll hear it.

6             MS. STOLL-DeBELL:  I just -- yeah.  I wanted to

7    bring to the Court (inaudible).

8             THE COURT:  All right.

9             MS. STOLL-DeBELL:  (Inaudible) which I failed to

10   do before.

11            THE COURT:  Okay.

12            MS. STOLL-DeBELL:  So, you know, the Patent Office

13   issues guidelines because they have thousands of examiners

14   who have to actually make decisions on thousands and

15   thousands of patent applications.  And since Bilski the

16   patent bar has been clamoring for some more concrete

17   instructions and con -- and consistent application of the

18   Supreme Court law to software cases and so that's why those

19   guidelines were issued.  But even in the guidelines

20   themselves they acknowledged that the law doesn't change.

21   They say that Alice doesn't create either per se excluded

22   category of subject matter such as software, business

23   methods, and it doesn't impose any special requirements for

24   the eligibility of software or business methods.  On the

25   second page they say that the basic inquiries to determine

1    whether subject matter eligibility is there or not remains

2    the same.  The examples that they give for examiners to use

3    cite to Bilski and Flook and Benson and all of those cases

4    that came before.  So, you know, they -- they have -- they

5    had issued new guidelines, but -- but it's not a substantive

6    change to the law, and it's not certainly one that says, you

7    know, before there was no 101 defense for MDx and now there

8    is one.  It just didn't change the law that way, Your Honor.

9    And, you know, if this were to come in we still think that we

10   would win a motion for summary judgment because in our case

11   we're not relying on computer implementation for our claims

12   to say that's why they're subject matter eligible.  We're

13   saying no one ever did what Health Grades did before Health

14   Grades did it, computer or otherwise, and for that reason it

15   is eligible and we still think it's -- we think that any kind

16   of 101 defense is destined to fail.

17          THE COURT:  Would -- do you -- what I heard

18   Mr. Stimpson say is that if this is allowed then that would

19   probably precipitate a motion for leave to file an additional

20   summary judgment motion which you would resist.  Do you see

21   it having any other impact on the case?  Do you -- this is a

22   purely legal matter.  You don't need discovery, right?

23          MS. STOLL-DeBELL:  We may need discovery.  And

24   like I said, I think Health Grades may want to go out and get

25   a -- get a different expert on this issue.  And so it for

1    sure would require a whole round of expert discovery.  And,

2    again, you have to look at is this an abstract idea or not

3    and what -- what was happening with computers and with the

4    health care industry and all of those kinds of things.  And

5    so -- so there may be some fact discovery, too.  But there

6    absolutely would need to be more expert discovery and expert

7    discovery completely unrelated to anything that -- that we've

8    looked at before.

9              And I'd go back to -- Your Honor, he could have --

10   I mean, there's a federal circuit case from 2011 that was

11   decided before their invalidity contentions were due,

12   <u>CyberSource</u>.  That found software claims to be not patent

13   eligible under Section 101 so there was law to support his

14   position.  Thank you.

15             MR. STIMPSON:  I have nothing further, Your Honor,

16   unless you have questions.

17             THE COURT:  I don't.  Thank you.  The motion for

18   leave to amend invalidity contentions and to add defense --

19   Section 101 defense is denied.  We are approximately three

20   months from trial in a case which has been pending for more

21   than three years time.  The patent rules from the Northern

22   District of California which the parties requested apply in

23   this case say that these contentions as to infringement and

24   invalidity should be set early and should be set firmly and

25   should not be altered.  There should be no changing sands

45

1    except upon good cause and I find that there is no good cause

2    here.  A diligent search should have included a search which

3    would have disclosed the additional prior art which the

4    defendant seeks to add.  The patent claims in the '060 patent

5    do include as a dependent claim, it's true, but do include

6    result lists and I -- I'm just simply not convinced that a

7    diligent search would not have turned up these three prior

8    art articles.

9           As to the Section 101 defense, I am convinced that

10   law existed at least in the form of <u>Benson</u> and <u>Flook</u> and

11   perhaps other cases which could have supported a good faith

12   Section 101 defense.  The defendant has not been timid in

13   raising defenses which urge a -- an expansion of the law.

14   I'm not even sure that this required an expansion of the law,

15   but there was sufficient basis upon which to make a Section

16   101 invalidity defense.  For whatever reason the defendant

17   chose not to do that and waited a very long time.  I am not

18   convinced that <u>Alice</u> is a significant change in the law which

19   justifies adding an important defense this late in the game.

20   So I'm going to deny the motion for leave to amend.  Do you

21   agree that in view of that the motion to compel should -- is

22   moot or should be denied, Mr. Stimpson?

23           MR. STIMPSON:  Actually, Your Honor, I don't.

24           THE COURT:  Okay.  I didn't think you would.

25           MR. STIMPSON:  Well, Your Honor, what -- in Your

1    Honor's order on the denial of the motion to amend I'm just

2    wondering if -- if it turns out that Health Grades, in fact,

3    had this and should have produced it whether that might give

4    us good cause, but if -- I guess if that -- if that -- that

5    part of the motion to compel is going to be denied as well

6    then I assume -- I don't know how this is going to work, but

7    it seems like if -- if the -- if it's denied, the motion to

8    amend is denied then even if they have the -- this NCQA

9    article I can't use it anyway.  So if that's the case then I

10   guess -- I guess I will have to withdraw the motion to

11   compel, that part, because there's no way I can use it even

12   if I get it.

13           THE COURT:  Okay.  I've said you cannot use it,

14   so --

15           MR. STIMPSON:  Okay.  All right.  Okay.  Then I do

16   withdraw it.

17           THE COURT:  Okay.

18           MR. STIMPSON:  (Inaudible).  There are two other

19   parts to this motion to compel, Your Honor.  One is on the

20   technical experts.  We've agreed with Health Grades that

21   we're going to have additional expert reports, technical

22   experts we're talking about primarily here.  We've had all

23   these query results that we've produced for -- as a result of

24   Your Honor's order.  They've all been produced.  Health

25   Grades says their experts are going to rely on them.  I know

1    our experts are going to rely on them.  They're -- Health

2    Grades has also produced some query results, hopefully more.

3    That's another part of our motion to compel.  But there's --

4    so there's a lot of new data and there's -- there are going

5    to be new expert reports and we just think that we should get

6    these expert depositions set because I know -- I'd like to

7    ask their question about their -- to ask some questions to

8    their expert about their theories.  I know they interpret

9    these results very different from we do -- the way we do and

10   we'd like to be able to examine them on it -- them.  And if

11   we don't set these expert depositions fairly soon they --

12   their schedules get blocked up and by October if we come back

13   to set them it's going to be a little late to try to get that

14   resolved in time then.  So we would like to have the

15   technical expert depositions scheduled as soon as possible.

16          The -- the second and last part of our motion to

17   compel that's still pending, Your Honor, is the queries we'd

18   like to have from Health Grades.  After the Court sanctions

19   order we did a very thorough reviews and analyses of our

20   database.  We produced a lot of different -- a lot of data.

21   And I asked Mr. Kostolansky to tell us after that order what

22   do you think you need.  He gave me a list.  We did it all

23   bang, bang, bang, bang, bang, and we gave it to them.  They

24   came back, asked for more and more and we kept giving it to

25   them, but they won't give us their queries.  But it's the

1    mirror image of our situation, Your Honor.  You ordered them

2    to provide a complete response to our interrogatory 6 long

3    ago, and that asked for information on damages.  Now, what's

4    good for the goose is good for the gander.  If -- if we have

5    to produce it they should have to produce it, too.  And

6    Health Grades opposition to this is very -- Page 12 of their

7    opposition, it's critical here.  They don't deny this is

8    relevant.  Page 12, the SQL queries of Health Grades database

9    that MDx now seeks, relate to the issue of whether or not

10   Health Grades practices its own patent.  That is, in turn --

11   thus this, in turn, is relevant to Health Grades' claim for

12   damages and Health Grades' assertion that secondary

13   considerations demonstrate that its patent claims are not

14   obvious.  They admit right there in no uncertain terms this

15   is relevant to our claims.  So why aren't they producing it?

16   The next two lines.  Health Grades has the burden on both

17   damages and secondary conditions -- secondary considerations,

18   thus Health Grades has the right to decide what evidence and

19   how much evidence it will rely on.  They're basically saying

20   look, this is our burden of proof so we'll decide what we're

21   going to give you.  That's what it says.  I mean, I've read

22   it about 10 times.  That's what it says.  They say it's

23   relevant.  We're not giving it to you because we're making

24   the decisions on what you're getting.  And that's what it

25   says.  See, and it is relevant.  They're right.  It's very

1    relevant to this.  If they're only -- if only one percent of

2    their web site is using this then that's critically

3    important.  It shows there's no demand for this.  It kills

4    their damages case and it kills their commercial success.

5         So, Your Honor, we respectfully request that

6    Health Grades do the same.  We're not asking for anything

7    that we didn't do.  Whatever we did they should be doing the

8    same because it's highly relevant to two issues, damages and

9    commercial success.  Anything else?  Thank you, Your Honor.

10        THE COURT:  Mr. Kostolansky.

11        MR. KOSTOLANSKY:  Yes.  Thank you, Your Honor.  We

12   begin, Your Honor, with the issue of expert depositions.  The

13   discovery that has gone on regarding SQL queries that have

14   been provided by both sides is really grist for the mill

15   regarding what the experts' opinions are.  And it -- it

16   remains to be seen whether the experts' opinions are going to

17   change in any way based upon that grist because the

18   underlying theories that have been articulated by the experts

19   throughout this case are pretty much set and I'm not certain

20   that there's going to be much change.  If there is a change

21   with respect to what's articulated in the expert reports then

22   that's the time to talk about whether depositions are

23   necessary.  The expert --

24        THE COURT:  But there just won't be any time.

25   You'll be very busy.  They'll be very busy.  Your experts

1    will be very busy.  Somebody's -- I mean, it's possible that

2    you'll resist those supplemental depositions because -- for

3    whatever reason, and maybe you can't get in front of Judge

4    Moore or me.  Won't we just run out of time?

5              MR. KOSTOLANSKY:  Well, their suggestion, Your

6    Honor, was that we have a conference with the Court on

7    October 19th or right around the time that the expert

8    rebuttal experts would be due and we would be happy to set a

9    conference with the Court for a couple days after any

10   rebuttal reports are due to address the issue regarding

11   whether it's necessary to proceed with expert depositions,

12   but the question is premature now especially in a case where

13   they have deposed our expert for over 14 hours already

14   regarding the reports that he's issued.  So if there's

15   something new that comes out then that's something that's

16   worthy of discussion, but -- but that -- that hasn't happened

17   and it's not clear that it will happen.

18             So as I said, Your Honor, if the experts and Your

19   Honor would like to set a conference shortly after the

20   rebuttal reports are due we're perfectly -- we're perfectly

21   willing -- willing to do that, but there just -- there needs

22   to be some substantiation that there's a need to take expert

23   -- expert depositions in a case where our expert's been

24   deposed for 14 hours.

