**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 11-cv-00520-RM-BNB

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC.,
doing business as Vitals.com,

      Defendant.

---

## ORDER

---

    This matter is before the Court on the motion filed by Defendant for a *Festo* hearing and

consideration of vacatur of the pretrial and trial proceedings (ECF No. 883).  A hearing was held

on October 10, 2014 on that motion pursuant to *Festo v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*

*Ltd.*, 535 U.S. 722 (2002) (hereinafter "*Festo*").  This Order results.

**I.**     **BACKGROUND**

    **A.  Facts and Procedural History**

    Plaintiff Health Grades, Inc. ("Health Grades") owns U.S. Patent No. 7,752,060, issued

July 6, 2010 (the "'060 Patent").  The invention claimed therein is an "Internet-based system and

method that connects patients with potential healthcare providers, e.g., physicians and hospitals."

('060 Patent col.1 ll.12-14.)  Defendant MDx Medical, Inc. ("MDx") maintains the website

www.vitals.com (the "MDx website"), the current version of which was launched in January

2011.  (ECF No. 195 at 2.)  Health Grades contends that the MDx website infringes the '060

Patent.  The Court has already set forth the basic facts regarding the claimed invention and the

accused product in several previous Orders, dated December 24, 2013; June 26, 2014; and July

15, 2014 (ECF Nos. 696, 808, 810).  I will only repeat previously set forth facts as necessary for

analysis of the issues now before the Court.

In the first of the referenced prior Orders, the Court ruled on a motion for partial

summary judgment of noninfringement filed by MDx, which argued that since every claim of the

'060 Patent requires the generation of a report on the "first healthcare provider" which "includes

comparison ratings of healthcare providers," and since its reports on the first healthcare provider

lacked such ratings, that the Court should grant summary judgment of noninfringement.  I

granted the motion in part.  (ECF No. 696.)  The Court found that a report on the first healthcare

provider, as opposed to a results list, which includes comparison ratings was required in order to

find literal infringement and the current iteration of the MDx website did not literally meet that

requirement.

The Court also discussed the parties' arguments with regard to the doctrine of

equivalents, discussing generally Health Grades' then-articulated accused equivalents, but

finding ultimately that one equivalent could withstand MDx's arguments at summary judgment:

> There is, however, one instance where it is less clear whether a noticeable
> departure from the profile has taken place—the "Search All Similar Doctors"
> hyperlink, which announces and facilitates providers comparisons and which is
> present from within multiple sections of the profile.

(ECF No. 696 at 20.)

The December 24, 2013 Order also briefly addressed MDx's contention that the patent prosecution history estops Health Grades from arguing that MDx infringes its patent by equivalents.  In doing so, the Court left open the possibility that it would "make future rulings pertaining to prosecution history," particularly once it had addressed the parties' arguments regarding MDx's obviousness defense, and it advised "that the record provided by the parties on this motion is inadequate for detailed consideration of the full implications of the prosecution history in this case."  (ECF No. 696 at 26-27.)

After the subsequent rulings on obviousness and willfulness (ECF Nos. 808, 810), MDx moved for the *Festo* Hearing and a final determination of the prosecution history estoppel issue. (ECF No. 883.)  The Court granted that motion and heard fully from both parties at the hearing on October 10, 2014 (the "*Festo* Hearing").  This matter is one for the Court to resolve, and the full patent history is before the Court.

## B.  Legal Standard

Whether prosecution history estoppel applies, as well as its scope, are questions of law to be determined by the Court.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003).  Under the doctrine of the equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)).  Patent claims protect the patentee not only from those who produce devices falling

3

within the literal patent claims, but also from "unscrupulous copyists" who "make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank*, 339 U.S. at 607.

Prosecution history estoppel, however, precludes application of the doctrine of equivalents when a patentee has narrowed a claim for reasons of patentability and thereby surrendered the ground covered by an accused equivalent. *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003). Determining the reach of prosecution history estoppel thus "requires an examination of the subject matter surrendered by the narrowing amendment." *Festo* at 737. Once the alleged infringer establishes that the patentee has disavowed the ground covered by an accused equivalent, the patentee is barred from relying on the doctrine of equivalents unless he or she can show a recognized exception to application of the estoppel doctrine. *Festo* at 739-41.

