# EXHIBIT A

(Redacted version of Dkt. # 944-2)

Civil Action No. 11-CV-00520-RM-BNB

**HEALTH GRADES, INC.'S ELECTRONIC FILING OF ITS NOVEMBER 6, 2014
HEARING EXHIBITS**

---

**Exhibit 3**

**Mitchel Rothschild Deposition Excerpt (highlighting added)**

2005056635_1

# In The Matter Of:

*HEALTH GRADES, INC.*
*v.*
*MDX MEDICAL, INC.*

_____

## *MITCHEL ROTHSCHILD - Vol. 1*
### *June 7, 2012*

_____

# *ATTORNEYS' EYES ONLY*

**MERRILL CORPORATION**

**LegaLink, Inc.**

311 South Wacker Drive
Suite 300
Chicago, IL 60606
Phone: 312.386.2000
Fax: 312.386.2275

Attorneys' Eyes Only

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF COLORADO

- - - - - - - - - - - - - - - x

HEALTH GRADES, INCORPORATED,    :

             Plaintiff,    :CIVIL ACTION NO:
                               11-CV-00520-PAB-BNB

   vs.                       :

MDX MEDICAL, INCORPORATED,    :

d/b/a, VITALS.COM,            :

            Defendant.    :

- - - - - - - - - - - - - - - x

Thursday, June 7, 2012

*        *        *

Videotaped Deposition of MITCHEL
ROTHSCHILD, taken pursuant to notice, held at the
office of Sills Cummis & Gross, 30 Rockefeller
Plaza, New York, New York, commencing at 8:59
a.m., before Anita Shemin, a Certified Shorthand
Reporter and Notary Public.

**Page 2**

1   A P P E A R A N C E S :
2     ROTHGERBER JOHNSON & LYONS, LLP
      BY:  JESUS M. VAZQUEZ, ESQUIRE
3     90 S. Cascade Avenue
      Suite 1100
4     Colorado Springs, Colorado 80903
      303.628.9517
5     jvazquez@rothgerber.com
      Counsel for the Plaintiff
6
7
      MERCHANT & GOULD
8     BY:  KRISTIN L. STOLL-DeBELL, ESQUIRE
      1050 Seventeenth Street
9     Suite 1950
      Denver, Colorado 80265
10    303.357.1670
      kstolldebell@merchantgould.com
11    Counsel for Plaintiff
12
13    SILLS CUMMIS & GROSS P.C.
      BY:  SCOTT STIMPSON, ESQUIRE
14    One Riverfront Plaza
      Newark, New Jersey 07102
15    973.643.7000
      sstimpson@sillscummis.com
16    Counsel for Defendant MDX
17
18  ALSO PRESENT:
19  PHILLIP GLAUBERSON, Legal Video Specialist
20  MIKE WAGNER, Summer Associate, Merchant & Gould
21  PHILLIP GREENSPUN
22
23
24
25

**Page 3**

1   JUNE 7, 2012
2         I N D E X
3   WITNESS        EXAMINATION BY        PAGE
4   MITCHEL ROTHSCHILD  Mr. Vazquez         6
5
6         E X H I B I T S
7   FOR IDENTIFICATION            PAGE
8   Rothschild Exhibit 1  Notice of        12
       Deposition
9
    Rothschild Exhibit 2  10/5/10 email    29
10
    Rothschild Exhibit 3  7/28/10 email    31
11
    Rothschild Exhibit 4  1/5/11 email     32
12
    Rothschild Exhibit 5  1/2/11 opinion of    35
13       Maldjian Law Group
14  Rothschild Exhibit 6  Screen shot from     49
       Vitals website
15
    Rothschild Exhibit 7  Screen shot from     49
16       Vitals website
17  Rothschild Exhibit 8  Freedom to operate   62
       opinion letter
18
    Rothschild Exhibit 9  Screen shot from     91
19       the Vitals website
20  Rothschild Exhibit 10  12/15/09 letter    91
21  Rothschild Exhibit 14  1/25/10 letter    94
22  Rothschild Exhibit 15  5/5/10 email    128
23  Rothschild Exhibit 16  March 2011 email   134
       string
24
25

**Page 4**

1          E X H I B I T S
             (Continued)
2
    FOR IDENTIFICATION            PAGE
3
    Rothschild Exhibit 12  January 2011 email   152
4        string
5   Rothschild Exhibit 11  12/30/10         158
       handwritten notes
6
    Rothschild Exhibit 13  Email string    169
7
    Rothschild Exhibit 25  Spreadsheets    176
8
    Rothschild Exhibit 17  PowerPoint      202
9        presentation
10  Rothschild Exhibit 18  PowerPoint      203
       presentation
11
    Rothschild Exhibit 20  PowerPoint      215
12       presentation
13  (No Exhibit 19 marked)
14  Rothschild Exhibit 21  Email string    217
15  Rothschild Exhibit 22  PowerPoint      220
       presentation
16
    Rothschild Exhibit 23  Email string    221
17
    Rothschild Exhibit 25  6/29/11 letter    224
18
    Rothschild Exhibit 24  PowerPoint      225
19       presentation
20
21
22
08:41:17   23
24
25

**Page 5**

| | | |
|---|---|---|
| 08:56:43 | 1 | THE VIDEOGRAPHER:  This is the video |
| 08:56:47 | 2 | operator speaking, Phillip Glauberson of |
| 08:56:52 | 3 | Merrill Legal Solutions. |
| 08:56:56 | 4 | Today is June 7th, 2012, and the |
| 08:56:58 | 5 | time is 8:59 a.m.  We are at the offices of |
| 08:57:01 | 6 | sills Cummis, 30 Rockefeller Center, New |
| 08:57:05 | 7 | York, New York, to take the videotaped |
| 08:57:08 | 8 | deposition of Mitchel Rothschild in the |
| 08:57:12 | 9 | matter of HealthGrades, Inc., versus MDX |
| 08:57:13 | 10 | Medical, Inc., in the United States |
| 08:57:15 | 11 | District Court, District of Colorado. |
| 08:57:15 | 12 | Will counsel please introduce |
| 08:57:19 | 13 | themselves for the record. |
| 08:57:21 | 14 | MR. STIMPSON:  Scott Stimpson, Sills |
| 08:57:22 | 15 | Cummis & Gross, representing the witness |
| 08:57:26 | 16 | and representing MDX. |
| 08:57:28 | 17 | MR. VAZQUEZ:  Jesus Vazquez, from |
| 08:57:29 | 18 | Rothgerber Johnson & Lyons, on behalf of |
| 08:57:34 | 19 | the Plaintiff, HealthGrades. |
| 08:57:39 | 20 | To my right is Kirstin Stoll-DeBell, |
| 08:57:45 | 21 | partner with the law firm Merchant & Gould. |
| | 22 | To her right is Mr. Phillip Greenspun, who |
| 08:57:48 | 23 | is an expert on noninfringement and |
| 08:57:53 | 24 | validity in this matter on behalf of |
| | 25 | HealthGrades, and we also have Mike Wagner, |

---

**Page 6**

| | | |
|---|---|---|
| 08:57:56 | 1 | a Summer Associate with Merchant & Gould on |
| 08:57:57 | 2 | our side of the table on behalf of |
| 08:58:00 | 3 | HealthGrades. |
| 08:58:14 | 4 | THE VIDEOGRAPHER: Will the court |
| 08:58:14 | 5 | reporter, Anita Shemin of Merrill, please |
| 08:58:14 | 6 | swear the witness. |
| 08:58:14 | 7 | MITCHEL ROTHSCHILD, |
| 08:58:20 | 8 | having been first duly sworn by the Notary Public |
| 08:58:20 | 9 | (Anita Shemin), was examined and testified as |
| 08:58:21 | 10 | follows: |
| 08:58:23 | 11 | EXAMINATION |
| 08:58:24 | 12 | BY MR. VAZQUEZ: |
| 08:58:26 | 13 | Q Good morning, Mr. Rothschild. |
| 08:58:30 | 14 | A Good morning. |
| 08:58:32 | 15 | Q As you know, my name is Jesus Vazquez, |
| 08:58:36 | 16 | and I am an attorney representing HealthGrades |
| 08:58:39 | 17 | in this matter. |
| 08:58:42 | 18 | I would like to -- we are going to ask |
| 08:58:43 | 19 | questions about a lot of subjects, but I am |
| 08:58:44 | 20 | going to start with just some basic background |
| | 21 | information. |
| 08:58:46 | 22 | Have you ever had your deposition |
| 08:58:48 | 23 | taken before, Mr. Rothschild? |
| 08:58:49 | 24 | A Yes. |
| | 25 | Q And how many times has your deposition |

**Page 7**

| | | |
|---|---|---|
| 08:58:52 | 1 | been taken? |
| 08:58:55 | 2 | A To the best of my recollection, twice |
| 08:58:59 | 3 | before. |
| 08:59:05 | 4 | Q Okay. Can -- can you tell me what |
| 08:59:08 | 5 | those two depositions related to, please? |
| 08:59:16 | 6 | A Yes. The more recent one was a case |
| 08:59:19 | 7 | in which a company that I was associated with |
| 08:59:23 | 8 | was a plaintiff against Kinkos that had, in |
| 08:59:25 | 9 | their -- in the company's opinion, improperly |
| 08:59:28 | 10 | terminated a contract. That cost the company a |
| 08:59:31 | 11 | good amount of money. |
| 08:59:32 | 12 | Q Okay. When you say it was a company |
| 08:59:34 | 13 | you were associated with, was this one of your |
| 08:59:39 | 14 | companies? |
| 08:59:39 | 15 | A It wasn't one of my companies. It's |
| 08:59:40 | 16 | Awards.com. I was senior executive at the |
| 08:59:42 | 17 | company. |
| 08:59:46 | 18 | Q Was that Awards? |
| 08:59:47 | 19 | A Awards.com. |
| | 20 | Q When was that deposition, if you |
| 08:59:50 | 21 | recall? |
| 09:00:02 | 22 | A I can't recall exactly, but probably |
| 09:00:04 | 23 | three to four years ago. |
| 09:00:04 | 24 | Q Okay. And did -- was it Kinkos that |
| | 25 | then took your deposition? |

**Page 8**

| | | |
|---|---|---|
| 09:00:06 | 1 | A Yes. |
| 09:00:09 | 2 | Q All right. |
| 09:00:11 | 3 | A Actually, FedEx. They had been |
| 09:00:13 | 4 | acquired by FedEx. |
| 09:00:15 | 5 | Q And what was the other instance in |
| 09:00:21 | 6 | which you have been deposed? |
| 09:00:27 | 7 | A I had worked for a company in the |
| 09:00:31 | 8 | 1990's -- actually 1980's, and the CEO of that |
| 09:00:35 | 9 | company was suing his lawyer for improper |
| 09:00:36 | 10 | representation, and they wanted to get me up |
| 09:00:38 | 11 | there as a factual witness about what was going |
| 09:00:39 | 12 | on with the company at the time. |
| 09:00:41 | 13 | Q Okay. So you were more of a fact |
| 09:00:42 | 14 | witness? |
| 09:00:44 | 15 | A Yes. I had not been with the company |
| 09:00:49 | 16 | for a decade. |
| 09:00:51 | 17 | Q Okay. And, Mr. Rothschild, have you |
| 09:00:56 | 18 | ever served as a -- strike that. |
| | 19 | Mr. Rothschild, have you ever been |
| 09:00:57 | 20 | designated as a Rule 30(b)(6) witness to testify |
| 09:01:00 | 21 | at a deposition? |
| 09:01:02 | 22 | A No. |
| 09:01:03 | 23 | Q And do you know what that is? |
| 09:01:08 | 24 | A As a layperson, it was explained to |
| | 25 | me. |

**Page 9**

| | | |
|---|---|---|
| 09:01:11 | 1 | Q Okay. So you have some experience |
| 09:01:14 | 2 | with -- with depositions, so I will be brief |
| 09:01:16 | 3 | just about some ground rules, which I think you |
| 09:01:18 | 4 | are probably aware of, but nonetheless, I think |
| 09:01:20 | 5 | it's beneficial to go over them quickly. |
| 09:01:24 | 6 | As you know, to your right, we have a |
| 09:01:27 | 7 | court reporter. She is transcribing everything |
| 09:01:29 | 8 | I say to the best of her ability, as she will |
| 09:01:33 | 9 | transcribe everything that you say to the best |
| 09:01:39 | 10 | of her ability. So it's important that I ask |
| 09:01:41 | 11 | and articulate my questions clearly. Likewise |
| 09:01:43 | 12 | it is important that you articulate your |
| 09:01:46 | 13 | responses clearly. |
| 09:01:54 | 14 | Sometimes she will ask you, hey, could |
| 09:01:55 | 15 | you spell what you just said, so we have a clear |
| 09:01:56 | 16 | record, and that's all that is about. |
| 09:02:01 | 17 | I do ask that you try to not start |
| | 18 | answering my question until I finish asking it. |
| 09:02:04 | 19 | That tends to happen as the day goes on because |
| 09:02:08 | 20 | we may fall into a pattern of more of a |
| 09:02:12 | 21 | conversation. That's important not just to have |
| 09:02:15 | 22 | a clear record, but as I am sure you may have |
| 09:02:19 | 23 | been advised by your attorney, he will -- may |
| 09:02:22 | 24 | make objections after I ask a question. |
| | 25 | And in very limited circumstances, he |

09:02:28 may even ask you to -- instruct you not to
09:02:29 answer, but in most cases, he will make an
09:02:30 objection, and then I will expect you to just
09:02:34 respond. Is that okay?
09:02:37 A It is.
09:02:42 Q Okay. And the other obvious nuance
09:02:44 is, our court reporter cannot transcribe a nod
09:02:48 of the head, or an uh-huh, or an um-hum, which
09:02:51 sometimes happens, that's how we talk normally.
09:02:53 Here this is a more formal procedure, so just
09:02:54 try to articulate a response versus a nod of the
09:03:03 head. Is that okay?
09:03:08 A It is.
09:03:11 Q All right. So, Mr. Rothschild, what
09:03:14 did you do to prepare for this deposition today?
09:03:18 A I looked over the list of issues which
were going to be the subject of the deposition,
09:03:23 and I tried to familiarize myself, as best as I
09:03:26 could, through my recollections and discussions
09:03:31 what the issues were.
09:03:36 I looked over much of the paperwork
09:03:41 that had been filed relative to this case, and
09:03:42 in a couple of instances, asked for some pieces
09:03:45 of information to fill out certain gaps in my
knowledge.

09:03:49 Q And those instances that you just
09:03:54 testified about, was that information you
09:03:57 requested from your attorneys?
09:03:57 A No. Well, it may have been through
09:04:03 the attorneys to our staff or directly from the
09:04:05 staff.
09:04:13 Q Okay. I don't want you to tell me
09:04:17 about anything that you and your attorneys
09:04:19 discussed, talked about at least in this context
09:04:21 of the prep, but in the instances that you
09:04:26 requested information from staff or somebody who
09:04:28 was not an attorney, can you tell me what those
09:04:41 requests were?
09:04:44 A Certain things regarding revenues, and
09:04:44 licenses of the company, and the methods for how
we identify how many physicians have edited
09:04:47 information.
09:04:55 Q Okay. And who was it that you made
09:05:00 those requests of?
09:05:03 A Again, some were direct, some were
09:05:07 through our attorney, but to the CFO of the
09:05:07 company, a gentleman called Hal Polley, and the
09:05:09 CTO of the company, a gentleman named Larry
09:05:10 West.
Q Who was the first one?

09:05:11 A Hal Polley.
09:05:21 THE REPORTER: Could you spell the
09:05:23 last name, please.
09:05:25 THE WITNESS: P-O-L-L-E-Y.
09:05:29 Q And did I understand correctly that
09:05:33 you said one of the areas that you requested
09:05:35 information about was methods to identify how
09:05:37 many physicians had edited their information?
09:05:37 A Yes.
09:05:38 Q Do you mean edited their profile
09:06:05 information?
09:06:10 A Yes.
09:06:21 Q Okay. Mr. Rothschild, I am going to
09:06:23 go ahead and mark the first exhibit of your
deposition, and I will hand it to you and hand a
09:06:23 copy to your attorney.
09:06:23 MR. STIMPSON: Thanks.
09:06:23 (Notice of Deposition marked
09:06:24 Rothschild Exhibit 1 for identification, as
09:06:25 of this date.)
09:06:33 BY MR. VAZQUEZ:
09:06:36 Q So what has been marked as Rothschild
09:06:43 Deposition Exhibit 1 is the notice of your
09:06:47 deposition, and also a few pages in, you will
see a list of topics that we requested MDX

09:06:53 designate a witness to testify about, and as you
09:06:54 know, you are that witness.
09:07:00 Is that right?
09:07:04 A Yes.
09:07:14 Q Okay. So I will just ask you to go to
09:07:16 Page 4, which has the title "Exhibit A," and it
09:07:18 also has the categories or topics.
09:07:19 Can you go to Page 4?
09:07:26 A I am on Page 4.
09:07:29 Q Okay. Thank you.
09:07:34 And then are these 15 topics the ones
09:07:35 which you testified earlier you spent some time
09:07:40 preparing for by reviewing them and so forth?
A Yes.
09:07:44 Q Okay. And other than the time you
09:07:48 spent looking at -- at this information, did you
09:07:49 spend time with counsel?
09:07:51 A Yes.
09:07:51 Q And I mean time with counsel preparing
09:07:54 for your deposition?
09:07:56 A Yes.
09:07:57 Q And how much time did you spend?
09:07:58 A Approximately two days.
09:07:59 Q Two days?
A (No response).

## Page 14

| | | |
|---|---|---|
| 09:08:04 | 1 | Q   Two eight-hour days? |
| 09:08:05 | 2 | A   No, maybe a day and a half. |
| 09:08:09 | 3 | Let me correct that. |
| 09:08:13 | 4 | Q   About 12 hours? |
| 09:08:14 | 5 | A   I am not keeping track of hours, but a |
| 09:08:23 | 6 | day and then morning from early to around |
| 09:08:25 | 7 | lunchtime. |
| 09:08:38 | 8 | Q   Okay.  Did you review documents during |
| 09:08:41 | 9 | this time, this day and a half? |
| 09:08:45 | 10 | A   Yes. |
| 09:08:52 | 11 | Q   Okay.  Mr. Rothschild, you are aware |
| 09:08:53 | 12 | that you, in addition to being MDX's designated |
| 09:08:54 | 13 | witness on the topics, that you are also a fact |
| 09:08:54 | 14 | witness in this deposition?  Are you? |
| 09:09:02 | 15 | A   I am familiar. |
| 09:09:04 | 16 | Q   Okay.  Can you tell me how it was that |
| 09:09:05 | 17 | you first came to know about HealthGrades? |
| 09:09:08 | 18 | MR. STIMPSON:  Excuse me just one |
| 09:09:11 | 19 | second.  Jesus, how do you -- how do you |
| 09:09:13 | 20 | want to do this between the individual and |
| 09:09:15 | 21 | the 30(b)(6)?  Do you want to tell me when |
| 09:09:18 | 22 | you start the 30(b)(6) or should I -- |
| 09:09:20 | 23 | because otherwise if you say something is a |
| 09:09:23 | 24 | 30(b)(6), and I don't think it is on the |
| | 25 | topic, normally I would just object, but I |

## Page 15

| | | |
|---|---|---|
| 09:09:26 | 1 | don't want to do that all day. |
| 09:09:28 | 2 | MR. VAZQUEZ:  Yes.  I mean, there is |
| 09:09:30 | 3 | some overlap, I think, but I mean clearly, |
| 09:09:31 | 4 | just -- just like the question I just |
| 09:09:33 | 5 | asked, it's more of a fact witness |
| 09:09:35 | 6 | question. |
| 09:09:39 | 7 | MR. STIMPSON:  Yes.  I am just |
| 09:09:41 | 8 | wondering, can I preserve my objections if |
| 09:09:42 | 9 | you -- to the 30(b)(6) so I don't have to |
| 09:09:44 | 10 | make them today?  Because otherwise when |
| 09:09:51 | 11 | you get to questions like this -- |
| | 12 | MR. VAZQUEZ:  Well, I propose this, |
| 09:09:55 | 13 | Scott.  If I ask a question which doesn't |
| 09:10:04 | 14 | appear to be something that comes under his |
| 09:10:06 | 15 | fact witness testimony or knowledge, and |
| 09:10:09 | 16 | then also is not a topic that goes under |
| 09:10:11 | 17 | one of the topics, at that point I think |
| 09:10:11 | 18 | you may say, hey, this isn't -- doesn't |
| 09:10:14 | 19 | fall under either of these roles. |
| 09:10:16 | 20 | MR. STIMPSON:  No, that's -- that's |
| 09:10:18 | 21 | fine.  I am not worried -- so much worried |
| 09:10:20 | 22 | about that.  If you were just taking a |
| 09:10:21 | 23 | 30(b)(6) deposition, I would say, hey, |
| 09:10:24 | 24 | look, there's no topic covering this, it's |
| | 25 | outside the scope, and therefore, there |

## Page 16

| | | |
|---|---|---|
| 09:10:31 | 1 | wouldn't be 30(b)(6) testimony, but since |
| 09:10:33 | 2 | it's both, I need to -- I don't want to be |
| 09:10:36 | 3 | objecting.  Like right now, I would have |
| 09:10:38 | 4 | objected to it because it's not 30(b)(6). |
| 09:10:40 | 5 | That would waste your time. |
| 09:10:41 | 6 | Can I -- can I preserve my objections |
| 09:10:42 | 7 | to the 30(b)(6) part, and you can do |
| 09:10:45 | 8 | whatever you want, and then -- |
| 09:10:45 | 9 | MR. VAZQUEZ:  I am not sure it's |
| 09:10:45 | 10 | necessary, Scott.  Why do you feel it's |
| | 11 | necessary?  Why did that question even come |
| 09:10:46 | 12 | up? |
| 09:10:50 | 13 | MR. STIMPSON:  It's not so much -- I |
| 09:10:52 | 14 | don't care about that question so much. |
| 09:10:54 | 15 | It's just that, you know, 30(b)(6) |
| 09:10:56 | 16 | testimony is the testimony of the company, |
| 09:10:57 | 17 | it's official testimony of the company.  It |
| 09:10:59 | 18 | is different from a fact witness. |
| 09:11:02 | 19 | So, you know, we have to have a clear |
| 09:11:05 | 20 | record of what -- what is a 30(b)(6) and |
| 09:11:08 | 21 | what isn't.  If you want, I will just go |
| 09:11:09 | 22 | ahead, and I will just say outside 30(b)(6) |
| 09:11:12 | 23 | or something as -- as you ask questions, |
| 09:11:14 | 24 | but I am just worried that might get |
| 09:11:15 | 25 | annoying, and then -- |

## Page 17

| | | |
|---|---|---|
| 09:11:16 | 1 | MR. VAZQUEZ:  I think it probably |
| 09:11:19 | 2 | would get annoying. |
| 09:11:20 | 3 | MR. STIMPSON:  I know, I know, but I |
| 09:11:20 | 4 | don't know how else to do it.  I have to |
| 09:11:22 | 5 | preserve my objections. |
| 09:11:23 | 6 | MR. VAZQUEZ:  In other words, you |
| 09:11:24 | 7 | would have made that objection in response |
| 09:11:26 | 8 | to that question? |
| 09:11:27 | 9 | MR. STIMPSON:  Yes.  Well, because it |
| | 10 | is -- it is outside the scope, right? |
| 09:11:29 | 11 | MR. VAZQUEZ:  But he's a -- he's a |
| 09:11:31 | 12 | fact witness. |
| 09:11:34 | 13 | MR. STIMPSON:  I know, but what I am |
| 09:11:37 | 14 | suggesting, so I don't have to do this, is |
| 09:11:39 | 15 | why don't we just agree that I don't have |
| 09:11:41 | 16 | to make that objection today, and if later |
| 09:11:43 | 17 | on, you try to say it's a 30(b)(6), I will |
| 09:11:44 | 18 | still have preserved that objection to say, |
| 09:11:47 | 19 | no, it wasn't really a 30(b)(6) because he |
| 09:11:49 | 20 | was both fact and 30(b)(6). |
| 09:11:51 | 21 | In that way, I don't have to interrupt |
| 09:11:52 | 22 | you any more about this, and I don't have |
| 09:11:53 | 23 | to worry because my objection will be |
| 09:11:55 | 24 | preserved. |
| | 25 | MR. VAZQUEZ:  And so the objection you |

| | | Page 18 |
|---|---|---|
| 09:12:01 | 1 | want to preserve specifically is that the |
| 09:12:03 | 2 | question is beyond the scope of the |
| 09:12:05 | 3 | categories that he's designated to testify |
| 09:12:09 | 4 | as a 30(b)(6) witness. |
| 09:12:12 | 5 | MR. STIMPSON:  For any questions |
| 09:12:15 | 6 | outside of these topics. |
| 09:12:17 | 7 | MR. VAZQUEZ:  I mean, part of my |
| 09:12:22 | 8 | hesitance to agree to the proposal, |
| | 9 | Mr. Stimpson, is, for example, that |
| 09:12:23 | 10 | question, I think, would come under No. 1. |
| 09:12:28 | 11 | MR. STIMPSON:  Okay.  But, see, that's |
| 09:12:30 | 12 | the point.  I mean, you may be right.  I |
| 09:12:31 | 13 | don't know what the question was, now I |
| 09:12:34 | 14 | don't even remember it. |
| 09:12:36 | 15 | MR. VAZQUEZ:  How -- how did he first |
| 09:12:38 | 16 | come to learn about HealthGrades. |
| 09:12:40 | 17 | MR. STIMPSON:  Okay.  But I mean, I |
| 09:12:42 | 18 | would not agree with that, so I would put |
| 09:12:43 | 19 | in an objection on that normally, but if we |
| 09:12:46 | 20 | just come to an agreement, all it's doing |
| 09:12:48 | 21 | is just preserving my objection, so I |
| 09:12:49 | 22 | don't -- the whole point of it is so I |
| 09:12:51 | 23 | don't have to keep talking, and you can |
| 09:12:52 | 24 | just ask your questions, and we don't have |
| | 25 | to worry about that topic, and that way, I |

| | | Page 19 |
|---|---|---|
| 09:12:57 | 1 | just get them later. |
| 09:12:59 | 2 | If it's on the topic, it is.  It's not |
| 09:12:59 | 3 | to exclude the testimony, it's just it's |
| 09:13:01 | 4 | not 30(b)(6). |
| 09:13:07 | 5 | MR. VAZQUEZ:  I mean, let's just say I |
| 09:13:10 | 6 | understand what you are saying.  And I know |
| 09:13:11 | 7 | you are, you know, doing the best -- doing |
| | 8 | what you feel you need to do -- |
| 09:13:12 | 9 | MR. STIMPSON:  Okay. |
| 09:13:17 | 10 | MR. VAZQUEZ:  -- as -- as representing |
| 09:13:20 | 11 | Mr. Rothschild, but if I just follow |
| 09:13:24 | 12 | through, play through what you are |
| 09:13:27 | 13 | suggesting, Scott, which is, for example, |
| 09:13:30 | 14 | preserve all objections that's beyond the |
| 09:13:31 | 15 | 30(b)(6) categories, just about anything |
| 09:13:32 | 16 | else is proper to be asked as a fact |
| 09:13:35 | 17 | witness. |
| 09:13:36 | 18 | MR. STIMPSON:  Okay.  And I agree with |
| 09:13:38 | 19 | that.  That's fine.  I wouldn't -- |
| 09:13:39 | 20 | MR. VAZQUEZ:  What is the -- so if you |
| 09:13:39 | 21 | look into the future, what is the point, |
| 09:13:47 | 22 | then? |
| 09:13:49 | 23 | MR. STIMPSON:  If you use the |
| 09:13:49 | 24 | 30(b)(6) -- a 30(b)(6) testimony can be |
| | 25 | used in ways that regular fact testimony |

| | | Page 20 |
|---|---|---|
| 09:13:51 | 1 | can't be, because it's the testimony of a |
| 09:13:52 | 2 | company, right.  So there are certain |
| 09:13:54 | 3 | things you can do for a 30(b)(6) that you |
| 09:13:57 | 4 | can't do with others. |
| 09:13:59 | 5 | And so what I don't want to do is I |
| 09:14:01 | 6 | don't want to have you use some piece of |
| | 7 | testimony from Mr. Rothschild and say he's |
| 09:14:03 | 8 | a 30(b)(6) witness, and this is what the |
| 09:14:07 | 9 | company has, you know, said, and they are |
| 09:14:09 | 10 | bound to whatever, and then I didn't make |
| 09:14:10 | 11 | an objection that it was outside the scope, |
| 09:14:13 | 12 | and I have lost my objection. |
| 09:14:16 | 13 | MR. VAZQUEZ:  Isn't Mr. Rothschild |
| 09:14:18 | 14 | appearing here in his capacity other than a |
| 09:14:20 | 15 | 30(b)(6), as a fact witness in his capacity |
| 09:14:21 | 16 | as an officer of MDX? |
| 09:14:22 | 17 | MR. STIMPSON:  Right, he is. |
| 09:14:23 | 18 | MR. VAZQUEZ:  Not in his personal |
| 09:14:26 | 19 | capacity, right? |
| 09:14:27 | 20 | MR. STIMPSON:  Personal, it is |
| 09:14:28 | 21 | Mr. Rothschild, and whatever his capacity |
| 09:14:32 | 22 | is, you have got his deposition. |
| 09:14:35 | 23 | Look, you are not going to agree, so |
| 09:14:35 | 24 | I'm just going to have to put my objections |
| | 25 | on the record.  I hope you don't find them |

| | | Page 21 |
|---|---|---|
| 09:14:39 | 1 | too annoying, but I will just keep making |
| 09:14:41 | 2 | objections. |
| 09:14:42 | 3 | But, anyway, objection outside of the |
| 09:14:44 | 4 | 30(b)(6).  If you want to agree, I'm happy |
| 09:14:44 | 5 | to agree with. |
| | 6 | MR. VAZQUEZ:  Let's see how it goes. |
| 09:14:46 | 7 | MR. STIMPSON:  Okay, that's fine. |
| 09:14:48 | 8 | MR. VAZQUEZ:  And see how annoying it |
| 09:14:49 | 9 | gets. |
| 09:14:51 | 10 | MR. STIMPSON:  I think it's going to |
| 09:14:51 | 11 | be annoying.  I want to put on the record |
| 09:14:52 | 12 | that I tried -- I tried to give you a way |
| 09:14:55 | 13 | around it. |
| 09:14:57 | 14 | BY MR. VAZQUEZ: |
| 09:14:59 | 15 | Q   I am afraid it's going to be a long |
| 09:15:01 | 16 | day, Mr. Rothschild. |
| 09:15:02 | 17 | A   So far, I haven't been that involved. |
| 09:15:04 | 18 | Q   Well, could you answer the question? |
| 09:15:08 | 19 | A   Repeat the question, please. |
| 09:15:09 | 20 | Q   How was it that you first came to |
| 09:15:15 | 21 | learn about HealthGrades? |
| 09:15:18 | 22 | MR. STIMPSON:  Same objection. |
| 09:15:24 | 23 | A   When we started the company in 2007, |
| 09:15:27 | 24 | one of the things that is proper for any company |
| | 25 | to do is to do a survey of who else was in the |

| | | |
|---|---|---|
| Page 22 | | Page 24 |

**Page 22**

```
09:15:30   1   market.  There were a number of companies in the
09:15:38   2   market, including HealthGrades.
09:15:40   3       Q   Okay.  So you did a survey?
09:15:43   4       A   Well, we looked at -- survey is not
           5   meant to be a formal document.  We looked out
09:15:46   6   and tried to identify who we could that were
09:15:51   7   competitors in the space, or beyond even
09:15:53   8   competitors, people that served the same market.
09:15:56   9       Q   Was that before or after the knee
09:15:58  10   surgery you had where you had the epiphany --
09:15:59  11       A   It was -- it was well after.
09:16:02  12       Q   I am sorry, I was not done.
09:16:05  13       A   Sorry.  Go head.
09:16:08  14       Q   Was that before or after that knee
09:16:12  15   surgery where you had a revelation that, boy,
09:16:13  16   it's important for me to know more about my
09:16:15  17   surgeon or people to know about doctors?
09:16:17  18       MR. STIMPSON:  Same objection.
09:16:17  19       When I say same objection, I will be
09:16:19  20   referring to the 30(b)(6) objection.
09:16:24  21       A   Well after.
09:16:24  22       Q   "Well after"?
09:16:26  23       A   Yes.
09:16:27  24       MR. STIMPSON:  Same.
          25       MR. VAZQUEZ:  Do you object to his
```

**Page 23**

```
09:16:28   1   answer?
09:16:30   2       MR. STIMPSON:  No, not the answer, to
09:16:33   3   your question.
           4   BY MR. VAZQUEZ:
09:16:35   5       Q   And what was it, if you can tell us,
09:16:43   6   if you remember, that you found out about
09:16:49   7   HealthGrades?
09:16:53   8       MR. STIMPSON:  Same objection.
09:16:56   9       A   When we launched the site, which we
09:16:58  10   had done with a number of other sites, we looked
09:17:03  11   around to who else was showing up in search
09:17:08  12   engine results, and HealthGrades was one of
09:17:12  13   probably a dozen companies that did it.  Their
09:17:15  14   business model was different than Vitals, so we
09:17:19  15   viewed them as not directly competitive.
09:17:22  16       Q   Okay.  And how was it that the
09:17:23  17   HealthGrades model was -- business model was
09:17:26  18   different from Vitals?
09:17:31  19       MR. STIMPSON:  Same objection.
09:17:37  20       A   They charged to get any information on
09:17:41  21   doctors, and you needed to pay a fee to see a
09:17:42  22   report.  We did not.
09:17:43  23       Q   Any other ways that you recall the
09:17:46  24   business model was different?
          25       MR. STIMPSON:  Same objection.
```

**Page 24**

```
09:18:00   1       A   That was the core of the business
09:18:20   2   model.  There was a subscription fee required,
           3   and that was the way they generated revenue, and
09:18:25   4   ours was more of an advertising model.
09:18:30   5       Q   So if I am paraphrasing what you just
09:18:35   6   said correctly, Vitals was going to be more of
09:18:36   7   an advertising business model.  I believe you
09:18:37   8   mean revenue for Vitals would be driven by
09:18:37   9   advertising?
09:18:40  10       MR. STIMPSON:  Same objection.
09:18:41  11       A   Yes.
09:18:42  12       Q   And you thought HealthGrades was what
09:18:44  13   type of model?
09:18:46  14       MR. STIMPSON:  Same objection.
09:18:49  15       A   HealthGrades was a subscription model,
09:18:49  16   I believe is what I said.
09:18:54  17       Q   Okay.  And what do you mean by that?
09:18:55  18       MR. STIMPSON:  Same objection.
09:18:58  19       A   You needed to pay to access the
09:18:59  20   information.
09:19:03  21       MR. STIMPSON:  Can I ask for a
09:19:04  22   continuing objection, so I cannot talk
09:19:05  23   during this?  At least this line of
09:19:07  24   questioning?
          25       MR. VAZQUEZ:  Scott, are you familiar
```

**Page 25**

```
09:19:09   1   with the topics?  I mean --
09:19:12   2       MR. STIMPSON:  I am.
09:19:14   3       MR. VAZQUEZ:  Are you saying that this
09:19:14   4   line of questioning is not 30(b)(6)?
09:19:15   5       MR. STIMPSON:  Yes.
09:19:17   6       MR. VAZQUEZ:  Why?
09:19:18   7       MR. STIMPSON:  Because -- you tell me
09:19:20   8   what topics it covers, you know, how it
09:19:21   9   compares to HealthGrades.  Where's that?
09:19:28  10   That wasn't in the original one.
09:19:29  11       MR. VAZQUEZ:  The differences between
09:19:29  12   the Defendant's products and services and
09:19:29  13   the claims of the patent.
09:19:29  14       MR. STIMPSON:  That's got nothing to
09:19:31  15   do with HealthGrades' comparison.  What
09:19:31  16   does that have to do with that?  You can't
09:19:34  17   find topics.
09:19:37  18       MR. VAZQUEZ:  Wait, hold on.  Hold on,
09:19:39  19   Mr. Stimpson.  Don't even start with this
09:19:41  20   that you can't even find --
09:19:43  21       MR. STIMPSON:  You are 0 for one.
09:19:44  22       MR. VAZQUEZ:  No, I am not 0 for one.
09:19:44  23   You are going 100 miles an hour, and you
09:19:45  24   know, this is my deposition.
          25       MR. STIMPSON:  I know that.  Fine.
```

## Page 26

09:19:49 1     MR. VAZQUEZ:  You just need to, you
09:19:52 2  know, simmer down.
09:19:55 3     MR. STIMPSON:  I am fine.
09:19:57 4     MR. VAZQUEZ:  No, no, no, you are not
09:20:00 5  fine.  You are being an obstructionist.
09:20:02 6  This is what you did at the last
09:20:04 7  deposition, and I've got the rules pulled
09:20:05 8  up and ready to get the judge on the line
09:20:07 9  and move for sanctions if you continue
09:20:07 10  this.
09:20:07 11     MR. STIMPSON:  Hold on.  The phone is
09:20:09 12  there.  Do you want the number?
09:20:11 13     MR. VAZQUEZ:  No, I've got the number,
09:20:12 14  Mr. Stimpson.  If you continue this line of
09:20:15 15  questioning, I am just telling you, we are
09:20:16 16  going to move for sanctions.  You are
09:20:16 17  violating the rules.  You are well aware of
09:20:16 18  them.
09:20:16 19     MR. STIMPSON:  You are being silly,
09:20:19 20  Mr. Vazquez.
09:20:21 21     MR. VAZQUEZ:  No, I'm not.
09:20:23 22     MR. STIMPSON:  Can I have a continuing
09:20:26 23  objection, so I don't have to --
09:20:28 24     MR. VAZQUEZ:  No, I am not.
25     MR. STIMPSON:  Same objection.

