IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-00520-PAB-BNB

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC.,
doing business as Vitals.com,

      Defendant.
_____

## ORDER REGARDING CLAIM CONSTRUCTION
_____

This matter is before the Court for the construction of U.S. Patent No. 7,752,060 (the "'060 Patent") [Docket No. 3] (the "patent"), assigned to plaintiff Health Grades, Inc. ("Health Grades"). The Court is called upon to construe various terms and phrases found in the patent.

## I. BACKGROUND

The patent "generally relates to an Internet-based system and method that connects patients with potential healthcare providers, e.g., physicians and hospitals." '060 Patent col. 1 ll. 12-14. "More particularly, the present invention relates to providing on-line ratings and reports comprised of detailed healthcare provider information with verified information sections, including physician verified and/or independent third-party-verified portions, and patient-provided information sections, to assist patients in differentiating among healthcare providers." '060 Patent col. 1 ll. 14-20. Health Grades contends that defendant MDX Medical, Inc. ("MDX") infringes claims 1, 4 through 9, 11,

and 14 through 16 of the '060 Patent.

Claims 1 and 4 through 9 of the '060 Patent provide as follows:

**1.**  A computer-implemented method of providing healthcare provider information to potential patients, said method comprising:

receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;

accessing healthcare provider-verified information about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;

compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;

compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;

creating, by the at least one computer processor, a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers; and

providing access to the healthcare provider report on the first healthcare provider over a computer network.

* * *

2

**4.** The method as defined in claim 1, wherein the healthcare provider report includes a hyperlink to an affiliated hospital, medical center, or other type of treatment center.

**5.** The method as defined in claim 1, wherein the access to the healthcare provider report is obtained through a predetermined Web page that provides search capabilities for a database comprised of healthcare provider information.

**6.** The method as defined in claim 5, wherein the search capabilities permit a search based on one or more from the group consisting of: name, medical specialty, gender, state, city, procedure, diagnosis, procedure, and location criteria.

**7.** The method as defined in claim 6, wherein the search of the database produces a results list of one or more healthcare providers satisfying the search criteria, wherein the results list includes the first healthcare provider.

**8.** The method as defined in claim 7, wherein the results list further includes an advertisement for the first healthcare provider with a hyperlink to information on the first healthcare provider.

**9.** The method as defined in claim 7, further comprising: determining from the results list whether a particular healthcare provider is a member of the company managing the Web site; and if the particular healthcare provider is a member of the company managing the Web site, providing enhanced services for the member healthcare provider on the Web site.

'060 Patent col. 20 l. 20 - col. 21 l. 56.

From this claim language, plaintiff contends that only the following three phrases require construction by the Court: "first healthcare provider"; "healthcare provider report on the first healthcare provider"; and "comparison ratings of healthcare providers."

In addition to those three phrases, defendant seeks to have the Court construe the following claim language: "healthcare provider-verified information"; "received from the first healthcare provider"; "verified by an independent third-party source"; "compiling"/"compile"; "using the healthcare provider-verified information, the patient-provider information, and the information verified by the independent third-party

3

source"; "hyperlink to an affiliated hospital, medical center, or other type of treatment center"; "the results list further includes an advertisement"; and "member of the company managing the website"/"member healthcare provider."

## II.  LEGAL STANDARDS FOR PATENT CLAIM CONSTRUCTION

Claim construction is a question of law for the court.  *See, e.g.*, *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).  In construing patent claims, courts are guided by the precedent of the Federal Circuit.  *See SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333 (Fed. Cir. 1999).  As that court has explained, "there is no magic formula or catechism for conducting claim construction."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc).  Even so, the *Phillips* decision outlined several key sources and doctrines that should be consulted and applied, all the while making clear that "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  *Id.*

Courts begin with the "bedrock principle" that "'the claims of the patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The words of the claims "'are generally given their ordinary and customary meaning,'" *id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," *id.* at 1313; *see CCS*

4

*Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, [courts] indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning."). Sometimes, when the claim language "involves little more than the application of the widely accepted meaning of commonly understood words," construction is relatively straightforward and "the ordinary meaning . . . may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. However, when the claim terms have a particular meaning in the field, courts "look[ ] to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id.* (quoting *Innova*, 381 F.3d at 1116). These sources include "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.*

Importantly, claim terms are not read in a vacuum. *Id.* at 1313. The context in which a term is used, both in the asserted claim as well as in other claims of the patent, can be valuable and instructive. *Id.* at 1314. In addition, the patent specification – the text and figures of the patent that precede the claims – "'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). However, "the claim requirement presupposes that a patent applicant defines his invention in the claims, not in the specification." *Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002); *see PSC Computer Products, Inc. v. Foxconn Intern., Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004) ("'[T]he

5

claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly[.]'") (quoting *United States v. Adams*, 383 U.S. 39, 48-49 (1966)).

Courts also consider the patent's prosecution history – the official record of the patent application and subsequent process before the U.S. Patent and Trademark Office. *Id.* at 1317. That history "provides evidence of how the PTO and the inventor understood the patent." *Id.* However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Courts may consult extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Id.* However, this evidence is "'less significant than the intrinsic record,'" i.e., the specification and prosecution history, *id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)), and courts must be wary not to use extrinsic evidence to override the meaning of the claim terms demonstrated by the intrinsic evidence. *Id.* at 1318-19. That is, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

In sum, a court's basic role is to construe the claim terms as they would be viewed by "the ordinary artisan after reading the entire patent." *Id.* at 1321. This is crucial in order to respect the public notice function of patents:

> The patent system is based on the proposition that claims cover only the invented subject matter. As the Supreme Court has stated, "[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."

*Id.* at 1321 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573-74 (1876)).  With these principles in mind, I turn to the claim construction issues presented in this case.

## III.  ANALYSIS

### A.  First Healthcare Provider

Plaintiff proposes the following construction for "first healthcare provider": "a physician or other healthcare professional."  Docket No. 79 at 8.[1]  The term "first healthcare provider" is used in Claim 1, Claim 7, Claim 8, and Claim 15.  *See* '060 Patent col. 20 ll. 26, 31-33, 40-41, 43, 45-46, 50-51, 59, 63-64, 67; *id.* col. 21 ll. 43, 46-47; and *id.* col. 22 ll. 17-18, 20, 23, 29-30, 32-33, 36, 41, 48-49, 53, 56.  Defendant does not dispute that "first healthcare provider" refers to a person, rather than an entity,[2] but suggests that it refers to "a specific healthcare provider, and the same provider referenced throughout the claims on which the request is received, healthcare-verified information accessed, patient-provided information is compiled, information verified by a third-party is compiled, and a report is created."  Docket No. 93 at 8 (internal citations omitted).  The focal point of the parties' dispute is whether "first healthcare provider" is a particular provider or may be one or more providers.

In support of its contention that "first healthcare provider" may be one or more providers, plaintiff presents two arguments: (1) that the indefinite article "a" is construed

---

[1]All page numbers following references to docket numbers refer to the page indicated at the top of the docket entry and not necessarily any page numbers supplied by the filer at the bottom of any respective page.

[2]*See* '060 Patent col. 20 ll. 33-38 (information regarding the "first healthcare provider" includes "specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies").

to refer to "one or more," and (2) that the claims and specification make clear that the invention includes the ability to conduct searches resulting in the receipt of information on multiple healthcare providers.

Plaintiff is correct that the "words 'a' or 'an' in a patent claim carry the meaning of 'one or more.'" *TiVo, Inc. v. EchoStar Communications Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008).  "That is particularly true when" – like here – "those words are used in combination with the open-ended antecedent 'comprising.'" *Id.*; *see Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (stating that the Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'") (citation omitted).   The "question whether 'a' or 'an' is treated as singular or plural depends heavily on the context of its use," *TiVo, Inc.*, 516 F.3d at 1303 ("The general rule does not apply when the context clearly evidences that the usage is limited to the singular."), but "[t]hat 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention," exceptions to which are found in only "extremely limited" circumstances. *Baldwin Graphic*, 512 F.3d at 1342.[3]

Here, however, the term "healthcare provider" is not immediately preceded by "a" or "an" but rather the modifier "first."   The issue, therefore, is not whether "a" healthcare provider means "one or more" healthcare providers, but whether "a first" healthcare

---

[3]Later in the claim, "first healthcare provider" is preceded by "the."  However, the *"*subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning." *Baldwin Graphic Sys.*, 512 F.3d at 1342.

provider is potentially plural or, as defendant contends, refers to a "specific" healthcare provider.  While the "use of the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation," *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003), the '060 Patent never introduces a "second" healthcare provider.  It is, therefore, not clear simply from the use of "first" that the healthcare provider is a specific provider distinguished from subsequently introduced providers.  With that said, qualifying "healthcare provider" with "first" does indicate the intent to distinguish that provider from other providers in some fashion.[4]

To rebut the implication that "a first healthcare provider" is limited to one person, plaintiff contends that the patent's "claims encompass systems for providing healthcare provider information relating to multiple healthcare providers."  Docket No. 79 at 11.  There is no dispute that such is the case.  For example, the patent's Summary describes an embodiment "involving search criteria limited to city/state information" where a "patient will be presented with a list of physician names with hyperlinks to those

---

[4]One possible interpretation of "first healthcare provider" that would be consistent with plaintiff's proposal is to conclude that the phrase refers to one or more healthcare providers resulting from a first search.  *See* '060 Patent col. 6 ll. 63-65  (describing an embodiment "including a first list 208 of physicians that closely match the specific name criteria entered by the user, the physician name results Web page"); *see also* '060 Patent col. 7 ll. 5-14 (describing a search resulting in a list of multiple physicians meeting a search criteria, such list containing "comparisons amongst the physicians . . . in which such comparisons highlight which physicians best fit the patient's specified criteria").  This interpretation, however, strains the meaning of "first" when placed directly before "healthcare provider."  Furthermore, it fails to account for claim 7's introduction of a "results list" with "one or more" healthcare providers resulting from a search.  Finally, the patent elsewhere refers to "healthcare providers" without use of "first," *see* '060 Patent col. 20 ll. 59-60, further supporting the interpretation that "first" identifies a single healthcare provider.

physicians' individual reports." '060 Patent col. 3 ll. 8-11. The specification further describes an embodiment of the invention where a patient can "find a physician by selecting the specialty desired from a list 142 of such specialties or to select the physician's name or hospital name from an alphabetical index of such names for physicians (140) and for hospital (144)." '060 Patent col. 5 l. 66 - col. 6 l. 3. Moreover, the patent embodies searches by last name or by city/state with multiple resulting healthcare providers. *See* '060 Patent col. 6 ll. 18-28 (citing Figs. 2A and 2B). These references to embodiments, however, do not resolve the issue of whether the "first healthcare provider" is a particular provider.

If plaintiff's construction is accepted, Claim 1 would describe "one or more first healthcare providers," without a clear explanation of how "first" modifies the term "healthcare provider" or how "first" is distinguished from the word "a" which precedes it. The use of "first" appears directed at identifying a particular healthcare provider in Claim 1 for purposes of describing the manner in which information may be acquired and presented in a healthcare provider report upon the "request for information regarding a first healthcare provider."[5] '060 Patent col. 20 ll. 25-26; *cf.* '060 Patent col. 2 ll. 21-28 ("In an exemplary embodiment, in response to a search query for a particular physician name conducted using a search engine external to the company Web site, the patient receives a Web-based 'profile' of a selected physician matching, or closely matching,

_____

[5]The Court notes that Claim 9 references a "particular healthcare provider" in the context of determining whether a particular provider is a "member of the company managing the Web site." '060 Patent col. 21 ll. 49-52. This "particular" healthcare provider, it seems, can be either the "first healthcare provider" or any other specific provider.

the entered search terms.  A profile lists detailed information potentially available about that physician which may be obtained in the form of a report."); '060 Patent col. 10 ll. 33-67.  Subsequent claims introduce the concept of searching for multiple providers fitting certain criteria.  For example, in Claim 6, the patent refers to a "search based on one or more from the group consisting of: name, medical specialty, gender, state, city, procedure, diagnosis, . . ., and location criteria."  '060 Patent col. 21 ll. 37-39.  In Claim 7, such a search "produces a results list of one or more healthcare providers satisfying the search criteria, wherein the results list includes the first healthcare provider."  '060 Patent col. 21 ll. 40-43.  In other words, Claim 7 incorporates Claim 1's description of information available regarding a "first healthcare provider," as well as the limitations introduced in Claims 2 through 6, and then adds the limitation that such information shall be found within a specific context, i.e., a list on which can be found the "first healthcare provider" introduced in Claim 1.  Plaintiff fails to account for these dependent claims and how they are consistent with "a first healthcare provider" meaning "one or more first healthcare providers."  *See* 35 U.S.C. § 112, ¶ 4 ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.  A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."); *Kraft Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (explaining that the doctrine of claim differentiation "creates a presumption that each claim in a patent has a different scope"); *see also Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010) ("Under [the doctrine of claim differentiation], 'the presence of a dependent claim that adds a particular limitation gives rise to a

11

presumption that the limitation in question is not present in the independent claim.'") (quoting *Phillips*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)).[6]

The Court concludes that "first healthcare provider" refers to a particular healthcare provider about whom information is requested and a report is produced. That "first healthcare provider" may also appear in lists of "one or more healthcare providers." '060 Patent col. 21 l. 41-42.

### B. Healthcare Provider Report on the First Healthcare Provider

Plaintiff argues that the "healthcare provider report on the first healthcare provider" refers to "a formatted and organized presentation of information that relates to one or more healthcare providers identified in response to a query for information regarding healthcare provider(s)." Docket No. 79 at 12. The phrase "healthcare provider report on the first healthcare provider" is used in Claim 1, Claim 12, and Claim 15. *See* '060 Patent col. 20 ll. 58-60, 63-67; *id.* col. 21 ll. 65-66; *id.* col. 22 ll. 48-49, 55-56. Defendant does not take issue with the description of the report's structure but contends that the report relates only to the particular "first healthcare provider" discussed above. *See* Docket No. 93 at 11 (proposing "a report directed specifically to the 'first healthcare provider'"). For the reasons discussed earlier when construing "first healthcare provider," the Court agrees with the defendant. The Court identifies no persuasive basis to construe "first healthcare provider" any differently in this context. With that said, the Court does not adopt defendant's proposed claim construction

---

[6]*Cf. TM Patents, L.P. v. International Business Machines Corp.*, 121 F. Supp. 2d 349, 380 (S.D.N.Y. 2000) ("A dependent claim may well be 'narrower' (i.e., more restrictive) than its associated independent claim while nonetheless expanding on the type of situation in which the patent would be infringed.") .

12

language.  Having already construed "first healthcare provider" and there being no dispute regarding "report," the Court finds that "healthcare provider report on the first healthcare provider" requires no further construction.

### C. Comparison Ratings of Healthcare Providers

Defendant argues that the "comparison ratings of healthcare providers" must relate to "multiple providers other than the first healthcare provider."  Docket No. 93 at 13.  The phrase "comparison ratings of healthcare providers" is used in Claim 1 and Claim 15.  *See* '060 Patent col. 20 ll. 64-65; *id.* col. 22 ll. 53-54.  Plaintiff points out that the comparison ratings are included in the report on the first healthcare provider and, therefore, it would make little sense for the ratings not to also include the first healthcare provider.  *See* Docket No. 79 at 16; *id.* at 15 (proposing "a rating system that facilitates comparison(s) amongst physicians to highlight which physician(s) identified in response to a query for information best fit one or more criteria").  The Court agrees with plaintiff that there is no indication that the comparison ratings found in the report on the first healthcare provider would not include ratings for that provider.  *See* '060 Patent col. 2 ll. 3-5 ("From [a results] list, a patient may access a detailed 'report' or, in one embodiment, comparison ratings on that particular provider.").