25             Now, Your Honor, turning to this issue of the

```
 1    discovery being directed to Health Grades regarding SQL
 2    queries.  So let's start with -- with the primary premise
 3    here, or one of them, and that is that they have been
 4    sanctioned for violating discovery orders issued by this
 5    Court and that's what led to this substantial SQL discovery
 6    that they responded to, much of which was ordered by the
 7    Court and we worked with the other side to figure out what
 8    the scope of the agreement would be regarding what would be
 9    produced.  And there are still disagreements about that, but
10    there's been a substantial production of documents by them
11    based upon a violation of a Court order.  Here there's been
12    no violation of any Court orders by Health Grades.  We have
13    discovery requests that they propounded long, long ago and we
14    responded to those.  We responded in a supplemental fashion
15    on October 31st, 2013, the last day before the last trial
16    date where the parties agreed that they could supplement
17    certain responses.  We did that.  We didn't provide -- that
18    didn't change the scope of our responses to a great degree.
19    What happened?  Nothing.  Nine months.  Now, here we are
20    three months from trial.  And what do they decide to do?
21    File a motion to compel.  You know what?  Let's get Health
22    Grades busy because we know how long it took us to do all
23    this stuff.  Now let's put the onus on them three months
24    before trial to have them spending all this time running
25    queries, doing searches to address issues that aren't
```

1    relevant with respect to their case, but are relevant with

2    respect to our own damage theories and our own ability to

3    present our case.  So --

4              THE COURT:  Well, now that's a problematic

5    argument.  The opponent has always been entitled to discovery

6    to test your theory of damages.

7              MR. KOSTOLANSKY:  There's no question about that,

8    Your Honor, but the question is timing.  So if this was an

9    issue that they were truly concerned about, something that

10   wasn't just a tit for tat, hey, we had to do this because we

11   violated a Court order, now we're going to go make them do it

12   which is what it very much looks like they would have filed

13   the motion in November of 2013 rather than waiting until

14   three months before trial to file a motion that concerns

15   issues regarding the scope of Health Grades -- Health Grades'

16   proof.  So the record is what the record is.  They could have

17   filed a motion to compel well before October 31st of 2013 if

18   they didn't like the state of Health Grades' responses, but

19   they decided not to, and now they want to put the -- shift

20   the onus on us when we're three months from trial, should be

21   preparing for trial, to go run a bunch of SQL queries through

22   the -- through the web site that will take a substantial

23   portion of time just like it did for what they had to do

24   based upon Your Honor's -- Your Honor's order.  And -- and so

25   this is something that certainly could and should have been

1    addressed earlier if it was a true problem for them, if they

2    truly had issues with the state of the discovery responses

3    that Health Grades made years ago.  And I think there was a

4    hearing Your Honor had earlier regarding a motion to compel

5    that had been filed by them and Your Honor in addressing that

6    issue said look, Health Grades has responded how Health

7    Grades has responded.  It's a matter that concerns their

8    proof and so that's -- you know, that's up -- that's up -- up

9    to them with respect to, you know, what their ultimate

10   evidence will be.  We've given them some additional SQL

11   responses over -- in the past month and we've offered to have

12   our person who put those -- those together subject to

13   deposition, but they have not at this point accepted that

14   offer.  So we think this -- this is something, Your Honor,

15   that comes -- comes too late and there has been ample

16   evidence provided regarding all of the elements of the claim

17   with respect to Health Grades use of the -- of those elements

18   in actually operating its web site through the patent.

19          THE COURT:  Why is it so burdensome to -- to run

20   these queries?

21          MR. KOSTOLANSKY:  Because, Your Honor, it involves

22   a substantial effort of -- of -- I mean, if we looked at the

23   claim charts that have been produced therein, changes with

24   respect to those.  I mean, there are many, many Excel

25   spreadsheets of information and documentation.  And to say

1    the mere image of these queries matches their interrogatory

2    requests, it doesn't, because the queries that they ran were

3    the subject of the negotiations that we entered into with

4    them as a result of their -- their being sanctioned by the

5    Court.  Now they're trying to say well, now that should all

6    be flipped over and applied to Health Grades here three

7    months -- three months before -- before trial.  So this is --

8    this is something that -- that takes a substantial amount of

9    computer time and expertise to run.  And -- and, you know, we

10   have looked into, you know, some of the issues regarding the

11   searches that they were seeking regarding the Shelton

12   article.  You know, that was, you know, going to be a $23,000

13   project.  And I'm not sure exactly, Your Honor, what the

14   scope of this project would be, but, I mean, it's something

15   that on their side they would say they spent hundreds of

16   hours on and so I assume that that would be -- would be the

17   same on our side given the shortness of time before trial.

18             THE COURT:  Thank you.

19             MR. KOSTOLANSKY:  Thank you, Your Honor.

20             THE COURT:  Mr. Stimpson?

21             MR. KOSTOLANSKY:  And, Your Honor, I think also I

22   should mention these -- the SQL queries, really they go to,

23   you know, the amount of detail like, for example, how -- how

24   many physicians submitted information with respect to these,

25   you know, three elements of the patent, age or -- or

1   languages spoken or hobbies.  So to the -- to the extent

2   we're trying to establish a breach of the patent by them it's

3   relevant to show that they, in fact, had these folks, these

4   doctors come in and enter those categories whether via

5   facsimile or whether through -- whether through the approve

6   button.  We have the capability of our doctors to enter that

7   information.  When you look on your -- on our web site you

8   can see that that information is -- is populated on -- on the

9   web site and by and large that information came from the

10  doctors and that's what our -- you know, what our testimony

11  will be.  So shifting an onus to Health Grades regarding the

12  precise number of people who -- who engage in these

13  activities I don't think is -- I don't think is -- is

14  necessary with respect to the -- the type of proof that's --

15  that's required here.

16          THE COURT:  Thank you.  Mr. Stimpson?

17          MR. STIMPSON:  Thank you, Your Honor.  I just

18  briefly looked over their opposition brief and I -- maybe I

19  missed it, but I don't see anything in their opposition brief

20  about timing, saying this is coming too late.  They didn't

21  raise that, at least in this section I don't see it.  I hope

22  I didn't miss it.  But Mr. Kostolansky raises it here.  But

23  what's going on behind the scenes of this motion, Your Honor,

24  is Health Grades continuing to tell us that we have to

25  continue to run queries.  In fact, we just ran queries,

```
 1      didn't we?  Didn't we just produce them yesterday or they're

 2      coming?  There's still more queries we're running for them.

 3      And so Mr. Kostolansky says don't make us run queries.  We're

 4      too close to trial.  They've been beating us over the head

 5      with that order telling us you've got to do this, you've got

 6      to do this, you've got to do this, and it's still going on

 7      and we're still producing queries.  And another thing is,

 8      Your Honor, they just produced some queries.  So we're back

 9      to this thing that's in their opposition brief where they say

10      no, now we'll tell you what we'll give you, you know, not

11      what you want or what you asked for in discovery and what we

12      admit is relevant, we'll tell you what you get.  So they

13      produced some queries.  They only addressed four of the 13

14      elements in the claim, and they're saying no, we're not

15      giving you anything more.  So they can't just produce the

16      stuff that they want to produce, Your Honor.  As -- as you

17      pointed out, we're entitled to what's in their files that

18      rebut their allegations.

19              THE COURT:  Well, Mr. Kostolansky raises it today

20      if he didn't do it in his papers that it comes too late.

21      It's tit for tat.  It does look a little bit like tit for

22      tat.  Why hasn't this been raised for months and months?

23              MR. STIMPSON:  Well, actually we did raise it long

24      ago, Your Honor, with the -- I don't remember if it was

25      January or February or March or whenever it was, but when we
```

```
 1    were doing this that we thought -- and it's in some e-mails,
 2    saying that we thought, you know, they needed to do this as
 3    well.  Now, we've been talking with them about it.  I don't
 4    know how long -- how far back our correspondence goes on this
 5    issue, but recently it came up again, and the reason it's
 6    coming up is because they keep sending e-mails and calling
 7    and saying okay, now, here's all the other stuff you're going
 8    to do for your queries.  And we're still doing it.  You know,
 9    we're complying with their requests.  They filed a motion to
10    compel, but I don't think the motion to compel says more
11    queries because we're just doing it all.  So they keep, you
12    know, beating on us for more queries and then complaining
13    that they shouldn't have to do anything besides what they
14    decide they should give us.  So that's why, Your Honor.
15    Thank you.
16               THE COURT:  Thank you.
17               MR. KOSTOLANSKY:  If I could clarify one point,
18    Your Honor.
19               THE COURT:  No.
20               MR. KOSTOLANSKY:  No?  I will sit down.
21               THE COURT:  I wouldn't.  The motion to compel is
22    denied.  Well, it's denied as to the queries.  I'm going to
23    set expert deposition dates or order that you set expert
24    deposition dates.  So I'll grant the motion to compel with
25    respect to the expert deposition dates.  You may depose the
```

1    experts as to new areas or issues which arise in these

2    supplemental reports.  You can define what's new better than

3    I can so I'm not going to get in the middle of that, but you

4    -- I will order that you set those depositions so that they

5    can occur.  The depositions are limited to new areas and

6    limited to not more than three hours of examination.

7         As to the queries, I'm going to deny the motion.

8    I think Mr. Stimpson's argument is actually quite telling.

9    This came up now because they keep beating us up about it and

10   we're doing it and they ought to, too.  That does sound of

11   tit for tat.  I think that if this had been important it

12   would have been raised months ago and so I'm going to deny

13   the request finding that the defendant waited too long and

14   that the underlying reason is to try to equalize a discovery

15   burden, not because the information is really important or

16   necessary in the preparation of the defendant's defense.

17   Those depositions -- should I set a deadline by which they

18   must be completed, the supplemental depositions?  I think I

19   should.  When do you think they should be --

20        MR. KOSTOLANSKY:  If you want to, Your Honor.  I

21   don't think there will be an issue with respect to -- to

22   getting them set, but -- but you're certainly welcome to.

23        MR. STIMPSON:  I think maybe by the end of October

24   or the first week of November would be a good idea so we're

25   not butting right up against trial.

1           THE COURT:  By November 7.

2           MR. STIMPSON:  Thank you, Your Honor.

3           THE COURT:  That brings us to Health Grades'

4    motion to compel and for additional sanctions.

5           MR. KOSTOLANSKY:  Your Honor, may I -- may I ask

6    the Court's indulgence to take a brief break before we -- we

7    begin?

8           THE COURT:  I think that's a great idea.  Let's

9    come back at 3:15.

10          MR. KOSTOLANSKY:  Your Honor, also, I would like

11   -- we brought -- I apologize.  We did not make arrangements

12   to have an electronic presentation for Your Honor, though we

13   did prepare to do that so I apologize for that.  But we do

14   have a projector screen that I would like to set up while

15   we're taking the break.  Is it -- this is going to be a

16   little bit longer of a motion than the ones we've dealt with

17   before and it will help speed things up.

18          THE COURT:  You have the equipment you can install

19   on this break?