## II. ANALYSIS

### A. The *Festo* Presumption and Its Exceptions

As noted above, under *Festo*, narrowing amendments made for reasons of patentability create "a presumption that the patentee surrendered the territory between the original claims and the amended claims." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1382 (Fed. Cir. 2005). "The patentee may rebut that presumption by showing that the alleged equivalent was unforeseeable at the time the amendment was made, that the alleged equivalent was tangential to the purpose

of the amendment, or that there was some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Id*.

Both parties agree that narrowing amendments were made with respect to the '060 Patent and that they were made for purposes of patentability. (*See, e.g.*, ECF No. 201, Health Grades Response to MDx's Motion for Summary Judgment, at 10 ("[T]he claim language 'comparison ratings of health care providers' was added for reasons of patentability."), 31-32 ("The prosecution history makes clear that the comparison ratings *limitation* was added to overcome the Patent Office's rejection based on Henley and Cook prior art…") (emphasis added).) Both parties agree that the *Festo* presumption applies. (*See, e.g.*, ECF No. 903 at 29-30 ("By amending the application, the inventor is deemed to concede that the patent does not extend as far as the original claims. We agree with that. We gave up original Claim 1, we gave up original Claim 19, and we are not trying to assert infringement of those claims now…. We need to look at the reason for the amendment and the accused equivalent and figure out whether they are related or not.").)

Health Grades seeks to rebut or overcome the presumption by relying solely on the second *Festo* exception, tangentiality. At the hearing, this exchange occurred:

> The Court: I know what your position is, but just to make sure that I'm not misunderstanding it, in terms of the three Festo exceptions, you are not relying on, in any way, shape or form, unforeseeability, nor are you relying on the relatively amorphous third exception; that being, some other reason.

> Ms. Stoll-DeBell: Yeah. We didn't get into the foreseeability issue, Your Honor. We don't need to, because we think that there's not a relationship between the reason for amendment and the accused equivalent.

> The Court: So that's a yes?

Ms. Stoll-DeBell: Yes.

(ECF No. 903 at 30-31.)  Health Grades has never argued the other two exceptions, therefore, they will not be addressed in this Order and are deemed inapplicable.

## B.  Relevant Patent History

On August 29, 2006, Health Grades filed its original application, which disclosed two independent claims,[1] as well as a number of dependent claims.  (ECF No. 705-2 at 2-5; ECF No. 79-4.)  Claim 1 disclosed:

> A method of providing healthcare provider information to potential patients, said method comprising:
>
> compiling healthcare provider-verified information;
>
> compiling past-patient provided information;
>
> compiling information verified by independent third-party sources;
>
> creating a healthcare provider report using the physician-verified information, the past-patient provided information, and the verified information; and
>
> providing access to the healthcare provider report over a computer network.

(ECF No. 705-2 at 2-3.)  Notably, dependent Claim 5 in the original application disclosed "[t]he method as defined in Claim 1, wherein the healthcare provider report includes comparison ratings of healthcare providers."  (*Id.* at 3.)

---

[1] The original independent claims were Claims 1 and 19.  The analytical history for Claims 1 and 19 (the latter of which in the final revised '060 Patent is now Claim 15) is largely the same, so I will not separately set it forth here.

The United States Patent and Trademark Office (the "Patent Office") rejected both independent claims, and essentially the entirety of the application, as being unpatentable because the claims were obvious in light of prior art.[2]  (ECF No. 201 at 30-31 and accompanying exhibits.)  The Patent Office cited Henley, U.S. Patent Pub. No. 2003/0195838, which discloses "[d]irect links to one or more transaction feedback databases . . . established to allow consumers of medical services to verify and evaluate a particular provider's product or service."  (ECF No. 197-7, Henley Patent Application, at 28 ¶ 37.)  In rejecting Claim 5, the comparison ratings claim, the Patent Office pointed to a series of paragraphs in Henley that it said also disclosed comparison ratings.  For instance, Henley disclosed "[a]n online user service feedback web-page and database are provided for acquiring and maintaining comments and feedback from both service providers and their patients/clients regarding the complexity and quality of services received or provided."  (*Id.* ¶ 16.)  Henley explained that its invention "also introduces helpful transaction evaluation features such as an associated 'complexity rating' for a particular service/procedure and a 'complexity divergence' indicator . . . ."  (*Id.* ¶ 18.)  And "[d]irect links to one or more transaction feedback databases are also established to allow consumers of medical services to verify and evaluate a particular provider's product or service."  (*Id.* ¶ 37.)