## Page 27

09:20:30 1     MR. VAZQUEZ:  This is ridiculous if
09:20:32 2  you think you are going to pull this off
09:20:35 3  all day.  I will just cancel it.  I will
09:20:38 4  just cancel it, and then we will -- you
09:20:41 5  know, we'll come back to New York after the
09:20:43 6  judge admonishes you and tells you how it
09:20:43 7  is you are supposed to behave.
09:20:43 8     MR. STIMPSON:  That sounds great,
09:20:45 9  okay.
09:20:46 10     MR. VAZQUEZ:  All right.
09:20:48 11     MR. STIMPSON:  Are you going to allow
09:20:51 12  a continuing objection?
09:20:52 13     MR. VAZQUEZ:  No, no.
09:20:53 14     MR. STIMPSON:  Get used to hearing it.
09:20:53 15     MR. VAZQUEZ:  You have been warned.
09:20:53 16     MR. STIMPSON:  Okay.
09:20:55 17     MR. VAZQUEZ:  All right.
09:20:59 18  BY MR. VAZQUEZ:
09:21:03 19     Q   How is it -- what was it,
09:21:04 20  Mr. Rothschild, that you felt was -- was
09:21:07 21  different between Vitals and HealthGrades?
09:21:10 22     MR. STIMPSON:  Objection.  This is
09:21:11 23  beyond the scope of the 30(b)(6) notice.
24     A   I believe I stated it in your prior
25  question.

## Page 28

09:21:18 1     Q   And as you know, because of the
09:21:20 2  exchange that we just had, very distracting by
09:21:21 3  Mr. Stimpson, I am not sure what you said.
09:21:24 4        Would you mind repeating it?
09:21:30 5     MR. STIMPSON:  Objection.  It's beyond
09:21:35 6  the 30(b)(6) notice.
09:21:39 7     A   HealthGrades' business was a
09:21:40 8  subscription model, vitals was an advertising
09:21:42 9  model.
09:21:44 10     Q   At the time, did not HealthGrades
09:21:46 11  advertise?
09:21:48 12     MR. STIMPSON:  Objection.  Beyond the
09:21:57 13  scope of the 30(b)(6).
09:22:01 14     A   I believe they did not have much, if
09:22:02 15  any, advertising on their profiles, but my -- my
09:22:04 16  memory may be faulty on that one.
09:22:04 17     Q   What is the time frame here that you
09:22:05 18  are talking about?
09:22:07 19     MR. STIMPSON:  Objection.
09:22:11 20        You have got to wait because I am
09:22:13 21  going to object to every question.
09:22:15 22        Objection.  Beyond the 30(b)(6) scope.
23     A   Early 2008.
09:22:16 24     Q   In early 2008?
25     MR. STIMPSON:  Same objection.

## Page 29

09:22:23 1     A   Yes.
09:22:34 2     Q   That is when you launched eVitals
09:22:39 3  website, correct, in early 2008?
09:22:42 4     A   Correct.
09:22:49 5     Q   When did you first learn of the '060
09:22:50 6  patent, Mr. Rothschild?
09:22:56 7     A   In the fall of 2010.
09:23:00 8     Q   And how was it that you first learned
09:23:05 9  about the '060 patent?
09:23:08 10     A   I think someone from our office
09:23:10 11  tripped over it, said, "Hey, did you see this?"
09:23:23 12     Q   Do you recall who that someone was?
09:23:24 13     A   I think it was Larry West.
09:23:30 14     Q   Okay.
09:23:30 15     MR. VAZQUEZ:  Do you have the copies
09:24:02 16  from -- from Boyer's deposition?
09:24:04 17     MR. STIMPSON:  No.
09:24:06 18  BY MR. VAZQUEZ:
09:24:10 19     Q   Mr. Rothschild, I am handing you
09:24:14 20  what's being marked as Deposition Exhibit 2,
09:24:14 21  which was an exhibit at Miss Boyer's deposition,
22  and we are trying to find a copy for your
09:24:14 23  counsel.
09:24:15 24        (10/5/10 email marked Rothschild
25  Exhibit 2 for identification, as of this

Page 30

09:24:20   1    date.)
09:25:06   2    BY MR. VAZQUEZ:
09:25:07   3      Q   In the meantime, you could take a look
09:25:09   4    at it.
09:25:11   5        MR. VAZQUEZ:  Well, I don't need a
09:25:14   6    copy.  Can you guys share?
09:25:20   7        MR. STIMPSON:  Yes, that's okay.
09:25:22   8      Q   Mr. Rothschild, is that the email that
09:25:23   9    you were referencing where somebody stumbled
09:25:24   10   upon it and told you about the patent?
09:25:25   11     A   This is the email that confirms my
09:25:28   12   recollection, yes.
09:25:30   13     Q   And are you sure that that's the first
09:25:48   14   time that you heard about the '060 patent?
09:25:51   15     A   I am pretty sure.
09:25:53   16     Q   Okay.  Here is -- Mr. Rothschild, I
09:25:56   17   know you are doing the best you can to remember.
09:25:58   18   What is the date of that email?
09:25:59   19     A   It is October 5th, 2010.
09:26:06   20     Q   And who is that email from?
09:26:06   21     A   Larry West.
09:26:06   22     Q   And to who is Mr. West's email
09:26:11   23   directed to?
09:26:14   24     A   To Erika Boyer and me.
          25     Q   So you recall receiving that, right?

Page 31

09:26:20   1      A   As I was reviewing information, I
09:26:38   2    recall seeing this particular email.  I have the
09:26:39   3    recollection that we knew about it in the fall.
09:26:40   4      Q   Okay.
09:26:40   5        MR. VAZQUEZ:  And we will mark this as
09:26:40   6    Exhibit 3.
09:26:40   7        (7/28/10 email marked Rothschild
09:26:50   8    Exhibit 3 for identification, as of this
09:26:54   9    date.)
09:27:02   10   BY MR. VAZQUEZ:
09:27:02   11     Q   And Deposition Exhibit 3 is an email
09:27:04   12   from Donald Hackett, to you and a Mr. Petrie,
09:27:05   13   correct?
09:27:12   14     A   Yes.
09:27:13   15     Q   And what is the date of that email?
09:27:14   16     A   July 28.
09:27:16   17     Q   And do you recall receiving this
09:27:18   18   email?
09:27:19   19     A   I do not.
          20     Q   Do you know what this email relates
09:27:27   21   to?
09:27:35   22     A   I do not.
09:27:36   23     Q   When you received the email which was
09:27:40   24   Deposition Exhibit 2, which is right there in
          25   front of you, what did you think when you first

Page 32

09:27:46   1    got that email?
09:27:53   2      A   That we needed to check it out along
09:28:22   3    with other patents and make sure that we were
09:28:26   4    not in violation.
09:28:33   5      Q   Okay.  Mr. Rothschild, I am handing
09:28:43   6    you what's been marked as Deposition Exhibit 4,
09:28:44   7    which also happens to be Deposition Exhibit 4
09:28:47   8    for Miss Boyer's deposition.
09:28:52   9        MR. STIMPSON:  This is an original
09:28:53   10   exhibit sticker I have right here.  Do you
09:28:58   11   want me to have this?
09:29:00   12       MS. STOLL-DeBELL:  No, I don't want
09:29:02   13   you to have that.
09:29:04   14       MR. VAZQUEZ:  This is not an original,
09:29:04   15   it is a color copy.
09:29:04   16       MS. STOLL-DeBELL:  Sorry.
09:29:04   17       MR. VAZQUEZ:  Okay.
09:29:04   18       (1/5/11 email marked Rothschild
          19   Exhibit 4 for identification, as of this
          20   date.)
09:29:05   21   BY MR. VAZQUEZ:
09:29:14   22     Q   So you were just testifying,
09:29:16   23   Mr. Rothschild, about how, when you heard about
09:29:20   24   the patent, you wanted to make sure that you
09:29:23   25   were not in violation of it and your policies

Page 33

09:29:27   1    would not violate the patent; is that correct?
09:29:30   2      A   Yes.
09:29:34   3      Q   Okay.  And so looking at Deposition
09:29:42   4    Exhibit 4, what is this?
09:29:44   5      A   This is an email to a couple of the
09:29:47   6    senior staff members regarding the patent in
09:29:51   7    question.
09:29:55   8      Q   And what is the date of this email?
09:29:58   9      A   January 5th, 2011.
09:30:01   10     Q   And what was the date of the email
09:30:03   11   from Mr. West alerting you to the patent?
09:30:11   12     A   October 5th, 2010.
09:30:14   13     Q   And so in the interim, did you take
09:30:15   14   any action to make sure any of your policies did
09:30:18   15   not violate the '060 patent?
09:30:22   16     A   Yes, we did.
09:30:27   17     Q   So what were those actions?
09:30:31   18     A   So we asked a law firm to do a review
09:30:31   19   of this and potentially other patents or patent
09:30:41   20   applications that might be of note to us, and I
09:30:49   21   think it comprised about a dozen different
09:30:55   22   potential patents for the ones that appeared to
09:31:01   23   be potentially relevant.  We had them write a
09:31:07   24   short opinion on it, and then I, particular to
          25   this patent from HealthGrades, engaged counsel

9  (Pages 30 to 33)

Page 34

| | |
|---|---|
| 09:31:15 | 1 to help us understand whether we were in |
| 09:31:17 | 2 violation and what we needed to do going forward |
| 09:31:26 | 3 to avoid any questions. |
| 09:31:36 | 4 Q And so when was it that you engaged |
| 09:31:38 | 5 counsel to look at this, as you just testified? |
| 09:31:38 | 6 A Probably early December of 2010. |
| 09:31:41 | 7 Q And how many -- did you engage more |
| 09:31:45 | 8 than one counsel? |
| 09:31:49 | 9 A Not directly. First we engaged the |
| 09:31:52 | 10 counsel to do -- well, first we engaged the |
| 09:31:58 | 11 counsel to do the review of the ten dozenish |
| 09:32:02 | 12 patents or the ones that were relevant, and then |
| 09:32:03 | 13 knowing HealthGrades' general reputation as |
| 09:32:05 | 14 being a litigious company, we said let's go |
| 09:32:08 | 15 deeper on this one. |
| 09:32:09 | 16 Q And what counsel are you referring to? |
| | 17 A For which one? |
| 09:32:14 | 18 Q Could you tell me every counsel that |
| 09:32:26 | 19 you have engaged to look at the patents, whether |
| 09:32:28 | 20 it is this whole set or just the '060 one? |
| 09:32:37 | 21 A We engaged a firm called Maldjian and |
| 09:32:46 | 22 something, please don't ask me to spell it |
| 09:32:48 | 23 because I don't know how to spell it, M-A-L-D-J |
| | 24 maybe I-A-N, and they did, as I say, about a |
| 09:32:56 | 25 half dozen reviews, and then we engaged Sills |

Page 35

| | |
|---|---|
| 09:33:12 | 1 Cummis specifically on the '060 patent. |
| 09:33:17 | 2 Q Okay. Between Mr. West's email, which |
| 09:33:25 | 3 was October 5th, and when you engaged Maldjian |
| 09:33:25 | 4 and Sills Cummis, did you take any actions to |
| 09:33:26 | 5 ensure that MDX was not violating the '060 |
| 09:33:26 | 6 patent? |
| 09:33:29 | 7 A Not really. |
| 09:33:33 | 8 Q And why not? |
| 09:33:59 | 9 A It's just a small company, 1,000 |
| 09:34:02 | 10 things going on. We tried to get to this in as |
| 09:34:04 | 11 reasonable haste as we could. |
| 09:34:05 | 12 Q Okay. I am going to give you now what |
| 09:34:05 | 13 has been marked as Deposition Exhibit 5, |
| 09:34:05 | 14 Mr. Rothschild. |
| 09:34:05 | 15 (1/2/11 opinion of Maldjian Law Group |
| | 16 marked Rothschild Exhibit 5 for |
| 09:34:17 | 17 identification, as of this date.) |
| 09:34:28 | 18 BY MR. VAZQUEZ: |
| 09:34:32 | 19 Q And as you will see, this Exhibit 5 |
| 09:34:39 | 20 appears to be an opinion by the law firm you |
| 09:34:39 | 21 were just testifying about, Maldjian. Is that |
| 09:34:40 | 22 correct? |
| 09:34:40 | 23 A Yes. |
| 09:34:45 | 24 Q Is this the opinion that you were |
| | 25 testifying about? |

Page 36

| | |
|---|---|
| 09:34:50 | 1 A Yes. |
| 09:34:53 | 2 Q Now, this -- if you need time to |
| 09:34:53 | 3 review it, I don't know how long it has been |
| 09:34:56 | 4 since you have seen it, but take that time, |
| 09:34:59 | 5 Mr. Rothschild. |
| 09:35:02 | 6 My question is: This appears to be |
| 09:35:05 | 7 only about the '060 patent? |
| 09:35:09 | 8 A This particular letter is one of a |
| 09:35:10 | 9 number of individual letters that they sent out, |
| 09:35:13 | 10 each one on different patents or patent |
| 09:35:17 | 11 applications. |
| 09:35:23 | 12 Q Okay. Do you or does MDX intend to |
| 09:35:26 | 13 rely on any opinions issued by Maldjian in this |
| 09:35:29 | 14 lawsuit? |
| 09:35:31 | 15 A We have engaged counsel, and counsel |
| 09:35:37 | 16 will tell us on whom to rely. |
| 09:35:37 | 17 Q Well, I can tell you that this |
| 09:35:40 | 18 opinion -- this letter, which is the only one |
| 09:35:41 | 19 that we have from Maldjian, there are no other |
| 09:35:45 | 20 letters or opinions that we are aware of, was |
| 09:35:48 | 21 just produced to us as opposed to the Sills |
| 09:35:52 | 22 Cummis opinion, which was produced by the |
| 09:35:54 | 23 deadline by which any opinions that MDX intended |
| 09:35:55 | 24 to rely upon were to be produced. So that's why |
| | 25 I am asking. |

Page 37

| | |
|---|---|
| 09:35:57 | 1 MR. STIMPSON: There's no question |
| 09:35:58 | 2 pending. |
| 09:35:57 | 3 MR. VAZQUEZ: Yes, there is. I just |
| 09:36:00 | 4 asked it. |
| 09:36:01 | 5 MR. STIMPSON: No, there isn't. |
| 09:36:01 | 6 MR. VAZQUEZ: That's why I just asked |
| 09:36:02 | 7 it. That's why I am asking. |
| 09:36:03 | 8 MR. STIMPSON: Then ask a question. |
| 09:36:04 | 9 That's a statement. What's the question? |
| 09:36:05 | 10 BY MR. VAZQUEZ: |
| 09:36:06 | 11 Q Do you understand that there's a |
| 09:36:10 | 12 question pending? |
| 09:36:12 | 13 A No. |
| | 14 Q Do you intend to rely on this opinion? |
| 09:36:13 | 15 A I believe I answered that question. |
| 09:36:19 | 16 MR. STIMPSON: Asked and answered. |
| 09:36:20 | 17 A That we are going to let our counsel |
| 09:36:23 | 18 determine the best method for how we should |
| 09:36:25 | 19 defend this. |
| 09:36:28 | 20 Q Okay. Well, since based on that |
| 09:36:32 | 21 answer, we don't know whether MDX intends to |
| 09:36:34 | 22 rely on this opinion in addition to the other |
| 09:36:36 | 23 one, I am just going to have to ask you some |
| 09:36:37 | 24 more detailed questions about this opinion. |
| | 25 MR. STIMPSON: We do intend to rely on |

Case 1:11-cv-00520-RM-BNB Document 944-1 filed 10/14/14 USDC Colorado pg 14 of 62

Page 38

```
09:36:43   1    it, so you know.
09:36:44   2         MR. VAZQUEZ:  Well, thank you.  It was
09:36:46   3    not disclosed by the deadline.
09:36:49   4         MR. STIMPSON:  I am sorry.
09:36:50   5         MR. VAZQUEZ:  Are you, really?
09:36:50   6         MR. STIMPSON:  I made a mistake.
09:36:52   7         MR. VAZQUEZ:  Yeah.
09:36:55   8    BY MR. VAZQUEZ:
09:36:59   9    Q    Mr. Rothschild, so let's go through,
09:37:04  10    then, from the very beginning, to the best of
09:37:08  11    your recollection, what was your first
09:37:12  12    communication with attorneys at Maldjian
09:37:13  13    regarding their work on providing you with this
09:37:13  14    opinion and any of the other letters you just
09:37:21  15    testified about?
09:37:23  16    A    Well, this opinion is dated
09:37:26  17    January 2nd, and obviously we had had, my guess
09:37:31  18    would be, a month or six weeks of conversation
09:37:34  19    prior so they could render an intelligent
09:37:39  20    conversation -- intelligent opinion.
09:37:47  21    Q    Okay.  What attorney or attorneys did
09:37:49  22    you communicate with at the Maldjian law firm
09:37:53  23    about their opinions?
09:37:57  24    A    I do not recall specifically.  It
          25    obviously was John Maldjian, and I believe he
```

Page 39

```
09:38:05   1    brought in another individual to look at the
09:38:08   2    details.  I am certain he did.  I cannot
09:38:12   3    remember the name at this point.
09:38:17   4    Q    Did you know John Maldjian personally?
09:38:19   5    A    I knew him professionally.
09:38:19   6    Q    But not personally?
09:38:21   7    A    I am not sure what you mean by
09:38:22   8    "personally."
09:38:23   9    Q    Well, is he a friend?
09:38:25  10    A    No.
09:38:27  11    Q    How did you know of him
          12    professionally?
09:38:31  13    A    We are in the intellectual property
09:38:35  14    business, and as issues crop up, and he had
09:38:35  15    given us advice previously.
09:38:38  16         Actually, I believe I never even met
09:38:38  17    him.
09:38:40  18    Q    You don't think you ever really met
09:38:43  19    him?
09:38:44  20    A    No.  I mean, I have spoken to him many
09:38:46  21    times on the phone, but I don't believe we ever
09:38:49  22    met personally.
09:38:50  23    Q    Okay.  And so what was the first time
09:38:55  24    that you spoke with him?
          25    A    About?
```

Page 40

```
09:39:05   1    Q    About the '060 patent?
09:39:07   2    A    It was probably, I am guessing, late
09:39:14   3    November, early December.
09:39:15   4    Q    And did you take notes of any
09:39:18   5    conversations that you had with Mr. Maldjian?
09:39:20   6    A    I do not recall that I did.  I --
09:39:22   7    generally speaking, he was asking me questions,
09:39:23   8    and he was writing down the information he
09:39:26   9    needed to form an opinion --
09:39:26  10    Q    Do you typically --
09:39:28  11    A    -- about this -- if I may finish.
09:39:28  12    Q    Yes.
09:39:40  13    A    -- again, about this was one of a
09:39:40  14    number.  So just to put it in context, this was
09:39:41  15    not the only patent we were discussing or patent
09:39:43  16    application.
09:39:46  17    Q    Do you typically take notes,
09:39:52  18    Mr. Rothschild, when you have conversations with
09:39:57  19    legal counsel about when you are seeking
09:39:59  20    opinions from them?
09:40:03  21    A    I generally don't feel that notes are
09:40:06  22    something that I remember.  I will sometimes
09:40:08  23    write it on a pad of paper.  I don't recall
09:40:11  24    having any from this conversation.
          25    Q    Okay.  But I was just asking more in
```

Page 41

```
09:40:20   1    general, if you typically take notes when you
09:40:21   2    have conversations with counsel when you are
09:40:22   3    seeking opinions from them?
09:40:25   4    A    Most of the conversations I have with
09:40:27   5    counsel are them asking me questions.  So I
09:40:30   6    assume they are taking the notes.
09:40:33   7    Q    All right.  Mr. Rothschild, I didn't
09:40:34   8    ask you who is asking questions in the
09:40:36   9    conversation.  I didn't ask you if they are
          10    taking notes.
09:40:38  11         My question is very simple:  Do you
09:40:42  12    typically take notes when you have conversations
09:40:43  13    with counsel when you are seeking opinions from
09:40:45  14    them?
09:40:47  15         MR. STIMPSON:  Objection to the form.
09:40:51  16    That has been fully asked and answered.
09:40:53  17         But you can answer it again, if you
09:41:01  18    want, Mr. Rothschild.
09:41:03  19    A    I believe I said I typically do not.
09:41:10  20    Q    You typically do not.
09:41:12  21         What documents did you provide to
09:41:13  22    Mr. Maldjian in the context of seeking the
09:41:16  23    opinion from him that he issued?
09:41:17  24         MR. STIMPSON:  Objection.  That
          25    assumes a fact.
```

Page 42

```
09:41:23   1      A   Again, this is based on my memory from
09:41:26   2   a couple of years -- from a year and a half -- a
09:41:33   3   year and change ago. I believe we went through
09:41:36   4   the website and looked at it to see whether the
09:41:37   5   site itself was in violation.
09:41:40   6      Q   Do you recall giving Mr. Maldjian any
09:41:42   7   documents?
09:41:47   8      A   I do not recall that I gave him. It
           9   is possible that I did, but I do not recall.
09:41:49  10   And my instincts are it would have been, look at
09:41:54  11   the website.
09:41:56  12      Q   And although you say you typically do
09:42:01  13   not take notes, do you recall whether you gave
09:42:04  14   Mr. Maldjian -- or whether you took any notes at
09:42:11  15   all on conversations you had with Mr. Maldjian?
09:42:15  16      A   As stated, I do not recall that I took
09:42:19  17   notes.
09:42:36  18      Q   Was there any other MDX employee that
09:42:44  19   communicated with Mr. Maldjian about the opinion
09:42:47  20   that MDX sought from him?
09:42:51  21      A   I don't think so. I don't think so.
09:42:53  22   It was mostly me driving this. We do not have
09:42:57  23   in-house counsel, so --
09:43:03  24      Q   So Mr. West was not involved?
          25      A   It's possible he was on a conversation
```

Page 43

```
09:43:09   1   with the attorneys. I do not recall.
09:43:11   2      Q   Did you have any meetings with
09:43:16   3   Mr. Maldjian, not phone conferences, but
09:43:17   4   literally meetings, whether at MDX, or their
09:43:21   5   offices, or anywhere else?
09:43:29   6      MR. STIMPSON: Objection.
09:43:34   7      A   No.
           8      Q   Did Mr. Maldjian tell you to do
09:44:38   9   anything to the Vitals' website in order to
09:44:44  10   avoid infringement of the '060 patent?
09:44:46  11      A   It does not look like this opinion
09:44:48  12   made any specific recommendations for action.
09:44:51  13      Q   And beyond what's written in the
09:44:52  14   opinion you were just reviewing, do you recall
09:44:57  15   any other -- any recommendations he made orally
09:44:59  16   for action?
09:45:03  17      A   No.
09:45:06  18      Q   So, for example, he did not tell you
09:45:13  19   to remove the ability to have comparison
09:45:21  20   ratings?
09:45:23  21      A   In the Vitals website? I don't
09:45:23  22   believe he did that.
09:45:24  23      Q   Okay. Did somebody else in his firm
09:45:26  24   do that?
          25      A   No.
```

Page 44

```
09:45:36   1      Q   Okay. Is there any attorney that you
09:45:41   2   consulted with that recommended you do that?
09:45:46   3      A   The opinion from both attorneys was
09:45:55   4   that we were not in violation, but to create a
09:46:01   5   belt and suspenders protection, removing the
09:46:03   6   comparison page seemed to be a good idea to have
           7   double protection.
09:46:06   8      Q   So just so that I understand,
09:46:24   9   Mr. Rothschild, no attorney asked -- recommended
09:46:27  10   that you do that?
09:46:30  11      A   We had conversations with the Sills
09:46:30  12   Cummis attorneys, and that page came up, that if
09:46:32  13   we wanted to be truly -- truly belt and
09:46:36  14   suspenders, that would be a good idea to have it
09:46:39  15   on the page -- have it on the site.
09:46:44  16      Q   So an attorney from Sills Cummis
09:46:44  17   recommended that you remove the comparison
09:46:47  18   ratings functionality from Vitals.com website?
09:46:49  19      MR. STIMPSON: Objection,
09:46:52  20   mischaracterizes his testimony.
09:46:59  21      A   I did not say he recommended, I said
09:47:02  22   we reviewed the site, and it appeared that that
09:47:02  23   was -- that was my decision to do it.
09:47:04  24      Q   So it was your decision to remove that
          25   functionality?
```

Page 45

```
09:47:10   1      A   Yes.
09:47:12   2      Q   And your decision was based on what,
09:47:17   3   Mr. Rothschild?
09:47:20   4      A   On the variety of conversations I had
09:47:22   5   had with the attorneys regarding the patent.
           6      Q   Okay. Can you please tell me about
09:47:25   7   those conversations. What was -- what was
09:47:41   8   discussed in those conversations, please?
09:47:47   9      A   What was discussed were the patent,
09:47:52  10   what MDX does, and where there might be some
09:47:59  11   areas of gray in ways in which, to use the
09:48:00  12   phrase, we could be like Cesar's wife, that we
09:48:03  13   would be best off to -- that where -- if the
09:48:06  14   attorneys were on the other side, as you are
09:48:07  15   today, where they would prod and poke and to
09:48:13  16   eliminate that as a possibility.
09:48:14  17      Q   So when you say that there were areas
09:48:18  18   of gray, what do you mean by that?
09:48:19  19      MR. STIMPSON: Excuse me one second.
09:49:08  20   Could I please have the last question and
09:49:10  21   answer read back.
09:49:12  22      (Requested Portion Read Back)
09:49:20  23      MR. STIMPSON: Thank you.
09:49:22  24      You can go and answer. I forgot the
          25   last question.
```

```
                                    Page 46
09:49:26   1        (Requested Portion Read Back)
09:49:31   2      A   I believe I answered it in the
09:49:34   3  previous question, but it is where if you were
09:49:40   4  on the other side, where you would say we have a
           5  contention that you could potentially be in
09:49:50   6  violation or where an advocate for that side
09:49:56   7  would do it.
09:49:56   8      Q   So based on that, is it accurate for
09:49:57   9  me to say concern, you had a concern about areas
09:49:59  10  of gray?
09:50:00  11      A   I did not.
09:50:09  12      Q   No concern at all?
09:50:12  13      MR. STIMPSON:   Objection, asked and
09:50:13  14  answered.
09:50:14  15      Q   No concern at all?
09:50:16  16      MR. STIMPSON:   Same objection.  He has
09:50:17  17  already answered that question.
09:50:19  18      You can answer it again, if you want,
09:50:20  19  Mr. Rothschild.
09:50:21  20      MR. VAZQUEZ:   He has to, right?
09:50:24  21      MR. STIMPSON:   He can.
09:50:26  22      MR. VAZQUEZ:   He has to.  You cannot
09:50:27  23  say -- tell the witness to not answer if he
09:50:29  24  doesn't want to.  He has to.
          25      MR. STIMPSON:   Why are you getting
```

```
                                    Page 47
09:50:33   1  upset, Jesus?
09:50:35   2      MR. VAZQUEZ:   Because I know what you
09:50:36   3  are doing, Stimpson.  You do this in every
           4  deposition, and I am not going to tolerate
09:50:37   5  it.
09:50:41   6      MR. STIMPSON:   My name is Scott,
09:50:42   7  okay.  And if you want to refer to
09:50:42   8  Stimpson, it's Mr. Stimpson, but I prefer
09:50:42   9  you call me Scott, okay?
09:50:42  10      MR. VAZQUEZ:   Scott, you cannot tell
09:50:43  11  this witness to not answer unless --
09:50:46  12      MR. STIMPSON:   I didn't.
09:50:47  13      MR. VAZQUEZ:   You said "if you want
09:50:49  14  to."  You said it now three times.  Please
09:50:51  15  stop saying "if you want to."
09:50:52  16      MR. STIMPSON:   Do you want to read it
09:50:54  17  back?  I encouraged him to answer it.
09:50:54  18      MR. VAZQUEZ:   "If you want to" is what
09:50:58  19  you have done.  You know it.
09:51:00  20      MR. STIMPSON:   That's fine.  He's
09:51:02  21  going to answer.  You just wasted five
09:51:02  22  minutes talking about something we both
09:51:02  23  agree he is going to answer.  So what are
09:51:04  24  you --
          25      MR. VAZQUEZ:   Please -- I'm telling
```

```
                                    Page 48
09:51:06   1  you, please do not tell the witness to
09:51:07   2  answer if he wants to.
           3      MR. STIMPSON:   I will do whatever I
09:51:08   4  want.
09:51:12   5      MR. VAZQUEZ:   He must answer unless
09:51:13   6  the answer calls for privileged materials.
09:51:16   7  You know this.
09:51:17   8      MR. STIMPSON:   Are you done?
09:51:19   9      MR. VAZQUEZ:   Yes, for now, I am.
09:51:21  10      MR. STIMPSON:   Mr. Rothschild, you can
09:51:21  11  answer the next question if you want to.
09:51:22  12      A   We did not have concern.
09:51:24  13      Q   Okay.
09:51:26  14      MR. VAZQUEZ:   We are going to stop the
09:51:29  15  deposition right now and take a break off
09:51:29  16  the record.  We need the room to ourselves,
09:51:31  17  and since you just said "if you want to"
09:51:32  18  again --
09:51:34  19      MR. STIMPSON:   He answered it.
09:51:35  20      MR. VAZQUEZ:   You just said "if you
09:51:36  21  want to" again.  That is completely against
09:51:39  22  the rules and --
09:51:39  23      MR. STIMPSON:   I don't think it is.  I
09:51:42  24  am encouraging him to answer it.
          25      MR. VAZQUEZ:   It is, you know it.  And
```

```
                                    Page 49
09:51:45   1  I am just going to stop it right now, and
           2  we are going to consider what action we are
           3  going to take here to stop this
09:51:49   4  obstructionist conduct of yours, Stimpson.
10:22:53   5      THE VIDEOGRAPHER:   Going off the
10:23:08   6  record, the time is 9:54 a.m.
10:24:59   7      (Recess taken)
10:25:01   8      THE VIDEOGRAPHER:   We are back on the
10:25:03   9  record.  The time is 10:27 a.m.
10:25:05  10  BY MR. VAZQUEZ:
10:25:09  11      Q   Mr. Rothschild, I am going to hand you
10:25:10  12  what has been marked as Exhibits 6 and 7 for
10:25:10  13  your deposition.
10:25:10  14      (Screen shot from Vitals website
10:25:10  15  marked Rothschild Exhibit 6 for
10:25:10  16  identification, as of this date.)
10:25:10  17      (Screen shot from Vitals website
10:25:10  18  marked Rothschild Exhibit 7 for
10:25:13  19  identification, as of this date.)
10:25:15  20  BY MR. VAZQUEZ:
10:25:18  21      Q   Take a moment to look at those
10:25:39  22  documents.  I will have some questions about it.
10:25:46  23      A   Okay.
10:25:52  24      Q   6 and then 7.
          25      Mr. Rothschild, Exhibit 6 is a screen
```

## Page 50

1  shot from the Vitals website, correct?
2      A   It is not correct.  It is a screen
3  shot from the old Vitals website.  It is no
4  longer applicable.
5      Q   Okay.  And why do you know that that
6  is a screen shot from the old website?
7      A   Because it has the comparison options,
8  and it has the pages that result from that, and
9  as per Exhibit 4 and my email of January 5th,
10  2011, we eliminated that.
11      Q   Okay.  And that's what I wanted to ask
12  you about, specifically whether these features
13  that are shown on the Exhibits 6 and 7 were on
14  the website when you sought the opinion from
15  Maldjian?
16      A   I don't know the exact timing they
17  were in the process of coming off.  Probably
18  when we started the process, they were on, and
19  then my guess would be by the end, they were off
20  or somewhere around there.  I don't know the
21  exact timing.
22      Q   When you say you started the process,
23  the opinion from Maldjian is dated January 2nd,
24  2011, right?
25      A   Yes.

## Page 51

1      Q   And when did the process start, as you
2  just put it?
3      A   Which process?
4      Q   Those were your words, sir.
5      A   The process with Maldjian?
6      Q   Yes, if that's what you meant.
7      A   Yes.
8          Five, six weeks before.
9      Q   Five to six weeks before January 2nd?
10      A   Yes.
11      Q   So at the end of November?
12      A   Roughly.
13      Q   Or in November?
14      A   (No response).
15      Q   And when was it that you first
16  approached or began your communications with the
17  Sills Cummis firm with respect to obtaining an
18  opinion from them?
19      A   Probably around December of 2010.
20      Q   And so if I understand correctly, you
21  sought the opinion from Maldjian first?
22      A   Yes.
23          Well, as stated previously, we sought
24  the opinion on numerous patents and patent
25  applications from them first, and because this

## Page 52

1  was a litigious competitor, we felt a deeper
2  dive could not hurt.
3      Q   What do you mean by "a deeper dive"?
4      A   A truly in-depth forensic of the site
5  and the patent.
6      Q   I am sorry.  What do you mean by
7  "in-depth forensic"?
8      A   Maldjian was looking at half a dozen
9  patents.  The level of detail down to which they
10  got was only so far, and we felt it was worth
11  getting a more extensive and deeper opinion.
12      Q   Okay.  Can you turn to Page 4 of the
13  Maldjian opinion, please.
14          And at the -- do you see the section
15  that is titled, "Capital B:  Summary Analysis"?
16      A   Yes.
17      Q   Thank you.
18          And the second paragraph, the end of
19  the second paragraph states, "because the
20  Vitals.com web based service does not provide
21  any report containing the comparison ratings, it
22  cannot and does not perform the steps of
23  creating a health care provider report...
24  including comparison ratings of health care
25  providers."