Plaintiff does not believe that the "comparison ratings" found in the report require inclusion of ratings for other physicians.  In other words, plaintiff argues that "comparison ratings" would cover any standardized ratings system, i.e., a "'5-star rating' system for all physicians within a database."  Docket No. 79 at 17.  As noted above, however, "first healthcare provider" refers to a particular provider.  Upon introducing the

concept of "*comparison* ratings" in Claim 1, the patent no longer uses the term "first healthcare provider" but rather refers to "comparison ratings of healthcare providers." '060 Patent col. 20 ll. 64-65.  It appears clear that the report on the first healthcare provider includes ratings of that provider as well as others to permit comparison, thus organizing the information "in a manner that . . . allow[s] a patient to compare physicians."  '060 Patent col. 1 ll. 44-45; *see* '060 Patent col. 7 ll. 11-14 ("In accordance with an embodiment of the invention, comparisons amongst the physicians may be provided to the patient, in which such comparison highlight which physicians best fit the patient's specified criteria.").

For the foregoing reasons, the Court construes "comparison ratings of healthcare providers" as including ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

### D.  Healthcare Provider-Verified Information

The term "healthcare provider-verified information" is used in Claim 1 and Claim 15.  *See* '060 Patent col. 20 ll. 30-32, 60; *id.* col. 22 ll. 19-21, 49-50.  Defendant requests the following construction for this term: "information proved to be true directly and personally by the healthcare provider."  Docket No. 93 at 16.  Plaintiff does not believe the word "verified" requires construction, but proposes the following in the event the Court disagrees: "information verified by a physician or other healthcare professional."  Docket No. 79 at 22.  The Court agrees with plaintiff that there is no

need to construe the word verified[7] and, to the extent it were to be construed, the plain and ordinary meaning would apply.[8]  *Cf. Phillips*, 415 F.3d at 1314 (when the claim language "involves little more than the application of the widely accepted meaning of commonly understood words," construction is relatively straightforward and "the ordinary meaning . . . may be readily apparent even to lay judges").

---

[7]In regard to defendant's request to have "directly and personally by the healthcare provider" included in the "healthcare provider-verified information" construction, the Court will discuss the manner in which the information is received when discussing the disputed phrase "received from the first healthcare provider" below.

[8]Although defendant is correct that "verify" can mean "to prove," "verify" may also mean, depending on its context, "confirm" or "substantiate."  Collins English Dictionary - Complete & Unabridged 10th Edition. HarperCollins Publishers. 13 Jan. 2012 <Dictionary.com dictionary.reference.com/browse/verify>; *cf. Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 n.2 (Fed. Cir. 2007) ("Although in *Phillips* we rejected an approach in which a broad dictionary definition is adopted and then whittled down only if contradicted by the specification, we did not prohibit the use of dictionaries in claim construction, nor did we define at what point in the claim construction analysis they may be consulted." (internal citation omitted)); *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316 (Fed. Cir. 2006) ("The district court's reference to the dictionary was not an improper attempt to find meaning in the abstract divorced from the context of the intrinsic record but properly was a starting point in its analysis, which was centered around the intrinsic record consistent with Phillips.").  Here, the specification makes clear that the act of "verifying" requires only that the website receive confirmation of the information from some other source, in this instance the healthcare provider.  Indeed, the confirmation described appears to not extend beyond receipt of such information from the first healthcare provider.  *See* '060 Patent col. 2 ll. 55-62 (where the patent's Summary describes "physician-verified, or physician-provided" information as well as "company-verified" information and "patient-provided information"); '060 Patent col. 7 ll. 56-64 ("The first section 306 contains physician-verified information, in which the member physician provides personal information, such as specialty information 316, medical philosophy 318, gender 320, age 322, years in the profession 324, years in the particular practice listed 326, if any, title 328, professional status 330, awards and honors 332, professional appointments 334, professional affiliations/memberships 336, publications338, languages 340, hobbies 342, etc. 344").  And, in fact, the claims state that the "healthcare provider information is received from the first healthcare provider," which is the next phrase about which there is a dispute.

### E.  Received from the First Healthcare Provider

The phrase "received from the first healthcare provider" is found in Claim 1 and

Claim 15.  *See* '060 Patent col. 20 ll. 31-32; *id.* col. 22 ll. 21-22.  Plaintiff contends that,

despite the plain meaning of this phrase, the information may be received from a

source other than the "first healthcare provider."  Docket No. 79 at 22-23.  In support of

that contention, it cites the following from the patent's specification:

> Start operation 1602 is initiated in response to accessing or obtaining
> specific physician information. In an embodiment, such information is
> obtained from the physician himself or herself through a client computer, a
> network, and a server system such as that depicted in FIG. 1. However, in
> other embodiments, the information may be obtained through other means.
> For example, in one embodiment, the information is obtained through an
> independent third party, such as the company Web service provider, that
> researches and gathers public information regarding a physician, such as
> medical license records, board certifications, federal or state disciplinary
> actions, and other sources of public information, such as advertising by
> physicians indicating office locations and practice types, insurance company
> physician listings, etc.

'060 Patent col. 17 ll. 1-22.  The Court finds that this passage merely emphasizes what

is clear from a plain reading of the claims.  Information may be verified by receipt of the

information from the first healthcare provider or in some *other* manner, such as "an

independent third-party source" or the patient, which are separately described in the

patent.  '060 Patent col. 20 ll. 29-57.  When the patent refers to information received

from the first healthcare provider, however, there can be no inference that it refers to

information received by some entity or individual that is not associated with that

particular healthcare provider.

The Court finds defendant's limitation that the information be received

"personally" from the first healthcare provider to be unduly limited.  The phrase and the

16

surrounding context contemplate receipt of information from the first healthcare provider or one of his or her agents, such as an employee, as distinguished from information received from patients or public sources.

### F.  Verified by an Independent Third-Party Source

The phrase "verified by an independent third-party source" is found in Claim 1 and Claim 15.  *See* '060 Patent col. 20 l. 51; *id.* col. 22 ll. 41-42.  Defendant seeks the following construction for this phrase: "proved to be true by an independent third-party source."  Docket No. 93 at 18.  Plaintiff does not believe the phrase requires a construction, relying on its plain and ordinary meaning.  As an initial matter, although "by an independent third party" is included in the phrase, neither party has sought to construe that aspect of the phrase.  Rather, the dispute turns on whether the verification must equate to proof.  For the reasons discussed above, the Court finds no basis to limit the meaning of "verified" in that manner.  The patent does not require that the third-party information be "proven" but rather only describes an attempt to substantiate that will provide a patient with "some assurance that the qualifications of the doctor have been checked by someone."  '060 Patent col. 8 ll.12-13.[9]  The claims in no way foreclose an embodiment where such "proof," however defined, would be required.  In short, the plain and ordinary meaning of "verified," which can encapsulate a range of conduct aimed at confirmation of information, shall apply.  No further construction is necessary.

---

[9]When describing the "verification" of patient-provided information, the patent merely requires a confirmation that the individual who is providing the information was a patient of the healthcare provider.  *See* '060 Patent col. 9 l. 35 - col. 10 l. 2.

### G.  Compiling / Compile

The term "compiling" is found in Claim 1 and Claim 3, *see* '060 Patent col. 20 ll. 39, 50; *id.* col. 21 ll. 15, 26, and the term "compile" is found in Claim 15.  *See id.* col. 22 ll. 29, 40.  Defendant argues that "compiling" should be construed to mean "gathering and putting together."  Docket No. 93 at 20.  Plaintiff does not believe that the words "compiling" and "compile" require construction, contending they should receive their plain and ordinary meaning.  If the terms are to be construed, plaintiff suggests that "compiling" means "putting together various pieces of information from different sources, such as ratings from different patients."  Docket No. 79 at 24.  Plaintiff does not believe the "gathering" is captured by the term.  The parties have not clearly articulated the difference, as they see it, between the acts of "putting together" information and "gathering" it.

In support of its definition, plaintiff emphasizes that the "specification does not use the term 'compiling' to mean 'gathering.'" Docket No. 79 at 24.  Plaintiff cites the following passage in support of its position that "compiling" means "putting together." *See* '060 Patent col. 10 ll. 29-32 ("[T]he information and data provided by the patient survey is compiled with other data provided by other past or current patients and maintained within the company database.").  As defendant points out, while the specification does use "compiling" to mean "putting together," such as when it refers to the "compiling, or creation, of healthcare provider profiles and/or reports," '060 Patent col. 18 ll. 24-27,[10] the claim language does not appear to exclusively use compiling in

---

[10]*See* '060 Patent col. 18 ll. 32-35 ("In an embodiment, the physician-provided information 1604, patient-provided information 1606, and independent third party

that manner.[11]   Rather, in Claim 1, patient-provided information is compiled, but only

after it is first "received."  *See* '060 Patent col. 20 ll. 38-49.  Therefore, to the extent the

parties are using "gathering" as the act of acquiring the information, "compiling" does

not appear to be used in that manner when describing "patient-provided information."

However, when Claim 1 describes "compiling information . . . verified by an independent

third-party source," the sources of such information are listed, but the manner in which

the information is acquired is not described by any other word but "compiling."  *See* '060

Patent col. 20 ll. 50-57.  In this instance, "compiling" does appear to refer to both

"gathering" the information and then putting it together with other information verified by

third-party sources.  In short, to the extent the term requires construction, the Court

concludes that, depending on the context in which it is used, "compiling" can mean

---

verification information 1608 is compiled into a report and/or profile 112 (FIG. 1) and stored in database 108.").

[11]Furthermore, it is far from clear that the specification uses "compiling" only to mean putting together.  For instance, the specification describes embodiments where information is obtained through an independent third party, such as the company Web service provider, that researches and gathers public information regarding a physician, such as medical license records, board certifications, federal or state disciplinary actions, and other sources of public information, such as advertising by physicians indicating office locations and practice types, insurance company physician listings, etc.  Once initiated, the operation flow of the compiling process 1600 passes from Start operation 1602 to access operation 1604, in which information regarding a physician is accessed . . . .  From access physician information operation 1604, process 1600 proceeds to receive patient information operation 1606.  In an embodiment, receive operation 1606 receives patient-provided information from the patient experience survey . . . .  While both the access physician information operation 1604 and the receive patient information operation 1606 allow for the potential verification of received and gathered information, such verification is not required at these steps in accordance with embodiments of the present invention.
'060 Patent col. 17 ll. 7-17, 23-27 and '060 Patent col 17 ll. 63 - col. 18 l. 1.

"gathering" and/or "putting together."

**H.  Using the Healthcare Provider-Verified Information, the Patient-Provider Information, and the Information Verified by the Independent Third-Party Source**

Claim 1 and Claim 15 describe the creation of the healthcare provider report by "using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source."  '060 Patent col. 20 ll. 58-62; *id.* col. 22 ll. 49-52.  The parties disagree about whether, as defendant contends, the "use" must be of "all" the designated information.  Defendant fails to persuasively explain why the Court should read such a limitation into claim language.  Defendant argues that "the" information refers back to the previous references to the categories of information described earlier in Claim 1.  That appears not to be in dispute, but also does not resolve whether "all" such information must be used when creating a report on a particular healthcare provider.  Defendant does not explain why the use of a subset of "information" somehow renders that information no longer within the categories previously identified in Claim 1.  Furthermore, the categories of information are being "used" to "create" a report.  There is nothing in the patent that requires, when receiving, acquiring, or compiling information, a predetermination of what will ultimately be put into a report.  *Cf.* '060 Patent col. 18 ll. 37-39 ("The particular embodiments described herein are not intended to limit the types of information which may be provided and/or verified.").  For instance, a patient or healthcare provider might provide information to the website that is not deemed relevant or important upon reaching the step of creating a report.  Because the Court rejects the insertion of "all" in

the claim language, the phrase requires no construction.

### I. <u>Hyperlink to an Affiliated Hospital, Medical Center, or Other Type of Treatment Center</u>

Claim 4 describes a "hyperlink to an affiliated hospital, medical center, or other type of treatment center."  '060 Patent col. 21 ll. 31-32.  Plaintiff contends that this phrase needs no construction.  Defendant disagrees, requesting the Court construe the phrase as follows: "Hyperlink to a website of the affiliated hospital, medical center, or other type of treatment center."   Docket No. 93 at 23.  Defendant includes "to a website" in order to clarify that the hyperlink cannot take somebody to another part of plaintiff's website.  The Court disagrees that a hyperlink "to" an affiliated hospital necessarily must lead to a website external to plaintiff's website.  In fact, from a review of the patent, it appears that "hyperlink" is used in the specification to refer to links to locations on plaintiff's website and not generally to external websites.[12]  *See* '060 Patent col. 2 ll. 63-67 ("As noted above, another embodiment, and aspects related thereto, involves profiles and reports containing similar content, formatting, hyperlinks, etc. for searches regarding hospitals, medical practices, nursing homes, and/or other treatment facilities."); col. 7 ll. 15-22 ("In an embodiment where the results are too numerous to list on one Web page, a hyperlink 216 to additional physicians satisfying the search results, or to additional 'member physicians' closely matching the criteria (218), is

---

[12]Although there is language in the specification that could be interpreted to refer to hyperlinks to external websites, *see* '060 Patent col. 7 ll. 18-22 ("In another embodiment, where a hospital pays a fee to the company, a hyperlink 214 to the hospital affiliated with a particular physician listed will also be provided next to that physician's name."), the patent language as a whole does not naturally imply that a hyperlink must direct users to information external to the website.

included.  In another embodiment, where a hospital pays a fee to the company, a hyperlink 214 to the hospital affiliated with a particular physician listed will also be provided next to that physician's name."); col. 7 ll. 38-42 ("In accordance with an embodiment where a hospital or medical practice is a member entity, a hospital hyperlink 234 for accessing a report or ratings on that hospital or medical practice is shown next to those physicians affiliated with the hospital."); col. 11 ll. 34-37 ("In accordance with an embodiment of the invention, a patient may access the detailed information report 718 in FIG. 7B for a hospital by selecting the quality report hyperlink on the hospital ratings Web page 702 (FIG. 7A).").  Because the Court finds no support for reading "to a website of" into the claim language, the phrase does not need to be construed.

J.  **The Results List Further Includes an Advertisement**

In Claim 8, the patent includes the phrase "the results list further includes an advertisement."  '060 Patent col. 21 ll. 44-45.  Defendant believes this phrase requires construction, but has not presented a definition that is anything other than a reconfiguration of the phrase, proposing the following definition: "The results list contains an advertisement as a part of the results list."  Docket No. 93 at 24.  The Court fails to see how this defines or otherwise clarifies the meaning of the phrase.  In fact, defendant does not contend that it does.  Rather, it simply points out what the clear language says and then proceeds to make what appears to be an invalidity argument. *See* Docket No. 93 at 23-24.  The Court will not construe this phrase because its meaning is evident.

**K.  Member of the Company Managing the Website / Member Healthcare Provider**

The phrases "member of the company managing the website" and "member healthcare provider" are found in Claim 9 and Claim 17, *see* '060 Patent col. 21 ll. 51-54; *id.* col. 23 ll. 7-8; *id.* col. 24 l. 1-3, 5, while "member healthcare provider" is also found in Claim 10.  *See id.* col. 21 l. 59.  Defendant contends that the "phrases 'member of the company managing the website' and 'member healthcare provider' mean member of the company entity that is managing the Web site."  Docket No. 93 at 25.  Again, defendant proposes a construction for these phrases that appears to do little other than reword them to no end.  In the absence of any persuasive explanation for why these phrases require construction, the Court declines to do so.

**IV.  CONCLUSION**

For the foregoing reasons, the Court concludes that the following terms and phrases require no construction: "healthcare provider report on the first healthcare provider"; "healthcare provider-verified information"; "verified by an independent third-party source"; "using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source"; "hyperlink to an affiliated hospital, medical center, or other type of treatment center"; "the results list further includes an advertisement"; and "member of the company managing the website"/"member healthcare provider."  The Court construes the remaining patent claim language at issue as follows:

• First Healthcare Provider:   a particular healthcare provider about whom information is requested and a report is produced.

• <u>Comparison Ratings of Healthcare Providers</u>:   ratings on multiple healthcare providers, including the "first healthcare provider," in the report on that "first healthcare provider," thus permitting comparison of the "first healthcare provider" with other potential healthcare providers.