20          MR. KOSTOLANSKY:  We do, Your Honor.

21          THE COURT:  All right.  That will be fine.

22          MR. KOSTOLANSKY:  Thank you.

23          THE COURT:  We'll be back at 3:15.

24          THE CLERK:  All rise.

25          (Whereupon, a brief recess was taken from

```
 1   approximately 2:59 p.m. to 3:19 p.m.)

 2            THE CLERK:  All rise.  Court is in session.

 3            THE COURT:  Thank you.  Please be seated.  Now we

 4   are at Health Grades' motion to compel and for additional

 5   sanctions.  Mr. Kostolansky?

 6            MR. KOSTOLANSKY:  Thank you, Your Honor.  Your

 7   Honor, our motion directs itself to five specific remedies.

 8   I want to address -- I want to address those remedies before

 9   moving onto the substance of our argument to put -- put

10   things in context.  First we ask that the compiling

11   third-party verified information element of the patent be

12   deemed established, that the creating a health care provider

13   report using third-party verified information be deemed

14   established, that clear and unvarnished responses to the

15   Interrogatory Number 2 regarding the foregoing elements be

16   provided, fourth, that we reconvene the deposition of MDx's

17   corporate representative in Denver at MDx's expense to

18   address these and related issues, and, fifth, that Health

19   Grades be awarded its attorney's fees and costs in connection

20   with this motion.  And I would note parenthetically, Your

21   Honor, that we are -- there are no attorney's fees or costs

22   or other sanctions being sought with respect to Mr. Ridley or

23   his -- or his firm.  Despite four chances MDx's interrogatory

24   answer to -- to Number 2 regarding these claim elements has

25   not been forthrightly and honestly answered despite three --
```

1    three orders from Your Honor regarding this matter.  And I

2    want to take a look, Your Honor, initially at the patent so

3    we can focus on the specific elements involved.  And if we

4    look at column 20 that sets forth the compiling information

5    regarding -- that's been verified by independent third-party

6    source comprising three or more of the group consisting of

7    the following, and then we have board certification,

8    licensure, disciplinary action information, medical school,

9    medical internship, residency, and fellowship.  That's the

10   compiling piece.  And then the creating a report piece

11   concerns, by one computer processor a health care provider

12   report using the health care provider verified information,

13   patient provided information, and the information verified by

14   independent third-party sources to prepare the report.

15           Judge Brimmer entered his order, Your Honor, in

16   *Markman* construing some of these terms that are at issue.

17   And if we could go to Page 18 of that order please, Dan,

18   there Judge Brimmer talks about compiling and compile.  And

19   on the next page it talks about when a -- when a -- where

20   claim 1 describes compiling information verified by an

21   independent third-party source, our -- our element at issue

22   here, the sources of such information are listed, but the

23   manner in which the information is acquired is not described

24   by any word but compiling.  In this instance compiling does

25   refer -- appear to refer to both gathering the information

1      and then putting it together with other information verified

2      by third-party sources.  In short, the -- to the extent the

3      term requires construction the Court concludes that depending

4      upon the context in which it is used compiling can mean

5      gathering or putting together.  And then in the next subpart

6      H, if we could go back to that headnote, please, Dan, we're

7      talking about -- the Court's talking about using health care

8      provider verified information.  And there, Your Honor, we see

9      the Court says the parties disagree about whether as

10     defendant contends the use must be of all the designated

11     information.  The defendant fails to persuasively explain why

12     the Court should read such a limitation into claim language.

13     Defendant argues that the information refers back to the

14     previous references to the categories of information

15     described earlier in claim 1.  That appears to be in dispute,

16     but also does not resolve the issue of whether all such

17     information must be used when creating a particular health

18     care provider report.  The defendant does not explain why the

19     use of a subset of information somehow renders the

20     information no longer within the categories previously

21     identified in claim 1.

22             Thus, Judge Brimmer in *Markman* is saying there's

23     no requirement to use all the information in creating the

24     report and there's no reference to any requirement to

25     actually display the information that may be used in creating

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

63

1    the report.  Judge Brimmer states that the categories of

2    information are being used to create a report.  There is

3    nothing in the patent that requires when receiving, acquiring

4    or compiling information a predetermination of what will

5    ultimately be put into the report.  The particular

6    embodiments described herein are not intended to limit the

7    types of information that may be provided and/or verified.

8    For instance, a patient or health care provider might provide

9    information to the web site that is not deemed relevant or

10   important upon reaching the step of creating the report.

11   Because the Court rejects the insertion of all in the claim

12   language the phrase requires no further construction.

13          Now, this is -- this element of the claim is

14   important, Your Honor, because MDx has moved for summary

15   judgment in connection with the comparison ratings element.

16   That's been denied.  They moved for summary judgment in

17   connection with the -- the health care provider verified

18   information element.  That motion was then withdrawn by them

19   and sanctions were entered with respect to the discovery

20   responses upon which they based that motion.  So MDx has now

21   focused its defense on the third-party verified information

22   element and the creating a report using that information.

23   The seven elements that are listed, Your Honor, include the

24   area -- the group that's been referenced earlier, the ABMS,

25   American Board of Medical Specialties, that provide

1    certification.  There's not much dispute that the

2    certification information is compiled by MDx and used in

3    creating the report.  MDx has taken the position that

4    internship, residency, fellowship, and medical school, that

5    that information is displayed when it's received from the

6    health care provider as opposed to a ver -- a third-party

7    source, thus, they are trying to create an issue with respect

8    to those elements for trial.  We disagree with their

9    position, but nonetheless, that's a position that they are --

10   they are contesting.

11           So that then takes us to the other two elements,

12   licensure and disciplinary action.  And to put this in

13   further context, Your Honor, let's take a look at Exhibit 48

14   because that is -- I'm sorry, that is Document 18 -- 817-2.

15   And here we have the report, the provider report of MDx

16   concerning Dr. Kano.  And you'll see on the screen, Your

17   Honor, there is a star or a snowflake for Dr. Kano

18   representing that she had been awarded the Patients' Choice

19   Award.  And there's a description there by MDx of what the

20   Patients' Choice Award concerns.  Now, the Patients' Choice

21   Award is only entered by MDx or awarded when there has been

22   no sanctions and when the physician is, in fact, licensed.

23   We believe under Judge Mark -- Judge Brimmer's *Markman* ruling

24   that MDx is using that information in connection with the

25   creation of the report when it puts the snowflake or star

1    symbol for the Patients' Choice Award on Dr. Kano's report.

2              And if we turn to the second page of Dr. Kano's

3    report we see there that -- awards and distinctions.  If we

4    could scroll up just a smidge, Dan.  Yeah, the very, very

5    bottom there.  Patients' Choice Award and Compassionate

6    Doctor Recognition, again, listed on the second page of Dr.

7    Kano's report.

8              Now, there's another award that MDx grants called

9    the Top 10 Doctor Award.  And if we could go to the MDx web

10   site page, Dan.  This is for Dr. Keggen (phonetics).  And if

11   we see, Your Honor, there's a reference there opposite Dr.

12   Keggen's name to Top 10.  And the description there by MDx

13   states that Vitals Awards Top 10 Doctor Honors, about four

14   lines up from the bottom.  And so we'll come back to this Top

15   10 Doctor Award as we look at how MDx has -- has addressed

16   this issue in discovery.  But the Top 10 Doctor Award is

17   awarded involving a reverse algorithm from MDx that utilizes

18   disciplinary action information to determine whether the

19   physician should receive a Top 10 Doctors Award and, hence,

20   have that Top 10 Doctors Award displayed in the MDx profile.

21             Now, on August 1st of this year we received an

22   e-mail from plaintiff's (sic) counsel, not a sworn -- yes,

23   not -- I'm sorry.  Defense counsel.  Thank you.  Not -- not a

24   sworn interrogatory answer, not an amended interrogatory

25   answer, but simply an e-mail.  And in that e-mail on

1    August 1st, 2014 MDx's counsel said the claim element

2    requires creating a report using the information, in this

3    case licensure and disciplinary action, not creating an

4    award.  Thus MDx was drawing a distinction between creating

5    an award that appears in the report and using information in

6    connection with the report, and that -- Your Honor, that type

7    of distinction defies common sense.  It's contrary to Judge

8    Brimmer's *Markman* ruling.  It's based purely on semantics and

9    it has nothing to do with the way in which MDx operates its

10   web site with respect to pulling information to -- that's

11   used in the preparation of these reports.

12           I want to walk through the four interrogatory

13   responses that -- that MDx has -- has provided in the face of

14   three Court orders, Your Honor, to demonstrate how MDx has

15   failed to answer the interrogatory directly and without

16   evasion and fully and completely as required under Rule 33

17   and under Your Honor's order.  So I put together a timeline,

18   Your Honor, if we could look at that.  There's a July 25

19   entry that sets -- sets the stage.  That's the interrogatory

20   where MDx was supposed to state based upon their insertions

21   of non-infringement how the accused products operate or

22   function differently than the claim element.  MDx's first

23   response to that simply stated that the reports on the MDx

24   web site do not include three or more of the information

25   verified by the independent third-party source.  Then we

1    stated that creating a report using third-party information

2    states, regarding that element, MDx reports do not use all of

3    the compiled information.  Well, Judge Brimmer has ruled in

4    *Markman* that that's -- that that is not -- not required in

5    order to -- to meet the elements.  Now, that answer was

6    provided prior to the *Markman* order being entered.  I should

7    add that.

8           Then Your Honor on April 26 of 2012 granted Health

9    Grades' motion and ordered MDx to supplement its response and

10   to state for each claim element whether MDx's accused

11   products provide such an element or an equivalent, and if

12   not, explain how MDx's accused products operate or function

13   differently than the claim element.

14          So then we get to May -- May 10, 2012, MDx's

15   second -- second supplemental response, and they say

16   regarding third-party verification element the MDx web site

17   does not display the following information, licensure or

18   disciplinary action.  Well, again, that display is not a

19   required element of any portion of the patent.  Then

20   regarding the creation of the report element MDx acknowledged

21   that licensure and disciplinary action is obtained from one

22   or more third-party sources.  So that -- that is, in fact, a

23   significant onoptic (phonetics) acknowledgment with respect

24   to the claims.  Then MDx further states the MDx reports do

25   not use all of the compiled information.  Again, that's an

1    irrelevancy under -- under Judge Brimmer's *Markman* order and,

2    you know, was rejected by him.

3           On January 3rd, 2014 Your Honor entered his

4    sanctions order and that found that MDx's interrogatory

5    answer regarding the health care provider verified

6    information was false, that its summary judgment argument was

7    unfounded, and, again, ordered MDx to respond to

8    Interrogatory Number 2, and stated that Health Grades may be

9    permitted to reopen discovery necessary to cure any

10   additional prejudice.  And there in that order Your Honor

11   made reference to -- if we could go ahead and pull that up,

12   Dan -- at Page 4 made reference to MDx's attempts to defend

13   its false interrogatory answer.  It went on to note that the

14   cases relied upon by MDx for its meritless argument -- then

15   if we could turn to the next page -- concerned motions to

16   compel with respect to requests for production of documents.

17   And there Your Honor noted I'm not concerned here with the

18   request for production of documents.  To the contrary, in

19   this case Health Grades served an interrogatory on MDx and I

20   ordered -- I entered an order compelling MDx to fully answer

21   the interrogatory by stating for each claim element which

22   includes the ones at issue now whether MDx's accused products

23   provide such an element or an equivalent, and if not, explain

24   how MDx's accused products operate or function differently

25   than the claim element.  And then the Court addressed what

1    one should do in answering interrogatories.  The party is

2    charged with the knowledge of what its agents know or what is

3    in its records -- in records available to it, or even for the

4    purposes of Rule 33 information which others have given it on

5    which it intends to rely in its suit.  And on the next page

6    Your Honor noted to the contrary, interrogatories must be

7    answered directly and without invasion -- evasion in

8    accordance with information that the answering party

9    possessions after due inquiry.  In this case and in view of

10   my order compelling discovery the due inquiry certainly

11   required MDx to go -- to gather information available from

12   its database by either designing necessary queries or

13   otherwise.