The Patent Office's rejection emphasized Henley, but did not rely exclusively upon it. For example, in terms of the claim element "creating a healthcare provider report using the physician-verified information, the past-patient provided information, and the verified information," the Patent Office said that "Henley may or may not explicitly disclose [this]

---

[2] There were also rejections based on indefiniteness and an invention based on non-statutory subject matter.

limitation [but] Cook [does disclose it].'' [3]  (ECF No. 79-4 at 88.)  The Patent Office went on to state that "it would have been obvious to one of ordinary skill in the art, at the time of the invention, to have modified the system of Henley so as to have included creating a healthcare provider report, in accordance with the teaching of Cook, in order to improve the efficiency of the system, since so doing could be performed readily and easily by any person of ordinary skill in the art, with neither undo experimentation, nor risk of unexpected results."  (*Id.*)

After the rejection from the Patent Office, as Health Grades related in prior briefing on the subject:

> In response, the Applicants amended the report element of claims 1 and 19 to add the comparison ratings limitation as shown below:
>
> 1. (Currently Amended) A method of providing healthcare provider information to potential patients, said method comprising:
>
> compiling healthcare provider information;
>
> compiling past-patient provided information;
>
> compiling information verified by independent third-party sources;
>
> creating, by a processor, a healthcare provider report using the ~~physician-verified~~ healthcare provider-verified information, the past-patient provided information, and the ~~verified~~ information verified by independent third-party

---

[3] The Patent Office listed three patents as "[t]he most remarkable prior art of record." (ECF No. 485-7 at 42.)  One was Henley.  Another is Cook, a patent aimed at "assisting patients to find healthcare providers who are using health information systems." (U.S. Patent Pub. No. 2006/0080146 ¶ 1.)  It discloses "[p]resenting graded reports (as opposed to certified/non-certified) to consumers about the EMR [Electronic Medical Records] system in use by each provider will result in providers having a powerful incentive to keep their technology up to date." (*Id.* ¶ 91.)  In addition to Cook and Henley, the other prior art mentioned by the Patent Office as pertinent (ECF No. 485-7 at 42) is Sameh, U.S. Patent Pub. No. 2004/0010423.  One of Sameh's independent claims disclosed "[a]n apparatus for providing health care to a patient, such apparatus comprising:  a website adapted to provide a webpage from a sponsor of the website to the patient that displays identifying information of the sponsor and that also displays identifiers of a plurality of physicians; a physician selection softkey adapted to detect selection of a physician of the plurality of physicians by the patient…" (*Id.* at Claim 30.)

> sources, wherein the healthcare provider report includes comparison ratings of healthcare providers; and
>
> providing access to the healthcare provider report over a computer network.

(ECF No. 201 at 31; ECF No. 349-2 at 14 (strike-outs and underlining in original to reflect amendments).)  This amendment (the "Initial Amendment"), among other things, added the limitation that "wherein the healthcare provider report includes comparison ratings of healthcare providers" to the otherwise broad reports referenced in the independent claims of the original application.  This narrowing language was originally the content of dependent Claim 5, but as part of the Initial Amendment, Health Grades cancelled dependent Claim 5 and moved its content into independent Claim 1.[4]

It is undisputed that the Initial Amendment, and specifically the comparison ratings limitation, "was added to overcome the Patent Office's rejection based on the Henley and Cook prior art."  (ECF No. 201 at 32.)  Health Grades used this narrowing limitation to enable it to argue a fine distinction:  that while the prior art teaches "making **facts** available for comparison, this is not the same thing as comparison **ratings**."  (ECF No. 201 at 32 (emphasis in original).)

On March 10, 2010, Health Grades had an interview with Patent Office staff in which the prior art and Health Grades' amendment were discussed.  (ECF No. 295-3.)  The patent history

---

[4] The issue of whether it matters that the language was originally in the patent application, albeit in dependent claim form, was addressed at the hearing and is clearly addressed in Federal Circuit case law:  "[T]he rewriting of dependent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel."  *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1182 (Fed. Cir. 2009) (quoting *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1134 (Fed. Cir. 2004)).

does not reveal the content of the discussions beyond the fact that "[n]o agreement was reached." (ECF No. 295-3 at 4.)