## Page 53

1          Did I read that accurately?
2      A   Read it again, please?
3      Q   Why don't you read it into the record,
4  Mr. Rothschild, beginning with the word
5  "because."
6      A   Where are you?
7      Q   At the last sentence of the second
8  paragraph under the summary analysis.
9      A   "Because the Vitals.com web based
10  service does not provide any report containing
11  the comparison ratings, it cannot and does not
12  perform the steps of creating -- "creating a
13  health care report... including comparison
14  ratings of health care providers."
15      Q   And what is the source of the
16  inclusion here "the Vitals.com web based service
17  does not provide any report containing
18  comparison ratings"?
19      A   Probably, I can't speak specifically
20  for him, but the definition of a report in both
21  HealthGrades and Vitals is a profile of the
22  doctor.  We call it a profile.  HealthGrades has
23  called it historically a report.
24      Q   When you say "definition of a report,"
25  whose definition are you referring to?

| | Page 54 |
|---|---|
| 10:32:27 | 1    A   The definition we were using in |
| 10:32:29 | 2   defining this, our definition. |
| 10:32:32 | 3    Q   Okay. |
| 10:32:36 | 4    A   And as far as HealthGrades is |
| 10:32:38 | 5   concerned, they have historically, I believe, |
| 10:32:45 | 6   called it a report. |
| 10:32:52 | 7    Q   Did you tell Mr. Maldjian, we don't do |
| 10:32:57 | 8   this, we don't have comparison ratings? |
| 10:32:59 | 9    A   He went through the site, so I think |
| 10:33:03 | 10   this is a report. I believe you were showing me |
| 10:33:07 | 11   Exhibit 7 is a report that lines up information |
| 10:33:11 | 12   about this -- about the physician's end to end, |
| 10:33:14 | 13   so -- |
| 10:33:16 | 14    Q   And so I'm not sure I follow you. |
| 10:33:19 | 15    A   So that was coming off the site. So I |
| 10:33:23 | 16   may have said it -- I don't recall the exact |
| 10:33:26 | 17   timing of it, but it was coming off the site. |
| 10:33:29 | 18    Q   Right. And I understand a little bit |
| 10:33:32 | 19   ago, you know, a year and a half ago, but I |
| 10:33:36 | 20   mean, it is important, at least for me, to try |
| | 21   and understand whether it was coming off the |
| 10:33:39 | 22   site or it had come off the site and what would |
| 10:33:46 | 23   be Mr. Maldjian's understanding of whether it |
| 10:33:49 | 24   was coming off the site or whether it had come |
| | 25   off the site, and that's what I am trying to see |

| | Page 55 |
|---|---|
| 10:33:59 | 1   if you could tell me. |
| 10:34:00 | 2    A   As I stated, I cannot recall the exact |
| 10:34:02 | 3   timing, but we knew that this was the one area |
| 10:34:05 | 4   where it was similar to the patent even though |
| 10:34:10 | 5   there were other places where we were not |
| 10:34:13 | 6   infringing so -- and nobody really went to it, |
| 10:34:16 | 7   so -- not very many people went to it, so we -- |
| 10:34:19 | 8    Q   Not many -- I am sorry. Continue. I |
| 10:34:20 | 9   am not sure when you say "went to it." |
| 10:34:32 | 10    A   The functionality of people clicking |
| 10:34:33 | 11   compare, not many people did that. |
| 10:34:36 | 12    Q   Okay. And how did that factor into |
| 10:34:37 | 13   the communications about this opinion, whether |
| 10:34:39 | 14   people -- whether a lot of people were -- or not |
| 10:34:46 | 15   clicked on that functionality? |
| 10:34:47 | 16    A   It was not relevant to the opinion. I |
| 10:34:51 | 17   stated in our willingness to drop it, and so we |
| 10:34:54 | 18   knew we were dropping it. |
| 10:34:58 | 19    Q   I see. So if I understand what you |
| | 20   are saying, tell me if I am incorrect, that |
| 10:35:00 | 21   because there were not a lot of users of the |
| 10:35:07 | 22   website -- of the Vitals website who were using |
| 10:35:10 | 23   that functionality, that influenced your |
| 10:35:18 | 24   decision to drop it? |
| | 25    A   I wouldn't say it influenced, but as |

| | Page 56 |
|---|---|
| 10:35:25 | 1   we tried to do an increasing level of clear |
| 10:35:29 | 2   areas where we did not even overlap into gray, |
| 10:35:32 | 3   the fact that not many people were using it made |
| 10:35:32 | 4   it a very easy decision. |
| 10:35:42 | 5    Q   Isn't one of the overall goals of the |
| 10:35:45 | 6   Vitals website to allow patients to find and |
| 10:35:47 | 7   compare doctors? |
| 10:35:51 | 8    A   No. Find, yes. Compare, no. |
| 10:35:52 | 9    Q   Doesn't the website, as we sit here |
| 10:35:55 | 10   today, actually say find and compare doctors? |
| 10:35:56 | 11    A   I don't know offhand what it says on |
| 10:35:59 | 12   the site. If you can show that to me, then |
| 10:36:01 | 13   perhaps it does. |
| 10:36:01 | 14    Q   Assuming it does? |
| 10:36:03 | 15    A   I don't know if it does. |
| 10:36:05 | 16       MR. STIMPSON: Objection. Hold on. |
| 10:36:07 | 17       Objection to the form of the question. |
| 10:36:09 | 18   It assumes facts. |
| | 19    Q   Assuming that it does say that today, |
| 10:36:10 | 20   how do users compare doctors? |
| 10:36:16 | 21       MR. STIMPSON: Objection to the form |
| 10:36:18 | 22   of the question. It is asking him to |
| 10:36:20 | 23   assume something he told you he doesn't |
| 10:36:24 | 24   think is there. |
| | 25    A   If you go to the supermarket, and you |

| | Page 57 |
|---|---|
| 10:36:31 | 1   look to buy a tomato, you have three tomatoes, |
| 10:36:36 | 2   you are going to by the nature of looking at |
| 10:36:45 | 3   them, compare one to the other. So one can look |
| 10:36:50 | 4   at Doctor A, and then look at Doctor B, and then |
| 10:36:57 | 5   look at Doctor C and compare it. |
| 10:37:01 | 6    Q   When Maldjian prepared this opinion, |
| 10:37:02 | 7   did they review the information contained in |
| 10:37:03 | 8   Exhibits 6 and 7? |
| 10:37:13 | 9    A   I believe they went through the whole |
| 10:37:16 | 10   site. |
| 10:37:20 | 11       But to clarify as stated, I do not |
| 10:37:23 | 12   recall whether this was still on the site at |
| 10:37:30 | 13   that time. |
| 10:37:33 | 14    Q   How is it that you track whether many |
| 10:37:37 | 15   users or not use that compare functionality? |
| 10:37:40 | 16    A   Every session a user has is a log, and |
| 10:37:42 | 17   there are many web tools that track user |
| | 18   behavior. |
| 10:37:48 | 19    Q   But is there a specific tool, |
| 10:38:07 | 20   Mr. Rothschild, that Vitals employs to track the |
| 10:38:10 | 21   use of that specific functionality? |
| 10:38:15 | 22    A   Google Analytics. |
| 10:38:25 | 23    Q   So there's not a -- a tool within the |
| 10:38:28 | 24   website that you use or somebody within MDX uses |
| | 25   to track what users to Vitals -- to the Vitals |

Page 58

```
10:38:34   1   website use, for example, specifically to
10:38:37   2   compare functionality?
10:38:41   3          MR. STIMPSON:  Objection to the form.
10:38:44   4      A   There are analytics packages that most
10:38:50   5   websites use that sit outside the site, but look
10:38:56   6   at it and analyze the behavior of people on the
10:39:01   7   site.  Google Analytics is one such package.
10:39:04   8      Q   Okay.  Did you do any type of log
10:39:08   9   analysis, Mr. Rothschild, that would determine
10:39:13  10   how many people used that feature?
10:39:14  11      A   That is what Google Analytics does.
10:39:23  12      Q   Are the results of that analysis in
10:39:26  13   paper format?
10:39:31  14      A   No.  It is a cloud based on one tool.
10:39:31  15      Q   Do you keep any records of the results
10:39:35  16   of the Google Analytics study that you were just
          17   referring to?
10:39:40  18      A   It's not a Google Analytics study, it
10:39:45  19   is an ongoing analytics of the site.
10:39:48  20          Periodically we look at which
10:39:52  21   different pages within the site, and we see
10:39:55  22   their usage.  We see the volumes that is
10:39:57  23   necessary for us to determine our advertising
10:39:59  24   inventory availability.  And so we look at
          25   different parts of the site, different page
```

Page 59

```
10:40:06   1   categories, and that was a page category that
10:40:15   2   was not getting much usage.
10:40:18   3      Q   And so do you have any records that
10:40:20   4   reference the rate of usage of that category?
10:40:24   5      A   I cannot speak to any extract that we
10:40:27   6   may have done, I do not know whether we have
10:40:30   7   that or not, but the Google Analytics keeps
10:40:33   8   track of the site.  And I am not sure exactly
10:40:41   9   how far back they store information, but we look
10:40:43  10   at it, and we make an ongoing series of
10:40:44  11   decisions about what to adjust or include on the
10:40:49  12   site based on use of behavior.
10:40:53  13      Q   And did you specifically look at the
10:40:58  14   rate of usage of the compare functionality
10:41:00  15   because of the '060 patent?
          16      A   No.  We have -- we look at pages on a
10:41:04  17   pretty regular basis, and so it was known that
10:41:14  18   it wasn't getting that much usage.  Known to the
10:41:19  19   extent that one looked at the analytics report.
10:41:26  20      Q   If I understand you correctly just
10:41:29  21   from the testimony we have had to date today,
10:41:32  22   this feature was removed in part because of this
10:41:46  23   so-called gray area to play it extra safe.  Am I
10:41:49  24   paraphrasing it accurately?
          25      A   Yes.
```

Page 60

```
10:41:55   1      Q   And you are not certain, as you sit
10:41:57   2   here today, whether MDX have records that tracks
10:42:00   3   the rate of usage of that compare feature
10:42:05   4   functionality that was removed?
10:42:11   5      A   As I sit here today, I do not know
10:42:13   6   whether we have done any specific extractions or
10:42:16   7   exports from Google Analytics in the periods
10:42:17   8   prior, but people do look at Google Analytics
10:42:20   9   and form conclusions about all manner of user
10:42:26  10   behavior on the site.
10:42:30  11      Q   All right.  Can you run,
10:42:36  12   Mr. Rothschild, an analytics to determine
10:42:38  13   whether users of the Vitals website open
10:42:43  14   multiple doctor profiles, doctor pages
          15   simultaneously?
10:42:47  16      A   I believe there is some ability to
10:42:54  17   look at number of profiles opened.  At the very
10:42:57  18   least, we see how many profiles are opened, and
10:43:01  19   we see how many visitors.
10:43:04  20      Q   So can that be done -- can you look at
10:43:07  21   whether users looked at profiles simultaneously?
10:43:08  22      A   I am not familiar with the specifics
10:43:10  23   of Google Analytics to be able to answer that
10:43:15  24   definitively.
          25      Q   Is there somebody within your company
```

Page 61

```
10:43:18   1   that may be able to tell me the answer to that
10:43:21   2   question?
10:43:25   3      A   I can get you that answer, if it is
10:43:28   4   required, by asking some folks in the company.
10:43:30   5   Since I assume this is a -- what's it called, a
10:43:33   6   30(b)(6) hearing, it's my responsibility to get
10:43:33   7   you that information, and if it's available, I
10:43:36   8   will.
10:43:38   9          MR. STIMPSON:  Actually,
10:43:39  10   Mr. Rothschild, we will talk about that
10:43:40  11   afterwards.  Just answer his questions, you
10:43:41  12   know.
10:43:42  13          THE WITNESS:  Okay.
          14          MR. STIMPSON:  -- if you have the
10:43:44  15   information now.  If you don't know, just
10:43:48  16   tell him you don't know, and Mr. Vazquez
10:43:48  17   and I can take it up later if he wants more
10:43:51  18   information.
10:43:54  19          THE WITNESS:  Okay.
10:43:59  20   BY MR. VAZQUEZ:
10:44:00  21      Q   If it's available, we would like the
10:44:03  22   logs for these analytics.  Do you know if they
10:44:04  23   are available?
10:44:04  24      A   The --
          25          MR. STIMPSON:  Objection, asked and
```

| | Page 62 |
|---|---|
| 10:44:11 | 1 answered. |
| 10:44:13 | 2 A The analytics do not track the logs, |
| 10:44:17 | 3 they summarize them. |
| 10:44:19 | 4 Q Are there any summaries available? |
| 10:44:22 | 5 A As stated, I do not know how far back |
| 10:44:25 | 6 Google Analytics keeps the data. |
| 10:44:33 | 7 Q Okay. And I understand that as to how |
| 10:44:35 | 8 far back Google Analytics keeps it. Does MDX |
| 10:45:09 | 9 keep it? |
| 10:45:11 | 10 A I don't know if we keep records on |
| 10:45:14 | 11 nonaggregated log files. |
| 10:45:14 | 12 Q Mr. Rothschild, I am handing you what |
| | 13 has been marked as Deposition Exhibit 8. |
| 10:45:14 | 14 (Freedom to operate opinion letter |
| 10:45:38 | 15 marked Rothschild Exhibit 8 for |
| 10:45:41 | 16 identification, as of this date.) |
| 10:45:42 | 17 BY MR. VAZQUEZ: |
| 10:45:44 | 18 Q Do you recognize what Deposition |
| 10:45:46 | 19 Exhibit 8 is? |
| 10:45:49 | 20 A Yes, I do. |
| 10:45:54 | 21 Q And what is it, please? |
| 10:46:04 | 22 A It is a freedom to operate opinion |
| 10:46:06 | 23 letter for services provided on Vitals website |
| 10:46:14 | 24 as prepared for the company by Sills Cummis. |
| | 25 Q Did you communicate with -- with |

| | Page 63 |
|---|---|
| 10:46:18 | 1 Philip Braginsky with respect to the matters |
| 10:46:19 | 2 that are the subject matter of this opinion? |
| 10:46:24 | 3 A Yes. |
| 10:46:26 | 4 Q Did you communicate with any other |
| 10:46:36 | 5 attorney within Sills Cummis & Gross about the |
| 10:46:41 | 6 subject matter of this opinion? |
| 10:46:43 | 7 A He was our primary attorney. I think |
| 10:46:45 | 8 at one of our meetings, he may have had another |
| 10:46:49 | 9 attorney whose name I do not recall. |
| 10:47:02 | 10 Q What other attorney, if you remember? |
| 10:47:07 | 11 MR. STIMPSON: Objection. Objection. |
| | 12 A As stated, I do not recall. |
| 10:47:07 | 13 Q Was it Timothy Heaton? |
| 10:47:10 | 14 A Possible. |
| 10:47:12 | 15 Q "Possible." |
| 10:47:18 | 16 You just don't remember? |
| 10:47:22 | 17 A I don't remember the name, but I |
| 10:47:28 | 18 believe it sounds right. |
| 10:47:33 | 19 Q And so if I recall correctly, when you |
| 10:47:34 | 20 went to Sills Cummis & Gross to seek an opinion, |
| 10:47:42 | 21 it was to, in your words, "drill deeper"? |
| 10:47:44 | 22 A Yes. |
| 10:47:51 | 23 Q And "drill deeper" into what? |
| 10:47:58 | 24 A As stated, it was not a question of |
| | 25 what, it was a question of knowing that Maldjian |

| | Page 64 |
|---|---|
| 10:48:06 | 1 did a shorter letter on a bunch of patents, this |
| 10:48:14 | 2 one in particular with HealthGrades has, as |
| 10:48:16 | 3 I said, a reputation of being litigious, we |
| 10:48:18 | 4 wanted to leave no stone unturned. |
| 10:48:24 | 5 Q So is it your opinion or your |
| 10:48:26 | 6 testimony, Mr. Rothschild, that the Sills |
| 10:48:28 | 7 Cummis & Gross analysis was more fulsome than |
| 10:48:32 | 8 Maldjian's? |
| 10:48:35 | 9 A It is my opinion that they dug deeper |
| 10:48:41 | 10 and raised deeper issues, looked at prosecution |
| | 11 history and other matters like that, that I |
| 10:48:43 | 12 don't believe Maldjian did. |
| 10:48:52 | 13 Q You anticipated my next question |
| 10:48:52 | 14 pretty well, which is if you could tell me what |
| 10:48:55 | 15 did Sills Cummis do that Mr. Maldjian did not |
| 10:48:58 | 16 do? |
| 10:48:59 | 17 A So having anticipated your question, I |
| 10:48:59 | 18 did not give you the answer? |
| 10:49:01 | 19 Q No, not completely. |
| 10:49:02 | 20 A What part did I not answer? |
| 10:49:03 | 21 Q Well, I'm not sure. |
| 10:49:07 | 22 Can you please tell me what is that |
| 10:49:08 | 23 you remember that Maldjian -- you told me what |
| 10:49:10 | 24 Sills Cummis & Gross did. That doesn't mean |
| | 25 that Maldjian didn't do it as well. |

| | Page 65 |
|---|---|
| 10:49:17 | 1 My question specifically is: What did |
| 10:49:20 | 2 Sills Cummis & Gross do that Maldjian did not |
| 10:49:22 | 3 do? |
| 10:49:29 | 4 A I believe that Maldjian's approach was |
| 10:49:33 | 5 to look at the patent or the patent application, |
| 10:49:37 | 6 look at Vitals, and deliver an expert opinion on |
| 10:49:39 | 7 looking at those two documents to see whether |
| 10:49:42 | 8 there was a violation for a variety of patents. |
| 10:49:44 | 9 The patent, '060 patent, as I have |
| | 10 gathered along the way, is the end product of a |
| 10:49:46 | 11 series of adjustments that have occurred in |
| 10:49:53 | 12 negotiations between HealthGrades and the Patent |
| 10:50:02 | 13 Office that are apparently relevant to what it |
| 10:50:03 | 14 is that the claims stand for, and I believe that |
| 10:50:06 | 15 in digging deep, Mr. Braginsky went and looked |
| 10:50:09 | 16 at things like that. |
| 10:50:11 | 17 Q So you believe that Mr. Braginsky |
| 10:50:12 | 18 looked at the prosecution history of the patent |
| 10:50:15 | 19 and Maldjian did not? |
| 10:50:23 | 20 A Yes. |
| 10:50:27 | 21 Q And what else did Mr. Braginsky do |
| 10:50:31 | 22 that Maldjian did not do? |
| 10:50:33 | 23 A He went and looked at, I believe, each |
| 10:50:36 | 24 of the individual components in the recipe of |
| | 25 what was considered health provider verified and |

---

Page 66

```
10:50:43   1   what's considered third-party verified, and
10:50:46   2   looked at each and tried to get down, dig deep
10:50:53   3   on each of those elements.
10:50:57   4      Q   And so it is what you just testified
10:51:00   5   to, Mr. Rothschild, Mr. Braginsky's attempt to
10:51:02   6   construe the terms of the patent?
10:51:03   7         MR. STIMPSON:  Objection to form.
10:51:06   8      A   Repeat the question.  I didn't
           9   understand it.
10:51:10  10      Q   Did Mr. Braginsky attempt to construe
10:51:23  11   the terms of the patent?
10:51:27  12      A   Mr. Braginsky's job relative to this
10:51:31  13   was to opine on how the current patent as it
10:51:36  14   stood related to Vitals, and where we felt we
10:51:39  15   had risks, if any, which apparently he did not
10:51:42  16   feel we did, and where we needed to be careful
10:51:48  17   to not slide as we created subsequent variations
10:51:50  18   of the site, that there were lines we should not
10:51:52  19   cross.
10:51:54  20      Q   All right.  I am being informed that
10:51:57  21   there are two minutes left in our tape,
10:52:00  22   Mr. Rothschild, so we will go off the record
10:52:01  23   briefly so the videographer can --
10:52:02  24      A   There's two minutes left in his tape?
          25      Q   In his tape.
```

Page 67

```
10:52:05   1         THE VIDEOGRAPHER:  This marks the end
10:52:06   2   of Tape No. 1 in the deposition of Mitchel
10:52:07   3   Rothschild.
10:55:07   4         Going off the record, the time is
10:55:20   5   10:54 a.m.
10:55:23   6         (Recess taken)
10:55:25   7         THE VIDEOGRAPHER:  Back on the record.
           8         Here marks the beginning of Tape No. 2
10:55:28   9   of the deposition of Mitchel Rothschild.
10:55:32  10         Going off -- I am sorry.  The time is
10:55:35  11   10:57.
10:55:41  12   BY MR. VAZQUEZ:
10:55:44  13      Q   Mr. Rothschild, when did you first
10:55:48  14   meet Philip Braginsky?
10:55:51  15      A   At some point in December of 2010.
10:55:56  16      Q   How did you come to meet him?
10:56:01  17      A   We have had a long standing attorney
10:56:07  18   relationship with a professional colleague of
10:56:09  19   his who is in the firm.  We became aware
10:56:12  20   obviously of the '060 patent and wanted to do
10:56:15  21   what ultimately ended up happening, which is
10:56:16  22   getting a freedom to operate opinion, or if
10:56:18  23   something else were the case, that, and so he
10:56:18  24   recommended Philip.
          25      Q   And did you meet with Mr. Braginsky
```

Page 68

```
10:56:21   1   personally?
10:56:23   2      A   Yes.
10:56:26   3      Q   And when was the first time that you
10:56:29   4   met with him?
10:56:31   5      A   Sometime in December of 2010.  I do
10:56:32   6   not recall the exact date.
           7      Q   And how many meetings did you have
10:56:36   8   with Mr. Braginsky?
10:56:45   9      A   I believe we had two in-person
10:56:48  10   meetings, maybe three, and numerous phone calls.
10:56:51  11      Q   Okay.  And what about Mr. Stimpson,
10:56:53  12   when did you first meet him?
10:57:00  13      A   I did not meet Mr. Stimpson until
10:57:02  14   after the lawsuit was filed, and we decided to
10:57:03  15   engage Sills Cummis.
10:57:04  16      Q   And what about Mark Rosenberg, did you
10:57:06  17   ever meet him?
10:57:19  18      A   I have never met him, but we have
10:57:21  19   spoken on the phone.
10:57:24  20      Q   Okay.  Why did you go to Maldjian,
10:57:26  21   Mr. Rothschild, if you had a relationship with
10:57:29  22   Sills Cummis?
10:57:33  23      A   I didn't have an intellectual property
10:57:36  24   relationship with Sills Cummis.
          25      Q   Okay.
```

Page 69

```
10:57:51   1      A   We didn't have, let me correct that.
10:57:54   2      Q   "We," meaning the company?
10:57:57   3      A   Yes, first person plural.
10:57:58   4      Q   Is there a specific attorney within
10:58:00   5   Sills Cummis that is your relationship attorney
           6   with MDX?
10:58:02   7      A   Yes.
10:58:05   8      Q   And who is that?
10:58:07   9      A   Jeffrey Wasserman.
10:58:15  10      Q   Okay.  And how did you meet
10:58:20  11   Mr. Wasserman?
10:58:22  12      A   I have known Mr. Wasserman in various
10:58:25  13   professional capacities in the past decade.  He
10:58:27  14   has done many contracts and M&A activities for
10:58:29  15   us.
10:58:31  16      Q   For your other companies?
10:58:33  17      A   Not just my companies, but other
10:58:36  18   companies in which I was associated.
10:58:38  19      Q   Right.  Like Raspberry?
10:58:41  20      A   Yes.
10:58:44  21      Q   So Maldjian was your intellectual
10:58:46  22   property law firm?
10:58:47  23      A   I wouldn't call them our law firm.  We
10:58:48  24   used them on occasion when these issues cropped
          25   up.
```

## Page 70

| | | |
|---|---|---|
| 10:58:52 | 1 | Q Intellectual property issues, though? |
| 10:59:01 | 2 | A Yes. |
| 10:59:02 | 3 | Q And so why did you not have Maldjian |
| 10:59:12 | 4 | just dig deeper versus going to Sills Cummis? |
| | 5 | A I believe the relationship with |
| 10:59:17 | 6 | Maldjian originated through Mr. Wasserman. He |
| 10:59:24 | 7 | then came to Sills Cummis and said -- he had |
| 10:59:27 | 8 | come, I think, over the course of prior periods, |
| 10:59:31 | 9 | and he just said we have a really deep IP |
| 10:59:31 | 10 | practice, let us really do this deep for you. |
| 10:59:33 | 11 | Maldjian is a couple person law firm, not real |
| 10:59:35 | 12 | big. |
| 10:59:37 | 13 | Q How many lawyers are at Maldjian, |
| 10:59:40 | 14 | Mr. Rothschild? |
| 10:59:57 | 15 | A I don't know exactly. Less than ten. |
| 10:59:59 | 16 | Q "Less than ten"? |
| 11:00:04 | 17 | A (No response.) |
| 11:00:09 | 18 | Q What information did you provide to |
| 11:00:17 | 19 | Mr. Braginsky? |
| 11:00:24 | 20 | A We sat down and went through the |
| 11:00:29 | 21 | patent, and we sat down and went through the |
| 11:00:34 | 22 | Vitals site in-depth and did the comparisons of |
| 11:00:36 | 23 | the patent claims to the site. |
| 11:00:39 | 24 | Q Okay. And so that is, if I understand |
| | 25 | you correctly, your meeting personally, and you |

## Page 71

| | | |
|---|---|---|
| 11:00:41 | 1 | are looking at the patent, and you are looking |
| 11:00:43 | 2 | at your website? |
| 11:00:45 | 3 | A Yes. |
| | 4 | Q On a computer, I assume? |
| 11:00:49 | 5 | A I believe so. |
| 11:00:52 | 6 | Q And what was the first part what you |
| 11:00:55 | 7 | said you provided to Mr. Braginsky or you did |
| 11:00:57 | 8 | with Mr. Braginsky? |
| 11:01:02 | 9 | A We looked at the existing HealthGrades |
| 11:01:04 | 10 | patent. |
| 11:01:16 | 11 | Q Okay. So other than those things, did |
| 11:01:18 | 12 | you provide Mr. Braginsky with any other |
| 11:01:20 | 13 | information? |
| 11:01:24 | 14 | A I am trying to think, because I am |
| 11:01:25 | 15 | sure he asked for pieces of information along |
| 11:01:34 | 16 | the way, and I am trying to recall which, if |
| 11:01:35 | 17 | any, there were. |
| 11:01:36 | 18 | He probably asked for some counts of |
| 11:01:38 | 19 | things like the data size. |
| 11:01:39 | 20 | Q "Counts"? |
| 11:01:43 | 21 | A Counts of how many physicians have |
| 11:01:45 | 22 | updated their information. |
| 11:01:48 | 23 | Q And why did he want that? |
| 11:01:54 | 24 | A Because one of the claims is physician |
| | 25 | verified. He wanted to see if that -- if there |

## Page 72

| | | |
|---|---|---|
| 11:02:01 | 1 | was an overlap between that. |
| 11:02:04 | 2 | Q And do you recall how many physicians |
| | 3 | had modified their information? |
| 11:02:08 | 4 | A I believe that that is in one of the |
| 11:02:11 | 5 | filings in which that was provided for the |
| 11:02:12 | 6 | summary judgment, which I can reference if you |
| 11:02:15 | 7 | do not have it. |
| 11:02:27 | 8 | Q If there's something that you feel can |
| 11:02:29 | 9 | help you answer the question, that's fine with |
| 11:02:34 | 10 | me, sure. |
| 11:02:39 | 11 | A So these percentages are actually a |
| 11:02:40 | 12 | year and five months after the meeting with |
| 11:02:43 | 13 | Mr. Braginsky, so I have it only well subsequent |
| 11:02:49 | 14 | to that. |
| 11:02:51 | 15 | Q Okay. What are the percentages that |
| 11:02:52 | 16 | you are discussing now that happened a year with |
| 11:02:55 | 17 | Mr. Braginsky? And we can go back to if you |
| 11:03:02 | 18 | remember anything. |
| 11:03:04 | 19 | A Percentages of how many physicians on |
| 11:03:09 | 20 | the Vitals site have modified their data fields. |
| 11:03:13 | 21 | Q And what percentages are those? |
| 11:03:19 | 22 | <span style="color:red">REDACTED</span> |
| 11:03:22 | 23 | |
| 11:03:24 | 24 | |
| | 25 | |

## Page 73

| | | |
|---|---|---|
| 11:03:30 | 1 | Q And do you recall what those |
| 11:03:32 | 2 | percentages were at the time that you were first |
| | 3 | engaging Mr. Braginsky? |
| 11:03:39 | 4 | A I do not, but they were obviously |
| 11:03:41 | 5 | significantly lower because there's a lapse |
| 11:03:45 | 6 | period of a year and four months. |
| 11:03:54 | 7 | Q The percentages at the time you were |
| 11:03:55 | 8 | discussing the opinion with Mr. Braginsky were |
| 11:03:56 | 9 | significantly lower than the ones you just -- |
| 11:03:58 | 10 | A They had to be. This is the |
| 11:04:00 | 11 | cumulative total. So it's anybody that has done |
| 11:04:02 | 12 | anything since the site started in May 2012. By |
| 11:04:04 | 13 | definition, in January 2000 -- December 2010, |
| 11:04:09 | 14 | January '11, it would have been significantly |
| 11:04:12 | 15 | lower. |
| 11:04:14 | 16 | Q Okay. When you said that one of the |
| 11:04:18 | 17 | things you did with Mr. Braginsky was looked at |
| 11:04:20 | 18 | the patent and then looked at the Vitals |
| 11:04:22 | 19 | website, what version of the website were you |
| 11:04:27 | 20 | referring to? |
| 11:04:30 | 21 | A We don't name versions. It was the |
| 11:04:35 | 22 | one that was live at that point. |
| 11:04:39 | 23 | Q Okay. In this lawsuit, as I assume |
| 11:04:41 | 24 | you are aware, there is -- we have referred to |
| | 25 | the old website and the current website. Are |

Page 74

11:04:46 1 you aware of that?
11:04:46 2 A I have heard those phrases used.
11:04:54 3 Those are not the ones we use.
11:05:00 4 Q Okay. And so our understanding is
11:05:05 5 that when we talk about the old website, that is
11:05:07 6 pre January 2011, and the comparison ratings
11:05:14 7 functionality was on the website, and when we
11:05:15 8 talk about the current website, it means after
11:05:17 9 that functionality was supposedly removed. Do
11:05:26 10 you understand that?
11:05:32 11 A I understand that.
11:05:41 12 Q And so having those two versions in
11:05:45 13 mind, which one is the one that Mr. Braginsky
11:05:50 14 reviewed and compared to the patent?
11:05:53 15 A When he started, my guess would be the
11:05:56 16 old, but we modified to move to what is -- to
11:05:58 17 what you are calling the new in the period
11:06:00 18 between when Mr. Braginsky started and he issued
11:06:01 19 his opinion.
11:06:01 20 Q I called it the current, but I
11:06:03 21 understand what you mean. Meaning it --
11:06:09 22 A Yes.
11:06:21 23 Q -- means current, right?
11:06:24 24 A Well, again, we continued to improve
25 the site, so --

Page 75

11:06:26 1 Q Do you know what percentage of
11:06:35 2 physicians who have visited the current site
11:06:39 3 have made a change to at least one data field?
11:06:43 4 A I would have no way of knowing how
11:06:46 5 many physicians visited the site unless they log
11:06:49 6 in, and that's only a very small percentage.
11:06:52 7 Q Well, with respect to the percentage
11:06:57 8 that you would know of, the ones who log in, do
11:06:59 9 you know how many of those would have made a
11:07:03 10 change to at least one data field?
11:07:06 11 A I do not know specifically.
11:07:08 12 Q Is that information obtainable?
11:07:09 13 A I believe we can obtain it.
11:07:11 14 Q What would you have to do to obtain
11:07:14 15 it, Mr. Rothschild?
11:07:19 16 A We would have to go back to our
11:07:22 17 database and look at how many physician log ins
11:07:36 18 there have been, net that down to eliminate
11:07:38 19 multiple log ins and then see how many changes
11:07:50 20 resulted.
11:07:52 21 Q Do you know how many physicians have
11:07:55 22 registered on Vitals.com?
11:07:57 23 A I don't think the word registration is
24 an appropriate word.
25 Q Why not?

Page 76

11:08:05 1 A Because they don't register, they log
11:08:07 2 in to change information.
11:08:10 3 Q But to be able to log in, do they need
11:08:11 4 a user name and a password?
11:08:15 5 A They need their email address and a
11:08:16 6 password.
11:08:18 7 Q Is the email address what we refer to
11:08:21 8 as a user name, then?
11:08:23 9 A It's the email address.
11:08:28 10 Q Okay. So some physicians have a
11:08:31 11 password, which in combination with their email
11:08:34 12 address, they can access portions of the
11:08:35 13 website, and physicians who do not have a
11:08:39 14 password cannot access, right?
11:08:43 15 A Correct.
11:08:47 16 The large percentage of them that do
11:08:49 17 that, without me actually knowing the specific,
11:08:53 18 come in to respond to user comments, which is
11:08:57 19 other functionality. So they are not
11:09:00 20 necessarily coming in specifically to their
11:09:02 21 profile, a lot of them want to respond to a
11:09:03 22 comment that they feel has been left unfairly
23 about them.
11:09:10 24 Q You mean patient feedback?
25 A Yes.

Page 77

11:09:16 1 Q Isn't it true, Mr. Rothschild, that
11:09:17 2 some physicians come in and actually do change
11:09:18 3 the data field?
11:09:25 4 A That is true.
11:09:27 5 Q And so what percentage of the
11:09:29 6 physicians who have passwords change the data
11:09:31 7 field; do you know?
11:09:33 8 A I do not know offhand.
11:09:37 9 Q Is that information something that you
11:09:42 10 could obtain?
11:09:52 11 A As -- as I answered previously, I
11:09:54 12 believe we can get factual data on how many log
11:09:57 13 ins we have and how many changes we have.
11:10:01 14 Q How would you go about doing that,
11:10:04 15 meaning would you talk to somebody that you can
11:10:07 16 tell me their name, and what would have to be
11:10:13 17 the procedure to be able to get that data
11:10:15 18 compiled?
11:10:19 19 A We have people that manage our
11:10:26 20 database, we have people that manage our log
11:11:20 21 ins, and we just go to a query into the database
22 and try to get the answers from someone on our
23 technical team.
11:11:24 24 Q Can you go back to Exhibit 4.
11:11:38 25 A Yes.

Page 78

| | | |
|---|---|---|
| 11:11:53 | 1 | Q And could you tell me -- on Page 2 of |
| 11:11:55 | 2 | the exhibit, there is a -- what appears to be a |
| 11:11:57 | 3 | number list of policies. Do you say that? |
| 11:12:01 | 4 | A Yes. |
| 11:12:02 | 5 | Q Would you mind reading into the record |
| 11:12:03 | 6 | that paragraph that precedes the policies? |
| 11:12:04 | 7 | A That starts with the words "to |
| 11:12:06 | 8 | ensure"? |
| 11:12:09 | 9 | Q Yes, sir. |
| 11:12:12 | 10 | A "To ensure that Vitals is not in |
| 11:12:16 | 11 | violation of this patent in any way, certain of |
| 11:12:18 | 12 | our policies, a list of which is noted below, |
| 11:12:22 | 13 | must continue to be strictly enforced." |
| 11:12:26 | 14 | Q Okay. And so does that mean that all |
| 11:12:33 | 15 | of the policies that you are referencing here |
| 11:12:36 | 16 | are listed there? |
| 11:12:42 | 17 | A All of which policies? |
| 11:12:45 | 18 | Q What you just read refers to policies, |
| 11:12:50 | 19 | and then it says, "the list of which is noted |
| 11:12:54 | 20 | below," so that list appears to have four |
| 11:12:55 | 21 | policies. Are those all of MDX's policies with |
| 11:12:55 | 22 | respect to ensuring that you respect |
| 11:12:59 | 23 | intellectual property of others? |
| 11:13:01 | 24 | MR. STIMPSON: Objection to form. |
| | 25 | A No. I believe it has the qualifier in |

Page 79

| | | |
|---|---|---|
| 11:13:09 | 1 | the paragraph that says certain of our policies. |
| 11:13:11 | 2 | These are ones that are specifically relevant to |
| 11:13:14 | 3 | the '060 patent. |
| 11:13:18 | 4 | Q And what -- what other policies, other |
| 11:13:20 | 5 | than these four, does MDX have with respect |
| 11:13:23 | 6 | to -- respecting violating the intellectual |
| 11:13:26 | 7 | property of others? |
| 11:13:29 | 8 | A We have many. Most are not written |
| 11:13:39 | 9 | down. We are a small company, so we tend not to |
| 11:13:43 | 10 | have a policy, but we don't use copyrighted |
| 11:13:47 | 11 | material. We don't use copyrighted, we don't -- |
| 11:13:47 | 12 | we allow people to modify information, we fix |
| 11:13:58 | 13 | information if we feel if we learn a better |
| 11:14:01 | 14 | source. |
| 11:14:04 | 15 | We -- I would say those are the main |
| 11:14:06 | 16 | ones, but, again, policies -- I don't want to |
| 11:14:11 | 17 | give the impression that policies define a book |
| 11:14:18 | 18 | that exists somewhere on a shelf of policies. |
| 11:14:23 | 19 | We are a small company, and so we kind of know |
| | 20 | what we need to do to stay on the right side of |
| 11:14:26 | 21 | IP and proper behavior. |
| 11:14:38 | 22 | Q Okay. With respect to Policy No. 1 in |
| 11:14:44 | 23 | your email, Mr. Rothschild, when did you |
| 11:14:49 | 24 | implement that policy? |
| | 25 | A These -- that policy was implemented |

Page 80

| | | |
|---|---|---|
| 11:14:54 | 1 | around this time. We had had trouble with IRF |
| 11:14:58 | 2 | anyway, but it was around this time. |
| 11:15:00 | 3 | Q What is IRF? |
| 11:15:01 | 4 | A Internship, residency and fellowship. |
| 11:15:05 | 5 | Q And what was the trouble that you had |
| 11:15:07 | 6 | had? |
| 11:15:10 | 7 | A First of all, a lot of times, you only |
| 11:15:18 | 8 | know graduate medical education, and you are not |
| 11:15:23 | 9 | sure whether it's any one of those specifically. |
| 11:15:27 | 10 | Second of all, many of them occur in |
| 11:15:31 | 11 | hospital settings that the quality of which |
| 11:15:38 | 12 | changes over time. And so they may have had the |
| 11:15:47 | 13 | internship 20 years ago, and now it is not a |
| 11:15:51 | 14 | good institution, and it was very spotty data. |
| 11:15:55 | 15 | Q Okay. Is this a Policy No. 1 |
| 11:15:59 | 16 | numbered -- No. 1 in this email, Mr. Rothschild, |
| 11:16:03 | 17 | was it implemented on the advice of counsel? |
| 11:16:11 | 18 | A It was implemented subsequent to the |
| | 19 | conversations with Mr. Braginsky about the way |
| 11:16:13 | 20 | to be belt and suspenders pure in terms of our |
| 11:16:17 | 21 | behavior relative to this patent. |
| 11:16:21 | 22 | Q Forgive me. What do you mean by "belt |
| 11:16:24 | 23 | and suspenders' when you use that phrase? |
| 11:16:29 | 24 | A I mean that honest people can disagree |
| | 25 | over what is considered a violation, and we |

Page 81

| | | |
|---|---|---|
| 11:16:39 | 1 | wanted to take ourselves out of anything that, |
| 11:16:42 | 2 | again, an opposing counsel could say, ah ha, you |
| 11:16:42 | 3 | are not doing what -- you are doing something |
| 11:16:46 | 4 | that is in violation of the patent potentially. |
| 11:16:53 | 5 | Q Okay. |
| 11:16:56 | 6 | A So there are vagueness about the |
| 11:16:59 | 7 | claims, and in most cases, these were not third |
| 11:17:01 | 8 | party verified, but we just felt let's just take |
| 11:17:04 | 9 | it out completely, and this way, we won't have |
| 11:17:07 | 10 | problems. |
| 11:17:08 | 11 | Q What is the vagueness about the claims |
| 11:17:10 | 12 | that you just referenced? |
| 11:17:17 | 13 | MR. STIMPSON: Objection to form. |
| 11:17:19 | 14 | A Just -- just because it comes from a |
| 11:17:21 | 15 | third party doesn't mean it's verified. |
| 11:17:22 | 16 | Q And what is vague about that? |
| 11:17:23 | 17 | A What is -- |
| 11:17:24 | 18 | MR. STIMPSON: Objection to form, and |
| | 19 | also, this calls for expert testimony, I |
| 11:17:29 | 20 | think. |
| 11:17:34 | 21 | You could answer. |
| 11:17:34 | 22 | A Okay. The word "verified," which is, |
| 11:17:37 | 23 | I believe, a word in the patent, could be |
| 11:17:46 | 24 | subject to different interpretations, and just |
| 11:17:47 | 25 | because somebody says it on a site, it doesn't |

| | |
|---|---|
| Page 82 | Page 84 |

**Page 82**

11:17:50 1 mean it has been verified, and we get it from

11:17:53 2 the sites where people just say it.