• <u>Received from the First Healthcare Provider</u>:   receipt of information from the first healthcare provider or one of his or her agents, such as an employee, as distinguished from information received from patients or public sources.

• <u>Compiling/Compile</u>:   gathering and/or putting together.

It is so **ORDERED**.

DATED February 13, 2012.

BY THE COURT:

 s/Philip A. Brimmer                                
PHILIP A. BRIMMER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

**Civil Action No. 11-cv-00520-RM-BNB**

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC.,
doing business as Vitals.com,

      Defendant.

_____

**ORDER GRANTING IN PART AND DENYING IN PART MDX'S MOTION FOR
PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT**

_____

This matter is before the Court on the motion for partial summary judgment of

noninfringement filed by Defendant MDx Medical, Inc.[1] ("MDx").  (ECF No. 195.)  The motion

is fully briefed and ripe for disposition.  A hearing was held regarding this motion on October

25, 2013.  (ECF No. 636.)  Pursuant to 28 U.S.C. § 1338(a), the Court's jurisdiction over this

case is based on the U.S. Patent Act, 35 U.S.C. § 101 *et seq.*

**I.  BACKGROUND**

    **A.  The 7,752,060 Patent**

Plaintiff Health Grades, Inc. ("Health Grades") owns U.S. Patent No. 7,752,060 (issued

Jul. 6, 2010) (the "'060 Patent").  The invention claimed therein relates to an "Internet-based

system and method that connects patients with potential healthcare providers, e.g., physicians

---

[1] The motion is for partial summary judgment as it pertains only to the alleged non-infringement by the MDx website as it has existed since January 2011.  As the motion is temporally constrained, the Court's rulings in this matter are confined to the time period designated by MDx.

1

and hospitals." ('060 Patent col.1 ll.12-14.)  More specifically, the patented system makes reports available to users containing physician-verified, third-party-verified, and patient-provided information about healthcare providers, including comparison ratings, in order to "assist patients in differentiating among healthcare providers."  ('060 Patent col.1 ll.14-20.)  A description of the invention is set forth in the Court's claim construction order (the "Markman Order") and need not be repeated at length here.  (ECF No. 138 at 1-4.)

Health Grades alleges that MDx infringes Claims 1, 4 through 9, 11, and 14 through 16 of the '060 Patent.  Claims 1 and 15 are independent claims which disclose, in pertinent part:

Claim 1:

>A computer-implemented method of providing healthcare provider information to potential patients, said method comprising: receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider . . . [and] creating . . . a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, **wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers . . . .**

('060 Patent col. 20 ll.20-22, 58-65 (emphasis added).)

Claim 15:

>An on-line information system for connecting healthcare providers with potential patients, the system comprising: at least one computer processor and memory…and comprising a series of instructions that, when executed . . . cause the . . . processor to: receive a request for information regarding a first healthcare provider . . . [and] create a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third party source, **wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers . . . .**

('060 Patent col. 22 ll. 9-18, 48-54 (emphasis added).)

MDx denies infringement and, for purposes of the instant motion, focuses on the apparent claim limitation or requirement that comparison ratings on healthcare providers be included in the report on the first healthcare provider.  MDx asserts that it does not include comparison ratings in its reports on the first healthcare providers (called "profiles" on the MDx website),[2] and thus Health Grades cannot establish infringement, either literally or by equivalents.

**B.  The Accused Product**

MDx maintains the website www.vitals.com (the "MDx website"), the current version of which was launched in January 2011.  (ECF No. 195 at 2.)  Health Grades asserts that this website is the infringing product.

MDx's website enables users to search for information on healthcare providers.  (ECF No. 195 at 3, ¶ 6; ECF No. 201 at 4, ¶ 6.)  A user can search for healthcare providers by name or by one or more descriptive variables, for example location, gender, or language ability.  (*See* ECF No. 201 at 22; ECF No. 207 at 3-6.)  When a user initiates a search for a particular provider by name, assuming there is but a single provider with such name, the user is taken directly to a profile on that particular provider.  For instance, if one were to type "Robin J. Sadker"[3] into the "Type a name" field, specifying "Denver, CO" for the place, as there is but one such Dr. Sadker in this location, the user would be taken directly to Dr. Sadker's profile.  This profile contains a variety of information including the provider's name, her address, medical specialties, patient reviews (based on a four-star rating system), and other data.  The ratings of other providers are not visible from any of the pages of her profile. (*See* screenshot of the Sadker profile, attached as Exhibit 1.)

---

[2] The '060 Patent refers to "reports on the first healthcare provider."  The MDx website calls its reports "profiles." For the most part, this Order will refer to "profiles" when referring to the MDx website, and "reports" when referencing the claimed invention and the patent language.
[3] The Sadker example will be used extensively throughout this Order.

If the user types only a non-unique or incomplete name, such as "Smith," or opts to search not by name, but by specialty, location or other criteria, then initiation of the search does not take the user to a profile on any single provider.  Instead, a search results page appears, which contains a list of providers with that name, specialty, location or specified criteria.  And for each provider shown, some data—including ratings—are displayed.  Thus, when viewing the search results, a user can simultaneously see names, addresses, specialties, and patient ratings of multiple providers satisfying the search criteria.  From the results list, the user can also compare providers by comparing the number of stars (ratings) each provider received.  The user may click on the hyperlinked name of any single provider and be taken to his or her profile or report.  (*See* screenshot of "Internist" in "Denver, CO," attached as Exhibit 2.)

To summarize, on the MDx website an individual provider's profile contains at most[4] only his or her individual rating (stars), but no ratings or stars for other providers.  Therefore, a user cannot, within the profile, find comparison ratings for other providers.  However, the user who has not yet selected a specific provider[5] profile to view, but rather has only initiated a broad or generic search, sees a result list from which the user can select a provider whose report the user wishes to view.  And on the results list, the user can see the ratings of multiple providers before determining which profile he or she wishes to review.

There is an additional aspect of the MDx website that merits mention.  The MDx provider profile is organized as follows:  Across the top of the profile is a persistent header which contains a photo or photo place-holder for the provider, a statement of her specialty and years of experience, and her address.  Beneath the persistent header are tabs for such items as credentials,

---

[4] Some healthcare providers have no patient reviews, and thus have greyed out—or zero—stars.
[5] For purposes of this Order, the healthcare provider, often herein simply referred to as a "provider," is an individual person, not a healthcare facility.

patient reviews, insurance, and other matters.  Clicking on a tab changes the information presented beneath the persistent header to that which corresponds to the subject of the tab. Within a tab section, the lower right hand corner of the "tab page" contains a hyperlink which reads "Search All Similar Doctors."[6]

The results list generated by clicking the hyperlink, which the Court calls a "hyperlink generated" search result, contains the same information for each provider as is shown on results lists generated by search results initiated by users (hereinafter "user initiated" searches or search results).  More precisely, as is true of user initiated searches, the hyperlink generated search results show ratings or stars for each provider listed in the results.  The principle differences between user initiated search results and hyperlink generated search results are twofold: (1) the user initiated search results can precede production of the provider profile discussed above; (2) the user initiated search results are in response to user generated search criteria, while hyperlink generated search results are returned on the basis of criteria established by MDx and are triggered by clicking on the referenced hyperlink.

### C. The Pivotal Issue

The '060 Patent covers provider reports containing information beyond comparison ratings of providers.  Indeed, a multitude of other information from the healthcare provider, patients and third parties is contained within each Health Grades provider report.  This additional information includes such data as addresses, specialty, board certification, disciplinary action, languages, and more.  And the "profiles" on the MDx website contain generally similar information.  (There is disagreement, however, as to whether MDx obtained its information by methods protected by the '060 Patent.)  The focus of the Court in this decision, however, is on

_____

[6] As near as the Court can determine, the hyperlink appears on each tab or page except that for "Patient Reviews," a seemingly deliberate, and curious, omission.

the issue of comparison ratings because it is the pivotal one between the parties as framed by the motion for summary judgment.

MDx contends that it does not infringe the '060 Patent, literally or by equivalents, because its provider profiles do not contain **within them** "comparison ratings of healthcare providers."  MDx views Claims 1 and 15, and the dependent claims which follow, as requiring comparison ratings in the provider profile.  And this requirement is viewed as a limitation of the '060 Patent.  Further, MDx contends that permitting Health Grades to proceed under the doctrine of equivalents would be improper as it would vitiate entirely the claim limitation that comparison ratings be in a specific location—within the healthcare provider profile or report.  MDx further argues that prosecution history estoppel should apply to bar application of the doctrine of equivalents, and that there is no substantial similarity between the claimed and accused products.

Health Grades' response is multifaceted.  It argues that MDx's search results[7] are within or part of the MDx provider profiles.  This response is dependent upon two alternative characterizations of the MDx search results.  Health Grades contends that the MDx search results page is actually the first page of the profiles of each provider shown thereon[8] or, alternatively, the results list contains a series of executive summaries for each provider shown where each summary is "part of" the profile or report for that provider.  In essence, Health Grades argues that MDx's search results are actually two things—search results **and** portions of provider profiles.  Health Grades bolsters this position by reliance on a user's ability to navigate between search results and subsequently  accessed profiles by using the forward and back buttons on the Internet browser which displays the web pages.

---

[7] Unlike the Court, MDx does not differentiate between user initiated searches and hyperlink generated searches. Health Grades seems to focus in its briefing and argument on what the Court has labeled as user initiated searches.
[8] Sometimes, Health Grades limits this further by suggesting that the results list is part of the report of the practitioner at the top of the results list.  (*See* ECF No. 201 at 25.)

As for infringement by equivalents, Health Grades reasserts its characterizations of the results list and submits that these characterizations are equivalent to comparison ratings within a report as protected by the '060 Patent.  As for vitiation, Health Grades argues that the doctrine of vitiation must be applied carefully so as to prevent the "all elements" rule from swallowing the doctrine of equivalents.  It also argues that there is not, in any event, complete vitiation of any claim element.  At most, there is but partial vitiation, according to Health Grades.  Health Grades further argues that neither prosecution history estoppel, nor product dissimilarity, precludes application of the doctrine of equivalents.

### D. The Markman Order

On February 13, 2012, Judge Brimmer[9] issued the Markman Order regarding claim construction in this case.  (ECF No. 138.)  In the Markman Order, he construed a number of terms central to resolution of the pending motion.  The term "first healthcare provider" was construed as follows:

- First Healthcare Provider: a particular healthcare provider about whom information is requested and a report is produced.

(*Id*. at 12.)

As to whether the "particular" healthcare provider may be one or more individuals, the Markman Order resolved this issue in footnote 4:

> One possible interpretation of 'first healthcare provider' that would be consistent with plaintiff's proposal is to conclude that the phrase refers to one or more healthcare providers resulting from a first search….This interpretation, however, strains the meaning of 'first' when placed directly before 'healthcare provider.' Furthermore, it fails to account for claim 7's introduction of a 'results list' with 'one or more' healthcare providers resulting from a search.  Finally, the patent elsewhere refers to 'healthcare providers' without use of 'first'…further supporting the interpretation that 'first' identifies a single healthcare provider.

---

[9] Subsequent to the issuance of the Markman Order, this matter was transferred to this District Judge.

(*Id*. at 9, n.4.)

The Markman Order also construed a term which lies at the heart of the instant motion—comparison ratings:

- <u>Comparison Ratings of Healthcare Providers</u>: ratings on multiple healthcare providers including the 'first healthcare provider,' in the report on that 'first healthcare provider,' thus permitting comparison of the 'first healthcare provider' with other potential healthcare providers.

(*Id*. at 14.)

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A movant who bears the burden at trial must submit evidence to establish every essential element of its claim.  *In re Ribozyme Pharms., Inc. Sec. Litig*., 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* FED. R. CIV. P. 56(c).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  When

reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

To be entitled to summary judgment of non-infringement, the moving party—MDx— must demonstrate that the facts presented and inferences therefrom, taken in the light most favorable to the non-moving party, would not permit a reasonable jury to return a verdict on the issue of infringement in favor of the patent holder. *Business Objects, S.A. v. Microstrategy*, 393 F.3d 1366, 1371-72 (Fed. Cir. 2005).

## III. ANALYSIS

MDx argues that every claim of the '060 Patent requires the generation of a report on the first healthcare provider which has within it "comparison ratings of healthcare providers." (ECF No. 195 at 2.) MDx contends that its website, as of January 2011, lacks reports on first healthcare providers which include such comparison ratings and, therefore, cannot infringe. (*Id.*) Health Grades argues that MDx's website infringes the '060 Patent, both literally and under the "doctrine of equivalents." (ECF No. 201 at 18-39.)

A determination of infringement is a two-step process. The first step is determining the meaning and scope of the asserted claims, which is a matter of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, 1456 (Fed. Cir. 1998) (en banc). The second step is comparing the accused device to the properly construed claims. *Id.* at 1454. This analysis is a question of fact. *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). A device literally infringes if each element of the asserted claim is found in the accused device. *Id.* Alternatively, a device may infringe under the doctrine of equivalents if it contains elements

"equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

### A.  Literal Infringement

MDx argues that it is entitled to summary judgment on the issue of literal infringement because its healthcare provider profiles do not include within them comparison ratings on multiple providers.  Simply stated, MDx claims that its provider profiles are not of a type protected by the '060 Patent.

Health Grades' response is as described earlier.  It essentially defines the results list, under alternative constructions, as part of the profile on the first healthcare provider.  And, as that redefined profile shows comparison ratings (stars) for multiple providers, Health Grades claims that the MDx website satisfies the claim limitation on which MDx focuses its motion, and constitutes literal infringement.  The Court finds this response creative, but not convincing.

Part of the issue being determined is largely resolved by the Markman Order.  In it, Judge Brimmer rejected the position, then being advanced by Health Grades, that the "first healthcare provider" was "one or more healthcare providers resulting from a first search."  (ECF No. 138 at 9, n. 4.)  If the search results do not constitute a collection of first healthcare providers, it naturally follows that they also do not constitute a collection of "report[s] on the first healthcare provider…[which] includes comparison ratings…" as required by independent Claims 1 and 15 and the dependent claims which follow.

Insofar as Health Grades seeks to construe the entire results list as the first page of the report of a single healthcare provider—assuming one could identify at that juncture which provider in that list was the first healthcare provider—Health Grades conflates the results list and

the provider report in a manner not consistent with the patent itself.  The '060 Patent makes the distinction several times between a results list and a provider report.  Claim 7 introduces a results list, distinct from the report.  ('060 Patent col. 21, ll. 40-44; *see also* ECF No. 138 at 9, n.4.) And the illustrations included in the specifications, such as Figure 10, clearly distinguish between "Search Results" and the "Select Physician Report" phase of the user experience.  (*See, e.g.*, '060 Patent Fig. 10, ECF No. 195-2 at 18.)  As Health Grades itself argued to the Court before the Markman Order issued, "[m]ultiple different providers may be identified in response to such a search…Reports may be created for any one, or all of, the providers identified in response to a search." (ECF No. 79 at 9.)  That statement recognizes what Health Grades is now struggling to back away from—that the report and the results list are separate and distinct items.