14           So then, Your Honor, MDx filed its third response

15   to Interrogatory Number 2.  If we go back to the timeline,

16   please, Dan, on January 24th, 2014.  And there MDx said

17   regarding third-party verification MDx states that the web

18   site after January 11 has not created provider profiles

19   containing or using disciplinary action information and has

20   not created provider profiles using or containing licensure

21   information.  Now, this is the first time, Your Honor, that

22   MDx had made such a disclosure regarding its discovery

23   responses.  And there is a document that MDx had produced

24   that raises issues regarding that disclosure and that is at

25   Docket Number 39-3, an e-mail exchange -- an internal e-mail

1    exchange at MDx.  So there we see there's an e-mail from an

2    employee Gina Larsen-Stoller (phonetics), November 9, 2011,

3    to Ms. Erica Boyer (phonetics) and others.  And Miss Boyer

4    has responsibilities with respect to maintaining the

5    information contained on the web site.  And if we go back to

6    the prior page we see Miss Larsen-Stoller asked -- and let's

7    -- let's back up.  Let's go up one more, Dan.

8              Do we actually mention sanctions publicly or we

9    just -- do we just collect the information in our database?

10   Does it take a certain amount of time for a sanction to be

11   registered with us?  I ask because I'd like to weed out

12   doctors with sanctions from our Top 10 polls, meaning the Top

13   10 Award, and I'd like to know how accurate our data is.  We

14   go back to the first page.  Miss Boyer responds on

15   November 9, the same day, just have the doctors with

16   sanctions suppressed from the selects that are run.  Thus it

17   appeared that MDx was using disciplinary action to cull or

18   weed out doctors with respect to awards that are appeared --

19   that appeared on its web site.

20             THE COURT:  Selects would be awards?

21             MR. KOSTOLANSKY:  I'm sorry?

22             THE COURT:  This says we -- from the selects --

23             MR. KOSTOLANSKY:  From the selects, yes.

24             THE COURT:  -- selects is the same as awards?

25             MR. KOSTOLANSKY:  That's -- that's how -- that's

1    how we were interpreting that because the question that was

2    posed involved the Top 10 Doctor Award which we -- which we

3    showed Your Honor -- Your Honor earlier.  Now, what had not

4    been a significant concern to us about whether this

5    disciplinary action was used to cull based upon this e-mail

6    that we had received from MDx, but now MDx is taking the

7    position in this interrogatory answer that this information

8    is, in fact, not being used to create a -- the provider

9    reports.

10          And so if we could go back to the timeline, Dan.

11   Let's go to the next entry up, the -- right there, third one,

12   up one.  MDx also said there that the database used to

13   populate provider profiles called Mongo (phonetics) does not

14   include licensure information, not licensure data.  Because

15   the Mongo database does not include licensure information

16   provider profiles are not created using licensure.  Thus that

17   raised the issue about whether licensure was used in

18   connection with preparing these reports.

19          So as part of the discovery process we took the

20   deposition of the MDx corporate representative in May of this

21   year and here's what he said to juxtapose that interrogatory

22   answer.  The next column, Dan, that next one down.  Yeah.

23          MDx's corporate representative testified as

24   follows:  When we produce the Mongo collection we bring over

25   the data from the data warehouse.  We don't pay attention as

1      a filter as to whether or not someone is licensed.  The

2      license data comes forward.  So now we have an interrogatory

3      answer that says they don't include licensure in the data and

4      we have deposition testimony from their corporate

5      representative that says they do.  Also, Your Honor, they --

6      in their interrogatory -- back to their interrogatory answer

7      on January 24 they state to -- right to the bottom, Dan, the

8      last two paragraphs.  MDx also states that the information is

9      not verified if it is subject to such disclaimers.  So now

10     they're raising another defense regarding this issue.  But

11     Judge Brimmer had already addressed that in his *Markman*

12     order.  Regarding third-party verified information he stated

13     the patent does not require third-party information be

14     proven, but, rather, only describes an attempt to

15     substantiate that will provide a patient with some assurance

16     that the qualification of the doctor had been checked by

17     someone.  And there's a reference to the '060 patent.  So

18     that particular response was not of great concern to us.

19            So after we received these discovery responses in

20     light of Your Honor's sanctions order we began the

21     negotiation to take the deposition of the corporate

22     representative of MDx which we did on May 15th and one of our

23     purposes was to address these issues.

24            The next event that occurred, Your Honor, was on

25     April 30th Your Honor denied the motion for reconsideration

 1      filed by MDx.  If we could go to that on the timeline, Dan.

 2      And there Your Honor held that the motion to compel made

 3      clear exactly what Health Grades was seeking and why, and my

 4      order compelled a full and complete answer to the question.

 5      At -- at that point reliance on California local rules was

 6      unreasonable.  Thus Your Honor recognized that California

 7      local rules do not trump orders of this Court, but the same

 8      pattern that appeared with respect to the prior sanctions

 9      order has continued with respect to this claim element.  And

10      in the prior sanctions order Your Honor noted that MDx

11      currently has no knowledge of any physician who entered

12      and/or modified three or more of the health care provider

13      verified information.  The argument was misleading, if not an

14      outright falsehood was made, and the care with which the

15      statements are presented lack -- that makes the lack of

16      candor clear.

17              When we took Mr. Balomo's (phonetics) deposition,

18      Your Honor, regarding licensure information -- if we could

19      bring up Exhibit 19, Dan.  When we took his deposition we

20      specifically referenced the topics to be covered, and topic 9

21      concerned the discovery responses that Your Honor had ordered

22      that we -- that we just reviewed, and then topic 12, to

23      remove any doubt about licensure, MDx's use of licensure

24      information and public records in creating provider profiles,

25      thus the use of licensure information regarding Mr. Balomo's

1    deposition as the MDx corporate representative was clearly

2    teed up.

3           Now, the next event that occurred, Your Honor,

4    there was further discussion between counsel regarding the

5    inadequate responses that MDx had made with respect to this

6    interrogatory concerning the claim elements at issue.  And

7    that failure to provide full and complete response led to a

8    further and now fourth supplement to Interrogatory Number 2

9    by MDx with respect to these elements.  If we could go, Dan,

10   to the -- to the timeline.

11          So here we have MDx stating that -- regarding

12   third-party information MDx contends that the third-party --

13   information from third parties includes disclaimers and

14   third-party information is not verified.  Okay.  We've

15   covered that.  Next regarding the creating a report using

16   third-party verified information, MDx, again, repeats that it

17   was not creating provider profiles containing or using

18   disciplinary action or licensure information.  So this is

19   eight days before we take Mr. Balomo's deposition where he

20   says that's not -- that's not the case.  MDx also --

21          THE COURT:  Who signed the -- who signed the

22   supplemental interrogatory answers?

23          MR. KOSTOLANSKY:  We will -- we will check, Your

24   Honor.  I -- I don't have that right now.  Oh, Ms. Boyer.  So

25   MDx also states, Your Honor, in its -- in its fourth

1    response, third, the vitals.com software code.  So now we're

2    bringing something new in.  Accessing the database used to

3    populate provider profiles called Mongo, and then they

4    reference the page, does not include licensure data except in

5    certain circumstances for accessing the provider portal.

6    Because the vitals.com software code accessing the Mongo

7    database does not include licensure information, provider

8    profiles are not created using licensure information.  So

9    let's -- Dan, let's put side by side that response which

10   starts with the word third and let's look at what -- what was

11   said prior in the January response.

12          In the January response which is at the top there,

13   Your Honor, they reference the database used to populate

14   provider profiles does not include licensure.  Now, in the

15   May response, even though that's still contrary to what

16   Mr. Balomo said, they say the vitals.com software code

17   accessing the database does not include licensure data.  So a

18   subtle twist from database which obviously they were

19   concerned might imply that the whole -- that the database is

20   used with respect to creating the reports, now they want to

21   switch it to the software code.

22          Okay.  Let's go to the next -- the next entry on

23   the timeline, next two.  Thank you.  So, I'm sorry, Page 3,

24   Dan.  There we go.  Yeah, that's it.

25          Okay.  As noted above, Mongo includes licensure.

1      MDx's corporate representative testified that licensure

2      information and disciplinary sanctions are included within

3      the Vitals provider data warehouse and that licensure

4      information was included in the Mongo collection.

5      Apparently, Your Honor, the Mongo collection is another

6      computer that draws off information that MDx chooses to move

7      forward into -- into the Mongo collection.  So licensure is

8      included in Mongo.  And that he initially believed

9      disciplinary information was included in Mongo, but then he

10     said he couldn't be sure.  Now, in fact, all the disciplinary

11     action information and the licensure information is included

12     within the -- the MDx database and -- and one need look no

13     farther than MDx's own documentation to see that.  And if we

14     could pull up Exhibit 5, Dan.  This is Vitals data and

15     database November of 2013, so not that long ago.  And we look

16     at the -- if we could go to Page 31.  Here's the data

17     uploading protocols ensure accuracy of information.  Critical

18     data changes occur monthly.  Certifications, licensure

19     status, disciplinary actions, sanctions and CQA.  So there

20     they're acknowledging with respect to their database that

21     licensure status and disciplinary actions are updated on a

22     monthly basis.  They state later new Patient Choice Award

23     winners are also identified monthly.  And then they state

24     data sources with less variability are updated on a three to

25     six-month cycle.  Hospital affiliations, awards, publications

1     (inaudible).  So they're updating the awards on a three to

2     six-month basis.  They're using licensure and data status

3     monthly.

4             Now, we've just looked at the interrogatory

5     answers that MDx provided.  No reference to awards being

6     included as part of the report or that information that is

7     used to create an award that is then placed on the provider

8     profile is not included in the report.  No disclosure of that

9     whatsoever despite four tries.  What they did do was they

10    tried to focus on well, hey, we don't display this

11    information or it's not verified or now they're trying to

12    develop some distinction as we saw between three and four --

13    their third and fourth response about the difference between

14    a database and software that's really never explained.  It's

15    not until August 1st, 2014, and, again, not in an

16    interrogatory answer, not in an amended verified statement

17    signed by -- by their client, but in an e-mail from the

18    lawyer do they say -- if we could go to the timeline, Dan --

19    the claim element creating requires -- right at the top --

20    Page 4, please.  The claim element requires creating a report

21    using this information, not creating an award.  And, Your

22    Honor, we can be creative as lawyers as much as we want

23    within limits.  That is way outside the bounds of appropriate

24    advocacy to say something that is involved in -- is used in

25    creating an award that appears in the report is not involved

1    in creating the report.  That makes no sense, defies common

2    sense, and is contrary to Your Honor's discovery order that

3    they should provide full and complete responses to the

4    interrogatory.

5            So let's assume that this half-baked notion that

6    they have has some level of validity.  Why wasn't it

7    disclosed prior to August 1, 2014, three months from trial --

8    four months from trial in an e-mail from counsel when Your

9    Honor specifically ordered the other side to provide full and

10   complete interrogatory responses in a non-evasive way and

11   even provided case law instructing regarding what should be

12   done with respect to answering interrogatories and what the

13   obligations of a party are?  So this is the first time, Your

14   Honor, then since July of 2011 when Health Grades propounded

15   this interrogatory that MDx took the position that

16   information used to create a piece of information that was

17   displayed in the report is not using that information to

18   create the report.

19           And so the e-mail went on, Your Honor.  And in the

20   next sentence MDx's counsel said -- down a little farther --

21   down a little farther, Dan, just -- yeah, there we go.