The Initial Amendment, Health Grades concedes, "was made for reasons of patentability (*i.e.*, to distinguish prior art) but did not result in the Patent Office allowing the claims.  Instead, the Patent Office required additional amendments before it allowed the claims."  (ECF No. 201 at n.9.)  In April 2010, after the meeting at the Patent Office, Health Grades submitted more extensive amendments to its claims (the "Supplemental Amendment").  After the Supplemental Amendment, Claim 1 read:

> A <u>computer-implemented</u> method of providing healthcare provider information to potential patients, said method comprising:
>
> <u>receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;</u>
>
> <u>accessing</u> healthcare provider-verified information <u>about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;</u>
>
> compiling, <u>by the at least one computer processor,</u> ~~past patient~~ patient-provided information <u>regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;</u>

compiling information regarding the first healthcare provider verified by an independent third-party source, ~~sources~~ wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;

creating, by [[a]] the at least one computer processor, a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the ~~past  patient~~ patient-provided information, and the information verified by the independent third-party source, wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers; and

providing access to the healthcare provider report on the first healthcare provider over a computer network.

(ECF No. 195-3, Patent History File Portions, at 4-5 (strike-outs and underlining in original to reflect amendments).)  After this second wave of amendments, on July 6, 2010, the '060 Patent issued.

### C.  Whether the Tangential Exception Applies

To rebut the *Festo* presumption, Health Grades must demonstrate that the rationale underlying any narrowing amendments bore no more than a tangential relationship to the accused equivalent.  *Festo*, 344 F.3d at 1369.  "In other words, this criterion asks whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Id*.  The Federal Circuit went on to note that although it could not "anticipate the instances of mere tangentialness that may arise, we can say that an amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim." *Id*.  The Federal Circuit made clear that courts should focus on "the patentee's objective

apparent reason for the narrowing amendment…that reason should be discernible from the prosecution history record, if the public notice function of a patent and prosecution history is to have significance." *Id*.

When the court is "unable to determine the purpose underlying a narrowing amendment—and hence a rationale for limiting the estoppel to the surrender of particular equivalents—the court should presume that the patentee surrendered all subject matter between the broader and the narrower language." *Id*. at 1366 (quoting *Festo* at 740). The tangential relation criterion for overcoming the *Festo* presumption is very narrow. *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp*., 523 F.3d 1304, 1315 (Fed. Cir. 2008) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc*., 480 F.3d 1335, 1342 (Fed. Cir. 2007)).

1. Comparison Ratings Limitation

Here, the purpose of the requirement that the Health Grades reports "include comparison ratings" of health care providers is clear from the prosecution history. Adding a requirement of comparison ratings into its independent claims, Health Grades thought, would distinguish its application from Henley. At the *Festo* Hearing, Health Grades addressed this very issue, and hinged its tangentiality argument on one key point:

> So now what really, really matters is why? Why did Health Grades make this amendment? Why did they add that the healthcare provider report includes comparison ratings of healthcare providers?... [I]t starts off at the bottom of page 11 of Health Grades' Office Action Response…. And so, first of all, it says, Henley fails to teach or suggest, for example, and then it quotes the claim limitation that was added to distinguish Henley, which is the, [w]herein the healthcare provider report includes comparison ratings of healthcare providers. That was the language that was actually added by amendment. And then it goes on to explain why this amendment gets around Henley. Distinguishes the Henley prior art. And so it talks about -- well first of all, in the second, fourth line down,

> it says, The cited portions of Henley provide no teaching or suggestion of, quote, comparison ratings, end quote. It doesn't say comparison ratings inside a report. Comparison ratings outside of a report. Comparison ratings included in a report. It says comparison ratings. There are no ratings in Henley.

(ECF No. 903 at 45-46.)