11:17:55 3 Q Have you read the -- Judge Bremmer's

11:17:58 4 claim construction order in this case,

11:18:01 5 Mr. Rothschild?

11:18:02 6 A Probably at the time. Not recently.

11:18:05 7 Q You mean at the time it was issued?

11:18:08 8 A Whenever. I don't remember it

11:18:11 9 specifically.

11:18:14 10 Q Well, to the extent you were just

11:18:17 11 talking about vagueness in the claims, do you

11:18:19 12 understand that Judge Bremmer, the Judge in this

11:18:21 13 lawsuit, has issued an order construing certain

11:18:24 14 terms in the claims?

11:18:29 15 A I know he has.

11:18:33 16 Q Was that important to you?

17 MR. STIMPSON: Objection to form.

11:18:36 18 A It is important relative to our

11:18:44 19 ability to vindicate our innocence.

11:18:45 20 Q And so I guess the answer is yes, it

11:18:51 21 was important?

11:18:54 22 MR. STIMPSON: Objection to the form.

11:18:56 23 A It is important in the case.

11:19:00 24 Q So do you recall whether the Judge

25 construed what "verified" means?

**Page 83**

11:19:04 1 A I do not recall.

11:19:18 2 Q What about Policy No. 2, when was that

11:19:20 3 implemented, Mr. Rothschild?

11:19:21 4 A Probably a year prior to this.

11:19:22 5 Q A year prior to the date of the email,

11:19:28 6 you mean?

11:19:30 7 A Yes.

11:19:31 8 Q So that would mean this was not

11:19:37 9 something that was on advice of counsel?

11:19:39 10 A Correct. It was something that

11:19:41 11 happened previously for different reasons.

11:19:47 12 Q The MDX master database, does that

11:19:51 13 contain licensure status?

11:19:54 14 A Yes.

11:19:54 15 Q So the policy referenced here in No. 2

16 is about whether that is displayed or not,

11:20:04 17 right?

11:20:13 18 A Correct.

11:20:16 19 Q And why did you implement that policy?

11:20:21 20 A Licensure status comes from an

11:20:26 21 individual state. There is no standardized

11:20:28 22 method. There are provisional statuses, there's

11:20:33 23 statuses once in some states where someone may

11:20:35 24 have graduated medical school, but not taken

25 their boards, and we strive for a uniform

**Page 84**

11:20:46 1 display of data across the country, and so it

11:20:51 2 was too messy to really display.

11:20:55 3 Q What about Policy No. 3,

11:20:58 4 Mr. Rothschild, when was that implemented?

11:21:01 5 A So that one is more complicated. We

11:21:07 6 did not have disciplinary action on the site, I

11:21:10 7 believe, at that point, again because we had

11:21:12 8 matching issues. So this was that when we were

11:21:13 9 going to put it on the site at some point in the

11:21:17 10 future, that we would make sure we didn't have

11:21:20 11 that plus the ratings.

11:21:26 12 So the policy was established at this

11:21:43 13 point, although it had no practical implication

11:21:44 14 focus when the disciplinary actions got up on

15 the site.

11:21:46 16 Q In that Policy No. 3, would you mind

11:21:51 17 reading it into the record, please?

11:21:54 18 A "Whenever disciplinary action is

11:21:55 19 recorded and displayed for provider, no patient

11:21:57 20 ratings or reviews gathered by Vitals is shown

11:22:02 21 in any report."

11:22:08 22 Q And what are the, quote/unquote,

11:22:12 23 reports that this references?

11:22:14 24 A The provider profile.

25 Q So it really means to reference one

**Page 85**

11:22:23 1 report, then? Just one?

11:22:39 2 A These are snapshots like you might

11:22:41 3 find on LinkedIn or a resume of an individual

11:22:46 4 and information about them.

11:22:49 5 MR. STIMPSON: Jesus, when you get to

11:22:50 6 a good stopping place.

7 MR. VAZQUEZ: Yeah, let's do it now.

8 THE VIDEOGRAPHER: The time is

9 11:25 a.m. We are going off the record.

10 (Luncheon recess taken)

11 (Time noted: 11:25 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 86

| | |
|---|---|
| 12:34:42 | 1     A F T E R N O O N   S E S S I O N |
| 12:34:45 | 2     (Time noted: 12:36 p.m.) |
| 12:34:48 | 3     THE VIDEOGRAPHER: Back on the record. |
| 12:34:50 | 4   The time is 12:36 p.m. |
| 12:34:58 | 5  BY MR. VAZQUEZ: |
| 12:35:01 | 6     Q  Mr. Rothschild, before we took our |
| 12:35:03 | 7  lunch break, I was asking you about the policies |
| 12:35:05 | 8  that are listed in Exhibit 4, and I just wanted |
| 12:35:07 | 9  to pick up and finish that line of questioning, |
| 12:35:14 | 10  okay? |
| 12:35:17 | 11    A  Sure. |
| 12:35:18 | 12    Q  And you testified that Vitals/MDX is a |
| 12:35:19 | 13  small company, so you don't really have a policy |
| 12:35:23 | 14  book, right? |
| 12:35:27 | 15    A  Yes. |
| 12:35:39 | 16    Q  And how do employees know what the |
| 12:35:41 | 17  policies are, then, if they are not kept in any |
| 12:35:45 | 18  book or single policy manual? |
| 12:35:51 | 19    A  There is a sign in our office that |
| 12:35:54 | 20  says, "If you have integrity, you need less |
| 12:35:57 | 21  rules." And we are a small company, and we try |
| | 22  to operate within the bounds of the law as we |
| 12:36:02 | 23  know it and do the right thing for our patients, |
| 12:36:07 | 24  and so I'd say it is part of the culture of the |
| | 25  company that people know what's going on when it |

Page 87

| | |
|---|---|
| 12:36:16 | 1  comes to certain specific things, like legal |
| 12:36:18 | 2  issues. We usually try to either make sure |
| 12:36:21 | 3  people understand it clearly. |
| 12:36:21 | 4     There's not that many people that have |
| 12:36:23 | 5  impact on what's going on, or we put out emails |
| 12:36:26 | 6  like this. |
| 12:36:30 | 7    Q  And so with respect to putting this |
| 12:36:36 | 8  email out, how come it was not distributed -- of |
| 12:36:38 | 9  course, I can't see any blind copies. How come |
| 12:36:44 | 10  it wasn't distributed to all of the employees? |
| 12:36:47 | 11    A  The two people who got it, one runs |
| 12:36:48 | 12  the database and one runs the -- was running the |
| 12:36:52 | 13  site at the time. And so those were the two |
| 12:36:58 | 14  main people that needed to know. |
| 12:37:00 | 15     We were probably at that point, 25, 30 |
| 12:37:04 | 16  employees. So that was a pretty easy way to |
| 12:37:07 | 17  communicate. |
| 12:37:08 | 18    Q  And so which -- can you tell me, is it |
| 12:37:12 | 19  Erika Boyer that runs the database or ran the |
| 12:37:14 | 20  site? |
| | 21    A  At that time she was the person |
| 12:37:15 | 22  responsible for product, which is what we called |
| 12:37:19 | 23  the site. |
| 12:37:27 | 24    Q  And then -- so, Mr. West, I assume, |
| | 25  would be the person who would be referred to as |

Page 88

| | |
|---|---|
| 12:37:30 | 1  running the database? |
| 12:37:39 | 2    A  Database and technology. |
| 12:37:39 | 3    Q  Why not send it to all of the |
| 12:37:39 | 4  employees? |
| 12:37:40 | 5    A  I don't know. It just isn't the way I |
| 12:37:41 | 6  did it. |
| 12:37:46 | 7    Q  I am sorry? |
| 12:37:48 | 8    A  I could see argument to do it all -- |
| 12:37:49 | 9  all the employees. Most of them were not |
| 12:37:54 | 10  impacted by it. |
| 12:37:58 | 11    Q  And how many employees did the company |
| 12:38:00 | 12  have at the time that you wrote this email? |
| 12:38:02 | 13    A  My guess is 25 to 30. |
| 12:38:04 | 14    Q  Of the 25 to 30, just two of the |
| 12:38:06 | 15  employees, in your view, would be impacted by |
| 12:38:18 | 16  the issues in this email? |
| 12:38:20 | 17    A  No, these are the senior managers. It |
| 12:38:25 | 18  was their job to ensure that things happen. |
| 12:38:27 | 19    Q  Do you remember we were also |
| | 20  discussing about doctors who had passwords so |
| 12:38:29 | 21  they could log into the site? |
| 12:38:35 | 22    A  I remember. |
| 12:38:37 | 23    Q  And when they do that, when they log |
| 12:38:41 | 24  in, do they have to confirm whether the |
| | 25  information about them is accurate? |

Page 89

| | |
|---|---|
| 12:38:44 | 1    A  No. |
| 12:38:48 | 2    Q  Why not? |
| 12:38:50 | 3    A  It's not the way the functionality is |
| 12:38:53 | 4  set up. It's optional for them to go in there |
| 12:38:54 | 5  and edit or -- |
| 12:39:00 | 6    Q  So they can't confirm the accuracy if |
| 12:39:02 | 7  they want to? |
| 12:39:05 | 8    A  If they open a tab on that particular |
| 12:39:10 | 9  piece of information, and it is written in |
| 12:39:20 | 10  there, and they choose not to change it and |
| 12:39:22 | 11  click accept, then they are accepting that |
| 12:39:25 | 12  information. |
| 12:39:26 | 13    Q  There is an assumption or presumption |
| 12:39:32 | 14  that if they accept it, it is accurate? |
| 12:39:36 | 15    A  I don't know that I would call it |
| 12:39:38 | 16  accurate, I would call it as the provider's |
| 12:39:41 | 17  point of view. If a provider said they went to |
| 12:39:50 | 18  Harvard, and they really went to Guadalajara |
| | 19  Medical School, it's not accurate, it's their |
| 12:39:52 | 20  point of view. |
| 12:39:57 | 21    Q  Mr. Rothschild, remember we were |
| 12:40:00 | 22  talking about the Policy No. 2 that says, quote, |
| 12:40:04 | 23  Our display of third-party verifying information |
| 12:40:06 | 24  does not include licensure status, closed quote? |
| | 25     Did I read that accurately? |

Page 90

| | | |
|---|---|---|
| 12:40:17 | 1 | A  It looks like you did, yes. |
| 12:40:19 | 2 | Q  And so do you display providers that |
| 12:40:21 | 3 | are not licensed? |
| 12:40:23 | 4 | A  That -- they are not providers if they |
| 12:40:26 | 5 | are not licensed. |
| 12:40:28 | 6 | Q  Meaning all providers that you display |
| 12:40:32 | 7 | are licensed? |
| 12:40:35 | 8 | A  All providers that we display are |
| 12:40:37 | 9 | licensed; however, not all licensed providers, |
| 12:40:44 | 10 | if they have provisional license status, are |
| 12:40:48 | 11 | displayed. |
| 12:40:48 | 12 | Q  Okay.  So aren't you, in effect, |
| 12:40:53 | 13 | displaying licensure data, then? |
| 12:40:55 | 14 | MR. STIMPSON:  Objection to form. |
| 12:40:59 | 15 | A  No, I don't believe we are.  We are |
| 12:41:02 | 16 | displaying the doctors that defines a doctor. |
| 12:41:09 | 17 | The definition of a doctor is one that a state |
| | 18 | has given a valid license to define them as |
| 12:41:11 | 19 | being a doctor. |
| 12:41:15 | 20 | Q  Do you think that users of your |
| 12:41:17 | 21 | website understand that if a provider is |
| 12:41:18 | 22 | displayed, that means they are licensed |
| 12:41:23 | 23 | somewhere? |
| 12:41:26 | 24 | MR. STIMPSON:  Objection to form, |
| | 25 | calls for expert testimony. |

Page 91

| | | |
|---|---|---|
| 12:41:31 | 1 | A  I cannot speak to what our millions of |
| 12:41:32 | 2 | users think as a group.  I can only speak to my |
| 12:41:34 | 3 | point of view. |
| 12:41:36 | 4 | Q  And what is your point of view as to |
| 12:41:37 | 5 | the question I asked? |
| 12:41:41 | 6 | A  My point of view as stated is that -- |
| 12:41:46 | 7 | MR. STIMPSON:  Excuse me.  Same |
| 12:41:47 | 8 | objection. |
| 12:41:51 | 9 | A  My point of view is that the |
| 12:41:55 | 10 | definition of a doctor, according to most |
| 12:41:58 | 11 | states, is one with an active valid license and |
| 12:42:01 | 12 | a pulse.  And so if they are displayed, then |
| 12:42:02 | 13 | they have those. |
| 12:42:21 | 14 | Q  "They have those," "those" meaning |
| 12:42:30 | 15 | what? |
| 12:42:34 | 16 | A  License and pulse. |
| | 17 | MR. VAZQUEZ:  And so let me enter what |
| 12:42:34 | 18 | has been marked as Deposition Exhibit 9. |
| 12:42:37 | 19 | (Screen shot from the Vitals website |
| 12:42:38 | 20 | marked Rothschild Exhibit 9 for |
| 12:42:40 | 21 | identification, as of this date.) |
| 12:42:40 | 22 | MR. VAZQUEZ:  And Deposition Exhibit |
| 12:42:40 | 23 | 10. |
| 12:42:40 | 24 | (12/15/09 letter marked Rothschild |
| | 25 | Exhibit 10 for identification, as of this |

Page 92

| | | |
|---|---|---|
| 12:43:01 | 1 | date.) |
| 12:43:05 | 2 | BY MR. VAZQUEZ: |
| 12:43:12 | 3 | Q  And here is No. 10. |
| 12:43:15 | 4 | Mr. Rothschild, with respect to |
| 12:43:16 | 5 | Deposition Exhibit 9, do you see this is a |
| 12:43:18 | 6 | screen shot from the Vitals website, correct? |
| 12:43:25 | 7 | A  Yes. |
| 12:43:29 | 8 | Q  And do you see on the bottom lower |
| 12:43:32 | 9 | right-hand corner, a date that the screen shot |
| 12:43:33 | 10 | was copied or the date of the screen shot shown |
| 12:43:39 | 11 | here is June 7, 2012, right? |
| 12:43:43 | 12 | A  Correct. |
| 12:43:50 | 13 | Q  And then do you see at the very top |
| 12:43:55 | 14 | line, the banner of the screen shot says, |
| 12:43:57 | 15 | "Doctor Reviews and Doctor Ratings:  Compare and |
| | 16 | Find Doctors," and "Vitals - Windows Internet |
| 12:43:59 | 17 | Explorer;" is that correct? |
| 12:44:04 | 18 | A  Yes, it is. |
| 12:44:07 | 19 | Q  And so remember earlier, I asked you |
| 12:44:07 | 20 | about doesn't your website actually say you |
| 12:44:10 | 21 | could compare doctors, and you weren't sure? |
| 12:44:17 | 22 | A  Right. |
| 12:44:20 | 23 | Q  So does this confirm, then, that, in |
| 12:44:21 | 24 | fact, at least as of today, it does say "Doctor |
| | 25 | Reviews and Doctor Ratings:  Compare and Find |

Page 93

| | | |
|---|---|---|
| 12:44:24 | 1 | Doctors"? |
| 12:44:28 | 2 | A  It's the header tag. |
| 12:44:34 | 3 | Q  What is a header tag? |
| 12:44:40 | 4 | A  A header tag is how Internet browsers |
| 12:44:41 | 5 | in a pithy way define pieces of sites. |
| 12:44:42 | 6 | Q  But isn't that there because MDX wants |
| 12:44:42 | 7 | it to say that? |
| 12:44:49 | 8 | A  Yes. |
| 12:44:52 | 9 | Q  Yes? |
| 12:44:56 | 10 | A  Yes. |
| 12:44:59 | 11 | Q  So, in fact, given this header tag and |
| 12:45:01 | 12 | given that that's what MDX wants the header tag |
| 12:45:03 | 13 | to say, users can compare and find doctors on |
| 12:45:05 | 14 | the Vitals site, correct? |
| 12:45:16 | 15 | A  They can. |
| 12:45:16 | 16 | Q  Then with respect to Deposition |
| 12:45:21 | 17 | Exhibit 10, this is a letter from Merchant & |
| 12:45:23 | 18 | Gould to you dated December 15, 2009, right? |
| 12:45:23 | 19 | A  Correct. |
| 12:45:25 | 20 | Q  Do you recall receiving this letter, |
| 12:45:26 | 21 | Mr. Rothschild? |
| 12:45:29 | 22 | A  Yes. |
| 12:45:33 | 23 | Q  And what was your reaction when you |
| 12:45:40 | 24 | received this letter? |
| | 25 | A  It was a patent application.  We |

Page 94

| | | |
|---|---|---|
| 12:45:46 | 1 | contacted a lawyer who said it is an application |
| 12:45:55 | 2 | who knows how the patent will issue, if it will |
| 12:45:56 | 3 | issue, what modifications there may be, and |
| 12:45:59 | 4 | let's write a letter of response, which they |
| 12:46:01 | 5 | did. |
| 12:46:03 | 6 | Q   Who was the lawyer that was contacted? |
| 12:46:05 | 7 | A   I am trying to remember the name.  I |
| 12:46:13 | 8 | believe -- do you have the response letter that |
| 12:46:15 | 9 | we have? |
| 12:46:39 | 10 | Q   I don't. |
| 12:46:42 | 11 | A   Let me see if I have it.  I may have |
| 12:46:43 | 12 | it here. |
| 12:46:45 | 13 | I don't know.  I don't know which |
| | 14 | lawyer sent the letter. |
| 12:46:46 | 15 | Q   Okay.  All right.  We may have found |
| 12:46:48 | 16 | it. |
| 12:46:50 | 17 | A   Okay. |
| 12:46:50 | 18 | MR. VAZQUEZ:  Let's mark this.  We may |
| 12:46:50 | 19 | be going out of order, but -- |
| 12:46:50 | 20 | (1/25/10 letter marked Rothschild |
| 12:47:15 | 21 | Exhibit 14 for identification, as of this |
| 12:47:17 | 22 | date.) |
| 12:47:21 | 23 | BY MR. VAZQUEZ: |
| 12:47:25 | 24 | Q   So we have marked as Deposition |
| | 25 | Exhibit 14, Mr. Rothschild, and this is a letter |

Page 95

| | | |
|---|---|---|
| 12:47:32 | 1 | from an attorney called Mark Rosenberg with |
| 12:47:35 | 2 | Sills Cummis & Gross dated January 25th, 2010; |
| 12:47:36 | 3 | is that correct? |
| 12:47:39 | 4 | A   Yes. |
| 12:47:41 | 5 | Q   And so is this the response letter |
| 12:47:44 | 6 | that you were asking me about a little bit ago? |
| 12:47:47 | 7 | A   I wasn't asking you about it, but this |
| 12:47:48 | 8 | is the response letter that I believe we used to |
| 12:47:49 | 9 | respond to the Merchant & Gould letter. |
| 12:47:50 | 10 | Q   You asked me -- you asked me if I had |
| 12:47:51 | 11 | a response letter, right? |
| 12:47:53 | 12 | A   Oh, if you had it, yes. |
| | 13 | Q   And is this it? |
| 12:47:57 | 14 | A   Yes. |
| 12:47:59 | 15 | Q   And so you contacted a Mr. Rosenberg? |
| 12:47:59 | 16 | A   Yes. |
| 12:48:06 | 17 | Q   Personally? |
| 12:48:06 | 18 | A   (No response). |
| 12:48:19 | 19 | Q   Did you meet with him? |
| 12:48:23 | 20 | A   Not in person. |
| 12:48:28 | 21 | Q   Okay.  Did this -- well, did -- did |
| 12:48:32 | 22 | the letter that this responds to, which I think |
| 12:48:39 | 23 | we marked as Exhibit 10, did the letter that's |
| 12:48:44 | 24 | shown in Exhibit 10, Mr. Rothschild, influence |
| | 25 | any of the policies shown on Exhibit 4, your |

Page 96

| | | |
|---|---|---|
| 12:48:53 | 1 | email? |
| 12:48:56 | 2 | A   No, they are not directly related. |
| 12:48:59 | 3 | Q   Are they indirectly related? |
| 12:49:00 | 4 | A   I believe at the time, because anybody |
| 12:49:03 | 5 | can file a patent about anything at any point -- |
| 12:49:05 | 6 | MR. STIMPSON:  Excuse me.  I just want |
| 12:49:06 | 7 | to interrupt and caution you not to |
| 12:49:07 | 8 | disclose any communications with your |
| 12:49:08 | 9 | counsel about this patent application, |
| 12:49:09 | 10 | okay? |
| 12:49:10 | 11 | THE WITNESS:  Okay. |
| | 12 | MR. STIMPSON:  You can answer his |
| 12:49:12 | 13 | questions, but just be careful on |
| 12:49:20 | 14 | communications with counsel. |
| 12:49:24 | 15 | THE WITNESS:  Okay. |
| 12:49:28 | 16 | A   So this was a bad patent.  I have |
| 12:49:30 | 17 | seen HealthGrades has actually filed a patent |
| 12:49:36 | 18 | not allowing people to call up their doctor |
| 12:49:39 | 19 | unless they get the patent.  I doubt whether the |
| 12:49:42 | 20 | are going to get that one, so who knew how long |
| 12:49:44 | 21 | it would take, who knew how long it would be |
| 12:49:47 | 22 | narrowed down, and so it did not influence any |
| 12:49:52 | 23 | policies. |
| 12:49:54 | 24 | Q   Okay.  My question was whether |
| | 25 | Merchant & Gould's cease and desist letter, |

Page 97

| | | |
|---|---|---|
| 12:50:07 | 1 | Deposition Exhibit 10, influenced any of the |
| 12:50:09 | 2 | policies in your email of January 5th, 2011. |
| 12:50:11 | 3 | You responded, "Well, not directly," and I just |
| 12:50:15 | 4 | was following up saying indirectly. |
| 12:50:17 | 5 | So your answer is it didn't even |
| 12:50:19 | 6 | influence any of your policies in any way? |
| 12:50:20 | 7 | A   When the patent was issued, the patent |
| 12:50:21 | 8 | influenced our policies. |
| 12:50:22 | 9 | Q   What about the letter that I am asking |
| 12:50:24 | 10 | you about, Mr. Rothschild? |
| 12:50:28 | 11 | A   No. |
| 12:50:28 | 12 | Q   The letter from Merchant & Gould dated |
| 12:50:35 | 13 | December 15th, 2009, informing you about the |
| 12:50:37 | 14 | application that led to the issuance of the |
| 12:50:38 | 15 | patent, this letter at all did not influence you |
| 12:50:40 | 16 | to make any policy changes or any changes at |
| 12:50:42 | 17 | all? |
| 12:50:47 | 18 | A   Correct. |
| 12:50:55 | 19 | Q   Mr. Rothschild, if you already had |
| 12:50:57 | 20 | Sills Cummis & Gross responding on January 25th, |
| 12:50:59 | 21 | 2010, why did you go to the Maldjian firm when |
| 12:51:03 | 22 | the patent was issued? |
| 12:51:06 | 23 | A   That's an incorrect frame.  We didn't |
| 12:51:09 | 24 | go to Maldjian when the patent was issued, we |
| | 25 | went to Maldjian to get a review of a variety of |

Page 98

```
12:51:19   1   different patents, get a sense of what any
12:51:22   2   issues may be out there, and that was a fairly
12:51:25   3   broad look that would have cost probably four
12:51:27   4   times as much as Sills Cummis.
12:51:30   5        So we said let's take a broad look,
12:51:32   6   see if we see any of them that are out there,
12:51:36   7   that we should look deeper, and then we went to
12:51:41   8   Sills to do it.
12:51:43   9        The Maldjian work at Sills would have
           10   probably cost significantly more.
12:51:46   11   Q   Okay.  If I understand your response,
12:51:52   12   there was a cost consideration where Maldjian
12:51:58   13   would have cost more than Sills?
12:52:00   14   A   No, I'm not saying that.  I'm saying
12:52:03   15   that in the look broadly at the patents, we
12:52:05   16   wanted somebody to give an overview.
12:52:07   17   Q   Well --
12:52:10   18   A   We use multiple firms.  We have
12:52:12   19   another firm that manages our patent
12:52:22   20   applications, yet a third firm.  So we have a
12:52:23   21   variety of different firms that do different
12:52:27   22   things.
12:52:33   23   Q   And Deposition Exhibit 5,
12:52:34   24   Mr. Rothschild, which is the Maldjian opinion,
           25   this opinion is restricted solely to the '060
```

Page 99

```
12:52:39   1   patent; is it not?
12:52:42   2   A   As I have said, this is one of a
12:52:44   3   series of letters.  This particular letter is
12:52:49   4   limited, but there are other letters similar in
12:52:50   5   scope to a variety of other patents.
12:52:51   6   Q   Okay.  And was this not a discrete
12:52:55   7   engagement?
12:52:58   8   A   It was not.
           9   Q   So this was part of a -- a list of
12:53:02   10   patents that you provided to Maldjian and said,
12:53:07   11   hey, give us your opinion on whether we have
12:53:10   12   anything to worry about any of these patents?
12:53:13   13       MR. STIMPSON:  Excuse me, I need to
12:53:15   14   interpose an objection.  There is
12:53:16   15   attorney-client privilege with regard to --
12:53:19   16   that is not waived with regard to any of
12:53:21   17   the other patents, so what you asked from
12:53:23   18   your counsel for any specific patent
12:53:24   19   that -- other than this one is privileged,
12:53:27   20   and you should not disclose that
12:53:30   21   information.
12:53:32   22       But if you can answer his question
12:53:36   23   without disclosing that, please provide it.
12:53:39   24       MR. VAZQUEZ:  Well, he's been
           25   testifying about a bunch of other letters.
```

Page 100

```
12:53:42   1       So my answer --
12:53:44   2   Q   I certainly have not asked you to
12:53:47   3   disclose any privileged communications.
12:53:52   4   Mr. Rothschild, I am just trying to understand
12:53:56   5   whether the work reference in this Exhibit 5,
12:54:06   6   the Maldjian opinion of the '060 patent, was
           7   that a discrete engagement, which you said,
           8   okay, now, I would like to hire you, Maldjian,
12:54:07   9   to give me an opinion on this patent?
12:54:10   10   A   No, it was not.
12:54:12   11   Q   Because it was a -- you had provided
12:54:39   12   them with a list of a number of patents?
12:54:42   13   A   We had provided them with a list, and
12:54:58   14   they identified a couple more as well.
12:55:10   15   Q   Okay.  Can we return to the -- your
12:55:15   16   email, the policies email, which is Exhibit 4.
12:55:17   17       And with respect to Policy No. 4 on
12:55:23   18   Page MDX 34445, can you read that policy into
12:55:25   19   the record, please?
12:55:27   20   A   "No report on Vitals shows comparison
12:55:50   21   ratings to other providers.  In particular
12:55:52   22   reference to patient experience surveys,
12:56:00   23   comparisons to national and specialty averages."
12:56:02   24   Q   And so, Mr. Rothschild, when was this
           25   policy implemented?
```

Page 101

```
12:56:12   1   A   The policy, as it reflects the
12:56:14   2   comparisons that you showed me in Exhibits 6 and
12:56:21   3   7, was implemented at that time.
12:56:28   4   Q   And what time was that?  I am sorry.
12:56:32   5   A   January -- January 5th, 2011.
12:56:34   6   Q   Well, if you look at the paragraph
           7   that precedes the four listed policies, doesn't
12:56:37   8   that say "must continue to be strictly
12:56:48   9   enforced"?
12:56:51   10   A   Right.  And that's -- the wording was
12:56:54   11   intended to mean the policy not violating the
12:56:56   12   patent.  Some of these were new activities.
12:56:59   13   Q   So this No. 4 was new?
12:57:04   14   A   It was as a result of this email.
12:57:05   15   Q   It was new as a result of this email?
12:57:11   16   A   Yes.
12:57:16   17   Q   The first time this policy had been
12:57:17   18   written down and communicated as a policy of
12:57:19   19   Vitals was in this email?
12:57:21   20   A   It certainly was the first time it was
12:57:23   21   in writing.
12:57:26   22   Q   Okay.
12:57:27   23   A   As I mentioned, most of these things
12:57:31   24   happen orally in the company.
           25   Q   Quarterly?
```

Page 102

| 12:57:37 | 1 | A   Orally. |
| 12:57:44 | 2 | Q   And was this Policy No. 4 |
| 12:57:46 | 3 | implemated -- implemented as a consequence of |
| 12:57:50 | 4 | advice of counsel? |
| 12:57:53 | 5 | A   It was implemented as a result of the |
|  | 6 | conversations that we had with Phil Braginsky |
| 12:57:54 | 7 | about that belt and suspenders protection that I |
| 12:58:06 | 8 | mentioned. |
| 12:58:10 | 9 | Q   Was it Mr. Braginsky's advice that you |
| 12:58:13 | 10 | implement the belt and suspenders protections? |
| 12:58:14 | 11 | A   No.  We asked them what would make us |
| 12:58:17 | 12 | bulletproof. |
| 12:58:21 | 13 | Q   And so was his advice that you |
| 12:58:23 | 14 | implement this Policy No. 4 in order to make |
| 12:58:25 | 15 | you, Vitals/MDX, bulletproof? |
| 12:58:28 | 16 | A   So if we wanted to be bulletproof, |
| 12:58:30 | 17 | there were certain things that needed to go |
| 12:58:31 | 18 | above and beyond, and so as a result, we did. |
| 12:58:34 | 19 | Q   So he said to be bulletproof, I advise |
| 12:58:36 | 20 | you -- |
| 12:58:39 | 21 | A   He did not say to be bulletproof.  We |
| 12:58:41 | 22 | asked what it would take to be bulletproof, and |
| 12:58:44 | 23 | he suggested a number of things. |
| 12:58:48 | 24 | Q   Okay.  So in response to you asking |
|  | 25 | for advice on what it would take to be |

Page 103

| 12:58:58 | 1 | bulletproof, Mr. Braginsky said you can do this |
| 12:59:01 | 2 | that's reflected in Policy No. 4? |
| 12:59:05 | 3 | A   Yes. |
| 12:59:12 | 4 | Q   And in order to implement this policy, |
|  | 5 | obviously you rotated this email for the first |
| 12:59:13 | 6 | time, what had to occur? |
| 12:59:21 | 7 | A   On the results page, that little |
| 12:59:22 | 8 | compare functionality needed to be taken off, |
| 12:59:23 | 9 | and the button that said "Profile and Compare" |
| 12:59:26 | 10 | just said profile. |
| 12:59:31 | 11 | Q   And I understand that, and I am asking |
| 12:59:34 | 12 | a little more mechanically.  Did you then have |
| 12:59:37 | 13 | to have a meeting with an individual, would |
| 12:59:40 | 14 | mechanically go into the website, the guts of |
| 12:59:44 | 15 | the website, to disable that or remove that as |
| 12:59:46 | 16 | you just said? |
| 12:59:46 | 17 | A   I wouldn't characterize it as a |
| 12:59:46 | 18 | meeting.  Once this is out, if there's any |
| 12:59:48 | 19 | questions -- |
| 12:59:49 | 20 | Q   Sure. |
| 12:59:50 | 21 | A   -- people ask, otherwise they go and |
| 12:59:51 | 22 | implement. |
| 12:59:52 | 23 | Q   Who did that? |
| 12:59:53 | 24 | A   Larry West. |
|  | 25 | Q   Larry West did it? |

Page 104

| 13:00:00 | 1 | A   Yes. |
| 13:00:03 | 2 | Q   He did not engage a web design firm, |
| 13:00:05 | 3 | or any other entity or person, he did it |
|  | 4 | himself?  I just want to understand. |
| 13:00:08 | 5 | A   I cannot speak to, because I don't |
| 13:00:12 | 6 | know the specific mechanics, whether he had our |
| 13:00:15 | 7 | in-house designer move a button over or whether |
| 13:00:19 | 8 | they just moved it over.  Sometimes the |
| 13:00:21 | 9 | engineers do it, sometimes the designers do it, |
| 13:00:27 | 10 | it depends on the change of functionality. |
| 13:00:28 | 11 | Q   But are both of those roles, engineers |
| 13:00:35 | 12 | and designers, performed by MDX employees? |
| 13:00:39 | 13 | A   Yes. |
| 13:00:41 | 14 | Q   So this -- this policy was implemented |
| 13:00:44 | 15 | by employees of MDX is what I am trying to get |
| 13:00:46 | 16 | to.  There was not a need to go outside of the |
| 13:00:47 | 17 | firm to hire somebody to come in and change the |
| 13:00:59 | 18 | code or the website in any way? |
| 13:01:06 | 19 | A   Correct. |
| 13:01:09 | 20 | Q   Okay.  And did you know when after |
| 13:01:16 | 21 | this email was sent, that was actually done? |
| 13:01:24 | 22 | A   I do not know exactly, but if it is |
| 13:01:25 | 23 | consistent with the way we do everything else, |
| 13:01:30 | 24 | within a day or two. |
|  | 25 | Q   Other than this Policy No. 4, what |

Page 105

| 13:01:45 | 1 | other things did Mr. Braginsky advise you to do |
| 13:01:52 | 2 | in order for you to be bulletproof? |
|  | 3 | A   No. 3 was our interpretation of how |
| 13:01:54 | 4 | not to run afoul of that recipe of health |
| 13:01:59 | 5 | provider verified and third-party provider |
| 13:02:01 | 6 | verified at the same time.  It was not, as I |
| 13:02:04 | 7 | said previously, anything that required a change |
| 13:02:05 | 8 | because disciplinary action wasn't up, but we |
| 13:02:11 | 9 | created the precautions, so that it would not be |
| 13:02:12 | 10 | a problem in the future. |
| 13:02:13 | 11 | Q   Okay.  Are you done? |
| 13:02:15 | 12 | A   Yes. |
| 13:02:18 | 13 | Q   So my question is:  If I understand |
| 13:02:22 | 14 | correctly, you said to Mr. Braginsky what we |
| 13:02:25 | 15 | need to do to be bulletproof, and he gave you |
| 13:02:31 | 16 | some advice, one of which was Policy No. 4, and |
| 13:02:33 | 17 | I am not sure if Policy No. 3 is part of his |
| 13:02:40 | 18 | advice or your interpretation of his advice? |
| 13:02:42 | 19 | A   They are listed, I believe, on the |
| 13:02:45 | 20 | patent, certain items.  There's a recipe on the |
| 13:02:51 | 21 | patent about how many health care provider |
| 13:02:54 | 22 | verified elements need to be, what they are, and |
| 13:02:57 | 23 | how many third-party verified, and it was |
| 13:03:06 | 24 | obvious from the review that in order to make |
|  | 25 | sure we were in compliance, we did not go over |

27 (Pages 102 to 105)