The contention that the results list generated in response to a user's search request constitutes a part of the report on the first healthcare provider and forms a basis for literal infringement is untenable.  It also requires acceptance of an almost magical quality which this Court is disinclined to attribute to the MDx website.  If the results list is the first page of a provider's profile, then the first page of the "report on the first healthcare provider" necessarily varies depending upon what search criteria is input by a website user.  In the case of Dr. Sadker, the first page of her report will differ if the user searches for "Sadker" in "Denver, CO" or "Robin" in "Denver, CO," and will then continuously change as the user refines the search to, perhaps, "female" or "female" and "board certified."  This chameleon-like quality of the first page of a provider profile would require the Court to depart from the idea of a singular, static Sadker profile.  This is a serious flaw in the Health Grades approach.[10]

---

[10] Even if one adopts the alternative approach Health Grades proposes—that the box or executive summary for Dr. Sadker is part of her profile and the remaining practitioners are those she is being compared to—is adopted, the magical or chameleon-like quality of the Sadker report remains.  In this construction, some portion of the profile or

Even if the foregoing were not enough reason to discount the creative interpretation being advocated by Health Grades, there are additional temporal and linguistic difficulties.  The Markman Order construes the first healthcare provider as a singular and particular individual "about whom information is requested and a report is produced." (ECF No. 138 at 23.)  This is wholly consistent with Claims 1 and 15 which each require that a "request for information regarding a first healthcare provider" be provided, and that then a "report on the first healthcare provider [which] includes comparison ratings" be created. ('060 Patent col. 20 ll. 20-22, 58-65; '060 Patent col. 22 ll. 9-18, 48-54.)  If the Health Grades view of a results list is to be adopted, one must first ignore the '060 Patent's requirement that the initiating event be a request for information about a singular and particular individual (a first healthcare provider).  Instead, one must treat generic search requests for such classes of persons as "female dentists" or "internists within Denver" as being a request for information about a singular and particular individual, or ignore that patent requirement altogether.  That is because the generic request may be all that precedes the generation of a results list, which Health Grades casts as the first page of one or more reports on the first healthcare provider or mini reports on first healthcare providers.  Again, the need for such contortion is indicative of the problems with Health Grades' response, and the Court cannot embrace Health Grades' proffered rationale for rejecting MDx's motion on literal infringement.

Earlier, the Court noted a distinction between user initiated search results and hyperlink generated search results.  Because the MDx hyperlink generated search results follow the production of a provider's profile, they avoid the temporal and linguistic difficulties just

report containing comparisons is continuing to vary, and the profile is non-static.  Two users, attempting to print the Sadker profile, would then have very different paper results depending upon their path to the Sadker information.  In the Court's view, a reasonable jury could not conclude that "different things" are the "same thing," in the manner argued by Health Grades.

discussed.  They also avoid the need for the characterization of the results as the first page of one or many provider reports, which the Court has just rejected.  Because of this, these hyperlink generated search results merit some additional discussion and analysis.

The MDx provider profile has already been briefly described.  The report is in a standard format.  Across the top is a persistent header showing the doctor's name and photo (if supplied), and her area of practice.  Beneath this are various tabs for such items as Summary, Patient Reviews, Credentials, and Accepted Insurance.  Clicking on any tab will change the information shown below the header and reveal data relevant to the tab selection.

The profile, regardless of tab selection, contains numerous hyperlinks throughout.  For example, clicking on the "Locations and availability" hyperlink within the persistent header for Dr. Sadker will take the user to the same portion of the report as clicking on the "Locations & Availability" tab.  And at any place within the profile, clicking on the hyperlinked name of the provider in the persistent header returns the user to the summary tab for that provider.

Some hyperlinks operate slightly differently.  Rather than moving the user about within the profile to a particular section or segment, these hyperlinks generate "call out" boxes which appear superimposed over the profile and contains requested information.  For example, if a user clicks on the "Education" hyperlink at the bottom of Dr. Sadker's summary page, the user will be taken to a page within the profile which shows her education beneath the persistent header. Once there, if the user then clicks on "University of Maryland" hyperlink, a call out box appears superimposed over the education page containing information about that medical school.

To complicate matters further, the call out box for the University of Maryland itself contains a hyperlink, which operates still differently: http://medschool.umaryland.edu/.  Clicking

13

on this hyperlink opens a new tab in the browser and takes the user to the University of Maryland website.

The ultimate question is whether the hyperlink generated search results, created upon the user's clicking on a "Search All Similar Doctors" hyperlink within a profile page on a first healthcare provider, are **part of** the profile of the first healthcare provider such that the comparison ratings within the results list can be said to be **"in" the profile**.  If so, Health Grades' claim for literal infringement would survive MDx's motion.  If not, MDx would be entitled to summary judgment on this aspect of literal infringement as well.

The failure of the parties to differentiate between user initiated search results which precede production of the "report" on the first healthcare provider and hyperlink generated search results accessed from within the provider "profile" leaves the Court with little direct guidance from the parties on this issue.  Nonetheless, the Court has determined that the hyperlink generated search results are not **in** the report of the first healthcare provider any more so than are the user initiated search results.

There are three bases for this conclusion.  First, the Court finds that the mere fact that a hyperlink is included in a first healthcare provider report is insufficient to establish that the results and data accessed through the link are within that report.  Today, across the Internet, hyperlinks are everywhere.  One can follow hyperlinks from Fox News to ESPN to CNN without ever typing an http address.  This simply does not mean that CNN data is within or part of ESPN or Fox News.  Second, the first healthcare provider profile on the MDx website is visually distinct.  One prominent feature that the Court has described is the persistent header, which disappears once one accesses the hyperlink generated search results.  The clear implication is

14

that the user has left the provider profile.  And there is no tab, hyperlink or other means within the hyperlink generated results list to return readily to the report.[11]  Third, and lastly, the Court looks to the address bar in the browser.  Returning to the example of Dr. Sadker, when one moves about her profile, the http address shows movement within a single and distinct report or location.  The address always begins with http://www.vitals.com/doctors/Dr_Robin_Sadker/. Depending upon whether one is looking at credentials or office location or accepted insurance, the address will end with "credentials" or "insurance" or other designation of the appropriate section within the Sadker profile.  When, however, the hyperlink generated search results are accessed, the address wholly changes to http://www.vitals.com/search?type=specialty&provider_type=1&q=110-Internist&location=Denver%2C+CO.  In the Court's view, the user remains on the MDx website, but is no longer in Dr. Sadker's profile.  Thus, the comparison ratings or stars for other providers are not "in the report on the first healthcare provider" as required by '060 Patent as construed by the Markman Order.

The Court finds there is no genuine dispute that MDx's website does not literally infringe the '060 Patent.  No reasonable jury could conclude otherwise.  Thus, MDx's Motion is granted with respect to literal infringement.

---

[11] To the extent that Health Grades may point to the browser's forward and back buttons as a means of navigating between the report and the results list, the Court declines to use such browser/operating system functionality as a means for concluding that all of these pages are easily accessible and thus "part" of a single report.  Apart from the fact that the Court views this as strained and improperly superimposing on the allegedly infringing device (webpage) functionality from the computer on which it is displayed, there is not even internal consistency in this position from Health Grades.  At oral argument, the Court inquired about various interchangeable browser and operating system methodologies for moving back and forth from one page to another (multiple instances of browser, multiple tabs, using the history button to navigate rather than the forward and back buttons on Internet Explorer).  For most methodologies, Health Grades made no claim that the functionality combined with the MDx website amounted to infringement.

### B.  Doctrine of Equivalents

A device that does not literally infringe may nonetheless infringe under the doctrine of equivalents if "every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). Equivalence is a question of fact.  *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000); *see also Winans v. Denmead*, 56 U.S. 330, 344 (1853) ("Whether, in point of fact, the defendant's [product] did copy the plaintiff's invention . . . is a question for the jury"). The Supreme Court has clearly articulated the motivation behind the doctrine of equivalents:

> [C]ourts have . . .  recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing . . . Outright and forthright duplication is a dull and very rare type of infringement.  To prohibit no other would place the inventor at the mercy of verbalism, and would be subordinating substance to form . . . The doctrine of equivalents evolved in response to this experience.

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950).

To determine whether a device infringes under this doctrine, a court may consider whether, on a limitation by limitation basis, the accused product "performs substantially the same function in substantially the same way with substantially the same result as each claim limitation."  *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).  A court may not use the doctrine to "erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely."  *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed. Cir. 1987).

MDx contends that Health Grades may not rely on the doctrine of equivalents to establish infringement, because (1) application of the doctrine in this case would vitiate the claim limitation that the comparison ratings be included in the report on the first healthcare provider; (2) Health Grades is estopped by patent prosecution history to rely on equivalents; and (3) there is no substantial similarity between MDx's website and the '060 Patent.  (ECF No. 195 at 9.)

### 1. Vitiating a Claim Term

MDx's position is relatively straightforward.  MDx notes that both Claims 1 and 15 characterize the first healthcare provider report as one which includes comparison ratings.  MDx notes that the Markman Order construed comparison ratings as being location specific—"in the report on that "first healthcare provider"."  (ECF No. 138 at 14.)  If the doctrine of equivalents were to be applied to ratings located "outside" of the report on the first healthcare provider, the result would then be to entirely vitiate a claim element that applies to a central component of the '060 Patent (comparison ratings "in" the report).  "[I]f a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve."  *Warner-Jenkinson*, 520 U.S. at 39 n.8 (emphasis in original).  Accordingly, courts will not apply the doctrine of equivalents where "the accused device contain[s] the antithesis of the claim structure."  *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1330 (Fed. Cir. 2009) (internal citation omitted).

MDx relies on cases pertaining to claims having location restrictions in support of its argument that equivalence would vitiate a claim limitation in this case.  In *Sage Products v. Devon Industries*, 126 F.3d 1420, 1424 (Fed. Cir. 1997), the court held that a container for disposing of sharp medical instruments did not infringe on the plaintiff's patent because it did

17

not have a disposal slot that was substantially "at the top of the container body" or a constriction extending substantially "over said slot" as required by the patent.   Instead, its disposal slot was within the body of the container.  *Id*. at 1423.  The court found that the patent claimed a "precise arrangement of structural elements that cooperate in a particular way to achieve a certain result" and that it contained "clear structural limitations." *Id*. at 1425.  It found that the patent defined a "relatively simply structural device" and that a skilled drafter would have been able to foresee the "limiting potential of the 'over said slot' limitation." *Id*. at 1425.  It pointed out that the drafter, foreseeing the results of the limitation, could have "sought claims with fewer structural encumbrances." *Id*.  It held that allowing the plaintiff "license to remove entirely the 'top of the container' and 'over said slot' limitations" would reduce the claim to a "functional abstract[], devoid of meaningful structural limitations on which the public could rely." *Id*. at 1424-25.

Similarly, in *Asyst Technologies v. Emtrak*, 402 F.3d 1188, 1192-95 (Fed. Cir. 2005), the court held that a device for manufacturing circuits did not infringe on the plaintiff's patent because it featured microcomputers that were not "mounted on" workstations, as required by the patent, but instead connected by a serial cable.  The court found that plaintiff had not offered any intrinsic evidence that the term "mounted on" included attached by serial cable. *Id*. at 1193.  The court also noted that the use of the term "mounted on" in the patent specification made it clear that the term meant attached or fastened to. *Id*.  In addition, the patent used the term "mounted on" interchangeably with the term "on" and distinguished it from the term "connected to." *Id*. at 1194.  Relying in part on this intrinsic evidence, the court concluded that the claim limitation was "binary in nature," meaning that a microcomputer could be "either mounted or unmounted," but not both. *Id*. at 1195.

Health Grades' response focuses, appropriately, on the claim language itself. The language allegedly vitiated is the near identical language in Claims 1 and 15 which requires:

> creat[e/ing] . . . a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-party source, **wherein the healthcare provider report on the first healthcare provider includes comparison ratings of healthcare providers . . . .**

('060 Patent col.20 ll. 58-65; col.22 ll. 48-54 (emphasis added).)  According to Health Grades, this claim element would not be vitiated, or at least only partially vitiated, by application of the doctrine of equivalents.

Health Grades' view is that the term "includes" is the crucial one.  It is said to be a "standard, generic transitional phrase that is used by patent lawyers to create an open-ended claim that does not exclude additional, unrecited elements or method steps."  (ECF No. 201 at 30.)  Health Grades further argues that "it would be error to characterize the 'includes' claim element as a binary choice, where the comparison ratings are either included in the report or not (*i.e.*, excluded).  Rather, the term 'includes,' if not literally met, encompasses a range of equivalents, such as 'linked to' or 'displayed side-by-side,' and the question of whether these differences are insubstantial or not should be decided by the jury." (*Id.*)  Thus, according to Health Grades, MDx's method of displaying comparison ratings is equivalent to that protected by the '060 Patent.

The Health Grades approach begs the question of whether the claim limitation at issue stems from the word "includes" or whether it stems instead from the term "comparison ratings of healthcare providers" which the Markman Order defines as ratings "in the report."  But the Court will resist the temptation to focus on either term in isolation.

19

The product at hand is different from most others analyzed in the case law under the doctrine of equivalents.  At issue is not a classic mechanical device, or even a chemical one. Instead, this case involves a digital product which is both novel and ambiguous in terms of its interplay with the doctrine of equivalents.  The issue before the Court is much more subtle than whether a tangible component lies at the top or in the middle of a physical device.

What is clear to the Court is that the choices as to "location" of the comparison ratings for purposes of application of the doctrine of equivalents in this case is not a binary choice.  The MDx website and display of provider information is not the antithesis of the claimed invention's display of that information.  Rather than black and white, the margins are here quite gray.

The MDx website generates user initiated search results which contain stars which can be said to permit comparisons of the various healthcare providers.  The user navigates from the results list to the provider profile by clicking on hyperlinks within the search results.  Once in the provider report, the user navigates about by clicking on tabs and hyperlinks—most of which obviously keep one within the profile.  Occasionally, a hyperlink (such as the University of Maryland example in the Sadker profile) takes one clearly outside the profile.  But this tends to be done in a straightforward manner by opening a new browser tab separate from that browser tab "containing" the provider profile.  There is, however, one instance where it is less clear whether  a noticeable departure from the profile has taken place—the "Search All Similar Doctors" hyperlink, which announces and facilitates provider comparisons and which is present from within multiple sections of the profile. This link appears "in" the profile beneath a box showing a handful of "similar doctors"—typically six—displayed by name, practice specialty, years of experience and city location.  None have stars or other ratings tools disclosed.  Clicking

on the "Search All Similar Doctors" hyperlink for what might be thought to yield similar data for additional providers instead navigates the user to search results containing multiple providers whose star ratings are prominently displayed.

The MDx website thus sandwiches the provider profile between user initiated search results and hyperlink generated search results. The profile has "in" it a hyperlink which appears multiple times and coaxes the user back into search results displaying comparison tools. And it does so using a navigation tool—hyperlinks—which is common for moving about within the profile. Although the Court has determined that the "stars" or comparison ratings are not actually "within" the profile for literal infringement purposes, it is far from certain that this fact would be apparent to an ordinary user. Regardless, the fact that a portal to the comparison ratings (the hyperlink) rests squarely within the provider profile blurs the distinction between "in the report" and "outside the report" and has no real analog in the realm of mechanical products.

Because of the foregoing, the Court need not determine and delineate the complete circumstances in which vitiation bars reliance on the doctrine of equivalents when dealing with digital products. Extrapolating from the case law on physical products, if the patented and allegedly infringing products are antitheses of one another in terms of a claim limitation, then application of the doctrine of equivalents should be barred where the claim limitation of the patent would be entirely vitiated by such application. That is not clearly the case here. Consequently, claim vitiation does not serve to preclude application of the doctrine of equivalents in this case.

### 2. *Prosecution History Estoppel*

MDx asserts that the patent prosecution history estops Health Grades to argue that MDx infringes its patent by equivalents.

Prosecution history estoppel precludes application of the doctrine of equivalents when a patentee has amended a claim for reasons of patentability to specifically exclude an accused equivalent. *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003). Estoppel does not apply, however, where the "alleged disavowal of claim scope is ambiguous." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003). Rather, the alleged disavowal must be clear and unmistakable," constituting "unambiguous evidence of disclaimer." *Id.* at 1325, 1326.

Once the alleged infringer establishes that the patentee has disavowed the accused equivalent, the patentee is barred from relying on the doctrine of equivalents unless he or she can show that (1) the amendment was made for a purpose other than patentability; (2) the alleged equivalent was unforeseeable at the time of application; or (3) the rationale underlying the amendment is tangential to the accused equivalent. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 739-41 (2002). "[T]he inquiry into whether a patentee can rebut the *Festo* presumption under the 'tangential' criterion focuses on the patentee's objectively apparent reason for the narrowing amendment." *Id.* at 1369. The reason "should be discernible from the prosecution history of record, if the public notice function of a patent and its prosecution history is to have significance." *Id.* An "amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim." *Id.* In cases where the court is "unable to determine the purpose underlying a narrowing amendment–and hence a rationale for limiting the estoppel to the surrender of particular

equivalents–the court should presume that the patentee surrendered all subject matter between the broader and the narrower language."  *Id.* at 1366.