22   Counsel -- up, up, up, up.  There we go.  And down and down.

23   No.  Yeah, there we go.  They further explained that even the

24   awards are not created using disciplinary action.  They are

25   given to the physician when certain criteria are met and

```
 1    there is an absence of disciplinary action, thus MDx's
 2    position that using information contained within the MDx
 3    computer system to cull out information that would be
 4    otherwise displayed in the provider profile is not used in
 5    creating the report because the information is removed from
 6    the report.  Well, that's a questionable position to take to
 7    begin with, but -- because even if you eliminate certain
 8    reports from your web site you're still using that
 9    information to determine what would be included in the report
10    that is created.  So, in other words, if someone's been
11    subject to sanctions, they earned the Patients' Choice Award,
12    but you don't give them the Patients' Choice Award, then
13    you're using that in deciding the content of the report.  But
14    even more importantly, Your Honor, the disciplinary action
15    is, in fact, used to determine whether someone will receive
16    the Patients' Choice Award as is licensure.  So when the --
17    when the physician is both licensed and has not been subject
18    to disciplinary action which MDx determines based upon its --
19    its -- the use of its information in its computer base then
20    they issue the award and the award appears on -- on the -- on
21    the provider profile, and so that is using that information,
22    Your Honor.  Let's go ahead down to the next paragraph, Dan.
23    Thus there can be no argument with respect to absence of
24    licensure information because that information must be used
25    in order to -- to receive an award, thus licensure
```

1    information is used in the creation of a report for an

2    individual who is entitled to receive the Patients' Choice

3    Award.  Nevertheless, Your Honor, despite all of that, MDx's

4    corporate representative when he -- when he's deposed on

5    May 15 testified he did not know whether a physician who had

6    been sanctioned was eligible to receive a Top 10 Doctor Award

7    given by MDx.  Again, completely -- completely contrary to

8    the existing state of the record and contrary to what he

9    should have been prepared to testify to.

10          So here's his -- his deposition testimony, Your

11   Honor.  Question, If a physician has been sanctioned is the

12   physician eligible to receive a Top 10 Doctor Award given by

13   MDx?  Answer, I don't know.  And this is a corporate rep of

14   MDx, May 15th, after these interrogatory answers have been

15   propounded saying that he doesn't -- he doesn't know when MDx

16   has just taken the position in its interrogatory answers that

17   is contrary to -- to what they now say.

18          Let's go back to the patent if we could, Dan,

19   Exhibit 1.  The patent in that second element refers to in

20   the third line of creating that health care provider report

21   using health care provider verified patient and the

22   information verified by an independent third-party source.

23   There's no requirement here, Your Honor, that anything be

24   displayed.  The question is completely one of use.  And this

25   information was used by MDx in creating their report and they

1     did not disclose that in their discovery responses.

2              THE COURT:  And it was used in creating the report

3     because it was used in awarding -- making awards which were

4     reported in the report?

5              MR. KOSTOLANSKY:  Which were -- yes, which were

6     presented and displayed in the report as a part of the report

7     designed to provide information to consumers which is the

8     function of all of the elements or pieces of a report.  Each

9     piece has the same function, providing information to

10    consumers.

11             So if we look at the last entry then from the

12    timeline, please, Dan, the last two.  Now, in opposition to

13    this motion Ms. Boyer submitted an affidavit on behalf of MDx

14    and there in paragraph five she confirms that medical

15    information -- medical licensure information is used to cull

16    physicians to determine eligibility to receive awards.  So

17    that's Miss Boyer today, in August of 2014.

18             Let's look at Mr. Balomo back in May.  He

19    testified that the licensure data comes forward.  It is not

20    used for the site.  It is not used for any purpose whatsoever

21    than to validate whether or not a person is who they say they

22    are when they're claiming their profile.  So it's a security

23    check.  Other than that it's not used in the site.  So now we

24    have two conflicting statements from MDx, one in a

25    deposition, one under oath within -- within three months of

1    each other and we still don't have either of those presented

2    in a verified interrogatory response.

3           So the discovery from MDx in connection with this

4    -- these topics, Your Honor, are filled with half-truths and

5    outright misstatements, all of which are designed to avoid

6    having to disclose that sanctions information and licensure

7    information is compiled by MDx and used to create the MDx

8    provider profiles.

9           Now, let's look at what MDx says.  So they tell us

10   that Health Grades position that disciplinary action

11   underlying an award is used in creating the report was not

12   set forth in Health Grades' infringement contentions.  In

13   other words, it's their fault.  It's not our fault.  It's

14   Health Grades' fault.  Well, as we're going to see in a

15   minute, Your Honor, Health Grades' infringement contentions

16   did address the issue regarding what was displayed in the

17   physician profile of MDx and did address the issue regarding

18   whether information that is not displayed is, in fact, used

19   in creating the report.  MDx simply chose to ignore the

20   information that Health Grades provided so that it could

21   continue to withhold information that's damaging to it

22   regarding the compiling of third-party verified information

23   element and using that information to create a report.  So

24   let's look at the disclosure that Health Grades made.  Let's

25   look, Dan, at Exhibit 110.

1            This is Your Honor's order regarding Health

2    Grades' motion for leave to amend infringement contentions.

3    If we go to the second page, there Health Grades -- Health

4    Grades seeks to amend its infringement contentions to

5    incorporate the infringement opinions of its technical

6    expert, Dr. Philip Greenspun.  So that was the issue with

7    respect to the motion.  On the next page Your Honor granted

8    the motion to amend January 14, 2013.  Mr. Greenspun's report

9    is dated January of -- I'm sorry, July of 2012.  In his

10   report -- if we go to paragraph 157, there Mr. Greenspun

11   talks about the three elements that are -- that the reports

12   do contain a combination of, and then he says furthermore,

13   the creation of the report involves using a combination of

14   the information that the physician entered or verified,

15   information the patients have provided, and information from

16   third-party sources even if that information is not

17   explicitly displayed.  And there in his report Dr. Greenspun

18   cites a Vitals PowerPoint thinking about physician quality

19   and he cites a particular page, 12068.  So, Dan, let's go if

20   we could to -- to that exhibit and let's go to Page 12068.

21   There MDx states in its document that a reverse algorithm was

22   created based on the extensive history of top doctor ratings.

23   Okay.  So MDx is using a reverse algorithm to figure out

24   who's entitled to a Top Doctor Award.  Then MDx notes -- and

25   this is, again, at Page 12068.  The individual quality

1    factors include all the data points previously mentioned.

2    So, now, let's go back two pages, Dan, and let's look at

3    those data points.  There's the Vitals data set, 62 fields.

4    They include things like patient ratings, academic

5    appointments, overall provider score, languages spoken, and

6    disciplinary action, thus Vitals is using disciplinary action

7    as part of a reverse algorithm to figure out who's entitled

8    to its Top 10 Doctor Award.  And that information was

9    disclosed to Vitals in the infringement conventions submitted

10   by Health Grades pursuant to Your Honor and as set forth in

11   Dr. Greenspun's report.  MDx says that Health Grades is

12   bringing up a new theory that would not be expected to come

13   to mind.  Well, this is not a new theory, Your Honor.  MDx's

14   argument is nothing more than an after-the-fact justification

15   to disguise its failure to fully and accurately and without

16   evasion respond to the discovery request as ordered by Your

17   Honor.  When we raise these issues with MDx they come back

18   with explanations that as we've seen defy common sense,

19   assert that sanctions and licensure is not used to create a

20   report when it's used to create a part of the report, and

21   that is all that is necessary in order to determine that that

22   information is used.  There's no requirement that all of the

23   third-party verified bits of information be used.  Judge

24   Brimmer says you can use part of that and you don't have to

25   display any of it.

```
 1            So let's look now at Page 9 of MDx's brief in this
 2    matter, Your Honor.  There MDx says that when -- when the
 3    create a report language is properly interpreted it means
 4    precisely what it says, the actual software creation of the
 5    report, thus the claim language requires that three or more
 6    of third-party data elements actually be used in that
 7    function, not some other analysis or software function like
 8    identifying providers for awards.  Well, first of all, the
 9    claim language doesn't require three or more data elements
10    actually be used in the function.  Judge Brimmer was very
11    clear about that.  You don't have to use three.  You have to
12    compile three.  So that's -- that's a misstatement of what --
13    of what Markman requires.  And then to bring in this notion
14    of the actual software creation, that's not in Judge
15    Brimmer's Markman order.  Judge Brimmer said using should be
16    interpreted in its own common sense way, not -- not some
17    creative after-the-fact justification for failure to respond
18    to the interrogatory answers.  The patent says nothing about
19    -- about this type of response.  MDx uses this with respect
20    to the Top Doctor Award in connection with a reverse
21    algorithm.  The results of which are then placed into the --
22    the reports on MDx's web site.  This software application
23    argument, Your Honor, is another slight of hand designed to
24    hide the truth, but even if one were going to hide the truth
25    through this slight of hand that should have been disclosed
```

1    in the four interrogatory answers that were provided and in

2    response to addressing the three orders that were entered by

3    the Court.

4            So, again, Your Honor, we ask that the third-party

5    verified information element be deemed established, that the

6    creating a report using third-party verified information be

7    deemed established, that MDx be ordered to answer fully,

8    completely without evasion Interrogatory Number 2 regarding

9    these questions -- these elements, that Mr. Balomo's

10   deposition be reconvened in Denver at MDx's expense to

11   address these and other matters, and that costs and

12   attorney's fees be awarded to Health Grades.

13           Now, Your Honor, let me return to the other part

14   of this motion and that is the -- the issue concerning

15   additional discovery regarding -- regarding the SQL responses

16   that MDx has provided.  So what we did here, Your Honor, was

17   we tried to make this -- excuse me.  We tried to make this as

18   easy and as straightforward as possible.  We looked at these

19   SQL responses.  We thought that almost 4,000 doctors appeared

20   to have met all the six elements of the claims.  We knew we

21   were going to end up in an argument with them if we

22   propounded further discovery trying to clarify that so we

23   took a very, very simple and unburdensome approach.  We

24   focused on one doctor and we traced that doctor's history

25   through the SQL responses that they had given, and in

1    connection with that we propounded 25 requests for admission,

2    that's it, all about one doctor.  And we felt that was the

3    easiest, most efficient way to address this issue.  So we

4    asked, for example, admit that the health care provider

5    report for Dr. Bharam, B-h-a-r-a-m, Bharam, uses medical

6    school information received from third parties.  Very

7    straightforward, requests like that.  Admit health care

8    provider report of Dr. Bharam included a hyperlink to an

9    affiliated hospital.  Admit that the report uses board

10   certification information received from ABMS.  A couple of

11   our requests for admission were answered so this is

12   noteworthy because we asked admit that MDx has received the

13   following types of health care provider verified information

14   from Dr. Bharam through direct portalets (phonetics).  So we

15   had SQL queries that said there were direct portalets by --

16   by Dr. Bharam, and the colon can then concern awards, honors,

17   languages, and professional appointments.  Here's the

18   response we get.  Denied that any of this information was

19   verified, but admitted that Dr. Bharam provided these

20   elements through direct portalets.  That wasn't the question.

21   The question was has MDx received.  That's the question.  And

22   they want to talk about whether something was verified.  They

23   deny the information was verified and they want to focus on

24   whether he provided it.