This, then, is the crux of Health Grades' argument.  The purpose for which Health Grades added comparison ratings to its independent claims, the argument goes, was simply to distinguish its product from Henley's, which did not have comparison ratings.  The *location* of the comparison ratings did not matter—the reason for adding them was to distinguish its product from a product that did not have comparison ratings at all.  Thus, whether the ratings are inside the report or not bears only a tangential relationship to the reason for the amendment.

To say that "location" is tangential depends on what is meant by "location" in the context of a report.  The Court would agree that location in the sense of "where within a report" is likely tangential.  Thus, I would readily conclude that the location of comparison ratings in the body of a report as opposed to the introduction (or a footnote or an executive summary) was a "location" which was tangential to the purpose of the narrowing amendments.  But that is not what Health Grades means by location; nor does this example capture the nature of the dispute between Health Grades and MDx.

MDx argues that its website contains doctor reports or profiles which do not contain within them comparison ratings.  Health Grades argues that the use of those reports coupled with comparison ratings outside the report which are accessible via hyperlink, browser navigation controls, search results or other means are actionable as equivalents to a healthcare provider

report which "includes comparison ratings of healthcare providers" as called for by the '060 Patent. Thus, Health Grades uses the term "location" as shorthand for any requirement that the healthcare provider report have within it the comparison ratings. In other words, Health Grades uses the term "location" in an extremely broad sense encompassing whether a feature is "in" the report or "outside" the report. And it argues that whether the comparison ratings were in the healthcare provider report or outside of it was tangential to the purposes of its narrowing amendments.

This argument is unavailing. What possible reason could there be to add a limitation that comparison ratings be within the healthcare provider report if it in fact did not matter whether the comparison ratings were in fact included *in* the report? How could one possibly distinguish an invention from prior art by comparing what was within or inside of Henley's reports with what may be outside of Health Grades' reports? Implicit and inherent in Health Grades' attempts to distinguish Henley and other prior art reports is that the narrowing limitation added a feature (comparison ratings) within the reports which previously did not have to be in the reports at all. And its presence "in" the report, as much as the comparison ratings themselves, was a critical feature.[5] The location of comparison ratings—insofar as that means that they exist *within* the report—was directly related to the purpose of the amendment. It is not tangential.

## 2. First Healthcare Provider and Further Specifications

At the *Festo* Hearing, the parties did not emphasize or seriously address the estoppel issues raised by the Supplemental Amendment. Nonetheless, the Supplemental Amendment was

---

[5] Indeed, this is why original dependent Claim 5 was made part of independent Claims 1 and 19.

as much a narrowing amendment, raising a presumption of prosecution history estoppel, as was the Initial Amendment.  After unsuccessfully addressing the Patent Office's concerns with the Initial Amendment, and after having a meeting thereon as to which no agreement was reached, Health Grades submitted the Supplemental Amendment to the Patent Office on April 26, 2010. In its submission, clearly signaling its intention to distinguish prior art, Health Grades stated:

> Henley in view of Cook fail to teach or suggest at least the following with respect to Claim 1:
>
> *receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients,* a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;
>
> accessing healthcare provider-verified information about the first healthcare provider, *wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;*
>
> compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and *wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;*
>
> *compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;*
>
> *creating,* by the at least one computer processor, *a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-*

> *party source,* wherein the healthcare provider report on the first healthcare provider includes *comparison ratings* of healthcare providers;

(ECF No. 295-3 at 11-12 (emphasis in original).)

The Supplemental Amendment further narrowed the Initial Amendment. After the Supplemental Amendment, the reports had to be based not only on information from three sources, but also on specific information from within each source. Healthcare provider information had to consist of "three of more from a group consisting of: specialty information, medical philosophy, gender . . . languages, and hobbies." (ECF No. 195-3 at 4-5.) Independent third-party information now had to be "three or more from the group consisting of: board certification, licensure . . . and medical fellowship information." (*Id.*) And patient information had to comprise "ratings" obtained in a particular manner. (*Id.*) Additionally, and importantly, Health Grades' invention no longer related simply to any healthcare provider report—even as limited by the referenced aspects of the Supplemental Amendment. The reports were further narrowed to reports on the "first healthcare provider"—a term which the claim construction order in this case (the "Markman Order") construed as "a particular healthcare provider about whom information is requested and a report is produced."[6] (ECF No. 138 at 23.)