Page 106

```
13:03:12   1   that limitation.
           2      Q   And so my question is:  What were --
13:03:17   3   what was the totality of the advice that
13:03:23   4   Mr. Braginsky gave you in response to your
13:03:26   5   request that he tell you what you needed to do
13:03:29   6   to be bulletproof.  We talked about 4 and No. 3.
13:03:31   7   What about No. 2, and No. 1 and anything else
13:03:34   8   that may not be reflected in your email?
13:03:36   9      A   No.  The general perception was that
13:03:38  10   we were fine, that we were not in violation of
13:03:44  11   the patent to begin with.  And so there were
13:03:45  12   really not issues, but there were a couple of
13:03:48  13   things we could do to improve our belt and
13:03:50  14   suspenders position.
13:03:53  15          So the limitations -- the
13:03:55  16   recommendations were fairly limited.
13:03:58  17      Q   So were No. 1 and 2 part of the
13:04:04  18   recommendations?
13:04:06  19      A   One, two and three together are all
13:04:08  20   about the count of how many have to fit in
13:04:11  21   there, so it was just a matter of how you
13:04:14  22   managed the count.
13:04:17  23      Q   Okay.  I am not sure how that responds
13:04:21  24   to what I am asking you, Mr. Rothschild.  Were
          25   one and two part of what Mr. Braginsky advised
```

Page 107

```
           1   you to do to be bulletproof?
13:04:24   2          MR. STIMPSON:  Objection, asked and
13:04:28   3   answered.
13:04:32   4      A   It was clear that we needed to make
13:04:36   5   sure that the totality of what was shown on
13:04:39   6   Vitals did not include whatever the numbers
13:04:41   7   were, three of seven, of one, and three of seven
13:04:47   8   of the other, whatever it may be, which is in
13:04:51   9   the early part of the email.
13:04:56  10          And so it wasn't Mr. Braginsky's
13:05:01  11   recommendation at all on the specifics, he just
13:05:04  12   said make sure you comply and don't display,
13:05:07  13   meaning we broke down the claim into individual
13:05:12  14   pieces and made sure that each of the individual
13:05:14  15   pieces, we were not in any violation even though
13:05:16  16   the claim itself is the totality of those, and
13:05:18  17   therefore, we didn't believe we were ever in
13:05:21  18   violation, but we broke it down to make sure we
13:05:25  19   weren't in violation of any of the pieces
13:05:27  20   independent.
13:05:30  21      Q   Well, you ran this email by
13:05:33  22   Mr. Braginsky, did you not, Mr. Rothschild?
13:05:34  23      A   I think he looked at it.
13:05:36  24      Q   He looked at it before you sent it,
          25   right?
```

Page 108

```
13:05:40   1      A   I don't know if he looked specifically
13:05:44   2   at the email or we had a conversation about -- I
13:05:46   3   don't recall if we had a conversation about it.
13:05:49   4      Q   But the conversation that you may have
13:05:50   5   had about it, did that occur before you sent it
13:05:56   6   to Mr. West and Miss Boyer?
13:05:56   7      A   Yes, I had a conversation with him to
13:05:58   8   make sure that this email was what was
13:05:59   9   necessary.
13:06:03  10      Q   "What was necessary"?
13:06:06  11      A   No, no, I take that back.  What was --
13:06:08  12   what we thought we wanted to do to ensure that
13:06:09  13   belt and suspenders, bulletproof.
13:06:38  14          MR. STIMPSON:  Can I have that last
13:06:40  15   answer back.
13:06:47  16          (Requested Portion Read Back)
13:06:52  17      Q   And so, Mr. Rothschild, to try to
13:06:53  18   understand, you consulted with Mr. Braginsky to
13:06:55  19   seek advice about how to be bulletproof, right?
13:06:56  20      A   Correct.
13:07:04  21      Q   He gave you some advice, right?
13:07:07  22      A   Correct.
13:07:10  23      Q   This email that you wrote to Larry
          24   West and Erika Boyer contains Mr. Braginsky's
          25   advice?
```

Page 109

```
13:07:24   1      A   It contains our interpretation of what
13:07:26   2   needed to be done, and the specifics, he was not
13:07:27   3   commenting on residency, per se, medical
13:07:33   4   residency.
13:07:39   5      Q   Sure.
13:07:42   6          And -- and you then, before sending
13:07:43   7   this to Mr. West and Miss Boyer, had
13:07:45   8   Mr. Braginsky review the email?
13:07:53   9      A   I did not say that.
13:07:55  10      Q   I am asking you if you did that.
13:07:56  11      A   Okay.  As I said to you previously, I
13:07:56  12   do not recall whether he reviewed it.  I doubt I
13:07:57  13   sent him a draft.  Probably more likely, we
13:08:00  14   talked about it.
13:08:03  15      Q   On the phone?
13:08:03  16      A   Yes.
13:08:06  17      Q   And having talked on the phone or
13:08:10  18   however it was that you had this communication
13:08:14  19   with Mr. Braginsky, is it fair to assume you
13:08:18  20   felt comfortable then that the email
13:08:19  21   appropriately or adequately conveyed to Mr. West
13:08:22  22   and Miss Boyer what had to be done to be
          23   bulletproof?
13:08:29  24      A   Yes, I believe so.
          25      Q   And sorry if I asked this before, but
```

---

Page 110

```
13:08:46   1   other than what's shown on this email, there was
13:08:48   2   no other suggestions by Mr. Braginsky to -- to
13:08:51   3   make sure you were bulletproof?
13:08:53   4      A   There's an implication that this email
13:08:54   5   is the recommendations of Mr. Braginsky.  I have
13:08:57   6   said to you we talked about it.  That's not the
13:09:02   7   case.
13:09:04   8         And that this is our interpretation of
13:09:08   9   what he said.
13:09:11  10      Q   Okay.  We do have a disconnect.  I
13:09:13  11   know we have talked about it for probably five
13:09:17  12   or ten minutes now, and I thought you said that
13:09:18  13   this email is the result of you asking
13:09:20  14   Mr. Braginsky for advice on how to be
13:09:27  15   bulletproof?
13:09:30  16      A   That is correct.
13:09:39  17      Q   Okay.  I will leave it at that.
13:09:39  18         As to this No. 4, the Policy No. 4,
13:09:41  19   which as you said, it was new, it was created as
13:09:44  20   a consequence, it was created for the first time
13:09:45  21   in this email, right?
13:09:55  22      A   Yes.
13:10:01  23      Q   All right.  Thus, on January 4th,
13:10:07  24   2010, the comparison ratings feature existed,
          25   correct?  I am sorry, January 4th, 2011?
```

Page 111

```
13:10:23   1      A   I believe so.
13:10:28   2      Q   Is that feature that you have
13:10:30   3   testified was removed, is it removed permanently
13:10:30   4   or is it just locked out?
13:10:37   5      A   I am not sure I understand the
13:10:40   6   question.
13:10:42   7      Q   Well, there's -- you showed -- I
13:10:42   8   showed you some exhibits, and they show a
13:10:44   9   button, right, that says "Compare"?
13:10:47  10      A   Yes.
13:10:51  11      Q   And so I think your testimony was that
13:10:51  12   it was removed or disabled, I am not sure
13:10:53  13   exactly the word, but I am paraphrasing; is that
13:10:56  14   correct?
13:10:59  15      A   You change the code, and instead of
13:11:01  16   there being two buttons with a code, there's one
13:11:02  17   button, the design changes, the code changes.  I
13:11:03  18   don't know about disable, it is a matter of
13:11:05  19   changing the code.
13:11:08  20      Q   All right.  I guess when I say
          21   disabled could be the button is still there, but
13:11:10  22   when you put the cursor on it, and you try to
13:11:11  23   click it, it won't work?
13:11:13  24      A   No.
          25      Q   That's not what you did?
```

Page 112

```
13:11:19   1      A   That's the bad user experience.  It
13:11:23   2   wouldn't be there, it was only one button.
13:11:29   3      Q   Okay.  So is -- are the changes in the
13:11:32   4   code, if you know, such that the functionality
13:11:37   5   is simply disabled or -- meaning the code is
13:11:40   6   still there, but it does not operate, it does
13:11:43   7   not function?
13:11:46   8      A   I am not an engineer.  I look at what
13:11:48   9   the result is, and the result on the site, it is
13:11:50  10   not there, and I cannot speak to the mechanics
13:11:53  11   of how one changes it.
13:11:56  12      Q   So other than the banner that says
13:12:07  13   find and compare doctors, there's no real button
13:12:09  14   that you can press that says compare?
13:12:20  15      A   Correct.
13:12:23  16      Q   Did Mr. Braginsky give you any advice
13:12:25  17   that you opted not to follow, Mr. Rothschild?
13:12:27  18      A   I don't believe so.  You hire an
13:12:29  19   attorney, and you follow their advice or you
          20   hire a different attorney is generally what I
13:12:35  21   have been taught.
13:12:41  22      Q   Okay.  I would imagine a person of
13:12:42  23   your experience might disagree with your
13:12:45  24   attorneys on certain things from time to time.
          25      A   In that case, we get different
```

Page 113

```
13:12:49   1   attorneys.  As you can see, we are still with
13:12:51   2   Sills Cummis.
13:12:53   3      Q   Okay.  What about Maldjian, did they
13:12:56   4   give you any advice that you disagreed with?
13:12:58   5      A   Maldjian did not give advice, as best
13:13:17   6   as I can tell.  Maldjian made a statement that
13:13:19   7   said you are not in violation, which has been
13:13:24   8   our contention all along.
13:13:27   9      Q   Returning to your policies email,
13:13:29  10   January 5th, 2011, Mr. Rothschild, Policy No. 1
13:13:32  11   states that, "Our display of third-party
13:13:34  12   verified information does not include IRF,"
13:13:34  13   closed quote.
13:13:36  14         I read that correctly; didn't I?
13:13:40  15      A   Yes.
13:13:45  16      Q   And IRF, you testified, means
13:13:48  17   internship, residency and fellowship?
13:13:50  18      A   Correct.
          19      Q   But isn't it true sometimes you do
13:13:51  20   display fellowship information?
13:13:54  21      A   It is.
13:13:57  22      Q   Doesn't that go against that policy,
13:14:00  23   then?
13:14:06  24      A   No, we display it if the provider
          25   offers it up and puts it in there, edited
```

| Page 114 | |
|---|---|
| 13:14:11 | 1 version. |
| 13:14:12 | 2 Q Meaning if a provider with a password |
| 13:14:13 | 3 goes in and literally adds it, it is? |
| 13:14:19 | 4 A Yes. |
| 13:14:21 | 5 Q It's not already there? |
| 13:14:23 | 6 A Yes, it's not on the site. |
| 13:14:26 | 7 Q But doesn't that concern you, that |
| 13:14:28 | 8 that would then -- that the display of the |
| 13:14:29 | 9 third-party verified information would include |
| 13:14:30 | 10 fellowship information? |
| 13:14:33 | 11 A Repeat the question. |
| 13:14:37 | 12 Q Wouldn't that concern you, then, that |
| 13:14:40 | 13 in that case, meaning when the doctor goes in |
| 13:14:42 | 14 and adds fellowship information, that therefore, |
| 13:14:46 | 15 your display of third-party verified information |
| 13:14:57 | 16 would include fellowship information? |
| 13:15:03 | 17 A No, because that is health provider |
| | 18 verified, which is a different category. |
| 13:15:06 | 19 Q Okay. Other than when providers go in |
| 13:15:12 | 20 and add fellowship information, as you said can |
| 13:15:14 | 21 be the case, isn't fellowship in your database? |
| 13:15:15 | 22 A It is in the database. |
| 13:15:17 | 23 Q In the master database; is that |
| 13:15:17 | 24 accurate? |
| | 25 A Yes, where we have it. |

| Page 115 | |
|---|---|
| 13:15:21 | 1 Q I am sorry? |
| 13:15:24 | 2 A Where it's avail -- yes, where we find |
| 13:15:26 | 3 it, yes. It's in the database. There's home |
| 13:15:28 | 4 addresses in the database as well of doctors. |
| 13:15:31 | 5 We don't display those. |
| 13:15:31 | 6 Q So you are saying, yes, fellowship |
| 13:15:32 | 7 information is in there, but you do not display |
| 13:15:32 | 8 it? |
| 13:15:37 | 9 A Correct. |
| 13:15:41 | 10 Q Except if the doctor displays -- |
| 13:15:43 | 11 decides to -- |
| 13:15:54 | 12 A To populate. |
| 13:15:55 | 13 Q Doctors cannot, when they log in, |
| 13:15:59 | 14 change or modify the master database? |
| 13:16:00 | 15 A Is that a question? |
| 13:16:03 | 16 Q Yes. I thought it was good by my |
| | 17 inflection. |
| 13:16:09 | 18 A Okay. That's not the way the database |
| 13:16:16 | 19 works. The database has multiple sources of |
| 13:16:20 | 20 information, and it preserves all sources from |
| 13:16:26 | 21 where the data comes. And so within the |
| 13:16:30 | 22 database, there may be 50 sources of information |
| 13:16:33 | 23 about a doctor's address, and provider |
| 13:16:39 | 24 self-reporter is what we call it, is one of the |
| | 25 data sources. |

| Page 116 | |
|---|---|
| 13:16:44 | 1 Q So maybe this might explain where I |
| 13:16:48 | 2 was coming from. When a doctor goes in and |
| 13:16:49 | 3 chooses to add fellowship information, he's |
| 13:16:55 | 4 doing that to what you would call his profile, |
| 13:16:59 | 5 correct? |
| 13:17:01 | 6 A He's doing that to his -- he's -- he |
| 13:17:04 | 7 has put it in there. Whether we display it or |
| 13:17:06 | 8 not is subject to business rules, and in some |
| 13:17:07 | 9 cases, we do, and in some cases, we don't. |
| 13:17:10 | 10 Q So when he puts it in there, what's |
| 13:17:13 | 11 the "there"? |
| 13:17:13 | 12 A It's what we call the easy edit aspect |
| 13:17:18 | 13 of the site where a provider can go in and edit |
| 13:17:20 | 14 information. |
| 13:17:22 | 15 Q And once a provider goes in and edits |
| | 16 the information, is the edited information |
| | 17 considered to be part of the master database? |
| 13:17:31 | 18 A Yes. |
| 13:17:35 | 19 Q Then in some cases, according to the |
| 13:17:38 | 20 business rules you just referenced, that |
| 13:17:41 | 21 fellowship information may be displayed or may |
| 13:17:43 | 22 not be? |
| 13:17:49 | 23 A Every piece of information is subject |
| 13:17:53 | 24 to business rules, so sometimes the |
| 13:17:57 | 25 self-reported is the dominant factor, sometimes |

| Page 117 | |
|---|---|
| 13:18:02 | 1 it's not. |
| 13:18:04 | 2 Q I guess the answer to my question is, |
| 13:18:06 | 3 yes, sometimes, depending on the business rule, |
| 13:18:08 | 4 the fellowship information is displayed, and |
| 13:18:10 | 5 sometimes it is not, it would be in the business |
| 13:18:12 | 6 rules? |
| 13:18:13 | 7 A If you are asking specifically about |
| 13:18:16 | 8 fellowship information, if -- |
| 13:18:18 | 9 Q I am. |
| 13:18:21 | 10 A -- a provider brings it in, and it is |
| 13:18:24 | 11 validated that it's from that provider -- |
| 13:18:33 | 12 validated is the wrong word, it is confirmed |
| 13:18:35 | 13 from that provider by us, then it is displayed. |
| 13:18:36 | 14 Q Okay. Do you collect fellowship |
| | 15 information from third parties, too, |
| 13:18:40 | 16 Mr. Rothschild? |
| 13:18:45 | 17 A We collect lots of information from |
| 13:18:46 | 18 many sources. Fellowship is one of the pieces |
| 13:18:49 | 19 we collect. |
| 13:18:49 | 20 Q The answer is, yes, fellowship |
| 13:18:50 | 21 information from third parties is collected, |
| 13:19:02 | 22 right? |
| 13:19:08 | 23 A Yes. |
| 13:19:11 | 24 Q Okay. And, Mr. Rothschild, would |
| | 25 business rules or website rules allow a doctor |

30 (Pages 114 to 117)

| Page 118 | Page 120 |
|---|---|

**Page 118**

13:19:15  1  to report a fellowship that is different from
13:19:17  2  what a third party reports?
13:19:18  3      A   Yes.
13:19:19  4      Q   You do allow that?
13:19:21  5      A   Yes.
13:19:24  6      Q   Okay.
13:19:25  7          MR. STIMPSON:  Jesus, when you get to
13:19:25  8  a good stopping point.
13:19:39  9          MR. VAZQUEZ:  Okay.  I have a couple
13:19:43 10  of more.
13:19:48 11  BY MR. VAZQUEZ:
13:19:50 12      Q   Same line of questions as to the INER,
13:19:51 13  internships and residency.  Do you allow doctors
13:19:51 14  to go in and add internship information?
13:19:53 15      A   Yes.
13:19:56 16      Q   And then depending upon the business
13:19:58 17  rules, that information may or may not be
13:20:01 18  displayed?
13:20:05 19      A   Yes.
13:20:12 20      Q   And if the internship information a
13:20:14 21  doctor adds is different from what a third party
13:20:16 22  may have reported, that same internship
13:20:17 23  information given by that provider, you would
13:20:18 24  still allow it to be displayed?
         25      A   Yes.

**Page 119**

13:20:19  1      Q   Is the same true for residency
13:20:22  2  information?
13:20:25  3      A   Yes.
13:20:28  4      Q   A doctor can add residency info?
13:20:29  5      A   Yes, he can, or yes, she can.
13:20:32  6      Q   Thank you.  My mother was a doctor, so
13:20:37  7  I appreciate that.
13:20:39  8          I read the internship information,
13:20:40  9  then, may or may not be displayed?
13:20:41 10      A   Correct.  They are treated
13:20:42 11  similarly --
13:20:47 12      Q   Sure.
         13      A   -- by and large.
13:20:49 14      Q   And then, also, a third party provides
         15  internship information that's different from
13:20:53 16
13:20:55 17  what the doctor may have provided, that still
13:20:58 18  may be displayed?
13:21:00 19      A   No, third party information on
13:21:02 20  internship is not displayed.
13:21:04 21      Q   Okay.  So, then, that is different
13:21:05 22  from residencies and fellowships?
13:21:07 23      A   No, third party is not displayed in
13:21:13 24  any case.
         25      Q   Okay.  I think I flipped it, then, in

**Page 120**

13:21:23  1  my question.  I was testing you.  You passed.
13:21:26  2          If -- if -- if the internship
13:21:29  3  information that is reported from a doctor is
13:21:31  4  different from that that's reported from a third
13:21:32  5  party, you may still allow the doctor's
13:21:33  6  information, internship information, to be
13:21:37  7  displayed?
13:21:42  8      A   Correct.
13:21:45  9      Q   Fine.
13:21:45 10          MR. STIMPSON:  Good stopping place?
13:21:47 11          MR. VAZQUEZ:  Yes, let's stop.
13:21:48 12          MR. STIMPSON:  Thank you.
13:21:49 13          MR. VAZQUEZ:  You are welcome.
13:21:49 14          THE VIDEOGRAPHER:  This marks the end
13:21:52 15  of Tape No. 2 in the deposition of Mitchel
13:35:40 16  Rothschild.
13:35:59 17          Going off the record, the time is
13:36:00 18  1:24 p.m.
13:36:04 19          (Recess taken)
13:36:07 20          THE VIDEOGRAPHER:  We are back on the
13:36:10 21  record.  The time is -- I am sorry.  Here
13:36:13 22  marks the beginning of Tape No. 3 in the
13:36:14 23  deposition of Mitchel Rothschild.  The time
13:36:17 24  is 1:38 p.m.
         25          MR. STIMPSON:  Jesus, can I just make

**Page 121**

13:36:22  1  a comment.  I hope I don't anger you with
13:36:25  2  it, and I don't intend to.
13:36:27  3          MR. VAZQUEZ:  Wait a minute.
13:36:29  4          MR. STIMPSON:  Psyche yourself up for
13:36:31  5  it?  I don't mean to start a war about
13:36:33  6  this, but I just feel like I have to tell
13:36:35  7  you, you know, we are now more than five
13:36:38  8  and a half hours after this deposition was
13:36:41  9  supposed to have started, and you know, you
13:36:43 10  have done the opinion letters, and it seems
13:36:46 11  to be going very slow.  So there's no doubt
         12  we are not going to allow Mr. Rothschild to
13:36:48 13  be deposed for another day, it is one day.
13:36:54 14  We will help you.  We are going to try
13:36:58 15  to cut down his -- his time for his
13:36:59 16  conference to half an hour, if we can, he
13:37:00 17  can stay late, but I am just stating it so
13:37:03 18  you know, okay?
13:37:07 19          MR. VAZQUEZ:  I appreciate what you
13:37:08 20  just said is what you would like to occur,
13:37:11 21  and I am happy to consider it, your -- your
13:37:12 22  language.
13:37:12 23          MR. STIMPSON:  That's all I ask.
13:37:16 24          MR. VAZQUEZ:  All right.  Thank you.
         25  BY MR. VAZQUEZ:

Page 122

```
13:37:22   1        Q   So, Mr. Rothschild, moving along, just
13:37:33   2    I think we are going to wrap up the opinion
13:37:36   3    stuff here very shortly.  When was the last time
13:37:37   4    that you spoke with Mr. Braginsky?
13:37:38   5        A   Probably early this year.
13:37:40   6        Q   Early in 2012?
13:37:41   7        A   Yes.
13:37:43   8        Q   Was that after the Markman order was
13:37:44   9    issued?
13:37:46  10        A   We were talking about completely
          11    different activities.
13:37:48  12        Q   Not about the '060 patent and the
13:37:51  13    HealthGrades lawsuit?
13:37:54  14        A   No.
13:37:56  15        Q   Did you consider having Mr. Braginsky
13:37:58  16    update that opinion after the Judge construed
13:38:00  17    some of the terms independent --
13:38:03  18        A   No.
13:38:07  19        Q   -- in the patent?
13:38:10  20        A   No, we hired highly competent counsel,
13:38:13  21    and they are advising us on how to behave at
13:38:18  22    this point.
13:38:20  23        Q   Okay.  When the Judge construed --
13:38:22  24    issued his Markman order, which construed some
          25    of the terms in the patent, were you informed of
```

Page 123

```
13:38:25   1    that by Mr. Braginsky?
13:38:26   2        A   No.
13:38:28   3        Q   Were you informed of that by
13:38:30   4    litigation counsel?
13:38:33   5            MR. STIMPSON:  Excuse me.  You can --
13:38:34   6        Q   Don't tell me what he told me, just
13:38:37   7    whether you were informed.
13:38:39   8            MR. STIMPSON:  You know what, he's
13:38:41   9    already said he knew about it.  I don't
          10    want him disclosing what litigation counsel
          11    said to him or didn't say to him, okay.
13:38:42  12        So --
13:38:46  13        Q   You did say you were aware of the
13:38:52  14    Markman order?
13:38:54  15        A   There are a variety -- I'm not a
13:38:57  16    lawyer by any means, and there's invalidity, and
13:39:01  17    Markman, and claim construction and all of this
13:39:02  18    kind of stuff, and I am kept up to speed, and I
13:39:07  19    don't know what each one is called, but it does
13:39:11  20    appear that things are proceeding in a way that,
13:39:15  21    at least from our side, seems satisfactory.
13:39:20  22        Q   You are starting to sound a lot like
13:39:21  23    management, Tim Bolan.  I appreciate that it is
13:39:24  24    chaotic and fast paced, but it is important for
          25    me to understand just whether you -- we talked
```

Page 124

```
13:39:34   1    about it earlier.  Do you know -- can you tell
13:39:35   2    me as you sit here today whether you read the
13:39:37   3    Markman order?
13:39:38   4        A   I am reasonably confident I read it at
13:39:40   5    the time, and that was a while ago, and I can't
13:39:42   6    say I read it.
13:39:56   7        Q   It was issued February 13 of this
13:39:59   8    year, so does that help at all?
          9        A   That was 30 million visitors ago.
13:40:02  10        Q   Do you feel that what the Judge in
13:40:11  11    this case believes the terms mean -- the terms
13:40:15  12    he construed mean are important to the lawsuit?
13:40:20  13            MR. STIMPSON:  I have a couple of
13:40:25  14    objections here.  First of all, that calls
13:40:25  15    for expert testimony.  I think it is beyond
13:40:28  16    any 30(b)(6) topic.
13:40:30  17            MR. VAZQUEZ:  I don't want to
13:40:34  18    interrupt you, counsel, but both opinions
13:40:36  19    couch their opinions or qualify them with
13:40:38  20    the phrase "properly construed."
13:40:42  21            "Properly construed," that refers
13:40:44  22    specifically to properly -- the terms in --
13:40:46  23    the claims terms have been properly
13:40:47  24    construed, so that's why I think this is
          25    relevant and part of the opinion.
```

Page 125

```
13:40:50   1            MR. STIMPSON:  Okay.  Then that wasn't
13:40:52   2    the right question.  Your question asked
13:40:53   3    him whether he thought it was important in
13:40:54   4    the litigation.
13:40:55   5            MR. VAZQUEZ:  Right.
13:40:55   6            MR. STIMPSON:  So that's my objection.
13:40:56   7            MR. VAZQUEZ:  Right.  Sure.
          8            MR. STIMPSON:  Okay.
13:40:59   9    BY MR. VAZQUEZ:
13:41:06  10        Q   To give context, Mr. Rothschild, you
13:41:11  11    saw opinions.  Opinions appear to state that if
13:41:16  12    the court construes the claim terms properly,
13:41:18  13    you should be safe.  The court has construed its
13:41:21  14    claim terms, and I think it's logical and
13:41:23  15    relevant for me to just ask you:  Did you read
13:41:25  16    the court's construction, did you feel the
13:41:28  17    court's construction was important, what do you
13:41:31  18    think about the court's construction?
13:41:33  19            MR. STIMPSON:  No, you know what, I
13:41:35  20    don't think so, Jesus, because now you are
13:41:36  21    getting beyond the opinions, and you are
13:41:37  22    talking about what he thinks during the
13:41:38  23    course --
13:41:40  24            MR. VAZQUEZ:  He said there was --
          25            MR. STIMPSON:  Wait a second, let me
```

Page 126

```
13:41:42   1    finish.  Wait a minute.
13:41:42   2         MR. VAZQUEZ:  You said it was his a
13:41:43   3    fine line.
13:41:45   4         MR. STIMPSON:  Wait a minute.
13:41:46   5         MR. VAZQUEZ:  All right.
13:41:47   6         MR. STIMPSON:  There's a fine line
           7    here between him -- you know, what's going
13:41:49   8    on in the litigation and what's going on
13:41:54   9    with the opinion counsel, and -- I think I
13:41:57  10    know what you are asking, but that's just
13:41:57  11    not clear to me, so please draw that
13:41:57  12    distinction clearly.
13:42:00  13         MR. VAZQUEZ:  All right.
13:42:13  14    BY MR. VAZQUEZ:
13:42:16  15    Q   The opinions you received were
13:42:19  16    qualified by the author of those opinions by
13:42:23  17    using language to the effect that properly
13:42:25  18    construed terms; isn't that right?
13:42:27  19         MR. STIMPSON:  Objection.  I think it
13:42:29  20    mischaracterizes the documents.
13:42:35  21         MR. VAZQUEZ:  Well, we will just go
13:42:43  22    back to the opinion, then.
13:42:47  23    Q   Let's go to the Sills Cummis & Gross
13:42:55  24    opinion, which is Exhibit 8.
          25         I think where I want to go -- bear
```

Page 127

```
13:43:08   1    with me a second.
13:43:10   2         So on Page 3 of the Sills Cummis &
13:43:15   3    Gross opinion, the first paragraph shown there
13:43:18   4    prior to this opinion gives some conclusions,
13:43:31   5    and then there's a sentence that reads, "This
           6    conclusion is grounded upon the determination
           7    that, given proper construction under the law,
13:43:36   8    Vitals.com services would not infringe the '060
13:43:40   9    patent."
13:43:43  10         And so what I am talking about is this
13:43:51  11    part that says "given proper construction under
13:43:55  12    the law," and so the author, Mr. Braginsky, is
13:43:59  13    referring to construction of the patent terms.
13:44:01  14         And so that extent, I am asking you
13:44:05  15    if you paid any particular attention to the
13:44:08  16    Judge's construction of the patent terms in the
13:44:11  17    case?
13:44:15  18    A   Given that this has moved out of the
13:44:18  19    realm of opinion into the realm of litigation,
13:44:23  20    we are guided by our counsel as to what the
13:44:27  21    proper behavior is for both the company and our
13:44:29  22    actions during the lawsuit, and we have -- it
13:44:30  23    appears to be --
13:44:32  24         MR. STIMPSON:  Don't disclose any
          25    communications with counsel, litigation
```

Page 128

```
13:44:33   1    counsel.
13:44:38   2         THE WITNESS:  Okay.
13:44:40   3    A   Right.
13:44:43   4         Okay.  So I'm not worried.
           5    Q   I am not asking you if you are
13:44:45   6    worried, Mr. Rothschild.  I am simply asking --
13:44:51   7    I am asking if you read the Judge's
13:44:51   8    construction, and you say you think you did, but
13:44:56   9    it has been a long time ago; is that right?
13:44:58  10    A   Yes.
13:45:01  11    Q   Okay.  And you don't remember either
13:45:04  12    at the time or just sitting here today what your
13:45:06  13    reaction was to the Judge's construction?
13:45:06  14    A   Correct.  It was legal -- legalese to
13:45:08  15    me, and I am not a lawyer, and --
13:45:18  16    Q   Right.
13:45:20  17    A   -- I asked our counsel, and they
13:45:20  18    responded to me with their opinion.
13:45:31  19         MR. VAZQUEZ:  What is the next number
13:45:32  20    in order?
13:45:53  21    Q   What is the last number you have?
13:45:55  22    A   14.
13:45:57  23    Q   Thank you.
13:45:57  24         I am handing you what has been marked
          25    as Deposition Exhibit 15, Mr. Rothschild.
```

Page 129

```
13:45:57   1         (5/5/10 email marked Rothschild
13:45:57   2         Exhibit 15 for identification, as of this
13:46:00   3         date.)
           4    BY MR. VAZQUEZ:
13:46:06   5    Q   This is an email from a guy called
13:46:29   6    Richard Forman to you on May 5th, 2010.
13:46:30   7         Do you recall receiving this email?
13:46:31   8    A   I obviously received it.  I don't
13:46:31   9    remember it at all.
13:46:32  10    Q   Okay.  So you say you obviously
13:46:33  11    received it?
13:46:36  12    A   My name is on it.
13:46:39  13    Q   Yes?
13:46:39  14    A   I frankly don't read all of my emails,
13:46:43  15    but I guess I received it, so --
13:46:47  16    Q   Yes.
13:46:48  17    A   My name is on it.
13:46:49  18    Q   Okay.  And so who is Mr. Forman?
13:46:51  19         MR. STIMPSON:  I would just like to
13:46:54  20    interpose an objection.  This is beyond the
13:46:55  21    30(b)(6).
13:46:56  22         MR. VAZQUEZ:  We can do that just
13:46:57  23    stating your objection.
13:46:59  24         MR. STIMPSON:  Okay.  Thank you.
          25    A   He is a member of our board of
```

Page 130

| | | |
|---|---|---|
| 13:47:06 | 1 | directors. |
| 13:47:09 | 2 | Q  Okay.  And he is with HVG, LLC? |
| | 3 | A  Yes. |
| 13:47:12 | 4 | Q  What does HVG, LLC, stand for?  I know |
| 13:47:24 | 5 | what LLC stands for. |
| 13:47:31 | 6 | A  Health Venture Group, LLC. |
| 13:47:32 | 7 | Q  And it appears he was feeding you -- |
| 13:47:41 | 8 | giving you some information related to |
| 13:47:44 | 9 | communications he was having with HealthGrades; |
| 13:47:45 | 10 | is that fair? |
| 13:47:56 | 11 | A  Not him, but somebody else he knows |
| 13:47:57 | 12 | based on the email. |
| 13:47:59 | 13 | Q  Right. |
| 13:48:00 | 14 | Is this information that he gave you |
| 13:48:02 | 15 | public? |
| 13:48:04 | 16 | MR. STIMPSON:  Objection, calls for |
| 13:48:08 | 17 | speculation. |
| 13:48:09 | 18 | A  I have no idea. |
| 13:48:15 | 19 | Q  I am going to cut to the chase.  Do |
| 13:48:18 | 20 | you feel it was appropriate -- inappropriate for |
| 13:48:19 | 21 | him to give you this information? |
| 13:48:22 | 22 | A  Inappropriate in what way? |
| 13:48:25 | 23 | Q  I will ask you the question, and |
| 13:48:26 | 24 | however you feel the word inappropriate is |
| | 25 | defined. |

Page 131

| | | |
|---|---|---|
| 13:48:31 | 1 | MR. STIMPSON:  Does this got some |
| | 2 | relevance to the lawsuit, Jesus, that you |
| 13:48:32 | 3 | can articulate? |
| 13:48:34 | 4 | MR. VAZQUEZ:  You can make a relevance |
| 13:48:35 | 5 | objection. |
| 13:48:38 | 6 | MR. STIMPSON:  No, actually, I am just |
| 13:48:39 | 7 | wondering if you are doing something you |
| 13:48:43 | 8 | shouldn't be doing here, but it's okay. |
| 13:48:47 | 9 | MR. VAZQUEZ:  The question is whether |
| 13:48:48 | 10 | Mr.-- Mr. Forman or Mr. Rothschild were |
| 13:48:49 | 11 | doing things that they shouldn't be doing. |
| 13:48:49 | 12 | MR. STIMPSON:  Well, then, how is that |
| 13:48:50 | 13 | relevant to the litigation is what I am |
| 13:48:51 | 14 | asking you. |
| 13:48:52 | 15 | MR. VAZQUEZ:  You can make your |
| 13:48:54 | 16 | objection. |
| 13:48:55 | 17 | MR. STIMPSON:  Yeah, I know. |
| 13:48:56 | 18 | MR. VAZQUEZ:  You don't get to ask me |
| 13:48:57 | 19 | why I ask the questions. |
| 13:49:00 | 20 | MR. STIMPSON:  Well, and you obviously |
| 13:49:01 | 21 | don't feel like you have to explain |
| 13:49:03 | 22 | yourself, but you know -- |
| 13:49:04 | 23 | MR. VAZQUEZ:  Can you just let him |
| 13:49:06 | 24 | answer?  The question is very clear. |
| | 25 | MR. STIMPSON:  How does this relate to |

Page 132

| | | |
|---|---|---|
| | 1 | your patent, Jesus? |
| 13:49:10 | 2 | MR. VAZQUEZ:  Let the record reflect |
| 13:49:13 | 3 | counsel is not making an objection, he's |
| 13:49:15 | 4 | just asking me questions. |
| 13:49:17 | 5 | MR. STIMPSON:  And let the record |
| 13:49:18 | 6 | reflect you are not answering it.  This has |
| 13:49:24 | 7 | got nothing to do with the '060 patent. |
| 13:49:26 | 8 | BY MR. VAZQUEZ: |
| 13:49:30 | 9 | Q  Do you -- do you believe that this -- |
| 13:49:30 | 10 | what Mr. Forman was doing here was |
| 13:49:30 | 11 | inappropriate?  It is a simple question. |
| 13:49:31 | 12 | MR. STIMPSON:  Objection. |
| 13:49:31 | 13 | A  No. |
| 13:49:32 | 14 | Q  "No"? |
| 13:49:34 | 15 | A  No. |
| 13:49:41 | 16 | Q  Why not? |
| 13:49:42 | 17 | A  He heard something about a competitor. |
| 13:49:45 | 18 | He is passing it along. |
| 13:49:47 | 19 | Q  Do you recall what you did with this |
| 13:49:49 | 20 | information, if anything? |
| 13:49:51 | 21 | A  I don't recall the information.  I am |
| 13:49:57 | 22 | quite sure we didn't do anything. |
| 13:50:01 | 23 | Q  Why are you quite sure? |
| 13:50:04 | 24 | A  Because HealthGrades had sniffed |
| | 25 | around trying to buy us probably around this |