MDx asserts that, during patent prosecution, Health Grades added the limitation that the report be "on the first healthcare provider" and that it "include" the "comparison ratings of healthcare providers" in order to obtain a patent over prior art.  (ECF No. 195 at 10; *see* ECF No. 195-3 at 4, 8, 17, 20.)  It further asserts that MDX's website falls within the territory disclaimed by these amendments.  (ECF No. 195 at 13.)  Health Grades concedes that these amendments were made for the purpose of patentability but argues that they are tangential to the accused equivalent.  (ECF No. 201 at 33.)  It was not the location of comparison ratings which drove amendments according to Health Grades.  Rather, amendments were made to differentiate from prior art the specific types of provider information presented to the user and distinguish comparison ratings from mere facts from which comparisons could be made.

### a.  Prosecution History

In its November 16, 2009 remarks, the Patent Office rejected Health Grades' Claim 1 on the grounds that the prior art (Henley and Cook) disclosed a "method of providing healthcare provider information to potential patients, said method comprising," "compiling health care provider-verified information," "compiling past-patient provided information," "compiling information verified by independent third-party sources," "providing access to the healthcare provider report over a computer network," and "creating a healthcare provider report using the physician-verified information, the past-patient provided information, and the verified information."  (Patent History File Portions, ECF No. 195-3 at 38-39.)  Subsequently, Health Grades amended Claim 1 by adding references to "a" or "the" "first healthcare provider" in six

23

of seven paragraphs, as well as limitations regarding the information to be included in the

provider reports and the method of gathering patient feedback.  After amendment, the claim read:

A <u>computer-implemented</u> method of providing healthcare provider information to potential patients, said method comprising:

<u>receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;</u>

<u>accessing</u> healthcare provider-verified information <u>about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;</u>

compiling, <u>by the at least one computer processor</u>, ~~past patient~~ <u>patient-</u>provided information <u>regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;</u>

compiling information <u>regarding the first healthcare provider</u> verified by <u>an</u> independent third-party <u>source</u>, ~~sources~~ <u>wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;</u>

creating, by [[a]] <u>the at least one computer</u> processor, a healthcare provider report <u>on the first healthcare provider</u> using the healthcare provider-verified information, the ~~past patient~~ <u>patient-</u>provided information, and the information verified by <u>the</u> independent third-party <u>source</u>, wherein the healthcare provider report <u>on the first healthcare provider</u> includes comparison ratings of healthcare providers; and

24

>               providing   access   to   the   healthcare   provider   report   <u>on   the   first</u>
> <u>healthcare provider</u> over a computer network.

(Patent History File Portions, ECF No. 195-3 at 4-5) (underlining signifies elements added to

amended claim).

The Patent Office also rejected Health Grades' initial Claim 5 on the grounds that prior

art discloses "the method as defined in claim 1, wherein the healthcare provider report includes

comparison ratings of healthcare providers." (Patent History File Portions, ECF No. 195-3 at

42.) The Patent Office cited Henley, U.S Patent Pub. No. 2003/0195838, which discloses

"[d]irect links to one or more transaction feedback databases . . . established to allow consumers

of medical services to verify and evaluate a particular provider's product or service." (Henley

Patent Application, ECF No. 197-7 at 28, ¶ 37.) In response, Health Grades argued that Henley

fails to teach or suggest "comparison ratings" on the grounds that "making general qualifications

'available' to a consumer" or providing "access to databases storing the 'identification' of

medical services providers" does not teach or disclose "comparison ratings." (Patent History

File Portions, ECF No. 195-3 at 26-27.) Health Grades subsequently canceled Claim 5. (Patent

History File Portions, ECF No. 195-3 at 18.)

The Patent Office rejected Claim 19 on the grounds that prior art discloses "[a]n on-line

information system for providing verified information regarding healthcare providers, the system

comprising: a compilation module for compiling healthcare provider-verified information," "a

compilation module for compiling patient-provided information," "a compilation module for

compiling healthcare provider information verified by an independent third party," "a computing

system with access to healthcare provider information stored in a database, wherein patients may

search the database and review healthcare provider reports to differentiate among healthcare

providers," and "a creation module for creating a healthcare provider report using the provider-verified information, the patient-provided information, and the independently verified information."  (Patent History File Portions, ECF No. 195-3 at 44-45.)

In response, Health Grades asserted the same arguments it had made with respect to Claim five.  (*Id.* at 28-29.)  It subsequently amended Claim 19 in part by replacing the limitation of a "computing system with access to healthcare provider information stored in a database, wherein patients may search the database and review healthcare provider reports to differentiate among healthcare providers" with the limitation that the system "create a healthcare provider report using the healthcare provider-verified information, the patient-provided information, and the independently verified information, wherein the healthcare provider report includes comparison ratings of healthcare providers."  (*Id.* at 20, 28-29.)

### b.  Discussion

The Court does not find the prosecution history in this case constitutes such "clear and unmistakable" evidence that Health Grades disclaimed coverage of comparison ratings "outside of" provider reports that the application of the doctrine of equivalents should be precluded at the summary judgment stage.  *See Omega*, 334 F.3d at 1325.  Indeed, as previously explained, the contours of "inside" and "outside" provider profiles or reports—for purposes of equivalents—are themselves somewhat amorphous in this case.

Notwithstanding the foregoing, the Court reserves the right to make further rulings pertaining to prosecution history.  The prosecution history implicates other aspects of this litigation (*e.g.*, obviousness) and that the record provided by the parties on this motion is

inadequate for detailed consideration of the full implications of the prosecution history in this case.

### 3.  Substantial Similarity

MDx argues that it does not infringe Health Grades' patent under the doctrine of equivalents as a matter of law because the MDx website lacks substantial similarity to the invention protected by the '060 Patent in that "[r]equiring the user to jump from place to place to view the claimed provider information and compare ratings of various providers is not even remotely similar to having all the other claimed information and comparison ratings in the one report on the first healthcare provider."  (ECF No. 195 at 13.)

Substantial similarity is a question of fact.  *Hoop v. Hoop*, 279 F.3d 1004, 1007 (Fed. Cir. 2002).  Under the "function-way-result" test, two elements are substantially similar if they perform substantially the same function, in substantially the same way, with substantially the same result.  *Crown Packaging*, 559 F.3d at 1312.  Applying this test, the court in *Cordis* held that there was sufficient evidence to support a jury's finding of infringement where an expert witness had testified that the "'corners' in claim 36 and the circular arcs or rounded corners of the [accused product] both function as actual and potential reference points for joining adjacent stent rings, fulfill this function through their similar locations, and can or do result in offset connections between stent rings."  561 F.3d at 1330.

For the reasons set forth above in the discussion of claim vitiation, the Court views the substantial similarity or lack thereof between the MDx website's display of provider information and the claimed invention to be far more debatable than either party admits.  Under the facts of this case, substantial similarity is a question best left for the jury.

Accordingly, the Court concludes that there exist disputes on genuine issues of material fact as to infringement by equivalents—notwithstanding MDx's contentions as to vitiation, prosecution history estoppel, and substantial similarity.  Infringement by equivalents in this case is properly for a jury to decide.  Since these facts give rise to reasonable inferences for a juror that equivalency could exist—and "reasonable inferences" must be found in the light most favorable to the nonmoving party—it becomes apparent that there is a genuine issue of material fact as to equivalence. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

## IV.  CONCLUSION

For the foregoing reasons, defendant MDx's Second Motion Pursuant to Federal Rule of Civil Procedure 56 for Partial Summary Judgment of Non-infringement (ECF No. 195) is

    1.  GRANTED as to literal infringement; and

    2.  DENIED as to infringement by equivalents.

DATED this 23rd day of December, 2013.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge

28

# Exhibit 1
## The Sadker Profile



# Exhibit 2
## Internist, Denver, CO



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 11-cv-00520-RM-BNB

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC.,
doing business as Vitals.com,

      Defendant.

---

**ORDER**

---

      This matter is before the Court on the motion filed by Defendant for a *Festo* hearing and consideration of vacatur of the pretrial and trial proceedings (ECF No. 883).  A hearing was held on October 10, 2014 on that motion pursuant to *Festo v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722 (2002) (hereinafter "*Festo*").  This Order results.

**I.      BACKGROUND**

      **A.  Facts and Procedural History**

      Plaintiff Health Grades, Inc. ("Health Grades") owns U.S. Patent No. 7,752,060, issued July 6, 2010 (the "'060 Patent").  The invention claimed therein is an "Internet-based system and method that connects patients with potential healthcare providers, e.g., physicians and hospitals." ('060 Patent col.1 ll.12-14.)  Defendant MDx Medical, Inc. ("MDx") maintains the website www.vitals.com (the "MDx website"), the current version of which was launched in January 2011.  (ECF No. 195 at 2.)  Health Grades contends that the MDx website infringes the '060

Patent.  The Court has already set forth the basic facts regarding the claimed invention and the accused product in several previous Orders, dated December 24, 2013; June 26, 2014; and July 15, 2014 (ECF Nos. 696, 808, 810).  I will only repeat previously set forth facts as necessary for analysis of the issues now before the Court.

In the first of the referenced prior Orders, the Court ruled on a motion for partial summary judgment of noninfringement filed by MDx, which argued that since every claim of the '060 Patent requires the generation of a report on the "first healthcare provider" which "includes comparison ratings of healthcare providers," and since its reports on the first healthcare provider lacked such ratings, that the Court should grant summary judgment of noninfringement.  I granted the motion in part.  (ECF No. 696.)  The Court found that a report on the first healthcare provider, as opposed to a results list, which includes comparison ratings was required in order to find literal infringement and the current iteration of the MDx website did not literally meet that requirement.

The Court also discussed the parties' arguments with regard to the doctrine of equivalents, discussing generally Health Grades' then-articulated accused equivalents, but finding ultimately that one equivalent could withstand MDx's arguments at summary judgment:

> There is, however, one instance where it is less clear whether a noticeable departure from the profile has taken place—the "Search All Similar Doctors" hyperlink, which announces and facilitates providers comparisons and which is present from within multiple sections of the profile.

(ECF No. 696 at 20.)

2

The December 24, 2013 Order also briefly addressed MDx's contention that the patent prosecution history estops Health Grades from arguing that MDx infringes its patent by equivalents.  In doing so, the Court left open the possibility that it would "make future rulings pertaining to prosecution history," particularly once it had addressed the parties' arguments regarding MDx's obviousness defense, and it advised "that the record provided by the parties on this motion is inadequate for detailed consideration of the full implications of the prosecution history in this case."  (ECF No. 696 at 26-27.)

After the subsequent rulings on obviousness and willfulness (ECF Nos. 808, 810), MDx moved for the *Festo* Hearing and a final determination of the prosecution history estoppel issue. (ECF No. 883.)  The Court granted that motion and heard fully from both parties at the hearing on October 10, 2014 (the "*Festo* Hearing").  This matter is one for the Court to resolve, and the full patent history is before the Court.

### B.  Legal Standard

Whether prosecution history estoppel applies, as well as its scope, are questions of law to be determined by the Court.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 344 F.3d 1359, 1367 (Fed. Cir. 2003).  Under the doctrine of the equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  *Warner–Jenkinson Co. v. Hilton Davis Chem. Co*., 520 U.S. 17, 21 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co*., 339 U.S. 605, 609 (1950)).  Patent claims protect the patentee not only from those who produce devices falling

3

within the literal patent claims, but also from "unscrupulous copyists" who "make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank*, 339 U.S. at 607.

Prosecution history estoppel, however, precludes application of the doctrine of equivalents when a patentee has narrowed a claim for reasons of patentability and thereby surrendered the ground covered by an accused equivalent. *Pioneer Magnetics, Inc. v. Micro Linear Corp.*, 330 F.3d 1352, 1356 (Fed. Cir. 2003). Determining the reach of prosecution history estoppel thus "requires an examination of the subject matter surrendered by the narrowing amendment." *Festo* at 737. Once the alleged infringer establishes that the patentee has disavowed the ground covered by an accused equivalent, the patentee is barred from relying on the doctrine of equivalents unless he or she can show a recognized exception to application of the estoppel doctrine. *Festo* at 739-41.

## II.    ANALYSIS

### A.  The *Festo* Presumption and Its Exceptions

As noted above, under *Festo*, narrowing amendments made for reasons of patentability create "a presumption that the patentee surrendered the territory between the original claims and the amended claims." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1382 (Fed. Cir. 2005). "The patentee may rebut that presumption by showing that the alleged equivalent was unforeseeable at the time the amendment was made, that the alleged equivalent was tangential to the purpose

4

of the amendment, or that there was some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question."  *Id*.

Both parties agree that narrowing amendments were made with respect to the '060 Patent and that they were made for purposes of patentability.  (*See, e.g*., ECF No. 201, Health Grades Response to MDx's Motion for Summary Judgment, at 10 ("[T]he claim language 'comparison ratings of health care providers' was added for reasons of patentability."), 31-32 ("The prosecution history makes clear that the comparison ratings *limitation* was added to overcome the Patent Office's rejection based on Henley and Cook prior art…") (emphasis added).)  Both parties agree that the *Festo* presumption applies.  (*See, e.g*., ECF No. 903 at 29-30 ("By amending the application, the inventor is deemed to concede that the patent does not extend as far as the original claims.  We agree with that.  We gave up original Claim 1, we gave up original Claim 19, and we are not trying to assert infringement of those claims now…. We need to look at the reason for the amendment and the accused equivalent and figure out whether they are related or not.").)

Health Grades seeks to rebut or overcome the presumption by relying solely on the second *Festo* exception, tangentiality.  At the hearing, this exchange occurred:

> The Court: I know what your position is, but just to make sure that I'm not misunderstanding it, in terms of the three Festo exceptions, you are not relying on, in any way, shape or form, unforeseeability, nor are you relying on the relatively amorphous third exception; that being, some other reason.
>
> Ms. Stoll-DeBell: Yeah.  We didn't get into the foreseeability issue, Your Honor.  We don't need to, because we think that there's not a relationship between the reason for amendment and the accused equivalent.
>
> The Court: So that's a yes?

5

Ms. Stoll-DeBell: Yes.

(ECF No. 903 at 30-31.)  Health Grades has never argued the other two exceptions, therefore, they will not be addressed in this Order and are deemed inapplicable.

## B.  Relevant Patent History

On August 29, 2006, Health Grades filed its original application, which disclosed two independent claims,[1] as well as a number of dependent claims.  (ECF No. 705-2 at 2-5; ECF No. 79-4.)  Claim 1 disclosed:

> A method of providing healthcare provider information to potential patients, said method comprising:
>
> > compiling healthcare provider-verified information;
> >
> > compiling past-patient provided information;
> >
> > compiling information verified by independent third-party sources;
> >
> > creating a healthcare provider report using the physician-verified information, the past-patient provided information, and the verified information; and
> >
> > providing access to the healthcare provider report over a computer
> network.

(ECF No. 705-2 at 2-3.)  Notably, dependent Claim 5 in the original application disclosed "[t]he method as defined in Claim 1, wherein the healthcare provider report includes comparison ratings of healthcare providers."  (*Id*. at 3.)

---

[1] The original independent claims were Claims 1 and 19.  The analytical history for Claims 1 and 19 (the latter of which in the final revised '060 Patent is now Claim 15) is largely the same, so I will not separately set it forth here.