25            Well, in -- in Judge Brimmer -- if we could pull

1    up Exhibit 4, Dan, Page 15.  In Judge Brimmer's *Markman*

2    order, right in the center there, Dan, it says here about

3    three lines from the left, down a little bit farther.  There

4    we go.  Right -- right in the middle of your page.  Do you

5    see the word here off to the right?  I'm sorry.  The right --

6    there we go.  Here the specification makes clear that the act

7    of verifying -- and this is in the context of health care

8    verified information -- requires only that the web site

9    receive confirmation of the information from some other

10   source, in this instance the health care provider.  Indeed,

11   the confirmation described appears not to extend beyond

12   receipt of such information from the first health care

13   provider, hence, our request for admission directing itself

14   to receiving that information which, again, was not -- as I

15   quoted and referenced was not answered by MDx.

16          So then, Your Honor, we get the affidavit or

17   declaration, I should say, of opposing counsel in connection

18   with this.  And if we could bring up 83-1, paragraph 18 at

19   Page 5.  Last three lines there on this first -- on -- the

20   supplemental response makes clear that no MDx report meets

21   all the elements of any claim and specifically that no report

22   has information verified by a provider.  So here we are.

23   We're back to the same thing again arguing about -- about

24   verification that's been addressed by Judge Brimmer.  No

25   report is -- no report is created using verified information

1    by a provider.  Same thing.  No report is creating -- using

2    three or more of the third-party data elements.  Well, that

3    was something we went through in the very, very beginning of

4    our discussion, Your Honor, about what that -- what that

5    requires.  It's not three or more.  Judge Brimmer says it

6    doesn't require using three or more.  It doesn't require

7    using all or any specific number.

8           And we had a hearing, Your Honor, on June 27th of

9    this year before Judge Moore where he basically came in and

10   told us what some of his orders were regarding several of the

11   pending motions.  If we could go to that, Dan, it's

12   Exhibit 22.  And an issue was raised by us in that hearing

13   about -- about what experts could opine to in light of the

14   *Markman* ruling.  And while we didn't argue the motion at the

15   time, Judge Brimmer simply told us his ruling.  And if we

16   could go to -- go to Page 7, please, Dan, and line 18.  I'm

17   sorry, 19.  And what I am telling you is that at this trial

18   I'm not going to permit experts to be redefining terms.

19   We're going to stick with the *Markman* order and any expert

20   testimony that tries to redefine that will be met with

21   difficulty.

22          And so, Your Honor, we have -- when we're

23   propounding discovery requests within the context of the

24   *Markman* ruling there are no responses that are consistent

25   with the *Markman* ruling, instead MDx goes back and utilizes

1    its old arguments that had been rejected during the *Markman*

2    proceeding in order to superficially respond to those

3    interrogatories or other requests.

4            So what we ask, Your Honor, with respect to this

5    element of our motion is that 25 requests for admission

6    directed to MDx that we've attached to our motion, that the

7    Court orders MDx to answer those interrogatories -- those

8    requests for admission and that they be answered consistent

9    with Judge Brimmer's ruling in *Markman*.  That's all I have,

10   Your Honor.  Thank you.

11           THE COURT:  Thank you.  Mr. Dickey?

12           MR. DICKEY:  Your Honor, Trent Dickey.  Could I

13   respectfully ask for five minutes to consult with my

14   cocounsel on this because there was a 15-page limit on the

15   briefs.  I understand why I'm seeing all this now for the

16   first time on these slides and a lot of documents that I

17   haven't reviewed, so I would like to consult with

18   Mr. Stimpson and Mr. Lee briefly so I can properly address

19   the totality of these new arguments that I'm hearing for the

20   first time.

21           THE COURT:  Okay.

22           MR. DICKEY:  Thank you.

23           THE COURT:  We'll reconvene at 4:30.

24           MR. DICKEY:  Thank you, Your Honor.

25           THE CLERK:  All rise.

1          (Whereupon, a brief recess was taken from

2     approximately 4:21 p.m. to 4:32 p.m.)

3          THE CLERK:  All rise.  Court is in session.

4          THE COURT:  Thank you.  Please be seated.  So Mr.

5     Kostolansky started at about 3:30, right --

6          MR. KOSTOLANSKY:  Yes.

7          THE COURT:  -- and -- and went to quarter past --

8     20 past and then we took a break.  So I will go to 5:30,

9     Mr. Dickey, but I'll have to stop at that.

10          MR. KOSTOLANSKY:  Your Honor, if I may.  Some of

11     the exhibits that are not yet in the record that are

12     referenced during my argument I have copies here.  I gave

13     copies to Mr. Dickey.  Would -- would Your Honor like to

14     receive copies?

15          THE COURT:  Yes, please.

16          MR. KOSTOLANSKY:  I will bring them up to you.

17          THE COURT:  Thank you.  Thank you.  Mr. Dickey.

18          MR. DICKEY:  Thank you, Your Honor.  The copies

19     counsel for Health Grades just mentioned that we received, we

20     received them six minutes ago.  We provided them with our

21     copies.  They filed the 15-page brief.  We responded point by

22     point to the 15-page brief.  Every issue that they raised we

23     specifically addressed it.  Today I received a stack of

24     documents a few minutes ago that I had not seen in connection

25     with this motion, a tremendous amount of argument that was

1    never raised below with the motion.  There's a technical

2    term.  I feel sandbagged.  I really do.  I believe we have to

3    have a right to supplement the record with rebuttal documents

4    for these new issues that have been raised and new documents

5    because we do have rebuttals on a lot of this stuff.  We

6    throw up partial transcripts and -- and Judge Brimmer's

7    *Markman* decision is a perfect example.  Now, this happens to

8    be in the record I believe, but we saw quotes of footnote 8,

9    dicta, which I'm going to address and plan to address in my

10   argument, but not the entirety of it.  And as far as the

11   depositions, we saw snippets of depositions.  That's not the

12   proper way to address a serious motion like this for

13   additional sanctions, Your Honor.  And I -- so I do

14   respectfully request the opportunity to supplement the

15   record.

16         THE COURT:  All right.  At the end at 5:30 we'll

17   talk about what you need and how much time.

18         MR. DICKEY:  Thank you, Your Honor.  Your Honor,

19   at no time has the information that plaintiffs complain about

20   been hidden or concealed, at no time.  They have known about

21   the specific facts they complain about and claim to have only

22   learned in July for three years, three years.  There were

23   three separate productions that specifically outlined the

24   requirements for awards and specifically provide exactly what

25   they say they didn't know until just recently.  They never

1    alleged this infringement allegation at any time until

2    recently that bestowing an award using a separate software

3    can be creating a report using disciplinary or sanction

4    information.  It's never been alleged.  That is something

5    that you would have to amend your contentions.  And I'll get

6    to that in a minute.  This is not about collecting data.

7    There are two aspects to this patent, and what we heard was a

8    blending of them that you cannot do.  One is compiling the

9    data, and that's a separate division under column 20 of the

10   patent which I think is attached to the Stimpson declaration

11   as Exhibit A.  And if you look there you'll see that award is

12   outside of these claim elements.  The only mention of award

13   is in the paragraph above the compiling and above the

14   creating of a report.  And that's the reason why the relevant

15   documents that are now relevant were produced because award

16   was a different aspect.  It wasn't part of this creating a

17   report for three verified third-party provider information.

18   Excuse me.  I misspoke.  Three different elements verified by

19   a third-party.  The patent requires the creation of a report

20   in addition to the compiling of this data.  It requires that

21   that be done with a computer processor.  In other words, it

22   is software.  It's not using it somehow else.  It's a

23   computer software program that does something that renders a

24   report.  MDx's software doesn't use disciplinary information.

25   It doesn't pull it from the database.  It doesn't pull

 1    licensure information from the database and create a profile
 2    or provider report.  It does pull award.  There's been an
 3    argument here that Judge Brimmer said you don't have to use
 4    all the elements.  That's true.  He said you don't have to
 5    use all the elements.  But at no time did he ever say you
 6    don't have to have at least three which we say the patent has
 7    already required in the report.  It's very different,
 8    compiling.  There has never been any argument that -- and
 9    there's never been any -- anything hidden that MDx has always
10    gathered what we call sanction information, disciplinary
11    information.  August 2011.  August 2011 we produced documents
12    that show the then four awards, and they specifically provide
13    that the doctors for the awards can't be sanctioned and have
14    to have active licenses.  And that was for the Patients'
15    Choice Award we heard today.  It was for the On Time Award.
16    It was for the Promptness Award and the Compassionate Doctor
17    Award which you also heard about today.  August 2011 they
18    knew that those awards were predicated on doctors that did
19    not have sanctions.  January 2012, e-mail.  We saw part of
20    the e-mail string.  Cutler (phonetics) to Erica Boyer.  They
21    marked this as a trial exhibit this document.  They had it.
22    They knew about it.  January 2012.  It's an intercompany
23    exchange talking about the very issues that they're claiming
24    surprise about.  Why can't I see sanctions in the web page?
25    They're not there.  They've never been there.  They don't

1   show them.  They don't display them.  That's not the aspect

2   of the patent.  We're not arguing display.  We talked about

3   display because the Court ordered us to talk about that issue

4   per se, but that's not the defense.

5            But in that e-mail, Your Honor, there's a

6   statement we want to weed out, as counsel said, doctors that

7   have sanctions from this Top 10 Award.  They clearly know

8   this.  What happens next?  They depose Mr. Cutler who's on

9   this e-mail and they depose Erica Boyer.  Erica Boyer is the

10  vice president of data collections.  She's the one that does

11  this, not Mr. Balomo which we'll talk about in a minute, the

12  30(b)(6) witness.  Erica Boyer confirmed under oath that they

13  collect disciplinary information.  It goes in the database.

14  There's no surprise.  They're claiming this is all a

15  surprise.  Back in June of 2012 she testified yes, we gather

16  that information.  And then what was she asked?  She wasn't

17  asked about awards.  She wasn't asked about a theory whether

18  that -- because it's in awards would be infringing.  She was

19  asked whether it's displayed in the web site, displayed in

20  the reports, several times, and she said no, it's not

21  displayed in the reports because it isn't.  It never gets to

22  the reports.  Now, there was no inquiry whatsoever of these

23  two witnesses about this new theory.  They didn't ask about

24  the Top Doctor Award or the Patients' Award during these

25  depositions, only whether they were -- only whether that

1      disciplinary information was displayed.

2             October 2013.  Five awards -- the requirements for

3      five awards are in documents we produced, and two additional

4      awards are also in this document production of October 2013.

5      That supplemental production was only 49 documents.  These

6      two documents clearly state as we have in our brief, in our

7      certification, and they're attached to our papers, clearly

8      state these award recipients aren't eligible if they have

9      sanctions.  They say no -- underneath each requirement it

10     says no sanctions and it says active license.  There's no

11     surprise.  There's nothing hidden.  This has always been

12     there.

13            The 30(b)(6) deposition of Mr. Balomo is a

14     complete red herring.  If you look at the topics, the

15     30(b)(6) topics, and you saw it on the screen, there was no

16     mention of disciplinary information there.  There's no

17     mention in the 30(b)(6) topics of awards.  That's because it

18     wasn't on the radar screen.  He's not the person to testify

19     about that and he wasn't prepared for it and we acknowledge

20     that.  The big issue here is Health Grades has never moved to

21     amend its contentions.  As a matter of law they have to.  As

22     a matter of the local patent rules they have to.  As we heard

23     in the first motion here you need to do that diligently.  You

24     need to allege your theories of infringement liability and

25     you've got to do it early and you've got to stick by it.