For the reasons previously explained, the requirement that the Health Grades reports contain (*i.e.*, have within them) the additional limitations was not tangential. The limitations were again included within the Health Grades' reports to distinguish reports found in or obvious from prior art, particularly Henley and Cook.

---

[6] In reaching this construction, the Markman Order rejected the notion that "first healthcare provider" referred to "one or more providers." The Markman Order also rejected any interpretation of "first healthcare provider" that would encompass the results of a first search. (ECF No. 138 at 7-12.)

### D. Tangentiality Case Law

The parties have each directed the Court to cases in which the tangential exception was discussed.  MDx focuses on case law referring to tangentiality as a "very narrow" exception.  *Honeywell*, 523 F.3d at 1315-16.  The rarity of the exception has no impact on the particularized ruling made herein, as "narrow" does not equal "unavailable."  Health Grades directs the Court to cases where tangentiality was found and suggests that the circumstances of the instant case are analogous to those of such cases.  For the most part, the Court determines that the inventions, patents, and prosecution histories are so different from case to case that their direct applicability to the instant case is dubious.  However, the cases particularly emphasized by Health Grades will be discussed because they illustrate the difficulty with Health Grades' position.

During the *Festo* Hearing, Health Grades relied upon *Centennial Molding v. Carlson*, 401 F. Supp. 2d 985 (D. Neb. 2005).  In that case, the patent at issue was for large, stackable containers for storing and dispensing liquid.  Each container or stackable portion contained a fill opening at the top and a cut-out or space at the bottom.  During prosecution, in order to overcome prior art, the claims were amended to require that the space at the bottom of the container be both in a corner and vertically aligned with the fill opening in the top of the container.  The prior art that the patentee in that case was trying to avoid had bottom spaces that were not vertically aligned with fill openings.  Consequently, the prior art containers had to be unstacked to be refilled while the patented containers did not.

In *Centennial Molding*, the patentee explained that the limiting amendment was meant to distinguish the product from prior art that lacked vertical alignment of its space and fill opening,

not to fix the location of the fill openings and spaces in the corner of the tanks. *Id*. at 993. Health Grades emphasized that although the "corner" language was used in the amendment, that location was tangential to the purpose of the amendment, which was distinguishing its product from the prior art through vertical alignment. The accused equivalent placed the fill opening and space at the middle of one side of the containers. The court allowed the patentee to proceed under the doctrine of equivalents as the location of the critical feature (corner versus side) was deemed tangential. Health Grades argued that "this case…is really relevant to what we're doing here, because it's a location claim, and that's what MDX is focused on; location, location, location. The corner location was in the amendment… But it wasn't the reason for the amendment." (ECF No. 903 at 37.)

The Court agrees that *Centennial Molding* is illustrative, but disagrees with Health Grades as to how. If Health Grades and MDx were disputing the tangentiality of "location" in the sense of where in the report certain features (comparison ratings) were found, then *Centennial Molding* would be more useful. The dispute here would then be analogous to corner versus non-corner features. But once Health Grades begins to use the term "location" as synonymous with "in or out of the report," *Centennial Molding* loses all significance. The equivalent in *Centennial Molding* would be something very different from corner versus non-corner. It would be, assuming one could envision such, vertical alignment on the structure of the containers versus vertical alignment which was not part of the containers at all but contained on "something else." That equivalence was not the one at issue in *Centennial Molding*. The notion

that a report limitation need not be "in" the report is an argument the Court is unwilling to accept.

Health Grades also discussed a Federal Circuit case from 2004 at length during the *Festo* Hearing—*Insituform Technologies, Inc. v. CAT Contracting, Inc*. 385 F.3d 1360 (Fed. Cir. 2004). The patent in that case was for an underground pipe repair method. The patent claimed "a process for impregnating a flexible tube liner with resin prior to insertion of the liner into a damaged pipe." *Id*. at 1362. The process involved applying a vacuum to the inside of the liner using a cup at one section, then moving the cup "to another section of the liner while the previously used window is sealed." *Id*. at 1363. The original claims were rejected due to a prior art patent, Everson, which disclosed a continuous vacuum and the creation of that vacuum from only a single vacuum source at the far end of the tube. *Id*. at 1369. To distinguish prior art, the patentee amended the claim to require one cup that moves along the pipe, dispensing with the need for the vacuum at the far end of the pipe. The accused equivalent, by contrast, used multiple cups and multiple vacuums, and thus did not literally infringe the claims, and the question became whether infringement based on that equivalent was barred by the prosecution history.