Page 133

| | | |
|---|---|---|
| 13:50:25 | 1 | time, and I can't recall that we operated any |
| 13:50:32 | 2 | differently based on this information. |
| 13:50:43 | 3 | Q  If you were in HealthGrades' shoes, |
| 13:50:45 | 4 | Mr. Rothschild, and you were trying to find |
| 13:50:49 | 5 | assets to purchase, and you were communicated |
| 13:50:51 | 6 | this information about investment criteria and |
| 13:50:53 | 7 | form of currency in the areas of strategic |
| 13:50:53 | 8 | investment, would it be okay for that |
| 13:50:55 | 9 | information to be disseminated? |
| 13:50:57 | 10 | MR. STIMPSON:  Objection.  It calls |
| 13:51:02 | 11 | for expert testimony.  It calls for |
| 13:51:03 | 12 | speculation.  It has absolutely no |
| 13:51:08 | 13 | relevance to anything. |
| 13:51:11 | 14 | Q  You can answer. |
| 13:51:13 | 15 | A  Every company has feelers out in the |
| 13:51:16 | 16 | marketplace.  It's up to them to determine how |
| 13:51:16 | 17 | close to the vest they want to hold this. |
| 13:51:20 | 18 | Apparently there was some information that got |
| 13:51:23 | 19 | out. |
| 13:51:25 | 20 | I would not want HealthGrades to know |
| 13:51:54 | 21 | it, but if they knew it, I wouldn't view it as |
| 13:51:56 | 22 | being anything improper. |
| 13:51:56 | 23 | Q  Okay.  The next one is 16. |
| | 24 | A  Actually, I would like to amend my |
| | 25 | comment. |

Page 134

| | | |
|---|---|---|
| 13:52:03 | 1 | Q Of course. |
| 13:52:05 | 2 | A The subject of this email is |
| 13:52:07 | 3 | "Responses from HealthGrades." |
| 13:52:10 | 4 | I believe HealthGrades made an |
| 13:52:21 | 5 | overture to our company about potentially |
| 13:52:27 | 6 | acquiring it, and this was within that context, |
| 13:52:28 | 7 | now that I am seeing the subject line. |
| 13:52:28 | 8 | Q Okay. Here is Deposition Exhibit 16, |
| 13:52:28 | 9 | Mr. Rothschild. |
| 13:52:34 | 10 | (March 2011 email string marked |
| 13:52:35 | 11 | Rothschild Exhibit 16 for identification, |
| 13:52:37 | 12 | as of this date.) |
| 13:52:49 | 13 | MR. VAZQUEZ: And unfortunately, I |
| 13:52:50 | 14 | only have two copies of this. Can you guys |
| 13:52:50 | 15 | share? |
| 13:52:51 | 16 | MR. STIMPSON: This is a big one. |
| 13:53:50 | 17 | MR. VAZQUEZ: Maybe there's two |
| 13:53:51 | 18 | copies. It's just two pages. |
| 13:53:55 | 19 | Q 103922, 103923. |
| 13:53:57 | 20 | A Okay. |
| 13:54:23 | 21 | MR. STIMPSON: No, I am going to read |
| 13:54:23 | 22 | those. |
| | 23 | THE WITNESS: Sure. |
| 13:54:33 | 24 | MR. STIMPSON: Okay. |
| | 25 | BY MR. VAZQUEZ: |

Page 135

| | | |
|---|---|---|
| 13:54:40 | 1 | Q Mr. Rothschild, this Exhibit 16 |
| 13:54:41 | 2 | contains an email string, correct? |
| 13:54:48 | 3 | A Yes, it does. |
| 13:54:51 | 4 | Q And the first email in the string is |
| 13:54:52 | 5 | from you to a bunch of individuals, which I |
| 13:54:52 | 6 | believe to be your board members, correct? |
| 13:54:56 | 7 | A Correct. |
| 13:54:57 | 8 | Q And the subject says "HealthGrades," |
| 13:55:03 | 9 | and the email is dated March 3rd, 2011, right? |
| 13:55:05 | 10 | A Um-hum. |
| 13:55:06 | 11 | Q And that you literally, I believe, the |
| 13:55:11 | 12 | date that the Complaint was filed? |
| 13:55:15 | 13 | A Something like that. |
| 13:55:18 | 14 | Q Okay. And so you wrote that you saw |
| 13:55:23 | 15 | this coming. And what do you mean by that, or |
| 13:55:32 | 16 | what did you mean by that when you wrote that? |
| 13:55:35 | 17 | A We knew HealthGrades had a patent. We |
| 13:55:36 | 18 | knew that they are litigious. And so its |
| 13:55:37 | 19 | potential was reasonably high that at some |
| 13:55:39 | 20 | point, we would scrape. |
| 13:55:41 | 21 | Q You would what? |
| | 22 | A Scrape. |
| 13:55:42 | 23 | Q Scrap with us? |
| 13:55:50 | 24 | A Scrap, scrape, whatever. |
| | 25 | Q Scrape is what they do on websites, |

Page 136

| | | |
|---|---|---|
| 13:55:56 | 1 | right? |
| 13:55:58 | 2 | A Scrap. |
| 13:55:59 | 3 | Q The second sentence says, "You may |
| 13:56:03 | 4 | recall we disclosed and we discussed it before |
| 13:56:07 | 5 | the last round." |
| 13:56:11 | 6 | What are you referring to there when |
| 13:56:13 | 7 | you wrote that? |
| 13:56:14 | 8 | A The Maldjian set of documents. |
| 13:56:16 | 9 | Q Oh, Maldjian, the law firm? |
| 13:56:21 | 10 | A (No response.) |
| 13:56:40 | 11 | Q You are saying you disclosed that |
| 13:56:42 | 12 | opinion to the board members? |
| 13:56:46 | 13 | A Yes. |
| 13:56:48 | 14 | Q You write here in this email, |
| 13:56:54 | 15 | Mr. Rothschild, that "It is very specific, has |
| 13:56:56 | 16 | a long development history, and we feel that |
| 13:56:58 | 17 | there was no patent violation by Vitals." |
| 13:56:59 | 18 | A There's one more sentence. |
| 13:56:59 | 19 | Q Yes, I just want to talk about this |
| 13:57:02 | 20 | sentence, though. |
| | 21 | A Okay. |
| 13:57:07 | 22 | Q And so you are referring specifically |
| | 23 | to the '060 patent when you say "it is very |
| 13:57:29 | 24 | |
| | 25 | specific"? |

Page 137

| | | |
|---|---|---|
| 13:57:37 | 1 | A Yes. |
| 13:57:40 | 2 | Q When you say -- you said earlier that |
| 13:57:41 | 3 | you disclosed the Maldjian opinion. Did you |
| 13:57:42 | 4 | also disclose the Sills Cummis opinion? |
| 13:57:45 | 5 | A No. |
| 13:57:46 | 6 | Q And why not? |
| 13:57:49 | 7 | A Because we had done a round of capital |
| 13:57:53 | 8 | raise, and that occurred before the -- the |
| 13:57:55 | 9 | Maldjian opinion was done of all of the stuff |
| 13:57:57 | 10 | around the time of raising of capital. |
| 13:57:58 | 11 | Q Are you saying that the Sills Cummis |
| 13:58:07 | 12 | opinion was not complete when that round |
| 13:58:11 | 13 | occurred? |
| 13:58:18 | 14 | A Correct. |
| 13:58:23 | 15 | Q One of the 30(b)(6) topics, |
| 13:58:39 | 16 | Mr. Rothschild, is the entities' licensures |
| 13:58:41 | 17 | that -- excuse me -- that MDX/Vitals licenses, |
| 13:58:55 | 18 | or sells or leases data to, right? |
| 13:58:57 | 19 | A Are you referring to No. 7 of the |
| 13:59:01 | 20 | categories? |
| | 21 | Q No. |
| 13:59:05 | 22 | A Which one are you referring to? |
| 13:59:17 | 23 | Q No. 11. |
| 13:59:19 | 24 | A Okay. |
| | 25 | Q No. 7, too, you were right. I beg |

| | Page 138 |
|---|---|
| 13:59:29 | 1 your pardon. |
| 13:59:32 | 2 A As were you. |
| 13:59:36 | 3 Q We were both right, yes. |
| 13:59:39 | 4 And I had a talk with Mr. Stimpson |
| 13:59:44 | 5 yesterday, and I told him that I would be asking |
| 13:59:47 | 6 you to list each and every entity to which MDX |
| 13:59:52 | 7 has licensed, leased or sold data beginning in |
| 13:59:54 | 8 2008 when you launched through today. |
| 13:59:58 | 9 Can you do that for us, please? |
| 14:00:00 | 10 A I can try. "Each and every" is a very |
| 14:00:02 | 11 high standard, so I am going to do based on what |
| 14:00:08 | 12 I know at present. |
| 14:00:10 | 13 Q I asked Mr. Cutler the question, and |
| 14:00:14 | 14 he came up with six. So I maybe assumed that |
| 14:00:19 | 15 there would have been three times that amount, |
| 14:00:21 | 16 but he may remember it that way, so let's just |
| 14:00:23 | 17 see what you can tell us. |
| 14:00:26 | 18 A This is highly confidential, cannot |
| 14:00:27 | 19 get back to HealthGrades. |
| | 20 Q Yes, we will designate this -- |
| 14:00:30 | 21 MR. STIMPSON: As much as this |
| 14:00:34 | 22 deposition transcript will be attorneys' |
| 14:00:36 | 23 eyes only until we designate it otherwise. |
| 14:00:37 | 24 MR. VAZQUEZ: Well, this is the first |
| | 25 time that I believe that we formally |

| | Page 139 |
|---|---|
| 14:00:39 | 1 instructed her to do so. So we should do |
| 14:00:41 | 2 that and -- |
| 14:00:42 | 3 THE WITNESS: Can you confirm to me |
| 14:00:44 | 4 that this will not get back to |
| 14:00:47 | 5 HealthGrades? |
| 14:00:48 | 6 MR. VAZQUEZ: Yes, sir. I take this |
| 14:00:52 | 7 seriously, and at least from this point |
| 14:00:53 | 8 forward, perhaps previous sections, that |
| 14:00:56 | 9 Mr. Stimpson will let us know. |
| 14:00:59 | 10 From this point forward, this is |
| 14:01:01 | 11 attorneys' eyes only, and each page of this |
| 14:01:03 | 12 transcript should so state on the bottom, |
| 14:01:07 | 13 and then when you produce the transcripts |
| 14:01:08 | 14 to the parties, this section should be a |
| 14:01:09 | 15 separate portion of the transcript from the |
| 14:01:16 | 16 others that are not. |
| 14:01:17 | 17 MR. STIMPSON: Actually, I think the |
| 14:01:18 | 18 agreement, which is going to go into the |
| | 19 protective order, if it hasn't already, is |
| 14:01:20 | 20 that it's all automatically attorneys' eyes |
| 14:01:24 | 21 only, and you have like 20 days, whatever, |
| 14:01:25 | 22 to specifically designate. So everything |
| 14:01:27 | 23 is attorneys' eyes only for this transcript |
| 14:01:28 | 24 and also the other -- |
| | 25 MR. VAZQUEZ: For depositions? |

| | Page 140 |
|---|---|
| 14:01:30 | 1 MR. STIMPSON: Yes. That's what our |
| 14:01:32 | 2 agreement says. |
| 14:01:34 | 3 MR. VAZQUEZ: I don't think that's |
| 14:01:35 | 4 correct, but you may be right. |
| 14:01:36 | 5 MR. STIMPSON: Then I need to ask it, |
| 14:01:39 | 6 did you tell anybody about what happened |
| 14:01:39 | 7 yesterday at the deposition? |
| 14:01:41 | 8 MR. VAZQUEZ: No. |
| 14:01:44 | 9 MR. STIMPSON: So if you could |
| 14:01:46 | 10 please -- maybe it was a misunderstanding, |
| 14:01:47 | 11 but those transcripts, all of our |
| 14:01:49 | 12 transcripts, are attorneys' eyes only, and |
| 14:01:50 | 13 I can tell you the protective order most |
| 14:01:52 | 14 certainly does say it. |
| 14:01:53 | 15 MR. VAZQUEZ: Can you have David or |
| 14:01:58 | 16 somebody pull that over because here's my |
| 14:02:00 | 17 understanding of how we agreed to do it. |
| | 18 It is no concern that it is |
| 14:02:01 | 19 Mr. Rothschild's, we are in the same |
| 14:02:03 | 20 position taking HealthGrades' deposition |
| 14:02:04 | 21 next week. |
| 14:02:06 | 22 MR. STIMPSON: Of course, yeah. |
| 14:02:09 | 23 MR. VAZQUEZ: If we are going to be |
| 14:02:10 | 24 asking questions about materials that have |
| | 25 been designated attorneys' eyes only, that |

| | Page 141 |
|---|---|
| 14:02:17 | 1 the transcript -- that the portions of the |
| 14:02:18 | 2 deposition that had those questions would |
| 14:02:23 | 3 be designated attorneys' eyes only. I |
| 14:02:25 | 4 don't recall that the depositions |
| 14:02:26 | 5 themselves are attorneys' eyes only. |
| 14:02:27 | 6 MR. STIMPSON: Let me bring it down. |
| 14:02:27 | 7 MR. VAZQUEZ: Do you want to take |
| 14:02:27 | 8 a break to confirm this? |
| 14:02:27 | 9 MR. STIMPSON: We would have to bring |
| 14:02:27 | 10 them down. |
| 14:02:27 | 11 MR. VAZQUEZ: You want to take a |
| 14:02:27 | 12 break? |
| 14:02:29 | 13 MR. STIMPSON: But anyway, the bottom |
| 14:02:32 | 14 line is -- |
| 14:02:32 | 15 MR. VAZQUEZ: Certainly from this |
| 14:02:34 | 16 point forward. |
| | 17 MR. STIMPSON: Yeah. And certainly |
| 14:02:36 | 18 from the days from when you started |
| 14:02:40 | 19 Tuesday, all of our transcripts -- |
| 14:02:42 | 20 MR. VAZQUEZ: I will agree to that if |
| 14:02:48 | 21 you can show me it says that. I am just |
| 14:02:49 | 22 saying we never noted on the record that |
| 14:02:50 | 23 that's the case. We can certainly do it. |
| 14:02:50 | 24 MR. STIMPSON: But anyway, nothing has |
| | 25 been disclosed anyway. |

Page 142

| | | |
|---|---|---|
| 14:02:52 | 1 | MR. VAZQUEZ:  I agree, but -- |
| 14:02:52 | 2 | MR. STIMPSON:  So I'm telling you no |
| 14:02:59 | 3 | matter what it says. |
| 14:03:21 | 4 | Is this the same court reporting |
| 14:03:22 | 5 | company? |
| 14:03:26 | 6 | THE REPORTER:  Yes. |
| 14:03:28 | 7 | MR. VAZQUEZ:  Merrill Lynch. |
| 14:03:30 | 8 | BY MR. VAZQUEZ: |
| 14:03:34 | 9 | Q   Mr. Rothschild, I -- I want you to |
| 14:03:38 | 10 | tell me, as best you can, the name of each and |
| 14:03:41 | 11 | every entity that MDX licensed, sold or leased |
| 14:03:45 | 12 | data to since the inception of the website or |
| 14:03:47 | 13 | launch of the website in January of 2008? |
| 14:03:51 | 14 | And this -- all of this is attorneys' |
| 14:03:55 | 15 | eyes only moving forward and will remain that |
| | 16 | way unless we inform the court reporter to |
| 14:03:57 | 17 | undesignate it, okay? |

REDACTED

Page 143

REDACTED

Page 144

REDACTED

| | | |
|---|---|---|
| 14:06:04 | 1 | |
| 14:06:08 | 2 | |
| 14:06:16 | 3 | |
| 14:06:29 | 4 | |
| 14:06:34 | 5 | |
| 14:06:35 | 6 | |
| 14:06:36 | 7 | |
| 14:06:39 | 8 | Q   Is that it? |
| 14:06:44 | 9 | A   That is my list. |
| 14:06:53 | 10 | Q   Thank you. |
| 14:06:56 | 11 | Which of those entities has patient |
| 14:07:01 | 12 | ratings? |
| 14:07:02 | 13 | A   I don't know within the dailies |
| | 14 | specifically which are doing patient ratings. |
| 14:07:05 | 15 | Q   Would the agreements that MDX has with |
| 14:07:14 | 16 | those entities indicate whether they are |
| 14:07:17 | 17 | licensing patient ratings? |
| 14:07:23 | 18 | A   Probably. |
| 14:07:25 | 19 | Q   Is there somebody other than you that |
| 14:07:27 | 20 | would be better suited to answer that question? |
| 14:07:29 | 21 | A   I'm capable of answering it.  I don't |
| 14:07:29 | 22 | think anybody knows it offhand. |
| 14:07:30 | 23 | Q   Off the top of their head? |
| 14:07:33 | 24 | A   Yes. |
| | 25 | Q   So they would have to -- have to look |

Page 145

| | | |
|---|---|---|
| 14:07:43 | 1 | to the agreements, which we can do, assuming we |
| 14:07:46 | 2 | have all of those? |
| 14:07:51 | 3 | A   If our counsel permits. |
| 14:07:57 | 4 | Q   I want to just jump back real quick to |
| 14:08:00 | 5 | something specific to us about you testified |
| 14:08:02 | 6 | about a disclosure of the Maldjian opinion to |
| 14:08:03 | 7 | the board members around the same time that you |
| 14:08:06 | 8 | were doing an investment round? |
| 14:08:10 | 9 | A   Yes. |
| 14:08:11 | 10 | Q   And I had asked you why you didn't |
| 14:08:13 | 11 | give the boards members the Sills Cummis |
| 14:08:20 | 12 | opinion, and I believe you said because it |
| | 13 | wasn't ready at that time, right? |
| 14:09:00 | 14 | A   Right. |
| 14:09:07 | 15 | Q   Bear with me one second. |
| 14:09:14 | 16 | Okay.  I am good.  I resolved that |
| 14:09:20 | 17 | question.  I was just asking. |
| 14:09:23 | 18 | A   Good. |
| 14:09:30 | 19 | Q   Mr. Rothschild, do you know what in |
| 14:09:33 | 20 | gross revenues from these license agreements are |
| 14:09:39 | 21 | on a year-to-year basis? |
| 14:09:42 | 22 | A   I would have to total it up.  Some are |
| 14:09:52 | 23 | no longer active.  Probably in total, they are |
| 14:09:52 | 24 | under $1 million a year. |
| | 25 | Q   For '08, '09; '10, '11, and '12 to |

---

**Page 146**

| | | |
|---|---|---|
| 14:09:54 | 1 | date? |
| 14:10:02 | 2 | A   Yes. |

REDACTED

| | | |
|---|---|---|
| 14:10:14 | 6 | Q   Okay.  When I asked you about the |
| 14:10:18 | 7 | patient, whether -- which of those agreements |
| 14:10:22 | 8 | with the entities you listed include patient |
| 14:10:29 | 9 | ratings, in other words, licensing, selling or |
| 14:10:34 | 10 | leasing patient ratings, you said something that |
| 14:10:37 | 11 | I believe that patient ratings are not within |
| | 12 | the data lease specifically; is that correct? |
| 14:10:41 | 13 | A   The way data leases work is people |
| 14:10:52 | 14 | choose certain elements to lease, and we charge |
| 14:10:55 | 15 | them based on the elements they choose to lease. |
| 14:10:56 | 16 | Q   So if they say we want to lease |
| 14:10:56 | 17 | patient ratings, that would be specifically set |
| 14:10:59 | 18 | forth? |
| 14:11:00 | 19 | A   Yes. |
| 14:11:04 | 20 | Q   And is it possible that they may |
| 14:11:06 | 21 | choose to say either the master base -- master |
| 14:11:07 | 22 | database in its entirety? |
| 14:11:08 | 23 | A   Never happens. |
| 14:11:09 | 24 | MR. STIMPSON:  Excuse me.  Do you |
| | 25 | want -- |

---

**Page 147**

| | | |
|---|---|---|
| 14:11:12 | 1 | MR. VAZQUEZ:  Okay.  Let's -- |
| 14:11:12 | 2 | MR. STIMPSON:  I could just tell you. |
| 14:11:14 | 3 | MR. VAZQUEZ:  Hold on. |
| 14:11:15 | 4 | MR. STIMPSON:  I'm sorry, I don't mean |
| 14:11:18 | 5 | to interrupt you. |
| 14:11:20 | 6 | MR. VAZQUEZ:  That's fine.  I know, |
| 14:11:21 | 7 | but you did, so let's just stop. |
| 14:11:26 | 8 | Let's go off the record. |
| 14:17:20 | 9 | THE VIDEOGRAPHER:  Going off the |
| 14:17:21 | 10 | record, the time is 2:13 p.m. |
| | 11 | (Discussion Off The Record) |
| 14:17:23 | 12 | THE VIDEOGRAPHER:  We are back on the |
| 14:17:28 | 13 | record.  The time is 2:19 p.m. |
| 14:17:32 | 14 | BY MR. VAZQUEZ: |

REDACTED

| | | |
|---|---|---|
| 14:17:58 | 22 | A   Correct. |
| 14:18:02 | 23 | Q   And I had asked previous to that, |
| 14:18:05 | 24 | trying to understand which of those entities |
| | 25 | actually licensed patient ratings, and you |

---

**Page 148**

| | | |
|---|---|---|
| 14:18:10 | 1 | recall that I think you said you are not sure? |
| 14:18:18 | 2 | A   Correct. |
| 14:18:21 | 3 | Q   But we may be able to determine that |
| 14:18:23 | 4 | by looking at the agreements. |
| 14:18:26 | 5 | I am afraid that I would like to ask |
| 14:18:29 | 6 | you to actually go through those agreements that |
| 14:18:35 | 7 | you just flipped through and see if you could |
| 14:18:36 | 8 | determine by reviewing those whether any of |
| 14:18:38 | 9 | those entities lease license patient ratings? |
| | 10 | A   (No response). |
| 14:18:41 | 11 | Q   Or maybe we can take a break and go |
| 14:18:50 | 12 | through the documents produced yesterday, maybe |
| 14:18:52 | 13 | make it easier. |
| 14:18:55 | 14 | Let's do it that way so you don't have |
| 14:18:56 | 15 | to do it -- we will look at the documents we |
| 14:18:59 | 16 | produced.  Give me five minutes. |
| 14:19:00 | 17 | MR. STIMPSON:  Do you want to do it at |
| 14:19:00 | 18 | the 3 o'clock break? |
| 14:19:03 | 19 | MR. VAZQUEZ:  Oh, that's right. |
| 14:19:06 | 20 | That's right. |
| 14:19:10 | 21 | Okay.  So we have 40 minutes.  Let's |
| 14:19:12 | 22 | do it at the 3 o'clock break.  Good. |
| 14:19:13 | 23 | Frankly, I have to go to the little boys' |
| 14:19:14 | 24 | room.  Can we just take a three minute |
| | 25 | break. |

---

**Page 149**

| | | |
|---|---|---|
| 14:19:18 | 1 | MR. STIMPSON:  I am sure. |
| 14:27:03 | 2 | THE VIDEOGRAPHER:  Going off the |
| 14:27:04 | 3 | record, the time is 2:21 p.m. |
| 14:27:08 | 4 | (Recess taken) |
| 14:27:09 | 5 | THE VIDEOGRAPHER:  We are back on the |
| 14:27:12 | 6 | record.  The time is 2:29 p.m. |
| 14:27:16 | 7 | MR. VAZQUEZ:  Before we continue with |
| 14:27:18 | 8 | our questions, we took a break off the |
| | 9 | record, and we came to an understanding as |
| 14:27:21 | 10 | to the treatment of deposition transcripts, |
| 14:27:27 | 11 | specifically deposition transcripts, |
| 14:27:30 | 12 | whether they are designated as attorneys' |
| 14:27:34 | 13 | eyes only, or more specifically in the case |
| 14:27:38 | 14 | where they are not so designated, we agree |
| 14:27:42 | 15 | that they will remain the entire transcript |
| 14:27:44 | 16 | attorneys' eyes only for 14 days after the |
| 14:27:45 | 17 | transcript is received. |
| 14:27:46 | 18 | MR. STIMPSON:  Received, yes. |
| 14:27:48 | 19 | MR. VAZQUEZ:  And received by the |
| 14:27:50 | 20 | latest -- |
| 14:27:54 | 21 | MR. STIMPSON:  By the producing party. |
| 14:27:56 | 22 | So in other words, when I get it, I have, |
| 14:27:57 | 23 | then, 14 days for Mitch to -- |
| 14:27:58 | 24 | MR. VAZQUEZ:  By the party that |
| | 25 | produced the witness, you mean. |

Page 150

| 14:28:02 | 1 | MR. STIMPSON: Right. |

14:28:02  1        MR. STIMPSON: Right.
14:28:05  2        MR. VAZQUEZ: Sure. Fourteen days
14:28:05  3    after receipt of the transcript by the
14:28:08  4    party who produced the witness who gave
14:28:10  5    testimony.
14:28:12  6        We also discussed the fact that there
14:28:15  7    have been other depositions taken in the
          8    case, including yesterday, the day before,
14:28:18  9    of Mr. Cutler, and Miss Boyer respectively,
14:28:23 10    and then other depositions earlier than
14:28:29 11    that, and we have agreed that those
14:28:30 12    transcripts will remain attorneys' eyes
14:28:33 13    only from 14 days -- well, 14 days --
14:28:36 14        MR. STIMPSON: If you get us the
14:28:39 15    designations, you know. I haven't even
14:28:40 16    looked at those in forever, so just let us
14:28:43 17    know, that's all, in 14 days from now.
14:28:49 18        MR. VAZQUEZ: Okay. Fourteen days
14:28:54 19    from now, we will, you know, alert each
14:28:54 20    other, the producing -- the attorney who
14:28:55 21    produced the -- the attorney who produced
14:28:57 22    the witness who testified, when they
14:28:59 23    receive the transcript, should remain
14:29:01 24    entirely attorneys' eyes only or a portion
         25    should remain attorneys' eyes only.

Page 151

14:29:08  1        MR. STIMPSON: That's fine, except I
14:29:09  2    don't get 14 days from now, I get 14 days
14:29:09  3    from when I get the transcript.
14:29:13  4        MR. VAZQUEZ: All right. In the case
14:29:13  5    of Mr. Rothschild, Miss Boyer and
14:29:14  6    Mr. Cutler.
          7        MR. STIMPSON: Yes.
14:29:16  8        MR. VAZQUEZ: Okay. I think that
14:29:28  9    actually captures everything. So let's
14:29:31 10    continue now. We are going to -- our --
14:29:32 11    our inquiry regarding opinion are
14:29:33 12    attorneys' eyes only?
14:29:33 13        MR. STIMPSON: Everything is
14:29:38 14    attorneys' eyes only until I de-designate
14:29:39 15    in the future.
14:29:41 16        MR. VAZQUEZ: Except now we have the
14:29:41 17    opportunity to actually follow the
14:29:42 18    protective order.
14:29:42 19        MR. STIMPSON: You know, I am not
14:29:44 20    following the protective order which says
14:29:46 21    that I have the opportunity to de-designate
14:29:49 22    the transcript, because for one reason, I
14:29:49 23    may need to stop and consult with my client
14:29:50 24    on what's confidential. That's why the 14
         25    days.

Page 152

14:29:54  1        MR. VAZQUEZ: Right.
14:29:56  2        MR. STIMPSON: I mean, the whole thing
14:29:57  3    about designating in a deposition is
14:30:01  4    garbage. Nobody ever does that anyway.
14:30:03  5        MR. VAZQUEZ: Well, then, since that
          6    protective order has not been entered,
14:30:04  7    maybe we can edit it and remove that.
14:30:08  8        MR. STIMPSON: Yeah, I always told
14:30:10  9    myself I should edit that.
14:30:11 10        MR. VAZQUEZ: I have just recently
14:30:11 11    seen it with Mr. Murray, and we have been
14:30:14 12    editing it.
14:30:17 13        MR. STIMPSON: Okay.
14:30:18 14        MR. VAZQUEZ: So we get it clean so we
14:30:19 15    both like it before we get it to the Judge.
14:30:20 16        All right. So we are continuing,
14:30:22 17    then, under AEO.
14:30:31 18    BY MR. VAZQUEZ:
14:30:33 19    Q   I am giving you what has been marked
14:30:33 20    as Deposition Exhibit 12, Mr. Rothschild.
14:30:33 21        MR. STIMPSON: Thanks. Just the two.
14:30:36 22        (January 2011 email string marked
14:30:37 23    Rothschild Exhibit 12 for identification,
14:31:01 24    as of this date.)
         25        MR. VAZQUEZ: I will take that.

Page 153

14:31:10  1    BY MR. VAZQUEZ:
14:31:14  2    Q   All right. This is an email string,
14:31:20  3    and you will see here that the first email on
14:31:22  4    the string is from you to Mr. Braginsky dated
          5    January 3rd, 2011. That is correct, right?
14:31:24  6    A   I guess. I am looking at it.
14:31:27  7    Q   Do you not recall writing this?
14:31:30  8    A   I do not.
14:31:33  9    Q   Okay. Do you have any reason to doubt
14:31:45 10    that this is authentic and that you wrote it?
14:31:48 11    A   I would assume it is authentic.
14:31:50 12    Q   Okay. Then do you recall,
14:31:53 13    Mr. Rothschild, I was asking you if maybe you
14:31:53 14    had Mr. Braginsky review your January 5, 2011
14:31:55 15    policies email before you sent it?
14:31:58 16    A   Correct.
14:32:01 17    Q   And you thought maybe you discussed it
14:32:03 18    in a conversation, or I am not sure you had sent
14:32:07 19    him a draft, and so this appears to confirm at
14:32:08 20    least that there was a conversation with
14:32:12 21    Mr. Braginsky about it?
14:32:15 22    A   It does.
14:32:15 23    Q   And then it also appears to confirm,
14:32:20 24    given that you wrote "Please review the attached
14:32:23 25    list of protocols for the Vitals.com website, to

Case No. 1:10-cv-00520-RM-BNW Document 295-1 filed 10/12/14 USDC Colorado pg 43
Case 1:11-cv-00520-RM-BNB Document 944 Filed 10/14/14 USDC Colorado Page 42 of 62
of 62

Page 154

| | | |
|---|---|---|
| 14:32:29 | 1 | ensure that this document, when it is |
| 14:32:30 | 2 | distributed to the staff, is in conformance with |
| 14:32:31 | 3 | our conversations," period, closed quote. |
| | 4 | Did I read that accurately? |
| 14:32:33 | 5 | A Yes. |
| 14:32:41 | 6 | Q Do you think that the attachment to |
| 14:32:43 | 7 | this was a draft of your January 5, 2011 email? |
| 14:32:49 | 8 | A I don't even recall this email, so I'm |
| 14:32:49 | 9 | not sure I can comment on whether it was an |
| 14:32:50 | 10 | extract or the whole one. I don't know. |
| 14:32:53 | 11 | Q And -- |
| 14:32:56 | 12 | THE WITNESS: By the way, is this |
| 14:32:57 | 13 | not -- why is this a document that is not |
| 14:32:59 | 14 | attorney-client privileged? |
| 14:33:00 | 15 | MR. STIMPSON: Because it relates to |
| 14:33:00 | 16 | other counsel. It's all the same subject |
| 14:33:01 | 17 | matter. |
| 14:33:02 | 18 | THE WITNESS: Oh, okay. |
| 14:33:06 | 19 | BY MR. VAZQUEZ: |
| 14:33:07 | 20 | Q It was privileged, but the privilege |
| 14:33:08 | 21 | is waived after the subject matter of the |
| 14:33:14 | 22 | opinion. |
| 14:33:17 | 23 | A Got it. Okay. |
| 14:33:18 | 24 | Q And so you invited Mr. Braginsky to |
| | 25 | edit, as you see, correct? |

Page 155

| | | |
|---|---|---|
| 14:33:23 | 1 | A Yes. |
| 14:33:35 | 2 | Q Do you recall if he edited it? |
| | 3 | A I do not recall if he did or not. |
| 14:33:38 | 4 | Q Okay. Mr. Braginsky then wrote you |
| 14:33:41 | 5 | back, right? |
| 14:33:44 | 6 | Or did he write Mr.-- |
| 14:33:47 | 7 | A Again, I don't really recall the |
| 14:33:48 | 8 | mechanics of the communications, so I don't know |
| 14:33:51 | 9 | if he wrote me back, or called me back or |
| 14:33:53 | 10 | whatever happened. |
| 14:33:58 | 11 | Q Okay. And I had asked you earlier, |
| 14:34:01 | 12 | you said that there may have been another |
| 14:34:04 | 13 | attorney at Sills Cummis & Gross, and I asked |
| 14:34:05 | 14 | you whether it was Timothy Heaton. I don't |
| 14:34:07 | 15 | remember if you said yes, that's him, or if you |
| 14:34:12 | 16 | do not recall. |
| 14:34:21 | 17 | A The name sounds vaguely familiar. |
| 14:34:22 | 18 | Q Okay. And so do you know what is the |
| 14:34:23 | 19 | information that indicates here was redacted? |
| 14:34:25 | 20 | A I don't. |
| 14:34:28 | 21 | Q Do you know? |
| 14:34:29 | 22 | A I don't. I don't exactly understand |
| 14:34:29 | 23 | what "redacted" means in this context. |
| 14:34:38 | 24 | Q Okay. |
| | 25 | MR. VAZQUEZ: Scott, do you know what |

Page 156

| | | |
|---|---|---|
| 14:34:39 | 1 | this information was or why it's redacted? |
| | 2 | MR. STIMPSON: No. |
| 14:34:40 | 3 | MR. VAZQUEZ: Can I ask you to please |
| 14:34:42 | 4 | give us the unredacted version of this, if |
| 14:34:43 | 5 | it hasn't been produced? |
| 14:34:43 | 6 | MR. STIMPSON: Well, you are going to |
| 14:34:44 | 7 | have to ask David. I don't know. |
| 14:34:45 | 8 | MR. VAZQUEZ: I am asking you right |
| 14:34:47 | 9 | now on the record. |
| 14:34:47 | 10 | MR. STIMPSON: Yeah, I know. And I am |
| 14:34:47 | 11 | telling you to ask David. |
| 14:34:48 | 12 | MR. VAZQUEZ: Well, I'm asking you on |
| 14:34:51 | 13 | the record, and -- |
| 14:34:53 | 14 | MR. STIMPSON: Well, I am telling you |
| 14:34:54 | 15 | I am not doing it. You can ask David. |
| 14:34:54 | 16 | MR. VAZQUEZ: Well, I am not doing |
| 14:34:54 | 17 | what you tell me to do. |
| 14:34:55 | 18 | MR. STIMPSON: Well, then, you won't |
| 14:34:58 | 19 | get it. |
| 14:35:00 | 20 | MR. VAZQUEZ: I am asking you to |
| 14:35:00 | 21 | simply produce the unredacted version of |
| 14:35:03 | 22 | this document. |
| 14:35:06 | 23 | MR. STIMPSON: I am making it |
| 14:35:09 | 24 | perfectly clear that you are not going to |
| | 25 | get it unless you email my associate, |

Page 157

| | | |
|---|---|---|
| | 1 | because I'm not -- I have other stuff to do |
| 14:35:12 | 2 | and ask David to do it. |
| 14:35:14 | 3 | MR. VAZQUEZ: Let the record reflect |
| 14:35:15 | 4 | that I asked you. |
| 14:35:18 | 5 | BY MR. VAZQUEZ: |
| 14:35:24 | 6 | Q And when you wrote here, |
| 14:35:26 | 7 | Mr. Rothschild, to Mr. Braginsky on January 3rd |
| 14:35:30 | 8 | 2011, "Any feedback on this," feedback on what? |
| 14:35:30 | 9 | A I gather on the prior email. |
| 14:35:33 | 10 | Q And you mean the protocols that were |
| 14:35:39 | 11 | attached? |
| 14:35:40 | 12 | A Again, as I do not recall the email, I |
| 14:35:42 | 13 | am not going to speculate based on looking at |
| 14:35:45 | 14 | the document at this moment. |
| 14:35:47 | 15 | Q So in the same vein, then, if I ask |
| 14:35:49 | 16 | you whether you are using these protocols, you |
| 14:35:50 | 17 | wouldn't know? |
| 14:35:53 | 18 | A If we are using the protocols today? |
| 14:35:53 | 19 | Q Yes. |
| 14:36:01 | 20 | A I am quite sure we follow them. |
| 14:36:02 | 21 | Q Whatever they were? |
| 14:36:05 | 22 | A No. I am assuming these four policies |
| 14:36:07 | 23 | are what I meant by protocols. |
| 14:36:09 | 24 | Q Oh, okay. All right. |
| | 25 | A But I am not certain because I don't |

Page 158

14:36:12　1　recall the email, but that would be my
14:36:42　2　assumption of how I would have thought about it.
14:36:44　3　　Q　Okay.
14:36:44　4　　All right.  Mr. Rothschild, I hand you
14:36:44　5　Exhibit 11.
14:36:49　6　　(12/30/10 handwritten notes marked
14:36:51　7　Rothschild Exhibit 11 for identification,
14:37:08　8　as of this date.)
14:37:10　9　　MR. STIMPSON:  Can I have -- thank
14:37:16　10　you.
14:37:17　11　　MR. VAZQUEZ:  I will put a request of
14:37:18　12　you on the record for redacted versions of
14:37:20　13　the last two pages from counsel for MDX.
14:37:22　14　　And then --
14:37:25　15　　MR. STIMPSON:  The last two pages?
14:37:27　16　　MR. VAZQUEZ:  The first two pages are
14:37:29　17　blank, they are unredacted.
14:37:30　18　　MR. STIMPSON:  They are unrelated to
14:37:32　19　this, so you are not going to get those.
14:37:32　20　　MR. VAZQUEZ:  I don't know what you
14:37:36　21　just said.
14:37:37　22　　MR. STIMPSON:  I said they are
14:37:39　23　unrelated to this.  They are notes that are
24　unrelated.
25　　MR. VAZQUEZ:  So you know what these

Page 159

14:37:45　1　documents are about?
14:37:47　2　　MR. STIMPSON:  I do.  They are
14:37:50　3　unrelated to the lawsuit, and I don't
14:37:51　4　think -- I mean I don't remember what was
14:37:52　5　on each page, but this, I did see.
14:37:54　6　　MR. VAZQUEZ:  So --
14:37:55　7　　MR. STIMPSON:  They are unrelated.
14:37:55　8　　MR. VAZQUEZ:  It's already on the
14:38:04　9　privilege log?
14:38:06　10　　MR. STIMPSON:  I don't know.
14:38:11　11　BY MR. VAZQUEZ:
14:38:14　12　　Q　What about, Mr. Rothschild, beginning
14:38:15　13　with MDX 104114, there are some handwritten
14:38:17　14　notes.  Is this your handwriting?
14:38:20　15　　A　No.
14:38:24　16　　Q　Do you know whose notes these are?
14:38:25　17　　A　I have never seen them before.
14:38:26　18　　Q　Not even in the day and a half of
14:38:31　19　prep?
14:38:41　20　　A　No.
14:38:44　21　　MR. VAZQUEZ:  Okay.  Then MDX 104116
14:38:45　22　all the way through 104121, these are all
23　redacted, these documents are unrelated as
14:38:45　24　well?
25　　MR. STIMPSON:  Correct.

Page 160

14:38:53　1　　MR. VAZQUEZ:  And As with the other
14:38:54　2　two pages, you don't know if they have been
14:39:03　3　logged in the privileged log?
14:39:05　4　　MR. STIMPSON:  I don't know if they
14:39:06　5　have been logged.
14:39:08　6　　MR. VAZQUEZ:  Do you know whose notes
14:39:09　7　these are?
14:39:10　8　　MR. STIMPSON:  I am not being deposed
14:39:13　9　here.
14:39:44　10　　MR. VAZQUEZ:  All right.  Well, we
14:39:45　11　have some notes here to go over in
14:39:47　12　painstaking detail.
14:39:50　13　　MR. STIMPSON:  You know what, I will
14:39:51　14　tell you if it's not in the log, and I
14:39:53　15　don't know if it is or isn't -- if it's not
14:39:56　16　in the log, I will take your word for it,
14:39:58　17　and I will note as a side, we don't have
14:39:59　18　any privilege log from you, yet, but I
14:40:00　19　believe these are --
14:40:01　20　　MR. VAZQUEZ:  You don't have an
14:40:03　21　opinion on it, Scott.
22　　MR. STIMPSON:  You know what --
14:40:04　23　　MR. VAZQUEZ:  You don't have an
14:40:07　24　opinion.
25　　MR. STIMPSON:  So what.  You have

Page 161

14:40:11　1　privileged documents you haven't produced,
14:40:12　2　and you haven't given us a log.
14:40:13　3　　MR. VAZQUEZ:  You know that I will be
14:40:15　4　getting to you a log.
14:40:17　5　　MR. STIMPSON:  I know.  You have been
14:40:19　6　telling me that for the last six months.
14:40:23　7　　Anyway, you know what, do what you
14:40:23　8　want with this document.  It will be on the
14:40:25　9　log.  I am not sure what the notes are.
14:40:27　10　　MS. STOLL-DeBELL:  Are they
14:40:28　11　Braginsky's?
14:40:31　12　　MR. STIMPSON:  I don't know.  I can't
14:40:32　13　be certain, and in any event, I am not
14:40:33　14　being deposed here, so you guys do what you
14:40:36　15　want to do.
14:40:38　16　　This wouldn't be on the log anyway.
14:40:39　17　You are asking about these notes.  This
14:40:40　18　wouldn't be on the log, they are produced
14:40:49　19　to you.
14:40:49　20　　MR. VAZQUEZ:  We can assume that these
21　notes that are not redacted are related
14:40:50　22　to -- at least written by the same
14:40:53　23　Mr. Rothschild as the redacted notes.  We
14:40:55　24　are just trying to figure out who the
25　author of these notes are.

Case No. 1:1 cv-00520-RM-BNB NYW   Document 295-4 filed 10/14/14   USDC Colorado   pg 45
Case 1:11-cv-00520-RM-BNB   Document 944   Filed 10/14/14   USDC Colorado   Page 44 of 62
of 62

Page 162

```
14:41:00   1        MR. STIMPSON:  Okay.  But you know, I
14:41:02   2   don't think that these need to be on a log,
14:41:04   3   these other pages, because they are not
14:41:04   4   related.  You would only put on the log
14:41:06   5   what you --
14:41:08   6        MR. VAZQUEZ:  Right.  And since -- and
14:41:10   7   so what I was hoping to look at the Bates
14:41:13   8   number of the unredacted -- of the redacted
14:41:16   9   page, look on here, and say, well, okay,
14:41:20  10   the author of the redacted page was Joe
14:41:22  11   Smith, so maybe we can assume that Joe
14:41:23  12   Smith is the author of the unredacted
14:41:23  13   version.  That's what I'm trying to do.
14:41:23  14        MR. STIMPSON:  Listen to me.  I don't
14:41:23  15   think --
14:41:26  16        MR. VAZQUEZ:  Okay, thanks.
14:41:28  17        MR. STIMPSON:  I don't think they need
14:41:28  18   be on there because they are unrelated.  We
14:41:29  19   only put on our privilege log what you
14:41:30  20   would produce other than apart from
14:41:30  21   privilege.
14:41:36  22        MR. VAZQUEZ:  It was produced like
14:41:36  23   this.  This is a document --
14:41:38  24        MR. STIMPSON:  It doesn't make them
          25   relevant.
```

Page 163

```
14:41:42   1        Come on, let's move along.  You guys
14:41:56   2   are taking a long time.
14:41:58   3        MR. VAZQUEZ:  You are funny, Scott.
14:42:02   4   BY MR. VAZQUEZ:
14:42:03   5        Q   Mr. Rothschild, do you see at the top
14:42:05   6   of these notes, they're dated December 30, 2010,
14:42:08   7   correct?
14:42:10   8        A   I am looking at the notes the same way
14:42:11   9   you are.  As I said, this is the first time I
14:42:13  10   have seen them, so I really can't vouch for
14:42:15  11   anything in these notes.
14:42:20  12        Q   And I am just asking you for the
14:42:22  13   record whether these notes say "Meeting:
14:42:24  14   12/30/10"?
14:42:25  15        MR. STIMPSON:  Objection to the form.
14:42:27  16   It is a document he has never seen before.
14:42:28  17        Q   You are seeing it now.  Just it
14:42:33  18   confirm for me.
          19        A   That is what is written there, yes.
14:42:37  20        Q   Then it says " - M. Rothschild,
14:42:40  21   P. Braginsky," and then "T. Heaton"?
14:42:41  22        MR. STIMPSON:  Objection to the form.
14:42:43  23   That wasn't a question.
14:42:49  24        Q   Is that what that says?
          25        A   It appears to say it, yes.
```

Page 164

```
14:42:55   1        Q   Okay.  Just does it at all help you
14:42:59   2   remember whether you were at a meeting on
14:43:01   3   12/30/2010 with Mr. Braginsky and Mr. Heaton?
14:43:04   4        A   As I have testified previously, I said
14:43:24   5   I was in a meeting with them in late December.
14:43:27   6   This apparently would be the date.
14:43:28   7        Q   Okay.  Do you see in the left-hand
14:43:28   8   column, there appears to be the words "Option 1"
14:43:31   9   is circled?
14:43:37  10        A   Yes.
14:43:43  11        Q   And there's an arrow that appears that
14:43:45  12   it says, "Need remove the tool for physicians to
14:43:47  13   verify/receive info from someone else besides
14:43:48  14   from the doctor."
14:43:50  15        Is that -- do you see what I just
14:43:52  16   read?
14:43:54  17        MR. STIMPSON:  Excuse me.  I will take
          18   a continuing objection, if I could, please.
14:43:54  19        MR. VAZQUEZ:  Please, sure.  Yes.
14:43:57  20        MR. STIMPSON:  Continuing objection is
14:43:58  21   that you are asking this witness to
14:44:00  22   interpret this document, which is
14:44:03  23   handwriting from somebody else which he
14:44:05  24   says he has never seen before, and you can
          25   read it as well as he can.  It is entirely
```

Page 165

```
14:44:10   1   inappropriate to ask a witness about a
14:44:12   2   document he has never seen before.
14:44:13   3        And that's my objection, and thank
14:44:16   4   you, I will take a continuing objection.
14:44:18   5        Q   Okay.
14:44:19   6        A   It's a little bit faded, but I think
14:44:22   7   that's a good an interpretation as any.
14:44:24   8        Q   Okay.  And to the extent that this
14:44:26   9   appears to purport to be notes of a meeting that
14:44:29  10   you were at, does that at all help you remember
14:44:30  11   whether this Option 1 or something called Option
14:44:38  12   1 was discussed?
14:44:40  13        MR. STIMPSON:  Excuse me.  I also need
14:44:42  14   to interpose another objection that it
14:44:44  15   effectively calls for expert testimony
14:44:48  16   because you are asking this witness to
          17   interpret and give opinions on something
14:44:49  18   that -- on a handwritten document that he
14:44:52  19   has never seen before.
14:44:54  20        Can I have a continuing objection to
14:44:56  21   that as well, please?
14:44:57  22        MR. STIMPSON:  Yes, of course.
14:45:01  23   BY MR. VAZQUEZ:
14:45:03  24        Q   My question was, and I am trying to
          25   get information, this is discovery, about a
```

Page 166

```
14:45:07   1   meeting that you apparently attended on December
14:45:07   2   30 in which something called Option 1 was
14:45:10   3   discussed.
14:45:12   4      A   Yes.
14:45:13   5      Q   Do you recall an Option 1 being
14:45:15   6   discussed in a meeting that you said you believe
14:45:19   7   you attended?
14:45:21   8      A   It Sounds somewhat familiar, I will
14:45:24   9   say now, and subsequently, I don't remember all
14:45:28  10   of the specifics of the meeting, because it was
14:45:31  11   a year and a half ago, but we discussed a
14:45:33  12   variety of different options.
14:45:35  13      Q   Okay.
14:45:43  14      A   So it appears that we discussed this.
14:45:49  15      Q   All right.  Did you discuss Option 2?
          16   At least these notes say -- it says, "So when
14:45:50  17   there's disciplinary action, don't show patient
14:45:55  18   ratings"?
14:45:57  19      A   So let me just go generally and state,
14:46:02  20   I don't know who wrote these.  I don't know
14:46:03  21   whether they are opinions or whether these items
14:46:07  22   were discussed, and I really have no context to
14:46:09  23   specify.
14:46:13  24         And finally, the narrow specifics of
          25   the meeting, what were discussed a year and a
```

Page 167

```
14:46:23   1   half ago, do allude me, and that's why -- I am
14:46:24   2   glad we have documentation that shows what
14:46:25   3   evolved from it, but I can't say whether these
14:46:26   4   options were discussed or whether they were just
14:46:27   5   written down by whoever the author was.
14:46:30   6         MR. STIMPSON:  The record should
14:46:31   7   reflect that the witness pointed to what is
14:46:34   8   Exhibit 4 concerning further documentation.
14:46:35   9      Q   And, Mr. Rothschild, would it be
14:46:36  10   helpful to you to answer these questions if you
14:46:37  11   knew who wrote these?
14:46:39  12      A   No.
14:46:39  13      Q   Not at all?
14:46:39  14      A   I assume it's either Braginsky or
          15   Heaton.
14:46:40  16      Q   Heaton.
14:46:42  17      A   Whatever.
14:46:46  18      Q   You know -- you know it's not you,
14:46:46  19   right?
14:46:48  20      A   I would never put myself first on a
14:46:49  21   list.
14:46:50  22      Q   Plus you don't recognize this as your
14:46:53  23   handwriting, right?
14:46:55  24      A   Yes.
          25      Q   Okay.  Option 3 on the next page,
```

Page 168

```
14:46:58   1   Mr. Rothschild --
14:47:02   2      A   Yes.
14:47:05   3      Q   -- is probably the easiest to read.
14:47:07   4   It says, "Reports do not include comparison,"
14:47:09   5   comparison" with two underlines.
14:47:11   6         Do you recall at the meeting an Option
14:47:14   7   3 being discussed?
14:47:17   8      A   I recall -- again, I don't know that I
14:47:42   9   categorize it as Option 3, but I recall that
14:47:42  10   conversation.  And as you can see from the
14:47:44  11   documentation subsequently, we took that off.
14:47:47  12      Q   Right.
14:47:51  13         MR. VAZQUEZ:  Okay.  Scott, do you
          14   expect us to have Bates numbers on our logs
14:47:52  15   that I promised you in my email last night?
14:47:55  16         MR. STIMPSON:  As long as I know what
14:47:57  17   they are.
14:48:00  18         MR. VAZQUEZ:  Well, we don't know what
14:48:02  19   these are, there are no Bates numbers.  So
14:48:06  20   if you expect us to give you Bates numbers,
14:48:06  21   then something like this, we need Bates
14:48:07  22   numbers, or else you will not get Bates
14:48:14  23   numbers, okay?
14:48:17  24         MR. STIMPSON:  All right.
          25   BY MR. VAZQUEZ:
```

Page 169

```
14:48:18   1      Q   Mr. Rothschild, I am giving you
14:48:18   2   Exhibit 13.
14:48:19   3         (Email string marked Rothschild
14:48:29   4         Exhibit 13 for identification, as of this
14:48:34   5         date.)
14:48:43   6   BY MR. VAZQUEZ:
14:48:48   7      Q   Who is Carl Zacar?
14:48:52   8      A   Carl Zacar is an executive at Athena
14:49:02   9   Health.  They are an investor in the company,
14:49:04  10   and he represents that investment to us.
14:49:05  11      Q   Athena is one of the entities that you
14:49:06  12   sell or license data to?
          13      A   No.
14:49:07  14      Q   No?
14:49:23  15      A   (No response).
14:49:26  16      Q   I am sorry, I am thinking of Aetna.
14:49:27  17         Who is the partner Vestar that -- that
14:49:29  18   you have a loose relationship with or had
14:49:38  19   conversations with?
14:49:45  20      A   I don't remember his name.  One of our
14:49:48  21   other investors is friends with him, and that's
14:49:53  22   who we were referring to here.
14:49:56  23      Q   So do you recall if you responded to
14:49:58  24   Mr. Zacar in your email?
          25      A   I assume I responded because he is
```

| | | Page 170 |
|---|---|---|
| 14:50:15 | 1 | asking questions, and he's an investor, but I |
| 14:50:17 | 2 | don't recall an email on it. I am not a huge |
| 14:50:17 | 3 | email guy, so I -- I don't know how it was. |
| 14:50:18 | 4 | Q I am sorry, what was that exhibit |
| 14:50:33 | 5 | number? |
| 14:50:35 | 6 | A 13. |
| 14:50:38 | 7 | Q Thank you. |
| 14:50:41 | 8 | Mr. Rothschild, let me ask you |
| 14:50:43 | 9 | something about Aetna. That's one of the |
| 14:50:44 | 10 | entities that you listed that you sell, or lease |
| 14:50:49 | 11 | or license data to, right? |
| | 12 | A Yes. |
| 14:50:52 | 13 | Q Do they -- do you know if they get |
| 14:51:01 | 14 | patient ratings? |
| 14:51:03 | 15 | A They don't at present, but the deal in |
| 14:51:05 | 16 | that particular one -- well, they don't at |
| 14:51:06 | 17 | present. I will leave it at that. |
| 14:51:07 | 18 | Q From that, can I infer that they did |
| 14:51:11 | 19 | in the past? |
| 14:51:16 | 20 | A No. |
| 14:51:20 | 21 | Q What do you mean by "at present"? |
| 14:51:22 | 22 | A They are planning to do it. |
| 14:51:26 | 23 | Q Is that related to the entry on the |
| 14:51:27 | 24 | top of the application? |
| | 25 | A ITriage is owned by Aetna. |

| | | Page 171 |
|---|---|---|
| 14:51:31 | 1 | Q The answer is yes? |
| 14:51:31 | 2 | A Yes. |
| 14:51:32 | 3 | Q And have you looked at the iTriage |
| 14:51:34 | 4 | application? |
| 14:51:35 | 5 | A Yes. |
| 14:51:38 | 6 | Q Do you have it on your Smartphone? |
| 14:51:43 | 7 | A Yes, actually, I do. |
| 14:51:43 | 8 | Q Have you ever done a query for a |
| 14:51:46 | 9 | doctor on the iTriage application? |
| 14:51:48 | 10 | A I have. |
| | 11 | Q Have you sorted it by patient ratings? |
| 14:51:52 | 12 | A I don't believe I have done that. |
| 14:51:58 | 13 | Q Are you aware that there is what we |
| 14:52:01 | 14 | call fine print on there that says that the |
| 14:52:03 | 15 | patient ratings information on the application |
| 14:52:06 | 16 | is obtained from Vitals? |
| 14:52:08 | 17 | A I wasn't familiar with the fine print, |
| 14:52:09 | 18 | but I know that they obtain it from us. |
| 14:52:12 | 19 | Q That they what from you? |
| 14:52:12 | 20 | A I know that they obtain it from us. |
| 14:52:14 | 21 | Q So they do obtain the patient ratings |
| 14:52:15 | 22 | from you? |
| 14:52:19 | 23 | A That is one of the leases with us, |
| 14:52:21 | 24 | yes. |
| | 25 | Q Okay. So how does that square with |

| | | Page 172 |
|---|---|---|
| 14:52:25 | 1 | what I think you said, which was that they do |
| 14:52:27 | 2 | not presently obtain patient ratings? |
| 14:52:29 | 3 | MR. STIMPSON: Objection to form, |
| 14:52:37 | 4 | mischaracterizes his testimony. |
| 14:52:38 | 5 | A I didn't say that. |
| 14:52:39 | 6 | Q Okay. I am sorry. |
| 14:52:40 | 7 | A I said I did not think they displayed |
| 14:52:41 | 8 | them the last I looked. |
| 14:52:41 | 9 | Q Okay. I appreciate the clarification. |
| | 10 | They obtain them for sure, you know |
| 14:52:42 | 11 | that? |
| 14:52:50 | 12 | A We ship them the ratings. |
| 14:52:52 | 13 | Q Okay. Are you familiar with the |
| 14:52:54 | 14 | format in which you ship the data that they buy |
| 14:52:59 | 15 | from you? |
| 14:53:03 | 16 | A Broadly speaking. |
| 14:53:04 | 17 | Q And is it organized by data fields |
| 14:53:04 | 18 | such as ratings in one of them? |
| 14:53:07 | 19 | A It is. |
| 14:53:10 | 20 | Q Is it the entire Vitals master |
| 14:53:13 | 21 | database? |
| 14:53:16 | 22 | A No. |
| 14:53:21 | 23 | Q What portions of the master database |
| 14:53:24 | 24 | do they buy? |
| | 25 | A As specified previously, the master |

| | | Page 173 |
|---|---|---|
| 14:53:34 | 1 | database is very broad and comprehensive, and |
| 14:53:38 | 2 | people license or lease individual components. |
| 14:53:40 | 3 | And in fact, they do not even use all of our |
| 14:53:41 | 4 | patient ratings, they only use a percentage. |
| 14:53:43 | 5 | Q So they use a percentage of your |
| 14:53:45 | 6 | patient ratings? |
| 14:53:47 | 7 | A Yes. |
| 14:53:48 | 8 | Q Do you know what percentage that is? |
| | 9 | A Probably about one-fifth. |
| 14:53:49 | 10 | Q One-fifth? |
| 14:53:55 | 11 | A (No response.) |
| 14:53:57 | 12 | Q 20 percent? |
| 14:54:01 | 13 | A Roughly. There's less. |
| 14:54:01 | 14 | MR. STIMPSON: Just a reminder of your |
| 14:54:02 | 15 | call at 3 o'clock. It's five, six hours. |
| 14:54:04 | 16 | Q Do you need to call home right now, |
| 14:54:04 | 17 | Mr. Rothschild? |
| 14:54:06 | 18 | A I have a minute or two, if you want to |
| 14:54:11 | 19 | go for only that. |
| 14:54:16 | 20 | Q Just a couple -- just a few more |
| 14:54:19 | 21 | questions that will just take a minute or two. |
| 14:54:20 | 22 | Why -- why not -- why does iTriage not |
| 14:54:25 | 23 | or Aetna not get more than 20 percent of the |
| 14:54:32 | 24 | patient ratings? |
| | 25 | A That's all they want to pay for. |

| Page 174 | | Page 176 | |
|---|---|---|---|
| 14:54:38 | 1 Q Good reason. | 15:59:37 | 1 Q Okay. Mr. Rothschild, I am going to |
| 14:54:41 | 2 When you did the deal, are you aware | 15:59:43 | 2 ask you some questions about some of the |
| 14:54:42 | 3 of whether they intend to display patient | 15:59:45 | 3 financial documents that have been produced to |
| 14:54:45 | 4 ratings or any other fields? | 15:59:48 | 4 us. I don't have all of them to give you, |
| 14:54:48 | 5 MR. STIMPSON: Objection. I will just | 15:59:49 | 5 you will be happy to know. |
| 14:54:51 | 6 be -- caution the witness here, if this is | | 6 MR. VAZQUEZ: What is the next number? |
| 14:54:55 | 7 anything that is confidential to iTriage or | | 7 MS. STOLL-DeBELL: Well, I premarked |
| | 8 Aetna, we have to do something to make sure | 16:00:09 | 8 some. We are actually on 25. |
| 14:54:56 | 9 that they are in order, and you can't just | 16:00:11 | 9 Q Here you go, 25. |
| 14:55:00 | 10 disclose their confidential information | 16:00:11 | 10 (Spreadsheets marked Rothschild |
| 14:55:02 | 11 even though it is under highly | 16:00:18 | 11 Exhibit 25 for identification, as of this |
| 14:55:03 | 12 confidential. I don't know if it is or | 16:00:22 | 12 date.) |
| 14:55:06 | 13 not, but just be careful about that. | 16:00:25 | 13 BY MR. VAZQUEZ: |
| 14:55:07 | 14 THE WITNESS: Well, we do have a | 16:00:35 | 14 Q What are these spreadsheets in Exhibit |
| 14:55:08 | 15 confidential agreement in place with them. | 16:00:38 | 15 25, Mr. Rothschild? What are they? |
| 14:55:10 | 16 MR. STIMPSON: So we may -- | 16:00:39 | 16 A These are our budgets for the year. |
| 14:55:10 | 17 THE WITNESS: I am going to be guided | 16:00:51 | 17 Q Do you know -- did you have a hand in |
| 14:55:13 | 18 by what you are telling me. | 16:00:55 | 18 preparing them? |
| 14:55:15 | 19 BY MR. VAZQUEZ: | 16:00:55 | 19 A Yes. |
| 14:55:19 | 20 Q This is a good time to take a break. | 16:00:56 | 20 Q Does -- what is a fiscal year for MDX? |
| 14:55:21 | 21 If you need to look at your confidentiality | 16:01:00 | 21 A Calendar. |
| 14:55:25 | 22 agreement with Aetna, that might be prudent. I | 16:01:05 | 22 Q Calendar? |
| 14:55:26 | 23 think that the way we are designating this | 16:01:09 | 23 A (No response). |
| 14:55:28 | 24 transcript safeguards that, but if you think you | 16:01:11 | 24 Q Some of the financial statements we |
| | 25 need to do something further, you are welcome | | 25 have received show different fiscal year end |

| Page 175 | | Page 177 | |
|---|---|---|---|
| 14:55:34 | 1 to. | 16:01:15 | 1 dates. Would that be a mistake, or is there |
| 14:55:36 | 2 A Fortunately, I defer to counsel. | 16:01:17 | 2 circumstances where you have different end |
| 14:55:38 | 3 Q You think about like a half hour? | 16:01:20 | 3 dates? |
| 14:55:39 | 4 A I am going to try to do it within a | 16:01:23 | 4 A I believe we only had a calendar year |
| 14:55:40 | 5 half hour. I will give them notice. | | 5 end since we started. |
| 14:55:41 | 6 Q We agreed to an hour. | 16:01:23 | 6 Q It would be December 31st for each |
| | 7 A I will do my best to -- | 16:01:31 | 7 year? |
| 14:55:44 | 8 Q That's fine. | 16:01:38 | 8 A Yes. |
| 14:55:47 | 9 A -- accelerate the process within the | 16:01:46 | 9 Q We have information that was produced |
| 14:55:48 | 10 fact that I am not in control of the | 16:01:50 | 10 to us that shows for years ended May 31st, 2009, |
| 14:55:48 | 11 conversation. | 16:01:57 | 11 and 2008. Is that at all ring a bell as to why |
| 14:55:50 | 12 Q Sure. We understand it and appreciate | 16:01:57 | 12 we might have information that shows financial |
| 14:55:50 | 13 it. | 16:02:01 | 13 statements for years ended May 31st for 2009 and |
| 14:55:53 | 14 MR. VAZQUEZ: Let's go off the record. | 16:02:07 | 14 2008? |
| 14:55:54 | 15 THE VIDEOGRAPHER: This marks the end | 16:02:08 | 15 A I think we may have -- a client wanted |
| 14:55:56 | 16 of Tape No. 3 in the deposition of Mitchel | 16:02:12 | 16 to see the last year of activity, so we adjusted |
| | 17 Rothschild. | 16:02:13 | 17 it, I believe. |
| 15:58:51 | 18 Going off the record, the time is | 16:02:16 | 18 Q So the client's request was from May |
| 15:59:16 | 19 2:58 p.m. | 16:02:18 | 19 to May? |
| 15:59:17 | 20 (Recess taken) | 16:02:22 | 20 A I think so. I really don't recall. |
| 15:59:19 | 21 THE VIDEOGRAPHER: Back on the record. | 16:02:30 | REDACTED |
| 15:59:21 | 22 Here marks the beginning of Tape No. 4 | 16:02:33 | |
| 15:59:23 | 23 in the deposition of Mitchel Rothschild. | 16:02:35 | |
| 15:59:24 | 24 The time is 4:01 p.m. | 16:02:39 | 24 A It sounds about right. |
| 15:59:31 | 25 BY MR. VAZQUEZ: | | 25 Q The same statements show -- |

Case 1:11-cv-00520-RM-BNB   Document 295-1   filed 11/24/14   USDC Colorado   page 48 of 61

|          | Page 178 |
|----------|----------|
| 16:02:44 | 1   A   If I may, I think, as the majority of |
| 16:02:47 | 2   what we do is the fiscal year in December, if |
| 16:02:50 | 3   you have those documents, that will be easier |
|          | 4   for me to reference and recall. |
| 16:02:54 | 5   Q   Okay.  And if I have them, I will show |
| 16:02:58 | 6   them to you, but I -- there were so many, and so |
| 16:03:05 | 7   many that appeared to be duplicates with minor |
| 16:03:07 | 8   changes, that we just decided to just ask you -- |
| 16:03:09 | 9   you know, both parties have damages experts, and |
| 16:03:09 | 10  they will be scrutinizing these, and we will |
| 16:03:12 | 11  depose the experts.  I thought that might have |
| 16:03:13 | 12  been -- |
| 16:03:14 | 13  A   You asked for a lot of information, so |
| 16:03:16 | 14  we provided it. |
| 16:03:17 | 15  Q   Yes, yes. |
| 16:03:20 | 16  A   But the December 31st stuff, I am |
| 16:03:22 | 17  better versed in. |
| 16:03:23 | 18  Q   Okay.  Let me kind of go through |
| 16:03:26 | 19  questions that I prepared, and if you are |
| 16:03:27 | 20  familiar with the answers, you are.  I |
| 16:03:30 | 21  understand you are not looking at everything I |
| 16:03:38 | 22  am asking you about. |

REDACTED

REDACTED

|          | Page 179 |
|----------|----------|

REDACTED

|          | Page 180 |
|----------|----------|
| 16:05:23 | 1   REDACTED |
|          | 2 |
| 16:05:26 | 3 |
| 16:05:38 | 4 |
| 16:05:40 | 5 |
| 16:05:43 | 6 |
| 16:05:43 | 7 |
| 16:05:47 | 8 |
| 16:05:49 | 9 |
| 16:05:50 | 10 |
| 16:05:51 | 11 |
| 16:05:55 | 12 |
| 16:05:56 | 13 |
| 16:05:58 | 14 |
| 16:06:09 | 15 |
| 16:06:11 | 16 |
| 16:06:18 | 17 |
| 16:06:22 | 18 |
| 16:06:24 | 19 |
| 16:06:26 | 20 |
| 16:06:29 | 21 |
| 16:06:32 | 22 |
| 16:06:44 | 23 |
| 16:06:50 | 24 |
|          | 25 |

|          | Page 181 |
|----------|----------|
|          | 1   REDACTED |
| 16:06:55 | 2 |
| 16:07:05 | 3 |
| 16:07:10 | 4 |
| 16:07:13 | 5 |
| 16:07:15 | 6 |
| 16:07:24 | 7 |
| 16:07:26 | 8 |
| 16:07:28 | 9 |
| 16:07:31 | 10 |
| 16:07:40 | 11 |
| 16:07:41 | 12 |
| 16:07:46 | 13 |
| 16:07:50 | 14 |
| 16:07:52 | 15 |
| 16:07:53 | 16 |
| 16:07:55 | 17 |
| 16:07:57 | 18 |
| 16:07:59 | 19 |
| 16:08:02 | 20 |
| 16:08:05 | 21 |
| 16:08:13 | 22 |
| 16:08:24 | 23 |
| 16:08:25 | 24 |
|          | 25 |

Page 182

REDACTED

---

Page 184

REDACTED

```
16:11:23    1
16:11:25    2
16:11:28    3
16:11:31    4
16:11:33    5
16:11:36    6
16:11:39    7
16:11:48    8
16:11:52    9
16:11:54   10
16:11:56   11
16:12:02   12
16:12:06   13
16:12:12   14
16:12:15   15
16:12:21   16
16:12:27   17
16:12:32   18
16:12:33   19
16:12:34   20
16:12:37   21
           22
16:12:57   23
16:13:14   24
           25
```

---

Page 183

REDACTED

---

Page 185

REDACTED

```
16:13:20    1
16:13:25    2
16:13:34    3
16:13:37    4
16:13:42    5
16:13:44    6
16:13:49    7
16:13:55    8
16:13:58    9
```

16:14:00   10    A   Probably do, although I'm not even
16:14:03   11 sure what it would be.  It's one of those
16:14:05   12 electronic things, and they populate the site,
16:14:11   13 but my guess would be we have an agreement.
16:14:17   14       They pay you a mysterious net number
16:14:19   15 unlike everybody else.  So there's not defined
16:14:24   16 revenue share, things like that.
16:14:26   17    Q   Do you know what the phrase, quote,
16:14:26   18 From DART, closed quote, means?  DART is all
16:14:28   19 caps, D-A-R-T.
16:14:34   20    A   Yes.
           21    Q   What does that mean?
16:14:40   22    A   DART is the piece of software that
16:14:49   23 serves the ads up.  So DART looks at our site --
16:14:51   24 it's a standard piece of software in the
           25 industry.  DART looks at our site and counts up

## Page 186

| 16:14:55 | 1 | how many impressions we have. |
| 16:14:59 | 2 | Impressions are how many times you |
| 16:15:01 | 3 | have an opportunity to display an ad based on |
| 16:15:04 | 4 | the traffic, based on the pages people look at, |
| 16:15:09 | 5 | et cetera. |
| 16:15:16 | 6 | DART's numbers are not always exactly |
| 16:15:23 | 7 | the same as our own internal numbers, so that's |
| 16:15:26 | 8 | why we often keep track of it a little bit |
| 16:15:32 | 9 | differently. |

REDACTED

## Page 188

REDACTED

| 16:18:23 | 1 |
| 16:18:26 | 2 |
| 16:18:28 | 3 |
| 16:18:35 | 4 |
| 16:18:41 | 5 |
| 16:18:43 | 6 |
| 16:18:43 | 7 |
| 16:18:44 | 8 |
| 16:18:54 | 9 |
| 16:18:56 | 10 |
| 16:19:01 | 11 |
| 16:19:04 | 12 |
| 16:19:06 | 13 |
| 16:19:22 | 14 |
| 16:19:26 | 15 |
| 16:19:29 | 16 |
| 16:19:32 | 17 |
|  | 18 |
| 16:19:41 | 19 |
| 16:19:46 | 20 |
| 16:19:51 | 21 |
| 16:19:58 | 22 |
| 16:20:04 | 23 |
| 16:20:06 | 24 |
|  | 25 |

## Page 187

REDACTED

## Page 189

REDACTED

| 16:20:10 | 1 |
| 16:20:14 | 2 |
| 16:20:15 | 3 |
| 16:20:24 | 4 |
| 16:20:27 | 5 |
| 16:20:30 | 6 |
| 16:20:32 | 7 |
| 16:20:35 | 8 |
| 16:20:37 | 9 |
| 16:20:41 | 10 |
| 16:20:49 | 11 |
| 16:20:51 | 12 |
| 16:20:52 | 13 |
| 16:20:56 | 14 |
| 16:21:04 | 15 |
| 16:21:07 | 16 |
|  | 17 |
| 16:21:13 | 18 |
| 16:21:24 | 19 |
| 16:21:29 | 20 |
| 16:21:31 | 21 |
| 16:21:35 | 22 |
| 16:21:45 | 23 |
| 16:21:48 | 24 |
|  | 25 |

REDACTED

Page 190

Page 192

REDACTED

Page 191

Page 193

REDACTED

Page 194

Page 196

REDACTED

Page 195

Page 197

Page 198

REDACTED

Page 199

REDACTED

Page 200

Page 201

REDACTED

| 16:39:02 | 1 | |
| 16:39:10 | 2 | |
| 16:39:12 | 3 | |
| 16:39:13 | 4 | |
| | 5 | |
| 16:39:14 | 6 | |
| 16:39:16 | 7 | |
| 16:39:17 | 8 | |
| 16:39:19 | 9 | |
| 16:39:21 | 10 | |
| 16:39:22 | 11 | |
| 16:39:24 | 12 | |
| 16:39:27 | 13 | |
| 16:39:31 | 14 | |
| 16:39:32 | 15 | |
| 16:39:35 | 16 | |
| 16:39:39 | 17 | |
| 16:39:57 | 18 | |
| 16:40:00 | 19 | |
| 16:40:03 | 20 | |
| 16:40:04 | 21 | Q   All right.  Let me just take a real |
| 16:40:04 | 22 | quick break and gather ourselves. |
| 16:40:04 | 23 |    MS. STOLL-DeBELL:  Five minutes at the |
| 16:40:06 | 24 | most. |
| | 25 | Q   Five minutes at the most. |

Page 202

| | | |
|---|---|---|
| 16:40:08 | 1 | A   Come back in five? |
| 16:40:11 | 2 | Q   Yes, please. |
| 16:49:19 | 3 | THE VIDEOGRAPHER:  Going off the |
| | 4 | record, the time is 4:42 p.m. |
| 16:49:20 | 5 | (Recess taken) |
| 16:49:23 | 6 | THE VIDEOGRAPHER:  We are back on the |
| 16:49:25 | 7 | record.  The time is 4:51 p.m. |
| 16:49:29 | 8 | BY MR. VAZQUEZ: |
| 16:49:29 | 9 | Q   Mr. Rothschild, I am handing you what |
| 16:49:29 | 10 | has been marked as Deposition Exhibit 17. |
| 16:49:29 | 11 | (PowerPoint presentation marked |
| 16:49:34 | 12 | Rothschild Exhibit 17 for identification, |
| 16:49:38 | 13 | as of this date.) |
| 16:49:41 | 14 | BY MR. VAZQUEZ: |
| 16:49:45 | 15 | Q   That is the same as Cutler Exhibit 30, |
| 16:49:48 | 16 | and really these last exhibits that we have, we |
| 16:49:50 | 17 | are just trying to authenticate them.  In other |
| 16:49:53 | 18 | words, what they appear to be. |
| 16:49:56 | 19 | So does this look familiar to you, |
| 16:49:58 | 20 | this PowerPoint presentation. |
| 16:50:01 | 21 | A   It does. |
| 16:50:04 | 22 | Q   It says on the lower left-hand column, |
| 16:50:05 | 23 | "Was presented to Google October 27, 2009." |
| 16:50:08 | 24 | Is that your recollection of what this |
| | 25 | was used for? |

Page 203

| | | |
|---|---|---|
| 16:50:15 | 1 | A   I trust things in print, so I would |
| 16:50:16 | 2 | have to say yes. |
| | 3 | Q   And were you involved in the creation |
| 16:50:17 | 4 | of it? |
| 16:50:29 | 5 | A   Yes, I was. |
| 16:50:31 | 6 | Q   Was it just you, or was it a |
| 16:50:40 | 7 | multi-authored document? |
| 16:50:42 | 8 | A   At that point, I was the main |
| 16:50:44 | 9 | PowerPointer in the company. |
| 16:50:45 | 10 | Q   The main PowerPointer and chief |
| 16:51:04 | 11 | perfectionist? |
| 16:51:07 | 12 | A   Indeed. |
| 16:51:07 | 13 | Q   Okay.  Mr. Rothschild, I am handing |
| 16:51:07 | 14 | you what has been marked as Deposition 18. |
| 16:51:07 | 15 | (PowerPoint presentation marked |
| 16:51:10 | 16 | Rothschild Exhibit 18 for identification, |
| 16:51:14 | 17 | as of this date.) |
| 16:51:16 | 18 | BY MR. VAZQUEZ: |
| 16:51:18 | 19 | Q   This appears to be another voluminous |
| 16:51:21 | 20 | PowerPoint? |
| 16:51:23 | 21 | A   I don't believe it is.  I believe we |
| 16:51:25 | 22 | have multiple copies or they are multiple |
| 16:51:29 | 23 | PowerPoints. |
| 16:51:29 | 24 | Q   Ah, okay. |
| | 25 | A   Even I do not propose PowerPoint this |

Page 204

| | | |
|---|---|---|
| 16:51:32 | 1 | thick. |
| | 2 | Q   I believe it was -- well, we assumed |
| 16:51:36 | 3 | that it was one because it was produced as one, |
| 16:51:50 | 4 | and it was sequentially Bates numbered in the |
| 16:51:52 | 5 | lower right-hand corner.  So let's take a few |
| 16:51:54 | 6 | minutes to go through. |
| 16:51:55 | 7 | On the very first page, in the lower |
| 16:51:55 | 8 | left-hand corner, do you know what this box is |
| 16:51:56 | 9 | here? |
| 16:51:59 | 10 | A   Yes. |
| 16:52:01 | 11 | Q   What is that? |
| 16:52:02 | 12 | A   Yes.  If you will notice, it says, |
| 16:52:04 | 13 | "Medco" on Page 2? |
| 16:52:07 | 14 | Q   Yes. |
| 16:52:10 | 15 | A   And when you do a cover page or |
| 16:52:14 | 16 | others, you tend to just put a little white box |
| 16:52:17 | 17 | over it so it doesn't show.  So when you print |
| 16:52:29 | 18 | it in color, it is as if you sort of print a |
| 16:52:31 | 19 | cover on the logo. |
| 16:52:33 | 20 | Q   Okay.  Well, I am flipping pages.  Can |
| 16:52:36 | 21 | you just do the same. |
| 16:52:59 | 22 | And when I am doing it, they all say |
| 16:53:02 | 23 | "Medco" at the bottom left. |
| 16:53:06 | 24 | A   They don't.  "Medco" ends at Page 19. |
| | 25 | Q   Okay.  So it looks like the first |

Page 205

| | | |
|---|---|---|
| | 1 | PowerPoint in this big exhibit that has been |
| 16:53:13 | 2 | marked as Exhibit 18 is one for Medco that's 19 |
| 16:53:16 | 3 | pages long? |
| 16:53:17 | 4 | A   Yes. |
| 16:53:18 | 5 | Q   Were you involved in the creation of |
| 16:53:20 | 6 | that one? |
| 16:53:25 | 7 | A   I was. |
| 16:53:29 | 8 | Q   Okay.  And then so there's another one |
| 16:53:29 | 9 | that apparently begins at MDX 12057 that says, |
| 16:53:30 | 10 | "Where consumers become patients"? |
| 16:53:32 | 11 | A   Yes. |
| 16:53:35 | 12 | Q   Are you familiar with this one? |
| 16:53:50 | 13 | A   I am not familiar with this specific |
| 16:53:51 | 14 | one since it doesn't say who it was for. |
| 16:53:53 | 15 | Q   Okay.  In flipping through the pages |
| 16:53:54 | 16 | as you are doing, do you see any reason to |
| 16:54:00 | 17 | believe that it is not a Vitals or MDX |
| 16:54:07 | 18 | PowerPoint? |
| 16:54:15 | 19 | A   It's an authentic MDX PowerPoint. |
| 16:54:21 | 20 | Q   It is, indeed.  And a lengthy one. |
| 16:54:25 | 21 | I am on Page 27, 33, 48, and it |
| 16:54:30 | 22 | continues, 44, 47. |
| 16:54:33 | 23 | Can you -- at Page 47, which is |
| 16:54:36 | 24 | MDX 12103, do you know why that's redacted |
| | 25 | there? |

Page 206

16:54:40  1      A   I am not the redactor, so I do not
16:54:45  2   know either what it is or what it does.
16:54:48  3      Q   It is funny you mention that, because
16:54:52  4   there are a number of documents that have been
16:54:54  5   produced in the case that appear to be redacted,
16:54:56  6   and it's our understanding that that's how they
16:55:00  7   are kept, that's how they were received by your
16:55:03  8   counsel, from MDX.
16:55:06  9          Are you aware of instances where you,
16:55:08  10  meaning MDX, redacts documents and keeps them
16:55:12  11  like that in the ordinary course?
16:55:13  12     A   I was not involved in the document
16:55:20  13  accumulation and distribution, so I cannot speak
16:55:24  14  to that.
16:55:25  15     Q   Are you involved in, say, the policies
16:55:27  16  by which MDX retains documents?
16:55:32  17     A   Retains?
16:55:34  18     Q   Yes.  In other words, stores them,
16:55:34  19  keeps them in the ordinary course of business?
16:55:36  20     A   I don't believe it qualifies as
16:55:36  21  policy.
16:55:37  22     Q   So you don't even have a policy for
16:55:39  23  that?
          24     A   That's correct.
          25     Q   And you personally don't redact

Page 207

16:55:49  1   documents and then keep them?
16:55:52  2      A   I myself either delete them or keep
16:55:54  3   them.
16:55:57  4      Q   Right.
16:56:06  5          Okay.  Well, let's continue to see how
16:56:06  6   long -- it looks like this one, the second
16:56:09  7   PowerPoint in the Exhibit 18, ends at Page 53?
16:56:15  8      A   Yes.
16:56:17  9      Q   And then there's sort of a thank you
16:56:18  10  page, it indicates maybe Jeff Cutler was the
16:56:19  11  person who presented this?
16:56:26  12     A   Yes.
16:56:27  13     Q   Right?
16:56:30  14     A   I guess.
16:56:31  15     Q   Okay.  Again, there's a new PowerPoint
16:56:33  16  that begins after the page that says Mr. Cutler,
16:56:36  17  and this --
16:56:39  18     A   It may be the same as the prior
16:56:39  19  PowerPoint or very similar.
16:56:40  20     Q   But it does begin ePage 1 and 2,
16:56:42  21  right?
16:56:45  22     A   Yes.
          23     Q   And do you have any reason to believe
16:56:48  24  that this is not an authentic MDX PowerPoint?
          25     A   I do believe it is authentic.

Page 208

16:56:57  1          MR. STIMPSON:  Objection to form.
16:57:03  2      Q   You do believe it is?
16:57:06  3      A   I believe it is.
16:57:09  4      Q   As do we.
16:57:15  5          By the way, who was involved, if you
16:57:16  6   know, on the MDX's side of the collection of
16:57:24  7   documents in this case?
16:57:26  8          MR. STIMPSON:  Objection, beyond the
16:57:26  9   30(b)(6) scope.
16:57:34  10     A   I don't know who on our technical
16:57:36  11  team, but somebody was scouring all of our
16:57:40  12  databases to see if there were any things that
16:57:41  13  might be relevant, and then our CFO was involved
16:57:43  14  somewhat in generating the information that was
16:57:48  15  necessary.
16:57:55  16     Q   Okay.  It looks like that what would
16:57:55  17  be the third PowerPoint is 68 pages long, right,
16:57:57  18  ending in MDX 12178?
16:57:59  19     A   Yes.
16:58:02  20     Q   All right.
16:58:05  21          All right.  And then here is what
          22  appears to be a fourth PowerPoint.  This one was
16:58:06  23  apparently presented and used with Cigna?
16:58:08  24     A   Correct.
          25     Q   Were you involved with this one,

Page 209

16:58:11  1   Mr. Rothschild?
16:58:15  2      A   Yes, I was.
16:58:33  3      Q   Did you create it?
16:58:47  4      A   Mostly, I did.
16:58:51  5      Q   And in flipping through it, we can --
16:58:51  6   we see it's 46 pages.  This one appears to end
16:58:54  7   MDX 12250, right?
16:59:00  8      A   Yes.
16:59:03  9      Q   It says -- it has your name on there.
16:59:04  10  So do you have any reason to believe this is not
16:59:12  11  an authentic MDX PowerPoint?
16:59:16  12     A   I believe it is.
16:59:20  13     Q   Okay.  We can then do the same
16:59:23  14  exercise for the PowerPoint beginning for --
16:59:25  15  this appears to be for Cigna as well at 12251.
16:59:29  16  That's a duplicate of yours?
16:59:31  17     A   There may have been multiples to
16:59:33  18  Cigna.
16:59:35  19          MR. VAZQUEZ:  You want to stipulate
16:59:37  20  that the remaining PowerPoint here is
          21  authentic, Mr. Stimpson?
16:59:38  22          MR. STIMPSON:  I haven't even got a
16:59:41  23  copy of it.
16:59:42  24          MR. VAZQUEZ:  You haven't even what?
          25          MR. STIMPSON:  I haven't gotten a

| | | Page 210 |
|---|---|---|
| 16:59:49 | 1 | copy. |
| 16:59:50 | 2 | MR. VAZQUEZ:  Yeah, I am trying to |
| 16:59:53 | 3 | sneak one in at the end of the day. |
| 16:59:57 | 4 | Q   Well, if -- |
| 16:59:59 | 5 | MR. STIMPSON:  I don't have a copy. |
| 17:00:02 | 6 | Thousands of pages. |
| 17:00:03 | 7 | THE WITNESS:  These make wonderful |
| 17:00:03 | 8 | Mother's Day's presents. |
| 17:00:12 | 9 | MR. STIMPSON:  I am good. |
| 17:00:13 | 10 | BY MR. VAZQUEZ: |
| 17:00:18 | 11 | Q   Well, Mr. Rothschild, there is this |
| 17:00:20 | 12 | other one here at the end, it appears to be for |
| 17:00:25 | 13 | Cigna, and it looks like this one is a shorter |
| 17:00:27 | 14 | one, right? |
| 17:00:28 | 15 | A   (No response). |
| 17:00:30 | 16 | Q   Maybe not.  It appears to be |
| 17:00:31 | 17 | continuing. |
| 17:00:33 | 18 | A   I believe it goes through to the end. |
| 17:00:35 | 19 | Q   "To the end." |
| | 20 | Do you have any reason to believe that |
| 17:00:37 | 21 | is not an authentic MDX -- |
| 17:00:40 | 22 | A   I believe it is authentic. |
| 17:00:43 | 23 | Q   Excellent. |
| 17:00:49 | 24 | That's what you call the glamor of the |
| | 25 | practice of law right there, that exercise. |

| | | Page 211 |
|---|---|---|
| 17:01:00 | 1 | A   I am envious. |
| 17:01:02 | 2 | Q   Noted you are not. |
| 17:01:06 | 3 | Now, Mr. Rothschild, we have had what |
| 17:01:07 | 4 | are titled "Financial Projections" produced in |
| 17:01:11 | 5 | the case.  Are you familiar with MDX's revenue |
| 17:01:15 | 6 | projections? |
| 17:01:21 | 7 | A   Yes. |

REDACTED

| | | Page 212 |
|---|---|---|
| 17:02:17 | 1 | REDACTED |
| 17:02:19 | 2 | |
| 17:02:21 | 3 | |
| 17:02:21 | 4 | |
| 17:02:24 | 5 | |
| 17:02:28 | 6 | |
| 17:02:32 | 7 | |
| 17:02:35 | 8 | Q   When I say "net revenue" -- or how do |
| 17:02:40 | 9 | you define revenue? |
| 17:02:44 | 10 | A   As accountants do. |
| 17:02:44 | 11 | Q   How is that? |
| 17:02:51 | 12 | A   Revenue received less bad pay or |
| 17:02:51 | 13 | credits. |
| 17:02:53 | 14 | Q   "Less bad pay," did you say? |
| 17:02:57 | 15 | A   Yes. |
| 17:03:02 | 16 | Q   What did you mean by "bad pay"? |
| 17:03:04 | 17 | A   Somebody doesn't pay a bill. |
| | 18 | Q   You are not also subtracting expenses? |
| 17:03:09 | 19 | A   That would not be net revenue. |
| 17:03:15 | 20 | REDACTED |
| 17:03:19 | 21 | |
| 17:03:22 | 22 | |
| 17:03:24 | 23 | |
| 17:03:25 | 24 | |
| | 25 | |

| | | Page 213 |
|---|---|---|
| 17:03:30 | 1 | A   Correct. |
| 17:03:30 | 2 | Q   And so from that, I infer that you |
| 17:03:31 | 3 | have some idea what you think gross profit |
| 17:03:33 | 4 | means, right? |
| 17:03:35 | 5 | A   Um-hum. |
| 17:03:36 | 6 | Q   What does gross profit mean to you? |
| 17:03:39 | 7 | A   "Gross profit"? |
| 17:03:47 | 8 | Q   Yes. |
| 17:03:48 | 9 | A   Means net revenue less cost of goods. |
| 17:03:54 | 10 | REDACTED |
| 17:03:59 | 11 | |
| 17:04:05 | 12 | |
| 17:04:08 | 13 | |
| 17:04:12 | 14 | |
| 17:04:16 | 15 | |
| 17:04:19 | 16 | |
| | 17 | |
| 17:04:21 | 18 | |
| 17:04:26 | 19 | |
| 17:04:30 | 20 | |
| 17:04:34 | 21 | |
| 17:04:39 | 22 | |
| 17:04:43 | 23 | |
| 17:04:50 | 24 | |
| | 25 | |

Page 214

| | | |
|---|---|---|
| 17:04:52 | 1 | operating income for 2012. Does that sound |
| 17:04:53 | 2 | accurate? |
| 17:04:56 | 3 | MR. STIMPSON: Objection. Same |
| 17:04:58 | 4 | objection without using the document. |
| 17:04:59 | 5 | A Does it sound accurate relative to |
| 17:05:01 | 6 | those projections or relative to where we are |
| 17:05:04 | 7 | now? |
| 17:05:05 | 8 | Q Yes, I guess I am asking, is that -- |
| 17:05:07 | 9 | is that, again, an old number? |
| 17:05:08 | 10 | A It is an old number. |
| 17:05:11 | 11 | Q What is the more accurate number, if |
| 17:05:13 | 12 | you know? |
| 17:05:14 | 13 | A Most likely have an operating loss of |
| 17:05:30 | 14 | about two and a half million. |
| 17:05:32 | 15 | Q For 2012? |
| | 16 | A Yes. |
| 17:05:35 | 17 | Q Do you know what those same two |
| 17:05:40 | 18 | metrics are projected to be for 2013, |
| 17:05:42 | 19 | Mr. Rothschild, meaning gross profit and |
| 17:05:45 | 20 | operating income? |
| 17:05:46 | 21 | A I do not know offhand. |
| 17:05:49 | 22 | Q Have those numbers or projections been |
| 17:05:53 | 23 | calculated? |
| 17:06:03 | 24 | A We have done -- we do a budget for the |
| | 25 | upcoming year, we do a forecast for the years -- |

Page 215

| | | |
|---|---|---|
| 17:06:05 | 1 | the next two years subsequent to that, and those |
| 17:06:09 | 2 | are very speculative by nature. |
| 17:06:11 | 3 | Q Have those been done? |
| 17:06:12 | 4 | A Yes. |
| 17:06:14 | 5 | Q All right. We are almost done, |
| 17:06:14 | 6 | Mr. Rothschild. |
| 17:06:14 | 7 | This is Exhibit 20. |
| 17:06:15 | 8 | (PowerPoint presentation marked |
| 17:06:16 | 9 | Rothschild Exhibit 20 for identification, |
| 17:06:18 | 10 | as of this date.) |
| 17:06:19 | 11 | BY MR. VAZQUEZ: |
| 17:06:24 | 12 | Q And -- |
| 17:06:25 | 13 | A More PowerPoints. |
| 17:06:31 | 14 | Q Yes. |
| | 15 | MR. VAZQUEZ: What I would like to do |
| 17:06:33 | 16 | is to simply note that the information in |
| 17:06:41 | 17 | this exhibit is authentic. |
| 17:06:43 | 18 | Now that we have a copy to counsel, we |
| 17:06:44 | 19 | can stipulate to it or else we can flip the |
| 17:06:44 | 20 | pages. This is exactly how it was |
| 17:06:46 | 21 | produced. |
| 17:06:47 | 22 | MR. STIMPSON: The information is |
| 17:06:52 | 23 | authentic? |
| 17:06:53 | 24 | MR. VAZQUEZ: The PowerPoints. This |
| | 25 | is a PowerPoint. This is an actual Vitals |

Page 216

| | | |
|---|---|---|
| 17:06:57 | 1 | PowerPoint. |
| 17:06:58 | 2 | MR. STIMPSON: You need to ask |
| 17:06:58 | 3 | Mr. Rothschild without -- you know, without |
| 17:07:00 | 4 | stopping and consulting. |
| 17:07:00 | 5 | MR. VAZQUEZ: Sure. |
| 17:07:01 | 6 | MR. STIMPSON: I can't stipulate to |
| 17:07:01 | 7 | it. |
| 17:07:03 | 8 | MR. VAZQUEZ: Sure. |
| 17:07:06 | 9 | BY MR. VAZQUEZ: |
| 17:07:08 | 10 | Q Mr. Rothschild, did you create the |
| 17:07:10 | 11 | PowerPoint that is shown here in Exhibit 20? |
| 17:07:16 | 12 | A This PowerPoint is at least three |
| 17:07:19 | 13 | years old, and I do not recall exactly how it |
| | 14 | was put together, but I would guess it is a |
| 17:07:21 | 15 | small company, I was involved. |
| 17:07:26 | 16 | Q And how can you tell that it was at |
| 17:07:27 | 17 | least three years old, just simply from the -- |
| 17:07:54 | 18 | A Page 62. |
| 17:07:57 | 19 | Q Page? |
| 17:08:02 | 20 | A Page 62. |
| 17:08:06 | 21 | The projections is from 2008, so it |
| 17:08:06 | 22 | was clearly projections prior to mid 2008. |
| 17:08:08 | 23 | Q But even Page 62 shows up to 2011, |
| 17:08:11 | 24 | correct? |
| | 25 | A Yes, it is a forecast. It says |

Page 217

| | | |
|---|---|---|
| 17:08:22 | 1 | "Financial Projections" on the top. |
| 17:08:23 | 2 | Q All right. So do you believe this is |
| 17:08:27 | 3 | an authentic MDX PowerPoint? |
| 17:08:31 | 4 | A As stated, I believe it is authentic. |
| 17:08:32 | 5 | I believe the data is way out of date, so |
| 17:09:10 | 6 | probably it is no longer accurate or relevant to |
| 17:09:12 | 7 | the forecasts. |
| 17:09:13 | 8 | Q Okay. I appreciate that. |
| 17:09:13 | 9 | I will give you what is marked as |
| 17:09:13 | 10 | Exhibit 21, Mr. Rothschild. |
| 17:09:23 | 11 | (Email string marked Rothschild |
| 17:09:26 | 12 | Exhibit 21 for identification, as of this |
| | 13 | date.) |
| 17:09:33 | 14 | MR. STIMPSON: What is this, 21? |
| 17:09:40 | 15 | MR. VAZQUEZ: Yes, 21. |
| 17:09:41 | 16 | MS. STOLL-DeBELL: It is not 21. Wow, |
| 17:09:43 | 17 | what a coincidence. |
| 17:09:52 | 18 | BY MR. VAZQUEZ: |
| 17:09:53 | 19 | Q And this is a string of emails, right, |
| 17:09:55 | 20 | Mr. Rothschild? |
| 17:10:03 | 21 | A It appears to be. |
| 17:10:09 | 22 | Q And if you go to the last page, which |
| 17:10:16 | 23 | would be the first email on the string at MDX |
| 17:10:17 | 24 | 83867, it appears to be an email from |
| | 25 | Mr. Levenson from Castle Connolly. Do you know |

| Page 218 | Page 220 |
|---|---|

**Page 218**

17:10:21  1 who that is?

17:10:22  2  A  Yes.

17:10:23  3  Q  Castle Connolly, is that one of your

17:10:25  4 major investors?

17:10:30  5  A  No.

17:10:34  6  Q  Is that a partner?

17:10:41  7  A  To some extent.  We don't really do

17:10:45  8 much with them.

17:10:47  9  Q  Okay.  And it appears to be writing

17:10:50  10 about -- it says right there, "I believe you are

17:10:54  11 going to create a similar service what is

         12 happening on that front," and right below it, it

17:10:55  13 says -- it has a link to HealthGrades -- the

17:10:58  14 HealthGrades website.

17:11:02  15      And do you know what he was talking

17:11:05  16 about there?

17:11:09  17  A  I don't.  I am assuming by "we," he

17:11:12  18 means himself.

17:11:17  19  Q  I don't know.

17:11:20  20  A  They -- they -- well, isn't this a

17:11:23  21 business of top doctors?  That's their business.

17:11:25  22  Q  Do you see, Mr. Rothschild, where a

17:11:26  23 little further up on that same page, it looks

17:11:33  24 like Wednesday, 10/29/2008 --

         25  A  Um-hum.

**Page 219**

17:11:44  1  Q  -- Mr. John Connolly wrote "Regarding

17:11:44  2 HealthGrades - Research hospitals, doctors and

17:11:46  3 nursing homes," to Mitch Raspberry Red.  That is

17:11:49  4 you, correct?

17:11:50  5  A  Yes.

17:11:52  6  Q  When you just said "we," who do you

17:11:55  7 think "we" is?

17:11:58  8  A  I don't know.  It was written by him.

17:12:01  9 I don't know.  I mean obviously the Vitals

17:12:02  10 service is similar to the HealthGrades service

         11 in that it helps people find doctors.

17:12:03  12  Q  Okay.

17:12:06  13  A  So I --

17:12:09  14  Q  Well --

17:12:28  15  A  -- certainly recognize that at all

17:12:30  16 points in our existence, we have similar

17:12:33  17 services.

17:12:35  18  Q  You had launched Vitals by then,

17:12:37  19 right, by 10/29/2008?

17:12:39  20  A  Yes.

17:12:41  21  Q  There was an overlap, and you were

17:12:51  22 still working with Raspberry, right?

17:12:54  23  A  I am a part owner.

17:12:55  24  Q  Right.  So when he says "we," was he

         25 referring to Raspberry or to Vitals?

**Page 220**

17:12:57  1      MR. STIMPSON:  Objection, calls for

17:12:58  2 speculation.

17:13:00  3  A  I don't know.

17:13:08  4  Q  You don't know?

17:13:08  5  A  I mean, Vitals was in existence.  I

17:13:35  6 don't know what he was referring to.

17:13:37  7  Q  All right.

17:13:37  8      All right.  Mr. Rothschild, this has

17:13:37  9 been marked as Rothschild Exhibit 22.

         10      (PowerPoint presentation marked

17:13:37  11      Rothschild Exhibit 22 for identification,

17:13:41  12      as of this date.)

17:13:44  13 BY MR. VAZQUEZ:

17:13:46  14  Q  I do not have even a copy for me.  If

17:13:48  15 you wouldn't mind sharing with your counsel.

17:13:50  16      MR. STIMPSON:  I am sorry.  It depends

17:13:58  17 on what you ask him.

17:14:00  18  Q  I just want to know who created that

17:14:01  19 PowerPoint, if you know?

17:14:03  20  A  I can speculate based on the content.

17:14:05  21  Q  Okay.

         22      MR. STIMPSON:  Objection, calls for

17:14:06  23 speculation.

17:14:07  24  Q  Are you going to speculate that you

         25 did it?

**Page 221**

17:14:10  1  A  I did not do it.

17:14:15  2  Q  And who do you speculate did it?

17:14:17  3      MR. STIMPSON:  Objection.

17:14:19  4  A  Somebody in our search engine

17:14:22  5 optimization group.

17:14:30  6  Q  Regardless of who did it, do you have

17:14:32  7 a reason to doubt that it actually was a

17:14:38  8 PowerPoint -- an MDX PowerPoint?

         9  A  It appears to be.

17:14:40  10  Q  Okay.  Thank you.

17:14:42  11      Here is what has been marked as

17:14:42  12 Exhibit 23, Mr. Rothschild.

17:14:42  13      (Email string marked Rothschild

17:14:59  14      Exhibit 23 for identification, as of this

17:15:00  15      date.)

17:15:01  16 BY MR. VAZQUEZ:

17:15:16  17  Q  It is a string of emails, as you can

17:15:17  18 tell, correct?

17:15:22  19  A  Um-hum.

17:15:27  20  Q  In the first page of the string,

17:15:30  21 Mr. Rothschild, it says -- MDX 42710 appears to

17:15:31  22 be an email from you dated February 27, 2008, to

17:15:33  23 Erika Boyer and Irving Weiss, among other

17:15:34  24 people, right?

         25  A  No.

Page 222

17:15:39   1   Q   "No"?
17:15:40   2   A   No.
17:15:42   3   Q   What did I just say wrong that makes
17:15:43   4   you say "No"?
17:15:45   5   A   I don't believe I sent that email.
17:15:47   6   Q   From Mitchel?
17:15:48   7   A   Okay.  Oh, that one, yes.
        8   Q   All right.  From Mitchel?
17:15:49   9   A   The bottom.
17:15:52  10   Q   I am sorry if I wasn't clear.
17:15:53  11       From you to those folks that I
17:15:55  12   mentioned?
17:15:55  13   A   Yes.
17:15:57  14   Q   February 27, 2008?
17:15:59  15   A   Yes.
17:16:02  16   Q   And do you have any reason to believe
17:16:03  17   that that's actually a copy of the email you
17:16:04  18   sent?
17:16:05  19   A   It would appear to be.
17:16:07  20   Q   That it is not?
17:16:15  21   A   It would appear to be.
17:16:19  22   Q   Okay.  And when you wrote, "We are in"
17:16:22  23   with an exclamation point, did you mean in to
17:16:25  24   Google Maps?
        25   A   Into Google Maps and Google content

Page 223

17:16:32   1   provider, being a Google content provider.
17:16:33   2   Q   This is right when you were launching
17:16:37   3   the Vitals website, right?  Or had you already
17:16:38   4   launched?
17:16:43   5   A   As of February 2008, we had already
17:16:52   6   launched it.
        7   Q   Okay.  Why was it important or
17:16:56   8   exciting news that you were in?
17:17:06   9   A   Because a good amount of traffic comes
17:17:08  10   to websites through Google, and if Google takes
17:17:10  11   your content, they make a link to you, and that
17:17:16  12   link gives you traffic.
17:17:19  13   Q   A link that would show up when
17:17:37  14   somebody uses Google to, let's say, look for
17:17:50  15   doctors or whatever inquiry they make?
17:17:54  16   A   Yes.
17:17:54  17   Q   This is 23.
17:17:55  18   A   We have two 23's.
17:17:57  19   Q   Do we?
17:17:59  20   A   Um-hum.
17:18:04  21   Q   The oil is running out of the machine.
17:18:14  22   Sorry about that.  Let's make that 24.
17:18:16  23   A   No, you gave me two 23's, and I am
17:18:16  24   taking it.
        25       MR. VAZQUEZ:  It's 25.

Page 224

17:18:16   1       (6/29/11 letter marked Rothschild
17:18:17   2   Exhibit 25 for identification, as of this
17:18:19   3   date.)
17:18:20   4   BY MR. VAZQUEZ:
17:18:21   5   Q   Would you mind putting that over the
        6   top of 23.
17:18:25   7   A   Which 23?
17:18:29   8   Q   The one that is June 29th, 2011, I
17:18:31   9   guess, letter from SVB.
17:18:33  10   A   Okay.
17:18:39  11       MR. STIMPSON:  What is this, 24, 25?
17:18:40  12       MR. VAZQUEZ:  25.
17:18:42  13   A   25.
17:18:43  14   Q   Do you recall this letter,
17:18:46  15   Mr. Rothschild?
17:18:47  16   A   Yes, I do.
17:18:50  17   Q   And what was the purpose of this
17:18:54  18   valuation?
17:19:02  19   A   We wanted to issue common stock
17:19:04  20   options to employees, and therefore, in order to
17:19:07  21   avoid any sort of tax -- negative tax
17:19:12  22   consequence to either the company or the issue
17:19:16  23   of the options, we had an independent valuation
17:19:18  24   done by a Silicon Valley Bank, who does this for
        25   a lot of web companies, and they calculate out

Page 225

17:19:23   1   how to do what they believe to be the valuation
17:19:26   2   of the common stock based on comparatives and
17:19:28   3   other things.
17:19:37   4   Q   Okay.  Have there been any other
        5   valuations after this one?
17:19:49   6   A   No, I think this was the most recent.
17:19:56   7   Q   Okay.  Thank you.
17:20:04   8       Okay.  Mr. Rothschild, I believe this
17:20:04   9   is the last one.  This is marked Exhibit 24.
17:20:04  10       Do you have another 24 there?
17:20:04  11       (PowerPoint presentation marked
17:20:05  12       Rothschild Exhibit 24 for identification,
17:20:17  13       as of this date.)
17:20:21  14   BY MR. VAZQUEZ:
17:20:25  15   Q   I think you do not.
17:20:31  16       I am just trying to confirm that
17:20:36  17   the -- that the PowerPoint presentation that is
17:20:38  18   shown within this Exhibit 24 is an
17:20:41  19   authentic MDX PowerPoint presentation?
17:20:42  20   A   I believe it is.
17:20:44  21   Q   Okay.
17:20:50  22       MR. VAZQUEZ:  And I believe I have no
17:20:51  23   further questions.
17:20:52  24       MR. STIMPSON:  I have nothing.
        25       MS. STOLL-DeBELL:  Thank God.

Page 226

| | | |
|---|---|---|
| 17:20:53 | 1 | MR. STIMPSON: I take it back. I have |
| 17:20:53 | 2 | some. |
| 17:20:54 | 3 | MR. VAZQUEZ: Hold on. |
| | 4 | BY MR. VAZQUEZ: |
| 17:20:57 | 5 | Q Mr. Rothschild, Mr. Rothschild, in all |
| 17:21:00 | 6 | seriousness, may have something to say here. |
| 17:21:00 | 7 | A Okay. Well, I do want to make a point |
| 17:21:02 | 8 | on this. |
| 17:21:07 | 9 | Q Yes? |
| 17:21:10 | 10 | A I want to make the point that merely |
| 17:21:16 | 11 | because it is an MDX PowerPoint, which does by |
| 17:21:19 | 12 | no means mean that we implemented or did things |
| 17:21:22 | 13 | here, this was most likely a suggestion from one |
| 17:21:25 | 14 | of our more aggressive search engine |
| 17:21:30 | 15 | optimization types, because that is a highly |
| 17:21:33 | 16 | competitive area on what we do, and so they tend |
| 17:21:35 | 17 | to always go over the edge in terms of making |
| 17:21:37 | 18 | suggestions. And by no means does it reflect |
| 17:21:38 | 19 | what shows up on the site. |
| 17:21:39 | 20 | Q Are there things that you signed here |
| 17:21:42 | 21 | that seems over the edge to you? |
| 17:21:43 | 22 | A Many. |
| 17:21:44 | 23 | Q Okay. Like what? |
| 17:21:45 | 24 | MR. STIMPSON: I think you said you |
| | 25 | had no more questions. |

Page 227

| | | |
|---|---|---|
| 17:21:50 | 1 | MR. VAZQUEZ: I know, but then he |
| 17:21:57 | 2 | added. |
| | 3 | MR. STIMPSON: Okay. |
| 17:22:07 | 4 | A I was just looking at things that -- |
| 17:22:11 | 5 | let's see, Page 6, HealthGrades example -- |
| 17:22:15 | 6 | MR. STIMPSON: I need a copy of that. |
| 17:22:15 | 7 | A -- we didn't do that at all. |
| 17:22:21 | 8 | Page 7, Insider Pages, which we didn't |
| 17:22:26 | 9 | do at all. |
| 17:22:27 | 10 | Page 9, vCards, which we didn't do at |
| 17:22:29 | 11 | all. |
| 17:22:32 | 12 | You know -- |
| 17:22:38 | 13 | Q I understand. Your point is -- is |
| 17:22:40 | 14 | well taken, that just because you say, hey, this |
| 17:22:45 | 15 | is an authentic MDX PowerPoint, it does not mean |
| 17:22:47 | 16 | that you are saying that everything that is |
| 17:22:50 | 17 | suggested was implemented. It doesn't mean that |
| 17:22:53 | 18 | anything -- the content is something that is |
| 17:22:55 | 19 | just casting stone. |
| 17:22:57 | 20 | A Right. It does not represent an |
| 17:23:00 | 21 | official policy of the company by any means. It |
| 17:23:01 | 22 | is one individual's suggestions for the things |
| 17:23:02 | 23 | we ought to do and one who is highly aggressive. |
| 17:23:03 | 24 | Q Yes. |
| | 25 | Still with the company? |

Page 228

| | | |
|---|---|---|
| 17:23:09 | 1 | A Yes. |
| | 2 | Q Who is that? |
| 17:23:12 | 3 | A It's somebody from the SCO shop, so I |
| 17:23:15 | 4 | am not sure who is from the SCO shop. |
| 17:23:16 | 5 | MR. VAZQUEZ: Okay. I really don't |
| 17:23:18 | 6 | have any more questions. |
| 17:23:18 | 7 | MR. STIMPSON: I have nothing. |
| 17:23:18 | 8 | MR. VAZQUEZ: Thank you. Thank you |
| 17:23:18 | 9 | for your time. |
| 17:23:18 | 10 | THE VIDEOGRAPHER: This -- this marks |
| 17:23:18 | 11 | the end of Tape No. 4 in the deposition of |
| | 12 | Mitchel Rothschild. We're going off the |
| | 13 | record. The time is 5:25 p.m., June 7, |
| | 14 | 2012. |
| | 15 | (Time noted: 5:25 p.m.) |
| | 16 | |
| | 17 | _____ |
| | 18 | MITCHEL ROTHSCHILD |
| | 19 | Subscribed and sworn to before me |
| | 20 | this ___ day of _____, 2012. |
| | 21 | |
| | 22 | _____ |
| | 23 | Notary Public |
| | 24 | |
| | 25 | |

Page 229

| | | |
|---|---|---|
| | 1 | C E R T I F I C A T E |
| | 2 | STATE OF NEW YORK ) |
| | 3 | : ss. |
| | 4 | COUNTY OF NEW YORK ) |
| | 5 | I, ANITA SHEMIN, a CSR, RPR |
| | 6 | and Notary Public within and for the State |
| | 7 | of New York, do hereby certify: |
| | 8 | That MITCHEL ROTHSCHILD, the witness |
| | 9 | whose deposition is hereinbefore set forth, was |
| | 10 | duly sworn by me and that such deposition is a |
| | 11 | true record of the testimony given by the |
| | 12 | witness. |
| | 13 | I further certify that I am not |
| | 14 | related to any of the parties to this action by |
| | 15 | blood or marriage, and that I am in no way |
| | 16 | interested in the outcome of this matter. |
| | 17 | IN WITNESS WHEREOF, I have hereunto |
| | 18 | set my hand this ____ day of _____, 2012. |
| | 19 | |
| | 20 | _____ |
| | 21 | ANITA SHEMIN, CSR, RPR |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Page 230

1  STATE OF NEW YORK   )    Pg 209 of 209 Pgs
2         ss:
3  COUNTY OF NEW YORK  )
4     I wish to make the following changes, for the
5  following reasons:
6  PAGE LINE
7  ____ ____ CHANGE: _____
8      REASON: _____
9  ____ ____ CHANGE: _____
10     REASON: _____
11 ____ ____ CHANGE: _____
12     REASON: _____
13 ____ ____ CHANGE: _____
14     REASON: _____
15 ____ ____ CHANGE: _____
16     REASON: _____
17 ____ ____ CHANGE: _____
18     REASON: _____
19 ____ ____ CHANGE: _____
20     REASON: _____
21 ____ ____ CHANGE: _____
22     REASON: _____
23 ____ ____ CHANGE: _____
24     REASON: _____
25