The United States Patent and Trademark Office (the "Patent Office") rejected both independent claims, and essentially the entirety of the application, as being unpatentable because the claims were obvious in light of prior art.[2]  (ECF No. 201 at 30-31 and accompanying exhibits.)  The Patent Office cited Henley, U.S. Patent Pub. No. 2003/0195838, which discloses "[d]irect links to one or more transaction feedback databases . . . established to allow consumers of medical services to verify and evaluate a particular provider's product or service."  (ECF No. 197-7, Henley Patent Application, at 28 ¶ 37.)  In rejecting Claim 5, the comparison ratings claim, the Patent Office pointed to a series of paragraphs in Henley that it said also disclosed comparison ratings.  For instance, Henley disclosed "[a]n online user service feedback web-page and database are provided for acquiring and maintaining comments and feedback from both service providers and their patients/clients regarding the complexity and quality of services received or provided."  (*Id.* ¶ 16.)  Henley explained that its invention "also introduces helpful transaction evaluation features such as an associated 'complexity rating' for a particular service/procedure and a 'complexity divergence' indicator . . . ."  (*Id.* ¶ 18.)  And "[d]irect links to one or more transaction feedback databases are also established to allow consumers of medical services to verify and evaluate a particular provider's product or service."  (*Id.* ¶ 37.)

The Patent Office's rejection emphasized Henley, but did not rely exclusively upon it. For example, in terms of the claim element "creating a healthcare provider report using the physician-verified information, the past-patient provided information, and the verified information," the Patent Office said that "Henley may or may not explicitly disclose [this]

---

[2] There were also rejections based on indefiniteness and an invention based on non-statutory subject matter.

limitation [but] Cook [does disclose it].” [3]  (ECF No. 79-4 at 88.)  The Patent Office went on to state that “it would have been obvious to one of ordinary skill in the art, at the time of the invention, to have modified the system of Henley so as to have included creating a healthcare provider report, in accordance with the teaching of Cook, in order to improve the efficiency of the system, since so doing could be performed readily and easily by any person of ordinary skill in the art, with neither undo experimentation, nor risk of unexpected results.”  (*Id.*)

After the rejection from the Patent Office, as Health Grades related in prior briefing on the subject:

> In response, the Applicants amended the report element of claims 1 and 19 to add the comparison ratings limitation as shown below:
>
> 1. (Currently Amended) A method of providing healthcare provider information to potential patients, said method comprising:
>
> compiling healthcare provider information;
>
> compiling past-patient provided information;
>
> compiling information verified by independent third-party sources;
>
> creating, by a processor, a healthcare provider report using the ~~physician-verified~~ healthcare provider-verified information, the past-patient provided information, and the ~~verified~~ information verified by independent third-party

---

[3] The Patent Office listed three patents as “[t]he most remarkable prior art of record.” (ECF No. 485-7 at 42.)  One was Henley.  Another is Cook, a patent aimed at “assisting patients to find healthcare providers who are using health information systems.”  (U.S. Patent Pub. No. 2006/0080146 ¶ 1.)  It discloses “[p]resenting graded reports (as opposed to certified/non-certified) to consumers about the EMR [Electronic Medical Records] system in use by each provider will result in providers having a powerful incentive to keep their technology up to date.”  (*Id.* ¶ 91.)  In addition to Cook and Henley, the other prior art mentioned by the Patent Office as pertinent (ECF No. 485-7 at 42) is Sameh, U.S. Patent Pub. No. 2004/0010423.  One of Sameh’s independent claims disclosed “[a]n apparatus for providing health care to a patient, such apparatus comprising:  a website adapted to provide a webpage from a sponsor of the website to the patient that displays identifying information of the sponsor and that also displays identifiers of a plurality of physicians; a physician selection softkey adapted to detect selection of a physician of the plurality of physicians by the patient…”  (*Id.* at Claim 30.)

> sources, wherein the healthcare provider report includes comparison ratings of healthcare providers; and
>
> providing access to the healthcare provider report over a computer network.

(ECF No. 201 at 31; ECF No. 349-2 at 14 (strike-outs and underlining in original to reflect amendments).)  This amendment (the "Initial Amendment"), among other things, added the limitation that "wherein the healthcare provider report includes comparison ratings of healthcare providers" to the otherwise broad reports referenced in the independent claims of the original application.  This narrowing language was originally the content of dependent Claim 5, but as part of the Initial Amendment, Health Grades cancelled dependent Claim 5 and moved its content into independent Claim 1.[4]

It is undisputed that the Initial Amendment, and specifically the comparison ratings limitation, "was added to overcome the Patent Office's rejection based on the Henley and Cook prior art."  (ECF No. 201 at 32.)  Health Grades used this narrowing limitation to enable it to argue a fine distinction:  that while the prior art teaches "making **facts** available for comparison, this is not the same thing as comparison **ratings.**"  (ECF No. 201 at 32 (emphasis in original).)

On March 10, 2010, Health Grades had an interview with Patent Office staff in which the prior art and Health Grades' amendment were discussed.  (ECF No. 295-3.)  The patent history

---

[4] The issue of whether it matters that the language was originally in the patent application, albeit in dependent claim form, was addressed at the hearing and is clearly addressed in Federal Circuit case law:  "[T]he rewriting of dependent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel."  *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1182 (Fed. Cir. 2009) (quoting *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1134 (Fed. Cir. 2004)).

9

does not reveal the content of the discussions beyond the fact that "[n]o agreement was reached." (ECF No. 295-3 at 4.)

The Initial Amendment, Health Grades concedes, "was made for reasons of patentability (*i.e.*, to distinguish prior art) but did not result in the Patent Office allowing the claims. Instead, the Patent Office required additional amendments before it allowed the claims." (ECF No. 201 at n.9.) In April 2010, after the meeting at the Patent Office, Health Grades submitted more extensive amendments to its claims (the "Supplemental Amendment"). After the Supplemental Amendment, Claim 1 read:

> A <u>computer-implemented</u> method of providing healthcare provider information to potential patients, said method comprising:
>
> <u>receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients, a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;</u>
>
> <u>accessing</u> healthcare provider-verified information <u>about the first healthcare provider, wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of: specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;</u>
>
> compiling, <u>by the at least one computer processor</u>, ~~past patient~~ patient-provided information <u>regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;</u>

compiling information <u>regarding the first healthcare provider</u> verified by <u>an</u> independent third-party <u>source</u>, ~~sources~~ <u>wherein the information verified by the independent third-party source comprises three or more from the group consisting of: board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;</u>

creating, by [[a]] <u>the at least one computer</u> processor, a healthcare provider report <u>on the first healthcare provider</u> using the healthcare provider-verified information, the ~~past patient~~ <u>patient</u>-provided information, and the information verified by <u>the</u> independent third-party <u>source</u>, wherein the healthcare provider report <u>on the first healthcare provider</u> includes comparison ratings of healthcare providers; and

providing access to the healthcare provider report <u>on the first healthcare provider</u> over a computer network.

(ECF No. 195-3, Patent History File Portions, at 4-5 (strike-outs and underlining in original to reflect amendments).) After this second wave of amendments, on July 6, 2010, the '060 Patent issued.

### C. Whether the Tangential Exception Applies

To rebut the *Festo* presumption, Health Grades must demonstrate that the rationale underlying any narrowing amendments bore no more than a tangential relationship to the accused equivalent. *Festo*, 344 F.3d at 1369. "In other words, this criterion asks whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent." *Id.* The Federal Circuit went on to note that although it could not "anticipate the instances of mere tangentialness that may arise, we can say that an amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim." *Id.* The Federal Circuit made clear that courts should focus on "the patentee's objective

11

apparent reason for the narrowing amendment…that reason should be discernible from the prosecution history record, if the public notice function of a patent and prosecution history is to have significance." *Id.*

When the court is "unable to determine the purpose underlying a narrowing amendment—and hence a rationale for limiting the estoppel to the surrender of particular equivalents—the court should presume that the patentee surrendered all subject matter between the broader and the narrower language." *Id.* at 1366 (quoting *Festo* at 740). The tangential relation criterion for overcoming the *Festo* presumption is very narrow. *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1315 (Fed. Cir. 2008) (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 480 F.3d 1335, 1342 (Fed. Cir. 2007)).

    1.  <u>Comparison Ratings Limitation</u>

Here, the purpose of the requirement that the Health Grades reports "include comparison ratings" of health care providers is clear from the prosecution history. Adding a requirement of comparison ratings into its independent claims, Health Grades thought, would distinguish its application from Henley. At the *Festo* Hearing, Health Grades addressed this very issue, and hinged its tangentiality argument on one key point:

> So now what really, really matters is why? Why did Health Grades make this amendment? Why did they add that the healthcare provider report includes comparison ratings of healthcare providers?... [I]t starts off at the bottom of page 11 of Health Grades' Office Action Response…. And so, first of all, it says, Henley fails to teach or suggest, for example, and then it quotes the claim limitation that was added to distinguish Henley, which is the, [w]herein the healthcare provider report includes comparison ratings of healthcare providers. That was the language that was actually added by amendment. And then it goes on to explain why this amendment gets around Henley. Distinguishes the Henley prior art. And so it talks about -- well first of all, in the second, fourth line down,

12

> it says, The cited portions of Henley provide no teaching or suggestion of, quote, comparison ratings, end quote. It doesn't say comparison ratings inside a report. Comparison ratings outside of a report. Comparison ratings included in a report. It says comparison ratings. There are no ratings in Henley.

(ECF No. 903 at 45-46.)

This, then, is the crux of Health Grades' argument. The purpose for which Health Grades added comparison ratings to its independent claims, the argument goes, was simply to distinguish its product from Henley's, which did not have comparison ratings. The *location* of the comparison ratings did not matter—the reason for adding them was to distinguish its product from a product that did not have comparison ratings at all. Thus, whether the ratings are inside the report or not bears only a tangential relationship to the reason for the amendment.

To say that "location" is tangential depends on what is meant by "location" in the context of a report. The Court would agree that location in the sense of "where within a report" is likely tangential. Thus, I would readily conclude that the location of comparison ratings in the body of a report as opposed to the introduction (or a footnote or an executive summary) was a "location" which was tangential to the purpose of the narrowing amendments. But that is not what Health Grades means by location; nor does this example capture the nature of the dispute between Health Grades and MDx.

MDx argues that its website contains doctor reports or profiles which do not contain within them comparison ratings. Health Grades argues that the use of those reports coupled with comparison ratings outside the report which are accessible via hyperlink, browser navigation controls, search results or other means are actionable as equivalents to a healthcare provider

13

report which "includes comparison ratings of healthcare providers" as called for by the '060 Patent.  Thus, Health Grades uses the term "location" as shorthand for any requirement that the healthcare provider report have within it the comparison ratings.  In other words, Health Grades uses the term "location" in an extremely broad sense encompassing whether a feature is "in" the report or "outside" the report.  And it argues that whether the comparison ratings were in the healthcare provider report or outside of it was tangential to the purposes of its narrowing amendments.

This argument is unavailing.  What possible reason could there be to add a limitation that comparison ratings be within the healthcare provider report if it in fact did not matter whether the comparison ratings were in fact included *in* the report?  How could one possibly distinguish an invention from prior art by comparing what was within or inside of Henley's reports with what may be outside of Health Grades' reports?  Implicit and inherent in Health Grades' attempts to distinguish Henley and other prior art reports is that the narrowing limitation added a feature (comparison ratings) within the reports which previously did not have to be in the reports at all. And its presence "in" the report, as much as the comparison ratings themselves, was a critical feature.[5]  The location of comparison ratings—insofar as that means that they exist *within* the report—was directly related to the purpose of the amendment.  It is not tangential.

## 2.   First Healthcare Provider and Further Specifications

At the *Festo* Hearing, the parties did not emphasize or seriously address the estoppel issues raised by the Supplemental Amendment.  Nonetheless, the Supplemental Amendment was

---

[5] Indeed, this is why original dependent Claim 5 was made part of independent Claims 1 and 19.

as much a narrowing amendment, raising a presumption of prosecution history estoppel, as was the Initial Amendment. After unsuccessfully addressing the Patent Office's concerns with the Initial Amendment, and after having a meeting thereon as to which no agreement was reached, Health Grades submitted the Supplemental Amendment to the Patent Office on April 26, 2010. In its submission, clearly signaling its intention to distinguish prior art, Health Grades stated:

> Henley in view of Cook fail to teach or suggest at least the following with respect to Claim 1:
>
> *receiving, by a Web server computer of a company providing a service for connecting healthcare providers with the potential patients,* a request for information regarding a first healthcare provider, wherein the Web server computer comprises at least one computer processor and memory;
>
> accessing healthcare provider-verified information about the first healthcare provider, *wherein the healthcare provider-verified information is received from the first healthcare provider and comprises three or more from the group consisting of specialty information, medical philosophy, gender, age, years in profession, years in practice, awards, honors, professional appointments, professional memberships, publications, languages, and hobbies;*
>
> compiling, by the at least one computer processor, patient-provided information regarding the first healthcare provider, wherein the patient-provided information comprises patient ratings from one or more past or current patients of the first healthcare provider, and *wherein the patient ratings are received from an on-line patient experience survey completed on a company Web site by the one or more past or current patients of the first healthcare provider, and wherein the company Web site is managed by the company providing the service for connecting healthcare providers with the potential patients;*
>
> *compiling information regarding the first healthcare provider verified by an independent third-party source, wherein the information verified by the independent third-party source comprises three or more from the group consisting of board certification, licensure, disciplinary action information, medical school, medical internship, medical residency, and medical fellowship information;*
>
> *creating,* by the at least one computer processor, *a healthcare provider report on the first healthcare provider using the healthcare provider-verified information, the patient-provided information, and the information verified by the independent third-*

> *party source,* wherein the healthcare provider report on the first healthcare provider includes *comparison ratings* of healthcare providers;

(ECF No. 295-3 at 11-12 (emphasis in original).)

The Supplemental Amendment further narrowed the Initial Amendment.  After the Supplemental Amendment, the reports had to be based not only on information from three sources, but also on specific information from within each source.  Healthcare provider information had to consist of "three of more from a group consisting of: specialty information, medical philosophy, gender . . . languages, and hobbies."  (ECF No. 195-3 at 4-5.)  Independent third-party information now had to be "three or more from the group consisting of: board certification, licensure . . . and medical fellowship information."  (*Id*.)  And patient information had to comprise "ratings" obtained in a particular manner.  (*Id*.)  Additionally, and importantly, Health Grades' invention no longer related simply to any healthcare provider report—even as limited by the referenced aspects of the Supplemental Amendment.  The reports were further narrowed to reports on the "first healthcare provider"—a term which the claim construction order in this case (the "Markman Order") construed as "a particular healthcare provider about whom information is requested and a report is produced."[6]  (ECF No. 138 at 23.)

For the reasons previously explained, the requirement that the Health Grades reports contain (*i.e.*, have within them) the additional limitations was not tangential.  The limitations were again included within the Health Grades' reports to distinguish reports found in or obvious from prior art, particularly Henley and Cook.

---

[6] In reaching this construction, the Markman Order rejected the notion that "first healthcare provider" referred to "one or more providers."  The Markman Order also rejected any interpretation of "first healthcare provider" that would encompass the results of a first search.  (ECF No. 138 at 7-12.)

### D.  Tangentiality Case Law

The parties have each directed the Court to cases in which the tangential exception was discussed.  MDx focuses on case law referring to tangentiality as a "very narrow" exception. *Honeywell*, 523 F.3d at 1315-16.  The rarity of the exception has no impact on the particularized ruling made herein, as "narrow" does not equal "unavailable."  Health Grades directs the Court to cases where tangentiality was found and suggests that the circumstances of the instant case are analogous to those of such cases.  For the most part, the Court determines that the inventions, patents, and prosecution histories are so different from case to case that their direct applicability to the instant case is dubious.  However, the cases particularly emphasized by Health Grades will be discussed because they illustrate the difficulty with Health Grades' position.

During the *Festo* Hearing, Health Grades relied upon *Centennial Molding v. Carlson*, 401 F. Supp. 2d 985 (D. Neb. 2005).  In that case, the patent at issue was for large, stackable containers for storing and dispensing liquid.  Each container or stackable portion contained a fill opening at the top and a cut-out or space at the bottom.  During prosecution, in order to overcome prior art, the claims were amended to require that the space at the bottom of the container be both in a corner and vertically aligned with the fill opening in the top of the container.  The prior art that the patentee in that case was trying to avoid had bottom spaces that were not vertically aligned with fill openings.  Consequently, the prior art containers had to be unstacked to be refilled while the patented containers did not.

In *Centennial Molding*, the patentee explained that the limiting amendment was meant to distinguish the product from prior art that lacked vertical alignment of its space and fill opening,

17

not to fix the location of the fill openings and spaces in the corner of the tanks. *Id*. at 993. Health Grades emphasized that although the "corner" language was used in the amendment, that location was tangential to the purpose of the amendment, which was distinguishing its product from the prior art through vertical alignment. The accused equivalent placed the fill opening and space at the middle of one side of the containers. The court allowed the patentee to proceed under the doctrine of equivalents as the location of the critical feature (corner versus side) was deemed tangential. Health Grades argued that "this case…is really relevant to what we're doing here, because it's a location claim, and that's what MDX is focused on; location, location, location. The corner location was in the amendment… But it wasn't the reason for the amendment." (ECF No. 903 at 37.)

The Court agrees that *Centennial Molding* is illustrative, but disagrees with Health Grades as to how. If Health Grades and MDx were disputing the tangentiality of "location" in the sense of where in the report certain features (comparison ratings) were found, then *Centennial Molding* would be more useful. The dispute here would then be analogous to corner versus non-corner features. But once Health Grades begins to use the term "location" as synonymous with "in or out of the report," *Centennial Molding* loses all significance. The equivalent in *Centennial Molding* would be something very different from corner versus non-corner. It would be, assuming one could envision such, vertical alignment on the structure of the containers versus vertical alignment which was not part of the containers at all but contained on "something else." That equivalence was not the one at issue in *Centennial Molding*. The notion

18

that a report limitation need not be "in" the report is an argument the Court is unwilling to accept.

Health Grades also discussed a Federal Circuit case from 2004 at length during the *Festo* Hearing—*Insituform Technologies, Inc. v. CAT Contracting, Inc*. 385 F.3d 1360 (Fed. Cir. 2004). The patent in that case was for an underground pipe repair method. The patent claimed "a process for impregnating a flexible tube liner with resin prior to insertion of the liner into a damaged pipe." *Id*. at 1362. The process involved applying a vacuum to the inside of the liner using a cup at one section, then moving the cup "to another section of the liner while the previously used window is sealed." *Id*. at 1363. The original claims were rejected due to a prior art patent, Everson, which disclosed a continuous vacuum and the creation of that vacuum from only a single vacuum source at the far end of the tube. *Id*. at 1369. To distinguish prior art, the patentee amended the claim to require one cup that moves along the pipe, dispensing with the need for the vacuum at the far end of the pipe. The accused equivalent, by contrast, used multiple cups and multiple vacuums, and thus did not literally infringe the claims, and the question became whether infringement based on that equivalent was barred by the prosecution history.

The Federal Circuit held that "Insituform has rebutted the *Festo* presumption." *Id*. at 1370. It found that the amendment limiting the literal scope of the claim to a single cup process bore only a tangential relation to the equivalent in question, a process using multiple cups. *Id*. The narrowing amendment in that case, the Federal Circuit reasoned, was for the purpose of distinguishing a particular prior art reference (Everson), and "Insituform made it clear that the

19

difference between its process and Everson was that its process did not have the disadvantage of the Everson process of a large compressor at the end of the liner.  There is no indication in the prosecution history of any relationship between the narrowing amendment and a multiple cup process, which is the alleged equivalent in this case." *Id.*

In *Insituform*, the narrowing amendment was made specifically and clearly to overcome prior art, and arguably, the same is true in this case, though rather than one specific prior art reference with a clear technological feature the patentee was trying to avoid—a single vacuum compressor at the end of the tube—here, Health Grades was trying to avoid at least three prior art references all covering similar terrain.  It did so by adding a specific limitation—the inclusion of comparison reports into a report on the first healthcare provider—and here, unlike in *Insituform*, there is a clear relationship between the narrowing amendment made and the alleged equivalent, which is a report with no comparison ratings literally included within the report.  Somewhat simplified, Health Grades' reports without comparison ratings within them equaled the prior art—at least in the eyes of the Patent Office.  So to distinguish the prior art, Health Grades' reports needed to have within them a feature that Henley's did not—comparison ratings.

In yet another case Health Grades emphasized, *Primos v. Hunter's Specialties, Inc*., the patent at issue concerned a device for simulating animal calls.  451 F.3d 841 (Fed. Cir. 2006).  The patented device was to be placed within the user's mouth, with a membrane above the user's tongue.  *Id.* at 844.  By forcing air through a gap between the membrane and the tongue, the membrane would vibrate and emit a certain animal sound. *Id*.  The patent claimed an improvement over prior art in that a shelf or plate was added above the membrane to resist

20

upward pressure by the tongue. *Id.* at 843. During patent prosecution the claims were amended, requiring that the plate be differentially spaced above the membrane, and that the plate have a length. *Id*. The accused equivalent had a "dome extending above the membrane, instead of a shelf or plate, as claimed in Primos's patents." *Id*. at 844. The court found that "prosecution history estoppel does not apply to prevent the application of the doctrine of equivalents." The Federal Circuit reached this finding because the two amendments made to the plate element— adding in differential spacing and length—did not narrow the scope of the claim so as to preclude the accused device. The accused device already had spacing, for one, and for the other, "every physical object has a length." *Id.* at 849.

*Primos* is easily distinguishable from the patent history at issue here. Health Grades, unlike Primos, did not begin with a limitation of comparison ratings, and then add specific other components to that element which may or may not have been deemed tangential. Health Grades added the comparison ratings *limitation to distinguish its healthcare provider report from prior art reports that did not include comparison ratings*. Now it claims that MDx's reports need not literally include comparison ratings to be found guilty of infringement under the doctrine of equivalents. But reports without comparison ratings were exactly what it was trying to distinguish itself from in the prior art, and so MDx's nonliteral accused equivalents fall squarely within the territory surrendered by Health Grades' amendments.

## III.   CONCLUSION

For the foregoing reasons, I find that Health Grades has failed to rebut the presumption of prosecution history estoppel. It is therefore barred from asserting the doctrine of equivalents

against all accused equivalents surrendered.  These include all equivalents which do not include "comparison ratings within a report on a first healthcare provider."

At the *Festo* Hearing, the Court asked the parties to submit their respective lists of accused equivalents.  In order to avoid potential confusion, a hearing will be held to discuss the applicability of this Order to the various equivalents proposed by the parties.  Court staff will contact counsel to arrange the date for such hearing.  The Court reserves the issue of vacatur of trial and pretrial proceeding, and that may also be discussed at the upcoming hearing.

DATED this 23rd day of October, 2014.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

**Civil Action No. 11-cv-00520-RM-BNB**

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC.,
doing business as Vitals.com,

      Defendant.

---

**ORDER ON INDIRECT INFRINGEMENT**

---

This matter is before the Court on the motion filed by MDx Medical, Inc. ("MDx") for summary judgment of no infringement with regard to Health Grades, Inc.'s First Amended Complaint, as it pertains to allegations relating to Aetna Life Insurance Company ("Aetna") and its iTriage application ("iTriage application") (hereinafter the "Aetna Motion")  (ECF No. 490). The Aetna Motion is fully briefed and ripe for disposition.  Pursuant to 28 U.S.C. § 1338(a), the Court's jurisdiction over this case is based on the U.S. Patent Act, 35 U.S.C. § 101 *et seq.*

**I.**     **BACKGROUND**

    **A.  Procedural History**

Plaintiff Health Grades, Inc. ("Health Grades") owns U.S. Patent No. 7,752,060 (issued Jul. 6, 2010) (the "'060 Patent").  The invention claimed therein relates to an "Internet-based system and method that connects patients with potential healthcare providers, e.g., physicians and hospitals."  ('060 Patent col.1 ll.12-14.)  MDx maintains the website www.vitals.com (the

1

"MDx website"), the current version of which was launched in January 2011.  (ECF No. 195 at 2.)  This Court has already set forth the basic facts regarding the claimed invention and the accused MDx product in several previous orders of this Court, dated April 4, 2013, June 26, 2014, and July 15, 2014 (ECF Nos. 696, 808, 810).  Those facts will be supplemented herein as necessary to focus on the iTriage websites.

During discovery in this case, Health Grades sought information and documents relating to MDx's database licenses.  MDx opposed many of these discovery requests, but Health Grades learned of a license to Aetna from MDx for Aetna's iTriage application.  (ECF No. 252 at 1.) Like the Health Grades and MDx websites, iTriage provides information and reports about healthcare providers to users of the websites (mobile and desktop), which can be used as a basis for healthcare provider selection.  Health Grades moved to amend its complaint to assert causes of action for joint infringement and indirect infringement in July of 2012, asserting that "Health Grades did not learn of the iTriage license until Aetna publicly announced it in March 2012." (*Id*.)

On January 11, 2013, Magistrate Judge Boland granted Health Grades' motion to amend its complaint to add allegations of indirect and joint infringement relating to a third party, Aetna. (ECF No. 480.)  The Amended Complaint contained allegations of joint infringement, inducing infringement, and contributory infringement.  (ECF No. 481.)  Subsequently, Health Grades withdrew its cause of action for joint infringement.  (ECF Nos. 512, 525 at 2 n.1.)  MDx moves for summary judgment on the remaining claims of infringement involving Aetna's iTriage application.

### B.  Facts

In the fall of 2011, MDx entered into an agreement with Aetna to provide Aetna with healthcare provider data for use in Aetna's iTriage application.  (ECF No. 481 at 4.)  "MDx also agreed to develop, manage and maintain a full database for use with the iTriage application and to provide training for Aetna to use this database." (*Id*.)  Aetna is a company that provides a service—the iTriage application—for connecting healthcare providers with potential patients. (ECF No. 525 at 5.)

The iTriage application instructs users that ratings of providers are done on the Vitals website; the patient ratings used by the iTriage application are obtained from surveys conducted on www.vitals.com, and the surveys are managed by MDx.  (ECF No. 490 at 3; admitted at ECF No. 525 at 5.)  The agreement between MDx and Aetna (the "Aetna Agreement") sets forth what MDx will provide Aetna:  it states that MDx will create a "Master Database," including establishing "an Aetna-defined database (*i.e*., to an Aetna-defined model) fed from the MDx database."  (ECF No. 486-1 at 7.)

The Aetna Agreement does not specify exactly what data Aetna will collect from MDx nor how Aetna will use that data; it did specify that the "Master Database will contain all MDx Patient Reviews, which will connect directly with Aetna's Patient Review System to be developed by Supplier."  (ECF No. 486-1 at 8.)  MDx also agreed to "include all its patient ratings for the providers in the Master Database, for display by Aetna."  (*Id*. at 9.)

## II.  STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A movant who bears the burden at trial must submit evidence to establish every essential element of its claim.  *In re Ribozyme Pharms., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* FED. R. CIV. P. 56(c).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## II.   ANALYSIS

There are two types of indirect infringement: active inducement and contributory infringement, and it "is axiomatic that '[t]here can be no inducement or contributory infringement without an underlying act of direct infringement.'"  *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012) (quoting *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004)).  The direct

4

infringement may be either literal or by equivalents.  The briefing on the instant motion devotes substantial attention to the degree to which the evidence supports or refutes the existence of direct infringement in the context of the iTriage products.

The Aetna Motion and accompanying briefing was filed before this Court ruled on MDx's motion for partial summary judgment on non-infringement (ECF No. 195).  The Court has now ruled on that motion, granting summary judgment in favor of MDx as to literal infringement, but denying it as to infringement by equivalents subject to further consideration of prosecution history estoppel.  (ECF No. 696 at 28.)  And on October 23, 2014, following a *Festo* hearing, the Court ruled in MDx's favor on prosecution history estoppel and ordered that Health Grades is estopped from "asserting the doctrine of equivalents against all accused equivalents surrendered."  (ECF No. 913 at 21-22.)  Given these rulings, much of the parties' arguments regarding direct infringement by Aetna and the iTriage application have largely been addressed.

The Court will not fully repeat the direct infringement analysis here.   The crucial aspect for purposes of the Aetna Motion is that much of the direct infringement disagreement has now been resolved.  In order for literal infringement to exist, comparison ratings of healthcare providers must be included within the healthcare provider report on the "first healthcare provider."  And equivalents in the form of ratings within search results returned before selection of a "first healthcare provider," as well as other equivalents which do not "literally include comparison ratings," (ECF No. 913 at 21), are not protected by the '060 Patent due to prosecution history estoppel.

Additionally, there has been a significant legal development which impacts this matter. Health Grades' briefing on this matter, which was filed in February 2013, relied heavily on

*Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1305 (Fed. Cir. Aug. 31, 2012) (*en banc*).  Health Grades stated that under the new rule announced in that case, "Health Grades does not need to prove that a single entity (e.g., Aetna) performs all of the steps of the claimed method in connection with a cause of action for indirect infringement."  (ECF No. 525 at 18.) That holding was recently reversed by the Supreme Court in *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, which held that indirect infringement would not be found where no one person committed direct infringement by performing all the steps of a patented method. 134 S.Ct. 2111 (2014).

These matters significantly affect the Aetna Motion.  As one example, Health Grades' counsel conceded at a hearing on October 30, 2014 that the *Festo* Order and other prior rulings essentially resolved any claim of direct infringement as it pertains to the iTriage mobile application.  Health Grades' counsel said that "the other portion of the iTriage website, the mobile app in that case, we view that as likely covered by your order. . ." (Hearing Transcript, October 30, 2014, at 13:14-13:16.)  Nonetheless, the Court will not herein dissect the various possible website configurations and direct infringement claims to discern whether any escape the impact of such matters.[1]  This is because the Court has determined that even assuming *arguendo* that some degree of direct infringement may still be provable, there is a lack of disputed issues of material fact on other elements of inducement and contributory infringement.  Analysis for each of these issues is set forth below.

---

[1] For example, Health Grades argues that direct infringement of Claim 15 exists by virtue of the claim being a system claim which can be read as being infringed whenever an accused system has the mere "reasonable capability" of an infringing use.  (ECF No. 525 at 22-24.)  While the Court does not read the claim in the manner suggested by Health Grades, the contention stands as an example of an allegation that might avoid the impact of the prior orders.

### A.  Active Inducement

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35

U.S.C. § 271(b).  "[I]nducement requires that the alleged infringer knowingly induced

infringement and possessed specific intent to encourage another's infringement." *DSU Med.*

*Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006).  The "mere knowledge of possible

infringement by others does not amount to inducement; specific intent and action to induce

infringement must be proven." *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363

(Fed. Cir. 2003).  Specific intent "may be established through circumstantial evidence [or] may

be inferred from all of the circumstances." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683,

699 (Fed. Cir. 2008) (quoting *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir.

1988)).

MDx argues that Health Grades has not and cannot proffer any evidence of specific intent

to induce infringement.  In response, Health Grades points to the following alleged facts, largely

derived from the Aetna Agreement: (1) MDx entered an agreement to develop, manage and

maintain a full database to be the data backbone for iTriage; (2) iTriage "is strikingly similar to

MDx's accused on-line information system;" (3) MDx has a policy it follows to avoid

infringement, but did not communicate this policy to Aetna and Aetna does not follow it; (4)

MDx is developing an Aetna Patient Review System and perhaps is also providing its "Provider

EZ Edit" tool which could enable Aetna to collect healthcare provider information directly from

the healthcare provider; and (5) MDx provided Aetna with a demonstration as to how MDx's

accused product functions.  (ECF No. 525 at 27-28.)  There is also passing reliance on the fact

that one official at MDx had the iTriage mobile application on his smart phone and, thus, was presumably aware of what Aetna was doing with MDx's data.  (ECF No. 525 at 10.)

None of the above facts, even if established and proven at trial by Health Grades, would create a genuine issue of material fact with respect to the specific intent of MDx to induce infringement.  The first three facts are hardly directed to the specific intent element—or if they are, even if accepted as true, they fall short of "culpable conduct, directed to encouraging another's infringement, not merely… knowledge of the direct infringer's activities." *DSU Med.*, 471 F.3d at 1306.  The mere fact that MDx agreed to provide data to Aetna does not speak to specific intent to induce infringement.  As MDx points out, Aetna—not MDx—determines the data it wants from the database and the structure of its websites.  (*See generally* ECF No. 486-1, Schedule No. 001 to the Aetna Agreement.)  Moreover, given the Court's prior rulings as to the MDx website, there are a number of ways the MDx data could be presented which would not constitute infringement.  The Aetna Agreement speaks to no specific presentation.  Accordingly, the licensing of data by MDx does not speak to an intent to induce Aetna to use the data in some particular manner which infringes the '060 Patent.

The similarity between the MDx and Aetna sites does not create a genuine issue of material fact regarding specific intent either.  As noted, the prior rulings largely insulate most MDx website configurations from claims of infringement.  Similarity to a non-infringing site is therefore hardly relevant—even assuming that MDx was responsible for inducing the similarity.

As for MDx's policy to avoid infringement, MDx is not required to communicate its policies to those with whom it does business.  The fact that MDx did not tell Aetna how MDx seeks to avoid infringement simply does not translate into evidence that MDx was therefore

8

seeking to induce infringement, particularly where MDx did not control or seek to control Aetna's use of the MDx data.  This line of reasoning simply requires too great an inferential leap for any reasonable jury.

The purported facts regarding the Aetna Patient Review System and the Provider EZ Edit tool are likewise insufficient.  Putting aside the difficulty that Health Grades' argument on this point is more speculative than concrete (*See* ECF No. 525 at 28 ("MDx is developing (or has developed) an Aetna Patient Review System . . . MDx may also be providing . . . its "Provider EZ Edit tool . . . ")), there is nothing in such purported facts, even if accepted as true, which suggests that data collected or verified be the precise data within the scope of the '060 Patent or that Aetna use such data in a manner which would infringe the '060 Patent.  Thus, even if there were evidence that MDx induced Aetna to use such tools, that evidence falls short of evidence supporting specific intent to induce infringement.

The most promising alleged fact for Health Grades on the specific intent issue, and in fact the only one that potentially addresses MDx's intent regarding Aetna's alleged infringement, is the assertion that "MDx…provided Aetna with a [presentation] as to how MDx's accused vitals.com website functions."  (ECF No. 525 at 28.)  The inference, of course, is that MDx induced or encouraged or led Aetna to use the data as MDx did.  Putting aside the content of the presentation for a moment, the first page of the exhibit evidencing the Powerpoint Presentation reveals the critical fact—it was "[p]resented to Aetna [on] January 11, 2008."  (ECF No. 525-17 at 2.)  At that point, the '060 Patent had not issued.  Regardless of whether or not the presentation actually serves as evidence of inducement, which in the Court's view it does not, as a matter of law there cannot be inducement or intent to induce if there is no patent at the time of

9

the alleged inducement.  *See, e.g.*, *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1196 (Fed. Cir. 1996).

Finally, the fact that an MDx official has the iTriage application on his smart phone is not circumstantial evidence of intent to induce.  That alleged fact may or may not, putting aside issues with the timeline, indicate knowledge of Aetna's product.  But inducement requires more. *See, e.g.*, *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009) (quoting *DSU Med.*, 471 F.3d at 1306. ("[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." ).)  And as conceded by Health Grades, given the prior orders of the Court, the mobile app does not infringe the '060 Patent.  (*See* Hearing Transcript, October 30, 2014, at 13:15-13:16.)

Health Grades' briefing on the specific intent element is inadequate to create a genuine issue of material fact with respect to specific intent.  After devoting considerable time to establishing direct infringement, Health Grades devotes less than two full pages to analyzing the specific intent element.  In that section, Health Grades asserts specific intent several times, but does not sufficiently link that conclusory assertion with actual disputed facts that would permitthis issue to go to a jury.   For instance, Health Grades asserts that "MDx developed, manages and maintains the Aetna Master Database with the specific intent that Aetna use it for iTriage," (ECF No. 525 at 28), but then follows that assertion with the alleged disputed facts that "MDx provides *a substantial amount* of its accused data to *allow* for iTriage to… infringe[] the asserted claims," and "MDx provides *almost all* of the accused elements of its database to Aetna and Aetna uses *almost all* of these elements in iTriage."  (*Id.*) (emphasis added).  The

10

emphasized words highlight the problem with Health Grades' argument—MDx licenses a database to Aetna, but nothing about the nature of that licensing agreement requires infringement.  And to withstand summary judgment, Health Grades needs something more than what it has shown the Court.

Health Grades' argument on the intent issue can be boiled down to the following statement:  "[b]y providing its accused data and performing the other tasks outlined in the Aetna Agreement, MDx is actively inducing Aetna to infringe the '060 patent."  (ECF No. 28.)  Having reviewed the agreement between Aetna and MDx that forms the core of Health Grades evidentiary accusations, the Court disagrees.  Providing a database does not amount to intent by MDx to induce infringement of the '060 Patent, and providing a database was fundamentally what MDx agreed to do and has done for Aetna.  The Aetna Agreement specifically sets forth Aetna's control over the data it receives from MDx, and makes clear that "Aetna defines the data it wants in the Master Database."  (ECF No. 486-1 at 8.)

Health Grades has failed to come forward with sufficient evidence of material factual disputes relating to specific intent so as to create a genuine issue for trial by jury.  Summary judgment is therefore granted with respect to active inducement by MDx.

### B.  Contributory Infringement

Under 35 U.S.C. § 271(c), a party is liable for infringement if he "offers to sell or sells within the United States or imports into the United States ... a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use."  Under this

statute, a party can be found liable for contributory infringement if that party sells or offers to sell a part or component that, while not itself infringing, has a particular use in something else that is covered by a patent.   *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010) *aff'd*, 131 S. Ct. 2238 (U.S. 2011).

"In order to succeed on a claim of contributory infringement, in addition to proving an act of direct infringement, plaintiff must show that defendant 'knew that the combination for which its components were especially made was both patented and infringing' and that defendant's components have 'no substantial non-infringing uses.' " *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009) (quoting *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005)).

MDx argues that the data it leases to Aetna has substantial non-infringing uses, and that providing Aetna with a database according to Aetna's specifications does not amount to contributory infringement.  (ECF No. 490 at 12.)  Health Grades responds in its brief with a scant two paragraphs, arguing that "the Aetna Agreement indicates that MDx creates a 'custom' data extract for Aetna based on MDx's 'proprietary' database."  (ECF No. 525 at 29.)  It is entirely unclear to the Court how Health Grades envisions that this fact demonstrates that there are no substantial non-infringing uses of the data.  In fact, upon review of the evidence submitted by Health Grades alone, the Court concludes that there are indeed substantial non-infringing uses of the data.

For instance, Health Grades submits along with its Opposition an Expert Report by Dr. Philip Greenspun, which takes the reader through how the iTriage app functions.  (ECF No. 525-11.)  Dr. Greenspun's report reflects an understanding that a results list that emerges in response

to a query is actually "the first page of the profile" on a first healthcare provider, which both the Markman Order and this Court rejected previously.  (*Id*. at 7.)  Once inside the report on the first healthcare provider, the screenshot provided by Health Grades reveals that the iTriage reports lack some claim elements, such as comparison ratings.  Thus, regardless of whether some current or past iteration of either the iTriage application or website actually infringes upon the '060 Patent, it is clear from Health Grades' own evidentiary submissions in response to the instant motion that that there are substantial non-infringing uses of the data.

Of course, the Court's prior rulings on literal infringement and prosecution history estoppel could not be anticipated.  Nonetheless, given the restrictions on literal infringement and on the doctrine of equivalents, the data provided by MDx can be presented in a wide variety of ways that do not infringe upon the '060 Patent.  Indeed, infringing uses are quite precise and narrow given the prior rulings, and other presentations and uses which do not infringe are numerous.

Whether simply data, "custom" data, or a "proprietary database," (and the parties may disagree on which of these it is), this Court finds that the information and tools MDx gives to Aetna do have substantial non-infringing uses.  There are many potential uses of this data that would, for example, not result in a report containing comparison ratings in the manner covered by the '060 Patent.  Health Grades has failed to come forward with sufficient evidence of material factual disputes relating to non-infringing uses so as to create a genuine issue for trial by jury.  Summary judgment is therefore granted with respect to contributory infringement by MDx.

13

## IV.  CONCLUSION

For the foregoing reasons, MDx's Motion for Summary Judgment of No Infringement with Regard to Amended Complaint and Allegations Relating to Aetna Life Insurance Company (ECF No. 490) is GRANTED.

DATED this 4th day of November, 2014.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00520-RM-BNB

HEALTH GRADES, INC.,

      Plaintiff,

v.

MDX MEDICAL, INC., d/b/a VITALS.COM,

      Defendant.

---

## *AMENDED* FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 54(b), the following Judgment is hereby entered.

Pursuant to the F.R.C.P. 54(b) Certification Order (Doc. 951) of Judge Raymond P. Moore entered on November 20, 2014, it is

ORDERED that the Stipulated Motion for Entry of Judgment under Rule 54(b) is GRANTED.  It is

FURTHER ORDERED that there is no just reason for delay of entry of final judgment as follows:

1.     Final judgment in favor MDx on summary judgment of no literal infringement (ECF No. 696), on the oral ruling of summary judgment of no infringement by configuration 1 (ECF No. 935), on the *Festo* ruling of no infringement by equivalents (ECF No. 913), and on the further oral rulings on configurations 1, 2 and 3 on November 7, 2014 (ECF No. 935), which in the aggregate fully dispose of Health Grades' infringement claims under configurations 1, 2, and 3;

2.      Final judgment in favor of MDx on summary judgment of no indirect infringement (ECF No. 931), which fully disposes of Health Grades' infringement claim under configuration 5;

3.      The Court certifies the Non-Infringement Orders for immediate appeal under Rule 54(b) for all purposes and issues relating to those judgments;

4.      The Court certifies the Markman Order (ECF No. 138) for immediate appeal under Rule 54(b) to the extent that it forms the basis for the judgments rendered herein.

*It is FURTHER ORDERED that judgment shall enter in favor of MDx on claims 1, 2, 3, and 5 of Health Grades' infringement contentions.  It is FURTHER ORDERED that all other claims, counterclaims and all other pending matters are hereby stayed nunc pro tunc to November 13, 2014 and will remain stayed during pendency of the Rule 54(b) appeal, with the sole exception of MDx's request for attorneys fees which will be briefed and decided notwithstanding the stay as to all other issues.*

Dated at Denver, Colorado this 21st day of November, 2014.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK


By:  s/   Cathy Pearson
_____

Cathy Pearson
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-CV-00520-RM-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

## HEALTH GRADES, INC.'S NOTICE OF APPEAL

---

Notice is hereby given that Plaintiff Health Grades, Inc. appeals to the United States Court of Appeals for the Federal Circuit from the Amended Final Judgment Pursuant to Fed. R. Civ. P. 54(b) [Doc. #953] on November 21, 2014, entering final judgments on summary judgment of no literal infringement [Doc. #696], on the oral ruling of summary judgment of no infringement by configuration 1 [Doc. #935], on the *Festo* ruling of no infringement by equivalents [Doc. #913], on the further oral rulings on configurations 1, 2 and 3 on November 6, 2014 [Doc. #935], on summary judgment of no indirect infringement for configuration 5 [Doc. #931], and all other rulings, proceedings, orders, findings, and decisions underlying or forming the basis of the forgoing, including the Court's Markman Order. [Doc. #138.]

The notice of appeal deadline would have been December 22, 2014. On December 3, Defendant MDx Medical, Inc. d/b/a vitals.com ("MDx") filed a Motion Pursuant to Rule 58(e) to Stay the Time for Filing of Notice of Appeal of the Amended Judgment Pending Resolution of MDx Medical, Inc.'s Application for Fees. [Doc. #959.] On December 4, the District Court granted MDx's Motion, holding "[t]he time to file an appeal is stayed for all parties until 14 days after the filing of the order on MDx's anticipated motion for attorney's fees." [Doc. #960.] On December 22, 2014, the District Court denied MDx's fee motion without prejudice. [Doc. #969.] This notice of appeal filed and served today is therefore timely.

Payment of $505, representing the $500 docketing fee required by 28 U.S.C. § 1913 and the $5 fee required by 28 U.S.C. § 1917, accompany this Notice of Appeal.

2005123213_1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-00520-RM-BNB

HEALTH GRADES, INC.,
Plaintiff,

v.

MDX MEDICAL, INC. d/b/a VITALS.COM,
Defendant.

---

## HEALTH GRADES, INC.'S NOTICE OF APPEAL

---

Notice is hereby given that Plaintiff Health Grades, Inc. appeals to the United States Court of Appeals for the Federal Circuit from the Amended Final Judgment Pursuant to Fed. R. Civ. P. 54(b) [Doc. #953] on November 21, 2014, entering final judgments on summary judgment of no literal infringement [Doc. #696], on the oral ruling of summary judgment of no infringement by configuration 1 [Doc. #935], on the *Festo* ruling of no infringement by equivalents [Doc. #913], on the further oral rulings on configurations 1, 2 and 3 on November 6, 2014 [Doc. #935], on summary judgment of no indirect infringement for configuration 5 [Doc. #931], and all other rulings, proceedings, orders, findings, and decisions underlying or forming the basis of the forgoing, including the Court's Markman Order.  [Doc. #138.]

The notice of appeal deadline would have been December 22, 2014.  On December 3, Defendant MDx Medical, Inc. d/b/a vitals.com ("MDx") filed a Motion Pursuant to Rule 58(e) to Stay the Time for Filing of Notice of Appeal of the Amended Judgment Pending Resolution of MDx Medical, Inc.'s Application for Fees.  [Doc. #959.]  On December 4, the District Court granted MDx's Motion, holding "[t]he time to file an appeal is stayed for all parties until 14 days after the filing of the order on MDx's anticipated motion for attorney's fees."  [Doc. #960.]  On December 22, 2014, the District Court denied MDx's fee motion without prejudice.  [Doc. #969.]  This notice of appeal filed and served today is therefore timely.

Payment of $505, representing the $500 docketing fee required by 28 U.S.C. § 1913 and the $5 fee required by 28 U.S.C. § 1917, accompany this Notice of Appeal.

Respectfully submitted January 5, 2015.

<u>*s/ Kris J. Kostolansky*</u>
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Adam L. Massaro, Esq.
1200 17th Street, Suite 3000
Denver, Colorado  80202
Tel:  (303) 623-9000
Fax:  (303) 623-9222
Email: gkanan@lrrlaw.com
       kkosto@lrrlaw.com
       amassaro@lrrlaw.com
*Attorneys for Plaintiff/Appellant*

2

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2015, I electronically filed the foregoing **HEALTH GRADES, INC.'S NOTICE OF APPEAL** was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Scott D. Stimpson, Esq.
David C. Lee, Esq.
Trent Dickey, Esq.
Sills Cummis & Gross P.C. – New York
101 Park Avenue, 28th Floor
New York, New York 10178
E-mail:    sstimpson@sillscummis.com
           dlee@sillscummis.com
           tdickey@sillscummis.com

Terence M. Ridley, Esq.
Wheeler Trigg O'Donnell, LLP
370 17th Street, Suite 4500
Denver, CO  80202-5647
E-mail:    ridley@wtotrial.com

_s/ Kris J. Kostolansky_
Gregory B. Kanan, Esq.
Kris J. Kostolansky, Esq.
Adam L. Massaro, Esq.
1200 17th Street, Suite 3000
Denver, Colorado 80202-5855
Tel:      (303) 623-9000
Facsimile: (303) 623-9222
Email: gkanan@lrrlaw.com
           kkosto@lrrlaw.com
           amassaro@lrrlaw.com

_Attorneys for Plaintiff/Appellant_

3