1          Now, Judge Martinez of this District Court

2     recently issued an opinion right on point in February of this

3     year in <u>Teashot v. Green Mountain Coffee Roasters</u>.  And he

4     explicitly stated as to infringement contentions whether

5     responsive to a contention -- a contention interrogatory,

6     local patent rules or a Scheduling Order which was in his

7     case, a Scheduling Order and the interrogatory, the party

8     should specify the party's infringement theories and the

9     defendant should be able to -- and I'm quoting now, "believe

10    that the plaintiff's disclosures contain all of the

11    infringement theories it was pursuing," end quote.  He struck

12    the plaintiff's desire to amend to add doctrine of

13    equivalence because it was too late.  Even though you --

14    technically you don't have to plead doctrine of equivalence

15    because it was too late to change that theory.  We've moved

16    to preclude Health Grades from making this new argument.  And

17    no doubt about it, it's a new argument.  It's twice removed.

18    And there's no -- I'm going to go through the *Markman* order a

19    little bit, Your Honor, and I'm going to go through some of

20    the history here, but this is a brand new claim and it's

21    something that they should have alleged long ago if they

22    really thought this was a valid claim.

23         Now, you have a declaration from Mr. Stimpson.  He

24    did lead the interrogatory response here.  He did not

25    anticipate this claim, nor should we have anticipated this

1    claim.  This is a new claim.  They've known about it.  We

2    cited a lot of law including Teashot on this very point.  But

3    there is total good faith here by defense and defense -- by

4    defendants and defense counsel here.  The plaintiff's theory

5    actually disregards their very patent claims.  It disregards

6    their specifications.  Creating a report has to be with the

7    software.  It has to be a computer processor.  If MDx's

8    software that creates the report, this program pulls awards,

9    that's not pulling disciplinary information.  That's not

10   pulling licensure information whether it goes into a report

11   or not.  It really doesn't matter whether it's displayed in

12   the report.  We're not arguing whether it's displayed in the

13   report.  We are saying because we -- Judge Brimmer did not

14   construe this, there still has to be three elements in that

15   report.  That I heard for the first time that maybe you

16   don't, but that's a new theory, too.  I'm not addressing that

17   today because it's truly not that relevant for this motion.

18   But -- and the declaration of Erica Boyer who's the one that

19   collects this data and confirmed with the head of IT, there's

20   a -- one software creates awards.  No question that the

21   creation of awards uses disciplinary information.  It uses

22   licensure information.  But then the award is moved into by a

23   different algorithm that takes other things into the actual

24   profile report.  We are adamant that that's a separate

25   distinct action and that is not using disciplinary

1    information or sanctions.  The testimony is truthful.  It's

2    accurate.  And patents are construed narrowly.  We believe

3    it's an absolutely valid defense here.  There's no slight of

4    hand.

5            Now, there are a lot of arguments -- the one thing

6    -- there were arguments about the verification.  And let me

7    just grab for a second, Your Honor, the *Markman* decision.

8    What we heard was a reading, a select portion of footnote 8,

9    Page 15 of the *Markman* order.  And what we did not hear is

10   the statement within the order itself, not the footnote, that

11   the Court agrees with plaintiff there is no need to construe

12   the word verified.  The judge explicitly decided not to

13   construe the word verified.  It's for the jury to decide.  He

14   then goes on in his footnote and says the defendants are

15   correct.  Verified can mean to prove or verify, and -- and he

16   goes on, confirm or substantiate.  And then he goes on and

17   the quote from plaintiffs is, you know, it's clear the act of

18   verification only -- can only require receiving confirmation.

19   That's his opinion in dicta.  It's not binding.  We will

20   never see that in a jury instruction because it wasn't

21   construed.  We have an absolute right to our position that

22   verification is not a secretary of a provider going onto a

23   web page, not making any changes.  Plaintiffs say that's

24   verification.  We disagree.  A group practitioner going onto

25   a web page, pushing a button, approve button which takes you

1     to the next screen, doesn't make any changes, they say that's

2     verification.  We disagree.  This is a contention and these

3     are our defenses and we adamantly believe they're accurate,

4     truthful, and reliable, and that's what our answers to

5     interrogatories say and we went through the detail of those

6     in the declaration and in the brief.  These are some of the

7     critical areas here.  They may not like the argument, but

8     those are the arguments, that we don't allow providers, we,

9     the company, doesn't allow providers to verify information

10    because it's not reliable.  So that is definitely -- that's

11    definitely an issue in dispute in this case and it's set

12    forth in our papers clearly as we went through the detailed

13    answers to Interrogatory Number 2.

14          Interrogatory Number 2, Your Honor, as Mr.

15    Kostolansky admitted, was incredibly burdensome, and we went

16    through and supplemented.  In fact, I think there was -- I

17    think in the queries there were 2,000 -- no, excuse me, two

18    and a half million pieces of additional information on the --

19    a group of the doctors, and there was over two and a half

20    million text words on another group of doctors in these

21    responses.  They were very burdensome and they -- we did go

22    through in painstaking detail.  We were taken to task on

23    saying that of 508 doctors may -- we used the word may have

24    X, Y, and Z.  The reason that may was used as we explained is

25    because the company doesn't track that information.  We have

1    no way of knowing whether those 508 doctors did or did not

2    qualify for that.  That's a perfectly -- we can't -- we can't

3    guess and there's no way to establish it.  Give me a minute,

4    Your Honor, because I was writing frantically with --

5            THE COURT:  Sure.

6            MR. DICKEY:  -- with the plaintiff's arguments

7    here and I made a lot of notes.  But I think the most

8    fundamental thing here is this -- the patent requiring two

9    different aspects, one, the creation of data which isn't

10   initial.  We've admitted that data is there.  But the second

11   is creating a report with computer software that uses the

12   data.  You can't go onto the web site and find who's been

13   sanctioned because it's not there.  It's not underlying.

14   It's not in metadata.  It's not in code you can't see.  It's

15   not there because it's not used to create the report.  Awards

16   are, but that's a different thing, bestowing awards.  The

17   company also uses awards for other things besides profiles

18   and -- and its -- we use awards for other businesses, too.

19           THE COURT:  So this is where Mr. Kostolansky

20   argues that there's a slight of hand.  You say we don't use

21   discipline in preparing our reports.  We do use it in

22   preparing our awards which are reported in our reports.

23           MR. DICKEY:  Absolutely correct, Your Honor.

24           THE COURT:  It seems to me that that -- then you

25   are using it because you are including it in -- in the awards

1    part which is included.

2              MR. DICKEY:  Your Honor, that's a two step

3    removed.  You have -- what's creating a report?  Creating a

4    report using.  You have to use the information to create a

5    report.  How far back do you go?  Where did you get the

6    discipline information?  If the disciplinary information came

7    from X source are you using X source in your -- creating your

8    report?  Are you using their X source?  How far back do you

9    go?  You don't see -- and, again, we're not arguing that

10   whether it's displayed or not is an issue for infringement.

11   It really is not.  The issue is whether the software extracts

12   it from the database because the database is a separate

13   aspect of the patent in column 20.  You create -- excuse me.

14   You're compiling a database.  And then what do you use from

15   that compiled database to build your report with the

16   software?  Awards are in that database.  That's what's

17   pulled, not the discipline, not the licensure.  It's the

18   awards that's pulled.  That's what's used.  Now -- and -- and

19   the software -- if the software pulled it -- even if it

20   wasn't displayed if the software pulled the disciplinary

21   information and it was behind the coding in the report I have

22   a little harder time with the argument, but it's not.  And

23   that's where -- this is not just a subtlety.  This is patent

24   law.  They're narrowly construed.  I don't think they could

25   get a patent around without these kind of specifics in here.

 1   And that's where our defense is that that's not using those

 2   elements.  And as I say, since this has been disclosed from

 3   day one -- not day one.  Excuse me.  It's been disclosed for

 4   three years that these are where the awards are.  They know

 5   the awards are in the web site.  They've always looked at

 6   them.  They've never once accused this.  Never once have they

 7   raised this issue, and there's a reason for it, because they

 8   didn't think about it and we didn't think about it that it

 9   would be a legitimate claim because it's so removed.  I'm

10   sorry.  Did the Court have --

11          THE COURT:  No.  You answered my question.

12          MR. DICKEY:  And -- and, by the way, there's no

13   question, Your Honor, MDx believes and has testified that the

14   software does not pull this data and use it for creating the

15   report.  Again, we admit it's in there, but we've always

16   admitted it's in there, in the database itself, the separate

17   compiling.

18          Your Honor, the deposition testimony -- the first

19   deposition testimony -- or I think it was interrogatory,

20   excuse me, not a deposition, of the Mongo was in error and

21   that was corrected.  That was corrected later on in a

22   supplemental interrogatory when he -- when I -- I forgot who

23   certified to those, but it may have been Miss Boyer, said

24   about the licensure information, the licensure information

25   has been in the database, always been in the database.  It's

1    just not pulled.  And we did correct that, and as I say, the

2    -- that has not been in issue.  Your Honor, the reason this

3    was raised in an e-mail, this issue again, was because we

4    were conferring with counsel over it because they were asking

5    the questions so we were answering the questions.  That's why

6    it was in an e-mail to address it and be forthright about it,

7    even though they should have known about it long ago from the

8    depositions and from the -- the prior discovery, as I say,

9    three separate times.  That's why I actually put it in an

10   e-mail because I was following up on a conversation where I'm

11   following up on an e-mail as a result of a conversation.

12   Counsel alleged that this was a subtle twist by our shifting

13   to software code.  I don't believe they can make the claim in

14   good faith that this is anything other than software code

15   that the patent is about.  The whole first argument was all

16   about software code.  This is all about what the software

17   does in creating a report.  That's not a subtle twist.

18   That's always been the position we thought of both parties.

19   The software creates the report.  The software compiles the

20   data.  As I say, if we look at the patent awards is not a

21   part of this compiling.  It's not a part of the second part.

22   It is in the preface of column 20 and it goes to a different

23   claim element altogether.  So this is definitely a new

24   argument.  This is -- this is not in the May 2014 interrog

25   response because it was never thought to be a claim.  If it

1    is a claim in this case, if it's allowed, if the Court rules

2    against us in our motion to preclude then we certainly would

3    want to fully address it in our interrogatory responses and

4    any other new arguments whatsoever.  We absolutely want to

5    address it, but it's a brand new claim to us.

6           There's -- let me move, Your Honor, to the -- the

7    argument on the request for admissions.  Virtually every one

8    of these requests for admissions could have been -- not all

9    of them, but all but a handful could have been made during

10   the case.  Instead of using a doctor's name they could have

11   said does the health care provider provide information?  They

12   could have done it generically just as effectively.  There is

13   no prejudice to them with these interrog -- these request for

14   admissions.  There's no reason to reopen discovery on these

15   issues other than the ones we -- we addressed.  What they're

16   trying to do is simplify their proofs probably because they

17   believe it would be a better form to present it to a jury in

18   a request to -- for admissions, but that's not what the

19   sanctions order provided for.  The sanctions order provided

20   if they had prejudice, if it was something new coming around

21   then, of course, it could be addressed.  This is not

22   something new coming around.  We answered the ones that are

23   new coming around and that's why we took the position we did

24   with respect to the requests for admissions.  They shouldn't

25   be allowed to reopen discovery on these issues for tactical

1    reasons which is unrelated to why the Court ordered what it

2    did order before.  And Judge Moore also, Your Honor -- we

3    agree with that.  Judge Moore is not construing additional

4    terms.  Additional terms are for the jury to decide.  They're

5    not for plaintiff's counsel to take a position and say aha,

6    you have to admit this because they believe a term should be

7    construed in a particular way.  That's for the jury.

8            I sort of back-ended this argument, Your Honor,

9    because I talked generically about the verification, the

10   dispute over what's verification, what's not.  That goes

11   directly to the 3,982 doctors.  And we've put it -- I think

12   it's pretty clear in our -- in our response brief.  MDx's

13   position has always been they don't have physicians verify --

14   this is not verified data and their claim requires

15   verification.  So all the elements are not met because the

16   verification claim element is not satisfied.  So we do not

17   admit that.  We contest that.  And it's another issue for the

18   jury.  But that's -- I sort of separated and forgot to tie it

19   into, Your Honor, to the 3,982 doctors out of the 830,000 in

20   the database.

21           Your Honor, if I could, if I could have just two

22   minutes to talk to my colleagues.  Again --

23           THE COURT:  Sure.

24           MR. DICKEY:  -- there was so much there.  I

25   haven't even had a chance to look at the new documents that

1    we received at 4:30, but I'm -- I don't know if they've

2    looked at them either, but give me one minute if you would,

3    please, or two.  Thank you.

4          Before I leave for my minute or two I wanted to

5    amplify one thing, Your Honor.  Local counsel -- and I -- we

6    put it in our brief, has absolutely no involvement, wasn't

7    tasked with discovery or any of these issues whatsoever.

8    Local counsel has been extremely helpful with procedures and

9    other issues which I don't want to obviously disclose, but

10   they weren't involved in discovery and we -- we thought

11   protocol, because this is what we do in other cases, their

12   name goes on all the submissions because we thought local

13   counsel's name is supposed to be on the submissions because

14   they're cocounsel, but they really should be removed from

15   this dispute.

16         THE COURT:  Thank you.

17         MR. DICKEY:  Your Honor, what I would request is

18   that we be provided with all the documents that were shown to

19   the Court today by plaintiffs that are not in the pleadings

20   in this case already.

21         THE COURT:  But you think you -- you've gotten

22   some.

23         MR. DICKEY:  I don't think we got the timeline.

24   We got some things, but I don't -- is the timeline in there?

25   Whatever -- whatever is not in there we -- I'm sure counsel

1    will provide them, no questions about that.  But we'll get

2    all those documents and I'd request 10 days to be able to

3    make a submission or rebuttal on anything new in those

4    documents or the submissions today to this Court.

5            THE COURT:  Okay.

6            MR. DICKEY:  Thank you, Your Honor.

7            THE COURT:  Thank you.  Mr. Kostolansky.

8            MR. KOSTOLANSKY:  Thank you, Your Honor.  Just --

9    just a couple -- couple points to make.  I want to note for

10   the record, Your Honor, the document -- the documents and the

11   nature of them that were tendered to the Court and to

12   opposing counsel.  The document labeled Exhibit 115 is a

13   screen shot from the Vitals web site, the defendant's web

14   site involving Dr. Keggen.  It's two pages.  What we --

15   what's been marked as Exhibit 19 is an amended notice of

16   deposition with respect to the MDx corporate representative

17   which obviously they've had.  What's been marked as

18   Exhibit 15 and tendered to Your Honor and the other side is

19   the Vitals data and database document which was marked as

20   Exhibit 5 to Mr. Balomo's deposition.  So that's something

21   that they have had also.  Exhibit 21 are excerpts from

22   Mr. Balomo's deposition.  Exhibit 14 is the portion of the

23   Vitals documentation where consumers become patients that's

24   cited in Mr. Greenspun's report.  And then Exhibit 22 is the

25   hearing transcript from Judge Moore that we referred to

```
 1       during our argument.  So, you know, most of this -- a lot of

 2       these documents are already in the -- in the -- in the record

 3       or are -- are Vitals -- Vitals documents.  With respect to

 4       the documents that are like the e-mail exchange that we went

 5       through with Ms. Boyer and Miss Larsen-Stoller from November

 6       of 2011, those documents show that licensure information and

 7       disciplinary action was used to create the report.  It was

 8       only in January of 2014 when we received an interrogatory

 9       response from MDx denying that, but not -- not providing any

10       type of explanation, especially the type of explanation that

11       they're -- that they're trying to provide today and how it's

12       shifted from database to -- to some type of software coding

13       that is still to date unexplained by them.

14              THE COURT:  Let me ask you this, Mr. Kostolansky.

15       Do I have -- discovery materials are not provided ordinarily

16       to the Court.  Do I have all of the responses to I think it's

17       Interrogatory 2, the interrogatory about which you complain?

18              MR. KOSTOLANSKY:  Yeah.  I believe you do, Your

19       Honor.  Yes.

20              THE COURT:  Okay.

21              MR. KOSTOLANSKY:  I think those are -- those are

22       all in the record.  The -- the one thing that -- that I

23       referred to during argument that Your Honor does not yet have

24       and that the other side does not yet have is that timeline

25       that we put up on the screen.  So I will -- I will go ahead
```

1    and provide copies of that to Your Honor and -- and to the

2    other side.

3              Regarding the -- the requests for admission, Your

4    Honor, and -- it strikes me as highly ironic that the other

5    side would say why don't you propound requests for admissions

6    that are more generic?  Because more generic requests are

7    going to end up with more squabbling and disputes about well,

8    there's an exception here, there's an exception there, you

9    know, out of 833,000 doctors, you know, 815,000 do X, so, you

10   know, we tried to avoid that.  We tried to make this as

11   simple as possible and that's why we selected one doctor.

12   Now, does the one doctor in all likelihood have the three

13   elements of physician -- of physician provided verified

14   information?  Yes.  That's another reason we selected him.

15   We're trying to move forward in this process.  So we send

16   them those requests and we ask them about receipt as I went

17   through before, and their -- their argument is look, Judge

18   Brimmer didn't really define verified.  We disagree with that

19   because in the footnote he -- he says here, meaning in this

20   case, the confirmation described appears not -- to not extend

21   beyond receipt of such information from the first health care

22   provider.  But all we asked about was receipt and they didn't

23   answer receipt and that's -- that's a fair question by us and

24   it's designed to simplify things.  So that -- that should be

25   answered.

1                    That's all I have, Your Honor.  Thank you.

2                    THE COURT:  Thank you.

3                    MR. DICKEY:  Your Honor, (inaudible), can I

4        briefly address one thing?

5                    THE COURT:  Yes.  Yes.

6                    MR. DICKEY:  I'm hearing for the first time the

7        argument that earlier MDx somehow admitted using licensure

8        information to create a report.  That is totally contrary to

9        my understanding of all the discovery to date unless there's

10       an argument here that getting onto your web site because it's

11       a security log-in somehow is creating the report.  But the

12       report is a separate stand-alone document.  It's a profile.

13       So this is why I think we need to have an opportunity to

14       respond more fully and I appreciate the Court's allowance of

15       that.  Thank you.

16                   THE COURT:  Thank you.

17                   MR. KOSTOLANSKY:  And I would note, Your Honor,

18       that you may be considering setting some type of further

19       briefing schedule on this and my sense is that you may be.

20       You know, the typical protocol would be motion, response,

21       reply.  And so, you know, we would like to be able to address

22       whatever it is that they may -- they may submit regarding our

23       motion.

24                   THE COURT:  So I actually think you're probably

25       too young, Mr. Kostolansky, but there was a --

112

```
 1              MR. KOSTOLANSKY:  I'm not.  I don't feel that many

 2      days, Your Honor.

 3              THE COURT:  -- there was a judge in the Denver

 4      District Court who was notorious because whoever spoke last

 5      always won.

 6              MR. DICKEY:  Your Honor, can I --

 7              THE COURT:  That -- that doesn't work with me, but

 8      -- but I do agree that the movant gets the last word.  It

 9      doesn't mean the movant wins, but the movant always gets the

10      last word.  So I will require that the plaintiff provide

11      copies of all of the documents shown on the screen and used

12      in your argument today to me and to defense counsel by

13      September 2nd.  You tell me there's only one such document.

14              MR. KOSTOLANSKY:  Your Honor, we'll do -- we'll do

15      that -- we'll do that -- we'll do that tomorrow because --

16              THE COURT:  Great.

17              MR. KOSTOLANSKY:  -- there -- there -- I've

18      tendered all of them except the timeline, so we'll do that

19      tomorrow.

20              THE COURT:  All right.  And then I will allow the

21      defendant until September 15th to provide its reply and I

22      will allow the plaintiff until September 22nd to provide a

23      surreply.  In addition, Mr. Kostolansky, I would like to

24      receive I guess by the 15th a document which merely directs

25      me to the location of all responses to Interrogatory 2.  And
```

113

```
 1    if I haven't -- if they aren't currently in the record then
 2    to provide copies of those responses to me.
 3              MR. KOSTOLANSKY:  Your Honor, when we talk about
 4    responses does that -- does that mean the queries as well, I
 5    mean, just for clarity?  In other words, the interrogatories
 6    are interrogatories, but counsel -- we actually agreed upon a
 7    lot of other things in supplemental discovery.  So I'm just
 8    curious -- I'm -- just for clarity I want to make sure the
 9    Court gets everything it wants.
10              THE COURT:  I was critical of the defendant
11    because on the first motion to compel where I imposed
12    sanctions the interrogatory response was not signed under
13    oath.  I was corrected about that and informed that, in fact,
14    there was an interrogatory answer signed under oath.  That's
15    what I want.  I want the interrogatory answers signed under
16    oath by the defendant.
17              MR. KOSTOLANSKY:  Very good, Your Honor.
18              THE COURT:  Those don't automatically come to the
19    Court, so --
20              MR. KOSTOLANSKY:  No.  I understand.  I -- I just
21    wanted -- I just want to make sure the Court didn't want the
22    additional information.  I have it.  Thank you.
23              THE COURT:  Well, everyone survived.  I didn't
24    have to wear my tie because of anyone dying.  I will take the
25    motion for sanctions under advisement and issue an order as
```

1    soon as I'm reasonably -- reasonably able and after receiving

2    the supplemental documents and briefing.

3              Anything more, Mr. Kostolansky?

4              MR. KOSTOLANSKY:  I would -- I would note, Your

5    Honor, that our motion is part motion to compel and part

6    motion for sanctions, and I would hate to see the motion to

7    compel tied up, if you will, with respect to the motion for

8    sanctions because the motion to compel is relevant with

9    respect to the trial on the merits, whereas the motion for

10   sanctions is less relevant.  And if they become tied up and

11   our motion were to be granted we end up, you know, taking

12   Mr. Balomo's deposition later.  We get the responses to the

13   requests for admission later.  It just -- it's -- it's a

14   concern given the December 1 trial date.  And obviously, you

15   know, Your Honor knows your calendar better than -- better

16   than anyone, but I just thought I would point that out.

17             THE COURT:  Thank you.  Mr. Dickey?

18             MR. DICKEY:  No, Your Honor.  I -- I'd just note

19   that the motion to compel, some of it is very intertwined

20   with contentions and defenses which we do want to address, of

21   course, as the Court has allowed us to do in response.

22             THE COURT:  Thank you very much.

23             MR. KOSTOLANSKY:  Thank you, Your Honor.

24             THE CLERK:  All rise.

25             (Whereupon, the within hearing was then in

1    conclusion at 5:13 p.m.)

2

3

4         I certify that the foregoing is a correct

5    transcript, to the best of my knowledge and belief (pursuant

6    to the quality of the recording) from the record of

7    proceedings in the above-entitled matter.

8

9

10    /s/ Laurel Tubbs              September 5, 2014

11   Signature of Transcriber            Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25