The Federal Circuit held that "Insituform has rebutted the *Festo* presumption." *Id*. at 1370. It found that the amendment limiting the literal scope of the claim to a single cup process bore only a tangential relation to the equivalent in question, a process using multiple cups. *Id*. The narrowing amendment in that case, the Federal Circuit reasoned, was for the purpose of distinguishing a particular prior art reference (Everson), and "Insituform made it clear that the

difference between its process and Everson was that its process did not have the disadvantage of the Everson process of a large compressor at the end of the liner.  There is no indication in the prosecution history of any relationship between the narrowing amendment and a multiple cup process, which is the alleged equivalent in this case." *Id.*

In *Insituform*, the narrowing amendment was made specifically and clearly to overcome prior art, and arguably, the same is true in this case, though rather than one specific prior art reference with a clear technological feature the patentee was trying to avoid—a single vacuum compressor at the end of the tube—here, Health Grades was trying to avoid at least three prior art references all covering similar terrain.  It did so by adding a specific limitation—the inclusion of comparison reports into a report on the first healthcare provider—and here, unlike in *Insituform*, there is a clear relationship between the narrowing amendment made and the alleged equivalent, which is a report with no comparison ratings literally included within the report.  Somewhat simplified, Health Grades' reports without comparison ratings within them equaled the prior art—at least in the eyes of the Patent Office.  So to distinguish the prior art, Health Grades' reports needed to have within them a feature that Henley's did not—comparison ratings.

In yet another case Health Grades emphasized, *Primos v. Hunter's Specialties, Inc.*, the patent at issue concerned a device for simulating animal calls.  451 F.3d 841 (Fed. Cir. 2006).  The patented device was to be placed within the user's mouth, with a membrane above the user's tongue.  *Id.* at 844.  By forcing air through a gap between the membrane and the tongue, the membrane would vibrate and emit a certain animal sound. *Id*.  The patent claimed an improvement over prior art in that a shelf or plate was added above the membrane to resist

upward pressure by the tongue.  *Id.* at 843.  During patent prosecution the claims were amended, requiring that the plate be differentially spaced above the membrane, and that the plate have a length.  *Id.*  The accused equivalent had a "dome extending above the membrane, instead of a shelf or plate, as claimed in Primos's patents."  *Id.* at 844.  The court found that "prosecution history estoppel does not apply to prevent the application of the doctrine of equivalents."  The Federal Circuit reached this finding because the two amendments made to the plate element— adding in differential spacing and length—did not narrow the scope of the claim so as to preclude the accused device.  The accused device already had spacing, for one, and for the other, "every physical object has a length."  *Id.* at 849.

*Primos* is easily distinguishable from the patent history at issue here.  Health Grades, unlike Primos, did not begin with a limitation of comparison ratings, and then add specific other components to that element which may or may not have been deemed tangential.  Health Grades added the comparison ratings *limitation to distinguish its healthcare provider report from prior art reports that did not include comparison ratings*.  Now it claims that MDx's reports need not literally include comparison ratings to be found guilty of infringement under the doctrine of equivalents.  But reports without comparison ratings were exactly what it was trying to distinguish itself from in the prior art, and so MDx's nonliteral accused equivalents fall squarely within the territory surrendered by Health Grades' amendments.

### III.    CONCLUSION

For the foregoing reasons, I find that Health Grades has failed to rebut the presumption of prosecution history estoppel.  It is therefore barred from asserting the doctrine of equivalents

against all accused equivalents surrendered.  These include all equivalents which do not include "comparison ratings within a report on a first healthcare provider."

At the *Festo* Hearing, the Court asked the parties to submit their respective lists of accused equivalents.  In order to avoid potential confusion, a hearing will be held to discuss the applicability of this Order to the various equivalents proposed by the parties.  Court staff will contact counsel to arrange the date for such hearing.  The Court reserves the issue of vacatur of trial and pretrial proceeding, and that may also be discussed at the upcoming hearing.

DATED this 23rd day of October, 2014.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge